UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
MARK NUNEZ; RODNEY BRYE, SHAMEIK SMALLWOOD;
TRAVIS WOODS; RALPH NUNEZ; KEITH BACOTE; JOSE
DEGROS; CHRISTOPHER GRAHAM; SONNY ORTIZ; CLIFFORD
SEWELL; and LESLIE PICKERING,

                          Plaintiffs,

            vs.

CITY OF NEW YORK; DORA SCHRIRO, FLORENCE FINKLE,
MICHAEL HOURIHANE, CARMINE LABRUZZO, MARK SCOTT,
LARRY DAVIS, SR.; WARDENS ROSE AGRO, EMMANUEL
BAILEY, ROBERT CRIPPS, EDMUND DUFFY, RONALD
JORGENSEN, EVELYN MIRABAL, KATHLEEN MULVEY;
DEPUTY WARDEN ERIC RAMOS; ASSISTANT DEPUTY
WARDEN DANIELLE JOHNSON; CAPTAINS WILLIAMS,
MAJORS, MASSEY, BEHARI (Shield # 1603), SISTRUNK,
BAIARDI, FADIMA (Shield #1298), THEO PRIMM (Shield # 1497),
SHERMA DUNBAR (Shield # 717), HERMAN MEDINA;
CORRECTIONS OFFICERS KIRKLAND, REGINALD ROTHWELL
(Shield # 18101), TODD BRISHINSKY, SALLEY, SIDNEY DAVIES
(Shield # 13893), MALCOM DAVIS (Shield # 841), OMAR ALSTON
(Shield # 14091), WALTER DEAN (Shield # 17183), ATEEN
WILLIAMS (Shield # 17038), ROBERT ORLANDI (Shield # 15929),
LOUIS LEONARD (Shield # 3479), CORY HUGHES (Shield #
18516), SANDY ARKHURST (Shield # 18507), ERIC THOMPSON
(Shield # 18488), QUINN (Shield # 18532), REMY (Shield # 17286),
JASON SOTO (Shield #18062), BUTTONS, ANTONIO BRAVO
(Shield # 17297), SANTIAGO, TUTEIN (Shield # 1643); ROBERT
LAMAR (Shield # 18472), HADDON BAILLIE (Shield # 10470),
GUTIERREZ (Shield # 11461), "JANE" JONES, "JOHN" GREGG,
THOMAS, EDWIN SLOLY (Shield # 11678), and JOHN/JANE DOES
#1-64,

                          Defendants.
------------------------------------------------------------------------x

**11-cv-5845**
**(LTS) (THK)**


**AMENDED**
**COMPLAINT**


**JURY TRIAL**
**DEMANDED**

Plaintiff Mark Nunez, along with plaintiffs Rodney Brye, Shameik Smallwood, Travis Woods, Ralph Nunez, Keith Bacote, Jose DeGros, Christopher Graham, Sonny Ortiz, Clifford Sewell, and Leslie Pickering, for his Amended Complaint alleges as follows:

## NATURE OF ACTION

1.      By this action, plaintiffs seek to end the pattern and practice of unnecessary and excessive force inflicted upon inmates of New York City jails by Department of Correction uniformed staff, and knowingly permitted and encouraged by Department supervisors (the "Unconstitutional Use of Force Practice").  Defendants include officers and captains who have inflicted brutal beatings on the named plaintiffs and other inmates, and who have lied and coerced false statements to prevent the beatings from coming to light.  Defendants also include supervisors in these jails and at the highest levels of the Department, who have created and now perpetuate a policy of permitting uniformed staff to use unlawful, excessive force with impunity.  These Defendants have not only failed to rein in lawless staff and curb violence in the jails, despite having full knowledge of the Unconstitutional Use of Force Practice and the scores of serious injuries prisoners have suffered as a result—such as broken bones, perforated eardrums, and spinal injuries, they have condoned and encouraged it.

2.      The pattern of brutality in the City's jails is deeply entrenched.  In five class actions and scores of individual lawsuits in twenty-five years, New York City Department of Correction ("DOC" or the "Department") inmates have come before this Court alleging a pattern of brutality in New York City's (the "City's") jails.  Five class actions have exposed a Department pervaded by a culture of routine and institutionalized staff violence against inmates, by a failure of accountability at every level, and by supervisors' deliberate and even calculated indifference to,

and tolerance and encouragement of, the Constitutional violations that occur on their watch.  And each time, the class sought  and obtained relief that—if sustained —would have rid the Department of the worst abuses.  That relief has included staff training as to when and how to apply physical force against inmates using methods that minimize injury; video monitoring in the jails; unbiased and thorough investigations into serious uses of force by staff; administrative discipline for staff members who violate the Department's use of force policy; staffing practices to ensure that routine violators are assigned to commands with little or no inmate contact; and personnel policies under which the very worst violators are terminated while conscientious officers are promoted to positions of responsibility.  But the Defendants have not changed their ways.  The abuse has continued.  This lawsuit seeks this Court's strong hand to finally put an end to the Defendants' abuse.

3.      In 1990, inmates first obtained injunctive relief in Fisher v. Koehler, 83 Civ. 2128 (S.D.N.Y.), a class action addressing, *inter alia*, excessive use of force in the Correctional Institution for Men ("CIFM"), a Rikers Island jail now known as the Eric M. Taylor Center ("EMTC").  Although that injunction remains in effect, its terms are limited to EMTC.  In the following years, classes of plaintiffs obtained injunctive relief curbing excessive and unnecessary force in the Bellevue Prison Psychiatric Ward (Reynolds v. Ward, 81 Civ. 101 (S.D.N.Y. 1990) (order and consent judgment)); in the Brooklyn House of Detention (Jackson v. Montemango, 85 Civ. 2384 (E.D.N.Y. 1991) (order approving stipulation for entry of judgment)); and in the Central Punitive Segregation Unit ("CPSU") (Sheppard v. Phoenix, 91 Civ. 4148 (S.D.N.Y. 1998) (order approving stipulation for entry of judgment)).  In all these cases, the Department narrowly limited relief to the particular facilities that were the subjects of the lawsuits and, in any event, allowed the unconstitutional practices to resume once those orders expired.  Most recently, a class of inmates

obtained a settlement that purported to offer system-wide relief in <u>Ingles v. Toro</u>, 01 Civ. 8279

(S.D.N.Y. 2006) (settlement agreement approved).  <u>Ingles</u> settled with a private settlement

agreement, and not an enforceable court order.  While the City could have continued the reforms to

which it agreed in <u>Ingles</u> and the prior orders, it did not do so, and upon the termination of <u>Ingles</u>,

the same Unconstitutional Use of Force Practice continued.

4.      Although these orders and agreements no longer protect inmates against unnecessary and

excessive use of force beyond the confines of EMTC and the hospital prison wards, they brought

meaningful reform while in effect and demonstrate that, if the Department chooses to, it could take

effective measures to rein in staff brutality and minimize the risk of harm to inmates in the City's

jails.  Had the Department implemented these reforms on a system-wide basis and sustained them

beyond the termination of the orders or settlements, the fifth inmate class-action lawsuit alleging

staff brutality, <u>Ingles</u>, might have been the last.

5.      By this action, a sixth group of Plaintiffs comes before this Court, requesting class

certification and alleging once again that the City's jails remain afflicted by the same culture of

violence, the same failure of accountability, and the same deliberate indifference and active

acceptance.  Conditions in the jails have deteriorated markedly.  Despite the training that staff is

supposed to receive, correction officers still mete out violence to inflict pain rather than to

maintain order.  Although video cameras are now mounted in some parts of the jails, correction

officers routinely escort inmates to unmonitored areas before beating them.  While investigators

are paid to examine serious uses of force, their whitewashed conclusions fly in the face of evidence

and common sense, crediting the most outlandish staff accounts and attributing blame to, and

punishing, the victims of assaults rather than the perpetrators.  Routine violators remain in close

contact with inmates, and are even transferred to the most sensitive parts of the jails, where they

can and do inflict repeated violations.   Indeed, the worst violators of the Department's written use of force policy are not seriously disciplined or fired; instead, the same persons who were named as defendants in previous complaints or cited administratively for excessive force violations when they were correction officers or captains are named again in this Complaint as deputy wardens, wardens, and in some cases stand near the top of the Department's administrative hierarchy.

6.      Plaintiffs, former and present inmates within Department jails, bring this action for injunctive and declaratory relief and for money damages to redress Defendants' violations of their rights under the Eighth and Fourteenth Amendments to the United States Constitution and the Constitution and laws of the State of New York.  Plaintiffs, and other inmates of Department jails, have been and continue to be subjected to brutal and unlawful beatings by uniformed Department staff while in Department custody, victims of the Defendants' Unconstitutional Use of Force Practice.  Plaintiffs seek, on an individual and class-wide basis, an appropriate remedial order to end the use of unnecessary and excessive force in all Department jails holding pre-trial detainees, with the exception of those Department commands already currently under court orders directed at the misuse of force (namely EMTC and the hospital prison wards).

<u>JURISDICTION</u>

7.      This action is brought pursuant to the Eighth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §§ 1983, 1988.  This court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a), and under 28 U.S.C. § 1367, which provides for supplemental jurisdiction over claims which arise under New York state law.

<u>VENUE</u>

8.      Venue is proper in this court pursuant to 28 U.S.C. § 1391.

<u>PARTIES</u>

9.      Plaintiffs Mark Nunez, Rodney Brye, Shameik Smallwood, Travis Woods, Ralph Nunez,

Keith Bacote, Jose DeGros, Christopher Graham, Sonny Ortiz, Clifford Sewell, and Leslie

Pickering at all times referred to in this Complaint were and, in the case of Plaintiffs Brye,

Smallwood and Woods, still are inmates in the custody of DOC and incarcerated in one of the jails

operated by the Department.  Plaintiffs DeGros, Bacote, and Ralph Nunez are no longer

incarcerated in Department facilities, but are likely to be returned to DOC custody in order to

attend court proceedings in pending cases.  Plaintiffs Mark Nunez and Leslie Pickering, though not

currently in DOC custody, are under the supervision of the New York State Department of Parole,

and will be returned to DOC custody if found to have violated any condition of their parole. While

in DOC custody, Plaintiffs are entirely subject to the control and supervision of DOC staff and

have no ability to avoid encounters with staff or walk away from potentially dangerous situations.

At any time Plaintiffs are thus, for reasons beyond their control, susceptible to becoming victims of

excessive force and in fact likely to become victims given the DOC's Unconstitutional Use of

Force Practice.

10.     Defendants Kirkland, Rothwell, Brishinsky, Leonard, Salley, Davies, Davis, Alston, Dean,

Williams, Orlandi, Hughes, Arkhurst, Thompson, Quinn, Remy, Soto, Buttons, Bravo,  Santiago,

Tutein, Lamar, Baillie, Gutierrez, Jones, Gregg, Thomas, Sloly, and John/Jane Does #1-64 were at

all times referred to in this Complaint, and upon information and belief still are, uniformed

correction officers employed by DOC and assigned to Department jails.  These Defendants are

sued in their individual capacities.  As uniformed correction officers, these Defendants have direct

contact with inmates whom they are supposed to protect.  Their responsibilities are required to be

carried out in a manner consistent with the legal mandates that govern the operation of the

Department and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force. At all times referred to in this Complaint, all of the above-named Defendants were and are acting within the scope of their employment as employees of the Department and acting under color of state law.  Plaintiffs do not know the names of the corrections personnel sued as John/Jane Does and will amend this Complaint to state the true names when they become known.

11.     Defendants Williams, Majors, Massey, Behari, Sistrunk, Dunbar, Baiardi, Fadima, Medina, and Primm were at all times referred to in this Complaint, and upon information and belief still are, captains employed by DOC and assigned to Department jails. These captains have direct, first-line supervisory responsibilities over the correction officers assigned to those jails, including responsibility for taking appropriate measures to ensure and protect the personal safety of inmates assigned to their housing or program areas.  These responsibilities are required to be carried out in a manner consistent with the legal mandates that govern the operation of the Department and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force.  At all times referred to in this Complaint, all of the above-named Defendants were and are acting within the scope of their employment as employees of the Department and acting under color of state law.  These Defendants are sued in their individual capacities.

12.     Defendant Danielle Johnson was at all times referred to in this complaint, and upon information and belief still is, an Assistant Deputy Warden employed by DOC and assigned to Department jails. As Assistant Deputy Warden, defendant Johnson serves as a Tour Commander and reviews and reviewed every use of force incident that occurs in her commands on her tour. She was and is responsible for the immediate reporting of all use of force incidents, for assigning

an investigating supervisor, for approving all facility use of force investigation reports, and for recommending discipline for misconduct. At all times referred to in this Complaint, Defendant Johnson was and is acting within the scope of her employment as an employee of the Department and acting under color of state law. She is sued in her individual capacity.

13.     Defendant Eric Ramos is and has been since April 2011 the Deputy Warden of the Central Punitive Segregation Unit ("CPSU"), and prior to that, was an Assistant Deputy Warden, employed by DOC and assigned to Department jails. As Deputy Warden of the CPSU, defendant Ramos was and is responsible for supervision of correction officers, captains and other supervisors with respect to the care, custody and control of prisoners confined in the CPSU. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force. As Deputy Warden, Defendant Ramos is and has been since April 2011 provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in the CPSU. As Assistant Deputy Warden prior to his promotion to head of the CPSU, defendant Ramos served as a Tour Commander and reviewed every use of force incident that occurred in his command on his tour. He was responsible for the immediate reporting of all use of force incidents, for assigning an investigating supervisor, for approving all facility use of force investigation reports, and for recommending discipline for misconduct. Defendant Ramos himself has been the subject of disciplinary charges prior to his promotion. At all times referred to in this Complaint, Defendant Ramos was and is acting within the scope of his employment as an employee of the Department and acting under color of state law. Defendant Ramos is sued in his individual capacity.

14.     Defendant Rose Agro was in October 2011 and February 2012, and still is, the Warden of

the George R. Vierno Center ("GRVC"), a Department jail.  As Warden, Defendant Agro was and is responsible for supervision of correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined in the jail.  These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force.  As Warden, Defendant Agro is provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in her jail. She is and was responsible for reviewing and approving these reports before forwarding them to the Integrity and Policy Division of the Department, as well as conducting investigations in her facility and recommending discipline for misconduct. At all times referred to in this Complaint, Defendant Agros was and is acting within the scope of her employment as an employee of the Department and acting under color of state law. Defendant Agro is sued in her individual capacity.

15.    Defendant Robert Cripps was in June, July and September 2011, the Warden of the Anna M. Kross Center ("AMKC"), a Department jail.  As Warden, Defendant Cripps was and is responsible for supervision of correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined in the jail.  These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force.  As Warden, Defendant Cripps was and is provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail.  He was and is responsible for reviewing and approving these reports before forwarding them to the Integrity and Policy Division of the Department, as well as conducting investigations in his facility and recommending discipline for misconduct.  At all times referred to in this

9

Complaint, Defendant Cripps was and is acting within the scope of his employment as an employee of the Department and acting under color of state law. Defendant Cripps is sued in his individual capacity.

16.     Defendant Emmanuel Bailey was in February 2011 the Warden of the Robert N. Davoren Center ("RNDC"), a Department jail.  As Warden, Defendant Bailey was responsible for supervision of correction officers, captains and other supervisors with respect to the care, custody and control of inmates confined in the jail.  These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force.  As Warden, Defendant Bailey was provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail.  He was responsible for reviewing and approving these reports before forwarding them to the Integrity and Policy Division of the Department, as well as conducting investigations in his facility and recommending discipline for misconduct.  Prior to his position as Warden, as a Captain in the Central Punitive Segregation Unit ("CPSU"), Defendant Bailey was notorious for his involvement in, and cover-up of, staff beatings of inmates (see paragraph 49, infra).  Following the relocation of the CPSU to another building in 1996, Bailey, like other staff members who had been assigned to the CPSU, was not promoted until some time after 2003, when Martin Horn became Commissioner of the DOC.   As a Warden, Defendant Bailey has been sued on multiple occasions for his failure to protect inmates from assault.  At all times referred to in this Complaint, Defendant Bailey was acting within the scope of his employment as an employee of the Department and acting under color of state law.  Defendant Bailey is sued in his individual capacity.

17.     Defendant Edmund Duffy was in March 2010 the Warden of RNDC.  As Warden,

10

Defendant Duffy was and is responsible for supervision of correction officers, captains, and other supervisors with respect to the care, custody, and control of inmates confined in the jail. These responsibilities were and are required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force. As Warden, Defendant Duffy was and is provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail. He was and is responsible for reviewing and approving these reports before forwarding them to the Integrity and Policy Division of the Department, as well as conducting investigations in his facility and recommending discipline for misconduct. At all times referred to in this Complaint, Defendant Duffy was and is acting within the scope of his employment as an employee of the Department and acting under color of state law. Defendant Duffy is sued in his individual capacity.

18.     Defendant Ronald Jorgensen was in June and July of 2011 the Deputy Warden for Security at AMKC, and since December 2011 has been employed at DOC headquarters. As Deputy Warden for Security, Defendant Jorgensen was responsible for supervision of correction officers, captains and other supervisors with respect to the care, custody and control of inmates confined in the jail. His responsibilities additionally included investigating use of force incidents, investigating staff members' roles in use of force incidents, and making recommendations for discipline in connection with use of force incidents. These responsibilities were required to be carried out in a manner consistent with the legal mandates that govern the operation of DOC and its jails, including the written Department directives and orders governing the use of force and the reporting of use of force. At all times referred to in this Complaint, Defendant Jorgensen was and is acting within the scope of his employment as an employee of the Department and acting under

color of state law.  Defendant Jorgensen is sued in his individual capacity.

19.     Defendant Evelyn Mirabal was in November 2011 the Warden of the Otis Bantum

Correctional Center ("OBCC"), a Department jail.  As Warden, Defendant Mirabal was and is

responsible for supervision of correction officers, captains, and other supervisors with respect to

the care, custody, and control of inmates confined in the jail.  These responsibilities were and are

required to be carried out in a manner consistent with the legal mandates that govern the operation

of DOC and its jails, including the written Department directives and orders governing the use of

force and the reporting of use of force.  As Warden, Defendant Mirabal was and is provided on a

daily basis with all reports of use of force, allegations of use of force, and other violent incidents in

her jail.  She was and is responsible for reviewing and approving these reports before forwarding

them to the Integrity and Policy Division of the Department, as well as conducting investigations

in her facility and recommending discipline for misconduct.  At all times referred to in this

Complaint, Defendant Mirabal was and is acting within the scope of her employment as an

employee of the Department and acting under color of state law.  Defendant Mirabal is sued in her

individual capacity.

20.     Defendant Kathleen Mulvey was in November 2009 and March and April 2011 the

Warden of GRVC.  As Warden, Defendant Mulvey was and is responsible for supervision of

correction officers, captains and other supervisors with respect to the care, custody and control of

inmates confined in the jail.  These responsibilities were and are required to be carried out in a

manner consistent with the legal mandates that govern the operation of DOC and its jails,

including the written Department directives and orders governing the use of force and the

reporting of use of force. As Warden, Defendant Mulvey was and is provided on a daily basis with

all reports of use of force, allegations of use of force, and other violent incidents in her jail.  She

12

was and is responsible for reviewing and approving these reports before forwarding them to the

Integrity and Policy Division of the Department, as well as conducting investigations in her facility

and recommending discipline for misconduct.  At all times referred to in this Complaint,

Defendant Mulvey was and is acting within the scope of her employment as an employee of the

Department and acting under color of state law.  Defendant Mulvey is sued in her individual

capacity.

21.     Defendant Florence Finkle was at all times referred to in this Complaint, and still is, the

Deputy Commissioner of Integrity and Policy of DOC.  As Deputy Commission, Defendant Finkle

was and is responsible for ordering and supervising the investigation of any and all incidents in

which any employee of the Department uses force against any inmate.  Defendant Finkle has been

and is provided on a daily basis with reports of applications of force, allegations of unreported use

of force, and other violent incidents in Department jails.  She has been and is responsible for

initiating recommendations for disciplinary action against officers and captains who engage in

misconduct.  At all times referred to in this Complaint, Defendant Finkle was and is acting within

the scope of her employment as an employee of the Department and acting under color of state

law.  Defendant Finkle is sued in her individual and official capacities.

22.     Defendant Mark Scott was in September 2011 the Warden of the Vernon C. Bain Center

("VCBC"), a Department jail, and is currently Assistant Chief of Security of DOC.  As Warden of

VCBC, Defendant Scott was responsible for supervision of correction officers, captains and other

supervisors with respect to the care, custody, and control of inmates confined in the jail.  These

responsibilities were required to be carried out in a manner consistent with the legal mandates that

govern the operation of DOC and its jails, including the written Department directives and orders

governing the use of force and the reporting of use of force.  As Warden, Defendant Scott was

provided on a daily basis with all reports of use of force, allegations of use of force, and other violent incidents in his jail. He was responsible for reviewing and approving these reports before forwarding them to the Integrity and Policy Division of the Department, as well as conducting investigations in his facility and recommending discipline for misconduct. As Assistant Chief of Security, Defendant Scott is responsible for monitoring and addressing all operational issues in Department jails pertaining to the safety and security of inmates and staff. These responsibilities include the tracking of incidents involving any use of force in any Department jail and the formulation of responses designed to protect the personal safety of all Department staff and inmates in its custody. As Assistant Chief of Security, Defendant Scott is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other incidents involving any use of force in any Department jail. At all times referred to in this Complaint, Defendant Scott was and is acting within the scope of his employment as an employee of the Department and acting under color of state law. Defendant Scott is sued in his individual and official capacities.

23. Defendant Carmine LaBruzzo was in June and July of 2011 Deputy Chief of Security of DOC, and is currently Deputy Chief of Department of DOC. As Deputy Chief of Security and as Deputy Chief of Department, Defendant LaBruzzo was and is responsible for monitoring and addressing all operational issues in Department jails pertaining to the safety and security of inmates and staff. These responsibilities included and include the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in its custody. As Deputy Chief of Security and as Deputy Chief of Department, Defendant LaBruzzo has been and is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails. At all times

14

referred to in this Complaint, Defendant LaBruzzo was and is acting within the scope of his employment as an employee of the Department and acting under color of state law.  Defendant LaBruzzo is sued in his individual and official capacities.

24.     Defendant Michael Hourihane was in June and July of 2011 Deputy Chief of Department, and since December 2011has been Chief of Department.  As Deputy Chief of Department, Defendant Hourihane was responsible for monitoring and addressing all operational issues in Department jails pertaining to the safety and security of inmates and staff.  These responsibilities included the tracking of violent incidents and the formulation of responses designed to protect the personal safety of Department staff and inmates in its custody.  As Deputy Chief of Department, Defendant Hourihane was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails.  Presently, as Chief of Department, Hourihane is the highest ranking uniformed member of the department, and is responsible for the supervision, oversight, and discipline of the uniformed security staff, including the supervisory security staff, in all the Department jails.  He is also responsible for the care, custody, and control of all inmates in the Department jails.  As Chief of Department, Hourihane is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails.  At all times referred to in this Complaint, Defendant Hourihane was and is acting within the scope of his employment as an employee of the Department and acting under color of state law.  Defendant Hourihane is sued in his individual and official capacities.

25.     Defendant Larry Davis, Sr. was in June and July of 2011 the Chief of Department.  As Chief of Department, Davis was the highest-ranking uniformed member of the Department and was responsible for the supervision, oversight, and discipline of the uniformed security staff,

including the supervisory security staff, in all the Department jails.  He was also responsible for the care, custody, and control of all inmates in the Department jails.  As Chief of Department, Davis was provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails.  At all times referred to in this Complaint, Defendant Davis was acting within the scope of his employment as an employee of the Department and acting under color of state law.  Defendant Davis is sued in his individual and official capacities.

26.     Defendant Dora Schriro was at all times referred to in this Complaint, and still is, the Commissioner of DOC.  As Commissioner, she has been and is the chief executive officer of the Department, responsible, consistent with the legal mandates governing the Department, for the management and control of all Department jails, and for all matters relating to the selection, supervision, promotion, training, and discipline of the uniformed staff, including the supervisory security staff, of the Department's jails. Defendant Schriro has been and is also responsible for the care, custody, and control of all inmates housed in the Department's jails.  As Commissioner, Schriro has been and is provided on a daily basis with reports of applications of force, allegations of unreported use of force, and other violent incidents in Department jails.  At all times referred to in this Complaint, Defendant Schriro was and is acting within the scope of her employment as an employee of the Department and acting under color of state law.  Defendant Schriro is sued in her individual and official capacities.

27.     Defendant City of New York is a municipal corporation which, through its Department of Correction, operates a number of detention jails, including all of the jails at issue in this lawsuit. The Department, through its senior officials at the central office and in each facility, promulgates and implements policies, including policies with respect to the use, reporting, and investigation of

force by uniformed staff.  In addition, the Unconstitutional Use of Force Practice has been and continues to be known to, perpetuated, permitted and encouraged—and thus institutionalized—by Department supervisors, including high-ranking central office Department personnel even though it is inconsistent with formal Department policy.  Because the Unconstitutional Use of Force Practice is widespread, long-standing, and deeply embedded in the culture of the Department, it constitutes an unwritten municipal policy or custom of the City.  The Department is also responsible for the appointment, training, supervision, and conduct of all DOC personnel, including the defendants referenced herein.

<u>CLASS ACTION ALLEGATIONS</u>

28.    Plaintiffs Brye, Smallwood, and Woods bring this action as a class action under Fed. R. Civ. P. 23 for violations of their constitutional and common law rights.  The proposed class is composed of all present and future inmates confined in any of the institutions and commands operated by DOC, except for EMTC, and the Elmhurst and Bellevue prison wards.  This action is brought pursuant to Federal Rules of Civil Procedure 23(a), (b)(1)(A) and (b)(2).  The class meets the requirements of Rule 23 as follows:

a.    There are well over 10,000 inmates confined within the aforementioned institutions at any one time.  The membership of the class continuously changes, rendering joinder of all members impracticable.

b.    Questions of law and fact presented by the named Plaintiffs are common to other members of the class.  Such questions include: (1) whether Department correction officers and supervisory personnel have engaged in a pattern and practice use of unnecessary and excessive force in Department jails and continue to do so; (2) whether Department  supervisory personnel have knowingly encouraged, facilitated and

institutionalized such brutality and continue to do so; (3) whether supervisory Department personnel have failed to investigate and remedy known incidents of unnecessary and excessive force and false reporting in the jails despite repeatedly having been informed of these problems through regularly circulating official reports, inmate complaints, external complaints, and prior litigation, and continue to do so; (4) whether there exist Department-wide unwritten policies within the DOC, including the Unconstitutional Use of Force Practice, that promote and encourage unconstitutional practices in the jails and central office but are allowed to remain in place and in practice; (5) whether supervisory Defendants have failed to train, supervise, and discipline line correction officers and staff in the institutions in order to prevent use of unnecessary and excessive force, and continue to do so; (6) whether DOC policies and procedures, including the Unconstitutional Use of Force Practice, demonstrate deliberate indifference to the need to supervise correction officers to prevent a widespread and institutionalized pattern and practice of unnecessary and excessive force against inmates; (7) whether a pattern and practice of unconstitutional unnecessary and excessive force against DOC inmates is being carried out and perpetuated by correction officers, captains, wardens, and the highest supervisors in the DOC in order to manage and control the DOC jails; (8) whether any or all of the foregoing constitute a violation, and a threat of continuing violation, of the rights of the class members under the Constitutions and laws of the United States and the State of New York; and (9) whether an injunction and declaratory relief is necessary in order to rectify the situation described in this Complaint. The common issues of law and fact such as those set forth above (among many others) predominate over any individual issues.

   c.  These questions of fact and law common to the class are susceptible to

common resolution and will generate common answers with respect to all members of the class, including what are the appropriate remedies that will be necessary to ensure (i) that the unconstitutional conduct at issue in this lawsuit, and the policies (including the Unconstitutional Use of Force Practice) and practices that perpetuate it are terminated in every respect, and (ii) that their harmful effects are nullified.

        d.      Every present and future inmate confined by the DOC in the affected DOC commands and institutions would benefit from an order enjoining and directing Defendants to cease the challenged unconstitutional conduct and the policies (including the Unconstitutional Use of Force Practice) and practices that perpetuate such conduct.

        e.      These policies and practices result in both the frequent infliction of severe physical and psychological injuries on inmates confined in these jails, and the maintenance of an atmosphere of fear and intimidation.  As a result, every inmate in these institutions risks being subjected to and injured by these unlawful practices.  The claims, policies and practices alleged in this Complaint are common to all members of the class.

        f.      The violations suffered by Plaintiffs Brye, Smallwood and Woods are typical of those suffered by the class.  Brye, Smallwood and Woods are current DOC inmates who—like all members of the proposed class—remain uniquely vulnerable to unnecessary and excessive use of force in DOC facilities.  The entire class will benefit from the remedial relief sought.

        g.      Plaintiffs Brye, Smallwood and Woods are presently incarcerated within institutions operated by DOC and possess live claims for injunctive relief.  These named Plaintiffs have no conflicts of interest with any class members and will fairly and adequately protect the interests of the class.  The Legal Aid Society, Prisoners' Rights

Project, counsel for Plaintiffs, is a legal services organization experienced in prisoners' civil rights litigation that, through prior litigation, has secured court-ordered institutional reform within several Department jails.  All of these previous cases proceeded as class actions. Emery Celli Brinckerhoff & Abady LLP is a law firm with offices in New York City that has extensive experience in successful civil rights litigation, including class action lawsuits against state and local governments and the Department of Correction. Ropes & Gray LLP is a law firm with offices in New York City that has extensive experience in complex federal litigation and in pro bono federal civil rights litigation on behalf of prisoners.

> h.    Plaintiffs satisfy Rule 23(b)(1)(A) because separate actions by individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the Defendants.

> i.    The Defendants have acted, or omitted to act, on grounds generally applicable to the class, thereby making appropriate injunctive relief with respect to the class as a whole pursuant to Rule 23(b)(2).

## FACTUAL ALLEGATIONS

### The Pattern of Misconduct by Uniformed Staff Assigned to Department Institutions:
### The Unconstitutional Use of Force Practice

29.    Members of the uniformed staff in Department jails regularly and routinely have used and continue to use unnecessary and excessive force without justification against inmates, including as punishment for minor misconduct, verbal complaints, protests, or perceived disrespect to staff. Some of these beatings have occurred hours or days after the initial contact between officer and

inmate.  See paragraphs 67, 150-51, infra.  Members of the uniformed staff regularly apply

unnecessary, excessive, and injurious force to beat inmates under circumstances where, at most,

some minimal, non-injurious restraint may have been justified to control the inmate.

30.     As a regular and routine matter, inmates who are targeted for abuse by members of the

uniformed staff in Department jails are removed from their cells to isolated areas and areas without

video cameras, such as search rooms and areas of facility receiving rooms (also known as "intake

areas") and beaten by groups of officers with no inmates or civilians as witnesses.  Others are

beaten in their cells.  Many inmates are beaten while they are handcuffed and/or naked.  See

paragraphs 72, 78, 89-92, 111, 114, 143, 151, infra.

31.     Inmates who have been beaten by uniformed staff have suffered a range of injuries, many

of which have required the provision of emergency medical care and/or hospitalization, and even

have resulted in severe and permanent injury.  Some of the injuries suffered by the named

Plaintiffs include: orbital fracture requiring surgery; perforation of the tympanic membrane

causing diminished hearing and tinnitus; acute mandibular fracture requiring the jaw to be wired

shut for three months; fractured bones including wrists, jaws, and the nose; nerve damage; facial

lacerations requiring stitches; and severe concussions causing permanent neurological damage.

See 69, 82, 97, 112, 115, 122, 129, infra.  A number of inmates beaten by staff have suffered severe

internal injuries in addition to the visible abrasions and contusions associated with punches to the

face and body.   See paragraphs 69, 71, 107, 115, 129, 137, 146, infra.

32.     After an inmate has been assaulted by staff, staff routinely falsify documents or fabricate

claims to cover up their own unlawful conduct or that of their colleagues.  In some cases, officers

fail to report any use of force; in others, they falsely under-report the amount of force they used or

witnessed; and in still others, they attempt to justify unnecessary and excessive force by falsely

claiming that an inmate had physically threatened or attacked a staff member.  See paragraphs 99, 108, 113, 116, 123, 154, infra.

33.    Members of the uniformed staff often solicit inmates who have been beaten or who have witnessed beatings to make false statements about incidents and the sources of their injuries, or to refrain from reporting them at all.  Often inmates are threatened with disciplinary charges if they report the incidents truthfully.  See paragraphs 95, 136, 138, infra.

34.    Routinely, inmates beaten in Department jails are falsely charged administratively with "assault on staff" and, when found guilty, confined in punitive segregation following disciplinary proceedings conducted by adjudication captains.  These proceedings, which are frequently completely unreliable, are conducted in violation of written policy and deny basic, constitutionally mandated protections. See paragraphs 99, 108, 113, 116, 123, 154, infra.

35.    Some captains in Department jails, including Defendants Williams, Majors, Massey, Behari, Sistrunk, Baiardi, Dunbar, Fadima, Primm, and Medina have ordered or participated in beatings; others have stood by while officers assaulted inmates in their presence and taken no steps to prevent injury to the inmate.  Some captains have covered up, or attempted to cover up, the illegal conduct of their subordinates. See paragraphs 95, 136, 138.

### The Pattern of Excessive and Unnecessary Force in the Jails is Known to, Fostered, and Encouraged by Department Supervisors

36.    The supervisory staff within the Department jails, including Defendants Warden Bailey, Warden Cripps, Deputy Warden of Security Jorgensen, Assistant Deputy Warden Johnson, Deputy Warden Ramos, Warden Agro, Warden Duffy, Warden Mirabal, Warden Mulvey, and the command structure of the Department (Defendants Schriro, Finkle, Hourihane, Davis, LaBruzzo and Scott) know that the pattern and practice of physical abuse described above, as well as the

sham investigation policy and practice with respect thereto, existed and still exists in the City's

jails.  Their failure to curb such conduct despite their affirmative duty to do so, and their specific

policies and acts that have created and now perpetuate such institutionalized conduct, including

the Unconstitutional Use of Force Practice, constitute deliberate indifference to the rights and

safety of the inmates in their care and custody, including those inmates named as Plaintiffs in this

action.  These Defendants' conduct is a substantial factor in the continuation of the

Unconstitutional Use of Force Practice and the proximate cause of the constitutional violations

alleged in this Complaint.

37.    The Department of Correction operates under a single, system-wide written use of force

policy Directive 5006 (the "Written Policy").  The Department trains all of its staff at a single

Training Academy subject to a uniform curriculum.  There is one centralized Integrity and Policy

Division (formerly called the Investigation Division) that is responsible for uniformly

investigating all reports of staff's use of force under uniform procedures.  There is a similar

centralized Division that is responsible for conducting all of the administrative prosecutions in the

few instances where the Department concludes unnecessary and excessive force has been used.

This Division also has the authority to decline to prosecute or negotiate a plea-bargain with a

Department employee.

38.    Administratively, the Department is organized with a paramilitary chain of command.  The

central office consists of the Commissioner, Chief of Department, and other top administrators.

There are three Supervising Wardens, each of whom has supervisory authority over several of the

jails and other commands (e.g., the Transportation Division).  Wardens and Deputy Wardens are

routinely transferred among facilities.  The uniformed staff is also routinely transferred from jail to

jail or to non-jail command posts throughout the city system.  Staff who are promoted are

transferred to new commands within the Department jails following their promotion. Officers who are known to have used unnecessary and excessive force in one command are often just transferred by the Department higher-ups to another command where they continue to have inmate contact, so the same systemic problems continue to occur. Inmates are also routinely transferred among the different facilities; many, including a number of the named Plaintiffs, are or were housed in several different facilities while in Department custody.

### Supervisors Receive Extensive Information Documenting the Extent and Severity of Excessive Force in the City's Jails

39.      The Commissioner, the Deputy Commissioner of Integrity and Policy, the former and current Chiefs of Department, the former and current Deputy Chiefs of Department, the former Deputy Chief of Security and the current Assistant Chief of Security—Defendants Schriro, Finkle, Davis, Hourihane, LaBruzzo and Scott—have known and (with respect to those who are current Department officials) do know the number, frequency, and severity of use of force incidents in city jails, as well as the names of the staff involved, and know that inmates continue to be at risk of unnecessary and excessive force at the hands of uniformed staff. Each of these central office supervisors receives and/or received daily compilation reports from Department commands documenting violent incidents, including reports of staff use of force. These "24-hour reports," which are circulated throughout the Department, contain brief summaries of use of force incidents. For years these summaries have documented, and continue to document, the routine application of injurious force to inmates by staff members under circumstances which often suggest that the staff accounts are fabricated to cover up brutality and other misconduct.

40.      Defendants Agro, as Warden of GRVC, Bailey, as Warden of RNDC, Cripps, as Warden of AMKC, Jorgensen, as Deputy Warden of Security of AMKC, Johnson, Assistant Deputy Warden

of RNDC, Ramos, as Deputy Warden of the CPSU in OBCC, Mirabal, as Warden of OBCC, Duffy, as Warden of RNDC, Mulvey, as Warden of GRVC, and Scott, as Warden of VCBC, were and are consistently apprised of the frequency and severity of inmates' injuries from violent encounters with correction staff in their commands. As Wardens, Deputy Warden of the CPSU (Ramos), Deputy Warden of Security (Jorgensen), and Assistant Deputy Warden (Johnson), each is responsible for reviewing and approving the reports of staff use of force before these reports were and are forwarded to the Integrity and Policy division for central office investigation. These use of force reports routinely document the infliction of serious injuries on inmates by staff. Supervisors' failure to properly address the unnecessary and excessive use of force, despite the information contained in these reports, reflects the unwillingness of those supervisors to question correctional staff's conduct, even when it is proscribed by the Written Policy. In these and other ways described herein, these Defendants created and perpetuated the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

**Supervisors Fail to Adequately Investigate Reports of Staff Use of Force**

41.     Defendant Finkle, the Deputy Commissioner of Integrity and Policy, and the investigative division that she heads, systematically fail to conduct meaningful investigations into uses of force by DOC staff. The investigative division routinely fails to conduct investigations as required by the Investigations Manual promulgated after the Ingles litigation. Where the investigative division does conduct investigations, it fails to follow its own guidelines, routinely crediting correction officer accounts that are implausible on their face, inconsistent with inmates' injuries, or obviously manufactured collaboratively after the fact. The division routinely fails to credit inmate accounts, even where these accounts are supported by eyewitnesses and consistent with inmate injuries. The division also regularly fails to take, review, and preserve crucial evidence, including witness

accounts, videotape, medical records, and physical evidence.  By its failure to act, its biased and incomplete investigative practices, and its collusion with correction officers who have created falsified accounts of their wrongdoing, Finkle and the investigative division signal to staff that they can engage in unnecessary and excessive use of force with impunity because their lies and attempts to cover-up wrong-doing will not be questioned.  In these and other ways described herein, Defendant Finkle has created and now perpetuates the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

42.     Department policy and practice is to have the reports filed by staff at Department jails regarding use of force incidents and the reports of the subsequent investigations conducted by supervisors at the jails, forwarded to the Department's central office for further investigation. Submission of these reports to the central office put the Deputy Commissioner of Integrity and Policy (Defendant Finkle), the Deputy Chief of Security (Defendant LaBruzzo), the Assistant Chief of Security (Defendant Scott), the Deputy Chiefs of Department (Defendant LaBruzzo and Hourihane), the Chief of Department (Defendant Hourihane and Davis) and the Commissioner (Defendant Schriro) on notice that unconstitutional practices and policies, including the Unconstitutional Use of Force Practice, have been and are rampant throughout the Department jails.  Among other things these reports: (1) document frequent and numerous instances in which correction staff inflict serious injuries, including head and facial trauma, multiple blunt trauma to the body, and perforated ear drums, on inmates; (2) conclude, with rare exceptions, that the inmate instigated the incident and that the incident was caused by similar conduct such as an inmate "making a threatening gesture" or "taking a menacing stance" and needed to be "subdued" or "restrained"; (3) frequently identify the location of the incident to be in an isolated area where there are no cameras and few people around, such as the facility receiving room, an inmate's cell,

or a similarly isolated area; (4) often involve a single inmate, who in some cases may even be naked, and who implausibly is reported to have assaulted an officer who is accompanied by other staff members; and (5) identify that certain correction officers and captains have been involved in a disproportionate number of these incidents. In these and other ways described herein, these Defendants created and now perpetuates the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

43.    The Department's investigative process has been and is inadequate on all levels. The supervisory staff of Department jails, including Defendants Bailey, Cripps, Mulvey, Mirabal, Duffy, Agro, Scott, Ramos, Johnson, and Jorgensen, have consistently conducted biased and incomplete investigations into complaints of officers' use of unnecessary and excessive force and have permitted officers who have violated Department guidelines to escape any discipline for their misconduct. Investigations conducted by the central office, including Defendants Schriro, Finkle, Davis, Hourihane, LaBruzzo and Scott, of officers' use of unnecessary and excessive force reflect the same bias in favor of uniformed staff. This improper conduct has continued for over twenty-five years and has not been corrected since the district court first found that the central office's use of force investigations were biased at the Correctional Institution for Men (a DOC facility). Fisher v. Koehler, 692 F.Supp. 1519, 1553-57 (S.D.N.Y. 1988), aff'd, 902 F.2d 2 (2d Cir. 1990). Although the Department originally agreed in 1998 to implement specific, court-ordered remedies for these long-standing deficiencies in the investigation of staff use of force in the CPSU (Sheppard v. Phoenix, 91 Civ. 4148 (RPP) (S.D.N.Y.) (Order Approving Stipulation for Entry of Judgment, July 10, 1998)), it has since abandoned those demonstrably successful measures and refused to apply those, or similar, reforms throughout the jails resulting in continued biased investigations. In these and other ways described herein, these Defendants

created and now perpetuate the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

44.    In addition to her routine review of the Department's reports, the Deputy Commissioner of Integrity and Policy, Defendant Finkle, has also received numerous letters from the Prisoners' Rights Project of the Legal Aid Society alleging serious physical abuse of a significant numbers of inmates by uniformed staff in Department jails for the past several years.  Many of these letters identify specific staff members as having engaged in repeated assaults on inmates. Defendant Finkle has taken no meaningful steps to address the deplorable facts repeatedly brought to her attention by these letters.  In these and other ways described herein, this Defendant created and now perpetuates the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

### Past and Current Litigation Has Placed Supervisory Staff Squarely on Notice as to the Nature, Causes and Persistence of Excessive Force in the City's Jails

45.    Since 2002, senior supervisors and uniformed staff in DOC have been sued repeatedly by inmates alleging staff beatings and cover-up.  Many of these cases, all resulting in favorable judgments for plaintiffs following settlement, include remarkably similar allegations of misconduct.  See, e.g.,

- Reynolds v. City of New York, 11 Civ. 621 (S.D.N.Y.) (alleging beat-up in GMDC resulting in shoulder fracture and loss of consciousness; settled for $200,500);

- Mull v. City of New York, 08 Civ. 8854 (S.D.N.Y.) (alleging beat-up in AMKC resulting in diffuse axonal injury to brain, partial loss of eyesight and partial loss of hearing and requiring the victim to take seizure medications; settled for $550,000);

- Belvett v. City of New York, 09 Civ. 8090 (S.D.N.Y.) (alleging beat-ups at GMDC

and RNDC resulting in facial fracture; settled for $350,000);

- <u>Youngblood v. Baldwin</u>, 08 Civ. 5982 (S.D.N.Y.) (alleging beat-up at GRVC resulting in skull laceration and broken nose; settled for $240,000);

- <u>Williams v. City of New York</u>, 07 Civ. 11055 (S.D.N.Y.) (alleging beat-up in OBCC resulting in fractured jaw and facial bones and torn earlobe; settled for $202,500);

- <u>Williams v. City of New York</u>, 09 Civ. 5734 (S.D.N.Y.) (alleging beat-up in RNDC resulting in laceration to head; settled for $87,500);

- <u>Lee v. Perez</u>, 09 Civ. 3134 (S.D.N.Y.) (alleging beat-up at NIC resulting in multiple rib fractures, a spinal fracture and a collapsed lung; settled for $300,000);

- <u>Shuford v. City of New York</u>, 09 Civ. 945 (S.D.N.Y.) (alleging two beat-ups at RNDC resulting in facial fractures; settled for $375,000);

- <u>Diaz v. City of New York</u>, 08 Civ. 4391 (S.D.N.Y.) (alleging beat-ups involving two inmates, one at AMKC and one at OBCC; settled for $400,000 and $450,000, respectively);

- <u>Lugo v. City of New York</u>, 08 Civ. 2931 (S.D.N.Y.) (alleging beat-up at NIC resulting in orbital fracture; settled for $185,000);

- <u>Cuadrado v. City of New York</u>, 07 Civ. 1447 (S.D.N.Y.) (alleging beat-up at RNDC resulting in punctured lung; settled for $175,000);

- <u>Scott v. City of New York</u>, 07 Civ. 3691 (S.D.N.Y.) (alleging beat-up at GMDC resulting in orbital fracture; settled for $175,000);

- <u>Pischeottola v. City of New York</u>, 06 Civ. 2505 (S.D.N.Y.) (alleging beat-up at

RNDC resulting in punctured lung requiring chest tube; settled for $150,000);

- <u>Rice v. N.Y.C.D.O.C.</u>, 03 Civ. 582 (S.D.N.Y.) (alleging beat-ups of two inmates at GRVC resulting in collapsed lung and contusion hematomas, in one case, and in neck and spinal cord injuries causing permanent stutter, in the other; settled for $255,000 and $590,000, respectively);

- <u>Joseph v. N.Y.C.D.O.C.</u>, 02 Civ. 9219 (S.D.N.Y.) (alleging beat-up at GRVC resulting in orbital fracture; settled for $375,000).

46.     In addition, senior correction supervisors possess actual knowledge of brutality in the City's jails from the five inmate class actions that have been filed over the last three decades.  (See paragraph 3, 43, supra.)  These lawsuits exposed the mechanics of the Unconstitutional Use of Force Practice at individual commands and, in the case of <u>Ingles</u>, throughout the entire DOC system.  These suits also identified the substantive causes of staff brutality and won reforms which, if they had been thoroughly and on a long-term basis systematically implemented, likely would have effectively ended the unconstitutional practices and policies at the Department's jails challenged in this lawsuit, including the Unconstitutional Use of Force Practice.  In <u>Ingles</u>, for example, this court approved a settlement agreement that required the installation of wall-mounted cameras in DOC jails, the revision of the DOC's use of force directive, modifications to staff training, the overhaul of procedures for investigations by the Integrity and Policy Divisions, the photographing of inmates following uses of force, the creation of a system tracking uses of force by individual officers, and ongoing monitoring by plaintiffs' counsel.  At all times relevant to this Complaint, the supervisory Defendants herein (Ramos, Johnson, Agro, Cripps, Bailey, Duffy, Jorgensen, Mirabal, Mulvey, Finkle, Scott, LaBruzzo, Hourihane, Davis, Schiro) not only knew that these reforms had not been instituted in all jails or were no longer in effect, but consciously

and affirmatively determined not to extend them system-wide, despite knowing their efficacy. Moreover, these Defendants have regularly received internal reports clearly demonstrating that the unconstitutional practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, have remained pervasive throughout the DOC jails.  (See paragraphs 39-40, supra.)  In light of this evidence, the supervisors' decision not to institute lasting reforms, but rather to abandon those demonstrably effective reforms at the termination of any period of meaningful oversight, constitutes and demonstrates a policy of deliberate indifference toward the rights and safety of the plaintiff class.

47.    The discovery obtained in the prior class actions placed senior supervisors on notice as to the existence of the unconstitutional practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, the manner in which those practices and  policies have operated, and the role that supervisory staff played in maintaining and perpetuating such practices and policies, including the Unconstitutional Use of Force Practice.

- The discovery provided in Sheppard included reports of over a thousand incidents and the investigations conducted in connection with these incidents over a ten-year period (1988-1998). This discovery demonstrated, inter alia, current and former supervisors' deliberate indifference to reported incidents of violence, current and former supervisors' encouragement of violence in the jails, pervasive acts of brutality by uniformed staff, cover-up of these incidents through the preparation of false reports, a systemic failure to ensure unbiased and thorough investigations of use of force incidents, supervisors' failure to engage in prompt and meaningful discipline of staff, and supervisors' long-standing failure or refusal to hold uniformed staff accountable for their misconduct.

31

- The discovery provided in Ingles included reports of over a thousand incidents and approximately 4000 24-hour reports collected over a four-year period (2000-2003). This discovery demonstrated that (1) both Wardens and headquarters staff knew, but almost entirely failed to address, the fact that uniformed staff routinely employed offensive and retaliatory tactics and techniques that caused needless physical pain and injury rather than defensive control tactics that could achieve equal or greater control while significantly reducing or minimizing injuries to inmates and staff; (2) the DOC failed to train its officers in how to apply self-defense techniques that achieve necessary levels of control without relying on impact strikes to the head and other vulnerable parts of the body; (3) facility-level and headquarters-level investigations into uses of force betrayed bias against inmates and in favor of staff, as well as lack of thoroughness on the part of investigators; and (4) DOC supervisory staff—from Wardens to Chiefs to Deputy Commissioners and the Commissioners themselves—possessed ample knowledge of the pattern of brutality in the jails, and of the inadequacy of DOC investigations into unnecessary and excessive uses of force.

48.    Given supervisors' knowledge about the nature and causes of brutality in the jails as demonstrated through the discovery in prior litigation—coupled with supervisors' knowledge that the measures intended to remedy such brutality were no longer being applied (a result of their decisions, as described supra), their awareness of continuing complaints and litigation arising from alleged acts of officer brutality in the jails, their possession of regularly-circulating reports recording the extent and severity of violence in the jails, and the other facts and circumstances alleged herein—supervisors knew and know that the systemic failures underlying the

32

unconstitutional practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, have continued unabated.    In light of this knowledge, the supervisory Defendants' actions, inactions and decisions, as alleged herein, constitute and demonstrate a policy of deliberate indifference toward the rights and safety of inmates under Department control. In these and other ways described herein, these Defendants have been, and are, key to the creation and perpetuation of unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

### Supervisors Permit and Encourage their Subordinates to Engage in Excessive Use of Force at No Detriment to their Careers

49.    Despite their knowledge of ongoing abuses in the City's jails under the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, supervisory staff retains correction officers and captains with demonstrated histories of misconduct to use unnecessary and excessive force against inmates and refuses to transfer them to non-contact positions.  In some cases—e.g., Defendants Jorgensen, Ramos, Scott, Bailey, and LaBruzzo— staff with such demonstrated propensities have even been promoted to positions of increased responsibility. As supervisory personnel themselves, Jorgensen, Ramos, Scott, Bailey, and LaBruzzo possess first-hand knowledge of the scope and severity of the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, based in part on their own historic actions as correction officers and captains.

- In 2008, Defendant Brishinsky and other correction officers brutally beat an inmate, causing severe brain injury and seizures, among other injuries.  As a result of this brutality, he was a named defendant in Mull v. City of New York, et. al., No. 08-cv-8954 (S.D.N.Y.).  The City of New York settled that case for $550,000 on

February 9, 2011.  Despite this history of abuse known to supervisory Defendants, Brishinky remains employed as a corrections officer assigned to the same post he had in 2008.

- While Defendant Jorgensen was assigned to the CPSU as a Captain in the 1990s, an Integrity Control Officer observed him beating an inmate and reported the assault—and the fact that Defendant Jorgensen had not been punished—to the jail's Deputy Warden for Security.  Jorgensen was subsequently promoted to Deputy Warden for Security at AMKC.

- Defendant Ramos was named as a defendant in the Ingles case because, as a captain at GRVC in 2002, he allegedly lured an inmate out of his cell and then instructed correction officers to assault the inmate.  That inmate suffered fractures to his nose and wrist.  After this incident, Ramos was promoted to Deputy Warden and transferred to CPSU.   At the time of Ramos' promotion and transfer, Jonathan Chasan of the Prisoners' Rights Project sent Defendant Commissioner Schriro a letter detailing Ramos' history of misconduct and admitted contempt for the Department's Written Policy, and urging that Ramos not be transferred to such a sensitive command.  Ramos is now the highest-ranking uniformed officer at CPSU. Since his transfer to CPSU, inmate complaints regarding the level of unnecessary and excessive force by DOC staff have increased dramatically.

- In 1997, when he was Security Captain assigned to the CPSU, Defendant Scott supervised and participated in an impermissible use of force during a cell extraction, then attempted to cover up the incident.  Scott was suspended 42 days in

connection with this assault.  An Administrative Law Judge found that Scott

impermissibly struck a prone inmate with a baton "as though he were spear

fishing," striking the inmate multiple times and causing a laceration to the inmate's

scalp.  The Administrative Law Judge additionally found that Scott was improperly

trained, that he failed to supervise his subordinates and that he submitted a false and

misleading report after the assault.  Following his suspension, Scott was

subsequently promoted and now occupies the position of Assistant Chief of

Security at DOC.

- Defendant Bailey was also assigned to the CPSU in the 1990s and was notorious

  for his involvement in inmate beatings.  An officer who later became an FBI

  informant witnessed him participate in assaults on inmates.  In particular, he

  witnessed Bailey assault an inmate and subsequently concoct a false story to

  explain the need for the unnecessary and excessive force.  Bailey was subsequently

  promoted to Warden of RNDC, where he was repeatedly sued for failing to protect

  inmates from staff brutality.

- As a captain assigned to the CPSU in the years between 1996 and 2003, LaBruzzo

  was personally charged in no fewer than six use of force incidents.  Prior to those

  charges, the Legal Aid Society advised the City by letter that LaBruzzo had been

  involved in a number of use of force incidents in which inmates had suffered

  serious injuries.  LaBruzzo was subsequently promoted and is currently Deputy

  Chief of Department.

50.     Notwithstanding the fact that high-ranking officials in Department jails and in the

Department's central office knew and know that the unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, result in unnecessary and excessive force being used on inmates, Defendants Schriro, Finkle, Davis, Hourihane, LaBruzzo and Scott have failed to implement measures that would curb the unlawful conduct of their subordinates, and instead have taken actions to perpetuate them.  These Defendants routinely dismissed inmates' complaints of staff beatings, even when the correction officers and captains allegedly involved failed to report a use of force and the inmate was seriously injured; when the inmate's injuries were obviously more serious than the staff accounts of their actions would suggest; and when the same correction officers and captains reported essentially the same scenarios over and over to describe incidents in which different inmates were injured.

51.    Pursuant to the Department's written policy, "Monitoring Uses of Force," codified as DOC Directive 5003, Department supervisors collect extensive information on every correction officer's use of force history.  Officers who use force three or more times within a calendar quarter are required to be interviewed by the facility commander, who must also read the underlying reports from the use of force incidents in which the office was involved and "ascertain whether force was necessary or whether a pattern of inappropriate behavior has emerged."  (Directive 5003(IV)(C)(1).  Additionally, pursuant to the Ingles settlement, there is a system to track officers' uses of force so that facility commanders and the Investigation Division can investigate incidents. Defendant supervisors thus know the use of force histories of their staff members, yet have failed to take reasonable measures to curb the pattern of unnecessary and excessive force.  Indeed, by their conduct they have perpetuated it.

52.    Every month, senior Department staff, including the supervisory Defendants identified in this Complaint, meets to review conditions and performance in the jails pursuant to the

Department's "Total Efficiency Accountability Management System" ("TEAMS") program.  In TEAMS meetings, they discuss use of force in the jails and the response thereto, further apprising senior Department staff of use of force incidents in the jails, how they are reported, and the nature and severity of injuries sustained by inmates.  There are still over 1000 use of force reports filed each year in the Department.

53.    Despite Directive 5003 and the TEAMS program, with rare exceptions uniformed staff whose misconduct is brought to the attention of supervisory personnel continue to work with inmates in Department jails without any substantial disciplinary action being taken against them. Many of these staff members are simply transferred from one jail to another, where their misconduct continues unchecked.  The information available through Directive 5003 and the TEAMS initiative has not been utilized by Wardens or Deputy Wardens of Security in Department jails to reduce the number of incidents of excessive or unnecessary use of force in the jails.  The fact that physical abuse by officers remains unrestrained has led the staff to believe—reasonably—that inmates may be beaten with impunity.

54.    In these and other ways described herein, these Defendants are key to the creation and perpetuation of unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

## Liability of the City of New York

55.    Prior to and at the time of the assaults upon each of the Plaintiffs named in this action, which are described infra in paragraphs 60-156, there existed in Department jails a pattern and practice of physical abuse of inmates by the uniformed staff assigned to these jails.  The elements of this pattern are described in paragraphs 29-35, supra. The pattern of unrestrained physical abuse by uniformed staff is now so institutionalized as to constitute a policy or custom that has caused

the deprivation of Plaintiffs' constitutional rights.

56.     Prior to and at the time of the assaults upon each of the Plaintiffs named in this action, which are described <u>infra</u> in paragraphs 60-156, there existed throughout the Department a pervasive pattern and practice of failing to conduct unbiased and thorough investigations of use of force incidents, and to discipline staff meaningfully and promptly for misconduct. The Department, through its Commissioners, Chiefs of Department, Chief of Security, and Deputy Commissioner of Integrity and Policy, has refused to hold accountable high-ranking supervisors—captains, assistant deputy wardens, deputy wardens, and wardens—in the face of frequent and significant misconduct, over a period of years, by these supervisors and by the officers they supervise.  The Department has also failed to use its promotional authority to punish—or decline to reward—supervisors who fail to perform their jobs adequately, thereby sending a clear message that a supervisor in a Department facility will suffer no damage to his or her career for turning a blind eye to evidence of staff misuse of force or for failing to properly investigate incidents in which inmates are injured by staff.  This pattern, and the longstanding failure or refusal to supervise uniformed staff, including supervisory staff, is so institutionalized as to constitute a policy of tolerating and authorizing physical abuse of inmates.  This policy of intentional cover-up and of allowing staff at all levels to act with almost complete impunity has caused and is causing the deprivation of Plaintiffs' constitutional rights.

57.     Prior to and at the time of the assaults upon each of the Plaintiffs named in this action, which are described infra in paragraphs 60-156, the Department failed to train staff to use force in conformity with the Department's own official written directives and the requirements of the United States and New York laws.  Because of this systematic failure, staff has not been and is not effectively trained as to the circumstances under which force can lawfully be employed, the proper

38

means of using force, or the amount of force that may permissibly be used. Consequently, staff regularly use force to punish or retaliate against inmates for minor or imagined offenses, use weapons or techniques in impermissible manners or on inappropriate occasions, use "street fighting" techniques not prescribed by Department directives, use items such as walkie-talkies as weapons with which to subdue inmates, use force after the need for force has ended, and use more force than is necessary under the given circumstances. Staff are not trained in minimally injurious use of force techniques, and do not receive ongoing training so that they can implement them in practice. This failure to train staff has caused and causes the deprivation of Plaintiffs' constitutional rights.

58.     The City has been and is on actual notice of the deplorable, long-standing, widespread and institutionalized unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, through among other things the prior lawsuits described herein and the facts uncovered in discovery therein.

59.     In these and other ways described herein, Defendant City is key to the creation and perpetuation of unlawful practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice.

**<u>The Named Plaintiffs</u>**

**<u>Mark Nunez</u>**

60.     Mark Nunez is a citizen of the United States and currently resides in Bronx County, New York. On or about March 4, 2010, Mr. Nunez was incarcerated at RNDC after being transferred from New York State custody for a court appearance in New York City.

61.     On March 4, 2010, Mr. Nunez and other inmates in his housing area were locked out of their cells for the day. Mr. Nunez and three other inmates were sitting in the day room when

Defendant Thomas observed that pantry workers had left food from the night before in the pantry. Defendant Thomas became irate, banged on the inmates' telephones as if to break them, and told the inmates to lock into their cells. When the inmates verbally protested and asked for a captain, Defendant Thomas pressed her personal body alarm to summon a "response team."

62.    Defendant Primm and Doe Defendants #1-4, all wearing riot gear, entered the housing area. Defendant Primm ordered the inmates to stand up, line up with their hands behind their back, and started fighting with one of the inmates. Upon the arrival of Defendant Johnson in the housing area, Mr. Nunez attempted to explain the situation to Defendant Johnson. Without warning, Mr. Nunez was maced from behind by Defendant Primm, and then, as he turned, was hit on the side of his face by Defendant Primm. As Defendant Primm restrained Mr. Nunez, he hit Mr. Nunez several times. Defendant Primm continued to hit Mr. Nunez with his radio on the back of his head after Mr. Nunez was restrained, and placed his knee on Mr. Nunez's neck.

63.    Mr. Nunez was taken to the search pen, stripped naked in front of several officers, and taunted. Despite his complaints, he was not seen by DOC medical staff for several hours.

64.    As a result of the beating, Mr. Nunez suffered swelling and stiffness of his neck, head, and wrists. He continues to suffer from injuries as a result of the assault, including flashbacks, nightmares, and cold sweats.

65.    Mr. Nunez did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail. Mr. Nunez did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used. The conduct of Defendants Johnson, Thomas, Primm, and Doe Defendants #1-4 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Nunez, and manifested deliberate indifference to Mr. Nunez's rights and

physical well-being.  Defendants Johnson, Thomas, Primm, and Doe Defendants #1-4 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Nunez.

**Rodney Brye**

66.     Rodney Brye is a citizen of the United States and is currently incarcerated at GRVC on Rikers Island.  On two separate occasions while he was on Rikers Island, Mr. Brye was subjected to unjustified beatings by uniformed corrections officers—first in June 2011 at AMKC, and then again in February 2012 at GRVC.

67.     In AMKC, on or about the early afternoon of June 28, 2011, Mr. Brye sought permission to use the law library from Defendant Officer Kirkland, which she denied. Later that same day, Defendants Officer Rothwell, Captain Williams, and Officer Brishinsky came to Mr. Brye's cell. Defendant Rothwell falsely accused Mr. Brye of calling Defendant Kirkland a "bitch."  Defendant Rothwell strip-searched Mr. Brye.  Defendants Rothwell, Brishinsky, and Williams handcuffed Mr. Brye behind his back and led him out of his housing block, where Mr. Brye was approached by Defendant Kirkland and John Does #5-6.   Defendants Rothwell, Williams, Brishinsky, and John Does #5-6 surrounded Mr. Brye, who was still handcuffed, and took him to a stairwell.  As Mr. Brye was escorted down the stairs in front of the officers, Mr. Brye was struck from behind twice with a hard object, first on his neck and then on his head.  He was struck with so much force that the blow to his head caused him to lose consciousness.

68.     When Mr. Brye regained consciousness, he was on the floor of the intake pen in an area that had a shower.  Mr. Brye was lying face-down on the ground, with his hands still handcuffed behind his back.  He was bleeding profusely from his head.  Although Mr. Brye posed no threat to anyone, Defendant John Doe #7 sprayed Oleoresin Capsicum spray ("OC spray") in Mr. Brye's face.  Mr. Brye's handcuffs were then removed, and the shower was turned on.  Mr. Brye was

41

unable to move his body.  A John Doe officer directed Captain Blake to call medical, because "the last thing we need in here is a corpse." Eventually, Mr. Brye was transported to the clinic at AMKC, where he was examined and medical personnel informed him that he had a "handball" sized hematoma that was bleeding on his head.

69.    Mr. Brye was transported by ambulance to Elmhurst Hospital.  A cervical spine CT taken at Elmhurst showed that Mr. Brye had suffered severe injuries to his spine.  The following day, he was transferred to Bellevue Hospital for further evaluation and treatment.  Mr. Brye underwent anterior cervical disectomy and fusion surgery at Bellevue on July 11, 2011. Mr. Brye remained at Bellevue for approximately four days for post-operative care.

70.    After he was discharged from Bellevue Hospital, Mr. Brye was taken back into the general inmate population and left in the intake area for approximately 20 hours.  During this time, Mr. Brye was left on a narrow slab made of concrete and steel until he was transported to the infirmary. Within about two weeks of having a major spinal surgery, Mr. Brye was removed from the infirmary and returned to the general inmate population.  Mr. Brye received none of the required physical therapy in the weeks immediately following his surgery.

71.    Mr. Brye has been left with life-altering and debilitating injuries.  His left side remains weak; both his left leg and left arm are weak.  He cannot walk without limping.  He cannot run, participate in sports, or walk any distance without using a cane.  Mr. Brye's injuries may be permanent and he may require a cane for the rest of his life.

72.    On February 29, 2012, Mr. Brye was assaulted a second time.  While waiting to see health clinic staff at GRVC, Mr. Brye encountered Defendant Officer Leonard, who insinuated that Mr. Brye did not need medical treatment.  Defendant Leonard then confiscated Mr. Brye's cane without justification.  Defendant Majors refused to return the cane to Mr. Brye and directed him to

go to an intake pen.  Defendant Leonard entered Mr. Brye's pen and, unprovoked, punched him in the face. Three other uniformed officers, Defendants Officer Salley and John Does #8-9, entered Mr. Brye's pen.  Defendant Salley placed Mr. Brye in a body hold, handcuffed him behind his back, and slammed Mr. Brye's face into the floor, injuring his forehead, mouth, and eye. Defendant Salley kicked Mr. Brye.  Even though Mr. Brye was not to be rear-cuffed because of his medical condition caused by the prior beating, the officers then maliciously left Mr. Brye rear-cuffed and leg-shackled in a locked pen for an extended period of time.

73.     As a result of his this second beating, Mr. Brye's original injuries were exacerbated, particularly his neck pain.  He also suffered cuts, bruises, and scrapes as a result of the second unjustified attack.

74.     Mr. Brye did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Brye did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Williams, Majors, Kirkland, Rothwell, Brishinsky, Leonard, Salley, and Doe Defendants #5-9 was malicious, intended to and did cause harm and physical injury to Mr. Brye, and manifested deliberate indifference to Mr. Brye's rights and physical well-being.  Defendants Williams, Majors, Kirkland, Rothwell, Brishinsky, Leonard, Salley, and Doe Defendants #5-9 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Brye.

**Shameik Smallwood**

75.     Shameik Smallwood is a citizen of the United States and is currently incarcerated at GRVC on Rikers Island.  On July 29, 2011, while incarcerated at AKMC, Mr. Smallwood was brutally beaten by DOC staff members.

76.     On July 29, 2011, Mr. Smallwood was visiting a friend in the visitation area of AMKC. His visit was interrupted when Defendant Davies and a female corrections officer, Doe Defendant #10, rushed over to Mr. Smallwood to prevent what they believed to be a transfer of contraband. Although Mr. Smallwood obeyed Defendant Davies' order to stand up, Defendant Davies placed Mr. Smallwood in a "full nelson" restraint by wrapping his arms under Mr. Smallwood's armpits and behind his neck. Doe Defendant #10 arrested Mr. Smallwood's visitor.

77.     Defendant Davies grabbed Mr. Smallwood's legs and lifted him off the ground, while Defendants Davis and Doe Defendant #11 (a male correction officer) assisted Defendant Davies to carry Mr. Smallwood out of the visitation area and into a small windowless room between the visitation area and the inmate search area.  Mr. Smallwood is approximately 5'7" or 5'8" in height. On information and belief, Defendant Davies is approximately 6'5" tall and Defendant Davis is approximately 5'9" tall.

78.     The small windowless room where Mr. Smallwood was taken had no video cameras.

79.     In the small windowless room, Defendant Davis, Defendant Davies, and Doe Defendant #11 threw Mr. Smallwood down to the floor face-first, handcuffed his hands behind his back, and began to beat Mr. Smallwood out of the sight of the other inmates and visitors.  Defendants Alston (who is approximately 6'2" tall) and Doe Defendants #12-13 joined the assault.  Defendant Davies, Davis, Alston, and Doe Defendants #11-13 punched, kicked, stomped and maced Mr. Smallwood's face, ribs, and back while Mr. Smallwood lay handcuffed on his stomach.  They inflicted multiple blows to his head, face, back and ribcage.  Throughout the beating, a male captain, Doe Defendant #14, stood in the room and watched as the other corrections officers beat Mr. Smallwood.  Doe Defendant #14 did not stop the beating.

80.     Defendant Davies took his hand-held radio and used it to hit Mr. Smallwood in the face,

44

thereby cutting him above his right eye. Mr. Smallwood lost consciousness as a result of being hit by Defendant Davies with the hand-held radio.

81.     Mr. Smallwood regained consciousness in the AMKC clinic. His right eye was swollen shut. He had a laceration over his right eye, swelling in his right cheek, a bloody nose, scratches, a contusion over his right ribs, and felt extreme pain in his torso.

82.     Mr. Smallwood was taken by ambulance to Elmhurst Hospital Center Emergency Services. At Elmhurst Hospital, Mr. Smallwood was diagnosed with a fracture of the right maxillary sinus, including the orbital floor and medial menisci sinus wall, with downward displacement of the orbital fat and oblique muscle. This injury caused acute, severe pain.

83.     Mr. Smallwood was subsequently taken to Bellevue Hospital to undergo facial surgery and the implantation of a metal plate for his orbital floor fracture. After his surgery, Mr. Smallwood spent several weeks at the North Infirmary Command ("NIC") on Rikers Island to recover. He required a cane to walk and a neck brace for his stiff neck.

84.     As a result of the assault and orbital fracture, Mr. Smallwood continues to suffer physical and emotional injuries, including chronic pain and soreness in his right eye and face, and back pain.

85.     Mr. Smallwood did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail. Mr. Smallwood did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used. The conduct of Defendants Davies, Davis, Alston, and Doe Defendants #10-14 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Smallwood, and manifested deliberate indifference to Mr. Smallwood's rights and physical well-being. Defendants Davies, Davis, Alston, and Doe Defendants #10-14

failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Smallwood.

**Travis Woods**

86.     Mr. Woods is a citizen of the United States and is currently detained at the Metropolitan Detention Center, a DOC-operated jail. On or about March 17, 2011, at the time DOC staff assaulted him, Mr. Woods was detained at GRVC.  A few days prior to the assault, Mr. Woods was given a false infraction by Defendant Behari, which was later dismissed based on surveillance footage that revealed the charges to be false.

87.     On or about the morning of March 17, 2011, Mr. Woods was escorted to the medical clinic by Defendants Dean and Sistrunk several hours after he complained of severe chest pain. Defendants Dean and Sistrunk placed Mr. Woods in protective mitts and shackles.  Upon arrival at the clinic, Defendant Dean placed Mr. Woods in an examination room, removed his ankle restraints, protective mitts, and handcuffs, and then cuffed one of Mr. Woods' hands to an examination bed.

88.     After Dr. Ranjan, a clinic doctor, rebuffed his inquiry about physical therapy, Mr. Woods pushed a waist-high partition next to his bed.  Defendant Dean then uncuffed Mr. Woods' hand from the examination bed.  Mr. Woods stood up and indicated to Defendant Dean that he would tie his shoes.  Defendant Dean pointed his OC spray at Mr. Woods as if to deploy it.  To protect himself from being sprayed, Mr. Woods picked up a chair and placed it in front of his face.

89.     Defendants Dean, Williams, Orlandi, and Leonard, who had also entered the room, grabbed the chair while swinging their fists and punching Mr. Woods around the chair.  These Defendants pushed Mr. Woods to the ground and beat his head and body with their fists and feet. The extraction team, Defendants John Doe #15-24, arrived in the examination room and hit Mr. Woods several times while applying ankle restraints.  The extraction team grabbed Mr. Woods by

his rearcuffs and ankle restraints, lifted him off of the ground, and carried him to a gurney.

90.    While on the gurney, Mr. Woods observed Defendants Arkhurst, Hughes, Massey (a captain), Ramos (an Assistant Deputy Warden), and Behari (a captain) in the clinic area.  Mr. Woods heard Defendant Ramos say, "It's on and poppin' now."  Mr. Woods observed several officers, including Defendants Arkhurst and Hughes, putting on rubber gloves.

91.    Mr. Woods was taken into a cubicle with walls high enough to hide what occurred inside the cubicle.  Defendant Behari stated, in reference to Mr. Woods, "If he acts like he can't walk, drop him on his face."  Mr. Woods complied with Defendants Hughes and Arkhurst's order to get on his knees and face the wall.

92.    Defendant Williams returned to scene and falsely accused Mr. Woods of hitting her Defendants Arkhurst and Hughes then punched Mr. Woods' head and face repeatedly with their fists while Defendants Ramos, Behari, and Sistrunk looked on.  Defendant Ramos and John Doe #25 sat outside the cubicle in full sight of the assault on Mr. Woods, but pretended to talk to each other and ignore the assault.  The beating stopped temporarily when Defendant Behari noticed others in the vicinity of the cubicle, but continued after these other people left the area.

93.    At one point, a male, dark-skinned doctor entered the cubicle to examine Mr. Woods for a "use of force" report related to the events in the examination room.  After Defendant Hughes and Mr. Woods exchanged words, Defendant Hughes became enraged, grabbed Mr. Woods, and began to hit him.  The doctor, realizing that Mr. Woods would be hit again, rushed out of the cubicle. Defendants Hughes and Arkhurst resumed beating Mr. Woods, but this time they applied significantly more force.  Defendant Behari kicked Mr. Woods several times.

94.    Defendants Arkhurst or Hughes struck Mr. Woods in his right ear with either their fist or a hand-held radio.  Mr. Woods heard a loud popping noise followed by ringing in his ear.  He

47

became dizzy and confused.  Shortly after he was hit in the ear, the beating stopped.  Defendant Hughes threatened Mr. Woods not ask for medical care or he would be beaten again.

95.    Despite Mr. Woods' visible injuries (facial swelling, bruises on his face, wrists, ankles, and body, a bloody lip), and a doctor's opinion that he needed x-rays, Defendant Hughes refused to allow Mr. Woods to go to Urgi-care.  Finally, Defendant Behari allowed Mr. Woods to be taken to Urgi-Care.  Defendants Behari, Arkhurst, and Hughes, all of whom had beaten Mr. Woods, escorted to him Urgi-care, remained present during his Urgi-care exam, and threatened him. Mr. Woods refused x-rays because he was fearful of further physical abuse by Defendants.  Upon his return to GRVC, Defendant Hughes told Mr. Woods, in sum or substance, "You did good. I thought I'd have to close up your other eye."

96.    Mr. Woods subsequently requested medical attention and was taken to the GRVC clinic the next morning.  At the GRVC clinic and Urgi-care, Mr. Woods' various injuries were noted: large periorbital swelling, large swelling over his entire forehead and areas of his scalp, large swelling and tenderness on his right mandible, difficulty opening and closing his mouth, and a dozen scratches of 1.5 centimeters-long beneath his left eye.

97.    Mr. Woods was taken to Bellevue Hospital for a CT Scan.  There, an examination showed that Mr. Woods had suffered a perforation of his right tympanic membrane and lacerations and contusions to his lower lip and cheek.  A CT scan of Mr. Woods' face demonstrated extensive facial swelling around his eyes, cheeks, and jaws.

98.    To this day, Mr. Woods suffers physical and emotional injuries as a result of his assault, including painful ringing and noises in his ear and diminished hearing.

99.    Despite the severe injuries to Mr. Woods and the unprovoked nature of the Defendants' assault, Mr. Woods was given an infraction and found guilty of assault on staff.  He was sentenced

to 115 days in punitive segregation.

100.    Mr. Woods did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Woods did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendants Dean, Williams, Orlandi, Leonard, Hughes, Massey, Ramos, Behari, Sistrunk, Arkhurst, and Defendants John Does #15-25 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Woods, and manifested deliberate indifference to Mr. Woods's rights and physical well-being. Defendants Dean, Williams, Orlandi, Leonard, Hughes, Massey, Ramos, Behari, Sistrunk, Arkhurst, and Defendants John Does #15-25 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Woods.

## Ralph Nunez

101.    Mr. Nunez is a citizen of the United States and is currently incarcerated in New York State custody in Sing Sing Correctional Facility.  On or about November 3, 2011, Mr. Nunez was assaulted by DOC staff while he was incarcerated at OBCC.

102.    On or about November 3, 2011, Nunez was visiting his girlfriend in the visitation area of the CPSU of OBCC.  Mr. Nunez sat in a "cage" in the visitation area and was separated from Ms. Delgado by a waist-high plastic divider.  Due to difficulties hearing one another, Mr. Nunez and Ms. Delgado leaned towards each other, but did not touch the divider.  Defendant Thompson instructed Mr. Nunez to lean back and became increasingly agitated.

103.    Without warning, Defendant Thompson and Defendant Quinn rushed into Mr. Nunez's visitation cage.  Unprovoked, Defendant Thompson grabbed Mr. Nunez by the throat with both hands, slammed him against the side of the cage, and then punched and choked him. Defendant

49

Quinn punched Mr. Nunez in the head, torso, and shoulders. While Defendants Thompson and Quinn beat Mr. Nunez, they dragged him out of the cage. Defendant Thompson grabbed Mr. Nunez by the throat, picked him up and slammed him against a gate in the visitor's area. Defendant Thompson choked Mr. Nunez, while yelling at him, in sum or substance, "I'm going to kill you." Finally, Defendant Quinn grabbed Mr. Nunez by his legs and sent him down to the floor, where he landed on his back and head. The back of Mr. Nunez's head smashed on to the tile floor. While Mr. Nunez was on the floor, Defendant Thompson pulled on his badge as if he were trying to rip it off his uniform and said, in words or substance, "Do you think I care about this job? I will kill you."

104. Ms. Delgado and other inmates in the visitation area witnessed the beating and begged Defendants Thompson and Quinn to stop. When Defendant Thompson realized that Ms. Delgado had witnessed the assault, he ordered another officer to "cuff that bitch, too." Ms. Delgado was then arrested without probable cause by DOC staff members.

105. Defendants Thompson and Quinn's beating of Mr. Nunez only ceased when he was handcuffed. Mr. Nunez lost consciousness briefly while being handcuffed, and again after the probe team escorted him to the intake area.

106. Mr. Nunez was taken to the mini-clinic, where he was dizzy, vomiting, losing his vision, and may have lost consciousness. Mini-clinic staff sent him to the Urgi-care facility for diagnosis. The Urgi-care facility sent Mr. Nunez to East Elmhurst Hospital by ambulance. At East Elmhurst Hospital, Mr. Nunez was diagnosed with a concussion. He vomited while at the emergency room and had to undergo a CAT scan.

107. As a result of the assault, Mr. Nunez was diagnosed with a serious concussion, contusions and swelling around his right eye, contusions and lacerations to his face, scalp, neck and chest

wall, and pain in his back and neck.  DOC staff members noted that Mr. Nunez possessed a right

periorbital ecchymosis and edema, and multiple abrasions and contusions of his neck and upper

torso. Since the assault, Mr. Nunez has been diagnosed with post-concussional syndrome.

108.    Despite the severe injuries to Mr. Nunez and the unprovoked nature of the Defendants'

assault, Mr. Nunez was given an infraction for allegedly assaulting Defendant Thompson.  He was

sentenced to more than 20 days in punitive segregation.

109.    Mr. Nunez did not assault or attempt to assault any officer nor did he present a threat to the

personal safety of any officer or to the security of the jail.  Mr. Nunez did not provoke the assaults,

nor did he conduct himself in any manner that would warrant any use of force, much less the

unnecessary and excessive force actually used.  The conduct of Defendants Thompson and Quinn

was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Nunez, and

manifested deliberate indifference to Mr. Nunez's rights and physical well-being.  Defendants

Thompson and Quinn failed to intervene to prevent the assaults on, or prevent further injury to,

Mr. Nunez.

**Keith Bacote**

110.    Mr. Bacote is a citizen of the United States and is currently incarcerated in New York State

custody at Mid-State Correctional Facility.  On at least two separate occasions while he was

detained at GRVC, or about April 15, 2011 and October 20, 2011, Mr. Bacote was seriously

assaulted by DOC staff members.

111.    On or about April 15, 2011, Mr. Bacote was in his cell when Defendant Arkhurst[1] entered

his cell, placed his hands around Mr. Bacote's neck and choked him.  He hit Mr. Bacote's face with

his hand.  He screamed at Mr. Bacote, in sum or substance, "Don't move. When I say to be quiet,

---

[1] Defendant Arkhurst is also alleged to have beaten Travis Woods.  See paragraph 92, infra.

you be quiet." Defendant Arkhurst then grabbed Mr. Bacote and forcibly pushed him to the mattress. Defendants Doe #26 and John Doe #27 joined Defendant Arkhurst and all hit Mr. Bacote's head and face repeatedly with their hands and fists. Defendant Doe #27 used his hand-held radio to strike Mr. Bacote's head several times. By this time, several other corrections officers had arrived at Mr. Bacote's cell. One officer, Defendant Doe #28, held a video camera, but pointed it towards the ground. After repeatedly striking Mr. Bacote, Defendant Arkhurst cuffed him and walked him out of the housing area. While Mr. Bacote walked through the housing area, Defendant Doe #26 or #27 hit Mr. Bacote in the face. Defendant Arkhurst dragged Mr. Bacote several feet using only Mr. Bacote's handcuffs to pull his entire body.

112.    Rather than being taken to the clinic, Mr. Bacote spent the rest of the night in an intake cell. The next morning Mr. Bacote was taken to the GRVC clinic and then sent to Urgi-care to receive treatment. DOC medical staff documented that Mr. Bacote had a hematoma and tenderness on his scalp, bruising on his face, contusions on his chest, tenderness to his right rib, and swelling, contusions and extreme swelling on his left forearm and chest. X-rays revealed that Mr. Bacote's left wrist was fractured.

113.    Despite the severe injuries to Mr. Bacote and the unprovoked nature of the Defendants' assault, Mr. Bacote was given an infraction for allegedly assaulting a corrections officer. He was sentenced to 105 days in punitive segregation.

114.    On the morning of October 20, 2011, Defendant Remy arrived at Mr. Bacote's cell and cuffed him so that Mr. Bacote could be transported for a counsel visit in Manhattan. Mr. Bacote was strip searched and passed through a magnometer. After the strip search, Mr. Bacote was rear-cuffed, with palms facing out. Defendant Remy—eventually joined by Defendants Soto and Buttons—escorted Mr. Bacote to the GRVC programs area. Defendants Soto, Buttons, and Remy

proceeded to take Mr. Bacote through a shortcut to the intake area where there were no video cameras.  Defendant Soto began swinging his fists towards Mr. Bacote to punch him. Defendant Remy released Mr. Bacote, while Defendant Buttons grabbed him from the back of his shirt and slammed him on to the floor face-first. Mr. Bacote's chin split and began to bleed from the impact on the floor.  Defendant Soto attempted to kick Mr. Bacote.  Defendants Bravo, Baiardi (a security captain), Dunbar (a captain), and Santiago emerged from another room and also kicked, stomped, and hit Mr. Bacote as he lay on the floor.  Defendant Soto jumped on Mr. Bacote's back.  Defendant Santiago repeatedly punched Mr. Bacote in the face.  Defendant John Doe #29, a programs area corrections officer, arrived and joined in the assault by hitting Mr. Bacote.  Mr. Bacote tried to turn his face away from the punches, but soon lost consciousness. When Mr. Bacote regained consciousness, he was in the medical clinic. Defendant Santiago was also present and smacked Mr. Bacote's face several times while Mr. Bacote was on a stretcher.  Thereafter, he lost consciousness again and awoke at East Elmhurst Hospital.

115.    At Elmhurst, Mr. Bacote presented with a laceration to his chain, swelling to his left eye and his forehead.  He had difficulty opening his left eyelid and decreased vision. He was diagnosed with an orbital floor fracture in his left eye and a nasal fracture.  He received six stitches to close up his laceration.  Subsequent examinations by DOC medical staff revealed that Mr. Bacote may have suffered nerve damage in his left eye. To this day, Mr. Bacote has trouble seeing out of his left eye and experiences headaches from bright light.

116.    Despite the unprovoked nature of his assault by DOC staff members, Mr. Bacote received an infraction based on the allegation that he assaulted Defendant Soto on October 20, 2011.  At the disciplinary hearing, Mr. Bacote testified that he had been rear-cuffed throughout the alleged assault on Defendant Soto.  Even so, the hearing officer sentenced Mr. Bacote to 90 days in

punitive segregation as punishment for the alleged infraction.

117.    Mr. Bacote did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Bacote did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendants Arkhurst, Remy, Soto, Buttons, Bravo, Baiardi, Dunbar, Santiago and Doe Defendants #26-29 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Bacote, and manifested deliberate indifference to Mr. Bacote's rights and physical well-being.  Defendants Arkhurst, Remy, Soto, Buttons, Bravo, Baiardi, Dunbar, Santiago and Doe Defendants #26-29 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Bacote.

**Jose DeGros**

118.    Jose DeGros is currently incarcerated in New York State custody in Adirondack Correctional Facility.  On or about September 16, 2011, while incarcerated at AMKC, Mr. Degros was brutally assaulted by DOC staff members.

119.    On September 16, 2011, Mr. DeGros attended medication call.  Defendant Tutein (first name unknown, African-American) ordered him to return to his cell.  While Mr. DeGros was in a corridor on the way back to his cell, without any justification or provocation, Defendant Lamar (first name unknown, African-American) punched Mr. DeGros in the face.  Defendants Lamar, Tutein, and Brishinsky,[2] with the assistance of Doe Defendants #30-34, threw Mr. DeGros to the ground.  All Defendants beat Plaintiff brutally, repeatedly punching and kicking him while he was on the ground.  Defendants also maced Mr. DeGros while he was on the floor.  Other Doe

---

[2]Defendant Brishinsky is alleged to have beaten Rodney Brye, see paragraph 67, supra, and another DOC inmate who filed a civil action in 2008.  See paragraph 49, supra.

Defendants witnessed this beating.

120.    Upon information and belief, some or all of the incident was videotaped, and the tape preserved, according to the Department of Correction.

121.    Defendants Lamar, Tutein, Brishinsky, and Doe Defendants #30-34 stopped beating Mr. DeGros when a DOC captain appeared on the scene.  Mr. DeGros was then sent to the showers to remove his bloody clothes and rinse off his bloodied and beaten body.  Eventually, Mr. DeGros was sent to Elmhurst Hospital Center for emergency medical care.

122.    As a result of this assault, Mr. DeGros suffered serious physical and emotional injuries, including an orbital floor fracture in his right eye which blurred his vision, a laceration to his left eyebrow requiring sutures to repair, injury to his lower jaw, and multiple cuts and bruises to his face and body.  Mr. DeGros also lost consciousness as a result of the injury.  Mr. DeGros continues to suffer physical and emotional injuries as a result of this assault.

123.    On information and belief, Mr. DeGros was sentenced to over 200 days in punitive segregation after being wrongfully accused of assaulting the staff who beat him.

124.    Mr. DeGros did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. DeGros did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendants Brishinsky, Tutein, Lamar, and Doe Defendants #30-34 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. DeGros, and manifested deliberate indifference to Mr. DeGros's rights and physical well-being.  Defendants Brishinsky, Tutein, Lamar, and Doe Defendants #30-34 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. DeGros.

**Christopher Graham**

125.    Christopher Graham is a citizen of the United States and currently resides in Queens County, New York.  On or about September 14, 2011, while in the custody of DOC in the Queens Criminal Court, Mr. Graham was brutally beaten by DOC staff.

126.    On the morning of September 14, 2011, Mr. Graham was brought to Queens Criminal Court for a court appearance in his criminal case.  Despite paperwork in DOC's possession requiring Mr. Graham to be placed in single-occupancy cells, he was placed into a crowded cell along with approximately four (4) to five (5) other inmates who were awaiting court appearances.

127.    Mr. Graham asked Defendant Baillie, a correction officer outside his cell, for his medication.  Defendant Baillie allowed Mr. Graham to exit the cell.  Once Mr. Graham exited the cell, without any provocation, Defendant Baillie punched Mr. Graham on his right jaw.  Defendant Baillie then grabbed Mr. Graham's arm, twisted it behind Mr. Graham's back, and forced him to the ground. While Mr. Graham was on the ground, Defendant Baillie brutally and viciously punched Mr. Graham multiple times on the right side of his face.  After savagely beating Mr. Graham, Defendant Baillie yanked Mr. Graham off of the floor and threw him into a single-occupancy cell.

128.    Mr. Graham did not receive medical attention, food, or water and was left alone in a cell for approximate six to seven hours.  Mr. Graham was bleeding profusely and spitting up blood, and his face was severely bruised and swollen.  Mr. Graham was then returned to Rikers Island, where he was brought to the medical clinic and underwent x-rays.

129.    X-rays taken at Rikers Island indicated that Mr. Graham sustained a sprained mandible as a result of the vicious assault.  An abscess of oral tissue was also observed in Mr. Graham's mouth. Mr. Graham was taken to Bellevue Hospital, where he was diagnosed with three acute mandibular

fractures.

130.    Mr. Graham underwent reconstructive surgery of his jaw, requiring the implantation of reconstruction plates, heavy elastics, and wires.  His jaw remained wired for more than 10 weeks following the brutal assault. Mr. Graham continues to suffer physical and emotional injuries, including difficulty chewing foods.

131.    Mr. Graham did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Graham did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendant Baillie was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Graham, and manifested deliberate indifference to Mr. Graham's rights and physical well-being.

**Sonny Ortiz**

132.    Sonny Ortiz is a resident of Kings County, New York.  On September 5, 2011, while incarcerated at VCBC, Mr. Ortiz was brutally beaten by DOC staff members.

133.    On the evening of September 5, 2011, Mr. Ortiz was in the VCBC dayroom with fellow inmate, David Salgado, while Defendant Gutierrez was asleep.  Another inmate, Chris Figueroa, entered the Dayroom, approached Mr. Ortiz, spit in his face, and punched him.  When Mr. Ortiz defended himself against Mr. Figueroa, an altercation ensued.  During the altercation, Defendant Gutierrez woke up and sprayed both Mr. Ortiz and Mr. Figueroa with OC spray.  Defendant Gutierrez then pushed Mr. Ortiz and Mr. Figueroa out of the dayroom and into the area between the dormitory's two houses and in front of the "bubble."  Defendant Gutierrez told Doe Defendant #35, who was in the bubble at the time, to "pull the pin."

134.    After Mr. Ortiz and Mr. Figueroa complied with Defendant Gutierrez's order to get on

their knees and put their hands above their heads, Defendant Gutierrez punched them both multiple times in the ribs. Defendant Gutierrez struck Mr. Ortiz with his baton twice on his upper back and the back of his head. The force of the baton strike to Mr. Ortiz's head delivered by Defendant Gutierrez caused Mr. Ortiz's head to slam into the jail bars in front of him.

135.    When Doe Defendants #36 and #37 arrived on the scene in riot gear, Doe Defendant #36 pushed Mr. Ortiz's head into the jail bars, jerked Mr. Ortiz's arm behind his back, and then yanked him to his feet by his arm. Doe Defendant #36 forced Mr. Ortiz down a flight of stairs to another hallway, where he received instructions from Doe Defendant #38 (a Hispanic captain), and violently slammed Mr. Ortiz's head into the wall.

136.    Mr. Ortiz was taken to the intake area, where he was ordered to strip naked and thrown into a shower where scalding hot water was poured on his body. Mr. Ortiz protested that he could not breathe because of his asthma, but was forced to remain in the shower. Mr. Ortiz was taken from the intake to the infirmary. Doe Defendant #38 (a Hispanic captain) and Defendant Fadima came to see Mr. Ortiz, demanded that he sign a "Statement" that all of his injuries were caused by his altercation with Mr. Figueroa, and threatened him with severe consequences if he did not sign. Mr. Ortiz refused to sign the "Statement."

137.    Mr. Ortiz was taken to Bellevue Hospital, where he was diagnosed with a concussion and pain, bruising and swelling in his face, his right ankle and the left side of his ribs. It was also documented that Mr. Ortiz suffered from post-concussive stuttering.

138.    On September 7, 2011, Defendant Fadima again presented Mr. Ortiz with a pre-written "Statement" (not written by Mr. Ortiz) that the injuries Mr. Ortiz sustained while being viciously beaten by DOC officers were actually the result of his altercation with Mr. Figueroa, and that Defendant Gutierrez had been injured by Mr. Ortiz and Mr. Figueroa. Defendant Fadima

58

threatened Mr. Ortiz that if he did not sign the "Statement" he would be brought back to the jail's intake area and then placed in solitary confinement.  Feeling as if he had no other choice, Mr. Ortiz signed Defendant Fadima's "Statement."

139.    Mr. Ortiz continues to suffer physical and emotional injuries, including continuing to suffer from a severe speech impediment, as a result of this assault.  He has had to receive treatment and therapy on numerous occasions to attempt to rectify his speech impediment.

140.    Mr. Ortiz did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Ortiz did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendants Fadima, Gutierrez, and Doe Defendants #35-38 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Ortiz, and manifested deliberate indifference to Mr. Ortiz's rights and physical well-being.  Defendants Fadima, Gutierrez, and Doe Defendants #35-38 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Ortiz.

**<u>Clifford Sewell</u>**

141.    Plaintiff Clifford Sewell is a citizen of the United States and is currently incarcerated in New York State custody in Sullivan County, New York.  On or about February 28, 2011, at the time DOC staff assaulted him, Mr. Sewell was detained at RNDC after being transferred there from Ulster Correctional Facility to RNDC for a court appearance.

142.    On or about February 28, 2011, Mr. Sewell was taking a shower, naked and alone.  He overheard other inmates outside the shower area shouting "stupid bitch."  Suddenly, Defendants Jones, Gregg, and John Doe #39 ran into the shower area, surrounded Mr. Sewell, and accused him of insulting a captain.  Mr. Sewell explained that he had not done so.

143.    Despite his response, Defendant Gregg punched Mr. Sewell below his left eye with his badge in his hand.  Defendant Gregg's blow caused Mr. Sewell to lose his balance in the shower and fall.  Defendant Gregg got on top of Mr. Sewell and punched Mr. Sewell in the head and face multiple times with his fists.  Defendant Gregg held Mr. Sewell up, exposing his torso, and invited Defendants Jones and John Doe #39 to hit Mr. Sewell.  Defendant Jones and Defendant John Doe #39 then hit and kicked Mr. Sewell repeatedly in the torso, chest, and ribs.  Defendant John Doe #39 hit Mr. Sewell with something that felt like a stick.  Defendant Jones kicked Mr. Sewell in the groin several times while Defendant John Doe #39 and Defendant Gregg held him immobile.   On information and belief, there are no cameras in the shower area at RNDC.

144.    After losing consciousness briefly, Mr. Sewell awoke to find himself surrounded by a "probe team" of approximately twenty DOC officers, Defendants John/Jane Does #40-59.  After he was handcuffed, Defendant John Doe #40 sprayed OC spray in his face.

145.    Mr. Sewell was then taken by Defendants John/Jane Does #40-59 to an intake cell, where he was photographed before being held there for several hours without medical attention.  He passed blood in his urine.

146.    As a result of the assault, Mr. Sewell suffered bruised ribs and sustained two lacerations, one on the left side of his face and one on the left side of his scalp.  The laceration on his scalp required stitches and the laceration on his face had to be closed with dermabond.

147.    Mr. Sewell continues to suffer physical and emotional injuries as a result of the assault, including pain in his eyes, fuzzy vision, reduced vision, nightmares, anxiety, depression, insomnia, and post-traumatic stress disorder

148.    Mr. Sewell did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Sewell did not provoke the assaults,

nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used. The conduct of Defendants Jones, Gregg, and Doe Defendants #39-59 was malicious and sadistic, intended to and did cause harm and physical injury to Mr. Sewell, and manifested deliberate indifference to Mr. Sewell's rights and physical well-being. Defendants Jones, Gregg, and Doe Defendants #39-59 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Sewell.

**Leslie Pickering**

149.    Plaintiff Leslie Pickering (a.k.a. Leslie Pickerson) is a citizen of the United States and currently resides in Bronx County, New York. On or about November 7, 2009, while incarcerated at GRVC, Mr. Pickering was brutally beaten by DOC staff members.

150.    On November 5, 2009, Mr. Pickering requested a haircut to prepare for a court appearance, which was refused by the corrections officer in charge of haircuts. When Mr. Pickering protested, corrections officer Adams falsely told Captain Vaughn that Mr. Pickering threatened to "cut" her if he did not get a haircut. Mr. Pickering denied making the threat and was corroborated by corrections officer Vesa. Mr. Pickering verbally expressed his frustration regarding the false accusation.

151.    Early in the morning of November 7, 2009, Mr. Pickering was awakened while sleeping in his bed by Defendant Sloly smashing a radio into his face. Defendant Sloly straddled Mr. Pickering in bed and struck him multiple times around the head and torso with his radio. Defendant Sloly's blows were so forceful that the battery fell out of his radio. After his radio broke, Defendant Sloly continued to hit Mr. Pickering using his fists and smacked him hard across

the left ear with an open palm.  Officer Pean[3] also struck Mr. Pickering repeatedly with his fists

multiple times around the head and torso.  Defendant Sloly told Mr. Pickering: "You disrespected

my lady!"  During the entire assault, Mr. Pickering lay prone on his bed and was clothed in only his

boxers and his socks.

152.     Defendants Sloly and Pean left Mr. Pickering's cell.  When Mr. Pickering entered the

dayroom, he heard them say, in sum and substance: "You disrespect females, this is what we gotta

do."  Defendant Sloly then punched Mr. Pickering in the nose.  Officer Pean jumped on top of him,

choking him.  Mr. Pickering dropped to the ground, while Officer Pean continued choking him.

On information and belief, a probe team including Defendants Doe #60-64 was present in the

dayroom (responding to an unrelated incident) at the time Defendant Sloly and Officer Pean were

assaulting Mr. Pickering, did not stop the assault, and instead joined Defendants Sloly and Officer

Pean in cuffing Mr. Pickering.

153.     Mr. Pickering was taken to intake, where Captain Medina took pictures of him, but told

him to close his mouth to hide his injuries.  Mr. Pickering heard Captain Medina tell Defendant

Sloly and Officer Pean that they should have beaten him in the back of the intake section, where

there were no cameras.

154.     Mr. Pickering was sentenced to punitive segregation after being wrongfully accused of

assaulting the staff who beat him.

155.     As a result of these assaults, Mr. Pickering lost a tooth, required stitches to his lip, fractured

his nose, and sustained severe pain to his jaw and hearing loss and tinnitus in his ear. which persist

to this day.  He continues to suffer physical and emotional injuries, including difficulty hearing and

dental treatment and surgery to replace the lost tooth.

---

[3] Officer Pean is now deceased and thus not a defendant in this action.

156.    Mr. Pickering did not assault or attempt to assault any officer nor did he present a threat to the personal safety of any officer or to the security of the jail.  Mr. Pickering did not provoke the assaults, nor did he conduct himself in any manner that would warrant any use of force, much less the unnecessary and excessive force actually used.  The conduct of Defendants Medina, Sloly, and Doe Defendants #60-64 was malicious and sadistic, intended to cause harm and physical injury to Mr. Pickering, and manifested deliberate indifference to Mr. Pickering's rights and physical well-being.  Defendants Medina, Sloly, and Doe Defendants #60-64 failed to intervene to prevent the assaults on, or prevent further injury to, Mr. Pickering.

**Plaintiffs Brye, Smallwood, Woods, Ralph Nunez, Bacote, DeGros, Graham, Ortiz and Sewell**

157.    Prior to the commencement of this action, and over thirty days ago, Plaintiffs Brye, Smallwood, Woods, Ralph Nunez, Bacote, DeGros, Graham, Ortiz, and Sewell filed and  served on the Comptroller of the City of New York verified Notices of Claim against the City of New York with respect to the conduct alleged herein.  To date, these claims have not been settled. Plaintiffs Brye, Smallwood, Woods, Ralph Nunez, Bacote, DeGros, Graham, Ortiz, and Sewell have commenced this action within one year and ninety days after the happening of the events upon which their claims are based.

## CLAIMS FOR RELIEF

**Class Representatives**

158.    Plaintiffs incorporate paragraphs 1-157, as is fully set forth herein.  Plaintiffs Brye, Smallwood, and Woods, and the class they represent, were deprived, and continue to be deprived, by Defendants Schriro, Finkle, Hourihane, LaBruzzo, Scott and the City of New York of their right

to be free from unnecessary and excessive force and punishment, and to due process of law, as guaranteed to them by the Eighth and Fourteenth Amendments to the United States Constitution, and the correlative provisions of the New York Constitution. These Defendants' conduct manifested deliberate indifference to the constitutional rights of Plaintiffs and the class.

Mark Nunez

159.    By reason of the foregoing paragraphs 60-65, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Johnson, Primm, Thomas, and Doe Defendants #1-4 deprived Mr. Nunez of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

160.    Defendants Duffy, Johnson, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. Nunez. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Nunez. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

161.    Defendant City, through DOC, and acting under the pretense and color of law, permitted,

64

tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Nunez's beating.  This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Nunez.  By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Nunez was subjected to a brutal beating, defendant City has deprived Mr. Nunez of rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Eighth and Fourteenth Amendments to be free from unnecessary and excessive force and retaliation.  As a direct and proximate result of the policy, practice and custom detailed above, Mr. Nunez sustained the damages alleged.

Rodney Brye

162.    By reason of the foregoing paragraphs 66-74, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Williams, Majors, Kirkland, Rothwell, Brishinsky, Leonard, Salley, and Doe Defendants #5-9 deprived Mr. Brye of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Brye sustained the damages alleged.

163.    Defendants Cripps, Agro, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the

time of the assault on Mr. Brye.  Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Brye.  These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Brye sustained the damages alleged.

164.    Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Brye's beating.  This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Brye.  By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Brye was subjected to a brutal beating, defendant City has deprived Mr. Brye of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation.  As a direct and proximate result of the policy, practice and custom detailed above, Mr. Brye sustained the damages alleged.

165.    In assaulting, battering, and threatening Mr. Brye, or standing by and failing to intervene when Mr. Brye was assaulted, Defendants Williams, Majors, Kirkland, Rothwell, Brishinsky, Leonard, Salley, and Doe Defendants #5-9, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Brye.  Defendants Cripps, Agro, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and employees were responsible for Mr. Brye's

assault and battery.  Defendant City, as employer of each of the Defendants, is responsible for their

wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the

misconduct and abuse of authority detailed above, Mr. Brye sustained the damages alleged.

166.    The conduct of Defendants Williams, Majors, Kirkland, Rothwell, Brishinsky, Leonard,

Salley, and Doe Defendants #5-9 and the conduct of Defendants Cripps, Agro, LaBruzzo, Finkle,

Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated

Mr. Brye's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment

and physical abuse.  Defendant City, as employer of each of the Defendants, is responsible for their

wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the

misconduct and abuse of authority detailed above, Mr. Brye sustained the damages alleged.

Shameik Smallwood

167.    By reason of the foregoing paragraphs 75-85, and by assaulting, battering, and using

unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other

Defendants from doing so, Defendants Davies, Davis, Alston, and Doe Defendants #10-14

deprived Mr. Smallwood of rights, remedies, privileges, and immunities guaranteed to every

person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the

Fourteenth Amendment to the United States Constitution to be free from unnecessary and

excessive force. Defendants acted under pretense and color of state law and within the scope of

their employments as DOC officers and employees.  As a direct and proximate result of the

misconduct and abuse of authority detailed above, Mr. Smallwood sustained the damages alleged.

168.    Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that

the pattern of physical abuse described above existed in the City jails prior to and including the

time of the assault on Mr. Smallwood.  Their failure to take measures to curb this pattern of

brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and

custody, including Mr. Smallwood. These defendants' conduct has been a substantial factor in the

continuation of such violence and a proximate cause of the constitutional violations alleged in this

complaint. As a direct and proximate result of the misconduct and abuse of authority detailed

above, Mr. Smallwood sustained the damages alleged.

169.    Defendant City, through DOC, and acting under the pretense and color of law, permitted,

tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation

by DOC staff at the time of Mr. Smallwood's beating. This widespread tolerance of correction

officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault

of the Mr. Smallwood. By permitting, tolerating and sanctioning a persistent and widespread

policy, practice and custom pursuant to which Mr. Smallwood was subjected to a brutal beating,

defendant City has deprived Mr. Smallwood of rights, remedies, privileges, and immunities

guaranteed to every citizen of the United States, secured by 42 U.S.C. § 1983, including, but not

limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and

excessive force and retaliation. As a direct and proximate result of the policy, practice and custom

detailed above, Mr. Smallwood sustained the damages alleged.

170.    In assaulting, battering, and threatening Mr. Smallwood, or standing by and failing to

intervene when Mr. Smallwood was assaulted, Defendants Davies, Davis, Alston, and Doe

Defendants #10-14, acting in their capacities as DOC officers, and within the scope of their

employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery

upon Mr. Smallwood. Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their

officers, agents, servants, and employees were responsible for Mr. Smallwood's assault and

battery. Defendant City, as employer of each of the Defendants, is responsible for their

wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Smallwood sustained the damages alleged.

171.    The conduct of Defendants Davies, Davis, Alston, and Doe Defendants #10-14 and the conduct of Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Smallwood's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Smallwood sustained the damages alleged.

Travis Woods

172.    By reason of the foregoing paragraphs 86-100, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Massey, Behari, Sistrunk, Ramos, Dean, Williams, Orlandi, Leonard, Hughes, Arkhurst, and Doe Defendants #15-25 deprived Mr. Woods of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Woods sustained the damages alleged.

173.    Defendants Ramos, Mulvey, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. Woods. Their failure to take measures to curb this pattern

of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care

and custody, including Mr. Woods. These defendants' conduct has been a substantial factor in the

continuation of such violence and a proximate cause of the constitutional violations alleged in this

complaint. As a direct and proximate result of the misconduct and abuse of authority detailed

above, Mr. Woods sustained the damages alleged.

174.    Defendant City, through DOC, and acting under the pretense and color of law, permitted,

tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation

by DOC staff at the time of Mr. Woods's beating. This widespread tolerance of correction officer

abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the

Mr. Woods. By permitting, tolerating and sanctioning a persistent and widespread policy, practice

and custom pursuant to which Mr. Woods was subjected to a brutal beating, defendant City has

deprived Mr. Woods of rights, remedies, privileges, and immunities guaranteed to every person of

the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed

under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation.

As a direct and proximate result of the policy, practice and custom detailed above, Mr. Woods

sustained the damages alleged.

175.    In assaulting, battering, and threatening Mr. Woods, or standing by and failing to intervene

when Mr. Woods was assaulted, Defendants Massey, Behari, Sistrunk, Ramos, Dean, Williams,

Orlandi, Leonard, Hughes, Arkhurst, and Doe Defendants #15-25, acting in their capacities as

DOC officers, and within the scope of their employment, each committed a willful, unlawful,

unwarranted, and intentional assault and battery upon Mr. Woods. Defendants Ramos, Mulvey,

LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and employees

were responsible for Mr. Woods's assault and battery. Defendant City, as employer of each of the

Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Woods sustained the damages alleged.

176.    The conduct of Defendants Massey, Behari, Sistrunk, Ramos, Dean, Williams, Orlandi, Leonard, Hughes, Arkhurst, and Doe Defendants #15-25 and the conduct of Defendants Ramos, Mulvey, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Woods's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse.  Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Woods sustained the damages alleged.

Ralph Nunez

177.    By reason of the foregoing paragraphs 101-109, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Thompson and Quinn deprived Mr. Nunez of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

178.    Defendants Ramos, Mirabal, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and

including the time of the assault on Mr. Nunez. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Nunez. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

179.    Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Nunez's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Nunez. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Nunez was subjected to a brutal beating, defendant City has deprived Mr. Nunez of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation. As a direct and proximate result of the policy, practice and custom detailed above, Mr. Nunez sustained the damages alleged.

180.    In assaulting, battering, and threatening Mr. Nunez, or standing by and failing to intervene when Mr. Nunez was assaulted, Defendants Thompson and Quinn, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Nunez. Defendants Ramos, Mirabal, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and employees were responsible for Mr. Nunez's assault and battery. Defendant City, as employer of each of the

Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

181.     The conduct of Defendants Thompson and Quinn and the conduct of Defendants Ramos, Mirabal, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Nunez's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Nunez sustained the damages alleged.

Keith Bacote

182.     By reason of the foregoing paragraphs 110-117, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Baiardi, Dunbar, Arkhurst, Remy, Soto, Buttons, Bravo, Santiago, and Doe Defendants #26-29 deprived Mr. Bacote of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Bacote sustained the damages alleged.

183.     Defendants Mulvey, Agro, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and

including the time of the assault on Mr. Bacote. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Bacote. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Bacote sustained the damages alleged.

184.    Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Bacote's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Bacote. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Bacote was subjected to a brutal beating, defendant City has deprived Mr. Bacote of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation. As a direct and proximate result of the policy, practice and custom detailed above, Mr. Bacote sustained the damages alleged.

185.    In assaulting, battering, and threatening Mr. Bacote, or standing by and failing to intervene when Mr. Bacote was assaulted, Defendants Baiardi, Dunbar, Arkhurst, Remy, Soto, Buttons, Bravo, Santiago, and Doe Defendants #26-29, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Bacote. Defendants Mulvey, Agro, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and employees were responsible for

Mr. Bacote's assault and battery. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Bacote sustained the damages alleged.

186.    The conduct of Defendants Baiardi, Dunbar, Arkhurst, Remy, Soto, Buttons, Bravo, Santiago, and Doe Defendants #26-29 and the conduct of Defendants Mulvey, Agro, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Bacote's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Bacote sustained the damages alleged.

<u>Jose DeGros</u>

187.    By reason of the foregoing paragraphs 118-124, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Brishinsky, Tutein, Lamar, and Doe Defendants #30-34 deprived Mr. DeGros of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. DeGros sustained the damages alleged.

188.    Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that

the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. DeGros. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. DeGros. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. DeGros sustained the damages alleged.

189.    Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. DeGros's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. DeGros. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. DeGros was subjected to a brutal beating, defendant City has deprived Mr. DeGros of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation. As a direct and proximate result of the policy, practice and custom detailed above, Mr. DeGros sustained the damages alleged.

190.    In assaulting, battering, and threatening Mr. DeGros, or standing by and failing to intervene when Mr. DeGros was assaulted, Defendants Brishinsky, Tutein, Lamar, and Doe Defendants #30-34, acting in their capacities as DOC officers, and within the scope of their employment, each committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. DeGros. Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their

officers, agents, servants, and employees were responsible for Mr. DeGros's assault and battery. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.* As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. DeGros sustained the damages alleged.

191.    The conduct of Defendants Brishinsky, Tutein, Lamar, and Doe Defendants #30-34 and the conduct of Defendants Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. DeGros's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior.* As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. DeGros sustained the damages alleged.

Christopher Graham

192.    By reason of the foregoing paragraphs 125-131, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendant Baillie deprived Mr. Graham of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendant acted under pretense and color of state law and within the scope of his employment as DOC officer and employee. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Graham sustained the damages alleged.

193.    Defendants LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of

the assault on Mr. Graham. Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Graham. These defendants' conduct has been a substantial factor in the continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Graham sustained the damages alleged.

194.     Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Graham's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Graham. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Graham was subjected to a brutal beating, defendant City has deprived Mr. Graham of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation. As a direct and proximate result of the policy, practice and custom detailed above, Mr. Graham sustained the damages alleged.

195.     In assaulting, battering, and threatening Mr. Graham, or standing by and failing to intervene when Mr. Graham was assaulted, Defendant Baillie, acting in his capacity as DOC officer, and within the scope of his employment, committed a willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Graham. Defendants LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and employees were responsible for Mr. Graham's assault and battery. Defendant City, as employer of each of the Defendants, is

responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Graham sustained the damages alleged.

196.    The conduct of Defendant Baillie and the conduct of Defendants LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Graham's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse. Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Graham sustained the damages alleged.

Sonny Ortiz

197.    By reason of the foregoing paragraphs 132-140, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Fadima, Gutierrez, and Doe Defendants #35-38 deprived Mr. Ortiz of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Ortiz sustained the damages alleged.

198.    Defendants Scott, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. Ortiz. Their failure to take measures to curb this pattern of brutality constitutes

deliberate indifference to the rights and safety of the inmates in their care and custody, including

Mr. Ortiz.  These defendants' conduct has been a substantial factor in the continuation of such

violence and a proximate cause of the constitutional violations alleged in this complaint.  As a

direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Ortiz

sustained the damages alleged.

199.    Defendant City, through DOC, and acting under the pretense and color of law, permitted,

tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation

by DOC staff at the time of Mr. Ortiz's beating.  This widespread tolerance of correction officer

abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the

Mr. Ortiz.  By permitting, tolerating and sanctioning a persistent and widespread policy, practice

and custom pursuant to which Mr. Ortiz was subjected to a brutal beating, defendant City has

deprived Mr. Ortiz of rights, remedies, privileges, and immunities guaranteed to every person of

the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed

under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation.

As a direct and proximate result of the policy, practice and custom detailed above, Mr. Ortiz

sustained the damages alleged.

200.    In assaulting, battering, and threatening Mr. Ortiz, or standing by and failing to intervene

when Mr. Ortiz was assaulted, Defendants Fadima, Gutierrez, and Doe Defendants #35-38, acting

in their capacities as DOC officers, and within the scope of their employment, each committed a

willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Ortiz.  Defendants

Scott, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and

employees were responsible for Mr. Ortiz's assault and battery.  Defendant City, as employer of

each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat*

*superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Ortiz sustained the damages alleged.

201.    The conduct of Defendants Fadima, Gutierrez, and Doe Defendants #35-38 and the conduct of Defendants Scott, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Ortiz's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse.  Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Ortiz sustained the damages alleged.

<u>Clifford Sewell</u>

202.    By reason of the foregoing paragraphs 141-148, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Jones, Gregg, and Doe Defendants #39-59 deprived Mr. Sewell of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Sewell sustained the damages alleged.

203.    Defendants Bailey, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. Sewell.  Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody,

including Mr. Sewell.  These defendants' conduct has been a substantial factor in the continuation

of such violence and a proximate cause of the constitutional violations alleged in this complaint.

As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr.

Sewell sustained the damages alleged.

204.    Defendant City, through DOC, and acting under the pretense and color of law, permitted,

tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation

by DOC staff at the time of Mr. Sewell's beating.  This widespread tolerance of correction officer

abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the

Mr. Sewell.  By permitting, tolerating and sanctioning a persistent and widespread policy, practice

and custom pursuant to which Mr. Sewell was subjected to a brutal beating, defendant City has

deprived Mr. Sewell of rights, remedies, privileges, and immunities guaranteed to every person of

the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed

under the Eighth and Fourteenth Amendments to be free from unnecessary and excessive force and

retaliation.  As a direct and proximate result of the policy, practice and custom detailed above, Mr.

Sewell sustained the damages alleged.

205.    In assaulting, battering, and threatening Mr. Sewell, or standing by and failing to intervene

when Mr. Sewell was assaulted, Defendants Jones, Gregg, and Doe Defendants #39-59, acting in

their capacities as DOC officers, and within the scope of their employment, each committed a

willful, unlawful, unwarranted, and intentional assault and battery upon Mr. Sewell.  Defendants

Bailey, LaBruzzo, Finkle, Hourihane, Davis, and Schriro, their officers, agents, servants, and

employees were responsible for Mr. Sewell's assault and battery.  Defendant City, as employer of

each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat*

*superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed

above, Mr. Sewell sustained the damages alleged.

206.    The conduct of Defendants Jones, Gregg, and Doe Defendants #39-59 and the conduct of Defendants Bailey, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, all as described in this Complaint, violated Mr. Sewell's rights under Correction Law §§500-k and 137(5), to be free from degrading treatment and physical abuse.  Defendant City, as employer of each of the Defendants, is responsible for their wrongdoing under the doctrine of *respondeat superior*.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Sewell sustained the damages alleged.

Leslie Pickering

207.    By reason of the foregoing paragraphs 149-156, and by assaulting, battering, and using unnecessary, excessive, brutal, sadistic, and unconscionable force, or failing to prevent other Defendants from doing so, Defendants Medina, Sloly, and Doe Defendants #60-64 deprived Mr. Pickering of rights, remedies, privileges, and immunities guaranteed to every person, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed by the Fourteenth Amendment to the United States Constitution to be free from unnecessary and excessive force. Defendants acted under pretense and color of state law and within the scope of their employments as DOC officers and employees.  As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Pickering sustained the damages alleged.

208.    Defendants Mulvey, LaBruzzo, Finkle, Hourihane, Davis, Schriro knew and/or know that the pattern of physical abuse described above existed in the City jails prior to and including the time of the assault on Mr. Pickering.  Their failure to take measures to curb this pattern of brutality constitutes deliberate indifference to the rights and safety of the inmates in their care and custody, including Mr. Pickering.  These defendants' conduct has been a substantial factor in the

continuation of such violence and a proximate cause of the constitutional violations alleged in this complaint. As a direct and proximate result of the misconduct and abuse of authority detailed above, Mr. Pickering sustained the damages alleged.

209. Defendant City, through DOC, and acting under the pretense and color of law, permitted, tolerated and was deliberately indifferent to a pattern and practice of staff brutality and retaliation by DOC staff at the time of Mr. Pickering's beating. This widespread tolerance of correction officer abuse of prisoners constituted a municipal policy, practice or custom and led to the assault of the Mr. Pickering. By permitting, tolerating and sanctioning a persistent and widespread policy, practice and custom pursuant to which Mr. Pickering was subjected to a brutal beating, defendant City has deprived Mr. Pickering of rights, remedies, privileges, and immunities guaranteed to every person of the United States, secured by 42 U.S.C. § 1983, including, but not limited to, rights guaranteed under the Fourteenth Amendment to be free from unnecessary and excessive force and retaliation. As a direct and proximate result of the policy, practice and custom detailed above, Mr. Pickering sustained the damages alleged.

PRAYER FOR RELIEF

210. WHEREFORE, Plaintiffs request that this court:

211. Declare that the conduct of the supervisory Defendants—Schriro, Finkle, Hourihane, LaBruzzo and Scott—as described above, violates the rights of the named Plaintiffs and the Plaintiff class under the Eighth and Fourteenth Amendments to the Constitution of the United States and under New York State Law;

212. Enjoin Defendants Schriro, Finkle, Hourihane, LaBruzzo and Scott, their successors, agents, servants, employees, and all those in active concert or participation with them from subjecting inmates in Department jails to unlawful physical abuse and the threat of

unlawful physical abuse, and require these Defendants to formulate and effectuate a remedy, subject to the court's approval and modification, if necessary, to end the practices and policies challenged in this lawsuit, including the Unconstitutional Use of Force Practice, in every unit in all Department jails, with the exception of those Department Commands already under current court orders directed at the misuse of force.  Such a remedy should include measures which address continuing deficiencies in selection, training, evaluation, supervision, promotion and command of the uniformed correction staff, and in the Department's investigatory and disciplinary practices, as described earlier in this Complaint;

213.   Retain jurisdiction in this case until the unlawful conditions, practices, policies, acts, and omissions complained of herein, including the Unconstitutional Use of Force Practice,  no longer exist and this court is satisfied that they will not recur;

214.   Award Plaintiff Mark Nunez compensatory damages in an amount to be determined at trial against Defendants Thomas, Primm, John/Jane Does #1-4, Johnson, Duffy, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, and punitive damages individually against each of Defendants Thomas, Primm, John/Jane Does #1-4, and Johnson for violation of his federal constitutional rights;

215.   Award Plaintiff Rodney Brye compensatory damages in an amount to be determined at trial against Defendants Kirkland, Rothwell, Brishinsky, Williams, Leonard, Salley, Majors, John/Jane Does #5-9, Agro, Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, on each of his state and federal causes of action, and punitive damages individually against each of Defendants Kirkland, Rothwell, Brishinsky, Williams, Leonard, Salley, Majors, and John/Jane Does #5-9 for violation of

his federal constitutional rights;

216.    Award Plaintiff Shameik Smallwood compensatory damages in an amount to be
determined at trial against Defendants Davies, Davis, Alston, John/Jane Does #10-14,
Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly
and severally, on each of his state and federal causes of action, and punitive damages
individually against each of Defendants Davies, Davis, Alston, and John/Jane Does #10-14
for violation of his federal constitutional rights;

217.    Award Plaintiff Travis Woods compensatory damages in an amount to be determined at
trial against Defendants Dean, Williams, Orlandi, Leonard, Hughes, Arkhurst, Massey,
Behari, Sistrunk, Ramos, John/Jane Does #15-25, Mulvey, LaBruzzo, Finkle, Hourihane,
Davis, Schriro, and the City of New York, jointly and severally, on each of his state and
federal causes of action, and punitive damages individually against each of Defendants
Dean, Williams, Orlandi, Leonard, Hughes, Arkhurst, Massey, Behari, Sistrunk, Ramos,
and John/Jane Does #15-25 for violation of his federal constitutional rights;

218.    Award Plaintiff Ralph Nunez compensatory damages in an amount to be determined at trial
against Defendants Thompson, Quinn, Ramos, Mirabal, LaBruzzo, Finkle, Hourihane,
Davis, Schriro, and the City of New York, jointly and severally, on each of his state and
federal causes of action, and punitive damages individually against each of Defendants
Thompson and Quinn for violation of his federal constitutional rights;

219.    Award Plaintiff Keith Bacote compensatory damages in an amount to be determined at trial
against Defendants Arkhurst, Remy, Soto, Buttons, Bravo, Dunbar, Santiago, Baiardi,
John/Jane Does #26-29, Mulvey, Agro, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and
the City of New York, jointly and severally, on each of his state and federal causes of

action, and punitive damages individually against each of Defendants Arkhurst, Remy, Soto, Buttons, Bravo, Dunbar, Santiago, Baiardi, and John/Jane Does #26-29 for violation of his federal constitutional rights;

220.   Award Plaintiff Jose DeGros compensatory damages in an amount to be determined at trial against Defendants Brishinsky, Tutein, Lamar, John/Jane Does #30-34, Cripps, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, on each of his state and federal causes of action, and punitive damages individually against each of Defendants Brishinsky, Tutein, Lamar, and John/Jane Does #30-34 for violation of his federal constitutional rights;

221.   Award Plaintiff Christopher Graham compensatory damages in an amount to be determined at trial against Defendants Baillie, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, on each of his state and federal causes of action, and punitive damages individually against Defendant Baillie for violation of his federal constitutional rights;

222.   Award Plaintiff Sonny Ortiz compensatory damages in an amount to be determined at trial against Defendants Gutierrez, Fadima, John/Jane Does #35-38, Scott, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, on each of his state and federal causes of action, and punitive damages individually against each of Defendants Gutierrez, Fadima, and John/Jane Does #35-38 for violation of his federal constitutional rights;

223.   Award Plaintiff Clifford Sewell compensatory damages in an amount to be determined at trial against Defendants Jones, Gregg, John/Jane Does #39-59, Bailey, LaBruzzo, Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, on each of his

state and federal causes of action, and punitive damages individually against each of
Defendants Jones, Gregg, and John/Jane Does #39-59 for violation of his federal
constitutional rights;

224.    Award Plaintiff Leslie Pickering compensatory damages in an amount to be determined at
trial against Defendants Sloly, Medina, John/Jane Does #60-64, Mulvey, LaBruzzo,
Finkle, Hourihane, Davis, Schriro, and the City of New York, jointly and severally, and
punitive damages individually against each of Defendants Sloly, Medina, and John/Jane
Does #60-64 for violation of his federal constitutional rights;

225.    Award Plaintiffs the costs of this action, including reasonable attorneys' fees; and

226.    Grant such other and further relief in favor of the Plaintiffs and the class as this Court
deems just and proper.

Dated:  May 24, 2012
          New York, New York

EMERY CELLI BRINCKERHOFF & ABADY
LLP


Jonathan S. Abady (jabady@ecbalaw.com)
Katherine Rosenfeld (krosenfeld@ecbalaw.com)
Vasudha Talla (vtalla@ecbalaw.com)
75 Rockefeller Plaza, 20th Floor
New York, NY  10019
 (212) 763-5000
*Counsel for Plaintiffs Mark Nunez, Rodney Brye,*
*Shameik Smallwood, Travis Woods, Ralph Nunez,*
*Keith Bacote, Jose DeGros, Christopher Graham,*
*Sonny Ortiz, Clifford Sewell, and Leslie Pickering*

THE LEGAL AID SOCIETY
Jonathan S. Chasan (jchasan@legal-aid.org)
Mary Lynne Werlwas (mlwerlwas@legal-aid.org)
199 Water Street, 6th Floor
New York, New York 10038

88

(212) 577-3530
*Counsel for Plaintiffs Mark Nunez, Rodney Brye,*
*Shameik Smallwood, Travis Woods, Ralph Nunez,*
*Keith Bacote, Jose DeGros, Christopher Graham,*
*Sonny Ortiz, Clifford Sewell, and Leslie Pickering*

ROPES & GRAY LLP
William I. Sussman
(William.Sussman@ropesgray.com)
Christopher P. Conniff
(christopher.conniff@ropesgray.com)
Amanda Raad (Amanda.Raad@ropesgray.com)
Joseph G. Cleemann
(Joseph.Cleemann@ropesgray.com)
1211 Avenue of the Americas
New York, NY 10036
(212) 596-9000
*Counsel for Plaintiffs Rodney Brye, Shameik*
*Smallwood, and Travis Woods, in their capacities as*
*potential class representatives*