1                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK

2

3 ------------------------------------X
                              :

4 NUNEZ,                        :
                              :  11-CV-05845 (LTS)

5               Plaintiff,    :
                              :

6           v.               :
                              :  500 Pearl Street

7 N.Y.C. DEPARTMENT OF CORRECTIONS,  :  New York, New York
    *et al.*,                  :

8                               :
              Defendants.   :  April 18, 2013

9 ------------------------------------X

10      TRANSCRIPT OF CIVIL CAUSE FOR STATUS CONFERENCE
       BEFORE THE HONORABLE JAMES C. FRANCIS

11         UNITED STATES MAGISTRATE JUDGE

12

    APPEARANCES:

13

    For the Plaintiffs:        AMANDA NICOLE RAAD, ESQ.

14                           Ropes & Gray, LLP
                          1211 Avenue of the Americas

15                           New York, New York  10036

16                           VASUDHA TALLA, ESQ.
                          KATHERINE ROSENFELD, ESQ.

17                           Emery Celli Brinckerhoff &
                            Abady, LLP

18                           75 Rockefeller Plaza
                          New York, New York  10019

19

20                           MARY LYNNE WERLWAS, ESQ.
                          JONATHAN CHASAN, ESQ.

21                           The Legal Aid Society
                          111 Livingston Street

22                           Brooklyn, New York  11201

23                    (Appearances continue on next page.)

24

25

Proceedings recorded by electronic sound recording,
transcript produced by transcription service

```
 1                                                                    2

 2

 3    APPEARANCES:   (Continued)

 4    For the City Defendants:      ARTHUR GABRIEL LARKIN, III, ESQ.
                                    The New York City Law Department
 5                                  100 Church Street
                                    New York, New York  10007
 6
                                    JAY SADAKIS, ESQ.
 7
                                    BRIAN WALL, ESQ.
 8

 9

10    Court Transcriber:            RUTH ANN HAGER, C.E.T.**D-641
                                    TypeWrite Word Processing Service
11                                  211 N. Milton Road
                                    Saratoga Springs, New York  12866
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

1          THE COURT:  This is Mark Nunez v. City of New York.

2     Counsel, please say your name for the record.

3          MS. RAAD:  Hi.  I'm Amanda Raad with Ropes & Gray on

4     behalf of the plaintiff class.  We also have here Vasudha

5     Talla and Katie Rosenfeld from Emery Celli on behalf of both

6     the class and the individuals in this matter and plaintiff

7     class and the individuals.  And then we have Mary Lynne

8     Werlwas and Jonathan Chasan from Legal Aid Society on behalf

9     of the plaintiff class and individuals.

10          THE COURT:  Good morning.

11          MS. ROBB:  Good morning.

12          MR. LARKIN:  For the City and for the defendants

13     represented by the City, Arthur Larkin, New York City Law

14     Department.  I expect, Your Honor, that Kim Savino will be

15     joining us shortly as well.  Good morning.

16          THE COURT:  Good morning.

17          MR. SADAKIS:  Good morning, Your Honor.  I'm Jay

18     Sadakis [Ph.] for three individually named defendants:  Jason

19     Soto, Edwin Sloly and Jaime Roman.

20          THE COURT:  Good morning.

21          MR. WALL:  Brian Wall [Ph.] [indiscernible]

22     defendant [indiscernible].

23          THE COURT:  Good morning.  Are we on the record?

24          THE CLERK:  Yes.

25          THE COURT:  Thanks.  I will say at the outset that

4

1   I'm disappointed at where we are at this point.  I had

2   expected based on prior interactions with this group that

3   there would be a higher level of cooperation.  And as

4   reflected in the letters that I've received, it seems to me

5   that there are a host of issues as to which there could have

6   been compromise and agreement.  And failing that, it seems to

7   me I will have to take a much more active role than I had

8   anticipated.

9        With respect to today's proceeding, we have an out.

10  I'm on criminal duty.  I've set aside this time because I

11  wanted to deal with this promptly.  So I will give each side

12  an initial 20 minutes to address both the issues as to which

13  you believe you are entitled to discovery that you haven't

14  received and issues to which the other side has said that it's

15  entitled to discovery, which it hasn't received.  We'll start

16  with the plaintiffs.  The defendants will have 20 minutes.

17  Then we'll have five minutes each for any response and that

18  will leave something short of ten minutes for any wrap-ups on

19  my part.  So let's start with the plaintiff.

20        MS. RAAD:  Thank you.  One issue that I think we can

21  get out of the way really quick, which we did just agree to,

22  is the form of the amended protective order that we've

23  submitted to the Court attached to the order.  The protective

24  order is just amended to specifically address the privacy laws

25  of the confidential and sensitive information that's contained

1  in some of the records, which both parties are going to be

2  producing.  So we do ask that the Court enter that order with

3  now agreement as to form on that by the parties.

4          THE COURT:  Very well.

5          MS. RAAD:  The next issue is dealing with the

6  production of two types of media files that are part of the

7  use-of-force reports.  So we have reached agreement on the

8  production of certain types of media files, but there's one

9  important category where we're still struggling and that's

10 media files for the defendants in this case.  And we're asking

11 that they be produced for all the defendants that actually

12 participated in the use-of-force incident or they were

13 witnesses to the use-of-force incident.

14          The media files there's two categories.  There's

15 video surveillance of the actual incident, which is absolutely

16 critical for us to be able to see firsthand what actually

17 occurred and we will review each and every video that we

18 receive and we absolutely plan to do that.  It's very

19 important for us to see whether the accounts that the

20 incidents are consistent with what we see on video and to see

21 the actions of the defendants in these cases.  That's the

22 video surveillance piece.

23          A second piece of media file is the MEO16

24 interviews, which are conducted when an investigation is

25 raise -- a use-of-force incident is raised to the

6

1   Investigation Division, the ID Division.  There can be an

2   MEO16 interview, which is done, as part of the mayor's

3   executive order.  And that interview is an interview with the

4   defendant to get defendant's side of the story.  And while

5   there is a transcript of that interview, we have found

6   historically that sometimes the transcript has material

7   inconsistencies or omissions, and so it's very important for

8   us to actually have the audio of interviews so that we can

9   make an assessment ourselves of whether there is or is not a

10  discrepancy and which account we find to be accurate, so it's

11  a crucial piece.  Both of these components are absolutely

12  crucial to our understanding of what happened, whether the

13  investigation was complete and accurate, and the accuracy of

14  any of the representations.

15          One of the things that the City has articulated is

16  that there's a burden to producing this information.  Our

17  understanding as we have seen copies of the actual video and

18  copies of this material and the use-of-force files is that

19  this information should all be stored with the use-of-force

20  reports.  It's transferred up the chain so that several people

21  sign off on it and it's moved from one place to another, so it

22  has to be able to be collected if it exists in some form.

23          For the MEO16 interviews it should exist, we

24  believe, with the Investigation Division file which the City

25  is going to and is collecting information from and that should

1   be one central location.

2          With respect to the video surveillance if it didn't

3   elevate it to an ID, Investigation Division, there is a

4   chance, as the City states, that it would be located with the

5   facility packet or it could possibly -- the information -- the

6   video may be residing at the individual facilities.  But if

7   that's the case, the City is also -- the majority of the

8   City's production, almost 75 percent of it has been of

9   facility-only use-of-force packets.  There's been 19 -- almost

10  2,000 packets produced of facility-only packets.  And so we

11  believe in the collection of the rest of the packets it would

12  be reasonable to take the full packet, which includes

13  necessarily the -- all the video surveillance that exists.

14          And then as far as burden on that goes, because it's

15  absolutely so critical, I mean, we are willing to talk about

16  if there's some way to collect it in a more official manner,

17  whether that be electronically -- if it's stored

18  electronically in some manner or whether there's some way to

19  bear some of the costs.  We're certainly willing to talk about

20  that, but we do believe it's absolutely crucial to our case.

21          The next issue is the location of stationary cameras

22  in all of the jails and this is a similar issue that we really

23  need to be able to see where the cameras are actually located

24  and that's because there's no way to determine whether or not

25  we've actually received the video that may or may not exist if

1   we don't know where the cameras are or where they were

2   supposed to be at the time of the incidents.

3         And the cameras, as we understand them, are labeled

4   and have names, so it seems that there must be an over-arching

5   map or outline that would be able to designate where it is

6   that the cameras exist in all of the jails.  You know, the

7   City has noted that we can take a tour of the jails, but that

8   does not necessarily show us where all of the cameras exist

9   and where they would have existed at the time of the

10  incidents, especially the individual incidents in these cases.

11        Corresponding with the location of the cameras, we

12  also think it's important that we know any directive or order

13  or communication essentially about where the cameras need to

14  be so that we can compare to determine is, in fact, the camera

15  operating in the location that it has been mandated to

16  operate.

17        And just for the quick backdrop on this, we have

18  several cases including cases with plaintiffs and the named

19  plaintiffs in this action where the issue is -- or the claim

20  is that the inmate is taken to an area that is off camera,

21  either perhaps after the recorded incident or subsequently

22  taken to a camera-less area and then there's further

23  interaction and that's where the problematic use-of-force is

24  really occurring.  And then for us to be able to see the

25  entire picture, we really need to know where the location of

9

1   all the stationary cameras are in the jail so that we can

2   catch the corridors as well.

3          With regard to the second set of discovery requests

4   we have been able to limit some of the matters, which I think

5   are set forth in the letter and so I'm only going to address

6   those that remain in dispute right now.  One of them deals

7   with the 24-hour reports and these are quick snapshots.

8   They're one page.  It's essentially a paragraph and an

9   electronic document that is taken immediately after a use-of-

10  force incident and it's perhaps in time the most

11  contemporaneous account of what has occurred and a description

12  of who was involved, the type of force used, and inmates.

13         And we've agreed that we need these -- or that the

14  City will produce these from January 2010 forward.  We had

15  originally requested them from January 2007 forward and that's

16  because it's a way for us to -- it's, in essence, a statistic

17  of sorts, and it's a way for us to account for individuals

18  involved in incidents, type of incidents, and we need it to be

19  able to prove a longstanding -- as we allege, a longstanding

20  practice of deliberate indifference.  These reports do go up

21  the supervisory chain and they are important information

22  relied upon by the supervisors and the wardens.  And so it's

23  important for us to be able to show whether or not there's a

24  longstanding practice to show some period of time.

25         In discussions with the City, we have volunteered to

10

1    shorten the time period from instead of January 2007 to July

2    2008.  Our hope is that this concession, along with the fact

3    that these are electronically-stored documents, it appears or

4    information that could be quickly pulled could ease the burden

5    and it's clearly very important and relevant to us for both

6    class and supervisory claims.

7              The next issue that we have deals with the

8    communications between the Department of Corrections and

9    several state and federal agencies.  That's request number 12.

10   And just to back up the first request, the 24-hour request is

11   request number four in plaintiff's second set of discovery

12   requests.  So moving on the request number 12, the

13   communications between the Department of Corrections and the

14   City and State and federal offices, we've set forth several

15   entities that we believe that the Department of Corrections

16   and the City may be communicating with, including the

17   Department of Justice, U.S. Attorney's Offices, District

18   Attorney's Offices, the mayor's office.  We've had some

19   discussion going back and forth about whether or not we might

20   limit some of these agencies, but essentially what we're

21   looking for are any communications that go to the knowledge of

22   the state of mind or frankly the summary of use-of-force

23   incidents and reporting of incidents to any of these agencies.

24   Clearly any communication dealing with that that's not

25   privileged would be very relevant to the knowledge of the

1  individuals that are riding those and to the -- again, to

2  supervisory claims and to our class claims and frankly, to all

3  of our claims.

4         And to the extent -- one of the other discovery

5  requests that we have talked about and we have reached a

6  little bit of an agreement on is whether or not there are

7  records that detail referrals of inmates' arrests or arrests

8  of correction officers as a result of a use-of-force incident.

9  It seems to me that these communications would be one avenue

10  into those referrals and one relevant area, so there seems to

11  be an overlap here between the two.

12         Now, I appreciate the City says that we're not going

13  to go through and look through every paper file that exists

14  and look for a communication.  That makes good sense that it

15  may not be kept in a reasonable way and paid for, but what we

16  submit is that this seems something that would be perhaps

17  easily addressed through some kind of electronic discovery

18  with a limited set of search terms designed to specifically

19  address only use-of-force incidents and only to these

20  agencies, so that is something we would like to work towards.

21         And the rest -- there's just one issue that I'm

22  going to quickly note, which is the notices -- of the request

23  for notices of claims and complaints and settlements.  We have

24  had substantial discussions with the City and I think we're

25  working towards resolution on there.  The City has identified

12

1   three categories of documents that are potentially responsive

2   and so I'm -- don't think that we need to table those for

3   discussion today.  And with that, I'm going to turn it over to

4   my colleague, Vasudha Talla.

5          MS. TALLA:  Good morning, Your Honor.  Your Honor,

6   I'll take the remaining ten minutes to talk about the

7   discovery disputes relating to the plaintiff's individuals

8   claims.  You know, specifically one of the things we have

9   asked for are these 22-R forms for all of the individual

10  defendants.  22-R forms are basically the Department's

11  internal road map or internal resume of a correction officer

12  that details all the disciplinary action taken against that

13  officer while they've been in the employment of the

14  Department.  You know, we brought some sample 22-R forms for

15  some officers that we think would be helpful, if the Court

16  would like to see it, just to illuminate exactly the type of

17  information that is on here and why it is so crucial for us to

18  have it.  You know, it's clearly relevant to the plaintiff's

19  claims about, you know, the -- these officers being people

20  who've accumulated either discipline because of use of force

21  or really even sometimes the lack of discipline despite their

22  use-of-force histories.  It's because there are so many

23  different categories of information and, you know, such an

24  important list of the various discipline, it's very important

25  for us to have this.

13

1          It's our understanding that apart from the 22-F

2    forms there is no other centralized place that collects all of

3    the information in one sort of easy-to-understand basically

4    list or index.  We understand from Mr. Larkin's letter he's

5    described a certain way that these forms are created.  We

6    still believe that to the extent we haven't received every 22-

7    R form that this is the most efficient way to collect this

8    information as opposed to going out to every single facility

9    and getting documents from each and every one.  I think what

10   we need to know is a much more specific understanding of

11   exactly what the burden would be in creating each of these

12   forms.  And to the extent that it is a burden for officers or

13   employees of the Department to pull it all together, what is

14   another way we could get all the information, and we just

15   don't feel like we've had this.  There are 65 defendants.  We

16   submit that it's just not a great burden to create such an

17   important document to this case.

18          The next issue has to do with documents and

19   photographs the plaintiffs have requested in order to identify

20   John Doe defendants as well as officer witnesses.  You know,

21   aid of -- the plaintiffs still have John Doe defendants in

22   their claims.  People that we have done our best to try and

23   identify using some of the use-of-force reporting information

24   that the City has given us but we -- as plaintiff's counsel we

25   need to be careful and we've done our best in only naming

14

1 defendants if we had a good-faith basis to believe that they

2 were involved in the incident.

3         So we still feel as though we need additional

4 information in the form of these log books, rosters, and sign-

5 in sheets, as well as photographs to review carefully the

6 information contained therein with our plaintiffs and really

7 determine the best way we can who we should name and we've

8 been very judicious about not over-naming defendants and

9 really only naming people we are certain about.

10        The City has offered to give a subset of documents.

11 We're willing to work with the City on the documents issue.  I

12 think that not only is it relevant to know who was working in

13 a particular area at a particular time when the plaintiff was

14 assaulted.  It's also important for us to know who was working

15 in the facility as a whole because some of our allegations

16 include the fact that certain defendants or John Doe

17 defendants were not necessarily assigned to the housing area

18 or the area of assault, but where people were working in the

19 facility either just before the tour in which the plaintiff

20 was assaulted or just after, so we may need a slightly broader

21 set of documents than what the City has offered.

22        In terms of photographs of inmates and employees, I

23 mean, we also think that's important to have.  I mean,

24 documents and names get us so far, but in fact the best way to

25 identify these people is visually.  The suggestion that the

1  plaintiff should be required to do these identifications at

2  their depositions is just not really workable.  I mean, it's

3  an adverse setting.  It's not a place where the plaintiff has

4  a good opportunity to sort of review this information with

5  their counsel and make these determinations.  If the City has

6  doubts or is skeptical about the accuracy of these

7  identifications that's certainly a topic for their

8  depositions, but we submit we should be able to review the

9  photographs and the documents prior to the plaintiff's

10  depositions.

11          About -- and the witnesses, the same thing is true

12  that we need to see photographs and documents that help us

13  identify people who our plaintiffs believe were there and are

14  not named in the use-of-force reports.  We do believe there is

15  a category of people that fall -- that are not going to be in

16  the use-of-force reports and which the documents and photos

17  would be helpful.

18          Just going directly to some more additional

19  important areas --

20          THE COURT:  Before we leave the identification

21  issue --

22          MS. TALLA:  Yes.

23          THE COURT:  -- with respect to identification of

24  John Doe defendants presumably that can now be limited to

25  those eight cases where there still are John Doe defendants,

16

1   right?

2            MS. TALLA:  Yes.

3            THE COURT:  And with respect to inmate witnesses,

4   how is it that you propose to do that?

5            MS. TALLA:  So what we have asked for are basically

6   lists of the inmates who were assigned either to the housing

7   area or to the clinic or basically logbook showing the

8   movement of inmates within the facility that would allow us to

9   determine which are the inmates who would have been in the

10  area of assault, whether it was in the housing area, a

11  corridor or a clinic, et cetera, and then to go from there to

12  see are these the people that our clients remember being in

13  the facility of the assault.

14           THE COURT:  Do we have any idea what that involves?

15  In other words, do we have an example of two or three

16  instances where we have unidentified witness inmates and a

17  sense of what the logbooks might show or --

18           MS. TALLA:  Sure.

19           THE COURT:  -- what the books might show?

20           MS. TALLA:  Yes.  So, for example, plaintiff Rodney

21  Brye who was assaulted or his assault started I guess in his

22  housing area and went into the corridor just outside of his

23  housing area.  He's identified a person that he knows as best

24  as he can as G. McLaren [Ph.] with a book and case number

25  starting 141, who was in the housing area.  And so that's not

17

1   somebody we've seen named in the use-of-force report

2   information we've received from the City, but we think a

3   logbook or some sort of roster listing the inmates who were in

4   his housing area would help us identify who that person is.

5            THE COURT:  That's more specific information you

6   have in most instances, I  would guess.  I mean, I would think

7   that was an easy one.

8            MS. TALLA:  That is one of the easier ones, but we

9   do have -- I mean, plaintiff Bacote is someone similar who

10  says, "I was assaulted in my housing area.  There was another

11  inmate witness there who was also suffered a use-of-force that

12  same day."  We think that a logbook or an inmate roster of the

13  people of the housing area as well as, you know, a set of

14  photographs of those inmates would help us identify who that

15  inmate witness was.

16           THE COURT:  Okay.

17           MS. TALLA:  Moving on, there -- the City has

18  requested a number of pieces of information from the

19  plaintiffs.  We've really done our best and we continue to

20  work with the City to try and address the type of information

21  that they want from our plaintiffs.  We've revised some of our

22  initial objections, but what's remaining are things that we

23  feel are really important.  Just keeping in mind the time, I

24  just want to go to what I think is the most important issue

25  for us, which is this request for information related to our

18

1  plaintiff's sealed arrests.

2        We have done quite a good bit of research and

3  thought carefully about this issue.  The first thing I'd like

4  to point out is that these claims are not false arrests civil

5  rights claims in which many of the cases that deal with 160.50

6  and the privilege that's accorded to that, they rise in that

7  context.  This is an excess of force set of claims.

8        And we -- looking at a recent decision by Judge

9  Scheindlin, the Lee Gonn [Ph.] case here in the Southern

10  District, we believe that's a good starting point for the

11  analysis.  In the Lee Gonn case the plaintiffs there brought

12  class action claims arising out of false arrests for

13  essentially trespass or improper stops.  There the City sought

14  paperwork underlying all of their prior sealed arrests and

15  Judge Scheindlin, you know, was very careful in noting that in

16  the balancing tests you have to do between the need for

17  information against the State-protected privacy interests, the

18  most the City could even get there were paperwork underlying

19  sealed arrests for trespass, which were related to the types

20  of claim that the plaintiffs were bringing.

21        Here we don't even go as far as that.  We're dealing

22  with an excessive force case in which, you know, the

23  plaintiff's prior arrest history -- or prior sealed arrest

24  history is really unrelated to the types of claims that they

25  are bringing.  The City has grounds for relevance here:

19

1  emotional damages, the need for Department of Correction

2  records or sort of falsification of information.  We would

3  submit that that's just not a good enough -- none of those are

4  good enough reasons to allow the blanket unsealing of all

5  prior sealed arrests without regard to when their arrests

6  occurred or what type of arrests they were for.  The

7  plaintiffs have emotional distress damages of just garden

8  variety.  These are not severe emotional distress claims.

9  Most of the cases cited by the City in which paperwork was

10 unsealed on the ground that it's relevant to emotional

11 damages, those plaintiffs were either involved in false arrest

12 civil rights claims or had severe emotional distress claims.

13 Neither of those things are present here.

14       With respect to the issue about the Department of

15 Corrections records, our understanding is that the Department

16 of Corrections maintains detailed records regarding every

17 inmate's history in the Department without regard to

18 disposition of the charges and they include information about

19 the inmate in various records such as use-of-force reports

20 that they give to the City -- or give to The Law Department

21 and The Law Department produces to us.  So we've never heard

22 about the Department being unable to provide information about

23 our plaintiffs without the sort of information or release for

24 their sealed arrests.

25       And finally, the issue about, you know, potentially

20

1  false statements or false names or gang membership, we think

2  that all that information would be available in the

3  Department of Corrections' own records.  They would be

4  available in conviction records.  And finally, to the extent

5  they have to come from sealed arrests paperwork, really we

6  should be confining it to a very small set of arrests, arrests

7  for things that are potentially relevant that includes some

8  sort of element or lying or fabrication, but not sealed

9  arrests related to drug possession ten years ago.

10          So that's our position about sealed arrests.  I

11  understand that I'm out of time, so I will sit down unless

12  Your Honor has questions of me.

13          THE COURT:  Thank you.  Mr. Larkin.

14          MR. LARKIN:  Good morning, Your Honor.  First of

15  all, just briefly address the requests you've made of

16  plaintiff as to which there are some objections and then I'll

17  try to address the matters that plaintiffs addressed earlier

18  concerning their demands to the City.

19          First, Your Honor, I think that the -- we have asked

20  for some basic information from the plaintiffs about their

21  claims that we typically ask for in every case and we've been

22  met with, what seems to me, a surprising level of somewhat

23  fierce resistance.  The first sort of key issue for us is, the

24  injuries that the plaintiffs are claiming and typically we ask

25  at the outset of the case for -- in an interrogatory answer a

21

1  list of the injuries that the plaintiffs are claiming and a

2  list of the medical providers that they have seen.

3       At first we got some objections to that.  They

4  wouldn't even give us the names of all the providers.  I

5  believe that objection has been withdrawn but the plaintiffs

6  continue to insist that they're not required to serve a sworn

7  response setting forth what their claims of injury are.

8       Now, Your Honor considered this issue, I believe, in

9  the RNC cases and generally ruled in those cases that the

10 interrogatory was proper and that it should be answered.  The

11 Local Rule, of course, limits interrogatories at the outset of

12 discovery to the location of documents, custodians of

13 documents, names of witnesses, and information of a similar

14 nature is the very last sentence of that Local Rule.  I

15 believe it's 33.3(a).  And we would suggest to the Court that

16 a simple statement by each plaintiff of the injuries that they

17 claim to have sustained in these use-of-force incidents is

18 within the kind of information.  It's information of a similar

19 nature to the kind of information you'd seek at the beginning

20 of the case concerning the location of documents or the

21 identity of witnesses; otherwise --

22       THE COURT:  I'm a little unclear on what the status

23 is with respect to the relation between the plaintiffs

24 certifying all of their information and defendants certifying

25 all of theirs.  As I understand it, defendants are resisting

22

1    having individual certifications, their interrogatory answers.

2           MR. LARKIN:  The City has served interrogatory

3    responses that the plaintiffs do not claim are deficient.  The

4    City verified all the information from their business records.

5    The individuals have no greater knowledge concerning these

6    matters than the City has in its business records.  Now, if

7    the Court were to require us -- require the City to simply

8    have officers come in and sign verifications, it seems to me

9    that that is an unnecessary burden; however, we could

10   certainly do -- we could certainly do that, I guess, and

11   produce them at the officer's depositions.

12          So, for instance, plaintiffs already have the

13   interrogatory responses, so when we bring the officers in to

14   prepare them for depositions, we could have them sign a

15   verification and produce the signed verification at the

16   deposition at most.  I mean, that would ease the burden on the

17   City.  The plaintiffs have not asked any other individual

18   defendant -- any individual defendant, that is, who's not

19   represented by the City to supply a sworn answer to any

20   interrogatories.  This is simply -- forgive me, Your Honor,

21   but this is [indiscernible] work.  It's completely

22   unnecessary.  It's not necessary for the plaintiffs to get any

23   additional information that they need for the case.

24          On the other hand, for us I don't have any statement

25   anywhere of the injuries that the plaintiffs are claiming.

23

1    What I have is a stack of medical releases for which I'm going

2    to eventually get medical records.  We're going to have to

3    then pour through the records page by page and I guess figure

4    out what injuries the plaintiffs appear to have sustained, and

5    we can ask the question at the deposition and then get the

6    answer and follow-up with further questions.  But an

7    interrogatory answer, Your Honor, would seem to be the most

8    efficient way to go about this.  And we need it to understand

9    the claims and to defend those claims.

10           The plaintiffs don't really need each individual to

11   sign a verification in order to get information that they need

12   to press their case, it seems to me.  It's -- in that respect,

13   as in many others, the burdens are not symmetrical, I would

14   submit to the Court, in this instance, but if the Court were

15   to direct us to do it I would simply ask that we be permitted

16   to bring verification pages to the depositions which we, you

17   know, look, if we have to do that, we can do that.  I just --

18   if we have to do it well in advance of depositions that

19   requires us to set up an additional appointment and that's

20   going to be burdensome.

21           THE COURT:  I guess my interest is going the other

22   way, which is reducing the burden on both sides.  And my

23   question is really why we need to go through and get

24   interrogatory answers from every plaintiff when the plaintiffs

25   are going to be deposed and you have the records.

24

1          MR. LARKIN:  It makes it easier to do the deposition

2     if I have a list of the injuries.  I can't ever remember

3     having a dispute with plaintiffs counsel, particularly in a

4     case like this where you've got class claims, where I would

5     think plaintiffs would want to move discovery along where the

6     plaintiffs refused to supply a simple interrogatory answer

7     setting forth what their injuries are.  I can't remember it in

8     ten years that I've worked for the City.  I was very surprised

9     to see that answer, to see that response, and to encounter

10    this resistance.  It is a basic demand we serve at the outset

11    of every case.  I mean, these individuals know what their

12    injuries are.  There's no reason that they can't give us a

13    simple statement explaining what the injuries are.  And I

14    think we typically get it in every case.

15          The Court is correct.  Eventually we're going to

16    have to look through the records.  We're going to have to do

17    that -- going to have to go through that exercise anyway.

18    It's simply more efficient for us to have a signed statement

19    setting out what the injuries are before we go into the --

20    before we go into the deposition.  That's the reason -- the

21    only reason why we -- why we raised it.

22          Some of the other interrogatories, Your Honor, the

23    identity of medical providers if we have the releases and I

24    have a letter from counsel setting forth -- excuse me --

25    setting forth the providers and explaining, you know, which

25

1  releases are provided I'm sure that's fine.  I'm not -- I

2  don't necessarily need a sworn statement of all the medical

3  providers, but there are two -- the injuries are one important

4  category for the interrogatories and the other is the

5  convictions, felonies and misdemeanors.

6           Typically, again, a request that the plaintiff

7  identify all convictions, criminal convictions, as well as --

8  you know, felony and for misdemeanor as well as the

9  jurisdiction where they were convicted doesn't seem to be

10  burdensome to me.  We're not asking for violations.  We're not

11  asking for disorderly conduct.  People generally ought to know

12  what their convictions are, when those convictions happened

13  and what jurisdiction they happened in.  I think in the five

14  boroughs it's easy enough for us to do a search and find out

15  what the convictions -- what the convictions are, but outside

16  the five boroughs it's a lot more difficult for us.

17           So I would certainly be willing to limit -- even

18  though I don't see any need to limit the interrogatory request

19  in this was; however, if we're talking about at this stage

20  given the fact that we didn't get the information that we were

21  clearly entitled to at the beginning of the case, at this

22  stage I would be willing to limit a response to convictions

23  outside the five boroughs of New York City so that we could

24  then at least know where to go to find other records.  If

25  someone has a conviction upstate or a conviction in the State

26

1   of New Jersey, for instance, Maryland, Delaware, wherever it

2   might be, that would be useful information for us because it's

3   more difficult for us to do searches of national databases.  I

4   mean, typically we don't do that, Your Honor.

5           With respect to releases, Your Honor, the main

6   concern here there are two concerns.  There's parole records

7   and then there were sealed arrests.  Parole records, it seems

8   to me, is not a difficult issue.  We know that 11 of the 12

9   plaintiffs at some point went before the Parole Board.  We

10  know, Your Honor, the two of the 12 were violated at some

11  point for -- or -- well, they were found to have violated the

12  conditions of parole and they were re-arrested and brought

13  back into the justice system.  Clearly, like an arrest of that

14  sort it seems to me is relevant to credibility.  When you go

15  on parole you agree to certain conditions.  You make a

16  promise.  These individuals -- two individuals -- and forgive

17  me, Your Honor, the names of the two are in our letter.  I

18  don't have them at my fingertips.  Clearly, at the barest of

19  bare minimums, the parole records for those individuals are

20  discoverable and I would submit the parole records for all of

21  them are discoverable.  If they appeared before the Parole

22  Board and admit to criminal acts in a transcript, then I think

23  we ought to at least have them for discovery and be able to

24  ask a few questions at depositions about the criminal conduct.

25  Clearly that can lead to admissible evidence with respect to

27

1  credibility, it seems to me, as well as damages.  I mean,

2  plaintiffs often -- not just these plaintiffs but plaintiffs

3  generally like to say, it's only garden variety emotional

4  distress, so don't give the City any more discovery except the

5  discovery that concerns this incident.

6          But, you know, to be fair to allow us to present a

7  fair defense, if the plaintiffs are going to take the witness

8  stand and say that they were subjected to an unreasonable use

9  of force and that they've -- since that time they've been, you

10 know, one individual claims in the complaint he says he's been

11 having nightmares.  Seems to me we ought to be able to explore

12 with that individual -- and I believe that's Mark Nunez -- you

13 ought to be able to explore with him, seal the arrests,

14 parole -- visits to the Parole Board, transcripts concerning

15 statements he may have made about his criminal history, and

16 the same would be true for all of the plaintiffs.

17         They're going to take the stand and they're going to

18 say that they were involved in a brutal incident.  It's left

19 them feeling helpless, humiliated, defenseless.  I mean, these

20 are people who deal with the system on a daily basis unlike

21 you and me.  It's just the way it is.  And I -- again, I am at

22 a loss as to the level of resistance to turning this stuff

23 over is surprising to me.

24         Sealed arrests go to a lot of different things.  I

25 can't tell you how many times I've looked at an arrest report

28

1   and seen a false name given by an individual and the police do

2   a little homework and find out that you've got -- it's the

3   same guy with the same NYCIT [Ph.] number.  It just gave you a

4   different name.  Aliases are always admissible.  That sort of

5   thing is always admissible.

6           So I think that for the interrogatory answers, the

7   important piece for us or the important pieces are the

8   injuries and the convictions, felony, misdemeanor, and the

9   releases that we would like to get, Your Honor, the most

10  important ones are the parole records or at a minimum allow us

11  to serve a subpoena on the Parole Board or -- and the releases

12  of sealed arrests.

13          And if I could address one or two points that

14  counsel had made with regards to DOC records.  Every time an

15  inmate is -- a person is arrested and brought into the system

16  they're given what's called a booking case number and

17  that's -- the booking case number is unique to that arrest.

18  If they're released and subsequently arrested, they come back

19  into the system, they get a new booking case number.  They

20  keep the same NYCIT number.  Every time an individual gets a

21  new booking case number, a new file is created which includes

22  a detailed questionnaire.  It includes other information;

23  sometimes it includes medical records.  It will include

24  infraction information for that particular incarceration.

25          When an inmate is involved in a use of force, the

29

1   bare bones information that is typically gathered for the use-

2   of-force investigation might include the dates of

3   incarceration, movement history of the years for all the

4   booking case numbers, as well as infractions.  But all the

5   other information that is in that file, the booking case file,

6   does not go into the use-of-force file.  We need a separate

7   release for that if the charges for which the inmate had been

8   arrested are sealed.  So the Department takes the position

9   that those booking case files for sealed arrests cannot be

10  disclosed without a 160.50 release.  I've explained this to

11  the plaintiffs and they continue to resist providing us with

12  160.50 releases.

13          To the extent that any inmate was arrested in a

14  custodial setting, it seems to me regardless of the

15  disposition of the charges that would be irrelevant arrests

16  for purposes of this case as well.

17          THE COURT:  I'm sorry.  Why is that?  If he was

18  arrested in a custodial setting and the -- and acquitted, why

19  does that become relevant?

20          MR. LARKIN:  I believe it's relevant because the

21  criminal charges against that individual could involve

22  resistance to authority.  Significant -- well, it might

23  involve significant -- it might involve insignificant.  It

24  might involve disobedience of institutional rules, although

25  typically that would result in an arrest.  But conduct in a

1  custodial setting is criminal.  Whether that results in

2  criminal charges, it seems to me, is relevant here to

3  credibility and to damages.  We've got --

4         THE COURT:  But he's acquitted.  That's why it's

5  sealed.

6         MR. LARKIN:  That's why it's sealed, but we should

7  still be permitted to ask a few questions at deposition about

8  what happened, and why the guy got charged, and what did he

9  do.  And this is what leads to or could lead, I should say,

10 could lead, Your Honor, to admissions about conduct that

11 subsequent -- that's relevant to depos -- that's relevant to

12 damages.  That's relevant to credibility under 608(b).  You

13 know, 608(b) allows inquiry on cross-examination into acts of

14 dishonesty that could involve theft of something from another

15 inmate's cell.  It could involve theft of something from a

16 Department facility that they weren't supposed to take.  I

17 don't know what is there because we haven't seen any of the

18 arrests or the charges.

19        So that -- gosh, I see I'm running out of time, Your

20 Honor, so I -- forgive me.  I just want to, if I may, touch

21 upon some of the matters that counsel addressed in their

22 presentation concerning the City's discovery.

23        With respect to media, going forward to produce all

24 media would be a lot easier than having to go back to files

25 that we've already produced to search for media.  And the

31

1  reason for that is -- and, again, Your Honor, we're not

2  objecting to Class A incidents media.  We're not objecting to

3  any of the named plaintiffs' media and we're not objecting to

4  engaging in a good-faith process where plaintiffs can tell us

5  incidents that they in good faith believed required production

6  fo media and we will simply get the media for them on a case-

7  by-case basis.  I think that we use that -- we use that

8  procedure -- that process in another case.  It appeared to

9  work pretty well.  Unless the number becomes unmanageable, I

10 don't anticipate objections or problems with an approach of

11 that type.

12       THE COURT:  What's the universe?  How many incidents

13 are we talking about?

14       MR. LARKIN:  Upwards of six to 7,000 use-of-force

15 incidents.  Now, the Class A's are going to be a smaller

16 subset and we've agreed to give the plaintiffs the media for

17 the Class A's because they're the more serious incidents.

18 We've agreed to give them the media opposite their own claims.

19 And then there's going to be a vast chunk of use-of-force

20 incidents that I'm sure counsel is going to review closely and

21 they might say, listen, we need the media for this incident.

22 Let's create a list and let's give it to the City and we will

23 then go and get the media for those incidents.  I assume it's

24 going to be a smaller number than five or 6,000 uses of use-

25 of-force files.

1          And we followed that procedure in the Ingalls' [Ph.]

2   case and I don't recall ever getting complaints that the

3   plaintiffs didn't get the media that they needed or that they

4   were entitled to.

5          THE COURT:  What happened then in Ingalls?  You

6   provided the ones that the plaintiffs requested.

7          MR. LARKIN:  Right.

8          THE COURT:  Presumably there was then some showing

9   by the defendants with respect to other uses of force, right?

10  I mean, you wouldn't have accepted that the uses of force as

11  to which the plaintiffs selected media were represented.

12         MR. LARKIN:  Oh, no.  We -- if we were going -- we

13  ended up settling that case.  But, of course, had we gone to

14  trial we may have -- very well have selected other incidents

15  and other media to show the factfinder if it came to that.

16  And without question, it we do that in this case, the

17  plaintiffs are going to get anything we decide to use in our

18  case in chief.

19         THE COURT:  So my question is, can we agree up front

20  on a smaller sample as to which there will be, if you will,

21  represented uses of force, media included, so that we're not

22  taking discovery on 7,000 incidents?

23         MR. LARKIN:  That's an interesting approach.  I had

24  not -- plaintiffs have not advanced that suggestion, nor have

25  we, in fairness, and so I -- you know, maybe some creative

1   thinking could have sort of addressed this matter as Your

2   Honor suggested at the beginning of the conference.

3          We're already in the process of gathering all this

4   stuff.  I can talk to my client further and I can -- I'm happy

5   to have discussions with plaintiffs about a subset of files,

6   maybe six months out of the year for 2010, '11, '12 might be

7   one just off the top of my head a semi-arbitrary suggestion.

8   I don't know, but I'm happy to have that discussion if

9   plaintiffs would like to do that.

10         With respect to cameras, I think we've agreed to

11  produce in response to the second document request response

12  and materials.  I do know that the Department has schematic

13  drawings for some, but not all of the jails.  Plaintiffs will

14  get those drawings subject to the protective order, of course.

15  We said in our response to the second document requests that

16  we produce responsive material, so I don't know -- I don't see

17  that as a continuing issue.  Question is, what information is

18  there.  Whatever is there we will provide and I think we've

19  stated that in our response to the document requests.

20         Twenty-four-hour reports, again, counsel --

21  plaintiffs are going to be getting thousands of use-of-force

22  files and for each of those files the 24-hour report will be

23  there if there was such a report.  To have us find other 24-

24  hour reports could wind up expanding the case because now if

25  plaintiffs are going to rely on a subset of 24-hour reports

34

1    for which we have not produced the use-of-force file, I may

2    want to go to the file and show the jury or the Court that the

3    incident, in fact, was not an unreasonable use of force and

4    here are the reasons why.

5         So given the number of files we're already producing

6    it just seems that to expand it to include 24-hour reports

7    it's kind of going to the wrong direction, it seems to me.

8    It's -- there's so much material that we're already providing.

9    It seems that they couldn't prove their case using what we're

10   giving them.  They certainly aren't going to be able to prove

11   it by a few additional 24-hour reports.

12        With respect to communications with other law

13   enforcement agencies -- and I apologize if I'm running over,

14   Your Honor -- briefly, every time there's an arrest inside the

15   jails there are communications between the officers -- the

16   correctional officers who made the arrest and the law

17   enforcement people, especially the Bronx DA's office.  If

18   plaintiffs want to limit the demand, and this is what I

19   understood our discussions to be about, if plaintiffs want to

20   limit the demands to the Commissioner's office and the Chief

21   of Department's office, let's just say, or others above the

22   rank of chief who had communications with a specific subset of

23   agencies, DOI, U.S. Attorney, Bronx DA's office, that's a

24   manageable demand that I can go to my client and we can

25   conduct some reasonable search.  But to say that you want all

1  communications between DOC, DOC, right, in quotes, and every

2  law enforcement agency in the area would be next to

3  impossible, it would be next to impossible to try to find all

4  that stuff.

5          When we produce the use-of-force file, if an arrest

6  resulted from the use of force, arrest of an inmate or the

7  arrest of an officer, that information will be in the file.

8  There'll be a notation there.  You know, Inmate Smith was

9  arrested.  In two of the uses of force that are an issue in

10 this case, named plaintiffs, arrests were made and the

11 indication is in the file that the arrests were made.  Those

12 arrests were of visitors in two incidences and the arrest of

13 another inmate, not a named plaintiff in another instance.

14 But the information is there.  You can go to the Court file

15 and find out if -- what happened to those criminal cases.

16         So without some limitation, the demand for

17 communications, it seems, is prohibitively burdensome for us

18 to just try to get everything there.  And with respect to

19 lawsuits, I can tell -- inform the Court that we do have some

20 additional responsive material that we will produce to the

21 plaintiffs that I believe will address the demands -- the

22 discovery demands, but we can have further discussions about

23 it if the material that we provide is somehow not -- I mean,

24 not complete.  I believe that what we're going to give them is

25 going to address the -- is going to address the demand.

1          22-R forms -- I don't want to belabor this, Your

2     Honor -- you know, getting the entire personnel file, I'm

3     going to have to go back to my client and ask them to create

4     22-R forms for the purpose of litigation.  That's not what 22-

5     R forms are for.  They're used for the Department's internal

6     tracking purposes when an officer is charged with misconduct.

7     We've produced them to the extent they exist.  And you -- that

8     gives you an indication of what any charges for violating

9     Department conduct happened up to that time.  And then you're

10    going to see the current pending charge, whether it's

11    excessive use of force or something else.

12          Now, we're going to be giving the plaintiffs files

13    concerning charges against officers for use of force, lying,

14    dishonesty, that sort of thing.  So they're going to have all

15    that.  They're going to have all that anyway and they're going

16    to have the existing 22-Rs.  So to make us create 22-Rs

17    doesn't seem to be quite as important as plaintiffs appear to

18    be suggesting, Your Honor.

19          THE COURT:  And am I correct that the 22-Rs are not

20    created on the basis of single database?

21          MR. LARKIN:  Correct.  It requires a manual phone

22    call to two or three different places.

23          THE COURT:  Right, right.

24          MR. LARKIN:  And then you have to create the

25    document and then, you know, they use it when there are

1   charges because whoever is looking at the charges wants to

2   know what has this guy done before when you look at -- that's

3   basically what 22-R is.

4          As far as the photos of inmates and whatnot, I -- I

5   mean, plaintiffs want -- you know, tours both before and

6   after, rosters of, you know, who's working on a certain tour

7   before and after use-of-force incident, seems to me, the most

8   the City ought to be required to produce is the tour when the

9   incident happened.  That's when you'll have a list of the

10  officers assigned to the jail and even that's an overboard

11  demand, it seems to me, because not every officer assigned to

12  the jail was necessarily involved in the incident or present.

13  And as far as photos are concerned, I'd like an opportunity to

14  use photo arrays, to see if the inmates recognize officers to

15  insure the integrity of the identification process.  If we

16  hand just a list of names and photographs that counsel gets to

17  talk to their client about in a privileged setting, counsel

18  knows who's assigned to the house and who wasn't and, lo and

19  behold, out of that process will come an identification of

20  three or four officers who happen to be in the housing area.

21          I'm suggesting give us a chance at least if we want

22  to do it to prepare photo arrays, show them to the plaintiffs,

23  even if it's in advance of the deposition.  And if counsel

24  wants to show the photo arrays to their clients in advance, I

25  can live with that as long as we don't identify who the

1   officers are and let the inmates view the photo array and make

2   a pick.  Yeah, that's the guy.  I saw him and we'll go from

3   there, it seems to me.  That doesn't seem unfair to me.  That

4   seems a little bit fairer.

5          And I believe, Your Honor, I apologize.  I've gone

6   over my -- well over my 20 minutes, so I'm going to sit down

7   and I'll rest on the submissions that we made, the remaining

8   issues.

9          MS. RAAD:  Thank you.  I'll try to be very brief.  I

10  want to just go back really quickly to correct one statement I

11  made about the media files.  I had accidentally or

12  inadvertently said that the MEO16 interviews are transcripts.

13  That's not correct.  It's a summary that exists in the ID file

14  that is prepared by ID of the actual interview, so it isn't

15  actually a word-for-word transcript, which is all the more

16  reason, right, why we need to -- why we believe that it's

17  important that we have the actual audio ourselves so that we

18  can hear the statements.

19         We talked about the number of incidents that really

20  are at issue here.  I just want to clarify what I think the

21  actual number is dealing with incidents involving named

22  defendants -- use-of-force incidents involving named

23  defendants.  I think the number is closer to 2200 as

24  represented by the City in the letter versus 7,000.  I think

25  that's the entire universe.  But with regard to the named

1  defendants it's 22.  It's a subset of that.

2         And within that subset there will certainly be many

3  instances perhaps where there is no -- where there is no video

4  and/or audio.  And so as far as the actual burden that is

5  going to exist one way or another on collecting that, I still

6  don't fully understand because it hasn't been fully

7  articulated to us.  I think it is much more minimal than has

8  been addressed.

9         THE COURT:  I'm not clear.  With respect to class

10  claims are you seeking information only with respect to the

11  2200 incidents or are you looking for information going

12  broader, to the 7,000?

13         MS. RAAD:  Right.  So for the 7,000 -- and we've

14  reached agreement on three parts of it -- we are going broader

15  than the 2200.  For the class claims we've asked also and the

16  City has agreed to give us the class -- the media for the

17  Class A use-of-force incidents.  And also, for all

18  incidents -- oh, I'm sorry, all of incidents involving

19  plaintiffs.  And they've also agreed that we can, as we talked

20  about, provide a list of additional incidents.

21         But because the -- with the dispute with regard to

22  the actual named defendants we believe a key subset and a very

23  important subset, and the reason the list we don't believe to

24  be practical -- the reason we're concerned with the list

25  approach is because we really do review each and every video

40

1  and that if we wait, it's impossible to essentially determine

2  which incident you need the video or audio for until you see

3  the video or audio to identify whether or not there's some

4  kind of discrepancy or issue.

5           In Ingalls, it is true that that's an approach that

6  was used, but from our point of view it wasn't a successful

7  approach because the time frame that re -- the information in

8  the media was coming back was so close to the deposition that

9  there wasn't -- you know, the whole file would be reviewed

10 multiple times to be able to make this analysis and it just

11 wasn't an efficient mechanism.

12          So we think it's a crucial part.  We think the

13 subset is much smaller than actual -- the remaining disputed

14 area is much smaller than actually 2200 even.  And to the

15 extent that there is a burden, we'd ask that the burden become

16 more clearly articulated, perhaps in some kind of affidavit

17 form so that we can talk about if there's an easier way to

18 further limit.  But we just really believe it's absolutely

19 crucial.

20          I understand that the representation that it would

21 be perhaps easier had they originally collected everything,

22 that it was easier on a going-forward basis, but we've

23 requested this from the very beginning.  It's really

24 important.  It's part of the file.  We still submit that you

25 should be able to go back to the facilities or to the

1   investigation -- to central locations and collect that

2   information, so we appreciate that it may be more efficient

3   going forward, but we still think it's key.

4          And I don't believe that all of the use-of-force

5   files which the City has agreed to produce her named

6   defendants have yet been produced.  So in collecting those

7   files it seems reasonable that you would collect the media at

8   the same time.

9          For the schematic drawings, it does sound like we,

10  of course, will keep anything subject to the protective order.

11  We just want to make absolutely sure that we're looking at all

12  the relevant places.  So to the extent that there's a

13  schematic drawing and the City produces it, that's great.  I

14  just want to make sure if there's an electronically-stored

15  image or something that exists outside of paper form that

16  we're certain that that's something the City is also going to

17  consider and evaluate in its search for relevant information

18  to make sure that we have available all that actually exists

19  or is accessible.

20          And the electronic point is actually one that ties

21  into the remaining two issues that I'm going to quickly touch

22  on, which are the 24-hour reports and the communications.  For

23  the 24-hour reports it really is a small subset we're still

24  talking about.  We've already limited it from 2000 -- January

25  2007 to July 2008.  We believe that they can quickly be

42

1   generated.  If they exist electronically they should be stored

2   electronically and we think we need a snapshot back in time to

3   be able to show the longstanding deliberate indifference here.

4   And the 24-hour reports are the closest in time memorial of

5   the event that actually occurs, so they are a key piece of

6   evidence.

7           And certainly for the communications once you design

8   search terms, the limiter [ph.] that makes it not burdensome

9   or that makes it not overly broad is that, of course, we're

10  looking for communications that relate to the key incidents --

11  or the key allegations in this case, which is use of force --

12  improper use of force.

13          So to the extent that the commissioner is reporting

14  out to the mayor, which happens on use of force, we want to

15  make sure that we do get those communications.  We believe

16  those are crucial and relevant to our case.

17          MS. TALLA:  Your Honor, I just wanted to say a few

18  things about some of the issues that the City raised.  22-R

19  forms, you know, the City has articulated a certain process

20  that they think is what needs to happen in order to have the

21  22-R form created.  This area like a few other areas that

22  we've brought to Your Honor's attention, our understanding of

23  what the burden is really differs from what the City's is.  We

24  do think that the information that goes on a 22-R form exists

25  in a much more centralized way.  In order for burden to be

1   properly evaluated, we would submit that an affidavit or some

2   sort of sworn testimony by a Department employee detailing

3   exactly what someone would have to do, how long it would take,

4   what any costs would be, is appropriate here.  I mean, 22-Rs

5   are a really significant thing here, something that we always

6   get in other excessive force cases that we bring against the

7   City.

8           So, you know, before a decision is made as to burden

9   and creation of documents, we think that we need much more

10  information from the City about its recordkeeping practices on

11  this issue.  The issue about injuries and medical treatment

12  provided as Your Honor suggested, it's just something

13  that's -- all the injuries are listed in our plaintiffs

14  complaint.  The medical records will have that information in

15  it.  We'd submit a description of injuries and treatment,

16  interrogatory responses, extra work.  You know, the

17  verification pages from the individual defendants, we're fine

18  with them being provided at depositions.  There's no need for

19  it to be done in some sort of extra meeting for The Law

20  Department to meet with their clients separately from just

21  meeting with them in preparation of depositions.

22          And with respect -- the one last thing I just want

23  to address is the sealed booking case file that the City

24  represents some sort of 160.50 release is necessary for the

25  Department to release sealed booking case files.  We offered

44

1   to give a release that would authorize the Department of

2   Correction to release all the records related to the

3   plaintiffs time in Department custody excepting underlying

4   paperwork for arrests that were sealed.  And so essentially

5   we're willing to give -- and obviously, we're not disputing

6   the relevance of Department records involving plaintiffs while

7   they're in Department custody, but we want to not give up the

8   protections that we believe are important with respect to

9   paperwork underlying sealed duress.  I mean, arrests are

10  sealed for a reason.  It's a very rare thing.  It happens

11  because a person has been acquitted or the claims have been

12  decided in their favor, so we think it's an important interest

13  to protect.

14          And finally, if Your Honor would allow me to say

15  this, this issue about garden variety emotional distress

16  claims, I mean, we have the representation that the plaintiffs

17  are going to be limited and claiming emotional injuries and

18  damages to garden variety distress claims.  Discussing the

19  idea of testimony going into nightmares, et cetera, we submit

20  that that is more appropriately resolved at a different time

21  in the case before the plaintiffs testify before a jury, if we

22  ever get that far, rather than here opening up that

23  information when they've already told and made the

24  representation that they're not seeking extensive or severe

25  emotional distress damages.

1              THE COURT:  Well, but if the determination is later

2    made that the plaintiffs can testify with respect to certain

3    psychiatric injury and the defendants are entitled to certain

4    information to test that, isn't that a little late to be

5    reopening discovery?

6              MS. TALLA:  Your Honor, you know, plaintiffs do not

7    plan to use their emotional state as a sword while not allow

8    in -- we have no plan to be unfair about this.  Plaintiffs do

9    not plan to testify extensively about all their emotional harm

10   in a way that arises to the level that it would be a severe

11   thing.  We don't intend to be unfair.  We don't intend to put

12   evidence about their mental state in the record.  The City

13   would then not have the ability to test them on it.  I agree

14   with you, but that's not our plan here.

15             THE COURT:  I think the devil would be in the

16   details in terms of what could come in.  Thank you.

17             Mr. Larkin, anything further?

18             MR. LARKIN:  Yes, just briefly.  Your Honor, with

19   respect to media, one possible resolution of this -- and

20   again, I appreciate the Court's comments earlier in the

21   conference that further discussion could have been useful.  We

22   could get all media going forward for use-of-force files that

23   are produced from 2010 much, much more easily than we could

24   get existing media for all uses of force involving the named

25   defendants.  So that would be a different subset of files, but

46

1  it seems to me that media in more recent incidents would be

2  more relevant to a class claim for injunctive relief than

3  would old media in older cases.

4       So if plaintiffs have all the media for the uses of

5  force that go from, say, 2010 to 2000 -- you know, mid-2013

6  and want to use that body of proof -- either side could then

7  use that body of proof.  We could use it, they could use it

8  and the burden would be much, much less.  And the simple

9  reason is that as we're gathering the new files going forward,

10  it's a lot easier to get -- to just go to the facilities, get

11  the file with the media in it, copy it, produce it in one shot

12  instead of having to go back to, say, a 2004 incident and

13  dredge up or search for the media to do that you've got to go

14  back to the institution where the files are kept.  And so it

15  may not be a perfect world, if you will, but it seems to me

16  that that could be a workable, more reasonable compromise on

17  the media issue.

18       As far as the schematic drawings, I will produce --

19  Your Honor, the drawings I've seen are actually pretty

20  interesting.  They're interactive CDs where you can actually

21  click on certain portions of the jail and see where the

22  cameras are.  It's an interesting piece of information and the

23  plaintiffs will get that to the extent that it exists.

24       Briefly, with respect to emotional injuries, I

25  think -- I mean, the devil is in the details and that counsel

47

1    just made a very telling admission.  We know what's going to

2    happen here.  These guys are going to come in and talk about

3    how horrible the incident was and our hands are going to be

4    tied when we get in front of the jury and that is a realistic

5    concern, Your Honor.

6            And as far as verification pages, look, my view is

7    that the individual defendants to have them sign verifications

8    is needless make work.  If the plaintiffs are directed to

9    supply supplemental interrogatory responses with

10   verifications, I understand the sort of -- what's the word I'm

11   looking for -- I understand that the symmetry and the balance

12   of saying that if I'm going to direct -- if the Court is going

13   to direct the plaintiffs to supply written verifications and

14   supplemental responses, well, then the individual defendants

15   ought to as well.  If that is the Court's ruling, my

16   suggestion was that we be permitted to produce the

17   verification pages at the depositions.

18           My respectful suggestion to the Court is that if the

19   Court does not direct the plaintiffs to produce supplemental

20   interrogatory answers, which I believe we're entitled to, then

21   I don't really see that anything is gained by having the City

22   produce individual verifications by the correction officers.

23   And I've taken up too much of Your Honor's time already, so I

24   thank you for your --

25           THE COURT:  Thank you all.

48

1      MS. RAAD:  Your Honor --

2      THE COURT:  No.

3      MS. RAAD:  Do you mind if --

4      THE COURT:  No.

5      MS. RAAD:  Okay.

6      THE COURT:  What I would like is to get a week from

7  tomorrow a letter -- hopefully, a joint letter telling me

8  what, if any, of the issues that were raised in the prior two

9  sets of letters are fully resolved so that I know that I'm not

10  making determinations on issues that are now moot.  There was

11  some suggestion that certain things were resolved between the

12  time of those letters and today and there was certainly

13  suggestion that information will be provided that probably

14  will be sufficient in certain respects.

15      So I'd like that laid out clearly for me.  After I

16  get that, I'll resolve the balance of the issues and we'll go

17  forward.  Thank you all.

18      ATTORNEYS:  Thank you, Your Honor.

19      MS. TALLA:  Just one question about that letter.  Do

20  you want that letter to include the remaining issues or just

21  the issues that have been resolved?

22      THE COURT:  I'll know the remaining issues from what

23  I've got here.

24      MS. TALLA:  Okay.

25      THE COURT:  So I think it may be -- it's a joint

49

1  letter and if you can agree on identifying which are which,

2  that's fine.  My concern is knowing which ones are taken care

3  of.

4          MS. TALLA:  Thank you, Your Honor.

5          THE COURT:  Thanks.

6                    *  *  *  *  *  *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

50

1           I certify that the foregoing is a court transcript

2    from an electronic sound recording of the proceedings in the

3    above-entitled matter.

4

5                              _____

6                              Ruth Ann Hager, C.E.T.**D-641

7    Dated:   April 18, 2013