UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------- X
                                       :

MARK NUNEZ, et al.,               :

                        Plaintiffs,     :

         - against -          :

                                    :  **11 Civ. 5845 (LTS)(JCF)**

CITY OF NEW YORK, et al.,        :

                                    :  **UNITED STATES' PROPOSED**

                   Defendants.   :  **COMPLAINT-IN-INTERVENTION**

                                    :

---------------------------------------------------------- X
                                         :

UNITED STATES OF AMERICA,   :

                                    :

                   Plaintiff-Intervenor,   :

         - against -          :

                                      :

CITY OF NEW YORK and NEW YORK CITY :
DEPARTMENT OF CORRECTION,     :

                   Defendants.   :

---------------------------------------------------------- X

      Plaintiff United States of America (the "United States"), by and through its attorney,

Preet Bharara, United States Attorney for the Southern District of New York, alleges upon

information and belief as follows:

## <u>INTRODUCTION</u>

      1.     Defendants City of New York and the New York City Department of

Correction (the "Department" or "DOC") have engaged in a pattern and practice of violating the

constitutional rights of male inmates—ages 16, 17, and 18—incarcerated at the jails on Rikers

Island (the "Subject Inmates").   Defendants' deliberate indifference to these constitutional rights

has caused the Subject Inmates serious physical, psychological, and emotional harm.

2.     Specifically, Defendants have engaged in a pattern and practice of subjecting the Subject Inmates to excessive and unnecessary use of force by DOC staff, and failing to adequately protect the Subject Inmates from violence inflicted by other inmates.  For years, Defendants have been aware of the extraordinarily high level of violence perpetuated against the Subject Inmates, but have failed to take meaningful action to correct the problem, including by (a) failing to meaningfully address an organizational culture that tolerates unnecessary and excessive force; (b) failing to ensure that use of force by DOC staff is properly reported and investigated; (c) failing to appropriately discipline correction officers who utilize unnecessary and excessive force, as well as those who supervise such officers; (d) failing to implement measures to ensure that the Subject Inmates are appropriately supervised by experienced, qualified, and well-trained staff; and (e) failing to maintain an effective and age-appropriate classification system and inmate grievance system.

3.     In addition, Defendants have engaged in a pattern and practice of placing the Subject Inmates in punitive segregation at an alarming rate and for excessive periods of time, which has resulted in significant psychological, physical, and developmental harm.  Defendants are well aware of the profound impact that solitary confinement can have on youth due to their stage of growth and development, but for years have failed to develop an adequate continuum of alternative disciplinary sanctions for rule violations that do not involve lengthy isolation. Although DOC recently announced its intention to stop placing 16- and 17-year olds in punitive segregation by the end of 2014, several 16- and 17-year olds remained in punitive segregation as of the middle of November 2014.  Defendants also continue to routinely place 18-year old inmates, including many with mental illnesses, in punitive segregation for excessive periods.

## JURISDICTION AND VENUE

4.      The United States is authorized to bring this action pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").

5.      The Attorney General certifies that all pre-filing requirements specified by 42 U.S.C. § 1997c have been met.  The Attorney General's certification is included in the United States' Notice of Motion, and is incorporated by reference herein.

6.      The Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345.

7.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because Defendants are located in this District and the events, actions, or omissions giving rise to the claims herein occurred in the Southern District of New York.

## THE DEFENDANTS

8.      Defendant City of New York (the "City") is a municipal corporation that oversees the operation of the jails located on Rikers Island where the Subject Inmates are incarcerated.

9.      Defendant New York City Department of Correction manages and operates the jails where the Subject Inmates are incarcerated.  The City and DOC are responsible for the safety, care, custody, and control of the Subject Inmates and others incarcerated on Rikers Island.

10.      At all relevant times, Defendants have acted or failed to act, as alleged herein, under the color of state law.

11.     The claims of the United States are asserted solely against the City of New York and the Department, and not against the individual defendants named in the Amended Complaint filed in *Nunez et al. v. City of New York et al.*, 11 Civ. 5845 (LTS)(JCF).

## FACTS

## BACKGROUND

12.     The jails where the Subject Inmates are incarcerated are institutions within the meaning of 42 U.S.C. § 1997.

13.     Defendants are political subdivisions of New York State, or agents thereof, within the meaning of 42 U.S.C. § 1997.  Defendants are governmental authorities, or agents thereof, with the responsibility for the administration of juvenile justice and the incarceration of juveniles within the meaning of Section 14141.

14.     New York is one of only two states in the United States that automatically charges all individuals aged 16 and older as adults.

15.     The vast majority of the Subject Inmates are pre-trial detainees.  Pre-trial detainees aged 16 and 17 are housed in the Robert N. Davoren Center ("RNDC").  Until recently, 18-year old pre-trial detainees were housed in RNDC as well.  In or around September 2014, DOC began housing most 18-year old pre-trial detainees in the George Motchan Detention Center ("GMDC"), although some are housed in the George R. Vierno Center ("GRVC") and some in the Central Punitive Segregation Unit ("CPSU") in the Otis Bantum Correctional Center.  Approximately half of the Subject Inmates are 18-year olds.

16.     Until recently, all sentenced Subject Inmates were placed at the Eric M. Taylor Center ("EMTC"), which houses inmates sentenced to serve one year or less.  Within the last few months, the Department began housing sentenced 16- and 17-year old inmates in RNDC.

17.    The average daily population for inmates aged 16-18 was 489 in FY 2014, 682 in FY 2013, and 791 in FY 2012.  These inmates' average length of stay at Rikers tends to be longer than the adult population.  In FY 2013, their average length of stay was 74.6 days. [1]

18.    Approximately half of the Subject Inmates are diagnosed with some form of mental illness.   Many have significant mental health impairments that can limit their impulse control.

19.    The United States sent Defendants a findings letter on August 4, 2014 ("Findings Letter") that set forth the unconstitutional conditions at the jails where the Subject Inmates are housed and concluded that there was a pattern and practice of conduct at Rikers that violated the constitutional rights of the Subject Inmates.  In particular, the Findings Letter asserted that DOC frequently subjects the Subject Inmates to the excessive and unnecessary use of force, fails to adequately protect the Subject Inmates from violence inflicted by other inmates, and places the Subject Inmates in punitive segregation at an alarming rate and for excessive periods of time.  The Findings Letter notified the Defendants of the minimum measures the United States believes may remedy the unconstitutional conditions.  The Findings Letter is appended to this Complaint-in-Intervention as Exhibit A and is incorporated by reference herein.

## STAFF USE OF FORCE AND INMATE-ON-INMATE VIOLENCE

**A. Defendants Have Failed to Protect the Subject Inmates from Harm Caused By Excessive and Unnecessary Use of Force by Staff and High Levels of Inmate-on-Inmate Violence.**

20.    The Constitution requires Defendants to protect inmates from the use of excessive and unnecessary force by staff as well as violence inflicted by other inmates. Defendants have failed to take minimum reasonable measures to fulfill this fundamental

---

[1] These figures include female inmates aged 16-18, who represent approximately 10% of the admissions for this age group.  The fiscal year runs from July through June of the following year.

responsibility, and for several years have been deliberately indifferent to the obvious and substantial risk of harm to the Subject Inmates resulting from staff use of force and inmate-on-inmate violence.   As a result of Defendants' systemic and widespread pattern, practice, and custom of utilizing unnecessary and excessive force, the Subject Inmates have sustained serious injuries in violation of their rights under the Eighth and Fourteenth Amendments of the Constitution.

### 1.   The Extraordinary Frequency of Use of Force and Violence

21.      The Subject Inmates face pervasive violence at Rikers and are at constant risk of physical harm during their incarceration.  DOC staff have routinely used force unnecessarily as a means to control the population and punish disobedient or disrespectful inmates.  Even when some level of force is necessary, the force used is often disproportionate to the risk posed by the inmate.  In addition, inmate-on-inmate fights and assaults are commonplace.

22.      Emergency alarms often sound in the Subject Inmates' housing areas signaling some altercation or disturbance.  As a result, the facility frequently is placed in locked down status and inmates are confined to their cells.  In FY 2014 alone, there were 1,303 responses to emergency alarms at RNDC and EMTC, up from 1,118 in FY 2013.

23.      Staff use force against the Subject Inmates with alarming frequency. According to DOC data, in FY 2014, there were 553 reported staff use of force incidents involving the Subject Inmates in RNDC and EMTC, resulting in 1,088 injuries.[2]  There were 565 reported staff use of force incidents in FY 2013 (resulting in 1,057 injuries), and 517 incidents in FY 2012 (resulting in 1,059 injuries).  In addition, 308 (or 43.7%) of the 705 Subject Inmates in

---

[2] These use of force figures exclude "use of force allegations," which refer to instances when sources other than DOC personnel report that force was used on an inmate.  There were 32 use of force allegations at RNDC or EMTC in FY 2014, 56 in FY 2013, and 45 in FY 2012.

custody as of October 30, 2012, had been subjected to use of force by staff on at least one occasion.

24.     The actual use of force numbers are likely even higher than DOC's data suggest because many incidents go unreported.  As discussed *infra*, correction officers often do not accurately report incidents, and warn inmates to "hold it down" (code for "don't report what happened") or otherwise pressure them not to report use of force incidents.

25.     The number of reported inmate-on-inmate fights and assaults is also striking, and further demonstrates that the Department is not fulfilling its obligation to ensure the safety and well-being of the Subject Inmates.  There were 657 reported inmate-on-inmate fights involving the Subject Inmates in RNDC and EMTC in FY 2014.  This marked a modest decrease from the 845 reported inmate-on-inmate fights in FY 2013, and the 795 reported inmate-on-inmate fights in FY 2012.[3]  In the first half of FY 2014, the Subject Inmates received a total of 775 infractions for fighting.

26.     Inmate-on-inmate fights are likely even more prevalent than reflected in DOC's data due in part to the inconsistent manner in which staff report inmate altercations.  For example, according to the results of an internal Department audit, RNDC failed to report 375 fights during calendar year 2011 alone, due in part to the lack of a codified definition of "inmate fight," and inconsistencies in how staff recorded and reported inmate altercations.  As discussed in more detail *infra*, the initial version of the audit report, prior to being revised at the direction of then DOC Commissioner Dora Schriro, concluded that the dramatic underreporting was due to RNDC management's failure "to supervise, manage, or oversee the facility's reporting of violence statistics, statistics that RNDC was obligated to report pursuant to department policy."

---

[3] From April 2012 through April 2013, fights resulted in 430 visible inmate injuries, according to data provided by the Department of Health and Mental Health.

27.     Inmate-on-inmate violence is pervasive in the jails that house the Subject Inmates in large part because the inmates are inadequately supervised by inexperienced and poorly trained correction officers, who fail to closely and adequately monitor inmate conduct.

28.     Staff uses of force and inmate-on-inmate fights and assaults have resulted in an alarming number of serious injuries to the Subject Inmates, including broken jaws, broken orbital bones, broken noses, long bone fractures, and lacerations requiring stitches.  The Department has failed to ensure that these injured inmates consistently receive prompt medical care.

29.     The Subject Inmates have sustained injuries at a staggering rate.  For instance, during the period April 2012 through April 2013, the Subject Inmates sustained a total of 754 visible injuries, according to data maintained by the Department of Health and Mental Health ("DOHMH"), which is responsible for providing medical services to inmates at Rikers.  The prevalence of head injuries is particularly striking.  From June 2012 through early July 2013, the Subject Inmates suffered a total of 239 head injuries, and were twice as likely to sustain such injuries as was the adult population.

30.     Bone fractures are common as well.  The Subject Inmates housed in RNDC and EMTC suffered a total of 96 suspected fractures from September 2011 through August 2012, according to DOHMH data.[4]  In addition, during FY 2013, the Subject Inmates were taken to an urgent care facility for emergency medical services 459 times.

31.     During the first half of 2012, 55% of the Subject Inmates brought to the RNDC medical clinic after a use of force incident had a verifiable injury.  This represented a higher rate than any other Rikers housing facility, taking into account inmate population.  Even more concerning, 48% of those injuries were to the inmate's head or face, including fractures, contusions, and lacerations.

---

[4] RNDC inmates suffered 22 jaw fractures during the first 5 ½ months of 2012 alone.

### 2.   Excessive and Unnecessary Staff Use of Force

32.     As described in more detail below, DOC staff have engaged in a pattern, practice, and custom of subjecting the Subject Inmates to excessive and unnecessary force.  For years, Defendants have failed to take reasonable measures to adequately address the deep-seated culture of violence that has pervaded the jails for years.  As a result, the Subject Inmates have been and continue to be harmed.

### a.   Headshots

33.     DOC staff frequently punch, strike, or kick the Subject Inmates in their head or facial area.  Staff sometimes deliver closed fist punches to an inmate's facial area as an initial response to a volatile situation, without first seeking to control or neutralize the inmate through less aggressive techniques.  DOC staff have regularly utilized headshots where no officer or other individual was at imminent risk of serious bodily injury and more reasonable methods of control could have been used to avoid such injury.

34.     DOC's 24-hour reports[5] from October 2012 through early April 2014 reveal a total of 64 incidents involving blows to a Subject Inmate's head or face.[6]  This is undoubtedly an underestimate of the number of headshots during this period, because 24-hour reports contain only initial incident summaries prepared by staff themselves.

35.     Headshots have become so widespread at Rikers that correction officers sometimes plainly admit using them.  Officers frequently claim that they struck a Subject Inmate in the head or face in self-defense after being first punched by the inmate, when in fact this was not the case.

---

[5] 24-hour reports include summaries of unusual incidents that occurred during a given day, including use of force incidents.

[6] The 64 incidents include 25 use of force allegations.  There were 12 additional incidents that do not specifically reference a blow to the head or face, but state that the officer punched the inmate and the inmate sustained an injury to his head or facial area.

36.     In other instances, staff report using only "upper body control holds" to restrain inmates, but the evidence—such as statements in the inmates' medical records describing facial swelling, bruising, or lacerations—strongly suggests that the officers in fact used headshots and submitted false reports.

37.     Headshots are a long-standing problem at Rikers.  In 2004, Steve Martin, the consultant retained in a then-pending class action lawsuit against DOC, issued a report noting the frequency with which DOC staff punched inmates in the face.  *See* Report of Steve J. Martin submitted in *Ingles v. Toro*, 01 Civ. 8279 (DC).  Mr. Martin wrote that "there is utterly no question that the Department, by tolerating the routine use of blunt force headstrikes by staff, experiences a significantly greater number of injuries to inmates than the other metropolitan jail systems with which I am familiar."  Notwithstanding their awareness of the serious risk of harm that headshots present, over the last ten years DOC management has failed to adequately address this long-standing problem through improved training, supervision, and staff disciplinary measures.

### b.  Use of Force as Punishment or Retribution

38.     Instead of using force only as a last resort, DOC staff improperly utilize force as a means to punish the Subject Inmates for real or perceived misconduct, and as a form of retribution.  Correction officers engage in abusive practices that are designed to be punitive and inflict pain on the Subject Inmates.

39.     DOC staff have taken inmates to isolated locations with limited or no camera coverage to inflict beatings.  Multiple correction officers are often involved in these beatings.  In addition, DOC staff have challenged the Subject Inmates to fights at locations with no video surveillance, such as stairwells or the RNDC school area.

40.    Correction officers also unnecessarily continue to use force against the Subject Inmates who already have been restrained.  They often continue to hit, slap, beat, or kick the inmates well after they have been placed in flex cuffs or otherwise restrained and no longer present any actual threat or safety risk.

41.    In addition, DOC staff punish the Subject Inmates through the use of painful escort techniques.  Corrections officers apply flex cuffs excessively tightly and exert intense pressure in order to inflict extreme pain.

### c. Use of Force in Response to Verbal Altercations and Failure to Follow Instructions

42.    DOC staff unnecessarily employ abusive physical force when confronted with verbal taunts and insults, noncompliant inmates, and inmate complaints, even though no safety or security threat exists.

43.    Due to their poor training and inexperience, correction officers lack adequate conflict resolution and de-escalation skills, which are particularly important when interacting with volatile youth.  When Subject Inmates talk back to an officer or make a derogatory remark, DOC staff frequently escalate the disagreement into a physical confrontation instead of exercising patience and seeking to de-escalate the situation.  As a result, force is needlessly applied and the Subject Inmates suffer preventable injuries.

### d.  Use of Force by Specialized Teams

44.     Each jail has a designated probe team that consists of a group of correction officers and supervisors who respond to disturbances and violent incidents.   Probe team members wear helmets, face shields, and protective equipment around their torso.  Inmates commonly refer to them as "the Turtles."

45.      Upon arriving at the scene of an incident, probe team members often quickly resort to the use of significant levels of force that are disproportionate to the threat or risk presented.  DOC has received multiple complaints regarding the dangerous conduct of probe teams, but has still failed to take reasonable steps to ensure that probe team members receive adequate training and are sufficiently qualified and experienced to effectively carry out their duties.

46.     Cell extraction teams are called upon to remove resistant or assaultive Subject Inmates from their cells.  Before resorting to force, cell extraction teams are required to first try to persuade inmates to voluntarily leave their cells through counseling.   Indeed, DOC policy requires that mental health staff be summoned to attempt to persuade an inmate to cooperate. However, either these efforts regularly fail or DOC policy is not being followed, as extractions frequently result in the unnecessary and excessive use of force and injuries to the Subject Inmates and DOC staff.

### e.  False Claims that Inmate Was Resisting to Justify Use of Force

47.     While employing excessive force against the Subject Inmates, DOC staff regularly yell "stop resisting" even though the inmate has been completely subdued or, in many instances, was never resisting in the first place.

48.     DOC staff engages in this practice to give the impression that the continued use of force is necessary to control the inmate, when in fact it is not.

49.     Correction officers who witness use of force incidents also frequently report that the inmate was resisting, even though that is false.

50.     Although DOC supervisors and management are aware of these efforts to "cover up" the unjustified use of continued force, they often fail to question whether inmates were actually resisting in a manner to warrant the level of force utilized.

**f.  High Levels of Use of Force in Areas Outside of Camera Coverage**

51.     DOC staff frequently employ excessive and unnecessary force in locations without video surveillance to avoid detection.

52.     For years at RNDC, a disproportionate number of the most serious use of force incidents occurred in locations that did not have cameras, such as the school area, stairwells, and intake holding pens.  Inmates, correction officers, and supervisors are well aware of these locations.  Some even have names.  For instance, the RNDC intake cells have been referred to by inmates as "forget about me" cells.

53.     DOC management was well aware of the frequency with which staff abused the Subject Inmates in these areas, and knew that additional video surveillance would likely deter the use of excessive and unnecessary force.  However, for years the Department has failed to install a sufficient number of cameras to ensure full coverage throughout RNDC.  Although more cameras have been installed since the United States issued the Findings Letter on August 4, 2014, hundreds of additional cameras are still needed to provide complete video surveillance coverage at the facility.

54.     As discussed above, in or around September 2014, DOC transferred most 18-year old pre-trial detainees from RNDC to GMDC.  Most of the GMDC units that now house 18-year old inmates have no video surveillance at all.  During September through November 2014, there were a total of 71 reported staff use of force incidents involving 18-year olds alone.

**B.  Defendants Have Exhibited a Pattern and Practice of Deliberate Indifference to Ongoing Serious Harm, and the Risk of Serious Harm, to the Subject Inmates from Excessive and Unnecessary Use of Force by Staff and High Levels of Inmate Violence.**

55.     Defendants' deliberate indifference to the known serious harm, and risk of serious harm, to the Subject Inmates is exhibited by the long history of violence at Rikers and Defendants' ongoing failure to, *inter alia*, select and promote a sufficient number of managers and supervisors with the necessary skills and commitment to address the extraordinarily high levels of violence perpetrated against and among the Subject Inmates, ensure that use of force incidents involving the Subject Inmates are properly documented and investigated, ensure that DOC staff are appropriately disciplined for utilizing excessive and unnecessary force and for attempting to cover up such use of force, implement measures to ensure that the Subject Inmates are appropriately supervised, maintain an effective and age-appropriate classification system, maintain an effective inmate grievance system, and ensure that DOC staff working with the Subject Inmates have effective training programs on both use of force and managing youth.

**1.  The Long History of Violence at Rikers**

56.     Defendants have been aware of the ongoing harm and risk of serious harm to the Subject Inmates for many years, based on a long and troubled history of pervasive staff use of force against inmates, yet have failed to correct these known deficiencies.  This history is the result of an organizational culture that accepts excessive and unnecessary violence as an inherent part of the jail environment.

57.    Defendants were put on notice of the systemic use of excessive and inappropriate force by DOC staff, and the culture of violence that surrounds it, by a series of use of force-related class action lawsuits brought by inmates dating back to the early 1980s.  Four of these class actions focused on specific facilities, including the jail currently known as EMTC (*Fischer v. Koehler*, 83 Civ. 2128), the Bellevue Prison Psychiatric Ward (*Reynolds v. Ward*, 81 Civ. 101), the Brooklyn House of Detention (*Jackson v. Montemango*, 85 Civ. 2384), and the Central Punitive Segregation Unit (*Sheppard v. Phoenix*, 91 Civ. 4148).  A fifth class action alleged system-wide constitutional violations (*Ingles v. Toro*, 01 Civ. 8279).  These cases all settled by either court-ordered or private settlement, instituting limited injunctive relief and certain reforms related to use of force policies.  Notwithstanding these reforms, a culture of violence has persisted in DOC jails, including the jails that house the Subject Inmates.

58.    In addition, Defendants have been alerted to staff misconduct through several criminal prosecutions of individual correction officers.  In 2011, two correction officers pled guilty in connection with events that led to the death of an adolescent in October 2008.  The inmate died from a punctured lung after he allegedly was beaten by other inmates for refusing to participate in "the Program," a system of extortion among young inmates that was reportedly operating at Rikers with the approval of correction officers.

59.    In 2012, a former Assistant Deputy Warden was found guilty of falsifying use of force reports and official misconduct, and a Captain was found guilty of falsifying use of force reports, official misconduct, and attempted assault, in connection with a beating of an inmate at RNDC.

60.    In 2013, ten DOC employees, including the former Assistant Chief for Security, two Captains, and seven correction officers, were indicted on a range of charges, including

attempted gang assault, tampering with evidence, and falsifying business records, in connection with the beating of an inmate at GRVC.

61.     In March 2014, four correction officers were indicted on charges including attempted gang assault, assault, falsifying business records, and official misconduct in connection with the beating of an inmate at GMDC.  In July 2014, a Captain and two correction officers were indicted on charges including attempted gang assault, assault, falsifying business records, and official misconduct in connection with the beating of another inmate at GRVC.

62.     As these criminal prosecutions make clear, Defendants knew that the Subject Inmates were being harmed due to excessive force by correction officers and their supervisors, and that reports of such incidents were being falsified, and yet Defendants failed to take any meaningful action to correct the systemic deficiencies that led to these incidents.

63.     Moreover, for years, Defendants' own internal data and reporting have shown that the Subject Inmates have been subject to an alarming number of use of force incidents and inmate-on-inmate fights and assaults that far exceed what one would expect in a correctional facility.  DOC management regularly received and reviewed volumes of materials that clearly reflected this high level of violence, including 24-hour reports, use of force reports, aggregate data on staff use of force and inmate-on-inmate fights and assaults, internal reports, and warnings set forth in emails from health officials at DOHMH.  Indeed, information from these sources, and others, was analyzed and provided to Defendants in the United States' Findings Letter. Nonetheless, Defendants have failed to implement sufficient measures to correct known systemic deficiencies that have led and continue to lead to serious harm, and risk of harm, to the Subject Inmates.

### 2. Failure to Put in Place Qualified Managers and Supervisors Who Are Committed to and Capable of Reducing the Level of Violence

64.    Defendants have been deliberately indifferent to harm to the Subject Inmates by failing to appoint a sufficient number of qualified managers and supervisors, including wardens and deputy wardens, with the necessary background, experience, and skills to meaningfully address the extraordinarily high levels of violence.  This has led to continued unnecessary and excessive staff use of force and high levels of inmate fights.

65.    Defendants have failed to adequately screen and select candidates before appointing them to senior positions.  As a result, many managers and supervisors are ill-equipped to properly oversee frontline staff and simply tolerate the excessive and unnecessary staff use of violence, instead of implementing necessary measures to curb it.

66.    For years, DOC managers and supervisors have failed to institute adequate systems, procedures, and practices to address widespread noncompliance with DOC policies, including use of force and reporting policies, and have failed to consistently hold staff accountable for their improper conduct.

67.    For example, as discussed above, in September 2012, an internal DOC audit conducted by DOC's Investigation Division ("ID") determined that RNDC management failed to report 375 inmate fights during calendar year 2011.  The report specifically found that the RNDC Warden and Deputy Warden for Security during that same time period, William Clemons and Turhan Gumusdere, had abdicated responsibility for RNDC's accurate reporting of inmate fights and generally failed to supervise, manage, or oversee RNDC's reporting of violence statistics, which the facility was obligated to report pursuant to DOC's own policies.

68.    The same September 2012 internal audit recommended that Clemons and Gumusdere be demoted for their blatant supervisory failures.  But the then-Commissioner of the

Department ordered the ID to remove the demotion recommendations from a subsequent version of the audit report. Rather than be demoted, Clemons was in fact promoted more than once, most recently in May 2014 to the position of Chief of Department, the highest ranking uniformed position.[7] Gumusdere also has been promoted, and is currently Warden of the largest jail on Rikers Island.

69.     Defendants also have failed to ensure continuity of facility management, making it difficult to institute and implement any meaningful reforms. There have been at least eight Wardens over the past eight years at RNDC. The lack of continuity is also reflected in the frequent turnover of RNDC Deputy Wardens.

### 3. Failure to Ensure Thorough and Accurate Reporting of Use of Force Incidents Involving the Subject Inmates

70.     Defendants have been deliberately indifferent to harm to the Subject Inmates by failing to ensure that use of force incidents are thoroughly and accurately reported and recorded. When use of force reporting is inaccurate or omitted altogether, excessive and unnecessary use of force goes undiscovered and unchallenged, which in turn leads to additional unnecessary and excessive use of force.

71.     Defendants have failed to take action to overcome a powerful code of silence that prevents staff who witness force from reporting it. For example, staff will frequently report that they witnessed an inmate using force against an officer or resisting an officer, but then fail to note or describe the force the officer employed in response to the inmate—even when the officer himself has reported that he has used force. Similarly, officers frequently affirmatively state that they did not witness any use of force despite other evidence that indicates they were at the scene where force was used. Investigators and supervisors reviewing use of force reports consistently

---

[7] Clemons ultimately retired in late 2014.

fail to point out these and other obvious omissions and failures to conform the reports to DOC policy, reinforcing a perception among staff that it is not important to be forthcoming or complete in their reports.

72.     Defendants have failed to prevent correction officers from neglecting to complete reports for comparatively "minor" uses of force, such as slapping and hitting the Subject Inmates to get them to stop talking, pay attention, or stop playing around in school.

73.     Defendants have failed to prevent correction officers and supervisors from pressuring inmates not to report use of force incidents, including by using the phrase "hold it down."  The warning may come from officers immediately following a beating, or sometimes days or weeks after an incident.  Correction officers delay taking inmates to clinics for medical attention as they try to convince them to "hold it down."  If the inmate indeed "holds it down" and declines to report a use of force, the staff also then do not report it.  Inmates who refuse to "hold it down" risk retaliation from officers in the form of additional physical violence and disciplinary sanctions.

74.     Defendants have failed to prevent correction officers and supervisors from intimidating non-DOC staff into not reporting use of force by DOC staff.  Non-DOC staff, including medical staff and teachers, often fail to report witnessing use of force, due in part to fear of retaliation from DOC uniformed staff.  Teachers at the schools on Rikers, where a disproportionate amount of violence against the Subject Inmates takes place, have been told to look the other way when inmates are being beaten so as not to be witnesses.

75.     DOC staff have engaged in a pattern and practice of submitting false use of force reports, and Defendants have frequently ignored or tolerated this fraudulent conduct.  For instance:

- DOC staff submit reports in which they allege that the inmate instigated the altercation by punching or hitting the officer, often allegedly in the face or head and for "no reason," "out of nowhere," "spontaneously," or "without provocation." But the officer has no reported injuries—no lacerations or fractures or even minor bruises or swelling—that would be commensurate with such blows.

- DOC staff submit reports in which they claim to use only limited physical force, such as control holds to subdue the inmate or "guide" him to the floor, but the inmate's injuries indicate a much greater level of force was used.

- DOC staff submit reports in which they claim injuries to their own hands, but do not report punching or hitting inmates, describing the force used as something more innocuous such as "control holds" or the use of OC spray.[8]

- DOC staff submit reports in which the description of an incident is inconsistent with the video recording, and officers later provide an addendum to their report or change their story when confronted with the video evidence.

76.     Defendants have failed to properly maintain and safeguard video recordings of use of force incidents. During the course of the United States' investigation, Defendants advised that they had lost or were otherwise unable to locate 35% of the video recordings of incidents requested. Many of Defendants' own investigative reports also note that although video was recorded, video evidence could not be found.

77.     Defendants have failed to ensure that incidents involving anticipated use of force, such as cell extractions, are properly and accurately recorded. In these videotapes, usually shot

---

[8] Oleoresin Capsicum ("OC") spray, commonly known as pepper spray, is a chemical agent that irritates the eyes and respiratory system of a target.

by correction officers using hand-held video cameras, use of force often is not clearly visible or other important information is not captured.

### 4. Failure to Properly Investigate Use of Force Incidents Involving the Subject Inmates

78.     Defendants have been deliberately indifferent to harm to the Subject Inmates by failing to conduct thorough and comprehensive investigations of staff use of force incidents. Reviews and investigations of use of force incidents are critically important because they are the means by which the Department is able to determine whether its own use of force policies are being followed and to evaluate the adequacy of staff reporting of incidents.  Rigorous investigations, conducted with integrity, are a key part of any system that intends to hold staff accountable for their actions, and thus prevent future abuses.

79.     The systemic failure of the investigative process at Rikers has contributed to the widespread use of excessive and unnecessary force against the Subject Inmates because staff are frequently not held accountable for policy violations, and expect their version of events to be accepted at face value with little scrutiny.

80.     Defendants have failed to ensure that use of force incidents are properly investigated by jail personnel (i.e., at the facility level).  This is particularly problematic as the majority of use of force incidents and allegations have been subject only to a facility-level investigation.  The facilities rarely find that force has been used inappropriately, and nearly always conclude that force was justified and in accordance with the Department's policies—often despite evidence to the contrary.  Facility investigations are cursory and include the following common and systemic deficiencies:

- General bias toward accepting staff's version of an event at face value, even where there is medical or other evidence to the contrary, and discrediting the inmate's account.

- Failure to consistently follow up with staff regarding obvious deficiencies in their use of force reports. As discussed above, these deficiencies may include accounts that are inconsistent with reported injuries to the inmate or the involved officers, accounts that fail to explain why officers did not or could not have used a lesser level of force, and suspiciously similar statements and language in descriptions of incidents.

- Failure to identify and reconcile material discrepancies in statements from involved officers, statements from staff and inmate witnesses, documentation of injuries, and video surveillance tapes (when available).

- Failure to make sufficient efforts to obtain statements from inmates, including the inmate subject to the use of force and inmate witnesses.

- Where video exists, failure to describe the events on the video. Often there is just a summary statement that the video was reviewed and was consistent with officers' use of force reports. Because video recordings frequently go missing, as described above, without an accurate and detailed description of the video recording, there is no longer any objective record of the incident.

81.    DOC assigns Captains and Tour Commanders to investigate incidents at the facility level who have not received adequate specialized training in investigative techniques, and show little familiarity with basic investigative skills or procedures. In most facility-level investigations, Captains and Tour Commanders simply summarize the use of force reports

provided by the officers involved, and the witness statements provided by other correction officers and inmates (if any).

82.     Defendants have failed to ensure that facility investigations are completed in a timely manner.  Facility investigations are completed slowly and use of force packages awaiting final approval become backlogged, notwithstanding the Department's policy that such investigations be completed within 15 days of the incident.  Facility management give each use of force package little more than a cursory review, making it easier for correction officers to conceal misconduct.

83.     Defendants have permitted the ID to conduct superficial reviews of facility-level investigations, which fail to detect and identify glaring deficiencies.

84.      Certain incidents, such as those involving serious injuries, may trigger a full investigation by the ID.  However, ID investigations of incidents involving the Subject Inmates frequently suffer from the same bias and other shortcomings that characterize the facility-level investigations, despite lengthy investigations by ostensibly trained investigators.  The ID disregards or is selective about the policy violations that it chooses to note in its reports—sometimes recommending charges only for some policy violations despite evidence of additional violations, and sometimes recommending no charges at all despite substantial evidence of one or more policy violation.

85.     Defendants also have failed to ensure that ID investigations are completed in a timely manner.  In the first part of 2013, the average completion time for investigation of a Class A use of force incident was just over 9 months.[9]  As of October 2012, 11 percent of the ID's cases had been open for over 350 days, and 42 percent of the ID's cases had been open for

---

[9] According to the Department's Use of Force Directive, a Class A use of force is one which requires "medical treatment beyond prescription of over-the-counter analgesics or the administration of minor first aid," including lacerations, fractures, sutures, chipped or cracked teeth, or multiple abrasions and/or contusions.

between 151 and 350 days.  Some investigations of incidents involving serious injuries,

including broken bones and sutures, have taken well over a year to complete.

### 5.  Failure to Ensure that Staff Are Appropriately Disciplined

86.    Defendants have been deliberately indifferent to harm to the Subject Inmates by

failing to appropriately discipline staff for using excessive and unnecessary force against the

Subject Inmates.  Because most investigations conclude that staff have not violated DOC

policies, often despite evidence to the contrary as discussed above, staff are rarely disciplined for

using excessive and unnecessary force.  In those relatively rare cases where a facility or ID

investigation results in a determination that staff used inappropriate force, the disciplinary

sanctions are minimal.  The most frequent disciplinary response by the Department is to

"counsel" a correction officer or send him or her for "re-training."  The failure to appropriately

discipline officers and supervisors for excessive or inappropriate use of force against the Subject

Inmates encourages future abuse, leading to continued harm or risk of harm to the Subject

Inmates.

87.    Defendants also have failed to ensure that Captains or other supervisors are

appropriately disciplined, or disciplined at all, for ineffective or inadequate supervision of the

correction officers under their command.

88.    Defendants have allowed officers who have been involved in staggering numbers

of use of force incidents to continue to work in areas that house the Subject Inmates.  Defendants

have failed to intervene in any meaningful way or to transfer such officers to jails that house

more mature inmates, but instead repeatedly "counsel" such officers and allow the behavior to

continue.  Over one six-year period from 2007 to 2012, there were four officers who had been

involved in between 50 and 76 use of force incidents at RNDC, and another seven officers who

had been involved in between 20 and 35 use of force incidents at RNDC.  The officer with the highest number of uses of force during the six-year period (76) was disciplined only once during this time; most of the others were disciplined once or twice, and some never.

89.      Defendants have failed to put in place a functioning early warning system for identifying and effectively intervening with those officers who are involved in an unusually high number of use of force incidents and other incidents that may serve as predictors of future misconduct.  An appropriate early warning system is an important management and accountability tool that allows for early intervention by alerting a facility to a need for additional training, insufficient policies, supervision lapses, or possible bad actors.

### 6.  Failure to Ensure that the Subject Inmates are Adequately Supervised

90.      Defendants have been deliberately indifferent to harm to the Subject Inmates by failing to adequately supervise them.  For years, staff responsible for managing the Subject Inmates have had minimal corrections experience, failed to interact with inmates in a professional manner, and failed to adequately monitor inmate conduct.  These failures have led to increased violent interactions between DOC staff and the Subject Inmates, as well as increased inmate-on-inmate violence.

91.      Defendants historically have placed new correction officers who come straight from the DOC Academy at RNDC.  Indeed, 220 (or 90.9%) of the 242 correction officers who started working at RNDC during calendar year 2012 came directly from the training Academy.  In addition, approximately 35% of RNDC correction officers had fewer than two years of experience in the Department as of early 2013.  New officers are ill-equipped to cope with the Subject Inmates who are often belligerent and suffer from a wide range of mental illnesses and

behavioral disorders.  As a result, inexperienced officers have quickly resorted to using violence as a means to control the inmates.

92.     RNDC also has been historically plagued by an excessive staff turnover rate. From January 2011 through April 4, 2013, 282 correction officers transferred out of RNDC, while 401 new correction officers were assigned to the facility.  The turnover level at the Captain level has been similarly high.  Thus, just as staff members may be developing some of the necessary conflict resolution techniques and interpersonal skills to effectively manage the population and curb violence, they have left for another facility.

93.     Defendants have failed to ensure basic levels of staff professionalism.  Staff have frequently insulted, humiliated, and antagonized the Subject Inmates, often using obscenities and abusive language without fear of any reprimand from supervisors.  Such unprofessional conduct provokes physical altercations, and leads to unnecessary violence.

94.     Defendants have failed to adequately oversee inmate conduct in jails, which contributes to the extremely high level of inmate-on-inmate violence.   Staff do not intervene as necessary in order to prevent verbal disagreements from escalating.  When physical altercations do occur, staff fail to intervene in a timely manner, exposing inmates to a significant risk of serious injuries.   Although the Department reduced the inmate-to-staff  ratio in RNDC after the issuance of the Findings Letter in an effort to improve inmate supervision, the ratio is still significantly higher than the ratio in many secure juvenile facilities, and no similar increased staffing was introduced in the units that house 18-year olds.

### 7. Failure to Put in Place an Effective and Age-Appropriate Classification System for the Subject Inmates and Failure to Institute an Adequate Inmate Grievance System

95.     Defendants have been deliberately indifferent to harm to the Subject Inmates by utilizing the same classification system for 16- and 17-year olds and adults.  A classification tool designed for adults can lead to inappropriate results when applied to youth.  The Department has failed to implement an age-appropriate classification system that takes into account the inmate's cognitive and emotional development and physical stature.  The deficiencies in DOC's classification system contribute to the unsafe conditions in the housing areas and increase the risk of inmate-on-inmate violence.

96.     Defendants have failed to make sufficient use of protective custody to ensure the safety of vulnerable Subject Inmates.

97.     Defendants also have been deliberately indifferent to harm to the Subject Inmates by failing to maintain an adequate grievance system, thus contributing to the failure to detect and address inappropriate or excessive use of force against these inmates.  For example, the emergency grievance system is insufficient.  The grievance policy states that inmates with grievances requiring immediate attention should submit a regular grievance form to the Captain or Tour Commander, who is then required to forward the form to the grievance coordinator within one day.  One day is too long for an inmate to wait when he faces an imminent threat to his safety or well-being.

### 8. Failure to Ensure Effective Staff Training on Use of Force and Youth Management

98.     Defendants have been deliberately indifferent to harm to the Subject Inmates by failing to provide effective training on both use of force and youth management.  The training curriculum historically has been poorly designed and repetitive, conveyed via a scripted lecture

format, and lacking in sufficient demonstrations, discussions, and role playing.  Moreover, the training has not been sufficiently focused on some of the most troubling practices at Rikers, such as headshots, false reporting, and painful escort techniques.

99.     Defendants have failed to adopt and implement specialized remedial training for officers who violate the Department's use of force policies and procedures.  The remedial training has been the same as the standard in-service training, which is less effective than a more specialized, focused, and rigorous program designed specifically for officers who already have engaged in improper conduct.

100.    In addition, Defendants have failed to provide effective training to staff on how to interact with and manage incarcerated youth.

**PUNITIVE SEGREGATION**

### A. Defendants Have Failed to Protect the Subject Inmates from Harm Caused by Prolonged and Excessive Punitive Segregation

101.    Defendants have engaged in a pattern and practice of placing Subject Inmates involved in use of force incidents and inmate-on-inmate fights, as well as Subject Inmates charged with committing non-violent rule violations, in punitive segregation at an alarming rate and for excessive periods of time, which has resulted in significant psychological, physical, and developmental harm.  Defendants' improper reliance on punitive segregation as a way to manage and control disruptive Subject Inmates violates their rights under the Eighth and Fourteenth Amendments to the Constitution.

102.    Inmates in punitive segregation are confined in six-by-eight-foot single cells for 23 hours each day, with one hour of recreation and access to a daily shower.  Recreational time is spent in individual chain-link cages, and many inmates choose to remain in their cells due to depression or because they do not want to submit to being searched and shackled just to be

outside in a cage.  Inmates are denied access to most programming and privileges available to the general population, and receive meals through slots on the cell doors.  They are not allowed to attend school, and are instead given schoolwork on worksheets and are offered educational services telephonically.

103.    The Department houses certain infracted inmates with mental health needs in the RNDC Restricted Housing Unit ("RHU"), which is jointly administered by DOC and DOHMH, and offers individual behavioral and group therapy.  The RHU utilizes a three-tiered reward system designed to create incentives for good behavior.  Upon being admitted to the RHU, inmates start at level zero and are locked in their cells 23 hours a day.  If inmates follow the rules, they may earn additional out-of-cell time for programming and leisure activities.  Inmates who successfully complete the RHU program—which takes approximately eight weeks—can earn up to a 50% reduction in their segregation time.  Those who do not comply with the program are transferred out of the RHU into the general population punitive segregation units.  The RHU, however, is still a punitive segregation setting where inmates are confined in single-occupancy cells for prolonged periods.  Even those inmates who progress to Level 3 of the program can earn only up to three hours of lock-out time.  As of October 1, 2013, only 29 of the hundreds of Subject Inmates who have been placed at the RHU had "graduated" from the program and received a sentence reduction.

104.    The Subject Inmates have received infractions at an extraordinarily high rate and have spent an exorbitant amount of time in punitive segregation.  On any given day in 2013, approximately 15-25 percent of the Subject Inmates were in punitive segregation, with sentences ranging up to several months.  For instance, on July 23, 2013, 140 Subject Inmates (or 25.7% of

the total population) were in some form of punitive segregation housing, and 102 (or 73%) of those inmates were diagnosed as seriously or moderately mentally ill.

105.    During the 21-month period from March 2012 through November 2013, a total of 3,158 Subject Inmates received infractions, or an average of more than 150 inmates each month. These 3,158 inmates received a total of 8,130 infractions, resulting in a total of 143,823 days sentenced to punitive segregation.  Several of the most common infractions were for non-violent conduct, such as failure to obey orders from staff (1,671 infractions), verbally harassing or abusing staff (561 infractions), failure to obey orders promptly and entirely (713 infractions), and shouting abusive-offensive words (392 infractions).

106.    The Subject Inmates have been routinely placed in punitive segregation at Rikers for months at a time.  Inmates accrue additional segregation time for offenses committed while in punitive segregation, which further extends their time there.

- Of the 27 Subject Inmates assigned to RNDC punitive segregation units on December 16, 2013, 11 had punitive segregation sentences of 60 or more days.

- Of the 22 Subject Inmates assigned to the RHU on December 16, 2013, 14 had punitive segregation sentences of 60 or more days.  (Of those 14 inmates, 10 had sentences exceeding 100 days.)

- Of the 25 Subject Inmates assigned to the now-closed punitive segregation unit for mentally ill inmates on April 3, 2013, 23 had punitive segregation sentences (including time accrued while in segregation) of 90 or more days (15 had between 90 and 194 days still owed, and eight had more than 200 days still owed).

107.     Shortly after the United States issued the Findings Letter on August 4, 2014,

DOC announced its intention to eliminate the use of punitive segregation for 16- and 17-year

olds by the end of the calendar year, including use of the RHU.  Since this announcement, the

number of 16- and 17-year olds in punitive segregation has been substantially reduced, although

several inmates remained there as of the middle of November 2014.  Notwithstanding the

Department's assurances, there remains a reasonable possibility that, without appropriate court-

ordered injunctive relief, the Department will return to its practice of regularly placing 16- and

17-year olds in punitive segregation, particularly given the Department's long history of relying

on solitary confinement to control this population.   Additionally, the Department continues to

place 18-year olds, including those diagnosed with mental illnesses, in punitive segregation.  As

of the middle of November 2014, more than forty 18-year olds were placed in punitive

segregation housing units at Rikers.

**B.   Defendants Have Exhibited a Pattern and Practice of Deliberate Indifference to
Ongoing Serious Harm, and the Risk of Serious Harm, to the Subject Inmates from
the Excessive Use of Punitive Segregation**

108.     The conditions of confinement in the punitive segregation units pose a risk of

causing significant psychological, physical, and developmental harm to the Subject Inmates.

Solitary confinement can have a particularly profound impact on young inmates due to their

stage of growth and development.  The American Academy of Child and Adolescent Psychiatry

has found that "[d]ue to their developmental vulnerability juvenile offenders are at particular

risk" of possible adverse psychiatric consequences from "prolonged solitary confinement."

(www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offender

s.aspx).  Young inmates can experience symptoms such as paranoia, anxiety, and depression

after being isolated for only a fairly short period.  This potential harm can be even greater for

inmates with disabilities or histories of trauma and abuse, who constitute a significant portion of the Subject Inmate population.

109.   For years, Defendants have been deliberately indifferent to the known serious harm, and risk of serious harm, to the Subject Inmates that is caused by subjecting them for excessive periods of time to the conditions that exist in punitive segregation housing. Defendants failed to develop and implement a continuum of alternative disciplinary sanctions for infractions that did not involve lengthy isolation.

110.   Although the Department finally took long overdue steps towards eliminating punitive segregation for 16- and 17-year olds after the United States issued the Findings Letter, as noted above, there is a reasonable possibility that, absent a court order, the Department may return to its practice of heavily relying on punitive segregation to control this population.  In addition, the Department continues to exhibit deliberate indifference to the safety and well-being of dozens of 18-year old inmates, including those who are mentally ill, who still remain in 23-hour solitary confinement for weeks as their psychological and physical well-being deteriorates.

## CAUSES OF ACTION

### FIRST CLAIM: DEFENDANTS' PATTERN AND PRACTICE OF VIOLATING THE SUBJECT INMATES' CONSTITUTIONAL RIGHTS (CRIPA)

111.   The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1 – 110, above.

112.   The Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997, authorizes the United States to seek equitable relief to remedy a pattern or practice of Defendants' depriving the Subject Inmates confined in DOC jails of rights, privileges, or immunities secured or protected by the Constitution.

113.    The acts, omissions, and practices alleged in paragraphs 1 – 110 constitute a pattern or practice of conduct that violates the rights, privileges, and immunities of the Subject Inmates secured by or protected by the Constitution.  *See* U.S. Const. Amend. VIII & XIV.

114.    Defendants are, have been, or should have been aware of the deficiencies alleged in paragraphs 1 – 110.  To date, Defendants have failed to take sufficient and effective measures to remedy these deficiencies.  These failures amount to deliberate indifference to the safety and health of the Subject Inmates, in violation of the rights, privileges, and immunities of these inmates that the Constitution secures and protects.  This deliberate indifference caused and continues to cause the violations of constitutional rights alleged.

115.    Unless restrained by this Court, Defendants will continue to engage in the acts and omissions set forth in paragraphs 1 – 110 that deprive the Subject Inmates of the rights, privileges, and immunities that the Constitution secures and protects.

## SECOND CLAIM: DEFENDANTS' PATTERN AND PRACTICE OF VIOLATING THE SUBJECT INMATES' CONSTITUTIONAL RIGHTS AND SECTION 14141

116.    The United States re-alleges and incorporates by reference the allegations set forth in paragraphs 1 – 110, above.

117.    Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141, authorizes the Attorney General to initiate a civil action for appropriate equitable and declaratory relief to eliminate a pattern and practice of conduct by law enforcement officers or by officials or employees of any governmental agency with responsibility for the administration of juvenile justice or the incarceration of juveniles that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.

118.   The acts, omissions, and practices alleged in paragraphs 1 – 110 constitute a pattern or practice of conduct that violates the rights, privileges, and immunities of the Subject Inmates secured by or protected by the Constitution.  *See* U.S. Const. Amend. VIII & XIV.

119.   Defendants are, have been, or should have been aware of the deficiencies alleged in paragraphs 1 – 110.  To date, Defendants have failed to take sufficient and effective measures to remedy these deficiencies.  These failures amount to deliberate indifference to the safety and health of the Subject Inmates, in violation of the rights, privileges, and immunities of these inmates that the Constitution secures and protects.  This deliberate indifference caused and continues to cause the violations of constitutional rights alleged, and violates 42 U.S.C. § 14141.

120.   Unless restrained by this Court, Defendants will continue to engage in the acts and omissions set forth in paragraphs 1 – 110 that deprive the Subject Inmates of the rights, privileges, and immunities that the Constitution secures and protects, in violation of 42 U.S.C. § 14141.

## PRAYER FOR RELIEF

WHEREFORE, the United States prays that the Court will:

(a)   Declare that Defendants' acts, omissions, and practices constitute a pattern or practice of conduct within the meaning of 42 U.S.C. § 1997 that deprives the Subject Inmates of rights, privileges, and immunities secured or protected by the Constitution, and that those acts, omissions, and practices violate the Constitution;

(b)   Declare that such deprivation of rights, privileges, and immunities secured or protected by the Constitution are in violation of 42 U.S.C. § 14141;

(c)     Enjoin Defendants and Defendants' agents from continuing these acts, omissions, and practices and order Defendants and Defendants' agents to take such remedial actions as will ensure lawful conditions of confinement at the jails that house the Subject Inmates; and

(d)     Order such other relief as the interests of justice may require.

Respectfully submitted this 11th day of __December__ , 2014 .

                                ERIC H. HOLDER, JR.
                                Attorney General of the United States

                                VANITA GUPTA
                                Acting Assistant Attorney General
                                Civil Rights Division

                                PREET BHARARA
                                United States Attorney for the
                                Southern District of New York

By:

                                JEFFREY K. POWELL
                                EMILY E. DAUGHTRY
                                Assistant United States Attorneys

36