# EXHIBIT A

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

August 4, 2014

The Honorable Bill de Blasio
City Hall
260 Broadway
New York, NY 10007

Commissioner Joseph Ponte
New York City Department of Correction
75-20 Astoria Blvd.
East Elmhurst, NY 11370

Zachary Carter
Corporation Counsel of the City of New York
100 Church Street
New York, NY 10007

    RE: <u>CRIPA Investigation of the New York City Department of Correction Jails on</u>
       <u>Rikers Island</u>

Dear Mayor de Blasio, Commissioner Ponte, and Mr. Carter:

   We write to report the findings of the investigation of the United States Attorney's Office for the Southern District of New York into the treatment of adolescent male inmates, between the ages of 16 and 18, at New York City Department of Correction ("DOC" or the "Department") jails on Rikers Island ("Rikers").[1]  By letter dated January 12, 2012, we notified the City of our intent to conduct an investigation pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and Section 14141 of the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141 ("Section 14141").  CRIPA and Section 14141 give the United States Department of Justice the authority to seek a remedy for a pattern or practice of conduct that violates the constitutional rights of inmates in detention and correctional facilities.  Our investigation has centered exclusively on whether DOC adequately protects adolescents from harm.  More specifically, we have focused on whether adolescents are subject to excessive and unnecessary use of force by DOC correction officers and their supervisors, whether DOC adequately protects adolescents from violence by other inmates, and whether DOC's extensive reliance on punitive segregation subjects adolescents to an excessive risk of harm.

---

[1] When we use the term "adolescents" or "adolescent inmates" in this letter, we are referring to male inmates between the ages of 16 and 18 housed at Rikers.

We primarily focused on practices and conduct during the period 2011 through the end of 2013. We reviewed hundreds of thousands of pages of records from both DOC and the Department of Health and Mental Health ("DOHMH"), which is responsible for providing medical services to inmates at Rikers.[2] These records included, among other things, use of force investigative files, inmate medical records, policies and procedures, training materials, disciplinary records, programmatic materials related specifically to adolescent inmates, and other data. We identified a sample of approximately 200 use of force incidents involving adolescent inmates, and specifically requested all records related to these incidents, including use of force reports, investigative reports and files, video surveillance, inmate medical records, and records relating to any disciplinary action taken against involved inmates or staff.[3] The Appendix to this letter includes summaries of several of these incidents, which are intended to illustrate some of the systemic problems we have identified through our investigation.

In addition, on January 8-11, 2013, and April 8-12, 2013, we conducted tours of those DOC facilities that house adolescent inmates together with a consultant who is an expert in corrections generally and use of force specifically. Together with our consultant, we interviewed staff from DOC and DOHMH on issues related to our investigation, including use of force policies and practices, inmate supervision, staffing, the use of punitive segregation, medical treatment of injuries, security, investigations, training, programs specific to adolescent inmates, and facilities management. Our consultant also interviewed 46 adolescent inmates.[4] Additionally, we had discussions with former Commissioner Schriro and her senior staff in January 2013 and December 2013.

We also conducted additional witness interviews, including interviews with staff from the Board of Correction, an independent board established by the City Charter responsible for ensuring DOC's compliance with minimum correctional standards. Finally, we reviewed materials provided to us by third parties, including the Board of Correction and the Legal Aid Society.

---

[2] We did not undertake a review of the adequacy of medical or mental health services provided to adolescent inmates at Rikers. Our discussions with DOHMH staff and review of DOHMH records were purely in support of our investigation into staff use of force, inmate-on-inmate violence, and the use of punitive segregation. However, our investigation nonetheless raises serious concerns about the quality of mental health services at Rikers; this critical issue, which warrants considerable attention and potentially raises concerns both under CRIPA and the Americans with Disabilities Act ("ADA"), may be addressed in a future investigation by this Office.

[3] For various reasons, including because DOC was unable to locate some videos, and because DOC did not provide us with open DOC Investigation Division and staff disciplinary files, we did not receive all relevant records for these sample incidents.

[4] After City attorneys expressed their desire to sit in on these interviews, we reached an agreement with the City whereby our consultant interviewed inmates one-on-one, outside both our presence and the presence of City attorneys, to encourage full and candid discussion between the inmates and our consultant. We participated, however, in the interview of one adolescent inmate—Inmate D—who was involved in a use of force that is highlighted in the Appendix to this report.

We thank DOC staff for their cooperation and professionalism throughout the course of this investigation.  The City has provided us with access to personnel and a large volume of records, and we have every reason to believe that the City will be receptive to our recommendations.  Consistent with the statutory requirements of CRIPA, we now write to advise you of the findings of our investigation and the minimum remedial steps necessary to address the serious deficiencies we have identified.  42 U.S.C. § 1997b.

We conclude that there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates.  In particular, we find that adolescent inmates at Rikers are not adequately protected from harm, including serious physical harm from the rampant use of unnecessary and excessive force by DOC staff.  In addition, adolescent inmates are not adequately protected from harm caused by violence inflicted by other inmates, including inmate-on-inmate fights.  Indeed, we find that a deep-seated culture of violence is pervasive throughout the adolescent facilities at Rikers, and DOC staff routinely utilize force not as a last resort, but instead as a means to control the adolescent population and punish disorderly or disrespectful behavior.  Moreover, DOC relies far too heavily on punitive segregation as a disciplinary measure, placing adolescent inmates—many of whom are mentally ill—in what amounts to solitary confinement at an alarming rate and for excessive periods of time.

As discussed more fully below, these conditions have resulted in serious harm to adolescent inmates at Rikers.  As a result of staff use of excessive force and inmate violence, adolescents have sustained a striking number of serious injuries, including broken jaws, broken orbital bones, broken noses, long bone fractures, and lacerations requiring sutures.

Our focus on the adolescent population should not be interpreted as an exoneration of DOC practices in the jails housing adult inmates.  Indeed, while we did not specifically investigate the use of force against the adult inmate population, our investigation suggests that the systemic deficiencies identified in this report may exist in equal measure at the other jails on Rikers.[5]

We recognize that Commissioner Ponte recently assumed the position and was not present when the misconduct detailed in this letter occurred.  We look forward to engaging in good faith discussions with the Commissioner and all interested parties to address the issues we have identified and implement appropriate remedial measures.

---

[5]  The Department is currently the subject of a class action lawsuit brought by current and former inmates at Rikers alleging system-wide, unconstitutional use of force by staff against inmates.  *See Nunez v. City of New York*, 11 Civ. 5845 (LTS) (THK).

## I.  SUMMARY OF FINDINGS

We find that the New York City Department of Correction systematically has failed to protect adolescent inmates from harm in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment of the United States Constitution.  This harm is the result of the repeated use of excessive and unnecessary force by correction officers against adolescent inmates, as well as high levels of inmate-on-inmate violence.

We have made the following specific factual determinations:

- force is used against adolescents at an alarming rate and violent inmate-on-inmate fights and assaults are commonplace, resulting in a striking number of serious injuries;
- correction officers resort to "headshots," or blows to an inmate's head or facial area, too frequently;
- force is used as punishment or retribution;
- force is used in response to inmates' verbal altercations with officers;
- use of force by specialized response teams within the jails is particularly brutal;
- correction officers attempt to justify use of force by yelling "stop resisting" even when the adolescent has been completely subdued or was never resisting in the first place; and
- use of force is particularly common in areas without video surveillance cameras.

Furthermore, we identified the following systemic deficiencies that contribute to, exacerbate, and indeed are largely responsible for the excessive and unnecessary use of force by DOC staff.  Many of these systemic deficiencies also lead to the high levels of inmate violence.  These deficiencies include:

- inadequate reporting by staff of the use of force, including false reporting;
- inadequate investigations into the use of force;
- inadequate staff discipline for inappropriate use of force;
- an inadequate classification system for adolescent inmates;
- an inadequate inmate grievance system;
- inadequate supervision of inmates by staff;
- inadequate training both on use of force and on managing adolescents; and
- general failures by management to adequately address the extraordinarily high levels of violence perpetrated against and among the adolescent population.

Finally, DOC's use of prolonged punitive segregation for adolescent inmates is excessive and inappropriate.

## II.     BACKGROUND

### A.     Department of Correction Jails on Rikers Island

The Department oversees one of the largest municipal jail complexes in the country. DOC handles over 100,000 admissions per year and manages an average daily population of approximately 14,000 inmates,[6] the vast majority of whom are held in ten facilities located on over 400 acres on Rikers Island in the East River.[7]   The population consists primarily of pre-trial detainees, although there is one facility on Rikers that houses sentenced inmates serving terms of one year or less.  Medical services are the responsibility of DOHMH, which contracts with Corizon Correctional Health.  Corizon staffs the medical clinics at each facility on Rikers, which provide day-to-day, out-patient medical care to inmates.

### B.     Adolescent Housing Units on Rikers Island

New York is one of only two states that automatically charges all individuals aged 16 and older as adults.[8]   Adolescent males are currently housed in three different jails on Rikers.  Most adolescents are placed at the Robert N. Davoren Center ("RNDC").  Recently, DOC assigned 18-year olds to separate RNDC housing units so they are no longer co-mingled with the 16- and 17-year olds.  Sentenced adolescent males are placed at the Eric M. Taylor Center ("EMTC"), which houses inmates sentenced to serve one year or less.  Finally, up to 50 adolescents may be housed in the Central Punitive Segregation Unit ("CPSU") at the Otis Bantum Correctional Center ("OBCC"), which, as its name suggests, is a central location for adult and adolescent inmates who are placed in punitive segregation after being found guilty of an infraction or who are in pre-hearing detention status.  Until recently, up to 50 adolescents were also housed in the Mental Health Assessment Unit for Infracted Inmates ("MHAUII"), a punitive segregation unit at the George R. Vierno Center ("GRVC") used to house infracted mentally ill inmates.  The Department closed MHAUII in late 2013.

Like many of the facilities on Rikers, the facilities that house adolescents are old and in poor condition.  RNDC was opened in 1972, EMTC in 1964, and OBCC in 1985.  Currently, all adolescents at RNDC are housed in cells, with the exception of newly admitted adolescents and those in mental observation housing units, who are housed in dormitories.  Adolescents in EMTC are housed in dormitories.  Adolescents in the CPSU are housed in a block of punitive segregation cells set aside for adolescents.  Over the course of our investigation, DOC increased the number of staff assigned to RNDC, including an increase from three to five officers in housing units during non-school hours, and added several supervisors, including a Deputy Warden responsible for adolescents.

---

[6] *See* Department of Correction website, http://www.nyc.gov/html/doc/html/about/about_doc.shtml.

[7] Additional facilities are located in Brooklyn, Manhattan, Queens, and a floating jail barge in the Bronx.  *See* http://www.nyc.gov/html/doc/html/about/facilities-overview.shtml.

[8] North Carolina is the other state.

### C.    Description of Adolescent Population

The average daily adolescent population at Rikers has recently deceased.  The average daily adolescent population was 489 in FY 2014, 682 in FY 2013, and 791 in FY 2012.[9]

The adolescent population at Rikers is a difficult one.  As compared with the adult inmate population, far more adolescents suffer from mental illness and more adolescents are awaiting trial on felony charges.  In FY 2013, approximately 51% of adolescent inmates at Rikers were diagnosed with some form of mental illness.  Inmates with mental illness are less likely to make bail as they tend to have fewer financial resources and family members are less willing to post their bail, so their average length of stay tends to be longer.  In FY 2013, the average length of stay on Rikers for adolescents was 74.6 days.  Also in FY 2013, nearly two-thirds of all adolescents admitted to Rikers were charged with felony crimes—almost twice the level as for adults admitted to Rikers.  The recidivism rate is also high.  In FY 2013, the average number of prior admissions into DOC custody for adolescents was 1.02.  In addition, many adolescent inmates are associated with street gangs and gang activity.

## III.    LEGAL STANDARDS

CRIPA prohibits states or their political subdivisions from engaging in a pattern or practice of conduct that deprives persons residing in or confined to an institution of their constitutional rights.  *See* 42 U.S.C. § 1997a(a).  Section 14141 similarly prohibits officials or employees of any governmental agency with responsibility for the incarceration of juveniles from engaging in a pattern or practice of conduct that deprives persons of rights, privileges, or immunities secured or protected by the Constitution or laws of the United States.  *See* 42 U.S.C. § 14141.

Prison administrators are constitutionally required "to take reasonable measures to guarantee the safety of the inmates."  *Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984); *Hayes v. NYC Dep't of Corr.*, 84 F.3d 614, 620 (2d Cir. 1996).  When a jurisdiction takes a person into custody and holds him against his will, the Supreme Court has held that the Constitution "imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998) (quoting *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 199-200 (1989)); *see also Randle v. Alexander*, 960 F. Supp. 2d 457, 471 (S.D.N.Y. 2013).

While the constitutional rights of convicted prisoners and pre-trial inmates are guaranteed under different constitutional norms, courts have consistently held that pre-trial detainees "retain at least those constitutional rights . . . enjoyed by convicted prisoners [under the Eighth Amendment]."  *Bell v. Wolfish*, 441 U.S. 520, 545 (1979); *see also Cuoco v. Moritsugu*, 222

---

[9] http://www.nyc.gov/html/doc/downloads/pdf/ANNUAL_REPORT_FY2013_ADOLESCENT.pdf.  These figures include adolescent females, which represent approximately 10% of all adolescent admissions.  The fiscal year runs from July through June of the following year.

F.3d 99, 106 (2d Cir. 2000) (noting that courts apply the "Eighth Amendment deliberate indifference test to pre-trial detainees bringing actions under the Due Process Clause of the Fourteenth Amendment"); *Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996).

The Eighth and Fourteenth Amendments forbid excessive physical force against inmates and pre-trial detainees. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994); *see also United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999). In determining whether excessive force was used, courts examine a variety of factors, including the extent of the injury suffered by the inmate, the need for the application of force, the relationship between the need for force and the amount of force used, the threat, if any, reasonably perceived by the responsible correction officers, and any efforts made to temper the severity of a forceful response. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992).

An Eighth Amendment claim for failure to protect inmates from harm is comprised of both a subjective and an objective component. *See Farmer*, 511 U.S. at 834. The subjective component requires a showing that a prison official acted with "'deliberate indifference' to inmate health or safety." *Id.* This requirement is satisfied when the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* at 837. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* The objective component turns on whether the inmate "is incarcerated under conditions posing a substantial risk of serious harm." *Id.* at 834. "Importantly, the objective prong can be satisfied even when no serious physical injury results." *Randle*, 960 F. Supp. 2d at 473.

## IV. INADEQUATE PROTECTION OF ADOLESCENT INMATES FROM HARM DUE TO EXCESSIVE AND UNNECESSARY USE OF FORCE BY STAFF AND HIGH LEVELS OF INMATE VIOLENCE

### A. Extraordinary Frequency of Violence

Adolescent inmates are subject to pervasive violence at Rikers. DOC staff routinely use force unnecessarily as a means to control the adolescent population and punish disobedient or disrespectful inmates in clear violation of DOC policy. Even when some level of force is necessary, the force used is often disproportionate to the risk posed by the inmate, frequently resulting in serious injuries to inmates and staff. In addition, inmate-on-inmate fights and assaults are commonplace, in part because youth are inadequately supervised by inexperienced and inadequately trained correction officers.

Adolescents are at constant risk of physical harm while incarcerated. The number of injuries sustained by adolescents is staggering. For instance, during the period April 2012 through April 2013, adolescents sustained a total of 754 visible injuries, according to DOHMH data.

Inmates see others being beaten and attacked and are afraid that they will face the same fate. During interviews with our consultant, many inmates expressed fear for their personal

safety.  The RNDC Ombudsman advised us that inmates have shared safety concerns with him as well.  Some inmates have even expressed a preference to be placed in punitive segregation instead of the general RNDC population due to the high level of violence at the facility.

On a daily basis, emergency alarms sound repeatedly in adolescent housing areas signaling some altercation or disturbance.  As a result, the facility frequently is placed in locked down status and inmates are confined to their cells.  In FY 2013 alone, there were 1,118 responses to emergency alarms in the RNDC and EMTC adolescent housing areas, or on average more than three alarms each day.

Simply put, Rikers is a dangerous place for adolescents and a pervasive climate of fear exists.  For years, DOC officials have been well aware of the frequency and severity of staff use of force against adolescents, the high incidence of inmate-on-inmate fights, and the number of serious injuries sustained by adolescents, but have failed to take reasonable steps to ensure adolescents' safety.  *See Farmer*, 511 U.S. at 847 ("a prison official may be held liable under the Eighth Amendment . . . only if he knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Ayers v. Coughlin*, 780 F.2d 205, 209 (2d Cir. 1986) (prison officials have a duty to "employ reasonable measures to protect an inmate from violence by other prison residents"); *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994) (noting that law enforcement officers bear an affirmative duty to intercede when they witness or have reason to know excessive force is being used or any constitutional violation is being committed).

## 1.    Frequency of Staff Use of Force

Staff use force against adolescent inmates with alarming frequency.  In FY 2013, there were 565 reported staff use of force incidents involving adolescents in RNDC and EMTC (resulting in 1,057 injuries).[10]  This represented a slight increase from FY 2012, when there were 517 reported staff use of force incidents involving adolescents at these same facilities (resulting in 1,059 injuries).  These are extraordinary figures considering that the average daily adolescent population at Rikers was only 682 in FY 2013, and 791 in FY 2012.  Indeed, 308 (or 43.7%) of the 705 adolescent males in custody as of October 30, 2012, had been subjected to the use of force by staff on at least one occasion.  Indeed, while adolescents made up only about 6% of the average daily population at Rikers, they were involved in a disproportionate 21% of all incidents involving use of force and/or serious injuries.  Our consultant, who has observed and worked with hundreds of correctional facilities, has never seen a higher use of force rate.

Moreover, the use of force numbers are undoubtedly even higher than DOC's data suggest because many incidents go unreported.  As discussed *infra*, correction officers often do

---

[10] These use of force figures exclude "use of force allegations," which refer to instances when sources other than DOC personnel report that force was used on an inmate.  There were 56 use of force allegations at RNDC or EMTC in FY 2013 and 45 in FY 2012.

not accurately report incidents, and warn inmates to "hold it down" or otherwise pressure them not to report use of force incidents.

### 2. Frequency of Inmate-on-Inmate Violence

The number of reported inmate-on-inmate fights and assaults is also striking, and further demonstrates that DOC is not fulfilling its responsibility to ensure the safety and well-being of adolescent inmates, resulting in grave harm to adolescents.

In FY 2013, there were 845 reported inmate-on-inmate fights involving adolescents at RNDC and EMTC. This marked an increase from the 795 reported fights in FY 2012.[11]  In the first half of FY 2014, a total of 775 infractions were issued to adolescents for fighting. Many fights involve the use of weapons, which are widespread at Rikers. During FY 2013, 345 weapons were discovered in the RNDC and EMTC adolescent housing areas, consisting mostly of shanks and shivs. Our consultant has never observed a system with such frequent inmate-on-inmate violence.

Again, there is good reason to suspect that inmate-on-inmate fights are even more prevalent than reflected in DOC's data. According to the results of an internal audit completed last year, RNDC failed to report 375 fights during calendar year 2011 alone, due in part to the lack of a codified definition of "inmate fight," and inconsistencies in how staff recorded and reported inmate altercations.[12]  Based on our discussions with former and current Department staff, similar reporting errors likely persisted well after 2011.

The limited programming and structured activities available at RNDC in part contribute to the extraordinary level of inmate-on-inmate violence. We recognize that DOC has taken steps to enhance its adolescent programming, including through the introduction of the Adolescent Behavioral Learning Experience ("ABLE"), a privately-funded, wrap-around school program administered by outside providers. However, adolescents remain too idle, particularly during evenings and weekends, which increases the likelihood of altercations. Moreover, the large number of adolescents in punitive segregation, discussed *infra,* are not permitted to participate in the limited programming that is available.

---

[11] From April 2012 through April 2013, adolescent fights resulted in 430 visible inmate injuries, according to DOHMH data.

[12] The internal report was not issued until 16 months after then-Commissioner Schriro directed the audit. RNDC staff's failure to accurately and consistently document inmate fights also was noted during a prior security audit in early 2011, but little was done to address the problem.

### 3.       High Number of Serious Injuries

Staff uses of force and inmate-on-inmate fights and assaults have resulted in an alarming number of serious injuries to adolescents, including broken jaws, broken orbital bones, broken noses, long bone fractures, and lacerations requiring stitches.  DOC too often fails to ensure that these injured inmates receive prompt medical care.

The prevalence of head injuries is particularly striking.  Adolescents suffer a disproportionate number of the reported inmate head injuries on Rikers.  From June 2012 through early July 2013, adolescents sustained a total of 239 head injuries, and were twice as likely to sustain such injuries as was the adult population.

Bone fractures are common as well.  Adolescents housed in RNDC and EMTC sustained a total of 96 suspected fractures from September 2011 through August 2012, according to DOHMH data.[13]  In addition, during FY 2013, adolescents were taken to Urgicare for emergency medical services 459 times.

The frequency with which staff use of force results in inmate injuries, and the nature and severity of those injuries, strongly suggest that correction officers are routinely employing excessive levels of force against adolescent inmates.  During recent years, DOHMH has tracked the number of inmate injuries inflicted by DOC staff, and the results are disturbing.  For instance, during the first half of 2012, 55% of the inmates brought to the RNDC clinic after a use of force incident had a verifiable injury.  This represented a higher rate than any other Rikers housing facility, taking into account inmate population.  Even more concerning, 48% of those injuries were to the inmate's head or face, including fractures, contusions, and lacerations.[14]

### B.       Inappropriate Use of Force by Staff

DOC has engaged in a systemic and pervasive pattern and practice of utilizing unnecessary and excessive force against adolescent inmates in violation of the Eighth and Fourteenth Amendments of the Constitution.  *See Farmer*, 511 U.S. at 832; *Walsh*, 194 F.3d at 47.

---

[13] RNDC inmates suffered 22 jaw fractures during the first 5 ½ months of 2012 alone.

[14] Our investigation did not focus on incidents involving alleged sexual assault.  However, the limited information we obtained raises a concern that DOC may be under-reporting sexual assault allegations.  In calendar years 2011 and 2012, DOC reported a total of only seven incidents of alleged sexual assault where the alleged victim was an adolescent.  (Five of these incidents were determined to be unfounded or unsubstantiated and the other two investigations were pending at the time DOC provided the data.)  This number seems extremely small given the size of the adolescent inmate population, the frequency of inmate-on-inmate violence, and the high rate of negative interactions between staff and inmates.  Our consultant expressed concern as to whether allegations of sexual assault are being consistently reported and investigated in compliance with the Prison Rape Elimination Act, 42 U.S.C. § 15601 *et seq*., and the relevant DOJ implementing regulations.  We encourage the Department to examine these issues.

Generally accepted correctional practices require that the appropriate use of force in a given circumstance should include a continuum of interventions, and that the amount of force used should not be disproportionate to the threat posed by an inmate.  Absent exigent circumstances, lesser modes of intervention, such as the issuance of infractions or passive escorts, ought to be utilized or considered before more serious and forceful interventions.  When force is necessary, correction officers generally should first apply techniques designed to immobilize, control, and restrain an aggressive inmate.  DOC routinely violates these well-accepted contemporary correctional practices, as well as the Department's own use of force policies.[15]

Rikers staff strike adolescents in the head and face at an alarming rate, and too often employ force for the purpose of inflicting injuries and pain.  Inmates are beaten as a form of punishment, sometimes in apparent retribution for some perceived disrespectful conduct.  Correction officers improperly use injurious force in response to refusals to follow orders, verbal taunts, or insults, even when the inmate presents no threat to the safety or security of staff or other inmates.  Adolescents have alleged that officers deliberately take them to off-camera locations in order to beat them and inflict serious injuries that will not be captured on video.  Finally, staff frequently continue to strike inmates after they are clearly under control and effectively restrained, often attempting to justify their actions later by reporting that the inmate continued to resist.  The Department's failure to curb these patterns and practices that place adolescents at ongoing risk of serious harm constitutes deliberate indifference to the adolescents' safety while in DOC custody and violates their constitutional rights.  *See Farmer,* 511 U.S. at 834; *see also Nunez v. Goord*, 172 F. Supp. 2d 417, 432 (S.D.N.Y. 2001) ("[P]rison officials' malicious and sadistic use of force is a *per se* violation of the Eighth Amendment, because the conduct, regardless of injury, 'always' violates contemporary standards of decency.") (citing *Hudson*, 503 U.S. at 9)).

As discussed later in this report, DOC fails to conduct rigorous and timely investigations of use of force incidents and does not consistently hold staff accountable for their conduct.  As a result, a culture of excessive force persists, where correction officers physically abuse adolescent inmates with the expectation that they will face little or no consequences for their unlawful conduct.

### 1.      Frequency of Headshots

Headshots refer to blows to an inmate's head or facial area, typically through a punch, strike or a kick.  Headshots are considered an excessive and unnecessary use of force, except in the rare circumstances where an officer or some other individual is at imminent risk of serious

---

[15] The Department's Use of Force Directive directs that force may be used "only as a last alternative after all other reasonable efforts to resolve a situation have failed."  The Directive further provides that "the amount of force used at any time should always be proportional to the threat posed by the inmate at that time," and "staff must start with the minimum amount of force needed and escalate the amount of force used only if the situation requires escalation."

bodily injury and no more reasonable method of control may be used to avoid such injury. Headshots can cause great bodily harm, usually serve no legitimate correctional purpose, are often retaliatory, and typically serve only to escalate incidents.

Headshots are commonplace at Rikers. We have identified numerous incidents where correction officers struck adolescents repeatedly in the head or face, often causing significant injuries. Based on our review of use of force incidents, inmate interviews, and other information, it is clear that headshots are not limited to situations where staff or others face an imminent risk of serious bodily injury. As discussed further below, staff too often strike inmates in the head or face to punish them for their prior conduct. Staff frequently deliver closed fist punches to an adolescent's facial area as an initial response to a volatile situation, without first seeking to control or neutralize the inmate through less aggressive techniques. Our consultant reported that headshots are far more common at Rikers than at any other correctional institution he has observed.

In many instances, correction officers readily admit hitting inmates but claim they acted in self-defense after being punched first by the inmate. As a threshold matter, even when an inmate strikes an officer, an immediate retaliatory strike to the head or face is inappropriate. Moreover, there is often reason to question the credibility of the officer's account. These incidents also disproportionately occur in locations without video surveillance, making it difficult to determine what transpired.

Based on a review of Department 24-hour reports[16] from October 2012 through early April 2014, we identified 64 incidents involving blows to an adolescent inmate's head or face.[17] This is undoubtedly an underestimate of the number of headshots during this period, because 24-hour reports contain only initial incident summaries prepared by staff themselves. Indeed, our review of incidents and witness interviews suggest that headshots were utilized far more frequently during this period. However, the fact that these summaries so often openly refer to headshots is disturbing. The following entries from 24-hour reports are representative of instances when staff plainly admit using headshots but claim that they were provoked by inmate conduct:

- On August 16, 2013, an inmate reportedly refused to comply with an order directing him to sweep up some debris, and then allegedly spit in the face of an officer and "took a fighting stance." The officer "punched the inmate in the facial area." The inmate sustained an injury to his "right periorbital" that required sutures. There was no video surveillance of the incident.

---

[16] 24-hour reports include summaries of unusual incidents that occurred during a given day, including use of force incidents.

[17] The 64 incidents include 25 "use of force allegations." There were 12 additional incidents that do not specifically reference a blow to the head or face but state that the officer punched the inmate and the inmate sustained an injury to his head or facial area.

- On August 26, 2013, an inmate reportedly spat at an officer while being transported in a DOC vehicle. "The officer defended himself with a punch to the inmate's facial area."  There was no video surveillance.

- On October 29, 2013, an inmate reportedly spat in the face of an officer.  The officer "punched the inmate in the face and the inmate sat on the bench terminating the incident."

- On February 27, 2014, an inmate reportedly sat down and refused to walk while being escorted from intake to the RNDC housing area.  An officer "approached the inmate and began hitting him in the facial area."  The inmate sustained a superficial scalp abrasion.

In addition to the significant number of incidents where officers plainly admit delivering headshots, as noted in further detail below, there are other occasions where staff report using only "upper body control holds" to restrain inmates, but the evidence—such as statements in the inmates' medical records describing facial swelling, bruising, or lacerations—strongly suggests that the officers in fact used headshots and submitted false reports.  The following example is illustrative:

- In January 2013, an inmate reported that he was beaten by a correction officer in the RNDC school area where there is no video surveillance.  Despite the fact that the inmate sustained multiple bruises to his neck and forehead, the correction officer denied striking the inmate.  The officer initially reported that he had used an "upper body control hold" to subdue the inmate.  However, the Captain assigned to investigate the incident found that the injuries sustained by the inmate were not consistent with staff use of force reports and concluded that the correction officer had "falsified his use of force report in an attempt to downplay" the incident.  (This incident, referred to as involving Inmate K, is described in further detail in the Appendix.)

Furthermore, headshots are a long-standing problem at Rikers.  In 2004, Steve Martin, the consultant retained in a then-pending class action lawsuit against DOC, issued a scathing report decrying the frequency with which DOC staff punched inmates in the face.  *See* Report of Steve J. Martin submitted in *Ingles v. Toro*, 01 Civ. 8279 (DC).  Mr. Martin wrote that "there is utterly no question that the Department, by tolerating the routine use of blunt force headstrikes by staff, experiences a significantly greater number of injuries to inmates than the other metropolitan jail systems with which I am familiar."  It is troubling that, ten years later, this practice continues.

### 2.      Use of Force as Punishment or Retribution

We found that Rikers staff utilize physical force to punish adolescent inmates for real or perceived misconduct and as a form of retribution, in violation of the Department's policy.[18] Many of these incidents involve adolescents with significant mental health impairments who have limited impulse control, making DOC's punitive conduct even more troubling.  Force used for the sole purpose of punishment or retribution is always considered improper, and can result in the most serious injuries.  For example:

- In December 2012, after being forcibly extracted from their cells for failure to comply with search procedures, two inmates (mentally ill inmates placed in the punitive segregation unit MHAUII) were taken to the GRVC clinic and beaten in front of medical staff.  Our consultant interviewed both inmates about this incident.  The New York City Department of Investigation ("DOI") conducted an investigation and concluded that staff had assaulted both inmates "to punish and/or retaliate against the inmates for throwing urine on them and for their overall refusal to comply with earlier search procedures." Based on inmate statements and clinic staff accounts, a Captain and multiple officers took turns punching the inmates in the face and body while they were restrained.  One clinician reported that she observed one inmate being punched in the head while handcuffed to a gurney for what she believed to be five minutes.  Another clinician reported that she observed DOC staff striking the other inmate with closed fists while he screamed for them to stop hurting him.  A physician reported that when he asked what was happening, correction officers falsely told him that the inmates were banging their heads against the wall.  A Captain later approached a senior DOHMH official and stated, in substance, that it was good the clinical staff were present "so that they could witness and corroborate the inmates banging their own heads into the wall."  The correction officers' reports did not refer to any use of force in the clinic, and each report concluded by stating:  "The inmate was escorted to the clinic without further incident or force used."  The involved Captain did not submit any use of force report at all.  One inmate sustained a contusion to his left shoulder and tenderness to his ribcage, and the other inmate reported suffering several contusions and soreness to his ribs and chest.  One of the inmates told our consultant that he was still spitting up blood due to the incident when interviewed more than a month later.[19]

- In June 2012, in an apparent act of retribution, two correction officers forcibly took an inmate to the ground and beat him.  The officers punched the inmate

---

[18] DOC's Use of Force Directive prohibits using force "[t]o punish, discipline, assault or retaliate against an inmate."

[19] The account of this incident is based on our consultant's interviews of the two inmates, and DOI's report summarizing its investigation and findings.

multiple times and kicked him in the head, resulting in serious injuries including a two-centimeter laceration to his chin that required sutures, a lost tooth, and cracking and chipping to the inmate's other teeth. According to the inmate, who was interviewed by our consultant, prior to the incident one of the officers had called him a "snitch" and was under the false impression that the inmate had previously reported that the officer had been involved in another use of force incident. (This incident, referred to as involving Inmate G, is described in further detail in the Appendix.)

- In May 2012, an inmate was beaten near the RNDC school area where there is no video surveillance. A correction officer punched him multiple times in the face, and another officer allegedly kicked him while he was on the ground. According to the inmate, the officer had gotten angry at him earlier in the day when he did not comply with orders to stop doing pushups and report to bed. The officer had threatened to "slap the shit out of him if he kept playing," according to another inmate. In his initial use of force report, the officer asserted that the inmate had instigated the fight by punching the officer in the face "without provocation," and that he had responded in self-defense by punching the inmate in the upper body. Later, the officer submitted a written addendum to his initial report acknowledging that he had punched the inmate in the facial area, not just the upper body. The inmate sustained a nasal fracture and bruises to his face and head. (This incident, referred to as involving Inmate C, is described in further detail in the Appendix.)

- In January 2012, an inmate splashed a correction officer with a liquid substance. While the inmate was flex-cuffed and being escorted away, the correction officer approached him and started punching him in his facial area, according to the investigating Captain's report. The correction officer did not stop until a probe team officer pushed her away from the inmate. The officer then punched the wall in anger. Although the investigating Captain concluded that the force used was "not necessary, inappropriate and excessive," a Tour Commander later reversed that position and concluded that the force used was necessary and within policy.

Inmates reported to our consultant that staff have taken inmates to isolated locations with no camera coverage to inflict beatings, and that multiple officers have teamed up to deliver these beatings. A senior DOHMH official told us that inmates have made similar statements to him and his staff.

Staff also regularly violate the Department's policy prohibiting use of force against an inmate who has ceased to resist. Correction officers often continue to hit, slap, beat, or kick adolescents well after they have been restrained and no longer present any actual threat or safety risk. Numerous inmates provided our consultant with specific and credible accounts of incidents

where this occurred.   Some of the most serious injuries occur when adolescents have been already placed in flex cuffs or taken to the ground and are unable to defend themselves. [20]

- In August 2013, four adolescent inmates were reportedly brutally beaten by multiple officers.  Based on accounts provided by the inmates, several officers assaulted the inmates, punching and kicking them and striking them with radios, batons, and broomsticks.  The beating continued for several minutes after the inmates already had been subdued and handcuffed.  The inmates were then taken to holding pens near the clinic intake where they were beaten again by several DOC Gang Intelligence Unit members, who repeatedly punched and kicked them while the inmates were handcuffed.  Two of the inmates reported that they had lost consciousness or blacked out during the incident.  The officers' written statements assert that the inmates instigated the fight and they used force only to defend themselves.  The Department's investigation of the incident was ongoing at the time this letter was prepared.  The inmates sustained multiple injuries, including a broken nose, a perforated eardrum, head trauma, chest contusions, and contusions and injuries to the head and facial area.  (This incident, referred to as involving Inmates M, N, O, and P, is described in further detail in the Appendix.)

- In January 2013, after reportedly being disruptive while waiting to enter the RNDC dining hall, an inmate, who was on suicide watch at the time, was taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground covering his head with his hands.  The inmate told investigators that the Captain had "punched [him] everywhere."  According to the Tour Commander's report, the Captain's use of force was "excessive and avoidable" because the inmate presented no threat while lying on the ground.  The inmate sustained bruises to his left and right shoulders, left and right lower arms, chest area, neck, middle back, and a finger on his right hand, as well as an abrasion to his right elbow.  (This incident, referred to as involving Inmate L, is described in further detail in the Appendix.)

Correction officers also punish inmates through the use of painful escort techniques.  For instance, several inmates complained that staff apply flex cuffs tightly and exert intense pressure in order to inflict extreme pain.  Given that inmates in flex cuffs are restrained and pose no safety threat, the officer's sole purpose in these situations is to inflict needless pain.

As reflected in the below examples, adolescents have sustained serious injuries to their wrists and hands as a result of these abusive tactics:

---

[20] In late 2013, DOHMH's Bureau of Correctional Health Services ("CHS") analyzed serious injuries involving staff uses of force for the entire inmate population.  According to CHS' report summarizing its review, 64 of the 80 inmates CHS interviewed reported having been struck by DOC staff after being restrained.

- An inmate told our consultant that in February 2013 a probe team Captain lifted his hands up while he was flex-cuffed, fracturing his wrist. According to the inmate's statement to DOC investigators, the Captain told him and the other inmates being escorted that "he would make them suffer," and "cry like babies." Another inmate told investigators the Captain had directed the officers to "make them scream" while the inmates were escorted through the corridor. We reviewed video of the incident showing the inmate being escorted down the corridor while rear-cuffed. We also reviewed medical records confirming that the inmate broke his left wrist as a result of the incident and required surgery. The Department's investigation of the incident was ongoing at the time this letter was prepared.

- An inmate told our consultant that after he got into a fight with another inmate in January 2013, the probe team arrived, placed him in flex cuffs, and applied significant pressure. According to the inmate, after the Captain asked the officer why he was not crying, the officer applied additional pressure. The inmate stated that he lost feeling in his hand and was told to "hold it down" and not report the injury. When our consultant interviewed him in April 2013, the inmate still had no feeling in his left thumb. We reported his ongoing pain to the Department, and the inmate was scheduled for a neurology consult thereafter.

We also identified instances where staff reportedly challenged inmates to fights at locations with no video surveillance, such as stairwells or the school area. For example:

- During an interview with our consultant, an inmate reported that he got into an altercation with a correction officer who threatened to confront him later at a location without cameras. According to the inmate, the officer subsequently attacked him in the school area, throwing numerous punches at his head.

### 3. Use of Force in Response to Verbal Altercations and Failure to Follow Instructions

Staff too often resort to abusive physical force when confronted with verbal taunts and insults, noncompliant inmates, and complaints, even though no safety or security threat exists. Although the inmate's conduct may constitute a rule violation and warrant some form of disciplinary action, it should not provoke an abusive physical response.

- In January 2014, an inmate sustained significant facial injuries as a result of a use of force incident that occurred in an RNDC school classroom. When interviewed by Board of Correction staff, the inmate reported that he was repeatedly punched and kicked in the head and face by multiple officers. The inmate claimed that the altercation began after a civilian employee's pen had been taken. The inmate was still spitting up blood and having difficulty

talking when Board of Correction staff interviewed him hours after the incident.

- In January 2013, an RNDC correction officer punched an inmate multiple times in the face and upper body area.  According to the inmate, the officer was upset because the inmates had been playing with their food.  (This incident, referred to as involving Inmate I, is described in further detail in the Appendix.)

- In January 2013, a Captain injured a mentally ill inmate in MHAUII by forcefully closing the rear slide door of the cuff port of his cell on the inmate's left arm.  In his written statement, the Captain stated that the inmate "was holding the cuff" and did not comply with orders to remove his hand from the slot.  However, the video of the incident shows the Captain forcefully closing the slot within just a few seconds of arriving at the inmate's cell.  (This incident, referred to as involving Inmate J, is described in further detail in the Appendix.)

- In August 2012, an RNDC correction officer got into a verbal confrontation with an inmate after the inmate asked that his clothes be returned.  The officer struck the inmate in his face.  In her account of the incident, the officer claimed that she was trying to direct the inmate towards his bed, and "inadvertently" touched his facial area.  Eyewitness reports and medical records, though, established that the officer had deliberately slapped the inmate and then provided false statements to investigators.

- In August 2012, during a cell search in MHAUII, an inmate, who was handcuffed at the time, reportedly verbally abused a correction officer and threatened to spit at him.  The correction officer claimed he heard the inmate collecting mucus in his mouth and responded by punching the inmate in the face.

- In May 2012, an inmate sustained serious injuries, including a skull fracture, as a result of a use of force incident that occurred in the RNDC search area.  The inmate claimed the beating took place after he had made a smart remark following a strip search.  An officer who admitted punching the inmate "numerous times in his face and upper body areas" claimed that the inmate instigated the incident by disobeying his order to comply with the search process and punching the officer.  (This incident, referred to as involving Inmate D, is described in further detail in the Appendix.)

Staff appear to be poorly versed in conflict resolution and de-escalation skills, which are particularly important when interacting with the volatile adolescent inmate population at Rikers. When an inmate talks back or makes a derogatory remark, staff frequently escalate the disagreement into a physical confrontation instead of exercising patience and seeking to de-

escalate the situation.  Staff fail to recognize the importance of using time and separation to avoid altercations.

During our tours of the facilities, we observed some staff members' combative approach and tendency to aggressively push inmates for immediate compliance with directives.  This serves only to further exacerbate the hostile atmosphere that permeates the adolescent housing areas.

### 4.    Use of Force by Specialized Teams

The probe and cell extraction teams too often deploy unnecessary and excessive use of force.  These teams are the source of numerous inmate complaints.

The probe team is the group of correction officers and supervisors who respond to disturbances and violent incidents.  Each facility has its own probe team.  Team members vary, depending on who is on duty for a particular shift.  Probe team members wear helmets, face shields, and protective equipment around their torso.  Inmates commonly refer to them as "the Turtles."

Upon arriving at the scene of an incident, probe team members too often quickly resort to the use of significant levels of force.  As demonstrated repeatedly during inmate interviews, adolescents fear the probe teams based on their aggressive reputation and heavy-handed tactics.  For instance, one mentally ill inmate told our consultant that a probe team member entered his cell and struck him on the back with a baton in March 2013.  The Department found that the probe team member used the baton "in an unethical manner" based on its review of the handheld camera recording, which was not provided to us despite our requests.  The RNDC Grievance Coordinator also advised our consultant that she has received numerous inmate complaints about the probe team.

Cell extraction teams are called upon to remove a resistant or assaultive inmate from his cell.  Before resorting to force, staff generally ought to first try to persuade inmates to voluntarily leave their cells through counseling.  Indeed, DOC policy requires that mental health staff be summoned to attempt to persuade an inmate to cooperate.  However, these efforts rarely succeed, and extractions too frequently lead to physical altercations and unnecessary injuries.[21]

### 5.    Falsely Claiming that Inmate Was Resisting to Justify Use of Force

While utilizing force, staff often yell "stop resisting" even though the adolescent has been completely subdued or, in many instances, was never resisting in the first place.  This appears intended to establish a record that the continued use of force is necessary to control the inmate.  Officers who witness the incident also frequently report that they heard the inmate was resisting, even though that is false.

---

[21] DOC does not require staff to document counseling efforts so it is difficult to assess compliance with this policy.

During our on-site interviews, multiple inmates, without prompting, referred to the practice.  A senior DOHMH official also reported that correction officers direct inmates to stop resisting while administering beatings.  In addition, we reviewed an anticipated use of force incident involving a cell search where the camcorder recording shows a Captain repeatedly yelling "stop resisting" from the outset, well before she even arrived at the entrance to the cell where she could see the inmate.  At one point, the inmate responds "I'm not resisting."  We could not determine what was happening in the cell because the camcorder was pointed at an officer's back and later at a polycarbonate shield.

This practice reflects a clear intent on the part of staff to cover up the use of unnecessary and excessive force.

### 6.      High Levels of Use of Force in Areas Without Cameras

The most egregious inmate beatings frequently occur in locations without video surveillance.  To its credit, DOC has installed hundreds of surveillance cameras in RNDC in response to the unacceptable levels of violence in the facility.  However, a number of areas with no video surveillance still remain.  A disproportionate number of the most disturbing use of force incidents occur in these areas, including several incidents cited in this letter and discussed at greater length in the Appendix.  In particular, an astonishing number of incidents take place in the RNDC school areas, including classrooms and hallways.  It is unclear why the Department has not installed additional cameras in these areas.  Other locations that did not have security cameras during the time period of our investigation include some search locations, the clinics, intake holding pens, and individual cells.

Inmates, correction officers, and supervisors are well aware of these locations.  Some even have names.  For instance, the RNDC intake cells are reportedly known as "forget about me" cells.

## V.      SYSTEMIC DEFICIENCIES LEADING TO EXCESSIVE AND UNNECESSARY STAFF USE OF FORCE AND HIGH LEVELS OF INMATE VIOLENCE

We have identified several deficiencies relating to the Department's systems, staffing, operations, and management that contribute to the excessive and inappropriate staff use of force against adolescents and the high incidence of inmate-on-inmate violence.  The Department must implement corrective measures to address these deficiencies to adequately protect the adolescent population from harm.  *See Fisher v. Koehler*, 692 F. Supp. 1519, 1564 (S.D.N.Y. 1988) ("evidence of systemic failures" in preventing improper use of force at New York City jails "supports a finding of a 'policy of deliberate indifference' as to staff-inmate violence on the part of defendants").

### A.        Inadequate Reporting of Use of Force

Department staff fail to adequately document use of force incidents involving adolescents.  The use of force reports we have examined are almost uniformly poor and contain many significant problems, including a general lack of detail, incomplete information, and internally inconsistent information.  In addition, reports frequently do not provide an accurate account of the incident or the level of force employed, and fail to specify any resulting inmate injuries.  Furthermore, despite DOC policies that require a use of force report from every officer involved in a use of force, as well as from every officer who witnesses a use of force by another officer, our investigation suggests that not all uses of force are documented and violence against inmates by staff is generally underreported.

Use of force reports are critically important as they form the basis for staff accountability.  If a use of force is not reported, or reported inadequately or falsely, then there is no reasonable basis for review of that incident and no appropriate method to hold staff accountable for the improper use of force.  Because of the poor reporting of use of force incidents at Rikers, unnecessary or excessive use of force goes undiscovered and unchallenged.  This, in turn, has resulted in a culture in which staff feel empowered to use force inappropriately, in ways that go outside the bounds of written policies, because they know they are unlikely to face any meaningful consequences.

### 1.        Failure to Report Use of Force

Pursuant to DOC's Use of Force Directive, all "[s]taff who employ or witness force or have been alleged to employ or witness force . . . shall prepare a written report concerning the incident based on their own observations and written independently from other staff that were involved or alleged to have been involved in the incident."  Furthermore, staff are required to prepare these reports "prior to leaving the facility unless medically unable to do so."  Despite this clear policy requirement, this rule appears to be frequently and intentionally ignored, especially if the use of force does not result in a serious injury.

There is evidence that a powerful code of silence prevents staff who witness force from reporting.  For example, staff will frequently report that they witnessed an inmate using force against an officer or resisting an officer, but then fail to note or describe the force the officer employed in response to the inmate—even when the officer himself has reported that he has used force.  Similarly, officers frequently affirmatively state that they did not witness any use of force despite other evidence that suggests they were at the scene where force was used.  Investigators and supervisors reviewing the use of force reports consistently fail to point out these and other obvious omissions and failures to conform the reports to DOC policy, reinforcing the perception of officers that it is not important to be forthcoming or complete in their reports.  For example:

- In April 2013, an inmate sustained facial injuries and contusions to his left shoulder after an officer struck him multiple times in the intake area of RNDC.  Video of the incident shows an officer standing idly by for several minutes just a few feet away.  This officer did not submit a use of force

witness report, and investigators noted that they would not have known he
was even in the area had they not viewed the video.

- In February 2012, an inmate was beaten in the head by an officer in the
  RNDC school area.  Three months after the incident, a different officer
  submitted a handwritten memo to the Warden, at the request of the Deputy
  Warden, describing the fact that he witnessed the first officer using "control
  holds" to gain control of the inmate, and that he was standing by to provide
  assistance if needed.  The investigating Captain's report found that the use of
  force was justified and included no mention of this officer witness's failure to
  submit a use of force witness report at the time of the incident.  The Tour
  Commander and the Warden, who concurred with the investigating Captain's
  conclusion, also did not reference the officer's failure to report the incident.
  The incident was never referred to the Department's Investigation Division,
  and the officer witness was not disciplined for his failure to submit a timely
  use of force report.

 We also have identified a pattern of correction officers failing to complete reports for
comparatively "minor" uses of force.  A correction officer assigned to EMTC described several
incidents to us that she alleged were never written up as use of force incidents, including
slapping and hitting adolescent inmates to get them to stop talking or stop playing around in
school.  We also reviewed an incident where an officer failed to submit a use of force report after
she had hit an inmate with handcuffs to wake him up while he was sleeping in class.  The
incident only came to light because the same officer similarly assaulted another inmate, and that
second assault led to a more serious altercation, which ultimately led to a full investigation by
the Investigation Division. (This incident, referred to as involving Inmate H, is described in
further detail in the Appendix.)  This failure to document "minor" uses of force was also noted
by the inmates themselves.  During an interview with our consultant, an inmate observed that
officers "slap, hit, and punch" adolescent inmates regularly, but only report a "use of force"
when there is a serious beating.

 Additionally, in some cases, officers and supervisors pressure inmates not to report, using
a phrase that is widely used and universally known at Rikers: "hold it down."  This expression is
code for, "don't report what happened."  Inmates who refuse to "hold it down" risk retaliation
from officers in the form of additional physical violence and disciplinary sanctions.  A DOC
Associate Commissioner acknowledged the underreporting of use of force by officers, noting
that it would be "disingenuous" to claim that it doesn't exist.  The head of the Investigation
Division also acknowledged the problem.

 A senior DOHMH official told us that he also was very familiar with the phrase, "hold it
down," and conveyed his belief that adolescents were often instructed not to report incidents.  He
indicated that one of the reasons inmates might agree to "hold it down" was that if inmates do
not report a use of force, they themselves were then less likely to be infracted and disciplined.

The official expressed concerns that inmates might not receive needed medical treatment for injuries caused by staff uses of force if pressured not to report the incident.[22]  In addition, the official believed that some injuries reported to be the result of alleged slip and fall accidents in fact involved unreported use of force, based on the unusual frequency of slip and fall accidents and the serious nature of the injuries that allegedly resulted from them.  For example, buried in the medical file of an inmate brought to the clinic for treatment of a one-centimeter laceration on his ear after a reported slip and fall is a note that the patient "claims he was hit in the left ear with cuffs," although the incident was not reported as a use of force.

In interviews with dozens of adolescent inmates, our consultant found that violence ranging from casual and spontaneous to premeditated and severe is often accompanied by the officers warning inmates to "hold it down."  According to our consultant, this phrase was familiar to almost every inmate he interviewed, as well as inmates he spoke with informally as he toured the jails.  The warning may come from officers immediately following a beating, or sometimes days or weeks after an incident.  Officers may even delay taking inmates to clinics for medical attention as they try to convince them to "hold it down."  If the inmate indeed "holds it down" and declines to report a use of force, the staff also then do not report it.

The following are a few of the examples described by inmates to our consultant:

- An inmate reported that he was punched and stomped on by several officers in a school corridor after verbally insulting one of them during an argument.  He asked to go to the medical clinic, but the officers refused to take him there, giving him tissues to clean himself up and telling him to "hold it down."  The inmate also described another incident in which officers beat him, injuring his arm.  They refused to take him to the clinic for medical care until he agreed to tell the clinic that he hurt his arm playing basketball.  He agreed to that story, and as far as he knows, the use of force was never reported.

- An inmate stated that he got into an altercation with an officer after fighting with another inmate.  Although he got 70 days in punitive segregation for fighting with the other inmate, a Captain told him he would not get any additional days for fighting with the officer if he didn't report that fight or discuss the situation.

- After a severe beating by multiple officers, an inmate was taken to a holding cell in intake and told by officers to "hold it down" while medical care was delayed for more than an hour.  He eventually was taken to Elmhurst Hospital

---

[22] According to the report prepared by DOHMH's Bureau of Correctional Health Services (discussed *supra* at n.20), 45 inmates (including adult inmates) reported in interviews that DOC staff interfered with their effort to seek medical treatment or otherwise retaliated against them after a use of force incident by, among other things, threatening inmates with violence or infractions unless they declined medical care or stated that the injures were due to something other than staff use of force.

for medical treatment.  He refused to "hold it down," and in fact filed a civil lawsuit against the Department, which settled before trial.  (Incident is referenced *supra* at 18 and described in further detail in the Appendix, referred to as involving Inmate D.)

- An inmate stated that when he asked staff for medical attention after being raped by an officer, he was told not to say anything about the incident.  He reported it anyway, and told our consultant that after doing so, staff continually harassed him.  In fact, the inmate reported to our consultant that he was warned by two officers not to say anything about the incident as he was being taken to speak with our consultant while our investigative team was at Rikers.[23]

During our site visit, we observed another example of staff exerting pressure on inmates to remain silent.  As an officer was bringing an inmate to our consultant for an interview, our consultant heard the officer tell him that he didn't have to tell our consultant "no damn story."

Finally, there is evidence suggesting that non-DOC staff, such as medical staff and teachers, also fail to report witnessing use of force, due in part to fear of retaliation from DOC uniformed staff, who prefer they look away when staff are using force against inmates. According to a senior DOHMH official, medical staff have faced retaliation for reporting injuries that they suspected were the result of staff uses of force.  We were advised of an incident where a medical staff member reported that the reason she had witnessed an inmate being beaten was that, because she was new, she did not know she was "supposed to go to the back" of the clinic during such incidents.  In addition, while DOC policy requires that mental health staff attempt to obtain inmates' cooperation to leave their cells in order to avoid forced cell extractions, mental health staff routinely leave the housing areas after doing so and before the cell extractions take place.  While this is partly to avoid injuries to medical staff, a DOHMH official admitted that this practice also protects mental health staff from witnessing the actual extraction.

There are also indications that teachers at the schools on Rikers, where as discussed above a disproportionate amount of violence against adolescents takes place, are told to look the other way when inmates are being beaten so as not to be a witness.  During an investigation of an incident in the RNDC school area, one teacher told an investigator that when a use of force incident occurs, Department of Education staff "knows [sic] they should turn their head away, so that they don't witness anything."  In connection with the same incident, another teacher told an investigator that she tried not to watch officers beating the inmate for the same reason, despite the fact that she could hear the inmate screaming and crying for his mother.  That teacher also tried to keep other inmates in the classroom away from the window so that they would not witness anything either.  The admission by two teachers that they had been instructed or trained to witness nothing did not appear to surprise the investigator who made no particular note in the

---

[23]  The inmate's allegation that he was pressured not to report this incident also raises concerns under the Prison Rape Elimination Act, 42 U.S.C. § 15601 *et seq.*, and the relevant DOJ implementing regulations.

investigation file.  (This incident, referred to as involving Inmate H, is described in further detail in the Appendix.)  Indeed, we reviewed many incidents involving use of force in the RNDC school area, but very few of the investigative files included witness statements from a teacher.  In the rare instances where the file included a statement, teachers most often reported that they did not see anything.

### 2.      Inadequate and/or Falsified Use of Force Reports

Pursuant to DOC's Use of Force Directive, a written report regarding a use of force incident must include a "complete account of the events leading to the use of force," a "precise description of the incident," "the specific reasons" force was necessary, "the type of force" used, and a "description of any injuries sustained by inmates or staff."

Rikers staff routinely fail to meet the standards set forth in this policy when completing use of force reports.  One of the many failures of the reports is a lack of detail sufficient to determine what actually happened, including why force was necessary and what injuries resulted. Reports frequently provide a generic description of the incident often using boilerplate terminology that appears designed to justify the use of force.  For example, rather than providing a complete and detailed description of the events leading up to the use of force, and exactly how the encounter unfolded, staff will simply report that an inmate "failed to respond to a direct order and became aggressive," that they "defended" themselves from the inmate, that they used "one two second burst of OC spray,"[24] and that they "told the inmate several times to stop resisting." Staff also rarely identify inmate injuries in their incident reports, and investigators and supervisors consistently fail to note this glaring and repeated omission.

Furthermore, our review of use of force reports has detected certain patterns that strongly suggest staff engage in false reporting.  These patterns include:

1)      Use of force reports in which staff allege that the inmate instigated the altercation by punching or hitting the officer, often allegedly in the face or head and for "no reason," "out of nowhere," "spontaneously," or "without provocation."  But then the officer has no reported injuries—no lacerations or fractures or even minor bruises or swelling—that would be commensurate with such blows.  While unprovoked assaults by inmates on staff certainly may occur, according to our consultant, they are rare in other jurisdictions.  This pattern of an allegation by a correction officer of an unprovoked attack by an inmate, with no commensurate officer injury, suggests that staff are justifying their own use of force by falsely accusing inmates of hitting them first.[25]

---

[24] Oleoresin Capsicum ("OC") spray, commonly known as pepper spray, is a chemical agent that irritates the eyes and respiratory system of a target.

[25] In July 2014, criminal charges were brought by the Bronx District Attorney's Office against a Captain and two correction officers for beating an adult inmate unconscious.  The DOC staff members were charged both with felony assault and with felony charges in connection with preparing and submitting false "use of force" reports. In June

2)  Use of force reports in which staff report using only limited physical force, such as control holds to subdue the inmate or "guide" him to the floor, while the inmate's injuries suggest a much greater level of force was used.  For example, the inmate sustains injuries to the face and head that are consistent with blows to the head.  This pattern suggests that officers are falsely reporting that the force they used was less severe than it actually was.

    In an interview, a senior DOHMH official noted that jail medical clinic staff have observed inmate injuries that are inconsistent with the officers' explanations of what occurred and how the inmate became injured, and our own review of medical records in conjunction with use of force reports bears this out.

3)  Use of force reports in which staff report injuries to their own hands, but do not report punching or hitting inmates, again describing the force used as something more innocuous such as "control holds" or using OC spray.  Again, this pattern suggests that officers are falsely reporting that the force they used was less severe than it actually was.

4)  Use of force reports submitted by multiple officers regarding the same incident in which similar or even identical language is used to describe the incident.  This similar or identical language could be a single unusual word, or an entire paragraph repeated virtually verbatim across reports.  This pattern suggests collusion among officers to tell a particular story and/or to cover up the actual facts of a particular incident.

    In an interview, an EMTC correction officer confirmed what the pattern of similarly worded reports suggests, namely that staff work together to cover-up the facts of incidents and to ensure that they provide consistent written accounts.  The officer told us that in her experience, Captains often tell officers what to write in their reports, and that officers understand that their reports must match the report of the Captain.  The officer referred to one instance when she was told that someone else would write a report for her regarding a use of force that she witnessed, although she never saw or signed any such report.

5)  Use of force reports in which the description of an incident is inconsistent with the video recording, and officers later provide an addendum to their report or

---

2013, criminal charges were brought against ten DOC staff members, including the former Assistant Chief of Security, two Captains, and seven correction officers, in connection with a severe assault on an adult inmate that resulted in multiple facial fractures.  These DOC staff members also were charged with not only felony assault, but with felony charges related to their attempts to cover-up the attack by submitting false use of force reports and false use of force witness reports, in which DOC staff claimed the inmate attacked an officer first.  While the inmates involved in these particular assaults were not adolescents, the allegedly false information in the use of force reports in these criminal incidents is similar to the patterns suggesting false reporting that we found in our investigation.

change their story when confronted with the video evidence.  Again, this pattern
suggests that officers are simply falsely reporting the force they used.

The following are just a selection of the many examples of these patterns that we
identified:

- After an incident outside the dining hall in January 2013, the Captain who
repeatedly had punched an inmate reported that the inmate had "continued to
resist by flailing his arm and moving his body about in [an] attempt to avoid
being cuffed."  However, this was contradicted by the video surveillance.  In a
supplemental report prepared almost two weeks after the incident, the Captain
acknowledged that the inmate "placed his hands by his head" while on the
ground and explained that he had not mentioned that in his initial report
"[d]ue to the inmates [sic] odd behavior and the adrenaline flowing."  (This
incident is also referenced *supra* at 16 and described in further detail in the
Appendix, referred to as involving Inmate L.)

- After a December 2012 incident, an officer reported that during a pat-frisk an
inmate "without provocation" punched him in the face, causing him to defend
himself by punching the inmate in the face.  The inmate told our consultant
that he never hit the officer, but instead that the officer hit him after he made a
snide remark.  Although the officer went to the hospital for treatment, medical
notes indicate that his face appeared normal with no swelling or bruising.

- After an incident in November 2012 in the RNDC school area, officers
reported only guiding an inmate to the floor and using a "one two second burst
of OC."  However, the inmate sustained facial bruising and swelling on the
nasal bridge.  Ten days later, the inmate was still complaining of pain, and
medical staff recommended an x-ray to rule out a nasal bone fracture.

- After a cell extraction in September 2012, officers reported only that they had
pinned an inmate to the wall and applied force to his upper torso and legs.
However, medical reports show that the inmate had pain in his right and left
jaw, swelling of his right jaw, as well as swelling and pain behind his left ear
and redness of the left ear canal.  Such injuries cannot be explained by the
force the officers reported using.  In this same incident, multiple officers used
a nearly identical phrase in their use of force reports, describing the way the
inmate "twisted and turned away from the bed."  Other officers used an
identical sentence to explain why force was used, citing the use of force policy
regarding the need to "defend oneself or another from a physical attack."

- After a May 2012 incident in the EMTC school area, an officer reported that
an inmate threw several punches to the officer's face and neck area without
warning.  Although the officer claimed injuries to his hand and shoulder, he

had no injuries to his facial area.  (This incident, referred to as involving Inmate E, is described in detail in the Appendix.)

### 3.      Failure to Use Video to Augment Use of Force Reporting:  Loss of Video and Poor Video Recordings of Anticipated Use of Force

Video recordings are extremely useful tools for reviewing use of force incidents, evaluating staff and inmate statements, and determining whether the use of force was appropriate.  Indeed, the Department relies heavily on video recordings in those instances where correction officers are actually charged and disciplined for excessive or inappropriate force.  The head of the Investigation Division noted, for example, that video evidence is critical in cases of excessive or inappropriate force because that is the evidence that is most clear cut.

As discussed above, several areas in the jails where adolescents are housed have no camera coverage whatsoever.  Additionally, critical videotapes frequently go missing.  As noted above, we requested all relevant records, including video surveillance, for approximately 200 use of force incidents.  Of the incidents in our sample that were captured by the video surveillance, the Department advised us that it had lost or was otherwise unable to locate over 35% of those video recordings.  Many investigative reports also note that although video was recorded, the video evidence cannot be located.

The missing video surveillance is alarming, given that the Department has a specific policy requiring any video recording of a use of force or alleged use of force to be retained in the office of the Deputy Warden for Security for no less than four years, as well as detailed procedures for documenting the chain of custody for any such recordings.  The frequency with which video evidence disappears either indicates an unacceptably blatant disregard for the Department's policies regarding the safeguarding of video evidence, or even more disturbingly, possible tampering with important evidence.

Another concern is the poor quality of some of the video recordings that do exist.  By policy, staff are required to film cell extractions, probe teams deployments, and other situations where use of force is anticipated.  There is a detailed policy requiring the videotaping of all cell extractions, from start to finish, including a requirement that the videotape show the extraction team's attempts to gain the inmate's compliance before force is used.  However, based on our review of incidents involving anticipated uses of force, the videotape is often shot poorly such that the use of force is not clearly visible and other important information is not captured.  The failure to properly videotape these incidents is particularly concerning given the frequency with which probe teams and cell extraction teams are involved in incidents where excessive and unnecessary force is allegedly used.

### B.      Inadequate Investigations into Use of Force

The Department's investigations into use of force by staff against adolescent inmates are inadequate at both the facility level and the Investigation Division ("ID").  Pursuant to Department policy, the facility (*e.g.*, RNDC) is generally responsible for conducting an initial

investigation into use of force incidents, and most incidents are not subject to any further review. Certain incidents, such as those involving serious injuries, may trigger a full investigation by the ID. As discussed below, the criteria for when the ID must investigate an incident appears unclear, and less than one-fifth of the adolescent use of force incidents and allegations in 2012 were subject to a full ID investigation. In addition to performing full investigations, the ID also conducts a limited review of a sample of facility-level investigations to assess their quality. Finally, use of force incidents of particular concern may be referred for an investigation by New York City's Department of Investigation, a separate city agency.

Reviews and investigations of use of force incidents are critically important because they are the means by which the Department is able to determine whether its own use of force policies are being followed and to evaluate the adequacy of staff reporting of incidents. Rigorous investigations, conducted with integrity, are a key part of any system that intends to hold staff accountable for their actions, and thus prevent future abuses. Our investigation has found the systemic failure of the investigative process at Rikers to be one of the central reasons for the widespread use of excessive and unnecessary force against adolescent inmates. The Department's failure to conduct thorough and comprehensive use of force investigations has resulted in a system where staff are frequently not held accountable for policy violations, and expect that their version of events will be accepted at face value with little scrutiny.

### 1.      Inadequate Investigations at the Facility Level

Facility-level investigations are conducted initially by one of the Captains within the facility where the incident took place, then reviewed by a Tour Commander and an Assistant Deputy Warden and/or Deputy Warden for Security, and ultimately approved by the Warden. The assigned investigating Captain cannot be the Captain who was supervising the officers involved in the use of force at the time of the incident. Because the majority of use of force incidents will never be reviewed by the ID or the DOI, this investigation by the facility is the sole Departmental review for most use of force incidents. These investigations are grossly inadequate.

The facility rarely finds that force has been used inappropriately, and nearly always concludes that force was justified and in accordance with Departmental policy—often despite evidence to the contrary. Based on our review of facility investigation files, we found the investigations to be cursory and identified the following common and systemic deficiencies:

- A general bias toward accepting staff's version of an event at face value, even where there is medical or other evidence to the contrary, and discrediting the inmate's account.

- Failure to consistently follow up with staff regarding obvious deficiencies in their use of force reports. As discussed above, these deficiencies may include accounts that are inconsistent with reported injuries to the inmate or the involved officers, accounts that fail to explain why officers did not or could

not have used a lesser level of force, and suspiciously similar statements and language in descriptions of incidents.

- Failure to identify and reconcile material discrepancies between statements from involved officers, staff witnesses, reported injuries, and video surveillance (when available).

- Failure to make sufficient efforts to obtain statements from inmates, including the inmates subject to the use of force and inmate witnesses.  Although we realize that inmates may be reluctant to talk to uniformed officers due to fear of retaliation, we were struck by the frequency with which facility investigative packages state that inmates refused to provide statements, especially given how openly inmates have discussed incidents with our consultant, medical staff, and even ID investigators.

- Where video exists, failure to describe the events on the video.  Often there is just a summary statement that the video was reviewed and consistent with officers' use of force reports.  Because video recordings so frequently go missing, as described above, without an accurate and detailed description of the video recording, there is no longer any objective record of the incident.

The Captains assigned to investigate incidents at the facility level do not receive specialized training in investigative techniques, and show little familiarity with basic investigative skills or procedures.  In most investigations, Captains and Tour Commanders simply summarize the use of force reports provided by the officers involved, and the witness statements provided by other correction officers and inmates (if any).  Finally, due in part to an antiquated system that relies on handwritten statements and the physical transfer of paper folders and files from one desk to another, there is often a backlog of use of force packages awaiting final approval, notwithstanding Departmental policy that use of force investigations be completed within 15 days of the incident.  This almost inevitably contributes to pressure on a facility's top management to give each use of force package little more than a cursory review, making it easier for correction officers to conceal misconduct.

## 2.     Lack of Clarity Concerning What Triggers ID Investigation

It is unclear what criteria are used for referring an incident to the ID for a full investigation—both in terms of how a determination is made as to which cases merit further investigation and who makes those determinations.  The criteria for involvement by the DOI in any particular incident are also ambiguous.  The lack of transparent lines of responsibility for investigations undermines the effectiveness of the investigative process, and creates the risk that particularly troubling incidents may escape the rigorous and comprehensive review they merit.

The policies regarding when the ID investigates an incident, as well as key officials' understanding of these policies, are inconsistent and contradictory.  According to the Use of Force Directive, "the facility is responsible in the first instance for investigating all uses of

force." This suggests that the ID becomes involved only after the facility has completed its own investigation of a use of force. But other Departmental policies, as described in the ID Training Manual and in interviews with Department officials, specify that ID investigates in the first instance all Class A uses of force, and allegations of Class A uses of force.[26] Written policies also specify other situations in which an ID investigation is mandatory, such as allegations that inmates were dissuaded from reporting force. The ID also appears to have the authority to open a full investigation whenever it deems it appropriate to do so. The facility officials we interviewed, including RNDC Deputy Wardens and the now former RNDC Warden, indicated they also have the discretion to refer any use of force to the ID, which may then "take over" an investigation. Responsibility for investigation of headshots illustrates some of the confusion in this area: although the head of the ID told us that her division handles investigations involving alleged headshots, it is clear that many such incidents are subject only to facility-level investigations.

Further complicating matters, the Department operates an Intelligence Unit ("IU") that also conducts investigations into matters such as inmate-on-inmate fights and violence. Although these incidents often lead to use of force by staff, and thus could have overlapping witnesses and evidence, the extent to which IU investigations are coordinated with facility investigations or ID investigations is unclear.

Finally, some incidents are referred to the DOI, or the DOI may on its own "take over" an investigation. According to written policies, the DOI broadly investigates "corruption or other criminal activity . . . or other misconduct within the Department of Correction." Although we believe it is important to have a watchdog agency outside the Department review use of force incidents that are of particular concern, there do not appear to be clearly established criteria concerning the types of investigations that require external review, nor is it clear how incidents are brought to the attention of the DOI.

The ambiguity surrounding when incidents are subject to investigations by the ID and/or the DOI is magnified by the Department's failure to implement an effective case management tool to track all pending and completed use of force investigations. The Department does not appear to have a single centralized system for tracking information on all use of force investigations and findings, including whether the facility, the ID, or the DOI (or some combination of these entities) investigated an incident, the date the investigation was commenced and completed, whether the investigating entity ultimately determined that force was used appropriately, and any resulting discipline of the correction officers involved.

---

[26] According to the Department's Use of Force Directive, a Class A use of force is one which requires "medical treatment beyond the prescription of over-the-counter analgesics or the administration of minor first aid," including lacerations, fractures, sutures, chipped or cracked teeth, or multiple abrasions and/or contusions.

### 3.      Inadequate Investigations by the ID

While we found ID investigations to be marginally more professional and sometimes of better quality than facility-level investigations, we nonetheless found that they suffer generally from the same bias in favor of correction officers and against inmates. The extraordinarily high number of use of force incidents appears to overwhelm the review and investigative capacities of the ID. The unit has an insufficient number of investigators to effectively review and investigate the use of force incidents at over a dozen DOC jails, especially given that these same individuals are also responsible for investigating other types of alleged staff misconduct and policy violations, including inmate disturbances, discovery of dangerous contraband, erroneous discharges, and serious injuries. During an interview, the head of ID acknowledged that her front line investigators have extremely high caseloads that impeded their ability to conduct expeditious investigations. Because the Department's investigative functions are overwhelmed in this way, they have become largely ineffectual and staff accountability for excessive or inappropriate use of force is greatly diminished.[27]

### a.      Poor Quality of ID Investigations

The ID investigations suffer from numerous problems. We found several instances where the ID concluded that staff's use of force was appropriate despite evidence suggesting otherwise or without conducting a comprehensive and rigorous investigation. Although ID investigations are conducted by trained investigators and are superficially more thorough than facility investigations, as noted above, they nonetheless are plagued by the same biases as the facility investigations, which affect the entire investigative process. Despite lengthy investigations, ID investigators frequently fail to reconcile contradictory statements or reports, usually defaulting to the staff version of events. While the ID has the ability to compel interviews of DOC staff, and usually does so, investigators often fail to ask obvious questions about deficiencies in staff reports or inconsistencies in their accounts. Additionally, investigators often fail to interview all the relevant witnesses, especially inmate witnesses. When they do interview inmates, ID investigators too frequently fail to credit their version of events, even when the inmate's account is more consistent with the medical records or other evidence. Finally, the ID disregards or is selective about the policy violations that it chooses to note in its reports—from failure to safeguard video and failure to submit timely use of force reports, to false reporting and excessive use of force—sometimes recommending no charges at all despite substantial evidence of one or more policy violations.

The following are just a few examples of some of these common problems:

- The ID conducted a full investigation of an incident in April 2012 in which an inmate alleged that he was beaten in the head by multiple correction officers at the behest of a female Captain in the RNDC school area after a heated

---

[27] In early 2014, DOC announced that the ID was going to add 26 staff positions.

argument with the Captain earlier that day.  The inmate provided a detailed account to the ID, describing two officers and the Captain by name.  The Captain who the inmate alleged ordered the beating claimed she was not in the area during the incident.  However, a preliminary ID report describes video showing a female Captain going up to the school area before the incident and then coming down from the school area with the probe team that removed the inmate from the area.  The final ID report includes a much shortened description of this video and omits the fact that a female Captain went either into or out of the school area.  The ID apparently made no attempt to find out where the Captain was at the time of the incident or who was with her.  The ID also did not interview or otherwise obtain a statement from one of the officers named by the inmate as participating in the beating, nor did the ID interview the probe team members to ask whether the Captain was present when they arrived.  Additionally, the one officer who admitted using force made inconsistent statements in his use of force report and to ID investigators, which he explained away by saying he had been "dazed" by the incident and thus forgot to include certain details, although he never submitted a supplemental report.  The ID nonetheless credited that officer's account that the inmate had punched him first, and concluded that the use of force was appropriate.  No charges were recommended and the case was closed.  (This incident, referred to as involving Inmate A, is described in further detail in the Appendix.)

- The ID conducted a full investigation of an incident in February 2012 in which it concluded that an officer had inappropriately sprayed an inmate with OC spray during an argument, when the inmate was clearly not a threat to the officer at the time.  The officer had stated in both her written use of force report and during her interview that the inmate had threatened her with a weapon, but the video showed that the inmate was actually turned away from the officer and in the process of putting on a sweatshirt when he was sprayed.  Another officer witness also submitted a use of force witness report containing information that the video showed was false, but the ID did not interview that officer.  While the ID recommended that charges be brought for unnecessary use of force, the ID did not recommend that any charges be brought for submitting false use of force reports or making false statements to investigators.

- The ID conducted a full investigation into a May 2011 incident in which an inmate was beaten by officers in the RNDC school area and suffered two broken front teeth, a lip laceration that required sutures, and additional facial swelling, contusions and abrasions.  Despite the fact that the officer previously had been involved in 45 separate use of force incidents, two of which resulted in charges, the ID investigators credited the officer's report that the inmate had struck the officer in the face with a closed fist "without any warning," requiring him to defend himself by striking the inmate in the

face and upper torso.  During an interview, the officer later added the fact that when he brought the inmate to the floor he brought him down face first and fell down on top of him, which the ID investigator believed was a possible cause of the broken teeth.  The ID investigator also failed to obtain written statements from or interview any of the probe team members who responded to the incident, and did not interview the one other officer who submitted a use of force witness statement, whom the inmate had alleged joined the first officer in beating him and kicking him in the mouth.  Although the incident took place in school during school hours, there is also nothing in the file that suggests that any inmates or teachers were interviewed about the incident.  No charges were recommended and the case was closed.

### b.      Untimeliness of Investigations

ID investigations are not completed in a timely manner.  Written policies state that DOC must maintain an eight-month average for completion of ID investigations of Class "A" uses of force, but that every effort must be made to complete investigations within five months.  However, according to the Department, in the first part of 2013, the average completion time for Class A use of force incidents was just over 9 months (278 days).  In addition, as of October 31, 2012, 11 percent of ID's cases had been open for more than 350 days, and 42 percent of ID's cases had been open for between 151-350 days.  We also found several examples of ID investigations into particularly serious incidents that took well over a year to complete.

- The ID's investigation into an incident involving an inmate who suffered a nasal fracture when an officer punched him in the face was not completed until 14 months after the incident.  (This incident is also referenced *supra* at 15 and described in further detail in the Appendix, referred to as involving Inmate C.)

- The ID's investigation into the use of force following an inmate fight—in which inmates alleged that a correction officer had hit them with a baton while they were lying handcuffed on the ground and one inmate suffered a laceration that required eight sutures on the back of his head—was not completed until 15 months after the incident.  The ID did not request the use of force package from the facility until more than two months after the incident, and did not even interview the officer involved until nine months after the incident.

- The ID's investigation into an incident involving an inmate who was beaten by multiple officers in the RNDC school area was not completed until 16 months after the incident. (This incident is also referenced *supra* at 22 and 24 and described in further detail in the Appendix, referred to as involving Inmate H.)

- The ID's investigation into an incident involving an inmate who suffered lacerations to the face and head after an encounter with officers was not completed until 18 months after the incident.

- The ID's investigation into an incident involving an inmate who suffered a broken tooth and laceration of the lip when an officer punched him in the face was not completed until 20 months after the incident. The two key officers involved in the incident were not interviewed by the ID until 16 months after the incident. (Incident is also referenced *supra* at 27-28 and described in detail in The Appendix, referred to as involving Inmate E.)

This undue delay diminishes the quality of the investigations because, as time passes, witness memories fade and evidence becomes less available. This is especially true at Rikers where the inmate population is transient, and witnesses may in fact be released or transferred to the state prison system long before an investigation is completed. Moreover, in the relatively few instances where officers are found to have violated policy, they are not subject to any disciplinary measures until long after the misconduct.

### c.     Superficial Review of Facility-Level Investigations

As discussed above, in addition to conducting full investigations of certain incidents, the ID is responsible for performing limited reviews of some facility-level investigations to ensure the facility has conducted an adequate investigation and reached appropriate conclusions regarding the use of force. The ID claims that it conducts this type of "facility-review" for all Class B[28] use of force allegations, all Class B and Class C[29] incidents involving headshots, instances where "substantive or procedural issues" have been detected, and/or when litigation is anticipated. And yet despite the serious and widespread problems with the facility investigations identified by our consultant, the ID frequently concurs with the facility's findings without noting deficiencies that should be obvious to trained investigators. Accordingly, while ID's facility review process should be playing a critical oversight role, there is minimal accountability for the poor quality of the facility-level investigations.

The ID's insufficient review of a deeply flawed facility-level investigation into an incident in January 2012 is particularly illustrative. This incident, briefly referenced above, *supra* at 15, occurred after an inmate splashed an officer in a housing area. The officer activated her alarm, and the probe team arrived, secured the inmate, and put him in restraints. After the

---

[28] According to the Department's Use of Force Directive, a Class B use of force is one "which does not require hospitalization or medical treatment beyond prescription of over-the-counter analgesics or the administration of minor first aid." The "forcible use of mechanical restraints in a confrontational situation that results in no or minor injury" is also a Class B use of force.

[29] According to the Department's Use of Force Directive, a Class C use of force is one that results in "no injury" to the staff member or inmate involved, and includes incidents where "use of OC-spray results in no injury, beyond irritation that can be addressed through decontamination."

inmate had been handcuffed, the officer approached the inmate and began to punch him in the face. The probe team Captain ordered the officer to stop punching the inmate, and another correction officer needed to physically pull the officer off the inmate, at which point she punched that officer and also punched the wall in anger. Another officer submitted a witness report alleging that the officer's punches did not actually connect with the inmate. The investigating Captain submitted a report the next day concluding that the officer's use of force was "unjustified," and submitted another, more detailed report a few days later noting that the officer's use of force was "not necessary, inappropriate, and excessive." However, the Tour Commander ultimately concluded that the use of force was necessary, noting that the video was consistent with that finding. When the ID reviewed the facility investigation and requested to view the video, the facility reported that the video had been lost. Although the ID reminded the facility that it must retain video of critical incidents for four years, the ID concluded that the facility's investigation was satisfactory. Our consultant found the ID's conclusion to be astonishing, given that the facility had concluded that the use of force was "necessary" and "within policy" despite the fact that two officers (including the probe team Captain) had submitted reports stating that the officer had punched an inmate who was in handcuffs, and was so out of control that she also had hit a fellow officer.

### C.      Inadequate Staff Discipline

The Department fails to adequately discipline staff for using unnecessary or excessive force against adolescents. Because most investigations conclude that staff have not violated DOC policies, often despite evidence to the contrary as discussed above, staff are rarely disciplined for using unnecessary or excessive force. And in those relatively rare cases where a facility or ID investigation results in a determination that staff used inappropriate force, the disciplinary sanctions are minimal. As a general matter, we found that the most frequent disciplinary response by the Department is to "counsel" a correction officer or send him or her for "re-training." Between January 1, 2011, and May 23, 2013, a total of 356 staff from RNDC underwent a 3-hour use of force re-training course.

Sometimes when initial investigations do find violations of policy, charges are recommended, but not brought, and therefore never result in any actual disciplinary action. Some examples of this include the following:

- The Tour Commander who conducted a facility investigation recommended, based on his review of the video and medical evidence, that a correction officer be charged with excessive force for striking an inmate on the head, and failing to report a use of force. However, the Deputy Warden and Warden did not concur with the Tour Commander's recommendation, finding that the force used was minimal and within Departmental guidelines. It is unclear whether the incident was ever passed on to the ID for further review.

- Similarly, in the incident described *supra* at 15 and 35-36 in which an officer struck an inmate in the face while he was in handcuffs (and then struck another officer), the investigating Captain found the use of force to be

unnecessary and excessive.  However, the Tour Commander and Warden disagreed, the ID declined to open a full investigation, and the officer was thus not subject to any disciplinary action.

In other instances where the Department found clear violations of use of force policies, the sanctions were not at all proportionate to the seriousness of the offense.  We found instances where staff misconduct was so egregious that, according to our consultant, in many correctional systems it would have warranted immediate termination—such as beating an inmate who was already restrained or using force and failing to report it—and yet significantly lesser sanctions were imposed.  Examples of staff discipline that was not proportionate to the offense include the following:

- An investigation into an August 2012 incident found that the officer threw a closed fist punch to the inmate's facial area while the inmate was in handcuffs and another officer had him in control holds.  The facility Warden recommended that the assaulting officer forfeit 20 vacation days.  The supervising Captain, who watched the entire incident, was "counseled" for "fail[ing] to be proactive with regard to his supervisory duties."  (This incident is also referenced *supra* at 18.)

- An investigation into a May 2012 incident found that the inmate's allegations that the officer slapped him on the head were correct.  Review of video showed one officer slapping the inmate's head as he stuck it out of a food slot, with another officer watching.  The officer who slapped the inmate submitted a false report in which he said he guided the inmate's head back into his cell.  The other officer submitted a report in which he said he did not witness any use of force.  The Department accepted negotiated plea agreements from both officers for loss of 18 vacation days and loss of 20 vacation days, respectively.

- An investigation into an April 2012 incident found that although the inmate was being disruptive, he posed no immediate threat.  The officer nonetheless struck the inmate in the head to gain control of him.  The officer was charged with failing to use conflict resolution skills and failing to notify a supervisor before using force.  The officer was sent for re-training.

- An investigation, including a review of video, into a February 2012 incident found that a correction officer "without provocation" pushed an adolescent inmate into a wall, and then pushed him into his cell.  The officer failed to report the use of force, falsely reporting that his feet became tangled with the inmate's feet and they both tripped.  He was charged with using force and failing to report it.  He was counseled and penalized one "owe[d] comp day."

As noted in the first example cited above, while Captains or other supervisors are sometimes cited for ineffective or inadequate supervision, they do not appear to be held accountable in any real way for the actions of the correction officers under their command.  In

his review of use of force incidents and disciplinary records, our consultant found no instances where Captains or other supervising officers were held accountable for the actions of the officers they supervised with sanctions equal to or more severe than those received by the officers.

Additionally, some officers with histories of involvement in staggering numbers of use of force incidents have remained at RNDC for years, in continuing close contact with adolescents. Rather than intervene in any meaningful way and consider transferring the officer to non-adolescent housing, the Department's practice is too often to "counsel" such officers in an interview.[30]

Based on our review of DOC records, we identified four officers who had been involved in between 50 – 76 use of force incidents at RNDC over the six-year period from 2007 – 2012, and another seven officers who had been involved in between 20 – 35 use of force incidents at RNDC over the same six-year period.[31]  The officer with the highest number of uses of force during the six-year period (76) was disciplined only once during this time; most of the others were disciplined once or twice, and some never.

Finally, the Department does not appear to have a functioning early warning system for identifying and intervening with those officers involved in critical incidents with unusual frequency.  An appropriate early warning system is an important management and accountability tool that allows for early intervention by alerting a facility to a need for additional training, insufficient policies, supervision lapses, or possible bad actors.

### D.    Inadequate Classification System for Adolescents

An adequate and effective inmate classification system is a fundamental management tool to ensure reasonably safe conditions in a correctional facility.  The primary purpose of a classification system is to house inmates based on their different levels of need and security risk. Inmates should be classified promptly after their admission into the facility, and then re-classified as necessary during their incarceration.  A classification system utilizes various objective factors to determine the appropriate custody level for an inmate.  The Department, which revised its classification system in 2012, now uses three custody levels—minimum, medium, and maximum.

The Department utilizes the same classification system for adolescents and adults.  A classification tool designed for adults can lead to inappropriate results when applied to youth. The system may not be "sensitive to the unique attributes and behaviors of youthful populations."  Department of Justice, Bureau of Justice Assistance, *Juveniles in Adult Prisons and Jails:  A National Assessment* at 65 (Oct. 2000), https://www.ncjrs.gov/pdffiles1/bja/182503.pdf.   For instance, the maturity levels of 16- and 17-

---

[30] One officer was identified as having been "counseled" on October 18, 2012, then again on November 29, 2012, and yet a third time on December 12, 2012, with no escalating response from the Department.

[31] During calendar year 2012 alone, one officer was involved in 16 reported uses of force.

year olds will vary more than adults, and can be a significant factor in properly classifying adolescent offenders. The Department's classification system does not take into account certain factors that may be particularly relevant when assessing the security risk or vulnerability of youth, such as the inmate's cognitive and emotional development and physical stature. Moreover, as further discussed below, a significant percentage of adolescents are assigned to punitive segregation housing where inmates with different classification levels are co-mingled. Finally, the Department does not make sufficient use of protective custody to ensure the safety of vulnerable adolescents. The deficiencies in the Department's classification system contribute to the unsafe conditions in adolescent housing areas and increase the risk of inmate-on-inmate violence.

### E.      Inadequate Inmate Grievance System

The inmate grievance system is deficient, and may discourage adolescent inmates from reporting inappropriate use of force by staff. An inmate grievance system is an important element of a functional jail system, intended to provide a mechanism for allowing inmates to raise concerns or issues related to conditions of confinement to the administration. If viewed as credible by inmates, it can also serve as a source of intelligence regarding potential security breaches, including excessive force or other misconduct.

At Rikers, inmate complaints regarding staff-on-inmate assaults and staff-on-inmate verbal harassment are non-grievable by policy. This is quite unusual. In most correctional systems, such grievances, including complaints about lack of professionalism, are viewed as among the highest priority grievances by administrators, according to our consultant. Although the Department has assured us that inmate allegations of staff use of force are reported and investigated, the process for reporting such incidents, as well as to whom they should be reported, are unclear.

The grievance system is also deficient in the way it handles emergency grievances where an immediate response is necessary, such as when inmates face an imminent threat to their safety or well-being—a common scenario for adolescents at Rikers. The grievance policy states that inmates with grievances requiring immediate attention should submit a regular grievance form to the Captain or Tour Commander, who is then supposed to forward the form to the grievance coordinator within one day. In some instances, one day may be too long for the inmate to wait. In other instances, there could be further delays because the grievance coordinator is unavailable or on leave.

F.      **Inadequate Inmate Supervision**

The high rates of staff use of force and inmate-on-inmate violence are attributable in part to inadequate inmate supervision.  The problem is not a lack of resources or too few staff.  RNDC has a relatively high staff-to-inmate ratio when compared to other jails.  As of early 2013, 778 correction officers were assigned to RNDC, resulting in almost a one-to-one staff-to-inmate ratio.  Instead, the problem is that many frontline RNDC staff have minimal corrections experience, fail to interact with inmates in a professional manner, and fail to adequately monitor the conduct of the challenging adolescent population.

1.      **Inexperienced Staff and Excessive Turnover**

RNDC is the first assignment for most new officers after they complete their initial training at the Academy.  Indeed, 220 (or 90.9%) of the 242 correction officers who started working at RNDC during calendar year 2012 came directly from the training Academy.  In addition, approximately 35% of RNDC correction officers had fewer than two years of experience in the Department as of early 2013.  These green officers are placed into one of the most combustible environments at Rikers, ill-equipped to cope with adolescents who are often belligerent and suffer from a wide range of mental illnesses and behavioral disorders.  As a result, inexperienced officers quickly resort to using violence as a means to control the inmates.  Others may be intimidated and reluctant to assert their authority, which reportedly has resulted in instances where older and more dominant adolescents exercise significant control over adolescent housing areas.  In short, the least experienced staff at Rikers are paired with arguably the most difficult inmate population to manage.

Furthermore, and also not surprisingly, RNDC suffers from an unusually high rate of staff turnover.  Correction officers are eager to escape the turbulent environment for a more tranquil facility.  From January 2011 through April 4, 2013, 282 correction officers transferred out of RNDC, while 401 new correction officers were assigned to the facility.  The turnover level at the Captain level is similarly high.  Thus, just as staff members may be developing some of the necessary conflict resolution techniques and interpersonal skills to effectively manage the adolescent population and curb violence, they leave for another facility.

In June 2012, DOC instituted modest special assignment pay to attract and retain more experienced staff at RNDC.  But this has made little difference, and RNDC continues to be plagued by excessive staff turnover.[32]

---

[32] The incentive pay offered to correction officers willing to work in adolescent housing areas is equal to a 3% increase for the first year, and can reach up to 12% over a 4-year period.  As of January 14, 2014, only 38 staff members had received "specialty pay" since it was introduced at RNDC.

## 2.        Lack of Continuity in Facility Management

An analogous lack of continuity among facility management also contributes to a cumulative leadership vacuum, making it difficult to institute and implement any meaningful reforms.  One top administrator told us there had been eight Wardens over the past eight years at RNDC.[33]  The Warden is the most important leadership figure for staff in any jail. A Warden who is in place for only a short time may be less inclined to take responsibility for any past problems related to violence among or against inmates, including use of force, in his or her jail.  The lack of continuity was also reflected in the RNDC Deputy Wardens, some of whom changed even between the dates of our two visits.

The constantly changing leadership is exacerbated by inadequate supervisory continuity for frontline officers.  Correction officers are supervised by different Captains depending on their shift assignment and schedules, as opposed to working a constant shift under the same Captain for an extended period of time.

## 3.        Lack of Staff Professionalism

A lack of staff professionalism exacerbates the volatile atmosphere in adolescent housing areas and contributes to the high level of violence.  Although there are exceptions, the unprofessional demeanor of staff and supervisors is widespread and readily apparent.

During our tours, we observed and heard staff yelling unnecessarily at inmates and using obscenities and abusive language.  Supervisors did not react or reprimand the officers in any way.  Numerous inmates told our consultant that staff are disrespectful and regularly scream, threaten, berate, and curse at them.  Inmates noted that staff frequently insult them and use racial epithets, such as "nigger."  The RNDC Grievance Coordinator described the facility as simply a very "hostile" place.

Staff also humiliate and antagonize inmates, which provokes physical altercations.  For instance, one EMTC correction officer reported that staff have ordered adolescents to strip down to their underpants and walk down the dormitory hallway (referred to as "walking down Broadway") when they misbehave.  Inmates also complain that staff retaliate against them by spitting in their food, tossing their belongings, and depriving them of food, commissary, and recreational privileges.

## 4.        Failure to Monitor Inmate Conduct

The pervasive inmate-on-inmate violence is largely due to DOC's failure to adequately supervise adolescents.  Staff cluster together on living units instead of interacting with inmates, and too often leave their assigned posts.  They frequently fail to closely monitor inmate conduct,

---

[33] In early 2014, after our on-site tours of the facilities and staff interviews, the Department once again appointed a new RNDC Warden.

and often do not intervene as necessary in order to prevent verbal disagreements from escalating. When physical altercations do occur, staff sometimes fail to intervene in a timely manner, exposing inmates to a significant risk of serious injuries. Several inmates informed our consultant that they were attacked when staff were not properly overseeing the area. One inmate told our consultant that he had witnessed multiple instances where officers allowed inmate fights to escalate by failing to intervene.[34]

Management has acknowledged deficiencies in staff supervision. For instance, after touring RNDC in January 2013, the RNDC Integrity Control Officer[35] noted in a report that staff were "ignoring the obvious potential security issues." She further noted that dayroom officers often stand in the entrance so that they can talk to the "B" post officer, rather than assuming a position where they can better observe the inmates. Not surprisingly, dayrooms are a common site for inmate-on-inmate fights.

The following examples illustrate how DOC staff fail to meet their obligation to protect youth from assaults:

- In May 2012, an inmate was attacked by two other inmates while on his way back to the housing area from the RNDC school. According to staff who observed video surveillance of the incident, one inmate approached the other inmate from behind and punched him in the face. The first inmate threw the second to the ground and repeatedly punched him in the face and head. A third inmate then kicked the second inmate several times on his body, and he lost consciousness. According to the investigation file, no staff witnessed the assault even though it occurred during inmate movement. The correction officer on duty was counseled regarding the proper procedure for escorting inmates from school to the housing area. During an interview with medical staff, the inmate who was beaten stated that he had requested medical treatment after waking up, but was not taken to the clinic until about three hours later. The inmate sustained a broken tooth and a fractured jaw.

- In March 2012, an inmate was assaulted by another inmate in an RNDC dayroom and sustained a broken jaw. The Incident Report makes no mention of any staff who observed or responded to the incident, although it was captured on video. The inmate who was attacked claimed that he previously had advised DOC staff that he felt unsafe and wanted to be transferred but his

---

[34] In August 2013, 11 inmates and one correction officer reportedly sustained injuries during a large fight involving adult inmates in GRVC. This incident was captured on video that was obtained by ABC News and posted on its website. (http://www.huffingtonpost.com/2013/08/22/rikers-island-prison-fight-video_n_3799160.html). Although there were numerous staff members at the scene, none intervened while inmates fought and threw chairs and other objects at each other. According to ABC, the incident continued for more than one hour.

[35] The Integrity Control Officer is charged with overseeing the extent to which staff comply with Department policies and procedures.

requests were ignored.  The inmate required two surgeries and his jaw was wired shut.

## G.      Inadequate Staff Training

The training offered by the Department to correction officers assigned to adolescent housing areas is deficient in several respects.

### 1.      Use of Force Training

Although the use of force training covers the basic components of the Department's policy, the curriculum is poorly designed and repetitive.  The training is conveyed via a scripted lecture format, and lacks sufficient demonstrations, discussions, and role playing.  A training program with more interactive exercises and examples of realistic scenarios presented through video training films would be far more effective and likely to better engage correction officers.  Moreover, the training does not sufficiently focus on some of the most troubling practices at Rikers, such as headshots, false reporting, and painful escort techniques.[36]  Given the long-standing use of force problems at Rikers, we expected that the Department would have developed a more innovative and interactive training program by now.

The remedial training for officers who violate the Department's use of force policies and procedures is the same as the standard in-service training.  Such "re-training" is less likely to have a positive impact than a more specialized, focused, and rigorous program designed specifically for officers who already have engaged in improper conduct.

### 2.      Training on Managing Adolescents

The vast majority of RNDC staff, including supervisors, have no prior professional experience working with adolescents.  However, until recently, DOC offered no comprehensive training on how to interact with and manage incarcerated youth, despite the dire need for such specialized training.  Indeed, after reviewing an incident in late 2012 where an officer improperly utilized force against an inmate in response to a verbal disagreement, the RNDC Integrity Control Officer recommended that the officer receive counseling and wrote:  "We have to set up some type of training to enforce to staff how to effectively deal with the adolescent population.  Staff cannot continuously respond to the kids like they do their own.  If this were an adult???????????"

In 2013, DOC finally introduced a 12-hour in-service training program on adolescent development principles and practices, which was developed by the Youth Development Institute.  Although a significant improvement, this training focuses too much on theory and adolescent

---

[36] The use of force training materials include an example that offers troublesome guidance to officers.  In the example, an inmate is seated in an unauthorized area and refuses to comply with an order to return to his housing area.  The inmate spits at the officer and states: "It will take more than you to move me."  The materials incorrectly indicate that these circumstances justify the use of chemical agents against the inmate.  However, in such a situation, best practices require the officer to first seek to control the situation verbally by applying appropriate conflict resolution skills, according to our consultant.

research, as opposed to teaching appropriate responses to the challenging behavior of incarcerated youth. The materials do not adequately address the practical skills needed to manage the Rikers adolescent population or handle the serious challenges RNDC staff actually face. The training also offers few realistic examples.

### H.    Management Deficiencies

The Department's top management has failed to meaningfully address an organizational culture that tolerates unnecessary and excessive force, which has resulted in an environment in which adolescent inmates are at constant risk of serious harm. There is a fundamental disconnect between the Department's top administrators, who operate in a high-end corporate environment off Rikers, and the Department's uniformed staff, who spend their days interacting with a difficult inmate population in aging, decrepit, and grim jail facilities on Rikers. One result of this disconnect is widespread frontline noncompliance with use of force policies, and top administrators who appear, with some exceptions, to be out of touch with the systemic deficiencies in inmate oversight and management. Despite several well-intentioned and useful reforms implemented over the past two years, the Department has not initiated any comprehensive and effective efforts to address the key factors driving the high incidence of staff violence against adolescent inmates, including a general inclination to use force as a tool to control adolescents, a tendency to escalate rather than de-escalate potential incidents, an environment premised on fear and intimidation, a widespread and tolerated code of silence among staff, and inexperienced frontline staff inadequately trained to manage the challenging adolescent population.

There is no question that the Department has a long and troubled history of staff use of force against inmates, which reinforces our finding of a deeply entrenched organizational culture that accepts violence as an inherent part of a jail environment. The Department has been the subject of six use-of-force related class action lawsuits brought by inmates and their advocates, starting back in the 1980s and continuing today with *Nunez v. the City of New York*, 11 Civ. 5845 (LTS)(THK), a class action alleging system-wide violations of inmates' constitutional rights. Four of the previous class actions focused on specific facilities, including the jail currently known as EMTC (*Fisher v. Koehler*, 83 Civ. 2128), the Bellevue Prison Psychiatric Ward (*Reynolds v. Ward*, 81 Civ. 101), the Brooklyn House of Detention (*Jackson v. Montemango*, 85 Civ. 2384), and the CPSU (*Sheppard v. Phoenix*, 91 Civ. 4148). The fifth class action, like *Nunez*, alleged system-wide constitutional violations (*Ingles v. Toro*, 01 Civ. 8279). All of these cases settled by either court-ordered or private settlement, instituting limited injunctive relief and certain reforms related to use of force practices and policies. In *Nunez*, which is currently in discovery, plaintiffs allege that any reforms that were instituted as a result of these cases were not sustained once those settlements and court orders terminated.

In addition to these court cases, there have been several criminal prosecutions of correction officers, including those referenced *supra* at note 25, and a case in which two officers pled guilty in connection with events that led to the death of an adolescent inmate, Christopher Robinson, in October 2008. Robinson died from a punctured lung after he allegedly was beaten by other inmates for refusing to participate in "the Program," a system of extortion among

adolescent inmates that was reportedly operating at Rikers with the approval of correction officers.  In an indictment unsealed on January 22, 2009, two officers were accused of enterprise corruption regarding the events that lead to Robinson's death.  At their arraignment, the assistant district attorney reportedly told the court that there were "scores" of victims, and that "[the accused] turned the jail into almost a nightmare environment."[37]  Bronx District Attorney Robert Johnson characterized the situation at the time as "turn[ing] a detention facility for adolescents into an incubator for violent criminal activity sanctioned by adults in positions of authority."[38]  The officers were sentenced to two years in prison, and one year in jail, respectively.[39]

DOC management has had little success grappling with this violent legacy.  During interviews and meetings both at the Department's Bulova headquarters and at the jails on Rikers and during tours of adolescent areas, our consultant was struck by the noticeable lack of presence of Departmental administrators and top managers in the facilities themselves.  This lack of presence, including management's physical separation from the jails themselves, contributes to a broken organizational culture within the facilities that is largely defined by anti-inmate attitudes and a powerful code of silence.  It also may contribute to a perception among uniformed staff, often repeated in statements made by the head of the correction officers' union, that civilian administrators don't understand how difficult their jobs are because they don't understand the reality of the situation on the ground in the facilities.  Based on his years of experience working with and observing correctional facilities around the country, our consultant believes that this disconnect, in turn, may contribute to a culture among uniformed staff that both tolerates blatant violations of the Department's use of force policies and attempts to shield its rank and file from discipline for violations of those policies, based in part on a belief that they were crafted by people who do not understand what they deal with every day.

---

[37] Graham Rayman, *Rikers Fight Club*, The Village Voice, Feb. 4, 2009.

[38] Press Release, Bronx District Attorney's Office, *Death of an 18-Year Old Inmate on Rikers Island Last October Leads to Numerous Charges*, Jan. 22, 2009, http://bronxda.nyc.gov/information/2009/case3.htm.

[39] Elizabeth A. Harris, *Corrections Officers Plead Guilty in Assault Case*, N.Y. Times, Oct. 21, 2011.

## VI.   EXCESSIVE AND INAPPROPRIATE USE OF PROLONGED PUNITIVE SEGREGATION

Adolescents involved in use of force incidents and inmate-on-inmate fights, as well as adolescents charged with committing non-violent rule violations, are placed in punitive segregation for extended periods of time.  The Department improperly relies on punitive segregation as a way to manage and control disruptive adolescents, placing them in what amounts to solitary confinement at an alarming rate and for excessive periods of time.  The Department's extensive use of prolonged punitive segregation for adolescents, including inmates with mental illnesses, exposes them to a risk of serious harm.  The manner in which DOC uses segregation to punish adolescents and the conditions of that segregation raise constitutional concerns, as well as concerns under Title II of the Americans with Disabilities Act, which prohibits under certain circumstances isolating adolescents with mental impairments in punitive segregation due to disability-related behaviors, and thereby denying them the opportunity to participate in correctional services, programs, and activities.[40]

On any given day in 2013, approximately 15-25 percent of the adolescent population was in punitive segregation, with sentences ranging up to several months.  For instance, on July 23, 2013, 140 adolescents (or 25.7% of the adolescent population) were in some form of punitive segregation housing, and 102 (or 73%) of those inmates were diagnosed as seriously or moderately mentally ill.  James Gilligan, M.D et al., *Report to the New York City Board of Correction* ("Gilligan Report"), at 3 (Sept. 5, 2013).

The excessive use of punitive segregation can cause significant, psychological, physical, and developmental harm to adolescents.  Solitary confinement can have a particularly profound impact on youth due to their stage of growth and development.  The American Academy of Child and Adolescent Psychiatry has found that "[d]ue to their developmental vulnerability juvenile offenders are at particular risk" of possible adverse psychiatric consequences from "prolonged solitary confinement." (www.aacap.org/AACAP/Policy_Statements/2012/Solitary_Confinement_of_Juvenile_Offenders.aspx).  Youth may experience symptoms such as paranoia, anxiety, and depression after being isolated for only a fairly short period.  This potential harm can be even greater for youth with disabilities or histories of trauma and abuse, which constitute a significant portion of the Rikers adolescent population.  Solitary confinement may have a long-lasting impact on adolescents who suffer from mental illnesses, and could result in self-harm or even suicide. The Attorney General's National Task Force on Children Exposed to Violence recently concluded that "[n]owhere is the damaging impact of incarceration on vulnerable children more obvious than when it involves solitary confinement."  Robert L. Listenbee, Jr., *Report of the Attorney General's National Task Force on Children Exposed to Violence* at 178 (Dec. 12, 2012), www.justice.gov/defendingchildhood/cev-rpt-full.pdf.  In addition, under the juvenile detention facility standards issued by the Juvenile Detention Alternatives Initiative of The Annie E. Casey

---

[40] Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

Foundation, room or cell confinement may be used only as "a temporary response to behavior that threatens immediate harm to the youth or others" and may never be used as a form of discipline or punishment. *See A Guide to Juvenile Detention Reform: Juvenile Facility Assessment* at 177 (2014), http://www.aecf.org/m/resourcedoc/aecf-juveniledetentionfacilityassessment-2014.pdf/.

Our consultant has concluded that the Department has created a vicious cycle that serves to perpetuate rather than curb adolescent violence. Troubled youth who exhibit violent or disruptive behavior are placed in punitive segregation for clearly excessive periods, where they reportedly too often do not receive the mental health services they need. Adolescents have a greater tendency to react to adverse conditions with anger and violence, and often act out, as illustrated by the high frequency of reported uses of force in punitive segregation areas. Facing weeks and often months of segregation time, they have little incentive to modify their behavior because the chance of returning to the general population prior to their release or transfer to another correctional facility is minimal. They often receive additional infractions while in punitive segregation, which further extends their time there. The effects of solitary confinement also may make these adolescents more prone to unstable and violent behavior, and exacerbate the mental health issues prevalent among the Rikers adolescent population.

A. **Adolescent Punitive Segregation Units**[41]

Youth in punitive segregation are confined in six-by-eight-foot single cells for 23 hours each day, with one hour of recreation and access to a daily shower.[42] Recreational time is spent in individual chain-link cages, and many inmates choose to remain in their cells due to depression or because they do not want to submit to being searched and shackled just to be outside in a cage. Inmates are denied access to most programming and privileges available to the general adolescent population, and receive meals through slots on the cell doors. They are not allowed to attend school, and are instead given schoolwork on worksheets and are offered educational services telephonically.[43] The majority of male adolescent inmates who commit

---

[41] Shortly after our second site visit in April 2013, DOC made the long overdue decision to stop placing infracted mentally ill adolescents in MHAUII. MHAUII was an inappropriate setting for any inmate suffering from mental illness, particularly adolescents. The conditions were deplorable, the physical facilities were in disrepair, and adolescents were not separated by sight and sound from adult offenders as required by correctional standards. It was evident that the adolescents were at risk of psychologically decompensating due to the corrosive environment. Several of the most egregious use of force incidents occurred at MHAUII. At the end of 2013, DOC finally closed the entire unit.

[42] Inmates may be permitted to attend visits, the law library, or religious services in addition to the one out-of-cell hour permitted for recreation. In addition, as discussed below, certain infracted inmates with mental illnesses are placed in RNDC's restrictive housing unit where they may earn additional out-of-cell time as they reach various goals.

[43] During our investigation, we did not focus on the nature or quality of the educational services delivered to adolescents, including adolescents placed in segregation units. However, we are concerned that the educational services offered to youth in punitive segregation units may not comply with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"), and may look more closely at this issue in the future.

infractions are placed in the general population punitive segregation units at RNDC ("RNDC Bing"), which have 64 beds, or the CPSU, which has 50 adolescent beds.

In 2012, the Department began assigning certain infracted adolescents with mental health needs to the RNDC Restrictive Housing Unit ("RHU") (30 beds), a program jointly administered by DOC and DOHMH that offers individual behavioral and group therapy. The RHU utilizes a three-tiered reward system designed to create incentives for good behavior. Upon being admitted to RHU, inmates start at level zero and are locked in their cells 23 hours a day. As inmates move towards achieving the program's goals, including good behavior and active participation in therapy sessions, they may earn additional out-of-cell time for programming and leisure activities. Inmates with non-violent Grade II and III infractions who successfully complete the program—which takes approximately eight weeks—can earn up to a 50% reduction in their segregation time. Those who do not comply with the program or engage in violence or anti-social behavior may be transferred out of the RHU into the general population punitive segregation units.

Although DOC executive staff are quick to point to the RHU as a significant accomplishment, the program has met with little success. As of October 1, 2013, only 29 of the hundreds of inmates placed at the RHU had "graduated" from the program and received a sentence reduction. DOC transfers adolescents out of the program well before it has any realistic chance of having a substantial positive impact. Commonly identified reasons for discharge include that the inmate was "clinically inappropriate," engaged in "excessive misbehavior," or was "deemed inappropriate." The correction officers assigned to the RHU lack sufficient training in mental health issues, such as suicide watch, according to the DOHMH doctor who oversees the program. The now former RNDC Warden noted that the program was not working when interviewed by our consultant.

During our tour of the RHU, we encountered an extremely troubling incident. We observed what appeared to be a suicide attempt by an inmate who had tied a ligature around his neck. The inmate was on the floor and unresponsive. Staff did not immediately enter the cell to cut the ligature and determine whether CPR was necessary, and it took an unreasonable amount of time for an emergency response team to arrive with a gurney and provide treatment to the inmate. During his tours, our consultant heard a number of comments from uniformed staff about inmates using suicide attempts to manipulate the officers and that the attempts therefore did not need to be taken seriously.

Although DOC's effort to offer some alternative for infracted adolescents with mental health needs may be well-intentioned, at its core, the RHU is still a punitive segregation setting where inmates are confined in single-occupancy cells for prolonged periods. Even inmates who progress to Level 3 of the program can earn only up to three hours of lock-out time. While our investigation did not focus on mental health care provided to adolescent inmates, we note that the authors of a report to the Board of Correction recently concluded that the RHU "should be eliminated because it is a punitive rather than a therapeutic setting for people with mental illness." Gilligan Report, at 10.

In addition, DOC has not developed an effective strategy for how to manage the adolescent population previously placed in MHAUII—inmates with mental illnesses who commit serious rule infractions and are not eligible for the RHU, such as adolescents who assault correction officers.[44]

### B.      Excessive Punitive Segregation Periods

Based on our review of Department data, it is clear that adolescents at Rikers receive infractions at an extraordinarily high rate and spend an exorbitant amount of time in punitive segregation.

During the 21-month period from March 2012 through November 2013, a total of 3,158 adolescent inmates were infracted, or an average of more than 150 inmates each month.  These 3,158 inmates received a total of 8,130 infractions, resulting in a total of 143,823 sentence days. Several of the most common infractions were for non-violent conduct, such as failure to obey orders from staff (1,671 infractions), verbally harassing or abusing staff (561 infractions), failure to obey orders promptly and entirely (713 infractions), and shouting abusive-offensive words (392 infractions).  Outside of a correctional facility, such conduct is often viewed as characteristic adolescent behavior.  At Rikers, this behavior can lead to substantial time in solitary confinement.[45]

Census data for adolescent punitive segregation units reveal that adolescents are routinely placed in punitive segregation for months at a time.

- Of the 57 adolescents assigned to the RNDC Bing on February 1, 2013, 36 had punitive segregation sentences of 60 or more days.  (12 had sentences between 60 and 89 days, 22 had sentences between 90 and 188 days, and two had sentences exceeding 200 days.)

- Of the 26 adolescents assigned to RHU on March 1, 2013, 22 had punitive segregation sentences of 60 or more days.  (Six had sentences between 60 and 89 days, 10 had sentences between 90 and 197 days, and six had sentences exceeding 200 days.)

---

[44] In late 2013, DOC opened the Clinical Alternative to Punitive Segregation ("CAPS") unit as an alternative to punitive segregation for inmates deemed to be seriously mentally ill.  When placed at CAPS, the inmate's infraction is set aside and he is assigned to a secure setting for treatment for a period of time determined by clinical staff. Unfortunately, the unit has only 60 beds for adult and adolescent male inmates combined, far fewer than is needed to accommodate the high number of seriously mentally ill inmates who commit infractions.  Very few adolescents have been placed in CAPS.  Gilligan Report, at 8.

[45] Our investigation has not focused on the quality or adequacy of the inmate disciplinary system.  However, based on the volume of infractions, the pattern and practice of false use of force reporting, and inmate reports of staff pressuring them not to report incidents, we believe the Department should take steps to ensure the integrity of the disciplinary process.

- Of the 25 adolescents assigned to MHAUII on April 3, 2013, 23 had punitive segregation sentences (including time accrued while in segregation) of 90 or more days (15 had between 90 and 194 days still owed, and eight had more than 200 days still owed.)

Inmates accrue additional segregation time for offenses committed while in punitive segregation. For instance, one mentally ill adolescent our consultant interviewed owed 374 days upon his admission to MHAUII, and then accrued an additional 1,002 days for infractions committed while there.

During our meetings, Department management highlighted its effort to address the overuse of punitive segregation through the use of the "temporary cell restriction" ("TCR") option, which was introduced in October 2012. Unfortunately, this initiative had a minimal impact and was short-lived. TCR was supposed to be used as an alternative to more formalized discipline. Correction officers could confine adolescents to their cells for up to two hours when they engaged in certain non-violent infractions, such as using obscene language or engaging in horseplay. However, staff were reluctant to use TCRs in lieu of the more formal disciplinary process. The TCR program was abandoned altogether in early 2014.

In response to the recent increased scrutiny of its inmate disciplinary system, DOC implemented sentencing reforms in late 2013 that apply to the adult and adolescent population. First, sentences for multiple non-violent infractions are now generally supposed to run concurrently, as opposed to consecutively. Second, under the prior system inmates would "carry over" previously accumulated punitive segregation time upon their re-incarceration, but now such historical time may be expunged. Specifically, DOC expunges time owed for infractions committed after one year has elapsed, with the exception of assaults on staff, inmate-on-inmate assaults resulting in serious injuries, and incidents involving the use of weapons, which will be expunged only after two years. Third, inmates in general population punitive segregation units for non-violent infractions may earn a conditional discharge after completing 66% of their sentence if they commit no violations while in segregation. Fourth, the Department implemented certain changes to its sentencing guidelines in an attempt to reduce the amount of time inmates spend in punitive segregation.[46]

Although these reforms are positive steps, it is too early to assess their impact. As recently as December 5, 2013, 105 adolescents remained in punitive segregation. There continues to be a punitive segregation backlog due to the lack of available beds. In addition, adolescents are still subject to the same sentencing guidelines as adults, and receive lengthy sentences for rule violations. In November 2013 alone, 160 adolescents were served with a total of 406 infractions that resulted in punitive segregation sentences totaling 6,024 days. Despite the revisions to the sentencing guidelines, the most serious infractions can still result in up to 90 days in punitive segregation. In addition, adolescents who "verbally abuse or harass staff members," do not "obey" certain orders, or do not "follow facility rules and staff orders relating

---

[46] DOC has indicated that it plans to implement additional reforms, including the use of intermediate sanctions in lieu of punitive segregation (*e.g.*, in-school detention, probation).

to movement inside and outside the facility," can receive up to a 20-day sentence, and those who threaten staff members can receive up to a 30-day sentence. Notwithstanding DOC's claim that the sentencing changes have substantially reduced average sentences, as of December 16, 2013, 11 of the 27 inmates assigned to one of the RNDC punitive segregation units had sentences of 60 or more days, 19 of the 27 inmates housed in the CPSU had sentences of 60 or more days, and 14 of the 22 inmates housed in the RHU had sentences of 60 or more days.[47]

## VII.   REMEDIAL MEASURES

We recognize that the Department has instituted several new initiatives in recent years, some of which are specifically designed to better manage the adolescent inmate population. Some of these, such as the RHU, focus on alternatives to traditional punitive segregation for disciplining adolescent inmates. Others are designed to more productively fill the time for adolescent inmates, such as the ABLE program, also discussed above. Still other measures aim to reduce conflict between adolescent inmates, including by moving adolescents out of dormitory housing and requiring them to wear institutional garb and footwear. Additional staff have been added to adolescent housing areas, as noted above, as well as additional management positions, including a newly created position of Deputy Warden for Adolescents. Although these initiatives are laudable, they have thus far done little to meaningfully reduce violence among the adolescent inmate population. Indeed, at least one relatively new initiative, the use of TCR, has already been abandoned by the Department.

The larger problem, however, is that by and large these reforms do not address—or even attempt to address—the core problem and the heart of our findings: use of excessive and unnecessary force by correction officers against adolescent inmates and the lack of accountability for such conduct. The few reforms that arguably go to this issue—such as the installation of additional cameras, the addition of a DIAL hotline that allows inmates to anonymously report abuse, including by staff, and the addition of an Integrity Control Officer located within RNDC—do not go nearly far enough. As noted above, for example, there are still many areas throughout RNDC and EMTC with no camera coverage, including the school areas, where adolescent inmates spend a significant portion of their waking hours. Fundamentally, these few changes alone—while certainly important—cannot and will not fix a system where officers regularly use excessive and unnecessary force with minimal consequences.

Accordingly, in order to address the constitutional deficiencies identified in this letter and protect the constitutional rights of adolescent inmates, the Department should implement, at a minimum, the following measures:

---

[47] Ten of the inmates housed in the RHU had sentences exceeding 100 days.

**A.     House Adolescent Inmates at a DOC Jail Not Located on Rikers Island that Will Utilize "Direct Supervision" Management Model**

1.     The Department should develop a plan to house adolescents at a DOC jail not located on Rikers Island that will be staffed by experienced, competent officers and supervisors who will receive specialized training in managing youth with behavioral problems and mental health needs.  The Department should incentivize well-qualified staff to volunteer for assignment to this facility by offering significant pay increases, preferred schedules, and other benefits.

2.     The Department should employ a "direct supervision" management style in the adolescent facility.  Direct supervision refers to an inmate management strategy in which, among other things, staff continuously interact with and actively supervise inmates from posts within housing areas, as opposed to being stationed in isolated offices.  Direct supervision has been shown to reduce rates of violence, lead to better inmate behavior, lower operating costs, and improve staff confidence and morale.  Frontline housing officers and first line supervisors are afforded substantial decision-making authority so that they feel empowered and responsible for the effective management and supervision of the unit.  To effectively employ the direct supervision approach, the jail should be designed to reduce the physical barriers between inmates and staff, and ensure clear sightlines to all housing areas.  It would be difficult to implement direct supervision at RNDC due to its linear design and layout.  Housing adolescent inmates at an alternative facility located off Rikers Island will put DOC in a better position to develop a new paradigm for effectively managing the adolescent inmate population.

**B.     Increase Number of Cameras in Adolescent Areas of Jails**

1.     Install additional video surveillance cameras in all adolescent areas, including but not limited to housing areas, school/classroom areas, intake, search locations, and clinics.

2.     Enhance and ensure compliance with procedures for maintaining video surveillance of use of force incidents and inmate-on-inmate fights or assaults, and sanction staff for failure to comply with these procedures.  If, upon preliminary review, a particular portion of the video footage appears crucial, that portion of the video should be copied and maintained separately from the original.

C.     **Strengthen the Department's Use of Force Directive**

1.     Develop and implement the following clarifications and changes to the Use of Force Directive, and related policies and procedures:

a.     Clarify the definition of "use of force" to provide better guidance on the conduct that triggers reporting and investigation requirements.  The definition should include any instance where staff use their hands or other parts of their body, objects, instruments, chemical agents, electric devices, fire arms or any other physical method to restrain, subdue, intimidate, or compel an inmate to act in a particular way, or stop acting in a particular way.

b.     Clarify that headshots are considered an excessive and unnecessary use of force, except in the rare circumstances where an officer or some other individual is at imminent risk of serious bodily injury and no more reasonable method of control may be used to avoid such injury.

c.     Explicitly prohibit, or further highlight and emphasize the prohibition on, the following:

i.     The use of unnecessarily painful escort or restraint techniques.

ii.    The use of force as a response to inmate verbal insults or threats.

iii.   The use of force against inmates in restraints, unless the inmate presents an imminent threat to the safety of staff or others in which case the force must be proportionate to the threat.

iv.    The use of force as corporal punishment, emphasizing the principle that force can be used only to stop or control what an inmate is currently doing, not in response to what he previously did.

v.     The use of force as a response to inmates' failure to follow instructions where there is no immediate threat to the safety of the institution, inmates, or staff, unless staff has attempted a hierarchy of nonphysical alternatives that are documented, including the use of time as circumstances allow.

vi.      Harassing or verbally provoking inmates.

vii.     Retaliation against inmates, Departmental staff, medical staff, or teachers for reporting a use of force incident or providing information in connection with a use of force investigation.

viii.    Pressuring or coercing inmates, Departmental staff, medical staff, or teachers not to report a use of force incident.

d.   In situations involving cell extractions or other planned uses of forces, require the following additional reporting:  (i) the name of the mental health care professional who attempted to resolve the incident without the use of force; (ii) a written report prepared by the mental health care professional setting forth his or her efforts to attempt to resolve the situation and why those attempts were not successful; and (iii) the length of time spent trying to resolve the situation without the use of force.

e.   Require staff in planned use of force situations to wait a minimum of 90 seconds after application of chemical agents before proceeding with a physical use of force so the chemical agent can take effect.  Staff should be required to document compliance with this procedure.  This requirement would not apply if an inmate's conduct changes a planned use of force into a reactive use of force.

f.   Specify requirements for training on the Use of Force Directive specifically, including which staff must complete the training, when they must be trained (including regular refresher courses), and the length of the training.

2.   Reorganize the Use of Force Directive to make it more accessible to front line correction officers, clarifying key requirements and prohibitions.  In addition, prepare a separate, short summary of the key requirements and prohibitions that are included in the Use of Force Directive.  The summary should be designed specifically for use and quick reference by correction officers.  A separate summary could be prepared for supervisors, outlining the key responsibilities for Captains and Tour Commanders.

**D.   Use of Force Reporting**

1.   Ensure that all staff who are involved in or witness a use of force incident submit complete, accurate, and prompt reports.  The Department should institute a zero tolerance policy for failure to submit complete, accurate, and prompt reports—both by involved officers or by witnesses—with

serious consequence for failure to do so.  Supervisors must also be held accountable for the failure of officers under their command to satisfy this requirement.

2.     In the event staff report that force was necessary due to an inmate's alleged resistance, require staff written reports to provide a specific and detailed description of the inmate's alleged resistance and conduct.

3.     Ensure that staff do not review video footage prior to completing their written reports or being interviewed, and prohibit staff from changing their written reports after reviewing video footage.

4.     To the extent possible, segregate staff involved in a use of force incident until they have submitted their written reports to ensure that they submit independent reports.

5.     Clarify the definitions of the categories of institutional violence data maintained by the Department (*e.g.*, "use of force allegations," inmate-on-inmate "fight" vs. "assault") to ensure the collection and reporting of reliable and accurate data.

6.     Ensure that adequate systems are in place to accurately track information on use of force incidents and inmate-on-inmate fights and assaults, including the inmate(s) and/or staff involved, the location of the incident, the nature of any injuries, medical care provided, the investigation and findings, and any corrective, disciplinary, or prosecution actions taken against inmates or staff.

7.     Ensure that medical staff advise the ID whenever they have reason to suspect that inmates have sustained injuries due to staff use of force so that such incidents are identified and properly investigated.  Train medical staff on how to report incidents where inmate mistreatment is suspected.

8.     Ensure that the camcorder operator assigned to search teams follows an established and approved video protocol and films any conflicts or incidents arising out of the search.

9.     In the event a camcorder operator fails to properly record a planned use of force, conduct an investigation and, when appropriate, take appropriate disciplinary actions.

10.    Expand the video recording protocol used for cell extractions or other planned uses of force to include the recording of:  (a) attempts made to obtain the inmate's compliance before force is used; (b) a statement from the team leader summarizing the situation and the plan for resolution; and

(c) a statement from the camcorder operator explaining any impediments to obtaining a clear video recording of the incident.

11.    Revise the grievance policy so that inmate complaints concerning staff use of force or staff verbal harassment are grievable, and ensure that such complaints are promptly referred for investigation.

12.    Develop and implement a reliable procedure for identifying and timely addressing emergency grievances involving inmate safety issues.

13.    Ensure that non-DOC staff, such as medical personnel and teachers, report any use of force that they witness.  Clearly communicate this requirement to all non-DOC staff, emphasizing that failure to report such incidents, or false reporting related to such incidents, may lead to administrative or legal sanctions.

**E.    Use of Force Investigations**

1.    Ensure that all use of force incidents are thoroughly and timely investigated, and that complete and detailed reports are prepared summarizing the findings and any recommended corrective actions.  Each person investigating an incident, whether for a preliminary investigation or a final investigation, should be required to make recommendations based on his or her findings.  Staff shall be accountable for biased, incomplete, or otherwise inappropriate investigations, reports, and recommendations.

2.    Ensure that every reasonable effort is made to obtain the involved inmate's account of a use of force incident, as well as the accounts of any key inmate witnesses, even if that requires making multiple interview attempts.  Assure inmate witnesses that they will not be subject to any form of retaliation for providing information in connection with an investigation.  Requests for interviews with inmates shall not be made at cell fronts or within sight or hearing of other inmates.  Generally such requests shall be made one-on-one and off the living unit.  Offer inmates the opportunity to be interviewed in a private and confidential setting.

3.    Require in-person interviews of any staff member who submits a written report stating that he or she did not observe any use of force where there is reason to believe that the staff member was in close proximity to the location of the incident and should have observed what occurred.

4.    Where video surveillance is available, require staff responsible for investigating the incident to summarize the video footage and explain whether the footage is consistent with witness reports.

5.      Ensure that use of force investigations are completed in a reasonable amount of time.  Require ID investigations to be completed within 60 days, absent unusual and documented circumstances.  If necessary, increase the staff and resources of the ID to ensure that each investigator is assigned a manageable caseload.

6.      Address the current backlog of pending ID investigations.  Complete investigations of any incident that occurred during the last three months within 60 days of the date of this report.  If necessary, allocate additional staff and resources to meet this deadline.

7.      Ensure that investigation of the most serious use of force incidents are prioritized to ensure that they are investigated in an expedited manner.

8.      Clarify the criteria used to determine whether use of force incidents must be investigated by the ID.  At a minimum, the ID should investigate any incident involving:  (a) an alleged headshot by staff; (b) a serious injury to an inmate or staff member; (c) a staff member who has been involved in three or more use of force incidents within the last 12 months; or (d) a staff member previously disciplined for violation of the use of force policies and procedures within the prior 18 months.

9.      Clarify the criteria used to determine whether a use of force incident should be referred to law enforcement for further investigation, and establish a mechanism for then promptly referring relevant incidents to outside investigative and law enforcement agencies, including the United States Attorney's Office for the Southern District of New York.

10.     Develop and implement a standardized system for the organization and contents of investigation files to facilitate review and oversight.

11.     Ensure that facility-level investigations are appropriate, thorough, and timely.  In addition to the currently required reviews of certain facility-level investigations by ID line investigators, require senior ID managers and Department managers to periodically review a sample of investigations conducted at the facility level as well.  The results of these reviews should be documented and any appropriate remedial actions should be taken.

12.     Develop and implement a quality control process to ensure that ID investigations are appropriate, thorough, and timely.  Senior Department managers should review a sample of investigations performed by the ID. The results of these reviews should be documented and any appropriate remedial actions should be taken.  In addition, an external entity should conduct periodic audits of the ID's operations and investigations.

**F.     Safety and Supervision**

1.     Ensure that inmates are adequately supervised at all times.

2.     Ensure that staff intervene in a timely manner to prevent inmate-on-inmate fights and assaults and de-escalate inmate-on-inmate altercations.

3.     Ensure that injured inmates receive prompt medical care after a use of force incident or inmate-on-inmate fight or assault.  Ensure that staff document the time and date an inmate is taken to receive medical care after a fight, assault, or staff use of force, and the time and date the inmate is initially assessed by medical staff.

4.     Develop and implement an age-appropriate classification system for adolescent inmates that incorporates factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

5.     Promptly place adolescents who express concerns for their personal safety in temporary protective custody housing, pending evaluation of the risk to the inmate's safety and a final determination as to whether the inmate should remain in protective custody housing, whether the inmate should be transferred to another housing unit, or whether other precautions should be taken.  The Department should follow the same protocol when a family member, lawyer, or other individual expresses credible concerns on behalf of an adolescent inmate.

6.     Transfer any inmates deemed to be particularly vulnerable or otherwise at risk to an alternative housing unit.

7.     Redefine expectations regarding staff professionalism and staff-inmate communications, and implement a zero-tolerance policy towards verbally harassing or humiliating inmates.  This prohibition should include homophobic slurs, racial epithets, and obscenities.  The Department should document the new expectations and clearly convey them to staff, and hold non-compliant staff accountable.

8.     Offer adolescents enhanced programming and activities, especially in the evenings and on weekends, to engage them and reduce idleness.

9.     To the extent possible, adopt a team staffing structure where a group of officers and a supervisor are consistently assigned to the same adolescent housing area and same tour to facilitate staffing continuity and improve staff-inmate relations.

10.    Limit the practice of assigning recently hired correction officers to adolescent housing areas immediately upon their graduation from the Academy.

11.    Develop and implement measures to reduce staff turnover at adolescent housing facilities.

12.    Adopt incentives, including greater financial incentives, to persuade experienced and qualified officers to work in adolescent housing facilities.

13.    Ensure that specialized teams, such as the probe and cell extraction teams, are staffed with officers with superior skills and extensive experience. To the extent possible, the staffing of these teams should remain constant for stability and continuity purposes.

14.    Require the Wardens and Deputy Wardens to tour adolescent housing units for at least one hour each day, making themselves available to respond to questions and concerns.

15.    Ensure that all allegations of sexual assault involving adolescents are properly and timely reported and thoroughly investigated, whether those allegations are from an inmate, a family member, an inmate advocate, a grievance, or some other source.

## G.    Training

1.    Develop more comprehensive and effective competency-based training programs on use of force policies and force and defensive tactics. The trainings should be largely scenario-based and involve significant role-playing, demonstrations, and/or videotape reflecting realistic situations. The training should emphasize, among other things, techniques to avoid the use of force when possible, the importance of using time and distance to de-escalate, the general prohibition against headshots, the utilization of control techniques designed to minimize injuries to inmates and staff, the need to cooperate with use of force investigations, and the array of disciplinary actions that will be taken for violations of use of force policies and procedures.

2.    Develop a remedial training program specifically designed for officers found to have violated use of force policies and procedures. This program shall be separate and different from the general in-service use of force training program, and shall focus in large part on the more frequent types of use of force violations.

3.      Develop a more comprehensive and effective competency-based training program on conflict resolution and crises intervention skills for frontline officers and first line supervisors.  The training should be realistic, corrections-specific, and skill-based.

4.      Revise the recently implemented adolescent training program so that it focuses less on theoretical principles and more on techniques to manage the challenging adolescent behaviors that staff routinely encounter. Require all staff assigned to adolescent facilities to successfully complete this training.

5.      Develop stand-alone required training on the importance of submitting prompt, complete, and accurate use of force reports, and the serious potential consequences (including criminal consequences) for falsifying use of force reports and/or failing to report a use of force, including as a witness.  The training should be offered at the Academy for new recruits, and refresher courses should be required annually.  Some version of this training should also be required for all non-DOC staff who work on Rikers Island.

6.      Develop and implement an effective and comprehensive competency-based training program for all staff responsible for reviewing or investigating use of force incidents (*e.g.*, ID staff, Wardens, Assistant Deputy Wardens, Captains, Tour Commanders) that covers investigation methods and skills, including conducting effective witness and victim interviews, reviewing video surveillance for consistency with policy requirements and inmate statements, and identifying and resolving areas of discrepancy.

7.      Ensure that staff are adequately trained on how to interact and manage adolescents with mental illnesses and/or suicidal tendencies.

H.     **Accountability**

1.     Ensure that staff are subject to appropriate and meaningful discipline for any violation of use of force policies and procedures, including but not limited to:  (a) using unnecessary or excessive force; (b) failing to submit prompt, complete, and accurate use of force reports; (c) encouraging, pressuring, or coercing inmates or DOC and non-DOC staff members not to report uses of force; and (d) failing to intervene as soon as practical when inmate-on-inmate violence occurs.

2.     Develop categories of officer misconduct that warrant termination, including but not limited to: (a) hitting an inmate who is in restraints; (b) kicking an inmate who is on the ground; (c) striking an inmate in the head except in situations where an officer or some other individual is at imminent risk of serious bodily injury and no more reasonable method of control may be used to avoid such injury; (d) providing an intentionally false use of force report or interview; and (e) intentionally failing to report staff use of force resulting in serious bodily injury.

3.     In the event that a staff member is found to have utilized excessive or unnecessary force or otherwise violated the Department's use of force policies, assess the fitness of the staff member for continued assignment to an adolescent housing area.

4.     Develop and implement a formalized progressive disciplinary process for violations of use of force policies and procedures.

5.     Develop and implement an early warning system ("EWS") designed to effectively identify potentially problematic staff as early as possible.

   a.     The EWS should track the frequency with which staff are involved in uses of force, are the subject of a complaint or grievance, engage in unprofessional conduct, are subject to disciplinary action, and are involved in other incidents that may serve as predictors of future misconduct.  The EWS should be triggered when officers reach a threshold developed and determined by the Department.

   b.     Staff identified by the EWS should be subject to an appropriate corrective action plan (at least one year in duration), and should be deemed ineligible for promotion or special assignments, including the probe or cell extraction teams, until the corrective action plan has been successfully completed.  The corrective action plan shall not substitute for, or mitigate, administrative disciplinary action in any incident.

6.      Require that a supervisor above the rank of Captain interview any staff member who: (a) utilizes a headshot; (b) uses restraints or escort techniques that result in an inmate injury; or (c) strikes an inmate without first applying OC spray. The interviewer should document the interview and attempt to ascertain whether the conduct violated Department policy and procedures.

7.      Ensure that ID staff and other staff responsible for investigating the use of force are appropriately disciplined for any failure to conduct a thorough, timely, and unbiased investigation.

8.      Ensure that DOC supervisors and managers are held accountable for the performance of their subordinates, including by being subject to appropriate disciplinary measures when staff under their supervision improperly use force or fail to adequately report the use of force.

9.      Develop a strategic plan to create and maintain a culture of accountability at all levels of the Department.

## I.      Inmate Discipline

1.      Develop and implement an adequate continuum of alternative disciplinary sanctions for rule violations that do not involve lengthy isolation, as well as systems to reward and incentivize good behavior.

2.      Develop and implement an alternative housing strategy for chronically disruptive adolescents that does not deny them the programming and privileges afforded to the general population and does not compromise the safety of other inmates or staff.

3.      Prohibit placing adolescents with mental health disorders in solitary confinement for punitive purposes. Ensure that a mental health care professional is consulted prior to the imposition of any disciplinary sanction on adolescents with mental health disorders.

4.      Establish an appropriate therapeutic secure setting to house adolescents with serious mental illnesses who commit infractions, which should be staffed by well-trained and qualified personnel and operated jointly by DOC and DOHMH.

5.      To the extent any adolescents without mental health disorders are placed in punitive segregation, monitor their medical and mental health status on a daily basis to ensure that their health is not deteriorating.

6.     Ensure that the conditions of the housing areas for infracted inmates, including individual cells, are sanitary, safe, adequately ventilated, and properly maintained.

7.     Retain an outside consultant to conduct an independent review of Department infraction processes and procedures to ensure that:  (a) they are fair and reasonable; (b) inmates are afforded due process; and (c) infractions are imposed on adolescents only where there is sufficient evidence of a rule violation. The consultant should document the results of the review and make any appropriate recommendations, which DOC should implement.

**J.     Management and Leadership**

1.     Develop and implement a comprehensive strategic plan for altering the institutional culture to one that does not tolerate violence, and holds staff accountable for using excessive or unnecessary force.

2.     Enhance management continuity at adolescent housing facilities, and limit, to the extent possible, the rate of turnover among Wardens and Deputy Wardens.

3.     Develop and implement procedures to identify systemic patterns associated with uses of force and inmate-on-inmate fights and assaults, and take appropriate steps to address these patterns.

4.     Require DOC's top operational administrators to conduct periodic unannounced tours (including evening and weekend tours) of adolescent housing areas.

\*\*\*

We hope to continue working with the Department in an amicable and cooperative fashion to address our outstanding concerns, and to develop specific policies and procedures that will implement the remedial measures discussed above. We are obligated to advise you that, in the event that we are unable to reach a resolution regarding our concerns, the Attorney General may initiate a lawsuit pursuant to CRIPA to correct deficiencies of the kind identified in this letter 49 days after appropriate officials have been notified of them. *See* 42 U.S.C. § 1997b(a)(1). We would prefer, however, to resolve this matter by working cooperatively with you and are hopeful that we will be able to do so in this case. We will be contacting you to discuss this matter in further detail.

Finally, please note that this findings letter is a public document. It will be posted on the website of the Civil Rights Division of the United States Department of Justice. We will also provide a copy of this letter to any individual or entity upon request.

Sincerely,

JOCELYN SAMUELS
Acting Assistant Attorney General
Civil Rights Division

PREET BHARARA
United States Attorney for the
Southern District of New York

By:

Jeffrey K. Powell
Assistant United States Attorney

By:

Emily E. Daughtry
Assistant United States Attorney

# APPENDIX

## REPRESENTATIVE USE OF FORCE INCIDENTS

In connection with our investigation, we identified a sample of approximately 200 use of force incidents involving adolescent male inmates and requested all records related to these incidents. Among other things, we requested use of force reports, investigative reports and files, video surveillance, inmate medical records, and records relating to any disciplinary action taken against involved inmates or staff. In addition, our consultant interviewed the adolescents involved in some of these incidents. As noted in the body of our letter, in many cases, we were not provided with video surveillance that existed at one time, because the Department claimed that it could no longer locate the footage.

We have compiled the below summaries based on our review of the materials provided and our consultant's interviews.[48] With the exception of the final incident referenced in the Appendix, we have not included incidents where there was an ongoing DOC investigation at the time this letter was prepared. These incident summaries are intended to illustrate several of the serious, systemic deficiencies we have identified in the body of our letter, which we have concluded violate the constitutional rights of adolescent inmates and expose them to an ongoing substantial risk of harm during their confinement at Rikers. These incidents are just some of the incidents that we have found to be problematic; they are in no way intended to serve as a complete list of all instances in which DOC staff have used unnecessary or excessive force against adolescents.

## 2012 INCIDENTS

### *Inmate A

In April 2012, DOC staff repeatedly punched Inmate A in the face near the RNDC school security gate, allegedly with the approval of a Captain who had previously gotten into a verbal altercation with the inmate. There is no video of the incident because there are no cameras in the school area.

During an interview with investigators the day following the incident, Inmate A provided the following detailed account: After leaving the school area to go to lunch, he set off the magnometer and a Captain told him to empty his pockets. He and the Captain had a heated argument and the Captain tossed Inmate A's chips into the garbage. Inmate A called the Captain a "bitch," and the Captain responded by saying, "all right, wait until you come back up." Another correction officer, who was also present, warned him to "watch when you come back." When Inmate A returned from lunch, the correction officer instructed him to wait at the security gate while the other inmates entered the classrooms. The officer asked the Captain what he and two other officers should do with Inmate A, and the Captain directed him to mace Inmate A,

---

[48] An asterisk indicates that our consultant interviewed the inmate involved in the incident during our on-site tours.

which he did.  The officer then punched Inmate A on the right side of his face.  After this initial blow, this same officer and the two other officers punched Inmate A approximately ten times in the face and ribs. When Inmate A fell to the ground, the officers began kicking him, and one of the kicks to the inmate's face cut his lip.

The ID inexplicably did not complete its investigation until June 2013, 14 months after the incident took place.  The officer who maced and initially punched inmate A told the ID investigators that when he instructed Inmate A to place his hands on the wall after Inmate A did not clear the magnometer, Inmate A punched him in the face and body.  The officer stated that he had neglected to mention in his initial written report that Inmate A had punched him in the body as well as the facial area because he was "dazed" after the incident.  According to the officer, he used the OC spray but it did not achieve the desired effect, so he punched Inmate A in the body and face.  The officer claimed he and Inmate A were the only ones in the area at the time of the incident.  When interviewed by ID investigators in January 2013, the Captain denied being in the area when the use of force occurred.

According to a logbook, Inmate A was not seen in the RNDC clinic until more than three hours after the incident.  Inmate A sustained a laceration to his upper lip and was transferred to Urgicare where he received three sutures.  Inmate A also suffered contusions to his right orbital and rib areas.  The officer sustained injuries to his left thumb and knee, but there is no indication in the record of any facial injuries, which is inconsistent with the officer's assertion that Inmate A punched him in the face.

Notwithstanding the officer's admission that he had repeatedly punched Inmate A in the body and face and the fact that the officer's injuries were inconsistent with his account, the ID concluded that the use of force was within the use of force guidelines.  According to DOC records, the officer was involved in a total of 13 use of force incidents at RNDC from 2010 through early 2013.

## **Inmate B**

In April 2012, Inmate B, who was in the adolescent punitive segregation unit of MHAUII due to mental health needs, was repeatedly punched in the head and upper body by an officer while two other officers stood idly by.  The incident was captured on video, which we reviewed.

Several inmates in the MHAUII multi-purpose room got into a disagreement and began throwing a storage bin at each other.  One officer entered the room and approached Inmate B, whose handcuffs apparently had been removed.  According to the infraction report later prepared by the officer, when he tried to re-apply the mechanical restraints, Inmate B stood up and pushed him, and the officer defended himself by "applying a combination of blows and strikes to the subject inmate's upper torso and took Inmate B down to the ground."  However, the video of the incident shows that the officer actually delivered multiple roundhouse punches to Inmate B's head, while at least two officers in the room stood by and made no attempt to intervene.  It is unclear from the video whether Inmate B actually pushed the officer as the officer contends.

Inmate B sustained multiple abrasions to the right and left side of his face, his right wrist, and his left elbow. The officer suffered trauma to his right thumb, presumably from punching Inmate B. Notwithstanding the video surveillance, the facility concluded that the force was minimal and necessary. The other officers in the multi-purpose room who witnessed the use of force inexplicably did not provide written reports as required by policy.

**Inmate C**

In May 2012, in an apparent act of retribution, Inmate C was beaten near the RNDC school, an area that does not have security cameras. Inmate C was punched several times in the face by an officer, and was allegedly kicked by a second officer after falling to the ground.

During his interview with investigators, Inmate C stated that an officer got angry at him one morning when he did not follow the officer's order to stop doing pushups and report to his bed. The officer threatened Inmate C and told him that he would "slap the shit out of him if he kept playing," according to a statement provided by another inmate. According to Inmate C, in the afternoon, while inmates were lining up to enter the RNDC classroom, the officer ordered Inmate C to stay behind. Inmate C reported that the officer then put on a pair of gloves, assumed a fighting stance, and punched Inmate C in the face approximately 15 times, causing him to fall to the floor. Inmate C reported that he felt a second officer kick him while he was bleeding on the ground.

In his use of force report, the first officer asserted that Inmate C instigated the fight by punching him in the face "without provocation," and that the officer punched Inmate C in his upper body only in self-defense. The officer claimed that he repeatedly used OC spray to subdue Inmate C and gave him several verbal commands to stop his aggression. However, several inmate witnesses confirmed many aspects of Inmate C's account, including that the officer instigated the incident, that Inmate C was hit repeatedly, and that other officers joined in the beating. The officer later submitted a written addendum to his initial report acknowledging that his punches were to Inmate C's facial area, not just to his upper body.

Inmate C sustained a nasal fracture and bruises to his face and head, which is consistent with being punched in the face. The first officer also sustained injuries and was transported to Booth Memorial Hospital for treatment. The ID, which did not complete its investigation until 14 months after the incident, concluded that the use of force was appropriate and that the facial blows delivered by the officer were used as self-defense. The officer was not disciplined, even though he indisputably filed a false use of force report that did not mention the punches to Inmate C's face.

**\*Inmate D**

In May 2012, Inmate D sustained serious injuries, including a skull fracture, as a result of a use of force incident that occurred in an RNDC search area, where there is no video surveillance.

Inmate D provided the following account:  When he entered the RNDC visit search area after a visit with his girlfriend, DOC staff ordered him to remove his clothing, squat, and cough.  Inmate D complained about the strip search but eventually complied.  After Inmate D made a smart remark to one officer, multiple officers proceeded to repeatedly punch and kick him in the chest, face, and head while he tried to protect himself.  He was then ordered to remove his clothes again, which he did (other than his socks).  Additional officers then joined in the beating and repeatedly punched and kicked Inmate D while he was on the ground.  A large metal fan was thrown on top of him multiple times.  Inmate D reported that at least five correction officers participated in the assault, and that the beating continued until one officer stated that he thought Inmate D was dead.  He was then handcuffed and kicked in the face a few more times.

Inmate D bled heavily, was taken to an intake pen, and did not receive medical treatment until more than an hour after the incident.  He was eventually taken to Elmhurst Hospital.

In statements to investigators, according to the officer to whom Inmate D initially made a smart remark, Inmate D instigated the altercation by disobeying his order to comply with the search process, throwing his underwear at the officer, and punching him in the face.  In his written report, the officer reported that he "defended [himself] punching [Inmate D] numerous times in his face and upper body area."  The officer claimed he did not observe any other staff member punch or kick Inmate D.  The other officers involved denied using any force themselves and claimed they did not see the first officer use any force either.

Inmate D sustained a skull fracture, bruises to his back and shoulders, and multiple lacerations to his forehead and inner lip requiring stitches.  The first officer sustained mild tenderness to his left anterior shoulder and left anterior knee, as well as mild swelling to the left side of his face.

The ID concluded that Inmate D's allegations that he was beaten by numerous officers were unsubstantiated.  Based on our review, the staff reports in this case raise credibility issues that should have been addressed during the investigation.  Most importantly, Inmate D's severe injuries are inconsistent with the accounts provided by the officers.  In addition, the Captain who arrived on the scene claimed he did not recall seeing any blood, which is inconceivable given Inmate D's injures.  Furthermore, the same initial officer asserted that a patterned contusion on Inmate D's upper back might have been caused by his watch when he pressed his forearm against Inmate D's back (as opposed to being a "boot print"), but medical personnel disagreed.  No effort was made to compare the officers' boots to the bruise pattern to determine whether an officer had in fact stomped on Inmate D.

The description of the incident Inmate D provided to our consultant in January 2013 is substantially consistent with the accounts he provided in May 2012 to the ID investigators, DOC medical staff, and the Legal Aid Society.  Inmate D received a sentence of 75 days in punitive segregation for not following orders and assaulting an officer.  Inmate D filed a lawsuit based on this incident, which settled before trial.

## Inmate E

In May 2012, Inmate E was ordered out of his classroom and beaten by officers in the EMTC school area after an officer perceived that Inmate E was challenging his authority by allegedly disregarding his order to pull up his ill-fitting and overly large institutional pants.  Inmate E suffered multiple injuries to his head and face, including a broken tooth.  One year and eight months after opening its investigation, the ID concluded that there was insufficient evidence to conclude that inappropriate and excessive force was used, no charges were recommended against the officers involved, and the case was closed.  There is no video surveillance in the ETMC school area.

In an interview with investigators, Inmate E explained that the day before the incident he had been issued institutional pants that were too big for him.  On the day of the incident, an officer looked into a classroom, saw that Inmate E's pants were falling down, and ordered him to pull them up.  Inmate E did so, but the officer ordered him out of the classroom and told him that he had to comply when given an order.  When Inmate E explained that his pants were too big, the officer told him not to question his authority, and pushed his head so that the back of his head hit the wall.  Inmate E became angry and "flinched" at the officer, but did not actually hit him.  The officer then started punching Inmate E.  A second officer then came out from the A post, and started punching him as well.  Together the two officers punched him in the ribs, right eye, left side of his forehead, and right side of his jaw.  Inmate E estimated that four or five punches landed on his jaw.  A third officer also joined in and began beating Inmate E as well.  Once the Captain arrived, she ordered Inmate E to put his hands on the wall, which he did.  The second officer then punched Inmate E again. Inmate E denied hitting any of the officers, and said he was just trying to block punches.  DOHMH records also indicate that Inmate E told medical staff that he was "jumped" and "punched all over his body" for "no apparent reason."

The officers' statements regarding the incident were not consistent with Inmate E's and not entirely consistent with each other.  In his use of force report and interview, the second officer said he saw Inmate E swing at the first officer, and that he came to his aid and together he and the first officer were able to restrain Inmate E against the wall.  The second officer said he did not see the first officer punching Inmate E and did not report taking part in or witnessing any force other than "restraining" Inmate E and "gaining control" over him.  The Captain reported that she saw Inmate E "strike [the first officer] in the face with a closed fist," when she arrived in the area, although the second officer reported that they had already gained control of him by the time the Captain arrived.  The first officer, who did not submit a use of force report until two days after the incident, reported that Inmate E first punched him three or four times on his face and neck, and that the punches were so powerful, they caused the officer's legs to "buckle."  He then punched Inmate E approximately three times; one punch inadvertently hit Inmate E in the face, and the others landed on his arms and torso.  The officer did not report any further strikes to Inmate E's head or torso, and only described putting Inmate E in a rear arm lock against the wall.

The first and second officers claimed torn rotator cuffs to the shoulders, although both refused to sign HIPAA forms for the release of medical records.  The first officer also claimed pain to his

left wrist, left shoulder, neck, and lower back.  Such injuries are more consistent with throwing punches than being punched "three or four times" in the face and neck.

Although the ID's case closing report states that "[Inmate E]'s version [of events] was not supported by other testimony," in fact six inmates provided statements substantially consistent with Inmate E's, including detailed statements regarding the fact that the first officer pushed Inmate E's head against the wall, that three officers were beating him, that Inmate E was trying to block the punches, and that the Captain watched the fight but did not intervene.

Inmate E sustained "multiple injuries to face, and head and mouth," including bruises to his right eye and lip, and injuries to the left side of his head, nose, and mouth.  He was sent to Urgicare for x-rays, where it was determined that he had a broken tooth.  In addition, photographs documented blood stains on his shirt.  Although the ID concluded that these injuries "can be accounted for by the officers' account of the force used," it is not credible that one inadvertent punch to the face and control holds could result in multiple bruises and injuries to the opposite sides of his head, a broken tooth, and leave blood stains on his shirt.

The ID took one year and eight months to complete this investigation, and recommended that the case be closed without charges.  The length of the investigation is particularly striking, given that a preliminary investigative case report was written up by the ID just five days after the incident, including summaries of all the statements inmate witnesses made to ID investigators.  At that time, the ID did not yet have the first officer's use of force report, and the preliminary report noted that the case should remain open in order for the first officer and other staff to "explain how [Inmate E] sustained a chipped tooth and multiple injuries to face, head and mouth."  It then took nearly nine months before the ID conducted an interview of the Captain, and then still another eight months before the ID conducted interviews of the first and second officers.  In total, the first and second officers were interviewed one year and five months after the incident took place.

### *Inmate F

In June 2012, Inmate F, a mentally impaired inmate, was repeatedly punched in the face by an officer who has been involved in well over 20 other RNDC use of force incidents.  Although the officer admitted that he delivered multiple blows to the inmate's face, the Department concluded that the force used was appropriate based on the officer's contention that he was acting in self-defense and responding to an unprovoked blow from the inmate.  There is no video of the incident because it occurred in the school area.

During an interview with our consultant, Inmate F reported that the officer challenged him to a one-on-one fight after they had gotten into a verbal confrontation in the RNDC school area.  Inmate F reported that the officer punched him in the face, injuring his nose.  Inmate F told our consultant that the officer kept on punching him, and he eventually punched the officer back and then ran into the corridor where he knew there was video surveillance and assumed a "surrender" position.  According to DOC records, the officer was involved in a total of 24 use of force

incidents at RNDC from 2007 through early 2013, including eight incidents in 2012 alone. He also has been subject to repeated disciplinary actions.

In his written report, the officer claimed that Inmate F initiated the altercation by punching him in the facial area after the officer found him in an unauthorized area (the teacher's lounge) and attempted to escort him to the school entrance. The officer openly acknowledged in his written report that that he "responded by throwing several punches striking [Inmate F] in the facial area." The officer also admitted that he did not attempt to use OC spray to subdue Inmate F before hitting him. Another officer who allegedly witnessed the event submitted a written report stating that Inmate F "spontaneously" punched the officer in his facial area and then the officer "retaliated by striking said inmate with a closed fist to his facial area." The officer witness did not mention that the officer involved in the incident actually delivered several punches, as that officer himself conceded. Inmate F denied assaulting the officer during his interview with investigators.

The Captain who investigated the matter and the Tour Commander concluded that the use of force was within the Department's guidelines, and the RNDC Warden and Deputy Warden for Security concurred with this finding. There is nothing in the record to suggest that the facility interviewed any potential inmate witnesses as part of its investigation, took into account the officer's use of force history, or explored why the only officer who admitted to witnessing the incident failed to mention that the officer involved in the incident delivered several punches as opposed to just one. In addition, although this incident involved multiple head blows, it was not referred to the ID for a more thorough investigation.

Inmate F sustained nasal and upper lip contusions and the officer suffered a contusion to his jaw. Inmate F's medical records note that he scratched his left arm "after the incident because he did not want to go to [the] box." Nonetheless, Inmate F was transferred to the RHU and placed on suicide watch. A few days after the incident, Inmate F's attorney advised DOC that Inmate F suffered from a lifelong condition of claustrophobia and that being housed in isolation could lead to a mental breakdown.

DOC pursued criminal charges against Inmate F based on the officer's allegation that Inmate F had assaulted him, but these charges were dismissed in December 2012.

## *Inmate G

In June 2012, in an apparent act of retribution, two officers forcibly took inmate Inmate G to the ground and beat him. Inmate G was punched multiple times and kicked in the head, resulting in serious injuries including a lost tooth.

During his interview with investigators, Inmate G reported that he walked into the pantry area in RNDC 3 Central North to get some water, and an officer told him he could not have any water because he was "a snitch." According to Inmate G, the officer was under the false impression that Inmate G had previously reported that the officer had been involved in another use of force incident. The officer grabbed Inmate G around the waist and threw him out of the pantry,

according to notes of the investigator who reviewed the video of the incident.  Inmate G reported that a second officer then grabbed him by the waist, threw him toward a supply closet, and said: "Oh what you doing?  You must want to get fucked up today?  You know who I am?"

Several minutes later, Inmate G had another confrontation in the vestibule area with both officers.  Inmate G told investigators that the two officers tried to restrain his arms, and eventually forcibly took him to the ground.  Inmate G stated that the second officer put his knee into Inmate G's back, making it hard for him to breathe, and then banged his face into the floor.  According to the ID report, the video revealed that Inmate G and the two officers struggled for several minutes.  After Inmate G was placed in flex cuffs and a Captain arrived, the second officer stomped on Inmate G's head, causing his chin to hit the floor and his upper front tooth to fall out.  Inmate G reported that a staff member told the first officer: "Yo, if anyone comes to you tell them this is what happened.  The inmate was being aggressive, he wasn't cooperating, and he was refusing to put his hands behind his back."  Inmate G was then taken to the clinic where he alleged he was further assaulted and pressured to prepare a false written statement about the incident, which he refused to do.

During interviews with investigators, the two officers claimed they used force only in response to Inmate G's aggression and repeated refusal to obey orders.  The first officer claimed that he had ordered Inmate G "to stop resisting" but he did not.  However, the written statements provided by both officers contained inaccuracies and were found to be inconsistent with the video surveillance.  For instance, in his written statement, the first officer falsely stated that he had guided Inmate G out of the pantry, while the video surveillance showed that he used physical force to remove him.  In addition, the second officer initially stated in his written report that he had "lost [his] balance causing [his] foot to momentarily and inadvertently make contact with [Inmate G's] head."  However, the second officer later admitted that he intentionally kicked Inmate G in the head "in the heat of the moment."  Neither officer used OC spray to subdue Inmate G before resorting to physical force.

Inmate G suffered a two-centimeter laceration to his chin that required sutures, lost a tooth, and sustained cracking and chipping to other teeth.  Although the ID investigation report repeatedly refers to video surveillance of the incident, DOC claimed the video could not be located and did not provide it to us.  The ID found that the first officer violated the use of force policy by utilizing physical force to remove Inmate G from the pantry when Inmate G did not pose a direct threat to him and recommended that charges be brought, although it does not appear from the records provided that the first officer was subject to formal discipline.  The second officer was suspended after the incident, but the length of his suspension is unclear.

## Inmate H

In September 2012, after shouting obscenities at an officer who had hit him in the ribcage with handcuffs while he was sleeping in class, Inmate H was pulled out of a classroom in the RNDC school area by a second officer and severely beaten in the corridor.  Two teachers in the area reported hearing Inmate H screaming and crying for his mother while being beaten.  Inmate H, who was not seen by medical clinic staff for more than four hours after the incident took place,

suffered pain and contusions to the left cheek, lower lip, and left upper ribcage.  There is no video surveillance in the RNDC school area.

In an interview with ID investigators on the day of the incident, Inmate H explained that he was sleeping with his head on his desk in the early afternoon, when he felt something hit him on the left side of his ribs.  Another inmate told him that an officer had hit him in the ribs.  The teacher in the classroom confirmed to ID that an officer had wrapped metal handcuffs around her hand and used them to hit him in the ribs in order to wake him up.  Inmate H then walked to the classroom door, and yelled obscenities at the officer.  According to Inmate H and as reported in the ID investigation report, a tall muscular officer then grabbed him, saying "yo get the fuck over here," and punched him in the left eye causing him to fall on the floor.  Inmate H told the ID that other officers then joined in, kicking him while he was on the floor on the face, head and back.  When he thought the beating was over, the first officer who had hit him in the ribs said, as reported by ID, "Oh just because I'm a female that don't mean nothing cause I can still fuck you up.  Next time watch your fucking mouth."  She then hit him and kicked him, after which another officer came over and asked if he could hit Inmate H as well.  Again according to Inmate H, the other officers in the area said, "sure, why not," after which the officer proceeded to kick him in the mouth.  Another officer asked if anyone had pepper sprayed him yet, and then proceeded to spray him directly in the eye, one inch from his eye.  According to Inmate H, he did not fight back while the officers were beating him.

The use of force reports submitted by three officers told a different story, but also contradicted each other in part.  The first officer initially reported Inmate H came off the wall during a pat frisk, grabbing her collar and ripping it.  She then claimed to defend herself from this assault by using closed hand strikes to Inmate H's "facial and upper body areas."  In an addendum submitted later, she noted that the pat frisk she reported earlier took place after Inmate H followed her into the corridor because he was angry that she had "tapped" him on the shoulder to wake him up while he was sleeping in class.  A second officer reported that he arrived on the scene while Inmate H was assaulting the first officer, at which point he sprayed Inmate H with OC.  But a third officer reported that the second officer appeared at the door of the classroom and ordered Inmate H into the corridor after Inmate H shouted obscenities at the first officer.  The Captain assigned to the facility investigation acknowledged that the stories of the three officers were somewhat contradictory, but concluded that the use of force was appropriate and the case should be closed without further investigation.

Several other statements, however, tend to confirm Inmate H's version of events.  A different inmate (the "inmate witness") stated to the ID that the same initial officer who woke up Inmate H by hitting him with handcuffs had also woken him up in the classroom by hitting him with handcuffs, but that the inmate witness didn't say anything because, as reported by the ID, "if you start to argue, they would say that you hit them first and you will catch a new charge."  Two teachers confirmed that the first officer hit the inmate witness with handcuffs in their classroom earlier in the day.  The inmate witness said that he saw the female officer hit Inmate H with handcuffs as well, but that when Inmate H started cursing, the officers "took him into the hallway and knocked him out."  The inmate witness said that he and several other inmates watched through the window of the classroom as three or four officers began to punch Inmate H.

In a follow-up interview with the ID several months later, the inmate witness said he didn't remember anything and didn't want to cooperate.

Three teachers also reported seeing Inmate H pulled by officers from the classroom into the corridor.  One teacher reported that after seeing Inmate H pulled from the class she heard him being beaten, but "tried not to look in the direction of where the CO and inmate were because she didn't want to see the inmate beat."  Once it appeared to be over, she looked out in the corridor and saw him lying on the floor, looking dazed.  According to handwritten notes in the ID file, she tried to keep her students away from the window.  She told her students that Inmate H was OK, but then heard the officer shouting at him again, loud thuds, and then the inmate's cries for his mother.  She described how she started to shake because she was so upset.  Another teacher gave a similar description, and said he heard "thumping" and "screaming," and that he "knew" that the inmate was being assaulted.  That teacher also stated that "when an incident occurs, [Board of Education] staff knows they should turn their heads so they don't witness anything."  He also stated that he heard the inmate "crying and screaming for his mother," and that the other inmates in his class were trying to see what was happening through the window "because they were upset."  After Inmate H was removed from the corridor, the teacher "saw blood and saliva on the floor."

While the first officer was treated at the on-site clinic for "shoulder pain" within minutes, Inmate H was not seen at the clinic until after 6pm that evening.  His injuries were described as "left upper rib cage pain (contusion)," "left cheek contusion," and "lower lip contusion," and he was treated with an ice pack and Tylenol for pain.

The ID investigation, which was not completed until January 2014—one year and four months after the incident occurred—recommended that charges be brought against the first officer for seven separate violations of DOC policies, including for using unnecessary force (including using force as retaliation), using blows to the head, striking an inmate with institutional equipment, failing to report a use of force, and providing false and misleading MEO-16 testimony, among other violations.  In addition, the ID investigation recommended charges against the second and third officers in connection with submitting false or inaccurate use of force reports and knowingly providing false and misleading statements during their MEO-16 interviews.  The first and second officers were later charged, and those charges are still pending, according to documents provided by DOC.

## 2013 INCIDENTS

### *Inmate I

In January 2013, Inmate I was hit several times in the RNDC school area where there are no security cameras.  An officer admitted that he punched Inmate I multiple times in the face and upper body area, but was not subject to any formal disciplinary action.

During his interview with Department investigators, Inmate I stated that the officer was upset because some of Inmate I's friends were playing with their food in the mess hall.  Once the

inmates were back in the classroom, the officer ordered Inmate I and another inmate to stand up and face the wall.  Inmate I claimed that at some point he laughed and the officer responded by punching Inmate I with a closed fist about ten times to the head and face.  Inmate I stated that he was able to block some of the punches, but then an unknown officer grabbed Inmate I, pulled him to the floor, and then took him into the bathroom.  The description Inmate I provided to our consultant is substantially similar to the account he provided to the Department investigators, except he told our consultant that another officer was also involved in punching him.  His account to the Legal Aid Society was substantially similar to the description of the incident he provided to our consultant.

According to an inmate witness, after Inmate I refused to comply with the officer's direction to put his hands on his head, the officer punched Inmate I one time on the side of his mouth causing Inmate I to fall to the floor.  The inmate further stated that the officer then punched Inmate I two times in the chest area and kicked him four times to the rib area.  The inmate claimed that the officer continued to hit Inmate I while another officer held Inmate I's arms behind his back.

The officer stated that he punched Inmate I in the face and upper body area only after Inmate I hit him in the face.  According to the officer, after bringing Inmate I down to the floor, he hit Inmate I again in response to Inmate I continuing to punch the officer.  The officer claimed that he gave Inmate I several verbal orders to cease his aggression before Inmate I finally complied.  The officer later amended his written report to add that he could not use chemical agents to subdue Inmate I because of the close proximity between himself and Inmate I.

Although other correction officers were in the vicinity at the time of the incident, none admitted to witnessing any use of force against Inmate I.

Inmate I sustained contusions on his lip and scalp consistent with being hit in the face.  The officer suffered a contusion on his right hand, but no injuries to his face, which is inconsistent with the officer's claim that Inmate I hit him in the face.

The ID concurred with the facility investigation's determination that the use of force "was appropriate and necessary" for the officer to defend himself.  The ID did not conduct an independent investigation, even though its report acknowledges that "[i]t is undisputable that [the officer] punched Inmate [I] in the facial area multiple times."  The facility recommended that the officer attend use of force re-training and subjected him to "a corrective interview" for violating the rule to avoid striking inmates in the head and facial areas when possible, but no formal disciplinary action was taken against the officer.  Inmate I was charged in criminal court (charges that were ultimately dismissed) and received 90 days of punitive segregation as a result of this incident.

## *Inmate J

In January 2013, Inmate J, a mentally ill inmate housed in MHAUII at the time, extended his forearm through the small cuffing port of his cell to get staff's attention because he wanted a shower and to use the telephone.  A Captain, accompanied by another officer, approached the

inmate's cell and, within seconds, forcibly closed the rear slide door of the cuff port on Inmate J's left arm and walked away. The incident was captured on video.

After the incident, Inmate J told clinic staff that the Captain approached his cell and "slammed the slot forcefully" on his arm without any warning, resulting in "shocking pain . . . like I got hit with a hammer or something." In his written statement, the Captain stated that he responded after being told that Inmate J "was holding the cuff" and gave Inmate J "several direct orders to remove his hand" before closing the slot. The Captain claimed that as he began to close the slot, Inmate J "simultaneously removed his hand swiftly… causing him to brush his arm against the closing slot." The officer who accompanied the Captain reported that the Captain asked Inmate J "numerous times" to remove his hand before closing the port. In contrast to the Captain, the officer claimed that the injury occurred because Inmate J "spontaneously stuck his arm back through the cuffing port at the same time" as the port was closed.

The video surveillance contradicts the written statements from both the Captain and the officer. The Captain slammed the slide door of the cuff port on Inmate J's arm within approximately ten seconds of arriving at Inmate J's cell, making it highly unlikely that he had repeatedly ordered Inmate J to remove his hand before inflicting the injury as the Captain and the officer claim. The video also shows the Captain closing the door while Inmate J's arm was still extended, further contradicting the Captain's account. When interviewed by our consultant, Inmate J stated that the Captain threw out the written statement he provided after the incident.

The Captain who investigated the matter and the Tour Commander concluded that the force was inappropriate but not excessive, and the GRVC Warden concurred. This finding demonstrates a fundamental and concerning misunderstanding of the definition of excessive force. Since it was not necessary to use force under these circumstances, any force used was excessive. Moreover, neither the Tour Commander nor the investigating Captain noted that both staff members had submitted false reports, or the inconsistencies between their reports.

The Tour Commander recommended command discipline for the Captain involved in the incident for violation of the Use of Force Directive, and the Warden subsequently recommended a 4-day penalty. This was at least the third time that the Captain had been subject to disciplinary action in connection with a use of force incident.

The ID reviewed the facility's investigation and found that it was "satisfactory" and no independent investigation was necessary.

Inmate J sustained trauma to his upper left arm, swelling, and a mild decrease in motion. The Tour Commander recommended that Inmate J receive "the maximum punitive segregation time allowed."

## Inmate K

In January 2013, an officer hit Inmate K in the school area where there are no security cameras. Inmate K told medical staff that he was "beaten" by the officer. Despite the fact that Inmate K

had multiple visible injuries on his face and neck, the officer denied striking Inmate K.  Based on the extent of the injuries suffered by Inmate K, the Captain assigned to investigate the incident found that the officer had falsified his report and that the use of force was excessive.

The officer told investigators he approached Inmate K and asked him to hand over playing cards, and when Inmate K refused to do so, the officer instructed Inmate K to go against the wall. According to the officer, Inmate K attempted to grab the officer's shirt and the officer used a "swiping motion" to release Inmate K's grip on his shirt and to gain distance.  Inmate K then kneeled down and placed his hands on his head.  The officer initially indicated in his report that he had used an "upper body control hold" to subdue Inmate K, but then amended his report to say that he had not used such a hold.  None of the inmates or correction officers in the area at the time of the incident admitted to witnessing any use of force.

Inmate K sustained multiple bruises to his forehead, neck and back, as well as pain in his wrist. The officer had swelling and bruising on his right thumb.

The Captain assigned to investigate the incident concluded that the use of force was "excessive and not proportionate to the threat presented."  The Captain further found that the injuries suffered by Inmate K were not consistent with staff reports and that the officer had "falsified his use of force report in an attempt to downplay" the incident.  Despite the Captain's recommendation that the ID investigate the matter, there is no record that such an investigation took place.  There is also no record of the officer being formally disciplined or subjected to any corrective action for either the use of excessive force or the submission of a false report.

Inmate K received 60 days of punitive segregation as a result of the incident even though there was evidence that the charges against Inmate K were based, at least in part, on a false report by the officer.

## Inmate L

In January 2013, after reportedly being disruptive while waiting to enter the RNDC dining hall, Inmate L (who was on suicide watch at the time) was taken down by a Captain and punched repeatedly on his head and upper torso while he lay face down on the ground covering his head with his hands.  Inmate L sustained multiple bruises and abrasions to his shoulders, arms, back, and neck.

Officers reported that Inmate L became disruptive while inmates lined up to enter the dining hall and did not comply with orders to cease his behavior.  According to the Tour Commander's report, when Inmate L refused to comply with the Captain's order to place his hands on the wall, the Captain "guided [the] subject to the wall then took him to the ground."  The Captain proceeded to punch Inmate L "twice in the head and upper torso," while the inmate was face down on the ground with his hands over his head, as confirmed by video surveillance.  The Tour Commander concluded that the Captain's use of force was "excessive and avoidable" since Inmate L presented no threat while on the ground.  Although the Tour Commander recommended command discipline, the Department did not provide any records showing that the

Captain was formally disciplined for his use of excessive force. Inmate L, however, was infracted for disorderly conduct.

Other evidence suggests that the level of force utilized was more severe than the facility found. Inmate L told investigators that the Captain "punched [him] everywhere." In addition, according to medical records, Inmate L sustained bruises to his left and right shoulders, left and right lower arms, chest area, neck, back, and a finger on his right hand, as well as an abrasion to his right elbow. It is unlikely that all of these injuries would result from just two punches. The Captain sustained mild swelling of his right wrist, possibly due to the punches he threw.

This is also another instance when staff submitted clearly false reports. In his initial written statement after the incident, the Captain falsely claimed that Inmate L "continued to resist by flailing his arm and moving his body about in [an] attempt to avoid being cuffed." This was contradicted by the video surveillance reviewed. In a supplemental report prepared almost two weeks after the incident, the Captain acknowledged that the inmate "placed his hands by his head" while on the ground and explained that he had not mentioned that in his initial report "[d]ue to the inmates [sic] odd behavior and the adrenaline flowing." Moreover, only one of the many staff members who submitted written reports acknowledged that the Captain punched Inmate L, and that officer stated that the blows were necessary due to Inmate L's "apparent assault" and "constant violent resistance." Notwithstanding these false reports, the clearly excessive force applied, and Inmate L's extensive injuries, this matter was not referred to the ID for a more extensive investigation.

## Inmates M, N, O, P

In August 2013, four RNDC inmates were seriously injured during a brutal use of force incident involving multiple officers in a trailer that contains classrooms. The incident was referred to the ID for investigation, but we did not receive the ID file because the investigation was still pending at the time this letter was prepared. The four inmates each provided substantially consistent accounts of the incident to the Legal Aid Society and a senior DOHMH official. The inmates all sustained serious injuries, including fractures. There is no video of this incident because there are no cameras in the RNDC school area.

The following is a general summary of the accounts the four inmates provided: The inmates and one officer were working in the trailer and got into a verbal confrontation. The officer grabbed Inmate M by his neck, slammed his face into a concrete wall, and then began to repeatedly punch him. The officer reported that he had been jumped and called for backup. Soon thereafter, several other officers, including probe team members, arrived and brutally assaulted the four inmates, punching and kicking them and striking them with radios, batons, and broomsticks. This continued for several minutes after the inmates had been subdued and handcuffed. The probe team then took the inmates to holding pens in the clinic intake area where they were handcuffed and beaten again by several DOC Gang Intelligence Unit members, who repeatedly punched and kicked them while they were handcuffed and slammed them against cell walls. Two of the inmates reported that they thought they had lost consciousness or blacked out for some period of time.

According to written staff reports, the inmates instigated the confrontation by attacking the officer who was working in the trailer.  Staff claimed that Inmate M pulled that officer off a ladder and started to kick and punch him, and then the other inmates joined in the assault, beating the officer with broken mop sticks and a metal rod.  According to staff, when other officers arrived to provide assistance, the inmates attacked them as well and fights ensued, with officers acting in self-defense.  Several officers stated that they punched the inmates in the upper torso and facial area to protect themselves.  According to the officers, the probe team eventually arrived and took the inmates away in restraints.  We did not receive any statements from the involved probe team officers or the Gang Intelligence Unit officers.

Several officers utilized similar phrasing and language in their written use of force reports, suggesting that the officers may have colluded with each other to ensure their reports were consistent.  For instance, one officer wrote that an inmate was "able to break this writer's hold and subsequently turned his aggression toward this writer."  Another officer noted that an inmate "broke from the control hold and then directed his aggression to this writer."  A third officer wrote that an inmate "was able to break this writer's control hold turning his aggression towards this writer."

The inmates sustained a wide array of serious injuries, including a broken nose, a perforated eardrum, head trauma, chest contusions, and other head and facial injuries.  Although clinic medical staff quickly determined that the inmates all needed hospital care, it took an unreasonably long time to secure escorts to transfer the inmates from the jail.  In an email shortly after the incident, a senior DOHMH official stated that "this type of delay could have proved fatal" and requested an investigation of why it took so long to take the inmates to the hospital.