**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*86 Chambers Street*
*New York, New York 10007*

June 22, 2015

**BY ECF**
The Honorable James C. Francis, IV
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Nunez v. City of New York*, 11 Civ. 5845 (LTS)(JCF)

Dear Judge Francis:

We write respectfully on behalf of the United States, counsel for the *Nunez* plaintiff class (The Legal Aid Society Prisoners' Rights Project, Emery Celli Brinckerhoff & Abady LLP, and Ropes & Gray LLP) (with this Office, collectively, "Plaintiffs' Counsel), and the City defendants (the "City"), to advise the Court that the parties have reached agreement on the terms of a Consent Judgment (the "Agreement") in the above-referenced matter, subject to final approval by the Civil Rights Division of the Department of Justice and the Mayor's Office. We expect to be in a position to submit the Agreement for the Court's preliminary approval no later than July 1, 2015. The Agreement, as set forth below, will be subject to this Court's oversight and provides for the appointment of an independent monitor.

The Agreement will require the New York City Department of Correction ("DOC") to develop and implement myriad new practices, systems, policies, and procedures designed to reduce violence in the jails and ensure the safety and well-being of inmates. The reforms mandated by this Agreement are designed to comprehensively address systemic deficiencies that have plagued the jail system on Rikers Island for years. Taken together, they represent the parties' collective views as to the measures necessary and appropriate to protect the constitutional rights of inmates. The Agreement is a product of lengthy negotiations, which involved not only our Office, *Nunez* plaintiff class counsel, and the City's counsel, but also the Civil Rights Division of the United States Department of Justice, Plaintiffs' corrections experts, and key DOC officials. The City is committed to moving forward with its reform efforts and to implementing the sweeping operational changes set forth in the Agreement, which the parties believe will result in a safer and more secure environment for both inmates and correction officers. This Agreement also takes into account reforms undertaken by the City on its own initiative, particularly with respect to the treatment of adolescents.

The parties have selected Steve J. Martin to serve as an independent monitor (the "Monitor"). Mr. Martin will be responsible for assessing compliance with each provision of the Agreement and submitting periodic reports to the Court. Mr. Martin has worked as a corrections

professional for over 40 years, including as a correction officer, General Counsel of the Texas State Prison System, and expert consultant for the United States Department of Justice, Civil Rights Division, and the United States Department of Homeland Security, Office of Civil Rights and Civil Liberties. He has visited or inspected over 700 confinement facilities in the United States and abroad, and has been continuously involved in institutional reform litigation since 1981. He has served as a federal court monitor in numerous prisons and state systems, large metropolitan jail systems, and juvenile justice facilities. Mr. Martin will have broad access to DOC's records, facilities, and staff, and may hire or consult with other qualified experts as is reasonably necessary to fulfill his duties. In addition, after each reporting period for the duration of the Agreement, DOC will provide him and Plaintiffs' Counsel with compliance reports that will contain extensive information and data related to implementation of different provisions of the Agreement.

Pursuant to the Agreement, this Court will maintain continuing jurisdiction over this action to ensure compliance with the required reforms. The Agreement will terminate only upon a finding by the Court that the City has achieved substantial compliance with all of the provisions of the Agreement, and has maintained such substantial compliance for a period of 24 months.

The 63-page Agreement calls for a wide range of reforms intended to dismantle the decades-long culture of violence in the City jails, and create an environment that protects both inmates and correction officers alike. The Agreement includes the following specific requirements:[1]

- Development of a New Use of Force Policy: DOC will develop, adopt, and implement a comprehensive, new use of force policy that will be subject to the Monitor's review and approval. The new policy will set forth explicit prohibitions regarding the use of certain categories of force, and provide correction officers with clear direction on when and how force may be used.

- Robust Requirements for Reporting Use of Force: Correction officers will be required to provide timely and detailed reports on every use of force incident, and will be required to independently prepare these reports. Any collusion in the preparation of use of force reports will result in disciplinary action.

- Complete and Timely Investigations of Use of Force Incidents: DOC will conduct thorough, timely, and objective investigations into use of force incidents to determine whether staff engaged in the excessive or unnecessary use of force or otherwise violated the use of force policy. The Agreement sets forth criteria that these investigations must satisfy, and requires DOC's investigators to prepare complete and detailed reports summarizing their findings, the basis for their findings, and any recommended disciplinary actions or remedial measures.

---

[1] The summary that follows enumerates most but not all areas of reform. The actual Agreement contains much more detail on these areas and includes other requirements.

- Increased Accountability: DOC will take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, when correction officers engage in the excessive or unnecessary use of force or otherwise violate the use of force policy. To ensure that correction officers are consistently held accountable for misconduct, DOC will develop and implement disciplinary guidelines that will include the range of penalties to be sought for different categories of violations. DOC will prosecute disciplinary actions as expeditiously as possible, and shall be staffed sufficiently to do so.

- Development of an Early Warning System: DOC will develop a system, subject to the Monitor's review and approval, to identify as soon as possible correction officers whose conduct may warrant corrective actions. The system will track and use performance data to help DOC identify staff members who are at risk of engaging in serious misconduct absent appropriate intervention or services by DOC.

- Creation of New Use of Force Auditor Position: DOC will designate a Use of Force Auditor who will report directly to the Commissioner or a designated Deputy Commissioner. The Use of Force Auditor will be responsible for analyzing all data relating to use of force incidents and identifying trends and patterns. The Use of Force Auditor will prepare quarterly reports setting forth the Auditor's findings and recommendations to the DOC Commissioner on how to reduce the number of use of force incidents and the severity of injuries resulting from these incidents.

- Comprehensive Video Surveillance of Jails: DOC will install sufficient additional wall-mounted video surveillance cameras throughout the jails to ensure complete camera coverage of the jails, with certain narrow exceptions such as the interior of shower areas and toilet areas, by February 28, 2018. DOC will install a total of at least 7,800 additional cameras on a rolling basis. At least 25% of these cameras must be installed by July 1, 2016, at least 50% by February 1, 2017, and at least 75% by July 1, 2017. DOC will seek to prioritize the installation of the cameras in facilities with the most significant levels of violence, and will preserve video capturing a use of force incident or inmate-on-inmate violence for a period of four years as a general practice.

- Implementation of a Pilot Program for Body-Worn Cameras: DOC will institute a pilot program involving the use of body-worn cameras by certain correction officers. After one year, DOC, in consultation with the Monitor, will evaluate the effectiveness and feasibility of using these cameras and determine whether DOC should continue or expand their use.

- Requirements for Use of Handheld Video Cameras: DOC will develop, adopt, and implement policies and procedures mandating that staff use handheld video cameras to record, among other things, responses to use of force incidents, cell extractions, and most living quarter searches, except when safety or security concerns require an immediate response that would preclude waiting for the

recording requirement. The policies will require that the recordings be continuous and that any break in the recording be explained.

- Enhanced Computerized Tracking Systems: DOC will track in a reliable, accurate, and computerized manner extensive data on all use of force incidents, use of force investigations, and staff disciplinary actions. DOC will utilize these systems to determine whether there are ways to enhance the quality of inmate supervision or oversight of correction officers, and to identify patterns in the use of force that need to be addressed. By the end of 2016, DOC will develop a new computerized case management system that will track data relating to incidents involving correction officers in a centralized manner.

- Improved Staff Recruitment and Selection: DOC will develop a comprehensive staff recruitment program to attract well-qualified applicants, and will employ an objective process to select and hire staff. The Agreement also requires DOC to conduct appropriate background investigations before hiring individuals, and identifies factors that must be considered, such as possible gang affiliations and the applicant's relationships with current inmates.

- Enhanced Screening of Supervisors and Special Unit Staff: Prior to promoting any correction officer to the position of Captain or higher or assigning an officer to certain special units (*e.g.*, punitive segregation and mental health housing areas), DOC will undertake a review of the officer's prior involvement in use of force incidents to verify that this does not raise concerns about the officer's qualifications.

- Additional Staff Training: DOC will develop a number of new pre-service and in-service training programs, as well as strengthen and improve existing training programs, addressing a variety of subject matters, including the new use of force policy, crisis intervention and conflict resolution, defensive tactics, cell extractions, and procedures, skills, and techniques for investigating use of force incidents. The Agreement specifies the minimum length of these trainings, and sets deadlines by which staff must complete them. New training programs and materials will be subject to the review and approval of the Monitor.

- Anonymous Reporting System: In consultation with the Monitor, DOC will establish a centralized system that will allow correction staff to anonymously report use of force policy violations.

- Notifications to the United States Attorney's Office: DOC will promptly notify the United States Attorney's Office for the Southern District of New York of any use of force incident where correction staff conduct appears to be criminal in nature.

In addition, the Agreement includes numerous provisions specifically addressing inmates under the age of 19 ("Young Inmates"), who were the focus of the Complaint-in-Intervention filed by the United States in December 2014, as well as the investigation that

this Office conducted pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997. The Agreement, among other things, requires the following reforms for Young Inmates:

- Safety and Supervision of Young Inmates: DOC will supervise Young Inmates in a manner that protects them from an unreasonable risk of harm. The Agreement specifically calls for DOC to:

  - Cap inmate-to-staff ratios and living unit sizes for housing units used for inmates under the age of 18, as well as housing units used for high and medium classification 18-year-old inmates.

  - Conduct daily inspections of Young Inmate housing areas to ensure that the conditions are reasonably safe and secure.

  - Develop, in consultation with the Monitor, an age-appropriate classification system for inmates under the age of 18.

  - Develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and during the summer, to minimize idleness and the potential for inmate-on-inmate violence. This programming shall be consistent with best practices in United States correctional systems.

  - Promptly transfer Young Inmates who express concerns for their safety to secure alternative housing pending an investigation and evaluation of the risk to the inmate's safety.

  - Adopt and implement a new approach to supervising and managing Young Inmates, commonly referred to as the "Direct Supervision Model." This model emphasizes frequent and informal communications between staff and inmates, and early staff intervention to avoid potential inmate-on-inmate conflicts or crisis situations. All staff assigned to Young Inmate housing areas will receive at least 32 hours of training on this new inmate management model.

  - Implement a system that seeks to consistently assign the same correction officers and supervisors to the same housing units.

  - Timely report and thoroughly investigate all allegations of sexual assault involving Young Inmates.

  - Train correction officers regularly assigned to the Young Inmate housing areas in conflict resolution and crisis intervention skills specific to managing Young Inmates, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies.

- Restrictions on Use of Punitive Segregation for Young Inmates: The Agreement includes several restrictions on the use of punitive segregation for Young Inmates, including the following:
    - DOC will not place any inmate under the age of 18 in punitive segregation. In consultation with the Monitor, DOC will develop alternative systems, policies, and procedures to discipline inmates under the age of 18 who commit infractions, and to reward and incentivize positive behaviors.
    - With respect to 18-year-olds, DOC will develop a continuum of alternatives to punitive segregation for inmate infractions, subject to the Monitor's review and approval. DOC will not use punitive segregation for any 18-year-old inmate with a serious mental illness and will place 18-year-old inmates in punitive segregation only after a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate. On a daily basis, DOC will monitor the medical and mental health status of any 18-year-old in punitive segregation.
- Review of Inmate Disciplinary Process: DOC will retain an outside consultant to conduct an independent review of DOC's infractions processes and procedures. The consultant will issue a report setting forth findings and recommendations, which DOC shall implement unless doing so would be unduly burdensome.
- Alternative Housing Site for Inmates Under the Age of 18: DOC and the Mayor's Office of Criminal Justice, in consultation with the Monitor, will make best efforts to identify an alternative site not located on Rikers Island to house inmates under the age of 18. The alternative site will be readily accessible by public transportation to facilitate visitation between inmates and family members, and have the capacity to be designed and/or modified in a manner to provide a safe and secure environment, access to adequate recreational facilities and programming, the capacity to house inmates in small units, and a physical layout that facilitates implementation of the Direct Supervision Model. DOC's periodic compliance reports to the Monitor and Plaintiffs' Counsel will include a summary of efforts made during each reporting period to identify an alternative site and a description of any sites under consideration.

In light of this Agreement, the parties respectfully request that any deadlines in this matter be stayed pending final approval of the Agreement by DOC, the Department of Justice and the Mayor's Office, the parties' application for the Court's preliminary approval of the Agreement, and the Court's subsequent final review of the Agreement (after notice to the class and a fairness hearing). In addition, counsel for the individual *Nunez* plaintiffs and counsel for the City have reached an agreement in principle to resolve most of the individual damages cases, which are subject to client approval, and thus request that the time to complete expert depositions in those cases be extended to July 1, 2015, to allow time to finalize those individual settlement

agreements and/or advise the Court regarding next steps should the cases not be resolved by that date.

        Respectfully,

        PREET BHARARA
        United States Attorney

By:  /s/ Jeffrey K. Powell
        JEFFREY K. POWELL
        EMILY E. DAUGHTRY
        Assistant United States Attorneys
        Tel:   (212) 637-2706/2777
        Email: Jeffrey.Powell@usdoj.gov
               Emily.Daughtry@usdoj.gov