UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                         :

MARK NUNEZ, et al.,                          :

                         Plaintiffs,       :

      - against -                  :

                                   :  11 Civ. 5845 (LTS)(JCF)
CITY OF NEW YORK, et al.,               :

                      Defendants.  :

------------------------------------------------------------ X
                                           :

UNITED STATES OF AMERICA,       :

                      Plaintiff-Intervenor,  :

      - against -                  :

CITY OF NEW YORK and NEW YORK CITY  :
DEPARTMENT OF CORRECTION,     :

                      Defendants.  :

------------------------------------------------------------ X

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY APPROVAL OF CONSENT JUDGMENT, APPROVAL OF CLASS NOTICE, AND REVISION TO DEFINITION OF CERTIFIED CLASS

## <u>TABLE OF CONTENTS</u>

BACKGROUND ....................................................................................................................2

SUMMARY OF CONSENT JUDGMENT.........................................................................5

ARGUMENT .....................................................................................................................14

    I.     THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE
          CONSENT JUDGMENT................................................................................14

          A.     The Consent Judgment is Fair, Adequate, and Reasonable. ..................... 15

                1.     The Consent Judgment Negotiation Process Was Fair. ................15

                2.     The Consent Judgment is Substantively Fair.................................17

          B.     The Consent Judgment Complies with the PLRA. ................................ 22

    II.    THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE. ........23

    III.   THE COURT SHOULD EXPAND THE DEFINITION OF THE
          CERTIFIED CLASS AS AGREED TO IN THE CONSENT
          JUDGMENT. ..................................................................................................25

CONCLUSION..................................................................................................................26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Benjamin v. Fraser*,
  156 F. Supp. 2d 333 (S.D.N.Y. 2001), *aff'd in part,*
  *vacated and remanded in part on other grounds*, 343 F.3d 35 (2d Cir. 2003).......................22

*Chatelain v. Prudential-Bache Sec.*,
  805 F. Supp. 209 (S.D.N.Y. 1992)..........................................................................................21

*City of Detroit v. Grinnell Corp.*,
  495 F.2d 448 (2d Cir. 1974), *abrogated on other grounds*, *Goldberger v. Integrated*
  *Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000)....................................................................14, 17

*D'Amato v. Deutsche Bank*,
  236 F.3d 78 (2d Cir. 2001)............................................................................................... 14-16

*Fisher v. Koehler et al.*,
  No. 83 Civ. 2128 (LAP) (S.D.N.Y.) .......................................................................................25

*In re Austrian & German Bank Holocaust Litig.*,
  80 F. Supp. 2d 164 (S.D.N.Y. 2000),
  *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001) .......................... 17-18

*In re Global Crossing Sec. & ERISA Litig.*,
  225 F.R.D. 436 (S.D.N.Y. 2004) ............................................................................................20

*In re Merrill Lynch Tyco Research Sec. Litig.*,
  249 F.R.D. 124 (S.D.N.Y. 2008) ......................................................................................17, 23

*In re NASDAQ Mkt.-Makers Antitrust Litig.*,
  176 F.R.D. 99 (S.D.N.Y. 1997) ..............................................................................................15

*In re PaineWebber Ltd. P'ships Litig.*,
  171 F.R.D. 104 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).............................................21

*In re Traffic Exec. Association-Eastern R.Rs.*,
  627 F.2d 631 (2d Cir. 1980).....................................................................................................15

*Ingles v. Toro*,
  438 F. Supp. 2d 203 (S.D.N.Y. 2006)........................................................................... passim

*Shapiro v. JPMorgan Chase & Co.*,
  No. 11 CIV. 7961 (CM), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ................................17

*Sheppard v. Phoenix*,
    91 Civ. 4141 (RPP), 1998 WL 397846 (S.D.N.Y July 16, 1998)............................................16

*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,
    396 F.3d 96 (2d Cir. 2005)...........................................................................................14, 23

*Weil v. Long Island Sav. Bank.*,
    188 F.Supp. 2d 258 (E.D.N.Y. 2002) ...............................................................................19

*Weinberger v. Kendrick*,
    698 F.2d 61 (2d Cir. 1982)...............................................................................................20

**STATUTES AND RULES**

18 U.S.C. § 3626(a) ...............................................................................................................15, 22

18 U.S.C. § 3626(c) ...............................................................................................................15, 22

28 U.S.C. § 1715(d) .....................................................................................................................25

42 U.S.C. § 1997 ...........................................................................................................................4

42 U.S.C. § 14141 ..........................................................................................................................4

Fed. R. Civ. P. 23(a) ......................................................................................................................2

Fed. R. Civ. P. 23(b)(1)(A) ...........................................................................................................2

Fed. R. Civ. P. 23(b)(2)..................................................................................................................2

Fed. R. Civ. P. 23(e)(1)................................................................................................................23

Fed. R. Civ. P. 23(e)(2)................................................................................................................14

**OTHER AUTHORITIES**

*Newberg on Class Actions* § 11.25 (4th ed. 2002)......................................................................14

Rodney Brye, Shameik Smallwood, Travis Woods, and Oscar Sanders, as the class representatives of the certified class in this action, through class counsel, Ropes & Gray LLP ("R&G"), Emery Celli Brinckerhoff & Abady LLP ("ECBA"), and The Legal Aid Society Prisoners' Rights Project ("LAS") (collectively, "Plaintiffs' Class Counsel"), together with the United States of America, through its counsel, the United States Attorney's Office for the Southern District of New York ("USAO") (Plaintiffs' Class Counsel and the USAO, collectively, "Plaintiffs' Counsel"), respectfully submit this Memorandum.

After vigorous litigation of the class claims in this action (including motion practice, production of millions of pages of documents, and dozens of depositions), and after many months of arm's-length and intensive negotiations to settle those claims (involving counsel, senior Department of Correction personnel including the Commissioner, and expert consultants), the parties have succeeded in reaching a comprehensive and detailed Consent Judgment (the "Consent Judgment") designed to remedy the alleged unconstitutional practices in the New York City jails.  A copy of the Consent Judgment is annexed as Exhibit A to the accompanying Declaration of Anna Friedberg, dated July 1, 2015 ("Friedberg Dec.").

This Motion asks that the Court: (1) preliminarily approve the proposed Consent Judgment executed by the parties (Friedberg Dec. Exhibit A), (2) approve the content and method of distribution of the notice to the class (Friedberg Dec., Exhibit B; *see* proposed Order annexed as Exhibit C thereto), (3) set dates for the process leading up to and including the Fairness Hearing, and (4) revise the definition of the certified class as agreed to by the parties in the proposed Consent Judgment.  The proposed Order contains provisions regarding preliminary approval of the Consent Judgment, the content of the proposed class notice and method of

distribution, the Fairness Hearing process, and the revised class definition.  Defendant The City of New York ("City") consents to the relief sought in this Motion.

## BACKGROUND

On August 18, 2011, Plaintiff Mark Nunez filed the original complaint in this action against the New York City Department of Correction (the "Department").  He alleged unjustifiable use of unnecessary and excessive force by the Department and certain Department staff members in violation of the United States Constitution.  ECF No. 2, Aug. 18, 2011.  On May 24, 2012, Mr. Nunez, along with seven other individual Plaintiffs and three proposed class representatives, filed an amended complaint against the City and a number of Department personnel who were sued individually and/or in their official capacities.  ECF No. 14, May 24, 2012.  In very brief summary, the amended complaint alleged that the City was, and long had been, engaged in a pattern and practice of using unnecessary and excessive force against inmates in the City jails, in violation of their rights under the Constitution of the United States and the Constitution of the State of New York.  The amended complaint sought injunctive and declaratory relief on behalf of a proposed class of current and future inmates of the jails not already subject to court orders governing the use of force, and damages for the individual plaintiffs.  A second amended complaint was filed on September 4, 2012, which added an additional class representative (those four class representatives, and those eight individual plaintiffs, collectively, the "Named Plaintiffs").  ECF No. 34, Sept. 4, 2012.

On January 7, 2013, the Court entered a stipulated Order, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1)(A) and 23(b)(2), certifying a class (the "Plaintiff Class") of: "all present and future inmates confined in jails operated by the Department, except for the Eric M. Taylor Center and the Elmhurst and Bellevue Prison Wards."  ECF No. 61, Jan. 7, 2013.  That

Order also appointed Rodney Brye, Shameik Smallwood, Travis Woods, and Oscar Sanders as representatives of the Plaintiff Class (the "Class Representatives"), and appointed R&G, ECBA, and LAS as Plaintiffs' Class Counsel.  That Order further required submission of a proposed notice to the Plaintiff Class and a plan for distributing that notice.  The parties submitted, and on February 28, 2013 the Court approved, an agreed-upon notice and method of dissemination.  ECF No. 78, Feb. 19, 2013.  Such notice subsequently was given to the Plaintiff Class.[1]

Very significant discovery was taken related to the class claims, both prior to and after the Court certified the Plaintiff Class.  The City produced over two million pages of documents (in electronic and hard copy form), including Department policies and procedures governing the use of force, use of force reports for thousands of incidents, training materials, and records relating to use of force investigations.  *See* Friedberg Dec. ¶ 5.  Plaintiffs' Class Counsel took 57 depositions, including depositions of current and former correction officers, captains, deputy wardens, wardens, and a deputy commissioner, as well as witnesses from outside the Department.  *See id.* ¶ 6.  As the Court is aware, the discovery process was hotly contested and involved a number of disputes, several of which required resolution by the Court.  *See id.* ¶ 7.

Plaintiffs' Class Counsel retained eminent expert consultants to assist them in connection with the class claims.  *See id.* ¶ 8.  Those experts toured the jails, reviewed discovery, and consulted frequently with Plaintiffs' Class Counsel.  *See id.*  In June 2014, Plaintiffs' Class Counsel (assisted by their expert consultants) and counsel for the City commenced settlement negotiations.  At counsel's request, the Court thereafter stayed all class-related deadlines.  *See id.* ¶ 9.  On September 22, 2014, Plaintiffs' Class Counsel and counsel for the City executed a

---

[1] As discussed *infra*, for purposes of the Consent Judgment, Plaintiffs' Class Counsel and the City have agreed to expand the definition of the Plaintiff Class to include present and future inmates confined in the Eric M. Taylor Center.

Memorandum of Understanding, which outlined in general terms some provisions of a potential settlement and noted others for further discussion.  *See id.* ¶ 11.

In 2012, the USAO commenced an investigation into the treatment of young male inmates, between the ages of 16 and 18 ("Young Inmates"), pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141.  As part of its comprehensive investigation, the USAO and its expert consultant reviewed hundreds of thousands of pages of Department records, analyzed a sample of approximately 200 use of force incidents involving Young Inmates, conducted tours of the facilities that housed Young Inmates, and interviewed staff, inmates, and other witnesses.  On August 4, 2014, the USAO and the Department of Justice issued a 79-page findings letter under CRIPA, which concluded that Young Inmates were being subjected to unconstitutional conditions of confinement.  In particular, the findings letter asserted that the City had engaged in a pattern and practice of:  (a) subjecting Young Inmates to excessive and unnecessary use of force; (b) failing to adequately protect Young Inmates from violence inflicted by other inmates; and (c) placing Young Inmates in punitive segregation at an alarming rate and for excessive periods of time.  After multiple meetings with the City concerning the findings letter and its recommended remedial measures, the USAO determined that it was necessary to intervene in this action.  On December 18, 2014, the United States, through the USAO, filed an unopposed motion to intervene as a plaintiff in this action, which was granted by the Court on December 23, 2014.  ECF No. 181, Dec. 23, 2014.

After the United States intervened, the parties continued to engage in extensive settlement negotiations.  *See* Friedberg Dec. ¶ 13.  Literally scores of in-person and telephonic settlement sessions were held over the course of several months.  The settlement discussions

involved direct participation not only by counsel, but also by key Department officials (including Commissioner Joseph Ponte) and the expert consultants retained by Plaintiffs' Class Counsel and the USAO.  *See id.*  The parties provided the Court with periodic updates on the status of the settlement discussions by letter and at Court conferences.  Detailed drafts of the operative provisions of a proposed agreement were exchanged, vigorously debated and negotiated, and ultimately finalized.  *See id*.  By letter dated June 22, 2015, the parties advised the Court that they had reached agreement on the terms of the Consent Judgment (ECF. No. 203, June 22, 2015), which has since been executed by all parties.  *See* Friedberg Dec. ¶ 14.

## SUMMARY OF CONSENT JUDGMENT

The parties have agreed to a Court-enforceable Consent Judgment that will provide substantial relief to the Plaintiff Class.  It will be subject to the Court's continuing jurisdiction and oversight, and provides for a Court-appointed, independent monitor (the "Monitor").  The parties have selected Steve J. Martin to serve as the Monitor.  He will be responsible for assessing compliance with each provision of the Consent Judgment and submitting periodic reports to the Court.  He will have broad access to the Department's records, facilities, and staff, and may hire or consult with other qualified staff as is reasonably necessary to fulfill his duties. In addition, after each reporting period for the duration of the Consent Judgment, the Department will provide Mr. Martin and Plaintiffs' Counsel with compliance reports that will contain extensive information and data related to implementation of different provisions of the Consent Judgment.

Built into the Consent Judgment are a wide range of reforms intended to dismantle the decades-long culture of violence in the City jails, and create an environment that protects both

inmates and correction officers alike.  The Consent Judgment includes the following specific

requirements:[2]

**Development of a New Use of Force Policy**:  The Department will develop, adopt, and

implement a comprehensive, new use of force policy that will be subject to the Monitor's review

and approval.  The new policy will set forth explicit prohibitions regarding the use of certain

categories of force, and provide correction officers with clear direction on when and how force

may be used.  *See* Consent Judgment § IV, "Use of Force Policy" ¶¶ 1-3.

**Robust Requirements for Reporting Use of Force**:  Correction officers will be required

to provide timely and detailed reports on every use of force incident, and will be required to

independently prepare these reports.  Any collusion in the preparation of use of force reports will

result in disciplinary action.  *See* Consent Judgment § V, "Use of Force Reporting and Tracking"

¶¶ 1-9.

**Complete and Timely Investigations of Use of Force Incidents**:  The Department will

conduct thorough, timely, and objective investigations into use of force incidents to determine

whether staff engaged in the excessive or unnecessary use of force or otherwise violated the use

of force policy.  The Consent Judgment sets forth criteria that these investigations must satisfy,

and requires the Department's investigators to prepare complete and detailed reports

summarizing their findings, the basis for their findings, and any recommended disciplinary

actions or remedial measures.  *See* Consent Judgment § VII, "Use of Force Investigations"

¶¶ 1-14.

**Increased Accountability**:  The Department will take all necessary steps to impose

appropriate and meaningful discipline, up to and including termination, when correction officers

---

[2] The summary that follows enumerates most but not all areas of reform.  The actual Consent Judgment contains
much more detail on these areas and includes other requirements.

engage in the excessive or unnecessary use of force or otherwise violate the use of force policy. To ensure that correction officers are consistently held accountable for misconduct, the Department will develop and implement disciplinary guidelines that will include the range of penalties to be sought for different categories of violations. The Consent Judgment requires the Department to seek to terminate correction officers found to have engaged in certain categories of egregious misconduct, absent exceptional circumstances. The Department will prosecute disciplinary actions as expeditiously as possible, and shall be staffed sufficiently to do so. *See* Consent Judgment § VIII, "Staff Discipline and Accountability" ¶¶ 1-5.

**Development of an Early Warning System**: The Department will develop a system, subject to the Monitor's review and approval, to identify as soon as possible correction officers whose conduct may warrant corrective actions. The system will track and use performance data to help the Department identify staff members who are at risk of engaging in serious misconduct absent appropriate intervention or services by the Department. *See* Consent Judgment § X, "Risk Management" ¶ 1.

**Creation of New Use of Force Auditor Position**: The Department will designate an individual to serve as an auditor of use of force incidents (the "Use of Force Auditor") who will report directly to the Commissioner or a designated Deputy Commissioner. The Use of Force Auditor will be responsible for analyzing all data relating to use of force incidents and identifying trends and patterns. The Use of Force Auditor will prepare quarterly reports setting forth the Auditor's findings and recommendations to the Commissioner on how to reduce the number of use of force incidents and the severity of injuries resulting from these incidents. *See* Consent Judgment § X, "Risk Management" ¶ 3.

**Comprehensive Video Surveillance of Jails**:  By February 28, 2018, the Department will install sufficient additional wall-mounted video surveillance cameras throughout the jails to ensure complete camera coverage (with certain narrow exceptions such as the interior of shower areas and toilet areas).  The Department will install a total of at least 7,800 additional cameras on a rolling basis.  At least 25% must be installed by July 1, 2016, at least 50% by February 1, 2017, and at least 75% by July 1, 2017.  The Department will seek to prioritize the installation in facilities with the most significant levels of violence.  In addition, the Department will preserve video capturing a use of force incident or inmate-on-inmate violence for a period of four years as a general practice.  *See* Consent Judgment § IX, "Video Surveillance" ¶¶ 1, 4.

**Implementation of a Pilot Program for Body-Worn Cameras**:  The Department will institute a pilot program involving the use of body-worn cameras by certain correction officers.  After one year, the Department, in consultation with the Monitor, will evaluate the effectiveness and feasibility of using these cameras and determine whether the Department should continue or expand their use.  *See* Consent Judgment § IX, "Video Surveillance" ¶¶ 2(a)-(c).

**Requirements for Use of Handheld Video Cameras**:  The Department will develop, adopt, and implement policies and procedures mandating that staff use handheld video cameras to record, among other things, responses to use of force incidents, cell extractions, and most living quarter searches, except when safety or security concerns require an immediate response that would preclude waiting for the recording requirement.  The policies will require that the recordings be continuous and that any break in the recording be explained.  *See* Consent Judgment § IX, "Video Surveillance" ¶ 2(d).

**Enhanced Computerized Tracking Systems**:  The Department will track in a reliable, accurate, and computerized manner extensive data on all use of force incidents, use of force

investigations, and staff disciplinary actions.  The Department will utilize these systems to

determine if there are ways to enhance the quality of inmate supervision or oversight of

correction officers, and to identify patterns in the use of force that need to be addressed.  By the

end of 2016, the Department will develop a new case management system to track such data

centrally.  *See* Consent Judgment § V, "Use of Force Reporting and Tracking" ¶¶ 14-21.

**Improved Staff Recruitment and Selection**:  The Department will develop a

comprehensive staff recruitment program to attract well-qualified applicants, and will employ an

objective process to select and hire staff.  The Department also will conduct appropriate

background investigations before hiring individuals that will include consideration of specified

factors, such as possible gang affiliations and the applicant's relationships with current inmates.

*See* Consent Judgment § XI, "Staff Recruitment and Selection" ¶¶ 1-3.

**Enhanced Screening of Supervisors and Special Unit Staff**:  Prior to promoting any

correction officer to the position of Captain or higher or assigning an officer to certain special

units (*e.g.*, punitive segregation and mental health housing areas), the Department will undertake

a review of the officer's prior involvement in use of force incidents to verify that this does not

raise concerns about the officer's qualifications.  The Department may not promote any officer

who has been found guilty, or pleaded guilty, more than once within the preceding five-year

period to various delineated disciplinary charges relating to the use of force, absent exceptional

circumstances.  *See* Consent Judgment § XII, "Screening and Assignment of Staff" ¶¶ 1-2.

**Review of Assignment of Disciplined Staff**:  The Department will review the

assignment of correction staff who have been found guilty or pleaded guilty more than once

during the preceding five-year period to various delineated disciplinary charges relating to the

9

use of force to determine whether such staff need to be reassigned.  *See* Consent Judgment § XII, "Screening and Assignment of Staff" ¶ 7.

**Additional Staff Training**:  The Department will develop a number of new pre-service and in-service training programs, as well as strengthen and improve existing training programs, addressing a variety of subject matters, including the new use of force policy, crisis intervention and conflict resolution, defensive tactics, cell extractions, and procedures, skills, and techniques for investigating use of force incidents.  The Consent Judgment specifies the minimum length of these trainings, and sets deadlines by which staff must complete them.  New training programs and materials will be subject to the review and approval of the Monitor.  *See* Consent Judgment § XIII, "Training" ¶¶ 1-8.

**Anonymous Reporting System**:  In consultation with the Monitor, the Department will establish a centralized system that will allow correction staff to anonymously report use of force policy violations.  *See* Consent Judgment § VI, "Anonymous Reporting System" ¶ 1.

**Notifications to the United States Attorney's Office**:  The Department will promptly notify the USAO of any use of force incident where correction staff conduct appears to be criminal in nature.  *See* Consent Judgment § XIX, "Reporting Requirements and Parties' Right of Access" ¶ 6.

In addition, the Consent Judgment includes numerous provisions specifically addressing Young Inmates, who were the focus of the Complaint-in-Intervention filed by the USAO.  The Consent Judgment, among other things, requires the following reforms for Young Inmates:

**Safety and Supervision of Young Inmates**:  The Department will supervise Young Inmates in a manner that protects them from an unreasonable risk of harm.   As set forth in

Section XV ("Safety and Supervision of Inmates Under the Age of 19") of the Consent

Judgment, the Department shall:

o      Cap inmate-to-staff ratios and living unit sizes for housing units used for inmates under

the age of 18, as well as housing units used for high and medium classification 18-year-

old inmates.

o      Conduct daily inspections of Young Inmate housing areas to ensure that the conditions

are reasonably safe and secure.

o      Develop, in consultation with the Monitor, an age-appropriate classification system for

inmates under the age of 18.

o      Develop and maintain a sufficient level of programming for Young Inmates, especially in

the evenings, on weekends, and during the summer, to minimize idleness and the

potential for inmate-on-inmate violence.  This programming shall be consistent with best

practices in United States correctional systems.

o      Promptly transfer Young Inmates who express concerns for their safety to secure

alternative housing pending an investigation and evaluation of the risk to the inmate's

safety.

o      Adopt and implement a new approach to supervising and managing Young Inmates,

commonly referred to as the "Direct Supervision Model."  This model emphasizes

frequent and informal communications between staff and inmates, and early staff

intervention to avoid potential inmate-on-inmate conflicts or crisis situations.  All staff

assigned to Young Inmate housing areas will receive at least 32 hours of training on this

new inmate management model.

o       Implement a system that seeks to consistently assign the same correction officers and supervisors to the same housing units.

o       Timely report and thoroughly investigate all allegations of sexual assault involving Young Inmates.

o       Train correction officers regularly assigned to the Young Inmate housing areas in conflict resolution and crisis intervention skills specific to managing Young Inmates, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies.

*See* Consent Judgment § XV, "Safety and Supervision of Inmates Under the Age of 19" ¶¶ 1-18.

**<u>Restrictions on Use of Punitive Segregation for Young Inmates</u>**:  The Consent Judgment includes several restrictions on the use of punitive segregation for Young Inmates, including the following:

o       The Department will not place any inmate under the age of 18 in punitive segregation.  In consultation with the Monitor, the Department will develop alternative systems, policies, and procedures to discipline inmates under the age of 18 who commit infractions, and to reward and incentivize positive behaviors.  *See* Consent Judgment § XVI, "Inmate Discipline" ¶¶ 2-4.

o       With respect to 18-year-olds, the Department will develop a continuum of alternatives to punitive segregation for inmate infractions, subject to the Monitor's review and approval. The Department will not use punitive segregation for any 18-year-old inmate with a serious mental illness and will place 18-year-old inmates in punitive segregation only after a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate.  On a daily basis, the Department will

monitor the medical and mental health status of any 18-year-old in punitive segregation.
*See id.* ¶¶ 5-8.

**Review of Young Inmate Disciplinary Process**:  The Department will retain an outside consultant to conduct an independent review of its infractions processes and procedures.  The consultant will issue a report with findings and recommendations, which the Department shall implement unless doing so would be unduly burdensome.  *See id.* ¶ 11.

**Alternative Housing Site for Inmates Under the Age of 18**:  The Department and the Mayor's Office of Criminal Justice, in consultation with the Monitor, will make best efforts to identify an alternative site not on Rikers Island to house inmates under the age of 18.  That site will be readily accessible by public transportation to facilitate visitation between inmates and family members, and have the capacity to be designed and/or modified to provide a safe and secure environment, access to adequate recreational facilities and programming, the capacity to house inmates in small units, and a physical layout that facilitates implementation of the Direct Supervision Model.  *See* Consent Judgment § XVII, "Housing Plan for Inmates Under the Age of 18" ¶ 1.

This Consent Judgment will be in effect until the Court finds that the City has demonstrated through a preponderance of the evidence that it has achieved and maintained substantial compliance with the Consent Judgment for 24 months.  *See* Consent Judgment § XXI, "Compliance, Termination, and Construction" ¶ 5.  The reforms mandated by this Consent Judgment and delineated above are designed to comprehensively address systemic deficiencies that have plagued the City jails for years.  Taken together, they represent the parties' collective views as to the measures necessary and appropriate to protect the constitutional rights of inmates.

**ARGUMENT**

**I.    THE COURT SHOULD GRANT PRELIMINARY APPROVAL OF THE
CONSENT JUDGMENT.**

Fed. R. Civ. P. 23(e)(2) provides that where, as here, the proposed settlement of a class

action will bind the class members, the Court "may approve it only after a hearing and on finding

that it is fair, reasonable, and adequate."  There is a "strong judicial policy in favor of

settlements, particularly in the class action context." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*,

396 F.3d 96, 116 (2d Cir. 2005).  A settlement should be approved "if it is fair, adequate,

reasonable, and not a product of collusion." *Id.* (citation and internal quotation marks omitted).

That entails an assessment of "both the settlement's terms and the negotiation process leading to

settlement." *Id.* (citing *D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001)).

Procedural fairness exists where the settlement "resulted from arm's-length negotiations

and…plaintiffs' counsel … possessed the experience and ability, and … engaged in the

discovery, necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85

(internal quotation marks omitted).  Substantive fairness exists where the settlement's terms are

fair, adequate, and reasonable according to the nine factors set forth in *City of Detroit v. Grinnell

Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), *abrogated on other grounds*, *Goldberger v. Integrated

Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000).  Because the Consent Judgment involves only

injunctive relief, the Court need not assess the last three *Grinnell* factors. *Ingles v. Toro*, 438 F.

Supp. 2d 203, 211 (S.D.N.Y. 2006).  A "presumption of fairness, adequacy, and reasonableness

may attach to a class settlement reached in arm's-length negotiations between experienced,

capable counsel after meaningful discovery." *Id.* (quoting *Wal-Mart*, 396 F.3d at 116).

Because only preliminary approval is involved here, the Court need make only an "initial

evaluation" of the fairness of the proposed settlement. *Newberg on Class Actions* § 11.25 (4th

ed. 2002), and need only find that there is "probable cause to submit the [settlement] proposal to class members and hold a full-scale hearing as to its fairness." *In re Traffic Exec. Association-Eastern R.Rs.,* 627 F.2d 631, 634 (2d Cir. 1980) (internal citation omitted). When the proposed settlement is "the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class and falls within the range of possible approval, preliminary approval [should be] granted." *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 176 F.R.D. 99, 102 (S.D.N.Y. 1997).

Because the Consent Judgment involves prospective relief regarding prison conditions, the Court must also find that it complies with the Prison Litigation Reform Act ("PLRA"), which requires that the "relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a) & (c). Although such findings may be properly deferred until the time of final approval, as discussed further below, the Consent Judgment meets the PLRA standard.

### A.   The Consent Judgment is Fair, Adequate, and Reasonable.

As explained below, the Consent Judgment is both procedurally and substantively fair.

### 1.   The Consent Judgment Negotiation Process Was Fair.

As noted, procedural fairness  exists if  the settlement "resulted from arm's-length negotiations and … plaintiffs' counsel …possessed the experience and ability, and …engaged in the discovery, necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85 (internal quotation marks omitted). This settlement easily meets that test.

The Consent Judgment was reached after extensive discovery, which required the Court's ongoing supervision and intervention. The City ultimately produced more than two million

pages of documents and electronic records.  *See* Friedberg Dec. ¶ 5.  Plaintiffs' Class Counsel created a database that organized that voluminous production, and used it to prepare for and take 57 depositions, including depositions of many current and former Department personnel – correction officers, captains, wardens, deputy wardens, and a deputy commissioner – as well as a Deputy Executive Director of the New York City Board of Correction and an Assistant Commissioner for the Bureau of Correctional Health, among others.  *See id.* ¶ 6.  Plaintiffs' Class Counsel were prepared to take, and would have taken had class discovery not been stayed, depositions of the highest ranking policy-makers in the Department.  *See id.*  In addition, prior to intervening in this action, the USAO conducted an exhaustive CRIPA investigation into the treatment of Young Inmates, as detailed above.  Plaintiffs' Counsel, and their expert consultants, relied heavily on the information obtained through discovery and the CRIPA investigation to propose and negotiate the terms of the Consent Judgment.

The negotiations were lengthy, vigorous, and arm's-length.  They were conducted over the course of several months by experienced and capable attorneys from R&G, ECBA, LAS, the USAO, and the City.[3]  In addition, senior Department personnel, including Commissioner Ponte, as well as Plaintiffs' expert consultants, were directly and extensively involved in the negotiations, which further ensures that the requirements of the Consent Judgment are practical

---

[3]  It is a matter of public record that the Prisoners' Rights Project of LAS has a detailed knowledge of the jails, having represented inmates in the jails for over 30 years and served as counsel in numerous excessive force class actions against the City.  ECBA counsel likewise have litigated many individual actions on behalf of jail inmates, and together with LAS prosecuted the most recent class action concerning use of force in the jails.  *See Ingles,* 438 F. Supp. 2d at 213.  The R&G attorneys prosecuting this action on behalf of the Plaintiff Class have taken the lead on many of the discovery-related aspects of this case, and have developed deep knowledge of the facts.  Plaintiffs' Class Counsel's expert consultant Steve J. Martin – who will be appointed the Monitor under the Consent Judgment if approved by the Court – was an expert and a jointly-chosen monitor in *Sheppard v. Phoenix*, 91 Civ. 4141 (RPP), 1998 WL 397846 (S.D.N.Y July 16, 1998) (excessive force class action addressing Rikers' Central Punitive Segregation Unit), and is a nationally-recognized expert on correctional facilities.  The USAO retained another corrections expert, Jeffrey Schwartz, who was also involved in the negotiation of the Consent Judgment.

and designed to effectively address the goals of reducing violence in the jails and ensuring the safety and well-being of inmates.  *See id* ¶ 16.

In sum, there can be no doubt that the process leading to the Consent Judgment was procedurally fair.

### 2.       The Consent Judgment is Substantively Fair.

There similarly can be no doubt that the Consent Judgment is substantively fair.  As noted, in making that determination in a case seeking injunctive relief, courts looks to the first six *Grinnell* factors:

> (1) the complexity, expense, and likely duration of litigation;
>
> (2) the reaction of the class to the settlement;
>
> (3) the stage of the proceedings and the amount of discovery completed;
>
> (4) the risks of establishing liability;
>
> (5) the risks of establishing damages;[4] and
>
> (6) the risks of maintaining the class action through trial.

*See* 495 F.2d at 463; *see also Ingles*, 438 F. Supp. 2d at 211.  "A court need not find that every factor militates in favor of a finding of fairness; rather, a court consider[s] the totality of these factors in light of the particular circumstances."  *In re Merrill Lynch Tyco Research Sec. Litig*., 249 F.R.D. 124, 134 (S.D.N.Y. 2008) (internal quotation marks omitted).

### (a)       Complexity, Expense, and Likely Duration of Litigation

"This [*Grinnell*] factor captures the probable costs, in both time and money, of continued litigation."  *Shapiro v. JPMorgan Chase & Co.*, No. 11 CIV. 7961 (CM), 2014 WL 1224666, at *8 (S.D.N.Y. Mar. 24, 2014).  "Most class actions are inherently complex and settlement avoids

---

[4] When examining injunctive rather than monetary relief, this factor is examined "in light of establishing remedies instead of damages."  *Ingles*, 438 F. Supp. 2d at 211.

the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001).  This case exemplifies that truism.

Were this class action to have continued, it would have involved more fact witness depositions (party and non-party), several discovery-related motions (involving such contentious issues as confidentiality designations by the City, the scope of discovery produced by the City, the number of witnesses to be deposed, and the resolution of complex privilege issues), expert analyses, reports, and depositions, possible summary judgment motions, and extensive preparation for trial.  *See* Friedberg Dec. ¶ 17.

A trial of this case would have been a lengthy and contentious affair, consuming more time and resources, and presenting complex issues for the Court to resolve.  It would have involved the presentation of evidence concerning each of the 12 Named Plaintiffs' individual excessive force claims, both to establish their individual claims as well as the Plaintiff Class's pattern and practice claims.  The trial also would have involved the presentation of evidence concerning use of force incidents against other inmates, and expert testimony.  Given the scope of the system-wide claims, Plaintiffs likely would have needed several weeks to present their case at trial.  Defendants would have countered with their own fact and expert witnesses. Furthermore, similar to *Ingles*, because this case includes the Named Plaintiffs' individual damages claims as well as the Plaintiff Class's injunctive and declaratory relief claims, "the trial would have involved both damages claims tried to a jury as well as equitable claims tried to the Court. Issues would have arisen as to what evidence would be presented to the jury and what evidence would be presented only to the Court."  *Ingles*, 438 F. Supp. 2d at 212.  And any trial result doubtless would be the subject of post-trial motions, and then appeal by the losing side.

*See id.* ("no matter what the outcome, the losing side would have undoubtedly appealed, further extending the duration of the case").

All of the above would take time – during which conditions in the jails would not be remedied – and would result in economic tolls on parties, counsel, and witnesses, as well as consumption of the Court's limited resources.

In stark contrast to that protracted and costly scenario, the Consent Judgment provides an expeditious and comprehensive solution to the problems that led to the filing of this class action. This factor strongly favors approval of the Consent Judgment.

### (b)      Reaction of the Class to the Settlement

Though notice of the Consent Judgment obviously has not yet been distributed to the Plaintiff Class, Plaintiffs' Class Counsel are confident that it will be well-received by them.  At present, this factor is neutral.

### (c)      Stage of the Proceedings and the Amount of Discovery Completed

This factor strongly favors approval of the Consent Judgment.  As discussed earlier, extensive discovery had been conducted over the span of many months, and both sides could make "an educated evaluation of the relative strengths and weaknesses of the parties' cases" such that "the parties are in a position to make informed settlement judgments." *Weil v. Long Island Sav. Bank.*, 188 F.Supp. 2d 258, 263-64 (E.D.N.Y. 2002).  The United States also conducted an extensive investigation before issuing its findings letter, and the information gathered during that investigation further informed the Plaintiffs as they negotiated the Consent Judgment.

### (d)      Risks of Continuing Litigation

Plaintiffs' Counsel submit that it makes most sense for the Court to consider together the fourth factor (the risks of establishing liability), the fifth factor (the risks of obtaining injunctive

relief)[5], and the sixth factor (the risks of maintaining the class action through trial), because each of them concerns the risks inherent in not settling now and proceeding to trial.

"[The fourth] factor does not require the Court to adjudicate the disputed issues or decide unsettled questions; rather, the Court need only assess the risks of litigation against the certainty of recovery under the proposed settlement." *In re Global Crossing Sec. & ERISA Litig*., 225 F.R.D. 436, 459 (S.D.N.Y. 2004); *see also Weinberger v. Kendrick*, 698 F.2d 61, 74 (2d Cir. 1982) (although the trial judge must "apprise himself of all facts necessary for an intelligent and objective opinion of the probabilities of ultimate success . . . all cannot really mean all [as it cannot be said that] in order to avoid trial, the judge must in effect conduct one") (internal citations omitted). Though Plaintiffs' Counsel are highly confident that they would prevail at trial, all litigation is inherently uncertain. *See Ingles*, 438 F. Supp. 2d at 213 (noting that "while plaintiffs had amassed a substantial body of evidence to prove their claims, establishing liability was by no means certain"). The Consent Judgment eliminates all risk of loss, and greatly benefits the Plaintiff Class by assuring that needed reforms will start to be implemented in the short term, rather than in years after a trial and appeals.

As for the fifth factor, even if liability were to be proven at trial, and upheld on the inevitable appeal, it would be challenging for the Court to direct, in a contested context, equitable remedies that would be as detailed and comprehensive as the relief included in the 63-page Consent Judgment. As described above, the settlement requires a tightly interwoven, carefully constructed set of specifically targeted reforms to redress the claims raised in the second amended class action complaint and the Complaint-in-Intervention. The Consent Judgment reflects a hard-fought negotiated remedy that commits the City and the Department to

---

[5] As previously noted, here the fifth factor really is the risk that the Plaintiff Class would be unable to demonstrate its entitlement to the requested relief.

establish – starting forthwith after final approval by the Court – new systems, practices, procedures, and policies designed to bring systemic changes to the jails.  Moreover, the likelihood of real reform and compliance is arguably greater when defendants voluntarily agree to implement changes through a consent decree than when relief is imposed upon them by a court after an intensely contested and protracted trial.  The fact that the City and the Department have agreed to these sweeping changes strongly supports approval of the Consent Judgment.  *See Ingles*, 438 F. Supp. 2d at 214 (noting that the "City has agreed to specific, concrete, and meaningful measures that will require, *inter alia,* the expenditure of millions of dollars . . . .  It is difficult to imagine that the Court would have imposed, following trial, significantly more extensive and detailed relief.").

As for the sixth factor, the risk that a class will be decertified during litigation also weighs in favor of approving a settlement.  *See Chatelain v. Prudential-Bache Sec.,* 805 F. Supp. 209, 214 (S.D.N.Y. 1992).  Here, Paragraph  6 of the Court's Order certifying the Plaintiff Class provided that the City could move to decertify (or vacate the Order) after the close of fact and expert discovery, and after conferring with Plaintiffs' Class Counsel.  The Consent Judgment eliminates that risk.

Where, as here, a settlement has been reached after an arm's-length negotiation, "great weight is accorded to the recommendations of counsel, who are most closely acquainted with the facts of the underlying litigation." *In re PaineWebber Ltd. P'ships Litig*., 171 F.R.D. 104, 125 (S.D.N.Y.), *aff'd*, 117 F.3d 721 (2d Cir. 1997).  Plaintiffs' Counsel, who are intimately familiar with the case, unanimously are of the view that the Consent Judgment reflects a very good outcome for the Plaintiff Class and should be approved.  *See* Friedberg Dec. ¶ 15.

In sum, consideration of these related factors strongly favors preliminary approval of the Consent Judgment.

### B.      The Consent Judgment Complies with the PLRA.

In *Ingles*, the one aspect of the settlement that "troubled" the court was the fact that it was not a "consent decree" under the PLRA, and thus any claimed violation could be "addressed only by bringing a new action for breach of contract in state court or by reinstating this action." 438 F. Supp. 2d at 214.  The court there nonetheless approved the settlement agreement. However, in this case, that "troubling" issue is not present, because the Consent Judgment is a "consent decree" under the PLRA, and thus is enforceable by this Court.  This is another reason why the Consent Judgment should be approved.

The PLRA requires the Court to find (at the final approval stage) that the Consent Judgment is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a) and (c).  In making that assessment, "[t]he court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a).

Here, the parties vigorously negotiated the Consent Judgment, and agreed upon all of its terms.  Agreements between the parties are "strong evidence," if not dispositive, that provisions reflected in those agreements comply with the needs-narrowness-intrusiveness requirement of the PLRA.  *Benjamin v. Fraser*, 156 F. Supp. 2d 333, 344 (S.D.N.Y. 2001) (citation and internal quotation marks omitted), *aff'd in part, vacated and remanded in part on other grounds*, 343 F.3d 35 (2d Cir. 2003).  In this case, Commissioner Ponte himself was extensively involved in hammering out many of the terms, counseled by experienced members of the City's Law Department.  *See* Friedberg Dec. ¶¶ 10, 13, 16.  The adversarial nature of the lengthy settlement

22

negotiations, with the direct involvement of the highest-ranking Department policy-makers, helped ensure that the relief was designed in such a manner as to meet the PLRA standard.

Moreover, the City has expressly agreed that the proposed relief is narrowly drawn, extends no further than is necessary to correct the alleged violations of federal rights, is the least intrusive means necessary to correct these violations, and will not have an adverse impact on public safety or the operation of the criminal justice system. *See* Consent Judgment § XXII, "Stipulation Pursuant to the Prison Litigation Reform Act" ¶ 1.

## II.   THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE.

In addition to the requirement that the Court give the Consent Judgment preliminary approval, under Rule 23 the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  The standard for the adequacy of settlement notice in a class action is that of reasonableness. *See Wal-Mart*, 396 F.3d at 113-14.  As for method of distribution, "[n]otice need not be perfect, but need be only the best notice practicable under the circumstances, and each and every class member need not receive actual notice, so long as class counsel acted reasonably in choosing the means likely to inform potential class members." *In re Merrill Lynch Tyco Research Sec. Litig*., 249 F.R.D. at 133.  As for content, notice is adequate if the average class member can understand it. *See Wal-Mart*, 396 F.3d at 114.

The proposed distribution method and content of the proposed notice meet these requirements.  They are based on the distribution method and content used for the notice of pendency of class action that the Court approved by its Order of February 28, 2013.  In addition, the City has agreed to the proposed distribution method and the content of the notice.

The proposed method of distribution easily meets the test of reasonableness.  As set forth in Paragraph 4 of the proposed Order (Friedberg Dec. Exhibit C): (i) no later than 10 days after

the entry of an Order granting preliminary approval of the Consent Judgment, the Department

shall post copies of the notice in English and in Spanish in areas of the law libraries, housing

areas, and receiving rooms of each jail where it is reasonably calculated to be seen by inmates in

the area, and such copies shall remain posted until the day after valid objections to the Consent

Judgment must be postmarked; and (ii) the Department shall deliver on two consecutive

Saturdays (the second and third Saturdays after preliminary approval has been granted), a copy

of the notice in English and in Spanish to every member of the Plaintiff Class who, at the time of

the distribution, is confined in a unit or housing area in which he or she is held in a cell twenty-

three (23) hours per day, including but not limited to all punitive segregation units and all

contagious disease units.  This method of providing notice will likely inform Plaintiff Class

members of the settlement and is adequate.

In addition, the content of the notice (a copy of which, in English and Spanish, is found at

Friedberg Dec. Exhibit B) is easily understandable by the average member of the Plaintiff Class.

In plain language, the notice explains: (i) the nature of this class action and the class claims

asserted; (ii) who is in the Plaintiff Class; (iii) the relief the pleadings sought; (iv) a summary of

the most significant terms of the Consent Judgment and how to get a copy of the Consent

Judgment; (iv) the reasons why Plaintiffs' Class Counsel recommend the Consent Judgment,

including the substantial benefits it will bring to the Plaintiff Class; (v) the nature of the class

claims that will be released by the Plaintiff Class members if the Consent Judgment is approved;

(vi) the Plaintiff Class members' right to object to all or part of the Consent Judgment and how

to object; (vii) the Fairness Hearing, including information about its purpose and when it will

occur; and (viii) how to contact Plaintiffs' Class Counsel with any questions or to get a copy of

the Consent Judgment.  The proposed Order includes a proposed date for the postmark deadline

for any objections (September 4, 2014), and a proposed deadline for the parties' counsel to file responses to any timely objections (October 2, 2014).[6]

Plaintiffs' Class Counsel respectfully request that the Court approve the content of the proposed class notice and order it to be distributed in the manner set out in the proposed Order.

## III.   THE COURT SHOULD EXPAND THE DEFINITION OF THE CERTIFIED CLASS AS AGREED TO IN THE CONSENT JUDGMENT.

For purposes of the Consent Judgment, Plaintiffs' Class Counsel and counsel for the City have agreed to expand the Plaintiff Class to include all present and future inmates confined in the Eric M. Taylor Center.  *See* Consent Judgment, § II "Jurisdiction, Venue, and Revised Class Definition" ¶ 2.  As a result, the class would be defined as "all present and future inmates confined in jails operated by the Department, except for the Elmhurst and Bellevue Prison Wards."  *See id.*  The previously certified class had excluded inmates housed in the Eric M. Taylor Center because they are subject to relief contained in another outstanding court order resolving a prior class action against the Department, *Fisher v. Koehler et al.*, No. 83 Civ. 2128 (LAP) (S.D.N.Y.).  Counsel in *Fisher* have agreed to terminate the provisions of that order to the extent they overlap with the subject matter of this Consent Judgment, subject to the approval of the Court in *Fisher* (which will be sought promptly) and provided that the Court in this action certifies the proposed revised class and approves the Consent Judgment.  Plaintiffs' Class Counsel and counsel for the City respectfully request that the Court certify the proposed revised class.

---

[6] Under the Class Action Fairness Act, 28 U.S.C. § 1715(b), the Consent Judgment and other materials must be served on the appropriate New York State and Federal officials within ten days of the filing of the proposed settlement and, under 28 U.S.C. § 1715(d), final approval of the Consent Judgment cannot be granted until 90 days after such notice is given.  Such notice will be served promptly if the Court grants preliminary approval.

## CONCLUSION

For the reasons set forth above, the parties respectfully request that the Court: (i) grant preliminary approval of the Consent Judgment annexed as Exhibit A to the Friedberg Declaration; (ii) direct that notice of the Consent Judgment be given in the form annexed as Exhibit B to the Friedberg Declaration and in the manner provided in the proposed Order annexed as Exhibit C to the Friedberg Declaration; and (iii) revise the definition of the certified class as set forth in the Consent Judgment and the proposed Order.

Dated:  New York, New York
July 1, 2015

Respectfully submitted,

FOR THE PLAINTIFF CLASS:

ROPES & GRAY LLP

By: /s/ William I. Sussman
        WILLIAM I. SUSSMAN
        CHRISTOPHER P. CONNIFF
        ANNA E. FRIEDBERG
        CHRISTINA G. BUCCI
        1211 Avenue of the Americas
        New York, New York, 10036
        Telephone: (212) 569-9000
        Email: William.Sussman@ropesgray.com
                Christopher.Conniff@ropesgray.com
                Anna.Friedberg@ropesgray.com
                Christina.Bucci@ropesgray.com

        All other signatories listed, and on whose behalf
        the filing is submitted, consent to its filing.

26

THE LEGAL AID SOCIETY


By:  /s/ Mary Lynne Werlwas

JONATHAN S. CHASAN
MARY LYNNE WERLWAS
199 Water Street, 6th Floor
New York, New York, 10038
Telephone: (212) 577-3530
Email: jchasan@legal-aid.org
        mlwerlwas@legal-aid.org


EMERY CELLI BRINCKERHOFF & ABADY LLP


By:  /s/ Jonathan S. Abady

JONATHAN S. ABADY
600 Fifth Avenue, 10th Floor
New York, New York, 10020
Telephone: (212) 763-5000
Email: jabady@ecbalaw.com


FOR THE UNITED STATES:

PREET BHARARA
United States Attorney for the
Southern District of New York

By:     /s/ Jeffrey K. Powell

JEFFREY K. POWELL
EMILY E. DAUGHTRY
LARA K. ESHKENAZI
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, NY  10007
Telephone: (212) 637-2706/2777/2758
Email: Jeffrey.Powell@usdoj.gov
        Emily.Daughtry@usdoj.gov
        Lara.Eshkenazi@usdoj.gov

27