United States District Court

Southern District of New York    x

Mark Nunez, et al.,

        Plaintiffs        11 civ 5845 (LTS) (JSF)

-against-

City of New York, el al.,

        Defendants

               X

United States of America

        Plaintiff-Intervener;

-against-

City of New York and New York City

Department of Correction

        Defendants    X

# NOTICE OF OBJECTION TO PROPOSED CLASS ACTION SETTLEMENT TO:

Barack H. Obama

Loretta E. Lynch

Sonia Sotomayor

Andrew Cuomo

Center for Constitutional Rights

Laura Taylor Swain

Legal Aid Society

Emery Celli Brinkerhof & Abady LLP

Ropes & Gray LLP

Amendment IX

The enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people.

Greek: dunamis meaning "power" is translated "virtue" or "ability"

The Spirit of the Lord [is] upon Me, because He has anointed Me [the Anointed One, the Messiah] to preach the good news (the Gospel) to the poor; He has sent Me to announce release to the captives and recovery of sight to the blind, to send forth as delivered those who are oppressed [who are downtrodden, bruised, crushed, and broken down by calamity],

To proclaim the accepted and acceptable year of the Lord [the day when salvation and the free favors of God profusely abound].       Luke 4:18, 19

Where there is no vision, the people perish... Proverbs 29:18

"I do solemnly affirm that I will faithfully execute the Office of President of the United States, and will to the best of my Ability, preserve, protect and defend the Constitution of the United States."

There is an incommensurable Power, which we are obligated to recognize as limitless in space and without beginning or end in time, and this Power is that which persists through all the changes in those sensible appearances under which the universe presents itself to us. - Camille Flammarich

The hand which holds this pen is composed of eternal and indestructible elements, and the atoms which constituted it existed in the solar nebula whence our planet came, and will exist forever.
- Camille Flammarion

Page 1

Prison administrators have always faced the task of maintaining order and discipline in a prison. Some means of dealing with inmates who violate instructional rules and regulations are required. One such means is the use of punitive isolation, which is isolation from the general population imposed as a penalty for violating institutional rules. Another means is administrative isolation, which is isolation from the general population for any reason other than punishment, such as protective isolation or isolation during an investigation of an alleged institutional rule violation or felony. Due to the violent nature inherent in a prison environment, including the widespread existence of prison gangs, prison systems are turning to the use of supermax prisons and statewide lockdowns, which I believe is not safe. This causes thousands of inmates to become angry at the loss of a visit, or in the middle of a $21 collect phone call with a family member. This is like baking soda + vinegar in a medicine bottle. Thousands of new crimes are waiting to be committed which causes a revolving door. More programs and productive educational services should be provided. Access to internet with restrictions. To obtain higher education such as the Harvard & MIT program. A homosexual male prisoner did not raise a constitutional issue when he alleged that prison officials denied him equal protection because they kept him in single occupancy. The prison officals had legitimate penalogical reasons for doing so such as safety and security. However, when a prisoner alleged that he suffered excessive administration segregation as discipline without due process, he was entitled to show that his administrative segregation constituted atypical and significant hardship in relation to the ordinary incidents of prison. Every person deserves the right to be safe no matter their age or sexual orientation. I believe that homosexuals and inmates under 19 should have seperate housing units to ensure safety. However, another court held that

Page 2

the deprivation of a comb, pillow, toothbrush, and toothpaste for seven
to 10 days in a maximum-security cell with continuous lighting, a
few roaches and mice in the cell, and no reading material, did not
constitute cruel and unusual punishment where the prisoner was not
denied the minimum necessities of food, water, sleep, exercise, toilet
facilities, and human contact. Contrast that with Griffin V. Smith, in
which the court held that conditions that might constitute infringements
of civil rights of prisoners in a special housing unit included excessive
and unnecessary use of force by guards, grossly inadequate provision
for exercise, denial of access to psychological specialists, unsanitary
food utensils, including cigarette burns and hair on food trays,
portions smaller than those provided to the general prisoner population
or less of mail to the superintendent. In 1995, The Supreme Court in
Sandin V. Conner severely reconfigured the analysis for determining
whether a prisoner subjected to disciplinary or administrative confinement
has a protected liberty interest that entitles him or her to the procedural
protections afforded under the due process clause. In so doing, the Court
rejected the analysis established by Hewitt V. Helms and its progeny
returning to the due process principals established in Wolff v. McDonnell
and Meachum V. Fano. Prior to Sandin, analysis of whether a liberty
interest was protected would require an examination of the text of
prison guidelines or regulations to determine whether mandatory language
that limited prison officials' discretion created an enforceable
expectation that the state would produce a particular outcome
with respect to the prisoners conditions of confinement. The Sandin
majority rejected this test because it created disincentives for
states to codify prison management procedures in the interest of uniform
treatment and because the approach led to the involvement of the federal courts
in the day-to-day management of prisons, often squandering judicial

Page 3

resources with little offsetting benefit to anyone. "Supermax" prisons
are maximum-security facilities with highly restrictive conditions
that are designed to segregate the "most" dangerous prisoners from the
general population. Their use has increased in recent years, in part as a
response to the rise in prison gangs and prison violence. Almost every
aspect of a prisoners life is controlled and monitored. Incarceration
in a "supermax" is synonymous with extreme isolation. Opportunities
for visitation are rare and are conducted through glass walls. Prisoners
are deprived of almost any environmental or sensory stimuli and of
almost all human contact. Placement is for an indefinite period, limited
only by a prisoners sentence. Prisoners otherwise eligible for parole
may also lose their eligibility while incarcerated in a supermax.
These conditions are not only in supermax prisions but also in local
and city jails and due to a use of force incident an inmates classification
may go up and the person is totally innocent. This is extreemly opressived.
    A prisoner was placed in a behavioral modification program (BMP) for
a rules infraction shortly after his arrival in the "supermax," Wisconsins
highest security prison. During the first five days under the BMP
he was deprived of all clothing and bedding and was fed a ground-up block
of food. He was denied all privileges. For the next seven days, he was allowed
to wear a sleeveless smock but was still denied bedding and soap. The
program caused him to become suicidal and to inflict wounds on himself.
The prisoner was denied the minimal civilized measure of life's
necessities required under the Eighth Amendment right to Equal Protection.
On appeal to the Supreme Court, the issue was the appropriate legal
standard to be used by courts in determining the constitutionally of
racial segregation in prison, not racial segregation itself. Courts have
found that the use of isolated confinement is a valid method of penal
administration. However, federal courts will provide relief for deprivation

Page 4

of a prisoner's constitutional right to be free of cruel and unusual punishment during his or her stay in isolated confinement. When the conditions of the confinement become such that a prisoner is deprived of personal hygiene and the facility, or his or her diet are inadequate the Eighth Amendment is violated. In addition, punishment that is imposed for an improper purpose or is disproportionate to the offense committed can violate the Eighth Amendment. | As the legal custodians of large numbers of men, including many who are being confined for crimes of violence, or crimes they did not commit, prison staffs are often confronted with situations in which it is necessary to use force against a prisoner or a group of prisoners. Force, in this connection, means any physical force directed toward another, either by direct physical contact or by the use of a weapon such as tear gas, chemical mace, billy club or firearm. I believe that billy clubs and sticks are unnecessary. | The controlling factual elements are the degree of force used by the prisoner, the prisoner's possession or non-possession of a deadly weapon, the reasonable perception on the part of the correctional officer that he or a third person is in danger of death or serious bodily harm, and the means of force available to the officer. When discussing the amount of force that is legally permissible, it is helpful to distinguish deadly force and nondeadly force. "Deadly force" may be defined as force that will likely cause death or serious bodily harm. Knives and firearms are always considered instruments of deadly force. "Non deadly" force is force that will normally cause neither death nor serious bodily harm. The use of fists, judo holds, chemical mace, and tear gas are examples of nondeadly force. Employing certain methods of applying force cannot, in the abstract, be categorized as either the use of deadly or nondeadly force. Certain factual elements of the case, primarily the area of the body struck, must be considered.

Page 5

For example, a blow to the head from a billy club is likely to cause death or serious bodily harm, and thus must be regarded as the use of deadly force. However, a blow to the knees would probably constitute non deadly force. I guess even if knee cap was shattered. Our society places great value on human life and on the right of Every Person to be free from physical contact by another. Consequently, the use of force by one individual against another is frowned upon For this reason, force is permissible only when all non-force alternatives have failed. I feel that we should also consider prison rape. I do not believe that the Prison Rape Elimination Act has been effective. Uncertainties in the law were put to rest in Hudson v. McMillian. A prisoner testified that the minor bruises, facial swelling, loosened teeth and cracked dental plate he suffered were the result of a beating by correctional officers. He testified that the beating took place while he was handcuffed and shackled following an argument with one of the officers, and that the supervisor on duty watched the beating, but merely told the officers" not to have too much fun." The district court found that the officers used force when there was no need to do so, and that the supervisor expressly condoned their actions. The court awarded damages to the prisoner. The Court of Appeals reversed, holding, among other things, that prisoners alleging the use of excessive force in violation of the Eight Amendment must prove "significant injury" and that the prisoner in Hudson could not prevail because his injuries were "minor" and required no medical attention. The United States Supreme Court reversed. It held that the use of excessive force against a prisoner may constitute cruel and unusual punishment even though the prisoner does not suffer serious injury. Whenever prison officials are accused of using excessive physical force constituting" the unnecessary and wanton infliction of pain" that violates the cruel

Page 6

and unusual punishments clause, the core judicial inquiry is that set out in Whitley v. Albers " whether the force used was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. The extention of Whitley's application of the unnecessary and wanton infliction of pain" standard to all allegations of force, whether the prison disturbance is a riot or a lesser disruption, worked no innovation. [Hudson V McMillian clarified the standards for determining whether Eighth Amendment violations have occurred. Whenever prison officials are accused of using excessive physical force in violation of the cruel and unusual punishments clause, the core judicial inquiry is whether force was applied in a good faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm. In Davidson v Flynn, correctional officers who needed to have cuff a prisoner being transported to another prison, deliberately applied the handcuffs too tightly in retaliation for his litigiousness. It was held that the prisoner's constitutional rights were violated. EVERY PERSON has the right to protect him - or herself against an assault by another. Prison officials may use force against a prisoner in their own self-defense. Correctional officers may use the degree of force reasonably necessary under the circumstances to protect themselves from the assault and to subdue the prisoners. While prison officals are afforded broad discretion in maintaining order, they are not justified in using any amount of force when the threat of disorder has subsided. The extent of such force depends upon the degree of force being used by the prisoner, the officers' reasonable perception of injury, and the means of resisting the assault. The test of reasonable force is whether the degree of force used is necessary under the facts and circumstances of the particular case as illustrated

Page 7

by Attica Correctional Facility v. Rockefeller. Force may be used against a prisoner in defense of third persons, such as another prisoner, prison staff, or visitors. The law regarding the use of force to prevent injury to third persons is similar to the rules regarding self-defense. A person is justified in using the degree of force reasonably necessary under the circumstances to protect the third party and to control the attacker. Prison officials may find themselves under a duty to provide prisoners with reasonable protection from constant threats of violence. What is reasonable under the circumstances again depends upon the degree of force being used by the attacker, the persons reasonable estimate of injury to the third party, and the means available to the person to control the attacker. Deadly force may be used against the attacker only if the third party reasonably appears to be in danger of death or serious injury and the use of deadly force is the last resort. It should not be a resort at all. Prison officials have the duty, sometimes imposed by statute, to prevent prisoners from committing crimes within a detention facility. Therefore, these officials have the privilege of using reasonable force to prevent either a misdemeanor or a felony. Generally, deadly force can be employed to prevent the commission of a felony, but only after all other means reasonably available have failed. Examples of common felonies committed within a prison are rioting and assault with a weapon upon another prisoner. Advocates of corporal punishment maintain that in order to enforce prison-discipline, it is necessary to punish past offenders, hopfully deterring future rule infractions. However, the harmful effects of such treatment may well outweigh any of its supposed benefits. The possible psychological effects of inhumane punishment have been described as follows:

Methods of discipline have a profound effect on the offender

Page 8

in regard to his mental a social attitudes both within the prison and after release. This is particularly evident in the case of first offenders, in whom permanent attitudes are often established which make for later social success or for a continued life of crime. The consequences of discipline are also grave in their effect on the mental conditions of offenders, leading them often into the so-called "prison neurosis" if unfavorable, or leading to constructive modification of personality if constructively administered )

State v. Cannon involved the constitutionality of a Delaware law that prescribed whipping as a form of punishment for specified crimes. Discussing the validity of whipping in light of the state constitution's ban on cruel and unusual punishment, the court reasoned that because whipping had been permitted in the state since 1719, while other forms of punishment that had formerly been used, such as burning at the stake, had been eliminated by the state legislature, it must be presumed that whipping was not considered cruel and unusual punishment by the people of Delaware. Any change, the court declared, must come from the state legislature. As for the Eighth Amendment to the United States Constitution, the court said that it could not find a single case as of the time in which a court had held, as a matter of federal constitutional law, that whipping violated the Eighth Amendment.

State v. Cannon was decided in 1963; in 1968, however, the United States Court of Appeals for the Eighth Circuit held, in the case of Jackson v Bishop, that whipping as a means of enforcing prison discipline did violate the Eighth and Fourteenth Amendments. The court stated that "the applicable standards are flexible ... and that broad and idealistic concepts of dignity, civilized standards, humanity, and decency are useful and usable." Using these criteria

Page 9

the court held whipping to be cruel and unusual punishment. In another Virginia case, the equal protection clause was violated when a prisoner was restrained with a five-point restraint for 48 hours because of his race and his complaints about previous expressions of racism. He was shown a drawing of a person in a noose, apparently implying that he would be lynched. A correctional officers use of force that results in nothing more than de minimis physical injuries can still violate the Eighth Amendments prohibition on cruel and unusual punishment. Detention in a penal institution necessitates a withdrawal of full enjoyment of constitutional rights. But exactly which rights are completely terminated and which are retained is usually unclear. Even rights not forfeited by incarceration are often retained in a diminished form. These general statements are illustrated by an analysis of the prisoner's specific right to use the mail system to send and recieve various items such as letters, legal materials, books, and magazines. Article I, §8 of the Constitution vests power in Congress to establish post offices. This power has been interpreted by the Supreme Court as granting to Congress and the U.S. Postal Service the exclusive right to use the mail system would thus seem clear. Reading and inspecting of prisoner mail serves two purposes: (1) it prevents contraband from being smuggled into or out of an institution; and (2) it enables the prison authorities to detect plans for illegal activity - namely escape. Thus, such action, at least for incoming mail, has uniformly been upheld by the courts. However, the administrators' refusal to mail correspondence that does not contain contraband or details of illegal schemes has been subject to judicial criticism. Under the traditional view, described in the preceding section, such a refusal is a normally considered unreviewable. Under the "new approach" prison

Page 10

officials are judicially required to justify such actions. Thus, in McNamara v. Moody, prison officials were held to have violated a prisoner's constitutional rights by refusing to mail a letter to the prisoner's girlfriend. The court held that censorship must be limited to concrete violations such as escape plans, plans for disruption of the prison system or work routine, or plans for importing contraband. A prison ban on prisoners sending letters that complain of internal conditions in the institution to the news media - radio, television, and the press - restricts First Amendment freedoms in two ways. First, the prisoners right to speech is curtailed. Second, the public's right to know what is happening within the prison system, a right that can only be fulfilled through an informed press, is restricted. The courts have generally given prison administrators unfettered discretion in refusing to allow one prisoner to correspond with another prisoner. The reason most often given to justify such action is that the control of -prisoner mail is an administrative function in which the courts refuse to intervene. Thus, in Schlobohm v. United States Attorney General, a federal district court held that a prison policy of prohibiting correspondence between prisoners of different institutions was permissible. The Court stated that indefinite mail restriction imposed as a punishment was a legitimate exercise of disciplinary power when a prisoner had violated existing prison mail regulations. Prison walls do not form a barrier that seperates prisoners from the protections of the Constitution, nor do they bar free citizens from exercising their own constitutional rights by reaching out to those on the "inside." Prisoners retain their First Amendment rights to communicate with family and friends. Courts have determined that there is no legitimate governmental purpose

Page 11

to be achieved by not allowing reasonable access to the telephone, and such use is protected by the First Amendment. | Prison administrators may place reasonable restrictions on mail, subject to the prisoner's qualified right to use the mail system. Formerly, many federal courts refused to intervene in prisoner suits that alleged undue restriction of mail rights unless the prisoner alleged that restrictions infringed upon another federal right, such as the rights to free speech and press, the right to petition the government for the redress of grievances, the right to communicate with an attorney, and the right to recieve information. | Many state constitutions and statutes encourage rehabilitation of prisoners. Such programs are considered essential by virtually all penologist if incarceration is to reduce the incidence of crime. For example, the American Correctional Association has stated that "prison serves most effectively for the protection of society against crime when its major emphasis is on rehabilitation" A commission appointed by President Lyndon Johnson to study the crime problem in the United States (poverty) concluded that "rehabilitation of offenders to prevent their return to crime is, in general, the most promising way to achieve this end (reduction of crime) or (reduction of incarceration) Despite the view that rehabilitation programs should be the core of any correctional system, the courts have refused to hold that there is an absolute right to rehabilitation during incarceration. | Litigation in the area of the civil disabilities of convicted felons, both incarcerated and released, will continue to increase as the revolution in prison law follows the prisoner beyond the prison wall. It is clear that the Americans with Disabilities Act applies to prisons and that prisoners with HIV infections or AIDS are covered by the Act. | The class defined as all present and future inmates confined in jails operated by

Page 12

the New York City Department of Correction should include inmates confined in Elmhurst and Bellevue Prision Wards because they are subject to violence, use of force, and being overmedicated. The class alleges, among other things, that DOC staff members use unnecessary and excessive force against inmates, that DOC supervisory personnel and the City of New York have a policy of knowingly permitting, tolerating, and encouraging this alleged misconduct, and that this alleged misconduct violates the Constitution and laws of the United States and the laws of the State of New York and the Constitutional Rights of Prisoners.

On December 23, 2014, the United States of America was permitted to intervene as a plaintiff in the Action. The United States Attorneys Office for the Southern District of New York and the Department of Justice previously had conducted an investigation into the treatment of male inmates under the age of 19 ("Young Inmates") and issued a report that such inmates were being subjected to unconstitutional conditions of confinement. (I, being a detainee have witnessed these unconstitutional conditions of confinement for inmates all ages and I object to some of the proposals of this proposed settlement.

• Court Oversight and Appointed Monitor: I object to this proposal. I believe that this is too much to fall on ones shoulder if new practices, system policies, and procedures are not executed properly.

• Development of a New Use of Force policy: I do agree to this proposal but I object the use of billy clubs.

• New Use of Force Auditor Position: I do agree to this proposal but would like to suggest that disposition hearing be reviewed by the Commissioner or Deputy Commissioner in use of force situations.

• Implementation of a Pilot Program for Body-worn Cameras: I do agree to this proposal but I object to certain correctional

Page 13

officers being assessed whether to continue or expand their
use after one year. I believe the limitation should be 9
years so that the 10th year shows their seinority and also
for the safety of correctional officers and inmates.
• Arrest of inmates: I object to this proposal of an arrest
of an inmate in connection with an incident involving use of
force only if an investigator with the Correction Intelligence
Bureau of the Department's Investigation Division has reviewed
the circumstances and determined that the recommendation
is based on probable cause. I believe that there is a conflict
of interest with correctional officers and investigators
who work for the same corporation!
• Inmates under 19: The Settlement Agreement also includes
numerous provisions specifically addressing Young Inmates,
including specific requirements relating to the safety and
supervision of Young Inmates and restrictions on the use of punitive
segregation. In addition, DOC and the Mayor's Office of Criminal
Justice will make best efforts to identify an alternative site
not located on Rikers Island to house inmates under the age of 18.
I object. I believe that Everyone has the right to be safe.
Theres no need to identify an alternitive site not located on
Rikers Island is security measures are going to store up and
that the proposals for cameras, new practices, system policies and
procedures are going to be executed on Rikers Island. If thats the
case homosexuals should also have the right to be safe. I believe
a great solution for this problem of safety for inmates under
19 would be to put them in their own unit or building on Rikers
Island with based rehabilitation and education programs
so that they can be productive men in society. I believe that

Page 14

More rehabilitation and education for all men who are
incarcerated should be pursued. Not another jail for
mostly minorities under 19 not recieving and education
and being oppressed by life's circumstances at an early
age which can lead to suicidal thoughts and mental illness.
Or any jail for any person being oppressed by lifes circumstances
and not recieving proper rehabilitation. I want to see
myself free and also other inmates who may have it worse
than me, that may not deserve to be in jail, or at least
deserves a second chance at life to be with family and
loved ones. I would also like to see the correctional officers
free who are also locked up with us and maybe stress
out by lifes circumstances, every day their lives are put
on the line. Until the last 40 years, correctional law was
practically nonexistent. Prisoners were regarded as "slaves of
the state". The tradition was that upon conviction of a felony,
prisoners lost all of their civil rights. Access to the courts was
denied and the treatment of prisoners was left to the uncontrolled
discretion of the warden. Indeed, some institutions were in fact
run by the prisoners themselves. Until the 1960s, the courts
had adopted a "hands off" attitude toward prisons. This is
no longer true. It is widely accepted that prisoners retain all
of their constitutional rights upon entering the prison system
that are not necessarily withdrawn by virtue of prison
security, discipline, and necessity. In short a prisoner takes
the Constitution into the prison with him. It is impossible to totally
regulate the operating and running of prison systems. There are too
many dissimilar events that occur on a daily basis. Positive
law must leave room for resolving the never ending issues that

Page 15

involves dealing with offenders. In areas not subject to the direct rule of law lies administrative discretion. This can be as simple as a correctional officer ordering a prisoner to pick up a cigarette, to a warden ordering a complete lockdown for security reasons. Decisionmaking outside the perimeters of positive law results in most of the litigation in correctional law.

Decisions of prison administrators for a substantial part of correctional litigation. Many prison administrators have brought the legal deluge upon themselves. Bad judgements, blatant violations of elementary principals of human dignity, and naive concepts and applications of nineteenth-century justice by prison officials have made judicial intervention into the correctional process inevitable. The adage "bad facts make bad law" is of particular relevance in prison litigation. Although litigation, or fear of litigation, does prompt prison administrators to take actions and institute needed reforms, there are many reasons why protracted litigation can be counterproductive to the correctional process. First, due to liberalized rules of discovery in both state and federal courts, prison administrators find themselves inundated with depositions, interrogatories, motions to produce, and other fact finding methods. Overworked officials find themselves spending the bulk of their time preparing for litigation rather than working on correctional issues. Second, morale suffers when prisoners file spurious claims, asking for millions of dollars in damages for alleged injuries suffered. It is common to sue officials for millions of dollars. The claims are specious, but have an effect on the officials credit rating. Third, counsel may not be available for correctional officials, except for those at the executive level and above. Even when provided, the interests of correctional administrators or politicians

Page 16

in settling a lawsuit can conflict with the interests of an individual correctional official. Finally, litigation, especially class action litigation, tends to create the atmosphere of confrontation, creating a "us versus them" mentality.

In recognizing that prisons do not house the most docile or easily governed persons, courts will allow the use of reasonable force by prison officials in five situations: self-defense, defense of third persons, enforcement of prison rules and regulations, prevention of escape, and prevention of crime. The test of reasonableness is whether the force is reasonable and necessary under the facts and circumstances of the particular case. Unreasonable corporal punishment to enforce prison discipline is considered cruel and unusual punishment, prohibited by the Eighth Amendment. Prison officials who attempt to revive the use of corporal punishment may find themselves facing criminal and civil actions. To avoid criminal a civil liability, prison officials should refrain from corporal punishment and seek alternative methods of prisoner control. Or just let us free. WHEREFORE, this petitioner respectfully prays that an order be issued, and taking into consideration the facts and argument annexed herein, or, in the alternative, and order be issued granting partial relief, or whatever relief the Court sees and deems fit and appropriate to insure the swift and proper administration of justice.

Yours, etc.,

July 20th, 2015

Mr. Joseph S. Cannon 349 1503252 (3CA)
Vernon C Bain Center
1 Halleck Street
Bronx, New York 10474

RECEIVED
SEP 01 2015
CHAMBERS OF
LAURA TAYLOR SWAIN
U.S.D.J.

USM 1:3
SDNY

NEW YORK NY 100
27 AUG 2015 PM 10 L

Ms Laura Taylor Swain
United States District Court
Southern District of New York
the Daniel Patrick Moynihan United States Courthouse
500 Pearl Street-New York, New York
10007-1312

RECEIVED
2015 SEP -4
NY PRO SE OFFICE