UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------- X
:
MARK NUNEZ, et al.,                                            :
:
                Plaintiffs,                        :
:
  - against -                                                 :
:  11 Civ. 5845 (LTS)(JCF)
CITY OF NEW YORK, et al.,                                      :
:
                Defendants.                        :  **DECLARATION OF STEVE J.**
:  **MARTIN**
-------------------------------------------------------------- X
:
UNITED STATES OF AMERICA,                                      :
:
                Plaintiff-Intervenor,              :
:
  - against -                                                 :
:
CITY OF NEW YORK and NEW YORK CITY                             :
DEPARTMENT OF CORRECTION,                                      :
:
                Defendants.                        :
-------------------------------------------------------------- X

      **STEVE J. MARTIN** hereby declares as follows:

1.   I submit this declaration in support of the parties' Joint Motion for Final Approval of the Consent Judgment.

2.   I have worked as a corrections professional for over 40 years, including as a correction officer, General Counsel of the Texas State Prison System, and expert consultant for the United States Department of Justice, Civil Rights Division, and the United States Department of Homeland Security, Office of Civil Rights and Civil Liberties. I have visited or inspected over 700 confinement facilities in the United States and abroad, and have been continuously involved in institutional reform litigation. Since 1987, I have been retained as an expert witness and consultant in more than 200 cases involving

correctional facilities, many of which involved allegations of excessive and unnecessary use of force. Notably, I served as one of two Joint Expert Consultants in the remedial phase of *Sheppard v. Phoenix*, 91 Civ. 4141 (RPP) (S.D.N.Y.), an earlier class action brought against Defendant The City of New York (the "City") with respect to use of force in the Central Punitive Segregation Unit. I also was retained as an expert by the plaintiffs in *Ingles v. Toro*, 01 Civ. 8279 (DC) (S.D.N.Y.), another action alleging a pattern and practice of excessive and unnecessary use of force in the City jails. I also have served as a federal court monitor in numerous prisons and state systems, large metropolitan jail systems, and juvenile justice facilities. I keep myself apprised of developments with respect to legal standards, as well as best practices, with respect to use of force by corrections staff. A copy of my curriculum vitae is attached to this declaration as Exhibit A.

3. In October 2012, I was retained as a consulting expert to advise and assist Ropes & Gray LLP, Emery Celli Brinckerhoff & Abady LLP, and The Legal Aid Society Prisoners' Rights Project (collectively, "Plaintiffs' Class Counsel") in their representation of the putative class and class representatives in this action.

4. As a consulting expert for Plaintiffs' Class Counsel, I reviewed a large volume of the documents produced by the City in discovery as well as transcripts of depositions of New York City Department of Correction ("DOC" or the "Department") personnel and other City-related witnesses. Specifically, I examined over 400 DOC use of force investigative files, which contained, among other things, investigative reports, video footage, and audio recordings of witness interviews. In addition, I reviewed various DOC operational policies and procedures (including the existing Use of Force Directive), use of force data, training materials, and staff disciplinary records. The records I reviewed in connection with this litigation primarily covered the period from 2010 - 2013.

5. In September 2013, I conducted tours of several of the City jails. Along with Plaintiffs' Class Counsel, I toured the Anna M. Kross Center, the Otis Bantum Correctional Center, the Robert N. Davoren Complex, the George R. Vierno Center, and the Vernon C. Bain Center.

6. Based upon my review of the information provided to me during the litigation and my decades of experience as a corrections professional and consultant, I concluded that substantial system-wide reforms were necessary to reduce the level of staff-on-inmate violence in the City jails, ensure the safety and well-being of inmates, and protect inmates' constitutional rights. Among other things, I found that the frequency of use of force incidents, including the number of incidents resulting in injuries to staff and inmates, was unusually high compared to other metropolitan jail systems. I identified instances where staff engaged in excessive and/or unnecessary use of force in violation of the Constitution, including a number of incidents where correction officers delivered blows to an inmate's head or facial area or improperly employed force to punish or retaliate against inmates. I also identified a number of systemic deficiencies, including the need to adequately report and investigate use of force incidents and the need to consistently and adequately hold staff accountable for misconduct. In addition, I found that the Department's policies and training related to the use of force were in need of significant improvement. The foregoing are intended not to be an exhaustive list, but rather as illustrative, of the significant issues that I concluded were present in the City jails.

7. I am aware that the United States Attorney's Office for the Southern District of New York ("USAO") conducted an investigation into the treatment of young male inmates, between the ages of 16 and 18 ("Young Inmates"), pursuant to the Civil Rights of Institutionalized Persons Act ("CRIPA"), 42 U.S.C. § 1997, and the Violent Crime Control and Law Enforcement Act of 1994, 42 U.S.C. § 14141. On August 4, 2014, the USAO and the Department of Justice issued a report ("CRIPA Report") that concluded that the City had violated the constitutional rights of Young Inmates and engaged in a pattern and practice of: (a) subjecting Young Inmates to excessive and unnecessary use of force; (b) failing to adequately protect Young Inmates from violence inflicted by other inmates; and (c) placing Young Inmates in punitive segregation at an alarming rate and for excessive periods of time. I have reviewed the CRIPA Report, which is attached as Exhibit A to the Complaint-in-Intervention filed by the United States on December 18, 2014. Many of the findings in the CRIPA Report with respect to the Department's use of

force against Young Inmates mirror issues I identified as more broadly present in the City jails based on my involvement in this case.

8. I directly participated in the settlement negotiations in this class action, which included dozens of in-person and telephonic sessions held over the course of several months. I provided extensive and detailed input on the nature and scope of the remedial measures included in the proposed Consent Judgment based on my professional judgment regarding what changes are necessary to address the problematic use of force practices identified during the litigation. I understand that the proposed Consent Judgment has been filed with the Court, but for convenience another copy is attached to this declaration as Exhibit B.

9. Several senior Department officials, including DOC Commissioner Joseph Ponte, also were heavily involved in the settlement negotiations. All of the provisions in the proposed Consent Judgment were extensively negotiated, at arm's-length, and closely analyzed, with the parties mindful of the operational challenges and burdens associated with implementing the relief. When the Department raised legitimate operational concerns with the breadth of certain proposals, the parties engaged in productive discussions to ensure that the relief was appropriately tailored to address such concerns while still serving the goal of reducing excessive and unnecessary use of force and violence in the City jails.

10. Recognizing the requirement that remedies should represent the least intrusive means necessary to correct the alleged violations, the parties frequently included language in the proposed Consent Judgment requiring the Department to develop and implement certain systems, policies, and trainings without specifying the precise elements of such systems, policies, and trainings. Instead, the proposed Consent Judgment often calls for the Department to develop these systems, policies, and trainings in consultation with the Court-appointed monitor provided for under the agreement, thereby preserving the Department's ability to fashion these remedies (in consultation with the monitor) in an appropriately targeted manner that takes into account any legitimate operational and logistical concerns.

11. Pursuant to the proposed Consent Judgment, I would serve as the monitor and be responsible for assessing compliance with the Consent Judgment and submitting periodic reports to the Court. I accepted this appointment based on my firm belief that compliance with the settlement's requirements will result in a substantial reduction in the improper use of force against inmates and a safer and more secure environment in the City jails.

12. As explained in more detail below, I believe that the relief included in the proposed Consent Judgment is necessary to adequately address the violations alleged by the Plaintiff Class and the United States (collectively, the "Plaintiffs"), narrowly tailored, and no more intrusive than is necessary to protect inmates' constitutional rights. The provisions are targeted to remedy the deficiencies identified, and do not extend to other unrelated aspects of the operation of the City jails. The practices, systems, policies, and procedures set forth in the proposed Consent Judgment may be extensive, but they are necessary to reform the agency.

13. Moreover, the remedial measures included in the proposed Consent Judgment should not have an adverse impact on public safety or the operation of the criminal justice system. The close involvement of Department policy-makers and operational personnel in negotiating the specific terms of relief has resulted in an agreement that is consistent with sound security practice. Moreover, because the remedies are designed to reduce violence in the City jails, the required changes are likely to promote public safety and protect both inmates and DOC staff from unnecessary harm and injuries.

14. The proposed Consent Judgment includes 14 categories of "operational" reforms. *See* Consent Judgment, §§ IV – XVII. As described below, each category of reforms is designed to specifically address the systemic deficiencies that contributed to the constitutional violations alleged by the Plaintiffs.[1]

15. Use of Force Policy (Consent Judgment, § IV). Section IV of the proposed Consent Judgment requires the Department to develop, adopt, and implement a new

---

[1] Given the length of the proposed Consent Judgment, it would not be practical to discuss each and every provision in the agreement. Instead, I have highlighted several of the most important reforms in my discussion.

comprehensive use of force policy subject to the monitor's review and approval.  It is essential for any corrections system to have a clear and comprehensive use of force policy so staff know what is expected of them.  Although the Department had an existing Use of Force Policy Directive, the required new use of force policy will be more robust, will explicitly prohibit certain categories of use of force, and will provide correction officers with more specific guidance on when and how to use force.  In addition, the staff use of force training discussed below will be based on the Department's use of force policy so it is important that the policy fully cover what is and what is not permissible.

16.  <u>Use of Force Reporting and Tracking (Consent Judgment, § V)</u>.  Section V of the proposed Consent Judgment requires, among other things, that DOC staff independently prepare timely, accurate, and detailed reports on every use of force of incident.  When reviewing DOC investigative files, I identified deficiencies in certain use of force reports prepared by staff.  Many were incomplete and failed to provide relevant information about the incident.  In addition, there have been occasions when staff have not reported the use of force and have pressured inmates to do the same.  It is essential for use of force incidents to be promptly and adequately reported so that the incident can be reviewed and investigated, and staff can be held accountable if they have engaged in any misconduct.  In addition, the Department's existing data tracking systems are antiquated and decentralized.  To address this issue, Section V also requires the Department to track in a reliable, accurate, and computerized manner extensive data on all use of force incidents, use of force investigations, and staff disciplinary actions.  Comprehensive and centralized data tracking systems are important management tools that will allow the Department to identify patterns of use of force incidents and implement operational changes that reduce the potential for improper uses of force.

17.  <u>Anonymous Reporting System (Consent Judgment, § VI)</u>.  Section VI of the proposed Consent Judgment requires DOC to develop a centralized system that can be used by staff to anonymously report use of force policy violations.  This new system will promote the goal of ensuring that all incidents are properly reported, without fear of retaliation, and can be investigated.

18. <u>Use of Force Investigations (Consent Judgment, § VII)</u>.  Section VII of the proposed Consent Judgment requires the Department to conduct thorough, timely, and objective investigations of use of force incidents to determine whether staff used excessive or unnecessary force or otherwise violated the use of force policy.  Among other things, Section VII sets forth the criteria that these investigations must satisfy, requires the Department to complete investigations within specified timeframes, expands the categories of incidents that are subject to full investigations by the Department's Investigation Division, and calls for the development and implementation of quality control systems and procedures to ensure the quality of the investigations.  When reviewing DOC investigative files, I identified many investigations that were incomplete, did not adequately reconcile contradictory information or challenge implausible assertions, or languished for excessive periods of time.  It is critically important for the Department to conduct timely, rigorous, and comprehensive investigations of use of force incidents to assess compliance with policies, determine whether corrective action is required, and hold staff accountable for any misconduct (or clear them if no misconduct is found) after a thorough and professional investigation.  Improving the quality and timeliness of reviews and investigations is a core component of any reform effort because staff need to know that their conduct will be examined and the use of excessive or unnecessary force will be identified and not tolerated.

19. <u>Staff Discipline and Accountability (Consent Judgment, § VIII)</u>.  Section VIII of the proposed Consent Judgment requires the Department to take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, when staff violate use of force policies, and calls for the Department to prosecute disciplinary actions as expeditiously as possible.  Under the agreement, the Department must develop and implement functional, comprehensive, and standardized disciplinary guidelines that will include the range of penalties to be sought for different categories of violations.  During my review, I noted that staff members who used unnecessary and excessive force were too often subject to minimal or no sanctions.  When discipline was imposed, it was frequently long after the incident.  In order to reduce incidents of excessive force in the City jails, the Department must appropriately and timely discipline staff who engage in the improper use of force to demonstrate that such conduct will not be tolerated.  The

general requirement that the Department seek to terminate staff found to have engaged in the categories of egregious misconduct set forth in Paragraph 2(d) of Section VIII should reinforce the Department's zero tolerance policy for the most abusive tactics.

20. <u>Video Surveillance (Consent Judgment, § IX)</u>.  Section IX of the proposed Consent Judgment requires the installation of sufficient additional wall-mounted video surveillance cameras throughout the City jails to ensure complete camera coverage of all areas by February 28, 2018.  Although the Department recently installed hundreds of new cameras, many housing areas still do not have surveillance coverage.  Video camera coverage is a very important tool with respect to preventing violence and in helping to accurately capture events relating to use of force incidents. The agreement requires DOC to accelerate the pace of the camera installation process and mandates that a total of 7,800 additional cameras be installed on a rolling basis.  Based on my corrections experience, comprehensive video surveillance is likely to substantially reduce the level of violence in correctional facilities.  In addition, the agreement requires the Department to institute a pilot project in which 100 body-worn cameras will be worn over all shifts.  Similar to video surveillance coverage, body-worn cameras can deter correction officers and inmates from engaging in improper conduct and also provide valuable evidence for investigations.

21. <u>Risk Management (Consent Judgment, § X)</u>.  Section X of the proposed Consent Judgment includes various provisions designed to minimize the risk of the improper use of force.  For instance, the Department must develop an early warning system ("EWS") that will track staff performance data in order to identify as soon as possible staff whose conduct may warrant corrective actions.  The EWS will alert management as to officers who are at risk of engaging in more serious misconduct and are in need of counseling, training, or other interventions.  In addition, the agreement calls for the designation of an individual to serve as "Use of Force Auditor," who will be responsible for analyzing all data relating to use of force incidents and identifying trends and patterns.  Based on this analysis, DOC management will be better positioned to develop strategies to minimize the use of force, such as by adjusting staffing or offering targeted counseling or training to staff when necessary.

22. <u>Staff Recruitment and Selection (Consent Judgment, § XI)</u>. Section XI of the proposed Consent Judgment requires the Department to develop a comprehensive staff recruitment program to attract well-qualified applicants. The Department must conduct appropriate background investigations before hiring staff, which shall include the assessment of factors such as an applicant's criminal history, gang affiliations, and any relationships with current inmates. As with other law enforcement personnel, it is extremely important to properly screen new DOC staff hires to ensure that they are qualified to handle the challenges and volatile situations they will face as correction officers. In order to effectively implement the widespread reforms in the proposed Consent Judgment, the Department will need carefully vetted and well-credentialed staff who are deeply committed to changing the culture in the City jails.

23. <u>Screening and Assignment of Staff (Consent Judgment, § XII)</u>. Section XII of the proposed Consent Judgment addresses the promotion of staff and the assignment of staff to special units (*e.g.*, punitive segregation and mental health housing areas). For example, prior to promoting any correction officer to the position of Captain or higher or assigning an officer to certain special units (*e.g.*, punitive segregation and mental health housing areas), the Department will undertake a review of the officer's prior involvement in use of force incidents to verify that this does not raise concerns about the officer's qualifications. The Department also may not promote any individual to the position of Captain or higher if the officer has been found guilty or pleaded guilty more than once within the preceding five-year period to various delineated DOC charges relating to the use of force, absent exceptional circumstances. While preserving management's general discretion to make personnel decisions, these provisions are designed to ensure that those promoted to supervisory positions or assigned to work with particularly vulnerable populations do not have troubling work histories that call into question their suitability for these positions. Because supervisors constantly provide guidance and advice to less experienced officers, it is important for supervisors to have demonstrated through their own conduct an understanding of what is permitted and what is not permitted with respect to the use of force.

24.  <u>Training (Consent Judgment, § XIII)</u>.  Section XIII of the proposed Consent Judgment requires the Department to develop new in-service and pre-service training programs, as well as to improve existing training programs, which cover a variety of subject matters, including the new use of force policy, crisis intervention and conflict resolution, defensive tactics, cell extractions, and procedures, skills, and techniques for investigating use of force incidents.  The USAO's expert consultant, Dr. Jeffrey A. Schwartz[2], and I have reviewed existing Department training curricula and noted a number of deficiencies and areas in need of improvement.  A high quality training program is an important component of any effort to implement enduring reforms and change the culture of a jail system.  Although the Department provides a wide range of training on various topics, the agreement addresses only those programs where changes are most needed to reduce the improper use of force.

25.  <u>Arrests of Inmates (Consent Judgment, § XIV)</u>.  Section XIV of the proposed Consent Judgment requires the Department only to recommend the arrest of an inmate in connection with a use of force incident after an investigator, as opposed to a correction officer involved in the incident, has reviewed the circumstances and determined that there is probable cause for the arrest.  This provision is designed to ensure that inmate arrests are based on probable cause.

26.  <u>Safety and Supervision of Inmates Under the Age of 19 (Consent Judgment, § XV)</u>.  Section XV of the proposed Consent Judgment sets forth a range of remedial provisions tailored to address the findings in the CRIPA Report with respect to the Department's failure to adequately protect Young Inmates from harm and violence inflicted by other inmates.  The CRIPA Report cited statistics reflecting an extraordinary high level of inmate-on-inmate fights and injuries among Young Inmates, and concluded that inadequate supervision, a deficient classification system, and limited Young Inmate

---

[2] Dr. Schwartz has served as a consultant for law enforcement and corrections agencies for approximately 35 years, and has been retained as an expert in numerous actions involving jails and prisons throughout the country.  Dr. Schwartz has particular expertise in the area of training and has assisted many jurisdictions with training their staff and developing effective training materials.  Dr. Schwartz was thoroughly involved in the negotiation of the provisions of the proposed Consent Judgment.

programming were factors contributing to the violence. The remedial provisions in Section XV are narrowly targeted to address these specific findings. As a general matter, the proposed Consent Judgment requires the Department to supervise Young Inmates in a manner that protects them from an unreasonable risk of harm. Specifically, the agreement calls for the Department, among other things, to cap inmate-to-staff ratios and living unit sizes, conduct daily inspections of Young Inmate housing areas to ensure that the conditions are reasonably safe and secure, intervene in a timely manner to prevent inmate-on-inmate fights and assaults, develop an age-appropriate classification system for inmates under the age of 18, develop and maintain a sufficient level of programming for Young Inmates to minimize idleness and the potential for inmate-on-inmate violence, adopt and implement a new approach to supervising and managing Young Inmates commonly referred to as the "Direct Supervision Model," implement a system that seeks to consistently assign the same correction officers and supervisors to the same housing units, and train correction officers on conflict resolution and crisis intervention skills specific to managing Young Inmates, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. These remedial measures will build on changes that the Department already has begun to implement with respect to the way it manages the adolescent population, and are narrowly drawn to complement those changes and address the specific deficiencies identified by the USAO.

27. <u>Inmate Discipline (Consent Judgment, § XVI)</u>. Section XVI of the proposed Consent Judgment includes restrictions on the use of punitive segregation for Young Inmates. These restrictions address the findings in the CRIPA Report that the Department had engaged in a practice of placing Young Inmates, including those with mental illnesses, in punitive segregation at an alarming rate and for excessive periods of time. The agreement prohibits placing inmates under the age of 18 in punitive segregation — a policy that the Department has already implemented — and requires the Department to continue to develop alternative systems, policies, and procedures to manage these inmates when they commit infractions. This relief is appropriately tailored to address the specific findings in the CRIPA Report with respect to DOC's use of punitive segregation for Young Inmates and the harm that can result. Like the remedial measures

for Safety and Supervision of Inmates Under the Age of 19 (Consent Judgment, § XV), the Inmate discipline reforms build on policies and procedures that have already been promulgated.

28. <u>Housing Plan for Inmates Under the Age of 19 (Consent Judgment, § XVII)</u>. Section XVII of the proposed Consent Judgment requires the Department and the Mayor's Office of Criminal Justice to make best efforts to identify an alternative site not located on Rikers Island to house inmates under the age of 18. As the Department and the City have acknowledged, the facility currently housing inmates under the age of 18, the Robert N. Davoren Complex, is not well-designed to serve as an adolescent facility, and adolescents would likely benefit from being moved away from the adult population on Rikers Island. Housing inmates under the age of 18 in an appropriate facility not located on Rikers Island is likely to further the goal of providing a safe and secure environment for this population.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on October 2, 2015.

_Steve J. Martin_
Steve J. Martin