# First Report of the *Nunez* Independent Monitor

**First Monitoring Period**
**October 22, 2015 through February 29, 2016**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Anna E. Friedberg
*Deputy Monitor*

Christina G. Bucci
*Associate Deputy Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Patrick Hurley
*Subject Matter Expert*

Emmitt Sparkman
*Subject Matter Expert*

**Introduction** ................................................................................................................. **1**

Background ................................................................................................................. 1

The Monitoring Team ................................................................................................ 3

The Monitoring Team's Priorities ............................................................................ 4

Summary of Work Completed in the First Monitoring Period ................................. 5

Use of Force in the First Monitoring Period ............................................................. 8

Overview of the Monitor's Report ........................................................................... 18

Monitor Recommendation Regarding Training Academy ....................................... 20

**Section-by-Section Analysis of Compliance** ....................................................... **20**

1. Use of Force Policy (Consent Judgment § IV) .............................................. 20

2. Use of Force Reporting and Tracking (Consent Judgment § V) .................... 29

3. Training (Consent Judgment § XIII) ............................................................. 36

   Monitor Recommendation Regarding the Training Academy ....................... 55

4. Anonymous Reporting System (Consent Judgment § VI) ............................. 57

5. Video Surveillance (Consent Judgment § IX) ............................................... 57

6. Use of Force Investigations (Consent Judgment § VII) ................................ 65

7. Staff Discipline and Accountability (Consent Judgment § VIII) .................. 78

8. Screening & Assignment of Staff (Consent Judgment § XII) ....................... 82

9. Risk Management (Consent Judgment § X) ................................................... 83

10. Safety and Supervision of Inmates Under the Age of 19 (Consent Judgment § XV) .... 87

11. Inmate Discipline (Consent Judgment § XVI) ............................................ 96

12. Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) ............. 109

13. Staff Recruitment and Selection (Consent Judgment § XI) ........................ 111

14. Arrests of Inmates (Consent Judgment § XIV) ........................................... 117

15. Implementation (Consent Judgment § XVIII) ............................................ 118

**Conclusion** ........................................................................................................... **121**

**Appendix 1** ................................................................................................................. **i**

# Introduction

This is the first report of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC") and the Monitoring Team to advance the reforms in the Consent Judgment during the first monitoring period, which covers the period from October 22, 2015[1] to February 29, 2016 ("First Monitoring Period").

## *Background*

The Consent Judgment is the result of a settlement of the *Nunez* class-action lawsuit against the Department, initiated in 2011, on behalf of inmates who alleged the Department had engaged in a pattern and practice of unnecessary and excessive force. A simultaneous investigation conducted by the United States Attorney's Office for the Southern District of New York ("SDNY") relating to the treatment of young male inmates (aged 16-18), began in 2012 and concluded with the issuance of a findings letter dated August 4, 2014, which cited a pattern and practice of excessive and unnecessary use of force, failure to adequately protect inmates from inmate-on-inmate violence, and inappropriate placement of 16- to 18-year-old male inmates in punitive segregation for excessive periods of time. After lengthy litigation of the *Nunez* class claims and the SDNY findings and after many months of intensive negotiations, the parties reached a comprehensive and detailed settlement agreement (the "Consent Judgment") designed to remedy the alleged unconstitutional practices in the Department's facilities.

---

[1] By Order of the Court, the Effective Date of the Consent Judgment is calculated as of November 1, 2015.

The Department manages 12 inmate facilities, nine of which are located on Rikers Island. In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, and to dismantle the decades-long culture of violence in these facilities, as well as targeted reforms to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 9,100 uniformed officers and 1,465 civilian employees and detains an average daily population of 9,900 inmates.

The Consent Judgment contains approximately 318 separate provisions divided into 15 topics: Use of Force Policy, Use of Force Reporting and Tracking, Anonymous Reporting System, Use of Force Investigations, Staff Discipline and Accountability, Video Surveillance, Risk Management, Staff Recruitment and Selection, Screening and Assignment of Staff, Training, Arrests of Inmates, Safety and Supervision of Inmates Under the Age of 19, Inmate Discipline, Housing Plan for Inmates Under the Age of 18, and Implementation.[2]

The requirements and deadlines in the Consent Judgment are ambitious and reflect the parties' collective desire to ensure timely reform. This desire must be balanced with an understanding that implementing well-reasoned, enduring and sustainable reforms will take time, and that implementation must progress in a reasonable and responsible manner in order to ensure the acculturation and sustainability of such reforms.

The Consent Judgment provisions are intended to resolve the issues considered in *Nunez* and the

---

[2] These topics align with the Department's 14-Point anti-violence reform plan adopted in March 2015, prior to the Effective Date of the Consent Judgment. The 14-Point reform plan focuses on safety, reducing violence and supporting culture change.

SDNY investigation, including the frequency of use of force incidents where Staff delivered blows to an inmate's head or facial area or improperly employed force to punish or retaliate against inmates, and the number of use of force incidents resulting in Staff and inmate injuries. The Consent Judgment also addresses a number of systemic deficiencies, including the absence of appropriate use of force tracking systems, inadequate use of force investigations, and the lack of a consistent and adequate system to hold Staff accountable for misconduct.

Under the Consent Judgment, the Department must develop and/or significantly improve its policies and training related to Staff use of force. The reforms are intended to promote the following principles of sound correctional practice: that the force used shall always be the minimum amount necessary to control a legitimate safety risk and be proportional to the resistance or threat encountered; that the use of excessive and unnecessary force is expressly prohibited; that the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; and that a zero-tolerance policy for excessive and unnecessary force must be rigorously enforced. Whether the policies and procedures prescribed in the Consent Judgment will actually have an effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the provision of adequate training to Staff, and consistent messaging to Staff through incentives and disincentives.

### The Monitoring Team

The team supporting the Monitor includes professionals with substantial experience and commitment to advancing correctional reform (collectively, "the Monitoring Team"). Team members include the Monitor, Deputy Monitor, Associate Deputy Monitor and three Subject Matter Experts, reflecting diverse professional backgrounds, experiences, and perspectives that help to ensure that the Monitoring Team's work is neutral, independent, balanced, objective, fair, reasonable, and responsible.

The Monitor, Steve J. Martin, is a career corrections professional and attorney with over 44 years of experience as a correctional officer, state prison system general counsel, federal court monitor, and expert in litigation involving jails and prisons nationwide and for the U.S. Departments of Justice and Homeland Security. The Deputy Monitor, Anna E. Friedberg, was plaintiffs' counsel in *Nunez* and has extensive experience leading investigations and advising the implementation of global compliance programs. Subject Matter Expert Dr. Kelly Dedel is the Director of One in 37 Research, Inc. and is a nationally-recognized expert on conditions of confinement for juveniles in detention and correctional facilities. Subject Matter Expert Patrick Hurley is a veteran corrections professional with 33 years of correctional experience in both adult and juvenile corrections and has served as the Warden of two prisons. Mr. Hurley has noted expertise in staff training related to use of force and the subsequent investigation of use of force incidents. Subject Matter Expert Emmitt L. Sparkman is a corrections administrator with over 40 years of experience working in juvenile and adult community and institutional corrections. Mr. Sparkman served as Deputy Commissioner for the Mississippi Department of Corrections Institution Division from November 2002 to May 2013. Associate Deputy Monitor Christina G. Bucci is an attorney who was also plaintiffs' counsel in *Nunez*, and has experience managing corruption investigations, and designing global compliance programs. More complete biographies are available in Appendix 1.

### *The Monitoring Team's Priorities*

As described above, the Consent Judgment is a detailed document that prescribes a comprehensive range of reforms. The Consent Judgment requires the Department to consult with the Monitor to create and refine policies, procedures, and systems; in some instances, the Monitor must also

approve them.[3] Consequently, during the First Monitoring Period, the Monitor prioritized the creation and refinement of policies, procedures, and systems, as they are the foundation upon which new practices will be built in order to bring the reforms to life. The Monitoring Team takes the same incremental approach to the task of monitoring because it will ensure appropriate synergy and necessary collaboration with the Department on the development and implementation of reforms.

In this first four-month reporting period, the Monitoring Team focused on four substantive areas in order to develop the necessary framework and foundation for reform: 1) developing and implementing a revised Use of Force Policy (Consent Judgment § IV); 2) creating and developing the eight enumerated training programs required by the Consent Judgment (Consent Judgment § XII); 3) developing and refining the procedures for investigating use of force incidents (Consent Judgment § VII); and 4) implementing reforms related to Inmates Under the Age of 19 (Consent Judgment §§ XV and XVI). Additionally, by interviewing Department leadership and facility staff, inmates, and external stakeholders, observing practices and reviewing hundreds of documents, the Monitoring Team developed a broad understanding of the Department's current culture, practices, and procedures, and established collaborative relationships with the wide variety of stakeholders to the *Nunez* reforms.

### *Summary of Work Completed in the First Monitoring Period*

Before the Consent Judgment was entered by the Court, by consent of the parties, the Monitor and Deputy Monitor began working with the Department during the summer of 2015. In August 2015, the Department asked the Monitor and Deputy Monitor to collaborate on the development of the revised use of force policy ("New Use of Force Directive"). That month, the Monitor and Deputy Monitor also

---

[3] The following sections in the Consent Judgment require Monitor approval: Consent Judgment § IV, ¶ 1 (Use of Force Policy), Consent Judgment § VII, ¶ 12 (quality controls procedures for investigations), Consent Judgment § X, ¶ 1 (Early Warning System), Consent Judgment § XIII, ¶ 1 (Training on the Use of Force Policy, Crisis Intervention and Conflict Resolution, and Probe Team), Consent Judgment § XVI, ¶ 3 (Positive Incentive policies and procedures for Inmates Under the Age of 18), Consent Judgment § XVI, ¶ 6 (Alternative Disciplinary Measures for Infractions for 18-year-old Inmates).

attended a full day of meetings hosted by the Department at its Bulova Headquarters. The Monitor and Deputy Monitor met with Department leadership and Staff who presented a summary of the Department's reform efforts to date and implementation plans relating to the reforms outlined in the Consent Judgment.

During the First Monitoring Period, the Monitoring Team has been present at various Department locations for in-person meetings and site visits on at least 25 days, including visits to 10 facilities (including the Training Academy), some of which were visited multiple times. The Monitoring Team met with Commissioner Joseph Ponte and more than 50 Department staff members, including corrections officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners. The Monitoring Team also communicated regularly, by phone and in-person, with plaintiffs' counsel, SDNY representatives, and counsel for the City (collectively, "Parties to the *Nunez* Litigation"); Directors and staff of the Board of Correction; union representatives for uniformed and non-uniformed DOC Staff; the Inspector General and Deputy Inspector General of the Department of Investigations; the Director of the Mayor's Office of Criminal Justice and members of her staff; and representatives from New York City Health + Hospitals (the Department's healthcare provider). The Monitoring Team also hosted two meetings with the Parties to the *Nunez* Litigation to provide an opportunity to exchange information regarding the implementation of reforms.

In this First Monitoring Period, the Department made significant strides towards developing and implementing the foundational steps necessary to establish enduring reform. History has proven that the road to sustainable reform is seldom swift or painless; it must be traversed in an incremental, well-reasoned, and methodical manner. Given the ambitious implementation schedule set forth in the Consent Judgment and the comprehensive scope of the reforms needed, the Monitoring Team believes that the Department accomplished as much as could reasonably be expected in the first four months of

implementation of the Consent Judgment. Having said this, these efforts are foundational and a great deal of work remains to be done. The Department has committed to meet the challenges necessary to reform the overall management of the New York City jails. The Monitoring Team will continue to work with the Department to ensure that it does, in fact, make sustained forward progress towards that goal.

Outlined below is a summary of some of the notable work completed during the First Monitoring Period:

- **Use of Force Policy**: The Department and the Monitoring Team worked collaboratively to develop and finalize the New Use of Force Directive. The new policy is consistent with both the requirements in the Consent Judgment and with sound correctional practices and legal standards. The New Use of Force Directive is a common-sense policy that should enable Staff to clearly understand when and how force may be used. The policy also sets forth explicit provisions regarding the use of certain categories of force and provides uniformed Staff with clear direction on when and how the use of such force is appropriate. Under the new policy, Staff continue to be empowered to take appropriate steps to protect themselves, their co-workers, and the inmates in their care.

- **Training**: The Department developed and/or revised eight separate training curricula, encompassing over 175 hours of instruction, supported by more than 600 pages of participant manuals, PowerPoint presentations, instructor lesson plans, and participant competency assessments. These training programs include topics in the most significant areas of managerial, practical, and physical skills for Staff in the following areas: Use of Force Policy Training; Crisis Intervention and Conflict Resolution Training; Probe Team Training; Defensive Tactics Training; Cell Extraction Training; Investigator Training; Young Inmate Management Training; and Direct Supervision Training.

- **<u>Use of Force Investigations</u>**: The Department developed and launched an entirely new part of the investigative process called "Preliminary Reviews," which require trained investigators to conduct an initial analysis of each use of force incident in a facility within days of the incident occurring – a procedure very different from the historical, often-delayed investigative process. The Department also began to develop new policies and procedures for conducting investigations generally.

- **<u>Inmates Under the Age of 19</u>**: The Department focused its initial efforts on creating alternative responses to inmate violence, in order to reduce its historical reliance on punitive segregation. While the response continuum is still under development, once complete, special programming units, new forms of accountability, and a multi-faceted incentive system will combine to encourage adolescents and young adults to refrain from aggressive behavior.

- **<u>Recruitment and Selection of Staff</u>**: In the last year, the Department significantly expanded its recruitment efforts in order to increase the number of well-qualified applicants to its workforce. As part of this endeavor, the Department revitalized its methods for recruiting Staff and strengthened its selection criteria to ensure that well-qualified applicants are ultimately hired.

*Use of Force in the First Monitoring Period*

Using physical force by Staff in a correctional setting is at times necessary to maintain order, keep Staff and inmates safe, and to enforce the law. Accordingly, the mere fact that physical force is used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. For example, if two inmates are fighting, Staff must intervene, often physically, to prevent either inmate from sustaining a serious injury. That said, the use of force should not be excessive (i.e., out of proportion to the level of the threat) or unnecessary (i.e., in response to behavior that does not actually

8

pose an imminent threat to safety or security). During the First Monitoring Period, the Monitoring Team analyzed use of force data to obtain a baseline of the rate of force, differences in its use across facilities, and the distribution of incidents across the various severity levels. For all analyses, the Monitoring Team reviewed data for the entire inmate population and also examined differences across age (i.e., adults, 18-year-olds and 16/17-year-olds).

The table below presents data on the use of force during the First Monitoring Period.[4] Rather than presenting the raw number of uses of force by Staff, a *rate per 100 inmates* was calculated to neutralize the impact of differences in the size of the inmate populations across the various age groups. The rate was calculated by dividing the number of uses of force ("n") into the average daily population ("ADP") for each month, and then multiplying the result by 100. The purpose of this analysis was to establish a baseline from which to measure the positive return on the various reforms implemented under the Consent Judgment. Trends will be examined as data from subsequent months are added to the analysis in future monitoring periods.

---

[4] These data include actual, reported uses of force and do not include alleged uses of force that have not yet been confirmed.

| | | | | | |
|---|---|---|---|---|---|
| **Uses of Force by Inmate Population**<br>November 1, 2015 to February 29, 2016 | | | | | |
| **Population** | **November 2015**<br>**n/ADP**<br>*Rate per 100* | **December 2015**<br>**n/ADP**<br>*Rate per 100* | **January 2016**<br>**n/ADP**<br>*Rate per 100* | **February 2016**<br>**n/ADP**<br>*Rate per 100* | **Average Monthly Rate**<br>*Rate per 100* |
| **All Inmates** | 373/10,009<br>*3.73* | 442/9,771<br>*4.52* | 394/9,811<br>*4.02* | 351/10,005<br>*3.51* | *3.95* |
| **Adults** | 271/9,621<br>*2.82* | 339/9,372<br>*3.62* | 298/9,404<br>*3.17* | 281/9,602<br>*2.93* | *3.16* |
| **18-year-olds** | 49/196<br>*25.00* | 40/200<br>*20.00* | 38/200<br>*19.00* | 27/215<br>*12.56* | *19.14* |
| **16/17 year-olds** | 53/192<br>*27.60* | 63/199<br>*31.66* | 57/207<br>*27.54* | 43/188<br>*22.87* | *27.42* |
| *Note: The Monitor receives data from the Department about 18-year-olds only, and not grouped in the category of young adults (18- to 21- year-olds), because this is how it is specified in the Consent Judgment. Accordingly, "adults" for the Monitoring Team's analysis, includes inmates aged 19 or older. The Department's other public reporting obligations track statistics by age a little differently from the statistics provided to the Monitor. The Department otherwise publicly reports data for all young adults together (18- to 21-year-olds) and "adults" are individuals that are 22 years old and older (instead of 19 years-old and older as the Monitoring Team classify them for this report).*<br>*Please also note: These data exclude one incident that involved both 16/17- and 18- year-old inmates from this analysis.* | | | | | |
| *Source: DOC* | | | | | |

Comparing the averages for the First Monitoring Period for the different age groups reveals that the average rate for 18-year-olds (19.14) is 6.1 times higher than the average rate for adults (inmates that are 19 years old and older) (3.16) and the average rate for adolescents (27.42) is 8.7 times higher than the average rate for adults. These same data are presented in the line graph below, which illustrates that the use of force rate for 16/17- and 18-year-olds is significantly higher than the rate for adult inmates. The Monitoring Team plans to conduct further analysis of use of force data, including disaggregating by age within each age category.

10



Source: DOC

The reasons for the significantly higher rates among younger inmates could be myriad: they could reflect differences in the behavior of younger inmates as compared to adults (e.g., younger inmates may be more likely to behave aggressively toward other inmates and Staff) or could reflect differences in the way in which Staff intervene in and de-escalate conflict (e.g., Staff in facilities housing younger inmates may be more likely to use force in situations where Staff in adult facilities may be able to quell tensions without the use of physical intervention). These hypotheses and others will be explored in subsequent monitoring periods.

Using the limited data the Monitoring Team already possessed, the team endeavored to understand more about this trend, trying to discern the factors underlying the use of force. The table below shows the portion of uses of force that the Department reported were attributed to inmate fights. The proportion was determined by dividing the number attributed to inmate fights into the total number

of uses of force. For example, for adults in November 2015, of the 271 uses of force, 58 (21.4%) were

attributed to inmate fights (58/271 = .214 x 100% = 21.4%).

| | **Use of Force Attributed to Inmate Fights** **November 1, 2015 to February 29, 2016** | | | | |
|---|---|---|---|---|---|
| **Population** | **November 2015** **n/Total UOF** **%** | **December 2015** **n/Total UOF** **%** | **January 2016** **n/Total UOF** **%** | **February 2016** **n/Total UOF** **%** | **Average Monthly %** |
| **Adults** | 58/271 21.4% | 71/339 20.9% | 73/298 24.4% | 80/281 28.5% | 282/1189 23.7% |
| **18-year-olds** | 22/49 44.9% | 19/40 47.5% | 25/38 65.8% | 19/27 70.3% | 85/154 55.2% |
| **16/17-year-olds** | 18/53 34.0% | 24/63 38.0% | 26/57 45.6% | 25/43 58.1% | 93/216 43.1% |
| *Source: DOC* | | | | | |

The bar chart below shows these same data in a different way. Both the table and bar chart

clearly illustrate that inmate violence is a more significant contributor to the use of force for adolescents

than it is for adults. Fully half of the uses of force for adolescents and 18-year-olds can be attributed to

inmate violence, while only about one-quarter of the uses of force with adult inmates occur for that

reason.



Source: DOC

    While these data only explain part of the significant difference in the rate of use of force among

adults and younger inmates, they highlight, with great clarity, the impact that effective strategies to

reduce inmate-on-inmate violence could have on reducing the overall use of force rate with Young

Inmates. Because so much of the use of force with Young Inmates is triggered by inmate violence,

reductions in inmate violence will bring with it corresponding reductions in the rate of force with this

population. These data highlight the importance of the reforms required in Consent Judgment § XV

(Safety and Supervision of Inmates Under Age 19) and Consent Judgment § XVI (Inmate Discipline). If

Young Inmates are driving the use of force rate, and inmate violence is driving the use of force rate

among Young Inmates, reducing violence among Young Inmates is key and also is the anticipated

outcome of the reforms required by the Consent Judgment.

    Use of force rates were also examined by facility to identify differences that exist across the

various jails managed by the Department. These data are presented in the bar graph below. Not

surprisingly, facilities that house the greatest concentrations of 16/17- and 18-year-old inmates (i.e., at

the Robert N. Davoren Center ("RNDC") and the George Motchan Detention Center ("GMDC"),

respectively) have the highest use of force rates. Among the facilities housing adults, the George R.

Vierno Center ("GRVC") has a significantly higher use of force. However, it is important to recognize

that the inmate composition in each facility is different and that the use of force rate within a facility

may be a reflection of the propensity for aggressive behavior among the inmate population housed in

each jail, or a reflection of other factors such as differences in programming, Staff, leadership, etc.

among the facilities. Additionally, the rate for the West Facility ("WF") should be interpreted with

caution due to the very low average daily population (ADP is approximately 30 inmates per month);

with such a small denominator, even few uses of force will result in a high rate.



Note: This chart does not include data from the prison hospitals because they are excluded from
this Consent Judgment. This chart also does not include the court facilities. It is not possible to
calculate a rate for those facilities because they do not have an average daily population.
Further, data for the West Facility (WF) should be interpreted with caution, given its small
population (the average adult population is 30 inmates per month).
Source: DOC

Use of force incidents are assigned a severity classification based solely on the injuries sustained by either Staff or inmates. "Class A" incidents are those resulting in the most severe injuries, that require medical attention beyond the prescription of over-the-counter analgesics or the administration of minor First Aid. Examples include incidents resulting in multiple abrasions, contusions, cracked, chipped or lost teeth, lacerations, punctures, fractures, loss of consciousness, or internal injuries. "Class B" incidents are those that result in minor injuries that require only the administration of First Aid or over-the-counter analgesics. Examples include superficial bruising, scrapes, scratches, or minor swelling. Class B incidents can also include minor injuries sustained from the forcible use of mechanical restraints. "Class C" incidents are those in which no injuries were sustained by Staff or inmates. Incidents in which chemical agents were used, but resulted in no injury other than irritation of the eyes, nose, or throat, are also categorized as Class C. As shown in the chart below, of the 1,560 uses of force that occurred during the First Monitoring Period, the majority (63%) did not result in any injury. Serious injuries occurred in the 2% (n=31) that were classified as "A" and lesser injuries occurred in the 35% (n=546) that were classified as "B." The distribution across severity levels was similar for adults, 18-year-olds and 16/17-year-olds.



Source: DOC

Injuries as a result of a use of force are concerning. An overarching goal of the Department and the Monitoring Team is to reduce the number of Staff and inmate injuries from use of force incidents. That said, the mere fact that an injury was reported as part of the use of force incident does not necessarily mean that the use of force was inherently excessive or that the injuries were a result of the Staff's use of force (e.g. an inmate-on-inmate fight that results in a use of force could be the cause of the inmate's underlying injuries). The chart below presents the rate of injuries for all Staff and inmates involved in use of force incidents over the First Monitoring Period. Rather than presenting the raw number of injuries, a *rate per 100 Staff or inmates* was calculated. The rate was calculated by dividing the number of Staff or inmates injured ("n") into the average daily population ("ADP") for each month, and then multiplying the result by 100. The purpose of this analysis was to establish a baseline from which to measure the positive impact of the various reforms implemented under the Consent Judgment.

Trends will be examined as data from subsequent months are added to the analysis in future monitoring periods.



*Source: DOC*



*Source: DOC*

The purpose of this initial review of use of force data is threefold. First, it illustrates the type of data analysis that the Monitoring Team will use to identify the impact of the various reforms as they are implemented across the life of the Consent Judgment. Second, it offers a model for how the Department can internally monitor the use of force and to identify trends and patterns, so that targeted interventions can be applied in the facilities and populations where problems are concentrated. This internal capacity to identify and solve problems is what will eventually make external oversight by the Monitor unnecessary. Finally, the use of force data anchors the report in the context of the conditions that created the need for external oversight, showing the levels of force currently being applied and the severity of resulting injuries. The Monitoring Team believes that reductions in the rate of force and frequency and severity of injuries are necessary and has confidence that the conscientious application of the variety of policies and practices required by the Consent Judgment will result in facilities that are safer for both Staff and inmates.

### *Overview of the Monitor's Report*

The following sections of this report summarize the Department's efforts to achieve substantial compliance with the provisions in each substantive section of the Consent Judgment. In each section, the Monitoring Team analyzed the steps taken by the Department and provided an assessment of the current level of compliance for provisions related to the Monitoring Team's priority areas of focus, discussed in the previous section of this report. The Monitoring Team also assessed compliance with additional provisions as described below. The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[5] (b) Partial Compliance,[6] and (c) Non-

---

[5] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

[6] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

compliance.[7] However, the Monitoring Team did not assess compliance for any provision with a deadline for completion that falls after February 29, 2016, though a summary is provided of the Department's progress to date. The Monitoring Team does not evaluate every provision in the Consent Judgment for assessment of compliance in this report. The fact that the Monitoring Team does not evaluate the Department's efforts towards achieving Substantial Compliance with a specific provision herein simply means that the Monitoring Team was not able to assess compliance with those aspects of reform during this reporting period—it should not be interpreted as a commentary on the Department's level of progress. Each of the Monitor's subsequent reports will build upon the last and will include assessing compliance for additional provisions over time. As described above, the Monitoring Team's strategy for assessing compliance is consistent with the overall approach that it is critical to consider, address, and evaluate the provisions in a sequential and logical manner in order to achieve lasting reform.

The Monitor's Report addresses all 15 substantive sections of the Consent Judgment in the order that reflects the priorities of the First Monitoring Period. For each substantive section, the report includes a summary of the requirements and the practices these requirements are intended to address. The introduction to each section also includes a summary of the overall efforts the Department made to achieve compliance with the provisions in the Consent Judgment and the Monitoring Team's involvement in that effort. The final portion of each section identifies the Monitoring Team's compliance assessment which includes a summary of the specific steps the Department has taken to achieve compliance, the Monitoring Team's analysis of those efforts, and recommendations for the Department's next steps, if applicable, followed by the Monitoring Team's compliance rating. If the

---

[7] "Non-compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions are embedded in the assessment of compliance for ease of reference.

### Monitor Recommendation Regarding Training Academy

In this First Monitoring Period, the Monitoring Team identified a fundamental challenge to the Department's efforts to advance reforms that the Monitor believes merits the Court's and City's attention. The Monitoring Team found the Department's Training Academy space and condition to be severely lacking, and are concerned that this deficiency may inhibit the Department's ability to reliably and consistently train its Staff. The Department has developed creative interim strategies to increase available space so that the training programs required under *Nunez* can be provided;[8] however, a long-term sustainable solution is needed.

While the issue in question is not specifically addressed in the Consent Judgment, given that adequate training is fundamental to transforming Staffs' and supervisors' practices regarding the use of force and enhancing Staffs' ability to conduct their duties safely and responsibly, the Monitoring Team outlines the concerns regarding this matter in the Training section of this report.

## Section-by-Section Analysis of Compliance

### 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting and is critical to the reduction of violence in confinement settings. A corrections system must have a clear and

---

[8] Current Staff will receive the In-Service classroom based training required under *Nunez* in trailers based on Rikers Island. Physical skills training will be provided in designated sprung structures on Rikers Island that are retrofitted with mats and padding.

comprehensive use of force policy so that Staff know what is expected of them when confronted by a threat to safety or security. Accordingly, the Consent Judgment requires the Department to develop, adopt and implement a New Use of Force Directive subject to the approval of the Monitor (¶ 1). The New Use of Force Directive is expected to be clear and easily understood by Staff (¶ 2). Although the Department had an existing use of force directive, the required new policy must be more robust, must explicitly prohibit certain categories of force, and must provide correction officers with more specific guidance on when and how to use force (¶ 3). As part of the effort to adopt the New Use of Force Directive, the Department, in consultation with the Monitor, must also advise Staff of the content of the New Use of Force Directive and any significant changes (¶ 4).

The development of the New Use of Force Directive is the first of many incremental steps necessary to change the culture within the Department. The New Use of Force Directive delineates Staff's responsibilities and the standard to which they will be held and the corresponding New Disciplinary Guidelines (required under Consent Judgment § VIII (Staff Discipline and Accountability), ¶ 2) provide the necessary accountability for those who fail to meet that standard.

During this First Monitoring Period, the Monitoring Team worked closely with the Department to develop both the New Use of Force Directive and an appropriate approach to implementing the new policy. As described in more detail below, properly implementing the New Use of Force Directive requires the Department to provide Staff appropriate instruction and practice on the substantive content and physical components so they can fully digest the new concepts of the revised policy before they are held accountable under the New Use of Force Directive. This will necessarily take time given that all Staff and Supervisors must be trained. As the New Use of Force Directive is implemented, the Monitoring Team will continue to identify and analyze patterns and practices surrounding use of force incidents, using the current Use of Force Policy as a guide, and to measure changes in the level of

systemic problems that have been present in DOC facilities for many years.

The New Use of Force Directive is not based on new law, nor does it abandon core principles from its predecessor. Rather, the New Use of Force Directive retains core principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps officers and their supervisors should take in response to threats to safety and security. In mid-August 2015, more than two months prior to the Effective Date of the Consent Judgment, the Department began consulting with the Monitor and Deputy Monitor on a proposed draft of the New Use of Force Directive prepared by the Department. In mid-October 2015, again prior to the Effective Date, a final version of the New Use of Force Directive, Directive #5006R-D, was approved by the Monitor.

The implementation of the New Use of Force Directive is the most critical component of the Consent Judgment's provisions regarding the use of force. The Monitoring Team believes there is a risk of increased violence within the jails if the implementation of the New Use of Force Directive is not managed appropriately. Accordingly, the Department and the Monitoring Team began to consider the implementation plan for the New Use of Force Directive (and corresponding New Disciplinary Guidelines) during the policy's development and after it was finalized. The Department originally planned for the New Use of Force Directive to be effective in November 2015. In late October 2015, in anticipation of that event, the Department began communicating with uniformed leadership and executive staff regarding the New Use of Force Directive.

Given the importance of these implementation issues, in November 2015, the Monitor and Deputy Monitor met with the Commissioner, his executive team (both civilian and uniformed), as well as Staff representatives, to consider the most reasonable and responsible approach to implement the new policies.[9] Based on the Monitoring Team's collective experience and these discussions, the Monitoring

---

[9] During this time, two events occurred that the Monitoring Team believed also merited consideration with respect to the implementation plan for the New Use of Force Directive. On November 5, 2015, one of the Department's officers was

Team concluded that additional deliberation, beyond November 2015, was necessary to determine the appropriate corresponding effective dates for these policies.

As a result, at the Monitor's suggestion, the Department informed Staff that the New Use of Force Directive would not become effective in November 2015, as previously reported, but would take effect at a later date, in February 2016. The New Disciplinary Guidelines would then take effect 30 days later. This extension would allow the Department to finalize the required Training Programs (as required by Consent Judgment § XIII) before the policy became effective.[10] As development of the training programs progressed, it became evident to both the Department and the Monitoring Team that a comprehensive delivery of the Use of Force Policy and Defensive Tactics training curricula prior to the effective date of the New Use of Force Directive was essential to best support Staff's understanding and successful implementation of the New Use of Force Directive. Consequently, the Department, in consultation with the Monitoring Team, advised Staff that the New Use of Force Directive (and corresponding New Disciplinary Guidelines) would not become effective in February 2016, but would become effective at a later, yet-to-be-determined date, for the purpose of enabling the Department to maximize the delivery of comprehensive Staff training prior to the New Use of Force Directive's effective date.

In order to finalize the implementation plan, the Monitoring Team continued to give careful consideration to the most appropriate strategy for executing the New Use of Force Directive and the corresponding New Disciplinary Guidelines. The Monitoring Team considered the current state of

---

seriously injured during an inmate assault with weapons and was slashed on the face multiple times. On that same day, the Court directed the Monitor's attention to concerns regarding the Department's planned execution of the New Use of Force Directive before providing training to Staff on the revised policy raised to the Court by the president of the Corrections Officers' Benevolent Association. (*See* Docket Entries 250 and 251.) The Department also reported to the Monitoring Team that uniformed Staff had voiced similar concerns during development of the New Use of Force Directive.

[10] This date was selected because at the time the decision was made, the Consent Judgment required the Department to finalize the training related to the Use of Force Policy by January 1, 2016 (60 days after the Effective Date and 30 days after the development of the Use of Force Policy). However, the time to complete the development of all trainings was extended to February 29, 2016 by Order of the Court on January 6, 2016.

affairs at the DOC, including Staff's existing practices and level of knowledge and competency surrounding the appropriate use of force, as well as the internal and public challenges to the Department's effort to implement the reforms required by the Consent Judgment. The Monitoring Team also discussed the strategy for implementation with a variety of stakeholders including the Commissioner, DOC Executives, Chiefs, Wardens, supervisors, DOC Staff, members of the Training Academy, Plaintiffs' Counsel (LAS, ECBA, and the U.S. Attorney's Office, including the United States Attorney), lawyers for the City of New York (including the Corporation Counsel), and members of the Mayor's staff.

It is within that context that the Monitoring Team concluded that the best and most efficient implementation strategy involves providing Staff the opportunity to master the policy's requirements and to acquire the physical skills necessary to comply with the policy before the New Use of Force Directive and the New Disciplinary Guidelines take effect. This means that most (if not all) Staff should receive training on the New Use of Force Policy and Defensive Tactics *before* the New Use of Force Directive and New Disciplinary Guidelines go into effect and Staff are held accountable under both policies. The Monitoring Team worked with the Department on the development of the new one-day training for the Use of Force Policy and the new three-day Defensive Tactics training (as described in more detail in the Training Section of this report). The Department's new Defensive Tactics curriculum is vastly improved and takes a markedly different approach from what the Department used to provide their Staff (including an increased emphasis on the use of de-escalation techniques). This training provides Staff with critical skills necessary to change their own, and inmates', behavior. The skills are not easy to master without appropriate training. Staff need an opportunity to practice the new physical skills on the mats so they can execute the techniques safely, without injuring themselves or the inmates. This training program is also much stronger than its predecessor and is more substantive than the 4-hour

annual refresher training that is the only Defensive Tactics training that the Department is required to provide to Staff under the Consent Judgment (§ XIII, ¶ 2(a)). Although not required by the Consent Judgment, the Department chose on its own initiative to provide the three-day Defensive Tactics Training course to all Staff. The Monitoring Team applauds the Department's commitment to provide this training program to all Staff.

The Department estimates that completion of the four-day training for Staff can be accomplished in 15 months.[11] Instructors will be trained and prepared to commence In-Service training on these programs on June 27, 2016. This date was selected to coincide with the graduation of the latest class of new recruits who are needed to serve as the relief cadre in DOC facilities so that current Staff can attend and participate in the training.[12] Training will then be provided to all Staff with the expectation that all Staff will receive the training package by September 27, 2017. Accordingly, the New Use of Force Directive will go into effect on September 27, 2017, and the corresponding New Disciplinary Guidelines will become effective on October 27, 2017. The Department is committed to providing this training over the 15-month period to all Staff. Nonetheless, a date certain for the effective date has been selected in order to ensure that the reforms progress at a reasonable pace.

This implementation approach is appropriate given the focus on changing practice and enhancing skills among Staff. DOC Staff need time to consider, practice, and learn the necessary physical skills in order to put them to use during their normal course of duty. Sequencing the training and policy rollout in this manner will also give Staff the necessary information and skills to understand why this approach to managing the use of force is better, safer, and ultimately in their best interest.

---

[11] The Monitoring Team will work closely with the Department during this period to ensure that training is delivered to all Staff timely and efficiently, and that it is accurately tracked and managed.
[12] The current new recruit class of approximately 600 officers will receive this training before their graduation in May 2016.

Synchronizing training on the New Use of Force Directive and Defensive Tactics is also optimal from a pedagogical perspective as the training curriculum of each topic is enhanced when provided close in time to the other. Staff would otherwise be left to implement the New Use of Force Directive without the tactical means to minimize harm to both themselves and inmates. The Monitoring Team believes this approach will also increase Staff's confidence in the reforms and increase the likelihood of Staff compliance with the New Use of Force Directive because the policy and training are provided in a fair and reasonable manner.

Implementing a policy change of this magnitude, especially in an agency of this size, necessitates a period of transition. Although the new policy will not become effective until September 2017, significant progress in advancing the required reforms must still be made during this time. Department Leadership and Facility Supervisors[13] can emphasize and reinforce the skills learned in training through their formal and informal communications with Staff. The current Use of Force Policy and Disciplinary Guidelines address many of the key components of reform and through consistent and robust enforcement the Department can advance the necessary culture change. The Department must also continue moving forward with its efforts to enhance its current investigation procedures to ensure that timely and thorough investigations are conducted in order to support the Department's overall efforts to impose appropriate and meaningful discipline for use of force violations under the current Disciplinary Guidelines.

The Monitoring Team's assessment of compliance is outlined below.

---

[13] The in-service Use of Force Policy training program for Supervisors will provide additional information and guidance on their roles and responsibilities.

## IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and finalized a New Use of Force Directive.

- The Department also developed a new Restraint policy.

### ANALYSIS OF COMPLIANCE

The Department began its development of the New Use of Force Directive months before the Effective Date of the Consent Judgment, which gave the Department and the Monitoring Team the opportunity to collaborate closely on its construction. The Department shared numerous drafts of the policy for review and feedback and was very receptive to incorporating the Monitoring Team's comments and suggestions, particularly those regarding ways to operationalize the new policy and develop procedures that comply with the requirements of the Consent Judgment. The new directive reflects the substance of that collaborative effort. The final version of the New Use of Force Directive, as approved by the Monitor, was completed in October 2015. The specific content in the New Use of Force Directive is discussed in subsequent provisions.

As noted above (and below), adopting and implementing the New Use of Force Directive will take time. The Department has already taken steps to adopt and implement the New Use of Force Directive. For instance, the Department informed Staff about the New Use of Force Directive and all Staff were provided copies of the New Use of Force Directive. The Department also developed key training programs and will begin deployment of those training programs in the "Second Monitoring Period" (March 1, 2016 to July 31, 2016). The adoption and implementation of the New Use of Force Directive also requires ongoing reinforcement of key concepts related to the use of force to ensure Staff conduct is consistent with the requirements in the Consent Judgment.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance<br>¶ 1. **(Adopt)** Partial Compliance<br>¶ 1. **(Implement)** Partial Compliance<br>¶ 1. **(Monitor Approval)** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment).

27

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department developed and finalized a New Use of Force Directive.

- The Department also developed a new and separate policy on the use of restraints.

**ANALYSIS OF COMPLIANCE**

The Consent Judgment provides specific guidance on the content of the New Use of Force Directive. Consent Judgment § IV (Use of Force Policy) includes over 20 specific provisions that must be incorporated in the new policy (¶ 3(a) to (t)). The Monitoring Team's content analysis confirmed that the New Use of Force Directive includes all of the required components. The Monitoring Team also verified that the new policy is generally consistent with the Consent Judgment. More specifically, the New Use of Force Directive addresses the requirements in Consent Judgment § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, Consent Judgment § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and Consent Judgment § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

While all of the requirements in ¶ 3 are appropriately addressed in the New Use of Force Directive, the Monitoring Team advised the Department that additional policy guidance was needed for the application of restraints (¶ 3(p)). The Monitor approved the Department's plan to encapsulate this guidance in a separate policy focused only on the use of restraints. Accordingly, the Department developed a separate policy regarding the use of restraints. The timing of the development of this policy coincided with new state law requirements regarding the use of restraints on pregnant women, which were incorporated in the new policy. The Monitoring Team and the Department collaborated to ensure the revised policy satisfies the Consent Judgment's requirements, appropriately addresses state law requirements, and provides Staff with clear and adequate guidance on the use of restraints. This policy will be finalized in the Second Monitoring Period.

Overall, the New Use of Force Directive is clearly written and organized and capable of being readily understood by Staff. It is consistent with the requirements in the Consent Judgment and best practices. The Monitoring Team concludes that this policy will provide Staff the necessary guidance and parameters to carry out their duties safely and responsibly.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-o).** Substantial Compliance<br>**¶ 3(p).** Partial Compliance<br>**¶ 3(q-t).** Substantial Compliance |

**IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)**

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In consultation with the Monitoring Team, the Department issued a teletype on November 23, 2015, advising Staff of the content of the New Use of Force Directive and any significant changes to the existing policy reflected in the new directive.

- The Department provided Staff with a copy of the New Use of Force Directive.

- The Department met with Staff in a variety of in-person meetings to advise them of the content of the New Use of Force Directive.

- The Department updated Staff on the implementation of the New Use of Force Directive on February 16, 2016.

- The Department developed training programs on the New Use of Force Directive for recruits and veteran Staff.

- The Department advised Staff about the new policy in written communications to Staff, town-hall style meetings with Staff, announcements at roll-call meetings, an editorial by the Commissioner in the *New York Daily News*[14], and signs and posters in DOC facilities.

- The Department developed a pamphlet incorporating a summary of the requirements in the Consent Judgment that advised Staff about the reforms that the Department would be implementing, including the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department, in consultation with the Monitoring Team, advised Staff in the fall of 2015 about the *Nunez* Consent Judgment, the New Use of Force Directive and significant changes to the New Directive as noted above. In order to successfully implement the new policy, the Department must continue to frequently and clearly communicate with Staff about the New Directive in order to address any questions or concerns, dispel any misunderstandings, and reinforce best practices.

| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |

## 2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

The Use of Force Reporting and Tracking section of the Consent Judgment addresses the

reporting and tracking of information related to use of force incidents. This section covers four specific

---

[14] Ponte, Joseph. "No going back on Rikers reforms: The jails will only get safer only if we stay the course," *NY Daily News*, 15 Nov. 2015, <http://www.nydailynews.com/opinion/joseph-ponte-no-back-rikers-reforms-article-1.2433109>

areas, "Staff Member Use of Force Reporting," "Non-DOC Staff Use of Force Reporting,"[15] "Tracking," and "Prompt Medical Attention Following Use of Force Incident." The purpose of these requirements and procedures is to ensure comprehensive and accurate reporting and reliable record-keeping with the ability to generate aggregate data to inform the identification of systemic problems regarding the use of force. Sound reporting and data analysis will support the Department's overall goals of reducing the use of force and achieving sustainable compliance with the reforms required by the Consent Judgment.[16] In this First Monitoring Period, the Monitoring Team consulted with the Department to develop policies, procedures, and systems related to the reporting and tracking requirements in this section.

This section imposes specific requirements and obligations on Staff for reporting a use of force (¶¶ 1-6, 8)[17] and on the Department for developing and implementing written policies and procedures for reporting a use of force (¶ 9). This section also requires the provision of prompt medical attention following a use of force incident (¶¶ 22 and 23) and requires tracking the delivery of such medical attention. The specific reporting requirements in ¶¶ 1-6, 8 and ¶¶ 22 and 23 are addressed in the New Use of Force Directive, which is discussed in the preceding section of this report.

This section also addresses the circumstances and obligations for Non-DOC Staff, including Medical Staff, to report use of force incidents (¶¶ 10-13). The Monitoring Team met with representatives of non-uniform, Non-DOC Staff to discuss the development of procedures regarding these provisions. The Monitoring Team did not evaluate the Non-DOC Staff reporting requirements (¶ 10) during this reporting period. The Monitoring Team also did not evaluate the reporting provisions

---

[15] Non-DOC Staff are defined in the Consent Judgment as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates."

[16] The data tracking systems have the added benefit of assisting the Monitoring Team's in assessing the Department's compliance with its obligations in the Consent Judgment.

[17] The requirement in ¶ 7 is best addressed in policies related to the investigations of Use of Force incidents.

related to Medical Staff (¶¶ 11-13) because the management of correctional health services was transferred during the First Monitoring Period.[18] The Monitoring Team met with representatives of New York City Health + Hospitals, the new provider of correctional health services, on a number of occasions to better understand their role and responsibilities.

During this First Reporting Period, the Monitoring Team focused on ensuring that appropriate reporting requirements were incorporated in the New Use of Force Directive and gaining a better understanding of the reporting structure for various stakeholders. Thus, the Monitoring Team did not assess compliance with the reporting practices (¶¶ 1-6, 8, 9, 10-13, 22-23) in this report.

The tracking requirements (¶¶ 14-21) in this section focus on documenting accurate, reliable and consistent information for use of force incidents generally, facility and Investigation Division ("ID") investigations, disciplinary action sought by the Department's Trials & Litigation Division, and inmate-on-inmate fights or assaults. Tracking Facility and ID investigations and disciplinary action sought by the Department's Trials & Litigation Division will ultimately be incorporated in the Department's Case Management System ("CMS") once it has been developed (¶ 18). These tracking systems are expected to generate aggregate reports to assist the Department with enhancing the quality of inmate supervision and Staff management, and identifying any systemic patterns associated with use of force incidents or inmate-on-inmate fights or assaults (¶ 20). In this First Monitoring Period, the Monitoring Team focused on the development of the incident and investigation tracking systems (¶¶ 14-16) and only assessed compliance for those tracking provisions. In the next reporting period, the Monitoring Team expects it will evaluate the Department's process for tracking disciplinary actions sought by the Department's Trials & Litigation Division (¶ 17) and inmate-on-inmate fights and assaults (¶ 19).

---

[18] On January 1, 2016, New York City Health + Hospitals took over the management of correctional health services from Corizon, Inc. and Damian Family Care Centers, Inc.

The Department also tracks alleged uses of force. These are claims by any individual that Staff used force against an inmate and the force was not previously reported (either because an incident report was not generated or the report generated did not document any force against the inmate concerned). An alleged use of force does not always mean that force was actually used; that is for the investigator to determine. This is also why data on alleged uses of force were not included in the use of force data analyzed in the Introduction of this report above. However, tracking and investigating alleged uses of force is critical to reducing the frequency with which actual uses of force go unreported, and the policy is that Staff who fail to submit an incident report regarding force they used or witnessed are subject to disciplinary measures.

In the First Reporting Period, there were 157 alleged uses of force. Of these 157 cases, the Department reported that five incidents (3%) were Class A, 43 incidents (27%) were Class B, and 109 incidents (69%) were Class C. The large majority of these alleged uses of force involved adults. 147 (94%) of these incidents were alleged use of force on an adult inmate, five (3%) of these incidents were alleged use of force on an 18-year-old inmate, and five (3%) of these incidents were alleged use of force on 16 or 17-year-old inmate. The Monitoring Team does not understand the disparity across age groups, but will continue to explore this issue. Going forward, the Monitoring Team will review alleged uses of force, particularly those that are substantiated, to assess the extent to which all uses of force are reported and timely investigated.

The Monitoring Team's assessment of compliance is outlined below.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

    a.    Use of Force Incident identification number.

    b.    Classification level of the Use of Force Incident, including any changes made to the classification level (*i.e.*, Class A, Class B, or Class C).

| | |
|---|---|
| c. | Date, time, and location of the Use of Force Incident. |
| d. | Facility that houses each Inmate upon whom force was used or alleged to have been used. |
| e. | Names and identification numbers of all Inmates upon whom force was used or alleged to have been used. |
| f. | Names and identification numbers of all Inmates who were present in the area of the Use of Force Incident. |
| g. | Names and shield numbers of all Staff Members who used, or are alleged to have used, force. |
| h. | Whether the Use of Force Incident was an Anticipated Use of Force. |
| i. | Nature of any injuries sustained by Inmates, Staff Members, or anyone else. |
| j. | A brief description of the type of force (*e.g.*, chemical agent, single punch to body, control holds, punches to face or head, multiple blows, kicks, use of batons or other instruments, etc.) that was used and by whom. |
| k. | Whether force was used while the Inmate was in restraints. |
| l. | Whether video footage captured the Use of Force Incident and a brief description of the camera used (*e.g.*, fixed surveillance, handheld, or body-worn). |
| m. | Whether any Inmate was arrested as a result of the Use of Force Incident, and if so, a description of the new criminal charges. |
| n. | A brief description of the Staff Member's stated reasons for engaging in the Use of Force. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS").

- IRS captures the information required by ¶ 14(a)-(i) and 14 (k)-(n) in individualized fields.

- The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

IRS is a computerized system that the Department utilizes to track information related to use of force incidents. The Monitoring Team assessed the components of IRS and found it has specific, appropriately labeled fields designed to capture the information required by the Consent Judgment. Using specific fields to enter the required data ensures it is tracked reliably, accurately, and consistently. IRS can generate a report for an individual use of force incident and can generate aggregate data reports. The Monitoring Team reviewed a sample of IRS reports and confirmed that the information contained in the incident report was entered reliably and accurately.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

33

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed an "Access Database," an interim computerized system, to track information related to Facility Investigations.

- The Access Database has specific fields to track the information enumerated in ¶ 15(a)-(g).

### ANALYSIS OF COMPLIANCE

The Monitoring Team assessed the components of the Access Database and found that it has clearly and appropriately labeled fields designed to capture the information required by the Consent Judgment. The system also includes specific fields that capture information about inmates and injuries, going beyond the requirements of the provisions of the Consent Judgment. Using specific fields to enter the required data allows the Department to track the information reliably, accurately, and consistently. The Access Database can generate reports for individual use of force incidents referred for investigation and can also generate aggregate data reports. The Monitoring Team reviewed a sample of reports generated from this Access Database and confirmed that the incident-specific information reliably and accurately reflected information contained in the incident reports. The Department intends to track this data in the CMS once it is operational.

| COMPLIANCE RATING | ¶ 15. Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to Full ID Investigations in a computerized tracking system called "ITTS."

- ITTS has specific fields to capture the information required in ¶ 16(a)-(g)

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assessed the components of ITTS and determined it has clearly and appropriately labeled fields designed to capture the information required by the Consent Judgment. Using specific fields to enter the required data allows the Department to track the information reliably, accurately and consistently. ITTS can generate reports for individual use of force incidents referred for a Full ID investigation and can also generate aggregate data reports, which the Monitoring Team has reviewed. The Department intends to track this data in the CMS once the system is operational. Going forward, the Monitoring Team will continue to audit the Department's tracking obligations and confirm a sample of reports generated by ITTS for the reliability and accuracy of the information entered based on the underlying incident report.

| **COMPLIANCE RATING** | ¶ 16. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[19] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department drafted definitions for the various categories of institutional violence, including all security indicators related to violence, focusing on clarity and the ability to collect and report reliable and accurate data.

- As required, the Department consulted with the Monitoring Team about the draft definitions, incorporating the Monitoring Team's comments and suggestions prior to finalizing the definitions.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed the final definitions of the categories of institutional violence and found that they include appropriate categories and clear definitions and are consistent with generally accepted practice. As such, the definitions will support the collection and reporting of reliable and accurate data.

| **COMPLIANCE RATING** | ¶ 21. Substantial Compliance |
|---|---|

---

[19] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

### 3. TRAINING (CONSENT JUDGMENT § XIII)

High-quality training programs are a vital component of the Department's efforts to implement enduring reforms and change the culture of the jail system. The provisions of the Training Section of the Consent Judgment establish requirements for the Department to develop new training programs given to recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training) and to improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (¶ 1(c)), Young Inmate Management (¶ 3), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)). The Department is expected to consult with the Monitoring Team to develop these training programs. Monitor approval is required for the Use of Force Policy, Crisis Intervention and Conflict Resolution, and Probe Team training programs.

The Training Programs are expected to include fully-developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises to be distributed to students. The Consent Judgment also establishes timelines for developing each lesson plan, the duration of each required training, the intended audience for each training, and timelines for providing the training programs. The Department is also expected to develop refresher modules for four of the training programs required under the Consent Judgment in order to reinforce the policies and procedures throughout Staff's tenure with the Department ("Refresher Lesson Plans"). The development of the Refresher Lesson Plans will occur after several cycles of Recruit and In-Service classes have been conducted. This will allow the Refresher Lesson Plans to incorporate feedback from both the initial training and observations of Staff performance to ensure they sufficiently addresses Staff needs. Given that the Refresher Lesson Plans will not be provided until after the Recruit and In-Service training has

been deployed, the requirement to develop and deploy the Refresher Lesson Plans has not come due and will be assessed in future monitoring periods.

The Monitoring Team divided the eight required training programs into three different categories, based on the groups of individuals to receive the training and topics they are intended to address. The first category includes training programs provided to all Staff about the use of force. The second category includes training programs provided to Staff who work regularly in Young Inmate Housing Areas. The third category includes training provided to a subset of Staff with specific duties (e.g., probe team, cell extraction or investigations). The chart below outlines the general requirements in the Consent Judgment for each of the eight training programs, organized into these three categories. In many instances the Department has chosen to provide more training hours than required. Accordingly, the chart identifies both the number of training hours required by the Consent Judgment and the number of training hours actually provided in parenthesis.

| Training Program | Required Attendees | Recruit Training Requirement | Initial In-Service Requirement | Refresher In-Service Requirement |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | 8 hours required (12 hours provided) | 8 hours required & provided | 4 hours required & provided |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | 24 hours required & provided | 24 hours[20] required & provided | 8 hours required & provided |
| **Defensive Tactics (¶ 2(a))** | | 24 hours required & provided | None required (24 hours provided) | 4 hours required & provided |
| **Young Inmate Management (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | n/a | 24 hours required & provided | 4 hours required (8 hours provided) |
| **Direct Supervision (¶4)** | | n/a | 32 hours required & provided | None required (4 hours provided) |
| **Probe Team (¶ 1(c))** | Staff assigned to work regularly at any Intake Post | 2 hours required (8 hours provided) | 2 hours required (8 hours provided) | n/a |
| **Cell Extraction (¶ 2(b))** | Staff regularly assigned to Special Units with cell housing | 4 hours required (8 hours provided) | 4 hours required (8 hours provided) | n/a |
| **Investigator (¶ 2(c))** | ID Investigators | n/a | 40 hours required & provided | n/a |
| | Facility Investigators[21] | n/a | 24 hours required | n/a |

In the First Monitoring Period, the Monitoring Team worked collaboratively with the

Department to develop and finalize the lesson plans for eight of the training programs. The development

and refinement of eight complex training programs, many newly created, in four months was an

---

[20] The duration of the training program can be reduced if the Monitor determines that the subject matters of the training can be adequately and effectively covered in less than 24 hours, but cannot be shortened to fewer than 16 hours.

[21] The Department developed a lesson plan for Facility Investigators. However, the Department and the Monitoring Team have decided to withhold finalizing it while the Department explores the concept of assigning all Facility Investigations to ID. This will ensure that all Staff are utilized and trained appropriately. The Monitoring Team will discuss the options and develop the appropriate approach for training Facility Investigators during the Second Monitoring Period.

ambitious undertaking and the Department worked hard to achieve this goal. The lesson plan developers, often while juggling multiple responsibilities, worked diligently to create each program. The Department demonstrated a strong commitment to training through the Staff time allocated for development of the training programs and through the construction of the programs by providing, in many cases, more hours of training then required by the Consent Judgment.

The Monitoring Team initially focused on the three training programs for all Staff regarding the Use of Force: the Use of Force Policy, Conflict Intervention and Crisis Resolution, and Defensive Tactics. The Monitoring Team reviewed and assisted in the development of the three training programs concurrently because, together, they provide the foundation for managing the use of force, covering when and how to use force and also how to de-escalate and avoid the use of force. Taking this holistic approach helps ensure that each training program appropriately references the others and builds upon the skills from the other training programs in order to maximize the effectiveness of the content of each lesson plan. The Monitoring Team similarly reviewed the Direct Supervision and Young Inmate Management lesson plans as a set, which allowed the Monitoring Team to consider components that would complement the various lesson plans and to suggest integrating relevant materials. Finally, the revised training programs to be provided to a subset of Staff with specific duties were reviewed for specific content, and to ensure that they reinforce the general concepts and approaches to reform contained in the other training programs related to use of force.

The Monitoring Team closely collaborated with the lesson plan developers as they created robust training programs that meet the content and performance requirements of the Consent Judgment and also provide Staff with the tools they need to safely and appropriately carry out their duties. The lesson plan developers for each training program were receptive to the Monitoring Team's suggestions and

feedback. Revised drafts of lesson plans frequently included creative solutions which further strengthened their content.

The Monitoring Team took a systematic approach to consulting with the Department on the development of each of the lesson plans. As part of this process, the Monitoring Team participated in a number of meetings and calls with the lesson plan developers for each training program. The discussions were thoughtful and provided an opportunity for the group to exchange ideas about the best way to present and operationalize the content for each of the training programs. The Department and the Monitoring Team exchanged several drafts of each of the training programs, which enabled the Monitoring Team to assess the lesson plans throughout the development process. The Monitoring Team assessed lesson plans by considering the requirements and spirit of the Consent Judgment in terms of lesson plan content, methodologies, and duration, and student performance assessments. The Monitoring Team also assessed the lesson plans for competency and scenario-based training specific to critical thinking skills needed for making appropriate decisions regarding potential use of force situations. The Monitoring Team also evaluated the content of the instructor cues, participant handbooks, lesson plan outlines, videos selected for use in the training materials, PowerPoint slides, written test materials (¶ 6), and other materials submitted for possible inclusion in the lesson plan. Finally, the Monitoring Team considered the sequencing of the lesson plan instruction to ensure that students will receive information for skill building rather than merely individual component information.

During the Second Monitoring Period, the Monitoring Team will observe the train-the-trainer sessions, and the training programs as they are delivered to recruits and Staff in order to assess the quality of instruction and student interaction relevant to the lesson plan content. As the training programs are deployed, the Monitoring Team will assess the requirements to record attendance and successful completion of the courses in a centralized system (as required by Consent Judgment § XIII,

¶¶ 6, 7, and 8). The Monitoring Team will also evaluate the deployment of re-training for Staff who have violated Department policies, procedures, rules, or directives relating to the use of force (as required by Consent Judgment § XIII, ¶ 5).

The Monitoring Team's assessment of compliance is outlined below.

| XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING) |
| --- |
| ¶1. Within 120 days[22] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor. |

<blockquote>
a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

    i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

        1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

        2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

    ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.
</blockquote>

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department created an interdisciplinary team to develop the New Use of Force Directive training. The team included training specialists and uniformed Staff who previously worked in the jails and are now certified instructors.

- The Department started the development of the Use of Force Policy lesson plan months before the Effective Date of the Consent Judgment and provided the first draft of the lesson plan to the Monitoring Team within a week of the Effective Date.

- The Department developed two separate Use of Force Policy lesson plans:

  o **New Recruit Lesson Plan**: A 12-hour training program that includes sections dedicated to de-escalation techniques, guidelines for working with inmates with mental health issues, group exercises, written scenarios, actual NY DOC videos depicting use of force incidents, and a written test.

---

[22] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- ▪ The lesson plan developers created an early version of the New Recruit Use of Force Policy Lesson Plan based on the New Use of Force Directive, which they provided to all new recruits in the Fall of 2015.
  - ○ **In-Service Lesson Plan**: An eight-hour training program that covers the New Use of Force Directive, and essentially the same information as the New Recruit Lesson Plan, but with more focused content. Two versions of the In-Service Lesson Plan were created— one version for line Staff and a second version for Supervisors to ensure that the lesson plans are focused appropriately on the differing roles and responsibilities within the Department.
- • Both lesson plans use various teaching techniques including:
  - ○ Lecture, group discussions, small group exercises, descriptive scenarios, video recordings of actual use of force cases and written tests to assess student comprehension.
- • The Department exchanged drafts of all lesson plans with the Monitoring Team.

ANALYSIS OF COMPLIANCE

The revised Use of Force Policy Training covers the New Use of Force Directive and reporting requirements set forth throughout the Consent Judgment to provide Staff with an understanding of the requirements of the New Use of Force Directive. As noted above, the Monitoring Team worked closely and collaboratively with the lesson plan developers on the development of the lesson plans. The Monitoring Team also observed the delivery of the draft lesson plan to recruits in the fall of 2015 and provided feedback to the Department which focused on student understanding, time allocations for each section, and general areas that needed enhancement.

The Monitoring Team's content analysis revealed that lesson plans are both competency- and scenario-based. The Recruit and In-Service lesson plans present the New Use of Force Directive in a manner that teaches students how the policy applies to daily situations that Staff encounter. The written scenarios in the lesson plan are realistic and have multiple choice questions to develop the participant's critical decision-making skills to avoid force and to assess whether the use of force is justified. The lesson also provides the appropriate Q&A and guidance to clarify application of the New Use of Force Directive. The Recruit and In-Service lesson plans utilize actual use of force incident videos representing real-life situations in the Department. These exercises ask students to assess real situations, critique Staff decision-making and actions, and discuss what could be done differently.

The Recruit and In-Service lesson plans conform to the requirements and spirit of the Consent Judgment. They are fully developed lesson plans with teaching outlines, examinations, and written materials, including written scenarios and exercises, which are provided to each student in a participant manual. The Monitoring Team approved the New Recruit and In-Service lesson for officers. The Department is modifying the In-Service lesson plan for Supervisors as described above. During the

Second Monitoring Period, the Monitoring Team will focus on the Department's initiation of the training schedule, scheduled to begin in June 2016.

| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance<br>¶ **1(a)(i).** Substantial Compliance<br>¶ **1(a)(i)(1) & (2).** Requirement has not come due<br>¶ **1(a)(ii).** Requirement has not come due |
|---|---|

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶ 1. Within 120 days[23] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

      b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

          i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

          ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

          iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department created an interdisciplinary team to develop the Crisis Intervention and Conflict Resolution training. The team included training specialists and uniformed Staff who previously worked in the jails and are now certified instructors.

- The Crisis Intervention and Conflict Resolution Training is a 24-hour training program. Materials include a PowerPoint, an instructor lesson plan, a student workbook, and an instructor version of the workbook with answers.

---

[23] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- o   The lesson plan developers developed the training using materials and information gathered from national conferences, special trainings and National Institute of Corrections resources.

- o   The training curriculum also includes interpersonal communications training.

• The Department exchanged drafts of all lesson plans with the Monitoring Team.

ANALYSIS OF COMPLIANCE

The Crisis Intervention and Conflict Resolution Training is a new training program that the Department will provide to all Staff to teach skills for effectively managing, controlling, and de-escalating inmate-on-inmate conflicts, inmate-on-Staff confrontations, and inmate personal crises.

The lesson plan developers demonstrated a deep understanding and appreciation for the issues and guidance that needed to be addressed in these training programs. The materials incorporated in the lesson plan are based upon well-established methods and techniques. The lesson plan includes scenarios regarding applying these techniques to Young Inmates and combined scenarios to create complex decision-making situations. The training program also includes some unique and memorable teaching techniques including the use of a theoretical "toolbox" that contains a variety of appropriate Staff responses to a situation. The use of the toolbox is intended to aid student retention and stimulate student performance on the job. As part of the training, the students will be videotaped in their role-play scenarios, and those videos will then be reviewed and discussed with the class. This method of practicing and processing the material helps students to assimilate the information in a way that significantly increases the likelihood that they will use the skills on the job.

The Crisis Intervention and Conflict Resolution Training program is competency-based and scenario-based. The lesson plan uses substantial role plays, demonstrations, and videos reflecting realistic situations. The lesson plan meets the requirements of the Consent Judgment and was approved by the Monitoring Team. During the Second Monitoring Period, the Monitoring Team will focus on the Department's initiation of the training schedule, scheduled to begin in June 2016.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance<br>**¶ 1(b)(i).** Substantial Compliance<br>**¶ 1(b)(ii).** Substantial Compliance with the timing requirements for the lesson plan. The requirement for the deployment of the training has not come due.<br>**¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶ 1. Within 120 days[24] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans

---

[24] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

      c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. Within 12 months of the Effective Date, the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Probe Team Training was developed by a team of Staff from the Emergency Services Unit who have served on Probe Teams and now serve as instructors.

- The Probe Team Training is an eight-hour training program. Materials include a student guide and an instructor lesson plan, designed to provide students with the following information:

  - o  The statutory authority and policies that govern the use of force (i.e. the New Use of Force Directive, Chemical Agents Directive, and Probe Team Directive).

  - o  The primary responsibilities and assignments of both Staff and supervisors on the Probe Team from initial deployment to on-scene assessment and leadership responsibilities.

  - o  The necessary equipment and etiquette to use (e.g. radio notifications) when responding to an alarm.

  - o  Proper procedures for maintaining accountability of Staff during an alarm and post-operation.

  - o  Proper sequence of events when clearing an alarm.

  - o  Proper record keeping of incidents and documentation of relevant training.

- The Department exchanged drafts of all lesson plans with the Monitoring Team.

## ANALYSIS OF COMPLIANCE

The Probe Team Training provides the Staff that serve on the Probe Team with the necessary guidance to resolve use of force incidents in a manner that maximizes inmate and Staff safety.

The Probe Team Training includes clear guidance on the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and Staff safety and is consistent with the requirements in the Consent Judgment. The Monitoring Team recommended that the training also emphasize how to utilize de-escalation techniques to avoid the use of force whenever possible. The inclusion of the de-escalation component is intended to improve the resolution of more incidents without using force, when necessary, is utilized in the safest manner for Staff and inmates.

The Probe Team training is eight hours, which far exceeds the two-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The Department and the Monitoring

| | |
|---|---|
| Team are in the process of finalizing the training curriculum and expect it to be completed in the Second Monitoring Period. | |
| **COMPLIANCE RATING** | **¶ 1(c).** Partial Compliance with the development of the lesson plan. The requirement has not come due for the deployment of the training. |

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[25] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

 a. <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

  i. The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

  ii. The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Defensive Tactics training was developed by a team of Staff with Emergency Services Unit experience who have significant experience working in the facilities and now serve as instructors.

- The Defensive Tactics Training is a 24-hour training, consisting of 10 different modules. Materials include lesson plans and participant manuals for each module.

- The 10 modules provide instruction on specific skills: balance and stances; break falls; pressure points; arm bars; punch defense; strikes and kicks; ground fighting; choke breaks; edged weapons defense; and practical application role-play.

- The Department exchanged drafts of all lesson plans with the Monitoring Team.

### ANALYSIS OF COMPLIANCE

 The revised Defensive Tactics Training will provide Staff the physical skills necessary to comply with the New Use of Force Directive and valuable physical skills needed to ensure Staff and inmate safety. The Monitoring Team observed the delivery of the draft lesson plan to recruits in the winter of 2015. Our feedback focused on student understanding, the selection of appropriate tactics and maneuvers, and general areas for enhancement. The Defensive Tactics training program includes fully

---

[25] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

developed lesson plans and is competency- and scenario-based. The delivery of the of information is clear and substantial and reinforces the concepts in the New Use of Force Directive.

The Defensive Tactics training program teaches a variety of defense tactics and pain compliance methods, training on a limited number of techniques to a high level of proficiency. Training is focused on a specific set of techniques to better enable students to utilize those physical skills on the job. The lesson plan repeatedly emphasizes the steps Staff should take to resolve an incident without resorting to physical force. It uses written scenarios to develop the students' critical thinking regarding use of force decision-making and it emphasizes the need to follow the New Use of Force Directive. The training program also uses internal Department videos to present actual situations, and includes role-playing and demonstrations. The participant manual is of excellent quality and includes professional-grade photographs demonstrating several phases of each technique. The training also includes a useful final module that brings together all of the ideas and concepts to help students better integrate the information.

The Defensive Tactics lesson plan is 24 hours and will be provided to recruits and to all current Staff. Providing 24 hours of In-Service Defensive Tactics Training to all current Staff greatly exceeds the requirements of the Consent Judgment and will provide Staff the necessary tools to ensure their own safety, and the safety of their colleagues and inmates. The Monitoring Team applauds the Department's decision to provide this training to all its Staff. As discussed in the Use of Force Policy section, the Monitoring Team believes this enhanced Defensive Tactics Training is key to the reduction of excessive force and enduring reform.

| COMPLIANCE RATING | ¶ 2(a). Substantial Compliance |
| | ¶ 2(a)(i). Substantial Compliance |
| | ¶ 2(a)(ii). Requirement has not come due |

## XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[26] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

        b.    Cell Extraction Team Training: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided within 12 months of the Effective Date to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

---

[26] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Cell Extraction training was developed by a team of Staff from the Emergency Services Unit who have significant experience working in the facilities and now serve as instructors.

- The Cell Extraction Training is an eight-hour training and the materials include a student guidebook, instructor lesson plan, written examination and a physical skills evaluation form, designed to provide instruction and test knowledge on the following topics:

  o The statutory authority and policies that govern the use of force for Cell Extractions (i.e. the New Use of Force Directive, Chemical Agents Directive, and Cell Extraction Directive).

  o The proper donning of protective riot equipment, chemical protective masks, cell/riot entry shields, and use of electrical devices.

  o Positioning of each of the extraction team members and their respective assignments, as well as the defensive postures during the team line-up, formations, movement and positioning of each team member while entering the cell or holding pen.

  o The proper placement of the cell/riot and EIS shields between the cell door and the wall.

  o The proper takedown and restraint techniques, and proper application of chemical agents.

  o An understanding of the risk of positional asphyxia when attempting to restrain an inmate who is combative and resisting.

- The Department exchanged drafts of all lesson plans with the Monitoring Team.

**ANALYSIS OF COMPLIANCE**

The revised Cell Extraction Training program will provide Staff the guidance and skills for safely responding to situations when an inmate refuses to leave his/her cell.

The content of the training program is based upon well-established methods and techniques and includes an appropriate level of detail. The participant manual includes very useful photographs and explanations. The Cell Extraction Team Training covers circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing them, including hands-on practice. The training program also provides clear direction regarding steps for gaining inmate compliance and how to respond when an inmate *does* comply and ultimately does not need to be extracted from his/her cell with force.

The Cell Extraction lesson plan is eight hours, double the duration required under the Consent Judgment, and will be provided to all Staff responsible for conducting Cell Extractions. The Monitoring Team applauds the Department's approach to developing this training and ensuring it is robust and provides all of the necessary guidance.

| **COMPLIANCE RATING** | **¶ 2(b).** Substantial Compliance for the development and duration of the training program. The requirement has not come due for the deployment of the training. |
| --- | --- |

## XIII. TRAINING ¶ 2 (c) (INVESTIGATOR TRAINING)

¶ 2. Within 120 days[27] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

      c.    Investigator Training: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

          i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Investigator Training is a 40-hour training program that covers the knowledge and skills needed to conduct thorough, objective, efficient, and timely investigations, including:

  - familiarization with ID's overall structure and relevant databases;

  - appropriate investigative techniques and skills;

  - documentation to review and create as part of an investigation;

  - and case management and organization skills.

- The Department exchanged drafts of all lesson plans with the Monitoring Team.

### ANALYSIS OF COMPLIANCE

    The Investigator Training is provided to all new investigators in ID (and also the investigators in the Application Investigation Units as described in the Staff Recruitment & Selection section of this report) to provide the appropriate guidance and information to conduct thorough, objective, efficient, and timely investigations. The Department already had an Investigator training program and it was revised to ensure consistency with the Consent Judgment. The Monitoring Team found the draft lesson plan was comprehensive and required very limited feedback. As ID adopts and implements new procedures, the corresponding trainings will need to be revised.

    The ID Investigator Training is 40 hours and covers investigative procedures, skills, and techniques consistent with best practices and the terms of the Consent Judgment. The lesson plan materials are in the form of a calendar of topics. The substance of the training is significant, with

---

[27] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

extensive instruction and student practice related to database manipulation, information retrieval and investigative techniques.

The Department reports that investigators also receive additional training to ensure greater insight and understanding of the situations they are investigating. For instance, they receive Cell Extraction, ESU, and Chemical Agents Training from members of the Emergency Services Unit within two weeks of completing the initial ID training course. Depending on staff availability, ID staff attend the three-day Defensive Tactics Training. The DOC Intelligence Bureau also provides training on Security Risk Group assignment. New investigators are also provided Evidence Collection Training that includes an overview of the evidence collection process and necessary protocol for ensuring the proper chain of custody and protecting the integrity of evidence. New investigators receive training in navigating and operating the Inmate Telephone Recording System, vouchering procedures, and protocols for securing evidence within ID offices.

Additional professional development is provided to investigators via external trainings in conjunction with surrounding tristate law enforcement agencies (i.e., NYPD Criminal Investigators Course, NYPD Detective Bureau's Interrogators Course, NYPD Detective Bureau's Sex Crimes Course, and NYPD Detective Bureau's Homicide Course). Investigators are also afforded the opportunity to be trained as NYS Peace Officers. The Department also reports that the training unit continually evaluates and identifies external training opportunities offered through the Department of Criminal Justice Services and national law enforcement entities in addition to those who operate in a correctional setting. The Department's lesson plan meets the requirements of this provision, and the additional training opportunities available to staff supplement the acquisition of skills needed to conduct high-quality investigations.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance |
|---|---|

### XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

     a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member

> subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.
>
> b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Safe Crisis Management training program includes a 24-hour Initial Training and an 8-hour Refresher Training. Materials include a participant manual, instructor's manual, PowerPoint and teaching outlines for each course.

- Prior to the Effective Date of the Consent Judgment, the Department conducted research on effective de-escalation and physical intervention tools for use with juveniles. Safe Crisis Management ("SCM"), a nationally recognized crisis management curriculum, was selected as the tool the Department would use to train Staff in the skills needed to meet the requirements of the Consent Judgment.

- Given that SCM is a proprietary curriculum, its creator (JKM Training, Inc.) developed the lesson plan. It includes all of the requirements of the Consent Judgment: it is competency-based, addresses conflict resolution and crisis intervention skills, and teaches skills for preventing and de-escalating inmate-on-inmate altercations.

- The Department shared drafts of all lesson plans with the Monitoring Team. An 8-hour refresher training was developed, despite the Consent Judgment's requirement of only 4 hours.

- The Department reported that 265 Staff Members were regularly assigned to Young Inmate Housing Areas as of the Effective Date. All Staff Members regularly assigned to Young Inmate Housing Areas must receive SCM training as required in the Consent Judgment.

  o  Of the 265 Staff Members, 106 Staff Members received SCM training before the Effective Date. After the Effective Date, another six out of the 265 Staff Members no longer required the SCM training because they either transferred to other facilities with no Young Inmates or they left the Department. Accordingly, 153 of the 265 Staff Members still needed to receive SCM training as of the Effective Date.

  o  Of the 153 outstanding Staff Members that required SCM training, 138 (90%) received SCM training as of May 18, 2016 (119 (77%) Staff members received the training during the First Monitoring Period and another 19 (13%) Staff members received the training between March 1 and May 18, 2016). 15 (10%) Staff Members have not received the SCM training as of May 18, 2016.

- Overall, the Department reported that during the First Monitoring Period, a total of 1,552 uniformed Staff across the Department received the SCM training.

## ANALYSIS OF COMPLIANCE

The fundamental principles of Safe Crisis Management were created by Norbert Belanger and Joseph K. Mullen. Both men have extensive experience in the juvenile justice system working with adolescents and together developed both the safe physical intervention techniques and the de-escalation crisis intervention process that are hallmarks of SCM. The Monitoring Team considers SCM to be one of the industry standards.

The SCM curriculum includes modules on adolescent development, environment/trauma, mental health and psychotropic medications and the ways in which these factors impact an adolescent's ability to cope with the stress of being incarcerated. SCM's "Behavior Support Plan" is a model for providing intensive support to youth who demonstrate chronically aggressive behaviors. In addition to these important de-escalation modules, SCM training also teaches participants how to intervene in emergency situations (e.g., in response to an immediate safety threat) using an array of physical restraint techniques designed to protect the safety of both Staff and youth. SCM's physical intervention module embraces the "least restrictive alternative" principle and includes an after-incident review to ensure compliance with policy and a constructive critique of Staff's performance during the incident.

SCM's focus on safety is evident in the following excerpt from the Safe Crisis Management Instructor's manual:

*Staff's professional responsibility holds the individual's safety as the primary concern. This is sometimes difficult for some staff to accept. The instinct for self-preservation lies beneath this difficulty. Staff must be helped to understand keeping individuals safe is not only a policy issue, but is a legal expectation. Keeping the individual's safety as the priority actually increases staff safety. Staff who encounter an escalating situation with personal safety as their primary concern is far more likely to be antagonistic, whereas, prioritizing the individual's safety is more likely to have a calming effect. Annual surveys conducted by JKM Training, Inc. indicate safety for individuals and staff increases with the implementation of SCM.*

The Department submitted the lesson plans for Initial and Refresher Training to the Monitoring Team for analysis and feedback. Given the Monitoring Team's familiarity with and respect for SCM as a behavior management and crisis intervention curriculum, the Monitoring Team's feedback focused largely on the delivery of the lesson plan rather than the content as it satisfies the requirements and spirit of the Consent Judgment, as discussed in the third bullet point above. The Monitoring Team recommended amplifying certain points relevant to the specific issues faced at RNDC, the Rose M. Singer Center ("RMSC"), and GMDC in the delivery of the materials.

The Consent Judgment requires this training program to address strategies for managing Young Inmates with mental health issues and those at-risk of self-harm, and while SCM is a solid program

trusted by the Monitoring Team, SCM training, by itself, does not provide comprehensive training on these issues. However, the Monitoring Team supports the Department's use of the SCM lesson plan, and concludes that issues related to managing Young Inmates with mental health issues and those at-risk of self-harm is covered sufficiently by the constellation of training programs that Staff working with Young Inmates will receive (i.e., Direct Supervision and Crisis Intervention and Conflict Resolution).

During the First Monitoring Period the Department provided SCM Training to 1,552 Staff Members, only a subset of whom were required to be trained under the Consent Judgment (those who are assigned to regularly work in Young Inmate Housing Areas). The majority of the Staff Members that received the SCM training, including Staff who have been assigned to regularly work in Young Inmate Housing Areas after the Effective Date, work in GMDC, RMSC, and RNDC, the three facilities that encompass the largest number of Young Inmate Housing Areas. Of the 153 Staff that were required to receive the SCM training in the First Monitoring Period, the Monitoring Team verified that 138 (90%) out of the 153 Staff Members received the training as of May 18, 2016 (as described above). The Department reported they plan to provide SCM training to the outstanding 15 Staff Members who require SCM training in the Second Monitoring Period. The Monitoring Team concludes that the Department substantially complied with the obligation to provide SCM training as required in ¶ 3(a).

During the Second Monitoring Period, the Monitoring Team intends to observe and provide feedback on the delivery of Initial SCM training, to provide feedback on the refinement of the SCM Refresher Training lesson plan, and to review data on the proportion of Staff who receive initial SCM training.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br>¶ **3(a).** Substantial Compliance<br>¶ **3(b).** Requirement has not come due |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[28] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.    The Direct Supervision Training shall be a minimum of 32 hours.

    b.    Within 9 months of the Effective Date, the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

---

[28] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department adopted the Direct Supervision curriculum that was developed jointly by the National Institute of Corrections ("NIC"), the Minnesota Sheriffs' Association, and the Minnesota Jail Resource Center. Direct Supervision has a long-standing history of proven effectiveness.

- The Direct Supervision Training consists of 12 modules, each with instructor lesson plans, participant manuals, and PowerPoint presentations for 11 of the 12 modules. The modules include: (1) Introduction; (2) Orientation to Direct Supervision; (3) Influencing Behavior; (4) Principles of Running a Direct Supervision Housing Unit; (5) Different Strokes for Different Folks: Flexible Supervision Strategies; (6) Planning and Organizing in the Unit; (7) Managing Differences in the Housing Unit; (8) Managing Inmate Behavior; (9) Managing Difficult Situations and Inmates; (10) Establishing Yourself in the Unit; (11) Housing Unit Laboratory; (12) Course Closeout.

- The Department exchanged drafts of all lesson plans with the Monitoring Team.

**ANALYSIS OF COMPLIANCE**

The Consent Judgment requires the Department to adopt Direct Supervision as the custody management model for Young Inmates. It is designed to foster constructive relationships and open communication between Staff and inmates.

The substance of the Monitoring Team's feedback on the lesson plans centered on three key concepts. First, because the Direct Supervision model was originally created by NIC to guide the supervision of adult inmates, adjustments were needed to ensure its appropriateness for supervising adolescent and young adult inmates. For example, the concept of the "normal adult" is a centerpiece of the original NIC Direct Supervision training. Obviously, adolescents are not capable of behaving like normal adults given the pace of their brain development, lack of experience, and under-developed coping skills. The training curriculum needed to be adjusted accordingly. Second, the Monitoring Team encouraged the Department to amplify the concept that, in order for Direct Supervision to be effective, Staff must avoid power struggles with inmates by consciously selecting lower-levels of intervention so as to avoid escalating conflicts. Finally, the Monitoring Team also recommended specific strategies to improve Staff-inmate verbal communication.

Once delivered, the Direct Supervision lesson plans will provide Staff with the knowledge and tools necessary to effectively address the behaviors they typically encounter with the young inmate population. The training is competency-based and Staff will be assessed for their ability to apply the various skills taught by the curriculum in a role-play scenario (Module 11). In the Monitoring Team's most recent feedback, the Monitoring Team re-emphasized its recommendation that competency assessment should focus more squarely on the hallmarks of the Direct Supervision model (e.g., holding

54

| | appropriate expectations for adolescents and young adult inmates, "catching inmates doing right," and consciously avoiding power struggles by applying a lower-level of intervention when managing conflict). In the Monitoring Team's estimation, the curriculum development is nearly complete. |
|---|---|
| **COMPLIANCE RATING** | ¶ **4.** Partial Compliance<br>¶ **4(a).** Partial Compliance<br>¶ **4(b).** Requirement has not come due |

**Monitor Recommendation Regarding the Training Academy**

As explained in the Introduction to the Monitor's Report, the Monitoring Team is concerned about the lack of space and poor condition of the Department's Training Academy. Quality training is fundamental to transforming and enhancing practices by Staff and supervisors regarding the use of force. Without it, they do not develop into professionals equipped with the necessary academic and tactical knowledge to conduct their duties safely and responsibly. Accordingly, the physical space where training is held is critical to the Department's overall goal of preparing Staff to meet the demands of their jobs. The Monitoring Team visited the Department's Training Academy located in Middle Village, Queens on at least six different days during the First Monitoring Period to observe trainings and meet with Staff in the Training Academy. The Monitoring Team was surprised by the limited amount of space and the poor physical condition of the building allocated to the Department for use as a Training Academy. The Monitoring Team is familiar with training facilities used by correctional systems around the nation and found this space and location to be severely lacking in comparison with facilities maintained by peer institutions and systems.

The Training Academy space is currently dedicated solely to the instruction of new recruits given the Department's unprecedented class sizes of approximately 600 officers. As such, the Training Academy cannot accommodate any In-Service or Refresher training. The Training Academy provides instruction during two consecutive tours (approximately 16-hours-per-day). Given the space limitations,

the Department also provides limited instruction on a third tour. This means the Academy is often in full use 24-hours-per-day.

The Training Academy occupies two floors in an office building below a roof-top parking garage, with 12 windowless classrooms that are each designed to accommodate approximately 20 students, connected by narrow hallways. The Defensive Tactics Training for recruits is taught in a basement gym. The mat space is so small that students have to be extremely cautious to remain on the mats when performing drills. These conditions create a risk of injury to the students. Limited space for the physical components of the class also restricts the opportunities for students to practice the skills being taught.

The Training Academy also has limited support facilities. For instance, the main floor has one bathroom for each gender, designed to accommodate one or two people at a time. A large break-out room once served as a cafeteria; food is no longer served, and the areas has only vending machines, tables, and chairs. This space is crowded, making it difficult to move between the tables. The food preparation area has a single household-style electric stove and is inadequate to address the food preparation needs of students.

As part of the Monitoring Team's assessment of the Training Academy, the Monitoring Team visited the NYPD's new training academy in College Point, Queens. The NYPD Academy, by contrast, is impressive. It is a state-of-the art space that provides for both classroom and tactical instruction in a modern, spacious facility with the newest in technology to aid in educational practices, emphasizing the importance and critical linkage of training and good law enforcement. In comparison, the conditions and lack of space at the DOC Training Academy send a troubling message to Staff about the importance of their training and level of professionalism, and the value of their public service. The conditions at the

Training Academy inhibit students' ability to practice and learn techniques freely and to experience the instruction with the full impact of the lesson plan.

The DOC and its Staff need and deserve appropriate space for the delivery of training. The City reported to the Monitoring Team that it made initial efforts to identify appropriate space and funds to establish a new Training Academy. As this process will take tremendous effort and time, the Monitoring Team recommends that the City increase its attention to this issue to ensure that the Department has all the necessary resources to sustain this unprecedented reform effort.

## 4.   ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This Section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to anonymously report use of force policy violations. The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the First Monitoring Period.

## 5.   VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the DOC facilities in order to more reliably detect and reduce levels of violence. The obligations related to video surveillance apply to three different types of video surveillance mediums, each having their own corresponding requirements under the Consent Judgment: stationary, wall-mounted surveillance cameras, handheld cameras, and body-worn cameras. The Video Surveillance section of the Consent Judgment requires the Department to install sufficient stationary cameras throughout the jails to ensure complete camera coverage of each facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)); and preserve video from all sources for at least 90 days (¶ 4).

In early February of 2015, prior to the Effective Date, the Department publicly announced its intention to install additional wall-mounted stationary security cameras in its facilities. As required under the Consent Judgment, the Department is expected to install approximately 7,800 additional cameras on a rolling basis throughout the facilities by February 28, 2018 (¶ 1). The first priority for installing cameras was at RNDC in all areas accessible to inmates under the age of 18, and was the only camera installation that was required to be completed during the First Monitoring Period, though the Department made substantial progress in installing cameras at GRVC and GMDC as well. The Monitoring Team assessed the results of the Department's installation efforts during a three-day tour of RNDC, GRVC, and GMDC. This Monitor's Report, however, only assesses compliance with the requirement to install cameras at RNDC (¶ 1(b)), because the other installation requirements have not yet come due (¶ 1(a), (c), (d)).

The Department's efforts to install additional new wall-mounted video surveillance cameras in the facilities are appropriately focused on the areas of priority outlined in the Consent Judgment (¶ 1 (c)(i-iii)). Accordingly, the Department has installed the largest number of additional cameras at RNDC, GMDC, and GRVC through the end of the First Monitoring Period. As of February 29, 2016, the Department installed a total of 1,350 new wall-mounted video surveillance cameras in the facilities, which are in addition to existing cameras located throughout the facilities.

During the First Monitoring Period, the Department developed policies related to the maintenance of stationary cameras (¶ 3) and the use of handheld cameras (¶ 2), which will formalize procedures required by the Consent Judgment, streamline communication between the various departments that manage the cameras, and improve the usefulness of information captured by stationary and handheld video surveillance in the facilities. The DOC Security Department, Engineering Department, Radio Shop, and Information Technology ("IT") Department each have responsibilities

related to different video surveillance areas. The Security Department is responsible for fixed, wall-mounted surveillance camera monitoring, and handheld and body-worn camera operation. The IT Department is responsible for installation and maintenance of video surveillance software for footage viewing and video recording storage. The Radio Shop and Engineering Department are responsible for the physical installation and maintenance of wall-mounted surveillance cameras.

The Department will institute a body-worn camera pilot project by November 1, 2016 (¶ 2). A pilot of this kind is unique in a correctional setting and will provide useful information to determine whether the use of body-worn cameras facilitates the Department's efforts to deter violence by both inmates and Staff. In the First Monitoring Period, the Monitoring Team and the Department discussed the development of the pilot, including identifying and selecting appropriate equipment. The Monitoring Team expects to continue this consultation as the Department launches the pilot. Because the requirement to begin the pilot has not come due, the Monitor will not assess compliance with this provision.

Finally, the Department is required to preserve all video from stationary, handheld, and body-worn cameras for 90 days in order to assist in the investigation of actual or future alleged use of force incidents or inmate-on-inmate violence (¶ 4). The Monitoring Team evaluated compliance with these requirements, as discussed below.

The Monitoring Team reviewed videos generated by wall-mounted surveillance and handheld cameras while reviewing use of force incidents. The continued monitoring of use of force incidents will necessarily include reviewing and analyzing conduct captured on video and assessing the quality of the video itself (especially in the case of handheld and body-worn cameras). Subsequent Monitor's reports will address any problematic trends as they are identified through these reviews.

As video surveillance expands throughout the facilities, the Department's ability to supervise and instruct Staff, manage and monitor inmates, and conduct investigations will be significantly enhanced. This is also true for the work of the Monitoring Team. The Monitoring Team has utilized videos of incidents involving the use of force in conversations with DOC staff to illustrate trends that raise concern. The ability to review an incident on video enriches those discussions and allows the Monitoring Team and the Department to have critical, substantive dialogues about the situations Staff face and their responses to them in order to identify and modify behavior that raise concern. Real-time video surveillance is also a useful tool for avoiding the use of force. The Monitoring Team encourages the Department to utilize the monitoring devices in the control rooms (and other common spaces where cameras are monitored) to view live feeds of video surveillance to support their proactive efforts to de-escalate conflicts where the use of force could otherwise become necessary. Vigilant monitoring of the video feed can help Staff to identify rising tensions and trigger the deployment of additional Staff to diffuse the situation.

The Department reports that Supervisors routinely utilize videos of use of force incidents as an educational tool during weekly meetings with Staff. Sometimes, the selected videos depict Staff conduct in use of force incidents that may be inconsistent with Department policy in order to generate a discussion about how a similar situation could be avoided in the future. Other times, the selected videos highlight situations in which Staff made good decisions and used good technique when addressing inmate conflicts in order to reinforce good practices. The Monitoring Team encourages the Department's continued use of both scenarios because reinforcing good practices and refining unacceptable behavior are equally important.

The Monitoring Team's assessment of compliance is outlined below.

## IX. VIDEO SURVEILLANCE ¶ 1(b) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    b.  The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department installed stationary, wall-mounted surveillance cameras in the housing units, schools, and ancillary areas at RNDC that are accessible to inmates under the age of 18.

- RNDC has a control room where designated Staff are responsible for monitoring the video footage captured on the wall-mounted cameras.

- The Department is in the process of placing monitors in each of the Housing Unit Control Centers (also known as the Housing Unit Bubbles) that will allow real-time monitoring of the fixed video surveillance cameras for the assigned area. The monitors placed in these locations will display the feeds from videos of all cameras, however recorded videos cannot be viewed on this system.

**ANALYSIS OF COMPLIANCE**

    This provision cross-references to two separate requirements with two different timelines that are specifically enumerated in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. The first provision (Consent Judgment § XV, ¶ 10) requires the Department to install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to inmates under the age of 18 by January 30, 2016 (within 90 days of the Effective Date) and the Monitoring Team to inspect the installation by February 29, 2016 (within 120 days of the Effective Date). The Monitoring Team appreciates that the Department moved expeditiously to satisfy this requirement to install cameras. This allowed the Monitoring Team to conduct the required verification well in advance of the 120-day deadline in the Consent Judgment. The Monitoring Team toured all areas of RNDC accessible to inmates under the age of 18, including all housing units, food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways and stairways. As part of this tour, the Monitoring Team observed the physical placement of the stationary, wall-mounted cameras and the footage captured on the video monitors. The Monitoring Team confirmed during the tour that a substantial number of stationary cameras have been installed in these areas and that the cameras sufficiently capture the activities and movement of all persons in a given area of a facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there are fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to inmates and Staff in a private setting, such as designated treatment rooms or cubicles (although there are fixed camera coverage of the ingress and egress of such areas). The Monitoring Team identified a very limited number of areas where coverage was not sufficient, and recommended that the Department consider installing cameras

in these areas. After reviewing the recommendations, the Department plans to conduct an assessment of the physical plant in the areas where the Monitoring Team proposed additional coverage to determine whether the proposed camera installations could be implemented; if so, the Department confirmed that it will address the Monitoring Team's recommendations.

The second provision (Consent Judgment § XV, ¶ 11) requires the Department, by July 1, 2016, to install additional, stationary, wall-mounted surveillance cameras in Facilities that house 18-year-olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year-olds and the Monitoring Team must tour these areas by August 1, 2016. As these deadlines fall within the Second Monitoring Period, they will be addressed in the next Monitor's report because the requirement has not come due.

| COMPLIANCE RATING | ¶ 1(b). (Installation at RNDC) Substantial Compliance |
|---|---|
| | ¶ 1(b). (Housing areas accessible to 18-year-old inmates) Requirement has not come due |

## IX. VIDEO SURVEILLANCE ¶ 1(e) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    e.   The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department invited the Monitoring Team and Parties to the *Nunez* Litigation to participate in its Internal Camera Working Group Meetings.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team participated in the Department's Camera Working Group meeting with Plaintiffs' Counsel on December 11, 2015. As part of that meeting, and in subsequent discussions, the Monitoring team reviewed the Department's security camera coverage plan that includes timelines, objectives, and key deliverables to provide Complete Camera Coverage in the Facilities by February 28, 2018. The installation of cameras is a joint effort between the Radio Shop, the Engineering Department, the specific facilities, and contracted vendors. The current installation plan is consistent with the deadlines outlined in the Consent Judgment (¶ 1(a)) and the plan for installation in the facilities is consistent with the prioritization order outlined in the Consent Judgment (¶ 1(c)).

As part of the Department's installation effort, the Monitoring Team recommends that the Department annotate its existing facility diagrams to identify the locations where cameras are located. This guide serves a dual purpose in that it assists the Department in its overall effort to track and maintain the cameras, and it can also serve as a useful guide for the Department during emergencies

and critical incidents. Overall, the Monitoring Team is encouraged by the Department's efforts to develop and implement an aggressive and comprehensive installation plan.

| COMPLIANCE RATING | ¶ 1(e). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2(d) (HANDHELD CAMERAS)

¶ 2.

    d.    Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall specify:

        i.    Handheld video cameras shall be used in the following situations, except when safety or security concerns require an immediate response that would preclude waiting for recording equipment: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe teams actions; and (4) Facility living quarter searches conducted by the Department's Emergency Services Unit ("ESU"), except Tactical Search Operations ("TSO"), random searches, and strip searches. Inmate resistance during a TSO, random search, or strip search, however, would trigger video recording if it is reasonably believed that a Use of Force or assault on Staff is about to occur or occurs.

        ii.    Handheld video camera operators shall record the following: (1) any attempts made to obtain the Inmate's compliance after the video camera operator has arrived in the area, (2) the Inmate's behavior, and (3) all Uses of Force by Staff.

        iii.    In cell extraction situations, the handheld video camera operator shall record: (1) a statement from the team leader summarizing the situation and the plan for resolution; (2) an introduction by each team member, describing the member's specific responsibilities in the plan for the Use of Force; and (3) a statement from the handheld video camera operator providing his or her name and explaining any impediments to obtaining a clear video recording of the incident.

        iv.    Handheld video camera operators shall receive appropriate training.

        v.    The video recording shall be continuous and any break in video continuity shall be vi. documented and explained by the handheld video camera operator, to the extent the operator knows of such breaks, in an incident report or Use of Force witness report.

        vi.    Compliance with these policies and procedures is the responsibility of the onsite Supervisor, as well as the operator of the handheld video camera.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The current Use of Force Directive, and Operations Order 6/15, issued on April 22, 2015, "Recording Equipment, Medium, and Electronic Evidence" are currently in place to address the use of handheld cameras.

- The Department provided the Monitoring Team with new draft policies and procedures that specifically address the use of handheld cameras.

### ANALYSIS OF COMPLIANCE

    The Department currently has two policies in place that govern the use of handheld cameras, the current Use of Force Directive and Operations Order 6/15, which was issued on April 22, 2015. The New Use of Force Directive also provides guidance on the use of handheld cameras. The Department is also in the process of developing a standalone policy, in consultation with the Monitoring Team,

describing how and when to use handheld cameras to ensure the procedures are consistent with the requirements in the Consent Judgment. As part of this process, the Monitoring Team assessed whether the policy is consistent with the requirements in the Consent Judgment, other existing policies, and best practices. The Department plans to finalize the policy during the Second Monitoring Period. Accordingly, it has not yet been adopted or implemented. Once the Department finalizes the policy, the Monitoring Team will consult on the necessary revisions to the relevant training (e.g. ¶ 2 (e)) to ensure it is consistent with the new policy, the requirements under the Consent Judgment, and best practices.

| COMPLIANCE RATING | ¶ 2(d). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 3(d) (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department provided the Monitoring Team with draft written policies and procedures, "Operations Order-Command Level Assessment and Maintenance of the Department Stationary Camera Surveillance System," relating to the replacement or repair of non-operational wall-mounted surveillance cameras.

### ANALYSIS OF COMPLIANCE

The Department consulted with the Monitoring Team about the development of the policy on the maintenance of non-operational wall-mounted surveillance cameras. As part of this process, the Monitoring Team analyzed whether the policy is consistent with the requirements in the Consent Judgment, including ¶ 3(a)-(c), and best practices, and that the policy addresses the needs of the Department. The Monitoring Team has provided the Department with feedback to enhance the process for tracking and managing the process of identifying and maintaining the cameras. The Department intends to finalize the policy during the Second Monitoring Period. Accordingly, the policy has not yet been adopted or implemented.[29]

| COMPLIANCE RATING | ¶ 3(d). Partial Compliance |
|---|---|

---

[29] The Department did, however, provide "[a] list of those cameras out of service for more than two weeks, and the length of time that they were out of service, by Facility," as required under Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶4 (c)(v). The Department has reported that many of these cameras have been fixed since the list was produced and the the Monitoring Team is working with the Department to ensure that the rest of the cameras that are in disrepair are repaired.

| IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION) |
|---|
| ¶ 4. Video Preservation |
| The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's current policy on recording requirement addresses this requirement.

- The Department's computerized system automatically preserves all video for 90 days.

- The New Use of Force Directive addresses the requirements in the Consent Judgment.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department has policies, procedures, and automated processes in place to ensure that videos are preserved as required under the Consent Judgment. The Department's current preservation policies require all video to be preserved for 90 days, or longer when the Department is notified of a use of force or inmate-on-inmate violence incident, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment. In order to test the Department's system for preserving video, the Monitoring Team randomly selected five facility/unit/time periods and viewed footage from 89 days prior. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem. The Department also reports its intention to issue a uniform video preservation policy for use of force incidents once all new related practices, including ID's video interview pilot and body-worn camera pilot program, are in place. Further, while not yet in effect, the Monitoring Team confirmed that these requirements are included in the New Use of Force Directive.

Going forward, the Monitoring Team will continue to confirm that the Department is preserving all video, including video from stationary, handheld, and body-worn cameras as required, by requesting videos during incident reviews and also by spot-checking the availability of footage during Monitoring Team tours of facilities.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

**6.  USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)**

The Use of Force Investigations section of the Consent Judgment covers a range of policies,

procedures and reforms, relating to the Department's method of conducting use of force investigations

65

to ensure they are thorough, timely, and objective. Rigorous and reliable investigations are critical to the Department's efforts to hold Staff accountable when they fail to adhere to its standards regarding using force and to avoid future abuses. Investigations of use of force incidents also provide important insight into potentially troubling patterns and practices related to the use of force.

Historically, the Department handled use of force investigations using two different levels of investigation. The first level, called "facility investigations," were reserved for less serious incidents and were completed by a Captain assigned to the facility where the incident occurred. The second level, called "ID Investigations," were completed by a dedicated investigator from ID who conducted a more comprehensive investigation.[30] Prior to the Effective Date, the Department reviewed its current ID procedures in preparation for implementing the changes necessary under this section. Its "AMKC Pilot Project" utilized a team of ID investigators to conduct Preliminary Reviews, as required by the Consent Judgment, of all incidents at the Anna M. Kross Center ("AMKC")[31]. This pilot shifted from historical practices by requiring ID investigators to conduct the follow-up investigation for all incidents, regardless of whether previously the incident would have warranted only a "facility-level" investigation. The Department's goal is to increase the capacity of ID to conduct *all* use of force investigations, eliminating the need for facility-level Captains to conduct lower level use of force investigations. Given the Captain's primary responsibility for front-line supervision in the jails, eliminating the additional responsibility as a facility use of force investigator will allow Captains to fully focus on front line supervision. The Monitoring Team supports this shift and will work with the Department and ID as they determine whether this approach is feasible and how best to implement it.

---

[30] Previously, "Incident Review Teams" within ID also conducted reviews of a subset of facility level investigations, called "IRTs." IRTs are no longer conducted.

[31] The Department chose to begin this pilot program at AMKC because it is one of the largest facilities with historically high rates of use of force incidents.

During the First Monitoring Period, the Department and the Monitoring Team focused primarily on the development, rollout, and monitoring of "Preliminary Reviews," an entirely new investigative tool described in the Consent Judgment. A Preliminary Review is just that: an investigator reviews available materials related to every use of force incident close in time-proximity to the event. One of the goals of the Preliminary Review is to ensure that every incident has an initial assessment to determine whether any additional investigative scrutiny is warranted. Once the review is complete, the preliminary reviewer categorizes the incident into one of three categories. The lowest level of scrutiny, "NFA," means no further investigative action is warranted. The next level is a "facility investigation" referral, and the highest level of scrutiny is a referral for a "Full ID" investigation. The preliminary reviewer will also determine whether any of the involved Staff Members should be re-assigned pending an investigation into the incident or if the incident should be referred to the New York City Department of Investigation. The preliminary reviewers' assessments also provide the Department with the ability to identify troubling practices related to the use of force so that they can be addressed shortly after the incident occurs.

The Monitor personally reviewed and analyzed the results of all Preliminary Reviews conducted between October 1, 2015 and February 29, 2016, totaling over 800 cases across eight facilities. Following each month's review, the Monitor provided feedback to ID about methods to further enhance the quality of the reviews and offered suggestions to further streamline the process. The Monitor's review also provided an initial snapshot of the type and manner in which force is currently utilized by Staff. Although DOC has initiated some of the fundamental changes necessary to minimize incidents of unnecessary and excessive force, these initial reforms are foundational and immediate results should not be expected.

The Monitor's initial assessment of use of force in the Department is based on the information obtained during Preliminary Reviews of use of force incidents. The Full ID investigations of use of force incidents that occurred after the Effective Date were not concluded until after the First Monitoring Period per the terms of the Consent Judgment (§ VII, ¶ 9). Accordingly, the Monitor is unable to draw any firm conclusions about the use of force because the information has not yet been verified through the substantive investigation process. However, the Monitor, advisedly and with a degree of caution, has made initial observations based on his examination and analysis of these Preliminary Reviews.

The number of use of force incidents involving head strikes and neck injuries; force being used on inmates in restraints; unexplained inmate injuries; incidents occurring outside of areas covered by surveillance cameras; high utilization rates for chemical agents; and unreported uses of force remain a source of continuing concern. More specifically, head strikes should not be used absent an imminent threat of death or serious bodily injury to Staff. Similarly, a restrained inmate can be subjected to additional force only in exceptional circumstances. Preliminary Review data suggests that the frequency of head strikes and force against inmates in restraints is higher than expected. Moreover, of equal concern, is the overall number of Staff use of force incidents that have occurred in the First Monitoring Period.

The data for all use of force incidents are being carefully tracked and reviewed by the Monitoring Team. Each subsequent report will expand on the examination and reporting on use of force as the Monitoring Team has the opportunity to assess completed investigations and other related processes.

Because a Preliminary Review is the first step in the investigative process, the procedures necessarily needed to be developed, tested, and finalized before many other requirements of the Consent Judgment could be addressed. Therefore, the Monitoring Team and Department's priority during this monitoring period was the successful launch of Preliminary Reviews, the development of corresponding

policies (¶¶ 12 and 15), which included incorporating the Consent Judgment's requirements into existing or new policies (e.g. ¶¶ 2[32], 5[33], 8, 13(e)[34]), and the development of the Video-ID Pilot project (¶ 6). The related reforms will be addressed in appropriate sequence after the Department has finalized the foundation for the investigative process. The Monitoring Team has assisted in the Department's refinement of policies and procedures related to facility investigations (¶ 13) and plans to continue that work during the Second Monitoring Period. The Monitoring Team will then move on to monitoring the refinement of Full ID Investigations (¶¶ 8, 9 and 16) once the procedures for the other types of investigations are in place. Department policy requires all ID investigators to utilize a standardized case file system. As the Department continues to evaluate the AMKC Pilot Project, the Video Pilot, and implements additional changes required by the Consent Judgment, it will continue to update the case file system. The Monitoring Team believes this is the most appropriate and reasonable approach and therefore has not yet evaluated this practice. While the Department reports that its current investigative practices are consistent with the requirements in the Consent Judgment, the foundational structures for such investigatory practices are still being updated. The Monitoring Team has not yet evaluated the Department's facility-level and Full ID investigations, but will do so in subsequent monitoring periods.

As part of the Department's overall effort to strengthen and enhance its investigative capabilities, going forward, the Monitoring Team will also evaluate the overall staffing levels to ensure that ID can complete Full ID Investigations in a manner that is consistent with the requirements in the Consent Judgment (¶ 11). Hiring a significant number of new civilian and uniform staff members for ID has been a major priority of the Department since early 2015. The Department reports that in January 2015, ID

---

[32] As discussed in the Use of Force Policy section above the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.
[33] As discussed in the Use of Force Policy section above the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.
[34] As discussed in the Use of Force Policy section above the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.

had 66 employees. As of March 30, 2016, the Department reports that ID has 129 employees. The Department continues to interview potential candidates for ID, intending to hire an additional 40 dedicated investigators to assist with the various reforms and ongoing pilots.

ID has a duty to refer cases to the Department of Investigations ("DOI") when Staff conduct is potentially criminal in nature (¶ 3). During the First Monitoring Period, the Monitoring Team established a relationship with the Inspector General of DOI and learned about the intersection of the Department's and DOI's use of force investigations to better understand DOI's role and the Department's referral process. The Monitoring Team has not yet evaluated the referral process for purposes of compliance.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In the summer of 2015, the Department conducted a "pre-pilot" to determine the most appropriate video equipment to use for the pilot and determine the initial scope for the pilot.

- The Department developed policies and procedures governing the pilot project.

- The Department met and discussed the scope and approach for the pilot project with the Monitoring Team.

### ANALYSIS OF COMPLIANCE

The Department, in consultation with the Monitoring Team, developed the procedures for a six-month Interview Video Recording Pilot ("Video Pilot") and a corresponding policy. Under the Video Pilot, each ID investigative team (operating throughout all of the facilities) will be assigned one Reveal Media, compact camera to video record investigative interviews with inmates who were involved in an alleged or actual use of force incident. As the pilot continues over the course of six months, the

Department, in consultation with the Monitor, will consider whether to expand the use of video recording devices to additional categories of interviews associated with use of force investigations. This decision will be informed by feedback from the pilot project, including whether the recordings enhance the quality of investigations, any logistical challenges identified, and any other identified benefits or challenges. At the conclusion of the pilot, the Deputy Commissioner of ID will prepare a report of the results of the pilot for the Commissioner and Monitor. The report and other data collected during the Video Pilot will then be used to determine whether the Department should require the use of video recorded interviews in connection with all use of force investigations, rather than audio recording such interviews. The Department expects to launch the pilot in the Second Monitoring Period.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below.

    a.    The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates or civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

    b.    The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

    c.    To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

    d.    The Preliminary Reviewer shall document the results of the Preliminary Review.

    e.    Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

        i.    No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain.

        ii.    Any resistance by the Inmate was passive.

| | |
|---|---|
| iii. | Staff Members had only minimal physical contact with the Inmate, using only soft hand controls. |
| iv. | The Use of Force Incident did not involve the use of weapons, including OC spray. |
| v. | There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective. |
| vi. | The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence. |
| vii. | Based on the Preliminary Review, the Use of Force was minimal, reasonably necessary, and clearly consistent with the New Use of Force Directive. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department launched the AMKC Pilot Project in October 2015 (prior to the approval of the Consent Judgment), and began conducting Preliminary Reviews of incidents at AMKC.

  o These reviews were conducted by Investigators from ID, who reviewed all available documentation for each incident as outlined in ¶ 7(a) above.

  o ID developed a computerized system that allows the preliminary reviewers to document their findings in an electronic form which includes required fields for the analysis of all items outlined in ¶ 7(b)-(e) above. This system can generate reports at both the individual and aggregate level.

- The Preliminary Review process was expanded to include the review of incidents at GMDC, GRVC, Otis Bantum Correctional Facility ("OBCC"), RMSC, and RNDC in December 2015. North Infirmary Command ("NIC") and West Facility were added in January 2016.

- The Department produced the results of the October-November 2015, December 2015, January 2016, and February 2016 Preliminary Reviews to the Monitor and Parties to the *Nunez* Litigation as required pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.[35]

## ANALYSIS OF COMPLIANCE

Preliminary Reviews based on the parameters of the Consent Judgment were initiated in October 2015, focusing only on incidents that occurred at AMKC, with other facilities to be phased-in over the coming months. The Monitoring Team supported this phased-in plan because it allowed the Department, with input from the Monitoring Team, to refine and hone the procedures before initiating the Preliminary Reviews at other facilities. As noted above, the Monitoring Team reviews the substance of the Preliminary Reviews each month and provides comments to the Department. The Monitoring Team also verified that Preliminary Reviewers are tracking the information required in ¶

---

[35] "At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)"

7(b)-(e) by assessing the content and structure of the computerized system that captures the data and the aggregate reports produced.

Preliminary Reviews are now taking place in eight facilities; the system has not yet rolled out in all facilities to cover all incidents. The Monitoring Team is encouraged by the successful progressive expansion of the Preliminary Reviews each month of the First Monitoring Period:

- November 2015: Across all Facilities, Preliminary Reviews were conducted for 15.01% of reported actual incidents and 21.05% of reported alleged incidents.

- December 2015: Across all Facilities, Preliminary Reviews were conducted for 25.11% of reported actual incidents and 47.8% of reported alleged incidents.

- January 2016: Across all Facilities, Preliminary Reviews were conducted for 67.51% of reported actual incidents and 48.48% of reported alleged incidents.

- February 2016: Across all Facilities, Preliminary Reviews were conducted for 74.64% of reported actual incidents and 72.50% of reported alleged incidents.

Preliminary Reviews also provide an avenue through which the Department can identify situations when swift remedial action is warranted to address Staff misconduct during a use of force incident. The Monitoring Team will work with the Department during the Second Monitoring Period and beyond to ensure that preliminary reviewers are making a determination as to whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct as required by ¶ 7(iii).

Another benefit of Preliminary Reviews to the investigative process is to enable the Department to better direct the resources of ID (and the facilities) toward incidents that require scrutiny. Under the previous investigative model, incidents were only scrutinized as the assigned investigators had time to assess the incident. It is critical that the Department appropriately deploy its resources so that the level of scrutiny is proportional to the seriousness of the incident. The creation of the "no further action" ("NFA") category for incidents is designed to do just that: identify incidents that do not merit additional scrutiny (as outlined in ¶ 7(e) above) beyond that which is applied during the course of the Preliminary Review. However, of the 731 Preliminary Reviews conducted between November 2015 and February 2016, only *one* incident matched the NFA criteria listed in the Consent Judgment. The Monitoring Team's review of all Preliminary Reviews suggests that other cases could be appropriately resolved at the Preliminary Review stage than are currently being captured using the requirements of the Consent Judgment. Accordingly, the Monitoring Team is working with the Department to explore a way to refine the incident categorization scheme in order to expand the NFA criteria. Doing so will enable the Department to deploy its resources more effectively, while also achieving the overall goal of

timely, efficient, and thorough investigations. This issue will continue to be explored in the next reporting period.

The Preliminary Reviews conducted by the Department were completed within a reasonable time frame, with an average time to review of just under three business days:

- November 2015: 2.28 business days

- December 2015: 2.50 business days

- January 2016: 2.96 business days

- February 2016: 2.23 business days

The Monitoring Team is concerned that the current two-day requirement may not provide sufficient time to allow the preliminary reviewer to conduct an appropriately thorough analysis. For example, collecting even the initial information can take an entire day (or longer) because the information is being generated at the same time it is being collected for review. This leaves only one day to review and analyze the materials for the Preliminary Review. The Monitoring Team will consult with the Department during the Second Monitoring Period regarding whether additional time is necessary to conduct the Preliminary Reviews in order to sustain the process system-wide. The Monitoring Team anticipates recommending an extension of the time permitted for conducting a Preliminary Review to ensure that preliminary reviewers have sufficient time to conduct a quality review.

In the next reporting period, the Monitoring Team will audit the accuracy of the Preliminary Reviews based on a review of a sampling of completed Preliminary Reviews. The Monitoring Team will also continue to provide feedback to ID and the reviewers as the Preliminary Review process is initiated at other facilities and the policies and procedures for such reviews are refined.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
| --- | --- |

### VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

    a. Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    b. In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time

> period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department identified 434 investigations that were outstanding as of the Effective Date and had been open for more than six months and were required to be closed by February 29, 2016.

- Nine of the 434 investigations were pending review by the Bronx DA's office or DOI, leaving 423 in the Department's control.

- The Department closed 413 (98%) out of the 423 investigations that remained in their control by February 29, 2016.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that the Department closed 413 of the 434 open investigations by February 29, 2016. Of the 21 outstanding cases, nine were on hold due to a pending DA or DOI investigation and the time to complete those investigations was tolled (¶ 10(b)). The remaining 12 investigations (3%) were not closed in a timely manner. The Department reported that the investigators who failed to timely close their investigations received Memorandums of Complaint ("MOC") for inefficient performance of duties, and their disciplinary cases are pending in the Trials Division.

ID also completed many of the investigations that were open as of the Effective Date, but had been open less than six months. As of the Effective Date, 374 cases had been open less than six months. The Department reports that it is on target to close all of these investigations in the Second Monitoring Period as required in the Consent Judgment. The Monitoring Team will assess compliance with this requirement in the Second Monitoring Report. Overall, the Monitoring Team is encouraged by the Department's efforts to eliminate the investigation backlog because it will allow ID to focus its efforts on implementing refined procedures to conduct more timely and efficient investigations going forward.

Compliance with this provision was not assessed in the First Monitoring Period because the Monitoring Team did not have an opportunity to sample the cases closed within 120 days because this deadline coincided with the last day of the monitoring period and therefore this provision has not yet been evaluated for a compliance rating. Further, the second portion of the requirement in this provision does not come due until the Second Monitoring Period. The Monitoring Team expects to conduct a sampling of the closed investigations during the Second Monitoring Period and anticipates assessing compliance with this provision in the Second Monitor's Report.

**VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)**

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department developed a draft policy identifying the quality control systems and procedures for Full ID investigations to ensure that ID Investigations meet the requirements in the Consent Judgment for a Full ID investigation (¶ 9).

- The Department adopted some interim quality control procedures for other use of force investigations as ID continues to develop the underlying policies and protocols for new investigation procedures (e.g. Preliminary Reviews).

**ANALYSIS OF COMPLIANCE**

The Department developed a number of interim quality control and auditing procedures to ensure the quality of use of force investigations pursuant to the Consent Judgment. However, given the number of ongoing pilot programs and other changes, the Department, with the Monitoring Team's support, decided to focus on implementing a policy governing the auditing procedure for Full ID investigations at this time. The Department consulted with the Monitoring Team about the policy and procedures to audit Full ID investigations and the policy will be finalized during the Second Monitoring Period. As the other pilots are evaluated and final changes are implemented, the Department, in consultation with the Monitoring Team, will implement additional quality assurance and auditing policies and procedures.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

**VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18 )**

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a. The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b. The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department designated a "Youth ID Team" consisting of one Captain, one civilian investigator, and four uniformed staff investigators who are based at RNDC.

- The Youth ID Team described above investigates all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving Adolescents (both male and female, pretrial detainees and sentenced inmates).

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that ID created a Youth ID Team to investigate use of force incidents involving inmates who are under the age of 18 at the time of the incident. The Youth ID Team is staffed with one Captain who supervises the team and an appropriate number of qualified and experienced investigators. The Youth ID Team is currently conducting Full ID Investigations of all use of force incidents involving inmates under the age of 18 that fall within the categories specified in ¶ 8, above. Going forward, the Monitoring Team will evaluate the investigations conducted by the Youth ID Team as part of the overall evaluation of Full ID investigations. The Monitoring Team will also evaluate whether the Youth ID Team is reviewing Facility Investigations as required in ¶ 14(b) of this section.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 14.** Substantial Compliance<br>**¶ 14(a).** Substantial Compliance<br>**¶ 14(b).** Not yet evaluated |

## VII. USE OF FORCE INVESTIGATIONS ¶ 15 (POLICIES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department developed draft policies and procedures for Preliminary Reviews that incorporate the specific requirements in the Consent Judgment.

- The Department reviewed and drafted revised policies and procedures for facility investigations that incorporate the specific requirements in the Consent Judgment.

- The Department developed draft policies and procedures for how ID investigators will conduct facility level investigations for ID's pilot project where ID investigators will conduct facility level investigations as described above.

**ANALYSIS OF COMPLIANCE**

As described above, the Department is in the process of conducting a significant overhaul of the way it approaches investigations. As part of this effort, and in consultation with the Monitoring Team, the Department is developing and revising its policies and procedures for Preliminary Reviews and investigations conducted by the facilities (or ID investigators at the pilot facilities) to ensure that they will result in thorough, timely, and efficient investigations and are consistent with the requirements in

the Consent Judgment. Given the number of ongoing pilot programs and other changes, the Department, with the Monitoring Team's support, has decided to focus initially on the policies and procedures related to Preliminary Reviews and Facility Investigations and will continue to do so in the next reporting period. The refinement of Full ID procedures will follow.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

### 7.   STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent and timely discipline is a key aspect in the overall effort to reduce and deter the use of excessive or unnecessary force by Staff. The foundational step to holding Staff accountable is the development and implementation of functional, comprehensive, and standardized disciplinary guidelines that include a range of penalties to be sought for different categories of violations. Historically, Staff who used unnecessary or excessive force were often subject to minimal, if any, sanctions. When discipline was imposed, it was frequently long after the incident. In order to reduce incidents of excessive and unnecessary force in its facilities, the Department must appropriately and timely discipline the responsible Staff to demonstrate that such conduct will not be tolerated.

The Consent Judgment requires the Department to take all necessary steps to impose appropriate and meaningful discipline (up to and including termination) (¶ 1) to ensure that Staff are consistently held accountable for misconduct. The Department must also revise its existing disciplinary guidelines to ensure the imposition of appropriate and standardized discipline, which includes identifying a range of penalties for different categories of violations embodied in disciplinary guidelines ("New Disciplinary Guidelines") (¶ 2). Further, the New Disciplinary Guidelines must include a presumption that the Department will seek to terminate Staff found to have engaged in three categories of egregious misconduct related to the use of force in order to reinforce the Department's zero-tolerance policy for the most abusive tactics (¶ 2(d)). Additionally, when an investigation finds that a Staff committed a use of force violation, supervisors in ID must ratify the disciplinary recommendations of the investigator (or

at the conclusion of a facility level investigation, the matter must be referred directly to the Trials Division), and the Trials Division must swiftly serve reasonable disciplinary charges (¶ 3). In order to carry out these duties, the Trials Division must be sufficiently staffed to enable such swift action (¶ 4) including negotiating plea dispositions and recommendations to the Office of Administrative Trials and Hearings that are consistent with the Disciplinary Guidelines (¶ 5).

The Department operates under the City's disciplinary framework of progressive discipline, which acknowledges that correcting behavior should, in most instances, start with the minimum penalty necessary to address the misconduct of an employee. Thereafter, penalties for additional misconduct should increase in severity. The Department also recognizes that discipline must be applied consistently; thus, similar misconduct committed by different individuals should generally receive the same range of penalties, although an employee's history is also taken into account to determine the appropriate penalty for a specific violation. To that end, the Department's current and new guidelines both outline progressive penalty ranges for specific categories of misconduct, up to and including termination. The current (and new draft) guidelines provide penalty ranges for the most common and egregious forms of misconduct for which the Department seeks to create a clear, consistent penalty structure. Misconduct not specifically enumerated in the guidelines is evaluated based on the nature of the misconduct and a review of any mitigating and/or aggravating factors. The Department recognizes that not all first instances of misconduct are minor violations of Department rules and therefore, certain misconduct may warrant a penalty of termination even in the first instance. The Commissioner is the ultimate determiner of discipline. After reviewing the factual circumstances, including mitigating and aggravating factors, a penalty decision may deviate from the guidelines.

As explained above, New Disciplinary Guidelines have been developed by the Department and will be implemented and made effective as described in the Use of Force Policy section of this report.

The Department has committed to imposing meaningful discipline (¶¶ 1 and 3)[36] under the current guidelines even before the New Disciplinary Guidelines take effect. The Monitor will review the Department's success in doing so by closely reviewing the follow-up actions taken (e.g., re-assignment, suspension, type of discipline imposed) in situations where Staff have engaged in serious misconduct. These situations include: (i) deliberately striking or using chemical agents on an inmate in restraints, in a manner that poses a risk of serious injury to the inmate, except in situations where the Staff member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member; (ii) deliberately striking or kicking an inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an inmate, and constitutes a needless risk of serious injury to an inmate; and (iii) causing or facilitating an inmate-on-inmate assault or fight, or allowing an inmate-on-inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an inmate or as a means to control or maintain order in any area of a Facility. The Monitoring Team will also review disciplinary sanctions imposed for less serious misconduct to ensure the full spectrum of misconduct is being addressed.

During the First Monitoring Period, the Monitoring Team has focused on assisting the Department with the development of the New Disciplinary Guidelines. Thus, this report will not assess compliance regarding the Department's efforts related to Consent Judgment § VIII (Staff Discipline and Accountability), ¶¶ 1, 3, 4 and 5.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range

---

[36] The current Staff Disciplinary Guidelines were established and implemented in 2004 as the "Department Trials and Litigation Division Negotiated Plea Agreement (NPA) Guidelines."

of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

a. The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

b. The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

c. The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

　i. Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

　ii. Deliberately failing to report Use of Force by a Staff Member.

　iii. The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

d. The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.

　i. Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.

　ii. Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate.

　iii. Causing or facilitating an inmate-on-inmate assault or fight, or allowing an inmate-on-inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility.

　iv. The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

e. If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the

| |
|---|
| modification of assignment unjust, which determination shall be documented and provided to the Monitor. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has drafted New Disciplinary Guidelines.

**ANALYSIS OF COMPLIANCE**

The Department has consulted with the Monitoring Team on its revisions to the existing disciplinary guidelines. The Monitoring Team discussed these guidelines with Department representatives and provided feedback to ensure the New Disciplinary Guidelines are consistent with the specific requirements in the Consent Judgment. The current draft of the New Disciplinary Guidelines addresses all of the specific requirements outlined in (¶ 2 (a) to (d)) above. Before the New Disciplinary Guidelines can be finalized, the Department must consult with Staff representatives about the revisions. The New Guidelines will take effect 30-days after the effective date of the New Use of Force Directive (*see* the Use of Force Policy section of this report for more detail).

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## 8. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion, assignment to Special Units, or in circumstances where Staff has been disciplined multiple times, for review of that Staff Member's assignment generally. More specifically, prior to promoting any correction officer to the position of Captain or higher or assigning an officer to certain special units (e.g., punitive segregation and mental health housing areas), the Department will undertake a review of the officer's prior involvement in use of force incidents to assess whether that involvement raises concerns about the officer's qualifications. The Department also may not promote any individual to the position of Captain or higher if the officer has been found guilty or pled guilty more than once within the preceding five-year period to various delineated DOC charges relating to the use of force, absent exceptional circumstances.

While preserving DOC management's general discretion to make personnel decisions, these provisions are designed to ensure that Staff promoted to supervisory positions or assigned to work with particularly vulnerable populations do not have troubling work histories that call into question their

suitability for these positions. Because supervisors provide guidance and advice to less experienced officers, they must have demonstrated through their own conduct an understanding of what is and is not permitted with respect to the use of force.

The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the First Monitoring Period and, accordingly, is not in a position to assess compliance for this provision.

## 9.  RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management Section of the Consent Judgment requires the Department to create a number of systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. These measures include developing and implementing a computerized Early Warning System ("EWS") (¶ 1); a requirement that a Warden review and provide guidance through "Counseling Meetings" to any Staff member who engages in repeated use of force incidents where at least one injury occurs and (¶ 2); creating a new position, Use of Force Auditor ("UoF Auditor"), who identifies systematic patterns and trends related to the use of force (¶3); a reporting and tracking system for litigation and claims related to the use of force (¶ 4); a requirement that the Office of the Corporation Counsel bring to the Department's attention allegations of excessive force that have not yet been investigated by ID (¶ 5); and the development and creation of an advanced Case Management System ("CMS") to systematically track data across the Department (¶ 6).

Pursuant to this section of the Consent Judgment (¶ 2), whenever a Staff member engages in a use of force three or more times during a six-month period, and at least one of those uses of force results in an injury to a Staff Member or inmate, the facility commanding officer is required to review the incidents and decide whether to hold a Counseling Meeting with the officer.[37] These meetings are a

---

[37] The Department already has a similar process in place, under Directive 5003.

useful opportunity to counsel, coach, and advise Staff about opportunities for de-escalating force, as well as properly managing and using force. However, the Counseling Meetings should not always be punitive in nature. They should also be utilized as an opportunity to encourage a Staff Member's skill and decision-making ability and to reinforce proper use of trained techniques. Overall, these meetings provide an opportunity for Wardens to impart their experience and knowledge regarding the proper use of force to Staff. Further, the Department also reported it is revising the policies governing these practices to ensure consistency with the terms of the Consent Judgment. In the First Monitoring Period, the Department reported that over 150 Staff Members participated in Counseling Meetings, although the Monitoring Team has not reviewed the substance of these meetings and did not evaluate this provision during this reporting period.

In order to develop an internal capacity to monitor the use of force and identify troubling trends, the Consent Judgment requires the creation of a new position, the Use of Force Auditor (¶ 3), who will analyze data, prepare quarterly reports and make recommendations to the Commissioner about reducing the frequency with which force is used and the number and severity of resulting injuries. The Monitoring Team will further assess this provision in subsequent monitoring periods.

As initially discussed in the Use of Force Reporting section of this report, the Department must track extensive data on all use of force incidents electronically, ensuring the data are both reliable and accurate. By the end of 2016, the Department is required to develop a new CMS, to track such data centrally (¶ 6). The requirement to develop CMS has not yet come due and will not be assessed for compliance, although the Department has made progress toward its development.

The Monitoring Team's assessment of compliance is outlined below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

a.   The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

b.   ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

c.   On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's Performance Metrics and Analytics Department ("PMA") is responsible for creating the EWS.

- The developers of EWS have gathered inputs from existing databases, including IRS, and ITTS, and are currently validating those inputs for use in the EWS system, for example:

  o   Inputs for Staff: age, time on job, post, whether steady or not, time since training.

  o   Inputs for inmates: mental illness status, Security Risk Group ("SRG") status (gang affiliation), Housing Units, environmental factors.

- The Department is also considering additional data that it may need to track for full functionality of EWS.

### ANALYSIS OF COMPLIANCE

The Monitoring Team met with the PMA team, which is responsible for the development of the EWS. Using statistical software, PMA compiled data from existing sources for use in the EWS. They identified some inconsistency among the variables and have cleaned and recoded the data accordingly. Using the clean dataset, PMA conducted basic descriptive analyses including frequencies and cross-tabulations to determine the potential influencers of use of force incidents. PMA is also developing a list of new variables that they would like to test for inclusion in EWS but are not currently contained in the dataset. From here, the final set of historical data will be compiled and tested to identify each variable's statistical relationship to Staff involvement in use of force incidents. Variables with a significant relationship will be included in a model, which will be then be tested with new data.

The Monitoring Team believes that EWS will aid the Department in its overall efforts to reduce the use of excessive and unnecessary force. The EWS will help identify Staff who are at risk of engaging in serious misconduct absent appropriate intervention or services by the Department. EWS is being built from the ground-up, and is a massive undertaking with the ability to have a tremendous

impact on the way the Department manages its Staff. The period of time to develop the EWS has not come due yet. Accordingly, the Monitoring Team will not assess compliance in this monitoring period.

| COMPLIANCE RATING | ¶ 1. Requirement not yet due |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks the filing and disposition of litigation relating to use of force incidents by receiving monthly reports from the Office of the Corporation Counsel.

- The information in these monthly reports is aggregated from the Matter Management System maintained by the Office of the Corporation Counsel. Each new case filed against the City is entered into the system and the record is updated as necessary throughout the span of the case until its disposition.

- The monthly reports contain the following information:
    - The filing and disposition dates of the case,
    - the names and shield numbers (if appropriate) of the defendants,
    - specifics about the incident,
    - amount in controversy,
    - the forum of the lawsuit, and
    - a description of the lawsuit.

- The Office of the Corporation Counsel and the Comptroller's Office devised a system to identify cases involve the use of force that includes an analysis of the complaint or claim, and application of the risk management codes utilized by the Comptroller's Office within the Office of Corporation Counsel's internal tracking system.
    - The Corporation Counsel then provides this information to the Department.

### ANALYSIS OF COMPLIANCE

The Department is tracking the filing and disposition of litigation relating to use of force incidents by receiving initial monthly reports from the Office of the Corporation Counsel that contain this information. The Monitoring Team reviewed a sample of the monthly reports to verify that the information described above is in fact being aggregated and shared with the Department. The Monitoring Team also spoke with representatives of the Office of the Corporation Counsel who report

this information to the Department, and the Department's Assistant General Counsel responsible for reviewing the quarterly reports, once generated, for *Nunez* purposes. Staff from the Office of the Corporation Counsel confirmed their intention to provide the Legal Division of the Department with new and updated information with respect to the filing, and the resolution, if any, of such litigation on a quarterly basis based on the fiscal year.

The first requirement in this provision ("develop and implement a method…") falls within the First Monitoring Period but the other requirements are not due until after the First Monitoring Period. The first quarterly reports required from the Office of the Corporation Counsel and the Office of the Comptroller will span January 1, 2016 through March 31, 2016, which is beyond the First Monitoring Period. As a result, the Monitoring Team did not assess compliance in this report.

The Department also reported its intention to seek information regarding the payment of claims related to use of force incidents from the Office of the Comptroller on a quarterly basis based on the fiscal year. In the next monitoring period, the Monitoring Team will report on these efforts along with the requirements in ¶ 5.

## 10. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this part of the Consent Judgment is to better protect Staff and inmates under the age of 19 from violence. Notably, of its own initiative, the Department decided to extend the protections afforded to 18-year-old inmates under the Consent Judgment to a larger group of young adults—those aged 18 to 21. While the Monitoring Team has endeavored to confine its discussions in this report to the 16-, 17- and 18-year-old inmates, the Department should be lauded for broadening the population of inmates who will benefit from the reforms achieved under the Consent Judgment.

Institutional violence is affected by many things—factors pertaining to the inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in the jails (e.g., security features and environmental hazards, as well as the daily structure and opportunities available). This section of the Consent Judgment includes provisions related to all of these factors.

For example, several provisions of the Consent Judgment are designed to *enhance the quality of supervision by Staff*, by requiring appropriately qualified, experienced and interested Staff (¶ 13),

minimum staffing ratios (¶ 16), and assignments to a steady unit/tour so that productive relationships can develop among Staff and between Young Inmates and Staff (¶ 17). Furthermore, the Consent Judgment requires Staff to be appropriately trained in Direct Supervision (¶ 12, discussed below, and in the Training section of this report) and mandates additional support for probationary (new) Staff. To the extent possible, probationary Staff should be assigned to units/tours with veteran Staff (¶ 14), so that informal on-the-job mentoring can help them to further develop the confidence and skills needed to carry out their duties. Finally, the Consent Judgment requires the Department to incentivize Staff (including with financial incentives) to take positions in Young Inmate Housing Areas (¶ 18). Given the focus on developing Direct Supervision training spanned the entire First Monitoring Period, provisions related to staffing were not assessed for the current monitoring period (¶¶ 13-18). That said, observations made while touring the Young Inmate facilities suggest that required staffing ratios are currently being met.

Other requirements related to the *supervision and surveillance of inmates* are contained in provisions related to video camera coverage. The phased installation approach required by the Consent Judgment focused first on the installation of stationary wall-mounted cameras in the facility housing adolescents (RNDC) (¶ 10), discussed in detail below and in the analysis of Video Surveillance in this report above, followed by facilities housing 18-year-olds, to be completed by July 1, 2016 (¶ 11). In the near future, the majority of 18-year-old male inmates will be housed in a single facility (GMDC). The Monitoring Team will survey the camera installation at that facility (as well as the housing units in other facilities with housing areas accessible to 18-year-old inmates) during the Second Monitoring Period.

Also contributing to the ability to protect inmates and Staff from harm are Consent Judgment provisions related to *the physical plant of the housing units*. The Consent Judgment requires daily inspections (¶ 2) and daily rounds (¶ 3) to ensure that all cell-locking mechanisms are operating properly

and to provide inmates with an avenue to voice security-related concerns. Neither of these provisions was rigorously analyzed for this First Monitor's Report, but informal conversations with RNDC and GMDC Staff, casual inspections of housing units, and reports from Headquarters staff indicate that historical problems with locking mechanisms have largely been addressed.

Most of the requirements that will directly affect an *inmate's propensity to engage in violence* and the Department's response to violence are contained in Consent Judgment § XVI (Inmate Discipline) (e.g., incentives for refraining from aggressive behavior and the Department's response to aggressive behavior). However, this section also contains some important features related to the underlying causes of institutional misconduct. For example, ¶ 5 requires the delivery of programming to minimize idle time and the potential for altercations. While not analyzed in depth during the First Monitoring Period, the Monitoring Team toured several special program units (e.g., Rikers Rovers, where inmates train dogs to prepare them for adoption; I-CAN, addressing employment readiness, parenting, relapse prevention and independent living skills) and looks forward to the planned influx of programming for the general population units. The Consent Judgment also requires inmates to be accurately classified according to their risk of institutional misconduct (¶ 4, discussed in detail below) and then housed appropriately (¶ 8, discussed in detail below). Furthermore, when inmates allege they have been the victims of sexual assault or otherwise perceive themselves to be at risk of harm, the Department must take specific steps to investigate those allegations (¶ 9; which will be evaluated once the Department completes currently on-going PREA training) and to house the inmate in a safe alternative unit (i.e., Protective Custody; ¶ 6 and ¶ 7, which will be evaluated during the Second Monitoring Period).

Although the relevant provision was not analyzed in detail for this report, some baseline data were prepared related to one of the core objectives of the Consent Judgment—protecting Young Inmates

from an unreasonable risk of harm by preventing inmate-on-inmate fights and assaults (¶ 1). Rather than presenting the raw number of fights and assaults, a *rate per 100 inmates* was calculated to neutralize the impact of differences in the size of the inmate populations across the various facilities and age groups. The rate was calculated by dividing the number of fights and assaults ("n") into the average daily population ("ADP") for each month, and then multiplying the result by 100.

Averaged across the First Monitoring Period, the rate of inmate-on-inmate violence by adolescents (26.5 per 100 inmates) was very similar to the rate among 18-year-olds (25.0 per 100 inmates). These data included incidents occurring at all of the facilities holding 18-year-olds (which is why the total number of incidents for "all 18-year-olds" is larger than the number at GMDC, for example). When looking at GMDC versus RNDC, where the vast majority of Young Inmates are housed, the rate of inmate-on-inmate violence is about 20% higher at GMDC versus RNDC (31.8 versus 26.2 per 100 inmates, respectively). Over time, the positive return on inmate safety brought forth by the provisions of the Consent Judgment should be evident in a decreasing rate of inmate-on-inmate violence.

| Inmate-on-Inmate Assaults and Fights<br>November 1, 2015 to February 29, 2016 | | | | | |
|---|---|---|---|---|---|
| **Facility/<br>Population** | **November 2015**<br>**n/ADP**<br>*Rate per 100* | **December 2015**<br>**n/ADP**<br>*Rate per 100* | **January 2016**<br>**n/ADP**<br>*Rate per 100* | **February 2016**<br>**n/ADP**<br>*Rate per 100* | **Average<br>Rate**<br>*Rate per 100* |
| **All<br>Adolescents** | 52/192<br>*27.1* | 54/199<br>*27.1* | 57/207<br>*27.5* | 46/188<br>*24.4* | *26.5* |
| **All<br>18-yr olds** | 49/196<br>*25.0* | 54/200<br>*27.0* | 56/207<br>*27.0* | 45/215<br>*20.9* | *25.0* |
| **EMTC** | 1/18<br>*5.6* | 3/16<br>*18.8* | 2/15<br>*13.3* | 3/16<br>*18.8* | *14.1* |
| **GMDC** | 45/124<br>*36.2* | 39/135<br>*28.9* | 49/143<br>*34.3* | 39/141<br>*27.7* | *31.8* |
| **RNDC** | 52/207<br>*25.1* | 62/213<br>*29.1* | 56/209<br>*26.8* | 48/201<br>*23.9* | *26.2* |
| **RMSC** | 1/17<br>*5.9* | 2/17<br>*11.8* | 2/18<br>*11.1* | 1/17<br>*5.9* | *8.7* |

*\*Note*: Data separated by age includes data from all facilities, some of which were not presented in the facility-level analysis because of small numbers (e.g., AMKC, BHPW, GRVC, MDC, NIC, OBCC, VCBC, and WF).
*\*\*Note*: Data on inmate-on-inmate violence among adolescents and 18-year-olds are combined for EMTC, RNDC and RMSC. No adolescents were housed at GMDC during the monitoring period, so those data are for 18-year-olds only.
*\*\*\*Note*: The rates of violence at EMTC and RMSC should be interpreted with caution because of the small number of inmates housed in those facilities. Small denominators create a large change in rate, even with the addition or subtraction of only a few events.

*Source: DOC*

_A note related to the application of these provisions to 16, 17 and 18-year-old females_: The

Consent Judgment applies to both male and female 16- to 18-year-old inmates. However, in a few areas,

the Monitoring Team believes the required reforms would be very difficult to implement with the 16- to

18-year-old female inmate population given the small number of inmates in this age range. On any given

day, approximately 11 adolescent girls and only one to seven 18-year-old girls are housed at RMSC. As

such, it would be very difficult to develop a classification system (¶ 4) specifically for 16- and 17-year-

old (adolescent) girls given the small number available for a construction or validation sample.

Similarly, the provision related to housing low- and high-classification inmates separately (¶ 8) is

difficult to apply to the small populations of adolescent and 18-year-old female inmates, and could result

in inmates being housed alone or with only one or two other girls which would be, in all likelihood,

counter to their treatment needs and the tenets of behavior change. Further, although 18-year-old girls

are housed together with 19- to 21-year-old females, the numbers and space restrictions are such that separation into low- and high-classification housing areas is not feasible, and in some cases could put 18-year-old girls in housing units that are larger than the inmate-to-Staff ratios set forth in Consent Judgment § XV, ¶ 16. The Monitoring Team is not aware of any information indicating that current practices for female adolescents and 18-year-old girls are not sufficient to protect them from harm; in fact, the opposite is true. Rates of violence for this population are extremely low. As a result, given the current size of the female adolescent inmate population, the Monitoring Team is not assessing compliance with ¶ 4 for female adolescents, or ¶ 8 for female adolescents and 18-year-old girls, for the First Monitoring Period.[38]

The Monitoring Team's assessment of compliance is outlined below.

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION SYSTEM) |
|---|
| ¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department currently utilizes a risk assessment instrument to classify adolescent inmates upon admission according to their accumulated score across eight risk factors: 1) severity of current charge; 2) severity of previous convictions; 3) history of escape; 4) past institutional conduct; 5) current SRG affiliation; 6) current age; 7) number of prior arrests; and 8) number of prior felonies. After a period of 60 days of incarceration inmates are reclassified, and risk factors related to prior arrests and prior felonies are replaced with the number and severity of disciplinary convictions in the last 60 days. Using the total score, the inmate is classified as minimum, medium, or maximum custody and placed either in the general population or, if an override is applied, on a unit designed for a special population (e.g., MO, protective custody, adolescent/young adults, infirmary, etc.). This is the instrument with which adolescent males are currently classified, and its use is governed by Policy 4100R-D "Classification."

- In August 2015, the Department began to pilot test a new risk assessment and housing system—the Housing Unit Balancer ("HUB"). This instrument differs from a traditional risk assessment

---

[38] Should the size of the female adolescent and 18-year-old girl population increase, the Monitoring Team may reconsider this position.

instrument (like the one described above) in that it utilized an extensive data set of approximately 60,000 inmate records (including adolescent males) to devise a "decision tree," rather than a numerical score, to guide classification decisions. Both are legitimate conventions in the field of risk assessment. The HUB construction research found that six factors were related to an inmate's propensity for institutional violence: 1) violent institutional conduct in the past seven years; 2) being known to mental health (defined by the Department as inmates who have three or more encounters with a New York City Health + Hospitals clinician); 3) age, with those under 25 years old being significantly more likely to engage in violence; 4) severity of the current charge; 5) being SRG-affiliated; and 6) number of prior arrests. The inmate's status on each of these items is entered into a matrix that assigns one of four classification levels: minimum, minimum-medium, medium-maximum, and maximum. Inmates are reclassified following a serious incident and/or after 100 days without an infraction. The HUB also has a provision for overrides to address factors that cannot be captured utilizing the decision-tree formula. The HUB was pilot tested at GRVC, is currently being used to classify young adult male inmates as they are moved into GMDC, and is planned to be implemented system-wide (including RNDC). Its use is governed by Policy 4104R-A "Interim Classification at GRVC and GMDC."

## ANALYSIS OF COMPLIANCE

The Department is simultaneously pursuing two strategies toward compliance. First, the existing classification system, which was developed via consensus rather than via an empirical process, could be considered "age-appropriate" if the Department produced basic research showing the general validity of the classification levels. In other words, based on the current risk assessment instrument, do maximum custody adolescent male inmates have higher rates of infractions than minimum custody adolescent male inmates? Alternatively, the HUB, which was created empirically and has already been validated, could be applied to adolescent male inmates in order to meet the requirements of this provision. The Department plans to pursue both courses of action during the Second Monitoring Period, anticipating that either strategy will result in Substantial Compliance.

In its report on the treatment of Young Inmates at Rikers, the SDNY was concerned that the existing classification tool (discussed in the first bullet, above) may not be appropriate for adolescents because the risk factors do not account for maturity, vulnerability, cognitive and emotional development or physical stature. While it is true that the risk factors themselves do not address these things (most risk assessment instruments do not), the classification and housing system *as a whole* provides a mechanism for these considerations. For example, if an inmate were developmentally or cognitively disabled, regardless of his scored classification level, he could be placed on a Mental Observation unit via the override mechanism. Similarly, if an inmate were very small in stature or extremely immature to the point that he created a risk of harm to himself, he could be placed in either

93

voluntary or involuntary Protective Custody. These override mechanisms allow staff to consider unique attributes or circumstances that are not captured by the scored risk items. The same override provisions will be available under the HUB.

During the Second Monitoring Period, the Monitoring Team will continue to observe the Department's progress toward Substantial Compliance. Remaining tasks to be accomplished include:

- Providing data to substantiate the general validity of the existing classification instrument with male adolescent inmates (i.e., that maximum custody inmates have higher rates of infractions than minimum custody inmates).
- Applying the HUB to the adolescent male inmate population.

In addition, the Monitoring Team will review the use of the override process to confirm that inmates with special needs or unique circumstances are housed in an appropriate setting, regardless of their classification level.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In the facilities that currently house the vast majority of male Young Inmates in general population (RNDC, GMDC, and EMTC), inmates classified as maximum custody are housed in units that have cells, while minimum custody inmates are housed in units with dormitory-style accommodations. (Medium custody inmates can be housed with either maximum or minimum custody inmates.)

### ANALYSIS OF COMPLIANCE

During the First Monitoring Period, the Monitoring Team visited all of the facilities that currently house the vast majority of male Young Inmates (some facilities were visited multiple times). While on site visits, both celled and dormitory-style housing units were toured, and the population sheets for each facility confirmed the count of inmates assigned to each location. Furthermore, all of the Headquarters staff and Wardens and Deputy Wardens in the male facilities confirmed the separation practice when asked. As the HUB (discussed in ¶ 4, above) is implemented for all male inmates, the software will provide extra assurances of separation because incompatible classification levels and housing assignments will create an error notice. These initial observations suggest the Department has met its obligation, however, going forward the Monitoring Team will conduct a more systematic review that cross-references classification level with housing assignment for a sample of

male Young Inmates in order to give a compliance rating, therefore this provision is not yet evaluated for a compliance rating.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 10 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

### ANALYSIS OF COMPLIANCE

Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department used the Direct Supervision model, developed by NIC, as the foundation for a training program for the supervision of adolescents and young adult inmates. The NIC model was adapted to address the unique characteristics of adolescents and the way in which their development, thought processes and behavior differ from adults. *See* the discussion of the Direct Supervision Training program in the Training section of this report above for a detailed discussion of the lesson plan curriculum development and the Monitoring Team's assessment of that lesson plan.

### ANALYSIS OF COMPLIANCE

The Department made critical steps towards adopting the Direct Supervision model as the overarching strategy for supervising adolescent and young adult inmates. Training curricula are being drafted and revised in response to the Monitoring Team's feedback. Further, the Department is encouraging its Staff to develop appropriate personal relationships with Young Inmates in order to improve the quality of supervision. Consent Judgment § XIII (Training), ¶ 4, provides for 120 days to develop the training curriculum and thus the requirement for implementation in this provision has not yet come due.

95

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## 11. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

The overall purpose of this section of the Consent Judgment is to reduce the Department's historical overreliance on punitive segregation as a mechanism for responding to Inmate misconduct. Rather than imposing a sanction that creates a risk to Young Inmates' emotional well-being and limits their access to necessary services and programs, the Consent Judgment requires the Department to construct an array of options for responding to misconduct that are safe, provide access to services, and that are responsive to the youth's treatment needs. In so doing, it is the Monitoring Team's hope that the Department will identify strategies that address the underlying causes of Young Inmates' misconduct so that their aggressive behavior will be less likely to reoccur. During the First Monitoring Period, the Department worked diligently to set this vision in motion, and while much work remains, the Monitoring Team is impressed by the Department's commitment to improving the way in which it responds to inmate misconduct.

During the First Monitoring Period, the Monitoring Team conducted numerous site visits, meetings, Staff and youth interviews, observations of practice and document reviews to understand the way in which punitive segregation is currently used and the options that are under development. Most striking are the significant changes in practice that occurred even before the Effective Date of the Consent Judgment. In December 2014, the Department, on its own initiative, abolished the use of punitive segregation for 16- and 17-year-old inmates (¶ 2, discussed in detail below). Alternative housing units—Second Chance Housing ("SCHU") and Transitional Restorative Unit ("TRU")—were opened before punitive segregation was abolished for 16- and 17-year-old inmates, and program refinements are ongoing for both adolescents and young adult male inmates (¶ 4 and ¶ 6, discussed in detail below). In January 2015, the Department abolished the practice of imposing punitive segregation

time owed from previous incarcerations on those inmates who remain eligible for punitive segregation (¶ 1, discussed in detail below). By way of historical, baseline information, in 2014, the Department housed approximately 600 inmates (of all ages) in punitive segregation on any given day, many of whom owed thousands of days of segregation time. At the time of this report, the total population had dropped to less than 200 inmates (of all ages) on the average day, with vastly reduced time-owed thanks to new upper limits on the amount of punitive segregation time that can be imposed. All of these steps are essential to reducing the Department's use of punitive segregation, as required by the Consent Judgment.

Of the Young Inmate populations subjected to punitive segregation at the time the Consent Judgment was negotiated, only the 18-year-olds remain. The Monitoring Team toured the punitive segregation housing units at OBCC and GRVC, interviewed staff, and observed operations. The Team also reviewed documents related to the number of 18-year-old inmates who served punitive segregation time during the monitoring period, and the list of inmates sentenced to punitive segregation time who awaited bed space. Interviews with staff from New York City Health + Hospitals helped the Monitoring Team to understand the process for ensuring that inmates with serious mental illnesses are not placed in punitive segregation (¶ 5, discussed in detail below). The Team collected initial information from the Department and New York City Health + Hospitals about the procedures for assessing whether confinement presents a substantial risk of serious harm to the Inmate (¶ 7), the daily monitoring of inmate's medical and mental health status while they are serving punitive segregation time (¶ 8), and the procedures for ensuring that any cells used for punitive segregation or Isolation housing for 18-year-old inmates shall not pose an unreasonable risk to inmates' safety (¶ 9). The Monitoring Team will not assess compliance with these provisions in this reporting period. Although not required by the Consent

Judgment, the Department intends to abolish the use of punitive segregation for the young adult

population (i.e., 18- to 21-year-olds) in the near future.

The planned elimination of punitive segregation for young adults should not occur without an

array of options for responding to misconduct that are well designed and properly implemented. At the

most basic level, the Department implemented a positive incentive program to discourage low-level

misconduct and incentivize positive behavior (¶ 3, discussed in detail below). On the opposite end of the

continuum, the Department designed and implemented several special program units of increasing

restrictiveness (SCHU, TRU and Secure) to respond to serious misconduct (¶ 4 and ¶ 6, discussed in

detail below). The Department's efforts to refine the program design, monitor implementation and

develop metrics to assess inmate outcomes will be the Monitoring Team's focus in the Second

Monitoring Period. Furthermore, the Monitoring Team will consult with the Department on an adequate

range of responses to mid-level misconduct in order to provide the full continuum required by the

Consent Judgment.

Further, procedures for the use of short-term isolation to de-escalate an out-of-control inmate

exist in a draft policy, though the Department did not utilize this tool during the First Monitoring Period

(¶ 10). The Monitoring Team's experience suggests that de-escalation confinement is an important tool

for protecting Staff and inmate safety during a crisis situation, though it must be carefully

operationalized to ensure it is used only when a legitimate safety threat exists and its duration is limited

to only what is necessary for the inmate to regain control of his/her behavior. This will also be a focus of

the Monitoring Team's activities in the Second Monitoring Period.

Finally, although not required by the Consent Judgment, the Monitoring Team feels strongly that

Staff's contribution to the operation of a safe facility should be rewarded as often and as meaningfully as

positive behavior is incentivized among the youth they supervise. During the monitoring period, the

Monitoring Team and Department had a brainstorming session to develop ideas for this purpose and the Monitoring Team is encouraged by the Department's receptivity to these ideas.

The Monitoring Team's assessment of compliance is outlined below.

## XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME)

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- BOC Regulations regarding this issue were amended in January 2015 to prohibit the imposition of punitive segregation time imposed, but not served, during a previous incarceration. Policy 6500-D "Inmate Disciplinary Due Process" Section III.D.1 lists the authorized dispositions that the Adjudication Captain may impose when an inmate is found guilty of an infraction. Subsection (d)(iv) states that in the case of punitive segregation, "Inmates shall not serve Punitive Segregation time that had been earned in a previous incarceration."

### ANALYSIS OF COMPLIANCE

In order to verify the implementation of the policy requirement above, the Monitoring Team interviewed staff involved in the administration of punitive segregation and reviewed relevant documents. Operations Security Intelligence Unit ("OSIU") staff manages the punitive segregation waitlist, placing infracted inmates who have been cleared by mental health into punitive segregation as bed space allows. OSIU staff confirmed that as of January 2015, the practice surrounding the imposition of punitive segregation changed so that punitive segregation days imposed but not served during a previous incarceration were no longer carried over. Furthermore, the Monitoring Team reviewed the punitive segregation waitlist from February 22, 2016, that included 27 18-year-old inmates. None of them were scheduled to serve any historically owed punitive segregation time.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION)

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Policy 4501R-D "Pre-Hearing Detention and Punitive Segregation Status Inmates" (Section IV.A.2.a) and Policy 6500R-D "Inmate Disciplinary Due Process" (Section III.B.1.b.i) both prohibit the placement of adolescents in punitive segregation. The Department's Compliance Report indicated that the prohibition went into effect in December 2014.

**ANALYSIS OF COMPLIANCE**

In order to verify the implementation of the two policies cited above, the Monitoring Team interviewed numerous Staff and reviewed relevant documentation. Throughout the First Monitoring Period, the substance of the Monitoring Team's discussions with both Headquarters and RNDC Staff revolved around the transformation of practice that flowed from this change in policy. In all cases, Staff confirmed that punitive segregation was no longer imposed for infractions committed by adolescents. OSIU staff who manage the placement of inmates in punitive segregation reported that, if an adolescent were to be erroneously sentenced to punitive segregation by an Adjudication Captain, the OSIU staff would identify the error via the waitlist printout, which includes each inmate's age. Such cases would be referred back to the RNDC Deputy Warden to rectify the situation. The Monitoring Team is not aware of any such cases.

In addition to interviewing Staff, the Monitoring Team reviewed the Infraction Logbook maintained at RNDC, which contains information on all infractions alleged, the disposition and the sanction imposed. Among the 180 infractions adjudicated between January 1, 2016, and February 3, 2016, punitive segregation was not imposed for any infraction committed by an adolescent. This mirrored the findings from a review of disciplinary hearing packets for 15 youth found guilty of Grade I or II infractions during this same time period—punitive segregation was never imposed. Thus, the Monitoring Team is confident that the Department has successfully abolished the use of punitive segregation with adolescents.

While the Department has abolished the use of punitive segregation for this population, the Monitoring Team's experience suggests that there is a risk that other forms of isolation could emerge in its wake. The Monitoring Team will continue to be vigilant about this issue as the team reviews the evolving practices for managing adolescent inmate's behavior and advancing inmate and Staff safety.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: INMATE INCENTIVES)

¶ 3. Within 90 days[39] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Prior to the Effective Date of the Consent Judgment, the Department developed and implemented a positive incentive system, Adolescents Striving for Change ("ASFC"), which allows adolescent inmates to earn up to $25 per week in credit by following the facility's rules. Earned credits can be used for commissary goods, barber services and phone calls. When

---

[39] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

inmates violate rules or behave aggressively, they lose a portion of the $25 credit. During a site visit to RMSC in January 2016, the Department reported that ASFC would be implemented with the adolescent girls in late February 2016.

- Two policies "Positive Behavior Management System (PBMS) Adolescents Striving for Change (ASFC) Incentive" (dated January 15, 2016) and "Positive Behavior Incentive System" (no date) have been drafted and partially implemented. Some of the features discussed in the policy (e.g., Bonus Bucks, Incentive Levels) have not yet been implemented.

- Phase II of the Department's incentive plan involves the administration of group incentives.

  o When inmates housed on RNDC units refrain from aggressive behavior, have low/no uses of force, or otherwise demonstrate positive behavior, they are given access to "enhanced recreation." The recreation facilities in the sprung structures include a soccer field, basketball court, foosball and a selection of board and video games.

  o Inmates housed on RNDC units with the lowest numbers of incidents, or those with significantly reduced numbers of incidents compared to previous levels, are rewarded with access to their own personal computer tablet for a two-week period. The tablets contain educational and entertainment programming and can be accessed during leisure time on the units. The tablet program was rolled out during the latter half of the monitoring period and is expected to continue. Toward the end of the monitoring period, adolescent girls at RMSC were also eligible for the tablet incentive.

ANALYSIS OF COMPLIANCE

The ASFC program includes the key elements of a basic token-economy program. Youth are rated throughout the day (on 1st, 2nd and 3rd shift) on a binary scale (if youth meet behavioral expectations, they receive a stamp; if they do not meet behavioral expectations, they do not receive a stamp) and Staff are required to annotate the card in every instance in which a stamp is not awarded. Its simple design results in a short learning curve among Staff and youth. Earnings are tabulated and youth are able to purchase incentives on a weekly basis.

To examine the implementation of the ASFC program, the Monitoring Team reviewed stamp cards generated by RNDC between November 2015 and January 2016, interviewed Operations Office staff who monitor the implementation of the ASFC program, and reviewed ASFC monitoring spreadsheets that track youth's performance in the program over time. Overall, the implementation of the stamp cards appeared to be solid. Behavior ratings appeared to be individualized (i.e., all youth did not receive the same rating each tour) and there were very few calculation errors in the weekly tabulations. Operations Office staff also cross-reference the daily behavior ratings with information on infractions from the facility's database to ensure that youth do not receive stamps on tours when they engaged in serious misconduct. One area that requires strengthening is the annotation on the back of the card that is supposed to be completed by unit Staff anytime a stamp is not awarded. These

annotations are important for ensuring the integrity of the ASFC system and also for understanding the behavior challenges of individual youth. Descriptions of the nature of the youth's misconduct were missing in about 30% of the stamp cards reviewed by the Monitoring Team.

The Monitoring Team reviewed the tools used by the Operations Office to assist with the implementation of the program and to track the youth's performance over time. Each week, every youth's earning level is entered into a spreadsheet. A scan of the data provided additional assurances that the ratings were individualized across youth. Further analysis revealed that large proportions of youth earn at the top end of the scale each week (i.e., about 70% earned $20 or $25 each week), signifying that Staff do not appear to be heavy-handed in making deductions. That said, additional efforts to validate the accuracy of the daily ratings against the youth's actual behavior are suggested to ensure the integrity of the system. This type of integrity is essential to ensure Staff buy-in. In many systems, Staff lose faith in incentive programs when they believe youth are given rewards that they did not actually earn. Data that demonstrates the accuracy of the Staff's ratings is important to counter such challenges, should they arise.

While the design and initial implementation of the ASFC program at RNDC are relatively solid, implementation needs to be fortified in a couple of areas:

- Ensuring that Staff accurately annotate the back of the stamp card on any shift where a stamp is not awarded; and

- Validating the accuracy of the behavior ratings using logbooks, video camera footage, interviews with Staff and youth, etc. The validation should be conducted over a short period of time and the results should be shared with unit Staff. Where performance needs to be improved, Staff should be reminded of the key components of the ASFC program and their responsibility to implement it properly. Where solid implementation is achieved, Staff should be informed of the validation results and applauded for properly implementing the program. Should Staff buy-in become problematic, these validation activities should be revisited.

Furthermore, the system needs to be enhanced in order to better address the unique needs of adolescents and to encourage youth to sustain positive behavior over time. Specifically:

- Increase the frequency with which incentives are awarded. Currently, incentives are awarded on a weekly basis, which is not frequent enough to sustain most adolescent's engagement in the program. Many systems include small daily rewards (e.g., snack, slightly later bedtime, movie or game time) to youth with good behavior throughout the day.

- Create an opportunity to earn rewards for sustained positive behavior. The program spreadsheets maintained by the Operations Office revealed that a significant proportion of youth earns at the top levels of the program for multiple weeks in a row. Other youth's behavior is far more variable, earning at the top of the scale for a couple weeks, but then plummeting to the $0 earning level shortly thereafter. These youth may benefit from incentives for sustaining

positive behavior over a period of time. Many jurisdictions establish a system of phases or levels that come with different levels of privilege (e.g., different bedtimes, access to TV or games, different items from the commissary, different types of uniforms, Honors Room or lounge, etc.). As youth sustain positive behavior, they are promoted to higher levels that come with increased privileges.

- o The Department drafted a policy, "Positive Behavior Incentive System" that incorporates this concept. During the Second Monitoring Period, the opportunities for this type of enhancement and the many options for constructive activities to offer as rewards will be explored in more depth.

Given that the ASFC program was not implemented with adolescent girls at RMSC until the end of the monitoring period (February 2016), the Monitoring Team could not provide an assessment for this report but plans to do so for the Second Monitoring Period. The Department is encouraged to apply the lessons learned from the RNDC implementation, and the technical assistance offered here, to the program's implementation at RMSC.

The Department has also begun to explore the opportunities available for group incentives. Per interviews conducted by the Monitoring Team, the computer tablet pilot program was well received among both Staff and youth, and Headquarters staff report that plans for full expansion are underway. Similar types of group incentives could be devised that cater to a broader range of interests, encourage physical activity, and promote the development of new skills and leisure-time interests. As expressed above, although not required by the Consent Judgment, the Monitoring Team feels strongly that Staff's contribution to the operation of a safe facility should be rewarded as often and as meaningfully as positive behavior is incentivized among the youth they supervise. During the monitoring period, the Monitoring Team and Department had a brainstorming session to develop ideas for this purpose. Enhancements to group and Staff incentives will be explored in more depth during the Second Monitoring Period. Once implementation has been solidified and additional features have been added to the program, the Department will need to finalize the policies related to the positive incentive system.

| **COMPLIANCE RATING** | **¶ 3.** Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS)

¶ 4. Within 90 days[40] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

---

[40] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to utilize due process hearings to discipline inmates, imposing either a reprimand or a surcharge for inmates who commit Grade I, II, or III infractions. According to Policy 6500R-D "Inmate Disciplinary Due Process" and as noted in ¶ 2, above, punitive segregation is no longer imposed on inmates under the age of 18.

- Although the Department does not consider them to be "disciplinary" or "punitive" in nature, two special programming units are now utilized as a response to adolescent male inmates who commit violent or serious infractions. Second Chance Housing Unit ("SCHU") and the Transitional Restorative Unit ("TRU") provide additional support and programming on self-contained units. The policy governing the operation of these units was the subject of significant work during the Monitoring Period. While the policy is not yet finalized, the Department has integrated feedback from the Monitoring Team and other stakeholders.

**ANALYSIS OF COMPLIANCE**

As noted above, on its own initiative, the Department abolished the use of punitive segregation for adolescents in December 2014, well in advance of the Effective Date of the Consent Judgment. The Monitoring Team applauds the Department for this change in response to institutional misconduct among adolescent inmates, as the move embraces recent research in juvenile justice showing the detrimental effects of isolation on the well-being of adolescents. Adolescents often emerge from isolation more frustrated, angrier, and more violent than when they entered, which in turn, has an adverse effect on facility safety. Safer facilities are the by-product of responses to infractions that focus on *changing behavior*, rather than simply suppressing it by placing violent inmates in isolation. For this reason, the Monitoring Team also supports the Department's shift in thinking toward responses to infractions that are support- and program-based, rather than responses that are more punitive in nature. Support- and program-based responses reduce the likelihood that misconduct will reoccur by focusing on the underlying causes of the behavior. In contrast, punitive responses rely on the deterrent quality of something aversive, which has been shown through research not to be particularly effective with adolescents, given the pace of their brain development.

The Consent Judgment requires the Department to implement disciplinary procedures that are safe and effective, provide access to mandated services, and that are consistent with the youth's treatment needs. Throughout the monitoring period, the Department committed significant time and energy to refining procedures for responding to the most serious infractions (e.g., those involving violence, causing injury, or involving the use of a weapon). The Second Chance Housing Unit ("SCHU") and the Transitional Restorative Unit ("TRU") provide additional support and programming on self-contained units. They were operational prior to the Effective Date of the Consent Judgment, but the policies governing their operation had not been finalized. With input from the Monitoring Team and other stakeholders, the Department revised early drafts of the TRU/SCHU policy in order to:

- better distinguish the admission criteria and process for TRU and SCHU,

- incorporate a process for youth objections in the admission process,

- ensure youth are oriented to the rules of the special units,

- prescribe staffing ratios,

- clarify various security procedures,

- emphasize the youth's rights to all mandated services,

- describe the type of programming interventions,

- structure the process for developing and monitoring behavior support plans,

- describe procedures for de-escalation and crisis management, and

- clearly articulate the requirements for step-down and discharge to the general population.

Based on a review of draft policy for TRU/SCHU and files of youth housed on TRU/SCHU in February 2016, the Monitoring Team also took the opportunity to comment on the overall program design in an effort to ensure alignment with sound practices for behavior change in adolescents. Subsequent revisions to the policy demonstrated the Department's responsiveness to the Monitoring Team's comments. During the Second Monitoring Period, the Monitoring Team will focus on the implementation of the units by reviewing individual youth records, interviewing Staff and youth, and helping the Department to identify metrics related to program operation and effectiveness. Once developed, the Department should monitor the performance and outcomes associated with the special units, making modifications to program design as needed.

While the Monitoring Team fully supports the development of these special housing units, particularly given the abolition of punitive segregation for this population, the continuum of responses to infractions needs additional development. A review of the RNDC Infraction Logbook, a sample of disciplinary hearing packets for 15 youth, and a review of ASFC cards suggested that the current continuum would benefit from additional options in the middle range, meaning something more significant than a verbal reprimand from the Adjudication Captain or the failure to earn an ASFC stamp (both appropriate for eliminating nuisance behaviors), but something less restrictive and intensive then transfer to one of the special units. An array of responses is needed to respond effectively to inmates who may engage in episodic aggression where no one is injured, who destroy or steal property, or who continuously disrupt the operation of the facility such that services to other inmates is often compromised. In these cases, responses that are skill-based and that focus on repairing the harm associated with the behavior have proven to be most effective with adolescents. The Department's draft policy, "Positive Behavior Incentive System" (no date) includes a concept, not yet implemented, of *Repairs* that require youth to make amends for their rule violations. Such restorative activities, particularly when properly implemented and combined with skill-based exercises consistent with youth's treatment needs, are generally effective in reducing the frequency of negative behaviors.

The Monitoring Team will further explore the *Repair* concept and other skill-focused options with the Department during the Second Monitoring Period in an effort to form a more robust array of options for responding to infractions.

The adolescent girls housed at RMSC also have due process hearings and ASFC stamp cards, but they do not have access to the TRU/SCHU special programming units, which may be unnecessary given the very low rates of violence among this population. However, as recommended for RNDC, a range of options beyond those appropriate to the lowest level infractions (i.e., reprimand) needs to be developed and implemented.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As indicated by Policy 6500R-D "Inmate Disciplinary Due Process" and Policy 4501R-D "Pre-Hearing Detention and Punitive Segregation Status Inmates," inmates with serious mental illness (SMI) may not be placed in punitive segregation. Instead, they are housed in the Clinical Alternatives to Punitive Segregation (CAPS) unit, which provides group and individual treatment by New York City Health + Hospitals.

### ANALYSIS OF COMPLIANCE

The Department's disciplinary policies are definitive on this issue—inmates with serious mental illnesses shall not be placed in punitive segregation. This policy requirement was echoed by all of the Headquarters and facility staff interviewed by the Monitoring Team, in addition to the MD, Chief of Service, Psychiatry for New York City Health + Hospitals. The New York City Health + Hospitals Chief of Service also opined that the current processes have functioned well to ensure that inmates suffering from SMI are treated in an appropriate clinical setting rather than being placed in punitive segregation. Interviews with the Wardens and Deputy Wardens at GRVC and OBCC, where 18-year-old inmates are housed in punitive segregation, also indicated that current practices are in place to screen inmates with SMI out of punitive segregation placement. To confirm the effectiveness of the reported practice, New York City Health + Hospitals reviewed a list of the 18-year-old inmates (68 inmates; 2 females, 66 males) who had been placed in punitive segregation during the current monitoring period and verified that none of them had a serious mental illness at the time of their consideration for punitive segregation.

As noted in the Overview for this section, the Department intends to abolish the use of punitive segregation for young adults (i.e., 18- to 21-year-olds) in the near future. Should its use extend beyond the contemplated plan, the Monitoring Team will review the CAPS program in more depth to ensure it meets the requirements of this provision.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: REDUCTION OF PUNITIVE SEGREGATION)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During the current monitoring period, the Department revised draft policy "Transitional Restorative Housing Unit (TRU) and Second Chance Housing Unit (SCHU)" and opened one special programming unit (SCHU) for 18-year-olds at GMDC.

- The Department also drafted a program description and discussed with the Monitoring Team its plans for an additional restrictive program option—the Secure Unit. Inmates have not yet been assigned to the Secure Unit, pending a draft policy, program design, and implementation plan.

### ANALYSIS OF COMPLIANCE

As discussed at length in ¶ 4, above, the Department and Monitoring Team collaborated extensively to refine the program concept and relevant policy for the TRU and SCHU. (Note that the TRU/SCHU policy will govern units in both the adolescent (RNDC) and young adult (GMDC) facilities.) After reviewing multiple drafts and providing both verbal and written feedback to the Department, the Monitoring Team supported the Department in its decision to pilot test the SCHU and TRU at GMDC. In March 2016, one SCHU unit was opened at GMDC.

During this First Monitoring Period, more detailed baseline data was gathered in order to track further reductions in the utilization of punitive segregation. Similar data will be reviewed in subsequent monitoring periods (to the extent the Department continues to use punitive segregation for 18-year-old inmates) to better quantify reductions in the Department's use of punitive segregation for this population. Furthermore, the Monitoring Team will continue to review data on the increased usage of special program units in order to establish the adequacy of the continuum required by this provision.

Between November 1, 2015 and February 29, 2016, a total of 68 18-year-old inmates were placed in punitive segregation, the vast majority of whom were placed there for assaultive behaviors against an inmate or Staff. Over half of the inmates (n=40; 59%) were "known to mental health," meaning that they were receiving mental health services at the time of their placement in punitive

segregation. The average length of stay in punitive segregation was 20.34 days. (Note that some of the inmates in the sample had only partially completed their sentence at the conclusion of the data collection period.) Of the 68 total inmates, approximately 15% (n=10) served multiple punitive segregation periods during the monitoring period (nine inmates served two periods; one inmate served three). Among those with multiple punitive segregation periods, the total average length of stay was 47.3 days for all periods combined.

The new upper limits on the amount of punitive segregation time that can be imposed has helped to reduce the backlog of inmates sentenced to a period of punitive segregation and awaiting a bed. Even so, the length of time that elapses between the infraction and placement in punitive segregation is not insignificant. At the end of the monitoring period, the punitive segregation waitlist (dated March 16, 2016) included 39 18-year-old inmates, 49% of whom were known to mental health. The median length of time on the waitlist for all 39 inmates was 147 days, or about five months.[41] Actual placement in punitive segregation is based on the seriousness of the infraction and the constellation of inmates currently serving punitive segregation time. The Department is very careful about which inmates are placed on units together and thus the effort to keep certain inmates separate can delay an inmate's placement on a punitive segregation unit. While awaiting bed space, these inmates remain on their regularly assigned housing unit.

The Department reported its intention to abolish the use of punitive segregation for inmates age 18 to 21. Given that isolation creates the same risks of decompensation for 18-year-olds as younger adolescents, the Monitoring Team supports this plan. However, experience with other systems suggests that the abolition of punitive segregation should be carefully sequenced to ensure that alternatives are guided by policy, and are fully implemented and programmatically sound. During the Second Monitoring Period, the Monitoring Team will continue to work with the Department to ensure the transition to alternative responses to serious infractions is accomplished deliberately, thoughtfully and safely. More specifically, the Monitoring Team recommends the following:

- Finalize the TRU/SCHU policy and develop metrics for monitoring the implementation of the programs and outcomes for inmates on the units. Adjust program design as necessary.
- Draft a policy for the operation of the Secure Unit and obtain input from the Monitoring Team and other stakeholders. Once the program design has been solidified, pilot test the unit's operation and make adjustments as necessary to improve safety, security and positive outcomes for inmates. Develop metrics for monitoring the implementation of programs and outcomes for inmates on the units.

| **COMPLIANCE RATING** | **¶ 6.** Partial Compliance |
| --- | --- |

---

[41] The median is the point at which 50% of the sample falls below, and 50% of the sample falls above. Rather than computing a mathematical average, the median is used because it is less susceptible to outliers (i.e., extremely short or long stays on the waitlist).

| **XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)** |
| --- |

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has contracted with Jeffrey A. Beard, Ph.D., to conduct an independent review of its infraction processes and procedures.

**ANALYSIS OF COMPLIANCE**

Dr. Beard is amply qualified to conduct the infraction process review. His report is due on June 30, 2016, just before the end of the Second Monitoring Period. The Monitoring Team will review the report at that time.

| **COMPLIANCE RATING** | ¶ 11. (Retention of Qualified Expert) Substantial Compliance<br>¶ 11. (Report by Outside Consultant) Requirement has not come due |
| --- | --- |

## 12. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for inmates under the age of 18 (¶¶ 1, 3). Approximately 200 16- and 17-year-old inmates are housed in facilities on Rikers Island, male adolescents at RNDC and female adolescents at RMSC. The intent of housing adolescent inmates at an alternative facility located off Rikers Island is to place them in a facility readily accessible by public transportation to facilitate visitation between inmates and their family members more easily, and in an environment that will support a new paradigm for effectively managing the adolescent inmate population. This new paradigm will rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

## XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department and the Mayor's Office of Criminal Justice ("MOCJ") are exploring alternative sites to house 16- and 17-year-old inmates as required by this section of the Consent Judgment. To date, they have examined the following:
  - o Budgetary issues
  - o Architectural and design considerations
  - o Accessibility features
  - o Site feasibility
  - o Community considerations

### ANALYSIS OF COMPLIANCE

Identifying and selecting an alternative housing site for adolescent inmates is a challenging and complex undertaking. The first step towards identifying any viable alternative housing site is the allocation of sufficient funds to support the new site. The City of New York has allocated $17 million in fiscal year ("FY") 2017 and $153 million in FY 2018 to identify and renovate an existing City-owned building or, if necessary, build a new facility away from Rikers Island to house inmates under the age of 18.

Identifying a potentially viable location involves assessing whether the physical plant will meet the needs of the Department and its inmates, evaluating the location of the facility and its accessibility, and discerning the community assets and challenges. The Monitoring Team met with representatives of MOCJ and the Department on several occasions to discuss their assessments of potential alternative housing sites. These considerations include assessing whether potentially viable alternative housing sites are readily accessible by public transportation to facilitate visitation between inmates and their family members, and have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house

youth in small units; and (e) a physical layout that facilitates Direct Supervision, as required in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶ 12.

In identifying potentially viable alternative housing sites, MOCJ and the Department are also considering the possibility that statutory changes[42] could impact the Department's responsibility for housing adolescents at any point during the period of time it will take to identify, select, and develop an alternative housing site. These considerations are essential to ensure the efficient use of resources. Furthermore, site selection may trigger the Uniform Land Use Review Process ("ULURP"), a multi-tiered review likely to require a significant period of time to complete. To date, the Monitoring Team regards the Department's efforts to search for and identify an alternative site as constituting "best efforts" as required by this provision. In particular, the Monitoring Team views the significant budget allocation by the City of New York as a strong commitment toward this goal. The Monitoring Team will continue to meet with the Department and MOCJ to discuss and assess their efforts to identify an alternative housing site.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance<br>¶ 3. Not currently applicable |
|---|---|

## 13. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The provisions in the Staff Recruitment and Selection section of the Consent Judgment focus on developing and maintaining a robust program to recruit new Staff to the Department (¶ 1) and the subsequent criteria to ensure that new Staff are appropriately screened and vetted during the hiring process and the two-year probationary period after hiring (¶¶ 2 and 3). DOC has two separate departments that focus on these efforts. The Correction Officer Recruitment Unit is responsible for recruitment of Staff. The Application Investigation Unit ("AIU") is responsible for screening all new Staff, as described more fully below. Prior to the Effective Date, as part of the Department's 14-Point Plan, and in response to a DOI investigation in 2015, the Department increased its efforts and focused on creating a more robust and thorough recruitment and selection process.

---

[42] New York State is one of only a few states that place 16- and 17-year-olds in the adult criminal justice system- prosecuting and sentencing them as adults. The City has advocated to change these laws so that 16- and 17- year-old offenders would instead be placed in the juvenile criminal justice system, a campaign called "Raise the Age." If this legislation passes, the 16- and 17-year -old inmates on Rikers Island would be transferred to the custody of the agency responsible for juvenile justice, NYC Administration for Juvenile Services ("ACS").

A candidate for the position of a correction officer must take and pass the Department of Citywide Administrative Services ("DCAS") examination in order to be considered for the job. Therefore, the Department is responsible for recruiting and encouraging qualified candidates to apply for and take the DCAS examination, as that creates the pool from which they may hire. Following the administration of the DCAS examination, the City creates a ranked list of individuals who are eligible for hire based on their examination scores. New York State Civil Service Law requires the Department to utilize the "One-in-Three" rule, whereby they must consider and hire one of the three candidates at the top of the Eligible List for appointment before moving down the list, unless all three are deemed ineligible by New York State Civil Service Law defined disqualifiers. The Department has an ambitious recruiting plan to hire approximately 1,800 new officers by the end of 2016.[43] This requires a massive recruiting effort to encourage candidates to take the DCAS examination so the Department has a sufficient pool from which to select eligible candidates.

The Monitoring Team met with representatives of the Department's Recruitment Staff and AIU on multiple occasions during the First Monitoring Period to discuss the requirements under this section of the Consent Judgment and the efforts the Department is taking to meet these requirements. The Monitoring Team is very pleased with the initiatives the Department has already instituted.

The Monitoring Team's assessment of compliance is outlined below.

| XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF) |
|---|
| ¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members. |

---

[43] The Department has a large officer deficit and has been relying heavily on overtime, and therefore has a vested interest in ramping up recruitment efforts to bring in not only well-qualified, but larger, recruitment classes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In June 2015, the Department reinstated a Correction Officer Recruitment Unit and hired a Human Resources Director who supervisors and manages a team of approximately 10 correction officers and a captain.

- The Department's Recruitment Team developed a profile of the ideal candidate, conceptualized as "the top 12 traits for a candidate." The profile was developed based on a review of the desired age, education, and key abilities of the candidate including physical attributes (such as strength, mobility, and ability to withstand cleaning fumes, chemical agents, and smoke/fire conditions), leadership traits, and communication style.

- The Department's Recruitment Program was then developed to attract the ideal candidate, as described above. The Program includes the following elements:
  - a "Recruiter Training Manual" which identifies the Department's recruitment goals, strengths, challenges, threats, and opportunities, and effectively outlines "Recruiter Talking Points for Key Department Messaging," and describes an ideal candidate, informed by a "Candidate Profile";
  - a training program for Recruiters.

- The Recruitment Unit is implementing new, modern recruitment tools to attract well-qualified candidates, including:
  - developing a free standing Recruitment website (http://www.nyc.gov/jointheboldest);
  - participating in 100+ recruiting events and expos in the community;
  - generating an external marketing campaign utilizing social media, YouTube, radio, and print media, among other media (e.g. https://www.facebook.com/jointheboldest/; https://twitter.com/CorrectionNYC ).

- The Recruitment Unit works closely with the Department of Public Information to improve overall branding and ensure consistency between the Department and recruiting efforts.

- The Recruitment Department is working with IT to build a Recruitment Database to track individuals expressing an interest in employment as a correction officer.

- The Recruitment Department developed a number of recruiting events to provide candidates with a better understanding of life as a correction officer. This includes open-house events on Rikers Island and in the facilities, and events where candidates have the opportunity to meet and hear from DOC leadership who encourage candidates to move forward with their application process.

- The Department increased the candidate entry salary to approximately $41,000.00.

ANALYSIS OF COMPLIANCE

The Department demonstrated its commitment to attracting well-qualified applicants by reinstating the Correction Officer Recruitment Unit in the summer of 2015, prior to the Effective Date of the Consent Judgment. The Recruitment Unit has an appropriate amount of staff, most of whom are uniformed members of service so they have first-hand knowledge of the requirements and responsibilities of a correction officer. The profile of the ideal candidate, discussed above, is a useful tool for identifying well-qualified applicants. The Department's overall Recruitment Plan provides clear guidance and objectives for recruiting Staff Members to attract well-qualified applicants.

The Monitoring Team is impressed by the Department's presence at various community events and their substantial effort in branding the agency (creating various promotional products, developing marketing materials, and utilizing social media) to attract interest to the position. The tools help the interested candidate to navigate the application process. For instance, the Recruitment Unit developed a video with clear and helpful guidance for signing up for the DCAS examination (which is a complicated process.)

Following the passing of the DCAS examination, the Recruitment Unit continues to maintain contact with potential candidates to maintain interest and encourage the candidate to continue with the process. To that end, the Recruitment Unit hosted events specifically for candidates that passed the DCAS examination. This effort ensures continued engagement with candidates and allows the Department to remain competitive with surrounding law enforcement and correctional agencies.

The Department's increased hiring efforts coincided with the Department's recruitment reforms. The Department recruited and graduated 592 recruits in August 2015, and swore in another 645 in January 2016, and an equivalent-sized recruit class is scheduled to begin for July 2016. The size and composition of the recruit class demonstrates the success of the Department's efforts in developing a comprehensive Staff recruitment program that is competitive with surrounding law enforcement and correctional agencies. Going forward, the Monitoring Team will continue to confirm the maintenance of the robust Recruitment Program discussed above. The Department indicated an interest in utilizing a Candidate Survey to determine the success of the Recruitment Program in driving the actual candidate pool and an overall qualitative assessment of the candidate pool to assess success in driving well-qualified applicants.

| COMPLIANCE RATING | ¶1. Substantial Compliance |
| --- | --- |

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's selection of potential candidates for employment involves a background check, medical screening, drug screening, and psychological test.

- The AIU invites candidates that have passed the DCAS examination to participate in a three-day orientation program, during which candidates are asked to bring relevant materials and the background check process is explained. At the start of the orientation, applicants are required to submit necessary information for screening and are informed that submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

- An AIU investigator is assigned to review each candidate's application. Staff responsible for conducting these investigations receive the same 40-hour training as investigators in the Department's Investigation Division (as discussed in the analysis of Training requirements above (Consent Judgment § XIII, ¶ 2 (c)), as well as additional training on relevant background check protocols and databases.

- Upon completing the orientation materials, the Candidate's application is evaluated for automatic disqualifiers:

  o The first set of disqualifiers are the NYSCL five automatic disqualifiers, and the second set of disqualifiers were a set "in-house" disqualifiers established by the Department to address the character and fitness of correctional officer candidates. The "in-house" disqualifiers are applied after candidates are selected under the New York City Civil Service Law Sections 61 and in Section 4.7.1 of the Rules and Regulations of the City Personnel Director. The rule expressed in both of these regulations requires the Department to choose at least one candidate for appointment from the three highest candidates on the New York Civil Service Eligible List,[44] allowing the Department the discretion to apply the "in-house" disqualifiers. The Department's Senior Management introduced three "in-house" automatic disqualifiers as:

---

[44] "Appointment or promotion from an established eligible list to a position in the competitive class shall be made by the selection of one of the three persons certified by the commissioner of citywide administrative services or the head of the certifying agency, as the case may be, as standing highest on such established list who are qualified and willing to accept such appointment or promotion." Section 4.7.1 of the Rules and Regulations of the City Personnel Director.

1. Employment: Dismissal from employment while a tenured member of a governmental or other public employer is an automatic disqualifier;

2. Arrest Totals can be an automatic disqualifier if the total meets the specific limitations for types of convictions in the last two years, five years, and lifetime (depending on severity); and

3. Driving Record Total can be an automatic disqualifier if the total meets the specific limitations for violations in the last two years or last five years (depending on severity).

- AIU considers a number of factors to assess a candidate's background and fitness to serve including the following:
  - An applicant's criminal history utilizing the following tools: E-Justice, NYS Parole, NYC Probation, Missing Persons, Wanted Persons and Criminal Arrest History databases;
  - An applicant's employment history;
  - Relationships or affiliation with gangs;
  - Relationships with current inmates;
  - Frequency of appearance in the Inmate visitor databases through review of Visit Express, SECURUS, IFCOM and IIS databases;
  - medical screening (including drug tests and fingerprinting);
  - Review of state child abuse registries Family Watchdog and WEBCRIMS;
  - Prior employment reference checks; and
  - Financial records/credit checks.

- The above information is compiled in the applicant's Case Record.

- AIU also utilizes a number of background assessment tools including SECURUS, IFCOM, IIS, Visitor Express, ILS, ELS, SRG, IRS, and NYPD databases to assess candidate backgrounds.

- AIU investigators conduct interviews and field visits of candidates to further verify their background information. AIU Investigators may also coordinate with their counterparts at the NYPD to compare information about candidates that have applied to both agencies.

- Upon reviewing the candidate's Case Record, the investigator drafts a summary of the background investigation and makes a recommendation regarding the candidate's application, recorded on a Case Review Sheet. The Commanding Officer and Deputy Commissioner each approve or disapprove of the Investigator's recommendation, and if disapproving, record the explanation for such disapproval in the comments portion of the Case Review Sheet.

- A secondary background check is conducted after the Staff Member completes a probationary period. This process includes re-submitting the Staff Members name to the databases described above to determine any new issues that may have arisen during the Staff Member's probationary period.

- Each applicant is provided with and required to acknowledge the AIU Appointment Subject to Investigation Form (part of the AIU Selection Package) that informs the candidate that submission of materially false information on the application may be grounds for the Department to seek termination of the Staff Member's employment at any future date. Both the current and new disciplinary guidelines include a corresponding violation.

  o Any new issues that are identified during the secondary background check that were not disclosed by the Staff Member may constitute materially false information.

**ANALYSIS OF COMPLIANCE**

The Department's selection of qualified candidates is a multi-step process. The Department developed a number of measures to create an objective process for the selection and hiring of Staff. As described in detail above, the Department begins an extensive process to conduct background investigations on each candidate. The background investigation also includes medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. AIU staff responsible for conducting these background investigations receive appropriate training, including the same training provided to ID Investigators as described in the Training Section of this report (Consent Judgment § XIII (Training), ¶ 2 (c)) and additional relevant training.

AIU's process to screen corrections officers for the position is objective and adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. Going forward, the Monitoring Team will continue to confirm the maintenance of the hiring standards discussed above, and will conduct a sampling of selected and unselected candidates to determine the adequacy of the background investigations conducted. Accordingly, the Monitoring Team did not evaluate ¶ 3 for this report.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
|---|---|

## 14. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the preliminary reviewer, reviewed the circumstances

warranting the potential arrest and determined that the recommendation is based on probable cause. The

purpose of this section is to ensure that inmate arrests are based on probable cause, and not for

retaliatory purposes. The Monitoring Team did not evaluate the Department's efforts to achieve

compliance with this section during the First Monitoring Period.

## 15. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed in the Consent

Judgment and coordination with the Monitoring Team. To that end, the Department developed an

interdisciplinary compliance team, which sits within the Legal Division and the Quality Assurance

Division and is dedicated to overseeing implementation of, and sustained compliance with, the Consent

Judgment. The Department hired a Deputy Commissioner for Quality Assurance and an Assistant

Commissioner for Quality Assurance. To date, the Department dedicated eight staff members of the

Legal Division (attorneys and non-attorneys) to work on advancing the reforms outlined in the Consent

Judgment. Further, the Department allocated six uniformed Staff (Assistant Deputy Wardens, Captains,

and officers) and two civilian auditors to the Quality Assurance Division and also expressed its intent to

identify two additional attorneys to better support the Quality Assurance Division. Finally, where the

Consent Judgment aligns with the 14-Point Plan, the Department's compliance team collaborates with

the Department's Project Management Office ("PMO") which coordinates the Plan's 14 initiatives,

supports working teams, and engages key department leadership.

The first two paragraphs in this section (¶¶ 1 & 2) are intended to ensure that the Department's

policies, procedures, practices, protocols, training curricula and corresponding documents, and logs and

handbooks are consistent with the requirements under the Consent Judgment to the extent that such

requirements are not explicitly stated in other provisions in the decree. In order to comply with these

provisions, the Department must first identify the materials that fit in this category and then analyze

whether any revisions are warranted or necessary. In an agency of this size, this process will inherently require the consideration of hundreds of policies, procedures, protocols, training curricula, practices, and other written documents (including logs, handbooks, manuals and forms). These revisions must also be appropriately coordinated and sequenced with one another, which requires collaboration across the various departments in the Department to ensure that revisions in one document or procedure are consistent with the requirements in the Consent Judgment and also other Department policies and procedures.

The second component of this section (¶ 3) requires the Department to appoint an employee to serve as the Compliance Coordinator. The Compliance Coordinator is intended to support the Department's efforts to implement the reforms in the Consent Judgment and serve as a liaison between the Department and the Monitoring Team and Parties to the *Nunez* Litigation.

| XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES) |
|---|

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The steps taken towards compliance with these two paragraphs are discussed together because policies, procedures, protocols, training curricula, and practices are intrinsically intertwined with other written documents, such as logs, handbooks, manuals, and forms.

- The process of identifying other policies, procedures, protocols, training curricula, and practices for revision began in conjunction with the Department's efforts to develop and revise policies as specifically required under the Consent Judgment.

- In the process of addressing the specific revisions to materials as required under the Consent Judgment, the Department identified, and in some cases revised, other materials that must be edited or modified for consistency with the requirements in the Consent Judgment.

- The Department also started the process of revising and/or developing other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Consent Judgment.

**ANALYSIS OF COMPLIANCE**

The timeline for this provision (within six months of the Effective Date) is after the First Monitoring Period so a compliance assessment will not be made for these provisions.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Requirement has not come due |
| | ¶ **2.** Requirement has not come due |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Executive Agency Counsel served as the Compliance Coordinator during the First Monitoring Period while the Department recruited, and subsequently hired, an Assistant Commissioner of Quality Assurance and Integrity to serve in the role of the *Nunez* Compliance Coordinator. The Executive Agency Counsel reports directly to the Deputy Commissioner of Legal Affairs/General Counsel and has appropriate access to the Commissioner.

- The Assistant Commissioner of Quality Assurance and Integrity (a.k.a. Compliance Coordinator) was appointed in March 2016. He reports directly to the Deputy Commissioner of Quality Assurance and Integrity (who reports directly to the Commissioner) and has appropriate access to the Commissioner.

- The Compliance Coordinator has over 30 years of corrections experience, having risen through the ranks at the Los Angeles County Sheriff's Office. During the last five years of his career in Los Angeles, he was responsible for quality assurance and compliance with a number of federal consent decrees.

**ANALYSIS OF COMPLIANCE**

The role of the Compliance Coordinator is an invaluable position to the Monitoring Team because this individual and their team help facilitate the Monitoring Team's work and ensure efficient transmittal and sharing of information. The Monitoring Team developed a strong working relationship with both individuals who have served in the role of the Compliance Coordinator. The first Compliance Coordinator began working with the Monitor and Deputy Monitor in the summer of 2015 and, as noted above, facilitated meetings, calls and discussions between the Department and the Monitoring Team well before the Effective Date of the Consent Judgment. This allowed the Monitoring Team to quickly get up to speed and build relationships with DOC leadership and staff,

which helped foster a collaborative and collegial relationship with the Department. The first Compliance Coordinator was open, transparent, available, and fully engaged in working with the Monitoring Team. She encouraged Executives, Supervisors and Staff to do the same. Her personal knowledge of the Department and deep relationships across the agency provided the Monitoring Team with a wealth of information. She had regular communication with the Monitoring Team, often speaking with members of the team daily, and ensured that Monitoring Team's requests were addressed in a timely fashion (often on the same day or within days of the request). The Compliance Coordinator also supported the work of the Monitoring Team by scheduling site visits, meetings, and calls with relevant staff, and providing requested information or documents.

The Monitoring Team is encouraged by the Department's selection of the new Compliance Coordinator who has relevant and impressive experience doing similar work in Los Angeles. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team demonstrates the Department's commitment to achieving and maintaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

# Conclusion

As should be evident by the foregoing analysis, the Consent Judgment put into motion a complex and exceedingly detailed roadmap for advancing, in a sustainable fashion, the safe, modern, and lawful operation of one of the largest jail systems in the United States. Such an undertaking places a significant burden on a wide variety of stakeholders, not the least of which are the Department officials and roughly 9,000 uniformed officers charged with superintending some 10,000 confined persons. Much has been accomplished during the First Monitoring Period to initiate the implementation of structures and processes upon which sustainable reform can be achieved. The Department has thus far demonstrated a willingness to work in a collaborative fashion with the Monitoring Team to advance the goals of the Consent Judgment. To be sure, this is merely the beginning of an extended journey that will require continued collaborative relationships to sustain the pace and substance of the reform in a fashion that truly achieves the aims of the Consent Judgment. Important foundational advancements have been made by the Department to begin to address the troubling issues that gave rise to this Consent Judgment. The

Department's performance to date should make the stakeholders cautiously optimistic that real reform is underway and building momentum.

**Appendix 1**

# Monitoring Team Biographies

## Steve J. Martin, Monitor

Mr. Martin is a career corrections professional and attorney currently engaged in private practice as a corrections consultant. He has been involved in a variety of roles as a consulting expert, federal court monitor, and court-appointed expert in jails, prisons and juvenile facilities across the U.S. He served as a corrections expert for the U. S. Department of Justice, Civil Rights Division, for approximately 15 years and for five years as an expert for the Department of Homeland Security, Office of Civil Rights and Civil Liberties. He has worked as a consultant in more than forty states and has visited or inspected more than 700 confinement facilities in the U.S., Northern Ireland, Guam, Saipan, Jamaica, Puerto Rico, and the American Virgin Islands. He has served or currently serves as a federal court monitor in numerous prisons and state systems, four large metropolitan jail systems, and two juvenile justice entities. His experience in juvenile confinement systems includes such state systems as New York, Texas, Ohio, and California.

During his more than 44 years in the criminal justice field, he worked as a correctional officer, probation and parole officer, and prosecutor. He is the former General Counsel/Chief of Staff of the Texas prison system and also served gubernatorial appointments in Texas on both a sentencing commission and a council for mentally impaired offenders. He coauthored a book on Texas prisons (Texas Prisons, The Walls Came Tumbling Down, Texas Monthly Press, 1987), and has written numerous articles on criminal justice issues. He served as an adjunct/visiting faculty member and as a visiting scholar at seven different universities, including the University of Texas School of Law and Queens University, Belfast.

Mr. Martin has been continuously involved in institutional reform litigation since 1981. This work includes extensive experience in the largest confinement operations (prison, jails, juvenile facilities) in the U.S. It also includes work as an agency counsel, a special assistant attorney general, a consultant to state agencies and legislative bodies, a defendants' and plaintiffs' expert, a court monitor, and a principal investigator for a variety of governmental agencies. He has appeared/testified before myriad oversight entities including the U.S. Congress. He has extensive experience in the development of correctional standards, policies, procedures and guidelines for confinement operations for juveniles and adults.

Mr. Martin received his Bachelor of Science in Criminology and Corrections and Master of Arts in Correctional Administration both from Sam Houston State University. Mr. Martin received his Juris Doctor from the University of Tulsa School of Law.

## Anna E. Friedberg, Deputy Monitor

Anna E. Friedberg is currently an Associate Managing Director based in Exiger's New York office where she serves as Deputy Monitor of the *Nunez* Monitoring Team. Ms. Friedberg is an attorney with extensive experience leading and managing large complex cases and investigations in the public and private sector and advising clients on the implementation of global compliance programs. She began her career at the international law firm Ropes & Gray LLP. There, she served as co-lead counsel in *Nunez v. City of New York*. Her practice also focused on anti-corruption and anti-trust investigations and litigation, serving global public companies and financial services clients. Ms. Friedberg also has broad

experience designing compliance programs and conducting risk assessments and pre-transactional due diligence. Prior to this, Ms. Friedberg was a Judicial Law Clerk for the Honorable Barbara S. Jones, U.S. District Court for the Southern District of New York. Ms. Friedberg also served as an Instructor for the Cornell Prison Education Project at the Cayuga Correctional Facility in upstate New York and interned at the United States Attorney's Office for the Southern District of New York.

Ms. Friedberg earned her Bachelor of Arts in Political Science from Rice University, and her Juris Doctor from Cornell Law School.

### Christina G. Bucci, Associate Deputy Monitor

Christina Bucci is currently an Associate Director based in Exiger's New York office where she serves as Associate Deputy Monitor of the *Nunez* Monitoring Team. Ms. Bucci is an attorney who served as plaintiffs' counsel in *Nunez* and has experience managing corruption investigations and designing global compliance programs. Ms. Bucci was formerly an associate with the international law firm Ropes & Gray LLP. In this role, she conducted multiple internal investigations concerning potential violations of anti-corruption laws by public and private companies, and developed and implemented programs to facilitate compliance with the Foreign Corrupt Practices Act (FCPA). In addition, Ms. Bucci has a range of experience in complex litigation including antitrust and class action litigation. Prior to joining Ropes & Gray, Ms. Bucci was an Intern at the Waterfront Commission of New York Harbor, where she assisted attorneys in investigating organized crime and corruption and interned at the United States Attorney's Office for the Eastern District of New York.

Ms. Bucci earned her Bachelor of Arts in Anthropology, magna cum laude, from Rollins College, and her Juris Doctor from New York University School of Law.

### Kelly Dedel, Ph.D., Subject Matter Expert

For over 15 years, Dr. Dedel has served as a court-appointed monitor for litigation involving the conditions of confinement for juveniles in detention and correctional facilities. She is nationally recognized as an expert in the following areas:

- protection from harm, reducing violence, programming and behavior management;
- suicide prevention;
- special education; and
- quality assurance.

Most recently Dr. Dedel has served as the monitor for Los Angeles County's juvenile probation camps and the State of Ohio's secure juvenile correctional facilities. Across the span of her career, she has worked in approximately 80 facilities. In addition to her work as a monitor, Dr. Dedel, along with Georgetown University's Center for Juvenile Justice Reform, created a practice model for youth in secure custody. This project includes both a monograph and an opportunity for demonstration sites to receive technical assistance to improve their practices surrounding youth in secure custody. Dr. Dedel also conducts research on objective risk classification instruments (e.g., construction and validation) and serves as a technical assistance provider on risk assessment for the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative (JDAI). She is a Coach for the Performance-Based Standards project (PbS), a data-driven improvement model that holds juvenile agencies and facilities to the highest

standards for operations, programs and services. Dr. Dedel is also a certified PREA auditor. In 2009, the American Probation and Parole Association awarded Dr. Dedel the University of Cincinnati Award for her outstanding contributions to the field.

Dr. Dedel earned Bachelor's Degrees in Psychology (with Honors) and Criminal Justice, both from the University of Richmond, Virginia. She received a Ph.D. in Clinical Psychology from the Center for Psychological Studies in Berkeley, California. Upon earning her doctorate, Dr. Dedel became a Senior Research Associate with the National Council on Crime and Delinquency, and later was a Founding Partner of the Institute for Crime, Justice and Corrections at the George Washington University. Since 2003, she has worked as the Director of One in 37 Research, Inc., a consulting firm currently based in Cody, Wyoming.

## Patrick Hurley, Subject Matter Expert

Patrick Hurley is a veteran corrections professional with 33 years of corrections experience. His career started in 1980 as a substance abuse counselor for the Ohio Department of Rehabilitation and Corrections at the Chillicothe Correctional Institute. This career ultimately led to service in five prisons, and two periods of service in the central office. He was a Warden at two facilities and a Bureau Chief of Construction, Activation and Maintenance. During his tenure, he was responsible for myriad duties such as Hostage Negotiator, Hostage Negotiation Team Leader, STAR Commander (which included overseeing the entire Special Response Team and Hostage Negotiation network for the agency), Accreditation Manager, Incident Command System Instructor/Coordinator, Investigator, Hearing Officer, and Trainer.

For six years he served as a Deputy Director for the Ohio Department of Youth Services as a consultant for Use of Force compliance for the Consent Judgment of *SH v. Stickrath*. He was instrumental in the development and delivery of Pre-Service, In-Service and Supervisors' Use of Force Training. He was a training instructor for Supervisors' Planned Use of Force training, and developed the curriculum for the Cell Extraction Training. He researched and implemented new restraint devices such as the Emergency Response Belt and the Humane Restraint Blanket. He developed and implemented all of the training for the facilities' Use of Force Reviewers and oversaw those positions for several years.

In addition to his corrections experience, Mr. Hurley served two years at the Orient Developmental Center working with residents who had a mental health diagnosis or developmental disabilities.

Mr. Hurley has a Bachelor of Arts from Miami University, Oxford, Ohio and a Master of Business Administration from the University of Dayton.

## Emmitt L. Sparkman, Subject Matter Expert

Emmitt L. Sparkman is a corrections administrator with over 40 years' experience working in juvenile and adult community corrections and institutions. He has held line and supervisory positions in the states of Texas, Kentucky and Mississippi. These positions include: correctional officer, education consultant, correctional captain, correctional major, probation officer, intake-detention superintendent, director of security, director of education, warden, superintendent, and deputy commissioner. He served as Deputy Commissioner of Institutions for the Mississippi Department of Corrections ("MDOC") from November 2002 until May 2013 and has held Warden positions at prisons in Texas, Kentucky and

iii

Mississippi. His warden experience includes managing correctional facilities that housed offenders of all custody levels:  minimum, medium, close, and death row.

Mr. Sparkman has been a consultant and expert witness in numerous states on prison and jail operations. He is both a certified Prison Rape Elimination Act (PREA) and American Correctional Association Accreditation Auditor. While the MDOC Deputy Commissioner for Institutions, he directed major reforms in the use of long-term segregation at the Mississippi State Penitentiary resulting in the successful reduction of the MDOC long-term segregation population from over 1,300 offenders to approximately 350 offenders. He has provided consulting services to corrections systems in the states of Maryland, Illinois, New Mexico, Oklahoma, Colorado, and South Carolina regarding the use of long term segregation and was a participant in the Federal Bureau of Prisons' Special Housing Unit Review and Assessment completed in December 2014.

Mr. Sparkman received his Bachelor of Science in Criminology and Corrections from Sam Houston State University and his Master of Science in Criminal Justice from Eastern Kentucky University.