# Second Report of the *Nunez* Independent Monitor

**Second Monitoring Period**
**March 1, 2016 through July 31, 2016**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Anna E. Friedberg
*Deputy Monitor*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Patrick Hurley
*Subject Matter Expert*

Emmitt Sparkman
*Subject Matter Expert*

Dennis Gonzalez
*Analyst*

**Introduction** ....................................................................................................... **1**

Executive Summary of Work Completed in the Second Monitoring Period ........................... 1

The Monitoring Team's Priorities ......................................................................... 4

Monthly Use of Force Trends Meeting .................................................................... 6

Recommendations from the Monitor Regarding the Training Academy & Body Scanners ...... 6

Overview of the Monitor's Report ........................................................................... 7

**Use of Force and Inmate Violence During the Second Monitoring Period** ............................ **9**

Monitor's Observations of Current Practices Regarding the Use of Force ............................ 10

Overall Trends ................................................................................................... 13

Use of Force and Injuries ..................................................................................... 14

Analysis of Use of Force Trends ........................................................................... 17

Locations of Incidents ......................................................................................... 17

Inmate Characteristics ........................................................................................ 18

Reasons for the Use of Force ................................................................................ 20

Department's Response to Use of Force and Violence Among Young Adults ...................... 25

Next Steps ........................................................................................................ 27

**Section by Section Analysis** ................................................................................ **29**

1.   Use of Force Policy (Consent Judgment § IV) ........................................................ 29

2.   Use of Force Reporting and Tracking (Consent Judgment § V) .................................. 33

3.   Training (Consent Judgment § XIII) .................................................................... 43

4.   Anonymous Reporting System (Consent Judgment § VI) .......................................... 64

5.   Video Surveillance (Consent Judgment § IX) ........................................................ 65

6.   Use of Force Investigations (Consent Judgment § VII) ............................................ 77

7.   Staff Discipline and Accountability (Consent Judgment § VIII) ................................. 101

8.   Screening & Assignment of Staff (Consent Judgment § XII) ..................................... 106

9.   Risk Management (Consent Judgment § X) ........................................................... 108

10.  Safety and Supervision of Inmates Under the Age of 19
     (Consent Judgment § XV) ............................................................................... 123

11.  Inmate Discipline (Consent Judgment § XVI) ....................................................... 138

12.  Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) ................. 154

13.  Staff Recruitment and Selection (Consent Judgment § XI) ....................................... 155

14.  Arrests of Inmates (Consent Judgment § XIV) ...................................................... 160

15.  Implementation (Consent Judgment § XVIII) ....................................................... 161

# INTRODUCTION

This is the second report of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC") and the Monitoring Team to advance the reforms in the Consent Judgment during the Second Monitoring Period, which covers March 1, 2016 to July 31, 2016 ("Second Monitoring Period").

The Department manages 12 inmate facilities, nine of which are located on Rikers Island. In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, and to dismantle the decades-long culture of violence in these facilities, as well as targeted reforms to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 9,375 uniformed officers and 1,707 civilian employees and detains an average daily population of 9,900 inmates ("Inmates").

*Executive Summary of Work Completed in the Second Monitoring Period*

The Consent Judgment was entered by the Court on October 22, 2015. The Monitor issued his First Report on May 31, 2016, which covered the first four-month period of the Consent Judgment from October 22, 2015 through February 29, 2016. This report captures the Department's efforts over the subsequent five months, through July 31, 2016. Although the frequent filing of routine Monitor Reports provides important information for stakeholders regarding the Department's incremental progress towards achieving compliance with the Consent Judgment, the short interval between reports also means

that the Department may not achieve major milestones during each Monitoring Period. Consequently, progress may appear to be gradual, even as the Department puts essential protocols in place. The Consent Judgment includes over 300 separate provisions and requires the development, refinement and implementation of a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against Inmates and reducing violence among Inmates, particularly Young Inmates (i.e., those under 19 years old). The work completed to date confirms that the road to sustainable reform will be neither swift nor painless; it must be traversed in an incremental, well-reasoned, and methodical manner.

During this Monitoring Period, the Monitoring Team scrutinized more closely the use of force within the Department. This included assessments of Preliminary Reviews, the underlying documentation, and closed investigation files. The Department continues to struggle with many of the problematic, excessive, and unnecessary uses of force that gave rise to the Consent Judgment, as detailed in the following Use of Force section. Furthermore, the level of violence at the Facilities housing Young Inmates is cause for significant concern. While abatement of such complex issues, realistically, cannot be achieved in the period of time that has elapsed since the Effective Date of the Consent Judgment, protecting Inmates from harm at the hands of Staff and other Inmates remains the critical priority for the Monitoring Team. Toward that end, the Department has implemented a number of policies, procedures, and training curricula to address use of force and Inmate-on-Inmate violence.

The Department's accomplishments during this Monitoring Period demonstrate their commitment to reform. The Department and the Monitoring Team have maintained a strong, collaborative relationship that has resulted in the development of a number of policies and procedures required under the Consent Judgment, as well as some additional policies and procedures that are not expressly required, but that will support the overall reform effort. The Department must maintain, and in

2

some instances *increase*, its efforts in order to achieve substantial compliance with the requirements of

the Consent Judgment. Outlined below is a summary of some of the notable work completed during the

Second Monitoring Period:

- **Risk Management**: The Department expended significant effort to develop and refine three

  critical risk management tools: the Commissioner's Twelve, the Action Review Committee and

  5003 Counseling Sessions. These tools will allow the Department to identify and better

  understand problematic uses of force by Staff members and strategies to mitigate such uses of

  force, and to ensure timely accountability for Staff members who engage in inappropriate uses of

  force and are the linchpin of any successful risk management and accountability system.

- **Training**: The Department began to deploy Special Tactics and Responsible Techniques

  ("S.T.A.R.T.") training to all Staff. The Department finalized, and the Monitoring Team

  approved, a lesson plan on the Use of Force Policy for Supervisors and the lesson plan for

  Facility Emergency Response (Probe Team).

- **Use of Force Investigations**: The Department assigned Investigative Division teams across all

  Facilities so that every use of force incident now receives a Preliminary Review.

- **Inmates Under the Age of 19**: The Department eliminated the use of Punitive Segregation for

  18-year-olds, replacing it with a program-focused alternative, the Secure Unit at GRVC. The

  City also identified an alternative location for housing 16- and 17-year-old Inmates outside of

  Rikers Island.[1]

  While the Department continues to struggle with reducing and controlling unnecessary and

excessive force and with reducing violence among Young Inmates, there is no lack of effort by the

Department to develop and implement policies, procedures, and training to address these issues. It is less

---

[1] Transfer of 16- and 17-year old Inmates to the alternative location is contingent on the City receiving approval via the
Uniform Land Use Review Process. The City reports it is beginning to work with all stakeholders to obtain such approval.

a question of whether there is a commitment to change and more of a question of how best to effect change in a timely and safe manner. While still in the early stages of the life of the Consent Judgment, all stakeholders must strive to maintain and, in some cases, even accelerate the pace of reform.

*The Monitoring Team's Priorities*

The Monitoring Team has maintained its incremental approach to the task of monitoring because it ensures appropriate synergy and collaboration with the Department on the development and implementation of sustainable reforms. During this Monitoring Period, the Monitoring Team focused on assisting the Department in developing its internal capacity to identify problematic trends in the use of force and to identify methods to address those concerns (i.e., "The Commissioner's Twelve" and the Action Review Committee, both described in detail in the Risk Management section). The Monitoring Team's expectation is that these procedures will improve the Department's ability to identify and respond to excessive and unnecessary uses of force.

The Monitoring Team identified five issues through its assessment of Preliminary Reviews of use of force incidents and brought them to the Department's attention so that strategies to reduce the frequency of their occurrence could be developed. The Monitoring Team's concerns included: (1) the high frequency of unnecessary uses of chemical agent ("OC spray"), (2) the use of head strikes, (3) the frequency of use of force on inmate's in restraints, (4) the absence of handheld video footage for use of force incidents where the use of handheld video is required, and (5) the failure to consistently and systematically identify and analyze patterns and trends about the incidents. The Monitoring Team highlighted these specific issues because all five are fundamental to accurately assessing and analyzing uses of force. The Monitoring Team also provided considerable technical assistance to the Department regarding the development of alternatives to Punitive Segregation for Young Inmates. Finally, the Monitoring Team spent significant time working with the Department and the Parties to develop a series

of agreements related to the use of information produced by the Department to demonstrate compliance with the Consent Judgment (*see* Docket Entry 290 and Appendix 1 to this Report).

During the Second Monitoring Period, the Monitoring Team was present at various Department locations for in-person meetings and site visits, including multiple visits to the Facilities on Rikers Island (including the ESU trailer and Training Academy). The Monitoring Team regularly met and communicated with Commissioner Joseph Ponte, his executive staff, and other DOC Staff members, including corrections officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners. The Monitoring Team also communicated regularly, by phone and in-person, with Plaintiffs' Counsel, SDNY representatives, and counsel for the City (collectively, "Parties to the *Nunez* Litigation"); Directors and staff of the Board of Correction; union representatives for uniformed and non-uniformed DOC Staff; the Inspector General and Deputy Inspector General of the Department of Investigations; representatives from the Mayor's Office of Criminal Justice; and representatives from New York City Health + Hospitals (the Department's healthcare provider). The Monitoring Team also hosted one meeting with the Parties to the *Nunez* Litigation to provide an opportunity to exchange information regarding the implementation of reforms.

During this Monitoring Period, the Monitoring Team also made numerous requests for documents and information, including requests for policies, procedures, use of force investigation files, candidate selection files, Staff schedules and Inmate files. The Department has been very responsive to the Monitor's requests and has produced thousands of pages of documents, including approximately 200 use of force investigation files, 100 candidate selection files, training attendance records, and bi-monthly and monthly data and information regarding the use of force and investigations. The Monitoring Team and the Department have also exchanged countless drafts of policies, procedures, and training lesson plans as described throughout this report.

_Monthly Use of Force Trends Meeting_

A critical component to the successful implementation of the reforms required by the Consent Judgment is an open and collaborative relationship between the Department and the Monitoring Team. The Monitoring Team meets monthly with the Commissioner, the Chief of Department, Deputy Commissioner of ID, Deputy Commissioner of Legal Affairs, Deputy Commissioner of Quality Assurance, the _Nunez_ Compliance Coordinators, and other Department representatives to discuss vital issues, particularly those related to the improper or excessive use of force. These meetings have provided the Monitoring Team and the Department the opportunity to identify key issues, trends and challenges facing the Department and to actively work together to develop solutions.

The Monitor selects issues for discussion each month, usually identified through the course of assessing the Preliminary Reviews of use of force incidents. The Monthly Meetings allow the Department to share information regarding steps they have taken to address issues and trends raised in previous meetings. During this Monitoring Period, topics included: (1) identifying problematic uses of force, (2) developing the Department's internal capacity to identify and analyze trends based on the Preliminary Reviews, (3) the excessive and/or unnecessary use of chemical agents, and (4) handheld camera operation issues.

_Recommendations from the Monitor Regarding the Training Academy & Body Scanners_

The Monitoring Team again _strongly urges_ the City to fund a long-term solution to address the limited and sorely inadequate training space available to the Department, as described in great detail in the First Monitor's Report (_see_ pages 55-57 of the Monitor's First Report). The Monitoring Team remains concerned that a long term solution is still years away. The Department has implemented a number of interim strategies to address the deficiencies in its current training space, and is continuing to try to identify and procure additional interim space. However, developing a permanent new Training

Academy will take time and significant resources. The Monitoring Team recommends that the City give increased attention to this issue to ensure that the Department has all the necessary resources to sustain this unprecedented reform effort.

Furthermore, as part of the effort to reduce violence, the use of force and the injuries to Staff and Inmates that result from both, the Monitoring Team encourages the Department to use all of the tools at its disposal, including ionizing body scanners. The Department has this equipment, but is currently not authorized to use it due to State law regulations restricting its use, the City has continued to advocate changing this law. The Monitoring Team's collective experience suggests that body scanners are an effective way to help control the flow of contraband into correctional facilities and, thus, believes that the Department should be authorized to use this equipment.

_Overview of the Monitor's Report_

The following sections of this report summarize the Department's efforts to achieve substantial compliance with the provisions in each substantive section of the Consent Judgment. The first section describes the Monitoring Team's findings related to the use of force, Inmate-on-Inmate violence, and other outcomes related to the procedural requirements of the Consent Judgment. Next, the Monitoring Team analyzes the steps taken by the Department to achieve compliance with each substantive section of the Consent Judgment and assesses the current level of compliance for provisions related to the Monitoring Team's priority areas.

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[2] (b) Partial Compliance,[3] and (c) Non-compliance.[4] The Monitoring Team did not assess compliance for any provision with a deadline for completion falling after July 31, 2016, though a summary of the Department's progress to date is provided.

The Monitoring Team did not assess compliance for every provision in the Consent Judgment in this report. The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress. This report also provides compliance ratings for several provisions that were not evaluated in the First Monitor's Report. Subsequent Monitor's Reports will do the same, continually increasing the total number of provisions assessed. The Monitoring Team's strategy for assessing compliance is consistent with the overall approach to reform described above: that provisions must be considered, addressed, and evaluated in a sequential and logical manner in order to achieve sustainable reform.

The Monitor's Report addresses all 15 substantive sections of the Consent Judgment. For each substantive section, the introduction includes a summary of the requirements and the practices the requirements are intended to address. The introduction also includes a summary of the Department's overall efforts to achieve compliance with the provisions in the Consent Judgment and the Monitoring Team's involvement in that effort. The final portion of each section provides the Monitoring Team's

---

[2] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

[3] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[4] "Non-compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

compliance assessment for a set of provisions, which includes a summary of the specific steps the Department has taken to achieve compliance, the Monitoring Team's analysis of those efforts, recommendations for the Department's next steps, if applicable, and the Monitoring Team's compliance rating, if applicable. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions are embedded in the compliance assessments for ease of reference.

## USE OF FORCE AND INMATE VIOLENCE DURING THE SECOND MONITORING PERIOD

The Consent Judgment provisions are intended to resolve the issues considered in *Nunez* and the SDNY investigation which generally aim to: (1) reduce the use of unnecessary or excessive force and provide Staff with new tools and training for responding to Inmate behaviors and by ensuring accountability for Staff's improper use of force and (2) to reduce violence in the Facilities that house Young Inmates by implementing procedures and protocols likely to address the underlying causes of violence (e.g., staffing levels, responses to misconduct, programming, incentives for positive behavior, etc.).

The purpose of this review of use of force and Inmate-on-Inmate violence data is threefold. First, the use of force and Inmate violence data anchors the report in the context of the conditions that created the need for external oversight, showing the levels of force currently being applied, the severity of resulting injuries, and the reasons that force is used. Second, over time, trend data will illustrate the impact of the various reforms as they are implemented across the life of the Consent Judgment. Finally, the analysis offers a model for how the Department can improve the way it internally monitors the use of force and Inmate-on-Inmate violence, identifying trends and patterns so that targeted interventions can

be applied in the Facilities and with populations where problems are concentrated. This internal capacity to identify and solve problems is what will eventually make external oversight by the Monitor unnecessary.

Regarding the use of force, the specific procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives and disincentives.

During this Monitoring Period, the Monitoring Team reviewed approximately 1,700 Preliminary Reviews of use of force incidents and over 200 use-of-force investigation files (including Preliminary Review files, backlog cases, and closed ID and Facility cases). To date, the Monitor has personally reviewed all 2,500 Preliminary Reviews completed on use of force incidents (the combined total of all Preliminary Reviews conducted in the First and Second Monitoring Periods), among other materials. For all analyses, the Monitoring Team reviewed data for the total Inmate population and also examined differences across age (i.e., adults, 18-year-olds and 16 and 17 year olds).

*Monitor's Observations of Current Practices Regarding the Use of Force*

Within the total number of use of force incidents, the number of incidents involving head strikes and force on restrained Inmates is high. The Monitor reviewed approximately 1,700 Preliminary

Reviews of use of force incidents in this Monitoring Period and identified approximately 235 use of force incidents that involved a blow or strike to the head and approximately 300 use of force incidents that involved inmates in restraints.[5] The frequency of this type of Staff response alone could suggest that Staff too frequently resort to force as a means to address all levels of resistance, including resistance in the form of non-compliance with a direct order, irrespective of the immediacy or seriousness of that resistance.

Furthermore, during this Monitoring Period, Preliminary Reviews (including review of video) revealed too many incidents which appeared to be unnecessary, excessive, unnecessary/excessive, and/or for the sole purpose of inflicting punishment.[6] When an Officer, rather than summoning a Supervisor, immediately resorts to the use of force on an Inmate who is passively resisting an order, then that force may be fairly characterized as *unnecessary*. Furthermore, when such force goes beyond that which is necessary to immobilize, neutralize, or control that immediate or active threat, it may fairly be characterized as *excessive*. When an Officer too quickly resorts to force and the force employed creates needless risk of harm, it may fairly be characterized as both *unnecessary and excessive*. When the force is plainly disproportionate to the level of resistance and appears to be used for the very purpose of causing harm or injury, it raises the issue of whether the Officer's conduct was *malicious*.

Among the Preliminary Review and closed Use of Force investigations examined by the Monitoring Team, a number of apparently unnecessary uses of force involved applications of chemical agents to Inmates who are either passively interacting with Officers or even complying with Officer commands. Some of these incidents were aggravated when the OC spray was used at less than the

---

[5] These numbers include both actual and alleged uses of force. Further, it is important to acknowledge that the Department has not completed the investigations into the majority of these incidents or reached conclusions about the nature and appropriateness of force, nor has the disciplinary process concluded.
[6] It is important to acknowledge that the Department has not completed the investigations into the majority of these incidents or reached conclusions about the nature and appropriateness of force, nor has the disciplinary process concluded.

required three-foot distance. In other instances, the OC spray was administered in copious amounts from a canister designed primarily as a crowd-control contaminate (MK-9 canister) rather than from a canister designed for a smaller area (MK-4 canister). The unnecessary incidents, of course, were not limited to the use of OC spray. Instances were also identified in which head strikes were used, even when the Officer(s) could have avoided force by taking time and/or creating distance between himself/herself and a verbally resisting Inmate. Instances were also identified in which Inmates were too forcefully slammed into a wall, rather than simply escorted appropriately or placed against a wall in a non-forceful manner. In some instances, the Inmates were restrained when slammed on the wall. In such an instance, the Officer's conduct is both unnecessary and excessive. Where the Department's investigation confirms the same, the Department must seek appropriate discipline.

Furthermore, in a few incidents, objective evidence indicated that line-level supervisors—Captains—were using excessive force. During this Monitoring Period, two Captains were each involved in two different use of force incidents for a total of four incidents where there was objective video evidence suggesting that the use of force was inappropriate, unnecessary or excessive. The mere fact that an Officer is involved in multiple uses of force is not necessarily an indicator that such force is inappropriate, unnecessary or excessive; however, when an Officer does appear on a recurring basis it does raise a concern for the Monitor and, consequently, such cases receive closer scrutiny. In examining the Preliminary Reviews, the Monitor noted that a growing number of Officers were repeatedly involved in use of force incidents, with varying levels of evidence of improper use of force in a number of these cases. Finally, in two instances, evidence suggested that force was used for the purpose of causing harm to an Inmate, and in one of those cases, an Assistant Deputy Warden was involved.

In addition to the foregoing substantive observations on Staff's use of force, in too many instances, Staff failed to properly videotape use of force incidents. This was especially prevalent when

12

the Probe Teams were involved in the use of force. In too many instances, Staff improperly used institutional equipment (e.g. striking an Inmate with an OC spray canister or institutional bucket or using an Electronic Immobilization Shield ("EIS") to knock an Inmate to the floor), improperly applied restraint holds and/or applied prohibited restraint holds (e.g. use of a choke hold) to Inmates. Finally, there has been at least one use of force incident in which evidence suggests that Staff failed to report it. Such a failure is among the most serious of all use of force violations and simply cannot be tolerated.

The Monitoring Team believes that reductions in the rate of force, reductions in the frequency and severity of injuries, and reductions in the overall level of violence are critically necessary. The Monitoring Team is also confident that the conscientious application of the policies and practices required by the Consent Judgment will result in Facilities that are safer for both Staff and Inmates. As discussed in later sections of this report, the Department shares these concerns and has recognized the underlying issues, which are being addressed in a collaborative fashion by the Department and the Monitoring Team.

*Overall Trends*

The commentary above discussed specific issues of concern. The following sections discuss aggregate data on the use of force and Inmate violence. As shown in the first line graph below, since the Effective Date, the total number of uses of force has ranged between 334 (May 2016) and 442 (December 2015) uses per month.[7] Because the Department houses a large number of Inmates (nearly 10,000), expressing the data as a *rate*, as in the second line graph, helps to contextualize it. A rate also neutralizes the impact of changes in the size of the Inmate population across time. The rate is calculated by dividing the number of uses of force ("n") into the average daily population ("ADP") for each month, and then multiplying the result by 100. Thus, for example, in July, there were 4.16 uses of force for

---

[7] These data include actual, reported uses of force and do not include alleged uses of force that have not been confirmed.

every 100 Inmates. The overall number and rate of use of force incidents during this Monitoring Period,

by any standard with which the Monitoring Team has had experience, is high. Furthermore, the dotted

trend lines in each graph show that, overall, the number and rate of uses of force has remained flat

(stable) since the Effective Date, neither increasing nor decreasing substantially.





*Use of Force and Injuries*

Use of force incidents are assigned a severity classification based on the severity of injuries

sustained by either Staff or Inmates. "Class A" incidents are those resulting in the most severe injuries[8],

_____

[8] These are injuries that require medical attention beyond the prescription of over-the-counter analgesics or the administration of minor First Aid. Examples include incidents resulting in multiple abrasions, contusions, cracked, chipped or lost teeth, lacerations, punctures, fractures, loss of consciousness, or internal injuries.

"Class B" incidents are those that result in minor injuries[9], and "Class C" incidents are those in which no injuries were sustained by Staff or Inmates. Incidents in which chemical agents were used, but resulted in no injury other than irritation of the eyes, nose, or throat, are also categorized as Class C.

As shown in the chart below, the majority (62%, n=1,162) of the 1,882 uses of force that occurred during the Second Monitoring Period did not result in any injury. Serious injuries occurred in the 2% (n=29) that were classified as "Class A" and lesser injuries occurred in the 37% (n=691) that were classified as "Class B." The distribution across severity levels was similar for adult Inmates, 18-year-olds and 16 and 17 year olds. This distribution is nearly identical to the distribution across injury severity levels observed among incidents occurring during the First Monitoring Period (*see* page 16 of the Monitor's First Report).



*Note: Percentages total more than 100% due to rounding.*

---

[9] These are injuries that require only the administration of First Aid or over-the-counter analgesics. Examples include superficial bruising, scrapes, scratches, or minor swelling. Class B incidents can also include minor injuries sustained from the forcible use of mechanical restraints.

That 39% of the use of force incidents resulted in injury is concerning, although the fact that an injury was reported as part of the use of force incident does not necessarily mean that the use of force was inherently excessive or that the injuries were a result of the Staff's use of force (e.g. an Inmate-on-Inmate fight that triggered the use of force could be the cause of the Inmate's injuries). The data below show the number of injuries sustained by Staff and Inmates during use of force incidents since the Effective Date. Overall, more Inmates than Staff were injured during incidents involving a use of force. Although many of the injuries are not serious (as shown in the chart above), the dotted trend lines indicate that the number of Staff and Inmate injuries have been trending upward since the Effective Date. Over time, these data on the number and severity of injuries will be a key indicator of the extent to which the safety goals of the Consent Judgment are being achieved.



_Analysis of Use of Force Trends_

The frequency of use of force and resulting injuries are obvious outcome measures associated with safety and the overall goals of the Consent Judgment. However, part of the Monitoring Team's duty is to assist the Department in problem-solving to reduce the use of force. In part, this occurs by a robust analysis of the locations where force is used, characteristics of the Inmates involved, and reasons for the use of force. The Department is currently working on further developing this data. In the future, this analysis may be supplemented by an examination of characteristics of Staff involved, within-facility trends, and other covariates that will emerge as the Department's data becomes more sophisticated.

_Locations of Incidents_

Use of force rates were also examined by Facility to identify differences across the various jails managed by the Department. For each Facility, an average rate of use of force since the Effective Date is presented in the bar graph below.

Facilities housing the greatest concentrations of 16/17- and 18-year-old Inmates (i.e., RNDC and GMDC, respectively) have the highest use of force rates. These age-related differences are examined in depth, below. Additionally, the rate for the West Facility ("WF") should be interpreted with caution due to the very low average daily population (approximately 30 Inmates per month); with such a small denominator, even few uses of force will result in a high rate. In the chart, the bars for these Facilities are greyed-out in order to focus more squarely on the other facilities.

Among the Facilities with large populations of adults, GRVC, OBCC and MDC have the highest use of force rate (6.98, 3.41 and 3.28, respectively). Just as importantly, EMTC and VCBC have the lowest rates of use of force (1.25 and 1.17, respectively). Even among Facilities housing adults, differences in Inmate characteristics (e.g., propensity for aggressive behavior, whether sentenced or pre-trial), differences in Staff characteristics (e.g., leadership, tenure, overtime burden), and differences in

17

access to programming and other services are likely to impact the use of force. These differences in location are ripe for analysis by the Department as it seeks solutions to address the overall use of force rate and frequency of injury.



_Inmate Characteristics_

Overwhelmingly, the rate of use of force is higher among younger Inmates than adults, a fact which comports with the Monitoring Team's experience in other jurisdictions. Even within this broad trend, several differences are notable. First, of all age groups, the use of force rate is highest among the 16- and 17-year-old Inmates (average rate=26.4). This may be attributable to Staff's lack of skill in managing Young Inmates, who typically have high energy levels, unevenly paced brain development that results in impulsivity and lack of judgment, and a lack of positive coping skills for dealing with the stress of the correctional environment. These issues are at the heart of the Consent Judgment's requirements for Young Inmates (discussed in the Training, Inmate Discipline and Safety and Supervision sections of this report).

Developmental research has also brought a new awareness to the field that many young adults (aged 18 to 21) may exhibit a similar lack of maturity and solid decision-making skills because their

brains are still developing as well. The Department has demonstrated its awareness of this research by extending many of the benefits and protections afforded to Young Inmates (those 18 and under) in the Consent Judgment to the broader population of Young Adult Inmates (those age 19 to 21). The Department's Young Adult Housing Plan is intended to increase the services available to this population. However, the table below identifies another important trend: the rate of use of force for 18-year-olds is more than twice the rate of use of force for older young adults (those age 19 to 21), with average rates of 19.1 and 9.0, respectively.

| | **Uses of Force by Inmate Population** March 1, 2016 to July 31, 2016 | | | | | |
|---|---|---|---|---|---|---|
| | **March 2016** n/ADP *Rate per 100* | **April 2016** n/ADP *Rate per 100* | **May 2016** n/ADP *Rate per 100* | **June 2016** n/ADP *Rate per 100* | **July 2016** n/ADP *Rate per 100* | **Average Rate** |
| **Adults** | 235/8691 *2.7* | 221/8625 *2.6* | 181/8569 *2.1* | 214/8552 *2.5* | 204/8526 *2.4* | *2.5* |
| **19-21 year olds** | 73/917 *8.0* | 57/869 *6.6* | 71/858 *8.3* | 92/845 *10.9* | 93/821 *11.3* | *9.0* |
| **18-year-olds** | 36/213 *16.7* | 29/205 *14.2* | 26/198 *13.1* | 55/192 *28.7* | 42/187 *22.5* | *19.1* |
| **16/17 year olds** | 30/182 *16.5* | 37/182 *20.3* | 56/191 *29.3* | 65/200 *32.5* | 66/198 *33.3* | *26.4* |
| *Source: DOC* | | | | | | |

Many things are changing for the adolescent and young adult Inmate populations—large concentrations of young adults are now housed at GMDC; prohibitions on the use of Punitive Segregation up to age 21 and the addition of several alternative programs for violent misconduct are now in place; improvements in programming are being made available to general population Inmates—which makes it difficult to understand the factors contributing to this stark difference in the use of force rates. However, the Monitoring Team encourages the Department to increase its focus on the 16- to 17-year-old Inmate population more overtly in its violence reduction initiatives and to continue to examine the root causes of the stark differences in use of force across the different age groups.

*Reasons for the Use of Force*

The reason that Staff used physical force with an Inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. As an initial matter, physical force by Staff in a correctional setting is at times necessary in order to maintain order, keep Staff and Inmates safe, and to enforce the law. Accordingly, the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and Inmates from serious harm. For example, if two Inmates are fighting, Staff must intervene, often physically, to prevent either Inmate from sustaining a serious injury. When an Inmate is engaged in active physical resistance to a lawful order, some level of force may be necessary.

However, not all uses of force are necessary. As discussed above, force may be unnecessary, excessive, or even malicious. While the Department and Monitoring Team do not yet have complete data on the frequency of excessive or unnecessary uses of force (allegations of such misconduct that occurred after the Effective Date are still under investigation), initial data to better understand and better focus subsequent inquiries is presented below. The Department tracks the reason reported by Staff for the use of force, using the nine categories presented in the chart below. The Department's current data system allows for only one reason to be associated with each incident, so the administrator entering the incident into the incident Reporting System ("IRS") must identify the predominant reason for the use of force. Frequently, Staff cite more than one reason for using force (e.g. an Inmate fight may also involve a refusal of a direct order and resisting application of a restraint) and the following data do not account for the secondary reasons. As a result, these data may underestimate the actual frequency with which a given reason was reported by Staff.

The table below presents the reasons Staff provided for using force for each month during the current Monitoring Period, along with an average for the 5-month period. As shown, the most frequent reasons include: in response to an Inmate-on-Inmate fight (33%), an Inmate's refusal to comply with a direct order (24%), and an assault on Staff (18%).

| Reason Provided by Staff for Uses of Force<br>March 1, 2016 to July 31, 2016 | | | | | | |
|---|---|---|---|---|---|---|
| **Reason** | **March 2016** | **April 2016** | **May 2016** | **June 2016** | **July 2016** | **Average** |
| **Total Uses of Force** | 374<br>100% | 344<br>100% | 334<br>100% | 426<br>100% | 405<br>100% | **100%** |
| **Inmate Fight** | 130<br>35% | 97<br>28% | 96<br>29% | 145<br>34% | 151<br>37% | **33%** |
| **Refuse Direct Order** | 77<br>21% | 107<br>31% | 86<br>26% | 99<br>23% | 80<br>20% | **24%** |
| **Assault on Staff** | 71<br>19% | 69<br>20% | 58<br>17% | 69<br>16% | 74<br>18% | **18%** |
| **Prevent Self Harm** | 53<br>14% | 26<br>8% | 34<br>10% | 55<br>13% | 35<br>9% | **11%** |
| **Resist Restraint/Escort** | 21<br>6% | 26<br>8% | 33<br>10% | 29<br>7% | 40<br>10% | **8%** |
| **Other** | 11<br>3% | 12<br>3% | 18<br>5% | 20<br>5% | 9<br>2% | **4%** |
| **Extraction** | 6<br>2% | 5<br>1% | 4<br>1% | 3<br>1% | 14<br>3% | **2%** |
| **Prevent Property Destruction** | 5<br>1% | 2<br>1% | 5<br>2% | 5<br>1% | 2<br><1% | **1%** |
| **Prevent Commission of Crime** | ~ | ~ | ~ | 1<br><1% | ~ | **<1%** |

These data offer additional insight into potential solutions for reducing the legitimate use of force. In general, this can be accomplished in two ways: (1) reducing the frequency of situations that trigger a use of force (e.g., Inmate fight, Staff assault) and (2) using non-physical means to respond to Inmate behavior (e.g., de-escalation, persuasion), both of which are among the goals of various provisions in the Consent Judgment. The Monitoring Team intends to deepen this analysis as additional information about the underlying reasons for using force becomes available. For example, incidents in which force was used to prevent self-harm will be further scrutinized, as will those related to failure to comply with a direct order, to ascertain whether other, non-physical responses may have been more appropriate.

Furthermore, the Department provided data on the overall rate of Inmate-on-Inmate fights during the current Monitoring Period, presented in the line graph below. These data include fights that resulted in the use of force (discussed in more depth, below) and those that did not (i.e., were disbanded upon verbal command, by peers, or otherwise did not require Staff intervention). These data clearly illustrate the significantly higher rates of Inmate-on-Inmate violence among younger Inmates, particularly the 16 and 17 year olds, as compared to their adult counterparts.



These trends are extremely concerning given the risk of harm to both Inmates and Staff that result from interpersonal violence. They highlight the importance of the sections of the Consent Judgment related to the reduction of violence among this population, Consent Judgment § XV (Safety and Supervision of Inmates Under Age 19) and Consent Judgment § XVI (Inmate Discipline). Without an emphasis on the underlying causes of violence among Young Inmates, identifying appropriately targeted interventions, and ensuring quality implementation of those responses, the Department is unlikely to achieve the reforms required by the Consent Decree.

Furthermore, Inmate-on-Inmate fight data is particularly interesting when viewed in the context of the use of force data. The table below examines the Inmate fight data next to the use of force data,

and identifies the proportion of Inmate fights in which a use of force was utilized. These data are presented by month and by age group. Across all Inmates, Staff utilized force to respond to approximately 25% of all Inmate-on-Inmate fights, meaning that 75% of fights end without physical intervention by Staff. Some interesting differences emerge when looking at these data by age:  Staff were much more likely to respond to fights among adolescent and 18-year-old Inmates using force than fights among adult Inmates (42% of adolescent's fights and 64% of 18-year-olds' fights versus 24% of other young adults' fights and 15% of fights among adult Inmates). The reasons for these differences are unknown at this time, but will be assessed by the Monitoring Team in subsequent Monitoring Periods.

| Proportion of Inmate Fights Involving UoF March 1, 2016 to July 31, 2016 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **March 2016** | | **April 2016** | | **May 2016** | | **June 2016** | | **July 2016** | | **Average** |
| **Population** | Inmate Fight - UoF | Total Fights | Inmate Fight - UoF | Total Fights | Inmate Fight - UoF | Total Fights | Inmate Fight - UoF | Total Fights | Inmate Fight - UoF | Total Fights | % of Fights w/UoF |
| **Adults (age 22+)** | 60 | 277 | 45 | 275 | 40 | 300 | 25 | 278 | 50 | 290 | 15% |
| | 22% | | 16% | | 13% | | 9% | | 17% | | |
| **19-21-year-olds** | 24 | 87 | 15 | 97 | 21 | 127 | 54 | 152 | 40 | 151 | 24% |
| | 28% | | 15% | | 17% | | 36% | | 26% | | |
| **18-year-olds** | 29 | 51 | 20 | 28 | 16 | 37 | 35 | 49 | 29 | 37 | 64% |
| | 57% | | 71% | | 43% | | 71% | | 78% | | |
| **16/17-year-olds** | 17 | 34 | 17 | 39 | 19 | 50 | 31 | 93 | 32 | 70 | 42% |
| | 50% | | 44% | | 38% | | 33% | | 46% | | |
| **All Inmates** | 130 | 449 | 97 | 439 | 96 | 514 | 145 | 572 | 151 | 548 | 25% |
| | 29% | | 22% | | 19% | | 25% | | 28% | | |

While these data only explain part of the variation in the use of force rates across adults and younger Inmates, they highlight the impact that effective strategies to reduce Inmate-on-Inmate violence could have on reducing the overall use of force rate with Young Inmates. In general, such strategies would include training Staff to address interpersonal conflict and develop constructive relationships with Young Inmates, significantly reducing the amount of idle time, developing gang management strategies

with help from community-based organizations, providing Inmates with chronic violent misconduct with treatment services that are delivered with fidelity, implementing a robust system of incentives and consequences—essentially, implementing the tools required by this Consent Judgment. Reductions in Inmate violence will bring a corresponding reduction in the rate of force.

*Department's Response to Use of Force and Violence Among Young Adults*

As noted earlier, in June and July 2016, the use of force rate for male adolescent and young adults increased significantly. The Department identified a number of circumstances they believed were associated with these spikes, particularly at GMDC. First, during the early part of the Monitoring Period, the Department was finalizing the consolidation of all young adult Inmates and the number of young adults housed together in GMDC totaled over 700. Although the transfer of young adults to GMDC had been on-going for some time, during the final months, a disproportionate number of high-risk Inmates (i.e., those with particularly violent histories or strong gang ties) were scheduled for transfer. By June, the number of high-risk young adults at GMDC had nearly doubled, from 40 in late May to 76 by mid-June, with a number of higher risk young adults still pending a move to GMDC. Concurrently, the number of alarms per day doubled and use of force incidents increased 141%, from 49 in May to 118 in June.

Second, during this same time, approximately 160 new Officers from the May 2016 graduating class were assigned to GMDC to help relieve the overtime issues. Throughout the implementation of the Department's Young Adult Housing Plan, the Department has tried to manage the surge in overtime and abate the negative consequences excessive overtime has on GMDC's ability to successfully manage this increasingly challenging population. Prior to introducing new Officers from the Academy, GMDC averaged close to 1,900 hours of overtime each day. While the introduction of new Officers into the facility lowered overtime initially, increasingly high numbers of incidents, related security responses and

25

alarms, and continued training requirements (many of which are detailed below in the Training section of this report) quickly eroded the initial overtime relief. The Department expects that the new recruits will contribute to reduced overtime and successfully managing young adults in the long term, but in the immediate future, new Officers demand the attention of their coworkers, senior staff, and managers to train and mentor them.

As a result of these challenges, the Department has begun to reevaluate the Young Adult Housing Plan, reconsidering whether having a single facility dedicated to an all-male, young adult Inmate population is the best path toward its goal of safer Facilities for Staff and Inmates. Toward that end, the Department is advancing a combination of immediate- and long-term measures for the management of the young adult population. Generally, 18-year-olds will remain at GMDC. The Department is examining an alternative housing strategy for 19- to 21-year-olds which would include co-mingling that population with adults. The Department reports that initial analysis revealed that when certain 19- to 21-year-old Inmates were co-mingled with adults, they were involved in fewer violent Inmate-on-Inmate incidents than their peers housed with only 18- to 21-year-olds in GMDC. These findings are consistent with the Monitoring Team's experience employing a similar housing strategy in other jurisdictions. Future housing plans for the 19- to 21-year-olds will therefore be based, in part, on further analysis of this initial finding.

At the end of the Monitoring Period, approximately 700 Young Adults remain in GMDC. The Department transferred 25 young adults from GMDC to AMKC, slowed the transfer of the remaining young adults housed outside of GMDC, and is working on alternative facility placements for a number of young adults. The Department also reports it instituted a daily classification and movement team meeting to ensure appropriate classification, housing, and gang separation Department-wide. This daily meeting stems from the discovery that at least 30% of the June incidents were linked to gang separation

and classification issues.

*Next Steps*

The Department has been quite vocal about its focus on violence reduction among the Young Adult population, and as noted throughout this section, the Monitoring Team encourages a similar focus for the 16- and 17- year-old Inmates at RNDC. Strategies to reduce violence at RNDC and GMDC will be a priority focus of the Monitoring Team's work during the Third Monitoring Period. Further, as DOC has noted, and consistent with the Monitoring Team's experience, frequently a small number of Inmates can account for a sizable portion of use of force incidents. Preliminary data from the Department from the first quarter of 2016 suggests there is a similar occurrence in the New York City Jails. During the next Monitoring Period, the Monitoring Team will work with the Department to focus on the effectiveness of the strategies employed to date in the effort to reduce violence and the consequent use of force for this targeted group. This analysis will include the identification of Inmates with high-frequency aggressive behaviors and a cross-referencing of those who have been exposed to the alternative programs (i.e., the Second Chance Housing Unit, Transitional Housing Unit, and Secure Unit). This comparison will identify whether the Department has accurately identified the Inmates who are contributing the largest portion of violence and other management problems for intensive intervention. In addition, this analysis will begin to look at the key components of the alternative programs to ascertain whether they have been implemented according to design (e.g., whether programs are being delivered with fidelity, whether Inmates are receiving all required services, etc.). Finally, this analysis will identify the key metrics that will be tracked on an on-going basis to assess the programs' effectiveness in reducing violence. These could include the type and intensity of the services provided, rate of violence and use of force, length of stay, and measures of program fidelity. Given the complexity

of this endeavor, the Monitoring Team expects that this effort is likely to span several Monitoring Periods.

Regarding next steps for reducing instances of unnecessary and excessive uses of force, the Consent Judgment requires the Department to implement a variety of tools to accomplish this goal. These include: providing Staff with clear guidelines about permissible uses of force, providing high-quality training on tools and techniques, providing on-going supervision and coaching to Staff, and ensuring accountability for Staff whose conduct is outside the parameters of permissible behavior. The Monitoring Team will continue to offer technical assistance and collaborate with the Department on developing and implementing policies and procedures related to each of these instruments of reform. Progress toward this end is the substance of the remainder of this report.

In summary, the analyses conducted in the Second Monitoring Period reinforced the Monitoring Team's concerns about the safety of the Facilities, Staff and Inmates given the high rates of use of force, the high rates of violence among adolescents and young adults, and the frequency with which use of force incidents that appear to be unnecessary, excessive and/or malicious continue to occur. The following sections of this report discuss the Department's progress in implementing the procedural steps required by the Consent Judgment that are intended to reduce the occurrence of problematic uses of force and to decrease the level of interpersonal violence in the Facilities housing Young Inmates. No single mechanism or approach will eliminate these improper practices in a matter of months. Some of these practices have been deeply ingrained in the Department for decades. However, the Monitoring Team thus far has been impressed with a large segment of DOC personnel who are genuinely committed to advancing the overarching goals of the Consent Judgment.

# SECTION BY SECTION ANALYSIS

## 1.  USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and Inmate safety. The Department developed a New Use of Force Directive and it was approved by the Monitoring Team prior to the effective date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, in the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the new policy and corresponding disciplinary guidelines took effect.[10] Therefore, the new policy will go into effect on September 27, 2017, with the disciplinary guidelines to follow on October 27, 2017.

During this Monitoring Period, the Department focused on implementing the New Use of Force Directive, which required the Department to provide Staff with training not only on the directive itself (including the differences between the new and old policies), but also on the additional physical skills they will need in order to properly implement the new concepts. The Department developed the Special Tactics and Responsible Techniques ("S.T.A.R.T.") program, a four-day bundled training program. S.T.A.R.T. includes one day of training on the New Use of Force Directive and three days of training on the new Defensive Tactics curriculum. The Training Section of this report provides further information about the deployment of this training.

The Monitoring Team's assessment of compliance is outlined below.

---

[10] The Monitoring Team will work closely with the Department during this period to ensure that training is delivered to all Staff timely and efficiently, and that it is accurately tracked and managed.

| **IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)** |
|---|

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive was finalized and approved by the Monitor.

- The Department developed new, standalone policies for the use of restraints and tasers.

**ANALYSIS OF COMPLIANCE**

The final version of the New Use of Force Directive, as approved by the Monitor, was completed in October 2015. The specific content of the New Use of Force Directive was discussed in First Monitor's Report.

As noted above (and in the First Monitor's Report), adopting and implementing the New Use of Force Directive will take time. During the current Monitoring Period, the Department took key steps to adopting and implementing the New Use of Force Directive including finalizing key training program curricula and deploying the training programs. Adopting and implementing the New Use of Force Directive also requires ongoing reinforcement of key concepts related to using force to ensure Staff conduct is consistent with the requirements of the Consent Judgment.

| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance<br>¶ 1. **(Adopt)** Partial Compliance<br>¶ 1. **(Implement)** Partial Compliance<br>¶ 1. **(Monitor Approval)** Substantial Compliance |
|---|---|

| **IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)** |
|---|

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive was finalized and approved by the Monitor.

- The Department developed new policies for the use of restraints and tasers.

- The Department began to revise its current directive on the use of chemical agents.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized and capable of being readily understood by Staff. It addresses the requirements in Consent Judgment § IV (Use of Force Policy) ¶ 3(a) to (t), Consent Judgment § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, Consent Judgment § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and Consent Judgment § IX (Video Surveillance) ¶¶

30

2(d)(i) and 4. Accordingly, it is consistent with the requirements of the Consent Judgment and is also aligned with best practice. This policy will provide Staff the necessary guidance and parameters to carry out their duties safely and responsibly.

**¶ 3(p)**

While all of the requirements in ¶ 3 are appropriately addressed in the New Use of Force Directive, the Monitoring Team has also worked with the Department to develop three standalone policies related to the use of restraints, chemical agents, and tasers.

*Restraint Policy*

As described in the First Monitor's Report, the Department developed a standalone policy regarding the application of restraints. The Monitoring Team and the Department collaborated to ensure the revised policy satisfies the Consent Judgment's requirements, appropriately addresses state law requirements, and provides Staff with clear and adequate guidance on the use of restraints. The policy was finalized during the Second Monitoring Period and issued to Staff on August 17, 2016.

*Chemical Agents Policy*

The Monitoring Team has made a number of recommendations to ensure that the chemical agents directive is consistent with the New Use of Force Directive. The Team offered, among other recommendations, more detailed guidance on the authorized use of various canister sizes, adoption of a method to track the amount of OC spray used in a given incident, and guidance about when Staff are required to check with medical personnel for contraindications. These recommendations were discussed during several Monthly Meetings. The Department is in the process of reviewing and revising the chemical agent policy. The Monitor expects to continue working with the Department on these revisions during the Third Monitoring Period.

*Taser X2 Conducted Electrical Device Policy*

During the current Monitoring Period, the Department also developed a policy for the use of the Taser X2 Conducted Electrical Device ("taser"). The Monitor has significant experience in confinement settings where the taser has been approved for use as a tactical device. The taser is a handheld conducted energy device primarily designed to disrupt a subject's nervous system by means of deploying a high voltage, low power current of electrical energy sufficient to cause pain and/or uncontrolled muscle contractions to override the subject's voluntary motor response. The taser is a tactical device that is within the accepted range of less lethal alternatives commonly deployed in confinement settings across the U.S. The Monitoring Team met with the Commissioner, Chief of Department, the highest ranking officer of the Emergency Service Unit ("ESU"), and representatives of the Commissioner's executive staff to collaborate on revisions to the policy to ensure that the use of the taser was limited to a select group of Staff and limited to a small set of circumstances with heightened safety concerns.

The use of the taser is currently limited to Captains assigned to the ESU. These individuals must receive the S.T.A.R.T. training, as well as 16 hours of taser training (which doubles the duration recommended by the manufacturer). The Monitoring Team reviewed the taser policy lesson plan and observed the two-day taser training. The Monitoring Team found the quality of the training was excellent and that it provided Staff with the information and skills necessary to safely and appropriately deploy the taser. The Department intends to begin using the taser during the Third Monitoring Period. The Monitor will closely review every incident involving the application of the taser.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-o).** Substantial Compliance<br>**¶ 3(p).** Partial Compliance<br>**¶ 3(q-t).** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In consultation with the Monitoring Team, the Department issued a teletype on May 31, 2016, advising Staff about the effective date of the New Use of Force Directive and Disciplinary Guidelines.

- The Department developed a messaging campaign to inform Staff about S.T.A.R.T. and also issued a teletype.

- The Department created large posters about S.T.A.R.T., which are displayed in every Facility and on the Department's intranet page and television screens.

- The Department developed a video about S.T.A.R.T. and it is scheduled to be played on the screens inside the Facilities during the Third Monitoring Period.

### ANALYSIS OF COMPLIANCE

The Department has appropriately and thoughtfully advised Staff about the implementation of the New Use of Force Directive. The messaging campaign for the training program is creative, constructive, and conveys a positive and productive message. In order to successfully implement the new policy, the Department must continue to frequently and clearly communicate with Staff about the New Directive in order to address any questions or concerns, dispel any misunderstandings, and reinforce best practices.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |

2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

      The Use of Force Reporting and Tracking section of the Consent Judgment addresses the reporting and tracking of information related to use of force incidents. This section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 & 23).

*Staff Member Use of Force Reporting*

      During this Monitoring Period, the Monitoring Team continued to consult with the Department to develop policies, procedures, and systems related to reporting and tracking requirements and continued to advise the Department on the implementation of new systems. The Monitoring Team also analyzed Staff use of force reports included in the investigation files of use of force incidents (both at the conclusion of the Preliminary Review and at the conclusion of the full investigation) as a component of the Monitoring Team's assessment of compliance with Staff's reporting obligations. This assessment is described in more detail in the Use of Force Investigations section of this Report. The Monitoring Team's initial findings suggest that Staff are generally complying with reporting requirements[11]; however, there are clearly instances where there are reporting deficiencies of varying degrees of seriousness. The Monitoring Team's initial findings also suggest that Staff assigned to investigate use of force incidents are reviewing incident packets with the specific purpose of ensuring compliance with these requirements. However, further assessment of Staff's use of force reports, allegations of use of force, and other materials is necessary before the Monitoring Team is in a position to assess compliance

---

[11] The Monitoring Team has identified some cases where it appears that Staff may have failed to report a use of force incident, however, the investigations for those cases have not been concluded. The Monitoring Team will conduct a more in-depth analysis of these cases in the next Monitoring Period to determine whether there is any veracity to these claims.

with Staff reporting obligations (¶¶ 1-8). A substantive update regarding the development of policies related to Staff Member reporting of use of force (¶ 9) is described in more detail in the box below.

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims by any individual that Staff used force against an Inmate and the force was not previously reported (either because an incident report was not generated or the report generated did not document any force against the Inmate concerned). An alleged use of force does not always mean that force was actually used; that will be determined through the Investigations process. This is also why data on alleged uses of force were not included in the use of force data analyzed in the Use of Force section of this report, above. However, tracking and investigating alleged uses of force is critical to reducing the frequency with which actual uses of force go unreported. Policy states that Staff who fail to submit an incident report regarding force they used or witnessed are subject to disciplinary measures.

The line graph below presents the number of alleged uses of force reported since the inception of the Consent Judgment (November 2015) through the end of the Second Monitoring Period (July 2016). As shown below, the number of allegations spiked in May and June 2016, before returning to the historical average in July 2016. During the next Monitoring Period, the Monitoring Team intends to further analyze use of force allegations to determine the rate at which these cases are substantiated.



*Non-DOC Staff Use of Force Reporting*

During the current Monitoring Period, the Monitoring Team further explored the efforts by New York City Health + Hospitals ("H+H") (the healthcare provider for Inmates in DOC custody) to implement the requirements for Non-DOC Staff Use of Force Reporting (¶¶ 11-13). The Consent Judgment imposes specific requirements on H+H employees to: report either to the Tour Commander, ID, the Integrity Control Officer, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the Medical Staff as being the result of a Use of Force (¶ 11); advise a Supervisor whenever they have reason to suspect that a use of force incident was improperly classified (¶ 12); and immediately refer emergency matters involving an imminent threat to an Inmate's safety or well-being to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible (¶ 13).

During the current Monitoring Period, the Monitoring Team met with representatives from H+H to understand their procedures for conveying and reinforcing these requirements with their employees. H+H reported that it provides a "Dual Loyalty Training" to all Staff that has been updated to incorporate the reporting requirements in the Consent Judgment. The Monitoring Team reviewed the training curriculum and is satisfied that the reporting obligations are being addressed through the scenario-based training modules. However, the Monitoring Team needs to conduct an assessment of Medical Staff's practice before assessing compliance with these provisions. Furthermore, the Monitoring Team also intends to learn more about the efforts undertaken by the City to meet the requirements in ¶ 10 (requiring all Non-DOC Staff who witness a use of force incident that results in an apparent injury to report such incident directly to the Tour Commander or a Supervisor).

_Tracking_

During the current Monitoring Period, the Monitoring Team analyzed the Department's efforts to track information as required in ¶¶ 14, 15, 16, 17, 19 and 21[12] and assessed compliance as discussed in the tables, below.

_Prompt Medical Attention Following Use of Force Incident_

The Department must provide prompt medical attention following a use of force incident (¶¶ 22 and 23) and must track the delivery of such medical attention. During the current Monitoring Period, the Monitoring Team reviewed Injury to Inmate Reports, analyzed the Department's tracking database, and spoke with Staff, Inmates, and H+H employees regarding these issues. The Monitoring team also visited and observed operations at the clinic and intake on multiple occasions in a number of Facilities. The Monitoring Team has identified some potential areas of concern regarding the prompt provision of medical attention for Inmates through its review of incident packets, as well as during on-site visits, but

---

[12] The Monitoring Team will assess compliance with ¶¶ 18 and 20 following the implementation of CMS.

further assessment is necessary before any conclusions can be drawn. The assessment of prompt medical attention is one of the Monitoring Team's priorities for the Third Monitoring Period.

The Monitoring Team's assessment of compliance is outlined below.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES) |
|---|

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment. In order to comply with this requirement, the Department must have policies or procedures that address Consent Judgment § V ¶¶ 1-6, 8, 22 and 23.

All nine paragraphs are addressed in the New Use of Force Directive, which will become effective September 27, 2017. The Monitoring Team analyzed the Department's existing policies and procedures to determine the extent to which the requirements of the Consent Judgment are addressed during the interim period before the New Use of Force Directive is in place.

- o **Requirements currently in policy or practice and also addressed in the New Use of Force Directive**: ¶¶ 1, 2, 3, 3(a)-3(f), 3(h), 5, 6, 8, 22

- o **Requirements in New Use of Force Directive but not fully addressed in current policies or practice**: ¶¶ 3(g), 4, 7, 23

  - ▪ ¶ 3(g) requires the Captain and the Staff Member(s) responsible for escorting the Inmate to the clinic following a use of force incident to include in their reports the approximate time the Inmate was transported to receive medical care and the name of the clinician or medical professional who provided care. While the time the Inmate is seen by Medical Staff and the clinician's name can be found on the Injury Report form #167R-A, the approximate time of escort is not included on that form and is not currently required to be included in the Captain or Staff's report.

  - ▪ All requirements in ¶ 4 are addressed in current policy and procedures except the requirement for Staff to obtain the Tour Commander's permission to leave the Facility without first preparing and submitting his or her Use of Force Report.

> ■  All requirements in ¶ 23 are addressed except for the requirement to record which Staff Members were in the area to receive post-incident evaluation or treatment.

As noted above, all reporting requirements are addressed in the New Use of Force Directive. Further, the majority of the reporting requirements are addressed in current policy and procedure. Accordingly, the Department has achieved Substantial Compliance with this provision. However, the Department has only achieved partial compliance with the adoption of these requirements because the New Use of Force Directive is not yet effective. The "implement" component of this provision will be assessed for each individual provision listed above once the policy has been put into practice.

| COMPLIANCE RATING | ¶ 9. (Develop) Substantial Compliance |
| | ¶ 9. (Adopt) Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

- a.  Use of Force Incident identification number.
- b.  Classification level of the Use of Force Incident, including any changes made to the classification level (*i.e.*, Class A, Class B, or Class C).
- c.  Date, time, and location of the Use of Force Incident.
- d.  Facility that houses each Inmate upon whom force was used or alleged to have been used.
- e.  Names and identification numbers of all Inmates upon whom force was used or alleged to have been used.
- f.  Names and identification numbers of all Inmates who were present in the area of the Use of Force Incident.
- g.  Names and shield numbers of all Staff Members who used, or are alleged to have used, force.
- h.  Whether the Use of Force Incident was an Anticipated Use of Force.
- i.  Nature of any injuries sustained by Inmates, Staff Members, or anyone else.
- j.  A brief description of the type of force (*e.g.*, chemical agent, single punch to body, control holds, punches to face or head, multiple blows, kicks, use of batons or other instruments, etc.) that was used and by whom.
- k.  Whether force was used while the Inmate was in restraints.
- l.  Whether video footage captured the Use of Force Incident and a brief description of the camera used (*e.g.*, fixed surveillance, handheld, or body-worn).
- m.  Whether any Inmate was arrested as a result of the Use of Force Incident, and if so, a description of the new criminal charges.
- n.  A brief description of the Staff Member's stated reasons for engaging in the Use of Force.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS").

- o IRS captures the information required by ¶ 14(a)-(i) and 14 (k)-(n) in individualized fields.
- o The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified the Department continues to track information electronically as described in the First Monitor's Report. During the Second Monitoring Period, the Monitoring Team confirmed accurate incident tracking by comparing a sample of reports generated from IRS to actual incident reports and reports from investigation files for a sample of dates and Facilities. The Monitoring Team confirmed that the vast majority of incident data is tracked accurately and reliably. However, information tracking could be improved in two areas: the location of incidents and list of Staff involved. In 14% of incidents reviewed, the "location" of the incident was listed as "unknown" in IRS but a location was listed in the underlying investigative file. In 9% of incidents reviewed, the list of involved Correction Officers available in IRS was not as exhaustive as the list in the underlying investigative file (e.g., IRS listed only two Staff, while the investigative file demonstrated three Staff were involved). The deviations identified are minimal and therefore the Department is in Substantial Compliance with these obligations.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As reported in the First Monitor's Report, the Department developed an interim database, utilizing Microsoft Access, to track information related to Facility Investigations.

  - o The database has specific fields to track the information enumerated in ¶ 15(a)-(g).

**ANALYSIS OF COMPLIANCE**

The database the Department uses to track information related to Facility Investigations is an interim measure until the Case Management System ("CMS") is developed. The Department has experienced some technical challenges with this interim system: while information can be entered into the database, it can be difficult to retrieve *ad hoc* aggregate reports. The time and resources needed to correct this problem (or build another interim system) would exceed the time needed to bring CMS on-

line. Accordingly, the Department and Monitoring Team agreed that focusing on the development of CMS, versus trying to produce additional aggregate reports about Facility Investigations, was the best use of resources.

Despite its limitations, the interim database was being used to track information about Facility Investigations and the Department was able to generate a report that identified Facility Investigations that sustained a use of force violation (as required by § XIX, ¶ 4(c)(ii)) during the First Monitoring Period and at least part of the Second Monitoring Period. The Monitoring Team identified some potential discrepancies in this report and shared them with the Department. The Department is working to identify the source of these issues to ensure that all cases that have a sustained use of force violation are tracked in a manner that can be reported to the Monitoring Team. In the Third Monitoring Period, the Monitoring Team will also develop some interim strategies to monitor these cases until better tracking systems are in place so this critical information is identified in the period before CMS is functional.

The Monitoring Team expects that the current challenges in tracking this data will be alleviated once CMS is implemented.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As discussed in the First Monitor's Report, the Department tracks information related to Full ID Investigations using a computerized tracking system called "ITTS."
  - ITTS has specific fields to capture the information required in ¶ 16(a)-(g)

### ANALYSIS OF COMPLIANCE

During the First Monitoring Period, the Monitoring Team assessed the components of ITTS and determined it had clearly and appropriately labeled fields designed to capture the information required by the Consent Judgment. During the Second Monitoring Period, the Monitoring Team reviewed reports generated from ITTS and confirmed such information was appropriately tracked and available upon request by comparing the ITTS data for the incident with the underlying use of force documentation. However, while the information is tracked accurately for each specific use of force

investigation, the system is unable to produce reliable and accurate aggregate reports of Full ID investigations. For instance, certain reports generated will include a list of both Full ID and Facility level investigations. The Department is aware of the issue and is actively working to identify a solution. In the interim, the Monitoring Team and the Department have had to manually review the reports regarding Full ID Investigations to identify and resolve potential discrepancies and errors. The Monitoring Team expects the Department will achieve substantial compliance with this provision when these issues are resolved.

| COMPLIANCE RATING | ¶ 16. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF LITIGATION)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to each use of force incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in a computerized tracking system called ITTS.[13] Key data elements include:

  o ITTS has a specific field for the use of force incident number.

  o ITTS has a field for "charges brought."

  o ITTS tracks the disposition of any disciplinary hearing.

- The Department reports that the required fields will be included in CMS.

### ANALYSIS OF COMPLIANCE

During the Second Monitoring Period, the Monitoring Team reviewed screenshots from the Trials side of the ITTS database and spoke with the Department about its use by Trials to determine the extent to which the Department is reliably and accurately tracking the information needed to meet the requirements of this portion of the Consent Judgment. ITTS only partially meets the requirements of this provisions. ITTS has a field to track the use of force number (¶ 17(a)), but the Department does not consistently enter the data in this field. ITTS only partially tracks the requirements in ¶ 17(b) because there is no computerized field to track the "disciplinary penalty sought at [OATH]." ITTS does track

---

[13] ID and Trials both use ITTS to track information. Each Department has access to one component of that system. The components are partitioned off from each other except certain basic case identifying information (e.g. use of force number) can be shared across partitions.

the disposition of all disciplinary hearings, including whether the Staff entered into a negotiated plea agreement, and the penalty imposed. While the Department reports that all of this data is tracked and retrievable from records the Department can access, not all of the items are tracked reliably or in a computerized manner as required by the provision. The Department is therefore in Partial Compliance with this provision of the Consent Judgment. The Department is required to maintain this information in CMS and the Department is working on developing the system to track this information. The Monitoring Team will reassess the compliance rating once CMS is implemented.

| COMPLIANCE RATING | ¶17. Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to Inmate-on-Inmate fights in the Inmate "Fight Tracker," a computerized system. The Fight Tracker includes the following fields of information:

  o names of the Inmates involved;

  o identification numbers of the Inmates involved;

  o date, time, and location of the Inmate-on-Inmate fight or assault; and

  o nature of any injuries sustained by Inmates.

- This information is captured for *all* fights and assaults, including those that do not involve a use of force.

### ANALYSIS OF COMPLIANCE

The Monitoring Team confirmed that the Department's Fight Tracker includes the information listed above by reviewing screen shots and reports generated from the system. However, Fight Tracker does not include all of the required information. This provision also requires the Department to track a brief description of the Inmate-on-Inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. These three fields are not included in the Fight Tracker database. The Monitoring Team recommended to the Department that it evaluate how this information can be tracked consistently and reliably.

The information missing from Fight Tracker is available for a subset of fights and assaults—those that involve a use of force—via the Incident Reporting System ("IRS"). However, the

Department cannot achieve substantial compliance with this provision until the required data elements are tracked for *all* fights and assaults, even those that do not involve a use of force.

| COMPLIANCE RATING | ¶19. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[14] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As reported in the First Monitor's Report, the Department drafted definitions for the various categories of institutional violence, including all security indicators related to violence, focusing on clarity and the ability to collect and report reliable and accurate data.
  - o As required, the Department consulted with the Monitoring Team about the draft definitions, incorporating the Monitoring Team's comments and suggestions prior to finalizing the definitions.

### ANALYSIS OF COMPLIANCE

The Department maintains appropriate definitions for the categories of institutional violence. Accordingly, the Department remains in Substantial Compliance. In future Monitoring Periods, the Monitoring Team will assess the Department's use of these categories to analyze data.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
|---|---|

## 3.   TRAINING (CONSENT JUDGMENT § XIII)

The provisions of the Training Section of the Consent Judgment establish requirements for the Department to develop new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training) and to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (¶ 1(c)), Young Inmate Management (¶ 3), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)).

---

[14] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

The Department was expected to consult with the Monitoring Team when developing these training programs, and the First Monitoring Period was substantially dedicated to the Monitoring Team's and Department's collaboration to develop the curriculum for these required training programs. During the Second Monitoring Period, additional curricula were finalized, the Department's Training Staff prepared for the deployment of trainings by training instructors, and the Department began to deploy the Use of Force Policy and Defensive Tactics training to all Staff.

Although the focus of this Monitoring Period was the actual deployment of the Use of Force Policy and Defensive Tactics training programs, the Monitoring Team also worked with the Department to finalize its Use of Force Policy Supervisor Training (¶ 1(a)) and Facility Emergency Response Training (¶ 1(c)). The Department and the Monitoring Team also continued to refine the Direct Supervision Training (¶ 4), as described in more detail below.

_S.T.A.R.T. Training_

During this Monitoring Period, the Department expended a large amount of time and resources on the development and deployment of S.T.A.R.T. In-Service training for Staff. As noted in other parts of this Report, this is a four-day comprehensive bundle of training that includes one day of Use of Force Policy Training and three days of Defensive Tactics Training. The deployment of S.T.A.R.T. to all Staff required significant planning and coordination among the Facilities, the Office of Administration, the Emergency Services Unit ("ESU"), and the Training Academy. The first cohort of S.T.A.R.T. began on July 18, 2016.

Prior to launching S.T.A.R.T., the Department conducted careful research and analysis to determine the best deployment approach and briefed the Monitoring Team on its plans. The Monitoring Team found both the analysis and plan to be reasonable and thoughtful. The plan was calculated to train all existing Staff on both curricula, training a few Facilities at a time. Once the Staff at one Facility have

been trained, training for Staff at another Facility will begin. Each four-day S.T.A.R.T. block trains up to 90 Staff, who are divided into two tours of 45, with each tour divided into two classes. The Chief of Administration's Office works closely with the Facilities and the Training Academy to select the Staff to be called out for a particular block. The 90 Staff Members are identified by name for each four-day block of S.T.A.R.T. via a Department teletype, which is issued to the facilities two weeks in advance of the beginning of the block. This advanced notice gives the facility Wardens sufficient time to inform the selected Staff. The first three facilities receiving S.T.A.R.T. training are GMDC, MDC, and OBCC.

The Department also needed to identify and procure dedicated space suitable for the long-term deployment of In-Service training. Given the limited space at the Training Academy, the Department secured an additional trailer on Rikers Island ("Annex II"). Annex II is utilized by the Academy to provide the one-day Use of Force Policy training as part of S.T.A.R.T. The trailer has three appropriately-sized classrooms that offer sufficient space and equipment for the training. For the Defensive Tactics training, the Department dedicated space at the West Facility sprungs for this purpose. The Department reports its maintenance teams have worked continuously to prepare the space, including the actual training space and the breakroom and kitchen areas. The Department also reports it is still in the process of identifying additional space that will supplement the current resources, including the possibility that the Department may be able to rent space from other City agencies.

The deployment of training has a significant impact on the operation of the Facilities. Staff attending S.T.A.R.T. are not available to work their posts. This impact on staffing is further exacerbated by the Department's current staffing levels and needs, as many Staff Members are already required to work significant overtime hours. The Department sought to minimize this challenge by devising an innovative process to provide temporary Staff to the facility to replace Staff who are participating in S.T.A.R.T. This cadre of Staff is identified by the Chief of Administration's Office and is comprised of

new recruits who recently graduated from the Training Academy and have already received S.T.A.R.T. training. Once the Staff complete their four-day block of training and return to their posts, the cadre moves on to relieve the Staff scheduled for the next training block. This innovative approach contributes to the efficiency of the training process and minimizes the operational and overtime impact on the Facilities.

In order to deploy the training, the Department also needed to interview, hire, train and certify additional qualified instructors. As part of this process, the Academy provided train-the-trainer ("ToT") to all instructors for Use of Force Policy and Defensive Tactics training.[15] The Monitoring Team's impressions of this ToT are described in detail, below.

The Department conducted a S.T.A.R.T. pilot program in June 2016, which allowed the Department to test the entire process, from identifying Staff and notifying the facilities to conducting the actual training. The Monitoring Team observed and provided oral and written feedback for the train-the-trainer and pilot sessions of S.T.A.R.T., as explained in greater detail below. Overall, the Monitoring Team was impressed by the Department's thoughtful and reasonable approach to deploying S.T.A.R.T. training and hopes that their efforts will result in high Staff engagement, understanding, appreciation, and application of the new policies and procedures.

*Tracking*

The Department is continuing the procurement process for a Learning Management System ("LMS"), which will enable the Training Academy to schedule individuals for courses, track attendance, and record examination results for all recruit, In-Service, and refresher training. Given the lengthy procurement process, the Department has implemented interim methods for tracking training. The Monitoring Team met with representatives of the Chief of Administration's Office, the Training

---

[15] The Department reports that the current Defensive Tactics instructors had also previously received the necessary New York State certification.

Academy, IT, and the *Nunez* Compliance Unit to gather information about these interim measures and subsequently reviewed a sample of the training records generated (as described in more detail below). For all recruits, the Training Academy currently uses a manual process for course scheduling. For S.T.A.R.T. training, the Chief of Administration's Office has been working closely with IT and the Training Academy to develop an in-house application tool for scheduling courses and tracking attendance, which will be used by the Training Academy to schedule Staff for S.T.A.R.T. training. This software will track attendance by scanning Staff ID cards and tracking any failures to appear or course re-takes. The software will generate reports at both the individual (e.g., student's name, course name, and date(s) of attendance) and aggregate levels (e.g., number of training participants for each course). IT has been working closely with other stakeholders to develop this software and the Department launched it in September 2016. For the first several weeks of S.T.A.R.T., the Training Academy used paper sign-in sheets and Excel spreadsheets to track attendance and the Monitoring Team reviewed those records as described below. Once the new in-house application is fully operational, the Academy will input the information tracked on paper into the automated system, so that the data in the software is comprehensive.

The results of Staff examinations for both the Use of Force Policy and Defensive Tactics components of S.T.A.R.T. are also being tracked. The Training Academy has acquired an additional scanning machine to scan exam responses at Annex II. This allows instructors to identify trainees who have passed or failed the exam within a very short period of time. Those who do not pass the exam are asked to review the material with the instructor and then re-take the test the same day. The Academy tracks the passage rate and number of re-tests for trainees who do not pass the first time. For Defensive Tactics training, a checklist is used to evaluate each student's performance of the required techniques.

Now that deployment of training is underway, the Monitoring Team will intensify its assessment of the Department's efforts to track training (as required by Consent Judgment § XIII, ¶¶ 6, 7, and 8) in the Third Monitoring Period. The Monitoring Team will also evaluate the deployment of re-training for Staff who have violated Department policies, procedures, rules, or directives relating to the use of force (as required by Consent Judgment § XIII, ¶ 5).

*Verification of Training Attendance and Records During Second Monitoring Period*

The Monitoring Team took steps to verify the Department's reported data on the number of In-Service Staff, Pre-Promotional Staff and Recruits who received *Nunez* required training. These steps included reviewing sign-in sheets, Staff transcripts, training schedules, and reviewing other tracking related materials on-site at the Training Academy. The Monitoring team also met and interviewed Department Staff responsible for generating and tracking such data. The Department uses different mechanisms to track Staff attendance at the various trainings (as described above), which therefore requires different monitoring strategies for each type of training (e.g. recruit training, In-Service S.T.A.R.T. training, etc.). The Monitoring Team utilized interim strategies to verify attendance of training during the Second Monitoring Period and the Staff that received such training are identified in the respective boxes below. In the Third Monitoring Period, the Monitoring Team will work with the Department to create a more fulsome monitoring strategy to consistently track and audit this information.

*Status of Training Program Development and Deployment*

The chart below describes the current status of each of the training programs required by the Consent Judgment.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized & training began July 2016 as part of S.T.A.R.T. | To commence at the conclusion of S.T.A.R.T. Training |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized Training provided in Pre-Promotional Training for Captains and ADWs; In-Service training to commence at the conclusion of S.T.A.R.T. Training. | To commence no earlier than completion of initial In-Service Crisis Intervention and Conflict Resolution Training |
| **Defensive Tactics (¶ 2(a))** | | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized & training began July 2016 as part of S.T.A.R.T. | To commence at the conclusion of S.T.A.R.T. Training |
| **Young Inmate Management ("SCM") (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | Training provided in mandatory Pre-Service training [16] | To be provided on an as needed basis for any Staff assigned steady posts in Young Inmate Housing Areas. | Curriculum finalized, Rollout to commence after initial In-Service is complete |
| **Direct Supervision (¶4)** | | Curriculum still in development & draft version of training provided to Recruits[17] | Curriculum still in development. In-Service training to commence at the conclusion of SCM Training. | To commence no earlier than completion of initial In-Service Training |
| **Probe Team (¶ 1(c))** | Staff assigned to work regularly at any Intake Post | n/a | Curriculum finalized. Training provided in Pre-Promotional Training for Captains and ADWs. | n/a |
| **Cell Extraction (¶ 2(b))** | Staff regularly assigned to Special Units with cell housing | Lesson Plan Finalized & training provided in mandatory Pre-Service training | Curriculum Finalized, Rollout TBD | n/a |
| **Investigator (¶ 2(c))** | ID Investigators | n/a | Curriculum Finalized & provided on an as needed basis as new Investigators join ID | n/a |

[16] The Consent Judgment does not require the development of an In-Service SCM training program because it was already in place prior to the Effective Date of the Consent Judgment. Although not required by the Consent Judgment, the Department has included SCM training in its mandatory pre-service training.

[17] Although not required by the Consent Judgment, the Department plans to provide all recruits with Direct Supervision Training. The recruits in the May 2016 graduating class received the Direct Supervision training based on a draft version of the lesson plan. Once the Direct Supervision lesson plan is finalized, the Monitoring Team and Department will compare the two lesson plans to determine if there are any substantive differences between the draft and final version of the training. If they exist, the Department and Monitoring Team will discuss how best to address those differences with the individuals that received the training as a recruit and are now assigned to regularly work in Young Inmate Housing.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| | Facility Investigators[18] | n/a | TBD | n/a |

Now that additional training curricula are complete, the Monitoring Team will continue to work with the Department to create a deployment schedule for each one of the trainings to the extent they have not been developed (as described in more detail below). Furthermore, the Monitoring Team intends to scrutinize attendance for all trainings to ensure they are completed within the agreed-upon timelines. The Monitoring Team's assessment of compliance is outlined below.

---

**XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)**

¶1. Within 120 days[19] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

            1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

            2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**:
  - The Department developed, and the Monitoring Team approved, the Use of Force Policy Recruit Lesson Plan and Use of Force Policy In-Service Lesson Plan during the First Monitoring Period, as described in the First Monitor's Report.

---

[18] The Department and the Monitoring Team have decided to withhold finalizing and providing Facility Investigator Training to all Facility Captains while the Department further develops the concept of assigning all Facility Investigations to ID.

[19] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- During the Second Monitoring Period, in consultation with the Monitoring Team, the Department finalized the Use of Force Policy Supervisor Lesson Plan.

- **S.T.A.R.T.**
  - The Department conducted train-the-trainer sessions for the Use of Force Policy instructors.
  - The Department also conducted a pilot of S.T.A.R.T. on two tours over a four-day period in June 2016.

- **Deployment of Training**:
  - Academy
    - The Use of Force Policy Recruit Lesson Plan is incorporated in the mandatory pre-service training.
      - The 618[20] recruits who graduated in the May 2016 class received the training.
    - 114 Captains[21] received the Use of Force Policy lesson plan as part of the Pre-Promotional Training program.
  - S.T.A.R.T.
    - All In-Service Staff will receive S.T.A.R.T. Training.
    - 82 Staff received the S.T.A.R.T. training as part of the June pilot.
    - 154 Staff received the S.T.A.R.T. training from July 18 to July 31, 2016.

ANALYSIS OF COMPLIANCE

Although not required by the Consent Judgment, the Department developed a standalone training for Supervisors to address the roles and responsibilities of Captains and ADWs related to the use of force. During the Second Monitoring Period, the Department finalized, and the Monitoring Team approved, the Use of Force Policy Supervisor Lesson Plan. This lesson plan is a modified version of the training program the Monitoring Team approved for In-Service Staff during the First Monitoring Period. The lesson plan is fully developed with teaching outlines, examinations, and written materials, including written scenarios and exercises, which are provided to each student in a participant's manual. The scenarios and test questions from the original training program were modified to present the material from the Supervisor's perspective. The lesson plan also includes realistic scenarios with practical guidance for Supervisors when responding to different incidents. The

---

[20] 618 Recruits graduated in May 2016. In order to graduate, the Recruits must complete all trainings in the mandatory pre-service training program.

[21] There were 118 Captains in the latest Pre-Promotional Class, not all of whom received all scheduled training by the end of the Second Monitoring Period, and the Department reports the remaining Captains in that Pre-Promotional Class are scheduled to make up the missed training days.

Supervisor Lesson Plan conforms to the requirements and spirit of the Consent Judgment. The Department will start to deploy this training to Supervisors in the Third Monitoring Period during Pre-Promotional Training and as part of the overall deployment of S.T.A.R.T.

During this Monitoring Period, the Department provided ToT to the instructors of the Use of Force Policy training. Two very experienced and highly qualified trainers from the Academy who were involved in the development of the lesson plan provided the ToT, including important tips, cues, and ideas regarding how certain parts of the Lesson Plan should be conveyed. The Monitoring Team observed the ToT and found that the instructors (including the trainee instructors) were engaged and enthusiastic, knowledgeable about the information to be presented and supportive of the overall reform effort. The training included role-plays with students and tested instructors' ability to respond to difficult and challenging questions and concerns that Staff may raise. The two trainers observed, offered constructive criticism, and evaluated overall performance of the trainees. The Monitoring Team also shared some targeted feedback to further improve the delivery of the lesson plan when the training is rolled out. The feedback focused on recommendations related to refining the messaging regarding the roll-out of the New Use of Force Directive, expectations for Staff, and the development of talking points related to Inmate discipline in response to certain violations (e.g. assault on Staff). The Monitoring Team also recommended that the instructors for the Use of Force Policy In-Service Training have an opportunity to receive the Defensive Tactics Training and Crisis Intervention and Conflict Resolution trainings on a priority basis to inform their overall knowledge of the overlap in the curricula.

The Monitoring Team also observed the pilot of S.T.A.R.T., attending portions of the training provided on both tours. The Monitoring Team found that the deployment of the Use of Force Policy Training was consistent with the approved lesson plan and also incorporated the Monitoring Team's feedback from its observation of the ToT session described above. The Monitoring Team was particularly pleased with the consistent and accurate messaging regarding the New Use of Force Directive's effective date, and the instructors' ability to answer tough questions from Staff about the rollout of the New Directive. Overall, the Monitoring Team was encouraged by the observation of ToT and the pilot deployment of the training. The instructors' understanding of the material and issues, ability to relate to Staff, and use of personal experiences, including tips and techniques for de-escalation, will further enhance the deployment of the training.

The Monitoring Team verified that S.T.A.R.T. training was provided to 350 In-Service Staff during the Second Monitoring Period by reviewing the attendance records for each training session (a total of 82 Staff received the S.T.A.R.T. training during the pilot in June 2016; an additional 154 received it in July 2016; and an additional 114 Staff received the S.T.A.R.T. training as part of their

Pre-Promotional Training curricula).[22] During the Third Monitoring Period, the Monitoring Team will again observe S.T.A.R.T. training to confirm consistent quality of instruction, and will audit training records to ensure the Department is on track to meet the goal of providing S.T.A.R.T. training to all uniformed Staff by September 2017.

| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance |
| --- | --- |
| | ¶ **1(a)(i).** Substantial Compliance |
| | ¶ **1(a)(i)(1) & (2).** Partial Compliance |
| | ¶ **1(a)(ii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶ 1. Within 120 days[23] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

        i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

        iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed, and the Monitoring Team approved, the Crisis Intervention and Conflict Resolution Training curriculum during the First Monitoring Period, as discussed in the First Monitor's Report.

- All recruits who graduated in May 2016 and the Captains in the Pre-Promotional Training program received the 24-Hour Crisis Intervention and Conflict Resolution Training.

---

[22] The Monitoring Team identified in a limited number of cases that Staff failed to sign "out" on the training attendance during the June 2016 Pilot.

[23] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- The Department will deploy Crisis Intervention and Conflict Resolution Training to all In-Service Staff once S.T.A.R.T. initial In-Service training is completed.
  - Training for all Staff will be bundled to include three days of Crisis Intervention and Conflict Resolution Training and two half-days of Use of Force Policy and Defensive Tactics Refresher Training.
- **Deployment of Training**:
  - The 618 recruits who graduated in May 2016 received the 24-Hour Crisis Intervention and Conflict Resolution Training at the Academy.
  - 106 Captains received the 24-Hour Crisis Intervention and Conflict Resolution Training as part of the Pre-Promotional Training program during the Second Monitoring Period.

ANALYSIS OF COMPLIANCE

The Monitoring Team approved the Crisis Intervention and Conflict Resolution Training curriculum during the First Monitoring Period. During the Second Monitoring Period, the Department deployed the training to the new recruits and Pre-Promotional Staff. The Department also presented a comprehensive plan for the rollout of Crisis Intervention and Conflict Resolution Training to all In-Service Staff that is scheduled to begin after the initial S.T.A.R.T. four-day bundle plan is complete. The plan is to mirror the four-day bundle with three days of Crisis Intervention and Conflict Resolution training and two half-day refreshers of the Use of Force Policy and Defensive Tactics training. This rollout plan will also allow the Department to provide the training in the most efficient and effective manner possible.

| COMPLIANCE RATING | ¶ 1(b). Substantial Compliance |
| --- | --- |
| | ¶ 1(b)(i). Substantial Compliance |
| | ¶ 1(b)(ii). Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due. |
| | ¶ 1(b)(iii). Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶ 1. Within 120 days[24] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    Probe Team Training: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. Within 12 months of the Effective Date, the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff

---

[24] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department finalized the Facility Emergency Response Training (formerly known as Probe Team Training) curriculum in the Second Monitoring Period, consulting with the Monitoring Team as required.

- The Facility Emergency Response Training was significantly improved in the areas described below:

  o Incorporating relevant instruction on the role and responsibility of the handheld camera operators;

  o Incorporating information related to the Incident Command System ("ICS"), including the response-level system, and detailed information on how the Probe Team and ICS interact;

  o Developing a student examination;

  o Enhancing the Participant's Manual to include information related to the objectives of the lesson plan and references to the Policies, Directives and Operations Orders governing the Probe Team's actions.

- The developers of this lesson plan met with the developers of the Use of Force Policy, Crisis Intervention/Conflict Resolution, and Defensive Tactics lesson plans to better understand what is covered in each course and to ensure consistent messaging and cross-referencing among the trainings.

- The 8-hour Facility Emergency Response Training is incorporated in the mandatory pre-service training beginning with the recruit class that began in June 2016 (and is scheduled to graduate in the fall of 2016).

- **<u>Deployment of Training</u>**:

  o 114 Captains received the 8-hour Facility Emergency Response Training as part of the Pre-Promotional Training program during the Second Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team exchanged multiple drafts of the Facility Emergency Response Training curriculum with developers and met with the developers to discuss specific feedback. Recent revisions included incorporating a discussion of issues the Monitoring Team identified through the course of reviewing Preliminary Reviews, additional information related to handheld camera operation, and additional revisions suggested by the developers. These final revisions were useful to ensuring the lesson plan documented all of the information encompassed in the training to ensure consistent delivery of the training over time and across instructors. The Facility Emergency Response Training

Participant's Manual was also improved, and now contains excellent photos that clearly demonstrate formations, escort techniques, "bad tactics" for example, and proper tactics.

The Facility Emergency Response Training is eight hours, which far exceeds the two-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The lesson plan provides Staff who serve on the Probe Team with the necessary guidance to resolve use of force incidents in a manner that maximizes Inmate and Staff safety. The Department has started to deploy the training by including it in the mandatory pre-service training for all recruits. The Monitoring Team will work with the Department to develop a comprehensive plan during the Third Monitoring Period for the rollout of the Facility Emergency Response Training to all intake Staff, as required by the Consent Judgment.

| COMPLIANCE RATING | ¶ 1(c). **Development**: Substantial Compliance<br>¶ 1(c). **Deployment**: The requirement has not come due. |
|---|---|

### XIII. TRAINING ¶ 2(A) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[25] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.  <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

        i.  The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.  The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**:

  o As discussed in the First Monitor's Report, the Department developed, and the Monitoring Team approved, the 24-hour Defensive Tactics Training curriculum.

  o The 24-Hour Defensive Tactics Training curriculum is provided to all recruits and bundled with the 8-hour Use of Force Policy Training for the S.T.A.R.T. training for all Staff.

- **S.T.A.R.T.**

---

[25] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

      o   The Department conducted train-the-trainer sessions for the Defensive Tactics instructors.

      o   The Department also conducted a pilot of S.T.A.R.T. on two tours over a four-day period in June 2016.

- **Deployment of Training**:

      o   Academy

            ▪   The Defensive Tactics Lesson Plan is incorporated in the mandatory pre-service training.

                  •   The 618 recruits who graduated in the May 2016 class received the training.

            ▪   106 Captains received the Use of Force Policy lesson plan as part of the Pre-Promotional Training program.

      o   S.T.A.R.T.

            ▪   *See* ¶1(a) above.

**ANALYSIS OF COMPLIANCE**

During the Second Monitoring Period, the Monitoring Team observed the Defensive Tactics train-the-trainer sessions, and a pilot version of S.T.A.R.T, which included the three-day Defensive Tactics Training module.

The Monitoring Team found that the deployment of Defensive Tactics training was consistent with the approved lesson plan. Importantly, the instructors thoroughly worked through all elements of a drill multiple times from various angles to ensure students understood the tactics being demonstrated. The instructors clearly emphasized the interaction of Defensive Tactics Training with the Staff's need to know and understand their obligations under the New Use of Force Directive. After observing train-the-trainer training, the Monitoring Team provided oral feedback to the Defensive Tactics developers, including recommendations for improving instruction, such as advising instructors to modify the use of certain terminology and certain techniques to assist with students' skill-mastery.

During the Defensive Tactics train-the-trainer session, the Monitoring Team also observed a mini teach-back session during which new instructors practiced delivering the training materials. The Monitoring Team found that the instructors' delivery accurately reflected the lesson plan materials. The new instructors were clearly engaged in the learning process and took the train-the-trainer sessions seriously, a tone that was set by the professional instruction provided by the head trainer during these sessions. The Monitoring Team provided written feedback after observing the pilot training and train-the-trainer that focused on ensuring that the lesson plan included certain information to ensure consistent delivery of the training over time and across instructors.

The Monitoring Team continues to be encouraged by the Department's commitment to training. The 24-hour Defensive Tactics training program provided to all Staff is well beyond the requirement in the Consent Judgment to provide Staff with four hours of refresher training annually.

The Monitoring Team verified that S.T.A.R.T. Training was provided to 350 In-Service Staff during the Second Monitoring Period (discussed in more detail, above, ¶ 1(a)). During the Third Monitoring Period, the Monitoring Team will again observe S.T.A.R.T. Training to confirm consistent quality of instruction, and will obtain and audit training records for S.T.A.R.T. to ensure the Department is on track to meet the goal of providing S.T.A.R.T. Training to all uniformed Staff by September 2017.

| **COMPLIANCE RATING** | **¶ 2(a).** Substantial Compliance |
| | **¶ 2(a)(i).** Substantial Compliance |
| | **¶ 2(a)(ii).** Requirement has not come due |

## XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[26] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.    <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided within 12 months of the Effective Date to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department developed, and the Monitoring Team approved, the Cell Extraction Team training curriculum during the First Monitoring Period, as discussed in the First Monitor's Report.

- **Deployment of Training**:

  o The 8-Hour Cell Extraction Team training is incorporated in the mandatory pre-service training.

    ▪ The 618 recruits who graduated in May 2016 received the Cell Extraction Team training in the Academy.

**ANALYSIS OF COMPLIANCE**

The Cell Extraction Team training curriculum was approved during the First Monitoring Period. It is eight hours, which far exceeds the four-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the

---

[26] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

necessary skills to fulfill their duties. The Department has started to deploy the training by providing it in the mandatory pre-service training for all recruits. The Monitoring Team will work with the Department to develop a comprehensive plan during the Third Monitoring Period for the rollout of the Cell Extraction Team training to all Staff regularly assigned to special units with celled housing.

| **COMPLIANCE RATING** | **¶ 2(b).** Substantial Compliance for the development and duration of the training program. The requirement has not come due for the deployment of the training. |
|---|---|

## XIII. TRAINING ¶ 2 (c) (INVESTIGATOR TRAINING)

¶ 2. Within 120 days[27] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As discussed in the First Monitor's Report, the Department has a comprehensive 40-hour training program for ID Investigators.

  - This 40-hour training was updated during the Second Monitoring Period to include a new module regarding the Prison Rape Elimination Act ("PREA") and additional evidence collection requirements. The training also now incorporates additional shadowing opportunities with current Investigators.

- All new-hires must complete this 40-hour training before they may be assigned any ID cases to investigate.

- **Deployment of Training**:

  - 19 Investigators were provided the 40-hour training during the Second Monitoring Period.

### ANALYSIS OF COMPLIANCE

    The Department's lesson plan continues to meet the requirements of this provision, and the additional training opportunities available to Staff supplement the acquisition of skills needed to

---

[27] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

conduct high-quality investigations. Further, the 19 new ID Investigators all received this training before they were assigned cases to investigate. Accordingly, the Department remains in Substantial Compliance with this provision. The Monitoring Team will observe the Investigator training in the Third Monitoring Period.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As discussed in the First Monitor's Report, the Department developed the 24-hour Safe Crisis Management ("SCM") training prior to the Effective Date and has continued to deploy the training. The Monitoring Team also approved the SCM 8-Hour Refresher training curriculum.

- The SCM training is incorporated in the mandatory pre-service training and provided as In-Service training.

- **Deployment of Training**:

  - At the close of the Second Monitoring Period, 2,771 Staff have received SCM training.

    - First Monitoring Period: 1,552 Staff were trained.

    - Second Monitoring Period: 1,219 number were trained.

- o Provision of training to Staff who were steady in Young Inmate Housing Areas as of November 1, 2015, but had not received the training as of November 1, 2015:
  - ▪ 265 Staff were regularly assigned to Young Inmate Housing Areas as of November 1, 2015.
  - ▪ Of the 265 Staff, 244 Staff received SCM training as of May 18, 2016, and six others no longer needed the training due to military leave and other reasons. Accordingly, 15 Staff still needed to receive SCM training as of May 18, 2016.
  - ▪ As of August 26, 2016, 13 out of the 15 outstanding Staff who required SCM training received it. One Staff Member is on indefinite sick leave and one resigned.
- o Provision of training to Staff who became steady in Young Inmate Housing Areas after November 1, 2015 required to receive SCM training:
  - ▪ The Department reported over 1,000 Staff had Steady Posts in Young Inmate Housing Areas at *some point* over the course of the Second Monitoring Period. The Department also identified which of those Staff received SCM training and the dates of that training. As described in more detail below, additional data and analysis is necessary before the Monitoring Team can provide reliable information as to the Department's compliance with this requirement.

ANALYSIS OF COMPLIANCE

The Department has deployed SCM training to a total of 2,771 Staff, well beyond the requirements in the Consent Judgment as this total includes Staff who are not assigned to work in Young Inmate Housing Areas. The majority of the Staff who received the SCM training work in GMDC, OBCC, RMSC, and RNDC. GMDC, RMSC, and RNDC are the three Facilities that encompass the largest number of Young Inmate Housing Areas. The Monitoring Team verified that as of August 26, 2016, all Staff regularly assigned to Young Inmate Housing Areas as of the Effective Date did in fact receive such training (or were no longer required to receive such training due to transfer to another facility or post, military leave or resignation).

However, as the Department continues to centralize housing of Young Inmates, the number and names of Staff regularly assigned to Young Inmate Housing Areas will grow and will fluctuate. Therefore, the best barometer to determine whether the Department is complying with the requirements of ¶ 3(a) is to determine the percentage of Staff regularly assigned to work in Young Inmate Housing areas at any point during the Monitoring Period who were SCM trained and the percentage who were not. Due to the high and fluctuating number of Steady Staff during the Second Monitoring Period, the Monitoring Team must further analyze and audit the staffing mechanism for these posts in order to develop an accurate understanding the meaning of a steady post before grading compliance with this

provision. The Monitoring Team will work with the Department to develop this analysis and subsequently audit this requirement during the Third Monitoring Period.

The Department finalized the SCM refresher lesson plan and it was accepted by the Monitoring Team. The training meets the requirements of this provision as described in the First Monitor's Report. While only required to prepare a four-hour refresher training program, the refresher program is eight hours. The refresher training has not yet been deployed as the Department has focused on ensuring all Staff received the initial training first. The Monitoring Team will encourage the Department in the Third Monitoring Period to develop a plan for deployment of this refresher course.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |
| | ¶ 3(a). Not Yet Evaluated (grade pending additional auditing by Monitoring Team in Third Monitoring Period) |
| | ¶ 3(b). Requirement has not come due |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[28] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.    The Direct Supervision Training shall be a minimum of 32 hours.

    b.    Within 9 months of the Effective Date, the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continued to develop the 32-hour Direct Supervision training curriculum, which is largely based on the Direct Supervision curriculum developed jointly by the National Institute of Corrections ("NIC"), the Minnesota Sheriffs' Association, and the Minnesota Jail Resource Center and as described in more detail in the First Monitor's Report.

- During the Second Monitoring Period, the Department shared a significantly revised version of the Direct Supervision Training materials with the Monitoring Team and the Monitoring Team provided feedback.

- The Department sent a curriculum developer, a Warden, a Captain, and an Officer to participate in the train-the-trainer program hosted by NIC. These Staff will discuss the lessons learned from this program and the Monitoring Team's feedback with the Young Inmate Facility commands to ensure the training addresses the needs and challenges the specific Facilities face.

- **Deployment of Training**:

---

[28] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- o  The 618 recruits who graduated in May 2016 received a draft version of the Direct Supervision training, although not required by the Consent Judgment.
- o  The Department will begin to provide the Direct Supervision training to all Staff assigned to work regularly in Young Inmate Housing Areas following the completion of SCM training, as described above.
- o  The Department has chosen to use same instructors for both SCM and Direct Supervision training.

ANALYSIS OF COMPLIANCE

The Department's efforts to further refine this training program are critical to its overall implementation. As described in the First Report, the Direct Supervision model is an entirely new way to manage Young Inmates and Staff the Facilities where they are housed. The Monitoring Team expects that proper implementation of this model will support the Department's efforts to better manage the Young Inmates in its custody.

The revised lesson plan materials for the Direct Supervision Training addressed the Monitoring Team's concerns discussed with the Department during the First Monitoring Period. The revised materials incorporated references to DOC specific issues, and also addressed the unique challenges of interacting with adolescent Inmates (two new modules now present strategies for providing positive incentives and strategies for managing adolescents/young adults). Overall, the Lesson Plan includes extensive instructor cues which adequately match the lesson plan material, the scenarios and exercises are well-designed and challenge the participants to think creatively, and to develop strategies to manage various situations using the methods contained in the lesson plan. The sequencing of the lesson plan is logical and progressive; each module builds upon the concepts provided in the previous module. Additionally, the lesson plan includes some creative competitive games to make training fun and to test the students' retention of the material. Overall, the exercises are very well designed and should produce active participation and challenge the students' understanding of the material.

The deployment of Direct Supervision training to all Staff regularly assigned to Young Inmate Housing Areas will require more time than originally contemplated in the Consent Judgment, given the competing demands for this group of Staff's time. The Department prioritized providing the 24-hour SCM training to this group of Staff first. These same Staff must also attend S.T.A.R.T. and the other trainings discussed in previous provisions. The Instructors for SCM will also provide Direct Supervision training. This will help to ensure continuity across curricula and allow the Department to efficiently deploy its limited training resources. During the Third Monitoring Period, the Monitoring Team will work with the Department to develop a plan to reasonably and efficiently deploy the training.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

4.  **ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)**

This section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to report use of force policy violations anonymously. The goal of this new system is ensure that all use of force incidents are properly reported, without fear of retaliation, and can be investigated.

The Monitoring Team's assessment of compliance is outlined below.

| VI. ANONYMOUS REPORTING ¶ 1 |
|---|
| ¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department worked with the Monitoring Team to finalize a Division Order to govern the creation, use, and maintenance of the ID Information Hotline ("Hotline"), a centralized system where Staff can report violations of Department policy anonymously.

- The finalized Division Order requires ID to initiate a preliminary investigation within three business days after receiving an anonymous report.

- The Department has posted the Hotline telephone number in all Facilities and areas that are accessible to uniform and civilian Staff.
  - o Posters appear in Staff areas including the Facilities' front entrances, locker rooms, and Staff lounges.
  - o Posters appear electronically on DOC TV, which is displayed in all Facilities and in Bulova Corporate Center.

- The Hotline went live in March 2016, and as of the end of July 2016, the hotline had received three total calls. The subjects of these calls were not use of force related.

**ANALYSIS OF COMPLIANCE**

The Department developed a comprehensive policy governing the Hotline that will be managed by ID. The Department consulted with the Monitoring Team on the development of the Division Order and incorporated the Monitoring Team's feedback into the final Division Order. Once the procedures were developed, the Department informed Staff about the Hotline using posters and electronic displays in the Facilities. The Monitoring Team visually confirmed the posting of information while conducting site visits throughout the Second Monitoring Period. The Department reports it has received three calls since the system's implementation, but none of the calls related to use of force. The Department agreed

to provide the Monitoring team with detailed information on anonymous reports relating to the use of force, if and when received via the Hotline.

The lack of Hotline calls pertaining to Use of Force incidents does not mean that Staff's concerns about use of force incidents are not being reported. Staff have a variety of mechanisms for reporting alleged use of force policy violations, such as using 311; notifying the Department of Investigation, the ID team in the Facility, lawyers, and reporting concerns up the chain of command in the Facilities. The Department reports that ID has seen an increase in the number of reported allegations from a variety of sources including Staff, Inmates, and civilians since the Effective Date, and believes that, in part, the increase is due to ID's increased presence in Facilities and also to Staff's overall awareness of the increased scrutiny on use of force incidents under *Nunez*. As noted in the Use of Force Reporting Section, the Monitoring Team will focus on Staff's reporting of use of force during the Third Monitoring Period.

| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |
|---|---|

### 5.  VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) handheld cameras; and (3) body-worn cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)); and preserve video from all sources for at least 90 days (¶ 4).

As required under the Consent Judgment, the Department is expected to install approximately 7,800 additional cameras on a rolling basis throughout the Facilities by February 28, 2018 (¶ 1). The Department's effort to ensure complete camera coverage is being undertaken in two steps: (1) "fast-

track" installation by the Department's Radio Shop Staff in all housing and ancillary areas at RNDC, GRVC, GMDC, OBCC and AMKC; and (2) capital engineering installation by third-party contractors at RMSC, VCBC, MDC, EMTC, NIC and BKDC.

As of July 30, 2016, the Department has installed 2,815 new wall-mounted cameras (1,350 as of the end of the First Monitoring Period and 1,465 during the Second Monitoring Period). During this Monitoring Period, the focus of installation has been on GMDC, GRVC, and RMSC. The Department reports that fast-track installation is fully complete at RNDC, and is nearing completion at GMDC. Further, the Department reports that approximately 100 percent of housing areas and 50 percent of ancillary areas at GRVC are now covered.

The Monitoring Team assessed the results of the Department's installation efforts during four days of on-site visits to all housing units at GMDC and GRVC; to select units that house 18-year-olds at RMSC, EMTC, AMKC, and NIC; and to the two housing units for 16 and 17 year olds at RMSC. The focus of the Monitor Team's tours was on housing areas accessible to 16, 17, and 18-year-olds (¶ 1(b)) and the installation of 25% of all cameras through July 1, 2016 (¶ 1(a)(i)), as those are the two installation requirements that came due during this Monitoring Period.

During the Second Monitoring Period, the Department continued to consult with the Monitoring Team on the development of policies related to the maintenance of stationary cameras (¶ 3) and the use of handheld cameras (¶ 2), which will formalize procedures required by the Consent Judgment, streamline communication between the various departments that manage the cameras, and improve the usefulness of information captured by stationary and handheld video surveillance in the Facilities. These policies are expected to be finalized in the Third Monitoring Period.

The Department is also in the process of developing the body-worn camera pilot project (¶ 2 (a)-(c)). A pilot of this kind is unique in a correctional setting and will provide useful information to

determine whether the use of body-worn cameras facilitates the Department's efforts to deter violence by both Inmates and Staff. The Monitoring Team and the Department discussed the development of the pilot, including identifying and selecting appropriate equipment, and how the current Video ID pilot may inform this project. The Monitoring Team expects to continue this consultation as the Department launches the pilot. Because the requirement to begin the pilot has not come due, the Monitor will not assess compliance with this provision.

Finally, the Department is required to preserve all video from stationary, handheld, and body-worn cameras for 90 days in order to assist with investigating actual or future alleged use of force incidents or Inmate-on-Inmate violence (¶ 4). The Monitoring Team evaluated compliance with these requirements, as discussed below.

As noted in the First Monitor's Report, the Department's ability to supervise and instruct Staff, manage and monitor Inmates, and conduct investigations will be significantly enhanced by the installation of additional cameras. The Monitoring Team's work will also be enhanced. Videotaped footage has been very helpful during conversations with DOC Staff to illustrate trends that raise concern. The ability to review an incident on video enriches those discussions and allows the Monitoring Team and the Department to have critical, substantive dialogue about the situations Staff face and their responses to them in order to identify and modify inappropriate behavior.

As described in more detail in the First Monitor's Report, the Monitoring Team continues to encourage the Department to utilize the monitoring devices in the control rooms (and other common spaces where cameras are monitored) to view live feeds of video footage to support their proactive efforts to de-escalate conflicts where the use of force could otherwise become necessary. The Monitoring Team also continues to encourage the Department to utilize footage of use of force incidents

as an educational tool during weekly Staff meetings to reinforce good practices and refine Staff's

understanding of unacceptable behavior.

The Monitoring Team's assessment of compliance is outlined below.

### IX. VIDEO SURVEILLANCE ¶ 1(a) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of July 31, 2016, the Department installed 2,815 new wall-mounted surveillance cameras throughout the Facilities.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team's assessment of obligations related to wall-mounted surveillance cameras includes reviewing installation plans, meeting with the teams responsible for installation, observing the physical placement of cameras during on-site tours, and reviewing the cameras on Genetec monitors.

The Department's installation efforts are appropriately focused on the areas of priority outlined in the Consent Judgment (¶ 1 (b) and (c)(i-iii)). Accordingly, the Department has installed the largest number of additional cameras at RNDC, GMDC, and GRVC.

The Department's installation of 2,815 wall-mounted surveillance cameras accounts for approximately 35% of its obligation to install 7,800 cameras. In order to assess compliance with this provision, the Monitoring Team observed the physical placement of cameras in the Facilities and compared this with live feeds of the video on the Genetec system. The Monitoring Team focused on the installation of cameras in the housing areas for Young Inmates (*see* ¶ 1(b) below) and the installation of cameras in the housing units at GRVC.

As noted in the First Monitor's Report, the Monitoring Team confirmed during its tour and review of Genetec video that a substantial number of stationary cameras have been installed at RNDC in locations accessible to Inmates under the age of 18, including all housing units, food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways and stairways. During this Monitoring Period, the Monitoring Team found during its tours and review of Genetec videos that the Department has also installed a substantial number of wall-mounted surveillance cameras in Facilities that house 18-year olds (*see* ¶ 1(b) below) and the housing areas of GRVC.[29]

---

[29] During these tours, the Monitoring Team identified a very limited number of areas where coverage was not sufficient, and recommended that the Department consider installing cameras in these areas. The Department plans to assess the physical plant in the identified areas to determine whether installation is possible; if so, the Department confirmed that it will address the Monitoring Team's recommendations.

The Monitoring Team is encouraged by the Department's efforts to efficiently and thoughtfully install cameras. The Department is on track to meet the deadline to install 7,800 additional stationary, wall-mounted surveillance cameras of February 28, 2018.

| COMPLIANCE RATING | ¶ 1(a)(i). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 1(b) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    b.   The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department installed stationary, wall-mounted surveillance cameras in the housing units, schools, and ancillary areas at RNDC that are accessible to Inmates under the age of 18.

- The Department installed additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year-olds to ensure complete camera coverage of all housing areas that are accessible to 18-year-olds.

### ANALYSIS OF COMPLIANCE

This provision includes two separate requirements with different timelines that are specifically enumerated in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. The first provision (Consent Judgment § XV, ¶ 10) requires the Department to install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 by January 30, 2016 (within 90 days of the Effective Date), and the Monitoring Team to inspect the installation by February 29, 2016 (within 120 days of the Effective Date). In the First Monitor's Report, the Monitoring Team found the Department in substantial compliance with § XV, ¶ 10.

The second provision (Consent Judgment § XV, ¶ 11) requires the Department to install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year-olds to ensure complete camera coverage of all housing areas that are accessible to 18-year-olds by July 1, 2016, and requires the Monitoring Team to inspect the installation by August 1, 2016. The chart below identifies the average monthly population of 18-year-old Inmates by facility during the Second Monitoring Period.

| | Average Monthly Population March to July, 2016 | Proportion of Population |
|---|---|---|
| AMKC | 0.20 | 0.10% |
| BHPW[30] | 0.40 | 0.20% |
| EMTC | 16.60 | 8.34% |
| GMDC | 161.80 | 81.31% |
| GRVC | 2.20 | 1.11% |
| MDC[31] | 0.20 | 0.10% |
| OBCC[32] | 2.60 | 1.31% |
| RMSC | 4.20 | 2.11% |
| RNDC[33] | 10.60 | 5.33% |
| WF | 0.20 | 0.10% |
| **Totals** | **199** | **100%** |

In order to assess compliance with this requirement, the Monitoring Team first identified the facilities that include housing units accessible to 18-year-olds (see chart above) or could possibly house this population (e.g. NIC)[34]. Within those facilities, the Monitoring Team then identified the housing units that house 18-year-old inmates. Those housing units were identified to be all housing units at GMDC, twelve housing units at RMSC[35], two housing units at EMTC, the Secure Unit at GRVC, PACE and CAPS at AMKC,[36] clinic units at NIC[37], and West Facility.[38] The Monitoring Team toured the relevant spaces over a three-day period in July 2016. The Monitoring Team found the Department had appropriate camera coverage in most areas, except for: (1) two 18-year-old housing areas in EMTC which had some stationary cameras that were not yet on-line and required additional time for installation and (2) several new cameras in the housing areas for 16, 17, and 18-year-olds at RMSC had

---

[30] The Bellevue Hospital Prison Ward ("BHPW") is excluded from the *Nunez* Consent Judgment.

[31] The Department reported that in April there was an average of one 18-year-old Inmate in MDC. However, no 18-year-old Inmates were housed in MDC in any other month of the Monitoring Period and the Department reports it does not intend to house 18-year-old Inmates at MDC. Accordingly, the Monitoring Team did not tour MDC to assess compliance with this requirement.

[32] Some 18-year-olds were housed at OBCC during the Monitoring Period in punitive segregation cells. As noted elsewhere in the Report, punitive segregation was eliminated for 18-year-old inmates during this Monitoring Period so the Monitor's tour did not include an assessment of camera coverage in punitive segregation of OBCC for purposes of compliance with this provision.

[33] All 16- and 17-year-old Inmates are housed at RNDC. It is possible that an 18-year-old Inmate may be housed at RNDC for a short period of time when a 17-year-old Inmate turns 18 years old and has not yet been transferred to another facility. The Monitoring Team toured the housing units that these Inmates could access during the First Monitoring Period.

[34] If the Department begins to utilize additional facilities and/or housing units to house 16, 17, or 18-year-old inmates then the Monitoring Team will assess the camera coverage in those housing units. Ultimately, complete camera coverage is required for all of the facilities by February 28, 2018 regardless of age.

[35] The Monitoring Team also toured the housing areas accessible to 16- and 17-year-old female Inmates.

[36] In addition, 18-year-old Inmates may be housed in the CAPS or PACE units at AMKC if the Inmate requires such services. During the Monitoring Period, one 18-year-old Inmate was housed at AMKC in April.

[37] 18-year-old Inmates may be housed in NIC if the Inmate requires certain medical treatment.

[38] The Monitoring Team toured West Facility, but did not inspect the installation of wall mounted cameras because the installation of cameras in that facility is ongoing. The Monitoring Team will assess compliance with the installation of cameras in West Facility once the wall mounted cameras have been installed.

been installed, but not yet brought on-line. Following the tour, the Department provided the Monitor with a concrete plan to install cameras in these locations and/or bring them on-line as soon as possible. The Monitoring Team conducted another tour of EMTC in September 2016 and confirmed the installation of cameras in the two housing units at EMTC. The Monitoring Team also confirmed that the cameras at RMSC were now on-line.

During these tours, the Monitoring Team identified a very limited number of areas where coverage was not sufficient, and recommended that the Department consider installing cameras in these areas. The Department plans to assess the physical plant in the identified areas to determine whether installation is possible; if so, the Department confirmed that it will address the Monitoring Team's recommendations.

The Monitoring Team finds that the Department has substantially complied with the requirement to install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines in ¶¶ 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

| COMPLIANCE RATING | ¶ 1(b). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 1(e) (STATIONARY CAMERA INSTALLATION)

¶ 1.

     e. The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department invited the Monitoring Team and Parties to the *Nunez* Litigation to participate in its Internal Camera Working Group Meetings.

### ANALYSIS OF COMPLIANCE

The Monitoring Team participated in the Department's Camera Working Group meeting on June 2, 2016. As part of that meeting, and in subsequent discussions, the Monitoring Team reviewed the Department's security camera coverage plan that includes timelines, objectives, and key deliverables to provide Complete Camera Coverage in the Facilities by February 28, 2018. The installation of cameras is a joint effort between the Radio Shop, the Engineering Department, the specific facilities, and contracted vendors. The installation plan is consistent with the deadlines outlined in the Consent Judgment (¶ 1(a)) and the installation plan for the Facilities is consistent with the priorities outlined in the Consent Judgment (¶ 1(c)).

As noted in the First Monitor's Report, the Monitoring Team continues to recommend that the Department annotate its existing Facility diagrams to identify camera locations. This guide may serve a

71

dual purpose in that it assists the Department in its overall effort to track and maintain the cameras, and would also be a useful guide for the Department during emergencies and critical incidents. Overall, the Monitoring Team is encouraged by the Department's efforts to develop and implement an aggressive and comprehensive installation plan.

| COMPLIANCE RATING | ¶ 1(e). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2(D) (HANDHELD CAMERAS)

¶ 2.

    d.   Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall specify:

        i.   Handheld video cameras shall be used in the following situations, except when safety or security concerns require an immediate response that would preclude waiting for recording equipment: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe teams actions; and (4) Facility living quarter searches conducted by the Department's Emergency Services Unit ("ESU"), except Tactical Search Operations ("TSO"), random searches, and strip searches. Inmate resistance during a TSO, random search, or strip search, however, would trigger video recording if it is reasonably believed that a Use of Force or assault on Staff is about to occur or occurs.

        ii.   Handheld video camera operators shall record the following: (1) any attempts made to obtain the Inmate's compliance after the video camera operator has arrived in the area, (2) the Inmate's behavior, and (3) all Uses of Force by Staff.

        iii.   In cell extraction situations, the handheld video camera operator shall record: (1) a statement from the team leader summarizing the situation and the plan for resolution; (2) an introduction by each team member, describing the member's specific responsibilities in the plan for the Use of Force; and (3) a statement from the handheld video camera operator providing his or her name and explaining any impediments to obtaining a clear video recording of the incident.

        iv.   Handheld video camera operators shall receive appropriate training.

        v.   The video recording shall be continuous and any break in video continuity shall be vi. documented and explained by the handheld video camera operator, to the extent the operator knows of such breaks, in an incident report or Use of Force witness report.

        vi.   Compliance with these policies and procedures is the responsibility of the onsite Supervisor, as well as the operator of the handheld video camera.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The current Use of Force Directive and Operations Order 6/15 "Recording Equipment, Medium, and Electronic Evidence" (issued on April 22, 2015) are both in place to address the use of handheld cameras.

- The Department provided the Monitoring Team with a revised draft of policies and procedures that specifically address the use of handheld cameras.

- The Department issued a teletype to be read at 21 consecutive roll calls reiterating the importance of responding to calls for assistance with handheld cameras and instructions on what should be recorded.

- The Department incorporated guidance on handheld camera operation in the Facility Emergency Response (Probe Team) Training materials.
- The Department developed a plan to conduct an inventory of all handheld recording equipment at each facility.
- The Quality Assurance Division has undertaken a new audit procedure, wherein they review the facility alarm response logbooks and then attempt to locate corresponding handheld camera footage on the Department's network drive.
- The Department reports that ID is now routinely exercising its ability to generate command discipline for Staff who has committed an obvious handheld camera policy violation, rather than referring the violation back to the facility as was the historical practice.

ANALYSIS OF COMPLIANCE

As described in more detail in the Use of Force Investigation section, the Monitoring Team and Department identified that certain Probe Team responses were not being adequately captured on handheld video for a variety of reasons, for example: a camera was not brought to the scene; the camera operator was not adequately capturing the incident; the camera was pointed away from the incident; or the handheld camera was brought to the scene but was not turned on in time to capture the incident. The Department created a multi-faceted approach to address the handheld camera issues identified. This included: (1) issuing a teletype that reinforces the Department's current handheld camera policies, (2) updating the Probe Team Training materials to incorporate guidance on handheld camera operation, (3) conducting an inventory of all handheld recording equipment, and (4) providing ID with the ability to generate command disciplines when they identify obvious handheld camera policy violations, rather than referring the violations back to the facility as was the historical practice. The Monitoring Team intends to focus more on the Department's efforts towards compliance with the obligations to re-train and/or discipline Staff related to violations of handheld camera policy (¶ 2(f)) in the Third Monitoring Period.

The Monitoring Team confirmed the Department maintains two policies that govern the use of handheld cameras, the current Use of Force Directive and Operations Order 6/15. The New Use of Force Directive also provides guidance on the use of handheld cameras. During this Monitoring Period, the Department continued to develop a standalone policy, in consultation with the Monitoring Team, describing how and when to use handheld cameras to ensure the procedures are consistent with the requirements of the Consent Judgment. As part of this process, the Monitoring Team assessed whether the draft policy was consistent with the requirements in the Consent Judgment, other existing policies, best practices, and addresses concerns identified during the course of the Monitoring Team's incident reviews. The Department has also started to revise relevant training programs (e.g. ¶ 2 (e)) related to the operation of handheld cameras and has consulted with the Monitoring Team on those changes. The Department plans to finalize the policy during the Third Monitoring Period. Accordingly, it has not yet been adopted or implemented. The Monitoring Team will also continue to consult on the necessary

| | |
|---|---|
| revisions to the training on the handheld camera (e.g. ¶ 2 (e)) to ensure it is consistent with the new policy, the requirements under the Consent Judgment, and best practices. | |
| **COMPLIANCE RATING** | **¶ 2(d).** Partial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 3(d) (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. <u>Maintenance of Stationary Cameras</u>

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department is in the process of modifying the Enterprise Asset Management ("EAM") database, a software package that is currently being used by Facilities to place work orders for maintenance repair (e.g. clogged toilets), so that it can be used to report and track out-of-service cameras.

- In the interim, each Facility continues with the practice of assigning Officers and Supervisors to conduct routine, daily assessments of the functioning of stationary cameras and video monitors, noting those that are inoperable and submitting daily or weekly reports that detail the status of the cameras.

- The Department convened a working group to solicit input from both frontline personnel as well as non-uniformed Staff on the procedures to include in a revised policy. This policy is intended to create a global solution for tracking inoperable cameras and documenting repairs, which is currently conducted differently across the Facilities.

**ANALYSIS OF COMPLIANCE**

    Historically, the Department did not consistently track inoperable cameras or document camera repairs. As noted in the First Monitor's Report, the Department drafted policies and procedures to create a systematic approach for tracking and monitoring camera repairs. As the policies and procedures were being developed, the Department also engaged in discussions with uniformed and non-uniformed Staff and determined that a computerized system was needed to ensure a consistent and sustainable method for tracking camera operability and repairs. The Department then determined that the existing EAM system could be adapted for this purpose. Accordingly, the Monitoring Team supported the Department's efforts to update the EAM system before finalizing the camera maintenance policy to ensure the policy incorporated the EAM system. The EAM modifications are expected to be completed during the Third Monitoring Period, at which time designated Staff at each Facility will be trained on the new process. The draft policy regarding maintaining and repairing wall-

mounted stationary cameras will also be finalized to reflect the necessary operational process of the EAM system. Accordingly, the policy has not yet been adopted or implemented.

During this Monitoring Period, the Monitoring Team analyzed the Department's interim tracking approach by reviewing the daily inoperable camera lists while on site at the Facilities.[39] Given the Department's efforts to develop and implement a more systematic approach, the Monitoring Team only conducted a review at five Facilities to determine whether the inoperable camera lists were generated on a daily basis. While the Facilities each approach the task differently, for the most part, their methods accomplish the objective. One Facility stopped documenting the results of the inoperable camera review during the Second Monitoring Period. Once this practice was brought to their attention, the Facility reinstated policies and procedures to ensure the daily assessment is completed and documented. On two subsequent visits, the Monitoring Team found the new procedures were being followed. The Monitoring Team will continue to review the Department's interim approach for tracking inoperable cameras until the new policies and procedures are implemented.

| COMPLIANCE RATING | ¶ 3(d). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. <u>Video Preservation</u>

    The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's current video recording policy addresses this requirement.

- The Department's computerized system automatically preserves all video for 90 days.

- The New Use of Force Directive addresses the requirements in the Consent Judgment.

- Operations Security Intelligence Unit ("OSIU") is responsible for preserving and exporting Genetec video beyond the 90-day preservation period. The Department has also provided the Deputy Director of Investigations ("DDI") in ID and ID Supervisors with the ability to preserve and export video from the Genetec system.

---

[39] The Department provided "[a] list of those cameras out of service for more than two weeks, and the length of time that they were out of service, by Facility," as required under Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶4 (c)(v). During the First Monitoring Period, the Department reported that 146 wall mounted cameras were inoperable for more than two weeks as of March 1, 2016. As of September 21, 2016, 124 of those cameras were repaired, 12 cameras remain inoperable and 10 cameras are no longer in service. During the Second Monitoring Period, the Department reported that 58 wall mounted cameras were inoperable for more than two weeks as of August 1, 2016 (including the 12 cameras that remain inoperable from the First Monitoring Period). As of September 27, 2016, 19 of the 58 cameras have been repaired and 2 of the 58 cameras are no longer in service.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department continues to have policies, procedures, and automated processes in place to ensure that videos are preserved, as required under the Consent Judgment. The Department's current preservation policies require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or Inmate-on-Inmate violence, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior during four different site visits. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem. The Department also reports its intention to issue a uniform video preservation policy for use of force incidents once all new related practices, including ID's video interview pilot and body-worn camera pilot program, are in place. Further, while not yet in effect, the Monitoring Team confirmed that these requirements are included in the New Use of Force Directive.

During this Monitoring Period, the Monitoring Team also assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by reviewing the handheld and wall-mounted videos included in the use of force investigation files. During this Monitoring Period, the Department produced approximately 200 investigation files for use of force incidents that occurred after the Effective Date. In all but four cases (approximately 2% of packets produced), all of the video that captured the incidents, to the extent such video existed, was preserved and produced as part of the investigation file. In cases where the video was not preserved the Preliminary Reviewer failed to request the preservation of Genetec footage beyond the 90-day period in two cases; in another case, the Preliminary Reviewer inadvertently preserved the incorrect camera angles; and in another case, the handheld video was reviewed by the Preliminary Reviewer while on site, but the Facility failed to upload the handheld video for preservation.

These four cases identified some potential weaknesses in the process for preserving video, so the Department modified some of its procedures to mitigate the possibility that video is not preserved. As an initial step, ID started to issue routine reminders to Preliminary Reviewers and Supervisors about the importance of preserving videos as soon as possible. Further, the Department provided DDI and ID Supervisors with the ability to preserve and export Genetec video in this Monitoring Period. Previously, only OSIU had the ability to preserve video. As noted above in ¶ 2(d), the Department has also made changes to its procedures for handheld video to mitigate the possibility that an incident is not captured on video or that the video is not preserved. The Monitoring Team is appreciative of the Department's efforts to address these preservation issues. The Monitoring Team will continue to look at this issue closely to ensure that all relevant video is persevered as required under the Consent Judgment.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

**6.  USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)**

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's method of conducting Use of Force Investigations to ensure they are thorough, timely, and objective. As discussed in the Use of Force introduction, high-quality investigations are critical to the Department's efforts to identify trends and patterns related to the improper use of force; to identify alternative, non-physical or less restrictive means of managing situations where a safety threat exists; and to ensure appropriate Staff accountability when necessary. Investigations also provide a useful window for the Department, and the Monitoring Team, to assess the Department's use of force.

During this Monitoring Period, the Department and the Monitoring Team continued to develop and refine the Preliminary Review process, an entirely new investigative tool introduced by the Consent Judgment. Notably, ID is now conducting Preliminary Reviews of _all_ use of force incidents. The Department also collaborated with the Monitoring Team about how to utilize the information available through the Preliminary Reviews to identify existing trends and to develop strategies that could influence the need to use force in the first place and to minimize the improper use of force when force is necessary. These efforts are described more fully in the discussion of the Monthly Meetings in the Introduction of this Report and in the Risk Management section of this Report.

The development and refinement of the Preliminary Review process is an intrinsic component of ID's efforts to improve the quality of Full ID investigations and ID's intent to assume responsibility for conducting investigations previously completed at the Facility level. The overall goal of consistent, timely, and robust investigations can be best achieved when they are conducted logically and efficiently. Toward that end, ID has identified several modifications to processes that will leverage the Department's resources. The Monitoring Team will also focus in the Third Monitoring Period on

77

collaborating with the Department to identify ways to conduct reliable investigations more quickly and efficiently (Consent Judgment § VII., ¶ 9(a)(i)(2)).

*Preliminary Review Analysis of Use of Force Incidents*

Utilizing the content of the Preliminary Reviews as a vehicle to examine the use of force assists the Department and the Monitoring Team in several ways, particularly in examining individual conduct in use of force incidents and identifying strategies for addressing practices that raise concern.

The Preliminary Review of individual use of force incidents remains the best source of information for the Monitoring Team about the use of force agency-wide. The reviews provide information about use of force throughout the Department close in time to when the incidents occur. During the Second Monitoring Period, the Monitor personally reviewed and analyzed the results of all Preliminary Reviews conducted between March 1, 2016 and July 31, 2016, totaling over 1,700 across 15 facilities and divisions (i.e. the Transportation Division), adding to the over 800 Preliminary Reviews the Monitor reviewed during the First Monitoring Period. The Monitor's observations from these reviews are discussed in the Use of Force Introduction of this report.

*Update on Investigation Process*

The Investigation Division's ("ID's") responsibilities have increased significantly because of the requirements in the Consent Judgment. ID is also spearheading a number of the new initiatives described throughout this report. With the new responsibility for conducting Preliminary Reviews and the expansion of the types of incidents requiring a Full ID investigation (as enumerated in § VII ¶ 8)[40], the

---

[40] "(a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not

78

ID caseload has increased exponentially. The Department reports that ID's use of force investigation caseload has risen by at least 31%[41], which includes a 12% increase in the number of Class B incidents receiving a Full ID investigation and a 78% increase in the number of Class C incidents receiving a Full ID investigation. ID has also continued to work on developing a strategic approach to conducting investigations of all use of force incidents. As part of this process, the Monitoring Team and Department have discussed the best way to utilize the findings from the Preliminary Reviews to conduct investigations that are more efficient and to close cases more quickly.

The Consent Judgment embodies the general principle that use of force investigations require different levels of scrutiny, depending on the conduct involved, and the highest level of scrutiny should be applied to uses of the force that result in severe injuries or the risk of severe injuries. Accordingly, the types of incidents enumerated in § VII ¶ 8 receive a Full ID investigation, while other uses of force either receive a Facility Level Investigation or may warrant "No Further Action" ("NFA"). This approach helps ensure that investigations are appropriately triaged.

This concept is embodied in ID's plan to assume responsibility for all use of force investigations within the Facilities. As described in the First Monitor's Report, the Department piloted the use of ID Investigators to conduct all use of force investigations at AMKC ("AMKC Pilot") (both Full ID investigations, and investigations historically investigated at the Facility-level). During this Monitoring Period, ID obtained additional staff to support the increased caseloads that will come with the expansion of the pilot project. ID has prioritized an RNDC-based ID team by year-end that mirrors the AMKC Pilot. One of ID's major challenges in expanding the pilot project is the need to hire additional Investigators. Facility-based teams require approximately 20 Investigators per team. These teams will

---

consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation."

[41] The Department developed this data by conducting a comparison of ID caseload from pre-Consent Judgment (11/1/2014-6/15/2015) to that same period under the Consent Judgment (11/1/2015-6/15/2016).

therefore require staffing levels not yet realized by ID, despite having brought 19 additional Investigators onboard during the Second Monitoring Period. Even with accelerated hiring, caseloads are continually affected by ID's expanding scope and staff attrition (e.g., retirement, resignations to other law enforcement opportunities, or reassignment following promotion).[42] The Monitoring Team will continue to review ID's staffing levels to ensure that ID can complete Full ID Investigations consistent with the requirements in the Consent Judgment (¶ 11).

The deployment of ID Teams at each facility must consider the workload and potential needs in each facility in order to develop an appropriate strategic plan. Based on the Monitor's review of over 2,500 Preliminary Reviews, the Monitoring Team's collective experience, and discussions with ID, the Monitor has concluded that certain categories of use of force incidents[43] can be resolved after the Preliminary Review is completed. Such cases can be: (a) closed with no further action, or (b) closed with a recommendation that involved Staff receive discipline, counseling, and/or re-training. However, as these scenarios are not currently captured by the category of NFA cases enumerated in § VII ¶ 7(e)[44], such cases are currently subject to a facility-level Investigation. Additional investigative steps are not necessary for these cases and subjecting them to a facility-level investigation creates unnecessary investigative work with limited value, diverts limited resources, and delays the outcome of cases that could be resolved more quickly. Accordingly, during this Monitoring Period, the Monitoring Team and ID developed a set of criteria and a process designed to identify incidents for which there is a "Presumption that Investigation is Complete at Preliminary Review stage" (or "PIC"), discussed further in the Preliminary Review analysis box below.

---

[42] The Department reported losing 13 investigators during the Second Monitoring Period to attrition, promotion, or termination.

[43] This is not intended to include the cases that require a Full ID Investigation as enumerated in § VII, ¶ 8.

[44] As reported in the First Monitor's Report, the current NFA category only captured one case in the First Monitoring Period. *See* page 73 of the First Monitor's Report.

Preliminary discussions during the Second Monitoring Period have explored other potential efficiencies, with the goal of closing certain investigations on an accelerated basis (Consent Judgment § VII, ¶ 9(a)(i)(2)). The Monitoring Team intends to focus on this issue more closely with ID during the Third Monitoring Period.

The Monitoring Team has started to analyze the content of investigations conducted at the facility level (¶ 13). Given ID's intent to assume responsibility for all investigations, the Monitoring Team determined that such analysis should be limited at present in order to focus on the greater goal of developing a comprehensive approach to ID conducting all investigations. Accordingly, the Monitoring Team focused on identifying whether any interim procedures were necessary to ensure objectivity, timeliness, and proper referrals for facility-level investigations during this period of transition. The Monitoring Team made recommendations regarding ensuring the objectivity of facility-level investigators; improving the timeliness of facility-level investigations (including weekly reviews of investigations open more than 25 business days); ensuring the proper classification of Use of Force incidents based on medical evidence; ensuring the proper referral of Use of Force policy violations to the Trials Division; and ensuring the proper referral of cases to ID based on the referral requirements of the Consent Judgment. The Department reports that it intends to evaluate if and how it can incorporate these recommendations into current procedures during the Third Monitoring Period.

The Monitoring Team also began to review completed Facility Investigation packets during this Monitoring Period. In order to better understand the process for investigation and how such cases eventually conclude, the Monitoring Team's initial focus was on cases that may warrant a recommendation for discipline. Going forward, the Monitoring Team intends to develop a strategic plan and method for assessing compliance with ID and facility-level investigations in order to be able to determine compliance ratings to ¶¶ 2, 4, 9, and 13.

_Timeliness of Investigations_

The Consent Judgment requires that all Full ID Investigation cases opened on November 1, 2015 through October 1, 2018, be closed within 180 days, absent extenuating circumstances or referral to DOI or another law enforcement agency. Thus, the deadlines for closing Full ID Investigations of use of force incidents occurring between November 1, 2015 and January 31, 2016, (except for the noted exceptions) fell within the Second Monitoring Period (i.e., November 2015 cases were required to be closed in May 2016, December 2015 cases in June 2016, and January 2016 cases in July 2016) (¶ 9(a)). The Monitoring Team assessed the timeliness of completion for this cohort of ID investigations by tracking open and closed Full ID Investigations based on monthly data provided by the Department. This assessment was limited to incidents that occurred in the month of November, December, and January because only those investigations were required to be closed within the Second Monitoring Period (deadlines to close being May 2016, June 2016 and July 2016 respectively). In analyzing this data, the Department and the Monitoring Team determined that the monthly reports generated by the Department included information for Full ID Investigations _and_ some facility level investigations.[45] Before issuing a compliance rating regarding this provision, additional analysis of closed cases and refinements to the process for assessing compliance with this requirement are necessary. Accordingly, the Monitoring Team will assess compliance with this provision in the Third Monitor's Report.

---

[45] The Department is currently analyzing its reporting systems to determine why the system includes some facility investigations when reports are run for Full ID investigations. As this analysis is ongoing, the Department and the Monitoring Team manually reviewed all remaining open Use of Force investigations and removed any open Use of Force investigations that are being conducted at the Facility level. However, the Monitoring Team determined it was too burdensome on the Department to conduct this same manual review for all closed Use of Force Investigations. Accordingly, the overall data is likely to overestimate the total number of investigations and proportion of closed investigations that were timely, since it likely includes some closed facility level investigations.

| | November 2015 | | December 2015 | | January 2016 | |
|---|---|---|---|---|---|---|
| **Use of Force Incidents Based on Date of Incident/Reported Date of Incident** | | | | | | |
| Total Number of Use of Force Incidents in the month with Full ID Cases | 124 | | 136 | | 138 | |
| Number of ID Cases closed as of August 31, 2016 | 117 | 94.35% | 115 | 84.56% | 98 | 71.01% |
| Number of Open Cases as of August 31, 2016[46] | 7 | 5.65% | 21 | 15.44% | 38 | 27.54% |
| **Deadline to Close Investigations** | | | | | | |
| 180 Day Deadline from 1st of the Month | May 2016 | | June 2016 | | July 2016 | |
| **Length of Time to Close Cases** | | | | | | |
| Number of cases closed within 180 Days | 80 | 64.52% | 74 | 54.41% | 74 | 53.62% |
| Number of Cases closed after 180 Days but within 194 Days | 20 | 16.13% | 12 | 8.82% | 5 | 3.62% |
| Number of Cases closed after 194 Days | 17 | 13.71% | 29 | 21.32% | 19 | 13.77% |

*Referral of Use of Force Incidents to DOI*

ID has a duty to refer cases to the Department of Investigations ("DOI") when Staff conduct is potentially criminal in nature (¶ 3). During this Monitoring Period, the Monitoring Team gathered additional information from both DOI and the Department regarding how ID refers cases and how DOI investigates such cases, and reviewed the Department's tracking documentation for such referrals, as described in more detail below.

*Classification of Use of Force Incidents*

As described in the Use of Force introduction section of the Report, every use of force incident is assigned a severity classification based on the severity of injuries sustained by either Staff or Inmates. Historically, the classification of the use of force incident determined the level of investigative scrutiny by the Facility or ID. However, that has now changed. The determination about whether ID will investigate an incident is based on a more holistic review of the incident and the type of force that was

---

[46] Three of these open cases (one in each month) are pending before DOI. Accordingly, the time to complete the investigation for those three incidents is tolled pending the completion of DOI's investigations.

applied or alleged to have been applied as enumerated in ¶ 8. The Monitoring Team analyzed both the classification of use of force incidents (¶ 5) and the referral of incidents to ID for investigation (¶ 8) as described below.

_Development of Policies and Procedures_

Developing policies and procedures related to investigations is an ongoing priority for ID and the Monitoring Team. During this Monitoring Period, ID continued to test and refine its procedures (¶¶ 12 and 15), including the incorporation of Consent Judgment requirements into existing or new policies (e.g. ¶¶ 2[47], 5[48], 8, 13(e)[49]). Appropriate sequencing of policy and procedure development is essential. Accordingly, ID and the Monitoring Team have focused on finalizing the policies and procedures related to Preliminary Reviews. ID next intends to revise and refine policies related to Full ID Investigations, including those related to maintaining the case file (¶ 16).

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers Use of Force cases to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

- Seven use of force incidents that occurred during the Monitoring Period were referred to DOI, with three of the seven subsequently being referred to the Bronx DA's office for criminal prosecution. The four remaining incidents are continuing to be investigated by DOI.

**ANALYSIS OF COMPLIANCE**

Representatives of the Department, ID and DOI communicate frequently and work together

---

[47] As discussed in the Use of Force Policy section above, the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.

[48] As discussed in the Use of Force Policy section above, the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.

[49] As discussed in the Use of Force Policy section above, the requirements in this provision have been incorporated in the New Use of Force Directive and the AMKC Pilot Project for ID conducting Facility investigations.

collaboratively. The representatives of ID, the Department's Legal Division, DOI, and the Bronx DA's office also meet monthly to discuss the status of cases pending before DOI and the Bronx DA. This collaborative relationship extends to ID's referral of certain investigations and DOI's subsequent responsibility for those cases. Accordingly, the referral and takeover process occurs fluidly and often the decision for DOI to takeover a case will occur following discussions between ID and DOI. Representatives of ID, the Chief's office, and the Facilities review each use of force incident (as discussed in detail in this section and the Risk Management section of this Report). This preliminary assessment includes a consideration of whether Staff's conduct appears criminal in nature and whether a referral to DOI may be necessary. ID communicates with DOI if any use of force incident appears to rise to that level. ID reports that it also considers the possibility of whether Staff's conduct appears to be criminal in nature *throughout* the course of the investigation, as new facts emerge. When this occurs, ID reports it immediately contacts representatives from DOI to discuss whether a referral is appropriate. DOI simultaneously reviews the initial description of all Class A use of force incidents prepared by the Central Operations Desk ("COD reports") and informs ID whether it will take over the investigation within 30 days of the incident (assuming that ID has not already referred the case to DOI). DOI also reviews Class B uses of force as well. DOI memorialized these procedures in a memorandum to the Department in February 2015.

The open and collaborative relationship between DOI and ID ensures that the referral to DOI occurs timely when the conduct of Staff appears to be criminal in nature. Additionally, the Monitoring Team has reviewed all Preliminary Reviews of use of force incidents and has not identified any use of force incident that should have been referred to DOI and that was not.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents with Class A, B, C, or P[50] when an incident is reported to the Central Operations Desk ("COD").

- All of the requirements of this provision are addressed in the New Use of Force Directive.

---

[50] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to the Central Operations Desk (COD) to be classified as Class A, B, or C.

- COD reclassifies incidents initially classified as Class P upon the receipt of additional information (e.g. medical information).

**ANALYSIS OF COMPLIANCE**

During the Second Monitoring Period, the Monitoring Team reviewed a random sample of use of force packets and COD reports to determine whether the Department is properly classifying use of force incidents as required by the Consent Judgment.

First, the Monitoring Team reviewed a sample of 55 use of force incidents classified as Class B and C from March, April, and May 2016.[51] The Monitoring Team analyzed the information available to the Preliminary Reviewer for each incident, including the Preliminary Incident Review and Investigative Reports, Injury to Inmate reports, incident photos and witness, Inmate, and Staff statements. This approach provided the Monitoring Team with data points for determining the proper classification of each incident. The Monitoring Team found that all of the incidents were assigned a classification and the Department properly classified all 55 incidents, according to the specific definitions contained in the Directive. Overall, the Monitoring Team found the Department tended to be over inclusive in classifying incidents (e.g., classified an incident as Class B even when the circumstances could have warranted a Class C designation). Going forward, the Monitoring Team will continue to monitor the classifications of use of force incidents to ensure they are applied appropriately. Additionally, going forward, the Monitoring Team will review the classification definitions to ensure that they are accurately capturing the range of the severity of injuries.

Second, the Monitoring Team reviewed COD reports from two weeks in each March, April, May, June, and July to assess cases originally designated as Class P (pending classification). Of the 1,167 use of force incidents reviewed; 795 were immediately assigned as a Class A, B, or C; 372 incidents were assigned as Class P. Of those 372 incidents, 329 (89%) were reclassified within a two-week period or less.[52]

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy

---

[51] The Monitoring Team did not analyze the cases classified as Class A because those cases receive the highest level scrutiny. Accordingly, the Monitoring Team deferred to such determination.

[52] The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within 2 weeks or less was sufficient to demonstrate compliance. Further, the impact of reclassification on a use of force incident is minimized because the determination of investigative scrutiny is now based on the type of force utilized as enumerated in ¶ 8 and not solely based on the classification of the use of force incident as it used to be prior to the Consent Judgment.

Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In the summer of 2015, the Department conducted a "pre-pilot" to identify the best video equipment to use and to determine the initial scope of the project.

- ID developed policies and procedures governing the pilot project.

- ID launched the Video Pilot on June 6, 2016.

- Between June 6, 2016 and July 31, 2016, ID Investigators attempted to videotape almost 200 interviews with Inmates. Approximately 70 Inmates consented to videotaped interviews.

- The Monitoring Team met with ID, including ID investigators who had experience using the cameras, to discuss their initial impressions and feedback on the pilot.

**ANALYSIS OF COMPLIANCE**

The development and implementation of the Video Pilot project is a challenging process. It requires close coordination between the ID investigators, technology support and, ultimately, the cooperation of those who are being interviewed. During this Monitoring Period, ID worked through a number of technological challenges to ensure that the cameras captured both audio and visual images and to ensure appropriate storage for the videos. ID Investigators' comments regarding the Video Pilot are mixed. While they found the cameras easy to use, the background noise at the Facilities tended to affect the ability to capture clear statements because the cameras needed to be placed further from the individual speaking to capture both visual and audio, making the audio less clear than a traditional audio recorder that can be placed closer to the interviewee. ID reported another challenge is that Inmates who were interviewed typically focused on the camera and did not fully engage in conversations with the Investigators, potentially influencing the quality of the information received.

The Monitoring Team observed a random sample of the videos produced as part of the pilot and found similar audio issues as reported by ID. Audio issues are an inherent challenge with video recordings, given that the attached camera and microphone must be placed a certain distance away from the individual in order to capture the visual image. The Monitoring Team noticed the Investigators attempted to limit the audio issues by placing the camera as close as possible to the individual when conducting the interview and by conducting the interview in a discrete location.

However, the ambient noise in the Facilities is difficult to minimize.[53] The Monitoring Team will work with ID to identify other potential solutions to address this issue. The Monitoring Team also noted that the organization of the videos on the web-based system could be strengthened and recommended that Investigators be reminded about the procedures for file organization on the system so that videos can be easily identified once uploaded.

ID and the Monitoring Team will continue to evaluate the Video Pilot during the Third Monitoring Period, to determine whether the videos have investigative value and whether to expand the pilot to include Staff interviews as well as Inmate interviews. The Monitoring Team also recommends that ID consult with representatives from the Trials & Litigation Department to determine whether the use of videos for interviews would be helpful to the Staff disciplinary process.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below.

    a. The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates or civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

    b. The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

    c. To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

    d. The Preliminary Reviewer shall document the results of the Preliminary Review.

    e. Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this

---

[53] Interviews are often conducted in a discrete location close to where the Inmate is currently housed. Movement is inherently limited given the number of operational and timing considerations that movement of an Inmate to a designated interview location would pose.

determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

|   |   |
|---|---|
| i. | No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain. |
| ii. | Any resistance by the Inmate was passive. |
| iii. | Staff Members had only minimal physical contact with the Inmate, using only soft hand controls. |
| iv. | The Use of Force Incident did not involve the use of weapons, including OC spray. |
| v. | There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective. |
| vi. | The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence. |
| vii. | Based on the Preliminary Review, the Use of Force was minimal, reasonably necessary, and clearly consistent with the New Use of Force Directive. |

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During the Second Monitoring Period, the Preliminary Review process was expanded to include the review of incidents at *all* DOC facilities. The Department began conducting Preliminary Reviews at MDC, BKDC, BXCT and VCBC in May 2016 and at EMTC in July 2016.

- The Department produced the results of the March 2016, April 2016, May 2016, June 2016, and July 2016 Preliminary Reviews to the Monitor and Parties to the *Nunez* Litigation as required pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.[54]

### ANALYSIS OF COMPLIANCE

*Rollout of Preliminary Reviews to All Facilities*

The phased approach for Preliminary Reviews at each Facility was complete in July 2016 with the addition of a Preliminary Review team covering incidents at EMTC. Therefore, by the end of this Monitoring Period, nearly all use of force incidents across facilities were receiving Preliminary Reviews:

- March 2016: Across all Facilities, Preliminary Reviews were conducted for 74.87 % of reported actual incidents and 57.78% of reported alleged incidents.

- April 2016: Across all Facilities, Preliminary Reviews were conducted for 72.38 % of reported actual incidents and 78.13 % of reported alleged incidents.

- May 2016: Across all Facilities, Preliminary Reviews were conducted for 85.33 % of reported actual incidents and 68.97 % of reported alleged incidents.

---

[54] "At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)"

- June 2016: Across all Facilities, Preliminary Reviews were conducted for 98.35 % of reported actual incidents and 80.88 % of reported alleged incidents.

- July 2016: Across all facilities, Preliminary Reviews were conducted for 97.53% of reported actual incidents and 82.50% of reported alleged incidents.

***Presumption Investigation Complete ("PIC")***

During the First Monitoring Period, and as described in the First Monitor's Report, the Monitoring Team and the Department identified that the "no further action" ("NFA") category for incidents that do not merit additional scrutiny (as outlined in ¶ 7(e) above) was not capturing the volume or type of incidents needed for the Preliminary Review resources to be effectively deployed. Accordingly, during this Monitoring Period, the Monitoring Team and Department conducted a thoughtful analysis about how to improve efficiency without sacrificing the quality of the process. The Monitoring Team and ID determined that proper categorization should focus on whether any additional investigative steps were necessary to reach a conclusion and then went about the task of identifying the relevant circumstances. The approach taken in the Consent Judgment with the NFA criteria (and the Monitor's proposed expansion to the NFA criteria) was to focus more on the facts of the incident and did not properly consider the *purpose* of further investigative steps. While developing the new approach, the Monitoring Team also consulted with the *Nunez* Plaintiffs and SDNY.

The revised approach is for NFA criteria to be replaced with newly-defined criteria that would create a <u>*Presumption that the Investigation is Complete*</u> after the Preliminary Review. It is important to emphasize that this criterion only creates a <u>*presumption*</u> and that it may not be appropriate in all cases to conclude the investigation after the Preliminary Review. Accordingly, certain cases may satisfy the presumptive criteria, but will nonetheless be subject to a facility-level or Full ID investigation because the Preliminary Reviewer determined such scrutiny is warranted. The PIC approach is outlined below:

- **<u>PIC Criteria</u>**: First, any use of force incident that meets the following criteria may be considered for a recommendation for a *presumption* of closure under PIC:

  - The incident under review must not involve a use of force (actual or alleged) that would require a Full ID investigation as required by Consent Judgment § VII, ¶ 8.

  - For those incidents that were captured on video in their entirety, <u>all</u> of the following criteria must be met:

- ▪ No Inmate injuries are attributed to any Staff actions (i.e. injuries were the result of an Inmate-on-Inmate fight[55]).
- ▪ Staff injuries are consistent with video evidence and/or witness and use of force reports.
- ▪ Staff reports are available and have been reviewed to ensure that they are consistent with the video evidence.

- o For those incidents that are not captured on video, <u>all</u> of the following criteria must be met:
  - ▪ No Inmate injuries.
  - ▪ Staff reports and Inmate statements are consistent with one another.
  - ▪ The incident involved only the use of chemical agents (OC spray) and no other type of force.

- **Consideration to Determine if Further Investigative Steps are Necessary**: Upon establishing that an incident meets the above criteria, the Investigator will review the incident to determine whether any additional investigative steps are required (*e.g.* further investigative steps may be warranted if Inmate statements are inconsistent with Staff reports and the Inmate's statements are not clearly contradicted by the video.) If, upon completion of the review, the Investigator concludes that further investigative work is warranted the incident will not be recommended for closure under PIC and will be classified for either a Full ID or facility-level investigation.

- **Conclusion of PIC Case**: Assuming the Investigator determines that no additional investigative steps are necessary, the Investigator can recommend that the case be closed. This recommendation will also determine whether any violations have been identified and include an appropriate referral back to the facility (e.g. command discipline, corrective interview, re-training) or Trials.

The Monitoring Team considers this approach superior to the current NFA approach because it explicitly requires the Investigator to consider whether additional investigative steps are necessary and assists in the efficient deployment of resources. The Monitoring Team believes this new formulation and process will lead to more timely and efficient investigations, and in cases in which a violation is identified, more timely accountability for Staff.

ID will test this new process across all Facilities (including the additional time to conduct the Preliminary Review, as described in more detail below) during the Third Monitoring Period beginning in October 2016. The Monitoring Team will evaluate the results of this effort to determine whether the

---

[55] Note that if there is an allegation or evidence of Staff having encouraged, facilitated, or orchestrated an Inmate-on-Inmate fight the incident will not be considered for a PIC.

PIC criteria and the five-business-day timeline for Preliminary Reviews (described in more detail below) achieves the overall goals articulated above. It is expected that this process (both deployment of the new criterion and the assessment) will take at least six months. The Monitoring Team will provide an update, and any preliminary findings, regarding the PIC process (including the time frames) in the Third Monitor's Report.

*Qualitative Audit of Preliminary Reviews*

During this Monitoring Period, the Monitoring Team audited the accuracy of the Preliminary Reviews by comparing a sample of completed Preliminary Reviews to the underlying materials available to the Preliminary Reviewer. The Monitoring Team selected a random 25% sample of Preliminary Review packets (which included the Preliminary Review form, Use of Force Reports, Injury-to-Inmate Reports, video surveillance, photographs) for different Facilities for Preliminary Reviews conducted in January, February, March, and April 2016. This sample was reviewed by the Monitoring Team to determine: (1) the extent to which the Preliminary Review reflected the key elements of the incident; (2) whether the Preliminary Reviewer had a complete set of materials upon which to base the review; and (3) the quality of the Preliminary Reviewers' analysis. This assessment served a dual purpose as it also allowed the Monitoring Team to analyze the timeliness of incident report submissions, as well as the accuracy and consistency of record and video preservation.

The random sample of Preliminary Review packets audited found that the Preliminary Review descriptions of incidents based on the underlying materials available at the time the Preliminary Review was conducted (including an accurate description of what appeared on video footage), were generally accurate. Accurate Preliminary Reviews are critical to the Department's reform efforts and the Monitoring Team's work to identify trends and formulate recommendations. The *quality* of the Preliminary Reviewer's analysis is also critical to this process and generally the reviews identify important issues (e.g., identifying cases of potential unnecessary force and situations where force could have been anticipated or avoided) and highlight important facts to follow-up on during the course of the investigation.

The audit identified three primary issues. First, Preliminary Reviewers did not always have all of the required documentation while conducting the review. Second, Preliminary Reviewers did not consistently complete some of the fields of the Preliminary Review form. Finally, in a few isolated cases, the video for a particular incident was not preserved. The video preservation issue is discussed in more detail in the Video Surveillance Section of this report.

*Documentation Issues*

Upon request, the Department provided the Monitoring Team with all materials that were available to the Preliminary Reviewers.[56] The review of these materials revealed that the Preliminary

---

[56] As noted in the Video Surveillance Section of this Report (¶ 4), in a few limited cases the video from the incident was not preserved and therefore not produced to the Monitoring Team.

Reviewers did not always have all the necessary information at the time of their reviews, as the Preliminary Review packets were often missing some of the information required to be reviewed under ¶ 7(a) of this section of the Consent Judgment, including Injury-to-Inmate Reports and Staff Use of Force Reports. The Monitoring Team conducted an analysis of the remarks by the Preliminary Reviewers in March, April, and May 2016 to determine how many reviewers noted that Staff reports or documentation was missing at the time of the review. Overall, the Monitoring Team found that 154 of 861 (18%) cases were missing at least some of the required information at the time the Preliminary Review was completed.

The Monitoring Team expects that extending the Preliminary Review timeframe to five business days, as discussed below, will allow the Reviewers the necessary time to collect the required documentation from the Facilities.

*Accuracy & Tracking of the Preliminary Review Form*

This audit also informed the Monitoring Team's understanding of the information produced in the monthly Preliminary Review worksheets. Preliminary Reviews are currently documented in a Microsoft Word format that is later entered into a spreadsheet for tracking. This is an interim process pending implementation of CMS, which will enable Preliminary Reviewers to enter information directly in CMS. The audit showed that the form was not completed consistently by the Preliminary Reviewers. For example, if the Investigator determined that one of the 10 criteria for a Full ID investigation was present, he/she would select the first applicable criteria but would not also determine whether any of the other criteria applied. The Monitoring Team did not find that this approach affected the veracity of the investigation, or whether referral of a case was appropriate, but it would affect the development of aggregate data related to the underlying reasons for referrals for Full ID investigations. The Department reports it has instructed its Investigators on the importance of fully completing all questions for data-tracking purposes, even when the information may appear elsewhere.

<u>Time to Complete Preliminary Reviews</u>

An analysis of the time required to complete Preliminary Reviews revealed an average of just over two business days. This analysis required a manual calculation for each case to determine the number of business days between the date of the incident and the date the Preliminary Review was completed. Most reviews were completed timely, as noted above; however, in some cases the review was completed before all of the necessary information was gathered. As discussed in the First Monitor's Report, the Monitoring Team remains concerned that the current two-day requirement does not provide sufficient time to allow the Preliminary Reviewer to conduct an appropriately thorough analysis. For example, collecting even the initial information and conducting any interviews can take an entire day or longer. This leaves only one day to review and analyze the materials for the Preliminary Review.

Accordingly, the Monitoring Team recommended that ID extend the timeframe for the Preliminary Review process by three additional business days (giving the Preliminary Reviewer up to five business days to complete a review) as part of the overall PIC process (as described in more detail above). The selection of three additional business days balances the need for DOC to complete an appropriate and quality initial assessment with the need for sufficient time to collect and gather the relevant information (*e.g.* tracking down a missing piece of information, such as the identity of an unidentified Inmate involved in or witness to an Inmate-on-Inmate fight). The Monitoring Team hopes that this will result in a more fulsome initial assessment that will then accelerate the conclusion of the full investigation. Further, this additional time will likely also ensure cases that may satisfy the PIC criteria are appropriately identified, which also assists the goal of efficiently completing investigations and imposing timely discipline, as warranted. The Monitoring Team will provide an update, and any preliminary findings, regarding the PIC process (including the time frames) in the Third Monitor's Report.

### Average Business Days to Complete Preliminary Reviews Department-Wide

| Second Monitoring Period | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Actual Use of Force Incidents | | | | | | | Alleged Use of Force Incidents | | | | | | |
| | March | April | May | June | July | Total | | March | April | May | June | July | Total |
| Average Business Day | 1.89 | 1.89 | 2.16 | 2.22 | 2.16 | **2.06** | Average Business Day | 1.83 | 1.75 | 1.84 | 3.47 | 2.35 | **2.25** |

**Average Business Days to Complete Preliminary Reviews by Facility:
Actual and Alleged UoF Incidents**
*(Note: A blank row means that Preliminary Reviews were not
conducted at those facilities for that month)*

| Second Monitoring Period | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Actual Use of Force Incidents | | | | | | | Alleged Use of Force Incidents | | | | | | |
| Facility | March | April | May | June | July | Facility Average | Facility | March | April | May | June | July | Facility Average |
| AMKC | 1.98 | 1.87 | 2.02 | 1.8 | 1.88 | 1.91 | AMKC | 2.14 | 1.71 | 1.88 | 1.78 | 1.4 | 1.78 |
| BHPW | | | | 1 | 1.67 | 1.34 | BHPW | | | | | 2 | 2.00 |
| BKCTS | | | 4 | 3.33 | | 3.67 | BKCTS | | | | | | |
| BKDC | | | 13 | 5.15 | 4.19 | 7.45 | BKDC | | | 2 | 9 | 3 | 4.67 |
| BXCT | | | 9 | 1.5 | 2 | 4.17 | BXCT | | | | 1 | | 1.00 |
| BXDC | | | | | 1 | 1.00 | BXDC | | | | | | |
| EHPW | | | | | 2 | 2.00 | EHPW | | | | | | |
| EMTC | | | | | 1.36 | 1.36 | EMTC | | | | | 1 | 1.00 |
| GMDC | 1.97 | 2.02 | 1.93 | 2.06 | 2.12 | 2.02 | GMDC | | 2 | 1.64 | 2 | 1.86 | 1.88 |
| GRVC | 1.82 | 1.87 | 1.88 | 1.9 | 2 | 1.89 | GRVC | 1.75 | 1 | 2 | 3.5 | 2 | 2.05 |
| MDC | | | 7.83 | 5.11 | 3.42 | 5.45 | MDC | | | 2 | 5.71 | 2.67 | 3.46 |
| MNCT | | | | 6.67 | 15 | 10.84 | MNCT | | | | 9 | 1 | 5.00 |
| NIC | 1.75 | 2 | 1.33 | 2 | | 1.77 | NIC | 2 | | | 2 | | 2.00 |
| OBCC | 1.67 | 1.71 | 1.87 | 2 | 1.92 | 1.83 | OBCC | 1.33 | 1.5 | 2 | 5 | 4.67 | 2.90 |
| QNCTS | | | | 1.5 | 2 | 1.75 | QNCTS | | 2 | | 2 | | 2.00 |
| RMSC | 2.29 | 2 | 2 | 2 | 2.82 | 2.22 | RMSC | 2 | | 3 | | 4 | 3.00 |
| RNDC | 1.83 | 1.93 | 1.86 | 1.78 | 1.75 | 1.83 | RNDC | 2 | 2 | 1.75 | 2 | 1 | 1.75 |
| TD | | 3 | | | | 3.00 | TD | | 2 | | | | 2.00 |
| VCBC | | | 2 | 5 | 1.5 | 2.83 | VCBC | | | | 1.5 | | 1.50 |
| WF | 1.5 | 1.67 | 2 | 2 | 1.3 | 1.69 | WF | 1.5 | | | | 1 | 1.25 |
| ESU | | | | | 4 | 4.00 | ESU | | | | | | |
| QDC | | | | | 2 | 2.00 | QDC | | | | | | |
| **Total** | **1.89** | **1.89** | **2.16** | **2.22** | **2.16** | **2.06** | **Total** | **1.83** | **1.75** | **1.84** | **3.47** | **2.35** | **2.25** |

The Monitoring Team anticipates the Department will achieve Substantial Compliance with this provision in the Third Monitoring Period once the new pilots have been implemented and the Preliminary Reviewers have access to all relevant information.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves:  (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID investigations if they meet any of the criteria in Consent Judgment §VII, ¶ 8.

  o During the Second Monitoring Period, of 1,751 Preliminary Reviews conducted, 571 (33%) incidents were referred for Full ID investigations, 1136 (65%) were referred for Facility Level Investigations, and 44 (2%) were closed by NFA.

**Preliminary Review Investigation Referrals**

| Referrals | Number of Incidents |
|---|---|
| Full ID Investigations | 571 (33%) |
| Facility Investigations | 1136[57] (65%) |
| NFA at AMKC | 44 (2%) |

### ANALYSIS OF COMPLIANCE

The Monitoring Team audited the use of force incidents that received a Preliminary Review in March, April and May 2016 to determine whether incidents were properly referred for a Full ID investigation when any of the criteria of Consent Judgment §VII, ¶ 8 were met. These cases represent a considerable percentage of all use of force incidents that occurred in this Monitoring Period (77% of reported actual incidents and 68% of reported alleged incidents). The Monitoring Team reviewed the Preliminary Reviews for 484 use of force incidents that were referred for facility-based investigations during the relevant months to determine whether or not a Full ID investigation was required. The Monitoring Team did not analyze the cases referred for a Full ID investigation because those cases

---

[57] This includes 143 cases that the Department identified as meeting the NFA criteria, but the incident received a facility-level investigation.

receive the highest-level scrutiny. The Monitoring Team found that 479 of 484 (99%) of the referrals for facility-level investigations were consistent with the requirements in the Consent Judgment. In only five instances, the Monitoring Team concluded that an incident *may* have warranted a Full ID investigation (one involving use of a shield, two involving Inmates who were arguably restrained, one involving unexplained injuries, and one involving a cuffing port). In each of these cases, the facts did not warrant a mandatory referral for a Full ID Investigation. Overall, these findings demonstrate that the Department is referring incidents for Full ID investigations appropriately.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

    a.   Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    b.   In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department identified 434 investigations that were outstanding as of the Effective Date and that had been open for more than six months and thus were required to be closed by February 29, 2016. These investigations included both Full ID Investigations and "IRT" cases, a process by which ID historically would review completed Facility Investigations to ensure the investigation was thorough and the conclusion appropriate.

  - The Department closed 432 (99.5%) of the 434 cases.

  - ID is in the process of drafting the closing memorandum for the two cases that remain open, and Trials has served charges in both cases.

- The Department identified 390 cases that were open as of the Effective Date and that had been open for less than six months and thus were required to be closed by April 29, 2016.

  - The Department closed 384 (98.4%) of the 390 cases.

  - Of the six cases that remain open, two are on hold due to a pending DA or DOI investigation; one was returned to ID by DOI in June 2016; Trials has brought charges

in one case; and two others remain under investigation with MEO-16 interviews just completed or pending.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that by the close of the Second Monitoring Period, the Department closed 99% of the ID cases that were open as of the Effective Date of the Consent Judgment, effectively clearing the backlog of ID cases. The Department reports that the one Investigator who did not complete backlogged cases in time was disciplined (this Investigator was assigned three cases that failed to close on time).

During the Second Monitoring Period, the Monitoring Team conducted an audit of the closed investigation files to ensure that ID cleared the backlog of cases in an appropriate and reasonable manner. The Monitoring Team selected a random sample of closed cases, reviewing a total of 91of the 789 closed investigations (12%). For each case, the Monitoring Team reviewed the entire investigative file, including video evidence. The majority of the materials reviewed evidenced thoughtful and thorough analysis by ID Investigators, demonstrating that Investigators are identifying a variety of procedural violations during their investigations, not just use of force violations. The Monitoring Team found that several Investigators were thorough in terms of their review of the evidence, interviewing witnesses, and evaluating evidence and testimony to draw logical conclusions. Some Investigators also identified contributing factors to the onset of an incident and recommended retraining or corrective counseling for those issues. One particularly effective method an Investigator employed was listing all questions or issues in dispute during the investigation and answering each of those questions during the investigation.

During this review, the Monitoring Team identified a few cases that merited stronger or additional investigative steps that might have improved the foundation for the conclusion. In particular, some Investigators failed to address all outstanding questions, particularly in relation to Inmate allegations, or failed to interview relevant Inmate witnesses to address such outstanding issues. Further, in some cases, Investigators did not consider remedial measures for *all* individuals involved in problematic uses of force and focused only on the individuals who were most culpable. The Monitoring Team discussed these findings with ID to ensure that greater consideration is given to these issues going forward and shared its recommendations in writing. The Monitoring Team will continue to monitor these issues routinely as part of the assessment of Full ID investigations (¶ 9).

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department finalized the policy identifying the quality control systems and procedures for Full ID investigations to ensure that ID Investigations meet the requirements of the Consent Judgment (¶ 9).

- The Department adopted some interim quality control measures for other Use of Force investigations as ID continues to develop the underlying policies and protocols for new investigation procedures (e.g. Preliminary Reviews).

**ANALYSIS OF COMPLIANCE**

The Department developed a number of interim quality control and auditing procedures to ensure the quality of Use of Force Investigations pursuant to the Consent Judgment. However, given the number of ongoing pilot programs and other changes, the Department, with the Monitoring Team's support, decided to focus on implementing a policy governing the auditing procedure only for Full ID investigations at this time. The Monitor approved the policy and procedures to audit Full ID investigations during the Second Monitoring Period. The Department, in consultation with the Monitoring Team, will implement additional quality assurance and auditing policies and procedures as the other pilots are evaluated and final changes are implemented.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18 )

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a.  The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b.  The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has a designated "Youth ID Team" consisting of one Captain, one civilian investigator, and four uniformed staff investigators which is based at RNDC.

- The Youth ID Team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced Inmates, age 16 or 17).

- All 42 use of force incidents involving 16- and 17-year-old male Inmates referred for a Full ID Investigation in the Second Monitoring Period were assigned to the Youth ID Team. No use of

force incidents involving female 16- and 17-year-old Inmates required a Full ID investigation in the Second Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that the Youth ID Team remained in place and was assigned the investigations of all use of force incidents involving Inmates who were under the age of 18 at the time of the incident. Going forward, the Monitoring Team will assess the quality and timeliness of the investigations conducted by the Youth ID Team as part of the overall evaluation of Full ID investigations. The Monitoring Team has not yet evaluated the Department's compliance with ¶ 14(b). However, as mentioned above, ID intends to expand the AMKC Pilot to RNDC by the end of the year, which will mean that the Youth ID Team will conduct all Full ID and Facility level investigations at RNDC.

| **COMPLIANCE RATING** | ¶ **14.** Substantial Compliance<br>¶ **14(a).** Substantial Compliance<br>¶ **14(b).** Not yet evaluated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 15 (POLICIES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- During the First Monitoring Period, the Department developed draft policies and procedures for Preliminary Reviews that incorporated the specific requirements of the Consent Judgment.

- During the Second Monitoring Period, the Department significantly revised the draft policy for Preliminary Reviews to incorporate the PIC process, and shared that draft with the Monitoring Team for feedback and discussion.

**ANALYSIS OF COMPLIANCE**

In consultation with the Monitoring Team, the Department is developing and revising its policies and procedures for Preliminary Reviews and investigations conducted by the Facilities (or ID investigators at the pilot facilities) to ensure that they will result in thorough, timely, and efficient investigations and are consistent with the requirements in the Consent Judgment. Given the number of ongoing pilot programs and other changes, the Department, with the Monitoring Team's support, decided to focus initially on the policies and procedures related to Preliminary Reviews. During this Monitoring Period, the Monitoring Team reviewed drafts of the Preliminary Review policy that incorporated the new PIC process and provided feedback to the Department. The Monitoring Team expects the Department to finalize the policy during the Third Monitoring Period.

The development of policies and procedures related to investigations traditionally conducted by the Facilities is ongoing. The Monitoring Team analyzed the current policies related to facility investigations and provided feedback on minor procedural changes to current practices that could make them more consistent with the Consent Judgment. The Monitoring Team is also collaborating with the Department about the development of procedures for ID when ID assumes responsibility for conducting all investigations. The Monitoring Team expects the development of a comprehensive policy relating to ID investigations to start during the Third Monitoring Period.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
| --- | --- |

### 7.   STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

As discussed in the Use of Force introduction to this report, meaningful, consistent, and timely discipline is a key aspect of the overall effort to reduce and deter the use of excessive or unnecessary force by Staff. During this Monitoring Period, the Monitoring Team focused on more immediate responses to Staff misconduct, as described in more detail in the Risk Management section, and gathering information about the formal disciplinary process by the Trials and Litigation Division ("Trials") in order to solidify the monitoring strategy going forward. Toward that end, the Monitoring Team met with the Acting Assistant Commissioner of Trials and an Executive Agency Counsel of Trials, representatives of the Chief's Office, and the Department's Legal Division, who provided an overview of the Department's disciplinary process. Topics included due process and the disciplinary system, the types of employees with and without due process rights, options for corrective action (e.g., corrective interview, command discipline, and formal charges) and the proceedings before the Office of Administrative Trials and Hearing ("OATH").

The formal disciplinary process by Trials against uniformed and non-uniformed Staff members may be initiated in different ways, including referrals made by 311 complaints, DOI, ID, and the Department's Facilities and commands. In use of force cases, however, the most common referral is through ID. When an ID Investigator recommends an employee for formal charges, a Memorandum of

101

Complaint ("MOC") is drafted and forwarded to the Chief of Administration, who assigns an MOC number.[58] The MOC is reviewed and signed by the Chief of Department and the Deputy Commissioner of ID and sent to Trials. Once Trials obtains a signed MOC and the MOC number and retrieves the employee's disciplinary record, Trials obtains ID's files on the instant matter. In order to preserve the Statute of Limitations, Trials must serve specifications and charges against the subject employee within 18 months of the date of the underlying incident. The case is then calendared for pretrial conference at OATH. At the pretrial conference, the case may be administratively filed, result in a negotiated plea agreement ("NPA"), or be scheduled for a trial. For NPA cases, the penalty options range from five to 60 days compensation forfeiture. If the subject employee had been serving a suspension during the time in question, the penalty may be set to time already served. If the NPA involved a penalty of extending probation, the probationary period, either full or limited, may be set between 12 months to 36 months. Other penalty options include those related to retirement or returning the subject employee to his or her command for command level discipline.

The Department reports that Trials has implemented a strategy to clear its backlog. The management team, comprised of the Acting Assistant Commissioner, Directors, and Team Leaders, systematically reviews every attorney's cases on a monthly basis and maps out deadlines and next steps to be achieved by the next review period. This requires every attorney, including the Directors, to physically review their case files, explain the case and the status with the supervisor, and explain any delay (*e.g.*, witnesses are unavailable, the matter has been taken over by an outside agency, including DOI, or the District Attorney's office). After the review, the manager or supervisor prepares a summary detailing specific deadlines and next steps, including when the report is to be submitted for closing,

---

[58] The Facilities engage in a similar process for investigations conducted at the facility level that conclude formal discipline should be imposed. In those cases, the Warden of the facility must approve any referral for formal discipline and forward it to the Chief of Administration.

when the case needs to be scheduled for pre-trial conference and any additional follow-up that needs to happen.

The Department reports that Trials has also begun tracking where each case is in the process, so that management can monitor how many cases have been fully approved and processed to completion by any particular attorney and where there may be a roadblock in the processing of cases. This step allows management to identify and thereby address any systemic problems or undue delays in case processing. Trials has also begun imposing internal deadlines to ensure more timely closing of cases. During the next Monitoring Period, the Monitoring Team will more closely review these procedures related to use of force cases.

The work conducted in this Monitoring Period will assist the Monitoring Team in developing a methodology and strategy to assess compliance with ¶¶ 1, 3, 4 and 5 in future Monitoring Reports.

The Monitoring Team's assessment of compliance is below.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)[59]

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

    a.    The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

    b.    The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

    c.    The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the

---

[59] §VIII, ¶ 2(e) is discussed in Risk Management section given that the provision is more applicable to discussion in that section. §VIII, ¶ 2(e) is not required to be incorporated in the Disciplinary Guidelines. Therefore, the Monitoring Team finds that it is inappropriate and confusing to discuss this requirement in the context of the Disciplinary Guidelines as this requirement will not be included in the guidelines.

Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

    i.    Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

    ii.    Deliberately failing to report Use of Force by a Staff Member.

    iii.    The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

    d.    The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.

    i.    Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.

    ii.    Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate.

    iii.    Causing or facilitating an Inmate-on-Inmate assault or fight, or allowing an Inmate-on-Inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility.

    iv.    The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has drafted New Disciplinary Guidelines.

## ANALYSIS OF COMPLIANCE

The current draft of the New Disciplinary Guidelines addresses all of the specific requirements outlined in (¶ 2 (a) to (d) above. During this Monitoring Period, the Department consulted with Staff representatives and the Monitoring Team about the revisions. The New Guidelines will take effect on October 27, 2017, which is 30-days after the effective date of the New Use of Force Directive.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a

|   | designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor. |
|---|---|
| b. | If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division. |
| c. | The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports that Staff are referred to the Trials Division for charges as determined by the conclusion of the ID and Facility Investigations.

- The Department reports, as discussed in the narrative above, that Trials is working to enhance its tracking processes for investigations referred to their division, as well as clearing a backlog of cases previously referred for charges that have yet to be resolved.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Monitoring Team focused on identifying the cases where ID or the Facility concluded Staff had committed a use of force violation and the case was referred to Trials. In developing this information, there were some inherent challenges with the current tracking systems. The Monitoring Team worked with the Department to develop some interim solutions, which required manual review and inputs, as described below.

The data from ID and Facility investigations are maintained in two different systems that each capture the conclusion of the investigation differently, so a manual assessment must be conducted in two different systems to identify the cases that were referred to Trials. In conducting this analysis, a number of individual considerations must be made. First, the conclusion of a use of force investigation can result in a finding of a use of force violation or other, non-use-of-force-related violation identified during the course of the investigation so each case must be reviewed to determine the type of violation. Further the specific type of violation substantiated by the investigation (*e.g.*, excessive use of force or failure to report a use of force) is not consistently tracked across investigations because the field that captures this information is a free form field (e.g. the same violation could be written out in words or may be described by a reference to the directive with or without reference to a specific provision).

The Monitoring Team expects that development of CMS will resolve many of these issues. As part of the Monitoring Team's work with the Department on CMS, the Monitoring Team will also

verify that this information can be captured systematically so that relevant aggregate data can be generated.

      The Monitoring Team did not assess compliance with this provision because additional analysis of the underlying cases is necessary. During the next Monitoring Period, the Monitoring Team will continue to work with the Department on the development of CMS. The Monitoring Team is also tracking and monitoring the cases that have been referred to Trials. If charges are brought, the case will be tracked through disposition. If charges are not brought, the Monitoring Team will review whether the reason for this determination was documented and what Trials subsequently determined should happen with the case.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Four new attorneys have joined Trials during this Monitoring Period.
- Three new attorneys are in the process of being hired.

**ANALYSIS OF COMPLIANCE**

      The Department reports it is actively working to increase the number of attorneys assigned to Trials, thus reducing the caseload assigned to any particular individual. The Department reports that staff attorneys, on average, are currently handling about 130 cases each, which include use of force and non-use of force matters. These individuals have strong litigation and trial experience, some with prior experience in a district attorney's office, or the New York City Department of Education, where they were charged with handling a large caseload. That said, the current caseload for each attorney is very high and difficult for even the most experienced individuals to manage and thus may compromise the quality of the case. As part of the Monitoring Team's overall assessment of Trials' caseload during the next Monitoring Period, the Monitoring Team will review whether the Trials Division has sufficient staff to allow for the prosecution of all disciplinary cases as expeditiously as possible.

## 8. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

      This section of the Consent Judgment addresses requirements for screening Staff prior to promotion, assignment to Special Units, or in circumstances where Staff has been disciplined multiple times, for review of that Staff Member's assignment generally. During this Monitoring Period, the Department focused on revising and modifying its screening process for promotions and assignments.

The Monitoring Team met with representatives from the Chief's Office, Office of Administration, ID, Trials, and the Legal Division to better understand the promotion process for Captains, ADWs, Deputy Wardens, and Wardens in order to develop a reasonable and appropriate monitoring strategy going forward. The Department is revising its existing policies[60] governing the screening of both pre-promotional candidates and Staff applying for special units. The Department determined that the complex screening process required four distinct policies: (1) a Directive that clearly sets forth which division or unit of the Department is responsible for what type of screening or background review, and covers new hires, volunteers, certain unit assignments, etc.; (2) an Operations Order governing the process for applying to openings for steady post assignments, and setting forth the details of the screenings necessary for certain specialized units and posts; (3) a Directive governing the promotions process for captains and above, and setting forth the details of the necessary pre-promotional screenings; and (4) an Operations Order, which is a revision of an existing Operations Order, that governs the details of the screenings required for assignments to certain units, such as Canine Unit, Communications Unit, Emergency Services Unit (ESU), and others. Many stakeholders were involved in drafting and revising these policies including ID, Trials, the Chief of Department, the Chief of Administration, Human Resources, the Legal Division, and the Office of Labor Relations. The Department has also revised the existing screening forms[61], including providing additional space for narrative explanations. The Monitoring Team intends to assess the implementation of these procedures more closely after the new policies are issued during the Third Monitoring Period.

The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section given the ongoing revisions to processes throughout the Second Monitoring Period.

---

[60] During this Monitoring Period, the Monitoring Team reviewed the existing policies for the promotion of Deputy Wardens and Wardens.

[61] During this Monitoring Period, the Monitoring Team reviewed the current versions of the promotional screening forms used by ID, Trials, and the Legal Department.

**9.  RISK MANAGEMENT (CONSENT JUDGMENT § X)**

The Risk Management Section of the Consent Judgment requires the Department to create a number of systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. These measures include developing and implementing a computerized Early Warning System ("EWS") (¶ 1); implementing "5003 Counseling Meetings" between the Warden and any Staff member who engages in repeated use of force incidents where at least one injury occurs (¶ 2); creating a new position, the use of Force Auditor ("UOF Auditor"), who identifies systemic patterns and trends related to the use of force (¶3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating a Case Management System ("CMS") to systematically track investigation data throughout the Department (¶ 6).

During the Second Monitoring Period, the Department, in collaboration with the Monitoring Team, prioritized the development of procedures to better understand and address the type of force employed by the Department. The Department created two entirely new processes, the Commissioner's Twelve Facility Action Plan ("Commissioner's Twelve") and the Action Review Committee, both of which are described in more detail below. These new processes for collecting, understanding, and evaluating the use of force go beyond the specific requirements of the Consent Judgment and demonstrate the Department's commitment to reform. The Department also refined its procedures for 5003 Counseling Meetings and continued to develop the EWS, CMS, and a tracking system for litigation claims (all described in more detail below).

*The Commissioner's Twelve*

During this Monitoring Period, the Monitoring Team focused on working with the Department to develop its internal capacity to understand the causes of and types of force utilized. Toward that end, in late May 2016, the Department developed and implemented the Commissioner's Twelve process,

108

wherein, on a weekly basis, facility Wardens must review all of the incidents in which the Preliminary Review process identified a problematic use of force and then must develop an Action Plan to address any trends. Twelve categories of problematic uses of force were identified based on discussions between the Commissioner and the Monitoring Team: head strikes, force utilized on Inmates in restraints, kicks, improper use of institutional equipment, prohibited restraint holds, camera malfunctions, excessive or unnecessary use of OC, unexplained injuries, unreported uses of force[62], anticipated uses of force[63], alleged uses of force[64], and Inmates being forcibly placed against the wall.

From May 29, 2016, through July 30, 2016, the Department reported that it reviewed 701 Preliminary Reviews pertaining to use of force incidents, identifying 268 incidents (38%) that fit into one or more of the 12 categories, for a total of 295 cases. While these data can be a valuable assessment tool, these data should not be interpreted as representing the frequency of improper use of force because the specific circumstances and facts of each incident must be considered further before judgment can be made about whether the force used was unnecessary or excessive. Use of physical force by Staff in a correctional setting is at times necessary to maintain order, keep Staff and Inmates safe, and to enforce the law. As such, the mere fact that physical force is used does not mean that Staff acted inappropriately because a deeper inquiry may reveal that the use of force was appropriate. It is also important to understand that this data includes both actual and alleged use of force incidents, as ID is required to conduct Preliminary Reviews of all incidents. After investigation, ID may determine that some of these alleged incidents are unfounded. However, by initially casting the net wide, the Department ensures a full consideration of the various dynamics that influence the way force is used, an essential step toward

---

[62] This category includes incidents in which the Department confirmed that force was used, but the incident was not reported by Staff.

[63] This category includes incidents in which the use of force was anticipated, but was not treated as such by the involved Staff.

[64] This category includes allegations of uses of force in which Inmate injuries are consistent with a use of force.

safer Facilities. For this reason, the Monitoring Team encourages the Department to continue to be over-inclusive when identifying incidents for the Commissioner's Twelve.

As described above, the purpose of categorizing incidents and action planning is not for individual accountability, but rather to identify trends in the types of problematic uses of force occurring at each facility, and to empower facility Wardens to develop Action Plans to address the root causes of these trends. The most commonly occurring categories were: force utilized on Inmates in restraints and head strikes. These findings mirror those of the Monitor, reported in the Use of Force introduction to this report. With respect to force utilized on Inmates in restraints, the incidents were disproportionately located at GRVC. Many instances occurred while Staff were escorting punitive segregation or mental observation Inmates, particularly when an Inmate physically resisted the escort. GRVC's Action Plan to address this issue included the following interventions: briefing Staff on proper escort procedures, verbal counseling for Staff who were involved in more than one incident, and requiring a Supervisor's presence when escorting problematic Inmates. With respect to head strikes, the incidents were disproportionately located at AMKC, GMDC, and MDC/CT. The facility Action Plans to address this issue include the following interventions: providing verbal counseling to Staff, reminding Staff to keep a safe distance, and reiterating that head strikes may only be used as a last resort, pursuant to Department policy.

The Commissioner's Twelve and the other efforts described in this Report demonstrate the Department's ongoing efforts to identify, understand, and reduce the problematic use of force. Any use of force incident where one or more of the 12 categories is confirmed is a concern. During the next Monitoring Period, the Monitoring Team will focus on reviewing cases involving the use of head strikes and force on Inmates in restraints to evaluate the appropriateness of the level of force, identify the root cause of these patterns, and identify potential solutions to minimize their occurrence.

*Action Review Committee*

The Consent Judgment requires the Department to consider whether a Staff member should be suspended, placed on modified duty, or reassigned to a non-Inmate contact post following a use of force incident pending the outcome of the investigation (§VII, ¶ 7, and §VIII, ¶ 2(e)). The Consent Judgment contemplates that the Preliminary Reviewer should consider this question as part of the Preliminary Review (§VII, ¶ 7 (iii)). However, this determination requires broader consideration by various stakeholders in order to determine the appropriate response to alleged misconduct. Normally, this question is addressed prior to the completion of the Preliminary Review by members of the Chief's Office, the Executive Staff of ID[65], and the Commissioner. The purpose of these reviews is for stakeholders from different backgrounds within the Department to review incidents of concern close in time to the incident's date.

In July 2016, the Chief of the Department formally reinstituted a longstanding Department process called "Rapid Review," which requires each Division Chief to personally review all use of force incidents occurring in the facilities they supervise. Simultaneously, ID staff also review use of force incidents and consider whether immediate action is warranted. The purpose of the Rapid Review process and ID's review is to determine whether actions need to be taken to address Staff conduct close in time to an incident, including whether Staff may need to be re-trained, placed on modified duty, reassigned to a non-Inmate contact, or suspended (collectively "immediate action").

The Action Review Committee meets bi-weekly and includes representatives from ID, Trials, the Chief's Office, the Academy, the Legal Division, and the Division Duty Chief. During the meetings, the Action Review Committee reviews any immediate action taken as a result of the Rapid Review or ID in the preceding two weeks to ensure that all decision-makers are aligned. The Action Review Committee

---

[65] The Preliminary Reviewer may also still identify Staff who warrant such consideration during the Preliminary Review in the event they are not identified by the immediate review.

also considers incidents where immediate action has not yet been taken, but where one or more members of the Committee believes some action may be appropriate. The Action Review Committee maintains a running list of incidents in which immediate action was taken, including the incident number, Staff's name, facility, and the specific action taken.

*Counseling Meetings (5003)*

One of the risk management tools historically used by the Department is Directive 5003R-A, Monitoring Uses of Force. Since its original inception in 1986, this policy has been used by the facility Commanding Officers, and other executives, to inform them of Staff member's disproportionate involvement in use of force incidents. Staff members who are involved in three or more use of force incidents in a six-month period participate in a counseling session, commonly referred to as a "5003 interview," with the Commanding Officer (or a designee) of their facility. 5003 interviews are not necessarily disciplinary in nature, because there are several legitimate factors that may contribute to staff's involvement in use of force incidents (such as the shift and post assignments, type of Inmate population, etc.). In other words, involvement in three use of force incidents, alone, is not necessarily indicative of a problem. Rather, the 5003 interview process empowers Commanding Officers to be fully knowledgeable about their Staff and the circumstances in which they find themselves, and allows Commanding Officers to identify any risks facing their facilities or Staff members.

Historically, the 5003 interview process had a number of drawbacks. In order to calculate the number of use of force incidents each Staff member was involved in, the Department relied on each facility to use locally installed software ("the software" or "the 5003 software"). The 5003 software had been in place since 1986, the original effective date of Directive 5003. Each facility had its own copy of the software, which was completely isolated from any other facility and any other reporting system utilized by the Department. Designated Staff members at each facility were responsible for entering each

112

use of force incident and the names of Staff involved into the software. In addition, because the 5003 software was not linked to the Department's other systems, the information entered was not automatically updated if an investigation revealed changes to the participants in the incident. Furthermore, because the 5003 software was locally installed at each facility, Staff records did not automatically follow Staff upon transfer to another facility.

During the current Monitoring Period, a new source of use of force information offering more accurate and reliable data was identified. After numerous meetings, discussions, and careful analysis over the course of several months, the Department determined that IRS would be a more accurate source of information on Staff members' involvement in use of force incidents.[66] IRS can produce a report for each Facility that includes Staff members' last names, first names, shield numbers, ranks, the number of use of force incidents in during a six month period, injury classes, incident dates, use of force descriptions, etc. The report will be provided to the facilities on a bi-monthly basis starting in August of 2016 and will include the names of all Staff members who have met the numerical threshold, along with other data needed for output tracking. This new process will make it easier for the Facilities to know which Staff have met the numerical threshold for a 5003 interview and will eliminate the need for the 5003 software. IRS also offers the Department the ability to retrieve Staff members' use of force history over the past five years.

Furthermore, the Consent Judgment requires a slight modification to the 5003 process (§ X, ¶ 2) in that Counseling Meetings are mandatory in some cases, and discretionary in others. When a Staff member is involved in three or more Uses of Force in a six-month period, the Commanding Officers must consider a number of factors to determine whether they *must* or *should* conduct a Counseling Meeting. The Commanding Officer must review the Staff member's use of force history, including

---

[66] Use of force allegations are also included.

Inmate injury severity and the Staff member's disciplinary history over the past five years.

In response, the Department revamped the current 5003 interview process in order to make it more effective and meaningful, and to also ensure it complies with the terms of the Consent Judgment. The policy was nearly completely revised. The 5003 interview process must be completed within 30 days of the facility's receiving the report, which will involve identifying which Staff must be counseled and making a decision about counseling for others who are in the discretionary category. The decision and results must be documented in all cases. Once the process and documentation is complete, the Department will reconcile the Facilities' information with the new lists generated from IRS, and will create new Excel documents with only those Staff member names that need to be counseled during the new 30-day period. The Department has also created a new form that Commanding Officers will use to document their 5003 interviews.

The Department consulted with the Monitoring Team about this new 5003 process and began rolling it out in early August 2016. In anticipation of launching the new process, the Department conducted a training session for all Facility Wardens. The revised 5003 Directive was issued on August 10, 2016, and as of the drafting of this report, the first set of data from IRS has been provided to the facilities. The Monitoring Team will assess the implementation of this process during the Third Monitoring Period.

The Monitoring Team's assessment of compliance is below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

      a.      The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

      b.      ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The

| | Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS. |
|---|---|
| c. | On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department is utilizing a number of tools to identify and mitigate risk regarding the use of force, all discussed in detail above:

    o The Commissioner's Twelve

    o Rapid Reviews and ID's review

    o Action Review Committee

    o 5003 Counseling Meetings

- The Department recruited and hired a Deputy Risk Manager who started working with the Department in the Third Monitoring Period and will work to develop additional risk mitigation processes and procedures.

- As discussed in the First Monitor's Report, the Department's Performance Metrics and Analytics Department ("PMA") is also working on creating EWS software, and the developers have gathered inputs from existing databases, including IRS and ITTS[67], and have been validating those inputs for use in the EWS system. PMA is also considering additional data that may be needed for full functionality of EWS (including data on all DOC admissions, and exploring data available in the Department's Employee Database).

    o The PMA estimates the timeline for this EWS is five to six years.

**ANALYSIS OF COMPLIANCE**

The Department is working to meet the requirements in this provision in a number of ways. First, developing and implementing the Commissioner's Twelve, the work of the Action Review Committee (including the Rapid Reviews and ID's review) and the revised process for 5003 counseling sessions are critical components to timely identification and mitigation of risk. Second, the Department recruited and hired a Deputy Risk Manager (this individual will begin working for the Department in the Third Monitoring Period). The Deputy Risk Manager will be responsible for developing and implementing risk mitigation systems to achieve the goals of this provision.

Finally, the Department is also working to develop a state of the art EWS software. During the Second Monitoring Period, the Monitoring Team met with the Performance Metrics and Analytics

[67] Including age, time on job, post, whether steady or not, time since training for Staff; and mental illness status, Security Risk Group ("SRG") status (gang affiliation), Housing Units, environmental factors for Inmates.

("PMA") team to discuss the progress and timeline for the EWS software. The Department's PMA office has continued its work on the development of EWS software, which began during the First Monitoring Period. During the Second Monitoring Period, PMA explored supplementary data in addition to the data sets previously considered. PMA developed queries to pull data on all DOC admissions, and has also explored the data available in the Department's Employee Database to assess their capacity to form comparison groups. PMA also continued their review of other jurisdictions' use of predictive analysis in risk management.

Based on the work completed to date, and the lessons learned from other jurisdictions, PMA advised the Monitoring Team that a comprehensive software system that is truly useful for the purpose of risk assessment will require five to six years to develop. Challenges include the complexity of Inmate information given their short stays in DOC custody, recidivism, and the lack of centralized, easily available data on employee leave, assignments, and duties. Further, the timeline for project completion must include adequate time for data cleaning, analysis, model production and testing, solution development and testing, piloting, and rollout.

The Monitoring Team's experience in this area suggests that the timeline for EWS software development is not unrealistic given the complexity of the task, number of indicators and dimensions to assess, and challenges in obtaining usable source data. Further, the Monitoring Team's consultation with other experts also suggests that police agencies' experience with similar tools (e.g., Early Intervention Systems) have not led to universal acclaim. Oftentimes, prior to the EIS issuing an alert about a particular individual, managers were already aware of ominous performance problems and were taking action via other avenues (e.g., using tools such as the Rapid Review and 5003 Counseling described above). As a result, they may not have been as conscientious about recording the intervention and its effectiveness within the EIS documentation. This may be one factor that contributes to the lack of solid research evidence of the effectiveness of these systems. That said, the Monitoring Team is of the opinion that the EWS, in concert with other tools, will assist the Department in identifying and responding to problematic uses of force among its Staff.

At this juncture, the Monitoring Team believes that the Department has identified and developed all of the processes that could be developed within the period of time since the Effective Date and continues to encourage the Department to develop solutions to identify sources of risk on both an individual and systemic level. The Monitoring Team believes that the Deputy Risk Manager

will provide strong assistance in this area, and looks forward to collaborating with this individual. During the next Monitoring Period, the Monitoring Team will work with the Department to identify additional measures to achieve the goals of this provision.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| --- | --- |
| | ¶ 1(a). Partial Compliance |
| | ¶ 1(b). Partial Compliance |
| | ¶ 1(c). Partial Compliance |

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department conducted 381 Counseling Meetings during the Second Monitoring Period with 289 Staff.

- The Department revised Directive 5003 and associated procedures related to Counseling Meetings.

- The new 5003 process includes:

  o Using IRS to generate a list of individuals who qualify for Counseling meetings from a centralized location at headquarters, instead of relying on the facilities to generate these lists.

    ▪ These IRS reports provide information not just about which Staff qualify, but details about the incidents the Staff were involved in. These IRS reports will be generated on a bi-monthly basis.

    ▪ The Department also developed a new process for Supervisors to more easily access the information regarding the Staff who require counseling and created a chart to track the completion of Counseling Meetings.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Department focused on overhauling the new 5003 process as described in detail above. The Department consulted with the Monitoring Team, which believes that the new process will lead to more efficient identification of Staff who require counseling and will provide Supervisors with more specific incident summaries so that Counseling Meetings are more substantive and effective. The Monitoring Team will review the implementation of this new policy during the Third Monitoring Period to determine whether the meetings are conducted as required, and to assess their quality and content, and to review the specifics of Staff involved in multiple counseling sessions.

During this Monitoring Period, the Monitoring Team also reviewed a random sample of Counseling Meeting summaries from meetings that took place during the First Monitoring Period. Documentation and quality varied across facilities. An in-depth analysis was not conducted given the imminent change to procedures. Accordingly, the Monitoring Team will not assess a compliance rating in this Monitoring Period.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2(e) (RESULTS OF PRELIMINARY REVIEW)

¶ 2.

e.   If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has developed the Action Review Committee (see description above).

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Staff Discipline and Accountability section because this requirement is more aptly considered a Risk Management tool. The Monitoring Team has been collaborating with the Department on the development of this process and the identification of Staff whose conduct may warrant immediate action. During this Monitoring Period, 20 Staff involved in 11 use of force incidents were either placed on modified duty (some pending re-training) or suspended based on the Department's preliminary assessment of use of force incidents (which occurred at various stages of the investigations including before the Preliminary Review was conducted, during, or after). During the next Monitoring Period, the Monitoring Team will work closely with the Department to further solidify this process and will verify that the Action Review Committee has identified the total universe of Staff members who should be considered for immediate action. Furthermore, the Monitoring Team expects to be in a better

position to provide more information about the number of cases that merited consideration and the outcomes, now that this process has been formalized. The Monitoring Team expects that the Department will achieve substantial compliance with this provision during the next Monitoring Period, if the process continues to be implemented as described in this Report.

| COMPLIANCE RATING | ¶ 2(e). Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department hired a UOF Auditor, who began working at the Department on August 29, 2016, and reports directly to the Commissioner.

- The Department recently promoted and appointed an Assistant Chief of Data Analytics whose work will, in part, benefit the new UOF Auditor.

- Before the UOF Auditor was hired, the Department assembled several key personnel, including the Deputy Commissioner of Investigations and his senior staff, the Chief of Department and his staff, as well as senior staff from the Office of the Commissioner and the Office of the General Counsel, to form an Auditor Report "Support Team." This team was responsible for conducting analysis and contributing to Auditor Reports until the Department hired and fully on-boarded a dedicated Auditor.

- The Department also drafted the first UOF Auditor Report and are conferring with the Monitoring Team about the structure, format, and methodology of the Report.

### ANALYSIS OF COMPLIANCE

The UOF Auditor is a new position required by the Consent Judgment in order to develop an internal capacity to monitor the use of force and identify troubling trends. The Auditor will analyze data, prepare quarterly reports and make recommendations to the Commissioner about reducing the

frequency with which force is used and the number and severity of resulting injuries. The Department conducted an extensive search for the ideal UOF Auditor candidate during the First and Second Monitoring Periods. As part of that process, the Department invited members of the Monitoring Team to meet with one of the top candidates for the position. The Monitoring Team also met with the candidate who was offered the position and reviewed his resume, finding him to be qualified and impressive. The Monitoring Team is also encouraged by the Department's promotion of a high-ranking uniform Staff to the role of Assistant Chief of Data Analytics whose work will, in part, benefit the new UOF Auditor. The Department's approach to incorporating this position within the Agency and maintaining an active and engaged relationship with the Monitoring Team demonstrates an indicator of the Department's commitment to achieving and maintaining reform.

During this Monitoring Period, the Monitoring Team shared recommendations for the type of information that the UOF Auditor should review, analyze and interpret. Further, the Auditor Support Team drafted the first quarterly Auditor Report and shared it with the Monitoring Team for input and recommendations. The initial draft report examined issues including use of force classification, seniority of Staff engaged in use of force incidents, reasons for use of force, significant increases or decreases in use of force rates, locations of use of force, and use of force incident videos. The Monitoring Team will work with the Department to finalize the first Auditor's Report and assist in developing the approach for future Reports to better analyze trends and patterns in the use of force including prevalence, location, type of force, injury severity and concentration in certain Facilities and/or among certain Staff or Inmates.

| COMPLIANCE RATING | ¶ 3. Partial Compliance<br>¶ 3(a). Partial Compliance<br>¶ 3(b). Partial Compliance<br>¶ 3(c). Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel provided the first quarterly report to the Department during the Second Monitoring Period. The report spanned January 1, 2016 through March 31, 2016, and contained the following information:

  o Case filing and disposition dates,

  o Names and shield numbers (if appropriate) of the defendants,

- o   Incident details,
- o   Dollar amount in controversy,
- o   Forum of the lawsuit, and
- o   Description of the lawsuit.

- The Department worked with the Office of the Comptroller to develop a system to notify the Department about notices of claim that the Comptroller has settled pre-litigation.
  - o   The Comptroller provided the first report to the Department during the Second Monitoring Period, and the Department is currently working with the Comptroller's Office to formalize both the process for sharing such reports and the restrictions on use of the data.

- The Department's newly hired Deputy Risk Manager will be responsible for managing and analyzing the information provided by the Office of the Corporation Counsel and the Comptroller's Office.

**ANALYSIS OF COMPLIANCE**

The Department is still in the process of developing and implementing a method for tracking the filing and disposition of litigation relating to use of force incidents. The Department's new Deputy Risk Manager will take on this responsibility during the Third Monitoring Period. In the interim, an Assistant General Counsel has been managing this process, including receiving and reviewing the quarterly reports from the Office of the Corporation Counsel and Comptroller's Office. The Monitoring Team reviewed the first quarterly report generated by the Office of the Corporation Counsel and determined it satisfied the requirements of ¶ 4. However, the Department is still working with the Comptroller's office to refine the process for receiving and sharing this information.

| **COMPLIANCE RATING** | **¶ 4.** Partial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- If they cannot confirm the incident was previously investigated, DOC Legal Division attorneys are required to notify a designated Assistant General Counsel who is responsible for *Nunez* matters whenever they receive an allegation of a use of force from the Office of the Corporation Counsel.

- The Department's Deputy General Counsel sent two emails with these instructions (April 2016 and June 2016) to all DOC attorneys reminding them of this process.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified the process described above with the designated Assistant General Counsel from the Department's Legal Division. The Assistant General Counsel informed the Monitoring Team that, to date, the Legal Division has only received one lawsuit that contained allegations regarding a use of force incident that did not appear to have been previously investigated. That lawsuit alleged an excessive use of force in an unknown location that occurred many years ago. The Assistant General Counsel reported to the Monitoring Team that she notified ID about the allegations. The Deputy Director of ID reviewed the allegations and determined that a Full ID Investigation was not warranted given the circumstances, a conclusion that the Monitoring Team believes is reasonable. Going forward, the Monitoring Team will continue to ensure that the process described above is maintained.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)

¶ 6. By December 1, 2016, the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department conducted the initial discovery, requirements analysis and market assessment for CMS from January 2012 through August 2013.

- The CMS RFP was released in May 2014.

- The initial vendor was selected in April 2015 and contract negotiations took place between April and August of 2015.

- The initial vendor withdrew their bid in August 2015.

- A second vendor was selected in August 2015 and contract negotiations took place between August and December 2015.

- On December 30, 2015, the contract with the second vendor was registered and notice to proceed was provided.

- The CMS development project began in January 2016 with the priority focus on information that is required to be tracked pursuant to Consent Judgment § V (Use of Force Reporting), ¶¶ 15, 16, 17.

- The Department convened a number of working groups with relevant representatives from IT, ID, Trials & Litigation, the Chief's Office, and the *Nunez* Compliance Unit who met frequently

and routinely to ensure the development of the tracking systems met the requirements of the Consent Judgment and were consistent with operational practice.

**ANALYSIS OF COMPLIANCE**

The purpose of CMS is to create a single, unified system to replace the existing disparate case management systems and related manual processes currently used by eight different DOC divisions/units including: Facility Investigations, Investigation Division (ID), Trials & Litigation Unit, Office of General Counsel, Equal Employment Opportunity Office (EEO), Office of Labor Relations, Office of Administration and the Health Management Division. CMS will track all of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions as set forth in Consent Judgment § V (Use of Force Reporting), ¶ 18.

The development of a new Case Management System is a huge undertaking by the Department and it has taken years (significantly pre-dating the Effective Date) to develop the scope of work, select and identify a vendor (including the selection of a second vendor after the first vendor withdrew), and build the system. The Monitoring Team received a status update in July 2016 from the Department's Deputy Commissioner of Information Technology, the IT Project Manager, and other individuals involved in the development process. The Department has prioritized the development of the components of CMS that are required under the Consent Judgment (noted above), but the system will also be used for other purposes (the development of which will occur in 2017).

The Consent Judgment requires the system to be developed by December 1, 2016, and the Department is working vigorously toward that deadline. Once developed, the system will need to be integrated into current systems and Staff across the agency will need to be trained in its use. CMS will replace a number of systems, including a number of manual systems. Accordingly, its use will completely transform the way the Department captures information and the protocols for a significant number of Staff. The Monitoring Team's experience suggests that development and implementation of new systems is often fraught with unexpected delays and thus will keep abreast of any challenges incurred.

| **COMPLIANCE RATING** | ¶ 6. Requirement has not yet come due |
|---|---|

## 10. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this part of the Consent Judgment is to better protect Staff and Inmates under the age of 19 from violence. As discussed in the Introduction to this report, Inmates under 19 contribute to a disproportionate amount of Inmate-on-Inmate violence given their number in the total Inmate population. Also as discussed in the Introduction, force is often used in response to Inmate

violence, as Staff have a duty to protect Inmates from harm at the hands of other Inmates. Thus, a focus on the safety and supervision of Inmates under age 19, by addressing the environmental, cultural, and interpersonal issues that underlie violent misconduct, will greatly assist the Department in its efforts to comply with the entire Consent Judgment—not just this section.

Notably, the Department extended the protections afforded to 18-year-old Inmates under the Consent Judgment to a larger group of young adults—those aged 19 to 21 who are housed at GMDC.[68] While the Monitoring Team has tried to confine the discussion in this section of the report to the 16-, 17- and 18-year-old Inmates, the Department should be lauded for broadening the population of Inmates who will benefit from the reforms achieved under the Consent Judgment. During the current Monitoring Period, all 16- and 17-year-old male Inmates were housed at RNDC, and nearly all 18-year-old male Inmates were housed at GMDC (a few were housed at GRVC for the Secure program; a small number of sentenced male 18-year-olds were housed at EMTC; a few were housed at OBCC in Punitive Segregation before the practice was abolished; and a few were at West/NIC). All female Inmates are housed at RMSC—with 16- and 17-year olds housed separately from those 18 and older.

Most of the requirements that will directly affect an Inmate's propensity to engage in violence and the Department's response to it are contained in the Inmate Discipline section of this report (e.g., incentives for refraining from misconduct and the disciplinary responses to aggressive behavior). That said, institutional violence is affected by many things—factors pertaining to the Inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in the jails (e.g., security features and environmental hazards, as well as the daily structure

---

[68] Originally, the Department intended to house all young adult Inmates (those aged 18-21) at GMDC. Given the increased violence as higher-risk young adults were transferred to GMDC, the Department is now rethinking this strategy. The features of this section of the Consent Judgment may not be available to 19- to 21-year-old Inmates who remain in other Facilities.

and program opportunities available). This section of the Consent Judgment includes provisions related to all of these factors.

Several of the provisions pertain to staffing, including those requiring minimum staffing ratios (¶ 16) and dispersing probationary Staff throughout the units (¶ 14). During the current Monitoring Period, the Monitoring Team began the complex task of analyzing the Facilities' staffing levels. While the Monitoring Team's observations, interviews with Staff and Inmates, and review of documents suggest that ratios are being met, and that probationary Staff are appropriately dispersed, the methodology for auditing Staff schedules is extremely cumbersome. During the Third Monitoring Period, the Monitoring Team intends to share the fruits of our efforts with the Department to confirm our preliminary results and to assist the Department with developing an internal capacity to demonstrate proof of practice in these areas.

In terms of consistent unit/post assignments (¶ 17), interviews with Staff Schedulers at RNDC, RMSC and GMDC indicated that current staffing levels have inhibited the steadying of Staff, though progress is being made in each facility. As reported during a meeting with the Department in June 2016, at GMDC, approximately 90-95% of Staff are on a steady tour and approximately 70% are assigned to a steady post. At RMSC, approximately 40% of Staff are on a steady tour and a "much smaller proportion" is assigned to a steady post. At RNDC, 100% of Staff are assigned to a steady tour and approximately 75% are assigned to a steady post. Once the larger recruit classes discussed in Staff Recruitment and Selection section of this report are fully installed in the facilities, the schedulers expected that they would be able to steady-up the Staff with greater success.

The Consent Judgment also includes provisions for the appropriate selection (¶ 13), incentivizing (¶ 18) and training of Staff (¶ 12). Of these, the Monitoring Team has audited the provisions related to training in Safe Crisis Management and Direct Supervision most rigorously, as discussed below and in

the Training section of this report. The process for selecting and incentivizing Staff working with Young Inmates has not yet been audited by the Monitoring Team.

Other requirements related to supervision and surveillance are contained in provisions related to camera coverage (¶¶ 10 and 11). A detailed analysis of the Department's success in these areas is provided in the Video Surveillance section of this report.

In addition, this section requires several new procedures related to properly securing the housing units and verifying that security devices are in proper working order. The Consent Judgment requires daily inspections (¶ 2) and daily rounds (¶ 3) to ensure that cell-locking mechanisms are operating properly and to provide Inmates with an avenue to voice security-related concerns, and the Department has several directives and orders that require routine inspections and daily rounds and their documentation. While these records were not rigorously audited during this Monitoring Period, the Monitoring Team conducted two on-site inspections of the locking mechanisms at GMDC. The Monitoring Team's observations at GMDC suggested that the Department's procedures had not been particularly effective in ensuring that cell-doors were properly secured when Inmates occupied their cells. Team members identified multiple doors that were left unsecured across multiple housing units. This creates an obvious risk of harm to Inmates by other Inmates, and may have contributed to the increasing rate of violence discussed in the Use of Force introduction to this report. In response to the Monitoring Team's feedback and findings from the Department's own Quality Assurance division, the Department plans to reexamine the various directives, potentially streamline the process, and to require supervisors to verify the Staff's inspections. The Monitoring Team also conducted an on-site inspection of all housing units at GRVC, the housing units for 18-year-olds at EMTC, and the housing units for 16-, 17-, and 18-year-olds at RMSC. The issues identified at GMDC were not present at these facilities, which suggests that a customized strategy for compliance for each facility is likely necessary. During the

Third Monitoring Period, the Monitoring Team will request documentation required by existing/revised procedures to audit the extent to which inspections are occurring as required, and will continue to verify whether cell-doors are secured during routine visits to the Facilities.

This section of the Consent Judgment contains some important features related to the underlying causes of institutional misconduct. For example, ¶ 5 requires the delivery of programming to minimize idle time and the potential for altercations. Throughout the Monitoring Period, the Team observed Inmates engaged in various programs at RNDC, RMSC and GMDC (e.g., school; Rikers Rovers, where Inmates train dogs to prepare them for adoption; I-CAN which addresses employment readiness, parenting, relapse prevention and independent living skills; and volunteer-led programs in music). Discussions with the Department indicate that additional programming is being planned in an effort to reduce idle time and expose Young Inmates to opportunities and skills that will assist with their reentry to the community. The Monitoring Team plans to work with the Department to devise a strategy for tracking the proportion of Inmates involved in the various programs and the duration of their engagement with them.

During the current Monitoring Period, the requirement to protect Inmates who voice concern for their safety (¶ 7) was audited. While the practices largely conform to the requirements of both policy and the Consent Judgment, a few areas in need of improvement were addressed with the Department. These are discussed in detail below.

Another mechanism that helps to protect Inmates from harm at the hands of other Inmates is the extent to which they are appropriately classified according to their risk of institutional misconduct (¶ 4) and housed appropriately (¶ 8). Both of these requirements are discussed in detail below. An important feature of any classification system is the ability to override the scored risk level to address individual nuances are not accounted for by the risk factors (e.g., mental health issues, stature, maturity, etc.) as

well as security concerns that are not adequately captured by the risk factors (e.g., a single, but very serious, violent infraction). Given that the Department has not yet applied an age-validated classification tool to the adolescent population, the provision regarding the use of this discretion (¶ 6) was not audited during the current Monitoring Period. An additional protection required under the Consent Judgment is to timely report and thoroughly investigate allegations of sexual assault (¶ 9). The Monitoring Team plans to make initial inquiries into the relevant procedures during the Third Monitoring Period, but rigorous audits of Facility practices will be initiated once the Facilities have completed currently on-going PREA training and planned mock-audits. Part of PREA training addresses the way in which allegations of sexual assault are reported and investigated, and new procedures will likely be put in place. The Monitoring Team also wants to be cautious not to interfere with the system improvements that are currently underway via the PREA technical assistance process that the Department is engaged in.

The Monitoring Team has not yet rated the Department's compliance with the requirement to protect Young Inmates from harm by de-escalating confrontations and intervening in a timely manner (¶ 1), as these skills will be taught during Direct Supervision training which has not yet begun. However, the Team continues to track data related to the rate of Inmate-on-Inmate fights and assaults, as described in the Use of Force section to this Report.

As shown in the table and line graph below, the rates of Inmate-on-Inmate violence have fluctuated a bit since the Effective Date of the Consent Judgment. The overall higher rate of Inmate-on-Inmate violence among 16- and 17-year-old Inmates, and particularly the most recent spike in assaultive behavior, is cause for concern. The dotted trend lines indicate that, since the Effective Date, violence is decreasing slightly among 18-year-old Inmates, but increasing slightly among 16- and 17-year-old Inmates. The Department has been quite vocal about its focus on violence reduction among the Young

Adult population; the Monitoring Team encourages a similar focus for the 16- and 17-year olds at

RNDC. Strategies to reduce violence at RNDC and GMDC will be a priority focus of the Monitoring

Team's work during the Third Monitoring Period.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Inmate-on-Inmate Violence**<br>November 1, 2015 to July 31, 2016 | | | | | | | | | | |
| | Nov. '15 | Dec. '15 | Jan. '16 | Feb. '16 | Mar. '16 | Apr. '16 | May. '16 | Jun. '16 | Jul. '16 | *Avg. Rate* |
| 16/17-year old-Inmates | 52/192<br>*27.1* | 54/199<br>*27.1* | 57/207<br>*27.5* | 46/188<br>*24.4* | 34/182<br>*18.7* | 39/182<br>*21.4* | 50/191<br>*26.1* | 93/200<br>*46.5* | 70/198<br>*35.3* | *28.2* |
| 18-year-old Inmates | 49/196<br>*25.0* | 54/200<br>*27.0* | 56/207<br>*27.0* | 45/215<br>*20.9* | 51/213<br>*23.9* | 28/205<br>*13.7* | 37/198<br>*18.7* | 49/192<br>*25.5* | 37/187<br>*19.8* | *22.4* |

*Note:* Data separate by age include data from all facilities that housed 16-, 17- and 18-year old Inmates during the Monitoring Period. Formula for calculating rate:  # of events/ADP x 100 = *rate per 100 Inmates*
*Source: DOC*



*A note related to the application of these provisions to 16-, 17- and 18-year-old females:* As

discussed in the First Monitor's Report, due to the small number of female Inmates in this age range, the

provisions related to classification and housing would be very difficult to implement properly. As a

result, the Monitoring Team is not assessing compliance with ¶ 4 for female adolescents, or ¶ 8 for

female adolescents and 18-year-old girls for the Second Monitoring Period. Should the size of the female adolescent and 18-year-old girl population increase, the Monitoring Team may reconsider this position.

The Monitoring Team's assessment of compliance is outlined below.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION SYSTEM)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As discussed in the First Monitor's Report, the Department currently utilizes a traditional risk assessment instrument to classify adolescents upon admission according to their risk of institutional violence. A compilation of scores on eight risk factors are combined to create a total score, which is translated to a risk level (Minimum, Medium or Maximum). Procedures surrounding the use of the initial and reclassification forms are articulated in Policy 4100R-D "Classification."

- The Department indicated its intention to validate its current classification instrument for the adolescent Inmate population.

### ANALYSIS OF COMPLIANCE

*As noted in the Introduction to this section, because of the small number of female adolescent Inmates and the challenges to validating an instrument for use on such a small population, the Monitoring Team is not assessing compliance with this provision for adolescent girls.*

The Department has utilized a traditional risk classification system to assess the risk of institutional violence and to guide housing decisions for many years. Recently, it developed a new system—the Housing Unit Balancer (HUB)—and has used it successfully with young adult and adult Inmates. However, the Department intends to continue to utilize its original classification instrument for adolescents, but has been unable to locate research findings indicating the validity of this instrument for the 16- and 17-year-old Inmate population. Evidence of the instrument's validity must be provided in order to reach substantial compliance with this provision and the Monitoring Team has offered to provide the Department with technical assistance toward this end. If the instrument's validity is established, the Monitoring Team will proceed to reviewing the quality of the implementation. If research demonstrates that the instrument is not valid, the Monitoring Team will assist the Department in identifying the necessary adjustments to ensure that the instrument properly categorizes 16- and 17-year-old Inmates into custody levels that are commensurate with their risk of institutional misconduct.

Once the instrument is determined to be valid, the Monitoring Team will audit the relevant classification records to ensure the system was applied accurately and to assess the use of override procedures. Override procedures are an essential part of any classification system because they permit modifications to the risk score (and subsequent housing decision) based on a variety of individual factors, such as maturity, vulnerability, cognitive or emotional development or physical stature. Overrides are also used to respond to known propensities for violence that were not adequately captured by the risk factors, but still represent a legitimate security concern that needs to be addressed in order to protect other Inmates from harm (e.g., a single, very serious violent infraction). While the override procedures are part of the classification system as a whole, they will also be assessed under provision ¶ 6, which speaks directly to the obligation to transfer vulnerable/at-risk Inmates to alternative housing.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Policy 6007R-A "Protective Custody" establishes procedures for the assignment of vulnerable Inmates into Protective Custody ("PC"). This policy was in place prior to the Effective Date. Key features of the policy include:
  - Inmates in PC are afforded the same lock-in/lock-out privileges and access to mandated services and programs as general population Inmates, but are separated from the rest of the Inmate population at all times.
  - Upon request of the Inmate or family member, an assessment by a Captain that an Inmate has a need for protection, or a court order, the Inmate is immediately kept separate from other Inmates, a request for Temporary Protective Custody is made to OSIU via telephone, and a PC number is assigned. The reasons for placement are documented on Attachment A "Initial Placement into Protective Custody Housing Form."
  - Within two business days, OSIU Staff reviews the placement of all Inmates placed in Temporary Protective Custody to determine whether continued assignment to PC is

necessary or whether placement in a less restrictive housing unit (e.g., General Population Escort unit; Mental Observation unit) would address the Inmate's safety needs. Factored into the decision are the type, immediacy and credibility of the threat; Inmate's vulnerability, SRG status and mental health status; notoriety and nature of the instant offense; information from the referring facility; and an interview with the Inmate. The decision to continue the Inmate in PC, or to discontinue placement and return the Inmate to general population or place in an alternative housing unit, and the reasons for this decision are documented on Attachment B "Protective Custody/General Population Escort Determination Form."

o   If the Inmate is continued in PC but does not consent to placement, he/she is placed in PC involuntarily. The Inmate has the option of contesting placement during a hearing in which he/she may appear, present witnesses, make a statement, present evidence and where he/she will be presented with the evidence suggesting that PC is necessary to maintain safety. Hearing facilitators are available to Inmates who cannot read or whose cases are particularly complicated, and interpreters are available to those who do not understand English. The reason for the placement, Inmate's statement regarding his/her placement, and notice of hearing are documented on Attachment C "Notice of Hearing Protective Custody Housing Form." If the Inmate consents to the placement in PC, or waives his/her right to a hearing, such information is also captured on Attachment C. Information from the hearing and the final determination by OSIU are recorded on Attachment D "Notice of Protective Custody Housing Disposition Form."

o   OSIU reviews the assignment of all Inmates in PC within 30 days of the initial assignment and then every 60 days thereafter. Five business days prior to the review, Inmates should be provided with Attachment E "Inmate Information for 30-Day/60-Day Protective Custody Status Review Form." On this form, Inmates are asked to indicate whether they would like to request removal from or request continued placement in PC. If the Inmate refuses to complete the form, the housing area supervisor must complete it. OSIU records its determination on Attachment D "Notice of Protective Custody Housing Disposition Form" for each review conducted.

## ANALYSIS OF COMPLIANCE

The Department's policy addresses the requirements of this provision related to prompt initial placement, evaluation of risk, timely determinations of placement, access for family/lawyers/others who express concern, and record-keeping procedures. Based on interviews with OSIU Staff central to PC decision-making, interviews with 15 Inmates in PC, and a review of 45 PC files from GMDC, RNDC and RMSC, the Monitoring Team concluded that, while the Department's policy is aligned with the

requirements of the Consent Judgment, in some areas, practice and/or record-keeping did not always comport with the requirements.

Most importantly, the Monitoring Team found that the Department and OSIU Staff clearly take seriously the responsibility to protect Inmates who express a concern for their safety. All Young Inmates who requested protective custody were immediately placed in temporary PC, and once assessed, the Monitoring Team found that all of their PC placements were continued. The Monitoring Team did not find evidence of any Young Inmate requesting PC and not receiving it, although one Young Inmate was eventually placed in a general population-escort house (GP-Escort; Inmates leave their unit for various services, but are kept separate from other general population Inmates at all times) rather than PC. When Inmates were interviewed by the Monitoring Team for other reasons (e.g., to learn about their experiences on TRU/SCHU), they indicated their awareness of the procedures for requesting PC and, aside from the stigma they may have experienced from peers, felt it was a viable option if they had safety concerns.

The PC files and Staff interviews clearly demonstrate that the Department embraces the heart of the matter: facility Staff take immediate action when Inmates, particularly Young Inmates, express a concern for their safety by promptly moving them to a protected location while OSIU quickly makes a determination. Inmates all reported that they felt safe in PC housing and felt that Staff took their concerns seriously. They also reported that they were free to request removal from PC at any time and were not limited to the 30/60 day reviews. The Monitoring Team reviewed practices related to the safe housing of LGBTQI Inmates and found the Department's practices to be aligned with the requirements of this Consent Judgment.[69]

That said, in a few areas, the Department needs to shore up practice and record-keeping in order to achieve substantial compliance. The feedback provided addressed the following:

- Ensuring the completeness of PC files (e.g., ensuring the appropriate set of Attachments is present, given each Inmate's individual circumstances);
- Providing Inmates with an opportunity to complete Attachment E, voicing their request for removal or continuation; and
- Individualizing the reasons that PC is continued or discontinued, rather than utilizing generic statements.

The Monitoring Team met with OSIU Staff to provide the Department with both verbal and written feedback describing the issues we observed. The Department discussed its plans to convene the relevant OSIU Staff to review policy requirements, record-keeping procedures, and to craft a strategy

---

[69] While current protections for LGBTQI Inmates are aligned with the requirements of the Consent Judgment, the Monitoring Team encourages the Department to review current practices in the context of PREA to ensure compatibility with the PREA Standards.

for demonstrating "proof of practice." The Monitoring Team plans to re-assess this issue toward the end of the Third Monitoring Period to assess progress toward substantial compliance.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Department policy 4100R-D "Classification" specifically states that "Inmates in the general population who are classified as maximum custody shall not under any circumstances be housed with minimum custody or medium custody Inmates" (II.E.1).

### ANALYSIS OF COMPLIANCE

*As noted in the Introduction to this section, because of the small number of female Young Inmates and the subsequent operational difficulties that ensue, the Monitoring Team is not assessing compliance with this provision at RMSC.*

The Department's policy reflects the requirements of this provision. In order to assess the extent to which housing practices are aligned with policy, the Monitoring Team requested the "Mis-Housed List" for each day in March, April and May 2016 for RNDC and GMDC. The Mis-Housed List identifies all Inmates whose classification level is incompatible with the security level of the assigned housing unit (i.e., high classification Inmates were mixed with low classification Inmates). For example, if an Inmate who is classified as "maximum" is housed on a unit designated for minimum and medium custody Inmates, his name would appear on the Mis-Housed List. Each weekday, the Warden of the Facility is required to document, in writing, the reason that each Inmate is mis-housed, and the plans for rectifying the situation, if needed. (In some cases, the Inmate's classification score may have been overridden, and thus the Inmate is not actually mis-housed.) The purpose of the Monitoring Team's audit was to identify the frequency with which mis-housing occurs, the reasons for mis-housing, and the timeliness of correction.

At RNDC, the audit of Mis-Housed Lists revealed that on any given day, the proportion of 16- and 17-year-old Inmates who are mis-housed is very low—generally less than 2% of the total adolescent Inmate population. As for the reasons for mis-housing, in nearly all cases, the Warden indicated that "the inmate's classification score changed while he was on the current unit." Because the classification process is automated, an Inmate's classification score could conceivably change overnight (i.e., upon a birthday; because of an infraction; or because sufficient time has elapsed

without an infraction to reduce the classification score via reclassification). However, this reason is legitimate only on the first day an Inmate appears on the list. On subsequent days, the reason the Inmate is mis-housed would likely have something to do with a lack of bed space on an appropriate unit or a lack of Staff action to rectify the situation. These reasons were rarely articulated on the Warden's memorandum. Most, but not all of the instances of mis-housing were rectified on the next business day. However, the audit revealed several Inmates (35 in all, over the 90-day period), who appeared on the Mis-Housed List for multiple days without explanation. The longest delays were between 7 and 10 days. The Department is researching the reasons for the delay in moving these Inmates to housing units commensurate with their custody level.

The Mis-Housed List is an artifact of the "old" classification system, and procedures for identifying mis-housed Inmates were only recently developed for facilities that utilize the HUB, one of which is GMDC, which houses 18-year-old Inmates. The process will be similar to that at RNDC: a daily list will be generated, and the Facility Warden will be required to identify, by phone and in writing, the reason for mis-housing and verify that the situation was rectified by close of business each weekday. The Monitoring Team spot-checked records from GMDC from late July 2016, and found that the process appears to be generating documentation that can be fully audited during the next Monitoring Period.

Once the procedures at both Facilities are sufficient to demonstrate the low proportion of mis-housed Inmates and timely re-housing or legitimate reasons for delayed mis-housing, the Department will achieve substantial compliance.

| **COMPLIANCE RATING** | **¶ 8.** Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10 & 11 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Refer to the discussion in the Video Surveillance Section of this Report, (¶ 1(b)) for a detailed discussion of this issue.

**ANALYSIS OF COMPLIANCE**

Refer to the discussion in the Video Surveillance Section of this Report, (¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|
| | ¶ 11. Substantial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department used the Direct Supervision model, developed by NIC, as the foundation for a training program for the supervision of adolescent and young adult Inmates. During the Second Monitoring Period, the Department shared a significantly revised version of the training materials with the Monitoring Team.

- The Department also attended a Training for Trainers provided by NIC to ensure proper delivery and implementation of the Direct Supervision model.

- The Department has chosen to utilize the same instructors who provide Safe Crisis Management (SCM) training to provide Direct Supervision training. Furthermore, there are competing demands on the Staff who require this training, as they also must attend S.T.A.R.T. and some of the other trainings required by the Consent Judgment. As a result, Direct Supervision In-Service training will begin following the completion of SCM Training, as discussed in the Training Section of this Report (¶ 4).

**ANALYSIS OF COMPLIANCE**

The Department continues to make critical steps to adopt the Direct Supervision model and to deliver high-quality training to Staff as described in the Training Section of this Report (¶ 4). Once Staff are trained, the Monitoring Team will begin to assess the extent to which Direct Supervision skills have been implemented and are in current practice among Staff assigned to Young Inmate Housing Areas.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

    a.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

    b.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

c.   The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports that the staffing templates used for the Daily Schedules are structured to reflect the requirements of this provisions of the Consent Judgment.

- Staff Schedulers from each Facility that houses Young Inmates reported their understanding of the requirement to distribute probationary Staff across the Facility when constructing the Daily Schedule. This awareness was also applied to their assignment of Staff working overtime, to ensure that probationary Staff were paired with veteran Staff.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team's observations during routine site visits, interviews with Staff and Inmates, and review of documents suggest that staffing ratios are being met consistently and that probationary Staff are appropriately dispersed. Further, these observations, interviews, and review of documents also suggest that requirements related to maximum housing unit capacity are also consistently met. However, the methodology for auditing Staff schedules is extremely cumbersome and thus hinders the Monitoring Team's ability to rate compliance at this time.

Although the requirements of the Consent Judgment are very straightforward, their application to the various Facilities is extremely complex. The first step was for the Monitoring Team to meet with Staff Schedulers from GMDC, RMSC and RNDC to gather information about how the required ratios are factored into the task of Staff scheduling, the process for distributing probationary Staff throughout the facility, and how Staff call-outs and substitutions could be identified on the written schedules. From there, the Monitoring Team requested the Daily Schedules for four randomly selected weeks in March, April, May and June 2016 from all Facilities that house Young Inmates (RNDC, GMDC, RMSC, and EMTC). Given that all of these Facilities also hold adult Inmates and the bed utilization plans often change, the Department also needed to identify the units housing Young Inmates during each of the requested weeks so that data on Young Inmates could be extracted from the information provided. The Department produced over 2,850 pages of schedules to the Monitoring Team in response to this request. In addition to the volume, other challenges were quickly identified: the Facilities operate several split shifts in addition to the traditional first, second and third shifts; the housing units are listed in an order that makes operational sense, but that is not audit-friendly; and the schedules are handwritten and not always easy to read.

The Monitoring Team took some initial steps to analyze the large volume of data, but needs to consult more closely with the Department to ensure the audit method will produce accurate results. The Monitoring Team also plans to assist the Department in developing an internal capacity to monitor

compliance with required staffing levels so that in the future, the Monitoring Team will be positioned to verify the Department's findings.

## 11. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

The overall purpose of this section of the Consent Judgment is to reduce the Department's historical overreliance on Punitive Segregation as a mechanism for responding to Inmate misconduct. Rather than imposing a sanction that creates a risk to Young Inmates' emotional well-being and limits their access to necessary services and programs, the Consent Judgment requires the Department to construct an array of options for responding to misconduct that are safe, provide access to services, and that are responsive to the youth's treatment needs. In doing so, it is the Monitoring Team's hope that the Department will identify strategies to address the underlying causes of Young Inmates' misconduct so that their aggressive behavior will be less likely to reoccur. During the Second Monitoring Period, the Department further limited its use of Punitive Segregation by excluding 18-year-old Inmates from Punitive Segregation and by opening two alternative programs at GMDC (i.e., the Second Chance Housing Unit ("SCHU"), the Transitional Restorative Unit ("TRU"))[70] and the Secure Unit ("Secure") at GRVC, all intended to address violent misconduct in a more programmatic fashion.

During the Second Monitoring Period, the Monitoring Team conducted interviews and reviewed data and documentation describing the use of Punitive Segregation during its waning days of use with 18-year-old Inmates (¶¶ 1, 2, 5, 6, 7, and 8, discussed in detail below). While in most cases, the Monitoring Team found that the Department's practices appeared to meet the Consent Judgment's requirements to protect Inmates in Punitive Segregation, the record-keeping and document maintenance was not sufficient to establish proof of practice in some instances. Should the Department decide in the future to utilize Punitive Segregation with Young Inmates, the Department will need to fortify its record-

---

[70] TRU and SCHU units are also available for use with the 16- and 17-year-old male Inmates at RNDC.

keeping procedures to achieve substantial compliance. Given that Young Inmates will no longer be housed in Punitive Segregation, the Monitoring Team did not prioritize an assessment of the cells used for Punitive Segregation (¶ 9) for review. Should Punitive Segregation be authorized for Young Inmates in the future, the Monitoring Team will also fully assess the conditions of all cells utilized for this purpose.

The Monitoring Team also conducted numerous site visits, meetings, Staff and Inmate interviews, observations of practice, and review of documents to help the Department refine the program designs for the SCHU/TRU/Secure units (¶¶ 4 and 6, discussed in detail below). Because these units will be the crux of the Department's efforts to reduce violence and protect Inmates and Staff from harm by Inmates, the quality of their implementation and their effectiveness are very much at issue. This will be the priority of the Monitoring Team's, and the Department's, work in the future. The Monitoring Team has developed a strategy to review the programs' strengths and challenges, and to identify appropriate metrics to gauge program operation, fidelity to design, and effectiveness in reducing violence. Implementing this strategy with the Department will begin early in the Third Monitoring Period.

Because other types of misconduct also contribute to the safety of the correctional environment, the Consent Judgment also requires the Department to establish an array of options to respond to the full variety of infractions (¶¶ 4 and 6, discussed in detail below) that may be imposed on an Inmate. The Department did not make significant progress in this area during the current Monitoring Period and is encouraged to accelerate the development of additional options for responding to misconduct. The Monitoring Team's experience suggests that safe environments also require the use of incentive systems to discourage misconduct and to encourage positive behavior (¶ 3, discussed in detail below). The Department now offers a few group incentives and has further developed its concept for an overarching

incentive program (the P.A.T.H. to Peace, discussed in more detail below). Its design is promising and the Monitoring Team looks forward to its full implementation.

Furthermore, although the Monitoring Team fully supports its use, the Department has not yet implemented procedures for the use of short-term isolation to de-escalate an out-of-control Inmate (¶ 10). This will be the subject of more intensive technical assistance from the Monitoring Team in the Third Monitoring Period. The Monitoring Team's experience suggests that de-escalation confinement is an important tool for protecting Staff and Inmate safety during a crisis situation, though it must be carefully operationalized to ensure it is used only when a legitimate safety threat exists and its duration is limited to only what is necessary for the Inmate to regain control of his/her behavior.

The Department met its obligations related to contracting with an outside expert to review the disciplinary process (¶ 11, discussed in detail below). While the report on the disciplinary process meets the requirements of the provision, the Monitoring Team offers some additional thoughts for the Department to consider as it develops quality assurance measures to ensure that the disciplinary process meets generally accepted practices as new disciplinary options come on-line.

Finally, as mentioned in the First Monitor's Report, although not required by the Consent Judgment, the Monitoring Team believes strongly that Staff's contribution to the operation of a safe facility should be rewarded as often and as meaningfully as positive behavior is incentivized among the youth they supervise. The Department has made some initial steps toward this end by including recognition for Staff in the design of the P.A.T.H. to Peace incentive program (described in more detail, below). During the pilot phase of the program, steady Staff in high-achieving units were presented with certificates recognizing their contribution to facility safety. The Monitoring Team encourages the Department to continue to develop a system of incentives and rewards for Staff who embrace the various reforms.

The Monitoring Team's assessment of compliance is outlined below.

## XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME)

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- BOC Regulations regarding this issue were amended in January 2015 to prohibit the imposition of Punitive Segregation time imposed, but not served, during a previous incarceration.

- Policy 6500R-D "Inmate Disciplinary Due Process" Section III.D.1 lists the permissible dispositions that the Adjudication Captain may impose when an inmate is found guilty of an infraction. Subsection (d)(iv) states that in the case of Punitive Segregation, "Inmates shall not serve punitive segregation time that had been earned in a previous incarceration."

**ANALYSIS OF COMPLIANCE**

During the First Monitoring Period, the Monitoring Team verified compliance with the policy above by interviewing Staff involved in the administration of Punitive Segregation and reviewed relevant documents. As noted in the First Monitor's Report, OSIU Staff manages the Punitive Segregation waitlist, placing infracted Inmates who have been cleared by mental health into Punitive Segregation as bed space allows. OSIU Staff confirmed that as of January 2015, the practice surrounding the imposition of Punitive Segregation changed so that Punitive Segregation days imposed but not served during a previous incarceration were no longer carried over.

For the current Monitoring Period, the Monitoring Team reviewed the list of 21 18-year old Inmates who served Punitive Segregation time between March and June 2016 and found that none of them were scheduled to serve any historically owed Punitive Segregation time. As noted below, in addition to the previous abolition of the practice for 16- and 17-year-old Inmates in December 2014, the Department abolished the use of Punitive Segregation for 18-year-old Inmates on June 30, 2016.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION)

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Policy 4501R-D "Pre-Hearing Detention and Punitive Segregation Status Inmates" (Section IV.A.2.a) and Policy 6500R-D "Inmate Disciplinary Due Process" (Section III.B.1.b.i) both prohibit the placement of adolescents in Punitive Segregation. These policies went into effect in December 2014.

**ANALYSIS OF COMPLIANCE**

The Department continued its prohibition and did not utilize Punitive Segregation for 16- or 17-year-old Inmates during the current Monitoring Period. Further, although not required to do so by the Consent Judgment, the Department also abolished the use of Punitive Segregation for 18-year-old Inmates on June 30, 2016. While the Monitoring Team applauds the Department for these changes in practice, the Team is also cautious that the sustainability of these reforms will depend heavily on the success of the alternative means of discipline, described more fully below, that are implemented to address Inmate misconduct. For this reason, the Monitoring Team will continue its vigilance about the quality of implementation of the alternatives and their success in responding to, and ultimately reducing, violent behavior among Young Inmates.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: INMATE INCENTIVES)

¶ 3. Within 90 days[71] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continued to utilize the Adolescents Striving for Change program ("ASFC") to incentivize positive behavior on an individual level at RNDC and RMSC. Under the program, Inmates may earn up to $25 in commissary credit per week when they meet behavioral expectations. When they do not, they lose a portion of the $25 credit.

- The Department continued to offer a group incentive—access to computer tablets loaded with educational and entertainment programming—to Inmates on housing units with low or reduced numbers of incidents.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Monitoring Team encouraged the Department to develop additional incentives to support positive behavior among Inmates and also focused on assessing the implementation of the ASFC program. As noted in the First Monitor's Report, the ASFC program is *one* component of the system of positive incentives. It includes the key elements of a basic token-economy program. By design, youth are rated on each of three Staff shifts each day on a binary scale (if youth meet behavioral expectations, they receive a stamp; if they do not meet expectations, they do not receive a stamp) and Staff are required to annotate the card in every instance in which a stamp is not awarded. Although this provision of the Consent Judgment only requires the application of positive

---

[71] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

incentives to Inmates under age 18, the Department included the use of the ASFC cards in the designs of the alternative disciplinary programs discussed in ¶ 6, below. As a result, the Monitoring Team has been attentive to the ASFC's implementation with 18-year-olds as well.

The Monitoring Team's experience in this area indicated that subpar implementation would undermine the objectives of the program, and during the First Monitoring Period, the Team encouraged the Department to be vigilant about the ASFC's implementation. During routine visits to GMDC, RNDC and RMSC in July 2016, the Monitoring Team discovered that on a few units, the cards were no longer being used and on others, they were not being completed according to the ASFC protocol (e.g., youth were being rated at the end of the day or at the end of the week, instead of at the end of each *shift)*. A similar pattern of incomplete cards was also observed during the Monitoring Team's routine visit to the Secure Unit at GRVC in August 2016. The Monitoring Team advised the Department of these findings and reiterated the Team's recommendation that the Department needed to fortify the implementation of the cards by making sure that the cards are completed by Staff following each shift; that the cards accurately reflect the youth's behavior; that the cards are properly annotated when a stamp is not earned; and that the youth's performance on the ASFC is regularly communicated to the youth (e.g., during a daily unit meeting). In response to the Monitoring Team's feedback, the Department developed a plan to correct the identified issues, including a new format for the cards that provides additional space for Staff to insert comments about the Inmates' behavior; a space for the Captain to sign-off on *each shift*, certifying the completeness and accuracy of the card; and a routine review from Department managers. During the Third Monitoring Period, the Monitoring Team will assess implementation and impact of these changes.

Although encouraged to do so, the Department has not yet developed additional enhancements to the individual incentive system in order to better address the unique needs of adolescents (by increasing the frequency with which incentives are awarded) and to encourage youth to sustain positive behavior over time (by creating an opportunity to earn rewards and privileges for sustained positive behavior). In order to reach substantial compliance with this provision, the Department will need to enhance the individual incentive system to address the concerns noted above.

Finally, as noted above, the Department has continued to utilize group incentives in the form of the computer tablets. A predetermined schedule identifies the week each housing unit is eligible for the incentive. Residents with consistently positive behavior during the prior two weeks are issued a tablet during the scheduled week. The Department reports that data on tablet usage is maintained by the tablet's vendor. The Monitoring Team will review these data during the Third Monitoring Period to further assess the quality of implementation of this incentive.

In May, an incentive room was opened for young adult inmates at GMDC. Housing units with positive behavior in the prior two weeks are offered time in the PEACE Center—a communal space with video game stations and game tables. Movie nights and other special events (e.g., Women's

Herstory Month events, Reentry Week activities, comedy shows and family events) have also been offered. The Department is encouraged to maintain and submit data to the Monitoring Team showing the level of participation for each of these programs and opportunities.

Toward the end of the Monitoring Period, the Department assembled and distributed Recreation Bins to each Young Inmate housing unit in GMDC, RMSC and RNDC. Unit Staff offer youth the opportunity to use the bins—which contain a variety of board games—in order to incentivize positive behavior. The availability of these bins will be useful as the Department implements Direct Supervision, in which Staff are encouraged to offer incentives and rewards during each shift.

Finally, the Department fleshed out the concept for an overarching incentive program, although implementation will begin in the Third Monitoring Period. The concept for the P.A.T.H. to Peace (Personal Recognition, Aspirational Values, Team Benefits, and Higher Privileges) combines both group and individual incentives, and will recognize both youth and Staff for their contributions to a safe facility. At the group level, housing units will be scored according to their adherence to a set of values (Safety, Accountability, Cleanliness, Respect, Education and Daring to Lead) on each shift, each day. Each week, units will be ranked according to their level of sustained high scores (e.g., Bronze, Silver, Gold, Platinum). Housing units at higher levels are afforded greater privileges (e.g., higher commissary shopping limits, extra recreation, late lock-in, movie nights, family day, Court letters, access to games, tournaments with prizes, special clothing, etc.). At the individual level, youth can earn certificates for program attendance, awards for cleanliness, and awards for peer leadership. Staff who are steady in high-level houses (i.e., Gold and Platinum) will be rewarded with free special meals, Officer of the Month certificates, recognition posters a Command and Gate 1 passes.

The Monitoring Team is impressed by the program's design and will offer assistance as requested to support its implementation during subsequent Monitoring Periods. The Monitoring Team will also assist the Department in developing metrics to measure the quality of implementation and effectiveness of the incentive programs.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS)

¶ 4. Within 90 days[72] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

---

[72] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to utilize due process hearings to discipline Inmates, imposing either a reprimand or a surcharge for Inmates who commit Grade I, II or III infractions. According to Policy 6500R-D "Inmate Disciplinary Due Process" and as noted in ¶ 2 above, punitive segregation is no longer imposed on Inmates under the age of 18.

- The Department continues to utilize two special programming units, Second Chance Housing Unit ("SCHU") and the Transitional Restorative Unit ("TRU") to respond to adolescents who exhibit violent misconduct. Between March 1, 2016 and August 31, 2016, there were 82 admissions to SCHU (n=40) and TRU (n=42) at RNDC. This included 61 Inmates, some of whom had multiple admissions.

**ANALYSIS OF COMPLIANCE**

As noted in the First Monitor's Report, the Monitoring Team made a number of recommendations on the initial draft of the SCHU/TRU policy, nearly all of which were addressed in the subsequent version of the policy. The same policy governs the implementation of programs at both RNDC and GMDC. The policy remains in draft form, as the Department anticipated additional refinement of the policy following the implementation of the SCHU/TRU units for young adults at GMDC. To avoid redundancy, the operation of the RNDC and GMDC programs are discussed under this provision of the Consent Judgment, even though the programs at GMDC technically respond to the Consent Judgment's requirements in ¶ 6, below. The Monitoring Team expects that the SCHU/TRU policy will be finalized in the Third Monitoring Period.

Once the Department established SCHU/TRU units at GMDC, the Monitoring Team undertook a review of Inmate files from May and June 2016 from both programs at GMDC (n=6) and RNDC (n=10) and offered feedback both verbally and in writing in June 2016. The Department created two new forms to support Inmates' involvement in the program: (1) a Behavior Support Plan ("BSP"; a treatment plan) and (2) a Behavior Support Plan Tracking Log (a form that provides a chronological record of the treatment team's consideration of the Inmate's progress). The Monitoring Team's recommendations included:

- Create SCHU/TRU files for each Inmate that contain documentation that clearly identifies the program to which youth had been admitted, the reason for admission and any objections voiced by the youth, the Behavior Support Plan, Tracking Log, infractions accumulated while in the program and any consequences imposed as a result, copies of ASFC cards, progress notes from individual sessions with the Program Counselor, etc. A review of Inmate files from late in the Monitoring Period indicated that files are becoming more complete. The Department also intends to require the Program Counselors to keep progress notes for individual youth and will include these in the program files.

145

- Enhance the BSP form to allow the programs to be better customized to the needs of individual Inmates and to provide opportunities for input from the youth and from each of the treatment team members. A review of Inmate files from late in the Monitoring Period indicated that the BSP form has not yet been reformatted.

- Ensure that BSP goals are realistic, observable and measurable and that a specific strategy for measuring progress is articulated. A review of Inmate files from late in the Monitoring Period indicated that skill-development is still needed in this area. A workshop is planned for the Third Monitoring Period.

- Revise the BSP Tracking Log so that it clearly identifies those who attended the treatment team meeting; records the youth's input into the conversation; identifies progress on each of the BSP goals; and captures any decisions made about the youth's length of stay on the unit. A review of Inmate files from late in the Monitoring Period indicated that all team members are now signing the log and the team's decision is clearly articulated. However, a mechanism for obtaining Inmate input and documenting progress toward goals remains a work in progress.

- Create metrics that will lead to an understanding of the quality of the programs' implementation and effectiveness. These could include length of stay, changes in the rate of infractions for individual youth, service provision, etc. The Monitoring Team developed a work plan for the Department for the Third Monitoring Period that includes this objective.

The Monitoring Team will continue to focus on these issues as the quality of implementation and effectiveness of these units are a central part of the work to reduce the level of violence and use of force at the facilities.

During the current Monitoring Period, the Department did not expand the options available to respond to Inmate misconduct for 16- and 17- year-old Inmates. As noted in the First Monitor's Report, the continuum of responses to infractions needs additional development. The current continuum would benefit from additional options in the middle range, meaning something more significant than a verbal reprimand from the Adjudication Captain or the failure to earn an ASFC stamp (both appropriate for eliminating nuisance behaviors), but something less restrictive and intensive than transfer to one of the special units. An array of options is needed to respond effectively to Inmates who may engage in episodic aggression where no one is injured, who destroy or steal property, or who continuously disrupt the operation of the facility such that services to other Inmates is often compromised. The Monitoring Team emphasizes this recommendation again, both to ensure proper accountability and order in the facility, and also as part of an overall strategy to address Inmate misconduct before it escalates to the level that would lead to placement in SCHU/TRU. The Monitoring Team's experience suggests that responses that involve both a skill-building element and a

restorative element are most effective in catalyzing behavior change. The Monitoring Team supports the Department's concept of *Repairs* and has also discussed a variety of other ideas in-person and in writing. The Monitoring Team encourages the Department to accelerate progress in this area.

Finally, while the Department takes its responsibility to ensure the safety of youth from other youth seriously, at times, this has resulted in an over-reliance on strategies to separate youth and suppress their behavior, rather than a focus on changing behavior to facilitate long-term safety. Toward the end of the First Monitoring Period and throughout the Second Monitoring Period, the Department temporarily placed several youth who had been involved in incidents (either as the aggressor or the victim) on a housing unit, alone, for several weeks at a time. While this strategy limited these youth's access to potential victims and thus suppressed violence, it interfered with the ability to deliver mandated services consistently and is inconsistent with the youth's treatment needs (a congruence that is required by this provision of the Consent Judgment). Although RNDC has housing unit resources that exceed those normally available in other jurisdictions, separating youth who do not get along with each other is not a sustainable long-term strategy for responding to infractions. The "keep separates" will increase exponentially and the staffing and space resources will be stretched too thin to sustain. Instead, focusing resources and programming on strategies to mediate conflict and to teach youth skills for managing interpersonal conflict will create the ability to manage safe facilities without having to rely on isolation or continued separation from peers. The Monitoring Team discussed this issue with the Department several times, and, during a meeting with Department Staff on this issue in June 2016, made it clear that while separation on a housing unit alone may be appropriate for a very short period of time (i.e., a few days), the use of this strategy must be strictly governed by a written protocol. This protocol should include the situations in which this housing strategy is permissible, time limitations, assurances that all mandated services will be provided, and a requirement to articulate in writing the timeline and conditions for gradually returning the youth to the general population. The Monitoring Team has offered to assist the Department in developing these protocols and has made multiple requests for this written protocol or a plan for developing such a protocol, but the Department has not responded to the Monitoring Team's requests.

The Department remains in partial compliance with this provision and has significant work to do to reach substantial compliance. The Monitoring Team's experience suggests that clear, proportional, effective accountability measures are essential to the operation of a safe correctional facility for adolescents and urges the Department to accelerate its progress in this area.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As indicated by Policy 6500R-D "Inmate Disciplinary Due Process" and Policy 4501R-D "Pre-Hearing Detention and Punitive Segregation Status Inmates," Inmates with serious mental illness (SMI) may not be placed in Punitive Segregation. Instead, they are housed in the Clinical Alternatives to Punitive Segregation (CAPS) unit, which provides group and individual treatment by New York City Health + Hospitals.

### ANALYSIS OF COMPLIANCE

As noted above, the Department abolished the use of Punitive Segregation with 18-year-old Inmates on June 30, 2016. The Department's policy for Punitive Segregation prohibits the placement of Inmates with SMI in Punitive Segregation. As detailed in the First Monitor's Report, Staff from all disciplines echoed the policy requirement and felt confident that current processes functioned to ensure that Inmates suffering from SMI are treated in an appropriate clinical setting.

For the current Monitoring Period, the Monitoring Team asked New York City Health + Hospitals to review the list of 21 18-year-old Inmates who served Punitive Segregation time between March 1 and June 30, 2016. They verified that none of the Inmates on the list had a serious mental illness at the time of their consideration for Punitive Segregation.

The Monitoring Team believes that the Department has complied with this provision based on the written assurance provided by New York City Health + Hospitals upon reviewing the list of Inmates. The fact that the Department has abolished the use of Punitive Segregation for 18-year-olds also gives the Team confidence that 18-year-old Inmates suffering from SMI will not be placed in Punitive Segregation in the future. However, the processes for documenting the Inmates' fitness for Punitive Segregation with regard to SMI, and for maintaining those records, are insufficient to demonstrate proof of practice (see ¶ 7, below). Should the Department return to the use of Punitive Segregation for Young Inmates, documentation and record-keeping practices in this area will need to be fortified in order to maintain substantial compliance.

This requirement of the Consent Judgment also requires the Department to place 18-year-old Inmates with serious mental illness who commit infractions involving violence in an "appropriate therapeutic setting." This part of the provision focuses on Inmates with SMI who commit violent infractions, and goes beyond their prohibition in punitive segregation. Currently, Inmates with serious mental illness are placed in the Clinical Alternatives to Punitive Segregation program ("CAPS") or the

Restricted Housing Unit ("RHU"). During the current Monitoring Period, a total of five Inmates who were sentenced to Punitive Segregation were placed in RHU instead. Their length of stay ranged from 3 days to 24 days, with an average length of stay of 12 days. Immediately following their time on RHU, three of the five Inmates were transferred directly to Punitive Segregation to serve the time remaining on their Punitive Segregation sentence; one was transferred to AMKC for mental health monitoring; and one was released to the general population. While it assumed that a mental health review occurred (an inmate cannot be placed in RHU without clearance from H+H), the Department could not produce the relevant clearance documentation for any of the Inmates. Going forward, 18-year-old inmates will no longer be placed in RHU. Inmates with serious misconduct who require a therapeutic setting will be placed in CAPS. During the Third Monitoring Period, the Monitoring Team will request information about 18-year-old Inmates placed in CAPS and will examine the "appropriate therapeutic environment" requirement.

While the Department remained in substantial compliance with the part of this provision related to excluding 18-year old Inmates with SMI from Punitive Segregation, the Monitoring Team realized that the provision was rated prematurely in the First Monitor's Report. The part of the provision related to the "appropriate therapeutic environment" requires additional inquiry and evaluation, and thus this provision will be rated in the Third Monitor's Report.

## XVI. INMATE DISCIPLINE ¶¶ 6 (18-YEAR-OLD INMATES: ALTERNATIVE DISCIPLINARY SANCTIONS)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During the current Monitoring Period, the Department revised the draft policy "Transitional Restorative Unit (TRU) and Second Chance Housing Unit (SCHU)" with input from the Monitoring Team. Units for 18-year-old Inmates were opened at GMDC in February 2016 (SCHU) and May 2016 (TRU). Between March 1 and August 31, there were 194 admissions to SCHU (n=85) and TRU (n=109) at GMDC. This included 147 Inmates, some of whom had multiple admissions.

- The Department drafted a policy governing the Secure Unit, made modifications to the policy based on the Monitoring Team's input, and opened the unit at GRVC on July 1, 2016. As of September 30, 2016, a total of 13 young adults had been admitted to the Secure Unit. Currently, the sample size is too small for a robust analysis of length of stay or Inmate outcomes.

ANALYSIS OF COMPLIANCE

The Department abolished the use of Punitive Segregation with 18-year-old Inmates on June 30, 2016. Between March 1 and June 30, 2016, a total of 21 18-year-old Inmates served time in Punitive Segregation—about one-third of the number during the previous 4-month period (68 18-year-old Inmates served Punitive Segregation time between November 1, 2015 to February 29, 2016). These 21 18-year-old Inmates represent approximately 10% of the total population of 18-year-old Inmates.

Because two Inmates served multiple episodes of Punitive Segregation during the current Monitoring Period, overall, the Monitoring Team reviewed 23 episodes of Punitive Segregation. The length of stay ranged from 6 days to 29 days, with an average length of stay of 22 days.[73] The two Inmates who served multiple Punitive Segregation episodes had combined lengths of stay of 40 days and 25 days, respectively. Thus, the Department continued to limit its use of Punitive Segregation for 18-year-olds, with fewer Inmates serving Punitive Segregation and significantly shorter lengths of stay than those witnessed historically.

Prior to abolishing the practice altogether, the Department opened two of its three alternative disciplinary units at GMDC (SCHU and TRU). Secure was opened in early July 2016 at GRVC and had admitted 13 young adults as of September 30, 2016. Comments on the quality of SCHU and TRU implementation and their effectiveness are discussed in ¶ 4, above. Not enough time has passed between the opening of the Secure Unit and the end of the Monitoring Period to examine the program's operation or Inmate outcomes. However, the Monitoring Team was impressed with the Department's thoughtful, measured approach to opening the Secure unit. Specialized Staff training on unit policy, operational drills and mock orientations were designed to ensure that Staff clearly understood the program's requirements and protocols prior to accepting Inmates.

An in-depth review of individual Inmate files will be conducted by the Monitoring Team in the Third Monitoring Period, along with the previously mentioned assessment of the quality of implementation and effectiveness of SCHU/TRU. This assessment will include an examination of whether the Inmates with the most violent infraction records have been exposed to the programs; whether the program services were provided as intended by the original design; whether Inmates in the programs have access to mandated services; whether Inmates make progress on their individual behavior goals; and whether Inmates are subsequently involved in fewer violent infractions than prior to program participation.

Although these three programs offer reasonable alternatives to Punitive Segregation for violent infractions, there remain a large volume of infractions for which Inmates used to receive Punitive Segregation time, but that now are without a defined accountability measure. The list of infractions for which Inmates could previously receive Punitive Segregation time includes a large number of non-

---

[73] In some cases, an Inmate may have been in Pre Hearing Detention just prior to the Punitive Segregation episode—the lengths of stay in these statuses are combined to create a total length of stay.

violent infractions that would not warrant time in SCHU/TRU/Secure (all of which are designed to address violent misconduct), for example: bribery, intentionally delaying the count, tampering with fire safety equipment, refusing to provide a DNA sample, possessing an electronic telecommunication device, possessing money greater than $50, among others. Between March 1 and June 30, 2016, a total of 119 Inmates were sentenced to Punitive Segregation time but did not serve it. The Department reported that these Inmates were found guilty of non-violent offenses, which are subject only to Punitive Segregation Lite (which provides for 7-hours lockout time). Given that none of the Punitive Segregation Lite units were permitted to house 18-year-olds, these Inmates did not serve any Punitive Segregation time for their infractions. This finding further reinforces the Monitoring Team's assertion that additional disciplinary options are needed to ensure accountability for the full range of infractions.

During the Third Monitoring Period, in addition to assessing the implementation and effectiveness of the SCHU/TRU/Secure Units, the Monitoring Team will examine the current options available to respond to infractions that, by policy, used to invoke Punitive Segregation time. Additional options for responding to non-violent infractions will be encouraged.

| **COMPLIANCE RATING** | ¶ 6. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶¶ 7 & 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION)

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- On February 25, 2016, the Department issued a teletype requiring New York City Health + Hospitals to assess _all_ 18-year olds sentenced to punitive segregation to ensure that the confinement does not present a substantial risk of serious harm to the Inmate. This teletype expanded the existing practice—which only required those with an "M Designation" (meaning they were known to mental health)—to comply with the requirements of the Consent Judgment.

- Policy 4501R-D "Pre-Hearing Detention and Punitive Segregation Status Inmates" requires medical staff to visually observe and communicate with all Inmates in Punitive Segregation at least once daily on weekdays to assess the Inmate's medical condition, and to identify those in need of treatment (see IV.3.l).

ANALYSIS OF COMPLIANCE

As noted above, the Monitoring Team confirmed that the 21 18-year-old Inmates who were placed in Punitive Segregation were not suffering from a serious mental illness. The Monitoring Team also requested documentation to demonstrate that H+H determined that Punitive Segregation did not present a substantial risk of harm in each of the 23 Punitive Segregation episodes involving 18-year-old Inmates.[74] The Monitoring Team found the record-keeping in this area to be subpar. The Department produced a variety of different documents (i.e., a combination of "H+H Substantial Risk Clearance" forms, "Pre-Hearing Detention Lock Down Clearance" reports, "Mental Health Review for Punitive Segregation" forms and "Mental Health Status Notification and Observation Transfer" forms) that, in the end, could only demonstrate proof of practice for 12 of the 23 (52%) Punitive Segregation episodes involving 18-year-olds. The Department also submitted a few other forms in response to this request, the "Mental Health Status Notification and Observation Transfer," that did not provide relevant information, so the Monitoring Team did not include them in the total.

During the First Monitoring Period, interviews with H+H staff suggested that Punitive Segregation Inmates' mental health status was monitored on a daily basis by H+H staff, and that Inmate's whose mental health was jeopardized by their continued placement on Punitive Segregation were transferred to a clinically-appropriate setting. The Monitoring Team reviewed the documentation regarding mental health rounds for 18-year-old Inmates in Punitive Segregation prior to its prohibition. A total of 23 Punitive Segregation episodes were reviewed, totaling 469 days. Of these, documentation revealed that H+H staff conducted individual assessments on 424 days (90%). None of the Inmates were recommended for removal from Punitive Segregation for mental health concerns.

For the most part, record-keeping regarding mental health rounds was adequate, though could be improved by ensuring that a *current roster* of Inmates in Punitive Segregation is used for documentation purposes. At times, newly admitted Inmates did not appear on the list and H+H staff did not always add them to the roster. The Department's *Nunez* Compliance Unit should be recognized for its high-quality internal audit of these records. The Monitoring Team's verification process found excellent document organization and high levels of accuracy by the reviewer. This is an important sign of progress toward the Department's ability to monitor practices, identify problems and enact solutions.

Should the Department return to the use of Punitive Segregation for Young Inmates, documentation and record-keeping practices regarding H+H's initial assessment of risk will need to be fortified in order to achieve substantial compliance.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
| | ¶ 8. Substantial Compliance |

[74] Two of the 21 Inmates had multiple stays in Punitive Segregation during the Monitoring Period, for a total of 23 Punitive Segregation episodes.

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department contracted with Jeffrey A. Beard, Ph.D. to conduct an independent review of its infraction process and procedures.

- Dr. Beard conducted an independent review and submitted a report to the Department on June 27, 2016, which in turn submitted it to the Monitor on July 6, 2016. The Department is currently considering Dr. Beard's recommendations.

### ANALYSIS OF COMPLIANCE

After a review of related policies and procedures, a review of a sample of infraction reports, analysis of infraction hearing outcome data, Staff interviews, observations of several infraction hearings, a review of the Adjudication Captain's Manual, and a tour of the punitive segregation, RHU and CAPS housing units, Dr. Beard concluded that "the infraction process [is] fair and reasonable, Inmates are afforded due process and infractions are only imposed when a rule violation is supported by a preponderance of the credible evidence." He offered a few recommendations, including to: (1) review policies on a regular basis and update them as necessary; (2) incorporate current Operational or Chief's Orders into policy so that the sum total of relevant issues is present in a single location; and (3) expand policy to require a mental health review for anyone with an M-designation prior to holding a disciplinary hearing. The Monitoring Team finds that Dr. Beard's review meets the requirements of the Consent Judgment.

That said, the Monitoring Team has some additional recommendations that could be useful as the Department develops a quality assurance mechanism to ensure that the disciplinary process meets the generally accepted practices in the field, particularly with the changes that will flow from the reduction in the use of punitive segregation and the availability of other disciplinary options. These include:

- Ensuring that the methodology for assessing the quality of the process includes interviews with infracted Inmates to better understand their experience of the hearing process.

- Collecting, analyzing and interpreting data on the rates at which infracted Inmates actually exercise their rights to make statements, produce witnesses, utilize a hearing

153

| | facilitator, utilize an interpreter, or appeal the outcome of the hearing. If low rates are observed, the Department should consider ways to make these supports more available or more attractive to Inmates. |
|---|---|
| | • Examining the frequency with which alternatives to punitive segregation are utilized and the extent to which they are actually imposed, proportional to the severity of the infraction, and whether they are effective in reducing misconduct. |
| **COMPLIANCE RATING** | **¶ 11.** Substantial Compliance |

## 12. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for Inmates under the age of 18 (¶¶ 1, 3). Approximately 200 16- and 17-year-old Inmates are housed in facilities on Rikers Island, male adolescents at RNDC and female adolescents at RMSC. The intent of housing adolescent Inmates at an alternative facility is to place them in a facility readily accessible by public transportation to facilitate visitation between Inmates and family members more easily, and in an environment that will support a new paradigm for effectively managing the adolescent Inmate population. This new paradigm will rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

The Department has made significant progress on the initiative, as described in more detail below.

| **XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3** |
|---|
| ¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model. |

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department and the Mayor's Office of Criminal Justice ("MOCJ") identified a suitable location—the Horizon Juvenile Center located in the Bronx. The Horizon Center is a secure detention facility for 14- and 15-year-old offenders, currently operated by New York City's Administration for Children's Services.

- The City of New York has allocated $17 million in fiscal year ("FY") 2017 and $153 million in FY 2018 to renovate the Horizon Center.

- The Department and MOCJ have consulted with several architectural and engineering firms and have made site visits to model programs in other jurisdictions to flesh out the vision for how the physical space should be configured to best support supervision and programming.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team is extremely encouraged by the significant attention, resources and time the Department and the City have expended to locate and finance a new facility for 16- and 17- year-old Inmates. The Department and the City, including MOCJ, have engaged in a thoughtful and deliberate approach to identify and develop appropriate space. Conversations with the Department and MOCJ confirmed that the selected location, once renovated, will meet the needs of the adolescent Inmate population and will comply with the safety, recreation, programming, housing and supervision requirements of this provision. The identified location is also accessibility by public transportation, which will facilitate the family engagement that is so critical to the rehabilitation of young offenders.

As noted in the First Monitor's Report, finalizing the site's selection may trigger the Uniform Land Use Review Process ("ULURP"), a multi-tiered review likely to require a significant period of time to complete. Further, the space must be appropriately designed and renovated before it can be used. Accordingly, the location must first be approved for use by the relevant stakeholders and then retrofitted for use.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
| | ¶ 3. Not currently applicable |

## 13. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The Department is engaged in an unprecedented recruitment effort. During this Monitoring Period, 645 officers graduated in May 2016 and a 726-person recruit class matriculated at the Academy in July 2016. The Department's Correction Officer Recruitment Unit ("Recruitment Unit"), and

Applicant Investigation Unit ("AIU"), work together to identify and select qualified Staff to fulfill the Department's staffing needs. During the Second Monitoring Period, the Recruitment Unit continued to attract an increased pool of potential candidates. AIU also expanded its Staff in order to meet the demand for background investigations to identify appropriately qualified Staff members.

During the Second Monitoring Period, the Monitoring Team continued to assess the Department's new and more robust Recruitment Program, building upon the work done in the First Monitoring Period (¶ 1). The Monitoring Team also analyzed a sample of background investigations conducted by AIU to assess the Department's compliance with the selection requirements of the Consent Judgment (¶¶ 2, 3).

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department engaged 4,149 candidates at 79 different recruiting events this year.

- The Department conducted outreach to potential candidates through three distinct avenues:

  o **Career Fairs**: The Recruitment Unit participated in many career fairs. In May 2016, the Recruitment Unit hosted an exclusive DOC agency-wide Career Fair at York College which brought over 800 potential candidates in contact with representatives from throughout the DOC to learn about the variety of career opportunities. A number of in-person screening interviews were also conducted.

  o **Community Events and Involvement:** Representatives of the Recruitment Unit participated in a variety of community events, including the St. Patrick's Day Parade, Greek Independence Day, the LGBT Expo, Public Service Career Expo, and PrideFest. The Recruitment Unit also organized an impressive effort to coordinate and facilitate the donation of used dresses for the "Cinderella Project."

- Quantitative increases in key areas:

- o **DCAS Exam Takers**: Compared to previous years, the number of potential candidates who took the DCAS exam grew substantially (10,203 DCAS exam takers for 2015/2016 over the administration of four exams, compared with 8,660 DCAS exam takers for 2013/2014 over the administration of six exams).

  - ▪ The Recruitment Unit also worked with the administrators of the DCAS exam to schedule more exams per year based on the increased volume of individuals interested in taking the exam.

- o **Social Media Followers**: The DOC has seen an increase, in some cases by two-fold, in the number of social media followers on Facebook, Twitter, Instagram, and YouTube from March 2016, compared to July 2016.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to be impressed by the professionalism and depth of the Department's recruitment efforts and materials. The impact of the increased volume and quality of the recruiting efforts is evident in the increase in candidates who are taking the DCAS exam and engaging with the Department on social media platforms. In particular, the increase in DCAS exam-takers is an important marker of success because the more people who take and pass the DCAS exam, the more candidates the Department ultimately has the opportunity to select and hire, as discussed in more detail below.

| **COMPLIANCE RATING** | **¶1.** Substantial Compliance |
| --- | --- |

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- • The Department's AIU Unit continues to process potential candidates as described in the First Monitor's Report, conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.

- • AIU is improving the Unit's organization to enhance certain areas of the investigations.

- o **Field Team**: A dedicated "Field Team" to conduct field visits for potential candidates was created. Previously, AIU relied on investigators to conduct the entire candidate assessment, including the background investigation and the field visit. The primary purpose of the Field Team is to confirm a candidate's place of residence. If the initial investigation leads to additional questions, the Field Team will also make contact with the candidate's neighbors or the local precinct.

- o **Medical Unit and Psychology Unit Expansion**: AIU also expanded the number of staff dedicated to the Medical and Psychology Units in order to conduct the necessary medical and psychological testing more efficiently.

- o **Agility Team**: AIU's agility testing is currently carried out by AIU investigators, using a detailed Agility Test developed by Standards and Associates, Inc. in 2014. Going forward, AIU will have a dedicated "Agility Team" that will not only have expertise in test administration, but will also work with potential candidates, recruits, and possibly current Staff, to improve their physical fitness throughout the selection process, during Academy Training and, potentially, over the course of their careers.

- AIU screened 4,695 potential candidates to fill the two most recent Academy classes that graduated in December 2015 and May 2016, as detailed below.

|  | December 2015 Graduating Class | May 2016 Graduating Class |
|---|---|---|
| Total number of candidates screened for the graduating class | 2,222 *(100%)* | 2,473 *(100%)* |
| Total number of candidates deemed not qualified | 618 *(28%)* | 645 *(26%)* |
| Total number of candidates selected | 630 *(28%)* | 665 *(27%)* |
| Candidates who were screened and were neither recommended nor disqualified, and who fall into other categories (e.g., candidate declined to continue process, withdrew from certification, etc.) | 974 *(44%)* | 1,034 *(42%)* |
| Candidates who were screened had investigations still pending at the start of the Academy Training | n/a | 129 *(5%)* |

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department continues to maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process includes certain factors that will automatically disqualify an applicant for employment as a Staff Member. The details of this process are enumerated in the First Monitor's Report and above. The quality of the screening process is demonstrated, in part, by the statistics regarding the Department's selection and disqualification of Staff Members for the December 2015 and May 2016 graduating classes, as shown in the chart above.

The Monitoring Team verified that the Department conducts extensive background investigations on each candidate. The background investigation includes medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. AIU Staff responsible for conducting these background investigations receive appropriate training, including the same training provided to ID Investigators as described in the Training Section of this report (Consent Judgment § XIII (Training), ¶ 2 (c)) and additional relevant training.

The Monitoring Team audited the background investigations conducted by AIU for candidates who were considered for the May 2016 graduating class. For these graduates who started at the Academy in January 2016, the background investigations began in mid-2015, months before the Effective Date of the Consent Judgment. The files evidenced in-depth investigative work, including the wide array of background check tools described in the First Monitor's Report.[75] That said, some of the practices that were adopted after the Effective Date obviously were not reflected in the files the Team reviewed.

The Monitoring Team also reviewed the underlying requirements for the medical, psychological and agility testing conducted by AIU as part of the selection process, and verified that the standards were detailed and, when possible, based on recognized national standards. Some of the standards are slated for revision and will be reviewed by the Monitoring Team during the Third Monitoring Period.

*Selected Candidates*

The Monitoring Team reviewed the investigative files for a random sample of approximately 10% (n=60) of the selected candidates. The background investigation files clearly demonstrated that AIU reviewed each candidate's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, frequency of appearance in the Inmate visitor logs, medical screening (including drug tests), presence on state or local child abuse registries (Family Watchdog and WEBCRIMS), prior employment references, and financial history including credit checks. The investigative files evidenced in-depth investigations into each candidate's background.

The Monitoring Team provided two recommendations to AIU to further strengthen the background investigation process. First, while AIU reported that their Field Team conducted field visits for every candidate, the field visit documentation was not always available in the candidate's file. AIU reported that when a field visit does not raise any red flags or concerns, the documentation is not immediately placed in the candidate's file for the primary investigator conducting the background investigation to consider.[76] However, when the field visit *does* raise issues, the primary investigator is

---

[75] E-Justice, NYS Parole, NYC Probation, Missing Persons, Wanted Persons and Criminal Arrest History databases; Family Watchdog and WEBCRIMS etc.

[76] AIU reported that this documentation is eventually placed in a candidate's file, but that there is a backlog in filing this documentation.

contacted immediately. The Monitoring Team recommended that Field Team staff provide documentation to the primary investigator contemporaneously with the visit so that it is obvious that the field visit occurred as required and to ensure that no red flags are inadvertently overlooked. The Monitoring Team will continue to monitor the quality of field visit documentation going forward.

Second, the Monitoring Team found that the primary investigators appear to be identifying potential areas of concern in a candidate's background, documenting their findings in the AIU case review sheet, and considering the information in the ultimate hiring decision. However, the investigators did not include a comprehensive explanation about why the potential area of concern should be discounted or overridden in recommending the candidate for hire. For example, primary investigators noted the following: financial debts, disqualification from the NYPD for psychological reasons; a history of domestic violence; a criminal history; a driving history, or known associations and contact with Inmates at Rikers. Some of these factors, while they did not rise to the level of automatic disqualifiers, nonetheless required exploration and comment. The Monitoring Team met with AIU Staff and found the basis for the decision to override these concerns was reasonable in each case, but recommended that these explanations should be documented in the summary recommendation portion of the case review sheet.

*Candidates Who Were Not Approved*

The Monitoring Team reviewed the investigative files for a random sample of approximately 2.5% (n=17) of the candidates who were considered but not approved. Investigative files for candidates who were not approved for selection provided clear disqualifying evidence for the position of Correction Officer. This evidence included recent substance abuse, excessive driving violations, recent arrests, medical and psychological issues, and in some cases, failing to provide the required materials to the investigator to enable them to complete the background investigation.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
|---|---|

## 14. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an Inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, reviews the circumstances warranting the potential arrest and determines that the recommendation is based on probable cause. The purpose of this section is to ensure that Inmate arrests are based on probable cause, and not for

retaliatory purposes. The Monitoring Team did not evaluate the Department's efforts to achieve

compliance with this section during the Second Monitoring Period.

## 15. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent

Judgment and coordination with the Monitoring Team. The first two paragraphs in this section (¶¶ 1 &

2) are intended to ensure that the Department's policies, procedures, practices, protocols, training

curricula and corresponding documents, and logs and handbooks are consistent with the requirements

under the Consent Judgment to the extent that such requirements are not explicitly stated in other

provisions in the decree.

The Monitoring Team continues to work closely with the interdisciplinary *Nunez* compliance

team convened at the inception of the Consent Judgment. The team sits within both the Legal Division

and the Quality Assurance Division and is dedicated to overseeing implementation of, and sustained

compliance with, the Consent Judgment. The work to develop and implement the reforms during the

course of the First and Second Monitoring Periods confirmed the benefit of a dedicated unit to focus on

compliance with this Consent Judgment.

In order to sustain its progress toward compliance, it is imperative that the Department continue

to provide the necessary resources to support this effort. The implementation of these reforms is a large

undertaking and requires tremendous resources to manage the development and implementation of the

reforms throughout the agency. In addition, once implementation is squarely underway, additional

resources will be needed for the Department to demonstrate compliance, or "proof of practice." As a

result, the task of managing the initiative requires exceptional organizational and leadership skills.

Accordingly, three individuals share the responsibility for coordinating the compliance effort within the

Department and serve as liaisons among the Department, the Monitoring Team, and Parties to the *Nunez*

Litigation (as contemplated ¶ 3 of this section).

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department revised a number of policies and procedures to conform with requirements in Nunez.

- The Department worked with the Policy and Procedures Unit ("PPU") to identify policies and procedures needing review to determine whether any revisions were necessary.

- The Department developed a timeline for reviewing and revising policies and procedures.

**ANALYSIS**

In an agency of this size, the process to revise and update policies and procedures involves hundreds of policies, procedures, protocols, training curricula, practices, and other written documents (including logs, handbooks, manuals and forms). The Department necessarily prioritized the work on the policies and procedures specifically enumerated in the Consent Judgment (*e.g.* §VII (Use of Force Investigations, Paragraph 12) and those that address procedures required by the Consent Judgment (*e.g.* the Department updated policies and procedures to address counseling requirements in §X (Risk Management), ¶ 2).

This provision requires that all policies, procedures, and training materials not specifically enumerated by the Consent Judgment must also be revised in order to be consistent with the provisions in the Consent Judgment. During this Monitoring Period, the Department and the Monitoring Team together determined that additional time was needed to complete the additional policy work in order to reasonably, efficiently, and thoughtfully develop sustainable policies and procedures that are consistent with the Consent Judgment. Additional time is necessary because the revisions must also be appropriately sequenced with one another, which requires collaboration across the various sectors of in the Department. Further, the policies, procedures, and training materials specifically enumerated in the Consent Judgment must be finalized first in order to ensure that any revisions to other policies, procedures and training are consistent with those materials. Accordingly, this measured approach mitigates potential confusion for Staff by ensuring updates are implemented thoughtfully, which will increase the likelihood of compliance with revised policies and procedures.

The Department's revised timeline was segmented into a few periods in order to identify, review, and implement any necessary revisions to policies, procedures, protocols, training curricula, practices, and other written documents (including logs, handbooks, manuals and forms). The timeline is reasonable and incorporates deadlines for each period, at which time the Department will consult with the Monitoring Team. Accordingly, the Monitor approved an extension of the overall deadline until July 31, 2017.

| COMPLIANCE RATING | ¶ 1. Requirement has not come due |
| | ¶ 2. Requirement has not come due |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Assistant Deputy Commissioner of Quality Assurance, Deputy General Counsel and an Assistant General Counsel share the responsibilities of the Compliance Coordinator.

### ANALYSIS OF COMPLIANCE

The role of the Compliance Coordinator is fulfilled by three energetic, highly-competent and committed individuals. During the Second Monitoring Period, it became apparent that coordinating with the Monitoring Team was inherently intertwined with supporting the development and implementation of the reforms. Accordingly, it became clear that dividing the responsibilities of the Compliance Coordinator among a few individuals increased efficiency and responsiveness to the Monitoring Team (and the Parties, as necessary). The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and maintaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |

- End -