# Third Report of the *Nunez* Independent Monitor

**Third Monitoring Period**
**August 1, 2016 through December 31, 2016**

## THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ...................................................................................................................... 1

   Executive Summary ........................................................................................................... 1

   The Monitoring Team's Priorities ................................................................................... 5

   Recommendations from the Monitor ................................................................................ 6

      -   Adequate Resources to Sustain Reform Efforts ......................................... 6

      -   Training Academy ...................................................................................... 7

      -   Body Scanners ........................................................................................... 8

   Overview of the Monitor's Report .................................................................................... 8

**Use of Force and Inmate Violence During the Third Monitoring Period** ........................... 10

   Monitor's Observations of Current Practices Regarding the Use of Force ............................. 12

   Overall Trends ................................................................................................................. 16

   Use of Force and Injuries ................................................................................................ 18

   Analysis of Use of Force Trends ..................................................................................... 20

   Locations of Incidents ..................................................................................................... 20

   Inmate and Staff Characteristics ..................................................................................... 22

   Reasons for the Use of Force .......................................................................................... 24

   Next Steps ........................................................................................................................ 33

**Section by Section Analysis** .............................................................................................. 35

    1.   Use of Force Policy (Consent Judgment § IV) ................................................. 35

    2.   Use of Force Reporting and Tracking (Consent Judgment § V) ...................... 43

    3.   Training (Consent Judgment § XIII) ................................................................ 69

    4.   Anonymous Reporting System (Consent Judgment § VI) ............................... 97

    5.   Video Surveillance (Consent Judgment § IX) ................................................. 99

    6.   Use of Force Investigations (Consent Judgment § VII) ................................. 117

    7.   Risk Management (Consent Judgment § X) ................................................... 157

    8.   Staff Discipline and Accountability (Consent Judgment § VIII) ................... 174

    9.   Screening & Assignment of Staff (Consent Judgment § XII) ....................... 189

    10.  Safety and Supervision of Inmates Under the Age of 19
       (Consent Judgment § XV) ............................................................................... 196

    11.  Inmate Discipline (Consent Judgment § XVI) ............................................... 218

    12.  Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) ....... 237

    13.  Staff Recruitment and Selection (Consent Judgment § XI) ........................... 239

    14.  Arrests of Inmates (Consent Judgment § XIV) .............................................. 246

    15.  Implementation (Consent Judgment § XVIII) ............................................... 247

   **Appendix A: Definitions** ............................................................................................... i

## INTRODUCTION

This is the third report of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[1] and the Monitoring Team to advance the reforms in the Consent Judgment during the Third Monitoring Period, which covers August 1, 2016 to December 31, 2016 ("Third Monitoring Period").

The Department manages 12 inmate facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, and to dismantle the decades-long culture of violence in these Facilities, as well as targeted reforms to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 10,050 uniformed Staff and 1,700 civilian employees and detains an average daily population of 9,800 inmates ("Inmates").

*Executive Summary*

The Consent Judgment was entered by the Court on October 22, 2015.[2]  The Third Monitoring Period marks the first full year of the implementation of the Consent Judgment. This report captures the Department's efforts to implement the reforms in the Consent Judgment from

---

[1] All defined terms utilized in this report are available in *Appendix A: Definitions.*
[2] The Effective Date of the Consent Judgment is November 1, 2015. (Docket Entry 260)

August 1, 2016, through December 31, 2016. Although the frequent filing of routine Monitor Reports provides important information for stakeholders regarding the Department's incremental progress towards achieving compliance with the Consent Judgment, the short intervals between reports also means that the Department may not achieve major milestones during each Monitoring Period. Consequently, progress may appear to be gradual, even as the Department puts essential protocols in place. The Consent Judgment includes over 300 separate provisions and requires the development, refinement, and implementation of a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against Inmates and reducing violence among Inmates, particularly Young Inmates (*i.e.*, those under 19 years old).

The Monitor is aware of the Report by the Independent Commission on New York City Criminal Justice and Incarceration Reform and New York City Mayor Bill de Blasio's recent announcement of the City's policy to close Rikers Island. The Monitor does not take a position on the City's policy or the recommendations by the Commission. However, the Monitor believes it is important to remind all stakeholders that the terms of the Consent Judgment remain in full force and effect. The requirements of the Consent Decree apply to all jails operated by the Department of Correction irrespective of location, except for the Elmhurst and Bellevue Prison Wards.

**The work completed to date confirms that the road to sustainable reform will be neither swift nor painless; it must be traversed in an incremental, well-reasoned, and methodical manner.** There is no lack of effort by the Department to develop and implement new policies, procedures, and training, many which go well beyond the requirements of the Consent Judgment. As described throughout this report, the Department committed significant

resources and conducted a considerable amount of work in this Monitoring Period to implement the requirements of the Consent Judgment. It is less a question of whether there is a commitment to change and more of a question of how best to effect change in a timely and safe manner. The Department's greatest challenges lie ahead. Properly implementing the reforms necessitates Staff learning the skills needed to change the way they interact with Inmates, and then holding Staff accountable for demonstrating the new skills.

A critical component to the successful implementation of the reforms required by the Consent Judgment is an open and collaborative relationship between the Department and the Monitoring Team. The Department and the Monitoring Team have maintained a strong, collaborative relationship, which has allowed the Monitoring Team and the Department the opportunity during this Monitoring Period to engage in frank conversations regarding the current trends in use of force. The Department continues to struggle with many of the problematic, excessive, and unnecessary uses of force that gave rise to the Consent Judgment, as detailed in the following "Use of Force" introduction. Furthermore, the level of violence at the Facilities housing Young Inmates is cause for significant concern. Uniformed Staff of all ranks and across divisions continue to struggle to develop a common understanding of when it is appropriate to use force. The lack of a common understanding has resulted in conflicting expectations for and confusion among Staff, as they are held accountable inconsistently. It is therefore crucial for the Department to have precise, detailed, internal agreement on the core principles guiding the appropriate use of force. Toward this end, uniformed Staff need to be better engaged in the process of reform to ensure that the expected culture change permeates the Facilities.

In order to address these concerns, the Monitoring Team has continued to focus its work with the Department on the development and refinement of interim procedures that will continue

to advance compliance while the implementation of other reforms may progress at a slower rate (*e.g.,* training all Staff as required under the Consent Judgment will necessarily take a long time; further seeking and imposing adequate formal discipline is also a lengthy process). The Monitoring Team has been encouraged by the Department's efforts to:

- Develop practices that require Facility leadership to engage in: (a) the analysis of all use of force incidents within their Facility; (b) the analysis of problematic use of force within their Facility that meet one of twelve themes of concerning force (the Commissioner's Twelve) with a corresponding requirement to develop action plans to address these areas of concern; and (c) the assessment and identification of incidents where the use of force should have been avoided with a corresponding requirement to work with Staff to avoid similar situations in the future.

- Respond to potential Staff misconduct close in time to the incident following an initial review of the incident (*e.g.,* re-training, counseling, suspension), which empowers the Department to engage Staff close in time to the incident and provide appropriate support or corrective action as warranted even before an investigation may be closed.

- The Investigation Division's efforts to develop strategies to leverage the work of the Preliminary Review of the use of force incident, an entirely new investigative process, in order to help manage its increasingly large workload to mitigate the delays in completing a full investigation.

While full resolution of the complex issues surrounding the use of force and Inmate violence, realistically, cannot be achieved in the period of time that has elapsed since the Effective Date of the Consent Judgment, the Monitoring Team is especially concerned that the rates of violence among Young Inmates have increased. Thus, protecting Inmates from harm at

the hands of Staff and other Inmates remains the critical priority for the Monitoring Team.

*The Monitoring Team's Priorities*

The Monitoring Team has maintained its incremental approach to the task of monitoring because it ensures appropriate synergy and collaboration with the Department on the development and implementation of sustainable reforms. The Monitoring Team focused on six core issues in this Monitoring Period: (1) the high frequency of unnecessary uses of chemical agent ("OC spray"), high impact force, and use of force on Inmates in restraints; (2) Staff reporting of use of force; (3) the provision of prompt medical attention following a use of force; (4) the absence of handheld video footage for use of force incidents where the use of handheld video is required; (5) use of force investigations; and (6) the development of alternatives to Punitive Segregation for Young Inmates.

*Work of the Monitoring Team*

During the Third Monitoring Period, the Monitoring Team was present at various Department locations for in-person meetings and site visits, including multiple visits to the Facilities on Rikers Island (including the Emergency Services Unit ("ESU") trailer and Training Academy). The Monitoring Team regularly met and communicated with Commissioner Joseph Ponte, his executive staff, and other DOC staff members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners. The Monitoring Team also communicated, by phone and in-person, with Plaintiffs' Counsel, SDNY representatives, and counsel for the City (collectively, "Parties to the *Nunez* Litigation"); Directors and staff of the Board of Correction; the Inspector General of the Department of Investigations and members of her staff; representatives from the Mayor's Office of Criminal Justice; and representatives from New York City Health + Hospitals (the

Department's healthcare provider).

During this Monitoring Period, the Monitoring Team also made hundreds of requests for documents and information, including requests for policies, procedures, use of force investigation files, candidate selection files, Staff schedules and Inmate files. The Department has been very responsive to the Monitor's requests and has produced thousands of pages of documents, including approximately 400 use of force investigation files, 100 candidate selection files, training attendance records, Inmate files, program spreadsheets, Staff schedules, bi-monthly and monthly data, and information regarding the use of force and investigations. The Monitoring Team and the Department have also exchanged countless drafts of policies, procedures, and training lesson plans as described throughout this report.

_Recommendations from the Monitor_

- ***Adequate Resources to Sustain Reform Efforts***

The Department has engaged in significant change over a short period of time. It is critical to the reform effort that the Department ensure the changes in practice are sustainable. This requires a strong and vigilant quality control effort throughout the Facilities and headquarters. The Nunez Compliance Unit ("NCU") and Use of Force Auditor are initial steps toward sustainability, but will not be adequate as currently configured. The Monitoring Team, via its collective experience, notes that additional engagement within the Facilities is needed to further advance the reforms. Accordingly, the Monitoring Team recommends that the Department:

- First, designate a high-ranking uniformed Staff in each Facility as a liaison to the Nunez Compliance Unit. The liaison duties would include providing constant support and guidance to the Facility in the nuances of the policies and procedures guiding the reform;

6

responding promptly to requests for Facility-specific information and documentation from the NCU; and organizing, compiling and maintaining information needed to establish proof of practice.

- Second, provide sufficient staffing[3] to the Nunez Compliance Unit including a mixture of uniformed Staff at all ranks and civilian staff. The duties of the NCU staff would include developing quality assurance standards that correspond to the various sections of the Consent Judgment and auditing Facility records to establish proof of practice; and

- Third, provide staff who report directly to the Use of Force Auditor to adequately support this important position.[4]

- *Training Academy*

The Monitoring Team continues to *strongly urge* the City to fund a long-term solution to address the limited and sorely inadequate training space available to the Department, as described in great detail in the First Monitor's Report (*see* pages 55-57 of the Monitor's First Report). The Department has implemented a number of interim strategies to address the deficiencies in its current training space, and is continuing to try to identify and procure additional interim space. However, the City must ensure that the Department has all the necessary resources to sustain this unprecedented reform effort. City officials confirmed to the Monitoring Team that the City is committed to addressing the Department's inadequate training space. The Monitoring Team will continue to work with appropriate City officials in the next Monitoring Period to ensure continued progress towards addressing these concerns.

---

[3] The Staff assigned to NCU must be permanently funded dedicated lines to ensure continuity and that the division remains appropriately staffed.

[4] The Use of Force Auditor currently conducts his work on his own. The Monitor recommends that the Use of Force Auditor have at least one Deputy Warden and Captain permanently assigned to his staff and at least one civilian business analyst.

- *Body Scanners*

As part of the effort to reduce violence, unnecessary and excessive uses of force, and the injuries to Staff and Inmates that result from both, the Monitoring Team continues to encourage the Department to use all of the tools at its disposal, including ionizing body scanners. The Department possesses the equipment, but is not currently authorized to use it due to State regulations restricting its use. The Monitoring Team's collective experience suggests that body scanners are an effective tool to help control the flow of contraband into correctional facilities and, thus, believes that the Department should be authorized to use this equipment.

_Overview of the Monitor's Report_

The following sections of this report summarize the Department's efforts to achieve Substantial Compliance with the provisions in each substantive section of the Consent Judgment. The first section describes the Monitoring Team's overall findings related to the use of force, Inmate-on-Inmate violence, and other outcomes related to the procedural requirements of the Consent Judgment. Next, the Monitoring Team analyzes the steps taken by the Department to achieve compliance with each substantive section of the Consent Judgment and assesses the current level of compliance for provisions related to the Monitoring Team's priority areas.

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[5] (b) Partial Compliance,[6] and (c) Non-Compliance.[7] The Monitoring Team did not assess compliance for any provision with a deadline for

---

[5] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

[6] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[7] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

completion falling after December 31, 2016, though a summary of the Department's progress to date is provided.

The Monitoring Team did not assess compliance for every provision in the Consent Judgment in this report. The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress. This report also provides compliance ratings for several provisions that were not evaluated in the First or Second Monitor's Report. Subsequent Monitor's Reports will do the same, continually increasing the total number of provisions assessed. The Monitoring Team's strategy for assessing compliance is consistent with the overall approach to reform described above: that provisions must be considered, addressed, and evaluated in a sequential and logical manner in order to achieve sustainable reform.

The Monitor's Report addresses all 15 substantive sections of the Consent Judgment. For each substantive section, the introduction includes a summary of the requirements and the practices the requirements are intended to address. The introduction also includes a summary of the Department's overall efforts to achieve compliance with the provisions in the Consent Judgment and the Monitoring Team's involvement in that effort. The final portion of each section provides the Monitoring Team's compliance assessment for a set of provisions, which includes a summary of the specific steps the Department has taken to achieve compliance, the Monitoring Team's analysis of those efforts, recommendations for the Department's next steps, if applicable, and the Monitoring Team's compliance rating, if applicable. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be

presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions are embedded in the compliance assessments for ease of reference.

## USE OF FORCE AND INMATE VIOLENCE DURING THE THIRD MONITORING PERIOD

The Consent Judgment provisions are intended to resolve the issues considered in *Nunez* and the SDNY investigation which generally aim to: (1) reduce the use of unnecessary or excessive force, by providing Staff with new tools and training for responding to Inmate behaviors and by ensuring accountability for Staff's improper use of force and (2) reduce violence in the Facilities that house Young Inmates by implementing procedures and protocols likely to address the underlying causes of violence (*e.g.*, Staffing levels, responses to misconduct, programming, incentives for positive behavior, etc.).

The Monitoring Team reviewed and analyzed use of force and Inmate-on-Inmate violence data throughout the Monitoring Period. The reason for including this analysis in this report is threefold. First, the use of force and Inmate violence data anchors the report in the context of the conditions that created the need for external oversight, showing the levels of force currently being applied, the severity of resulting injuries, and the reasons that force is used. Second, over time, trend data will illustrate the impact of the various reforms as they are implemented across the life of the Consent Judgment. Finally, the analysis offers a model for how the Department can improve the way it internally monitors the use of force and Inmate-on-Inmate violence, identifying trends and patterns so that targeted interventions can be applied in the Facilities and with populations where problems are concentrated. It is worth noting that the

Department's Use of Force Auditor came on board during the Third Monitoring Period and has begun to produce quarterly reports. Many of the concerns discussed in the section below were also identified by the UOF Auditor, as summarized in the Risk Management section of this report. The Monitoring Team is encouraged that the Department is beginning to develop an internal capacity to identify these problematic issues and applauds the UOF Auditor for his candid review of Department practices.

Regarding the use of force, the specific procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives and disincentives.

During this Monitoring Period, the Monitoring Team reviewed approximately 2,000 Preliminary Reviews of use of force incidents and over 400 use of force investigation files (including Preliminary Review files, and closed ID and Facility cases). To date, the Monitoring Team has reviewed all 4,500 Preliminary Reviews completed on use of force incidents (the combined total of all Preliminary Reviews conducted in the First, Second, and Third Monitoring Periods), among other materials. For all analyses, the Monitoring Team reviewed data for the

11

total Inmate population and also examined differences across age (*i.e.*, adults, 18-year-olds, and 16- and 17-year-olds).

<u>*Monitor's Observations of Current Practices Regarding the Use of Force*</u>

The seriously problematic issues of Staff use of force set out in the Second Monitor's Report (at pgs. 10-12) continued in unabated fashion during this Monitoring Period. The Monitoring Team has also found that there are significant delays in disciplinary action for Staff, which further exacerbates the problematic use of force issues previously set out. For use of force incidents taking place since the Effective Date, formal discipline for Staff misconduct has not been imposed in a single instance as of December 31, 2016, as discussed in the Staff Discipline and Accountability section of this report. The most prevalent misapplications of force continue to involve the use of chemical agents. Staff members continue to use OC at unsafe distances often aggravated by using the inappropriate canister size. In addition to using OC in contravention of manufacturers' specifications, Staff members too often use OC precipitously, without taking time to summon a Supervisor, and/or fail to engage in de-escalation strategies prior to OC use. Moreover, Staff members too often use OC in retaliation for an Inmate's verbal insults, threats, or swearing. The Department is consulting with the Monitoring Team on strategies to address the problematic use of OC spray, including revising the Chemical Agents Directive (as discussed in detail in the Use of Force Policy section of this report) and developing roll-call trainings.

Hard impact force likewise continues at an alarming rate in the form of head strikes, wall slams, and violent takedowns often involving neck/chokeholds. There have been instances in which Inmates have been subjected to multiple forms of problematic force in a single incident. Often, these incidents are not reported accurately and in some cases not reported at all. There have been instances in which Inmates have been subjected to high levels of force causing

injuries, only to be followed by delays in providing needed medical attention. Restrained Inmates have been dragged and/or lifted by their restraints and even kicked while prone in restraints. A persistent problem in reviewing use of force incidents is the too frequent absence of handheld video camera coverage, often during the critical portion of the incident (discussed in detail in the Video Surveillance section of this report).

Set out below are four summaries of particularly illustrative incidents of problematic applications of force involving multiple forms of force in a single incident. As of the end of Third Monitoring Period, all these incidents had investigations pending within the Investigations Division. These incidents are by no means aberrational or isolated occurrences.

- A partially-clad, unarmed female Inmate was being "disruptive" and was pinned on the wall with a poly carbon shield. Thereafter, one officer placed her in a chokehold and pulled her hair. A Captain then repeatedly applied OC spray from a MK-9 canister, with one of the three applications at a distance of less than six feet. The Inmate alleged that the officer who pulled her hair and applied the chokehold also punched her in the eye and while the punch could not be viewed on the video, there was a corresponding eye injury. There is little evidence of verbal strategies to de-escalate the situation, other than threats of OC spray. It is noted that the Captain and the officer who used the chokehold and pulled the Inmate's hair were both involved in another incident five days earlier in which an Inmate alleged that she was kicked in the face causing a serious nose bleed. The video review of that incident did confirm the injury and showed the Inmate was left on the floor of an intake pen bleeding and was not treated at the Facility clinic until five hours after the incident.

- An Inmate was rear-cuffed and escorted to a cell by ESU Staff after they had requested that he terminate a phone call. The escort to the cell was needlessly painful and risked injury. After the Inmate was secured face first to the rear wall of the cell, an ESU officer struck the Inmate in the mouth when he turned his head. The officer then, at point blank range, used OC spray. The supervising Captain failed to file a report and the second officer failed to file a complete report of the events. The officer who delivered the head strike and the OC spray had a prior violation for excessive force and has two pending violations for excessive force.

- A search team consisting of approximately twenty-five Correction Officers, a probe team, and several Captains were conducting an unscheduled search of a dorm. While one of the Inmates was engaged in a verbal exchange with a Captain, the Captain precipitously used OC spray on the Inmate. The handheld camera was immediately diverted from the incident during which time an officer "inadvertently" punched the Inmate causing a

13

laceration to his left eye and fracturing the officer's right hand. When the handheld camera resumed coverage the Inmate was prone on the ground totally engulfed by Correction Officers. An Inmate witness described the strike as a "superman" punch. The Inmate did not receive medical treatment until approximately ten hours after the incident.

- An Inmate ordered to stand against a wall came off the wall and lunged at an officer. The officer deployed OC spray and thereafter utilized multiple punches to the Inmate's face. These strikes were captured on video and DOC suspended the officer for excessive force.

In addition to identifying individual incidents in which the use of force was problematic and discussing them with the Department, the Monitoring Team also conducted a targeted analysis of head strikes, a specific subset of problematic uses of force. The Monitoring Team identified approximately 305 use of force incidents that involved a blow or strike to the head during this Monitoring Period. The Monitoring Team conducted a particularized review of all head strike incidents in the Monitoring Period to: (1) assess whether the head strike was appropriate (*i.e.*, whether the Staff was in imminent danger of death or serious bodily injury and lesser means were not readily available to control the situation); (2) identify patterns in the circumstances that gave rise to the Staff's inappropriate use of a head strike; (3) identify the various ways in which Staff misrepresented their actions when the head strike was utilized outside of the very limited circumstance in which they are permitted; and (4) identify how the head strike was ultimately detected.

Based on preliminary assessments, some of the head strikes appeared necessary for the safety of the Staff person, but many were utilized to punish, discipline, assault or retaliate against an Inmate. Head strikes were more likely to be utilized when Inmates were actively resisting the application of restraints or escort or when Inmates engaged in assaultive behavior, and Staff failed to utilize a readily available lesser means of establishing control. In other words, the head strike was not proportionate to the amount of resistance or level of aggression demonstrated by

the Inmate. In less than 20 percent of the incidents reviewed did Staff identify their use of a head

strike as self-defense or specifically report using a head strike, often instead utilizing a vague

term such as "upper control hold." Often, the head strike was detected by an Inmate's allegation,

during an interview by an investigator, during a routine video review, or determined by the

nature of the Inmate's injury.

Set out below are summaries of several illustrative incidents of problematic applications

of force involving head strikes. As of the end of Third Monitoring Period, all these incidents had

investigations pending within the Investigations Division. These incidents, like those previously

cited herein, are by no means aberrational or isolated occurrences.

- A rear-cuffed Inmate was under escort when he attempted to spit on a Captain. The Captain responded with repeated head strikes and kicks. After the Inmate was taken to the ground and under the control of Correction Officers, an officer who had been observing the incident walked over to the prone Inmate and delivered a kick to his upper body. It is noted that DOC took immediate action and suspended both the Captain and the officer following the incident.

- An officer was removing a bed sheet from a cell front and reported pushing the Inmate in the "upper torso;" however, the video reflected a head strike with injury to the Inmate's left temporal region, left cheek, and lower lip. After the head strike, a Captain dispersed OC spray at point blank range, jeopardizing the safety of other Correction Officers controlling the Inmate. The officer who used the head strike had, two months earlier and without provocation, used OC spray on an Inmate using the telephone.

- Correction Officers were removing cuffs from an Inmate in the intake area of the Facility when the Inmate suddenly moved his body. Seven Correction Officers were present, five of whom began to take control of the Inmate. Several Correction Officers utilized head strikes and a chokehold. The Inmate never attempted to strike any officer as claimed in the Correction Officers' reports. The Inmate sustained ten discrete head injuries as the result of the force.

- A rear-cuffed Inmate was being escorted from the clinic area when he and his escort passed an observing officer. The Inmate's elbow made contact with the officer's upper body (chest area). As the escort continued past the observing officer, the officer delivered a head strike to Inmate. The officer reported the contact as an aggressive "attack" causing "severe pain" and causing the officer to "lose balance." A review of the video was starkly inconsistent with the officer's report and regardless of the extent of contact, the head strike was unnecessary as the Inmate was moving away from the officer under the total

15

control of the escorting official. None of the participants or witnesses reported the head strike.

The Monitoring Team intends to continue to conduct this type of analysis in the Fourth Monitoring Period. The Department is urged to develop its own capacity for this type of analysis and is required, through the clear language of the Consent Judgment, to address such problematic uses of force with timely and proportional disciplinary measures with Staff.

### Overall Trends

The commentary above discusses specific issues of concern. The following sections discuss aggregate data on the use of force and Inmate violence.[8] As shown in the first line graph below, since the Effective Date, the average number of use of force incidents each month is approximately 391, and has ranged between 334 (May 2016) and 442 (December 2015).[9] Because the Department houses a large number of Inmates (nearly 10,000), expressing the data as a *rate*, as in the second line graph, helps to contextualize it. A rate also neutralizes the impact of changes in the size of the Inmate population over time. The rate is calculated by dividing the number of uses of force into the average daily population for each month, and then multiplying the result by 100. The rate is interpreted by saying, for example, in December 2016, there were

---

[8] The Monitoring Team believes that robust quantitative data analysis will help the Department to achieve the goals of the Consent Judgment. Unfortunately, the data's current problem-solving value is limited because, in many cases, the Department does not collect data needed for essential inquiries into the root causes of the observed trends in use of force or violence. For example, the Department's convention for tracking the reason for each use of force (discussed in detail, below) is incomplete and raises more questions than it answers. Not only do these limitations impact the ability of the Monitoring Team to conduct rigorous analyses to assist with developing solutions, but the limitations also hinder the Department's ability to conduct its own analysis or to publicly report comprehensive data. Despite these limitations, the Monitoring Team is obligated to delve deeply into the problems that underlie the provisions of the Consent Judgment and the Department's efforts to overcome them. That said, the Monitoring Team is fully aware that several of the analyses based on this data are therefore incomplete and lead to additional questions. Hopefully, the quality of the Department's data will improve over time so that it can be more useful to the task of problem-solving.

[9] These data include actual, reported uses of force and do not include alleged uses of force that have not been confirmed.

3.93 uses of force for every 100 Inmates. The overall number and rate of use of force incidents during this Monitoring Period, by any standard with which the Monitoring Team has had experience, is high. Furthermore, the dotted trend lines in each graph show that, overall, the number and rate of uses of force have increased incrementally since the Effective Date. The Department has noted through more sophisticated internal analysis that the rate of increase has slowed somewhat, in comparison to the years prior to the Effective Date. While a slowed rate of increase is encouraging, the Department still has considerable work to do to reduce the number and rate of uses of force.





*Use of Force and Injuries*

Use of force incidents are assigned a severity classification based on the severity of injuries sustained by either Staff or Inmates. "Class A" incidents are those resulting in the most severe injuries,[10] "Class B" incidents are those that result in minor injuries,[11] and "Class C" incidents are those in which no injuries were sustained by Staff or Inmates. Incidents in which chemical agents were used, but resulted in no injury other than irritation of the eyes, nose, or throat, are also categorized as Class C.

As shown in the chart below, the majority (65%, n=1,312) of the 2,024 uses of force that occurred during the Third Monitoring Period did not result in any injury. Serious injuries occurred in the 1% (n=30) that were classified as "Class A" and lesser injuries occurred in the 34% (n=682) that were classified as "Class B." The number and proportion of injuries of various classifications has not varied substantially since the Effective Date. The Department is encouraged to analyze the circumstances in which the most serious injuries, Class A, occur so that trends and practices ripe for improvement can be identified. The relatively small number of Class A injuries make this type of qualitative analysis feasible. During the next Monitoring Period, the Monitoring Team also intends to consult with the Department about the Monitoring Team's findings related to the classification of injuries, as described in more detail in the Use of Force Investigation Section of this Report.

---

[10] These are injuries that require medical attention beyond the prescription of over-the-counter analgesics or the administration of minor First Aid. Examples include incidents resulting in multiple abrasions, contusions, cracked, chipped or lost teeth, lacerations, punctures, fractures, loss of consciousness, or internal injuries.

[11] These are injuries that require only the administration of First Aid or over-the-counter analgesics. Examples include superficial bruising, scrapes, scratches, or minor swelling. Class B incidents can also include minor injuries sustained from the forcible use of mechanical restraints.



That 35% of the use of force incidents resulted in injury is concerning, although the fact that an injury was reported as part of the use of force incident does not necessarily mean that the use of force was inherently excessive or that the injuries were a result of Staff's actions (*e.g.,* an Inmate-on-Inmate fight that triggered the use of force incident could be the cause of the Inmate's injuries).

The graph below shows the number of injuries sustained by Staff and Inmates during use of force incidents since the Effective Date. Historically, more Inmates than Staff were injured during incidents involving Staff force. However, this trend reversed during the current Monitoring Period when, in three of the five months of the Monitoring Period, more Staff than Inmates were injured. Although most of the injuries were not serious (as shown in the chart above), the dotted trend line indicates that the number of Staff injuries have been trending upward since the Effective Date, while the number of Inmate injuries has been trending slightly

19

downward. While one of the key goals of the Consent Judgment is to improve Inmate safety, an equally important goal is to improve the safety of Staff. The Department is encouraged to examine the reasons these disparate trends are occurring.



*Analysis of Use of Force Trends*

The frequency of use of force and resulting injuries are obvious outcome measures associated with safety and the overall goals of the Consent Judgment. However, part of the Monitoring Team's duty is to assist the Department in problem-solving to reduce the use of force. In part, this occurs by a robust analysis of the locations where force is used, characteristics of the Inmates and Staff involved, within-Facility trends and reasons for the use of force. The Department's Use of Force Auditor now produces quarterly reports that examine these covariates.

*Locations of Incidents*

Use of force rates were examined by Facility to identify differences across the various jails managed by the Department. For each Facility, a rate of use of force per 1,000 Inmate days

since the Effective Date is presented in the bar graph below.[12] GMDC and GRVC have the highest UOF rates (.353 and .360, respectively), followed by RNDC (.241), MDC (.224), OBCC (.215), and BKDC (.202).[13] UOF is likely to be impacted by Inmate characteristics (e.g., age, sentenced or pre-trial), facility characteristics (e.g., facility size, leadership, concentration of high classification inmates, special populations, programming), and Staff characteristics (e.g., tenure, skills, overtime burden). The Department is encouraged to examine the underlying causes of high UOF rates and to develop Facility-specific strategies to target the specific nuances in each jail. Use of force rates were examined by Facility to identify differences across the various jails managed by the Department. For each Facility, an average rate of use of force since the Effective Date is presented in the bar graph below.



*Source: DOC*

---

[12] A "rate per 1,000 inmate days" uses the number of events (UOF) as the numerator and the cumulative total of inmates during the period of inquiry (number of inmates each month since the Effective Date) as the denominator. This neutralizes the impact of changing population sizes within and among facilities.
[13] The rate for the West Facility ("WF") should be interpreted with caution due to the very low average daily population (approximately 30 Inmates per month); with such a small denominator, even few uses of force will result in a high rate.

*Inmate and Staff Characteristics*

Overwhelmingly, the rate of use of force is higher among younger Inmates than adults, a fact which comports with the Monitoring Team's experience in other jurisdictions. Even within this broad trend, several differences are notable. First, of all age groups, the use of force rate is highest among the 16- and 17-year-old Inmates (average rate since the Effective Date = 29.2). This may be attributable to Staff's lack of skill in managing Young Inmates, who typically have high energy levels, unevenly paced brain development that results in impulsivity and lack of judgment, and a lack of positive coping skills for dealing with the stress of the correctional environment. These issues are at the heart of the Consent Judgment's requirements for Young Inmates (discussed in the Training, Inmate Discipline, and Safety and Supervision sections of this report). Developmental research has also brought a new awareness to the field that many young adults (aged 18 to 21) may exhibit a similar lack of maturity and solid decision-making skills because their brains are still developing as well. The Department's Young Adult Housing Plan is intended to increase the services available to this population by concentrating this age group at GMDC. The graph below shows that, as suggested by this research, young adults also have a high rate of use of force as compared to adults. Within the group of Inmates age 18 to 21, 18-year-olds have significantly higher rates of use of force than the 19 to 21-year-old Inmates. While all 18-year-old male Inmates are housed at GMDC,[14] some of the 19 to 21-year-old male Inmates have been dispersed to other Facilities in an attempt to maximize the calming effect that older Inmates may provide. Each Facility needs to attend to the contribution of 19 to 21-year-

---

[14] 18-year-old male Inmates may also be placed in special housing units at OBCC (Young Adult ESH), GRVC (Secure), or at AMKC (CAPS or PACE). Beginning in January of 2017, 18-year-old sentenced male Inmates are all housed at GMDC and are no longer housed at EMTC.

olds to their use of force trends and may need age-specific strategies to reduce the level of

Inmate misconduct and to increase Staff's skill in working with Inmates of this age group.



### Rate of Force per 100 Inmates, by Age
*November 2015 - December 2016*

|  | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Adult |  |  |  |  | 2.7 | 2.6 | 2.1 | 2.5 | 2.4 | 2.6 | 2.2 | 2.5 | 2.8 | 2.3 |
| 19-21 yo |  |  |  |  | 8.0 | 6.6 | 8.3 | 10.9 | 11.3 | 9.8 | 8.1 | 10.5 | 11.2 | 11.6 |
| 18 yo | 25.0 | 20.0 | 19.0 | 12.6 | 16.9 | 14.2 | 13.1 | 28.7 | 22.5 | 28.0 | 18.6 | 17.5 | 22.5 | 21.0 |
| 16/17 yo | 27.6 | 31.7 | 27.5 | 22.9 | 16.5 | 20.3 | 29.3 | 32.5 | 33.3 | 30.6 | 45.6 | 31.9 | 31.2 | 27.4 |

*Note: During the First Monitoring Period (November 2015-February 2016), the Department produced these data for 16- and 17-year-olds, 18- year-olds, and included 19- to 21- year-olds with the adults. These data were broken out into the 19- to 21-year-old category starting with the Second Monitoring Period.*

Many things are changing for the 18-year-old Inmates at GMDC: they are no longer

placed in Punitive Segregation and several alternative programs for violent misconduct are now

in place; they have a number of new programs to reduce idle time; and they now participate in a

group incentive program (the "Levels"), all of which are discussed in detail in the Safety and

Supervision of Inmates Under the Age of 19 section of this report. Over time, the Monitoring

Team expects that these things will reduce Inmate misconduct and the consequent use of force. While many of these tools are available for the 16- to 17-year-old Inmate population as well, the development of some of them lags behind (*e.g.*, the group incentive program has not yet been implemented at RNDC; Direct Supervision training has not yet begun), also discussed in subsequent sections of this report. Furthermore, a review of quarterly use of force data with Inmates involved in five or more uses of force in each quarter confirmed that incidents involving a UOF are concentrated among a relatively small number of Inmates. In 2016, just 97 inmates accounted for 846 uses of force, which is 18% of the total 4,652 uses of force. These data suggest that Department's UOF reduction efforts should include strategies to address chronic behavior problems among Inmates who are involved in disproportionate numbers of uses of force.

The Department's UOF reduction efforts will also benefit from examining Staff characteristics to identify subgroups of Staff who should be prioritized for training or for more intensive skill-building efforts. Characteristics could include probationary status, tenure, shift, and overtime, among others. If Staff in these groups are involved in disproportionate numbers of uses of force, specific training or coaching to address key gaps in knowledge or to enhance techniques could be deployed. This is the same strategy used in the Department's efforts to develop an Early Warning System, with the fruits of that analysis used in a proactive, rather than reactive, fashion.

*Reasons for the Use of Force*

Understanding the reason that Staff use physical force with an Inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. As an initial matter, physical force by Staff in a correctional setting is at times necessary to maintain order,

keep Staff and Inmates safe, and to enforce the law. Accordingly, the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and Inmates from serious harm. For example, if two Inmates are fighting, Staff must intervene, often physically, to prevent either Inmate from sustaining a serious injury. When an Inmate is engaged in active physical resistance to a lawful order, some level of force may be necessary.

However, not all uses of force are necessary. As shown in the various examples above, force may be unnecessary, excessive, or even malicious. The Department and Monitoring Team do not yet have enough data to make a determination on the frequency of excessive or unnecessary uses of force because much of the misconduct that occurred after the Effective Date is still under investigation. Data on the prevalence of excessive and unnecessary uses of force will flow from the analysis of closed investigations in subsequent Monitoring Periods. However, initial data to better understand and better focus subsequent inquiries is presented below. The Department tracks the reason reported by Staff for the use of force, using nine different categories. The Department's current data system allows for only one reason to be associated with each incident, so the administrator entering the incident into the Incident Reporting System ("IRS") must identify the predominant reason for the use of force based on the initial report of the incident. Frequently, Staff cite more than one reason for using force (*e.g.,* an Inmate fight may also involve a refusal of a direct order and resisting application of a restraint) and the following data do not account for the secondary reasons. As a result, these data may underestimate the actual frequency with which a given reason was reported by Staff. Accordingly, the Monitoring Team encourages the Department to revise its current tracking

capabilities in order to have the ability to track more than one reason for the use of force incident.

The chart below presents the reasons provided for using force for each month during the past two Monitoring Periods. The figures within each stripe of the bars represent the proportion of uses of force that were attributed to that reason each month (*e.g.*, in March, 35% of the uses of force were attributed to fights). As shown, the most frequent reasons were fights, refusing a direct order, and assaults on Staff. One of the ways to reduce the legitimate use of force is to address the situations that trigger them, by preventing Inmate fights and assaults on Staff. This is the goal of most of the sections of the Consent Judgment that pertain to Young Inmates.



The chart also highlights use of force types that merit further consideration by the Department. For example, the proportion of uses of force in response to self-harming behaviors

(*i.e.*, yellow block within each bar) decreased from an average of 11% per month during the

Second Monitoring period, to an average of 4% per month during the Third Monitoring period.

Whether this decrease occurred because the frequency of self-harming behaviors decreased or

because Staff developed other, non-physical means of addressing these situations is worth

exploring. Conversely, the proportion of uses of force in response to refusing a direct order (*i.e.*,

orange block within each bar) increased from an average of 24% per month during the Second

Monitoring Period to an average of 32% per month during the Third Monitoring Period. Again, it

is still unknown whether these changes occurred because Inmates refused direct orders more

often or because Staff are using force more often in response to this behavior. The Monitoring

Team remains concerned about the use of force in this situation because, typically, a refusal does

not represent the legitimate safety threat that is a threshold requirement for the use of force,

unless there is an immediate security need to gain compliance. The Department is encouraged to

address how to respond to refusals with Staff, by teaching, encouraging and modeling methods

of de-escalation and persuasion that do not require physical intervention. That change, alone,

could result in a significant reduction in the use of force.

The Department provided data on the rate of Inmate-on-Inmate fights during the current

Monitoring Period, presented in the line graph below. This data includes fights that resulted in

the use of force and those that did not (*i.e.*, were disbanded upon verbal command, by peers, or

otherwise did not require Staff intervention). These data clearly illustrate the significantly higher

rates of Inmate-on-Inmate violence among younger Inmates, as compared to their adult

counterparts.



### Rate of Inmate-on-Inmate Fights, by Age

|  | Mar | Apr | May | Jun | Jul | Aug | Sept | Oct | Nov | Dec |
|---|---|---|---|---|---|---|---|---|---|---|
| Adults | 3.2 | 3.2 | 3.5 | 3.25 | 3.4 | 4.2 | 4.2 | 4.3 | 3.9 | 4.4 |
| 19-21 yo | 9.5 | 11.2 | 14.8 | 18 | 18.4 | 14.3 | 13.1 | 14.2 | 11.8 | 14.7 |
| 18 yo | 23.9 | 13.7 | 18.7 | 25.5 | 19.8 | 44.5 | 36.8 | 32 | 25.3 | 27.6 |
| 16/17 yo | 18.7 | 21.4 | 26.2 | 46.5 | 35.4 | 44 | 43.1 | 27 | 32.3 | 33.5 |

These trends are concerning given the risk of harm to both Inmates and Staff that result from interpersonal violence. They highlight the importance of the sections of the Consent Judgment related to the reduction of violence among this population, Consent Judgment § XV (Safety and Supervision of Inmates Under Age 19) and Consent Judgment § XVI (Inmate Discipline). Without an emphasis on the underlying causes of violence among Young Inmates, identifying appropriately targeted interventions, and ensuring quality implementation of those responses, the Department is unlikely to achieve the reforms required by the Consent Decree.

Of particular concern are the increases in the rate of Inmate-on-Inmate fights among the younger Inmates during the current Monitoring Period. Among 16- and 17-year-olds, the rate of fights during the Second Monitoring Period was 29.6, compared to 36.0 during the Third

Monitoring Period. Among 18-year-olds, the rate of fights during the Second Monitoring Period was 20.3, compared to 33.2 during the Third Monitoring Period. While the reforms required by the Consent Judgment are far too new to have resulted in significant decreases in Inmate violence, the rates of violence were not expected to increase. The Department is encouraged to continue to strive to understand the root causes of violence among Young Inmates and whether patterns exist in terms of the location or the Staff present when violence occurs. For example, during this Monitoring Period, the Department became concerned about the number of fights occurring at the RNDC school. Changes were made to the way in which 16- and 17-year-old Inmates are housed (now, according to education track so that they attend school with Inmates they already know). Toward the end of the Monitoring Period, the rate of fights among this population began to decrease, which the Department attributes to the school-based changes.

The Monitoring Team made additional efforts to understand the dimensions of violence among Young Inmates by examining data pulled from the Department's Inmate Fight Tracker database. Certain housing units had a concentration of fights occurring in them, and as discussed above, the school was also a hotspot for Inmate violence. Further, to identify whether a subset of Inmates was responsible for a disproportionate amount of violence, the Monitoring Team identified the number of Inmates who engaged in two or more fights per month during the period October through December 2016. At RNDC, where the 16- and 17-year-old Inmates are housed, 14 Inmates engaged in two or more fights per month, demonstrating a concentrated group of Inmates responsible for a disproportionate amount of violence. At GMDC, only two Inmates met the criteria, demonstrating violence is spread out more evenly across the Inmate population, which suggests that the strategies for preventing Inmate violence may be different at the two Facilities. At RNDC, an effective violence prevention strategy would involve intensive services

(*e.g.*, anger management, conflict resolution skills, mental health services when warranted, etc.) for the subset of Inmates with chronic violent misconduct, while at GMDC, a more global strategy for violence prevention is needed, such as the group incentive program that has just gotten underway (discussed in detail in the analysis of Consent Judgment § XVI (Inmate Discipline), ¶ 3, in this report).

Furthermore, Inmate-on-Inmate fight data is particularly interesting when viewed in the context of the use of force data. The table below identifies the proportion of Inmate fights in which a use of force was utilized. These data are presented by month and by age group:

| Proportion of Fights Involving Use of Force, March to December 2016 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Age Group | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Avg. |
| Adult (22+) | 22% | 16% | 13% | 9% | 17% | 19% | 16% | 23% | 20% | 14% | 17% |
| 19- to 21-year-olds | 28% | 15% | 17% | 36% | 26% | 23% | 22% | 23% | 20% | 20% | 23% |
| 18-year-olds | 57% | 71% | 43% | 71% | 78% | 37% | 29% | 33% | 35% | 26% | 48% |
| 16- & 17-year-olds | 50% | 44% | 38% | 33% | 46% | 36% | 40% | 36% | 38% | 40% | 40% |
| *Source: DOC* | | | | | | | | | | | |

Across all Inmates, Staff utilized force to respond to approximately 19% of all Inmate-on-Inmate fights (98 Uses of Force Reason-Fight/507 fights = .19), meaning that 81% of fights ended without physical intervention by Staff. Some interesting differences emerge when looking at these data by age: Staff were much more likely to respond to fights among adolescent and 18-year-old Inmates using force than fights among adult Inmates (40% of adolescent's fights and 48% of 18-year-olds' fights versus 23% of other young adults' fights and 17% of fights among adult Inmates). While the proportions among other age groups have remained relatively stable, the proportion of fights in which force was used decreased noticeably among the 18-year-olds from the prior Monitoring Period. The Department should assess the extent to which the absence of force is appropriate (*i.e.*, did Inmates break up upon verbal command? Or did Staff fail to

intervene when they should have?) among all age groups. Furthermore, looking for patterns within these two categories (*i.e.*, incidents in which force is used/not used) may reveal something about the nature of the interpersonal conflict that may be useful for prevention efforts.

While these data only explain part of the variation in the use of force rates across adults and younger Inmates, they highlight the impact that effective strategies to reduce Inmate-on-Inmate violence could have on reducing the overall use of force rate with Young Inmates. In general, such strategies would include training Staff to address interpersonal conflict and develop constructive relationships with Young Inmates, significantly reducing the amount of idle time, developing gang management strategies with help from community-based organizations, providing Inmates with chronic violent misconduct with treatment services that are delivered with fidelity, implementing a robust system of incentives and consequences—essentially, implementing the tools required by this Consent Judgment. Reductions in Inmate violence will bring a corresponding reduction in the rate of force.

*Leadership and Management of Facilities that House Young Inmates*

In addition to the improvements that can flow from a genuine commitment to address the issues highlighted in this report and those of the UOF Auditor, the Department can also make gains in the reform effort by appropriately resourcing the Facilities that house the male adolescents and Young Adults—RNDC and GMDC. The current leadership team at GMDC is strong—a group consisting of a well-qualified, reform-minded Warden, Deputies and Assistant Deputies who are open to new ideas for managing Inmates and are setting a new tone in the culture of the Facility. Unfortunately, one of the Deputy Wardens was recently re-assigned, and not replaced. The Monitoring Team is concerned about the loss of a key Supervisory position that is critical to modeling, encouraging and holding Staff accountable for properly utilizing the

new tools they are being given for the safe management of Inmates via training and new Inmate programming. GMDC has struggled to control the level of violence and UOF while simultaneously implementing new programs and incentive systems for inmates and training and on-boarding new staff. Disrupting GMDC's high-functioning and reform-minded administrative team threatens the sustainability of the many gains made, and introduces additional delays into the process of reform as new administrators become acclimated. The Monitoring Team encourages the Department's leadership to ensure that the Facilities have properly resourced administrative teams so that they can properly oversee the enormous task at their feet.

Similarly, the Department made an important statement for RNDC by appointing a DWIC for Adolescent Operations in late 2016 and creating an Adolescent Response Team ("ART"). The DWIC is also a well-qualified, reform-minded leader who has demonstrated a commitment to improving the management of the adolescent Inmate population. As part of her efforts, the DWIC personally selected seven Correction Officers who demonstrated a particular talent for and interest in working with adolescents. Each officer on the team is assigned to a specific building within the Facility to serve as a liaison between the assigned Staff and the DWIC. The ART officers are expected to model best practices in working with adolescents and to encourage Staff's skill development. The ART officers are expected to know every adolescent Inmate housed in their assigned building and to develop an appropriate rapport. Further, each ART officer has additional duties to support the management of adolescents in the Facilities (*e.g.,* movement, management of positives incentives (school snacks, individual incentives, stamp cards), and programming). A key function of the ART officers is to provide de-escalation support; they are frequently called to the housing units to assist Staff in de-escalating tensions among Inmates and, hopefully, to prevent an act of violence or use of force. The Monitoring

Team is encouraged by this innovation and believes the ART will have a key role in reducing violence and the use of force at RNDC.

While both the DWIC position and ART are important innovations for addressing the requirements of the Consent Judgment, they must be appropriately supported and maintained for the long haul. Several of the strategies for addressing Inmate and Staff safety, reducing Inmate violence, and reducing unnecessary and excessive uses of force are in their infancy (*e.g.*, SCHU and TRU programs; tools learned in S.T.A.R.T.) or have not yet been launched (*e.g.*, the group incentive program or "Levels" system; Direct Supervision training; appropriate discipline for Staff misconduct). Proper implementation of these strategies will require the Department to commit to providing personnel, resources and support commensurate with the enormity of the task.

*Next Steps*

As illuminating as these data are, they may not capture what is, perhaps, one of the most important dynamics of Staff use of force—how many use of force incidents could have been avoided altogether if Staff had vigorously committed to strategies to avoid force rather than too quickly defaulting to hands-on force. The thousands of incidents preliminarily reviewed thus far are replete with examples in which Staff could have taken the time to summon Supervisors to assess the need to use force and thereby providing an opportunity to de-escalate the situation. Inherently, the opportunity to consider whether force may be avoided altogether is present in every anticipated use of force situation. In other words, it has been proven time and again in confinement settings that Staff who take **time** to employ non-force options by creating a safe and secure **distance** from the potential aggressor, experience substantially lower rates of Staff use of force. To be sure, when there is an immediate need to use force, Staff must act swiftly and surely

within policy to neutralize the Inmate resistance, but that obligation is no more or less important than the obligation to avoid force when it is objectively reasonable to do so. Historically, given the litigation surrounding Staff application of force, it is not hyperbole to suggest that the Department has a deeply entrenched culture of managing troublesome and/or often potentially dangerous Inmates with an "iron fist." Such a culture impedes development and implementation of alternatives to Staff use of force. To the extent that Staff at all levels of the agency can alter their mindset to include alternatives for force when appropriate is the extent to which a seismic shift in culture can occur, the result of which will be the substantial decrease in frequency of force and harm to Staff and Inmates alike.

The analyses conducted in the Third Monitoring Period reinforced the Monitoring Team's concerns about the safety of the Facilities, given the high rates of use of force, the high rates of violence among Adolescents and Young Adults, and the frequency with which use of force incidents that appear to be unnecessary, excessive and/or malicious continue to occur. During the upcoming Monitoring Period, the Monitoring Team will focus on: (1) working with the Department to identify and address avoidable use of force; (2) assisting the Department to develop targeted trainings to address areas of concern related to use of force; (3) ensuring handheld cameras are capturing incidents as required; (4) engaging in problem-solving efforts to identify barriers to prompt medical attention after a use of force; (5) encouraging the Department to increase efforts to develop the Early Warning System, and (6) assessing the quality of use of force investigations and corresponding Staff discipline. Furthermore, the Monitoring Team will continue its examination of the various alternatives to Punitive Segregation and incentive programs for adolescents and young adults, assessing the quality of implementation, and the effectiveness of the programs in reducing Inmate violence.

The following sections of this report discuss the Department's progress in implementing the reforms required by the Consent Judgment that are intended to reduce the occurrence of problematic uses of force and to decrease the level of interpersonal violence in the Facilities housing Young Inmates. No single mechanism or approach will eliminate these improper practices in a matter of months. Some of these practices have been deeply ingrained in the Department for decades and their reversal will take a significant period of time.

## SECTION BY SECTION ANALYSIS

### 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and Inmate safety. The Department developed a new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, in the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.[15] Therefore, the new policy will go into effect on September 27, 2017, with the disciplinary guidelines to follow on October 27, 2017.

During this Monitoring Period, the Department continued to deploy the Special Tactics and Responsible Techniques ("S.T.A.R.T.") program, a four-day bundled training program on the New Use of Force Directive and the new Defensive Tactics curriculum, as part of its efforts to implement the New Use of Force Directive. The Training Section of this report provides

---

[15] The Monitoring Team is closely monitoring the Department's efforts during this period to ensure that training is delivered to all Staff timely and efficiently, and that it is accurately tracked and managed.

further information about the deployment of this training.

*Use of Chemical Agents*

During the Third Monitoring Period, chemical agents continued to be the most-utilized type of force, including being used in approximately half of all Class A incidents. Though frequently used properly, chemical agents are vulnerable to operator error and misuse. During the Third Monitoring Period the Department and the Monitor have focused in depth on both of these issues. Operator error can be caused by a number of factors, including a misunderstanding of how to use the chemical agent, an empty canister, or a malfunctioning canister. Anecdotally, the Department reports that most instances where a Staff Member attempts to deploy chemical agent but is unable to do so are caused by user error rather than by an empty or malfunctioning canister. Following a reported malfunction, the subject canister is collected and tested by members of the Emergency Services Unit ("ESU"). In the past, the Department reports that the majority of these tests have demonstrated that the canister was capable of functioning properly, which leads to the conclusion that user error was to blame. The Department's misuse of chemical agents can generally be divided into four categories: (1) chemical agents deployed on a passively resisting Inmate, deployed as retaliation, or deployed precipitously or prematurely in situations where the use of force should have been an anticipated event; (2) excessive quantity of chemical agent deployed; (3) chemical agents deployed when Staff was too close to the Inmate; and (4) chemical agent was administered in copious amounts from a canister designed primarily as a crowd-control contaminate (MK-9 canister) rather than from a canister designed for a smaller area (MK-4 canister).

The Monitoring Team worked with the Department to identify strategies to decrease the number of problematic use of force incidents involving chemical agents during this Monitoring

Period. The Department developed a multi-faceted approach to addressing these issues, including revising the Chemical Agents Directive to provide additional guidance and clarity to Staff (further discussion of the policy is included in ¶ 3(p) below), instituting a pilot at MDC to address malfunctioning chemical spray canisters, holding focus groups with Staff who had recently been re-trained in the use of chemical agents to gauge effectiveness, and developing short roll-call trainings incorporating video from actual use of force incidents.

The Monitoring Team also observed the Department's chemical agent training that is provided to recruits and pre-promotional classes during this Monitoring Period. The Monitoring Team found the training provides appropriate and adequate foundational training for Staff on the use of chemical agents. The training was comprehensive, competency- and scenario-based, and provided Staff clear guidance about the use of chemical agents, including detailed guidance on the authorized use of various canister sizes. Notwithstanding the positive findings about the chemical agent training, more targeted work with Staff is necessary to address the aforementioned areas of concerns, specifically the use of unnecessary and/or excessive amounts of chemical agents, the use of inappropriately-sized canisters, the retaliatory use of chemical agents by DOC Staff, and the lack of supervision, accountability and enforcement for such inappropriate actions. Accordingly, the Monitoring Team intends to work closely with the Department on the development, and corresponding roll-out, of the short roll-call trainings to provide Staff additional guidance on the appropriate use of chemical agents.

As noted in the Second Monitor's Report (at pg. 31), the Department and Monitoring Team also discussed adopting a method to track the amount of chemical agent spray used in a

given incident.[16]  Facilities do not weigh canisters before distributing them to Staff so the Facilities are unable to tell when a canister is empty or how much chemical agent was deployed during a use of force incident. In the Monitoring Team's experience, implementing a weighing system requires significant resources and operationally is very burdensome. Given these challenges, the Monitoring Team and the Department prioritized the initiatives described above. The Department also developed a pilot to reduce the possibility that empty canisters are accidentally distributed to Staff.

During this Monitoring Period, the Department developed a pilot program at Manhattan Detention Center ("MDC"), wherein MK-4 canisters were given serial numbers and assigned to a specific Staff member, who is personally responsible for his or her canister. The Staff Member stores the canister is his or her locker when not on duty. Following a use of force incident involving chemical agent deployment, the canister is taken out of service and collected by ESU, and the Staff Member is assigned a brand-new MK-4 canister. The MDC pilot commenced on December 12, 2016 and it is therefore too early to determine what, if any, effect the individual canister assignments have on the number of reported malfunctions due to empty canisters. The Monitoring Team will assess the pilot in the next Monitoring Period and those observations, and any recommendations, will be included in the next Monitor's Report. The Monitoring Team will closely monitor the outcome of these initiatives to determine whether the Department should give greater consideration to implementing a weighing system.

*Use of Taser*

On August 29, 2016, the Department issued a Directive on the use of Taser X2

---

[16] Each new MK-4 canister utilized by the Department contains, on average, 4.4 ounces of chemical agent; this is the equivalent of seven two-second bursts. The actual weight varies depending on environmental factors.

Conducted Electrical Devices Directive ("Taser Directive") following approval by the Monitor. The Taser X2 Conducted Electrical Devices ("Taser Devices" or "Taser") are only authorized for use by trained and certified ESU Supervisors as a less lethal force alternative and as an additional option for the use of force as outlined in the Department's New Use of Force Directive. The Directive gives Staff clear guidance on when the use of a Taser is authorized, and how the use of the Taser is governed by the current Use of Force Directive (further discussion of the policy is included in ¶ 3(p) below). As described in the Second Monitor's Report, the Monitoring Team also observed the two-day training on the use of the Taser and found the quality of the training to be excellent and that it provided ESU Supervisors with the information and skills necessary to safely and appropriately deploy the Taser devices.

During the Third Monitoring Period, ESU Captains displayed the Taser in two incidents, and in both cases, the Staff Member was able to gain compliance from Inmates with a history of violence without actually deploying the Taser. The Department promptly notified the Monitoring Team of both Taser displays, and provided all required reports and videos.

Following the first Taser display, the Monitoring Team met with the ADW from ESU and the Captain who displayed the Taser to discuss the incident. After the second Taser display, the Monitoring Team shared written feedback with suggestions on how to further strengthen the documentation process to adequately capture the circumstances surrounding the incident. The Monitoring Team intends to routinely meet with ESU Staff to discuss best practices to further strengthen Staff's use and mastery of the Taser. The Monitoring Team will also observe the refresher Taser training class.

The Monitoring Team's assessment of compliance is outlined below.

| IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive was finalized and approved by the Monitor.

- The Department issued new, stand-alone policies for the use of restraints and Tasers.

**ANALYSIS OF COMPLIANCE**

The final version of the New Use of Force Directive, as approved by the Monitor, was completed in October 2015. The specific content of the New Use of Force Directive was discussed in First Monitor's Report.

As noted above (and in the first two Monitor's Report), adopting and implementing the New Use of Force Directive will take time. During the current Monitoring Period, the Department took key steps including finalizing key training program curricula and deploying the training programs. Adopting and implementing the New Use of Force Directive also requires ongoing reinforcement of key concepts related to using force to ensure Staff conduct is consistent with the requirements of the Consent Judgment.

| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance<br>¶ 1. **(Adopt)** Partial Compliance<br>¶ 1. **(Implement)** Partial Compliance<br>¶ 1. **(Monitor Approval)** Substantial Compliance |
|---|---|

| IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS) |
|---|

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive was finalized and approved by the Monitor.

- The Department issued new policies for the use of restraints and Tasers that were approved by the Monitor.

- The Department continued to revise its current directive on the use of chemical agents.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized and capable of being readily understood by Staff. It addresses the requirements in Consent Judgment § IV (Use of Force Policy) ¶

3(a) to (t), Consent Judgment § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, Consent Judgment § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and Consent Judgment § IX (Video Surveillance) ¶¶ 2(d)(i) and 4. Accordingly, it is consistent with the requirements of the Consent Judgment and is also aligned with best practice. This policy will provide Staff the necessary guidance and parameters to carry out their duties safely and responsibly.

**¶ 3(p)**

While all of the requirements in ¶ 3 are appropriately addressed in the New Use of Force Directive, the Monitoring Team has also worked with the Department to develop three stand-alone policies related to the use of restraints, chemical agents, and Tasers.

*Restraint Policy*

The Department issued a stand-alone policy regarding the application of restraints on August 17, 2016. The Monitoring Team and the Department collaborated on the development of the policy to ensure the policy satisfies the Consent Judgment's requirements, appropriately addresses state law requirements, and provides Staff with clear and adequate guidance on the use of restraints. Following implementation, the Monitoring Team and the Department determined that additional policy guidance regarding the procedures related to the use of restraint desks is necessary. The Monitoring Team and the Department intend to work together to revise the policy during the next Monitoring Period.

*Chemical Agents Policy*

The Department and the Monitoring Team continued to work on revisions to the Chemical Agents Directive during this Monitoring Period to ensure the policy is clear and provides adequate guidance to Staff on when and how much OC spray is appropriate in a given situation.[17]  These revisions include: clarification that deployment of chemical agents is only appropriate in cases where an Inmate refuses a direct order when there is an immediate enforcement need to comply; more detailed guidance on the authorized use of various canister sizes; and guidance about when Staff are required to check with medical personnel for contraindications before deploying chemical agents. The revisions to the policy also include clarifications to address the Department's concerns that the language of the existing policy ("Current Chemical Agents Directive") suggested to Staff that they could utilize chemical agents whenever an Inmate refused to follow an order, regardless of the circumstance and without following the anticipated use of force protocol. The lack of clarity in the language of the Current Chemical Agents Directive made it difficult for ID to substantiate investigations, and for Trials to successfully seek and impose discipline. Similarly, the Current Chemical Agents Directive did not explicitly state that MK-9 is to be utilized for crowd control situations while the MK-4 is meant for individuals. The Department reported that focus groups with Staff confirmed that additional guidance in the policy was necessary. The revised Chemical Agents

---

[17] Deployment of OC spray is limited to three, two second bursts.

Directive clarifies both of these points. The Monitoring Team expects the policy will be finalized and issued during the Fourth Monitoring Period.

*Taser X2 Conducted Electrical Device Policy*

The Department issued the Taser Directive on August 29, 2016, following approval by the Monitor. The use of the Taser is currently limited to Captains assigned to the ESU. The Department worked collaboratively with the Monitoring Team during the Second Monitoring Period to develop the policy and those efforts, including observations from the corresponding training and lesson plan, were described in the Second Monitor's Report (at pg. 31). The Monitor is notified by the Department following every display and/or application of the Taser and the Monitoring Team and the Department routinely discuss best practices related to the Taser.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-o).** Substantial Compliance<br>**¶ 3(p).** Partial Compliance<br>**¶ 3(q-t).** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In consultation with the Monitoring Team, the Department issued a teletype on May 31, 2016, advising Staff about the effective date of the New Use of Force Directive and Disciplinary Guidelines.

- The Department developed a messaging campaign to inform Staff about S.T.A.R.T., and also issued a teletype.

- The Department created large posters about S.T.A.R.T., which are displayed in every Facility and on the Department's intranet page and television screens.

**ANALYSIS OF COMPLIANCE**

The Department has appropriately and thoughtfully advised Staff about the implementation of the New Use of Force Directive. The messaging campaign for the training program is creative, constructive, and conveys a positive and productive message. In order to successfully implement the New Use of Force Directive, the Department must continue to frequently and clearly communicate with Staff about the New Directive in order to address any questions or concerns, dispel any misunderstandings, and reinforce best practices. The Monitoring Team will work with the Department during the next Monitoring Period on the continued messaging campaign necessary to advise Staff of

the upcoming effective date for the New Use of Force Directive on September 27, 2017.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## 2.  USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

The Use of Force Reporting and Tracking section of the Consent Judgment addresses reporting and tracking information related to use of force incidents. This section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[18]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 & 23). Within the analysis of Staff Member Use of Force Reporting, the issue of availability of Staff Use of Force Reports ("Staff Reports"), and use of force allegations are addressed. This section also addresses the Monitoring Team's efforts to assess allegations related to the manipulation of violence statistics.

*Staff Member Use of Force Reporting*

During this Monitoring Period, the Monitoring Team analyzed compliance with the Staff reporting obligations required by the Consent Judgment (¶¶ 1-8) and related policies (¶ 9) by reviewing use of force reports generated by Staff following a use of force. The Monitoring Team sampled Staff Reports from two sources: Preliminary Review files[19] and Closed Investigation files.

The Monitoring Team assessed the Staff Reports from 115 closed investigation files which were also selected to assess the quality of Full ID Investigations. The majority of the files reviewed were selected randomly within a stratified sample of Class A, B, and C use of force

---

[18] A discussion about the Department's efforts to develop CMS (¶ 18) is addressed in the Risk Management section of this Report.

[19] As noted below, the Preliminary Review investigation files did not always provide a complete set of Staff Reports. Accordingly, the Monitoring Team relied on closed ID investigation files for a systematic review of the Staff reporting obligations.

43

incidents that took place between November 1, 2015 and September 30, 2016. The Monitoring Team also reviewed additional closed investigations: some conducted by the *Youth ID Team*, a sample of closed investigations of *allegations* of use of force made between November 1, 2015 and September 30, 2016, all investigations closed with charges between November 1, 2015 and September 30, 2016, and specific investigations selected by the Monitor because an assessment of the Preliminary Review of the incident revealed objective evidence of wrong-doing. These files included 470 Staff Reports (approximately 160 of which were Staff use of force Allegation Reports), and 381 Staff Witness Reports. Although many of the incidents occurred after the Effective Date, but prior to this Monitoring Period, all of the investigations were subsequently closed at the end of the Second Monitoring Period or during this current Monitoring Period.[20]

-   ***Availability of Staff Use of Force Reports***

Three provisions in this Section (¶¶ 2, 4 and 8) address a Staff Member's obligation to timely prepare and submit Staff Reports, and requires the Department to discipline or re-train Staff who fail to meet these obligations. Staff are responsible for completing Staff Reports and Use of Force Witness Reports on prescribed forms that Staff mostly complete by hand.[21] As detailed initially in the Second Monitor's Report, the Monitoring Team noted that the ID investigator conducting the Preliminary Review ("Preliminary Reviewers") often did not have all or some of the Staff Reports when conducting the Preliminary Review. As the Monitoring Team learned, this occurred because the Staff Reports were not consistently available in the Tour Commander's Office when the Preliminary Reviewer went to collect the reports—because the Staff Member failed to turn the report in on time, because the report was turned into the Tour

---

[20] Staff reporting obligations have remained the same since the Effective Date.
[21] Occasionally, Staff type their reports, but most Staff do not have access to a computer during the ordinary course of business.

Commander's Officer and later collected by the Facility Investigating Captain (responsible for collecting and analyzing the reports for Facility Investigations) before the Preliminary Reviewer was able to make a copy of the reports, or for some other unknown reason. Despite Preliminary Reviewers having five days to conduct Preliminary Reviews during the Third Monitoring Period, the Preliminary Reviewers still report that missing documentation is a significant issue (analyzed in more detail in the Use of Force Investigations section of this report). The Monitoring Team's review of Preliminary Review packages had similar findings.

The Monitoring Team raised this concern with the Department, noting that it was difficult to determine whether the underlying problem was that Staff Reports were *not being timely completed* or because the completed reports were *not getting to the Preliminary Reviewer* systematically. Curiously, the Monitoring Team identified several instances where the Staff Reports were not available to the Preliminary Reviewer at the time of the Preliminary Review, but were subsequently included in the full investigative file, and the Staff Reports were dated the same day as the incident. In some cases, this occurs when Staff Reports are not stored in the same place in the Tour Commander's Office and the Preliminary Reviewer missed the Staff Report when collecting the Facility documentation of the incident. However, the Monitoring Team also suspects that, occasionally, Staff Reports were backdated to the date of the incident instead of the date the report was completed. Whether the Staff's intention was to make it appear that reports were timely or whether the backdating was for some other reason is unknown. The Monitoring Team encouraged the Department to advise Staff that reports must be dated according to the date on which they were written.

The Department developed new processes to increase the accuracy of date and time reporting and to ensure the reports are available to Preliminary Reviewers. First, Staff Reports

will now be date- and time-stamped upon collection in the Control Room of each Facility. This process will be implemented in the Fourth Monitoring Period, after the Department receives the time-stamp machines. The Department has already prepared communication to Staff, approved by the Monitoring Team, which will effectuate this requirement. Second, the Department developed two checklists to verify the inclusion of all required documentation in Preliminary Review and Full ID investigations. ID will apply the first checklist to every Preliminary Review, tracking whether Staff Reports and other essential documents were available to the Preliminary Reviewer. The Bureau Chief of Operations will be notified of any missing documents and will issue command discipline as appropriate. The Legal Division will apply the second checklist to investigation packages requested by the Monitor (*i.e.*, Facility and Full ID) to track missing reports, documents, videos, or other media, and will notify ID or the Bureau Chief of Operations. ID or the Bureau Chief of Operations will obtain the missing documents and will recommend and/or impose discipline where appropriate.

The Monitoring Team is encouraged by the Department's swift action to address the problem of missing Staff Reports and anticipates the new procedures will be effective. Increased availability of Staff Reports will increase the quality of the Preliminary Reviews and, ultimately, use of force investigations.

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims by any individual that Staff used force against an Inmate and the force was not previously reported (either because an incident report was not generated or the report generated did not document any force against the Inmate concerned). An alleged use of force does not always mean that force was actually used; that is determined through the investigations process. This is also why data on alleged uses of

force were not included in the analysis in the Use of Force introduction to this report, above. The line graph below presents the number of alleged uses of force reported since the inception of the Consent Judgment (November 2015) through the end of the Third Monitoring Period (December 2016). As shown below, the number of allegations spiked in May and June 2016, before returning to the historical average in July 2016. The Monitoring Team is exploring the potential causes for this spike, which is not yet known.



Tracking and investigating alleged uses of force is critical to reducing the frequency with which actual uses of force go unreported. Policy states that Staff who fail to submit an incident report regarding force they used or witnessed are subject to disciplinary measures. To that end, during this Monitoring Period, the Monitoring Team reviewed investigations of allegations from two perspectives. First, the Monitoring Team reviewed Preliminary Reviews of all use of force allegations from August through December 2016 to assess the type and level of detail provided

in the allegations. Second, the Monitoring Team reviewed the completed Full ID investigations

of a portion of allegations made between November 1, 2015 and September 30, 2016 that were

closed by November 2016.

-   *Preliminary Review Assessment of Use of Force Allegations*

The Monitoring Team reviewed 151 Preliminary Reviews allegations from August 2016,

to December 2016.[22] Key factors that were analyzed included whether the allegation included a

specific time and date the incident allegedly occurred, whether the Inmate had consistent injuries

based on an available Injury-to-Inmate Report (although origin of injuries is not yet determined),

and whether the Preliminary Reviewer found video evidence of the allegation.

| | August 2016 | September 2016 | October 2016 | November 2016 | December 2016 | Total |
|---|---|---|---|---|---|---|
| **Total Allegations in Month** | 39 | 20 | 30 | 25 | 37 | 151 |
| **Allegation had specific date** | 38 (97%) | 19 (95%) | 30 (100%) | 24 (96%) | 32 (86%) | 143 (95%) |
| **Allegation had specific time** | 27 (69%) | 11 (55%) | 19 (63%) | 12 (48%) | 18 (49%) | 87 (58%) |
| **Inmate Had Injuries Consistent with Allegation[23]** | 8 (21%) | 4 (20%) | 12 (40%) | 4 (16%) | 10 (27%) | 38 (25%) |
| **Preliminary Reviewers Description of Video Evidence of Incident corroborates Inmate Allegation** | 2 (5%) | 1 (5%) | 1 (3%) | 2 (8%) | 3 (8%) | 9 (6%) |
| **Preliminary Reviewers Description of Video Evidence of Incident supports some of the Inmate Allegation[24]** | 6 (15%) | 2 (10%) | 7 (23%) | 10 (40%) | 19 (51%) | 44 (29%) |

---

[22] The Preliminary Review entries in each month are based on when the Preliminary Review of the allegation took place and was entered into ITTS, not when the allegation was made or the alleged incident took place, so these numbers may not match the allegation data above exactly.
[23] Not all alleged incidents involve injuries, so this figure is not to suggest that all other allegations had injuries inconsistent with their allegations, only that some allegations can be further bolstered by corroborating injury evidence.
[24] This is not intended to capture incidents where video evidence may discredit the allegation in its entirety.

The focus of this assessment was to identify allegations where there is objective evidence that may be able to substantiate the report (or not). Of course, the most concerning allegations are those where video evidence either supports the Inmate allegations, or captures at least some of the incident as described in the Inmate's allegations (and the video evidence did not otherwise discredit the Inmate's allegation). Most of the allegations (95%) identified a specific date on which the incident allegedly occurred. Over half (58%) of the allegations included a specific time. Fewer of the allegations had corroborating evidence identified by the Preliminary Reviewer such as consistent injuries (25%); video evidence supporting the allegation (9%); or video evidence capturing some of the incident as described in the Inmates allegation (*e.g.*, video captures the Inmate and alleged involved Staff at the time and place of the allegation, but may not depict the alleged incident itself because the alleged use of force took place off camera) (29%)[25]. The Monitoring Team will continue to follow these allegations as the investigations are completed, ensuring that reasonable determinations are made as to whether an allegation is founded, and appropriate discipline is sought when the allegation is verified.

- ***Closed Full ID Investigations of Allegations of Use of Force***

The Monitoring Team reviewed the closed Full ID investigations of a portion of allegations that were made between November 1, 2015 and September 30, 2016. In assessing the outcome of these investigations, the Monitoring Team found that 26 of the 29 incidents (90%) did not raise concerns that the investigation was biased, inadequate or incomplete. Investigations of allegations by their very nature are difficult to substantiate because of the frequent lack of objective evidence, and often the outcome rested on whether to credit the Inmate's statements or

---

[25] Not all alleged incidents would necessarily have been captured on video, so this is not to suggest that those not partially captured or entirely captured on video were *discredited* by video evidence, as no video evidence may have existed.

Staff statements (either made in Use of Force Allegation reports or during an interview with ID).
Accordingly, Inmate and Staff statements are very important to these investigations. The
Monitoring Team found that investigators conducted Staff interviews related to allegations in 18
of 29 cases (62%) reviewed, and that investigators were more likely to conduct Staff Interviews
in investigations of allegations of use of force compared with investigations of reported use of
force. The Monitoring Team's findings related to closed Full ID Investigations, including the
review of closed Full ID Investigations into Use of Force Allegations, is described in more detail
in the Use of Force Investigations section of this report.

_Non-DOC Staff Use of Force Reporting_

During the Third Monitoring Period, the Monitoring Team communicated with
representatives from New York City Health + Hospitals ("H+H") (the healthcare provider for
Inmates in DOC custody) to discuss implementing and tracking the requirements for Non-DOC
Staff Use of Force Reporting (¶¶ 10-13).

The Consent Judgment imposes specific requirements on H+H employees (along with all
other Non-DOC employees): those who witness a use of force incident that results in an apparent
injury must report the incident directly to the Tour Commander or a Supervisor  (¶ 10); those
who have reason to suspect that an Inmate has sustained injuries due to a use of force, where the
injury was not identified to the medical staff as being the result of a use of force, must report
their suspicions to the Tour Commander, ID, the Integrity Control Officer, the Warden of the
Facility, or a Supervisor (¶ 11); those who have reason to suspect that a use of force incident was
improperly classified must advise a Supervisor (¶ 12); and those who suspect an imminent threat
to an Inmate's safety or well-being must immediately refer the matter to a Supervisor, who shall
review the emergency matter with the Tour Commander as quickly as possible (¶ 13).

H+H continues to provide training that addresses the reporting requirements in the Consent Judgment to all H+H staff. Currently, there is no reporting template for H+H employees to report a use of force outside of the medical template used by health staff to record injury encounters. While the Monitoring Team has confirmed that H+H staff are trained to report suspected unreported or improperly classified uses of force to their Supervisors, the Monitoring Team will work with H+H in the Fourth Monitoring Period to develop a template for suspected use of force reports, and a process for ensuring that the Department and the Monitoring Team will have access to such reports.

*Tracking Use of Force*

During the current Monitoring Period, the Monitoring Team analyzed the Department's efforts to track information as required in ¶¶ 14, 15, 16, 17, 19 and 21[26], and assessed compliance as discussed in the boxes for each provision below. Once reported, a unique number is assigned to every reported and alleged use of force incident by the Central Operations Desk ("COD"). A short summary of the incident is also generated by COD and referred to as a "COD Report," which is entered into the Incident Review System ("IRS"). Every day, a "24-hour Report" is generated that includes all incidents reported to COD and is disseminated to appropriate Department staff via email.

- ***Allegations of Manipulating Violence Statistics***

During this Monitoring Period, the Monitoring Team became aware of allegations that the Department may be altering certain violence statistics, including use of force statistics, by reclassifying incidents initially reported as use of force incidents to log-book entries.[27]

---

[26] The Monitoring Team will assess compliance with ¶¶ 18 and 20 following the implementation of CMS.

[27] *See* Brown, Stephen Rex, and Blau, Reuven. "Rikers Island correction bosses routinely 'purge' unfavorable violence stats to create illusion of reform, review shows," 28 August 2016. New York Daily News.

Approximately 13 incidents were identified in connection with these allegations, eight of which were use of force incidents, and a sub-set of those eight were identified as having changed in the reporting system subsequent to the incident's initial report.

The fact that an initial report is subsequently changed does not, on its face, suggest manipulation, since changes to initial reports are anticipated once further information is obtained. The Monitoring Team reviewed each of the identified incidents and found that the Department's determination that some of those incidents were not actually uses of force to be reasonable.

That said, as a result of the allegations, the Monitoring Team developed a series of processes to monitor the Department's reporting mechanisms and to identify any modification to the use of force classification after the initial reporting of an incident. If any modifications are made, the Monitoring Team closely reviews the incident to assess whether the modification was reasonable.

This monitoring process begins with the assignment of use of force numbers. The Monitoring Team receives, on a bi-weekly basis, all COD Reports for use of force incidents that occurred in the preceding two-week period. Because use of force numbers are assigned sequentially, the Monitoring Team first ensures that all sequential numbers are present on the bi-weekly COD reports. If the numbers are out of sequence, the Monitoring Team seeks an explanation for the gap from the Department. The Monitoring Team has identified at least two reasons for a gap in use of force incident numbers: typographical errors (*i.e.*, a number is skipped by a mistake or the same incident is entered twice) or the initial classification of the incident as a use of force, with a subsequent modification to a log-book entry. When the latter situation occurs, the number originally assigned to the incident is taken out of rotation. The Monitoring

---

<http://www.nydailynews.com/new-york/exclusive-rikers-island-bosses-cover-violence-stats-article-1.2768232>

Team reviews the documentation for all such incidents to ensure the Department's decision to reclassify the incident was appropriate. The Monitoring Team identified five cases where this occurred during the Monitoring Period. Two were typographical errors, and three were reclassified as log-book entries. Two of the reclassifications were assessed by the Monitoring Team to be reasonable, and the third reclassification was subsequently reclassified as a use of force.

Second, the Monitoring Team compares the monthly use of force statistics the Department reports to the total number of monthly use of force incidents included in the bi-weekly COD reports to ensure they match, or identify if any changes were made after the initial report to the Monitor. The monthly numbers are again checked against the Department's use of force statistics provided to the Monitor and the Parties as required at the end of the Monitoring Period. As a result of this analysis, the Monitoring Team identified two cases where the classification was modified after submission of the monthly use of force statistics. The Monitoring Team reviewed both incidents and found the reclassification of the incidents to be reasonable.

Finally, the Monitoring Team also cross-checks this information to ensure all reported or alleged use of force incidents receive a Preliminary Review as required, discussed in more detail in the Use of Force Investigations section of this report.

_Prompt Medical Attention Following Use of Force Incident_

The Department must provide prompt medical attention following a use of force incident (¶¶ 22 and 23) and must track its delivery. During the current Monitoring Period, the Monitoring Team reviewed Injury-to-Inmate Reports (including all the reports included in closed investigation files as part of the closed investigation review described above), scrutinized the

Department's tracking database, conducted numerous onsite inspections of intake pens and clinics throughout the jails, and spoke with Staff, Inmates, and H+H employees regarding these issues. Through these reviews, observations, and discussions, the Monitoring Team identified concerns related to the time Inmates were spending in intake prior to receiving medical attention. As outlined further below, the Department is implementing strategies to address these concerns, the assessment of which will be a priority in the Fourth Monitoring Period.

The Monitoring Team's assessment of compliance is outlined below.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UoF)

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's current Use of Force Directive, and New Use of Force Directive, require Staff to immediately notify his/her Supervisor when a use of force incident occurs.
- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, which supervisor was notified after the incident, and at what time they were notified.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assesses this requirement from two perspectives. The first is to determine if Staff affirmatively report whether and which Supervisor they notified before or after involvement in a use of force incident for reported use of force incidents. The Monitoring Team reviewed the portions of Staff Reports where Staff are required to identify the supervisor notified and the time notification took place. The Monitoring Team analyzed 309 Staff Reports and found that this section of Staff Reports was not properly or consistently utilized by Staff, and was blank 16.5% of the time (51 Staff Reports). The Monitoring Team suspects Staff may be leaving this portion of the form blank in cases where the Staff Member did not personally make the notification, or if a Captain or another Supervisor was already on the scene at the time the incident occurred. The Monitoring Team will continue to assess the accuracy of the information recorded, and explore the reasons why Staff may not be indicating which Supervisor was notified on their reports.

The Monitoring Team also assesses the frequency and legitimacy of allegations made by Inmates (discussed in more detail in the Introduction to this section of the report above). The Monitoring Team examines Inmate allegations made through various channels including those made to Department representative, and those reported through outside agencies like the Legal Aid Society. If

substantiated, these incidents are cases of unreported use of force. The Monitoring Team has identified instances where video and other objective evidence demonstrate that Staff failed to report a use of force incident, but the Monitoring Team must continue to conduct additional assessment of allegations in order to determine the rate at which use of force may be unreported. The Monitoring Team will continue to focus on this in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 4 & 8 (DUTY TO PREPARE AND SUBMIT TIMELY UoF REPORTS)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's current Use of Force Directive, and the New Use of Force Directive, require Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ or witness, or are alleged to have employed or witnessed force (¶ 2).

- The Department's current Use of Force Directive, and the New Use of Force Directive, address the timing of when Staff Reports must be submitted (¶ 4). All requirements in ¶ 4 are addressed in current policy and procedures except the requirement for Staff to obtain the Tour Commander's permission to leave the Facility without first preparing and submitting his or her Use of Force Report. The Department's New Directive explicitly incorporates all the requirements of the Consent Judgment.

- The Department's Current Disciplinary Guidelines, and the New Use of Force Directive, address the requirement that any Staff Member who fails to notify a Supervisor, or failed to prepare and submit a complete and accurate Use of Force Report, shall be subject to discipline or other corrective action (¶ 8).

### ANALYSIS OF COMPLIANCE

¶¶ 2, 4, and 8 are addressed together because, in combination, they require Staff to submit timely Staff Reports, and require the Department to take appropriate corrective action when Staff fail to do so.

*Timely Submission of Use of Force Reports & Failure to Report Uses of Force* (¶¶ 2 and 4)

As noted above, the Monitoring Team has concerns about the accuracy of the dates on certain Staff reports and expects the Department's new strategies to address these concerns. In the meantime, the Monitoring Team compared the date the Staff Reports were written to the date of the actual use of force for the 309 Staff Reports reviewed. In nearly all instances (94.4%), the date recorded on the Report was the same day of the actual use of force. 15 of the 309 (4.8%) reports did not have the same day of the actual or alleged use of force: in five of the 15 Staff Reports the date written was either missing or incomplete (the month and year was noted, but not the day); in eight of the 15 the Staff Reports were dated the day after the incident; and in two of the 15 Staff Report, the date on the Staff Report was days after the incident. It is curious to the Monitoring Team that the vast majority of Staff Reports have the date of the incident as one would expect greater variance in report dates (*e.g.*, a Staff Member forgets to complete a report, a Staff Member cannot submit a report because they fall ill, etc.) especially since Staff Reports are frequently unavailable to the Preliminary Reviewer close in time to the incident.

The Monitoring Team found too many instances where Staff may not have promptly reported using force, failed to complete use of force reports, or completed use of force reports which omitted key facts. In at least some cases, it appears Staff were given the opportunity to prepare reports after-the-fact, or add addendums to their initial reports. For example, the Monitor reviewed the documentation for an incident that occurred in August 2016 that was initially unreported, but later discovered after a review of Genetec video. A more detailed review of this matter revealed that Staff were likely allowed to file backdated Staff Reports after the incident was discovered on Genetec. During the course of the Monitor's December 2016 meeting with the Commissioner and his executive staff, the Monitor explicitly advised that backdating or altering reports after the fact must cease immediately. The Monitoring Team also met with representatives from a key prosecutor's office to learn about the prosecution of egregious failure to report cases. The Monitoring Team will be scrutinizing this matter moving forward.

*Discipline or Other Corrective Action for Failure to Report Uses of Force* (¶ 8)

The Monitoring Team focused its initial assessment of this provision on the Department's efforts to impose formal discipline for Staff who failed to report use of force:

| Type of Discipline (or Informal Correction) | Total Investigations Closed Since Effective Date of Consent Judgment with Pending Disciplinary Charges | Total Investigations Closed Since Effective Date of Consent Judgment with Pending Disciplinary Charges Related to Failure to Report |
|---|---|---|
| Formal Charges | 92 | 11 (12%) |

The data above demonstrates that, in at least some cases, investigations are identifying potential failure to report cases and referring those cases for Discipline. The Monitoring Team intends to look more closely at alternative methods the Department may take to address the failure to report or inaccurate reporting of use of force incidents. The Monitoring Team also encourages the Department to consider how they can address these cases more quickly, perhaps though Immediate Action, to address cases where it is clear a Staff Member failed to report an incident at all.

| COMPLIANCE RATING | ¶ 2. Partial Compliance ¶ 4. Partial Compliance ¶ 8. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 3 (REQUIRED ELEMENTS OF STAFF REPORTS)

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include the following, to the extent the information is known by the reporting Staff Member:

    a.    The date, time, and location of the Use of Force Incident.

    b.    The date and time the Use of Force Report was completed.

    c.    A list of all Staff Members who used force.

    d.    A list of all persons on whom force was used.

    e.    A list of all persons, including Non-DOC Staff Members, who were present when the Use of Force Incident occurred.

    f.    A detailed description of the Use of Force Incident, the events preceding the Use of Force Incident including any attempts to de-escalate the situation and avoid the Use of Force, and the reasons for engaging in the Use of Force. All reports must include a detailed description of the physical resistance exhibited by the Inmate; the type and level of force used by the Staff Member writing the report and by all other Staff who used force; whether any Staff used instruments or weapons, and if so, a description of the circumstances that led to their use; and a description of the nature and extent of any visible or apparent injuries sustained by Inmates, Staff, or others.

    g.    As to reports prepared by the Captain and the Staff Member(s) responsible for escorting the Inmate to the clinic, the approximate time the Inmate was transported to receive medical care, and the name of the clinician or medical professional who provided care.

    h.    To the extent applicable, the name of any Staff Member who authorized and/or supervised the Use of Force Incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements listed as ¶ 3(a)-(h) above.

- The Department's current Use of Force Directive requires Staff to report all elements in ¶ 3(a)-3(f), 3(h) above, but does not require "the Captain and the Staff Member(s) responsible for escorting the Inmate to the clinic following a use of force incident to include in their reports the approximate time the Inmate was transported to receive medical care and the name of the clinician or medical professional who provided care," as required by ¶ 3(g).

  o While the time the Inmate is seen by medical staff and the clinician's name can be found on the Injury-to-Inmate form #167R-A, the approximate time of escort is not included on that form and is not currently required to be included in the Captain or Staff's report.

- The Department's current Use of Force Policy also does not require that Staff record the time the Staff Report was written (as required by ¶ 3(b)), but the new date and time-stamp procedure described in detail above will satisfy this requirement.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team closely scrutinized the extent to which Staff are properly utilizing the fields on the Staff Report forms. The Monitoring Team found certain areas of Staff Reports were not consistently filled out, including:

- The Supervisor notification field (as discussed in the analysis of ¶ 1 above).
- The list of Staff involved in an incident. Staff often only provided the names of three other Staff involved in the incident, because this area of the forms only has three spots. The Department must ensure that Staff are directed to use additional space if more than three Staff are involved.
- The list of other Inmates who witnessed the incident.
- The check boxes requiring an affirmative response (*i.e.*, "Did you use force or were you a witness?"; "Were alternatives, such as verbal commands, attempted before force was used?"; and "Did you claim any injuries as a result of the incident?").
- The signature line for Staff to sign their Staff Reports.

The Monitoring Team will continue to review Staff Reports and Witness Reports to determine the extent to which they conform to the requirements of the Consent Judgment, and work with the Department in areas where, through training or other means, proper Staff reporting techniques can be reinforced.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 5, 6 & 7 (INDEPENDENT STAFF REPORTS)

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive covers the requirements in ¶¶ 5, 6 and 7 above.

- The Department issued a Memorandum Dated November 20, 2008 from the Bureau Chief of Facility Operations Office stating that Staff may not review video prior to completing their Use of Force Reports (¶ 5).

- The Department's current Use of Force Directive requires that Staff prepare their reports "based on their own observations and written independently from other Staff that were involved or were alleged to have been involved in the incident," but does not explicitly require that Staff be separated from each other while they prepare their Use of Force Reports (¶ 6).

- No current Department policy addresses the requirement in ¶ 7 above, but collusion is an issue that ID investigator's address when reviewing evidence as part of the Preliminary Review or Full ID investigation of an incident.

### ANALYSIS OF COMPLIANCE

The Monitoring Team reviewed hundreds of Staff Reports and Use of Force Witness Reports in conjunction with the review of closed ID investigation and Preliminary Review files, and reviewed the investigation closing reports (and all other documents in the closed files) to determine what, if any, reporting issues were noted by the ID investigator.

Staff Reports reviewed as part of the Preliminary Review or closed ID investigation assessment, suggest that, in at least some cases, Staff may be conferring with one another when completing reports about the use of force incident. In those cases, the Monitoring Team found that Staff Reports for the same incident lacked specificity in similar areas, and/or utilized the same peculiar or vague phrasing to describe the use of force employed. This concerning practice has plagued the Department and appears ingrained in Staff practice. The Department must work diligently to change this practice and hold Staff accountable for failure to accurately and independently report their own recollection of the use of force

incident. The Monitoring Team has found that the Preliminary Reviewers are often identifying these potential issues in the Preliminary Review of the incident. However, the Monitoring Team found that these patterns were not often identified or addressed by the investigator in the Closed ID Investigation file. For example, in one incident, an Officer was disciplined for failing to report a closed fist head strike which was later confirmed on video, but other Correction Officers involved were not disciplined for writing in their Staff Reports that the Officer had used an "open-hand" strike.

The findings of the Preliminary Reviewer's assessment, which are more contemporaneous to the Monitoring Period, gives the Monitoring Team confidence that ID will continue to make improvements in identifying and addressing collusion in closing reports moving forward.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
| | ¶ 6. Partial Compliance |
| | ¶ 7. Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23, and current policies address these requirements as outlined throughout this section of the report in each box.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-8, 22 and 23. As outlined throughout this section, while the Department's New Use of Force Directive addresses such requirements, the Department's current policies address some, but not all, of the requirements in Consent Judgment § V ¶¶ 1-8, 22 and 23. The "implement" component of this provision will be assessed for each individual provision listed above once the policy has been signed into effect.

| COMPLIANCE RATING | ¶ 9. (Develop) Substantial Compliance |
| | ¶ 9. (Adopt) Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

| | |
|---|---|
| a. | Use of Force Incident identification number. |
| b. | Classification level of the Use of Force Incident, including any changes made to the classification level (*i.e.*, Class A, Class B, or Class C). |
| c. | Date, time, and location of the Use of Force Incident. |
| d. | Facility that houses each Inmate upon whom force was used or alleged to have been used. |
| e. | Names and identification numbers of all Inmates upon whom force was used or alleged to have been used. |
| f. | Names and identification numbers of all Inmates who were present in the area of the Use of Force Incident. |
| g. | Names and shield numbers of all Staff Members who used, or are alleged to have used, force. |
| h. | Whether the Use of Force Incident was an Anticipated Use of Force. |
| i. | Nature of any injuries sustained by Inmates, Staff Members, or anyone else. |
| j. | A brief description of the type of force (*e.g.*, chemical agent, single punch to body, control holds, punches to face or head, multiple blows, kicks, use of batons or other instruments, etc.) that was used and by whom. |
| k. | Whether force was used while the Inmate was in restraints. |
| l. | Whether video footage captured the Use of Force Incident and a brief description of the camera used (*e.g.*, fixed surveillance, handheld, or body-worn). |
| m. | Whether any Inmate was arrested as a result of the Use of Force Incident, and if so, a description of the new criminal charges. |
| n. | A brief description of the Staff Member's stated reasons for engaging in the Use of Force. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to use of force incidents in a computerized system called IRS.

  o IRS captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields.

  o The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified the Department continues to track information electronically as initially described in the First Monitor's Report. During the Third Monitoring Period, the Monitoring Team confirmed that the majority of incident data is tracked accurately and reliably. However, the information tracking could be improved in the same two areas identified in the last report: the location of incidents and list of Staff involved. Additionally, the Monitoring Team found the description of the force used is much more specific in the investigation files than the IRS entries, which is to be expected.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 14(a)-(n).** Substantial Compliance |

**V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)**

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the

Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As reported in the First Monitor's Report, the Department developed an interim database, utilizing Microsoft Access, to track information related to Facility-level investigations.

  - The database had specific fields to track the information enumerated in ¶ 15(a)-(g).

- The Department worked with the Monitoring Team to develop alternative processes to track this information going forward.

**ANALYSIS OF COMPLIANCE**

The database the Department uses to track information related to Facility-level investigations is an interim measure until the Case Management System ("CMS") is developed. As described in the Second Monitor's Report (at pgs. 39-40), the Department continued to experience some technical challenges with this interim system.

Despite its limitations, the Department continued to enter relevant data into the interim database and was able to generate a report that identified the status of Facility-level investigations. The Monitoring Team identified some potential discrepancies in this report and shared them with the Department. During the Third Monitoring Period, the Department and Monitoring Team worked together to identify the source of these discrepancies to ensure that the Monitoring Team receives data from this interim system to support the overall monitoring effort. With the approval of the Monitoring Team, the Department modified the method by which Facility Investigations are tracked, which went into effect in February 2017.

| **COMPLIANCE RATING** | **¶ 15.** Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As discussed in the First Monitor's Report, the Department tracks information related to Full ID Investigations using a computerized tracking system called "ITTS."

  - ITTS has specific fields to capture the information required in ¶ 16(a)-(g)

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to utilize reports generated from ITTS throughout the Monitoring Period to conduct various analyses and assessments. During the First Monitoring Period, the Monitoring Team assessed the components of ITTS, and determined it had clearly and appropriately labeled fields designed to capture the information required by the Consent Judgment. Full ID investigations are "opened" in ITTS by members of ID's tracking unit, sometimes leading to a delay in entering the data into the system. During the Second Monitoring Period, the Monitoring Team reviewed reports generated from ITTS, and confirmed such information was appropriately tracked and available upon request by comparing the ITTS data for the incident with the underlying use of force documentation for a sample of incidents.

Previously, while the information was accurately tracked on an individual basis, the system was not producing reliable and accurate aggregate reports of Full ID investigations. During the current Monitoring Period, the Monitoring Team and the Department worked together to identify the most reliable type and source for the monthly reports the Monitoring Team requires. Monthly, the Department provides the Monitoring Team with two reports from ID: (1) a list of all Full ID investigations opened by ID in the prior six months; and (2) a list of all Full ID investigations closed by ID in the prior six months. The six-month period of time is intended to capture data entry delays, as well as any investigations which begin as Facility-level investigations but were subsequently upgraded to Full ID investigations or were re-opened as Full ID investigations. The monthly reports include the use of force number, date of incident, injury class of incident, the Facility date opened by ID, the date closed by ID, and whether the investigations resulted in UOF-related charges (*i.e.*, charges associated with a violation of the Use of Force Directive) or non-UOF-related charges (*i.e.*, any other violation of Department Directives, Operations Orders, or Rules and Regulations).

The Department will achieve Substantial Compliance with this provision when it is able to demonstrate that this information can be generated accurately and consistently over a period of time.

| COMPLIANCE RATING | ¶ 16. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to each use of force incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in a computerized tracking system called ITTS.[28] Key data elements include:

  o ITTS has a specific field for the use of force incident number.

  o ITTS has a field for "charges brought."

  o ITTS tracks the disposition of any disciplinary hearing.

- The Trials & Litigation Division created an interim report for the Monitoring Team of cases pending before Trials that includes the use of force number, the Trials case number, the incident date, the name, title and shield number of the respondent, the Facility, a brief description of the case (*i.e.* what the disciplinary issue is), the date charges were served, the disposition, the date of any Negotiated Plea Agreement ("NPA"), and the case status (open or closed). This Report was also provided to the Parties at the end of the Monitoring Period pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 4(c)(ii).

- The Department reports that the required fields will be included in CMS.

ANALYSIS OF COMPLIANCE

As described in the Second Monitor's Report, the Trials side of ITTS has a number of limitations with regard to the data that is collected. Accordingly, the Monitoring Team worked with the Department to develop an interim reporting strategy, since any changes to the current systems would become obsolete with the implementation of CMS. The data derived from this report is discussed in the Staff Discipline and Accountability section of the Monitor's Report. The Department is required to maintain this information in CMS and the Department is working on developing the system to track this information. The Monitoring Team will reassess the compliance rating once CMS is implemented.

| COMPLIANCE RATING | ¶17. Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

---

[28] ID and Trials both use ITTS to track information. Each Department has access to one component of that system. The components are partitioned off from each other except certain basic case identifying information (*e.g.*, use of force number) can be shared across partitions.

- The Department tracks information related to Inmate-on-Inmate fights in the Inmate "Fight Tracker," a computerized system. The Fight Tracker includes the following fields of information:

  o names of the Inmates involved;

  o identification numbers of the Inmates involved;

  o date, time, and location of the Inmate-on-Inmate fight or assault; and

  o nature of any injuries sustained by Inmates.

- This information is captured for *all* fights and assaults, including those that do not involve a use of force.

**ANALYSIS OF COMPLIANCE**

As stated in the Second Monitor's Report (at pgs. 42-43), the Monitoring Team confirmed that the Department's Fight Tracker includes the information listed above by reviewing screen shots and reports generated from the system, but the Fight Tracker does not include *all* the required information. This provision also requires the Department to track a brief description of the Inmate-on-Inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. These three fields are not included in the Fight Tracker database. The Monitoring Team recommended that the Department evaluate how this information can be tracked consistently and reliably, and during this Monitoring Period, the Department has been working to determine whether the feedback can be incorporated. The Department reported that incorporating these additional elements in the tracking system may require a significant change in policy and operational practice. Given the complexity of modifying tracking systems, the Department reports it is still considering how best to capture this data and will consult with the Monitoring Team on the feasibility and plan in the Fourth Monitoring Period.

| **COMPLIANCE RATING** | **¶ 19.** Partial Compliance |
|---|---|

---

**V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)**

¶ 21. Within 90[29] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[29] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- As reported in the First Monitor's Report, the Department drafted definitions for the various categories of institutional violence, including all security indicators related to violence, focusing on clarity and the ability to collect and report reliable and accurate data.
  - As required, the Department consulted with the Monitoring Team about the draft definitions, incorporating the Monitoring Team's comments and suggestions prior to finalizing the definitions.

**ANALYSIS OF COMPLIANCE**

The Department maintains appropriate definitions for the categories of institutional violence. Accordingly, the Department remains in Substantial Compliance. In future Monitoring Periods, the Monitoring Team will assess the Department's use of these categories to analyze data.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
|---|---|

---

**V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 (PROMPT MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)**

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports its policy is that Inmates with immediate medical needs should be treated immediately. The Department also reported the principle that generally all Inmates with non-serious injuries should be seen by medical staff within four hours of an incident.

- The Department is working with H+H to determine ways to provide medical treatment more quickly, including two pilot programs described in detail below.

**ANALYSIS OF COMPLIANCE**

Ensuring the Department meets its obligation to provide prompt medical attention is a top priority for the Monitoring Team. As noted in the Second Monitor's Report (at pgs. 36-37), the Monitoring Team has found that too often Inmates are waiting too long to receive medical treatment. The Monitoring Team continues to closely review the time to provide medical treatment to Inmates both through on-site observation and in the medical documentation in the use of force investigation packets received, and this concern persists.

As part of the Monitoring Team's assessment of this provision, the Monitoring Team systematically reviewed the Injury-to-Inmate Reports in conjunction with the assessment of both Preliminary Reviews of incidents in this Monitoring Period and closed ID Investigation files. The Monitoring Team reviewed 74 Injury-to-Inmate Reports pulled from closed Full ID investigation files,

and 47 from Preliminary Review files for actual incidents (this excluded Injury-to-Inmate reports from investigation files that were either of allegations, or that had Injury-to-Inmate reports with illegible or missing treatment times) and made the following findings.

| Source of Injury-to-Inmate Report | Treatment Provided in 2 Hours or Less | Treatment Provided between 2 & 4 Hours | Treatment Provided between 4 & 6 Hours | Treatment provided over 6 hours after Incident |
|---|---|---|---|---|
| *Closed Investigation Files Reviewed* | 35 of 74 (47%) | 19 of 74 (26%) | 13 of 74 (18%) | 7 of 74 (9%) |
| *Preliminary Review Files Reviewed* | 16 of 47 (34%) | 16 of 47 (34%) | 6 of 47 (13%) | 9 of 47 (19%) |

Overall, the amount of time to provide medical treatment is too long. Of most significant concern are the 16 Inmates that received medical treatment over six hours after the incident, five Inmates waited over 10 hours before being treated by medical, and five waited over eight hours. The Department must provide medical care much faster overall in order to meet the provisions of the Consent Judgment.

The Monitoring Team met with the Department and representatives from H+H during the Third Monitoring Period to discuss the cause of such delays and brainstorm ways to address the delay as described in more detail below. In response to that discussion, the Department developed two Pilot Programs to be implemented in the Fourth Monitoring Period. The Monitoring Team anticipates that the pilot programs will assist the Department and H+H in developing appropriate strategies to ensure prompt medical care is provided.

*Medical Triage Pilot Program*

The first pilot program at GRVC will involve the creation of a medical triage following an incident where Inmates do not appear to require the infrastructure of the clinic because they have no visible injuries or minor injuries (*i.e.*, mild scrapes or bruises, OC exposure, etc.). Medical staff will be contacted by Correctional Health Services ("CHS"), a term used for H+H in the jails, to report to the designated triage location, at which time, the Inmates will be escorted to the triage location. This triage will not be used for any Inmate who requires immediate medical assistance. If an Inmate requires immediate medical assistance, that Inmate will be escorted to the clinic. Logbooks and Injury-to-Inmate Reports will be kept in the triage area to track the time of an incident, time medical staff were called to respond to the triage location, time of arrival to triage location by medical staff, the time the Inmate was seen by medical staff, and any other additional information about treatment (*i.e.*, refused medical treatment, brought to clinic for further evaluation, etc.). The Department has identified a

housing unit in GRVC as the likely triage pilot location. Certain physical modifications need to be approved by the State Commission of Correction and then completed before this pilot can be rolled out. The Department anticipates commencement of the triage pilot will occur during the Fourth Monitoring Period.

*Intake Improvement Pilot Program*

In addition to the triage pilot, the Department expects to roll out a program in the next Monitoring Period that seeks to identify Inmates with injuries who are waiting in intake and notify health staff accordingly. Leveraging (with some modifications) the wristband pilot at RNDC,[30] the Department expects to be able to carefully track wait-time in Intake with this new process. While logistics remain to be decided, at other Facilities, the Tour Commander will likely be responsible for contacting CHS operations when an Inmate with injuries is awaiting medical attention in intake. CHS Operations would then track the wait-time of the Inmate and be able to notify Health Affairs if an Inmate is not seen within four hours.

The Monitoring Team looks forward to assessing the impact these pilots have on the medical needs of Inmates involved, and determining the viability of expanding such pilots going forward.

| **COMPLIANCE RATING** | **¶ 22.** Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 23 (TRACKING OF MEDICAL TREATMENT)

¶ 23. DOC shall record in the Department's Inmate Information System the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Currently, the Department's Inmate Information System ("IIS"), tracks all elements required by ¶ 23, except which Staff Members were in the area to receive post-incident evaluation or treatment.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed screen shots provided by the Department demonstrating that IIS tracks when Inmates arrive at the clinic, the time they were produced to a clinician, and the time treatment was completed. The Monitoring Team has not yet evaluated a sample of reports to verify the accuracy of this information. Accordingly, a compliance rating will not be assessed.

---

[30] This is a computerized tracking pilot where Inmates scan a wristband every time they enter and exit a location. When arriving in Intake, the Staff can then identify in the system that the Inmate needs medical attention.

3.  TRAINING (CONSENT JUDGMENT § XIII)

The provisions in the Training Section of the Consent Judgment are the pillars that support the reform effort, as the new and revised training curricula are often Staff's initial exposure to the changes in practice and reforms prescribed by *Nunez*. The Consent Judgment required the Department to develop new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)). As outlined in the chart below, the new lesson plans required by the Consent Judgment have all been finalized and approved by the Monitoring Team except for Direct Supervision, which the Department and the Monitoring Team continued to refine during the Monitoring Period. The Monitoring Team also worked with the Department to finalize the lesson plan for Defensive Tactics for Senior Management, a specialized, truncated version of the Defensive Tactics training designed for Deputy Wardens and Wardens.

During the Third Monitoring, the Department deployed the first significant delivery of the required trainings to Staff. The Monitoring Team also observed and provided feedback and recommendations about the delivery of those trainings to further enhance the curricula being offered. The Monitoring Team observed the following trainings this Monitoring Period: S.T.A.R.T and Cell Extraction Team training provided in Pre-Promotional Training, In-Service

Safe Crisis Management training ("SCM"), Facility Emergency Response training (formerly known as Probe Team training) provided to recruits, and portions of the ID Investigator training. The Monitoring Team also observed, and provided feedback, for three training programs not required by the Consent Judgment but that address skills central to the proper use of force: Taser training and Chemical Agents training (as described in the Use of Force Policy section of this report), and "C-Sog" Training (a Special Operations training provided to members of the Department's ESU Staff).

_Training Deployment_

The Department is engaged in an unprecedented effort to train a large number of Staff as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff (_e.g.,_ PREA, Chemical Agents, etc.) and training an unprecedented number of recruits.[31] Under the Consent Judgment, the Department is required to provide eight (8) full days of training[32] to all Staff (approximately 8,000 Staff Members). An additional seven (7) full days of training are required for Staff regularly assigned to Young Inmate Housing areas (approximately 2,000 Staff Members).[33]  Further, at least two (2) full days of training are required for Staff assigned to work in specific positions (intake and Special Housing Units with cell housing). Many of the reforms required under the Consent Judgment also require training in order to be successfully implemented, even if the training is not explicitly enumerated as a requirement in the Consent Judgment. For instance, in order to implement the new CMS, the Department must

---

[31] Since November 1, 2015, approximately 2,000 recruits have been trained and graduated. In December 2016, the Department matriculated another 900 officers.

[32] This includes the one full day of Use of Force Policy initial training, three days of Defensive Tactics initial training, three days of Conflict Resolution and Crisis Intervention training and a half day of Use of Force Policy refresher training and a half day of Defensive Tactics refresher training (which will be provided in a bundle with the Conflict Resolution and Crisis Intervention training). The first four days of this training is provided as S.T.A.R.T. The second four days of this training will be provided after all Staff have received S.T.A.R.T.

[33] This includes three days of Young Inmate Management Training and four days of Direct Supervision Training.

train all Staff (uniform and civilian) on how to use the new system. It is currently expected that there will be at least 1,600 users (including at least 1,000 uniform Staff) and that the CMS training will last one (1) full day.

The deadlines in the Consent Judgment contemplated that all training, except Crisis Intervention and Conflict Resolution, would be developed and deployed within the first year of the Consent Judgment. While this deadline reflected the collective goal to deploy training as quickly as possible, the deadlines were not realistic. Significant resources are required to sustain this training effort, including operational logistics to plan and assign Staff to the training while, simultaneously, operating the jails. Scheduling the training requires a team of organized individuals at the Training Academy who work with each of the Facilities to schedule and monitor attendance. Further, the Department needs adequate space and trained instructors to deploy the training. Finally, and most critically, the Facilities require support to back-fill for Staff who are pulled to receive the training (most Staff must be replaced in the Facility while they are at training), which must be balanced with the need to manage the overtime burden already at issue in the Department.

The Department has necessarily prioritized providing S.T.A.R.T. to all In-Service Staff, and SCM Training to all those who work in RNDC or GMDC (going beyond the requirements in the Consent Judgment, which only requires SCM to be provided to those who are regularly assigned to Young Inmate Housing Areas). Given these significant burdens, the Department has not yet deployed the following three trainings to *In-Service Staff* within the deadlines prescribed in the Consent Judgment (the training has been incorporated into the mandatory Pre-Service training): Facility Emergency Response Training (¶ 1(c)) to Staff regularly assigned to Intake, Cell Extraction Training (¶ 2(b)) to Staff regularly assigned to Special Unit Housing with Cell

housing, and Direct Supervision Training (¶ 4) to Staff regularly assigned to Young Inmate

Housing. The Department advised the Parties and the Monitor that the deadlines could not be

met. The Parties, with the Monitor, have initiated discussions in good faith to agree upon a

reasonable extension of time as required by Consent Judgment § XXI (Compliance, Termination,

& Construction), ¶ 6. The Monitor anticipates an agreement will be reached among the Parties

and the Monitoring Team, at which time the new timeline will be submitted to the Court for

approval.

### *Use of Additional Training Space at John Jay College of Criminal Justice ("John Jay")*

The Department continues to struggle to find space to provide training, and continues to

seek alternatives to meet the extensive training needs of Recruit and In-Service Training. During

this Monitoring Period, the Department secured additional training space at John Jay which can

accommodate over half of the current recruit class. The Monitoring Team toured the space and

found it to include approximately 20 adequately-sized classrooms, an area for gymnasium-style

instruction, a large lecture room that can accommodate 118 students, sufficient break-out space,

and offices for Training Academy Staff, as well as space for the Applicant Investigations Unit

("AIU") to conduct certain background screenings. The current recruit class is divided into two

groups, which split their mandatory Pre-Service Training time between the John Jay campus and

the Metropolitan Avenue Training Academy. The Monitoring Team is encouraged that the

Department continues to develop interim solutions to accommodate its training needs.

### *S.T.A.R.T. Progress*

The Department began to provide Staff with the S.T.A.R.T. bundle of training—one full

day of Use of Force Policy Training on the New Directive, and three full days of revamped

Defensive Tactics Training, for a combined 4-day bundle— at the end of the Second Monitoring

Period with the goal to provide S.T.A.R.T. to all Staff by September 2017. The Monitoring Team closely monitors the Department's efforts to deploy the training and the Department remains on track to meet its goal.

The Department generally tries to deploy S.T.A.R.T. to an average of 90 Staff every four days. The Training Academy is focused on providing the training to Staff in a group of three Facilities, the first such group being MDC, OBCC, and GMDC, from which nearly all Staff have been trained as of the end of this Monitoring Period. The next group of Facilities targeted for this training is RMSC, EMTC, and GRVC. On a daily basis, the Academy works with representatives from the core group of targeted Facilities to determine how many Staff can be called out for a given four-day block. Sometimes, targeted Facilities are able to provide more than 90 Staff in a given four-day block (depending on overtime, vacation, etc.), and when that is the case, the Training Academy is able to accommodate the additional students by pulling in additional instructors, even if overtime is required for the instructors. If the group of targeted Facilities is unable to provide 90 Staff to fill a four-day block, the Academy calls out Staff from other Facilities, attempting to ensure that at least 90 Staff are called out for each four-day block.

The Department's calculations for training deployment include a built-in assumption that certain training classes will not be filled to capacity (*e.g.,* due to Staff calling in sick, personal emergencies, or official business (attending court dates)). The Training Academy maintains a real-time tracking system for S.T.A.R.T attendance which utilizes barcode scanners to track attendance. The Academy is then able to determine if those called out for a training did not attend and follows up as appropriate. If Staff do not attend training and do not have a valid excuse, they are considered AWOL and the Academy will advise the Facility to deliver a Command Discipline to that Staff Member, which the Training Academy monitors.

The Department trained 2,417 Staff members in S.T.A.R.T. in this Monitoring Period. The Department faced some attendance challenges in November 2016 due to the Thanksgiving Holiday and vacation days that were pre-awarded to Staff. However, the Department made up for the deficiencies by exceeding the call-out quota in December 2016. If the Department is able to train on average **532** Staff per month in the nine months between January 2017 and September 2017, they will have all In-Service Staff trained in S.T.A.R.T. by September 27, 2017, when the New Directive becomes effective. Based on the attendance to date, this average appears attainable, and the Monitoring Team will continue to monitor the progress of S.T.A.R.T.

| Date of Deployment | Staff Trained |
|---|---|
| **June Pilot** | 82 |
| **July 18th- 31st 2016** | 154 |
| **August, September, October 2016** | 1,244<br>(Avg. 414/month) |
| **November 2016** | 444 |
| **December 2016** | 729 |

_Status of Training Program Development and Deployment_

The chart below describes the status of each training program required by the Consent Judgment. The number of Staff who received the training during the Monitoring Period is addressed in the individual boxes for each training, below, as part of the compliance assessment.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized & training began July 2016 as part of S.T.A.R.T. | To commence at the conclusion of S.T.A.R.T. |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized Training provided in Pre-Promotional Training for Captains and ADWs; In-Service training to commence at the conclusion of S.T.A.R.T.. | To commence no earlier than completion of initial In-Service Crisis Intervention and Conflict Resolution Training |
| **Defensive Tactics (¶ 2(a))** | | Curriculum finalized & training provided in mandatory Pre-Service training | Curriculum finalized & training began July 2016 as part of S.T.A.R.T. | To commence at the conclusion of S.T.A.R.T. |
| **Young Inmate Management ("SCM") (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | Training provided in mandatory Pre-Service training [34] | To be provided on as needed basis for any Staff assigned steady posts in Young Inmate Housing Areas. | Curriculum finalized, rollout to commence in Fourth Monitoring Period. |
| **Direct Supervision (¶4)** | | Curriculum still in development & draft version of training provided to Recruits[35] | Curriculum was finalized in the Fourth Monitoring Period. In-Service training to commence at the conclusion of SCM Training. | To commence no earlier than completion of initial In-Service Training |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | Staff assigned to work regularly at any Intake Post | Lesson Plan Finalized & training provided in mandatory Pre-Service training | Curriculum finalized. Training provided in Pre-Promotional Training for Captains and ADWs. | n/a |
| **Cell Extraction (¶ 2(b))** | Staff regularly assigned to Special Units with cell housing | Lesson Plan Finalized & training provided in mandatory Pre-Service training | Curriculum Finalized, Training provided in Pre-Promotional Training for Captains and ADWs. | n/a |
| **Investigator (¶ 2(c))** | ID Investigators | n/a | Curriculum Finalized & provided on an as needed basis as new investigators join ID | n/a |

---

[34] The Consent Judgment does not require the development of an In-Service SCM training program because it was already in place prior to the Effective Date of the Consent Judgment. Although not required by the Consent Judgment, the Department has included SCM training in its mandatory Pre-Service training.

[35] Although not required by the Consent Judgment, the Department plans to provide all recruits with Direct Supervision Training.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| | Facility Investigators | n/a | TBD[36] | n/a |

In the next Monitoring Period, the Monitoring Team intends to evaluate the deployment of re-training for Staff who have violated Department policies, procedures, rules, or directives relating to the use of force (as required by Consent Judgment § XIII, ¶ 5).

*C-Sog Programming*

As part of the Department's overall reform efforts, in 2015, the Department retained U.S. Corrections Special Operations Group ("C-Sog") as consultants to provide ESU Staff with exposure to various new techniques and options for operational management. In the summer of 2016, C-Sog provided a program to ESU Staff that included an overview of a number of topics such as Kinetic Precision Delivery Systems, Inmate Surrender Ritual, Use of Impact Tools, and Dealing with Mentally Ill Inmates.

During this Monitoring Period, allegations were made that this program may be providing Staff with information that is inconsistent with, and possibly in contravention of, the requirements of the Consent Judgment.[37]  The Monitoring Team met with the lead trainer from C-Sog twice, spoke with Staff who attended the program, observed multiple days of the program, and reviewed the materials presented and shared with Staff. The Monitoring Team did not find any evidence that the C-Sog program promoted the use of prohibited use of force techniques or was inconsistent with the goals and aims of the Consent Judgment or sound correctional practice.

---

[36] *See* "Investigator Training" box below for explanation of plan for providing Facility Investigator Training to all Captains as required.
[37] *See* Calder, Rich and Gonen, Yoav. "Rikers trains guards in prohibited eye gouges, elbow strikes," New York Post. 27 August 2016. <http://nypost.com/2016/08/22/rikers-trains-guards-in-prohibited-eye-gouges-elbow-strikes/>

The Department does not currently have any additional scheduled programming with C-Sog. If the Department decides to present additional C-Sog programming or adopt any of the techniques introduced by the C-Sog program, the Department has confirmed that it will consult with the Monitoring Team prior to implementation.

The Monitoring Team's assessment of compliance is outlined below.

| **XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)** |
| --- |

¶1. Within 120 days[38] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

> a. <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.
>
>> i. The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.
>>
>>> 1. Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.
>>>
>>> 2. Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.
>>
>> ii. The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**: The Use of Force Policy **Recruit** lesson plan, Use of Force Policy **In-Service** lesson plan, and Use of Force Policy for **Supervisors** lesson plan have all been developed, approved by the Monitoring Team, and are being delivered to Staff.

- **Deployment of Training**:
  - Academy
    - The Use of Force Policy Recruit lesson plan is incorporated in the mandatory Pre-Service training.
      - The 711 recruits who graduated in the November 2016 class received the training.

---

[38] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

> > > ▪ 21 ADWs received the Use of Force Policy training for Supervisors as part of the Pre-Promotional Training program offered this Monitoring Period.
> >
> > o S.T.A.R.T.
> >
> > > ▪ All In-Service Staff will receive S.T.A.R.T., which includes the Use of Force Policy In-Service training.
> > >
> > > ▪ As stated above, 2,417 Staff received S.T.A.R.T. during this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*Observation*

During this Monitoring Period, the Monitoring Team observed the Use of Force Policy for Supervisors training provided to a class of ADW's in Pre-Promotional training. As described in the Second Monitor's Report (at pgs. 51-52), although not required by the Consent Judgment, the Department developed a standalone training for Supervisors to address the roles and responsibilities of Captains and ADWs related to the use of force. During the observation, the instructors were professional, thorough, and unwavering in their clarity of the requirements of the New Use of Force Directive. The instructors answered all questions posed by Staff appropriately and provided explicit reference to the details of the New Use of Force Directive. The Monitoring Team found the class of Pre-Promotional ADW's took the class seriously and appeared to be dedicated to following the New Use of Force Directive. Following the observation, the Monitoring Team provided recommendations to further improve the delivery of the training, including, among others, that more scenarios, real-incident videos, and role-plays be utilized in place of reading portions of the directive to the class.

*Verification of Attendance and Examination Scores*

The Monitoring Team focused on the verification of S.T.A.R.T. attendance and training records during this Monitoring Period as discussed below in the analysis of compliance for ¶¶ 6 and 7.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance<br>¶ **1(a)(i).** Substantial Compliance<br>¶ **1(a)(i)(1) & (2).** Partial Compliance<br>¶ **1(a)(ii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶ 1. Within 120 days[39] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

---

[39] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

b.  <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

   i.  The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

   ii.  The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

   iii.  The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department developed, and the Monitoring Team approved, the Crisis Intervention and Conflict Resolution training curriculum during the First Monitoring Period, as discussed in the First Monitor's Report.

- All recruits who graduated in November 2016 and the ADW's in the Pre-Promotional Training program received the 24-Hour Crisis Intervention and Conflict Resolution training.

- The Department will deploy Crisis Intervention and Conflict Resolution training to all In-Service Staff once the initial S.T.A.R.T. In-Service training is completed.

  o  Training for all Staff will be bundled to include three days of Crisis Intervention and Conflict Resolution training and two half-days of Use of Force Policy and Defensive Tactics Refresher training. The deployment of this training bundle is expected to take the same length of time it will take to deploy S.T.A.R.T.

- **Deployment of Training**:

  o  The 711 recruits who graduated in November 2016 received the 24-Hour Crisis Intervention and Conflict Resolution Training at the Academy.

  o  21 ADWs received the 24-Hour Crisis Intervention and Conflict Resolution training as part of the Pre-Promotional Training program offered this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The rollout plan for the Crisis Intervention and Conflict Resolution Training described above will also allow the Department to provide the training in the most efficient and effective manner possible. The Monitoring Team will prioritize the observation of the Crisis Intervention and Conflict Resolution training for recruits in the Fourth Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance |
| | **¶ 1(b)(i).** Substantial Compliance |
| | **¶ 1(b)(ii).** Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due. |
| | **¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶ 1. Within 120 days[40] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. Within 12 months of the Effective Date, the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department finalized the Facility Emergency Response training (formerly known as Probe Team Training) curriculum in the Second Monitoring Period, consulting with the Monitoring Team as required, and is now offering the approved training in mandatory Pre-Service and Pre-Promotional Training.

- **Deployment of Training**:

  - The 711[41] recruits who graduated in November 2016 received the 8-Hour Facility Emergency Response training at the Academy.

  - 21 ADWs received the 8-Hour Facility Emergency Response training as part of the Pre-Promotional Training program offered this Monitoring Period.

### ANALYSIS OF COMPLIANCE

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The lesson plan provides Staff who serve on the Probe Team with the necessary guidance to resolve use of force incidents in a manner that maximizes Inmate and Staff safety. The Department has started

---

[40] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[41] 711 recruits graduated in November 2016. To graduate, the recruits must complete all trainings in the mandatory pre-service training program.

to deploy the training by including it in the mandatory Pre-Service training for all recruits. The Monitoring Team will continue to work with the Department to develop a comprehensive plan for the rollout of the Facility Emergency Response Training to all Staff regularly assigned to intake posts, as discussed in more detail in the introduction to this section of the report above. This will include exploring ideas of prioritizing this training for specific groups of Staff, based on their responsibilities.

*Observation*

The Monitoring Team observed the delivery of the Facility Emergency Response training provided to the recruits in the November 2016 graduating class. The Monitoring Team found the delivery of the training to be strong in many areas. Particularly, both instructors stressed that the goal for Staff is to achieve voluntary compliance from the Inmates and not to resort to use of force. Both instructors gave specific feedback to students about voice level, tone, gestures, facial expressions, deal making, promises or similar criteria that will negatively impact or positively impact de-escalation in the scenarios presented in the training.

The instructors did a good job of explaining the Operations Order Governing Facility Emergency Response in a detailed manner. The instructors took the time to explain to recruits how those orders become reality on shift, extensively covering the materials related to Level A responses, Level B responses, lightly touched upon the Level C and D responses, and provided the essential information from the Operations Order related to all of these levels.

The Monitoring Team recommended that instructors find some additional approaches to present this material to make it more engaging. Currently, the students take turns reading portions of the Operations Order which is time consuming and did not engage the students in a meaningful way. The Monitoring Team also provided minor recommendations related to the organization and sequencing of the delivery and materials. Finally, the Monitoring Team recommended incorporating videos or role-plays to demonstrate certain points, and recommended that the Academy consider developing the opportunity for students to be recorded during the training so they can review and critique role-play scenarios. This tool is very effective in bolstering the student's confidence and/or establishing clear objectives for the student as they strive to improve their performance. The Monitoring Team is working with the Academy to apply these recommendations.

| COMPLIANCE RATING | ¶ 1(c). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[42] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These

---

[42] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.   <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

        i.   The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.   The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**:

  - The 24-hour **In-Service** and **Recruit** Defensive Tactics training lesson plans have been developed, approved by the Monitoring Team, and are currently in use.

  - During the Third Monitoring Period, the Department drafted a Defensive Tactics lesson plan for **Senior Management**. This lesson plan focuses on the skills and understanding of the Defensive Tactics techniques that Deputy Wardens and Wardens should have in order to use the techniques if necessary and/or to assess use of force incidents after the event.

- **Deployment of Training**:

  - Academy

    - The Defensive Tactics training is incorporated in the mandatory Pre-Service Training.

      - The 711 recruits who graduated in the November 2016 class received the training.

    - 19 ADWs received the Defensive Tactics training for Supervisors as part of the Pre-Promotional Training program offered this Monitoring Period.

  - S.T.A.R.T.

    - *See* ¶1(a) above.

**ANALYSIS OF COMPLIANCE**

    The Monitoring Team continues to be encouraged by the Department's commitment to training. The 24-hour Defensive Tactics training program provided to all Staff is well beyond the requirement in the Consent Judgment which requires only four hours of refresher training annually.

*Development of Lesson Plans*

During this Monitoring Period, the Monitoring Team collaborated with the Training Academy on the development of new Defensive Tactics training for **Senior Management** (Deputy Wardens and Wardens) by sharing feedback and comments. This training is a truncated, 3-hour version of the Defensive Tactics lesson plan, and provides Senior Management with a demonstration of all the techniques presented during the Pre-Service and In-Service Defensive Tactics training. Given the many demands on Deputy Wardens' and Wardens' time, this truncated training was developed to provide an appropriate overview of the training provided to Staff since it is critical that Senior Management have an understanding of, and exposure to, the tools Staff are learning as this will support enhanced supervision of Staff use of force in the jails. This instruction will also bolster Senior Management's ability to assess tactics used after the incident takes place.

The feedback provided by the Monitoring Team included encouraging the use of videos of real incidents and the addition of more decision-making instruction to the lesson plan. The Academy reported that there is an ongoing effort to explore the possibility of using real incident videos in this and other trainings. The Monitoring Team suggested the addition of more decision-making instruction because Senior Managers are often required to provide real-time oversight and instruction during a use of force situation, and this additional guidance will provide additional tools for on-scene management.

### _Observation_

During this Monitoring Period, the Monitoring Team observed the three-day Defensive Tactics training provided to a class of ADWs in Pre-Promotional Training. The Monitoring Team and the Training Academy staff had collaborative discussions about the training throughout this observation period.

The Monitoring Team found the Defensive Tactics instructors did a good job of wedding tactics to the requirements in the New Use of Force Directive. For example, the instructors taught defensive strikes and defensive kicks to be used in situations of deadly force. The instructors were very clear about the conditions that must be present and are required by the New Use of Force Directive to justify the use of these techniques. This was explained and emphasized throughout the training.

The Monitoring Team shared a number of recommendations and observations while on site to address issues related to acoustics during instruction, encouraging the use of real incident videos, and encouraging the Department to consider more generally how spit masks are being utilized by the Department. The Department reports it is actively considering how it may be able to implement spit masks in scenarios not already utilized by the Department (_i.e._, Enhanced Restraints).

The Monitoring Team has concerns about the level of exertion in the training in that it may be greater than what an average Staff Member may be able to handle. In particular, the Monitoring Team is concerned about the level of exertion required by the warm-up exercises, and strongly recommends

that the Department re-assess the warm-up exercises, particularly for In-Service Staff who have not recently had to pass agility standards.

*Verification of Attendance and Examination Scores*

The Monitoring Team focused on the verification of S.T.A.R.T. attendance and training records during this Monitoring Period as discussed below in the analysis of ¶¶ 6 and 7.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2(a).** Substantial Compliance<br>**¶ 2(a)(i).** Substantial Compliance<br>**¶ 2(a)(ii).** Requirement has not come due |

## XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[43] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

b.   <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided within 12 months of the Effective Date to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The eight-hour Cell Extraction Team training curriculum has been developed, approved by the Monitoring Team, and is actively in use.

- **Deployment of Training**:

  - The eight-hour Cell Extraction Team training is incorporated in the mandatory Pre-Service training.

    - The 711 recruits who graduated in November 2016 received the Cell Extraction Team training in the Academy.

  - 21 ADWs received the eight-hour Cell Extraction Team training as part of the Pre-Promotional Training program offered this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Cell Extraction Team training curriculum was approved during the First Monitoring Period. It is eight hours, which far exceeds the four-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The Department has started to deploy the training by providing it during the

---

[43] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

mandatory Pre-Service training for all recruits, and in the Pre-Promotional Training. The Monitoring Team will continue to work with the Department to develop a comprehensive plan for the rollout of the Cell Extraction Team training to all Staff regularly assigned to Special Units with celled housing, as discussed in more detail in the introduction to this section of the report above. This will include exploring ideas of prioritizing this training for specific groups of Staff based on their responsibilities.

*Observation*

The Monitoring Team observed the eight-hour Cell Extraction Team training provided to a class of ADWs in Pre-Promotional Training. A portion of the training was provided in a closed housing unit in GMDC, allowing students to have hands-on training experience in conducting mock extractions.

The training was delivered effectively, with significant (and appropriate) emphasis on proper camera operation during an extraction. Instructors demonstrated pain compliance and soft hand control techniques to gain control of an Inmate, baton techniques to effectively gain control of an Inmate's arms and other extremities, how to take an Inmate to the floor to apply mechanical restraints, use of the gurney, and how the entire team can work together tactically to assist the shield person. The Monitoring Team provided only minor feedback to the instructors in real-time, which was incorporated into the training.

| COMPLIANCE RATING | ¶ 2(b). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2 (c) (INVESTIGATOR TRAINING)

¶ 2. Within 120 days[44] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As discussed in the First Monitor's Report, the Department has a comprehensive 40-hour training program for ID investigators.

---

[44] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- This 40-hour training was updated during the Second Monitoring Period to include a new module regarding the Prison Rape Elimination Act ("PREA") and additional evidence collection requirements. The training also now incorporates additional shadowing opportunities with current investigators.

- All new-hires must complete this 40-hour training before they may be assigned any ID cases to investigate.

- **Deployment of Training**:

  - 18 investigators were provided the 40-hour training during the Third Monitoring Period.

ANALYSIS OF COMPLIANCE

The Department's ID Investigator lesson plan continues to meet the requirements of this provision, and the additional training opportunities available to Staff supplement the acquisition of skills needed to conduct high-quality investigations.

*Observation of ID Investigator Training*

The Monitoring Team observed portions of the 40-hour investigator training during the Third Monitoring Period. The training provided to ID investigators is extensive, thorough, and practical. Further, all statements made to trainees during the training were consistent with the goals and requirements of the Consent Judgment and overall reform efforts. The ID Investigator Training is structured like a "workshop" training and provides a combination of lecture, on-site work, and independent work so it is not purely theoretical. This structure makes it more difficult to observe the training in full, but demonstrates the practical nature of the training being offered. Students were often asked to do work independently, for example reviewing case files for discussion, or asked to summarize witness statements. A portion of the training involves shadowing ID investigators. The training also includes reviewing, summarizing, and analyzing real-incident videos and discussing how an officer's actions compare to applicable Directives.

The Monitoring Team will continue to work with ID to ensure that the training provided to investigators is thorough, thoughtful, and consistent.

*Facility Investigator Training*

As described in the First Monitor's Report, the Department, with the Monitoring Team's support, decided to withhold finalizing and providing Facility Investigator Training to all Facility Captains while the Department further developed the concept of assigning all Facility Investigations to ID. However, as the progress of that takeover has stalled, as described in the Use of Force Investigations section of this report, the Monitoring Team will work with the Department in the Fourth Monitoring Period to develop a plan to deploy the Facility Investigator Training.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

> a.  The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

> b.  The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As discussed in the First Monitor's Report, the Department implemented the 24-hour SCM training prior to the Effective Date and has continued to deploy the training.

- The Monitoring Team approved the SCM eight-hour refresher training curriculum, and the Department plans to deploy the refresher training at the beginning of the Fourth Monitoring Period.

- The SCM training is incorporated in the mandatory Pre-Service training and provided as In-Service training.

- **<u>Deployment of Training</u>**:
  - At the close of the Third Monitoring Period, 4,011 Staff have received SCM training.
    - First Monitoring Period: 1,552 Staff were trained.
    - Second Monitoring Period: 1,219 Staff were trained.
    - Third Monitoring Period: 1,240 Staff were trained.
  - Provision of training to Staff required to receive SCM training:
    - The Department has chosen to provide SCM Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent

Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates are housed. As of the end of the Third Monitoring Period, 77% of Staff assigned to RNDC and 87% of Staff assigned to GMDC had received SCM Training.

| Facility | Total Staff Assigned to Facility as of December 31, 2016 | Staff Trained in SCM as of December 31, 2016 | Received Pre-Service SCM Training | Received In-Service SCM Training |
|---|---|---|---|---|
| RNDC | 785 | 608 (**77%**) | 407 (**67%**) | 201 (**33%**)[45] |
| GMDC | 929 | 808 (**87%**) | 427 (**53%**) | 381 (**47%**)[46] |

- ▪ The Department also must provide the training to Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. As outlined in the chart below, 16-, 17-, and 18-year-old Inmates are also housed in GRVC (18-year-old male Inmates in Secure), RMSC (16-, 17- and 18-year-old female Inmates), and OBCC (18-year-old male Inmates in YA ESH).

| Facility or Housing Area | Total Staff Regularly Assigned[47] | Staff Trained in SCM |
|---|---|---|
| GRVC (Secure Unit) | 19 | 19 |
| RMSC (Housing Areas with 16-, 17-, and 18-year-old Female Inmates) | 17 | 13 |
| OBCC (Young Adult Enhanced Supervision Unit) | 4 | 4 |

ANALYSIS OF COMPLIANCE

The Department finalized the SCM refresher lesson plan and it was approved by the Monitoring Team. The training meets the requirements of this provision as described in the First Monitor's Report.

---

[45] This excludes those Staff Members who received SCM Training as both In-Service Training and Recruit Training.
[46] This excludes those Staff Members who received SCM Training as both In-Service Training and Recruit Training.
[47] Staff "regularly assigned" to Young Inmate Housing Areas is not defined in the Consent Judgment and the Department does not currently have a status of "regularly assigned" Staff. The Department and the Monitoring Team determined that for this Monitoring Period that "regularly assigned" would be measured by an official steady post (for OBCC's Young Adult Enhances Supervision Unit), or those Staff, that while not awarded an official steady post, were assigned to the housing units consistently for each tour they worked. The Department and Monitoring Team agreed that additional work would be conducted in the next Monitoring Period to determine the best measure to identify "regularly assigned" Staff going forward.

While only required to prepare a four-hour refresher training program, the refresher program is eight hours, which the Department will begin deploying at the start of the Fourth Monitoring Period. As discussed in more detail below, the Monitoring Team also intends to work with the Department on the In-Service SCM training.

*Observation*

The Monitoring Team observed In-Service SCM training this Monitoring Period, and while the Monitoring Team observed instructors who were committed to the idea that Young Adults should be treated in a way that acknowledges the emotional limitations of their age, the Monitoring Team found areas that needed improvement. The Monitoring Team provided written feedback to the Department outlining concerns the Monitoring Team had based on the observation of the SCM training curriculum in October 2016, and subsequently met with the Training Academy Warden and supervisors of Young Adult Programming to discuss these concerns. The Monitoring Team is concerned about the Department's ability to implement three specific SCM tools, and the limited discussion of these tool in the SCM Training curriculum: (1) Emergency Safety Interventions; (2) Behavior Support Plans; and (3) Post-Incident De-Briefing Process.

- ***Emergency Safety Interventions***

The Monitoring Team expressed concerns that training Staff in two different physical restraint techniques (SCM's Emergency Safety Interventions and Defensive Tactics) may be confusing for Staff, even though the tactics are not mutually exclusive. While observing SCM training, the Monitoring Team noticed little endorsement of the use of SCM's Emergency Safety Interventions and little confidence demonstrated by either the instructors or the students that these techniques would be useful for the Staff working at DOC. The Monitoring Team also expressed concerns that the physical techniques being taught in a small classroom setting, and not a gym setting, posed challenges for safe instruction of the techniques. The Monitoring Team recommended that the Department's Defensive Tactics instructors be utilized as a resource for instruction of the SCM physical techniques. Following this recommendation, the Department's Defensive Tactics instructors are working with the SCM instructors to improve the instruction of the SCM physical skills (including exploring whether incident videos can be utilized to enhance the training), and began using larger classrooms to address the classroom setting issue.

- ***Behavior Support Plans ("BSPs")***

The delivery of the SCM training only provides minimal guidance to the process of creating and implementing BSPs. Currently, BSPs are only being utilized for youth on Specialized Housing Units, and the BSPs being used do not conform to the guidance provided by SCM. As envisioned in the SCM curriculum, a BSP is a behavior management tool that could be used for *any* youth exhibiting problem behavior, not just those in Specialized Housing Units. The Department does not currently have plans to

89

expand the BSPs to all youth, but needs to consider a plan for such expansion and in doing so incorporate the BSP guidelines from SCM.

- ***Post-Incident Debriefing Process***

As currently delivered, the SCM training also does not have sufficient detail or depth regarding the Post-Incident Debriefing Process. SCM identifies Post-Incident Debriefing as a mandated practice, which involves debriefing with both Inmates and Staff after an incident. SCM debriefing procedures include asking Staff critical questions in the assessment of their own performance, and the performance of their peers. This process also solicits Staff response regarding strategies they used to avoid the use of force and solicits their thoughts about any needed changes to the Behavior Support Plans for the involved Inmates. The debriefing process also asks Inmates to reflect on what triggered the incident and how they might respond differently in the future. While some processes already in place at the Department act in some capacity as Post-Incident Debriefing for Inmates, there is virtually no implementation of the procedures as envisioned by the SCM curriculum for Staff.

The failure to implement these tools inhibits the Department's ability to meet the requirements of the Consent Judgment. The Monitoring Team will work with the Department to further improve the implementation of the SCM curriculum in these areas moving forward.

*Verification of Attendance*

The Department has deployed SCM training to a total of 4,011 Staff, well beyond the requirements in the Consent Judgment (this total includes Staff who are not assigned to work in Young Inmate Housing Areas, *i.e.*, recruits who ultimately get assigned elsewhere). The majority of the Staff who received the SCM training work in GMDC, OBCC, RMSC, and RNDC. GMDC, RMSC, and RNDC are the three Facilities that encompass the largest number of Young Inmate Housing Areas.

However, as the Department continues to centralize housing of Young Inmates, the number and names of Staff "regularly assigned" to Young Inmate Housing Areas will grow and fluctuate. The concept of "regularly assigned" is a difficult definition for the Department to operationalize at this time, as discussed further in the Safety and Supervision of Inmates Under the Age of 19 section of this report. Therefore, the Department decided that the best barometer to determine whether the Department is complying with the requirements of ¶ 3(a) was to determine the proportion of Staff assigned to work at RNDC and GMDC as of the end of the Monitoring Period who were SCM trained and the proportion who were not. In addition, the Department created specific definitions and lists of regularly assigned Staff for Young Inmate Housing Areas outside of GMDC and RNDC (GRVC, RMSC, and OBCC). The Department and Monitoring Team did not analyze similar data for EMTC.[48] The Staff considered to be "regularly assigned" to these units include those who are awarded an official steady post (for OBCC's Young Adult Enhances Supervision Unit), or those Staff, that while not awarded an official

---

[48] This analysis will not be conducted in the next Monitoring Period at EMTC because all the 18-year-old sentenced Inmates will be housed at GMDC as of January 2017.

steady post, were assigned to the housing units consistently, though informally, for each tour they worked. Based on the chart above, almost all Staff in these categories were provided SCM training as required.[49] It is important to note that all Staff who were consistently assigned to the Secure Unit at GRVC were Staff who had received SCM training as part of their mandatory Pre-Service training. The Monitoring Team will continue to work with the Department to ensure that an appropriate number and balance of probationary and veteran Staff are consistently assigned to Young Adult Housing Areas as required by Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 13-17.

The Monitoring Team reviewed the Department's comparative analysis of reports generated from the Training Academy's e-scheduling system and the lists obtained from the Chief of Administration's Office that showed all Staff assigned to GMDC and RNDC as of December 31, 2016, and those Staff with either official steady posts or who were consistently assigned to Young Inmate Housing Areas at RMSC, OBCC and GRVC, which generated the data in the chart above. The Department is in Substantial Compliance with the requirement to deploy SCM training as a significant majority of Staff assigned to GMDC and RNDC have received the training, well beyond the requirement to provide the training just to those Staff who are "regularly assigned to Young-Inmate Housing Areas" as required by the Consent Judgment.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance <br> ¶ **3(a).** Substantial Compliance <br> ¶ **3(b).** Requirement has not come due |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[50] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.    The Direct Supervision Training shall be a minimum of 32 hours.

    b.    Within 9 months of the Effective Date, the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[49] The number of Staff requiring this training at these Facilities will increase in subsequent Monitoring Periods as the Department implements a Staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area and the same tour, to the extent feasible given leave schedules and personnel changes as required by Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶ 17.

[50] This date includes the 60-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- The Department continued to develop the 32-hour Direct Supervision training curriculum, which is largely based on the Direct Supervision curriculum developed jointly by the National Institute of Corrections ("NIC"), the Minnesota Sheriffs' Association, and the Minnesota Jail Resource Center and as described in more detail in the First Monitor's Report.

- During the Second Monitoring Period, the Department shared a significantly revised version of the Direct Supervision training materials with the Monitoring Team and the Monitoring Team provided feedback, the Department and Monitoring Team continued to tweak the lesson plan during the Third Monitoring Period, finalizing the lesson plan in the Fourth Monitoring Period.

- **Deployment of Training**:

  o The 711 recruits who graduated in November 2016 received a draft version of the Direct Supervision training, although not required by the Consent Judgment.[51]

  o 20 ADWs received a draft version of the Direct Supervision training as part of the Pre-Promotional Training program offered this Monitoring Period.

ANALYSIS OF COMPLIANCE

The Department's efforts to further refine this training program are critical to its overall implementation. As described in the First Report, the Direct Supervision model is an entirely new way to manage Young Inmates and staff the Facilities where they are housed. The Monitoring Team expects that proper implementation of this model will support the Department's efforts to better manage the Young Inmates in its custody.

*Development of Lesson Plan*

The Department and Monitoring Team continued to work together this Monitoring Period to improve the Direct Supervision lesson plan and tailor the material to the reality of working at DOC. In response to Monitoring Team feedback provided this Monitoring Period, the Department provided a revised lesson plan which made significant improvements to the material to tailor the language and scenarios to DOC. The material was customized to reflect DOC's terminology, policy, procedures and current directives that would be understood by both Instructors and participants. For example, terms like "housing unit" were changed to "housing areas"; "lockdown" was changed to "lock-in" (because lock-down in this agency implies a total Facility lock-down); "Inmates" was changed to "Adolescents/Young Adults"; "shifts" are now referred to as "tours"; where lengthy lock-ins were offered as a punishment/consequence, it was indicated that this option was not appropriate nor

---

[51] The recruits in the November 2016 graduating class received the Direct Supervision training based on a draft version of the lesson plan. Once the Direct Supervision lesson plan is finalized, the Monitoring Team and Department will compare the two lesson plans to determine if there are any substantive differences between the draft and final version of the training. If they exist, the Department and Monitoring Team will discuss how best to address those differences with the individuals that received the training as a recruit and are now assigned to regularly work in Young Inmate Housing.

permitted by BOC standards; where lessons emphasized that Inmates be treated as "rational adults," this phrase was changed using, "rational individuals," which reflects developmental research highlighting the emotional and cognitive nuances of adolescence and young adulthood due to the uneven pace of brain development. The Monitoring Team had only minor feedback to a subsequent version of the lesson plan, and the Department incorporated that feedback and finalized the Direct Supervision Lesson Plan in the Fourth Monitoring Period.

The Training Academy is also continuing to work on the development of a Supervisor Lesson Plan in response to recommendations from the Monitoring Team who has expressed it is critical to the successful implementation of Direct Supervision model in the Facilities.

The deployment of Direct Supervision training to all Staff regularly assigned to Young Inmate Housing Areas will require more time than originally contemplated in the Consent Judgment, given the competing demands for this group of Staff's time. The Department prioritized providing the 24-hour SCM training to this group of Staff first. These same Staff must also attend S.T.A.R.T. and the other trainings discussed in previous provisions. The Monitoring Team will continue to work with the Department to develop a comprehensive plan for the rollout of the Direct Supervision Training to all Staff regularly assigned to Young Inmate housing units, as discussed in more detail in the introduction to this section of the report above.

| COMPLIANCE RATING | ¶ 4 (a)-(b). Partial Compliance |
|---|---|

## XIII. TRAINING ¶¶ 6 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to develop a sophisticated Learning Management System ("LMS") which will track and record all aspects of all trainings, including all *Nunez*-required trainings, and will track attendance and exam results, among other things.

- During the development of LMS, the Department is utilizing interim solutions to certify attendance and examination results. For S.T.A.R.T., attendance is tracked using Training Tracking Software ("TTS") that the Department's IT Division developed in-house.

  o The Training Academy plans to expand the TTS to track attendance to all other courses, including both Pre-Service Training and In-service Trainings. The Academy has been in communication with the representatives from the IT Division to achieve this goal.

  o Currently for other In-Service Training, hand-written sign-in sheets are entered the Academy's electronic transcript generating system.

- For recruits, the interim solution for tracking attendance is the use of daily sign-in sheets, which are ultimately recorded electronically on each recruit's transcript (which confirms that they attended all required trainings prior to graduation). Similar daily sign-in sheets are used for Pre-Promotional Staff.

- Tablets are issued to all recruits during mandatory Pre-Service training and are used to take examinations for some *Nunez*-required content, while most other content is tested in aggregate mid-term and final examinations.

ANALYSIS OF COMPLIANCE

The Monitoring Team took steps to verify the Department's reported training data. These steps included reviewing sign-in sheets and training schedules. The Department uses different mechanisms to track Staff attendance at the various trainings, which therefore requires different monitoring strategies for each type of training (*e.g.,* Pre-Service Training, In-Service S.T.A.R.T., etc.). The Monitoring Team collaborated with the Nunez Compliance Unit to develop appropriate strategies to assess compliance with attendance and examination requirements, and to verify the underlying documentation. The Monitoring Team focused on developing these strategies for (1) attendance and examination records for S.T.A.R.T. (reviewing data from TTS and Scantron Examinations), (2) attendance records for SCM Training (discussed in detail in the box for SCM Training above), (3) attendance records for all *Nunez* training provided to recruits, and (4) attendance records for all *Nunez* training provided to the Pre-Promotional Class of ADWs that were promoted and trained this Monitoring Period. The Monitoring Team strongly encourages the Department to develop a sustainable internal quality assurance strategy to assess and verify attendance and examination records for all *Nunez* required trainings.

*Review of Examination Records* (¶ 6):

- ***S.T.A.R.T.***

The Department conducted, and the Monitoring Team verified and reviewed, an internal audit of the attendance and examination records for one four-day S.T.A.R.T. block in each month of the Monitoring Period (except for August 2016 which was analyzed the last Monitoring Period). The findings of this audit demonstrate that TTS provides an accurate and reliable way to track attendance.

As part of the audit, the Department was also able to demonstrate that the Training Academy issues Command Disciplines for those Staff who failed to appear for training for undocumented reasons.

The electronic attendance records generated by TTS were a useful tool in analyzing the accuracy of examination results. The Consent Judgment requires that all Staff who attend, and receive credit for attending, a *Nunez*-required training program take and pass an examination at the close of the program. Accordingly, there should be corresponding examination results for every Staff member who attended the training. Unfortunately, the assessment of the examination results for S.T.A.R.T. identified some possible issues with the tracking process as the number of Staff who took the examination did not match the number of Staff who attended. For example, in some cases there were more examination evaluations for Defensive Tactics than there were Staff who attended, and, in other cases, more Staff attended the Use of Force Policy training than were recorded as taking the exam. These issues occurred in each of the training blocks reviewed. The examination results and documentation reviewed did demonstrate that Staff who initially failed an exam were required to re-take the exam. As described in the Second Monitor's Report, Staff who do not pass the exam are provided an opportunity to review the material with the instructor and then re-take the test on the same day.

The Monitoring Team will work with the Department in the next Monitoring Period to try to resolve the discrepancies identified.

- ***Recruit Training***

The Monitoring Team and the Nunez Compliance Unit also collaborated on developing an audit strategy for recruit examinations that would then be implemented in the Fourth Monitoring Period. The exams completed by the recruits are administered and scored in a combination of electronic and hand-written systems. For example, Use of Force Policy and Crisis Intervention and Conflict Resolution examinations are administered on tablets following those training course, while other *Nunez*-required course work is tested in aggregate mid-term and final exams.

*Verification of Attendance Records* (¶ 7):

- ***S.T.A.R.T.***

 S.T.A.R.T. is tracked by the TTS. The TTS allows the Academy to schedule S.T.A.R.T. courses and identify the individuals to be called out for each block. When Staff Members arrive at the training, the Staff Member scans their Departmental identification cards for check-in and check-out at each class. The Monitoring Team tested the system while on site and found it was in working order. The TTS is then able to generate reports indicating who was scheduled for what course on what day, as well as who attended and who did not. The TTS was launched with the September 7, 2016 S.T.A.R.T. block, and has captured the attendance for all of the blocks since then. This electronic individualized process provides the necessary certification attesting to attendance as required by ¶ 7.

The Department conducted, and Monitoring Team verified and reviewed, an internal audit of the attendance records for one four-day S.T.A.R.T. block in each month of the Monitoring Period as

described above.

- *Recruit Training*

Recruits *must* attend each day of Academy Training unless a valid excuse is provided. Recruits are divided and assigned into lettered companies and this is the group they participate in classes with throughout the duration of the mandatory Pre-Service Training. All recruits must sign-in and sign-out on their company's daily sign-in sheet. The Academy reviews these sign-in sheets to determine if anyone did not sign in, and proceeds to verify if that person is missing for a valid reason (they called in sick, or are at the gun range receiving other training, etc.), and if not, they attempt to reach the recruit on their cell phones. If a recruit is missing without explanation, they are considered AWOL, or absent from one's post.

The Academy uses these sign-in sheets to determine whether an individual has received all required trainings before graduation. If a recruit has not signed in on a specific day, they must make up the courses missed by participating in a make-up training of that course offered on a day or shift they are not otherwise scheduled for training. These make-up classes are documented with make-up attendance sheets. In order to verify that all recruits received all *Nunez*-required trainings, the Monitoring Team determined it needed to verify the entire attendance process for recruits for all trainings rather than try to identify and assess attendance on the days the *Nunez* trainings were provided since they were spread out over the course of the mandatory Pre-Service training. The Monitoring Team sampled the attendance records for two companies for a full month during Pre-Service Training and reviewed any make-up documentation for those recruits who missed their original courses. The analysis of this documentation confirmed that all but a few recruits attended mandatory Pre-Service Training as assigned.[52] For those companies audited, all trainees who missed classes made-up those courses prior to graduation.

- *Pre-Promotional ADWs*

The Department promoted and trained a Pre-Promotional class of 21 ADWs this Monitoring Period. The Monitoring Team conducted an assessment of all the sign-in sheets for the *Nunez*-required trainings provided to this class of ADWs (Use of Force Policy training, Crisis Intervention and Conflict Resolution training, Facility Emergency Response training, Defensive Tactics training, Cell Extraction Team Training, Safe Crisis Management training, and Direct Supervision training). The Monitoring Team verified that all 21 individuals attended all necessary training during this Monitoring Period, except three individuals (two who missed a day of the three-day Defensive Tactics training, and one who missed a day of Direct Supervision training), as identified in the chart below. The two individuals who missed one day of Defensive Tactics attended a make-up class during the beginning of the Fourth Monitoring Period, and the ADW who missed one day of Direct Supervision training will be scheduled to make up that class.

---

[52] The trainees from one company did not miss any days (except one who resigned), and the other company had one trainee out sick for five days, for which make-up documentation for the courses missed was confirmed.

| Training Program | Pre-Promotional ADWs Trained |
|---|---|
| Use of Force Policy Training | 21 |
| Crisis Intervention and Conflict Resolution Training | 21 |
| Facility Emergency Response Training | 21 |
| Defensive Tactics Training | 19 |
| Cell Extraction Team Training | 21 |
| Safe Crisis Management Training | 21 |
| Direct Supervision Training | 20 |

*Centralized System to Maintain Training Records* (¶ 8):

The current tracking systems for examinations and attendance is a combination of hand-written and interim electronic tracking systems which, while verifiable, are difficult to track for the Academy. A centralized electronic system will significantly improve the reliability of this information. As described in the Second Monitor's Report (at pgs. 46-47), the Department is continuing the procurement process for LMS, which will enable the Training Academy to schedule individuals for courses, track attendance, and record examination results for all recruit, In-Service, and refresher training, and the Department continues to use interim systems for these purposes. The Monitoring Team is encouraged both by the Department's efforts to move forward with LMS and the development of TTS as an interim solution for attendance tracking. Use of that system for all *Nunez*-required trainings will support the Department's efforts to achieve Substantial Compliance with these tracking provisions.

The Department reports that they anticipate the procurement process for LMS will be complete by mid-2017, and that an LMS system could be functional by mid-2018.

| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance<br>¶ **7.** Partial Compliance<br>¶ **8.** Partial Compliance |
|---|---|

4. **ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)**

This section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to report violations of the current Use of

Force Directive anonymously. The goal of this new system is to ensure that all use of force

incidents are properly reported, without fear of retaliation, and can be investigated.

The Monitoring Team's assessment of compliance is outlined below.

## VI. ANONYMOUS REPORTING ¶ 1

¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department finalized a Division Order to govern the creation, use, and maintenance of the ID Information Hotline ("Hotline"), a centralized system where Staff can report violations of Department policy anonymously.

- The finalized Division Order requires ID to initiate a preliminary investigation within three business days after receiving an anonymous report.

- The Department has posted the Hotline telephone number in all Facilities and areas that are accessible to uniform and civilian Staff.
  - Posters appear in Staff areas including the Facilities' front entrances, locker rooms, and Staff lounges.
  - Posters appear electronically on DOC TV, which is displayed in all Facilities and in Bulova Corporate Center.

- The Hotline received a total of fourteen calls from March 2016 to December 2016. None of these calls were use of force related.

**ANALYSIS OF COMPLIANCE**

The Department continues to maintain a comprehensive policy governing the Hotline that is managed by ID, as described in the prior Monitor's Reports and advertises the Hotline using posters and electronic displays in the Facilities. The Monitoring Team visually confirmed the posting of information while conducting site visits throughout the Third Monitoring Period. In an effort to ensure the Hotline remains a viable option for Staff, the Monitoring Team recommends the Department develop a plan to ensure the Hotline remains advertised on various mediums (TV, website and in the Facilities) on a routine basis.

The Monitoring Team reviewed all 14 of the calls received by the hotline by reviewing the call information listed in ID's Tracking Sheet, as well as the information on Screening Intake forms. This review confirmed that ID received 14 calls and that none of them were use of force related.

The lack of Hotline calls pertaining to use of force incidents does not mean that Staff's concerns

about use of force incidents are not being reported. Staff continue to have a variety of mechanisms for reporting alleged Use of Force Directive violations, such as calling 311; notifying the variety of appropriate recipients including the Department of Investigation, the ID team in the Facility, lawyers, or the Legal Aid Society; and reporting concerns up the chain of command in the Facilities. The Department reports that ID has seen an increase in the number of reported allegations since the Effective Date, and believes that, in part, the increase is due to ID's increased presence in Facilities and to Staff's overall awareness of the increased scrutiny on use of force incidents under *Nunez*.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## 5.   VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) handheld cameras; and (3) body-worn cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)); and preserve video from all sources for at least 90 days (¶ 4).

### *Installation of Wall-Mounted Cameras*

As required under the Consent Judgment, the Department must install a sufficient number of stationary, wall-mounted surveillance cameras to ensure "Complete Camera Coverage"[53] of

---

[53] "The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to Inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera

all areas of all Facilities by February 28, 2018. As part of this effort, the Department must install

7,800 additional cameras on a rolling basis throughout the Facilities by February 28, 2018 (¶ 1).

The Department has been engaged in a massive effort to install video surveillance cameras

through (1) "fast-track" installation by the Department's Radio Shop Staff in all housing and

ancillary areas at RNDC, GRVC, GMDC, OBCC and AMKC; and (2) capital engineering

installation by third-party contractors at RMSC, VCBC, MDC, EMTC, NIC and BKDC.

During this Monitoring Period, none of the interim deadlines for installation of the 7,800

wall-mounted cameras came due. Nonetheless, the Monitoring Team continued to systematically

assess the installation of cameras to ensure the Department is on track to meet the deadline for

Complete Camera Coverage by February 28, 2018. As part of this effort, the Monitoring Team

also assessed the camera coverage of the additional housing units (Young Adult ESH at OBCC

and West Facility) that may be used to house 18-year-old Inmates that had not previously been

assessed (¶ 1(b)).[54]

As of January 31, 2017, the Department reports it has installed 6,681 new wall-mounted

cameras (1,350 as of the end of the First Monitoring Period, 1,465 during the Second Monitoring

Period and 3,866 during the Third Monitoring Period).[55] During this Monitoring Period, the

focus of installation has been on GRVC, GMDC, OBCC and AMKC. The Department reports

that fast-track installation is fully complete at all housing areas in RNDC, GRVC, GMDC,

---

coverage of the ingress and egress of such areas). "Complete Camera Coverage" shall not include small, isolated
blind spots caused by technological and/or mechanical limitations or the design of interior spaces." Consent
Judgment § III (Definitions), ¶ 8.
[54] The Department began to use Young Adult ESH to house some 18-year-old Inmates during this Monitoring
Period. The West Facility is also an option to house 18-year-old Inmates as discussed in the Second Monitor's
Report (at pgs. 69-70). Although no 18-year-olds were housed in West Facility during this Monitoring Period, the
Monitoring Team nonetheless toured the location since it is possible 18-year-old Inmates may be housed there.
[55] It must be noted, however, that in some of the Facilities where third-party contractors have installed cameras that
although the contractors have completed installing the cameras, post-installation work remains before the
Department can utilize the newly added surveillance cameras. In assessing camera coverage, the Monitoring Team's
confirms that the cameras are both installed and on-line.

OBCC and AMKC. Further, the Department reports that approximately 90% of ancillary areas at GMDC and 75% of ancillary areas at GRVC are now covered. The Monitoring Team remains encouraged by the Department's efforts to install video surveillance cameras. The Department remains on track to achieve complete camera coverage in all the Facilities by February 28, 2018.

*Maintenance of Stationary Cameras*

The Department issued a policy during the Third Monitoring Period to formalize procedures to ensure the cameras remain in working order (¶ 3). Prior to issuing the Operations Order, the Department's IT Division modified the Enterprise Asset Management ("EAM") database in order to allow the Facilities to report out-of-service cameras and for the Radio Shop to track their repairs electronically through EAM. Additionally, the Department has provided training to designated Facility EAM officers on how to use the database to manage the Facility's out-of-service cameras. Facilities began using the EAM in October of 2016, and its use has made reporting out-of-service cameras, and correspondingly, tracking them for repair or replacement, a much more uniform process. The EAM effectively coordinates the level of communication necessary between the Facilities, which must report their out-of-service cameras identified, and the Radio Shop, which must ensure that out-of-service cameras are repaired within two weeks, and if not, must report the reasons they could not be repaired within the time period. The Monitoring Team completed an initial assessment of this process and will conduct a more extensive assessment of the Department's efforts to maintain cameras during the Fourth Monitoring Period.

*Handheld Cameras*

The Consent Judgment requires that handheld cameras must be used in the following situations, except when safety or security concerns require an immediate response that would

preclude waiting for recording equipment: (1) responding to a use of force incident; (2) cell extractions; (3) Probe Team actions; and (4) Facility living quarter searches conducted by ESU, except Tactical Search Operations ("TSO"), random searches, and strip searches. The footage from handheld camera provides critical, objective evidence of what occurred during the incident as it can be brought close to the scene and captures audio, neither of which are possible with stationary wall mounted cameras. This is particularly crucial in locations where the installation of wall-mounted cameras is not yet complete. During the Third Monitoring Period, the Department finalized a handheld camera policy directive, in consultation with the Monitoring Team (¶ 2). Despite the implementation of the policy, and efforts to encourage the use of the handheld cameras in situations where required, the Monitoring Team has observed that Staff consistently fail to bring a handheld camera to the scene or fail to fully capture the incident when a camera is on the scene. As described in more detail below, the Monitoring Team is extremely concerned about these failures. After numerous discussions with the Monitoring Team about how to address these concerns, the Department has committed to increasing its efforts to address this issue and to demonstrate progress. The Monitoring Team will closely monitor this issue during the next Monitoring Period and will routinely assess whether handheld cameras are available at the scene and whether the appropriate footage of the incident is captured.

*Body-Worn Camera Pilot*

In this Monitoring Period, the Department also continued to develop the body-worn camera pilot but determined that it was not ready to begin on November 1, 2016 as originally planned. The Department advised the Parties (and the Monitor) the deadline could not be met. Accordingly, "the Parties with the Monitor [will continue to] meet in good faith to agree upon a

reasonable extension of time" for the pilot as required by Consent Judgment § XXI, ¶ 6. The Monitor anticipates an agreement will be reached at which time the Court will be advised.

The Department has selected a body camera, manufactured by Reveal Media. The Department also identified GRVC as the pilot Facility. Stakeholders across all levels of the Department developed a draft Directive which will govern the pilot. The Department is currently reviewing the Monitoring Team's comments and feedback on the draft Directive. In December 2016, the Department reports it also began meeting with representatives from the ADW-DW, Captains', and Correction Officers' unions regarding the logistics of the pilot, the draft policy, and other questions and concerns they have identified. Those meetings will continue in the next Monitoring Period. Additionally, the Department is continuing to assess the physical plant of the Facility to determine whether IT upgrades are needed to support the camera docking stations, and will also begin to develop training materials for the pilot.

_Video Preservation_

Finally, the Department is required to preserve all video from stationary, handheld, and body-worn cameras for 90 days in order to assist with investigating actual or future alleged use of force incidents or Inmate-on-Inmate violence (¶ 4). The Monitoring Team tested these requirements through a number of different assessments as discussed below.

_Ongoing Recommendation_

As noted in the first two Monitor's Reports, the Department's ability to supervise and instruct Staff, manage and monitor Inmates, and conduct investigations will be significantly enhanced by the installation of additional cameras (_see_ page 60 of the First Monitor's Report and pages 67 to 68 of the Second Monitor's Report). Videotaped footage has been very helpful during conversations with DOC Staff to illustrate trends that raise concern. The ability to review

an incident on video enriches those discussions and allows the Monitoring Team and the Department to have critical, substantive dialogue about the situations Staff face, and their responses to them in order to identify and modify inappropriate behavior.

As described in more detail in the First Monitor's Report, the Monitoring Team continues to encourage the Department to utilize the monitoring devices in the control rooms (and other common spaces where cameras are monitored) to view live feeds of video footage to support Staff's proactive efforts to de-escalate conflicts where the use of force could otherwise become necessary.[56] The Monitoring Team also continues to encourage the Department to utilize footage of use of force incidents as an educational tool during weekly Staff meetings to both reinforce good practices and to refine Staff's understanding of unacceptable behavior.

The Monitoring Team's assessment of compliance is outlined below.

## IX. VIDEO SURVEILLANCE ¶ 1(a) & (C) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras as follows:

        1.    First Wave: Robert N. Davoren Complex, George R. Vierno Center, and George Motchan Detention Center.

        2.    Second Wave: Anna M. Kross Center, Vernon C. Bain Center, Otis Bantum Correctional Center, and Eric M. Taylor Center.

        3.    Third Wave: Queens Detention Complex, West Facility, North Infirmary Command, Brooklyn Detention Complex, Manhattan Detention Complex, Rose M. Singer Center, and Donald J. Cranston Judicial Center.

---

[56] The Monitoring Team is encouraged by the efforts of the ART at RNDC and the Crisis Intervention Team at AMKC to proactively try to de-escalate incidents and hope the use of real-time video may further assist in those efforts.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of January 31, 2017, the Department installed 6,681 new wall-mounted surveillance cameras throughout the Facilities.

- The Department installed additional stationary, wall-mounted surveillance cameras in RNDC, GRVC and GMDC as part of the First Wave of camera installations as listed in the Consent Judgment (¶ 1 (c)(i)).

- The Department installed additional stationary, wall-mounted surveillance cameras in OBCC and WF housing units as part of the Second and Third Waves listed in the Consent Judgment (¶ 1 (c)(ii-iii)).

**ANALYSIS OF COMPLIANCE**

The Monitoring Team addresses ¶¶ 1 (a) and (c) together given the requirement to ensure Complete Camera Coverage in all of the Facilities requires the installation of additional cameras. There were no interim deadlines to install cameras in this Monitoring Period, but the Monitoring Team toured certain Facilities as part of the overall effort to ascertain Complete Camera Coverage and to assess whether the Department is on track to meet the deadline of February 28, 2018.

In order to assess compliance with this provision, the Monitoring Team observed the physical placement of cameras in the Facilities and compared this with live feeds of the video on the Genetec system.

*First Wave: RNDC, GRVC and GMDC*

For the Third Monitoring Period, the Monitoring Team conducted its second round of video surveillance tours at RNDC, GRVC and GMDC to work towards assessing compliance with Complete Camera Coverage in each of these Facilities.

- ***Housing Units***

The Monitoring Team previously found that the Department had installed a substantial number of stationary cameras in all housing units at GMDC and GRVC as described in the First and Second Monitor's Report. The Monitoring Team also previously found that the Department had installed a substantial number of stationary cameras in all housing units accessible to 16 and 17-year-old Inmates at RNDC. The Monitoring Team toured the rest of the housing units at RNDC during this Monitoring Period and found the Department had installed a substantial number of stationary cameras in those housing units as well. The Monitoring Team has identified a small number of locations within the housing units at GMDC, GRVC, and RNDC that still require camera coverage. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

- *Ancillary Areas*

The Monitoring Team confirmed during its tour and review of Genetec video that a substantial number of stationary cameras have been installed in the ancillary areas at RNDC, GRVC and GMDC, including food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways and stairways. The Monitoring Team identified a limited number of areas where camera coverage was not yet complete and that the installation of additional cameras may be necessary. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

- *Prior Monitoring Period Recommendations*

During the Tours, the Monitoring Team also assessed the status of cameras installed in response to the Monitoring Team's previous recommendations. The Monitoring Team found that cameras had been installed in all the priority areas identified, but that some of the recommendations still need to be addressed. The Monitoring Team and the Department are scheduled to meet in the next Monitoring Period to develop a reasonable plan to address the outstanding recommendations (including the recommendations made at the end of the Third Monitoring Period).

In addition to the on-site tours, the Monitoring Team completed an analysis of use of force incidents that occurred at RNDC, GRVC and GMDC during November 2016 to identify whether any occurred in areas without camera coverage or blind spots. The Monitoring Team identified a few discrete areas where camera coverage is lacking and recommended that the Department install additional cameras as appropriate. By assessing camera coverage through both the physical inspection and an analysis of Preliminary Review investigations, the Monitoring Team has greater confidence that RNDC, GRVC and GMDC are approaching complete camera coverage. The Monitoring Team anticipates these three Facilities will achieve Complete Camera coverage in the Fourth Monitoring Period.

## Second Wave: OBCC

The Monitoring Team had not previously assessed OBCC for installation of wall mounted cameras. The tour at OBCC allowed the Monitoring Team to assess both overall compliance with camera installation and to assess compliance with ¶ 1 (b). The Monitoring Team found the Department has installed a substantial number of stationary cameras in all open housing units at OBCC. For the areas toured, the Monitoring Team identified a few additional areas where coverage was not sufficient and recommended that the Department consider installing cameras in these areas. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

*Third Wave: WF*

The Monitoring Team toured the Sprungs at West Facility that are used to house Inmates to assess overall compliance with camera installation and with (¶ 1 (b)).[57] The Monitoring Team identified a few discrete areas where coverage was not sufficient and recommended that the Department consider installing cameras in these areas. Installation of cameras remains ongoing at West Facility and the Department reports it will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

The Monitoring Team is encouraged by the Department's efforts to install wall-mounted cameras throughout the Facilities. The Department reports it has installed 6,681 wall-mounted surveillance cameras, which accounts for approximately 85% of its obligation to install 7,800 cameras by February 28, 2018 (¶ 1 (a)). The Department is on track to meet this deadline. The Department has also made substantial progress towards achieving complete camera coverage by February 28, 2018 and appears on track with that deadline as well. Within the Facilities where camera installation is ongoing, the Monitoring Team strongly recommends the Department prioritize the installation of additional cameras in the clinic and intake areas to the extent coverage is lacking. During the Fourth Monitoring Period, the Monitoring Team will focus on touring the Second Wave Facilities and finalizing the assessment of complete camera coverage in the First Wave Facilities.

| COMPLIANCE RATING | ¶ 1(a) (i). Substantial Compliance<br>¶ 1(c). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 1(b) (STATIONARY CAMERA INSTALLATION FOR 16-, 17- & 18-YEAR-OLD INMATES)

¶ 1.

d.   The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department installed stationary, wall-mounted surveillance cameras in the housing units, schools, and ancillary areas at RNDC that are accessible to Inmates under the age of 18.

---

[57] The Department reports that it may house 18-year-old Inmates at West Facility. While no 18-year-old Inmates were housed in West Facility during this Monitoring Period, camera installation, and a subsequent tour by the Monitoring Team, was required pursuant to ¶ 1(b).

- The Department installed additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year-olds to ensure complete camera coverage of all areas that are accessible to 18-year-olds.

- The Department installed additional stationary, wall-mounted surveillance cameras in OBCC (Young Adult ESH) and WF in this Monitoring Period.

ANALYSIS OF COMPLIANCE

As noted in previous Monitor's Report, provision (¶ 1 (b)) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. This provision was assessed as "Substantial Compliance" in the Second Monitor's Report.

The Monitoring Team found in the First and Second Monitor's Report that the Department was in Substantial Compliance with the installation of cameras in the facilities that house 16-, 17-, and 18-year-old Inmates (*see* pages 61-62 of the First Monitor's Report and pages 69-71 of the Second Monitor's Report). During the Second Monitoring Period, the Monitoring Team systematically identified and toured all housing units that could possibly house 18-year-old Inmates. The Monitoring Team found the Department had appropriate camera coverage in most areas, except for specific areas in EMTC[58] and RMSC which were confirmed as completed or on line during the September 2016 follow up tours (*see* pgs. 70- 71 of the Second Monitor's Report).

In this Monitoring Period, the Department began to house some 18-year-old Inmates in Young Adult ESH. The West Facility is also an option to house 18-year-old Inmates as discussed in the Second Monitor's Report (*see* pgs. 69-70). Although no 18-year-olds were housed in West Facility during this Monitoring Period, the Monitoring Team nonetheless toured West Facility since it is possible 18-year-old Inmates may be housed there along with OBCC. During these tours, as noted above, the Monitoring Team noted appropriate camera coverage in the housing areas, but identified a limited number of areas in OBCC ESH and WF where coverage was not sufficient and recommended that the Department consider installing additional cameras in these areas.

Given these findings, the Department remains in Substantial Compliance with the requirement to install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines in ¶¶ 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

| COMPLIANCE RATING | ¶ 1(b). Substantial Compliance |
|---|---|

---

[58] The Department reports that beginning in January of 2017 that EMTC will no longer house male 18-year-old sentenced Inmates and they will instead to be housed at GMDC.

| IX. VIDEO SURVEILLANCE ¶ 1(e) (CAMERA WORKING GROUP MEETING) |
|---|

¶ 1.

    e.  The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department invited the Monitoring Team and Parties to the *Nunez* Litigation to participate in its Internal Camera Working Group Meetings.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team participated in the Department's Camera Working Group meeting on November 28, 2016. As part of that meeting, and in subsequent discussions, the Monitoring Team reviewed the Department's security camera coverage plan that includes timelines, objectives, and key deliverables to provide Complete Camera Coverage in the Facilities by February 28, 2018. The installation of cameras is a joint effort between the Radio Shop, the Engineering Department, the specific Facilities, and contracted vendors. The installation plan is consistent with the deadlines outlined in the Consent Judgment (¶ 1(a)) and the installation plan for the Facilities is consistent with the priorities outlined in the Consent Judgment (¶ 1(c)).

As noted in the Second Monitor's Report, the Monitoring Team continues to recommend that the Department annotate its existing Facility diagrams to identify camera locations. This guide may serve a dual purpose in that it assists the Department in its overall effort to track and maintain the cameras, and would also be a useful guide for the Department during emergencies and critical incidents. Overall, the Monitoring Team is encouraged by the Department's efforts to develop and implement an aggressive and comprehensive installation plan.

| COMPLIANCE RATING | ¶ 1(e). Substantial Compliance |
|---|---|

| IX. VIDEO SURVEILLANCE ¶ 2(d) & (f) (HANDHELD CAMERAS) |
|---|

¶ 2.

    d.  Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall specify:

        i.  Handheld video cameras shall be used in the following situations, except when safety or security concerns require an immediate response that would preclude waiting for recording equipment: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe teams actions; and (4) Facility living quarter searches conducted by the Department's Emergency Services Unit ("ESU"), except Tactical Search Operations ("TSO"), random searches, and strip searches. Inmate resistance during a TSO, random search, or strip search, however, would trigger video recording if it is reasonably believed that a Use of Force or assault on Staff is about to occur or occurs.

  ii.  Handheld video camera operators shall record the following: (1) any attempts made to obtain the Inmate's compliance after the video camera operator has arrived in the area, (2) the Inmate's behavior, and (3) all Uses of Force by Staff.

  iii.  In cell extraction situations, the handheld video camera operator shall record: (1) a statement from the team leader summarizing the situation and the plan for resolution; (2) an introduction by each team member, describing the member's specific responsibilities in the plan for the Use of Force; and (3) a statement from the handheld video camera operator providing his or her name and explaining any impediments to obtaining a clear video recording of the incident.

  iv.  Handheld video camera operators shall receive appropriate training.

  v.  The video recording shall be continuous and any break in video continuity shall be vi. documented and explained by the handheld video camera operator, to the extent the operator knows of such breaks, in an incident report or Use of Force witness report.

  vi.  Compliance with these policies and procedures is the responsibility of the onsite Supervisor, as well as the operator of the handheld video camera.

 f. When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department finalized Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence" on September 14, 2016. This was developed in consultation with the Monitoring Team.

- The Department issued a teletype on August 11, 2016, to be read at 21 consecutive roll calls reiterating the importance of handheld video surveillance when a probe team is responding to an incident. The teletype emphasized the responsibility of the Facility Tour Commander in verifying the inventory of all recording equipment at the beginning of each tour.

- The Department issued seven Memorandum of Complaints to Staff during the Third Monitoring Period for *intentionally failing to capture incidents*. The Department did not find that any Staff *repeatedly failed to capture incidents due to failure to follow DOC policies* during this Monitoring Period.

## ANALYSIS OF COMPLIANCE

  As described in detail in the Second Monitor's Report (at pgs. 73-74), the Monitoring Team and the Department identified that certain Probe Team responses were not being adequately captured on handheld video for a variety of reasons: a camera was not brought to the scene; the camera operator was not adequately capturing the incident; the camera was pointed away from the incident; or the camera was brought to the scene but was not turned on in time to capture the incident. The Monitoring Team has

found that this issue persists and that the Department's efforts to date to address the issue have not yet mitigated the areas of concern.

*Handheld Camera Policy* (¶ 2(d))

The Monitoring Team verified that the Department's policy addressed each of the requirements in ¶ 2(d)(i)-(vi). Upon issuing the new policy, the Department reports it emphasized the importance of following the policy through a teletype issued to each of the Facilities.

*Availability of Handheld Video* (¶ 2(d))

The Monitoring Team closely reviews every use of force incident to determine the availability of video. Generally, the Preliminary Reviewer provides adequate notation of the existence of video generally, but there is often ambiguity about the type of video available. The Department must strengthen its efforts to comment on the existence of video, lack thereof, any incomplete video and the reason for these issues as part of the Preliminary Reviewers' assessments.

The Monitoring Team developed data to demonstrate the persistence of this issue by individually reviewing use of force incidents from November 2016 at four Facilities (RNDC, GMDC, GRVC and West Facility) to assess the number of incidents that required handheld video surveillance (*e.g.*, probe team actions or cell extractions) and whether the footage was available or had been potentially manipulated by the Facility.[59] The data below demonstrates a significant departure from expected practice.

| Facility | Number of UoF incidents where handheld video would be expected | Number of incidents where handheld video was either not available, the Preliminary Reviewer did not specifically reference handheld video or the Preliminary Reviewer noted the footage was manipulated |
|---|---|---|
| GMDC – Nov. 2016 | 40 | 15 (38%) |
| GRVC – Nov. 2016 | 34 | 14 (41%) |
| RNDC – Nov. 2016 | 37 | 34 (92%) |
| West Facility – Aug & Sept. 2016 | 7 | 4 (58%) |

*Investigator Access to Handheld Video* (¶ 2(f))

The Consent Judgment requires ID and Facility investigators to have full access to handheld camera footage (and body-worn camera footage when available). The Facilities are responsible for saving the handheld video footage on a shared drive and investigators have access to that shared drive. The Department reports that Staff in the Facilities do not always upload the video to the shared drive in a

---

[59] The analysis was based on the Preliminary Reviewers summary of the incident. An incident was assumed as 'missing handheld footage' if the Preliminary Reviewer specifically said the footage was not available to them *or* if they did not reference the handheld footage in the summary of their findings. Failure to reference handheld footage is also concerning as it potentially signifies an incomplete assessment of the incident.

consistent manner so in some cases the video may exist, but it is not available to the investigator because they cannot locate it on the shared drive. The Monitoring Team observed these issues during an on-site assessment of preserved handheld video from use of force incidents spanning January to October 2016. The Department reports it has conducted a training for Staff and developed a standardization process to ensure that video is consistently and timely uploaded and available to investigators. The Department also reports command disciplines will be issued when handheld footage is not uploaded. The Monitoring Team will closely Monitor the Department's efforts to address this issue in the next Monitoring Period.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Consent Judgment requires any Staff Member who does not reasonably and accurately capture a use of force incident to be re-trained. Further, if a Staff Member repeatedly fails to capture key portions of incidents or intentionally fails to capture the incident on video, the Staff Member must be referred to the Trials Division for discipline. The Monitor will be notified of any such situations. The Monitoring Team has not yet assessed the Department's efforts to re-train Staff, but intends to focus on handheld camera training during the next Monitoring Period. As for discipline, the Department reported that it issued Memorandum of Complaint's to seven Staff Members in the Third Monitoring Period for intentional failure to capture incidents on handheld cameras. The Department reported at least one Staff member was suspended as well. The Department reports that no MOC's were generated for Staff *repeatedly* failing to capture incidents due to a failure to follow DOC policies.

In reviewing closed ID investigations, as discussed in more detail in the Use of Force Investigations section of this report, the Monitoring Team found that a lack of handheld camera video footage was a consistent evidentiary problem. The Monitoring Team's concern regarding handheld camera video footage is exacerbated by investigators' failure to adequately address *why* footage is missing, and in failing to explore why the footage is missing, the investigators also fail to address whether discipline is required for such failure.

The Monitoring Team encourages the Department to utilize all tools at disposal to ensure that appropriate and timely action is taken in response to Staff's non-compliance with the requirements of the handheld camera policy.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **2(d) (Develop). Substantial Compliance**<br><br>¶ **2(d) (Adopt and Implement)** Non-Compliance<br><br>¶ **2(f).** Partial Compliance |

---

**IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)**

¶ 2.

    e.      There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld

video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 was issued on September 29, 2016 and incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department incorporated guidance on handheld camera operation in the Facility Emergency Response (Probe Team) Training materials.

- The Department started to revise the handheld video camera training lesson plan.

- Handheld camera training is included in mandatory Pre-Service Training.

## ANALYSIS OF COMPLIANCE

As described in the Second Monitor's Report (at pgs. 55-56), the Department updated the Probe Team Training materials to incorporate guidance on handheld camera operation, in consultation with the Monitoring Team. This Monitoring Period, as described in more detail in the Training section of this report, the Monitoring Team observed the delivery of the Probe Team Training to recruits and found that the training thoroughly covered the role of the handheld camera operator when the Probe Team responds to a use of force incident.

Following the finalization of the policy, the Department turned to revising the lesson plan for handheld cameras, which was still in the process at the end of the Monitoring Period. The Monitoring Team and the Department plan to work together during the Fourth Monitoring Period to revise and finalize the lesson plan to ensure it addresses the issues of concern outlined in this report.

| COMPLIANCE RATING | ¶ 2(e). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    At least twice a month, the assigned Supervisor shall (i) review a substantial portion of the wall-mounted surveillance cameras in order to determine which cameras are not recording properly, and (ii) review the accuracy of the daily assessments. The assigned Supervisor shall document the results of these reviews, including which daily assessments, if any, were inaccurate.

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted

surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department issued Operations Order 19/16, "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," on October 3, 2016.

- The Department implemented the EAM database across all Facilities in October 2016.

- The Facilities continue to assign Correction Officers to conduct routine, daily functional assessments of stationary cameras and video monitors, noting those that are inoperable and submitting daily or weekly reports that detail the status of the cameras.

- The Facilities have assigned Supervisors to routinely assess a substantial portion of the wall-mounted surveillance cameras to ensure the cameras are operating properly and to verify the accuracy of the daily assessments. These reviews are documented.

## ANALYSIS OF COMPLIANCE

During the Third Monitoring Period, the Monitoring Team conducted an initial assessment of the Department's efforts to implement the new directive for the maintenance of stationary cameras.

### Camera Maintenance Policy

The new camera maintenance policy establishes procedures for assessing and maintaining the Department's stationary wall-mounted cameras. The policy is intended to ensure that cameras are maintained in good working order and that malfunctioning or inoperable cameras are repaired in accordance with the requirements of Section IX, ¶¶ 3(a)-(d). The Monitoring Team verified that the policy incorporates the enumerated requirements.

- ***Facility's Routine Assessment of Video Surveillance Cameras***

The Monitoring Team conducted an initial assessment of the Department's efforts to implement the new camera maintenance policy by (1) assessing the operability of cameras while on site and (2) reviewing a sample of the daily documentation generated by each Facility to identify inoperable cameras.

While on site at four Facilities (RNDC, GMDC, GRVC and OBCC), the Monitoring Team verified the completion of the daily camera assessment by reviewing the daily "Down Camera" list and comparing them to the live Genetec Monitors. The Monitoring Team found the daily assessment were occurring as required, were accurate, and were being acted upon. The form received was from the nightly review, and by the time of the Monitoring Team's assessment the following afternoon, many of the cameras listed as inoperable had been fixed. The Monitoring Team was also encouraged that the vast majority of cameras at the Facility (over 95%) were operable on the days reviewed. The

Monitoring Team will continue to test the daily camera assessment process across Facilities while onsite.

The Monitoring Team also reviewed the daily camera assessment forms for all Facilities for three weeks during the Monitoring Period (weeks of November 7, 2016; December 5, 2016; December 26, 2016) and the Supervisor's bi-monthly camera review form for all Facilities for the month of December. The Monitoring Team found the records demonstrated that all Facilities have begun to conduct both assessments. The review of these records identified some areas of concern regarding documentation, such as incomplete forms or inconsistencies between the daily and bi-monthly forms when they overlapped. Given that this is a new process, it is expected that some additional time will be necessary for quality implementation. The Monitoring Team has made suggestions to the Department to further strengthen the process. Further, the Monitoring Team intends to work with the Department to develop its own internal quality assurance for this process.

- ***Maintenance of Inoperable Cameras***

The Department is required to fix inoperable cameras within two weeks of the reported outage, barring exceptional circumstances that must be documented. During the Third Monitoring Period, the Department relied on its interim tracking for inoperable cameras until the EAM system was put in place part way through the Monitoring Period. The Monitoring Team reviewed the maintenance records from EAM for the later portion of the Monitoring Period and it generally demonstrated that the system provides reliable data and that cameras are repaired within two weeks. The Department also reported that as of December 31, 2016, 52 cameras remained inoperable for more than two weeks.[60] The Monitoring Team intends to conduct a more thorough analysis of the Department's implementation of these procedures in the next Monitoring Period.

During the Fourth Monitoring Period, the Monitoring Team will work with the Department to develop its own quality assurance efforts to assess compliance with the various components of requirements ¶ 3(a)-(d). This includes the Facility assessments as well as the ongoing maintenance of the stationary cameras. The Department will achieve Substantial Compliance with this provision when it is able to demonstrate that it consistently identifies inoperable cameras and ensures maintenance is completed within two weeks, barring exceptional circumstances.

| COMPLIANCE RATING | ¶ 3 (a)-(d). Partial Compliance |
|---|---|

---

[60] As of December 31, 2016, 2% of the cameras were out for 2-3 weeks, 37% of the cameras were out for 3-5 weeks, 52% of the cameras were out for 5-7 weeks, and 10% of the cameras were out for more than seven weeks.

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. <u>Video Preservation</u>

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's current video recording policy addresses this requirement.

- The Department's computerized system automatically preserves all video for 90 days.

- The New Use of Force Directive addresses the requirements in the Consent Judgment.

- Operations Security Intelligence Unit ("OSIU") is responsible for preserving and exporting Genetec video beyond the 90-day preservation period. The Department has also provided the Deputy Director of Investigations ("DDI") in ID and ID Supervisors with the ability to preserve and export video from the Genetec system.

### ANALYSIS OF COMPLIANCE

The Monitoring Team confirmed that the Department continues to have policies, procedures, and automated processes in place to ensure that videos are preserved, as required under the Consent Judgment. The Department's current preservation policies require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or Inmate-on-Inmate violence, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment. The Department also reports its intention to issue a uniform video preservation policy for use of force incidents once all new related practices, including ID's video interview pilot and body-worn camera pilot program, are in place. Further, while not yet in effect, the Monitoring Team confirmed that these requirements are included in the New Use of Force Directive.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

The Monitoring Team also assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by reviewing the handheld and wall-mounted video footage included in the use of force investigation files. During this Monitoring Period, the Department produced approximately 430 investigation files for use of force incidents that occurred after the Effective Date. In all but seven cases (approximately 2% of packets produced), all video capturing the incidents, to the extent such video existed, was preserved and produced as part of the investigation file.

In the cases where video was not preserved, the Department reported it was because Staff either failed to appropriately communicate the request to preserve video or the incorrect video footage was inadvertently preserved. The Monitoring Team also tested the Department's preservation of Genetec and handheld video beyond the 90-day requirement by randomly selecting 100 incidents where the Preliminary Review acknowledged the existence of video to determine if the video was preserved. The Monitoring Team confirmed the Department preserved video footage (either Genetec, handheld or both) for 97 of the 100 incidents on a shared electronic drive or on DVD. Given the importance of preservation of video, the Monitoring Team will continue to closely scrutinize the availability, accessibility, and preservation of video in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### 6.   USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's method of conducting use of force investigations to ensure they are thorough, timely, and objective. As discussed in the Use of Force introduction, high-quality investigations are critical to the Department's efforts to identify trends and patterns related to the improper use of force; to identify alternative, non-physical or less restrictive means of managing situations where a safety threat exists; and to ensure appropriate Staff accountability when necessary. Investigations also provide a useful window for the Department, and the Monitoring Team, to assess the Department's use of force. During this Monitoring Period, the Monitoring Team remained focused on the investigations completed by the Investigation Division ("ID"), and dedicated significant time and resources to reviewing and assessing the Preliminary Review of every use of force incident (¶ 7), reviewing and assessing completed investigations by ID ("Full ID Investigations") as required by ¶ 9 of this section, and collaborating with the Department to identify ways to conduct reliable investigations more quickly and efficiently (Consent Judgment § VII, ¶ 9(a)(i)(2)). As part of this effort, the Monitoring Team observed portions of the two-week investigator orientation training and

shadowed ID investigators conducting investigations within the Facilities. Throughout the Monitoring Period, the Monitoring Team shared its findings regarding both the Preliminary Reviews and closed investigations and discussed with the Department how any concerns might be addressed in the future.

The overarching goal of the reforms enumerated in the Consent Judgment is to ensure the Department conducts timely, thorough, and quality investigations of use of force incidents and that the Department's resources are deployed appropriately and efficiently. Accordingly, it is critical for the Department to have adequate practices in place to ensure a spectrum of investigative scrutiny is applied to an incident in order to determine whether the force employed was justified or not. The Monitoring Team and the Department have focused extensively on trying to develop appropriate procedures to achieve this goal during this Monitoring Period as described below.

*Preliminary Review Analysis of All Use of Force Incidents*

During this Monitoring Period, ID completed over 2,000 Preliminary Reviews of individual use of force incidents. The information derived from the Preliminary Reviews is an intrinsic component to the successful implementation of the reforms in the Consent Judgment. The Preliminary Reviews also remain the best source of information for the Monitoring Team about the use of force agency-wide. The information from the Preliminary Reviews also helps the Department to identify existing trends and to develop strategies that could influence the need to use force in the first place and to minimize the improper use of force when force is necessary. Given the value of this information and ID's familiarity with it, ID is responsible for developing the Commissioner's Twelve Data and leads the Immediate Action Committee (both discussed in more detail in the Risk Management section of this report).

The overall goal of consistent, timely, and robust investigations can be best achieved when the investigations are conducted logically and efficiently. To support this effort, the Monitoring Team and ID continued to work together on how best to leverage the analysis developed during the Preliminary Reviews. During this Monitoring Period, ID initiated the PICs (Presumption Investigation Complete) pilot, whereby the investigation of certain incidents that would otherwise have been a *Facility*-level investigation could be closed after the Preliminary Review. ID also developed a proposal to Fast-Track certain cases based on the findings of the Preliminary Review for incidents that would otherwise receive a *Full ID* Investigation (as required by Consent Judgment § VII, ¶ 8). The overall goal with these processes is to identify certain investigations that can and should be closed more quickly either because they merit timely discipline or the available evidence justifies the Staff's actions so additional investigative steps are not warranted.

- ***Presumption Investigation Complete Following Preliminary Review (PIC)***

As detailed in the Second Monitor's Report, the Department developed the PIC pilot to replace the "No Further Action" ("NFA") criteria set forth in Consent Judgment § VII, ¶ 7(e)(i-vii) given that the NFA criteria did not reflect the realities of current investigation practices. The PIC criteria follows a flow chart for each use of force incident, and is a fact-based approach to determine whether the use of force investigation can be closed after the initial Preliminary Review or whether further investigative steps are necessary.[61]  PIC also allows investigators to close cases and seek discipline even where procedural violations are identified, in a set number of circumstances. With the approval of the Monitoring Team, ID implemented a pilot of the PIC

---

[61] *See* pgs. 90-92 of the Second Monitor's Report for a full description of the PIC process.

criteria Department-wide on October 3, 2016. Since PIC's inception, only three use of force

cases were closed under the PIC criteria.

The Department reports that following the implementation of PIC on October 3, 2016, ID

leadership randomly reviewed Preliminary Reviews to determine whether investigators were

designating PIC when appropriate. They found that cases which could have been closed as a PIC

were in fact designated as Facility-level investigations instead of PIC. This initial finding is not

surprising given that the process has only been in place for a few months and ID investigators are

still learning how to apply the PIC criteria. The Monitoring Team appreciates that ID

investigators are being overly cautious in applying these new criteria in order to avoid closing a

case which would otherwise require investigation under the Consent Judgment. Further, as

discussed in more detail in the Use of Force Reporting section of this report, Preliminary

Reviewers often do not have access to Staff Reports when conducting Preliminary Reviews. This

inhibits the ability to close a case under PIC since Staff Reports are required. The Monitoring

Team expects that the implementation of PIC can only be meaningfully implemented after the

Preliminary Reviewers consistently have access to a full set of Staff Reports in a timely fashion,

and the Monitoring Team encourages PIC's use, because the proper application of the criteria

will ultimately make available desperately needed investigatory resources.

The Department also reported that when applying the PIC criteria, some Preliminary

Reviewers found it difficult to close cases as a PIC due to the criteria that "staff reports are

available to the Preliminary Reviewer and both Staff and Inmate statements are consistent with

each other." In cases that could otherwise qualify for closure under the PIC analysis, Preliminary

Reviewers found that they were often unable to close a case because the involved Inmate refused

to provide a statement and therefore there was no consistent Inmate statement. ID consulted with

the Monitoring Team about how to handle these situations. The Monitoring Team advised the Department that an Inmate's refusal to provide a statement should not serve as a basis to exclude the case from PIC consideration as long as the Inmate was afforded the opportunity to provide a statement by both the Facility and ID, the Inmate refused both opportunities, and those refusals were documented.

The Monitoring Team continues to believe the PIC process will support the overall goal of conducting more timely and efficient investigations, and in cases in which a violation is identified, more timely accountability for Staff. However, the Monitoring Team is not in a position to assess the implementation of the PIC criteria given the small number of cases identified for qualification during this Monitoring Period. The Monitoring Team will continue to work closely with the Department to address and resolve the identified operational issues and will closely review any incidents identified for PIC during the Fourth Monitoring Period.

- ***Fast-Tracking of Investigations***

In furtherance of the Department's goal to close use of force cases expeditiously and to streamline the disciplinary process, ID and Trials developed a Fast-Track proposal during the Third Monitoring Period. The proposed Fast-Track process is intended to speed up the investigation for three categories of cases following the completion of the Preliminary Review. As a threshold matter, the only cases that would qualify for consideration for Fast-Track are those in which the type of force employed would require as Full ID Investigation under ¶ 8 of this section and the incident is captured on video.

The first category of Fast-Track cases include those cases where the video demonstrates that one or more officers involved in the use of force commits a violation(s) of the Departmental

Directives or Rules and Regulations where formal discipline, except for termination,[62] would be sought. Cases fitting these criteria will be identified by ID following the Preliminary Review, and will be shared with the Trials division. Trials will then assess the case to determine if the evidence collected at that stage, including the video, can substantiate formal charges. If so, then the case can be closed by ID and Trials will take it over[63]. A settlement conference will then be scheduled with the Deputy Commissioner of Investigations, the Assistant Commissioner of Trials, Staff Member(s) involved in the case, the Staff member(s) union representative, and the Staff Member(s) union counsel to meet and attempt to negotiate a resolution of the matter. ID and Trials anticipate that a number of days will be set aside each month for settlement conferences. On each settlement conference day, it is anticipated that a number of cases can be scheduled and resolved on that day.

The other two categories of cases that would qualify for Fast-Track include those that would otherwise qualify for Full ID investigations, but the Preliminary Review of the incident, including the video, clearly and conclusively demonstrates that either: (1) there were no violations and therefore the force is justified or (2) the use of force allegation is unfounded. In these situations, further investigating the matter would have limited value, would consume already scarce recourses, and would also delay the outcome of cases that could be resolved more quickly. When an ID investigator identifies a case that satisfies these criteria after a Preliminary Review, the ID investigator will review the case with a Supervisor to confirm that no further

---

[62] It is anticipated in cases where the Department will seek termination that the Staff Member will exert their right to go to Trial before OATH. Accordingly, a Full ID Investigation, including conducting MEO-16 interviews of Staff, will need to be completed.
[63] If Trials determines that the available evidence cannot substantiate charges, Trials will instruct ID to conduct additional investigative steps.

investigative steps are necessary. If the Supervisor agrees, the final step is to present the file to

the Deputy Director of ID for closing.

The Monitoring Team is encouraged by the Department's efforts to develop creative

approaches to accelerate the investigation of certain types of cases and believes this proposal

embodies the general principle that use of force investigations require different levels of scrutiny.

The Monitoring Team intends to discuss the proposal further with the Department and the Parties

during the Fourth Report Period, before making a recommendation about whether the

Department should pilot the process.

- ***Maximizing Preliminary Reviews to Support Full ID and Facility Investigations***

The Monitoring Team also worked with the Department during this Monitoring Period on

how to best leverage the analysis completed during the Preliminary Review to support the

subsequent investigation by ID or the Facility.

The assignment of investigators to Full ID investigations differs across the ID teams

(each Facility has a dedicated team) based on staffing capabilities, and only some teams employ

the practice of assigning the same investigator to both the Preliminary Review and the Full

Investigation of an incident. The Monitoring Team and ID discussed the expansion of the current

approach at some Facilities where the investigator who conducted the Preliminary Review is

subsequently assigned to conduct the Full ID investigation. The Monitoring Team and ID agreed

that the continuity of an investigator from the Preliminary Review to the Full ID investigation is

beneficial to the overall investigation. Accordingly, ID expanded that model to other Facilities,

but in the process discovered that it sometimes results in uneven caseloads for the investigators

depending on the disposition of the cases (*e.g.*, one investigator may be assigned to conduct the

Preliminary Review of five incidents that are ultimately determined to all be Facility

investigations while another investigator may be assigned to conduct Preliminary Reviews on five different incidents that are ultimately determined to be Full ID investigations). ID is continuing to evaluate the various strategies for assignment of investigations, while ensuring an even caseload for all investigators, and will apprise the Monitoring Team of its efforts during the Fourth Monitoring Period.

If the Preliminary Review determines that an investigation should be investigated by the Facility, then an investigator within the Facility will conduct the investigation. Facility investigators do not currently have access to the results of the Preliminary Review of an incident that is deemed to be a Facility investigation. The Monitoring Team recommended identifying a mechanism to provide the Investigating Captain at the Facility Level with the results of the Preliminary Review so the Investigating Captain has the benefit of the Preliminary Reviewer's analysis in order to strengthen the Facility-level investigation. The Monitoring Team intends to meet with the Department during the next Monitoring Period to address how this recommendation may be incorporated into the Facility investigation process.

*Assessment of Closed ID Investigations*

As described in the First and Second Monitor's Reports, ID's caseload has increased exponentially since November 1, 2015. In this Monitoring Period, 915 use of force incidents were referred to ID for a Full ID investigation (up from 576 referrals in the last Monitoring Period). ID reports that in this Monitoring Period the increase in cases referred were primarily use of force on Inmates in restraints, use of institutional equipment, video malfunctions, head strikes and kicking. Further, the number of cases referred for a Full ID investigation for other circumstances, *i.e.*, cases ID reviews and decides to upgrade to Full ID investigations even where the *Nunez* Full ID criteria are not met; went from 30 in the Second Monitoring Period to over

100 in the Third Monitoring Period. The increase in cases assigned to ID is also likely a result of

the impact of additional video surveillance (which identifies issues that may merit further

investigation), an increase in Inmate allegations that require Full ID investigations, ID

Preliminary Reviewers have become more proficient in correctly identifying cases which

necessitate a Full ID investigation under the Consent Judgment, and ID has been proactively

upgrading more cases even where they do not fit the *Nunez* criteria. The increase in cases

requiring a Full ID investigation has had a corresponding impact on the rate in which ID can

close ID investigations. During this Monitoring Period, ID closed 391 investigations compared to

707 cases in the Second Monitoring Period.

During this Monitoring Period, the Monitoring Team reviewed 115 closed Full ID

investigation files, which included hundreds of Staff Reports, Injury-to-Inmate Reports, Inmate

Infraction histories, Staff interview recordings, Genetec and handheld camera media, and ID

investigator's analysis and conclusions in the form of "Closing Reports". This review allowed

the Monitoring Team to assess multiple provisions within the Consent Judgment, as well as the

provisions related directly to ID investigations. The majority of files reviewed were selected

randomly within a stratified sample of Class A, B, and C use of force incidents that took place

between November 1, 2015 and September 30, 2016. The Monitoring Team also reviewed

additional closed investigations: some conducted by the *Youth ID Team*, a sample of closed

investigations of *allegations* of use of force made between November 1, 2015 and September 30,

2016, all investigations closed with charges between November 1, 2015 and September 30, 2016,

and specific investigations selected by the Monitor because an assessment of the Preliminary

Review of the incident revealed objective evidence of wrong-doing.

Each file was reviewed by two members of the Monitoring Team. The Monitor and two of the Monitoring Team's Subject Matter Experts assessed the overall quality of the investigations and adherence to generally accepted practices while other members of the Monitoring Team assessed files for compliance with the specific requirements of the Consent Judgment.[64] The Monitor personally reviewed investigations in which the Preliminary Review revealed objective evidence of wrong-doing.

The Monitoring Team found that the closed Full ID Investigation files were well-organized, and demonstrated that ID investigators dedicate significant time to collecting and summarizing Staff Reports and other evidence. Review of these files revealed that in many instances the number of investigative steps taken to complete the investigation did not appear entirely necessary to reach the investigative conclusions, which could have been established more efficiently. As described above, and in the First and Second Monitor's Report, the Monitoring Team's experience strongly suggests that various methods can be employed to remove time consuming and unnecessary investigative steps—particularly with incidents that are captured on video—that will allow ID to reach reasonable conclusions about whether force was justified or unjustified (and, therefore, whether discipline should be sought) more efficiently. Further, as described in more detail below, the investigations often lacked a critical analysis of the evidence, including failures to identify and address gaps in Staff or witness interviews; instead, investigators relied on available Staff Reports, alone, and weighted those reports more heavily than other available evidence. Additionally, the investigation often failed to identify, address, or recommend discipline for many of the operational deficiencies noted elsewhere in

---

[64] Specific requirements include those found in Reporting and Tracking, Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-8, and 22), and Full ID investigations Consent Judgment § VII (Use of Force Investigations), ¶¶ 2 and 9.

this Monitor's Report—including issues related to handheld cameras and Staff use of force reporting obligations.

Due to the lack of issue-spotting and other deficiencies, investigators unreasonably failed to pursue disciplinary action in cases where there was objective evidence of wrongdoing. The Monitoring Team reviews all Preliminary Review entries of use of force incidents, and based on the initial findings, selects incidents to review the Preliminary Review investigation file for the purpose of identifying examples whether there is objective evidence of wrong-doing (*e.g.* video footage). The Monitoring Team then reviews the closed investigations for these incidents. Assessing how the Department deals with this sub-set of cases, arguably involving the more egregious and more easily provable use of force violations, provides insight into how the Department treats use of force violations as a whole. Unfortunately, the Monitoring Team found that too often, even where objective evidence of wrong-doing is clearly apparent, the Department failed to pursue adequate discipline. Below are five such examples where deficient ID Investigations lead to a failure to pursue discipline for Staff misconduct, all of which were closed in the Third Monitoring Period:

- A cuffed Inmate sustained a lip injury requiring six sutures to close. The investigator concluded the force was appropriate and minimal. In reaching that conclusion, the investigator failed to address clear evidence that officer participants colluded in writing their reports, all of which contained highly suspicious explanations for the injury. The Inmate alleged that his injury was caused by a deliberate head strike by an officer wearing a ring. There is no indication the investigator ever asked the officer if he was wearing a ring. The officer interviews occurred over four months after the incident, and the Inmate witness interviews occurred over six months after the incident.

- An Inmate was under escort by a Captain when the Captain very forcefully slammed the Inmate into a wall, causing the Inmate's head to likewise hit the wall forcefully. The video provides ample evidence that this needlessly high degree of force was deliberate and not in any way provoked by the Inmate. Moreover, the Captain's report and statements about the wall slam were strained ("I think at the time I placed him on the wall he hit his head on the wall because he had his head down.") The investigator concluded no violation because the investigator "found no evidence that [the Captain] intended to

127

harm the Inmate."  The investigator also concluded that because the Inmate did not "inform the medical Staff if his head slammed against the wall..." the investigator "believed" that this was not an act of malice on the Captain's part. It is further noted that the Inmate was not seen by medical Staff until approximately nine hours after the incident.

- An investigator found that an officer used excessive force by unnecessarily using multiple head strikes on an Inmate. However, the investigator never addressed the false reports filed by the offending officer and three other officer participants.

- An application of force occurred when an Inmate refused an ESU strip search. It was reported that the Inmate punched an officer in the upper torso, prompting the officer to respond with multiple head strikes. The handheld camera was not activated until after the force had concluded. The investigator concluded that the force was "minimal and proportional to the threat posed by [the Inmate]."  The investigator never addressed the issue of why the handheld camera did not capture the application of force. In fact, the camera operator was never interviewed. Moreover, there were missing and incomplete reports filed in the matter that likewise were never addressed during the course of the investigation.

- A young Inmate was removed from the classroom for being disruptive. He was placed on the wall in a hallway with two Correction Officers exercising hands-on control under the supervision of a Captain. OC spray was used twice, with the second application at point blank range causing the two Correction Officers to relinquish control of the Inmate who then ran down the hallway escaping the OC spray. The investigator closed the case with no further action, without addressing the issue of the second application of OC spray which was less than three feet and unnecessary and caused the Correction Officers to relinquish control of the Inmate due to their own contamination from the OC.

### *Recommendation Regarding Sharing of Information between ID & Trials after Formal Discipline has been imposed*

A critical competent to strengthening investigations is to ensure close coordination between ID and the Trials division. Currently, in cases where charges are recommended and the case is sent to Trials, the ID investigators are not notified about how the case is ultimately resolved. The Monitoring team recommended to the Department that the quality of work by investigators could be enhanced by regular communication with Staff attorneys from Trials. In order to further strengthen investigators' skill and fortify future investigations, the attorney and the investigator should discuss any areas where further investigation or documentation may have

been helpful. These discussions will also help further enhance the ID investigator's understanding and appreciation of the disciplinary process. The Department initially reported that implementing this recommendation, using either emails or a live discussion between the assigned Trials attorney and the ID Investigator, would negatively impact ID and Trials' ability to conduct their work because this update takes additional time. Sharing this information is critical to improving the quality of investigations, and thus the Monitoring Team will work with ID and the Trials Division during the next Monitoring Period to determine how to best implement this recommendation.

*Facility Investigations*

The Monitoring Team did not assess Facility-level investigations (¶ 13) in this Monitoring Period as ID was expected to take over these investigations in a short period of time. However, ID's takeover of Facility-level investigations system-wide will require more time than expected because ID has been unable to hire the additional investigators needed to take on the additional workload. Accordingly, the Monitoring Team will assess the quality of Facility-level investigations during the next Monitoring Period. As an initial step towards that review, the Monitoring Team and the Department developed a routine reporting process for Facility-level investigations to create a flow of investigations for the Monitoring Team to review (this reporting process is described in more detail in the Use of Force Reporting Section (¶ 15) of this Report). Combined, assessing Full ID investigations and Facility investigations will enable the Monitoring Team to assess the overall quality and timeliness of investigations (¶ 1) and the Department's response to investigators found to have conducted or supervised a biased, incomplete, or inadequate investigation (¶ 4).

The Monitoring Team's assessment of compliance is outlined below.

| VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS) |
| --- |

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

    a.    After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

    b.    When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

    c.    All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- The Preliminary Review Operations Order requires the investigator conducting the Preliminary Reviewer to attempt to interview Inmates who are the subject of a use of force incident, and those who witnesses the incident as part of the Preliminary Review.

- Assigned ID investigators or Facility investigators may also interview or re-attempt to interview Inmates as part of their investigation of a use of force incident.

**ANALYSIS OF COMPLIANCE**

The Inmate Interview requirements of ¶ 2 above have a number of practical elements: reasonable attempts to interview Inmates must be made and documented, including by the ADW following medical treatment; Inmate statements shall not be unreasonably discredited by an investigator; and an Inmate's statement or interview should be conducted in a private and confidential location. Each of these requirements were assessed by the Monitoring Team by reviewing Preliminary Reviews, closed ID Investigations, and interviews conducted as part of the Video ID Pilot Project (¶ 6).

*Attempts and Documentation*

The Monitoring Team found that Preliminary Reviewers attempted to interview the Inmate involved in an actual use of force within days of the incident. However, if the Inmate was unavailable, the Preliminary Reviewers did not often re-attempt to interview the Inmate. Given the time frame to conduct the Preliminary Reviews, the investigators reported it is difficult to attempt to interview the Inmate more than once before the Preliminary Review must be completed. For use of force allegation cases, the Monitoring Team found that Preliminary Reviewers in at least some Facilities were not attempting to interview the inmate making the allegations at the time of the Preliminary Review. The Monitoring Team has shared this feedback with the Department.

The Monitoring Team also found that in their Closing Reports, ID Investigators documented their attempts to interview Inmates, either by including a summary of the Inmate's statement or by indicating that the Inmate refused to be interviewed. The quality of these interviews has not yet been evaluated, except those evaluated as part of the analysis of the Video ID Pilot Project (¶ 6).

*Crediting of Inmate Statements*

A review of Full ID investigations revealed that Inmate statements were too often discredited without adequate explanation. This problem was identified in 21 of 115 (18%) investigative files. The failure to properly address the Inmate's statement resulted in outstanding questions at the conclusion of the investigation.[65] Further, if an Investigator found a small inconsistency or inaccuracy in an Inmate's statement, too often, it was discredited while inaccurate or underreporting by Staff was often ignored.

*Privacy and Confidentiality of Inmate Interview*

As described in more detail in the analysis of the Video ID Pilot Project (¶ 6) below, Inmates are not consistently given the opportunity to provide statements in private or confidential locations, often being interviewed on the Housing Units. Upon receiving this feedback, ID reported it has reminded Staff of this obligation, the effectiveness of which will be assessed during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- During this Monitoring Period, four use of force incidents were referred to DOI, with two cases subsequently being referred to the Bronx DA's Office for criminal prosecution and the other continuing to be investigated by DOI. The Department also reported that at least one non-use of force incident has been referred to DOI, which DOI subsequently reported has been referred to the Bronx DA's office.

- A total of 16 use of force cases were pending before DOI at the end of the Monitoring Period. Of these, 13 have been referred to the Bronx DA's office.[66]

---

[65] This does not mean to suggest that Inmate statements were credited in all other cases, as Inmate statements were not always available, and were not often the crux of the investigation, so the question of whether the investigator properly credited the Inmate statements was not part of every review.
[66] The SDNY has been notified of each of these thirteen cases by DOI pursuant to § XIX, ¶ 6.

**ANALYSIS OF COMPLIANCE**

As described in detail in the Second Monitor's Report, representatives of the Department, ID and DOI communicate frequently and work together collaboratively. They meet monthly to discuss the status of cases pending before DOI and the Bronx DA. This collaborative relationship extends to ID's referral of certain investigations and DOI's subsequent responsibility for those cases as described in more detail in the Second Monitor's Report (at pgs. 84 to 85).

The positive relationship between DOI and ID ensures that the referrals to DOI occur timely when the conduct of Staff appears to be criminal in nature. The Monitoring Team independently verified the status of cases with both DOI and the Department and confirmed that each entity has consistent information about cases referred to DOI, and those pending consideration of criminal prosecution by outside law enforcement entities. Additionally, in its review of Preliminary Reviews, the Monitoring Team has not identified any use of force incident that should have been referred to DOI but was not.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department immediately classifies all use of force incidents with Class A, B, C, or P[67] when an incident is reported to the Central Operations Desk ("COD").

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- Upon the receipt of additional information (e.g. results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

**ANALYSIS OF COMPLIANCE**

In order to assess compliance with this provision, the Monitoring Team reviewed the Preliminary Review and COD reports for all use of force incidents, and assessed a random sample of use of force injury reports.

*Injury Classification*

---

[67] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to the Central Operations Desk (COD) to be classified as Class A, B, or C.

In order to verify that the incident was properly classified according to injury level, the Monitoring Team reviewed a sample of the 50 use of force incidents classified as Class B and C injuries occurring between August and November 2016.[68]  The Monitoring Team analyzed the information available to the Preliminary Reviewer for each incident, including the Preliminary Incident Review and Investigative Reports, Injury-to-Inmate reports, incident photos, and witness, Inmate and Staff Reports. The Monitoring Team found that 47 (94%) of the 50 incidents were assigned a classification consistent with the specific definitions contained in the Directive. During a review of incidents for other purposes, the Monitoring Team also identified an additional 13 use of force incidents in which the classification should have been higher than what was assigned. In four of the 13 incidents, the injuries described were Class A, but Class B was assigned. In nine of the 13 incidents, the injuries were Class B, but Class C was assigned. The Monitoring Team will continue to review the injury classifications to ensure they are accurate and in accordance with the Consent Judgment requirements.

*Class P Assessment*

Of the 1,052 use of force incidents reviewed, 574 incidents were initially classified as Class P. Of these, 542 (94%) were reclassified within a two-week period or less.[69]

*Lacerations Treated by Dermabond*

During this Monitoring Period, the Monitoring Team also reviewed all cases where Dermabond was applied to treat lacerations. Lacerations requiring sutures are a Class A injury. However, lacerations treated with Dermabond are traditionally classified as a Class B injury. "Dermabond is a cyanoacrylate tissue adhesive that forms a strong bond across apposed wound edges, allowing normal healing to occur below. It is marketed to replace sutures that are 5-0 or smaller in diameter for incisional or laceration repair."[70]   The Monitoring Team found that Dermabond was used to treat lacerations in three cases that were classified Class B. The Monitoring Team intends to discuss these cases with the Department to determine whether these injuries should be classified as Class A during the next Monitoring Period.

Overall, the Monitoring Team found the majority of use of force incidents were classified appropriately and that the Department tended to be cautious when classifying incidents (*e.g.*, classified

---

[68] The Monitoring Team did not analyze the cases classified as Class A because those cases receive the highest-level scrutiny. Accordingly, the Monitoring Team deferred to such determination.

[69] The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance. Further, the impact of reclassification on a Use of Force incident is minimized because the determination of investigative scrutiny is now based on the type of force utilized as enumerated in ¶ 8, and not solely based on the classification of the use of force incident as it used to be prior to the Consent Judgment.

[70] Using Tissue Adhesive for Wound Repair: A Practical Guide to Dermabond, THOMAS B. BRUNS, M.D., and J. MACK WORTHINGTON, M.D., University of Tennessee College of Medicine, Chattanooga, Tennessee, *Am Fam Physician*. 2000 Mar 1;61(5):1383-1388.

an incident as Class B, even when the circumstances could have warranted a Class C designation). The Monitoring Team will continue to monitor the classifications of use of force incidents to ensure they are applied appropriately.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In the summer of 2015, the Department conducted a "pre-pilot" to identify the best video equipment to use and to determine the initial scope of the project.

- ID developed policies and procedures governing the pilot project, wherein ID investigators video record Inmate interviews during the course of their use of force investigation.

- ID launched the Video Pilot on June 6, 2016. The pilot focused on RNDC and was expanded to AMKC at the end of the Monitoring Period.

- ID leadership met with the ID investigators at RNDC and AMKC to provide feedback and advice regarding Inmate interviews.

- ID, in consultation with the Monitoring Team, extended the pilot to June 30, 2017.

- The Monitoring Team met with ID, including ID investigators who had experience using the cameras, to discuss their initial impressions and feedback on the pilot.

- ID investigators made 426 attempts to interview inmates. Of these, 160 interviews (38%) were captured on camera, and 241 Inmates (57%) refused to provide a statement on camera, and the records for 25 Inmates (6%) were not sufficiently documented to determine whether a statement was obtained on camera or not.

- Over 100 of the statements obtained on video occurred at RNDC where the Youth ID Team is assigned. Over two thirds of those statements were obtained on the housing unit, while the rest occurred in Intake, the clinic or other areas in the Facility.

ANALYSIS OF COMPLIANCE

ID launched the Video Recording Pilot ("Video Pilot") on June 6, 2016 that continued throughout this Monitoring Period. Inmates are afforded the opportunity to provide a written or audio statement even if they elect not to provide a statement on video. During this Monitoring Period, the Monitoring Team met with ID leadership to discuss the status of the pilot and to obtain feedback on its results. The Monitoring Team also reviewed a random sample of the videos statements.

ID leadership reported that initial findings suggest that video recordings enhance the quality of investigations because the video recordings capture body language and offers the Inmate the opportunity to physically demonstrate what took place during an incident. The Trials division has also preliminarily found that Inmate's video statements assist in their disciplinary cases. To date, only two cases with video interviews have been referred to Trials, so the experience is limited, but Trials believes that it is useful for their investigation to have the Inmate on camera providing a description of the incident. Further, Trials believes that capturing the Inmate's injuries on video will help to corroborate the Inmate's injury if and when the incident goes to trial. Finally, ID has found that the presence of the video camera has not had a chilling effect on whether an Inmate agrees to provide a statement. The Department reports that if an Inmate refuses to provide a statement on video that they are likely to also refuse to provide both an audio and written statement.

ID, Trials, and the Monitoring Team identified some issues and challenges with the pilot that merit further consideration. They fall into three categories: (1) quality of the interviews, (2) location of interviews, and (3) logistical issues.

*Quality of Interviews*

The Monitoring Team reviewed a sample of the recorded interviews and found that the quality of the interviews with Inmates were lacking, likely due to the fact that they did not take place in a private setting. The Monitoring Team encouraged ID to review a sample of the videos and advise to investigators on how to best conduct an interview with an Inmate to ensure the greatest level of candor, and obtain necessary and relevant information. In response to this feedback, the Department reported that a sample of the videos were reviewed and a meeting was held with the Youth ID Team at RNDC to provide feedback and advice regarding Inmate interviews. ID reports that the Video Pilot has changed the investigator and Inmate interview dynamic. Prior to the Video Pilot two investigators conduct an Inmate interview together. One investigator would take notes while the other investigator questioned the Inmate and maintained a visual of the Inmate. Now, while one investigator is taking

notes and questioning the Inmate, the other is video recording the Inmate. Because both investigators are either taking notes or video recording, their attention is distracted away from the Inmate, which among other things creates potential safety issues for the investigators. Clips to attach the video camera to the investigator's clothing were issued to replace the need for the investigator to hold the video camera. Unfortunately, the use of the clip identified a different problem: When the clip is attached to the investigator's clothing, the investigator cannot see whether the Inmate is captured in the video camera shot.

*Location of Interviews*

ID investigators do not always have access to ideal locations to interview inmates, impacting the candor of the Inmate, and causing investigators to feel unsafe. For example, interviews may be conducted in close quarters, such as in the pantry, requiring the investigator to be in close proximity, and to hold the camera in close proximity, to the inmate. The lack of private spaces to interview Inmates has also continued to cause problems for investigators in obtaining quality interviews. This problem is not unique to the video pilot, and even pre-dates the Consent Judgment. If an inmate is being interviewed in an open area, other Inmates may hear/observe the interview, which in turn may cause the interviewed inmate to be less truthful with the investigator. However, conducting interviews in a private setting is logistically challenging. Significantly, non-uniform investigators are not permitted to move or escort inmates. Further, because so many Inmates refuse to give statements, they are also likely to resist escort to a more private setting. The Monitoring Team's experience suggests that a requirement to move Inmates to a private location for an interview is inherently problematic, given the number of operational and timing considerations. However, the Monitoring Team intends to brainstorm with the Department on this issue during the next Monitoring Period to identify additional options that may be available to mitigate the issues ID identified

*Logistical Issues*

ID reported additional logistical issues including background noise at the facilities making it difficult to obtain clear statements. As noted in the Second Monitor's Report, the Monitoring Team found similar audio issues. This problem appears to occur most often with interviews taking place on the housing unit, compared held in a more discrete location (audio issues were present in these situations as well, but not as prevalent).

The placement of the cameras also caused a number of issues. ID reported that some Inmates were distracted by the video camera, which may have affected their ability to engage in a meaningful conversation about the use of force incident with the investigator. Trials noted problems with the movement of the camera. Because many interviews take place in non-ideal settings, some Inmates move around during the interview causing the investigator recording the video interview to have to adjust and re-focus the video camera.

On a positive note, the Monitoring Team noted that the organization of the videos on the web-based system had improved from the last review. The Monitoring Team continues to encourage ID to reinforce the importance of file organization to ensure that the results of the pilot can be easily reviewed.

*Extension of Video ID Pilot*

ID concluded, in consultation with the Monitoring Team, that the pilot should be extended. This additional time will allow the Department the opportunity to try to resolve some of the challenges identified and to gather additional information and data in order to determine whether the videos have investigative value and should be permanently adopted. The continuation of the pilot should also permit more cases with video recorded interviews to reach the Trials Division so that the impact of the video recordings can be more broadly assessed. Accordingly, the Video Pilot has been extended to June 30, 2017. ID and the Monitoring Team will continue to evaluate the Video Pilot during the Fourth Monitoring Period.

| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below.

      a.    The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates and civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the

Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

b.    The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

c.    To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

d.    The Preliminary Reviewer shall document the results of the Preliminary Review.

e.    Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

  i.    No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain.

  ii.   Any resistance by the Inmate was passive.

  iii.  Staff Members had only minimal physical contact with the Inmate, using only soft hand controls.

  iv.   The Use of Force Incident did not involve the use of weapons, including OC spray.

  v.    There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective.

  vi.   The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence.

  vii.  Based on the Preliminary Review, the Use of Force was minimal, reasonably necessary, and clearly consistent with the New Use of Force Directive.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviews were conducted on 2,165 of 2,179 (99 %) use of force Incidents during the Monitoring Period.

- The Department produced the results of the August 2016, September 2016, October 2016, November 2016, and December 2016 Preliminary Reviews to the Monitor and Parties to the *Nunez* Litigation as required pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.[71]

## ANALYSIS OF COMPLIANCE

### *Quality of Preliminary Reviews*

ID now conducts Preliminary Reviews on <u>all</u> use of force incidents. The Monitoring Team is impressed by ID's ability to develop, implement, and sustain this new process in such a short period of time. As mentioned above, these reviews remain an excellent source of information for the Monitoring

---

[71] "At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)"

Team and also function as a resource for the Department to implement a variety of Risk Management systems.

There are still a few areas where continued work is necessary to strengthen the Preliminary Reviews and achieve Substantial Compliance. First, and most importantly, the investigators conducting the Preliminary Reviews still do not consistently have access to all relevant information (*e.g.* Staff Reports) as described in more detail below. Second, ID is still piloting PIC and the additional length of time to conduct the Preliminary Reviews. However, the Monitoring Team found that when Preliminary Reviewers have the majority of the necessary documentation when conducting their assessments (including all Staff Reports, Injury-to-Inmate Reports, and video), their assessments are generally both reliable and informative.

*Rollout of Preliminary Reviews to All Facilities*

The vast majority of use of force incidents received Preliminary Reviews in this Monitoring Period. Preliminary Reviews had rolled out to all Facilities by the end of the Second Monitoring Period. However, incidents occurring at the Transportation Division or Writ Court did not begin to receive Preliminary Reviews until October when the VCBC team was assigned to conduct Preliminary Reviews of those incidents. To ensure that all use of force incidents received a Preliminary Review, the Monitoring Team cross-referenced bi-weekly COD Reports received (as described in the Use of Force Reporting section of this report above) with the Preliminary Reviews conducted to determine if any incidents occurred that did not receive a Preliminary Review:

| Month | Total UoF | Total Number of Preliminary Reviews Completed | Total Number of Incidents with no Preliminary Review |
|---|---|---|---|
| August 2016 | 464 | 458 | 6 (1.2 %) |
| September 2016 | 415 | 413 | 2 (0.5%) |
| October 2016 | 428 | 425 | 3 (0.7%) |
| November 2016 | 461 | 459 | 2 (0.5%) |
| December 2016 | 411 | 410 | 1 (0.3%) |

As depicted in the chart above, a very small proportion of incidents did not receive a Preliminary Review. Reasons for missing Preliminary Reviews included: delays in entering the Preliminary Review data and so it did not appear on the chart; the Transportation Division or Writ Court were not covered by a Preliminary Review team at the time; or that ID immediately began a full investigative call-out for Class A incidents and by-passed the Preliminary Review forms (all Class A incidents now receive a Preliminary Review). Furthermore, there was some initial confusion in August and September at EMTC, the last Facility to start Preliminary Reviews, about when to conduct a Preliminary Review and certain incidents immediately received a call-out instead of a Preliminary

Review. The EMTC investigation team ultimately conducted Preliminary Reviews for all incidents at EMTC beginning in August, albeit some were beyond the five-day time period.

*Presumption Investigation Complete ("PIC")*

As described in the narrative above, and in the Second Monitor's Report (at pgs. 90-91), the Department is piloting a process to identify cases with a *Presumption that the Investigation is Complete* after the Preliminary Review that would replace the "no further action" ("NFA") category (as outlined in ¶ 7(e)). The Monitoring Team reviewed the three cases closed under the PIC criteria this Monitoring Period and determined that all three incidents met the required criteria, and the decision to close the cases was reasonable. The Monitoring Team will continue to work with the Department to improve the application of PIC and will provide further assessment in the next Monitoring Period.

*Time to Complete Preliminary Reviews*

As described in the Second Monitor's Report (at pgs. 93-95), the Monitoring Team recommended that ID extend the timeframe for the Preliminary Review process by three additional business days (giving the Preliminary Reviewer up to five business days to complete a review) as part of the overall PIC process. The extension balances the need for DOC to complete an appropriate and quality initial assessment with the need for sufficient time to collect and gather the relevant information (*e.g.,* tracking down a missing piece of information, such as the identity of an unidentified Inmate involved in or witness to an Inmate-on-Inmate fight). ID advised investigators of the additional time frame to complete investigations in conjunction with the roll-out of PICs. ID Staff have reported to the Monitoring Team that the additional time to complete the reviews has been helpful to the overall process.

The Monitoring Team has found that Preliminary Reviews are generally completed within the required time frame[72] (see table below), analyzing the average number of actual days it takes to conduct the Preliminary Review for incidents that occurred in October to December (when the new time frame was implemented). For this analysis, the Monitoring Team determined that seven days is equivalent to five *business* days. RMSC and EMTC, the two last Facilities to begin conducting Preliminary Reviews, on average took a little more time to complete Preliminary Reviews.

---

[72] The Monitoring Team utilized the Preliminary Review Completion date provided in the monthly excel charts to conduct this analysis. Prior to relying on this information, the Monitoring Team conducted a review of underlying Preliminary Review forms and compared the Preliminary Review completion dates recorded on those forms with those recorded in the excel charts provided (which are the electronic reports run from ITTS following the manual input of the Preliminary Review Form information into ITTS). This review demonstrated only minor discrepancies, and the level of variance was not great enough to warrant a manual review of all files to reconcile the discrepancies.

| Average Days Overall | Actual Incidents October to December | | Alleged Incidents October to December | |
|---|---|---|---|---|
| | Number of PRs | Total | Number of PRs | Total |
| | 1,210 | 6.73 | 92 | 7.33 |
| Percentage of Preliminary Reviews conducted in under 7 days | 953 | 78.90% | 74 | 80.58% |
| Average Days of Preliminary Reviews conducted in under 7 days | 5.29 | | 5.45 | |
| Percentage of Preliminary Reviews conducted in over 7 days | 257 | 21.10% | 18 | 19.42% |
| Average Days of Preliminary Reviews conducted in over 7 days | 12.42 | | 15.63 | |

*Documentation Issues*

The Monitoring Team routinely reviews the underlying documentation available to the investigator conducting the Preliminary Review for particular use of force incidents. As noted in the Second Monitor's Report (at pgs. 92-93), the Monitoring Team found that the Preliminary Reviewers did not always have all the necessary information at the time of their reviews, as the Preliminary Review packets were often missing some of the information required to be reviewed under ¶ 7(a) of this section of the Consent Judgment, including Injury-to-Inmate Reports and Staff Reports. This issue persisted into the Third Monitoring Period and the chart below identifies the number of occasions the Preliminary Reviewer noted that they did not have access to certain information. Five Facilities, MDC, GMDC, BKDC, GRVC and RNDC, account for the largest amount of missing documentation for incidents analyzed from August to October 2016. Not surprisingly, they also generally account for the largest number of incidents. It is worth noting that while AMKC had the fourth largest number of incidents, it had one of the lowest rates of missing documentation. The Monitoring Team believes that the AMKC pilot currently underway in the Facility allows for more streamlined document collection.

| Facility | Analysis of August, September, and October 2016 Preliminary Reviews | |
|---|---|---|
| | Number of Preliminary Reviews Missing Reports | Percent of Preliminary Reviews Missing Reports |
| MDC | 60 out of 92 | 65.21% |
| GMDC | 159 out of 241 | 62.24% |
| MNCT | 11 out of 18 | 61.11% |
| BKCT | 6 out of 10 | 60.00% |
| BKDC | 42 out of 76 | 55.26% |
| GRVC | 56 out of 168 | 51.85% |
| RNDC | 114 out of 226 | 50.44% |
| BHPW | 2 out of 4 | 50.00% |
| BXCT | 1 out 4 | 25.00% |
| AMKC | 11 out of 137 | 8.02% |
| RMSC | 1 out of 20 | 5.00% |
| OBCC | 2 out of 87 | 2.30% |
| Total | 465 out of 1276 | 36.44% |

The Monitoring Team anticipates that some of these issues will be alleviated after the Department implements the tracking processes described in the Use of Force Reporting section of this report in the Fourth Monitoring Period. The Monitoring Team also anticipates that the additional three days to conduct Preliminary Reviews will also assist in this effort. As this additional time was only implemented toward the end of the Monitoring Period, and after this analysis was completed, it is too soon to tell the impact of this additional time on the collection of documentation.

The Monitoring Team strongly encourages the Department to address these issues, and hold Staff and Supervisors accountable for failure to ensure timely reports, as these reports are critical to the Preliminary Review of incidents. Further, the PIC and Fast-Track will only be meaningfully piloted once all documentation is available.

*Accuracy & Tracking of the Preliminary Review Form*

In this Monitoring Period, the Department increased its efforts to resolve the data input issues the Monitoring Team identified in the Second Monitoring Period. As described in the Second Monitor's Report, the Monitoring Team found that the Preliminary Review forms were not completed consistently by the Preliminary Reviewers. For example, if the Preliminary Reviewer determined that one of the 10 criteria for a Full ID investigation was present, he/she would select the first applicable criteria but would not also determine whether any of the other criteria applied. The Monitoring Team did not find that this approach affected the veracity of the investigation, or whether referral of a case was appropriate, but it would affect the development of aggregate data related to the underlying reasons for referrals for Full ID investigations. The Department and the Monitoring Team worked together to increase the tracking process to ensure that all relevant data is captured. the Monitoring Team maintains its own data (*e.g.*, number of head strikes and kicks, incidents involved Inmates under the age of 18) based on an individual assessment of every Preliminary Review of use of force incidents, and compares that date with the incidents identified by the Preliminary Reviewers. The Monitoring Team shares this data with the Department and the Monitoring Team has found the tracking of these three data points have improved over the course of the Monitoring Period.

| Preliminary Review Month | Preliminary Reviewers Accuracy in Identifying Head Strikes | Preliminary Reviewers Accuracy in Identifying Kicks | Preliminary Reviewers Accuracy in Identifying Incidents Involving Inmates 18 or Younger |
|---|---|---|---|
| August 2016 | 70% | 62% | N/A |
| September 2016 | 56% | 72% | N/A |
| October 2016 | 83% | 80% | 81% |
| November 2016 | 92% | 90% | 99% |
| December 2016 | 100% | 77% | 96% |

Further, the Monitoring Team notes that these data problems are short-lived, as the Preliminary Review process will be included in CMS. The Preliminary Reviewer will complete the Preliminary

Review directly in CMS and various mandatory fields (*e.g.*, the 10 criteria for a Full ID investigation) must be completed before the investigator can move on to the next step of the process.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves:  (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID investigations if they meet any of the criteria in Consent Judgment § VII, ¶ 8.
  - During the Third Monitoring Period 2,165 Preliminary Reviews were conducted and the Preliminary Reviewer referred the cases for investigation as outlined in the chart below.

**Preliminary Review Investigation Referrals**

| Referrals | Second Monitoring Period n=1,751 (100%) | Third Monitoring Period n=2,162 (100%) |
|---|---|---|
| Full ID Investigations | 571 (33%) | 863 (40%) |
| Facility Investigations | 1,136[73] (65%) | 1293[74] (59.8%) |
| NFA at AMKC | 44 (2%) | 6 (<1%) |

  - ID reports that additional investigations are referred for a Full ID investigation after the Preliminary Review process for a variety of reasons.

### ANALYSIS OF COMPLIANCE

The Monitoring Team conducted a two-prong assessment to assess compliance with this provision. As noted in the Second Monitor's Report (at pg. 97), the Monitoring Team found that 99%

---

[73] This includes 143 cases that the Department identified as meeting the NFA criteria, but the incident received a Facility-level investigation.

[74] This includes 22 cases that the Department identified as meeting the NFA criteria, but the incident received a Facility-level investigation.

(479 of 484) of a large sample of use of force incidents reviewed were referred appropriately. During this Monitoring Period, the Monitoring Team reviewed a sample of 200 use of force incidents from August, September, November, and December 2016 that were referred for Facility-Level investigations to determine whether or not a Full ID investigation was required. The Monitoring Team found that 198 of 200 (99%) of the incidents that received Facility-level investigations were consistent with the requirements in the Consent Judgment, meaning that only 2 (1%) incidents were referred for Facility-level investigations that should have been referred for a Full ID investigation. The Department subsequently opened a Full ID Investigation into one of these two incidents upon receiving the Monitoring Team's feedback, and one incident received only a Facility-level investigation.

For the cases that were referred for Full ID Investigations by the Preliminary Reviewer in August, September and October 2016, the Monitoring Team found that 475 of the 478 cases (99.3%) referred to ID for a Full investigation had a corresponding investigation opened, meaning three cases that should have been opened as Full ID cases were not on the Department's Full ID Open case list. The Monitoring Team notified the Department of these three cases, and the Department explained that they were entered into ITTS incorrectly initially but all three were ultimately corrected and opened as Full ID Investigations.

The results of these two assessments demonstrate that ID is conducting investigations in to the specific use of force incidents as required by this provision.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria:

    a. *Timeliness.*

        i. Beginning on the Effective Date and for three years following the Effective Date, or until October 1, 2018, whichever is earlier:

            1. ID shall complete all Full ID Investigations by no later than 180 days from the date the Use of Force Incident was referred to ID ("Referral Date"), absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 180-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation commenced after the Effective Date that is open for more than 180 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

            2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 180-day time frame set forth in the preceding subparagraph.

        ii. Beginning on October 1, 2018, or three years after the Effective Date, whichever is earlier, and for the duration of the Agreement:

            1. ID shall complete all Full ID Investigations by no later than 120 days from the Referral Date, absent extenuating circumstances outside the Department's control that warrant an extension of this deadline. Any extension of the 120-day deadline shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. Any Full ID Investigation that is open for more than

144

120 days shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

2. The Department shall make every effort to complete Full ID Investigations of less complex cases within a significantly shorter period than the 120-day time frame set forth in the preceding subparagraph.

iii. In the event that a Use of Force Incident is referred to DOI, or following the further referral by DOI to the District Attorney's Office ("DA") or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the Full ID Investigation shall be tolled while the other agency is investigating the matter or making a decision on immunity. ID shall on at least a monthly basis contact DOI to monitor the status of investigations referred to other law enforcement agencies.

b. *Video Review.* The assigned ID Investigator ("ID Investigator") shall review all relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras, and shall summarize the relevant video footage and explain whether the footage is consistent with witness reports. The ID Investigator shall document any non-functioning cameras, any unavailable video footage, or any other barrier to reviewing all relevant video footage. In the event that no or only incomplete video surveillance can be located even though the Use of Force Incident took place at a location under video surveillance, ID shall investigate why no or only incomplete video surveillance can be located, and document its findings.

c. *Witness Interviews.* The ID Investigator shall interview all relevant witnesses, including the Inmate(s) subject to the alleged Use of Force, Staff alleged to have been involved in the Use of Force Incident, and Inmates, Staff, or civilian staff who witnessed the incident. However, in situations in which there is a large number of witnesses and interviewing all such persons is likely to be duplicative and unduly burdensome, the ID Investigator shall interview a reasonable number of such witnesses. All witness interviews shall be audio recorded or video recorded.

i. The Inmate(s) who were subject to the alleged Use of Force shall be interviewed within two weeks of the Referral Date, absent unusual circumstances that shall be documented in the investigation file and reviewed by a Supervisor. The ID Investigator shall attempt to interview the Inmate even if the Inmate declined to be interviewed previously, except if the Inmate has been criminally charged in connection with the Use of Force Incident and has declined to be interviewed for that reason.

ii. All interviews of Staff involved in the Use of Force Incident shall be completed within 30 days of immunity grants from the Trials Division, DOI, or DA, absent unusual circumstances that shall be documented in the file and reviewed by a Supervisor.

iii. Interviews shall be conducted of any Staff Member who submits a written report stating that he or she did not observe any Use of Force where there is reason to believe the Staff Member was in close proximity to the location of the incident and should have observed what occurred.

iv. If a decision is made not to interview a witness, the basis for that decision shall be documented in the investigation file.

v. ID shall conduct its own independent interview of a witness even if the Facility previously interviewed the witness.

d. *Review of Medical Evidence.* The ID Investigator shall take reasonable steps to obtain in a timely manner relevant medical records for any Inmate or Staff Member injured during a Use of Force Incident. Such steps shall include timely seeking a medical release from the injured person(s). The ID Investigator shall review the medical records to determine whether they are consistent with video surveillance, witness accounts, and other evidence, and take reasonable steps to reconcile any inconsistencies. A report from the New York City Office of Chief Medical Examiner shall be obtained when necessary to determine the cause of an injury or address complex forensic questions.

e. *Report.* At the conclusion of his or her investigation, the ID Investigator shall prepare a complete and detailed report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures ("ID Closing Memorandum"). The ID

145

Closing Memorandum shall set forth all the evidence gathered during the investigation, state whether Staff engaged in excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive, and explain how any conclusions and recommendations are supported by the evidence. If an Inmate's prior infraction or criminal history, or a Staff Member's Use of Force or disciplinary history, is included in the ID Closing Memorandum, its effect, if any, on the conclusion in the ID Closing Memorandum shall be documented. Where there are inconsistencies between different pieces of evidence such as witness statements, the report shall adequately explain the basis for crediting one source of evidence over another.

f.   *Supervisory Review.* All ID reports shall be reviewed by the ID Investigator's supervisor to ensure that they comply with the terms of this Agreement and other applicable Department procedures and requirements. The supervisor shall address any aspect of the ID Closing Memorandum or ID Full Investigation that does not comply with the terms of this Agreement and other applicable Department procedures and requirements. The name of the supervisor who conducts this review, the date of the review, and the findings of the review shall be documented in the file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID conducts investigations of all incidents in the required categories of ¶ 8, by reviewing and summarizing relevant video footage, conducting Staff interviews, conducting interviews of Inmates and other witnesses, and reviewing relevant medical evidence.

- ID investigators summarize these steps in a detailed investigative closing report ("Closing Report"), which must be reviewed and signed off on by the investigator's Supervisor and the Deputy Director of ID.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team conducted an initial assessment of closed ID investigations during this Monitoring Period, which provided the Monitoring Team with tremendous insight in to the quality of investigations. As described throughout this report, and below, several issues were identified that concern the Monitoring Team. As a result, additional assessment is necessary before an assessment of compliance can be made.

*Timeliness (¶ 9(a))*

For the first three years after the Effective Date, the Department must close ID cases within 180-days of the incident date. ID is working hard to meet the goal of the 180-day deadline. The Department reports that historically it often could take an average of 300 or more days to conduct an investigation.

To date, approximately 1,108 use of force incidents between November 1, 2015 and May 31, 2016[75] were referred to ID for a Full investigations. ID has closed approximately 876 of these cases (80%). On average, it took ID 162 days to close these investigations. Of the closed cases, 59% were closed within 194 days[76] of the incident, 14% were closed one month after the 194 days elapsed, and

---

[75] This time period captures the incidents where the deadline to close a case came due by December 31, 2016.
[76] 194 days was selected as the appropriate measure to determine if ID investigations were closed timely. This time frame includes the 180 days contemplated under the Consent Judgment and an additional 14 days, which the

27% were closed more than one month after the 194 days elapsed. Approximately 232 cases (22%) are still pending with ID as of the end of the Monitoring Period.[77]

In an effort to increase the number of Full ID cases closed within the 180-day deadline, ID has implemented new strategies, including the "CorStat" process, which is a monthly review of each ID Team caseload, with an emphasis on Full ID cases that have not closed by the 180-day deadline. Once a month each Facility ID Team meets with the Deputy Commissioner of ID, the Director of ID, the team's Deputy Director of Investigations, and the team's Supervisor. During these meetings, investigators provide status updates on their caseloads, with emphasis on any cases that are over the 180-day deadline. The Deputy Commissioner and the Director then determine what next steps the investigator should take, and institute a case closure plan.

The Monitoring Team is concerned about the length of time it is taking to close investigations. As an initial step to address this issue, the Department must leverage the initial findings of the Preliminary Reviews which will then allow ID to conduct quality investigations and close cases more timely. ID is currently working to develop appropriate processes as described above (*e.g.*, PIC and Fast-Track).

*Video Review* ¶ 9(b)

The Monitoring Team found that ID investigators reviewed available video evidence as part of the investigation, and generally provided detailed summaries of the video evidence in their Closing Reports. However, the summary of video evidence was not always accurate or objective (see discussion below under "Closing Reports"). Furthermore, investigators did not adequately document when video footage was unavailable, and why. For example, in one instance a handheld video operator is visible in Genetec footage, but there was no handheld footage available to the investigator and no mention or explanation for its absence by the investigator. Additionally, if handheld video was available but out of focus or not trained on the incident properly, the investigators failed to identify the issue or potentially explore the reason for such failures. Handheld video footage was frequently unavailable because a handheld camera was not brought to the scene by the Probe Team, and investigators failed to explore or explain why there had been no handheld video operator on the Probe Team.

The Monitoring Team strongly recommends that investigators and their Supervisors are advised of the requirements for handheld video in a use of force incident and to address these issues as

Monitoring Team determined was an appropriate additional allowable period of time to meet the deadline in good faith and is consistent with the terms of the Consent Judgment (§XXI, ¶6).
[77] The majority of cases that remain pending are investigations where the deadline to close the investigation most recently came due. 114 (49%) investigations were 1-50 days overdue beyond 194 days from the incident; 61 (26%) investigations were 51-90 days overdue beyond 194 days from the incident; 57 (25%) investigations were more than 90 days overdue beyond 194 days from the incident.

appropriate in the investigation.[78]

*Witness Interviews ¶ 9(c)*

The Consent Judgment includes specific requirements regarding the individuals who should be interviewed as part of an ID investigation, the time frame for completing those interviews, as well as documentation requirements.

Through the review of closed Full ID Investigations, the Monitoring Team found that investigators were rarely interviewing all Staff involved in a use of force incident, or attempting to interview relevant witnesses. In over one-quarter of the files reviewed, the Monitoring Team concluded that the investigator failed to interview **relevant** witnesses, including Inmates and Staff involved in the incident in order to address outstanding questions in the investigation. In some cases, *no* Staff were interviewed, even when the Monitoring Team found outstanding investigative questions or Inmate allegations that were not properly explored. In both cases, the Closing Reports of the investigation failed to provide an adequate explanation for the lack of additional interviews. To provide context for the number of Staff who were interviewed, compared with the number involved in the use of force incident under investigation, for the files reviewed, 68 interviews were conducted with Staff, compared with 472 Staff Reports and 381 Staff Witness Reports submitted for those same incidents. In other words, investigators interviewed only 8% of the Staff involved or witness to the incidents reviewed. Furthermore, 85 of 115 (74%) investigations reviewed for this analysis[79] had <u>no</u> Staff interviews conducted at all. The Monitoring Team noted that more Staff interviews were conducted for those incidents that were closed with charges than those that were not—Staff interviews were conducted in 11 of 21 (52%) of cases closed with charges, compared with Staff interviews being conducted in 23 of 94 (24%) cases closed with no charges.

The Monitoring Team does not expect that investigators will conduct interviews of *all* Staff. However, investigators must provide greater consideration to interview Staff, witnesses and Inmates with *relevant* information. To the extent that an investigator elects not to conduct interviews, the investigator must provide an adequate explanation in the Closing Report. Both of these issues must be remedied by the Department as they compromise the integrity of the investigations as a whole.

---

[78] The Department reports that the prior version of the handheld video directive was vague on the requirement that a handheld camera was required when a probe team responded to a Use of Force incident, which made it difficult to substantiate a violation. The new handheld camera directive resolves this issue and ID reports that investigators have been advised of this change and so any time a probe team does not respond with a camera, the investigator should be investigating the failure and recommending discipline when appropriate.
[79] This analysis excluded the 21 incidents Closed with Charges, the analysis of which is otherwise included in the qualitative assessment of Investigations overall but not in the quantitative assessment. Additionally, the Staff Reports or Witness Reports were not included in the analysis of Staff reporting obligations described in the Use of Force Reporting and Tracking section of this report, so the comparison to Staff Report and Witness Report numbers is not available.

*Review of Medical Evidence* ¶ 9(d)

The Consent Judgment requires ID investigators to obtain and consider all relevant medical evidence. The Monitoring Team found that ID investigators routinely analyzed Injury-to-Inmate reports and other medical evidence as part of the investigation. Inmates rarely withheld medical release permission, and medical records were therefore typically available to the investigator. However, the extent to which the information was utilized to form a conclusion was sometimes not evident. Too often, the Monitoring Team found that ID investigators credited the Staff's statement about how an injury was sustained. This was particularly concerning in cases where the Staff's statement about how the injury was sustained did not appear consistent with the other available evidence. In those cases, the Monitoring Team did not find evidence that the ID investigator generally consulted with medical Staff as part of the assessment.

*Investigation Closing Report* ¶ 9(e)

The Consent Judgment requires that an ID investigator prepare a closing memorandum at the conclusion of his or her investigation that includes a complete and detailed report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. The Monitoring Team found that in most cases the Closing Reports included a significant amount of summarization of evidence in the file (*e.g.*, Video Evidence, Staff Reports, Staff, Inmate, and Witness Interviews), but lacked objective analysis of that evidence, and evidence was often not summarized in a neutral way. By way of illustration, below are examples of specific deficiencies observed in Closing Reports:

- In an incident captured on handheld camera members of the Probe Team can be heard cursing at the Inmate, including calling the Inmate names, and one Staff can be seen unnecessarily escalating the situation with the Inmate by essentially taunting the Inmate through his face shield. The investigator categorized this in the Closing Report as the Officer and Inmate exchanging words throughout the incident, characterizing the Inmates statements as confrontational, but not addressing the Probe Team Member's unprofessional and inappropriate management of the situation.

- In another example, the investigator failed to identify and address a closed fist punch that was not reported by Staff, but that was alleged by the Inmate, which was clearly visible in video evidence.

- In an incident where all but one Staff involved in the incident reported that there was no resistance during the escort of the Inmate following the main use of force Incident, the Inmate can be heard (but not seen) on the handheld camera footage crying out in pain as Staff Members direct him to "stop resisting." The investigator does not address the Staff's failure to video this portion of the incident, or the majority of the Staff's failure to report the Inmate's resistance.

The Closing Reports appear to require significant time to complete, but they fail to focus on the salient issues and do not include critical analysis of the incident or identify potential issues, and how they were addressed as part of the investigation. Overall, the Monitoring Team concluded that the investigations reviewed had at least some components that were biased, inadequate, or incomplete. This was true for 53 of 115 investigations reviewed (46%), for reasons including: failure to interview relevant witnesses, including Inmates, to answer outstanding questions in the investigation; failure to bring charges/discipline for use of force violation issues, including failure to report use of force or failure to submit reports and in some cases focused only on the individuals who were most culpable; failure to identify an anticipated use of force, or a failure to properly supervise situation (remedial measures could have been recommended to prevent force in the future in a similar situation); failure to address all inmate allegations in actual use of force situations; and failure to consult medical staff in determining whether inmate injuries were consistent with Staff accounts. Significant work is needed to improve the quality of these Closing Reports.

*Supervisory Review* ¶ 9(f)

All completed ID investigations must be reviewed and approved by the Investigator's Supervisor and the Deputy Director of ID. Of those reviewed, 101 of 115 (88%) were approved by the Investigator's Supervisor and the Deputy Director of ID. In 13 cases (11%), either the Investigator's Supervisor or Deputy Director signed the closing memo, but not both and, and one file (less than 1%) was missing the Closing Report entirely. While most of the Closing Reports reviewed were signed by the Investigator's Supervisor and a Deputy Director of ID, nothing in the Closing Reports documented the Supervisors' findings or recommendations based on their review. The Department has reported anecdotally that this type of assessment is occurring, but that it is not documented.

The Monitoring Team's findings strongly suggest that Supervisors need to provide additional guidance, mentorship, and recommendations to Investigators before closing an investigation to ensure the Investigator has considered all the issues, conducted adequate analysis, and in the cases where force has been justified, that the conclusion is reasonable.

*Conclusions*

The deficiencies described above are consistent with many of the issues the Monitoring Team identified in the assessment of closed Full ID investigations for incidents that occurred *before* the Effective Date (as described in the Second Monitor's Report (at pgs. 97-98)).

Significant effort is necessary to improve the quality of ID investigations. The Monitoring Team is confident that with appropriate guidance, mentorship, and commitment that the quality of the investigations will improve. This initiative must begin immediately as it is expected that the required improvements will take considerable time to implement. The Monitoring Team intends to work closely with ID during the next Monitoring Period to develop strategies to address these deficiencies and will provide any assistance necessary to support this effort. However, a lack of meaningful progress to

improve investigations in the next Monitoring Period will result in the assessment of a Non-Compliance rating in the Fourth Monitoring Period.

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

    a. Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    b. In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department identified 434 investigations that were outstanding as of the Effective Date and that had been open for more than six months, and thus were required to be closed by February 29, 2016. These investigations included both Full ID Investigations and "IRT" cases, a process by which ID historically would review completed Facility Investigations to ensure the investigation was thorough and the conclusion appropriate.

  o The Department closed 434 (100%) of the 434 cases.

- The Department identified 390 cases that were open as of the Effective Date and that had been open for less than six months, and thus were required to be closed by April 29, 2016.

  o The Department closed 385 (98.4%) of the 390 cases.

  o Of the five cases that remain open, two are on hold due to a pending DA or DOI investigation; two were submitted for closure by ID; and one case is pending receipt of medical records from DOHMH.

### ANALYSIS OF COMPLIANCE

The Monitoring Team verified that by the close of the Second Monitoring Period, the Department closed 99% of the ID cases that were open as of the Effective Date of the Consent Judgment, effectively clearing the backlog of ID cases.

As described in the Second Monitor's Report, during the Second Monitoring Period, the Monitoring Team conducted an audit of the closed investigation files to ensure that ID cleared the

backlog of cases in an appropriate and reasonable manner. The findings of those audit are addressed on pgs. 97-98 of the Second Monitor's Report. The Monitoring Team will continue to monitor ID investigations routinely as part of the assessment of Full ID investigations (¶ 9).

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID currently has 80 investigators. ID reports that investigators assigned to work only on use of force cases have an average caseload of 23 cases, while investigators assigned to both use of force and non-use of force cases have an average caseload of 30 cases.

- ID hired an additional 18 uniform and civilian investigators during the Third Monitoring Period, but also lost six staff due to transfers and resignations. Thus, ID only added a net of 12 investigators during this Monitoring Period.

- The Department is actively seeking to hire both civilian and uniform Staff as ID investigators.
  - o The Department advertises that it seeks candidates with strong investigative background, excellent communications skills, strong analytical and writing skills, the ability to be objective and thorough in conducting investigations of law enforcement personnel, and a valid driver's license. Foreign language skills are desirable. The preferred candidate has a BA/BS. Successful candidates must clear a background investigation.
  - o For uniform Staff candidates, ID reviews the candidate's history with the Department, including an evaluation of sick time, attendance, past disciplinary history, UOF history and their overall service records. In addition, ID evaluates uniformed members' training and academic histories.

- ID executive Staff report they conduct interviews of qualified applicants on a rolling basis and often conduct interviews on approximately 15 days every month.

- The Department's Recruitment Unit and HR Recruitment Manager work in concert to support ID's need for additional investigators, and created a committee dedicated to working with ID to recruit and hire additional staff.

- HR also works with the City's Office of Management and Budget ("OMB") to allocate funds for the required staffing lines in ID. Currently, there are 12 civilian vacancies open within ID.

- The Department reports it sought authorization to hire additional investigators in the last budget cycle, but that request was denied. The Department reports it intends to seek authorization to hire additional investigators in the next budget cycle.

**ANALYSIS OF COMPLIANCE**

As described throughout this report, ID has seen an increase in caseload and corresponding responsibilities. Currently, the workload for investigators is more than double the Department's stated ideal caseload of 10. ID has been actively recruiting additional investigators, both uniformed and civilian. In order to hire new staff, the Department must have authorization from OMB. The salary ranges for positions are set through collective bargaining with the union representing employees in the civil service title. The salary the Department may offer for a civilian position is based on the set "level" of the position, and employees with no prior City experience must be hired at the "new hire" rate. Employees with two years of City experience are paid a minimum "incumbent rate" which is 15% above the "new hire rate," however, there is some discretion within the salary range for each level for these employees. The level and salary range for investigators at ID is consistent with the level and salary range for investigators in other city agencies. The Department reports that the Office of Labor Relations ("OLR") has advised all City agencies that a salary above the minimum rate for employees must be based upon a demonstrated need and approved by OLR. The limited discretion in salary is a significant challenge in hiring qualified candidates. The Department reports it has had discussions with OLR and OMB to obtain discretion in salary in order to ensure that the Department can meet the obligations of the Consent Judgment.

At the end of the current Monitoring Period, ID was authorized to hire an additional 12 investigators. The Department sought additional hiring lines from OMB in the last budget cycle, but the request was denied. Accordingly, the Department reports it is attempting to repurpose other hiring lines to meet some of the needs for ID. Further, the Department reports that it intends to request authorization for additional hiring lines in the next budget-cycle this spring.

The Monitoring Team is concerned about ID's ability to hire qualified investigators and maintain reasonable caseloads for each investigator given their current constraints. The Monitoring Team strongly encourages the City to consider how it may be able to support the Department's efforts to ensure that ID has sufficient resources to conduct the its critical work.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department finalized the policy identifying the quality control systems and procedures for Full ID investigations to ensure that ID Investigations meet the requirements of the Consent Judgment (¶ 9).

- The Department adopted some interim quality control measures for other use of force investigations as ID continues to develop the underlying policies and protocols for new investigation procedures (*e.g.*, Preliminary Reviews).

**ANALYSIS OF COMPLIANCE**

The Department developed a number of interim quality control and auditing procedures to ensure the quality of use of force investigations pursuant to the Consent Judgment. However, given the number of ongoing pilot programs and other changes, the Department, with the Monitoring Team's support, decided to focus on implementing a policy governing the auditing procedure only for Full ID investigations at this time. The Monitor approved the policy and procedures to audit Full ID investigations, and anticipates that its implementation may address many of the issues described in this Report. The Department, in consultation with the Monitoring Team, will implement additional quality assurance, and auditing policies and procedures as the other pilots are evaluated and final changes are implemented.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a. The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b. The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has a designated "Youth ID Team" consisting of one Captain, two civilian investigators, and six uniformed Staff investigators which is based at RNDC.

- The Youth ID Team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced Inmates, age 16 or 17).

- 134 use of force incidents involving Inmates who were under the age of 18 at the time of the incident were referred for Full ID investigations during this Monitoring Period. No use of force

incidents involving female 16- and 17-year-old Inmates required a Full ID investigation in the Third Monitoring Period.

- Towards the close of the Third Monitoring Period, ID began assigning all Facility Investigations involving Youth to investigators on the Youth ID Team for review upon the close of the Facility Investigation. This was done be re-invigorating the IRT assignment process that was previously utilized by ID to assign ID investigators to review closed Facility Investigations.

**ANALYSIS OF COMPLIANCE**

*Composition of Youth ID Team and Assignment to Youth ID Cases*

The Monitoring Team verified that the Youth ID Team remained in place. The Monitoring Team conducted an analysis to verify that 134 use of force incidents involving Inmates who were under the age of 18 at the time of the incident that were referred for Full ID investigations during this Monitoring Period were in fact assigned to the Youth ID Team. The Monitoring Team confirmed that all 134 cases were assigned appropriately. The Department continues to grow the Youth ID Team, which is termed the "RNDC Team" within ID. During the Third Monitoring Period, ID added two new investigators to the team. Both new investigators to the RNDC Team are Correction Officers with four-year college degrees and prior investigation experience within ID.

*Quality of Youth ID Team Investigations*

The Monitoring Team reviewed a sample of the Full ID Investigations conducted by the Youth ID Team as part of the overall assessment of closed ID Investigations. The Monitoring Team found that the work of the Youth ID Team suffered from the same deficiencies identified in the discussion of ¶ 9 requirements above. The Monitoring Team noted significant deficiencies, biases or inadequate investigations in almost half (15 out of 28) of the Youth ID Team cases reviewed. In particular, the Monitoring Team found that investigators' failures to identify and address potentially dangerous and inappropriate use of force resulted in missed opportunities to identify and correct undesirable Staff behavior. The Monitoring Team found that the investigators failed to identify and address: force used on restrained, subdued Inmates which presented unnecessary risk of injury to the Inmate; takedown techniques used by Staff that run unnecessary risk of asphyxiation and serious injury to Inmate; Staff's failure to utilize de-escalation attempts and failure to treat situations as anticipated use of force situations when de-escalation was possible but not utilized; and Staff not only failing to de-escalate, but acting in such a way that unnecessarily escalated the situation further (including Staff mocking an Inmate during an incident). In the next Monitoring Period, the Monitoring Team intends to meet with the Youth ID Team to discuss various methods to improve the quality of the investigations, and ways to utilize their review of incidents to improve the type of use of force employed by Staff on youth. However, a lack of meaningful progress to improve investigations, including by the Youth ID Team, in

the next Monitoring Period will result in the assessment of a Non-Compliance rating in the Fourth Monitoring Period.

*Youth ID Team Review of Closed Facility Investigations Involving Youth*

During this Monitoring Period, ID initially planned to expand the Youth ID Team so that it could investigate *all* use of force incidents at RNDC by the end of the Monitoring Period. However, as described above, that timeline has been extended. Accordingly, Youth ID Team investigators will now review of all Facility-level investigations involving 16- or 17-year-old Inmates (male and female) once the investigation is closed. This process began at the end of the current Monitoring Period and will be reviewed by the Monitoring Team during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 14. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 15 (POLICIES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department finalized the Preliminary Review Operations Order in the Second Monitoring Period in consultation with the Monitoring Team. A few minor revisions were made in the Third Monitoring Period, in consultation with the Monitoring Team, and the revised version was issued on November 30, 2016.

- The Department developed a plan and timeline to review and revise ID's internal Division Orders and Manual.

### ANALYSIS OF COMPLIANCE

In consultation with the Monitoring Team, the Department finalized the policies and procedures for Preliminary Reviews to ensure that they will result in thorough, timely, and efficient investigations and are consistent with the requirements in the Consent Judgment. The Department also developed a plan to review and revise ID's internal Division Orders and Manual. ID is currently collecting, reviewing, and analyzing all internal Division Orders and the current ID Manual to determine whether any modifications are necessary to ensure consistency with the requirements in the Consent Judgment (including addressing the requirements related to maintaining case files (¶ 16)).[80] Following this assessment, ID plans to develop a timeline that prioritizes which policies and procedures must be addressed first, and then begin to revise and modify the policies and procedures in consultation with

---

[80] The Monitoring Team's review revealed files that were well organized. Further, the investigator training demonstrated that ID Investigators are instructed on how to maintain organized, standardized case files.

the Monitor. The Department's goal is to complete this process by July 15, 2017.[81]  The Monitoring Team will work closely with the Department throughout the development process to ensure that the policies and procedures will result in thorough, timely, and efficient investigations and are consistent with the requirements in the Consent Judgment.

The development of policies and procedures related to investigations traditionally conducted by the Facilities is ongoing. An initial assessment of gaps in the policies has been completed. The Department and the Monitoring Team intend to reinvigorate efforts to revise the policy in the next Monitoring Period given that ID has now determined that its ability to conduct all use of force investigations will take longer than originally contemplated. Although ID's efforts to take over all use of force investigations will take longer than expected, the Monitoring Team also continues to consult with ID about the development of procedures for when ID assumes responsibility for conducting all investigations. As part of this process, ID and the Monitoring Team will assess the results of the current pilot and consider whether any adjustments may be necessary.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

### 7.  RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management Section of the Consent Judgment requires the Department to create a number of systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. These measures include developing and implementing a computerized Early Warning System ("EWS") (¶ 1); implementing "5003 Counseling Meetings" between the Warden and any Staff Member who engages in repeated use of force incidents where at least one injury occurs (¶ 2); creating a new position, the use of force auditor ("UOF Auditor"), who identifies systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have

---

[81] This date was determined based on an initial assessment of the process, and may change once the scope of the project is identified at the conclusion of the initial assessment.

not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation data throughout the Department (¶ 6).

During the Third Monitoring Period, the Department continued to refine many of the new processes developed to address concerning practices related to use of force, including the Commissioner's Twelve Facility Action Plans ("Commissioner's Twelve"); the Immediate Action Review Committee; the "Rapid Reviews" by Facility Wardens; and the revised 5003 Counseling Meeting process. During this Monitoring Period, the Department also created a new process designed to identify avoidable uses of force ("Avoidables"). The Department also continued to develop the EWS, CMS, and a tracking system for litigation claims (all described in more detail below).

The Monitoring Team continued to collaborate with the Department to refine these procedures and reviewed the outcomes of the various processes to evaluate their effectiveness and identify any particular trends or patterns.

_The Commissioner's Twelve_

As discussed in more detail in the Second Monitor's Report (at pgs. 108-110), in late May 2016, the Department developed and implemented the Commissioner's Twelve process, wherein, on a weekly basis, Facility Wardens must review all of the incidents in which the Preliminary Review process identified a problematic use of force and then must develop an action plan to address any trends. Twelve categories of problematic uses of force were identified: head strikes, force utilized on Inmates in restraints, kicks, improper use of institutional equipment, prohibited restraint holds, camera malfunctions, excessive or unnecessary use of OC,

unexplained injuries, unreported uses of force,[82] anticipated uses of force,[83] alleged uses of force,[84] and Inmates being forcibly placed against the wall.

From July 31, 2016 through December 31, 2016, the Department reported reviewing 2,019 Preliminary Reviews of use of force incidents, and identified 618 use of force incidents (roughly 30% of the total incidents reviewed) that fit into one or more of the 12 categories. During the Third Monitoring Period, the Department also continued to host weekly meetings with Facility Wardens and their executive staff regarding the outcomes of the Commissioner's Twelve process, as well as any other issues related to use of force which may have arisen.

The Monitoring Team continues to be encouraged by the Commissioner's Twelve process, particularly as it provides Wardens with valuable contemporaneous data and information gathered from Preliminary Reviews. The Monitor reviewed the Facilities' action plans from one week near the end of the Monitoring Period. While the quality of responses was not consistent across all Facilities, and it is too soon to determine the effectiveness of these plans, there is no question this process is prompting Facility administrators to focus on issues regarding the improper use of force close in time to the incident. In some instances, the process is prompting Facility administrators to issue memoranda or host shift meeting reminders about particular policies that are critical to the proper use of force. It should be noted that the data collection associated with this process, including both the categorization of the use of force in a Facility and the Facility action plans, can also be utilized by the Use of Force Auditor to supplement his work. The Monitoring Team encourages the Department to continue to provide

---

[82] This category includes incidents in which the Department confirmed that force was used, but the incident was not reported by Staff.

[83] This category includes incidents in which the use of force was anticipated, but was not treated as such by the involved Staff.

[84] This category includes allegations of uses of force in which Inmate injuries are consistent with a use of force.

Wardens with appropriate guidance and feedback in order to strengthen the quality of the Facility Action Plans and encourages Wardens to continue to dialogue with Staff to address the areas of concern highlighted by the Commissioner's Twelve.

*Review of Use of Force Incidents: Immediate Action Review Committee, Rapid Reviews, and "Avoidables"*

The Consent Judgment requires the Department to consider whether a Staff Member should be suspended, placed on modified duty, or reassigned to a non-contact post following a use of force incident pending the outcome of the investigation (§ VII, ¶ 7, and § VIII, ¶ 2(e)). The Consent Judgment contemplates that the Preliminary Reviewer should consider this question as part of the Preliminary Review (§ VII, ¶ 7(iii)). However, this determination requires broader consideration by various stakeholders in order to determine the appropriate response to alleged misconduct. Normally, this question is addressed prior to completing the Preliminary Review by members of the Chief's Office, Wardens, the Executive Staff of ID,[85] and the Commissioner, through the Immediate Action Committee and the Rapid Review Process, which the Department bolstered this Monitoring Period. The Monitoring Team assesses the Department's efforts with these processes in the boxes below.

During this Monitoring Period, the Department created a new process to identify avoidable Uses of Force. Twice every month, the Bureau Chief of Security provides the Department's operational leadership with information regarding use of force incidents which may have been avoidable. Facility Wardens and their staff then review the identified incidents. Like the Rapid Review Process, wherein Wardens are expected to review every use of force

---

[85] The Preliminary Reviewer may also still identify Staff who warrant such consideration during the Preliminary Review in the event they are not identified by the immediate review.

incident which is captured on video, and consider whether the force used was appropriate and within guidelines, in the "Avoidables" process, they are expected to review video of identified incidents to determine whether they agree that the use of force could have been avoided. In both the Rapid Review and the "Avoidables" process, Facility Wardens are empowered to take immediate action, which could range from informal conversations with the Staff involved, to formal counseling, command discipline, retraining, or referral for charges. The Monitoring Team intends to more closely review the incidents captured through the Rapid Reviews and "Avoidables" process during the next Monitoring Period now that these processes have been fully implemented.

The Department also continues to utilize the Total Efficiency Accountability Management System ("TEAMS") process. TEAMS meetings are held once per month and are led by the Commissioner and executive staff of the Department, including all uniformed Chiefs. Facility Wardens and their executive staff attend TEAMS and are questioned about incidents occurring within their Facilities, including total Uses of Force, the number of avoidable incidents, and any disciplinary actions they have taken. During this Monitoring Period, the Monitoring Team observed a TEAMS meeting and found it useful for increasing transparency and accountability among uniform leadership. It also provides a forum for discussing areas of concern, strategizing about solutions, and exchanging best practices.

The Monitoring Team's assessment of compliance with these provisions is below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

      a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

| | |
|---|---|
| b. | ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS. |
| c. | On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During the current Monitoring Period, a Deputy Risk Manager was hired to lead the efforts to address this provision.

- The Department developed and began to implement several tools to identify and mitigate risk regarding the use of force:

  - The Commissioner's Twelve

  - Rapid Reviews

  - Immediate Action Review Committee

  - "Avoidables" Process

  - 5003 Counseling Meetings

- The Department is refining the process for tracking Staff with charges pending before Trials & Litigation.

- The Department reports that the Deputy Risk Manager is working closely with the New York City Law Department to utilize litigation data from the last five years to shed light on vulnerabilities of Department practices or policies. This analysis will identify Correction Officers who are repeatedly named as defendants in ligation and those who have patterns of risky behavior not otherwise identified.

- As discussed in the First Monitor's Report, the Department's Performance Metrics and Analytics Department ("PMA") is also working on creating EWS software. The developers have gathered inputs from existing databases, including IRS and ITTS,[86] and have been validating those inputs for use in the EWS system. PMA is also considering additional data that may be needed for full functionality of EWS (including data on all DOC admissions, and exploring data available in the Department's Employee Database).

  - The PMA estimates the timeline for completion is five to six years.

---

[86] Including age, time on job, post, whether steady or not, time since training for Staff; and mental illness status, Security Risk Group ("SRG") status (gang affiliation), Housing Units, environmental factors for Inmates.

ANALYSIS OF COMPLIANCE

As discussed more fully in the Second Monitor's Report (at pgs. 115-116), the Department is working to develop a state of the art EWS software which will require five to six years to develop.

Therefore, the Department is working to meet the requirements of this provision in a number of other ways. First, the various processes used to analyze and track uses of force have created a number of data streams to assist in quickly identifying Staff Members whose conduct warrants corrective action. This data also helps the Department to identify systemic policy or training deficiencies. These processes include Preliminary Reviews, the Commissioner's Twelve, the work of the Immediate Action Review Committee, the Rapid Reviews, identifying avoidable uses of force, and Counseling Meetings. These are all critical components of a system for timely identification and mitigation of risk. Second, in addition to the data available through the processes describe above, other data (*e.g.*, personnel data, disciplinary data and Inmate data) is valuable to a fully functional early warning system.

*Addressing Potential Policy and Training Deficiencies*

As a result of information gathered through the processes described above, the Department has identified some systematic policy and training deficiencies. For instance, as described in more detail in the Use of Force Policy section, the Department has worked to address identified deficiencies with the deployment of Chemical Agents by revising the Chemical Agents directive and developing a corresponding roll-call training for all Staff.

The Department also determined that staff of all ranks are struggling with situations involving a passive Inmate who is nevertheless refusing to follow orders, particularly when the Inmate is in a location which impacts the safe operation of the Facility, such as in a corridor. Staff have requested further guidance on how long to wait out a passively resistant Inmate, and what the next steps should be when de-escalation and conflict resolution have not been effective. To provide additional clarity to Staff, the Department is developing brief roll-call trainings, in consultation with the Monitoring Team, utilizing videos of real incidents to be rolled out during the Fourth Monitoring Period. Members of the Training Academy, ESU, and the Office of the Bureau Chief of Operations worked together to identify 25 videos, approximately half of which depict "justified" Uses of Force, and half of which depict "un-justified" Uses of Force along with a short question and answer component. The videos will be played at roll-call along followed by discussion with Staff in all Facilities.

*Identification of Staff Members whose conduct may merit Corrective Action*

Now that the Department has developed a variety of useful and reliable sources of data, the information must be centralized to effectively identify Staff Members whose conduct may warrant corrective action. To support this effort, the Monitoring Team shared two separate lists with the Deputy Risk Manager that identified Staff the Monitor recommended for review based on analysis of Preliminary Reviews and disciplinary data. The first list identified approximately 40 Staff who were frequently involved in uses of force generally, and whose repeated participation warranted exploration. The second list was a subset of the first and identified seven Captains who had been involved in multiple uses of force, for which the Monitor identified as problematic either individually, or when taken in totality. The Department reviewed the current status of the seven Captains and provided information about disciplinary or Counseling actions (if any) that had been taken to date. However, the Department has not subsequently conducted its own systematic analysis to identify Staff whose conduct warrants additional scrutiny.

During this Monitoring Period, the Department refined several excellent processes that now provide reliable data that would allow the Department to conduct this analysis. However, the Monitoring Team is concerned that the further development of this process has stalled during the development of other procedures. Accordingly, during the next Monitoring Period, the Department must demonstrate significant progress towards implementing a manual, but effective, early warning system, or an assessment of Non-Compliance will be issued. As this provision requires the approval of the Monitor, the Monitor expects the Department will work in close collaboration with the Monitoring Team to develop the appropriate practices and procedures.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting

and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department issued the new 5003 Directive on August 10, 2016.

- The Department reported that training was provided to all Commanding Officers (or their representatives) at the end of July, 2016.

- The Department implemented the new 5003 Counseling Meeting process across all Facilities in August, 2016.

- The new 5003 Counseling Meeting process includes:

  - Using IRS to generate a list of individuals who qualify for Counseling meetings from a centralized location at headquarters, instead of relying on the Facilities to generate these lists.

  - Providing information not just about which Staff qualify, but details about the incidents the Staff were involved in. These IRS reports will be generated on a bi-monthly basis.

  - A new process for Supervisors to more easily access the information regarding the Staff who require counseling and created a chart to track the completion of Counseling Meetings.

  - A list of questions for the Facilities to complete for each staff member that confirms whether the staff member received counseling or not, the reasons why or why not and the outcomes of the 5003 Counseling Meeting. The chart includes drop down lists and guidance questions to ensure the information is completed consistently and adequately.

  - The chart is sent to each Facility to complete every other month.

- Following the roll out of the revised process, IRS reports were generated by the Department in August, October and December 2016. Once the 5003 Counseling Meeting process was shared, the Facilities shared the data with the Department within one month.

- During the current Monitoring Period, the Department conducted 610 Counseling Meetings involving a total of 533 Staff.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team began to review the implementation of the revised 5003 Counseling Meeting process during the Third Monitoring Period. As an initial matter, the Monitoring Team confirmed that the policy and procedures for the new 5003 Counseling Meeting process adequately address the requirements in ¶ 2. The Department's creation and use of a uniform excel chart is a

positive step toward ensuring the Facilities provide all required information and for greater transparency of the 5003 Counseling Meeting process.

As this process only began during this Monitoring Period, the Monitoring Team focused its initial assessment on whether Facilities were provided with the information needed to meet the policy expectations, which they were. The Monitoring Team intends to more closely assess the quality of process in the next Monitoring Period.

*Testing of December 2016 records*

The Monitoring Team received the bi-monthly spreadsheets from the Department that occurred during this Monitoring Period. The spreadsheets contained the list of all staff who qualified for a 5003 Counseling session in that period for each Facility and identified which Staff were counseled and which Staff were not counseled. The facilities were required to provide either the counseling outcome or the reasons why a Staff member did not receive counseling. As expected with a new process, the Department reported some initial implementation issues with the first set of reports including:

- A couple of Facilities used the old reporting forms as they transitioned to the new process.
- Several of the Facilities provided inadequate reasons for not counseling Staff such as, Staff being on sick leave, on vacation or no longer assigned to that Facility.
- Some of the 5003 Counseling Meeting forms were submitted with a few fields incomplete.

In light of these initial issues, the Monitoring Team elected to focus our initial review on the data collation process, to allow the Department the opportunity to resolve the initial issues it had identified. The Monitoring Team assessed the completed December 2016 spreadsheet and shared feedback with the Department on initial areas of concern. For example, several Facilities did not complete their Excel spreadsheet or were inconsistent in how they complete the spreadsheets. The Department reported that in December 2016 across all Facilities, a total of 492 staff were involved in an actual or alleged use of force three or more times during a six-month period and that one or more of these Uses of Force resulted in an injury to a Staff member or Inmate. As noted elsewhere in the report, involvement in three use of force incidents, alone, is not necessarily indicative of a problem, there are several legitimate factors that may contribute to staff's involvement in use of force incidents (such as the shift and post assignments, type of Inmate population, etc.). Further, a 5003 Counseling Meeting is not disciplinary in nature as leadership may use the meeting as an opportunity to reinforce best practice for Staff who are more frequently engaged in situations that may require the use of force. The Department has demonstrated that it is now centrally tracking Staff who meet the criteria for a counseling meeting and requires the Warden to report about whether the meeting has occurred or not.

While the Monitoring Team has seen an improvement in the 5003 Counseling Meeting process compared to the previous Monitoring Period, additional work is necessary to reduce inconsistencies

and errors in the documentation. The Monitoring Team encourages the Department to conduct its own assessment of the Facilities responses to 5003 Counseling Meetings and will continue to work with Department to develop its own 5003 Counseling Meeting quality assurance framework. The Monitoring Team will continue to assess the 5003 Counseling Meeting process in subsequent Monitoring Periods to assess the quality and content of Counseling Meetings and whether all Staff who required counseling received it.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2(e) (RESULTS OF PRELIMINARY REVIEW)

¶ 2.

e.      If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintained the Immediate Action Review Committee, which meets bi-weekly to review use of force incidents to determine whether any "immediate action" should be taken to correct identified problems.
- The Immediate Action Review Committee members changed slightly based on identified need; the Committee now includes representatives from ID, Legal, Trials, the Bureau Chief of Operations, and the Training Academy.
- The Immediate Action Review Committee considered 36 use of force incidents during this Monitoring Period and took "immediate action" in 26 of those incidents with 34 individual Staff members. Corrective actions ranged from retraining, counseling, or placement on non-contact posts, to reassignment or suspension.
- The Department conducts Rapid Reviews of all use of force incidents wherein Wardens are expected to review every use of force incident that is captured on video, and consider whether the force used was appropriate and within guidelines.

### ANALYSIS OF COMPLIANCE

The Monitoring Team has chosen to address this provision in this section rather than in the Staff Discipline and Accountability section because this requirement is more aptly considered a Risk Management tool. The Monitoring Team has been collaborating with the Department on the development of this process and the identification of Staff whose conduct may warrant immediate action. During this Monitoring Period, the Department took immediate action against **34 individual** Staff members involved in **26 incidents** that took place in this Monitoring Period. The immediate

action taken sometimes included a combination of responses (*e.g.*, modified duty and re-training) so the following action totals will be greater than the total number of Staff:

- 5 Staff members were suspended for either five or 10 days;
- 2 Staff members were placed on modified duty pending re-training;
- 24 Staff members were referred for re-training (this captures all cases where a staff was referred for retraining, including situations where additional discipline may have been imposed).
- 2 Staff members were referred for counseling.
- 2 command disciplines were imposed.
- 2 Staff members were re-assigned.

During this Monitoring Period, the Monitoring Team met with the Department on several occasions to discuss the type of conduct that should be considered during the immediate action evaluation. The Monitoring Team identified eight use of force incidents for consideration. The immediate action committee considered these incidents and immediate action was taken in three of those cases (in one of the three cases, the Department had previously taken action, but that information inadvertently had not been initially provided to the Monitor). In the five other cases, the Department determined that additional investigation was necessary before action could be taken. The Monitoring Team discussed these results with the Department and found the Department's approach regarding all eight cases to be reasonable. During the next Monitoring Period, the Monitoring Team will also review incidents captured through the Rapid Reviews to assess the substance of the incidents captured and subsequent responses in that process as well.

Overall, the Monitoring Team is impressed by the Department's efforts to timely address areas of concern and potential misconduct and encourages the Department to maintain these practices to further fortify the overall goal of timely and meaningful training, counseling, and accountability. The Monitoring Team must conduct additional analysis in order to make a qualitative assessment as to the effectiveness and appropriateness of the immediate action responses to date, and will do once a critical number of such actions has been taken. To achieve Substantial Compliance, the Department must demonstrate the Rapid Review process conducts a similar assessment to the Immediate Action Committee and that both processes identify appropriate cases for consideration and demonstrate reasonable consideration and responses are conducted as a result.

| COMPLIANCE RATING | ¶ 2(e). Partial Compliance |
|---|---|

| X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR) |
|---|

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department hired a UOF Auditor, who began working at the Department on August 28, 2016, and reports directly to the Commissioner.

- Before the UOF Auditor was hired, the Department assembled several key personnel, including the Deputy Commissioner of Investigations and his senior staff, the Chief of Department and his staff, as well as senior staff from the Office of the Commissioner and the Office of the General Counsel, to form an Auditor Report "Support Team." This team was responsible for conducting analysis and contributing to Auditor Reports until the Department hired and fully on-boarded a dedicated Auditor.

    o This interim team drafted the first two Quarterly Auditor Reports.

- The UoF Auditor drafted the third Quarterly Auditor Report.

**ANALYSIS OF COMPLIANCE**

The UOF Auditor is a new position required by the Consent Judgment in order to develop an internal capacity to monitor the use of force and identify troubling trends. This position was filled at the beginning of the Third Monitoring Period; the Auditor's official title is "Chief Internal Monitor." The Chief Internal Monitor provided his first report to the Monitoring Team with the Third Compliance Report. The Monitoring Team found the report to be thorough and insightful. The Report explored IRS data, Inmate fight data, Inmate population data, Investigation Division Preliminary Reviews, Staff seniority data, Inmate classification and housing data, and T.E.A.M.S. Master Book data. The Report comprehensively looked at the following: rate of force by Staff seniority, location of force, Inmates involved in five or more uses of force, and reliability of Preliminary Review data. The report included the following significant observations (among others):

- **Injury Classification**: Since Q1 2015, the Department has seen a significant decrease in the number of Class "A" (major injury) and Class "B" (minor injury) incidents (-37% and -19% respectively), and an increase in Class "C" incidents (+11%; incidents with no injury).

- **Staff Seniority**: Correction Officers on probation (a two-year period) accounted for 42% of the use of force and Captains on probation (a one year period) accounted for 34%. The probationary Correction Officers accounted for a significant majority (62%) of the Correction Officers with five years of service or less involved in a UOF. Captains on probation accounted for 43% of Captains and had five years of experience or less involved in a UOF.

The Chief Internal Monitor also made several high-level recommendations regarding areas of Leadership, Tour Assignments, Calculating the use of force Rate, and the support necessary to maintain and support the efforts of the Use of Force Auditor.

   The Monitoring Team is extremely impressed by the Auditor's work to date and looks forward to working with the Chief Internal Monitor and the Department to determine how best to utilize the extensive data analysis and recommendations. The work of the Auditor is critical to the Department's efforts to achieve and sustain the necessary reforms. To do so, the Use of Force Auditor must have appropriate staffing with permanently funded lines, as noted in the introduction to this report. In order to achieve Substantial Compliance with this provision, the Department must demonstrate that the Use of Force Auditor consistently produces thoughtful and reliable analysis and that the Department considers the issues raised and responds to areas of concern as appropriate.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel provides monthly and quarterly reports of lawsuits filed and settled, which include the following:

   o Case filing and disposition dates,

   o Names and shield numbers (if appropriate) of the defendants,

   o Incident details,

   o Dollar amount in controversy,

   o Forum of the lawsuit, and

   o Description of the lawsuit.

- The Deputy Risk Manager has been working closely with the Office of the Corporation Counsel, analyzing the reports provided. Additionally, the Office of the Corporation Counsel's Risk Management Unit now meets monthly with the Deputy Risk Manager, providing regular communication and earlier notification of potential patterns of risky officer behavior or Department practices.

- The Department continues to work with the Office of the Comptroller to develop a system to notify the Department about notices of claim that the Comptroller has settled pre-litigation.
    - o The Comptroller provided a report of all claims filed against the Department over an eight-month period, but the report did not consistently identify which claims were use of force related.

- The Department's Deputy Risk Manager is actively managing and analyzing the information provided by the Office of the Corporation Counsel and working with the Comptroller's Office to come up with a protocol for real-time reporting of claims.

**ANALYSIS OF COMPLIANCE**

  The Department is still in the process of developing a method for tracking the filing and disposition of litigation relating to use of force incidents provided by the Office of Corporation Counsel and the Comptroller's Office[87]. The Department's Deputy Risk Manager has taken on this responsibility during the Third Monitoring Period, studying the litigation data from the past five fiscal years to identify broad patterns or clusters of lawsuits which can shed light on vulnerabilities of Department policies or practices. This analysis could also identify Correction Officers who are repeatedly named as defendants in litigation and those who have patterns of risky behavior not otherwise identified. The Monitoring Team will look more closely at this work during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel provides the Department with all complaints relating to an excessive use of force and requests all investigation files and associated evidence.

---

[87] The Department reports after the close of the Monitoring Period that it has also developed a process to obtain routine reporting from the Comptroller's Office related to claims against the Department.

- Whenever DOC receives a use of force allegation from the Office of the Corporation Counsel, they confirm whether a use of force investigation into the allegation has been already been conducted. If they cannot confirm the incident was previously investigated, DOC Legal Division attorneys are required to notify a designated Assistant General Counsel who is responsible for *Nunez* matters.

- The Department's Deputy General Counsel sent multiple emails to all DOC attorneys reminding them of this process and reminds them of their obligations verbally during Legal Division Management meetings.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified the process described above with the designated Assistant General Counsel from the Department's Legal Division and attorneys from the Office of the Corporation Counsel. The Office of the Corporation Counsel reports that all allegations of excessive use of force in a lawsuit are brought to the Department's attention. The Department reports it only received one lawsuit, filed in the Supreme Court Bronx, that contained allegations regarding a use of force incident that did not appear to have been previously investigated. The Department reported to the Monitoring Team that ID reviewed the compliant and determined that an ID investigation was not merited. The Monitoring Team found ID's determination to be reasonable based on the circumstances. Going forward, the Monitoring Team will continue to ensure that the process described above is maintained.

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)

¶ 6. By December 1, 2016, the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As outlined in prior Monitor's Reports, the Department has been working to develop CMS since early 2012.

- As of the end of the Third Monitoring Period, the Department's current completion status for CMS is reported to be as follows:

  o Facility workflow for capturing use of force incidents – 75%

  o Use of force documents – scanning and uploading capability – 25%

  o Video and Audio file upload and access – 25%

- o   Preliminary Review functionality – 75%

- o   Full investigation functionality – ID – 75%

- o   Full investigation functionality – Facilities – 50%

- o   Trials functionality – 50%

- o   Command Disciplines – 50%

- o   Memoranda of Complaints – 50%

- o   IRS interface – 75%

- o   Employee, Inmate and Visitor look up system interfaces – 75%

- o   Reports – 25%

ANALYSIS OF COMPLIANCE

The purpose of CMS is to create a single, unified system to replace the existing disparate case management systems and related manual processes currently used by eight different DOC divisions/units including: Facility Investigations, Investigation Division, Trials & Litigation Unit, Office of General Counsel, Equal Employment Opportunity Office ("EEO"), OLR, Office of Administration and the Health Management Division. CMS will track all the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions as set forth in Consent Judgment § V (Use of Force Reporting), ¶ 18.

The Consent Judgment requires the system to be developed by December 1, 2016. In November 2016, the Department met with the Monitoring Team to discuss the status of CMS development and implementation. The Monitoring Team agreed that proper development and training were key to the success of the system, and that requesting an extension of the deadline in the Consent Judgment was appropriate. The Parties, with the Monitor, have initiated discussions in good faith to agree upon a reasonable extension of time as required by Consent Judgment § XXI (Compliance, Termination, & Construction), ¶ 6. The Monitor anticipates an agreement will be reached among the Parties and the Monitoring Team, at which time the new timeline will be submitted to the Court for approval.

The Monitoring Team observed a demonstration of CMS functionality with representatives from the Department's IT, Legal, Trial, and Investigations Divisions as well as the vendor building the system. The system is impressive, versatile and has tremendous functionality. The Monitoring Team is confident that the system will capture all elements required by *Nunez*. The system also captures certain data based on the recommendations from the Monitoring Team. CMS goes far beyond what is specifically required in the Consent Judgment, and will further enhance the reform efforts in a variety of ways. The sophisticated programming of the web-based environment has many built in conventions that will require Staff to follow actions that comport with the *Nunez* requirements. For example, the system sets required documentation for Facility Investigating Captains to collect, and has conventions which require Facility and ID Investigations to be assigned and carried out in a specific way. By way

of illustration, Preliminary Reviews will be conducted in CMS and the functionality in CMS has strict programming conditions that require Preliminary Reviewers to choose options that comport with the Preliminary Review Policy. For instance, for every incident the Preliminary Reviewer must assess and determine whether each of the 10 circumstances warranting a Full ID investigation (§ VII, ¶ 8) are present for the incident. Depending on the results, the system will then automatically determine the level of scrutiny required. This process will not only enhance the reliability of the data, but also help ensure that requirements of the Consent Judgment are met.

The Department has also been developing a training plan as all end-users must be trained on CMS before it can be implemented. The Department reports that for use of force functionality alone, the Department will need to train approximately 1,600 Staff including all Captains and higher-ranking uniformed staff up to the Chief of Department, all ID staff members, all Trials and Litigation staff members, staff from the Bureau Chief of Administration's office, and most Legal Division members. The Commissioner and his staff will also require training. Conservatively, training all necessary uniformed staff will require a minimum of nine weeks, with additional time needed to train all non-uniformed staff. Once development is complete, the system will need to be integrated into current systems and the Department must install the necessary equipment to support the system (*e.g.*, scanners to upload certain forms).

CMS will completely transform the way the Department captures information and the protocols for a significant number of Staff. The Monitoring Team believes CMS will also significantly enhance the work of the Department. The Monitoring Team's experience suggests that developing and implementing new systems is often fraught with unexpected delays and thus will keep abreast of any challenges incurred.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

### 8.  STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely discipline is an indispensable element of the overall effort to reduce and deter the use of excessive and unnecessary force by Staff. This Monitoring Period, the Monitoring Team continued to focus on more immediate responses to Staff misconduct, as described in detail in the Risk Management section, and also started to review the full spectrum of disciplinary options (*e.g.*, corrective interview, command discipline, and formal charges). Toward that end, the Monitoring Team met with the new Assistant Commissioner of

the Trials and Litigation Division ("Trials"),[88] the Executive Managing Director and an Executive Agency Counsel of Trials, along with the Deputy Commissioner of ID, the Deputy Director of ID, representatives of the Chief's Office, and the Department's Legal Division, to further understand the various options the Department has for holding Staff accountable.

Following a use of force incident, a number of procedural and investigative actions take place in order to determine whether the conduct was justified, and when it was not, to impose meaningful discipline. Even at its best, this process requires significant time to complete. Unfortunately, the Monitoring Team has observed undue delay surrounding several of these steps, which has extended the overall time to impose discipline to a point that undermines the integrity of the entire process. The graphic below provides an overview of all steps in this process in order to illustrate the complexity and also to focus the reader on the particular steps at issue in this part of the Consent Judgment.

---

[88] During this Monitoring Period, the Commissioner appointed a new Assistant Commissioner of Trials.

## Process to Impose Formal Discipline



During this Monitoring Period, the Monitoring Team focused on the initial steps for imposing formal discipline in use of force cases when a Staff member is found to have committed a violation, presented in blue boxes in the above graphic. This process requires coordination across a number of divisions. In most use of force cases, the referral for formal

discipline occurs following the conclusion of an investigation.[89] The majority of these

investigations are conducted by the Investigation Division, but some are also conducted at the

Facility-level.[90]  When an ID investigator recommends an employee for formal charges in the

Closing Report, a Memorandum of Complaint ("MOC") is drafted by the ID investigator. The

Deputy Commissioner of ID reviews both the Closing Report and the MOC and decides whether

to approve or to decline any recommended discipline.[91]  The MOC is then forwarded to the Chief

of Administration, who reviews and signs the MOC and assigns an "MOC number." The MOC is

then sent to Trials. Once Trials obtains a signed MOC and the MOC number, they must assess

the evidence and full file before drafting charges. Upon determining that charges are warranted,

Trials drafts the charges and prepares them for service. Generally, charges are served by the

Facility where the subject Staff member is assigned. Further, in order to preserve the statute of

limitations, Trials must generally serve specifications and charges against the subject employee

within 18 months of the date of the underlying incident.

The Monitoring Team met with the Assistant Commissioner, the Executive Managing

Director, and an Executive Agency Counsel from Trials several times to better understand Trials'

process overall, the efforts to prosecute cases as expeditiously as possible, and the various

potential causes of delay that can occur when prosecuting cases. Delays in imposing formal

---

[89] The formal disciplinary process by Trials against uniformed and non-uniformed Staff members may be initiated in different ways, including referrals made by 311 complaints, DOI, ID, and the Department's Facilities and commands.

[90] The Facilities engage in a similar process for investigations conducted at the Facility-level that conclude formal discipline should be imposed. In those cases, the Warden of the Facility must approve any referral for formal discipline and forward it to the Chief of Administration.

[91] The required timelines include that in the first 30 days after an investigation finds that a Staff Member committed a UOF Violation the Deputy Commissioner of ID must decide whether to approve or to decline any recommended discipline within 30 days of receiving the ID Closing Memorandum and then promptly provides the file to Trials. Trials then shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation.

discipline occur for a variety of reasons, the fault of which lies across the Department and not within a single division, and also includes some delays which are outside of the Department's control.

The first step to imposing formal discipline is developing and serving charges, which involves a number of different Departments that must coordinate to share information. This complexity has resulted in significant delay in the ultimate service of charges, with the problems stemming from various stages of the process and lies within different divisions of the Department. In order to begin drafting charges, the Trials division must first receive the MOC. The Department reports it can often take more than 30 days after the Deputy Commissioner of ID has signed the MOC for Trials to receive it, whereby they can begin drafting the charges. This is likely due to a delay in the coordination efforts between ID providing the MOC to the Bureau Chief of Administration's Office and the time it takes for the office of the Bureau Chief of Administration to process the MOC. Further, after receiving the MOC, the Trials Division is often not in a position to draft charges because of incomplete information available to the Trials Division attorney. The Department reports in order to properly assess a case and draft charges, the attorney in the Trials Division needs to review all relevant evidence for the case to ensure that charges are warranted. This could include Genetec footage, handheld video, audio interviews, and/or photographs depending on the nature of the case. This evidence is not routinely provided to the Trials Division attorney with the MOC due to current record-keeping practices, and must be requested.[92] So, although a case may be closed by ID and the MOC may have been forwarded to the Trials Division by the Bureau Chief, attorneys in the Trials Division still cannot process the case, because they do not have the materials needed to make a fair,

---

[92] It is expected that the implementation of CMS will alleviate these issues.

complete assessment.

Once the Trials attorney assesses the evidence and drafts charges, they are sent to the Facility to be served on a respondent. The Department reports that Facilities often take over 30 days to do so. The significant delays in the parts of the process most directly related to imposing discipline currently hinder the Department's ability to timely impose discipline. Outcomes at each stage are discussed in detail below.

Certainly, some of the delays incurred throughout the process of imposing discipline are out of the Department's control. Notably, the Office of Administrative Trials and Hearings ("OATH"), which hears Department disciplinary cases brought by Trials, only hears Department cases on Wednesdays, and limits the number of cases heard each week to twelve. Other frequent causes of delay are difficulty in scheduling respondent Staff Members for appearances due to sick leave and pass days, as well as multiple respondent cases which require conflict counsel.

That said, most of the steps required to impose discipline are within the Department's control, and thus the Monitoring Team expects meaningful corrective action, which the Department has committed to working with the Monitoring Team to achieve. To the Department's credit, the above analysis of the various delays was internally generated, which demonstrates a growing ability to identify the underlying causes of operational problems that are resulting in less than desirable outcomes.

In an effort to combat some of the delays in imposing discipline, Trials and ID have also developed a Fast-Track proposal, as discussed above in the Use of Force Investigations section of this report. This process is designed to efficiently identify and prosecute Staff who commit a

Use of Force policy violation in which formal discipline, except for termination,[93] may be sought. This proposal would have the added benefit for both the Department and Staff to resolve disciplinary matters closer in time to the incident in question, making any discipline more meaningful and preventing the Staff from waiting in limbo while the case awaits adjudication at OATH.

During the next Monitoring Period, the Monitoring Team intends to work with the Department to scrutinize the various sources of internal delay discussed above and develop strategies to address them.

The Monitoring Team's assessment of compliance is below.

| VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1 (APPROPRIATE AND MEANINGFUL DISCIPLINE) |
|---|

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As part of the Commissioner's Twelve process (as described in detail in the Risk Management section of this report), the Facilities reported they conducted eight Corrective Interviews, issued 64 Command Disciplines, referred one Memorandum of Complaint, and suspended five Staff in response to incidents identified during the current Monitoring Period.
- A total of 382 Staff have MOC's pending before Trials as of December 31, 2016.
- Trials closed cases against 316 Staff Members with disciplinary actions between November 1, 2015 and December 31, 2016. Of the cases closed:
  - 275 cases involved Staff's conduct in incidents that occurred and MOC's signed *before* November 1, 2015 ("Pre-Pre").
    - On average it took 1,039 days to resolve each of the cases from the date of the incident.
  - 37 cases involved Staff's conduct in incidents that occurred *before* November 1, 2015, but the MOC was signed *after* November 1, 2015 ("Pre-Post").

---

[93] It is anticipated in cases where the Department will seek termination that the Staff Member will exert their right to go to Trial before OATH. Accordingly, a Full ID Investigation, including conducting MEO-16 interviews of Staff, will need to be completed.

- On average it took 541 days to resolve each of the cases from the date of the incident.
  - Four cases involved Staff's conduct in incidents that occurred *after* November 1, 2015 ("Post-Post").
    - On average it took 243 days to resolve each of the cases from the date of the incident.
- The chart below identifies the breakdown of the dispositions of the cases broken down by the three categories above.

| Disposition | Description of Disposition | *Pre-Pre* | *Pre-Post* | *Post-Post* | Total # of Cases | Total % |
|---|---|---|---|---|---|---|
| Guilty | Cases that have been adjudicated at OAT where the Administrative Law Judge found that the Department proved the alleged misconduct by a preponderance of the evidence. | 5 | 0 | 0 | 5 | 2% |
| Negotiated Plea Agreement | A formal settlement agreement entered into by the Department and Respondent, with the assistance of assigned counsel, that satisfies the specifications and charges of the case. | 132 | 11 | 0 | 143 | 45% |
| Return Back To Command | A particular type of NPA, where the parties agree to refer the matter back to the Respondent's command to be adjudicated at a Command Discipline hearing. | 1 | 1 | 0 | 2 | 1% |
| Deferred Prosecution | Cases where prosecution of the case is deferred as a result of the Member of Service having resigned or retired from the Department. Disciplinary proceedings will be restored if the Member resumes employment with the Department. | 36 | 3 | 0 | 39 | 12% |
| Medical Separation | Cases under Section 71 and 73 of the Civil Service Law that are not considered discipline. If a member of service has been medically separated, that individual has one year, after proving fitness for duty per DCAS, to return to work. | 0 | 1 | 0 | 1 | <1% |
| Administratively Filed; Dismissed; MOC Rescinded | In general, cases where the Department is unable to prove the alleged misconduct by a preponderance of the evidence. There are other instances where a case maybe administratively filed, including, for | 98 | 21 | 4 | 123 | 39% |

| | | | | | |
|---|---|---|---|---|---|
| | instance, if the charges were not served before the individual left the agency, for whatever reason. If a case is administratively filed, it should not be part of the individual's disciplinary history. | | | | | |
| Not Guilty | Cases that have been adjudicated at OATH where the Administrative Law Judge found that the Department failed to prove the alleged misconduct by a preponderance of the evidence. | 3 | 0 | 0 | 3 | 1% |
| **Total** | | **275** | **37** | **4** | **316** | **100%** |

**ANALYSIS OF COMPLIANCE**

The Department has various options to respond to problematic Staff conduct, including both informal and formal discipline. Many of the informal options are discussed in greater detail in the Risk Management section of this report. Therefore, for purposes of assessing compliance with this provision, the Monitoring Team intends to focus on issuance of Command Disciplines, Staff suspensions and Formal Charges.[94] This analysis will ultimately also include identifying potential cases where the Monitoring Team believes charges should have been brought but were not. Such analysis, and discussion with the Department, will be completed in subsequent Monitoring Periods.

The Monitoring Team focused its initial assessment of the Department's level of compliance by gathering data about the cases pending before Trials, and the Facilities' responses to cases identified as part of the Commissioner's Twelve process. This data is currently the most reliable data available from interim tracking systems. Given the pending development of CMS (discussed in the Risk Management section) the Monitoring Team has focused on only obtaining certain data in order to ensure that the focus remains on the ultimate objective of transitioning to CMS in the near future. That said, in the next Monitoring Period, as an interim measure, the Monitoring Team and the Department will focus on improved interim tracking methods for Command Discipline.

As described in greater detail above, and in the Use of Force Investigation section, the process for investigating and prosecuting Formal Charges is a complicated, time-consuming process. As shown in the data in the bullet points above, to date, the majority of cases closed by Trials during the pendency of the Consent Judgment were related to incidents that occurred prior to the Effective Date of the Consent Judgment, over 14 months ago, and it is important to note that not all cases closed by Trials actually impose discipline. In fact, all four cases closed by Trials involving Staff's conduct in incidents that occurred *after* the Effective Date were closed without the imposition of discipline. The Monitoring Team intends to more closely review the cases closed by Trials in the next Monitoring

[94] In subsequent Monitoring Periods, the Monitoring Team will also evaluate the disciplinary process and imposition of discipline for probationary and managerial employees, which is a somewhat separate from the formal charges process described above.

182

Period in order to determine whether the outcomes of the disposition resulted in appropriate and meaningful discipline.

A core component of meaningful discipline is that it must be imposed timely. The sample of incidents with closed cases occurring *after* the Effective Date is currently too small for reliable analysis. That said, the Monitoring Team is very concerned about the protracted process to impose discipline and strongly encourages the Department to evaluate and revise its current practices to ensure timely discipline is imposed. The analysis of the Department's efforts to address cases with pending charges is described in more detail in ¶ 3 below.

During the next Monitoring Period, the Monitoring Team intends to more closely review the issuance of Command Discipline and Staff suspensions. Accordingly, an assessment of compliance cannot yet be made.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)[95]

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

  a.  The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

  b.  The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

  c.  The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

      i.   Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

      ii.  Deliberately failing to report Use of Force by a Staff Member.

      iii. The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced

---

[95] §VIII, ¶ 2(e) is discussed in Risk Management section given that the provision is more applicable to discussion in that section. §VIII, ¶ 2(e) is not required to be incorporated in the Disciplinary Guidelines. Therefore, the Monitoring Team finds that it is inappropriate and confusing to discuss this requirement in the context of the Disciplinary Guidelines as this requirement will not be included in the guidelines.

<table>
<tr><td></td><td></td><td>misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.</td></tr>
<tr><td>d.</td><td></td><td>The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.</td></tr>
<tr><td></td><td>i.</td><td>Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.</td></tr>
<tr><td></td><td>ii.</td><td>Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate.</td></tr>
<tr><td></td><td>iii.</td><td>Causing or facilitating an Inmate-on-Inmate assault or fight, or allowing an Inmate-on-Inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility.</td></tr>
<tr><td></td><td>iv.</td><td>The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.</td></tr>
</table>

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has drafted New Disciplinary Guidelines.

**ANALYSIS OF COMPLIANCE**

The current draft of the New Disciplinary Guidelines addresses all of the specific requirements outlined in (¶ 2 (a) to (d)) above. During this Monitoring Period, the Department consulted with Staff representatives and the Monitoring Team about the revisions. The New Guidelines will take effect on October 27, 2017, which is 30-days after the effective date of the New Use of Force Directive.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

| | |
|---|---|
| a. | If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor. |
| b. | If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division. |
| c. | The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and |

serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- 46 Use of Force cases were closed by ID and referred to Trials for Formal Charges from August 1, 2016 through December 31, 2016.

- Trials closed cases against 316 Staff Members with disciplinary actions between November 1, 2015 and December 31, 2016.

- A total of 382 Staff have charges pending before Trials as of December 31, 2016
  - o 154 of the cases that were pending before Trials as of December 31, 2016 were the result of incidents and investigations closed *before* November 1, 2015.
    - ▪ As of December 31, 2016, these cases have been pending an average of 1,101 days since the incident date.
  - o 136 cases involved incidents that occurred *before* November 1, 2015, but the investigation was closed *after* November 1, 2015.
    - ▪ As of December 31, 2016, these cases have been pending an average of 629 days since the incident date.
  - o 92 cases involved incidents that occurred *after* November 1, 2015.
    - ▪ As of December 31, 2016, these cases have been pending an average of 297 days since the incident date.

- The Department reports that during this Monitoring Period, Trials implemented a new case assignment process to ensure that attorneys receive the cases as quickly as possible.[96]

- The Department reports that since September 2016, the Trials Division has taken steps to speed up the OATH process:
  - o Trials attorneys are required to appear at OATH on their own cases, which has allowed for more negotiated settlements since the attorneys have move familiarity with the facts needed to work out appropriate dispositions.
  - o The Trials Division has worked with the OATH judges to permit attorneys with multi-respondent cases to schedule the large cases outside of the Department's dedicated weekly date at OATH.

---

[96] Currently the case file, including the signed MOC's, are maintained in hard copy so a number of tracking and logistical steps are necessary to ensure all necessary documentation has been received before the case is assigned to the attorney.

  o Trials attorneys are required to maintain certain information in a shared document that is accessible to all Trials managers.

ANALYSIS OF COMPLIANCE

  The Monitoring Team focused its analysis on the cases referred to Trials during the pendency of the Consent Judgment (November 1, 2015 and December 31, 2016) and those that are still pending. Cases pending before Trials may be in various different stages within Trials—awaiting charges to be drafted, charges to be served, discovery, pre-trial or scheduled trial at OATH. The data discussed below clearly illustrates two things: (1) a large number of cases are pending before Trials (382 cases, total); and (2) in a large portion of these cases (n=154, or 40%), the investigation was completed before the Effective Date of the Consent Judgment, over 14 months ago. This alone suggests that the Department is not meeting its obligations regarding timely staff discipline.

  The Monitoring Team closely reviewed this data to better understand the source and magnitude of the problem. The cases were placed into three groups: (1) the charges stem from an incident that occurred before the Effective Date and the investigation was closed before the Effective Date ("PRE-PRE"); (2) the charges stem from an incident that occurred before the Effective Date, but the investigation was closed after the Effective Date ("PRE-POST"); and (3) the charges stem from an incident and investigation that occurred after the Effective Date ("POST-POST"). Using data provided by the Department for each of these cases, the extent to which charges were served timely was assessed for each group. The analysis discussed below utilized only the two groups where the investigation was closed after the Effective Date of the Consent Judgment, and therefore the requirements of the Consent Judgment applied to the cases (i.e., PRE-POST and POST-POST). The Monitoring Team analyzed both the instances where charges were served and cases in which charges have yet to be served for timeliness. Among the PRE-POST cases, charges were served in 124 of the 136 cases (91%) and have not been served in 12 cases (9%)[97]. Among the POST-POST cases, charges were served in 42 of 92 case (46%) and have not been served in 50 cases (54%).

  A measure of timeliness was applied to both groups and a guideline of 45 days was established as a threshold.[98] As shown in the table below, highlighted in red, large proportions of cases in both categories did not have charges served timely. More specifically, even for cases where charges have

---

[97] In 2 of the 12 cases, the statute of limitations has expired and therefore charges cannot be served. In 6 of the 12 cases, the cases were administratively filed and no charges will be served. In 4 of the 12 cases, charges were served before the expiration of the statute of limitations in the Fourth Monitoring Period.

[98] 45 days was selected as the appropriate measure to determine if charges were served timely from the time the Deputy Commissioner of ID signed the MOC to when the charges were ultimately served. Currently, the Department only tracks the time at which the MOC is signed, so the Monitoring Team is unable to assess whether the Deputy Commissioner of ID reviews the Closing Report and corresponding MOC (if appropriate) within 30 days of a Use of Force investigation finding that a Staff Member committed a UOF violation. The 45 days was selected to include the obligation for ID and the Bureau Chief of Administration to promptly refer the file to Trials after the MOC has been signed by ID as well as the obligation of Trials (and by extension the Facilities) to make best efforts to serve charges within 30 days.

been served, large proportions of those charges were served over 45 days after the investigation closed (65% of PRE-POST cases and 67% of POST-POST cases). In cases where charges have not yet been served, similarly large proportions of cases extend beyond the 45-day timeline (100% of PRE-POST cases and 62% of POST-POST cases). Clearly, the Consent Judgment's objective of imposing meaningful discipline is not being achieved.

| Cases Pending at Trials | | |
|---|---|---|
| PRE-PRE (Incident **PRE** Effective Date; Investigation **PRE** Effective Date) | n=154 | 100% |
| Charges Served<br>Charges NOT Served | 152<br>2 | 98.7%<br>1.3% |
| PRE-POST (Incident **PRE** Effective Date; Investigation **POST** Effective Date) | n=136 | 100% |
| Charges Served<br>*Timely (before investigation closed or within 45 days of closure)*<br>*Not Timely (45+ days since investigation was closed)*<br>Charges NOT Served<br>*Not Expired (<45 days since investigation was closed)*<br>*Not Timely (45+ days since investigation was closed)* | 124<br>*43*<br>*81*<br>12<br>*0*<br>*12* | 91%<br>*35%*<br>*65%*<br>9%<br>*0%*<br>*100%* |
| POST-POST (Incident **POST** Effective Date; Investigation **POST** Effective Date) | n=92 | 100% |
| Charges Served<br>*Timely (before investigation closed or within 45 days of closure)*<br>*Not Timely (45+ days since investigation was closed)*<br>Charges NOT Served<br>*Not Expired (<45 days since investigation was closed)*<br>*Not Timely (45+ days since investigation was closed)* | 42<br>*14*<br>*28*<br>50<br>*19*<br>*31* | 46%<br>*33%*<br>*67%*<br>54%<br>*38%*<br>*62%* |

In addition to the large proportions of cases in which charges were not served timely, the length of time in which cases remain without charges being served is significant. Among cases in which charges were served late, the average number of days between investigation closure and serving charges was 136 days in the PRE-POST group and 125 days in the POST-POST group. Among cases in which charges have yet to be served, the average number of days between investigation closure and December 31, 2016 was 288 days in the PRE-POST group and 140 days in the POST-POST group.

These findings reveal a serious breakdown in the system and likely are caused by a variety of delays from the signing of the MOC, delivery to the Bureau Chief of Administration, and then ultimate assignment to Trials along with the case file. This compounds delays incurred at other points in the process (e.g., timely investigations, discussed in Use of Force Investigation section). Currently, the data tracked by the Department is insufficient to determine exactly where the breakdown is occurring,

as the only data points provided to the Monitoring Team are the date the investigation closed[99] and the date charges are served. Dates for the interim steps are not available at this time, so it is not possible to use quantitative data to determine exactly where the delays lie. However, much can be learned via anecdotal information and knowledge of the routine processes involved. ID, the Facilities, Trials and the Bureau Chief of Administration must work together to develop a strategy to ensure that: (1) investigations are closed timely; (2) referred to Trials timely (including both the MOC and all other relevant information); (3) charges are drafted timely; and (4) that charges are served timely.

The Department has advised the Monitoring Team that it is committed to working on developing appropriate data, and processes to address and correct these issues. As an initial step, the Department started to track additional data after the close of the Monitoring Period, which will hopefully assist in the efforts to identify and resolve some of the delays in the ultimate service of charges. The Monitoring Team will work closely with the Department in the Fourth Monitoring Period to better understand where the logjams exist and how best to address them in order to develop processes and procedures that allow the Department to achieve compliance with this provision.

| COMPLIANCE RATING | ¶ 3. Non-Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As of March 29, 2017, Trials' current staff consists of one Assistant Commissioner, four Directors (one of whom is on extended military leave), 20 attorneys (one of whom is on extended leave), and 12 support staff.
- A new Assistant Commissioner of Trials was appointed during this Monitoring Period.
- Six new Trial attorneys were hired during the Monitoring Period, one of whom began working during the Monitoring Period while the remaining five attorneys will begin working in early 2017.
- Five support staff were hired during the Monitoring Period, two of whom started working during the Monitoring Period while the remaining three Staff will begin working in early 2017.
- Trials is actively recruiting for seven additional Trial attorney positions and two support staff.
- The Department's Recruitment Unit and HR Recruitment Manager work in concert to support Trial's need for additional staff, and have a committee dedicated to recruiting and hiring staff for Trials.

---

[99] The Monitoring Team found that in some cases conflicting information was provided about the investigation closed date. The Monitoring Team's calculations are based on the best available data, but notes it may not be entirely accurate.

ANALYSIS OF COMPLIANCE

The Department reports the caseload for each Trials attorney during this Monitoring Period was approximately 90 cases, which is a decrease from the caseloads of 130 reported during the prior Monitoring Period. Even with this reduction, the caseload for Trials staff is still too high to achieve the reforms required by the Consent Judgment. Caseloads include a mixture of use of force cases, as well as EEO, Medical Separation, PREA, and others. In order to address the workload, the Department is working to hire more qualified staff for Trials. The Recruitment Unit reported that it worked throughout the Monitoring Period to actively recruit additional attorneys and support staff for Trials at 75 different events and also targeted recruitment at all local law schools. Members of the Trials division are actively interviewing candidates to fill the open positions. Trials is also working to implement strategies to better manage its caseload. During this Monitoring Period, Trials implemented a new case assignment process to ensure that attorneys receive the cases as quickly as possible.

The hiring and compensation process for staff at Trials is governed by the same process described in the Use of Force Investigations section of this report, assessing ¶ 11. In order to hire new staff, the Department must have authorization from OMB. The salary the Department may offer for a position is based on the set "level" of the position, however, there is some discretion in the salary range of the level based on a candidate's prior experience or number of years in prior City employment. The level and salary range for attorneys in the Trials Division is consistent with the level and salary range for attorney positions in other city agencies, but the limited discretion in salary is a significant challenge in hiring qualified candidates. The Department reports it has had continued discussions with OLR and OMB to try to obtain additional discretion in order to attract the best candidates for Trials.

The Monitoring Team strongly encourages the Department, OLR and OMB to continue work together collaboratively in order to ensure that the Department can meet the obligations of the Consent Judgment. Further, the Monitoring Team continues to encourage the Department to maintain its existing recruitment efforts and, to the extent possible, increase those efforts to ensure the Department attracts the best possible candidates.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## 9.  SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion, assignment to Special Units, or in circumstances where Staff have been disciplined multiple times, for review of that Staff Member's assignment generally. During this Monitoring Period, the Department focused on revising and finalizing its screening process for promotions

and assignments to Special Units. These procedures were implemented towards the end of the Monitoring Period as described in greater detail below.

The Department developed four distinct policies to address ¶¶ 1-6 of this Section: (1) a Directive that clearly sets forth which division or unit of the Department is responsible for each type of screening or background review of categories of individuals, and covers new hires, volunteers, certain unit assignments, etc.; (2) an Operations Order governing applications for steady post assignments, and setting forth the details of the screenings necessary for certain specialized units and posts; (3) a Directive governing the promotion process for Captains and above, and setting forth the details of the necessary pre-promotional screenings; and (4) a revised Operations Order that articulates the screenings required for assignments to certain units, such as Canine Unit, Communications Unit, Emergency Services Unit ("ESU"), and others. The Department also revised the existing screening forms, including providing additional space for narrative explanations. Three of the four policies outlined above became effective in the Third Monitoring Period, with the final policy effective in January 2017.

*Screening for Promotions*

The promotion process is determined by multiple factors, including the requirements of this section of the Consent Judgment. The initial steps for promotion are governed by Civil Service rules. The candidate for the first two levels of promotion (Officer to Captain and Captain to Assistant Deputy Warden ("ADW")) must take and pass the Department of Citywide Administrative Services ("DCAS") examination in order to be considered for the promotion, as they are civil service positions. DCAS creates a ranked list of individuals who are eligible for hire or promotion based on their examination results (the "DCAS Eligible List"). The rank of Deputy Warden (the level after ADW) and above are non-civil service positions and therefore an

examination is not required to be considered for these positions. Both civil service and non-civil

service candidates are then processed through the internal screening requirements which includes

a review by ID, the Inspector General of the DOI, Health Management, Equal Employment

Opportunity, CARE, the Legal division and Trials & Litigation.

The specific screening requirements in this section (¶¶ 1-6), referred to as the "Nunez

Requirements", are assessed by ID and Trials & Litigation. While promotions to the rank of

Deputy Warden or above do not require any additional testing, they are subject to an additional

panel review by the Reassignment Board. A promotion to Chief also requires an interview with

the Promotion Board at City Hall. Once the candidates are assembled (either on the DCAS

examination list, or recommended by the panel), the Office of the Chief of Administration

collects and collates the screening forms from each of the relevant divisions. These materials are

provided to the Commissioner and the Chief of Department for a final decision regarding

promotion.

The screening process for Captains and ADWs must be conducted in accordance with the

New York State Civil Service Law, which requires the Department to utilize the "One-in-Three"

rule, whereby they must consider and hire/promote one of the top three candidates on the

Eligible List before moving down the list, unless all three are deemed ineligible by New York

State Civil Service Law defined disqualifiers.[100] Candidates who were not selected remain on the

list until the list expires and a new list is issued. During this Monitoring Period, the Monitoring

Team met with various representatives from the Department to discuss the implementation of the

---

[100] Civil Service Law allows the DCAS Commissioner or other examining agency to disqualify candidates who have been found guilty of a crime, have intentionally made a false statement in their application or have been dismissed from private employment because of habitually poor performance.

revised promotion policies, procedures and forms, and reviewed the screening forms for Staff

promoted during this Monitoring Period, which is discussed in more detail below.

*Screening for Assignment to Special Units*

The process for screening and assigning Staff to Special Units is outlined in the

Operations Order "Awarding Job Assignments within a Command Operations Order" (effective

11/21/16). New and vacant job assignments within a command must be conspicuously posted for

21 days on employee bulletin boards within the Facilities. Candidates are then processed through

the internal screening requirements which includes various screening considerations (*e.g.*, PREA

screening) as well as the requirements specifically enumerated in ¶¶ 4-6 of the Consent

Judgment. Specifically, ID is responsible for reviewing an applicant's use of force history during

the prior five years and any closing memoranda issued during the prior two years. Trials &

Litigation is required to review the applicant's disciplinary history during the prior five years.

The Deputy Warden of Security and Deputy Warden of Administration review the forms once

submitted and make their recommendation for the post which is then forwarded to the

Commanding Officer to make a final determination whether or not to assign Staff to the Special

Unit. The Facility must then provide the Office of Equal Employment Opportunity with a

completed form outlining the timeframe of the job vacancy bulletin, a completed 22R (Employee

Performance Service Report) for each candidate, and the Awarded Post Memorandum which

includes the reason for their final selection.

Given the Monitoring Team's focus on the screening requirements, the Monitoring Team

has not yet assessed compliance with the Department's obligation under ¶ 7 (requiring review of

assignments of Staff disciplined multiple times) but intends to do so in the next Monitoring

Period. The Monitoring Team's assessment of compliance for all other provisions is outlined

below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the following (collectively the "Review"):

a. The following data regarding the Staff Member's involvement in Use of Force Incidents during the prior 5 years, to the extent such data is electronically maintained by the Department in IRS or any other computerized system: (i) the number of Use of Force Incidents the Staff Member has been involved in, (ii) the type and severity of injuries sustained by Staff and Inmates; (iii) whether the conduct was classified as a Class A, B, or C Use of Force; (iv) whether the Use of Force Incident involved a strike or blow to the head or other vital area of an Inmate, kicking an Inmate, the use of a baton or other instrument of force against an Inmate, the use of a prohibited restraint hold on an Inmate, or an allegation of any such conduct; and (v) whether the Inmate was in restraints prior to the Use of Force incident.

b. The Staff Member's disciplinary history during the prior five years, including whether the Staff Member has been found guilty or pleaded guilty in connection with charges relating to a Use of Force Incident and any command discipline imposed as a result of the Use of Force.

c. Any ID Closing Memoranda issued during the prior 2 years for any Use of Force Incident where the Staff Member used or was alleged to have used force.

d. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the promotion, which shall become part of the Staff Member's personnel file.

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department finalized Directive 2230, Pre-promotional Assignment Procedures, and it was issued on December 23, 2016.

- The Department issued revised forms for screening for promotions used by ID and Trials & Litigation Division.

- During this Monitoring Period, the Department screened the following Staff for promotion:
  - No Correction Officers were screened for promotion to Captain.

- o  27 Captains were screened for promotion to ADW and 21 were selected.
- o  29 ADWs or higher were considered and approved for promotion to the rank of Deputy Warden or higher as follows:
  - ▪  10 Staff Members were promoted.
    - •  Four were promoted to Deputy Warden;
    - •  One was promoted to Deputy Warden in Command;
    - •  Three were promoted to Warden; and
    - •  Two were promoted to Chief.
  - ▪  20 Staff Members were screened and approved for promotion, but have not yet been promoted based on the current operational needs of the Department. These candidates may be promoted in the future at the discretion of the Commissioner.
    - •  Seven Deputy Wardens have been screened and approved for promotion to Warden.
    - •  Thirteen ADWs have been screened and approved for promotion to Deputy Warden.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that the Department's policy addresses the requirements to consider the candidate's use of force history (¶¶ 1(a)[101] (c) and (d)), Disciplinary History (¶¶ 2(a) to (d)) and pending Disciplinary actions (¶ 3). The Monitoring Team recommended that the Department clarify the policy with minor language tweaks and formatting to the requirements addressing ¶ 1(b) and ¶ 2(e) in order to mitigate any potential misinterpretation in the implementation of the policy. The Monitoring Team will review any new Department policies in the Fourth Monitoring Period to ensure they are consistent with the requirements in the Consent Judgment.

*Review of Promotion Documentation*

The Monitoring Team reviewed and assessed the screening documentation for the 27 Captains screened for promotion to ADW and the 10 Staff promoted to the rank of Deputy Warden and above.

The Monitoring Team conducted an independent assessment of the candidates and found the promotion of all 31 candidates was reasonable and in accordance with the requirements in ¶¶ 1-3. Despite the revised policy coming into effect after all but two Staff were promoted, none of the Staff were promoted in contravention of the requirements in the Consent Judgment. For the six candidates who were not promoted to ADW, the Monitoring Team found that the Department's decision not to

---

[101] The Department is only permitted to maintain a Staff Member's record of Command Discipline for one year.

promote the Staff member was also reasonable and confirmed they had been appropriately screened against the requirements in ¶¶ 1-3.

The Monitoring Team will continue to closely review the screening documents for Staff applying for promotion to ensure that Staff are consistently promoted in accordance with policy and the Consent Judgment Requirements. In order to achieve Substantial Compliance, the Department must also be able to provide the Monitoring Team with the relevant documentation.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|
| | ¶ 2. Partial Compliance |
| | ¶ 3. Partial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department finalized Operations Order 23/16 "Awarding Job Assignments within a Command," which came into effect on 11/21/16.

### ANALYSIS OF COMPLIANCE

The Monitoring Team verified that the policy for screening staff for Special Units incorporates the requirements in ¶¶ 4, 5, 6. As per the requirement in ¶ 4, ID must review the Staff Member's use of force history for the prior five years and make an assessment against the criteria in Consent Judgment § XII, ¶ 1(a)(c)(d). Trials & Litigation is responsible for reviewing the Staff Member's disciplinary history against the requirement in ¶ 5. The policy then requires "the Commanding Officer, or designee" to review any Staff Member assigned to a Special Unit who was disciplined for misconduct arising from a use of force Incident, as per requirement Consent Judgment § XII, ¶ 6. The Monitoring Team has recommended the Department clarify the policy with minor language tweaks related to the

requirements addressing ¶ 6 in order to mitigate any potential misinterpretation in the implementation of the policy.

Now that the Screening for Special Units policy has been finalized, the Department reports that it has implemented the policy across all Facilities and has started the review process for screening Staff Members to Special Units. The Department did not appoint staff to any Special Units under the new screening procedure before the end of the Monitoring Period. The Monitoring Team will assess the Department's efforts to screen Staff for Special Units during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 4. Partial Compliance<br>¶ 5. Partial Compliance<br>¶ 6. Partial Compliance |
| --- | --- |

### 10. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this part of the Consent Judgment is to better protect Staff and Inmates under the age of 19 from violence. As discussed in the introduction to this report, Inmates under the age of 19 contribute and are victims of a disproportionate amount of Inmate-on-Inmate violence. Most of the requirements that will directly affect an Inmate's propensity to engage in violence and the Department's response to it are contained in the Inmate Discipline section of this report (*e.g.,* incentives for refraining from misconduct and the disciplinary responses to aggressive behavior). That said, institutional violence is affected by many things—factors pertaining to the Inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in the jails (*e.g.*, security features and environmental hazards, as well as the daily structure and programming available). This section of the Consent Judgment includes provisions related to all of these factors. By the conclusion of the Third Monitoring Period, the Monitoring Team was able to assess compliance with nearly all of the provisions in this section. The discussion is organized by provision, following this introduction.

The Department and Monitoring Team met several times to discuss the information necessary to evaluate compliance with provisions that refer to Staff who are "consistently assigned" and "regularly assigned" to Young Inmate Housing Areas and to clarify the Department's obligations toward this end. Currently, some Staff are consistently assigned to a given housing unit because they are "awarded a steady post," which means they apply for and are appointed formally to the post. In these cases, the Warden decides to open bidding for a particular unit on a particular tour and Staff apply for the steady post. However, not all posts are put out for bid and, in fact, a larger proportion of Staff may work on a particular unit consistently, even though not awarded the steady post. Still other staff work on "The Wheel," where they are intentionally assigned to different posts on different tours throughout the week. This is a long-standing practice in the Department and, because it is the polar opposite of the regular unit assignments envisioned by the Consent Judgment, it will take some time and effort to adjust.

In order to demonstrate compliance with the staffing-related provisions, the Department will need to establish a Staff assignment system that produces regular assignments (either formal or informal) (§ XV, ¶ 17) and will need to produce data on two groups of Staff—those with an awarded post and those who are regularly assigned through a more informal mechanism. The Monitoring Team and the Department will work together during the Fourth Monitoring Period to develop an audit strategy to identify the number and proportion of Staff who are consistently assigned to Young Inmate Housing Areas so that compliance with provisions related to consistent assignment to Young Inmate Housing Areas (Consent Judgment § XV, ¶ 17), tracking Staff transferred into and out of Young Inmate Housing Areas (Consent Judgment § XV, ¶ 18), reporting the names of Staff who were assigned to work regularly in Young Inmate Housing

Areas at the beginning and end of the Monitoring Period (Consent Judgment § XIX, ¶ 4(c)(ix)), and providing SCM and Direct Supervision training to Staff assigned to work regularly in Young Inmate Housing Areas (Consent Judgment § XIII, ¶ 3 and ¶ 4) can be assessed using quantitative data.

As noted in the Training section of this report, the Department has agreed to include the broader range of Staff who are regularly, but informally, assigned to Young Inmate Housing Areas in the group of Staff who receive SCM training. Furthermore, the Department will train *all* Staff assigned to RNDC and GMDC in SCM given that Staff in those two Facilities are likely to frequently interact with Young Inmates even if they are not awarded a steady post or do not have an informal regular post. The Monitoring Team expects a similar approach to providing Direct Supervision training. As noted above, the Department and the Monitoring Team must still develop a strategy to identify the Staff regularly assigned to Young Inmate Housing in the other Facilities (*e.g.*, RMSC, OBCC, and GRVC) so that they can be trained in SCM and Direct Supervision.

Regarding the Department's efforts to comply with ¶ 13, related to the qualifications and experience of Staff in Young Inmate Housing Areas, and ¶ 18, related to incentives for working in Young Inmate Housing Areas, the Monitoring Team has yet to rate compliance. The Department reported that a significant number of recent graduates from the Academy have expressed interest in working with adolescents and young adults. In Fall 2016, RNDC administrators went to the Training Academy to introduce the opportunities for working with adolescents at RNDC and tried to recruit Staff to RNDC during On-The-Job training. These efforts led to interviews with approximately 100 recruits who indicated an interest in working with adolescents, of whom 80 were selected and 70 were ultimately assigned to RNDC following

graduation. The Monitoring Team plans to meet with the Department during the Fourth

Monitoring Period to develop an audit strategy for these two provisions.

The Monitoring Team's assessment of compliance for the rest of the provisions in this

section is outlined below.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As detailed in the following narratives about the many components of the reforms related to Young Inmates in the Safety and Supervision and Inmate Discipline sections of this report, the Department continues to design, implement and refine a range of strategies designed to produce safer Facilities.

- The Department's Use of Force Auditor compiled reports for Q1, Q2 and Q3 of 2016 that accurately highlighted the high rates of use of force (many of which were in response to Inmate-on-Inmate violence) among Young Inmates. The Use of Force Auditor meets directly with Facility Wardens to identify, discuss and troubleshoot the trends in use of force. The Use of Force Auditor also made a series of recommendations designed to improve the management of Facilities, changing the culture to address high rates of use of force, and improve the safety and security of Inmates and Staff. In addition to addressing the high rates of use of force, several of the recommendations, if implemented, could positively impact the level of violence in the Facilities.

- The Department identified the RNDC school as a hotspot for Inmate violence and learned that, in part, these problems were driven by Inmates' encountering youth outside of their living units throughout the school day. In an effort to prevent violence from occurring in school, the Department began to house youth according to their educational needs (*e.g.*, high school diploma or GED) so that youth attend all classes with their living unit. Reducing access to other, less familiar Inmates throughout the school day appears to have reduced Inmate violence in the school area.

**ANALYSIS OF COMPLIANCE**

In concert with Consent Judgment § XVI (Inmate Discipline), the overall purpose of this section of the Consent Judgment is to better protect Staff and Young Inmates from violence. In part, preventing and de-escalating potentially violent confrontations between Inmates requires the skills

taught in Safe Crisis Management and Direct Supervision. Until Staff achieve a mastery of these skills and begin to develop constructive relationships with Inmates, expecting significantly reduced rates of violence would be premature. In addition, increases in Staff skill in managing Young Inmates will be magnified by operational practices such as new disciplinary strategies, incentives for positive behavior, and increases in structured programming that will reduce Inmates' idle time. The Monitoring Team expects the rates of violence to decrease as these various reforms take hold. The data required to track the rates of violence are now routinely provided by the Department and thus are reported here.

The rates of violence among Young Inmates since the Effective Date of the Consent Judgment are shown in the following graph.



| | Nov 15 | Dec 15 | Jan 16 | Feb 16 | Mar 16 | Apr 16 | May 16 | Jun 16 | July 16 | Aug 16 | Sep 16 | Oct 16 | Nov 16 | Dec 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16/17 yo | 27.1 | 27.1 | 27.5 | 24.4 | 18.7 | 21.4 | 26.1 | 46.5 | 35.3 | 44 | 43.1 | 27 | 32.3 | 33.5 |
| 18 yo | 25 | 27 | 27 | 20.9 | 23.9 | 13.7 | 18.7 | 25.5 | 19.8 | 44.5 | 36.8 | 32 | 25.3 | 27.6 |

As shown in the graph above, the rates of violence among Young Inmates have increased since the Effective Date of the Consent Judgment. The average rate of violence during the Third Monitoring Period (36.0 for 16- & 17-year-olds and 33.2 for 18-year-olds) was substantially higher than during the previous nine months of the Consent Judgment (28.2 for 16- & 17-year-olds and 22.4 for 18-year-olds). The reasons for these increases in violence are not yet understood. While decreases in violence would not be expected this early into the reforms, increases were also not expected.

Recent analyses of Inmate Fight Tracker data revealed some interesting differences between RNDC and GMDC. At RNDC, a significant number of Inmates engaged in frequent violence during the last three months of the Third Monitoring Period (arbitrarily set at two fights per month, or six fights during the three-month period). A total of 14 Inmates met this threshold, contributing a total of

97 fights over the three-month period. In contrast, at GMDC, only two Inmates met this threshold. This information is currently under consideration by the Monitoring Team. At the very least, it suggests that different strategies to address violence may be needed at the two Facilities. At RNDC, strategies that address chronic violence among a smaller number of Inmates are necessary, while at GMDC, violence appears to be more widespread and thus a more comprehensive strategy for preventing and responding to more episodic violence will be necessary. The Monitoring Team undertook several other analyses to better understand the contours of Inmate violence and the Department's response to it. These are described in detail in the discussion of ¶ 4 and ¶ 6 of the Inmate Discipline section of this report.

It is important to recognize that these data are examined at a specific point in time, while the reforms being undertaken (particularly regarding incentive programs and alternative disciplinary measures) are continually being implemented and refined. Furthermore, rates of violence are impacted by many, many things—most of which are being addressed by the Consent Judgment—and thus the full impact of these reforms on Inmate violence will not be visible for some time.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

---

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" requires Correction Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty. The FSIR is submitted to the area Captain, who signs and submits the report to the Tour Commander, who signs and submits the report to the Deputy Warden for Security.

- Operations Order 4/16 "Inoperable Cell Summary Report (ICSR)" requires Correction Officers to complete a report every evening, except Friday and Saturday, between 2100 and 2300 that documents whether any cells are inoperable. The report is submitted to the Control Room at the end of the tour. Each day, the Supervisor of Mechanics compiles the information and submits a list of inoperable cells to the Environmental Health Officer, who makes a visual inspection and then informs Inmate Movement of the loss of the cell.

- Two Security Memoranda were issued at GMDC (in July and August 2016) both of which reminded Staff to inspect all cells on each tour to ensure they lock properly, to move Inmates in inoperable cells and to document the issue in the Non-Reportable Log Book. Supervisors were

also reminded to ensure that none of the cell doors are obstructed and to make two logbook entries during their tours verifying that no Inmate was placed in a cell that does not lock properly. In September 2016, GRVC issued a security memorandum that emphasized current procedures. In November and December of 2016, RNDC issued similar security memoranda.

- The Department reported that internal meetings were held with stakeholders from Young Inmate Facilities to discuss current policy and procedure.

**ANALYSIS OF COMPLIANCE**

As in previous Monitoring Periods, the Monitoring Team regularly spot-checked cell doors during routine visits to the Facilities housing Young Inmates. The Monitoring Team also identified incidents involving failed or manipulated cell locking mechanisms at GMDC and RNDC via the COD reports, Preliminary Reviews, and review of completed investigations. While problems with locking mechanisms continue to be regularly identified, the frequency of problems has not approached the levels discussed in the Second Monitor's Report (at pg. 126-127).

During site visits to RNDC and GMDC in November 2016, the Monitoring Team reviewed Facility Security Inspection Reports (FSIR) and Inoperable Cell Summary Reports (ICSR) for the previous two weeks to develop an audit strategy. Baseline data on the number of inoperable cells was also requested from the Department. The audit strategy targets three key questions:

- Did Staff conduct the required inspections?
- Did Staff identify all inoperable locks?
- Did the Department refrain from assigning an Inmate to cells with inoperable locks until the locks were fixed?

To answer these questions, the Monitoring team has designed and tested an audit strategy that will be shared with the Department in the Fourth Monitoring Period to determine whether it is a feasible way to obtain the necessary information. This strategy will involve a review of FSIRs and ICSRs to determine whether inspections occurred as required and to record any inoperable cells that were identified. These cells will be compared to Housing/Cell Assignment reports to determine whether Inmates were placed in cells during the period of inoperability. In addition, the Monitoring Team will identify specific cells with malfunctioning locks via COD reports and will verify whether the locks were identified and taken off-line as required. Once the audit strategy has been refined with input from the Department, an audit of Facility records will occur toward the end of the Fourth Monitoring Period so that a compliance rating can be assessed. Eventually, the Monitoring Team will expect the Department to conduct the audit internally, with the Monitoring Team verifying the results and underlying documentation.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour all Young Inmate Housing Areas at least once each shift, unless the Warden or Deputy Warden is not in the Facility during that shift, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented an any general deficiencies shall be noted.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Monitoring Team's observation of practice and unit logbook reviews during routine site visits to RNDC, RMSC and GMDC suggest that Wardens and Deputy Wardens routinely visit the housing units and interact with both Inmates and Staff.

### ANALYSIS OF COMPLIANCE

The Monitoring Team plans to audit this provision during the Fourth Monitoring Period. During routine visits to the Facilities housing Young Inmates (RNDC, RMSC, GMDC, GRVC-Secure and OBCC-YA-ESH), a random sample of housing units will be identified and their logbooks will be reviewed for the preceding two weeks. The frequency with which the Warden or Deputy Warden made rounds during each tour and made a substantive entry about general deficiencies will be recorded so that a compliance rating can be assessed. As with all provisions, eventually, the Monitoring Team will expect the Department to conduct the audit internally, with the Monitoring Team verifying the results and underlying documentation.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 & ¶ 6 (CLASSIFICATION SYSTEM AND VULNERABLE INMATES)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit, or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department originally intended to utilize the Housing Unit Balancer (HUB) to classify adolescents at RNDC. However, because the HUB is mainly predicated on properly balancing the various SRG groups within and across housing units, and because the adolescent population is relatively small (ADP is approximately 200 Inmates), the Department recently decided that the HUB was not the best means to classify the adolescent population.

- The Department plans to use the pre-existing classification instrument to identify adolescent Inmates' risk of institutional violence. Their classification level will be combined with their education needs to determine the appropriate housing unit.

- The Department recognizes the need to validate the classification system specifically for the adolescent population. Although the Department recently secured a contract to validate the HUB, the scope of work does not include validating the old classification tool. The Department plans to consult with the contractor to determine whether an assessment or validation of the old classification system is possible under the HUB validation contract.

**ANALYSIS OF COMPLIANCE**

As evidenced in the previous two Monitor's Reports, the Department has changed course multiple times in its plan to comply with this provision. As of the end of the Monitoring Period, no substantive progress has been made. The Department continues to apply the classification tool that was in place at the time the Consent Judgment was signed, and has not produced any documentation indicating the instrument is valid for use with adolescents. The instrument may in fact be a valid tool for classifying adolescents' risk of institutional misconduct, but the Department bears the burden of demonstrating such. Because the Department has not yet done so, the Department is in Non-Compliance with this provision.

The Monitoring Team supports the decision to house adolescent Inmates according to their education level, but also sees the housing decision as separate from the task of classifying Inmates according to their risk of institutional violence. During the Fourth Monitoring Period, the Monitoring Team expects the Department to make substantive progress with the task of assessing the effectiveness of its classification tool for use with adolescents and making any necessary adjustments. Shortly after the conclusion of the Monitoring Period, the Department retained an outside consultant who will validate the old classification instrument.

One of the common features of a classification system is an override provision. An override of an Inmate's scored classification level permits intake Staff to house the Inmate in a unit that departs from that suggested by the scored classification level. For example, in a downward override, an Inmate who scores as maximum custody could be overridden to be placed in a minimum-security unit if the Staff felt that such placement would better protect the Inmate. Similarly, in an upward override, an Inmate would be placed in a unit that is more restrictive than his classification score suggests because of objective factors suggesting he may present more of a risk to safety and security than indicated by his scored level. Overrides can also be used to place Inmates on mental health units, units for Inmates with developmental disabilities and other vulnerabilities, or units featuring higher levels of medical care, when indicated. Once the Department validates its classification tool to ensure it accurately classifies adolescent Inmates according to their risk of institutional misconduct, the Monitoring Team will work with the Department to ensure appropriate override provisions are articulated in policy and to assure they are applied whenever indicated by an Inmate's unique circumstances.

| **COMPLIANCE RATING** | ¶ **4.** Non-Compliance<br>¶ **6.** Not yet evaluated |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING) |
|---|

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has a broad range of services and programs for Young Inmates, including discharge planning services; art, music and drama programs; college courses; creative writing and poetry; animal safety and dog adoption preparation; employment readiness; OSHA certifications; and other vocational programs. Some of these are programs for youth in the general population, some are programs for Inmates in the special housing units (SCHU, TRU, Secure, ESH), and some are for Inmates who are admitted to special "Program Houses" that have a unifying programmatic theme.

- The Department also tracks services that are provided by Program Counselors who are assigned to most units that house Young Inmates.

**ANALYSIS OF COMPLIANCE**

During the Third Monitoring Period, the Monitoring Team conducted its first assessment of the extent to which Young Inmates can access programming that minimizes idleness and the potential for violence. The Monitoring Team received daily schedules for the Secure Unit and the units housing female Young Inmates at RMSC. Routine visits to the various Facilities suggested that many Young Inmate housing units do not have a posted daily schedule. A schedule that identifies the planned activities during waking hours on both weekdays and weekends is a customary, basic practice in correctional facilities. The schedule alerts Inmates to what they can expect during the day, and ensures that Staff who do not normally work on the unit (a relatively frequent practice in the Facilities) know which activities they must coordinate. The Department has been made aware of the Monitoring Team's expectation that all units housing Young Inmates must have a daily schedule posted in the unit.

An analysis of the RMSC unit schedules for the week of November 7, 2016 revealed the following:

- The amount of structured programming varies by unit. Some units provided about two hours of programming per day, while other provided about four hours of programming per day.

- Young Inmates who go to school (mandatory for 16- and 17-year-old Inmates, voluntary for 18-year-old Inmates) receive an additional five hours of programming per day.

- A broad array of programs is available including cognitive behavioral therapy (*i.e.*, DBT); music, art and drama; and interpersonal communication skills. Inmates age 18

and older also have access to a variety of vocational courses (*e.g.*, Cosmetology, Flagging, CPR, etc.). Inmates can also access individual counseling from the Program Counselors and may receive clinical services from mental health clinicians.

Overall, Young Inmates at RMSC have access to programming during at least half of their waking hours on weekdays—much more if the Inmate attends school. However, on weekends, most units provide only a fraction of the programming offered during the week. When the vocational programming is available, Young Inmates who opt into the programs have little idle time. However, adolescent Inmates have very few programming options on the weekends. These impressions drawn from the daily program schedules were confirmed during a site visit to RMSC in which the Monitoring Team was accompanied by a Programming Captain who provided rich descriptions of the programs and discussed her efforts to encourage Young Inmates to participate. When interviewed, Inmates reported that the programs were interesting, of high-quality, and ran according to schedule.

The Department recently tasked Program Counselors who serve Young Inmates with tracking the programming offered and Inmate participation levels on each of their units. Program tracking occurs on 14 units at GMDC, 11 units at RNDC, and six units at RMSC (most of these are either program units or alternative disciplinary units). The Department provided sample data for two units at GMDC for the week of December 10, 2016, which was analyzed by the Monitoring Team. Overall, the units received an average of nearly three hours of programming per day on the days the Program Counselor was present (five of the seven days per week). This represents about 20% of the 14 lock-out hours. Young Adult Inmates who chose to attend school received an additional five hours of programming per week day, which when combined, total over half of the lock-out hours on a week day. A broad array of programming types that are associated with the typical criminogenic needs of incarcerated youth were provided (*e.g.*, cognitive behavioral therapy/DBT, anti-gang programming, communication skills, art therapy, family dynamics). The Monitoring Team noted a few other structured activities that were not included on the spreadsheets (*e.g.*, recreation and law library) but that represent additional hours of structured activity. While these activities are not conducted by the Program Counselor, adding them to the spreadsheets would give the Department a useful tool for demonstrating compliance with this provision. The Department reported that it will consider doing so during the Fourth Monitoring Period.

The GMDC spreadsheets also track participation rates. Of the programs operated by the Program Counselors and reported in the sample data, an average of 55% of the youth assigned to the units participated in the various programs. Most of those who did not participate had excused absences (*e.g.*, court, visits, "other" reasons). Starting in January 2017, the spreadsheets will also include school participation levels.

Finally, during a tour provided to the Monitoring Team this Monitoring Period, the Department showcased the PEACE Center (a space available to Inmates in housing units that achieve higher levels

in the incentive program (see the discussion of the incentive program for ¶ 3 of Inmate Discipline in this report). The focus of the PEACE Center is workforce development, giving Inmates hands-on training opportunities that prepare them for employment. Courses were chosen from sectors with a local demand and with "friendly" background check requirements. A series of 20-hour modules are available, along with contacts with a community provider. Modules include Digital Literacy, Carpentry, Basic Electric, and Culinary Arts. A series of short-term certifications are also available: Scaffolding, Flagging and CPR. The Department reports that several hundred young adult Inmates have obtained these credentials since June 2016, and approximately 100 Young Adult Inmates have received the more intensive certifications since September 2016.

Clearly, the Department has made significant efforts to develop programming options for Inmates. Programs engage Staff, program counselors and a wide range of community volunteers and are available in varying constellations and amounts to Inmates in the Facilities that house Young Adult Inmates. While objective data and unit schedules were not provided for RNDC, observations during routine site visits and conversations with Department Staff suggest that many of the same opportunities are available to adolescent Inmates.

The task before the Department is to begin to quantify the offerings and participation rates so that it can demonstrate compliance with this provision. The Monitoring Team suggests the following steps: (1) create and post a daily schedule for all units housing Young Inmates; (2) expand upon the Program Counselors' spreadsheets to include education and activities run by volunteers and Facility Staff, even on the Counselors' days off; (3) obtain participation data from all programs/activities and the school; (4) ensure that programming is similarly robust on days when the Program Counselors are not present; (5) develop a methodology for analyzing and interpreting the data so that gaps in programming can be identified. The Monitoring Team plans to discuss the implementation of these suggestions with the Department during the Fourth Monitoring Period and also plans to conduct its own rigorous audit using a sample of programming spreadsheets from all Facilities housing Young Inmates.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should

remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The requirements of Policy 6007R-A "Protective Custody" are summarized in the Second Monitor's Report (at pgs. 131-132). This policy includes Attachments A-F, which are the following forms:

    o Attachment A: "Initial Placement into Protective Custody Housing Form"

    o Attachment B: "Protective Custody/General Population Escort Determination Form"

    o Attachment C: "Notice of Hearing Protective Custody Housing Form"

    o Attachment D: "Notice of Protective Custody Housing Disposition Form"

    o Attachment E: "Inmate Information for 30-Day/60-Day Protective Custody Status Review Form"

    o Attachment F: "Protective Custody Notice of New Evidence/Hearing Form"

- In response to the Monitoring Team's feedback that documentation of OSIU's initial interviews with Inmates on Attachment B needed to be more individualized, the Department reports that OSIU Staff have made an effort to provide additional details beyond what the referring Captain supplies in Attachment A.

- In response to the Monitoring Team's feedback that Inmates were not being given the opportunity complete Attachment E, which indicates whether they want to stay in Protective Custody ("PC") or return to the general population, the Department reports that OSIU Staff have made an effort to provide Inmates with Attachment E prior to the 30- and 60-day reviews.

- To ensure that 30- and 60-day reviews are timely, the Department reports that OSIU recently created a log to track these due dates.

**ANALYSIS OF COMPLIANCE**

As noted in the Second Monitor's Report (at pgs. 131-133), the Department's policy for PC addresses the requirements of this provision related to prompt initial placement, evaluation of risk, timely determinations of placement, access for family/lawyers/others who express concern, and record keeping procedures. As before, the Monitoring Team continues to find that the Department and OSIU Staff clearly take seriously the responsibility to protect Inmates who express a concern for their safety. Among the files reviewed during the Third Monitoring Period, all Young Inmates who expressed concern for their safety were immediately placed in temporary PC and, once assessed, all the PC placements were continued.

In November 2016, the Monitoring Team conducted an on-site review of PC files to assess the extent to which the Monitoring Team's feedback from the Second Monitoring Period had been

addressed. Of the 37 youth in PC on the day of the site visit, a total of 15 cases (41%) were reviewed (6 cases at RNDC; nine cases at GMDC; there were no Inmates in PC at RMSC). These 15 cases included 19 PC episodes, as some Inmates had multiple stays in PC during the Third Monitoring Period. Based on this review, the Monitoring Team provided the Department with written feedback and recommendations, the more substantive of which are discussed below.

Policy requires an assessment within two-business days of the initial placement to determine whether PC should be continued. In 16 of the 19 episodes (84%), the two-business day timeline was met. However, policy requires OSIU Staff to actually interview the Inmate as part of the review, and OSIU Staff indicated that at times, manpower is not sufficient for this to occur and the assessment is done by paper-only. Given the priority of Inmate safety, continuing the PC placement even without an interview seems prudent. However, to comply with policy and to ensure good practice, the Inmate should be interviewed. OSIU workload/manpower may need to be adjusted to ensure this occurs. Furthermore, policy requires OSIU Staff to consult with the referring Facility, and this does not appear to be occurring based on the substance of the information entered on Attachment B forms reviewed. Procedures for this consultation need to be established and information entered on Attachment B forms needs to reflect the information gleaned from this discussion. On a positive note, in contrast to the files reviewed during the previous Monitoring Period, the more current files included a summary of infraction information from IIS.

In 11 of the 19 PC episodes, the Inmate had been in PC for more than 30 days, so a 30-day review was required. Some of these also required subsequent 60-day reviews. Of the 11 episodes, the 30/60 day reviews were timely in only six of the 11 episodes (55%). OSIU Staff indicated that these reviews were sometimes late because of workload/manpower issues. The Department recently created a tracking log for the 30/60 day reviews which may assist with their timeliness. Most of the 30/60 day reviews included only generic language (*e.g.*, "a review was completed, PC will be continued") and did not include the Inmates' particular circumstances (such as, continues to fear for safety, doing well on PC and feels safe there, recent incidents, other OSIU documents or information, etc.). In contrast to previous reviews, Appendix D forms (which documents the 30/60-day review) were present in all files.

In contrast to previous reviews, all files included Attachment E forms, which contained statements from the Inmates about their desire to continue PC. However, all the Attachment E forms were completed on one of two dates, and were completed for all Inmates, even those for whom a 30/60-day review was not yet required. As the use of Attachment E forms become routine practice, the dates on the Attachment E forms should correspond more closely to the date of the Inmate's 30/60-day review.

In addition to providing this feedback to the Department, the Monitoring Team also provided a proposed monitoring checklist to draw OSIU Staff's attention to the key elements of the PC files that are assessed to determine compliance with this provision. Incremental progress from the previous

review was evident. As the manpower/workload issues are addressed, compliance with policy and the requirements of this provision are expected. A subsequent audit of PC files and interviews with Inmates and Staff on PC units are planned for the Fourth Monitoring Period.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Department Policy 4100R-D "Classification" specifically states that "Inmates in the general population who are classified as maximum custody shall not under any circumstances be housed with minimum custody or medium custody Inmates".

- Temporary co-mingling, or mis-housing, can occur when (1) an Inmate's classification level changes automatically overnight (*e.g.*, upon a birthday, or when an Inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility.

- The Department has a procedure in place to review housing assignments daily, identify any instances of co-mingling, and resolve them. Through this procedure, most incidents of mis-housed Inmates are resolved within 24 hours of the occurrence.

### ANALYSIS OF COMPLIANCE

*As noted in the Second Monitor's Report, because of the small number of female Young Inmates and the subsequent operational difficulties that ensue, the Monitoring Team is not assessing compliance with this provision at RMSC.*

The Department's policy reflects the requirements of this provision. To assess the extent to which housing practices were aligned with policy, the Monitoring Team requested the "mis-housed reports" for two two-week periods during the Third Monitoring Period, August 18-27 and September 18-October 1, 2016, for RNDC, GMDC and EMTC.[102] Mis-housed reports identify all Inmates whose classification level is incompatible with the security level of the assigned housing unit (*i.e.*, high classification Inmates were mixed with low classification Inmates). For example, if an Inmate who is classified as "maximum" is housed on a unit designated for minimum and medium custody Inmates,

---

[102] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because they are special housing units like those noted in the text of the Provision.

his name would appear on the mis-housed list. Each weekday, the Warden of the Facility is required to document, in writing, the reason that each Inmate is mis-housed, and the plan for rectifying the situation, if needed. In some cases, the Inmate's classification score may be overridden, and thus the Inmate is not actually mis-housed. The purpose of the Monitoring Team's audit was to identify the frequency with which mis-housing occurs, the reasons for mis-housing, and the timeliness of correction.

The mis-housing reports from <u>RNDC</u> were well-organized and very helpful for assessing compliance. The memos were detailed and clear, and all necessary supporting documentation was attached. Of the 20 days in which mis-housed reports were required (reports are not required on the weekends), the Department provided 17 complete reports (85%). Overall, these reports revealed that mis-housing is a low-frequency event. On any given day, between three and eight adolescents were mis-housed, or approximately 2-4% of the adolescent population (ADP is approximately 200 Inmates). The reason for the mis-housing was always that the Inmate's classification score changed, which necessitated a move to a different unit. Most of the mis-housings were rectified within one day, and nearly all within the three days required by the Classification policy. In some cases, the Inmates' classification scores were overridden, and thus they could stay in their original units.

For <u>EMTC</u>,[103] mis-housed reports were submitted for 13 of the 20 days (65%) in which reports were required. As noted above, the number of mis-housed Inmates on any given day is very small—on many days, all Inmates were housed correctly. On a small number of days, one or two Inmates were mis-housed. These Inmates were either re-housed within the three days permitted by policy, or their classification score was overridden so they could remain in the original housing unit.

At both RNDC and EMTC, Inmates are classified using the "old classification tool" (see ¶ 4, above, for more information) and the mis-housed reports utilize the scores on this instrument to identify whether an Inmate is in the proper housing unit. At GMDC, Inmates are classified using the Housing Unit Balancer (HUB). Although the Department reported they had a process for monitoring mis-housing at GMDC during the Second Monitoring Period, the process was not implemented until late January 2017. The HUB mis-housing process is a bit more convoluted than that for the old classification instrument, but the function and outcome will be the same. GMDC's mis-housing reports will be included among the reports audited by the Monitoring Team during the Fourth Monitoring Period. In the next Monitoring Period, the Monitoring Team also intends to request the override forms related to the instances of mis-housing to ensure the override was applied properly.

As reported previously, at times during the Second Monitoring Period, mis-housing of certain Inmates persisted beyond the three days permitted by policy. In response to a request for additional information, the Department indicated that in some cases, the Inmates had been discharged (but

---

[103] Beginning in the Fourth Monitoring Period, this analysis will no longer be conducted at EMTC because all of the 18-year-old sentenced Inmates will be housed at GMDC as of January 2017.

remained on the population list for some reason). In other cases, the reason for continued mis-housing was "for the safety and good order of the Facility." This issue was not identified as occurring in the Third Monitoring Period, but should it arise in the future, individualized information will need to be provided that gives the exact discharge date or that explains the nature of the threat to safety and security, and how it was ultimately resolved.

To reach Substantial Compliance, the Department must: (1) provide a complete set of mis-housed reports for the days requested for RNDC and GMDC; and (2) demonstrate that mis-housing continues to be a low-frequency event and that mis-housing is rectified timely.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Department Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment" ("5011 Policy") establishes policies for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against Inmates. The policy describes procedures to be taken in the case of sexual abuse of an Inmate by another Inmate, or by a Staff, contractor, or volunteer.

  o Inmate-on-Inmate sexual abuse involves *non-consensual* contact with breasts or genitals or penetration with an object that is *coerced by overt or implied threats of violence*.

  o Staff-on-Inmate sexual abuse involves, among other things, contact with breasts or genitals or penetration with an object *with or without the consent of the Inmate*.

- The Department's 5011 Policy is much broader than the requirements of this provision, as it is constructed to address all the requirements of the Prisoner Rape Elimination Act ("PREA"). For example, it includes provisions related to Staff training, Inmate orientation, intake screening, housing LGBT and adolescent Inmates, searches, etc., and also addresses sexual harassment and retaliation, which are not addressed in this provision of the Consent Judgment.

- The Department's 5011 Policy covers reporting sexual abuse allegations. Staff must accept all reports of sexual abuse made verbally, in writing, anonymously and from third parties and must document all reports. Inmates may also report sexual abuse via the DOI 24-hour hotline, the PREA Hotline, the 311 Hotline ("Constituent Services"), a grievance, or to a third-party such as Legal Aid or a family member. All allegations must be immediately reported to the Staff's

immediate supervisor, who notifies the Tour Commander, who notifies COD, the Warden, ID, the PREA Compliance Manager and PREA Coordinator. The allegation is documented on a "PREA-Related Incident Report" form which is sent to ID, the PREA Compliance Manager and Coordinator.

- The Department's 5011 Policy addresses investigations of sexual abuse allegations. DOI investigates allegations of Staff-on-Inmate sexual abuse that are potentially criminal in nature. ID investigates allegations of Inmate-on-Inmate sexual abuse, and allegations involving Staff-on-Inmate harassment or abuse that are not accepted for investigation by DOI.

- Among other things, the policy requires ID and DOI investigators to gather and preserve direct and circumstantial evidence; use recording devices to interview alleged victims, suspected perpetrators and witnesses; and review prior complaints and reports of sexual abuse involving the suspected perpetrator. The investigation must be documented in a written report that includes a description of the physical and testimonial evidence, the reasoning behind credibility assessments, investigative facts and findings and copies of all evidence, when feasible.

- The Department's 5011 Policy requires investigators to submit a final written report to the ID Supervisor within 60 business days of the incident being reported. The report must include the factual findings and whether the charges were substantiated, unsubstantiated, or unfounded.

**ANALYSIS OF COMPLIANCE**

The Department routinely provides data to the Monitoring Team about the allegations of sexual abuse that are received regarding Young Inmates. Between the Effective Date of the Consent Judgment and the end of the Third Monitoring Period (November 1, 2015 and December 31, 2016), there were 28 allegations involving Young Inmates. The distribution across the Facilities was:

- 11 from RNDC (39%);

- 10 from GMDC (36%);

- two from EMTC (7%); and

- five from RMSC (18%).

The rate of allegations increased noticeably beginning in June 2016, about the same time that the Facilities began to educate Inmates and Staff about the protections afforded under PREA. An increase in the rate of allegations following education efforts is typical in the Monitoring Team's experience. Of the 28 allegations, 17 (61%) alleged Staff-on-Inmate sexual abuse and 11 (39%) alleged Inmate-on-Inmate sexual abuse. In terms of the reporting mechanism:

- eight of the 28 allegations (29%) were made via the 311 Hotline;

- five were self-referrals (21%);

- three were via the Facility (11%);

- two were via DOI (7%);

- two were via a 3rd Party/Legal Aid (7%);

- one was via COD (4%); and

- the reporting mechanism was not indicated in seven cases (25%).

As required by PREA, the Department has a variety of legitimate, easily accessible and confidential avenues for Inmates to report their concerns.

In the Monitoring Team's experience, Inmates do not always report allegations close in time to the date on which the incident occurred. Furthermore, Inmates sometimes do not know the date the incident happened. Still, it is useful to look at the lapse of time between the incident and the Inmate's report. Eleven of the 28 allegations (39%) did not have an incident date. For the other 17 allegations, the average length of time between the incident and the Inmate's report was 14 days. Most of the allegations (10 of the 17, or 59%) were reported within three days of the purported incident.

Policy requires investigations of sexual abuse allegations to be completed within 60 days of the incident being reported. During the current Monitoring Period, ID investigated all 28 allegations.

None of the 28 cases were investigated timely. Only three of the 28 investigations (11%) had been completed, but none met the 60-day timeline (147, 189 and 216 days to complete). The remaining 25 cases are still pending. Five cases (20%) have been open between 61 and 120 days; 11 cases (44%) have been open between 120 and 240 days, and nine cases (36%) have been open for more than 240 days. Although the Department has a variety of reporting mechanisms, significant work is required to meet the timely investigation requirement of this provision.

In addition to tracking the timeliness of reporting and investigating sexual abuse allegations, the Monitoring Team's strategy also includes an assessment of the quality of the investigations produced. Two investigations, both completed by ID, were reviewed for this purpose, although one of them was completed prior to the Effective Date of the Consent Judgment. Both investigations were assigned and opened timely and substantive investigatory steps were taken that same day. One included an excellent synopsis of what can be seen (and what is not seen) on video footage, which provided a solid foundation for the unsubstantiated finding. However, in both cases, investigators failed to interview witnesses to the alleged events. In one case, the investigator also failed to interview the alleged perpetrator and referenced a positive drug test (irrelevant to whether the sexual assault occurred) in the justification for an unsubstantiated finding. These deficiencies are troubling, but given that the investigations were not completed recently, the Monitoring Team is hopeful that more recent cases will evidence higher quality investigatory tactics. The Monitoring Team will further assess the quality of closed investigations during the next Monitoring Period.

In order to achieve Substantial Compliance, the Department must: (1) continue to make timely reports to ID/DOI and take prompt investigative action; (2) complete investigations within the 60-day

timelines, except in unusual circumstances; and (3) produce high-quality investigations that reflect sound investigatory technique. While the Department has demonstrated success in meeting its timely reporting obligation, improvements in the timeliness and quality of investigations are needed to achieve Substantial Compliance.

| COMPLIANCE RATING | ¶ 9. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10 & 11 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

### ANALYSIS OF COMPLIANCE

Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|
| | ¶ 11. Substantial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department used the Direct Supervision model, developed by NIC, as the foundation for a training program for the supervision of adolescent and young adult Inmates. The lesson plan continues to be modified based on feedback from the Monitoring Team, which has largely focused on tailoring the curriculum to the specific nuances of DOC Facilities.

- During the Third Monitoring Period, the Department submitted a revised lesson plan to the Monitoring Team.

- The November recruit class and 20 pre-promotional ADWs received a draft version of the Direct Supervision training during the Third Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department has adopted the Direct Supervision model and continues to revise it based on the Monitoring Team's feedback as described in the Training Section of this report. Although the training curriculum was not developed from scratch, the Department committed significant time and resources to adapting the training to its environment (*e.g.*, development of the curriculum to fit local nuances; travel expenses for a team to attend an NIC seminar about enhancements to the curriculum). The Department is also developing a version of the Direct Supervision lesson plan for Supervisors.

However, given the number of training obligations required for this Consent Judgment, the implementation of the Direct Supervision training has not proceeded on the schedule originally anticipated in the drafting of the Consent Judgment. While this delay is understandable, the Monitoring Team underscores the importance of training staff as quickly as possible, as the Direct Supervision philosophy is critical to the culture change required for a successful reform. Once Staff are trained, the Monitoring Team will begin to assess the extent to which Direct Supervision skills have been implemented and are in current practice among Staff assigned to Young Inmate Housing Areas.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

a. The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

b. The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

c. The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In the past year, the Department has drastically expanded its recruiting and hiring efforts and reports that it has increased its Staffing resources by 30%. As a result, the Department reports

216

that Young Inmate Housing Areas have largely been able to maintain the appropriate Staffing ratios.

- The Department also reported that it continues to make best efforts to ensure that no shift is Staff exclusively by probationary Staff members, even with the large proportion of the workforce that recently graduated from the Academy.

- When the Department reviewed the Monitoring Team's preliminary staffing analysis (discussed below), inaccuracies in the information provided to the Monitoring Team were discovered. The Department is working to correct these issues so that the Monitoring Team can accurately assess the extent to which the Department is complying with this provision.

- The Department calculated the average number of probationary staff for each Facility that houses young Inmates: GMDC had 397 (which is approximately 43% of the reported 929 staff assigned to GMDC); RMSC had 98 (which is approximately 16% of the reported 607 staff assigned to RMSC; note that RMSC has only a handful of units that house Young Inmates); and RNDC had 205 (which is approximately 26% of the reported 785 staff assigned to RNDC).

ANALYSIS OF COMPLIANCE

As discussed in the Second Monitor's Report (at pg. 137), the Monitoring Team's observations during site visits, interviews with Staff and Inmates, and review of documents suggest that required staffing ratios and maximum housing unit capacities are being met consistently, and that probationary Staff are appropriately dispersed. A strategy for auditing staffing records was developed during the Second Monitoring Period.

During the Third Monitoring Period, the Monitoring Team conducted an initial staffing audit. For two days in May and June, all three tours were assessed at RNDC, RMSC, GMDC and EMTC. Using either the Daily Schedule or Monthly Schedule, the names/number of Staff who worked each unit on each shift were identified along with each Staff's status as either probationary/veteran. Spreadsheets for each shift/day/unit/Facility were provided to the Department to ensure the Monitoring Team had utilized the correct strategy in identifying which Staff worked. Furthermore, preliminary results were reported to the Department so that the way in which the information would be used and the compliance assessment would be made were transparent. Metrics for compliance included:

- Proportion of shifts during waking hours that were staffed within required ratios
- Proportion of shifts during sleeping hours that were staffed within required ratios
- Proportion of shifts staffed exclusively by probationary Staff
- Proportion of units that exceeded the maximum unit size

Initial results indicated that required staffing levels, maximum living unit sizes and proper distribution of probationary staff were usually achieved, but exceptions were also noted. Perhaps more importantly, this initial staffing audit alerted the Department to inaccuracies in the information that was

provided to the Monitoring Team. In some cases, the Department provided a copy of the *weekly* schedule, which is essentially a plan for how the units will be staffed each day of the week. However, this plan often needs to be adapted to accommodate staff call-outs, sicknesses, special programs and other needs. These changes are recorded on the *daily* schedule, which was not always among the documents provided to the Monitor. The Department developed a procedure for tracking staff ratios and the distribution of probationary staff each day. This procedure began in January 2017 and will be very helpful for assessing compliance in the Fourth Monitoring Period. The new procedure will also further the Department's internal capacity to track performance in these areas.

| COMPLIANCE RATING | ¶ 14. Partial Compliance<br>¶ 16(a). Partial Compliance<br>¶ 16(b). Partial Compliance<br>¶ 16(c). Partial Compliance |
|---|---|

**11. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)**

The overall purpose of this section of the Consent Judgment is to reduce the Department's past overreliance on Punitive Segregation as a mechanism for responding to Inmate misconduct. Rather than imposing a sanction that creates a risk to Young Inmate's mental health and limits their access to necessary services and programs, the Consent Judgment requires the Department to construct an array of options for responding to misconduct that are safe, provide access to services and that are responsive to youth's treatment needs. In doing so, it is the Monitoring Team's hope that the Department will identify strategies to address the underlying causes of violence so that aggressive behavior will be less likely to reoccur. The Department abolished the practice of Punitive Segregation for 16- and 17-year-old Inmates in December 2014, and excluded 18-year-old Inmates in June 2016. The total exclusion of 18-year-olds from Punitive Segregation goes beyond the requirements of the Consent Judgment, which requires only that the Department "reduce [its] reliance on Punitive Segregation as a disciplinary measure." The Monitoring Team applauds the Department's leadership in this area.

218

As a result of the prohibition on the use of Punitive Segregation with Young Inmates, the Monitoring Team's focus in this section is the development of alternative disciplinary measures and a strategy for incentivizing positive behavior, discussed in detail below. Combined with the reforms discussed in the Safety and Supervision section of this report, the Department has begun to implement a range of strategies to reduce Inmate violence and to create safer Facilities. The burden on Staff to think and behave differently in nearly every aspect of the Facility's operation should not be underestimated. In this period of rapid change, it is expected that program development will be uneven and that key issues may have to be reconsidered and revised multiple times before optimal implementation is achieved. For this reason, the Monitoring Team encourages patience with the Department.

The Department developed a continuum of options for responding to violent Inmate misconduct. In response to less severe violent infractions (*i.e.*, fights and assaults *without* serious injury; property destruction; splashing), Inmates are referred to the Second Chance Housing Unit (SCHU). Inmates who commit more serious violent infractions (*i.e.*, fights and assaults *with* serious injury) are referred to the Transitional Restorative Unit (TRU). Both RNDC and GMDC have SCHU and TRU units. Both units have the same lockout time as the general population (14 hours) and a range of programming that is consistent with adolescents' treatment needs such as cognitive behavioral therapy (DBT Skills), interactive journaling, individual counseling, therapy with a mental health clinician when indicated, education (mandatory for 16- and 17- year-old Inmates, voluntary for 18-year-olds) and a range of structured programs delivered by community volunteers and contractors. Inmates are limited to $15 in commissary purchases on SCHU and $10 on TRU.

SCHU and TRU are the only two alternative disciplinary programs for 16- and 17-year-old Inmates and thus the SCHU and TRU programs at RNDC tend to house Inmates with more serious infractions than those at GMDC, since 18-year-old Inmates also have access to two other, more restrictive disciplinary options. The Secure Unit, opened in July 2016 and located at GRVC, houses Inmates with serious violent infractions (*e.g.*, slashing/stabbings, very serious injuries, continued violent behavior while in SCHU or TRU). The program operates in three phases: Phase 1 has a 10-hour lockout, $10 commissary limit, and a 28-day minimum length of stay; Phase 2 has a 12-hour lockout, $15 commissary limit, and the length of stay depends on the Inmate's behavior; and Phase 3 has a 14-hour lockout, $25 commissary limit and the length of stay depends on the Inmate's behavior. The Secure Unit offers a range of programs to address Inmates' violent behavior including cognitive behavioral therapy (DBT Skills), interactive journaling, individual counseling, therapy with a mental health clinician when indicated, and education (which is voluntary for 18-year-olds). Finally, the most restrictive unit, Young Adult Enhanced Supervision Housing (YA-ESH) was opened in October 2016 and is located at OBCC. Currently, YA-ESH has two levels: (1) YA "Entry-level" has a seven-hour lockout, $70 commissary limit (to comport with the adult version of the program) and Inmates are in restraint desks during all out-of-cell time. The reported purpose of the YA Entry level is to conduct an assessment within the first 28 days; (2) YA "Level 1" has a seven-hour lockout, $70 commissary limit, requires restraint desks during out-of-cell time, and has a 45-day review timeline. The Department is still constructing the policy for YA-ESH and contemplating whether young adult Inmates will have access to ESH Levels 2 through 4, as they exist for adult ESH Inmates. While young adult Inmates age 19 to 21 can be placed in YA-ESH for a larger set of infractions, the

Department reports that among 18-year-old Inmates, *only* those who commit a stabbing or slashing will be placed in YA-ESH.

The Monitoring Team's work to assess the quality of the various alternative disciplinary programs, whether they were implemented according to design and their responsiveness to the requirements of the Consent Judgment—along with all the other provisions in this section—is discussed in detail below.

### XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME), ¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION), ¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM), ¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND ¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old Inmates in December 2014 and excluded 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed the Department's other disciplinary and operational practices, and did not see any evidence that the central feature of Punitive Segregation (*i.e.*, 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with Young Inmates during the current Monitoring Period, the Monitoring Team did not assess compliance with these provisions.

Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation (at pgs. 141-142 and 151-152).

Given that the practice is no longer in place, the Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to Inmates' physical or mental health) cannot be rectified. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report.

| COMPLIANCE RATING | ¶ **1.** Substantial Compliance (per the Second Monitor's Report) |
|---|---|
| | ¶ **2.** Substantial Compliance (per the Second Monitor's Report) |
| | ¶ **7.** Partial Compliance (per the Second Monitor's Report) |
| | ¶ **8.** Substantial Compliance (per the Second Monitor's Report) |
| | ¶ **9.** Not currently applicable |

## XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: INMATE INCENTIVES)

¶ 3. Within 90 days[104] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to utilize the "Adolescents Striving for Change" (ASFC) stamp cards in all adolescent housing units at RNDC and RMSC; in the Second Chance Housing Unit (SCHU), Transitional Restorative Unit (TRU), Success House and Rikers' Rovers at GMDC; and in the Secure Unit at GRVC.

- In response to implementation problems identified by the Monitoring Team, the Department revised the stamp cards to require a signature from a Supervisor on each tour to ensure that Staff are using the cards properly.

- The Department continues to offer the use of computer tablets and Xboxes as a group incentive for units with consistently positive behavior. RNDC has also begun providing snacks to students at school, which has been an effective incentive for youth to arrive at school on time.

- The Department implemented a Facility-wide incentive system at GMDC, the Path to PEACE, or "Levels System." This program has not yet been implemented at RNDC or RMSC where Inmates under the age of 18 are housed.

---

[104] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

ANALYSIS OF COMPLIANCE

As noted above, the Department continues to utilize the ASFC stamp cards to incentivize positive behavior. Under the program, Inmates may earn up to $25 in commissary credit per week when they meet behavioral expectations. When they do not, they lose a portion of the $25 credit. By design, youth are rated every day on each of three Staff shifts using a binary scale (if youth meet behavioral expectations, they receive a stamp; if they do not meet expectations, they do not receive a stamp). Staff are required to annotate the card in every instance in which a stamp is not awarded. Although this provision only requires the application of positive incentives to Inmates under the age of 18, the Department included the use of the stamp cards in the design of several of the alternative disciplinary programs discussed in ¶ 6, below. As a result, the Monitoring Team has been attentive to the stamp cards' implementation with 18-year-olds as well.

During routine site visits throughout the Monitoring Period, the Monitoring Team reviewed cards in use on the adolescent housing units and special housing units for young adults. Continued implementation problems were revealed, particularly at RNDC which has a larger number of units and more Staff who must implement the cards. Problems included Staff being unaware of the cards altogether, incomplete cards, and Supervisors failing to sign the cards as required. These problems were also observed during a routine visit to RMSC. At GMDC and the Secure Unit, however, implementation appears to be somewhat better, perhaps because of the focus on the cards during weekly Support Team meetings for the special housing units. Little conversation about the cards among youth, Staff, or supervisors is apparent for the general population units at RNDC and RMSC. Despite feedback from the Monitoring Team about these issues, the Department did not take substantive efforts to shore up implementation during the Third Monitoring Period. Subsequently, the Department developed an internal audit procedure, which was implemented in January 2017. The Monitoring Team hopes that this internal process, and better accountability for the Staff charged with using the cards, will lead to improvements in the process and increased value toward the goal of Facility safety. The implementation issues must be resolved in order for the Department to reach Substantial Compliance with this provision.

The stamp cards are a type of token economy, variations on which are used in juvenile Facilities throughout the country, and the Monitoring Team strongly supports their use. However, the cards' value is limited by the poor quality of their implementation. Furthermore, the ASFC program lacks certain features that have been discussed in each of the previous Monitor's Reports: increasing the frequency with which incentives are awarded and opportunities to earn rewards and privileges for sustained positive behavior. Furthermore, the Department needs to find a way to communicate with the youth about their performance, at least on a weekly basis. This is the only way the stamp cards will assist the youth in modifying their behavior—by helping them identify the behaviors that resulted in a loss of commissary credit, the circumstances surrounding those behaviors, and more positive ways of

dealing with similar situations in the future. The Department needs to enhance the incentive system in order to reach Substantial Compliance with this provision.

In part, this may be accomplished through a robust implementation of the Path to PEACE, or "Levels System." This Facility-wide group incentive program was rolled out at GMDC during the Third Monitoring Period. The concept combines both group and individual incentives, and recognizes both youth and Staff for their contributions to a safe Facility. At the group level, each week, Staff and Program Counselors score each unit on a variety of factors (*i.e.*, incidents, infractions, respect for Staff, sanitation, compliance with rules, cell compliance, uniform compliance, lock-ins, court production, smoking, program participation) to determine their level (*e.g.*, Bronze, Silver, Gold, and Platinum). Housing units at higher levels are afforded greater privileges (*i.e.*, higher commissary limits, extra recreation, late lock-in, movie nights, family day, Court letters, access to games, tournaments with prizes, special clothing, etc.). At the individual level, youth earn certificates for perfect program attendance, and Staff who regularly work Platinum houses are given certificates of appreciation.

During the early implementation at GMDC, the scoring method was adjusted and various methods for monitoring implementation were established. Data on unit achievement levels during the first 13 weeks of implementation was submitted to the Monitoring Team for review. By the end of the period, approximately 40% of the housing units were achieving the top levels (*i.e.*, Gold and Platinum). Inmates in these units have access to higher commissary limits and video games, movie nights, tournaments and other special activities to reward their positive behavior. The Department expended considerable resources to furnish the Youth Engagement Services Center, outfitted with various recreational activities, equipment and a recording studio, and the PEACE Center, which is a vocational training center. Youth in high-level houses have access to these Facilities. When interviewed by the Monitoring Team, Inmates expressed enthusiasm for the Levels program and the other group incentives that are offered (*e.g.*, computer tablets and Recreation Bins).

The Department's efforts to replicate the Levels program in other Facilities are underway. Implementation is expected in March-April 2017 at RNDC and sometime in Summer 2017 at RMSC. In the meantime, the Monitoring Team continues to offer implementation support, to monitor the evolution of the Levels' program design and to offer input on useful metrics for the Department's internal efforts to demonstrate compliance. A Command Level Order is being drafted to memorialize the procedures as they are currently implemented, which the Monitoring Team will review once completed.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS) AND ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 4. Within 90 days[105] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old Inmates in December 2014 and excluded 18-year-olds in June 2016.

- The Department has two programs to respond to 16 and 17-year-old Inmates who commit infractions: Second Chance Housing Unit (SCHU at RNDC) and Transitional Restorative Unit (TRU at RNDC). Both are discussed in the introduction to this section of the report and analyzed in more detail below.

- The Department has four programs to respond to infractions among 18-year-old Inmates: Second Chance Housing Unit (SCHU at GMDC), Transitional Restorative Unit (TRU at GMDC), the Secure Unit (at GRVC), and Young Adult Enhanced Supervision Housing (YA-ESH; at OBCC). Each program is briefly discussed in the introduction to this section of report and analyzed in more detail below.

### ANALYSIS OF COMPLIANCE

The ability of the Department to achieve the overall goal of the Consent Judgment of safer Facilities for Staff and Inmates depends largely on the success of its efforts to control violence in the jails. In order to do so, the Department needs to achieve global reforms around training, staffing, and monitoring the use of force to ensure it is appropriate and addressing uses of force that are not. Drilling in further, the Department needs to identify responses to violence that are effective in holding Inmates accountable and that reduce their propensity to commit subsequent violent infractions. The Department took a major step toward this end by prohibiting the use of Punitive Segregation with Young Inmates. While this type of confinement may suppress violent behavior in the moment, it does not address the underlying causes of violence or to make it less likely to occur. In fact, this type of confinement causes many adolescents to become more angry and desperate, with exacerbated symptoms of mental illness, and a much higher risk of self-harm. Now that this practice has been fully abolished for Young

---

[105] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (see Docket Entry 266).

Inmates, the Department turns toward the urgent task of building effective alternative disciplinary responses.

_Continuum of Alternative Disciplinary Responses_

Draft policies exist for all four of the programs listed above. The Monitoring Team has made comments and helped to shape the guidance so that the policies conform to the requirements of the Consent Judgment and reflect sound correctional practices. Two of the programs (SCHU and TRU) have been in place for some time. The draft policy needs to be revised to reflect the lessons learned in the early implementation phase, submitted to the Monitoring Team for review, and finalized. Finalizing these policies will be a key focus for the Fourth Monitoring Period. The other two programs (Secure and YA-ESH) are newer and thus the policies are not yet ready to finalize. The Monitoring Team provided comments on both draft policies (for Secure in July 2016 and for YA-ESH in February 2017) and expects revisions will be made as the programs' implementation is more well established. The Department will need to have policies that guide each of the four programs' operation, approved by the Monitoring Team, in order to reach Substantial Compliance with this provision.

Now that the concepts for the continuum of disciplinary options have been developed and implemented, the Monitoring Team has begun to examine the program models to understand more about their operation and to assess whether they appear to be effective in responding to Inmate misconduct. During the Third Monitoring Period, the Team focused on three key areas: (1) whether the intended target population is being exposed to the programs (_i.e._, were the right Inmates being admitted); (2) program fidelity, or whether the programs are being delivered according to design (_i.e._, is a multidisciplinary team engaged with the Inmate; does an individualized plan guide the delivery of services; are the services provided); and (3) basic outcomes (_e.g._, length of stay and level of violence within the programs).

- _**Target Population**_

The Department provided data on admissions to the SCHU and TRU programs at RNDC and GMDC for the current Monitoring Period. At RNDC, there were 43 admissions to SCHU and 43 admissions to TRU, or 86 total admissions, involving a total of 59 Inmates. Of the 59 Inmates, 38 Inmates (64%) had a single exposure to the program, while 21 Inmates (36%) had multiple admissions. At GMDC[106], there were 87 admissions to SCHU and 131 admissions to TRU, or 218 total admissions involving a total of 182 Inmates. Of these, 151 Inmates (83%) had a single exposure to the program, while 31 Inmates (17%) had multiple admissions.

Given that RNDC's average daily population is about one-fifth the size of GMDC's (~200 Inmates versus ~1000 Inmates), the rate of referrals at RNDC appears to be significantly higher than at GMDC. In part, this may be due to overall higher rates of violent infractions among the 16- and 17-

---

[106] Data from GMDC includes _all_ Young Adult Inmates, not just 18-year-olds.

year-old Inmates, but may also be due to differences in the way the referral process operates at the two Facilities. For example, it is possible that RNDC casts a wider net when referring Inmates to the programs, admitting Inmates who would not be considered for the programs at GMDC. Furthermore, a significantly larger proportion of Inmates at RNDC had multiple exposures to the programs than at GMDC (36% versus 17%, respectively). The reasons for these multiple admissions should be examined more closely by the Department as they suggest that the Inmate's violent behavior persisted, even after exposure to the SCHU and TRU programs' services.

The Monitoring Team conducted several analyses to assess whether Inmates with violent infractions were being properly referred to the alternative programs. First, a list of Inmates with three or more violent infractions between March 1 and August 31, 2016 and a list of Inmates who had been admitted to SCHU and TRU during the same time period were compared. Given the more recent tenure of the Secure and YA-ESH programs, a similar analysis on the target population was not conducted. The TRU/SCHU comparison revealed that, for the most part, Inmates who engaged in repeated violent misconduct were being identified and placed in the programs, in accordance with stated eligibility criteria. Of the 29 Inmates aged 16, 17 and 18 with three+ violent infractions, 24 (83%) had been admitted to either SCHU or TRU.

The Department also provided the Monitoring Team with a list of Inmates with repeated uses of force for a similar time period (five+ uses of force between March 1 and September 30, 2016). Among the 92 adolescents and young adults on this list, only 49 (53%) had been in either SCHU or TRU. While they may have been exposed to some other sort of intervention (*e.g.*, mental health services), it was surprising to the Monitoring Team that so many of the "high-fliers" had not been exposed to either of the two programs. Given what is known about the reasons for the use of force discussed in the introduction to this report, it is very possible that Inmates were involved in a use of force for a behavior that would not make them eligible for either SCHU or TRU (*e.g.*, disobeying a direct order). Notably, five of the 43 Inmates who had not been exposed to the program accounted for 73 uses of force over a six-month period.

In summary, the SCHU and TRU programs appear to be admitting most of the Inmates who are exhibiting frequent violent misconduct. However, the Department is encouraged to examine the group of Inmates with repeated violent misconduct and/or frequent uses of force to identify why they were not referred to the alternative programs and/or whether they were exposed to other interventions designed to address this behavior (*e.g.*, mental health treatment; other interventions provided by Program Counselors; Punitive Segregation, while it was operational).

- ***Program Fidelity***

Programs designed to modify Inmates' behavior must be guided by a plan for the delivery of services. Most often, the guide takes the form of an individualized plan that identifies problem behaviors, specifies goals, and prescribes services to assist the Inmate in meeting those goals. In the

best programs, multi-disciplinary teams convene to discuss the Inmates' progress toward goals and to make any necessary modifications to the plans or the services being provided if the Inmate is not progressing as expected.

To assess the extent to which the SCHU, TRU and Secure programs reflect these practices, the Monitoring Team reviewed a set of files for four (4) Inmates in GMDC's TRU program in October 2016 and nine (9) Inmates in the Secure Program during December 2016. This relatively small sample was selected because the Department had yet to plan and deliver the professional development sessions that were recommended in the previous Monitor's Report to improve the quality of goal-writing, and thus the quality of the plans was unlikely to have improved significantly from the prior review (see below for an update on the status of the workshop). That said, the review of the Secure Program's files was the first in-depth look at program fidelity for that program and thus was quite useful to the Monitoring Team's efforts to support program development.

The Monitoring Team also observed Support Team meetings at RNDC and GMDC (both of which, at the time, reviewed SCHU and TRU Inmates during the same meeting) and at the Secure Unit. Each of the Support Team meetings had good multi-disciplinary representation including the Unit Managers, uniformed line Staff and supervisors, Program Counselors, H+H clinicians, education Staff, and other stakeholders (*e.g.*, the Facility Ombudsman, Law Library Staff, an Assistant Commissioner). All of the meetings would benefit from a more specific focus on the Inmates' behavior goals and objective measures of the Inmates' progress (discussed in more detail below). That said, the Support Team members clearly knew all of the Inmates well, worked well as a team, and had insight into the Inmates' behaviors.

The SCHU, TRU and Secure programs are all guided by individual Behavior Support Plans (BSP) that are discussed each week during the multi-disciplinary Support Team meeting. The Second Monitor's Report (at pgs. 144-147) outlined several recommendations designed to strengthen the BSPs and the way in which Inmates' progress is tracked and documented. Some of the recommendations have been addressed: (1) program files have been created for each Inmate that contain admission documents, infraction histories, the BSP, a tracking log that identifies when the Support Team met and the substance of the conversations, copies of ASFC cards and, at least in the case of the Secure Program, weekly contact notes from the Program Counselors and program attendance sheets; and (2) the Tracking Log has been reformatted to better capture the substance of the conversation and the input from various stakeholders. That said, continued improvement is needed in the following areas:

- Ensure that BSP goals are individualized, realistic, observable and measurable, and that a specific strategy for measuring progress is articulated. The Department retained a consultant to deliver a BSP goal-writing workshop on February 21-22, 2017.
- Documentation surrounding the process for program referral and admission needs to be complete and accurate. In both the TRU and Secure Program's files received, the

various forms and attachments that are required by policy were often incomplete or improperly filled out. As a result, discerning whether some of the Inmates met the programs' referral criteria and whether all of the required procedures were followed was not possible.

- The Support Team tracking logs need to clearly indicate the Inmate's place in the program (*e.g.*, how long he has been there; what Level or Phase he is on; whether or not he is being promoted). This is essential for monitoring the Inmate's length of stay and whether it is commensurate with the Inmate's behavior.

- As an extension of the first bullet above, the Support Team needs to better describe the Inmate's progress on each goal. Some Inmates did not appear to have any specific goals articulated on their BSPs. In other cases, the goals were referenced and often changed from week to week, but objective data was not used to support a conclusion about whether the goal had been met or not. Sometimes, it was difficult to discern whether the Support Team even contemplated a conclusion about any of the goals. The ASFC Cards (described in ¶ 3, above) and program attendance sheets (discussed in the bullet below) could be useful for this purpose, along with entries from the units' Behavior Logs.

- Program Counselors have begun to track Inmates' participation in the various programs they offer in attendance program sheets. While this is a good practice, the information should be aggregated each week, for each Inmate so that his overall program participation can be better considered by the Support Team.

The Program Counselors in the alternative disciplinary programs collect data on the services they provide and the level of Inmate participation. Program Counselors are expected to provide three hours of group programming and individual counseling per day to each unit. Groups could include Community Meetings, Cognitive-Behavioral Therapy (CBT) programs (*e.g.*, Dialectical Behavior Therapy/DBT, Anger Management, anti-gang programming, structured recreation, communication skills, etc.) The Department provided the Monitoring Team with a sample of these documents for SCHU/TRU at RNDC and GMDC. An initial analysis revealed that the intensity of programming was lower than expected—behavior-focused units generally must provide *intensive* services to address youth's challenges. However, it is likely that these results were at least partially impacted by glitches in the data collection procedure. The Department has since revised the data collection forms and continues to train Program Counselors on their obligations toward this end. In addition, the initial data indicated that Community Meetings and structured recreation were offered far more frequently than CBT programs that focus on behavior change. Again, this finding may be due in part to problems with the data collection method. However, going forward, the type and intensity of programming will be a key element of the Monitoring Team's assessment of the viability of the alternative disciplinary programs. CBT programs must be delivered at the appropriate intensity in order to have an impact on

Inmates' behavior. The new Program Counselor data collection forms were implemented mid-January, 2017 and thus valid data will be available for analysis for the Fourth Monitor's Report.

Quality implementation of programs to change Inmates' behavior is a complex, incremental process. The Department continues to lay the foundation for the delivery of programming designed to address Inmate's violent misconduct. As this foundation is fortified, the Monitoring Team will review the quality of the various programs (*e.g.*, DBT skills, interactive journaling, and other group programs) by reviewing program manuals, direct observation, and interviews with facilitators and participants. In the Fourth Monitoring Period, the Monitoring Team will review YA-ESH Inmate files to identify the strengths and weaknesses of the program during its early implementation.

- ***Outcomes***

The Department reported it has partnered with the Vera Institute of Justice, a highly-regarded research organization with significant expertise in correctional programs, to evaluate the effectiveness of the SCHU and TRU programs as one part of a much larger evaluation of the overall Young Adult initiatives. The SCHU/TRU portion of the evaluation will examine Inmates' experiences while in the programs (*e.g.*, behavior, length of stay, program participation, and completion of support plan goals) and will compare their infraction records, housing stability, and program involvement before and after the program. The evaluation is funded by the National Institute of Justice under a 3-year grant that began in June 2016. Thus, the results of this research will not be available until mid-2019.

In the interim, the Department should develop some basic metrics to assist with the on-going effort to solidify implementation. In addition to the bullet points listed in the Program Fidelity section above, the Department should also conduct routine tracking of the length of stay and the frequency of violence and other types of infractions in the alternative programs, as well as post-program outcomes related to misconduct. The Monitoring Team conducted an initial review of some of these indicators:

- *Length of stay.* The SCHU and TRU program rosters for Inmates admitted during the current Monitoring Period were used to estimate the length of stay in each program. Only Inmates who "graduated" from SCHU and TRU were included in the analysis (*i.e.*, Inmates who were still in the program or who were discharged from the Facility were excluded).
  - Among the 89 Inmates who "graduated" from the programs at RNDC, the average length of stay was 28 days, and the median was 24 days. Of those who graduated from the programs, a small portion (17%) of the Inmates stayed 14 days or less; about half (53%) stayed between 15 and 29 days; 23% stayed between 30 and 59 days; and 8% stayed 60 days or more.
  - Among the 189 Inmates who "graduated" from the programs at GMDC, the average length of stay was 25 days, and the median was 22 days. About one-quarter of the Inmates (23%) stayed 14 days or less; half (50%) stayed between

15 and 29 days; 25% stayed between 30 and 59 days; and 2% stayed 60 days or more.

Given that the programs will not be effective unless the Inmate receives the proper dosage (*i.e.*, duration and intensity of the programs designed to change behavior), the Department should explore the reasons that about one-quarter of the program graduates were in the program for only two weeks. The shorter lengths of stay may be appropriate based on the Inmates' behavior, but may also indicate a snafu in the program design. Furthermore, the reasons for the longer lengths of stay should be examined to ensure they are legitimate.

Unlike the SCHU and TRU program models which originally estimated a length of stay between two and four weeks, the program models for Secure and YA-ESH have significantly longer estimated lengths of stay (Secure: Phase 1 is at least 28 days, Phases 2 and 3 depend on the Inmate's behavior but are typically two to three weeks; YA-ESH: the Entry phase is 28 days, and Level I is 45 days). Given the recent tenure of the programs, a sufficient sample size was not yet available to calculate a reliable average length of stay for either program. For all programs, in addition to making sure the Inmates are in the programs long enough to benefit from the interventions, the Department must also assess the extent to which Inmates are not progressing as anticipated and/or staying in the programs longer than expected, even as their behavior improves. If this occurs, the underlying reasons will need to be closely examined.

- *Frequency of Violence and Misconduct.* The frequency of misconduct on a special housing unit is difficult to predict. Given the restrictiveness of the programs and the various interventions designed to reduce idle time and modify behavior, the levels of violence should be relatively low. However, given the extensive violent histories of the Inmates placed in the programs, it would not be surprising for violent behavior to persist. The Monitoring Team reviewed data on the number of incidents occurring in each of the alternative disciplinary programs throughout the Third Monitoring Period. Overall, YA-ESH and the Secure unit have very low levels of violence. GMDC's TRU program had a noticeable increase in the number of violent incidents and uses of force in November and December 2016, compared to previous months. RNDC's TRU program has had a moderate number of incidents and uses of force throughout the five-month period, although most of the incidents were non-violent. Both SCHU programs had low numbers of incidents and uses of force.

The Department is encouraged to create a template for the ongoing monitoring of the alternative disciplinary programs that includes the number of admissions, average lengths of stay (total and within-Phase or Level), the rates of infractions, violent infractions, and uses of force. These last three indicators should utilize a *rate* (number of incidents/ADP) in order to make the programs comparable to each other given their different capacities. The Department should also take initial steps to examine the frequency of misconduct post-program in order to gauge effectiveness. This type of ongoing monitoring is essential for the Department to make program modifications to improve the effectiveness of the program, particularly during the interim period while the Vera Institute's research is underway.

*Other Strategies to Address Misconduct*

- ***Solo Housing***

As discussed in the previous Monitor's Report, at times, the Department over-relies on strategies to separate youth and suppress their behavior, rather than mediating conflicts or focusing on behavior change to facilitate long-term safety. One such practice, referred to as "Solo Housing" by the Monitoring Team, involves temporarily placing youth involved in multiple incidents (as either the aggressor or the victim) on a dormitory-style housing unit alone with a Staff, for some period of time (from a few days to a couple weeks). The Monitoring Team's concerns center around the social isolation from peers and the difficulty for the youth to access the full range of mandated programming and other services to address their treatment needs. While separation from peers for a very short period of time (*i.e.*, a few days) may be appropriate, the use of solo housing should be very limited and must be governed by a written protocol. The Department submitted a list of the Inmates at RNDC who were solo housed and the duration of said housing. A total of six (6) Inmates were solo housed during the current Monitoring Period. In three cases, the solo housing was caused by the Inmates' special status (*e.g.*, City Sentenced, General Population Escort, or awaiting age verification) and the fact that no other Inmates of the same status were currently in custody. The duration of solo housing for these Inmates was quite short (six days, two days and one day, respectively). In the other three cases, Inmates were deliberately placed on a unit alone for security reasons (*e.g.*, gang related issues; threats of violence; threats to safety). The duration of solo housing for these Inmates was also relatively short (eight days, four days and one day). That said, their placement, experience while on the unit, and removal from the unit was not guided by policy.

The Department submitted a draft policy for Solo Housing to the Monitoring Team in December 2016. The Monitoring Team provided recommendations related to the following issues:

- Articulating the referral process;
- Articulating procedures for how waking hours will be occupied and documented (*e.g.*, meals, education, recreation, other mandated services);
- Articulating a maximum allowable length of stay;

- Creating a service plan for youth that describes the services the youth will receive while solo housed and the specific steps to be taken to return to a unit where the Inmate can interact with peers;
- Articulating how the release/transfer decision from the unit is made.

To the extent that the Department wants to continue to use Solo Housing, the Monitoring Team will continue to work with the Department to refine the policy. Furthermore, the number of Inmates placed in solo housing, the reasons for it, and the duration will continue to be tracked.

- ### *Mid-level Infractions*

As discussed in both the First and Second Monitor's Reports, the Department's continuum of responses to infractions requires expansion to address mid-level misconduct, such as threatening Staff, episodic aggression or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other Inmates are compromised. Data from the Inmate Fight Tracker suggests that episodic aggression is a frequent occurrence—that many Inmates engage in a single fight and thus may not warrant the intervention of SCHU or TRU, but still require some form of accountability. Currently, the only options to address these behaviors are a reprimand and/or surcharge of $25 from the Adjudication Captain, and these are only imposed *if* the Staff write an infraction and it navigates the adjudication process. Otherwise, it appears that many Inmates do not face meaningful accountability measures for their mid-level misconduct, which contributes to the overall lack of safety at the Facilities. The Monitoring Team emphasizes this recommendation yet again, both to ensure proper accountability and order in the Facility, and as part of an overall strategy to address Inmate misconduct before it escalates to a level that would lead to placement in one of the alternative disciplinary programs. The Monitoring Team's experience suggests that responses that involve both a skill-building element and a restorative element are most effective in catalyzing behavior change and sending a message to both Staff and Inmates that misconduct is not tolerated. The Monitoring Team supports the Department's concept of *Repairs* and has also discussed a variety of other ideas in-person and in writing. The Monitoring Team encourages the Department to accelerate progress in this area.

The Department has made clear progress in expanding the range of disciplinary options to replace Punitive Segregation. Quality implementation of programs to change Inmates' behavior is a complex, incremental process. Now that the Department has implemented the core strategies, it will need to finalize policies, improve the goal-focus of the various programs, monitor implementation and program fidelity, and assess effectiveness. Furthermore, the Department needs to continue to address the practice of solo housing and to develop a range of mid-range accountability measures for behaviors that do not warrant placement in one of the alternative programs.

| COMPLIANCE RATING | ¶ **4.** Partial Compliance |
| --- | --- |
|  | ¶ **6.** Partial Compliance |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old Inmates in December 2014, and excluded 18-year-olds in June 2016.

- The same protections for 18-year-old Inmates with serious mental illnesses ("SMI") who commit violent infractions have been extended to the Secure Unit and Young Adult Enhanced Supervision Housing ("YA-ESH"). Inmates with SMI are excluded from both programs and must be placed in an appropriate therapeutic setting.

- The Department has two therapeutic units for Inmates with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of Inmates with SMI who have committed an infraction; PACE also offers treatment to Inmates with SMI, but is completely separate from the infraction process. During the Third Monitoring Period, no 18-year-old Inmates were housed in either unit.

- The Department reported its intention to create a PACE unit for young adults within the next 12 months, but does not currently plan to open a young adult CAPS unit.

### ANALYSIS OF COMPLIANCE

Although the use of Punitive Segregation has been abolished, this provision offers protections to Inmates with SMI that goes beyond their placement in Punitive Segregation. This provision requires Inmates with SMI to be placed in an appropriately therapeutic setting. Toward that end, the Department excluded Inmates with SMI from both YA-ESH and the Secure Unit in both policy and practice. During the Third Monitoring Period, a total of ten (10) 18-year-old Inmates spent time in the Secure Unit and four (4) 18-year-old Inmates spent time in YA-ESH. According to H+H, the Department's mental health provider, none of these Inmates were SMI prior to or during placement in the units. For context, H+H estimates that very few 18-year-old Inmates have serious mental illnesses (approximately 15 Inmates on any given day, which is less than 10% of the total number of 18-year-old Inmates).

The Department reported that no 18-year-old Inmates were housed in either PACE or CAPS during the Third Monitoring Period. Should an 18-year-old Inmate be housed in either unit as the result

of an infraction in subsequent Monitoring Periods, the placement, length of stay and appropriateness of the therapeutic environment will be discussed in the analysis of compliance with this provision.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

    a.    Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

    b.    The Tour Commander of the Facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

    c.    The Inmate shall remain in confinement for only so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the Inmate at least once every three hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department drafted a "De-Escalation and Temporary Cell Restriction ('TCR')" Policy, which was submitted to the Monitoring Team for review and comment.

- The Department has concerns about the intersection of TCR and the use of force; the BOC mandated services standard; and the language in the Consent Judgment requiring less severe measures, Tour Commander notification, and the role of mental health Staff. These are the subject of on-going discussions with the Monitoring Team.

### ANALYSIS OF COMPLIANCE

Currently, out-of-control Inmates are escorted to the Intake unit immediately following a use of force. Not only does this require Staff resources for transport, it also creates a risk of harm to both Staff and Inmates during transport. Furthermore, given the commotion of the Intake unit, placing an out-of-control Inmate in that setting creates a further risk of harm to other Inmates and Staff. For these reasons, the Monitoring Team supports the use of TCR on the Inmate's own housing unit in the immediate aftermath of a use of force or in response to other crisis situations in which an immediate risk of harm is present. The Monitoring Team's experience in both juvenile and adult facilities throughout the country indicates that this de-escalation tool is part of the generally accepted practice when proper protections are in place to ensure it is used only to respond to legitimate safety threats and to limit its duration. When properly designed and implemented, the use of TCR can enhance the safety

of both Inmates and Staff. Although the Consent Judgment does not require the Department to utilize de-escalation confinement, the Monitoring Team encourages the practice.

During the Fourth Monitoring Period, the Monitoring Team will continue to assist the Department in refining the draft policy, and will consult with stakeholders as needed in an effort to address the Department's concerns and identified barriers. If the Department chooses to implement this tool, the Monitoring Team will audit the practice to ensure it comports with the Department's policy.

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Dr. Beard conducted an independent review of the Inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with a mental health designation ("M-designation") prior to holding a disciplinary hearing.

- The Department held meetings with stakeholders from OSIU and the Adjudication Unit to review the suggestions.

- The Department reports that it has updated several key policies related to the Adjudication process, "RED ID and Enhanced Restraint Inmates," "Inmate Disciplinary Due Process," and "Pre-Hearing Detention and Punitive Segregation Status Inmates."

- The Department has deliberated on Dr. Beard's suggestion related to mental health reviews and noted that large proportions of Inmates already receive this protection (*e.g.*, those going to pre-hearing detention or segregation; those on or with a history of being housed on a mental observation unit; those with histories of suicide attempts; those with a history of committing similar offenses; and any Inmate upon request of the hearing officer). Discussions with stakeholders are on-going as to the feasibility of reviewing all M-designated Inmates prior to a hearing.

**ANALYSIS OF COMPLIANCE**

In the previous Monitor's Report, the Monitoring Team made several additional suggestions related to (1) interviewing infracted Inmates to better understand their experiences during the process; (2) collecting, analyzing and interpreting data about how often Inmates exercise their various rights; and (3) examining the frequency with which alternatives to Punitive Segregation are utilized and imposed and if it was effective in reducing misconduct.

The Department reported that it has collected information on the frequency with which Inmates request a hearing interpreter or facilitator and whether the assistance was received, although it did not present the substance of the information. The Monitoring Team will request the data for review in the Fourth Monitoring Period. The Department has not yet contemplated the Monitoring Team's other recommendations, but plans to do so in the Fourth Monitoring Period, as it makes a final decision about Dr. Beard's suggestions.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

## 12. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for Inmates under the age of 18 (¶¶ 1, 3). Approximately 200 16- and 17-year-old Inmates are housed in Facilities on Rikers Island, male adolescents at RNDC and female adolescents at RMSC. The intent of transferring adolescent Inmates to an alternative Facility is to place them in a facility readily accessible by public transportation to facilitate visitation between Inmates and family members more easily, and to house them in an environment that will support a new paradigm for effectively managing the adolescent Inmate population. This new paradigm will rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

The Department has made significant progress on the initiative, as described in more detail below.

| XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3 |
|---|

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department and the Mayor's Office of Criminal Justice ("MOCJ") identified a suitable location—the Horizon Juvenile Center located in the Bronx. The Horizon Center currently is a secure detention facility for 14- and 15-year-old offenders, currently operated by New York City's Administration for Children's Services.

- The City of New York has allocated $17 million in fiscal year ("FY") 2017 and $153 million in FY 2018 to renovate the Horizon Center.

- The Department and MOCJ have consulted with several architectural and engineering firms and have made site visits to model programs in other jurisdictions to flesh out the vision for how the physical space should be configured to best support supervision and programming.

- The Department contracted with a consultant to conduct a feasibility study of the use of the Horizon Center. The consultant is expected to complete the study in Spring 2017. In order to develop the feasibility study, the consultants frequently meet with DOC staff, including representatives from the Engineering Division, Maintenance Division, Young Adult Programming, and other Operational representatives.

- The Department, MOCJ and other relevant City Agencies met weekly during the Monitoring Period to continue to plan and coordinate on the development of the space.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to be extremely encouraged by the significant attention, resources and time the Department and the City have expended to locate and finance a new facility for 16- and 17- year-old Inmates. The Department and the City, including MOCJ, have engaged in a thoughtful and deliberate approach to identify and develop appropriate space. Conversations with the

Department and MOCJ confirmed that the selected location, once renovated, will meet the needs of the adolescent Inmate population and will comply with the safety, education, recreation, programming, housing and supervision requirements of this provision. The identified location is accessible by public transportation, which will facilitate the family engagement that is so critical to the rehabilitation of young offenders. The Monitoring Team intends to tour the Horizon Center during the next Monitoring Period.

      As noted in the First and Second Monitor's Report (at pgs.154-155), finalizing the site's selection may trigger the Uniform Land Use Review Process ("ULURP"), a multi-tiered review likely to require a significant period of time to complete. Further, the space must be appropriately designed and renovated before it can be used. Accordingly, the location must first be approved for use by the relevant stakeholders and then retrofitted for use.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance<br>¶ 3. Not currently applicable |
|---|---|

## 13. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

      The Department continues to recruit classes of new Officers consistently increasing size. During the Third Monitoring Period, the Department graduated 711 new Correction Officers in November 2016, and matriculated 922 recruits at the Training Academy in December 2016. The Department's Correction Officer Recruitment Unit ("Recruitment Unit"), and AIU, continue their coordinated effort to identify and select qualified Staff to meet the Department's staffing needs. During the Third Monitoring Period, these units worked together to improve the quality of the candidate pool with candidates more likely to qualify for appointment by: (1) identifying common administrative disqualifiers (like failure to hold a valid Driver's License) early in the recruitment process and working with the candidate to remedy them; and (2) recruiting at colleges and universities to increase the likelihood that a potential candidate has the necessary college credits for qualification.

      During the Third Monitoring Period, the Monitoring Team continued to assess the Department's Recruitment Program (¶ 1), and analyzed another sample of background

investigations conducted by AIU to assess the Department's compliance with the selection requirements of the Consent Judgment (¶¶ 2, 3).

*Upcoming Challenges with Available Civil Service Lists*

As described in the First Monitor's Report, the Department may only select candidates who have passed the DCAS Examination, who are then ranked on a list of individuals who are eligible for hire based on their examination scores, referred to as the Civil Service List. Due to the significantly increased recruit class sizes over the last two years, the Department has quickly moved through the available candidates on the Civil Service Lists. Previously, AIU was considering candidates who had taken the exam many years before and remained on the list. However, as the recruit classes grew in size, AIU quickly exhausted the corps of candidates on the available Civil Service Lists. While the Recruitment Unit is successfully driving more individuals to take the DCAS Exam (in order to increase the pool of candidates on the available Civil Service Lists), those ranked lists are not necessarily generated close in time to when individuals take the exam. The Department reports that it can take over 10 months for the list to be generated after a candidate takes the exam. Therefore, AIU anticipates in the near term that they have screened all individuals on the available Civil Service Lists and will no longer have new candidates to consider because of the delay in publishing new Civil Service Lists. Therefore, AIU is working with DCAS to obtain those lists more quickly following the exams. This includes building an AIU database to demonstrate systematically to DCAS that AIU has in fact exhausted the available lists and appropriately applied the one-in-three consideration rule. The Monitoring Team encourages the Department and DCAS to continue to work together to ensure the lists are generated timely.

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department conducted outreach to potential candidates through Career Fairs and involvement in Community Events, engaging 3,900 individuals at approximately 70 events during this Monitoring Period.
  - **Career Fairs**: The Recruitment Unit participated in the Mega Job Fair at Nassau Community College, Military Transition Job Fair at West Point, St. John's University Fall Career and Internship Expo, and the Hellenic Society Career Expo during this Monitoring Period.
  - **Community Events and Involvement:** Representatives of the Recruitment Unit participated in a variety of community events, including the Labor Day Parade, African-American Day Parade, Meet and Greet at Teachers Preparatory High School, Veteran's Day Parade, Turkey Giveaway with MCU, People en Espanol.
  - **Youth Explorers Program:** The Department also launched its Youth Explorers Program, a leadership development program for youth between 14 and 17 years old who are interested in learning more about a career in law enforcement. The Recruitment Unit held an open house in November 2016 to receive applications, and the program began in January 2017 with ten students enrolled.
- Quantitative increases in key areas:
  - **DCAS Exam Takers**: The Department continues to drive candidates to take the DCAS Exam:
    - October 2016 Exam: 3,001 Filers, 2,067 Takers
    - November 2016 Exam: 2,124 Filers, 1,466 Takers
  - **Social Media Followers**: The Department continues to see increases in the number of social media followers on Facebook, Twitter, Instagram, and YouTube from July 2016, compared to January 2017.

|  | Facebook Followers | Twitter Followers | Instagram Followers | YouTube Followers |
|---|---|---|---|---|
| **March 2016** | 3,773 | 355 | 601 | 53 |
| **July 2016** | 4,931 | 586 | 1,274 | 149 |
| **January 2017** | 12,745 | 875 | 3,688 | 347 |

ANALYSIS OF COMPLIANCE

The Monitoring Team remains impressed by the Recruitment Unit's ability to continually increase key quantitative metrics such as the number of candidates who take the DCAS Exam and the number of individuals engaging with the Recruitment Unit on social media. The Monitoring Team encourages the unit to continue to find new ways to outreach to potential pools of untapped candidates. The Monitoring Team routinely monitors the Recruitment Unit's social media to assess the engagement and messaging provided to potential candidates through these outlets, and to verify event attendance and turnout at recruitment events. The Monitoring Team finds the use of those tools by the unit to be both professional and effective. The launch of the Youth Explorers Program is a novel way to reach a younger pool of candidates who can begin to think about a career in corrections while still in high school. The program will hopefully have a positive overall effect in the community, bolstering the Department's reputation as a community leader and enabling the Department to attract desirable candidates.

The Monitoring Team applauds the enormous efforts of the Recruitment Unit to create a candidate pool large enough to attract sufficient high-quality candidates and to fill exceptionally large recruit classes.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's AIU Unit continues to process potential candidates as described in the First and Second Monitor's Report, conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.

- AIU is improving the Unit's organization, Staffing, and policies to enhance certain areas of the investigations.

  o **Medical Unit and Psychology Unit Expansions**: AIU continues their efforts to expand the number of staff dedicated to the Medical and Psychology Units to conduct the necessary screenings.

  o **Agility Team**: This Monitoring Period, AIU hired certified trainers for the Agility Team who will coach candidates who need assistance to pass the Agility test, and will ultimately assist current Staff who are struggling to maintain fitness. AIU has secured space at Queens Detention Center for the Agility Team's use, which will include treadmills and other fitness equipment.

  o **Investigator Manual and Finalized Guidelines**: AIU is working to finalize guidelines for Medical and Psychological evaluations, and for the Agility Team. AIU is also working to create policies based on memoranda that will ultimately be compiled in a comprehensive Investigator Manual for AIU Staff. The goal is for AIU to finalize the policies and Investigator Manual by the end of 2017.

- AIU screened 2,283 potential candidates to fill the Academy classes that graduated in November 2016, and had a comparative selection rate with prior classes as shown below:

|  | December 2015 Graduating Class | May 2016 Graduating Class | November 2016 Graduating Class |
|---|---|---|---|
| Total number of candidates screened for the graduating class | 2,222 *(100%)* | 2,473 *(100%)* | 2,283 *(100%)* |
| Total number of candidates deemed not qualified | 618 *(28%)* | 645 *(26%)* | 450 *(20%)* |
| Total number of candidates selected | 630 *(28%)* | 665 *(27%)* | 746 *(33%)* |
| Candidates who were screened and were neither recommended nor disqualified, and who fall into other categories (*e.g.*, candidate declined to continue process, withdrew from certification, etc.) | 974 *(44%)* | 1,034 *(42%)* | 1,087 *(47%)* |
| Candidates who were screened and had investigations still pending at the start of the Academy Training | n/a | 129 *(5%)* | n/a |

ANALYSIS OF COMPLIANCE

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report. In some areas, AIU goes beyond the initial background investigation process to continue to improve their own investigations—for instance, AIU reports that its Staff reviews the investigation files for Staff later found to be involved in corruption issues to determine whether any indication of that future behavior was evident during candidate selection. The Monitoring Team commends AIU's efforts to strengthen its own processes and thinks this a worthy practice that will enable AIU to continue to improve their work.

As in the Second Monitoring Period, the Monitoring Team audited a sample of the background investigations conducted by AIU for candidates who were considered for the November 2016 graduating class.

*Selected Candidates*

The Monitoring Team reviewed the investigative files for a random sample of approximately 10% (n=75) of the selected candidates. The background investigation files clearly demonstrated that AIU reviewed each candidate's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, frequency of appearance in the Inmate visitor logs, medical screening (including drug tests), presence on state or local child abuse registries (Family Watchdog and WEBCRIMS), prior employment references, and financial history including credit checks. The investigative files evidenced in-depth investigations into each candidate's background. As stated in the Second Monitor's Report (at pg. 159), the Monitoring Team provided two recommendations to AIU related to Field Visit documentation and bolstering the summary recommendation portions of the Case Review Sheets. AIU has incorporated the recommendations into their practices, but they were not fully reflected in the Investigative Files reviewed for the November 2016 graduating class as those investigations were conducted before the Monitoring Team provided the recommendations. The Monitoring Team will continue to review investigations going forward, and anticipate seeing evidence of the new practices.

Based on the review of the November 2016 files, the Monitoring Team made additional recommendations related to creating an Investigator Manual and further improving Field Visits, and provided feedback on specific investigations. The Executive Director of AIU confirmed that these recommended practices coincided with their own plans to refine AIU's policies and procedures.

- ***Investigator Manual***

The Monitoring Team suggested that AIU investigators would benefit from a comprehensive manual of AIU policies and procedures to guide them through the investigation process. This manual would include, among other things, comprehensive guidance for the standards that should be applied by

the investigator and guidance on the type of information that should be gathered, beyond what is currently provided in the AIU guidelines which includes only the specific disqualifiers. The Executive Director of AIU reported that AIU has started to create a comprehensive manual for Staff, with the goal to complete it by the end of 2017.

- *Field Visits*

The Monitoring Team reiterated their recommendation that AIU's Field Team staff should provide documentation about the field visit to the primary investigator contemporaneously with the visit to confirm that the field visit occurred as required and to ensure that no red flags are inadvertently overlooked. The Monitoring Team further recommended a more intensive approach to Field Visits beyond the residence checks taking place currently, specifically the use of collateral verification questions for neighbors and acquaintances while on Field Visits. The Executive Director of AIU reported AIU's goal of implementing a more intensive approach to Field Visits, including a standardized form and questions for use by the Field Team. This goal remains a work in progress.

- *Feedback on Specific Investigations*

Overall, the Monitoring Team found that AIU investigators identified candidates with the following type of non-disqualifying red flags in their backgrounds less frequently than noted in the previous files reviewed: financial debts, disqualification from the NYPD for psychological reasons; history of domestic violence; criminal history; driving-violation history; or known associations and contact with Inmates at Rikers. This suggests to the Monitoring Team that the Department is attracting a stronger candidate pool. The Monitoring Team provided specific feedback regarding potential areas of concern for individual candidates in only six of 76 (8%) files reviewed, for example noting that a candidate's incarcerated associates or criminal history warranted additional explanation in the file to substantiate the investigator's recommendation to hire the candidate.

*Candidates Who Were Not Approved*

The Monitoring Team reviewed the investigative files for a random sample of approximately 10% (n=42)[107] of the candidates who were considered but not approved. Investigative files for candidates disqualified for failing medical and psychological testing had clear documentation of such failures within the files. However, when a candidate was disqualified for other reasons (*i.e.* failure to report for the investigation, failure to disclose prior arrests), the AIU investigator did not include a summary of the evidence or basis for their recommendation in the candidate's file. During the audit, the Monitoring Team identified the basis or evidence for disqualification within the file by reviewing all available documentation and hand-written investigator notes. The Monitoring Team recommended AIU institute a process that requires the investigator to document their analysis and reason for not selecting a candidate in a consistent manner. AIU reported that the division has a Non-Selection Unit responsible

---

[107] AIU was unable to locate the file for one candidate who was not selected for hire that the Monitoring Team selected for auditing.

for documenting this information, but there is a backlog in this effort and so information was either not yet complete or not up-to-date in the files reviewed. The Monitoring Team will ensure that the work of the Non-Selection Unit is reviewed as part of the audit of AIU investigative files during the Fourth Monitoring Period.

| **COMPLIANCE RATING** | ¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
| --- | --- |

### 14. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an Inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau ("CIB") or ID, with input from the Preliminary Reviewer, reviews the circumstances warranting the potential arrest and determines that the recommendation is based on probable cause. The purpose of this section is to ensure that Inmate arrests are based on probable cause, and not effected for retaliatory purposes. The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the Third Monitoring Period, but has started to gather information necessary to assess compliance, as discussed below.

During the Third Monitoring Period, the Bronx District Attorney's Office opened a satellite office to house the Rikers Island Prosecution Bureau and Public Integrity Bureau. The Monitoring Team met with the Bronx District Attorney and her executive staff to discuss common areas of concern related to violence in the jails and corresponding prosecution of troubling cases. The Monitoring Team continued these conversations with the Unit Chief of Rikers Island Prosecution Unit and Chief of the Public Integrity Bureau on a few occasions.

The Department reports that it continues to work collaboratively with the Bronx District Attorney's Office. The Department also reports that when an Inmate or visitor violates the law,

the Department's CIB works with the Bronx DA's office to investigate, collect evidence, and carry out the arrest.[108] The Bronx DA and the Department have focused their efforts on cases involving stabbings, slashings, serious assaults on Staff or other Inmates, possession of contraband and dangerous articles, arson, and escape—although arrests are not limited to these crimes. The Department reports it is working to improve its evidence collection protocols. Further, the Department is working collaboratively with the Bronx DA to seek consecutive sentences for Inmates who are re-arrested for misconduct in DOC Facilities so that if convicted, the defendant will begin to serve his or her prison term for the crime committed at Rikers only after he or she has served the term for their original offense.

## 15. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. The first two paragraphs in this section (¶¶ 1 & 2) are intended to ensure that the Department's policies, procedures, practices, protocols, training curricula and corresponding documents, and logs and handbooks are consistent with the requirements of the Consent Judgment to the extent that such requirements are not explicitly stated in other provisions in the decree.

The third paragraph in this section focuses on coordinating the Department's compliance efforts, including coordinating with the Monitoring Team. The Department continues to maintain the NCU" that was convened at the inception of the Consent Judgment. The NCU sits within both the Legal Division and the Quality Assurance Division and is dedicated to overseeing implementation of, and sustained compliance with, the Consent Judgment. The amount of work

---

[108] The Bronx DA Public Integrity Bureau prosecutes cases involving corruption committed by public servants, as well as allegations of excessive force by uniformed public servants, including members of the Department.

required to develop and implement the reforms continues to confirm the benefit of a dedicated unit to focus on compliance. As described in the Introduction section to this Report, the Monitoring Team strongly encourages the Department to commit the necessary resources to support the NCU to ensure the Department can achieve and sustain compliance.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[109]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department revised a number of policies and procedures to conform with requirements in *Nunez*.

- The Department and the Policy and Procedures Unit identified and began to review the universe of directives, corresponding procedures, and operation orders that needed to be assessed in order to determine whether any revisions are necessary.

- The Department reviewed over 200 directives and corresponding procedures and 300 operation orders and identified those related to the provisions of the Consent Judgment. Some portion of these may need to be revised to ensure that they are consistent with, incorporate, and address all provisions of the Consent Judgment.

- The Department also worked with the Chief of Department's office to identify over 800 command level orders that need to be reviewed to determine whether any revisions are necessary.

**ANALYSIS**

The Department continued to prioritize the development of policies and procedures specifically enumerated in the Consent Judgment (*e.g.*, Consent Judgment § VII (Use of Force Investigations), ¶ 12) and those that address procedures required by the Consent Judgment (*e.g.*, the Department updated policies and procedures to address counseling requirements in Consent Judgment § IX (Video Surveillance), ¶ 3). The Department also continued its work to identify all policies, procedures, and

---

[109] The Monitor approved an extension of this deadline to July 31, 2017 (*see* Second Monitor's Report at pgs. 162-163).

training materials, that while not specifically enumerated by the Consent Judgment, must also be revised in order to be consistent with the provisions in the Consent Judgment.

The Department provided status updates to the Monitoring Team on this process throughout the Monitoring Period. The Department provided the Monitoring Team with comprehensive lists of all Department directives and operation orders, and identified those that address issues related to provisions in the Consent Judgment. The Monitoring Team has reviewed these lists and identified a few additional policies that may also need to be modified. The Monitoring Team will work with the Department during the next Monitoring Period to finalize the list of directives and operation orders that need to be assessed for any necessary revisions. The Department will also determine whether additional policies and procedures may need to be created to address the requirements that are not addressed in the Department's current policies and procedures.

| COMPLIANCE RATING | ¶ 1. Requirement has not come due<br>¶ 2. Requirement has not come due |
|---|---|

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Assistant Deputy Commissioner of Quality Assurance, Deputy General Counsel and an Assistant General Counsel share the responsibilities of the Compliance Coordinator.

**ANALYSIS OF COMPLIANCE**

The role of the Compliance Coordinator continues to be fulfilled by three energetic, highly-competent and committed individuals. The Monitoring Team communicates almost daily with the Compliance Coordinators and other members of the Department. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and maintaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

**- End -**

# Appendix A: Definitions

| Acronym or Term | Definition |
|---|---|
| ACS | Administration for Children Services |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| AMKC | Anna M. Kross Center |
| ART | Adolescent Response Team |
| ASFC | Adolescents Striving for Change |
| Avoidables | Process at the Facility-level to identify and address avoidable use of force incidents |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BSP | Behavior Support Plan |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CHS | Correctional Health Services |
| CIB | Correction Intelligence Bureau |
| CIRPA | Civil Rights of Institutionalized Persons Act |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| Commissioner's Twelve | Commissioner's Twelve process, wherein, on a weekly basis, facility Wardens must review all of the incidents in which the Preliminary Review process identified a problematic use of force and then must develop an Action Plan to address any trends. Twelve categories of problematic uses of force were identified based on discussions between the Commissioner and the Monitoring Team: head strikes, force utilized on Inmates in restraints, kicks, improper use of institutional equipment, prohibited restraint holds, camera malfunctions, excessive or unnecessary use of OC, unexplained injuries, unreported uses of force[1], anticipated uses of force[2], alleged uses of force[3], and Inmates being forcibly placed against the wall. |
| C-Sog | Corrections Special Operations Group |

---

[1] This category includes incidents in which the Department confirmed that force was used, but the incident was not reported by Staff.

[2] This category includes incidents in which the use of force was anticipated, but was not treated as such by the involved Staff.

[3] This category includes allegations of uses of force in which Inmate injuries are consistent with a use of force.

| Acronym or Term | Definition |
|---|---|
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DCID | Deputy Commissioner of ID |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DOJ | Department of Justice |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EIS | Electrical Immobilization Shield |
| EMTC | Eric M. Taylor Center |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| FY | Fiscal Year |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ICS | Incident Command System |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service Training | Training provided to current DOC Staff |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| IT | Information Tracking |
| LMS | Learning Management System |
| MDC | Manhattan Detention Center |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandums of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |

| Acronym or Term | Definition |
|---|---|
| NFA | No Further Action |
| NIC | National Institute of Corrections |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OC Spray | Chemical Agent |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| PBMS | Positive Behavior Management System |
| PC | Protective Custody |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PMA | Performance Metrics and Analytics Department |
| PMO | Project Management Office |
| PPU | Policy and Procedures Unit |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit Training | Mandatory Training provided by the Training Academy to new recruits |
| Rapid Review Process | Wardens review every use of force incident which is captured on video, and consider whether the force used was appropriate and within guidelines. |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SDNY | Southern District of New York |
| SMI | Serious Mental Illness |
| SRG | Security Risk Group |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |

| Acronym or Term | Definition |
| --- | --- |
| TEAMS | Total Efficiency Accountability Management System |
| ToT | Train the trainer |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TSO | Tactical Search Operation |
| TTS | Training Tracking System |
| ULURP | Uniform Land Use Review Process |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |