# Fourth Report of the *Nunez* Independent Monitor

**Fourth Monitoring Period**
**January 1, 2017 through June 30, 2017**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction**......................................................................................................... 1
  Background ............................................................................................................ 1
  Organization of the Report................................................................................... 2
  Executive Summary .............................................................................................. 4
    Policy & Training ............................................................................................. 6
    Use of Force & Supervision of Staff ............................................................... 7
    Investigations & Accountability ...................................................................... 11
    Procedures that Support Desired Use of Force Outcomes............................... 12
    Reducing Violence Among Young Inmates (16-, 17- & 18-Year-Olds)........... 14
  Recommendations and Next Steps........................................................................ 16

**Staff Use of Force and Inmate Violence Trends During the Fourth Monitoring Period..... 18**
  Analysis of Use of Force Data .............................................................................. 19
  Use of Force and Injuries ..................................................................................... 22
  Type of Force Used .............................................................................................. 24
  Incident Location ................................................................................................. 25
  Inmate Characteristics.......................................................................................... 28
  Staff Characteristics ............................................................................................. 32
  Reasons for the Use of Force ............................................................................... 33
  Avoidable Use of Force ....................................................................................... 36

**Section by Section Analysis ............................................................................... 39**
  1.  Use of Force Policy (Consent Judgment § IV) ............................................ 39
  2.  Use of Force Reporting and Tracking (Consent Judgment § V) ............... 44
  3.  Training (Consent Judgment § XIII)........................................................... 66
  4.  Anonymous Reporting System (Consent Judgment § VI)........................... 95
  5.  Video Surveillance (Consent Judgment § IX) ............................................ 97
  6.  Use of Force Investigations (Consent Judgment § VII)........................... 113
  7.  Risk Management (Consent Judgment § X) .............................................. 149
  8.  Staff Discipline and Accountability (Consent Judgment § VIII)........... 161
  9.  Screening & Assignment of Staff (Consent Judgment § XII) ................... 182
  10.  Staff Recruitment and Selection (Consent Judgment § XI)................... 190
  11.  Arrests of Inmates (Consent Judgment § XIV)........................................ 197
  12.  Implementation (Consent Judgment § XVIII) ........................................ 198

**Current Status of Young Inmates ................................................................... 203**
  Raise the Age ..................................................................................................... 203
  Facility Leadership and Support from Headquarters ........................................... 203
  Trends in Use of Force and Violence .................................................................. 205
  13.  Safety and Supervision of Inmates Under the Age of 19
      (Consent Judgment § XV) ...................................................................... 209
  14.  Inmate Discipline (Consent Judgment § XVI)......................................... 232
  15.  Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII).... 251
  **Appendix A: Definitions** ................................................................................... i

# INTRODUCTION

This is the fourth report of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[1] and the Monitoring Team to advance the reforms in the Consent Judgment during the Fourth Monitoring Period, which covers January 1, 2017 to June 30, 2017 ("Fourth Monitoring Period").

*Background*

The Department manages 12 inmate facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 10,750 uniformed Staff and 1,700 civilian employees, and detains an average daily population of 9,300 inmates.[2]

The Consent Judgment was entered by the Court on October 22, 2015.[3]  It includes over 300 separate provisions and requires the development, refinement, and implementation of a series of new and often complex policies, procedures, and training, all focused on reducing the

---

[1] All defined terms utilized in this report are available in *Appendix A: Definitions.*
[2] 34.1% of the inmate population are detained for four days or less, while 18.4% of the population are detained three months or more. The average length of stay for an inmate is 63.6 days. (*See* "NYC Department of Correction at a Glance," <http://www1.nyc.gov/site/doc/about/doc-statistics.page>).
[3] The Effective Date of the Consent Judgment is November 1, 2015. (Docket Entry 260)

1

use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (i.e., those under 19 years old). Although the frequent filing of routine Monitor Reports provides important information for stakeholders regarding the Department's incremental progress towards achieving compliance with the Consent Judgment, the short intervals between reports also means that the Department may not achieve major milestones during each Monitoring Period. Consequently, progress may appear to be gradual, even as the Department puts essential protocols in place.

The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of **_sound correctional practice_**: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives, and disincentives.

_Organization of the Report_

The following sections of this report summarize the Department's efforts to achieve Substantial Compliance with the provisions in each section of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of use of force ("UOF") trends and then assesses compliance with the specific provisions related to Staff's use of force (e.g. policy,

2

reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Next, the report examines violence and UOF among Young Inmates and then assesses compliance with the provisions applicable to Young Inmates (e.g., classification, programming, protective custody, staffing, incentives and discipline, etc.).  The Monitoring Team's strategy for assessing compliance is consistent with supporting the advancement of reforms in that provisions must be considered, addressed, and evaluated in a sequential and logical manner to achieve sustainable reform. The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[4] (b) Partial Compliance,[5] and (c) Non-Compliance.[6] During this Monitoring Period, the Monitoring Team also elected to withhold a compliance rating ("Compliance Rating Withheld") for certain provisions where the Department made initial efforts to achieve compliance, but additional work or assessment was both necessary and forthcoming in order for the Monitoring Team to be in a position to apply a rating.  The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report, but with each Monitoring Period, the Monitoring Team has increased the proportion of provisions for which the compliance level has been assessed.[7] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for

---

[4] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision.

[5] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[6] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

[7] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress. This report also provides compliance ratings for several provisions that were not evaluated in the prior three Monitor's Report. Subsequent Monitor's Reports will do the same, continually increasing the total number of provisions assessed.

completion falling after June 30, 2017, though a summary of the Department's progress to date is provided.

The Monitor's Report addresses all 15 substantive sections of the Consent Judgment. For each substantive section, an introduction includes a high-level summary of the section's requirements as well as contextual information that is important for understanding the detailed discussion about the various provisions. The rest of each section provides the Monitoring Team's compliance assessment for a set of provisions, which includes a summary of the specific steps the Department has taken to achieve compliance, the Monitoring Team's analysis of those efforts, recommendations for the Department's next steps, if applicable, and the Monitoring Team's compliance rating, if applicable. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions is embedded in the compliance assessments for ease of reference.

*Executive Summary*

The Consent Judgment provisions are intended to resolve the issues considered in *Nunez* and the SDNY investigation, and generally aim to: (1) reduce unnecessary or excessive force, by providing Staff with new tools and training for responding to inmate behaviors and by ensuring accountability for Staff's improper use of force and (2) reduce violence in the Facilities that house Young Inmates by implementing procedures and protocols likely to address the underlying causes of violence (e.g., Staffing levels, responses to misconduct, programming, incentives for positive behavior, etc.). Other stakeholders have recently called for the closing of Rikers Island. While that decision is beyond the scope of *Nunez,* the Monitoring Team strongly encourages the

City and the Department to remain focused on addressing the existing conditions of confinement. Improvements and compliance with the *Nunez* Consent Decree cannot be deferred.

At the end of the Monitoring Period, the Commissioner and the Chief of Department resigned. Commissioner Ponte guided the Department through the initial implementation of the *Nunez* reforms by modeling a new approach for managing the New York City Jails. He set a tone for the Department that reform is necessary, committed essential resources, and established some key strategies for the Department to evaluate its use of force more rigorously.  The Monitoring Team is encouraged that the Mayor appointed competent, committed, and reform-minded individuals in the roles of Acting Commissioner[8] and Acting Chief of Department. The Monitoring Team is confident that these individuals will maintain—if not accelerate—the pace of reform and will ensure that disruption is minimized during the leadership transition. A more fulsome discussion of the impact of these leadership changes will be discussed in the next Monitor's Report.

The conditions that merited the reforms required by the Consent Judgment were the result of a long period of mismanagement, limited resources, and antiquated and bureaucratic processes at the Department.  Once the Consent Judgment was imposed, the Department was immediately tasked with overhauling policies and procedures, modernizing processes for tracking information, and starting the long road toward evolving its approach to managing inmates and changing the mindsets of leaders and uniformed Staff. There is no lack of effort by the Department to develop and implement new policies, procedures, and training, many which go well beyond the requirements of the Consent Judgment. As described throughout this report, the Department committed significant resources and conducted a considerable amount of work in

---

[8] On October 3, 2017, the Mayor appointed the Acting Commissioner to the Commissioner of the Department of Correction.

this Monitoring Period to implement the requirements of the Consent Judgment. For an agency with over 10,000 Staff, fully resolving the complex issues surrounding the improper use of force, and inmate violence simply cannot be achieved during the 20 months that have elapsed since the Effective Date of the Consent Judgment, and significant work remains.

Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends, to a significant degree, on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives, and disincentives.  Culture change requires a multi-faceted approach: (1) developing and implementing adequate policies that devise and describe appropriate and necessary procedures; (2) designing and implementing training programs that provide Staff with the skills required to carry out the expected practices; (3) supervising Staff in a manner that encourages and rewards those who implement the new practices and that guides and influences those who are slower to adapt to the new ways of managing inmates; (4) applying scrutiny to situations in which policies and procedures were not followed to determine what went wrong and how it could be corrected; and (5) imposing corrective action and discipline when Staff's behavior is not aligned with policy.

- *Policy & Training*

The Department has made significant progress with the first two steps—policy and training.

- **Policy**: The Department has developed a comprehensive directive regarding the Use of Force that comports with best practices and the requirements of the Consent Judgment.  The Policy went into effect on September 27, 2017, after this Monitoring Period, but prior to the filing of this Report.

- **Training**: DOC completed the Herculean task of providing S.T.A.R.T. training to all Staff as part of the implementation of the new Use of Force Directive. As of the filing of this Report, the Department has provided training on the new Use of Force Directive and Defensive Tactics to over 9,000 In-Service Staff and Recruits (over 99% of all active Department Staff). The Department has also deployed several relevant trainings to Staff working with Young Adults. Furthermore, the Department has made significant strides in developing and deploying high quality trainings required under *Nunez*. The training programs are delivered by effective and dedicated instructors, and Staff actively participate and engage in the lessons.

- ### *Use of Force & Supervision of Staff*

While the Department has made significant gains in safely managing the Young Inmate population, described in more detail below, serious and problematic issues involving Staff use of force continue in an unabated fashion. The Department has a deeply entrenched culture of managing troublesome and/or potentially dangerous inmates with an iron fist. This ingrained propensity of Staff to immediately default to force to manage any level of inmate threat or resistance continues to produce high monthly incident numbers, especially in the absence of timely accountability for such misconduct. The cultural dynamic that permeates so many encounters between Staff and inmates in DOC is quite simply a consequence of Staff actions and behaviors that too often engender, nurture, and encourage confrontation. For example,[9] in an

---

[9] Eight incidents are described throughout the Executive Summary. In six of the eight incidents, the Department took some sort of immediate administrative response after the incident occurred including re-training for some Staff, re-assigning one Staff Member to a new post, placing one Staff member on a non-inmate contact post, and demoting one Supervisor. The investigation into two of these incidents are complete, while six are still pending. Of the two closed cases, the Department imposed Command Discipline on two Staff Members in one case, and the Staff member in the other closed case was reassigned. Formal discipline may be imposed in the six other cases that are pending once those investigations are completed.

April incident, an Officer precipitated a use of force and after the inmate had been restrained, a Captain was heard on tape exhorting Officers in a crude and profane manner to use further force if necessary, notwithstanding that the inmate was no longer exhibiting any resistance to Staff. The circumstances related to particular incidents suggest that some Staff relish confrontation rather than act to avoid it. Confrontation avoidance appears to be anathema to many supervisors and line Staff, and is far too often not even put into play.

To a large extent, Staff's tendency to engage in this pattern of hyper-confrontation falls under the rubric of unprofessional conduct and, to a lesser extent, the inexperience of Staff. For example, when Staff routinely use improper and needlessly painful escort techniques, confrontation is inevitable and any inmate resistance to the painful escort technique is viewed as resistance which in turn generates use of additional force. When Staff immediately resort to force rather than summoning a supervisor in an anticipated force situation, non-force alternatives are, of course, foreclosed. When Staff use hard takedown techniques on restrained inmates, the risk of injury increases exponentially. When OC is disbursed arbitrarily among a group of inmates, some of whom are not resisting but are merely present, confrontation is inevitable. When an aggressive officer uses profanity and needlessly shoves and threatens an inmate, confrontation is unavoidable.

At the end of each Monitoring Period, the Subject Matter Experts (SMEs) submit to the Monitor summaries of their observations and impressions of the Preliminary Reviews, investigations, and other documentation they have reviewed. The following excerpts from these summaries illustrate these very real operational issues:

     o  Staff resort too quickly to aggressively taking inmates to the floor.

     o  Cell extraction teams appear to frequently enter cells/holding areas at full speed

and forcibly apply the shield when inmate resistance is passive or minimal and
did not require a full speed extraction.

o   Staff frequently fail to recognize that a situation is escalating and continue to
verbally engage inmates with provocative language.

o   Staff reports often detail inmate resistance in heightened clarity but rarely note
inappropriate actions by Staff that escalated the incident.

o   Staff lack effective listening skills.

o   Staff fail to maintain safe distances when interacting with inmates.

In addition to these problematic behaviors from line Staff, supervision by certain
Captains often fosters unprofessional conduct by line Staff.  The number of Captains who are
frequently and repeatedly involved in problematic UOF incidents is disturbing.  That these
Captains are often left in a position to engage in subsequent misconduct is one of the clearest
examples of the lack of accountability in the DOC.  In order to facilitate the culture shift the
Department needs in order to be successful, those who embody the goals of the Consent
Judgement through their words and actions should be publicly recognized, rewarded and
incentivized. Conversely, those who continue to engage in problematic and confrontational
behavior with inmates should not be rewarded nor incentivized to continue behaving in this
manner. The choices the Department makes about tangible rewards, verbal accolades,
assignments and promotions speak volumes to the line Staff about the leadership's values and the
culture they intend to promote.

During the first month of the Fourth Reporting Period there were 412 UOF incidents,
which included at least 50 possible head strikes, at least 95 instances of force on restrained
inmates, the use of at least 10 prohibited holds and at least 20 instances involving the use of

9

institutional equipment.[10]  The January 2017 incidents included one Captain who was involved in no fewer than four problematic applications of force and one in which the Captain used a racial epithet when ordering Staff to place the inmate on the wall. During an incident in late December 2016, a Deputy Warden ordered a Captain to use chemical agents ("OC") on a restrained inmate standing passively with his face to the wall.  Yet another Captain, who has an extensive recent history of involvement in problematic uses of force, used a crowd-control canister of OC on an inmate who was restrained and lying prone on the ground.  In yet another incident, one Officer needlessly precipitated what became a potentially dangerous major disturbance.  During that incident, another Officer was virtually out of control and engaged in a shoving match with a Captain, and thereafter used OC on a restrained inmate who was acting in compliance with the other Officers' orders.

During June 2017, there were 423 use of force incidents which included at least 35 possible head strikes, at least 100 instances of uses of force on restrained inmates, the use of at least 15 prohibited holds and at least 25 instances involving the use of institutional equipment.[11] Just as in the beginning of the Monitoring Period, the end of the Monitoring Period also included a number of troubling incidents involving Captains.  A Captain with an extensive recent history of involvement in problematic uses of force was involved in an incident during which the Captain kicked/stomped an inmate.  In February, this same Captain had unnecessarily used OC on an inmate and thereafter slammed the inmate into a wall, causing a head injury requiring five sutures.  Another UOF incident in May involved an unnecessary application of OC and the supervising Captain failed to report that the incident even occurred.

---

[10] This data is based on the Department's reporting of Staff reported uses of force. It is important to acknowledge that the Department has not completed the investigations into the majority of these incidents.
[11] Refer to footnote 10.

Vigilant supervision by all levels of the uniformed Staff will be the necessary lynchpin of compliance. Techniques, strategies, and attitudes that support the S.T.A.R.T. training must be reinforced on a daily basis by both non-disciplinary and disciplinary means—and this reinforcement must be timely, appropriately, and consistently applied.

- ***Investigations & Accountability***

In order for the Department to achieve the intended outcome of using force safely, proportionally and only when necessary, it must provide not only adequate supervision, but must conduct timely and appropriate investigations and impose adequate and timely accountability. As set forth below, Full ID and Facility investigations are all too often not completed in a timely fashion and are plainly deficient in quality, resulting in no remedial actions being taken when they are clearly warranted. The misuses of force that regularly occur in the Department simply cannot continue to go on unabated. While the traditional investigation and discipline strategies— if timely and of high-quality—are one way to hold Staff accountable, the Monitoring Team has recommended and is working closely with the Department to implement an array of fast-acting accountability measures that can deliver the zero-tolerance message swiftly, *if* implemented with vigor.

- **Use of Force Investigations**: The Department's Investigation Division conducts a Preliminary Review of all use of force incidents. These reviews provide sound and reasonable assessments of the incident and identify potential next steps for a continued investigation (to the extent one is warranted). However, the Department's use of force investigations, by the Facilities and the Investigations Division ("ID"), remain inconsistent, of low quality, and untimely. Investigation delays have been compounded by ID's increased caseload (for which new

efficiencies are currently underway) and a backlog of Facility Investigations which challenges the Facilities' ability to keep up with new investigations. Allegations of sexual assault and harassment of Young Inmates suffer from many of these same investigative issues and very few are completed timely.

- **<u>Staff Accountability and Risk Management</u>**: The Department's Trials division has recently improved its ability to serve and file charges timely. However, the Department as a whole continues to struggle to impose meaningful and appropriate accountability and discipline to Staff who engage in misconduct. Untimely and poor-quality investigations inhibit the delivery of a streamlined and consistent message to Staff regarding appropriate versus inappropriate force. The Department is striving to develop and hone new processes to identify opportunities to provide contemporaneous guidance and/or ensure timely corrective action through the Wardens' reviews of Use of Force incidents as part of the Rapid Reviews and the "Avoidables" process; the Immediate Action Review Committee's review of incidents; identifying Staff who require counseling as part of the 5003 process; and developing an interim Early Warning System designed to identify Staff Members with problematic conduct who may need additional support, mentorship, and/or corrective action. These tools may contribute to more timely corrective action.

- *Procedures that Support Desired Use of Force Outcomes*

In order to achieve the desired use of force outcomes—safe, proportional and only when necessary—the Department must implement various practices that support the elements of

culture change described above. Many of these are required by the Consent Judgment and key issues are highlighted below:

- **Use of Force Reporting**: The Department has continued to develop, refine, and utilize data to better understand and address the ways in which Staff use force in the jails.  The Department also dedicated significant resources to continuing to build a Case Management System.  However, the Department has not been able to demonstrate that Use of Force Reports are consistently or timely completed. The Department's antiquated system for generating and maintaining reports contributes to the issue. During this Monitoring Period, the Department began to develop strategies to collect the use of force reports more systematically so they are readily available to use of force investigators to support investigations.

- **Video Surveillance**: The Department has nearly completed installing a sufficient number of stationary, wall-mounted surveillance cameras to achieve complete camera coverage.  However, the Department continues to struggle with capturing use of force incidents on handheld cameras, though the process for uploading handheld video footage has begun to improve.

- **Screening Staff for Promotion**: The Department screened and promoted 85 Staff to Supervisory positions in this Monitoring Period. Although, to date, the Monitoring Team has found the Department's screening process generally meets the requirements of *Nunez*, the delays in conducting investigations and limited discipline imposed by the Department inhibits the Department's ability to thoroughly assess a candidate's qualifications for any given position. The importance of Supervisors, discussed above, and the vast amount of work

required to achieve the goals of the Consent Judgment heightens the importance of the Department utilizing reasonable judgment in promoting Staff. All promotions should facilitate the culture shift the Department needs in order to be successful.

- **Hiring New Staff**: The Department's Recruitment Unit and Applicant Investigation Unit continue to work together to attract and process unprecedented numbers of qualified candidates to fill increasingly larger recruit classes, resulting in 2,821 graduates from the Training Academy since the Effective Date, and matriculating another 1,203 during this Monitoring Period.

- *Reducing Violence Among Young Inmates (16-, 17- & 18-Year-Olds)*

Young inmates (those under age 19) contribute a disproportionate share of the Department's use of force and inmate-on-inmate violence. Use of Force rates at RNDC and GMDC have decreased, however, rates of violence during the current monitoring period were largely comparable to those witnessed in January-June 2016. Some of this violence is very serious, involving stabbing or slashing Staff or other inmates. Some inmates, particularly at RNDC, exhibit chronically violent behavior. The Department has established some of the component parts necessary to reduce violence and to develop new responses to Young Inmate misconduct.

- The Department has made a clear and significant commitment to providing programs to Young Inmates to enhance skill development and reduce idle time, both of which will reduce violence and enhance positive youth development. The combination of education services, mandated recreation, Program Counselor-led programming, and programming delivered by community-based partners means

14

that, if an inmate chooses to be involved, a large portion of out-of-cell time is consumed by structured programming led by an adult. The Department is developing strategies to demonstrate proof of practice in this area.

- A group incentive program, "the Levels," is now operational at both RNDC and GMDC. This program rates each housing unit on a variety of factors (i.e., incidents, respect for Staff, sanitation, compliance with rules, lock-ins, etc.) and inmates receive rewards and privileges commensurate with their unit's performance level. A rich array of activities is available to incentivize positive behavior. This program may help the Department to identify options for providing accountability for inmates who violate institutional rules, by either suspending privileges or transferring poorly-behaved inmates to housing units with fewer privileges. Currently, the options for imposing effective inmate discipline are limited.

- Several alternatives to Punitive Segregation are now operational. They include Second Chance Housing Unit ("SCHU"; least restrictive), Transitional Housing Unit ("TRU"), the Secure Unit, and Young Adult-Enhanced Supervision Housing ("YA-ESH"; most restrictive). These programs house inmates who commit violent infractions in a restrictive setting, and offer several programs to address their behavior. By design, these programs should provide discipline that begins to address the underlying causes of violent behavior, therefore making it unlikely to reoccur. However, in order to do so, the quality of behavior supporting planning must be improved, criteria for progressing through the programs must be clarified, and basic program monitoring and quality assurance protocols must be enacted.

15

- The Department improved its immediate response to disruptive and violent misconduct by identifying a location at RNDC and GMDC, away from Main Intake, where inmates can be transported to regain control of their behavior and await re-housing. [12] This tool will allow the Department to separate inmates who pose an immediate threat from others on the housing unit, while protecting the processing function of Main Intake. Once policy is finalized and fully implemented, the effectiveness of this tool can be assessed.

*Recommendations and Next Steps*

The work completed to date confirms that the road to sustainable reform will be neither swift nor painless; it must be traversed in an incremental, well-reasoned, and methodical manner. Furthermore, the pace of progress will also be uneven. Certain issues may be easy to resolve or may benefit from a synergy that comes along at just the right time. Others may seem intractable for a time, and progress toward compliance with them may sometimes feel out of reach. For these reasons, while the Monitoring Team continues to push the Department to achieve incremental progress during each Monitoring Period, the Monitoring Team also urges patience and an open-mindedness to let new ideas emerge and be tested rather than to rush forward with a set idea of how or when things should be done.

Given the concerns listed above and discussed in far more depth in the subsequent sections of this report, the Monitoring Team will focus on supporting the Department's efforts in certain key areas during the next Monitoring Period: (1) implementing the New Use of Force Directive and disciplinary guidelines; (2) developing strategies to better manage and reduce the use of force; (3) improving the timeliness of Staff accountability and discipline; (4) improving

---

[12] The Department began to utilize this model in other Facilities beginning in the Fifth Monitoring Period.

the timeliness and quality of UOF investigations; and (5) expanding the array of disciplinary options for Young Inmates and ensuring the viability of the existing alternatives to Punitive Segregation.

Finally, the Monitoring Team strongly urges the Department to dedicate adequate resources to support the pursuit of reform and to sustain it once it is achieved. As evidenced throughout this report, developing and implementing the reforms in the Consent Judgment is a massive undertaking and the necessary resources to maintain these efforts continue to expand as the Department works to achieve and sustain compliance in more and more areas. The Monitoring Team therefore strongly recommends that the Department maintain adequate staffing resources in areas directly related to achieving and/or maintaining compliance with *Nunez*, including for: (1) the Nunez Compliance Unit ("NCU"), which is starting to develop an internal capacity to monitor performance, and manages the flow of information to the Monitoring Team; (2) the UOF Auditor who must analyze and interpret UOF data and then use it to drive improved practice; (3) the Deputy Risk Manager to support the Early Warning System; and (4) the Facilities that must respond to requests for information and support Staff as they implement new practices.

## STAFF USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE FOURTH MONITORING PERIOD

In this section, the Monitoring Team analyzes the Department's use of force and inmate-on-inmate violence data throughout the Monitoring Period. The reasons for including this analysis are threefold. First, the use of force and inmate violence data anchors the report in the context of the conditions that created the need for external oversight, showing the levels of force currently being applied, the severity of resulting injuries, and the reasons that force is used. Second, over time, trend data will illustrate the impact of the various reforms as they are implemented across the life of the Consent Judgment. Finally, the analysis offers a model for how the Department can improve the way it internally monitors the use of force and inmate-on-inmate violence, identifying trends and patterns so that targeted interventions can be applied in the Facilities and with populations where problems are concentrated.

It is worth noting that the Department conducts its own analysis of this data, via the work of the UOF Auditor and the Assistant Chief of Data Analytics and Planning[13]. Many of the concerns discussed in this section were also identified by the Department. Further, the monthly Total Efficiency Accountability Management System ("TEAMS") process and weekly Operational Leadership meetings of the top uniform and civilian leadership create transparency and accountability among managers. They also provide a forum for discussing areas of concern, strategizing about solutions, and exchanging best practices. The Monitoring Team is encouraged that the Department is beginning to develop an internal capacity to identify problematic issues

---

[13] After the Monitoring Period, the Assistant Chief of Data Analytics and Planning was promoted to Bureau Chief of Security.  The position of Assistant Chief of Data Analytics and Planning was not backfilled.  Therefore these responsibilities were maintained by the former Assistant Chief of Data Analytics and Planning in his new position as the Bureau Chief of Security.

and encourages the Department to build upon this capacity by developing strategies to address identified problems.

Understanding the reasons that Staff use physical force with an inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. As an initial matter, physical force by Staff in a correctional setting is at times necessary to maintain order, keep Staff and inmates safe, and to enforce the law. Accordingly, the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. For example, if two inmates are fighting, Staff must intervene, often physically, to prevent either inmate from sustaining a serious injury. When an inmate is engaged in active physical resistance to a lawful order, some level of force may be necessary. However, not all uses of force are necessary. As discussed in prior Monitor Reports, force may be unnecessary, excessive, or even malicious.

The Monitoring Team's findings regarding the Department's current use of force is based on an assessment of almost 7,000 Preliminary Reviews completed to date (between the Effective Date, November 1, 2015, and the end of the Fourth Monitoring Period, June 30, 2017) and over 350 closed use of force investigation files completed during the same period. The findings discussed in this section draw on observations from this most current dataset.

_Analysis of Use of Force Data_

The following section discusses aggregate data on the use of force and inmate violence.[14] The overall number and rate of use of force incidents during this Monitoring Period, by any

---

[14] The Monitoring Team believes that robust quantitative data analysis will help the Department to achieve the goals of the Consent Judgment. Unfortunately, the data's current problem-solving value is limited because, in many cases, the Department does not collect data needed for essential inquiries into the root causes of the observed trends in use

standard with which the Monitoring Team has had experience, remains high. Furthermore, the

blue dotted trend lines in each graph below show that, overall, the number and rate of uses of

force have stayed relatively constant since the Effective Date.[15]



However, during this period of time, the number of inmates has decreased slightly and

thus expressing the use of force data as a *rate*, as in the line graph below, is more accurate. The

blue dotted trend line illustrates that the rate of use of force has increased very slightly.  A rate

neutralizes the impact of changes in the size of the inmate population over time.[16]

---

of force or violence. For example, the Department's convention for tracking the reason for each use of force (discussed in detail, below) is incomplete and raises more questions than it answers. Despite these limitations, the Monitoring Team is obligated to delve deeply into the problems that underlie the provisions of the Consent Judgment and the Department's efforts to overcome them. That said, the Monitoring Team is fully aware that several of the analyses based on this data are therefore incomplete and lead to additional questions. Hopefully, the quality of the Department's data will improve over time so that it can be more useful to the task of problem-solving.

[15] These data include actual, reported uses of force and do not include alleged uses of force that have not been confirmed.

[16] The rate is calculated by dividing the number of uses of force into the average daily population for each month, and then multiplying the result by 100. The rate is interpreted by saying, for example, in January 2017, there were 4.40 uses of force for every 100 inmates.



Year-by-year comparisons offer greater insight into current trends and suggest that force may be increasing a bit. Given the seasonal variations in population size and UOF, comparing the number of uses of force to the previous year may be more accurate than comparisons to the previous Monitoring Period, which are set arbitrarily. The red boxes in the graphs above highlight the months being compared—January through June in 2016 and 2017. The graph below shows use of force rates for January-June 2016 (orange) compared to rates for the same months in 2017 (grey) and illustrate more clearly that the rate of use of force has increased. In January-June 2017, the rate of use of force was about 9% higher than the previous year (2017 average = 4.07; 2016 average=3.75).



The Department's use of force continues to fluctuate slightly but has not yet dropped significantly for a sustained period of time. A significant and sustained drop in the rate of the use of force is needed to meet the overall goal of the Consent Judgment.

*Use of Force and Injuries*

The majority (62%, n=1,380) of the 2,243 uses of force that occurred during the Fourth Monitoring Period did not result in any injury, as shown in the chart below, and are classified as "Class C."[17] Serious injuries occurred in the 2% (n=37) that were classified as "Class A"(the most severe injuries)[18] and lesser injuries occurred in the 36% (n=826) that were classified as "Class B."[19]  The number and proportion of injuries of various classifications have not varied substantially since the Effective Date. The Monitoring Team continues to encourage the

---

[17] "Class C" incidents are those in which no injuries were sustained by Staff or inmates. Incidents in which chemical agents were used, but resulted in no injury other than irritation of the eyes, nose, or throat, are also categorized as Class C.

[18] These are injuries that require medical attention beyond the prescription of over-the-counter analgesics or the administration of minor First Aid. Examples include incidents resulting in multiple abrasions, contusions, cracked, chipped or lost teeth, lacerations, punctures, fractures, loss of consciousness, or internal injuries.

[19] These are injuries that require only the administration of First Aid or over-the-counter analgesics. Examples include superficial bruising, scrapes, scratches, or minor swelling. Class B incidents can also include minor injuries sustained from the forcible use of mechanical restraints.

Department to analyze the circumstances in which the most serious injuries, Class A, occur so that trends and practices ripe for improvement can be identified. The relatively small number of Class A injuries make this type of qualitative analysis feasible.  The Monitoring Team intends to conduct this analysis in future Monitoring Periods.



That 38% of the use of force incidents resulted in injury to either an inmate or Staff is concerning, although the fact that an injury was reported as part of the use of force incident does not necessarily mean that the use of force was inherently excessive or unnecessary.  The bar graph below illustrates the number of injuries sustained by Staff and inmates during use of force incidents since the Effective Date.

Historically, more inmates than Staff were injured during incidents involving Staff force. However, this trend reversed in the Third Monitoring Period when more Staff than inmates were injured and continued throughout most of the current Monitoring Period. Although most of the injuries were not serious (as shown in the pie chart above), the orange dotted trend line in the bar graph below indicates that the number of Staff injuries have been trending upward since the Effective Date, while the blue trend line indicates that number of inmate injuries has been

trending slightly downward. While one of the key goals of the Consent Judgment is to improve inmate safety, an equally important goal is to improve the safety of Staff. The Department is encouraged to examine the reasons these disparate trends are occurring.



| | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Inmate | 114 | 134 | 114 | 101 | 117 | 87 | 113 | 141 | 149 | 119 | 115 | 117 | 103 | 55 | 111 | 90 | 81 | 102 | 109 | 146 |
| Staff | 99 | 92 | 74 | 61 | 81 | 75 | 84 | 109 | 102 | 94 | 114 | 121 | 136 | 95 | 118 | 87 | 108 | 111 | 130 | 107 |

_Type of Force Used_

An important part of the Consent Judgment's overall goal is to ensure that the amount of force used is proportional to the level of threat and/or amount of resistance from the inmate. Recent changes in practice are evident in the changing proportions of uses of force involving physical restraints (i.e., control holds, takedown techniques, physical force) versus chemical restraints (i.e., OC spray). The table below shows the proportion of incidents utilizing each type of force.[20]

---

[20] These data represent the Primary Type of UOF. The Department also uses mechanical restraints (e.g., handcuffs, flexcuffs, polycarbon shields, Tasers), but they consistently amount to less than 3% of all incidents involving force and thus are not illustrative.



During the first four quarters of the Consent Judgment's existence, the proportions were steady, with a little less than 70% of the incidents involving the use of chemical agents and about 30% involving the use of physical restraints as the primary type of force. However, beginning at the end of 2016, the lines on the graph begin to converge, indicating a decrease in the proportion of incidents using chemical agents and an increase in the proportion that utilize physical restraint as the primary technique. During the most recent quarter, the distribution across force types was approximately 50/50. These trends suggest that the decisions Staff make about the type of force to utilize are changing.  An in-depth review of the type of physical force being used is necessary before any inference can be made about whether this is an improvement in practice or simply a change in the Staff's choice of techniques.

*Incident Location*

- **By Facility**

The Department-wide trends mask some important differences among the Facilities. The following table categorizes the Facilities in terms of whether they showed an *increase* or a

25

*decrease* in the UOF rate when comparing January to June 2016 and 2017. The reductions in

UOF at RNDC and GMDC are encouraging, and are discussed in more depth in the "Current

Status of Young Inmates" section of this report. Conversely, the large increase in the rate of UOF

at several of the Facilities is cause for concern.

| Facilities where UOF Rate Increased | | Facilities where UOF Rate Decreased | |
|---|---|---|---|
| Facility | % increase | Facility | % decrease |
| VCBC | +116% | RNDC | -47% |
| RMSC | +71% | GMDC | -11% |
| OBCC | +54% | GRVC | -4% |
| WF | +51% | | |
| EMTC | +40% | | |
| BKDC | +38% | | |
| MDC | +13% | | |
| AMKC | +2% | | |
| *At some Facilities, the sample size was too small (<30 incidents) for meaningful comparison. These include: BKCTS, BHPW, CIB, CJB, EHPW, MNCTS NIC, QNCTS, SCRI and TD.* | | | |

At some Facilities, the increases in UOF may be related to significant shifts in the inmate

population and the destabilizing impact this has on both Staff and inmates or the expansion of

units designed to house particularly problematic inmates.  The increases may also be due to

Facility leadership that has not yet embraced the goals of the reform nor the need to think

differently about the way in which force is used and how they will instill a new culture in their

Facilities.  Obvious causes for increases witnessed between 2016 and 2017 are not immediately

apparent for some Facilities (i.e., nothing significant changed at RMSC) and are ripe for further

analysis. For example, an examination of data on the *reasons for the UOF* at RMSC reveals that

inmate-on-inmate fights increased 30%, assaults on Staff increased 94% and refusals of direct

orders increased 160% between the first half of 2016 and the first half of 2017. (Reasons for the

UOF are discussed more fully below). Each of these behaviors will have their own causes and correlations, but if properly explored, could lead to some effective Facility-specific strategies to reduce the UOF at RMSC. Other Facilities with significant increases may benefit from a similar type of inquiry.  The Department reported at the end of the Monitoring Period that it is evaluating this data and developing strategies to reduce the use of force.  The Monitoring Team intends to work closely with the Department on this issue in the next Monitoring Period.

- **Locations within Facility**

Identifying within-Facility hot spots also reveals areas that are ripe for problem-solving. As shown in the table below, most uses of force (about 60%) occurred in the housing areas. Given that this is where inmates spend most of their time, this is not surprising. That said, reducing idle time and improving Staff's ability to de-escalate tensions and mediate conflict could lead to a reduction in the situations that create a need for force to be used. Notably, the number of UOF in inmate school areas decreased significantly from 2016 to 2017, suggesting that the Department's problem-solving strategies involving housing inmates in the same academic level—which avoids the mixing of housing units in the classroom—have largely been effective (*see* the Young Inmate Sections of this Report for a more detailed discussion).

| Incident Areas | January to June 2016 | | January to June 2017 | | % Change |
|---|---|---|---|---|---|
| Housing Area | 1361 | 61% | 1315 | 59% | -4% |
| Intake Areas | 281 | 12% | 336 | 15% | 20% |
| Corridors | 158 | 7% | 165 | 7% | 4% |
| Areas with No Facility (e.g. Transportation Division) | 119 | 5% | 105 | 5% | -12% |
| Clinic (Medical Services Area) | 95 | 4% | 84 | 4% | -12% |
| Bridge/Vestibule | 31 | 1% | 61 | 3% | 97% |
| Other | 49 | 2% | 49 | 2% | ~ |
| Inmate Visits | 23 | 1% | 39 | 2% | 70% |

| | | | | | |
|---|---|---|---|---|---|
| Inmate School Areas | 42 | 1.9% | 19 | 1% | -55% |
| Stairwell | 9 | <1% | 17 | 1% | 89% |
| Outdoor Recreation | 11 | <1% | 13 | 1% | 18% |
| Inmate Mess Hall | 16 | <1% | 12 | 1% | -25% |
| Other Areas with Small # of Force | 28 | 1% | 28 | 1% | ~ |

Following force in housing units, force is used most often in the Intake and corridors. Increases in the numbers of UOF that occurred in Intake areas and vestibules from the first half of 2016 to 2017 suggest that problem-solving strategies around inmate movement and the use of certain spaces in the Facility may be effective in reducing the UOF in those areas. The high number of uses of force occurring in Intake areas has been of concern since the Effective Date. Disruptive inmates are escorted to Main Intake immediately following a use of force. This is problematic for several reasons: (1) the practice diverts Intake Staff from their primary duty of processing inmates in and out of the Facility; (2) placing an agitated inmate in the Intake pens brings unnecessary chaos and tension into the unit, which sometimes erupts into additional violence; (3) the inherently chaotic environment of Intake does not serve the de-escalation purpose for an agitated inmate. During this Monitoring Period, the Monitoring Team worked with the Department to develop procedures for a Satellite Intake to reduce the Department's reliance on the Main Intake for post-incident management to temporarily secure inmates pending further assessment and housing placement, as necessary.

*Inmate Characteristics*

- **Differences Across Age Groups**

Another useful lens for examining UOF data is the age of the inmate involved. Although the number of uses of force, department-wide, has remained relatively stable since the Effective Date, the graph below shows the recent significant decreases among Young Inmates (i.e., those

under the age of 19; shown in blue) and slight increases among the other age groups (i.e., 19-21

year-olds—"Young Adults", shown in green, and adults age 22 or older, shown in grey). Young

Inmates are targeted by the array of reforms in Consent Judgment § XV (Safety and Supervision

of Inmates Under the Age of 19) and Consent Judgment § XVI (Inmate Discipline). The graph

below, and other more detailed data discussed in the referenced sections, indicate that the various

reforms are starting to be effective in their ability to decrease the need to use force with this

segment of the population. Many of these strategies (i.e., programs to reduce idle time, increased

staffing ratios, incentive programs), if more broadly implemented, may be effective in reducing

the use of force department-wide.



The chart below illustrates that 16-, 17- and 18-year-olds are not driving the use of force

numbers in the same way they were when the Consent Judgment went into effect.  The yellow

and grey bars show the decreasing proportions contributed by 16-, 17- and 18-year-old inmates.

While these decreases are encouraging, it is also important to recognize that Young Inmates are still responsible for a disproportionate amount of UOF department-wide. During the current Monitoring Period, Young Inmates comprised only 3.5% of the total inmate population, yet contributed 16% of the uses of force. Trends related to Young Inmates are discussed in more depth in the "Current Trends Among Young Inmates" section of this report.



Overall however, these data suggest that the Department needs to identify and target the underlying reasons for the use of force among the older inmates (i.e., age 19 and older) in order to achieve the reforms envisioned by the Consent Judgment.

- **Inmates Involved in 5 or More Uses of Force Per Quarter**

As is typical in correctional systems nationwide, incidents involving the use of force are concentrated among a relatively small number of inmates. During the first six months of 2017, just 41 inmates accounted for 292 uses of force, which is 13% of the total 2,243 uses of force. These data suggest that Department's UOF reduction efforts should include strategies to address chronic behavior problems among inmates who are involved in disproportionate numbers of uses

of force. Compared to the first six month of 2016, the number of inmates with five or more UOF has decreased 18% (from 50 to 41), and the number of UOF contributed by this small group of inmates decreased 26% (from 393 to 292). These data suggest that the Department is having some success in managing inmates who are chronically involved in UOF incidents.

| Inmates with 5 or More Uses of Force, January to June 2016 and 2017 | | | |
|---|---|---|---|
| | **2016** | **2017** | **% change** |
| # of Inmates with 5+ UOF | 50 | 41 | -18% |
| # UOF contributed | 393 | 292 | -26% |
| Total # of UOF | 2,223 | 2,243 | +1% |

The Department has employed two strategies to manage particularly challenging inmates. First, representatives from DOC, Health Affairs and H+H meet weekly to discuss particularly challenging inmates with diagnosed mental health issues. The purpose of the meeting is to discuss potential treatment and management strategies that could reduce their involvement in uses of force, violence, and other problem behaviors. Many of the inmates involved in five or more UOF, with diagnosed mental health issues, discussed above, were referred to this group for discussion.  Following discussions with the Monitoring Team, the Department is exploring the possibility of expanding this process and conducting a similar assessment for problematic inmates who do not have a diagnosed mental health issue to broaden the potential solutions that could be considered for an individual inmate. The Department shared draft criteria and procedures for this expanded approach with the Monitoring Team, with the intention to implement this strategy during the next Monitoring Period.

Many of the inmates involved in five or more uses of force during the first six months of 2017 have been in DOC custody for extended periods of time.  Inmates incarcerated for long

periods of time in a jail setting pose significant challenges to custody management.  Accordingly,

the second strategy the Department developed is a process to work collaboratively with the

District Attorney's Offices in all five counties to prioritize the prosecution of certain inmates

who have been incarcerated for over 600 days, and have exhibited challenging behavior and/or

engaged in violent behavior while in DOC custody (e.g. stabbing or slashings or a large number

of use of force incidents).[21]  In an attempt to reduce this population, in the Fall of 2016, the

Bureau Chief of Criminal Justice[22] created a process to increase communication with law

enforcement.  The Department develops a weekly list of 50 inmates in DOC custody who meet

this criterion and pose the most significant management challenges.  The list is shared with the

District Attorney's Office in each of the five counties.  The District Attorneys research the

inmates' current case statuses (in many cases an inmate may have more than one case pending

and possibly in multiple jurisdictions) and attempt to prioritize the prosecution of the cases.  The

Department reports that this initiative has been successful and noted a marked reduction in the

number of inmates who remain in their custody 600 days or more.

_Staff Characteristics_

The Department's UOF reduction efforts also need to examine Staff characteristics to

identify subgroups of Staff who should be prioritized for training or for more intensive skill-

building efforts. Characteristics could include probationary status, tenure, shift, and overtime,

among others.[23] If Staff in these groups are involved in disproportionate numbers of uses of

force, specific training or coaching to address key gaps in knowledge or to enhance techniques

---

[21] On average, there are more than 500 inmates who have been incarcerated for more than 600 days.
[22] At the end of the Monitoring Period, the Bureau Chief of Criminal Justice was promoted to the Acting Chief of Department.  The Chief of Department's office took over management of this process at the end of the Monitoring Period.
[23] The Department's current data management tools makes some of this analysis difficult, particularly related to tracking the Staff's shift and overtime.

could be deployed. This is the same strategy used in the Department's efforts to develop an Early Warning System, with the fruits of that analysis used in a proactive, rather than reactive, fashion.

During this Monitoring Period, approximately 2,400 of 9,700 (24%) Correction Officers and approximately 300 of 840 (36%) Captains were involved in or supervised at least one use of force.  As noted throughout this report, the mere fact a Staff member was involved in a use of force does not mean they acted inappropriately, but given the current frequency of inappropriate and unnecessary uses of force, the Monitoring Team encourages the Department to continue to review each use of force incident to determine whether additional support may be needed. Furthermore, the Monitoring Team encourages the Department to continue to track and consider frequent involvement in uses of force by an individual Staff member to identify whether a pattern of misconduct may need to be addressed. Depending on the Staff's post or assignment, a higher level of involvement may be completely appropriate. In other cases, a higher level of involvement may indicate a likelihood to utilize force too quickly or a tendency to exacerbate rather than calm rising tensions.  During this Monitoring Period, 30 Officers and 11 Captains were involved in 10 or more uses of force.

*Reasons for the Use of Force*

Understanding the reasons Staff use force with inmates is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. Sometimes, force is necessary to maintain order, keep Staff and inmates safe, and to enforce the law. Accordingly, the mere fact that force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect Staff and inmates from serious harm. Data on the frequency of violent incidents makes this point clearly. As shown in the table below, the incidence of stabbings and slashings, and

33

inmate fights increased during the current Monitoring Period, as compared to the same time the previous year.

| Institutional Violence, January through June 2016 and 2017 | | | |
|---|---|---|---|
| Incident Type | 2016 | 2017 | % change |
| Stabbings and Slashings | 66 | 76 | +15% |
| Inmate Fights | 2,819 | 2,939 | +4% |
| Serious Injuries from Assaults/Fights | 81 | 60 | -26% |

Obviously, some inmates pose an immediate risk of serious harm to other inmates and thus effective measures (i.e., UOF) to prevent additional harm are required. Furthermore, intervening with well-executed, well-timed and proportional physical intervention can reduce the likelihood that inmates and Staff will sustain a serious injury. Despite increases in the number of stabbings, slashings and fights, fewer inmates sustained serious injuries. While the incidence of violence and the presence of dangerous contraband in the Facilities are serious and significant problems that needs to be addressed, the reduction in serious injury is important to recognize.

Other types of inmate behaviors may also pose legitimate threats to safety and security and thus will require some level of physical intervention.[24] That said, Staff who are skilled in de-escalation and conflict resolution may be able to avoid the need to use force in all but the most dire of situations, a skill that will be reinforced through the In-Service training of all Staff in Crisis Intervention and Conflict Resolution Training, which the Department will begin to offer following the conclusion of S.T.A.R.T. training.

---

[24] The Monitoring Team also continues to encourage the Department to use all of the tools at its disposal, including ionizing body scanners. The Department possesses the equipment, but is not currently authorized to use it due to State regulations restricting its use. The Monitoring Team's collective experience suggests that body scanners are an effective tool to help control the flow of contraband into correctional facilities and, thus, believes that the Department should be authorized to use this equipment.

Data on the number and rate of use of force during the current Monitoring Period indicated that force was used with approximately the same frequency as in prior Monitoring Periods. However, data on the reasons for the use of force suggest that behaviors, on both the part of Staff and/or the part of inmates, changed in the first half of 2017, as compared to the first half of 2016. The Department tracks the reason reported by Staff for the use of force, using nine different categories.[25] Even though the overall number of uses of force were nearly identical, the number of uses of force applied in circumstances where inmates were resisting restraints increased over 100% and cell extractions increased 92%. Uses of force in response to refusals to comply also increased (35%). On the other hand, uses of force to prevent inmate violence decreased (i.e. to prevent harm decreased 78%, in response to fights decreased 18%).

| Reason for the Use of Force | January to June 2016 | January to June 2017 | % Change |
|---|---|---|---|
| Resist Restraints/Escorts | 132 | 279 | + 111% |
| Extraction | 38 | 73 | + 92% |
| Refuse Direct Orders | 601 | 814 | + 35% |
| Assault on Staff | 394 | 403 | + 2% |
| Prevention of Commission of Crime | 1 | 0 | -100% |
| Prevention of Infliction of Harm | 226 | 49 | -78% |
| Other | 85 | 25 | -71% |
| Prevention of Destruction of City Property | 29 | 13 | -55% |
| Inmate Fight | 717 | 587 | -18% |
| **Total** | **2,223** | **2,243** | -1% |

---

[25] The Department's current data system allows for only one reason to be associated with each incident, so the administrator entering the incident into the Incident Reporting System ("IRS") must identify the predominant reason for the use of force based on the initial report of the incident. Frequently, Staff cite more than one reason for using force (e.g., an inmate fight may also involve a refusal of a direct order and resisting application of a restraint) and the following data do not account for the secondary reasons. As a result, these data may underestimate the actual frequency with which a given reason was reported by Staff. Accordingly, the Monitoring Team encourages the Department to revise its current tracking capabilities in order to have the ability to track more than one reason for the use of force incident.

The causes of these shifts are likely two-fold: changes in inmate behavior and/or changes in the way Staff respond to those behaviors. The Department would benefit from additional exploration to determine what is driving these changes and to assess Staff's behaviors to ensure they are aligned with policy and the requirements of the Consent Judgment.

*Avoidable Use of Force*

As illuminating as these data are, they may not capture what is, perhaps, one of the most important dynamics of Staff's use of force—how many use of force incidents could have been avoided altogether if Staff had vigorously adhered to operational protocols, and committed to strategies to avoid force rather than too quickly defaulting to hands-on force. The thousands of Preliminary Reviews examined thus far are replete with examples in which Staff could have taken the time to summon Supervisors to assess the need to use force and thereby created an opportunity to de-escalate the situation. Inherently, the opportunity to consider whether force may be avoided altogether is present in every anticipated use of force situation. In other words, it has been proven time and again in confinement settings that Staff who take **time** to employ non-force options by creating a safe and secure **distance** from the potential aggressor are involved in significantly fewer uses of force. To be sure, when there is an immediate need to use force, Staff must act swiftly and surely within policy to neutralize the inmate resistance, but that obligation is no more or less important than the obligation to avoid force when it is objectively reasonable to do so.

During this Monitoring Period, the Department fortified the "Avoidables" process whereby Facility leadership reviews all use of force incidents captured on video to determine whether and how the incident could have been avoided.  As part of this assessment, Facility leadership consider how certain operational or management strategies could have mitigated the

situation that resulted in the need to use force (e.g. ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions) and/or how the force employed could have been avoided in its entirety or deployed differently. Facility leadership determined that 433 of the 1,995[26] (22%) use of force incidents that occurred during the current Monitoring Period were avoidable. Of the avoidable incidents, one-third were considered avoidable because of unprofessional Staff behavior (133). As shown in the table below, other causes of potentially avoidable incidents were: (1) skill deficits (e.g., interpersonal communication, escort techniques, distance, handcuffing), and (2) misuse of security features (e.g., unsecured gates/doors; improper use of security device or OC). In response to these findings, Facility leadership reported that it has conducted corrective interviews, counseling, and imposed command discipline as appropriate. Given that some of these cases may require additional investigation, certain responses may be deferred until the investigation is complete.

The Monitoring Team is encouraged by this process and the Department's efforts to identify situations in which force could be avoided, however its value lies in communicating this information to line Staff, and the follow-up coaching and role modeling that should shape their behavior over time. Now that the process for identifying avoidable uses of force is underway, the Monitoring Team expects the Department to demonstrate how it has utilized this information in its coaching and training efforts so that Staff can successfully avoid a UOF under similar circumstances. In particular, the results should be used to increase coaching, mentorship and

---

[26] The Department only conducted this analysis on the use of force incidents in this Monitoring Period that were at least partially captured on camera. Accordingly, incidents that were not captured on video were not evaluated.

supervision to fortify basic operational and inmate management skills and to expand formal

training to include de-escalation and conflict resolution skills.[27]

| Reason the Event was Potentially Avoidable | # | Percentage Based on 1,995 Incidents Considered to Determine if Avoidable |
|---|---|---|
| Unprofessional Staff Behavior | 135 | 6.77% |
| Lack of IPC Skills | 108 | 5.41% |
| Improper Escort | 38 | 1.90% |
| Unsecure Gate/Door | 36 | 1.80% |
| Unsafe Distance | 29 | 1.45% |
| Improper Use of Security Devices | 26 | 1.30% |
| Improper Handcuffing | 25 | 1.25% |
| Others | 29 | 1.45% |
| Anticipated | 5 | 0.25% |
| Improper Use of Chemical Agents | 2 | 0.10% |

---

[27] The Department is scheduled to deploy a 3-day conflict resolution training to all Staff following the completion of S.T.A.R.T. training this Fall.

# SECTION BY SECTION ANALYSIS

## 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. The Department developed a new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, in the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.[28] The New Directive went into effect on September 27, 2017, after this Monitoring Period, but before the issuance of this Report.  The disciplinary guidelines are expected to go into effect on October 27, 2017.

During this Monitoring Period, the Department, in consultation with the Monitoring Team, developed and/or refined a number of standalone policies related to the UOF, including chemical agents, restraints, the Monadnock Expandable Baton ("MEB"), and Spit-Masks. Further, as described in more detail in the preceding section, the Monitoring Team also continued to work with the Department to refine practices for how to address unnecessary and excessive uses of force, and to develop Staff's de-escalation and conflict resolution skills to prevent the incidents that often lead to a use of force.

---

[28] The Monitoring Team is closely monitoring the Department's efforts to deliver this training as reported in more detail in the Training section of this report.

*Taser*

   The Monitoring Team has continued to closely scrutinize the Department's use of the

Taser (*see* the Second Monitor's Report at pgs. 31-32 and the Third Monitor's Report at pgs. 38-

39).  During the Fourth Monitoring Period, ESU Captains displayed the Taser in one incident,

and utilized the Taser in two other incidents.  The Monitoring Team continues to review the

written and video documentation of each incident and meets with Department leadership to

evaluate each use of the Taser.  In these three cases, the Monitoring Team found Staff has

exercised reasonable caution with the use of the Taser.  It has not been used as a device of

convenience and the low number of events demonstrate that approach.  The Monitoring Team

identified challenges associated with the Captain having sole responsibility for operating the

Taser itself, and at the same time being responsible for management of the incident.  The agency

is working with the Monitoring Team to explore the use of the Incident Command System

whenever possible to create a division of responsibilities so that the Taser Operator may focus on

Taser management decisions. The Monitoring Team will continue its close scrutiny of Taser

incidents to ensure its use is appropriate and that Staff clearly understand and only utilize the

Taser where there is an objective "compelling need."

   The Monitoring Team's assessment of compliance is outlined below.

## IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The New Use of Force Directive was finalized and approved by the Monitor.

### ANALYSIS OF COMPLIANCE

   The final version of the New Use of Force Directive, as approved by the Monitor, was

completed in October 2015. The specific content of the New Use of Force Directive was discussed in

the First Monitor's Report. This Monitoring Period, the Monitoring Team and the Department agreed

to jointly conduct a final review of the New Directive to determine if any modifications, consistent with the provisions in the Consent Judgment, are necessary to address any issues that have been identified since it was finalized in October of 2015.  This review will occur during the next Monitoring Period to ensure that the New Directive is revised, as appropriate, before it is implemented. [29]

During the current Monitoring Period, the Department took key steps towards implementing the New Directive by continuing to deploy S.T.A.R.T. training. As noted in the prior Monitor Reports, adopting and implementing the New Use of Force Directive also requires ongoing reinforcement of key concepts related to using force to ensure Staff conduct is consistent with the requirements of the Consent Judgment.  Once the New Directive is implemented, the Monitoring Team's assessment of Compliance will include an assessment of Staff's implementation and compliance with the provisions in the New Directive.

| COMPLIANCE RATING | ¶ 1. (Develop) Substantial Compliance |
| | ¶ 1. (Adopt) Partial Compliance |
| | ¶ 1. (Implement) Partial Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive was finalized and subsequently approved by the Monitor.

- The Department issued and the Monitoring Team approved a revised directive on the use of chemical agents.

- The Department issued, and the Monitoring Team approved, a new policy on the use of the MEB.

- The Department drafted a standalone policy on the use of Spit-Masks.

- The Department is in the process of revising the standalone Restraint Policy, and has received input from the Monitoring Team.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It addresses the requirements in Consent Judgment § IV (Use of Force Policy) ¶ 3(a) to (t), Consent Judgment § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, Consent Judgment §

---

[29] This review did occur prior to the filing of this report, and prior to the promulgation of the New Directive on September 27, 2017.

VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and Consent Judgment § IX (Video Surveillance) ¶¶ 2(d)(i) and 4. Accordingly, it is consistent with the requirements of the Consent Judgment and is also aligned with best practice. This policy will provide Staff the necessary guidance and parameters to carry out their duties safely and responsibly.

¶ 3(p)

While all the requirements in ¶ 3 are appropriately addressed in the New Use of Force Directive, the Monitoring Team has also worked with the Department as they refine the policies on the use of restraints and chemical agents and developed two standalone policies on the MEB and Spit-Masks.

*Chemical Agents Policy*

The Department issued a revised version of the Chemical Agents Directive during this Monitoring Period that provides clear and adequate guidance to Staff on when and how much OC spray is appropriate in a given situation, as described in more detail in the Third Monitor's Report (at pgs. 36-38).

*Restraint Policy*

During this Monitoring Period, the Department and the Monitoring Team collaborated on revisions to the standalone Restraints policy to incorporate additional policy guidance regarding the procedures related to the use of restraint desks.  These revisions were incorporated into the revised policy, which will be issued during the next Monitoring Period.[30]

*Monadnock Expandable Baton Policy*

During this Monitoring Period, the Department developed a policy for the use of the MEB.  The Monitoring Team provided feedback on the policy to ensure that it was consistent with the New Directive, particularly as it related to levels of inmate resistance warranting the use of the MEB.  The Department incorporated this feedback, and finalized and issued the MEB Operations Order in June 2017.

*Spit-Mask Policy*

During this Monitoring Period, the Department developed a policy regarding the use of the Spit-Masks. The Department consulted with the Monitoring Team on the development of the policy and the Monitoring Team provided recommendations to ensure that the policy addressed appropriate warnings, precautions, and procedures for observing an inmate who is donning a Spit-Mask. The policy is expected to be finalized during the next Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **2.** Substantial Compliance<br>¶ **3(a-o).** Substantial Compliance<br>¶ **3(p).** Partial Compliance |

---

[30] The revised Restraint Policy was finalized and issued in July of 2017.

| ¶ 3(q-t). Substantial Compliance |
| --- |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In consultation with the Monitoring Team, the Department issued a teletype on May 31, 2016, advising Staff about the effective date of the New Use of Force Directive and Disciplinary Guidelines.

- The Department developed and deployed a messaging campaign to inform Staff about S.T.A.R.T. training, and also issued a teletype.  The Department began updating this campaign in preparation for the implementation of the New Use of Force Directive on September 27, 2017.

- The Department continued to advertise S.T.A.R.T. training on large posters which are displayed in every Facility, and on the Department's intranet page and television screens.

- During this Monitoring Period, the Department issued two teletypes providing additional guidance to Staff on the use of force, including what to do when inmates possess weapons and how to proceed during anticipated uses of force.

### ANALYSIS OF COMPLIANCE

During this Monitoring Period, the Department determined that it needed to provide additional guidance to Staff about the circumstances in which: (1) a use of force is appropriate when an inmate has a weapon and (2) trigger an anticipated use of force.  In consultation with the Monitoring Team, the Department issued two teletypes to provide Staff with this additional guidance.

The Department also continues to advise Staff about the implementation of the New Use of Force Directive and the S.T.A.R.T. training, where the policy requirements are covered.  The Department's messaging campaign for the training program is creative, constructive, and conveys a positive and productive message. In order to successfully implement the New Use of Force Directive, the Department must continue to frequently and clearly communicate with Staff about the New Directive in order to address any questions or concerns, dispel any misunderstandings, and reinforce best practices. Finally, during this Monitoring Period, the Monitoring Team provided suggestions for rolling out the New Use of Force Directive on September 27, 2017 in order to ensure that the communication to Staff is clear and appropriate.  The Department and the Monitoring Team will work together during the next Monitoring Period to finalize and roll-out the New Use of Force Directive.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
| --- | --- |

2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[31]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 & 23). Within the analysis of Staff Member Use of Force Reporting, the issues of availability of Staff Use of Force Reports ("Staff Reports") and Use of Force allegations are addressed.

*Staff Member Use of Force Reporting*

As initially discussed in the Second Monitor's Report, the Monitoring Team found that Staff Use of Force reports were not readily available. Staff Reports are critical to the Department's efforts to review and assess use of force incidents to determine whether force was used appropriately. Staff are responsible for completing Staff Reports and UOF Witness Reports on prescribed forms that Staff most often complete by hand.[32]  Staff Reports are even more important when reviewing an incident that is not captured on video. Accordingly, to ensure accurate reporting and timely comprehensive investigation, Staff Reports must be submitted promptly and made available to investigators. Further, without the timely and consistent availability of Staff Reports, the Department cannot demonstrate that Staff Reports are being completed in the time periods required by the Consent Judgment.  During this Monitoring Period, the Monitoring Team recommended the Department evaluate its practices for collecting UOF Reports and to develop a more systematic process that would make Staff Reports easily accessible to all stakeholders. In response, the Department developed and implemented a new

---

[31] A discussion about the Department's efforts to develop CMS (¶ 18) is addressed in the Risk Management section of this Report.
[32] Occasionally, Staff type their reports, but most Staff do not have access to a computer during the ordinary course of business.

process to improve the timely submission and availability of Staff Reports as described in more detail below.

*Analysis of Completed Use of Force Reports*

During this Monitoring Period, the Monitoring Team analyzed compliance with the Staff reporting obligations required by the Consent Judgment (¶¶ 1-8) and related policies (¶ 9) by reviewing Staff Use of Force Reports. The Monitoring Team sampled Staff Reports from two sources: Preliminary Review files and Closed Investigation files.

The Monitoring Team assessed the Staff Reports from 119[33] closed Facility investigation files which were also used to assess the quality of Facility Investigations. The majority of the files reviewed were selected randomly, stratified by Facility, among investigations that closed between January 1, 2017 and April 30, 2017. The Monitoring Team also reviewed a sample of closed investigations of *allegations* of use of force and some investigations that were selected because the Preliminary Review revealed objective evidence of wrong-doing. Together, these investigation files included over 250 Staff Reports, and almost 700 Staff Witness Reports.

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims by any individual that Staff used force against an inmate and the force was not previously reported (either because an incident report was not generated or the report generated did not document any force against the inmate concerned). An alleged use of force does not always mean that force was actually used; that is determined through the investigations process. This is also why data on alleged uses of force were not included in the analysis for the Use of Force Trends section of this report, above.

---

[33] The Monitoring Team reviewed 119 files to conduct its assessment of Staff Reporting, and 118 files for the assessment of the quality of Facility Investigations due to the timing of production of some of files when the review took place.

The first line graph below presents the number of alleged uses of force reported since the inception of the Consent Judgment (November 2015) through the end of the Fourth Monitoring Period (June 2017). The second line graph presents the number of alleged uses of force reported per month since the inception of the Consent Judgment through the end of the Fourth Monitoring Period, comparing year-over-year monthly numbers.





The year-by-year analysis demonstrates that allegations in 2017 have gone down compared with allegations in the same months in 2016. The Monitoring Team intends to more closely analyze the allegation statistics in future Monitoring Periods to better assess potential trends or patterns.

Investigating alleged uses of force is critical to reducing the frequency with which actual uses of force go unreported. Policy states that Staff who fail to submit an incident report regarding force they used or witnessed are subject to disciplinary measures. To that end, the Monitoring Team reviewed investigations of allegations from two perspectives. First, the Monitoring Team reviewed all Preliminary Reviews for alleged uses of force from the current Monitoring Period to assess the type and level of detail provided in the allegations. Second, the Monitoring Team intends to review a sample of the Full ID investigations of these allegations, once they are completed.

*Tracking Use of Force*

During the current Monitoring Period, the Monitoring Team assessed the Department's efforts to track information as required in ¶¶ 14, 15, 16, 17, 19 and 21[34], and assessed compliance with each provision, as discussed below. Once reported, a unique number is assigned to every reported and alleged use of force incident by the Central Operations Desk ("COD"). A short summary of the incident is also generated by COD and referred to as a "COD Report," which is entered into the Incident Review System ("IRS"). Every day, a "24-hour Report" is generated that includes all incidents reported to COD and is disseminated to appropriate Department staff via email. This Monitoring Period the Monitoring Team visited the Central

---

[34] The Monitoring Team will assess compliance with ¶¶ 18 and 20 following the implementation of CMS.

Operations Desk and observed this process first hand on a number of occasions to better understand how use of force incidents are reported and tracked.

- ***Use of Force Reporting Accuracy***

The Monitoring Team continued to closely monitor the Department's reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). During this Monitoring Period, the Monitoring Team reviewed all 10 incidents that the Monitoring Team identified were originally classified as a use of force incident and were subsequently downgraded to a logbook entry. The Monitoring Team did not agree with the re-classification of seven of these incidents.[35] The 7 incidents were all minor uses of force, and this re-classification only occurred a few times, but the process of downgrading use of force incidents sends a troubling and confusing message to Staff that there is a grey area, or some discretion, in what is considered a UOF. The Monitoring Team strongly encourages the Department to err on the side of validating the Staff's decision to report, and minimize the frequency of reclassification of incidents.

The Monitoring Team's assessment of compliance is outlined below.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF) |
|---|
| ¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br>• The Department's current Use of Force Directive, and New Use of Force Directive, require Staff to immediately notify his/her Supervisor when a use of force incident occurs.<br>• Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, which supervisor was notified after the incident, and the time of notification.<br>**ANALYSIS OF COMPLIANCE** |

---

[35] Upon further discussion with the Monitoring Team, the Department changed the classification of four of these incidents back to use of force. The Monitoring Team has some outstanding questions related to the other three cases that it must address with the Department.

The Monitoring Team assesses this requirement from two perspectives. First, the Monitoring Team assessed the extent to which Staff affirmatively report whether and which Supervisor they notified before or after a use of force incident. The Monitoring Team reviewed the portions of Staff Reports where Staff are required to identify the supervisor notified and the time notification took place. The Monitoring Team analyzed 250 Staff Reports and found that this section was completed 88% of the time (219 Staff Reports). The Monitoring Team suspects in the case where these sections are not complete that Staff may be leaving this portion of the form blank in cases where the Staff Member did not personally make the notification, or if a Captain or another Supervisor was already on the scene at the time the incident occurred.

Second, the Monitoring Team assessed the frequency and legitimacy of allegations made by inmates. The Monitoring Team examined inmate allegations made through various channels including those made to Department representative, and those reported through outside agencies like the Legal Aid Society. If substantiated, these incidents are cases of unreported use of force. The Department identified four cases in this Monitoring Period through Preliminary Reviews where video and other objective evidence strongly suggest that Staff deliberately failed to report a use of force incident. As of the end of the Monitoring Period, the Full ID investigations are still pending.[36]  The Monitoring Team must continue to conduct additional assessment of allegations in order to determine the rate at which use of force may be unreported. Unreported uses of force continue to be an important focus of the Monitoring Team.

*Assessment of Use of Force Allegations via Preliminary Reviews*

The Monitoring Team reviewed 215 Preliminary Reviews[37] of allegations made between January 2017 and May 2017. The analysis is provided in the table below. Key factors identified included whether the allegation had a specific time and date the incident allegedly occurred, whether the inmate had consistent injuries based on an available Injury-to-Inmate Report (although origin of injuries is not yet determined), and whether the Preliminary Reviewer found video evidence that corroborated the allegation.

---

[36] The Monitor recommended to the Department that it develop a process to expedite the investigation of these types of cases.
[37] The Preliminary Review entries in each month are based on when the Preliminary Review of the allegation took place and was entered into ITTS, not when the allegation was made or the alleged incident took place, so these numbers may not match the allegation data above exactly.

| | Jan. 2017 | Feb. 2017 | Mar. 2017 | Apr. 2017 | May 2017 | Totals |
|---|---|---|---|---|---|---|
| Total allegations in month | 27 | 30 | 49 | 22 | 32 | 160 |
| Allegation had specific date | 26 | 27 | 37 | 21 | 27 | 138 |
| Allegation had specific time | 13 | 24 | 24 | 18 | 20 | 99 |
| Inmate had injuries consistent with allegation[38] | 9 | 15 | 18 | 7 | 13 | 62 |
| Preliminary Reviewers description of video evidence of incident *corroborates* inmate allegation | 1 | 3 | 8 | 5 | 6 | 23 |
| Preliminary Reviewers description of video evidence of incident supports *some* of the inmate allegation[39] | 9 | 14 | 14 | 10 | 13 | 60 |

The purpose of this assessment was to identify allegations with objective evidence that may validate or contradict the allegation. Of course, the most concerning allegations are those in which video evidence supports the allegations, in whole or in part. The analysis conducted in this Monitoring Period revealed an increased proportion of allegations that had corresponding video evidence than conducted in the previous review (Third Monitor's Report at pgs. 48-49). Most of the allegations (86%) identified a specific date on which the incident allegedly occurred, and 60% included a specific time. Fewer of the allegations had corroborating evidence identified by the Preliminary Reviewer such as consistent injuries (39%); video evidence supporting the allegation (14%); or video evidence capturing some of the incident as described in the allegation (e.g., video captures the inmate and allegedly involved Staff at the time and place of the allegation, but may not depict the alleged incident itself because the alleged use of force took place off camera) (38%)[40].

The Monitoring Team will continue to closely scrutinize allegations of use of force and the subsequent investigations to ensure that the Department timely and appropriately investigates and disciplines Staff who fail to report a use of force.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, 5, 6 & 7 (INDEPENDENT & COMPLETE STAFF REPORTS)

---

[38] Not all alleged incidents involve injuries, so this figure is not to suggest that all other allegations had injuries inconsistent with their allegations, only that some allegations can be further bolstered by corroborating injury evidence.  Further, the fact that an inmate's injury is consistent with the allegation does not mean that the allegation is true, but that it merits further investigation to determine whether the injury was the result of an unreported use of force.

[39] This is not intended to capture incidents where video evidence may discredit the allegation in its entirety.

[40] Not all alleged incidents would necessarily have been captured on video, so this is not to suggest that those not partially captured or entirely captured on video were *discredited* by video evidence, as no video evidence may have existed.

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's current Use of Force Directive, and the New Use of Force Directive, require Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2).

- The Department's New Use of Force Directive addresses all requirements listed in ¶¶ 3(a)-(h).

- The Department's current Use of Force Directive requires Staff to report all elements in ¶ 3(a)-3(f), 3(h) above, but does not require "the Captain and the Staff Member(s) responsible for escorting the inmate to the clinic following a use of force incident to include in their reports the approximate time the inmate was transported to receive medical care and the name of the clinician or medical professional who provided care," as required by ¶ 3(g).

  o While the time the inmate is seen by medical staff and the clinician's name can be found on the Injury-to-Inmate form #167R-A, the approximate time of escort is not included on that form and is not currently required to be included in the Captain or Staff's report.

- The Department's current Use of Force Policy also does not require Staff to record the time the Staff Report was written (as required by ¶ 3(b)), but the new date and time-stamp procedure implemented during this Monitoring Period addresses this requirement.

- The Department's New Use of Force Directive covers the requirements in ¶¶ 5, 6, and 7 above.

- The Department issued a Memorandum Dated November 20, 2008 from the Bureau Chief of Facility Operations Office stating that Staff may not review video prior to completing their Use of Force Reports (¶ 5).

- The Department's current Use of Force Directive requires that Staff prepare their reports "based on their own observations and written independently from other Staff that were involved

or were alleged to have been involved in the incident," but does not explicitly require that Staff be separated from each other while they prepare their Use of Force Reports (¶ 6).

- No current Department policy addresses the requirement in ¶ 7 above, but collusion is an issue that ID investigators considers when reviewing evidence as part of the Preliminary Review or Full ID investigation of an incident.

ANALYSIS OF COMPLIANCE

*Completion of UOF Reports* (¶ 3)

The Monitoring Team closely scrutinized the extent to which Staff are properly utilizing the fields on the Staff Report forms. Most fields on the Staff Report form are consistently completed. However, the Monitoring Team found certain areas of Staff Reports were consistently incomplete or blank. One such area was the field for identifying inmate witnesses: 45 of the 118 (38%) use of force incidents included Staff Reports that left the inmate witness field blank or incomplete, when evidence in the file demonstrated that other inmates were present (e.g., attempts by the Investigator to obtain inmate witness statements, or the location of the incident made it very likely that other inmates were present). The Monitoring Team found that it was often the case that this field was left blank or stated "unknown," "none," or "not applicable" in the Use of Force Reports and Witness Reports reviewed, yet the investigative file included multiple inmate witness statement refusal forms, demonstrating that there were in fact inmate witnesses. It appears Staff are simply not filling out this field accurately. Further, the Monitoring Team found in its review of Staff Reports in Preliminary Reviews that Staff often fail to include details in their reports of Staff conduct that is less becoming (e.g. Staff provocation of an incident including cursing or temper).

*Review of Video Footage* (¶ 5)

The Monitoring Team did not find specific evidence in any investigation file to suggest that Staff were reviewing video footage of an incident prior to writing their Staff Reports, however, Staff reports are often vague and similar to other Staff Reports in an incident.

*Independent Preparation of Reports* (¶¶ 2 & 6)

During the review of 119 closed Facility Investigation files this Monitoring Period, the Monitoring Team found that 22 of the 119 incidents (19%) included Staff Reports with some evidence of collusion, like the use of similar canned or identical phrasing (including to describe the level of an inmate's resistance or the inmate's actions) by multiple Staff describing the same incident, at times potentially in contravention of video evidence. This is consistent with the Monitoring Team's findings from the Third Monitoring Period (*see* Third Monitor's Report at pg. 59).

*Review of Reports for Compliance with ¶¶ 3 to 6 and Staff Collusion* (¶ 7)

To date, the Monitoring Team has found that the Preliminary Reviewers often identify potential deficiencies related to the requirements in ¶¶ 3, 6, and 7, and the Monitoring Team continues to

encourage the Department to ensure that such issues are identified and addressed by the investigator at the close of the investigation. The Department must work diligently to change this practice and hold Staff accountable for failure to accurately and independently report their own recollection of the use of force incident.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **2.** Partial Compliance |
| | ¶ **3.** Partial Compliance |
| | ¶ **5.** Partial Compliance |
| | ¶ **6.** Partial Compliance |
| | ¶ **7.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 4 & 8 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's current Use of Force Directive addresses when Staff Reports must be submitted (¶ 4) except the requirement for Staff to obtain the Tour Commander's permission to leave the Facility without first preparing and submitting his or her Use of Force Report. The Department's New Directive explicitly incorporates all of the requirements of this provision.

- The Department's Current Disciplinary Guidelines, and the New Use of Force Directive, address the requirement that any Staff Member who fails to notify a Supervisor, or failed to prepare and submit a complete and accurate Use of Force Report, shall be subject to discipline or other corrective action (¶ 8).

### ANALYSIS OF COMPLIANCE

¶¶ 4 and 8 are addressed together because, in combination, they require Staff to submit timely Staff Reports, and require the Department to take appropriate corrective action when Staff fail to do so.

*Timely Submission of Use of Force Reports* (¶ 4)

The Department's inability to collect Use of Force Reports in a systematic and consistent manner makes it difficult for the Department to demonstrate that Staff submit Use of Force Reports as soon as practicable as required under ¶ 4 the Consent Judgment.  The accessibility and availability of

Use of Force Reports is of critical importance to understanding what occurred during a use of force incident and to support the investigation (Preliminary Reviews, Facility/ID Investigations).  Further, the success of the initiatives to streamline and complete investigations more timely (e.g. PICs and Fast-Track), as described in detail in the Investigations section of this report, also depend on timely report submission and easily accessibility and are undermined by the Department's disorganized process for report collection. Accordingly, the Department's ability to timely collect Use of Force Reports will significantly support the Department's reform efforts.

In this Monitoring Period, the Department worked to address these deficiencies by implementing the time and date stamps in each Facility and developing a process to systematically collect and track the collection of Use of Force Reports.  This process was implemented at the end of the Monitoring Period so the Monitoring Team has not yet had an opportunity to measure its effectiveness.  However, the Monitoring Team conducted an initial assessment by testing the time and date time stamp in each Facility and speaking with Staff about the new collection process.

*Date- and Time-Stamps*

The purpose of the date- and time-stamps is to ensure the accuracy of the date on the Use of Force Reports.  It is expected that this process may also have the ancillary effect of encouraging Staff to submit their reports more promptly. Below is an example of the stamp that will now appear on every submitted Staff Report, this one from RMSC:



The Monitoring Team individually verified the presence and accuracy of the date- and time-stamp machines in each Facility in the first few weeks after they were implemented.  As to be expected with a new process, the Monitoring Team identified some issues with the maintenance and security of the machines.  In response to feedback from the Monitoring Team, the Department refined the procedures for the date- and time-stamp machines to ensure they are routinely checked and maintained. The Monitoring Team conducted a subsequent assessment and found that the date- and time-machine stamps were in working order in each Facility and displayed the accurate time and date.

*Centralized Collection Procedures*

The Monitoring Team found that Preliminary Reviewers continued to often not have all the necessary documentation at the time of their reviews, in particular Staff Reports, as described in more detail in the Second and Third Monitor's Report.  In response to the Monitoring Team's concerns, a centralized collection process was implemented this Monitoring Period to ensure the timely submission and availability of Staff Reports. Staff must submit their report at the end of their tour, and the Tour Commander is responsible for scanning in Staff Reports and saving to a shared drive, which is

accessible to ID. If Staff Reports are not turned in by the end of the Tour Commander's tour, the Tour Commander is responsible for reporting that to the Warden.

After the Department implemented the new report collection procedures, the Monitoring Team visited each Facility, spoke with Staff and observed the process for collection. The Monitoring Team identified some areas where additional guidance and support would improve the implementation process including, greater clarity about where to provide and store use of force reports for scanning, better guidance on logistics of scanning the reports (including uniform naming conventions), and a systematic process for confirming reports are uploaded as required.  The Monitoring Team will report on the Department's efforts to address this feedback in the next Monitor's Report.

Because these collection procedures were only implemented beginning in June 2017, it is too early to assess the impact of the new report collection procedures. However, the Monitoring Team spoke with ID Staff about their experience with the new process and they reported a positive initial assessment of the new collection procedures, that Staff Reports are available more timely and are much easier to access on the shared drive, saving them time by not having to visit the Facility and search in various locations for the Staff Reports. The Monitoring Team also conducted an initial exploration of the Use of Force Reports available on the shared drive to assess the availability of the Staff Reports for incidents occurring at the end of the Monitoring Period.  Of the 20 incidents reviewed, reports were available in 98% of the incident folders. A more thorough assessment of the timely submission of Use of Force Reports will occur once the collection process is fully implemented.

*Discipline or Other Corrective Action for Failure to Report Uses of Force (¶ 8)*

The Monitoring Team focused its initial assessment of this provision on the Department's efforts to impose formal discipline for Staff who failed to report use of force:

| Type of Discipline | Total *Closed* Cases Since Effective Date[41] of Consent Judgment with Disciplinary Charges Related to Failure to Report or False Reporting | Total *Pending* Cases Since Effective Date of Consent Judgment with Disciplinary Charges Related to Failure to Report or False Reporting |
|---|---|---|
| Formal Charges[42] | 47 | 61 |

The data above demonstrates that, in at least some cases, investigators are identifying potential failure to report cases and referring those cases for discipline. The Monitoring Team intends to explore

---

[41] These data include all cases with Investigations that closed since the Effective Date of the Consent Judgment.
[42] The Department's data regarding cases before Trials is not comprehensive.  In late 2016/early 2017, the Department and the Monitoring Team developed a manual case-tracking process for cases pending before Trials.  Given the significant efforts this undertaking required, the Department did not conduct a retrospective review to develop comparable data for cases that were pending before Trials as of November 1, 2015, but closed prior to the institution of this tracking process.

with the Department in the next Monitoring Period whether there are alternative methods for addressing the failure to report or inaccurate reporting of use of force incidents; some of these may be more expeditious such as Immediate Action or Fast-Track.

However, the analysis of 118 Facility Investigations closed during this Monitoring Period revealed 39 incidents (33%) where the Monitoring Team identified reporting problems, but the Facility failed to bring charges or other appropriate discipline. These reporting issues included inaccurately reporting the number of chemical agent applications, failing to report unnecessary use of force by other Staff, false reporting related to the inmate's behavior to justify the force used, outright failure to report a Use of Force (confirmed allegations from inmate), omitting witnesses and failing to report using prohibited holds and head strikes. The Department must increase its efforts to accurately identify and hold Staff accountable for the failure to accurately report uses of force.

| COMPLIANCE RATING | ¶ **4.** Non-Compliance<br>¶ **8.** Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23, and current policies address these requirements as outlined throughout this section of the report in each box.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-8, 22 and 23. As outlined throughout this section, while the Department's New Use of Force Directive addresses such requirements, the Department's current policies address some, but not all, of the requirements in Consent Judgment § V ¶¶ 1-8, 22 and 23. The "implement" component of this provision will be assessed for each individual provision listed above once the policy has been signed into effect.

*Recommended Changes to the Use of Force Report Form, #5006-A, Part A*

The Monitoring Team evaluated the Use of Force Report Form (Form #5006-A, Part A) to ascertain compliance with the reporting requirements in the Consent Judgment and enumerated in the New Use of Force Directive that will be effective on September 27, 2017.  The Monitoring Team identified a few areas where the form could be updated to ensure the form matches the reporting requirements in the New Directive (and Consent Judgment). This includes additional space to identify

whether the Use of Force was anticipated; and additional fields to include reporting of certain individuals who were notified about the force and who participated or witnessed the force.  The Department intends to revise the form in the next Monitoring Period, in consultation with the Monitoring Team, before the New Use of Force Directive is implemented.

| **COMPLIANCE RATING** | ¶ 9. **(Develop)** Substantial Compliance<br>¶ 9. **(Adopt)** Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ ¶10-13 (NON-DOC STAFF REPORTING)

¶ 10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident that results in an apparent injury report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident.  The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents that result in apparent injuries, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force.  The person to whom such report is made shall be responsible for relaying the information to ID.  ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive.  The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

¶ 13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) provides "Dual Loyalty" training to all H+H staff that addresses the reporting requirements in the Consent Judgment.

- H+H maintains a dedicated email address for staff to use to report suspected human rights related violations.

### ANALYSIS OF COMPLIANCE

H+H continues to provide training to all H+H staff on their reporting obligations under *Nunez*. As reported in the Third Monitor's Report, there is no reporting template for H+H employees to report a use of force outside of the medical template used by health staff to record injury encounters. However, H+H does maintain an email address for staff to use to report important issues concerning inmates. The Monitoring Team encouraged H+H to create a separate dedicated email address to field reporting related inquiries from their staff, separate from the email address used to report other issues

57

with inmates and will continue to work with H+H to ensure the appropriate reporting avenues are available to their staff and utilized appropriately.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to use of force incidents in a computerized system called IRS.

  - IRS captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields.

  - The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

### ANALYSIS OF COMPLIANCE

The Monitoring Team previously confirmed that the majority of incident data is tracked accurately and reliably. Only minor deviations between the investigation files and what was in IRS related to location of incidents and list of Staff involved were noted.  The description of the force used is much more specific in the investigation files than in the IRS entries, which is to be expected.[43]

The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. The Monitoring Team will periodically re-verify that the Department continues to track the information as required in a dedicated audit, but may not do so every reporting period going forward as the deviations noted to date were minor, and no change in procedure for tracking occurred that would warrant a re-assessment.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

---

[43] *See* Second Monitor's Report (at pg. 39); Third Monitor's Report (at pg. 61).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department revised its process for tracking Facility Investigations and now uses an Excel worksheet, developed in consultation with the Monitoring Team.  The Excel workbook tracks the information in ¶ 15(a)-(f).

- The Department separately tracks any use of force incident that was referred to or taken over by DOI for further investigation and the date of such referrals ¶ 15 (g).

- The Department reports that the required fields will be included in CMS.

**ANALYSIS OF COMPLIANCE**

The database the Department currently uses to track information related to Facility Investigations is an interim measure until the Case Management System ("CMS") is completed. As described in the Second Monitor's Report (at pgs. 39-40), the Department experienced technical challenges with the Microsoft Access-based interim system developed initially. With the approval of the Monitoring Team, the Department modified the method by which Facility Investigations are tracked, which went into effect in January 2017. At that time, the Department began entering and tracking relevant information requested by the Monitoring Team, pulled from closed Facility Investigation files, into a streamlined Excel document.

The new interim process for collecting data regarding Facility Investigation is much easier to use and provides data in a manner that can be easily digested and analyzed.  Because the data is manually inputted, input errors sometimes arise because information is illegible or information was not provided by the investigator. The Monitoring Team compared the underlying Facility Investigation file for the 119 closed Facility Investigations reviewed for the Facility Investigation Audit with the information entered in the Excel document and found a match to the underlying data in 99 out of the 119 files reviewed (83%).[44]

The Department will achieve Substantial Compliance with this provision once able to demonstrate that information can be generated accurately and consistently over a period of time either in the interim system and/or CMS.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

---

[44] This finding is not surprising as the data is manually entered.  The Excel tracker had errors in 19 entries, which included erroneously marking that a Warden did not concur with the Tour Commander's findings, when in fact the Warden had concurred; incorrectly identifying that no Command Discipline, re-training, or a corrective interview was recommended following an incident, when in fact it had been; and incorrectly marking that a Tour Commander concluded the force was necessary when in fact they had concluded it was unnecessary, and vice versa.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS) |
|---|

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As discussed in the First Monitor's Report, the Department tracks information related to Full ID investigations using a computerized tracking system called "ITTS."

  o ITTS has specific fields to capture the information required in ¶ 16(a)-(g).

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to utilize reports generated from ITTS to conduct various analyses and assessments. During the First Monitoring Period, the Monitoring Team assessed the components of ITTS, and determined it had clearly and appropriately labeled fields designed to capture the information required by the Consent Judgment. Full ID investigations were "opened" in ITTS by members of ID's tracking unit, sometimes leading to a delay in entering the data into the system. During the Second Monitoring Period, the Monitoring Team reviewed reports generated from ITTS and compared them to the underlying use of force documentation for a sample of incidents. This review confirmed the information was appropriately tracked.

The Department continues to produce reports to the Monitoring Team on a monthly basis as described in the Third Monitor's Report (at pg. 63).  While the information in the system is accurate, the information in the reports is often delayed because it is manually inputted.  It is expected that the Department will achieve Substantial Compliance with this provision in the next Monitoring Period if it continues to accurately and consistently generate reports from this system.

| COMPLIANCE RATING | ¶ 16. Partial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE) |
|---|

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- During this Monitoring Period, the Trials & Litigation Division developed an Excel workbook, to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The Department reports that the required fields will be included in CMS.

**ANALYSIS OF COMPLIANCE**

As described in the Second Monitor's Report, the Trials side of ITTS has a number of limitations with regard to the data that is collected. Accordingly, the Monitoring Team helped the Department to develop an interim reporting strategy to manually capture the majority of this information, since any changes to the current systems would become obsolete with the implementation of CMS. This report was produced for the first time during the Fourth Monitoring Period and the data derived from this report is discussed in the Staff Discipline and Accountability section of this report. Overall, the Monitoring Team finds the data in this Excel is accurate and easy to digest. The Department is required to maintain this information in CMS and the Department is working on developing the system to track this information. The Monitoring Team will reassess the compliance rating once CMS is implemented.

| COMPLIANCE RATING | ¶ 17. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to inmate-on-inmate fights in the Inmate "Fight Tracker," a computerized system, including names of the inmates involved; identification numbers of the inmates involved; date, time, and location of the inmate-on-inmate fight or assault; and nature of any injuries sustained by inmates.

- An inmate-on-inmate fight or assault that results in a use of force is reported in IRS (as well as the Fight Tracker), and will also be tracked as part of the use of force investigation and include the required information.

- An inmate-on-inmate fight or assault that involves a slashing or revealed a dangerous article is reported in IRS (as well as the Fight Tracker) and will track all required information.

**ANALYSIS OF COMPLIANCE**

As stated in the Second Monitor's Report (at pgs. 42-43), the Monitoring Team confirmed that the Department's Fight Tracker includes the information listed above by reviewing screen shots and reports generated from the system, but the Fight Tracker does not include *all* the required information. This provision also requires the Department to track a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. These three fields are not included in the Fight Tracker database. However, this information is tracked in other computerized systems if the inmate-on-inmate fight or assaults resulted in a use of force, slashing or revealed a dangerous article.

| COMPLIANCE RATING | ¶ 19. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[45] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As reported in the First Monitor's Report, the Department drafted definitions for the various categories of institutional violence, including all security indicators related to violence, focusing on clarity and the ability to collect and report reliable and accurate data.
    - As required, the Department consulted with the Monitoring Team about the draft definitions, incorporating the Monitoring Team's comments and suggestions prior to finalizing the definitions.

**ANALYSIS OF COMPLIANCE**

The Department maintains appropriate definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department remains in Substantial Compliance. The Monitoring Team assesses the Department's use of these categories to analyze a variety of data throughout the Monitoring Period as discussed throughout this report.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
|---|---|

---

[45] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 (PROMPT MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)**

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports that its policy is that inmates with immediate medical needs should be treated immediately. The Department also reported its goal that generally all inmates with non-serious injuries should be seen by medical staff within four hours of an incident.

- The Department is working with H+H to determine ways to provide medical treatment more quickly, including two pilot programs described in detail below.

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident (¶¶ 22 and 23) and must track its delivery. Ensuring the Department meets its obligation to provide prompt medical attention is a top priority for the Monitoring Team. The Monitoring Team continues to closely monitor the time to provide medical treatment to inmates both through on-site observations and in the medical documentation contained in Use of Force investigation packets.

The Monitoring Team systematically reviewed the Injury-to-Inmate Reports contained in Preliminary Reviews packets and closed Facility Investigation files. The Monitoring Team reviewed 163 Injury-to-Inmate Reports including in the closed Facility Investigation files, and 81 Injury-to-Inmate Reports from 50 Preliminary Review files for incidents the occurred in 2017 (two files had no Injury-to-Inmate reports available).[46] The table below presents the findings:

| Source of Injury-to-Inmate Report | Treatment Time *Unknown or Illegible* | Treatment Provided in *< 2 hours* | Treatment Provided *btw. 2 & 4 hours* | Treatment Provided *btw. 4 & 6 hours* | Treatment provided *> 6 hours* | Total |
|---|---|---|---|---|---|---|
| *Closed Facility Investigation Files Reviewed* | 20 (12%) | 40 (25%) | 64 (39%) | 28 (17%) | 11 (7%) | **163** |
| *Preliminary Review Files of 2017 Incidents* | 8 (10%) | 13 (16%) | 22 (28%) | 19 (24%) | 18 (23%) | **80** |
| **Total** | 19 (12%) | 53 (22%) | 86 (35%) | 47 (19%) | 29 (12%) | **243** |

As was also found in the Second and Third Monitor's Reports, the Monitoring Team found that too often, inmates are waiting too long to receive medical treatment. Only 57% of inmates were treated

---

[46] This analysis excluded an assessment of Injury-to-Inmate reports from investigation of use of force allegations.

within four hours.  Of most significant concern are the 29 inmates who received medical treatment over six hours after the incident, including one inmate who waited 24 hours before receiving medical attention. The Department must provide medical care more expeditiously in order to meet the requirements of this provision.

During this Monitoring Period, the Department began to implement strategies including development of Satellite Intakes, the GRVC Medical Triage Pilot, and expansion of the RNDC Wristband Tracking, which are designed to shorten medical wait times and address the Monitoring Team's concerns that inmates were spending too much time in Intake prior to receiving medical attention, as described in the Third Monitor's Report (at pgs. 66-67). Once implemented, the Monitoring Team will gather routine data from those pilot programs to assess the success of those programs in providing timely medical treatment.

*Satellite Intake*

The Department's Satellite Intake initiative serves multiple purposes, as described in more detail in the Use of Force Trends section and in the inmate Discipline section of this report. Satellite Intake is also intended to reduce medical wait time for inmates. In some situations, inmates need to be seen by the clinic, but cannot be taken there directly (e.g., space concerns, the other person involved is also in the clinic). In these cases, an inmate may be taken to Satellite Intake to await escort to the clinic.  Using Satellite Intake in this way will reduce the burden on the Main Intake and also help to expedite the delivery of medical care, given the narrower focus on less chaotic atmosphere of Satellite Intake.

*Medical Triage Pilot Program*

The Department also established a medical triage location at GRVC, used when five or more inmates are involved in a use of force incident or inmate-on-inmate fight and do not have any visible injuries requiring medical treatment.  Inmates who only require decontamination following exposure to Chemical Agents may be placed in the Medical Triage location.  All inmates with visible injuries requiring treatment or who complain of injuries requiring a further assessment will be evaluated at the main Clinic location. Inmates who were exposed to chemical agents but have no further injuries will be decontaminated in the medical triage location. Inmates who do not have any injuries but still must be seen by medical staff will also be assessed in the medical triage location and then returned to their housing areas.

The purpose of this pilot is to expedite the medical evaluation of inmates following an incident and to avoid placing inmates main Intake location who may languish for an extended period of time while waiting to be seen by medical staff. The Monitoring Team reviewed a draft Command Level Order during this Monitoring Period, and the Department reports they are incorporating the Monitoring Team's feedback and will share the updated draft with H+H early in Fifth Monitoring Period.

A Housing Area in GRVC has been designated as the medical triage location. Uniform Staff will respond to the location when it is activated by a tour commander. The New York State Commission of Correction ("SCOC") needed to review, in-person, all proposed physical changes to the housing area before approving the modifications. The proposed changes were ultimately approved and to date, nearly all modifications have been completed. The Monitoring Team provided comments to the Department on a draft of the Command Level Order for the medical triage pilot. The Department expects the Order will be finalized in the next Monitoring Period. Once the Command Level Order is finalized, and staffing of the location has been resolved, the Department will commence the pilot.

_Intake Improvement Pilot Program_

The Department is also in the process of developing a pilot at RNDC where Staff will utilize inmate identification wristbands to track how long inmates have been in Intake waiting to be seen by medical staff. Following a use of force incident or inmate-on-inmate fight, an inmate will have their wristbands scanned upon arrival to Intake and Staff will designate the receiving location as Intake. The inmate will then be brought to Intake (either main Intake location or Satellite Intake location) and have his wristband scanned again. Staff assigned to either Intake location will then confirm that the inmate's current location is reflected as Intake on the electronic Dashboard, which monitors inmate movement based on the wristband. From there, Staff will activate a "medical function" on the Dashboard that will place a triangular icon next to the inmate's name, which will alert Staff that the inmate is waiting to be seen by medical staff. The icon will be green when the inmate has been in Intake for less than two hours; yellow when the inmate has been in Intake for more than two hours but less than three hours; and red when the inmate has been in Intake for more than three hours. Staff will be required to check the Dashboard at least every 30 minutes and to communicate with CHS staff routinely to ensure that inmates are seen by medical staff in a timely manner.

The Department has drafted a Command Level Order to guide Staff on the procedures for this pilot, which the Monitoring Team reviewed and found satisfactory.  Once the policy is promulgated, the pilot will commence. The Department has expressed plans to expand inmate wristbands to other commands, and expects that if this pilot is effective in reducing medical wait times, it will be used at other Facilities as they receive inmate wristbands.

| **COMPLIANCE RATING** | **¶ 22.** Partial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 23 (TRACKING OF MEDICAL TREATMENT) |
| --- |

¶ 23. DOC shall record in the Department's Inmate Information System the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Currently, the Department's Inmate Information System ("IIS"), tracks all elements required by ¶ 23, except the requirement to identify Staff Members who were in the area to receive post-incident evaluation or treatment.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed screen shots provided by the Department demonstrating that IIS tracks when inmates arrive at the clinic, the time they were produced to a clinician, and the time treatment was completed. The Monitoring Team has not yet evaluated a sample of reports to verify the accuracy of this information. Accordingly, a compliance rating will not be assessed.

## 3. TRAINING (CONSENT JUDGMENT § XIII)

The provisions in the Training section of the Consent Judgment are the pillars that support the reform effort, as the new and revised training curricula are often Staff's initial exposure to the changes in practice and reforms prescribed by *Nunez*. The Consent Judgment required the Department to develop new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)). As outlined in the chart below, all lesson plans required by the Consent Judgment have been finalized and approved by the Monitoring Team. The Monitoring Team also continues to work with the Department to develop

training curricula on Chemical Agents, Monadnock Expandable Batons, Tasers, body-worn cameras, and handheld cameras (as required by Consent Judgment § IX, ¶ 2(e)) described below. Once underway, the Monitoring Team plans to observe the delivery of these trainings.

During the Fourth Monitoring Period, as the Department continued to deploy the required trainings to Staff, the Monitoring Team observed and provided feedback about the delivery to further enhance the curricula. The Monitoring Team observed the following trainings this Monitoring Period: S.T.A.R.T. Senior Management Training provided to Chiefs, Wardens and Deputy Wardens; In-Service Use of Force Policy Training (first day of S.T.A.R.T. Training); Recruit Direct Supervision Training; Recruit Use of Force Report Writing Overview Training; Recruit Crisis Intervention & Conflict Resolution Overview Training; and the Taser Refresher Training.

_Training Academy & Deployment_

The Department continues its effort to train its large workforce as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff (e.g., Prison Rape Elimination Act ("PREA"), Chemical Agents, etc.) and training an unprecedented number of recruits.[47]  The Monitoring Team is very encouraged by the City's commitment of one hundred million dollars to fund a new training academy.  This is an important and critical step to ensure that the Department has adequate training space to support its Staff.  The City reports it is working on identifying an appropriate location and the Monitoring Team strongly encourages the City to maintain its diligence and focus on implementing this long-term solution to address the limited and sorely inadequate training space available to the Department, as described in detail in

---

[47] Since November 1, 2015, the Department has trained and graduated 2,870 recruits. In June 2017, the Department matriculated another 1,203 officers. It is worth noting that the Pre-Service training provided by the Department has increased from 16 weeks to 24 weeks to accommodate for _Nunez_-required and other new training programs offered.

the First Monitor's Report (at pgs. 55-57).  The Monitoring Team will continue to work closely with appropriate City representatives to ensure the City continues to make progress on providing the Department with appropriate Training facilities.

As described in prior Monitor's Reports, significant operational, scheduling and space resources are required to sustain this training effort. The Department has necessarily prioritized providing Special Tactics and Responsible Techniques ("S.T.A.R.T.") training to all In-Service Staff, and Safe Crisis Management ("SCM") Training to all those who work in RNDC and GMDC (going beyond the requirements in the Consent Judgment, which only requires SCM to be provided to those who are "regularly assigned" to Young Inmate Housing Areas).

The Department also continues to utilize training space at John Jay College of Criminal Justice in order to meet these extensive training needs (described in detail in the Third Monitor's Report at pg. 72). The Monitoring Team is pleased that the Department continues to maintain this interim solution until a permanent solution is implemented.

*S.T.A.R.T. Progress*

The Monitoring Team closely monitors the Department's progress in meeting its training obligations. The Department began to provide Staff with the S.T.A.R.T. bundle of training—one full day of Use of Force Policy Training on the New Directive, and three full days of revamped Defensive Tactics Training, for a combined 4-day bundle—at the end of the Second Monitoring Period with the goal to provide S.T.A.R.T. to all Staff by September 27, 2017. The Department trained 2,700 Staff members in S.T.A.R.T. during this Monitoring Period. As of the end of the Fourth Monitoring Period,[48] the Department has trained 2,821 Recruits and 5,353 In-Service

---

[48] As expected, the Department's ability to provide this training to Staff slowed towards the end of the Fourth Monitoring Period as the pool of remaining Staff to be trained became smaller, making the scheduling and filling of each training block more difficult.

Staff since the Effective Date. The Department also trained two-thirds of the Senior Management

during the Fourth Monitoring Period, including the Bureau Chief, Division Chiefs, Wardens,

Deputy-Wardens-in-Charge, and Deputy Wardens.[49] The Department remains on track to train

all Staff by September 27, 2017. The Monitoring Team applauds the efforts of the Academy

Staff and all S.T.A.R.T. instructors to deploy this training. The Academy Staff and S.T.A.R.T.

instructors embraced the task of instructing unprecedented numbers of Staff, while placing

tremendous demands upon their own personal stamina and Department resources.  To achieve

the goal of completing the S.T.A.R.T. training on time, the instructors often worked double shifts

for months, and in some cases for more than a year. During the Monitoring Team's observations,

the Team was encouraged by the quality of instructions, including the instructor's energy,

engagement of the class, attention to detail, and overall commitment to supporting the

Department's reform efforts and culture change.

|  | First Monitoring Period (November 2015 to February 2016) | Second Monitoring Period (March to July 2016) | Third Monitoring Period (August to December 2016) | Fourth Monitoring Period (January to June 2017) | Total Staff Trained |
|---|---|---|---|---|---|
| Number of In-Service Staff Trained | n/a | 236 (*June & July 2016 only*) | 2,417 | 2,700 | 5,353 |
| Number of Recruits Trained | 592 | 618 | 711 | 900 | 2,821 |

*Status of Training Program Development and Deployment*

The chart below describes the status of each training program required by the Consent

Judgment. The number of Staff who received the training during the Monitoring Period is

addressed in the detailed discussion of each training, below, as part of the compliance

assessment.

---

[49] By the end of August, all but a few high-ranking uniform Staff have received S.T.A.R.T. training.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | Curriculum finalized. Training provided in mandatory Pre-Service training | Curriculum finalized. Training began July 2016 as part of S.T.A.R.T. | To commence at the conclusion of S.T.A.R.T. |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | Curriculum finalized. Training provided in mandatory Pre-Service training | Curriculum finalized. Training provided in Pre-Promotional Training for Captains and ADWs; In-Service training to commence at the conclusion of S.T.A.R.T.. | To commence no earlier than completion of initial In-Service Crisis Intervention and Conflict Resolution Training |
| **Defensive Tactics (¶ 2(a))** | | Curriculum finalized. Training provided in mandatory Pre-Service training | Curriculum finalized. Training began July 2016 as part of S.T.A.R.T. [50] | To commence at the conclusion of S.T.A.R.T. |
| **Young Inmate Management ("SCM") (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | Training provided in mandatory Pre-Service training [51] | To be provided to any Staff newly assigned to RNDC, GMDC, or Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. | Curriculum finalized, rollout commenced in Fourth Monitoring Period. |
| **Direct Supervision (¶4)** | | Curriculum still in development. Draft version of training provided to Recruits[52] | Curriculum finalized. Training began May 2017. To be provided to Staff assigned to RNDC, GMDC, and Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. | To commence no earlier than completion of initial In-Service Training |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | Staff assigned to work regularly at any Intake Post | Lesson Plan finalized. Training provided in mandatory Pre-Service training | Curriculum finalized. Training provided in Pre-Promotional Training. Training to be deployed in Fifth Monitoring Period. | n/a |
| **Cell Extraction (¶ 2(b))** | Staff regularly assigned to Special Units with cell housing | Lesson Plan finalized. Training provided in mandatory Pre-Service training | Curriculum finalized. Training provided in Pre-Promotional Training. Training to be deployed in Fifth Monitoring Period. | n/a |

[50] Although not required by the Consent Judgment, the Department on its own initiative chose to develop and provide a three-day Defensive Tactics Training to all In-Service Staff.

[51] The Consent Judgment does not require the development of an In-Service SCM training program because it was already in place prior to the Effective Date of the Consent Judgment. Although not required by the Consent Judgment, the Department has included SCM training in its mandatory Pre-Service training.

[52] Although not required by the Consent Judgment, the Department plans to provide all recruits with Direct Supervision Training.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Investigator (¶ 2(c))** | ID Investigators | n/a | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | n/a |
| | Facility Investigators | n/a | TBD[53] | n/a |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | TBD[54] | Lesson Plan finalized. Training provided in mandatory Pre-Service training beginning with the class that matriculated in June 2017. | Curriculum finalized. Plan for deployment of training to be developed in Fifth Monitoring Period. | n/a |

_Chemical Agent Training_

During this Monitoring Period, the Department began to revise its chemical agent training lesson plan for Recruits, Supervisors and the refresher course for In-Service Staff, in consultation with the Monitoring Team. As noted in the Third Monitor's Report, the Monitoring Team's observation of the training found the training to be comprehensive, competency- and scenario-based, and provided Staff clear guidance about the use of chemical agents, including detailed guidance on the authorized use of various canister sizes, the training needed to be updated to reflect the New Use of Force Directive, New Chemical Agents Directive 4510R-H, and current agency practice. The lesson plan was revised to address the revisions to the Directive, including incorporation of the current manufacturer's recommended minimum safe distance for deployment and the decontamination process. The Department reports it intends to finalize and implement the revised lesson plans during the next Monitoring Period.[55]

---

[53] _See_ "Investigator Training" box below for explanation of plan for providing Facility Investigator Training to all Captains as required.

[54] The Department, in consultation with the Monitoring Team, intend to discuss how to identify trained operators of handheld video cameras at each Facility for each tour and at ESU in the next Monitoring Period.

[55] The Department finalized the Recruit Chemical Agents Lesson Plan early in the Fifth Monitoring Period.

*Taser Refresher Training*

This Monitoring Period, the Monitoring Team observed the Taser Refresher Training[56] and found the instructors to be thorough regarding the Taser safety features and practice, covering the intricacies of the Taser operation and options, and ensuring that Staff understood the definition of "compelling need" as described in the Taser Directive. The instruction also addressed report writing requirements and used the Taser Directive to remind Staff of the type and amount of information that should be included in their reports following a Taser use or display.

Appropriate guidance was provided to the class regarding de-escalation expectations, including encouraging Staff to address and mitigate inmate grievances to minimize the need for force.  The instructors also led a discussion of the three recent instances in which the Taser had been displayed (note: at the time of the refresher training, the Taser had not yet been deployed). Staff reviewed videos associated with the incidents and discussed and critiqued the Staff's conduct, including feedback from the Monitoring Team.

*Monadnock Expandable Baton ("MEB") Training*

In connection with the Department's implementation of the MEB Directive as described in the Use of Force Policy section of this report, the Department developed a training course for the MEB, an eight-hour course covering the MEB Directive, the proper use of the MEB including grip and handcuffing, the authorized strike zones for the MEB, general information on the mechanics and maintenance of the MEB. The Monitoring Team's latest feedback to the MEB Training lesson plan recommended incorporating additional detail regarding the level of resistance an inmate must be exhibiting to make the use of the MEB acceptable, emphasizing the

---

[56] The Monitoring Team's assessment of the initial Taser training was described in the Second Monitor's Report (at pgs. 31-32).

guidelines on this issue in the finalized MEB policy.  The training is expected to be finalized and implemented during the next Monitoring Period.

*Body-Worn Camera Training*

In connection with the development of the draft body-worn camera policy, as described in more detail in the Video Surveillance section of this report, the Department developed a one hour and 45-minute Body-Worn Camera lesson plan. The Monitoring Team reviewed drafts of the lesson plan, and encouraged the developers to include opportunities to apply the core concepts to videotaped demonstrations. The Department reports that the lesson plan developers are incorporating these recommendations, including ensuring that Staff can live-record during class exercises, and then have the opportunity to play back those recordings in class.  The training will be finalized and deployed in the next Monitoring Period.

The Monitoring Team's compliance assessment is outlined below.

| XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING) |
| --- |
| ¶1. Within 120 days[57] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor. |
|     a.    Use of Force Policy Training: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below. |
|         i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy. |
|             1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors. |
|             2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members. |
|         ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter. |

---

[57] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**: The Use of Force Policy **Recruit** lesson plan, Use of Force Policy **In-Service** lesson plan, and Use of Force Policy for **Supervisors** lesson plan have all been developed and are being delivered to Staff.

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - The Use of Force Policy Recruit lesson plan is incorporated in the mandatory Pre-Service training.
    - The 900 recruits who graduated in the May 2017 class received the training.
  - 74 out of 79 Captains received the Use of Force Policy training for Supervisors as part of the Pre-Promotional Training program offered this Monitoring Period.

- **Deployment of Training (In-Service)**:
  - S.T.A.R.T.
    - All active[58] In-Service Staff will receive S.T.A.R.T., which includes the Use of Force Policy In-Service training by September 2017.
    - A total of 5,353 Staff have received S.T.A.R.T. training since it was initially deployed in 2016.
      - 2,700 Staff received S.T.A.R.T. during this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department continues to deliver the New Use of Force Policy Lesson Plan for In-Service Staff (8-hour training) and for recruits (12-hour training), both of which have been approved by the Monitoring Team.

*Observation*

During this Monitoring Period, the Monitoring Team observed the In-Service Use of Force Policy training provided to Officers, and separately as provided to Deputy Wardens, Wardens, and Chiefs, and observed a Use of Force Policy- Report Writing Overview course provided to Recruits.

- *Use of Force Policy Training*

The Monitoring Team found that instructors continued to adhere to the lesson plan and delivered the material completely and appropriately, as had been observed in prior Monitoring Periods. The instructors also facilitated student interactions whenever possible in order to reinforce key points. This is an effective technique because when students hear their peers advocating or supporting the New

---

[58] The Department has identified approximately 890 Staff who are unavailable for this training due to being on medical modified duty, modified duty, indefinite sick leave, or terminal leave. The Department reports that if/when these Staff return to full duty status, the Department will ensure that they receive S.T.A.R.T. training.

Directive, it serves to advance the reforms and improves the likelihood that other Staff members will understand the purpose behind some of the requirements of the New Directive.

The In-Service Use of Force Policy Training provided to Deputy Wardens and Wardens (separately) was a unique opportunity for the Monitoring Team to observe first-hand the uniformed leadership's understanding of the New Directive. The group of uniform leadership receiving this training was engaged, and the course was dynamic. Supervisors actively participated and asked many thoughtful and insightful questions. This exchange with instructors will be very valuable to the Training Academy staff and Department as they finalize the implementation plan for the New Directive to ensure uniformed leadership have consistent and correct understanding of the policy to support the Staff in their Facilities.

- *Use of Force Policy- Report Writing Overview*

To reinforce the students' report writing skills, the Academy provides an additional course on this topic. The overview course takes place after a company has completed the two-day Use of Force Policy training and is usually a two-period course. The course focuses on scenario-based report writing exercises, where the students go through the different types of Use of Force reports in detail and prepare a sample report based on a hypothetical scenario. The Monitoring Team observed this training during this Monitoring Period, finding the content to be consistent with the general Use of Force Policy curriculum provided to recruits and the training materials to be of practical use.

*Refresher Training*

During this Monitoring Period, the Monitoring Team began to discuss the content and provision of the S.T.A.R.T. Refresher Training with the Department and Training Academy Staff. This lesson plan will be finalized during the next Monitoring Period and provided to Staff at the conclusion of the initial S.T.A.R.T. training.

| **COMPLIANCE RATING** | **¶ 1(a).** Substantial Compliance<br>**¶ 1(a)(i).** Substantial Compliance<br>**¶ 1(a)(i)(1) & (2).** Partial Compliance<br>**¶ 1(a)(ii).** Requirement has not come due |
| --- | --- |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶ 1. Within 120 days[59] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.   <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use

---

[59] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include initial training for new Staff Members ("Initial Crisis Intervention Training"), in-service training for current Staff Members ("In-Service Crisis Intervention Training"), and refresher training ("Refresher Crisis Intervention Training"), as set forth below.

i.   The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

ii.  The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date.

iii. The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Development of Lesson Plan**: The Department developed the Crisis Intervention and Conflict Resolution for In-Service and Recruits during the First Monitoring Period, as discussed in the First Monitor's Report.

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - The 900 recruits who graduated in May 2017 received the 24-Hour Crisis Intervention and Conflict Resolution Training at the Academy.
  - 77 out of 79 Captains received the 24-Hour Crisis Intervention and Conflict Resolution training as part of the Pre-Promotional Training program offered this Monitoring Period.

- **Deployment of Training (In-Service)**:
  - The Department will deploy Crisis Intervention and Conflict Resolution training to all In-Service Staff once the initial S.T.A.R.T. In-Service training is completed.
    - Training for all Staff will be bundled to include three days of Crisis Intervention and Conflict Resolution training and two half-days of Use of Force Policy and Defensive Tactics Refresher training. The deployment of this training bundle is expected to take the same length of time it took to deploy S.T.A.R.T.

## ANALYSIS OF COMPLIANCE

The Department continues to successfully meet the expectations of the Consent Judgment by providing Crisis Intervention and Conflict Resolution training to all recruit classes. The Department will develop the roll-out plan for providing this training to In-Service Staff in the next Monitoring Period, to commence after the completion of S.T.A.R.T.

*Observation*

This Monitoring Period, the Monitoring Team observed the Crisis Intervention and Conflict Resolution Overview course provided to recruits. This overview course is a condensed re-cap of the full 24-hour curriculum that is designed to reinforce the content of the full course to help the recruits prepare for their examinations.

The content of the overview was consistent with the approved lesson plan materials, and the Monitoring Team was impressed by the instructor's delivery. The instructor emphatically endorsed the materials using his on-the-job experiences and successes. The lesson plan is lecture-based and it kept the class engaged and involved.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance <br><br> **¶ 1(b)(i).** Substantial Compliance <br><br> **¶ 1(b)(ii).** Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due. <br><br> **¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶ 1. Within 120 days[60] of the Effective Date, the Department shall work with the Monitor to develop new training programs in the areas set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[61] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Development of Lesson Plan**: The Department finalized the Facility Emergency Response training (formerly known as Probe Team Training) curriculum during the Second Monitoring Period, consulting with the Monitoring Team as required, and is now offering the approved training in mandatory Pre-Service and Pre-Promotional Training.

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - The 900 recruits who graduated in May 2017 received the eight-hour Facility Emergency Response training at the Academy.

---

[60] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[61] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

o   78 out of 79 Captains received the eight-hour Facility Emergency Response training program offered this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The lesson plan provides Probe Team Staff with the necessary guidance to resolve use of force incidents in a manner that maximizes inmate and Staff safety. The Department has included this curriculum in the mandatory Pre-Service training for all recruits, and in Pre-Promotional Training. During the next Monitoring Period, the Department will begin to rollout the Facility Emergency Response Training to all Staff with awarded steady posts in Intake, with a deadline to train all such Staff by December 31, 2017. The Department and Monitoring Team will then evaluate whether the training should be provided to any additional Staff.

| COMPLIANCE RATING | ¶ 1(c). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[62] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

a.  Defensive Tactics Training: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

i.  The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

ii.  The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

• **Lesson Plan Deployment**:

o   The 24-hour **In-Service** and **Recruit** Defensive Tactics training lesson plans have been developed and are currently in use.

o   During this Monitoring Period, the Department finalized, and Monitoring Team approved, a Defensive Tactics lesson plan for **Senior Management**. This lesson plan focuses on the skills and understanding of the Defensive Tactics techniques that Deputy

---

[62] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

Wardens, Wardens, and Chiefs should have in order to use the techniques if necessary and/or to assess use of force incidents after the event.

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - ○ The Defensive Tactics training is incorporated in the mandatory Pre-Service Training.
    - ▪ The 900 recruits who graduated in the May 2017 class received the training.
  - ○ 73 out of 79 Captains received the Defensive Tactics training for Supervisors as part of the Pre-Promotional Training program offered this Monitoring Period.

- **Deployment of Training (In-Service)**:
  - ○ S.T.A.R.T.
    - ▪ *See* ¶1(a) above regarding In-Service S.T.A.R.T. training for Officers.
    - ▪ The Department also provided Defensive Tactics for Senior Management to 42 Chiefs, Wardens, Deputy-Wardens-in-Charge, and Deputy Wardens this Monitoring Period.

ANALYSIS OF COMPLIANCE

The Department continues to deploy the three day Defensive Tactics training to recruits and In-Service Staff. Although not required by the Consent Judgment, the Department chose on its own initiative to provide the three-day Defensive Tactics Training course to all Staff. The Monitoring Team continues to applaud the Department's commitment to provide this training program to all Staff.

*Lesson Plan Development*

 The Department continues to deliver the 24-hour Defensive Tactics training to In-Service Staff and Recruits. The lesson plan was approved by the Monitoring Team during the First Monitoring Period.

During this Monitoring Period, the Training Academy finalized a new Defensive Tactics training for **Senior Management** (Deputy Wardens and Wardens), with input from the Monitoring Team.

*Observation*

During this Monitoring Period, the Monitoring Team observed Senior Management Defensive Tactics training provided to Deputy Wardens and then separately to a class of Wardens and Chiefs. The Chiefs, Wardens and Deputy Wardens were instructed by a group of Defensive Tactics Instructors, all of whom effectively delivered the tactics and incorporated the New Directive in their instruction. The Chiefs and Wardens in attendance were actively engaged, and satisfactorily completed the physical warm up and the technique performance portions of the class. They were also very involved in seeking clarification regarding use of force descriptions, justifications, and affirmation of authorization to use the trained techniques. The Deputy Wardens were similarly engaged with the instructors,

pressed them for clarification when necessary, and the instructors effectively reinforced the principals of the New Directive.

*Refresher Training*

During this Monitoring Period, the Monitoring Team began to discuss the content and provision of the S.T.A.R.T. Refresher Training (which includes Defensive Tactics) with the Department and Training Academy Staff. This will be developed and finalized during the next Monitoring Period and provided to Staff at the conclusion of the initial S.T.A.R.T. training.

| COMPLIANCE RATING | ¶ 2(a)(i). Substantial Compliance<br>¶ 2(a)(ii). Requirement has not come due |
|---|---|

## XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[63] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.    <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[64] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plan**: The eight-hour Cell Extraction Team training curriculum has been developed and is actively in use.

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - The 900 recruits who graduated in May 2017 received the eight-hour Cell Extraction Team training at the Academy.

  - 76 out of 79 Captains received the eight-hour Cell Extraction Team training program offered this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Cell Extraction Team training curriculum was approved during the First Monitoring Period. It is eight hours, which far exceeds the four-hour lesson plan requirement of the Consent Judgment, and demonstrates the Department's overall commitment to ensuring Staff have the necessary skills to fulfill their duties. The Department has included this curriculum in the mandatory Pre-Service training for all recruits, and in Pre-Promotional Training. During the next Monitoring Period the Department will begin to rollout the Cell Extraction Training to all Staff with awarded steady posts in special units

---

[63] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[64] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

with Cell Housing, with the deadline to train all such Staff by December 31, 2017. The Department and Monitoring Team will then evaluate whether the training should be provided to any additional Staff.

| COMPLIANCE RATING | ¶ 2(b). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(c)(i) (ID INVESTIGATOR TRAINING)

¶ 2. Within 120 days[65] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs, as needed, for the topics set forth in subparagraphs (a) - (c) below. These training programs shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Development of Lesson Plan**: As discussed in the First Monitor's Report, the Department has a comprehensive 40-hour training program for ID investigators.
  - This 40-hour training was updated during the Second Monitoring Period to include a new module regarding the PREA and additional evidence collection requirements. The training also now incorporates additional shadowing opportunities with current investigators.
- All ID new-hires must complete this 40-hour training before they may be assigned any cases to investigate.
- The Department sent 30 ID Investigators to FBI Interview and Interrogation training.
- **Deployment of Training**:
  - All 28 investigators who started working at ID this Monitoring Period were provided the 40-hour training during the Fourth Monitoring Period.

### ANALYSIS OF COMPLIANCE

The Department's ID Investigator lesson plan continues to meet the requirements of this provision, and the additional training opportunities available to Staff during this Monitoring Period supplement the acquisition of skills needed to conduct high-quality investigations. The Monitoring

---

[65] This date includes extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

Team was encouraged by the Department's efforts to obtain additional training opportunities for ID investigators, including training with the FBI.

*Observation*

As the Department works to improve the quality of ID Investigations, as discussed further in the Use of Force Investigations section of this report, the Department plans to develop additional In-Service training for Investigators focused on enhancing their case review techniques. The Monitoring Team will review the content of this training to ensure that it adheres to the standards of the Consent Judgment and addresses the noted deficiencies in ID Investigation Reports, as described in detail in the Third Monitor's Report (at pgs. 124-128 and 144-151).

*Facility Investigator Training* (¶ 2(c)(ii))

As discussed in more detail in the Use of Force Investigations section of the Monitor's Report, in the analysis of ¶ 13, the development and rollout of the Facility Investigator Training is being considered in connection with a comprehensive plan to improve Facility Investigations and is expected to be completed by the end of the next Monitoring Period.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall include initial training (the "Initial Young Inmate Management Training") and refresher training (the "Refresher Young Inmate Management Training"), as set forth below.

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plans**: As discussed in the First Monitor's Report, the Department implemented the 24-hour SCM training prior to the Effective Date and has continued to deploy the training.

    o The Monitoring Team approved the SCM eight-hour refresher training curriculum, and the Department began deploying the refresher training at the beginning of this Monitoring Period.

- The SCM training is incorporated in the mandatory Pre-Service training and provided as In-Service training.

- **Deployment of Initial Training**:

    o As of June 30, 2017, 4,770 Staff have received SCM training.

        ▪ First Monitoring Period: 1,552 Staff were trained.

        ▪ Second Monitoring Period: 1,219 Staff were trained.

        ▪ Third Monitoring Period: 1,240 Staff were trained.

        ▪ Fourth Monitoring Period: 1,159 Staff were trained.

    o Provision of training to Staff required to receive SCM training:

        ▪ The Department has chosen to provide SCM Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates are housed. As of the end of the Fourth Monitoring Period, 84% of Staff assigned to RNDC and 93% of Staff assigned to GMDC had received SCM Training.

| Facility | Total Staff Assigned to Facility as of June 30, 2017 | Staff Trained in SCM as of June 30, 2017 | Received Pre-Service SCM Training | Received In-Service or Pre-Promotional SCM Training |
|---|---|---|---|---|
| **RNDC** | 825 | 696 (84%) | 273 (33%) | 423 (51%)[66] |
| **GMDC** | 889 | 824 (93%) | 439 (49%) | 384 (43%)[67] |

        ▪ The Department also must provide the training to Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. As outlined in the chart below, 16-, 17-, and 18-year-old inmates are also housed in GRVC

---

[66] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service Training.
[67] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service Training.

(18-year-old male inmates in Secure), RMSC (16-, 17- and 18-year-old female inmates), and OBCC (18-year-old male inmates in YA ESH).

| Facility or Housing Area | Total Staff Regularly Assigned as of June 30, 2017[68] | Staff Trained in SCM |
|---|---|---|
| GRVC (Secure Unit) | 28 | 28 (100%) |
| RMSC (Housing Areas with 16-, 17-, and 18-year-old Female Inmates) | 11 | 10 (91%) |
| OBCC (Young Adult Enhanced Supervision Unit) | 8 | 5 (63%) |

- The Department is working to provide that the remainder of Staff required to get SCM training (65 at GMDC, 129 at RNDC, three at OBCC, and one at RMSC) are in fact trained.

- **Deployment of Refresher Training**:
  - The Department provided SCM Refresher Training to 978 Staff this Monitoring Period.

ANALYSIS OF COMPLIANCE

As outlined above, the Department continued to deploy Recruit and In-Service SCM Training during the Fourth Monitoring Period, and began to deploy SCM Refresher Training to In-Service Staff. As described in the First Monitor's Report (at pgs. 52-53), this training, combined with other trainings provided to Staff who work with Young Inmates, meets the content requirements of this provision.

*Observation*

As described in detail in the Third Monitor's Report (at pgs. 89-90), the Monitoring Team observed In-Service SCM training and provided some feedback regarding the Department's ability to implement three specific SCM tools: (1) Emergency Safety Interventions; (2) Behavior Support Plans; and (3) Post-Incident De-Briefing Process.

- *Emergency Safety Interventions*

The Monitoring Team had expressed concerns that training Staff in two different physical restraint techniques (SCM's Emergency Safety Interventions and Defensive Tactics) may be confusing for Staff, even though the tactics are not mutually exclusive. While observing SCM training, the Monitoring Team noticed little endorsement of the use of SCM's Emergency Safety Interventions and

---

[68] Staff "regularly assigned" to Young Inmate Housing Areas is not defined in the Consent Judgment and the Department does not currently have a status of "regularly assigned" Staff. The Department and the Monitoring Team determined that for this Monitoring Period that "regularly assigned" would be measured by an official steady post (for OBCC's Young Adult Enhanced Supervision Unit), or those Staff, who while not awarded an official steady post, were assigned to the Young Inmate housing units consistently for each tour they worked. The Department and Monitoring Team agreed that during the next Monitoring Period, the best strategy for identifying "regularly assigned" Staff would be identified.

little confidence demonstrated by either the instructors or the students that these techniques would be useful for the Staff working at DOC. The Monitoring Team also expressed concerns that the physical techniques being taught in a small classroom setting, and not a gym setting, posed challenges for safe instruction of the techniques. The Monitoring Team recommended that the Department's Defensive Tactics instructors be utilized as a resource for instruction of the SCM physical techniques. Following this recommendation, the Department's Defensive Tactics instructors are working with the SCM instructors to improve the instruction of the SCM physical skills (including exploring whether incident videos can be utilized to enhance the training), and began using larger classrooms to address the classroom setting issue.

- ***Behavior Support Plans ("BSPs") and Post-Incident Debriefing Process***

The delivery of the SCM training only provides minimal guidance to the process of creating and implementing BSPs, and does not have sufficient detail or depth regarding Post-Incident Debriefing Process. Currently, BSPs are only being utilized for youth on Specialized Housing Units, and the BSPs being used do not conform to the guidance provided by SCM. SCM debriefing procedures include asking Staff critical questions in the assessment of their own performance, and the performance of their peers, and asks inmates to reflect on what triggered the incident and how they might respond differently in the future. The Department does not currently have plans to expand the BSPs to all youth, and while some processes already in place at the Department act in some capacity as Post-Incident Debriefing for inmates, there is virtually no implementation of the procedures as envisioned by the SCM curriculum for Staff. There has been no substantive improvement in these areas during the Fourth Monitoring Period, and the failure to implement these tools inhibits the Department's ability to implement the tools of SCM. The Monitoring Team will continue to encourage the Department to improve the implementation of the SCM curriculum in these areas moving forward.

*Attendance Verification*

The Department has deployed SCM training to a total of 4,770 Staff, well beyond the requirements in the Consent Judgment (this total includes Staff who are not assigned to work in Young Inmate Housing Areas, i.e., recruits who ultimately get assigned elsewhere). The majority of the Staff who received the SCM training work in GMDC, OBCC, RMSC, and RNDC, which are the three Facilities that house the largest number of Young Inmates.

The Department and the Monitoring Team continue to utilize definition of Staff "regular assignment" as described in the Third Monitor's Report (at pgs. 90-91). Based on the chart above, almost all Staff in these categories were provided SCM training as required. The Monitoring Team will continue to work with the Department to ensure that an appropriate number and balance of probationary and veteran Staff are consistently assigned to Young Adult Housing Areas as required by Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 13- 17.

The Monitoring Team reviewed the Department's comparative analysis of reports generated from the Training Academy's e-scheduling system and the lists obtained from the Chief of Administration's Office that showed all Staff assigned to GMDC and RNDC as of June 30, 2017, and those Staff with either official steady posts or who were consistently assigned to Young Inmate Housing Areas at RMSC, OBCC and GRVC, which generated the data in the chart above. The Department is in Substantial Compliance with the requirement to deploy SCM training, as a significant majority of Staff assigned to GMDC and RNDC have received the training, well beyond the requirement to provide the training just to those Staff who are "regularly assigned to Young-Inmate Housing Areas" as required by the Consent Judgment. The Monitoring Team recommended that the Department ensure that the Uniform Leadership at Facilities housing Young Adults also receive SCM Training as the Department finalizes the rollout of the In-Service Training.

_SCM Refresher Training_

The Department rolled out the Monitor-approved SCM Refresher Training curriculum during this Monitoring Period, and trained 978 Staff. Going forward, to assess the Department's compliance with ¶ 3(b), the Monitoring Team will verify the specific Staff required to get SCM Refresher based on when they received the initial training.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br>¶ **3(a).** Substantial Compliance<br>¶ **3(b).** (Development of Refresher Lesson Plan) Substantial Compliance<br>¶ **3(b).** (Deployment of Refresher Training) Not Yet Rated |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[69] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.    The Direct Supervision Training shall be a minimum of 32 hours.

    b.    By April 30, 2018,[70] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Development of Lesson Plan**: The Department finalized the 32-hour Direct Supervision Lesson Plan during the Fourth Monitoring Period, and began providing that training to recruits and In-Service Staff.

---

[69] This date includes the extension that was granted by the Court on January 6, 2016 (_see_ Docket Entry 266).

[70] This is the extension granted by the Court on April 4, 2017 (_see_ Docket Entry 297).

- **Deployment of Training (Pre-Service and Pre-Promotional)**:
  - The 900 recruits who graduated in May 2017 received the finalized 32-hour Direct Supervision training at the Academy.
  - 75 out of 79 Captains received the 32-hour Direct Supervision training program offered this Monitoring Period.

- **Deployment of In-Service Training**:
  - The Department will provide Direct Supervision training:
    - The Department will provide Direct Supervision Training to the same group of Staff that received SCM Training, as described above.
    - During the Fourth Monitoring Period, the Department provided the training to 60 In-Service Staff.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service and recruits meets the requirements of the Consent Judgment. Although not required by the Consent Judgment, the Department is providing this training to a much larger group of Staff than is required to receive it (including by incorporating the training in the mandatory Pre-Service training). The Department started to deploy the In-Service training at the end of the Monitoring Period and the Monitoring Team will closely scrutinize the deployment of the training to ensure the Department remains on track to provide the training by April 30, 2018.

*Observation*

The Monitoring Team observed a portion of the Direct Supervision training as it was delivered to the recruit class. The Monitoring Team found the instructors did an excellent job naturally teaching the curriculum, tying it seamlessly to their own experiences within the Department. This made the curriculum very practical for the recruits.

The training was engaging, particularly because the recruits had already participated in their on-the-job training ("OJT") prior to the Direct Supervision Training. The instructors engaged the recruits using their own observations from OJT and intertwining them with the instructors' own experiences to highlight Direct Supervision principals. The instructors also felt that the recruits OJT experiences enhanced the quality of the Direct Supervision Training. The Monitoring Team encouraged the Department to schedule the delivery of Direct Supervision Training for recruits after OJT, if feasible. The Department reports it will make best efforts to continue this model.

| **COMPLIANCE RATING** | **¶ 4 (a)-(b).** Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

    e.    There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Development of Lesson Plan**:
  - The Department's "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 was issued on September 29, 2016 and incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).
  - This Monitoring Period, the Department finalized the Handheld Camera Training Lesson Plan with input and ultimate approval of the Monitoring Team.
  - The Department also incorporated guidance on handheld camera operation in the Facility Emergency Response (Probe Team) Training materials.
  - The Department developed a training and lesson plan to advise Staff on how to save and upload handheld video to the Department's main computer system.

- **Deployment of Training**:
  - Handheld Camera Training is included in mandatory Pre-Service Training beginning with the class that matriculated in June 2017.
  - The Department provided ad hoc training to Staff on how to save and upload handheld video.
  - The Department also provided the training for handheld video to representatives from each Facility who upload and save handheld video.

**ANALYSIS OF COMPLIANCE**

    The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section, because it is more aptly considered along with the Department's other training programs. This Monitoring Period, the Department and the Monitoring Team worked together to finalize the Handheld Camera Lesson Plan, which included both written feedback and an in-person meeting between the Monitoring Team and lesson plan developers. The initial draft of the lesson plan was weighted toward knowledge of the Handheld Camera Directive, and basic camera familiarization, with very little of the material dedicated to developing the skill set necessary to produce an acceptable recording of a live event. The Monitoring Team recommended that the training be approached as if it were one of the modules of a Defensive Tactics lesson plan.  In other words, the instructors want to have the students with a camera in their hands as much as possible, practicing and critiquing their

recordings of simulated events, creating the same type of scenarios that the Staff would encounter during the performance of their duties.

The Department revised the lesson plan so that the finalized version aims to produce students who not only understand the directive, but have a satisfactory level of proficiency at recording live events with recordings that are clear, capture the best and widest view of the scene, and provide good documentation of the actions of Staff and the inmate(s).  The Department will work with the Monitoring Team in the next Monitoring Period to develop a plan to provide this training to ensure every Facility has trained operators on every tour and in ESU.

*Training on Uploading Handheld Video*

This Monitoring Period, the Nunez Compliance Unit began provided training to Staff on how to properly upload video, in conjunction with other efforts to improve the availability of video footage. The Monitoring Team found the training program developed and provided by the Office of Bureau Chief of Facilities was excellent.  The training is interactive and includes hands on practice and simulations to teach Staff how to upload, file and name videos.

| COMPLIANCE RATING | ¶ 2(e). Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.      Such re-training must be completed within 60 days of the determination of the violation.
    b.      The completion of such re-training shall be documented in the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department began tracking all re-training provided to Staff in an excel spreadsheet.

- The Academy uses the spreadsheet to document who is required to receive re-training, the type of training needed, the corresponding use of force incident that resulted in the need for re-training, and the date the required training is provided to the Staff member.

### ANALYSIS OF COMPLIANCE

The Department and Monitoring Team worked together this Monitoring Period to begin the tracking and verification that Staff who have violated Department policies, procedures, rules, or directives relating to the use of force, receive the required re-training. Going forward, the Monitoring Team will receive monthly reports from the re-training excel tracker, and based on this information will assess whether those required to receive re-training under ¶ 5 are in fact receiving the required training. The Monitoring Team will need to determine if this excel tracking mechanism appropriately captures those who require training as per ¶ 5, and if so, whether those individuals are receiving the

requisite training in a timely manner. As the Monitoring Team has only begun to receive the documentation described above, a compliance assessment will not be made this Monitoring Period.

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to develop a sophisticated Learning Management System ("LMS") which will track all aspects (e.g., attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- During the development of LMS, the Department is utilizing interim solutions to certify attendance and examination results. For S.T.A.R.T., attendance is tracked using Training Tracking Software ("TTS") that the Department's IT Division developed in-house.

  - The Training Academy plans to expand the TTS to track attendance to all other In-service Trainings and is working with the IT Division to achieve this goal.

  - Currently for In-Service Training other than S.T.A.R.T. training, hand-written sign-in sheets are entered the Academy's electronic transcript generating system.

- For recruits, the interim solution for tracking attendance is the use of daily sign-in sheets, which are ultimately inputted to an electronic system to confirms that they attended all required trainings prior to graduation. Similar daily sign-in sheets are used for Pre-Promotional Staff.

  - The Training Academy expanded TTS to track attendance for all Recruit courses beginning with the Recruit class that matriculated in June 2017.

- Tablets are issued to all recruits during mandatory Pre-Service training and are used to take examinations for some *Nunez*-required content, while most other content is tested as part of the mid-term and final examinations.

### ANALYSIS OF COMPLIANCE

¶¶ 6 and 7 require that all Staff members who complete the *Nunez* required trainings must pass an examination at the conclusion of the training program (¶ 6), and that the Department must ensure

that all Staff certify attendance in the required training programs (¶ 7). This Monitoring Period, working with the Department, the Monitoring Team expanded its strategy for verifying examination and attendance records. The Monitoring Team now verifies examinations for In-Service S.T.A.R.T, In-Service SCM, all Recruit Training, and all *Nunez*-related Pre-Promotional Training, the results of which are described in more detail in § XIII, ¶ 6 and 7 below.

The Monitoring Team took steps to verify the Department's reported training data by reviewing sign-in sheets and training schedules. The Department uses different mechanisms to track Staff attendance at the various trainings, which therefore requires different monitoring strategies for each type of training (e.g.*,* Pre-Service Training, In-Service S.T.A.R.T., etc.). The Monitoring Team collaborated with the Nunez Compliance Unit to develop appropriate strategies to assess compliance with attendance and examination requirements, and to verify the underlying documentation. During this Monitoring Period, the Monitoring Team developed and worked with the Department to execute these strategies to assess attendance and examination records for: (1) S.T.A.R.T. (reviewing data from TTS and Scantron Examinations), (2) SCM Training (discussed in detail in the provision related to SCM Training, above), (3) all *Nunez* training provided to recruits, and (4) all *Nunez* training provided to students in the Pre-Promotional Class who were promoted during the Monitoring Period.

*Review of Examination Records* (¶ 6):

- ***Recruit Training Examinations***

The Department reviewed and summarized, and the Monitoring Team verified, the examination records for all *Nunez*-required trainings for two companies that graduated in May 2017. The outcome of this assessment identified exams that seem to be administered appropriately in some cases, but some potential issues were identified as described below:

- **Use of Force Policy Training**: Examination records for both companies demonstrated that all recruits passed the examination on their first try.

- **Defensive Tactics Training**: Examination records for both companies demonstrated that all recruits passed the evaluation on their first try.

- **Probe Team Training**: Examination records for both companies demonstrated that all recruits passed the evaluation, and all received the same scores. Considering the evaluation has multiple parts, with evaluation scores ranging from one to five on each part, the fact that all evaluation forms reviewed had the same score in every category for every recruit raises questions about the reliability of the evaluations.

- **Cell Extraction Team Training**: Examination records for both companies demonstrated that all recruits passed the evaluation, with differing scores on the multi-part evaluation forms ranging from three to five.

- **Crisis Intervention and Conflict Resolution Training**: Examination records for one company demonstrated that all recruits passed the exam on their first try. The other

company's records demonstrated that 12 out of 24 recruits in the Company did not pass the exam, and make-up exams were not administered.[71]

- **SCM Training:** The Academy has been unable to find any of the SCM evaluations for the two companies assessed due to the instructor having taught those courses being out on indefinite sick leave.

Based on the analysis above, there is room for improvement in the process, record keeping, and re-taking of examinations.

- *Pre-Promotional Training Examinations*

The Department conducted, and the Monitoring Team verified, an internal audit of all of the *Nunez*-required trainings' examination records for 10% of the Pre-Promotional Captains (8 students) who graduated this Monitoring Period. The Monitoring Team found the examination records for Use of Force Policy, Defensive Tactics, SCM, and Conflict Resolution and Crisis Intervention to be reliable,[72] and demonstrated that all students passed their examinations on the first try. However, this audit did bring to light that evaluation forms were not utilized for Probe Team or Cell Extraction Team Training for this Pre-Promotional class, a deficiency which the Department reports will be remedied (and monitored) going forward.

- *In-Service SCM Training Examinations*

The Department conducted, and the Monitoring Team verified and reviewed, an internal audit of the examination records for 10% (18 students) of Staff who received SCM training this Monitoring Period. Examination records were verified for 16 out of 18 Staff, but the Academy was unable to locate the examination records for two individuals.

- *S.T.A.R.T. Examinations and Attendance*

During this Monitoring Period, as was done in the Third Monitoring Period, the Department conducted, and the Monitoring Team verified, an identical internal assessment of the attendance and examination records for one four-day S.T.A.R.T. block in each month of the Fourth Monitoring Period to determine if such discrepancies remained after the causes were identified and attempted to be corrected. The audit results yielded some continued issues with the tracking of Defensive Tactics evaluations, but overall demonstrated that the vast majority of Staff who participated in each block of training attended all four days as required, and took and passed both the Use of Force Policy exam and passed the Defensive Tactics evaluation. The review also found:

- Those who failed the Use of Force Policy exam were required to re-take the exam.
- Those who did not attend the exam or were unable to pass the Defensive Tactics evaluation do not appear to have made-up that evaluation or remedied that failure.
- A handful of individuals who were not present for all three days of Defensive Tactics

---

[71] The Department has reported they are arranging to provide the refresher training in the next Monitoring Period.
[72] The Academy could not locate one examination record for one course for a single Captain, a negligible deviation from otherwise reliable records for these courses.

training were nonetheless still evaluated even though they should not have been.

The Department also explored the discrepancies identified during the Third Monitoring Period audit, including the discrepancy between the number of Staff who attended the trainings and those who had an examination result. For example, there were sometimes more examinations than attendees, or vice versa. The Department discovered a number of reasons for the discrepancies, including: some Staff who were "walk-ins" (not originally scheduled for the course) to the trainings whose attendance was never recorded but who took the exams; some Staff who did not attend all three days of the Defensive Tactics training so they did not count in the total attendance numbers, but nonetheless were evaluated; and in a couple of instances, Staff scanned in their IDs for a training in the wrong room, so they were counted as part of the attendance but did not take an examination. The Academy has been working closely, and communicating frequently, with the Defensive Tactics instructors in order to ensure that those individuals who were absent on any Defensive Tactic training day do not receive an examination, which addresses part of the issues identified, and are working to prevent the other minor errors that resulted in these discrepancies.

*Attendance Record Verification* (¶ 7):

- *Recruit Training Attendance*

As described in the Third Monitor's Report (pg. 96) recruits *must* attend each day of Academy Training unless a valid excuse is provided, and all missed classes must be made up before a recruit may graduate from the Academy. In order to verify that all recruits received all *Nunez*-required trainings, the Monitoring Team determined it was most efficient to verify attendance for a set period of days, rather than try to identify and assess attendance on the days the *Nunez* trainings were provided since the *Nunez* trainings are spread out over the course of the entire mandatory Pre-Service training. The Monitoring Team sampled the attendance records for two companies for a full month during Pre-Service Training and reviewed any make-up documentation for those recruits who missed their original courses. The analysis of this documentation demonstrated that only a handful of students missed required training. During the month audited, large parts of the company were absent due to a snow storm, so the entire company made up that training before graduation. For those companies whose records were assessed, in all but two instances, the Academy was able to demonstrate make-up documentation for trainees who missed classes. These were minor discrepancies in a largely well-documented system.

- *Pre-Promotional Captains Attendance*

The Department promoted and trained a Pre-Promotional class of 79 Captains this Monitoring Period. [73] The Monitoring Team conducted an assessment of all the sign-in sheets for the *Nunez*-required trainings provided to this class of Captains (Use of Force Policy training, Crisis Intervention

---

[73] Almost all of the newly promoted Captains that missed courses participated in make-up courses by the end of August 2017.  The rest are scheduled to receive the training in the next Monitoring Period.

and Conflict Resolution training, Facility Emergency Response training, Defensive Tactics training, Cell Extraction Team Training, Safe Crisis Management training, and Direct Supervision training). The Monitoring Team verified that all but a handful of the 79 Captains who graduated received all of the required *Nunez*-related trainings.

*Next Steps on Examination and Attendance Audits*

The Monitoring Team appreciates the work of the NCU in facilitating and collaborating on these audits, collecting and reviewing attendance and examination records from the Academy, and summarizing the internal findings as to the existence and veracity of the record keeping. As described above, the Monitoring Team found generally that examination and attendance records were available, and make-up classes were completed for those Staff who missed any required trainings. However, there were examples where Staff failed to make-up examinations that were not initially passed. Going forward, the Monitoring Team plans to work with the Department and Academy to generally to firm up the procedures for administering and storing attendance and examination records to ensure accurate and verifiable records.

*Centralized System to Maintain Training Records* (¶ 8):

The current tracking systems for examinations and attendance is a combination of hand-written and interim electronic tracking systems which, while verifiable, are difficult to use. A centralized electronic system will significantly improve the reliability of this information. As described in the Second Monitor's Report (at pgs. 46-47), the Department is continuing the procurement process for LMS, which will enable the Training Academy to schedule individuals for courses, track attendance, and record examination results.

The Department's procurement process for LMS was nearly complete by the end of this Monitoring Period, and the Department is finalizing the vendor selection and needs final approval from OMB. Throughout the Fourth Monitoring Period, the Department was working to complete the procurement process for LMS, reviewing vendor responses to the request for services, responding to several vendor questions, and ultimately participating in a presentation from the top vendor. The Department expects the project will begin in earnest in September 2017, and the project will require nine to 12-months to implement. The Department reports that it expects LMS will have broad capability beyond what is required by the Consent Judgment, and will provide an efficient means to:

- Manage and track both historical and current:
  - Curricula
  - Topics specific to each course
  - Course-to-certification mappings
- Schedule course sessions that account for:
  - Certification expiration dates of enrollee population
  - Instructor's certifications

o   Quantity of Staff who meet post-specific requirements
- Enroll all DOC Facilities/entities in courses as needed
- Provide timely, configurable cross-Facility reporting of course enrollments, course attendance, post-specific certification needs, and certifications tracking
- Deliver and track attendance of online courses

The Monitoring Team is encouraged both by the Department's efforts to move forward with LMS and the development and expansion of use of TTS as an interim solution for attendance tracking. Continued use of that system for all *Nunez*-required trainings will support the Department's efforts to achieve Substantial Compliance with these tracking provisions.

| COMPLIANCE RATING | ¶ 6. Partial Compliance<br>¶ 7. Partial Compliance<br>¶ 8. Partial Compliance |
|---|---|

## 4.   ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all use of force incidents are properly reported, without fear of retaliation, and can be investigated.  The Department established an anonymous hotline in March 2016.

The Monitoring Team's assessment of compliance is outlined below.

| VI. ANONYMOUS REPORTING ¶ 1 |
|---|
| ¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br><br>• Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect.<br><br>• The finalized Division Order requires ID to initiate a preliminary investigation within three business days after receiving an anonymous report. |

- The Department has posted the hotline telephone number in all Facilities and areas that are accessible to uniformed and civilian Staff.
  - 250 additional posters were ordered and placed in high-traffic areas (the Staff lounge (KK), administrative corridor, and main entrance) throughout the Facilities, 45 of these were mounted and drilled behind lexan (polycarbonate) to prevent damage and vandalism.
- Posters routinely appear electronically on the intranet and will continue to appear on DOC TV.
  - In May 2017, the Department increased the frequency with which the Anonymous Reporting System slide is advertised on the Department's intranet homepage and on DOC TV. The slide will be re-posted on the intranet homepage every six months and will remain for one month each time. Moreover, the slide will now be continuously posted on DOC TV.
- The Department developed a process for ID staff to check the Facilities every 6 months to ensure the posters advertising the hotline are in good condition and that they are advertised in high-traffic locations and to recommend re-posting if necessary.
- The hotline received a total of 21 calls from January 2017 to June 2017. One of these calls was related to a use of force incident.

ANALYSIS OF COMPLIANCE

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision as described in the Third Monitor's Reports (pgs. 98-99). During this Monitoring Period, the Department developed and implemented a campaign to further advertise the Anonymous Hotline to Staff and created a process to ensure the Hotline is advertised on a routine basis. The Monitoring Team visually confirmed the placement of the posters advertising the hotline in high-traffic areas throughout the Facilities while conducting site visits.

The Monitoring Team reviewed the Screening Intake Forms for the 21 calls to the hotline, and confirmed that only one was use of force related. The Monitoring Team reviewed the anonymous report for this call and confirmed a timely Preliminary Review was initiated for the reported allegation.

The total numbers of calls the Hotline received in the Fourth Monitoring Period was the highest to date. Of the 21 total calls, 19 were received during May and June, following the distribution and posting of new posters to the Facilities. Though the hotline only received one call pertaining to use of force, this is not the only avenue for reporting use of force concerns. Violations may be reported through a call 311, notify ID directly, contact lawyers or the Legal Aid Society, or report concerns up the chain of command in the Facilities. As described in more detail in the Use of

Force Reporting section, the Department has received a steady stream of allegations since the Effective Date.  The Department believes the increase in reporting is due in part to ID's increased presence in Facilities and to the overall awareness of the increased scrutiny on use of force incidents under *Nunez*.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

### 5.   VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) handheld cameras; and (3) body-worn cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f))[74]; and preserve video from all sources for at least 90 days (¶ 4).

The Department has made significant strides towards the installation of a sufficient number of stationary, wall-mounted surveillance cameras to ensure "Complete Camera Coverage"[75] of all areas of all Facilities by February 28, 2018 (¶ 1 (c)). As of June 30, 2017, the

---

[74] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this Report.

[75] "The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera coverage of the ingress and egress of such areas). "Complete Camera Coverage" shall not include small, isolated

Department reports it has installed 7,921 new wall-mounted cameras (1,350 as of the end of the First Monitoring Period, 1,465 during the Second Monitoring Period, 3,866 during the Third Monitoring Period and 1,240 during the Fourth Monitoring Period).[76] The Monitoring Team remains encouraged by the Department's efforts to install video surveillance cameras, particularly the substantial efforts of the Department's Radio Shop to achieve this goal by installing and maintaining wall-mounted cameras. Radio Shop staff have demonstrated a genuine commitment to this effort and have remained open to the Monitoring Team's suggestions to ensure Complete Camera Coverage in the Facilities. Their responsiveness and dedication to this project has been crucial to the Department's progress towards satisfying the requirements of the Consent Judgment. The Department remains on track to achieve Complete Camera Coverage in all the Facilities by February 28, 2018.

The availability of video footage of incidents has increased significantly.  However, the Department continues to struggle to produce handheld video footage of use of force incidents, as described in the Second and Third Monitor's Reports (at pgs. 72-74 and pgs. 110-112, respectively). Even with increased video footage from stationary cameras, the footage from handheld cameras is critical because the camera can be brought close to the scene and can capture audio, neither of which are possible with stationary wall-mounted cameras.[77] The Department's efforts to address these deficiencies are addressed in more detail in the discussion below.

---

blind spots caused by technological and/or mechanical limitations or the design of interior spaces." Consent Judgment § III (Definitions), ¶ 8.

[76] In some of the Facilities where third-party contractors installed cameras, although the contractors have completed the initial installation, post-installation work remains before the Department can actually use the cameras. In assessing camera coverage, the Monitoring Team's evaluates that the cameras are both installed and online.

[77] This is particularly crucial in places where wall-mounted cameras are not yet fully installed. During this Monitoring Period, the Department tracked use of force incidents where handheld video was required and whether the video was uploaded.

_Body-Worn Camera Pilot_

The Department continued to prepare for the body-worn camera pilot program.[78] The use of body-worn cameras is unique in a correctional setting, and thus initiating the pilot requires the Department to wade through complex preliminary issues. The Department procured the necessary mounting devices and docking stations for the cameras. The roll-out plan includes a messaging strategy, Staff surveys regarding their expectations of the impact of the body-worn cameras, and training on the use of the body-worn cameras (as discussed in more detail in the Training section of this Report). The Department also continued to meet with representatives from the ADW-DW, Captains', and Correction Officers' unions regarding the logistics of the pilot, the draft policy, and other questions and concerns. Finally, the Department met with the City Law Department, the City's Officer of Labor Relations, and internal stakeholders to discuss the pilot's implementation. The Monitoring Team will work closely with the Department during the next Monitoring Period on the roll-out and assessment of the body-worn camera pilot.

_Ongoing Recommendation_

As noted in the first three Monitor's Reports, the Department's ability to supervise and instruct Staff, manage and monitor inmates, and conduct investigations is significantly enhanced by the installation of additional cameras as described in the First Monitor's Report (at pg. 60), the Second Monitor's Report (at pgs. 67-68), and the Third Monitor's Report (at pgs. 103-104). Joint discussions about videotaped footage has greatly enhanced the quality and precision of conversations between the Monitoring Team and DOC Staff regarding the Department's use of force and trends that raise concern. The ability to dissect the incidents captured on tape

---

[78] The Court granted an extension to commence this pilot on October 10, 2017 (_see_ Docket Entry 303).

encourages substantive dialogue about the situations Staff face, and the range of possible options and responses to those situations.

As described in more detail in the First Monitor's Report, the Monitoring Team continues to encourage the Department to utilize footage of use of force incidents as an educational and training tool during weekly Staff meetings to both reinforce good practices and to refine Staff's understanding of unacceptable behavior.  Further, the Monitoring Team continues to encourage the Department to utilize the monitoring devices in the control rooms (and other common spaces where cameras are monitored) to view live feeds of video footage to support Staff's proactive efforts to de-escalate conflicts where the use of force could otherwise become necessary. The Monitoring Team is encouraged by the efforts of the Adolescent Response Team at RNDC and the Crisis Intervention Team at AMKC to intervene proactively; it is likely that the use of real-time video would further assist their efforts. During this Monitoring Period, the Department initiated real-time monitoring of the ESH units with a dedicated control room and Staff specifically assigned to identify and detect potential violence, and communicating the concerns to the Staff on the unit.

The Monitoring Team's assessment of compliance is outlined below.

## IX. VIDEO SURVEILLANCE ¶ 1(a) (b) & (c) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the

|  | installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [. . . in three waves as enumerated in ¶¶ (1) to (4)]. |
| d. | Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time. |
| e. | The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of June 30, 2017, the Department has installed 7,921 new wall-mounted surveillance cameras throughout the Facilities.

  - During this Monitoring Period, 1,240 cameras were installed. Due to a lack of IT storage space, 1,075 of those cameras were not initially brought online. Additional storage space was procured by the Department in June 2017, and IT commenced bringing the additional cameras online.

- The Department reports that installation of stationary, wall-mounted surveillance cameras is complete in all housing units in all Facilities.

- The Department reports that installation of stationary, wall-mounted surveillance cameras in ancillary areas across Facilities is between 30% and 98% complete.

- The Department invited the Monitoring Team and Parties to the *Nunez* Litigation to participate in its internal Camera Working Group Meetings.

**ANALYSIS OF COMPLIANCE**

The Department has been engaged in a massive effort to install video surveillance cameras through (1) "fast-track" installation by the Department's Radio Shop Staff in all housing and ancillary areas at RNDC, GRVC, GMDC, OBCC, and AMKC; and (2) capital engineering installation by third-party contractors at RMSC, VCBC, MDC, EMTC, NIC, and BKDC.

*Installation of stationary, wall-mounted cameras (¶ 1 (a)) to ensure Complete Camera Coverage (¶ 1 (c))*

The Monitoring Team addresses the provisions of ¶ 1 (a) and (c) 1 together given the requirements to install additional cameras and ensure Complete Camera Coverage are intertwined.  In order to assess compliance with this provision, the Monitoring Team observed the physical placement of cameras in the Facilities during multiple video surveillance tours and review of live feeds of the video on the Genetec system.

During this Monitoring Period, the Monitoring Team conducted video surveillance tours at AMKC, EMTC, MDC, RMSC, and VCBC. The tours covered housing units and ancillary areas, including food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways, and stairways.  A substantial number of cameras had been installed in the housing units and most of the ancillary areas of these Facilities. The Monitoring Team identified a small number of locations within the Facilities that still require camera coverage. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

Given that the installation of cameras throughout the Facilities has occurred across multiple Monitoring Periods, the chart below illustrates the current installation status of each Facility.

**Status of Installation**

| Facility[79] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations | Reference to Prior Monitor Report Findings |
|---|---|---|---|---|---|
| GMDC | Substantially Complete | Substantially Complete | Yes (Entire Facility) | Not yet addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure Unit Only) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes (Partial; Facility houses male adolescents) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Partially Complete | Yes (CAPs and PACE units may house 18-year-olds) | Not yet addressed | Second Report (pg. 66) |
| EMTC | Substantially Complete | Partially Complete | No | Partially addressed | Second Report (pg. 66) |
| OBCC | Substantially Complete | Partially Complete | Yes (YA ESH Only) | Not yet addressed | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | Not yet addressed | N/A |
| MDC | Substantially Complete | Substantially Complete | No | Not yet addressed | N/A |
| RMSC | Substantially Complete | Substantially Complete | Yes (Partial Facility houses female adolescents & 18-year-olds) | Not yet addressed | Second Report (pg. 66) |
| WF | Substantially Complete | Partially Complete | Yes (18-year-olds may be housed in WF) | Partially addressed | Third Report (pg. 107) |

---

[79] The Facilities are organized and highlighted by installation wave as defined in ¶ 1 (c).

| NIC | Not Yet Evaluated | No | N/A | Second Report (pg. 66) |
| QDC | Not Yet Evaluated | No | N/A | N/A |
| BKDC | Not Yet Evaluated | No | N/A | N/A |
| DJCJC | Not Yet Evaluated | No | N/A | N/A |

The Monitoring Team is encouraged by the Department's efforts to install wall-mounted cameras throughout the Facilities and that it has already exceeded *physical* installation of the 7,800 cameras required to be installed by February 28, 2018 (¶ 1 (a)) (some of these cameras must still be placed online). The Department has also made substantial progress towards achieving Complete Camera Coverage of all Facilities by February 28, 2018 and is on track to meet that deadline. In some Facilities, the cameras have been installed, but are not yet placed online because of a lack of electronic storage space. The Department reports it has requested and received the required budget to create additional video storage space to accommodate the cameras installed during the Fourth Monitoring Period. The Department will achieve Substantial Compliance with the installation requirements when the cameras are both installed and online. Within the Facilities where camera installation is ongoing, the Monitoring Team strongly recommends the Department prioritize the installation of additional cameras in the clinic and intake areas to the extent coverage is lacking. During the Fifth Monitoring Period, the Monitoring Team will focus on touring the Third Wave Facilities and finalizing the assessment of Complete Camera Coverage in the First and Second Wave Facilities.

The Monitoring Team continues to recommend that the Department annotate its existing Facility diagrams to identify camera locations. This guide may serve a dual purpose in that it assists the Department in its overall effort to identify and maintain the cameras, and would also be a useful guide during emergencies and critical incidents. Overall, the Monitoring Team is encouraged by the Department's efforts to develop and implement an aggressive and comprehensive installation plan.

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (¶ 1 (b))

As noted in previous Monitor's Reports, provision ¶ 1 (b) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. As demonstrated in the chart above and discussed in the First, Second, and Third Monitor's Reports, the Department has installed cameras in the Facilities that house 16-, 17-, and 18-year-old inmates (*see* the First Monitor's Report at pgs. 61-62, the Second Monitor's Report at pgs. 69-71, and the Third Monitor's Report at pgs. 107-108).

Given these findings, the Department remains in Substantial Compliance with the requirement to install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with ¶¶ 10 and 11 of § XV (Safety and Supervision of Inmates Under the Age of 19).

*Internal camera working group meeting* (¶ 1 (e))

  The Department invited the Monitoring Team and Plaintiffs' Counsel to participate in the Department's Camera Working Group meeting. A member of the Monitoring Team and Plaintiffs' Counsel attended the meeting on June 26, 2017. As part of that meeting, and in subsequent discussions, the Monitoring Team reviewed the Department's security camera coverage plan that includes timelines, objectives, and key deliverables to provide Complete Camera Coverage in the Facilities by February 28, 2018. The camera installation is a joint effort between the Radio Shop, the Engineering Department, the specific Facilities, and contracted vendors. The installation plan is consistent with the deadlines outlined in the Consent Judgment ¶ 1(a) and the installation plan for the Facilities is consistent with the priorities outlined in the Consent Judgment ¶ 1(c).

| COMPLIANCE RATING | ¶ **1(a).** Requirement has not come due |
| --- | --- |
| | ¶ **1(a)(i).** Substantial Compliance |
| | ¶ **1(a)(ii).** Substantial Compliance |
| | ¶ **1(a)(iii).** Requirement has not come due |
| | ¶ **1(b).** Substantial Compliance |
| | ¶ **1(c).** Partial Compliance |
| | ¶ **1(d).** Requirement has not come due |
| | ¶ **1(e).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 2(d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

¶ 2.

  d. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

  f. When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence" remained in effect.

- In December 2016, the NCU initiated a quality assurance ("QA") program of handheld camera footage across all Facilities. Every Facility is required to submit its daily alarm response log and

upload the associated handheld video to a dedicated folder. The NCU analyzes the alarm response logs and handheld videos and tallies the number of missing or deficient alarm response logs or handheld videos and shares these findings with the Facilities.

- o If video cannot be located or an error is identified, NCU asks the Facility to locate and upload the video by the close of business, copying the Bureau Chief of Facility Operations. If the video cannot be located, the Facility must notify NCU and describe the corrective action taken (i.e., corrective interview or command discipline).

- The NCU found all Facilities had high deficiency rates in completing the alarm response logs and uploading the handheld video. The NCU reported that the issues relating to handheld cameras fell into three categories: (1) handheld video footage was uploaded to the wrong network drive or was labelled incorrectly, making it difficult or nearly impossible to find; (2) issues with the alarm response logs made it difficult to identify video; and (3) under current policy, the Tour Commander is responsible for uploading the handheld video. Therefore, this cumbersome and time-consuming task is the responsibility of a relatively small number of people.

- The NCU delivered training at each Facility on how to upload video footage to the shared drive.

- The Department requires Tour Commanders to confirm to the Warden that any handheld video footage captured during the Tour has been uploaded by the end of their tour.

- At the end of the Monitoring Period, the Bureau Chief of Facility Operations began to meet weekly with the Assistant Chiefs to discuss handheld video deficiencies for each Facility to increase accountability for Facilities struggling to upload handheld video.

- The Bureau Chief of Facility Operations and the NCU meet with the Monitoring Team monthly to report on the Department's progress and collaborate on potential solutions to obstacles to compliance.

- To improve the availability and access to handheld video the Department developed three initiatives at the end of the Monitoring Period:

- o First, the Department developed a spreadsheet which automatically creates consistent video file names with seven categories: the Facility, date, tour, area, housing type, incident type, and time of the incident. The result is that each video has a unique file name that can be copied and pasted into the folder. This uniform naming convention will allow staff Department-wide to identify video more easily.

- o Second, Staff under the Bureau Chief of Facility Operations were certified to provide Handheld Camera training to Staff.  The Department also developed a comprehensive lesson plan on how to upload handheld video as discussed in the Training section of this Report.

- o Third, the Department began to track the imposition of accountability at the Facility level for video footage that was not uploaded.
  - ▪ In June 2017, the first month for which data is available, the Department reports that disciplinary action was imposed in 43 cases across nine Facilities.
- ID issued four Memorandum of Complaints ("MOC") to Staff during the Fourth Monitoring Period for *intentionally failing to capture incidents*. The Department did not find that any Staff *repeatedly failed to capture incidents due to failure to follow DOC policies* during this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department remains in Non-Compliance with this provision, as it continues to struggle to produce handheld video footage consistently.  During this Monitoring Period, the Department developed a plan of action to address the deficiencies described in detail in the Second and Third Monitor's Reports (*see* the Second Monitor's Report at pgs. 72-74 and the Third Monitor's Report at pgs. 109-112). As part of its QA process, the Department began to meet routinely with the Monitoring Team to refine the audit process and to develop a plan of action to address the issues identified. Given the findings that video could not be produced for the majority of Facility alarms, the initial focus has been on ensuring the video is properly uploaded. Once the uploading issues have been addressed, the Department and the Monitoring Team will then focus on ensuring the quality of the video is sufficient. That said, while the Monitoring Team did not systematically assess the quality of the video, the Monitoring Team did identify that in at least some instances where handheld footage was reviewed, the camera operator did not adequately capture the incident; the camera was pointed away from the incident; or the camera was brought to the scene but was not turned on in time to capture the incident.

*Handheld Camera Policy* (¶ 2(d))

The Department maintains a policy regarding the use of handheld video cameras that was developed in consultation with the Monitoring Team during the Third Monitoring Period.  The Department considered revising the Policy during this Monitoring Period to refine the situations in which a handheld camera should be brought to the scene.  However, upon further consultation with the Monitoring Team, the Department determined that handheld video cameras should be brought to <u>all</u> alarm responses.  At the end of the Monitoring Period, the Department determined in order to support its efforts to timely upload video footage that the policy needed to be revised to allow a Tour Commander to designate another Staff Member to upload the handheld video.  The Department consulted with the Monitoring Team about the change and the Monitoring Team supported the initiative.  The Department intends to update the Policy during the next Monitoring Period.[80]

---

[80] Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence" was revised and issued in August 2017.

*Availability of Handheld Video* (¶ 2(d))

Throughout the Fourth Reporting Period, handheld video continued to be unavailable for the majority of incidents where it was required. It is the Department's obligation to ensure production of handheld video is available in a timely and consistent manner. The Department reports that when video is unavailable, it is because it was not uploaded, not because video was not recorded. Regardless of the cause, the video is not available.

The NCU's audit identified a total of 1,223 alarms across all Facilities in January 2017. The video was uploaded properly for 390 of these alarms (32%). In June 2017, the Facilities had a total of 921 alarms.[81] The video was uploaded properly for 518 of these alarms (56%). In other words, during the last month of the Monitoring Period, the Department demonstrated some overall improvement in the availability of handheld video footage, likely attributable to additional training and a focus on accountability by uniform leadership, described further below.[82]

To address the deficiencies uncovered by the audit, the NCU developed, initiated and refined its QA program in order to improve practice. The Department undertook two training efforts. Initially, training was provided on an *ad hoc* basis, but the Facilities still struggled to properly upload video after this training. In response, the Department developed an interactive training program to teach Staff how to upload, store, and name video files. In total 96 representatives from each Facility attended the training. In June 2017, the Department began systematically tracking when discipline was imposed on Staff who violated these policies. The Department reported that in June 2017, discipline was imposed in 43 cases across the Facilities. This involved four corrective interviews and 39 Command Disciplines across nine Facilities.

Towards the end of the Monitoring Period, the Monitoring Team observed an increased prioritization by the uniform leadership at the highest levels (including more frequent meetings and accountability as noted above) to address these deficiencies. The Monitoring Team believes the Department's current plan of action is sufficient to address these deficiencies and expects the Department to maintain its focus and efforts on this issue to ensure significant and sustained progress is made during the upcoming Monitoring Period.

*Investigator Access to Handheld Video* (¶ 2(f))

The Consent Judgment requires ID and Facility investigators to have full access to handheld camera footage (and body-worn camera footage when available). The Facilities are responsible for saving the handheld video footage on a shared drive and investigators have access to that shared drive. As described above, the video footage is often not properly uploaded and thus not available to the

---

[81] The lower number of alarms in June reported here is partly due to a more nuanced data analysis approach by the NCU. Not all Facility alarms require a handheld camera and these were being incorrectly included in the totals for the earlier months.

[82] The Department reports that these improvements continued in July and that video was uploaded properly for 806 (81%) of alarms.

investigators. When it is properly uploaded to the shared drive, investigators report they are able to access the video. However, discussions with Investigators revealed they did observe an improvement in the availability of handheld video from the Facilities towards the end of the Fourth Monitoring Period.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Consent Judgment requires any Staff Member who does not reasonably and accurately capture a use of force incident to be re-trained. Further, if a Staff Member repeatedly fails to capture key portions of incidents or intentionally fails to capture the incident on video, the Staff Member must be referred to the Trials Division for discipline. The Department is required to notify the Monitor of any such situations. The Monitoring Team has not yet assessed the Department's efforts to re-train Staff, but intends to focus on handheld camera re-training during the next Monitoring Period. The Monitoring Team also intends to more closely scrutinize closed investigations to assess the Department's evaluation of cases where handheld camera footage is not available, but should have been.  As for discipline, the Department reported that it issued MOCs to four Staff Members during the Fourth Monitoring Period for intentional failure to capture incidents on handheld cameras. The Department reports that no MOC's were generated for Staff *repeatedly* failing to capture incidents due to a failure to follow DOC policies.

| **COMPLIANCE RATING** | ¶ **2(d).** Non-Compliance |
| | ¶ **2(f).** Partial Compliance |

---

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

a.   The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

b.   Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

c.   At least twice a month, the assigned Supervisor shall (i) review a substantial portion of the wall-mounted surveillance cameras in order to determine which cameras are not recording properly, and (ii) review the accuracy of the daily assessments. The assigned Supervisor shall document the results of these reviews, including which daily assessments, if any, were inaccurate.

d.   Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- During this Monitoring Period, the Department revised Operations Order 07/17, "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," in consultation with the Monitoring Team.

- The Department continues to use the Enterprise Asset Management ("EAM") database that was rolled out during the Third Monitoring Period. This program allows the Facilities to report out-of-service cameras and allows IT and the Radio Shop to track repairs electronically.  The Department also uses EAM to track the number of out-of-service cameras, the amount of time the cameras remain out, and the reason the camera is inoperable.

- Correction Officers in each Facility are assigned to conduct routine, daily functional assessments of stationary cameras and video monitors, noting those that are inoperable and submitting daily or weekly reports that detail the status of the cameras.

- Assigned Supervisors in each Facility are responsible for routinely assessing a substantial portion of the wall-mounted surveillance cameras to ensure they are operating properly and to verify the accuracy of the daily assessments. These supervisory reviews are documented and completed bi-monthly.

- In April 2017, the NCU initiated a QA program to audit the accuracy of the wall-mounted surveillance camera daily and bi-monthly assessments. The initial audit found the Facilities were not completing the forms accurately.

- In response to these findings, the NCU developed some strategies to improve compliance. The NCU provides immediate feedback to each Facility when an error is found and ensures it is corrected within 24 hours. All results are also communicated to the Chief's Office for greater accountability for the Facilities.

- NCU Staff meet with each Facility to provide guidance on completing the forms accurately and properly assessing the status of the cameras.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assessed the Department's efforts to achieve compliance with this provision by reviewing: (1) the Camera Maintenance Policy, (2) the implementation of the Department's daily/bi-monthly tracking of inoperable cameras via onsite observation and the Department's internal audit procedures, and (3) the Department's efforts to repair inoperable cameras in a timely manner.

*Camera Maintenance Policy*

The Department maintains procedures for assessing and maintaining the Department's stationary wall-mounted cameras in accordance with the requirements of Section IX, ¶¶ 3(a)-(d) as described in the Third Monitor's Report (at pgs.114-115).  During this Monitoring Period, the Radio

Shop reported that the Facilities used EAM to report cameras that were inoperable because of an IT/mechanical issue—which the Radio Shop addresses—as well as those cameras that had been obstructed in some manner (e.g. toothpaste placed over the box)—which the Radio Shop is not responsible for. This delayed resolution of the issue.  Accordingly, the Department, in consultation with the Monitoring Team, revised the Operations Order to specify that in cases where the stationary camera appears to be obstructed, the Officer on post must attempt to clear the obstruction.  If successful, the form will reflect that the obstruction was 'abated' and will not be reported in EAM.

*QA Program of Camera Maintenance Records*

As described above, the Department implemented a QA program of the Facilities' stationary camera maintenance forms. The purpose of the audit was to assess the accuracy of the forms, which is the essential first step toward timely repair. In April 2017, the Facilities' average deficiency rate was 45% for the daily and bi-monthly forms, combined. On the daily forms, the most common deficiencies were the date the camera was assessed as inoperable and the Supervisor's name and shield. On the bi-monthly forms, the most common deficiency was the cross-check with the daily form. By May 2017, the average deficiency percentage in both daily and bi-monthly forms combined had decreased to 11%.

The Department's internal quality assurance for this process shows promise, and the Monitoring Team has recommended that the Department further embed this process into the Facilities' daily procedures. In the next Monitoring Period, the Monitoring Team intends to test the veracity of the Department's internal QA process and review a sample of the NCU's QA audits of the Facilities' daily camera assessment forms and the Supervisor's bi-monthly camera review forms against the NCU analysis.  Ultimately, the Monitoring Team expects that the Facilities will sustain this process and produce accurate, complete forms, independent of the daily scrutiny by the NCU.

*Maintenance of Inoperable Cameras*

The number of cameras the Department must maintain is significant and requires considerable resources to ensure they are functioning properly. The Department is required to fix inoperable cameras within two weeks of the reported outage, barring exceptional circumstances that must be documented. During the Fourth Monitoring Period, the Department provided the Monitoring Team with monthly EAM reports showing the number of inoperable cameras, the number fixed, the length of time to fix the cameras, and the reason for outages greater than two weeks. Overall, the majority of cameras are being fixed within the required timeline. The Department repaired a total of 3,934 wall-mounted stationary cameras throughout the Department.[83] 3,678 of the cameras within 2 weeks (93%), 85 between 2-3 weeks (2%), 87 within 3 to 5 weeks (2%), and 84 beyond 5 weeks (2%).  The Department reported that as of June 30, 2017, 80 cameras remained inoperable for more than two

---

[83] This includes repairs of all wall-mounted stationary camera in the Department (not just those cameras that have been installed as part of this initiative).

weeks.[84]

The number of reported inoperable cameras is reasonable with what the Monitoring Team would expect for the total number of cameras in the system.  Further, to date, the Monitoring Team has found that inoperable cameras have not impacted the Department's efforts to capture use of force incidents.  Overall, the Monitoring Team is encouraged by the Department's efforts to maintain its cameras and will continue to monitor the number of inoperable cameras during the Fifth Monitoring Period.

The Department has made considerable progress in this provision during the Fourth Monitoring Period by developing its own quality assurance process to ensure the accuracy of the forms being entered EAM. The Department remains in Partial Compliance as it works towards ensuring the Facilities are consistently and accurately reporting all down cameras.

| COMPLIANCE RATING | ¶ 3 (a)-(d). Partial Compliance |
| --- | --- |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. Video Preservation
The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department Operations Order 06/15, "Recording Equipment, Medium, and Electronic Evidence" remains in effect.

- The current Use of Force Directive addresses the requirements in the Consent Judgment. The Department's New Use of Force Directive addresses the preservation requirements as well.

- The Department's computerized system automatically preserves all video for 90 days, assuming sufficient storage space.

  o Video may not be stored for 90 days if the Department runs out of IT storage space. The Department identified IT storage space issues given the large number of cameras that have been placed on the system and as a result of an upgrade to new Genetec software. The new Genetec settings caused many of the cameras to record continuously (as opposed to recording only when movement is detected), and therefore filled all

---

[84] As of June 30, 2017, the breakdown of the 80 cameras out for more than two weeks was as follows: 4 (5%) of the cameras were out for 2-3 weeks, 8 (10%) of the cameras were out for 3-5 weeks, 19 (24%) of the cameras were out for 5-7 weeks, and 49 (61%) of the cameras were out for more than seven weeks.

available space on the archive server. Once the archive server was full, older footage
was being automatically deleted from the archive to make room for the current footage.

    o   As a result, a limited number of cameras did not preserve video for the required 90 days.
First, from late October 2016, the Department reported in this Monitoring Period that it
was remedied by the Department in December, 2016.  Second, in April 2017, the
Department identified approximately 300 cameras whose archive servers were also full
and consequently were only retaining 64 to 87 days of video. The Department received
the additional storage space in June 2017 and the 300 cameras were brought back up to
the full 90-day archive.

- IT continues to monitor the storage space and the Department has reported that the Legal
Division will be notified if storage space issues arise again.

- Operations Security Intelligence Unit ("OSIU") is responsible for exporting Genetec video for
all Facility level investigations in order to preserve footage beyond the 90-day preservation
period.

- ID is responsible for preserving video for Full ID investigations. In February 2017, ID created
the ID Video Unit to aid this process. After the assigned Investigator determines which Genetec
angles and times are necessary and relevant to their investigation, the Investigator completes a
DVD Request Task form and the ID Video Unit exports the requested angles. The Department
has also provided the Deputy Director of Investigations ("DDI") in ID and ID Supervisors the
ability to preserve and export video from the Genetec system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department's current preservation policies,
procedures, and automated processes require all video to be preserved for 90 days, or longer when the
Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent
with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment. The Department also
reports that it intends to issue a uniform video preservation policy for use of force incidents once all
new related practices, including ID's video interview pilot and body-worn camera pilot program, are in
place. Further, while not yet in effect, the Monitoring Team confirmed that these requirements are
included in the New Use of Force Directive.

While the IT storage issues discussed above impacted a small number of cameras for a short
period of time and were subsequently remedied, the Department developed a process to mitigate the
possibility of this occurring in the future. The Department reports it will closely scrutinize IT storage
going forward, and the Monitoring Team will continue to closely evaluate the Department's efforts to
preserve all relevant video.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

The Monitoring Team also assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage included in the use of force investigation files produced to the Monitoring Team[85] and (2) randomly assessing video for incidents investigated by ID.

First, during this Monitoring Period, the Department produced approximately 487 investigation files for use of force incidents occurring after the Effective Date. In all but seventeen cases (approximately 3% of packets produced), all video capturing the incidents, to the extent such video existed, was preserved and produced as part of the investigation file. In the cases where video was not preserved, the Department reported that Staff either failed to appropriately communicate the request to preserve video, the incorrect video footage was inadvertently preserved, and in one case the video was not preserved due to IT storage issues.

Second, the Monitoring Team also tested the Department's preservation of Genetec footage beyond the 90-day requirement by randomly selecting 92 incidents where the existence of Genetec video was noted in the Preliminary Review to determine if the video was preserved and could be provided to the Monitoring Team contemporaneously during the assessment. The Monitoring Team confirmed that the Department preserved footage for 86 of the 92 incidents (91%) on a shared electronic drive. Given the importance of preservation of video, the Monitoring Team will continue to closely scrutinize the availability, accessibility, and preservation of video during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
| --- | --- |

## 6.   USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct to ensure investigations are thorough, timely, and objective. As discussed in the Use of Force Trends section of this report, high-quality

---

[85] The Monitoring Team also began to evaluate the preservation of handheld video footage, but given the systemic issues identified with the collection and organization of handheld video, the Monitoring Team has not conducted a formal assessment.

investigations are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department. Both individual accountability and a zero-tolerance message for unnecessary and excessive force are critical to the culture change that will be central to the reforms envisioned by the Consent Judgment. Thorough, logical, and legitimate investigations, at varying levels of scrutiny, are a fundamental tool for ensuring that force is used only when necessary and in the proper proportion. The Monitoring Team has focused on the various investigatory tools currently available to the Department to help develop a robust array of investigative options. These options need to be complementary, and their proper design, implementation, and interplay will be complicated. For these reasons, the Monitoring Team urges patience as the Department designs the necessary components.

In the aggregate, investigations are useful to the Department's efforts to identify trends in the misuse of force and also provide a useful window for the Monitoring Team to assess the Department's progress toward ameliorating the conditions that gave rise to the Consent Judgment. During this Monitoring Period, the Monitoring Team worked with ID to improve the quality and timeliness of Full ID investigations, and to refine the processes for Investigators to leverage the findings of the Preliminary Reviews. The Monitoring Team also conducted an initial assessment of Facility Investigations.

The Consent Judgment outlines specific investigative steps that must be taken in order to complete Preliminary Reviews, Facility Investigations, and ID investigations. The overall goal of this section is for the Department to produce reasonable, reliable, and timely investigations to assess Staff's use of force so that any potential violations can be identified and corrective action can be imposed in a timely fashion. To achieve this goal, the level of scrutiny needs to match the severity of the incident and the quality of evidence available. Not every investigation needs to or

should be met with the same level of rigor or the same investment of resources. In other words, a one-size-fits-all approach to investigations will not be sufficiently nimble to achieve the goal of expediency. Instead, Investigators should be empowered to use their professional judgment to apply the appropriate level of scrutiny to the various types of investigations. This ability to efficiently allocate resources so that responses with a high-level of investigative scrutiny are applied only to the most complex and/or concerning cases is essential to the Department's ability to comply with the Consent Judgment. Investigations into incidents that are less complex or less serious can be resolved far more quickly and, in so doing, support the overall goal of timely accountability for Staff misconduct.

The Monitoring Team's significant experience in evaluating Staff's use of force in the Department, as well as in jurisdictions throughout the country, confirms the importance of a flexible, multi-layered approach like that described above for determining whether force was properly employed (e.g., justified, proportional, properly executed, etc.). The proper application of professional judgment can only be cultivated in objective, dedicated investigators when they are well-trained and appropriately supervised. Accordingly, the Monitoring Team has focused on supporting the Department's development of an appropriate spectrum of investigatory tools, as described in more detail below.

*Investigation Division*

The Deputy Commissioner of Investigations resigned during the Monitoring Period.[86] Although an Acting Deputy Commissioner was appointed swiftly, this unexpected departure as well as overall leadership changes in the agency created discomfort and uneasiness within the division. However, strong leadership from those who remained in ID during this transition led to

---

[86] The Department is actively recruiting a new Deputy Commissioner of Investigations.

continued progress with initiatives that were underway before the Deputy Commissioner left the agency.

The Monitoring Team has continued to provide feedback to improve the quality and timeliness of investigations. In assessing ID's work, the dramatic increases in workload since the Effective Date of the Consent Judgment must be recognized. Most notably, ID is now responsible for conducting a Preliminary Review of all use of force incidents, which total almost 7,000 to date. The Monitoring Team remains very impressed by ID's ability to produce quality Preliminary Reviews of **all** use of force incidents within a few days of each incident.  Prior to the Effective Date, only a basic assessment of individual use of force incidents was available through the Facilities' COD reports that were created within a few hours of the incident.  Any further assessment of the incident had to wait until the Facility and ID investigations were complete, which was often months to a year after the incident. Even so, trends in the use of force were never tracked centrally or systematically.

Although designed to be preliminary, Preliminary Reviews include most of the investigative steps of a full investigation, including interviews with involved inmates and inmate witnesses, and reviewing Genetec and handheld video footage, Staff Reports, and Injury-to-Inmate Reports.[87] The only steps not undertaken by the Preliminary Reviewer are Staff interviews (which are only permitted in Full ID investigations) and the collection of some collateral information (e.g., logbook entries, other documentation that could help to understand the circumstances at the time of the incident, etc.), although, while not required, that material is also often collected and reviewed at the Preliminary Review stage.  The Monitoring Team has found the Preliminary Reviews to include comprehensive and thoughtful analysis and

---

[87] This assumes that all necessary documentation is available in a timely manner.

assessments. The chart below compares the requirements for each type of Investigation required by the Consent Judgment.

| | Requirements | Preliminary Review | Facility Investigation | Full ID |
|---|---|---|---|---|
| **Video Review** | Genetec | √ (¶ 7(a)(i)) | √ (¶ 13(c)) | √ (¶ 9(b)) |
| | Handheld | √ (¶ 7(a)(i)) | √ (¶ 13(c)) | √ (¶ 9(b)) |
| **Staff** | Review Staff UOF Reports | √ (¶ 7(a)(ii)) | √ (¶ 13(d)) | * |
| | Conduct Interviews of Staff | | | √ (¶ 9(c)) |
| **Inmate** | Interviews and/or written statement from inmate | √ (¶ 7(a)(iii))[88] | √ (¶ 13(d)) | √ (¶ 9(c)) |
| **Witnesses** | Review written statement from Witness | √ (¶ 7(a)(iv)) | √ (¶ 13(d)) | * |
| | Review any interviews of Witness | √ (¶ 7(a)(iv)) | √ (¶ 13(d)) | * |
| | Conduct Interviews of all Relevant Witness | | √ (¶ 13(d)) | √ (¶ 9(c)) |
| **Medical Evidence** | Injury-to-Inmate Report | √ (¶ 7(a)(v)) | √ (¶ 13(e)) | √ (¶ 9(d)) |
| | Photographs of Inmates Injuries | √ (¶ 7(a)(vi)) | √ (¶ 13(e)) | √ (¶ 9(d)) |
| | Photographs of Staff Injuries | √ (¶ 7(a)(vi)) | √ (¶ 13(e)) | √ (¶ 9(d)) |
| | Reports reflecting Staff injuries | √ (¶ 7(a)(vi)) | √ (¶ 13(e)) | √ (¶ 9(d)) |
| | NYC OCME Report when necessary | | | √ (¶ 9(d)) |
| **Closing Report** | | √ (¶ 7(d)) | √ (¶ 13(f)) | √ (¶ 9(e)) |
| **Supervisory Review** | | * | √ (¶ 13(g)) | √ (¶ 9(f)) |
| **Time to Conduct Investigation** | | 5 Business Days[89] | 25 Business Days (¶ 13(b)) | 180 Days (¶ 9(a)(i)) |
| **Confirm Classification** | | √ (¶ 7(b)) | √ (¶ 13(e)) | * |
| *Although not required by the Consent Judgment, these steps occur in practice. | | | | |

In addition to the Preliminary Reviews, ID's workload has also increased in other ways. A greater volume of cases now requires a Full ID investigation.  Prior to the Effective Date, ID was responsible for investigating only the most serious use of force incidents or allegations and, most, if not all, required an in-depth investigation. ID now investigates cases that previously would have been assigned to the Facility.  Accordingly, the Full ID caseload has increased significantly. ID opened 776% more use of force investigations this Monitoring Period than

---

[88] In the event that the inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the inmate(s) concerning the Use of Force Incident.
[89] The Monitoring Team recommended that ID pilot conducting Preliminary Reviews in 5 Business Days.

during the same period in 2015 (1,113 versus 127[90] cases, respectively) and the PREA caseload

increased by 337% (520 versus 119 cases, respectively).  To address this volume of cases with

any measure of veracity and efficiency, the strategy for managing cases and the responsibilities

of ID investigators must change.

The Monitoring Team and Department are developing a range of options to be utilized by

Investigators, but their proper application will require a mental shift by ID Investigators. During

this Monitoring Period, the Monitoring Team observed that Investigators appeared to be

struggling to utilize the full range of options being introduced.  This may be due, in part, to their

historical reliance on the full-blown investigation as the sole mode for resolving their cases.

Moving forward, they must be encouraged to exercise their professional judgment and close

cases when appropriate, as they now must investigate a significantly larger number of use of

force incidents, and not just the most serious ones.  Further, in order to respond to the increased

caseload, ID increased the size of its division and Staff need time and opportunity to gain the

appropriate experience to conduct investigations that apply the proper level of scrutiny.

During this Monitoring Period, ID advanced a variety of initiatives to close investigations

more timely and to leverage the work completed at the Preliminary Review stage.  Several

options now exist for ID Investigators to capitalize on the work of the Preliminary Review so

that cases can be resolved more quickly. Following the Preliminary Review: (1) the Preliminary

Reviewer may close an investigation that would otherwise have been investigated at the Facility-

level (i.e., Presumption Investigation Complete Following Preliminary Review, or "PIC"); (2)

when culpability is clear, ID may work with the Trials Division to accelerate the disciplinary

phase without necessarily conducting all steps for a Full ID investigation (i.e., "Fast-Track" with

---

[90] This is a Department reported figure, as this data pre-dates the Consent Judgment.

charges); (3) ID may expedite closure when video evidence conclusively indicates the force was justified, or the allegation was unfounded (i.e., "Fast-Track" without charges); and (4) Investigators can provide information obtained from the Preliminary Review to the Facility for swift corrective action (i.e., a "Facility Referral," described in detail below).  The Monitoring Team believes these options will result in a more fulsome continuum of investigative scrutiny that will increase efficiency, conserve scarce investigative resources, accelerate discipline when indicated, and hasten exoneration when justified.

*Facility Investigations*

The requirement to conduct a Full ID investigation on a larger range of cases has likewise decreased the number of incidents that are now subject to a Facility Investigation.  The Monitoring Team delayed assessing Facility Investigations until this Monitoring Period because ID was originally expected to take over all investigations by the end of 2016.  Unfortunately, this timeline was extended indefinitely because sufficient resources to enact the takeover are not currently available.  The Monitoring Team strongly encourages the Department to prioritize the goal of ID taking over all investigations.  In addition to identifying the necessary resources, in order to achieve this goal, the Department must find efficiencies for the investigations process, as discussed at length above.  When successfully implemented, these efficiencies will decrease the investigative hours needed to address the large volume of cases, making an ID takeover more realistic.

In the meantime, the Monitoring Team determined that it was necessary to assess the current Facility Investigation process.  To that end, during this Monitoring Period, the Monitoring Team and the Department collectively focused on developing and implementing an improved tracking processes for Facility Investigations until CMS is implemented.  This

119

additional data provided new insight into the completion rates and outcomes of Facility

Investigations, as discussed in more detail below.  Further, as described in more detail below, the

Facilities also addressed a significant number of outstanding Facility Investigations and

developed a process to ensure more timely closure of Facility Investigations going forward.

To address the identified problems, the Monitoring Team will work with the Department

during the Fifth Monitoring Period to develop an interim strategy to improve the process for

completing Facility-level investigations timely, including how the Department can utilize CMS

to do so (CMS is scheduled to be implemented during the Fifth Monitoring Period).  Work to

streamline the Facility Investigation process must necessarily be completed before the

Department can deploy Facility Investigator training as required by Consent Judgment §XIII

(Training), ¶ 2(c)(ii).  The Monitoring Team expects to be in a position to provide a

recommendation related to the deployment of Facility Investigator training by the end of the

Fifth Monitoring Period.

_Update on Monitor Recommendation Regarding Preliminary Reviews & Facility Investigations_

During the previous Monitoring Period, the Monitoring Team suggested that Facility

Investigators should have the benefit of the Preliminary Reviewer's analysis when conducting

the Facility-level investigation.[91]  The Department's current method for tracking Preliminary

Reviews makes implementing this recommendation difficult.  Information is manually entered

into the data system after the Preliminary Review is complete and the Facilities do not have

access to the system where the information is stored.  Communication will improve when CMS

is implemented, but in the interim, ID developed a process to support the overall goal of

---

[91] This recommendation is limited to those incidents receiving a Facility-level investigation, as the results of the
Preliminary Reviews for incidents subject to a pending Full ID investigation may not be shared with the Facility
because it may compromise the integrity of the ongoing investigation.

leveraging the Preliminary Reviews to aid Facility Investigations.  "Facility Referrals" will be sent to the Facilities when violations are identified during the Preliminary Review of the incident, which provides the Facility with the benefit of deficiencies identified by ID and ensures that the Facility addresses them in a timely fashion.  The Monitoring Team will continue to encourage the Department to identify other ways to utilize the findings of Preliminary Reviews to inform Facility Investigations.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

    a.    After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

    b.    When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

    c.    All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates who are the subject of a use of force incident, and those who witnesses the incident, as part of the Preliminary Review.

- Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

### ANALYSIS OF COMPLIANCE

The inmate interview requirements of ¶ 2 above have a number of practical elements: (1) investigators must make and document reasonable attempts to interview inmates, including the ADW who interviews inmates following medical treatment; (2) Investigators shall not unreasonably discredit inmate statements; and (3) Investigators must conduct inmate interviews in a private and confidential location.  Each of these requirements were assessed by the Monitoring Team by reviewing closed ID

Investigations during the Third Monitoring Period (*see* Third Monitor's Report at pgs.130-131); by reviewing a sample of closed Facility Investigations this Monitoring Period; by reviewing Preliminary Reviews since the Effective Date; and by reviewing interviews conducted as part of the Video ID Pilot Project (¶ 6).

*Interview Attempts and Documentation*

The Monitoring Team found that Preliminary Reviewers attempted to interview inmates involved in actual uses of force within days of the incidents.  However, if the inmate was unavailable, the Preliminary Reviewers often did not make an additional attempt to interview the inmate before completing the Preliminary Review.  This is not surprising given the inherent logistical difficulties in trying to conduct the interview before the Preliminary Review timeline expired.

During the previous Monitoring Period, Preliminary Reviewers at some Facilities were not dependably interviewing inmates involved in alleged uses of force.  During the current Monitoring Period, Preliminary Reviewers appeared to attempt to interview inmates who alleged a use of force more consistently.  In one instance, a Preliminary Reviewer even attempted to contact an inmate who had been discharged shortly after making the allegation.

The Monitoring Team also found that in ID Closing Reports, Investigators documented their attempts to interview inmates, either by including a summary of the inmate's statement or by indicating that the inmate refused to be interviewed.  The quality of these interviews has not yet been evaluated, except those evaluated as part of the analysis of the Video ID Pilot Project (¶ 6).  As discussed in more detail in the Monitoring Team's assessment of the Video ID Pilot Project (¶ 6), during this Monitoring Period, ID Investigators also attempted to interview over 604 inmates on video (approximately 180 of whom agreed).

Finally, the Monitoring Team also assessed a random sample of closed Facility Investigations to assess the extent to which an attempt was made to interview the inmate, finding that interview attempts were often made, but the inmate often refused to provide a statement to the Facility.

*Crediting of Inmate Statements*

The review of Facility Investigations revealed that inmate statements were too often discredited without adequate explanation.  The Monitoring Team found 15 examples where the failure to properly address the inmates' statements resulted in outstanding questions at the conclusion of these investigations.[92]

*Privacy and Confidentiality of Inmate Interview*

As described in more detail in the analysis of the Video ID Pilot Project (¶ 6) below, the Monitoring Team found in prior Monitoring Periods that inmates were not consistently given an

---

[92] This does not mean to suggest that inmate statements were credited in all other cases, as inmate statements were not always available, and were not often the crux of the investigation, so the question of whether the investigator properly credited the inmate statements was not part of every review.

opportunity to provide statements in private or confidential locations, and were often interviewed on the Housing Units.  The Monitoring Team saw an improvement in this practice for those interviews conducted on video, as described in ¶ 6 below, but must continue to analyze whether this practice continues for other interviews going forward.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- Five use of force cases were referred to DOI during this Monitoring Period.

- A total of 10 use of force cases were pending before the Bronx DA and one use of force case was pending before the Manhattan DA at the end of the Monitoring Period.

### ANALYSIS OF COMPLIANCE

As described in detail in the Second Monitor's Report (at pgs. 84-85), representatives of the Department, ID and DOI communicate frequently and work together collaboratively.  They meet monthly to discuss the status of cases pending before DOI and the Bronx DA.  This collaborative relationship extends to cases that ID refers and DOI assumes responsibility for.

The communication between DOI and ID ensures that ID promptly refers cases in which Staff's conduct appears to be criminal in nature.  The Monitoring Team independently verified the status of cases with both DOI and the Department and confirmed that each entity has consistent information about cases referred to DOI and those pending consideration of criminal prosecution by outside law enforcement agencies.  Additionally, during its review of Preliminary Reviews, the Monitoring Team has not identified any use of force incident that should have been referred to DOI but was not.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department immediately classifies all use of force incidents with Class A, B, C, or P[93] when an incident is reported to the Central Operations Desk ("COD").

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- Upon the receipt of additional information (e.g. results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assessed the Department's efforts to maintain compliance with this provision by reviewing the COD reports and Preliminary Reviews for all use of force incidents. The Monitoring Team and the Department engaged in many discussions this Monitoring Period to ensure that incidents are accurately classified. The Monitoring Team conducted a qualitative assessment of the incidents' classification through its review of Preliminary Reviews conducted in January-April 2017.[94] The Monitoring Team found that 25 of 1,588 (2%) incidents reviewed were misclassified. The Department reported that all 25 of these incidents would be subsequently upgraded by the Department in IRS.

As the data demonstrates, the overwhelming majority of use of force incidents reviewed were classified appropriately. The Monitoring Team also found that the Department tended to be cautious when classifying incidents (e.g., classified an incident as Class B, even when the circumstances could have warranted a Class C designation). The Monitoring Team will continue to monitor incident classifications to ensure they are applied appropriately.

This provision also ensures that incidents are classified in a timely manner when injury information is not immediately available at the time the initial classification determination is made. The Monitoring Team has found that most incidents with Class P are re-classified in a timely manner as described in prior Monitor Reports. The Monitoring Team reviewed 545 use of force incidents, 299 incidents were initially classified as Class P. Of these, 286 (95.65%) were reclassified within a two-week period or less.[95]

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

---

[93] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to the Central Operations Desk to be classified as Class A, B, or C.

[94] The Monitoring Team assessed the classification of UOF incidents produced for the months of January, February, March, and April pursuant to ¶ 7(d) of §VII (Use of Force Investigations).

[95] The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance. Further, the impact of reclassification on a use of force incident is minimized because the determination of investigative scrutiny is now based on the type of force utilized as enumerated in ¶ 8, and not solely based on the classification of the use of force incident as it used to be prior to the Consent Judgment.

**VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)**

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID continued to conduct video interviews during the Fourth Monitoring Period.[96]

- ID will prepare a report evaluating the results of the Interview Video Recording Pilot as of June 30, 2017, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or challenges associated with the use of video to record the interviews.  ID will continue to attempt to video tape inmate interviews while developing this report.

- ID leadership met with the ID investigators at RNDC and AMKC to provide feedback and advice regarding inmate interviews.

- ID investigators made 604 attempts to interview inmates between January and June 2017. Of these, 182 interviews (30%) were captured on camera, and 422 inmates (70%) refused to provide a statement on camera.

  - Over 50 of the statements obtained on video (31%) occurred at RNDC where the Youth ID Team is assigned. Another 40 (24%) occurred at AMKC where the pilot was expanded to at the end of the Third Monitoring Period. The remaining interviews were conducted at multiple other Facilities.

- Four investigations referred to Trials for discipline included inmate interviews on video.

**ANALYSIS OF COMPLIANCE**

ID continued the Video Recording Pilot ("Video Pilot") during this Monitoring Period. The Monitoring Team met with ID leadership to discuss the status of the pilot and to obtain feedback on its results, and also to review a random sample of video statements.

ID leadership reported that the overall quality of interviews on video improved during this Monitoring Period as Investigators became more confident and comfortable conducting video

---

[96] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

interviews.  In particular, the video quality improved, interviews were held in private settings more often, and Investigators asked questions from the ID standardized script.  ID reports that Supervisors have been providing Investigators with feedback more quickly, which has also allowed Investigators to implement suggestions more effectively. As reported during the Third Monitoring Period, ID reports that videos enhance the quality of investigations because they capture body language and also offer inmates the ability to physically demonstrate what took place during an incident.

The Monitoring Team's review of a sample of videos also found an improvement in overall quality, demonstrating that investigators have addressed many of the issues identified in the Third Monitoring Period (*see* the Third Monitor's Report at pgs. 135-137). The video interviews were more often conducted in private settings, the cameras were steady for the duration of the interview, and the sound quality in some of the videos had improved. The Monitoring Team is encouraged by this progress, and encourages ID to continue to provide timely feedback to Investigators on their video interviews and to reinforce the elements of a high-quality video interview.

While the quality of the interviews has improved, ID and the Monitoring Team identified some issues and challenges with the pilot that persisted during this Monitoring Period. As reported in the Third Monitor's Report (at pg. 136), ID investigators are still struggling to consistently access ideal locations for interviews to provide appropriate private and quiet locations. The Monitoring Team's experience suggests that a requirement to move inmates to a private location for an interview is inherently problematic, given the number of operational and timing considerations. However, the Monitoring Team intends to continue to brainstorm with the Department on this issue to identify additional options that may be available to provide appropriate settings for an interview.

To date, four cases with video interviews have been referred to the Trials Division for prosecution. Two of the cases were settled at the pre-trial conference stage and the Trials Division reports that the inmate video recorded statements were strong evidence and assisted in the staff members accepting the Negotiated Plea Agreements ("NPA"). The other two cases are pending pre-trial conferences. The Trials Division reported that it believes that the videos will aid in the resolution of these matters as well.

During the next Monitoring Period, ID will develop the required report to consider the benefits of the video ID pilot and whether it should continue the practice.  ID will continue with the pilot during this evaluation period.  The Monitoring Team will consult with the Department about whether to continue to move forward with video recording of inmates after evaluating the Department's report and

reviewing the cases before Trials that include video interviews of inmates.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. <u>Preliminary Reviews</u>: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below.

a. The individual responsible for conducting the Preliminary Review ("Preliminary Reviewer") shall review the following: (i) the relevant video footage of the Use of Force Incident, including footage from fixed surveillance cameras and handheld or body-worn cameras; (ii) Use of Force Reports from Staff; (iii) interviews and/or written statements from the Inmate(s) subject to the Use of Force or alleged Use of Force; (iv) interviews and/or written statements from Inmates or civilian staff who witnessed the incident; (v) Injury-to-Inmate Reports; (vi) photographs of Inmates and Staff Members that were taken after the Use of Force Incident; and (vii) reports reflecting any injuries to Staff Members. In the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident.

b. The Preliminary Reviewer shall confirm that the Use of Force Incident is properly classified as a Class A, Class B, or Class C Use of Force.

c. To the extent any factual inaccuracies in the information required to be maintained under Paragraph 14(a) - (m) of Section V (Use of Force Reporting and Tracking) are identified during the course of the Preliminary Review, the information shall be corrected or updated in IRS.

d. The Preliminary Reviewer shall document the results of the Preliminary Review.

e. Under limited circumstances, the Preliminary Reviewer may determine that his or her review is sufficient and it is not necessary to take any additional investigative steps. The Preliminary Reviewer may make this determination only if the following criteria are clearly met and documented, and this determination is reviewed and approved by a supervisor in ID:

   i. No Staff Member, Inmate, or other person sustained any injury, and the Inmate who was subjected to the Use of Force did not allege any pain.

   ii. Any resistance by the Inmate was passive.

   iii. Staff Members had only minimal physical contact with the Inmate, using only soft hand controls.

   iv. The Use of Force Incident did not involve the use of weapons, including OC spray.

   v. There was an immediate need for the Inmate to comply with Departmental or Facility rules, policies, regulations, or court orders, and non-force alternatives had proven ineffective.

   vi. The descriptions of the Use of Force Incident included in the Use of Force Reports submitted by Staff Members were consistent with the affirmative statement by the Inmate who was subjected to the Use of Force and all other evidence.

   vii. Based on the Preliminary Review, the Use of Force was minimal, reasonably necessary, and clearly consistent with the New Use of Force Directive.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Preliminary Reviews were conducted for 2,444 actual and alleged use of force incidents during this Monitoring Period.

- <u>P</u>resumption that the <u>I</u>nvestigation is <u>C</u>omplete (PIC) Rollout:

  - ID continued to pilot PIC at AMKC.

  - At the end of the Monitoring Period, ID expanded the use of PIC to all Facilities.

  - ID identified 42 use of force investigations for closure through PIC.

- The Department produced the results of the monthly Preliminary Reviews (January through June 2017) to the Monitor and Parties to the *Nunez* Litigation as required pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.[97]

**ANALYSIS OF COMPLIANCE**

ID now conducts Preliminary Reviews on <u>all</u> use of force incidents,[98] and the Monitoring Team remains pleased by the quality of this process. As noted above, the Preliminary Review remains the Department's most consistent, reliable, and informative assessment of use of force incidents throughout the Department.  This is particularly encouraging because it occurs so close in time to the incident. When the Preliminary Reviewers possess the majority of the documentation needed to conduct their assessments (including all Staff Reports, Injury-to-Inmate Reports, and video), their assessments are informative and appropriately identify preliminary issues or conclusions. The Monitoring Team believes leveraging the tremendous work of Preliminary Reviews will support the overall goal of more timely accountability for Staff when violations are identified.

Continued work is necessary in a few areas to strengthen the Preliminary Reviews and achieve Substantial Compliance. First, and most importantly, the investigators conducting the Preliminary Reviews must have access to all relevant information (e.g. Staff Reports) as described in more detail below. Second, PIC needs to be more fully utilized, as discussed below. It is expected that better access to relevant information will assist in the Department's efforts to utilize this option appropriately.

*Presumption Investigation Complete ("PIC")*

The Department continued to pilot a process to identify cases with a *Presumption that the*

---

[97] "At the end of each month, the Department shall provide the Monitor and Plaintiffs' Counsel with the documented results of all Preliminary Reviews conducted in the preceding month pursuant to Paragraph 7(d) of Section VII (Use of Force Investigations). (For example, the results of Preliminary Reviews concluded in January would be provided at the end of February.)"

[98] During the Fourth Monitoring Period, the Monitoring Team confirmed that Preliminary Reviews were conducted on at least 99% of all use of force incidents. Occasionally, the Monitoring Team noted a handful of incidents on a monthly basis that did not appear to have received a Preliminary Review, but the Department was able to provide documentation for each incident to demonstrate a Preliminary Review was conducted and may not have been in the monthly excel tracker due to an entry error.

_Investigation is Complete_ after the Preliminary Review. This designation replaced the "no further action" ("NFA") category (as outlined in ¶ 7(e)). As described in the Third Monitor's Report (at pgs. 119-121), ID pilot-tested the PIC criteria beginning in October 2016. The pilot included full implementation for AMKC incidents and practice applying the criteria for all other incidents (the ID investigators for teams outside of AMKC practiced applying the criteria, but those Facility-level investigations still went forward). Beginning on June 1, 2017, the PIC pilot was fully implemented to all Facility teams.

To date, the PIC process has been underutilized. During the Third Monitoring Period, the Department identified only three cases for PIC.  With the expansion of PIC to all Facilities, ID closed another 42 cases under PIC during this Monitoring Period.  The Monitoring Team verified that ID investigators appropriately applied the criteria in all cases and they merited closure following the completion of the Preliminary Review.

The implementation of PIC has been slow, primarily because Preliminary Reviewers often do not have a full set of Staff Reports when conducting Preliminary Reviews, as discussed in more detail in the Use of Force Reporting and Tracking section of this report. This inhibits their ability to close a case under PIC since Staff Reports are required. Once procedures to improve the accessibility of Staff Reports are implemented, a significant impact on PIC is expected. Further, ID reports that investigators have been conservatively applying the criteria as they become familiar with the process because they want to ensure a case is not closed prematurely. The Monitoring Team encourages ID investigators to vigorously apply the PIC criteria as the Monitoring Team has found through its assessment of all use of force investigations that even more incidents satisfy these criteria than are currently identified by ID. Maximizing the use of this tool is critical to the Department's overall effort to efficiently manage its caseload and improve the overall quality of investigations. PIC is needed to ensure resources are reserved for completing higher-quality and more timely investigations of the more serious incidents.

The Monitoring Team expects the number of PICs cases to rise in the Fifth Monitoring Period, because the criteria were only considered for incidents outside of AMKC during the last month of this Monitoring Period, so as the other Facility teams ramp up, its use will expand. The Monitoring Team will continue to closely review incidents identified for PICs and provide feedback where appropriate.

_Timeliness_

Previously, the Monitoring Team recommended that ID test an extended timeframe for Preliminary Reviews, allowing up to five business days to complete a review. Since the extension, Preliminary Reviews are generally completed within the required time frame.  The revised period of time to complete the Preliminary Reviews is reasonable.  The increased quality of the review outweighs any interest in completion of the review a few days earlier, especially because there is no basis to believe that the outcome of the review a few days earlier can or would materially change the response by the Department. The table below shows the average number of calendar days to complete

Preliminary Reviews for incidents that occurred January through June 2017. For this analysis, the Monitoring Team determined that seven *calendar* days is equivalent to five *business* days. The Monitoring Team intends to formally assess the effectiveness of the revised timeline once the Department's initiatives to more systematically and timely collect use of force documentation are implemented (via the systems described and the implementation of CMS).

|  | Preliminary Reviews Completed | Completed within 7 days | | Completed beyond 7 days | | Average Number of Days to Complete |
|---|---|---|---|---|---|---|
| Actual Use of Force | 2,254 | 1756 | 78% | 498 | 22% | 6.96 |
| Alleged Use of Force | 196 | 152 | 78% | 44 | 23% | 8.13 |

*Documentation Issues*

The Monitoring Team routinely reviews the underlying documentation available to the investigator conducting the Preliminary Review for particular use of force incidents. Previously, the Monitoring Team found that the Preliminary Reviewers often did not have all the necessary information at the time of their reviews, as the Preliminary Review packets were often missing some of the information required to be reviewed under ¶ 7(a) of this section of the Consent Judgment, including Injury-to-Inmate Reports and Staff Reports. As discussed and assessed above in the Use of Force Reporting and Tracking section of this report, the Department rolled out a new collection process at the end of this Monitoring Period which is intended to improve the timeliness and availability of Staff Reports.  The Monitoring Team intends to closely scrutinize the effectiveness of this process during the next Monitoring Period.

*Accuracy & Tracking of the Preliminary Review Form*

The Department and the Monitoring Team have worked together over the last two Monitoring Periods to increase the reliability of data generated by Preliminary Reviewers to ensure that all relevant data is captured. As noted in prior reports, the data is currently manually entered into the system after the form is completed by the Preliminary Reviewer.  The Monitoring Team has found that the Department's efforts to track information from the Preliminary Reviews more accurately has increased, especially in identifying head strikes and kicks.  It is expected that the implementation of CMS in the next Monitoring Period will further increase the level of accuracy as investigators will directly enter the data into the system, which will also minimize data entry errors. This Monitoring Period, ID also revised the Preliminary Review form in connection with its revision of the ID Closing Report (discussed in more detail in ¶ 9 below), to ensure consistency in the information collected, analyzed, and documented at the Preliminary Review stage.

**COMPLIANCE RATING**   **¶ 7.** Partial Compliance

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves:  (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force;  (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID investigations if they meet any of the criteria in Consent Judgment § VII, ¶ 8.

**Preliminary Review Investigation Referrals**

| Referrals | Second Monitoring Period 1,751 (100%) | Third Monitoring Period 2,162 (100%) | Fourth Monitoring Period 2,444[99] (100%) |
|---|---|---|---|
| Full ID Investigations | 571 (33%) | 863 (40%) | 1,139 (47%) |
| Facility Investigations | 1,136[100] (65%) | 1293[101] (60%) | 1,266 (52%) |

- ID reports that additional cases are referred for a Full ID investigation after the Preliminary Review process if the facts or circumstances of the incident merit additional scrutiny, even if the facts of the case do not meet the specifically enumerated circumstances in this provision.

### ANALYSIS OF COMPLIANCE

The Monitoring Team conducted a two-pronged compliance assessment for this provision. First, the Monitoring Team assessed the cases referred for Facility Investigations.[102] As noted in the prior Monitor Reports (*see* Second Monitor's Report at pg. 97, and Third Monitor's Report at pg. 144), the Monitoring Team has found the overwhelming majority of cases are appropriately referred.

---

[99] The total number of referrals is slightly less than the total Preliminary Reviews for this Monitoring Period because the Monitoring Team did not have the data for a small number of incidents.

[100] This includes 143 cases that the Department identified as meeting the NFA criteria, but the incident received a Facility-level investigation nonetheless.

[101] This includes 22 cases that the Department identified as meeting the NFA criteria, but the incident received a Facility-level investigation nonetheless.

[102] The Monitoring Team deferred to the Department's referral of cases for Full ID investigations as those cases receive the highest level of scrutiny.

131

The Monitoring Team analyzed 205 use of force incidents from January through April 2017, and found that 201 of the 205 incidents (98%) were properly referred for Facility-level investigations. The remaining four incidents (2%) should have been referred for a Full ID investigation. Upon the Monitoring Team's recommendation, these incidents were opened as Full ID investigations.

The Monitoring Team also verified that ID opened a case for all incidents referred for a Full ID investigation.  The Monitoring Team analyzed the 589 incidents referred for Full ID investigations from the January to March 2017 incidents.  The Monitoring Team found that 581 of the 589 (99%) incidents had an open Full ID investigation, meaning 8 cases (1%) that should have been opened as Full ID cases were not assigned for Full ID cases.[103]

The results of these two assessments indicate that ID is meeting the requirements of this provision.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

  a.   *Timeliness* [. . .]
  b.   *Video Review* [. . .]
  c.   *Witness Interviews* [. . .]
  d.   *Review of Medical Evidence* [. . .]
  e.   *Report* [. . .]
  f.   *Supervisory Review* [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID opened 1,113 Full ID investigations into use of force incidents in this Monitoring Period and closed 432 investigations in this Monitoring Period.

- ID investigates incidents in the categories required by ¶ 8, by reviewing and summarizing relevant video footage, conducting interviews with Staff and inmates who were involved or witnessed the incident, reviewing relevant medical evidence, and assessing other collateral information.

- ID investigators summarize their steps in a detailed investigative closing report ("Closing Report"), which must be reviewed and approved by the investigator's Supervisor and the Deputy Director of ID.

- ID developed a revised closing form for Preliminary Reviews and Closed ID investigations to enhance the quality of investigations and address the feedback from the Monitoring Team.

---

[103] The Department upgraded 5 of the 8 incidents upon assessment of this information from the Monitoring Team. The three additional cases are still being evaluated as of the filing of this Report.

- ID leadership participated in a workshop with the Monitoring Team to review a sample of cases to address and work through identified deficiencies and solutions on how to better address these issues in future investigations.

- The ID Auditor conducted an assessment of a sample of Full ID investigations and Preliminary Reviews.  ID developed a process for Supervisors to review the report and respond to the ID Auditor's findings. This will be implemented during the next Monitoring Period.

- In an effort to improve the timeliness of investigations, ID developed the "CorStat" process, which is a monthly review of each ID Team's caseload, emphasizing Full ID cases that have not closed by the 180-day deadline. Once a month, each Facility ID Team meets with the Deputy Commissioner of ID, the Director of ID, the team's Deputy Director of Investigations, and the team's Supervisor. During these meetings, investigators provide status updates on their caseloads, the Deputy Commissioner and the Director determine the next steps for the investigator, and institute a case closure plan.

- Towards the end of the Monitoring Period, ID adopted a vertical case assignment strategy for ID investigators, which means that Full ID investigations are assigned to the Investigator who completed the Preliminary Review.

- ID also implemented the "Fast Track" Process:

  o ID referred nine cases to Trials for Fast Track, four of which were accepted. As of the end of July 2017, these four cases had all been successfully closed utilizing a Negotiated-Plea Agreement ("NPA"), with reasonable outcomes. Five cases were rejected by the Trials Division because they required additional investigative steps in order to substantiate the charges.

  o ID identified 11 cases that could be closed through Fast Track, because the evidence at the Preliminary Review stage clearly demonstrated that there was no violation, or that the violation could be addressed at the Command Level through a Facility Referral.

- ID implemented the process of "Facility Referrals"

  o ID finalized a Facility Referral Division Order, which was approved by the Monitoring Team, and signed into effect shortly after the end of the Fourth Monitoring Period. A "Facility Referral" occurs when ID notifies a Facility of any specific issues identified in a Preliminary Review or other ID review of an incident, with specific instructions for the Facility to take appropriate and necessary action.

  o The Division Order requires ID investigators to obtain written proof from the Facility that issues identified in the referral were remediated. If ID later determines that the Facility did not adequately address the issues, ID will either direct the Facility to explain why they failed to address the issues, or re-open the case as a Full ID

Investigation. All Facility Referrals, and subsequent proof of remediation, will be
tracked by ID and reports will be provided to the Monitoring Team on a regular basis.

ANALYSIS OF COMPLIANCE

ID leadership has expressed a strong commitment to improve the quality and timing of
investigations, including genuine receptivity and willingness to address the feedback from the
Monitoring Team as described in the Third Monitor's Report (at pgs. 124-128 and 146-151). As noted
in that Report, most of the investigations lacked a critical analysis of the evidence and often needlessly
repeated and summarized information. ID's current struggles are not for a lack of will to improve, but
rather the sheer volume of work that needs to be done by relatively new staff who require time to learn
the system and gain appropriate experience conducting investigations.  As a result of the expanded ID
responsibilities described above, the current caseloads for individual Investigators exceed the ideal
caseload targeted by ID (8-10 cases per investigator), which in turn, impacts the timeliness and quality
of ID investigations.

During this Monitoring Period, ID focused on addressing the Monitoring Team's concerns, but
the fruits of this effort could not be demonstrated during this Monitoring Period given the length of
time required to conduct a Full ID investigation.  Accordingly, the Monitoring Team did not conduct
another systematic assessment of closed ID investigations during this Monitoring Period.[104]  ID
leadership and the Monitoring Team also focused on developing and encouraging processes for
investigators to close less complex cases more quickly as required under ¶ 9(a)(i)(2) in order to resolve
investigations more timely and achieve the overarching goal of more timely accountability in cases
where violations are identified.

_Investigation Quality_

The Monitoring Team participated in a working group meeting with ID supervisors and Deputy
Directors to workshop five closed Full ID investigations and to discuss problems with the quality of the
work product. The five cases illustrated many of the investigative deficiencies the Monitoring Team
identified. In advance of the meeting, the Deputy Directors reviewed each case file and prepared
presentations regarding deficiencies they identified, as well as ways the deficiencies could have or
should have been addressed. The meeting provided an opportunity for ID leadership, the Deputy
Directors and the Monitoring Team to exchange ideas for improving the quality of subsequent
investigations. The Monitoring Team found that the Supervisors who participated had a firm grasp of
the concepts discussed, and appreciated their openness to discuss the Monitoring Team's feedback on
investigations they supervised.

In another effort to empower ID Supervisors, ID expanded the distribution of the results of the

---

[104] The Monitoring Team did, however, review a number of completed ID investigations of concerning incidents and
found these investigations were continuing to present the same types of problems described in the Third Monitor's
Report.

ID Auditor's findings (described in more detail in ¶ 12, below). Deputy Directors are expected to address any deficiencies identified by the Auditor with their respective teams, and then explain how the deficiencies will be mitigated going forward. This new process was implemented at the end of this Monitoring Period.  The Monitoring Team will provide an assessment of this process in the next Monitoring Period.

*Improving Closing Report Templates*

ID revised the template for Closing Reports to provide additional guidance and efficiency to investigations in order to enhance the quality of Full ID investigations. The new template will be incorporated into CMS.  The template is designed to steer the investigators toward specific questions and to eliminate unnecessary repetition and summarization. ID consulted with the Monitoring Team on the new template and the Monitoring Team provided minor feedback.  The Monitoring Team thinks the new template may serve as a potentially powerful tool to improve the quality of Full ID investigations and streamline the process to minimize inefficiencies and reduce the time to complete Full ID investigations.  The Monitoring Team will closely scrutinize this process once it is implemented, which is expected to occur in the next Monitoring Period.

*Investigator Case Assignment*

During this Monitoring Period, ID also implemented a vertical case assignment strategy to better leverage and maximize the work of Preliminary Reviews to improve the quality and timeliness of the subsequent Full ID investigation. ID's initial strategy for assigning investigators to Full ID investigations differs across the ID teams as discussed in the Third Monitor's Report (at pgs. 123-124). Only some teams assign the same investigator to both the Preliminary Review and the Full investigation of an incident.  ID initially expressed hesitation in adopting this vertical case assignment to all ID teams because of concerns that it may result in uneven caseloads for investigators. However, upon further consideration during this Monitoring Period, ID recognized that the benefits of vertical case assignment, including increasing the quality of all Preliminary Reviews and Full ID investigations and in May 2017, ID began universal vertical case assignment.  As part of this process, ID is working on creative ways to ensure even caseload distribution while still utilizing the vertical system.

*Information Sharing between ID & Trials*

A critical component of holding Staff accountable for misconduct is to ensure close coordination between ID and the Trials division. As reported in the Third Monitor's Report, currently, in cases where charges are recommended and the case is sent to Trials, the ID investigator is not personally notified of the case's ultimate resolution. The Monitoring team suggested that the quality of work by investigators could be enhanced by regular communication with Staff attorneys from Trials. The Monitoring Team met with staff from Trials during this Monitoring Period to discuss this recommendation, and the Department is considering how best to implement this recommendation.

*Closure of Less Complex Cases More Timely*

ID and the Monitoring Team have continued to discuss how ID can close less complex cases more timely.  The development and implementation of these initiatives require significant thought, consideration and communication.  During this Monitoring Period, ID focused on implementing Fast-Track and the Facility Referral process, as discussed below.  ID and the Monitoring Team are also continuing to discuss additional ideas for closing less complex cases in a more timely fashion.

- ***Fast-Track***

Fast-Track was implemented in May 2017. Following a Preliminary Review, three categories of cases are accelerated: (1) those in which video evidence demonstrates that one or more officers involved in the use of force commits a violation(s) of Departmental Directives or Rules and Regulations and where formal discipline, except for termination,[105] would be sought; (2) those in which video evidence clearly and conclusively demonstrates that the use of force was justified; and (3) those in which video evidence clearly and conclusively demonstrates that a use of force allegation is unfounded. A total of fifteen cases have been closed using Fast Track. Four cases were accepted and closed by Trials.[106]  An additional eleven cases were closed by ID. To fortify the process and build specific guidance for investigators, ID identified eleven cases that could be closed through Fast-Track and shared them with the Monitoring Team for feedback and comments.  The Monitoring Team found the closure of all of these cases was appropriate.  The Monitoring Team expects this process will be utilized more often during the next Monitoring Period as investigators get more comfortable applying this criteria, which will further advance the goal of timely case closure and imposing discipline as appropriate.

- ***Facility Referrals***

During this Monitoring Period, ID developed the Facility Referral initiative.  The goal of this initiative is to minimize redundancy in addressing potential violations, and increase the time in which the Department may take corrective action.  The Monitoring Team believes this process has promise and will closely scrutinize its implementation in the next Monitoring Period.

*Timeliness (¶ 9(a))*

ID continues to struggle to close cases in a timely manner.  ID is mindful of the 180-day deadline, but has not yet achieved this goal in most cases. The Department reports that historically, investigators took 300 days or more to close an investigation, so even the 180-day timelines is a massive undertaking. The challenge of the shortened timeline is compounded by the significant increase in caseload for ID investigators, particularly given their responsibility for conducting both

---

[105] It is anticipated in cases where the Department will seek termination that the Staff Member will exert their right to go to Trial before OATH. Accordingly, a Full ID Investigation, including conducting MEO-16 interviews of Staff, will need to be completed.
[106] The Monitoring Team found the closure and imposition of discipline in these four cases was reasonable.

Preliminary Reviews and Full ID investigations.  As noted above, ID's case load has increased over 700% percent.  Given these dynamics, ID's struggles to manage its increased workload while trying to implement a number of new initiatives is unsurprising. Accordingly, the importance of robust implementation of initiatives designed to close less complex cases more quickly cannot be overstated. Further, efforts to minimize the number of cases that require investigations, either through PICs, Fast-Track, and reducing the use of force overall, will ultimately support the effort to improve the quality of investigations. Finally, the Department's efforts to scrutinize cases monthly through the "CorStat" process should also facilitate timely case closure.

ID was responsible for 2,264 Full ID investigations of incidents occurring between November 1, 2015 and November 30, 2016 that were due to close by June 30, 2017. Of these cases, 29% (655) closed within 194 days[107] of the incident, 8% (191) closed within one month of the 194-day timeline, and 22% (494) were closed more than one month after the 194-day timeline. Approximately 900 cases (41%) were still pending with ID as of August 31, 2017.[108]

With regard to timeliness, ID reports that Staff interviews are a consistent source of delay because scheduling interviews with the Staff member and their legal representative, particularly for Captains, is difficult.  The Monitoring Team intends to assess this situation more closely during the next Monitoring Period in order to search for mechanisms to reduce this delay.

The Monitoring Team appreciates that ID has an unprecedented volume of cases, but the length of time to close investigations is of serious concern. Accordingly, the Monitoring Team will be routinely meeting with ID during the next Monitoring Team to more closely scrutinize ID's closure rates and, as noted above, strategize about initiatives to close less complex cases more quickly. With fewer cases, both the quality and timeliness of Full ID investigations should improve.

*Conclusions*

The Monitoring Team is encouraged by the numerous reasonable and appropriate steps ID has taken this Monitoring Period to improve the quality of investigations and to close cases more quickly. A compliance rating is being withheld because it is premature to rate the impact of the initiatives that have been developed but not yet fully implemented.  The Monitoring Team intends to closely scrutinize these efforts during the next Monitoring Period and will meet with ID routinely to ensure continued progress.

| COMPLIANCE RATING | ¶ 9. Compliance Rating Withheld |
|---|---|

---

[107] 194 days was selected as the appropriate measure to determine if ID investigations were closed timely. This time frame includes the 180 days contemplated under the Consent Judgment and an additional 14 days, which the Monitoring Team determined was an appropriate additional allowable period of time to meet the deadline in good faith and is consistent with the terms of the Consent Judgment (§XXI, ¶6).

[108] The majority of cases that remain pending are investigations where the deadline to close the investigation most recently came due. 205 (19%) investigations were 1-50 days overdue beyond 194 days from the incident; 203 (19%) investigations were 51-90 days overdue beyond 194 days from the incident; and 648 (61%) investigations were more than 90 days overdue beyond 194 days from the incident.

| **VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)** |
|---|

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. Those ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date and have been open for more than six months shall be completed within 120 days of the Effective Date. All other ID Use of Force investigations and reviews involving the categories of Use of Force Incidents set forth in Paragraph 8 above that are outstanding as of the Effective Date shall be completed within 180 days of the Effective Date. These deadlines may not be extended absent extenuating circumstances outside the Department's control.

    a.    Any extension of these deadlines shall be documented and subject to approval by the DCID or a designated Assistant Commissioner. In the event a deadline is extended, the investigation shall be subject to monthly reviews by the DCID or a designated Assistant Commissioner to determine the status of the investigation and ensure that all reasonable efforts are being made to expeditiously complete the investigation.

    b.    In the event that the Use of Force Incident that is the subject of an ID Use of Force investigation or review outstanding as of the Effective Date has been or is referred to DOI, or following the further referral by DOI to the DA or another outside law enforcement agency, for investigation or a decision on immunity, the time period for the Department to complete the investigation or review shall be tolled while the other agency is investigating the matter or making a decision on immunity.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department identified 434 investigations that were outstanding as of the Effective Date and that had been open for more than six months. These were required to be closed by February 29, 2016. These investigations included both Full ID investigations and "IRT" cases, a process by which ID historically would review completed Facility Investigations to ensure the investigation was thorough and the conclusion was appropriate.

  o The Department has closed 434 (100%) of the 434 cases.

- The Department identified 390 cases that were open as of the Effective Date and that had been open for less than six months. These were required to be closed by April 29, 2016.

  o The Department has closed 390 (100%) of the 390 cases.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that by the end of this Monitoring Period, the Department closed all of the ID cases that were open as of the Effective Date of the Consent Judgment, clearing the backlog of ID cases.

As described in the Second Monitor's Report, during the Second Monitoring Period, the Monitoring Team conducted an audit of the closed investigation files to ensure that ID cleared the backlog of cases in an appropriate and reasonable manner. The findings of those audit are addressed in the Second Monitor's Report (at pgs. 97-98). The Monitoring Team will continue to monitor ID investigations routinely as part of the assessment of Full ID investigations (¶ 9).

| **COMPLIANCE RATING** | **¶ 10.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The chart below identifies the Staffing Breakdown for ID as of August 2017.

|  | 2014 (Pre November 1, 2015) | 2015 (Pre November 1, 2015) | 2015 (Post November 1, 2015) | 2016 | 2017 |
|---|---|---|---|---|---|
| Staff | 66 | 78 | 124 | 137 | 159 |
| Investigators | 42 | 53 | 72 | 82 | 107 |
| Preliminary Review Captains | 0 | 0 | 0 | 12 | 11 |
| Total | 108 | 131 | 196 | 231 | 277 |

- ID reports that investigators assigned to work exclusively on use of force cases have an average caseload of 22.3 cases, while investigators assigned to both use of force and non-use of force cases have an average caseload of 32.8 cases.

- ID hired an additional 25 uniformed and civilian investigators during the Fourth Monitoring Period, but also lost five staff due to transfers and resignations. Thus, ID only added a net of 20 investigators during this Monitoring Period.
  - Additionally, 21 of the 25 newly hired investigators are Temporary Duty, or "TDY," Officers. These TDY investigators are not permanent ID staff and can be removed from ID at any time.

- The Department is actively seeking to hire both civilian and uniformed Staff as ID investigators.
  - The Department seeks candidates with strong investigative backgrounds, excellent communications skills, strong analytical and writing skills, the ability to be objective and thorough in conducting investigations of law enforcement personnel, and a valid driver's license. Foreign language skills are desirable. The preferred candidate has a BA/BS. Successful candidates must clear a background investigation.
  - For uniformed Staff candidates, ID reviews the candidate's history with the Department, including an evaluation of sick time, attendance, past disciplinary history, UOF history and overall service records. In addition, ID evaluates uniformed members' training and academic histories.

- The Department's Recruitment Unit and HR Recruitment Manager work in concert to support ID's need for additional investigators, and created a committee dedicated to working with ID to recruit and hire additional staff.

- o The Recruitment Unit participates in events specifically targeting potential candidates for ID investigator positions.

- HR also works with the City's Office of Management and Budget ("OMB") to allocate funds for the required staffing lines in ID. As of May 2017, 16 civilian vacancies were open within ID, along with two open support staff lines.

- The Department reports it sought authorization from OMB to hire additional investigators in the last budget cycle, but the request was denied. The Department reports it intends to seek authorization to hire additional investigators in the next budget cycle.

**ANALYSIS OF COMPLIANCE**

As described throughout this report, ID has seen an increase in caseload volume and corresponding responsibilities. Currently, the workload for investigators is still more than double the Department's stated ideal caseload of 8-10 cases per investigator. ID has been actively recruiting additional investigators, both uniformed and civilian, but struggles to make significant gains in light of natural attrition. This Monitoring Period, the Department gained 20 investigators, but the majority are temporarily assigned Correction Officers on whom ID is unable to rely in the long term. The Department continues to be challenged to hire qualified civilian staff due to the salary limitations imposed by the civil service title, as described in detail in the Third Monitor's Report (at pgs. 152-153). At the end of the current Monitoring Period, ID was authorized to hire an additional 16 investigators.

The Monitoring Team remains concerned about ID's ability to hire qualified investigators and maintain reasonable caseloads for each investigator given their current constraints. The Monitoring Team strongly encourages the City to consider how it may be able to support the Department's efforts to ensure that ID has sufficient resources to conduct its critical work.

| **COMPLIANCE RATING** | ¶ 11. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- During the Third Monitoring Period, ID issued Division Order 05/16 governing the procedures for an internal audit of ID investigations to ensure compliance with the requirements of ¶ 9 of this section of the Consent Judgment.  The Order was approved by the Monitoring Team.

- The ID Auditor issued initial findings regarding the assessment of a sample of Full ID investigations and Preliminary Reviews.  ID developed a process for Supervisors' review and

response to the ID Auditor's findings, which will be completed during the next Monitoring Period.

- The Department adopted some interim quality control measures for other use of force investigations, as ID continues to develop the underlying policies and protocols for new investigation procedures (e.g., Preliminary Reviews, PICs, Fast-Track).
- This Monitoring Period, ID revised the Preliminary Review and Closing Report templates to improve the information analyzed by investigators.

ANALYSIS OF COMPLIANCE

The Department developed a number of interim quality control and auditing procedures to improve the quality of Full ID investigations as described above in ¶ 9. The Department, in consultation with the Monitoring Team, will implement additional quality assurance, and auditing policies and procedures as the other pilots are evaluated and final changes are implemented.

*ID Auditor Findings*

ID assigned a dedicated investigator to audit the quality of investigations. This individual reviews a randomly selected sample of closed ID investigations and Preliminary Reviews and assesses whether an investigator's work product fulfills the obligations of ID's procedures. The first such report of this type, including a high-level summary, was complete in February 2017 and disseminated to ID leadership. Once the initial report was complete, it was provided to the Deputy Directors who supervised any of the investigations reviewed in order to provide an opportunity to review and respond. At the end of the Fourth Monitoring Period, the Deputy Directors were required to review and respond to the auditor's findings for each of the cases they supervise. The Monitoring Team assessed the ID Auditor's high-level summary and found it to be consistent with the Monitoring Team's own findings as to the quality of ID investigations as outlined in the Third Monitor's Report (at pgs. 146-151).  This process is still in its infancy so a more fulsome assessment will occur in future Monitoring Periods. The Monitoring Team will receive the reports and findings of the ID Auditor and the Deputy Directors responses on a routine basis going forward, and the Monitoring Team will begin assessing the quality of those materials during the Fifth Monitoring Period.

ID's efforts to develop its own internal capacity to assess the quality of investigations is a significant step to assist in its overall efforts to improve quality of its investigations and sustain progress that is made.  The Monitoring Team strongly encourages ID to maintain this process and to continue to critically evaluate quality and timeliness of its investigations.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.    All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed.  All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

      a.      *Objectivity* [. . .]
      b.      *Timeliness* [. . .]
      c.      *Video Review* [. . .]
      d.      *Witness Statements* [. . .]
      e.      *Collection and Review of Medical Evidence* [. . .]
      f.      *Report* [. . .]
      g.      *Supervisory Review* [. . .]
      h.      *Recommended Disciplinary Action* [. . .]
      i.      *Referral to ID* [. . .]
      j.      *Role of Integrity Control Officer* [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All use of force incidents are assigned to an Investigating Captain shortly after the incident occurs.

  - The Investigating Captain is responsible for collecting all relevant documentation, including Staff Reports, Injury-to-Inmate Reports, Infraction Reports, etc., to create a complete Facility-investigation file.

- The Investigating Captain assigned to the use of force incident conducts the investigation of the incident unless informed by ID that the case was closed under PIC or assumed for a Full ID investigation.

  - The Investigating Captain then drafts an investigation report, which is reviewed by the Tour Commander, and ultimately reviewed and approved by the Facility's commanding officers.

- Facility investigations are governed by the current Use of Force Directive, which has been in place since before the Effective Date of the Consent Judgment.

### ANALYSIS OF COMPLIANCE

During this Monitoring Period, the Monitoring Team conducted its initial assessment of Facility investigations. First, the Department produced an improved tracking system for closed and pending Facility investigations, which provided the Monitoring Team useful insight into their timing and outcome.  Second, the Monitoring Team analyzed a sample of 118 Facility investigations. This review provided the Monitoring Team with a baseline understanding of the quality of Facility investigations, which will be used to inform policy recommendations, initiatives to improve the timing and quality of the Facility investigations, and recommendations regarding Facility Investigator Training. As described

in more detail below, many of the issues and concerns identified through this review mimic the issues identified for Full ID investigations, discussed in the Third Monitor's Report (at pgs. 124-128 and 146-151).

*Timeliness of Facility Investigations* (¶ 13(b))

Prior to this Monitoring Period, the Monitoring Team had some generally unreliable information related to *closed* Facility investigations, but no information related to the number or age of open investigations at each Facility.  During this Monitoring Period, the Department reported that the Facilities had significant backlogs of investigations.  The Department's new tracking process provided greater insight into the scope and depth of the problem.

First, the Department had a significant backlog of investigations[109] (for both incidents prior to the Effective Date and after the Effective Date). The new tracking process revealed significant problems with the timeliness of investigations of incidents occurring post-Effective Date. Accordingly, in this Monitoring Period, the Department implemented a plan to eliminate the backlog. The Bureau Chief of Facility Operations instituted a protocol requiring each Facility Warden to close a certain number of cases weekly (depending on the backlog at that particular Facility) and monitoring their progress.  As a result of this process, the Facilities closed the investigations for over 2,000 use of force incidents that occurred between November 2015 and December 2016.[110]  A little over 130 investigations of incidents occurring between November 2015 and December 2016 remained pending as of August 2017.

| November, 2015 to December 31, 2016 Incidents[111] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Closed Within 25 Business Days | | Closed Between 26 & 30 Business Days | | Closed Beyond 30 Business Days | | Total *Pending* Beyond 25 Business Day Deadline | | Total Cases |
| 336 | 15% | 161 | 7% | 1637 | 72% | 134 | 6% | 2268 |

The timeliness of investigations improved more recently. For the over 1,200 Facility investigations opened during the current Monitoring Period, 62% were closed within the required

---

[109] This includes not only use of force-related Facility investigation packages, but other types of incidents requiring investigation pursuant to Department policy.

[110] The Facilities also worked to close the investigations of incidents that occurred prior to the Effective Date.  As of August 2017, over 300 investigations (mainly from two Facilities) of incidents that occurred prior to the Effective Date are pending.  The Department is developing a plan to ensure these investigations are completed as soon as possible.

[111] The data regarding investigations of incidents from November 2015 to December 2016 is not comprehensive, but captures a significant number of the Facility Investigations conducted during this time period. The data is developed from the Department's closed Facility Investigation tracking excel, which was implemented beginning in January 2017. The tracking excel captures any Facility Investigation that was closed beginning in January 2017, and any investigations that were closed before January 2017, but had not yet been inputted into the former tracking database used prior to January 2017.

timeline (or a few days after). This improvement is encouraging, but the performance level is not yet sufficient to achieve compliance.

| January to June 2017 Incidents | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Closed Within 25 Business Days | | Closed Between 26 & 30 Business Days | | Closed Beyond 30 Business Days | | Total Pending Beyond 25 Business Day Deadline | | Total Cases |
| 645 | 52% | 120 | 10% | 346 | 28% | 129 | 10% | 1240 |

*Facility Investigation Outcomes*

The table below shows the reported outcomes of investigations closed between January 1, 2017 and the end of the Fourth Monitoring Period. As shown, the Facility investigators determined that force was appropriate in 90% of the 1,111 investigations closed. These determinations are simply not credible.[112] The Department's own assessment of incidents through Rapid Reviews and Avoidables, as well as the Monitoring Team's assessment of use of force incidents investigated by the Facility, fully contradict this conclusion. That so many of the Facility investigators and the reviewing Facility Command Supervisors came to the conclusion that force was appropriate signifies problems with this investigative tool.

| Force Was Appropriate | | Force Was Unnecessary | | Force was Excessive | | Outcome Unknown (Data Not Available) | | Total |
|---|---|---|---|---|---|---|---|---|
| 1,003 | 90% | 13 | 1% | 7 | 1% | 88 | 8% | 1,111 |

*Quality of Facility Investigations*

The Monitoring Team analyzed a sample of 118 Facility investigation files which closed in 2017. The majority were selected randomly within a stratified sample (stratified by Facility) of Facility use of force investigations that closed between January 1, 2017 and April 30, 2017.  The Monitoring Team also selected some additional files to review based on: (1) certain outcomes of the investigation (for example, those investigations where the Warden did not agree with the Tour Commander's findings, or where the Tour Commander found the force to be unnecessary or excessive) and (2) an assessment of the Preliminary Review of the incident revealed objective evidence of wrong-doing.

As a threshold matter, the Monitoring Team found that the Investigating Captains conducting the investigations were not involved in or supervised the incident for which they were investigating as required under ¶ 13(a).  However, the Monitoring Team found the following deficiencies:

  o  Inmate Statements were discredited without explanation;

---

[112] The Warden concurred with the Tour Commander in all but one of the incidents with known outcomes.

o   Some investigations had no inmate statements at all, either because of refusal, lack of attempt to interview the inmate or no mention of inmate statements in the file;

o   Investigators failed to note obvious evidence of collusion in Staff Reports, including using very canned verbiage, identical phrasing, etc.;

o   Investigators did not address Staff's failure to identify an Anticipated Use of Force, or to properly supervise a situation;

o   Inmate allegations were not adequately addressed;

o   Investigators failed to interview relevant inmates and to close important gaps in the investigation;

o   Investigators failed to bring charges/discipline for use of force violations, Staff's failure to report a use of force or Staff's false reporting.

These findings, along with the outcome data described above, call the veracity of Facility investigations into serious question.

*Conclusion and Next Steps*

The Department is unable to demonstrate compliance with the timely completion of investigations given the significant backlog and delay in timely closing investigations. Toward the end of the Monitoring Period, the Department started to refine the process for tracking (e.g., investigations where an extension of time to complete was granted and/or in situations where discipline was imposed for cases that were not closed in a timely fashion).  This revised tracking process will be implemented during the next Monitoring Period.  Further, the Department will be meeting with the Monitoring Team routinely to assess progress toward timely case closure and to identify any systemic obstacles.

The process for Facility investigations sorely needs to be enhanced.  These investigations must be coordinated with ID's responsibilities and the other processes the Department has put in place to address the misuse of force, including Rapid Reviews and Avoidables.  The Department began to consider how to make improvements at the end of the Monitoring Period and will be consulting with the Monitoring Team during the next Monitoring Period to finalize its approach. Accordingly, the Monitoring Team is withholding the compliance rating for the quality-related provisions. The Department, in consultation with the Monitoring Team, will develop a plan by the end of the Fifth Monitoring Period.

| COMPLIANCE RATING | ¶ 13 (a), (c) to (j). Compliance Rating Withheld<br>¶ 13(b). Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

  a.  The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

  b.  The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has a designated "Youth ID Team" consisting of one Captain, two civilian investigators, and six uniformed Staff investigators which is based at RNDC.

- The Youth ID Team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced inmates, age 16 or 17).

- During this Monitoring Period, 46 use of force incidents were referred for Full ID investigations involving male inmates under the age of 18 at the time of the incident, and three use of force incidents were referred for a Full ID investigation involving female 16- and 17-year-old inmates.

- During this Monitoring Period, Facility investigations involving youth were assigned to the Youth ID team for review upon closure. This was done by restarting the IRT ("Investigation Review Team") assignment process that was previously utilized by ID to assign ID investigators to review Facility Investigations once they are closed by the Facility, conducting a quality assessment of the Facility-level investigation.

  o  103 IRTs were assigned to the Youth ID Team for incidents that occurred during this Monitoring Period. ID completed the IRT review of six of the 103 cases (6%) by the close of this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*Composition of Youth ID Team and Assignment to Youth ID Cases*

The Monitoring Team verified that the Youth ID Team remained in place, and continues to include qualified staff. During this Monitoring Period, a civilian Youth ID investigator was transferred to a new position within ID, and was replaced by another civilian investigator with a college degree, an MBA, and prior investigation experience within ID. The Monitoring Team also verified that all referrals for Full ID investigations involving inmates under 18 were assigned to the Youth ID Team.

146

*Quality of Youth ID Team Investigations*

The Monitoring Team met with the Youth ID Team Supervisor as part of the workshop with ID to address the quality of investigations, described in ¶ 9.  One of the cases discussed was a Youth ID Team investigation.  The Monitoring Team also reviewed a sample of Full ID Investigations conducted by the Youth ID Team as part of the overall assessment of closed ID Investigations during the Third Monitoring Period. The work of the Youth ID Team suffered from the same deficiencies identified more generally. The Monitoring Team believes that the steps to improve the quality of investigations as described in ¶ 9 will also elevate the quality of Youth ID Team investigations.  It is expected that the reductions in the use of force with the adolescents will also positively impact the quality of investigations because the caseload will decrease.  However, as stated in ¶ 9 above, it is premature to assess the impact of efforts to improve the quality of these investigations because of the time required to close Full ID investigations.

*Youth ID Team Review of Closed Facility Investigations Involving Youth* (¶ 14(b))

Youth ID Team investigators are now required to review all closed Facility-level investigations involving 16- or 17-year-old male and female inmates.  The Department reports that 104 Facility investigations were assigned IRTs. To date, the Youth ID team has only conducted a very small number of Facility investigations reviews, so the Monitoring Team has not yet assessed their quality.

| COMPLIANCE RATING | ¶ **14.** Substantial Compliance<br>¶ **14(a).** Partial Compliance<br>¶ **14(b).** Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files.  Each investigation file shall include at least the following:  (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID maintained the Preliminary Review Operations Order that was developed during the Second Monitoring Period, revised during the Third Monitoring Period and issued on November 30, 2016.

- ID took a three-phase approach to develop a comprehensive set of policies and procedures for the division.

  o Phase 1: *Identify Policies and Procedures*: ID identified and collected 74 internal memorandums, Division Orders and procedures.

  o Phase 2: *Review Policies*: ID reviewed policies and procedures to determine if they required any revisions or needed to be rescinded.  ID also determined which policies related to any *Nunez* obligations.

  o Phase 3: *Revisions*: ID will revise and issue updated procedures as necessary.

- The current Use of Force Directive governs the procedures for Facility investigations.

**ANALYSIS OF COMPLIANCE**

The Department has a large number of policies and procedures related to the investigation of use of force incidents.

*ID Investigations*

Investigations conducted by ID (including Preliminary Reviews and Full ID investigations) are governed by a series of internal memorandums, division orders and directives that are maintained by ID, some of which have been in place since the 1990s, as ID does not have a comprehensive manual of procedures that collects all of the policies and procedures in one place. ID completed Phase 1 and 2 of its review (described above). During the next Monitoring Period, ID will undertake the tasks of reviewing, revising, consolidating and/or rescinding policies as appropriate.  As part of this effort, ID is developing an appropriate timeline for Phase 3.  The Monitoring Team will continue to work closely with the Department to ensure that the final set of policies and procedures will properly guide thorough, timely, and efficient investigations and that they are consistent with the requirements of the Consent Judgment.

*Facility Investigations*

The procedures for Facility investigations are enumerated in the current Use of Force directive, but are not included in the New Use of Force Directive.  Accordingly, during the next Monitoring Period, the Department, in consultation with the Monitoring Team, the Department will develop and implement a stand-alone policy governing the investigations conducted by the Facility.

*Standardized system and format for organizing the contents of investigation files* (¶ 16)

The Monitoring Team has not had an opportunity to systematically analyze the Department's efforts to develop and implement a standardized system and format for organizing the contents of investigation files.  That said, the Monitoring Team has generally found that ID files reviewed are well-organized.

| **COMPLIANCE RATING** | **¶ 15.** Partial Compliance |
|---|---|

| ¶ **16.** Not Yet Rated |
| --- |

7.   RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management Section of the Consent Judgment requires the Department to
create a number of systems to identify, assess, and mitigate the risk of excessive and unnecessary
use of force. These measures include developing and implementing a computerized Early
Warning System ("EWS") (¶ 1); implementing "5003 Counseling Meetings" between the
Warden and any Staff Member who engages in repeated use of force incidents where at least one
injury occurs (¶ 2); creating a new position, the use of force auditor ("UOF Auditor"), who
identifies systemic patterns and trends related to the use of force (¶ 3); creating a reporting and
tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of
the Corporation Counsel to notify the Department of all allegations of excessive force that have
not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation
data throughout the Department (¶ 6).

During the Fourth Monitoring Period, the Department continued to refine many of the
new processes developed to address concerning practices related to use of force, including the
Wardens' reviews of use of force incidents as part of the Rapid Reviews and the "Avoidables"
process; the Immediate Action Review Committee's review of incidents; the presentation of use
of force data during monthly Total Efficiency Accountability Management System ("TEAMS")
meetings and weekly Operational Leadership meetings; identifying Staff who require counseling
as part of the 5003 process; and developing EWS. The Department also continued to develop
CMS and a process for evaluating litigation claims. Each of these is described in more detail
below. The Monitoring Team continued to collaborate with the Department to refine procedures,
review outcomes, identify trends and evaluate effectiveness.

*Early Warning System (EWS)*

During the Fourth Monitoring Period, the Department developed the concept for a new EWS, with preliminary endorsement from the Monitoring Team, designed to identify Staff Members with problematic conduct who may need additional support, mentorship, and/or corrective action. In contrast to the automated process discussed in previous Monitor's Reports, projected to require several years to complete, the new EWS incorporates some manually-driven aspects that avoid the need for various systems that store electronic data to speak to each other. The Department selected a variety of sources of use of force data and developed threshold criteria within those sources to identify Staff who may require additional support, including monitoring for a finite period of time. The goal of monitoring is to help Staff develop the skill set necessary for managing inmates appropriately, before more serious disciplinary matters arise. The Monitoring Team consulted with the Department on the development and refinement of these procedures, as described in more detail in the discussion below.

*The Commissioner's Twelve*

The Department continued to assess whether incidents meet one of 12 areas of concern, described in detail in previous reports (*see* the Second Monitor's Report at pgs. 108-110 and the Third Monitor's Report at pgs. 158-160). However, after reviewing data produced by this process, the Monitoring Team determined that the data collected was neither comprehensive nor reliable.  A review of responses from Facility leadership and discussions with Staff also suggested that the associated plans of action had become more of a perfunctory exercise, rather than a strategy with the potential to affect cultural change within the Department. Given these concerns, at the end of the Monitoring Period, the Monitoring Team recommended that the Department suspend the Commissioner's Twelve process pending an assessment of the other

processes in place to address problematic uses of force in order to determine the most effective approach. The Monitoring Team encourages the Department, in particular the uniform leadership, to review behaviors typified by the Commissioner's Twelve during their routine discussions with Staff.

*Monitoring Team Recommendation for Staffing of UOF Auditor*

The Monitoring Team recommended in the Third Monitor's Report that the Department provide appropriate support for the UOF Auditor.  During this Monitoring Period, the UOF Auditor served as the Acting Deputy Commissioner of Quality Assurance and oversaw the Quality Assurance Division of NCU.  In this period of transition, the UOF Auditor leveraged the staff in the Quality Assurance Division of NCU to assist in the work of the UOF Auditor.  While this provided a short term solution for the need for additional support, it is important for the UOF Auditor to have dedicated resources to focus on this important work.  The Monitoring Team strongly encourages the Department to identify and provide dedicated resources to the UOF Auditor.

The Monitoring Team's assessment of compliance with these provisions is below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Deputy Risk Manager developed a concept for a new EWS in consultation with the Monitoring Team.

- The Department will draw on several sources of use of force data to identify Staff whose conduct may warrant additional oversight. Each of these data sources have set threshold criteria which trigger a screening for EWS if met:

  o Immediate Action Review Committee

  o Rapid Reviews

  o Command Disciplines

  o 5003 Counseling Meetings

  o Preliminary Reviews

  o UOF incidents

- If the threshold is met in any of the data categories above, a screening process ensues which includes a comprehensive review of the Staff Member's history with the Department, including, but not limited to, the Staff Member's assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, inmate history (if relevant), the circumstances of each use of force, and the proportionality of force used. This individualized screening is conducted to determine whether an intervention could improve a Staff Member's performance through placement in a monitoring program.

- The monitoring program will involve routine counseling and coaching and close review of all use of force incidents in which the Staff Member is involved. Continued poor performance may extend the duration of the monitoring period. The Staff Member may also be re-assigned or referred for re-training to address any performance deficiencies.

- This Monitoring Period, the Department conducted the analysis of a few of the use of force data sources above.

- The Department conducted case studies during this Monitoring Period to test the screening process.

  o The Department initiated the monitoring program for two Staff Members at the end of the Monitoring Period.

ANALYSIS OF COMPLIANCE

In contrast to the automated process discussed in previous Monitor's Reports, projected to require several years to complete, the Department developed the concept for a new EWS that incorporates some manually-driven aspects that avoid the need for various systems that store electronic data to speak to each other. As noted above, the Department identified data sources and threshold

criteria that may indicate Staff have a pattern of problematic uses of force, and set thresholds for each one. If a Staff member meets the threshold, his or her history will be reviewed more closely to identify whether appropriate sources of support and monitoring may reduce the risk of future problematic uses of force. The Monitoring Team reviewed the data sources and thresholds set by the Department and agreed they are appropriate. Successfully identifying a set of useful predictors is noteworthy given the Department's limited data, and the Monitoring Team is encouraged by the Department's efforts to leverage and re-purpose existing data.

The Department has yet to utilize the new EWS protocol to identify a pool of Staff who meet the various thresholds.  To further assess the usefulness of the selected predictors, the Monitoring Team suggested a pilot study/set of case studies that could be used to simulate how the factors and thresholds will work to identify a pool of Staff.  The Monitoring Team will review these data during the next Monitoring Period and will continue to work with the Department on the process for accurately identifying a pool of Staff with problematic patterns of use of force.

The Monitoring Team also evaluated the Department's initial framework for screening and monitoring Staff identified through the EWS.  The framework is reasonable and incorporates both global strategies to better support Staff as well as individualized support.  The Monitoring Team is encouraged by the Department's efforts to pilot the monitoring process and will evaluate its implementation during the next Monitoring Period.

The Monitoring Team commends the Department's progress during this Monitoring Period in developing the concept for a new EWS that will not require years to implement, as is the case for the fully automated version. That said, significant work remains to implement the new EWS, including identifying Staff to screen, deeper reviews, and the ongoing monitoring of identified Staff. Once these steps have been implemented, the Monitor will be positioned to provide the required approval of EWS. In the next Monitoring Period, the Department must focus and refine the screening and monitoring protocols and identify a staffing model to sustain this process. A compliance rating is being withheld in order for the Monitoring Team to further evaluate the outcomes of the initiatives developed during this Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Compliance Rating Withheld |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department revised the 5003 Directive in consultation with the Monitoring Team.

- The 5003 Counseling Meeting process includes:

  - A standardized process to identify Staff Members who qualify for Counseling Meetings as required in ¶ 2 of this section, based on IRS data.

  - The Legal Division develops a chart of the Staff Members who qualify for a Counseling Meeting and shares it with each Facility Warden every other month.

  - The chart includes a list of Staff who qualified for a Counseling Meeting and the details of the incidents the Staff were involved in.

  - The chart also includes a set of questions for the Facilities to complete following its assessment of each Staff Member identified for a Counseling Meeting. Questions include; whether the Supervisor elected to conduct a Counseling Meeting with the Staff Member, whether the Staff Member received counseling or not, the reasons why or why not, and the outcomes of the 5003 Counseling Meeting.

  - The Facility is required to assess each Staff Member and conduct Counseling Meetings with Staff who are selected. Within 30 days of receiving the chart, the Facility must provide the results of its assessment and responses to the questions discussed above. The Facility must also provide an individual form for each Staff Member who received a Counseling Meeting.

- During the current Monitoring Period, 689 Staff Members qualified for a Counseling Meeting.[113]

---

[113] As noted elsewhere in the report, involvement in three use of force incidents, alone, is not necessarily indicative of a problem, there are several legitimate factors that may contribute to Staff's involvement in use of force incidents

ANALYSIS OF COMPLIANCE

As part of the Monitoring Team's assessment of this provision, the Monitoring Team confirmed that the Directive outlining this procedure remains in effect. In order to assess the quality of implementation, the Monitoring Team interviewed several Facility Supervisors regarding the 5003 counseling process. The Monitoring Team also assessed the documentation produced by the Facilities regarding whether a Staff Member was considered for a 5003 Counseling Meeting.

*Feedback from Facility Supervisors*

Discussions with Facility leadership revealed confusion about when Counseling Meetings are supposed to be conducted, how to complete the paperwork and what should be discussed during the counseling sessions. Those interviewed expressed that they feel pressured to always find a coaching or retraining message to relay to Staff during a 5003 Counseling Meeting, regardless of whether the force used by Staff was appropriate or not. Once the Monitoring Team relayed this feedback to the Department, the Department reported its intention to develop additional guidance and training materials for Supervisors regarding the 5003 counseling sessions.

*Document Review*

The Monitoring Team reviewed the 5003 counseling data produced by the five Facilities with the largest number of Staff qualifying for a Counseling Meeting in February and March, 2017.  The Monitoring Team reviewed the completed charts and supporting documentation submitted for the five Facilities. Findings included:

- A total of 340 Staff qualified for a 5003 Counseling Meetings across the five Facilities reviewed, representing 71% of all Staff who qualified across all Facilities in February and March, 2017.
    - 12 of the 340 Staff identified qualified for a *mandatory* 5003 counseling session, as required under the terms of the Consent Judgment.
- The charts and individual supporting documentation were not consistently completed and did not include all relevant information, which meant it was unknown if the Staff member was selected to receive a counseling session and if it occurred.
- Across the five Facilities, Wardens reported that a total of 197 counseling sessions were conducted. 11 of 12 (92%) compulsory Counseling Meetings were reportedly conducted (one was unknown, with no response provided) and 186 of 328 (57%) discretionary Counseling Meetings were reportedly conducted. In 62 cases, the Monitoring Team could not discern whether the Warden was reporting that a counseling session occurred

---

(such as the shift and post assignments, type of inmate population, etc.). Further, a 5003 Counseling Meeting is not disciplinary in nature as leadership may also use the meeting as an opportunity to reinforce best practices for Staff who are more frequently engaged in situations that may require the use of force.

because appropriate documentation was not provided. In 80 cases, the Facility indicated that they elected not to conduct a 5003 counseling session.

- Only one of the five Facilities imposed any formal discipline (other than re-training or reassignment). Five Staff received Command Discipline, including one Staff Member who qualified for a compulsory Counseling Meeting.

As the analysis above demonstrates, the Department is struggling to implement the revamped 5003 counseling process. The required information is not consistently or reliably reported by the Wardens and the process for capturing data on who participated in counseling sessions appears to be inefficient.  The Department needs to develop a more reliable and efficient process to track who qualified for counseling (including whether the counseling session is mandatory or discretionary) and whether the Staff member participated in a Counseling Meeting.

*Impact of 5003 Counseling Meetings*

The Monitoring Team has not had an opportunity to conduct a thorough assessment of the quality of 5003 Counseling Meetings, given that the threshold issue of whether the sessions have occurred needs to be addressed first.  However, the Monitoring Team did assess records related to nine Captains who were involved in a pattern of problematic uses of force.  In each case, the Facility conducted 5003 Counseling Meetings, and yet the problematic uses of force persisted after the counseling session occurred. While the Monitoring Team has not yet completed a systematic review of the quality of the 5003 Counseling Meetings, these initial observations suggest they may not be particularly effective in mitigating future misconduct.

*Conclusion*

Although the Monitoring Team acknowledges the efforts made by the Department to try and revamp this process, the current findings raise a number of concerns. In order to maintain its Partial Compliance rating, the Department must address the concerns outlined above. The Department reported to the Monitoring Team that it is working to address these concerns and will consult the Monitoring Team on the proposed changes in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

### X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.      The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.      The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that:  (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the

|   | Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed. |
|---|---|
| c. | The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Chief Internal Monitor serves as the Use of Force Auditor. The Use of Force Auditor was also named the Acting Deputy Commissioner of Quality Assurance in this Monitoring Period and reported to the Acting First Deputy Commissioner.[114]

  o The Use of Force Auditor issued the Q4 2016 and Q1 2017 Auditor Reports during this Monitoring Period.

  o The Use of Force Auditor resigned at the end of the Monitoring Period.

- The Department began to actively recruit a new Use of Force Auditor at the end of the Monitoring Period.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Use of Force Auditor issued reports regarding his findings for Q4 2016 and Q1 2017. The Q4 2016 report explored several key themes relating to use of force, such as reasons for use of force and tenure of Staff using force. The Q1 2017 report explored Staff injury rate and the handheld camera footage audit by the Nunez Compliance Unit.

The Use of Force Auditor made several sound recommendations regarding; (1) the importance of first-line supervisors, (2) the need to evaluate force relative to inmates' resistance, (3) the validity of the Commissioner's Twelve process, and (4) the need for regular in-service defensive tactics refresher training to include scenarios involving problematic inmates and/or inmates with mental health issues.

The work of the Use of Force Auditor is critical to the Department's efforts to achieve and sustain the necessary reforms. To do so, the Use of Force Auditor must have appropriate staffing with permanently funded lines, as noted above. The Monitoring Team was extremely impressed by the Use of Force Auditor's work during this Monitoring Period and notes that his resignation will impact the Department's ability to conduct its own internal assessments. The Monitoring Team hopes that a candidate of equal caliber and commitment can be identified as a replacement. In order to achieve Substantial Compliance with this provision, the Department must demonstrate that the Use of Force Auditor consistently produces thoughtful and reliable analysis and that the Department considers the issues raised and responds to areas of concern as appropriate.

| **COMPLIANCE RATING** | **¶ 3.** Partial Compliance |
|---|---|

---

[114] The Deputy Commissioner of Quality Assurance was named the Acting First Deputy Commissioner during this Monitoring Period. The Acting First Deputy Commissioner maintained oversight of the Quality Assurance division in this new role.

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel provides monthly and quarterly reports of lawsuits filed and settled, which include the following:

    o Case filing and disposition dates,

    o Names and shield numbers (if appropriate) of the defendants,

    o Incident details,

    o Dollar amount in controversy,

    o Forum of the lawsuit, and

    o Description of the lawsuit.

- This Monitoring Period, the Department produced the Quarterly Law Department litigation reports covering January-June 2017. These reports are produced on a routine basis as they are received from the Law Department.

- The Department developed a process for receiving the Office of the Comptroller reports regarding the payment of claims related to UOF incidents.  The first report covered April-June 30, 2017

### ANALYSIS OF COMPLIANCE

The Monitoring Team confirmed that the Department received the documents described above. The Monitoring Team will continue to verify the Office of the Corporation Counsel lists continue to be provided and that the Officer of the Comptroller reports are provided quarterly.  During this Monitoring Period, the Department's Deputy Risk Manager also began evaluating this information and considering various methodology for how this information can be analyzed and considered to support the Department's overall risk mitigation efforts. The Monitoring Team met with the Deputy Risk Manager to discuss this analysis, and is optimistic that the Deputy Risk Manager's assessment of this information will yield valuable insight.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

| X. Risk Management ¶ 5 (ID Investigations of Lawsuits) |
|---|

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**Department's Steps Towards Compliance**

- The Office of the Corporation Counsel provides the Department with a list of all complaints relating to the excessive use of force, and requests all investigation files and associated evidence.

- Whenever DOC receives a use of force allegation from the Office of the Corporation Counsel, they confirm whether a use of force investigation into the allegation has already been conducted. If they cannot confirm the incident was previously investigated, DOC Legal Division attorneys are required to notify a designated Assistant General Counsel who will then share the information with ID to consider whether a Full ID Investigation is warranted.

- The Department's Deputy General Counsel sent multiple emails to all DOC attorneys reminding them of this process and reminds them of their obligations verbally during Legal Division Management meetings.

- The Department received two lawsuits containing allegations regarding a use of force incident that did not appear to have been previously investigated.

- ID reviewed the complaints for those two cases and opened an investigation into one of the allegations and determined that a Full ID investigation was not merited in the second case.

**Analysis of Compliance**

 The Office of the Corporation Counsel reports that all allegations of excessive use of force in a lawsuit are brought to the Department's attention. The Department's process to identify any UOF allegations in a lawsuit that was not previously investigated is adequate. The Monitoring Team confirmed that during this Monitoring Period, ID considered whether to open investigations regarding two allegations that had not already been investigated. The Monitoring Team found ID's decision to open an investigation into one of the allegations and not to open an investigation for the other allegation was reasonable, based on the circumstances. Going forward, the Monitoring Team will continue to ensure that the process described above is maintained.

| Compliance Rating | ¶ 5. Substantial Compliance |
|---|---|

**X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)**

**V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)**

¶ 6. By August 31, 2017,[115] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As outlined in prior Monitor's Reports, the Department has been working to develop CMS since early 2012 (*see* the Second Monitor's Report at pgs. 122-123 and the Third Monitor's Report at pgs. 172-174).

- The Department focused on finalizing the Trials functionality, and refining the ID and Facility investigations functionality.

- The Department's IT Division has been working with the vendor on migrating data from the Department's current systems, such as ITTS.

- The Department also took a critical step towards implementing CMS—identifying the universe of UOF-related CMS users. The Department identified approximately 1,600 total users, including 1,300 uniform Staff (including Facility Tour Commanders and about 1,000 Captains), all ID staff, all Trials staff, certain Legal Division staff, as well as executive staff of the Department, including the Commissioner's staff.

- The Department will provide a full day of training for all CMS users. The vendor will develop the training and will train the DOC instructors. Space for the training has been secured and DOC instructors have been identified. It is anticipated that all training will be completed by December 2017.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team addresses ¶ 6 of this section as well as Consent Judgment § V (Use of Force Reporting), ¶ 18 together. CMS is a single, unified system that replaces the existing disparate case management systems and related manual processes currently used by eight different DOC

---

[115] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Docket Entry 297).

divisions/units including: Facility Investigations, Investigation Division, Trials & Litigation Unit, Office of General Counsel, Equal Employment Opportunity Office ("EEO"), OLR, Office of Administration and the Health Management Division. CMS will track all the information concerning Facility investigations, Full ID investigations, and disciplinary actions as set forth in Consent Judgment § V (Use of Force Reporting), ¶ 18.

During this Monitoring Period, the Department made continued progress on CMS and is on track to implement CMS by the end of the year. The Monitoring Team observed CMS during an in-depth demonstration of the Use of Force related capabilities. The Monitoring Team was impressed by the significant and sophisticated components embedded in the system. CMS will integrate data from other systems, and provide both uniformed Staff and headquarters staff with an entirely new, integrated way to input and manage investigations, the imposition of corrective action, and analyze corresponding data. The Department has committed significant time, resources, and personnel to develop CMS. A large number of dedicated individuals across the Department have worked collaboratively to ensure that the system not only works from a technical stand point, but also mirrors the appropriate work flows for each division.

The Monitoring Team applauds the Department's diligent efforts to develop CMS. CMS will completely transform the way the Department captures and reports information related to Staff accountability. The Monitoring Team believes CMS will also significantly enhance the work of the Department to conduct investigations, impose discipline, and collect and analyze data. The Monitoring Team's experience suggests that developing and implementing new systems is often fraught with unexpected delays and thus will keep abreast of any challenges incurred.

| COMPLIANCE RATING | ¶ 6. Requirement Not Yet Due |
| | ¶ 18. Requirement Not Yet Due |

### 8. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely accountability is an indispensable element of the overall effort to reduce and deter the use of excessive and unnecessary force by Staff. This Monitoring Period, the Monitoring Team continued to focus on processes to help the Department identify and address Staff misconduct more quickly, as described in detail in the Risk Management section. Only with dependable processes for detecting Staff's misuse of force can the certainty of discipline work as a deterrent. The Monitoring Team also continued to scrutinize the full spectrum of tools available to address Staff misconduct (e.g., re-training, corrective

interview, command discipline, and formal charges).  Toward that end, the Monitoring Team met

with the General Counsel and Deputy General Counsel for the Department, Deputy General

Counsel of the Trials and Litigation Division ("Trials"), the Executive Managing Director and an

Executive Agency Counsel of Trials, along with the Deputy Commissioner of ID, the Deputy

Director of ID, representatives of the Chief's Office, and the Department's Legal Division, to

further understand the various options available to the Department for holding Staff accountable.

The graphic below provides an overview of the Department's tools for identifying potential

misconduct and the options that may be employed to address the misconduct identified.  The

Department has numerous methods for both detecting and responding to misconduct, but has not

yet sufficiently implemented these options to ensure that meaningful, timely, and adequate

corrective action is imposed.

| Tools for Detecting Potential Misconduct | Options for Corrective Action |
|---|---|
| <br><br>• Ad hoc review by Agency Officials<br>• Preliminary Reviews<br>  o Facility Referrals<br>• Immediate Action Committee Review<br>• Facility Level<br>  o Rapid Reviews<br>  o Avoidables<br>  o Facility Investigations<br>  o 5003 Review Process<br>• Full ID Investigations | • Re-Training<br>• Corrective Interviews<br>• Counseling (including 5003 Counseling)<br>• Command Discipline<br>  o Written/Oral Reprimand<br>  o Forfeiture of up to 5 Vacation/Compensation Days<br>  o Change of Assignment<br>  o Revocation of authorization for outside employment<br>• Suspension<br>• Modified Duty<br>• Reassignment<br>• Demotion<br>• Personnel Determination Review (PDR)[116]<br>  o Extension of Probation<br>  o Termination<br>• Formal Discipline<br>  o Courses that address the misconduct (e.g. anger management) |



---

[116] Disciplinary options for probationary Staff.

| |
|---|
| o Return to Command for Command Discipline |
| o Forfeiture of Days (1 to 60 compensation/vacation days) |
| o Suspension |
| o Probation (ranging from 12 to 36 months) |
| o Irrevocable Retirement/Resignation |
| o Termination |

During this Monitoring Period, the Trials & Litigation division focused on serving charges more timely, improving communication with ID to receive necessary materials to prosecute cases more efficiently, and identifying case processing delays and potential solutions for them.  The process for imposing formal discipline requires coordination among several different divisions and is lengthy, complex, and overly bureaucratic, as illustrated in the flow chart below. This onerous process prolongs the imposition of discipline.  Accordingly, during this Monitoring Period, the Department and the Monitoring Team began exploring options to make the process more efficient.  This work continued at the end of the Monitoring Period and a more fulsome status update will be provided in the next Monitor's Report.



Use of Force incident occurs.
ID conducts Preliminary Review of incident.
Facility or ID conducts investigation.
Facility or ID investigation completed.
Investigator drafts MOC if charges are substantiated.
Commanding Officer or DC of ID reviews and approves MOC. MOC is forwarded to Bureau Chief of Administration.
Office of Bureau Chief of Administration tracks case and assigns case number.
Signed MOC & 22-R Form is sent to Trials.
Director of Trials reviews case and assigns attorney to case.
Attorney assigned to case within 2 days of receipt of MOC and provided MOC and 22-R.
Trials Investigator assigned to case and collects investigation materials.
Investigation file is seperately forwarded to Trials by ID or Facility.
Trials Attorney drafts charges.
Trials Administrator sends charges to Respondent's assigned Facility with copy to Bureau Chief of Facilities.
Charges are served by Facility.
If Facility has not served within 20 days of receipt of MOC, the Trials attorney alerts Trials Administrator and a certified copy of the charges is mailed.
After service of charges, Trials Attorney provides discovery materials to Respondent's Attorney.
Trials Attorney assesses case and confers with Trials Manager to develop settlement offer.
Trials Attorney may attempt to settle case without OATH and will request Respondent to appear at HQ.
OATH proceeding scheduled after penalty offer is approved and discovery is sent.
OATH generally occurs one day a week with 12 cases, and 4 attorneys and one manager assigned.
Trials Administrative Assistant is responsible for all logistics of scheduling OATH including coordination with Respondent's Command.
1 of 3 outcomes at OATH: (1) NPA (blue boxes) or (2) Trial (orange boxes) (3) Adjourned if Respondent doesn't appear
If NPA, the Trials Attorney must draft closing report within 2 weeks.
Deputy General Counsel reviews closing report and approves or provides feedback within 2 days of receipt.
NPA is forwarded to General Counsel for approval and returned to Trials.
Trials tracks receipt of NPA from GC then forwards file to Commissioner for final approval.
Commissioner approves NPA or modifies outcome and returns to Trials.
Trials collects materials and closes case within ~5 days after Commissioner's approval.
Discipline is imposed after NPA is finalized.
If no NPA at OATH, then a Trial is scheduled.
Trial is conducted.
ALJ renders a Report & Recommendation after Trial and Trials attorney drafts Closing Report.
Commissioner reviews Report & Recommendation and either adopts or modifies outcome.
Respondent may appeal deicision through Article 78 or Civil Service Commsion.
Discipline Imposed.

The Monitoring Team's assessment of compliance is below.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

¶ 2.

e.   If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Facility can impose corrective action on Staff using Command Discipline.
  - The Department developed a process to manually track Command Disciplines beginning in January 2016. Command Discipline will also be tracked in CMS.
- The Trials & Litigation division is responsible for imposing formal discipline.
- The Department conducts an initial evaluation of use of force incidents through Rapid Reviews, Avoidables, the Immediate Action Committee, Preliminary Reviews, and ad hoc review by Agency officials. If misconduct is detected, it is addressed by either imposing immediate corrective action or through additional investigation.[117]
  - The Department maintained the Immediate Action Review Committee, which meets bi-weekly, to determine whether any "immediate action" should be taken to correct identified problems in use of force incidents.
    - The Immediate Action Review Committee members changed slightly this Monitoring Period based on identified need. The Committee now includes representatives from ID, Legal, Trials, the Chief of Department, the Bureau Chief of Facility Operations, and the Training Academy.
  - Facility Wardens or designated Deputy Wardens or Deputy-Wardens-in-Charge ("DWIC") conduct Rapid Reviews of all use of force incidents captured on video within 48 hours.  They review incident videos to assess whether the force used was within guidelines, whether any procedural errors occurred, and whether any immediate administrative action is required. Such action could range from informal conversations

---

[117] Depending on the severity or complexity of the violation, additional investigation may be required before corrective action can or should be imposed.

with the Staff involved, to formal counseling, command discipline, re-training, or
referral for charges.

- ▪ Of the 1,843 Rapid Reviews conducted in this Monitoring Period by Facility
  Leadership, 357 incidents (19%) were recommended for immediate
  administrative action by the Command (e.g. re-training, counseling, suspension).
  The type of immediate action imposed is discussed in detail below.

- o Similar to the Rapid Review process, Facility Wardens or designated Deputy Wardens
  or DWICs also assess all use of force incidents captured on video within 48 hours to
  determine whether the force was potentially avoidable, how it could have been avoided,
  and whether immediate administrative action is warranted.

  - ▪ Facility leadership determined that 433 of the 1,995 (22%) use of force incidents
    that occurred on video during the current Monitoring Period were avoidable.

- o During this Monitoring Period, ID developed the Facility Referral process (as discussed
  in more detail in the Use of Force Investigation Section), which provides the
  opportunity for ID investigators to refer certain violations identified during the
  Preliminary Review back to the Facility to be addressed with appropriate corrective
  action.

- The Department closed 1,111 Facility Investigations of use of force incidents during this
  Monitoring Period. The outcomes of the Facility Investigations are discussed below.

- The Department closed 432 Full ID Investigations during this Monitoring. The outcomes of the
  ID Investigations are discussed below.

- The Department considered 12 Personnel Determination Reviews ("PDRs") during this
  Monitoring Period. The outcomes of the PDRs are discussed below.

**ANALYSIS OF COMPLIANCE**

¶¶ 1 and 2(e) are addressed together because, read together, they require timely, adequate and
meaningful discipline. The Department has various formal and informal mechanisms for responding to
Staff misconduct. These include corrective interviews, re-training, 5003 counseling sessions,
Command Discipline (e.g., reprimands, vacation day forfeiture, reassignment, etc.) and formal
discipline (e.g., vacation day forfeiture, suspension, probation, termination). As noted in previous
Monitor's Reports, the Department's data on Staff discipline is not maintained centrally or in a
systematic manner. Most information is tracked manually, using text fields that defy aggregation. That
said, even though cumbersome, the Department produced a large volume of data this Monitoring
Period that was helpful to the Monitoring Team's assessment of compliance.

As noted in the Use of Force Investigations section of this report, the Department struggles to
complete investigations timely, which contributes to the delays observed in imposing appropriate
discipline.  Accordingly, prioritizing timely completion of investigations and the use of interim
corrective actions is a top priority for the Monitoring Team. The Monitoring Team is of the belief that

Staff's behavior can be shaped effectively through a variety of mechanisms, not just via formal discipline. Therefore, the Monitoring Team has encouraged the Department to utilize coaching, counseling, and other forms of corrective action as essential strategies for stimulating behavior change, and considers this to be a core responsibility of Supervisors and Facility leadership.

The implementation of CMS will be a significant improvement over what currently exists and will help the Department to better understand its own practices and, eventually, will be useful for demonstrating compliance. However, until CMS is implemented, the Monitoring Team has had to piece together the available information to understand the current state of affairs. During this Monitoring Period, the Department refined its tracking process in certain areas which allowed the Monitoring Team to report on Staff Discipline in more depth than in previous Monitoring Periods. While the Monitoring Team is encouraged by the Department's efforts to identify and address potential misconduct, the Department still has much work to do in order to timely and adequately impose corrective action on Staff.

*Corrective Action Following Close in Time Review of Incidents* (¶ 2(e))

The Consent Judgment requires the Department to consider whether corrective action should be taken against a Staff Member pending the outcome of an investigation (§ VII, ¶ 7, and § VIII, ¶ 2(e)). In the most egregious cases, the Department must consider whether the Staff Member should be suspended, placed on modified duty, or reassigned to a non-contact post pending the outcome of the investigation.  The Consent Judgment contemplates that the Preliminary Reviewer should consider this question as part of the Preliminary Review (§ VII, ¶ 7(iii)). However, this determination requires broader consideration by various stakeholders in order to determine the appropriate response to alleged misconduct. This question may have been addressed prior to completing the Preliminary Review by members of the Chief's Office, Wardens, the Executive Staff of ID, and the Commissioner, through the Rapid Reviews, "Avoidables" process, or the Immediate Action Committee.[118] Further, ID's Facility Referrals will provide the Department with several tools to identify and address potential violations close in time to the incident, as required by § VIII, ¶ 2(e).

Collectively, the Immediate Action Committee, Rapid Reviews, and the "Avoidables" processes form a solid foundation for Facilities to detect misconduct and to initiate administrative corrective action, without having to wait until an investigation has closed. They also provide greater flexibility and more options for responding to misconduct proportionally. Having both Headquarters and Uniformed Leadership reviewing incidents is an important first step and is critical to a robust disciplinary process. Given the current infrequency with which discipline is imposed across the Department, it is encouraging to see any process which gives rise to Staff accountability. In particular, these processes provide an important opportunity for Facilities to impose contemporaneous corrective action, which is a crucial part of culture change.

---

[118] The Preliminary Reviewer may also still identify Staff who warrant such consideration during the Preliminary Review in the event they are not identified by these reviews.

That said, the Monitoring Team has found that the Department often relies on re-training and corrective interviews instead of imposing discipline in cases where objectively the evidence supports the imposition of discipline. While re-training and corrective interviews are sometimes proportional to the severity of misconduct, certain Staff behaviors will require a stronger response. Furthermore, the danger of unnecessary duplication among strategies for imposing corrective action is very real, and could lead to situations in which speedy incident reviews and close-in-time corrective actions work at cross purposes with more formal disciplinary processes farther down the line. As the Department develops new investigative tools and options for corrective actions, it must be vigilant about how the pieces will fit together to achieve synergy and efficiency.  The Department must actively guard against strategies becoming duplicative or self-defeating (for instance that contemporaneous corrective action does not foreclose the imposition of more formal discipline, if merited).

During the current Monitoring Period, the Department conducted 1,843 Rapid Reviews of incidents captured on video. Facility Supervisors found that force was not used appropriately in 8% of the incidents (155) and that procedural errors occurred in 22% of the incidents (410). In 357 cases (19%), the Facility recommended some form of contemporaneous administrative action[119] (e.g. re-training, counseling, suspension, modified duty).

The Immediate Action Review Committee considered 31 use of force incidents during this Monitoring Period and imposed corrective action in 29 of those incidents, with 37 individual Staff Members. The types of corrective action are enumerated below. The immediate action taken sometimes included a combination of responses (e.g., modified duty and re-training) so the action totals are greater than the total number of Staff:

- o  6 Staff members were suspended;
- o  2 Staff members were placed on modified duty;
- o  16 Staff members were referred for re-training;
- o  10 Staff members were referred for counseling;
- o  2 command disciplines were imposed; and
- o  2 Staff members were re-assigned.

Overall, while the Monitoring Team is encouraged that the Department is utilizing these tools, the frequency of their use compared with the more numerous violations identified by the Monitoring Team suggests that these processes are not used sufficiently to address potential Staff misconduct. Taken together, these close-in-time strategies addressed almost 400  problematic use of force incidents that occurred during this Monitoring Period which, based on the Monitoring Team's review, is only a portion of the Staff misconduct that warranted some type of contemporaneous response.  Therefore, as described in the Investigations section of this report, the Monitoring Team encourages the Department

---

[119] Note this is generally different from the work of the Immediate Action Committee, although there are times where the information identified by a Rapid Review and by the Immediate Action Committee overlap.

to improve its ability to detect misconduct when it occurs. Once detected, actions to impose appropriate and timely feedback or discipline, depending on the violation, must be taken.

*Actions Taken Following an Investigation*

During the current Monitoring Period, the Department closed 1,111 Facility investigations. As discussed in the Use of Force Investigation section of this Report, very few of these investigations identified any Staff misconduct (a finding that is very concerning to the Monitoring Team). Of the 175 incidents in which misconduct was identified (i.e., only 15% of the closed Facility investigations), the following actions were taken:

| Actions Taken by Facility Investigators, January to June, 2017 | | |
| --- | --- | --- |
| Total Cases with Identified Misconduct | 175 | 100% |
| Re-Training | 12 | 7% |
| Corrective Interview | 35 | 20% |
| Referred for Command Discipline | 127 | 73% |
| Referred to Trials & Litigation | 1 | <1% |

While some of the cases were referred for re-training or corrective interviews, the vast majority were referred for Command Discipline, discussed in more detail below.

The Department also closed 432 Full ID investigations during this Monitoring. Among them, 24 cases (6%) were referred to Trials for charges and 10 cases (2%) were referred for a Personnel Determination Review ("PDR"; the disciplinary process for probationary Staff). Based on the volume of misconduct identified by the Monitoring Team during its review of use of force incidents, it is clear that neither the Facility investigations nor the Full ID investigations are detecting the full-range of Staff misuse of force. As a result, fewer cases were funneled for consideration for corrective action.

*Types of Command Discipline*

Whether identified via Rapid Reviews, Avoidables, Immediate Action Committee, Facility Investigations or Full ID investigations, cases in which misconduct has occurred can be referred for Command Discipline, which is disciplinary action imposed by Facility leadership. Several corrective options are available following a Command Discipline, including reprimands, corrective interviews, loss of compensation time or vacation days, and referrals to trials with a MOC for charges to be filed. During the current Monitoring Period, 224 cases were referred for Command Discipline. Of these, 25% (56) were dismissed, 8% (18) were rescinded (e.g., Staff resigned, ID assumed the case, etc.), 14% (31) were still pending as of the filing of this report, corrective action was imposed in just over half (52%, 116) of the cases referred for Command Discipline, and 1% (3) had incomplete tracking data so the outcome is unknown. While some portion of the dismissals are certainly legitimate, it is difficult to discern at this point whether the volume of dismissals is appropriate. The quality of investigations undoubtedly has bearing on the integrity of the disciplinary mechanisms. The interaction between these two tools will be explored further in subsequent Monitoring Periods.

| Type of Command Discipline Issued, January to June 2017 | | |
|---|---|---|
| Total | 116 | 100% |
| Loss of Comp/Vacation Days | 69 | 59% |
| Referred to Trials with MOC | 17 | 15% |
| Corrective Interview | 22 | 19% |
| Verbal Reprimand | 8 | 7% |

As shown in the table above, the most frequent corrective action taken under the Command Discipline umbrella is loss of compensation/vacation days, which occurred in 59% of the cases in which corrective action was imposed.

*Cases Considered for Personnel Determination Review*

When a Staff Member on probation engages in misconduct, discipline is imposed through the PDR. The PDR is completed by the First Deputy Commissioner. Through this process, corrective action may be imposed (e.g. re-training), the Staff Member's probationary period can be extended or the Staff Member may be terminated. During this Monitoring Period, eight Staff were referred for PDR. Four additional Staff who were referred during the previous Monitoring Period were also considered for PDR. Of these 12 cases, five were resolved during this Monitoring Period:

- One Staff was referred for re-training;
- Two Staff's (one Officer, one Captain) probation was extended;
- One Staff resigned; and
- One Staff was terminated.

The other seven cases were still pending at the end of this Monitoring Period.

*Discipline Imposed by Trials & Litigation*

Formal Discipline for Staff misconduct is handled by Trials & Litigation.[120] This section discusses the type of discipline imposed by the Department, while the discussion in ¶ 3, below, discusses Trials' process for imposing Staff discipline.

Since the Effective Date, at least 886 Staff have been referred to Trials.[121] Almost three quarters of these referrals (72%) involved misconduct identified in incidents that occurred prior to the Effective Date, while the remaining incidents occurred after the Consent Judgment went into effect. As shown in the table below, a small proportion (3%, 27) of cases sent to Trials involve incidents that occurred during the current Monitoring Period. This is not surprising given the long length of time currently

---

[120] As noted above, this does not include Staff who are on probationary status.
[121] The Department's data regarding cases before Trials is not comprehensive. In late 2016/early 2017, the Department and the Monitoring Team developed a manual case-tracking process for cases pending before Trials. Given the significant efforts this undertaking required, the Department did not conduct a comprehensive retrospective review so at least some cases that were pending before Trials as of November 1, 2015, but closed prior to the institution of this tracking process are not included in this analysis.

required to complete an investigation (see the Use of Force Investigation section for a more detailed discussion).

Just under three quarters (72%) of these cases referred to Trials have been closed, while 28% remain pending. Larger proportions of older cases have been closed (e.g., 83% of incidents pre-Effective Date are closed); however, large numbers of cases—even those from pre-Effective date (17%, 109) and those referred in 2016 (54%, 119)—were still pending at the end of the current Monitoring Period. The flow chart in the introduction to this section and the discussion in ¶ 3, below, illustrate the complexity of the process for imposing discipline. This complexity, and the time involved to navigate it, is a significant barrier to the imposition of timely discipline required by the Consent Judgment.

| | Cases Pending Before Trials, *by Date of Incident*, November 1, 2015 to June 30, 2017 | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Status** | **Prior to November 2015** | | **November 2015 to December 2016** | | **January to June 2017** | | **Total** | |
| | **640** | | **219** | | **27** | | **886** | |
| **Pending** | 109 | 17% | 119 | 54% | 23 | 85% | 251 | 28% |
| **Closed**[122] | 531 | 83% | 100 | 46% | 4 | 15% | 635 | 72% |

For cases that were closed, the following types of discipline were imposed. The majority of cases (61%) were closed via NPA, which are formal settlements that impose a penalty. The types of penalties imposed via an NPA are discussed further below. A smaller proportion of cases (29%) were Administratively Filed, meaning that the allegation of misconduct—though it may have been substantiated at the Investigation stage—was not supported by a preponderance of the evidence.[123] A small portion (8%) of cases were deferred because the accused Staff member resigned or retired from service. Only five of the 635 closed cases have been adjudicated with the accused found guilty,[124] and only two of the 635 Staff Members were terminated.[125] The table below shows the distribution across these categories by time period. No significant variations are apparent for "older" versus "newer" cases.

| | Cases Closed by Trials, *by Date of Incident*, November 1, 2015 to June 30, 2017[126] | | | |
|---|---|---|---|---|
| **Disposition** | **Prior to November 2015** | **November 2015 to December 2016** | **January to June 2017** | **Total** |
| | **531** | **100** | **4** | **635** |

---

[122] See the footnote above (fn. 121) noting the limitations regarding the data captured through the Department's tracking processes.

[123] It is worth noting that the vast majority of cases that were administratively filed related to incidents that occurred prior to the Effective Date.

[124] Trials reports that the vast majority of cases are settled at OATH.

[125] In at least a few cases where termination was sought, the Staff member elected to retire either through a Deferred Prosecution Agreement or NPA.

[126] See the footnote above (fn. 121) noting the limitations regarding the data captured through the Department's tracking processes.

| NPA | 318 | 60% | 69 | 72% | 2 | 50% | 389 | 61% |
|---|---|---|---|---|---|---|---|---|
| Administratively Filed | 154 | 29% | 27 | 24% | 2 | 50% | 183 | 29% |
| Deferred Prosecution | 49 | 9% | 4 | 4% | 0 | ~ | 53 | 8% |
| Adjudicated/Guilty | 5 | 1% | 0 | ~ | 0 | ~ | 5 | 1% |
| Terminated | 2 | 0% | 0 | ~ | 0 | ~ | 2 | 0% |
| Not Guilty | 3 | 1% | 0 | ~ | 0 | ~ | 3 | 0% |

As noted above, the majority of cases where discipline was imposed by Trials involved NPAs. The table below shows the types of penalties imposed via the NPAs.[127] About one-tenth (12%) were returned to the Facility for Command Discipline (see above for a description of the types of corrective action that may be imposed). A small proportion (2%) of Staff agreed to retire. The remaining cases involved a loss of compensation/vacation days and/or suspension and, in many cases, a term of probation may also have been imposed.  A little over 30% of the NPAs involved a penalty of 30 days or less (suspension, lost time, or a combination) and almost 20% involved a penalty of more than 30 days (suspension, lost time, or a combination). These Staff were restored to full duty after serving their penalty.

| Penalty Imposed by NPA, *by Date of Incident*, November 1, 2015 to June 30, 2017[128] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Penalty** | **Prior to November 2015** | | **November 2015 to December 2016** | | **January to June 2017** | | **Total** | |
| | **318** | | **69** | | **2** | | **389** | |
| Refer for Command Discipline | 25 | 8% | 20 | 29% | 0 | 0% | 45 | 12% |
| Retirement | 6 | 2% | 2 | 3% | 0 | 0% | 8 | 2% |
| 5-10 days | 10 | 3% | 9 | 13% | 1 | 50% | 23 | 6% |
| 11-20 days | 37 | 12% | 15 | 22% | 1 | 50% | 53 | 14% |
| 21-30 days | 34 | 11% | 9 | 13% | | 0% | 43 | 11% |
| 31-40 days | 12 | 4% | 1 | 1% | 0 | 0% | 14 | 4% |
| 41-50 days | 17 | 5% | 5 | 7% | 0 | 0% | 21 | 5% |
| 51+ days | 35 | 11% | 8 | 12% | 0 | 0% | 38 | 10% |
| Data Not Available[129] | 142 | 45% | 0 | 0% | 0 | 0% | 142 | 37% |

---

[127] The Department only began to systematically track the types of penalties imposed via the NPAs in January 2017. Accordingly, data is not available for the majority of cases where an NPA was imposed before the Department implemented its new tracking system.

[128] See the footnote above (fn. 121) noting the limitations regarding the data captured through the Department's tracking processes.

[129] The Department only began to systematically track the types of penalties imposed via the NPAs in January 2017. Accordingly, data is not available for the majority of cases where an NPA was imposed before the Department implemented its new tracking system.

*Summary*

Compared to previous Monitoring Reports, the Monitoring Team had significantly more data to utilize in its compliance assessment. That said, the manually tracked data has its limitations as discussed throughout this Report. When CMS is fully implemented, the ability to identify a solid baseline and measure progress toward compliance will be much enhanced.

The data above clearly illustrate that, compared to the volume of misconduct detected by the Monitoring Team during its assessment of use of force incidents, the Department does not impose corrective action nearly often enough. Part of the problem lies with the integrity of the investigation process, which, for various reasons, does not reliably or timely detect misconduct—85% of closed Facility Investigations and 92% of closed Full ID Investigations did not identify any Staff misconduct (see the Use of Force Investigation section of this report). While misconduct certainly does not occur in *every* use of force incident, these findings are clearly out of sync with the frequency of improper, unnecessary, and excessive uses of force identified by the Monitoring Team during their close scrutiny of incidents.

However, even when misconduct is detected and a case is referred for discipline, significant proportions of cases are dismissed with no penalty imposed (25% of cases referred for Command Discipline were dismissed; 19% of cases referred to Trials were Administratively Filed). While certainly some of the dismissals were legitimate, it is also likely that the poor quality of investigations is contributing to some portion of the cases that are dismissed. Furthermore, to date, the majority of cases closed during the pendency of the Consent Judgment involved incidents that occurred prior to the Effective Date, over 20 months ago.  Only 75 Staff members have been disciplined for conduct related to use of force incidents occurring after the Effective Date.[130]  Another 142 cases are still pending.

To the extent corrective action is taken, long delays are common. A core component of meaningful accountability is its timeliness. As discussed in the Use of Force Investigation section, investigations stagnate for many reasons, delays that are further compounded by the complex process for administering discipline depicted in the flow chart above and discussed at length in ¶ 3, below. Together, these delays severely undermine the credibility and efficacy of the disciplinary process to the extent that meaningful discipline for Staff misconduct is rarely administered.

In order for Department to achieve compliance with the requirements of this provision, all of the component parts must work together (i.e., Facility Leadership, ID, Trials, Bureau Chief of Administration, Legal, and the Commissioner). In response to a recommendation by the Monitoring Team, the Department has begun to evaluate holistically its various processes for identifying and addressing misconduct. It is expected that this evaluation will reveal numerous opportunities to streamline and create efficiencies in a system that too often is mired in bureaucracy.  The Monitoring

---

[130] Another 29 cases against Staff have been administratively filed for use of force incidents that occurred after the Effective Date.

Team is working closely with the Department to support this effort and will provide a more fulsome update in the next Monitor's Report.

The Monitoring Team expects that as CMS comes online, data quality will improve, allowing more precise analysis of the trends and more sophisticated problem-identification. Furthermore, additional qualitative analysis is needed, particularly in the area of dismissals, to discern whether the outcome of the disciplinary process was reasonable.

| COMPLIANCE RATING | ¶ 1. Non-Compliance<br>¶ 2(e). Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines.

a. The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH and the aggravating and mitigating factors to be taken into account in determining the specific penalty to seek.

b. The Disciplinary Guidelines shall include the range of penalties that the Department will seek in discipline matters including those before OATH against Supervisors in cases where, as a result of inadequate supervision, Staff Members are found to have engaged in UOF Violations. These penalty ranges shall be consistent with the Department's commitment to hold Supervisors, regardless of their rank, accountable for culpability in the chain of command.

c. The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) and (ii) below will result in the Department taking all necessary steps to seek a penalty ranging from, at a minimum either a 30-day suspension without pay (a portion of the 30 days may consist of the loss of accrued vacation days), or a 15-day suspension without pay plus a one-year probation period as agreed to by the Staff Member, up to and including termination. If the penalty imposed is a 15-day suspension without pay plus a one-year probation period, the terms of the probation shall specify that any Use of Force Violation or significant policy violation will result in termination.

i. Deliberately providing materially false information in a Use of Force Report or during an interview regarding a Use of Force Incident.

ii. Deliberately failing to report Use of Force by a Staff Member.

iii. The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek such penalties against Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make such a penalty an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor.

d. The Disciplinary Guidelines shall state that the misconduct referenced in subparagraphs (i) - (iii) below will result in the Department taking all necessary steps to seek termination of the Staff Member.

i. Deliberately striking or using chemical agents on an Inmate in restraints, in a manner that poses a risk of serious injury to the Inmate, except in situations where the Staff Member's actions were objectively reasonable in light of the facts and circumstances confronting the Staff Member.

174

|   | ii. | Deliberately striking or kicking an Inmate in the head, face, groin, neck, kidneys, or spinal column, or utilizing choke holds, carotid restraint holds, or other neck restraints, in a manner that is punitive, retaliatory, or designed to inflict pain on an Inmate, and constitutes a needless risk of serious injury to an Inmate. |
|---|---|---|
|   | iii. | Causing or facilitating an Inmate-on-Inmate assault or fight, or allowing an Inmate-on-Inmate assault or fight to continue where it is clearly safe to intervene, in order to punish, discipline, or retaliate against an Inmate or as a means to control or maintain order in any area of a Facility. |
|   | iv. | The Disciplinary Guidelines shall provide that the Department will take all necessary steps to seek the termination of Staff Members who have engaged in the above-referenced misconduct unless the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make termination an unjust sanction for the Staff Member. Any such determination shall be documented by the Commissioner and provided to the Monitor. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- This Monitoring Period, the Department continued to review and revise the New Disciplinary Guidelines.

**ANALYSIS OF COMPLIANCE**

The current draft of the New Disciplinary Guidelines addresses all of the specific requirements outlined in (¶ 2 (a) to (d)) above. During this Monitoring Period, the Department consulted with Staff representatives and the Monitoring Team about revisions to the drafted guidelines. The New Guidelines will take effect on October 27, 2017, which is 30-days after the effective date of the New Use of Force Directive.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

---

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

| a. | If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor. |
|---|---|
| b. | If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division. |
| c. | The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner |

for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- This Monitoring Period, Trials & Litigation developed a new manual process for tracking information related to cases referred until CMS is implemented.
- A new process was designed to ensure timely service of charges.
  - o Trials attorneys are assigned a case and tasked with drafting charges shortly after receiving the signed MOC and employee's disciplinary record (also known as a 22R).
  - o The assigned attorney promptly requests the investigation file to facilitate the drafting of charges, but will begin the drafting process immediately, if possible, using the MOC.
  - o Once charges are received, a Trials Administrative Manager immediately sends them to the employee's assigned Facility. The Administrative Manager contacts the Facility thereafter to ensure timely service.
  - o The Bureau Chief of Facilities is copied on the service of all charges and assists in communicating with the Facilities. This process is also tracked systematically throughout Trials to ensure accountability.
  - o If the Facility has not served charges within 20 days of Trials' receipt of the MOC, Trials will serve the charges by certified mail.
- Trials leadership met with the Monitoring Team on a routine basis throughout the Monitoring Period to collaborate on initiatives to increase the timeliness of dispositions. The focus during this Monitoring Period was the timely service of charges and an analysis of the anatomy of Trials' cases to identify potential inefficiencies and develop strategies to address them.
- Trials reports it is working with ID to ensure the efficient transfer of case information and evidence.

**ANALYSIS OF COMPLIANCE**

This provision addresses the Department's responsibility for timely referring cases meriting formal discipline to Trials, and Trials' responsibility for serving charges and reaching a disposition for Staff following a sustained use of force violation.  While the Monitoring Team is focused on Trials' work related to cases involving use of force violations, Trials is also responsible for the imposition of formal discipline for all violations in the agency.

During this Monitoring Period, the Monitoring Team met routinely with representatives from Trials to address the deficiencies identified in the previous Monitor's Report.  The Deputy General Counsel of Trials has demonstrated a genuine commitment to reforming the division and achieving the overarching goal of timely discipline. Trial staff were candid about the challenges and shortcomings of Trials' disciplinary process and were open to crafting various initiatives to increase efficiencies. The initial focus of these discussions was on the timely service of charges.  As shown in the table below, Trials has now served charges on nearly all of the MOCs received by the end of the Monitoring Period.

A few were dismissed (administratively filed) based on an assessment of the MOC and charges were not served.

| Charges Served, *by date of MOC*, November 1, 2015 to June 30, 2017[131] | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Status** | **Prior to November 2015** | | **November 2015 to December 2016** | | **January to June 2017** | | **Total** | |
| | 146 | | 287 | | 115 | | 548 | |
| Served | 146 | 100% | 275 | 96% | 109 | 95% | 530 | 97% |
| Not Served and/or Case Administratively Filed[132] before Charges served | ~ | ~ | 12 | 4% | 6 | 5% | 18 | 3% |

This provision requires charges to be served within a reasonable time. The bar chart below illustrates the timeliness of Trials' service of charges. The yellow and orange bars show the increasing proportion of charges served timely, according to the date the MOC was received by Trials. During the current Monitoring Period, Trials served charges within 45 days of receipt of the MOC in 94% of cases.



---

[131] See the footnote above (fn. 121) noting the limitations regarding the data captured through the Department's tracking processes.
[132] In a few cases, the matter was administratively filed before the charges were served.

Once charges are filed, the assigned attorney processes and develops the case for ultimate disposition.  As shown in the table below, during the current Monitoring Period, Trials was managing 416 cases in which the MOC was received prior to the Effective Date of the Consent Judgment ("Prior to Nov 2015" in the table). Nearly all of these had been resolved by the end of the Monitoring Period (66% were closed with a disposition and 26% were administratively filed); only 8% (34 cases[133]) remain. Since the Effective Date, Trials has received an additional 440 MOCs. Of these, less than half are still pending (43%; most of which are 2016 MOCs), while 40% have been closed with a disposition (most of these are 2016 MOCs). The fact that Trials has been able to close 35% of the cases received in 2017, despite having the MOC for less than 6 months, is encouraging.

| Outcomes, *by date of MOC*, November 1, 2015 to June 30, 2017[134] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Outcome | Prior to November 2015 | | November 2015 to December 2016 | | January to June 2017 | | Total |
| | 416 | | 325 | | 115 | | 856 |
| Pending | 34 | 8% | 131 | 40% | 60 | 52% | 225[135] | 26% |
| Closed with Disposition | 275 | 66% | 137 | 42% | 40 | 35% | 452 | 53% |
| Administratively Filed | 107 | 26% | 57 | 18% | 15 | 13% | 179 | 21% |

These data show that Trials is slowly eliminating the backlog of cases that occurred before the Effective Date. However, timeliness is an issue. The tables below illustrate these dynamics in more detail.

| Time to Case Closure, *by date of MOC*, November 1, 2015 to June 30, 2017[136] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Time to Closure | Prior to November 2015 | | November 2015 to December 2016 | | January to June 2017 | | Total |
| | 382 | | 193 | | 55 | | 630 |
| 6 months or less | 8 | 2% | 52 | 27% | 52 | 95% | 112 | 18% |
| 6 to 12 months | 24 | 6% | 85 | 44% | 3 | 5% | 112 | 18% |
| 1 to 2 years | 143 | 37% | 56 | 29% | 0 | 0% | 199 | 32% |
| 2 to 5+ years | 207 | 72% | 0 | ~ | 0 | ~ | 207 | 33% |

---

[133] Of these 34 cases, 15 are pending before law enforcement and so final disposition must await the outcome of the review and/or prosecution by law enforcement.

[134] See the footnote above (fn. 121) noting the limitations regarding the data captured through the Department's tracking processes.

[135] Approximately 26 cases involved incidents that occurred between January to June 2017, but the MOC was received after June 30, 2017. These 26 cases are still pending before Trials and are included in the analysis of cases where the incident occurred between January and June 2017, but these cases are not included in the analysis here.

[136] In a few cases, data was not available to conduct this analysis.  Accordingly, a small number of closed cases were not included in this analysis.

The table above clearly illustrates the progress Trials is making in closing cases more quickly, though it also shows that a significant proportion of cases continue to languish without closure or discipline being imposed. Most of the backlogged cases (i.e., MOC prior to Effective Date) took several years to close. For MOCs received prior to the Effective Date, the average length to case closure was 798 days, compared to 275 days for 2016 MOCs and 85 days for cases closed in 2017. In 2016, about 27% of cases were closed within 6 months. During the current Monitoring Period, however, the portion of cases closed within 6 months increased significantly to 95%. Though this is only about half of the cases received in 2017, the greater efficiency in case closure is a hopeful sign of progress.

However, a large proportion of cases remains pending with Trials. The table below illustrates the period of time these cases have been languishing. The few cases that remain with Trials from prior to the Effective Date have been pending for a very long time, and a small number of cases are also pending with a law enforcement agency and thus out of the Department's control. Among cases in which the MOC was received between November 1, 2015 to December 31, 2016 (the first three Monitoring Periods), roughly half (56%) have been pending between six months and one year, and just under half (44%) have been pending between one and two years. Given that they were referred within the past six months, cases with an MOC from the current Monitoring Period have by default been pending for less time.

| Time Cases Remain Pending, *by date of MOC*, November 1, 2015 to June 30, 2017[137] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Time Cases Remain Pending | Prior to November 2015 | | November 2015 to December 2016 | | January to June 2017 | | Total | |
| | 19 | | 124 | | 58 | | 201 | |
| 6 months or less | 0 | ~ | 0 | ~ | 58 | 100% | 58 | 29% |
| 6 to 12 months | 0 | ~ | 70 | 56% | ~ | ~ | 70 | 35% |
| 1 to 2 years | 10 | 53% | 54 | 44% | ~ | ~ | 64 | 32% |
| 2 to 5+ years | 9 | 47% | ~ | ~ | ~ | ~ | 9 | 4% |
| Additional Cases Pending with Law Enforcement | 15 | | 7 | | 2 | | 24 | |

Together, these data on case processing by Trials illustrate the significant delays that hinder the Department's compliance with this provision. Accordingly, the Department and the Monitoring Team began exploring options to make the process more efficient. Trials began developing processes for more efficient service of discovery and a process for settling cases before they are presented at OATH. This work continued at the end of the Monitoring Period and a more fulsome status update will be

---

[137] Approximately 26 cases involved incidents that occurred between January to June 2017, but the MOC was received after June 30, 2017. These 26 cases are still pending before Trials and are included in the analysis of cases where the incident occurred between January and June 2017, but these cases are not included in the analysis here because the MOC was received after the end of the Monitoring Period.

provided in the next Monitor's Report. During the next Monitoring Period, in addition to examining the anatomy of Trials' cases and the flow of case processing in order to identify opportunities for efficiency, the Monitoring Team also plans to closely scrutinize cases that are Administratively Filed to understand more about the characteristics of these cases and to assess the appropriateness of the disposition. Although significant work remains to meet the requirements of this provision, Trials made notable progress during this Monitoring Period. A compliance rating is being withheld in order for the Monitoring Team to further evaluate the outcomes of the initiatives developed during this Monitoring Period.

| COMPLIANCE RATING | ¶ 3. Compliance Rating Withheld |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

- Trials' current staff consists of one Deputy General Counsel, four Directors, 20 attorneys (one on extended leave), and 13 support staff.
- Trials is actively recruiting for an additional Trials attorney and two support staff.
- The Department's Recruitment Unit and HR Recruitment Manager work in concert to support Trials' need for additional staff, and have a committee dedicated to recruiting and hiring staff for Trials.
- Trials reports it reduced the number of open cases from 1,659 to 1,002 between April 5, 2016 and July 7, 2017.[138]

### ANALYSIS OF COMPLIANCE

The Department reported that the caseload for each Trials attorney during this Monitoring Period was approximately 40 cases, which is a decrease from the caseload sizes reported during previous Monitoring Periods (i.e., 90 cases in the Third Monitoring Period and 130 in the Second Monitoring Period). The Trials division has made some progress in its closure of cases but, the caseload for Trials staff is still too high to achieve the reforms required by the Consent Judgment. Caseloads include a mixture of use of force cases, as well as EEO, Medical Separation, PREA, and others. In order to address the workload, the Department is attempting to hire additional qualified staff for Trials. The Recruitment Unit reported it attended 75 different events and also targeted recruitment at all local law schools to actively recruit additional attorneys and support staff for Trials. Further, Trials' leadership is actively interviewing candidates to fill the open positions. Strategies to better manage Trials' caseload include assigning legal coordinators to specific cases and a method to resolve cases before they go to OATH.

---

[138] Note, this figure includes all cases before Trials and not just use of force cases.

The hiring and compensation process for staff at Trials is governed by the same process described in the Use of Force Investigations section of this report, assessing ¶ 11. In order to hire new staff, the Department must have authorization from OMB. The salary the Department may offer for a position is based on the set "level" of the position, however, there is some discretion in the salary range of the level based on a candidate's prior experience or number of years in prior City employment. The level and salary range for attorneys in the Trials Division is consistent with the level and salary range for attorney positions in other city agencies, but the limited discretion in salary is a significant challenge to hiring qualified candidates.

The Monitoring Team strongly encourages the Department, OLR and OMB to continue work together collaboratively in order to ensure that the Department can meet the obligations of the Consent Judgment, especially because the caseload for Trials is expected to increase as investigations begin to close more timely and as the new Disciplinary Guidelines are implemented. Further, the Monitoring Team continues to encourage the Department to maintain its existing recruitment efforts and, to the extent possible, increase those efforts to ensure the Department attracts the best possible candidates.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
| --- | --- |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAs)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines.  Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Trials reports that all NPAs are consistent with the current Disciplinary Guidelines.
- The DOC's General Counsel reviews and approves all NPAs before review by the Commissioner.
- The Commissioner reviews and approves all NPAs.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Monitoring Team confirmed that all NPAs are submitted to the Department's General Counsel for approval.  Following approval by the Deputy General Counsel, the cases are returned to Trials for tracking and are then submitted to the Commissioner for approval. The Monitoring Team also worked with the Department to develop a process to track this process and amount of time it takes to complete each step. These data will be analyzed in detail during the next Monitoring Period, after which a compliance rating will be assessed.

| COMPLIANCE RATING | ¶ 5. Not Yet Rated |
| --- | --- |

9.  **S**CREENING **& A**SSIGNMENT OF **S**TAFF **(C**ONSENT **J**UDGMENT § **XII)**

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion or assignment to Special Units or, in circumstances where Staff have been disciplined multiple times, requirements for reviewing that Staff Member's assignment generally. The Department maintains four distinct policies to address ¶¶ 1-6 of this section: (1) a Directive that clearly sets forth which division or unit of the Department is responsible for screening and reviewing each category of individuals (e.g., new hires, volunteers, certain unit assignments, etc.); (2) an Operations Order governing applications for steady post assignments that sets forth the details of the screenings required for certain specialized units and posts; (3) a Directive governing the promotion process for Captains and above that sets forth the details of the required pre-promotional screenings; and (4) a revised Operations Order that articulates the screenings required for assignments to certain units, such as the Canine Unit, Communications Unit, Emergency Services Unit ("ESU"), and others. All four policies and associated forms remained in effect during the Fourth Monitoring Period.

_Screening for Promotions_

During the Fourth Monitoring Period, the Department promoted 79 Captains, two Wardens, one Assistant Chief, two Bureau Chiefs, and an Acting Chief of Department. The promotion process is guided by multiple factors, including the requirements of this section of the Consent Judgment. The promotion process is depicted graphically below and is described in greater detail in the Third Monitor's Report (at pgs.190-192).



| | | | | |
|---|---|---|---|---|
| DCAS Exam | **Civil Service Requirements** > U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity > educational or experience requirements >drug test; medical, psychological & physical testing > resident of NY or counties | DOC In-House Disqualifiers > dismissal from prior employment > arrests total > driving record total AIU Background Investigation | Review of Candidate's History/Background Investigation by Director of AIU and Deputy Commissioner of AIU | **Correction Officer** |
| DCAS Exam (Completion of probation - 2 Years CO, unless extended) | **Requirements** > must hold valid drivers license > resident of NY or counties > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner Review | **Captain** |
| DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) | **Requirements** > must hold valid drivers license > resident of NY or counties > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner Review | **Assistant Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) | Review of UoF and Disciplinary History, and Performance Evaluations | Re-Assignment Board Review Rating, Interview, Candidates Ranked | Chief & Commissioner review candidates recommended by Re-Assignment Board | **Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as DW, unless extended) | HR reviews UoF and Disciplinary History, and Performance Evaluations | Promotion Board Review, interview candidates and make recommendations | Chief & Commissioner to review candidates recommended by Promotion Board | Mayoral Approval | **Warden** |
| No specific time requirement for holding the Warden position in order to be considered for a Chief-level appointment | Nunez Screening, including review of UoF and Disciplinary History | Commissioner and Chief of Staff | Mayoral Approval | **Chief** |

*Screening for Assignment to Special Units*

The process for screening and assigning Staff to Special Units is outlined in the Operations Order "Awarding Job Assignments within a Command Operations Order," which was revised during this Monitoring Period, in consultation with the Monitoring Team. The revision clarifies that the training requirements for certain Special Units are not a pre-condition for consideration, but rather that the training will be provided before the Staff Member begins the assignment. The screening process for assignment to Special Units is depicted below and described in greater detail in the Third Monitor's Report (at pgs. 192-193).



Given the Monitoring Team's focus on the screening requirements, the Department's compliance with its obligation under ¶ 7 (requiring review of assignments of Staff disciplined

multiple times) has not yet been evaluated. The Monitoring Team's compliance assessment for

all other provisions is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the following (collectively the "Review"):

    a. The following data regarding the Staff Member's involvement in Use of Force Incidents during the prior 5 years, to the extent such data is electronically maintained by the Department in IRS or any other computerized system:  (i) the number of Use of Force Incidents the Staff Member has been involved in, (ii) the type and severity of injuries sustained by Staff and Inmates; (iii) whether the conduct was classified as a Class A, B, or C Use of Force; (iv) whether the Use of Force Incident involved a strike or blow to the head or other vital area of an Inmate, kicking an Inmate, the use of a baton or other instrument of force against an Inmate, the use of a prohibited restraint hold on an Inmate, or an allegation of any such conduct; and (v) whether the Inmate was in restraints prior to the Use of Force incident.

    b. The Staff Member's disciplinary history during the prior five years, including whether the Staff Member has been found guilty or pleaded guilty in connection with charges relating to a Use of Force Incident and any command discipline imposed as a result of the Use of Force.

    c. Any ID Closing Memoranda issued during the prior 2 years for any Use of Force Incident where the Staff Member used or was alleged to have used force.

    d. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the promotion, which shall become part of the Staff Member's personnel file.

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 2230, Pre-promotional Assignment Procedures, remains in effect.

- During this Monitoring Period, the Department screened the following Staff for promotion:

    o 104 Corrections Officers were screened for promotion to Captain.

        ▪ 83 Correction Officers were selected and 79 of the 83 accepted the promotion to Captain.

    o No Captains were screened for promotion to ADW.

- 33 ADWs or higher were considered and approved for promotion to the rank of Deputy Warden or higher as follows:
  - Six Staff Members were promoted.
    - Two were promoted to Warden;
    - One was promoted to Assistant Chief;
    - Two were promoted to Bureau Chief; and
    - One was promoted to Acting Chief of Department.
  - 27 Staff Members were screened and approved for promotion, but have not yet been promoted based on the current operational needs of the Department. These candidates may be promoted in the future at the discretion of the Commissioner.
    - 17 Deputy Wardens have been screened and approved for promotion to Warden.
    - 10 ADWs have been screened and approved for promotion to Deputy Warden.

### ANALYSIS OF COMPLIANCE

Strong leadership is critical to the Department's ability to reform its culture and the manner in which Supervisors manage and coach their Staff is an integral component of such leadership. The decisions the Department makes about promotions sends a clear message to the line Staff about the values and the culture the Department intends to promote.  In order to identify Supervisors with the proper attributes, the Consent Judgment requires the Department to consider a candidate's use of force and disciplinary history (¶ 1(a)-(d)).  Further, the Consent Judgment also mandates that a Staff Member may not be promoted if: (1) he or she has been found guilty or pleaded guilty to certain violations on two or more occasions in the previous five-year period, unless the Commissioner or a Deputy Commissioner determines exceptional circumstances exist that make such promotion appropriate (¶ 2), or (2) pending disciplinary charges for a use of force violation (¶ 3).

The Department's ability to conduct quality and timely investigations and to impose timely accountability all directly impact the information available to the Department when assessing a candidate for promotion. However, given the limited discipline imposed by the Department to date, the disqualifiers articulated by the Consent Judgment applies infrequently to candidates.  More generally, the lack of accountability for use of force violations limits the Department's ability to thoroughly assess the candidates' qualifications for any given position. The current state of affairs heightens the importance of the Department utilizing reasonable judgment in promoting Staff, to ensure that any promotion facilitates the culture shift the Department needs in order to be successful.

As noted above, during this Monitoring Period, the Department promoted a class of Captains and a number of executive uniformed leadership.  Promotions from Officer to Captain and ADW occur

in a group.  Therefore, Officers and Captains are not promoted on an ad hoc basis, but rather are promoted at certain periods of time based on the Department's needs (promotions to the rank of Deputy Warden and above occur on an ad hoc basis based on the operational needs of the Department). In order to assess compliance with the Department's screening process for promotion, the Monitoring Team reviewed the screening documentation for 37 Staff (31 Officers screened for promotion to Captain, 20 of whom were ultimately selected by the Department, and six Staff promoted to the rank of Deputy Warden and above).

*Review of Candidates* (¶ 1)

> The Monitoring Team found that the Department's assessment of the 37 Staff generally satisfied the requirements of the "Review" as defined by (¶ 1).  That said, the Department's documentation does not specify the justification for promoting someone whose qualifications may be questioned, even though they are not disqualified by ¶ 2.[139]  Without a basis for promotion in these cases, the Department is unable to demonstrate how the concerns were evaluated or the rationale for ultimately discounting them. Without evidence of deliberation, the review appears to be perfunctory, simply done to meet the technical requirements of ¶ 1(d).

> The Monitoring Team found that three of the 20 candidates who were promoted to Captain had been investigated for, found guilty of, and were recently disciplined for use of force related misconduct. Given the Department's history of failure to impose timely and appropriate discipline, the Monitoring Team was encouraged that, though long delayed, discipline was imposed in these cases. However, the objective evidence regarding each candidate's misconduct raised concerns about their fitness for the role of Supervisor.

> In addition, two Officers were involved in use of force incidents where the recommended charges were administratively filed (i.e., dismissed) just prior to the promotion.  The Department's decisions to administratively file one of the cases was questionable, given the objective evidence available. The Officer's subsequent promotion heightens the Monitoring Team's concern about deficiencies in the investigation and disciplinary processes (discussed in the Use of Force Investigations and Staff Discipline and Accountability sections of this report).  If investigations and/or the discipline imposed are not appropriate, then subsequent decisions (e.g., those related to promotion) do not have a solid foundation for deliberation, which may lead to decisions that give the outward appearance that force-related misconduct is tolerated and may even be rewarded. Such occurrences send a troubling and conflicting message to Staff and jeopardize the Department's ability to catalyze the culture shift needed for increased Staff and inmate safety.

---

[139] The Trials division raised concerns about three of the Officers who were promoted to Captain. Although the Review did not reveal any objective basis not to promote the Officer based on the *Nunez* criteria, the Department was unable to provide the basis for the decision to promote these candidates despite the concerns raised.

*Disciplinary History* (¶ 2)

The Monitoring Team found that the sample of the 20 Officers promoted to Captain and the six Staff promoted to the rank of Deputy Warden had not been found guilty or pleaded guilty to the specified violations on two or more occasions in the last five-years. Screening packages will continue to be scrutinized to assess compliance with this provision.

*Pending Disciplinary Matters* (¶ 3)

The current delays in completing investigations and imposing discipline, discussed at length in other sections of this report, have a direct impact on the Department's ability to promote certain candidates because disciplinary charges often remain pending for long periods of time.  In this most recent Captain's class, none of the Officers promoted had pending charges at the time of promotion. Although it is worth noting that the Department resolved pending disciplinary matters for four candidates who were subsequently promoted within a few days of the resolution.[140]  The six Staff promoted to the rank of Deputy Warden and above did not have any pending disciplinary actions.

*Conclusion*

The Monitoring Team strongly encourages the Department to closely scrutinize those being considered for supervisory positions and to apply reasonable judgment regarding promotion decisions. The Department is also strongly encouraged to exercise heightened scrutiny in cases where the candidate does not meet the strict requirements for disqualification, but has been involved in recent misconduct. In cases where a candidate's fitness can objectively be questioned, the Department must demonstrate the rationale for the decision to promote the individual. The Monitoring Team will continue to closely review the screening documents for Staff applying for promotion to ensure that decision-making comports with policy and the Consent Judgment's requirements.

| COMPLIANCE RATING | ¶ **1.** Partial Compliance |
| --- | --- |
| | ¶ **2.** Partial Compliance |
| | ¶ **3.** Partial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

---

[140] In two cases, the pending disciplinary matters were administratively filed.  In two other cases, discipline was imposed.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 10/17 "Awarding Job Assignments within a Command," was revised in consultation with the Monitoring Team.

- Between November 21, 2016 and June 30, 2017, the Department screened and assigned 31 Staff to Special Units.[141]

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that the Department maintains policies for screening Staff for Special Units that incorporate the requirements in ¶¶ 4, 5, and 6, as discussed in the Third Monitor's Report (at pg. 195). The revisions to the screening procedures made during this Monitoring Period are consistent with the requirements of the Consent Judgment. The Department reports that Staff Members are screened for Special Units across all Facilities, as required by the policy. The Department screened and assigned 31 Staff to Special Units under the new screening procedure by the end of the Monitoring Period. The Monitoring Team will more closely scrutinize the Department's efforts to screen Staff for Special Units (¶¶ 4 and 5) during the next Monitoring Period.

*Screening of Disciplined Staff's Assignments to a Special Unit* (¶ 6)

During this Monitoring Period, the Monitoring Team identified a Staff Member assigned to a Special Unit who was disciplined for use of force related misconduct and believed the situation merited further review to determine whether the Staff Member should be reassigned to a non-Special Unit. In response to the Monitoring Team's recommendation, one of the Commissioner's Senior Correctional Administrators assessed this Staff Member's assignment. Upon review by the Commissioner, the Staff Member was reassigned to a non-Special Unit. The Department reports it is working to develop a standard protocol for how these assessments will be conducted going forward. The Monitoring Team intends to consult with the Department on this process during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|
| | ¶ 5. Partial Compliance |
| | ¶ 6. Partial Compliance |

---

[141] Special Units are defined as "Enhanced Supervision Housing, Transitional Restorative Units, Second Chance Housing, Restrictive Housing Units, and any Punitive Segregation or mental health units. This term includes any equivalent future units as established by the Department." § III (Definitions), ¶ 28.

**10. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)**

The Department's Correction Officer Recruitment Unit ("Recruitment Unit"), and

Applicant Investigation Unit ("AIU"), continued their coordinated effort to identify and select

qualified Staff to meet the Department's staffing needs. These units continued to work together

to improve the quality and breadth of the candidate pool. The recruit classes of new Officers

have consistently increased in size during the pendency of the Consent Judgment, resulting in a

total of 2,821 graduates from the Training Academy since the Effective Date. Further, an

additional 1,203 candidates matriculated in the Academy during this Monitoring Period, but will

graduate in the Fifth Monitoring Period.  The total number of recruits that have matriculated

and/or graduated during the pendency of the Consent Judgment is demonstrated in the chart

below.

| Academy Class Graduation Date | December 2015 | May 2016 | November 2016 | May 2017 | November 2017 (projected) |
|---|---|---|---|---|---|
| **Number of Graduates** | 592 | 618 | 711 | 900 | 1,203 (matriculated) |

During the Fourth Monitoring Period, the Monitoring Team continued to assess the

Department's Recruitment Program (¶ 1), and analyzed another sample of background

investigations conducted by AIU to assess the Department's compliance with the selection

requirements of the Consent Judgment (¶¶ 2, 3).

The Monitoring Team's assessment of compliance is outlined below.

**XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)**

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department conducted outreach to potential candidates through Career Fairs and Community Events, engaging 7,064 individuals at approximately 208 events during this Monitoring Period.

  o **Career Fairs**: The Recruitment Unit participated in Career Fair events such as the Manhattan College Spring Career Fair, New York Public Library Career Fair Series, NYC Diversity Veterans, Civilian and Students Career Fair, and Columbia University's Spring Career Fair. The Recruitment Unit also reported attending out-of-state recruitment events in Maryland and Philadelphia.

  o **Community Events and Involvement:** Representatives of the Recruitment Unit participated in a variety of community events, including the National Day of Service at Food Bank for New York City, the St. Patrick's Day Parade, N.O.B.L.E. Family Day and St. Nicholas Greek festival.

  o **Youth Explorers Program:** The Recruitment Unit maintained its Youth Explorer program which began in January 2017 with ten students enrolled. The Youth Explorers Program is a leadership development program for youth between 14 and 17 years old who are interested in learning more about a career in law enforcement.

- Quantitative increases in key areas:

  o **DCAS Exam Filers and Takers**: [142] The Department continues to recruit candidates to file and take the DCAS Exam.  Four DCAS exams were administered during this Monitoring Period:

    - February 2017 Exam: 2,468 exam filers, 1,643 exam takers

    - April 2017 Exam: 2,998 exam filers, 1,872 exam takers

    - May 2017 Exam: 1,930 exam filers, 1,070 exam takers

    - June 2017 Exam: 1,904 exam filers; 1,352 exam takers

  o **Social Media Followers**: The Department continues to see increases in engagement on social media, as outlined below:

| | Facebook Followers | Twitter Followers | Instagram Followers | YouTube Followers |
|---|---|---|---|---|
| **March 2016** | 3,773 | 355 | 601 | 53 |

---

[142] An exam "filer" is someone who registers for the specific DCAS exam and pays the necessary fee. Thus, the total number of exam filers reflects the number of individuals that registered/signed up for that exam when registration was available. An exam "taker" is someone who actually took the exam after registering. The number of "takers" is everyone that took the exam at some point when it was open. This reflects only the number that took the exam, not the number that passed the exam.

| | | | | |
|---|---|---|---|---|
| **July 2016** | 4,931 | 586 | 1,274 | 149 |
| **January 2017** | 12,745 | 875 | 3,688 | 347 |
| **July 2017** | 14,493 | 1,292 | 4,776 | 580 |

**ANALYSIS OF COMPLIANCE**

The Department's success in attracting and training a large number of well-qualified candidates to serve as Correction Officers depends on the success of the Recruitment Unit. Without the tremendous effort of the Recruitment Unit to develop a continuous stream of new potential candidates, the Department would not be able to screen, hire, and train candidates on the scale that they have done since the Effective Date.

The Monitoring Team remains impressed by the Recruitment Unit's ability to continually increase key quantitative metrics such as the number of candidates who take the DCAS Exam and the number of individuals engaged with the Recruitment Unit on social media. This Monitoring Period, the Recruitment Unit increased the number of potential candidates and engaged more than twofold the number of candidates from the last Monitoring Period. The Monitoring Team continues to encourage the Recruitment Unit's efforts to maintain engagement with prospective candidates and continue to develop creative ways to identify additional candidates.

The Monitoring Team routinely monitors the Recruitment Unit's social media to assess the engagement and messaging provided to potential candidates through these outlets. The Recruitment Unit maintains a public calendar of events on their website called "Correction in Community" which lists the Community Events they will be attending each month. The use of those tools by the unit is both professional and effective. The marketing materials also produced by the unit, including those on social media, and in print, are consistently professional and engaging.

The Monitoring Team applauds the enormous efforts of the Recruitment Unit to create a candidate pool large enough to attract sufficiently high-quality candidates and to fill exceptionally large recruit classes.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include

medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- AIU continues to process potential candidates as described in the first three Monitor's Reports,[143] conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.

- AIU is continuing its efforts to improve the Unit's organization, staffing, and policies to enhance certain areas of the investigations.

  - **Dedicated Office Space Expansion**: Due to the significant increase in the number of dedicated AIU staff since 2015, AIU is seeking additional office space at DOC Headquarters so all AIU Staff work in the same location. AIU currently has offices in the DOC Headquarters on multiple floors and in difference spaces throughout the building and temporary offices at John Jay College of Criminal Justice.

  - **Medical Unit and Psychology Unit Expansions**: AIU continues its efforts to expand the number of staff dedicated to the Medical and Psychology Units to conduct the necessary screenings.

  - **Agility Team**: This Monitoring Period, AIU outfitted new space at the Queens Detention Center for the Agility Team's use ("Training Center"), including treadmills and other fitness equipment. The Team now has a staff of five. The Department reported that prior to the start of the June 2017 Academy Class, AIU offered an optional six-week boot camp—held two days a week at the Training Center—to prepare candidates for the demanding physical requirements of Academy training. The boot camp was reportedly successful and likely to be offered to future classes.

  - **Investigator Manual and Finalized Guidelines**: In May 2017, AIU posted a position for a dedicated part-time AIU Policy and Procedure Writer. Once filled, this staff member will be responsible for conducting a comprehensive review of all AIU's current memorandums and policies (including the Medical and Psychological screening guidelines) and drafting a comprehensive suite of policies for AIU.

- AIU worked with DCAS this Monitoring Period, meeting on a bi-weekly basis, to ensure the timely availability of Civil Service Lists:

  - The Department reported that this increased communication led to more examinations being offered, the opening of additional testing sites in Queens, and DCAS' agreeing to

---

[143] *See* First Monitor's Report at pgs.115-117; Second Monitor's Report at pgs. 157-159; and Third Monitor's Report at pg. 244.

provide the Department a preliminary list of candidates that passed the exam before establishing the Civil Service List (which can take months) so AIU can begin to process candidates more quickly.

- AIU screened 3,441 potential candidates to fill the Academy classes that graduated in May 2017:

| | December 2015 Graduating Class | May 2016 Graduating Class | November 2016 Graduating Class | May 2017 Graduating Class |
|---|---|---|---|---|
| **Total number of candidates screened for the graduating class** | 2,222 *(100%)* | 2,473 *(100%)* | 2,283[144] *(100%)* | 3,441 *(100%)* |
| **Total number of candidates approved for hire[145]** | 630 *(28%)* | 665 *(27%)* | 746 *(33%)* | 950 *(28%)* |
| **Total number of candidates disqualified based on medical screening** | [146] | | 120 *(5%)* | 135 *(4%)* |
| **Total number of candidates disqualified based on Psychological screening** | | | 71 *(3%)* | 92 *(3%)* |
| **Total number of candidates disqualified based on background investigation screening** | | | 42 *(2%)* | 53 *(1.5%)* |

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report.

*Assessment of Background Investigations* (¶ 3)

As in the Second and Third Monitoring Periods, the Monitoring Team audited a sample of the background investigations conducted by AIU for candidates who were considered and both selected and not selected for the May 2017 graduating class.

---

[144] Many candidates are neither recommended nor disqualified, and fall into other categories such as the candidate declined to continue with the hiring process, withdrew from certification, etc.

[145] Not all candidates approved for hire will become Correction Officers. Some will decline the offer and not matriculate at the Academy, others may not complete Academy training.

[146] The Department only began tracking the specific reason a candidate was disqualified (i.e. due to medical, psychological screening, background investigation) with the candidates screened for the class that graduated in November of 2016. Previously the Department tracked the number of candidates who were disqualified for any reason.

- *Assessment of Files for Selected Candidates*

The Monitoring Team reviewed the background investigative files for a random sample of approximately 10% (78) of the selected candidates. The background investigation files clearly demonstrated that AIU reviewed and summarized in the case review sheet each candidate's criminal history, employment history, relationships or affiliation with gangs, relationships with current inmates, frequency of appearance in the inmate visitor logs, medical screening (including drug tests), presence on state or local child abuse registries (Family Watchdog and WEBCRIMS), prior employment references, and financial history including credit checks. The investigative files evidenced in-depth investigations into each candidate's background. As described below, the Monitoring Team identified two areas of deficiencies within the files (one of which, visits by the Field Team to a candidate's home address ("Field Visits"), was discussed in prior Monitor Reports[147]).

- *Third-Party Employment Verification*

The Monitoring Team found that candidates selected for hire were often missing the responses from third parties to verify a candidate's prior employment. The Monitoring Team discussed the missing third-party verification with AIU, who described specific practices which arguably justified selecting a candidate even when this information was missing. For example, employment verifications are sent to all prior employers of a candidate, for some candidates this means that employers from as far back as 20 or more years could be contacted. In other cases, the prior employer may simply fail to respond to the verification request or respond at a much later date.  It is not necessarily unreasonable for AIU to continue with the appointment of a candidate without third party employment confirmation, especially when the rest of the background check is clean. That said, AIU needs a documented process on how to manage the receipt, or lack thereof, of third party employment verifications so investigators consistently address and document circumstances when employment verification are not received or if it is received at a much later date.

- *Field Visits*

The Monitoring Team continues to have concerns regarding two areas of the Field Visit protocol:

1) **Lack of documentation**: Documentation that a Field Visit occurred was not available in 61 of the 78 files reviewed (78%). The Department reports that Field Visits are conducted for every candidate, but that documentation may just not be filed appropriately. Without documentation, the Department is unable to demonstrate that the field visits are in fact taking place as reported.

2) **Timing and adequacy of Field Visits**: The Monitoring Team found improvement from the prior audits in the small number of cases where the documentation for the Field Visit

---

[147] *See* Second Monitor's Report at pg. 159; Third Monitor's Report at pg. 245.

was available, the Field Visit documentation often included collateral contacts at the candidate's residence, which is an improvement from prior audits. However, the results of the Field Visit were not often available to the investigator in a timely fashion.  The Monitoring Team has re-iterated to AIU that the purpose of the Field Visit is not merely to verify the candidate's address and that sharing the results of the Field Visits with the investigator contemporaneously with their investigation is important since the results may merit additional follow-up or investigation.

In response to this feedback, the Executive Director of AIU reported that AIU plans to implement a more intensive protocol for Field Visits, including a standardized form and questions to be asked by the Field Team.

- *Feedback on Specific Investigations*

The Monitoring Team provided feedback to AIU regarding potential areas of concern regarding the investigation of individual candidates in only seven of 78 (8%) files reviewed.  For example, the Monitoring Team recommended that further investigation or verification should have been conducted regarding a candidate's immigration status or a candidate's unexplained inmate contacts.

- ***Assessment of Files for Candidates Who Were Not Approved***

The Monitoring Team reviewed the investigative files for a random sample of approximately 5% (15) of the candidates who were considered but not approved for hire. The files reviewed had clear rationale and documentation for the disqualification of the candidate. During the last Monitoring Period, the Monitoring Team recommended that investigators should document their basis for not selecting a candidate in a consistent manner. AIU reported at the time that some of its staff are assigned to a Non-Selection Unit who are responsible for documenting this information, but there was a backlog in this effort and so information was either not yet complete or not up-to-date in the files reviewed. This backlog appears to have been abated because the review of the more recent files included the appropriate documentation, including documentation for the basis for disqualification based on medical and psychological screening results, or Notice of Final Background/Character Disqualification Letter to the Candidate describing the reason for disqualification (e.g. the candidate had an extensive history of moving violations in their driving record).

*Comprehensive Objective Process for Selection and Hiring* (¶ 2)

The Monitoring Team's review of investigative files in the Second, Third, and Fourth Monitoring Period demonstrated that AIU utilizes appropriate background investigation tools and consistently applies a set of criteria that automatically disqualify a candidate—including arrest and driving record standards. However, while there are written disqualifiers, and written Medical and Psychological standards, AIU does not have a comprehensive set of policies governing the process and assessment of background investigations.

The Monitoring Team continues to recommend that AIU create a comprehensive Investigator Manual which would include, among other things, guidance for the standards that should be applied by the investigator, the type of information that should be gathered, and how information should be documented and incorporated in candidate files. The concerns identified above, including those related to third-party verification and Field Visits, demonstrate the need for such written policies. The Monitoring Team believes that some of these deficiencies will be abated by providing investigators with clear and consistent guidance in written procedures. The creation of a comprehensive set of policies are **critical** to ensuring and demonstrating that the Department is conducting consistent and appropriate vetting and selection of potential candidates and maintaining compliance with the Department's obligation under the Consent Judgment. The Monitoring Team is encouraged that AIU has created and posted a position for a dedicated Policy Writer to assist in the development of a set of comprehensive policies to govern the work undertaken by AIU. In order for the Department to remain in Substantial Compliance with ¶ 2, the Department must make significant progress in developing clear and consistent policies to ensure compliance with this provision in the next Monitoring period.

During the next Monitoring Period, the Monitoring Team intends to learn more about the Department's process for monitoring certain candidates who were hired, but whose background investigation highlighted potential concerns that merit continued oversight.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
|---|---|

## 11. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, reviews the circumstances warranting the potential arrest and determines that the recommendation is based on probable cause. The purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the Fourth Monitoring Period.

**12. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)**

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. The first two paragraphs in this section (¶¶ 1 & 2) are intended to ensure that the Department's policies, procedures, practices, protocols, training curricula and corresponding documents, and logs and handbooks are consistent with the requirements of the Consent Judgment to the extent that such requirements are not explicitly stated in other provisions in the decree.

The third paragraph in this section focuses on coordinating the Department's compliance efforts, including coordinating with the Monitoring Team. The Department continues to maintain the Nunez Compliance Unit ("NCU"), originally convened at the inception of the Consent Judgment. The NCU sits within both the Legal Division and the Quality Assurance Division and is dedicated to overseeing the implementation of, and sustained compliance with, the Consent Judgment. The amount of work required to develop and implement the reforms continues to confirm the benefit and need for a dedicated unit to focus on compliance.

*Monitor Recommendations Regarding Staff Resources*

As described in the Third Monitor's Report (at pgs. 6-7), the Monitoring Team strongly recommended that the Department commit adequate resources to sustain this reform effort. First, the Monitoring Team suggested that each Facility should have a high-ranking uniformed Staff Member to act as a liaison to the NCU. Just after the end of the Monitoring Period, the Department reorganized its uniformed leadership, in part, to ensure closer oversight of Facility operations.  Two Bureau Chiefs are now responsible for this task, with Assistant Chiefs reassigned to divisions, each of which includes a number of the Department's Facilities.  This reorganization supports the Department's efforts hold Facility leadership responsible for owning

and promoting the reforms that must occur within their walls.  Rather than designating a single person at each Facility to act as an NCU liaison as recommended by the Monitoring Team, the Department has chosen to require all Facility leadership and higher-ranking uniformed Staff to understand the requirements of Nunez and to embrace their roles in implementing and managing the reforms. The Department hopes that this will lead to greater teamwork and avoid the risk of siloing the many responsibilities.

That said, specific Facility Staff are assigned to work with NCU on internal audits of several Consent Judgment provisions. Primarily, Facility staff assist by both developing and collecting relevant documents. Once the NCU analyzes and interprets the information, Division Chiefs and Bureau Chiefs of Facility Operations review the NCU's findings and work with the Facility leadership to improve performance, which may improve corrective action or discipline, if warranted. The Department reports it is also exploring the possibility of identifying a Staff member in each Facility to serve as a liaison to the NCU.

The Chief of Department also conducts weekly Nunez Compliance Meetings with members of her staff, the two Bureau Chiefs of Facility Operations, the Divisional Chiefs, the Acting Commissioner of Quality Assurance and members of the NCU team. During the next Monitoring Period, the Monitoring Team will evaluate the extent to which the reorganization, weekly meetings and system for individual staff assignments to assist NCU are achieving the desired objective of ensuring that the Facilities are owning, promoting and facilitating the reforms required by the Consent Judgment.

The Monitoring Team also recommended in the Third Monitor's Report that the Department maintain appropriate staffing for the NCU.  During this Monitoring Period, an attorney was assigned to the Legal Division of the NCU on a part-time basis as well as two

officers and an analyst were assigned to the Quality Assurance Division of NCU.  While the

Monitoring Team is encouraged that the Department has provided additional resources to the

unit, given the enormity of the task of shaping practice, measuring performance and

demonstrating compliance, additional NCU staff will be necessary.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[148]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department revised a number of policies and procedures to conform with requirements in *Nunez*.

- The NCU and Policy and Procedures Unit reviewed the universe of directives, corresponding procedures, and operation orders that needed to be assessed in order to determine whether any revisions are necessary.

- The Department reviewed over 200 directives and corresponding procedures and over 300 operation orders to identify the subset that are related to the provisions of the Consent Judgment. Some portion of this subset may need to be revised to ensure that they are consistent with, incorporate, or address all provisions of the Consent Judgment.

- The NCU and the Chief of Department's office identified over 800 command level orders that need to be reviewed to determine whether any revisions are necessary.

### ANALYSIS

The Department continued to prioritize developing policies and procedures specifically enumerated in the Consent Judgment (e.g., Consent Judgment § IV (Use of Force Policy), ¶ 3(p)) and those addressing procedures required by the Consent Judgment (e.g., the policies for alternative to punitive segregation housing units for adolescents and young adults in Consent Judgment § XVI (Inmate Discipline), ¶¶ 3 and 6). The Department also continued its work to identify all policies,

---

[148] The Monitor approved an extension of this deadline to January 31, 2018.

procedures, and training materials, that while not specifically enumerated by the Consent Judgment, may need to be revised in order to be consistent with the provisions in the Consent Judgment.

The Department provided status updates to the Monitoring Team on this process throughout the Monitoring Period. The Department provided the Monitoring Team with comprehensive lists of all Department directives and operation orders, and identified those that address issues related to provisions in the Consent Judgment. Further, the Department routinely advises the Monitoring Team of all directives and operation orders that are promulgated in the Department. The Monitoring Team will consult with the Department during the next Monitoring Period regarding the necessary revisions to the directives and operation.

| COMPLIANCE RATING | ¶ **1.** Requirement has not come due |
|---|---|
| | ¶ **2.** Requirement has not come due |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Assistant Commissioner of Quality Assurance, Deputy General Counsel and an Assistant General Counsel share the responsibilities of the Compliance Coordinator.
  - o The Assistant Commissioner of Quality Assurance resigned during the Monitoring Period, as did the individual who was named Acting Assistant Deputy Commissioner of Quality Assurance.  At the end of the Monitoring Period, a Senior Correctional Administrator was named as the new Acting Deputy Commissioner of Quality Assurance.
- The NCU provided the Monitoring Team with responses to over 400 requests for information and documentation (including production of over 400 use of force investigation files from Preliminary Reviews, Facility Investigations, and Full ID Investigations). The NCU also produces over 50 reports of certain information on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.
- On more than 55 business days during the Monitoring Period, the NCU scheduled and/or facilitated meetings between the Monitoring Team and the Commissioner, his executive staff, and other DOC staff members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners, and also facilitated site visits to all of the Facilities.

**ANALYSIS OF COMPLIANCE**

The role of the Compliance Coordinator continues to be fulfilled by three energetic, highly-competent and committed individuals. The Monitoring Team communicates almost daily (and sometimes multiple times a day) with the Compliance Coordinators and members of the NCU team, as well as other members of the Department. The Department's staff in NCU are hardworking, smart, conscientious and provide invaluable assistance to the Monitoring Team. Not only do they manage the flow of information to the Monitoring Team, arrange meetings and phone calls between Department Staff and the Monitoring Team, and provide logistical support to Monitoring Team site visits, they have also begun to organize, analyze and interpret information before it is submitted to the Monitoring Team. These efforts have helped to develop joint understandings of the barriers to compliance and potential solutions to them. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

The Monitoring Team's experience in other jurisdictions suggests that progress is accelerated when those involved in the operation of the Facilities are intimately involved in developing new procedures, assessing performance, identifying barriers and developing solutions to identified problems. In so doing, greater ownership of both the problems and the path forward is augmented, and role modeling and culture change begin to hasten the speed of reform. The Monitoring Team encourages the Department to continue its efforts to push the responsibility for compliance into the Facilities, and also encourages recognition for Staff as milestones are achieved.

| **COMPLIANCE RATING** | **¶ 3.** Substantial Compliance |
|---|---|

# CURRENT STATUS OF YOUNG INMATES

_Raise the Age_

On April 10, 2017, Governor Cuomo signed "Raise the Age" (RTA) into law. RTA will dramatically impact the way in which 16- and 17-year-olds who commit crimes are processed through the justice system. Rather than treating all 16- and 17-year-olds as if they were adults and processing them through the Criminal Court, RTA established different pathways for court processing that are designed to better address the underlying causes of delinquency among young offenders. Most cases will be heard in Family Court, while most violent felony cases will be heard in the youth part of the adult criminal court. In addition, RTA requires 16- and 17-year-olds to be moved out of the adult jails, off Rikers Island, by October 1, 2018. The specifics of exactly where the youth will be housed and who will operate the Facility in both the short- and long-term are all still under deliberation. Suffice to say, RTA will have a major impact on the adolescent population at Rikers, though the dimensions of that impact will not be known for several months. Until the plans to implement RTA are more definitive, the Monitoring Team has refrained from making any changes to the monitoring strategy. Similarly, if or until the adolescents are physically removed from DOC custody, the Monitoring Team remains committed to helping the Department meet its obligations to improve their conditions of confinement.

_Facility Leadership and Support from Headquarters_

The Third Monitor's Report discussed the Monitoring Team's positive impressions of the leadership at both RNDC and GMDC and these impressions have only intensified during the current Monitoring Period. At both Facilities, the Wardens, Deputy Wardens and Assistant Deputy Wardens have shown a commitment to changing the way Young Inmates are viewed,

supported, and managed. With an innate understanding that Young Inmates process information

and make decisions differently than adults, the leadership teams at RNDC and GMDC are

excellent role models for their Staff in new ways to manage challenging youth behaviors.

Further, rather than shy away from the complex requirements of the Consent Judgment, both

teams have approached the logistical, cultural, and conceptual challenges with vigor and

creativity, learning from each other's successes and missteps. While the Department has

committed significant fiscal resources to improving the conditions of confinement in the Young

Inmate Facilities, the Monitoring Team is mindful of the other types of support that will be

necessary to fully evolve and sustain the reforms. For example:

- Properly incentivizing and rewarding Staff who take on challenging assignments (e.g.,
  TRU/SCHU steady officers, Adolescent Response Team officers). These things need not be
  monetary—Gate 1 passes, flexibility in mutual shift exchanges, and other forms of time off
  are very compelling;

- Enacting methods for limiting turnover in these challenging posts (e.g., creating promotional
  opportunities within the youth-focused assignments so that dedicated Staff do not need to
  leave these assignments in order to advance their careers);

- Creating opportunities for a wider range of uniformed Staff who are dedicated to the Young
  Inmate population to visit other jurisdictions with facilities that successfully support the
  needs of youth in secure custody;

The Monitoring Team also recognizes the leadership and support flowing from the

Division of Youthful Offender Programs ("DYOP") at Bulova. The Deputy Commissioner,

Assistant Commissioners and other Staff offer invaluable leadership in expanding the

programming available to Young Inmates, supporting the Structured Supportive Housing units

(SSHs; i.e., alternatives to Punitive Segregation), facilitating the implementation of the Levels group incentive programs, and supporting the Program Counselors who are tasked with providing group and individual interventions to address the root causes of violence. Not only would these various programs not be as evolved without the efforts of DYOP staff, but they also would not have accumulated the data now available to measure progress toward Substantial Compliance. These achievements are discussed in detail in the following Safety and Supervision of Inmates Under the Age of 19 section and Inmate Discipline section of this report.

_Trends in Use of Force and Violence_

As discussed in the Introduction to this report, adolescents and young adults contribute a disproportionate share of the Department's uses of force and inmate-on-inmate violence. That said, compared to the previous Monitoring Period, the current Monitoring Period witnessed decreases in both uses of force and violence at GMDC and RNDC where all male Young inmates are housed.[149] These trends are discussed in detail, below.

The purpose of this brief introduction to the Young Inmate portions of the Consent Judgment is to delve more deeply into the trends in UOF and violence among Young Inmates. The graph below shows that, during the current Monitoring Period, the rates of inmate-on-inmate violence among Young Inmates decreased significantly from the high rates witnessed during the previous Monitoring Period. That said, comparing January to June 2016 to January to June 2017 reveals far more modest reductions (see the red boxes in the graph below). For 16/17-year-olds, the average rate of violence during the current Monitoring Period was 26.5 per 100, compared to

---

[149] GMDC houses nearly all 18-year-olds and the majority of inmates aged 19 to 21. Together, the Department refers to this subpopulation as "young adults." Because § XV and XVI of the Consent Judgment addresses only a subset of these inmates—those under age 19—the Monitoring Team has tried to limit the discussion and assessment of compliance to 16-, 17- and 18-year-old inmates. However, given the housing strategy for young adults and the impact of violence and uses of force among 19- to 21-year-olds on the 18-year-old inmates, the entire subgroup of 18- to 21-year-olds is discussed in this introduction.

27.4 per 100 during the same period in 2016. For 18-year-olds, the average rate of violence during the current Monitoring Period was 21.6 per 100, compared to 25.6 per 100 during the same period in 2016. Though the reductions are modest, likely contributors are examined in the Safety and Supervision of Inmates Under the Age of 19 and Inmate Discipline section of this report.



A review of Inmate Fight Tracker data for January to June 2017 clearly illustrated the differing levels of involvement in violence among inmates. A small number engage in frequent violence (eight 16/17-year-olds and one 18-year-old were involved in 8+ fights during the six-month period, accounting for nearly 80 fights). A larger segment is involved in more intermittent violence (82 16/17-year-olds and 45 18-year-olds were involved in 3+ fights in the six-month period). An even larger segment was involved in only one fight, and still other inmates were not involved in violence at all during the six-month period, though they may have been involved in other forms of misconduct. Given the turnover in the inmate population, these data are not easy

to interpret, but they do suggest that consequences of different intensities are needed to address inmates who engage in violence and other misconduct at different frequencies.

The Department has made solid progress on each end of the behavior management continuum—responses to serious/frequent violence (the Supportive Structured Housing units; "SSHs") and a group incentive program (the Levels) to encourage inmates to refrain from misconduct altogether. However, the mid-range of the behavior management continuum—responses to more intermittent violence and to non-violent misconduct—needs to be further developed. These issues are discussed throughout the following Safety and Supervision of Inmates Under the Age of 19 and Inmate Discipline sections of this report.

Furthermore, during this Monitoring Period, the Monitoring Team analyzed just under 400 Preliminary Reviews and Investigations of incidents occurring in RNDC, GMDC, and RMSC, which house the vast majority of Young Inmates. These reviews revealed that most fights are incidents of opportunity in which inmates assault each other in dayrooms, classrooms, corridors, by the phones, and on the tiers. While some may not be preventable, a good proportion are facilitated by security lapses including a failure to properly supervise the area, failure to de-escalate rising tensions, cell doors being open when they should be secured, poorly executed pat searches, and the like. All of these are actionable circumstances. As the Officers' operational skills improve, many of these violent incidents may be averted. A good portion of the violence also appears to be Security Risk Group ("SRG")-related. Most of these assaults involve small groups of inmates, with very few one-on-one fights, and appear to be instigated by a few key inmates. Even with a sound SRG balancing strategy, unknown nuances will contribute to spontaneous incidents, such as issues festering from the street, or violence that erupts from what began as a normal conversation. Addressing these spontaneous eruptions will require a high-

level of vigilance from Staff and expertise in verbal de-escalation and conflict resolution. The best way to reduce the incidence of UOF is to prevent the circumstances that led to the UOF from occurring.

Data from the current Monitoring Period suggests that Staff at RNDC, in particular, have had some success in preventing the behaviors that lead to a UOF. The graph below shows trends in the UOF among Young Inmates since the Effective Date of the Consent Judgment. During the current Monitoring Period, the average rate of UOF among 16- and 17-year-old inmates was 16.5 per 100, compared to 24.8 per 100 during the same period in 2016. During the current Monitoring Period, the average rate of UOF among 18-year-olds increased in comparison to the same period in 2016, 20.7 per 100 versus 17.4 per 100, respectively.



As is known from data on the reasons force is used (discussed in the Introduction to this report), inmate-on-inmate violence is only one of many precipitators of a UOF and overall UOF rates can only illuminate so much about Facility practices. The Monitoring Team recommends that the Department delve into the reasons for the use of force, *by age*, to identify the specific inmate behaviors and Staff responses that contribute to the observed increases and decreases in overall UOF rates.

As discussed in detail in the following sections of this report, the interplay between the reforms required under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19) and Consent Judgment § XVI (Inmate Discipline) has real power to impact both the rate of inmate-on-inmate violence and the UOF among Young Inmates. Some of the strategies underway in the Young Inmate Facilities (e.g., programs to reduce idle time; incentives for positive behavior; considering new sanctions for mid-level misconduct) may also be useful to address the rates of violence and UOF among older populations (particularly the 19- to 21-year-olds) who are housed in other Facilities.

## 13. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this part of the Consent Judgment is to better protect Staff and inmates under the age of 19 from violence. Most of the requirements that will directly affect an inmate's propensity to engage in violence and the Department's response to it are contained in the Inmate Discipline section of this report (e.g., incentives for refraining from misconduct and the disciplinary responses to aggressive behavior). That said, institutional violence is affected by many things—factors pertaining to the inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in

the jails (e.g., security features and environmental hazards, as well as the daily structure and programming available). This section of the Consent Judgment includes provisions related to all of these factors.

As discussed in the preceding section, "Current Status of Young Inmates," the frequency of UOF and frequency of inmate-on-inmate violence recently decreased among Young Inmates. These improvements are driven by several things including solid leadership at both RNDC and GMDC where Young Inmates are housed; growing availability of programming to reduce idle time; initial implementation of the Levels group incentive program; and the operation of various housing options for addressing the needs of serious and chronic violent inmates. While the declining rates of violence and UOF among Young Inmates are encouraging, significant and steady reductions over time are needed to reach Substantial Compliance.

Overall, the Monitoring Team is very encouraged by the Department's achievements regarding Young Inmates during the current Monitoring Period and hopes that the recent decreases in UOF and violence become enduring trends. The Monitoring Team's assessment of compliance for the provisions in this section is detailed below.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As detailed in the following narratives about the many components of the reforms related to Young Inmates in §XV "Safety and Supervision" and §XVI "Inmate Discipline," the Department continues to design, implement and refine a range of strategies designed to produce safer Facilities.

**ANALYSIS OF COMPLIANCE**

In concert with Consent Judgment § XVI (Inmate Discipline), the overall purpose of this section of the Consent Judgment is to better protect Staff and Young Inmates from violence. In part,

preventing and de-escalating potentially violent confrontations between inmates requires the skills taught in Safe Crisis Management and Direct Supervision. Until Staff achieve a mastery of these skills and begin to develop constructive relationships with inmates, expecting significantly reduced rates of violence would be premature. In addition, increases in Staff skill in managing Young Inmates will be magnified by operational practices such as new disciplinary strategies, incentives for positive behavior, and increases in structured programming that reduce inmates' idle time. The Monitoring Team expects the rates of violence to continue to decrease as these various reforms take hold. The data required to track the rates of violence are now routinely provided by the Department, and is discussed in the preceding section, "Current Status of Young Inmates."

The progress toward reforms required by the Consent Judgment (e.g., the Levels program, new programming opportunities for Young Inmates, the removal of highly aggressive inmates to one of the SSHs) may have contributed to the observed reductions. It is also likely that the strong leadership at both Facilities has contributed to an evolving, safer culture for inmates and Staff. The leaders' determination to implement the complex requirements of the Consent Judgement requires both logistical skill and a willingness to treat inmates differently. Their ability to model these attributes for their subordinates is an essential component to achieving reform.

It is important to recognize that these data are examined at a specific point in time, while the reforms being undertaken (particularly regarding incentive programs and alternative disciplinary measures) are continually being implemented and refined. Furthermore, rates of violence are impacted by many, many things—most of which are being addressed by the Consent Judgment, though some are in their infancy. Violence should decrease further as the component parts of the reform related to training Staff in Direct Supervision and consistent Staff assignments are more fully addressed.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells.

- During the previous Monitoring Period, Security Memoranda were issued at both GMDC and RNDC to remind Staff of their responsibilities regarding daily inspections. The Department reports that the Memoranda appear to have reduced the frequency of issues related to locking mechanisms noted by the Monitoring Team during previous Monitoring Periods.

- During the current Monitoring Period, the Department began an internal audit procedure to determine whether RNDC Staff were completing FSIRs and DCSRs as required and the extent to which their content was congruent. These data are discussed below.

**ANALYSIS OF COMPLIANCE**

As noted above, the Department has begun internal audits to create an ability to demonstrate compliance with this provision. The Department reported the following completion rates from its initial audit at RNDC:

| RNDC | April | May | June | Average |
|------|-------|-----|------|---------|
| FSIR Completion | 67% | 87% | 88% | 81% |
| DCSR Completion | 88% | 94% | 81% | 88% |

On average, RNDC Staff completed the FSIRs and DCSRs on 81% and 88% of the required shifts, respectively. This is a solid result for an initial audit, and it is likely that compliance rates will improve in subsequent months. The Department submitted the results of the audit to the Monitoring Team for review and discussion, which will occur during the Fifth Monitoring Period.

The Department reported its plans to expand the audit to verify the accuracy of the reports with on-site inspections and to confirm that inmates were not housed in cells with inoperable locks. These three components (i.e., report completion, report accuracy, and housing outcome) are appropriate targets for demonstrating compliance. Once the Department has enacted the full audit strategy, the Monitoring Team will examine the data to verify the results. The Department also intends to begin audits at other Young Inmate Facilities (i.e., GMDC, RMSC and single units at GRVC and OBCC), although a timeline has not been identified. The Monitoring Team applauds the Department's initiative in this area, as having an internal capacity for identifying and addressing problems to improve performance and outcomes is an important consideration of the Department's efforts to achieve Substantial Compliance.

Each month, the Monitoring Team tracks incidents involving cell locking mechanisms at GMDC and RNDC via the COD reports, Preliminary Reviews, and review of completed Investigations. Between January 1 and July 23, 2017, there were four UOF incidents involving a compromised lock at Facilities housing Young Inmates. While Staff certainly need to remain vigilant about the operability of locks—and the Department's internal audits are likely to ensure that they do so—the data collected by the Monitoring Team does not suggest that inmates' compromising cell locks is driving a major portion of UOF.

| **COMPLIANCE RATING** | **¶ 2.** Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour all Young Inmate Housing Areas at least once each shift, unless the Warden or Deputy Warden is not in the Facility during that shift, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented and any general deficiencies shall be noted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See discussion below.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team originally planned to audit this provision during the Fourth Monitoring Period in order to rate the level of compliance. The Monitoring Team conducted a brief readiness assessment to determine whether log book entries were the best/only way to collect this information and to get a sense of what the current level of performance might be. For a one-week period in March 2017, the Monitoring Team reviewed log book entries from three units at GMDC (i.e., 63 shifts). Every day, multiple log book entries were made by Supervisors (who make their entries in red ink). On average, 8.5 entries per 24-hour period were recorded (range 5-11), meaning that supervisor-level Staff visited the units approximately every 3 hours. The difficulty in determining compliance with this provision lies in being able to discern the rank of the individual conducting the rounds. Sometimes, the individual noted his or her rank (particularly the Captains), but many times, the individuals only signed his or her name (which were often not legible) and included their shield number. Furthermore, it was difficult to discern the level of contact that supervisors had with the inmates during their time on the unit because most of the entries used the same rote language to indicate that a tour of the unit was conducted.

Clearly, developing the data to demonstrate compliance with this issue will be a very challenging and time-consuming task for both the Monitoring Team and the Department. Given the other, higher priority issues associated with the requirements of the Consent Judgment (e.g., reducing unnecessary and excessive uses of force, supporting the implementation of the SSHs, overseeing the

implementation of the incentive programs), the Monitoring Team is not prioritizing this issue but will return to it when the other reforms are well underway.

| COMPLIANCE RATING | ¶ 3. Not yet rated. |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION SYSTEM)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department originally intended to utilize the Housing Unit Balancer ("HUB") to classify adolescents at RNDC. However, because the HUB is mainly predicated on properly balancing the various SRG groups within and across housing units and because the adolescent population is relatively small (ADP is approximately 160 inmates), the Department decided that the HUB was not the best strategy for classifying the adolescent population.

- The Department then planned to use its original classification instrument to identify adolescent inmates' risk of institutional violence. The classification level would be combined with an inmate's education track and SRG affiliation to identify an appropriate housing unit.

- The Department contracted with a well-known and highly respected expert in validating classification systems to examine the validity of the HUB for the adult population and to examine the validity of both the HUB and the original classification instrument for the adolescent inmate population.

- The research showed that neither the HUB nor the original instrument were valid for use with the adolescent inmate population.

### ANALYSIS OF COMPLIANCE

*As noted in the Second Monitor's Report, because of the small number of female Young Inmates and the subsequent operational difficulties that ensue, the Monitoring Team is not assessing compliance with this provision at RMSC.*

As evidenced in the previous Monitor's Reports, the Department has changed course multiple times in its plan to comply with this provision. During the current Monitoring Period, the Department achieved an important milestone—obtaining research on the validity of the two instruments available for use in classifying adolescent inmates to better inform decision-making. Unfortunately, the research showed that neither instrument was valid for use with adolescents. The Monitoring Team is withholding the Compliance Rating during this period because the Department took significant steps to address the basis upon which the Monitoring team assessed Non-Compliance in the previous

Monitoring Period.  However, as noted below, additional work is necessary for the Department to achieve compliance.

From here, the Department will need to take on the task of selecting a new instrument to determine each adolescent inmate's risk of institutional misconduct. This can be accomplished in two ways: (1) by creating the instrument from scratch, using the large volume of data the Department has on the adolescent population or (2) adopting an instrument from another jurisdiction and pilot testing it with the DOC population to ensure it is valid (local conditions sometimes invalidate an instrument that is valid in another jurisdiction). Given the recent passage of Raise the Age and the Department's future collaboration with NYC Administration of Children's Services ("ACS"), discussed in the preceding section "Current Status of Young Inmates," this decision should be made collaboratively and the instrument should comply with any relevant state regulations. It is possible that ACS (or the State's Office of Children and Family Services) is already using an internal classification tool that may be valid for DOC's population or would be interested in collaborating on the development of a new one. The Department is consulting with the Monitoring Team to develop a pathway to achieve compliance. In the next Monitor's Report, the specific steps and progress toward them will be discussed.

As noted in previous Monitoring Reports, the Monitoring Team supports the decision to house adolescent inmates according to their education level, but also sees the housing decision as separate from the task of classifying inmates according to their risk of institutional violence. The Department reports that identifying the youth's education track at admission, considering the youth's SRG affiliation and housing the youth accordingly has resulted in a safer school environment. The Monitoring Team tracks incidents that occur in the RNDC school each month, using the COD reports. Between January 1 and July 23, 2017, there were only 15 UOF incidents in the school area, suggesting that the school-building is no longer a hot-spot for violence, as had been previously identified by the Department.

One of the essential features of a classification system is an override mechanism, as discussed in the Third Monitor's Report (at pg. 204).  An override mechanism will need to be incorporated into the classification instrument that the Department develops or adopts so that Staff may account for individual factors and circumstances that cannot be captured by the scored risk factors.

| COMPLIANCE RATING | ¶ 4. Compliance Rating Withheld |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In 2014, the Department allocated only $250,000 for youth-centered programs. In 2017, the Department reports a budget of $19,000,000 for this programming.

- The Department partners with nearly 80 community-based organizations to provide programming to inmates at GMDC, RNDC and RMSC.

- The Department has a broad range of services and programs for Young Inmates, including discharge planning services; art, music and drama programs; college courses; creative writing and poetry; animal safety and dog adoption preparation; employment readiness; and OSHA certifications and other vocational programs. Some of these are programs for youth in the general population, some are programs for inmates in the special housing units (SCHU, TRU, Secure, ESH), and some are for inmates who are admitted to special "Program Houses" that have a unifying programmatic theme.

- The Department also provides programs designed to address Young Inmate's criminogenic needs, such as Dialectical Behavior Therapy (DBT), Interactive Journaling, gang intervention and violence prevention groups. These are delivered in a joint effort by Program Counselors and volunteers from community organizations.

- RNDC recently launched a mentoring program whereby inmates are mentored by RNDC Staff who have indicated both a desire and special skill in working with Young Inmates.

- The Department's vocational programs deserve special recognition. These programs provide industry-recognized credentials and certificates to program graduates. Youth in these programs have, to date, earned over 1,500 credentials and nearly 700 Trading Futures certificates. Courses include Cosmetology, Building Trades, Barista Training, Food Preparation, OSHA Construction and Maintenance, Flagging and Scaffolding, CPR, and Simulated Driving Programs.

- The Department tracks services that are provided by Program Counselors who are assigned to most units that house Young Inmates.

- In addition to these programs, all 16- and 17-year-old inmates are required to attend school 5 hours per weekday. While not required to do so, 18-year-old inmates are also able to attend full-day schooling. The Secure and YA-ESH units provide 3 hours of school per weekday for 18-year-old inmates who elect to attend, while TRU and SCHU inmates may attend full-day school in the Facilities' regular school buildings.

ANALYSIS OF COMPLIANCE

The Department has made a clear and significant commitment to providing programs for inmates to enhance skill development and reduce idle time, both of which will reduce violence and enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued its efforts to monitor the extent to which the Department is complying with the requirement

to provide programs that minimize idleness and reduce the potential for violence. Current audit efforts looked only at the programming delivered by Program Counselors and the proportion of inmates who attended school each day. As discussed in the provision in the next section related to the Department's incentive system (i.e., the Levels system), inmates in high-performing units also obtain access to enhanced recreation and other leisure time programming. A significant volume of programming is also delivered by the Department's many partners from community-based organizations. An audit strategy for this segment of programming has not yet been identified, but, once audited, the Monitoring Team expects that the sum total of data will demonstrate that Department has succeeded in meeting their obligations in this area.

As noted in the previous Monitor's Report, the Department requires Program Counselors to track the services they provide to Young Inmates each day. The Monitoring Team randomly selected 17 housing units at GMDC, RNDC and RMSC and reviewed Program Counselors' spreadsheets for a randomly selected week in March 2017. Unfortunately, it turned out that during the selected week, Program Counselors were often out of the Facilities for training and a number were also out sick, meaning that programming was delivered on fewer days than expected. These absences also contributed to the finding that Program Counselors provided an average of between .8 and 2.4 hours of programming each day (depending on the Facility/unit). The Monitoring Team and the Department both believe that these results are atypical and thus must do better in subsequent audits to identify weeks during which training is not scheduled. This will permit a more accurate assessment of the Department's performance for this segment of program delivery.

Although the training schedule adversely impacted the volume of programming provided, program participation rates were likely unaffected. At GMDC, on average, 85% of the inmates assigned to each unit participated in the Program Counselors' programming, 56% participated at RNDC, and 78% participated at RMSC. Usually, inmates were absent for legitimate reasons such as being out to court, or receiving services from medical or mental health staff. It is worth noting that the Department's obligation is to provide *access* to programming, and unless there were obvious reasons for the failure to participate that were under the Department's control (e.g., a decision to refuse access to programming to certain inmates), participation rates should not affect the Department's ability to achieve Substantial Compliance.

The type of programming delivered by the Program Counselors was also examined. While the community-based organizations provide a very important range of services that are clearly required for appropriate adolescent development and that serve an important role in violence reduction, the responsibility to deliver programming that is specifically related to anger management, impulse control, decision-making, and interpersonal communication and conflict resolution falls largely to the Program Counselors. The audit of Program Counselors' records revealed, unfortunately, that community meetings and structured recreation activities were far more prevalent than the DBT,

journaling, and conflict resolution programs. During the Monitoring Period, the Program Counselors received a 20-hour DBT training. As they hone their skills in delivering these types of programs, the Monitoring Team hopes they will become more prevalent among the programming provided to Young Inmates.

The Monitoring Team also observed several group sessions at Young Inmate Facilities. An Interactive Journaling group was led by a Program Counselor who had an easy mastery of the core developmental tasks of adolescents (i.e., identity, personal values, achievement, autonomy and belonging). He deftly wove these objectives into the process of reviewing the youth's entries in their journals. A DBT group was co-led by two Program Counselors who understood and delivered the DBT curriculum as it was designed. The group had an appropriate mix of interactive discussion and group activities. Using relevant examples of the skills being taught, the facilitators held the youth's attention and were also able to bring individual youth back into the conversation when their attention began to wane. The Gangsters Making Astronomical Community Changes ("GMACC") program, delivered by a community-based organization, brought credible messengers to the Facility to discuss the youth's gang involvement and the consequences they faced because of it. One of the youth peppered the facilitators with questions and seemed to be questioning his own affiliation—the ability to ask these things of people with lived experience is invaluable. Giant Thinking is also delivered by a community-based partner. Combining physical activity with mindfulness exercises, the facilitators delivered a high-energy, engaging group session. A key strength of this group is the youth's ability to continue their engagement post-discharge, since the group holds regular, structured activities in public areas throughout NYC. The Monitoring Team also briefly observed barista training, the simulated driving course, Culinary Arts, acting programs, pet training, horticulture, mural arts programming, and music therapy programming. These experiences testified to the quality and diversity of the program offerings for Young Inmates. The Monitoring Team intends to continue to observe programs throughout subsequent monitoring periods.

Finally, the Monitoring Team also reviewed monthly attendance reports that are maintained by the NYC DOE for the education programs at RNDC, RMSC and GMDC. The purpose of this review was to gain a general sense of the proportion of youth who attend school to better estimate the volume of programming hours received by the average Young Inmate. The reports capture the number of youth who are required (i.e., the 16- and 17-year-olds) or eligible (i.e., the 18-year-olds) to attend school and the number of youth who report to school each day. As noted above, there are a variety of legitimate reasons why inmates do not attend school—particularly for court. Students may also refuse to attend school. As with on-unit programming, the Department's obligation is to *provide access* and to address non-attendance issues that are within their control. For example, early in the life of the Consent Judgment, students often refused to attend school because of the fear of violence in the school wing, where student from all units mixed together. As discussed in the provision related to Classification, above, the Department now houses youth according to their education track, which means that students

go to school with youth from their own housing unit. The Department reports that this has decreased fear, and increased participation in school. Similarly, the Department initiated a "First Come, First Served" program to provide snacks to students who arrive to school on time. Both efforts demonstrate the Department's commitment to helping Young Inmates take advantage of the various program offerings. The review of monthly attendance data revealed that the vast majority of 16- and 17-year-old students attend school, while only a small segment of young adult students attend. These findings were compatible with those of the Special Master of the *Handberry* litigation (addressing education services), who recently found the Department in "substantial compliance" on this issue.[150]

Thus, the Department is vigorously pursuing several strategies to meet the requirements of this provision. The combination of school, mandated recreation, Program Counselor-led programming and programming delivered by community-based partners should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming led by an adult. The unit schedules also identify the variety of programs being brought to the units. (The Monitoring Team continues to monitor whether unit schedules are posted on each housing unit during routine visits to the Facilities.)

However, the Department continues to struggle with documenting program delivery. Not only is documentation needed to demonstrate compliance, but it can be particularly useful in identifying whether there are times/days in which inmates have excessive idle time. The current method for Program Counselors to record their activities is both time-consuming and prone to error and a good strategy for capturing programming provided by community-based organizations has not been identified. During the next Monitoring Period, the Monitoring Team plans to work with the Department to identify some alternative, basic strategies for collecting this information that will provide the ability to demonstrate compliance while not detracting from the program providers' time available to deliver programming.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit, or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See discussion below.

---

[150] *See*, The First Report of The Status of Education Services for Youth Aged 16-21 at Rikers Island by Special Master Peter Leone dated February 1, 2017 (96-cv-6161 S.D.N.Y.).

ANALYSIS OF COMPLIANCE

During the current Monitoring Period, the Monitoring Team explored the goals and intent of this provision and considered an appropriate monitoring strategy. The goal of this provision is to ensure that youth who are being bullied, threatened or otherwise victimized are moved to a different housing unit where they will be safer. The intent is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Monitoring Team's routine site visits and review of documentation for other provisions clearly show that the Department makes such transfers all the time. Discussions with Facility leadership and those who work with Young Inmates in the SSH units suggest that when interpersonal conflicts threaten to turn violent, the Department routinely takes steps to separate those involved in the conflict and to protect vulnerable inmates. Transfers may involve either the aggressor or the inmate being victimized. The Department must strike a delicate balance among intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff to develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Department's flexibility for programming, population management, etc. if large numbers of inmates have "keep separate" markers applied.

The challenge for demonstrating compliance with this provision will be in the documentation. During the Fifth Monitoring Period, the Monitoring Team will meet with the Department to identify the mechanism by which such housing transfers occur and to identify opportunities for these transfers to be documented.

| COMPLIANCE RATING | ¶ 6. Not yet rated. |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report, at pgs. 131-132).

- In response to the Monitoring Team's feedback about the substance of information found in the attachments to Protective Custody ("PC") documentation and timeliness of required interviews,

the Department has proposed revising certain policy requirements to allow OSIU staff to focus more intensely on Young Inmates and those who are disputing their placement in PC.

**ANALYSIS OF COMPLIANCE**

As noted in the Second Monitor's Report, the Department's policy for Protective Custody addresses the requirements of this provision related to prompt initial placement, evaluation of risk, timely determinations of placement, access for family/lawyers/others who express concern, and record keeping procedures.

The Monitoring Team conducted its third review of PC files during the current Monitoring Period. From the group of inmates who were in PC on the day of the audit, 10 inmates from RNDC, 10 inmates from GMDC, and three of the four files for 18-year-olds in PC at RMSC were randomly selected. A few of the inmates had multiple admissions to PC during the current Monitoring Period, for a total of 28 PC episodes. This audit revealed a similar constellation of problems noted in prior reviews, and interviews with OSIU staff uncovered some of the logistical problems associated with meeting the requirements of the policy, including workload related delays for interviews and delays related to obtaining information from the referring Facility.

The Department responded to the Monitoring Team's feedback with a proposal for some practical and reasonable changes to the Protective Custody policy. Most of these involve reassigning responsibilities for completing interviews and certain parts of the documentation and making minor adjustments to timelines. The substance of the Department's proposed changes addresses the concerns flowing from the Monitoring Team's multiple reviews of PC inmate files. The proposed changes to policy are not expected to change the PC process for Young Inmates in any way, but will free up OSIU staff's time to focus more intensely on Young Inmates to ensure their PC placements are appropriate.

As before, the Monitoring Team continues to find that the Department and OSIU staff take seriously the responsibility to protect inmates who express a concern for their safety. All of the Young Inmates who expressed a concern for their safety were immediately placed in temporary PC, and once assessed, all the PC placements were continued. Monitoring Team members interviewed inmates in PC at RNDC, GMDC and RMSC, all of whom stated they felt safe in the PC unit and knew that they could request removal from PC if they desired to do so. Once the proposed policy revisions are finalized and implemented, the Monitoring Team will conduct another review of documentation for Young Inmates in PC to assess compliance with this provision. The Monitoring Team is hopeful this can occur during the Fifth Monitoring Period.

| **COMPLIANCE RATING** | ¶ **7.** Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains Policy 4100R-D "Classification" which specifically states that "Inmates in the general population who are classified as maximum custody shall not under any circumstances be housed with minimum custody or medium custody Inmates" (II.E.1).

- Temporary co-mingling, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (e.g., upon a birthday, or when an inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility.

- The Department has a procedure in place to review housing assignments daily, identify any instances of co-mingling, and resolve them. Through this procedure, most incidents of mis-housed inmates are resolved within 24 hours of the occurrence.

**ANALYSIS OF COMPLIANCE**

*As noted in the Second Monitor's Report, because of the small number of female Young Inmates and the subsequent operational difficulties that ensue, the Monitoring Team is not assessing compliance with this provision at RMSC.*

The Department's policy reflects the requirements of this provision. However, the Department's ability to achieve Substantial Compliance requires the use of a valid instrument to identify adolescents who are high, medium and low custody so that separations among them are based on legitimate risks. Given the Department's recent research showing that the current system is not valid for use with adolescents (discussed in ¶4 "Classification"), the audits of the housing assignments for RNDC, described below, tested the process rather than the outcomes. In other words, the Monitoring Team assessed the ability of the internal review process to successfully identify inmates who needed to be re-housed to a unit with a compatible classification level and the extent to which those inmates were moved expeditiously. Given that 18-year-olds are classified using the HUB, which is valid for use with males age 18 or older, the Monitoring Team was able to examine both process and outcomes for GMDC.

The Monitoring Team requested the "mis-housed reports" for three two-week periods during the Fourth Monitoring Period, for RNDC and GMDC.[151] Mis-housed reports identify all inmates whose

---

[151] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in special housing units like those noted in the text of the

classification level is incompatible with the security level of the assigned housing unit (i.e., high classification inmates were mixed with low classification inmates). For example, if an inmate who is classified as "maximum" is housed on a unit designated for minimum and medium custody inmates, his name would appear on the Mis-Housed List. Each weekday, the Warden of the Facility is required to document, in writing, the reason that each inmate is mis-housed, and the plan for rectifying the situation, if needed. In some cases, the inmate's classification score may be overridden, and thus the inmate is not actually mis-housed. The purpose of the Monitoring Team's audit was to identify the frequency with which mis-housing occurs, the reasons for mis-housing, and the timeliness of correction.

The mis-housing reports from RNDC were well-organized and complete. The memos were detailed and clear, and all necessary supporting documentation (including copies of any overrides that were applied) was attached. Mis-housing continues to be a low-frequency event for adolescents. Often, no adolescents were mis-housed. On the other days, between one and five adolescents were mis-housed, but the vast majority were rehoused within the three days required by policy. When it occurred, most inmates were mis-housed because their classification level had changed, which necessitated a transfer to a different unit. A few inmates were considered mis-housed because their classification level was incompatible with the program house in which they resided. The Monitoring Team recommends considering overrides for these inmates when appropriate, as providing access to a desired program may promote institutional safety. The process for identifying and transferring mis-housed inmates at RNDC appears to be sufficient to meet the requirements of this provision. Assuming the current performance level remains, once an appropriately validated classification tool is implemented, RNDC will be in Substantial Compliance with this provision.

At GMDC, inmates are classified using the Housing Unit Balancer (HUB). The HUB mis-housing process uses slightly different tools, but operates under the same principles as the mis-housing process at RNDC. Although the Department reported this process was in place at GMDC during the Second Monitoring Period, the process was not fully implemented until late February 2017. As a result, only 20 of the 30 days requested by the Monitoring Team utilized the proper strategy for identifying mis-housed inmates. Furthermore, among the 20 days reviewed, several glitches were identified in the data, suggesting that this process is not fully dependable for identifying the universe of mis-housed inmates, the reasons they were mis-housed, or the actions to be taken. While most of the glitches could be explained upon consultation with the Department, that this information was not clearly articulated on the memo prepared by the Facility suggests that the information would not have been obvious to decision-makers in the moment. The mis-housed reports highlighted GMDC's priority on placement in program units, even when incompatible with the inmate's classification level. These types of placements are perfectly acceptable (encouraged, even) but the documentation surrounding them was

Provision. EMTC audits are no longer necessary because all 18-year-old sentenced inmates were housed at GMDC as of January 2017.

not always clear. The Monitoring Team recommends the development of an override procedure and relevant documentation for the HUB, since the HUB does not currently contain this feature. Documentation issues aside, mis-housing appears to be an equally rare phenomenon at GMDC. Once documentation improves, the Monitoring Team expects GMDC will be in Substantial Compliance with this provision.

The Monitoring Team will repeat the audit for GMDC during the Fifth Monitoring Period to identify the baseline performance level. Hopefully, this audit will demonstrate that mis-housing is relatively rare, is quickly rectified, and that the process has integrity, as demonstrated by RNDC.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- The Department contracted with The Moss Group, a highly respected technical assistance provider, to provide support for issues related to sexual safety and implementing PREA.

### ANALYSIS OF COMPLIANCE

The Department routinely provides data to the Monitoring Team about allegations of sexual abuse and harassment involving Young Inmates. During the Fourth Monitoring Period, there were 11 such allegations. Most were from RNDC (n=8; 73%) and a few were from GMDC (n=3; 27%). No allegations of sexual abuse or harassment involving Young Inmates were received from RMSC. Three of the 11 (27%) alleged Staff-on-inmate sexual abuse and the remaining eight (73%) alleged harassment. Based on the Monitoring Team's experience, a higher prevalence of allegations involving Staff than allegations involving other inmates is typical of adolescent populations.

The Department shared some of the feedback they had received from The Moss Group with the Monitoring Team. While PREA is far broader than what is required by the Consent Judgment, there was one area of overlapping concern. Policy requires Staff who have any knowledge, suspicion or information regarding an incident of sexual abuse or harassment to complete a "PREA Incident Report." The Department informed the Monitoring Team that the Moss Group observed that while Staff had a general understanding of this requirement, they were sometimes unaware that, in addition

to notifying a supervisor, they *also* had to complete a PREA incident report. While the Moss Group acknowledged that Staff verbally reported allegations up the chain of command, they encouraged the Department to remind Staff of their obligation to also complete a PREA incident report. In future Monitoring Periods, the Monitoring Team will also request copies of the companion incident reports for each allegation.

Policy requires investigations of sexual abuse allegations to be completed within 60 business days of the incident being reported. Since the Effective Date, the Department has received 40 allegations of sexual abuse or harassment involving Young Inmates. Of these 3% (n=1) were administratively closed (merged with another case), 13% (n=5) were closed by investigation (all outside the 60 business-day window), 18% (n=7) were pending within the 60 business-day timeline, and 68% (n=27) were pending beyond the 60 business-day timeline for investigations as of June 30, 2017. Of these,

- 14% (n=4) were pending between 61-120 business days since the date the allegation was reported;
- 41% (n=11) were pending between 121-240 business days since the date the allegation was reported;
- 44% (n=12) were pending for more than 240 business days since the date the allegation was reported. Nine of these 20 cases have been pending for more than one year.

The Department is aware of the Monitoring Team's concerns and will develop a plan to address them during the next Monitoring Period. The content of that plan, and an assessment of its effectiveness, will be discussed in the Fifth Monitor's Report.

The Monitoring Team reviewed completed investigation reports for the five cases involving sexual assault or harassment of Young Inmates that occurred since the Effective Date. Two of these were closed administratively and referred to another agency. The remaining three were investigated and closed by ID investigators. The sample size is far too small for definitive statements about the adequacy of the investigation process, but in all cases, it appeared that Staff had reported the allegation to ID promptly and the investigators opened an investigation into the allegation immediately thereafter. However, these three investigations also raised concern because of their failure to interview key witnesses, long delays to witness interviews, and apparent failure to ask key follow-up questions or to collect relevant evidence. These impressions were shared with the Department with the hope they would encourage closer oversight of the quality of the investigators' work to ensure that their inquiries meet professional standards.

| COMPLIANCE RATING | ¶ 9. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10 & 11 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

### ANALYSIS OF COMPLIANCE

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance<br>¶ 11. Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department used the Direct Supervision model, developed by NIC, as the foundation for a training program for supervising adolescent and young adult inmates.

- After exchanging several draft lesson plans, the Monitoring Team approved the training curriculum and lesson plan during the current Monitoring Period.

- Direct Supervision training is now underway for both recruits and In-Service Staff. The 900 recruits who graduated in May 2017 received the finalized 32-hour Direct Supervision training at the Academy. In addition, 75 Captains and 60 in-service Staff received Direct Supervision training during the current Monitoring Period.

### ANALYSIS OF COMPLIANCE

As noted in the Training section of this report, the Department has agreed to include the broader range of Staff who are regularly, but informally, assigned to Young Inmate housing in the group of Staff who receive SCM training. Furthermore, the Department will train *all* Staff assigned to RNDC and GMDC in SCM given that Staff in those two Facilities are likely to frequently interact with Young Inmates, even if they are not awarded a steady post or do not have an informal regular post. The

Department has taken a similar approach to providing Direct Supervision training. As noted in subsequent provisions, the Department and the Monitoring Team must still develop a strategy to identify the Staff regularly assigned to Young Inmate Housing in the other Facilities (e.g. RMSC, OBCC, and GRVC) so that they can be trained in SCM and Direct Supervision.

The Department has begun to train Staff in Direct Supervision and the Monitoring Team observed a portion of the course, as described in the Training section of this report above. Once Staff are trained, the Monitoring Team will begin to assess the extent to which Direct Supervision skills have been implemented and are in current practice among Staff assigned to Young Inmate housing areas.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has a recruit selection process to attract qualified Staff to work in Young Inmate Housing Areas while participating in mandatory Pre-Service training.

- OJT is offered at GMDC and RNDC so that recruits can experience working with the Young Inmate population before indicating to which jail they prefer to be assigned.

- Executive Staff from RNDC and GMDC interview recruits to gauge interest and review relevant experience and then personally select recruits to work in their commands.

- Recruits are permitted to make written requests to be assigned to a Young Inmate Facility and may also volunteer to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration.

- The Department reports that 84 of the 85 recruits recently assigned to RNDC (99%) and 56 of the 88 recruits recently assigned to GMDC (64%) received these assignments due to their interest or backgrounds in working with youth. At GMDC, an additional 31% of assigned recruits completed their OJT at GMDC, so they had some familiarity with the population.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team discussed the recruit selection process with the Facility leadership at both RNDC and GMDC. Both Facilities reported efforts to attract qualified candidates who were interested

in working with Young Inmates. Not only did they have a presence at the Academy, but they also individually interviewed candidates to determine their qualifications and suitability for an assignment with Young Inmates. Once the Commands made their selections, the Department shared data on the recruits ultimately assigned to RNDC and GMDC. As detailed above, nearly all recruits were either specifically requested by the Command at each Facility or requested to be assigned to a Young Inmate Facility. A significant proportion of recruits also completed OJT at one of the Young Inmate Facilities and thus acquired some first-hand knowledge about what the job would entail.

The Monitoring Team also met with the Bureau Chief of Administration to learn more about the way in which recruits are engaged by the Young Inmate Facilities, the timeline for interviews and selection, and how the ultimate assignments are made. These inquiries will continue in the next Monitoring Period to identify ways to strengthen the process in order to maximize the number of interested and qualified recruits who are assigned to the Young Inmate Facilities, particularly as the process is applied to the recruit class that will graduate in October/November 2017.

| COMPLIANCE RATING | ¶ 13. Not yet rated. |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[152]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

    a.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1.  The maximum living unit size shall be 15 Inmates.

    b.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1.  The maximum living unit size shall be 25 Inmates.

    c.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds.  The maximum living unit size shall be 30 Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In the past year, the Department has drastically expanded its recruiting and hiring efforts and reports that it has increased its uniformed workforce by 37%. The Department reports that Young Inmate housing areas have been able to maintain the appropriate Staffing ratios.

- The Department also reported that it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff Members. In some Facilities, this has been

---

[152] The Consent Judgment does not include a ¶ 15 for this Section.

challenging given the large proportion of the workforce that recently graduated from the Academy.

- The Department conducted an initial staffing audit to determine current levels of compliance with this provision, discussed in detail below. These audits measure the Department's staffing levels against the ratios specified in the Consent Judgment.

- The Department calculated the average number of probationary Staff for each Facility that houses inmates under 18: GMDC had 365 (which is approximately 39% of the reported 945 Staff assigned to GMDC); RMSC had 122 (which is approximately 21% of the reported 582 Staff assigned to RMSC; note that RMSC has only a handful of units that house Young Inmates); and RNDC had 215 (which is approximately 27% of the reported 812 Staff assigned to RNDC).

ANALYSIS OF COMPLIANCE

As discussed in previous Monitor's Reports, the Monitoring Team's observations during site visits, interviews with Staff and inmates, and review of documents suggest that required staffing ratios and maximum housing unit capacities are being met consistently. Furthermore, the Department conducted its first internal audit to determine the level of compliance with the staffing provisions. The Monitoring Team applauds the Department's initiative in this area, as developing an internal mechanism to identify and resolve problems is essential to ensuring the sustainability of reforms.

The Department audited shift staffing records for each Facility and unit housing Young Inmates during the last four months of the current Monitoring Period. The table below presents the findings of the audits:

| Facility | # units, 4 month range | # shifts, 4 month total | % shifts staffed w/in ratio, avg. | % shifts staffed with probationary/ veteran mix | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | Mar | Apr | May | Jun | AVERAGE |
| GMDC | 20-35 | 10,829 | 100% | 65% | 46% | 46% | 41% | 50% |
| GRVC | 1 | 366 | 100% | 100% | 100% | 100% | 100% | 100% |
| RMSC | 3-6 | 1,592 | 100% | 90% | 74% | 83% | 69% | 79% |
| RNDC | 19-21 | 7,524 | 100% | 50% | 58% | 58% | 45% | 53% |
| OBCC | 1 | 366 | 100% | 94% | 86% | 99% | 86% | 91% |
| TOTAL: | 44-64 | 20,677 | 100% | 80% | 73% | 77% | 68% | 75% |

Regarding compliance with staffing ratios, the left side of the table shows the number of units that housed Young Inmates each month, and the total number of shifts that were audited. Across the over 20,000 staffing records reviewed, required staffing ratios (specified in (a)-(c) of ¶ 16) were met for each unit 100% of the time. During the next Monitoring Period, the Monitoring Team will spot-

check the audit records to verify the Department's findings. Assuming the audit results are valid and the Department maintains a similar level of performance during the next Monitoring Period, the Monitoring Team expects the Department will achieve Substantial Compliance with this provision.

Regarding compliance with the requirement to use "best efforts" to disperse probationary Staff, the Department audited the same set of over 20,000 staffing records to ascertain the portion of units with an appropriate mix of probationary and veteran Staff. The outcomes reported by the Department should be considered preliminary, as during the first two months of the audit, a significant volume of data was missing and could not be recovered. As a result, the proportions of shifts reported with an appropriate mix were calculated based on an incomplete set of data. That said, the preliminary data are encouraging. GRVC and OBCC, each with one unit that houses 18-year-olds, both had high levels of compliance with this provision (100% and 91%, respectively). RMSC was also largely successful in achieving a mix of probationary and veteran Staff, with 79% of the shifts/units showing an appropriate mix. Having an appropriate mix of probationary and veteran Staff was more challenging at GMDC and RNDC, which house most of the 16-, 17-, and 18-year-old inmates. At GMDC, only 50% of the 10,829 staffing records reviewed reflected the desired mix. At RNDC, only 53% of the 7,524 staffing records reviewed did so. During the next Monitoring Period, the Monitoring Team will spot-check these audit records to ensure that complete data sets were utilized and to verify the Department's findings.

Based on conversations with the Staff schedulers at each Facility, the large influx of recruits at GMDC and RNDC and the large number of units housing Young Inmates makes the mix of veteran and probationary Staff difficult to achieve. In addition, the training requirements for other portions of the Consent Judgment mean that large numbers of veteran Staff are pulled from the Facility to attend training, and are covered by a cadre of relief Staff who are all new graduates from the Academy. Furthermore, sick leave, vacations, hospital runs, and steady post assignments also limit the flexibility available in Staff assignments.

However, schedulers reported several efforts to minimize the frequency with which a unit is staffed only by probationers. They reported they are conscious about Staff's probationary status and construct the weekly schedule with this in mind (i.e., the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years. The tenure of probationary Staff is also considered when making unit assignments. During the next Monitoring Period, the Department is instituting a new practice that requires each Facility to generate a Staffing Memorandum that outlines the exact number of Staff in each category (probationary and veteran) who

were available to work each month (i.e., not on sick leave, vacation, steady post, etc.). NCU will use this information to help the Facilities problem-solve and progress toward Substantial Compliance.

The Monitoring Team believes that the "best effort" requirement has been met, and also feels confident that as proportion of probationary Staff (currently ranging between 20-40%) at the Young Inmate Facilities decreases over time, the mix of probationary and veteran Staff will be easier to achieve. Once the Department's findings have been verified, assuming these efforts stay the same and the performance level in the next Monitoring Period is similar, the Monitoring Team believes the Department will have achieved Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 14. Partial Compliance<br>¶ 16(a). Partial Compliance<br>¶ 16(b). Partial Compliance<br>¶ 16(c). Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See discussion below.

**ANALYSIS OF COMPLIANCE**

As noted in the previous Monitor's Report, the Department and the Monitoring Team have consulted about the difficulties in interpreting, and complying with, this provision under the current staffing structure. The current structure allows some Staff to be consistently assigned to a given housing unit because they have been "awarded a steady post," which means they applied for and were formally appointed to the post. In these cases, the Warden decides to open bidding for a particular unit on a particular tour and Staff apply for the steady post. However, not all posts are put out for bid, and in fact, a larger proportion of Staff may work on a particular unit consistently, even though not awarded the steady post. Still other Staff work on the "the wheel," where they are intentionally assigned to different posts on different tours throughout the week. This is a long-standing practice in the Department and, because it is the polar opposite of the regular unit assignments envisioned by the Consent Judgment, it will take some time, creativity, and effort to adjust. Add to this complexity is the recent passage of Raise the Age, which will dramatically affect the housing of 16- and 17-year-old inmates and the staffing of the units in which they are housed.

The Department has made clear efforts to ensure consistent staffing at Facilities housing Young Inmates. While the proportion of Staff with awarded steady posts remains low, greater proportions are assigned to the same tour consistently.

| Consistent Staffing at Young Inmate Facilities | | |
|---|---|---|
| Facility | % Steady Tour | % Steady Post |
| GMDC | | |
| Officer | 45% | 45% |
| Captain | 72% | 72% |
| RMSC | | |
| Officer | 15% | 15% |
| Captain | 55% | 55% |
| RNDC | | |
| Officer | 76% | 29% |
| Captain | 43% | 21% |

In order to demonstrate compliance with this provision, the Department will need to establish a Staff assignment system that produces regular assignments (either formal or informal). A list of Staff who were either formally or informally consistently assigned to Young Inmate Housing Areas will need to be maintained and regularly updated. Given the various complexities discussed above, the Monitoring Team and the Department have not yet identified reasonable steps toward compliance nor an audit methodology. As the Department's plans to implement Raise the Age continue, this requirement of the Consent Judgment will continue to be part of the discussion.

| COMPLIANCE RATING | ¶ 17. Not yet rated. |
|---|---|

## 14. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

The overall purpose of this section of the Consent Judgment is to create tools and strategies for managing inmate behavior in order to reduce violence and improve Staff and inmate safety. This involves creating an incentive system to motivate inmates toward positive behavior and to encourage program engagement and also involves creating a robust array of disciplinary sanctions that hold inmates accountable for their behavior and help to reduce the likelihood of subsequent violence. Rather than imposing sanctions that create a risk to Young

Inmate's mental health and limit their access to necessary services and programs, the Consent

Judgment requires the Department to construct an array of options for responding to misconduct

that are safe, provide access to services and that are responsive to youth's treatment needs. In

doing so, it is the Monitoring Team's hope that the Department will identify strategies to address

the underlying causes of violence so that their aggressive behavior will be less likely to reoccur.

The Department abolished the practice of Punitive Segregation for 16- and 17-year-old inmates

in December 2014 and excluded 18-year-old inmates in June 2016. The total exclusion of 18-

year-olds from Punitive Segregation goes beyond the requirements of the Consent Judgment,

which requires only that the Department "reduce [its] reliance on Punitive Segregation as a

disciplinary measure." The Monitoring Team applauds the Department's leadership in this area.

   The Monitoring Team's focus in this section is the development of a range of alternative

disciplinary measures and strategies for incentivizing positive behavior, discussed in detail

below. The Department created a set of programs labelled Supportive Structured Housing units

("SSHs"): Young Adult-Enhanced Supervision Housing ("YA-ESH"); the Secure Unit; the

Transitional Restorative Unit ("TRU"); and the Second Chance Housing Unit ("SCHU").[153]

These programs have varying levels of restrictiveness and were designed to address serious and

chronic violent behavior. Their establishment was an essential first step in abolishing the use of

Punitive Segregation as the SSHs address the most problematic inmates and create accountability

for the most serious violence.

   The inmates targeted for the SSHs are a very small fraction of the total inmate population

but are responsible for a great deal of violence and have inflicted serious harm on both inmates

and Staff during their incarceration. Part of the goal of this section of the Consent Judgment is to

---

[153] These programs are described in more detail in the Third Monitor's Report (at pgs. 219-221).

develop effective strategies to address their behaviors by decreasing their access to potential victims and increasing interventions to reduce the likelihood of future violence. These are the dual goals of the SSHs. Properly managing these inmates will have a significant impact on Staff and inmate perceptions of safety, and the overall culture change which must ensue in order for the Department to be successful in reforming its system. As a result, the Department has spent an extraordinary amount of time, energy, and resources figuring out how to manage this small segment of the inmate population.

However, it is also important to realize that when it was permitted, Punitive Segregation was used to address a broad range of inmate misconduct, and the SSHs only satisfy part of the Department's obligations under the Consent Judgment. While the clear majority of Young Inmates do not engage in serious or chronic violence, many do behave aggressively on occasion. The Department also needs effective strategies for holding these inmates accountable and helping them to develop interpersonal and self-regulation skills to manage conflict without violence. Now that the SSHs are operational, the Department and the Monitoring Team need to focus more squarely on the programs and interventions that are designed to support positive behavior across the entire Young Inmate population.

Combined with the reforms discussed in the Safety and Supervision of Inmates Under the Age of 19 section of this report, the Department has begun to implement a range of strategies to reduce inmate violence and to create safer Facilities. The burden on Staff to think and behave differently in nearly every aspect of the Facility's operation should not be underestimated. In this period of rapid change, it is expected that program development will be uneven and that key issues may have to be reconsidered and revised multiple times before optimal implementation is achieved. For this reason, the Monitoring Team encourages patience with the Department.

The Monitoring Team's work to assess the quality of the options for inmate discipline is discussed in detail below.

---

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME), ¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION)
¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),
¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND
¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs.  Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health.  The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record.  If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old inmates in December 2014 and excluded 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed the Department's other disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (i.e., 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with Young Inmates during the current Reporting Period, the Monitoring Team did not assess compliance with these provisions. Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation.

Given that the practice is no longer in place, the Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot be rectified. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the Monitoring Team did not assess this provision while the practice was still in effect. Now that it has

been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| COMPLIANCE RATING | ¶ **1.** Substantial Compliance (per the Second Monitor's Report). |
| --- | --- |
| | ¶ **2.** Substantial Compliance (per the Second Monitor's Report). |
| | ¶ **7.** Partial Compliance (per the Second Monitor's Report) |
| | ¶ **8.** Substantial Compliance (per the Second Monitor's Report) |
| | ¶ **9.** Not Currently Applicable. |

## XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: INMATE INCENTIVES)

¶ 3. Within 90 days[154] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to utilize the Adolescents Striving For Change ("ASFC") stamp cards in all adolescent housing units at RNDC and RMSC; in the Second Chance Housing Unit (SCHU), Transitional Restorative Unit (TRU) at GMDC; and in the Secure Unit at GRVC.

- In response to early implementation problems identified by the Monitoring Team, the Department revised the stamp cards to require a signature from a Supervisor on each tour to ensure that Staff are using the cards properly.

- The Department successfully piloted a Facility-wide incentive system, the "Levels," at GMDC during the previous monitoring period and continues to refine and enhance the model. The program was implemented at RNDC during the current Monitoring Period. Implementation has not yet begun at RMSC.

  - The Levels system addresses some of key aspects the Monitoring Team identified as lacking in the ASFC card structure (i.e., more frequent opportunities for reward; opportunities to earn additional privileges with sustained positive behavior). Either weekly (RNDC) or bi-weekly (GMDC), Unit Managers and other Facility administrators reflect on their observations and interactions with each unit and pull information from logbooks to score each unit on a variety of factors (i.e., incidents, infractions, respect for Staff, sanitation, compliance with rules, cell compliance, uniform compliance, lock-ins, court production, smoking, program participation). The units' performance is translated to a level (e.g., Copper, Bronze, Silver, Gold,

---

[154] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

Platinum). Housing units at higher levels are afforded greater privileges such as higher commissary limits, extra recreation, late lock-in, movie nights, family day, Court letters, access to games, tournaments with prizes, special clothing, etc. At GMDC, the Department expended considerable resources to furnish the YES Center, outfitted with various recreational activities, equipment and a recording studio, and the PEACE Center, which is a vocational training center. Youth in high-level houses have access to these Facilities.

**ANALYSIS OF COMPLIANCE**

The Department is pursuing two strategies toward compliance with this provision: (1) the Adolescents Striving for Change stamp cards (described in detail in the Third Monitor's Report at pgs. 223-224); and (2) the group incentive program ("the Levels," discussed in detail below). Although this provision only requires the application of positive incentives to inmates under age 18, the Department included the use of the stamp cards in the design of several of the alternative disciplinary programs discussed in ¶ 6, below. Furthermore, the incentive program is a key strategy toward violence reduction, which is required under § XV, ¶1 "Prevent Fight/Assault." As a result, the Monitoring Team has been attentive to the stamp cards' and Levels implementation with 18-year-olds as well.

*ASFC Stamp Cards*

During routine site visits throughout the Monitoring Period, the Monitoring Team reviewed cards in use on the adolescent housing units and special housing units for young adults. The implementation problems noted in previous Monitoring Periods have improved slightly. Most of the cards reviewed contained a complete and current set of stamps or notations for each youth. When compared to the Behavior Log books (used in TRU, SCHU and Secure to record misconduct), most of the cards had compatible information. However, the procedure for Captains to sign the cards after each shift—to verify their completeness and accuracy—has not been well-implemented. Oftentimes, the cards reviewed by the Monitoring Team were either missing Captain's signatures or had signatures by the same Captain for the entire card. As discussed in previous Monitors' Reports, the accuracy of the Staff's ratings is essential to the viability of the ASFC as a behavior management strategy. During the current Monitoring Period, the Department began routine audits of the ASFC cards. While the audits were ramped up slowly, by the end of the Monitoring Period, staff from the Division of Youthful Offender Programming conducted audits at all Facilities holding Young Inmates that utilize the ASFC. The Department reported very few errors for these initial audits. During the next Monitoring Period, the Monitoring Team will review audits along with the underlying documentation to verify the Department's findings.

The stamp cards are a type of token economy, variations on which are used in juvenile facilities throughout the country, and the Monitoring Team strongly supports their use. However, as discussed in previous Monitor's Reports, the Department needs to find a way to communicate with the youth about

their performance, at least on a weekly basis. This is the only way the stamp cards will assist the youth in modifying their behavior—by helping them identify the behaviors that resulted in a loss of commissary credit, the circumstances surrounding those behaviors, and more positive ways of dealing with similar situations in the future. Just as important, youth whose behavior is overwhelmingly positive need regular, individual recognition in order to further reinforce behavior norms.

*The Levels*

After piloting the Levels system at GMDC in late 2016, the Department fully implemented it at RNDC during the current Monitoring Period. As described above, the program design utilizes a group incentive model to encourage positive behavior. The strength of the program lies in the availability of incentive and rewards that the youth find both desirable and meaningful. At GMDC, the Department expended considerable resources to furnish the YES Center, outfitted with various recreational activities, equipment and a recording studio, and the PEACE Center, which is a vocational training center. The Monitoring Team encourages a similar investment of resources at RNDC to fully support the Levels system.[155] Other than enhanced recreation space in the Sprungs, comparable opportunities are not yet available at RNDC. That said, the Facility has done a commendable job identifying incentives that are meaningful to the youth.

The original Levels program design included Staff-recognition for those who regularly work on Platinum units, but this feature has not yet been implemented. The Monitoring Team strongly encourages the Department to do so.  Staff who are skilled at supporting positive behavior among youth should be rewarded as often and as meaningfully as inmates who meet expectations.

The Monitoring Team analyzed unit-level performance data for both RNDC and GMDC for the current Monitoring Period. In the average week, about 50-60% of the units earned the highest levels (i.e., Platinum and Gold) and received access to the rich array of rewards. About 15-20% of the units earned at the bottom levels (i.e., Copper and Bronze). Young Inmates in these houses were restricted from desirable rewards and programs in an effort to motivate improved group performance. Overall, the Levels system appears to clearly distinguish high-performing units from those that need additional behavior support for youth and/or increased coaching for Staff in managing youth behavior. Five units at RNDC and 11 units at GMDC consistently scored at the highest levels throughout the Monitoring Period, while three units at RNDC and two units at GMDC consistently scored at the lowest levels throughout the Monitoring Period. The Levels system also appears to be sufficiently flexible to adapt to changing unit performance. Seven units at RNDC and about 13 at GMDC moved up and down the levels according to their changing levels of performance. When interviewed by the Monitoring Team, inmates appeared to understand the Levels program, thought it was fair, and expressed enthusiasm about the incentives they could earn.

---

[155] With the passage of Raise the Age, the housing for adolescent inmates will change in the near future. For this reason, portable incentives seem most prudent.

From experience in other jurisdictions, the Monitoring Team has emphasized the need for program fidelity to ensure buy-in from both Staff and inmates. This means confirming that incentives are delivered when they are earned, and are withheld when they are not earned. Similarly, poorly behaved youth on units that are otherwise high-performing should be restricted from incentives as appropriate, or transferred to a housing unit at a lower level if their misconduct becomes chronic.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS) AND ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 4. Within 90 days[156] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old inmates in December 2014 and excluded 18-year-olds in June 2016.

- The Department developed several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct

  o The Department has two programs to respond to 16- and 17-year-old inmates who commit infractions: Second Chance Housing Unit (SCHU) and Transitional Restorative Unit (TRU), both at RNDC. These are discussed in detail below.

  o The Department has four programs to respond to infractions among 18-year-old inmates: Second Chance Housing Unit (SCHU; at GMDC), Transitional Restorative Unit (TRU; at GMDC), the Secure Unit (at GRVC), and Young Adult Enhanced Supervision Housing (YA-ESH; at OBCC). Each program is discussed in detail below.

- To address less serious and episodic violent misconduct, the Department continues to use the Infraction process and has also begun to explore options for restricting access to things of value (i.e., commissary limits; less frequent haircuts).

---

[156] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

ANALYSIS OF COMPLIANCE

      Given the abolition of Punitive Segregation for adolescents and young adults, the Department needs to develop ways to respond to misconduct that was previously addressed by Punitive Segregation.[157] Some of this misconduct is serious (i.e., slashings, stabbings and assaults with injury) or chronic (i.e., a repeated pattern) violence, and for these situations, the Department established four Structured Supportive Housing units (SSHs). These are discussed in detail below. The monitoring strategy for these units involved reviewing and making recommendations on draft policies; discussions with DOC leaders about the vision, goals, benefits and operational challenges of the units; observing the daily operations via videotaped footage; closely reviewing videotaped footage and documents pertaining to critical incidents; observing Support Team meetings; reviewing approximately 40 SSH files; tracking admissions and releases and calculating lengths of stay and release types; tracking rates of violence and UOF for each SSH; reviewing materials submitted to the BOC to support requests for variances; and interviewing line Staff, program counselors, volunteers, and inmates housed on the units.

      Fortunately, most inmate misconduct is neither serious nor chronic, and for these negative behaviors, proportional responses are needed that address treatment needs, provide access to mandated services and that do not jeopardize safety. These are also discussed in detail below.

*Responses to Serious and Chronic Violence*

      During the current Monitoring Period, the Monitoring Team focused on supporting the Department's efforts to refine and finalize the Supportive Structured Housing units (SSHs) policies; monitoring the flow of inmates in and out of the SSHs; assessing the level of violence in the SSHs; and assessing the quality of individualized behavior support planning.

      As noted previously, the Department has partnered with the Vera Institute of Justice, a highly-regarded research organization with significant expertise in correctional programs, to evaluate the effectiveness of the SCHU and TRU programs as one part of a much larger evaluation of the overall Young Adult initiative. The SCHU/TRU portion of the evaluation will examine inmates' experiences while in the programs (e.g., behavior, length of stay, program participation, completion of support plan goals) and will compare their infraction records, housing stability and program involvement before and after the program. The evaluation is funded by the National Institute of Justice under a 3-year grant that began in June 2016. Thus, the results of this research will not be available until mid-2019.

---

[157] Previously, Young Inmates could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

- *Policy*

Policies have been drafted for all four of the SSHs listed above. Throughout the Monitoring Period, the Monitoring Team and the Department exchanged multiple drafts, revisions, and feedback. Only a few points of clarification remain on each of the policies and thus they should be finalized during the next Monitoring Period. Even as they are finalized, the Department's options and practices for responding to misconduct will continue to evolve. The Monitoring Team's experience suggests that practices will continue to evolve as new options become available and thus, the Department is encouraged to be open to revisiting the policies and procedures in the future. The Monitoring Team does not see such evolution as cause for concern, but rather encourages it.

- *Admissions and Releases*

Each month, the Department submits a list of inmates who were admitted and released from the SSHs. The Monitoring Team analyzes these data to better understand the flow of inmates, their lengths of stay, and the reasons they are released from the programs. A total of 224 Young Inmates were admitted to one of the SSHs during the Monitoring Period. The vast majority (n=205) were admitted to either SCHU or TRU, programs that are focused on addressing violent misconduct but which do not restrict the inmate's lock-out time or movement beyond what occurs in the general population. The remaining 19 inmates (all 18-year-olds) were admitted to either YA-ESH or Secure, which both utilize additional hardware (i.e., restraint desks; partitions between pods) and other restrictive procedures (i.e., escorted movements, reduced lock-out times) to prevent subsequent violent misconduct.

A review of SSH inmate files revealed that all of the inmates admitted to YA-ESH met the referral criteria (i.e., committed a slashing or stabbing while in custody). The file review also indicated that while it appeared that those admitted to Secure, TRU, and SCHU also met referral criteria, additional information about the severity of any injuries sustained would be useful for a definitive conclusion. Finally, a basic analysis was conducted using the Department's Fight Tracker to identify inmates with chronic violence and whether they had been admitted to an SSH. Of the nine Young Inmates who had eight or more fights during the Monitoring Period, all but one inmate had been admitted to an SSH and some inmates had multiple admissions. In summary, the SSH admissions appear to conform to the referral criteria in policy.

Inmates were released from the SSHs for a variety of reasons. Some (19% of the 238 inmates released during the Monitoring Period) were discharged from custody and either returned to the community or transferred to state prison. Some (77% of the 192 inmates who were not discharged) "graduate" and were transferred to a general population housing unit. Some (8% of those who were not discharged) were stepped down to a less restrictive SSH (e.g., from YA-ESH to Secure, from Secure to TRU, or from TRU to SCHU). Some (15% of those who were not discharged) were stepped up to a more restrictive SSH (e.g., from SCHU to TRU, from TRU to Secure, or from Secure to YA-ESH). There were some within-program differences:

- All of the inmates who were released from YA-ESH were stepped down to Secure;
- 50% of the inmates who were released from Secure were transferred to GP units, 13% were stepped down to TRU, and 38% were stepped up to YA-ESH;
- 85% of the inmates who were released from TRU were transferred to GP units, 10% were stepped down to SCHU, and 5% were stepped up to Secure;
- 76% of the inmates who were released from SCHU were transferred to GP units and 24% were stepped up to TRU. (SCHU is the least restrictive SSH, so step down is not possible.)

These data indicate that large proportions of the inmates in TRU and SCHU satisfied program requirements and thus were transferred to GP units. Further, the array of SSHs appears to provide options for increasing and decreasing restrictiveness depending on inmate's behavior and needs.

The Department provided data on the admission and release dates for each inmate admitted to the SSHs, permitting a median length of stay (MLOS) calculation. Program-specific length of stay data are most meaningful:

- The MLOS for inmates who were stepped down from YA-ESH was 61 days;
- The MLOS for inmates who graduated from Secure was 69 days;
- The MLOS for inmates who graduated from TRU was 28 days; and
- The MLOS for inmates who graduated from SCHU was 20 days.

The MLOS for YA-ESH and Secure should be interpreted with caution since such small numbers of 18-year-old inmates have been subjected to them, and because their lengths of stay have varied significantly (from three to 208 days). The larger numbers of inmates in the TRU and SCHU programs make these data more stable. The shorter MLOS for SCHU than TRU is compatible with the programs' concept—that SCHU would be a shorter intervention than TRU. The Department has implemented procedures for multi-disciplinary consultation about SSH inmates who appear to stagnate or for whom progress is not evident.

- ***Level of Violence***

The Consent Judgment requires that the responses to inmate misconduct may not jeopardize Staff or inmate safety. Given the disciplinary histories of the inmates in the SSHs, particularly in YA-ESH and Secure, regular examination of the SSHs' level of violence is needed. Each month, the Department submits data on violent incidents and UOF for each of the six SSHs, along with the units' average daily population (ADP). In terms of violence and UOF:

- YA-ESH (ADP about 10) averaged about 1 violent incident per month and about 2 UOF per month;
- Secure (ADP about 9) averaged about 2.3 violent incidents per month and about 5.5 UOF per month;

- GMDC TRU (ADP about 16) averaged about 3 violent incidents per month and about 5.2 UOF per month;
- GMDC SCHU (ADP about 9) averaged less than 1 violent incident per month and about 1 UOF per month;
- RNDC TRU (ADP about 9) averaged about 1.3 violent incidents per month and about 2.2 UOF per month; and
- RNDC SCHU (ADP about 7) averaged less than 1 violent incident per month and about 1 UOF per month.

These data suggest that, given the violent histories of the inmates placed in them, the SSHs have relatively low levels of violence and UOF. The particularly low levels witnessed at YA-ESH are likely attributable to the restrictive hardware being used to manage inmates' behavior. The Monitoring Team is hopeful that eventually these external controls will be transferred to internal controls as the inmates are taught skills to self-regulate and address interpersonal conflict without violence.

- *Behavior Support Planning*

The effectiveness of the SSHs in reducing the risk of subsequent violence among the inmates placed in them will depend, in large part, on the quality of the programming and behavior support received. An inmate's successful return to general population—or to the community—will depend on his accumulation of skills to manage anger, regulate emotions, control impulses and respond to interpersonal conflict, all to avoid violence. The SSHs' ability to catalyze such change is essential to the perception among Staff, inmates and stakeholders that they are viable alternatives to Punitive Segregation.

To ascertain the quality of behavior support planning, the Monitoring Team reviewed approximately 40 inmate files from the SSHs. Secure, TRU and SCHU all utilize a "Behavior Support Plan" while YA-ESH has a standard set of general behavioral and program participation expectations. As noted in previous Monitor's Reports, these plans and expectations suffer from a lack of specificity and measurability. Their general nature does not identify the root causes of the inmates' violent behavior (as is the SSHs' goal, stated in policy) and does not provide sufficient guidance about what the inmate needs to do to satisfy program requirements. Further, even when general goals are set, the method for measuring progress toward them is not articulated on the plans.

Secure, TRU, and SCHU have multi-disciplinary teams that meet weekly to review inmates' progress. Part of the file review involved reviewing the Support Team log that documents these weekly conversations. The logs have improved since the previous Monitoring Period—they identify the inmate's length of stay, Phase/Level, and whether the team recommends promotion or retention. However, documentation about progress toward goals remains vague. The Monitoring Team also observed team meetings for each program each Monitoring Period and has consistently found that while the teams do speak generally about an inmate's progress, they do not anchor the conversation in

objective information about the inmate's performance. RNDC's team is very strong—the team members are well-prepared, share information freely, seem to understand what is driving each youth's behavior, have obvious respect for each other and a desire for each youth to succeed, and craft creative interventions to support youth's behavior. These strengths would be maximized by a more deliberate, intentional focus on a small number of individualized goals and objective information about the inmate's progress each week. The YA-ESH does not utilize a multi-disciplinary team meeting; instead, the Deputy Warden reviews written reports from the unit staff and program counselor about the inmate's behavior and program participation each month and makes a decision about retention on YA-ESH or transferring to another SSH. While the general expectations are clear—positive behavior and program participation—the lack of specific, measurable goals and objective information about inmate progress makes it difficult to discern the reasons that inmates are retained on the unit or stepped down to Secure. Eventually, the BSPs will also need to identify the programs and interventions that are intended to support each goal and provide objective data about the extent to which the programs are delivered/attended as prescribed.

The Department has undertaken several steps to improve the quality of behavior support planning. Program Counselors participated in a 20-hour Dialectical Behavior Therapy (DBT) training. DBT coaches also observed and provided feedback on the Program Counselors' skills in delivering the curriculum, which the Department will utilize for on-going professional development. Improved knowledge of the DBT curriculum and its delivery should help the Program Counselors to articulate more meaningful goals on the BSPs, and will better help the youth to acquire needed skills. Finally, the Department contracted with a behavioral health expert who will deliver training on BSP goal development and measurement once the Program Counselor's DBT skills have been shored up.

_Responses to Less Serious and Episodic Misconduct_

As discussed in previous Monitor's Reports, the Department's continuum of responses to infractions requires expansion to address mid-level misconduct, such as threatening Staff, episodic aggression or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. The cornerstone of the Department's response to misconduct is the infraction process, where an Adjudication Captain determines whether the inmate is culpable for the misconduct and then imposes a sanction. Prior to its abolition for use with Young Inmates, the sanction usually involved a period of Punitive Segregation for both violent and non-violent Grade I and Grade II infractions. Currently, the only two sanctions imposed by the Adjudication Captain are either a $25 fine or a verbal reprimand. The Monitoring Team's analysis of infraction data revealed that the majority of inmates involved in fights in February/March 2017 received infractions (71% at RNDC; 56% at GMDC). A subsequent analysis of nearly 700 infractions issued to Young Inmates between January and May 2017 for violent misconduct found that a little less than two-thirds of infracted inmates were found guilty (61% at RNDC and 64%

at GMDC) and thus either a fine or verbal reprimand was imposed. While this is one way to respond to less serious and episodic misconduct, neither a fine nor a verbal reprimand are particularly effective strategies for shaping the behavior of adolescents.

The Monitoring Team's experience suggests that behavior modification is more likely when inmates are restricted from accessing desired activities or privileges and when they are required to participate in an activity that addresses the underlying cause of the behavior in question. The Department reports initial steps toward this end by restricting access to extra haircuts, limiting commissary purchases, restricting access to unit programs earned through the Levels program or transferring to a unit with a lower Level. The Department needs to develop a basic procedure for documenting these restrictions so that the veracity of the approach can be assessed by the Monitoring Team. As noted in previous reports, the Monitoring Team also encourages the Department to consider responses to misconduct that involve both a skill-building element and a restorative element.

*Other Strategies to Address Misconduct*

- ***Solo Housing***

As discussed in previous Monitor's Reports, at times, the Department has chosen to temporarily place youth involved in multiple incidents (as either the aggressor or the victim) on a housing unit alone with a Staff, for some period of time. Occasionally, natural attrition causes Young Inmates with special statuses (e.g., Protective Custody, sentenced) to be housed alone (e.g., the only other Young Inmate with that status is discharged to the community). This type of solo housing tends to be very short in duration.

Early in the monitoring effort, the Monitoring Team was concerned about the length of stay for inmates placed in this setting for reasons related to their behavior, the lack of written guidance for Staff on the criteria for placement, and lack of programming to support reintegration with peers. Since December 2016, the Department and the team exchanged multiple revisions of the policy and it is expected to be finalized during the next Monitoring Period. The new policy places limits on the length of stay and requires approval up the chain of command for extensions; sets referral criteria and written procedures for the day-to-day operation; requires written, individualized support plans and intensive programming; requires clear behavioral expectations and daily assessments of performance; requires a weekly progress review by a support team; and requires a variety of documentation to support the practice.

During the current Monitoring Period, solo housing was used only five times for reasons related to an inmate's behavior (three at RNDC; once at RMSC; and once for an 18-year-old placed at West). Three other inmates were housed alone for a period of time because they were the only adolescents with a special status (e.g., General Population Escort, PC). Among those placed in solo housing for behavioral reasons, one was joined by a peer after four days and the other two were joined by a peer

after 13 days. As of June 30, 2017, the inmate housed in West had been solo housed for 91 days.[158] This inmate had exhibited a pattern of violent behavior toward both inmates and Staff while housed in the most restrictive units (both Secure and YA-ESH). The Monitoring Team received a copy of his support plan and visited him on numerous occasions to confirm that he was receiving the services specified in the plan.

Overall, the solo housing option is used infrequently and usually not for long periods of time. The new policy provides structure to the decision-making, unit procedures and documentation requirements. The Monitoring Team is therefore less concerned about the use of solo housing. Moving forward, compliance with the policy will continue to be monitored anytime a Young Inmate is placed in solo housing.

| COMPLIANCE RATING | ¶ 4. Partial Compliance<br>¶ 6. Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-old inmates in December 2014 and excluded 18-year-olds in June 2016.

- The same protections for 18-year-old inmates with serious mental illnesses (SMI) who commit violent infractions have been extended to the Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH). Inmates with SMI are excluded from both programs and must be placed in an appropriate therapeutic setting.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation (CAPS) and Program for Accelerated Clinical Effectiveness (PACE). CAPS addresses the needs of inmates with SMI who have committed an infraction; PACE also offers treatment to inmates with SMI, but is completely separate from the infraction process. During the Fourth Monitoring Period, no 18-year-old inmate who committed a violent infraction was placed in either housing unit.

- The Department reported its intention to create a PACE unit for young adults within the next 12 months.

---

[158] The inmate was discharged from DOC custody in July 2017.

**ANALYSIS OF COMPLIANCE**

Although the use of Punitive Segregation has been abolished, this provision offers protections to inmates with SMI that goes beyond their placement in Punitive Segregation. This provision requires inmates with SMI who commits an infraction involving violence to be placed in an appropriately therapeutic setting. Toward that end, the Department excluded inmates with SMI from both YA-ESH and the Secure Unit in both policy and practice. When an inmate is identified for placement in either YA-ESH or Secure, OSIU notifies Health Affairs, which requests both medical and mental health clearance from H+H. Only when this clearance is received may an inmate be placed in either unit.

The Department maintained data on clearance for YA-ESH referrals throughout the Monitoring Period. A total of ten (10) 18-year-old inmates were referred to YA-ESH and clearance for placement was sought. Seven of these were cleared by both health and mental health professionals and admitted to YA-ESH. All of the requests for clearance occurred prior to the inmates' placement on the unit. Of the other three inmates, two were cleared, one was not cleared, and none of the three were ultimately placed in YA-ESH.

The Department began to maintain data on clearance for referrals to the Secure Unit in mid-May 2017. Upon request by the Monitoring Team, H+H reported that none of the inmates admitted to Secure prior to that date suffered from SMI. The Department's data showed that the three inmates referred and admitted to Secure after the log was created were all properly cleared.

The Monitoring Team has suggested a few refinements to the record-keeping procedure that will provide better documentation of the timing of the clearance for both units. If adopted and utilized consistently, the documentation will be able to clearly demonstrate that inmates with SMI are excluded from placement on the restrictive units.

The Department reported that no 18-year-old inmates were housed in either PACE or CAPS during the Fourth Monitoring Period. Should an 18-year-old inmate be housed in either unit as the result of an infraction in subsequent Monitoring Periods, the placement, length of stay and appropriateness of the therapeutic environment will be discussed in the analysis of compliance with this provision.

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

    a.    Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

| | |
|---|---|
| b. | The Tour Commander of the Facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement. |
| c. | The Inmate shall remain in confinement for only so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the Inmate at least once every three hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department determined that a current practice, "Satellite Intake," could be utilized to serve the purpose of de-escalating a disruptive inmate (among other purposes of Satellite Intake).

- The Department revised the existing Ops Orders into a Department Policy to permit the use of Satellite Intake at other Facilities.

- Both RNDC and GMDC currently operate Satellite Intake units.[159]

## ANALYSIS OF COMPLIANCE

Previously, disruptive inmates were escorted to Main Intake immediately following a use of force. This was problematic for several reasons: (1) the practice diverted Intake Staff from their primary duty of processing inmates in and out of the Facility; (2) placing an agitated inmate in the intake pens brought unnecessary chaos and tension into the unit, which sometimes erupted into additional violence; (3) a chaotic environment does not serve the de-escalation purpose for an agitated inmate. To address these concerns, the Monitoring Team encouraged the Department to establish de-escalation cells on each housing unit so that disruptive inmates could be addressed without transporting to Main Intake. After brainstorming about a solution to anticipated problems, the Department determined that the use of Satellite Intake units—where inmates are temporarily placed for a variety of reasons, unrelated to behavior problems, to await rehousing—could address the concerns. The Monitoring team discussed the current operation of the Satellite Intake units with Facility leadership, reviewed draft Ops Orders, visited the units and made recommendations to ensure that when disruptive inmates were housed in the units, the conditions of confinement were aligned with sound correctional practice. The Department revised the Ops Orders into a department-wide policy, which was issued in September 2017.

The Monitoring Team reviewed practices at RNDC and GMDC by consulting with Facility Leadership and reviewing log book entries at both facilities. Recommendations flowing from this review were memorialized into policy. Key features include:

- The unit may not be used for punishment, harassment, retaliation or to address the needs of suicidal inmates;

---

[159] The Department operates Satellite Intakes in other Facilities throughout the Department as well.

- When practical (i.e., no immediate safety threat), Staff must first attempt conflict resolution prior to placing an inmate on the unit;
- Inmates who escalate to the point of being out-of-control are transported to a location proximal to mental health staff in order to be evaluated/counseled;
- The duration of placement is limited to the time needed for assessment and re-housing;
- Safety and welfare checks are required at 15-minute intervals to address the potential for self-harming behavior;
- A Tour Commander (or above) assesses the inmate to determine their readiness for release;
- Reauthorization up the chain of command is required at three, six, 12, and 24 hours;
- All placements must be documented in the unit logbook, including: date/time of placement, reason for placement, person authorizing placement, services provided to inmates, visits by supervisors/medical/mental health staff, and date/time of release; and
- Facility commands must report data each month showing the frequency and duration of all placements.

During the Fifth Monitoring Period, the Monitoring Team will review the units' operation at RNDC and GMDC to determine compliance with policy.

| COMPLIANCE RATING | ¶ 10. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.
- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with an M-designation prior to holding a disciplinary hearing.

- The Department held meetings with stakeholders the Adjudication Unit, CHS, Health Affairs, and the Legal Division to discuss the provision related to the mental health review. A few issues regarding the feasibility of implementation were identified, discussed below.

**ANALYSIS OF COMPLIANCE**

The Department made several decisions about the recommendations offered by Dr. Beard to improve the Adjudication Process:

- Regular Policy Review. The Department agrees that a regular review of policies is a sound idea and is drafting a Policymaking Directive to guide the process. The directive will offer guidance on who will conduct the reviews, how often they will occur, and the substance of the process itself.

- Consolidation of Written Guidance for Staff. The regular review described above will also be the mechanism by which all teletypes, directives and Ops Orders will be incorporated into revised policy to improve Staff understanding of the requirements on particular issues.

- Mental Health Reviews. The Department identified several barriers to implementing Dr. Beard's suggestion regarding mental health reviews including a lack of clarity on the intent (e.g., competency assessments or evaluations used to guide sentencing), challenges in conducting an assessment while meeting due process timelines, a sentiment that existing protections for inmates with mental health issues may already be sufficient, and a resistance to applying the recommendation to those with an M-designation since this is not necessarily indicative of a significant mental health need. The Department indicated that clarification will be sought from Dr. Beard, after which conversations with key stakeholders will continue. The Department also discussed the various recommendations of the Monitoring Team and offered the following feedback:

- Interview Infracted Inmates. The Monitoring Team suggested that the Department interview inmates to better understand their experience of the process (e.g., whether they felt respected, understood what was happening, thought the process was fair). The Department indicated that they believed the current procedures for appeal and/or Article 78 proceedings were sufficient for ensuring that inmates' rights are protected.

- Data on Inmates' Exercising Rights. The Monitoring Team suggested that the Department collect information on the extent to which inmates actually exercise their rights to an interpreter, facilitator, and appeal. The Department reported that it does collect this information and the Monitoring Team intends to analyze this data during the next Monitoring Period.

- Examining the Alternatives to Punitive Segregation. The Monitoring Team suggested including the adjudications to YA-ESH and Secure in the review of the Adjudication Process. The Department responded that these are separate processes from the issues contemplated by Dr. Beard.

250

In summary, the Department has met most of its obligations for this provision, save for a decision about whether Dr. Beard's recommendation regarding mental health reviews will be implemented. The Monitoring Team believes that interviews with inmates who are affected by the Department's policies and practices are an essential component of any strategy to assess implementation or assure quality.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

### 15. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for inmates under the age of 18 (¶¶ 1, 3). Approximately 175 16- and 17-year-old inmates are housed in Facilities on Rikers Island, male adolescents at RNDC and female adolescents at RMSC. The intent of transferring adolescent inmates to an alternative Facility is to place them in a facility readily accessible by public transportation to facilitate visitation between inmates and family members more easily, and to house them in an environment that will support a new paradigm for effectively managing the adolescent inmate population. This new paradigm will rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

---

**XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3**

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department and MOCJ have consulted with several architectural and engineering firms and have made site visits to model programs in other jurisdictions to flesh out the vision for how the physical space should be configured to best support supervision and programming.

**ANALYSIS OF COMPLIANCE**

On April 10, 2017, Governor Cuomo signed Raise the Age ("RTA") into law. RTA will dramatically impact the way in which 16- and 17-year-olds who commit crimes are processed through the justice system. In addition to changes in the court of jurisdiction, RTA requires 16- and 17-year-olds to be moved out of the adult jails, off Rikers Island, by October 1, 2018. The specifics of exactly where the youth will be housed and who will operate the facility in both the short- and long-term are all still under deliberation.

As noted in the Third Monitor's Report, the Department's plans to comply with this provision of the Consent Judgment were well underway. Obviously, these plans had to be considered in light of RTA. In addition to working with their State and City partners to understand how the law must be implemented and the state regulations that may apply to the new housing for inmates under age 18, the Department has regularly consulted and updated the Monitoring Team. The Department is evaluating all potential options for housing adolescent inmates against the requirements of the Consent Judgment (i.e., safety, sufficient recreation and programming space, small units, physical layout, and accessibility by public transportation).

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **3.** Not currently applicable |
|---|---|

**- End -**

# Appendix A: Definitions

| Acronym or Term | Definition |
|---|---|
| ACS | Administration for Children Services |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidables | Process at the Facility-level to identify and address avoidable use of force incidents |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BSP | Behavior Support Plan |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CHS | Correctional Health Services |
| CIB | Correction Intelligence Bureau |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| Commissioner's Twelve | Commissioner's Twelve process, wherein, on a weekly basis, facility Wardens must review all of the incidents in which the Preliminary Review process identified a problematic use of force and then must develop an Action Plan to address any trends. Twelve categories of problematic uses of force were identified based on discussions between the Commissioner and the Monitoring Team: head strikes, force utilized on Inmates in restraints, kicks, improper use of institutional equipment, prohibited restraint holds, camera malfunctions, excessive or unnecessary use of OC, unexplained injuries, unreported uses of force[160], anticipated uses of force[161], alleged uses of force[162], and Inmates being forcibly placed against the wall. |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DCID | Deputy Commissioner of ID |

[160] This category includes incidents in which the Department confirmed that force was used, but the incident was not reported by Staff.

[161] This category includes incidents in which the use of force was anticipated, but was not treated as such by the involved Staff.

[162] This category includes allegations of uses of force in which Inmate injuries are consistent with a use of force.

| Acronym or Term | Definition |
|---|---|
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service Training | Training provided to current DOC Staff |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| LMS | Learning Management System |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandums of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| NPA | Negotiated-Plea Agreement |

| Acronym or Term | Definition |
|---|---|
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| PC | Protective Custody |
| PDR | Personnel Determination Review |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit Training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review Process | Wardens review every use of force incident which is captured on video, and consider whether the force used was appropriate and within guidelines. |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| SMI | Serious Mental Illness |
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |

| Acronym or Term | Definition |
|---|---|
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking System |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |