# Special Report of the *Nunez* Independent Monitor

**March 5, 2018**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

i

**Table of Contents**

Introduction ........................................................................................................................... 1
SCOC Findings ..................................................................................................................... 1
Overview of RNDC ............................................................................................................... 2
Monitoring Team's Assessment of Locking Mechanisms ..................................................... 2
Impact of Housing Unit Closures .......................................................................................... 5
Conclusion ............................................................................................................................. 6

*Introduction*

This is a special report of the independent court-appointed Monitor, Steve J. Martin in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (SDNY) regarding a recent determination by the New York State Commission of Correction ("SCOC") mandating closure of all celled housing in the Robert N. Davoren Center ("RNDC") due to the current state of the locking mechanisms. This report discusses the Monitoring Team's work assessing the locking mechanisms at RNDC and the potential impact of this expedited closure, with no plan (or time to plan), on the *Nunez* Plaintiff Class members.[1] Abruptly transferring the adolescents currently housed in the units in question raises serious safety concerns and threatens the loss of progress made to date in complying with the *Nunez* Consent Judgment.

*SCOC Findings*

On February 28, 2018, the SCOC issued a revised Maximum Facility Capacity ("MFC") formulation for RNDC that requires the closure of 1,184 cells (all celled housing units) at RNDC by March 6, 2018. The basis for the SCOC's decision was: (1) a March 7, 2017, Minimum Standard evaluation report for RNDC found the sliding doors of 32 cells (in 7 housing units) were breached by either staff or inmates, and the New York City Department of Correction's (the "Department") response to this report failed to confirm whether those specific cells had been vacated and repaired and, more broadly, the SCOC had not received any requests to repair or replace the locking mechanisms throughout the facility, and (2) since 2016, there were 24 reported instances in which inmates of various housing areas within RNDC were able to breach their cell doors and enter the common area (including an incident on February 24, 2018). Accordingly, the SCOC stated "[this] demonstrate[s] that that the cell doors of RNDC subject to

---

[1] The Plaintiff Class is defined as "all present and future inmates confined in jails operated by the Department, except for the Elmhurst and Bellevue Prison Wards." § II (Jurisdiction, Venue and Revised Class Definition), ¶ 2.

breach are both wide-spread and unknown to the Department. This represents a grave threat to the safety, security and good order of the facility and the safety of staff, inmates and the public."

*Overview of RNDC*

RNDC currently houses all male 16- and 17-year-old inmates[2] as well as male adult inmates (a mixture of detainees and sentenced inmates awaiting transfer to state facilities). RNDC has 50 housing units—36 celled units and 24 dormitory units. Adolescents are currently housed in 20 units (15 celled units[3] and 5 dormitories) and adults are housed in 18 units (11 celled units and 7 dormitories). A total of 11 units are currently closed (most for construction) and one unit is used as Satellite Intake. RNDC also has a school, outdoor and indoor recreational space, and additional programming space.

All housing units with cells are in six buildings. Each of the six buildings has six housing units (for a total of 36 housing units) and each housing unit has approximately 33 cells. The maximum living unit population for 16- and 17-year-old inmates is 15 inmates, pursuant to ¶ 16(a) of § XV (Safety and Supervision of Inmates Under the Age of 19) of the *Nunez* Consent Judgment (Dkt. # 249). This allows DOC considerable flexibility to work around cells with inoperable locks. However, DOC also relies on the additional space and flexibility in order to separate youth with interpersonal conflict in order to prevent violence.[4]

*Monitoring Team's Assessment of Locking Mechanisms*

The Monitoring Team has been evaluating the cells' locking mechanisms at RNDC as part of the team's assessment of compliance with the Consent Judgment requirement to "take

---

[2] The average daily population for adolescents is approximately 120.
[3] At least 65 adolescents housed at RNDC would have to be transferred to one or more other facilities.
[4] The Monitoring Team continues to encourage the Department to focus resources and programming on strategies to mediate disputes and to teach youth skills for managing interpersonal conflict. These skills will enhance safety without an overreliance on physical separation and housing reassignment.

reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates."[5] To the extent the cells are inoperable, the Department must "stop using the cell until the locking mechanism is repaired."[6]

RNDC has two different types of rail and rack door locking systems that are antiquated and complicated. The rail and rack door systems are typical of jail and prison construction of the era in which the facility was built and the system is in use in many other jurisdictions across the country. Maintaining the integrity of locks is a challenge for all correctional systems, even those with more modern fixtures. That said, this older locking system requires routine and vigilant security assessments and maintenance to minimize an inmate's unauthorized exit from his cell. Equally important, if a lock is found to be compromised, the cell must be taken off-line immediately so the lock can be repaired.

The Monitoring Team regularly spot-checks cell doors during routine visits to RNDC. On March 1, 2018, the Monitoring Team assessed approximately 330 randomly selected cell doors (in 10 randomly selected housing units, two in each of the five buildings[7] with celled housing units that are currently open) at RNDC. Of these:

- 124 cells (38%) had operable locks and were occupied;
- 136 cells (41%) had operable locks but were unoccupied;
- 61 cells (18%) had been identified by DOC as inoperable and were unoccupied;
- An additional seven cells (2%) were identified by the Monitoring Team as being inoperable/susceptible to manipulation but were unoccupied; and
- *Two cells (1%) were identified by the Monitoring Team as being inoperable and were occupied.*

---

[5] *Nunez* Consent Judgment, § XV (Safety and Supervision of Inmates Under the Age of 19), ¶ 2.
[6] Ibid.
[7] The Monitoring Team did not test the cell doors in the sixth building because the building is under construction. The Monitoring Team did tour one housing unit in that building and the cell doors in that unit are similar to the doors in other active housing units.

3

Overall, while a sizeable number of cells had inoperable locks (70 of 330, or 21%), the Department had mitigated the safety and security risk by not housing inmates in cells with inoperable locks in 99% of its housing assignments.

The Monitoring Team also identifies incidents involving failed or manipulated cell locking mechanisms at RNDC via routine reports provided by the Department to the Monitoring Team, including the Central Operations Desk incident reports, Preliminary Reviews, and review of completed investigations. In 2017, the Monitoring Team identified nine use of force incidents involving a compromised lock at RNDC.[8] The data collected by the Monitoring Team does not suggest that inmates' compromising cell locks is driving a major portion of use of force. (*see also* page 213 of the Fourth Monitor's Report (Dkt. # 305)).

The Department has two policies in place to identify inoperable cells. Operations Order 15/15 "Facility Security Inspection Report (FSIR)" requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty. Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that inmates are not housed in them. The Department's procedures to identify and deactivate inoperable cells pending repair are reasonable, but policies must also be implemented properly in order to achieve their intended purpose.

In early 2017, the Department implemented an internal quality assurance program to assess compliance with policy and *Nunez* Consent Judgment, § XV, ¶ 2. Currently, the audit

---

[8] Between January 1 and February 18, 2018, RNDC had 4 uses of force involving a compromised lock.

process focuses on whether RNDC Staff are completing FSIRs and DCSRs as required and the extent to which their content is congruent (i.e., "reconciled"). The audits completed July through December of 2017 at RNDC's revealed a high level of completion (98% for both forms) and low rates of error (6% unreconciled). However, although quality assurance ("QA") staff intend to do so, the current audit methodology does not yet verify the accuracy of the documents nor do they assess whether inmates were assigned to cells with known inoperable locks. The Monitoring Team provided feedback on this QA program on February 1, 2018 to encourage the full implementation of the audit strategy.

*Impact of Housing Unit Closures*

If the Department is forced by SCOC to rapidly close the housing units at RNDC and transfer the displaced youth to facilities without a plan (or time to develop such a plan),[9] the Monitoring Team foresees considerable safety and security risks and significant lost ground with respect to the Department's compliance with *Nunez*. These are enumerated briefly below:

- Staffing. It is likely that RNDC staff who now work with adolescents would not follow them to wherever they are ultimately placed. RNDC staff have undergone specific training related to adolescents (e.g., three-day Safe Crisis Management Training and four-day Direct Supervision Training) and have expressed a desire to work with youth. They have also developed relationships with many of the youth that are critical to being able to intervene effectively when tensions rise. Moving the adolescents elsewhere would eliminate this asset.

---

[9] The planning is already underway to move the adolescents off Rikers Island by October 1, 2018 as required by the Raise the Age law. The 16- and 17-year-olds will be moved to the Horizon Center in the Bronx. The Department is engaged in extensive planning with ACS to facilitate this move. The Monitoring Team visited the Horizon Center in December 2017 and has also begun to offer both guidance and technical assistance to ensure that the requirements of *Nunez* are addressed.

- Violence Reduction. RNDC staff have been trained to implement two incentive programs—an individual program and a group program—to encourage compliance with facility rules and reduce violence. These systems do not exist in DOC's other jails. Furthermore, RNDC has two programs used to respond to youth who commit serious and chronic violence which have specially trained staff and multidisciplinary teams to support their operation. They cannot simply be exported to another location. Moving the adolescents abruptly would dislocate the system's main tools for reducing violence among this population.

- Education. The Department is obligated to provide school to adolescents and school is the cornerstone to the Department's efforts to reduce idle time and engage youth in structured programming. The other jails do not have an appropriate school facility.

- Housing Density. At RNDC, the adolescent population is distributed across a large number of units that are operating below capacity. This provides flexibility to keep youth separate in response to security concerns. If the adolescents are transferred elsewhere, the housing units are likely to be more densely populated and this security tool would be lost. The situation is even more dangerous considering that the staff of the receiving facility do not have relationships with these youth, do not know the dynamics among them, and have not had the specialized training they need to manage interpersonal conflict among this age group.

*Conclusion*

The Consent Judgment includes thoughtfully constructed reforms designed to reduce violence for all populations and improve the safety and supervision of young inmates. RNDC's antiquated locking mechanism are challenging to maintain, but vigorous security checks,

vigilance in housing assignments, and ongoing maintenance can mitigate the safety issues. At the core, the goal is to ensure compromised cells are not inhabited and are fixed as soon as possible. The Monitoring Team's recent audit suggests that housing an inmate in a cell with a known inoperable lock is a low-frequency event. A fully developed quality assurance plan will help ensure that these processes are working as designed. Closing these housing units on an expedited time frame with no plan would be disruptive and counter-productive to the overall goal of jail safety, and outweighs any potential safety concern associated with antiquated locking mechanisms.