# Fifth Report of the *Nunez* Independent Monitor

**Fifth Monitoring Period**
**July 1, 2017 through December 31, 2017**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ................................................................................................ **1**

*Background* ..................................................................................................... 1

*Executive Summary* ........................................................................................ 3

*Next Steps: Mission Critical Aims* ................................................................ 6

*Training Academy* .......................................................................................... 7

*Organization of the Report* ........................................................................... 8

**Staff Use of Force and Inmate Violence Trends During the Fifth Monitoring Period** ......... **10**

*Quantitative Assessment of the Use of Force* ............................................... 11

*Qualitative Assessment of the Use of Force* ................................................ 18

*Department's Assessment of Use of Force* ................................................... 22

**Identifying & Addressing Use of Force Misconduct** ................................ **25**

*Identifying Use of Force Misconduct* ........................................................... 26

*Initial Assessments of Use of Force* ............................................................. 27

*Investigations* ................................................................................................ 31

*Responses: Addressing Misconduct* ............................................................. 33

*Conclusion & Next Steps* .............................................................................. 38

**Section by Section Analysis** ..................................................................... **40**

1.    Use of Force Policy (Consent Judgment § IV) ................................. 40

2.    Use of Force Reporting and Tracking (Consent Judgment § V) ....... 43

3.    Training (Consent Judgment § XIII) ................................................. 57

4.    Anonymous Reporting System (Consent Judgment § VI) ................. 78

5.    Video Surveillance (Consent Judgment § IX) .................................. 80

6.    Use of Force Investigations (Consent Judgment § VII) .................... 91

7.    Risk Management (Consent Judgment § X) ...................................... 111

8.    Staff Discipline and Accountability (Consent Judgment § VIII) ...... 119

9.    Screening & Assignment of Staff (Consent Judgment § XII) .......... 128

10.   Staff Recruitment and Selection (Consent Judgment § XI) .............. 131

11.   Arrests of Inmates (Consent Judgment § XIV) ................................ 136

12.   Implementation (Consent Judgment § XVIII) ................................. 136

**Current Status of Young Inmates** ............................................................ **140**

Trends in Violence ........................................................................................ 140

Trends in UOF .............................................................................................. 142

Raise the Age—16- and 17-Year-Olds .......................................................... 145

Housing for 18-Year-Olds (GMDC Closure) ............................................... 150

**Young Inmates Section by Section Analysis** .......................................... **150**

13.   Safety and Supervision of Inmates Under the Age of 19
      (Consent Judgment § XV) ................................................................ 150

14.   Inmate Discipline (Consent Judgment § XVI) ................................. 167

15.   Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) .... 179

**Appendix A: Definitions** ………………………………………………………i

**Appendix B: Flowchart of Disciplinary Process**………..…………………....iv

**Appendix C: Flowchart of Promotions Process**…..……………………..…….v

## INTRODUCTION

This is the Fifth Report[1] of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[2] and the Monitoring Team to advance the reforms in the Consent Judgment during the Fifth Monitoring Period, which covers July 1, 2017 to December 31, 2017 ("Fifth Monitoring Period").

*Background*

The Department manages 12 inmate Facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 11,115 uniformed Staff and 1,700 civilian employees, and detains an average daily population of 9,100 inmates.[3]

The Consent Judgment was entered by the Court on October 22, 2015.[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series

---

[1] A Special Report was also filed by the Monitor on March 5, 2018. (Docket Entry 309)

[2] All defined terms utilized in this report are available in ***Appendix A: Definitions***.

[3] 34% of the inmate population is detained for four days or less, while 19% of the population is detained three months or more. The average length of stay for an inmate is 61.5 days. (*See* "December 6 – DOC at a Glance Report," <http://www1.nyc.gov/site/doc/about/doc-statistics.page>).

[4] The Effective Date of the Consent Judgment is November 1, 2015. (Docket Entry 260)

of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (i.e., those under 19 years old). The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principals can take root without a culture change within the agency that embraces them.

Culture change requires a multi-faceted approach: (1) developing and implementing adequate policies that devise and describe appropriate procedures; (2) designing and implementing training programs that provide Staff with the skills required to carry out expected practices; (3) supervising Staff in a manner that encourages and rewards those who implement the new practices and that guides and influences those who are slower to adapt to the new ways of managing inmates; (4) applying scrutiny to situations in which policies and procedures were not followed to determine what went wrong and how it could be corrected; and (5) imposing corrective action and discipline when Staff's behavior is not aligned with policy.

The Department is under significant scrutiny. Along with the *Nunez* Monitoring Team's oversight, the Department has come under increased scrutiny by City and State regulators and legislatures. Further, there has been significant attention on the City's stated intention to close the nine jails on Rikers Island. While the jails' location in New York City is beyond the scope of

2

*Nunez*,[5] the overall goal of the Consent Judgment—a safer and more humane jail system—must be met regardless of where the jails are located. As described in this report, significant work is necessary to *change the culture* of the Department. Accordingly, the Monitoring Team <u>strongly encourages</u> all stakeholders to support the Department in its efforts to address the issues that gave rise to the Consent Judgment as significant resources and commitment continue to be needed to achieve and sustain compliance with the overall goals of the Consent Judgment and its individual provisions.

<u>Executive Summary</u>

The end of the Fifth Monitoring Period marked just over two years of implementing the Consent Judgment. Over the last two years, the Department has worked diligently to develop and implement new policies, procedures, and training, many of which go well beyond the requirements of the Consent Judgment. The Department and the Monitoring Team have also maintained a constructive and collaborative relationship which relies on the mutual exchange of ideas, and candid and thoughtful discussions as initiatives are developed and refined to address the reforms in the Consent Judgment.

At the beginning of this Monitoring Period, a new team was appointed to lead the Department. The Mayor appointed a new Commissioner and Chief of Department, both of whom are competent, committed, and reform-minded. The new leadership, even during a period of transition, maintained their commitment to reform and demonstrated an increased vigor for and emphasis on achieving compliance with the Consent Judgment. The Commissioner also

---

[5] The requirements of the Consent Judgment apply to all jails operated by the Department regardless of physical location, except for the Elmhurst and Bellevue Prison Wards. (Consent Judgment § II (Jurisdiction, Venue, And Revised Class Definition), ¶ 2.)

appointed several key personnel to critical positions to support an increased emphasis on achieving compliance with *Nunez*.

Given that the conditions giving rise to the Consent Judgment were the result of a long period of mismanagement, limited resources, and antiquated and bureaucratic processes at the Department, fully resolving the complex issues surrounding the improper use of force and inmate violence could not reasonably be achieved in two years. Despite the Department's efforts this Monitoring Period to achieve compliance, the Department has not yet made significant progress toward the primary goal of reducing the use of unnecessary and excessive force. The use of force has continued to increase rather than diminish, even as the inmate population has decreased. This Monitoring Period ended with the highest monthly number of UOF incidents during the life of the Consent Judgment. Of greater concern is the continuing pattern of seriously problematic incidents. As discussed in the Staff Use of Force and Inmate Violence Trends section, many of the aspects of misuse of force that existed two years ago continue to plague the DOC, including head strikes, misusing chemical agents, use of prohibited holds, needlessly painful escort tactics, and incidents escalated by Staff (including hyper-confrontational Staff demeanor), and an over-reliance on Probe Team responses.

As described in prior reports, the Department has made some progress in the effort to address violence in the Facilities that house 16-, 17- and 18-year-old inmates. As discussed in more detail in the sections on Young Inmates in this Report, the overall rate of violence has not changed appreciably for Young Inmates, despite some short peaks and valleys. However, the overall rate of use of force ("UOF") is trending downward. Both RNDC and GMDC have benefitted from solid leadership and support from the Division Youthful Offender Programming to increase programming and reduce idle time. In order to achieve the overall goal of reduced

violence, Facilities housing Young Inmates need to fortify their disciplinary responses to address those whose aggression may be infrequent, but still requires effective accountability measures.

Whether the policies and procedures prescribed in the Consent Judgment will ultimately have the intended effect on Staff conduct depends to a significant degree on strong leadership throughout the Department, the quality of training for Staff, and consistent messaging to Staff through supervision, incentives, and disincentives. The Department does not consistently identify Staff misconduct when it occurs, and even when misconduct is identified, the Department does not always respond to it timely. These deficiencies subvert the Department's ability to comply with the Consent Judgment.

While DOC has not yet developed a functional structure to enable a more rapid pace toward compliance, there are operational areas where progress is being made. The Investigation Division is improving in terms of the quality of its work product although it continues to be hampered by a lack of investigators and a constantly increasing backlog of cases such that timely completion of investigations simply cannot be achieved. The Trials and Litigation Division ("Trials Division") is also clearly beginning to operate more efficiently and is imposing discipline more quickly once the investigation is closed. Further, the handheld video of incidents is now regularly available for post-incident review and investigation. The Department focused on a number of initiatives, listed below, many of which are ongoing projects, and which have, to date, achieved mixed results. These are discussed in more detail in the subsequent sections of the report.

> ➢ Signed the New Use of Force Directive into effect
>
> ➢ Developed Department-wide and Facility-based security metrics and targets
>
> ➢ Consistently assigning Staff to specific posts throughout the Facilities

➢ Piloted an initiative to improve coordination of daily schedules to avoid conflicts and minimize the disruption of services to inmates

➢ Increased focus and accountability regarding:

    ○ 5003 Counseling Session

    ○ Rapid Reviews and "Avoidables"

➢ Completed deployment of Special tactics and Responsible Techniques ("S.T.A.R.T.") Training to all Staff

➢ Provided leadership training to civilian and uniform Executive leadership

➢ Implemented the Case Management System across the Department and to all Facilities

➢ Completed installation of video surveillance cameras in all housing units on Rikers Island

➢ Developed an Early Warning System ("EWS")

*Next Steps: Mission Critical Aims*

Given the many complex issues the Department must manage on a daily basis, the Monitoring Team, in concert with DOC leadership, identified a set of "Mission Critical Aims." These initiatives were selected in order to approach compliance in a strategic and structured manner. They are intended to accelerate Facility managers' owning the administration of use of force. This process began in the Fifth Monitoring Period and has yielded some important progress in areas such as increased staffing for the Investigation Division ("ID") and the EWS program; improving the time to approve executed Negotiated-Plea Agreements ("NPAs"); and fostering more intensive concentration on concrete operational issues.

The Monitoring Team, in conjunction with the Department, has devised a set of Mission Critical Aims for the Sixth Monitoring Period. The top three priorities for the next Monitoring Period are: (1) developing and implementing an aggressive and formalized approach to complete less complex Full ID cases more quickly; (2) buttressing the process for identifying misconduct based on the Preliminary Review so it can be fast-tracked for disposition and discipline; and (3) supporting the Department's relocation of 16-, 17-, and 18-year-olds inmates, focusing initially on staffing, use of force techniques, and ensuring appropriate responses for inmates involved in serious institutional violence.

Additional mission critical aims in this Monitoring Period include: (4) addressing operational deficiencies that contribute to the use of force; (5) improving Facilities' ability to detect and respond to the misuse of force; (6) fortifying the responses to violence among Young Inmates; and (7) continuing to refine and fully implement the EWS.

*Training Academy*

The limited and sorely inadequate training space available to the Department was described in detail in the First Monitor's Report (at pgs. 55-57). The City has reported it shares the Monitoring Team's view that quality training is fundamental to transforming and enhancing practices by Staff and supervisors regarding the use of force. Accordingly, the Monitoring Team was very encouraged by the City's commitment of $100 million dollars to fund a new Training Academy, announced during the Fourth Monitoring Period. This is a critical step toward ensuring that the Department has adequate training space to support its Staff. During the Fifth Monitoring Period, the City evaluated two potential sites, but neither possessed all the necessary characteristics so the search for an appropriate space continues. The Monitoring Team is concerned that the process of identifying an appropriate location will be protracted and the

realization of a dedicated Training Academy will not occur in a reasonable time frame. Delay in development of the Training Academy will only impede the Department's efforts to develop and maintain a modern correctional staffing complement. Accordingly, the Monitoring Team strongly encourages the City by the end of the next Monitoring Period to commit to a reasonable time frame that a new dedicated Training Academy will be built and available to the Department. The Monitoring Team will continue to work closely with appropriate City representatives to ensure the City continues to make progress on providing the Department with appropriate training space.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight, showing the levels of force currently being applied, the severity of resulting injuries, and the reasons that force is used. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses the detection and response to the misuse of force in its own section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (e.g. policy, reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Finally, the report examines violence and UOF among Young Inmates and then

assesses compliance with the provisions applicable to Young Inmates (e.g., classification, programming, protective custody, staffing, incentives and discipline, etc.).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[6] (b) Partial Compliance,[7] and (c) Non-Compliance.[8] During this Monitoring Period, the Monitoring Team also elected to withhold the compliance rating ("Compliance Rating Withheld") for certain provisions where the Department made initial efforts to achieve compliance, but additional work was both necessary and forthcoming in order for the Monitoring Team to apply a rating.[9] The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report but, with each Monitoring Period, has increased the proportion of provisions for which the compliance level has been assessed.[10] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for completion falling after December 31, 2017.

---

[6] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward. The language of the Consent Judgment provisions is embedded in the compliance assessments for ease of reference.

[7] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[8] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

[9] The Monitoring Team only intends to withhold a compliance rating on rare occasions, when necessary under the circumstances.

[10] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

## STAFF USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE FIFTH MONITORING PERIOD

The Department continues to struggle to effectively manage UOF. The overall number of UOF, by any standard with which the Monitoring Team has had experience, remains high. Unfortunately, UOF is also increasing. The average number of UOF since the Effective Date is 394 per month. The Department exceeded that average in eight of the past 12 months and in all six months of the current Monitoring Period (see Graph 1, below).



**Graph 1. Total Uses of Force**
*November 2015-December 2017*

Further, the force employed is too often unnecessary and/or excessive. In this section of the report, the Monitoring Team evaluates both quantitative and qualitative aspects of the Department's use of force. Not only does this analysis provide the current status of compliance, it also highlights trends that should inform the Department's problem-solving efforts. Over time,

quantitative and qualitative trends will illustrate the impact of the various reforms and the extent to which the Department is achieving the outcomes required by the *Nunez* Consent Judgment.

<u>*Quantitative Assessment of the Use of Force*</u>

- **Overall Trends**

Given the continued reductions in the size of the inmate population (Average Daily Population ("ADP"), in 2017 was 6% lower than the ADP for 2016; 9,225 versus 9,803 inmates, respectively) examining UOF as a rate is essential to assess whether Staff's practices have changed. A *rate per 100 inmates* neutralizes the impact of the changing size of the population, and thus provides an objective comparison of the conditions of confinement over the life of the Consent Judgment. Graph 2, below, shows that the UOF rate has increased since the Effective Date. While the average *number* of UOF per month increased only 2.6% from 2016 to 2017 (388 to 398, respectively), the average UOF *rate* increased 9.1% (3.96 to 4.32 per 100 inmates, respectively). Finally, the monthly UOF rate was higher in 2017 than 2016 in 10 of 12 months (see Graph 3). By any measure, these data indicate that the various reforms required by the Consent Judgment have not yet had the desired effect of reducing overall UOF.



**Graph 2. Use of Force Rate**
*November 2015-December 2017*



- **Facility Specific Trends**

An analysis of data at the Facility-level is useful to pinpoint which Facilities are contributing the largest proportion of UOF, where the rates are highest, and Facilities whose performance seems to be degrading over time. Examining the Facilities according to their UOF rate per 100 inmates tells a more nuanced story and identifies places where the high numbers of UOF cannot be explained by the size of the population. For example, EMTC has the second largest ADP (n=1,262 inmates) but has one of the lowest numbers of uses of force during the current Monitoring Period (n=125 uses of force), meaning it has one of the *lowest rates* (1.64). Conversely, GRVC has the seventh largest ADP (n=682 inmates), but one of the highest numbers of use of force during the current Monitoring Period (n=272 uses of force), and thus has a much *higher rate* (6.67).

The table below ranks the 12 Facilities by UOF rate and identifies whether the rate in the current Monitoring Period is higher than the rate in the previous Monitoring Period and whether it is higher than the 2016 rate (i.e., whether the Facility's performance is degrading over time).

By all measures—the proportion contributed, current rate, degrading performance over time—several of the Facilities are not performing well. While this is not the only analysis that could be useful to the Department, it is one that could better focus the Department's efforts to reduce the sheer volume and potentially unnecessary and excessive uses of force discussed in the "Qualitative Assessment of the Use of Force" section, below.

| Rank | Facility | Fifth Monitoring Period Rate | Higher than Fourth Monitoring Period? | Higher than 2016? |
|---|---|---|---|---|
| | *Overall* | *4.63* | *Y (4.01)* | *Y (3.96)* |
| 1. | WF[11] | 20.60 | N (21.34) | Y (14.24) |
| 2. | OBCC | 6.92 | Y (5.31) | Y (3.67) |
| 3. | GRVC | 6.67 | Y (6.16) | N (6.91) |
| 4. | RNDC[12] | 5.97 | Y (3.82) | N (8.04) |
| 5. | GMDC | 5.76 | N (7.05) | N (8.63) |
| 6. | MDC | 5.62 | Y (4.03) | Y (3.53) |
| 7. | RMSC | 5.08 | Y (4.59) | Y (2.83) |
| 8. | BKDC | 4.52 | Y (3.35) | Y (2.50) |
| 9. | VCBC | 2.97 | Y (2.66) | Y (1.21) |
| 10. | NIC | 2.86 | Y (1.56) | Y (2.56) |
| 11. | AMKC | 2.84 | Y (2.61) | Y (2.42) |
| 12. | EMTC | 1.64 | N (1.85) | Y (1.62) |

- **Injury Severity**

UOF incidents are classified using the severity of injuries sustained by either Staff or inmates. As shown by the size of the purple bars in the chart below, the proportion of severe injuries (Class A) resulting from a UOF increased significantly during the current Monitoring

---

[11] The rate for the West Facility ("WF") should be interpreted with caution due to the very low average daily population (approximately 30 Inmates per month); with such a small denominator, even few uses of force will result in a high rate.

[12] As noted in the section "Current Status of Young Inmates," the rate of UOF among the adolescent population is decreasing, indicating that the problems at RNDC appear to be driven by the adult population.

Period (35 Class As from July to December 2016 compared to 96 Class As from July to December 2017). This increase may be partly driven by improvements in the classification of injuries that focus on the injury itself (i.e., lacerations) rather than the type of treatment (e.g., stitches versus Dermabond). The Monitoring Team examined the closed investigations of 20 Class A incidents that occurred since the Effective Date to gain a deeper understanding of what may lead to Class A incidents. The review did not reveal any clear patterns or trends about the type of force or certain set of circumstances that result in a Class A injury. Given these findings, the Monitoring Team suggests that analyzing and addressing specific concerning types of force (e.g. head strikes) may be more prudent to reduce and minimize force that risks greater injury, whether an injury was in fact sustained or not.



- **Type of Force**

    An important part of the Consent Judgment's overall goal is to ensure that the level of force used is proportional to the level of threat and/or amount of resistance from the inmate. The graph below demonstrates a changing proportion of UOF involving physical restraints (i.e.,

14

control holds, takedown techniques, physical force) versus chemical restraints (i.e., OC spray) as the primary type of force used, shown in the graph below.[13]



The decreasing proportion of OC spray suggests that, while the overall number of uses of force may be increasing, Staff appear to be making decisions about the type of force to use differently. The Department has observed these same trends, but an in-depth review of the type of physical force being used is necessary before any inference can be made about whether this is an improvement in practice (i.e., that force is becoming more proportional) or simply a change in the Staff's choice of techniques.

- **Location**

The vast majority of UOF occur in the housing areas (about 60%). While they represent a smaller proportion of UOF, the number occurring in intake areas (about 10-15%) increased

---

[13] These data represent the Primary Type of UOF. The Department also uses mechanical restraints (e.g., handcuffs, flexcuffs, polycarbon shields, Tasers), but they consistently amount to less than 3% of all incidents involving force and thus are not illustrative.

significantly (30%) from 2016 to 2017. Other areas where relatively small numbers of UOF occurred but which saw an increase from 2016 to 2017 include stairwells (93% increase), bridges/vestibules (88% increase), visitation areas (86% increase), and corridors (15% increase). Conversely, incidents in school areas decreased significantly (46% decrease) suggesting that the Department's strategy to house youth according to their academic level has largely been effective at reducing violence in school (discussed in more depth in the section on the Safety and Supervision of Inmates Under the Age of 19). The Department is encouraged to craft place-based strategies to address these hot spots and to assess whether existing strategies (e.g., Satellite Intake) are producing the desired outcomes.

- **Age**

The graph below shows the proportion of UOF contributed by each of the various age groups. One could argue that UOF reduction efforts should focus on adults since they contribute so many incidents to the total. However, Young Inmates are responsible for a disproportionate share (16- to 18-year-olds are only 3% of the total population yet accounted for 14% of all UOF). Similarly, the 2017 UOF rate among adults (2.9 per 100 inmates) is a fraction of the UOF rate among those aged 19-21 (12.3), 18-year-olds (17.5), and adolescents (21.2). Accordingly, the Monitoring Team recommends that the Department delve into the underlying reasons for both interpersonal violence and uses of force, *by age*, to identify the specific inmate behaviors and Staff responses that contribute to the observed trends.



Finally, in all age groups, a small proportion of inmates continue to be responsible for a large number of UOF. The Department continues to maintain two strategies to manage particularly challenging inmates: (1) representatives from DOC, Health Affairs and H+H meet weekly to discuss particularly challenging inmates with diagnosed mental health issues,[14] and (2) the Department works collaboratively with the District Attorney's Offices in all five counties to prioritize the prosecution of certain inmates who have been incarcerated for over 600 days, and have exhibited challenging behavior and/or engaged in violent behavior while in DOC custody (e.g. stabbing or slashings or a large number of use of force incidents). Both strategies are described in more detail in the Fourth Monitor's Report (at pgs. 31 to 32).

---

[14] During this Monitoring Period, the Department devised a new set of procedures to expand this initiative more broadly to evaluate inmates involved in a certain number of fights and/or use of force incidents within a quarter. The Monitoring Team intends to assess this strategy after it has been implemented in the next Monitoring Period.

*Qualitative Assessment of the Use of Force*

Given that physical force by Staff in a correctional setting is at times necessary to maintain order and safety, the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm.[15] That said, there are times that the situation leading to a use of force could have been prevented had the Staff been better-equipped with skills for de-escalation, mediating conflict, and avoiding security lapses. Furthermore, even when force is ostensibly necessary, the way in which it is applied may be excessive or malicious. These are the situations of utmost concern to the Monitoring Team.

To assess the frequency and circumstances surrounding problematic UOF, the Monitoring Team reviewed over 2,000 Preliminary Reviews and over 75 closed UOF investigation files this Monitoring Period.[16] The Monitoring Team continues to observe the same elements of Staff misuse of force that gave rise to the Consent Judgment. These troubling patterns of force are outlined below.[17]

> ➢ Using head strikes in situations not permitted by policy[18]
>
> ➢ Misusing chemical agents
>
> ➢ Using prohibited holds

---

[15] The Monitoring Team continues to encourage the Department to use all of the tools at its disposal, including ionizing body scanners. The Department is not currently authorized to use the scanners due to State regulations restricting its use. The Monitoring Team's collective experience suggests that body scanners are an effective tool to help control the flow of contraband into correctional facilities and, thus, believes that the Department should be authorized to use this equipment.

[16] The Monitoring Team's findings discussed in this Report also draws on the significant information and documentation reviewed and analyzed in prior Monitoring Periods.

[17] After reviewing the preliminary data each month, the Monitoring Team provides DOC with a list of problematic patterns observed during the previous month (Operational Feedback).

[18] The sheer number of head strikes utilized in use of force incidents is higher than could reasonably be expected to be necessary given the level of threats identified. Staff too frequently resort to the use of head strikes when other options are more appropriate and available.

> ➤ Using needlessly painful escort tactics that risk and/or cause injury

> ➤ Taking restrained inmates to the ground

> ➤ Escalating incidents by:

>> o Staff complicity in inmate-on-inmate assaults;

>> o Unprofessional Staff language and demeanor;

>> o Over-reliance on Probe Team response resulting in an unnecessary number of Staff responding to the area and increasing tension and stress.

The data derived from the Preliminary Reviews of the use of force incidents in this Monitoring Period demonstrate that the frequency of these concerning practices has remained relatively constant since the last Monitoring Period. At the beginning of the Monitoring Period in July 2017, there were 411 use of force incidents which included at least 47 possible head strikes, at least 93 instances of uses of force on restrained inmates, and the use of at least 15 prohibited holds. Towards the end of the Monitoring Period, in November 2017, there were 444 use of force incidents which included at least 43 possible head strikes, at least 93 instances of uses of force on restrained inmates, and the use of at least 10 prohibited holds.

October 2017 marked the end of the Consent Judgment's second year. The following synopsis of October 2017 incidents illustrate that so many of the elements of misuse of Staff force that existed two years ago continue to plague the DOC.[19]

> ➤ A Captain was captured on video striking an inmate eight times in an intake pen. Four days earlier, this same Captain supervised a Probe Team escort of an inmate in a painful position resulting in a fractured digit and lacerations to the inmate's

---

[19] The investigations for the majority of these incidents is still ongoing. In some cases the Department took immediate action, while in others, it did not. The Department's efforts to identify and respond to misconduct is explored more fully in the next section.

wrists.

➤ An Officer[20] was captured on video striking an inmate seven times during a Probe Team response.

➤ An Officer unnecessarily dispensed an excessive amount of OC spray into an intake cell full of inmates, all of whom had to be removed from the cell for decontamination.

➤ A Captain[21] used OC spray based on a false report that the inmate "charged" toward a Staff Member. The video reflects that the inmate was simply walking away from the Staff Member, not charging him.

➤ An inmate was taken to the floor by officers and, after having been subjected to OC, was placed in a chokehold that was maintained even though the inmate could be heard screaming that he could not breathe.

➤ An inmate was taken to the ground, after which an officer used multiple head strikes while two inmates joined in to deliver repeated kicks to the inmate's body.

➤ Following a major use of force by a Probe Team, an inmate was escorted in a purposeful manner to cause pain. During this escort, the supervising Captain[22] can be heard on video making such comments in response to the inmate's screams that it was "music to his ears."

➤ A Captain used three applications of OC spray on a prone inmate subject to control of no less than three officers. The Captain reported the force was necessary because the inmate was "aggressively swinging at officers with closed

---

[20] This same Officer has been involved in no less than four other incidents in 2017 in which use of force violations were identified.
[21] The Captain had three other pending Command Disciplines during the same month.
[22] This same Captain had numerous other use of force violations in 2016-17.

fists." On video, the inmate was not observed aggressing with closed fists any time during the incident.

➢ An officer struck an inmate and then stepped on his head in the main clinic. A nurse attempted to intervene. In response, a Captain[23] screamed and cursed at the nurse.

- **Reasons for UOF**

Understanding the reasons that Staff use physical force with an inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. Not all uses of force are necessary, and every anticipated use of force incident has an inherent opportunity to consider whether force could have been avoided altogether if Staff had managed the situation differently. For example, it has been proven time and again in confinement settings that Staff who take time to employ non-force options by creating a safe and secure distance from the potential aggressor are involved in significantly fewer uses of force. As discussed in prior Monitor Reports, when a situation is poorly managed, the resulting force may be unnecessary, excessive, or even malicious.

Compared to the previous Monitoring Period, a larger proportion of the UOF were reported to be in response to violence (e.g., assaults on staff, fights, preventing the infliction of harm) during the current Monitoring Period (54% versus 46%). Similarly, a smaller proportion were as a result of inmate management issues (e.g., cell extractions, refusing orders, resisting escorts; 45% versus 51%). The Monitoring Team has found that Staff's performance often creates or contributes to the need to use force. In particular, the Monitoring Team has found that

---

[23] During 2017, this Captain was involved in no less than five incidents in which reviewers concluded the UOF was avoidable.

Staff fail to: (1) exhaust non-force options; (2) de-escalate the situation (e.g. displaying unprofessional conduct and a hyper-confrontational demeanor); (3) maintain distance during verbal exchanges with inmates; (4) recognize anticipated force situations and summon a supervisor; (5) address reasonable grievances (e.g. individual inmate issues, group inmate issues, medical problems, access to privileges); (6) respond proportionally and instead react to inmates' negative behavior/minimal resistance with aggressive force; and (7) adhere to basic security measures (e.g. failing to secure doors; allowing inmates in restricted areas, applying restraints improperly).

_Department's Assessment of Use of Force_

The Department has a number of forums to discuss areas of concern, strategize about solutions, and exchange best practices. During this Monitoring Period, the Department continued to conduct monthly Total Efficiency Accountability Management System ("TEAMS") meetings and weekly Operational Leadership meetings of the top uniform and civilian leadership. Under the Department's new leadership, the tenor of these meetings has noticeably shifted. The meetings discuss the Department's problems in a frank and concrete manner and they exchange ideas and potential solutions. For instance, in this Monitoring Period, leadership discussed, among other things: (1) how to utilize increased video surveillance to improve supervision of Captains and Officers; (2) strategies for how to manage Staff who are frequently engaged in force; (3) incentives for Staff for positive performance (e.g. employee recognition or providing certain perks like improved parking locations); and (4) incentives for Inmates who had achieved certain milestones (e.g. longer visit times, family days or celebrations for certain holidays). Facility leaders who are not meeting expectations are asked to explain their poor results. This

focus appears to have increased accountability and transparency and highlights that the Department is actively searching to identify solutions to the complex problems they face.

The Department has also continued to produce and analyze UOF data, via the work of the Bureau Chief of Security, UOF Auditor and the other divisions in the Department. Many of the concerns discussed in this section were also identified by the Department. During the Fifth Monitoring Period, the Chief of Department and Bureau Chief of Security identified eight security-related indicators (e.g. total number of use of force, total number of serious injuries to inmates, etc.) and developed targets for each Facility to pinpoint the expectation for reductions in each of these areas. Each Facility's efforts towards meeting their targets is discussed at the TEAMS and Operational Leadership meetings. So far, the results of this initiative are mixed. Some areas have improved, such as the general functioning of the medical clinic and overall sanitation, but the Department has yet to achieve a significant and sustained reduction in the use of force or violence.

While the use of concrete data to measure Facility performance is very encouraging, the potential for positive outcomes lies in the accurate *interpretation* of the data and the use of those interpretations to drive improved practices. The Department is encouraged to focus on interpreting its data and exploring how the data may assist in devising problem-solving strategies. This will also assist the Department in ultimately evaluating the effectiveness of those strategies in producing the intended outcomes.

Finally, the Department and the Monitoring Team have also maintained a strong, collaborative relationship focused on solving the problems discussed above. This has provided many opportunities for candid discussions about the concerning trends in use of force. In fact, in this Monitoring Period, the Department invited the Monitoring Team to discuss the findings in

the Fourth Monitor's Report with DOC Leadership and leadership from each Facility. It was a

collaborative and constructive discussion.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

In order for the Department to succeed in using force safely, proportionally, and only when necessary, it must be able to detect and respond to misconduct when it occurs. This means providing adequate supervision in the moment and critically reviewing UOF incidents after-the-fact. To date, the Department has not successfully and consistently applied either of these two strategies, which accounts in large part for its continued high UOF rate and frequent misuse of force.

The Commissioner and her Executive leadership team have demonstrated a commitment to reforming the agency and a strong command and understanding of the deeply troubling issues facing the Department. Although this leadership team was only put into place half way through this Monitoring Period, the Monitoring Team found this new leadership team immediately increased the focus on achieving compliance with the reforms enumerated in the Consent Decree and demonstrated the urgency that is necessary to address the underlying issues that must change. The momentum necessary to reform the agency and sustain those reform can be achieved if DOC Leadership, both at Headquarters and at the Facility-level, identify and acknowledge violations and then immediately address and respond to those violations. Unless and until Facility managers identify and act upon violations such as those set out above, and as a consequence, take ownership of their Facilities, all of the forward movement from many of the processes put in place as a result of the Consent Judgment will be undermined. For those managers who fail to take such ownership and fail to act in ways that exemplify ownership, executive staff must act to rehabilitate them or replace them with officials willing and capable of responsibly managing their subordinates in accordance with the Consent Judgment and sound correctional practice. Absent this, the Department will be unable to fully implement and enforce

all the provisions of the Use of Force Directive. Through vigilant enforcement, Staff should

develop skills to assess potentially dangerous situations, apply non-physical interventions, and

know when force is permissible and, equally important, when it is not. Both individual

accountability and a zero-tolerance message for unnecessary and excessive force are critical to

the culture change that will be central to the reforms envisioned by the Consent Judgment.

*Identifying Use of Force Misconduct*

The Department's mechanisms to identify and detect the misuse of force can be classified

into two primary categories: (1) initial assessments, which includes Rapid Reviews, Avoidables,

Preliminary Reviews and Immediate Action Committee review; and (2) investigations, including

ID and Facility Investigations. The Department's various mechanisms to identify misconduct are

introduced below:

| Avoidables | Rapid Review | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
|---|---|---|---|---|---|
| **WHEN** | | | | | |
| Within 48 hours of incident | Within 48 hours of incident | Committee Meets Bi-Weekly | 5 Business Days | 25 Business Days after referral from Preliminary Review | 180 Days after referral from Preliminary Review |
| **BY WHOM** | | | | | |
| Warden, DWIC, DW | Warden, DWIC, DW | ID, Legal, Trials, Chiefs, Training Leadership | ID Staff | Facility Investigating Captain | ID Investigators |
| **INCIDENTS REVIEWED** | | | | | |
| Actual use of force incidents with video available | Actual use of force incidents with video available | Incidents referred from variety of sources | All use of force incidents | Incidents that do not meet criteria for Full ID or PIC | Incidents that meet ¶ 8 criteria, or otherwise warrant Full ID Investigation |
| **INFORMATION REVIEWED FOR EACH INCIDENT** | | | | | |
| Video Only | Video Only | Video, and other available evidence if necessary | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, conduct MEO-16 interviews (if needed) |
| **FIFTH MONITORING PERIOD DATA** | | | | | |

| Avoidables | Rapid Review | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
|---|---|---|---|---|---|
| 417 (19%) of the 2,204 cases were avoidable | 559 (25%) of the 2,164 incidents identified issues with Staff conduct | Corrective action was imposed on 39 Staff involved in 33 incidents | 2,572 reviews conducted<br><br>1,319 referred for Facility Investigations<br><br>1,253 referred for ID investigations | 959 closed; corrective action was recommended in 22% of closed cases | 528 closed; Charges or PDRs were recommended in 19% of closed cases. |

These identification tools, if implemented properly, can turn the tide of abuse at the hands of Staff. Currently these tools are not consistently identifying misconduct even when objective evidence of the misuse of force exists. Without dependable outcomes for identifying the misuse of force, the Department's responses to misconduct, as outlined below, will be inherently incomplete.

*Initial Assessments of Use of Force*

The Department conducts an initial evaluation of use of force incidents through Rapid Reviews, Avoidables, Preliminary Reviews, the Immediate Action Committee, and ad hoc review by Agency officials. If misconduct or other faults in the use of force (e.g., procedural violations) are identified, it is addressed by either imposing immediate corrective action or through additional investigation.[24] Having both Headquarters and uniformed leadership reviewing incidents is critical to a robust disciplinary process. Collectively, the various tools form a solid foundation for identifying misconduct and initiating timely, proportional corrective action and discipline when warranted. These tools also provide an opportunity for the Department to impose contemporaneous corrective action, which is crucial for culture change.

---

[24] Depending on the severity or complexity of the violation, additional investigation may be required before corrective action can or should be imposed.

- **Rapid Reviews & Avoidables**

The Rapid Review and Avoidables processes facilitate ownership of use of force incidents by Facility leadership. Through the assessment of Rapid Reviews and Avoidables, Facility leadership may take immediate action with Staff to respond to misconduct identified including re-training, counseling, imposition of command discipline, or suspension.[25] Given the infrequency with which discipline is currently imposed across the Department, it is encouraging to see any process which gives rise to Staff accountability. While some quality outcomes were observed during this Monitoring Period, the processes must be applied consistently across the system. What follows are two examples of the type of flawed Rapid Reviews that must be eliminated in order for this process to become effective.

> ➢ An Assistant Deputy Warden ("ADW"), as a result of plainly hyper-confrontational behavior bordering on loss of supervisory control, precipitated a use of force in which he then used a prohibited chokehold that resulted in a neck injury to the inmate. The Rapid Review found the force used was within guidelines and no procedural errors were identified.[26]

> ➢ A Captain, with two prior use of force violations in 2016, is seen on video repeatedly taunting an inmate. When the Probe Team escorts the inmate away, the Captain follows the inmate and continues to taunt him. In response to the provocation, the inmate attempts to strike the Captain and the Probe Team quickly secures the inmate. After the inmate was secured, the Captain continues his

---

[25] Depending on the circumstances of the incident, the Facility may be instructed not to proceed with immediate administrative action in order to allow further investigation by ID and/or law enforcement.

[26] The investigating Captain of the Facility Investigation subsequently found no violation and the Tour Commander and Warden concurred with those findings. ID subsequently took over the investigation and the case was Fast-Tacked for discipline. NPAs were issued to the ADW involved in the incident and the Tour Commander who signed off on the initial investigation (the investigating Captain and Warden are no longer with the Department).

taunting. The Rapid Review found no violations.

The Department needs to increase the skill and perception of those conducting the Rapid Reviews and Avoidables processes, so these reviews become a reliable method for detecting misconduct. Most importantly, there must be an improvement in the reviewers' ability to identify misconduct when it occurs. This may in part come from experience as the process is implemented for a longer period of time, but the problem also requires accountability for Facility leaders who are unwilling or unable to properly serve in this role.

Further eliminating redundancy by merging the Rapid Reviews and Avoidables processes, which are currently conducted separately by Facility leadership, would promote efficiency. In addition, referrals for corrective action must be tracked more closely to demonstrate the integrity of the process and to ensure that if a recommendation for administrative action is made, that action is taken. At the end of the Monitoring Period, the Department reported that it is revising the Rapid Review and Avoidables processes to reduce redundancy and is developing a more systematic protocol to track the outcomes of these reviews.

- **Preliminary Reviews**

The Monitoring Team remains impressed by ID's ability to produce quality Preliminary Reviews of **all** use of force incidents within a few days of each incident. Most Preliminary Reviews are thorough, and the quality has continuously improved since the inception of the Consent Judgment. To the extent feasible, each Preliminary Review should benefit from and build off of findings of any prior reviews of an incident, such as Rapid Reviews and Avoidables. During this Monitoring Period, ID began reviewing the conclusions of the Rapid Reviews while conducting the Preliminary Review to identify situations in which the reviewers concurred and might therefore be able to resolve the case more quickly.

The Monitoring Team strongly recommends that the Department conduct a more holistic review of the Preliminary Reviews on a routine basis in order to identify: (1) potential patterns and trends occurring at a specific Facility or across the Department; (2) certain Staff who may merit heightened scrutiny; (3) certain incidents that may merit fast track for discipline. The Department reports it is considering how to operationalize this recommendation.

- **Immediate Action Committee**

The Department maintained the Immediate Action Committee, which meets bi-weekly, to determine whether any "immediate action" should be taken to correct identified problems in use of force incidents (that has not otherwise been addressed by the Rapid Review, Avoidables, or ad hoc review). The members of the Immediate Action Committee are a group of highly competent, reform-minded individuals who have identified incidents with misconduct. However, the 33 incidents for which the committee considered such action during this Monitoring Period is only a portion of the Staff misconduct that warranted some type of contemporaneous response. During this Monitoring Period, corrective action was imposed in 20 of those incidents, with 39 individual Staff Members. The types of corrective action are enumerated below. The immediate action taken sometimes included a combination of responses (e.g., modified duty and re-training) so the action totals are greater than the total number of Staff:

- o  9 Staff members were suspended;

- o  1 Staff member was placed on modified duty;

- o  7 Staff members were referred for re-training;

- o  24 Staff members were referred for counseling;

- o  5 command disciplines were imposed; and

- o  4 Staff members were re-assigned.

The data above does not include the immediate corrective responses taken by the Facility during Rapid Review and Avoidables because that information is not currently kept in a manner that can be aggregated. While this means additional immediate action was taken for some Staff than reported above, the Monitoring Team still strongly encourages the Immediate Action Committee to consider a broader range of cases, particularly those involving more serious misconduct where input from representatives from ID and Trials would be beneficial.

*Investigations*

Appropriate, logical, and thoughtful investigations are a critical tool for detecting the misuse of force and for ameliorating the conditions that gave rise to the Consent Judgment. Currently, the Department struggles with conducting timely investigations that result in reasonable outcomes as discussed in more detail in the Investigations section of this report (¶¶ 9 and 13). As described in prior Monitor Report's, ID has a significantly increased case load. While the Facilities remain responsible for conducting the investigations of certain use of force incidents, generally those cases where the force employed had a lower risk of causing harm.

ID has the potential to conduct quality investigations. For instance, a recently completed investigation with multiple staff, multiple issues, and multiple inmate witnesses, reflected a comprehensive gathering and analysis of evidence resulting in charges clearly supported by the investigation. But further work is needed to consistently produce quality and timely investigations by ID. The ongoing deficiencies regarding the quality of Facility investigations are far worse, including repeated examples of a complete disregard for objective evidence of wrongdoing that is ignored up the entire chain of command. Such a pattern makes a compelling

argument that once ID has an adequate number of investigators, the vast number of use of force incidents should be investigated by ID.[27]

The following two examples of deficient investigations (one ID and one Facility Investigation) are provided to illustrate a variety of issues that were pervasive in the investigations reviewed during the Fifth Monitoring Period. The Department must learn to manage these types of issues in a substantive and timely fashion in order to reduce the systemic problems that currently exist at virtually all Facilities operated by the Department.

> ➢ *Example: ID Investigation*

This investigation was closed in October 2017 and took a total of 14 months to complete, well beyond the 180-day deadline.[28] The incident occurred in August 2016 and was cited in the Third Monitor's Report (at pg. 13).[29] Despite video evidence showing that Staff used inappropriate force and committed other administrative violations, the investigation was closed without charges. The evidence reflected, among other things: (1) a prohibited chokehold applied in an attempt to take the inmate to the ground; (2) a prohibited hold of grabbing and pulling on the inmate's hair to take the inmate to the ground; (3) three separate applications of OC spray from a MK-9 canister, one of which was applied at a prohibited distance (less than six feet); (4) delayed medical attention to treat an eye injury; (5) failure of participating officers to file complete and accurate reports detailing their actions (one of the officers had previously been disciplined for the same violation).

The investigation failed to address the reporting violations, the prohibited chokehold, and

---

[27] A good demonstration of the dichotomy in the quality between ID and Facility investigations can be seen in the Monitoring Team's findings regarding a review of closed ID and Facility Investigations of alleged uses of force described in more detail in the Use of Force Reporting section of this report.

[28] The ID investigator completed the investigation in May 2017, almost nine months after the incident, and another five months passed before it was approved by one of the Deputy Directors of Investigations.

[29] This incident was included in that report to illustrate an event involving multiple forms of problematic force employed in a single incident.

the misuse of the OC. The ID Investigation was closed with a Facility Referral for the officer who pulled the inmate's hair. The Facility counseled her and referred her for further training based on the Facility Referral from ID. The ID Investigator justified the appropriateness of this outcome because the officer was forthcoming in their interview with the investigator. However, it must be noted, the officer denied the hair-pulling tactic until confronted with the video evidence.

> ➢ *Example: Facility Investigation*

This incident was simultaneously investigated by the Facility and ID due to a communication error between ID and the Facility. The incident is currently an open ID investigation.[30] The deficiencies described here stem from the closed Facility Investigation of the incident. The incident occurred in May 2017 and the investigation was completed in October 2017, four months after the 25-business day deadline.

This incident involved a Probe Team captain who used an MK-9 canister to repeatedly strike the inmate's head. The video also confirmed use of a prohibited hold and at least six applications of OC spray. There were also obvious reporting violations. The Facility Investigator and the Tour Commander concluded their investigative findings by stating that the force was consistent with, and well within, Department guidelines. Both the Facility Warden and Deputy Warden concurred with these findings. That the three top officials at the Facility, all of whom have been trained on the New Use of Force Directive, signed off on an incident with these facts would be very troublesome even if it were an isolated event. Unfortunately, it is not.

*Responses: Addressing Misconduct*

---

[30] The implementation of CMS will minimize this possibility of simultaneous investigations based on the way cases are managed within the system.

Once Staff's misuse of force is identified, the way in which the Department responds to it has great bearing on the extent to which the misconduct is likely to reoccur. The Department may respond to misconduct at the Facility-level and/or with Formal Discipline. Staff's behavior can be shaped effectively through a variety of mechanisms, not just via formal discipline. Therefore, the Monitoring Team has strongly encouraged the Department to utilize its entire spectrum of responses including coaching, counseling, and other forms of corrective action as they are all essential strategies for stimulating behavior change.  It is a core responsibility of Supervisors and Facility leadership to ensure appropriate responses are imposed.

The Monitoring Team continues to remind all stakeholders that the imposition of discipline requires significant balance and coordination to ensure the interest of completing speedy incident reviews and close-in-time corrective action does not undermine the ability to bring formal discipline and/or more punitive discipline, if merited, due to principles of double jeopardy.

- **Facility-Level Responses**
    - *Counseling, Corrective Interviews, and Re-Training*

The Monitoring Team supports the use of counseling, corrective interviews, and re-training when they are substantive and utilized appropriately. However, the Department often relies on re-training and corrective interviews instead of imposing discipline in cases where the evidence objectively supports it.[31] While re-training and corrective interviews are sometimes proportional to the severity of misconduct, certain Staff behaviors require a stronger response.

---

[31] The Department's current tracking processes defy aggregation in a reliable manner. While it is understandable some informal responses may not be tracked, improved tracking of most Facility-level responses is needed.

o   *Command Discipline*

The Monitoring Team has strongly encouraged the Department's use of Command Discipline to impose disciplinary action more swiftly, when appropriate, in order to bypass (or shorten) the lengthier process of formal discipline. The issuance of a Command Discipline is governed by a detailed policy, which, among other things, requires that they be issued and adjudicated within specified time frames that are much shorter than timeframes for formal discipline. This year, the Department improved its processes for tracking Command Discipline and further improvement is expected via the Case Management System ("CMS").

This Monitoring Period, the overall number of Command Disciplines related to UOF nearly doubled compared to the last Monitoring Period (427 in the Fifth Monitoring Period versus 224 in the Fourth Monitoring Period) and 60% more corrective actions were imposed (211 versus 132). Further, a greater proportion of cases received more serious consequences (e.g., loss of comp/vacation days; 69% versus 59%). Despite these improvements, 30% of the 427 Command Disciplines issued this Monitoring Period were dismissed. The Department's leadership found this unreasonable and is closely scrutinizing the Facilities' use and evaluation of Command Disciplines to improve adjudication rates and mitigate the possibility of dismissal.

| Adjudicated Command Disciplines | Fourth Monitoring Period | Fifth Monitoring Period |
|---|---|---|
| **UOF Related Command Disciplines Issued** | **224** | 427 |
| **Total Cases Corrective Action Imposed (Days, Corrective Interview, Verbal Reprimand, or MOC)** | **132 (59%)** | **211 (49%)** |
| *Loss of Comp/Vacation Days (including Guilty)* | *78 (59%)* | *146 (69%)* |
| *Referred to MOC* | *19 (14%)* | *11 (5%)* |
| *Corrective Interview* | *23 (17%)* | *35 (17%)* |
| *Verbal Reprimand* | *12 (9%)* | *19 (9%)* |
| **Dismissed** | **70 (31%)** | **127 (30%)** |

o   *Suspensions, Modified Duty, and Re-Assignment*

35

The Department has a number of administrative responses it may take in response to identified misconduct in a particular incident and/or an identified pattern of misconduct.  In this Monitoring Period, the Department recommended the suspension of at least 17 Staff Members through the Immediate Action Committee, and the Rapid Reviews and Avoidables process.[32] The Department may also modify the Staff Members duty or re-assign them. The Department utilized both of these options a number of times in this Monitoring Period, beyond those reported through the work of the Immediate Action Committee. However, these decisions are not currently maintained in a manner that is readily available for reporting. These administrative responses provide leadership with an important tool to address potential misconduct close in time to the incident.

- **Formal Discipline**

Formal Discipline for tenured Staff misconduct is handled by Trials & Litigation and the entire process is outlined in ***Appendix B: Flowchart of Disciplinary Process***.[33] Most cases are closed via a NPA. More specifically, 80% of the 498 use of force-related cases closed by Trials in 2017 were handled via NPAs.

| Trials Cases Closed in 2017 | | | | | |
|---|---|---|---|---|---|
| **Total** | **NPA** | **Administratively Filed** | **Deferred Prosecution** | **Adjudicated/ Guilty** | **Not Guilty** |
| **498** | 398 | 77 | 20 | 3 | 0 |
| | 80% | 15% | 4% | 1% | 0% |

The Monitoring Team has generally found that the discipline imposed via NPA is proportional to the misconduct. The table below demonstrates the range of compensatory days relinquished and other penalties accepted via NPA.[34]

---

[32] The Department may suspend Staff outside of these processes and the Monitoring Team has not evaluated that additional data.
[33] This does not include Staff who are on probationary status, which are handled via PDRs, explored below.
[34] In many cases, a term of probation is also imposed as part of the NPA.

| Executed NPAs in 2017 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total | Refer for Command Discipline | Retirement | 5-10 days | 11-20 days | 21-30 days | 31-40 days | 41-50 days | 51+ days |
| **397**[35] | 82 | 12 | 50 | 87 | 68 | 14 | 30 | 54 |
| | 21% | 3% | 13% | 22% | 17% | 4% | 8% | 14% |

The Trials Division has made significant progress during this Monitoring Period to impose discipline more quickly. That said, the process to impose formal discipline is lengthy. The Consent Judgment does not set a required time frame to impose formal discipline, but, there are timeframes for certain procedures within the process, including up to 6 months to complete the underlying investigation, and 30 days to serve charges. Accordingly, it can take over a year to impose formal discipline. In 2017, only 10 (2%) of the 498 cases closed with formal discipline were completed within six months of the incident. Conversely, 90% of cases resolved with formal discipline were completed over a year after the misconduct occurred. Given these procedures and time frames, the Monitoring Team continues to encourage the Department to utilize other forms of responses to misconduct, such as Command Discipline (when appropriate), to support the overall goal of swift discipline.

- **Personal Determination Review ("PDR")**

When a Staff Member on probation engages in misconduct, discipline is imposed through the PDR. The outcome of the PDR is decided by the First Deputy Commissioner. Through this process, corrective action may be imposed (e.g. re-training), the Staff Member's probationary period can be extended, or the Staff Member may be terminated. In 2017, 29 PDRs were decided related to UOF violations as outlined below.

---

[35] This analysis omits the data for one case closed by NPA in 2017 because certain data was unavailable.

| 2017 PDRs | | | | | | | |
|---|---|---|---|---|---|---|---|
| Outcome of PDR | Total | Probation Extended | Terminated | Resigned | Re-Training | Decision Pending | No Action Taken |
| Number of Staff | 29 | 19 (66%) | 3 (10%) | 2 (7%) | 1 (3%) | 3 (10%) | 1 (3%) |

*Conclusion & Next Steps*

While misconduct does not occur in every use of force incident, the Department's findings absolving Staff of misconduct are, in too many cases, inconsistent with the frequency of improper, unnecessary, and excessive uses of force identified by the Monitoring Team. As demonstrated above, the Department does not yet systematically identify misconduct. Uniformed Staff of all ranks and across divisions continue to struggle to develop a common understanding of when using force is appropriate and the proportionality that must be applied. This lack of common understanding has resulted in conflicting expectations for and confusion among Staff, as they are held accountable inconsistently. It is therefore crucial for the Department to have precise, detailed, internal agreement on the core principles guiding the appropriate use of force, and when force is used unnecessarily, excessively, or simply could be improved upon through better technique, the Department should deliver a timely response.

The Department has developed a number of initiatives to address and improve the deficiencies noted in this section. As described in the Use of Force Investigations and Accountability & Discipline section of this report, initiatives are underway to further improve the timeliness of investigations and the imposition of discipline, including "Fast-Track". Under Fast-Track, ID expedites the closure of ID investigations and coordinates with Trials to expedite the imposition of discipline. While the concept has merit, it has not been meaningfully implemented. The Monitoring Team intends to prioritize the Fast-Track initiative in the next Monitoring Period as the process has promise to address misconduct in an appropriate and timely manner.

38

Further, an important tool the Department is developing to add to the processes of both identifying and addressing misconduct is the EWS. The work of the EWS is a critical component to identifying and supporting Staff who are struggling with proper application of force. The goal of EWS is to serve as a tool to improve Staff conduct before it escalates to more serious misconduct. The Department has continued to make progress in developing and implementing EWS. The Monitoring Team encourages the Department to further integrate this process into practice. As discussed in more detail in the Risk Management section of this report, while the framework for EWS is now solidly in place, the Department must maintain sufficient resources to ensure it can manage and sustain its work.

# SECTION BY SECTION ANALYSIS

### 1.  USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. During this Monitoring Period, the new Use of Force Policy ("New Use of Force Directive," or "New Directive") went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017.[36] The New Directive is not based on new law, nor does it abandon core principles from its predecessor—the New Directive retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to Staff on the steps officers and their supervisors should take in response to threats to safety and security.

During this Monitoring Period, the Department, in consultation with the Monitoring Team, continued to develop and/or refine a number of standalone policies related to the use of force, including the use of restraints and Spit Masks.

The Monitoring Team's assessment of compliance is outlined below.

| IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
|---|
| ¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** <br> • The Department developed a new UOF Directive and it was approved by the Monitor. <br> • The New Use of Force Directive became effective on September 27, 2017. <br> **ANALYSIS OF COMPLIANCE** |

---

[36] The Department developed the new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, in the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

This Monitoring Period, the Department adopted the New Directive. Prior to adoption, the Monitoring Team and the Department conducted a final review of the New Directive to determine whether additional revisions were necessary to address issues that have been identified since it was initially drafted in October 2015. The New Directive was revised to include the use of soft-hand techniques and minor edits to ensure consistency with other policies. Prior to the effective date of the policy, the Department also completed in-service S.T.A.R.T. training, a complex and time-consuming task.

Implementation of the New Directive requires not only informing and training relevant Staff, but also consistently following and applying the policy. Therefore, properly implementing the New Use of Force Directive will require ongoing reinforcement of key concepts and clear demonstration that Staff's practices are consistently aligned with policy and the Consent Judgment. As described in the preceding sections, the frequency of excessive and unnecessary uses of force clearly indicates that proper implementation has not yet been achieved. In order for the Department to achieve compliance with implementing the New Use of Force Directive, it must demonstrate that Staff are using force safely, proportionally, and only when necessary. Following the close of the Monitoring Period, the Department developed a Use of Force Improvement Plan. As part of this initiative, the Department intends to deploy de-escalation teams and assign mentoring captains to each Facility, as well as review videos of use of force incidents weekly within the Facilities to provide a forum to discuss how to appropriately utilize force. The Department also selected two Facilities to pilot additional initiatives, including leveraging additional analysis from ID's assessment of Preliminary Reviews, and pro-active video monitoring of those Facilities. The Monitoring Team believes this plan is promising and will provide a more fulsome report on the plan and the impact of these initiatives in the next Monitor's Report.

| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance |
| | ¶ 1. **(Adopt)** Substantial Compliance |
| | ¶ 1. **(Implement)** Non-Compliance |
| | ¶ 1. **(Monitor Approval)** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The New Use of Force Directive became effective on September 27, 2017. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V

(Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including Spit Masks (finalized and issued during this Monitoring Period), the use of Restraints (revised and re-issued during this Monitoring Period), Chemical Agents, and the use of Electronic Immobilization Shields, Tasers, and Monadnock Expandable Batons.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment and is also aligned with best practice. This policy also provides Staff the necessary guidance and parameters to carry out their duties safely and responsibly. In this Monitoring Period, the Monitoring Team also worked with the Department to develop and refine two related standalone policies (Spit Masks and Restraints). The Monitoring Team collaborated with the Department to ensure that the policies included appropriate warnings, precautions, and procedures and were aligned with the requirements of the Consent Judgment.

| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-t).** Substantial Compliance |
|---|---|

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- During this Monitoring Period, the Department developed and executed a rollout campaign for the New Directive, which included:
  - **Developing Campaign Materials:**
    - A high-level team of uniform Leadership worked with the Office of Public Information (DCPI) and the Complex Litigation Unit ("CLU") to develop a media plan for the Department.
    - The team also developed a presentation for information sessions in each Facility, developed avenues for Staff to ask questions about the Directive (including a dedicated email address and Q & A boxes in each Facility), and developed physical and electronic posters to advise Staff about the New Directive.
  - **Holding Information Sessions:**
    - The Department held approximately 30 information sessions on different tours.

- ▪ Each session was led by members of the high-level uniform leadership team, the Facility's leadership, and representatives from both the Legal Division and Trials and Litigation Unit. The sessions included a presentation and an opportunity for staff to ask questions.
  - o **Distributing the New Directive:**
    - ▪ Paper copies of the New Directive were distributed to the Facilities.

ANALYSIS OF COMPLIANCE

The Department's rollout campaign of the New Use of Force Directive was well-executed. The Monitoring Team worked with the high-level leadership team to finalize the campaign materials described above and found the presentation materials to be thoughtful and engaging. The materials described critical components of the New Directive, emphasized key points, addressed frequently asked questions, and provided engaging use of force examples analyzed through the lens of the New Directive. The Monitoring Team observed numerous information sessions across the Facilities, and the material was well delivered, the message and information was consistent with the overall reform efforts of the Department, and Staff were engaged and asked thoughtful and reasonable questions.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## 2.  USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[37]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 & 23). Within the analysis of Staff Member Use of Force Reporting, the issues of availability of Staff use of force reports ("Staff Reports") and Use of Force allegations are addressed.

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims that Staff used force against an inmate and the force was not previously reported. An allegation does not always mean

---

[37] A discussion about the Department's efforts to develop CMS (¶ 18) is addressed in the Risk Management section of this Report.

that force was actually used; that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis, above.

The chart below presents the number of alleged uses of force reported per month in 2016 and 2017. Although there are some month-to-month variations, the average monthly number of allegations each year is approximately the same (39.3 versus 39.7).



Investigating alleged uses of force is critical to reducing the frequency with which actual uses of force may go unreported. The Monitoring Team has focused on allegations where there is objective evidence (i.e. video was available or there was relevant medical evidence) that may substantiate the report or not. In this Monitoring Period, the Monitoring Team reviewed 10 such closed allegation cases, five closed Facility Investigations and five closed Full ID Investigations and the results are described in the analysis of ¶ 8 below.[38]

*Assessment of Downgraded UOF Incidents*

The Monitoring Team continued to closely monitor the Department's reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). During this Monitoring

---

[38] All 10 of these allegations were reported in late 2016 or in 2017 and the investigations were closed in 2017.

Period, the Department downgraded one use of force incident to a logbook entry.[39] The

Monitoring Team strongly encourages the Department to err on the side of validating the Staff's

decision to report, which appears to be occurring given only one incident was downgraded.

 The Monitoring Team's assessment of compliance is outlined below.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF) |
|---|
| ¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.
- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

**ANALYSIS OF COMPLIANCE**

 The Monitoring Team assesses this requirement from three perspectives:

 First, in previous Monitoring Periods, the Monitoring Team assessed whether Staff followed the appropriate notification procedures (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)) and found that the relevant section of the forms was filled out fairly consistently. In subsequent Monitoring Periods, the Monitoring Team will conduct this assessment again.

 Second, the Monitoring Team assesses the frequency and legitimacy of allegations made by inmates to identify how often use of force incidents go unreported. The Monitoring Team examined inmate allegations made through various channels including those made to Department representatives, and those reported through outside agencies like the Legal Aid Society. The Department identified six cases in this Monitoring Period through Preliminary Reviews where video and other objective evidence strongly suggest that Staff deliberately failed to report a use of force incident. For example, a Captain used hands-on-force assisted by three officers and failed to report the incident to a Tour Commander. As of the end of the Monitoring Period, the Full ID Investigations are still pending.[40] Unreported uses of force continue to be an important focus of the Monitoring Team.

---

[39] The Monitoring Team reviewed the video and preliminary review for this incident and confirmed it was not a use of force incident.

[40] The four such cases which were identified in the Fourth Monitoring Period are still pending Full ID Investigations as well.

Third, the Monitoring Team will continue to closely scrutinize investigations of allegations to ensure that the Department timely and appropriately investigates and disciplines Staff who fail to report a use of force, the analysis of which is discussed further in regard to ¶ 8 below.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, 5, 6 & 7 (INDEPENDENT & COMPLETE STAFF REPORTS)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h), and ¶¶ 5, 6, and 7 above.

### ANALYSIS OF COMPLIANCE

The Monitoring Team assessed compliance with ¶¶ 2, 3, 5, 6 & 7 in prior Monitoring Periods (*see* Fourth Monitor's Report (at pgs. 51-52)). In this Monitoring Period, the Monitoring Team reviewed Staff Reports in connection with our assessment of Preliminary Reviews, ID, and Facility Investigations, and has not identified any marked difference in the Staff's practices with these provisions from prior Monitoring Periods. The Monitoring Team found that while Staff Reports overall provide information in all required fields, the quality of that information varies. While the Monitoring Team found some reports meet the requirements of these provisions, others: (1) utilize vague or generic language which does not always accurately or fully reflect the nature, extent, and duration of the force used to control or restrain an inmate; (2) are incomplete, and while they often describe the

conduct of the inmate, the reports often fail to describe Staff actions; (3) are not consistent with objective video evidence; (4) include false information, in direct contradiction to other evidence. In subsequent Monitoring Periods, the Monitoring Team will conduct a more systematic assessment of these provisions.

| **COMPLIANCE RATING** | **¶¶ 2, 3, 5, 6, and 7.** Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 4 & 8 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirement that any Staff Member who fails to notify a Supervisor, or fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to discipline or other corrective action (¶ 8).

**ANALYSIS OF COMPLIANCE**

¶¶ 4 and 8 are addressed together because, in combination, they require Staff to submit timely Staff Reports, and require the Department to take appropriate corrective action when Staff fail to do so.

*Timely Submission of Use of Force Reports* (¶ 4)

The availability of Staff Reports is of critical importance to understanding what occurred during a use of force incident. Further, the success of the initiatives to streamline and complete investigations more timely also depend on timely submission and accessibility of those reports. The Department's inability to collect Staff Reports in a systematic and consistent manner makes it difficult to demonstrate compliance with this provision and hampers the Department in relation to several other provisions that relate to procedures utilizing Staff Reports as their foundation.

As discussed in the Fourth Monitor's Report, the Department continues to require Facilities to utilize a series of folders on network shared drives for uploading Staff and Witness Reports, as well as other paperwork associated with Use of Force incidents. At the end of the current Monitoring Period,

the Nunez Compliance Unit ("NCU") began to audit the extent to which Staff Reports were being submitted within 24 hours of a reported use of force incident. The initial results demonstrated that the Facilities are still struggling to upload the necessary reports within the required time frame. Accordingly, the Department remains in Non-Compliance with this requirement. At the end of this Monitoring Period, CMS was implemented and the process for uploading reports changed. In order to support this transition, and address the overall lag time in uploading reports, the Department provided additional support to the Facilities. The Department provided additional training to Tour Commanders, cheat sheets of instructions on how to scan in reports, and deployed ID investigators to assist in uploading reports. The Monitoring Team will assess the extent to which this support has produced improved outcomes in the next Monitor's Report.

*Discipline or Other Corrective Action for Failure to Report Uses of Force* (¶ 8)

The Monitoring Team assessed the Department's efforts to impose formal discipline for Staff who failed to report use of force. 38% of MOCs received by Trials in 2017 included failure to report or false reporting charges (often in combination with other charges), which has been consistent year-over-year (42% of MOCs received in 2016 included failure to report or false reporting charges).

This Monitoring Period, the Monitoring Team reviewed the closed Facility and ID Investigations for a select sample of 10 UOF allegations as described above. Five cases were investigated by ID, and five were investigated by the Facility.

- **Investigations Division Cases**: All five cases found the specific inmate allegations to be unsubstantiated, but three of the cases identified uses of force that should have been reported that were not. The investigations were thorough, drew appropriate conclusions, and recommended appropriate charges based upon the investigations.
- **Facility Investigation Cases**: All five investigations determined that the allegations were unsubstantiated, and one of the five investigations determined that force was used but unreported. However, the Monitoring Team found that the conclusions in four of the five cases was not reasonable in light of the available evidence. The recommended discipline was only reasonable in one case. In the other four cases, more than one violation was not addressed, such as failure to report, filing an inaccurate report, failure to immediately address a security concern or other failures to perform the duties of the post.

| **COMPLIANCE RATING** | ¶ **4.** Non-Compliance |
| | ¶ **8.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses such requirements, and the "implement" component of this provision is assessed within the individual assessment of the specific provision in this Report.

*Changes to the Use of Force Report Form, #5006-A, Part A*

This Monitoring Period, the Department revised the Use of Force Report Form, #5006-A, Part A, and Witness Report Form in consultation with the Monitoring Team, to facilitate consistent and accurate reporting and ensure all reporting requirements enumerated in the New Use of Force Directive are captured. The changes included new fields to identify: whether the use of force was anticipated; the name of any Staff Member who authorized and/or supervised the incident (if applicable); any non-uniform staff who participated in, witnessed, or whom the writer observed present at the incident and their actions; and the approximate time the inmate was transported to receive medical care and the name of the clinician or medical professional who provided care, to the extent known (for reports prepared by Captains/Staff Members responsible for escorting the inmate to the clinic).

The revised Use of Force Report and Use of Force Witness Report Forms were incorporated into the New Directive that became effective on September 27, 2017.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
|---|---|

---

**V. USE OF FORCE REPORTING AND TRACKING ¶ 10 (NON-DOC STAFF REPORTING)**

¶ 10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident that results in an apparent injury report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents that result in apparent injuries, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) issued a use of force reporting policy to address ¶¶ 10, 11, and 12 of this Section.
  - At the end of this Monitoring Period, H+H revised its reporting policy to advise staff of their obligation to report a use of force incident regardless of whether there is an

"apparent injury" and sent periodic reminders to medical staff to remind them of this obligation.

- H+H's electronic medical record system requires any H+H staff that signs into the system to read and acknowledge a statement regarding their reporting obligations in order to gain access the system.[41]  Staff must acknowledge this statement every time they sign into the system and access to the system is denied if the acknowledgement is denied.

- H+H provides "Dual Loyalty" training to all H+H staff that addresses the reporting requirements in the Consent Judgment.

- This Monitoring Period, H+H initiated a dedicated email address for their staff to report use of force issues.

**ANALYSIS OF COMPLIANCE**

¶ 10 of this section of the Consent Judgment requires the City of New York to take steps to ensure that non-DOC staff report witnessing of use of force incidents. As an initial matter, the City has not yet demonstrated that it has communicated this requirement to non-DOC staff or enforced such requirement to ensure that these reports are provided to DOC as required.

Medical staff (H+H) are a critical group that are required to report. H+H has taken steps within the agency to communicate this requirement to their staff. H+H continues to provide training to all H+H staff on their reporting obligations under *Nunez*, and the leadership at H+H have reinforced these reporting obligations through written policy addressing the reporting obligations, a mandatory acknowledgment of reporting obligations in the electronic medical record system and advertising the reporting channels on the homepage of health staff's computers. H+H reported that the obligation to report a use of force "that result[s] in apparent injuries" also created confusion about when to report. Towards the end of the Monitoring Period, in response to these concerns, and to encourage reporting, H+H clarified the obligation to report and expanded the requirement to cover reporting of any use of force incident witnessed.

The steps taken by H+H are significant; however, they simply have not had the desired effect— health staff very rarely report use of force incidents or complete witness reports. H+H reported receiving only four reports from their staff this Monitoring Period, compared with the over 100 use of force incidents that the Department reported occurred in clinic areas or other areas where medical treatment is provided. While it is difficult to assess the precise number of health staff reports expected depending on who may have been present at each incident, the complete dearth of such reports clearly demonstrates that health staff are very rarely reporting use of force they witness. Health staff reporting is a critical component to having the full picture of use of force incidents—particularly because there is

---

[41] H+H reports in the next Monitoring Period that this statement will be updated to reflect the broader requirement for H+H staff to report any Use of Force Incident that they witness regardless of whether it results in an apparent injury.

limited camera coverage in many areas where health staff are typically present. The Monitoring Team is working with H+H to develop stronger reporting channels and ways to induce reporting. The limited reports by H+H staff signifies that greater steps must be taken to ensure staff comply with their reporting obligations going forward.

Given the City's failure to demonstrate compliance, and the failure of H+H to demonstrate that medical staff are consistently and routinely reporting use of force, the City is in Non-Compliance with this provision.

| COMPLIANCE RATING | ¶ 10. Non-Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to use of force incidents in a computerized system called Incident Reporting System ("IRS") which captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields. The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

### ANALYSIS OF COMPLIANCE

The Monitoring Team previously confirmed that the majority of incident data is tracked accurately and reliably.[42] With the implementation of CMS, the data tracked in IRS will now feed into CMS but will still be entered and maintained in IRS. The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. The Monitoring Team will periodically re-verify that the Department continues to track the information as required in a dedicated audit but may not do so every Monitoring Period going forward as the deviations noted to date were minor, and no change in tracking procedure occurred that would warrant a re-assessment.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended

---

[42] *See* Second Monitor's Report (at pg. 39); Third Monitor's Report (at pg. 61).

Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continued to manually track Facility Investigations in an Excel worksheet. The Excel workbook tracks the information in ¶ 15(a)-(f).

- The Department separately tracks any use of force incident that was referred to, via ID, or taken over by the Department of Investigations ("DOI") for further investigation and the date of such referrals as required in ¶ 15 (g).[43]

- The information in ¶ 15(a)-(f) is now tracked in CMS, which went live in December 2017.

**ANALYSIS OF COMPLIANCE**

The database the Department currently uses to track information related to Facility Investigations was developed as an interim measure until CMS was complete. This Monitoring Period, the Department continued to use the interim tracking system as CMS only went live at the end of this Monitoring Period.

As reported in the Fourth Monitor's Report (at pg. 59), the Department will achieve Substantial Compliance with this provision once it is able to demonstrate that information can be generated accurately and consistently over a period of time either in the interim system and/or CMS. As CMS only became live at the end of this Monitoring Period, the Monitoring Team will re-assess compliance with Facility Tracking within CMS during the Sixth Monitoring Period.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As discussed in the First Monitor's Report (at pgs. 34-35), the Department tracks information related to Full ID Investigations using a computerized tracking system called "ITTS", which has specific fields to capture the information required in ¶ 16(a)-(g).

---

[43] This will also now be tracked in CMS.

- The information in ¶ 16(a)-(g) is tracked in CMS which went live in December 2017.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to utilize reports generated from ITTS to conduct various analyses and assessments. The Department continues to produce reports to the Monitoring Team on a monthly basis as described in the Third Monitor's Report (at pg. 63). While the information in the system is accurate, the information in the reports is often delayed because it is manually inputted. When the Department is able to demonstrate that information can be generated accurately and consistently over a period of time they will achieve Substantial Compliance. As CMS only became live at the end of this Monitoring Period, the Monitoring Team will assess compliance with ID Tracking within CMS during the Sixth Monitoring Period.

| COMPLIANCE RATING | ¶ 16. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Trials Division continues to utilize an Excel workbook to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The information in ¶ 17(a) to (c) is tracked in CMS, which went live in December 2017.

**ANALYSIS OF COMPLIANCE**

The Trials division has maintained the required data in an Excel workbook all through 2017. The Monitoring Team frequently utilizes the information maintained in the tracker and has found it is accurate and easy to digest. It is clear the Trials division also utilizes this tracking system to actively manage its cases. The Department is in Substantial Compliance with this requirement as it has demonstrated that this information is consistently tracked in a reliable, accurate, and computerized manner.

| COMPLIANCE RATING | ¶ 17. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to inmate-on-inmate fights in the inmate "Fight Tracker," a computerized system that includes names and booking numbers of the inmates involved; date, time, and location of the fight or assault; and the nature of any injuries sustained by inmates.

- An inmate-on-inmate fight or assault that results in a use of force is reported in IRS (as well as the Fight Tracker) and is also tracked as part of the use of force investigation and includes the required information.

- An inmate-on-inmate fight or assault that involves a slashing or revealed a dangerous article is reported in IRS (as well as the Fight Tracker) and tracks all required information.

### ANALYSIS OF COMPLIANCE

The Department's Fight Tracker includes most of the information listed while other databases (IRS and use of force investigations) include a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence.

| COMPLIANCE RATING | ¶ 19. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[44] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As reported in the First Monitor's Report (at pg. 35), the Department drafted definitions for the various categories of institutional violence, including all security indicators related to violence, focusing on clarity and the ability to collect and report reliable and accurate data.

---

[44] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

o   As required, the Department consulted with the Monitoring Team about the draft definitions, incorporating the Monitoring Team's comments and suggestions prior to finalizing the definitions.

**ANALYSIS OF COMPLIANCE**

The Department maintains appropriate definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department remains in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | **¶ 21.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 (PROMPT MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports that its policy is for inmates with immediate medical needs to be treated immediately and that those with non-serious injuries should be seen by medical staff within four hours of an incident.

- The Department is working with H+H to determine ways to provide medical treatment more quickly, including two pilot programs described in detail below.

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident and must track its delivery. Ensuring the Department meets this obligation is a top priority for the Monitoring Team. The Monitoring Team continues to closely monitor the timeliness of medical treatment to inmates both through on-site observations and in the medical documentation contained in Use of Force investigation packets.

The Monitoring Team systematically reviewed the Injury-to-Inmate Reports contained in Preliminary Reviews packets produced this Monitoring Period. The Monitoring Team reviewed 70 Injury-to-Inmate Reports from 50 Preliminary Review files for incidents that occurred between July and November 2017. The table below presents the findings:

| Source of Injury-to-Inmate Report | Treatment Time *Unknown or Illegible* | Treatment Provided in *< 2 hours* | Treatment Provided *btw. 2 & 4 hours* | Treatment Provided *btw. 4 & 6 hours* | Treatment provided *> 6 hours* | Total |
|---|---|---|---|---|---|---|
| *Preliminary Review Files July 2017- November 2017 Incidents* | 2 (3%) | 14 (20%) | 32 (46%) | 13 (19%) | 9 (13%) | **70** |

The time to provide medical treatment improved in this Monitoring Period compared with the last Monitoring Period (69% of treatment provided within four hours compared with 54% in the last Monitoring Period). Further, the amount of treatment provided beyond six hours decreased from 23% of incidents to 13% of incidents. That said, inmates are still waiting too long to receive medical treatment. While the Department has shown some improvement from this sample, the Monitoring Team still believes the Department must provide medical care more expeditiously in order to meet the requirements of this provision.

*Satellite Intake*

The Department's Satellite Intake is, among other things, intended to reduce medical wait time for inmates. In some situations, inmates need to be seen by the clinic, but cannot be taken there directly (e.g., space concerns, the other person involved is also in the clinic). In these cases, an inmate may be taken to Satellite Intake to await escort to the clinic. Using Satellite Intake in this way is intended to reduce the burden on the Main Intake and also help to expedite the delivery of medical care, given the narrower focus and less chaotic atmosphere of Satellite Intakes. Satellite Intakes operated in five Facilities throughout the Fifth Monitoring Period (AMKC, GMDC, GRVC, MDC, and RNDC).

*Medical Triage Pilot Program*

A Housing Area in GRVC was designated to serve as a medical triage location. The Medical Triage location was only activated twice during the Monitoring Period. Given its limited use and some operational challenges, the Department is re-evaluating the utility of this pilot, and will work with the Monitoring Team in the Sixth Monitoring Period to determine whether it should be continued.

| COMPLIANCE RATING | ¶ 22. Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 23 (TRACKING OF MEDICAL TREATMENT)

¶ 23. DOC shall record in the Department's Inmate Information System the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Currently, the Department's Inmate Information System ("IIS") tracks the time when inmates arrive at the medical clinic, the time they were produced to a clinician, and the time treatment was completed, but does not track the requirement to identify Staff Members who were in the area to receive post-incident evaluation or treatment. IIS does not track the time of the use of force incident in relation to the medical treatment time.

- The Department developed a new initiative using electronic wristbands to track an inmate's Intake arrival time, Clinic arrival time, and clinic out time.

56

**ANALYSIS OF COMPLIANCE**

As described in prior Monitor Reports, the Monitoring Team reviewed IIS screen shots showing when inmates arrive at the clinic, the time they were produced to a clinician, and the time treatment was completed. However, IIS lacks the critical component of the related incident time to be able to track an inmate's medical wait time in relation to an involved use of force incident. The Department has undertaken a pilot to capture both Intake and Clinic wait times.

*Intake Improvement Pilot Program*

This Monitoring Period the Department developed a computerized tracking system that allows Staff to track when inmates arrive at intake, that they need to be seen by medical, and the time they were transferred to the clinic. In the Fifth Monitoring Period, the tracking pilot was operationalized at RNDC, but recorded only a minimal amount of medical wait time data due to some common pitfalls with Staff use of the system.

The Department is working to solidify the procedures at RNDC through roll call trainings and a Command Level Order with additional instructions. The Department is also simultaneously expanding the tracking technology to other Facilities, with the goal of using the solidified procedures and data from RNDC to inform the use of this tracking capability at other Facilities moving forward. The Monitoring Team intends to assess compliance with this provision in the next Monitoring Period.

| **COMPLIANCE RATING** | **¶ 23.** Not Yet Rated |
|---|---|

### 3.   TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)). As outlined in the chart below, all initial lesson plans required by the Consent Judgment have been finalized and approved by the Monitoring Team,

and the Monitoring Team is working with the Department to develop refresher training curricula where required.

During the Fifth Monitoring Period, the Department continued its effort to train its large workforce as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff (e.g., Prison Rape Elimination Act ("PREA"), Chemical Agents, etc.) and training an unprecedented number of recruits.[45] The Monitoring Team also observed and provided feedback about the delivery to further enhance certain curricula. The Monitoring Team observed In-Service Probe Team Training, In-Service Cell Extraction Training, and Recruit Chemical Agents Training during this Monitoring Period.

*Deployment of Training*

As described in prior Monitor's Reports, significant operational, scheduling, and space resources are required to sustain this training effort. The Department continues to utilize the Training Academy in Middle Village, and training space at John Jay College of Criminal Justice and on Rikers Island in order to meet these extensive training needs (described in detail in the Third Monitor's Report (at pg. 72)).

*S.T.A.R.T. Progress and Initiation of Advanced Correctional Techniques ("A.C.T")*

During this Monitoring Period, the Department completed the herculean task of training all Staff in the S.T.A.R.T. bundle—one full day on the New Use of Force Directive and three full days of revamped Defensive Tactics Training, for a combined four-day bundle. The Department has trained over 10,000 Staff in S.T.A.R.T. since the Effective Date, including In-Service Staff, Recruits, Senior Management and uniformed Staff who are ID Investigators.

---

[45] Since November 1, 2015, the Department has trained and graduated 3,965 recruits. In January 2018, the Department matriculated another 832 officers. It is worth noting that the Pre-Service training provided by the Department has increased from 16 weeks to 24 weeks to accommodate for *Nunez*-required and other new training programs offered.

With the completion of S.T.A.R.T. training, the Department is initiating the next phase: Advanced Correctional Techniques ("A.C.T."), comprised of three days of Crisis Intervention and Conflict Resolution Training and one day of Use of Force Policy and Defensive Tactics refresher trainings (which are each a half day). The Crisis Intervention and Conflict Resolution training curriculum was approved by the Monitoring Team during the First Monitoring Period and has been provided during Recruit Training since then. As of the end of the Fifth Monitoring Period, the lesson plans for the Use of Force Policy and Defensive Tactics Refresher trainings are being finalized with the Monitoring Team to ensure they incorporate relevant content and target identified operational deficiencies by providing specific guidance on certain concepts and techniques.

A.C.T. deployment will begin in the Sixth Monitoring Period and is expected to be completed in May 2019. This time frame, approximately 16 months, is similar to the time required to deploy S.T.A.R.T. to all Staff. Given the similar considerations to the deployment of S.T.A.R.T.—the number of Staff who require the training (approximately 10,000 uniformed Staff), the number of days for the training, the logistics for providing such training (and the need to cover those posts while Staff receive the training), as well ensuring other required training is provided—16 months is a reasonable time frame.

*Additional Trainings*

- ***Leadership Training***

The Department has demonstrated a commitment to not only provide its uniform Staff with critical training through S.T.A.R.T. and A.C.T., but to also invest in their leadership and management—both uniform and non-uniform—by providing a number of leadership-oriented trainings. During this Monitoring Period, the Department provided: (1) seven days of Staffing

Analysis training to a select group of Captains, Deputy Wardens, Wardens, and Assistant Commissioners; (2) multiple days of specialized leadership training to Executive Staff including the Commissioner, Senior Leadership, Chiefs, and Deputy Commissioners; and (3) a one-day Critical Thinking Training to hundreds of uniformed Staff as well as other individuals throughout different levels of leadership.

- ***Chemical Agent Training***

During the previous Monitoring Period, in consultation with the Monitoring Team, the Department began to revise its chemical agent training lesson plan for Recruits and Supervisors, the refresher course for In-Service Staff, and the MK-9 lesson plan to reflect the new Chemical Agents Directive which became effective in March 2017. During the current Monitoring Period, the Department finalized the Recruit and MK-9 lesson plans and incorporated the Monitoring Team's feedback on the In-Service Refresher and Supervisor lesson plans.

- ***Monadnock Expandable Baton ("MEB") Training***

In connection with implementing the MEB Directive, the Department developed a training course. The Monitoring Team and Department continue to work together on assessing the best use of the MEB and ensuring the lesson plan reflects those practices.

- ***Body-Worn Camera Training***

The Department provided Body-Worn Camera training to those participating in the Body-Worn Camera Pilot, as discussed in more detail in the Video Surveillance section of this report.

*Status of Training Program Development and Deployment*

The charts below describe the status of each required training program.

| | Training Provided during Fifth Monitoring Period | | | | | Total Training Provided Nov.2015 – Dec. 2017 | |
|---|---|---|---|---|---|---|---|
| | Recruit Class November 2017 | Pre-Promotional Captains[46] | Pre-Promotional ADWs | In-Service | Refresher | Initial Training | Refresher |
| Use of Force Policy (¶ 1(a)) | 1,144 | 101 | 4 | 1,172 | N/A | **10,646** | **N/A** |
| Crisis Intervention and Conflict Resolution (¶ 1(b)) | 1,144 | 100 | 4 | N/A | N/A | **4,269** | **N/A** |
| Defensive Tactics (¶ 2(a)) | 1,144 | 97 | 4 | 1,172 | N/A | **10,631** | **N/A** |
| Young Inmate Management ("SCM") (¶3) | 1,144 | 101 | 3 | 202 | 314 | **6,499** | **1,292** |
| Direct Supervision (¶4) | 1,144 | 99 | 4 | 139 | N/A | **3,627** | **N/A** |
| Probe Team ("Facility Emergency Response Training") (¶ 1(c)) | 1,144 | 101 | 4 | 75 | N/A | **3,147** | **N/A** |
| Cell Extraction (¶ 2(b)) | 1,144 | 98 | 4 | 67 | N/A | **3,635** | **N/A** |
| Investigator (¶ 2(c)) | All 31 Investigators hired in this Monitoring Period received training | | | | | **96[47]** | **N/A** |

---

[46] A small number of Pre-Promotion Captains missed various courses throughout their pre-promotional training due to sick leave, scheduled vacations and other excused absences. The Department reported it is working to ensure that any of the newly promoted Captains that missed a training course make them up.

[47] This does not include those trained in the First Monitoring Period as the Monitoring Team had not begun verifying the number of investigator's training until the Second Monitoring Period.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | Curriculum finalized and approved by Monitoring Team. 12-hour[48] Training provided in mandatory Pre-Service training | Curriculum finalized and approved by Monitoring Team. 8-hour training provided with S.T.A.R.T. and _completed_ in September 2017. | Curriculum under development. 4-hour refresher to commence as part of A.C.T. |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | Curriculum finalized and approved by Monitoring Team. 24-hour Training provided in mandatory Pre-Service training | Curriculum finalized and approved by Monitoring Team. 24-hour training provided in Pre-Promotional Training; In-Service training to commence as part of A.C.T. | 8-hour refresher will commence after completion of A.C.T. |
| **Defensive Tactics (¶ 2(a))** | | Curriculum finalized and Monitoring Team consulted. 24-hour training provided in mandatory Pre-Service training | Curriculum finalized and Monitoring Team consulted. 24-hour training provided with S.T.A.R.T. and _completed_ in September 2017. [49] | Curriculum under development. 4-hour refresher to commence as part of A.C.T. |
| **Young Inmate Management ("SCM") (¶3)** | Staff assigned to work regularly[50] in Young Inmate Housing Areas | 24-hour training provided in mandatory Pre-Service training[51] | 24-hour training to be provided to any Staff newly assigned to RNDC, GMDC, and Staff regularly assigned to work in Young Inmate Housing areas _outside_ of RNDC and GMDC. | Curriculum finalized and Monitoring Team consulted. 8-hour training began in Fourth Monitoring Period. |
| **Direct Supervision (¶4)** | | Curriculum finalized and Monitoring Team consulted. | Curriculum finalized and Monitoring Team consulted. 32-hour training began May 2017 and continues to be deployed to all Staff assigned to RNDC, GMDC, and Staff | Will develop and commence after the completion of initial In-Service training |

[48] Only eight hours of training is required by the Consent Judgment.

[49] Although not required by the Consent Judgment, the Department on its own initiative chose to develop and provide a three-day Defensive Tactics Training to all In-Service Staff.

[50] The Department and the Monitoring Team continue to define Staff "regularly assigned" as described in the Third Monitor's Report (at pgs. 90-91) for the provision of both SCM and Direct Supervision.

[51] The Consent Judgment does not require the development of an In-Service SCM training program because it was already in place prior to the Effective Date of the Consent Judgment. Although not required by the Consent Judgment, the Department has included SCM training in its mandatory Pre-Service training.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| | | 32-hour training provided in mandatory Pre-Service training [52] | regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. | |
| Probe Team ("Facility Emergency Response Training") (¶ 1(c)) | Staff assigned to work regularly at any Intake Post | Curriculum finalized and approved by Monitoring Team. 8-hour training provided in mandatory Pre-Service training.[53] | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in Pre-Promotional Training and training to Staff with awarded steady posts in Intake began in Fifth Monitoring Period. | n/a |
| Cell Extraction (¶ 2(b)) | Staff regularly assigned to Special Units with cell housing | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in mandatory Pre-Service training.[54] | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in Pre-Promotional Training and training to Staff with awarded steady posts in Intake began in Fifth Monitoring Period. | n/a |
| Investigator (¶ 2(c)) | ID Investigators | n/a | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | n/a |
| | Facility Investigators | n/a | TBD[55] | n/a |
| Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e)) | TBD[56] | Lesson Plan finalized. 3-hour training provided in mandatory Pre-Service training beginning with the class that matriculated in June 2017. | Curriculum finalized and Monitoring Team consulted. Plan for deployment of training to be developed in Sixth Monitoring Period. | n/a |

---

[52] Although not required by the Consent Judgment, the Department provides all recruits with Direct Supervision Training.

[53] The Consent Judgment only requires 2-hours of training.

[54] The Consent Judgment only requires 4-hours of training.

[55] *See* "Investigator Training" box below for the status of providing Facility Investigator Training to all Captains as required.

[56] The Department, in consultation with the Monitoring Team, intend to discuss how to identify trained operators of handheld video cameras at each Facility for each tour and at ESU in the next Monitoring Period.

The Monitoring Team's compliance assessment is outlined below.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)

¶1. Within 120 days[57] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy [and provided in the timeframe outlined in 1. And 2.]

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.

### ANALYSIS OF COMPLIANCE

      The Department has achieved Substantial Compliance with ¶ 1(a) and ¶ 1(a)(i) by providing Use of Force policy training to recruits as part of the mandatory Pre-Service training and providing the training to all Staff as part of S.T.A.R.T. As described above, the refresher training is in development and expected to be finalized and deployed during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 1(a). Substantial Compliance<br>¶ 1(a)(i). Substantial Compliance<br>¶ 1(a)(i)(1) & (2). Substantial Compliance<br>¶ 1(a)(ii). Requirement has not come due |
| --- | --- |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶1. Within 120 days[58] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

---

[57] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[58] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

| | |
|---|---|
| i. | The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy. |
| ii. | The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training within 26 months of the Effective Date. |
| iii. | The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

**ANALYSIS OF COMPLIANCE**

The Department continues to meet the expectations of Consent Judgment ¶ 1(b)(i) by providing Crisis Intervention and Conflict Resolution training to all recruit classes. As discussed above, the In-Service training will be part of A.C.T. and will occur at the beginning of the Sixth Monitoring Period. The expected completion date is May 2019.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance |
| | **¶ 1(b)(i).** Substantial Compliance |
| | **¶ 1(b)(ii).** Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due. |
| | **¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶1. Within 120 days[59] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

c.   <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[60] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

---

[59] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[60] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

**ANALYSIS OF COMPLIANCE**

*Deployment of Training*

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan requirement of the Consent Judgment. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. During this Monitoring Period, the Department began providing the Facility Emergency Response Training to all Staff with awarded steady posts in Intake, with a deadline to train all such Staff by December 31, 2017. The Department initially identified 94 people with steady posts in Intake who required the Probe Team Training this Monitoring Period. The Department trained a total of 75 Staff this Monitoring Period, but this was not a direct subset of the 94 Staff initially identified as having steady posts in Intake. The Department reported that upon calling out the Staff who were originally identified for this training, the Facilities determined that many of the Staff Members who held the awarded posts were either on terminal leave, transferred, or simply no longer worked in the area although they officially held the post. As such, the Facilities sent Staff for the training whom they identified as those who regularly work in the designated areas.

During the Sixth Monitoring Period it is expected that more Staff will be identified to receive Probe Team training, as the Department focuses on steadying more posts in each Facility and additional staff are regularly assigned to work in Intake.

*Observation*

The Monitoring Team observed the In-Service Facility Emergency Response this Monitoring Period. The training included a thoughtful lecture component, followed by videotaped scenario-based physical training, concluding with a debriefing of the videos. The Monitoring Team found that this training provided trainees with an opportunity to obtain hands on training and also provide an opportunity for instructors to critique practical application of the team formation and other tactics covered in the materials.

| COMPLIANCE RATING | ¶ 1(c). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[61] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.   Defensive Tactics Training: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

---

[61] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

| | |
|---|---|
| i. | The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy. |
| ii. | The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

**ANALYSIS OF COMPLIANCE**

The Department has achieved Substantial Compliance by incorporating and deploying Defensive Tactics training as part of the mandatory Pre-Service training for recruits. Although not required by the Consent Judgment, the Department provided the three-day Defensive Tactics Training course to all Staff as part of S.T.A.R.T. The Monitoring Team continues to applaud the Department's commitment to provide this training program to all Staff. As described above, the Department is finalizing the curriculum for the Defensive Tactics refresher training as part of A.C.T.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2(a)(i).** Substantial Compliance |
| | **¶ 2(a)(i).** Substantial Compliance |
| | **¶ 2(a)(ii).** Partial Compliance |

## XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[62] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.    <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[63] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

**ANALYSIS OF COMPLIANCE**

*Deployment of Training*

The Cell Extraction Team training is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. During this Monitoring Period, the Department began providing the Cell Extraction Training to all Staff with awarded steady posts in special units with celled housing. The Department initially identified 79 people with steady posts in Special Units with celled housing who require Cell Extraction Team Training in this Monitoring Period. The Department

---

[62] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[63] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

trained at total of 67 Staff this Monitoring Period, but this was not a direct subset of the 79 Staff initially identified for the same reasons described in the Probe Team Training box above.

During the Sixth Monitoring Period it is expected that more Staff will be identified to receive Cell Extraction Team training, as the Department focuses on steadying more posts in each Facility and additional staff are regularly assigned to Special Units with celled housing.

*Observation*

The Monitoring Team observed the Cell Extraction Training as provided to a group of In-Service Staff with awarded steady posts in special units with celled housing. The training included a lecture component, followed by physical training with Emergency Services Unit ("ESU") Officers playing the role of inmates in a variety of different scenarios to enable Staff to practice different types of cell extraction responses. Overall, the Monitoring Team found that the training was effective and comprehensive.

| COMPLIANCE RATING | ¶ 2(b). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[64] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

       ii.    The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.
- All new-hires must complete ID's 40-hour training before they may be assigned any cases to investigate.
- During this Monitoring Period, ID sent several staff members to a course with the New York State Department of Corrections and Community Supervision's Office of Special Investigations

---

[64] This date includes extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

in its ongoing effort to further develop the skills of investigators and effectively enhance the quality of ID investigations.

- All uniformed Staff Investigators received S.T.A.R.T. training. The Department is also developing a plan to provide this training to its civilian ID Investigators.

**ANALYSIS OF COMPLIANCE**

The Department's ID Investigator lesson plan continues to meet the requirements of this provision and it is provided to staff as required. Given the concerns identified with the quality of ID investigations, the Monitoring Team continues to encourage the Department to utilize training as appropriate to support Staff in developing their investigative skills.

*Facility Investigator Training* (¶ 2(c)(ii))

At the end of the Fifth Monitoring Period, the Department began implementing CMS and drafted a revised Facility Investigations Policy (as discussed in more detail in the Use of Force Investigations section of the Monitor's Report, in the analysis of ¶ 13). The Monitoring Team has recommended that developing the Facility Investigator Training be held in abeyance until the end of the Sixth Monitoring Period to allow the Department and Monitoring Team the opportunity to determine the impact of the revised policy and implementation of CMS on Facility Investigations. The Department has been training the necessary Staff (including all Captains) on CMS since November 2017.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2(c)(i).** Substantial Compliance<br>**¶ 2(c)(ii).** Not Yet Rated |

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate

> Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.
- The Department has chosen to provide Safe Crisis Management ("SCM") Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates are housed. As of the end of the Fifth Monitoring Period, 92% of Staff assigned to RNDC and 96% of Staff assigned to GMDC had received SCM Training.[65]

| Facility | Total Staff Assigned to Facility as of December 31, 2017 | Staff Trained in SCM as of December 31, 2017 | Received Pre-Service SCM Training | Received In-Service or Pre-Promotional SCM Training |
|---|---|---|---|---|
| **RNDC** | 885 | 812 (92%) | 359 | 453[66] |
| **GMDC** | 911 | 875 (96%) | 479 | 396[67] |

- The Department also must provide the training to Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. As outlined in the chart below, 16-, 17-, and 18-year-old inmates are also housed in GRVC (18-year-old male inmates in Secure), RMSC (16-, 17- and 18-year-old female inmates), and OBCC (18-year-old male inmates in YA ESH).

| Facility or Housing Area | Total Staff Regularly Assigned as of December 31, 2017 | Staff Trained in SCM |
|---|---|---|
| **GRVC (Secure Unit)** | 20 | 20 (100%) |
| **RMSC (Housing Areas with 16-, 17-, and 18-year-old Female Inmates)** | 12 | 12 (100%) |
| **OBCC (Young Adult Enhanced Supervision Unit)** | 14 | 12 (86%) |

---

[65] The Monitoring Team reviewed the Department's comparative analysis of reports generated from the Training Academy's e-scheduling system regarding who received SCM Training and the lists obtained from the Chief of Administration's Office for Staff assigned to GMDC and RNDC as of December 31, 2017 and Staff with official steady posts and those consistently assigned to Young Inmate Housing Areas at RMSC, OBCC and GRVC to establish the data in the boxes below.

[66] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service training.

[67] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service training.

- During this Monitoring Period, SCM Training was provided to the Warden, Deputy Wardens and Deputy-Warden-in-Charge of GMDC and RNDC, and the Wardens of RMSC, OBCC, and GRVC. The Department continues to work to provide this training to the Deputy Wardens as RMSC, OBCC, and GRVC.

ANALYSIS OF COMPLIANCE

*Training Content*

As described in the First Monitor's Report (at pgs. 52-53), this training, combined with other trainings provided to Staff who work with Young Inmates, meets the content requirements of this provision. As described in detail in the Third Monitor's Report (at pgs. 89-90), and Fourth Monitor's Report (at pgs. 84-85), the Monitoring Team observed In-Service SCM training and provided some feedback regarding the Department's training on three specific SCM tools: (1) Emergency Safety Physical Interventions; (2) Behavior Support Plans; and (3) Post-Incident De-Briefing. In prior Monitoring Periods, the Department took steps to coordinate the Emergency Safety Physical Interventions instruction with Defensive Tactics instruction and to use a larger classroom during the instruction to improve hands-on learning. Behavior Support Plans are still only used for a limited group of inmates (i.e., those in the Safe Supported Housing Units ("SSHs")) and Post-Incident de-briefing is not implemented as envisioned by SCM. However, the SCM Training provided to Staff gives an accurate picture of the Department's use of these tools, so the concern about mixed messaging in terms of what is being taught and what is in practice has been alleviated. The Monitoring Team will continue to evaluate the implementation of SCM as part of its overall efforts to monitor the provisions related to Young Inmates.

*SCM In-Service Training*

As outlined above, the Department continued to deploy Recruit and In-Service SCM Training and SCM Refresher Training to In-Service Staff. The Department has deployed SCM In-Service training to a total of 5,170 Staff, well beyond the requirements of the Consent Judgment (this total includes Staff who are not assigned to work in Young Inmate Housing Areas, i.e., recruits who are ultimately assigned elsewhere). The majority of the Staff who received the SCM training work in GMDC, RMSC, and RNDC, which are the three Facilities that house the largest number of Young Inmates. The Department has achieved Substantial Compliance with the requirement to deploy SCM In-Service training.

*SCM Refresher Training*

The Department rolled out the Monitor-approved SCM Refresher Training curriculum during the Fourth Monitoring Period and trained another 314 Staff this Monitoring Period. The Monitoring Team is developing a plan to review the timeliness of the refreshers provided going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br><br>¶ **3(a).** Substantial Compliance<br><br>¶ **3(b).** (Development of Refresher Lesson Plan) Substantial Compliance<br><br>¶ **3(b).** (Deployment of Refresher Training) Partial Compliance |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[68] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

b.   The Direct Supervision Training shall be a minimum of 32 hours.

c.   By April 30, 2018,[69] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

- The Department has chosen to provide Direct Supervision Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates are housed. As of the end of the Fifth Monitoring Period, 39% of Staff assigned to RNDC[70] and 44% of Staff assigned to GMDC had received Direct Supervision Training.[71]

| Facility | Total Staff Assigned to Facility as of December 31, 2017 | Staff Trained in Direct Supervision as of December 31, 2017 | Received Pre-Service Direct Supervision Training | Received In-Service or Pre-Promotional Direct Supervision Training |
|---|---|---|---|---|
| **RNDC** | 885 | 343 (39%) | 297 | 45[72] |

---

[68] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[69] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

[70] The Department also prioritized providing the training to those assigned to the Adolescent Response Team.

[71] The Monitoring Team reviewed the Department's comparative analysis of reports generated from the Training Academy's e-scheduling system regarding who received Direct Supervision Training and the lists obtained from the Chief of Administration's Office for Staff assigned to GMDC and RNDC as of December 31, 2017 and Staff with official steady posts and those consistently assigned to Young Inmate Housing Areas at RMSC, OBCC and GRVC to establish the data in the boxes below.

[72] This excludes those Staff Members who received Direct Supervision Training as part of both Recruit and In-Service training.

| GMDC | 911 | 404 (44%) | 363 | 41[73] |

- The Department also must provide the training to Staff regularly assigned to work in Young Inmate Housing areas *outside* of RNDC and GMDC. As outlined in the chart below, 16-, 17-, and 18-year-old inmates are also housed in GRVC (18-year-old male inmates in Secure), RMSC (16-, 17- and 18-year-old female inmates), and OBCC (18-year-old male inmates in YA ESH).

| Facility or Housing Area | Total Staff Regularly Assigned as of December 31, 2017 | Staff Trained in Direct Supervision |
|---|---|---|
| **GRVC (Secure Unit)** | 20 | 16 (80%) |
| **RMSC (Housing Areas with 16-, 17-, and 18-year-old Female Inmates)** | 12 | 11 (92%) |
| **OBCC (Young Adult Enhanced Supervision Unit)** | 14 | 9 (64%) |

- This Monitoring Period, Direct Supervision Training was provided to the Wardens of RNDC, OBCC, RMSC, and GRVC, and some Deputy Wardens in those Facilities. The Department continues to work to provide this training to the remaining Deputy Wardens of these Facilities and the new Warden of GMDC.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment. The Department has deployed Direct Supervision training to a total of 2,384 Staff this Monitoring Period. The Department is in Partial Compliance with the requirement to deploy Direct Supervision training because the training is still in the process of being deployed to Staff and the timeline to provide the training has not yet come due. However, planned Staffing changes at the Department, including the planned closure of GMDC during the Sixth Monitoring Period, will require a re-assessment of which Staff require this training going forward.

| **COMPLIANCE RATING** | **¶ 4 (a)-(b).** Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

---

[73] This excludes those Staff Members who received Direct Supervision Training as part of both Recruit and In-Service training.

| | |
|---|---|
| e. | There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department has a standalone Handheld Camera Training Lesson Plan, has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials, and has a separate short training and lesson plan to advise Staff on how to save and upload handheld video to the Department's main computer system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training programs. During the Fourth Monitoring Period, the Department and the Monitoring Team worked together to finalize the Handheld Camera Lesson Plan. The Department focused this Monitoring Period on providing Cell Extraction Team Training and Probe Team Training, which include handheld camera instructions. The Department will work with the Monitoring Team to ensure every Facility has trained operators on every tour and in ESU.

| **COMPLIANCE RATING** | **¶ 2(e).** Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.    Such re-training must be completed within 60 days of the determination of the violation.
    b.    The completion of such re-training shall be documented in the Staff Member's personnel file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Academy tracks Staff required to receive re-training using an Excel spreadsheet.

- The Academy uses the spreadsheet to document who was referred for re-training, the type of training needed, the use of force incident that resulted in the need for re-training, and the date the required training was provided to the Staff member.

**ANALYSIS OF COMPLIANCE**

While the Academy has a tracking mechanism for Staff who require re-training, the Department does not have a formalized process in place to ensure that re-training referrals from various sources (i.e., Command-Level, Immediate Action Committee, Rapid Reviews) are received on a routine basis. The Monitoring Team is working with the Department to systematize re-training referrals to ensure all those recommended to receive re-training are tracked by the Academy, and ultimately receive re-training in the recommended area. The Monitoring Team intends to focus on this process in the next Monitoring Period in order to assess compliance.

| COMPLIANCE RATING | ¶ 5. Not Yet Rated |
|---|---|

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to develop the Learning Management System ("LMS") which will track key aspects (e.g., attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**: During the development of LMS, the Department is utilizing the Training Tracking Software ("TTS") as an interim solution. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings, most *Nunez*-required In-Service trainings, and most Pre-Promotional Training. TTS scans Staff's identification cards in the classrooms and the information from the electronic sign-in is then manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript. Some *Nunez* required trainings still utilized written sign-in sheets this Monitoring Period.

- **Examination Tracking**:
  - **Pre-Service**: Tablets issued to all recruits during mandatory Pre-Service training are used to take examinations for all *Nunez*-required courses.

o **In-Service and Pre-Promotional**: In-Service exams are given in a paper format or include physical skill assessments administered by the instructor and the results are tracked in excel.

ANALYSIS OF COMPLIANCE

_Review of Examination and Attendance Records_ (¶¶ 6 & 7):

¶¶ 6 and 7 require that all Staff members who complete the _Nunez_-required trainings must pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). This Monitoring Period, the Monitoring Team collaborated with the CLU to expand its strategy for assessing examination and attendance records and verifying the underlying documentation. The results of this assessment are described in detail below.

- _**Recruit Training Examinations and Attendance**_

The Department reviewed and summarized, and the Monitoring Team verified, the examination and attendance records for all _Nunez_-required trainings for two companies that graduated in November 2017. All Recruits in the company's whose records were reviewed received the required training. Passing scores on examinations were verified based on results from: (1) exams taken electronically on iPads for UoF Policy, SCM, and Crisis Intervention and Conflict Resolution training, and (2) written performance evaluations for Cell Extraction and Probe Team Training. In this Monitoring Period, the Department did not conduct performance evaluations at the end of the Defensive Tactics course, so the Monitoring Team was only able to confirm the Recruits went to the Defensive Tactics training but could not determine whether they passed the course. Overall, the training records for the Recruit class demonstrate organized maintenance. The Monitoring Team notes that the examination records for those examinations taken on the iPad are very well organized and easily verifiable.

- _**Pre-Promotional Training Examinations and Attendance**_

The Department conducted, and the Monitoring Team verified, an internal audit of the _Nunez_-required trainings' examination and attendance records for the Pre-Promotional Training for the 101 student Captain's class and four student ADW class that graduated this Monitoring Period. The sign-in attendance records demonstrated that all but a handful of the students in the Pre-Promotional classes attended the initial offering of all required trainings.

The results of the review of the examinations records were a mixed bag. Paper examinations were given for UoF Policy, SCM, and Crisis Intervention and Conflict Resolution. These examinations demonstrated the majority of the students passed those courses (although approximately 30% of the Use of Force Policy exams for the Captain's class could not be located by the Academy). However, the Department is struggling to demonstrate that performance evaluations are conducted at the end of Pre-Promotional training classes for Probe Team, Cell Extraction Team, and Defensive Tactics Training. The performance evaluations were (1) delayed in being produced to the Monitoring Team; (2) not

available for all attendees (sometimes missing almost 50% of the evaluations); and (3) some of the documentation for the ADW Pre-Promotional performance evaluations raised questions about whether they were completed contemporaneously when the course took place. The Monitoring Team will be working with the Department in the Sixth Monitoring Period to determine how best this information can be collected and maintained to ensure they are completed timely and available in a reliable manner.

- ***In-Service and Refresher SCM Training Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for 10% of the Staff who received SCM In-Service (19 students), and SCM Refresher (29 students) training this Monitoring Period. The Monitoring Team confirmed all students attended the course through sign-in sheets and TTS attendance printouts. For In-Service SCM training, examination records verified 17 out of 19 Staff passed the exam, but the Academy was unable to locate the examination records for the final two individuals. For the Refresher SCM training, examination records confirmed 28 out of 29 Staff passed the exam, and the Academy was unable to locate the examination record for one individual.

- ***In-Service Direct Supervision Attendance[74]***

The Department conducted, and the Monitoring Team verified and reviewed, an internal audit of attendance records for 10% of Staff who received In-Service Direct Supervision (13 students) training this Monitoring Period. The Monitoring Team confirmed that all students attended the course through sign-in sheets and TTS attendance printouts.

- ***In-Service Probe Team and Cell Extraction Team Training Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for all In-Service Staff who received Cell Extraction (67 Staff) and Probe Team Training (75) this Monitoring Period. The sign-in sheets for both trainings confirmed all Staff reported as attending went to the course. All Staff passed the Probe Team Training performance evaluation. The Monitoring Team could only confirm that half of the Staff that attended the Cell Extraction training passed the performance evaluation because the Academy was unable to locate the performance evaluations for almost half of the Cell Extraction attendees.

- ***S.T.A.R.T. Examinations and Attendance***

During this Monitoring Period, as was done in the past two Monitoring Periods, the Department conducted, and the Monitoring Team verified, a similar internal assessment of the attendance and examination records for one four-day S.T.A.R.T. block in each month of the Fifth Monitoring Period that S.T.A.R.T. was offered (July-October 2017). The audit results were consistent with prior findings, yielding continued, albeit minor, issues with the tracking of Defensive Tactics

---

[74] Direct Supervision does not have a separate examination for students because the last module of the approved lesson plan is a dedicated review and practice module in which students respond to a series of questions on Direct Supervision, analyze scenarios for compliance with Direct Supervision concepts, and develop plans to address hypothetical situations.

evaluations, but overall demonstrated that the vast majority of Staff who participated in each block of training attended all four days as required, and took and passed both the Use of Force Policy exam and passed the Defensive Tactics performance evaluation.

*Centralized System to Maintain Training Records* (¶ 8):

The current tracking system for examinations and attendance includes a combination of hand-written and interim electronic tracking systems. This Monitoring Period, the Department expanded its use of the interim electronic tracking system to track additional attendance for In-Service and Pre-Promotional *Nunez*-required trainings and all Recruit training.

A centralized electronic system will significantly improve the reliability of the information. The Department is continuing the procurement process for LMS which will enable the Training Academy to schedule individuals for courses, track attendance, and record examination results. (*see* Second Monitor's Report (at pgs. 46-47) and Fourth Monitor's Report (at pgs. 94-95)). Unfortunately, after almost completing the procurement process in the Fourth Monitoring Period, the process had to be re-started in the Fifth Monitoring Period. The Office of Management and Budget ("OMB") reported to DOC that it needed to revise its Request for Proposals ("RFP") for LMS to remove the Human Resources capabilities because those capabilities could be addressed by software already procured by a different City agency. Therefore, the RFP and procurement process had to be re-started with a revised RFP. This has likely set back the timeline for completion of LMS by 9-12 months.

Despite these delays in obtaining LMS, the Monitoring Team is encouraged by the Department's expanded use of TTS as an interim solution for attendance tracking. Continued use of that system for all *Nunez*-required trainings will support the Department's efforts to achieve Substantial Compliance with these tracking provisions.

| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance<br>¶ **7.** Partial Compliance<br>¶ **8.** Partial Compliance |
|---|---|

## 4.   ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitor, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all Use of Force incidents are properly reported without fear of retaliation and can be investigated. The Department established an anonymous Hotline in March 2016.

The Monitoring Team's assessment of compliance is outlined below.

## VI. ANONYMOUS REPORTING ¶ 1

¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect.

- The finalized Division Order requires ID to initiate a preliminary investigation within three business days of receiving an anonymous report.

- As noted in the Fourth Monitor's Report (pgs. 95-97), the Department placed 250 posters in high traffic areas, 45 of these were mounted and drilled behind Lexan (polycarbonate). The Department also continues to advertise the Hotline telephone number in all Facilities, DOC TV, and the Department's intranet home page.

- The anonymous reporting slide was re-posted on the intranet homepage in November 2017 for one month and will continue to be reposted every six months. The slide remains permanent on DOC TV.

- In December 2017, ID staff conducted a routine check of the posters throughout all Facilities to confirm that they are mounted in Lexan and remain in high traffic areas such as the Staff lounge (KK), administrative corridor and main entrance. During their routine check, ID observed that most remained in good condition and were not defaced.

- The Hotline received a total of 28 calls from July 2017 to December 2017. None of these calls were related to a use of force incident.

### ANALYSIS OF COMPLIANCE

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision as described in the previous Monitor's Reports. The Department also has a reasonable process to ensure the Hotline is advertised on a routine basis. The Monitoring Team also continued to observe the Hotline advertised on DOC TV and posters in high-traffic areas throughout Facilities while conducting site visits.

The Monitoring Team reviewed the screening intake forms for the 28 calls the Hotline received this Monitoring Period and none were Use of Force related. The total numbers of calls the Hotline received in the Fifth Monitoring Period was the highest to date, showing greater awareness of the resource among staff. Though none of the calls pertained to Use of Force, other avenues are available for reporting Use of Force concerns by Staff and inmates including calling 311, notifying ID directly, contacting lawyers for the Legal Aid Society, or reporting concerns up the chain of command in the Facilities

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

### 5. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f) [75]); and preserve video from all sources for at least 90 days (¶ 4).

The Department remains on track to achieve "Complete Camera Coverage"[76] of all areas of all Facilities by February 28, 2018 (¶ 1 (c)). As of December 31, 2017, the Department reports it has installed 8,529 new wall-mounted cameras.[77] The Department, and in particular the Radio

---

[75] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this Report.

[76] "The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera coverage of the ingress and egress of such areas). "Complete Camera Coverage" shall not include small, isolated blind spots caused by technological and/or mechanical limitations or the design of interior spaces." Consent Judgment § III (Definitions), ¶ 8.

[77] In some of the Facilities where third-party contractors installed cameras, although the contractors have completed the initial installation, post-installation work must be completed before the Department can actually use the cameras. In assessing camera coverage, the Monitoring Team's evaluates that the cameras are both installed and online.

Shop, has continued to demonstrate a significant commitment to installing and maintaining wall-mounted cameras in the Facilities. Further, the Department significantly improved the availability of handheld video. The Department initiated the body-worn camera pilot at GRVC on October 9, 2017 as discussed in more detail below.

*Pro-Active Video Surveillance*

During the Fifth Monitoring Period, the Department built a new video monitoring unit to monitor live video feeds to identify and detect potential violence, identify contraband, and provide support to leadership in the Facilities.[78] As described in prior Monitor Report's, the Monitoring Team believes the additional video coverage will enhance the Department's ability to detect and prevent potential violence (*see* the Second Monitor's Report (at pgs. 67-68), the Third Monitor's Report (at pgs. 103-104), and the Fourth Monitor's Report (at pgs. 99-100)). Further, the Monitoring Team continues to recommend that the Department annotate its existing Facility diagrams to identify camera locations. This guide may serve a dual purpose in that it assists the Department in its overall effort to identify and maintain the cameras and would also be a useful guide during emergencies and critical incidents.

The Monitoring Team's assessment of compliance is outlined below.

| IX. VIDEO SURVEILLANCE ¶ 1(a) (b) & (c) (STATIONARY CAMERA INSTALLATION) |
|---|

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

---

[78] The video monitoring unit officially opened on January 31, 2018 and will be discussed in more detail in the Sixth Monitor's Report.

c.   The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

d.   Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

e.   The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As of December 31, 2017, the Department has installed 8,529 new wall-mounted surveillance cameras throughout the Facilities, 1,771 of which were installed during the current Monitoring Period.

- The Department reports that installation of stationary, wall-mounted surveillance cameras is complete in all housing units in all Facilities and is between 90% and 100% complete in ancillary areas of each Facility.

## ANALYSIS OF COMPLIANCE

The Department engaged in a massive effort to install video surveillance cameras through (1) "fast-track" installation by the Department's Radio Shop Staff in all housing and ancillary areas at RNDC, GRVC, GMDC, OBCC, and AMKC; and (2) capital engineering installation by third-party contractors at RMSC, VCBC, MDC, EMTC, NIC, and BKDC.

*Installation of stationary, wall-mounted cameras to ensure Complete Camera Coverage* (¶ 1 (a), (c))

During this Monitoring Period, the Monitoring Team conducted numerous video surveillance tours during which the physical placement of cameras was observed, and live feeds of the video were reviewed on the Genetec system. The tours focused on ancillary areas where cameras had been installed since the initial video surveillance tours, including food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways, and stairways.

Given that the installation of cameras throughout the Facilities has occurred across multiple Monitoring Periods, the chart below illustrates the current status of installation at each Facility. Overall, the Monitoring Team is encouraged by the Department's success in working to meet this aggressive and comprehensive installation plan.

## **Status of Installation**

| Facility[79] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[80] | Reference to Prior Monitor Report Findings |
|---|---|---|---|---|---|
| GMDC | Substantially Complete | Substantially Complete | Yes (Entire Facility) | N/A[81] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure Unit Only) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes (Partial; Facility houses male adolescents) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE units may house 18-year-olds) | Not yet addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| EMTC | Substantially Complete | Partially Complete | No | Partially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| OBCC | Substantially Complete | Substantially Complete | Yes (YA ESH Only) | Not yet addressed | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | Not yet addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | Not yet addressed | Fourth Report (pg. 102) |
| RMSC | Substantially Complete | Substantially Complete | Yes (Partial; Facility houses female adolescents & 18-year-olds) | Not yet addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| WF | Substantially Complete | Partially Complete | Yes (18-year-olds may be housed in WF) | Partially addressed | Third Report (pg. 107) |
| NIC | Substantially Complete | Substantially Complete | No | N/A | Second Report (pg. 66) |
| QDC | N/A – no housing units | Not yet evaluated | No | N/A | N/A |
| BKDC[82] | Substantially Complete | Substantially Complete | No | N/A | N/A |
| DJCJC | N/A – no housing units | Not yet evaluated | No | N/A | N/A |

---

[79] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[80] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras. Following February 28, 2018, a more systematic review will take place.

[81] Given the Department's announcement that GMDC is slated for closure, the need to address any recommendations for camera installation is moot.

[82] The physical placement of the cameras was confirmed during the tour but the cameras are not yet all online.

If a Facility has Complete Camera Coverage, it is expected that the vast majority of incidents should be captured on video and have a corresponding Rapid Review. Accordingly, in order to finalize the Monitoring Team's assessment of Complete Camera Coverage in each Facility, the Monitoring Team will review a sample of Use of Force incidents to determine whether they were captured on camera. The Monitoring Team conducted this assessment of incidents from July through October at GMDC, RNDC, and GRVC, the three Facilities in the first installation wave, and found the overwhelming majority of incidents had been captured on video and reviewed. The Monitoring Team will share its comprehensive assessment of Complete Camera Coverage in all Facilities in the next Monitor's Report after the deadline to install has come due.

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (¶ 1 (b))

As noted in previous Monitor's Reports, provision ¶ 1 (b) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. As demonstrated in the chart above and discussed in the First, Second, Third and Fourth Monitor's Reports, the Department has installed cameras in the Facilities that house 16-, 17-, and 18-year-old inmates and thus remains in substantial compliance.

*Internal camera working group meeting* (¶ 1 (e))

There is no longer a need for the internal camera working group meeting to discuss the prioritization and timeline for the installation of additional cameras in the Facilities because the project is near completion. Should the need for a major installation of additional cameras arise in the future, the Monitoring Team will evaluate whether the meetings should be reinstated.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(a).** Requirement has not come due<br>**¶ 1(a)(i)-(iii).** Substantial Compliance<br>**¶ 1(b).** Substantial Compliance<br>**¶ 1(c).** Partial Compliance<br>**¶ 1(d).** Requirement has not come due<br>**¶ 1(e).** Substantial Compliance (per Fourth Monitor's Report) |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.     Body-worn Cameras

    a.     Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

    b.     The 100 body-worn cameras shall be distributed among officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

| | |
|---|---|
| c. | The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department initiated its body-worn camera pilot at GRVC on October 9, 2017. Interim Operations Order 17/17 was issued on 10/6/17 and the body-worn camera lesson plan was finalized. These were developed in consultation with the Monitoring Team.

- During the initial 90 days, the Department agreed that no disciplinary action would be initiated, except for situations involving intentional acts and that Staff would be able to review the footage prior to preparing their reports.

- The Department trained 35 Staff members on how to use the body-worn cameras during the Fifth Monitoring Period.

- 10 body-worn cameras were distributed to 10 Staff members in designated areas at GRVC. Staff were required to activate the body-worn cameras in specified situations (e.g. use of force incidents, witnessing or responding to an inmate-on-inmate fight or escorting inmates).

- IT installed docking stations in the main Control Room and met with GRVC leadership to provide information on how to review body-worn camera footage once uploaded into the evidence management system.

- The body-worn cameras were activated in response to four use of force incidents and also captured one use of force allegation during the Fifth Monitoring Period.

- The Department developed a survey to gauge initial impressions from Staff using the body-worn cameras.

- The Department plans to expand the pilot during the next Monitoring Period.

## ANALYSIS OF COMPLIANCE

The Monitoring Team met with participants in the body-worn pilot and GRVC leadership to learn about any identified problems as the pilot progressed and found that Staff embraced the use the of the body-worn cameras and that the cameras were a helpful tool. The Monitoring Team also reviewed all five use of force incidents where the body-worn cameras were activated during the Fifth Monitoring Period. While it is too early in the pilot to make any final conclusions, the initial videos were an excellent source of audio and video and provided close-up interactions between inmates and Officers. In most instances, the body-worn cameras were turned on when force was anticipated and provided invaluable context and insight into what precipitated the use of force (i.e. capturing nuanced details such as the inmate's mood, reactions or facial expressions). The body-worn cameras also provide additional video and audio content that neither Genetec nor handheld cameras provide.

| COMPLIANCE RATING | ¶ 2(a)-(c). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

| | |
|---|---|
| ¶ 2. | Handheld Cameras |
| | d. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).] |
| | f. When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence" was revised on 8/16/17 in consultation with the Monitoring Team.

- The NCU continued its quality assurance ("QA") program of handheld camera footage across all Facilities. The NCU analyzes the handheld videos by tallying the number of errors on the alarm response logs and the number of missing handheld videos and shares these findings with the Facilities and the Monitoring Team on a routine basis.

- The NCU reported that the proportion of handheld video properly uploaded increased at all Facilities during this Monitoring Period, from 56% in July to 90% for the remainder of the Monitoring Period.

- Tour Commanders are required to confirm to the Warden that any handheld video footage captured during the Tour has been uploaded by the end of their tour.

- The Bureau Chief of Facility Operations continued to meet weekly with the Assistant Chiefs to discuss handheld video deficiencies for each Facility to increase accountability for Facilities struggling to upload handheld video.

- The Bureau Chief of Facility Operations and the NCU met with the Monitoring Team routinely to report on the Department's progress and collaborate on potential solutions to obstacles to compliance.

- From July to December 2017, the Department reported that 134 disciplinary actions were imposed for violations of the handheld video directive.

- ID issued 12 Memorandum of Complaints ("MOC") to Staff during the Fifth Monitoring Period for *intentionally failing to capture incidents*. The Department did not find that any Staff *repeatedly failed to capture incidents due to failure to follow DOC policies* during this Monitoring Period. ID also issued nine MOCs to ADWs for supervisory failure with respect to ensuring the handheld video was uploaded.

ANALYSIS OF COMPLIANCE

*Policy* (¶ 2 (d))

The Department continues to maintain a policy regarding the use of Handheld Cameras. During this Monitoring Period, the policy was revised to allow a Tour Commander to designate another Staff Member to upload the handheld video.

*Availability of Handheld Video* (¶ 2(d))

The Department made significant improvements during this Monitoring Period regarding the availability of handheld video, a direct result of a concerted effort by the Department. All Facilities demonstrated significant improvement with uploading video and sustained this progress from August to December 2017.

The Department's improvement in the availability of handheld video footage is likely attributable to several key initiatives: comprehensive training for all Facilities; developing a streamlined yet detailed procedure to upload video for consistency and clarity; a thorough QA process; greater scrutiny by leadership; and increased accountability at the Facility level. The NCU's QA program enabled the Department to achieve multiple objectives: quantifying how many handheld videos were being uploaded allowed the NCU and the Chief's office to identify which Facilities were struggling the most and why and then providing support to ensure it was properly uploaded. The QA program also allowed the Department to impose targeted discipline to Facilities that repeatedly failed to meet expectations. At several key senior leadership meetings throughout the Fifth Monitoring Period, the Monitoring Team noted an ongoing scrutiny of this issue by senior leadership and an unwavering commitment to holding the Facilities accountable for uploading handheld video. The sustained and consistently high number of handheld video uploads during the Fifth Monitoring Period have demonstrated that the Department has met its obligations in this area.

The Monitoring Team conducted an independent assessment of handheld video availability to verify the NCU results described above. The review found no issues with the NCU's audit and the handheld video could be located for all incidents sampled. Given the improved availability of handheld video, the Monitoring Team recommends the Department now expand its focus to ensure that investigators have access to the videos (see ¶ 2(f) below) and to assess the quality of the handheld video footage being captured. To the extent feasible, the Department should leverage the findings of use of force investigations, and others already reviewing the video, to develop an appropriate process to identify videos with potential quality issues.

*Investigator Access to Handheld Video* (¶ 2(f))

The Consent Judgment requires ID and Facility investigators to have full access to handheld camera footage (and body-worn camera footage when available). As described above, the video footage is now consistently being uploaded to the shared drive and investigators have access to that shared drive.

To assess whether investigators had access to the footage, the Monitoring Team reviewed a sample of Preliminary Reviews and found that, in about 20% of instances where the handheld video was expected (e.g. probe team attendance or institutional searches), the Preliminary Reviewer didn't have access to the handheld video at the time of the preliminary review.[83] These findings suggest in at least some instances that the ID investigator can't access the video at the Preliminary Review stage even though the video was uploaded to the system. During the Sixth Monitoring Period, the Monitoring Team plans to work with the Department to ensure that ID investigators have consistent and timely access to handheld videos at the time of the Preliminary Review.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Consent Judgment requires any Staff Member who do not reasonably and accurately capture a use of force incident on handheld video to be re-trained. The Monitoring Team has not yet assessed the Department's efforts to re-train Staff but intends to focus on this issue during the next Monitoring Period.

As for discipline, the Department reported that it issued MOCs to 12 Staff Members during the Fifth Monitoring Period for intentional failure to capture incidents on handheld cameras, though none were generated for Staff *repeated* failures. Nine MOCs were issued to Staff for supervisory failure with respect to uploading handheld video.

| COMPLIANCE RATING | ¶ **2(d).** Substantial Compliance<br>¶ **2(f).** Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    At least twice a month, the assigned Supervisor shall (i) review a substantial portion of the wall-mounted surveillance cameras in order to determine which cameras are not recording properly, and (ii) review the accuracy of the daily assessments. The assigned Supervisor shall document the results of these reviews, including which daily assessments, if any, were inaccurate.

---

[83] The Monitoring Team found that 40% of the videos that were missing when the Preliminary Review was conducted were subsequently available to the ID investigator to review.

<blockquote>

d.   Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

</blockquote>

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 07/17, "Command Level Assessment and Maintenance of Stationary Surveillance Cameras" remains in effect and addresses the requirements of ¶ 3 (a) to (d).

- The Department continues to report and track out-of-service cameras with the Enterprise Asset Management ("EAM") database that was rolled out during the Third Monitoring Period.

- Assigned Staff and supervisors continue to assess stationary cameras and record their findings in daily and bi-monthly forms, which are then entered into EAM to trigger repair.

- NCU continues to conduct a Quality Assurance (QA) program of the daily and bi-monthly forms for accuracy. If any discrepancies are found, they are documented in internal QA reports and discussed during the Nunez Compliance Meetings.

- The NCU has expanded its QA program to include a random audit of Genetec video to ensure all down or obstructed cameras are reported accurately by Facilities.

**Analysis of Compliance**

The Department has made measurable progress in its ability to identify, track and fix inoperable cameras during the Fifth Monitoring Period. The Department continues to report that a reasonable number of cameras require maintenance and the majority of cameras are being repaired within two weeks. The Monitoring Team has not found that inoperable cameras have impacted the Department's ability to capture use of force incidents as the majority of incidents are captured on camera.[84]

The Monitoring Team assessed the Department's efforts to achieve compliance with this provision by reviewing: (1) the updated QA program regarding the identification and reporting of inoperable cameras, and (2) the efforts to repair inoperable cameras in a timely manner.

_Facility Assessment of Inoperable Cameras_ (¶ 3 (a)-(c))

The Monitoring Team confirmed the NCU audit demonstrated that Staff and supervisors continue to complete daily and bi-weekly assessment forms to report down cameras and that the forms are fully completed (e.g. name, date and signature of the form preparer and supervisor). NCU tracks the results of these assessments in monthly QA reports. By the end of the Fifth Monitoring Period, the Department reported that the majority of daily assessment forms had all required fields completed. The NCU's audit is the first step in ensuring that inoperable cameras are identified by ensuring the forms are completed as required.

However, the audit will need to also confirm that the forms are _accurately_ identifying all down

---

[84] See ¶1 of Video Surveillance.

cameras and that a corresponding work order has been placed for the down camera. In November, NCU expanded its audit to confirm that the forms are accurately identifying all down cameras and that there is a corresponding EAM work order for all down cameras on the Facility forms. The Monitoring Team sampled a number of the Fifth Monitoring Period daily forms against the EAM work orders and confirmed the NCU audit results.

In the next Monitoring Period, the Monitoring Team intends to work with the Department to ensure the most reasonable, efficient and effective strategy is in place to identify all down cameras so that it can appropriately demonstrate compliance with these requirements.

*Maintenance of Inoperable Cameras (¶ 3 (d))*

The Monitoring Team confirmed the Department's policy regarding camera maintenance remained in effect to address the requirements of ¶ 3 (a) to (d). Further, the Monitoring Team evaluated the time required to repair the cameras that have been reported as inoperable. The vast majority of inoperable cameras are repaired within two weeks. The monthly EAM reports showed that throughout the Monitoring Period that the Department repaired a total of 5,378 wall-mounted stationary cameras.[85] The vast majority (4,877 cameras; 91%) were repaired within two weeks, 137 (3%) between two to three weeks, 176 (3%) within three to five weeks, and 188 (3%) beyond five weeks.[86] Given the extraordinary number of cameras in the Agency, the number of reported inoperable cameras is consistent with what the Monitoring Team would expect. The Monitoring Team is encouraged by the Department's success in maintaining and quickly repairing inoperable cameras.

| **COMPLIANCE RATING** | **¶ 3 (a)-(c).** Partial Compliance<br>**¶ 3 (d).** Substantial Compliance |
| --- | --- |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. Video Preservation

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Operations Order 06/15, "Recording Equipment, Medium, and Electronic Evidence" remains in effect.

---

[85] This includes repairs of all wall-mounted stationary camera in the Department (not just those cameras that have been installed as part of this initiative).
[86] The majority of cameras repaired beyond the two-week deadlines are in housing units not currently in use.

- The Department's computerized system automatically preserves all video for 90 days, assuming sufficient storage space.
  - The Department received funding to purchase additional video storage space and equipment was purchased in December 2017.
- IT continues to monitor the availability of storage space and the Department has reported that the Legal Division will be notified if storage space issues arise.
- The video preservation unit moved to the Chief of Department's office. There are now three dedicated officers responsible for preserving Genetec video footage beyond the 90-day preservation period.
- The ID Video Unit continues to preserve the Genetec video required for ID Use of Force investigations.

**ANALYSIS OF COMPLIANCE**

The Department has continued to demonstrate substantial compliance with this provision. The Monitoring Team confirmed that the Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. The review encompassed both use of force incidents and inmate fights. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

With respect to preservation of video beyond 90 days, the Department has continued to demonstrate substantial compliance, over a sustained period. The Monitoring Team assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage and handheld video included in the use of force investigation files produced to the Monitoring Team, and (2) randomly assessing stationary and handheld video of incidents investigated by ID. Only a small number of investigation packages have been produced to the Monitoring Team where the video was not preserved, often due to a clerical error. Further, the Monitoring Team's random testing found 99% of videos were adequately preserved.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## 6. USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of

policies, procedures, and reforms relating to the Department's methods for investigating

potential use of force-related misconduct. High-quality investigations are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department. The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion.

During this Monitoring Period, the Department continued to recruit a Deputy Commissioner of Investigations and ID sought additional funding for staffing. The lack of a permanent leader and limited resources contributed to the long-standing quality and timeliness problems within the division. However, strong leadership by existing ID staff was instrumental in maintaining the progress to date, especially with Preliminary Reviews. Following the close of the Monitoring Period in January of 2018, the Commissioner appointed a new Acting Deputy Commissioner of ID[87] and announced that ID and Trials will now both report to the Acting Deputy Commissioner of ID. These changes have the potential to improve efficiencies to address the timeliness and quality issues which continue to plague investigations of Staff misconduct and may also lead to efficiencies in imposing discipline.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Every use of force incident receives a Preliminary Review.
- ID and the Facilities investigate use of force incidents following the completion of the Preliminary Review.

---

[87] Necessary vetting must be completed by DOI and City Hall before this individual can be named permanently to the position.

ANALYSIS OF COMPLIANCE

The Monitoring Team has evaluated thousands of Preliminary Reviews, including the underlying documentation for hundreds of these, along with hundreds of Facility and ID investigations. The Monitoring Team continues to find that Preliminary Reviews remain the best quality and most timely assessment of use of force incidents completed by the Department. The subsequent investigations by ID and the Facility do not always maintain this level of quality.

ID Investigations are inconsistent in quality and take too long to close. While ID investigations tend to be of better quality than Facility investigations, ID investigations still suffer from serious deficiencies including: (1) failure to address all evidence; (2) failure to reconcile conflicting evidence; (3) failure to neutrally assess evidence and therefore close calls in the assessment of evidence are decided in favor of Staff; (4) failure to consistently use inmate witness statements as evidence; (5) inconsistent supervisory reviews that sometimes ignore the presence of evidence contrary to investigative findings that the investigator failed to address. The findings of Facility Investigations are generally not reliable, as they often ignore objective evidence, with analysis that is pro forma.

Given these findings and the problems described in the Identifying & Addressing Use of Force Misconduct section above, the Department is not in compliance with this provision. Specific findings for each of these types of investigations, as well as initiatives to improve ID Investigations (¶ 9) and Facility Investigations (¶ 13), as described in the boxes below.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident [according to the terms of (a) to (c).] The Department shall not discredit Inmates' accounts without specifying a basis for doing so. [. . .]

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates who are the subject of a use of force incident and those who witness the incident as part of the Preliminary Review.

- Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

- ID also plans to offer videotaping of all inmate interviews, as described in ¶ 6 below.

ANALYSIS OF COMPLIANCE

The inmate interview requirements of ¶ 2 above have a number of practical elements: (1)

investigators must make and document reasonable attempts to interview inmates, including the ADW who interviews inmates following medical treatment; (2) Investigators shall not unreasonably discredit inmate statements; and (3) Investigators must conduct inmate interviews in a private and confidential location. Each of these requirements were assessed by the Monitoring Team in prior Monitoring Periods as described in the Third Monitor's Report (at pgs. 130-131) and in the Fourth Monitor's Report (at pgs. 121-123).

*Interview Attempts and Documentation*

The Monitoring Team has consistently found that Preliminary Reviewers of UOF incidents attempt to interview inmates involved in actual uses of force within days of the incident. Further, in ID Closing Reports, Investigators document their attempts to interview inmates, either by including a summary of the inmate's statement or by indicating that the inmate refused to be interviewed. The Monitoring Team intends to more systematically assess the quality of interviews by reviewing audio and/or video recordings in future Monitoring Periods.

*Crediting of Inmate Statements*

The Monitoring Team has continued to find that too often inmate statements are discredited without adequate explanation. As the Department works to shore up the quality of investigations, this will be a key component for improvement.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- 13 use of force cases were referred to or assumed by DOI during this Monitoring Period.

- At the end of the Monitoring Period, a total of 14 use of force cases were pending before DOI, five were pending with the Bronx District Attorney ("DA"), three were pending with the Manhattan DA, and one was pending with the Kings County DA, for a total of 23 cases pending with external agencies.

**ANALYSIS OF COMPLIANCE**

Staff conduct that appears to be criminal in nature related to a Use of Force incident continue to be referred and/or taken over by DOI. Further, the Monitoring Team has not identified any use of force incident that should have been referred to DOI but was not.

In terms of managing these cases, as described in detail in the Second Monitor's Report (at pgs. 84-85), representatives of the Department, ID and DOI communicate frequently and work together collaboratively. They meet monthly to discuss the status of cases pending before DOI and the Bronx DA. The Monitoring Team recently observed one such meeting and found these meetings are a valuable opportunity to share information and ensure cases are processed externally and internally as efficiently as possible.

The communication between DOI and ID ensures that ID promptly refers cases in which Staff's conduct appears to be criminal in nature. The Monitoring Team recently recommended a few improvements to this process, including: (1) refinements to the Department's current tracking processes to ensure all information is consistently tracked, and (2) expanding the Department's routine check-ins to include any law enforcement agencies that may be investigating a use of force case. The Monitoring Team and the Department intend to discuss the feasibility and implementation of these refinements in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents with Class A, B, C, or P[88] when an incident is reported to the Central Operations Desk ("COD").

- Upon the receipt of additional information (e.g. results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

### ANALYSIS OF COMPLIANCE

The Department has consistently demonstrated, over a number of Monitoring Periods, that the overwhelming majority of use of force incidents are classified appropriately and accordingly has maintained Substantial Compliance with this requirement. The Monitoring Team assessed the use of

---

[88] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C

force incident classifications for Preliminary Reviews conducted in July to September 2017. The Monitoring Team found that 14 of 1,333 (1%) incidents reviewed were misclassified.[89]

The Monitoring Team did not review any Class P incidents this Monitoring Period given the Department's historical accuracy[90] in classifying and reclassifying them. The process will be re-assessed periodically to ensure the Department remains in Substantial Compliance.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID continued to conduct video interviews during the Fifth Monitoring Period.[91]

- ID evaluated the pilot and issued a report with its findings. ID discussed its report evaluating the results of the Interview Video Recording Pilot with the Monitoring Team.

- In this Monitoring Period, the Department, in consultation with the Monitor, determined that the use of cameras to video record inmate interviews should become permanent ID policy. ID concluded that video recording inmate interviews enhanced the quality of their investigations by capturing the inmate's body language and offering the inmate the opportunity to physically demonstrate what took place during the incident.

- ID investigators will continue to offer inmates the opportunity to provide a verbal statement, written statement, and audio recorded interview in addition to a video recorded interview.

### ANALYSIS OF COMPLIANCE

ID has satisfied the requirements of this provision. A year-long pilot program concluded with a written report indicating that videotaped interviews enhanced the quality of investigations. The

---

[89] The Department agreed with this assessment and subsequently updated the classification of these incidents in its systems.
[90] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).
[91] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

Department intends to incorporate videotaped interviews into practice and will provide camera equipment in every ID staffed location by the end of the Sixth Monitoring Period. This will permit all ID staff to utilize video cameras to record inmate interviews. ID also plans to periodically review video recorded interviews to ensure the desired level of quality.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. <u>Preliminary Reviews</u>: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviews were conducted for 2,572 actual and alleged use of force incidents during this Monitoring Period.

- ID expanded the use of <u>P</u>resumption that the <u>I</u>nvestigation is <u>C</u>omplete (PIC) (described in detail in the Third Monitor's Report at pgs. 119-121) to all Facilities and identified 146 use of force investigations for closure through PIC.

- The Department produced the results of the monthly Preliminary Reviews (July through January 2017) to the Monitor and Parties to the *Nunez* Litigation as required pursuant to Consent Judgment § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.

- Beginning December 13, 2017, all Preliminary Reviews are conducted in CMS.

### ANALYSIS OF COMPLIANCE

ID continues to conduct Preliminary Reviews on <u>all</u> use of force incidents.[92] Preliminary Reviews remain the Department's most consistent, reliable, and informative assessment of use of force incidents. ID's success in conducting Preliminary Reviews consistently for two years has demonstrated significant steps towards Substantial Compliance. ID will achieve Substantial Compliance with this provision once the Preliminary Reviewers can consistently access and evaluate all relevant documentation timely and the Preliminary Reviews are completed in a timely manner.

---

[92] During the Fourth Monitoring Period, the Monitoring Team confirmed that Preliminary Reviews were conducted on at least 99% of all use of force incidents.

*Presumption Investigation Complete ("PIC")*

The Department continued to utilize PIC this Monitoring Period, closing 146 cases that would otherwise have been Facility Investigations. This process has been slow to expand and has been used most by the ID team at AMKC and inconsistently by ID Teams at other Facilities. The Monitoring Team has strongly encouraged ID to increase its use of this practice. As investigators become more familiar with CMS, the use of PICs should increase. CMS has a work flow that automatically identifies cases that meet PICs criteria based on the investigators' responses to certain questions.

The Monitoring Team verified that ID investigators appropriately applied the PIC criteria by reviewing all relevant documentation for a sample of PICs cases. The Monitoring Team found all of the PIC cases could squarely be closed following the Preliminary Reviews (including some closed with violations that could be addressed at the command level).

*Timeliness*

Almost 95% of Preliminary Reviews of incidents conducted between July through the end of November were completed within 10 business days. The table below shows the average number of business days to complete Preliminary Reviews for incidents that occurred July through November 2017.[93] Given the volume of cases and the quality of the reviews, the Monitoring Team is satisfied that the time required to complete the reviews is reasonable under the circumstances. With the implementation of CMS, the Monitoring Team expects the timing of the Preliminary Reviews will improve as documentation is available more timely, Investigators become more adept at using CMS, additional resources for ID are obtained, and the Department reduces the overall number of Use of Force incidents.

| Preliminary Review Timing July-November 2017 | | | | |
|---|---|---|---|---|
| | Preliminary Reviews Completed | Completed within 5 business days | Completed within 6-10 Business Days | Completed beyond 10 Business Days |
| Actual Use of Force | 2,095 | 1,042 (49.74%) | 959 (45.78%) | 94 (4.5%) |
| Alleged Use of Force | 200 | 81 (40.5%) | 111 (55.5%) | 8 (4%) |

*Availability of Documentation*

The Monitoring Team routinely assesses the availability of the underlying documentation to the investigator conducting the Preliminary Review. Although there has been some progress during this Monitoring Period, Investigators still struggle to obtain timely access to Staff and Witness Reports and some handheld video (as discussed further in the Use of Force Reporting section (¶¶ 4 and 8) and Video Surveillance section (¶ 2(f)) of this report). ID reports it has been working vigilantly to coordinate with the Facilities to improve access to documentation and handheld videos. While Staff

---

[93] The Monitoring Team excluded the data from December 2017 because CMS was implemented part-way through that month and the reporting mechanisms changed.

reports and other Facility-level documentation will still be handwritten, they will be scanned and made available in CMS. Accordingly, once CMS is fully operationalized, it is expected ID investigators will have more timely access to documentation and video.

*Accuracy & Tracking of the Preliminary Review Form*

The Department and the Monitoring Team have worked together over the last two Monitoring Periods to increase the reliability of data generated by Preliminary Reviewers to ensure that all relevant data is captured. The Monitoring Team has seen consistent improvement and it is expected that the use of CMS to conduct Preliminary Reviews will further improve the reliability of data. The initial reports produced from CMS have improved data fields and a decreased lag time in reporting because the reviews no longer have to be manually entered into the system after they are completed.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID Investigations when they meet any of the criteria in Consent Judgment § VII, ¶ 8.

- Of the 2,572 Preliminary Reviews completed, 1,2453 (49%) were referred to ID, while 1,319 (51%) were referred to the Facility or closed as part of PICs.

| Referrals | Second Monitoring Period | Third Monitoring Period | Fourth Monitoring Period | Fifth Monitoring Period |
|---|---|---|---|---|
| Total | 1,751 (100%) | 2,162 (100%) | 2,444[94] (100%) | 2,572 (100%) |

---

[94] The total number of referrals is slightly less than the total Preliminary Reviews for this Monitoring Period because the Monitoring Team did not have the data for a small number of incidents.

| Full ID Investigations | 571 (33%) | 863 (40%) | 1,139 (47%) | 1,253 (49%) |
| All Other (Facility Investigations or PICs) | 1,136[95] (65%) | 1,293[96] (60%) | 1,266 (52%) | 1,319 (51%) |

- ID reports that additional cases are referred for a Full ID Investigation after the Preliminary Review process is complete if additional facts or circumstances of the incident come to light that merit additional scrutiny, even if the facts of the case do not meet the specifically enumerated circumstances in this provision.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team conducted a two-pronged compliance assessment for this provision in previous Monitoring Periods (*see* Second Monitor's Report (at pg. 97), Third Monitor's Report (at pg. 144), and Fourth Monitor's Report (at pgs. 131-132)). The Monitoring Team has found the overwhelming majority of cases are appropriately referred. The Monitoring Team continues to evaluate the Preliminary Reviews of all use of force incidents and has not identified any substantial deviation from these findings. Accordingly, the Department has remained in Substantial Compliance with this provision. Preliminary Reviewers have been referring an increasing percentage of incidents for Full ID Investigations throughout the course of the Consent Judgment. This is likely due to the reviewers becoming more familiar with, and adept at identifying facts in an incident that require a Full ID Investigation and a growing practice of referring cases that do not trigger automatic referral for a Full ID Investigation because they are otherwise problematic.

| **COMPLIANCE RATING** | **¶ 8.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.   *Timeliness* [. . .]
    b.   *Video Review* [. . .]
    c.   *Witness Interviews* [. . .]
    d.   *Review of Medical Evidence* [. . .]
    e.   *Report* [. . .]
    f.   *Supervisory Review* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[95] This includes 143 cases that the Department identified as meeting the No Further Action ("NFA") criteria, but the incident received a Facility-level investigation nonetheless.

[96] This includes 22 cases that the Department identified as meeting the NFA criteria, but the incident received a Facility-level investigation nonetheless.

- ID opened 1,382 Full ID Investigations into use of force incidents during this Monitoring Period and closed 528[97] investigations during this Monitoring Period.

- ID continues to conduct and evaluate investigations via the processes described in the Fourth Monitor's Report (at pgs. 132-133).

- Beginning December 13, 2017, all ID Investigations are conducted within CMS. CMS includes the new Closing Report format devised during the previous Monitoring Period.

- ID continued the "Fast-Track" and "Expedited Case Closure" processes this Monitoring Period:

  o **Fast-Track**: Cases that can be referred to the Trials Division with an MOC without MEO-16 interviews are "Fast-Tracked." Trials accepted five such cases this Monitoring Period.

  o **Expedited Case Closure**: Some Class B and C cases can be closed more quickly with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. To date, ID has closed 11 cases this way. During this Monitoring Period, ID identified 300 Class C cases that potentially meet these criteria and are working to assess those for Expedited Case Closure.

- **Facility Referrals**:

  o Last Monitoring Period, ID finalized the Facility Referral Division Order. A "Facility Referral" occurs when ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to a Facility with instructions for the Facility to take appropriate action.

  o This Monitoring Period, each Facility Referral and subsequent proof of remediation was tracked by ID and was provided to the Monitoring Team.

    ▪ 232 Facility Referrals were issued in the Fifth Monitoring Period. Of these, the Facility has provided a response to 164 (71%), while the remaining were outstanding at the end of the Monitoring Period.

ANALYSIS OF COMPLIANCE

During this Monitoring Period, ID continued initiatives to improve the timing and quality of ID Investigations by developing and encouraging processes for investigators to close less complex cases more quickly as required under ¶ 9(a)(i)(2). This will help ID to achieve the overarching goal of more timely accountability in cases where violations are identified. The Monitoring Team continues to strongly recommend that the level of investigative scrutiny match the severity of the incident and the quality of evidence available. Not every investigation needs to or should be met with the same level of

---

[97] This includes approximately 30 of the cases closed as "PICs" described above due to data tracking reasons.

rigor or the same investment of resources. In other words, a one-size-fits-all approach to investigations will not be sufficiently nimble to achieve compliance with this provision.

*Quality of the Investigations*

The Monitoring Team has seen some improvement with ID investigations and found the quality of ID investigations is significantly better than those conducted by the Facility. That said, the quality of ID investigations still requires significant improvement. The Monitoring Team reviewed approximately 75 closed ID investigations during this Monitoring Period. This review included several investigations that were opened and closed after the April 2017 workshop where the Monitoring Team shared recommendations about how the investigations' process and work product could be improved. Some of the subsequent investigations showed marginal improvements in organization and methodology, the presence of relevant and applicable information (e.g. policies, Staff and inmate backgrounds), and overall coherence (e.g. identifying issues in dispute and a summary of the evidence collected and reviewed for the investigation). However, quality remains inconsistent. Some investigations are thorough, draw appropriate conclusions, and recommend appropriate discipline while many others suffer from the same deficiencies as noted in the Third Monitor's Report (at pgs. 124-128 and 146-151). For instance, investigators frequently do not conduct Staff interviews when necessary, fail to identify and address all violations and issues, and discredit inmate statements without the necessary evidence and/or explanation. Further improvement is necessary. The Monitoring Team intends to conduct another workshop with ID leadership in the next Monitoring Period to continue to work through the identified issues.

*Timeliness* (¶ 9(a))

ID has long struggled with the timely closure of investigations. In 2015, ID closed 585 use of force-related investigations in an average of 309 days. While ID's current closure rates are an improvement over prior practice, the length of time to close investigations is still of serious concern. ID's unprecedented caseload and current level of resources inhibit the division's ability to close cases timely. Further, Staff interviews are a consistent source of delay because scheduling interviews with the Staff member and their legal representative remains difficult, particularly for Captains. The Monitoring Team has strongly encouraged the City and the Department to address this delay by working with the appropriate union representatives. The Department reports it is working with union representatives to address this issue.

ID currently has 3,267 pending cases, 1,232 cases (38%) are pending less than 180 days, 1,136 cases (34%) have been pending between 180 days and one year, 897 cases (27%) have been pending between one and two years, and 2 cases have been pending for more than 2 years. Of the 528 cases ID closed during this Monitoring Period, only 134 (25%) were closed within 180 days, 184 (35%) were closed between 181-365 days, and 210 (40%) took over one calendar year to close. The timely closure of ID investigations is a top priority.

*Closure of Less Complex Cases More Timely*

ID and the Monitoring Team have continued to develop strategies on how ID can close less complex cases more timely. During this Monitoring Period, ID implemented the Expedited Case Closure process, described above. ID identified a sample of 11 cases that could be closed under this process and sought the Monitoring Team's input on whether this type of closure was reasonable for each case. The Monitoring Team agreed with both the closure and the corresponding Facility Referrals for a command-level response when appropriate.[98] Subsequently, ID identified an additional 300 class C cases that could be closed under this process. Further, ID may expand this process to Class B cases after consulting the Monitoring Team. The Expedited Case Closure process could effectively address the case backlog and create efficiencies in other areas.

Unfortunately, the use of the Fast-Track process has been almost non-existent because ID has identified only a handful of cases. The Monitoring Team has identified a large number of cases that could be set on Fast-Track and encourages ID to implement this process with increased vigor. The Monitoring Team intends to prioritize this process during the next Monitoring Period and expects the ID –Trials merger will facilitate its use.

*Facility Referrals*

ID utilizes Facility Referrals either after completing the Preliminary Review or after closing an ID case when the investigator has identified a specific violation best addressed at the Facility-level (instead of charges). The Facility Referral process tracks the Facility's response to the violation identified by ID.

*Conclusion*

ID has developed a number of reasonable steps to improve the quality of its investigations and to close cases more quickly, but results are not yet evident, especially given the limited resources at ID. The Monitoring Team strongly recommends the City support the Department by providing the necessary resources to ensure that these initiatives can be implemented with vigor. The Monitoring Team also expects the next Monitoring Period will be pivotal for ID given the appointment of new leadership and the merging of ID and Trials. A compliance rating is being withheld because it is premature to rate the impact of the initiatives that have been developed, but not yet fully implemented.

| **COMPLIANCE RATING** | **¶ 9.** Compliance Rating Withheld |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. [. . .]

---

[98] In one case the Monitoring Team recommended that an additional Facility Referral be generated upon closure for one of the incidents, a recommendation with which the Department agreed.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that by the end of the Fourth Monitoring Period, the Department closed all of the ID cases that were open as of the Effective Date of the Consent Judgment.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance (per Fourth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of this Monitoring Period, ID had 171 staff, including 117 investigators handling open ID investigations.

- ID reports that investigators have a combined use of force and non-use of force caseload of 42 cases, compared to 33 cases in the Fourth Monitoring Period. Regarding use of force cases only, investigators had an average caseload of 26 at the end of the Fifth Monitoring Period, compared to 22 cases at the end of the Fourth Monitoring Period.

- The Department is actively seeking to hire both civilian and uniformed Staff as ID investigators. As part of this effort, the salary for ID investigators was increased.

- The Department sought authorization from OMB to hire additional staff for ID.

**ANALYSIS OF COMPLIANCE**

This provision requires the City to ensure that the Department have appropriate resources to conduct timely and quality investigations. Since the inception of the Consent Judgment, ID's caseload and corresponding responsibilities have increased thus requiring significantly more resources. Further, during this Monitoring Period, ID reassigned over 800 cases due to investigator turnover. This turnover, combined with an insufficient total number of investigators, has resulted in unsustainable caseloads and corresponding unreasonable delays in case closures. Accordingly, the Department sought additional funding from the City to provide additional resources for ID. The City reports that it is working with the Department to provide ID with necessary resources so additional staff can be hired. Accordingly, the compliance rating is being withheld as the Monitoring Team needs an opportunity to evaluate the scope and impact of these resources before a rating can be assessed. In order to achieve compliance, the City must demonstrate that the resources provided to the Department are adequate to provide ID with the necessary resources to reasonably complete it work and the Department must utilize these resources to ensure the ID division has adequate staffing to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement.

| COMPLIANCE RATING | ¶ 11. Compliance Rating Withheld |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID has streamlined forms and reports for Preliminary Reviews and Investigations, as described in the Fourth Monitor's Report (at pg. 135). CMS includes these fields and certain fields are mandatory to ensure the information is inputted.

- Preliminary Reviews and Investigations must be evaluated by Supervisors before being finalized.

- ID maintains Division Order 05/16 governing the procedures for an internal audit of Preliminary Reviews and ID investigation.

- The ID Auditor conducted audits of 10 Full ID Investigations and 36 Preliminary Reviews and developed a report of his findings. Once the initial report is complete, it is provided to the supervising Deputy Directors.

### ANALYSIS OF COMPLIANCE

Quality Control of any process should be approached from two perspectives—ensuring mechanisms are in place from the outset that ensure proper procedures are followed and conducting a back-end review of the outcome of the process to test its quality. For investigations, this translates to ensuring the procedures for conducting Preliminary Reviews and Full ID investigations are structured in such a way to encourage a quality inquiry, and then a review of completed investigations to determine if quality standards have been met.

The Department has set in place strong initial quality control mechanisms by including Preliminary Review and ID forms in CMS (similar forms are also in CMS for Facility Investigations). It forces investigators at all levels to collect specific information and documentation and answer detailed questions with numerous conditional aspects which encourages proper work flows. While the *process* for approving Preliminary Reviews and ID Investigations is in place and appropriate, the Supervisory assessment of the quality of investigations needs to improve.

Regarding the back-end review for quality, ID's internal audit is still a work in progress. ID Auditor reports and requests for Deputy Directors to respond to those reports has been sporadic. The Monitoring Team received the November and December 2017 audit reports. ID reports that while the ID Auditor continues to review a sample of Preliminary Reviews and Closed Investigations, the structure of DDI responses as initially conceptualized was burdensome. The Monitoring Team will work with the Department in the Sixth Monitoring Period to improve the implementation of quality

control measures, particularly for the audit processes, to ensure the ID Auditor's work is appropriately focused to support improvement.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.    All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

     a.     *Objectivity* [. . .]
     b.     *Timeliness* [. . .]
     c.     *Video Review* [. . .]
     d.     *Witness Statements* [. . .]
     e.     *Collection and Review of Medical Evidence* [. . .]
     f.     *Report* [. . .]
     g.     *Supervisory Review* [. . .]
     h.     *Recommended Disciplinary Action* [. . .]
     i.     *Referral to ID* [. . .]
     j.     *Role of Integrity Control Officer* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department revised the Facility Investigations Policy this Monitoring Period, discussed in more detail in ¶ 15 below.

- All but two of the Facilities eliminated their backlog of investigations.

- CMS is now used to conduct all aspects of Facility-level Investigations, digitizing a previously entirely paper-driven process.

- This Monitoring Period, the Department trained nearly all Facility Captains and ADWs in the use of CMS.

**ANALYSIS OF COMPLIANCE**

*Quality of Facility Investigations*

The Monitoring Team found extensive deficiencies in the quality of Facility Investigations in the review conducted and described in the Fourth Monitor's Report (at pgs. 144-145). The Monitoring Team's assessment of Facility investigations during this Monitoring Period found the noted deficiencies have not been addressed and the outcomes are not reliable, often failing to recognize objective evidence.

*Procedural Requirements* (¶ 13(b), (c), (d), (e))

Facility Investigations generally adhere to the procedural requirements of this provision. The Department is completing these investigations in a timely manner ((¶ 13(b)), reviewing relevant video (¶ 13(c)), gathering witness statement (¶ 13(d)), and collecting and reviewing medical evidence (¶ 13(e)) as required, and are therefore in Partial Compliance with these requirements.

As reported in the Fourth Monitor's Report, Facilities had a significant backlog of investigations[99] (for both incidents prior to the Effective Date and after the Effective Date), and implemented a largely successful plan to clear that backlog. One Facility has over 100 investigations pending for incidents occurring prior to 2016, while the other has over 80 cases pending for incidents occurring in 2017. At the end of Fifth Monitoring Period, all Facilities except those two have successfully eliminated their backlogs and generally kept pace with new investigations and are therefore in Partial Compliance with ¶ 13(b).

In total, the Facilities closed over 950 Facility Investigations during the Fifth Monitoring Period, with 75% closed within the required timeline (or a few days after) compared to only 59% closed timely during the prior Monitoring Period. This continued improvement is encouraging.

| July to December 2017 Incidents | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Closed Within 25 Business Days** | | **Closed Between 26 & 30 Business Days** | | **Closed Beyond 30 Business Days** | | **Total Pending Beyond 25 Business Day Deadline** | | **Total Cases** |
| 606 | 55% | 214 | 20% | 139 | 13% | 134 | 12% | **959** |

*Quality of Facility Investigations* (¶ 13(a), (f), (g), (h))

The Monitoring Team has not seen evidence of improvement in the actual assessment of the use of force incident. The investigations fail to demonstrate: objectivity (¶ 13(a)) in assessing the evidence; closing reports that are supported by the evidence (¶ 13(f)); supervisory review ensuring compliance with relevant policies and procedures (¶ 13(g)); or appropriate disciplinary action in light of the evidence (¶ 13(h)).

With respect to the disciplinary action taken at the conclusion of a Facility Investigation, the Monitoring Team notes there has been some marginal improvement in this Monitoring Period in the proportion of cases where disciplinary action was recommended at the conclusion of the investigation.

| | January to June 2017 Incidents | | July to December 2017 Incidents | |
|---|---|---|---|---|
| **Cases Referred to Trials** | 3 | 0% | 6 | 1% |
| **Cases Referred for Command Discipline** | 155 | 11% | 155 | 16% |
| **Cases Referred for Corrective Interview** | 50 | 4% | 48 | 5% |
| **Cases Referred for Re-Training** | 14 | 14% | 2 | 0% |
| **Total Cases Identified for Corrective Action** | **222** | **16%** | 211 | **22%** |
| Total Closed Cases | **1,349** | | **959** | |

---

[99] This includes not only use of force-related Facility investigation packages, but other types of incidents requiring investigation pursuant to Department policy.

That said, the Department is in Non-Compliance with ¶ 13(a), (f), (g), (h), for the reasons described in greater detail in the Identifying and Addressing Use of Force Misconduct section of this report above.

*Next Steps*

The Monitoring Team expects that the use of CMS will impact the way Facility Investigations are conducted in several ways. First, Facility Investigators will now have access to and the benefit of the Preliminary Review for the cases they are investigating. Second, the fields in CMS will require certain information to be entered and assessed before the investigation can be closed (e.g. identifying a video malfunction, and a required explanation for such malfunction; addressing any verbal commands given prior to using force, if applicable). Finally, CMS will eliminate redundancies because Facility Investigations may only be conducted *after* the Preliminary Review has determined the case is not a Full ID case or a PICs case. Prior to CMS, Facility Investigations often would continue simultaneously as ID was conducting the Preliminary Review (and possibly the Full ID Investigation) until the Facility received a "takeover notice." Often, these notices may be missed or received only after the Facility Investigation was completed resulting in duplicative work. Accordingly, it is expected that CMS will also reduce unnecessary work. The Department must demonstrate that these factors, and other initiatives, have improved the quality of the outcomes of Facility Investigations in order to achieve compliance with ¶ 13(a), (f)-(h).

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 13 (a), (f)-(h).** Non-Compliance<br>**¶ 13 (b)-(e).** Partial Compliance<br>**¶ 13 (i)-(j).** Not Yet Rated |

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has a designated "Youth ID Team" consisting of two Captains, one civilian investigator, and six uniformed Staff investigators which is based at RNDC.

- The Youth ID Team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced inmates, age 16 or 17).

- During this Monitoring Period, 55 use of force incidents involving male inmates under the age of 18 at the time of the incident were referred for Full ID Investigations.

- 159 Facility Investigations involving youth were assigned to the Youth ID team for review upon closure, using the Incident Review Team ("IRT") templates as described in the Fourth Monitor's Report at pg. 146.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to verify that ID maintains a Youth ID Team with qualified staff who conduct Full ID Investigations for all UOF incidents involving 16 and 17-year-old inmates. The quality of Full ID Investigations is discussed in regard to ¶ 9 above. With respect to the work of the Youth ID Team, the Department reports that the new DDI overseeing the Youth ID Team implemented additional quality control mechanisms for the team this Monitoring Period. The Monitoring Team is hopeful that the new leadership for this team will produce improved quality and timeliness of the work product.

*Youth ID Team Review of Closed Facility Investigations Involving Youth* (¶ 14(b))

Youth ID Team investigators are now required to review all closed Facility Investigations involving 16- or 17-year-old male and female inmates. 159 Facility investigations were assigned IRTs this Monitoring Period, adding to the 103 IRTs assigned in the last Monitoring Period. To date, only 30 IRTs have closed. The Monitoring Team reviewed a sample of completed IRTs to assess the quality of review and found the completed IRTs reasonably assessed the Facility Investigations that were the subject of the IRT. The Department is in Partial Compliance with this requirement because of the significant number of IRTs that remain outstanding.

| **COMPLIANCE RATING** | **¶ 14.** Substantial Compliance<br>**¶ 14(a).** Partial Compliance<br>**¶ 14(b).** Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory

review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- ID is continuing to develop a comprehensive set of policies and procedures.

  - Phase 1: *Identify Policies and Procedures*: ID identified 74 internal memorandums, Division Orders and procedures.

  - Phase 2: *Review Policies*: ID reviewed policies to determine if they required any revisions or needed to be rescinded. ID also identified policies related to any *Nunez* obligations.

  - Phase 3: *Revisions*: ID will revise and issue updated procedures as necessary.

- This Monitoring Period the Department revised the standalone Facility Investigations Policy.

**ANALYSIS OF COMPLIANCE**

The Department has a large number of policies and procedures related to investigating use of force incidents.

*ID Investigations*

As described in prior Monitor Reports, ID does not have a comprehensive manual of all policies and procedures in one place. ID completed Phase one and two of its review (described above). Given the various changes currently underway with ID (including the merger with Trials and new leadership), the Monitoring Team has encouraged ID to balance the need to develop written procedures while encouraging creative thinking in developing a flexible and appropriate framework for conducting investigations. In this interim period, the Monitoring Team has supported ID's efforts to advise staff of expectations in informal communications while larger initiatives are being developed, which can then be incorporated into a comprehensive manual. The Monitoring Team will continue to work closely with the Department to ensure that the final set of policies and procedures properly guides thorough, timely, and efficient investigations and that they are consistent with the requirements of the Consent Judgment.

*Facility Investigations*

In this Monitoring Period, the Department, in consultation with the Monitoring Team, issued a stand-alone policy governing Facility-level investigations. This policy now addresses all of the requirements of Consent Judgment §VIII, ¶ 13.

*Standardized system and format for organizing the contents of investigation files* (¶ 16)

The Monitoring Team has not yet focused on the Department's efforts to develop and implement a standardized system and format for the contents of investigation files. That said, the

| | Monitoring Team has generally found that ID files are well-organized and anticipates that CMS will lead to even greater standardization and organization. |
|---|---|
| **COMPLIANCE RATING** | **¶ 15.** Partial Compliance<br>**¶ 16.** Not Yet Rated |

## 7.  RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management Section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. These measures include developing and implementing a computerized EWS (¶ 1); implementing "5003 Counseling Meetings" between the Warden and any Staff Member who engages in repeated use of force incidents where at least one injury occurs (¶ 2); creating a new position, the use of force auditor ("UOF Auditor"), who identifies systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation data throughout the Department (¶ 6). Each of these is described in more detail below.

The risks facing the Department are broad and varied and require timely and flexible responses that are comprehensive and all-encompassing. In addition to the formal requirements under Risk Management (Consent Judgment § X), the Department has developed several other initiatives to ensure it is managing and mitigating risk appropriately, including the Wardens' UOF reviews as part of the Rapid Reviews and the Avoidables process; the Immediate Action Committee's review of incidents; presenting UOF data during monthly TEAMS meetings and weekly Operational Leadership meetings. These are discussed in the introductory sections of this report.

The Monitoring Team's assessment of compliance with the Risk Management provisions is below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

 a. The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

 b. ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

 c. On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Deputy Risk Manager continued to refine and roll-out EWS in consultation with the Monitoring Team. EWS draws on several sources of use of force data to identify Staff whose conduct may warrant additional oversight. Each of these data sources have set threshold criteria that trigger a screening for EWS if met, as described in the Fourth Monitor's Report (at pg. 151).

- This Monitoring Period, the Department made progress towards implementing EWS:
  - Drafting an EWS Policy detailing the procedures described briefly above;
  - Developing a staffing plan that outlines the responsibilities and roles of anticipated EWS staff positions;
  - Developing reasonable schedules for reviewing data sources to identify additional individuals for screening;
  - Identifying individuals for screening and initiating the screening process;
  - Posting for two civilian staff positions; and
  - Assigning a Captain and Officer to the EWS Staff.

- This Monitoring Period, seven Staff were assigned to the EWS monitoring program.

### ANALYSIS OF COMPLIANCE

The framework for EWS is now solidly in place. The critical step for implementing EWS is ensuring staff resources are sufficient to ensure it can manage and sustain its work. While staff have been assigned to EWS, additional _permanent_ Staff is necessary. EWS cannot be fully implemented

without the appropriate support. In order to achieve Substantial Compliance, the Department must finalize the EWS policy (expected to be completed during the Sixth Monitoring Period); obtain permanent staff for EWS; consistently and systematically screen staff; maintain the EWS Monitoring program; and continue to assess and fulfill staffing needs. The Monitoring Team will continue to routinely meet with the Deputy Risk Manager to consult on the implementation of EWS and stay informed on the progress.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains the 5003 Directive governing this process, it was revised again in this Monitoring Period in consultation with the Monitoring Team.

  o The Department also updated the 5003 counseling form to make it more clear and concise. The Department introduced a 5003B form which provides the Warden with an additional tool to recognize Staff Members for exceptional conduct relating to uses of force.

- During this Monitoring Period, the NCU conducted numerous information sessions with Facility leadership, providing the Wardens with guidance on the record-keeping expectations and how to improve the quality of 5003 counseling sessions.

- During this Monitoring Period, the NCU, with the assistance of the Bureau Chiefs of Facility Operations, initiated an audit of the 5003 counseling meetings starting in October 2017. This audit found that many of the Facilities were not consistently or accurately documenting their 5003 counseling meetings.

- In response, the NCU provided additional support and reminders to the Facilities to improve the 5003 counseling process. Further, senior leadership have increased their focus on this issue and have added 5003 counseling sessions to the agenda in both the monthly TEAMs and weekly NCU meetings so Facilities routinely report on progress.
- NCU audited the December 2017 Counseling Meetings and saw an increase in the number of Counseling Meetings being conducted and recorded.
- The NCU audits revealed that 1,025 Staff qualified for a counseling meeting in October and December.[100]
  - In December, the Department reported that 336 Staff across all Facilities were counseled.

**ANALYSIS OF COMPLIANCE**

During the latter part of the Fifth Monitoring Period, the Department began to show progress with meeting its 5003 Counseling requirements. For example, compared to NCU's October 2017 audit, the December 2017 audit results revealed an improvement in the number of Facilities completing and submitting the 5003 counseling forms and spreadsheets appropriately. This is likely attributable to the additional scrutiny from the NCU and Senior Leadership, the guidance provided to the Wardens, and the streamlined 5003 process and forms (described above). The Monitoring Team met with the NCU and Bureau Chiefs of Facility Operations during the Fifth Monitoring Period to discuss the Facilities' progress, the results of the NCU audits, and the initiatives to address the deficiencies described in detail in the Fourth Monitor's Report (at pgs. 154-156).

The NCU's audits are the first step to improving the 5003 counseling sessions. The Monitoring Team recommends the Department continue its focus on ensuring Staff are being counseled when required (or appropriate) and those counseling sessions are documented accurately on the associated forms and records. Most importantly, the Monitoring Team encourages the Department to continue to emphasize the purpose of these sessions to Facility leadership, to improve the quality of the sessions.[101]

| **COMPLIANCE RATING** | **¶ 2.** Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

---

[100] As noted elsewhere in the report, involvement in three use of force incidents, alone, is not necessarily indicative of a problem, there are several legitimate factors that may contribute to Staff's involvement in use of force incidents (such as the shift and post assignments, type of inmate population, etc.). Further, a 5003 Counseling Meeting is not disciplinary in nature as leadership may also use the meeting as an opportunity to reinforce best practices for Staff who are more frequently engaged in situations that may require the use of force.

[101] The counseling sessions are an opportunity to provide feedback and guidance to Staff on how to appropriately manage the use of force and emphasize non-forceful methods to resolve conflicts (e.g. non-physical intervention and problem solving).

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

a.  The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

b.  The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

c.  The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In November 2017, the Department appointed a new Chief Internal Monitor who serves as the UOF Auditor.

- The Chief Internal Monitor issued his first UOF Auditor Report in February 2018.

- In this Monitoring Period, the Department considered the recommendations from the Q3 and Q4 2016, and Q1 2017 UOF Auditor Reports and incorporated them into practice or elected not to adopt those recommendations.

**ANALYSIS OF COMPLIANCE**

During the current Monitoring Period, the Department recruited and hired a new UOF Auditor. Given his short tenure to date, the UOF Auditor spent his initial time at the Department familiarizing himself with Department operations, Staff and leadership and drafted a report regarding these initial impressions. The UOF Auditor was not yet in a position to extrapolate trends or recommendations.

The Department also consulted with the Monitoring Team about the recommendations from the Q3 and Q4 2016, and Q1 2017 Use of Force Auditor Reports. The Department's overall assessment was reasonable – in some cases the Department addressed and adopted the recommendations while in other cases the Department determined the recommendations were either not feasible or moot. The Monitoring Team found that when the Department elected not to adopt the recommendation, those decisions were conducted thoughtfully and the decision to not adopt those recommendations was reasonable and appropriate. Three recommendations that the Department incorporated into practices are: (1) Assistant Chiefs were assigned to oversee specific Facilities to create greater accountability (Q3 2016 recommendation); (2) the Department is in the process of steadying Staff to work consistently in the same housing area (Q3 2016 recommendation), as discussed in the Screening and Assignment of Staff section of this report; and (3) the Department has received funding for ADW assistant positions who will assist with Nunez-related compliance (Q4 2016 recommendation).

In order to achieve Substantial Compliance with this provision, the Department must demonstrate it has an individual(s) who identify and address trends and patterns in use of force incidents. This should include, but not be limited to, trends and patterns with respect to use of force incident prevalence, location, severity, and concentration in certain Facilities and/or among certain Staff or Supervisors. This data and information must also be evaluated to develop strategies to address the identified issues.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel provides monthly and quarterly reports of lawsuits filed and settled, which include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum of the lawsuit, and description of the lawsuit.

- During this Monitoring Period, the Department produced the Quarterly Law Department litigation reports covering July to December 2017. These reports are produced on a routine basis as they are received from the Law Department.

- The Office of the Comptroller provides reports to the Department regarding the payment of claims related to UOF incidents covering July to December 2017.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department received the documents described above. The Monitoring Team will continue to verify that the Office of the Corporation Counsel and Office of the Comptroller lists are provided as required. During this Monitoring Period, the Department's Deputy Risk Manager continued to consider various ways to incorporate the information into EWS. Analyzing these reports is time-consuming because it requires manually matching cases in the reports to the correct Staff and relevant use of force numbers in the Department's tracking systems. Accordingly, the Deputy Risk Manager is focusing on high value claims and settlements from these reports.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel continues to provide the Department with a list of all complaints relating to the excessive use of force and requests all investigation files and associated evidence.

- The assigned DOC Legal division attorney evaluates each use of force allegation received to confirm whether an investigation into the allegation has already been conducted. If a previous investigation cannot be confirmed, the DOC Legal Division attorney notifies a designated Assistant General Counsel who then shares the information with ID to consider whether a Full ID Investigation is warranted.

- During the current Monitoring Period, the Department received one lawsuit containing allegations regarding a use of force incident that did not appear to have been previously investigated. ID reviewed the complaint for this case and contacted the plaintiff's attorney to request an interview with the plaintiff.

**ANALYSIS OF COMPLIANCE**

　　The Department's process to identify any UOF allegations in a lawsuit that were not previously investigated is adequate. The Monitoring Team confirmed that during this Monitoring Period, ID considered whether to open an investigation regarding one allegation that had not already been investigated and the Monitoring Team found ID's consideration of the complaint appropriate.

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)

¶ 6. By August 31, 2017,[102] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall

---

[102] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Docket Entry 297).

have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The use of force and use of force investigations functionality of the Department's Case Management System went live on December 13, 2017.

- By January 2018, the Department provided the 8-hour CMS Training to almost all Facility-level Captains, ADWs, Deputy Warden In Commands ("DWICs"), and Wardens, as well as staff from ID, Trials, the Legal Division and the Assistant Chiefs, Bureau Chiefs, and Chief of Department's Office.

## ANALYSIS OF COMPLIANCE

CMS's implementation is a very significant milestone for the Department and the Monitoring Team remains impressed by the Department's diligent planning, training, and organization surrounding its rollout. CMS is expected to completely change the way the Department conducts use of force investigations and related discipline, as well as the Department's ability to review and aggregate data of this information.

The Monitoring Team reviewed CMS capability, by reviewing the detailed CMS manual and attending a CMS training, and confirmed its functionality meets the requirements of the Consent Judgment. The investigations' workflows in CMS are extremely detailed and thoughtful and the Monitoring Team is looking forward to receiving CMS-generated investigation files and aggregate reports during the Sixth Monitoring Period. CMS also has the capacity to track and run reports as required by ¶ 18. Given that CMS was only implemented at the end of the Monitoring Period, the Monitoring Team has not yet had adequate time to evaluate such reports.

Although the roll-out of CMS was largely successful, the rollout was not without some challenges (as to be expected with the rollout of any large technological system). The biggest hurdle is Staff familiarizing themselves with the system. CMS is a tremendous change in practice for Staff based in the Facilities, who previously conducted their work in a mainly paper-based system, so Staff must acquaint themselves with all new practices. As noted in the Use of Force Reporting section above, the Department is providing additional support to the Facilities to help familiarize Staff with CMS. The Department's IT staff has also had to adjust some of the workflows within CMS to address glitches that were encountered after the system went live. For example, set parameters in the investigations workflows require Staff of a certain rank to complete certain tasks. The workflow did not account for situations when the individual with the assigned task may be unavailable and someone needs to fill in. For example, if an ID Supervisor is out of the office, the Deputy Directors of Investigation need to be able to assign Preliminary Reviews to investigators (this has since been fixed).

CMS will also support EWS because the system can allow information about uses of force and involved Staff to be examined, sorted, and analyzed in a variety of ways and minimizes reliance on manual tracking processes. While EWS is not a computerized system that can speak to CMS, the interplay of the CMS data and EWS Monitoring Program will be maximized through the work of EWS staff.

| **COMPLIANCE RATING** | **¶ 6.** Substantial Compliance<br>**¶ 18.** Partial Compliance |
| --- | --- |

8. **STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)**

Meaningful, consistent, and timely accountability is an indispensable element of the overall effort to reduce and deter the use of excessive and unnecessary force by Staff. This Monitoring Period, the Monitoring Team continued to focus on the Department's processes to identify and address Staff misconduct more quickly as described in more detail in the Identifying & Addressing Use of Force Misconduct section above.

The Monitoring Team's assessment of compliance is below.

| **VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)** |
| --- |
| ¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").<br>¶ 2.<br>    e.  If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br>• The Department **_identifies_** misconduct:<br>  o  Close-in-time to the incident through: Rapid Reviews; Avoidables; Preliminary Reviews (and corresponding Facility Referrals) and the Immediate Action Committee.<br>  o  Through Facility Investigations and ID investigations.<br>• The Department **_responded_** to misconduct in the following ways: |

119

o   Corrective Interviews, counseling, retraining, Command Discipline, and suspension.

o   Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff **and** PDRs for probationary staff.

**ANALYSIS OF COMPLIANCE**

¶¶ 1 and 2(e) are addressed together because, read together, they require timely, adequate and meaningful discipline. While the Department has a reasonable process to identify incidents close-in-time where corrective action is appropriate as required under ¶ 2(e) through Rapid Reviews, Avoidables, Preliminary Reviews and the Immediate Action committee, for various reasons, the Department does not consistently identify and respond to relevant misconduct as described in more detail in the Identifying & Addressing Use of Force Misconduct section of this report. These processes must be shored up to achieve Substantial Compliance.

As for the imposition of meaningful corrective action, the Department does not impose meaningful corrective action nearly often enough to achieve compliance with ¶ 1, also as described in more detail in the Identifying & Addressing Use of Force Misconduct section of this report. While misconduct certainly does not occur in _every_ use of force incident, the Department's findings are far out of sync with the frequency of improper, unnecessary, and excessive uses of force identified by the Monitoring Team during their close scrutiny of incidents. The Department must rely on various strategies to ensure that appropriate, meaningful, and timely discipline is imposed. These responses must be proportional. Accordingly, certain violations may only require a corrective interview or re-training, other misconduct a Command Discipline, while other misconduct may require formal discipline. Given the lengthy process to impose formal discipline, the Monitoring Team continues to strongly encourage the Department to utilize processes where the response to misconduct can occur more swiftly based on the facts of the case. In order to achieve compliance, the Department must demonstrate the entire spectrum of responses are utilized appropriately and reasonably to address identified misconduct.

| **COMPLIANCE RATING** | ¶ **1.** Non-Compliance<br>¶ **2(e).** Partial Compliance |
| --- | --- |

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)**

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

•   The Department promulgated the New Disciplinary Guidelines on October 27, 2017.

**ANALYSIS OF COMPLIANCE**

The New Disciplinary Guidelines address all of the specific requirements outlined in ¶ 2(a) to (d) of the Consent Judgement (see pgs. 25-26 of the Consent Judgment for the full text). Prior to their promulgation, the Department consulted with Staff representatives and the Monitoring Team the about revisions. Given the timing of this Report, the Trials Division has not yet processed any cases under the new guidelines and thus compliance cannot yet be assessed on the Department's implementation of the guidelines.

| **COMPLIANCE RATING** | **¶ 2. (a) to (d)** (Develop Guidelines) – Substantial Compliance<br>**¶ 2. (a) to (d)** (Implement Guidelines) – Not Yet Rated |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

    b.    If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Facilities refer MOCs to Trials if the conclusion of a Use of Force Investigation merits charges.

- The Trials Division continued its manual process for tracking information related to cases until CMS was implemented.

- Trials continued to serve changes as described on pgs. 176-177 of the Fourth Monitor's Report.
  - Trials served charges in **178 of 179 (99%)** cases requiring the service of charges (10 additional cases were administratively filed before the service of charges).

- - 169 (95%) of charges were served within 30 days, eight were served between 31 and 45 days and one charge was served beyond 45 days after receipt of the MOC.
- Trials began to serve discovery more timely.
  - o In cases where charges were served during the Monitoring Period, discovery was served in **165 of 169** cases.[103]
- Trials identified **51** cases for Off Calendar Dispositions ("OCD") to negotiate resolutions for cases without the need to appear before OATH.
- Trials completed **256** closing memos during this Monitoring Period.
- At the conclusion of the Monitoring Period, Trials had **184** cases pending.

**ANALYSIS OF COMPLIANCE**

*ID Referral of Charges* (¶ 3(a))

The Monitoring Team has not yet had an opportunity to systematically assess ID's compliance with this provision. It is expected that CMS will assist in the Monitoring Team's efforts to evaluate the Department's compliance with this provision and expects to begin monitoring this provision in the next Monitoring Period.

*Facility Referral of MOC to Trials* (¶ 3(b))

The Facility conducts investigations of incidents that generally are less severe. Accordingly, the majority of violations identified are best resolved at the Facility level. However, if misconduct is identified through the Facility Investigation that merits charges, the Facility refers the MOC directly to Trials. The Monitoring Team has not yet evaluated this provision as further assessment of current documentation is needed. The Monitoring Team intends to evaluate this in the next Monitoring Period.

*Trials* (¶ 3(c))

The process to impose formal discipline for tenured Staff is outlined in Appendix B. ¶ 3(c) focuses on the work of Trials to address UOF Violations of tenured Staff. It is important to note that while the Monitoring Team focuses on Trials' work related to cases involving tenured Staff and UOF violations, Trials is also responsible for imposing formal discipline for all violations by tenured Staff in the agency.

The Trials Division continues to progress toward the outcomes required by this provision and has worked diligently to address the deficiencies identified in the previous Monitor's Report. The Deputy General Counsel of Trials and her team demonstrate a genuine commitment to reforming the division and achieving the overarching goal of timely discipline.

*Service of Charges*

Throughout 2017, the Trials Division sustained a reasonable process to serve charges timely in the vast majority of cases. Of 287 charges served in 2017:

- 252 (88%) were served within 30 days;

---

[103] Trials closed nine cases where charges were served in this Monitoring Period before the service of discovery.

- 28 (10%) were served between 31 and 45 days;
- and seven (2%) were served beyond 45 days.

Trials' made quick progress and sustained solid results for an entire calendar year. Accordingly, Trials has achieved Substantial Compliance with this requirement.

*Administratively Filed Cases*

Cases are administratively filed for a number of reasons, including when the case is not supported by a preponderance of the evidence, even though it may have been substantiated at an earlier stage. Such cases must be reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy General Counsel of the Legal Division. The proportion of cases administratively filed decreased from the prior Monitoring Period (11% versus 21%, respectively). This Monitoring Period, the Monitoring Team reviewed 51 cases administratively filed to determine the reasonableness of Trials' decision not to pursue those charges.[104] The reason the 51 cases reviewed were administratively filed fell into five main categories:

| Reason | Number of Cases |
|---|---|
| (1) Insufficient Evidence to Support Formal Discipline (including two in which the statute of limitations for serving charges had expired) | 35 (68%)[105] |
| (2) The respondent retired or died | 6 (12%) |
| (3) The ALJ questioned the sufficiency of evidence after an OATH Conference | 6 (12%) |
| (4) Clerical reasons (i.e. charges were duplicative of another case) | 3 (1%) |
| (5) Commissioner recommended administratively filing in the interest of justice. | 1 (2%) |

The Monitoring Team found the determination to administratively file the 16 cases in categories two to five were all reasonable. The Monitoring Team conducted a more thorough assessment of 19 of the 35 cases[106] administratively filed for insufficient evidence, including review of the underlying investigative documentation, to determine if the finding was reasonable. The Monitoring Team found that the decision not to pursue the charges was reasonable in all instances, representing sound legal judgment based on the strength of the evidence.

*Expeditious Prosecution of Disciplinary Cases*

Assessing the prosecution of disciplinary cases requires a review of several processes. In order to achieve compliance, Trials must ensure timely service of charges and discovery and must have procedures for quickly disposing cases. This requires assessing the individual circumstances of each case and to have multiple options for moving a case forward (e.g. settlement or proceeding with OATH). During this Monitoring Period, Trials made notable progress in serving discovery more

---

[104] These 51 cases represented all cases that were administratively filed where Trials received the MOC after November 1, 2015 and that were closed by September 2017.

[105] Charges were served in 19 of the 35 cases before the case was administratively filed.

[106] This represents a total of 13 ID investigations, as some investigations resulted in MOCs for more than one officer.

timely; developing a process to settle cases outside of OATH, and eliminating the backlog of older cases.

- **Service of Discovery**

During this Monitoring Period, Trials achieved some improvement in serving discovery compared to the last Monitoring Period. Trials now has imposed a goal to serve discovery with 30 days of serving charges. Discovery was served within 30 days in 63% of these recent cases, which is a significant increase from the previous Monitoring Period where discovery was served within 30 days in only 32% of cases. The chart below illustrates the time it took Trials to serve discovery for all cases where the MOC was received during this Monitoring Period. Continued improvement in the timely service of discovery is needed in order to achieve Substantial Compliance.

| Total | 01 to 15 Days | 16 to 30 Days | 30 to 60 Days | 60 to 120 Days | 120 to 180 Days | 180 to 365 Days | Pending Service of Discovery |
|---|---|---|---|---|---|---|---|
| 169 | 73 (43%) | 34 (20%) | 44 (26%) | 13 (8%) | 0 (0%) | 1 (1%) | 4 (2%) |

- **Fast-Track Cases**

During this Monitoring Period, Trials accepted a total of five cases identified as Fast-Track matters from ID (i.e., ID accelerated the investigation in order to expedite the imposition of discipline). While the concept has merit, it has not been meaningfully implemented as discussed in more detail in the Use of Force Investigation section of this report.

- **OCD**

Off Calendar Dispositions ("OCD") is a proactive and innovative approach devised by Trials at the close of the Fourth Monitoring Period and was implemented during the current Monitoring Period. OCD cases are those with charges drafted and served, that are assigned to a Trials attorney, and are not cases where the Department is seeking severe penalties or termination. Cases meeting OCD criteria are negotiated at headquarters on a regular basis between Trials' attorneys and Respondents, circumventing the need to appear at OATH. Of the 51 OCD cases identified:

- 65% (33) were closed (16 were closed by Trials within six months of the receipt of the MOC, 10 closed between six and 12 months, and seven were closed beyond 12 months);
- 31% (16) were pending with Trials; and
- 4% (2) were pending final approval.

This strategy has great potential for closing cases more quickly. The Monitoring Team recommends that Trials maximize this process by identifying cases for OCD as soon as possible once the case has been assigned to Trials.

- ***Approval of Trials Closing Memos***

A closing memo must be drafted to close each case at Trials. The Monitoring Team evaluated the time it takes to draft, edit, and finalize the memo and for the Trials Deputy General Counsel to

approve the closing memo for all NPAs to determine whether this was occurring in a reasonable time frame. In this Monitoring Period, 94% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within a month (~60% within two weeks, ~ 25% in three weeks and ~9% in four weeks with the remaining 6% completed within 50 days) of the NPA being executed. Overall, this process appears reasonable, but the Monitoring Team encourages Trials to continue to refine this process to ensure as many closing memos as possible are completed in less than three weeks.

- ***Time for Trials to Close Cases***

Trials continued to address its backlog of cases pending for over a year (i.e., Trials received the MOC over a year ago). The reduction of the backlog at Trials is best demonstrated by coupling the data about closed cases with the cases that remain pending as of the end of the Monitoring Period. As of the end of the Monitoring Period, Trials had a total of 184 cases pending (63% of the cases pending at Trials had been with Trials less than six months). Among the older cases, 4% had been pending between six and 12 months; and 19% over one year. In addition, a number of cases (7%) remained pending with law enforcement. While consideration of serious cases by law enforcement for potential criminal prosecution is of critical importance, the Monitoring Team is concerned by the length of time such consideration takes, leading to stale discipline if and when the case is returned to the Trials Division for resolution (especially when Law enforcement elects not to bring a case).

The reduction of the backlog meant Trials could focus on resolving cases closer-in-time to the receipt of the MOC. During this Monitoring Period, 60% of the 256 cases Trials closed had been pending less than a year with Trials. This is an improvement over the last Monitoring Period where older and fewer cases were closed. Further enhancements to the processing of cases are necessary to achieve compliance. It is expected that improved times to serve discovery and increased use of OCD will help achieve that goal.

| Time between MOC Receipts and Trials Completes the Case Closing Memo | Fourth Monitoring Period | | Fifth Monitoring Period | |
|---|---|---|---|---|
| **Total** | **231** | | **256** | |
| 6 months or less | 50 | 22% | 78 | 30% |
| 6 to 12 months | 51 | 22% | 76 | 29% |
| 1 to 2 years | 63 | 27% | 85 | 33% |
| 2 to 3 years | 49 | 21% | 17 | 7% |
| 3+ Years | 18 | 8% | 2 | 1% |

- **Status of Closed Cases**

Trials closed 256 cases in this Monitoring Period. The types of case closures are presented in the chart below:

| Type of Case Closure | 256 | |
|---|---|---|
| NPA | 216 | 84% |
| Administratively Filed | 29 | 11% |
| Deferred Prosecution | 8 | 3% |
| Guilty Verdict | 3 | 1% |

The majority of closed cases (84%) were closed via NPA with dispositions that spanned a range of penalties:

- 22% were referred for Command Discipline[107];
- 22% imposed 3-10 days of leave forfeiture;
- 23% imposed 11-20 days of leave forfeiture;
- 15% imposed 21-30 days of leave forfeiture; and
- 15% imposed more than 30 days (of these, 19 cases imposed more than 51 days).

These differences suggest the disposition is based on an assessment of individual circumstances. During this Monitoring Period, the Monitoring Team evaluated the use of NPAs on a number of cases in which objective evidence of misconduct was available, finding that the discipline imposed was reasonable and appropriate.

_Conclusion_

The Trials Division made significant progress during the current Monitoring Period and the Monitoring Team applauds the hard work of the division. The Monitoring Team encourages the Trials Division to maintain its progress and further integrate the initiatives discussed above to ensure cases are prosecuted as expeditiously as possible once assigned to Trials. While the focus of this section is on the efforts made by Trials to dispose of cases, it is worth noting that the long delays in completing investigations continues to undercut the overall goal of imposing timely discipline.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3(a)**. Not Yet Rated<br>**¶ 3(b)**. Not Yet Rated<br>**¶ 3(c)**.<br>    • Substantial Compliance (Charges)<br>    • Substantial Compliance (Administratively Filed)<br>    • Partial Compliance (Expeditiously Prosecuting Cases) |

---

[107] The spectrum of misconduct in the cases received by Trials, like ID, has evolved given the increased types of cases that are now investigated by ID. Accordingly, the Monitoring Team has strongly encouraged that Trials leverage the use of Command Discipline in order to resolve these cases which would have traditionally been managed at the Facility Level (but are now funneled to ID) and can be disposed of more quickly.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Trials' current staff consists of one Deputy General Counsel, four Directors, 21 attorneys, and 12 support staff.

- Trials hired one attorney (and one attorney returned from maternity leave) and two Legal Coordinators (who had not yet started as of the end of the Monitoring Period).

- Trials is actively recruiting for three additional attorneys.

- Trials reports it reduced the number of open cases from 1,002 on July 7, 2017 to 659 on December 31, 2017.[108]

**ANALYSIS OF COMPLIANCE**

While the timeliness of case closure has improved, as described above, the caseload[109] for Trials staff is still too high to achieve the reforms required by the Consent Judgment, particularly because staff's caseload is expected to increase as investigations are closed more timely and as the New Disciplinary Guidelines are implemented.

The Monitoring Team strongly encourages the Department, Office of Labor Relations ("OLR"), and OMB to continue to work together collaboratively in order to ensure that the Department can meet the obligations of the Consent Judgment. Further, the Monitoring Team encourages the Department to maintain or increase its recruitment efforts to ensure the Department attracts the best possible candidates.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Trials reports that all NPAs are consistent with the Disciplinary Guidelines.

- All NPAs are reviewed and approved by the Deputy General Counsel of Trials.

- Following approval by the Deputy General Counsel of Trials, the NPA is sent to the DOC's General Counsel for reviews and approval. The General Counsel then returns the NPA to Trials and Trials sends the NPA to the Commissioner for final approval.

    o Part way through the Monitoring Period, the General Counsel delegated her review and

---

[108] Note, this figure includes all cases before Trials and not just use of force cases.
[109] Caseloads include a mixture of use of force cases, as well as Equal Employment Opportunity Office ("EEO"), Medical Separation, PREA, and others that are not measured in this Report.

approval responsibility to the Deputy Risk Manager. Further, the Deputy Risk Manager now sends all reviewed and approved NPAs directly to the Commissioner.

- The Commissioner reviews and approves all NPAs and returns the NPA to Trials for processing.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has generally found that the discipline imposed via NPA is proportional to the misconduct as discussed in Identifying & Addressing Use of Force Misconduct section and ¶ 3 above. During this Monitoring Period, the process for finalizing NPAs was closely scrutinized to ensure maximum efficiency. A backlog and several inefficiencies were identified in the review and approval process. As a result of these findings, the Department revised its process for reviewing and approving NPAs. After these new processes were implemented, the time to finalize NPAs improved significantly. A compliance rating is being withheld until the next Monitoring Period because the Monitoring Team needs to assess data collected over a longer period of time.

| COMPLIANCE RATING | ¶ 5. Compliance Rating Withheld |
|---|---|

## 9. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion or assignment to Special Units or, in circumstances where Staff have been disciplined multiple times, requirements for reviewing that Staff Member's assignment generally. The Department maintains four distinct policies to address ¶¶ 1-6 of this section: (1) a Directive that clearly sets forth which division or unit of the Department is responsible for screening and reviewing each category of individuals (e.g., new hires, volunteers, certain unit assignments, etc.); (2) an Operations Order governing applications for steady post assignments that sets forth the details of the screenings required for certain specialized units and posts; (3) a Directive governing the promotion process for Captains and above that sets forth the details of the required pre-promotional screenings; and (4) an Operations Order that articulates the screenings required for assignments to certain units, such as the Canine Unit, Communications Unit, ESU, and others. All four policies and associated forms remained in effect during the Fifth Monitoring Period.

*Steady Staff & Screening of Staff Assigned to Special Units*

In this Monitoring Period, the Department focused on the process of assigning Staff to work consistently in the same housing area. This process of steadying Staff is expected to improve Facility operations by increasing the Staff Member's investment in their assignment, improving the rapport between Staff and inmates and provide for a more cohesive working environment. Once the steadying-up process is completed, all Special Unit Posts will have Staff members who are either steady, or have been awarded the post through the screening, application and bidding process described in Operations Order 10/17 (*see* the Third Monitor's Report (at pg. 195) and the Fourth Monitor's Report (at pg. 184)). The Monitoring Team previously assessed the screening of Staff assigned to Special Units in the Fourth Monitor's Report (at pgs. 188-189). Given the Department's efforts to steady staff, the Monitoring Team did not assess compliance with the screening requirements for the Special Units in this Monitoring Period. The Monitoring Team intends to conduct a subsequent assessment of compliance with the obligation to screen Staff assigned to Special Units (¶¶ 4 to 6) in the Sixth Monitoring Period.

The Monitoring Team's compliance assessment is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the [provisions enumerated in (a) to (d)]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Directive 2230, Pre-promotional Assignment Procedures, remains in effect.

- During this Monitoring Period, the Department promoted the following Staff:

    o 102 Corrections Officers were promoted to Captain.

    o Four Captains were promoted to ADW.

    o Five ADWs were promoted to DW.

    o Chief of Department.

**ANALYSIS OF COMPLIANCE**

In order to identify Supervisors with the proper attributes, the Consent Judgment requires the Department to consider a candidate's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment also mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including the requirements of this section of the Consent Judgment. The promotion process is depicted in the flow chart in ***Appendix C: Flowchart of Promotions Process*** and is described in greater detail in the Third Monitor's Report (at pgs.190-192).

To verify the Department was screening and promoting Staff in accordance with these criteria, the Monitoring Team reviewed the screening documentation for the following Staff:

- 33 Officers promoted to Captain (32% of total promoted)
- 19 Officers not-promoted to Captain (20% of Officers who were not selected for promotion)
- All four Captains promoted to ADW
- All five ADWs promoted to DW

*Review of Candidates (¶ 1)*

The Monitoring Team reviewed the screening and promotion materials for Staff screened for promotion to Captain, ADW, DW and Chief of Department, and found that the Department's assessment of Staff satisfied the requirements of the "Review" as defined by (¶ 1). The Monitoring Team also met with the Commissioner and the Chief of Department who confirmed they review and consider the screening materials when making a determination on whether to promote a Staff member.

*Disciplinary History (¶ 2)*

The Monitoring Team found that the sample of the Staff who were promoted had not been found guilty or pleaded guilty to the specified violations on two or more occasions in the last five-years.[110] Screening packages will continue to be scrutinized to assess compliance with this provision.

---

[110] In this Monitoring Period, formal discipline was not imposed on Staff close in time to their promotion.

*Pending Disciplinary Matters* (¶ 3)

The Monitoring Team found that the sample of the Staff who were promoted did not have pending disciplinary charges at the time of promotion.

*Overall Assessment*

As described above, the Department has satisfied the screening requirements when conducting promotions. In this Monitoring Period, the Monitoring Team observed the Department utilized improved judgment and thoughtful consideration when deciding whether to promote a Staff member. Thus, the Department has achieved Substantial Compliance.

The Staff the Department choses to promote sends a message to line Staff about the culture it intends to cultivate and their behavior sets an example for Officers. A small number of Staff were promoted who, although screened appropriately, raised concern about their fitness to serve as Supervisors. These concerns would not be identified through the reviews required by the Consent Judgment. Accordingly, the Monitoring Team strongly recommends the Department consider leveraging other sources of information, including EWS assessments, to ensure that Staff who are selected for supervisory roles have the leadership capacity to be role models, are setting a positive example for others to follow, do not have a concerning use of force history and are managed appropriately (*see* Fourth Monitor's Report (at pgs. 187-188)).

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |

## 10. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The Department's Correction Officer Recruitment Unit ("Recruitment Unit"), and Applicant Investigation Unit ("AIU"), continued their coordinated effort to identify and select qualified Staff to meet the Department's staffing needs. These units continued to work together to improve the quality and breadth of the candidate pool. The recruit classes of new Officers this Monitoring Period increased in size from the last Monitoring Period, as the classes have done so during the pendency of the Consent Judgment, resulting in a total of 3,965 graduates from the Training Academy since the Effective Date. Further, an additional 832 candidates matriculated in

the Academy in January 2018. The total number of recruits that have matriculated and/or graduated during the pendency of the Consent Judgment is demonstrated in the chart below.

| Academy Class Graduation Date | December 2015 | May 2016 | November 2016 | May 2017 | November 2017 | January 2018 (projected) |
|---|---|---|---|---|---|---|
| Number of Graduates | 592 | 618 | 711 | 900 | 1,144 | 832 |

During the Fourth Monitoring Period, the Monitoring Team continued to assess the Department's Recruitment Program (¶ 1) and analyzed another sample of background investigations conducted by AIU to assess the Department's compliance with the selection requirements of the Consent Judgment (¶¶ 2, 3).

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department conducted outreach to potential candidates through Career Fairs and Community Events, engaging over 6,000 individuals at over 200 events during this Monitoring Period.
- The Department continues to maintain or see quantitative increases in key areas including Department of Citywide Administrative Services ("DCAS") Exam Filers and Takers, and social media followers on Facebook, Twitter, Instagram and YouTube.

### ANALYSIS OF COMPLIANCE

The Department's success in attracting and training a large number of well-qualified candidates to serve as Correction Officers depends on the success of the Recruitment Unit, which has consistently delivered throughout the pendency of the Consent Judgment.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- AIU continues to process potential candidates as described in the first four Monitor's Reports,[111] conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.

- AIU is continuing its efforts to improve the Unit's organization, staffing, and policies to enhance certain areas of the investigations, including enhancing Field Team Visits and dedicating significant resources to an Agility Team.

- AIU continued to work with DCAS this Monitoring Period, meeting on a bi-weekly basis, to ensure the timely availability of Civil Service Lists.

- AIU screened 3,306 potential candidates to fill the Academy classes that graduated in November 2017:

| | December 2015 Graduating Class | May 2016 Graduating Class | November 2016 Graduating Class | May 2017 Graduating Class | November 2017 Graduating Class |
|---|---|---|---|---|---|
| **Total number of candidates screened for the graduating class** | 2,222 (*100%*) | 2,473 (*100%*) | 2,283[112] (*100%*) | 3,441 (*100%*) | 3,306 (100%) |
| **Total number of candidates approved for hire[113]** | 630 (28%) | 665 (27%) | 746 (*33%*) | 950 (28%) | 1,220 (37%) |

---

[111] *See* First Monitor's Report (at pgs.115-117); Second Monitor's Report (at pgs. 157-159); Third Monitor's Report (at pg. 244), and Fourth Monitor's Report at (pgs. 192-196).

[112] Many candidates are neither recommended nor disqualified, and fall into other categories such as the candidate declined to continue with the hiring process, withdrew from certification, etc.

[113] Not all candidates approved for hire will become Correction Officers. Some will decline the offer and not matriculate at the Academy, others may not complete Academy training.

| | | | | | |
|---|---|---|---|---|---|
| **Total number of candidates disqualified based on medical screening** | 114 | | 120 (*5%*) | 135 (*4%*) | 177 (5%) |
| **Total number of candidates disqualified based on Psychological screening** | | | 71 (*3%*) | 92 (*3%*) | 183 (5.5%) |
| **Total number of candidates disqualified based on background investigation screening** | | | 42 (2%) | 53 (*1.5%*) | 6 (<1%) |

## ANALYSIS OF COMPLIANCE

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report.

*Assessment of Background Investigations* (¶ 3)

As in the Second, Third, and Fourth Monitoring Periods, the Monitoring Team audited a sample of the background investigations conducted by AIU for candidates who were considered and selected for the November 2017 graduating class.

The Monitoring Team reviewed the background investigative files for a random sample of approximately 10% (117) of the selected candidates. The background investigation files clearly demonstrated that AIU reviewed and summarized in the case review sheet each candidate's criminal history, employment history, relationships or affiliation with gangs, relationships with current inmates, frequency of appearance in the inmate visitor logs, medical screening (including drug tests), presence on state or local child abuse registries (Family Watchdog and WEBCRIMS), prior employment references, and financial history including credit checks. The investigative files evidenced in-depth investigations into each candidate's background. Included in the candidate files reviewed this Monitoring Period was an example of a candidate who was disqualified by AIU due to their criminal record. Despite the Department's in-depth investigation supporting a sound decision to disqualify, the Civil Service Commission Appellant Division overturned AIU's disqualification. This case demonstrates the high burden the Department must meet in order to disqualify an individual.

---

[114] The Department only began tracking the specific reason a candidate was disqualified (i.e. due to medical, psychological screening, background investigation) with the candidates screened for the class that graduated in November of 2016. Previously the Department tracked the number of candidates who were disqualified for any reason.

While the Department generally conducts adequate background investigations, the Monitoring Team continued to see the same two areas of deficiencies within the files as discussed in prior Monitor Reports regarding Third-Party Employment Verification and Field Team Visits.[115]

- **Third-Party Employment Verification**

The Monitoring Team found that candidates selected for hire were often missing the responses from third parties to verify a candidate's prior employment. Through its review of hundreds of AIU files during this and other Monitoring Periods, the Monitoring Team rarely had concerns about information present in a candidate file as to a candidate's fitness to become a Correction Officer.  However, the unknowns represented by loose ends like unreturned employment verification forms raise such concerns merely because of *possible,* albeit unlikely, unknown negative information.

- **Field Visits**

The Monitoring Team has raised concerns regarding the timing of the Field Visits and lack of documentation as discussed in the Fourth Monitor's Report (at pg. 195). In response to these concerns, AIU implemented a new form and practice for Field Visits which now uses collateral contacts and consistent information gathering for Field Visits as the Monitoring Team had previously recommended. While the Monitoring Team appreciates the updated practice in information gathering, the Field Team visits are still not occurring contemporaneously with the background investigation, which is a continued concern.

*Comprehensive Objective Process for Selection and Hiring* (¶ 2)

Currently AIU provides guidance to investigators on how to consistently manage background investigations which relies on a form-driven process that ensures specific information is collected and considered for each candidate. The Monitoring Team continues to recommend that AIU create a comprehensive Investigator Manual which would include, among other things, guidance for the standards that should be applied by the investigator, the type of information that should be gathered, and how information should be documented and incorporated in candidate files. Given the concerns identified above related to third-party verification and Field Visits, the Monitoring Team has recommended that policies addressing those two areas be prioritized in development. AIU hired a full-time policy writer in the Fifth Monitoring Period who is set to begin working in the Sixth Monitoring Period. The Department has reported a commitment to work with the Monitoring Team on the development of these policies and the Monitoring Team is looking forward to working with the policy writer going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3.** Substantial Compliance |

---

[115] *See* Second Monitor's Report (at pg. 159); Third Monitor's Report (at pg. 245), and Fourth Monitor's Report (at pg. 195).

**11. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)**

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, reviews the circumstances warranting the potential arrest and determines that the recommendation is based on probable cause. The purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team did not evaluate the Department's efforts to achieve compliance with this section during the Fifth Monitoring Period. The Monitoring Team intends to evaluate this process in the Sixth Monitoring Period.

**12. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)**

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. The Department's investment in compliance with the *Nunez* Consent Judgment has continued to increase under the leadership of the new Commissioner and Chief of Department. Implementation continues to be managed jointly by the Complex Litigation Unit and the Nunez Compliance Unit. The number of Department staff assigned to work primarily on the implementation of the Consent Judgment continued to grow throughout the Fifth Monitoring Period. An Assistant General Counsel manages a team of 11 non-uniform staff in the Complex Litigation Unit. An Assistant Commissioner for Quality Assurance manages the Nunez Compliance Unit, which grew to a total of 11 staff members (eight uniform Staff members and three non-uniform staff).

Members of the Complex Litigation Unit and the Nunez Compliance Unit work directly with a variety of Staff from all Facilities and commands, including the FIS officers, EAM

officers, Deputy Wardens of Security and Administration, and Commanding Officers. The Division Chief and Bureau Chiefs are also involved on a daily basis, ensuring accountability up the chain of command. Further, weekly Nunez Compliance Meetings are held with the Chief of Department, two Bureau Chiefs of Facility Operations, the Divisional Chiefs, the Acting Commissioner of Quality Assurance, the Assistant General Counsel responsible for the Complex Litigation unit and members of NCU and CLU.

As described in the Third Monitor's Report (at pgs. 6-7), the Monitoring Team strongly recommended that the Department commit adequate resources to sustain this reform effort. The amount of work required to develop and implement the reforms continues to confirm the benefit of and need for a dedicated unit to focus on compliance. At the end of January 2018, the Department reported it received additional funding from OMB to appoint a new ADW in each Facility to act as a *Nunez* liaison. While the Monitoring Team is encouraged that the Department has provided additional resources to the unit, given the enormity of the task of shaping practice, measuring performance and demonstrating compliance, additional NCU staff will be necessary.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[116]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department revised a number of policies and procedures to conform to requirements of *Nunez*.

---

[116] The Monitor approved an extension of this deadline to January 31, 2018.

- The Department developed and implemented Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance and routine review of Department policies.

- The Department completed its review of all Consent Judgment-related Directives and Operations Orders to determine if current policies are consistent with the terms of the Consent Judgment, whether any revisions are necessary, and whether new policies need to be developed.

- An extensive Excel chart with a breakdown of each provision of the Consent Judgment and the relevant policies was developed collaboratively with the Monitoring Team. The document links all *Nunez*-related Directives and Operations Orders to their applicable Consent Judgment provisions.

**ANALYSIS**

The Department has continued to evaluate and revise policies, procedures, and trainings to ensure they are consistent with the requirements in the Consent Judgment and with each other. The review identified that, in general, the Department's policies are consistent with the Consent Judgment and only require minor revisions. During the Sixth Monitoring Period, the Department plans to work with the Monitoring Team to address the necessary revisions. The Department is also identifying an approach for assessing whether existing Command Level Orders ("CLOs") are up-to-date and consistent with existing Directives and Operations Orders.

| **COMPLIANCE RATING** | ¶ **1.** Requirement has not come due |
| | ¶ **2.** Requirement has not come due |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Acting Assistant Commissioner of Quality Assurance, Deputy General Counsel and an Assistant General Counsel share the responsibilities of the Compliance Coordinator.

- The CLU provided the Monitoring Team with responses to over 300 requests for information and documentation (including producing over 300 use of force files such as Preliminary Reviews, Facility Investigations, and Full ID Investigations). The Department also responded to over 95 feedback and/or recommendations from the Monitoring Team regarding practices that often require significant collaboration between the Department and the Monitoring Team to

address and implement. The CLU also produces over 60 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.

- On more than 55 business days during the Monitoring Period, the NCU scheduled and/or facilitated meetings between the Monitoring Team and the Commissioner, her executive staff, and other DOC staff members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners and also facilitated site visits to all of the Facilities.

### ANALYSIS OF COMPLIANCE

The Monitoring Team communicates almost daily (and often multiple times a day) with the Compliance Coordinators and members of the CLU team, as well as other members of the Department. The Department's staff in CLU are hardworking, smart, conscientious and provide invaluable assistance to the Monitoring Team. Not only do they manage the flow of information to the Monitoring Team, arrange meetings and phone calls between Department Staff and the Monitoring Team, and provide logistical support to Monitoring Team site visits, they have also begun to organize, analyze and interpret information before it is submitted to the Monitoring Team. These efforts have helped to develop joint understandings of the barriers to compliance and potential solutions to them. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

The Monitoring Team's experience in other jurisdictions suggests that progress is accelerated when those involved in the operation of the Facilities are intimately involved in developing new procedures, assessing performance, identifying barriers and developing solutions to identified problems. In so doing, greater ownership of both the problems and the path forward is augmented, and role modeling and culture change begin to hasten the speed of reform. The Monitoring Team encourages the Department to continue its efforts to push the responsibility for compliance into the Facilities, including incorporating the newly funded ADW positions into this process. Finally, the Monitoring Team also encourages recognition for Staff as milestones are achieved. [117]

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

---

[117] The Monitoring Team is encouraged that the Chief of Department, as well as the NCU, have both taken opportunities in public forums to recognize Facilities and/or Staff Members who have achieved milestones.

# CURRENT STATUS OF YOUNG INMATES

_Trends in Violence_[118]

As discussed in the Introduction to this report, adolescents and young adults contribute to a disproportionate share of the Department's uses of force and inmate-on-inmate violence. That said, within-group comparisons are also illustrative, particularly since two full years of data are available. During 2016 and 2017, the overall rate of violence has not changed appreciably for Young Inmates, despite some short peaks and valleys. However, the overall rate of UOF is trending downward. These trends are discussed in detail, below.

The table below and the graph on the next page show that, during the current Monitoring Period, the rates of inmate-on-inmate violence among Young Inmates spiked for both age groups (16/17-year-olds and 18-year-olds) during the latter part of 2016, but throughout 2017, rates of violence for both age groups lowered and stabilized somewhat. The peaks and valleys in the rates of violence have not endured beyond a couple months and overall, the rate of violence has remained about the same for the past two years (shown by the dotted trend lines in the graph). Both the table and graph demonstrate that the rate of violence among Young Inmates has not yet shown a substantial or sustained decrease.

| Average Rates of Violence, 16, 17, and 18-year-olds | | | | | |
|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | **Average** |
| 16/17-year-olds | 27.4 | 35.9 | 26.5 | 29.4 | **29.8** |
| 18-year-olds | 21.6 | 31.0 | 25.6 | 22.7 | **25.2** |

---

[118] It is important to recognize that these data are examined at a specific point in time, while the reforms being undertaken (particularly regarding incentive programs and alternative disciplinary measures) are continually being implemented and refined. Furthermore, rates of violence are impacted by many, many things—most of which are being addressed by the Consent Judgment, though some are in their infancy.

The Monitoring Team's analysis of Preliminary Reviews from GMDC and RNDC suggested that a greater proportion of fights are occurring on the housing units, with a diminishing proportion occurring in school. Youth continue to seem undeterred by Staff presence, although this may be due in part to the fact that the skills taught in SCM and Direct Supervision training have yet to be put into action in any broad sense. Fights are sometimes facilitated by security lapses including a failure to properly supervise the area, failure to de-escalate rising tensions, cell doors being open when they should be secured, poorly executed pat searches, and the like. As Staff's operational skills improve, many of these violent incidents may be averted.

A review of the inmate Fight Tracker data continues to illustrate the differing levels of involvement in violence among inmates both within and across age groups. A small number engage in frequent violence (25 16/17-year-olds and three 18-year-olds were involved in 6+ fights during the six-month period). A larger segment is involved in more intermittent violence (60 16/17-year-olds and 41 18-year-olds were involved in 3-5 fights in the six-month period). An even larger segment was involved in only one fight (118 16/17-year-olds and 164 18-year-olds), and still other inmates were not involved in violence at all during the six-month period, though they may have been involved in other forms of misconduct. Given the turnover in the inmate population, these data are not easy to interpret, but they do suggest that consequences of different intensities are needed to address inmates who engage in violence and other misconduct at different frequencies. Large proportions of youth will not qualify for the deeper end sanctions and thus in order to reduce violence, the Department must identify and implement effective sanctions for the many inmates who commit violence more infrequently. The Monitoring Team has made this same recommendation in every Monitor's Report to date.



The Department continues to have options at each end of the behavior management continuum—responses to serious/frequent violence (the Supportive Structured Housing units; SSHs) and an individual (Adolescent Striving For Change ("ASFC") cards) and group incentive program (the Levels) aimed at encouraging inmates to refrain from misconduct altogether. However, the mid-range of the behavior management continuum—responses to more intermittent violence and to non-violent misconduct—needs to be fully developed. These issues are discussed in the Inmate Discipline section of this report.

*Trends in UOF*

The table and graph below show trends in the UOF rate among Young Inmates since the Effective Date of the Consent Judgment. The average UOF rate has varied over the past two years (best seen in the table), although the overall trend is decreasing somewhat (best seen via the dotted trend line in the graph). This suggests that the various reforms required by the Consent

142

Judgment to manage Young Inmates may be starting to produce the intended outcomes as Staff begin to rely less on physical force to manage the Young Inmate population.

That said, the UOF rate for both age groups remain extremely high compared to their adult counterparts—the average UOF rate for adults age 22+ was 2.9 in 2017—and to what is observed in other jurisdictions. These data help to describe the context within which Staff must manage the Young Inmate population. As a result of their immaturity, uneven and unfinished brain development, and lack of experience dealing with the stressful environment of a jail, Young Inmates pose different and more complex challenges than adults. For this reason, the Staff who work with them must have a different skill set and must understand the underlying causes of the Young Inmate's behavior in order to address them and reduce violence. Staff training to develop these skills is now fully underway (e.g., SCM and Direct Supervision), and the Monitoring Team is hopeful that as Staff implement these new skills, the high rates of UOF and interpersonal violence will begin a sustained and substantial decline.

| Average Rates of Use of Force, 16, 17, and 18-year-olds | | | | | |
|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Average |
| 16/17-year-olds | 24.8 | 31.7 | 16.5 | 26.0 | **24.8** |
| 18-year-olds | 17.4 | 21.7 | 20.7 | 14.3 | **18.5** |

Inmate-on-inmate violence is only one of many precipitators of a UOF and overall UOF rates can only illuminate so much about Facility practices (as discussed in the introductory sections of this Report). As the Department learns more about the underlying causes of violence and UOF, the quest for solutions may take on new dimensions.



Both 16/17-year-olds and 18-year-olds will be transitioned to new housing in 2018. The Department has begun planning the complicated moves although major decisions about staffing and training have yet to be made. In addition to the logistical and operational transitions, Staff will be further challenged to strive for more positive outcomes as both Staff and Young Inmates will be affected by the stress of uncertainty and change.

Given these significant modifications to the management of Young Inmates, the Monitoring Team expects some disarray in the pursuit of compliance. The Monitoring Team has been involved with several other jurisdictions that have closed, consolidated or opened new facilities. While some level of uncertainty is expected, proactive and deliberate planning can actually accelerate progress toward compliance and can reduce the likelihood that conditions will further degrade. The Monitoring Team is committed to providing any assistance necessary to produce more positive outcomes.

*Raise the Age—16- and 17-Year-Olds*

Raise the Age ("RTA") was passed on April 10, 2017 and requires 16- and 17-year-olds to be moved off Rikers Island by October 1, 2018 and into facilities that are managed in conjunction with Administration for Children Services ("ACS"). RTA requires a shift in the City's philosophy for managing 16- and 17-year-old inmates to one that is more child-centered and rehabilitation-oriented than the current approach. The ultimate goal of this shift is to create an environment in which violence among youth, and between Staff and youth, is reduced. The magnitude of the operational changes catalyzed by RTA cannot be understated. The changes in location, coworkers, peers, policy, and procedure will lead to uncertainty and stress among both Staff and youth, and the potential for violence during the early stages is significant. The deadlines imposed by RTA are aggressive and reflect the collective desire to change the management strategy for this population. However, the Monitoring Team cautions against prioritizing the speed of the transition over taking the time to conduct the necessary preparation required to implement the new practices safely.

The majority of 16- and 17-year-old youth will be housed at the Horizon Center in the Bronx, a transition which requires extensive planning among DOC, ACS and the Mayor's Office of Criminal Justice. This planning continued in earnest throughout the current Monitoring Period. The Monitoring Team offered both guidance and technical assistance to minimize any regression in compliance with youth-related *Nunez* requirements. *Nunez* requirements relating to staffing, training, the use of force, disciplinary options, and behavior management/incentives have been a central focus of these conversations, with youth and Staff safety being the primary concern. The Monitoring Team also visited the Horizon Center in December 2017.

Implementing RTA requires significant coordination among a variety of stakeholders. As a threshold matter, DOC's and ACS' joint operation of the facilities requires policy and practice to be aligned. Further, multiple oversight bodies are involved including state regulators (OCFS and SCOC), City regulators (BOC), and court monitors (the *Nunez* Monitor). While the *Nunez* and BOC requirements remain the same, RTA requires new state regulations to be developed. The law was passed in April 2017, but OCFS did not issue regulations for the new facilities until December 2017. As of April 18, 2018, the SCOC, the other state regulator, has yet to issue its regulations for these facilities. These delays in providing regulatory guidance have hindered planning for the transition.

Moving operations to a new building is a major undertaking on its own. In addition, the transition requires many changes to policy and practice (e.g., a physical plant that will create higher density housing units/fewer empty beds, the use of room confinement as a de-escalation strategy, blending operational responsibility across two agencies, among others). All of these require strategic planning and will involve inevitable growing pains. Most immediately, the OCFS regulations prohibit the use of OC spray, which will trigger a radical change in the way in which DOC staff manage crises. Currently, OC spray is one of the first strategies used by DOC staff to respond to a crisis. Staff will not be able to resort to control-based strategies, but will need to approach crisis management through a different lens, and that lens is not one that can simply be changed out like a new set of glasses.

The Monitoring Team has extensive experience in other systems that have made this transition and it can be fraught with negative outcomes if Staff are not equipped with the necessary tools and competencies for managing crises without OC spray. Accordingly, an abrupt shift away from OC spray is ill-advised. In other words, without the requisite skill-development

for Staff to safely and effectively utilize physical interventions in situations with an imminent threat of harm, both youth and Staff are at risk of injury. Instead, a comprehensive strategy for teaching new physical restraint techniques, including team tactics and opportunities for drill and practice, is an essential foundation for the transition that is underway.

If the use of OC spray is abolished overnight, Staff will not have the benefit of a transition period to test out and hone alternative skills with the comfort of knowing they have OC as a back-up to regain control. Staff need to be able to identify those situations that they can easily manage with new techniques and similarly identify circumstances where additional training, drill, and practice are needed. For these reasons, a formal, gradual transition away from OC spray is prudent. Once staff begin to feel confident in their skills of persuasion and physical intervention, OC spray could be eliminated as response to circumstances involving small numbers of youth and less serious violence (e.g., a fight between two youth with no weapon). Gradually, staff will learn to manage all manner of crises by using physical intervention and team tactics rather than relying on chemical restraints.

The magnitude and complexity of the task and its central role in facility safety speak loudly to the need to get the transition right by taking the time required for proper implementation. Simply put, there is not enough time before October 1, 2018 to safely eliminate the use of OC spray. The Monitoring Team will work with the City and the Department to develop the framework and timeline for a proper transition. Accordingly, the Monitoring Team strongly recommends the City seek an extension to the October 1, 2018 deadline in order to safely eliminate the use of OC spray.

Significant work is underway and must continue into the next Monitoring Period to manage this transition. The Department has developed and begun implementing a plan to support a safe transition to Horizon:

- **<u>Staffing</u>**: It is critical to identify the leadership and Staff who will be assigned to Horizon. The Department has identified the number of Staff at each rank needed to operate Horizon, as well as a recruitment strategy, incentive plan and timeline for selecting these Staff and will begin to enact this plan in the Sixth Monitoring Period.

- **<u>Policies and Procedures</u>**: The organizational structure involving both DOC and ACS, as well as regulations from OCFS and SCOC will require modifications to existing policies and procedures.[119] The Department has identified the set of policies and procedures that need to be updated to address OCFS regulations and is in the process of revising them in collaboration with ACS. Once drafted, DOC will consult with the Monitoring Team, as appropriate, during the next Monitoring Period.

- **<u>Messaging</u>**: Particularly with regard to the prohibition on the use of OC, messaging to Staff about the changes is critical to maximize buy-in. DOC needs to "own" the change. The message needs to be grounded in facts, research, and lessons from other juvenile justice agencies about how to safely manage violent youth without the use of OC. The Department reports it is working on a

---

[119] As noted above, the SCOC regulations have not been issued yet so it is unclear as of the filing of this Report whether additional policies and procedures may need to be developed and/or updated based on the SCOC regulations as well.

messaging campaign, including supporting Staff to visit other jurisdictions where similar transitions have occurred.

- **<u>Training</u>**: Given the extensive changes in crisis management practices, significant training is required. This includes ensuring Staff receive: (1) Direct Supervision; (2) training on a UOF continuum that does not include the use of OC spray (e.g., SCM and its Emergency Safety Physical Interventions, ESPIs); and (3) training on team tactics (not currently part of the DOC Defensive Tactics curriculum, but part of SCM and other reputable curricula. To the extent feasible, these trainings should be done in conjunction with ACS Staff to build rapport and confidence in managing this population in the new setting. The Department intends to update its current training programs, as necessary, utilizing expertise from ACS, consultants, and the Monitoring Team during the next Monitoring Period. High-quality training, the opportunity for drill and practice, and the refinement of new skills from on-the-job coaching are all essential elements of a safe transition away from the use of OC.

The transition catalyzed by RTA is not just about moving the adolescent operation to a new building. The intent of the law is to fundamentally change the way the City manages and treats adolescents to align practices with the rehabilitative and child-centered philosophy of the juvenile justice system. Given DOC's current practices and staff culture, the philosophical shift required to align practices accordingly is substantial and the goals of RTA will not be achieved by simply exporting practices from RNDC. "Doing it right" means doing it safely, and the Monitoring Team is committed to ensuring that the Department prioritizes the time required to

develop new competencies among the Staff who will bear the burden of managing the transition on a daily basis.

*Housing for 18-Year-Olds (GMDC Closure)*

The City announced its intention to close GMDC in June 2018. The Department reports that all 18-year-old male inmates will be moved to RNDC, which will continue to also hold adults and adolescent inmates (all housed separately) until the adolescents move off-island in October 2018. A rehousing plan is currently underway to ensure that the Department's significant investments in programming resources are transported to GMDC so that 18-year-olds will continue to benefit. The Monitoring Team will receive regular updates on the progress of the transition.

As discussed in detail in the following sections of this report, the interplay between the reforms required under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19) and Consent Judgment § XVI (Inmate Discipline) has real power to impact both the rate of inmate-on-inmate violence and UOF among Young Inmates. Some of the strategies underway in the Young Inmate Facilities (e.g., programs to reduce idle time; incentives for positive behavior; considering new sanctions for mid-level misconduct) may also be useful to address the rates of violence and UOF among older populations (particularly the 19- to 21-year-olds) who are housed in other Facilities.

## YOUNG INMATES SECTION BY SECTION ANALYSIS

### 13. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this section of the Consent Judgment is to better protect Staff and inmates under the age of 19 from violence. Most of the requirements that will directly affect an inmate's propensity to engage in violence and the Department's response to it are contained in

the Inmate Discipline section of this report (e.g., incentives for refraining from misconduct and the disciplinary responses to aggressive behavior). That said, institutional violence is affected by many things—factors pertaining to the inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in the jails (e.g., security features and environmental hazards, as well as the daily structure and programming available). This section of the Consent Judgment includes provisions related to all of these factors.

As discussed in the preceding section, "Current Status of Young Inmates," the rate of interpersonal violence has been relatively constant over the past two years (despite some peaks and valleys), while the rate of UOF has declined a bit for both age groups. Both RNDC and GMDC have benefitted from solid leadership and the infusion of resources to increase programming and reduce idle time.

The Monitoring Team's assessment of compliance is outlined below.

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to design, implement and refine a range of strategies designed to produce safer Facilities, as detailed in the following narratives about the many components of the reforms related to Young Inmates in §XV "Safety and Supervision" and §XVI "Inmate Discipline."

### ANALYSIS OF COMPLIANCE

In concert with Consent Judgment § XVI (Inmate Discipline), the overall purpose of this section of the Consent Judgment is to better protect Staff and Young Inmates from violence. The progress toward reforms required by the Consent Judgment (e.g., the Levels program, new programming opportunities for Young Inmates, the removal of highly aggressive inmates to one of the SSHs) may have contributed to the modest reductions in use of force. It is also likely that the strong leadership at

both Facilities has contributed to an evolving, safer culture for inmates and Staff. The leaders' determination to implement the complex requirements of the Consent Judgement requires both logistical skill and a willingness to treat inmates differently. Their ability to model these attributes for their subordinates is an essential component to achieving reform.

In part, preventing and de-escalating potentially violent confrontations between inmates requires the skills taught in Safe Crisis Management and Direct Supervision. Training is now fully underway, but until Staff achieve a mastery of these skills and begin to develop constructive relationships with inmates via consistent unit assignments, significantly reduced rates of violence will not be achieved. In addition, increases in Staff skill in managing Young Inmates will be amplified by operational practices such as the use of special units for managing chronically aggressive youth, incentives for positive behavior, and structured programming that reduce inmates' idle time. Once the Department identifies dependable practices for holding Young Inmates accountable for episodic violent behavior and addresses the underlying causes of misconduct more effectively, sustained reductions should become evident.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells.

- The Department has continued its internal audit procedure to determine whether RNDC Staff were completing Facility Security Inspection Reports ("FSIRs") and Inoperable/Down Cell Summary Reports ("DCSRs") as required and the extent to which their content was congruent (i.e., "reconciled"). The Department also began to audit GMDC records at the end of the Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team issued a special report on this issue on March 5, 2018. The Team's test of 330 cell doors at RNDC found that approximately 21% of cells had locks that were inoperable, but only two of these cells (1%) were occupied. Furthermore, a review of 2017 incident-based data identified nine use of force incidents involving compromised locks at RNDC, suggesting that inoperable locks are not driving a major portion of UOF. While the Monitoring Team's audits suggest that the Department is mitigating the security risks by not housing inmates in cells with inoperable locks, the Department also needs to develop an internal capacity to monitor this issue. The NCU began to audit this issue in early 2017.

The Monitoring Team met with NCU to learn about the audit methodology and found it to be thorough, well-managed, and likely to result in valid and accurate findings. However, the current audits are not yet sufficient for establishing compliance because they do not verify the accuracy of the documents nor do they assess whether inmates were assigned to cells with known inoperable locks.

RNDC's records revealed a high level of completion (98% for both forms) and low rates of error (6% unreconciled). Audits of GMDC records have a short tenure but reveal initially high completion rates (98% and 97%) though high rates of error (an average of 56% of the forms were unreconciled). Given that RNDC will continue to house Young Inmates even once the adolescents are moved off-island, the Department is encouraged to continue these audits and enhance them with the other substantive portions of the audit methodology, discussed below. Given that GMDC is slated to close in a few months, focusing NCU resources on the accuracy problems observed with GMDC's records may not be prudent. In order to reach substantial compliance, the Department needs to audit the remaining Facilities that house a small number of Young Inmates (RMSC, GRVC and OBCC).

| **COMPLIANCE RATING** | **¶ 2.** Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour all Young Inmate Housing Areas at least once each shift, unless the Warden or Deputy Warden is not in the Facility during that shift, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented, and any general deficiencies shall be noted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See discussion below.

**ANALYSIS OF COMPLIANCE**

As noted in the Fourth Monitor's Report, developing the data to demonstrate compliance with this issue will be a very challenging and time-consuming task for both the Monitoring Team and the Department. Given the other, higher priority issues associated with the requirements of the Consent Judgment (e.g., reducing unnecessary and excessive uses of force, supporting the implementation of the SSHs, overseeing the implementation of the incentive programs) and the upcoming and complex changes afoot (e.g., closing GMDC and transferring the 16- and 17-year-olds off-island), the

153

Monitoring Team is not prioritizing this issue for the upcoming Monitoring Period. However, the transition of the Young Inmate populations may provide an opportunity to establish some new operational practices with documentation requirements that would ease the burden of auditing and monitoring. The Department is encouraged to consider this issue during its planning phases.

| COMPLIANCE RATING | ¶ 3. Not Yet Rated. |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION SYSTEM)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to house adolescent inmates according to their education level (assessed during the intake process) so that adolescents attend classes with peers they already know by virtue of living on the same housing unit.

- The Department plans to contract with a well-respected consultant to develop a valid risk assessment instrument for housing the 16- and 17-year-olds.

**ANALYSIS OF COMPLIANCE**

The Department has made the initial first steps toward compliance by conducting a study to determine whether the current classification system is valid and, upon finding that it was not, by contracting with a well-respected researcher to develop a valid tool. As noted in previous Monitor's Reports, given the passage of Raise the Age and the Department's future collaboration with NYC ACS, the instrument that is ultimately developed will likely be implemented after the 16- and 17-year-olds have been moved off-island. The new instrument will need to produce valid classifications and will also need to comply with any relevant state regulations. It will also need to include an override mechanism, as discussed in the Third Monitor's Report (at pg. 204), so that Staff may account for individual factors and circumstances that cannot be captured by the scored risk factors.

Once developed, the Monitoring Team will assess the application of the risk classification tool and override procedures, along with the extent to which adolescents are housed appropriately (via ¶ 8 "Separation of High and Low Risk Young Inmates"). Furthermore, the Monitoring Team will reassess its decision to exclude female adolescents from monitoring (as discussed in the Second Monitor's Report (at pgs. 129-130)), depending on the findings regarding the new instrument's validity and application to female youth.

As noted in previous Monitor's Reports, the Monitoring Team supports the Department's decision to house adolescent inmates according to their education level, but also sees the housing decision as separate from the task of classifying inmates according to their risk of institutional

violence, and thus it does not satisfy the Department's obligation to develop a valid classification tool that screens for the risk of institutional violence. That said, the Monitoring Team tracks incidents that occur in the RNDC school each month, using information gleaned from the Fight Tracker database. Between July 1 and December 31, 2017, there were 219 fights among adolescent males, 24 of which (11%) occurred in the school area. While previously the school had been identified as a hot-spot for inmate violence, during the current Monitoring Period, relatively few fights occurred in the school area, with the vast majority occurring on the housing units.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In 2014, the Department allocated only $250,000 for youth-centered programs. In 2017, the Department reported a budget of $19,000,000 for this programming.

- The Department continues to partner with nearly 80 community-based organizations to provide programming to inmates at GMDC, RNDC and RMSC.

- The Department added opportunities for Young Adults to enroll in college courses, and 102 young adults received college credit by the end of the current Monitoring Period.

- The Department added to the applications that may be accessed via the digital tablets to include foreign language tutorials, educational games and meditation exercises.

- Workforce development courses in CPR, OSHA, Flagging and Carpentry are now available to adolescents at RNDC.

- The Department continues to track services that are provided by Program Counselors who are assigned to most Young Inmate housing units. During the next Monitoring Period, tablet-based data entry will be piloted with the hope of streamlining the process for proof of practice.

- In addition to these programs, all 16- and 17-year-old inmates continue to be required to attend school five hours per weekday. While not required to do so, 18-year-old inmates in the general population, Second Chance Housing Unit ("SCHU") and Transitional Restorative Unit ("TRU") also have the option to attend full-day schooling. Those in ESH or Secure may attend school 3 hours per day.

### ANALYSIS OF COMPLIANCE

The Department is pursuing compliance with this provision by providing various types of programming: education, structured programming delivered by Program Counselors, structured

programming delivered by community partners, leisure time activities and recreation. Enhancing skill development and reducing idle time will both reduce violence and enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing Program Counselor-led programming and activities and reviewing education attendance data. The Department has yet to identify a comprehensive, dependable way to accurately assess the large volume of programming delivered by community partners and thus that data has not been reviewed to date. Substantial compliance depends on ensuring that all Young Inmate housing units are scheduled for programming that occupies the majority of youth's waking hours on both weekdays and weekends, over a sustained period of time. Now that the Department is fully staffed with Program Counselors and strategies for documentation are fully underway, substantial compliance is well within reach.

*Education*

The Monitoring Team reviewed monthly attendance reports maintained by the NYC DOE for the education programs at RNDC, RMSC and GMDC which revealed that the vast majority of 16- and 17-year-old students attend school, while only a small segment of young adult students attend. These findings were compatible with those of the Special Master of the *Handberry* litigation (addressing education services), who in early 2017 found the Department in "substantial compliance" on this issue.[120]

*Structured Programming by Program Counselors and Community Partners*

Early in the Monitoring Period, several units housing Young Inmates did not have the enhanced programming required by this provision because the Department was not fully staffed with Program Counselors. However, this situation was rectified by the end of the Monitoring Period (83% of Young Inmate units at RMSC, 74% at RNDC, and 54% at GMDC have Program Counselors). Those without Program Counselors are "program units" that have enhanced services separate from the Program Counselor-led programming (e.g., Rikers Rovers, ICAN, Horticulture, H+H operated units, etc.). Both Secure and YA-ESH have full-time Program Counselors. Thus, it appears that all Young Inmate housing units now have the structure to support the delivery of programming required by this provision.

Program Counselor records tracking the services that are actually delivered revealed that community meetings and structured recreation activities continue to be more prevalent than the Dialectical Behavior Therapy ("DBT"), journaling, and conflict resolution programs that are designed to address the underlying causes of violence. None of these programs are likely to be effective without attention to fidelity (whether they are implemented as designed, teaching all of the required concepts)

---

[120] *See*, The First Report of The Status of Education Services for Youth Aged 16-21 at Rikers Island by Special Master Peter Leone dated February 1, 2017 (96-cv-6161 S.D.N.Y.). As of the writing of this report, a subsequent report by Dr. Leone had not been issued.

and dosage (whether youth receive the prescribed number of hours of the program). In response to this concern, the Department indicated that it requires each Program Counselor to construct a monthly schedule of which programs will be delivered and has emphasized the preference for cognitive-behavioral programming and the need to provide the appropriate number of sessions of each type of program.

*Structured Leisure Activities and Recreation*

In addition to these rehabilitative services, all Young Inmates also receive recreation and access to structured leisure activities (e.g., tablets, board games and video games). While these activities do not address the underlying causes of violence, their value lies in the ability to reduce idle time and to provide exposure to new experiences and constructive options for free time.

*Group Programming Observations*

As in previous Monitoring Periods, the Monitoring Team also observed several group sessions at Young Inmate Facilities (6 sessions of DBT, Interactive Journaling, Youth Communication and Leadership Skills). The groups covered core concepts and involved activities with relevant life examples. While the instructors varied in their facilitation skill, all made efforts to stimulate dialog among group members about the issues raised in group. All of these groups focused the youth on topics related to the underlying causes of their delinquency, and all of them kept the youth engaged throughout the hour-long group. This is the essence of the type of structured programming required by the Consent Judgment.

The Department has invested considerable resources in hiring Program Counselors, training them in the various group curricula, and purchasing the materials needed to implement the groups. Unfortunately, the level of distraction from DOC Staff on the units threatens to undermine the Department's investment and the Program Counselors' efforts. The Monitoring Team urges the Department to create better group norms, to create workable group space with sufficient seating, to set boundaries around competing activities, and to communicate the importance of these activities to DOC Staff and to require them to behave in a manner that elevates, rather than undermines, the group process.

*Summary*

Overall, the Department is vigorously pursuing several strategies to meet the requirements of this provision. The recent increase in the number of Program Counselors bodes well for a more universal application of programming in subsequent Monitoring Periods. The combination of education, mandated recreation, Program Counselor-led programming and programming delivered by community-based partners should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult.

However, the Department continues to struggle with documenting program delivery. A tablet-based method for Program Counselors to track their service delivery is being piloted in the subsequent

157

Monitoring Period, which could bring greater efficiency to the recording, analyzing and interpreting of these data, and ultimately to using the information to drive performance.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department implemented a tracking mechanism to identify the frequency of housing transfers that occur in order to protect vulnerable inmates.

### ANALYSIS OF COMPLIANCE

The goal of this provision is to ensure that youth who are being bullied, threatened or otherwise victimized are moved to a different housing unit where they will be safer. At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Department must strike a delicate balance among making transfers to protect vulnerable inmates, intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff to develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Department's flexibility for programming, population management, etc.

The Monitoring Team and Department collaborated to develop a tracking form for the purpose of demonstrating compliance with this provision. The Department began tracking transfers in October 2017 and provided 3-months' worth of data for adolescents at RNDC and 18-year-olds at GMDC. Despite the Department's initial estimation that such transfers are made "frequently" and the Monitoring Team's observation that inmates' housing assignments are often adjusted; the reported data did not bear this out. Only four inmates at GMDC were reportedly transferred for the purpose of protecting a vulnerable inmate, and no such transfers were reported from RNDC. The Monitoring Team will discuss these data and this process to ensure it accurately reflects the actual practice during the subsequent Monitoring Period.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit,

or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report (at pgs. 131-132)).

- In response to the Monitoring Team's feedback about the substance of information found in the Protective Custody ("PC") documentation and timeliness of required interviews, the Department proposed revising certain policy requirements to allow Operations Security Intelligence Staff ("OSIU") staff to focus more intensely on Young Inmates and those who are disputing their placement in PC. The Monitoring Team approved this concept.[121]

### ANALYSIS OF COMPLIANCE

The Monitoring Team did not audit PC files during the current Monitoring Period believing it to be more prudent to give the Department time to align its new policy and practice. Even though the revised policy has not yet gone into effect, the Department reported that current practice now mirrors the requirements of this provision. The Monitoring Team plans to conduct another comprehensive review of the PC files for Young Inmates during the next Monitoring Period to assess the extent to which changes in practice have addressed the Monitoring Team's previous concerns about timeliness of interviews and the substance of documentation.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Policy 4100R-D "Classification" which addresses the requirements of this provision.

- The Department has a procedure in place to review housing assignments daily, identify any instances of co-mingling, and resolve them at RNDC.

---

[121] At the end of the current Monitoring Period, while revising the policy, the Department decided to make additional changes (that would only affect the adult PC population) and thus the policy has yet to be finalized.

- A new Housing Unit Balancer ("HUB")-based procedure to identify mis-housed inmates was implemented at GMDC.

**ANALYSIS OF COMPLIANCE**

The Department's policy reflects the requirements of this provision. Temporary co-mingling, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (e.g., upon a birthday, or when an inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility

Process-wise, the protocol to identify and resolve instances of mis-housing continues to work well <u>at RNDC</u>, as the small number of adolescents who are mis-housed are promptly transferred to an appropriate housing unit. However, as a foundational matter, the lack of a valid classification tool for adolescents (discussed in ¶4 "Classification") hinders achieving compliance at RNDC. Once the new tool is developed and the adolescents are moved off-island, audits to assess compliance with this provision for the adolescent population will resume. Furthermore, the decision not to monitor compliance for female adolescents will be reassessed.

Previous Monitor's Reports have described the Department's struggle to meet the requirements of this provision for 18-year-olds housed <u>at GMDC</u>.[122] Even though the procedural issues with the HUB have now been rectified (i.e., a HUB-based process was developed and implemented) and mis-housing appears to be a relatively rare occurrence, two factors continue to threaten the integrity of the data and any conclusions that can be drawn from it. Often, when the reason that an improperly housed inmate languished in that status for so long is questioned, the Department reports that the date an inmate was moved to an appropriate housing unit is based on IIS, which is not always accurate. Not only do IIS' frequent inaccuracies make monitoring this provision difficult, but also means that the Department itself must have trouble identifying when and for how long inmates remain mis-housed, and thus will have difficulty managing the process and assessing its own progress toward compliance. The Monitoring Team intends to work with the Department during the next Monitoring Period to identify a viable work-around for this problem.

Furthermore, the use of overrides (i.e., the process to deviate from the scored classification level by housing an inmate in a unit with a higher or lower security level) does not appear to conform to the generally accepted practice, which would require any proposed override to be signed by a Supervisor *before it is implemented*. The purpose of the supervisory approval is to ensure that the rationale for housing the inmate out-of-class is reasonable and aligned with the Department's priorities. The approval should not be pro forma. During the audit of mis-housed reports, several inmates were identified whose overrides had been "pending" for several days, even though the inmate had already

---

[122] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Housing units like those noted in the text of the Provision. EMTC audits are no longer necessary because all 18-year-old sentenced inmates were housed at GMDC as of January 2017.

been moved/placed out-of-class. Overrides have a legitimate and important custody management purpose and the Monitoring Team fully supports their use. However, sufficient protections must be in place to ensure they are used only in exceptional cases and that the rationale for an override is aligned with Department policy. In other words, a Supervisor must approve the override *prior to* an inmate being housed out-of-class. The Monitoring Team will address this issue with the Department during the subsequent Monitoring Period.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- The Department contracted with The Moss Group, a highly-respected technical assistance provider, to provide support for issues related to sexual safety and implementing PREA.

### ANALYSIS OF COMPLIANCE

The Department routinely provides data to the Monitoring Team about allegations of sexual abuse and harassment involving Young Inmates. During the Fifth Monitoring Period, there were eight such allegations. Most were from RNDC (n=7; 88%) and one was from GMDC (12%). No allegations of sexual abuse or harassment involving Young Inmates were received from RMSC. Five of the eight alleged *sexual abuse* (63%) and six of the eight involved *staff-on-inmate* allegations (75%). Based on the Monitoring Team's experience, a higher prevalence of allegations involving Staff than allegations involving other inmates is typical of adolescent populations.

The Department shared some of the feedback they received from The Moss Group with the Monitoring Team. While PREA is far broader than what is required by the Consent Judgment, there was one area of overlapping concern. While allegations are promptly reported by Staff via the normal incident reporting process, Staff are not dependably completing the PREA incident report, which is also required.

 Policy requires investigations of sexual abuse allegations to be completed within 60 business days of the incident being reported. The Department still does not meet this requirement. Only 15 cases have been closed since the Effective Date—5 of which were closed during the current Monitoring

Period and only <u>one</u> of which was closed timely (it was taken over by DOI). Among the other four cases, the average time to closure was 250 days. A total of 49 cases referred since the Effective Date are still pending and only <u>four</u> (8%) were pending within the 60 business-day timeline. Another 21% were pending for more than 365 business-days. The lack of timely case closure severely compromises the integrity of the Department's response to allegations of sexual assault.

The Department reported its plans to address these persistent deficiencies. The plan includes additional staffing, salary increases for investigators, and efforts to have Staff interviews occur in a more timely fashion to speed along the investigation. The Monitoring Team feels these are essential first steps and that other potential efficiencies may become visible once ID is fully staffed.

Not only does timeliness continue to be problematic, the investigatory process continues to evidence significant structural problems such as the failure to interview key witnesses, long delays to witness interviews, and apparent failure to ask effective follow-up questions or to collect relevant evidence. The Monitoring Team has offered similar feedback in its assessment of the broader set of ID investigations (non-PREA), and the Department has reported that investigators are being instructed to address these deficiencies. The effectiveness of this instruction will be evaluated as subsequent cases are closed and reviewed by the Monitoring Team.

If no demonstrable improvement is observed in the subsequent Monitoring Period, the Department risks receiving a Non-Compliance rating on this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 9.** Partial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10 & 11 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Refer to the discussion of Video Surveillance in this report above (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

**ANALYSIS OF COMPLIANCE**

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 10.** Substantial Compliance<br>**¶ 11.** Substantial Compliance |

| **XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)** |
|---|

| ¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |
|---|

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to use the Direct Supervision model, developed by NIC, as the foundation for a training program for supervising adolescent and young adult inmates. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Direct Supervision training continues for recruits and is now underway for In-Service Staff, as described in the Training section of this report.


**ANALYSIS OF COMPLIANCE**

As noted in the Training section of this Report, In-Service training has begun. Once a majority of Staff assigned to Young Inmate housing areas have been trained, the Monitoring Team will begin to assess the extent to which Direct Supervision skills have been implemented and are in current practice among Staff assigned to Young Inmate housing areas.

| **COMPLIANCE RATING** | **¶ 12.** Partial Compliance |
|---|---|

| **XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)** |
|---|

| ¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth. |
|---|

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Executive Staff from RNDC and GMDC interview recruits to gauge interest and review relevant experience and then personally select recruits to work in their commands.

- Recruits are permitted to make written requests to be assigned to a Young Inmate Facility and may also volunteer to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration.

- The Department reports that all of the 116 recruits recently assigned to RNDC (100%) and 91 of the 140 recruits recently assigned to GMDC (65%) received these assignments due to their interest or backgrounds in working with youth. At GMDC, an additional 32% of assigned

recruits completed their on the job training ("OJT") at GMDC, so they had some familiarity with the population.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team discussed the recruit selection process with Department and Facility leadership. Both reported efforts to attract qualified candidates who were interested in working with Young Inmates. In response to a suggestion from the Monitoring Team, the interviews for the most recent recruit class took place much earlier in the process this time, which gave the Facilities more flexibility to select recruits for their Command.

As detailed above, nearly all recruits assigned to RNDC and GMDC were either specifically requested by the Command at each Facility or the recruits asked to be assigned to a Young Inmate Facility. Further, a significant proportion of recruits also completed OJT at one of the Young Inmate Facilities and thus acquired some first-hand knowledge about what the job would entail.

| **COMPLIANCE RATING** | **¶ 13.** Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[123]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

   a.   The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

   b.   The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

   c.   The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports that Young Inmate housing areas have been able to maintain the appropriate Staffing ratios and that it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff Members. In some Facilities, this has been challenging given the large proportion of the workforce who recently graduated from the Academy.

- The Department continues to audit staffing ratios and probationary Staff dispersion, and recently transferred the audit responsibility to a select few Facility commands.

---

[123] The Consent Judgment does not include a ¶ 15 for this Section.

- The Department calculated the average number of probationary Staff for each Facility that houses 16-, 17-, and 18-year-old inmates: GMDC had 333 (which is approximately 43% of the reported 769 Staff assigned to GMDC); RMSC had 185 (which is approximately 35% of the reported 529 Staff assigned to RMSC; note that RMSC has only a handful of units that house Young Inmates); and RNDC had 262 (which is approximately 34% of the reported 764 Staff assigned to RNDC).

ANALYSIS OF COMPLIANCE

The Department continued its internal audits to determine its level of compliance with the staffing provisions. The Monitoring Team met with the NCU to discuss the methodology and found the process to be well-conceptualized and very thorough. A review of data analyzed by the NCU found compatible results and that NCU's internal audit process leads to valid conclusions about the state of compliance.

Shift staffing records continued to reveal that all Facilities and units housing Young Inmates were staffed within the ratios required by the Consent Judgment. NCU's audits through October 2017 revealed 100% compliance at all Facilities housing Young Inmates. Given the high compliance ratings and integrity of the audit process, NCU transferred responsibility to GMDC, GRVC and RMSC to begin conducting the audits themselves in November and December 2017. NCU intends to do a more limited audit of Facility records in order to verify the Facilities' findings. In turn, the Monitoring Team will review these audits during subsequent Monitoring Periods. The Department has achieved substantial compliance with the provision related to staffing ratios and maximum unit size.

Regarding the appropriate dispersion of probationary staff, the internal audits found the that GMDC and RNDC, where most Young Inmates are housed, achieve the appropriate mix of veteran and probationary Staff about 50% of the time. Young Inmate units in other Facilities have higher levels of compliance (80%-100%). Given the large recruiting efforts bringing unprecedented numbers of new Staff into the Facilities and the length of the probationary period (two years), it is unlikely that these numbers will shift rapidly. Furthermore, sick leave, vacations, hospital runs, and steady post assignments also limit the flexibility available in Staff assignments.

However, schedulers reported several efforts to minimize the frequency with which a unit is staffed only by probationers. They reported being conscious about Staff's probationary status and constructing the weekly schedule with this in mind (i.e., the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years. The tenure of probationary Staff is also considered when making unit assignments.

For these reasons, the Monitoring Team believes that the "best effort" requirement has been met, and is confident that as proportion of probationary Staff (currently ranging between 30-40%) at the Young Inmate Facilities decreases over time, the mix of probationary and veteran Staff will be easier to achieve. The Department's comprehensive internal audits also testify to the Department's ability to monitor the issue, identify and correct problems in the future, absent external oversight.

| **COMPLIANCE RATING** | ¶ **14.** Substantial Compliance<br>¶ **16(a).** Substantial Compliance<br>¶ **16(b).** Substantial Compliance<br>¶ **16(c).** Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See discussion below.

### ANALYSIS OF COMPLIANCE

As noted in the previous Monitor's Report, the Department and the Monitoring Team have consulted about the difficulties in interpreting, and complying with, this provision under the current staffing structure (*see* pg. 231 of the Fourth Monitor's Report). The Department has made clear efforts to ensure consistent staffing at Facilities housing Young Inmates.

| **Consistent Staffing at Young Inmate Facilities as of March 2018** | | |
|---|---|---|
| **Facility** | **% Steady Tour** | **% Steady Post** |
| **GMDC[124]** | | |
| Officer | 85% | 10% |
| Captain | 47% | 49% |
| **RMSC** | | |
| Officer | 96% | 96% |
| Captain | 100% | 100% |
| **RNDC** | | |
| Officer | 81% | 63% |
| Captain | 99% | 84% |

[124] Given the closure of GMDC, the number of steady posts has decreased at this Facility as the Department has started to close housing units.

| | |
|---|---|
| As the Department's plans to implement Raise the Age continue, meeting the specific requirements of this provision will be a critical step. | |
| **COMPLIANCE RATING** | **¶ 17.** Not Yet Rated. |

### 14. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

The overall purpose of this section of the Consent Judgment is to create tools and strategies for managing inmate behavior in order to reduce violence and improve Staff and youth safety. This involves creating an incentive system to motivate youth toward positive behavior and to encourage program engagement and also involves creating a robust array of disciplinary sanctions that hold youth accountable for their behavior and help to reduce the likelihood of subsequent violence. The Department abolished the practice of Punitive Segregation for 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016. The total exclusion of 18-year-olds from Punitive Segregation goes beyond the requirements of the Consent Judgment, which requires only that the Department reduce its reliance on Punitive Segregation as a disciplinary measure.

A continuum of responses to misconduct to replace Punitive Segregation is required for substantial compliance. To date, the Department has developed and fully implemented programs on either end of the continuum: (1) the Supportive Structured Housing units (ESH, Secure, TRU and SCHU) [125] which target the small number of Young Inmates who commit serious/continued violence; and (2) the incentive ("Levels") system.

Combined with the reforms discussed in the "Safety and Supervision of Inmates Under the Age of 19" section of this report, the Department has begun to implement a range of strategies to reduce violence and to create safer Facilities. The burden on Staff to think and

---

[125] These programs are described in more detail in the Third Monitor's Report (at pgs. 219-221).

behave differently in nearly every aspect of the Facility's operation should not be underestimated. In this period of rapid change, which will only intensify with the closure of GMDC and transfer of adolescents off-island, it is expected that program development will be uneven and that key issues may have to be reconsidered and revised multiple times before optimal implementation is achieved.

The Monitoring Team's assessment of compliance is outlined below.

## XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME), ¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION) ¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM), ¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND ¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016.

### ANALYSIS OF COMPLIANCE

The Monitoring Team reviewed the Department's other disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (i.e., 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with Young Inmates during the current Monitoring Period, the Monitoring Team did not assess compliance with these provisions.

Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation.

Given that the practice is no longer in place, the Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot be rectified. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the Monitoring Team did not assess this provision while the practice was still in effect. Now that it has been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance (per the Second Monitor's Report). |
| --- | --- |
| | ¶ 2. Substantial Compliance (per the Second Monitor's Report). |
| | ¶ 7. Partial Compliance (per the Second Monitor's Report) |
| | ¶ 8. Substantial Compliance (per the Second Monitor's Report) |
| | ¶ 9. Not Currently Applicable. |

## XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: INMATE INCENTIVES)

¶ 3. Within 90 days[126] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to utilize the Adolescents Striving for Change ("ASFC") stamp cards in all Young Inmate housing units at GMDC, RNDC, and RMSC, and in the Secure and Young Adult Enhanced Supervision Housing ("YA-ESH") units.

- In response to early implementation problems identified by the Monitoring Team, the Department revised the stamp cards to require a signature from a Supervisor on each tour to ensure that Staff are using the cards properly.

- The Department conducted internal audits of ASFC cards throughout the current monitoring period.

- The Department continues to use a Facility-wide incentive system, the "Levels," at GMDC and RNDC.

### ANALYSIS OF COMPLIANCE

---

[126] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

The Department is pursuing two strategies toward compliance with this provision: (1) the ASFC stamp cards (described in detail in the Third Monitor's Report (at pgs. 223-224)); and (2) the group incentive program ("the Levels," described in detail in the Fourth Monitor's Report (at pg. 238)). Although this provision requires the application of positive incentives only to youth under age 18, the Department included the use of the stamp cards in the design of several of the alternative disciplinary programs discussed in ¶ 6, below, some of which serve 18-year-olds. Furthermore, the incentive program is a key strategy toward violence reduction for all youth, which is required under § XV, ¶1 "Prevent Fight/Assault." As a result, the Monitoring Team has been attentive to the stamp cards' and Levels implementation with 18-year-olds as well.

*ASFC Stamp Cards*

The Department began to conduct monthly internal audits of ASFC cards in July 2017. These audits focus only on whether the cards are present and complete. Throughout the Monitoring Period, problems were identified on several units by the Department and the Monitoring Team, especially at RMSC. While cards were nearly always present, they sometimes were not fully complete (e.g., stamps were missing, but nothing on the back of the card justified the absence with a description of misconduct), and Captains sometimes either did not sign the card during their tours or signed the card when the Staff member had left the shift blank. The Department responded to problems identified in the audits by posting placards in the housing units to remind Staff of their duties.

While audits of completeness are necessary and ongoing, the accuracy of the behavior ratings also need to be verified. The Monitoring Team suggested that the internal audits also begin to look at whether the information on the card reflected information contained in the unit behavior logs. When misconduct occurs, the cards are one way to ensure that youth are held accountable. Currently, the extent to which the cards capture the various behaviors for which some sort of accountability is needed is not known. In addition, as discussed in previous Monitor's Reports, this type of system is effective only to the extent that youth receive close-in-time feedback on their behavior. As an initial step, the Monitoring Team suggested that the auditors ask the youth on each unit how the information on the cards is relayed to them and whether they are ever engaged in conversations about their performance on the cards. This will identify a baseline of current practice that can be built upon.

*The Levels*

The Levels continue to be utilized as a group behavior management strategy. The design of the program is robust, it appears to distinguish high-performing units from those needing additional behavior support for youth and/or increased coaching for Staff in managing youth behavior, and it is sufficiently flexible to adapt to changing unit performance.

From experience in other jurisdictions, the Monitoring Team has emphasized the need for program fidelity to ensure buy-in from both Staff and youth. This means ensuring that the criteria for awarding a Level is clear and transparent to both youth and Staff. While the requirements are clear on

170

paper, a review of Level assessment forms completed by RNDC Staff (i.e., a form where Staff rate their housing unit on the 10 different factors) compared to the Level actually assigned suggests that the Monitoring Team needs to examine the process more closely to better understand the interplay between Staff ratings and administrative decisions. This will occur during the subsequent Monitoring Period and recommendations will be made as necessary.

The Monitoring Team also recommends that the Department, as part of its internal audits, ensures that incentives are delivered when they are earned, and are withheld when they are not earned. Similarly, poorly behaved youth on units that are otherwise high-performing should be restricted from incentives as appropriate or transferred to a housing unit at a lower level if their misconduct becomes chronic. These issues are ripe for examination by internal audits.

The original Levels program design included Staff-recognition for those who regularly work on Platinum units, but this feature has not yet been implemented. The Monitoring Team strongly encourages the Department to do so. Staff who are skilled at supporting positive behavior among youth should be rewarded as often and as meaningfully as youth who meet expectations.

The transition of adolescents off-island provides an excellent opportunity to shore up the implementation of the ASFC and Levels programs so that the culture of the new facilities immediately benefits from these essential behavior management tools.

| **COMPLIANCE RATING** | **¶ 3.** Partial Compliance |
| --- | --- |

### XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS) AND ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 4. Within 90 days[127] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016.

---

[127] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

- The Department developed and implemented several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct (SCHU, TRU, Secure and YA-ESH).

- To address less serious and episodic violent misconduct, the Department continues to use the Infraction process but has begun to explore options for restricting access to things of value (i.e., commissary limits; less frequent haircuts).

ANALYSIS OF COMPLIANCE

Given the abolition of Punitive Segregation for adolescents and young adults, the Department needs to develop ways to respond to misconduct that was previously addressed by Punitive Segregation.[128] Some of this misconduct is serious (i.e., slashings, stabbings and assaults with injury) or chronic (i.e., a repeated pattern) violence, and for these situations, the Department established four Structured Supportive Housing units (SSHs). These programs have been operational for over a year and are described in more detail on pgs. 219-221 of the Third Monitor's Report. Fortunately, most youth misconduct is neither serious nor chronic, and for these negative behaviors, the Consent Judgment requires proportional responses that address treatment needs, provide access to mandated services and that do not jeopardize safety.

*Responses to Serious and Chronic Violence*

During the current Monitoring Period, the Monitoring Team focused on supporting the Department's efforts to finalize policies; monitoring the flow of inmates in and out of the SSHs; assessing the level of violence in the SSHs; and assessing the quality of individualized behavior support planning. Further, the Department began to collect metrics for the SCHU/TRU programs.

- **Policy**

The Monitoring Team approved the policy for TRU and SCHU and it has been signed into effect by the Department. Depending on how these programs are exported once the adolescents move off-island, the policy may need revisions. Also, the Monitoring Team has provided several rounds of feedback on the Secure and ESH policies that can be incorporated with the Department's planned program enhancements and future policy revisions.

- **Admissions and Releases**

There were 269 admissions to the SSHs during the current Monitoring Period, a 20% increase from the previous Monitoring Period (n=224). The vast majority (n=260; 97%) were admissions to either SCHU or TRU, programs that are focused on addressing violent misconduct but that do not restrict the youth's lock-out time or movement beyond what occurs in the general population. The

---

[128] Previously, Young Inmates could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

remaining nine admissions (53% fewer than the previous Monitoring Period; n=19) were to either YA-ESH or Secure, which both utilize additional hardware (i.e., restraint desks; partitions between pods) and other restrictive procedures (i.e., escorted movements, reduced lock-out times) to prevent subsequent violent misconduct.

A review of SSH files revealed that all those admitted appeared to meet the referral criteria but, as noted in the previous Monitor's Report, additional information about the severity of any injuries would be useful for monitoring adherence. Youth continue to exit the programs in one of four ways: discharge from custody, "graduating" and transferring to the general population, stepping up to a more restrictive program, and stepping down to a less restrictive program. There were some within-program differences:

- Both inmates who exited YA-ESH were stepped down to Secure;
- Of the seven youth who exited Secure, four were transferred to the general population, two were discharged, and one was stepped-up to YA-ESH once he turned 19;
- Of the 151 youth who exited TRU programs, 3% were stepped up, 21% were stepped down (much more common at RNDC than GMDC), 60% were transferred to the general population, and 13% were discharged.
- Of the 111 youth who exited SCHU programs, 39% were stepped up, 51% were transferred to the general population and 8% were discharged.

Now that the programs have been operational for over one year, the Department should enhance its strategy for monitoring effectiveness. Current metrics involve only the most basic data on admissions and releases, along with some infraction data that is not particularly meaningful on the surface. Other issues ripe for consideration could include: (1) better understanding the reasons that significant proportions of youth are stepped up to TRU from SCHU and (2) assessing the extent to which youth who are transferred to the general population reduce or cease their involvement in misconduct.

The Department provided data on the admission and release dates for each inmate admitted to the SSHs, permitting a median length of stay (MLOS) calculation. Youth graduated from TRU after approximately 24 days and graduated from SCHU after approximately 20 days. Data on length of stay for YA-ESH and Secure are not reliable because so few 18-year-olds were exposed to these programs. The Department has implemented procedures for multi-disciplinary consultation about SSH youth who appear to stagnate or for whom progress is not evident. Aggregate data on these youth would also be illuminating and would help to enhance the program's effectiveness.

- **Level of Violence**

The Consent Judgment requires that the responses to youth misconduct may not jeopardize Staff or youth safety. Overall, these data suggest that, given the violent histories of the inmates placed in them, the SSHs have relatively low levels of violence and UOF. Program-specific data for 2017 are most meaningful:

| ADP, Levels of Violence and UOF in SSH Units, 2017 | | | |
|---|---|---|---|
| Unit | ADP | Average # Violent Incidents per Month | Average # UOF per Month |
| YA-ESH | 10[129] | 0.9 | 1.8 |
| Secure | 8 | 2.8 | 4.6 |
| GMDC TRU | 17 | 3 | 4.5 |
| GMDC SCHU | 8 | 0.25 | 0.58 |
| RNDC TRU | 9 | 2.3 | 3.6 |
| RNDC SCHU | 7 | 0.67 | 1.1 |

- **Behavior Support Planning**

     The effectiveness of the SSHs in reducing the risk of subsequent violence among the youth placed in them will depend, in large part, on the quality of the programming and behavior support received. A youth's successful return to general population—or to the community—will depend on his accumulation of skills to manage anger, regulate emotions, control impulses and respond to interpersonal conflict, all to avoid violence. The SSHs' ability to catalyze such change is essential to the perception among Staff, youth and stakeholders that they are viable alternatives to Punitive Segregation.

     Since the Effective Date, the Monitoring Team has reviewed nearly 100 SSH files (40 during the current Monitoring Period) and observed approximately 14 Support Team meetings files to ascertain the quality of behavior support planning. Individual Support Plans (ISPs) are now being completed timely, within a few days of the youth's arrival on the unit. While the Support Team meetings generally reveal a group of dedicated professionals who are well-prepared, share information freely, seem to understand what is driving youth's behavior and have obvious respect for each other and a desire for each youth to succeed, they operate under a program structure that needs several improvements:

  > **No ISPs or Support Team in YA-ESH.** The YA-ESH program design includes neither individual support plans nor Support Team meetings. Youth are not formally engaged in an assessment of their progress and there is little transparency about the criteria for advancement. The Department reports that the program design is currently being modified to include these features.

  > **No Summary of Prior SSH Involvement.** Given the frequency with which youth are transferred among programs, a short case summary of the youth's behavior and progress in the referring program would be helpful. Hopefully, the Staff from the referring

---

[129] This was mainly 19 to 21-year-old inmates.

program learned a great deal about effective strategies for working with each youth—these lessons must be communicated to the receiving program.

➢ **Structure for promotion/demotion/transfer remains unclear**. The issue is complicated by the presence of poor-quality ISP goals that do not provide a clear roadmap. The fact that the youth are not present during the Support Team meeting further limits the transparency of these decisions.[130]

➢ **ISP Goals are Not Measurable or Modified.** Across all programs, a few of the Program Counselors have improved the way they articulate goals so that they are measurable (e.g., "attend school 5x per week") but for the most part, the goals suffer from a lack of measurability, a lack of behavior-focus, or prescribe a service rather than a behavior target (e.g., "attend DBT"). Support Teams are referencing goals more often now, but fail to revise the ISP when it becomes clear that a youth is having trouble meeting the goal. This appears to occur because ISPs do not link goals to specific interventions designed to help the youth achieve them, and thus the general prescription to "attend programming" or "respect staff" are offered as the panacea for all youth.

➢ **Common Behavior Problems are Not Addressed.** In some programs more than others, Support Teams seem to note common behavior problems (e.g., covering cell window; refusing to lock in) but they are not addressed in a meaningful way. This is defeating because these behaviors are what often trigger uses of force, which means youth are not promoted to the next level, and the overall length of stay is thus extended. Specific behavior goals, interventions, incentives and sanctions for these behaviors may accelerate youth's progress.

The Department previously engaged two consultants for the purpose of enhancing the quality of behavior support planning, but these efforts appear to have stagnated. Particularly given the intention to export these functions when the adolescents move off-island, shoring up the program implementation and Staff skill development will increase the likelihood of these programs' effectiveness in their new location.

*Responses to Less Serious and Episodic Misconduct*

The Department's continuum of responses to misconduct needs to be expanded to address behaviors such as threatening Staff, episodic aggression or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. These behaviors are not serious enough to warrant placement in an SSH. Currently, the Department's current response to these behaviors is to write an infraction, although only

---

[130] The Department reports it is planning to include inmates in the Support Team meetings in the next Monitoring Period.

two sanctions are available to Adjudication Captains—a $25 fine or a verbal reprimand. Neither is an effective strategy for shaping the behavior of adolescents.

Previous Monitor's Reports have discussed this issue at length (*see* pgs. 146-147 of the Second Monitor's Report, pg. 233 of the Third Monitor's Report, and pgs. 244-245 of the Fourth Monitor's Report). While the Department has voiced its agreement that additional disciplinary options are necessary and has reported the use of a few strategies that the Monitoring Team supports, no progress has been made in formalizing the options or developing a method to document their occurrence and follow through. Such documentation is necessary to establish compliance, but more importantly, a system for recording sanctions imposed is vital to ensuring that the sanctions are implemented once prescribed. Most sanctions will involve either a loss of privilege or the imposition of a consequence over a period of time—a procedure for documenting these things is essential given that multiple Staff will be responsible for imposing them.

*Other Strategies to Address Misconduct/ Solo Housing*

During the Current Monitoring Period, Solo Housing was used relatively infrequently as a behavior management strategy, only nine times (four at RNDC, four at GMDC and one at RMSC). The Monitoring Team verified with H+H that none of the youth had a serious mental illness (SMI). The median length of stay was six days, meaning that half exited after less than one week and half stayed longer than one week (11, 15, 18 and 31 days). Four of the youth were transferred to some type of special housing (e.g., TRU or PC), three were joined on the unit by another youth, and two were transferred back to the general population. In all but one case, the arrangements appeared to resolve the safety issue as the youth did not return to Solo Housing.

The Solo Housing policy was signed into effect at the end of the current Monitoring Period. Going forward, the Monitoring Team will assess the implementation of the policy to ensure that youth who are placed in solo housing do not languish and receive intensive interventions to speed their return to the general population.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
| | ¶ 6. Partial Compliance |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016.

- The same protections for 18-year-olds with serious mental illnesses ("SMI") who commit violent infractions have been extended to the Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH). Those with SMI are excluded from both programs and must be placed in an appropriate therapeutic setting.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of inmates with SMI who have committed an infraction; PACE also offers treatment to inmates with SMI, but is completely separate from the infraction process.

**ANALYSIS OF COMPLIANCE**

The Department submitted data on medical and mental clearance for all YA-ESH and Secure referrals throughout the Monitoring Period. Two 18-year-olds were referred to YA-ESH—both were cleared, receiving clearance from medical and mental health on the same day of the request. Eight 18-year-olds were referred to Secure—all of them were cleared by medical and mental health within one or two days of the request. The process appears to be efficient, and also capable of identifying youth who are not suitable for placement in restrictive housing (data on inmates over age 18 provided examples of youth who were not cleared by either medical or mental health, suggesting that the approval is not pro forma).

For the first time since the Effective Date, Young Inmates were placed in CAPS/PACE. One youth had two stays in CAPS, once for three weeks and the other for three days prior to being discharged. The youth admitted to PACE remained in the program for approximately five months. The Monitoring Team will further assess the appropriateness of such placements should the number of Young Inmates placed in these programs increase significantly in subsequent Monitoring Periods.

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department determined that a current practice, "Satellite Intake," could be utilized to serve the purpose of de-escalating a disruptive inmate (among other purposes of Satellite Intake).

- The existing Ops Orders was revised to limit the length of stay to six hours; to include both a movement log that records admissions and releases and a tour log that records 15-minute checks and other operational notes; and to require Custody Management and H+H to be notified of any placements in the unit.
- Both RNDC and GMDC currently operate Satellite Intake units.[131]
- The Department reports that Division Chiefs conduct formal reviews of Satellite Intake.

**ANALYSIS OF COMPLIANCE**

A description of the Satellite Intake function can be found on page 248 of the Fourth Monitor's Report. The Monitoring Team reviewed Satellite Intake records at GMDC to assess compliance with the revised policy requirements and this provision. Several issues were noted that prevented meaningful data analysis including: improperly recorded entry/exit times; multiple entries for youth whose stay straddled two tours; and vague reasons for placement. This feedback was shared with the Department to enhance the quality of implementation at all Facilities.

A review of weekly/monthly reports for November and December 2017 revealed that RNDC used the unit relatively infrequently—only nine times and that all but one inmate was transferred to a regular housing unit within six hours. Practices at GMDC were harder to discern because many of the reports were not accurate or complete. They did not give a total count of inmates, did not give a complete breakdown on length of stay, and did not describe the circumstances resulting in longer lengths of stay.

Accurate, easy-to-decipher documentation is essential for the Department to monitor the appropriate use of this resource. The Monitoring Team will continue to review the logbooks and reports to identify how often Young Inmates are placed in this setting and to assess the extent to which Satellite Intake conforms to the requirements of policy. When the adolescents are transferred off-island, other behavior management practices may fall under this provision and thus will be subject to routine monitoring.

| **COMPLIANCE RATING** | **¶ 10.** Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

---

[131] The Department operates Satellite Intakes in other Facilities throughout the Department as well.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with an M-designation prior to holding a disciplinary hearing.

- The Department implemented Directive 0000R-A "Implementing Departmental Policy," as discussed in the Implementation Section of this report.

- The Department sought clarification on the third recommendation from Dr. Beard, who clarified that the review was suggested for the purpose of relaying relevant information to the Adjudication Captain and to determine whether Correctional Health Services ("CHS") should be present during the hearings.

**ANALYSIS OF COMPLIANCE**

The Department addressed Dr. Beard's first two recommendations via its new policy regarding annual review and consolidation. By the end of the Monitoring Period, although the Department had received clarification of Dr. Beard's intent with regard to the "mental health review," they had not yet determined whether or how to implement the recommendation.

In summary, the Department has met most of its obligations for this provision, save for a decision about whether Dr. Beard's recommendation regarding mental health reviews will be implemented.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

## 15. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for inmates under the age of 18 (¶¶ 1, 3). The intent of transferring adolescent inmates to an alternative Facility is to place them in a Facility readily accessible by public transportation to facilitate visitation between inmates and family members more easily, and to house them in an environment that will support a new paradigm for effectively managing the adolescent inmate population. This new paradigm will

rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

## XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- RTA requires 16- and 17-year-olds to be moved out of the adult jails, off Rikers Island, by October 1, 2018. The City has formed numerous Task Forces and working groups to plan RTA's implementation. The Mayor's Office for Criminal Justice is coordinating with the department and with ACS regarding the many decisions and plans required to transfer the adolescents to the new facilities.

- The City plans to renovate two facilities currently operated by ACS for this purpose: (1) Crossroads, located in the Brownsville neighborhood of Brooklyn and (2) Horizon, located in the Mott Haven neighborhood of the South Bronx. Renovations will maximize operational capacity, enhance programmatic, recreational and educational space and upgrade certain health and safety features. The City has already begun its planned $55 million renovation.

### ANALYSIS OF COMPLIANCE

The Monitoring Team toured Horizon during the Monitoring Period, accompanied by key staff from both the Department and ACS. Post-renovation, the physical space at Horizon will meet the safety, housing, recreational and programming space requirements of this provision. The Facility is also accessible by public transportation.

The months ahead will require vigilance and careful planning to ensure that the Department maintains its current level of compliance with the *Nunez* provisions related to adolescents. In some cases, the Monitoring Team believes there is an opportunity to shore up existing practices so that operations post-transition actually improve upon the current state of affairs. Several members of the Monitoring Team have worked with other jurisdictions as they opened, closed and consolidated

facilities and are fully committed to offering any technical assistance and support necessary to help the Department and its stakeholders to navigate this transition.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **3.** Not currently applicable |

• **End** •

# Appendix A: Definitions

| Acronym or Term | Definition |
| --- | --- |
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidables | Process at the Facility-level to identify and address avoidable use of force incidents |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CHS | Correctional Health Services |
| CLOs | Command Level Orders |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| DA | District Attorney |
| DBT | Dialectical Behavior Therapy |
| DCAS | Department of Citywide Administrative Services |
| DCID | Deputy Commissioner of ID |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| Fast-Track | ID expedites the closure of ID investigations and coordinates with Trials to expedite the imposition of discipline. |

| Acronym or Term | Definition |
|---|---|
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FSIR | Facility Security Inspection Report |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| Levels system | Incentive program where housing units are awarded different levels based on a number of factors |
| LMS | Learning Management System |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| NPA | Negotiated-Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCD | Off Calendar Dispositions |
| OC Spray | Chemical Agent |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| PC | Protective Custody |
| PDR | Personnel Determination Review |

| Acronym or Term | Definition |
| --- | --- |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review Process | Wardens review every use of force incident which is captured on video, and consider whether the force used was appropriate and within guidelines. |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| SMI | Serious Mental Illness |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| TEAMS | Total Efficiency Accountability Management System |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking System |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

| Process | Steps |
|---------|-------|

**Investigations**

Use of Force incident occurs. → ID conducts Preliminary Review of incident. → Facility or ID conducts and completes investigation. → Investigator drafts MOC if charges are substantiated and MOC is reviewed and approved by Commanding Officer or DC of ID

**Bureau Chief of Admin**

MOC is forwarded to Bureau Chief of Administration. → Office of Bureau Chief of Administration tracks case and assigns case number. → Signed MOC & 22-R Form is sent to Trials.

**Trials**

**Evaluation & Preparation of Case by Trials**

Director of Trials reviews case and assigns attorney to case within 2 days of receipt of MOC → Trials Attorney drafts charges & sends to Trials administrator to forward to Respondent's assigned Facility with copy to Bureau Chief of Facilities. → Charges are served by Facility and/or sent by certified mail within 30 days of receipt of MOC

Investigation file is separately forwarded to Trials by ID or Facility. → Trials Investigator assigned to case and collects investigation materials. → Discovery materials are served to Respondent's Attorney

Trials Attorney assesses case and confers with Manager to determine next steps

**Prosecution of Cases**

**Off Calendar Disposition (OCD)** (settle case without the need for OATH)

**OATH** proceeding scheduled if no settlement or the case can't be settled based on discipline sought.

Beginning with the assignment of the case, throughout the prosecution process, Trials evaluates the case and may determine case should be **Administratively filed** or **Deferred Prosecution**.

Settlement conference is scheduled at HQ with Trials Attorney and Respondent.

Trials Administrative Assistant schedules all logistics of OATH including coordination with Respondent's Command.

OATH generally occurs one day a week and 12 cases can be heard (including UoF and other matters).

1 of 2 outcomes at OCD
(1) NPA
(2) No settlement reached and schedule with OATH

1 of 4 outcomes at OATH:
(1) NPA
(2) Trial
(3) Adjourned if Respondent doesn't appear
(4) Administratively File case

**Outcome**

**NPA** (either via OCD or at OATH) *Executed by Respondent & Trials Attorney*

**Trial** (if no NPA at OATH) & ALJ renders a **Report & Recommendation ("R&R")**

Trials Attorney drafts closing report within 2 weeks of receipt of:
• NPA executed
• ALJ Decision Received
• Administratively Filed Decision
• Deferred Prosecution Decision

**Closing Case Process**

Trials Deputy General Counsel reviews and approves closing memo. → Legal Deputy General Counsel reviews and approves. → *If NPA or R&R* Commissioner reviews and either approves or modifies outcome.

*If Administratively Filed or Deferred Prosecution* **Case Closed & Returned to Trials**

**Case Closed & Returned to Trials AND Discipline Imposed**

Respondent may appeal ALJ decision through Article 78 or Civil Service Commission.



**Appendix C: Flowchart of Promotions Process**

| | | | | |
|---|---|---|---|---|
| DCAS Exam | **Civil Service Requirements**<br>> U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity<br>> educational or experience requirements<br>>drug test; medical, psychological & physical testing<br>> resident of NY or counties | **DOC In-House Disqualifiers**<br>> dismissal from prior employment<br>> arrests total<br>> driving record total<br><br><u>AIU Background Investigation</u> | Review of Candidate's History/Background Investigation by Director of AIU and Deputy Commissioner of AIU | **Correction Officer** |
| DCAS Exam (Completion of probation - 2 Years CO, unless extended) | **Requirements**<br>> must hold valid drivers license<br>> resident of NY or counties<br>> 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner Review | **Captain** |
| DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) | **Requirements**<br>> must hold valid drivers license<br>> resident of NY or counties<br>> 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner Review | **Assistant Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) | Review of UoF and Disciplinary History, and Performance Evaluations | Re-Assignment Board Review<br>Rating, Interview, Candidates Ranked | Chief & Commissioner review candidates recommended by Re-Assignment Board | **Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as DW, unless extended) | HR reviews UoF and Disciplinary History, and Performance Evaluations | Promotion Board Review, interview candidates and make recommendations | Chief & Commissioner to review candidates recommended by Promotion Board | Mayoral Approval → **Warden** |
| No specific time requirement for holding the Warden position in order to be considered for a Chief-level appointment | Nunez Screening, including review of UoF and Disciplinary History | Commissioner and Chief of Staff | Mayoral Approval | **Chief** |