# Sixth Report of the *Nunez* Independent Monitor

**Sixth Monitoring Period**
**January 1, 2018 through June 31, 2018**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Consultant*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ............................................................................................................. **1**
*Background* ................................................................................................................ 1
*Executive Summary* .................................................................................................. 2
*Next Steps: Mission Critical Aims* .......................................................................... 5
*Training Academy* .................................................................................................... 5
*Organization of the Report* ..................................................................................... 6
**Staff Use of Force and Inmate Violence Trends During the Sixth Monitoring Period** ...... **8**
*Facility Trends* ......................................................................................................... 12
*Injury Severity* ......................................................................................................... 12
*Location* ................................................................................................................... 13
*Reason Force Is Used* .............................................................................................. 13
*Age and Use of Force* .............................................................................................. 14
*The Department's Efforts to Address High Rates of Use of Force* ........................... 16
*Summary* .................................................................................................................. 18
**Identifying & Addressing Use of Force Misconduct** ............................................. **19**
*Identifying Use of Force Misconduct* ..................................................................... 20
*Initial Assessments of Use of Force* ....................................................................... 21
*Investigations* .......................................................................................................... 26
*Responses: Addressing Misconduct* ....................................................................... 30
**Section by Section Analysis** ................................................................................... **40**
    1.    Use of Force Policy (Consent Judgment § IV) ........................................ 40
    2.    Use of Force Reporting and Tracking (Consent Judgment § V) ........................ 43
    3.    Training (Consent Judgment § XIII) .......................................................... 58
    4.    Anonymous Reporting System (Consent Judgment § VI) .................................. 79
    5.    Video Surveillance (Consent Judgment § IX) ......................................... 81
    6.    Use of Force Investigations (Consent Judgment § VII) ............................ 92
    7.    Risk Management (Consent Judgment § X) ............................................ 114
    8.    Staff Discipline and Accountability (Consent Judgment § VIII) ...................... 124
    9.    Screening & Assignment of Staff (Consent Judgment § XII) ......................... 135
    10.    Staff Recruitment and Selection (Consent Judgment § XI) .............................. 140
    11.    Arrests of Inmates (Consent Judgment § XIV) ......................................... 144
    12.    Implementation (Consent Judgment § XVIII) .......................................... 145
**Current Status of Young Inmates** ........................................................................ **149**
*Housing for 18-Year-Olds (GMDC Closure)* ....................................................... 149
*Implementation of Raise the Age and the Management of 16- and 17-Year-Olds* ......... 150
    Preparation for the Transfer to Horizon During the Sixth Monitoring Period ......... 151
    Transition to Horizon Juvenile Center ..................................................................... 153
    Monitoring Team Recommendations to Improve Safety at Horizon ....................... 157
*Trends in Violence and UOF* ................................................................................. 162
**Young Inmates Section by Section Analysis** ....................................................... **167**
    13.    Safety and Supervision of Inmates Under the Age of 19
    (Consent Judgment § XV) ........................................................................... 167
    14.    Inmate Discipline (Consent Judgment § XVI) ........................................ 182
    15.    Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) .... 195
**Appendix A: Definitions** ……………………………………………………………… i

# INTRODUCTION

This is the Sixth Report[1] of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[2] and the Monitoring Team to advance the reforms in the Consent Judgment during the Sixth Monitoring Period, which covers January 1, 2018 to June 30, 2018 ("Sixth Monitoring Period").

*Background*

The Department manages 12 inmate Facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 10,740 active uniformed Staff and 1,920 civilian employees and detains an average daily population of 8,896 inmates.[3]

---

[1] A Special Report was also filed by the Monitor on March 5, 2018. (Docket Entry 309)

[2] All defined terms utilized in this report are available in ***Appendix A: Definitions***.

[3] 32% of the inmate population is detained for four days or less, while 21% of the population is detained three months or more. The average length of stay for an inmate is 68 days. (*See* "July 31 – DOC at a Glance Report," <https://www1.nyc.gov/assets/doc/downloads/press-release/DOC_At%20a%20Glance-entire_FY%202018_073118.pdf>).

The Consent Judgment was entered by the Court on October 22, 2015.[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (i.e., those under 19 years old). The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principals can take root without a culture change within the agency that embraces them.

*Executive Summary*

The Department's new leadership team was firmly in place throughout the current Monitoring Period. The Commissioner, Chief of Department, Deputy Chief of Staff,[5] a number of Assistant Chiefs and Wardens, as well as the leadership of the ID & Trials Division, Legal Division (in particular the team conducting Risk Management work and the Complex Litigation Unit), the *Nunez* Compliance Unit, the Information Technology, and the Young Adult and Adult Programming divisions, along with their respective teams, all demonstrated a strong commitment to achieving the reforms envisioned by the Consent Judgment by developing and implementing

---

[4] The Effective Date of the Consent Judgment is November 1, 2015. (Docket Entry 260)
[5] The Deputy Chief of Staff was promoted to Chief of Staff following the close of the Monitoring Period.

various initiatives designed to change the Department's culture. The Department has also maintained a transparent, collaborative, and constructive relationship with the Monitoring Team.

Along with scrutiny from the Monitoring Team, the Department remains under significant scrutiny from various City and State stakeholders, often creating competing priorities and initiatives that make it difficult for the Department to sustain its focus on one area of compliance. Further, significant attention continues to be paid to the City's stated intention to close the nine jails on Rikers Island. While the jails' location in New York City is beyond the scope of *Nunez*,[6] the overall goal of the Consent Judgment—a safer and more humane jail system—must be met regardless of where the jails are located. Accordingly, the Monitoring Team continues to strongly encourage all stakeholders to support the Department in its efforts to address the issues that gave rise to the Consent Judgment as significant resources and continued commitment are needed to achieve and sustain compliance with the overall goals of the Consent Judgment and its individual provisions.

A significant focus during the Sixth Monitoring Period (and into the Seventh Monitoring Period) was the implementation of Raise the Age ("RTA"), which required the 16- and 17-year-olds to be moved off Rikers Island into a Secure Juvenile Detention Center by October 1, 2018. RTA requires a shift to a more developmentally-appropriate philosophy for managing this age group. The youth were moved to Horizon Juvenile Center a few weeks before this report was filed and the initial transition has been challenging. The Monitoring Team is closely scrutinizing the situation. An assessment of the current state of affairs at Horizon and a series of

---

[6] The requirements of the Consent Judgment apply to all jails operated by the Department regardless of physical location, except for the Elmhurst and Bellevue Prison Wards. (Consent Judgment § II (Jurisdiction, Venue, And Revised Class Definition), ¶ 2.)

recommendations to improve facility safety are outlined in the *Implementation of Raise the Age and the Management of 16- and 17-Year-Olds* section of this report (*see* pgs. 150-162).

In this report, the Monitoring Team also details the DOC's continued efforts to implement measures designed to reduce both the sheer number of uses of force and the unnecessary and excessive application of force by Staff. Despite significant effort by the Department, these measures simply have not yielded the results necessary to materially advance the overarching goals of the Consent Judgment. On a micro level, this report sets out a myriad of reasons that can be put forth as explanations for that lack of success. On a macro level, there remains a significant disconnect between the goals of those governing the agency and those of the on-the-ground operators who have daily contact with the inmates incarcerated in the 12 Facilities managed by the Department. While initiatives such as the recently developed Use of Force Improvement Plan (discussed in more detail in the Staff Use of Force and Inmate Violence Trends section below), in particular the work being conducted through the OBCC/GRVC pilot, seems promising, the overall lack of forward progress remains a concern. Further, assuming that the pilot's potential is fully realized and sustained, replicating the model at the remaining 10 Facilities can best be described as a daunting task given the concentrated commitment of both resources and expertise, not to mention Staff buy-in, that is required to fully implement it.

Complex institutional reform is necessarily incremental and can move at a glacial pace. The two-and-half year record of reform that has been established portends a pace that will become intolerable at some point in the future. The Monitoring Team will continue to do everything possible to facilitate advancement of the Consent Judgment and will continue to assist the Department in developing and implementing additional reform initiatives. However, without question, the ultimate responsibility for implementing the reforms rests predominantly with the

DOC, other relevant City agencies (*e.g.* H+H, ACS), and ultimately the City and the respective staff of these agencies. The Monitoring Team cannot supplant those actually charged with implementing and enforcing, and thereby institutionalizing, such change.

*Next Steps: Mission Critical Aims*

Following the close of the Sixth Monitoring Period, the Monitoring Team identified a set of "Mission Critical Aims" in order to approach compliance strategically and to facilitate progress in critical areas during the next Monitoring Period. They are: (**1**) prioritize investigating misconduct and imposing discipline in cases that involve egregious misuses of force and/or Staff who are involved in a number of concerning acts of misconduct; (**2**) instruct, counsel, or discipline any investigator and/or supervisor who conducts, reviews, or approves a biased, incomplete, or inadequate UOF investigation; (**3**) ensure timely and adequate discipline is imposed on probationary Staff who violate the Department's Use of Force policy; (**4**) enhance Staff's skill in concrete operational issues, particularly those that could transform the culture of interpersonal aggression that characterizes Staff-inmate relationships; (**5**) safely open the new facility for 16- and 17-year-olds, as required by Raise the Age; and (**6**) ensure adequate and permanent Staffing for E.I.S.S. to support the division's efforts to implement EWS, screen Staff for special units, and screen Staff for new assignments after they have been disciplined.

*Training Academy*

The Department continues to suffer from limited and sorely inadequate training space as described in detail in the First Monitor's Report (at pgs. 55-57). During this Monitoring Period, the City reported it evaluated a number of potential sites for the Training Academy, though one has not yet been selected. As part of this effort, the City also considered how to build the Academy most efficiently once the site is selected so that it can put the City's commitment of

$100 million dollars to use as soon as possible. The Monitoring Team encourages the City to continue to diligently work toward making this effort a reality. The Monitoring Team will continue to monitor this issue to ensure progress in providing the Department with appropriate training space.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses detecting and responding to the misuse of force in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (*e.g.* policy, reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Finally, the report examines recent changes and current trends regarding Young Inmates and then assesses compliance with the provisions applicable to Young Inmates (*e.g.*, classification, programming, protective custody, staffing, incentives and discipline, etc.).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[7] (b) Partial Compliance,[8] and (c) Non-Compliance.[9] The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report but, with each Monitoring Period, has increased the proportion of provisions for which the compliance level has been assessed.[10] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for completion falling after June 30, 2018.

---

[7] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[8] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[9] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

[10] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

# STAFF USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE SIXTH MONITORING PERIOD

The Department continues to be plagued by high numbers of uses of force. Since the Effective Date of the Consent Judgment, the number of uses of force has trended steadily upward, as has the use of force rate (i.e., the rate per 100 inmates; used to neutralize changes in the size of the inmate population). Unfortunately, the Department hit an all-time high in January 2018, with 550 uses of force in that month (see Graph 1), for a rate of 6.18 (see Graph 2). Furthermore, the use of force rate was *higher in each of the six months of the current Monitoring Period than in any previous year* since the Effective Date of the Consent Judgment (see the yellow line in Graph 3).







The Monitoring Team evaluated several possible explanations for these trends.
Conventional wisdom would suggest that as a system's population decreases, the number of uses
of force should also decrease. Sometimes, the observed decreases are proportional—meaning
that the number of uses of force decreases along with the decreases in the population. In these

situations, the use of force rate stays the same because a smaller number of uses of force are being applied to a smaller number of inmates.

However, a far more desirable outcome—indeed, the overall goal of the Consent Judgment—is for the decrease in the number of uses of force to outpace the decrease in the size of the population (i.e., the UOF rate actually decreases). In part, this occurs because of ancillary benefits that come from having fewer inmates to manage (*e.g.*, fewer inmate-inmate conflicts, greater access to limited program slots, lower density/fewer people in a small space). However, in the Monitoring Team's experience in other jurisdictions, a more powerful stimulus for driving down the use of force rate is when the culture of the facility changes, when staff start interacting with inmates differently and when inmates experience less frustration/aggravation that erupts into violence. Unfortunately, this does not appear to be occurring at the Department yet, despite the leadership's commitment to reform and the significant resources committed to this effort (*e.g.*, new policies and procedures, improved reporting and tracking, an unprecedented volume of training). In fact, despite the significant decrease in the size of the inmate population, the number of uses of force continues to increase (see Graph 5, below). This graph shows the number of uses of force (orange line) in tandem with the average daily population (blue bars). Ideally, the dotted trendlines would both be decreasing, with the orange line decreasing more steeply. Instead, the use of force trendline is increasing, in stark contrast to the decrease in the population.



The key question is *why*. Why is use of force not decreasing, at least on pace with decreases in the size of the population, if not more sharply? The Monitoring Team's observations suggest use of force is not decreasing because the Staff-inmate culture has not changed. As noted in the Executive Summary, a disconnect between the leadership's desire to reform the system appears to be simply overwhelmed by an intractable culture among line Staff that too often results in violent conflicts with inmates and conduct outside the parameters of safe uses of force. Inmates continue to behave aggressively toward each other and Staff, often as a result of frustrations about their conditions of confinement. Staff continue to needlessly escalate situations, and too often engage at a level that is disproportionate to the severity of the circumstance. These dynamics produce a vicious cycle that further entrenches distrust and prevents the development of a functional, safe correctional environment.

*Facility Trends*

Most of the Facilities had higher use of force rates during the current Monitoring Period than during the previous two years. As shown in the chart below, only four Facilities (EMTC, GMDC, VCBC and WF) had lower average use of force rates in 2018 than during the previous two years. Among the other eight Facilities, average use of force rates have increased. While some of the Facilities have lower rates than their counterparts, very few of the Facilities are trending in the right direction.



Graph 6. Average Use of Force Rates, by Facility
*2016-2018*

|  | AMKC | BKDC | EMTC | GMDC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2.42 | 2.5 | 1.62 | 8.63 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.24 |
| 2017 | 2.72 | 3.94 | 1.74 | 6.4 | 6.42 | 4.82 | 2.21 | 6.12 | 4.83 | 4.9 | 2.81 | 20.97 |
| 2018 | 2.91 | 5 | 1.61 | 5.47 | 9.14 | 6.62 | 3.07 | 6.51 | 5.2 | 10.47 | 1.93 | 9.49 |

*Injury Severity*

The previous Monitor's Report raised concern about the proportion of A-level injuries, as shown by the size of the purple bar in the chart below. During the current Monitoring Period, the increasing trend did not continue, although the proportion of A-level injuries is still higher than previously. The Monitoring Team has not identified any clear patterns that would explain the trends in Class A injuries.



*Location*

As reported in previous Monitor's Reports, the majority of uses of force continue to occur in housing units (53%). That said, a smaller proportion of uses of force occurred in Intake areas compared to previous Monitoring Periods (15% and approximately 30%, respectively). This may be due to an increased focus by the Department on incidents occurring in Intake and moving inmates through Intake areas more expeditiously.

*Reason Force Is Used*

Understanding the reasons that Staff use physical force with an inmate is a key facet of the effort to identify strategies to reduce the use of excessive and unnecessary force. Physical force by Staff in a correctional setting is at times necessary to maintain order and safety and the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. That said, not all uses of force are necessary, and every anticipated use of force incident has an inherent opportunity to consider

13

whether force could have been avoided altogether if Staff had managed the situation differently. For example, it has been proven time and again in confinement settings that Staff who take time to employ non-force options by creating a safe and secure distance from the potential aggressor are involved in significantly fewer uses of force. As discussed in prior Monitor Reports, when a situation is poorly managed, the resulting force may be unnecessary, excessive, or even malicious.

As noted in prior reports, the proportion of UOF that was reported to be in response to violence (*e.g.*, assaults on Staff, fights, preventing the infliction of harm) continues to increase (58%, compared to 54% and 46% in previous Monitoring Periods). Similarly, the proportion attributed to inmate management issues (*e.g.*, cell extractions, refusing orders, resisting escorts) continues to decline (40%, compared to 45% and 51% in previous Monitoring Periods). The Monitoring Team continues to note frequent situations when Staff's conduct creates or contributes to the need to use force. Many of the dynamics described in the Fifth Monitor's Report (see pg. 22) continue unabated.[11] Furthermore, the Department continues to classify at least 20% of its UOF as "avoidable."[12]

*Age and Use of Force*

As shown in the table below, by far, adolescents (16- and 17-year-olds) have the highest use of force rate in the department, routinely 10 times higher than the rate observed among

---

[11] Staff continue to fail to: (1) exhaust non-force options; (2) de-escalate the situation (*e.g.* displaying unprofessional conduct and a hyper-confrontational demeanor); (3) maintain distance during verbal exchanges with inmates; (4) recognize anticipated force situations and summon a supervisor; (5) address reasonable grievances (*e.g.* individual inmate issues, group inmate issues, medical problems, access to privileges); (6) respond proportionally and instead react to inmates' negative behavior/minimal resistance with aggressive force; and (7) adhere to basic security measures (*e.g.* failing to secure doors; allowing inmates in restricted areas, applying restraints improperly).

[12] Avoidable incidents are those that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.* ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions).

adults. Use of force rates among 18-year-olds (included in the target population of the Young

Inmate section of the Consent Judgement) and 19- to 21-year-olds (classified as Young Adults

by the Department) are relatively interchangeable, save for a sharp spike in the use of force

against 18-year-olds that coincided with their transfer to RNDC after GMDC's closure. (The

Young Inmate section of this report discusses that transition in more detail). These data clearly

illustrate the need for age-based use of force reduction strategies.



Use of Force Rates, by Age
July 2017 to June 2018

| | Jul 17 | Aug 17 | Sep 17 | Oct 17 | Nov 17 | Dec 17 | Jan 18 | Feb 18 | Mar 18 | Apr 18 | May 18 | Jun 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16-17yo | 24.5 | 27.3 | 25 | 26.8 | 23.5 | 29.2 | 42.3 | 39.1 | 32.8 | 39.1 | 43.3 | 34 |
| 18yo | 13.2 | 12.6 | 11.9 | 17.3 | 11.5 | 19.4 | 13.8 | 16 | 12.2 | 11 | 10.9 | 32.9 |
| 19-21yo | 15.9 | 15.9 | 12.7 | 11.8 | 12.1 | 8.5 | 16.8 | 13.1 | 14.2 | 13.6 | 17.3 | 18.2 |
| 22+yo | 2.9 | 2.8 | 3.1 | 3 | 3 | 3.6 | 4.5 | 3.4 | 3.5 | 3.1 | 3.6 | 2.8 |

While the rates are demonstrably higher among younger inmates, it is important to

recognize the contribution of uses of force with adult inmates to the overall use of force

numbers. As shown in the pie chart below, over half of all uses of force occur among the adult

inmate population, with much smaller numbers occurring among younger inmates. While the rate

of uses of force is low among adults (average 3.5 during the current Monitoring Period), the

sheer volume (1,621 during the current Monitoring Period) suggests that efforts to prevent the

behaviors that lead to the use of force among adults are needed to significantly reduce the

number of uses of force. Of course, of utmost concern are the uses of force that are unnecessary or excessive—these are the subject of discussion throughout most of the remainder of this report.



### _The Department's Efforts to Address High Rates of Use of Force_

In April 2018, the Department initiated a two-part Use of Force Improvement Plan. Uniform and civilian leaders collaborated to develop an initiative focused on providing consistent, routine operational guidance to improve Staff's understanding of when force is appropriate and how to avoid using force when it is not necessary.

The first part includes Department-wide initiatives: (1) launching a use of force communication strategy, including video instruction. The strategy is a renewed effort to advise Staff of their obligations under _Nunez_ and includes Department-wide, weekly critiques of use of force incidents at roll-calls. Facility leaders lead discussions about various operational issues and how to better manage them; (2) deploying de-escalation teams within each Facility to respond to the scene of rising tensions; (3) revamping the Rapid Review/Avoidables process (discussed in

more detail in the Identifying & Addressing Use of Force Misconduct section); (4) implementing a weekly support team to develop strategies to better support female inmates with problematic behavior; and (5) assigning Training Captains within each Facility to coach Staff to avoid using force and to provide technical guidance when force becomes necessary.

The second part of the plan focuses on OBCC and GRVC, which are among the Facilities with the highest rates of use of force, and includes initiatives to address use of force from multiple perspectives ("OBCC/GRVC Pilot"). A hallmark of this pilot is increased collaboration between ID and the Facilities' Leadership (discussed in more detail in the Identifying & Addressing Use of Force Misconduct section). The Compliance and Safety Center ("CASC") also now monitors both Facilities remotely by video to identify security issues and loose operational practices and to provide real-time feedback. Additionally, the body-worn camera pilot was expanded at GRVC, and ESU teams now patrol OBCC. Finally, the Correctional Intelligence Bureau increased its scrutiny of both Facilities in an effort to prevent interpersonal conflict from erupting in violence.

The Monitoring Team applauds the Department's implementation of this plan, which is supported by various divisions across the Department. The plan includes several concrete initiatives devised to address the very issues that line Staff and supervisors confront on a daily basis. Notably, the plan has increased candor and transparency among leadership and line Staff about why the reforms have not yet taken hold. Such dialog is critical to ultimately stimulating the necessary culture change. While it is too early to ascertain the impact of the plan, the Monitoring Team's observations to date suggest that, if this plan is implemented with fidelity, positive outcomes should be achieved.

*Summary*

As noted in each of the prior Monitor's Reports, the reforms envisioned by the Consent Judgment will require: (1) policies that describe safe, appropriate procedures; (2) training programs that provide Staff with the skills to carry out expected practices; (3) supervision that encourages and rewards Staff who implement the new practices and guides and influences those who are slower to adapt to the new ways of managing inmates; (4) scrutiny, when policies and procedures were not followed to determine what went wrong and how it could be corrected; and (5) corrective action and discipline when Staff's behavior is not aligned with policy. The Department has many initiatives underway that address all five of these components, which have been implemented with varying degrees of fidelity.

However, in order to maximize their effectiveness and to achieve the dual goals of reducing situations that require force and reducing the prevalence of the misuse of force, a sixth dimension needs to be addressed. The Monitoring Team has grown convinced that the dynamic that characterizes Staff-inmate relationships, along with surrounding issues concerning power and compliance, are a root cause of many of the struggles currently plaguing the Department. The Monitoring Team is grappling with the contours of this dynamic and potential strategies to address this issue but believes that an intentional strategy directed at substantially improving the Staff-inmate dynamic is necessary. This will be a focus of the Monitoring Team in the Seventh Monitoring Period.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection and appropriate response to misconduct is necessary for the Department to succeed in using force safely, proportionally, and only when necessary. In this section, the Monitoring Team provides an overview of the Department's ability to identity misconduct reliably and respond to it with interventions that are likely to prevent re-occurrence.

Uniformed Staff of all ranks and across divisions continue to struggle to recognize when using force is appropriate and the proportionality that must be applied. Staff also lack skills in de-escalating confrontations before they turn violent and in motivating and persuading compliance with directives, rather than forcing compliance via physical intervention. Conflicting messages from leadership (inconsistent discipline and long delays before action is taken) breed further confusion among Staff.

Given their central role in molding the skills and behavior of line Staff, the Department took several steps during this Monitoring Period to develop internal agreement on the core principles guiding the appropriate use of force among the uniformed leadership and to enhance their ability to detect misconduct and to respond quickly when misconduct occurs. The Department:

- Worked to address the Monitoring Team's concerns by revising the Rapid Review/Avoidables Process;

- Piloted an initiative between ID and OBCC/GRVC to better align ID's and uniform Staff's understanding of the parameters surrounding the proper use of force;

- Merged ID and Trials to more efficiently leverage the work of the two units; and

- Initiated a Fast Track pilot to impose formal discipline more quickly.

19

During this Monitoring Period, the Monitoring Team noticed a shift in tone during the weekly/monthly leadership meetings. The meetings are more transparent in that they reference a common set of metrics and expect Facility leadership to explain any negative trends. When leadership is unable to do so satisfactorily, changes in management are made. All of these steps are necessary to ensure that uniformed leadership and line Staff realize that previous practices simply cannot continue.

While some strides have been made, the Department continues to struggle with managing and tracking Command Discipline at the Facility level. Furthermore, troubling systematic failures were identified in imposing discipline for probationary Staff.

*Identifying Use of Force Misconduct*

The Department's various mechanisms to identify misconduct are described below:

| INITIAL ASSESSMENT | | | INVESTIGATIONS | |
|---|---|---|---|---|
| Rapid Reviews/ Avoidables | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| WHEN | | | | |
| Within 48 hours of incident | Committee Meets Bi-Weekly | 5 Business Days | 25 Business Days after referral from Preliminary Review | 180 Days after referral from Preliminary Review |
| BY WHOM | | | | |
| Warden, DWIC, DW | ID, Legal, Trials, Chiefs, Training Leadership | ID Staff | Facility Investigating Captain | ID Investigators |
| INCIDENTS REVIEWED | | | | |
| Actual use of force incidents with video available, separate review conducted for each involved Staff Member | Incidents referred from variety of sources | All use of force incidents | Incidents that do not meet criteria for Full ID or PIC | Incidents that meet ¶ 8 criteria, or otherwise warrant Full ID Investigation |
| INFORMATION REVIEWED FOR EACH INCIDENT | | | | |
| Video Only | Video, and other available evidence if necessary | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, conduct MEO-16 interviews (if needed) |

| INITIAL ASSESSMENT | | | INVESTIGATIONS | |
|---|---|---|---|---|
| Rapid Reviews/ Avoidables | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| SIXTH MONITORING PERIOD DATA | | | | |
| Rapid Reviews were conducted for 1,170 incidents from April to June 2018, covering 3,785 instances of Staff involvement. | Corrective action was imposed on 67 Staff involved in 51 incidents | 2,820 - 2018 incidents [13]<br><br>476 Closed by PICs<br><br>942 referred for Facility Investigations<br><br>1,396 referred for ID investigations | 472 closed 2018 incidents | ID closed 567 cases; ID issued charges in 82 cases, PDRs in 11 cases and 2 cases resulted in charges and PDRs |

*Initial Assessments of Use of Force*

The combination of Rapid Reviews/Avoidables, Preliminary Reviews, the Immediate Action Committee, and ad hoc review by Agency officials of use of force incidents form a solid foundation for identifying misconduct and the opportunity to initiate timely, proportional corrective action and discipline when warranted.[14] While the Department continues to struggle to identify misconduct consistently, various initiatives were put in place to improve the evaluation of misconduct. The necessary culture change should begin to progress as Facility leadership identifies the misuse of force more consistently and responds appropriately with Staff.

- **Rapid Reviews & Avoidables**

The Department took two crucial steps to improve the Rapid Review/Avoidables process during the Monitoring Period. First, the process was streamlined in April 2018 by combining the efforts into a single review at the Facility-level ("Rapid Reviews"). For each incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so,

---

[13] The referral status for six incidents is unknown.
[14] Depending on the severity or complexity of the violation, additional investigation may be required before corrective action can or should be imposed.

how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type. The reviews are forwarded up the chain of command for approval, ending with the Bureau Chief of Facility Operations, whose office compiles the final results and circulates the list to relevant stakeholders for review. Following the reviews, CLU combines the daily files into an Excel spreadsheet and collects proof of practice for all corrective action imposed.[15]

Second, ID piloted an initiative with the leadership for OBCC/GRVC. Beginning in April 2018, ID started to scrutinize all UOF at OBCC and GRVC even more closely. One goal of this assessment is to better align assessments conducted by uniform leadership via the Rapid Reviews with ID's analysis. On a weekly basis, ID compares its own analysis of each incident with the Facility's assessment and identifies cases where the appraisals are not compatible and/or incidents that are concerning for various reasons. These incidents are compiled into weekly reports that are shared with Facility leadership and discussed during bi-weekly meetings between ID and the Facility leadership. The Monitoring Team has reviewed the weekly reports and observed numerous meetings between ID and Facility Leadership. The Monitoring Team found that over the course of the first three months of this pilot that alignment between ID and the Facilities improved. The bi-weekly meetings include candid discussions of Staff's missteps and insightful deliberations about the identified misconduct and how best to address it.

These initiatives have started to result in more reliable outcomes for Rapid Reviews, especially at OBCC and GRVC. Following the implementation of the new Rapid Review process in April 2018, 1,170 Rapid Reviews were conducted (97% of the 1,203 actual incidents). Of

---

[15] Depending on the circumstances of the incident, the Facility may be instructed not to proceed with immediate administrative action in order to allow further investigation by ID and/or law enforcement.

these, 277 (24%) were deemed avoidable, 104 (9%) were deemed unnecessary, and 419 (36%)

evidenced procedural errors (*e.g.* failure to secure cross gates, not ensuring leg irons were secure

before placing an inmate on a gurney). The Facilities recommended corrective action with

respect to 841 Staff as outlined below:

| April-June 2018 Rapid Review Corrective Action | | |
|---|---|---|
| **Type** | **N=844** | **%** |
| **Suspension** | 3 | <1% |
| **Command Discipline** | 335 | 40% |
| **Corrective interviews or Counseling** | 477 | 57% |
| **Re-training** | 10 | 1% |
| **Post re-assignment** | 1 | <1% |
| **MOC** | 18 | 2% |
| *Total # of Staff lower than the types of action combined because sometimes re-training was recommended in conjunction with other corrective action* | | |

- **Preliminary Reviews**

ID investigators continue to conduct a Preliminary Review of every actual and alleged

UOF incident. During this Monitoring Period, the quality of Preliminary Reviews continued to

improve. Preliminary Reviewers also have improved access to Staff reports, Genetec, and

handheld video. The Preliminary Reviews are more thorough and consistent than prior

Monitoring Periods, including providing detailed information as to what contributed to the use of

force incident, and utilizing all available information. Finally, ID is beginning to close more

cases upon the completion of the Preliminary Review under the criteria for the Presumption

Investigation is Complete ("PIC").[16] Further, the Preliminary Reviewers are also beginning to

leverage the work of the Rapid Reviews, which allows more cases to be resolved more quickly

---

[16] The investigation of certain incidents that would otherwise have been a *Facility*-level investigation can be closed after the Preliminary Review for cases that meet certain criteria. This designation replaced the "no further action" ("NFA") category (as outlined in Consent Judgment §VII (Use of Force Investigations), ¶ 7(e)). PIC also allows investigators to close cases and seek discipline even where procedural violations are identified, in a set number of circumstances.

as a PIC and/or with a Facility Referral based on the Facility's Rapid Review. The Monitoring Team continues to encourage ID to leverage the work of the Preliminary Reviews to support the overall effort to close investigations more quickly.

The implementation of CMS resulted in some challenges in timely completion of Preliminary Reviews that resulted in a backlog. The initial implementation of CMS combined with a high volume of incidents in January created the initial backlog as investigators got acclimated with conducting Preliminary Reviews in the new system. Even after the initial version of the Preliminary Review was complete, the workflows in CMS created a more rigid supervisory review process that also caused delay. The supervisory review component is critical. The Monitoring Team reviewed a sample of the event logs for the delayed Preliminary Reviews, and found a significant portion were delayed because the supervisor had not yet approved the Preliminary Review. Often approval was delayed because there was significant communication between the supervisors and the investigator with constructive feedback on how to improve the Preliminary Review. The delays were mainly concentrated in the four Facilities, which not surprisingly, that had the largest number of incidents. This was compounded with the fact that these teams also each suffered some staffing challenges.

ID took several steps to address the backlog of Preliminary Reviews. First, ID prioritized closure of Preliminary Reviews that require a Full ID investigation as any outstanding issues and questions could be addressed during the investigation. ID also prioritized completion of any incidents where an initial Preliminary Review had not been drafted. Only a portion of the backlogged incidents from the Sixth Monitoring Period had no initial Preliminary Review complete by the investigator, and ID targeted the nine investigators who were primarily responsible for that backlog and instructed them to focus intensely on the closure of those

Preliminary Reviews above other work. Further, ID set interim deadlines to ensure the supervisors continue to move the cases through the supervisory review process required by the CMS permissions.

Further, ID encouraged supervisors to review the delayed Preliminary Reviews to determine whether they could be closed through PIC, Expedited Closure,[17] or the case could be fast tracked for discipline.[18] Preliminary Reviews of incidents identified for these initiatives often take longer to close as they are more heavily scrutinized to ensure a case is not closed prematurely. However, the additional time to conduct this review is still generally shorter than the time it would have taken if the case was referred for a full investigation and then closed. The Monitoring Team continues to encourage the use of these tools, as the majority of incidents can be closed in a more truncated manner. That said, ID must improve the time to complete Preliminary Reviews as the delays in closure can have a negative ripple effect for cases that are referred to the Facility, who do not receive the case until the Preliminary Review has been closed by ID.

- **Immediate Action Committee**

The Department maintained the Immediate Action Committee, which meets bi-weekly to review any cases that executive leadership (uniform and civilian), ID, or E.I.S.S. staff identify as meriting heightened consideration of immediate disciplinary action, including suspension or modification of duty, particularly for those incidents where it is found a Staff member has more likely than not engaged in conduct that would merit potential termination pursuant to § VIII, ¶

---

[17] Cases that would have otherwise received a Full ID investigation may be closed with less investigative steps (like PICs) if the specific facts demonstrate less investigative steps are necessary.
[18] Incidents fully captured on video with all available evidence may be fast tracked for formal discipline.

2(d)(i) to (iii) of the Consent Judgment.[19] During the Sixth Monitoring Period, the Immediate

Action Committee considered more cases compared to previous Monitoring Periods. The table

below shows the types of immediate actions being taken.

| Immediate Action Committee[20] | | | |
|---|---|---|---|
| | Fourth Reporting Period | Fifth Reporting Period | Sixth Monitoring Period |
| Total Use of Force Incidents Considered | 29 | 34 | 51 |
| Total Staff Members where Immediate Action Taken | 30 | 39 | 67 |
| *Suspension* | *7* | *9* | *18* |
| *Modified Duty* | *3* | *1* | *3* |
| *Retraining* | *15* | *7* | *12* |
| *Counseling* | *10* | *24* | *29* |
| *Command Discipline* | *3* | *5* | *16* |
| *Reassigned* | *2* | *4* | *5* |
| *Other (including E.I.S.S. Screening to consider placement in E.I.S.S. Monitoring)* | *0* | *0* | *12* |
| *The immediate action taken sometimes included a combination of responses—e.g., modified duty and re-training—so the action totals are greater than the total number of Staff* | | | |

While the Monitoring Team is encouraged the Immediate Action Committee is

improving its identification of cases that merit consideration, the Monitoring Team continues to

find examples of cases that should have been considered for Immediate Action but were not

considered, particularly incidents that demonstrate a repeated pattern of misconduct by Staff.

*Investigations*

Appropriate, logical, and thoughtful investigations are a critical tool for detecting the

misuse of force and for ameliorating the conditions that gave rise to the Consent Judgment. The

Department continues to struggle with conducting timely investigations that result in reasonable

outcomes as discussed in more detail in the Use of Force Investigations section of this report (¶¶

---

[19] The Department may elect to suspend or modify duty of a Staff member for a variety reasons beyond potential termination cases.

[20] The data above does not include the immediate corrective responses taken by the Facility during Rapid Reviews as described above.

9 and 13). The volume of use of force incidents has an associated increase in ID's caseload. ID's ability to manage the volume of work remains a significant concern. On the other hand, the number of investigations completed by the Facility has decreased as ID closes more cases through the PICs process and more cases are referred for Full ID investigations.

- **ID Investigations**

During this Monitoring Period, the Department merged ID and the Trials & Litigation Division ("Trials") to create the Investigation and Trials Division ("ID & Trials") in an effort to streamline the investigation and disciplinary process. Although the union of these divisions does not alter the pre-existing responsibilities or purpose of either, the Department hopes that it will result in a more seamless process from investigation through adjudication.

The Monitoring Team believes that the merger of ID & Trials will better support the overall effort to improve the quality and timeliness of investigations and to impose meaningful discipline. While the Monitoring Team reviewed a handful of investigations closed during this Monitoring Period that met quality standards, a far larger number fail to properly evaluate evidence and often disregard evidence that appeared to contradict the investigators' findings and conclusions. Improving the quality of ID investigations remains a top priority for the Department, and the Monitoring Team will support the improvement efforts as appropriate, including collaboration on initiatives within ID & Trials to address these issues as well as workshops with investigators.

- **Facility Investigations**

The incidents referred for Facility investigation are generally those where the force employed had a lower risk of causing harm. They are fewer in number than Full ID Investigations. While there are fewer cases, the ongoing deficiencies of the process and product

are far worse in magnitude than those identified among Full ID Investigations. Too often,

Facility investigations reveal a complete disregard for objective evidence of wrongdoing that is

ignored up the entire chain of command. The Department must improve its ability to critically

evaluate use of force incidents in order to meet the larger goals of the Consent Judgment. Below

are two examples of biased, incomplete and inadequate investigations conducted by the Facility.

> *Example: Facility Investigation* #1

Video footage captures a Captain who precipitously used MK-9 chemical agent spray on

two inmates from less than six feet away in the dayroom of a housing unit. The OC cross-

contaminated four other COs, one of whom subsequently struck an inmate in the head with her

canister. The Facility investigator[21] concluded there were no violations and closed the

investigation with no action. Notwithstanding the following apparent violations that were never

identified or addressed:

- Precipitous use of force (anticipated with time to summon the Probe Team);
- Inappropriate use of MK-9;
- Deployment of MK-9 at less than six feet;
- Head-strike with OC canister; and
- False/Incomplete reporting.

The failure of the investigator to identify any violations, despite objective evidence, is

plainly inadequate and biased in favor of the Staff. The deficiencies were further exacerbated by

the fact that the investigation was approved up the chain of command.

> *Example: Facility Investigation* #2

An officer precipitated a UOF incident when he pushed an inmate causing the inmate to

fall and slide across the floor. The Officer continued to aggressively pursue the inmate and his

---

[21] This matter was erroneously referred for a Facility Investigation (the head-strike made it an automatic referral for a Full ID investigation). Following identification by the Monitoring Team, this investigation has been upgraded for a Full ID Investigation, which was pending as of the end of this Monitoring Period.

partner intervened along with an inmate witness to separate the officer and this inmate. Following the incident, the officers filed incomplete and inaccurate reports. Despite objective evidence to the contrary, the Facility Investigation found that the UOF was precipitated by the inmate's non-compliance when given orders. The investigator concluded the force used to control the incident was necessary to manage the incident, minimal and proportionate to the threat presented, and was used in an appropriate and prescribed manner in accordance with Departmental policy, and recommended only that the officers receive re-training for report writing. This finding is even more curious as the Facility's own Rapid Review found that the officer in question should be disciplined because the office precipitated the force.[22] Despite the leadership's Rapid Review finding, the Facility investigation was approved up the Facility's chain of command without identifying these issues or imposing adequate discipline.

As part of the effort to ensure the Department conducts appropriate, high-quality investigations, the Consent Judgment §VII (Use of Force Investigations), ¶ 4, requires: "[a]ny Staff Member found to have completed a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to discipline, instruction, or counseling." To date, the Monitoring Team is only aware of a single incident where a Staff member was found to have violated this provision, notwithstanding that the Monitor has—on repeated occasions and to a variety of audiences—urged DOC officials to make enforcing this provision a high priority. Until and unless such provisions are consistently and timely implemented and enforced, such patterns will inevitably continue. Until Captains, Tour Commanders and Assistant Wardens are made aware that they have failed to conduct proper investigations, they will continue to produce marginally

---

[22] The Command Discipline was ultimately dismissed because of Due Process Violations.

adequate, if not wholly inadequate, work regardless of the priorities set by DOC in conjunction with the Monitor's Office on such critical matters. The Monitoring Team intends to closely scrutinize this provision in the next Monitoring Period and will assess compliance in the Seventh Monitor's Report.

_Responses: Addressing Misconduct_

Responding quickly and appropriately to identified misconduct is critical to minimizing the possibility that the misconduct will reoccur. Staff's behavior can be shaped effectively through a variety of mechanisms, including re-training, counseling, responses by the Facility and formal discipline. Therefore, the Monitoring Team has strongly encouraged the Department to utilize its entire spectrum of responses including coaching, counseling, and other forms of corrective action as they are all essential strategies for stimulating behavior change, and a core responsibility of Department leadership.

The Monitoring Team continues to remind all stakeholders that imposing discipline requires significant coordination as each incident must be individually assessed to determine the appropriate response. Further, the Department must balance the interest of imposing close-in-time corrective action with the overarching goal to impose appropriate formal discipline and/or more punitive discipline, if merited, to avoid the possibility of precluding formal discipline or more punitive discipline by principles of double jeopardy.

- **Facility-Level Responses**

  o _Counseling, Corrective Interviews, and Re-Training_

The Monitoring Team supports the use of counseling, corrective interviews, and re-training when they are substantive and utilized appropriately. However, the Department often over relies on re-training, corrective interviews and counseling (including 5003 counseling

sessions) even in cases where the evidence objectively supports a more significant disciplinary response.

o   *Command Discipline*

The Monitoring Team has strongly encouraged the Department's use of Command Discipline to impose disciplinary action, when appropriate, because it can be imposed more swiftly than the lengthy process required for formal discipline. The use of Command Discipline is governed by a detailed policy that, among other things, requires issuance and adjudication within specified timeframes that are much shorter than those for formal discipline.

By the end of the previous Monitoring Period, the Department appeared to have improved its processes for manually tracking Command Disciplines using an Excel spreadsheet. However, this process transitioned into CMS when it was implemented in December 2017. Now, the Command Discipline process is partially conducted electronically (versus entirely paper driven), but still requires certain components to be completed on paper. Command Disciplines are now issued and generated out of CMS, but Staff are still required to be presented with, and sign, a hard copy version of the Command Discipline determination form which then must be scanned and uploaded back into CMS and then coded. While the transition to CMS for Command Disciplines did result in some improvement in the availability and accessibility of the documentation, the Department was unable to produce reliable outcome data, reporting that Facilities were not accurately coding information into CMS. The inclusion of Command Discipline in CMS is a step in the right direction, but the Department cannot achieve compliance with the current state of affairs. The Department reports that NCU will begin auditing this process during the Seventh Monitoring Period to identify barriers to proper tracking and to develop reliable data. Given its significance to the overall accountability process, improving the

use and proof of practice surrounding Command Discipline must be a priority for the Department.

   o   *Suspensions, Modified Duty, and Re-Assignment*

The Department may take a number of administrative actions in response to identified misconduct. During this Monitoring Period, the Department suspended 21 Staff Members for use of force related misconduct, with suspensions lasting from five to 30 days.[23]

The Department may also modify the Staff Members' duty or re-assign them. Both options were used several times during this Monitoring Period as a result of a finding of misconduct by the Immediate Action Committee, Rapid Reviews, through Screening procedures (discussed in the Screening section of this report), and ad hoc reviews. Staff re-assignment or modification occurs via so many avenues that aggregating the data is difficult. That said, it appears the Department utilized these options more frequently during this Monitoring Period than previously. These administrative responses are an important tool for addressing potential misconduct close-in-time to the incident and the Monitoring Team urges the Department to continue to utilize these options.

- **Formal Discipline**

The Trials Division continued to make significant progress during this Monitoring Period to impose discipline more quickly. That said, the process to impose formal discipline remains lengthy, requiring various procedures occurring across multiple divisions. The current delays in conducting investigations further prolong the imposition of formal discipline. Formal discipline

---

[23] All suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay

for tenured Staff[24] misconduct is handled by Trials and the entire process is outlined in *Appendix B: Flowchart of Disciplinary Process* in the Fifth Monitor's Report.

Imposing formal discipline can take over one year. As shown in the chart below, only eight (3%) of the 250 cases closed with formal discipline during this Monitoring Period were completed within six months of the incident. Conversely, 83% of cases resolved with formal discipline were completed over a year after the misconduct occurred. While current processing times are far too long, a greater proportion of cases are closing more quickly (in 2017, 49% of cases closed two years or more after the incident, compared to only 17% during the current Monitoring Period).

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | |
|---|---|---|---|---|---|---|
| Closure Date | Jan. - June 2017 | | July 2017 to Dec. 2017 | | Jan. - June 2018 | |
| Total | 153 | | 246 | | 250 | |
| 6 months or less | 0 | 0% | 7 | 3% | 8 | 3% |
| 6 to 12 months | 7 | 5% | 22 | 9% | 35 | 14% |
| 1 to 2 years | 43 | 28% | 125 | 51% | 164 | 66% |
| 2 to 3 years | 42 | 27% | 63 | 26% | 33 | 13% |
| 3 + years | 61 | 40% | 29 | 12% | 10 | 4% |

As demonstrated in the table below, most formal discipline is imposed via an NPA, a trend which is increasing over time, while the number of cases that are administratively filed or closed as a deferred prosecution have decreased.

| Discipline Imposed by Date of Ultimate Case Closure[25] | | | | | | |
|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | |
| Total | 210 | | 289 | | 271 | |
| NPA | 153 | 73% | 246 | 85% | 250 | 92% |
| Administratively Filed | 45 | 21% | 32 | 11% | 16 | 6% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% |
| Adjudicated/Guilty | 0 | 0% | 3 | 1% | 1 | 0% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% |

---

[24] This does not include Staff who are on probationary status, which are handled via PDRs, explored below.
[25] These are cases that have been signed off by the Commissioner.

The table below demonstrates the range of compensatory days relinquished and other penalties accepted via NPA. The Monitoring Team's initial findings on the discipline imposed is discussed in more detail in the Staff Discipline and Accountability section of this report.

| Penalty Imposed by NPA by Date of Formal Closure | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Total | Refer for Command Discipline | Retirement /Resignation | 1-10 days | 11-20 days | 21-30 days | 31-40 days | 41-50 days | 51+ days |
| 250 | 27 | 2 | 93 | 55 | 29 | 14 | 11 | 19 |
| | 11% | 1% | 37% | 22% | 12% | 6% | 4% | 8% |

An NPA may also include additional terms, including a period of disciplinary probation. During this Monitoring Period, a total of 35 Staff members were under disciplinary probation as a result of their use of force related misconduct, ranging from six months to the entire duration of their employment. The majority had probation terms of 12 to 24 months. Staff on disciplinary probation are also enrolled in E.I.S.S. monitoring so they receive additional support and guidance. The Monitoring Team has recommended that Trials consider using disciplinary probation more often.

Of the formal discipline imposed since November 2015, 54% was imposed for incidents that occurred after the Effective Date and the other 46% was imposed for incidents that occurred prior to the Effective Date.[26] Given the backlog in ID investigations, the fact that many cases languished is not surprising. While Trials has effectively alleviated its backlog, the backlog at ID continues to inhibit the Department's ability to impose formal discipline timely. Accordingly, formal discipline was only imposed for nine cases from this Monitoring Period by July 31, 2018.

---

[26] The Monitoring Team notes that the Department's record keeping of formal discipline at the early stages of the Consent Judgment was not reliable. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed since November of 2015.

| Formal Discipline Imposed by Date of Incident as of July 31, 2018 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Pre Nov. 2015 | | Nov. 2015 - Dec. 2016 | | Jan. to June 2017 | | July 2017 to Dec. 2017 | | Jan. to June 2018 | | Grand Total | |
| **Total** | **411** | | **348** | | **68** | | **48** | | **9** | | **884** | |
| NPA | 401 | 98% | 345 | 72% | 68 | 100% | 48 | 100% | 9 | 100% | 871 | 99% |
| Adjudicated/Guilty | 7 | 2% | 1 | 0% | 0 | ~ | 0 | ~ | 0 | ~ | 8 | 1% |
| Not Guilty | 3 | 1% | 2 | 1% | 0 | ~ | 0 | | 0 | ~ | 5 | 1% |

    o   Fast-Track Pilot

In an effort to improve the time required to close cases and impose discipline, ID & Trials revised its Fast-Track program during the current Monitoring Period. While Fast-Track was originally developed to expedite case closings, it was underutilized because investigators were not always proficient in applying the criteria needed to successfully Fast-Track a case. To improve investigators' skill, Trials attorneys were paired with investigators earlier in the process, so they could assist in identifying cases that qualify for Fast-Track. An ancillary benefit was improved insight to each other's perspectives and responsibilities and more collegial work relationships among staff. In April 2018, ID & Trials launched a six-week Fast-Track pilot program that identified 141 cases for Fast-Track. This is a significant increase over the four Fast-Track cases identified between January and March 2018.

The results of this pilot speak for themselves and the Monitoring Team strongly supports the use of Fast-Track going forward. The Department reports that ID & Trials intend to institute this program as part of the unit's standard practices in the next Monitoring Period.

- **Personnel Determination Review ("PDR")**

Discipline for probationary Staff[27] is administered via a Personnel Determination Review ("PDR"). If an investigation concludes that probationary Staff engaged in misconduct, a memo is sent by ID[28] or the Facility Commanding Officer to the Deputy Commissioner of HR with a

---

[27] Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods.
[28] The Department reports that ID submits the vast majority of PDRs for use of force misconduct.

summary of the incident and the misconduct along with the proposed recommendation for discipline. HR then processes the memo and submits it to the First Deputy Commissioner for review and determination. Unlike the MOC process for tenured Staff which requires three layers of review (by the Deputy General Counsel, Deputy Risk Manager, and the Commissioner), the First Deputy Commissioner is the sole decider of the PDRs. The outcome of the PDR is limited to three options: (1) extension of probation,[29] (2) demotion or termination,[30] or (3) no action.

The Monitoring Team closely scrutinized the PDR process and identified systematic failures to impose adequate and meaningful discipline on probationary Staff. Accordingly, the Monitoring Team has grave concerns about its procedures, oversight, and outcomes. As an initial matter, case processing by HR is unreliable and disorganized. HR does not have a reliable process to track the status of all UOF related PDRs.[31] Further, HR's record keeping of the actual paperwork is not sufficient.[32] This mismanagement of the PDR process precluded the Department from acting on the PDRs for at least 14 probationary Staff because they were tenured before discipline could be imposed.[33]

The Department's current practice is to defer a decision on the PDR until right before the Staff is set to tenure. In this Monitoring Period, the 22 PDR determinations made by the First Deputy Commissioner were made between two days and one year after HR received the memo

---

[29] Probation may be extended up to a total of six months. The probationary period may also be extended for any period of time the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[30] Correction Officers may be terminated via PDR. However, Captains and ADWs may only be demoted via PDR, termination must be completed through formal discipline as Staff is those positions have Civil Service protections.

[31] The Department and the Monitoring Team have expended significant effort to develop a comprehensive tracking chart. After months of work, the Monitoring Team believes that the overwhelming majority of UOF related PDRs from January 2017 to the present have now been identified.

[32] The Department was not able to easily or timely provide relevant PDR paperwork to the Monitoring Team for evaluation.

[33] The Department identified and reported this issue to the Monitoring Team. The vast majority of probationary Staff that tenured did so in this Monitoring Period.

recommending discipline, as demonstrated below. This practice mitigates the meaningfulness of the discipline as it delays notification to the Staff and further entrenches the inappropriate behavior as the opportunity to learn and correct the behavior is needlessly delayed. Further, disorganization and mismanagement of this process means that waiting to impose discipline can result in losing the opportunity to impose discipline.

| Time between submission of PDR to HR and sign-off by the First Deputy Commissioner | | | | | | |
|---|---|---|---|---|---|---|
| 0 to 30 Days | 31 to 60 Days | 61 to 90 Days | 91 to 120 Days | 121 to 180 Days | Beyond a year | Unknown |
| 7 (35%) | 4 (20%) | 2 (10%) | 2 (10%) | 2 (10%) | 2 (10%) | 1 (5%) |

For the 14 Staff who tenured before the PDR could be processed, the Department has subsequently issued MOCs for three Staff (the statute of limitations had passed for the other 11 Staff). For the 11 Staff where formal discipline could not be imposed, the Department reported it would provide re-training to each of those Staff members. In response to the Monitoring Team's recommendation, the Department also committed to counseling each of these Staff.[34]

Between the Effective date and July 31, 2018, the Department has imposed discipline on 49 probationary Staff through PDRs related to UOF misconduct.[35] 17 probationary Staff have been terminated, one Staff was demoted, and probation was extended for six Staff for three months and 25 Staff for six months. The chart below demonstrates the outcome of the 67 PDRs that have been completed through July 31, 2018 based on the date the PDR was signed.

---

[34] As of the filing of this report, the Department reports it has provided counseling to 10 of the 14 Staff identified.
[35] A PDR may cover more than one UOF Incident.

| Date of PDR Completion[36] | Nov. 2015 to Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July 1 to 31, 2018 | | Grand Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 4 | | 7 | | 12 | | 32 | | 12 | | 67 | |
| Termination | 1 | 25% | 1 | 14% | 3 | 25% | 8 | 25% | 4 | 33% | 17 | 25% |
| Demotion | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 8% | 1 | 1% |
| 3 Month Extension of Probation | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 6 | 50% | 6 | 9% |
| 6 Month Extension of Probation | 2 | 50% | 2 | 29% | 6 | 50% | 14 | 44% | 1 | 8% | 25 | 37% |
| Tenured | 0 | 0% | 3 | 43% | 1 | 8% | 10 | 31% | 0 | 0% | 14 | 21% |
| No Action | 0 | 0% | 0 | 0% | 2 | 17% | 0 | 0% | 0 | 0% | 2 | 3% |
| Resignation | 1 | 25% | 1 | 14% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% |

16 of the PDR determinations deviated from the recommendation by ID (11 of those cases imposed less discipline than recommended and five imposed more discipline than recommended). In all 16 cases, no rationale or justification was provided for the deviation. Accordingly, the final disposition by the First Deputy Commissioner for each of these cases was impossible to reconcile with ID's written recommended discipline.

While the number of PDRs completed in each Monitoring Period has steadily increased, the combination of delays in completing the investigation and assessing the PDR resulted in the completion of only seven PDRs for incidents occurring in this Monitoring Period as shown in the chart below.

| Date of Incident | Nov. 2015 - Dec. 2016 | | Jan. to June 2017 | | July 2017 to Dec. 2017 | | Jan. to June 2018 | | July 1 to July 31, 2018 | | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 33 | | 18 | | 7 | | 7 | | 1 | | 66 | |
| Termination | 6 | 18% | 6 | 33% | 3 | 43% | 2 | 29% | 0 | 0% | 17 | 26% |
| Demotion | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 14% | 0 | 0% | 1 | 2% |
| Extension of Probation - 3 Months | 1 | 3% | 2 | 11% | 2 | 29% | 0 | 0% | 1 | 100% | 6 | 9% |
| Extension of Probation - 6 Months | 12 | 36% | 7 | 39% | 2 | 29% | 3 | 43% | 0 | 0% | 24 | 36% |
| Resignation | 2 | 6% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% |
| Tenured | 11 | 33% | 2 | 11% | 0 | 0% | 1 | 14% | 0 | 0% | 14 | 21% |
| No Action | 1 | 3% | 1 | 6% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% |

The probationary period is a critical juncture for a Staff member's career. During this time, Staff learn the responsibilities and expectations of their position and are evaluated for their

---

[36] The Department only began to systematically track PDRs related to UOF misconduct in 2017 at the request of the Monitoring Team. Accordingly, the data prior to 2017 is not comprehensive.

fitness in the role. The purpose of the probationary period is undermined by the insufficient oversight and failures of the PDR process. It is imperative that this process is significantly improved in the next Monitoring Period. The Monitoring Team will continue to scrutinize this process very closely. Following the close of the Monitoring Period, the Monitoring Team shared a comprehensive set of recommendations with the Department to address these deficiencies and overhaul the PDR process. The Department expressed a commitment to work with the Monitoring Team to develop a reliable and sustainable PDR process.

# SECTION BY SECTION ANALYSIS

### 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. [37] The New Directive is not based on new law, nor does it abandon core principles from its predecessor—the New Directive retains core principles of the former policy while providing further explanation, emphasis, detail, and guidance to Staff on the steps officers and their supervisors should take in response to threats to safety and security. The Department's efforts to implement the New Directive, particularly in relation to the Use of Force Improvement Plan, is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

| IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE) |
| --- |
| ¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br>• The Department developed a new UOF Directive and it was approved by the Monitor.<br>• The New Use of Force Directive remains in effect.<br>**ANALYSIS OF COMPLIANCE** |

---

[37] The Department developed the new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, in the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

The Consent Judgment requires the Department to develop, adopt, and implement a New UOF Directive. The Department previously developed a new UOF Directive approved by the Monitor and adopted it during the Fifth Monitoring Period once all Staff received S.T.A.R.T. training.

Implementing the New Directive requires not only informing and training relevant Staff, but also consistently following and applying the policy.[38] Therefore, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. The Department has committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and is currently providing a refresher through A.C.T. The UOF Improvement Plan, described in more detail in the preceding section, includes concrete steps and initiatives to inform and educate Staff, improve Staff skill and performance regarding the use of force, and identify and address misconduct to enforce the policy. As the Department developed and began to implement the plan in April 2018, they grappled with the best way to address operational deficiencies in a meaningful way, hoping also to change Staff behavior and culture. The initial implementation of the plan is a meaningful step, and while the initiative has promise, it is but one step in a long path toward full implementation of the New UOF Directive.

The Department has achieved compliance with some of the components of this provision (*e.g.* developing and adopting the policy, and informing and training Staff on the policy), but significant work remains, particularly to achieve sustained and significant reductions of the misuse of force. The Department took concrete steps during this Monitoring Period to implement the UoF Directive, but the lack of meaningful results indicate that a Partial Compliance rating is premature.

| **COMPLIANCE RATING** | ¶ 1. (Develop) Substantial Compliance |
| | ¶ 1. (Adopt) Substantial Compliance |
| | ¶ 1. (Implement) Non-Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

---

[38] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: Spit Masks, restraints, Chemical Agents, Electronic Immobilization Shields, Tasers, and Monadnock Expandable Batons.

- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock downs and searches for ballistic weapons.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment and is also aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly. During this Monitoring Period, the Monitoring Team provided feedback on the Department's policies related to lock down and ballistic searches. The Department reports it will consult with the Monitoring Team during the next Monitoring Period to revise the policies as necessary.

| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-t).** Substantial Compliance |
| --- | --- |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign as described in the Fifth Monitor's Report at pg. 43.

- During this Monitoring Period, the Department developed and implemented a messaging campaign as part of the Use of Force Improvement plan with weekly use of force-related themes communicated to Staff through posters, roll-call videos, and slides and videos on DOCTV and intranet.

**ANALYSIS OF COMPLIANCE**

The Department's initial rollout campaign for the New Use of Force Directive was well-executed. The Department's work this Monitoring Period was an extension of that campaign and included thoughtful messaging of key use of force-related themes in a coordinated manner. Weekly themes included supervisory and leadership-related issues, as well as themes targeting Officers, including appropriate escort techniques, anticipated use of force scenarios, when to utilize OC spray, and how to de-escalate situations to avoid a UOF. The Monitoring Team reviewed the messaging campaign materials and found them to be thoughtful and appropriately targeted. The Monitoring Team also observed some of the roll call trainings and found they provided an appropriate forum to provide

| | |
|---|---|
| guidance and encourage constructive dialogue among the Staff. | |
| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |

## 2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Accurate and timely reporting and tracking of use of force is critical to the Department's overall goal to effectively manage use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[39]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 & 23).

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims that Staff used force against an inmate and the force was not previously reported. An allegation does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis, above.

The chart below presents the number of alleged uses of force reported every month from January 2016 through June 2018. Although there are some month-to-month variations, the average number of allegations per month has decreased from year to year, with 39.3 in 2016, 36.3 in 2017, and 30.1 mid-way through 2018.

---

[39] A discussion about the Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this Report.



Investigating alleged uses of force is critical to reducing the frequency with which actual uses of force may go unreported. The Monitoring Team has focused on reviewing allegations where there is objective evidence (i.e. available video or relevant medical evidence) that may or may not substantiate the report. As in the previous Monitoring Period, the Monitoring Team reviewed 10 such closed allegation cases, five closed Facility Investigations and five closed Full ID Investigations, and the results are described in the analysis of ¶ 8 below.

*Assessment of Downgraded UOF Incidents*

The Monitoring Team continued to closely monitor the Department's reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). The Monitoring Team did not identify any cases that were downgraded in this Monitoring Period.

The Monitoring Team's assessment of compliance is outlined below.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF)

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.

- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assessed this requirement from three perspectives:

First, in previous Monitoring Periods, the Monitoring Team assessed whether Staff followed the appropriate notification procedures (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)) and found that the relevant section of the forms was filled out fairly consistently. In subsequent Monitoring Periods, the Monitoring Team will repeat this assessment.

Second, the Monitoring Team assessed the frequency and legitimacy of inmates' allegations to identify how often use of force incidents go unreported. The Department identified five cases in this Monitoring Period through Preliminary Reviews where video and other objective evidence strongly suggest that Staff deliberately failed to report a use of force incident, all five incidents had pending ID investigations as of the end of the Monitoring Period.[40] The Monitoring Team also examined inmate allegations made through various channels including those made to Department representatives, H+H staff, and those reported through outside agencies like the Legal Aid Society ("LAS"). As an initial step, the Monitoring Team ensures there is a corresponding investigation for each report the Monitoring Team receives.[41] Then, the Monitoring Team evaluated whether the reports by LAS or H&H is what triggered the investigation or if the incident had been previously reported. The Monitoring Team found that three of the 22 reports from H+H prompted an investigation of the allegation because it had not otherwise been reported. Of the 25 reports LAS submitted regarding UOF incidents, all incidents had already been reported, as either actual or alleged incidents, through other channels before the LAS complaint was received by the Department.

---

[40] The Monitoring Team had identified four such cases in the Fourth Monitoring Period (see Fourth Monitor's Report at pg. 49) and six such cases in the Fifth Monitoring Period (see Fifth Monitor's Report at pg. 45). All but one of these ten cases have open investigations. The one closed incident, referenced in the Fifth Report at pg. 45, has a closed investigation which confirmed a use of force occurred and the involved Staff Member was suspended.

[41] The Monitoring Team found 27 of the 28 UOF allegations received from LAS in this Monitoring Period had a corresponding UOF investigation. Further, 22 of 23 UOF reports received from H+H Staff in this Monitoring Period had a corresponding UOF investigation. The Monitoring Team intends to discuss the basis for ID electing not to proceed with investigations in the final two cases in the next Monitoring Period.

Third, the Monitoring Team closely scrutinized investigations of allegations to ensure they reached reasonable conclusions and that the Department imposed discipline on Staff who fail to report a use of force. This analysis is discussed further in ¶ 8 below.

Unreported uses of force continue to be an important focus of the Monitoring Team, and specific, sometimes egregious, instances of failures to report have been identified in every Monitoring Period. Given that the number of reported UOF in this Department is so high, the number of unreported UOF may seem low in comparison. However, the most troubling uses of force are those that go unreported, because an unreported UOF cannot be assessed by relevant stakeholders and a determination of whether the force was unnecessary or excessive is precluded. The Department will achieve Substantial Compliance when there are only very isolated or no instances of unreported uses of force.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, 5, 6 & 7 (INDEPENDENT & COMPLETE STAFF REPORTS)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2)**,** and addresses all requirements listed in ¶¶ 3(a)-(h), and ¶¶ 5, 6, and 7 above.

### ANALYSIS OF COMPLIANCE

The Monitoring Team assessed compliance with ¶¶ 2, 3, 5, 6 & 7 in prior Monitoring Periods (*see* Fourth Monitor's Report (at pgs. 51-52)). During this Monitoring Period, the Monitoring Team reviewed Staff Reports in connection with Preliminary Reviews, ID, and Facility Investigations. Staff's practices have not changed significantly from those reported in prior Monitoring Periods. The Monitoring Team found that while Staff Reports provide information in all required fields, the quality of that information varies. The Monitoring Team continued to find that while some reports meet the requirements of these provisions, others: (1) utilize vague, boilerplate language like "upper body control holds" which does not accurately or fully reflect the nature, extent, and duration of the force used to control or restrain an inmate (particularly using this phrase instead of reporting the use of head strikes); (2) are incomplete, and while they often describe the conduct of the inmate, the reports often fail to describe Staff actions; (3) are not consistent with objective video evidence; or (4) include false information, in direct contradiction to other evidence.

| COMPLIANCE RATING | ¶¶ 2, 3, 5, 6, and 7. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 4 & 8 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4 and the Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8.

- At the end of the Fifth Monitoring Period, the *Nunez* Compliance Unit ("NCU") began to audit the extent to which Staff Reports were being submitted and uploaded within 24 hours of a reported use of force incident and began holding Facilities accountable when Staff Reports were not submitted and uploaded to CMS within 24 hours of an Actual UOF.

- Beginning in May 2018, NCU also began assessing whether UOF allegation reports were submitted and uploaded to CMS within 72 hours of the allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).

47

ANALYSIS OF COMPLIANCE

¶¶ 4 and 8 are addressed together because, in combination, they require Staff to submit timely Staff Reports, and require the Department to take appropriate corrective action when Staff fail to do so.

*Timely Submission of Use of Force Reports* (¶ 4)

Staff Reports are critically important to understanding what occurred during a use of force incident. As described in prior Monitor's Reports, the Department has struggled to demonstrate that UOF reports are submitted timely. NCU's initial audit results during this Monitoring Period confirmed that Facilities were continuing to struggle to upload the necessary reports within the required time frame. However, the accountability created by NCU's close scrutiny resulted in a drastic improvement beginning in April 2018, [42] as shown by the chart below:

| Month | Actual UOF | | | Allegations of UOF | | |
|---|---|---|---|---|---|---|
| | *Reports Completed* | *Total Staff* | *% Uploaded within 24 Hours* | *Reports Completed* | *Total Staff* | *% Uploaded within 72 Hours of the Allegation* |
| **February**[43] | 696 | 1296 | 54% | *NCU began collecting data for UOF allegations in May 2018* | | |
| **March** | 1008 | 1440 | 70% | | | |
| **April** | 917 | 960 | 96% | | | |
| **May** | 1100 | 1171 | 94% | 20 | 23 | 87% |
| **June** | 1014 | 1147 | 88% | 24 | 25 | 96% |

The Department's improvements have moved the Department out of Non-Compliance. The Department will achieve Substantial Compliance with ¶ 4 when it demonstrates sustained high levels of performance.

*Discipline or Other Corrective Action for Failure to Report Uses of Force* (¶ 8)

Reporting violations, (including inaccurate, misleading, and false reporting or failure to report) are not minor violations. Staff who exaggerate, lie, or fail to report use of force thwarts the overall mission of assessing the use of force and ensuring that force is only utilized when necessary. The Department continues to identify and impose discipline related to reporting issues. For instance, 66 of the 210 (31%) MOCs received by Trials in this Monitoring Period included at least some type of reporting violation. That said, the Department does not identify or address reporting violations nearly enough. Further, when discipline is imposed, the Monitoring Team has found that the discipline is inconsistent.

---

[42] There was a slight reduction in the uploading of reports in June compared with April and May. According to NCU's analysis, two facilities are responsible for the majority of the 133 reports that were not uploaded in time. Further, one incident accounted for 10 of the 26 missing/late reports.
[43] The Department's data for January 2018 was analyzed under a different methodology, and is therefore excluded from this analysis.

This Monitoring Period, the Monitoring Team also reviewed closed Facility and ID Investigations for a select sample of UOF Allegation cases. The Monitoring Team focused on these allegations because there was objective evidence (i.e. video was available or there was relevant medical evidence) that may substantiate the report or not. The Monitoring Team reviewed four Full ID cases, and five Facility Investigation cases. Overall, these nine cases reviewed revealed three unreported uses of force confirmed by the investigator, five unsubstantiated allegations, and one interaction that the investigator deemed unintentional (stepping on an inmate's foot) and therefore not an unreported use of force.

- **Investigation Division Cases**: The investigator substantiated or partially substantiated the allegations in two of the four incidents (the other two incidents found no evidence force was used and did not substantiate any of the inmate allegations). The disciplinary recommendations were reasonable for the primary subjects of all the cases where the allegations were substantiated, although not all ancillary issues were addressed.
- **Facility Investigation Cases**: Of the five Facility Investigations reviewed, the investigator substantiated one allegation, and did not substantiate three allegations. The discipline in response to the unreported UOF was reasonable, but not all ancillary issues were addressed. For one incident, for which the inmate alleged the Officer stepped on his foot, which was caught on video, the investigator deemed it unintentional therefore did not substantiate the allegation or conclude there was an unreported UOF. The Monitoring Team questioned this conclusion.

| COMPLIANCE RATING | ¶ **4.** Partial Compliance |
| | ¶ **8.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses such requirements, and the "implement" component of this provision is assessed within the individual assessment of the specific provisions in this Report.

| COMPLIANCE RATING | ¶ **9.** Substantial Compliance |

## V. Use of Force Reporting and Tracking ¶ 10, 11, & 12 (Non-DOC Staff Reporting)

¶ 10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[44]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

## Department's Steps Towards Compliance

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) has a use of force reporting policy to address ¶¶ 10, 11, and 12 of this Section.
  - H+H's revised reporting policy, which was implemented at the end of the Fifth Monitoring Period, advises staff of their obligation to report a use of force incident regardless of whether there is an "apparent injury," which comports with the revised Consent Judgment requirement.

- H+H reinforced the use of force reporting obligations to its staff in a number of ways this Monitoring Period:
  - H+H's electronic medical record system continues to require any H+H staff who signs into the system to read and acknowledge a statement regarding their reporting obligations in order to gain access the system. Staff must acknowledge this statement every time they sign into the system and access to the system is denied if the acknowledgement is denied;
  - Communicated the requirements of the revised policy to staff as part of a Grand Rounds presentation at the end of the Monitoring Period;
  - Provided a Webinar training, developed with input from the Monitoring Team, to staff at the beginning of the Seventh Monitoring Period; and
  - For every UOF that occurs in areas where clinic staff were likely to have been present,[45] H+H operations staff reach out on a monthly basis to providers scheduled to work in

---

[44] This language reflects the revised language ordered by the court May 14, 2018 (Docket Entry 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."
[45] Clinic, Mental Observation Units, PACE, CAPS, RHU, ESHU, ESHU YA, SCHU, TRU, Secure, ARNT, BTB, or Bing/CPSU units.

those areas at the time/date of the reported UOF to determine if they directly witnessed a UOF and, if so, to elicit reports.

- H+H has a dedicated email address for staff to submit their reports, either immediately after witnessing the force or after being prompted by the monthly reminders from operations staff.
- This Monitoring Period, H+H worked with ID to develop a protocol to share the H+H staff reports with ID and the Monitoring Team.
  - ○ H+H staff submitted 22 reports of UOF, covering 23 individual incidents, this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

¶ 10 of this section of the Consent Judgment requires the City of New York to take steps to ensure that non-DOC staff submit a report when they witness use of force incidents. The City has failed in its obligations and thus is in Non-Compliance. The City did not take any steps during this Monitoring Period to demonstrate that it has communicated or enforced this requirement with non-DOC staff.[46]

In this Monitoring Period, the Monitoring Team reviewed video footage of 21 UOF incidents that occurred in the school and clinic, places where non-DOC staff are most likely to witness an incident. In 9 of these, non-DOC staff can be seen observing the UOF incident—six in the school and three in the clinic. None of the non-DOC witnesses submitted reports in these nine incidents (or any of the other 12 incidents—though it is less clear whether non-DOC staff witnessed those incidents). Further, to date, the Monitoring Team has no evidence that non-DOC staff have ever submitted a report except for the reports made by H&H staff, described below.

Medical staff (H+H) are a critical group of non-DOC staff who are required to submit reports when they witness a UOF incident. H+H has taken steps to communicate this requirement to their staff, as described above. These efforts are showing signs of improvement as more reports have been submitted in this Monitoring Period than the last (22, versus only a handful in the previous Monitoring Period). However, reports are still only submitted sporadically, are often delayed, and are therefore not submitted consistently enough to suggest that H+H staff are reporting routinely, as required. As a reference point, there were over 100 UOF incidents that occurred in clinic locations throughout this Monitoring Period. While it is not expected that every incident may have H+H staff witnesses, it is clear that more reports than 22 should have been submitted. The Monitoring Team expects further improvement in the submission of reports as H+H continues to reinforce this obligation with their Staff and hold those accountable who fail to report.

| COMPLIANCE RATING | ¶ 10. Non-Compliance |
|---|---|

---

[46] Following the close of the Monitoring Period, the City provided the Monitoring Team with its plans to advise Non-DOC staff of their reporting obligation.

| | ¶ 11. Not Yet Rated |
| --- | --- |
| | ¶ 12. Not Yet Rated |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS") which captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields. The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

### ANALYSIS OF COMPLIANCE

The Monitoring Team previously confirmed that the majority of incident data was tracked accurately and reliably.[47] The data continues to be entered and maintained in IRS and is fed into CMS. The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. Periodically, the Monitoring Team may re-verify that the Department continues to track the information as required. However, the deviations noted to date were minor, and no change in tracking procedure occurred that would warrant a re-assessment.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department manually tracks the outcome of Facility Investigations for the incidents that took place prior to December 13, 2017 in an Excel worksheet. Beginning with the implementation of CMS in December 2017, Facility Investigations are conducted directly in CMS. The Excel worksheet and CMS track the information as required by ¶ 15(a)-(f).

---

[47] *See* Second Monitor's Report (at pg. 39); Third Monitor's Report (at pg. 61).

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals, as required in ¶ 15(g).

**ANALYSIS OF COMPLIANCE**

All Facility Investigations are now conducted directly in CMS, which is a reliable, accurate computerized system that allows for aggregate reporting of the information required by ¶ 15(a)-(f).

| COMPLIANCE RATING | ¶ 15. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The information in ¶ 16(a)-(f) is tracked in CMS which went live in December 2017, and the Investigation Trials Tracking System ("ITTS") continued to track ongoing ID Investigations for incidents occurring before that date.

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals as required in ¶ 16(g).

**ANALYSIS OF COMPLIANCE**

All ID Investigations are now tracked in CMS, which is a reliable, accurate computerized system that allows for aggregate reporting of the information required by ¶ 16(a)-(f).

| COMPLIANCE RATING | ¶ 16. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Trials Division continues to utilize an Excel workbook to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The information in ¶ 17(a) to (c) is also tracked in CMS, which went live in December 2017.[48]

**ANALYSIS OF COMPLIANCE**

The required information is tracked in CMS. The Trials Division also maintains a more detailed Excel worksheet to track the status of a case while it is processed in Trials (*e.g.* tracking the dates of service of charges and discovery, and timing of final approvals for case closure). The Monitoring Team relies heavily on this more detailed worksheet and has found it is accurate and easy to digest. It is clear the Trials division also utilizes this tracking system to actively manage its cases. The Department is in Substantial Compliance with this requirement as it has demonstrated that this information is consistently tracked in a reliable, accurate, and computerized manner.

| COMPLIANCE RATING | ¶ 17. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to inmate-on-inmate fights in the inmate "Fight Tracker," a computerized system that includes names and booking numbers of the inmates involved; date, time, and location of the fight or assault; and the nature of any injuries sustained by inmates.

- In addition, inmate-on-inmate fights and assaults that result in a use of force are reported in IRS and subsequently tracked as part of the use of force investigation.

- Further, an inmate-on-inmate fight or assault that involves a slashing or use of a weapon is reported in IRS which tracks all required information.

**ANALYSIS OF COMPLIANCE**

The Department's Fight Tracker includes most of the information listed while other sources (IRS and use of force investigations) include a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring

---

[48] Only cases that occurred after CMS was implemented are tracked in CMS.

Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence.[49]

| **COMPLIANCE RATING** | **¶ 19.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[50] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains definitions of institutional violence, as reported in the First Monitor's Report (at pg. 35), that were developed in consultation with the Monitoring Team.

- This Monitoring Period, the Department posted the definitions of the categories of institutional violence on the Department's intranet page, ensuring easy access for relevant stakeholders.

**ANALYSIS OF COMPLIANCE**

The Department maintains appropriate definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department remains in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | **¶ 21.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[51]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Prompt Medical Attention (¶ 22):**

---

[49] Late in the Monitoring Period, the Department alerted the team that some of the information contained in the Fight Tracker at GMDC may not be accurate because data entry was disrupted during the transition to RNDC.
[50] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).
[51] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (Docket #316).

- o The Department promulgated a revision to Directive 4516R-B "Injury to Inmate Reports" during this Monitoring Period.
    - ▪ The policy requires inmates to be afforded medical attention as soon as practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight.
    - ▪ The policy also sets forth new guidelines for affording *expedited* medical treatment. Inmates who appear to have specific conditions or complain of having such conditions (*e.g.* loss of consciousness, seizures, etc.) must be produced directly to a clinic (and not taken to an intake location) following a UOF or inmate-on-inmate fight.

- **Tracking Medical Treatment Times (¶ 23)**:
    - o This Monitoring Period, NCU began tracking and analyzing medical wait times for inmates following a UOF.
        - ▪ NCU tracks the medical wait times for each inmate involved in all reported UOF incidents using information from the Injury to Inmate Report. [52]
        - ▪ Beginning in May 2018, the Facilities began to provide written explanations for inmates who received medical attention beyond the four-hour timeline.
    - o **Wristband Pilot Program**: The Department continues to use electronic wristbands to track an inmate's Intake arrival time, Clinic arrival time, and clinic out time. The wristbands are in use only at RNDC but, all Facilities now have access to the inmate tracking system in intake and clinic locations, so they are in a position to leverage the system's dashboard to track wait time in intake and clinic locations as described below:
        - ▪ Any time an inmate has been involved in a Use of Force or inmate-on-inmate fight and is waiting to be seen by medical staff in an Intake location, Staff must activate a "medical function" in the inmate tracking system that will result in a triangular icon placed next to the inmate's name. This icon is color-coded to alert Staff how long an inmate has been waiting in intake to be seen by medical staff. A Command Level Order was promulgated with the roll-out of this pilot in the Fifth Monitoring Period to provide procedures and the expectations for Staff to be in contact with H+H, and Correctional Health Services personnel to ensure that inmates are seen by medical staff in a timely manner.
    - o **Medical Triage Pilot Program**: A Housing Area in GRVC was designated to serve as a medical triage location. The Medical Triage location was only activated twice during

---

[52] A small number of Injury to Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

the Fifth Monitoring Period. Given its limited use and some operational challenges, the Department re-evaluated its utility during the Sixth Monitoring Period and suspended the use of the triage location.

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). This Monitoring Period, the Department advanced in two important areas: (1) set out clear guidelines to support the implementation of this requirement by promulgating the revised "Injury to Inmate Reports" Policy; and (2) began collecting and analyzing medical wait time data in a more reliable way through NCU's work. The Department also continued its work in other areas aimed at improving the provision and tracking of medical wait times via the Intake Improvement Pilot Program.

NCU's work to collect medical wait time data is a critical step towards ensuring timely medical attention for inmates for a UOF incident, and the tracking mechanism maintained by NCU satisfies the requirements in ¶ 23. As of the end of the Monitoring Period, 79% of all inmates involved in a UOF incident received medical treatment within four hours (compared to only 52% in January 2018).

| Wait Times for Medical Treatment Following a UOF | | | | | |
|---|---|---|---|---|---|
| **MONTH** | **# of Medical Encounters Analyzed** | **2 hours or less** | **Between 2 and 4 hours** | **Between 4 and 6 hours** | **6 hours or more** |
| **Jan. 2018** | 814 | 27% | 30% | 18% | 24% |
| **Feb. 2018** | 704 | 30% | 37% | 18% | 14% |
| **Mar. 2018** | 719 | 31% | 37% | 21% | 12% |
| **Apr. 2018** | 642 | 38% | 37% | 17% | 9% |
| **May 2018** | 740 | 42% | 33% | 15% | 9% |
| **June 2018** | 625 | 41% | 38% | 15% | 7% |

An important new aspect of NCU's work, beginning in May 2018, was better understanding why medical treatment was provided beyond four hours. This includes seeking explanations from the Facilities for cases where medical wait times exceeded four hours, which not only created greater accountability at the Facility level and improved performance but assists in better understanding the delays in medical treatment. Further, NCU evaluated the type of injuries sustained by inmates whose wait time exceeded four hours. This provided insight into how often medical treatment was unduly delayed for those suffering injuries. For instance, in June, NCU found that at least 97 out of 137 (71%) inmates who received medical attention in excess of four hours either refused medical attention, had no visible injuries, did not require medical treatment, and/or were only treated for OC exposure. Furthermore, the majority of these remaining inmates did not have significant injuries. Further, the Department reports that Intake Staff at RNDC found the Wristband Pilot Program helpful in real-time tracking inmate wait times and should support the overall effort to ensure inmates are provided prompt medical attention.

| **COMPLIANCE RATING** | **¶ 22.** Partial Compliance |
|---|---|
| | **¶ 23.** Substantial Compliance |

## 3. TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)). As outlined in the chart below, all initial plans required by the Consent Judgment have been finalized and approved by the Monitoring Team. Further, the refresher training lesson plans for courses where the Department has deployed the initial training to all Staff have also been finalized and approved by the Monitoring Team.

During the Sixth Monitoring Period, the Department continued to deploy a significant amount of training as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff (*e.g.*, Prison Rape Elimination Act ("PREA"), Chemical Agents, etc.) and training its large class of recruits.[53] The Monitoring Team observed SCM In-Service, the four-day Advanced Correctional Techniques ("A.C.T") Training, and Recruit Chemical Agent Training during this Monitoring Period and provided feedback about the

---

[53] Since November 1, 2015, the Department has trained and graduated 4,780 recruits. In July 2018, the Department matriculated another 431 officers. It is also worth noting that Pre-Service training has increased from 16 weeks to 24 weeks to accommodate *Nunez*-required and other new training programs.

delivery to further enhance these curricula. Overall, the Monitoring Team continues to be impressed by the quality of the training provided to Staff, and the knowledge and dedication of the Academy instructors.

*Deployment of Training*

As described in prior Monitor's Reports, significant operational, scheduling, and space resources are required to sustain this training effort. The Department continues to utilize the Training Academy in Middle Village, and training space at John Jay College of Criminal Justice and on Rikers Island (described in detail in the Third Monitor's Report (at pg. 72)).

*Deployment of Advanced Correctional Techniques ("A.C.T")*

During this Monitoring Period, the Department began providing A.C.T. Training to In-Service Staff. A total of 2,304[54] Staff were trained between March and June 2018. Deployment of training is scheduled to take 16 months (the same amount of time to deploy S.T.A.R.T.) and must be completed by May 31, 2019.[55] The Department has sufficient time to meet this deadline, but it must diligently monitor progress to ensure it remains on pace. The Monitoring Team intends to work with the Department in the next Monitoring Period to improve its tracking process for A.C.T. training.

A.C.T. is comprised of three days of Crisis Intervention and Conflict Resolution Training and one day of combined Use of Force Policy and Defensive Tactics refresher trainings (which are each a half day). The Department and Monitoring Team worked together to finalize the Use of Force Policy (for Staff and for Supervisors) and Defensive Tactics Refresher lesson plans to

---

[54] Staff that received the Crisis Intervention and Conflict Resolution training as part of Pre-Service Training (those who graduated from the Academy in December 2015 onward) are not required to re-take the three days of this training during A.C.T. and only participate in the one-day Use of Force/ Defensive Tactics refresher training. The total number trained includes those who received the one-day refresher (1,364) and those who needed and received the full four-day A.C.T. training (940).

[55] *See* Docket Entry 312.

ensure they incorporated relevant content and targeted operational deficiencies by providing specific guidance on certain concepts and techniques.

The Monitoring Team observed A.C.T. training and provided the instructors and lesson plan developers real time feedback and follow-up recommendations for slight improvements to the instructors' delivery, specifically to fully utilize the time dedicated to Crisis Intervention and Conflict Resolution and clarifying some of the Defensive Tactics techniques to ensure proper acquisition by Staff.

The Monitoring Team recommended that the Department prioritize A.C.T. training to the Department's uniform leadership. As of July 16, 2018, over half of the 63 members of the uniform leadership had received the one-day combination of Supervisor UOF Policy and Defensive Tactics refresher training. As for the Conflict Resolution and Crisis Intervention component of the training, the Department began developing a condensed version of Conflict Resolution and Crisis Intervention training that focuses on supervisory responsibility and will consult with the Monitoring Team before it is finalized. The lesson plan will be completed during the next Monitoring Period and provided to executive leadership on a priority basis.

*Deployment of Probe and Cell Extraction Team Training*

During this Monitoring Period, the Department continued to deploy the in-service component of Probe Team Training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)). The Department also revised the lesson plans for the Probe Team and Cell Extraction Team training to address the Monitoring Team's concerns about Staff competence in using gurneys. When a gurney is needed for escort (when an inmate refuses to walk following a use of force incident), Staff often struggle to place both non-compliant and compliant inmates on the gurney. The lesson plan revisions provide some

guidance to Staff on this issue and is a short-term solution as the Department considers long-term operational, policy, and training solutions.

Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with cell housing.[56] As required, the Department initially identified the Staff based on their post assignment (either Intake or Special Units with celled housing) and began in the Fifth Monitoring Period to provide training to this group of Staff.

As this training rolled out, it became clear the post-focused requirements do not identify the Staff most in need of these trainings. While Facility Emergency Response teams may include Staff who are regularly posted in Intake, the team also includes Staff who work Security, Corridor and Escort posts, and a number of other Facility-specific posts ("identified posts"). Further, Cell Extractions are generally conducted by the same Staff who serve on the Facility Emergency Response team (and not the Staff assigned to the housing unit). Accordingly, the Department, in consultation with the Monitoring Team, determined that the Facility Emergency Response Training and Cell Extraction Training should be provided to Staff who work regularly on Intake, Security, Corridor, and Escort posts, and the relevant Facility-specific posts. As of May 2018, an identified total of 675 Staff held these posts. By the end of the Monitoring Period, 38% had been trained in Facility Emergency Response Training and 28% had been trained in Cell Extraction Team Training, either as recruits or through In-Service training this Monitoring Period.

---

[56] Both trainings are incorporated into the mandatory pre-service training and provided to recruits.

| | Total Staff with Identified Posts | Total Staff with Identified Posts who Received In-Service Training in 6th M.P. | Total Staff with Identified Posts who Received Training prior to 6th M.P. | Total Staff who are trained |
|---|---|---|---|---|
| **Facility Emergency Response Training** | 675 | 208 | 49 | **257 (38%)** |
| **Cell Extraction Team Training** | 675 | 3 | 187 | **190 (28%)** |

The number of Staff the Department is seeking to train in both of these areas far exceeds the number initially estimated to require the training. A combined total of almost 700 Staff will now be trained, versus the projected 173 Staff holding posts in Intake or Special Units. That said, the Department must do a better job targeting those who need the training and prioritizing that training to those Staff. Well over half of those targeted for these trainings have not received it. While, curiously, 332 Staff who are *not* assigned to these identified posts received the In-Service Facility Emergency Response Training this Monitoring Period. Furthermore, the Department took no meaningful steps during the Sixth Monitoring Period to provide the Cell Extraction Team training to Staff in identified posts. At the close of the Monitoring Period, the Department reported it is developing a revised process for managing this training to ensure those that require the training actually receive it.

*Additional Trainings*

- ***Chemical Agent Training***

This Monitoring Period, the Department finalized the In-Service Supervisor training, incorporating the Monitoring Team's feedback, and continued to update the short In-Service Refresher training accordingly.[57] The Monitoring Team also observed the revised Recruit Chemical Agent training which was delivered effectively, particularly the segment requiring

---

[57] In consultation with the Monitoring Team, the Department revised the chemical agent training lesson plan for Recruits and Supervisors, the refresher course for In-Service Staff, and the MK-9 lesson plan to reflect the revised Chemical Agents Directive (effective in March 2017) during the Fourth Monitoring Period, and finalized these updates for the Recruit and MK-9 lesson plans during the Fifth Monitoring Period.

Staff to perform realistic tasks after controlled exposure to OC spray—a scenario likely to be encountered by the Recruits during their service.

- ***Monadnock Expandable Baton ("MEB") Training***

In connection with implementing the MEB Directive, the Department finalized the lesson plan for the MEB in this Monitoring Period and will deploy the training during the next Monitoring Period.

*Status of Training Program Development and Deployment*

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| **Use of Force Policy (¶ 1(a))** | All Staff | Curriculum finalized and approved by Monitoring Team. 12-hour[58] Training provided in mandatory Pre-Service training | Curriculum finalized and approved by Monitoring Team. 8-hour training provided with S.T.A.R.T. and *completed* in September 2017. | Curriculum finalized and Monitoring Team consulted. 4-hour refresher commenced as part of A.C.T. in Sixth Monitoring Period |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | | Curriculum finalized and approved by Monitoring Team. 24-hour Training provided in mandatory Pre-Service training | Curriculum finalized and approved by Monitoring Team. 24-hour training provided in Pre-Promotional Training; In-Service commenced as part of A.C.T. in Sixth Monitoring Period. | 8-hour refresher Will be developed and will commence after initial In-Service A.C.T. is completed. |
| **Defensive Tactics (¶ 2(a))** | | Curriculum finalized and Monitoring Team consulted. 24-hour training provided in mandatory Pre-Service training | Curriculum finalized and Monitoring Team consulted. 24-hour training provided with S.T.A.R.T. and *completed* in September 2017. [59] | Curriculum finalized and Monitoring Team consulted. 4-hour refresher commenced as part of A.C.T. in Sixth Monitoring Period |
| **Young Inmate Management ("SCM") (¶3)** | Staff assigned to work regularly[60] in Young Inmate Housing Areas | 24-hour training provided in mandatory Pre-Service training[61] | 24-hour training to be provided to any Staff assigned to RNDC (and provided to GMDC Staff during Sixth Monitoring Period before the Facility closed). | Curriculum finalized and Monitoring Team consulted. 8-hour refresher training began in Fourth Monitoring Period. |
| **Direct Supervision (¶4)** | | Curriculum finalized and Monitoring Team consulted. 32-hour training provided in mandatory Pre-Service training [62] | Curriculum finalized and Monitoring Team consulted. 32-hour training began May 2017 and continues to be deployed to all Staff | Will develop and commence after the completion of initial In-Service training |

[58] Only eight hours of training is required by the Consent Judgment.

[59] Although not required by the Consent Judgment, the Department on its own initiative chose to develop and provide a three-day Defensive Tactics Training to all In-Service Staff.

[60] The Department and the Monitoring Team continue to define Staff "regularly assigned" as described in the Third Monitor's Report (at pgs. 90-91) for the provision of both SCM and Direct Supervision.

[61] The Consent Judgment does not require the development of an In-Service SCM training program because it was already in place prior to the Effective Date of the Consent Judgment. Although not required by the Consent Judgment, the Department has included SCM training in its mandatory Pre-Service training.

[62] Although not required by the Consent Judgment, the Department provides all recruits with Direct Supervision Training.

| Training Program | Required Attendees | Recruit Training Status | Initial In-Service Status | Refresher In-Service Status |
|---|---|---|---|---|
| | | | assigned to RNDC (and provided to GMDC Staff during Sixth Monitoring Period before closure of that jail). | |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | Staff assigned to work regularly at any Intake Post | Curriculum finalized and approved by Monitoring Team. 8-hour training provided in mandatory Pre-Service training.[63] | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in Pre-Promotional Training and training to Staff with various posts (including Intake, Security, Corridor and Escort Posts) who regularly field these teams. | n/a |
| **Cell Extraction (¶ 2(b))** | Staff regularly assigned to Special Units with cell housing | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in mandatory Pre-Service training.[64] | Curriculum finalized and Monitoring Team consulted. 8-hour training provided in Pre-Promotional Training and training to Staff with various posts (including Intake, Security, Corridor and Escort Posts) who regularly field these teams. | n/a |
| **Investigator (¶ 2(c))** | ID Investigators | n/a | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | n/a |
| | Facility Investigators | n/a | TBD[65] | n/a |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | Lesson Plan finalized. 3-hour training provided in mandatory Pre-Service training beginning with the class that matriculated in June 2017. | Curriculum finalized and Monitoring Team consulted. Training provided to ESU Staff beginning in July 2018. | n/a |

---

[63] The Consent Judgment only requires 2-hours of training.

[64] The Consent Judgment only requires 4-hours of training.

[65] *See* "Investigator Training" box below for the status of providing Facility Investigator Training to all Captains as required.

The charts below present the status of each required training program.

| | Training Provided during Sixth Monitoring Period | | | | | Total Training Provided Nov. 2015 – June 2018 | |
|---|---|---|---|---|---|---|---|
| | Recruit Class November 2017 | Pre-Promotional Captains | Pre-Promotional ADWs | In-Service | Refresher | Initial Training | Refresher |
| **Use of Force Policy (¶ 1(a))** | 815 | N/A | N/A (Received as part of S.T.A.R.T.) | N/A | 1364 | **11,461** | **1,364** |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | 815 | N/A | 12[66] | 940 | N/A | **6,036** | **N/A** |
| **Defensive Tactics (¶ 2(a))** | 815 | N/A | N/A (Received as part of S.T.A.R.T.) | N/A | 940 | **11,870** | **1,364** |
| **Young Inmate Management ("SCM") (¶3)** | 815 | N/A | 13 | 72 | 832 | **7,399** | **2,124** |
| **Direct Supervision (¶4)** | 815 | N/A | 13 | 377 | N/A | **4,819** | **N/A** |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | 815 | N/A | 13 | 503 | N/A | **4,478** | **N/A** |
| **Cell Extraction (¶ 2(b))** | 815 | N/A | 13 | 24 | N/A | **4,487** | **N/A** |
| **Investigator (¶ 2(c))** | All 25 investigators hired in this Monitoring Period received training | | | | | **121[67]** | **N/A** |

The Monitoring Team's compliance assessment is outlined below.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)

¶1. Within 120 days[68] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.    Use of Force Policy Training: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy [and provided in the timeframe outlined in 1. And 2.]

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

---

[66] One pre-promotional ADW missed the final day of Crisis Intervention.
[67] This does not include those trained in the First Monitoring Period as the Monitoring Team had not begun verifying this information until the Second Monitoring Period.
[68] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

**ANALYSIS OF COMPLIANCE**

The Department has achieved Substantial Compliance with ¶ 1(a) and ¶ 1(a)(i) by providing Use of Force policy training to recruits as part of the mandatory Pre-Service training and providing the training to all Staff as part of S.T.A.R.T. The UOF policy refresher lesson plans for Staff and a separate curriculum targeting Supervisors were finalized during the Sixth Monitoring Period. These were deployed as part of A.C.T. as described above and is scheduled to be completed by May 31, 2019.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance<br>¶ **1(a)(i).** Substantial Compliance<br>¶ **1(a)(i)(1) & (2).** Substantial Compliance<br>¶ **1(a)(ii).** Partial Compliance |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶1. Within 120 days[69] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

        i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[70]

        iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the two charts above.

**ANALYSIS OF COMPLIANCE**

The Department continues to meet the expectations of Consent Judgment ¶ 1(b)(i) by providing Crisis Intervention and Conflict Resolution training to all recruit classes. As discussed

---

[69] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).
[70] This date includes the extension that was granted by the Court on April 24, 2018 (*see* Docket Entry 312).

above, the In-Service training is part of A.C.T., was deployed at the beginning of this Monitoring Period and is scheduled to be completed by May 31, 2019.

| COMPLIANCE RATING | ¶ 1(b). Substantial Compliance |
|---|---|
| | ¶ 1(b)(i). Substantial Compliance |
| | ¶ 1(b)(ii). Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due. |
| | ¶ 1(b)(iii). Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING)

¶1. Within 120 days[71] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    Probe Team Training: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[72] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.

### ANALYSIS OF COMPLIANCE

       The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training, and the Department began deployment of this training to Staff regularly assigned to specific posts that field the Facility Emergency Response Teams, including but not limited to Intake posts (as described in more detail above). The Department, in consultation with the Monitoring Team, will identify a target date to provide this training to the remaining Staff in the identified posts, and a plan to ensure the revised deadline is met.

| COMPLIANCE RATING | ¶ 1(c). Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[73] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

---

[71] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).
[72] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).
[73] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

a. <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

    i. The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

    ii. The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.

### ANALYSIS OF COMPLIANCE

The Department has achieved Substantial Compliance with ¶ 2(a)(i) by incorporating and deploying Defensive Tactics training as part of the mandatory Pre-Service training for recruits. Although not required by the Consent Judgment, the Department provided the three-day Defensive Tactics Training course to all Staff as part of S.T.A.R.T. The refresher training was finalized this Monitoring Period and was deployed as part of A.C.T. as described above.

| COMPLIANCE RATING | ¶ 2(a)(i). Substantial Compliance |
|---|---|
| | ¶ 2(a)(ii). Partial Compliance |

### XIII. TRAINING ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶ 2. Within 120 days[74] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

b. <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[75] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.

### ANALYSIS OF COMPLIANCE

The Cell Extraction Team training is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. However, the Department has only deployed this In-Service training to a small number of Staff who require it, as described in more detail above. The Department,

---

[74] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

[75] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).

in consultation with the Monitoring Team, will identify a target date to provide this training to the remaining Staff in the identified posts, and a plan to ensure the revised deadline is met.

| **COMPLIANCE RATING** | ¶ **2(b). (Pre-Service)** Substantial Compliance<br>¶ **2(b). (In-Service)** Non-Compliance |
|---|---|

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[76] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.   <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

       i.   ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

      ii.   The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.
- All new-hires must complete ID's 40-hour training before they may be assigned any cases to investigate.
- All uniformed investigators received S.T.A.R.T. training, and the Department provided an abbreviated S.T.A.R.T. training to most civilian ID investigators this Monitoring Period.

### ANALYSIS OF COMPLIANCE

*ID Investigator Training* (¶ 2(c)(i))

    The Department's ID Investigator lesson plan continues to meet the requirements of this provision and it is provided to staff as required. Given the concerns about the quality of ID investigations, the Monitoring Team continues to encourage the Department to utilize training to support Staff in developing their investigative skills.

*Facility Investigator Training* (¶ 2(c)(ii))

    The Monitoring Team recommended that development of Facility Investigator Training be held in abeyance until the end of this Monitoring Period so that the Department and Monitoring Team could determine the impact of the revised policy and CMS implementation on Facility Investigations (as

---

[76] This date includes extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

discussed in more detail in the Fifth Monitor's Report, at pgs. 106-108). As anticipated, CMS has impacted Facility Investigations in a myriad of ways. Now that the Department and the Monitoring Team better understand this process, during the next Monitoring Period, a plan will be developed to determine how best to achieve the overall goal of quality investigations for cases typically investigated by the Facility, as discussed in more detail in ¶ 13 of the Use of Force Investigations section of this report.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance<br>¶ 2(c)(ii). Not Yet Rated |
|---|---|

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.

- The Department chose to provide Safe Crisis Management ("SCM") Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates were housed. The analysis below focuses on RNDC because GMDC was closed during this

Monitoring Period.[77] As of the end of the Sixth Monitoring Period, 96% of RNDC Staff had received SCM Training and 36% had also received SCM Refresher training.

| Facility | Total Staff Assigned to Facility as of June 30, 2018 | Staff Trained in SCM as of June 30, 2018 | Received Pre-Service SCM Training | Received In-Service or Pre-Promotional SCM Training | Received SCM Refresher Training |
|---|---|---|---|---|---|
| RNDC | 962 | 921 (96%) | 445 | 476[78] | 334 |

- SCM Training was provided to the majority of Facility leadership at RNDC.

**ANALYSIS OF COMPLIANCE**

*Training Content*

As described in the First Monitor's Report (at pgs. 52-53), this training, combined with other trainings provided to Staff who work with Young Inmates, meets the content requirements of this provision.

The Monitoring Team continues to evaluate the implementation of SCM as part of its overall efforts to monitor the provisions related to Young Inmates. With the implementation of Raise the Age, the Department will train and implement a more robust SCM curriculum, in particular, training will teach Staff skills in physical intervention and team tactics that are not currently taught by the Department. The Department plans to provide the original JKM version of SCM Training to all Staff who will work at Horizon, which will be operationally committed to SCM practices. In addition to monitoring implementation at Horizon, the Monitoring Team will also focus on ways to improve the SCM training for Staff consistently assigned to work with 18-year-olds who will remain solely in DOC custody and will utilize the information gained during the observation of SCM Refresher Training this Monitoring Period to inform this work.

*SCM In-Service Training*

The majority of the Staff who received the SCM training work in the Facilities that house the largest number of Young Inmates. The Department has achieved Substantial Compliance with the requirement to deploy SCM In-Service training, but subsequent compliance ratings will depend on the extent to which Horizon Staff are also trained in the JKM version of SCM.

*SCM Refresher Training*

---

[77] As of the end of the Fifth Monitoring Period, 96% of Staff assigned to GMDC had received SCM Training. Additionally, while the Monitoring Team previously assessed whether this training was provided to Staff regularly assigned to Young Inmate Housing Areas *outside* of RNDC, the Monitoring Team is no longer assessing those facilities, as described in the box regarding Direct Supervision below.

[78] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service training.

The Department rolled out the Monitor-approved SCM Refresher Training curriculum during the Fourth Monitoring Period and has provided it to 334 Staff from RNDC. Deployment of the refresher training will be impacted by the transition to Horizon as the Staff moving to the new Young Adult facility will receive the revised initial SCM training, so they will not receive the refresher training at this juncture.

| **COMPLIANCE RATING** | **¶ 3.** Substantial Compliance<br>**¶ 3(a).** Substantial Compliance<br>**¶ 3(b).** (Development of Refresher Lesson Plan) Substantial Compliance<br>**¶ 3(b).** (Deployment of Refresher Training) Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[79] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    a.     The Direct Supervision Training shall be a minimum of 32 hours.

    b.     By April 30, 2018,[80] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See the two charts above.
- The Department has chosen to provide Direct Supervision Training not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment, but to *all* Staff assigned to work at RNDC and GMDC, where most Young Inmates were housed. The analysis in this report focuses on RNDC because GMDC was closed during the Sixth Monitoring Period.[81] As of the end of the Sixth Monitoring Period, only 43% of Staff assigned to RNDC had received this training.[82]

---

[79] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).
[80] This is the extension granted by the Court on April 4, 2017 (*see* Docket Entry 297).
[81] As of the end of the Fifth Monitoring Period 44% of Staff assigned to GMDC had received Direct Supervision Training.
[82] The Department also prioritized providing the training to those assigned to the Adolescent Response Team, which was completed in the Sixth Monitoring Period.

| Facility | Total Staff Assigned to Facility as of June 30, 2018 | Staff Trained in Direct Supervision as of June 30, 2018 | Received Pre-Service Direct Supervision Training | Received In-Service or Pre-Promotional Direct Supervision Training |
|---|---|---|---|---|
| RNDC | 962 | 418 (43%) | 341 | 77[83] |

- The Department continues to work to provide Direct Supervision to the Facility leadership of RNDC.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment. At this juncture, the Monitoring Team intends to only assess the implementation of Direct Supervision at RNDC, so RNDC Staff should be prioritized for this training. The Department is currently failing to provide the Staff at RNDC with the required training. This Monitoring Period, while the Department provided Direct Supervision Training to 377 In-Service Staff, only 77 of those Staff trained were at RNDC. The majority of Staff at that Young Adult facility have yet to bet trained. The Department must do a better job at targeting the training to the appropriate Staff. The Department, in consultation with the Monitoring Team, will identify a target date to provide this training to all remaining RNDC Staff, taking into consideration staffing changes associated with Raise the Age, and a plan to ensure the revised deadline is met.

For the following reasons, the Monitoring Team does not plan to assess Direct Supervision implementation (or training requirements for regularly assigned Staff) for the following units at this time:

- Secure Unit at GRVC, ESH at OBCC, CAPS/PACE at AMKC: These units have their own programming model, so implementing Direct Supervision may not be necessary;
- Sentenced 18-year-olds at EMTC: The small number of 18-year-olds may not warrant Direct Supervision implementation at this Facility because implementing a specialized model for such a small number of housing units (that may shift) would be operationally impractical; and
- 18-year-old female inmates at RMSC: The small number of 18-year-olds may not warrant Direct Supervision implementation at this Facility because implementing a specialized model for such a small proportion of housing units (that may shift) would be impractical.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|
| | ¶ 4 (a). Substantial Compliance |
| | ¶ 4 (b). Non-Compliance |

---

[83] This excludes those Staff Members who received Direct Supervision Training as part of both Recruit and In-Service training.

## IX. Video Surveillance ¶ 2(e) (Handheld Camera Training)

¶ 2.

    e.    There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department has a standalone Handheld Camera Training Lesson Plan, has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials, and has a separate short training and lesson plan to advise Staff on how to save and upload handheld video to the Department's main computer system.

- The Department has provided the Handheld Camera Training to 159 (of 164) ESU, ESU support, and K-9 unit Staff.

### ANALYSIS OF COMPLIANCE

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations. The Department has provided the standalone handheld camera training to all but a handful of the active ESU Staff,[84] and must continue to work on a strategy to ensure every Facility has trained operators on every tour. Further, as noted above 4,478 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff which also includes training on the operation of handheld video cameras.

| COMPLIANCE RATING | ¶ 2(e). Partial Compliance |
|---|---|

## XIII. Training ¶ 5 (Re-Training)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.    Such re-training must be completed within 60 days of the determination of the violation.

    b.    The completion of such re-training shall be documented in the Staff Member's personnel file.

---

[84] The Department will provide the training to the five Staff who did not receive the training in early September 2018.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Academy continued to track Staff required to receive re-training using an Excel spreadsheet, however the Department determined that this approach did not account for all retraining requests from other Department stakeholders. The Department then built a ticketing system during the Fifth Monitoring Period but, upon implementation, found the system to be unreliable.

- The Complex Litigation Unit ("CLU") revised its plan to identify, track, and audit re-training records and intends to implement the new tracking system during the next Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team intends to evaluate the Department's efforts to achieve compliance with this provision in the next Monitoring Period. In order to achieve compliance, the Department must demonstrate that it is reliably and consistently identifying all Staff who have been identified for re-training (*e.g.* through Immediate Action Committee, Command level referrals, Rapid Reviews, and Facility Referrals from ID) and that the Staff ultimately receive the recommended training.

| COMPLIANCE RATING | ¶ 5. Not Yet Rated |
|---|---|

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to develop the Learning Management System ("LMS") which will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**: During the development of LMS, the Department uses the Training Tracking Software ("TTS") as an interim solution. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings, and all *Nunez*-required In-Service and Pre-Promotional trainings except those conducted by ESU (which include Probe Team and Cell Extraction Team Training). TTS scans Staff's identification cards in the

classrooms and this information is then manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

- **Examination Tracking**:
  - o **Pre-Service**: Examinations for all *Nunez*-required Pre-service courses are taken using a tablet and the results are tracked in Excel.
  - o **In-Service and Pre-Promotional**: In-Service exams are given in a paper format or involve physical skill assessments administered by the instructor.

ANALYSIS OF COMPLIANCE

*Review of Examination and Attendance Records (¶¶ 6 & 7):*

¶¶ 6 and 7 require that all Staff members who complete the *Nunez*-required trainings must pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). This Monitoring Period, NCU reviewed training records to ensure attendance is tracked accurately and examinations are administered as required. The Monitoring Team reviewed NCU's assessment and verified the underlying documentation. The results of this assessment are described in detail below and revealed that the Department has improved its tracking of training attendance and examination records compared to prior Monitoring Periods, although still struggles with record-keeping of training conducted by ESU.

- *Recruit Training Examinations and Attendance*

The Department reviewed and summarized, and the Monitoring Team verified, the examination and attendance records for all *Nunez*-required trainings for two companies (25 recruits in each) that graduated in May 2018. All Recruits in these companies received the required training (as initially offered with their Company, or as make-up classes). NCU reviewed examination scores for: (1) exams taken electronically on iPads for UOF Policy, SCM, and Crisis Intervention and Conflict Resolution training, and (2) written performance evaluations for Cell Extraction, Probe Team Training, and an overall Defensive Tactics qualification by an instructor. All passing records were located except for two. Overall, the training records for the Recruit class were maintained in an organized fashion, particularly those administered on the iPad.

- *Pre-Promotional Training Examinations and Attendance*

NCU conducted, and the Monitoring Team verified, an internal audit of the *Nunez*-required trainings' examination and attendance records for the 13 Staff in the ADW Pre-Promotional Training during this Monitoring Period. All but one of the 13 ADWs attended all days of all *Nunez*-required trainings. One student did not attend the final day of Crisis Intervention and Conflict Resolution Training and therefore also did not sit for that exam.

All examinations and evaluations (except for one Crisis Intervention and Conflict Resolution exam described above) were available, including those for Probe Team and Cell Extraction Team

Training, and the ADWs passed all required exams. These results demonstrated improved record keeping from the prior Captains' and ADWs' class reviewed during the last Monitoring Period.

- ***In-Service and Refresher SCM Training Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for 10% of the Staff who received SCM In-Service (sample of 7 students) and SCM Refresher (sample of 77 students) training during this Monitoring Period. TTS printouts demonstrated that all students attended the course and examination records confirmed all Staff passed the exam.

- ***In-Service Direct Supervision Attendance***

The Department conducted, and the Monitoring Team verified and reviewed, an internal audit of attendance records for 10% of Staff who received In-Service Direct Supervision (sample of 37 students) training during this Monitoring Period. The Monitoring Team confirmed that all students attended the course through TTS attendance printouts.[85]

- ***In-Service Probe Team and Cell Extraction Team Training Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for all In-Service Staff who received Facility Emergency Response training during this Monitoring Period. Attendance for those reported to have attended the course was confirmed using sign-in sheets, and instructor evaluations were confirmed for most attendees (evaluations were missing for some training dates in January 2018). Records for Cell Extraction Training were not reviewed due to the very small number of Staff received this training during this Monitoring Period. The Monitoring Team recommends that the attendance and evaluations for the trainings conducted by ESU are incorporated into the electronic tracking systems used by the Academy in order to improve the Department's ability to ensure those that require the training receive it and it can be more easily verified.

- ***A.C.T. Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, a similar internal assessment of the attendance and examination records for one four-day A.C.T. training block. The audit demonstrated that the vast majority of Staff who participated in each block of training attended all four days as required (or attended make-up classes), and also took and passed the scantron Conflict Resolution and Crisis Intervention examination.

*Centralized System to Maintain Training Records* (¶ 8):

---

[85] Direct Supervision does not have a separate examination for students because the last module of the approved lesson plan is a dedicated review and practice module in which students respond to a series of questions about Direct Supervision, analyze scenarios for compliance with Direct Supervision concepts, and develop plans to address hypothetical situations.

The current tracking system for examinations and attendance includes a combination of hand-written and interim electronic tracking systems. This Monitoring Period, the Department expanded its use of the interim electronic tracking system to include attendance for additional In-Service and Pre-Promotional *Nunez*-required trainings and all Recruit training. Currently, ESU-conducted training is the only course not using TTS.

A centralized electronic system will significantly improve the reliability of the information, as there are still manual components to the current methods of record-keeping (for example, even where electronic tracking is used for attendance records via TTS, those electronic sign-in sheets must be manually input into the e-scheduling transcripts for each Staff). The Department is continuing the procurement process for LMS which will enable the Training Academy to schedule individuals for courses, track attendance, and record examination results. (*see* Second Monitor's Report (at pgs. 46-47) and Fourth Monitor's Report (at pgs. 94-95)). After having to re-start the procurement process in the Fifth Monitoring Period, the Department reported that a vendor was recently identified as the likely contractor for LMS, and assuming all budgetary approvals are received, work to build the system could begin mid-way through the Monitoring Period.

Despite these delays in obtaining LMS, the Monitoring Team is encouraged by the Department's expanded use of TTS as an interim solution for attendance tracking. Continuing to use TTS for all *Nunez*-required trainings will support the Department's efforts to achieve Substantial Compliance with these tracking provisions. In particular, the Monitoring Team encourages the use of TTS for In-Service training for Facility Emergency Response and Cell Extraction Team training conducted by ESU as it is expected that will significantly improve the tracking process.

| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance<br>¶ **7.** Partial Compliance<br>¶ **8.** Partial Compliance |
|---|---|

## 4.   ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitoring Team, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all Use of Force incidents are properly reported without fear of retaliation and can be investigated. The Department has maintained an anonymous hotline since March 2016.

The Monitoring Team's assessment of compliance is outlined below.

## VI. ANONYMOUS REPORTING ¶ 1

¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect and addresses the requirements of ¶ 1.

- The Department continues to advertise the hotline telephone number in all Facilities, DOC TV, and the Department's intranet home page.

- In July 2018, ID staff conducted a routine check of the posters throughout all Facilities to confirm that they are mounted in Lexan (polycarbonate) and remain in high traffic areas such as the Staff lounge (KK), administrative corridor and main entrance. During their routine check, ID observed that nearly all posters throughout 18 commands remained in good condition and were not defaced. Only one command did not display a poster and an additional two commands had posters displayed, but not mounted behind Lexan. The Department confirmed that non-mounted posters will be replaced by the Department's maintenance division.

- The hotline received a total of 18 calls from January 2018 to June 2018. One of these calls was related to a Use of Force Incident.

### ANALYSIS OF COMPLIANCE

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision as described in the previous Monitor's Reports. The Monitoring Team continued to observe the hotline advertised on DOC TV and posters in high-traffic areas throughout Facilities while conducting site visits.

A review of the screening intake forms for the 18 hotline calls during this Monitoring Period confirmed that one call was Use of Force related. The Monitoring Team confirmed that ID initiated a Preliminary Review for this anonymous call. Though the hotline received only one call pertaining to the use of force, Staff and inmates have other avenues for reporting use of force concerns including calling 311, notifying ID directly, contacting lawyers for the Legal Aid Society, and reporting concerns up the chain of command in the Facilities.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

5.  VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f));[86] and preserve video from all sources for at least 90 days (¶ 4).

During this Monitoring Period, the Department achieved an important milestone and there is now "Complete Camera Coverage"[87] of all Facilities (¶ 1 (c)). As of June 30, 2018, the Department reports it has installed a total of 10,536 new wall-mounted cameras. The Department's video surveillance capability is expansive and far greater than most correctional systems with which the Monitoring Team has experience.

---

[86] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this Report.

[87] "The term "Complete Camera Coverage" means fixed camera coverage sufficient to capture the activities and movement of all persons in a given area of a Facility, with the exception of toilets, the interiors of cells, the interiors of shower areas (although there must be fixed camera coverage of the ingress and egress of shower areas), and areas located within clinics and mini-clinics that are used exclusively to provide medical treatment to inmates and Staff Members in a private setting, such as designated treatment rooms or cubicles (although there must be fixed camera coverage of the ingress and egress of such areas). "Complete Camera Coverage" shall not include small, isolated blind spots caused by technological and/or mechanical limitations or the design of interior spaces." Consent Judgment § III (Definitions), ¶ 8.

*Proactive Video Surveillance*

As described in prior Monitor Report's, the Monitoring Team believes the additional video coverage will enhance the Department's ability to detect and prevent potential violence. The Department has leveraged its video surveillance capability by maintaining the video monitoring unit (as described in the Fifth Monitor's Report, pg. 81). The video monitoring unit continued to monitor live video feeds to detect potential violence, identify contraband, and provide support to leadership in the Facilities. During the Sixth Monitoring Period, the video monitoring unit implemented a new ticketing system to track and ensure all recommendations made to the Facilities are appropriately addressed and closed out. The Department also created the Compliance and Safety Center (CASC) unit. The CASC monitors live video feeds to provide real time video monitoring oversight and immediate feedback for the Facilities on compliance issues such as unsecured doors and poor incident de-escalation.

The Monitoring Team's assessment of compliance is outlined below.

## IX. VIDEO SURVEILLANCE ¶ 1(a) (b) & (c) (STATIONARY CAMERA INSTALLATION)

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent

| | |
|---|---|
| | feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time. |
| e. | The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities. |

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- As of June 30, 2018, the Department has installed 10,536 new wall-mounted surveillance cameras throughout the Facilities, 2,007 of which were brought online during the current Monitoring Period.

- The Department maintains a comprehensive list of recommendations for additional wall mounted stationary cameras, compiling recommendations from the Monitoring Team's physical inspections or at the discretion of the Chief of Department and other agencies.

### ANALYSIS OF COMPLIANCE

The Department has installed a significant number of wall-mounted surveillance cameras, well beyond the 7,800 cameras required by the Consent Judgment and has achieved "Complete Camera Coverage" of all Facilities.

### _Installation of stationary, wall-mounted cameras to ensure Complete Camera Coverage_ (¶ 1 (a), (c))

During this Monitoring Period, the Monitoring Team conducted video surveillance tours at AMKC, BKDC, DCJC, NIC and WF during which the physical placement of cameras was observed, and live feeds of the video were reviewed on the Genetec system. The tours covered housing units and ancillary areas where cameras had been installed since the initial video surveillance tours, including food service pantries in the housing units, dayrooms, Special Programming Areas, clinics, intake, hallways, and stairways. The Monitoring Team identified a small number of locations within the Facilities where additional camera coverage may be beneficial. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

Given that the installation of cameras throughout the Facilities has occurred across multiple Monitoring Periods, the chart below illustrates the current status of installation and recommendations at each Facility.

## Status of Installation

| Facility[88] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[89] | Reference to Prior Monitor Report Findings |
|---|---|---|---|---|---|
| GMDC[90] | Substantially Complete | Substantially Complete | Yes (Entire Facility) | N/A[91] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure Unit Only) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes (Partial; Facility houses male adolescents) | Partially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE units may house 18-year-olds) | Partially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| EMTC | Substantially Complete | Substantially Complete | No | Partially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| OBCC | Substantially Complete | Substantially Complete | Yes (YA ESH Only) | Partially addressed | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | Not yet addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | Not yet addressed | Fourth Report (pg. 102) |
| RMSC | Substantially Complete | Substantially Complete | Yes (Partial; Facility houses female adolescents & 18-year-olds) | Not yet addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially Complete | Yes (18-year-olds may be housed in WF) | Partially addressed | Third Report (pg. 107) |
| NIC | Substantially Complete | Substantially Complete | No | Partially addressed | Second Report (pg. 66) |
| QDC | N/A – no housing units | N/A – not currently in use | No | N/A | N/A |
| BKDC | Substantially Complete | Substantially Complete | No | Not yet addressed | N/A |
| DJCJC | N/A – no housing units | Substantially Complete | No | Not yet addressed | N/A |

To finalize the assessment of Complete Camera Coverage in each Facility, the Monitoring Team reviewed a sample of Rapid Reviews, Preliminary Reviews and Use of Force investigation packets to

---

[88] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[89] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras.

[90] As of the end of June 2018 the Department no longer houses inmates at GMDC.

[91] Given that GMDC has now closed, the need to address recommendations for camera installation is moot.

determine whether they were captured on camera.[92] Overall, the Monitoring Team found the overwhelming majority of incidents were captured on video.

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (¶ 1 (b))

As noted in previous Monitor's Reports, provision ¶ 1 (b) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. As demonstrated in the chart above, the Department has installed cameras in the Facilities that house 16-, 17-, and 18-year-old inmates and thus remains in Substantial Compliance.[93]

*Use of Force incidents not captured on video and subsequent identification of blind spots* (¶ 1 (d))

To date, neither the Department nor the Monitoring Team has identified a Use of Force Incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot. That being said, the Monitoring Team met regularly with the Radio Shop and learned that the Department is installing additional cameras in response to the Monitoring Team's recommendations from the site work completed. Cameras are being installed based on the order in which the recommendation was received.

*Internal camera working group meeting* (¶ 1 (e))

As stated in the Fifth Monitor's Report (at pg. 84), there is no longer a need for the internal camera working group because the project is complete. Should the need for a major installation of additional cameras arise in the future, the Monitoring Team will evaluate whether the meetings should be reinstated.

| COMPLIANCE RATING | ¶ 1(a). Substantial Compliance |
| | ¶ 1(b). Substantial Compliance |
| | ¶ 1(c). Substantial Compliance |
| | ¶ 1(d). Substantial Compliance |
| | ¶ 1(e). Substantial Compliance (per Fourth Monitor's Report) |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.    Body-worn Cameras

a.    Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

---

[92] It should be noted that it is not expected that 100% of incidents will be captured on camera as the Consent Judgment explicitly excludes certain areas from camera coverage. See ¶8 of Definitions.
[93] The Monitoring Team will evaluate the installation of stationary wall-mounted cameras in the Facility that will house 16 and 17-year-old inmates once they are moved off Rikers Island.

| | |
|---|---|
| b. | The 100 body-worn cameras shall be distributed among officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor. |
| c. | The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department initiated its body-worn camera ("BWC") pilot at GRVC on October 9, 2017.

- The BWC Directive, Operations Order 17/17, developed in consultation with the Monitoring Team, remains in effect. Staff are required to activate the body-worn cameras in specified situations (*e.g.* use of force incidents, witnessing or responding to an inmate-on-inmate fight or escorting inmates).

- The Department finalized the body-worn camera lesson plan, in consultation with the Monitoring Team, and deployed the training to Staff participating in the pilot.

- The Department expanded the Body Worn Camera Pilot and trained 68 Staff members (12 Captains and 56 Officers) to use the body-worn cameras during the Sixth Monitoring Period. These Staff are posted in a range of areas including mental health observation units, intake and punitive segregation.

- The body-worn cameras were activated in response to nine use of force incidents during the Sixth Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has continued to closely review all aspects of the pilot as it has expanded across GRVC. The Monitoring Team observed the body-worn camera training conducted at GRVC during the Sixth Monitoring Period. Trainers demonstrated how to operate the cameras, discussed the requirements of the BWC Directive including reporting requirements and engaged participants in several real-life scenarios of when to activate the BWCs.

The Monitoring Team's reviewed the nine use of force incidents where the body-worn cameras were activated during the Sixth Monitoring Period. The Monitoring Team continues to find the body-worn camera footage is an excellent source of audio and video the body-worn cameras provide, that neither Genetec nor handheld can provide. The Monitoring Team is very encouraged by this pilot and will continue to closely scrutinize its expansion as it moves forward and the pilot is expanded in the next Monitoring Period.

| **COMPLIANCE RATING** | **¶ 2(a)-(c).** Partial Compliance |
|---|---|

| **IX. Video Surveillance ¶ 2 (d) & (f) (Use & Availability of Handheld Cameras)** |
|---|

| ¶ 2. | Handheld Cameras | |
|---|---|---|
| | d. | Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).] |
| | f. | When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified. |

## Department's Steps Towards Compliance

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team, remains in effect.

- The NCU continued its quality assurance ("QA") program of handheld camera footage across all Facilities.

- The NCU reported that, of the 8,479 alarms during the Sixth Monitoring Period, 8,361 (98.6%) of the corresponding handheld videos were uploaded.

- From January to June 2018, the Department reported that 43 Facility Referrals were generated for violations of the handheld video directive. Facility responses to these referrals ranged from individual corrective action (*e.g.* counseling) to Facility-wide initiatives (*e.g.* emphasizing handheld video directive requirements at roll call).

- ID issued 2 Memorandum of Complaints ("MOC") to Staff during the Sixth Monitoring Period for *intentionally failing to capture incidents*. The Department did not find that any Staff *repeatedly failed to capture incidents due to failure to follow DOC policies* during this Monitoring Period. ID also issued seven MOCs to ADWs for supervisory failure with respect to ensuring the handheld video was uploaded.

## Analysis of Compliance

### *Policy* (¶ 2 (d))

The Department continues to maintain an adequate policy regarding the use of Handheld Cameras.

### *Availability of Handheld Video* (¶ 2(d))

The Department has demonstrated significant progress in demonstrating that handheld video is captured in situations where it is required and that it is subsequently uploaded and available in a timely

manner to support the Department's efforts to evaluate the circumstances of an incident. The Department has continued to hold the Facilities accountable for uploading handheld video through the NCU's QA program and the weekly *Nunez* meetings where each Facility's weekly results are closely scrutinized and discussed by leadership. The NCU's audit methodology was streamlined to focus on the total number of alarms, corresponding logbook entries, the number of videos uploaded and that they were named correctly. The consistently high number of handheld video uploads during the Sixth Monitoring Period demonstrates that the Department has continued to meet its obligations in this area.

The Monitoring Team independently assessed handheld video availability to verify the NCU's results and the vast majority of the sample tested had been adequately uploaded. Given that handheld video is now routinely available, the Monitoring Team recommends the NCU's audits should shift to assessing the quality of the handheld video being captured. To the extent feasible, the Department should leverage the findings of use of force investigations, and others already reviewing video footage, to develop an appropriate process to identify videos with potential quality issues.

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities' improvement in promptly uploading handheld video has had a corresponding positive effect on ID's ability to access the footage. In the event video footage cannot be located, the investigator contacts NCU which can usually assist by referencing their log of alarm responses and the associated handheld video because the inability to locate the video is often an inadvertent filing error.

Compared to previous Monitoring Periods, the Monitoring Team found that handheld video is reviewed much more frequently during the Preliminary Reviews. The Monitoring Team found that the Preliminary Reviewer had access to the handheld video at the time of the preliminary review in a sample of 19 of the 20 instances where it was expected (*e.g.* probe team attendance or institutional searches). Further, the Monitoring Team has not identified any systemic issues preventing investigators from reviewing footage when completing their Preliminary Reviews or Full ID investigations. These results demonstrate that the Department is not only ensuring the handheld video is adequately captured and uploaded, but the investigators also have consistent access to the handheld video when completing their Preliminary Reviews.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

Although errors in capturing incidents on handheld video are infrequent, the Facilities held Staff accountable for failing to ensure handheld video was adequately recorded and uploaded through multiple corrective interviews, verbal counseling, Command Disciplines and MOCs. The Monitoring Team and investigators are continuing to find some handheld videos with poor video quality. However, the Department has not identified a pattern of any individual Staff repeatedly failing to adequately capture an incident. These issues in the main have been addressed in investigations, but there have been some lapses in imposing discipline (*e.g.* with PDRs), which are discussed and addressed in the Staff Discipline and Accountability section of this Report.

| COMPLIANCE RATING | ¶ 2(d). Substantial Compliance |
|---|---|
| | ¶ 2(f). Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. <u>Maintenance of Stationary Cameras</u>

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[94]

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 07/17, "Command Level Assessment and Maintenance of Stationary Surveillance Cameras" remains in effect and addresses the requirements of ¶ 3 (a) to (d).

- Assigned Staff and supervisors continue to assess stationary cameras and record their findings on daily forms, which are then entered into Enterprise Asset Management (EAM) to trigger repair.

- NCU conducts a Quality Assurance (QA) program that was expanded in this Monitoring Period to ensure the daily forms are completed, are accurate (by reviewing a random sample of Genetec video), and there are corresponding records for repair. If any discrepancies are found, they are documented in internal QA reports and discussed during the *Nunez* Compliance Meetings.

### Analysis of Compliance

    The Department continued to make measurable progress in identifying, tracking and repairing inoperable cameras during the Sixth Monitoring Period. As expected with the large number of cameras in the system, on-going maintenance will be required. The number of cameras requiring maintenance is reasonable and the majority of cameras are being repaired within two weeks. Further, the Monitoring Team has not found that inoperable cameras have impacted the Department's ability to capture use of force incidents as the majority of incidents continue to be captured on camera.[95]

---

[94] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (Docket Entry 316).
[95] *See* ¶1 of Video Surveillance.

The Monitoring Team assessed the Department's efforts to achieve compliance with this provision by reviewing: (1) NCU's QA program regarding identifying and reporting inoperable cameras, and (2) the efforts to repair inoperable cameras in a timely manner.

*Facility Assessment of Inoperable Cameras* (¶ 3 (a)-(c))

During this Monitoring Period, the Monitoring Team and the Department determined that the original Supervisory review under ¶3(c) was onerous, inefficient and did not support the overall aim of ensuring inoperable cameras were accurately and timely identified and reported for repair and that a QA system was the more appropriate and efficient manner to ensure compliance.[96] Accordingly, in this Monitoring Period the NCU QA program was expanded to assess the accuracy of forms documenting down cameras by assessing whether all down cameras were identified on the daily forms. In April 2018, NCU began utilizing archival Genetec footage to assess whether staff accurately completed daily assessment forms. If a camera appeared to be down in the archival footage and it was not documented in the daily form, NCU records the error and shares the information during *Nunez* Compliance meetings. A two-week follow-up is conducted to ensure cameras have been repaired. NCU also confirmed that any cameras identified on the daily forms were reported in EAM. At the end of the Monitoring Period, NCU also began to check whether any inoperable cameras that were identified through the audit, but not on the daily forms were nonetheless entered into EAM for repair.

The May and June NCU audit results found that the Facilities completed almost all of the daily forms and that almost all of the cameras listed on the daily forms have a corresponding entry in EAM. As the QA process for double checking the accuracy of the daily forms only began at the end of the Monitoring Period, the results of that audit will be analyzed and shared in the next Report. The Department will achieve Substantial Compliance with ¶ 3 (a)-(c) when the QA program is fully developed and implemented, and it can demonstrate that the Facilities are accurately and timely identifying and reporting inoperable cameras.

*Maintenance of Inoperable Cameras* (¶ 3 (d))

The Monitoring Team evaluated the time required to repair inoperable cameras. The vast majority were repaired within two weeks. Monthly EAM reports showed that throughout the Monitoring Period that the Department repaired a total of 6,195 wall-mounted stationary cameras.[97] The vast majority (5,540 cameras; 89%) were repaired within two weeks, 288 (5%) between two to three weeks, 174 (3%) within three to five weeks, and 193[98] (3%) beyond five weeks. Given the extraordinary number of cameras in the Department, the number of reported inoperable cameras is consistent with what the Monitoring Team would expect and the rate at which cameras are repaired is reasonable. The Monitoring Team is encouraged by the Department's success in maintaining and

---

[96] Following the close of the Monitoring Period, the Court ordered a revision to this provision based on the recommendation of the Monitoring Team (Docket Entry 316).

[97] This includes repairs of all wall-mounted stationary camera in the Department (not just those cameras that have been installed as part of this initiative).

[98] The majority of cameras repaired beyond the two-week deadlines are in housing units not currently in use.

| | |
|---|---|
| quickly repairing inoperable cameras. | |
| **COMPLIANCE RATING** | **¶ 3 (a)-(c).** Partial Compliance<br>**¶ 3 (d).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. <u>Video Preservation</u>

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Operations Order 06/15, "Recording Equipment, Medium, and Electronic Evidence" remains in effect.

- The Department's computerized system automatically preserves all video for 90 days.

- The video preservation unit in the Chief of Department's office continues to preserve Genetec video beyond the 90-day period for UOF incidents subject to Facility Investigations and at the request of leadership.

- The ID Video Unit has two dedicated officers who preserve the Genetec video required for all UOF incidents. ID investigators submit requests for date/time/angles and the video is uploaded to a shared folder only ID can access.

- Body worn camera footage is automatically uploaded to the DEMs system when Officers place their body worn cameras in the dock. All body worn camera footage remains on the system for 90 days. If a video captures a UOF or other reportable incident, the video preservation unit in the Chief of Department's office marks the video as 'evidential' which then preserves the video on DEMs indefinitely.

- ID investigators assigned to GRVC and the GRVC Warden are able to view the body worn camera footage directly in DEMs.

**ANALYSIS OF COMPLIANCE**

The Department has continued to maintain Substantial Compliance with this provision. The Monitoring Team confirmed that the Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. The review encompassed both use of force incidents and inmate fights. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

With respect to preserving video beyond 90 days, the Department has continued to demonstrate Substantial Compliance over a sustained period. The Monitoring Team assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage, handheld and body-worn camera video footage included in the use of force investigation files produced to the Monitoring Team, and (2) randomly assessing a sample of stationary and handheld video of incidents investigated by ID. Only a small number of investigation packages have been produced to the Monitoring Team where the video was not preserved, often due to a clerical error. Further, the Monitoring Team's random testing found the videos for all incidents reviewed were adequately preserved.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### 6.   USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct. High-quality investigations are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department. The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion.

#### Merger of ID & Trials Division and the ID Initiatives Plan

Investigations into potential use of force-related misconduct are at the core of the *Nunez* reforms. As such, the responsibility for many *Nunez*-required initiatives falls to the Investigations Division ("ID"). During this Monitoring Period, a permanent leadership team was established for ID and the division was merged with the Trials Division ("Trials"), as discussed in the Identifying and Addressing Misconduct section of the report above (referred to as "ID &

Trials" throughout this report). The former Deputy General Counsel of Trials was appointed the Deputy Commissioner ("DC") of ID & Trials and the former Deputy Director of ID was appointed as the Assistant Commissioner ("AC") of ID & Trials. The new leadership team immediately set about identifying weakness within the division and devising appropriate strategies to maximize both effectiveness and efficiency of the work of ID investigators and Trials attorneys. The DC and AC consulted extensively with the Monitoring Team about their initiatives and how best to address the various issues and recommendations identified by the Monitoring Team.

It became evident through this process that their staff were pulled in multiple directions and lacked clear guidance on how to tackle the competing priorities presented by the various initiatives developed by the Department or the Monitoring Team. As a result, the Department developed an ID Initiatives Workplan ("ID Workplan"), similar to the Department's Use of Force Improvement Plan, to identify the necessary steps and stakeholders needed to fully implement each initiative. To support this effort, the Monitoring Team developed a comprehensive list of its recommendations and feedback for the Department to incorporate into the ID Workplan. The Department shared the initial ID Workplan with the Monitoring Team shortly after the close of the Sixth Monitoring Period.

The ID Workplan includes specific tasks with responsible parties, deadlines, status and notes for each task. The tasks cover a broad range of topics including ID policies, initiatives to facilitate collaboration between ID and the Facilities, enhancing ID's access to evidence, addressing obstacles for timely completion of Preliminary Reviews and Full ID cases, increasing the use of PICs and Fast-Track, creating a process to prioritize certain cases (*e.g.* egregious uses of force, Staff involved in multiple uses of force), and improving the timeliness and quality of

sexual assault investigations, among many others. Clearly, this complex process will require significant coordination to ensure implementation is logically sequenced.

ID has significant work ahead to achieve compliance, but the Monitoring Team believes that the initiatives currently underway are promising and likely to result, over time, in the ID & Trials division conducting timely and reliable investigations with appropriate discipline as merited.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Every use of force incident receives a Preliminary Review.
- ID and the Facilities investigate use of force incidents once the Preliminary Review is complete.

### ANALYSIS OF COMPLIANCE

The Monitoring Team has evaluated thousands of Preliminary Reviews and hundreds of Facility and ID investigations. Preliminary Reviews continue to be the most consistent and reliable assessments of use of force incidents. While ID investigations tend to be of better quality and more detailed than Facility investigations, ID investigations still suffer from serious deficiencies. Full ID investigations are inconsistent in quality and take too long to close. While the Monitoring Team reviewed a handful of investigations closed during this Monitoring Period that met quality standards, the Monitoring Team noted the following deficiencies in ID Investigations reviewed this Monitoring Period: (1) investigators failed to properly evaluate evidence and disregarded evidence that appeared to contradict their findings and conclusions; (2) investigators did not identify or address that Staff Reports lacked the necessary detail as to what occurred in UOF incidents; and (3) on multiple occasions, video evidence contradicted the investigators' conclusions, or video evidence depicted issues simply not addressed by the investigation. Further, the quality of evidence is negatively impacted due to the delays in addressing cases. For instance, the value of a Staff interview decreases as time goes on because the interviewees simply cannot recall the incident or the specifics of the incident.

The findings of Facility Investigations are generally not reliable, as they often ignore objective evidence, with analysis that is pro forma. The Facility Investigations reviewed this Monitoring Period (discussed in more detail in ¶ 13 below) demonstrated that the Facility Investigation does little to improve upon the Preliminary Review of the incident, are biased in favor of the Staff, and focus more on inmate conduct.

Given these findings, along with those described in the Identifying & Addressing Use of Force Misconduct section above, the Department is not in compliance with this provision.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident [according to the terms of (a) to (c).] The Department shall not discredit Inmates' accounts without specifying a basis for doing so. [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates who are the subject of a use of force incident and those who witness the incident as part of the Preliminary Review.

- Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

- **Videotaped Inmate Interviews**:

  o Following the success of the video interview pilot, ID is working toward utilizing body-worn camera technology to offer the option to videotape all inmate interviews going forward.[99]

  o This Monitoring Period, the Department installed the necessary charging and uploading equipment in areas accessible to ID's Facility-based teams in all Facilities except QDC, which is still in progress.

### ANALYSIS OF COMPLIANCE

The inmate interview requirements of ¶ 2 above have a number of practical elements: (1) investigators must make and document reasonable attempts to interview inmates, including the ADW who interviews inmates following medical treatment; (2) investigators shall not unreasonably discredit inmate statements; and (3) investigators must conduct inmate interviews in a private and confidential location.

---

[99] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

*Interview Attempts and Documentation*

The Monitoring Team continues to find that Preliminary Reviewers of UOF incidents attempt to interview inmates involved in actual uses of force within days of the incident. Further, in ID Closing Reports, investigators document their attempts to interview inmates, either by including a summary of the inmate's statement or by indicating that the inmate refused to be interviewed.

Based on review of audio recorded statements, the quality of the interviews is inconsistent. Many of the investigators ask appropriate questions to elicit the inmate's a description or demonstration of what occurred. However, some investigators unnecessarily pointed out any perceived failures by the inmate to comply during the incident or violations committed by the inmate. This type of commentary has a chilling effect on the interview and may detract from the legitimacy of the investigation process from the inmate's perspective, leading to less cooperation in the future.

*Crediting of Inmate Statements*

The Monitoring Team continued to find that too often inmate statements are discredited without adequate explanation. Investigators continue to use insignificant inconsistencies from inmate interviews to discredit the inmate's version of events.

*Privacy and Confidentiality of Inmate Interview*

The Monitoring Team has seen consistent improvement by investigators to provide inmates an opportunity to provide statements in more private or confidential locations such as pantries, dayrooms, or stairwells instead of on the housing unit. While these are not ideal interview locations, considering the time and space constraints, these locations are an improvement from Housing Areas that lack privacy and interviews conducted in the presence of other inmates.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- 10 use of force cases were referred to or taken over by DOI during this Monitoring Period.

- At the end of the Monitoring Period, a total of seven use of force cases were pending before DOI, 15 were pending with law enforcement (four with the Bronx District Attorney ("DA"), three with the Manhattan DA, and three with the U.S. Attorney's Office for the Southern District of New York "SDNY")).

**ANALYSIS OF COMPLIANCE**

Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly and/or assumed by DOI. During this Monitoring Period, the Monitoring Team did not identify any use of force incident that should have been referred to DOI, but was not. The cases evaluated by DOI and subsequently City and Federal prosecutors' offices represent some of the most troubling use of force incidents. Accordingly, it is critical that they are processed as expeditiously as possible, which is difficult given the various layers of review across and within various agencies required to bring a criminal prosecution. Therefore, the tracking and management of these cases is crucial.

During this Monitoring Period, the Monitoring Team shared a number of recommendations to streamline this process. In response, the Department refined its internal tracking processes and also expanded its monthly check-in meetings (as described in the Second Monitor's Report at pgs. 84-85) to include any law enforcement agency that is investigating a use of force case (previously, these meetings only occurred with representatives from the Bronx DA's office and DOI).

*Tracking of Cases*

Communication between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and the Southern District of New York) must be regular and open to ensure that potential criminal cases are not inadvertently undermined by internal Department investigation. Further, once it is determined that a criminal case will not be brought, the Department must be notified as soon as possible so the case can be processed, and discipline imposed as appropriate. While the Monitoring Team believes a routine check-in among all stakeholders is important, those attending must be willing to work collaboratively and come prepared with relevant information. The Monitoring Team observed one of the monthly meetings and found that representatives from one DA's office came unprepared to discuss the cases on the agenda and the representative from another DA's office was curt and shared inaccurate information about the communication between other agencies. If these meetings are to continue, the Monitoring Team strongly recommends that the participating law enforcement agencies prioritize the relevant cases and work collaboratively with the Department, DOI, and SDNY to ensure cases are processed as efficiently as possible.

*Length of Time to Evaluate Cases*

The improved tracking and communication resulted in fewer cases languishing with outside agencies. During the previous Monitoring Period, 23 cases were pending with outside agencies, compared to only 15 this Monitoring Period. However, the length of time required for outside agencies to consider cases for prosecution is still quite long—a few of these 15 cases have been with outside agencies for over two years. Prosecutorial agencies reviewing these cases must make every effort to ensure cases are prosecuted, or returned to the Department, as expeditiously as possible.

The vast majority of UOF cases evaluated by City and Federal prosecutors' offices do not result in criminal prosecution. The delays in reviewing these cases further delay the Department's ability to

impose discipline on Staff once the case is returned to the Agency. Accordingly, the Department has started to track the progress of these cases more closely to ensure they are processed expeditiously once the case is returned.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[100] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

### ANALYSIS OF COMPLIANCE

The Department has consistently demonstrated, over several Monitoring Periods, that the overwhelming majority of use of force incidents are classified accurately and accordingly has maintained Substantial Compliance with this requirement. The Monitoring Team assessed the use of force incident classifications for Preliminary Reviews conducted in January to March 2018. As required by § VII (Use of Force Investigations), ¶ 7(b), the Monitoring Team found that Preliminary Reviews identified a small number of incidents that may have been potentially misclassified and followed up to have the incident re-classified by the Facility. The Monitoring Team also identified only a handful of cases that may have been misclassified.

*Class P Assessment*

This provision also ensures that incidents are classified in a timely manner when injury information is not immediately available at the time the initial classification determination is made. The Monitoring Team has found that most incidents with Class P are reclassified in a timely manner, consistent with findings from prior Monitoring Periods.[101] During the current Monitoring Period, 160 of

---

[100] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C

[101] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

the 168 (95%) Class P incidents randomly selected by the Monitoring Team were reclassified within two weeks or less. [102]

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### ANALYSIS OF COMPLIANCE

Last year, ID completed a year-long pilot to video record interviews and concluded that videotaped interviews enhanced the quality of investigations (as discussed in the Fifth Monitor's Report at pgs. 96-97). The Department's efforts to implement video-taped inmate interviews is discussed in ¶ 2 above.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance (per Fifth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID conducts Preliminary Reviews of all use of force incidents in CMS.
  - As of mid-July 2018, of the 2,820 incidents in the Sixth Monitoring Period, 1,826 (65%) were officially completed in CMS (meaning all sign-offs were complete). Another 797 incidents (28%) had Preliminary Reviews at various stages (88 had been drafted by

---

[102] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance.

investigators and 709 were pending some level of supervisory approval). Finally, 191 incidents (7%) from the Sixth Monitoring Period had no initial Preliminary Review completed by the investigator as of the close of the Sixth Monitoring Period.[103]

- ID closed 410 cases under Presumption that the Investigation is Complete (PIC) (described in detail in the Third Monitor's Report at pgs. 119-121).

ANALYSIS OF COMPLIANCE

The Identifying and Addressing Misconduct section of this report provides an overview of the Monitoring Team's assessment of the current status of Preliminary Reviews. The Monitoring Team continues to review all Preliminary Reviews[104] as they remain the most reliable source of information about use of force incidents. The Department dedicates significant time and effort to completing quality Preliminary Reviews.

Completing Preliminary Reviews using CMS helped investigators identify cases that may meet the PIC criteria for closure. The system requires users to answer a series of questions and when a case meets defined criteria, CMS will recommend the case for PIC closure (which needs to be approved by the investigator and the supervisor). This resulted in 410 cases being closed, almost three times more than the 146 cases closed in the last Monitoring Period. The increased use of PIC is consistent with the Monitoring's Team's findings, as noted in prior Monitor's Reports, that more cases could close through PICs then were previously identified. As discussed in more detail in ¶ 13 below, the Monitoring Team's evaluation of closed Facility Investigations revealed additional cases that could have been closed by PIC. The Monitoring Team also assessed a sample of PIC cases and found they all satisfied criteria for closure. In a few cases, closure under PIC was appropriate, but the investigator failed to recommend that a discrete violation could be addressed by the Facility. The Monitoring Team held a productive workshop with the investigators who conducted these investigations to discuss potential improvements.

While ID continues to produce quality Preliminary Reviews, they take longer to complete following the implementation of CMS (discussed in more detail in the Identifying and Addressing Misconduct section of the report, above). Given these delays, ID was unable to achieve Substantial Compliance with this provision as the time to fully complete Preliminary Reviews is too long, averaging 41 business days.[105] Timely completion of Preliminary Reviews should improve as Staff become more proficient with CMS and ID obtains additional Staff.

---

[103] Preliminary Reviews for these incidents were subsequently completed.

[104] Given the backlog of completing Preliminary Reviews, the Monitoring Team also evaluates the initial draft of Preliminary Reviews not yet completed to allow the Monitoring Team the ability to review incidents more contemporaneously. The Monitoring Team also receives copies of all completed Preliminary Reviews.

[105] This reflects the time between when the incident occurs and formal closure of the Preliminary Review after all supervisory reviews are complete, data previously reported only captured the time to complete the initial Preliminary Review. The data available through CMS does not allow the Monitoring Team the ability to calculate the time to complete the initial Preliminary Review. The Monitoring Team conducted a manual review of a sample

| **COMPLIANCE RATING** | ¶ **7.** Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID Investigations when they meet any of the criteria in Consent Judgment § VII, ¶ 8.

- The 2,820 use of force incidents that occurred in this Monitoring Period were referred as shown in the chart below.

| Referrals | Incidents Occurring in the Sixth Monitoring Period |
| --- | --- |
| **Total** | **2,820 (100%)** |
| **Full ID Investigations** | 1,396 (50%) |
| **PICs** | 476 (17%) |
| **Facility Investigations** | 942 (33%) |
| **Unknown** | 6 (<1%) |

- ID reports that additional cases are referred for a Full ID Investigation after the Preliminary Review process is complete if additional facts or circumstances that merit additional scrutiny are revealed, even if the facts of the case do not meet the specifically enumerated circumstances in this provision.

### ANALYSIS OF COMPLIANCE

The Department remains in Substantial Compliance with this provision as ID continues to refer cases for Full ID Investigations appropriately. The Monitoring Team reviewed a sample of cases referred for Facility Investigation to ensure they did not qualify for Full ID Investigation as per ¶ 8

---

of Preliminary Reviews and found that the time to complete an initial Preliminary Review ranged from five days to a few months.

criteria. Consistent with prior reviews (see Second Monitor's Report at pg. 97, Third Monitor's Report at pg. 144, and Fourth Monitor's Report at pgs. 131-132), the Monitoring Team found that the overwhelming number of referrals to the Facility were appropriate.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

a.   *Timeliness* [. . .]
b.   *Video Review* [. . .]
c.   *Witness Interviews* [. . .]
d.   *Review of Medical Evidence* [. . .]
e.   *Report* [. . .]
f.   *Supervisory Review* [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID continues to conduct investigations as described in the Fourth Monitor's Report (at pgs. 132-133). ID investigators are assigned to Facility based teams and are responsible for conducting the Preliminary Reviews for all incidents and any cases subsequently referred for Full ID Investigation. Generally, the investigator who conducts the Preliminary Review is also responsible for the Full ID Investigation.

- All ID investigations of UOF incidents that occurred in this Monitoring Period were conducted within CMS.

- ID continued the "Fast-Track" and "Expedited Case Closure" processes this Monitoring Period:

  o **Fast-Track Pilot**: ID investigators and Trials attorneys identified 217 cases for Fast Track, and all but 14 were approved.

  o **Expedited Case Closure**: Some cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") can be closed more quickly with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. The Department reported that ID Identified 43 cases for expedited closure during this Monitoring Period.[106]

- **Facility Referrals**:

---

[106] The tracking of expedited case closure is currently completed ad hoc as there is not a way to track expedited case closures in CMS. Accordingly, this is a conservative estimate of the number of cases closed under expedited case closure in this Monitoring Period.

- o ID continued using Facility Referrals during this Monitoring Period, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to a Facility with instructions for the Facility to take appropriate action.
- o This Monitoring Period, ID tracked each Facility Referral and subsequent proof of remediation. Of the 189 Facility Referrals issued this Monitoring Period, the Facility has provided a response to 181 (96%).

**ANALYSIS OF COMPLIANCE**

*Timeliness (¶ 9(a))*

During this Monitoring Period, the ID leadership worked to develop appropriate strategies to address ID's case backlog. The newly-combined ID & Trials Division is poised to support the overall goal of closing investigations more quickly and imposing timely and meaningful discipline when appropriate. However, the volume of investigations that must be completed by ID investigators remains daunting, as demonstrated in the chart below. Of the over 4,100 cases that were either pending or closed as of the end of this Monitoring Period, fewer than 900 (20%) were closed or pending within the 180-day deadline. Accordingly, ID's focus remains on how best to leverage Preliminary Reviews to streamline the completion of Full ID Investigations so that investigators can close cases more quickly without sacrificing the quality of the inquiry.

| End of Monitoring Period | Less than 180 Days | 180 Days and 1 Year | Over a Year | Total |
|---|---|---|---|---|
| Pending | 737 (21%) | 1,220 (34%) | 1,603 (45%) | 3,560 |
| Closed | 106 (19%) | 135 (24%) | 326 (57%) | 567 |

The successful Fast-Track pilot (discussed in the Identifying and Addressing UOF Misconduct section, above) demonstrated that it is possible to close cases more quickly without sacrificing the quality of the investigation or integrity of the disciplinary response. As noted in prior Monitor's Reports, the level of investigative scrutiny must match the severity of the incident and the quality of evidence available. Not every investigation needs or should be met with the same level of rigor or the same investment of resources. The Monitoring Team believes that ID's stated efforts to implement Fast-Track as part of its standard practices in the next Monitoring Period will result in more efficient case closure.

Leveraging the Preliminary Reviews has also been a key focus. The nearly 300% increase in PICs (cases that would have otherwise resulted in a Facility Investigation) has confirmed that a significant number of cases can be closed following the Preliminary Review. Accordingly, ID leadership has encouraged supervisors to apply the expedited case closure procedures (closure of cases that would have otherwise resulted in a Full ID Case) with more vigor.

Facility Referrals, either after completing the Preliminary Review or after closing an ID investigation, can also help to resolve cases more quickly. The frequency of Facility Referrals has stayed generally consistent over time, but the Monitoring Team continues to encourage further use of this tool, particularly to address violations identified in PICs cases.

During this Monitoring Period, the Monitoring Team has also strongly encouraged ID to triage its current caseload and prioritize certain investigations (*e.g.*, those that involve concerning misconduct, Staff engaged in a pattern of misuses force, cases that were considered by the Immediate Action Committee, or cases recently returned from Law Enforcement) so that they can be processed as quickly as possible and are not lost within the volume of work that needs to be completed. This priority was incorporated into the ID Workplan. The Monitoring Team intends to work closely with ID on implementation of this initiative in the next Monitoring Period.

*Quality of the Investigations*

The Monitoring Team continues to find the quality of ID Investigations is lacking in most investigations reviewed. While ID investigators may properly identify key points and violations associated with the primary subject of the investigation, they often miss or ignore issues in the actions or reporting of other involved Staff. One particular area of weakness is the investigators' failure to identify incomplete, misleading, or false reports by participants other than the primary actor or by witnesses. ID investigators should also more frequently and thoroughly identify issues contributing to avoidable uses of force (*e.g.* failure to secure doors, lack of situational awareness, failure to supervise, lack of interpersonal skills, and inefficient performance of duties). Overall, investigators still struggle to evaluate evidence correctly when devising their findings and conclusions. That said, when misconduct is identified, investigators generally recommended reasonable actions in their conclusions. Of the 567 UOF investigations closed in this Monitoring Period, 82 (15%) of these cases resulted in charges for at least one Staff member, 11 (2%) of these cases resulted in at least one PDR for a probationary Staff, and 2 (<1%) cases resulted in both charges and a PDR.

To improve the quality of investigations, ID supervisors are providing more timely feedback during the drafting and completion of Preliminary Reviews. This is a critical opportunity to ensure that investigators identify the full constellation of issues so that the case can be closed early or so investigators are poised to investigate all outstanding questions. The Monitoring Team strongly encourages this type of supervision at this critical juncture because, in elevating the quality of Preliminary Reviews, the findings can be leveraged to close cases more quickly and improve the overall investigation.

MEOs-16 Staff interviews increased among the investigations reviewed this Monitoring Period, but there continue to be extended delays in interviewing Staff participants and witnesses. ID has started to work with the Captain's union to develop strategies to conduct MEO-16 interviews more timely. The Monitoring Team strongly encourages ID to prioritize this initiative.

The Monitoring Team conducted a workshop with ID Staff regarding Full ID Investigations (in addition to the PICs workshop described above) and shared recommendations about how the investigators' process and work product could be improved. ID investigators were eager to learn and were generally receptive and inquisitive. Additional workshops will be held in subsequent Monitoring Periods. With more experience and more active mentorship, the quality of investigations should continue to improve.

*Conclusion*

Driven by the appointment of new leadership and the merging of ID and Trials, ID implemented a number of initiatives to improve the quality of its investigations and to close cases more quickly, embracing new initiatives with vigor. While there is significant work to complete to achieve Substantial Compliance with this provision, ID's work plan and the initiatives put in place during this Monitoring Period demonstrate that ID is developing an effective foundation to achieve compliance and intent on overhauling the division.

| COMPLIANCE RATING | ¶ 9. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. [. . .]

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that by the end of the Fourth Monitoring Period, the Department closed all of the ID cases that were open as of the Effective Date of the Consent Judgment.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance (per Fourth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department received authorization from OMB to hire additional staff for ID.
  - The City's Executive Budget released in April 2018 contained new funding for DOC-- $3.4M in additional funds for FY19 and $4.9M annually starting in FY20. As a result, ID now has funding for an additional 71 authorized civilian positions.
- The Department is actively seeking to hire both civilian and uniformed Staff as investigators and supervisors to fill the allocated personnel lines.

- o HR developed recruiting strategy for ID that included a detailed marketing plan for investigator, supervisor, and leadership positions.
- o ID interviewed over 100 investigator and supervisor candidates.
  - ▪ 25[107] civilian staff were hired and onboarded in New Hire Orientation during this Monitoring Period.
  - ▪ An additional 20 civilian staff were hired by the end of the Sixth Monitoring Period or early in the Seventh Monitoring Period but had not yet attended New Hire Orientation. Three promotions were also extended to supervisors within ID.
- As of the end of this Monitoring Period, ID had the following staff working in the division:

| Deputy Commissioner | Assistant Commissioner | Deputy Director Investigator | Supervising Investigator | Investigator – Civilian | Assistant Deputy Warden | Captain | Correction Officer | Support Staff |
|---|---|---|---|---|---|---|---|---|
| 1 | 1 | 6 | 9 | 58 | 3 | 16 | 77 | 12 |

- At the close of this Monitoring Period, ID had 3,560 open Full ID Investigations and an additional 2,276 open non-UOF cases. ID reports that investigators have a combined use of force and non-use of force caseload of 53 cases.

**ANALYSIS OF COMPLIANCE**

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. During this Monitoring Period, the City provided funding to support additional staffing for ID, which is critical given the continued increase in workload. The caseloads for investigators and supervisors has continued to increase in each Monitoring Period. On average, each investigator's caseload has increased by 20, compared to the same time last year.

The Department made significant efforts this Monitoring Period to recruit, interview, and hire additional investigators, supervisors, and leadership for ID. Even with attrition, ID gained 11 staff during this Monitoring Period and additional Staff are identified to start during the next Monitoring Period. The Monitoring Team continues to strongly encourage all divisions in the agency to work collaboratively to recruit, interview, and on-board the necessary Staff as it is imperative that ID has the necessary resources.

| **COMPLIANCE RATING** | **¶ 11.** Partial Compliance |
|---|---|

**VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)**

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[107] Since hiring, two of these staff have since resigned, and one was returned to their command.

- CMS includes several mandatory fields to ensure Facility and ID investigators collect and analyze evidence systematically.

- Preliminary Reviews and Investigations must be evaluated by supervisors before being finalized.

- ID suspended the ID Auditor program and instead began to assess data internally to identify barriers to completing investigations. The initial assessment focused on the obstacles to timely closure of Preliminary Reviews (*see* Identifying and Addressing UOF Misconduct, above).

- ID created an ID Initiatives Manager position to orchestrate the various initiatives to improve the quality of ID Investigations and intends to fill this position in the next Monitoring Period.

ANALYSIS OF COMPLIANCE

The Department has established strong initial quality control mechanisms to ensure proper procedures are followed by including Preliminary Review and ID forms in CMS (CMS has similar forms for Facility Investigations). This forces investigators at all levels to collect specific information and documentation and to answer detailed questions with numerous conditional aspects to ensure proper work flows. The Monitoring Team reviewed the workflow status for a sample of Preliminary Reviews conducted during this Monitoring Period and observed significant communication between supervisors and investigators before Preliminary Reviews were finalized in CMS. The supervisory review of Preliminary Reviews was of higher quality than previously seen. While this sometimes led to delays in closing the Preliminary Reviews, the mentoring and training contained in the Preliminary Review workflow logs has real value. Supervisors often encouraged investigators to improve the evidentiary analysis, or encouraged investigators to address inconsistencies in the reports or video.

Regarding the back-end quality review of closed ID investigations, previously, the ID Auditor reviewed a sample of Preliminary Reviews and closed investigations and provided feedback to DDIs. The process proved to be burdensome and, considering the significant volume of cases and various initiatives undertaken by ID, the Monitoring Team and Department determined the ID Auditor's work was not contributing to improvement in needed areas. Instead, the new initiatives undertaken via the ID Workplan will support more targeted portions of the investigative process and specific investigators who need more guidance and support.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.   All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in

which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

a. *Objectivity* [. . .]
b. *Timeliness* [. . .]
c. *Video Review* [. . .]
d. *Witness Statements* [. . .]
e. *Collection and Review of Medical Evidence* [. . .]
f. *Report* [. . .]
g. *Supervisory Review* [. . .]
h. *Recommended Disciplinary Action* [. . .]
i. *Referral to ID* [. . .]
j. *Role of Integrity Control Officer* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains a standalone Facility Investigations Policy.

- CMS is now used to conduct all aspects of Facility-level Investigations for incidents that occurred since December 13, 2017.

**ANALYSIS OF COMPLIANCE**

*Timeliness of Facility Investigations* (¶ 13(b))

As an initial matter, while the Department was largely successful in closing out the pre-CMS backlog as reported in the Fourth Monitor's Report, the Department still did not close approximately 180 cases pending before two Facilities. The statute of limitations has now passed for these incidents and therefore no action can be taken. Some pre-CMS cases remained pending where the statute of limitations had not passed, and this Monitoring Period the Facilities closed the investigations of 228 incidents that occurred in 2017. Of these, 33 (14%) were closed within 25 business days, 41 (18%) between 26-30 business days, and 154 (68%) in 31 business days or more.

The number of incidents requiring a Facility Investigation dropped this Monitoring Period after the implementation of CMS because of ID's improved use of PICs. However, the delay in closures of the Preliminary Reviews means that the overall length of time between the incident date and the close of the Facility Investigation has necessarily extended. The timeliness of Facility investigations once the Facility has received the case has also deteriorated since the implementation of CMS. The Facilities closed 441 Facility Investigations for incidents that occurred during the Sixth Monitoring Period, in an average of 75 business days from the date of the incident. The backlog of Preliminary Reviews contributed to the delay, since the Facility cannot begin its investigation until the Preliminary Review is officially completed. However, Facilities required an average of 42 days to close the investigation *after* the Preliminary Review was closed, 17 business days beyond the deadline.

| January to June 2018 Incidents Closed or Pending | | | | | | | |
|---|---|---|---|---|---|---|---|
| Closed Within 25 Business Days | | Closed Between 26 & 30 Business Days | | Closed Beyond 30 Business Days | | Total Pending Business Day Deadline | | Total Cases | |
| 4 | 0.5% | 4 | 0.5% | 498 | 51% | 470 | 48% | 976 | 100% |

*Purpose and Quality of Facility Investigations* (¶ 13(a), (f), (g), (h))

The Monitoring Team reviewed 30 investigations of incidents that both occurred and were closed in this Monitoring Period and completed after CMS had been implemented for a number of months.

The quality of Facility Investigations has not improved from the Monitoring Team's prior assessment. The Monitoring Team's ability to view the Preliminary Reviews and Facility Investigations side-by-side further underscored the inadequacies of the Facility Investigations. Often, Facility investigators conducted cursory and biased assessments of the evidence that favored the Staff involved, while focusing on the inmates' misconduct. Additionally, in several cases, the Rapid Review and/or the Preliminary Reviewer identified a potential violation,[108] and that issue was not identified or addressed by the Facility investigator. While the majority of these violations were not significant, they should not have gone unaddressed.

At their best, the Facility Investigations are a redundant version of the work completed by the Preliminary Reviewers. At their worst, they are an unreliable avenue for identifying Staff misconduct. Furthermore, in some cases, it also appeared the investigation could have been closed through PICs and did not necessarily require a Facility Investigation. During the next Monitoring Period, the Monitoring Team intends to work with the Department to determine how best to achieve the overall goal of quality investigations for these type of cases, by leveraging the Rapid Reviews and Preliminary Reviews and improving the identification of PICs cases. It was discovered early in the Seventh Monitoring Period that Facility investigators did not have access to the Preliminary Review in CMS or access to Rapid Review of the incident as part of their investigation. The Department reports it is working to remedy both of these issues.

As for the outcome of the Facility investigations completed in this Monitoring Period, only a small proportion resulted in a recommendation for re-training, counseling, command discipline, or MOC, far less than what would be expected given the level of misconduct identified by the Monitoring Team. Overall, Facility investigations failed to demonstrate: objectivity in assessing the evidence (¶ 13(a)); closing reports that are supported by the evidence (¶ 13(f)); supervisory review ensuring compliance with relevant policies and procedures (¶ 13(g)); or appropriate disciplinary action in light of the evidence (¶ 13(h)).

---

[108] In some cases, the Preliminary Reviewer incorporated the violations noted by the Rapid Reviewer in the Preliminary Review

*Procedural Requirements* (¶ 13 (c), (d), (e))

Facility Investigations generally adhere to the procedural requirements of this provision. The investigators review relevant video (¶ 13(c)), gather witness statement (¶ 13(d)), and collect and review medical evidence (¶ 13(e)) as required. Therefore, the Department is in Partial Compliance with these requirements.

*Next Steps*

The Department reports it intends to consult the Monitoring Team about initiatives to improve the quality of Facility Investigations. The Monitoring Team intends to assess Facility investigations completed by OBCC/GRVC to determine if their collaboration with ID (part of the UOF Plan) is improving the quality of Facility Investigations.

| COMPLIANCE RATING | ¶ 13 (a)-(b), (f)-(h). Non-Compliance<br>¶ 13 (c)-(e). Partial Compliance<br>¶ 13 (i)-(j). Not Yet Rated |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

   a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

   b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has a designated "Youth ID Team" consisting of one Captain and six uniformed Staff investigators. The team is based at RNDC and conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced inmates, age 16 or 17).

- During this Monitoring Period, 45 use of force incidents involving inmates under the age of 18 at the time of the incident were referred for Full ID Investigations.

- 97 Facility Investigations involving youth were assigned to the Youth ID team for review upon closure, using the Incident Review Team ("IRT") templates (described in the Fourth Monitor's Report at pg. 146).

- The Department reported that the Youth ID Team began to receive monthly training in May 2018, which included the following topics: video review techniques (to help team members

discern what is viewed on video and how to relate it to the UOF Directive); inmate statements/canvassing for witnesses; officer reports/MEO-16 interviews; analyzing evidence; and case conclusion and recommendations.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that ID maintains a Youth ID Team with qualified staff who conduct Full ID Investigations for all UOF incidents involving 16- and 17-year-old inmates. The quality of Full ID Investigations is discussed in ¶ 9 above.

*Youth ID Team Review of Closed Facility Investigations Involving Youth (¶ 14(b))*

Youth ID Team investigators are now required to review all closed Facility Investigations involving 16- or 17-year-old male and female inmates. 97 Facility investigations were assigned IRTs this Monitoring Period, adding to the 262 IRTs assigned in the prior two Monitoring Periods, with only a small portion of these IRTs completed. The Monitoring Team reviewed a sample of completed IRTs to assess their quality and found that they provided reasonable assessments.

To date, few IRTs have closed, and the Department is contemplating the best quality assurance process for Facility Investigations involving adolescent inmates as part of the ID Workplan. The Department is in Partial Compliance with this requirement because the quality of investigations remains mixed and the significant number of IRTs that remain outstanding.

| **COMPLIANCE RATING** | ¶ **14.** Substantial Compliance<br>¶ **14(a).** Partial Compliance<br>¶ **14(b).** Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- The Department contracted with The Moss Group, a highly-respected technical assistance provider, to provide support for issues related to sexual safety and implementing PREA.

- ID has a dedicated PREA team that is responsible for investigating all PREA-related allegations.

- During this Monitoring Period, ID developed a specific plan to accelerate the closure of the backlog of PREA investigations involving Young Inmates. This included evaluating all pending cases to consider next steps and to leverage preliminary findings. ID also developed a new closing report and improved processes for closure and supervisory review.

- During this Monitoring Period, the Department closed 40 PREA investigations. Of these, 11 (28%) were unfounded, 25 (63%) were unsubstantiated, and four (10%) were substantiated. Of those substantiated:
  - Two involved sexual harassment (one inmate-on-inmate and one 3rd party);
  - Two involved sexual abuse (both inmate-on-inmate); and
  - Two were from RNDC, one from GMDC and one from RMSC.

- As of June 30, 2018, a total of 12 cases remained pending with ID. Five alleged *staff-on-inmate sexual abuse*, five alleged *staff-on-inmate harassment*, and two alleged *inmate-on-inmate sexual abuse*. Most of the cases (58%) had been pending for over one year, while the remainder had been pending for less than a year. None were pending within the 60 business days allotted by policy.

ANALYSIS OF COMPLIANCE

Although this provision pertains only to Young Inmates, it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations of sexual abuse and harassment involving Young Inmates. During the Sixth Monitoring Period, there were four such allegations (three from GMDC, one from RNDC, none from RMSC). All were allegations of *staff-on-inmate* sexual misconduct, three alleged *abuse* and one alleged *harassment.* Based on the Monitoring Team's experience, a higher prevalence of allegations involving Staff than allegations involving other inmates is typical of adolescent populations.

Policy requires investigations of sexual abuse allegations to be completed within 60 business days of the incident being reported. The Department did not meet this requirement, in large part due to a significant backlog of cases, some dating back to 2016 and all beyond the 60-day window. This backlog was largely cleared during the current Monitoring Period, as discussed above. The Monitoring Team expects the Department to keep current with its PREA investigations involving Young Inmates from this point forward.

In terms of substance, prior Monitor's Reports have noted the failure to interview key witnesses, long delays to witness interviews, and apparent failure to ask effective follow-up questions or to collect relevant evidence. During this Monitoring Period, only three investigation packets were submitted by the Department for the Monitoring Team's review. In these, even with some of the procedural problems noted above, the findings appeared to be reasonable based on the available evidence. The Monitoring Team intends to assess a larger sample of closed investigations in the next

Monitoring Period. It is premature to assess a compliance rating given the small sample of incidents reviewed to date.

| COMPLIANCE RATING | ¶ 9. Not Yet Rated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- The Department maintained the standalone Facility Investigations Policy issued during the Fifth Monitoring Period.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications. ID is planning to draft and implement a comprehensive set of policies and procedures as part of the ID Workplan.

### ANALYSIS OF COMPLIANCE

The Department has a large number of policies and procedures related to investigating use of force incidents.

#### *ID Investigations*

As described in prior Monitor Reports, ID does not have all of its policies and procedures in a single place. However, ID has identified over 70 memorandum, orders and relevant directives that are currently in effect and identified those that are *Nunez*-related as well as those that need to be updated and/or rescinded. Given the various changes currently underway with ID (including the merger with Trials and new leadership), the Monitoring Team has encouraged ID to balance the need to develop written procedures while encouraging creative thinking in developing a flexible and appropriate framework for conducting investigations. In this interim period, the Monitoring Team has supported ID's efforts to advise staff of expectations via informal communications while larger initiatives are being developed, which can later be incorporated into a comprehensive manual. The Monitoring Team will continue to work closely with the Department to ensure that the final set of policies and

procedures properly guides thorough, timely, and efficient investigations and that they are consistent with the requirements of the Consent Judgment.

*Facility Investigations*

The Facility Investigation Policy promulgated during the Fifth Monitoring Period addresses all of the requirements of Consent Judgment §VIII, ¶ 13.

*Standardized system and format for organizing the contents of investigation files* (¶ 16)

The Monitoring Team has generally found that ID files are well-organized. The implementation of CMS has created even greater structure to the investigation files and further improved accessibility to relevant information.

| **COMPLIANCE RATING** | ¶ **15.** Partial Compliance<br>¶ **16.** Substantial Compliance |
| --- | --- |

## 7.   RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management Section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The risks facing the Department are broad and varied and require timely and flexible responses that are comprehensive and all-encompassing. These measures include developing and implementing a computerized Early Warning System (¶ 1); implementing "5003 Counseling Meetings" between the Warden and any Staff Member who engages in repeated use of force incidents where at least one injury occurs (¶ 2); creating a new position, the use of force auditor ("UOF Auditor"), who identifies systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation data throughout the Department (¶ 6). Each of these is described in more detail below.

The Monitoring Team's assessment of compliance is below.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Deputy Risk Manager continued to refine and roll-out the Department's Early Warning System in consultation with the Monitoring Team.

- In June 2018, the Commissioner created the Early Intervention, Support, and Supervision Unit ("E.I.S.S.") which will conduct the work of the Early Warning System to identify Staff whose use of force practices may benefit from early intervention. Once identified as a candidate based on criteria outlined in the Fourth Monitor's Report at pg. 152, Staff are provided extra support, guidance and closer supervision of their use of force for a set period of time.

- The E.I.S.S. Unit will report to the Office of Administration. The E.I.S.S. is currently managed by the Deputy Risk Manager while the Department recruits an Assistant Commissioner to head the unit.

- In addition to creating the E.I.S.S. Unit, the Department made the following progress in implementing its E.I.S.S. program this Monitoring Period:

  - Refined and finalized the draft of the E.I.S.S. Policy;[109]

  - Hired a civilian analyst to support the Deputy Risk Manager, in addition to the three temporary duty uniform staff on the team (two captains, and one officer);

  - Initiated the Staff screening and monitoring process:

    - Nearly 200 Staff were referred for screening, either because they met screening criteria or were directly referred to E.I.S.S. following recent conduct that appeared to merit support. As of the end of the Monitoring Period,

      - E.I.S.S. screened a portion of those Staff, and many of those screened were identified for monitoring.

---

[109] The Policy was subsequently promulgated during the Seventh Monitoring Period.

- Ten Staff were enrolled in the E.I.S.S. monitoring program, one of whom successfully completed the monitoring term[110] in May 2018.
- In collaboration with the Chief's office, E.I.S.S. enrolled almost 40 Staff in Monitoring (to begin in the 7th Monitoring Period). These staff were identified via the screening process or are currently on disciplinary probation.

**ANALYSIS OF COMPLIANCE**

The framework for EWS was established by the end of the Fifth Monitoring Period and the process for operationalizing the E.I.S.S. unit began during this Monitoring Period. The Monitoring Team is encouraged by the Department's creation of a dedicated E.I.S.S. unit because it will provide Staff with needed support and will institutionalize the practice of monitoring staff performance. Staffing challenges have slowed its implementation, but the initial screening and monitoring efforts suggest real potential in helping to support and change Staff behavior. The Deputy Risk Manager reported a significant change in attitude, behavior, and use of force record for Staff being monitored, even among Staff who have been identified as having long-standing problematic behaviors.

The Monitoring Team evaluated a sample of the completed screening forms this Monitoring Period for individuals who were *not* recommended for monitoring, and found the decision not to place the particular Staff member on monitoring to be reasonable. At this juncture, the number of Staff who are subject to monitoring is too small for a robust assessment but anecdotally, the process appears to be beneficial for both the uniform leadership and the Staff participants and provide an opportunity to evaluate behavior critically and catalyze improved performance.

That said, significant works remains to achieve Substantial Compliance. During the next Monitoring Period, the Department needs to screen Staff consistently and systematically so that E.I.S.S. functions as it was designed and must also expand the monitoring program to include all staff requiring such assistance. To accomplish this, E.I.S.S. must maintain sufficient _permanent_ staffing. Currently, the number of E.I.S.S. staff is not sufficient to support the expected number of participants. One additional civilian position has been allocated, but the long-term use of TDY uniform Staff is not sustainable. Accordingly, the Monitoring Team strongly encourages the Department to work with haste to ensure E.I.S.S. is staffed appropriately.

---

[110] A Staff Member completes monitoring when the Staff member has demonstrated progress in their UOF-related conduct and otherwise demonstrates they have benefited from the program over a specified period of time (six or 12 months). The monitoring period may be extended if E.I.S.S. staff do not observe Staff have made meaningful progress during the initial monitoring period.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 5003R-B "Monitoring Uses of Force" remained in effect.

- The Department continues to manage the 5003 counseling process, as described in the Fourth Monitor's Report at pg. 154.

- Senior leadership continued to focus on this issue. 5003 counseling sessions were added to the TEAMS and weekly NCU meeting agendas so that Facilities must routinely report their progress.

- NCU continued to audit the 5003 counseling sessions across all Facilities. The NCU revised the audit process to include the following information: (1) total number of Staff who qualified for a 5003 counseling session, (2) the number of counseling sessions that occurred, (3) the number of Staff who qualified for a Class A mandatory counseling session, (4) the number of Class A mandatory counseling sessions that occurred, and (5) 5003 forms' completion.

- In this Monitoring Period, the following Staff were identified for counseling and counseling was conducted as demonstrated below: [111]

---

[111] As noted elsewhere in the report, involvement in three use of force incidents, alone, is not necessarily indicative of a problem, there are several legitimate factors that may contribute to Staff's involvement in use of force incidents (such as the shift and post assignments, type of inmate population, etc.). Further, a 5003 Counseling Meeting is not disciplinary in nature as leadership may also use the meeting as an opportunity to reinforce best practices for Staff who are more frequently engaged in situations that may require the use of force.

|  | **February** | **April** | **June** | **Total** |
|---|---|---|---|---|
| **Mandatory Counseling Sessions** | 64 of 84 (76%) completed | 56 of 67 (84%) completed | 15 of 17 (88%) completed[112] | 135 of 168 (80%) completed |
| **Discretionary Counseling Sessions** | 309 of 548 (56%) completed | 253 of 495 (51%) completed | 190 of 358 (53%) completed | 752 of 1,401 (54%) completed |

ANALYSIS OF COMPLIANCE

The NCU audits of the 5003 counseling sessions continued to improve the Department's ability to identify, track and ensure counseling sessions occurred as required. While the improvements are encouraging, the Department must ensure Staff are counseled when appropriate/required and that counseling sessions are accurately documented. At a minimum, Class A mandatory counseling sessions must occur without fail, with only very isolated exceptions. Most importantly, the Department must continue to emphasize the purpose of these sessions to Facility leadership in order to improve the quality of the intervention with Staff. [113]

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

## V. USE OF FORCE REPORTING AND TRACKING 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

---

[112] Originally NCU considered involvement in any Class A incident, regardless of who was injured, in its assessment of who required mandatory counseling sessions. Beginning in June 2018, in identifying what required a mandatory counseling session, NCU only considered UOF that resulted in a Class A Injury *to an inmate*, which is what is required by the Consent Judgment.

[113] The counseling sessions are an opportunity to provide feedback and guidance to Staff on how to appropriately manage the use of force and emphasize non-forceful methods to resolve conflicts (*e.g.* non-physical intervention and problem solving).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Chief Internal Monitor (serving as the UOF Auditor) issued two reports during the Sixth Monitoring Period (Q4 2017 report was issued in February 2018; Q1 2018 report was issued in July 2018). The Chief Internal Monitor served as the Acting Assistant Commissioner of NCU at the beginning of the Monitoring Period and was subsequently appointed as Acting Associate Commissioner of the Correction Intelligence Bureau. As a result, he relinquished his role as Chief Internal Monitor and Acting Assistant Commissioner of NCU in the Spring of 2018.

  o The Q4 2017 and Q1 2018 reports summarized the Department's UOF improvement plan initiatives, discussed in the introduction of this Report. The initiative includes a range of strategies to both understand the factors driving the high rates of excessive and unnecessary force across the Department and to decrease use of force incidents across the Department.

- Beginning in April 2018, the Department piloted a process for analyzing UOF Incidents at OBCC and GRVC and developed weekly reports that assessed the following:

  o <u>General Metrics</u>: (1) total use of force incidents, (2) head strikes, (3) use of force in restraints, (4) OC spray, (5) reason for force, (6) Staff repeatedly involved in force, (7) inmates repeatedly involved in force, and (8) locations of incidents;

  o <u>Incident Characteristics</u>: time of incident, location of incident, reason for force and primary use of force type;

  o <u>Trends</u>: UOF injury, UOF by Tour, UOF by Location, Reason for Force, and Primary UOF Type

  o <u>Qualitative Assessment by ID</u>: problematic incidents and/or incidents where ID and the Facility (based on the Rapid Review have differing conclusions about the incident;

  o These cases are discussed: (1) in bi-weekly meetings with the executive leadership of ID and the Facility Leadership, (2) weekly *Nunez* meetings, and (3) in other forums such as TEAMs and Operational Leadership meetings.

- The Department uses aggregate reports of use of force data and investigations metrics to inform strategic initiatives, including the use of aggregate data from IRS and CMS, to inform and drive initiatives within the following units and divisions: ID, Performance Metrics & Analytics (PMA) Office, Bureau Chief of Security, Bureau Chief of Facility Operations, COD, CLU, NCU, and E.I.S.S. This data drives initiatives like the UOF Improvement Plan, TEAMS meetings, 5003 Counseling sessions, E.I.S.S., and Problematic Inmate Meetings.

**ANALYSIS OF COMPLIANCE**

*UOF Auditor*

The concept of a UOF Auditor has evolved since it was originally conceived. First, the original idea for a single person to complete a complex UOF analysis and report on Department trends simply is not feasible. Several divisions must be coordinated and the workload requires multiple people. Furthermore, the position has never been continuously filled for a significant period of time (two staff held the role for approximately six months each) as recruiting and retaining the appropriate individual for this position has been challenging.

The OBCC/GRVC pilot addressed throughout this report is another avenue for the Department to achieve the goals of the UOF Auditor using a different structure. The Monitoring Team believes this process is likely superior to the UOF Auditor approach outlined in the Consent Judgment because it provides real time feedback to the Facilities and involves direct engagement between ID and the uniform Staff. This should better support the overall goal to reduce the frequency and severity of use of force incidents.

The Monitoring Team has evaluated all of ID's weekly reports developed for OBCC and GRVC in this Monitoring Period and found the weekly reports have noted that the Rapid Reviews have started to identify and address more issues and the findings are more consistent with those of ID. The weekly reports are a crucial tool in providing a contemporaneous summary of the most pertinent aspects of a UOF incident, including identification of UOF violations and operational deficiencies that give rise to a use of force (*e.g.* Staff leaving a door open which then precipitates a UOF incident), including patterns and trends that get to the core of what issues the Facilities are facing (*e.g.* a specific housing unit keeps having a disproportionate number of incidents). This allows Uniform leadership to provide feedback directly to the Staff close in time and empower them to address any issues as effectively as possible. The Monitoring Team also observed multiple meetings where the Executive and Uniform leadership discuss the content of these reports and have found that they result in productive discussions on how to identify and improve practice.

*Use of Aggregate Reports to Enhance Oversight*

As demonstrated throughout this Report, the Department has the capacity to generate aggregate reports as required by ¶ 20. The Department utilizes the aggregate data, which includes data from IRS, ID Investigations, Trials, and Inmate-on-Inmate Fight tracking, to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with UOF or inmate-on-inmate fights or assaults. The OBCC/GRVC Pilot described above demonstrates how the data from ID can be fully maximized to inform targeted trends analysis within a Facility. The TEAMS meetings are also a good example of how the Department uses security metrics (including UOF and inmate-on-inmate fights) from aggregate reporting to inform strategic initiatives as exemplified by the UOF Improvement Plan. As described above, E.I.S.S. also utilizes informal and formal discipline data to inform screening and monitoring decisions. These are just some examples of the myriad ways the Department uses the data available to them.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Partial Compliance<br>¶ **20.** Substantial Compliance |

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel provides monthly and quarterly reports of lawsuits filed and settled, which include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum of the lawsuit, and description of the lawsuit.

- During this Monitoring Period, the Department produced the Quarterly Law Department litigation reports covering January to June 2018. These reports are produced on a routine basis as they are received from the Law Department.

- The Office of the Comptroller provided reports to the Department regarding the payment of claims related to UOF incidents covering January to June 2018.

- During the Sixth Monitoring Period, E.I.S.S. began to assess this information more systematically. E.I.S.S. staff consolidated all lawsuits commenced and disposed of from January 2017 to June 2018 and identified all cases related to a UOF. For UOF cases, E.I.S.S. obtained relevant information (*e.g.* UOF incident numbers, Facility, Staff names, Staff shield number and classification of all injuries). E.I.S.S. is now working on incorporating this information as part of background screening of EWS and considering how this information may be further incorporated into the screening process.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department received the documents described above. The Monitoring Team will continue to verify that the Office of the Corporation Counsel and Office of the Comptroller lists are provided as required. As noted above, the Department is now utilizing this information to further support its efforts to support Staff as part of the E.I.S.S. initiative.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel continues to provide the Department with a list of all complaints relating to the excessive use of force and requests all investigation files and associated evidence.

- The assigned DOC Legal division attorney evaluates each use of force allegation received to confirm whether an investigation into the allegation has already been conducted. If a previous investigation cannot be confirmed, the DOC Legal Division attorney notifies a designated Assistant General Counsel who then shares the information with ID to consider whether a Full ID Investigation is warranted.

- During the current Monitoring Period, ID reviewed the allegation referred in the Fifth Monitoring Period and elected not to open an investigation of the matter after an initial assessment of available information. The Department also received one allegation of excessive force in a lawsuit, which had not been subject to an ID investigation, and elected not to open an investigation of the matter after conducting an initial assessment of available information.

**ANALYSIS OF COMPLIANCE**

The Department's process to identify any UOF allegations via a lawsuit that were not previously investigated is adequate. The Monitoring Team confirmed that during this Monitoring Period, ID considered whether to open an investigation regarding one allegation that had not already been investigated. The Monitoring Team found ID's consideration of the complaint was appropriate.

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
| --- | --- |

**X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)**
**V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)**

¶ 6. By August 31, 2017,[114] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

---

[114] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Docket Entry 297).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The use of force and use of force investigations function of the Department's Case Management System went live on December 13, 2017.

- Throughout this Monitoring Period, the Department conducted all Preliminary Reviews, Facility Investigations, and ID Investigations for incidents occurring since December 13, 2017 in CMS. The Department also uses CMS to generate and track Command Disciplines.

**ANALYSIS OF COMPLIANCE**

CMS's implementation was a significant milestone for the Department and has completely changed the way the Department conducts use of force investigations and related discipline, as well as the Department's ability to review and aggregate this information.

The Monitoring Team reviewed CMS capability by reviewing the detailed CMS manual, attending a CMS training, and working with CLU to understand how reports can be generated through CMS. The Team confirmed CMS's functionality meets the requirements of the Consent Judgment. As anticipated with any new technological system, implementation has met a few difficulties. As discussed in other portions of this report, using CMS to conduct Preliminary Reviews has slowed down the process and tracking Command Discipline has incurred a few challenges, as described in the Identifying and Addressing UOF Misconduct section of this report. That said, once these issues are resolved, tracking this information in CMS should enhance the Department's ability to track and assess UOF incidents and the resulting outcomes.

The data contained in CMS has been also been integrated with the work of EWS conducted by E.I.S.S. CMS allows UOF information and the Staff involved to be examined, sorted, and analyzed in a variety of ways and minimizes reliance on manual tracking processes. EWS is not a computerized system that can be integrated into CMS, but the interplay of the CMS data and the E.I.S.S. Monitoring Program will be maximized through the work of E.I.S.S. staff, who use CMS for data-gathering.

The Monitoring Team confirmed CMS has the capacity to track and run reports as required by ¶ 18. The investigations workflows in CMS are extremely detailed and the Monitoring Team received CMS-generated investigation files and aggregate reports throughout this Monitoring Period. However, the full reporting mechanism in CMS, which will allow the Department to run sophisticated aggregate reports more easily, is not yet functional. The Department creates aggregate reports for internal purposes and for the Monitoring Team using a combination of advanced search functions in CMS (which have field limitations) and using canned reports the vendor created. Unfortunately, this sometimes means that a report cannot be altered to meet the needs of the Department (or the Monitoring Team) very easily. There have also been times where the canned reports have glitches and must be re-worked. This will be resolved when the full functionality of CMS is rolled out.

Overall, CMS is capable of providing more detailed and accurate reports than could be produced previously, but the system's complexity means that extracting data is not always straightforward. The Department and Monitoring Team continue to work together to maximize CMS's capabilities. The Monitoring Team anticipates the Department will achieve Substantial Compliance if it continues to address the kinks in the system to allow staff to fully access the system's potential.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance<br>¶ 18. Partial Compliance |
|---|---|

### 8. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely accountability is an indispensable element of the overall effort to reduce and deter the use of excessive and unnecessary force by Staff. This Monitoring Period, the Monitoring Team continued to focus on the Department's processes to identify and address Staff misconduct more quickly as described in more detail in the Identifying & Addressing Use of Force Misconduct section above.

The Monitoring Team's assessment of compliance is below.

| VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY) |
|---|
| ¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").<br>¶ 2.<br>   e. If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor. |
| DEPARTMENT'S STEPS TOWARDS COMPLIANCE |
| • The Department *__identifies__* misconduct:<br>   ○ Close-in-time to the incident via Rapid Reviews, Preliminary Reviews (and corresponding Facility Referrals), and the Immediate Action Committee.<br>   ○ Through Facility Investigations and ID investigations.<br>• The Department *__responds__* to misconduct in the following ways: |

      o   Corrective interviews, counseling, retraining, Command Discipline, and suspension.

      o   Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff **and** PDRs for probationary Staff.

ANALYSIS OF COMPLIANCE

¶¶ 1 and 2(e) are addressed together because when read together, they require timely, adequate, and meaningful discipline. While the Department has a reasonable process to identify incidents close-in-time where corrective action is appropriate through Rapid Reviews, Preliminary Reviews, and the Immediate Action Committee, for various reasons, the Department continues to struggle with consistently identifying and responding to relevant misconduct, as described in detail in the Identifying & Addressing Use of Force Misconduct section of this report. That said, the Department made progress during this Monitoring Period in this area by streamlining the Rapid Review process and implementing a system to ensure the Facilities address the recommended outcomes. Further, the Monitoring Team has found that the OBCC/GRVC pilot improved the Rapid Review assessments by those two commands as they are identifying misconduct more reliably and addressing misconduct more appropriately. Finally, the Fast Track pilot and the work completed by Trials is promising.

However, the Department still does not impose meaningful corrective action nearly often enough to achieve compliance with ¶ 1, as described in more detail in the Identifying & Addressing Use of Force Misconduct section of this report. While misconduct certainly does not occur in _every_ use of force incident, the Department's findings of misconduct are out of sync with the objective evidence of wrong doing identified by the Monitoring Team's work.

The Department must improve its reliance on the assortment of strategies designed to ensure that appropriate, meaningful, and timely discipline is imposed. Certain violations may only require a corrective interview or re-training, other misconduct may require a Command Discipline, and some misconduct may require formal discipline. Given the lengthy process to impose formal discipline, the Monitoring Team continues to strongly encourage the Department to utilize processes where the response to misconduct can occur more swiftly based on the facts of the case.

In order to achieve compliance, the Department must demonstrate the entire spectrum of responses are utilized appropriately and reasonably to address identified misconduct. For example, the Department must expand upon the success of the Fast Track pilot conducted by ID and Trials to improve the time and meaningfulness of the imposition of formal discipline. Trials must also continue to prosecute cases as expeditiously as possible as described in more detail below. Further, the Department must continue to leverage the findings of the Rapid Reviews, Preliminary Reviews, and Immediate Action Committee to identify and address misconduct that can be addressed close in time to the incident. The Department must also improve the issuance of Command Disciplines through CMS to ensure they are appropriately utilized, tracked, and processed in a timely manner so they are not

dismissed on a technicality.[115] Finally, the Department must address and resolve the failures in the PDR process to ensure PDRs are processed timely and the outcomes are consistent with the objective evidence.[116] Given the current state of affairs, the Monitoring Team will further increase its scrutiny of the Department's efforts to impose discipline in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
| --- | --- |
| | ¶ 2(e). Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgement (see pgs. 25-26 of the Consent Judgment for the full text).

- The Trials Division received 25 cases regarding incidents that occurred between October 27, 2017 and June 30, 2018. Of these, four were closed by June 30, 2018 (three closed with NPAs and one was administratively filed).

- The Department has decided at least 36 PDRs related to probationary Staff from July 2017 to June 30, 2018.[117] In this same time period, 2 probationary Staff resigned so a PDRs decision was not made and 14 probationary Staff tenured before a decision could be made.[118]

### ANALYSIS OF COMPLIANCE

The Department is also required to "act in accordance with the Disciplinary Guidelines." As the disciplinary process is different for probationary and tenured Staff, the Monitoring Team addresses them in turn below.

---

[115] The Department has reported to the Monitoring Team that CLU and NCU are working on a plan to assess and improve the Command Discipline process in the next Monitoring Period.

[116] Following the close of the Monitoring Period, the Department devised a new process to track, monitor and assess PDRs. The Monitoring Team will evaluate this process in the next Report.

[117] Given the Department's issues with tracking PDRs, the information reported is the Monitoring Team's best efforts to identify those PDRs completed in this time period.

[118] The Department subsequently issued MOCs for 4 of the 14 Staff who tenured before the PDR was decided. The statute of limitations expired in the other cases.

*Probationary Staff*

The Department did not consistently impose discipline on probationary Staff as required in ¶ 2 and discussed in more detail in the Identifying & Addressing Use of Force Misconduct section.

*Tenured Staff*

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together. Only a small number of cases have been referred to Trials for incidents that have taken place since the Disciplinary Guidelines came into effect given the delays in completing investigations. The Monitoring Team evaluated the four cases that were closed under the new guidelines and found the outcomes were consistent with the disciplinary guidelines. That said, a sufficient number of cases have not yet been closed by Trials, so the Monitoring Team cannot yet assign a compliance rating.

The vast majority of cases (93%) that Trials submitted a closing memo for in this Monitoring Period were closed via NPA with dispositions spanning a range of penalties, as shown in the table below. Given the expansion of cases now investigated by ID, the spectrum of misconduct cases received by Trials has similarly evolved. Accordingly, the Monitoring Team has encouraged Trials to leverage the use of Command Discipline in order to resolve cases that would have traditionally been managed at the Facility Level (but are now funneled to ID) and can be disposed of more quickly.[119]

| Penalty Imposed by NPA by Date of Trials Closing Memo | | | | | | |
|---|---|---|---|---|---|---|
| | 4th Monitoring Period | | 5th Monitoring Period | | 6th Monitoring Period | |
| Total | 172 | | 218 | | 280 | |
| Refer for Command Discipline | 24 | 14% | 49 | 22% | 34 | 12% |
| Retirement or Resignation | 8 | 5% | 4 | 2% | 2 | 1% |
| 1-10 days | 12 | 7% | 48 | 22% | 110 | 39% |
| 11-20 days | 38 | 22% | 50 | 23% | 53 | 19% |
| 21-30 days | 30 | 17% | 33 | 15% | 36 | 13% |
| 31-40 days | 8 | 5% | 5 | 2% | 14 | 5% |
| 41-50 days | 17 | 10% | 9 | 4% | 13 | 5% |
| 51+ days | 35 | 20% | 20 | 9% | 18 | 6% |

The Monitoring Team assessed over 150 cases in which objective evidence of misconduct was available and discipline was imposed, the vast majority of these incidents occurred prior to October 27, 2017. The Monitoring Teaming carefully assessed the reasonableness of discipline imposed as all of these matters must be considered based on the individual set of facts. Further, the imposition of discipline requires appropriate balance and consideration as there are numerous factors that must be considered in reaching a just result, such as weighing aggravating and mitigating factors, the strength of the evidence, and the appropriate use of resources. The discipline imposed was not always

---

[119] The Monitoring Team intends to closely scrutinize this process in the next Monitoring Period to ensure the Command Discipline is imposed.

consistent for similar misconduct and, in some cases, the discipline imposed appeared to be lighter than what would have been expected given the facts. However, overall, the Monitoring Team found that the Department has started to impose discipline in scenarios that previously went unaddressed. The Monitoring Team intends to continue to closely scrutinize the disciplinary outcomes.

    The Monitoring Team also evaluated the three OATH decisions that were issued during this Monitoring Period (one found guilty and two found not guilty). The Monitoring Team found that the discipline sought by Trials in these cases was reasonable, but the number of OATH decisions are too small for the Monitoring Team to draw any conclusions at this juncture.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2. (a) to (d)** (Develop Guidelines) – Substantial Compliance<br>**¶ 2. (a) to (d)** (Act in Accordance with the Guidelines)<br>• *Probationary Staff* – Non-Compliance<br>• *Tenured Staff* – Partial Compliance<br>**¶ 5. Disposition of NPAs and Recommendations to OATH Judges**<br>• Partial Compliance |

| |
|---|
| **VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)** |

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

    b.    If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

• The Facilities refer MOCs to Trials if the conclusion of a UOF Investigation is that the case merits charges.

• Trials continued to utilize several strategies to expedite cases.

- o Trials continued to improve the timing on the process of certain materials:
  - ▪ Trials serves changes as described on pgs. 176-177 of the Fourth Monitor's Report. In cases requiring the service of charges, Trials served _all_ 202 charges within 30 days of receiving the MOC. Eight additional cases were administratively filed or closed before charges were served.
  - ▪ Trials continued to emphasize timely service of discovery.
- o A Fast Track Pilot was initiated to close cases more quickly.
  - ▪ Trials accepted 213 of the 227 cases evaluated for Fast Track. Of these, 24 were referred for PDR. Of the 213, 40 cases were closed by the end of the Monitoring Period.
- o The Off-Calendar Disposition ("OCD") process was integrated into the Trials work flow and all cases are now evaluated to determine if resolutions can be negotiated without appearing before OATH. Since the process was developed, 79 cases have been identified for OCD (51 during the last Monitoring Period, 26 during the current Monitoring Period). Of these:
  - ▪ 92% (73) were closed (43 were closed by Trials within six months of the receipt of the MOC, 17 closed between six and 12 months, and 13 closed beyond 12 months);
  - ▪ 8% (6) remain pending with Trials.
- o Trials leadership continued to emphasize completing closing memos in a reasonable period of time.
- • Trials completed **302** closing memos during this Monitoring Period.
- • Trials had **146** use of force cases pending at the conclusion of the Monitoring Period.

**ANALYSIS OF COMPLIANCE**

_ID Referrals_ (¶ 3(a))

The Monitoring Team has not yet systematically assessed ID's compliance with this provision. The Monitoring Team must assess both ID's referrals of cases to Trials for tenured Staff misconduct, and referrals of cases to HR for probationary Staff, in order to assess compliance with this provision.

As an initial step towards assessing compliance, the Monitoring Team has reviewed a sample of the 27 memos that ID submitted in this Monitoring Period with recommended discipline for probationary Staff. The Monitoring Team found that the Department's recommendation for discipline was generally reasonable.

The Monitoring Team intends to scrutinize this provision in subsequent Monitoring Periods.

_Facility Referral of MOC to Trials_ (¶ 3(b))

The Facilities investigate less severe violations of the use of force policy. However, if misconduct that merits charges is identified through the Facility Investigation, the MOC is referred

directly to Trials. The Monitoring Team has not yet evaluated this provision as further assessment of available documentation is needed.

*Trials* (¶ 3(c))

The process to impose formal discipline for tenured Staff is outlined in *Appendix B: Flowchart of Disciplinary Process* (attached to the Fifth Monitor's Report). It is important to note that the Monitoring Team focuses only on Trials' work related to cases involving UOF violations for tenured Staff, but Trials is also responsible for imposing formal discipline for *all* violations by tenured Staff in the agency.

The Trials Division continues to progress toward the outcomes required by this provision and has worked diligently to address the deficiencies identified in previous Monitor's Reports. The division continued to demonstrate a genuine commitment to reform and achieving the overarching goal of timely discipline, particularly with the Fast-Track pilot.

*Service of Charges*

The Trials Division has maintained a consistent, reliable, and sustainable process to timely serve charges since January 2017. All charges served during this Monitoring Period were served on time. Accordingly, Trials has maintained Substantial Compliance with this requirement.

*Administratively Filed Cases*

The Monitoring Team continued to evaluate the cases that are administratively filed, which occurs for a number of reasons, including when the case is not supported by a preponderance of the evidence, even though it may have been substantiated at an earlier stage. Such cases must be reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Risk Manager of the Legal Division.

The proportion of cases administratively filed continued to decrease. Only 16 cases were administratively filed this Monitoring Period. The Monitoring Team reviewed 22 cases administratively filed that had not be previously reviewed by the Monitoring Team to determine whether Trials' decision not to pursue charges was reasonable.[120] The 22 cases were administratively filed for the following reasons, and the Monitoring Team found Trial's decision not to pursue these charges was reasonable given the specific circumstances of the matter:

- o  two respondents retired before charges were served;
- o  one respondent had previously received a Command Discipline for the same incident;
- o  one case was a duplicate charge; and
- o  18 were administratively filed for a number of other reasons including that the evidence was not sufficient to sustain the charges either because the respondent had

---

[120] These 22 cases represented all cases that were administratively filed where Trials received the MOC after November 1, 2015 and that were closed between October 2017 and May 2018.

reasonable defenses, or the charge was simply difficult to prove at O.A.T.H based on the specific facts of the case.

*Deferred Prosecution*

The Department will defer prosecution if a Staff member retires or resigns while charges are pending. The case will be re-opened and prosecuted if the Staff member returns to work. The Monitoring Team reviewed five deferred prosecution cases and found Trials deferred prosecution because the respondent retired before the case could be prosecuted.

*Expeditious Prosecution of Disciplinary Cases*

Assessing the expediency of prosecution of disciplinary cases requires a review of several processes. In order to achieve compliance, Trials must ensure timely service of charges and discovery and must have procedures for quickly resolving cases without a Trial, which requires significantly more time and resources. This requires assessing the individual circumstances of each case and having multiple options to move a case forward. During this Monitoring Period, Trials continued to serve charges timely, improved discovery and made notable progress in developing avenues to ensure case closure without proceeding before OATH.

- **Service of Discovery**

During this Monitoring Period, Trials continued to make improvements in serving discovery. Trials set a goal to serve discovery with 30 days of serving charges and met this goal (or resolved the case via Fast-Track) in 86% of its cases. The chart below illustrates the time it took Trials to serve discovery for all cases where the MOC was received during this Monitoring Period. The Monitoring Team encourages Trials to continue to serve discovery as soon as possible.

| Date of MOC | Total | Service of Discovery Pending | Fast Track | 01 to 15 Days | 16 to 30 Days | 30 Days to 60 Days | 60 to 120 Days | Closed before Discovery Served |
|---|---|---|---|---|---|---|---|---|
| **January - June 2018** | **202** | 5 | 94 | 65 | 14 | 12 | 9 | 3 |
| | | 2% | 47% | 32% | 7% | 6% | 4% | 1% |

- **Fast-Track and OCD Cases**

As noted in other areas of this Report, Trials made significant strides in fast-tracking the imposition of formal discipline. The Fast-Track pilot demonstrated that cases can and should be resolved more expeditiously. Trials also continued to assess cases for Off Calendar Dispositions ("OCD").[121] The type of cases considered for OCD are similar to those evaluated for Fast-Track, and many of the cases that would have been considered for OCD are now addressed through Fast-Track. With the reduction of the backlog and increase of cases managed through Fast-Track, the number of

---

[121] This process was developed during the last Monitoring Period as a strategy to address Trials' backlog and to address cases with charges drafted and served, that are assigned to a Trials attorney, but are not cases where the Department is seeking severe penalties or termination. Trials' attorneys and respondents negotiate cases meeting OCD criteria, circumventing the need to appear at OATH.

cases officially designated as OCD cases dropped. Further, Trials reports that its Staff now consider how to close out cases without the use of OATH as part of the routine course of business and so technically all cases are considered for OCD even if they are not specifically designated as such.

Fast-Track and OCD have great potential for closing cases more quickly and the Monitoring Team recommends that Trials continue to consider as many cases as possible to address outside of the OATH process.

- **Approval of Trials Closing Memos**

A closing memo must be drafted to close each case at Trials. The Monitoring Team evaluated the time it takes to draft, edit, and finalize the memo and for the Trials Director[122] to approve the closing memo for all NPAs to determine whether this was occurring in a reasonable time frame. During this Monitoring Period, 89% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within a month of the NPA being executed. The time to complete closing memos increased slightly compared to the previous Monitoring Period, but still appears to be reasonable. That said, the Monitoring Team encourages Trials to continue to refine this process to ensure as many closing memos as possible are completed in less than three weeks.

- **Time for Trials to Close Cases**

Given the significant reduction of the case backlog during the previous Monitoring Period, Trials was able to focus on resolving cases closer-in-time to the receipt of the MOC. Importantly, the cases currently pending with Trials demonstrate that cases continue to be managed timely and only a limited number of cases languish once they are received by Trials.

The time cases are pending with Trials is best demonstrated by coupling the data about closed cases with the cases that remain pending as of the end of the Monitoring Period. As of the end of the current Monitoring Period, a total of 146 cases were pending. Of these, only 72 cases are pending with Trials (65% of the cases had been with Trials less than six months, 21% had been pending between six and 12 months; and 15% over one year[123]). Of the other 74 pending cases, 45% of those cases are pending with law enforcement, another 46% are awaiting additional investigation by ID and the additional 9% are either awaiting an OATH decision or the completion of the Trials closing memo. As discussed in prior reports, cases that must be addressed through the OATH process take significantly longer to complete given the limited number of cases that can be heard before OATH, the protracted time to conduct a trial, and then the subsequent time to receive a decision. Further, cases are often

---

[122] Closing Memos were signed by a Trials Director while the Department recruited a new Deputy General Counsel for Trials.

[123] The majority of cases pending over one year either were awaiting an OATH decision or were recently returned from law enforcement. Trials is asked to hold any discipline in abeyance until Law Enforcement officials complete their assessment to determine whether criminal charges may be brought.

pending before law enforcement for extended periods of time as described in ¶ 3 of the Use of Force Investigation Section of this report.

As demonstrated in the chart below, Trials has produced more closing memos in each of the last three successive Monitoring Periods (232, 258 and 302, respectively). Further, 71% of those cases in this Monitoring Period had been pending less than six months. This is significant improvement over the last Monitoring Period where older and fewer cases were closed. In order to achieve compliance, Trials must demonstrate it can continue to close as many cases as soon as possible, including continued use of Fast-Track and OCD.

| Time between MOC Receipts and Trials Completes the Case Closing Memo | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | |
|---|---|---|---|---|---|---|
| Total | 232 | | 258 | | 302 | |
| 0 months to 3 months | 29 | 13% | 40 | 16% | 142 | 47% |
| 3 months to 6 months | 24 | 10% | 40 | 16% | 72 | 24% |
| 6 to 12 months | 48 | 21% | 74 | 29% | 35 | 12% |
| 1 to 2 years | 60 | 26% | 85 | 33% | 41 | 14% |
| 2 to 3 years | 53 | 23% | 14 | 5% | 6 | 2% |
| 3+ Years | 18 | 8% | 5 | 2% | 6 | 2% |

- **Status of Closed Cases**

The types of case closures are presented in the chart below:

| Type of Case Closure | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | |
|---|---|---|---|---|---|---|
| | 232 | | 258 | | 302 | |
| NPA | 172 | 74% | 218 | 84% | 280 | 93% |
| Administratively Filed | 48 | 21% | 29 | 11% | 17 | 6% |
| Deferred Prosecution | 12 | 5% | 8 | 3% | 2 | 1% |
| Guilty Verdict | 0 | 0% | 3 | 1% | 1 | 0% |
| Not Guilty Verdict | 0 | 0% | 0 | 0% | 2 | 1% |

*Conclusion*

The Trials Division has continued to make progress during the current Monitoring Period and the Monitoring Team applauds the division's hard work and the corresponding outcomes. The Trials Division is encouraged to further integrate the initiatives discussed above into standard practice to ensure cases are prosecuted as expeditiously as possible once assigned to Trials. While the focus of this section is on the efforts made by Trials to dispose of cases, it is worth noting that the long delays in completing investigations continues to undercut the overall goal of imposing timely discipline.

| **COMPLIANCE RATING** | ¶ **3(a)**. Not Yet Rated<br>¶ **3(b)**. Not Yet Rated<br>¶ **3(c)**.<br>  • Substantial Compliance (Charges)<br>  • Substantial Compliance (Administratively Filed)<br>  • Partial Compliance (Expeditiously Prosecuting Cases) |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Trials' current staffing complement includes one Executive Director, three Directors, 21 attorneys, and 15 support staff.

- Trials recruited a new Deputy General Counsel (who is scheduled to join the Department in the next Monitoring Period) and two attorneys this Monitoring Period (one declined the offer and the other is scheduled to begin in the next Monitoring Period) and hired two Legal Coordinators.

- The Department reports that Trials is actively recruiting at least five additional attorneys.

- The number of pending cases with Trials continued to decline in this Monitoring Period and closed the Monitoring Period with 582 open cases.[124]

**ANALYSIS OF COMPLIANCE**

While the timeliness of case closure has improved as described above, the caseload for Trials staff is still too high to achieve the reforms required by the Consent Judgment, particularly because staff's caseload is expected to increase as the Fast Track initiative is fully implemented, investigations are closed more timely, and as more incidents are prosecuted under the New Disciplinary Guidelines.

The Monitoring Team strongly encourages the Department, Office of Labor Relations ("OLR"), and OMB to continue to work together collaboratively in order to ensure that the Department can meet the obligations of the Consent Judgment. Further, the Monitoring Team encourages the Department to maintain or increase its recruitment efforts to ensure the Department attracts the best possible candidates.

| **COMPLIANCE RATING** | ¶ 4. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All NPAs are reviewed and approved by the Deputy General Counsel of Trials, are then sent to the Deputy Risk Manager for review and approval. The Deputy Risk Manager sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for processing.

---

[124] This information is as of July 5, 2018. Caseloads include a mixture of use of force cases, as well as Equal Employment Opportunity Office ("EEO"), Medical Separation, PREA, and others that are not under the purview of the Monitoring Team.

- 253 NPAs were approved by the Commissioner during this Monitoring Period. The sign-off process by the Deputy Risk Manager and the Commissioner was completed within three weeks for 83% of the cases, and all but two of the remaining cases were reviewed and approved within a month.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Department's new process for approving NPAs was evaluated by the Monitoring Team. The review of NPAs by the Deputy Risk Manager and the Commissioner is considerably more efficient than prior Monitoring Periods. Given its importance, and the significant responsibilities of the Deputy Risk Manager and the Commissioner, this review will necessarily take some time. That said, the Deputy Risk Manager completes her review 73% within two weeks and the Commissioner completes her review and approval of NPAs 85% within a week. Accordingly, the Department is in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 5. Approval of NPAs: Substantial Compliance |
|---|---|

**9.   SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)**

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) or assignment to Special Units (¶¶ 4, 5). This section also requires the Department to consider a Staff member's assignment on a Special Unit after being disciplined (¶ 6) and more generally whether a Staff Member should be re-assigned or placed on non-inmate contact after a Staff Member has been disciplined multiple times.

The Monitoring Team's compliance assessment is outlined below.

**XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)**

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the [provisions enumerated in (a) to (d)]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Directive 2230, Pre-promotional Assignment Procedures, remains in effect, and addresses the requirements of ¶¶ 1 to 3.

- During this Monitoring Period, the Department screened and promoted the following Staff:
  - 13 Captains to ADW;
  - One ADW to DW;
  - Three DWs to Warden; and
  - One Warden to Assistant Chief.

**ANALYSIS OF COMPLIANCE**

In order to identify Supervisors with the proper attributes, the Consent Judgment requires the Department to consider a candidate's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment also mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including the requirements of this section of the Consent Judgment. The promotion process is depicted in *Appendix C: Flowchart of Promotions Process* (attached to the Fifth Monitor's Report) and is described in greater detail in the Third Monitor's Report (at pgs.190-192).

To verify the Department screened and promoted Staff in accordance with these criteria, the Monitoring Team reviewed the screening documentation for all Staff promoted during the Sixth Monitoring Period.

*Review of Candidates (¶ 1)*

The Monitoring Team reviewed materials for Staff screened for promotion to ADW, DW, Warden and Assistant Chief and found that the Department's assessment satisfied the requirements of the "Review" as defined by ¶ 1.

*Disciplinary History (¶ 2)*

The Monitoring Team found that none of the Staff who were promoted had been found guilty or pleaded guilty to the specified violations two or more times in the past five-years.

*Pending Disciplinary Matters (¶ 3)*

The Monitoring Team found that none of the Staff who were promoted had pending disciplinary charges at the time of promotion.

*Overall Assessment*

The Staff the Department chooses to promote sends a message to line Staff about the culture it intends to cultivate, and their behavior sets an example for Officers. The Monitoring Team continues to encourage the Department to consider all relevant information available before promoting a Staff member to ensure they are appropriately qualified. Overall, the Monitoring Team found that the

Department utilized sound judgment and thoughtful consideration in this Monitoring Period when deciding whether to promote a Staff member.

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
| --- | --- |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 10/17 "Awarding Job Assignments within a Command," continues to be in effect.

- The Department developed a list of approximately 518 Staff members who have been awarded a post or are steadily assigned to any of the Special Units across the Facilities that require screening. The vast majority of Staff have steady assignment rather than an awarded post.

- In this Monitoring Period, the Department began to operationalize this requirement and screen Staff in a manner similar to that used for promotions. The specific screening criteria (as enumerated in ¶¶ 4, 5) are assessed by ID and Trials. The Commanding Officer then reviews the assessments from ID and Trials to determine whether assignment to the Special Unit is appropriate.

  - The Department screened 218 (41%) of the 518 Staff assigned to Special Units by the end of the Monitoring Period. Out of the Staff screened, 213 were approved for the Special Unit and five were denied.

### ANALYSIS OF COMPLIANCE

*Screening for Assignment to Special Units (¶¶ 4, 5)*

The Department has struggled to implement the requirements of ¶¶ 4 and 5. As a threshold matter, the Department's process for tracking Staff that require screening and the outcome of those screened is cumbersome, inconsistent, unreliable, and poorly managed.

Of those Staff identified who require screening, less than half of the Staff were in fact screened in this Monitoring Period, despite having the six months to complete the task. A sample of the completed screening forms for 51 Staff (45 approved and six not approved) was evaluated. The Monitoring Team found that all required information was evaluated, except for the Staff's Command Discipline history. Aside from this omission, the Monitoring Team found the outcomes of the screening for 45 of the 51 Staff evaluated were reasonable. In six cases, the Warden's ultimate approval for Staff assignment contradicted the record compiled for the Staff. The Monitoring Team recommended re-screening or a review of the documentation for those six Staff members.

The Department is not in compliance with this provision because of the significant deficiencies in the screening process and the failure to timely complete the necessary screening. In order to achieve compliance with this provision, the Department must ensure: (1) there is a reliable process to identify and track Staff through the screening process, (2) the screening considers all required information, (3) the necessary screening occurs, and (4) the outcome of the screening is reliable and consistent with the information identified through the screening process. The Department reported that it is developing new procedures to address the Monitoring Team's concerns that will be implemented in the next Monitoring Period.

*Screening of Disciplined Staff's Assignments to a Special Unit (¶ 6)*

As of the end of the Monitoring Period, the Department had not developed an effective process to implement this provision and therefore had not operationalized this requirement. Following the close of the Monitoring Period, the Department shared a plan with the Monitoring Team on how this screening will occur going forward and began to operationalize it. The Monitoring Team notes that in order to full operationalize this provision, the Department must maintain a reliable list of Staff assigned to Special Units (as described above). The Monitoring Team intends to evaluate the process and outcomes of the screening in the next Monitoring Period.

| **COMPLIANCE RATING** | ¶ **4.** Non-Compliance |
| | ¶ **5.** Non-Compliance |
| | ¶ **6.** Non-Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 7 (REVIEW OF ASSIGNMENTS OF STAFF DISCIPLINED MULTIPLE TIMES)

¶ 7. The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise

in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department began operationalizing the requirements of ¶7 during the Sixth Monitoring Period. As an initial step, the Department first evaluated Staff who the Monitoring Team suggested had met the threshold of two guilty violations within a five-year period ("the 2 in 5 threshold") to identify: (1) whether the Staff actually met the 2 in 5 threshold and for those who met the threshold (2) whether their post should be reassigned, per each Staff's Commanding Officer.

  o The Department determined that 35[125] of the Staff identified by the Monitoring Team met the 2 in 5 threshold. Collectively, the Wardens made the following determinations:

    ▪ 5 Staff were reassigned to posts with limited inmate contact;

    ▪ 19 Staff had been reassigned to posts with limited inmate contact prior to the screening; and

    ▪ 11 Staff were deemed suitable for their current post.

- The Department subsequently developed a routine process for conducting this screening. On a bi-monthly basis, E.I.S.S. will identify Staff who meet the 2 in 5 threshold and will then provide the list of relevant Staff to the Facilities for the Warden's assessment of whether Staff should be reassigned to positions with more limited inmate contact. This information will then be returned to E.I.S.S. to track and review.

  o In June 2018, E.I.S.S. identified 23 additional Staff who met the 2 in 5 threshold and the Wardens made the following determinations:

    ▪ 6 Staff were reassigned to limited inmate contact;

    ▪ 7 Staff had been reassigned to posts with limited inmate contact prior to the screening; and

    ▪ 10 Staff were deemed suitable for their current post.

## ANALYSIS OF COMPLIANCE

---

[125] 10 of the Staff identified by the Monitoring Team had either retired or were on indefinite sick leave so were not included in this assessment.

*Identification of which Staff meet the 2 in 5 threshold*

The Monitoring Team reviewed the Department's assessments of the 58 Staff who met the 2 in 5 threshold and found the vast majority of Staff were correctly identified as meeting the threshold.[126] The Facilities were then asked to review the posts for all 58 Staff who met the 2 in 5 threshold.

*Review of Staff assignment who met the 2 in 5 threshold*

The Monitoring Team reviewed the Facilities' assessments of assignment for the 58 Staff who met the 2 in 5 threshold. The outcomes were reasonable for the most part, but in some cases there was not enough information for the Monitoring Team to independently assess the reasonableness of the Facilities' decision.

*Conclusion*

The Monitoring Team is encouraged that the Department has operationalized this requirement. The Monitoring Team provided significant technical assistance during this Monitoring Period to support the Department in operationalizing this requirement. This included discussions on the most appropriate sources of information to identify Staff who meet the threshold, how to best analyze the information, and the screening frequency. Implementation issues still remain, and more work is required to ensure all Staff are being systematically identified to be reviewed and the Facilities' assessment rationale of the Staff assignments is reasonable and appropriately supported by the record. The Monitoring Team expects the Department will achieve Substantial Compliance with this provision once this process is fully operationalized and the reviews of assignments consistently demonstrate reasonable outcomes.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## 10. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The Department's Correction Officer Recruitment Unit ("Recruitment Unit"), and Applicant Investigation Unit ("AIU"), continued their coordinated effort to identify and select qualified Staff to meet the Department's staffing needs. These units continued to work together to improve the quality and breadth of the candidate pool. This Monitoring Period, the number of recruits in the new classes of Officers decreased from the previous Monitoring Period for the first time since the pendency of the Consent Judgment (815 versus 1,144). A total of 4,780 new

---

[126] The Monitoring Team intends to discuss a handful of cases with the Department to determine whether or not the Staff met the threshold requirement.

Officers have graduated from the Training Academy since the Effective Date. Further, an additional 431 candidates matriculated in the Academy in July 2018 and will graduate in November 2018. The total number of recruits that have matriculated and/or graduated during the pendency of the Consent Judgment is demonstrated in the chart below.

| Academy Class Graduation Date | Dec. 2015 | May 2016 | Nov. 2016 | May 2017 | Nov. 2017 | June 2018 | Nov. 2018 (projected) |
|---|---|---|---|---|---|---|---|
| **Number of Graduates** | 592 | 618 | 711 | 900 | 1,144 | 815 | 431 |

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department conducted outreach to potential candidates through Career Fairs and Community Events, engaging over 5,000 individuals at almost 200 events during this Monitoring Period.

- The Department continues to maintain a strong social media presence on Facebook, Twitter, Instagram and YouTube, and continues to see increases in the number of Department of Citywide Administrative Services ("DCAS") Exam Filers and Takers.

### ANALYSIS OF COMPLIANCE

The Department's success in attracting and training a large number of well-qualified candidates to serve as Correction Officers depends on the success of the Recruitment Unit, which has consistently delivered throughout the pendency of the Consent Judgment. The recently matriculated recruit class of approximately 430 marks the smallest class since the pendency of the Consent Judgment and reflects the fact that the Department has nearly reached its internal staffing goals.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- AIU continues to process potential candidates as described in the first four Monitor's Reports, conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.[127]

- AIU screened 3,330 potential candidates to fill the Academy classes that graduated in May 2018:

| ACADEMY GRADUATION DATE | Dec. 2015 | May 2016 | Nov. 2016 | May 2017 | Nov. 2017 | May 2018 |
|---|---|---|---|---|---|---|
| Total number of candidates screened[128] | 2,222 (100%) | 2,473 (100%) | 2,283 (100%) | 3,441 (100%) | 3,306 (100%) | 3,330 (100%) |
| Total number of candidates approved for hire[129] | 630 (28%) | 665 (27%) | 746 (33%) | 950 (28%) | 1,220 (37%) | 864 (26%) |
| Total number of candidates disqualified based on medical screening | [130] | | 120 (5%) | 135 (4%) | 177 (5%) | 88 (3%) |
| Total number of candidates disqualified based on Psychological screening | | | 71 (3%) | 92 (3%) | 183 (5.5%) | 182 (5.5 %) |
| Total number of candidates disqualified based on background investigation screening | | | 42 (2%) | 53 (1.5%) | 6 (<1%) | 101 (3%) |

- AIU developed an overall plan for developing a comprehensive investigator manual.

- During the Sixth Monitoring Period, a policy writer was hired for AIU to support drafting a comprehensive AIU Investigator Manual and formalizing AIU policies and practices.

- In this Monitoring Period, AIU promulgated guidance to its staff on Third Party Employment Verifications and Field Visits.

## ANALYSIS OF COMPLIANCE

---

[127] *See* First Monitor's Report (at pgs.115-117); Second Monitor's Report (at pgs. 157-159); Third Monitor's Report (at pg. 244), and Fourth Monitor's Report at (pgs. 192-196).

[128] Many candidates are neither recommended nor disqualified, and fall into other categories such as the candidate declined to continue with the hiring process, withdrew from certification, etc.

[129] Not all candidates approved for hire will become Correction Officers. Some will decline the offer and others may not complete Academy training.

[130] The Department only began tracking the specific reason a candidate was disqualified (i.e. due to medical, psychological screening, background investigation) with the candidates screened for the class that graduated in November 2016. Previously the Department tracked the number of candidates who were disqualified for any reason.

*Assessment of Background Investigations* (¶ 3)

As discussed in prior Monitor's Reports, the Department generally conducts adequate background investigations. In each of the past four Monitoring Periods, the Monitoring Team audited a sample of AIU background investigations of candidates who were considered and selected for entry into Recruit classes. AIU conducted background investigations using substantially similar methods during the Sixth Monitoring Period, so the Monitoring Team did not conduct an audit in this Monitoring Period (but intends to do so in subsequent Monitoring Periods).

*Policies*

In this Monitoring Period, the Monitoring Team worked with AIU to improve policies and practices to address the Monitoring Team's recommendation that AIU strengthen its practices and procedures related to Third-Party Employment Verification and Field Team Visits.[131] AIU developed new policies in both areas and worked collaboratively with the Monitoring Team to finalize the new procedures. AIU disseminated written guidance to AIU investigators at the end of this Monitoring Period.

- **Third-Party Employment Verification**

The Monitoring Team previously found that investigations of candidates selected for hire were often missing the responses from third parties to verify prior employment. AIU's new Third-Party Employment Verification Policy now requires specific information to be gathered *prior* to a hiring decision being made and includes steps to be taken by investigators and documentation to be gathered to verify prior employment.

- **Field Visits**

The Monitoring Team previously raised concerns regarding the timing of the Field Visits and lack of documentation as discussed in the Fourth Monitor's Report (at pg. 195). In response to these concerns, AIU implemented a new process for collateral contacts and documentation to improve the quality of these visits. In addition, a newly promulgated policy has very specific guidance for preparing, gathering and using information obtained during a Field Visit.

*Comprehensive Objective Process for Selection and Hiring* (¶ 2)

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report.

AIU continues to provide guidance to investigators on how to consistently manage background investigations by utilizing a form that has specific fields for information to ensure that information is collected and available for consideration for each candidate. While this form is useful, the Monitoring

---

[131] *See* Second Monitor's Report (at pg. 159); Third Monitor's Report (at pg. 245), Fourth Monitor's Report (at pg. 195), and Fifth Monitor's Report (at pg. 134-135).

Team continues to recommend that AIU create a comprehensive Investigator Manual which would include, among other things, guidance on the standards that should be applied by the investigator, the type of information that should be gathered, and how information should be documented and incorporated in candidate files. This work is now underway with AIU's full-time policy writer. The Monitoring Team has routine contact with AIU and the policy writer who is developing the manual, with the goal of having a working draft of the manual by October 2018, and a finalized version by the end of the year.

*DOI Report*

On May 3, 2018, DOI issued a report entitled, "Persistent Problems in the Hiring of City Correction Officers," summarizing DOI's review of 291 Candidate files from the January, June and December 2016 Recruit classes. DOI made a number of reasonable recommendations that often aligned with those of the Monitoring Team (including related to Field Visits, third-party employment verification and recommending there be a comprehensive investigator manual). While the Monitoring Team has found that the Department is meeting its obligations under *Nunez*, the Monitoring Team encourages the Department to consider and implement the recommendations by DOI as they are consistent with best practice and will elevate the screening and hiring process.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

## 11. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, reviews the circumstances warranting the potential arrest and determines that the recommendation is based on probable cause. The larger purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team began an initial assessment of this provision during this Monitoring Period and reviewed the Department's current policies and procedures regarding inmate arrests. An assessment of the Department's compliance with this provision will be made once the Monitoring Team has had an opportunity to evaluate additional information, which it intends to do during the Seventh Monitoring Period.

12. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. The Commissioner and Chief of Department have continued to make compliance with the *Nunez* Consent Judgment a priority and supported this effort with significant resources. Implementation continues to be managed jointly by the Complex Litigation Unit and the *Nunez* Compliance Unit ("NCU"). The Assistant Commissioner for Quality Assurance manages the NCU with a total of 10 staff members (six uniform Staff members and five non-uniform staff). An Assistant General Counsel manages a team of 8 non-uniform staff in the Complex Litigation Unit.

The NCU had a number of leadership changes during this Monitoring Period. Two different individuals served as Acting Assistant Commissioner of the unit until the Department appointed a third individual to officially serve in this role in early June. The Monitoring Team has worked closely with the new Assistant Commissioner of NCU in his prior role as an Assistant General Counsel in the Complex Litigation Unit and expects this prior experience will enhance NCU's ability to support the Department's efforts to demonstrate compliance and identify and resolve any barriers to compliance. In the month since his appointment, the Monitoring Team found that NCU's productivity accelerated and the quality of the audit reports improved.

The CLU and NCU continue to work directly with a broad range of staff on a daily basis. Further, weekly meetings are held with the Chief of Department and other high-level commanding officers to troubleshoot and promote compliance. As described in the Introduction of this Report, the meetings with NCU, CLU and Department leadership have grown more robust with greater discussions of NCU's audit work, the findings of CASC's video monitoring and substantive candid discussions of specific Use of Force Incidents and various operational issues

to address.

The Monitoring Team continues to strongly recommend that the Department commit adequate resources to sustain this reform effort. The amount of work required to develop and implement the reforms continues to confirm the benefit of and need for a dedicated unit to focus on compliance. In this Monitoring Period, the NCU received additional funding for more Staff. The Department focused initially on retaining a permanent Assistant Commissioner for the unit and then allow the new Assistant Commissioner the opportunity to determine the most appropriate Staffing compliment for the unit.[132] While the Monitoring Team is encouraged that the Department has provided additional resources to the unit, given the enormity of the task of shaping practice, measuring performance and demonstrating compliance, additional NCU staff will be necessary as NCU only currently audits a portion of the provisions from the Consent Judgment. As described throughout this report, NCU and CLU will be further expanding efforts and so it is expected that additional resources will be required.

The Monitoring Team's assessment of compliance is outlined below.

### XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[133]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- An extensive Excel chart cross-referencing each provision of the Consent Judgment to the relevant policies was developed collaboratively with the Monitoring Team.

---

[132] After the close of the Monitoring Period, the Department reported it has a staffing plan for these additional lines which it intends to work towards implementing in the next Monitoring Period.

[133] The Monitor approved an extension of this deadline to January 31, 2018.

- Throughout the duration of the Consent Judgment, the Department revised a number of policies and procedures to conform to *Nunez* requirements.

- The Department developed and implemented Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance and routine review of Department policies.

- The Department completed its review of over 200 Directives and corresponding procedures and over 300 Operations Orders to identify the subset that is related to the Consent Judgment and to determine whether any revisions are necessary or whether new policies need to be developed.

- The Department has completed the vast majority of the necessary revisions to Directives and Operations Orders and developed all new Directives and Operations Orders identified by the review.

- The NCU and the Chief of Department's office identified over 800 Command Level Orders ("CLO") that need to be reviewed to determine whether any revisions are necessary.

**ANALYSIS**

The Department continued to evaluate and revise policies, procedures, and trainings to ensure they are consistent with the requirements in the Consent Judgment and with each other. The review identified that, in general, the Department's policies are consistent with the Consent Judgment and only required minor revisions, most of which have been completed. Given the evolving nature of the reform efforts, it is expected that policies and procedures will continue to be revised and updated to ensure they comport with current practice and are consistent with one another. The last outstanding item for the Department to address related to policies is any revisions to CLOs. The Department has started work on developing a plan on how to evaluate CLOs and address CLOs, which they will work on implementing in the next Monitoring Period in consultation with the Monitoring Team.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance<br>¶ **2.** Partial Compliance |
|---|---|

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Assistant Commissioner of Quality Assurance and Deputy General Counsel share the responsibilities of the Compliance Coordinator.[134]
- The CLU and NCU provided the Monitoring Team with responses to over 320 requests for information and documentation and over 100 feedback and/or recommendations from the Monitoring Team regarding practices that often require significant collaboration between the Department and the Monitoring Team to address and implement. The CLU also produced over 300 use of force files such as Preliminary Reviews, Facility Investigations, and Full ID Investigations. The CLU and NCU also produced over 70 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.
- On more than 60 business days during the Monitoring Period, the CLU scheduled and/or facilitated meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC staff members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners and also facilitated site visits to all of the Facilities.

ANALYSIS OF COMPLIANCE

The Monitoring Team communicates daily (and often multiple times a day) with the Compliance Coordinators, members of the CLU and NCU teams, as well as other members of the Department. The Department's staff in CLU and NCU are hardworking, smart, conscientious, responsive and provide invaluable assistance to the Monitoring Team. Not only do they manage the flow of information to the Monitoring Team, arrange meetings and phone calls between Department Staff and the Monitoring Team, and provide logistical support to Monitoring Team site visits, they have also begun to organize, analyze and interpret information before it is submitted to the Monitoring Team. These efforts have helped to develop joint understandings of the barriers to compliance and potential solutions to them. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

The Monitoring Team encourages the Department to continue its efforts to push the responsibility for compliance into the Facilities to provide greater ownership of both the problems and the path forward, which experience suggests is where the culture change will take hold. Finally, the Monitoring Team also encourages recognition for Staff as milestones are achieved. [135]

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

---

[134] The Assistant General Counsel of the Complex Litigation Unit was promoted to Deputy General Counsel in this Monitoring Period. As of the end of the Monitoring Period, the Department was in the process of recruiting a new Assistant General Counsel to supervise the Complex Litigation Unit.

[135] The Monitoring Team is encouraged that the Chief of Department, as well as the NCU, have both taken opportunities in public forums to recognize Facilities and/or Staff Members who have achieved milestones.

# CURRENT STATUS OF YOUNG INMATES

During this Monitoring Period, the Department continued working towards transferring the Young Inmate populations (16/17-year-olds and 18-year-olds) to new facilities, as discussed in the previous Monitor's Report. Organizing these projects has required significant time and energy from the Department and other City agencies. Not only are the transfers logistically complicated, requiring substantial coordination, but the magnitude of the change creates stress and uncertainty among both Staff and youth. That said, the Department and the Monitoring Team have worked hard to anticipate the areas in which *Nunez* compliance may be impacted and have attempted to be proactive in order to minimize slippage. However, the Monitoring Team expects that these transfers will impact the Department's progress toward compliance with the Consent Judgment.

## *Housing for 18-Year-Olds (GMDC Closure)*

GMDC, which housed the vast majority of 18-year-olds, was closed in June 2018 after transferring the population to other jails throughout the DOC system. All 18-year-old male inmates were moved to RNDC, except for those in special units at GRVC and OBCC and those who are sentenced, who are now housed at EMTC. RNDC also holds adults and adolescent inmates (all housed separately) until the adolescents move off-island in October 2018. While not yet complete, the Department is in the process of moving the special programming equipment from GMDC's PEACE Center and YES Center to RNDC so that 18-year-olds can continue to benefit from the leisure time and career technical education programs that were so successful at GMDC.

While the Department successfully achieved the timely closure of GMDC, the Monitoring Team's observations while on site suggest that a more thorough orientation to the

physical plant, operation and unique nuances of RNDC would have been helpful to both Staff
and youth. Better informing youth about differences in rules and procedures may have eliminated
some early frustration and resulting aggression. Providing Staff with opportunities to become
familiar with the physical plant and new operational procedures may have countered some of the
stress and confusion that disrupted the daily operation. The negative consequences of the stress
of uncertainty and change may persist as the transfer was only completed at the end of this
Monitoring Period. The Monitoring Team hopes that the experience provided several
constructive "lessons learned" that can be applied to smooth the transition of 16/17-year-olds
off-island.

The Monitoring Team has been involved with several other jurisdictions that have closed,
consolidated or opened new facilities. While some level of disorder is expected, proactive and
deliberate planning can actually accelerate progress toward compliance and can reduce the
likelihood that conditions will further degrade. The Monitoring Team is committed to providing
any assistance necessary to produce more positive outcomes for 16/17-year-olds and to
accelerate the decreasing trend in violence and UOF among 18-year-olds.

_Implementation of Raise the Age and the Management of 16- and 17-Year-Olds_

During the Sixth Monitoring Period, the Department continued to coordinate with the
Administration of Children Services ("ACS"), Mayor's Office of Criminal Justice ("MOCJ"),
and other City Agencies to plan for the implementation of Raise the Age ("RTA"), a State law
that went into effect on October 1, 2018, just before this report was filed. RTA requires 16- and
17-year-olds to be moved out of the adult jails, off Rikers Island. RTA also requires a shift to a
more developmentally-appropriate philosophy for managing 16- and 17-year-olds, by focusing
on skill development and treatment, providing opportunities for engagement in a broad range of

programs, and managing behavior using a system of engaging incentives and effective sanctions. RTA also requires the Staff's response to crises to reflect generally accepted use of force practices in juvenile justice, which should rely on safe, physical interventions, and team tactics.

**Preparation for the Transfer to Horizon During the Sixth Monitoring Period**

During the Sixth Monitoring Period, the Department engaged in extensive planning with ACS and consulted with the Monitoring Team on a range of issues including:

- *Training*. The Department developed a training plan for Staff scheduled to work at Horizon. This included training on Safe Crisis Management (which includes behavior management, de-escalation, and physical intervention skills) and other relevant topics.

- *Use of Force policy and practice*. The Department and ACS developed several policies regarding the use of force at Horizon (*e.g.* Safety Intervention, Mechanical Restraints, Rapid Response Teams, etc.). The Department developed a multi-phase strategy, in consultation with the Monitoring Team, to safely eliminate the use of OC Spray[136] gradually as part of its Horizon transition plan.[137] The strategy's timeline provided Staff sufficient time to acquire the necessary skills and confidence to safely manage Horizon without the use of OC Spray. Following its development, the City requested a waiver to delay elimination of OC Spray at Horizon until the Staff were adequately prepared to safely manage the facility without it. The State denied the City's initial request for a

---

[136] The use of OC Spray is prohibited by OCFS regulations. *See* 9 CRR-NY §180-3.14 (Behavioral intervention policies) (a)(4)(ii).

[137] The Monitoring Team advised in the Monitor's Fifth Report that an abrupt shift away from OC Spray was ill-advised and the safest strategy to eliminate the use of OC Spray was to do so gradually. (*see* Monitor's Fifth Report at pgs. 146 to 147).

waiver.[138] The State has subsequently granted the City the authority to utilize OC spray under a limited set of circumstances, which is discussed in more detail below.

- *Behavior management*. ACS is responsible for developing a behavior management program that helps to shape youth's behavior by incentivizing safe behavior and establishing clear consequences for rule violations. The program will be implemented collaboratively by ACS, DOC, and DOE staff. The first draft of the behavior management program was submitted to the Monitoring Team after the close of the Monitoring Period.

- *Other policies and procedures*. The Department and ACS developed a series of policies and procedures regarding Horizon's operation, including youth supervision, room confinement, behavior management, and programming, among others. The Monitoring Team provided feedback on these policies to the extent they implicated *Nunez* requirements. Policies remained under development as of the end of the Monitoring Period.

- *Staff selection*. The Department identified Staff who would be assigned to Horizon, using both State standards and *Nunez* requirements for Staff qualification and selection.

The deadlines imposed by RTA are aggressive and reflect the collective desire to change the management strategy for this population swiftly. The Monitoring Team's preference has always been for the City to "do it right" rather than "do it fast." However, RTA was passed with a specific deadline for implementation that even under the best of circumstances would have

---

[138] The State denied the initial waiver request because it contended that the use of OC Spray was "aversive conditioning," which is prohibited by Social Services Law (SSL) §§ 488(1)(e) and 488 (11). Further, the State noted that the use of OC Spray was contrary to the goals of the RTA legislation to no longer subject juveniles to the potentially harmful impacts of correctional settings and practices.

been challenging to meet. While the time frame was limited, the Department's transition to Horizon was not supported by the volume and quality of preparation that the Monitoring Team encouraged. The original timelines for several critical tasks were delayed, some for reasons beyond the Department's or City's control (*e.g.* a TRO issued by a State Court that impacted Staff assignment and training as well as protracted promulgation of State regulations), and some because the development of critical components of the transition simply took too long (*e.g.* development of a viable behavior management program). These delays created serious concerns for the Monitoring Team that the facility's operation would be compromised, and these shortcomings would impact Horizon Staff's ability to properly implement new practices and would negatively impact safety for both youth and Staff in the short-term. As discussed in more detail below, the Department is encouraged to implement a variety of strategies to fortify Staff's skills and knowledge to enhance training and to better develop and implement its strategy for behavior management to address the shortcomings in preparation caused by the compressed timeline.

**Transition to Horizon Juvenile Center**

As of October 1, 2018, all 16- and 17-year-olds had been moved to the Horizon Juvenile Center in the Bronx. The Facility is jointly operated by DOC and ACS. DOC Staff address security, movement, and the day-to-day management of youth in the facility, while ACS Staff serve as Case Managers and Program Counselors, coordinate community programming, and provide other types of support (*e.g.* food preparation, barbershop, building maintenance, laundry, etc.).

The scale of this transition required strategic coordination among all agencies (*e.g.*, DOC, ACS, MOCJ, DOE, and other City agencies) to: (1) renovate an existing secure facility and

transport operations to that location, (2) blend operational responsibilities across several agencies, and (3) develop policies and practices to align the various regulations from OCFS, SCOC, BOC, and the *Nunez* Consent Judgment, among others.

Growing pains are inevitable as the DOC and ACS Staff and youth acclimate to the new facility. The Monitoring Team has extensive experience in other systems that have made similar changes and expect that this transition will be bumpy. Along with adapting to new policies and procedures, the physical plant of the new building—although in much better condition and possessing a much more vibrant atmosphere than RNDC—also brings a new set of challenges. For example, having fewer units and fewer empty beds at Horizon prevents the Department from addressing interpersonal disputes by separating youth, as they did regularly at Rikers. Instead, DOC and ACS Staff must address these conflicts by actively supervising and de-escalating tensions as they arise, teaching youth new skills for co-existing peacefully, incentivizing positive behavior, and sanctioning violence when it occurs.[139]

While the youth were initially transferred to Horizon without incident, the Department struggles to contain violence and disorder within the facility. The Monitoring Team is closely scrutinizing the operation of Horizon, particularly the response to crises and subsequent use of force. The Monitoring Team has toured Horizon and met with Staff and youth. The Monitoring Team also reviewed the vast majority of UOF incidents from the first 10 days of operation and now reviews incident reports on a daily basis.

In its first sixteen days of operation, there were 59 uses of force (2 – Class As, 33 – Class Bs, and 24 – Class Cs). Of these uses of force, approximately two-thirds were in response to assaultive behavior, either against other youth or Staff, and the rest were in response to other

---

[139] ACS began to implement the behavior management program during the second week of operation at Horizon. The behavior management program will be collaboratively implemented by ACS, DOC, and DOE staff.

types of misconduct. The majority of uses of force were in response to outright spontaneous group disturbances, some of which were serious episodes of collective violence. Further, the Department reports that there were at least 31 inmate injuries and 39 Staff injuries during this time.

Many of the violent incidents reviewed by the Monitoring Team were characterized by sudden eruptions involving multiple assailants on an individual youth or Staff. Because Staff were outnumbered and occupied with trying to physically manage those directly involved, they were unable to control by-standers, many of whom joined the fray. Many of these incidents required an extended time to contain—sometimes because youth interfered in Staff's ability to respond—and thus the risk of serious injury increased. DOC Staff were observed attempting to de-escalate each situation, attempting to utilize safe physical interventions, and generally responding in a professional manner. In reviewing these group disturbances, the Monitoring Team found Staff's conduct was overwhelmingly reasonable under the exigent circumstances. However, Staff clearly struggled to contain these incidents with the tools available to them and sometimes were unable to prevent injuries, to themselves and inmates, from occurring. The Department's leadership and Staff at Horizon have conveyed a genuine commitment and desire to managing the facility safely and addressing the specific needs of the youth. That said, the Monitoring Team believes that the current situation is serious, dangerous, and unsafe for both youth and Staff.

In response to the level of disorder at Horizon, the Department has modified movement throughout the facility to minimize youth interactions and to prevent their regular contact with youth outside their assigned housing unit. Some of the furniture in the school and on the housing units has been secured to the floor so it cannot be thrown or otherwise used as a weapon. The

Department and ACS also plan to increase programming and to expedite family visits, both of which have been shown in other jurisdictions to reduce interpersonal violence. Further, the Department intends to provide Staff with body-worn cameras in the coming days. While these are useful strategies, the Monitoring Team's experience suggests more is needed to stabilize the facility, as described in detail below.

The Department needs to regain control of the facility, to reduce the risk of imminent harm and to establish parameters and strategies for the safe operation of the facility as discussed throughout this report. The Monitoring Team's experience suggests that providing the Department a short period of time during which OC Spray can be used would allow staff to respond to violent confrontations before they escalate to large group disturbances or incidents in which someone is seriously hurt, and contain and disperse a large disturbance if one occurs. Because OC Spray is an inflammatory agent that creates a sensation of burning to the skin, it can temporarily incapacitate aggressors which enables the user to intervene, disperse, distract, and regain control of dangerous situations. In very real terms, it is difficult to assault another person if you are experiencing a burning sensation to your skin and/or eyes and it provides the user time to contain and control the situation. As the Department successfully implements the strategies discussed throughout this report and once operational control and a foundation of safety is achieved, OC Spray should be eliminated from the facility's operation so that it comports with generally accepted practice and state regulations.

The State has determined that a limited waiver allowing the Department to utilize OC Spray for seven days, with an opportunity to extend the waiver, is necessary. The State's authorization of the use of OC Spray includes many conditions, some of which are not feasible to implement or are overly burdensome. As a threshold matter, the State's waiver is youth specific

and predicated on an assessment of the specific youth's history of violence. Given that Horizon's violent incidents are often precipitated spontaneously and in units housing youth of various security classifications, a specific youth's history of violence is not particularly relevant to the assessment of the immediate risk of harm, particularly to contain and disperse group disturbances.

The State waiver also includes burdensome procedural requirements for reporting and tracking. During this time of crisis, the Department needs simplicity, not complexity. While the use of OC Spray will undoubtedly be closely scrutinized by various stakeholders (including the Department itself, the Monitoring Team, SCOC, and OCFS), the Monitoring Team strongly cautions against imposing burdensome requirements for reporting and tracking. Such requirements could interfere with the Department's ability to operationalize the limited use of OC Spray effectively and could be counterproductive to responding immediately to the imminent risk of harm.

Further, the seven-day period is problematic because it does not afford Staff a legitimate opportunity to alter the current conditions of the facility. Instead, a seven-day timeline perpetuates the current conditions without catalyzing any improvements, only to resume the disorder a short time later. The opportunity to seek an extension only creates further uncertainty and distracts the Department from focusing on the immediate security needs.

**Monitoring Team Recommendations to Improve Safety at Horizon**

The Department needs an immediate solution to address the violence at Horizon. For the reasons discussed throughout this report, the tools immediately available to the Department are insufficient for the City to meet its obligation to protect the youth from unreasonable risk of

harm (*see* Consent Judgment[140] § XV. (Safety & Supervision of Inmates Under the Age of 19), ¶ 1).[141] Accordingly, the Monitoring Team strongly recommends[142] that the State grant the City an initial 90-day limited waiver of prohibition of the use of OC Spray (9 CRR-NY §180-3.14(a)(4)(ii)) under the circumstances prescribed below.[143] Allowing the Department to utilize OC Spray during this time will allow the facility to stabilize while providing the City the necessary time to ameliorate the conditions giving rise to the violence by building a robust behavior management program, improving Staff's competency on an array of physical interventions and team tactics in lieu of OC Spray, and providing the State and City time to consider whether additional housing options may be available for this population.

Therefore, the Monitoring Team requests that the City provide the appropriate State regulators with these recommendations immediately, and no later than October 18, 2018. For the reasons set out below, the Monitoring Team strongly recommends the State grant the City the authorization to utilize OC spray for a 90-day period as outlined below as soon as practicable, and no later than October 24, 2018.

---

[140] The purpose of the Consent Judgment "is to protect the constitutional rights of the inmates confined in jails operated by the Department." *See* Consent Judgment § I. (Background) at pg. 1. In particular, the Consent Judgment addresses the findings of the SDNY and the Department of Justice "that concluded that young male inmates, between the ages of 16 and 18, were being subjected to unconstitutional conditions of confinement. In particular, the findings letter asserted that the City had engaged in a pattern and practice of: (a) subjecting these inmates to excessive and unnecessary use of force; (b) **failing to adequately protect them from violence inflicted by other inmates**; and (c) placing them in punitive segregation at an alarming rate and for excessive periods of time." *Id.* at pgs. 1 and 2. (emphasis supplied)

[141] "Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent inmate-on-inmate fights and assaults, and to de-escalate inmate-on-inmate confrontations, as soon as it is practicable and reasonably safe to do so."

[142] The Monitoring Team strongly recommended in the Fifth Monitor Report that it was necessary for the City to have additional time, beyond October 1, 2018, to safely eliminate the use of OC Spray. The current conditions at Horizon underscore the necessity of this additional time. (*see* Monitor's Fifth Report at pgs. 146 to 147).

[143] As described throughout this section of the report, the use of OC Spray is expressly not contemplated for use as aversive conditioning.

- _Circumstances_. The use of OC Spray should be limited to when the safety or health of a youth or Staff Member is in immediate jeopardy and other de-escalation and crisis management interventions have been tried and failed, or are deemed unlikely to be effective. However, OC may be used as the first intervention in situations where there is imminent risk of a death or grievous bodily harm to Staff, youth, visitors, or other persons. OC Spray may never be used to punish, discipline, assault, or retaliate against a youth.[144]

- _Contraindications for Individual Youth_. As noted above, in general, decisions about the use of OC Spray must be based on the specific circumstances of the incident, rather than the specific youth. That said, certain youth will have medical or mental health contraindications that should be noted in their Individual Behavior Plans.[145] OC must not be used on any youth with a contra-indication absent exigent circumstances.

- _Staff Authorized to Use OC Spray_. Only certain Staff should be permitted to carry OC Spray. As an initial matter, one designated Staff Member on each housing unit (and no more than one) should be permitted to carry OC Spray (_i.e.,_ an MK-4 canister only). This will permit Staff to intervene immediately, without waiting for a response team to arrive, which will minimize the potential harm to youth and Staff. In addition, corridor Staff, Rapid Response Team, Captains, Assistant Deputy Wardens, Deputy Wardens, and Wardens should be permitted to carry OC Spray.

    Any Staff member authorized to carry OC Spray must be trained and certified for its use and must not have had any Use of Force related disciplinary actions within the

---

[144] _See_ Consent Judgment § IV. (Use of Force Policy), ¶ 3.c.i.
[145] OCFS Regulations require that each youth shall have an individualized plan that documents recommended de-escalation techniques and notes any restrictions on the use of physical restraints within 10 days of admission. _See_ 9 CRR-NY §180-3.14 (a)(1).

last two years. The authorization to carry OC Spray must be revoked for any Staff member who is subsequently disciplined for improper use of OC Spray or unnecessary or excessive force.

- *Post-incident Medical Treatment*. As required by DOC policy and the Consent Judgment, medical attention must be provided as soon as possible following the use of OC Spray. Treatment for exposure should begin with those who are most seriously affected.

- *Reporting*. Any use of OC Spray must be reported pursuant to DOC policy (which include the requirements proscribed by the Consent Judgment) and OCFS regulations.[146] The reporting should also address youth-specific requirements (*e.g.*, notification must be provided to the youth's guardian about the use of the restraint),[147] which must occur within 24 hours of the incident.

- *Storage and Maintenance of OC Spray*. All OC canisters stored within the facility shall should be maintained in a safe and secure manner.[148] Such storage shall ensure that only those certified and authorized for the use of OC have access to it.

This initial 90-day period should allow the Department to gain control of the facility and stabilize the environment so alternative tools to manage the violence can take hold. First, a robust behavior management program is critical to the safe operation of the facility because it is the primary way in which youth become engaged in the safety objective, by incentivizing positive behavior and sanctioning rule violations effectively and proportionally. Not only does the program need to be properly designed, but youth and Staff also need detailed instruction on

---

[146] OCFS regulations regarding the reporting of incidents is codified in 9 CRR-NY § 180-3.8 (Reports).
[147] *See* 9 CRR-NY § 180-3.15 (k).
[148] Further, all OC canisters should be removed from the Facility at least one day prior to the date of expiration.

how the program works and sufficient time to experience its benefits before buy-in will be established. Without this buy-in, the behavior management program will not be an effective violence reduction tool. The Monitoring Team has deep expertise in this area and is committed to assisting the Department and ACS with this task. Furthermore, per the Consent Judgment, policies, procedures and practices related to the behavior management program are subject to the Monitor's approval. [149]

Second, training Staff to utilize a new continuum of physical interventions in response to crises takes time. Providing the required SCM training is the first step, but Staff also need to drill and practice in order to develop the appropriate reflexes and confidence to intervene safely. Further, Staff would benefit from feedback and coaching following live applications of SCM techniques. Without these skills and confidence, the Staff will be unable to prevent harm from occurring to themselves or youth. The Monitoring Team strongly encourages the City to commit, and provide adequate resources, to support this effort.

Third, the City and State should explore alternative housing strategies that would better protect youth and Staff from harm. As noted previously, the layout of Horizon's physical plant and its current population means that more youth are housed on each unit than previously at RNDC. The higher census on the units makes it difficult to contain incidents and to limit the number of youth who may become involved, particularly on those units housing youth with a greater propensity for violence. Reducing the census on these units could be an effective strategy for preventing violence but would require the City to expand into other properly-licensed

---

[149] *See* § Consent Judgment XVI. (Inmate Discipline), ¶ 3.

facilities (*e.g.*, Crossroads)[150] in order to access additional housing units.[151] The Monitoring Team believes that a strategy for additional housing flexibility would contribute to the Department's ability to address the current unsafe conditions.

As the initial 90-day period comes to a close, the Department and ACS, in consultation with the Monitoring Team and other stakeholders (as appropriate), shall assess the current level of facility safety in order to determine appropriate next steps.

The Monitoring Team will continue to closely scrutinize the Department's operations at Horizon and is committed to applying its considerable expertise in operational transitions and best practices for juvenile offenders to guide the Department and ACS in this monumental task.

The transition to Horizon will cause, many, if not most, of the provisions related to adolescents in the Consent Judgment to look quite different in subsequent Monitoring Periods and thus, in this report, the Monitoring Team has refrained from repeating this comment for each provision discussed in the body of the report, below.

*Trends in Violence and UOF*[152]

As discussed in the Introduction to this report, adolescents and young adults contribute a disproportionate share of the Department's uses of force and inmate-on-inmate violence. That said, within-group comparisons are also illustrative, particularly when long-term trend data is available. Over the past 30 months, the overall rates of violence (i.e., youth-on-youth violence and youth-on-staff violence) and UOF have not improved appreciably for Young Inmates,

---

[150] Crossroads is a certified Specialized Secure Detention Center and is currently at about 35% capacity.

[151] The Monitoring Team suggests that consideration be given to whether the female 16- and 17-year-old youth at Horizon, and/or a select group of male 16- and 17-year-old inmates with lower classification scores may be housed at Crossroads.

[152] It is important to recognize that these data are examined at a specific point in time, while the reforms being undertaken (particularly regarding incentive programs and alternative disciplinary measures) are continually being implemented and refined. Furthermore, rates of violence are impacted by many, many things—most of which are being addressed by the Consent Judgment, though some are in their infancy.

despite some short peaks and valleys. Both metrics are trending slightly upward for 16/17-year-olds and slightly downward for 18-year-olds and remain significantly higher than what is observed in other, safer jurisdictions.

The table below shows that during the current Monitoring Period, the rates of youth-on-youth violence among 16/17-year-olds increased significantly and decreased very slightly among 18-year-olds.[153] The line graph illustrates that the peaks and valleys in the rates of violence have not endured beyond a couple months and that overall, the rate of violence has increased slightly for 16/17-year-olds and decreased slightly for 18-year-olds (shown by the dotted trend lines in the graph). Both the table and graph demonstrate that the rate of violence among Young Inmates has not yet shown a substantial or sustained decrease.

| Average Rates of Violence, 16/17-year-olds and 18-year-olds | | | | | | |
|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | 30-month Average |
| 16/17-year-olds | 27.4 | 35.9 | 26.5 | 29.4 | **34.6** | 30.8 |
| 18-year-olds | 21.6 | 31.0 | 25.6 | 22.7 | **21.3** | 24.4 |

---

[153] Late in the Monitoring Period, the Department alerted the team that some of the information contained in the Fight Tracker at GMDC may not be accurate because data entry was disrupted during the transition to RNDC. As a result, these trends should be interpreted with caution.



The Monitoring Team's analysis of Preliminary Reviews from GMDC and RNDC revealed an increase in the proportion of fights occurring in school, both in classrooms and in hallways. Youth continue to seem undeterred by Staff presence, although this may be due in part to the fact that the skills taught in SCM and Direct Supervision training have yet to be put into action in any broad sense. Staff appear to be making more extensive attempts to de-escalate tensions, but further refinement of the practice will be needed to produce the desired outcomes. Security lapses continue to occur but were not a contributing factor in every event. As discussed above, both populations of Young Inmates are relocating, and Staff will need to refine or develop new operational skills to ensure security lapses do not contribute to the level of violence.

As discussed in previous Monitor's Reports, the level of engagement in violence differs across youth. Fight Tracker data continue to show that a small subset of youth is engaged in frequent violence, while a larger subset is involved in more occasional violence. Still another group of youth may be only involved in a single fight, and some youth are not involved in

violence at all during their incarceration. These patterns suggest that consequences of different intensities are needed to respond to youth who engage in violence and other misconduct at varying frequencies. Large proportions of youth will not qualify for the deeper end sanctions and thus in order to reduce violence, the Department must identify and implement effective sanctions for the many youth who commit violence and other misconduct more infrequently. The Department took initial steps to flesh out its continuum during the current Monitoring Period but there is still much work to do to develop the robust array of responses required by the Consent Judgment. This is discussed in more detail below. Furthermore, while the Department has implemented a group incentive program (the Levels), it needs to shore up the implementation of its individual incentive program (ASFC cards) to include direct communication with youth about their behavior. These issues are also discussed below.

The table and graph below show trends in the UOF rate among Young Inmates since the Effective Date of the Consent Judgment. The average UOF rate has varied over the past 32 months (shown in the table and graph, below), and is generally increasing among 16/17-year-olds and decreasing among 18-year-olds. The current Monitoring Period's average rate of UOF for 16/17-year-olds is the highest it has been since the Effective Date of the Consent Judgment. However, the downward trend among 18-year-olds is promising and would have been more significant if not for the upheaval experienced as these youth were transferred from GMDC to RNDC in June 2018 (month 32 in the line graph, below).

That said, the UOF rate for both age groups remains extremely high compared to their adult counterparts—the average UOF rate for adults age 22+ was 2.9 in 2017—and to what is observed in other jurisdictions.

| Average Rates of Use of Force, 16/17-year-olds and 18-year-olds | | | | | | |
|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Average |
| **16/17-year-olds** | 24.8 | 31.7 | 16.5 | 26.0 | **38.4** | **27.5** |
| **18-year-olds** | 17.4 | 21.7 | 20.7 | 14.3 | **16.1** | **18.0** |



These data help to describe the context within which Staff must manage the Young Inmate population. As a result of their immaturity, uneven and unfinished brain development, and lack of experience dealing with the stressful environment of a jail, youth pose different and more complex challenges than adults. For this reason, the Staff who work with them must have a different skill set and must understand the underlying causes of the Young Inmate's behavior in order to address them and reduce violence. Staff training to develop these skills is now fully underway (*e.g.*, SCM and Direct Supervision) and the Monitoring Team is hopeful that as Staff implement these new skills, the high rates of UOF and interpersonal violence will begin a significant and substantial decline.

As discussed in detail in the following sections of this report, the interplay between the reforms required under Consent Judgment § XV (Safety and Supervision of Inmates Under the

Age of 19) and Consent Judgment § XVI (Inmate Discipline) has real power to impact both the rate of inmate-on-inmate violence and UOF among Young Inmates. Some of the strategies underway in the Young Inmate Facilities (*e.g.*, programs to reduce idle time; incentives for positive behavior; considering new sanctions for mid-level misconduct) may also be useful to address the rates of violence and UOF among older populations (particularly the 19- to 21-year-olds) who are housed in other Facilities.

## YOUNG INMATES SECTION BY SECTION ANALYSIS

### 13. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

The overall purpose of this section of the Consent Judgment is to better protect Staff and inmates under the age of 19 from violence. Most of the requirements that will directly affect an inmate's propensity to engage in violence and the Department's response to it are contained in the Inmate Discipline section of this report (*e.g.*, incentives for refraining from misconduct and disciplinary responses to aggressive behavior). That said, institutional violence is affected by many things—factors pertaining to the inmates themselves, to the Staff and the type of supervision they provide, and to the environment surrounding the people who live and work in the jails (*e.g.*, security features and environmental hazards, as well as the daily structure and programming available). This section of the Consent Judgment includes provisions related to all of these factors.

The Monitoring Team's assessment of compliance is outlined below.

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** |

- The Department continues to design, implement and refine a range of strategies designed to produce safer Facilities, as detailed in the following narratives about the many components of the reforms related to Young Inmates in §XV "Safety and Supervision" and §XVI "Inmate Discipline."

**ANALYSIS OF COMPLIANCE**

In concert with Consent Judgment § XVI. (Inmate Discipline), the overall purpose of this section of the Consent Judgment is to better protect Staff and Young Inmates from violence. The reforms required by the Consent Judgment (*e.g.*, incentive programs, programming opportunities, continuum of disciplinary options, consistent staffing), once fully and properly implemented, should lead to safer Facilities. As discussed in the Introduction to this section, the level of safety appears to be slowly increasing for 18-year-olds but is deteriorating for 16/17-year-olds. Given the magnitude of the changes yet to come when rehousing the 16/17-year-olds, the Monitoring Team is concerned about additional deterioration. For this reason, the transition *must* have as its first priority the safety of youth and Staff.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells.

- The NCU continued its internal audit procedure to determine whether Staff are completing FSIRs and DCSRs as required and the extent to which their content was congruent (i.e., "reconciled"). The methodology was expanded during the current monitoring period to include procedures to (1) verify the accuracy of the DCSR and (2) ensure that youth are not housed in cells with inoperable locks.

- The Department audited compliance in Young Inmate housing at RNDC, GMDC (through June 2018) and AMKC (beginning in May 2018). It began auditing RMSC in July 2018.

**ANALYSIS OF COMPLIANCE**

The NCU's enhanced audit process is comprehensive, well-managed, and likely to result in valid and accurate findings. The methodology now includes all facets of compliance with this provision.

Across all three Facilities audited by NCU, monthly audits revealed that forms were nearly always complete, nearly always accurate and that youth were very rarely housed in cells with inoperable locks (one or two youth per month). When youth were housed in cells with inoperable locks, NCU's subsequent inspections revealed that the youth had been promptly rehoused. Further, the Monitoring Team monitors the CODs each month to identify whether any doors/locks were compromised resulting in a use of force and RNDC and GMDC. In the first half of the period, seven such incidents were identified, but notably, for the last half of the period, there were only two. It appears that the Department is meeting the requirements of this provision at RNDC and GMDC. AMKC's audits have only just begun and require more time to determine the durability of the results.

The Department has demonstrated at RNDC, GMDC and AMKC that it has an internal capacity to identify and respond to problems in this area. Given the observed performance levels at the Facilities, the audits could be scaled back to a subset of days each month. In order to reach Substantial Compliance, the Department needs sustain its progress and to audit the remaining Facilities that house a small number of Young Inmates (RMSC, GRVC and OBCC).

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3.[154] A Warden or Deputy Warden shall tour:

    a.   all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted.

    b.   all Housing Areas with 16-and 17- year-old inmates at least twice per week, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented and any general deficiencies shall be noted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See discussion below.

**ANALYSIS OF COMPLIANCE**

At the end of the Monitoring Period, the requirement for this provision was modified by the Court following the Monitoring Team's suggestion that the original provision was operationally

---

[154] This language reflects the revision ordered by the court on August 10, 2018 (Docket Entry 316).

infeasible and out of sync with generally accepted practice. The section above contains the revised language. The Monitoring Team believes these tours are very valuable to the management of the Facility. The revised language, which requires regular albeit fewer tours by the Wardens and Deputies, is practical and should not encroach on other management functions. The more practical schedule also creates an opportunity for more substantive interactions during the tour. This provision will be monitored and rated in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 3. Not yet rated. |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION SYSTEM)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of adolescents and the security risks they pose.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to use the point-driven classification tool to assess youth's risk of institutional violence. The resulting classification level guides the youth's assignment to celled- or dormitory-style housing.

- The Department continues to house adolescents according to their education level (assessed during the intake process) so that they attend classes with peers they already know by virtue of living on the same housing unit.

- The Department has contracted with a well-respected consultant to develop a valid risk assessment instrument for housing 16- and 17-year-olds. The Department, ACS and the consultant met during this Monitoring Period to identify the needs for the risk assessment tool.

- The Department and ACS began to collect the data necessary to develop the tool. Various problems in obtaining an appropriate dataset were encountered, pushing the target completion date back to mid-September 2018.

### ANALYSIS OF COMPLIANCE

Although the Department has tried several strategies to reach compliance with this provision (*e.g.*, testing the original tool; testing the HUB; and finally, developing a new instrument), it has yet to achieve the core component, namely, accurately assessing youth's risk of institutional violence and housing them appropriately. The development of the new classification instrument is fully underway.[155] As noted in previous Monitor's Reports, the new instrument must produce valid classifications and must include an override mechanism to account for individual factors and circumstances that cannot be captured by the scored risk factors. It is essential to recognize that the

---

[155] The Department reported that the new classification tool was completed in early October. Its construction and implementation will be reviewed during the Seventh Monitoring Period.

classification tool itself does not prevent violence. Rather, violence reduction comes from the way the tool is implemented: how youth are housed, the level of supervision and services that surround youth who are high risk and Staff's skill in de-escalating youth who are prone to violence.

During the Seventh Monitoring Period, the Monitoring Team will assess the application of the risk classification tool and override procedures, along with the extent to which adolescents are housed appropriately (via Consent Judgment § XV. (¶ 8 Separation of High and Low Risk Young Inmates)). Furthermore, the Monitoring Team will reassess its decision to exclude female adolescents from monitoring (as discussed in the Second Monitor's Report at pgs. 129-130), depending on the findings regarding the new instrument's validity and application to female youth and the current status of Raise the Age implementation.

| **COMPLIANCE RATING** | **¶ 4.** Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In 2014, the Department allocated only $250,000 for youth-centered programs. In 2017, the Department reported a budget of $19,000,000 for this programming.

- The Department continues to partner with nearly 80 community-based organizations to provide programming to youth at GMDC, RNDC and RMSC.

- The Department continued opportunities for Young Adults to enroll in college courses and 111 young adults had received college credit by the end of the current Monitoring Period.

- The Department continues to utilize digital tablets that include both education and entertainment applications. Youth may also earn access to the Music Lab to develop their skills in the creative arts.

- Workforce development courses continue to be available to all Young Inmates. These include 20-hour Trading Futures modules (430 course completions during the current Monitoring Period) and industry-recognized training programs to develop skills in high-growth occupations (643 certifications awarded in the current Monitoring Period). Other vocational courses (*e.g.*, digital literacy, barista training and barbering) are also available.

- The Department continues to track services provided by Program Counselors assigned to Young Inmate housing units.

- In addition to these programs, all 16- and 17-year-old inmates continue to be required to attend school five hours per weekday. While not required to do so, 18-year-old inmates in the general

population, SCHU and TRU also have the option to attend full-day schooling. Those in ESH or Secure may attend school three hours per day.

**ANALYSIS OF COMPLIANCE**

The Department is pursuing compliance with this provision by providing various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by community partners, leisure time activities and recreation. Enhancing skill development and reducing idle time will both reduce violence and enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing Program Counselor-led programming and activities and reviewing education attendance data. The Department has yet to identify a comprehensive, dependable way to accurately assess the large volume of programming delivered by community partners and thus that data has not been reviewed to date. Substantial Compliance depends on ensuring that all Young Inmate housing units are scheduled for programming that occupies the majority of youth's waking hours on both weekdays and weekends, over a sustained period of time.

Though once fully staffed with Program Counselors, the Department lost several program counselors during the current Monitoring Period. Of the 53 units housing Young Inmates, 55% had an assigned program counselor (most counselors serve two units) and 25% had other enhanced programming (*e.g.*, I-CAN, Rikers' Rovers, or mental health units). However, 21% of Young Inmate Housing units did not have the benefit of either enhanced programming or a program counselor, resulting in excessive idle time for these youth. Of particular concern is that three of these units are TRU units, housing youth who are arguably the most in need of the services of a Program Counselor.

*Education*

The Monitoring Team reviewed monthly attendance reports maintained by the NYC DOE for the education programs at RNDC, RMSC and GMDC which revealed that the vast majority of 16- and 17-year-old students (about 80%) attend school on any given day, while only a small segment (20% or less) of young adult students attend. These findings were compatible with those of the Special Master of the *Handberry* litigation (addressing education services), who in early 2017 found the Department in "substantial compliance" on this issue.[156] In addition to academic instruction, many Young Inmates have benefitted from the wide array of career technical education programs, as discussed in the bullet points above.

*Structured Programming by Program Counselors and Community Partners*

---

[156] *See*, The First Report of The Status of Education Services for Youth Aged 16-21 at Rikers Island by Special Master Peter Leone dated February 1, 2017 (96-cv-6161 S.D.N.Y.). As of the writing of this report, a subsequent report by Dr. Leone had not been issued.

The Department has approximately 10 vacant Program Counselors positions. As a result, several units do not receive the required volume of structured programming intended to reduce idle time and address the underlying causes of violence. Without sufficient Staff or structured programs to service all units housing Young Inmates, the Department will be hard pressed to achieve Substantial Compliance with this provision.

Program Counselor records for approximately 20 housing units (male and female; GP, program and SSH) from June 2018 were reviewed. These showed that a Program Counselor was usually present five days per week, but the volume and type of programming varied considerably across counselors, Facilities and program types. Youth in SSH units generally received more programming from the counselors, which makes sense given their more challenging behaviors. Most of the youth received between one and two hours per day of structured programming from a Program Counselor. Time spent preparing materials and schedules, a reliance on "self-guided" activities (i.e., dropping off packets for the youth to complete) among some counselors, adapting to operational emergencies (*e.g.*, lockdowns and alarms), and conflicting schedules with community partners interfered with the delivery of the targeted three hours of programming per unit per day, even among those units with an assigned Program Counselor.

*Structured Leisure Activities and Recreation*

In addition to rehabilitative services, all Young Inmates also receive recreation and access to structured leisure activities (*e.g.*, tablets, board games and video games). While these activities do not address the underlying causes of violence, their value lies in the ability to reduce idle time and to provide exposure to new experiences and constructive options for free time. The Department's many community partners contribute a significant volume of programming, some of which can be continued after the youth is discharged.

*Group Programming Observations*

As in previous Monitoring Periods, the Monitoring Team also observed group sessions at Young Inmate Facilities (Young Men's Work at GMDC, Peer Pressure at RNDC and individual Interactive Journaling at GRVC). The instructors varied in their facilitation skill and familiarity with the materials, but all youth were fully engaged. DOC staff were constructively engaged in both groups and often added comments and asked questions of the youth. However, as noted in previous Monitor's Reports, groups continued to be interrupted by DOC staff (*e.g.*, PM school was called during one of the groups; DOC staff were talking loudly by the staff table during another). Additional work is needed to coordinate daily schedules and clarify expectations for DOC staff who are present on the units during group programming.

*Summary*

Overall, the Department is vigorously pursuing several strategies to meet the requirements of this provision. However, recent staffing shortages among Program Counselors could impede

compliance if the gaps in structured programming cannot be filled by community partners. The combination of education, mandated recreation, Program Counselor-led programming and programming delivered by community-based partners should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult.

Furthermore, the Department continues to struggle with documenting program delivery from community partners and delivering the CBT-type programming in a dosage that is likely to be effective. A tablet-based method for Program Counselors to track their service delivery is being piloted which could bring greater efficiency to the recording, analyzing and interpreting of these data, and ultimately to using the information to drive performance.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In February 2018, RNDC issued an Ops Order about procedures for rehousing to protect vulnerable youth.

- The Department utilized a tracking form to identify the frequency of housing transfers. Unfortunately, the practice was disrupted following the closure of GMDC and transition to RNDC.

**ANALYSIS OF COMPLIANCE**

The goal of this provision is to ensure that youth who are being bullied, threatened or otherwise victimized are moved to a different housing unit where they will be safer. At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Department must strike a delicate balance among making transfers to protect vulnerable inmates, intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff to develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Department's flexibility for programming, population management, etc.

Despite the Department's initial estimation that such transfers are made "frequently" and the Monitoring Team's observation that youth's housing assignments are often adjusted, the reported data still do not bear this out. The NCU held meetings with Facility leadership in February 2018 to reiterate the requirements of this provision and to discuss the required documentation. Only one youth from

174

GMDC and 8 youth from RNDC were reportedly transferred during the current Monitoring Period. Most of the youth transferred were victims of fights, although a couple transfers were made to remove aggressive youth from a housing unit.

Furthermore, the already anemic procedure was completely disrupted in June 2018. GMDC did not prepare a report, citing a low population, and RNDC no longer had staff trained in this process. Now that the Young Inmates have been largely consolidated at RNDC, the Department is encouraged to increase its vigilance to identify opportunities to protect vulnerable youth post-intake and to document the actions taken to enhance safety when they occur.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report, at pgs. 131-132).

- The Department drafted revisions, in consultation with the Monitoring Team, to the Protective Custody directive to address the Monitoring Team's feedback about the substance of information found in the Protective Custody ("PC") documentation and timeliness of required interviews. The Department revised certain policy requirements to allow OSIU staff to focus more intensely on Young Inmates and those who are disputing their placement in PC. The Department also decided to further revise the Directive to address the interplay between PC status and violent misconduct, particularly among adult inmates. The policy has yet to be finalized.

- During this Monitoring Period, OSIU improved both practice and documentation. NCU also developed and implemented a process for internal audits of performance in this area.

### ANALYSIS OF COMPLIANCE

Although the revised Protective Custody policy has yet to be finalized, the Department made significant progress in shoring up both the practices surrounding the use of PC and its internal auditing and quality assurance function.

During the current Monitoring Period, 92 male and female youth spent time in PC. Most (76%) were self-referred, while 15% were court-ordered and 9% were placed in PC at the Facility's discretion (though all youth agreed with their placement). Nearly all (98%) were reviewed by OSIU within the 2 business days permitted by policy. Females and adolescent males had a median length of stay of 22 and 20 days, respectively, while 18-year-old youth had longer lengths of stay (median 32 days). Most of the youth's time in PC ended because they were discharged (51%), while others were removed because of aggressive behavior (32%; more likely among adolescent males) or requested removal (12%).

The Monitoring Team conducted a comprehensive audit of 19 PC files (14 currently in PC and five who had requested removal from PC during the current Monitoring Period). Overall, the documentation surrounding the PC process was much improved from the last review in early 2017. Findings included:

- The nature of the youth's safety concern was clear and detailed.
- OSIU reviewed the youth's PC status within the 2-day business timeline.
- Youth were promptly informed of OSIU's decision and their right to a hearing.
- All 30- and 60-day reviews were timely.
- Youth provided input into the reviews via a written statement.
- Once interviewed, youth were removed from PC upon request.

In addition, the Monitoring Team conducted interviews with approximately 15 youth in protective custody at RNDC, GMDC and RMSC. In all cases, youth felt safe, reported no contact with youth in the general population, and understood the process for requesting removal from PC if desired. They recalled OSIU staff visiting them to ask about their safety concerns and generally felt that unit staff addressed their issues appropriately. Some of the youth complained that they did not receive enough programming and leisure time activities, though all reported that they received mandated services (*e.g.*, school, meals, showers, visits, recreation, etc.).

The Monitoring Team met with NCU to discuss the methodology and results of the audits obtained thus far. The methodology is excellent—often more detailed than the audits conducted by the Monitoring Team. The results generally reflect the findings of the Monitoring Team discussed above— that with few exceptions, the Department's practices conform to policy. The Monitoring Team recommends that the Department expand the methodology to include a measure of length of stay and to include interviews with youth on the PC units.

Overall, the Department has achieved Substantial Compliance with this provision. The Department is encouraged to maintain the same level of performance and vigilant oversight once the 16- and 17-year-olds are moved off-island and once the new Directive is signed into effect.

| COMPLIANCE RATING | ¶ 7. Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains Policy 4100R-D "Classification" which addresses the requirements of this provision.

- The Department has a procedure in place to review housing assignments daily, identify any instances of co-mingling, and resolve them at both RNDC and GMDC.

- The Department worked with the Monitoring Team to address its struggle to meet the requirements of this provision for 18-year-olds housed at GMDC.[157] Procedural issues with the HUB were rectified (i.e., a HUB-based mis-housing process was developed and implemented), issues regarding the use of overrides were addressed and an alternative to IIS for tracking a youth's actual location was identified.

**ANALYSIS OF COMPLIANCE**

The Department's policy reflects the requirements of this provision. Temporary co-mingling, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (*e.g.*, upon a birthday, or when an inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility.

Process-wise, the protocol to identify and resolve instances of mis-housing works well at RNDC and GMDC, as the small number of youth who are mis-housed are promptly transferred to an appropriate housing unit. The Monitoring Team reviewed a sample of mis-housing records for a 25-day period. Mis-housing is a rare event: among a population of approximately 200 16- and 17-year-olds, on any given day, between 1 and 3 youth were mis-housed. In all but one case, the youth was moved to appropriate housing within one or two days. However, as noted in previous Monitor's Reports, the lack of a valid classification tool for adolescents (discussed in ¶4 "Classification") hinders achieving compliance for adolescents at RNDC. Once the new tool is developed and implemented, audits to assess compliance with this provision will resume. The Monitoring Team found that no 18-year-olds were mis-housed during the 25-day period reviewed. Both youth whose housing unit did not match their classification level had proper overrides in place.

---

[157] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Housing units like those noted in the text of the Provision. EMTC audits are no longer necessary because all 18-year-old sentenced inmates were housed at GMDC as of January 2017.

The procedure for identifying and promptly rectifying occasions where a youth's classification level and housing unit are incompatible is very solid. Assuming that the current frequency of mis-housing does not change significantly, once a valid classification tool for 16- and 17-year-olds has been implemented, the Department should reach Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10 & 11 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|
| | ¶ 11. Substantial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to use the Direct Supervision model, developed by NIC, as the foundation for a training program for supervising adolescents and young adults. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Direct Supervision training continues for recruits and is now underway for In-Service Staff, as described in the Training section of this report.

### ANALYSIS OF COMPLIANCE

As noted in the Training section of this Report, in-service training has begun. Once a majority of Staff assigned to Young Inmate housing areas have been trained, the Monitoring Team will begin to assess the extent to which Direct Supervision skills have been implemented and are in current practice among Staff assigned to Young Inmate housing areas. The Department needs to accelerate its progress in both training Staff and implementing the core concepts of Direct Supervision. Continued slow progress may lead to a Non-Compliance rating in subsequent Monitoring Periods.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Recruits: Recruits may make written requests to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration. Executive Staff from RNDC also interviewed recruits to gauge interest and review relevant experience and then personally selected recruits to work in their commands.

- The Department reports that all of the 38 recruits recently assigned to RNDC (100%) received these assignments due to their interest or backgrounds in working with youth.

- Transfer of GMDC Staff: Upon GMDC's closure, Staff from GMDC were reassigned. Reassignments to RNDC, where the majority of Young Inmates are housed, were made based on requests from RNDC's Commanding Officer, Staff volunteers and/or transfer requests coupled with seniority considerations.

|  | Total Number of Staff Transferred | Command Selection | Transfer Requests/Volunteer |
|---|---|---|---|
| RNDC | 62 | 34 | 28 |

### ANALYSIS OF COMPLIANCE

The Department continues to maintain a reasonable process to identify and assign recruits with a particular interest in or relevant experience working with youth to Facilities with Young Inmates. Further, the Department's process for reassigning Staff from GMDC to RNDC was reasonable to attract qualified and experienced Staff.

Staff assigned to other units holding small numbers of youth are discussed in the Screening and Assignment of Staff section of this Report, as their fitness for the position is addressed in the screening for special units.

| COMPLIANCE RATING | ¶ 13. Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[158]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

  a.  The ratio between Inmates and Direct Supervision floor officers shall be no more than 15:1 in Young Inmate Housing Area units used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

  b.  The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

  c.  The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department reports that Young Inmate housing areas have been able to maintain the appropriate Staffing ratios.

- NCU has transferred responsibility for collecting staffing data to the Facilities. Facility staff complete both daily and monthly reports and upload the information to a shared drive for NCU to verify and compile. With the closure of GMDC and subsequent transfer of 18-year-olds, audits at AMKC and EMTC began in June 2018. The Department reports that it met required Young Inmate staffing ratios on 100% of shifts during the current monitoring.

- The Department reports it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff. Schedulers at the Facilities reported several ways that they minimize the frequency with which a unit is staffed only by probationers. They reported being conscious about Staff's probationary status and constructing the weekly schedule with this in mind (i.e., the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years. The tenure of probationary Staff is also considered when making unit assignments.

- The Department reported the average number of probationary Staff for the Facilities where the majority of 16-, 17-, and 18-year old youth are held: RNDC had 290 (which is approximately 33% of the reported 884 Staff assigned) and RMSC had 235 (which is approximately 38% of the reported 618 Staff assigned to RMSC; note that RMSC has only a handful of units that

---

[158] The Consent Judgment does not include a ¶ 15 for this Section.

house Young Inmates). GMDC's numbers were skewed by its closure in June, but at last report, GMDC had 185 probationary Staff (which is approximately 44% of the reported 422 Staff assigned at that time).

## ANALYSIS OF COMPLIANCE

The Department continued its internal audits to determine its level of compliance with the staffing provisions. During the previous Monitoring Period, the Monitoring Team found that NCU's internal audit process leads to valid conclusions about the state of compliance. Several Facilities assumed responsibility for staffing audits and appeared to produce comparable results.

Audits of staff-to-youth ratios continue to reveal that all Facilities and units housing Young Inmates were staffed within the ratios required by the Consent Judgment. Staffing data throughout the Monitoring Period were reviewed, and no deviations from required ratios were identified. While the Department has achieved Substantial Compliance with the provision related to staffing ratios and maximum unit size, NCU's role in compiling data could be enhanced by adding a short narrative indicating a summary of findings and whether any discrepancies were noted each month.

Regarding the appropriate dispersion of probationary Staff, the internal audits found that GMDC and RNDC, where most Young Inmates were housed during the Monitoring Period, achieved the required mix of veteran and probationary Staff about 60% (RNDC) or 70% (GMDC) of the time. RMSC's average rate of compliance was 72% for the six-month period, although performance improved considerably (to about 90%) in the final three months. Young Inmate units in other Facilities (i.e., OBCC, GRVC) have higher levels of compliance (80%-100%).

RMSC attributed their improvements to having fewer officers on "the wheel" and more officers on steady posts. Further, the small number of Young Inmate units allowed them to assign tenured Staff to the housing units. Conversely, RNDC has a large number of Young Inmate units, and less flexibility in assignments since new SCOC regulations require an additional Staff on the housing units for the overnight tour.

Given the large recruiting efforts bringing unprecedented numbers of new Staff into the Facilities and the length of the probationary period (two years), it is unlikely that these numbers will shift rapidly, however, incremental progress is now visible. In addition to the number of probationary Staff, sick leave, vacations, hospital runs, and steady post assignments also limit the flexibility available in Staff assignments.

The Monitoring Team believes that the "best effort" requirement has been met by the Department's efforts described above and is confident that as proportion of probationary Staff (currently ranging between 30-40%) at the Young Inmate Facilities decreases over time, the mix of probationary and veteran Staff will be easier to achieve. The Department's comprehensive internal audits also testify to the Department's ability to monitor the issue, identify and correct problems in the future, absent external oversight.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **14.** Substantial Compliance<br>¶ **16(a).** Substantial Compliance<br>¶ **16(b).** Substantial Compliance<br>¶ **16(c).** Substantial Compliance |

**XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶17 (CONSISTENT ASSIGNMENT OF STAFF)**

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See discussion below.

**ANALYSIS OF COMPLIANCE**

As noted in the previous Monitor's Report, the Department and the Monitoring Team have consulted about the difficulties in interpreting, and complying with, this provision under the current staffing structure (*see* Fourth Monitor's Report at pg. 231). The Department has made clear efforts to ensure consistent staffing at Facilities housing Young Inmates, utilizing both awarded steady posts and more informal but consistent assignments. The Monitoring Team plans to meet with Facility schedulers during the next Monitoring Period to understand more about the methodology used so that the Department's reported rates of consistent staffing can be verified.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **17.** Partial Compliance. |

## 14. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

The overall purpose of this section of the Consent Judgment is to create tools and strategies for managing inmate behavior in order to reduce violence and improve Staff and youth safety. This involves creating an incentive system to motivate youth toward positive behavior and to encourage program engagement and also involves creating a robust array of disciplinary sanctions that hold youth accountable for their behavior and help to reduce the likelihood of subsequent violence. The Department abolished the practice of Punitive Segregation for 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016. The total exclusion of 18-year-olds from Punitive Segregation goes beyond the requirements of the Consent Judgment,

which requires only that the Department reduce its reliance on Punitive Segregation as a disciplinary measure.

A continuum of responses to misconduct to replace Punitive Segregation is required for Substantial Compliance. Previously, the Department implemented: (1) the Supportive Structured Housing units ("SSHs"; ESH, Secure, TRU and SCHU) [159] which target the small number of Young Inmates who commit serious/continued violence; and (2) the incentive ("Levels") system. During the current Monitoring Period, the Department began to apply consequences for less serious misconduct, which will round out the continuum once fully implemented.

Combined with the reforms discussed in the "Safety and Supervision of Inmates Under the Age of 19" section of this report, the Department has begun to implement a range of strategies to reduce violence and to create safer Facilities. The burden on Staff to think and behave differently in nearly every aspect of the Facility's operation should not be underestimated. Furthermore, the closure of GMDC and plans for transferring the adolescents off-island have added yet another layer of complexity to the task. It is expected that program development will continue to be uneven and that key issues may have to be reconsidered and revised multiple times before optimal implementation is achieved.

The Monitoring Team's assessment of compliance is outlined below.

---

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME),**
**¶ 2 (INMATES UNDER THE AGE OF 18: PUNITIVE SEGREGATION),**
**¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

---

[159] These programs are described in more detail in the Third Monitor's Report (at pgs. 219-221).

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, *Benjamin v. Ponte*, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016.

### ANALYSIS OF COMPLIANCE

The Monitoring Team reviewed the Department's other disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (i.e., 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with Young Inmates during the current Reporting Period, the Monitoring Team did not assess compliance with these provisions. Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation.

The Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot currently be rectified because the practice is no longer in place. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the Monitoring Team did not assess this provision while the practice was still in effect. Now that it has been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance (per the Second Monitor's Report).<br>¶ **2.** Substantial Compliance (per the Second Monitor's Report).<br>¶ **7.** Partial Compliance (per the Second Monitor's Report)<br>¶ **8.** Substantial Compliance (per the Second Monitor's Report)<br>¶ **9.** Not Currently Applicable. |

## XVI. Inmate Discipline ¶ 3 (Inmates Under the Age of 18: Inmate Incentives)

¶ 3. Within 90 days[160] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### Department's Steps Towards Compliance

- The Department continues to utilize the Adolescents Striving for Change ("ASFC") stamp cards in all Young Inmate housing units at GMDC, RNDC, and RMSC, and in the Secure and YA-ESH units. DYOP audits the cards each month.

- The Department continues to use a Facility-wide incentive system, the "Levels," at GMDC and RNDC.

### Analysis of Compliance

The Department is pursuing two strategies toward compliance with this provision: (1) the ASFC stamp cards (described in detail in the Third Monitor's Report at pgs. 223-224); and (2) the group incentive program ("the Levels," described in detail in the Fourth Monitor's Report at pg. 238). Although this provision requires the application of positive incentives only to youth under age 18, the Department included the use of the stamp cards in the design of several of the alternative disciplinary programs discussed in ¶ 6, below, some of which serve 18-year-olds. Furthermore, the incentive program is a key strategy toward violence reduction for all youth, which is required under § XV, ¶1 "Prevent Fight/Assault." As a result, the Monitoring Team has been attentive to the stamp cards' and Levels implementation with 18-year-olds as well.

Though various Ops Orders have been drafted over the years, all of these strategies still need to be guided by formal policy. This is probably most practically done once the adolescents have been moved off-island and the anticipated practice is better conceptualized.

### ASFC Stamp Cards

The Department began to conduct monthly internal audits of ASFC cards in July 2017. These audits focus only on whether the cards are present and complete. While the audits continue to find that most of the units have complete cards, pockets of poor implementation continue to occur. DYOP provided technical assistance on the spot to address identified problems, though also noted that recent changes in Facility leadership will require on-going training efforts. Despite repeated encouragement from the Monitoring Team to do so, the Department has yet to incorporate a measure of accuracy into its audit process (*e.g.*, comparing the ratings on the cards to entries in the units' behavior logs). The SSHs routinely compare these sources of information and, during the early implementation phase, frequently found incompatible entries. Problems with the accuracy of behavior ratings are very

---

[160] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (*see* Docket Entry 266).

common in other jurisdictions and the Monitoring Team continues to urge the Department to attend to this important facet of the cards' validity.

Furthermore, the Department has yet to identify a protocol for staff (uniformed or Program Counselors) and youth to communicate about the behavior ratings each day. One staff told the Monitoring Team, "The cards are just for the staff." The effectiveness of point-card systems depends on the feedback youth receive about their behavior close-in-time to when the behavior occurs. Both of these recommendations have been communicated in previous Monitor's Reports and in meetings with DYOP but have yet to be acted upon. Until then, the utility of the cards as a behavior management strategy and as a viable strategy for pursuing compliance with this provision is questionable.

*The Levels*

The Levels continue to be utilized as a group behavior management strategy. The design of the program is robust, it appears to distinguish high-performing units from those needing additional behavior support for youth and/or increased coaching for Staff in managing youth behavior, and it is sufficiently flexible to adapt to changing unit performance. Between 60-70% of the housing units earn Silver or Gold level in any given week, and thus gain access to additional rewards and programming opportunities. About 15-20% of units score at the Platinum level.

From experience in other jurisdictions, the Monitoring Team has emphasized the need for program fidelity to ensure buy-in from both Staff and youth. This means ensuring that the criteria for awarding a Level is clear and transparent to both youth and Staff. The Department reports that Unit Managers complete an assessment form to rate each unit on 10 different factors. While the requirements are clear on paper, the Department has not implemented a records-keeping protocol and thus this facet of the Levels program cannot be adequately monitored. The content of the rating forms and their contribution to the assigned Level need to be made available for scrutiny in order for the Department to achieve Substantial Compliance with this provision.

The Monitoring Team also recommends that the Department, as part of its internal audits, ensures that incentives are delivered when they are earned, and are withheld when they are not earned. Similarly, poorly behaved youth on units that are otherwise high-performing should be restricted from incentives as appropriate or transferred to a housing unit at a lower level if their misconduct becomes chronic. These issues are ripe for examination by internal audits.

The original Levels program design included Staff-recognition for those who regularly work on Platinum units, but this feature has not yet been implemented. The Monitoring Team strongly encourages the Department to do so. Staff who are skilled at supporting positive behavior among youth should be rewarded as often and as meaningfully as youth who meet expectations.

The transition of adolescents off-island provides an excellent opportunity to shore up the implementation of the ASFC and Levels programs so that the culture of the new facilities immediately benefits from these essential behavior management tools.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 4 (INMATES UNDER THE AGE OF 18: INMATE INFRACTIONS) AND ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 4. Within 90 days[161] of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprive them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 16- and 17-year-olds in December 2014 and excluded 18-year-olds in June 2016.

- The Department developed and implemented several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct (SCHU, TRU, Secure and YA-ESH).

  - The Department maintains policies for TRU and SCHU, which were approved by the Monitoring Team.

- To address less serious and episodic violent misconduct, the Department continues to rely on the infraction process and has begun utilizing other types of sanctions as well.

### ANALYSIS OF COMPLIANCE

The overall goal of this provision is to ensure that youth misconduct is promptly addressed by an effective tool for holding youth accountable.[162] Some misconduct is serious (i.e., slashings, stabbings and assaults with injury) or chronic (i.e., a repeated pattern), and for these situations, the Department established four Structured Supportive Housing units (SSHs; see pgs. 219-221 of the Third Monitor's Report). These programs have been operational for approximately two years and appear to be properly targeting serious misconduct.

Fortunately, most youth misconduct is neither serious nor chronic (e.g., fights without injury, serious disruptions to the orderly operation of the Facility, etc.), and for these negative behaviors, the

---

[161] This date includes the 30-day deadline extension that was granted by the Court on January 6, 2016 (see Docket Entry 266).

[162] Previously, Young Inmates could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

Consent Judgment requires proportional responses that address treatment needs, provide access to mandated services and that do not jeopardize safety.

*Responses to Serious and Chronic Violence*

During the current Monitoring Period, the Monitoring Team continued to review the flow of inmates in and out of the SSHs; the level of violence in the SSHs; and the quality of individualized behavior support planning and support team operations.

- **Admissions and Releases**

There were 193 Young Inmate admissions to the SSHs during the current Monitoring Period.[163] These involved 145 unique youth, 63 of whom had multiple admissions. The vast majority (95%) were admissions to either TRU or SCHU, programs that are focused on addressing violent misconduct but that do not restrict the youth's lock-out time or movement beyond what occurs in the general population. The remaining 10 admissions (5%) were to either YA-ESH or Secure, which both utilize additional hardware (i.e., restraint desks; partitions between quads) and other restrictive procedures (i.e., escorted movements, reduced lock-out times) to prevent subsequent violent misconduct.

In 23% of admissions, youth were transferred among the SSHs prior to being released (either to the general population or discharged to the community). Among all releases, most youth (72%) were transferred to a general population unit, while 20% were discharged prior to completing the program. The other youth were transferred to another jurisdiction (n=2) or remained in the SSH at the end of the Monitoring Period.

A review of ESH and Secure files—including adjudication hearing packets—revealed that those admitted appeared to meet the referral criteria. Examples of youth who were denied admission to these programs because they did not meet the criteria were noted, suggesting the referral process is deliberative. The reasons for the youth's movement among the phases/levels (or lack of movement) was more clearly articulated than in the past.

Data on program admissions and releases for all of the SSHs (ESH, Secure, TRU and SCHU) was analyzed. In terms of length of stay:

- 3 of the 5 youth admitted to YA-ESH stayed less than one week; the others stayed 41 days and 57 days before being stepped down to a less restrictive unit or discharged.
- 1 of the 5 youth admitted to Secure stayed less than a week; two others stayed 75 and 103 days before being transferred to a GP unit; and two youth had been on the unit for 24 days and remained there at the end of the Monitoring Period.

---

[163] These data are not comparable to previous Monitoring Periods because the analysis now counts transfers between programs as a single admission. In previous Monitoring Periods, each transfer was counted as a new admission.

- In YA-TRU and SCHU, the median length of stay for youth who transferred between the programs was 29 days. The median length of stay for youth who spent time in only one of the programs before being transferred to a general population unit was 20 days.
- In Adolescent TRU and SCHU, the median length of stay for youth who transferred between programs was 37 days. The median length of stay for youth who spent time in only one of the programs before being transferred to a general population unit was 19 days.

The basic flow of youth in, out and among these programs appears to conform to policy requirements.

- **Level of Violence**

The Consent Judgment requires that the responses to youth misconduct may not jeopardize Staff or youth safety. The table below presents data on the rates of violence and UOF in the SSHs. For the most part, the rates are higher in the SSHs than the overall rates for these age groups (discussed in the Current Status section, above). This is unsurprising given the target population for these programs.

Within-program data for the previous calendar year can be compared to the current Monitoring Period:

| ADP, Levels of Violence and UOF in SSH Units | | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | | | **January-June 2018** | | |
| **Unit** | **ADP** | **Average # and (Rate per 100) of Violent Incidents per Month** | **Average # and (Rate per 100) of UOF per Month** | **ADP** | **Average # and (Rate per 100) of Violent Incidents per Month** | **Average # and (Rate per 100) of UOF per Month** |
| **YA-ESH**[164] | 10 | 0.9 (9.0) | 1.8 (18.0) | 10 | 3.0 (30.0) | 3.7 (37.0) |
| **Secure** | 8 | 2.8 (35.0) | 4.6 (57.5) | 6 | 1.3 (21.6) | 1.67 (27.8) |
| **GMDC TRU** | 17 | 3 (17.6) | 4.5 (26.5) | 19 | 2.8 (14.7) | 4.0 (21.1) |
| **GMDC SCHU** | 8 | 0.3 (3.75) | 0.6 (7.5) | 5 | 0.7 (14.0) | 1.0 (20.0) |
| **RNDC TRU** | 9 | 2.3 (25.6) | 3.6 (40.0) | 8 | 5.0 (62.5) | 6.7 (83.8) |
| **RNDC SCHU** | 7 | 0.7 (10.0) | 1.1 (15.7) | 7 | 1.2 (17.1) | 1.7 (24.3) |

Some of the trends in these data are worth further exploration in the Department's assessment of program effectiveness, such as recent increases in violence and UOF in ESH, Young Adult SCHU, and Adolescent TRU compared to the previous Monitoring Period, along with recent decreases in both

---

[164] The vast majority of inmates in YA-ESH are 19 to 21-years-old.

metrics in Secure. Understanding why these events occur, and how they might be prevented, is key to increasing safety.

- **Behavior Support**

The effectiveness of the SSHs in reducing the risk of subsequent violence among the youth placed in them will depend, in large part, on the quality of the programming and behavior support received. A youth's successful return to general population—or to the community—will depend on his accumulation of skills to manage anger, regulate emotions, control impulses and respond to interpersonal conflict, all to avoid violence. The SSHs' ability to catalyze such change is essential to the perception among Staff, youth and stakeholders that they are viable alternatives to Punitive Segregation.

In terms of _behavior support planning_, the Department continued to draft individual support plans (ISPs) for youth in SCHU, TRU, and Secure. YA-ESH does not utilize ISPs. The Department did not believe substantial progress had been made in this area, so the Monitoring Team decided not to review TRU/SCHU files for this Monitoring Period. Findings from the previous review at the end of 2017 included that, while the ISPs were completed timely, they lacked an appropriate focus (i.e., goals suffered from a lack of measurability, did not focus on discrete behaviors, prescribed a service rather than a behavior target, or did not address behaviors that hinder program advancement). New goals were sometimes suggested during support team meetings to respond to emerging problematic behaviors, but their structure suffered from the same deficiencies. ISPs did not link goals to specific interventions designed to help the youth achieve them, and thus the general prescription to "attend programming," "follow all rules" or "respect staff" were offered as the panacea for all youth. DYOP reports continued efforts to coach Program Counselors in this area. Further, as noted in previous Monitor's Reports, better communication among SSHs would likely improve the quality of services. A significant proportion of youth were transferred among the programs, yet the files contain no evidence of the other SSHs' work with these youth.

In terms of _services_, most of the SSHs have a Program Counselor who delivers an array of programming (_e.g._, Anger Management, Interactive Journaling, DBT, etc.). As noted in the previous section, three of the TRU units are currently without a Program Counselor which will severely limit the Department's ability to adequately support youth who engage in serious or chronic violence. During the current Monitoring Period, the Department completed a DBT workbook designed to standardize the delivery of this program and increase consistency across counselors. Data on programming hours suggests that some programs may not be delivered in a sufficient dosage. Monthly planners are now being used to address this problem.

In terms of _monitoring youth's progress_, all of the SSHs now utilize a Support Team structure to evaluate youth's readiness for promotion. A Support Team function was added to the ESH program model during the current Monitoring Period. The Monitoring Team observed Support Team meetings

for all programs and—problems with ISPs notwithstanding—found them to include an energetic group of knowledgeable professionals who are well-prepared, share information freely, seem to understand what is driving youth's behavior and have obvious respect for each other and a desire for each youth to succeed. Transparency and communication with youth about the teams' discussion and decisions has improved, especially for ESH.

- **Quality Assurance and Program Effectiveness**

Particularly as the Young Inmates move and resettle in their new facilities, internal efforts to monitor progress in the areas discussed above are essential to avoid slippage in the level of compliance. The Department collects basic metrics on the TRU and SCHU programs, but the Monitoring Team has encouraged the Department to develop more sophisticated methods that would be more useful for enhancing program effectiveness (*e.g.*, length of stay, violence and use of force, infractions, outcomes). The Department has made initial steps toward these improvements by collecting data on the rate of infractions before and after involvement in TRU or SCHU but has yet to interpret or apply the information to the program's operation. The Monitoring Team will continue to encourage the Department to expand the quality assurance efforts to include ESH and Secure, and to devise program metrics that are more useful to the task of improving program effectiveness. These steps are essential to ensuring that the SSHs are a viable and effective strategy for addressing serious misconduct.

_Responses to Less Serious and Episodic Misconduct_

As discussed in previous Monitor's Reports, the Department's continuum of responses to misconduct needs to be expanded to address behaviors such as threatening Staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. These behaviors are not serious enough to warrant placement in an SSH, but an effective response is necessary to promote Facility safety. Historically, the Department's only response to these behaviors has been to write an infraction, where only two sanctions are available to Adjudication Captains—a $25 fine or a verbal reprimand. Neither is an effective strategy for shaping the behavior of adolescents. During the current Monitoring Period, the Department began to track the utilization of alternatives for a small subset of misconduct, fights that resulted in a use of force.

Preliminary data show that while they still rely on the infraction process, Facilities are beginning to use other types of sanctions, such as commissary restrictions (at GMDC) and moving youth to another unit (at RNDC). Many youth at RNDC also receive "informal counseling from staff"—which may be useful from a relationship-building perspective but does not appear to involve an accountability mechanism. The Monitoring Team is pleased that the Department has begun to utilize sanctions that are more likely to result in behavior change than the current infraction process. However, problems with the limited scope of the practice and validity of the data have been identified

and significant work remains to ensure that all youth who commit misconduct are held accountable in a constructive manner.

*Solo Housing*

During the Current Monitoring period, Solo Housing was used relatively infrequently as a behavior management strategy: only 13 times (6 at RNDC, 2 at GMDC and 5 at RMSC).[165] Most of these youth were housed alone for a couple weeks, though a couple youth were housed alone for longer periods of time.

The Solo Housing policy was signed into effect at the end of the previous Monitoring Period and the Monitoring Team began to assess the extent to which the Department's practice mirrored the policy requirements. The Monitoring Team is very concerned about the poor implementation of this policy. The Department is not following the protocol established in collaboration with the Monitoring Team and has been unable to provide documentation showing that the youth placed in Solo Housing receive the various protections designed to assuage concerns about the length of stay, need for services and deleterious effects of social isolation. Given the closure of GMDC and consequent shortage of bed space at RNDC, it is possible that Solo Housing will be used even less frequently in the future. However, if it is used, the Department must provide all of the services and supports required by policy in order for the Monitoring Team to continue to support this practice.

| **COMPLIANCE RATING** | ¶ **4.** Partial Compliance |
| | ¶ **6.** Partial Compliance |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- 18-year-olds with serious mental illnesses (SMI) who commit violent infractions are excluded from Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH) and must be placed in an appropriate therapeutic setting.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation (CAPS) and Program for Accelerated Clinical Effectiveness (PACE).

---

[165] These data do not include youth who were housed alone because they were the only inmate of a certain classification or housing type.

CAPS addresses the needs of inmates with SMI who have committed an infraction. PACE also offers treatment to inmates with SMI but is completely separate from the infraction process.

**ANALYSIS OF COMPLIANCE**

The Department submitted data on medical and mental clearance for all YA-ESH and Secure referrals throughout the Monitoring Period. Five 18-year-olds were referred to YA-ESH and all were cleared within one days of the request. Six 18-year-olds were referred to Secure (one transferred from ESH), and all were cleared within one day of the request for screening. The process appears to be efficient, and also capable of identifying youth who are not suitable for placement in restrictive housing (data on inmates over age 18 provided examples of inmates who were not cleared by either medical or mental health, suggesting that the approval is not pro forma).

Three 18-year-olds were placed in CAPS/PACE during the current Monitoring Period. One was placed in CAPS in early June and remained there at the end of the Monitoring Period, while two others were placed in PACE (one stayed for 12 days before being transferred to a Mental Observation unit, and the other remained for several months, although he turned 19 during that time and thus was no longer classified as a Young Inmate for the purpose of this provision). The Monitoring Team will further assess the appropriateness of such placements should the number of Young Inmates placed in these programs increase significantly in subsequent Monitoring Periods.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain "Satellite Intake," and utilizes it to serve the purpose of de-escalating a disruptive inmate (among other purposes of Satellite Intake). The length of stay in Satellite Intake is limited to 6 hours. A movement log is used to record admissions and releases and a tour log is used to record 15-minute checks and other operational notes. Custody Management and H+H must be notified of any placements on the unit.

- The Satellite Intake Ops Order was revised during this Monitoring Period to reflect the changes previously announced in a teletype. The Ops Order was promulgated in July 2018.

- Both RNDC and GMDC operated Satellite Intake units during some portion of the Monitoring Period.[166]

---

[166] The Department operates Satellite Intakes in other Facilities throughout the Department as well.

- Facilities are required to submit a compilation report of their use of Satellite Intake to Custody Management each week.

**ANALYSIS OF COMPLIANCE**

A description of the Satellite Intake function can be found on page 248 of the Fourth Monitor's Report. The Monitoring Team conducted two reviews of Satellite Intake weekly reports and reviewed the Satellite Intake logbook at RNDC while on site. The use of Satellite Intake declined toward the end of the Monitoring Period: RNDC went from about 25 uses in January to only about 2 or 3 in May and June. GMDC stopped using Satellite Intake in March. Most of the youth stayed less than 3 hours before being transferred to a new housing unit.

While Satellite Intake does not appear to be used often or for long periods of time, the Department still needs to improve the completeness of its data to demonstrate compliance. The Monitoring Team requested documentation for a 13-week period. Only 70% of the weeks included a complete package of information; others were missing either the summary memo or the supporting log book documentation. Specific length of stay data was available for only three of the six uses during the time period.

| **COMPLIANCE RATING** | **¶ 10.** Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with an M-designation prior to holding a disciplinary hearing.

- The Department implemented Directive 0000R-A "Implementing Departmental Policy," as discussed in the Implementation Section of this report.

- The Department sought clarification on the third recommendation from Dr. Beard, who explained that the review was suggested for the purpose of relaying relevant information to the Adjudication Captain and to determine whether H+H should be present during the hearings.

- In June 2018, the Department decided it would not implement this third suggestion, finding the recommendation to be unduly burdensome and believing that existing protections were sufficient.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team is seeking more information about the Department's existing practices and decision not to implement Dr. Beard's third suggestion. The purpose of Dr. Beard's assessment was to ensure the process for adjudicating infractions is fair and reasonable, a standard that is essential for good correctional practice. Dr. Beard's suggestion is one way to achieve this goal, but there are likely others. During the next Monitoring Period, the Monitoring Team and Department will discuss existing practices regarding pre-hearing evaluations, how the results of these evaluations are used to inform the infraction hearing, and how evaluations contribute to the use of accommodations during hearings.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

### 15. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

This section of the Consent Judgment requires the Department to make best efforts to identify an alternative housing site, off of Rikers Island, for inmates under the age of 18 (¶¶ 1, 3). The intent of transferring adolescent inmates to an alternative Facility is to place them in a facility readily accessible by public transportation to facilitate visitation between inmates and family members more easily, and to house them in an environment that will support a new paradigm for effectively managing the adolescent inmate population. This new paradigm will rely more heavily on the creation of positive relationships between Staff and youth, and the reduction of idle time via the availability of an array of rehabilitative programming that addresses the underlying causes of their delinquency.

| XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3 |
|---|
| ¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The |

Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The City continues to work towards moving the 16- and 17-year-olds out of the adult jails, off Rikers Island, by October 1, 2018 as required by RTA. The City has formed numerous Task Forces and working groups to plan RTA's implementation. The Mayor's Office for Criminal Justice is coordinating with the Department and ACS regarding the many decisions and plans required to transfer the adolescents to the new facilities.

- The City plans to renovate two facilities currently operated by ACS for this purpose: (1) Crossroads, located in the Brownsville neighborhood of Brooklyn and (2) Horizon, located in the Mott Haven neighborhood of the South Bronx. Renovations will maximize operational capacity, enhance programmatic, recreational and educational space and upgrade certain health and safety features. The planned $55 million renovation is well underway. Horizon has been designated as the facility to hold youth that would have otherwise been held at Rikers Island.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team made its second tour of Horizon during the Monitoring Period, accompanied by key staff from both the Department and ACS. Post-renovation, the physical space at Horizon will meet the safety, housing, recreational and programming space requirements of this provision. The facility is also accessible by public transportation.

The October 1, 2018 implementation date for Raise the Age is imminent. The months ahead will require vigilance and careful planning to ensure that the Department maintains its current level of compliance with the *Nunez* provisions related to adolescents. In some cases, the Monitoring Team believes there is an opportunity to shore up existing practices so that operations post-transition actually improve upon the current state of affairs. Several members of the Monitoring Team have worked with other jurisdictions as they opened, closed and consolidated facilities and the Monitoring Team is fully committed to offering any technical assistance and support necessary to help the Department and its stakeholders to navigate this transition.

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance |
|---|---|
| | ¶ **3.** Not currently applicable |

• End •

# Appendix A: Definitions

| Acronym or Term | Definition |
| --- | --- |
| ACS | Administration for Children Services |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidables | Process at the Facility-level to identify and address avoidable use of force incidents |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BSP | Behavior Support Plan |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DCID | Deputy Commissioner of ID |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |

i

| Acronym or Term | Definition |
|---|---|
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| LMS | Learning Management System |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| NPA | Negotiated-Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| PC | Protective Custody |

| Acronym or Term | Definition |
|---|---|
| PDR | Personnel Determination Review |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review Process | Wardens review every use of force incident which is captured on video, and consider whether the force used was appropriate and within guidelines. |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| SMI | Serious Mental Illness |
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking System |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |

| Acronym or Term | Definition |
| --- | --- |
| YA-ESH | Young Adult Enhanced Supervision Housing |