# Seventh Report of the *Nunez* Independent Monitor

**Seventh Monitoring Period**
**July 1, 2018 through December 31, 2018**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ................................................................................................................ **1**
    Background .................................................................................................................. 1
    Current Status of Reform ........................................................................................... 2
    Organization of the Report......................................................................................... 9

**Staff Use of Force and Inmate Violence Trends During the Seventh Monitoring Period ... 11**
    Facility Trends .......................................................................................................... 17
    Efforts to Understand the Department's Increasing UOF Rates.............................. 19
    Consequences of High UOF Rate ............................................................................ 27

**Identifying & Addressing Use of Force Misconduct** ...................................................... **31**
    Identifying Use of Force-Related Misconduct ........................................................ 31
    Investigating Use of Force-Related Misconduct...................................................... 38
    Addressing Use of Force-Related Misconduct ....................................................... 38

**Section by Section Analysis** ........................................................................................... **52**
    1.    Use of Force Policy (Consent Judgment § IV) ........................................ 52
    2.    Use of Force Reporting and Tracking (Consent Judgment § V) ......................... 55
    3.    Training (Consent Judgment § XIII)....................................................... 73
           Training Academy ................................................................................... 74
    4.    Anonymous Reporting System (Consent Judgment § VI)................................... 91
    5.    Video Surveillance (Consent Judgment § IX) ......................................... 92
    6.    Use of Force Investigations (Consent Judgment § VII)...................... 104
    7.    Risk Management (Consent Judgment § X) ............................................ 137
    8.    Staff Discipline and Accountability (Consent Judgment § VIII)....................... 151
           Analysis of OATH Decisions ................................................................ 151
    9.    Screening & Assignment of Staff (Consent Judgment § XII) ............................ 172
    10.    Staff Recruitment and Selection (Consent Judgment § XI).......................... 180
    11.    Arrests of Inmates (Consent Judgment § XIV).............................................. 185
    12.    Implementation (Consent Judgment § XVIII) ................................................... 186

**Transfer and Management of 16- and 17-Year-Old Youth** .......................................... **192**
    13.    Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII).... 206

**Current Status of 18-year-olds Housed on Rikers Island** ............................................ **208**
    14.    Safety and Supervision of Inmates Under the Age of 19  (Consent Judgment §
    XV)    .................................................................................................. 211
    15.    Inmate Discipline (Consent Judgment § XVI)................................................ 228
  **Appendix A: Definitions** …………………………………………………………...…i
**Appendix B: Training Charts** ……………………………………………………………..v
    Status of Initial Training Program Development and Deployment………………….v
    Status of Refresher Training Program Development and Deployment……………….ix
    Status of Training Provided Since the Effective Date …………………………….xi
**Appendix C: OATH Penalties** ……………………………………………………...…xii
**Appendix D: Flowchart of Promotions Process** …...……………………………….…xiv

# INTRODUCTION

This is the Seventh Report[1] of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the New York City Department of Correction ("the Department" or "DOC")[2] and the Monitoring Team to advance the reforms in the Consent Judgment during the Seventh Monitoring Period, which covers July 1, 2018 to December 31, 2018 ("Seventh Monitoring Period").

## *Background*

The Department manages 13 inmate Facilities, nine of which are located on Rikers Island ("Facility" or "Facilities"). In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 11,000 active uniformed Staff and 1,900 civilian employees, and detains an average daily population of 8,136 inmates.[3]

---

[1] A Special Report was also filed by the Monitor on March 5, 2018. (*see* Dkt. Entry 309)

[2] All defined terms utilized in this report are available in ***Appendix A: Definitions***.

[3] 28.5% of the inmate population is detained for four days or less, while 22% of the population is detained three months or more. The average length of stay for an inmate is 72.8 days. (See "January 29 – DOC at a

The Consent Judgment was entered by the Court on October 22, 2015.[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (*i.e.*, those under 19 years old). The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principles can take root without a culture change within the agency that embraces them.

*Current Status of Reform*

As discussed throughout this report, the conditions at Rikers remain out of conformity with the requirements of the Consent Judgment. During the current Monitoring Period, the Department's use of force rates reached their highest levels since the Consent Judgment went into effect. The unremitting level of use of force impedes the Department's ability to make progress in other areas. Investigations of staff misconduct and subsequent imposition of Staff discipline are not keeping pace with the volume of new cases flowing into the system. While the rate of reform is not stagnant (the Department has taken several incremental steps to advance the

---

Glance Report," <https://www1.nyc.gov/assets/doc/downloads/press-release/DOC_At%20a%20Glance-1st6_Months_FY2019_012919.pdf>).

[4] The Effective Date of the Consent Judgment is November 1, 2015. (*see* Dkt. Entry 260)

reform), it has yet to achieve, on a systemic level, most of the principal reforms required by the Consent Judgment. In fact, as set out in this report, the Department is in Non-Compliance with three of the most consequential provisions of the Consent Judgment: (1) implementation of the Use of Force Policy (§ IV., ¶1); (2) timely and quality investigations (§ VII., ¶1); and (3) meaningful and adequate discipline (§ VIII., ¶1). That said, it is also true that the foundation upon which a reformed system can stand has begun to take shape.[5]

At its best, reforming a correctional system is a complex, long-term process that requires varying measures of technical expertise, patience and perseverance. At its most challenging—in places like the Department of Correction, with its deeply dysfunctional operating systems and violent cultures that have been entrenched for decades—things often get worse before they get better. Like all troubled systems, the Department has had to confront failed systems and gaps in its basic foundations and begin to undo and unravel the many systems and forces that have served to maintain the status quo for so long. This degree of reform never occurs flawlessly or quickly, and the initial incremental gains may appear to be completely inadequate given the size of the task remaining. But, in reality, this is not the case. These incremental steps are, in fact, essential and foundational.

The Consent Judgment has been in effect for three years. At the outset of its implementation, the Department had few of the systems necessary to understand the size and scope of its problems, much less the capacity and momentum to catalyze change of the necessary magnitude envisioned in the Consent Judgment. An uncomfortable, but inevitable, side-effect of building the necessary systems over the past several years is that the size, scope, causes, and

---

[5] To that end, the Department was found to be in Substantial Compliance with about 159 provisions of the Consent Judgment in this Monitoring Period.

implications of the Department's myriad problems now stand in sharp relief. This is, in part, why this report is so lengthy—the Monitoring Team has dissected a wealth of data about the Department's performance in order to identify many of the root causes of and potential solutions to the problems addressed by the Consent Judgment. This would not have been possible without the Department's success in building necessary foundational systems that are discussed throughout this report.

One of the Department's most significant foundational advances are the Preliminary Reviews completed by the Investigation Division. Every UOF is examined by the Investigations Division to ascertain whether Staff followed policy, which is exactly the type of internal oversight needed to set a new tone about what is permissible. Nearly all uses of force are now captured by either stationary or hand-held video cameras and written use of force reports are now submitted timely; data systems and other electronic tools (*e.g.*, Case Management System and the Trials Tracker) are now capable of producing reliable reports; and the Nunez Compliance Unit and Compliance and Safety Center ("CASC") now develop and analyze data to show the nature and extent of various operational issues that contribute to the interrelated problems of violence and excessive and unnecessary uses of force. These systems were developed collaboratively with the Monitoring Team. Although these systems may, at first, appear inconsequential, they are in fact critical to effectuate and maintain the broader systemic changes anticipated by the Consent Judgment. These new structures quite literally represent a pathway to improving practice and are essential to assessing whether conditions are actually evolving and improving.

In addition to building the foundation, the Department has also experienced some success in various intermediate steps on the path to reform, such as serving misconduct charges to Staff

4

in a timely manner, developing a classification instrument for 16- and 17-year-olds, and routinely using hand-held cameras to record planned uses of force. These three provisions were the first to be rated in Non-Compliance in the Third Monitoring Period and the Department has since achieved Substantial Compliance. The Department has been in Substantial Compliance with provisions related to staff recruitment and selection since shortly after the Consent Judgment went into effect and, over the past three years, has trained and retrained one of the largest correctional workforces in the country. The Department also successfully moved 16- and 17-year-olds off of Rikers Island. While these achievements remain fragmented and have not yet catalyzed the broader changes in practice that the Consent Judgment requires, they are important precursors to systemic reform.

The Monitoring Team has guided, pushed and prodded the system toward reform, but the Department's achievements to date are the result of many individuals who share the Monitoring Team's commitment to transformation. In particular, the Commissioner, Chief of Department, Chief of Staff, Chiefs of Security and Facility Operations, Deputy and Assistant Commissioners of Investigations and Trials, the General and Deputy General Counsel, and the Assistant Commissioner of Quality Assurance have been tireless in their efforts to set the course forward. Despite these efforts, many Staff's practices have not changed, perhaps because they do not see the value of reform or because they are "waiting it out." DOC staff have seen countless leaders (and Mayoral administrations) come and go and may still be waiting to see if the Commissioner's vision for reform will prevail. It is impossible to know in advance whether the current leadership will be able to persuade the rank-and-file to adopt the necessary changes and to dismantle the decades-long culture that has allowed poor conditions to endure, but it must be

said that the current leadership has embraced the reform effort and is moving the system in the right direction, albeit at a slower pace than we collectively desire.

The Department continues to be candid and collaborative with the Monitoring Team, even with the frequent delivery of negative feedback and disappointing results. A key emphasis of the Monitoring Team has been to focus the Department on addressing three persistent, interrelated problems that thwart the Department's efforts to move forward: (1) the high use of force rate at certain facilities, particularly RNDC; (2) the resulting increase in the number of investigations opened and the complexity of that process, which hinders the process for holding staff accountable; and (3) the compounding delays in imposing staff discipline and the lack of integrity of some of these systems.

The nuances of these problems are being identified by the Monitoring Team's ongoing scrutiny of uses of force which consists of reviewing all initial incident reports ("CODs"), all Preliminary Reviews, and a large sample of UOF investigations and corresponding staff disciplinary actions. Source documentation is also examined, including videotaped footage of UOF incidents; Staff, witness and inmate reports; medical assessments; and other available evidence. These efforts have identified a number of patterns in Staff practices that must be addressed in order for the Department to achieve the overarching goals of the Consent Judgment. The following recommendations were developed by the Monitoring Team to stimulate meaningful progress, have been shared with the Department and are discussed in detail throughout this report:

- Employ a comprehensive and directed strategy to **address persistent deficiencies in Staff's UOF practices**. Not only must the Department focus directly on problematic behaviors that either lead to or result in excessive uses of force, but it must do so on multiple levels to

address the problem from various angles. This includes an intentional emphasis on known

deficiencies during the course of incident reviews, consistent messaging from leadership and

supervisors at all levels, and unfailing efforts to help Staff identify alternatives to using force

to create a safe environment. It is equally important to frequently and publicly acknowledge

staff who manage situations appropriately to encourage those Staff and reinforce the adoption

of new practices. The Monitoring Team suggests the following strategies:

- o Significantly increase the frequency with which Staff utilize non-physical means to
  obtain control, including verbal de-escalation, crisis management, and the strategic use of
  rapport, persuasion and incentives to encourage positive behavior among inmates. Too
  often, Staff's confrontational demeanor and demands for immediate compliance
  precipitate the use of physical force.

- o Reduce the over-reliance on the Probe Team when responding to incidents;

- o Use lock-downs more judiciously to limit the negative collateral consequences of this
  practice;

- o Cease the practice of unsafe and ineffective UOF techniques (*e.g.*, painful escort
  techniques and use of head strikes outside the situations in which they are permitted by
  policy);

- Improve the Department's ability at all levels to **accurately identify UOF-related
  misconduct**. Identifying the circumstances surrounding the problem (*e.g.*, who, what, where,
  why) is the critical first step in the lengthy process to altering Staff's problematic practices to
  ensure safe facilities.

- **Fortify the Preliminary Review process** to support more efficient case closure (which will, in turn, reduce the investigations backlog) and utilize the particulars of the review process to craft better informed strategies to address recurring problems.

- **Restructure the protocol for cases currently referred for Facility Investigation**. As currently constituted and performed, Facility Investigations add no value to the process of addressing Staff misconduct. This process must be transformed to produce a meaningful, efficient inquiry into Staff's conduct.

- **Improve the process and timeliness of imposing Staff discipline**. The current process, while much improved, remains ineffective due to the lack of timely completion of investigations and the still varying quality of investigations, which, in turn, leads to lack of timely imposition of staff discipline, rendering it ineffective in deterring Staff misconduct.

- Develop a process for **effectuating Command Disciplines and Facility Referrals** that brings uniformity and integrity to the process.

- **Assign a Uniformed Liaison(s) to the Monitoring Team** who is tasked with working directly with the Monitoring Team to advance the reforms at the Facility-level. The goal is to stimulate ownership among uniformed leadership, supervisors, and Staff and to utilize the information from the Monitoring Team and *Nunez* Compliance Unit ("NCU") to develop Facility-based solutions to pervasive problems.

The Department's lack of significant progress to date brings it to a watershed moment. Without quantifiable, tangible, meaningful change in the conditions at the Facilities, the Monitoring Team must consider other actions to stimulate progress toward the overarching goals of the Consent Judgment. In the short-term, the Department must demonstrate appreciable progress on each of the recommendations above. The quality of the Department's planning and

the extent to which the concepts have been operationalized by the end of the Eighth Monitoring Period will be an essential part of the Monitoring Team's deliberation about whether to advise the Parties that additional remedial measures are necessary, including potential Court-ordered relief.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses detecting and responding to the misuse of force in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (*e.g.*, policy, reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Finally, the report examines recent changes and current trends regarding 16, 17, and 18-year-olds. Given the physical separation and different facility management structure for 16- and 17-year-olds and 18-year-olds (who remain on Rikers Island), the Monitor's Report will now have two separate sections organized by age group. Provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), § XVII (Housing Plan for Inmates Under the Age of 18) will be addressed depending on the applicability of the provision to each age group. A small group of provisions in §§ XV and XVI are addressed

Case 1:11-cv-05845-LTS-JCF   Document 327   Filed 04/18/19   Page 13 of 256

in other sections of this report (*e.g.*, § XV, ¶¶ 10, 11 camera coverage in facilities housing Young Inmates is addressed in the Video Surveillance section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Inmates is addressed in the Use of Force Investigations section of this report).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[6] (b) Partial Compliance,[7] and (c) Non-Compliance.[8] The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report but, with each Monitoring Period, has increased the proportion of provisions for which the compliance level has been assessed.[9] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for completion falling after December 31, 2018.

---

[6] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[7] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains.

[8] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment.

[9] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

## STAFF USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE SEVENTH MONITORING PERIOD

The overall goal of the *Nunez* Consent Judgment is to reduce the frequency with which force is used, and more particularly, the use of unnecessary and excessive force. By any measure, the Department is not meeting its obligations as the number of uses of force continues to climb, reaching the highest level in December 2018 (n=608, as shown in the first graph below) since the Consent Judgment went into effect. Additionally, when bringing an incident under control, the degree of injury, as well as the needless and gratuitous infliction of pain which may not result in visible or identifiable injury, are important hallmarks of "excessive and unnecessary force" and, thus, were at the center of the concerns that gave rise to the Consent Judgment. Staff actions can and often do result in varying degrees of bodily pain with no visible or identifiable injury, *e.g.*, chokeholds, takedowns, wall slams, OC, painful escorts holds, body strikes, etc. Such actions also contribute significantly to a destructive culture, and the Monitoring Team remains very concerned that such actions on the part of Staff are not being successfully addressed and remain largely unchecked. Therefore, of equal concern to the sheer volume of incidents (and problematic incidents in particular), is DOC's response when Staff have engaged in misconduct—the agency's record of assessing misconduct, as well as imposing discipline for such misconduct is woefully inadequate, as set out throughout this report.



Normally, as a correctional population decreases, the number of uses of force will also decrease. Sometimes, the observed decreases are proportional—meaning that the number of uses of force decreases along with the decreases in the population. In these situations, the use of force rate stays the same because a smaller number of uses of force are being applied to a smaller number of inmates. However, a far more desirable outcome—indeed, the overall goal of the Consent Judgment—is for the decrease in the number of uses of force to outpace the decrease in the size of the population (*i.e.*, the UOF rate actually decreases). Unfortunately, as shown in the graph below, the UOF rate is traveling in the opposite direction, meaning even *more* force is being used with fewer inmates (*see* Sixth Monitor's Report pgs. 9-11 for a full discussion of this issue). The steadily climbing use of force rate is shown by the dotted trendline in the graph below and clearly illustrates the source of the Monitoring Team's grave concerns.



The table below shows the six-month average UOF rate for each Monitoring Period since 2016.

The average rate for the current Monitoring Period is **79% higher** than the rate in the first full

six-month Monitoring Period (Jan-Jun 2016).

| Six-month Average UOF Rates, 2016-2018 | | | | | | |
|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** |
| **6-month Average** | 3.75 | 4.16 | 4.01 | 4.63 | 5.10 | **6.71** |

Furthermore, the line graph below shows that in every month in 2018, the UOF rate was higher

than all previous years.



Together, these aggregate trends show that the Department has lost ground in addressing its main objective—reducing unnecessary and excessive force and addressing those things in the environment (things attributable to both Staff and inmates) that contribute to situations where force is needed. Force is sometimes necessary in a confinement setting for a variety reasons, and as such, an end goal of "zero UOF" is totally impractical. However, the Department has yet to impact the factors that would lower its UOF rate to more reasonable levels. Furthermore, even a legitimate, unavoidable use of force has negative consequences: it is incredibly taxing on the system (*e.g.*, Staff time required to write reports, review, and investigate incidents; unit or Facility lock-downs that prevent access to programming and services) and any use of force exacerbates the risk of injury for both Staff and inmates.[10] All of these dynamics are discussed in more detail below. These alarming data raise many questions about why the reforms the

---

[10] The Monitoring Team acknowledges that one of the legitimate purposes of UOF is to mitigate serious injuries from being inflicted (*e.g.*, breaking up an inmate-on-inmate fight where a weapon is being used). In these situations, an injury may not be avoidable, although hopefully the use of force reduces the seriousness of an injury that might have occurred.

Department has put in place have yet to have a positive impact and underscore the need for better and deeper solutions to impact the underlying causes of the increases.

In fact, most of the various reforms required by the Consent Judgment remain a "work-in-progress." At the outset of monitoring, the Department had few of the tools necessary to gauge the size and scope of the problem, and thus an essential first step was to build these systems. While many of these are now regularly utilized, they are still susceptible to problems with data entry and analysis. Even once reliable and valid, they serve only as the foundation upon which the changes required to impact the UOF rate will be built.

While several good concepts to reduce force have emerged, most remain in the early implementation phase and have yet to achieve the expected impact. For example, the Department's UOF Improvement Plan was discussed in the Sixth Monitor's Report (at pg. 17). Despite efforts throughout 2018, it has not been well implemented and thus its impact has been minimal. The status of each element of the plan is discussed below:

- **Improving Communication**. Efforts to advise Staff about their obligations, critique actual incidents, and provide coaching to Staff were initially successful, but came to a halt in September when the initiative was pushed to the Facilities to manage independently.

- **Deploying De-Escalation Teams.** The Monitoring Team saw no evidence that these teams were ever developed or deployed.

- **Revamping the Rapid Review/Avoidables Process.**[11] The Department succeeded in improving the tracking process for this analysis and has somewhat improved its ability to

---

[11] For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any

identify problematic incidents. However, the strategy needs to be fortified with improved follow-through on the Facilities' chosen plan of action.

- **Implementing Support Teams for Female Inmates**. The UOF rate at RMSC has decreased slightly, though the extent to which the Support Teams altered inmates' behavior is unknown.

- **Assigning Training Captains to Coach Staff**. While Mentoring Captains have been identified, the Department reports that their work is not always properly aligned with the issues the Department is hoping to influence (*e.g.*, quality interactions, improved report writing, resolving interpersonal conflict).

- **Increased Focus on OBCC & GRVC**. Additional support and resources were provided to OBCC and GRVC, which included a pilot of the ID/Facility Coordinated Use of Force Analysis.[12] As discussed throughout this report, this is a promising approach and has been subsequently expanded to other facilities.

The data presented in this section illustrate a discouraging picture and the glacial pace of reform is difficult to tolerate. While the Department must accelerate its effort to implement the various strategies with fidelity, patience will also be required to assess their full impact. That

---

corrective action is necessary, and if so, for what reason and of what type. "Avoidable" incidents are those that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (e.g. ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions).

[12] As described in the Sixth Monitor's Report (at pg. 22) ID scrutinizes all UOF at OBCC and GRVC (and expanded to RNDC and AMKC this Monitoring Period) to better align assessments conducted by uniform leadership via the Rapid Reviews with ID's analysis. On a weekly basis, ID compares its own analysis of each incident with the Facility's assessment and identifies cases where the appraisals are not compatible and/or incidents that are concerning for various reasons. These incidents are compiled into weekly reports that are shared with Facility leadership and discussed during bi-weekly meetings between ID and the Facility leadership.

said, until Facility leaders (Captains, ADWs, DWs and Wardens) are fully invested in the spirit

of reform, are committed to implementing the reforms, are recognized when their actions support

the Department's UOF reduction goals and are held appropriately accountable when they fail to

act or they act in ways that undermine the Department's goals, the unacceptable pace of reform

will persist.

*Facility Trends*

Examining Facility-level UOF data helps to identify the sources of the problem and

places where force is used most frequently. As shown in the bar chart below, during this

monitoring period, the Facilities with the highest rate of force were RNDC (28.06), MDC (9.71),

BKDC (6.76), and NIC (6.34).[13]

- In one Facility (RNDC), force has <u>sky-rocketed</u>. The concentration of younger inmates at

  this Facility is a contributing factor (discussed in depth in the "Current Status of 18-Year-

  Olds on Rikers Island" section of this report) along with the level of disorder that

  accompanied the transfer of 18-year-olds into, and 16- and 17-year-olds out of the

  Facility.

- In three Facilities (OBCC, RMSC, WF), the UOF rate <u>recently decreased</u> at a time when

  it increased everywhere else. These changes occurred despite the fact that the type of

  inmates housed at the Facilities has not varied.

- In several Facilities (BKDC, GRVC, MDC, NIC), the UOF rate has <u>gradually increased</u>

  to a point that is concerning.

---

[13] Note, data for HOJC, where the 16- and 17-year-olds are now housed, is not included in the chart below because it has only been operational since October 1, 2018 (the Transfer and Management of 16- and 17-Year-Old Youth section of this report provides a more comprehensive assessment of UOF in that facility). Prior to October 1, 2018, UOF with these youth are included in RNDC's data.

- In some Facilities (AMKC, EMTC, VCBC), the UOF rate has <u>remained lower</u> than their counterparts, though recent increases at VCBC create reason to be watchful.

The Department's efforts to understand the dynamics at play at RNDC and to understand and attempt to replicate the factors that contributed to improvements at OBCC, RMSC and WF are essential.



| | AMKC | BKDC | EMTC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2.42 | 2.5 | 1.62 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.24 |
| 2017 | 2.72 | 3.94 | 1.74 | 6.42 | 4.82 | 2.21 | 6.12 | 4.83 | 4.9 | 2.81 | 20.97 |
| Jan-Jun 18 | 2.91 | 5 | 1.61 | 9.14 | 6.62 | 3.07 | 6.51 | 5.2 | 10.47 | 1.93 | 9.49 |
| Jul-Dec 18 | 3.63 | 6.76 | 1.89 | 9.39 | 9.71 | 6.34 | 4.3 | 4.4 | 28.06 | 4.22 | 4.76 |

Average Use of Force Rates, by Facility
*2016-2018*

In particular, the Department must seek to understand why the specific component of the Use of Force Improvement Plan that was implemented at both OBCC and GRVC produced differing results (UOF has decreased at OBCC but has remained consistently high at GRVC). Both Facilities received three new forms of support: 1) weekly meetings with ID ("ID/Facility Coordinated Use of Force Analysis") to discuss the types of use of force problems occurring at the Facility; 2) increased support from CASC, which monitors the Facilities remotely by video and provides real-time feedback about security issues and loose operational practices; and 3) Correction Intelligence Bureau ("CIB") scrutiny of the population to prevent interpersonal conflict from erupting in violence. OBCC's lower rates of force are particularly interesting given

18

that the Facility houses all of the Enhanced Supervision Housing ("ESH") units and thus has a significant proportion of difficult-to-manage inmates. From the Monitoring Team's vantage point, the differences seem due in large part to the Facility Leadership, including their willingness and skill to use the information that ID provides to change practice at the line-level. The Department should examine each component more thoroughly to identify and replicate the factors that appear to be most effective.

*Efforts to Understand the Department's Increasing UOF Rates*

Several factors contribute to the Department's high UOF rates. As an initial matter, differences in UOF rates across age have been a constant since the Monitoring Team's tenure, and Facilities with the highest proportions of young inmates have had the highest UOF rates. Further, the Monitoring Team has identified four persistent contributors to the high UOF rate and attendant problems of excessive and unnecessary UOF. First, as highlighted in the Introduction section of this report, Staff have not yet fully embraced the principles of de-escalation and their approach often leads to situations that create or exacerbate the need to use force. This includes counterproductive *language* (*e.g.*, referring to inmates in depersonalizing terms such as "bodies" or "packages"; taunting or provoking), *tone* (*e.g.*, yelling, shouting or using a sarcastic or antagonizing tone), and *non-verbal communication* (*e.g.*, shaking OC cannisters, slapping batons in a threatening manner or invading the inmate's personal space). Furthermore, a variety of tactical concerns are prevalent, such as the overreliance on the Probe Teams to handle incidents and unsafe and ineffective techniques (*i.e.*, painful escort techniques and head strikes outside the circumstances permitted by policy). Finally, constant reorganization of Facility leadership and inconsistent Staff assignments to housing units compromise the Department's ability to provide

clear and consistent messaging about expected practices. These and other dynamics are discussed in more detail below.

- **Age-Related Variables**

The data presented in the graph below clearly illustrate the need for age-based strategies. Factors surrounding the UOF with 16- and 17-year-old receive special attention in this report because of the recent transfer of these youth to Horizon Juvenile Center ("HOJC" or "Horizon") and the dynamics influencing its early phase of operation. The 18-month average UOF rate with these youth is roughly 10 times higher than that of the adult population (42.1 versus 3.5), with sharp increases in recent months. These dynamics are discussed at length in the section titled "Current Status of 16- and 17-Year Old Youth."

Adolescents aside, UOF rates across other age groups are also illuminating, as shown in the line graph below. Young Adults (age 18-21) clearly have different patterns than adults (age 22 and older). Within the Young Adult category, the average UOF rate for 18-year-olds is significantly higher than those aged 19-21 (29.0 versus 16.9 during the current monitoring period) and has increased sharply since June 2018, when GMDC was closed and these youth were moved to RNDC. Some of this was likely due to the stress of the transition and the absence of some of the programmatic opportunities (*i.e.*, the YES and PEACE Centers) that were available at GMDC and are still under construction at RNDC. That the trend has yet to subside is cause for concern and the Department must redouble its efforts to provide effective leadership, additional tools for Staff, and compelling incentives for youth in order to improve safety at that Facility.



| | Jul 17 | Aug 17 | Sep 17 | Oct 17 | Nov 17 | Dec 17 | Jan 18 | Feb 18 | Mar 18 | Apr 18 | May 18 | Jun 18 | Jul 18 | Aug 18 | Sep 18 | Oct 18 | Nov 18 | Dec 18 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 16-17yo | 24.5 | 27.3 | 25 | 26.8 | 23.5 | 29.2 | 42.3 | 39.1 | 32.8 | 39.1 | 43.3 | 34 | 33 | 54 | 63.8 | 95.5 | 52.5 | 72.2 |
| 18yo | 13.2 | 12.6 | 11.9 | 17.3 | 11.5 | 19.4 | 13.8 | 16 | 12.2 | 11 | 10.9 | 32.9 | 51.9 | 54.9 | 54.8 | 41 | 51.7 | 85.7 |
| 19-21yo | 15.9 | 15.9 | 12.7 | 11.8 | 12.1 | 8.5 | 16.8 | 13.1 | 14.2 | 13.6 | 17.3 | 18.2 | 20 | 20.7 | 21.6 | 21.6 | 21.2 | 29.6 |
| 22+yo | 2.9 | 2.8 | 3.1 | 3 | 3 | 3.6 | 4.5 | 3.4 | 3.5 | 3.1 | 3.6 | 2.8 | 3.4 | 4.4 | 3.7 | 4.4 | 4.1 | 4.1 |

As noted in previous Monitor's Reports, while the UOF rates are higher among younger inmates, the sheer number of adult inmates in the system contribute a significant number of uses of force. During the current Monitoring Period, there were 1,783 uses of force with adults age 22 and older, which comprises just over 50% of the total 3,480. Understanding the contributors to the use of force for the adult population is just as essential as a young inmate strategy for a significant and sustained reduction in the overall UOF numbers.

- **Inmate Dynamics**

The use of force is a dynamic interaction—it is catalyzed by both inmates' and Staff's behavior and cannot be effectively reduced without due attention to all of the contributing factors. Strategies to impact both parties are necessary for a significant and sustained reduction in the UOF rate.

Inmate behavior has an undeniable influence on the frequency with which force is used. When inmates exhibit threatening or violent behavior, Staff are duty-bound to respond and often

21

a use of force is necessary to gain control of the situation and to prevent or reduce the likelihood of harm. As discussed extensively in the Young Inmate section of this report, an array of tools and strategies are likely to impact inmates' dangerous behavior including decreasing idle time and providing a robust system of incentives and meaningful accountability measures. Many of these remain in the developmental phase for young inmates and thus their full value is yet to be realized. Similar interventions for adults, though not specifically required by the Consent Judgment, will be necessary to reduce the sheer volume of uses of force Department-wide.

In addition to widespread initiatives to address inmate behavior overall, initiatives targeting those inmates involved in high numbers of uses of force are also essential. Data illustrates this point clearly. In 2018, a total of 239 inmates[14] were involved in at least 1,899 uses of force. In other words, about 3% of inmates accounted for about 30% of the total UOF. Strategies to reduce misconduct and the UOF with this population are critical, but alone, this will not solve the UOF problem. Fully 70% of the uses of force (n=4,401) were distributed among the other 97% of inmates, and thus to significantly decrease the UOF rate, more global strategies to target inmate misconduct, frustration and aggression—and Staff's response to it—must also be enacted.

- **Staff Conduct and Practices**

Physical force by Staff in a correctional setting is at times necessary to maintain order and safety and the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. That said, not all

---

[14] 192 of the 239 inmates have an "M" designation, which means the individual was provided some level of mental health treatment during their incarceration.

uses of force are necessary, and every anticipated use of force incident has an inherent opportunity to consider whether force could have been avoided altogether if Staff had managed the situation differently. The Monitoring Team has identified three tactical concerns related to the use of force.

- *Staff Precipitated Force*: The Monitoring Team has observed many situations in which Staff's approach to a situation created or exacerbated the need to use force and has identified these "Staff-precipitated events" as an area that is ripe for action by the Department. Acting in a manner that is hasty, hurried, thoughtless, reckless, careless or in disregard of consequences can create a chain of unwanted events for Staff, inmates, Supervisors, investigators, etc. The Monitoring Team is working closely with the Department to create broad understanding across the Department's leadership of this dynamic and to insist on appropriate Staff accountability. As noted above, the Monitoring Team strongly believes that the active buy-in from Facility leaders at all levels is essential to improving the pace of reform.

- *Overreliance of Probe Teams*: The Monitoring Team is also concerned about Staff's overreliance on the Probe Team, the demeanor of which often escalates the situation and virtually ensures that force will become necessary. Rather than exhausting de-escalation tools or implementing a safe physical intervention technique themselves, too often, unit Staff call for the Probe Team which consistently intensifies the combative tenor of the situation and causes incidents/alarms/lock-downs to drag on unnecessarily. The overreliance on Probe Teams and corresponding lock-downs happen far too often and sustains a culture

where Staff are quick to use force and to resort to techniques that are often disproportionate to the severity of the threat.

- *Unsafe and ineffective UOF tactics*:

  - ➢ Painful Escort Techniques: Too often and for no justifiable reason, Staff utilize painful escort techniques (*e.g.*, bent wrist lock or overextension of the shoulder) when escorting inmates to intake or the clinic following a UOF. Painful escort techniques provoke the inmate, do not provide effective control, and do not prevent the need for additional force if the inmate becomes resistant.

  - ➢ Head strikes: The Monitoring Team regularly identifies situations in which Staff utilize head strikes in circumstances outside those permitted by policy (*i.e.*, as a last resort, when no other options are available, and Staff are faced with the imminent threat of death). Not only is the action out of proportion to the nature of the threat, but any head strike carries with it a risk of serious injury and often further escalates the inmate's behavior. It does not limit the inmate's movement and thus is an ineffective technique for obtaining control of a situation.

- **Staffing and Supervision**

"Staff-to-inmate ratios" are always a central topic of any reform effort, but the definition of that term is important to specify. Sometimes, an overall "Staff ratio" is calculated using the number of Staff in the building compared to the number of inmates in the building. Simply having more Staff in the building who are not actively supervising inmates is unlikely to have a direct impact on Facility safety. In fact, it could have the opposite effect. As discussed above, a

large presence of Staff in protective gear responding to an incident will likely increase the likelihood of a use of force. That said, having sufficient "roving Staff" to ensure inmates can be escorted efficiently, to support the various security needs (*e.g.*, gate or hallway posts), and to respond to large-scale disturbances is obviously also essential. The Department has the largest number of roving/non-housing unit Staff of any adult confinement operation of which the Monitoring Team is aware.

A more refined definition, one that counts only the number of Staff who are in proximity to and actively engaging and supervising inmates is the more appropriate metric. In other words—how many Staff are assigned to housing unit posts, recreation posts, or school posts during the times that inmates are present? While in some situations it may be helpful to increase the number of Staff assigned to posts in units housing particularly volatile groups of inmates (*e.g.*, the SSHs and units housing young adults), finding the proper balance is essential.

The Monitoring Team has observed during routine site visits and while examining Facility schedules that the Department's housing unit Staff ratios are consistent with generally accepted practice. Further, the Monitoring Team's extensive review of Use of Force incidents has not suggested that a lack of Staff contributes to the frequency of incidents or the use of force. Rather than increasing the Staff ratio, the Monitoring Team encourages the Department to pursue the following goals: 1) the same complement of Staff is consistently assigned to each housing unit; 2) these Staff possess the proper demeanor for the assignment; and 3) consistent adherence to standard security procedures. When these principles are satisfied, Staff can generally maintain safe units through their familiarity with the inmates, constructive relationships with inmates and each other, and predictable and consistent rule enforcement.

One of the other contributing factors to high levels of disorder in the Facilities is unstable leadership. While the Monitoring Team supports the general concept that newly-reforming systems need to make leadership changes to ensure those in charge are committed to the Department's vision and possess the necessary leadership skills, the leadership assignments systemwide have yet to stabilize. In particular, the assignments of Bureau and Assistant Chiefs, Wardens and Deputy Wardens constantly fluctuate.

During this Monitoring Period, the two Bureau Chiefs and two Assistant Chiefs retired. The two remaining Assistant Chiefs were promoted to Bureau Chief of Security and Chief of Facility Operations. Accordingly, the Department promoted four individuals to fill the Assistant Chief vacancies. Other Monitoring Periods have been marked by similar levels of reorganization.

Warden assignments are in a similar state of flux. In the 38 months since the Effective Date, six of the facilities have had <u>three</u> wardens, two facilities have had <u>four</u> wardens, one facility has had <u>five</u> wardens, and two facilities have had <u>six</u> wardens. In fact, as of the close of the Monitoring Period, only two facilities (BKDC and VCBC) were operating with Wardens who had been in place for even one full year. Similar changes are observed in Deputy Wardens' assignments and the support Staff that accompany each of these leadership positions.

This revolving door of leadership has had a corresponding impact on the Department's ability to implement the reforms. Not only do these transitions compromise continuity in messaging and supervision, but also obstruct progress in developing and implementing necessary practices. At best, the transition to new leadership delays progress as the new leaders become acclimated to the facility. At worst, initiatives that were underway during one Warden's tenure are abandoned when a new Warden is appointed, a pattern that has caused regression in several

26

key areas of the overall reform.[15] Finally, the lack of stable leadership and the inconsistent assignments of housing unit Staff produce a vicious cycle where both traction and continuity are elusive. The Monitoring Team hopes that both situations become stabilized in the near term so that the Department can begin to reap the benefits of consistent leadership teams and longer-term, consistent guidance; are able to coach Staff; and can push emerging practices forward without disruption.

*Consequences of High UOF Rate*

The use of force has many consequences for the relationships between Staff and inmates and the overall tenor and level of disorder in the Facility. Even uses of force that are within policy guidelines have an adverse impact on the culture of the Facility for those who work and live there. For example, every use of force requires multiple Staff to write reports, each of which must be reviewed by several people, at best, and at worst, investigated at several levels of the Department, each time being reviewed up the chain of command, and then multiple staff are engaged in the process of determining appropriate Staff discipline when warranted. This process, though necessary to ensure the appropriate UOF, is ***enormously*** taxing on the system, preventing Staff from attending to other important duties in the care and custody of inmates. A use of force usually also results in the inmate being infracted, which requires attention from an adjudication Captain and several others to mete out inmate discipline. In the immediate aftermath of the incident, inmates are escorted to intake to receive medical treatment (which taxes both the resources in intake and the medical staff's ability to deliver timely care to inmates with medical

---

[15] This dynamic also reinforces the need to develop sustainable practices that are not dependent on particular individuals to implement practice.

concerns), units and Facilities are often locked down,[16] which compromises access to programming (negating efforts to reduce idle time and catalyze behavior change) and services (limiting inmates' access to the few comforts afforded while in custody, which deepens their frustration). This burden is present even when the use of force falls within policy guidelines. Uses of force falling outside policy guidelines have an even more deleterious impact on the culture, creating a cycle of violence, retribution and mutual combat, a cycle that compromises safety for both inmates and Staff. Clearly, the system simply cannot operate safely and produce any sort of positive outcome when constantly in the throes of managing the collateral consequences of each UOF.

A particularly concerning consequence is a use of force that results in injury to Staff or inmates. At times, the amount of force used is excessive and leads to injury, but at other times, it is poor technique that causes an injury. Furthermore, unfortunately, in some circumstances, an injury may be purely accidental and/or unavoidable. The Department routinely tracks data on the level of injuries to both inmates and Staff (combined). As shown in the graph below, the proportion of UOF with no injury ("C"; represented by the blue bar) has remained approximately the same over time. Conversely, the proportion of uses of force in which an injury occurred ("A" and "B"; represented by the purple and green bars) has also remained about the same. However, because the total number of UOF has increased over the same period, this means a larger *number* of Staff and inmates were injured during the current Monitoring Period than prior periods (*e.g.*, n= 1,048 people with "A" or "B" injuries in Jan-June 2018 compared to n=839 in Jan-June 2016, an increase of 25%). This is obviously concerning.

---

[16] The Monitoring Team's observations suggest that the Department over relies on the use of lock downs—in particular in connection with a Probe Team response.



This data on "injury class" is useful in broad strokes but raises more questions than it answers. While some sorting to determine the source of injury occurs prior to assigning the classification, it is not a perfect system and leaves some significant unknowns about how injuries are sustained (*e.g.*, whether from the fight or from the use of force). During the current Monitoring Period, the Department conducted research to tease apart the injury class data to identify the proportion of injuries that were sustained by inmates and the likely cause of those injuries. The Monitoring Team would recommend a similar analysis focused on injuries to Staff in order to further advance Facility safety.

The research showed that the vast proportion of uses of force did *not* result in injuries to inmates (77% of all UOF incidents in November 2018), and that in an additional 7% of incidents, the injuries reported were not caused by the use of force itself. This is obviously positive. That said, 14% of uses of force in November 2018 *did* result in injuries to inmates that were the result of the use of force (in the remaining 2% of incidents, the cause of injury could not be

29

determined). The analysis drilled further into this 14% (n=73 incidents) to examine the small subset with the most serious (Class A) injuries. Of the six Class A injuries to inmates, four were found to be the result of the use of force. The results of this analysis are critical to problem-solving efforts to improve safety in the facilities. An obvious next step is to closely examine the incidents with injuries resulting from the UOF to identify whether the Staff properly executed an appropriate technique and/or whether a different technique may have been advisable. Identifying patterns in the circumstances surrounding the use of force that led to injuries is essential to being able to change practice to improve safety.

While the Department's focus on injury (both in the way it classifies uses of force and in the research priority assigned to it) is important, the Monitoring team also emphasizes that the needless infliction of pain when bringing an incident under control is just as concerning as actions resulting in injuries. It is unquestioned that Staff actions can and do result in varying degrees of bodily pain with no visible or identifiable injury, *e.g.*, chokeholds, takedowns, wall slams, OC, painful escorts holds, bodily strikes, etc. This is one of the hallmarks of "excessive and unnecessary force" and thus is at the center of the concerns that gave rise to the Consent Judgment. Not only does this type of behavior contribute to a destructive culture, the gratuitous infliction of pain is every bit as actionable in class action lawsuits to address inhumane conditions and in Staff disciplinary matters.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection and appropriate response to misconduct is essential for the Department to succeed in using force safely, proportionally, and only when necessary. In this section, the Monitoring Team provides an overview of the Department's ability to reliably identify misconduct and to respond with interventions that are likely to prevent re-occurrence.

The Department continued to take steps to develop internal consensus on the core principles guiding the appropriate use of force among uniformed leadership, to enhance their skills in detecting misconduct, and to ensure they respond close-in-time to when misconduct occurs. The Department maintains weekly meetings with all Facility leadership to review and discuss UOF incidents, which is an excellent forum for identifying areas of confusion and developing internal consensus. The ID/Facility Coordinated Use of Force Analysis at OBCC and GRVC was expanded to AMKC and RNDC this Monitoring Period. The purpose of this initiative is to better align ID's and uniform Staff's understanding of the parameters surrounding the proper use of force.

However, the Department must not only be able to identify misconduct, but also determine appropriate responses, and to follow through to ensure discipline is actually imposed. As discussed below, the Department's failure to ensure discipline of all types is actually imposed is undercutting the integrity of the entire disciplinary process.

### *Identifying Use of Force-Related Misconduct*

The Department's various mechanisms for identifying misconduct are described below:

| INITIAL ASSESSMENT | | | INVESTIGATIONS | |
|---|---|---|---|---|
| Rapid Reviews/ Avoidables | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| WHEN | | | | |
| Within 48 hours of incident | Committee Meets Bi-Weekly | 5 Business Days | 25 Business Days after referral from Preliminary Review | 180 Days after referral from Preliminary Review |
| BY WHOM | | | | |
| Warden, DWIC, DW | ID, Legal, Trials, Chiefs, Training Leadership | ID Staff | Facility Investigating Captain | ID Investigators |
| INCIDENTS REVIEWED | | | | |
| Actual use of force incidents with video available, separate review conducted for each involved Staff Member | Concerning incidents referred from variety of sources | All use of force incidents | Incidents that do not meet criteria for Full ID or PIC | Incidents that meet ¶ 8 criteria, or otherwise warrant Full ID Investigation |
| INFORMATION REVIEWED FOR EACH INCIDENT | | | | |
| Video Only | Video, and other available evidence if necessary | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, conduct MEO-16 interviews (if needed) |
| SEVENTH MONITORING PERIOD DATA<br>**3,483** Incidents from July 1, 2018-December 31, 2018 | | | | |
| Rapid Reviews were conducted for 3,087 incidents that occurred between July - December 2018, involving 12,129 Staff. | Corrective action was imposed on 30 Staff. | 1,617 *Pending* Preliminary Reviews<br><br>1,866 *Complete* Preliminary Reviews:<br><br>o   915 *Referred* for ID investigations<br><br>o   642 *Referred* for Facility investigations<br><br>o   309 *Closed* as PICs | 605 Facility Investigations Closed in the Seventh Monitoring Period | 563 UOF investigations closed during the Seventh Monitoring Period (most from incidents occurring in previous periods).<br><br>82 (15%) of closed cases resulted in charges for at least one Staff member and 11 (2%) of these cases resulted in both charges and a PDR. |

The combination of Rapid Reviews/Avoidables, Preliminary Reviews, the Immediate

Action Committee, and ad hoc review by Agency officials of use of force incidents forms a solid

foundation for identifying misconduct and the opportunity to initiate timely, proportional

corrective action and discipline when warranted.[17]

- **Rapid Reviews**

The Department continued its combined Rapid Reviews/Avoidables analysis this

Monitoring Period ("Rapid Reviews"). For every actual UOF incident captured on video,[18] the

Facility Warden must identify: (1) whether the incident was avoidable, and if so, how; (2)

whether the force used was necessary; (3) whether Staff committed any procedural errors; and

(4) for each Staff Member involved in the incident, whether any corrective action is necessary,

and if so, for what reason and of what type. The reviews are forwarded up the chain of command

for approval, ending with the Bureau Chief of Facility Operations, whose office compiles the

final results and circulates the list to relevant stakeholders for review.

The Monitoring Team is finding that the Rapid Reviews are identifying misconduct more

consistently, especially for Facilities included in the ID/Facility Coordinated Use of Force

Analysis initiative. During this Monitoring Period, Rapid Reviews assessed 3,087 actual uses of

force involving 12,129 Staff actions (covering 94% of actual UOF incidents; Staff were reviewed

multiple times if they were involved in multiple incidents). Of these, 688 of the 3,087 (22%)

incidents were deemed avoidable, 186 of the 3,087 (6%) incidents were deemed unnecessary,

and 1,225 of the 3,087 (40%) incidents revealed procedural errors (*e.g.,* failure to secure cross

gates, failure to ensure leg irons were secure before placing an inmate on a gurney), with some

incidents falling into more than one of these categories. The Facilities recommended corrective

or disciplinary action with respect to 2,754 Staff (including command discipline, re-training,

---

[17] Depending on the severity or complexity of the violation, additional investigation may be required
before corrective action can or should be imposed.

[18] The Rapid Reviews/Avoidables does not consider UOF allegations.

verbal reprimand, and 5003 counseling). It is important to note that Rapid Reviews for cases that are subject to Full ID investigations will often not have a recommended disciplinary outcome (or the recommended disciplinary action will not occur) so as not to preclude the imposition of formal discipline.

While there have been improvements with Rapid Review process, it is critical that the recommendations are acted upon. This Monitoring Period, CLU collected the proof of practice for administrative action recommended from Rapid Reviews, but the Facilities were often delayed in providing the proof of practice for action recommended and often it was determined that the recommend outcome was not ultimately imposed.

- **Preliminary Reviews**

ID investigators continue to conduct a Preliminary Review of every actual and alleged UOF incident. During this Monitoring Period, the quality of Preliminary Reviews was maintained and Preliminary Reviewers continued to have consistent access to Staff reports, Genetec, and handheld video. The Preliminary Reviews continued to utilize all available information, which results in a reliable summary of the circumstances that contributed to the use of force.

As described in detail in the Sixth Monitor's Report (at pg. 24), the implementation of the Case Management System ("CMS") and the sheer volume of uses of force led to delays in completing Preliminary Reviews and triggered a backlog. As of mid-February 2019, only 46% of incidents from the Seventh Monitoring Period had completed Preliminary Reviews with supervisory approval. The reason for pending status of the remaining 54% of cases (n=1,617) is shown in the table below:

| Reasons for Pending Status of Preliminary Reviews for Incidents Occurring in the 7th Monitoring Period | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July 2018 | Aug. 2018 | Sept. 2018 | Oct. 2018 | Nov. 2018 | Dec. 2018 | Total # (%) |
| **Awaiting Approval by Supervisor or DDI to Assign for *Facility Investigation*** | 3 | 7 | 48 | 79 | 67 | 61 | **265 (16%)** |
| **Awaiting Approval by Supervisor or DDI to Assign for *Full ID Investigations*** | 4 | 10 | 67 | 146 | 94 | 125 | **446 (28%)** |
| **Awaiting Approval by Supervisor or DDI to Assign for *PIC Closure*** | 1 | 9 | 53 | 58 | 54 | 78 | **253 (16%)** |
| **Pending Investigator Review[19]** | 3 | 9 | 68 | 97 | 180 | 296 | **653 (40%)** |
| TOTALS | **11** | **35** | **236** | **380** | **395** | **560** | **1617** |

While delayed Preliminary Reviews continue to be problematic, Preliminary Reviews are being leveraged more often to determine whether a case can be closed through Presumption Investigation Complete ("PIC")[20] (along with Facility Referrals sometimes), Expedited Closure,[21] or whether the case can be fast-tracked for discipline.[22] This is an encouraging trend. When an incident is identified for one of these dispositions, the Preliminary Review often takes longer because it is more heavily scrutinized to ensure it is not closed pre-maturely. Nevertheless, the additional time required for this purpose is still generally shorter than the time required for a Full ID Investigation. The Monitoring Team continues to encourage the use of these tools, as the majority of incidents can be closed in a more truncated manner.

---

[19] The majority of cases in this status are pending with the investigator to complete the first draft. However, some cases in this status have been returned to the investigator to incorporate comments and edits from the initial supervisory review.

[20] The investigation of certain incidents that would otherwise have been a *Facility*-level investigation can be closed after the Preliminary Review for cases that meet certain criteria. This designation replaced the "no further action" ("NFA") category (as outlined in Consent Judgment §VII (Use of Force Investigations), ¶ 7(e)). PIC also allows investigators to close cases and seek discipline even where procedural violations are identified, in a set number of circumstances.

[21] Cases that would have otherwise received a Full ID Investigation may be closed with fewer investigative steps (like PICs) if the specific facts demonstrate fewer investigative steps are necessary.

[22] Incidents fully captured on video with all evidence available may be fast tracked for formal discipline.

These expedited cases aside, ID must improve the timeliness of Preliminary Reviews as the delays have a negative impact on cases that are referred to the Facilities, which do not receive cases until the Preliminary Review has been closed by ID.

- **Immediate Action Committee**

The Immediate Action Committee continues to meet bi-weekly to review any cases in which immediate disciplinary action (*e.g.*, suspension or modified duty) should be considered, as identified by executive leadership (uniformed and civilian), ID, or staff of the Early Intervention, Support, and Supervision Unit ("E.I.S.S"). In particular, incidents are prioritized when it appears a Staff Member has more likely than not engaged in conduct that would merit potential termination pursuant to Consent Judgment § VIII, ¶ 2(d)(i) to (iii).[23] The cases reviewed by the Immediate Action Committee appear to be selected appropriately. While the Monitoring Team is encouraged by the type of cases the Immediate Action Committee is reviewing, the Department is encouraged to expand the scope of cases considered by the Immediate Action Committee, in particular those incidents where either there is objective evidence of wrong doing that can easily be addressed close in time to the incident or incidents that involve a Staff Member who has been engaged in a repeated pattern of misconduct.

The table below shows the types of immediate actions that were recommended by the Immediate Action Committee.

---

[23] The Department may elect to suspend or modify duty of a Staff member for a variety reasons beyond potential termination cases.

| Immediate Action Committee[24] Outcomes | | | | |
|---|---|---|---|---|
| | **Fourth Monitoring Period** | **Fifth Monitoring Period** | **Sixth Monitoring Period** | **Seventh Monitoring Period** |
| Total Use of Force -Incidents Considered | 29 | 34 | 51 | 42 |
| Total Staff Members - Immediate Action Taken | 30 | 39 | 67 | 30 |
| *Suspension* | *7* | *9* | *18* | *7* |
| *Modified Duty* | *3* | *1* | *3* | *6* |
| *Retraining* | *15* | *7* | *12* | *0* |
| *Counseling* | *10* | *24* | *29* | *16* |
| *Command Discipline* | *3* | *5* | *16* | *6* |
| *Reassigned* | *2* | *4* | *5* | *5* |
| *Other (including E.I.S.S. screening, PDR submissions or recommendation to Fast-Track Investigations)* | *0* | *0* | *12* | *14* |
| *The immediate action taken sometimes included a combination of responses—e.g., modified duty and re-training—so the action totals are greater than the total number of Staff.* | | | | |

While the Immediate Action Committee routinely recommended specific action be taken in many of the cases reviewed, the Department did not actually impose all of the recommended outcomes. The Department was able to confirm that all recommended suspensions were enacted, but the other recommended outcomes were less frequently imposed (and some were only imposed following inquiry from the Monitoring Team). The Department was unable to confirm that all modified duty recommendations, CDs, E.I.S.S. screenings, or re-training actually occurred. The Department was also unable to confirm that any of the recommended counseling occurred (in some cases because the leadership who conducted the counseling failed to confirm it occurred before they left the Department). Finally, the recommendations for expedited investigation and PDRs have not yet been completed.

---

[24] The data above does not include the immediate corrective responses taken by the Facility during Rapid Reviews as described above.

When presented with these poor results, the Department established an internal mechanism, to be implemented in the Eighth Monitoring Period, to ensure Immediate Action Committee recommendations are imposed timely.

*Investigating Use of Force-Related Misconduct*

Appropriate, logical, and thoughtful investigations are necessary for detecting the misuse of force and for ameliorating the conditions that gave rise to the Consent Judgment. Unfortunately, many of the Department's investigations continue to suffer from methodological flaws and protracted timelines, causing the quality of some evidence to degrade and calling the outcomes into question, as discussed in more detail in the Use of Force Investigations section of this report (¶¶ 1, 9, and 13). The increase in the number of uses of force incidents causes an associated increase in ID's caseload, taxing the investigators beyond what can reasonably be accomplished. These dynamics are concerning and heighten the importance of initiatives that can improve the timeliness of investigations—both to improve the quality of evidence and the veracity of the conclusions, and to gradually reduce the investigators' workload.

*Addressing Use of Force-Related Misconduct*

Responding promptly and appropriately to identified misconduct is critical to minimizing the possibility that the misconduct will reoccur. Staff's behavior can be shaped effectively through a variety of mechanisms, including re-training, counseling, responses by the Facility and formal discipline. Therefore, the Monitoring Team has strongly encouraged the Department to utilize its entire spectrum of responses including coaching, counseling, and other forms of corrective action as they are all essential strategies for stimulating behavior change, and a core responsibility of Department leadership. That said, imposing discipline requires significant coordination as each incident must be individually assessed to determine the appropriate

response. The Department must balance the interest of imposing close-in-time corrective action with the potential to preclude more severe discipline by principles of double jeopardy. Certain misconduct cases may require additional investigation to fully determine what occurred and/or to support the imposition of more significant discipline. Accordingly, the goal is to not only ensure a *timely* response, but one that it is *proportional* to the misconduct identified and ultimately *imposed*.

Once the Department has determined that Staff's misconduct warrants discipline, the discipline must be adjudicated, then imposed. During this Monitoring Period, the Monitoring Team identified significant flaws in the Department's adjudication process and the corresponding imposition of discipline, which are discussed throughout this report.

- **Facility-Level Responses**

  o *Facility Referrals*

ID continued utilizing Facility Referrals during this Monitoring Period, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to a Facility with instructions for the Facility to take appropriate action. Facility Referrals are a useful tool as it provides the opportunity for ID to address specific issues (especially more minor misconduct) in a timely fashion to mitigate the possibility of it occurring in the future. As in prior Monitoring Periods, the Facilities do not respond timely to these referrals, and their responses are often lacking. It is critical for the Facilities to address these referrals and so the Monitoring Team recommended that the Department improve the process to ensure that Facility Referrals are addressed in a timely fashion with adequate responses.

o   *Counseling, Corrective Interviews, and Re-Training*

The Monitoring Team supports the use of counseling, corrective interviews, and re-training when they are substantive and utilized appropriately. However, the Department continues to rely too heavily on re-training, corrective interviews and counseling (including 5003 counseling sessions) instead of more significant discipline. That said, in cases where more significant discipline is imposed, the *addition* of re-training, corrective interviews and/or counseling to support improved practice would also benefit the Staff Member.

o   *Command Discipline ("CD")*

The Monitoring Team has long encouraged the Department to use the Command Discipline process to impose disciplinary action, when appropriate, because the process is less cumbersome than that required for formal discipline. A Command Discipline can range from a verbal discipline up to the forfeiture of five vacation/compensatory days. Command Discipline is governed by a detailed policy that, among other things, requires CDs to be issued and adjudicated within timeframes that are much shorter than those for formal discipline. Command Disciplines are utilized in two ways. The Facility may generate a Command Discipline within 30 days of an incident (to then be subsequently adjudicated). A Command Discipline may also be generated as part of a Negotiated Plea Agreement with a recommendation to adjudicate at the Facility level or with an agreed upon number of days (up to 5 days) to be forfeited by the Staff Member.

While CDs are a solid concept, they are useless if not actually adjudicated (meaning the hearing to determine what discipline should be imposed does not occur) or imposed (meaning that the recommended discipline is not actually instituted). The discussion below outlines the Department's significant failures regarding CDs. These findings suggest that the process has not

been properly managed by the Facilities or by the Office of Administration which is responsible for monitoring this process. First, the Monitoring Team discovered that Command Disciplines were not being adjudicated at the Facility-level at an alarming rate. Second, the Monitoring Team discovered that most of the 215 NPAs for Command Disciplines that had been effectuated between 2017 and August of 2018 had never been adjudicated and/or imposed. The transition to managing CDs through CMS may have initially contributed to some of these failures. The workflows created some confusion and delays in processing Command Disciplines. That said, these limitations were identified many months ago and are still not addressed or ameliorated.

Further troubling about these findings is that the Monitoring Team, rather than the Department, identified these systemic deficiencies despite the fact that the data was easily available to those responsible for overseeing the process. The Office of Administration has been tracking this information and the First Deputy Commissioner has been observed during TEAMs, and in other forums, utilizing this data to question Facility leadership. Despite access to this information, it was the Monitoring Team, not the Department, that identified the pervasive deficiencies and exerted significant pressure to correct the problem. At the close of the Monitoring Period, the Department is still not adjudicating or imposing Command Disciplines in a consistent or reliable manner.

■ CDs Generated by the Facility

NCU was tasked with conducting an audit of the adjudication of Command Disciplines after it was determined how few were actually addressed. NCU's audit of CDs generated by the Facilities focused on those recommended via Rapid Reviews, which is the major source of CDs from UOF-related misconduct and was a manageable sample size. The processing of Command Disciplines requires multiple steps: (1) the CD must be generated in CMS within 30 days of the

incident date; (2) then reviewed and heard by a hearing officer who determines the outcome of the CD (ranging from dismissal to a five-day penalty for Staff); and (3) if the penalty was a reduction in vacation or compensation days then HR must be notified and must remove the days from the Staff Member's CityTime bank.

As far as whether the Facilities are adjudicating the Command Disciplines that are recommended by Rapid Reviews, the audit results were dismal and confirmed the Monitoring Team's findings. For example, for November 2018, 76 CDs were recommended based on the Rapid Reviews, but 39 of the 76 (51%) were closed administratively in CMS, never entered into CMS at all, or dismissed at the hearing; 30 of the 76 (40%) were still pending in CMS at the time NCU conducted its audit in mid-January 2019; and only 7 of the 76 (9%) resulted in either days being deducted, a verbal reprimand, or corrective interview.

Using the results of this study, NCU is working with uniformed Staff to reinforce the requirements for processing CDs in CMS by conducting additional trainings on best practices. NCU is also working with the responsible entities within the Facilities to ensure the final stages of the CD are processed timely and with integrity by tracking this process through a centralized excel chart that is accessible to all Facility leadership so the status of all CDs can be easily identified. NCU routinely monitors this chart to track progress and follow-up with the relevant commands as necessary. Further, beginning in the Eighth Monitoring Period, NCU will consider how to ensure that, once a CD is adjudicated, any days the Staff must forfeit are in fact imposed in the system by HR.

 ▪ NPA-CDs

Trials has resolved 215 NPAs for Command Disciplines between 2017 and August of 2018. There are two types of NPAs for Command Disciplines-- an NPA CD can either be (1)

settled for a return to the command to adjudicate, or (2) include a specified number of days which then by-passes the adjudication process and only requires the time to be deducted from the Staff Member's CityTime bank. The Monitoring Team found that the vast majority of the NPAs for Command Disciplines, of either type, were not actually adjudicated and/or imposed.

Upon identifying this issue, NCU was tasked with working with the Facilities to ensure the 214 NPA CDs were actually adjudicated and imposed. Of the 214 NPAs, 91 were settled for a specific number of days forfeited by the Staff and thus only required the time to be deducted from their bank of time by HR. Of these 91, 86 have now been imposed by HR and the time has been removed from the Staff Member's bank in CityTime.[25] In 65 of the 86 cases (76%), the discipline was imposed within 45 days of the execution of the NPA. In 21 of the 86 cases (24%), discipline was imposed beyond 45 days, the six most egregious cases occurring over ten months after the NPA was executed.

123 of the 214 NPAs were settled for a Command Discipline to be adjudicated by the Facility (the majority of these NPAs were from 2016 and 2017). The majority of these CDs were only adjudicated after NCU began to manage the process part way through this Monitoring Period.

About 30 of the cases (25%) of the NPA CDs were either dismissed or the Staff Member resigned before the discipline could be imposed. Further, only 54 cases (44%) resulted in the forfeiture of days. While a verbal reprimand, counseling or a corrective interview may have been appropriate in a few cases, 29 (22%) cases with those outcomes is unreasonable given the

---

[25] Of the five remaining cases, two are still pending and three involve Staff that either retired or are on military leave before the time could be imposed.

severity of misconduct. Finally, it is just plainly unacceptable that 10 (8%) cases remain pending almost six months after this issue was identified.

The process of settling an NPA for a return to the Command for a hearing is an inefficient use of resources as it requires multiple layers of review (through headquarters and the Facility) and further prolongs the imposition of discipline because an additional hearing is required. By sending the NPA back to the Facility to adjudicate the CD, it also allows for the possibility that the discipline may be dismissed at the Facility-level, which undermines the whole disciplinary process. Accordingly, the Monitoring Team recommended that the use of NPA CDs should be limited to a specific forfeiture of days. The Department reported at the end of the Monitoring Period that Trials would adopt the Monitoring Team's recommendation. Further, the Department has devised a process to ensure that NPA CDs for specific forfeiture of days are now imposed by HR in a timely and reliable manner.

   o   *Suspensions, Modified Duty, and Re-Assignment*

The Department may take a number of administrative actions in response to identified misconduct. During this Monitoring Period, the Monitoring Team verified that the Department suspended 11 Staff Members for use of force related misconduct, with suspensions lasting from five to 10 days.[26] The Department also recommended modification to Staff Members' duty, or re-assigned Staff several times during this Monitoring Period in response to misconduct identified via the various mechanisms discussed above (only some of which the Monitoring Team could verify actually occurred). Staff re-assignment or modification occurs via so many

---

[26] As per Department policy (Memorandum 01/99 - Suspension without Pay (Captain and Above)), all suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay.

avenues that aggregating and comparing the data is difficult. These administrative responses are an important tool for addressing identified misconduct close-in-time to the incident and the Monitoring Team urges the Department to continue to maximize their use of these options.

- **Formal Discipline**

The Trials Division continued to build upon the progress it had made in previous Monitoring Periods to impose discipline in a more timely fashion. That said, the process to impose formal discipline remains lengthy, requiring various procedures which occur across multiple divisions. The current delays in conducting investigations further prolongs the imposition of formal discipline. Formal discipline for tenured Staff's[27] misconduct is handled by Trials and the entire process is outlined in *Appendix B: Flowchart of Disciplinary Process* in the Fifth Monitor's Report.

The majority of formal discipline takes over a year to be imposed. As shown in the chart below, only 19 of the 244 cases (8%) closed with NPAs during this Monitoring Period were completed within six months of the incident. While current processing times remain far too long, some slight improvements are evident (*i.e.*, the proportion of cases closed within a year is trending slowly upward across Monitoring Periods, from 5%, to 12%, to 16% to 22% respectively).

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Closure Date | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | |
| Total | 153 | | 242 | | 251 | | 244 | |
| 0 to 6 months | 0 | 0% | 7 | 3% | 7 | 3% | 19 | 8% |
| 6 to 12 months | 7 | 5% | 21 | 9% | 33 | 13% | 35 | 14% |
| 1 to 2 years | 43 | 28% | 126 | 52% | 172 | 69% | 144 | 59% |
| 2 to 3 years | 42 | 27% | 58 | 24% | 28 | 11% | 26 | 11% |
| 3 + years | 61 | 40% | 30 | 12% | 11 | 4% | 20 | 8% |

---

[27] This does not include Staff who are on probationary status, which are handled via PDRs, explored below.

As demonstrated in the table below, most formal discipline is imposed via an NPA, a trend which is increasing over time (*i.e.*, from 73% in early 2017 to 95% during this Monitoring Period), while the number of cases that are administratively filed or closed as a deferred prosecution have decreased over time (*i.e.*, from 27% in early 2017 to just 4% during the current Monitoring Period).[28]

| Discipline Imposed by Date of Ultimate Case Closure[29] | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | |
| Total | 209 | | 286 | | 272 | | 257 | |
| NPA | 153 | 73% | 242 | 85% | 251 | 92% | 244 | 95% |
| Administratively Filed | 44 | 21% | 32 | 11% | 16 | 6% | 6 | 2% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% | 5 | 2% |
| Adjudicated/Guilty | 0 | 0% | 4 | 1% | 1 | 0% | 2 | 1% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% | 0 | 0% |

The table below demonstrates the range of compensatory days relinquished (about half of all cases relinquish 30 days or less) and other penalties accepted via NPA (about half of all cases are referred for Command Discipline). The Monitoring Team's initial findings on the discipline imposed is discussed in more detail in the Staff Discipline and Accountability section of this report.

| Penalty Imposed by NPA by Date of Ultimate Case Closure | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date of Incident | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | |
| Total | 153 | | 242 | | 251 | | 244 | |
| Refer for Command Discipline | 16 | 10% | 64 | 26% | 78 | 31% | 121 | 50% |
| Retirement/Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% |
| 1-10 days | 11 | 7% | 41 | 17% | 42 | 17% | 52 | 21% |
| 11-20 days | 34 | 22% | 51 | 21% | 54 | 22% | 26 | 11% |
| 21-30 days | 29 | 19% | 39 | 16% | 31 | 12% | 24 | 10% |
| 31-40 days | 9 | 6% | 6 | 2% | 14 | 6% | 4 | 2% |
| 41-50 days | 18 | 12% | 11 | 5% | 16 | 6% | 14 | 6% |
| 51+ days | 28 | 18% | 26 | 11% | 14 | 6% | 0 | 0% |

---

[28] The Monitoring Team intends to conduct a comprehensive assessment of the imposition of discipline via NPA beyond CDs in the next Monitoring Period.

[29] These are cases that have been signed off by the Commissioner.

An NPA may also include additional terms, including a period of disciplinary probation. During this Monitoring Period, the Monitoring Team verified that 34 Staff members were under disciplinary probation as a result of their use of force related misconduct. Terms ranging from six months to the remaining duration of their employment were observed, with the majority receiving terms of 12 to 24 months. This included four Staff placed on disciplinary probation via NPAs that were imposed during this Monitoring Period. Staff on disciplinary probation are also enrolled in E.I.S.S. monitoring so they receive additional support and guidance. The Monitoring Team has recommended that Trials consider using disciplinary probation more often.

Of the formal discipline imposed since November 2015, 78% was imposed for incidents that occurred prior to December 2016 (424 of those incidents occurred prior to the Effective Date and 394 occurred between November 2015 and December 2016).[30] Accordingly, to date, only 22% of the formal discipline imposed by Trials is in response to incidents that occurred in 2017 or 2018. Only three cases of misconduct occurring during the current Monitoring Period had formal discipline imposed. Given the backlog in ID investigations, the fact that cases continue to languish is not surprising. While Trials has effectively alleviated its backlog, the backlog at ID continues to inhibit the Department's ability to impose formal discipline timely.

| Formal Discipline Imposed by Date of Incident | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Pre Nov. 2015 | | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 |
| Total | 424 | | 394 | | 133 | | 69 | | 29 | | 3 |
| NPA | 413 | 97% | 391 | 99% | 133 | 100% | 69 | 100% | 29 | 100% | 3 | 100% |
| Adjudicated/Guilty | 8 | 2% | 1 | 0% | 0 | 0% | 0 | 0% | 0 | ~ | 0 | 0% |
| Not Guilty | 3 | 1% | 2 | 1% | 0 | 0% | 0 | 0% | 0 | ~ | 0 | 0% |

---

[30] The Monitoring Team notes that the Department's record keeping of formal discipline at the early stages of the Consent Judgment was not reliable. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed since November of 2015.

- **Personnel Determination Review ("PDR")**

During this Monitoring Period, the Department worked towards improving the discipline for probationary Staff[31] administered via a Personnel Determination Review ("PDR"). As outlined in the Sixth Monitor's Report, this process was significantly flawed. Accordingly, during this Monitoring Period, the Monitoring Team provided significant assistance and extensive oversight of this process to support the Department's efforts to enhance the integrity of the PDR process. While the First Deputy Commissioner reported to the Monitoring Team that the Department intended to the address the issues raised, significant pressure, follow-up, and oversight by the Monitoring Team was required for the Department to be in a position to demonstrate any progress.

As an initial step, the Monitoring Team strongly encouraged the Department to fortify the process to submit, review, and complete a PDR. Consensus was ultimately reached on a set of processes which were incorporated into a revised PDR policy. The new process for PDRs includes set deadlines to ensure PDRs are processed timely and also requires consultation among the First Deputy Commissioner, ID and, for exceptional cases, the Commissioner. The Monitoring Team will receive contemporaneous information on all PDRs as they are processed. This system of checks and balances should ensure greater integrity. Following the close of the Monitoring Period, the Department shared a revised draft of the PDR policy which is nearly complete and will be finalized in the Eighth Monitoring Period.

Another critical component of the PDR process is adequate tracking. The case processing by HR was unreliable and disorganized, lacking a reliable process to track the status of all UOF-

---

[31] Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods.

related PDRs. Despite the significant effort expended by the Department and the Monitoring

Team to develop a comprehensive tracking chart, the Monitoring Team continued to identify

errors and omissions in the tracking chart through the end of the Monitoring Period. Following

the close of the Monitoring Period, the Department's tracking protocol appears to be much

improved, more reliable, and now captures the overwhelming majority of UOF-related PDRs

from January 2017 to the present.

In prior Monitoring Periods, the Monitoring Team identified at least 16 Staff who tenured

before the PDR could be imposed due to the flawed PDR process. As demonstrated in the chart

below, this situation did not arise in this Monitoring Period. This is an encouraging development

and demonstrates that the Department's new procedures for completing PDRs will certainly

minimize the possibility that a Staff Member will tenure before the PDR can be imposed.

| Chart of PDRs *Not* Completed by Date of Determination | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 |
| **Total** | 1 | | 4 | | 1 | | 10 | | 2 |
| Tenured | 0 | 0% | 3 | 75% | 1 | 100% | 10 | 100% | 0 | 0% |
| Resignation | 1 | 100% | 1 | 25% | 0 | 0% | 0 | 0% | 2 | 100% |

It is worth noting that the failure to timely process two PDRs (under the old system)

resulted in two concerning outcomes in this Monitoring Period. In these two cases, Staff had

been recommended for termination, but the PDRs were not acted upon in a timely manner. In

one case, a Staff Member was recommended for termination in relation to the excessive use of

force in the spring of 2018. The PDR was not processed timely and the Staff Member

subsequently resigned five months after the PDR was submitted in order to work at the NYPD.

Another Staff Member had been recommended for termination in relation to excessive use of

force, and the PDR was also not processed timely. Meanwhile, the Staff Member engaged in

another problematic use of force and suffered severe injuries. This Staff Member subsequently

resigned before the PDR could be processed. These examples highlight the significant consequences of the various PDR processing failures, which hopefully will be avoided in the future under the new procedures.

Between the Effective Date and December 31, 2018, the Department has imposed discipline related to UOF misconduct on 82 probationary Staff through PDRs, 50% of which occurred during the current Monitoring Period.[32] Of the 82 completed PDRs, 22 probationary Staff were terminated, six Staff were demoted, probation was extended for 51 Staff for either three or six months, an MOC was issued for one Staff, and no action was taken in two cases. The table below shows the outcome of the 82 PDRs based on the date the PDR was signed by the First Deputy Commissioner.

| Chart of PDRs Completed by Date of Determination | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | |
| **Total** | **4** | | **4** | | **12** | | **21** | | **41** | |
| Demotion | 0 | 0% | 0 | 0% | 1 | 8% | 0 | 0% | 5 | 12% |
| Extension of Probation - 3 Months | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 9 | 22% |
| Extension of Probation - 6 Months | 2 | 50% | 3 | 75% | 6 | 50% | 14 | 67% | 17 | 41% |
| Termination | 2 | 50% | 1 | 25% | 3 | 25% | 7 | 33% | 9 | 22% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% |
| No Action | 0 | 0% | 0 | 0% | 2 | 17% | 0 | 0% | 0 | 0% |

In terms of the outcomes of the PDRs, the Monitoring Team found that the vast majority of disciplinary recommendations from ID were reasonable and were ratified by the First Deputy Commissioner. The First Deputy Commissioner deviated from ID's recommendations in seven of 82 cases (9%), imposing lighter discipline in about half the cases and more severe discipline for the others. At the time, the process did not yet require a written justification for deviations, so the rationale for these decisions was not reviewed by the Monitoring Team.

---

[32] A PDR may cover more than one UOF Incident.

Although the number of PDRs processed during each Monitoring Period has steadily increased, most of them are for incidents that occurred quite long ago given the delay in investigations and the process's lack of efficiency. As a result, only seven PDRs for Staff behavior occurring in this Monitoring Period have been processed, as shown in the table below.

| PDR Completed by Date of Incident | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | |
| Total | 23 | | 16 | | 19 | | 22 | | 7 | |
| Demotion | 0 | 0% | 0 | 0% | 2 | 11% | 2 | 9% | 1 | 14% |
| Extension of Probation - 3 Months | 1 | 4% | 2 | 13% | 4 | 21% | 1 | 5% | 1 | 14% |
| Extension of Probation - 6 Months | 15 | 65% | 7 | 44% | 10 | 53% | 13 | 59% | 0 | 0% |
| Termination | 6 | 26% | 6 | 38% | 3 | 16% | 4 | 18% | 3 | 43% |
| No Action | 1 | 4% | 1 | 6% | 0 | 0% | 1 | 5% | 1 | 14% |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 5% | 1 | 14% |

The probationary period is a critical juncture in a Staff Member's career. During this time, Staff learn the responsibilities and expectations of their position and are evaluated for their fitness for the role. The overall goal of the probationary period is undermined by the insufficient oversight and failures of the PDR process. It is imperative that the new processes described above are implemented consistently, reliably and with vigor. The Monitoring Team will continue to scrutinize this process very closely.

# SECTION BY SECTION ANALYSIS

### 1.  USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") went into effect on September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. [33] The New Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps officers and their supervisors should take when responding to threats to safety and security. The Department's efforts to implement the New Directive is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

### IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and promulgated a new UOF Directive on September 27, 2017. The policy was approved by the Monitor.

#### ANALYSIS OF COMPLIANCE

The Consent Judgment requires the Department to develop, adopt, and implement a new UOF Directive. The Department previously developed a new UOF Directive approved by the Monitor and

---

[33] The Department developed the new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

adopted it during the Fifth Monitoring Period once all Staff received Special Tactics and Responsible Techniques Training ("S.T.A.R.T.").

Implementing the New Directive requires not only informing and training relevant Staff, but also consistently following and applying the policy.[34] Therefore, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. The Department has committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and is currently providing a refresher UOF Policy course through Advanced Correctional Techniques Training ("A.C.T").

The UOF Improvement Plan, developed late in the Sixth Monitoring Period (April 2018), included concrete steps and initiatives to inform and educate Staff with the goal of improving Staff skill and performance when using force. The plan also focused on identifying and addressing misconduct at the Facility-level to better enforce policy. As discussed in the UOF Introduction, many components of the UOF Improvement Plan failed, simply from a lack of continued support within the Department, and lost momentum towards the end of the Monitoring Period. While some initiatives showed promise, like short roll-call trainings addressing core use of force issues, they were not delivered beyond September 2018. The one apparently successful component of the UOF Improvement Plan is ID's close scrutiny of incidents and weekly guidance to uniform leadership at OBCC, GRVC, AMKC and RNDC as part of the ID/Facility Coordinated Use of Force Analysis initiative. While not particularly successful at GRVC, the initiative showed promise at OBCC, and thus was expanded to RNDC and AMKC this Monitoring Period. Despite this one promising component, overall, the UOF Improvement Plan has not led to demonstrable improvement in Staff's skill or performance in any use of force area during the Seventh Monitoring Period.

As discussed throughout this report, the Monitoring Team is extremely concerned about the current state of use of force within the agency. Unnecessary and excessive force is occurring too frequently and is often precipitated by Staff's behavior. Furthermore, the overall volume of UOF suggests that the Department has yet to effectively address the dynamics underlying inmate violence or to improve Staff's skill in relating to inmates, de-escalating tensions, and resolving interpersonal conflict in any meaningful way. Although the Department has achieved compliance with some of the components of this provision (*e.g.,* developing and adopting the policy, and informing and training Staff on the policy), the continued upward trend in the UOF rate and the sheer number of instances in which force is unnecessary and/or excessive clearly illustrate that the Department has yet to achieve the necessary reductions in harmful practices to demonstrate compliance.

| **COMPLIANCE RATING** | ¶ 1. (Develop) Substantial Compliance<br>¶ 1. (Adopt) Substantial Compliance |
|---|---|

---

[34] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

| |
|---|
| **¶ 1. (Implement)** Non-Compliance<br>**¶ 1. (Monitor Approval)** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: spit masks, restraints, chemical agents, electronic immobilization shields, tasers, and Monadnock Expandable Batons.

- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock-downs and searches for ballistic weapons.

### ANALYSIS OF COMPLIANCE

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment § IV, ¶ 3 (a-o, q-t) and is also aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly.

The Department maintains a number of standalone policies to provide guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force in order to address the requirement of ¶ 3(p). The Monitoring Team has collaborated with the Department on a number of policies related to these topics.

During this Monitoring Period, the Department worked with the Monitoring Team to finalize revisions to the Ballistic Search Command Level Order, which was promulgated early in the Eighth Monitoring Period. The Monitoring Team also worked with the Department on revisions to the Lock-Down policy. Those revisions were still in progress at the close of the Monitoring Period.

During the current Monitoring Period, the Monitoring Team recommended that the Department review its policy governing the use of batons, given the Monitoring Team's assessment that batons are frequently misused by the Probe Teams. Specifically, the Monitoring Team recommended that the Department evaluate the types of batons currently used by Staff, including whether to continue the use

of all three types—(1) MEB - Monadnock Expandable Baton (Expandable/Collapsible Metal Baton (used by ESU), 24" in length); (2) Celayaton Baton - Wooden or Composite Baton about 24" in length; and (3) 36" Riot Baton. The Department's assessment of this recommendation has languished for an unreasonable period of time—and the Monitoring Team had to make repeated inquiries to the Department to ensure that the Department made progress on this assessment. The Department has reported for almost six months that they are evaluating several options for replacing the 36" Riot Baton used by the Probe Team, but has not made a final decision.

Furthermore, the Monitoring Team recommended that the Department reconsider which Staff are authorized to use batons (including whether *every* Probe Team member needs to be issued a baton). Finally, the Monitoring Team recommended that the Department expand the MEB policy (previously developed in consultation with the Monitoring Team) to govern the use of all batons into a single policy. Following the close of the Monitoring Period, and six months after the initial recommendation, the Department reported that it started the process of revising the baton policy. As this policy was not completed by the end of the Monitoring Period, the Department is in Partial Compliance with ¶ 3(p).

| COMPLIANCE RATING | ¶ 2. Substantial Compliance<br>¶ 3(a-o, q-t). Substantial Compliance<br>¶ 3(p). Partial Compliance |
| --- | --- |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43).

| COMPLIANCE RATING | ¶ 4. Substantial Compliance (as per Fifth and Sixth Monitor's Report) |
| --- | --- |

## 2. USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Accurate and timely reporting and tracking of use of force is critical to the Department's overall goal to effectively manage use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force

Reporting" (¶¶ 1-6,[35] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[36]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims that Staff used force against an inmate and the force was not previously reported. An allegation does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis, above.

The chart below presents the number of alleged uses of force reported every month from January 2016 through December 2018. Although there are some month-to-month variations, the average number of allegations per month has decreased from year to year, with 39.3 in 2016, 36.3 in 2017, and 32.8 in 2018 (a 17% decrease from 2016).



---

[35] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

[36] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.

Investigating alleged uses of force is critical to reducing the frequency with which actual uses of force may go unreported. The Monitoring Team has focused on reviewing allegations where there is objective evidence (*i.e.*, available video or relevant medical evidence) that may or may not substantiate the report to ensure adequate investigations. The assessments discussed in prior Monitor's Reports identified deficiencies when allegations were investigated at the Facility level instead of by ID. During this Monitoring Period, the Monitoring Team reviewed five closed allegation cases (three closed at the Facility-level and two closed as PICs cases) to ensure they were adequately investigated and responded to if the allegation was ultimately confirmed. The results of this review are described in the analysis of ¶ 8 below.

*Assessment of UOF Data*

The Department's reporting of UOF data is under significant scrutiny by various stakeholders (including the Board of Correction, DOI and local legislatures). The Monitoring Team also closely monitors the Department's reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). As part of this assessment, the Monitoring Team reviews any UOF incidents that have been downgraded, which only occurred twice since July 2017 and did not occur in this Monitoring Period. The Monitoring Team has also found the Department in Substantial Compliance with the proper classification of UOF incidents (§ VI. (Use of Force Investigations), ¶ 5) for the last six consecutive Monitoring Periods. Overall, the Monitoring Team has not identified evidence to suggest that there is a pattern or practice within the Department of manipulating UOF data.[37] The Monitoring Team intends to continue to closely scrutinize the matter given the importance of accurate and transparent reporting.

---

[37] It is worth noting that the fact that an initial report is subsequently changed does not, on its face, suggest manipulation, since changes to initial reports are anticipated once further information is obtained or data entries are identified.

The Monitoring Team's assessment of compliance is outlined below.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF) |
|---|

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.

- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assesses this requirement from three perspectives:

First, UOF reports were audited to determine whether Staff completed the relevant sections of the forms. The Monitoring Team found in previous Monitoring Periods that Staff completed the relevant section of the forms fairly consistently (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)). In subsequent Monitoring Periods, the Monitoring Team will repeat this assessment.

Second, the Monitoring Team assesses the frequency of inmates' allegations made through various channels. The Department identified six cases in this Monitoring Period through Preliminary Reviews where video and other objective evidence strongly suggest that Staff deliberately failed to report a use of force incident, three incidents had pending ID investigations as of the end of the Monitoring Period, and three had pending Preliminary Reviews.[38] The Monitoring Team also examined inmate allegations made through various channels including those made to Department representatives, H+H staff, and those reported through outside agencies like the Legal Aid Society ("LAS"). As an initial step, the Monitoring Team ensures there is a corresponding investigation for each report from these sources. Then, the Monitoring Team evaluated whether the reports to LAS or H+H are what triggered the investigation or, conversely, whether a previous report triggered the

---

[38] The Monitoring Team had identified four such cases in the Fourth Monitor's Report at pg. 49, six such cases in the Fifth Report at pg. 45, and five such cases in the Sixth Monitor's Report (at pg. 45), totaling 15 cases. At the end of the Seventh Monitoring Period, 11 of these 15 cases have open investigations. Of the four closed cases, three closed which confirmed a use of force occurred and the involved Staff Member was charged or suspended, and one case closed with no action. The Monitoring Team found ID's closure of the case with no action was not reasonable in light of the available evidence. ID leadership also determined the investigation was deficient and counseled the involved investigator and supervisor about how they could improve the investigation. Unfortunately, this counseling session occurred after the statute of limitations had expired so charges for the underlying misconduct could not be brought.

investigation. This Monitoring Period, H+H submitted 54 allegations from Staff and LAS submitted 44 allegations (24 reports were use of force-related and 20 were non-use of force). Of the 54 allegations submitted by H+H, most (n=46; 85%) were already being investigated by ID, a few (n=5; 9%) reports prompted ID to open an investigation, one report was determined to be unsubstantiated, and the Monitoring Team is working with the Department on determining the need for an investigation for the remaining two reports. Of the 24 use of force allegations submitted by LAS, most (n=21; 88%) were already being investigated by ID, and a few (n=3; 13%) prompted ID to open an investigation.

Third, the Monitoring Team closely scrutinized investigations of alleged uses of force to ensure they reached reasonable conclusions and that the Department disciplined Staff who failed to report a use of force. This analysis is discussed further in ¶ 8 below.

Unreported uses of force continue to be an important focus of the Monitoring Team, and specific, sometimes egregious, instances of failures to report have been identified in every Monitoring Period. Given that the number of reported UOF in this Department is so high, the number of unreported UOF may seem low in comparison. However, the most troubling uses of force are those that go unreported, because the extent to which the force was unnecessary or excessive is never assessed. The Department will achieve Substantial Compliance when there are only very isolated or no instances of unreported uses of force.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| --- | --- |

| V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, 5, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS) |
| --- |
| ¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor. |
| ¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).] |
| ¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request. |
| ¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h), and ¶¶ 5, 6, and 7 above.

ANALYSIS OF COMPLIANCE

The Monitoring Team continued to review a significant number of Staff Reports as part of the Team's assessment of Preliminary Reviews, and ID and Facility Investigations. The Monitoring Team assessed compliance with ¶¶ 2, 3, 5, & 6 in prior Monitoring Periods (*see* Fourth Monitor's Report at pgs. 51-52). Staff's practices have not changed significantly from those reported in prior Monitoring Periods. Staff Reports continue to include information in all required fields, but the quality of that information varies. One specific area the Monitoring Team assessed this Monitoring Period is whether DOC Staff's UOF or UOF witness reports accurately identify whether any non-DOC staff were present in the area during the UOF. Both reporting forms include a specific box for Staff to list "any uniform or non-uniform staff involved in or present at the time of the incident." The Monitoring Team reviewed 20 UOF/UOF witness reports for incidents where video footage confirmed that non-DOC staff were present, yet only one witness noted the presence of non-DOC staff. The Monitoring Team informed the Department of these findings early in the Eighth Monitoring Period.

The Monitoring Team continues to find that while some reports meet the requirements of these provisions (including examples where Staff accurately report and describe the use of head strikes), others: (1) utilize vague, boilerplate language like "upper body control holds" which does not accurately or fully reflect the nature, extent, and duration of the force used to control or restrain an inmate (particularly when this phrase is used instead of reporting the use of head strikes); (2) are incomplete, and while they often describe the conduct of the inmate, the reports often fail to describe Staff actions (and the Staff action that is described sometimes does not explain injuries sustained by the inmate); (3) are not consistent with objective video evidence; or (4) include false information, in direct contradiction to other evidence (for example, that an inmate struck first, when in fact Staff struck first).

Regarding "upper body control holds," that is not a defensive tactic, nor are "upper body controls holds" taught in training. Staff appear to use that term to cover any inmate contact from the chest to the head and any tactic or action utilized by Staff, including takedowns, pushes, and head strikes. Staff must identify what tactic was actually utilized and where on the body the Staff's hands or arms were placed. The Monitoring Team intends to work with the Department in the next Monitoring Period on how to address the over use of this phrase to encourage Staff to use a more accurate description in their reports.

| COMPLIANCE RATING | ¶¶ 2, 3, 5, and 6. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's

permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The *Nunez* Compliance Unit ("NCU") continues to audit the extent to which Staff Reports are submitted and uploaded within 24 hours of a reported use of force incident or within 72 hours of an allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).

- During this Monitoring Period, 7,974 of 9,158 reports (87%) for reported UOF were submitted and uploaded within 24 hours. 81 of 91 reports (89%) for UOF allegations were submitted and uploaded within 72 hours.

| Month (2018) | Actual UOF | | | Allegations of UOF | | |
|---|---|---|---|---|---|---|
| | *Reports Uploaded Timely* | *Total Staff* | *% Uploaded within 24 Hours* | *Reports Uploaded Timely* | *Total Staff* | *% Uploaded within 72 Hours of the Allegation* |
| **February** | 696 | 1296 | 54% | *NCU began collecting data for UOF allegations in May 2018* | | |
| **March** | 1008 | 1440 | 70% | | | |
| **April** | 917 | 960 | 96% | | | |
| **May** | 1100 | 1171 | 94% | 20 | 23 | 87% |
| **June** | 1014 | 1147 | 88% | 24 | 25 | 96% |
| **July** | 982 | 1203 | 82% | 13 | 13 | 100% |
| **August** | 1355 | 1626 | 83% | 19 | 19 | 100% |
| **September** | 1242 | 1491 | 83% | 8 | 10 | 80% |
| **October** | 1354 | 1473 | 92% | 18 | 19 | 95% |
| **November** | 1511 | 1614 | 94% | 15 | 19 | 79% |
| **December** | 1530 | 1751 | 87% | 8 | 11 | 73% |

**ANALYSIS OF COMPLIANCE**

*Timely Submission of Use of Force Reports* (¶ 4)

Staff Reports are critically important to understanding what occurred during a use of force incident, and the accountability created by NCU's close scrutiny resulted in a drastic improvement beginning in April 2018 and continuing through the end of 2018, as shown in the table above. It is important to note that the table above depicts those Staff reports that were *submitted and uploaded* timely, and some portion more were submitted timely (*e.g.*, time-stamped within 24 hours of the incident), but not uploaded timely, demonstrating further compliance with these requirements.

Prior to 2018, the Department did not have a systematic or centralized system to maintain UOF Reports. Over the last year, the Department implemented a reliable process for submitting and tracking UOF reports that has resulted in significant and sustained improvement. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion.

61

The Department has demonstrated Substantial Compliance with this requirement due to the sustained high levels of performance.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE)

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8.

**ANALYSIS OF COMPLIANCE**

Reporting violations (*e.g.*, inaccurate, misleading, and false reporting or failure to report) are not minor violations. Staff who exaggerate, lie, or fail to report a use of force thwart the overall goal to assess each use of force to determine whether force is only utilized when necessary. The Department continues to identify and impose formal discipline and PDRs related to reporting issues. That said, the Department does not identify or address reporting violations nearly as often as they occur. Further, when discipline is imposed, the Monitoring Team has found that the discipline varies and is not always significant enough compared with the violation.

This Monitoring Period, the Monitoring Team reviewed five closed allegation cases (three closed at the Facility-level and two closed by ID following the conclusion of the Preliminary Review) and found all five cases were adequately investigated. The three incidents investigated by the Facility reasonably concluded that the allegations were not substantiated. The two cases closed upon completion of the Preliminary Review confirmed that two minor uses of force occurred but were not reported by Staff. In one case, the reviewer recommended appropriate corrective action. In the other case, corrective action was not recommended, which was reasonable given the facts and circumstances of the specific case.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

ANALYSIS OF COMPLIANCE

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses such requirements, and the "implement" component of this provision is assessed within the individual provisions in this report.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 10 & 11 (NON-DOC STAFF REPORTING)

¶ 10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[39]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During this Monitoring Period, the Corporation Counsel submitted a letter to all relevant agencies outlining their obligation to report use of force incidents as required by the Consent Judgment.

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) maintained its use of force reporting policy and process to address ¶¶ 10, and 11 of this section. This process includes:

  o Maintaining a dedicated email address for H+H staff to submit their reports. H+H also has a dedicated staff member who reviews and distributes those reports to ID to include in the use of force investigation; and

  o Reinforcing use of force reporting obligations to its staff in a number of ways:

    ▪ H+H's electronic medical record system continues to require any H+H staff who signs into the system to read and acknowledge a statement regarding their reporting obligations in order to gain access to the system. Staff must

---

[39] This language reflects the revised language ordered by the court May 14, 2018 (see Dkt. Entry 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."

acknowledge this statement every time they sign into the system and access to the system is denied if the acknowledgement is denied; and

- For every UOF that occurs in areas where clinic staff were likely to have been present,[40] as a backstop, H+H operations staff reach out on a monthly basis to providers scheduled to work in those areas at the time/date of the reported UOF to determine if they directly witnessed a UOF and, if so, to elicit reports.

   o During this Monitoring Period, H+H staff submitted 54 reports of UOF (either witness reports, or UOF allegations relayed from an inmate) related to 46 individual incidents or alleged incidents.

- Department of Education ("DOE") notified their staff of the obligation to report uses of force under the Consent Judgment during this Monitoring Period:

   o <u>All DOC Facilities except Horizon</u>: the DOE reported that the Corporation Counsel's directive was distributed to East River Academy staff at Rikers during the last week of September 2018. As part of the roll out, staff were advised to complete reports using existing incident report forms and to give them to their supervisors (the Assistant Principals) who would then scan them to the Tour Commanders or Warden and Deputy Warden.

   o <u>Horizon</u>: the DOE also reported the directive and roll out described above were provided to Horizon staff in November 2018.

- ACS notified their staff at Horizon of the obligation to report uses of force under the Consent Judgment during this Monitoring Period.

   o ACS distributed the Corporation Counsel's directive, provided basic instruction to ACS staff on their reporting obligations (both under *Nunez* and other required reporting), and collected and distributed a few reports to the Investigations Division and Monitoring Team.

   o ACS also worked this Monitoring Period with the Monitoring Team to bolster their reporting process, to create a centralized collection and distribution process much like the H+H process.

## ANALYSIS OF COMPLIANCE

¶ 10 of this section of the Consent Judgment requires the City of New York to take steps to ensure that non-DOC staff submit a report when they witness use of force incidents. Non-DOC Staff is defined in the Consent Judgment § III (Definitions), ¶ 22 as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social

---

[40] Clinic, Mental Observation Units, PACE, CAPS, RHU, ESHU, ESHU YA, SCHU, TRU, Secure, ARNT, BTB, or Bing/CPSU units.

services, counseling, or educational services to Inmates." The three largest groups of Non-DOC staff reporters are H+H staff (who provide medical and mental health care in the New York City jails), DOE Staff (who provide educational services to inmates), and ACS Staff (who are jointly operating HOJC with DOC). H+H has been working on the implementation of this requirement since 2017, whereas DOE and ACS Staff only began to implement this requirement during this Monitoring Period.[41]

The City notified DOE and ACS this Monitoring Period of their obligation to report and subsequently those agencies provided that notification to all of their staff. H+H continued to refine its practices to ensure collection and distribution of those reports to ID.

### Medical Staff Reporting (¶¶ 10 & 11)

Medical and mental health staff (H+H) are a critical group of non-DOC staff who are required to submit reports when they witness a UOF incident. H+H's efforts to communicate this requirement to their staff is yielding improved results as more reports were submitted during this Monitoring Period than previously (54, versus 22 in the Sixth Monitoring Period, and compared to only a handful during the Fifth Monitoring Period). The Monitoring Team reviewed all 54 H+H reports submitted to ID this Monitoring Period. Of these, 34 reports appeared to be written by staff directly witnessing a UOF incident and the remaining 20 appeared to be written by staff relaying a suspected or alleged UOF, which demonstrates compliance with ¶ 11 as well as ¶ 10.

As in prior Monitoring Periods, the Monitoring Team reviewed video footage of 13 incidents that occurred in medical areas, places where non-DOC staff are most likely to witness an incident, to determine whether reports were submitted as required. In two incidents in the clinic, staff can be seen observing the UOF incident, yet no non-DOC witness reports were submitted. Reports were not submitted for any of the other 11 incidents either, though it is less clear whether non-DOC staff witnessed the events.

The quality of the reports submitted by H+H staff often lacked specificity. As a threshold issue, it was sometimes difficult to determine whether the incident being described was one directly witnessed by the medical staff, or an allegation from an inmate being reported by staff.

The quality and quantity of reports still needs to improve, but H+H is no longer in Non-Compliance. The Monitoring Team shared feedback with H+H early in the Eighth Monitoring Period to address these issues and shared recommendations for improving the quality of the reports. H+H reported to the Monitoring Team that it would work with the Monitoring Team in the next Monitoring Period to address these issues.

### DOE Staff Reporting

DOE staff provide educational services to Inmates in certain DOC facilities, including RNDC, RMSC, EMTC, OBCC, GRVC, and Horizon. DOE has been slow to develop a process for collecting

---

[41] The obligation for ACS staff to report only began in this Monitoring Period with the opening of HOJC.

and distributing reports. Although DOE notified staff of their obligation to report, no reports were submitted by DOE staff during the Seventh Monitoring Period. Accordingly, DOE is in Non-Compliance with this provision.

At the close of the Monitoring Period, the Monitoring Team provided detailed feedback and recommendations to DOE for developing a centralized process to collect UOF reports and to distribute to DOC in a reliable and consistent manner. In response, counsel for the City advised the Monitoring Team that despite the DOE's initial work to implement the reporting requirements, their employee union—United Federation of Teachers (and its counsel)—do not agree with the joint position of the Monitoring Team, the City, and DOE that their members must report and are refusing to report as required. Given this impasse, the Monitoring Team intends to consider what additional guidance from the Parties or the Court may be necessary in order to proceed.

*ACS Staff Reporting*

ACS is jointly operating Horizon with DOC. During this Monitoring Period, ACS notified HOJC staff of their obligation to report. ACS staff submitted a handful of reports in December 2018. However, ACS did not have an adequate process to centrally collect reports from its staff nor to centrally distribute those reports to DOC. The Monitoring Team worked with ACS to identify improvements which will be rolled out during the Eighth Monitoring Period. A compliance rating for ACS is premature at this point because ACS' obligation and implementation of this provision began only part-way through the Monitoring Period.

*Incorporation of Non-DOC Reports in DOC Investigations*

The Monitoring Team also worked with ID to ensure that (1) when non-DOC staff reports are submitted, they are linked to the corresponding investigation, included in the investigation file and considered by investigators; and (2) if an investigation into the matter is not currently active, one is opened to investigate whether a UOF occurred and if so, its appropriateness. The Monitoring Team found that some H+H reports were linked and considered as part of a UOF investigation, while other investigations did not include the H+H reports submitted.

| COMPLIANCE RATING | ¶ 10. (H+H) – Partial Compliance<br>(DOE) – Non-Compliance<br>(ACS) – Not Yet Rated<br>¶ 11. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS") which captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields. The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team previously confirmed that the majority of incident data was tracked accurately and reliably.[42] The data continues to be entered and maintained in IRS and fed into CMS. The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. Periodically, the Monitoring Team may re-verify that the Department continues to track the information as required. However, the deviations noted to date have been minor, and no change in tracking procedure occurred that would warrant a re-assessment.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Since December 2017, Facility Investigations are conducted directly in CMS, and CMS tracks the information related to Facility Investigations as required by ¶ 15(a)-(f).

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals, as required in ¶ 15(g).

**ANALYSIS OF COMPLIANCE**

All Facility Investigations are now conducted directly in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 15(a)-(f).

| COMPLIANCE RATING | ¶ 15. Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

---

[42] *See* Second Monitor's Report (at pg. 39); Third Monitor's Report (at pg. 61).

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The information in ¶ 16(a)-(f) is tracked in CMS which went live in December 2017, and ID investigations for incidents occurring since then are conducted directly in CMS. The Investigation Trials Tracking System ("ITTS") continued to track ongoing ID investigations for incidents occurring before that date, and information is being systematically migrated over to CMS as those investigations close.

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals as required in ¶ 16(g).

## ANALYSIS OF COMPLIANCE

All ID investigations are now tracked in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 16(a)-(f).

| COMPLIANCE RATING | ¶ 16. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Trials Division continues to utilize an Excel workbook to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The information in ¶ 17(a) to (c) is also tracked in CMS, which went live in December 2017.[43]

## ANALYSIS OF COMPLIANCE

---

[43] Only cases that occurred after CMS was implemented are tracked in CMS.

The required information is tracked in CMS. The Trials Division also maintains a more detailed Excel worksheet to track the status of a case while it is processed in Trials (*e.g.,* tracking the dates of service of charges and discovery, and timing of final approvals for case closure). The Monitoring Team relies heavily on this more detailed worksheet and has found it is accurate and easy to digest. It is clear the Trials Division also utilizes this tracking system to actively manage its cases. The Department is in Substantial Compliance with this requirement as it has demonstrated that this information is consistently tracked in a reliable, accurate, and computerized manner. The Trials Division reports it intends to rely on CMS more, by incorporating some of the information that is tracked manually.

| COMPLIANCE RATING | ¶ 17. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to inmate-on-inmate fights in the inmate "Fight Tracker," a computerized system that includes names and booking numbers of the inmates involved; date, time, and location of the fight or assault; and the nature of any injuries sustained by inmates.

- In addition, inmate-on-inmate fights and assaults that result in a use of force are reported in IRS and subsequently tracked as part of the use of force investigation.

- Further, an inmate-on-inmate fight or assault that involves a slashing or use of a weapon is reported in IRS which tracks all required information.

### ANALYSIS OF COMPLIANCE

The Department's Fight Tracker includes most of the information listed while other sources (IRS and use of force investigations) include a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence.[44] While the Fight Tracker includes the fields required by this provision, on several occasions the Fight Tracker has omitted fights that were known to have occurred. Previously, this occurred as GMDC closed down and more recently, as Horizon opened. The Fight Tracker is an essential source of data on the level of violence in the facilities and the sources of

---

[44] Late in the Monitoring Period, the Department alerted the team that some of the information contained in the Fight Tracker at GMDC may not be accurate because data entry was disrupted during the transition to RNDC.

error must be identified and resolved. However, given these relatively isolated occurrences, the Department continues to be in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 19. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[45] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

* The Department maintains definitions of institutional violence, as reported in the First Monitor's Report (at pg. 35), that were developed in consultation with the Monitoring Team, and the Department has these definitions posted on the Department's intranet page, ensuring easy access for relevant stakeholders.

### ANALYSIS OF COMPLIANCE

The Department maintains appropriate definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[46]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

* **Prompt Medical Attention (¶ 22)**:
  o The Department maintained Directive 4516R-B "Injury to Inmate Reports" during this Monitoring Period, which requires inmates to be afforded medical attention as soon as

[45] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[46] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* Dkt. Entry 316).

practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight, and also sets forth guidelines for affording *expedited* medical treatment. Inmates who appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, etc.) must be produced directly to a clinic (and not taken to an intake location) following a UOF or inmate-on-inmate fight.

o   During this Monitoring Period, a total of 5,101 medical encounters were analyzed – 38% of patients were seen in less than 2 hours, 36% of patients were seen between 2 and 4 hours, 15% of patients were seen between 4 and 6 hours, and 12% of patients were seen beyond 6 hours as shown in the table below:

| Wait Times for Medical Treatment Following a UOF | | | | |
|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | Between 4 and 6 hours | 6 hours or more |
| Jan. 2018 | 814 | 27% | 30% | 18% | 24% |
| Feb. 2018 | 704 | 30% | 37% | 18% | 14% |
| Mar. 2018 | 719 | 31% | 37% | 21% | 12% |
| Apr. 2018 | 642 | 38% | 37% | 17% | 9% |
| May 2018 | 740 | 42% | 33% | 15% | 9% |
| June 2018 | 625 | 41% | 38% | 15% | 7% |
| 6th MP Totals | 4244 | 35% | 35% | 17% | 13% |
| July 2018 | 767 | 34% | 34% | 19% | 14% |
| Aug. 2018 | 799 | 32% | 35% | 18% | 16% |
| Sep. 2018 | 854 | 38% | 35% | 16% | 10% |
| Oct. 2018 | 681 | 41% | 34% | 15% | 10% |
| Nov. 2018 | 969 | 42% | 37% | 11% | 10% |
| Dec. 2018 | 1031 | 39% | 37% | 13% | 12% |
| 7th MP Totals | 5101 | 38% | 36% | 15% | 12% |
| 2018 Totals | 9345 | 36% | 35% | 16% | 12% |

- **Tracking Medical Treatment Times (¶ 23)**:
  o   NCU continued to track and analyze medical wait times for inmates following a UOF.
    ▪   NCU tracks the medical wait times for each inmate involved in all reported UOF incidents using information from the Injury to Inmate Report,[47] and requires the Facilities to provide written explanations for inmates who received medical attention beyond the four-hour time frame.

ANALYSIS OF COMPLIANCE

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). NCU's work to systematically collect medical wait time data was a critical step to ensure timely medical attention is provided and to track the length of delay, as required. The

---

[47] A small number of Injury to Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

Department continues to produce the majority of inmates (74%) for medical treatment within four hours (compared to 70% in the Sixth Monitoring Period and only 57% in January 2018).

An important aspect of NCU's work, beginning in May 2018, was to better understand the reasons for medical treatment delayed beyond four hours by asking for explanations from the Facilities—explanations often related to groupings of incidents or multi-inmate incidents that overwhelmed the clinic at times. Not only did these inquiries provide useful information, but also created greater accountability at the Facility-level and improved performance. NCU also evaluated the type of injuries sustained by inmates whose wait time exceeded four hours, which provided additional insight into how often medical treatment was unduly delayed for those suffering injuries.

Ultimately the goal is to ensure the wait for medical attention is as short as possible. That said, given the number of medical encounters (including those related to UOF, other routine medical procedures, and emergencies), delays in medical treatment are bound to occur. Accordingly, it is critical that the patients with the most severe injuries and potential for risk of harm are prioritized. Of the 27% of inmates who received medical attention in excess of four hours this Monitoring Period, the majority had no injuries or ultimately refused medical treatment. It is important to note that this data only tracks when an inmate was seen and treated by medical staff in the clinic. This data does not capture de-contamination following OC spray exposure unless de-contamination occurred in the clinic. De-contamination of OC spray exposure generally occurs before the inmate is taken to the clinic for medical assessment after a UOF either in intake or in a shower on the housing unit.

However, some number of inmates with injuries did wait in excess of four hours. Therefore, in this Monitoring Period, the Monitoring Team recommended that NCU collect additional information for any inmate who received medical attention *beyond* four hours, and *sustained injuries* so the Department and the Monitoring Team were better positioned to understand what occurred and whether there could be any changes in practice to mitigate this in the future. This assessment demonstrated that the majority of inmates with serious or potentially serious injuries are prioritized and generally seen within four hours. For example, in December 2018, for the major commands, 249 (25%) inmates were treated in excess of four hours (out of a total of 990 inmates treated by medical staff following a use of force). When excluding the inmate refusals, 85% of inmates received medical attention within four hours. When excluding both refusals and inmates with no injuries, 95% of inmates received medical attention within four hours of a UOF incident. NCU identified a total of 42 inmates (about 4%) who complained of an injury who were seen by medical staff in excess of four hours. 20 of these 42 had some objective evidence of an injury but were generally minor injuries such as abrasions, bruising, or swelling. Of these 20 injuries, three were listed as lacerations by medical staff. One injury also involved a loose tooth. 22 of 42 injuries were general complaints of pain or tenderness that typically did not have any visible evidence of an injury. This suggests that medical treatment is being prioritized for those that require medical treatment more quickly.

| | |
|---|---|
| NCU did a commendable job in collecting and analyzing medical wait time data and improving performance within the Facilities. This enabled the Department to demonstrate that inmates were receiving medical treatment as soon as practical following a use of force and achieving Substantial Compliance with the Consent Judgment requirements. | |
| **COMPLIANCE RATING** | ¶ **22.** Substantial Compliance<br>¶ **23.** Substantial Compliance |

### 3.   TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)).

During the Seventh Monitoring Period, the Department continued to deploy a significant volume of training as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff (*e.g.*, Prison Rape Elimination Act ("PREA"), Chemical Agents, etc.) and providing comprehensive training for recruits. The Monitoring Team observed SCM training provided to Horizon staff during this Monitoring Period.

*Training Academy*

In this Monitoring Period, the City has continued its efforts to evaluate a number of potential sites for the Training Academy so that it can put the City's commitment of $100 million dollars to use as soon as possible. As described in detail in the First Monitor's Report (at pgs. 55-57), the Department's current training facilities suffer from limited and sorely inadequate training space. The City has kept the Monitoring Team apprised of its diligent efforts to design and build out the space once the site is selected as well as identify adequate training space, although appropriate space has not yet been selected. As this is a long-term project, the Monitoring Team continues to encourage the City to diligently work toward making this effort a reality. The Monitoring Team will continue to monitor this issue to ensure progress is made in providing the Department with appropriate training space.

*Deployment of Training*

As described in prior Monitor's Reports, significant operational, scheduling, and space resources are required to sustain this training effort. The Department continues to utilize the Training Academy in Middle Village, training space at John Jay College of Criminal Justice, and training space on Rikers Island (described in detail in the Third Monitor's Report (at pg. 72)), while the City plans for a new Training Academy as described above.

The Training Division has had inconsistent leadership over the life of the Consent Judgment. At least five different executive leaders, many in interim capacities, have managed the Training Division during the last three years while the Department recruited and hired a permanent leader for the Training Division. Throughout this time, the Department's Complex Litigation Unit ("CLU") has needed to provide significant support to the Training Division in an effort to keep the Department on track. In September 2018, the Department hired a new Deputy

Commissioner of Training & Development who worked with Department leadership to develop the following priorities:

- Refresh four key uniform development programs, including the Recruit training program, the Captains' Pre-Promotional training program, the ADWs' Pre-Promotional training program, and General Office curriculum;

- Design, develop, and deliver leadership development programming for civilian supervisors and managers;

- Expand traditional learning formats to include experiential learning, and online, self-paced learning through modules customized by the agency;

- Enhance DOC instructor capability; and

- Integrate a Learning Management System into operations to enhance course and Instructor scheduling, enrollment tracking and reporting, and enrollment-related data management.

This assessment and overhaul of the Training Division comes at a critical time. As described in more detail below, the Division's limited leadership has resulted in a lack of ownership for managing the deployment of *Nunez*-related training. The Department has had some success, including training all Staff in S.T.A.R.T. and deploying most of the initial trainings required by the Consent Judgment. However, significant work remains to maintain and achieve compliance with the Consent Judgment's ongoing requirements such as providing refresher training at specific time intervals and ongoing training obligations for Staff newly assigned to specific posts (*e.g.*, Probe Team Training, Cell Extraction Team Training, SCM and Direct Supervision Training).

It has become evident over the last year that the Department does not have a sustainable process for managing the deployment of training. The Monitoring Team has had to exert significant and persistent oversight to ensure that *Nunez*-required trainings were deployed as required. The Monitoring Team shared feedback in a number of mediums and has often been the primary manager of training initiatives to ensure *Nunez* training programs are deployed as required. The Department simply did not maintain a reliable or sustainable process to ensure training was deployed to the appropriate Staff or at a pace necessary to meet the Consent Judgment requirements. In order for the reforms enumerated in the Consent Judgment to be successful long term, the Department must be capable of continuing without the Monitoring Team's persistence and oversight. *Nunez* training requirements must become a permanent piece of the Department's larger framework of Pre-Promotional, Pre-Service, and In-Service training. The Monitoring Team advised the Department of these concerns and strongly recommended that the Training Division develop internal mechanisms to not only ensure compliance but create ownership within the Training Division. The Monitoring Team will now be working directly with the Deputy Commissioner of Training & Development and his staff on these issues rather than coordinating through CLU in order to create greater transparency and to ensure improved ownership and accountability.

Following the close of the Monitoring Period, the Deputy Commissioner of Training & Development reported that he will provide greater oversight of *Nunez* requirements to ensure the Training Division can independently manage its training programs, assess what training needs to occur, how much training has occurred and needs to be provided, and what, if any, further work must be done to achieve compliance. Further, the Monitoring Team continuously notes operational deficiencies through its extensive review of use of force videos and other work with

the Department, and a consistent method for providing this information to the Training Division would be worthwhile. As the Division begins to refresh key training areas, the Monitoring Team is working with the Deputy Commissioner to develop an appropriate feedback strategy.

*Deployment of Advanced Correctional Techniques ("A.C.T")*

The Department continued to deploy A.C.T. Training to In-Service Staff throughout this Monitoring Period, prioritizing providing the four-day training course to those who had not previously received Crisis Intervention and Conflict Resolution training as recruits, over the one-day training course for those who only needed the refresher courses.[48] A total of 4,481 Staff received A.C.T. training between March 2018 and mid-January 2019. The deadline for training completion is May 31, 2019 and a significant number of Staff have yet to be trained (as of mid-January 2019, almost 2,000 Staff still needed the one-day training, and almost 4,000 Staff still needed the 4-day training).[49] In an effort to meet the deadline, at the end of this Monitoring Period, the Deputy Commissioner of Training & Development instituted various strategies to improve the pace of training, including: (1) providing specific make-up training days for Staff who were part of a four-day cohort but missed one or more days of training (instead of re-scheduling them for a new four-day cohort which wastes training slots); and (2) doubling the number of A.C.T. offerings each week over two tours. The Department is also considering a creative approach to running the one-day training concurrently with the four-day training during the Eighth Monitoring Period.

---

[48] Staff who received Crisis Intervention and Conflict Resolution training as part of Pre-Service Training (those who graduated from the Academy in December 2015 onward) are not required to re-take the three-day portion of A.C.T. that covers this topic. These Staff only participate in the one-day Use of Force/ Defensive Tactics refresher training. The total number trained includes those who received the one-day refresher (2,150) and those who needed and received the full four-day A.C.T. training (2,331).

[49] *See* Dkt. Entry 312.

Previously, the Monitoring Team recommended that the Department prioritize delivering A.C.T. training to the Department's uniform executive leadership. Thus far, only the one-day combination of Supervisor UOF Policy and Defensive Tactics refresher training has been provided to this group (45 of 56 uniform leadership staff (80%) had been trained as of the end of the Monitoring Period). The one-day Conflict Resolution and Crisis Intervention training has not yet been provided to any uniform leadership.

See *Appendix B: Training Charts* for the status of development and deployment of initial and refresher training programs required by the Consent Judgment, and for the total number of Staff who have attended each required training program in this Monitoring Period and since the Effective Date. The boxes below analyze the Department's progress in training specific Staff in these required trainings.

| XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING) |
|---|

¶1. Within 120 days[50] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.   <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.   The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy [and provided in the timeframe outlined in 1. And 2.]

        ii.   The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

    The Department has achieved Substantial Compliance with ¶ 1(a) and ¶ 1(a)(i) by providing Use of Force policy training to recruits as part of the mandatory Pre-Service training and providing the

---

[50] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

training to all Staff as part of S.T.A.R.T. Operating together, these two training components reached all uniformed Staff.

Regarding ¶ 1(a)(ii), the UOF Policy refresher training lesson plans for Staff and a separate refresher curriculum targeting Supervisors were finalized during the Sixth Monitoring Period. These continue to be deployed as part of A.C.T. as described above, with planned completion by May 31, 2019.

| **COMPLIANCE RATING** | **¶ 1(a).** Substantial Compliance<br>**¶ 1(a)(i).** Substantial Compliance<br>**¶ 1(a)(i)(1) & (2).** Substantial Compliance<br>**¶ 1(a)(ii).** Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶1. Within 120 days[51] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

b.   Crisis Intervention and Conflict Resolution Training: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

   i.   The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

   ii.  The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[52]

   iii. The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

The Department continues to meet the expectations of Consent Judgment ¶ 1(b)(i) by providing Crisis Intervention and Conflict Resolution training to all recruit classes. As discussed above, the In-Service training continues to be deployed as part of A.C.T., and is required to be completed by May 31, 2019.

---

[51] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[52] This date includes the extension that was granted by the Court on April 24, 2018 (*see* Dkt. Entry 312).

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance<br><br>**¶ 1(b)(i).** Substantial Compliance<br><br>**¶ 1(b)(ii).** Substantial Compliance with the length requirements for the lesson plan. The requirement for the deployment of the training has not come due.<br><br>**¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶1. Within 120 days[53] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.   <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[54] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

¶ 2. Within 120 days[55] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.   <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[56] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B*.

### ANALYSIS OF COMPLIANCE

    During this Monitoring Period, the Department deployed the In-Service component of Probe Team Training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)) to the vast majority of the select group of Staff required to receive this training.[57]

---

[53] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[54] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

[55] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[56] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

[57] Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with celled housing, but the Department determined during the last previous Monitoring Period that a number of other Facility-specific posts ("identified posts")

Conducted by the Emergency Services Unit ("ESU"), the Department made a concerted effort during this Monitoring Period to deliver this training, which is a significant improvement from the past. During this Monitoring Period, a total of 589 Staff held posts that required this training. By the end of the Monitoring Period, 89% had been trained in Facility Emergency Response Training and 97% had been trained in Cell Extraction Team Training, either as recruits, in Pre-Promotional Training or through In-Service training.[58] While the Monitoring Team does not have reason to believe that this training was not provided as reported, the audit of training records identified a significant margin of error, as described further in the discussion of ¶¶ 6-8 below. Therefore, the Department remains in Non-Compliance with the training requirements for Probe Team Training and Cell Extraction Training because the Department cannot reliably demonstrate that the identified Staff actually received the training.

Additionally, the Department must develop a process to ensure that any Staff newly assigned to these posts receive both the Facility Response Team training and the Cell Extraction training, and has advised that this process will be implemented during the Eighth Monitoring Period. The Department will achieve compliance when it can demonstrate a reliable and sustainable process to provide and track this training on an ongoing basis to Staff newly assigned to these posts.

*Probe Team Training* (¶ 1(c))

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. Regarding In-Service training, the Department reported it deployed the In-Service component of the Facility Emergency Response training to the vast majority (89%) of the select group of Staff required.

*Cell Extraction Training* (¶ 2(b))

The Cell Extraction Team training is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. Regarding In-Service training, the Department deployed the in-service component of Cell Extraction Team training to the vast majority (97%) of the select group of Staff required to receive this training as described above.

| COMPLIANCE RATING | ¶ 1(c). Probe Team Training (Pre-Service) Substantial Compliance<br>¶ 1(c). Probe Team Training (In-Service) Non-Compliance |
| --- | --- |

---

including Intake, Security, Corridor, and Escort posts, and the relevant Facility-specific posts are the Staff who actually field serve on Facility Emergency Response (previously known as Probe Teams) and Cell Extraction Teams.

[58] Additionally, a handful of the originally identified 589 no longer needed the training as they were later identified as indefinite sick, TDY, retired, etc.

| | ¶ 2(b). Cell Extraction Training (Pre-Service) Substantial Compliance |
| --- | --- |
| | ¶ 2(b). Cell Extraction Training (In-Service) Non-Compliance |

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[59] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.   <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

        i.    The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.    The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

      The Department has achieved Substantial Compliance with ¶ 2(a)(i) by incorporating and deploying Defensive Tactics training as part of the mandatory Pre-Service training for recruits. Although not required by the Consent Judgment, the Department provided the three-day Defensive Tactics course to all Staff as part of S.T.A.R.T. A refresher training lesson plan for Staff was finalized during the Sixth Monitoring Period, and as discussed above, continues to be deployed as part of A.C.T., with planned completion by May 31, 2019.

| **COMPLIANCE RATING** | ¶ 2(a)(i). Substantial Compliance |
| --- | --- |
| | ¶ 2(a)(ii). Partial Compliance |

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing

---

[59] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

b.   The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B*.

- The Department chose to provide Safe Crisis Management ("SCM") Training to *all* Staff assigned to work at RNDC, where most Young Inmates are housed, not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment.[60] As of the end of the Seventh Monitoring Period, 95% of RNDC Staff had received SCM Training (either as Pre-Service or In-Service) and 44% had also received SCM Refresher training.

| Facility | Total Staff Assigned to Facility as of Dec. 31, 2018 | Staff Trained in SCM as of Dec. 31, 2018 | Received Pre-Service SCM Training | Received In-Service or Pre-Promotional SCM Training | Received SCM Refresher Training |
|---|---|---|---|---|---|
| **RNDC** | 821 | 776 (95%) | 367 | 409[61] | 364 (44%) |

- SCM Training has been provided to the majority of Facility leadership at RNDC and the Monitoring Team continues to work with the Department to ensure new leadership receives the training.

- The Department also provided a revamped SCM Training to 282 of the 306 Staff assigned (92%)[62] to work at Horizon Juvenile Center this Monitoring Period, which exclusively houses adolescent inmates.

## ANALYSIS OF COMPLIANCE

*Training Content*

---

[60] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

[61] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service training.

[62] The training was provided to all but two of the remaining available Staff in the Eighth Monitoring Period.

As described in the First Monitor's Report (at pgs. 52-53), this training, combined with other trainings provided to Staff who work with Young Inmates, meets the content requirements of this provision.

The Monitoring Team continues to evaluate the implementation of SCM as part of its overall efforts to monitor the provisions related to Young Inmates. SCM implementation is discussed in further detail, particularly as it relates to Horizon, in the Transfer and Management of 16- and 17-Year-Old Youth section of this report.

*SCM In-Service Training*

The majority of the Staff who received the SCM training work in the Facilities that house the largest number of Young Inmates. The Department has achieved Substantial Compliance with the requirement to deploy SCM In-Service training.

*SCM Refresher Training*

The Department rolled out the Monitor-approved SCM Refresher Training curriculum during the Fourth Monitoring Period and has provided it to 44% of Staff from RNDC. The Department also contracted with the creators of SCM (JKM Training, Inc.) to provide additional on-site training at HOJC to reinforce Staff skills in using SCM techniques. Beginning in the Eighth Monitoring Period, JKM will be on site monthly for six months to provide SCM reinforcement training. During these sessions, JKM trainers will review videotaped footage of UOF incidents with trainees and will discuss ways to improve Staff's response and use of SCM techniques.

| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br>¶ **3(a).** Substantial Compliance<br>¶ **3(b).** (Development of Refresher Lesson Plan) Substantial Compliance<br>¶ **3(b).** (Deployment of Refresher Training) Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[63] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    b.    The Direct Supervision Training shall be a minimum of 32 hours.

    c.    By April 30, 2018,[64] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

---

[63] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[64] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.
- The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most Young Inmates are housed, not just to those regularly assigned to work in Young Inmate Housing Areas, as required by the Consent Judgment.
- During this Monitoring Period, the Department identified 300 RNDC Staff who had not yet received Direct Supervision Training and provided training to approximately 270 of them as of the end of the Monitoring Period.
- The Department continues to provide Direct Supervision to the Facility leadership of RNDC.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment ¶ 4 and ¶ 4(a). The Department has struggled to provide the Direct Supervision training to RNDC Staff, with no targeted approach to provide RNDC Staff the training (as opposed to Staff from other Facilities), due to the issues described in more detail in the narrative of this section above regarding overall management of the *Nunez* requirements.

At the beginning of this Monitoring Period, the Monitoring Team asked the Department to identify RNDC Staff who still required Direct Supervision training and deploy the training accordingly. After much prompting, the Department identified the Staff who required the training and began to deploy it. Unfortunately, the Monitoring Team, rather than the Department, identified that all required Staff at RNDC had not yet received the training and that Direct Supervision was being randomly deployed to Staff at other Facilities who do not require the training under the Consent Judgment. Once the Department realized the error, the training approach became more targeted and the Department provided the training to nearly all Staff who required it. The Department will achieve Substantial Compliance when it can demonstrate a reliable and sustainable process to track and provide this training on an ongoing basis to Staff newly assigned to RNDC.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance<br>¶ **4 (a).** Substantial Compliance<br>¶ **4 (b).** Partial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

    e.    There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, probe team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department developed a stand-alone Handheld Camera Training Lesson Plan that was incorporated into the mandatory Pre-Service training, beginning with the class that graduated in November 2017.

- The Department provided the stand-alone Handheld Camera Training Lesson Plan to ESU, ESU support, and K-9 unit Staff during prior Monitoring Periods.

- The Department has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials.

- The Department has a separate short training and lesson plan with instructions for Staff on saving and uploading handheld video to the Department's main computer system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations.

As noted in the Video Surveillance section of the report, Staff are required to capture the following circumstances on handheld video: (1) responding to a Use of Force Incident; (2) all cell extractions; (3) all probe team actions; and (4) Facility living quarter searches conducted by the Department's ESU, except Tactical Search Operations ("TSO"), random searches, and strip searches. The Department has provided the standalone handheld camera training to active ESU Staff and to all recruits. Further, as noted in the tables in the introduction to this section, 5,197 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff which also includes training on the operation of handheld video cameras. Given the nature of the Probe Team, the assignment to handheld camera operator is made once the team is assembled. The Monitoring Team has found that generally all incidents are captured on handheld video as required.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

      a.      Such re-training must be completed within 60 days of the determination of the violation.

| b. | The completion of such re-training shall be documented in the Staff Member's personnel file. |

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During this Monitoring Period, the Department developed and implemented a computerized re-training request system ("Service Desk").
- The Department also developed a corresponding policy, Operations Order 13/18, "Academy Training Service Desk." The policy mandates that all re-training required as a result of a Use of Force incident must be entered into and tracked through the Service Desk.
- Once entered, the Academy and the Staff Member's assigned command are responsible for tracking the status of the training to ensure that it is completed. The Service Desk ticket is closed after the Academy confirms re-training occurred.

## ANALYSIS OF COMPLIANCE

The Department has struggled to implement this provision. The ad hoc systems described in prior reports were not reliable or sustainable, so a new system was developed this Monitoring Period to identify Staff who require re-training and track whether it was received. This process is complex, requiring coordination across multiple divisions and all Facilities, but once complete, will bring integrity to the system.

The Monitoring Team believes the Service Desk policy and implementation plan to be reasonable. As designed, the Service Desk will serve as a functional tool for requesting and tracking Staff re-training. Because it was implemented at the end of the Monitoring Period, the Monitoring Team has only had an opportunity to review initial Service Desk reports and has not yet been able to assess whether it is being implemented as designed, is capturing re-training requests from all sources, or whether the Academy is providing the training as requested. Therefore, the Monitoring Team has not yet rated this provision.

| COMPLIANCE RATING | ¶ 5. Not Yet Rated |

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to develop the Learning Management System ("LMS") which will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**:

  o **TTS:** During the development of LMS, the Department uses the Training Tracking Software ("TTS") as an interim solution. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings and all *Nunez*-required In-Service and Pre-Promotional trainings except those conducted by ESU (which includes Probe Team and Cell Extraction Team Training). TTS scans Staff's identification cards in the classrooms and then this information is manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

  o **Hand-Written Sign-in Sheets**: Attendance for In-Service and Pre-Promotional trainings conducted by ESU (which include Probe Team and Cell Extraction Team Training) are captured by hand-written sign-in sheets. The Department reported that ESU began utilizing TTS in November of 2018, but hand-written sign-in sheets were produced to the Monitoring Team for training occurring after that date, calling into question that assertion.

- **Examination Tracking**:

  o **Pre-Service**: Examinations for all *Nunez*-required Pre-Service courses are taken using a tablet and the results are tracked in Excel.

  o **In-Service and Pre-Promotional**: In-Service exams are administered on paper or involve physical skill assessments administered by the instructor and the results are captured on paper.

ANALYSIS OF COMPLIANCE

*Review of Examination and Attendance Records* (¶¶ 6 & 7):

¶¶ 6 and 7 require that all Staff members who complete the *Nunez*-required trainings must pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). This Monitoring Period, NCU reviewed training records to ensure attendance is tracked accurately and examinations are administered as required. The Monitoring Team reviewed NCU's assessment and, for the most part, verified the underlying documentation. The Monitoring Team recommends that NCU share its results and constructive feedback directly with the Academy so that any areas of weakness can be addressed. NCU reports the Training Division's records have improved.

The results of the training audit are described in detail below and continue to reveal improvements in attendance and examination records. However, ESU's training records continue to require improvement. As noted above, despite a strong recommendation by the Monitoring Team, and the Department's report that TTS is now utilized by ESU, there is no evidence that ESU has actually implemented TTS.

- ***Recruit Training Examinations and Attendance***

The Department assessed, and the Monitoring Team verified, the examination and attendance records for all *Nunez*-required trainings for two companies that graduated in December 2018. All recruits in these companies attended the required training (as initially offered with their company, or as make-up classes), except one recruit appeared to still have a pending Probe Team course to make-up. NCU reviewed the examination scores for: (1) exams taken electronically on iPads for UOF Policy, SCM, and Crisis Intervention and Conflict Resolution training, and (2) written performance evaluations for Cell Extraction, Probe Team Training, and an overall Defensive Tactics qualification by an instructor. Passing records were located, or reasoning for exception (*e.g.,* no Defensive Tactics physical evaluation for a pregnant recruit), for all but a handful of evaluations and examinations for courses reviewed. Overall, the training records for the recruit class were maintained in an organized fashion, particularly those administered on the iPad.

- ***Pre-Promotional Training Examinations and Attendance***

NCU conducted, and the Monitoring Team verified, an internal audit of the *Nunez*-required trainings' examination and attendance records for a 10% sample of Staff in the Captains Pre-Promotional Training during this Monitoring Period. All examinations and evaluations (except one missing Probe Team and one missing Cell Extraction training evaluation) were available.

- ***In-Service and Refresher SCM Training Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for 10% of the Staff (sample of 54 students) who received SCM Refresher training during this Monitoring Period. TTS printouts demonstrated that all students attended the course and examination records confirmed all but one Staff passed the exam (one exam record could not be located).

- ***In-Service Direct Supervision Attendance***

The Monitoring Team reviewed a sample of TTS sign-in sheets for Direct Supervision blocks of training and confirmed that the RNDC Staff that had been reported as attending had corresponding TTS sign-in sheets for those dates.[65]

---

[65] Direct Supervision does not have a separate examination because the last module of the lesson plan is a dedicated review and practice module in which students respond to a series of questions about Direct Supervision, analyze scenarios for compliance with Direct Supervision concepts, and develop plans to address hypothetical situations.

- ***A.C.T. Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, a similar internal audit of attendance and examination records for one four-day A.C.T. training block. The audit demonstrated that the vast majority of Staff who participated in each block of training attended all four days as required (or attended make-up classes), and also took and passed the scantron Conflict Resolution and Crisis Intervention examination. This evaluation also proved helpful to the Monitoring Team in understanding the pace of A.C.T. training.

- ***In-Service Probe Team and Cell Extraction Team Training Examinations and Attendance***

The Monitoring Team attempted to verify the roster of Staff with identified posts who received Probe Team and Cell Extraction Team Training this Monitoring Period by reviewing a sample of underlying sign-in sheets and evaluations for courses on specific dates. Unfortunately, the review of underlying documentation demonstrated that the roster the Department had produced to demonstrate compliance with the training requirements for Staff in identified posts was not reliable. For Probe Team Training, the Monitoring Team attempted to verify attendance of 58 Staff based on roster attendance, and could not locate 9 of 58 (16%) attendance records. For Cell Extraction Training, the Monitoring team reviewed attendance records for 86 Staff based on dates provided in roster, and could not locate 13 of the 86 (15%) attendance records. It was evident that the Department had not internally analyzed these records before production of the documentation to the Monitoring Team. Subsequently, the Monitoring Team worked with the Department to determine the cause of these discrepancies, and found that they were caused by three problems: (1) the rosters inaccurately logged some of the training dates so the rosters and sign-in sheets did not match up (*e.g.*, someone was in fact trained on October 30, 2017, not October 30, 2018); (2) some Staff who had only been registered for the training were listed as attending, but the Staff did not in fact attend the training; and (3) all relevant sign-in sheets were not initially produced.

The Monitoring Team continues to recommend that ESU utilize the electronic tracking systems used by the Academy in order to improve the Department's ability to track and manage the training provided and also to demonstrate compliance.

*Centralized System to Maintain Training Records* (¶ 8):

As noted in prior Monitor Reports, a centralized electronic system to track training will significantly enhance the Department's ability to identify which Staff require training and when, the completion of required courses and the overall maintenance of training records. During this Monitoring Period, the scope of work proposal for LMS was finalized following input from the Deputy Commissioner of Training & Development. The Monitoring Team confirmed the scope of work addresses the *Nunez* requirements.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

|  | ¶ **7.** Partial Compliance |
|  | ¶ **8.** Partial Compliance |

## 4.   ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitoring Team, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all Use of Force incidents are properly reported without fear of retaliation and can be investigated. The Department has maintained an anonymous hotline since March 2016.

The Monitoring Team's assessment of compliance is outlined below.

### VI. ANONYMOUS REPORTING ¶ 1

¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect. The Division Order requires ID to initiate a preliminary investigation within three business days of receiving an anonymous report.

- The Department has received the following calls since the Anonymous Reporting Hotline went live in March 2016

|  | March. to June 2016 | July to Dec. 2016 | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 |
|---|---|---|---|---|---|---|
| **Total Calls Received** | 3 | 11 | 21 | 28 | 18 | 23 |
| *Number of UOF related calls* | *0* | *0* | *1* | *0* | *1* | *0* |

- The Department continues to advertise the hotline telephone number in all Facilities on large posters, DOC TV, and the Department's intranet home page.

- Bi-annually, ID requests that Wardens and Division Chiefs from all Facilities check the status of the posters advertising the hotline to determine if any repairs or replacements are needed. The Facilities then report their findings to ID.

- In December 2018, each Facility conducted a routine check of the posters to confirm they were mounted in Lexan (polycarbonate) and remained in good condition in high traffic areas such as the Staff lounge ("KK"), administrative corridor, and main entrance. During their routine check, Facility Staff observed that in all but one Facility, posters were mounted behind Lexan, remained in good condition, and were not defaced. Repairs to the poster at the one Facility were made.

**ANALYSIS OF COMPLIANCE**

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision. The Monitoring Team continued to observe the hotline advertised on DOC TV and posters in high-traffic areas throughout Facilities while conducting site visits. Although the hotline did not receive any calls pertaining to UOF this Monitoring Period, the fact that the hotline continues to routinely receive calls suggests that it remains an avenue for Staff to report misconduct. The Monitoring Team reviewed the substance of each call and its classification as "UOF-related" or not and agreed with the Department's classification in each case. It is worth noting that the Department receives UOF concerns through a number of channels including direct reports by Staff and inmates to Facility and/or ID staff, calls to 311, reports from non-DOC Staff (*e.g.* H+H), inmate grievances, and from Legal Aid Society lawyers.

| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |
|---|---|

### 5. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures

regarding the use of handheld video cameras (¶ 2(d-f));[66] and preserve video from all sources for at least 90 days (¶ 4).

The Department's video surveillance capability is expansive and far greater than most correctional systems with which the Monitoring Team has experience. As of December 31, 2018, the Department reports it has installed a total of 10,429 new wall-mounted cameras.

With widespread video surveillance capabilities across the Facilities, the Department continues to utilize the camera footage proactively. As described in prior Monitor's Reports, the video monitoring unit and CASC remain in operation. These assets should be leveraged as much as possible to enhance the Department's ability to detect and prevent potential violence.

The Monitoring Team's assessment of compliance is outlined below.

| IX. VIDEO SURVEILLANCE ¶ 1 (STATIONARY CAMERA INSTALLATION) |
| --- |

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

---

[66] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

e.      The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of June 30, 2018, the Department has installed 10,429 new wall-mounted surveillance cameras throughout the Facilities.

- The Department maintains a comprehensive list of recommendations for additional wall-mounted stationary cameras, compiling recommendations from the Monitoring Team, Chief of Department, and other divisions within the Department.

- Cameras were installed at HOJC prior to transferring 16- and 17-year-old residents from RNDC to HOJC.

**ANALYSIS OF COMPLIANCE**

The Department has installed a significant number of wall-mounted surveillance cameras, well beyond the 7,800 cameras required by the Consent Judgment and has achieved "Complete Camera Coverage" of all Facilities.

*Installation of stationary, wall-mounted cameras to ensure Complete Camera Coverage* (¶ 1 (a), (c))

During this Monitoring Period, the Monitoring Team conducted a video surveillance tour at HOJC during which the physical placement of cameras was observed, and live feeds of the video were reviewed on the Genetec system. The tour covered housing units and ancillary areas where cameras had been installed, including dayrooms in the housing units, Special Programming Areas, school, gymnasium, clinics, intake, mess hall, hallways, and stairways. The Monitoring Team identified a small number of locations within HOJC where additional camera coverage may be beneficial. The Department advised the Monitoring Team it will consider the recommendations and will either install the cameras as recommended or discuss with the Monitoring Team as appropriate.

Given that cameras have been installed across multiple Monitoring Periods, the chart below illustrates the current status of installation and recommendations at each Facility.

- ***Status of Installation***

The Department has completed installation of cameras in almost all areas of the Facilities. Consequently, the overwhelming majority of incidents are captured on video, which the Monitoring Team confirmed by a review of a sample of Rapid Reviews, Preliminary Reviews, and UOF investigations.[67] The Monitoring Team has recommended a relatively small number of additional cameras are installed in certain areas of the Facilities to minimize potential blind spots. The Monitoring Team received regular updates from the Radio Shop as the Department continued to install additional

---

[67] It should be noted that it is not expected that 100% of incidents will be captured on camera as the Consent Judgment explicitly excludes certain areas from camera coverage. See ¶8 of Definitions.

cameras in response to the Monitoring Team's recommendations from the site tours. Cameras are being installed based on the order in which the recommendation was received.

| Facility[68] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[69] | Reference to Prior Monitor Report Findings |
|---|---|---|---|---|---|
| GMDC[70] | Substantially Complete | Substantially Complete | No | N/A[71] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure) | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE units may house 18-year-olds) | In progress | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| EMTC | Substantially Complete | Substantially Complete | Yes (sentenced 18-year-olds) | In progress | Second Report (pg. 66) Fourth Report (pg. 102) |
| OBCC | Substantially Complete | Substantially Complete | Yes (ESH YA only) | In progress | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |
| RMSC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially Complete | No | In progress | Third Report (pg. 107) Sixth Report (p.83) |
| NIC | Substantially Complete | Substantially Complete | No | In progress | Second Report (pg. 66) Sixth Report (pg. 83) |
| QDC | N/A – no housing units | N/A – not currently in use | No | N/A | N/A |
| BKDC | Substantially Complete | Substantially Complete | No | To be addressed | Sixth Report (pg. 83) |
| DJCJC | N/A – no housing units | Substantially Complete | No | To be addressed | Sixth Report (pg. 83) |
| HOJC | Substantially Complete | Substantially Complete | Yes | To be addressed | N/A |

---

[68] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[69] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras.

[70] As of the end of June 2018 the Department no longer houses inmates at GMDC.

[71] Given that GMDC has now closed, the need to address recommendations for camera installation is moot.

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (¶ 1 (b))

As noted in previous Monitor's Reports, provision ¶ 1 (b) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. As demonstrated in the chart above, the Department installed cameras in HOJC which now houses 16- and 17-year-old residents and there were no changes to the Facilities housing 18-year-olds, and thus remains in Substantial Compliance.

*Use of Force incidents not captured on video and subsequent identification of blind spots* (¶ 1 (d))

To date, neither the Department nor the Monitoring Team has identified a Use of Force Incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot.

*Internal camera working group meeting* (¶ 1 (e))

As stated in the Fifth Monitor's Report (at pg. 84), the internal camera working group is no longer needed because the project is complete. Should the need for a major installation of additional cameras arise in the future, the Department and the Monitoring Team will evaluate whether the meetings should be reinstated.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(a).** Substantial Compliance <br> **¶ 1(b).** Substantial Compliance <br> **¶ 1(c).** Substantial Compliance <br> **¶ 1(d).** Substantial Compliance <br> **¶ 1(e).** Substantial Compliance (per Fourth Monitor's Report) |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.   Body-worn Cameras

    a.   Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

    b.   The 100 body-worn cameras shall be distributed among officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

    c.   The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department initiated its body-worn camera ("BWC") pilot at GRVC on October 9, 2017. Staff assigned a BWC were provided training that was developed in consultation with the Monitoring Team.

- The BWC Directive, Operations Order 17/17, developed in consultation with the Monitoring Team, remains in effect. Staff are required to activate the body-worn cameras in specified situations (*e.g.,* use of force incidents, witnessing or responding to an inmate-on-inmate fight or escorting inmates).

- The Department has 51 operable body-worn cameras at GRVC and is in the process of expanding the pilot.

- The body-worn cameras were activated in response to thirty use of force incidents during the Seventh Monitoring Period.

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the number of use of force incidents captured on BWCs increased compared to the last Monitoring Period (30 compared to 9 respectively). The Monitoring Team reviewed a sample of BWC video captured during the Seventh Monitoring Period and continues to find that BWC footage is a valuable source of audio and video that stationary and handheld cameras cannot provide. The fixed nature of BWCs results in audio that is often superior to handheld cameras and an angle that reflects the perspective of the involved Staff. The Monitoring Team found the BWC footage to be useful in reconstructing use of force incidents and analyzing not only the force utilized, but the events that precipitated the force.

As part of the Monitoring Team's assessment, the Monitoring Team reviewed the Preliminary Review of most incidents in which Staff indicated they activated their BWC. The Monitoring Team identified a few incidents where investigators were unable to locate BWC footage. In response to this finding, the Department reported that investigators are continuing to familiarize themselves with the system to improve efficiency and minimize error. The Monitoring Team will continue to review BWC footage and the related Preliminary Reviews to ensure investigators are able to locate the footage to complete investigations.

At the close of the Monitoring Period, the Monitoring Team met with the Department to discuss next steps for expansion of the pilot. The Department reported the pilot has been very successful and intends to expand the use of body-worn cameras throughout the Department. This will require significant resources and coordination, so the expanded use of body-worn cameras will occur over time. The first area of expansion will be at HOJC in the spring of 2019. The Monitoring Team attended a BWC training at HOJC which was both effective and well received by Staff. The Monitoring Team will continue to work collaboratively with the Department on the expanded use of body-worn cameras.

| **COMPLIANCE RATING** | **¶ 2(a)-(c).** Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

¶ 2.      Handheld Cameras

d. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

f. When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team, remains in effect.

- The NCU continued its quality assurance ("QA") program of handheld camera footage across all Facilities.

- The NCU reported that, of the 9,758 alarms[72] during the Seventh Monitoring Period, 9,446 (96.8%) of the corresponding handheld videos were uploaded.

- From July to December 2018, the Department reported that 42 Facility Referrals were generated for violations of the handheld video directive. Facility responses to these referrals ranged from individual corrective action (*e.g.,* counseling or re-training) to Facility-wide initiatives (*e.g.,* requiring the handheld video directive to be recited at roll call).

- ID issued one Memorandum of Complaints ("MOC") to Staff during the Seventh Monitoring Period for *intentionally failing to capture incidents*. The Department did not find that any Staff *repeatedly failed to capture incidents due to failure to follow DOC policies* during this Monitoring Period.

## ANALYSIS OF COMPLIANCE

### Policy (¶ 2 (d))

The Department continues to maintain an adequate policy regarding the use of Handheld Cameras.

---

[72] NCU includes both level A and B alarm responses because the Department's policy requires both level A and B alarms to be captured on handheld video. A UOF incident has two levels of responses depending on whether the incident escalates. Usually a level A alarm will be called first, and if the incident can't be resolved by the level A response, a level B alarm is triggered which is when the Probe team will respond. The Consent Judgment requirement for handheld camera footage is limited to a level B alarm response.

*Availability of Handheld Video* (¶ 2(d))

The Department continues to demonstrate that handheld video is captured in situations where required and that the footage is subsequently uploaded and available in a timely manner. To support this effort, NCU maintains its QA program and their results are examined and discussed by leadership during the weekly *Nunez* meetings. NCU's audit methodology was revised to include a 10% sample review of the conclusory statement in the video (to confirm the correct video was uploaded). The consistently high proportion of handheld videos uploaded during the Seventh Monitoring Period demonstrates that the Department has continued to meet its obligations in this area.

The Monitoring Team independently assessed handheld video availability to verify NCU's results and all but one of the incidents sampled had been uploaded appropriately. NCU's audit was extremely well organized and the documentation reviewed supported NCU's audit conclusions. The quality of handheld video is addressed through the Preliminary Review or investigation (*e.g.*, if the camera appears to be intentionally turned off or pointed away at any point of the incident, it is noted by the reviewer or investigator).

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities' improvement in promptly uploading handheld video has had a positive effect on ID's ability to access the footage. In the event video footage cannot be located, the investigator contacts NCU which can usually assist by referencing their log of alarm responses and the associated handheld video. The inability to locate the video is often an inadvertent filing error. The Monitoring Team has found during its routine review, that the Preliminary Reviews have increasingly referenced handheld video, which demonstrates continued improvement of handheld video availability. In a randomly selected group of assessed cases, the Monitoring Team found that the investigator had access to the handheld video 20 of the 22 cases reviewed. The review was focused on whether the video was available to the ID investigators for incidents where NCU had confirmed the video existed. Finally, the Monitoring Team has not identified any systemic issues preventing investigators from reviewing footage when completing their Preliminary Reviews or Full ID Investigations. These results demonstrate that the Department is not only ensuring the handheld video is adequately captured and uploaded, but the investigators also have consistent access to the handheld video when completing their Preliminary Reviews.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

Although errors in capturing incidents on handheld video are infrequent, when it did occur, the Facilities held Staff accountable for failing to ensure handheld video was adequately recorded and uploaded through corrective interviews, verbal counseling, Command Disciplines and MOCs. The Monitoring Team and investigators continue to find some handheld videos with poor video quality (*e.g.*, some handheld videos that do not remain on the subject). However, these are isolated incidents and neither the Department, nor the Monitoring Team, have identified a pattern of any individual Staff

repeatedly failing to adequately capture an incident or that issues occur at a specific Facility. A few cases have also been identified where an incident is not captured due to technology issues (*e.g.*, failed camera battery or problem with the camera). These issues in the main have been addressed in investigations.

| **COMPLIANCE RATING** | **¶ 2(d).** Substantial Compliance<br>**¶ 2(f).** Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. <u>Maintenance of Stationary Cameras</u>

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[73]

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department, in consultation with the Monitoring Team, promulgated Operations Order 12/18 "Command Level Assessment and Maintenance of Stationary Surveillance Cameras" to remove the requirement to complete the bi-monthly BMR-1 forms in light of the Court's August 10, 2018 order that modified Consent Judgment § IX, ¶ 3(c).

- Assigned Staff and supervisors continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into Enterprise Asset Management (EAM) to trigger repair.

- NCU conducts a QA program on this issue. NCU revised its QA program during this Monitoring Period, in consultation with the Monitoring Team, to ensure the daily forms are complete and accurate (by reviewing a random sample of Genetec video), and to ensure corresponding repair orders have been generated. Discrepancies are documented in internal QA reports and discussed during weekly *Nunez* Compliance Meetings.

---

[73] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

- o On a daily basis, NCU reviews the MSS-1 forms and EAM Work orders and documents any deficiencies or errors. NCU then communicates directly with the Facilities to ensure corrective action is taken. On a monthly basis, NCU compiles a report of its findings (which is shared with the Monitoring Team) on the number of cameras identified as inoperable on the daily MSS-1 forms and whether work orders were submitted for those cameras.
- o NCU's QA program also includes an assessment of whether the submitted forms captured all inoperable cameras. Each month, NCU conducts a spot check of archival Genetec video at all Facilities to identify inoperable cameras that were not included on daily MSS-1 forms. NCU verifies whether any inoperable cameras identified through this process were entered into EAM even if they were not on daily forms. The results of the spot check are shared with the Facilities at *Nunez* Compliance Meetings and a two-week follow-up is conducted to ensure inoperable cameras have been repaired.
- The Department's Radio Shop is responsible for repairing the stationary cameras. Below is a chart of the timing to complete the repairs.

| Time to Repair Inoperable Cameras | | | | |
|---|---|---|---|---|
| | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 |
| *Total Repaired* | 3,934 | 5,378 | 6,195 | 5,867 |
| *Repaired within 2 weeks* | *3,678 (93%)* | *4,877 (91%)* | *5,540 (89%)* | *4,789 (82%)* |
| *Repaired within 2 to 3 weeks* | *85 (2%)* | *137 (3%)* | *288 (5%)* | *473 (8%)* |
| *Repaired within 3 to 5 weeks* | *87 (2%)* | *176 (3%)* | *174 (3%)* | *352 (6%)* |
| *Repaired beyond 5 weeks* | *84 (2%)* | *188 (3%)* | *193 (3%)* | *253 (4%)* |

**Analysis of Compliance**

The Department maintained its progress in identifying, tracking, and repairing inoperable cameras during the Seventh Monitoring Period. As expected with the large number of cameras in the system, on-going maintenance is required. The number of cameras requiring maintenance remains reasonable and the majority of cameras are being repaired within two weeks. Further, the Monitoring Team has not found that inoperable cameras have impacted the Department's ability to capture use of force incidents as the majority of incidents continue to be captured on camera.[74]

*Facility Assessment of Inoperable Cameras*

- ***Daily Assessment of Inoperable Cameras (¶ 3 (a)-(b)) & NCU QA Program (¶ 3 (c))***

The Facilities continued to document daily assessments of stationary cameras on the MSS-1 forms. However, following the modification of the Consent Judgment that no longer required bi-monthly assessments by Facility supervisors, Facility leadership stopped utilizing the BMR-1 forms at the beginning of the Monitoring Period.

---

[74] *See* ¶ 1 of Video Surveillance.

During the Seventh Reporting Period, the Facilities completed 99% of the daily forms and 99% of the cameras identified on those forms had corresponding work orders. The Monitoring Team verified a sample of original daily forms, work orders, and NCU's tracking spreadsheet and found the documents to be accurate and support the information reported on monthly Stationary Camera Reports.

During the Seventh Reporting Period, NCU's spot check of the accuracy of the submitted forms found that 1,121 of the 1,401 inoperable cameras identified were reported on the daily forms. 78 of the 280 cameras not listed on the form did have a work order despite not being listed on the daily form. Meaning 1,199 of the 1,401 (86%) had been identified or had a corresponding work order in EAM for repair. The Monitoring Team met with NCU and verified their conclusions based on the spot-checks, archival Genetec Footage, EAM work orders, and NCU tracking spreadsheets. NCU maintains an organized, accurate, and reliable tracking process.

The Department will achieve Substantial Compliance with ¶ 3 (a)-(c) when the QA program is fully developed and implemented, and when it can demonstrate that the Facilities are accurately and timely identifying and reporting inoperable cameras.

*Maintenance of Inoperable Cameras* (¶ 3 (d))

The vast majority of inoperable video surveillance cameras are repaired within two weeks. Monthly EAM reports showed that throughout the Monitoring Period, the Department repaired a total of 5,867 wall-mounted stationary cameras.[75] Given the extraordinary number of cameras in the Department, the number of reported inoperable cameras is consistent with what the Monitoring Team would expect and the rate at which cameras are repaired is reasonable. The Monitoring Team is encouraged by the Department's success in maintaining and quickly repairing inoperable cameras.

| COMPLIANCE RATING | ¶ 3 (a)-(c). Partial Compliance |
| | ¶ 3 (d). Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. Video Preservation

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's Operations Order 06/15, "Recording Equipment, Medium, and Electronic Evidence" remains in effect.

---

[75] This includes repairs of all wall-mounted stationary camera in the Department (not just those cameras that have been installed as part of this initiative).

- The Department's computerized system automatically preserves all video for 90 days.

- The video preservation unit in the Chief of Department's office continues to preserve Genetec video beyond the 90-day period for UOF incidents subject to Facility investigations and at the request of leadership.

- The Department's Operation Order 02/19, "Video Monitoring Unit (VMU) and Video Review Unit (VRU)" was revised to clarify the video that is preserved by VMU.

- The ID Video Unit has two dedicated Officers who preserve the Genetec video required for all UOF incidents. ID investigators submit requests for date/time/angles and the video is uploaded to a shared folder only ID can access.

- Body-worn camera footage is automatically uploaded to the Digital Evidence Management System ("DEM") when Officers place their body worn cameras in the dock. All body-worn camera footage remains on the system for 90 days. If a video captures a UOF or other reportable incident, the video preservation unit in the Chief of Department's office marks the video as 'evidential' which then preserves the video on DEMs indefinitely.

- ID investigators assigned to GRVC and the GRVC Warden are able to view the body worn camera footage directly in DEMs.

**ANALYSIS OF COMPLIANCE**

The Department has continued to maintain Substantial Compliance with this provision. The Monitoring Team confirmed that the Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent with the requirements set forth in Section IX, ¶ 4 of the Consent Judgment.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. The review encompassed both use of force incidents and inmate fights. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

With respect to preserving video beyond 90 days, the Department has continued to demonstrate Substantial Compliance over a sustained period. The Monitoring Team assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage, handheld and body-worn camera video footage included in the use of force investigation files produced to the Monitoring Team, and (2) randomly assessing a sample of stationary and handheld video of incidents investigated by ID. Only a small number of investigation packages have been produced to the Monitoring Team where the video was not preserved, often due to a clerical error. Further, the Monitoring Team's random testing found the videos for the vast majority of incidents reviewed were adequately preserved.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## 6. USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct. High-quality investigations are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department. The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion.

The investigations side ("ID") of the newly combined Investigation and Trials Division ("ID &Trials") plays a crucial role in the Department's reform efforts. ID has a significant workload that has increased every Monitoring Period since the Effective Date of the Consent Judgment. This is partly due to the fact that the Consent Judgment requires ID to conduct Preliminary Reviews for every use of force incident, in addition to requiring a much larger group of cases receive Full ID Investigations. Prior to the implementation of the Consent Judgment, ID was investigating less than 200 cases at any given time. Now, at any given time, ID is conducting a Preliminary Review of all UOF incidents (6,000 Preliminary Reviews in 2018) and has thousands of cases pending a Full ID investigation. Because of its unique vantage point, ID has also been at the heart of several initiatives implemented to address operational issues contributing to the use of force (*e.g.*, ID/Facility Coordinated Use of Force Analysis) as discussed throughout this report.

ID maintains a very strong leadership team. The Deputy and Assistant Commissioners are smart, creative, dedicated and reform-minded leaders who are committed to the reform effort.

During this Monitoring Period, the re-organization of ID & Trials teams was completed, and various practices were revised. Teams of Trials attorneys are now paired with Facility-specific ID investigator teams, which increases coordination between attorneys and investigators throughout the investigation process which should help to identify cases for formal discipline more efficiently and to build stronger cases (or, alternatively, streamline investigations when additional investigative steps are not necessary).

Toward the end of the Monitoring Period, an Initiatives Manager joined ID to oversee and advance ID's various initiatives. The ID Initiatives Manager reports directly to the Assistant Commissioner of Investigations and also liaises with the Monitoring Team. The ID Initiatives Manager is a crucial position and has already provided significant value to the Division in just his short tenure.

The ID Initiatives Manager is now responsible for managing the comprehensive workplan ("ID Workplan") initially developed during the Sixth Monitoring Period, and was revised in this Monitoring Period to reflect current priorities and initiatives. Many task-specific Consent Judgment requirements related to ID's work are identified in the ID Workplan along with the specific tasks necessary for implementation. Given the sheer volume of work that needs to be completed, the ID Initiatives Manager is responsible for prioritizing among the initiatives. The priorities identified in the ID Workplan focus on finalizing ID policies (where significant progress was made in December 2018 and January 2019), creating a process to prioritize the investigation of certain concerning UOF cases (e.g. development of the use of force priority squad ("UPS"), increased use of Fast Track, and processes to close more cases following the completion of the Preliminary Review), improved quality of investigations (e.g. addressing obstacles to timely completion of Full ID cases and providing training and mentoring to

investigators and supervisors), addressing the backlog of Preliminary Reviews and cases nearing or past the statute of limitations, and recruiting and retaining qualified investigators.

ID has significant work ahead to achieve compliance, but the Monitoring Team believes that the initiatives currently underway are promising and likely to result, over time, in the ID & Trials Division conducting timely and reliable investigations with appropriate discipline as merited. Importantly, in the short term, initiatives are underway to ensure that cases involving potentially problematic conduct are investigated and addressed with purpose, while at the same time ensuring that resources are not unduly expended on cases that do not involve such conduct.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Every use of force incident receives a Preliminary Review.
- ID and the Facilities investigate use of force incidents once the Preliminary Review is complete.

### ANALYSIS OF COMPLIANCE

The Monitoring Team has evaluated thousands of Preliminary Reviews and hundreds of Facility and ID investigations in this Monitoring Period. Preliminary Reviews continue to be the most consistent and reliable assessments of use of force incidents. However, as noted in the Identifying & Addressing Use of Force Misconduct section of this report, the sheer number of incidents has resulted in a backlog of Preliminary Reviews. While ID investigations tend to be of better quality and more detailed than Facility investigations, ID investigations still suffer from serious deficiencies which have not changed appreciably from Monitoring Period to Monitoring Period. Full ID Investigations are still inconsistent in quality and take too long to close. While the Monitoring Team does continue to find examples of ID investigations that meet quality standards, the following deficiencies were prevalent among investigations reviewed this Monitoring Period: (1) investigators did not properly investigate *all* the issues; (2) investigators disregarded video evidence or unreasonably assessed the video evidence; and (3) the investigators' conclusions were not justified based on the preponderance of the evidence.

Similarly, the findings of Facility investigations were generally not reliable, as they often ignored objective evidence, with analysis that is *pro forma*. The small sample of Facility investigations reviewed this Monitoring Period revealed use of force violations and issues that remained unaddressed, evidence that was disregarded, and findings and conclusions that were not based on the preponderance of the evidence. Facility investigators:

- do not analyze use of force incidents appropriately,
- do not appear to understand the concept of "proportionality" in using force or the types of Defensive Tactics which are permitted with certain types of resistance,
- rarely identify when Staff use inappropriate techniques,
- rarely identify when the inmate's actions or resistance was provoked by Staff, and
- leave unaddressed inaccurate reports by involved Staff and Staff witnesses.

Given these findings the Department is not in compliance with this provision.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
|---|---|

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[76] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

  c.  Investigator Training: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

  i.  ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

  ii.  The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B* for information on the deployment of ID Investigator Training.
- All new-hires must complete ID's 40-hour training before they may be assigned cases.
- All uniformed investigators received S.T.A.R.T. training and most civilian investigators received abbreviated S.T.A.R.T. training.

---

[76] This date includes extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

ANALYSIS OF COMPLIANCE

This provision is addressed in this section versus the Training section of the report because the training of investigators is intertwined with the other work described in this section.

*ID Investigator Training* (¶ 2(c)(i))

The Department's ID Investigator Training lesson plan continues to meet the requirements of this provision and it is provided to staff as required. Additional training for investigators, particularly Supervisors, is also being developed as part of the initiatives managed by the ID Initiatives Manager. ID has also provided opportunities for investigators to receive specialized training for certain subject matter areas (*e.g.*, PREA or SCM training) as discussed in more detail below.

*Facility Investigator Training* (¶ 2(c)(ii))

The Monitoring Team previously recommended that this provision be held in abeyance until June 2018, as the Department had various initiatives to address investigation deficiencies. This Monitoring Period, Staff from ID conducted some targeted training for Facility investigators at GRVC, OBCC, and RNDC, leveraging the ID/Facility Coordinated Use of Force Analysis. Unfortunately, the training initiative was discontinued after a key staff member retired. The Department has not otherwise provided any Facility investigator training with the exception of training on CMS. Accordingly, the Department is in Non-Compliance with this provision. Following the close of the Monitoring Period, the Department reported that it is evaluating the best path forward for addressing Facility Investigations, which may impact the type and target population for training going forward.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance<br>¶ 2(c)(ii). Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

    a. After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

    b. When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

    c. All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- This Monitoring Period, the Department revised and standardized its Inmate Voluntary Statement Forms to codify the requirement of ¶ 2(b) that "the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation." The revised forms will be implemented during the Eighth Monitoring Period.

- The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates involved in a use of force incident and those who witness the incident.

- Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

- **Videotaped Inmate Interviews**:

  o Following the success of the video interview pilot, ID worked toward utilizing body-worn camera technology to offer the option to videotape all inmate interviews going forward.[77]

  o Body-worn cameras, computers, and charging stations are available in all ID-staffed locations.

  o ID began using body-worn cameras division-wide in October 2018. As of October 22, 2018, ID investigators have been advised to afford involved inmates and witnesses the opportunity to provide a video recorded statement during the course of their investigation. Additionally, ID trained newly assigned staff and offered refresher courses on the use of body-worn cameras.

  o ID also developed a draft policy regarding the use of body-worn cameras for interviews, which is pending review by ID management.

ANALYSIS OF COMPLIANCE

The inmate interview requirements of ¶ 2 have a number of practical elements: (1) investigators must make and document reasonable attempts to interview inmates, including the ADW who interviews inmates following medical treatment; (2) the Department shall assure inmates they will not be subject to retaliation for providing information in connection with an investigation; (3) investigators shall not unreasonably discredit inmate statements; and (4) investigators must conduct inmate interviews in a private and confidential location.

_Interview Attempts and Documentation_

The Monitoring Team continues to find that Preliminary Reviewers of UOF incidents attempt to interview inmates involved in actual uses of force within days of the incident (even if/when

---

[77] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

Preliminary Review closures are delayed). In ID Closing Reports, investigators document their attempts to interview inmates, either by including a summary of the inmate's statement or by indicating that the inmate refused to be interviewed. Further, Facility investigators also record the status of inmate statements in the relevant CMS field (either summarizing the inmate's statement, or, more often, documenting that the inmate refused to provide a statement to the Facility).

In order to further support efforts to encourage inmates to provide statements to investigators, the Inmate Voluntary Statement form was revised in this Monitoring Period. In response to a recommendation by the Monitoring Team, the form now codifies the Consent Judgment requirement, providing notification to the inmate that they will not be subject to any form of retaliation for providing information in connection with the investigation.

*Investigator Assessment of Inmate Statements*

The Monitoring Team continues to find that, too often, inmate statements are discredited without adequate explanation. Investigators often use insignificant inconsistencies from inmate interviews to discredit the inmate's version of events. This issue speaks to the overall quality of ID and Facility investigations, particularly the issue of analysis and findings not being justified based on the preponderance of the evidence. That said, the Monitoring Team has reviewed investigations where the investigators attempted to corroborate the inmate statements with video evidence, and inmate allegations and statements were appropriately credited (most often when there was corroborating evidence).

*Privacy and Confidentiality of Inmate Interview*

The Monitoring Team continues to see investigators attempt to provide more private or confidential locations (*e.g.*, pantries, dayrooms, or stairwells) for inmate interviews. While these are not ideal interview locations, considering the time and space constraints, these locations are an improvement from Housing Areas that lack privacy given the presence of other inmates.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- 10 use of force cases were referred to or taken over by DOI during this Monitoring Period.

- At the end of the Monitoring Period, a total of five use of force cases were pending before DOI (three of which were related), and eight were pending before law enforcement or were being

actively prosecuted (one with the Bronx District Attorney ("DA"), one with the Brooklyn DA, and six with the U.S. Attorney's Office for the Southern District of New York "SDNY").

- The Department refined its internal tracking processes for cases pending with law enforcement. The Department also continued to coordinate monthly with DOI and the Bronx DA's office on cases pending with those offices (as described in the Second Monitor's Report at pgs. 84-85).
  - o During this Monitoring Period, the monthly check-in meetings were expanded to include any law enforcement agency that is investigating a use of force case, including participation by representatives from SDNY.

**ANALYSIS OF COMPLIANCE**

Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly and/or assumed by DOI. During this Monitoring Period, the Monitoring Team consulted with ID staff about two UOF incidents that may be criminal in nature and should be considered by law enforcement. These cases are currently pending evaluation by SDNY.

*Tracking of Cases*

The cases evaluated by DOI and subsequently City and Federal prosecutors' offices represent some of the most troubling use of force incidents. Accordingly, it is critical that they are processed as expeditiously as possible, which is difficult given the various layers of review across and within various agencies required to bring a criminal prosecution. Therefore, proper tracking and management of these cases is crucial, both of which were significantly enhanced during the Seventh Monitoring Period.

As an initial step, the Department improved its case tracking to ensure cases are tracked from the moment they are referred to law enforcement, to tracking the monthly status updates while the case remains pending with law enforcement, and finally through the process within the Department to ensure the case is closed and processed once the evaluation and/or prosecution by law enforcement is complete.

The monthly check-in meetings between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and SDNY) occur regularly and provide an adequate forum for coordinating cases. This includes ensuring the Department places its own investigations on hold while the criminal investigation is ongoing, while also ensuring that cases do not languish once referred to law enforcement. The Monitoring Team has observed these meetings and observed significantly more coordination and cooperation at the end of 2018 than in prior Monitoring Periods.

*Length of Time to Evaluate Cases*

The improved tracking and communication appears to have resulted in a decrease in the time that outside agencies are reviewing cases. In particular, DOI has been assessing cases more timely and either elevating them to prosecutors or clearing them back to the Department. However, the total time

required for outside agencies to consider cases for prosecution is still **too long**—for example, a few of the cases pending consideration by law enforcement at the end of this Monitoring Period occurred over two years ago. This is of great concern to the Monitoring Team as the vast majority of cases reviewed by law enforcement do not result in a criminal proceeding and are ultimately referred back to the Department for administrative processing and discipline. Accordingly, the administrative response and discipline for these matters are very protracted. It is therefore imperative that law enforcement representatives make every effort to ensure cases are prosecuted, or returned to the Department, as expeditiously as possible.

The Monitoring Team noted delays from the Bronx DA's office in providing relevant documentation to SDNY. Therefore, during this Monitoring Period, SDNY began participating in the monthly meetings described above to expedite information flow with the DA's office.

*Department's Assessment of Cases Returned from Law Enforcement*

As noted above, law enforcement agencies decline to prosecute the vast majority of cases reviewed. In those circumstances, the cases are referred back to the Department for administrative processing and discipline, as appropriate. As described throughout this section of the report, the timeliness of ID investigations remains a serious issue and so the Monitoring Team recommended that the investigation of these cases are prioritized given the probability that they involve serious misconduct and a disciplinary response is likely warranted. To date, these serious cases, like most others, have languished in ID. However, the improved tracking of these cases appears to have had a positive corresponding impact on ID's management of these cases as there has been demonstrated improvement in the efficiency in managing them, including serving of charges as appropriate. Further, for cases that merit charges, the charges were served before the expiration of the SOL.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 4 (BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS)

¶ 4. Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department can discipline, instruct, or counsel those who conduct or sign-off on a biased, incomplete or inadequate investigation.

### ANALYSIS OF COMPLIANCE

The Department's investigators, particularly Facility investigators, often produce inadequate investigations, as described throughout this section of the report. The Department rarely addresses these issues with the investigator or responds with appropriate discipline, instruction, or counseling. It is difficult for the Monitoring Team to track instruction and counseling of investigators as this often

occurs on a more informal basis. Anecdotally, the Monitoring Team is aware that some instruction and counseling does occur (more frequently with ID investigations versus Facility investigations). In addition, the Monitoring Team from time to time has conducted workshops to help support the Department's efforts to instruct investigators.

The Monitoring Team identified a handful of cases where Facility investigators who conducted inadequate, incomplete, or biased investigations were disciplined.[78] The Department imposed discipline in seven cases in 2018 where a Captain was disciplined for conducting, or supervisor was disciplined for approving, a biased, incomplete, or inadequate investigation. Given the prevalent investigation deficiencies discussed throughout this section, the Monitoring Team would expect to see more frequent efforts to guide and/or discipline both investigators and supervisors who approve the subpar work product, and therefore the Department is in Partial Compliance. An obvious situation involves Facility investigators who close a case with no action (finding that the force was appropriate and within guidelines) while the Rapid Review for the same incident finds the force unnecessary or excessive, which the Monitoring Team believes goes unaddressed too often.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[79] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.,* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

### ANALYSIS OF COMPLIANCE

*Classification of UOF Incidents*

The Department has consistently demonstrated, over several Monitoring Periods, that the overwhelming majority of use of force incidents are classified accurately and accordingly has maintained Substantial Compliance with this requirement. As part of the investigation of all UOF

---

[78] In at least one case, the Department addressed the problematic investigation after it was raised by the Monitoring Team.

[79] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C

incidents, Preliminary Reviewers review all UOF incidents to determine if they may need to be re-classified as required by Consent Judgment § VII (Use of Force Investigations), ¶ 7(b). Through the routine assessment of Preliminary Reviews, the Monitoring Team found in this Monitoring Period that Preliminary Reviewers recommended that a small number of incidents that should be considered for re-classification based on information obtained through the investigation. The Monitoring Team and the Department discussed the potential re-classification of these incidents as recommended by the Preliminary Reviewers and, after repeated requests to address the recommendations, the Department ultimately re-classified 23 incidents as part of this review. The Monitoring Team separately recommended the Department consider a small number of incidents that would benefit from additional review to determine if they should be re-classified. As a result of this review, the Department re-classified three incidents.[80] Overall, the Department's assessment of the re-classification of these incidents was reasonable. The Department's protracted assessment of potentially misclassified incidents demonstrated that it does not have a reliable process in place to ensure that misclassified incidents caught by Preliminary Reviewers are subsequently re-classified. The Department has reported it has enhanced its procedures, which will be implemented in the next Monitoring Period.

Notwithstanding the delay in the assessment of re-classification of this very small number of incidents, the problem was limited in scope and the overwhelming majority of use of force incidents during the Seventh Monitoring Period were classified accurately. Thus, the Department has maintained Substantial Compliance.

*Class P Assessment*

This provision also requires that incidents are classified in a timely manner when injury information is not immediately available when the initial classification determination is made. The Monitoring Team has found that most incidents with Class P are reclassified in a timely manner, consistent with findings from prior Monitoring Periods.[81] During the current Monitoring Period, 209 of the 221 (96%) Class P incidents randomly selected by the Monitoring Team were reclassified within two weeks or less.[82]

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
| --- | --- |

---

[80] The Department is still evaluating two incidents to determine if re-classification is necessary.

[81] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

[82] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance.

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### ANALYSIS OF COMPLIANCE

In 2017, ID completed a year-long pilot program to video record interviews and concluded that videotaped interviews enhanced the quality of investigations (as discussed in the Fifth Monitor's Report at pgs. 96-97). The Department's efforts to implement videotaping inmate interviews systemwide is discussed in ¶ 2 above.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance (per Fifth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID uses CMS to conduct Preliminary Reviews of all use of force incidents.
  - As of mid-February 2019, of the 3,483 incidents that occurred during the Seventh Monitoring Period, Preliminary Reviews were officially completed in CMS (meaning all sign-offs were complete) for 1,866 (54%). Of the 1,617 incidents (46%) with pending Preliminary Reviews, 964 (60%) are pending some level of supervisory approval, and 653 (40%) are pending with the investigator.
- ID closed 404 cases under Presumption that the Investigation is Complete (PIC) (described in detail in the Third Monitor's Report at pgs. 119-121) this Monitoring Period, including 238 with incident dates from this Monitoring Period.

### ANALYSIS OF COMPLIANCE

The Monitoring Team continues to review all Preliminary Reviews[83] as they remain the most reliable source of information about use of force incidents. The Department dedicates significant time and effort to completing quality Preliminary Reviews. The Preliminary Review includes most of the core components of the investigation, including a summary of what occurred based on an assessment of available video as well as Staff, inmate, and witness reports.

*PICs*

Investigators use of CMS has continued to help identify cases that may meet the PIC criteria for closure. This resulted in 404 cases being closed this Monitoring Period, on par with the number closed in the last Monitoring Period (n=410). However, the Monitoring Team continues to believe that more cases can be closed through the PIC process. In particular, the overwhelming majority of cases currently referred for Facility investigations could actually be closed following the completion of the Preliminary Review and not referred for a Facility investigation because the necessary information is available to make a final determination of whether or not misconduct occurred. When necessary, appropriate discipline can be imposed based on the findings of the Preliminary Review and it is unlikely that a Facility investigator faced with the same evidence could have additional findings.

The Monitoring Team routinely reviews PIC cases to ensure cases are not closed prematurely or without appropriate responses to Staff misconduct. As in previous Monitoring Periods, the Monitoring Team finds that while some PIC cases clearly met the required criteria for closure, the investigator failed to recommend that a discrete violation be addressed by the Facility using a Facility Referral. This is not a flaw or fault of the use of PIC, but simply a symptom of the larger issues with investigator's judgement and ability to accurately assess Staff conduct and craft appropriate responses. In other words, it is doubtful that the discrete violation would have been addressed had the investigation been a Facility investigation or even a Full ID Investigation instead of a PIC, as no further investigative steps were necessary to identify the violation, it simply needed a more critical eye to actually assess the Staff's behavior as inappropriate.

*Timeliness of Preliminary Reviews*

One area of particular concern regarding the Preliminary Reviews is the protracted time for completion. The length of time to complete Preliminary Reviews continued to increase throughout 2018, averaging 53 business days during this Monitoring Period (compared to 41 business days during the previous Monitoring Period).[84] This is not particularly surprising given the transition to CMS and

---

[83] Given the backlog of completing Preliminary Reviews, the Monitoring Team also evaluates the initial draft of Preliminary Reviews not yet completed to allow the Monitoring Team the ability to review incidents more contemporaneously. The Monitoring Team also receives copies of all completed Preliminary Reviews.

[84] This reflects the time between when the incident occurs and formal closure of the Preliminary Review after all supervisory reviews are complete, data previously reported only captured the time to complete the initial Preliminary Review. The data available through CMS does not allow the Monitoring Team the

some of the work flow issues, as well as the increased number of cases that require Preliminary Reviews (*i.e.*, increased number of uses of force) and the increasing workload related to other ongoing initiatives within the Division (*e.g.* ID/Facility Coordinated Use of Force Analysis, efforts to improve PREA and Full ID Investigations, among other things). That said, the Preliminary Review delay triggers corresponding delays in any subsequent actions that may need to be taken. Accordingly, completing Preliminary Reviews timely must be a priority.

At the close of the Monitoring Period, ID shared a proposal with the Monitoring Team for restructuring the Preliminary Review process to ensure more expeditious completion, as well as address the Monitoring Team's recommendation that the findings of the Preliminary Review are leveraged to expand the number of cases that are closed following the completion of the Preliminary Review. The Monitoring Team intends to work closely with the Department to develop and refine this initiative to ensure it is adequate, sustainable, and can be implemented as soon as possible.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID Investigations when they meet any of the criteria in Consent Judgment § VII, ¶ 8.
  - ID reports that additional cases are referred for a Full ID Investigation after the Preliminary Review process is complete if additional facts or circumstances that merit additional scrutiny are revealed, even if the facts of the case do not meet the specifically enumerated circumstances in this provision.

---

ability to calculate the time to complete the initial Preliminary Review. The Monitoring Team previously conducted a manual review of a sample of Preliminary Reviews and found that the time to complete an initial Preliminary Review ranged from five days to a few months.

- The 3,483 use of force incidents (actual and alleged) that occurred in this Monitoring Period were referred as shown in the chart below for the 1,866 (54%) of incidents with closed Preliminary Reviews, based on the incident status as of mid-February 2019:

| Investigation Type | 6th Monitoring Period Incidents with Closed PR (n=2,814) | 7th Monitoring Period Incidents with Closed PR (n=1,866) |
|---|---|---|
| **Pending or Closed Full or Expedited ID Investigations** | 1,375 (49%) *--1,112 Pending* *--263 Closed* | 915 (49%) *--653 Pending* *--262 Closed* |
| **Pending or Closed Facility Investigations** | 955 (34%) *--182 Pending* *--773 Closed* | 642 (34%) *--440 Pending* *--202 Closed* |
| **Closed PICs** | 484 (17%) | 309 (17%) |

*Note: The table utilizes the case status as of mid-February 2019. At that time, the Preliminary Review was still pending for 1,617 incidents occurring during the Seventh Monitoring Period, and 4 incidents occurring during the Sixth Monitoring Period.*

**ANALYSIS OF COMPLIANCE**

The Department remains in Substantial Compliance with this provision as ID continues to refer cases for Full ID Investigations appropriately. The Monitoring Team reviewed a sample of cases referred for Facility investigation to ensure they did not qualify for Full ID Investigation as per ¶ 8 criteria. Consistent with prior reviews (*see* Second Monitor's Report at pg. 97, Third Monitor's Report at pg. 144, and Fourth Monitor's Report at pgs. 131-132), the Monitoring Team found that at least 95% of the sample had appropriate referrals for Facility investigation.

| **COMPLIANCE RATING** | **¶ 8.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS)

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Investigators review all UOF reports and UOF witness reports as part of Preliminary Reviews, ID investigations, or Facility investigations.

**ANALYSIS OF COMPLIANCE**

As noted above, investigators routinely review all UOF reports, though they rarely cite Staff collusion in findings of their investigations. As described in the Use of Force Reporting and Tracking

section of this report, the Monitoring Team often finds the quality of the Staff reports to be lacking, including the use of vague and boilerplate language, language inconsistent with video evidence, or the inclusion of false information. When these issues are seen among Staff Reports for the same incident, the specter of collusion emerges but often goes unaddressed by the investigator handling the case.

Additionally, as described in regard to Use of Force Reporting and Tracking, ¶ 8, while charges were occasionally brought for use of force reporting-related violations (including collusion) during this Monitoring Period, the frequency of such charges is not compatible with what the Monitoring Team would expect, based on the findings of its review of Staff Reports noted above.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:
  a.   *Timeliness* [. . .]
  b.   *Video Review* [. . .]
  c.   *Witness Interviews* [. . .]
  d.   *Review of Medical Evidence* [. . .]
  e.   *Report* [. . .]
  f.   *Supervisory Review* [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID continues to conduct investigations as described in the Fourth Monitor's Report (at pgs. 132-133). ID investigators are assigned to Facility-specific teams and are responsible for conducting the Preliminary Reviews for all incidents and any cases subsequently referred for Full ID Investigation. Generally, the investigator who conducts the Preliminary Review is also responsible for the Full ID Investigation.

- All ID investigations of UOF incidents occurring during this Monitoring Period were conducted within CMS.

- ID closed 563 UOF investigations during this Monitoring Period and also closed 404 cases as PICs.

- Of the 563 UOF investigations closed in this Monitoring Period, 82 (15%) of these cases resulted in charges for at least one Staff Member and 11 (2%) of these cases resulted in both charges and a PDR.

- ID continued the "Fast-Track" and "Expedited Case Closure" processes this Monitoring Period:

  o **Fast-Track**: Fast-Track became part of ID & Trials' standard practice following the pilot program during the Sixth Monitoring Period. ID investigators worked with Trials attorneys to identify Fast-Track cases (discussed in more detail in the Staff Accountability & Discipline section of the report).

119

- o **Expedited Case Closure**: Some cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. The Department reported that ID closed 275 cases through expedited closure during this Monitoring Period.

- **Facility Referrals**:
  - o ID continued using Facility Referrals during this Monitoring Period, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to a Facility with instructions for the Facility to take appropriate action.
  - o This Monitoring Period, ID tracked each Facility Referral and subsequent proof of remediation. Of the 241 Facility Referrals issued this Monitoring Period, the Facility provided a response to 146 (61%). Facility responses to these referrals ranged from individual corrective action (*e.g.* counseling) to Facility-wide initiatives (*e.g.* addressing a repeated failure during roll call).

**ANALYSIS OF COMPLIANCE**

The sheer volume of UOF incidents that require investigation is daunting and overwhelming. The ID investigators simply have more work than can reasonably be completed in a timely manner. Their workload is only increasing over time as the number of uses of force has not abated. As a result, there is a significant backlog of cases, some of which have languished beyond the statute of limitations. The investigators' high workloads will cause the quality of the investigations to suffer as evidence gets stale and may further lead to staff burnout. Accordingly, cases must be prioritized using smart, creative strategies to ensure serious cases are dealt with appropriately and conserving resources when cases do not require additional scrutiny. As discussed in more detail below, ID developed and began to implement some triage efforts during this Monitoring Period. It is imperative that these initiatives are implemented as soon as and with as much vigor as possible.

*Timeliness* (¶ 9(a))

Completing investigations simply takes too long. The overwhelming majority of investigations have not closed within the Consent Judgment's original 180-day timeline, nor the new 120-day timeline that went into effect on October 1, 2018. The time cases are pending with ID is best understood by looking at data on both pending cases and those that have been closed. The table below shows the length of time cases have been pending as of the last day of both the Sixth and Seventh Monitoring Periods as well as the number of cases closed in each of those Monitoring Periods.

| Status of UOF Incidents Since Effective Date Subject to ID Investigations | | | | |
|---|---|---|---|---|
| | Pending as of June 30, 2018 | Closed Between Jan. – June 2018 | Pending as of Dec. 31, 2018 | Closed Between July – Dec. 2018 |
| Within 120-days *post October 1, 2018* | 898 (24%) | 159 (26%) | 325 (7%) | 231 (41%) |
| 121 days to 180 days | | | 417 (9%) | 80 (14%) |
| 181 days to 18 months | 2,248 (59%) | 353 (57%) | 2,366 (52%) | 105 (19%) |
| 18 months to 2 years | 535 (14%) | 101 (16%) | 864 (19%) | 113 (20%) |
| Beyond 2 years[85] | 125 (3%) | 5 (1%) | 600 (13%) | 34 (6%) |
| **TOTALS** | **3,806** | **618** | **4,572** | **563** |

In the table above, the shaded columns contain data from the current Monitoring Period and the unshaded columns contain data from the previous Monitoring Period. Of the 5,135 cases that were pending or closed in this Monitoring Period, a total of 1,053 (21%) were closed or pending within the 180-day deadline. This is the same rate of timeliness as the previous Monitoring Period (of the 4,127 cases, 843 (20%) were timely). While the number of closed cases is the same for both Monitoring Periods, the number of pending cases increased *significantly*—by over 1,000 cases—during this Monitoring Period due to the increase in the number of UOF incidents. This clearly demonstrates that, as the backlog continues to increase and as the cases continue to age, the Department will not be in a position to achieve compliance any time in the near future. That said, the data also demonstrates that some of the initiatives to close cases more quickly are having the desired outcome. During this Monitoring Period, 55% of cases closed were closed within 180 days compared to only 19% during the last Monitoring Period. This suggests that once the backlog is resolved (which can only occur when the number of new UOF cases entering the system slows substantially), ID will be in a position to close cases in a more timely manner.

- ***Statute of Limitations ("SOL")***

Most concerning within the backlog are investigations pending beyond the statute of limitations (which is 18 months for UOF cases).[86] Even if these investigations substantiate Staff misconduct, the Department is generally unable to discipline Staff. Beginning in early 2018, the number of cases

---

[85] As described in ¶ 10 below, the Department closed all cases that were open as of November 1, 2015. The oldest pending case occurred in January of 2016 so was pending just under 3 years as of December 31, 2018.

[86] Pursuant to Civil Service Law - CVS § 75, ¶ 4, "no removal or disciplinary proceeding shall be commenced more than eighteen months after the occurrence of the alleged incompetency or misconduct complained of and described in the charges . . . such limitations shall not apply where the incompetency or misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime."

pending beyond the statute of limitations began to grow, reaching approximately 1,500 cases pending by the end of the Seventh Monitoring Period. For cases beyond the SOL, the Department is precluded from bringing charges in cases where they may be merited unless the misconduct fits the crime exception—for which cases administrative charges can be brought if the behavior also constitutes a crime.[87]

The fact that this volume of investigations is pending beyond the SOL is plainly unacceptable. However, it is worth noting that approximately 130 of the 1,500 cases pending beyond the SOL and 49 of the 147 cases that were closed beyond the SOL in this Monitoring Period had charges or PDRs brought *before* the statute of limitations expired.[88] While in some of the pending cases, charges were brought before the expiration of the 18-month time period and not all cases pending beyond the SOL may merit charges, this is of little consolation.

The number of the cases with expired SOLs creates significant collateral consequences. The Department is not only precluded from bringing charges if misconduct is later identified, but it also diverts limited staff resources from more current cases. Approximately 240 of the 1,350 cases pending beyond the SOL with no charges were cases that had been selected by the Monitoring Team for review as there was possible objective evidence of wrong doing based on an initial assessment of the incident (Preliminary Review, Staff Reports, video evidence, etc.). While discipline may not have been merited in each of these cases, there certainly were many cases in this group with evidence of wrongdoing that could not be addressed because the statute of limitations passed. The Monitoring Team recommended that ID evaluate eight of these 240 cases to determine if there was sufficient evidence to bring charges under the criminal exception to the SOL. ID reviewed these cases and determined that none would meet the exception to SOL. However, the Deputy Commissioner of ID reported that this review revealed potential investigative biases that would be addressed through training to minimize the occurrence in the future.

The Monitoring Team has strongly recommended that the Investigation Division expedite the closure of cases that have passed the SOL in order to clear the docket and ensure that future cases do not suffer the same fate. The Investigation Division has reported it will close out the backlogged cases with expired SOLs in the next Monitoring Period as swiftly as possible. Further, the Monitoring Team recommended that ID develop an initiative to minimize the possibility that cases with expected charges are not pending beyond the SOL. ID reported a plan will be developed in the next Monitoring Period in consultation with the Monitoring Team.

---

[87] This does not require that the respondent also be charged criminally, the charges are still brought through the administrative proceedings.

[88] 27 of the 128 cases that were closed beyond the statute of limitations in the Sixth Monitoring Period had charges or PDRs brought *before* the statute of limitations expired.

- ***Leveraging Preliminary Reviews***

As noted in prior Monitor's Reports, the level of investigative scrutiny must match the severity of the incident and the quality of evidence available. Not every investigation needs or should be met with the same level of rigor or the same investment of resources. Therefore, a critical tool to reducing the backlog of Full ID cases and closing certain cases more timely is leveraging the work of the Preliminary Review by: (1) closing cases that do not require further investigative steps via PICs or expedited closure, either with no action or corrective action for any identified misconduct, (2) identifying cases for fast track to formal discipline, and (3) identifying cases that merit increased scrutiny either because it involves serious misconduct or is part of a pattern of poor behavior by a particular Staff Member.

o   PICs and Expedited Closure

The Monitoring Team continues to strongly encourage the Department to identify cases that could be resolved following the completion of the Preliminary Reviews through PICs or expedited closure. While the number of cases closed under PICs during this Monitoring Period was similar to the last, the number of cases closed through expedited closure increased from 43 during the last Monitoring Period to 275 during this Monitoring Period. The Monitoring Team has continued to find that the overwhelming majority of cases identified for closure under PICs or expedited closure are reasonable as no further investigative steps are necessary. In fact, the Monitoring Team continues to find that ID is underutilizing both of these options.

Another benefit of using PICs and expedited closure is that discipline for identified misconduct can be imposed more timely. During this Monitoring Period, Facility Referrals increased compared to the last monitoring period (241 vs. 189, respectively). Facility Referrals are used more often for cases closed under PICs or expedited closure because the majority of identified misconduct is best addressed at the Facility level. Facility Referrals are a critical tool in ensuring meaningful and adequate discipline is imposed. However, the Monitoring Team has found that Facility Referrals are not imposed as they should be. Accordingly, the Monitoring Team has recommended that during the next Monitoring Period the Department reinforce the procedures for this process to ensure that Facility Referrals are imposed as recommend by ID.

o   Fast-Track and ID & Trials Merger

The information gathered during the Preliminary Review often provides enough information to determine if the case can be fast-tracked for formal discipline. Because ID & Trials are now merged, ID is well situated to work collaboratively with their colleagues from Trials to identify and refer cases for Fast-Track. However, the number of cases referred for Fast-Track decreased by about half during this Monitoring Period compared to the last (81 versus 234, respectively).

The decrease in cases is likely a result of the change in approach to Fast-Track. During the last Monitoring Period, ID & Trials earmarked certain days to identify cases that may be suitable for Fast-

Track with consideration given to the investigator's entire caseload. During this Monitoring Period, ID investigators were expected to refer cases during the ordinary course of their work day. Given their focus on so many other issues, it is likely that investigators simply did not prioritize Fast-Track cases in the same way. The Monitoring Team's review suggested that additional cases could have been considered and recommended that ID & Trials reinvigorate the process to encourage investigators to use Fast-Track during the next Monitoring Period.

○   Case Prioritization

The Monitoring Team has long identified Preliminary Reviews as a reliable method to identify cases where serious misconduct may have occurred and/or identify Staff with patterns of misconduct that must be addressed. This information, in conjunction with the ID/Facility Coordinated Use of Force Analysis (currently conducted for OBCC, GRVC, RNDC and AMKC), can be leveraged to identify cases that should either be prioritized for completion by the Facility-specific ID team or referred to the Use of Force Priority Squad ("UPS," as discussed in more detail below). Using the Preliminary Review, or the ID/Facility Coordinated Use of Force Analysis, to identify serious cases and to prioritize them in the investigators' workload will help ensure that discipline is imposed in a more timely manner and mitigate the possibility that the statute of limitations expires. At the close of the Monitoring Period, the ID Initiatives Manager began to: (1) consider how certain cases could be prioritized and (2) develop the docket for UPS.

*Quality of the Investigations*

The Monitoring Team has continued to find inconsistent quality among the Full ID Investigations reviewed. While the investigation of certain incidents is adequate and results in reasonable outcomes, some investigators' techniques are inadequate, and the cases languish for long periods of time and evidence becomes stale. Given the current backlog, a marked improvement in the overall quality of investigations is unlikely to occur in the short-term. That said, steps can and must be taken now to improve the quality of investigations.

One step toward this end is the Use of Force Priority Squad, as discussed in more detail below, to ensure that the most problematic cases are addressed by a team of qualified investigators in a timely manner. Further, the ID Initiatives Manager is devising short training programs for Supervisors to develop their skills in analyzing and reviewing investigations and in mentoring investigators to elevate their skill sets.

Full ID Investigations are very detailed and usually include a large volume of supporting documentation. That said, the investigators' analysis of the evidence is often lacking, issues of potential misconduct are often overlooked, and video evidence is disregarded or interpreted in a way that is inconsistent with the objective evidence on the video. Investigations also do not consistently cite Staff for incomplete, misleading, or false reports (especially those of secondary actors or witnesses). Further, operational and interpersonal issues contributing to the use of force (*e.g.,* failure to secure

doors, lack of situational awareness, failure to supervise, lack of interpersonal skills, and inefficient performance of duties) are often ignored. Finally, conclusions are often not justified or are not supported by the available evidence.

That said, during this Monitoring Period, the Monitoring Team noticed that investigators identify issues related to secondary actors more often. Previously, investigators focused only on the actions of the most culpable Staff member, often missing or ignoring issues in the actions or reporting of other Staff involved. Recently, investigators have broadened their scope beyond the primary subject of the investigation. Also on a positive note, when misconduct is identified, investigators' recommendations for corrective action are generally reasonable.

- ***Use of Force Priority Squad***

The Investigation Division developed the Use of Force Priority Squad ("UPS") to operate within ID. Composed of a group of highly qualified investigators, UPS' goal is to investigate serious and egregious uses of force and/or misconduct by Staff with concerning histories of misconduct in a timely fashion. UPS includes four investigators, one supervising investigator, and one Deputy Director, all of whom were chosen based on their skill set and experience. UPS was developed during the Seventh Monitoring Period, and launched early in the Eighth Monitoring Period.

A fact-based assessment is used to assign cases to UPS and the ID Initiatives Manager maintains a docket of the cases assigned. Cases are considered based on their severity, referral from Immediate Action, and incidents involving Staff with concerning histories of misconduct. Referrals from the Monitoring Team may also be considered. A balance is sought when selecting cases for the UPS docket to ensure the most concerning cases are assigned to this team, while not assigning so many cases that UPS becomes overwhelmed and can no longer function as intended.

The Monitoring Team is encouraged by the creation and implementation of UPS and expects that it will improve the quality and timeliness of serious cases.

*Conclusion*

ID & Trials' leadership and their staff have been working tirelessly and demonstrated significant commitment to achieving compliance with the Consent Judgment requirements, the fact remains that ID is failing to close cases timely and the quality of Full ID Investigations is inconsistent and often inadequate. While much work remains to achieve Substantial Compliance with this provision, ID & Trials continue to demonstrate that the division is working towards developing an effective foundation for compliance.

| **COMPLIANCE RATING** | ¶ **9(a).** Non-Compliance<br>¶ **9. (b) to (f)** Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. [. . .]

**ANALYSIS OF COMPLIANCE**

The Monitoring Team verified that by the end of the Fourth Monitoring Period, the Department closed all of the ID cases that were open as of the Effective Date of the Consent Judgment.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance (per Fourth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department is actively seeking to hire both civilian and uniformed Staff as investigators and supervisors to fill the allocated personnel lines.
  - o HR continues to recruit specifically for ID staffing positions.
  - o ID interviewed well over 100 investigator and supervisor candidates during this Monitoring period.
    - ▪ 26 staff (including one Confidential Investigator) were hired and onboarded in New Hire Orientation during this Monitoring Period, and seven additional staff (including three Supervising Investigators) were hired by the end of the Seventh Monitoring Period. These staff completed New Hire Orientation at the beginning of 2019.
- The City and the Department reported they worked together to ensure that salaries for posted positions were competitive with peer agencies.
- As of the end of this Monitoring Period, ID had the following staff working in the division:

| Deputy Comm. | Assistant Comm. | Director | Deputy Director Investigator | Supervising Investigator | Investigator Civilian | Supervisor ADW | Investigator Captain | Investigator Correction Officer | Support Staff |
|---|---|---|---|---|---|---|---|---|---|
| As of June 2018 (Sixth Monitoring Period) | | | | | | | | | |
| 1 | 1 | N/A | 6 | 9 | 58 | 3 | 16 | 77 | 12 |
| As of December 2018 (Seventh Monitoring Period) | | | | | | | | | |
| 1 | 1 | 4 | 6 | 13 | 77 | 0 | 16 | 74 | 12 |

- ID reports that, on average, investigators have a combined use of force and non-use of force caseload of 52 cases each.

**ANALYSIS OF COMPLIANCE**

126

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. Thus far, the City has provided funding to increase ID's staffing, which is critical given the continued increase in workload.

The Department made significant efforts this Monitoring Period to recruit, interview, and hire additional investigators, supervisors, and leadership for ID. Even with attrition, ID had a net gain of 20 staff, including 19 civilian investigators—a critical staff role—during this Monitoring Period. This is significant improvement over the last Monitoring Period where the Division grew by only 11 staff. The Monitoring Team continues to strongly encourage all divisions in the agency to work collaboratively to recruit, interview, and on-board the necessary staff, as it is imperative that ID has the resources it needs. Particularly as more creative approaches or specialized teams are utilized, ID may need additional resources to ensure it has the necessary flexibility.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- CMS includes several mandatory fields to ensure Facility and ID investigators collect and analyze evidence systematically.

- Preliminary Reviews and investigations must be evaluated by supervisors before being finalized.

- ID suspended the ID Auditor program during the Sixth Monitoring Period.
  - The ID Initiatives Manager is coordinating a number of initiatives (*e.g.*, mini trainings for investigators and Supervisors) that are expected to support the overall goal of improving the quality of ID investigations.

### ANALYSIS OF COMPLIANCE

The Department has established strong initial quality control mechanisms to ensure proper procedures are followed by including Preliminary Review and ID forms in CMS (CMS has similar forms for Facility investigations). This forces investigators at all levels to collect specific information and documentation and to answer detailed questions with numerous conditional aspects to ensure proper work flows. The Monitoring Team continues to see evidence of significant communication between supervisors and investigators before Preliminary Reviews are finalized in CMS, and throughout the investigative process, as demonstrated in the workflow status fields. Furthermore, the quality of Preliminary Reviews suggests that these internal quality control mechanisms are producing the desired outcomes.

Regarding the back-end quality review of closed ID investigations, previously, the ID Auditor reviewed a sample of Preliminary Reviews and closed investigations and provided feedback to DDIs. The process proved to be burdensome and, considering the significant volume of cases and various initiatives undertaken by ID, the Department and Monitoring Team agreed that the ID Auditor's work was not resulting in improved quality. The development of a quality assurance program will be incorporated into the Division's long-term initiatives and will be developed once priority initiatives (*e.g.*, UPS) have taken root.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

<u>Facility Investigations</u>

¶ 13.    All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

        a.    *Objectivity* [. . .]
        b.    *Timeliness* [. . .]
        c.    *Video Review* [. . .]
        d.    *Witness Statements* [. . .]
        e.    *Collection and Review of Medical Evidence* [. . .]
        f.    *Report* [. . .]
        g.    *Supervisory Review* [. . .]
        h.    *Recommended Disciplinary Action* [. . .]
        i.    *Referral to ID* [. . .]
        j.    *Role of Integrity Control Officer* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains a standalone Facility Investigations Policy.
- CMS is now used to conduct all aspects of Facility-level investigations for incidents that occurred since December 13, 2017.

**ANALYSIS OF COMPLIANCE**

<u>*Purpose and Quality of Facility Investigations* (¶ 13(a), (c), (f), (g), (h))</u>

At best, Facility investigations are a redundant version of the work completed by the Preliminary Reviewers, and at worst, they are an unreliable avenue for identifying Staff misconduct. Understanding the circumstances in which these investigations are conducted sheds some light into the deficiencies the Monitoring Team has identified. Any Captain in the Facility can be assigned to investigate an incident (assignment is generally determined by availability). The investigation must be

conducted among the Captain's other competing duties. Captains do not generally have dedicated offices, but have shared work space with access to a communal computer where they can then access CMS with their unique log-in. While they can access CMS for the purpose of entering their own investigation, they are currently unable to access the Preliminary Review (an inadvertent oversight when CMS was built) and do not have access to the Facility's Rapid Review.[89] Captains cannot access Genetec footage independently, requiring a request to Facility leadership. Finally, Captains are also not assigned smart phones so communication is limited to when the Captain can access a computer, in-person meetings and sharing hard copy documents through the mail. In other words, they lack access to nearly all of the existing information about the incidents they have been assigned and thus have no recourse but to try to replicate the investigative steps already taken.

Facility investigators currently lack the skill, training, resources, and direction to conduct objective investigations of incidents. Therefore, it is unsurprising that Facility investigations provide no greater insight or analysis than the Preliminary Reviews (see ¶ 1 for a description of the qualitative inadequacies). As for the outcome of the Facility investigations completed during this Monitoring Period, only a small proportion resulted in a recommendation for re-training, counseling, command discipline, or MOC, far less than what would be expected given the level of misconduct identified by the Monitoring Team. Overall, Facility investigations failed to demonstrate: objectivity in assessing the evidence (¶ 13(a)); review relevant video (¶ 13(c)); closing reports that are supported by the evidence (¶ 13(f)); supervisory review ensuring compliance with relevant policies and procedures (¶ 13(g)); or appropriate disciplinary action in light of the evidence (¶ 13(h)).

*Timeliness of Facility Investigations* (¶ 13(b))

The continued delay in closures of the Preliminary Reviews means that the overall length of time between the incident date and the close of the Facility Investigation continues to be extended, as Facility investigators do not begin their investigations until the Preliminary Review is completed. The Consent Judgment requires Facility Investigations to be completed in 25 Business Days. The Facilities closed 605 Facility investigations during the Seventh Monitoring Period, in an average of 116 business days from the date of the incident. Due to the backlog in Preliminary Reviews, the Facilities are not starting their investigation until well beyond the 25-business day deadline, and therefore none are closed within that deadline. Therefore, the chart below demonstrates the timing of closed and pending Facility investigations compared with the date the Preliminary Review was completed.

---

[89] Rapid Reviews are maintained in one large document and not in CMS.

| Facility Investigations Closed or Pending within the 7th Monitoring Period as of Dec. 31, 2018 | | | | |
|---|---|---|---|---|
| Investigation Type | Investigations Closed or Pending Within *25 Business Days* from Preliminary Review Completion Date | Investigations Closed or Pending Between *25-40 Business Days* from Preliminary Review Completion Date | Investigations Closed or Pending Beyond *40 Business Days* from Preliminary Review Completion Date | Total Cases |
| **Closed Facility Investigations** | 79 (13%) | 112 (18%) | 414 (68%) | 605 (100%) |
| **Pending Facility Investigations** | 47 (14%) | 42 (12%) | 251 (74%) | 340 (100%) |

*Procedural Requirements* (¶ 13 (d), (e))

For the most part, Facility investigations adhere to the procedural requirements of this provision. The investigators generally, gather witness statement (¶ 13(d)) and collect and review medical evidence (¶ 13(e)) as required. Therefore, the Department is in Partial Compliance with these requirements.

*Next Steps*

The Monitoring Team has strongly recommended that the Department evaluate the Facility investigation process and consider whether it can be enhanced or if a different approach should be taken in order to investigate this group of cases. The Department is consulting with the Monitoring Team and actively considering a number of potential solutions, which are expected to be developed during the next Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ 13 (a)-(c), (f)-(h). Non-Compliance |
| | ¶ 13 (d)-(e). Partial Compliance |
| | ¶ 13 (i)-(j). Not Yet Rated |

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a. The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b. The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department assigns ID investigators to Facility-specific teams. The Youth ID Team spanned two different Facilities during this Monitoring Period, as 16- and 17-year-olds were at

RNDC until October 2018 then moved to Horizon as fully described in the Transfer and Management of 16- and 17-Year-Old Youth section of this report.

- The Horizon Youth ID Team consists of one supervisor and four civilian investigators.

    o This team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced inmates, age 16 or 17).

    o The Supervisor and three of the four[90] investigators received the same Safe Crisis Management training as Horizon uniform Staff to provide the proper context for their UOF investigations.

    o The Department also reports that the Horizon team coordinates with the New York State Justice Center when necessary to elevate incidents that may be considered abuse and/or neglect cases which they are statutorily mandated to investigate.

**ANALYSIS OF COMPLIANCE**

The Youth ID Team includes a Supervisor and sufficient staff as required by the Consent Judgment to conduct all Full ID Investigations for all UOF incidents involving 16- and 17-year-old inmates. The RNDC Facility Team was responsible for completing any Full ID cases for incidents involving 16- and 17-year-old inmates before the transfer, while the Horizon Youth ID Team conducts all Full ID Investigations for any incidents involving adolescents since they were transferred. Because Horizon only opened part way through the Monitoring Period it is too early to assess a sample of the investigations conducted by the Horizon team. The Monitoring Team has reviewed a sample of Full ID Investigations from RNDC and has found that they are of the same mixed quality as all Full ID Investigations as discussed in ¶ 9 above.

*Youth ID Team Review of Closed Facility Investigations Involving Youth* (¶ 14(b))

Prior to the 16- and 17-year-olds moving to Horizon, the Youth ID Team investigators at RNDC also reviewed all closed Facility investigations involving 16- or 17-year-old male and female inmates using the Investigation Review Team ("IRT") assignment process. ID investigators are assigned to review completed Facility investigations through IRT once they are closed to conduct a quality assessment of that investigation. The Department reported that the RNDC team continued the review of IRTs throughout this Monitoring Period, and provided feedback to some Facility investigators, including at least one case where the IRT identified a biased investigation and charges were brought against the Facility investigating Captain, charges were also brought against the Officer for an underlying use of force violation. Due to the changing nature of the Youth ID Team with the move of 16- and 17-year-olds to Horizon, the Monitoring Team recommended that the Department

---

[90] The remaining investigator received the training in the Eighth Monitoring Period.

suspend the IRT process at RNDC so as to conserve limited resources now that the 16- and 17-year-old youth are no longer housed at RNDC. The Monitoring Team will work with the Department to determine the best approach for the new HOJC team to meet the obligations of ¶ 14(b) going forward.

| **COMPLIANCE RATING** | ¶ **14.** Substantial Compliance<br>¶ **14(a).** Partial Compliance<br>¶ **14(b).** Not Yet Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- The Department continues its contract with The Moss Group, a highly-respected technical assistance provider, to provide support for issues related to sexual safety and implementing PREA.

- ID has a dedicated PREA Team that is responsible for investigating all PREA-related allegations. While all incidents even remotely sexual in nature are referred to ID by the facilities and 311 as "PREA allegations," the PREA Team identifies which of these actually meet the definitions of sexual abuse and sexual harassment as defined by the PREA standards ("PREA reportable").[91] Those that do not meet the definition are still investigated by the PREA Team but are identified as "non-PREA reportable."

- During the Seventh Reporting Period, ID & Trials changed the leadership structure for the ID PREA Team. Its former Deputy Director was promoted to Director of the team and a new Deputy Director with many years of experience as an NYPD Special Victims Detective was hired to assist with supervision.

- During this Monitoring Period, ID further reduced the backlog of PREA cases. The following strategies contributed to alleviating the backlog and should help to sustain timeliness:

---

[91] See https://www.prearesourcecenter.org/ec-item/1291/1156-definitions-related-to-sexual-abuse for the definitions in PREA standard 115.6.

o The ID PREA Team's staffing level increased since the last Monitoring Period, from 18 PREA investigators in June 2018 to the current level of one Director, one Deputy Director, six Supervisors, 26 PREA investigators, and two analysts.

o Beginning in December 2018, call-out reports must now be completed and submitted for supervisory review within five business days of the call-out. A new structure for the call-out report form requires investigators to explain what occurred during the call-out, the results of the interviews conducted, and whether the allegation is "PREA reportable" or "non-PREA reportable" and the type of allegation (abuse or harassment). The new format allows more timely direction and guidance from the supervisor on subsequent investigatory steps. Further, information from the call-out report can now be easily transferred to the closing report, which saves time.

o Additional training was provided to staff on the PREA Team

    ▪ Four ID PREA Team members attended training on interviewing victims (Forensic Experiential Trauma Interview; "FETI") in October 2018. The FETI training is taught by an outside agency hired by the NYPD to train its Special Victims Detectives.

    ▪ Four ID PREA Team investigators attended a four-day NYPD Special Victims training in October 2018 at the Office of Chief Medical Examiner of the City of New York ("OCME").

**ANALYSIS OF COMPLIANCE**

Although this provision pertains only to Young Inmates, it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations that are sexual in nature involving Young Inmates. Given that this provision targets "sexual assault," the Monitoring Team has used the PREA rubric as the best representation of the intended scope, although PREA cases also include sexual harassment in addition to sexual abuse. The Monitoring Team continues to review all closed investigations to ensure that the PREA/Non-PREA designation is reasonable and consults with ID whenever a difference of opinion is identified.

As shown in the table below, of the 93 referrals involving Young Inmates since January 1, 2016, a total of 61 (66%) met the definition of sexual abuse or sexual harassment and were deemed "PREA reportable," while 32 (34%) did not meet the definition and were deemed "non-PREA reportable." During the current Monitoring Period, 29 cases were referred, 21 of which (72%) were determined to be PREA-reportable and eight of which (28%) did not meet the PREA definition of sexual abuse or

harassment. The vast majority of all allegations (n=20 of 29,[92] 69%) were from HOJC, with the remainder from RNDC (n=5; 17%), RMSC (n=3; 10%), and BXCT (n=1; 3%). In the Monitoring Team's experience, an increased rate of allegations is typical in Facilities with high levels of disorder and that undergo significant transitions, such as the move from RNDC to HOJC. Furthermore, upon investigation, several allegations from HOJC were found to have been false reports, called in by a single youth in an effort to have other youth removed from his housing unit.

Of the 21 PREA allegations made during this Monitoring Period, 14 alleged *youth-on-youth abuse* (48%), 4 alleged *youth-on-youth harassment* (14%), 9 alleged *staff-on-youth abuse* (31%) and 2 alleged *staff-on-youth harassment (7%).*

| Number of Referrals, by Date of Report | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan. - Jun 2016 | Jul - Dec. 2016 | Jan. - Jun 2017 | Jul - Dec. 2017 | Jan. - Jun 2018 | July - Dec. 2018 | Total |
| **Total Cases Referred** | 13 | 21 | 16 | 10 | 4 | 29 | 93 |
| PREA | 10 (77%) | 12 (57%) | 7 (44%) | 9 (90%) | 2 (50%) | 21 (72%) | 61 (66%) |
| Non-PREA | 3 (33%) | 9 (43%) | 9 (56%) | 1 (10%) | 2 (50%) | 8 (28%) | 32 (34%) |

*Note: PREA = allegation meets the definition of sexual harassment or sexual abuse from PREA Standard 115.6; Non-PREA = allegations of a sexual nature that do not meet the definition of sexual harassment or sexual abuse (e.g., consensual relationships, single occurrences of sexualized comments or remarks, etc.)*

The following outcome analysis includes only those cases meeting the PREA definitions of abuse or harassment. Policy requires investigations of PREA allegations to be completed within 60 business days of the incident being reported. As shown in the table below, the Department significantly improved its performance here. Of the 15 PREA cases closed during the current Monitoring Period, 40% (n=6) were closed within the 60-business day timeline and 60% were closed beyond it (n=9). Previously, nearly all cases closed were far beyond the required timeline. Of the 12 PREA cases that remained pending at the end of the Monitoring Period, 83% (n=10) were within the 60-business day timeline and only 17% (n=2) were not. In other words, the Department is managing cases more timely. While some of the backlogged cases continue to flow through the system, the majority of new cases are closing within the required timeline. The table below clearly shows the improvement in timeliness across the last six Monitoring Periods.

---

[92] 16 of the 20 allegations at HOJC met PREA definitions of sexual abuse or harassment.

| Closed PREA Investigations, by Date Closed | | | | | | |
|---|---|---|---|---|---|---|
| | Jan. - June 2016 | July - Dec. 2016 | Jan. - June 2017 | July - Dec. 2017 | Jan. - June 2018 | July - Dec. 2018 |
| **Total PREA Cases** | **0** | **7** | **1** | **4** | **25** | **15** |
| **Timing of Investigation** | | | | | | |
| *Within 60 business days* | ~ | ~ | ~ | *1 (25%)* | ~ | *6 (40%)* |
| *61-120 business days* | ~ | ~ | ~ | ~ | *1 (4%)* | *3 (20%)* |
| *More than 121 business days* | ~ | *7 (100%)* | *1 (100%)* | *3 (75%)* | *24 (96%)* | *6 (40%)* |
| **Outcome of Investigation** | | | | | | |
| *Unfounded* | ~ | *2 (29%)* | *1 (100%)* | *1 (25%)* | *7 (28%)* | *9 (60%)* |
| *Unsubstantiated* | ~ | *2 (29%)* | ~ | *3 (75%)* | *16 (64%)* | *6 (40%)* |
| *Substantiated* | ~ | ~ | ~ | ~ | *2 (8%)* | ~ |
| *Missing/Unknown* | ~ | *3[93] (43%)* | ~ | ~ | ~ | ~ |

As shown in the table above, nearly all of the cases referred and closed to date were either unsubstantiated or unfounded (n=50 of the 52 (96%) of the cases in which a finding could be discerned). In the Monitoring Team's experience, it is not unusual for large proportions of cases to be unfounded or unsubstantiated, though the quality of the investigation must certainly be adequate in order to feel confident about a low prevalence rate. For this reason, the Monitoring Team also assesses the quality of the investigations to ascertain whether all available evidence was collected and whether the investigators' findings were reasonable based on that evidence.

Approximately half of the investigations closed during this Monitoring Period (n=13 of 25, 52%) were reviewed.[94] The Team selected all investigations of allegations made in 2018 and closed during this Monitoring Period to ensure the most accurate view of current investigators' skill, which can be difficult to assess in cases with long closure times. Prior Monitor's Reports have noted the failure to interview key witnesses, long delays to interview witnesses, and apparent failure to ask effective follow-up questions or to collect relevant evidence. The most current investigations revealed improvements over cases reviewed in the past, particularly in timely response to the scene (the same or next business day); interviews with youth witnesses where investigators are asking key questions and relevant follow-up questions; and detailed synopses of what can be seen on Genetec or hand-held footage. After consultation with the Monitoring Team, the Department reported it will take steps to shore up the accuracy of the chronological log provided to the Monitoring Team (*e.g.*, including all cases involving youth aged 16 to 18; including the investigators' classification of whether the case

---

[93] Three of the cases closed during this Monitoring Period had outcomes that could not be easily discerned (e.g., merged with another case that closed during a different monitoring period, marked closed with no specific finding).

[94] The Monitoring Team reviewed cases classified as both meeting and not meeting PREA definitions in order to assesses the veracity of those classifications.

meets PREA criteria and what type). Furthermore, investigators have been encouraged to conduct interviews with Staff witnesses, as appropriate, in order to obtain more extensive contextual information about the allegation which should enhance the integrity of the investigation.

Among the most current investigations reviewed, the Monitoring Team found that investigators' findings were reasonable based on the evidence. In many of these cases, readily available evidence supported closure with a finding of unsubstantiated or unfounded (i.e., the alleged victim recanted, or video evidence clearly indicated that the allegation was false). Accordingly, the investigation could be addressed relatively quickly and efficiently. To date, most of the investigations reviewed have not involved complicated allegations (e.g. where there is not clear evidence that the allegation is unfounded) and so the Monitoring Team has not yet had an opportunity to review investigations that require a more sophisticated and thorough assessment. Overall, significant improvement in the timeliness and quality of investigations of sexual abuse is evident and the Monitoring Team is encouraged by the Department's progress.

| COMPLIANCE RATING | ¶ 9. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- The Department maintained the standalone Facility Investigations Policy issued during the Fifth Monitoring Period.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications, and the ID Initiatives Manager did considerable work at the end of the Seventh Monitoring Period continuing into the Eighth Monitoring Period to facilitate the collection, organization, culling, and revising of these policies and procedures, including:

  o Identifying and collecting over 70 individual memos, policies, procedures, directives or communications to investigators that have been governing the work of ID;

  o Rescinding over 50 of these, and maintaining, revising or replacing all others;

o   Drafting new policies or procedures.

**ANALYSIS OF COMPLIANCE**

*ID Investigations*

Immediately after being on-boarded, the ID Initiatives Manager began working on the overhaul of ID policies. This initiative had been ongoing prior to his employment but required a dedicated manager as the work was burdensome and complex and required coordination with a large number of stakeholders. The ID Initiatives Manager reported that an initial draft of all policies that will comprise the ID Manual were completed just after the close of the Monitoring Period. These policies will be reviewed by a leadership working group and will be shared with the Monitoring Team, with a goal to complete by the end of the Eighth Monitoring Period. The ID Initiatives Manager has demonstrated a strong command of the issues and served as a reliable and valuable facilitator to move this project forward.

*Facility Investigations*

The Facility Investigation Policy promulgated during the Fifth Monitoring Period addresses all of the requirements of Consent Judgment §VIII, ¶ 13.

*Standardized system and format for organizing the contents of investigation files* (¶ 16)

The Monitoring Team has generally found that ID files are well-organized. CMS has brought even greater structure to the investigation files and further improved accessibility of relevant information.

| COMPLIANCE RATING | ¶ 15. Partial Compliance<br>¶ 16. Substantial Compliance |
|---|---|

## 7.   RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The varied risks facing the Department require flexible, comprehensive and timely responses. These measures include developing and implementing an Early Warning System (¶ 1); implementing "5003 Counseling Meetings" between the Warden and any Staff Member who engages in repeated use of force incidents where at least one injury occurs (¶ 2); creating a new position, the use of force auditor ("UOF Auditor"), who identifies systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the

use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation data throughout the Department (¶ 6). Each of these is described in more detail below along with the Monitoring Team's assessment of compliance.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

   a.  The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

   b.  ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

   c.  On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- This Monitoring Period, the E.I.S.S. unit was established in the Department's Administration Division. A policy for E.I.S.S.' work was also finalized and codified in a revised version of Directive 5003R-C "Monitoring Uses of Force."

- Triggers to Screen Staff for Potential Monitoring:

   o   The Directive includes specific triggers for E.I.S.S. screening from various sources (including the Immediate Action Committee, Rapid Reviews, Preliminary Reviews, Trials case tracker, 5003 counseling history, and Command Discipline tracker) which must be analyzed at regular intervals (e.g., depending on the criteria, bi-weekly, bi-monthly, or monthly) to identify Staff for screening.

- Screening Staff to Determine Whether to Place on Monitoring:

   o   Once Staff are identified for screening, they are considered for E.I.S.S. monitoring which includes a comprehensive review of their history with the Department, including, but not limited to, their assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, inmate history (if relevant), the circumstances of each use of force, and the proportionality of force used. The purpose of the screening is to determine whether the E.I.S.S. monitoring program could improve a Staff Member's performance.

- The monitoring process is a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command:
  - E.I.S.S. staff meet with Wardens and other uniform leadership to outline their responsibilities in overseeing the Staff in E.I.S.S. monitoring in their Facilities.
  - E.I.S.S. staff prepare and share information on the Staff Member's use of force history with the Facility command.
  - The Facility leadership is then responsible for monitoring the Staff's use of force, meeting with the Staff to discuss any use of force incidents the Staff is involved in, and providing monthly progress reports back to E.I.S.S.

- The E.I.S.S. Assistant Commissioner was appointed in November 2018 to facilitate the transition with the planned departure of the Deputy Risk Manager in early 2019.

- In addition to the Assistant Commissioner, the E.I.S.S. division is staffed by two Captains, a civilian Principal Administrative Associate, and two Correction Officers. During this Monitoring Period, another Staff Analyst was selected, but elected to take another position following the end of the Monitoring Period.

- Between July 1, 2018 and December 31, 2018, 111 Staff who met criteria outlined in the Fourth Monitor's Report at pg. 152 were screened and 51 Staff were enrolled in the monitoring program. E.I.S.S. met with Facility leadership and the identified Staff to review their recent use of force history and discuss a monitoring plan to improve their performance.

- By the end of the Monitoring Period, three Staff had completed a 12-month monitoring term.

ANALYSIS OF COMPLIANCE

*Staffing for E.I.S.S. Unit*

As noted above, the Department hired an Assistant Commissioner during this Monitoring Period who will ultimately take over the management of E.I.S.S. from the Deputy Risk Manager upon her departure in early 2019. The Deputy Risk Manager played a pivotal role in the development of E.I.S.S., the corresponding policy and development of the team, and building the program from the ground up. The Deputy Risk Manager is a creative and dynamic individual, who is passionate about this work and truly reform minded, and the departure will create a void.

Obtaining staff for E.I.S.S. has proceeded slowly and the Division is still not fully staffed. The Monitoring Team recommends that another leadership position be added to E.I.S.S. to manage the routine assessment of Staff for monitoring and to further support the implementation of the monitoring program within the Facilities. Because the E.I.S.S. process is quite new, the Facilities still require significant support and guidance and the current E.I.S.S. leadership is currently stretched too thin to meet this need.

*Policy and Procedure*

The development of the E.I.S.S. policy was a critical first step to outlining the framework of E.I.S.S. to get the program off the ground. However, the procedures in the policy do not provide adequate guidance on how to consistently implement the screening and monitoring procedures, and the procedures used in practice are not fully reflected in policy. Accordingly, the Monitoring Team will work with E.I.S.S. staff in the next Monitoring Period to determine if modifications to the policy and/or additional written procedures are needed to ensure the program is implemented with fidelity.

*Identification of Staff for Screening*

The ultimate goal of E.I.S.S. is for Staff who potentially need additional guidance to be consistently identified, then screened, and if warranted, placed on monitoring. The source triggers are the first step in capturing Staff who will then be screened to determine if they may benefit from E.I.S.S. monitoring. As expected, utilizing the triggers to identify Staff who should be screened and then screening those Staff is time intensive.

While E.I.S.S. staff are assessing some source triggers routinely (*e.g.*, Rapid Reviews), they appear to be underutilizing other required sources, such as Staff identified by the Immediate Action Committee. Policy requires that Staff who are recommended for action by the Immediate Action Committee are required to be screened for E.I.S.S. monitoring. However, the Monitoring Team found that E.I.S.S. screening was not routinely conducted after the Immediate Action Committee recommended action for Staff.

Further, even for those source triggers utilized by E.I.S.S. to identify Staff for screening, full screening work-ups are not being conducted as contemplated by policy—instead, E.I.S.S. staff review source triggers on an ad hoc basis and conduct a short informal review of a Staff's background or history in order to determine whether a full screening is warranted (which then includes reviewing a full history of the Staff as described in the bullets above).

Given the current capabilities of E.I.S.S. staff and the Facilities' capacity to monitor Staff, the Monitoring Team recommends that E.I.S.S. prioritize those triggers most likely to identify Staff for screening who may ultimately benefit the most from E.I.S.S. monitoring. We further recommend that to the extent that any potential triage measures are utilized (like the ad hoc process described above) that process is fully developed to ensure it is consistently applied and adequately memorialized. The Monitoring Team intends to work with the Assistant Commissioner of E.I.S.S. during the next Monitoring Period to evaluate the implementation plan for E.I.S.S. and ensure that trigger sources (*e.g.*, the Immediate Action Committee) are properly prioritized, and that current practices regarding how the source triggers are reviewed is memorialized.

*Screening for Monitoring*

E.I.S.S. has a comprehensive process for screening Staff to determine whether monitoring could improve their performance. The Monitoring Team has found the screening process and the ultimate

outcomes to be generally reasonable. Staff whose behavior has been most concerning to the Monitoring Team are often also picked up by E.I.S.S.'s screening process and are placed on monitoring after screening.

*Monitoring of Staff in E.I.S.S.*

During this Monitoring Period, E.I.S.S. staff made progress implementing the monitoring component of the program. Importantly, they coached and prepared Wardens to fulfill their roles, and also met with a select group of Staff who had been placed on monitoring to introduce them to the program. With the assistance from the Chief's office and ESU, E.I.S.S. also provided some Staff special training and guidance by reviewing their use of force history. By all accounts, the meetings among Staff, E.I.S.S. leadership, and uniform leadership to discuss the Staff Member's conduct and how to improve practice were fruitful.

However, during this Monitoring Period, E.I.S.S. determined that Facilities did not consistently inform Staff that they had been placed on Monitoring and were not conducting monitoring sessions as required. The Monitoring Team requested a sample of the Facilities' monthly progress reports for Staff who are on monitoring, but the Department was unable to produce many of those requested, suggesting that the Wardens either did not complete the paperwork and/or did not conduct the required meetings. For those reports that were received, in addition to being delayed in production, the Monitoring Team found that most contained only cursory information and were often repetitive from month to month, suggesting a lack of thoughtful assessment.

E.I.S.S. reports that it is devising a more consistent notification process—one that does not initially rely on Facility-level notification—to advise Staff of their placement in monitoring that will be implemented during the next Monitoring Period. Further, E.I.S.S. reported that it is increasing its efforts to ensure the Facilities conduct monthly progress meetings as required.

At this juncture, the number of Staff who have completed monitoring (n=3) is too small for a robust assessment. That said, anecdotally, the Monitoring Team spoke with one Staff who completed E.I.S.S. monitoring who reported that it was beneficial and supportive, and that he felt better equipped with necessary tools to be successful in his position.

Significant works remains to achieve Substantial Compliance, including bolstering all phases of this process—identifying Staff for screening, screening Staff in a timely manner, and notifying and monitoring those selected. Ultimately, E.I.S.S. and the Facilities must ensure that Staff on monitoring are adequately evaluated and provided the necessary support to improve their performance.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff

Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 5003R-C "Monitoring Uses of Force" remained in effect and the requirements of ¶ 2 are captured in the policy (as noted above the policy was updated during the Monitoring Period to cover the work of E.I.S.S.).

- The Department continues to manage the 5003 counseling process, as described in the Fourth Monitor's Report at pg. 154.

- 5003 counseling sessions are discussed at the weekly NCU meetings and Facilities must routinely report their progress.

- NCU continued to compile the 5003 counseling session data across all Facilities by identifying: (1) the total number of Staff who qualified for a discretionary 5003 counseling session, (2) the number of discretionary counseling sessions that occurred, (3) the number of Staff who qualified for a Class A mandatory counseling session, (4) the number of Class A mandatory counseling sessions that occurred, and (5) 5003 forms' completion.

- During this Monitoring Period, Facilities delivered mandatory counseling to 70 of the 94 Staff (74%) who met criteria for a Class A session. Facilities also delivered discretionary counseling to 933 who met criteria for 5003 counseling.

| Seventh Monitoring Period 5003 Counseling Data | | | |
|---|---|---|---|
| | Mandatory | | Discretionary |
| | Number of Staff counseled | Number of Staff who qualified | Number of Staff counseled |
| *August 2018* | 30 (88%) | 34 | 305 |
| *October 2018* | 25 (93%) | 27 | 220 |
| *December 2018* | 15 (45%) | 33 | 408 |
| **TOTAL** | **70 (74%)** | **94** | **933** |

## ANALYSIS OF COMPLIANCE

Counseling sessions required by the Consent Judgment are termed "5003 counseling sessions" in reference to the Directive that codifies the requirements. The Department continues to conduct 5003

counseling sessions and NCU continues its audits of this process which improve the Department's ability to identify, track, and ensure counseling sessions occurred as required. The Consent Judgment requirements regarding counseling can be separated into four categories, discussed in more detail below.

*Identifying Staff who Require Counseling*

- ***Mandatory Counseling Sessions***

Counseling sessions are required if, at any time during a six-month period, Staff was involved in a use of force resulting in a Class A Injury to an inmate. The vast majority of Staff who required a mandatory counseling session during the Seventh Monitoring Period were reportedly counseled by the Facilities.

- ***Discretionary Counseling Sessions***

At the Warden's discretion, Staff who have been involved in three or more Use of Force incidents during a six-month period may be counseled if one of these incidents resulted in an injury to a Staff Member or inmate, and none resulted in a Class A injury to an inmate. When Staff meet this requirement, the Warden is required to evaluate whether the Staff Member requires counseling.

It is important to emphasize that the counseling sessions are not disciplinary in nature, but rather an opportunity to provide feedback and guidance on appropriately managing the use of force and to reinforce non-physical methods for resolving conflicts. Further, the benefit of counseling is not limited to those who may have engaged in misconduct. Staff who have engaged in frequent, albeit necessary, force can also benefit from guidance and support. Finally, counseling can be an opportunity to recognize Staff who have engaged in exemplary conduct. In fact, at the request of Facility leadership, the counseling form was specifically updated so it could be used for a variety of reasons, such as recognizing Staff for exceptional conduct during a use of force (see pg. 113 of Fifth Monitor's Report). Despite this revision, the Monitoring Team has not seen evidence this option has been utilized.

To ensure the Department was appropriately identifying Staff to be counseled, the Monitoring Team reviewed a sample of the 5003 counseling sessions where the Facilities elected *not* to counsel the Staff member (n=20), and found mixed results. In some cases, the decision not to counsel appeared reasonable in light of the available information. It is not expected that all Staff who meet this threshold will be counseled. That said, it is critical that Staff most in need of counseling have the opportunity to receive coaching from Facility leadership. Unfortunately, the Monitoring Team found several cases in in which the decision not to counsel appeared questionable or even outright unreasonable given the available facts. The Monitoring Team found the Warden's determination on whether or not to counsel was often premised on whether the force was appropriate or within DOC policies. However, leadership sometimes just look to the Staff Member's post to determine whether or not to counsel the Staff Member. If the post inherently led to situations where the use of force was more likely (*e.g.,* Probe

Team), then the Facility sometimes elected not to counsel. The Monitoring Team would encourage the Department to consider counseling for Staff engaged in high numbers of use of force (even if all appropriate and necessary) in order to provide Staff with additional support.

The Monitoring Team intends to more closely assess the Facilities' decision-making and documentation of counseling sessions during the next Monitoring Period.

*Documenting the Counseling Sessions*

The Department is required to document all 5003 counseling decisions and the basis for decisions *not* to provide counseling. When counseling sessions are held, the Warden is required to document a summary of the counseling meeting and any recommended corrective actions. The Facility Warden's review and the counseling meeting are kept separate from any disciplinary actions that may be taken. The Department utilizes a standardized form to track this information.

- ***Facility Documentation Electing not to Counsel a Staff Member***

In its review of 20 counseling forms, the Monitoring Team found that the required forms generally included the name of the individual who made the decision not to counsel as well as the date the decision was made. However, documentation of the basis for the Warden's decision not to counsel varied in quality. At times, the decision appeared to rest on a thoughtful review of the Officer's conduct. In other cases, the decision not to counsel was inconsistent with other information regarding the same Staff's conduct (*e.g.* Rapid Review by the Facility found Staff engaged in misconduct, but the Warden reached the opposite conclusion about the same incident on the counseling form). Further, some determinations were vague and/or had limited information, so it was not clear why the Warden elected not to counsel the Staff member.

- ***Counseling Forms***

The Monitoring Team also reviewed a small sample of forms documenting counseling sessions with Staff. All of the forms included the names of those providing and receiving the counseling, the date on which it occurred, but relatively few included the required summary of the discussion and any necessary corrective actions. The Monitoring Team intends to review these forms more closely during the next Monitoring Period.

*Substance of 5003 Counseling Sessions*

The overall quality of 5003 counseling sessions is very difficult to measure, and the Monitoring Team has struggled to identify an appropriate methodology. Observing a counseling session will inevitably have a chilling effect on the discussion and may diminish the opportunity for a frank and open conversation that gets to the heart of the issue, thus ineffectively addressing the concerning behavior. Improvements in a Staff Member's conduct post-counseling session is not necessarily the product of an exemplary counseling session, nor is continued misconduct always the result of a poorly

done counseling session. The Monitoring Team is continuing to consider appropriate ways to measure the substance of 5003 counseling sessions.

*E.I.S.S. Tracking of Counseled Staff*

E.I.S.S. is required to track whether Staff Members participated in 5003 counseling meetings, and, if so: (a) the name of the individual who provided the counseling, and (b) the date on which it occurred. NCU and CLU developed a spreadsheet to track Staff who have been identified for either mandatory or discretionary counseling, as well as whether the counseling session occurred. This spreadsheet tracks even more than required and is utilized by E.I.S.S. to not only keep track of Staff who have been counseled, but as a resource for subsequent intervention by the division. The tracking spreadsheet generally mirrors the information from the counseling forms and include the Warden's basis for not counseling, such as 'UOF tactics were appropriate'. Overall, this 5003 counseling documentation is well-organized and easy to follow.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department expanded the ID/Facility Coordinated Use of Force Analysis at OBCC and GRVC to include AMKC and RNDC, which includes weekly reports with the following information:

- o <u>General Metrics</u>: (1) total use of force incidents, (2) head strikes, (3) use of force when an inmate is already in restraints, (4) OC spray, (5) reason for force, (6) Staff repeatedly involved in force, and (7) inmates repeatedly involved in force;

- o <u>Incident Characteristics and Trends</u>: time of incident (including tour), location of incident, reason for force and primary use of force type;

- o <u>Qualitative Assessment by ID</u>: ID prepares a summary of the majority of incidents that occurred that week with a focus on problematic incidents and/or incidents where ID and the Facility (based on the Rapid Review) have differing conclusions about the incident. The summary includes a description of both the Facility and ID's findings and any misconduct identified. These summaries also identify any potential operational deficiencies that may have led to the need for force. To the extent that the Facility and ID's assessments differ, ID provides an explanation of the differences and the basis for ID's conclusion. These cases are discussed: (1) in bi-weekly meetings with the executive leadership of ID and the Facility Leadership, (2) at weekly *Nunez* meetings, and (3) in other forums such as TEAMs and Operational Leadership meetings.

- The Department uses aggregate use of force and investigations data to inform strategic initiatives within the following units and divisions: ID, Performance Metrics & Analytics (PMA) Office, Bureau Chief of Security, Bureau Chief of Facility Operations, COD, CLU, NCU, and E.I.S.S. This data informs initiatives such as the UOF Improvement Plan, TEAMS meetings, 5003 counseling sessions, E.I.S.S., and Problematic Inmate Meetings.

- An example of the Department's strategic use of data is its recently completed analysis of injuries that occur during use of force events, which is described in detail in the UOF Introduction of this report.

**ANALYSIS OF COMPLIANCE**

These two provisions are addressed together because this data is the foundation of the UOF Auditor's work and the processes which stand in lieu of the UOF Auditor.

*UOF Auditor* (§ X., ¶ 3)

The approach to achieving compliance with this provision has evolved and the Department is not currently seeking to fill the UOF Auditor position (see the Sixth Report (at pgs. 119-120) for more detail). Instead of relying on a single person, the Department has a variety of data sources and a number of initiatives that can be leveraged to support the overall goal of identifying, addressing, and reducing the misuse of force. In order for the Department to do so, it must have an internal capacity for data analysis and interpretation. This could be achieved through a centralized and focused division and/or by leveraging information from various sources and analyzing and interpreting it for a specified project or purpose. While the Monitoring Team agrees that the Department may achieve Substantial Compliance by de-centralizing this function, to do so, the Department must identify patterns and trends

related to the UOF more broadly and take action to respond to those trends, beyond simply relying on investigations into individual UOF incidents.

During this Monitoring Period, the Department began to critically evaluate its UOF injury data as discussed in the Staff Use of Force and Inmate Violence Trends during the Seventh Monitoring Period at pages 30-31. This type of analysis is exactly the type of assessment that the Department needs to conduct to identify patterns and trends related to the UOF. The Monitoring Team is encouraged that the Department has started to embark on this type of analysis and recommends these assessments.

The ID/Facility Coordinated Use of Force Analysis weekly reports provide valuable information that supports the Department's efforts to increase the Facilities' internal capacity to identify and address misconduct. They contain a wealth of information about emerging patterns and trends within each Facility, and about specific incidents. These reports are disseminated and discussed at the weekly *Nunez* meetings which are attended by leadership from all Facilities, leadership from the ID & Trials Divisions, the Assistant Commissioner of NCU, the Assistant Commissioner of E.I.S.S., and leadership from the CLU. Given the sheer volume of cases, the Monitoring Team has recommended that the leadership of E.I.S.S. and ID & Trials leverage the information gathered in the weekly reports to help support and prioritize their work. In particular, this information can help identify Staff that may benefit from an intervention with E.I.S.S. and/or cases that should be fast tracked so discipline can be imposed more quickly.

The Monitoring Team evaluated all of the weekly reports developed during this Monitoring Period and found that ID continues to identify more potentially troubling patterns and cases than are being identified by the Facilities' Rapid Reviews, although they are more compatible than in the past (particularly at OBCC). The weekly reports are a crucial learning tool for the Facilities to develop consensus on pertinent issues. At each weekly *Nunez* meeting, ID selects a sample of incidents for review, generally focusing on those cases where the Facilities' and ID's assessments diverge. Discussing cases in this forum is an excellent learning exercise for properly identifying UOF violations and operational deficiencies. Typically, factors that may have given rise to the incident (*e.g.,* a door may not have been properly secured which provided an opportunity for two rival inmates to fight) are discussed, which reinforces the importance of consistent operational practice in the safe management of the Facility. The Monitoring Team attended several meetings where the Executive and Uniformed leadership discussed the content of the weekly reports and observed productive discussions about identifying concerning Staff behavior and improving practice. These discussions are fruitful and appear to provide additional guidance and support to uniform supervisors in considering how to provide feedback and guidance to their own Staff.

This initiative has facilitated productive dialogue and has led to some improvement in the Facility's ability to accurately identify concerning Staff behavior via Rapid Reviews. Identifying the

problem is only the first part; the Facilities then need to understand from Staff why these same issues continue to reoccur. Given its recently decreasing UOF rate, OBCC may be effectively leveraging this information to improve Staff practice. On the other hand, GRVC has not yet demonstrated positive results and thus may not be properly leveraging the wealth of information in these reports. (Note: it is too early to measure the impact at RNDC and AMKC).

*Use of Aggregate Reports to Enhance Oversight* (§ V., ¶ 20)

As demonstrated throughout this report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and Inmate-on-Inmate Fight tracking to identify opportunities to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with UOF or inmate-on-inmate fights or assaults. The Department reports that the Chief Information Officer and the new Assistant Commissioner of Information Technology intend to conduct a holistic evaluation of how various data streams are utilized. The Monitoring Team intends to discuss this initiative during the next Monitoring Period.

The weekly ID reports described above demonstrates how the data from ID has the potential to stimulate change in practice, *if* the information is properly leveraged by the Facilities. The TEAMS meetings are a good example of how the Department uses security metrics (*e.g.,* UOF and inmate-on-inmate fights) from aggregate reporting to inform discussion about Staff practice. As described above, E.I.S.S. also utilizes informal and formal discipline data to inform screening and monitoring decisions. The Department has improved its capacity to collect and aggregate data from a variety of sources, but the next step is for the Department to interpret and apply it to specific practices to produce better outcomes.

| COMPLIANCE RATING | ¶ 3. Partial Compliance<br>¶ 20. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel provided quarterly reports of lawsuits filed and settled from July to December 2018. The reports include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum of the lawsuit and description of the lawsuit.

- The Office of the Comptroller provided reports to the Department regarding the payment of claims related to UOF incidents covering July to December 2018.

- During the Seventh Monitoring Period, the Department reported that E.I.S.S. continued to assess this information. E.I.S.S. staff consolidated all lawsuits initiated and disposed in 2017-2018 and identified all UOF related cases. For UOF cases, E.I.S.S. obtained relevant information (*e.g.,* UOF incident numbers, Facility, Staff names, Staff shield number and classification of all injuries).

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed that the Department received the documents described above. The Monitoring Team will continue to verify that the Office of the Corporation Counsel and Office of the Comptroller lists are provided as required.

The Monitoring Team continues to recommend that the Department utilize the information provided by the Corporation Counsel and the Comptroller to support its risk mitigation efforts and the work of E.I.S.S. To that end, the Monitoring Team is encouraged by the Department's efforts to gather this information in a manageable format to facilitate evaluation of this data and consideration on how it may inform its work going forward. The Monitoring Team intends to closely evaluate the Department's analysis and use of this information in the next Monitoring Period.

| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel continues to provide the Department with a list of all complaints relating to the excessive use of force and requests all investigation files and associated evidence.

- The assigned DOC Legal Division attorney evaluates each use of force allegation received to confirm whether an investigation has already been conducted. If a previous investigation cannot be confirmed, the DOC Legal Division attorney notifies a designated Assistant General Counsel who then shares the information with ID to consider whether a Full ID Investigation is warranted.

- During this Monitoring Period, the Department did not receive notification of any lawsuits involving alleged excessive force that had not already been subject to an ID investigation.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed the above process is still in place. The Department's process to identify UOF allegations via a lawsuit that were not previously investigated is reasonable and adequate and they remain in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)

¶ 6. By August 31, 2017,[95] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The use of force and use of force investigations function of the Department's Case Management System went live on December 13, 2017.

- Beginning with incidents occurring on December 13, 2017, the Department has conducted all Preliminary Reviews, Facility Investigations, and ID investigations in CMS. The Department also uses CMS to generate and track Command Disciplines.

**ANALYSIS OF COMPLIANCE**

During the Seventh Monitoring Period, the Department was able to more fully harness the capabilities of CMS and has achieved Substantial Compliance with these requirements. As described in the Sixth Monitor's Report (at pgs. 123-124), CMS completely changed the way the Department conducts use of force investigations and related discipline. While some of the growing pains of using CMS to conduct Preliminary Reviews and track Command Disciplines remain (as described in the Identifying and Addressing UOF Misconduct section of this report), those issues are related more to investigative backlogs and user-errors than shortfalls of CMS as a system.

---

[95] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Dkt. Entry 297).

CMS also provides the Department the ability to review and aggregate incident- and investigation-specific information. CMS' capability meets the requirements of the Consent Judgment. The system's complexity means that extracting data was not initially straightforward or successful. However, as Department staff became more familiar with the capabilities and worked with the Monitoring Team, aggregate reports from CMS improved this Monitoring Period and the Monitoring Team received better, more accurate reports from CMS.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance |
|---|---|
| | ¶ 18. Substantial Compliance |

## 8. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely accountability is an indispensable element of the overall effort to reduce and deter the use of excessive and unnecessary force by Staff. This Monitoring Period, the Monitoring Team continued to focus on the Department's processes to identify and address Staff misconduct more timely as described in more detail in the Identifying & Addressing Use of Force Misconduct section above.

During this Monitoring Period, a new Deputy General Counsel was appointed to manage the Trials Division. Further, as noted in other sections of this report, the Investigation Division & Trials are now merged, with teams of investigators and attorneys assigned to the same cases, which is expected to reduce the time to resolution.

_Analysis of OATH Decisions_

The Office of Administrative Trials and Hearings ("OATH") is the City's central, independent and impartial administrative law court that conducts adjudication hearings for the Department of Correction (among other City agencies) pursuant to New York State Civil Service Laws § 75. The range of penalties an Administrative Law Judge ("ALJ") may recommend the Commissioner impose are set by law and include a reprimand, a fine of up to $100, a suspension

without pay of **up to** (but no more than) 60 days, demotion in title, or termination.[96] The

Commissioner has the authority to accept the factual findings and penalty recommendation or

modify as appropriate. The Commissioner's determination is subject to appeal to the Civil

Service Commission.

The Department Disciplinary Guidelines "do not seek to modify the Civil Service law, or

controvert any collective bargaining agreement between the parties. Therefore, any penalty

referred to in these guidelines that is beyond the scope of the Civil Service Law can only be

imposed pursuant to a signed agreement with the individual respondent." (Preamble to the New

Disciplinary Guidelines). While the majority of discipline imposed by the Department is

resolved through an NPA, meaning Staff settle the case before trial, the disciplinary outcome is

influenced by the potential penalty that could be recommended via an OATH trial. Many cases

have an initial conference with an ALJ to discuss the matter and attempt to settle the case.

Accordingly, the precedent and standards set at OATH are an integral component of the

disciplinary process.

The Monitoring Team reviewed a number of OATH decisions regarding DOC Staff use

of force-related misconduct to explore the standards employed by ALJ's to better understand the

considerations and constraints on the Department's formal discipline process. The overall

emphasis of OATH precedent focuses on progressive discipline, including providing Staff an

opportunity to modify their behavior.[97] The case law has established a number of factors to be

---

[96] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[97] *See, e.g., Dep't of Correction v. Pelle,* OATH Index No. 1410/07 at 7-8 (May 22, 2007), aff'd, NYC
Civ. Serv. Comm'n Item No. CD 08-11-SA (Feb. 20, 2008) (35-day suspension imposed where officer,
with three years of experience and no prior disciplinary record, ignored captain's order, placed inmate in
an improper hold, and issued false or misleading reports; ALJ emphasized that employees should,
wherever appropriate, receive the benefit of progressive discipline and receive an opportunity to modify
their behavior).

considered in recommending the appropriate penalty including the seriousness of the

misconduct; the employee's background (including length of service); disciplinary history; the

impact of the misconduct on the agency's mission; the penalty imposed on others for similar

misconduct; the presence of mitigation (such as provocation or unusual stress); and the adequacy

of the penalty to deter similar misconduct by the employee or others.[98] A summary of relevant

cases and corresponding penalties recommended by OATH are attached in *Appendix C: Oath

Penalties*.

       The case law regarding an ALJ's recommendation for termination generally focuses on

whether an inmate sustained serious physical injury, if the use of force is extreme (often also

considering whether the inmate's conduct precipitated the incident), if the Staff member has a

significant disciplinary history, and/or if there is an extensive cover-up.[99] Four relevant cases in

which the Department sought termination are evaluated in more detail below in order to illustrate

how these standards are applied.

       In *Dep't of Correction v. Sinacore* (May 2018), the ALJ found that respondent called the

inmate complainant a derogatory homosexual slur, aggressively frisked the inmate in the genital

area, kicked him in the legs, pulled his pants down far enough to expose his buttocks, submitted

a false and misleading written report, and made false and misleading statements at an

investigative interview by failing to report the use of excessive force. While the ALJ in *Sinacore*

found that the respondent committed "serious misconduct," the respondent's disciplinary record

was "troubling," and the respondent "offered no meaningful mitigation." The ALJ concluded that

---

[98] *See, e.g., Dep't of Correction v. Sinacore,* OATH Index No. 1244/18 (May 4, 2018), modified on penalty, Comm'r Dec. (May 24, 2018), appended, aff'd, NYC Civ. Serv. Comm'n Case No. 2018-0468 (Sept. 5, 2018), appended.

[99] *See, e.g., Dep't of Correction v. Rothwell*, OATH Index No. 1963/17 (Nov. 3, 2017), modified, Comm'r Dec. (Jan. 8, 2018).

"[a] significant penalty, short of termination [which the Department was seeking], is necessary to make clear to respondent that verbal or physical abuse of inmates and deception are inconsistent with the Department's mission."[100] The OATH Judge recommended a penalty of 60 days suspension.[101]

In *Dep't of Correction v. Rothwell* (Nov. 2017), the ALJ found that the Captain respondent used excessive force when she struck an inmate in the head and face multiple times after the inmate was subdued and prone on the floor; the Captain also submitted a false and misleading written report, and made false and misleading statements at an investigative interview by failing to report the use of excessive force. The ALJ also found that the respondent's status as a Supervisor created "a high duty to maintain good order and discipline both by word and deed, and to provide complete and accurate reports and statements."[102] The ALJ also found mitigating factors that warranted a penalty short of termination, including the fact that the use of force was "set in motion by the inmate's conduct [. . .]. The force used by respondent was a brief single event and the injuries to the inmate appear to have been relatively minor, requiring no serious medical treatment."[103] Ultimately, a penalty of 50 suspension days was recommended.[104]

In *Dep't of Correction v. Ward* (Dec. 2018),[105] the Department sought termination of the officer respondent pursuant to Consent Judgment § VIII, ¶ 2(d). The respondent admitted he

---

[100] *Sinacore* at pg. 17.

[101] The DOC Commissioner utilized an action of the Commissioner and overruled the OATH decision and imposed a penalty of termination of employment, which was affirmed on appeal.

[102] *Rothwell* at pg. 13.

[103] *Rothwell* at pg. 13.

[104] The Commissioner adopted OATH's factual findings, but modified the recommended disciplinary outcome to 49 suspension days as Department Memorandum 01/99 requires that all suspension days for Captains are completed in 7 day increments.

[105] OATH Index No. 2137/18.

placed his hand around an inmate's neck during a struggle to protect himself from the inmate

spitting on him. The ALJ explained that respondent "placing his hand around the inmate's neck

was impermissible and potentially life-threatening, and warrants a significant penalty."[106] That

said, the ALJ went on to opine that "after [the Respondent] display[ed] extraordinary patience

and restraint with a non-compliant inmate, respondent resorted to force primarily as a defensive

measure. Further, respondent appears unlikely to repeat such conduct."[107] In recommending a

penalty of 35 suspension days, the ALJ found that:

> "Respondent is an almost 18-year city employee with minimal prior disciplinary history.
> The use of force was set in motion by the inmate's conduct, specifically his belligerence
> and attempt to spit upon respondent. The force used by respondent was a brief single
> event, did not appear to obstruct the inmate's airway, and the inmate did not suffer any
> injuries. Respondent accepted responsibility for his actions, and was always candid
> regarding his conduct [. . . Further t]he principles of progressive discipline and the length
> of respondent's employment also weigh in favor of a penalty that is short of
> termination."[108]

A case in which termination was recommended by an ALJ is also illustrative of the

weight given to various factors including inmate injuries. In *Dep't of Correction v. Behari* (Sept.

2014)[109] respondents punched and struck an inmate while restrained, causing significant injury,

then carried him, hog-tied. Some respondents failed to report the incident, while others falsely

reported the incident. The beating caused "severe facial trauma and a transverse process fracture

to his back", a broken, "tilted" nose, and several other injuries/bleeding to the eye and head. In

supporting their decision to terminate the respondents, the ALJ noted "this case appears to

---

[106] *Id.* at pg. 8.

[107] *Id.*

[108] *Id.* at pgs. 7-8.

[109] OATH Index Nos. 781/14, 782/14, 783/14, 784/14, 785/14 & 786/14 (Sept. 25, 2014), aff'd, NYC Civ.
Serv. Comm'n Case No. 2015-0162 (Nov. 10, 2015), appended, aff'd, 56 Misc. 3d 1203(A)(Sup. Ct. N.Y.
Co. 2016).

combine some of the worst aspects of the use of force cases: a coordinated effort to enter an inmate's cell, serious physical injury, an attempted cover-up, and a lack of provocation by the inmate."[110] However, the opinion also noted that the "**the tribunal generally recommends lesser penalties where the inmate does not suffer serious injury as a result of the improper use of force**."[111] (emphasis supplied).

These cases raise an overarching concern regarding the emphasis placed on whether the inmate sustained serious injuries in determining the appropriate penalty. This approach is misguided and fails to consider the potential *risk* of harm the Staff conduct posed, or the *serious pain* that may have been inflicted on the inmate(s) but did not result in serious injury. It is unquestioned that Staff actions can and do result in varying degrees of bodily pain with no visible or identifiable injury, *e.g.*, chokeholds, takedowns, wall slams, OC, painful escort holds, bodily strikes, etc. However, the risk of serious injury and the needless infliction of pain when bringing an incident under control is just as concerning as actions resulting in injuries. In fact, the risk of serious injury as well needless pain are two of the hallmarks of "excessive and unnecessary force" and thus are at the center of the concerns that gave rise to the Consent Judgment. Not only does this type of behavior contribute to a destructive culture, the gratuitous infliction of pain is every bit as actionable in class action lawsuits to address inhumane conditions and in Staff disciplinary matters. Accordingly, failure to give similar weight to these two hallmarks has a direct impact on the Department's obligations to *seek* specific disciplinary

---

[110] *Id.* at 67.

[111] *Id.* at pg. 65. The ALJ in *Behari* noted that a prior OATH case (*Dep't of Correction v. Reid*, OATH Index Nos. 1898/14, 1901/14 (June 18, 2014)) had very similar facts, except that the inmate did not sustain injuries, thus a penalty short of termination was imposed.

sanctions pursuant to § VIII., ¶¶ 2 (c), (d), and to generally impose meaningful discipline for UOF misconduct violations pursuant to § VIII., ¶ 1.

The Department is required to **seek** termination under Consent Judgment § VIII., ¶ 2(d) in three enumerated scenarios of UOF related misconduct, which do not easily conform to OATH's consideration of various factors. As noted above, the focus on serious injuries as a factor is not consistent with the Consent Judgment requirement which focuses on the *risk* of serious injury to the inmate. Further, the scenarios contemplated for termination are the most troubling UOF misconduct, but OATH precedent suggests that these situations may not be considered "extreme" without the presence of a serious injury. Further, the Consent Judgment does not require consideration of the Staff Member's disciplinary history or that there is evidence of an extensive cover-up. While the disciplinary history of a Staff member is certainly relevant in the consideration of the appropriate discipline, as noted in the Department's Disciplinary Guidelines, "not all first instances of misconduct are minor violations of Department rules and directives, as such, certain misconduct may warrant a penalty of termination even on the first instance," (Preamble to the New Disciplinary Guidelines). It appears that the tribunal would be resistant to terminate Staff under the circumstances proscribed by the Consent Judgment without the presence of one or more factors as laid out above.

There is further tension with OATH precedent and the Department's obligation to **seek** certain disciplinary outcomes related to deliberate failure to report or false reporting pursuant to Consent Judgment § VIII, ¶¶ 2(c) (Deliberate Failure to Report or False Reporting). In failure to report and false reporting cases, OATH precedent considers the severity of the use of force and

whether or not the inmate sustained a serious injury in assessing the appropriate penalty.[112] The

Consent Judgment requirements were carefully crafted to ensure there were appropriate

consequences for reporting violations. This is because the most troubling uses of force are those

that go unreported, as an unreported UOF cannot be assessed by relevant stakeholders and a

determination of whether the force was unnecessary or excessive is precluded. Further, as

described in more detail above, emphasis on whether or not the inmate sustained a serious injury

fails to consider two of the hallmarks of unnecessary and excessive force, the *risk* of serious

injury and needless infliction of *pain*. Deliberate failure to report or false reporting of incidents

that involve either a risk of serious injury or needless infliction of pain are equally troubling to

those where an inmate sustained a serious injury.

While the Monitoring Team supports the use of progressive discipline and consideration

of aggravating and mitigating factors in determining the appropriate outcome, the Department is

in an untenable position in balancing many of the OATH factors and implementing the Consent

Judgment requirements for timely and meaningful discipline,[113] a "zero tolerance policy for

excessive and unnecessary force,"[114] and seeking specific disciplinary outcomes for certain UOF

misconduct.[115] In order to satisfy these requirements, the Department must be able to find the

appropriate balance in imposing meaningful discipline in a reasonable period of time. As noted

throughout this report, efficiencies in imposing discipline are crucial. However, the precedent set

by OATH increases the likelihood of cases going to trial given the tension between OATH

---

[112] *See Dep't of Correction v. Cantelmo*, OATH Index No. 2562/17 (Oct. 12, 2017), *aff'd*, NYC Civ. Serv. Comm'n Case No. 2018-0135 (July 23, 2018) at 5.

[113] Consent Judgment § VIII (Staff Discipline and Accountability), ¶ 1.

[114] Consent Judgment § IV (Use of Force Policy), ¶ 3(a).

[115] Consent Judgment § VIII (Staff Discipline and Accountability), ¶ 2.

standards and those of the Consent Judgment. This will not only prolong the imposition of

discipline but also creates uncertainty in the discipline that may be imposed. Accordingly, the

Monitoring Team recommends that Department leadership share this analysis with the leadership

of OATH to discuss how these concerns may be considered and addressed going forward to help

facilitate the Department's obligation to ensure meaningful and adequate discipline is imposed.

The Monitoring Team's assessment of compliance is below.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

¶ 2.

e.   If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has various structures to *__identify__* misconduct:
  - Close-in-time to the incident via Rapid Reviews, Preliminary Reviews (and corresponding Facility Referrals), and the Immediate Action Committee.
  - Through Facility investigations and ID investigations.
- The Department has various structures to *__respond__* to misconduct:
  - Corrective interviews, counseling, re-training, Command Discipline, and suspension.
  - Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff *and* PDRs for probationary Staff.
- The Department convenes the Immediate Action Committee to evaluate cases that meet the criteria of ¶ 2(e), as well as other concerning cases, close in time to when they occur. The committee considers whether immediate action should be taken (*e.g.*, suspension, modified duty) as well as whether the case should be expedited for investigation.

### ANALYSIS OF COMPLIANCE

¶¶ 1 and 2(e) are addressed together because when read together, they require timely, adequate, and meaningful discipline. The Department has continued to maintain a reasonable process to identify

incidents close-in-time where corrective action is appropriate through Rapid Reviews, Preliminary Reviews, and the Immediate Action Committee. The Department's Rapid Review process improved slightly during this Monitoring Period (particularly at certain facilities), which indicates that the Facilities are improving their ability to identify misconduct.

The Immediate Action Committee also continues to convene every other week to review a select group of incidents and continues to identify cases that may merit immediate corrective action. In general, the Committee succeeds in targeting the cases where Staff's conduct more likely than not included the various types of misconduct set forth in ¶¶ (d)(i) –(iii) of this section. Given the need to impose discipline more timely, the Monitoring Team encourages the Committee to expand the scope of cases that are reviewed to include more cases where timely discipline would be appropriate.

One area of concern is the Department's failure to ensure that all of the Immediate Action Committee's recommendations are actually effectuated. The Monitoring Team found that while most recommended suspensions did occur, other recommendations were not imposed consistently. The Department reports it has devised a new process to ensure that the recommendations of the Immediate Action Committee are effectuated and will implement this process in the next Monitoring Period.

Despite the improvements noted above, the Department continues to struggle to consistently identify and respond to misconduct, as described in detail in the Identifying & Addressing Use of Force Misconduct section of this report. Further, even in cases where discipline is recommended, the Department has been unable to ensure the discipline is reliably imposed.

The Department still does not impose meaningful corrective action nearly often enough to achieve compliance with ¶ 1, as described in more detail in the Identifying & Addressing Use of Force Misconduct section of this report. While misconduct certainly does not occur in every use of force incident, the Department's findings of misconduct are out of sync with the objective evidence of wrong doing identified by the Monitoring Team's work.

The Department must improve its reliance on the assortment of strategies designed to ensure that appropriate, meaningful, and timely discipline is imposed. Certain violations may only require a corrective interview or re-training, other misconduct may require a Command Discipline, and some misconduct may require formal discipline. Given the lengthy process to impose formal discipline, the Monitoring Team continues to strongly encourage the Department to utilize processes where the response to misconduct can occur more swiftly based on the facts of the case.

To the extent that discipline is recommended, the integrity of the system depends on it actually being imposed. As discussed in the Identifying & Addressing Use of Force Misconduct section of this report, the Department has consistently failed to do so. This includes failures to adjudicate Command Discipline at the Facility Level. Further Command Discipline dispositions (either from the Facility or

through NPA[116]) are then not imposed. The Department also struggles with imposing discipline for probationary Staff. Only after significant pressure and oversight by the Monitoring Team does the Department now impose discipline through the Probationary Disciplinary Review ("PDR") process. Finally, the discipline (*e.g.*, loss of vacation/compensatory days or suspension days) agreed upon in NPAs beyond Command Disciplines are often also unreasonably delayed given lengthy investigations.

In order to achieve compliance, the Department must demonstrate that the entire spectrum of responses to address identified misconduct is applied proportionally and dependably. As an initial step, the Department must ensure misconduct is reliably and consistently identified and leverage the Fast-Track process to address as many of these cases as possible through that system. The Department must fortify the Command Discipline process to ensure they are appropriately utilized, tracked, and processed in a timely manner.[117] The Department must also continue to improve the integrity of the PDR process to ensure they are processed timely and the outcomes are consistent with the objective evidence.[118] Trials must also continue to prosecute cases as expeditiously as possible as described in more detail below. Finally, the imposed discipline must actually be effectuated. If not, all the work that came before is rendered meaningless.

Given the current state of affairs, the Monitoring Team intends to continue to heavily scrutinize the Department's efforts to impose discipline in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
|---|---|
| | ¶ 2(e). Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

---

[116] An NPA negotiated for return to Command must be adjudicated by the Facility unless the NPA specifically identifies the number of days to be forfeited by the Staff. If the number of days are specifically identified then the Command Discipline just needs to be entered into the system by HR to ensure that the time is deducted.

[117] The Department has reported to the Monitoring Team that CLU and NCU are working on a plan to assess and improve the Command Discipline process in the next Monitoring Period.

[118] Following the close of the Monitoring Period, the Department devised a new process to track, monitor and assess PDRs. The Monitoring Team will evaluate this process in the next Report.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgement (see pgs. 25-26 of the Consent Judgment for the full text).

- As of the end of the Monitoring Period, the Trials Division has received a total of 48 cases related to incidents that *occurred* between October 27, 2017 and August 30, 2018.[119] Of these, 41 (85%) were closed by December 31, 2018 (40 closed with NPAs and one was administratively filed).

- The Department decided 43 PDRs related to probationary Staff in this Monitoring Period with the following outcomes:

| Outcome | # (%) |
|---|---|
| Demotion | 4 (9%) |
| Extension of Probation - 3 Months | 9 (21%) |
| Extension of Probation - 6 Months | 17 (40%) |
| Termination | 9 (21%) |
| No Action | 2 (5%) |
| Resignation | 2 (5%) |
| TOTAL | 43 (100%) |

**ANALYSIS OF COMPLIANCE**

The Department is required to "act in accordance with the Disciplinary Guidelines." Because the disciplinary process is different for probationary and tenured Staff, the Monitoring Team addresses them separately below.

*Probationary Staff*

The Department continues to struggle to process PDRs, but some improvement was observed in tracking UOF-related PDRs and processing cases more timely in advance of the Staff Member's tenure (discussed in more detail in the Identifying & Addressing Use of Force Misconduct section). That said, the Monitoring Team remains concerned about the integrity of the PDR process. While many of the dispositions are reasonable, there remain a number of questionable disciplinary decisions made by the First Deputy Commissioner. The Monitoring Team intends to continue to closely scrutinize the impositions of PDRs.

*Tenured Staff*

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together. Only a small number of cases (n=48) have been referred to Trials for

---

[119] As of the end of the Monitoring Period, the most recent case pending with Trials was from August 28, 2018.

incidents that have taken place since the Disciplinary Guidelines came into effect given the delays in completing investigations. The Monitoring Team evaluated the outcomes of about half of the cases that were closed under the new guidelines and generally found them to be reasonable and consistent with the Disciplinary Guideline requirements.

The Monitoring Team's assessment of the discipline imposed by the Department necessarily included an assessment of recent OATH decisions given the direct impact on the discipline imposed by the Department on tenured Staff. The assessment of this precedent, described in the introduction to this section of the report, was particularly relevant to the implementation of the mandatory termination provisions (¶ 2(d)(i) to (iv)).

In this Monitoring Period, the Trials Division and Monitoring Team discussed the implementation of the mandatory termination provisions (¶ 2(d)(i) to (iv)) and potential cases and fact patterns that would meet this standard. Given the complexity of this analysis, the Trials Division reports it intends to consult with the Monitoring Team going forward about specific cases that may meet these criteria to ensure consistent application of the standard. To date, the Monitoring Team has only identified one or two cases that _may_ meet this standard (both cases are still under investigation). That said, it is important to emphasize that the Department is not limited to seeking termination on the cases that meet the standard enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases where termination could appropriately be sought given the level and/or pattern of misconduct. To date, the Department has only terminated one tenured Staff member related to UOF misconduct.[120]

Most of the cases closed by Trials (94%) were via NPA, and imposed a range of penalties, as shown in the table below. Given the expansion of cases now investigated by ID, the spectrum of misconduct cases received by Trials has similarly evolved. Accordingly, the severity of discipline is more expansive, from Command Discipline to the loss of a significant number of days. As demonstrated in the chart below, Trials has increasingly relied on the use of Command Disciplines to close out matters.

| Penalty Imposed by NPA by Date of Trials Closing Memo | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 4th Monitoring Period | | 5th Monitoring Period | | 6th Monitoring Period | | 7th Monitoring Period |
| **Total** | **170** | | **220** | | **282** | | **225** |
| Refer for Command Discipline | 23 | 14% | 55 | 25% | 93 | 33% | 115 | 51% |
| Retirement or Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% |
| 1-10 days | 13 | 8% | 40 | 18% | 52 | 18% | 44 | 20% |
| 11-20 days | 37 | 22% | 50 | 23% | 53 | 19% | 27 | 12% |
| 21-30 days | 30 | 18% | 36 | 16% | 34 | 12% | 22 | 10% |
| 31-40 days | 8 | 5% | 6 | 3% | 15 | 5% | 3 | 1% |
| 41-50 days | 16 | 9% | 9 | 4% | 20 | 7% | 11 | 5% |
| 51+ days | 35 | 21% | 20 | 9% | 13 | 5% | 0 | 0% |

---

[120] The Department reported that there were a number of cases where the Department intended to seek termination, but the Staff member resigned.

The Monitoring Team assessed the outcomes of approximately 90 cases in which objective evidence of misconduct was available and discipline was imposed, the vast majority of which occurred prior to October 27, 2017. The Monitoring Team carefully assessed the reasonableness of discipline imposed based on the specific facts of the case. The Monitoring Team's assessment considered the overall principles that imposing discipline requires appropriate balance among the various factors that must be considered in reaching a just result (*e.g.*, weighing aggravating and mitigating factors, the strength of the evidence (including any guidance from the OATH judge during OATH conferences), the appropriate use of resources, considering progressive discipline, etc.), and the timeliness of the disposition.

As an initial matter, the Monitoring Team evaluated Trials' use of Command Disciplines. As previously reported, the Monitoring Team has encouraged Trials to leverage the use of Command Discipline in order to resolve cases that would have traditionally been managed at the Facility Level (but are now funneled to ID) and can be disposed of more timely.[121] However, two issues emerged during this Monitoring Period. First, the Monitoring Team found that Trials over-relied on Command Disciplines in cases where objective evidence would reasonably suggest that the discipline should be more severe. The Monitoring Team reviewed a number of these cases with the Trials Division, which subsequently committed to apply greater scrutiny regarding this issue. Second, the Command Disciplines imposed via NPAs were not actually effectuated which undermined the entire system of discipline. Following the Monitoring Team's findings, the Department revisited each case and reported that the vast majority of Command Disciplines have now been imposed. In the future, Trials will only utilize the Command Discipline option for NPAs when the Command Discipline includes a specific number of days, thus by-passing the adjudication process at the Facility. Further, a verification process is now in place to ensure that the time is actually deducted from the Staff's record.

The Monitoring Team's evaluation of the remaining NPA cases had mixed results. In at least half the cases, the Monitoring Team found that the disciplinary outcomes were reasonable. However, in about one-quarter of the cases, the outcome was questionable, but considerations such as progressive discipline, mitigating factors and imposing swifter discipline all suggest that the outcomes were not unreasonable. That said, in less than a quarter of the cases, the discipline appeared inconsistent with the identified misconduct. The Monitoring Team discussed these cases with the Trials leadership. In at least some cases, it appeared that in the effort to close cases more timely, unreasonable disciplinary decisions were made. While the Monitoring Team appreciates the importance of swifter discipline, proportionality is of the utmost concern. In some of the other cases, certain factors emphasized by OATH precedent (*e.g.* the lack of serious harm inflicted on the inmate was weighted over the risk of

---

[121] The Monitoring Team intends to closely scrutinize this process in the next Monitoring Period to ensure the Command Discipline is imposed.

serious injury posed by the use of a head strike) appeared to influence outcomes that appeared disproportionate to the misconduct.

Overall, the Department's efforts to impose discipline for tenured Staff is mixed. While many of the disciplinary outcomes are reasonable, there still remain cases where the discipline is not proportional to the misconduct.

| **COMPLIANCE RATING** | ¶ **2. (a) to (d)** (Develop Guidelines) – Substantial Compliance<br>¶ **2. (a) to (d)** (Act in Accordance with the Guidelines)<br>   • *Probationary Staff* – Partial Compliance<br>   • *Tenured Staff* – Partial Compliance<br>¶ **5. Disposition of NPAs and Recommendations to OATH Judges**<br>   • Partial Compliance |
| --- | --- |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

a. If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

b. If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

c. The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

• The Facilities refer Memorandum of Complaints ("MOC") to Trials if the investigator found that the case merits charges.

• Trials continued to utilize several strategies to expedite cases, and some efficiencies have been realized:

   o Trials serves changes as described on pgs. 176-177 of the Fourth Monitor's Report. In cases requiring the service of charges, Trials served *all* 129 charges within 30 days of receiving

the MOC. Two additional cases were administratively filed or closed before charges were served.

- o Trials continued to emphasize timely service of discovery.
- Fast Track has been adopted into routine practice to close cases more timely. The status of the Fast Track cases is outlined below.

| Status of Fast-Track Cases by Date Referred to Trials[122] | | |
|---|---|---|
| | Cases Received Jan. to June 2018 | Cases Received July to December 2018 |
| *Pending* | 12 | 9 |
| *Closed* | 156 | 30 |
| *Submitted for PDR* | 27 | 5 |
| *Rejected[123]* | 39 | 37 |
| **Total** | **234** | **81** |

- The Off-Calendar Disposition ("OCD") process[124] was integrated into the Trials work flow and all cases are now evaluated to determine if resolutions can be negotiated without appearing before OATH. Since the process was developed, 129 cases have been identified for OCD. Of these, 104 were closed (81%) and 25 remain pending with Trials (19%).
- Trials leadership continued to emphasize completing closing memos in a reasonable period of time. Trials completed **240** closing memos during this Monitoring Period.
- A total of **172** use of force cases were pending at the end of the Monitoring Period (15 of which are on hold due to pending law enforcement investigations).

**ANALYSIS OF COMPLIANCE**

*ID Referrals* (¶ 3(a))

The Consent Judgment requires the Deputy Commissioner or Assistant Commissioner to approve any investigations that recommend charges within 30 days of the investigation's completion date. The Monitoring Team has generally found that the final approval by the Deputy Commissioner occurs in a reasonable amount of time. However, as noted in the Use of Force Investigations section of this report, investigations often languish and so the review and sign-off is protracted from the date of incident.

The process for ID to recommend discipline following the close of an investigation is different for tenured and probationary Staff. For tenured Staff, the closure of a case with charges requires a

---

[122] It is worth noting that many of the cases received in Sixth Monitoring Period were then resolved in the Seventh Monitoring Period.

[123] Cases are rejected for a number of reasons, including the Staff Member rejected the settlement offer, or Trials staff determined more investigation is necessary in order to sustain a disciplinary penalty.

[124] This process was developed in the Fifth Monitoring Period as a strategy to address Trials' backlog and to address cases with charges drafted and served, that are assigned to a Trials attorney, but are not cases where the Department is seeking severe penalties or termination. Trials' attorneys and respondents negotiate cases meeting OCD criteria, circumventing the need to appear at OATH.

MOC to be drafted by Trials (discussed in more detail below). The investigation recommends only that charges should be brought and does not identify the actual discipline to impose. For probationary Staff, if an investigator recommends discipline, the closed investigation packet will also include a draft memo to HR outlining the misconduct and recommended discipline for the probationary Staff member. The Monitoring Team reviewed all of the memos submitted for PDRs during this Monitoring Period and found that the overwhelming majority recommended reasonable disciplinary outcomes. Finally, the Monitoring Team is not aware of any cases where the investigation concluded that charges should be brought and the Deputy Commissioner disagreed with that assessment.

*Facility Referral of MOC to Trials* (¶ 3(b))

The Facilities investigate less severe violations of the use of force policy. However, if misconduct that merits charges is identified through the Facility investigation, the MOC is referred directly to Trials. The Monitoring Team has not yet evaluated this provision given the substantial work required to ensure the integrity of the investigation process.

*Trials* (¶ 3(c))

The process to impose formal discipline for tenured Staff is outlined in *Appendix B: Flowchart of Disciplinary Process* (attached to the Fifth Monitor's Report).[125] Trials went through a period of transition during this Monitoring Period, with new leadership and the merger with ID. It is worth highlighting that despite these changes, the Trials division continued to progress toward the outcomes required by this provision and has worked diligently to address the deficiencies identified in previous Monitor's Reports.

*Service of Charges*

The Trials Division has maintained a consistent, reliable, and sustainable process to timely serve charges since January 2017. All charges served during this Monitoring Period were served on time. Accordingly, Trials has maintained Substantial Compliance with this requirement.

*Administratively Filed Cases*

The Monitoring Team continued to evaluate the cases that are administratively filed. This disposition occurs for a number of reasons, including when charges are not supported by a preponderance of the evidence, even though misconduct may have been substantiated at an earlier stage. Such cases must be reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Risk Manager of the Legal Division.

The proportion of cases administratively filed continued to decrease. Only six cases were administratively filed during this Monitoring Period compared to 22 cases in the previous monitoring period. The Monitoring Team reviewed 10 new cases that had been administratively filed to determine

---

[125] It is important to note that the Monitoring Team focuses only on Trials' work related to cases involving UOF violations for tenured Staff, but Trials is also responsible for imposing formal discipline for *all* violations by tenured Staff in the agency.

whether Trials' decision not to pursue charges was reasonable.[126] The Monitoring Team found Trial's decision not to pursue these charges was reasonable given the specific circumstances of the matter:

- One respondent provided evidence at OATH that exonerated the respondent of the charges
- One respondent had left the Department for medical reasons before the charges were served
- Two cases were administratively filed for clerical reasons as they were duplicates of other charges
- Six cases were administratively filed due to insufficient evidence to support formal discipline (five of which the Administrative Law Judge questioned the sufficiency of evidence after an OATH Conference, and one where charges were served merely to preserve the SOL but ID & Trials ultimately decided not to pursue the discipline once the investigation closed).

*Deferred Prosecution*

The Department defers prosecution if a Staff member retires or resigns while charges are pending, though the case is re-opened and prosecuted if the Staff member returns to work. The Monitoring Team has previously reviewed deferred prosecution cases and found the deferrals were appropriate.

*Expeditious Prosecution of Disciplinary Cases*

Assessing the expediency of prosecution requires a review of several processes. In order to achieve compliance, Trials must ensure timely service of charges and discovery and must have procedures for timely resolving cases without a trial, which requires significantly more time and resources. This requires assessing the individual circumstances of each case and having multiple options to move a case forward. During this Monitoring Period, Trials continued to serve charges timely, improved discovery, and made notable progress in developing avenues to ensure case closure without proceeding before OATH.

- ***Service of Discovery***

Trials maintained its goal of serving discovery within 30 days of serving charges. The table below illustrates the time required to serve discovery for all cases where the MOC was received during this Monitoring Period. The Monitoring Team encourages Trials to continue to serve discovery as soon as possible. Most of the cases (81%) had discovery served within 30 days and/or were part of the Fast-Track initiative and discovery was served timely as part of that process.

| Date of MOC | Total | Pending | Fast Track | 01 to 29 Days | 30 to 60 Days | 60 to 119 Days | 120 to 180 Days | Closed before Discovery Served |
|---|---|---|---|---|---|---|---|---|
| **July - Dec. 2018** | **131** | 4 | 87 | 19 | 5 | 6 | 2 | 8 |
| | | 3% | 66% | 15% | 4% | 5% | 2% | 6% |

---

[126] These 10 cases represented all cases that were administratively filed where Trials received the MOC after November 1, 2015 and that were closed between May 2018 and December 2018.

- ***Time for Trials to Close Cases***

During this Monitoring Period, Trials was able to focus almost exclusively on resolving cases closer-in-time to the receipt of the MOC. The time cases are pending with Trials is best understood by looking at data on both pending cases and those that have been closed. As of the end of the current Monitoring Period, a total of 172 cases were pending. Of these, 156 cases are pending with Trials (125 of the cases had been with Trials less than six months, 19 had been pending between six and 12 months; and 12 over one year[127]). The other 16 pending cases, 15 are pending with law enforcement, another 1 case is awaiting additional investigation by ID. As discussed in prior reports, cases that must be addressed through the OATH process take significantly longer to complete given the limited number of cases that can be heard before OATH, the protracted time to conduct a trial, and then the subsequent time to receive a decision. Further, cases are often pending before law enforcement for extended periods of time as described in ¶ 3 of the Use of Force Investigations section of this report.

As shown in the table below, over time cases have been proceeded more timely, with 69% of cases closed within 3 months in the current Monitoring Period (compared with 47%, 15%, and 12% in previous monitoring periods). It is worth noting that the total number of cases closed by Trials decreased compared to the previous Monitoring Period. That said, the number of cases closed by Trials in the last Monitoring Period reflected a concerted effort to both close cases through the Fast-Track pilot as well as other cases on the docket. While fluctuations in the number of cases that are closed is to be expected, the Monitoring Team continues to encourage Trials to utilize Fast-Track and OCD processes to resolve more cases more timely. Overall, these data are encouraging, and the Monitoring Team applauds the work of the Trials Division for maintaining and improving upon developed efficiencies.

| Time between Receipt of MOC and Completion of Case Closing Memo | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | | Seventh Monitoring Period |
| Total | 232 | | 260 | | 310 | | 240 |
| 0 to 3 months | 28 | 12% | 40 | 15% | 146 | 47% | 166 | 69% |
| 3 to 6 months | 24 | 10% | 40 | 15% | 74 | 24% | 26 | 11% |
| 6 to 12 months | 48 | 21% | 76 | 29% | 34 | 11% | 31 | 13% |
| 1 to 2 years | 61 | 26% | 85 | 33% | 41 | 13% | 11 | 5% |
| 2 to 3 years | 53 | 23% | 17 | 7% | 6 | 2% | 3 | 1% |
| 3+ Years | 18 | 8% | 2 | 1% | 9 | 3% | 3 | 1% |

---

[127] The majority of cases pending over one year either were awaiting an OATH decision or were recently returned from law enforcement. Trials is asked to hold any discipline in abeyance until Law Enforcement officials complete their assessment to determine whether criminal charges may be brought.

- ***Fast-Track and OCD Cases***

Trials has begun to incorporate Fast Track and the OCD process into its standard practices. Both have demonstrated that cases can and should be resolved more expeditiously. That said, it is critical that these initiatives are implemented with integrity and the discipline imposed is reasonable, which as noted above, it sometimes was not. This is not to suggest that these cases should not have been resolved through these expeditious processes—almost all of the cases were appropriately selected for these initiatives but rather that the ultimate disposition was not appropriate. Given the potential of these two strategies, the Monitoring Team encourages their use so that as many cases as possible are addressed outside of the OATH process.

- ***Approval of Trials Closing Memos***

A closing memo must be drafted to close each case at Trials. The Monitoring Team evaluated the time required to draft, edit, and finalize the memo and for the Deputy General Counsel[128] to approve them to determine if the time frame is reasonable. During this Monitoring Period, 77% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within one month of the NPA being executed. While the time to complete closing memos increased compared to the previous Monitoring Period, it still appears to be reasonable. That said, the Monitoring Team encourages Trials to continue to refine this process to complete closing memos within three weeks whenever possible.

- ***Status of Closed Cases***

As noted above, Trials closes the majority of its cases via NPA. Encouragingly, the number of cases administratively filed continues to decrease suggesting improved assessment and coordination with ID before cases are recommended for discipline. Further, the number of not guilty verdicts remain a rare occurrence.

| Type of Case Closure | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | | Seventh Monitoring Period | |
|---|---|---|---|---|---|---|---|---|
| | 232 | | 260 | | 310 | | 240 | |
| NPA | 170 | 73% | 220 | 85% | 282 | 91% | 225 | 94% |
| Administratively Filed | 49 | 21% | 29 | 11% | 23 | 7% | 7 | 3% |
| Deferred Prosecution | 12 | 5% | 8 | 3% | 2 | 1% | 5 | 2% |
| Guilty Verdict | 1 | 0% | 3 | 1% | 1 | 0% | 2 | 1% |
| Not Guilty Verdict | 0 | 0% | 0 | 0% | 2 | 1% | 1 | 0% |

## Conclusion

The Trials Division has continued to make progress during the current Monitoring Period and the Monitoring Team applauds the division's hard work and the corresponding outcomes. The Trials

---

[128] Closing Memos were signed by a Trials Director until the new Deputy General Counsel for Trials was hired early in the Monitoring Period.

Division is encouraged to further integrate the initiatives discussed above into standard practice to ensure cases are prosecuted as expeditiously as possible once assigned to Trials. While the focus of this section is on the efforts made by Trials to dispose of cases, it is worth noting that the long delays in completing investigations continues to undercut the overall goal of imposing timely discipline.

| **COMPLIANCE RATING** | **¶ 3(a)**. Not Yet Rated |
| | **¶ 3(b)**. Not Yet Rated |
| | **¶ 3(c)**. |
| | • Substantial Compliance (Charges) |
| | • Substantial Compliance (Administratively Filed) |
| | • Partial Compliance (Expeditiously Prosecuting Cases) |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, three Directors, 20 attorneys, and 14 support staff.
- During this Monitoring Period, a Deputy General Counsel joined the division. The Department also hired one agency attorney and one Legal Coordinator.
- The Department reports that Trials is actively recruiting additional attorneys.
- The number of pending cases with Trials at the end of the Monitoring Period was 620 cases, with approximately 174 UOF related.[129]

**ANALYSIS OF COMPLIANCE**

While the timeliness of case closure has continued to improve as described above, the caseload for Trials staff is still too high to achieve the reforms required by the Consent Judgment, particularly because staff's caseload is expected to increase as the Fast-Track initiative is fully implemented, investigations are closed more timely, and as more incidents are prosecuted under the New Disciplinary Guidelines.

The Monitoring Team strongly encourages the Department, Office of Labor Relations ("OLR"), and OMB to continue to collaborate to ensure that the Department can meet the obligations of the Consent Judgment. Further, the Monitoring Team encourages the Department to maintain or increase its recruiting efforts to ensure the Department attracts the best possible candidates.

| **COMPLIANCE RATING** | **¶ 4.** Partial Compliance |

---

[129] Caseloads include a mixture of use of force cases, as well as Equal Employment Opportunity Office ("EEO"), Medical Separation, PREA, and others that are not under the purview of the Monitoring Team.

| VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAs) |
|---|

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All NPAs are reviewed and approved by the Deputy General Counsel of Trials then forwarded to the Deputy Risk Manager for review and approval. The Deputy Risk Manager sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for processing.

- 254 NPAs were approved by the Commissioner during this Monitoring Period. The approval process by the Deputy Risk Manager and the Commissioner was completed within one month for 85% of the cases, within two months for 13% of cases and 6 cases were closed beyond 2 months.

**ANALYSIS OF COMPLIANCE**

The Department's process for approving NPAs continues to be efficient and timely. Given its importance, and the significant responsibilities of the Deputy Risk Manager and the Commissioner, this review will necessarily take some time. That said, the Deputy Risk Manager completed her review within three weeks for 70% of cases and the Commissioner completed her review and approval within two weeks in 97% of cases (with the overwhelming majority completed in one week). During this Monitoring Period, a number of cases required additional scrutiny by the leadership. The Monitoring Team reviewed these cases and found the considerations and the time required to resolve them was generally reasonable. Accordingly, the Department is in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 5. Approval of NPAs: Substantial Compliance |
|---|---|

### 9. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) or assignment to Special Units (¶¶ 4, 5). This section also requires the Department to consider a Staff Member's assignment on a Special Unit after being disciplined (¶ 6) and more generally whether a Staff Member should be re-assigned or placed on non-inmate contact after a Staff Member has been disciplined multiple times (¶ 7).

The Monitoring Team's compliance assessment is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the [provisions enumerated in (a) to (d)]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 2230, Pre-Promotional Assignment Procedures, remains in effect, and addresses the requirements of ¶¶ 1 to 3. The Trials screening form was revised during this Monitoring Period to provide an additional recommendation option based on Trials' assessment of the candidate's record.

- During this Monitoring Period, the Department promoted the following Staff after conducting the necessary screening:
  - 97 Officers to Captain;
  - Three Captains to ADW;[130]
  - Two ADW to DW;
  - Four DWs to Warden; and
  - One Assistant Chief to Chief

### ANALYSIS OF COMPLIANCE

The screening requirements of the Consent Judgment were developed to support the Department in identifying Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a Staff Member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including the screening requirements of this section of the Consent Judgment, and is depicted in *Appendix D: Flowchart of Promotions Process*.

To verify that the Department screened and promoted Staff according to these criteria, the Monitoring Team reviewed the screening documentation for a sample of Officers promoted to Captain,

[130] The screening for promotion took place during the Seventh Monitoring Period, but the Captains were promoted to ADWs early in the Eighth Monitoring Period.

and for all Staff promoted to the rank of ADW or higher during the Seventh Monitoring Period. The Monitoring Team used a targeted approach to select a sample of Staff promoted to Captain, focusing on promotions of Staff where additional scrutiny may be required (*e.g.,* promotion was denied in a prior round or Staff had been disciplined for misconduct).

As described in more detail below, the information gathered through the screening of two ADWs in this Monitoring Period raised questions about the Staff Member's fitness to serve in the position. While neither of these promotions violated the provisions of the Consent Judgment, the Staff the Department chooses to promote sends a message to line Staff about the culture it intends to encourage, and their behavior sets an example for Officers. Accordingly, the Monitoring Team continues to encourage the Department to carefully consider the screening materials for all candidates prior to promotion.

*Review of Candidates* (¶ 1)

The Monitoring Team's review of the screening materials found that the Department's assessment satisfied the requirements of the "Review" as defined by ¶ 1. Overall, these reviews demonstrated thoughtful analysis and that the Divisions reviewing this information had utilized discretion in making their recommendations for promotion. However, the screening materials for one promotion did raise concerns about the candidate's suitability for promotion. A year prior to the candidate's promotion, the Department sought to terminate the candidate at a hearing before OATH due to the Staff Member's use of excessive force and corresponding false and misleading statements related to an incident that occurred prior to the Effective Date. The OATH Judge found the Staff Member guilty, but recommended a term of suspension instead of termination. The candidate did not have any other UOF related discipline in their file so the requirements of ¶ 2 were not triggered. However, the promotion is questionable given the facts of the case and that only a year prior the Department had sought to terminate the candidate. Ultimately, the Department determined that promotion was appropriate as they determined the Staff Member was adequately disciplined and has not subsequently engaged in misconduct since the incident occurred prior to the Effective Date.

*Disciplinary History* (¶ 2)

Of the over 100 Staff members promoted in this Monitoring Period, only one Staff member was promoted that had been found guilty or plead guilty to the specified violations more than two times in the past five years as enumerated in ¶ 2. The concerns about the disciplinary record of this candidate, and their fitness for promotion, was raised during the screening process. This triggered consideration and discussion by the Commissioner, Chief of Department and other executives prior to promotion. The Commissioner determined that exceptional circumstances existed and so promotion of this candidate was appropriate. These exceptional circumstances were not initially documented in writing, but, following a reminder from the Monitoring Team, the Commissioner shared a memo that

documented the exceptional circumstances with the Monitoring Team and reported the memo would also be placed in the candidate's file.

In this Monitoring Period, the Monitoring Team's review of the screening materials raised a question about how the Department can best evaluate discipline imposed on a candidate via a Command Discipline and/or PDR. Currently, discipline is evaluated through the 22R form and an assessment by Trials. The 22R form lists both the Command Discipline and MOCs imposed. Any discipline imposed by MOCs are evaluated and considered by the Trials division in order to make their screening recommendations. As for CDs, it is unclear whether any division is considering and evaluating the relevant Command Disciplines imposed when screening Staff for promotion, other than just reporting their existence. It also does not appear that PDRs are captured through the Department's existing screening processes. The Department reported in the next Monitoring Period it intends to evaluate whether there is a more efficient process to capture and evaluate this information. That said, the Monitoring Team's evaluation of available documentation and data did not reveal any promotions that would have been called into question under ¶ 2 because of Command Disciplines and/or PDRs that had been imposed.

_Pending Disciplinary Matters (¶ 3)_

The Monitoring Team found that none of the Staff who were promoted had pending disciplinary charges at the time of promotion.

_Procedures for Promotion_

Overall, the Monitoring Team found that the Department utilized sound judgment and thoughtful consideration in this Monitoring Period when deciding whether to promote a Staff Member. To further enhance and improve the sustainability of the promotions process, the Monitoring Team made two recommendations in this Monitoring Period.

First, the Monitoring Team encouraged the Department to consider all relevant information available before promoting a Staff Member to ensure they are appropriately qualified. The Monitoring Team recommended the work of E.I.S.S. be leveraged to further enhance the screening and assignment process. In particular, the Monitoring Team recommended that the Department seek input from E.I.S.S. on Staff prior to their promotion. To the extent the Staff Member has worked with E.I.S.S., that information is incredibly insightful and would provide additional context into a Staff Member's suitability for promotion.

Second, the Monitoring Team recommended that the Department implement a standard process to ensure that the specific screening of a Staff Member, described in more detail above, occurs as close in time as practicable to promotion so that the decision maker has the most current and relevant information to make an informed promotion decision. The screening and promotion processes cannot occur simultaneously so inherently there is a lag between the completion of the screening forms and the Staff Member's promotion. The Monitoring Team found that generally the screening and

promotion steps are reasonably proximal. However, in at least one case, the screening was completed one year prior to the Staff's promotion.[131] In order to ensure that promotion determinations are made with the most current information, the Monitoring Team recommended that the screening forms only remain valid for a specified time period and beyond that time frame, the screening forms must be redone before a determination of promotion can be made.

During the next Monitoring Period, the Department has reported it will work on revising the screening procedures to address the recommendations discussed above.

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance |
|---|---|
| | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 10/17 "Awarding Job Assignments within a Command," remains in effect.

- The Department continued to conduct the retroactive screening of more than 500 Staff currently on Special Units (identified in the chart below), but it is not yet complete.

| **Facility** | **Special Units** |
|---|---|
| AMKC | MO, CAPS, PACE |
| EMTC | MO |
| GRVC | ESH, RHU, P-SEG, MO, Secure |
| OBCC | ESH, MO |
| RMSC | RHU, MO, Nursery, Rover, Transgender Unit |
| RNDC | TRU, Second Chance, MO |

---

[131] The decision to promote the Staff member appeared to be reasonable based on the information available to the Monitoring Team despite the old screening materials.

**ANALYSIS OF COMPLIANCE**

*Screening for Assignment to Special Units (¶¶ 4, 5)*

The implementation of this screening process requires coordination with a number of different stakeholders. The Facilities must identify the Staff to be screened, screening forms must be developed by the Chief of Department's Office, relevant Divisions must complete the screening forms, and the screening forms must be evaluated by the Facilities in order to make a determination about the Staff Member's assignment. Every division is responsible for managing their portion of the screening process. The Legal Division has provided some support to this process, but there is no Division or individual that is responsible for the global management of this screening process.

The Department's original plan to implement this requirement was to screen all Staff who already had been awarded a post or were steadily assigned to any of the Special Units ("retroactive screening"). Once complete, the Department would then begin screening Staff as they are assigned to Special Units. However, the retroactive screening has languished. It was initially expected to be completed by June 2018, to coincide with the end of the Sixth Monitoring Period. At that point, retroactive screening was only 41% complete. Since then, the Department made little progress. Further, the list of Staff that require screening is now out of date and must be revised. It is clear that this process has languished and a consistent and sustainable screening process is needed.

As for the Staff screening that did occur, the Monitoring Team reviewed a sample of the screenings completed during 2018 and found that the process and documentation had improved slightly from the Monitoring Team's initial review. That said, the Department remains in non-compliance with these provisions because of its failure to timely complete the necessary screening for Staff assigned to Special Units. In order to achieve compliance with this provision, the Department must ensure: (1) a reliable process is created for identifying and tracking Staff throughout the screening process, (2) the screening considers all required information, (3) the screening occurs before Staff are assigned to a Special Unit, and (4) the decision whether to assign to a Special Unit is consistent with the information gathered during the screening process. The Monitoring Team has provided advice and guidance to the Department on how to develop this process and the Department reported that it is developing new procedures to address the Monitoring Team's concerns that will be implemented during the next Monitoring Period.

*Reassignment of Staff following Disciplinary Action (¶ 6)*

The Department has not yet implemented this provision. In prior Monitoring Periods, the Department conducted this screening on an ad hoc basis. However, properly implementing this provision is impossible without a comprehensive list of Staff who are assigned to the Special Units which the Department has yet to develop given that the retroactive screening process is still underway. The Monitoring Team has recommended on several occasions that the Department devise a process to

implement this requirement, but has yet to see progress toward this end. The Monitoring Team strongly encourages the Department in the Eighth Monitoring Period to put this process into place.

| Compliance Rating | ¶ 4. Non-Compliance |
| | ¶ 5. Non-Compliance |
| | ¶ 6. Non-Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 7 (REVIEW OF ASSIGNMENTS OF STAFF DISCIPLINED MULTIPLE TIMES)

¶ 7. The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department screened Staff who met the 2-in-5 threshold (outlined in ¶7) during the Seventh Monitoring Period.
- E.I.S.S. periodically identified Staff who meet the 2 in 5 threshold by assessing the formal discipline imposed by Trials.
  - E.I.S.S. utilizes the Trials Division's UOF discipline tracking chart (in conjunction with information from IRS and hard copy Trials files) to identify any Staff who meet the threshold of 2 dispositions within 5 years. E.I.S.S. staff then conduct a qualitative assessment of the incidents to determine whether they meet all the specific criteria of ¶ 7.
  - E.I.S.S. provides the list of relevant Staff to the Facilities for the Warden's assessment of whether Staff should be reassigned to positions with more limited inmate contact. This information is then returned to E.I.S.S. to track and review.
  - The outcomes of the Staff that met the threshold and the Department's assessment are outlined below.

| Disciplinary Time Period Evaluated | Screening Evaluation Completed | Total number of Staff who met the 2 in 5 criteria & post was evaluated[132] | Staff placed on limited inmate contact based on assessment | Staff already on limited inmate contact prior to assessment | Staff were deemed suitable for their current post |
|---|---|---|---|---|---|
| Through January 2018 | July 2018 | 35 | 5 (14%) | 19 (54%) | 11 (31%) |
| Through May 2018 | July 2018 | 23 | 6 (17%) | 7 (20%) | 10 (29%) |
| Through August 2018 | November 2018 | 15 | 4 (27%) | 7 (47%) | 4 (27%) |
| Through October 2018 | March 2019 | 32[133] | 1 (3%) | 9 (28%) | 22[134] (69%) |

ANALYSIS OF COMPLIANCE

The Department's implementation of this requirement requires the coordination of several stakeholders. First, a dedicated E.I.S.S. staff member collects and evaluates the Department's disciplinary and incident data to determine which Staff meet the threshold. Those Staff that meet the threshold are then grouped by Facility. The Assistant Chief's for each division then pass along the list of Staff that meet the threshold to their respective Facilities. The Facility leadership then evaluate the Staff Member's post to determine whether modification of duty is necessary. The Facility then completes the screening form and a completed excel for each Staff evaluated. This information is then all collected and returned to the Complex Litigation Unit to review and ensure it is complete. Invariably, there is significant back and forth either because certain information is missing, or the information provided is insufficient. It should be noted that despite recommendations from the Monitoring Team, the Department doesn't currently have a process in place to assess the outcomes holistically or ensure that any recommended modifications of duty are in place. This process is incredibly cumbersome and requires significant coordination and oversight. Further, the process is stretched over various Divisions and groups which makes it difficult to ensure adequate ownership and accountability. If the Department elects to keep this process in place, the only pathway to Substantial Compliance is to ensure that there is one Division with identified leadership who is responsible for ensuring each of these pieces is occurring.

*Identification of which Staff meet the 2 in 5 threshold*

The 2-in-5 screening process is complex and time consuming. During this Monitoring Period, the Monitoring Team met with E.I.S.S. staff to better understand the identification and screening process. The Monitoring Team conducted a parallel assessment to E.I.S.S.' August and October 2018 screening and found the vast majority of Staff were correctly identified as meeting the 2 in 5 threshold

---

[132] As of the October 2018 screening, there were 14 Staff who met the 2-in-5 threshold but were not screened for their assignment because they were no longer with the Department, on medical leave or temporarily assigned to the Correction Academy.

[133] The number of Staff the Department identified was overinclusive than what was required.

[134] These numbers were the results of a qualitative assessment by the Monitoring Team and may not capture reassignments that occurred in earlier rounds of screening.

which then required a review of their posts by Facility leadership. E.I.S.S.'s has a dedicated staff member who developed a complicated spreadsheet to administer the screening. The process has slightly improved from the Sixth Monitoring Period, however this process is cumbersome and there are still inefficiencies that could be streamlined to ensure that the screening is reliable and consistent.

*Review of Staff assignment who met the 2 in 5 threshold*

The Monitoring Team reviewed the outcome of the Facilities' assessments of post assignments for the 47 Staff who met the 2 in 5 threshold in the Seventh Monitoring Period. The outcomes were reasonable for the most part with the majority of Staff either reassigned or had previously been reassigned to limited inmate contact through other avenues.

*Conclusion*

The Monitoring Team is encouraged by the Department's improvements in documenting and administering Staff screening to ensure that those with concerning disciplinary histories do not remain in posts with extensive inmate contact. However, the Department has not fully implemented this requirement as the screening process still has only occurred a few times and is not yet on a routine schedule. Further, to the extent that progress has been made, it has been in concert with significant guidance and assistance from the Monitoring Team. This requirement can easily be conducted routinely with the appropriate tracking and processes in place. The Monitoring Team met with the Department and provided recommendations on how to further streamline the screening process to ensure this occurs on a routine basis. The Department will achieve Substantial Compliance with this provision once this process is fully operationalized, the screening occurs on a routine schedule, the screening process is efficient and reliable, and the reviews of assignments consistently demonstrate reasonable outcomes.

| **COMPLIANCE RATING** | ¶ **7.** Partial Compliance |
| --- | --- |

## 10. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The Department's Correction Officer Recruitment Unit ("Recruitment Unit") and Applicant Investigation Unit ("AIU") continued their coordinated effort to identify and select qualified Staff to meet the Department's staffing needs. These units continued to work together to improve the quality and breadth of the candidate pool. As shown in the table below, Academy class sizes have decreased since the Fifth Monitoring Period as the Department's staffing needs have decreased. A total of 5,168 new Officers have graduated from the Training Academy since

the Effective Date, and an additional 415 candidates who matriculated in the Academy in

February 2019 will graduate in June 2019.

| Academy Class Graduation Date | Dec. 2015 | 2016 | 2017 | 2018 | 2019 (projected for June) |
|---|---|---|---|---|---|
| Total | 592 | 1,329 | 2,044 | 1,213 | 415 |
| Breakdown by Class | 592 (Dec. '15) | 618 (May '16) 711 (Nov. '16) | 900 (May '17) 1,144 (Nov. '17) | 815 (June '18) 398 (Dec. '18) | 415 (June '19) |

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department conducted outreach to potential candidates through career fairs and community events, participating in 192 such events during this Monitoring Period, including 42 diversity events.

- The Department continues to maintain a strong social media presence on Facebook, Twitter, Instagram and YouTube, and continues to obtain an adequate number of Department of Citywide Administrative Services ("DCAS") exam filers and takers.

### ANALYSIS OF COMPLIANCE

The Department's success in attracting and training a large number of well-qualified candidates to serve as Correction Officers depends on the success of the Recruitment Unit, which has consistently delivered throughout the pendency of the Consent Judgment. While recruit class sizes are trending downward, maintaining a strong recruitment effort enables the Department to continue selecting the most qualified candidates from the applicant pool.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with

current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- AIU continues to process potential candidates as described in the first four Monitor's Reports, conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards.[135]

- AIU screened 1,974 potential candidates to fill the Academy class that graduated in December 2018. It is important to note that the screening and consideration of some candidates may occur across multiple classes and the outcome of that candidate's selection process is only reflected for the class when the selection decision is finalized:

| ACADEMY GRADUATION DATE | Dec. 2015 | May 2016 | Nov. 2016 | May 2017 | Nov. 2017 | May 2018 | Dec. 2018 |
|---|---|---|---|---|---|---|---|
| **Total number of candidates screened**[136] | 2,222 (100%) | 2,473 (100%) | 2,283 (100%) | 3,441 (100%) | 3,306 (100%) | 3,330 (100%) | 1,974 (100%) |
| **Total number of candidates approved for hire**[137] | 630 (28%) | 665 (27%) | 746 (33%) | 950 (28%) | 1,220 (37%) | 864 (26%) | 440 (22%) |
| **Total number of candidates disqualified based on medical screening** | n/a[138] | | 120 (5%) | 135 (4%) | 177 (5%) | 88 (3%) | 81 (4%) |
| **Total number of candidates disqualified based on Psychological screening** | | | 71 (3%) | 92 (3%) | 183 (5.5%) | 182 (5.5%) | 196 (10%) |
| **Total number of candidates disqualified based on background investigation screening** | | | 42 (2%) | 53 (1.5%) | 6 (<1%) | 101[139] (3%) | 5 (<1%) |

---

[135] *See* First Monitor's Report (at pgs.115-117); Second Monitor's Report (at pgs. 157-159); Third Monitor's Report (at pg. 244), and Fourth Monitor's Report at (at pgs. 192-196).

[136] Many candidates are neither recommended nor disqualified, and fall into other categories such as the candidate declined to continue with the hiring process, withdrew from certification, etc.

[137] Not all candidates approved for hire will become Correction Officers. Some will decline the offer and others may not complete Academy training.

[138] The Department only began tracking the specific reason a candidate was disqualified (i.e. due to medical, psychological screening, background investigation) with the candidates screened for the class that graduated in November 2016. Previously the Department tracked the number of candidates who were disqualified for any reason.

[139] The perceived spike in disqualified candidates for this class was merely the finalization of the screening process for candidates who had been pending across many classes and ultimately officially disqualified in mid-2017.

- At the end of the Sixth Monitoring Period, AIU promulgated policies relating to Third-Party Employment Verifications and Field Team Visits as recommended by the Monitoring Team.

- During the Seventh Monitoring Period, AIU finalized a comprehensive draft of the AIU Investigator Manual, which includes the policies noted above, in addition to specific guidance for investigators on which tools to use in conducting background investigations and how to assess the information gathered from those tools and sources.

- AIU refers some new hires to ID for additional monitoring during their probationary period if their background raises potential concerns about their suitability for the position but does not rise to the level that they are disqualified from being hired. These Staff are then monitored by ID during their probationary period. ID's practices relating to monitoring of Staff are governed by the "Internal Monitoring of Staff" Policy.

**ANALYSIS OF COMPLIANCE**

*Assessment of Background Investigations (¶ 3)*

As done previously, the Monitoring Team audited a sample of AIU's background investigations of candidates (n=45; or 10%) who were selected for the class that graduated in December 2018. Overall, the files were consistent with prior reviews in terms of demonstrating that appropriate investigatory tools were used.[140] The audit did not identify any candidates recommended for hire who met any of the AIU disqualifiers. However, some candidates were recommended for hire despite certain red flags (*i.e.*, suspicious tattoos; minor level of inmate contact; other issues noted by the investigators; or other outstanding items in their file). These candidates (n=6, or 13% of the 45 files audited) were recommended for ID Monitoring.

To verify the ID Monitoring process, the Monitoring Team requested and reviewed the entire list of candidates that were recommended for ID Monitoring from the class who entered the Academy in July 2018. The Monitoring Team found that AIU had developed a list of Staff requiring monitoring, but there was a clerical error that resulted in a delay in AIU sharing this information with ID until raised by the Monitoring Team. The Monitoring Team will monitor this area going forward to ensure that AIU consistently and timely provides ID with the necessary information for Staff recommended for monitoring.

Regarding the background investigations, similar to previous reviews, in the sample of files reviewed this Monitoring Period, the Monitoring Team found that many files did not have any Third-

---

[140] The background investigation files clearly demonstrated that AIU reviewed and summarized in the case review sheet each candidate's criminal history, employment history, relationships or affiliation with gangs, relationships with current inmates, frequency of appearance in the inmate visitor logs, medical screening (including drug tests), presence on state or local child abuse registries (Family Watchdog and WEBCRIMS), prior employment references, and financial history including credit checks.

Party Employment Verifications, including from the candidates' current employer. These candidates were selected prior to AIU promulgating its Third-Party Employment Verification Policy. Going forward, AIU leadership has confirmed that the candidate selection files completed after the promulgation of the policy will comport with the new Third-Party Employment Verification and Field Visit Policies.

In addition to the above audit, the Monitoring Team took a new approach this Monitoring Period in assessing background investigation files by selecting certain files for a specific reason (*i.e.*, not randomly) to determine whether the background investigation neglected to act on any obvious warning signs. The Monitoring Team reviewed the background investigation files for the 22 Staff who were terminated prior to the completion of their probationary period, since the Effective Date, for UOF-related misconduct to determine if any red flags were missed or if there were other notable patterns in these files. Of the 22 files reviewed, a few candidates had some potential warning signs (*e.g.*, misdemeanor arrest or concerning score on integrity portion of psychology test), but none rose to the level that the candidate met the Department's disqualifiers. Further, the background investigation conducted provided a reasonable basis for the Department to hire the candidate (*e.g.*, the arrest was a long time ago, subsequent work history suggested the candidate was reliable, etc.) Thus, it appears that investigators' initial decision-making was appropriate for these individuals, despite the fact that their employment with DOC was later terminated.

*Comprehensive Objective Process for Selection and Hiring* (¶ 2)

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report.

This Monitoring Period, AIU's full-time policy writer completed a draft AIU Investigator Manual, researching best practices from around the country, and working with supervisors within different divisions of AIU (Agility, Psychological, Medical, etc.) to develop guidelines for conducting each element of the selection process. AIU engaged in bi-monthly status reports with the Monitoring Team and provided the draft to the Monitoring Team for review and feedback. The Monitoring Team will work with AIU during the Eighth Monitoring Period to finalize the manual and ensure it sufficiently outlines all aspects of the Department's objective process for selecting and hiring Staff.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
| --- | --- |

## 11. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident. The larger purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team's assessment of compliance is outlined below.

### XIV. ARREST OF INMATES (¶ 1)

¶ 1. The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The two policies governing the Department's processes for arresting inmates are CLO 04/15 and Operations Order 52/89. The Department is in the process of revising these policies to ensure they reflect current practice.

- The Department's Criminal Investigation Bureau ("CIB") is responsible for arresting inmates as well as for tracking and maintaining evidence, arrest packages and arrest data

- The Department arrested 546 inmates in 2018 and reported the reasons for arrest in the chart below.



2018 Arrest of Inmates by Reason

185

ANALYSIS OF COMPLIANCE

The Monitoring Team began to assess this provision during the Seventh Monitoring Period. As an initial step, the Monitoring Team reviewed the relevant policies governing the arrest of inmates and found that the current policies did not accurately reflect the Department's current practice. Accordingly, the Monitoring Team recommended the Department evaluate and revise its policies to ensure consistency. The Department reported both policies remain under review by CIB and the Policy and Procedures Unit. The Monitoring Team has had to prod the Department to move this review forward as the Department's assessment of these policies has languished and taken longer than seems reasonable. The Department subsequently provided a specific date in the Eighth Monitoring Period that a draft will be provided to ensure that this moves forward. The Monitoring Team will continue to work with the Department to ensure an accurate policy is developed and eventually implemented.

In this Monitoring Period, the Monitoring Team gathered data on the arrest of inmates to identify the number of inmate arrests that occurred in 2018 and how the Monitoring Team can best identify arrests that have been made in connection with a UOF Incident. Of the 546 arrests in 2018, 188 have an associated UOF number. However, the Monitoring Team must conduct an additional assessment to better understand the association between a UOF number and the corresponding arrest. Accordingly, during the Eighth Monitoring Period, the Monitoring Team intends to review a sample of inmate arrest packages related to use of force to ensure the recommendations are based on probable cause.

| Compliance Rating | ¶ 1. Not Yet Rated |
|---|---|

## 12. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. The Department's leadership, in particular, the Commissioner and Chief of Department, have continued to make compliance with the *Nunez* Consent Judgment a top priority. Successful implementation of the over 300 provisions of the Consent Judgment requires significant involvement and buy-in from all divisions of the Department. During this Monitoring Period, managing compliance with the *Nunez* Consent Judgment continued to be jointly led by the Complex Litigation Unit ("CLU") and the *Nunez* Compliance Unit ("NCU"). The Department has maintained an active and engaged relationship with the Monitoring Team, which

continues to demonstrate the Department's commitment to achieving and sustaining reform. The CLU and NCU continue to work directly with a broad range of staff on a daily basis and spearhead many of the problem-solving initiatives when there are obstacles to compliance.

The NCU manages most of the quality assurance programs and problem-solving efforts. NCU's Assistant Commissioner was appointed just before the start of this Monitoring Period and has demonstrated strong leadership of the division. The division frequently collaborates with the Monitoring Team and is a valuable resource to both the Monitoring Team and the Department. NCU has devised solid QA programs and reporting mechanisms to support the Department's efforts to assess, and ultimately achieve, compliance with some of the requirements of the Consent Judgment. The Division's productivity has accelerated, and the quality of the work product has improved. As methodologies are solidified, NCU pushes the processes into the Facilities to develop sustainable processes to improve practice. That said, given the enormity of the task of shaping practice, measuring performance, and demonstrating compliance, additional NCU staff will be necessary as NCU only currently audits a portion of the provisions from the Consent Judgment.

CLU manages the Monitoring Team's document and data requests and drives various policy initiatives to address the findings of, and recommendations from, the Monitoring Team. CLU regularly checks with the Monitoring Team to ensure Department practice is consistent with the Consent Judgment and best practice. The Department's staff in CLU are hardworking, smart, conscientious, dependable and provide invaluable assistance to the Department and the Monitoring Team. The CLU has provided a valuable foundation upon which the Department can implement essential changes to practice.

The Department simply is failing to achieve compliance with the core goals of the

Consent Judgment. Accordingly, the Department is at a critical juncture in operationalizing and implementing the *Nunez* requirements, and a shift in the approach from the Department, and the Monitoring Team, is necessary. While the CLU and NCU are valuable resources, those divisions cannot operationalize the various reforms as they are neither responsible for nor have control of the Divisions that must actually implement the core use of force-related initiatives. In particular, the overreliance on CLU is not sustainable and will prolong the Department's ability to achieve Substantial Compliance. The uniform Staff managing the jails and the Divisions tasked with specific *Nunez* requirements must take greater ownership of both the problems and the path forward, which experience suggests is where the culture change will take hold. The Monitoring Team has observed progress and sustainability when those tasked with operationalizing the requirements are also responsible for demonstrating compliance. For example, the leaders of ID &Trials have a strong command of the *Nunez* requirements, a willingness to think creatively about how to address particular issues and are therefore driven to implement sustainable practices that are expected to ultimately achieve compliance with the *Nunez* requirements.

Accordingly, the Monitoring Team recommended after the close of the Monitoring Period that the Department modify its compliance management structure to minimize the reliance on CLU to manage compliance and ensure greater engagement, transparency, and accountability with the uniformed Staff and the various divisions tasked with implementing the *Nunez* reforms. The initial focus of this transition will be with the uniformed leadership and the Training Division (discussed in more detail in that section of this report). Given the enormity of the task, this shift will take careful planning and balance to ensure a common and accurate understanding of the *Nunez* requirements while also ensuring individual accountability and ownership for operationalizing particular provisions. The Monitoring Team intends to work

closely with the Department on this initiative during the next Monitoring Period.

The Monitoring Team's assessment of compliance is outlined below.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[141]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- An extensive Excel chart cross-referencing each provision of the Consent Judgment to the relevant policies was developed collaboratively with the Monitoring Team.

- Throughout the duration of the Consent Judgment, the Department revised a number of policies and procedures to conform to *Nunez* requirements.

- The Department developed and implemented Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance, and routine review of Department policies.

- The Department completed its review of over 200 Directives and corresponding procedures and over 300 Operations Orders to identify the subset that is related to the Consent Judgment and to determine whether any revisions are necessary or whether new policies need to be developed.

- The Department has completed most of the necessary revisions to Directives and Operations Orders and has developed all new Directives and Operations Orders identified by the review.

- The NCU and the Chief of Department's office identified over 800 Command Level Orders ("CLO") that need to be reviewed to determine whether any revisions are necessary.

### ANALYSIS

The Department continued to evaluate and revise policies, procedures, and trainings to ensure they are consistent with the requirements in the Consent Judgment and with each other. The review identified that, in general, the Department's policies are consistent with the Consent Judgment and only required minor revisions, most of which have been completed. One outstanding item the Department must address is revising CLOs. Given the other priorities in this Monitoring Period, the Department has only started on this process in earnest by sharing a draft proposal on how to manage CLOs going forward with the Monitoring Team. The Monitoring Team has shared some feedback, but further

---

[141] The Monitor approved an extension of this deadline to January 31, 2018.

discussions are required. The Department reports it intends to consult with the Monitoring Team in the next Monitoring Period on how to manage this process to revise CLOs.

Given the evolving nature of the reform efforts, it is expected that policies and procedures will continue to be revised and updated to ensure they comport with current practice and are consistent with one another. Therefore, the policies and procedures necessary to effectuate the Consent Judgment continue to evolve.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|
| | ¶ 2. Partial Compliance |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Assistant Commissioner of Quality Assurance and Deputy General Counsel share the responsibilities of the Compliance Coordinator.[142]
- The CLU and NCU provided the Monitoring Team with responses to over 340 requests for information and over 80 memos containing recommendations from the Monitoring Team. Many of these were complex and required significant collaboration between the Department and the Monitoring Team to address. The CLU also produced over 380 use of force files (such as Preliminary Reviews, Facility investigations, and Full ID Investigations), PREA files, and Trials closing memos. The CLU and NCU also produced over 80 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.
- During the Monitoring Period, the CLU scheduled and/or facilitated frequent meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC staff members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners and also facilitated site visits to all of the Facilities.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team communicates daily (and often multiple times a day) with the Compliance Coordinators, members of the CLU and NCU teams, as well as other members of the

---

[142] The role of the Compliance Coordinator was filled by two different people in this Monitoring Period. The first Compliance Coordinator was promoted to Deputy General Counsel and replaced by another Assistant General Counsel. The replacement Compliance Coordinator was subsequently also promoted to another position. Therefore, the original Compliance Coordinator re-assumed this responsibility towards the end of the Monitoring Period.

Department. As described above, the Department's staff in CLU and NCU are hardworking, smart, conscientious, responsive and provide tremendous assistance to the Monitoring Team. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform. While the Monitoring Team recommends a shift away from relying on CLU and NCU to support the _implementation_ of reforms, CLU and NCU continue to provide invaluable assistance in _coordinating_ compliance with this Consent Judgment.

| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance |
|---|---|

## TRANSFER AND MANAGEMENT OF 16- AND 17-YEAR-OLD YOUTH

By October 1, 2018, all 16- and 17-year-old youth housed at RNDC were transferred to Horizon ("HOJC") in order to comply with the State's Raise the Age ("RTA") law, which requires a shift to a more developmentally-appropriate philosophy for managing youth by focusing on skill development and treatment, providing opportunities for engagement in a broad range of programming and managing behavior using a system of engaging incentives and effective sanctions.[143] RTA also requires the Staff's response to crises to reflect generally accepted UOF practices in juvenile justice, which rely on safe, physical interventions and team tactics and which prohibit the use of chemical agents.[144] HOJC is jointly operated by the Department, which is responsible for supervision, movement, and Facility safety and security, and the Administration of Children's Services ("ACS"), which is responsible for providing programming, case management and other types of support (*e.g.*, food services, barbershop, building maintenance, laundry, etc.).

As detailed in the Sixth Monitor's Report (at pgs.147-157), the Monitoring Team had significant concerns that the Facility's operation would be compromised by various delays in planning for critical tasks, presenting a risk of harm to both youth and Staff. Throughout the final three months of the current Monitoring Period, the Facility still experienced a high level of disorder and violence, and while the level of crisis receded somewhat since opening day, both

---

[143] The Nunez Consent Judgment also required that "[t]he Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site")." § XVII., ¶ 1.

[144] The Monitoring Team originally advocated for a time-limited expansion of the State's waiver which allowed HOJC to utilize OC spray to address high-levels of violence. However, the strategy was not implemented for a number of reasons and thus the Monitoring Team focused its efforts on supporting Staff's acquisition of physical intervention skills taught in SCM and a range of violence prevention strategies.

the Department and ACS continue to have much work to do to ensure safe conditions at HOJC. Progress to date, along with recommendations for the path forward, are detailed in the following section of this report. Given the short tenure at the new Facility (only three months at the close of the Monitoring Period), compliance ratings for the provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19) and Consent Judgment § XVI (Inmate Discipline) related to 16- and 17-year-old youth were not assessed by the Monitoring Team. The first compliance ratings regarding the applicable provisions for 16- and 17-year-old youth in those two sections will be assessed for the Eighth Monitoring Period. As an initial step in monitoring compliance with the Consent Judgment at HOJC, this section discusses the levels of violence and UOF, and provides a description of the current status of a subset of key provisions most closely related to violence and use of force.

Given the physical separation and different Facility management structure for 16- and 17-year-olds and 18-year-olds (who remain on Rikers Island), the Monitor's Report will now have two separate sections organized by age group. Provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), § XVII (Housing Plan for Inmates Under the Age of 18) will be addressed depending on the applicability of the provision to each age group. A small group of provisions in §§ XV and XVI are addressed in other sections of this report (*e.g.*, § XV, ¶¶ 10, 11 camera coverage in facilities housing Young Inmates is addressed in the Video Surveillance section of this Report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Inmates is addressed in the Use of Force Investigation section of this report).

While the Facility has many immediate and long-term challenges, discussed in detail below, it is important to recognize the short-term accomplishments of both agencies. DOC

transferred approximately 100 youth to a new Facility without incident; staffs the Facility at levels far beyond what is required by the Consent Judgment; completed the development of a valid classification instrument for adolescents; has full video coverage; and has made solid strides in collaborating with ACS. For its part, ACS has allocated resources to Program Counselors, Case Managers and their supervisors; engaged an extensive array of community partners to deliver programming; developed a behavior management program that mirrors best-practice; and also has made solid strides in collaborating with DOC. All of these things are necessary components of a safe Facility, but as described below, much work remains.

*Rate of Use of Force and Violence*

As shown in the table and graph below, the <u>rate of Use of Force</u> among 16- and 17-year-olds increased drastically throughout the Monitoring Period, both in the period prior to moving to HOJC (July-September 2018) and in the immediate aftermath (October-December 2018; to the right of the red line in the graph).

| Average Rates of Use of Force, 16/17-year-olds at RNDC | | | | | | | HOJC |
|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Sept 2018 | Oct-Dec 2018 |
| **16/17-year-olds** | 24.8 | 31.7 | 16.5 | 26.0 | 38.4 | **50.3** | **73.4** |



The table and graph above show the use of force rate from 2016 through 2018. The UOF levels in 2016 through early 2018 parallel the conditions that brought rise to the Consent Judgement in the first place. Alarmingly, the rates witnessed throughout the current Monitoring Period exceeded even those levels, with rates two to three times higher than previously witnessed.

While, in part, the increase in the use of force is related to the level of violence and other types of disorder among youth, discussed in detail below, the frequency with which Staff resort to using force is also related to their skill in verbal de-escalation, managing interpersonal conflict, and using rapport and incentives to encourage positive behavior. Given the compressed timeline for Staff training (discussed in the previous Monitor's Report at pgs. 148-149 and pgs. 156-157), Staff had little time to practice or master these skills as taught in Safe Crisis Management ("SCM") training. Furthermore, after much debate, the use of OC spray is prohibited at HOJC, and thus Staff were also required to respond to crises in ways that had

previously not been part of their repertoire. The Monitoring Team's close review of incidents at HOJC indicated that, while "textbook" SCM techniques are not always used, Staff generally found safe alternatives for responding to disorder, including incidents involving multiple youth and stark aggression.

As shown in both the table and graph below, the rate of violence among 16- and 17-year-olds also hit a record high during the current Monitoring Period. While the rate of violence among adolescents had been trending upward for the past two years, the increase accelerated just prior to and just after the transition to HOJC. In addition to the limitations associated with the compressed timeline for Staff training discussed above, several key tools were not yet in place when HOJC opened its doors. Most critically, the behavior management program was not fully prepared, forcing HOJC to implement a modified version of it that is significantly weaker in both design and effectiveness. In fact, during the first few weeks of operation, youth were not held accountable for their violent misconduct in any way, and because the population has remained a bit higher than originally projected, HOJC has not had the ability to make strategic housing transfers to separate youth as it has done in the past. All of this set a dangerous tone at the Facility, one in which disorder flourished, and in which Staff had to redouble their efforts to exercise control over the daily operation so that school and other programming could be provided as scheduled. The interference in the delivery of these key programs led to an excess of unstructured, idle time among the youth and further amplified the various risks to safety. While the level of violence decreased somewhat in December 2018, it remains at a level that continues to seriously concern the Monitoring Team.

| Average Rates of Youth-on-Youth Violence, 16/17-year-olds at RNDC | | | | | | | HOJC |
|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Sept 2018 | Oct-Dec 2018 |
| 16/17-year-olds | 27.4 | 35.9 | 26.5 | 29.4 | 34.6 | 45.2 | 45.5 |



In short, the initial phase of operation at HOJC was marked by extreme levels of violence and UOF and a relative absence of many of the critical tools needed to safely manage a detention Facility. Once the Facility opened, both the Department and ACS responded to the high levels of violence by working diligently to implement several of the tools that were not yet available on opening day (*e.g.*, incentives to encourage positive behavior; sanctions for misconduct; augmenting SCM training), all of which are discussed below. That said, the Department and ACS need to accelerate their progress with the various reforms so that overall rates of violence and UOF show a sustained, significant downward trend. The Monitoring Team remains committed to providing any technical assistance that would benefit the Department's and ACS'

197

efforts to build the necessary foundation for a safe Facility that promotes positive youth outcomes.

*Policy Development*

The Consent Judgment includes several provisions that require the Monitor's approval and/or consultation of policies related to the use of force and efforts to address youth violence. The Monitoring Team reviewed (1) the Safe Crisis Intervention Policy, (2) Rapid Response Team, (3) Mechanical Restraints, (4) Supervision of Youth in Specialized Juvenile Detention, (5) Room Confinement, (6) Contraband, (7) Behavior Management (*i.e.*, positive incentives) to assess the extent to which they reflected the Consent Judgment requirements.

*Current Status of Key Provisions Related to Violence and UOF*

While the Consent Judgment requires many reforms related to youth violence and the UOF, some are likely to have a bigger impact on safe outcomes than others, and thus were prioritized. These are described in detail, below.

- **Staffing and Training.**

The Consent Judgment requires the Department to provide sufficient numbers of Staff trained in key areas, including the use of force and de-escalation tools appropriate for use with adolescents.[145] Safe Crisis Management ("SCM"), a curriculum that is used in juvenile detention facilities throughout the country, meets both of these requirements. While the majority of Staff have received initial SCM training, the Monitoring Team has observed (via Genetec footage review) that Staff have not yet developed skills in using the various team tactics and effectively containing youth-on-youth fights so that they do not escalate to group disturbances. The Department re-engaged SCM trainers to assist Staff in developing these critical skills. Beginning

---

[145] *See* Consent Judgment § XIII (Training) ¶ 3.

in the Eighth Monitoring Period, JKM will be on site monthly for six months to provide SCM reinforcement training. During these sessions, JKM trainers will review videotaped footage of UOF incidents with trainees and will discuss ways to improve Staff's response and use of SCM techniques.

The Consent Judgment also requires a specific Staff ratio (15:1 during waking hours and 30:1 overnight) and limits the maximum size of housing units to 15 youth.[146] State regulations for the Facility require a ratio of 1:6 (waking) and 1:12 (overnight), and thus the Facility's schedule supports the number of Staff needed to satisfy the Consent Judgment. HOJC's physical plant does not include units larger than 15 youth, which is aligned with the requirements of the Consent Judgment.

Finally, the Consent Judgment has requirements about the Staff qualifications, incentives for Staff to work with youth,[147] distributing probationary Staff so that they are assigned to units along with veteran Staff and consistently assigning the same Staff to units/tours.[148] These provisions will be audited in detail for the Eighth Monitor's Report.

- **Behavior Management Program**.

The Consent Judgment requires the Department to reward and incentivize positive behaviors and to discipline youth in a manner that does not compromise safety and is consistent with treatment needs and provides access to mandated services.[149]As noted in the analysis of

---

[146] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶16 (a).

[147] Incentives included a salary increase, adequate locker room, staff lounge and parking passes. As of October 1, 2018, the Department appears to be in Substantial Compliance with this provision.

[148] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶13, 14, 17, 18.

[149] *See* Consent Judgment § XVI (Inmate Discipline) ¶3 and 4. Further, the Consent Judgment § XVI (Inmate Discipline) ¶2 prohibits the use of Punitive Segregation with youth under age 18. The Department abolished this practice in December 2014 and has been in Substantial Compliance since the Effective Date of the Consent Judgment.

factors contributing to high levels of violence above, the intended individual-level behavior management program (STRIVE+) was not yet fully developed when HOJC first opened. As an interim measure, the Facility implemented a modified version of the program (STRIVE Community) which assesses and incentivizes behavior at the unit-level. While it is positive that the Facility implemented an interim strategy, group behavior management programs are generally less effective than individually-based programs in shaping youth's behavior and reducing violence, and thus the Monitoring Team fully supports the transition to STRIVE+.

In STRIVE Community, by design, if youth on the unit do not engage in negative behavior and attend school, the unit earns access to an array of rewards, including extra phone calls, snacks and activities and a meal from McDonalds. Youth who do not meet these expectations should be excluded from the bonus activities. During STRIVE Community's initial implementation, the delivery of rewards was not always synchronized with the youth's behavior (*i.e.*, rewards were occasionally provided to youth who engaged in violent behavior and/or provided to the unit even when all youth did not attend school). Further, the system for rating the youth's behavior initially needed to be fortified (*i.e.*, *both* waking-hours tours needed input into the ratings, and rating forms needed to be submitted consistently by DOC staff). The system for responding promptly to violent misconduct suffered from a lack of individualization (*i.e.*, youth received the same sanction—denial of access to the group's rewards—regardless of the severity and frequency of their misconduct) and a lack of consistency (*i.e.*, the various methods for tracking misconduct were not synchronized resulting in conflicting information). These problems were largely addressed during the first couple months of the program's operation and speak to the developing, functional collaboration between DOC and ACS.

This collaboration is clearly apparent in the way in which youth are consulted about their negative behavior and the consequences for it. Together, DOC and ACS staff meet with the youth to discuss the behavior and its consequences and then summarize the conversation in a jointly-signed letter to the youth. The Monitoring Team has long encouraged a similar practice with the Stamp Cards used on Rikers Island and is particularly pleased about HOJC staff's commitment to providing behavioral feedback and elevating the youth's voice in this way.

While the Monitoring Team discussed the variety of problems noted above with DOC and ACS staff, the Monitoring Team's requests for modification were tempered by the fact that the Facility is on the cusp of implementing a new, better, individually-derived behavior management program. The Monitoring Team, DOC and ACS did not want to compromise the integrity of the planning process for the new program by diverting time and energy to fix a program that is soon to be obsolete. The Monitoring Team's experience in other jurisdictions has demonstrated how essential proper preparation and training are to the ultimate success of a behavior management program and thus the Monitoring Team has been supportive of—and tried not to interfere with— the integrity of the STRIVE+ work plan, as discussed below.

STRIVE+ will replace STRIVE Community during the Eighth Monitoring Period. ACS contracted with a highly-regarded behavior management consultant to design the program and developed a robust work plan for user-testing and associated revisions to the program design; creating the training curriculum; crafting a training schedule for DOC, ACS and DOE staff; and an implementation timeline. STRIVE+ closely mirrors one of the best evidence-based programs for managing adolescents' behavior in the country and the Monitoring Team fully expects that once fully implemented, it will exert a positive influence on the Facility's level of disorder.

Under STRIVE+, youth will earn points throughout the day for meeting behavior expectations and will advance to higher levels with sustained positive performance. Higher levels are associated with a broader array of incentives (*e.g.*, enriched activities, special programs, additional phone calls, higher commissary limits, etc.). This phased incentive system also provides opportunities to sanction misconduct in ways that meet the Consent Judgment's requirements for consistency with treatment needs and continued access to mandated services. Depending on the severity of the misconduct, youth will lose access to individual incentives or will be demoted to lower levels that have fewer rewards and comforts. These sanctions will also be accompanied by a restorative activity in which the youth must take action to repair the harm to other youth or staff who were victimized. ACS is also developing a strategy for a weekly multi-disciplinary team meeting to design and monitor individualized, intensive intervention plans for youth with chronic aggressive behaviors. In total, STRIVE+ is a superior program to what had been implemented for these youth at RNDC.

Though it is stronger, it is also significantly more complex. The Monitoring Team's experience with similar programs in other jurisdictions suggests that solid implementation typically requires many months, necessitates constant oversight of Staff's use of the program and analysis to assess whether program objectives are being attained, and often compels re-training to refine staff's application of the program. While this timeline may be frustrating in the short term, the long-term objective of providing a safe Facility for youth and staff requires a certain level of analysis and patience.

- **Programming**.

ACS is responsible for coordinating programming delivered by its Program Counselors and its wide variety of community partners. The vision is for all youth to have at least three

hours of diverse programming after school and on weekends. Currently, eight Program Counselors coordinate programming across the Facility's 10 housing units and are supported by a Director of Programs, Program Supervisor, Recreation Supervisor, Chaplain, and Behavior Management Coordinator. ACS reported its intention to hire 15 more Program Counselors and three additional supervisors to better support the program and to ensure the expected volume of programming is delivered, particularly on weekends. The efforts of the Program Counselors are supplemented by a cadre of Case Managers who provide services largely outside of the requirements of the Consent Judgment but are nonetheless valuable to the goals of reducing idle time and facilitating positive outcomes.

During the current Monitoring Period, the Monitoring Team took initial steps to ensure that data on the volume and type of programming would be available for the Eighth Monitoring Period, when compliance ratings will be assessed.[150] ACS developed a tracking form and provided the Monitoring Team with data from December 2018 to assess whether the tracking form was practical and the current status of program delivery. The analysis revealed that expected volume of programming is not being met, though it is unclear at this point whether the problem is one of documentation or practice. Potential modifications to the tracking process or to the expectations for Program Counselors will be discussed with ACS early in the Eighth Monitoring Period.

- **Room Confinement**.

A short period of room confinement following a violent incident or use of force is often necessary to allow youth to regain control and process the event with Staff, and for Staff to re-engage the uninvolved youth in a structured activity and regain operational control of the area.

---

[150] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶5.

As such, the Monitoring Team supports the appropriate use of room confinement for the purpose of de-escalation, meaning that it is used only when the youth presents an immediate risk of harm and less restrictive measures to help the youth regain control have not been effective and/or when needed for staff to regain operational control of the unit. When a youth is placed in confinement, the duration should last only as long as the youth continues to present an immediate risk of harm and multiple protections (e.g., safety checks, opportunities to process the event with a variety of staff, procedures for authorizing extensions to the initial period) must be in place to ensure youth do not languish in confinement. This is different from room confinement that is used as a disciplinary sanction, a practice that is not supported by either the Monitoring Team, the Consent Judgment, or State regulations. As noted above, DOC drafted a Room Confinement policy that describes its use for the purpose of de-escalation and that addresses both State regulations and the requirements of the Consent Judgment.[151]

The Monitoring Team attempted to assess practices related to room confinement during the early phase of HOJC's operation. As discussed above, since HOJC opened, the level of disorder has been high and thus strategies to ensure that tensions have dissipated and to give Staff an opportunity to regain control of the environment are essential. The use of Room Confinement is a new practice for most HOJC staff (at RNDC, the use of Satellite Intake for this purpose was fairly sporadic and short-lived). This novelty may explain the challenges observed in its implementation to date. Although there was some evidence that youth were placed in their rooms during the first couple months of HOJC's operation, the required documentation was either not completed at all or did not include most of the structures required by policy. The Monitoring Team discussed these concerns with DOC Staff and provided a written summary of

---

[151] *See* Consent Judgment § XVI (Inmate Discipline) ¶10.

policy requirements and the intended auditing strategy in order to clarify expectations. Room confinement data will be analyzed throughout the Eighth Monitoring Period to assess the extent to which protections surrounding the duration and assessment of the youth's readiness for release are being addressed.

- **Protective Custody.**

The size of the population transferred from RNDC and the higher-than-expected number of new admissions to HOJC has constrained DOC's ability to operate the assortment of Special Units (*e.g.*, TRU and SCHU, Protective Custody) that were utilized at RNDC. As a result, the existing DOC process for Protective Custody (*i.e.*, a specialized unit with formalized admission, review and removal procedures) has not been implemented at HOJC. It is worth noting that most juvenile detention and correctional facilities do *not* utilize a specialized unit for this purpose. Instead, juvenile facilities tend to implement a variety of procedural protections for youth who are deemed particularly vulnerable to harm from other youth. The Monitoring Team has discussed various procedural options with DOC and has encouraged the selection of a strategy that is both operationally feasible and that addresses the obligation to address youth's needs for protection from harm at the hands of other youth.[152] Implementing the option selected by the Department and the development of required procedures will be prioritized during the Eighth Monitoring Period.

- **Classification**.

The development of a valid classification instrument for adolescents was underway prior to the transfer from RNDC to HOJC.[153] The Department contracted with a well-respected

---

[152] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶7.

[153] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶4.

consultant to design and validate initial and reclassification instrument, which were completed shortly after HOJC opened. The Monitoring Team had the opportunity to discuss the various features of the tool's construction, validation and scoring rubric with DOC's consultant. The instrument is valid for the target population, reflects a sound methodology and adeptly engages the DOC, ACS and mental health staff who need to provide input into the scoring of the variety of risk factors. While the HOJC population was scored retroactively and new admissions are now scored upon admission, the Department has yet to develop a housing and supervision strategy that leverages this knowledge about the youth's risk of institutional misconduct. The Monitoring Team recommended that the DOC consider various ways that supervision could be differentiated for low- and high-risk youth (*e.g.*, how line movement occurs, whether assigned seating is used, whether youth can recreate as a large group or must be separated into smaller groups for easier management, etc.). The Department was also reminded that the Consent Judgment requires low- and high-risk youth to be housed separately, though medium-risk youth may be housed with either group.[154] During the Eighth Monitoring Period, the Monitoring Team will audit the accuracy of the classification forms and the practices surrounding overrides and will examine housing and supervision practices.

**13. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)**

Although the Monitoring Team has not made compliance assessments for most of the provisions that apply to 16- and 17-year-olds for the reasons stated in the introduction to this section, the Consent Judgment § XVII "Housing Plan for Inmates Under the Age of 18" required the Department to make best efforts to move these youth to an alternative site. Clearly, this requirement has been met, and thus compliance with the provision is rated below.

---

[154] *See* Consent Judgment § XV (Safety & Supervision of Young Inmates) ¶8.

| **XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3** |
|---|
| ¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.<br><br>¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The City moved all the 16- and 17-year-olds off Rikers Island to Horizon Juvenile Center. The Facility is jointly operated by the Department and ACS.

**ANALYSIS OF COMPLIANCE**

As described in the previous section, the Department transferred 16- and 17-year-old youth to Horizon Juvenile Center (HOJC), an alternative housing site, off of Rikers Island. While the initial phase of operation has suffered from high levels of disorder, over the long term, once practices and operations fulfill the mandate of Raise the Age, the philosophical shift and physical transfer will absolutely be in the youth's best interest. The Monitoring Team is pleased that the State and City made this monumental change.

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **3.** Not Currently Applicable |
|---|---|

207

# CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

As noted in the previous section detailing the status of HOJC, the Monitor's Report discusses the status of Young Inmates in two separate sections. This section describes the status of provisions related to 18-year-old youth. These youth remain housed on Rikers Island with the vast majority of males housed at RNDC and all female 18-year-olds housed at RMSC. Sentenced 18-year-old males are housed at EMTC; those who require the mental health services available via CAPS and PACE are housed at AMKC; and some males are housed either in ESH at OBCC or Secure at GRVC. RNDC was in a massive state of flux throughout the current Monitoring Period. At the end of June 2018, the Department closed GMDC and transferred most male 18-year-olds to RNDC. Shortly thereafter (October 1, 2018), all 16- and 17-year-old youth were transferred from RNDC to Horizon (HOJC). The Monitoring Team's concerns about the initial transition from GMDC to RNDC were discussed in the Sixth Monitor's Report (at pgs.145-146).

## Rate of Use of Force and Violence for 18-Year-Olds

As shown in the table and graph below, the Use of Force rate among 18-year-olds skyrocketed during the current Monitoring Period. The Monitoring Team has been extremely concerned about the state of affairs at RNDC, in particular, both because it houses the vast majority of 18-year-olds and because its UOF rates are significantly higher than the other Facilities. The current six-month average use of force rate is roughly 3.5 times higher than the previous six-month average. Certainly, some of the uses of force are attributed to the youth's violent and threatening behaviors which is discussed in more detail below. However, the frequency with which Staff resort to using force is also related to Staff's skills in verbal de-escalation, managing interpersonal conflict, and using rapport and incentives to encourage positive behavior. These skills are central to a Direct Supervision model, which as described in ¶

12 below, has not yet been implemented in a meaningful way. The Monitoring Team is hopeful

that once all Staff are trained and their aptitude with these essential skills improves, and once the

programming enhancements discussed below are in place, the Facility's level of disorder should

decrease and Staff should resort less often to using force to manage the population.

| Average UOF Rate, 18-year-olds | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | **Jul-Dec 2018** | 36 Month Average |
| **18-year-olds** | 17.4 | 21.7 | 20.7 | 14.3 | 16.1 | **56.7** | 24.5 |



As shown in both the table and graph below, the <u>rate of violence</u> among 18-year-olds also

hit a record high during the current Monitoring Period, completely reversing the downward trend

noted in the previous Monitor's Report. The average rate of violence more than doubled

compared to the previous six-month period. Much of the violence may be attributed to

disruption, stress and uncertainty caused by the closure of GMDC and subsequent transfer to

RNDC. However, the Department's management of the transition and the fact that many of the

assets known to have contributed to previous reductions were not in place when the 18-year-olds arrived at RNDC—most notably the programming spaces in the PEACE and YES Centers— suggest that at least some of the increase in violence may have been preventable with advanced planning and/or a more extended timeline for closure and transition. Further, the protocol for Staff transfers (*i.e.*, based on seniority) and the number of promotions and Staff departures resulted in a large proportion of new/probationary Staff being assigned to RNDC to work with this challenging population. Furthermore, the Department did not have a full complement of Program Counselors for much of the Monitoring Period and has not steadied up its Staff, both of which likely contributed to the instability.

| Average Rates of Youth-on-Youth Violence, 18-year-olds | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | 36-month Average |
| 18-year-olds | 21.6 | 31.0 | 25.6 | 22.7 | 21.3 | 48.3 | 28.4 |



The Monitoring Team has repeatedly encouraged the Department to develop a more robust and effective continuum of disciplinary responses to youth misconduct, beyond the use of the deep-end sanctions available through SCHU/TRU/Secure/ESH. As discussed in more detail below, the Department now has a concept for a Graduated Sanctions program, but the status quo persisted throughout the entire Seventh Monitoring Period. An excess of idle time, lack of meaningful incentives for positive behavior, and a lack of effective sanctions for more episodic and less serious violence predictably created an environment marked by disorder and a persistent lack of safety for both youth and Staff.

As discussed in detail in the following sections of this report, the interplay between the reforms required under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19) and Consent Judgment § XVI (Inmate Discipline) has real power to impact both the rates of youth-on-youth violence and use of force. The Department has maintained solid performance in some areas (*e.g.*, Protective Custody, separating high- and low-custody youth, maintaining required Staff ratios) and has continued to pursue robust implementation in others (*e.g.*, the programs developed for youth engaged in serious violent misconduct, programming by Program Counselors and community partners). However, in several key areas, the Department must accelerate its progress (*e.g.*, a continuum of responses for mid-level misconduct, implementing Direct Supervision, consistent staffing) to reap the benefits to youth and Staff safety and to fulfill its obligations under the Consent Judgment.

**14. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)**

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to design, implement and refine a range of strategies designed to produce safer Facilities, as detailed in the following narratives about the many components of the reforms related to Young Inmates in §XV "Safety and Supervision" and §XVI "Inmate Discipline."

**ANALYSIS OF COMPLIANCE**

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

As discussed in the Introduction to this section, the gains in safety among 18-year-olds noted during the previous Monitoring Period were completely reversed following the closure of GMDC and transfer to RNDC. Some deterioration was expected, though not of this magnitude. As currently operated, the Facility's level of disorder and rate of use of force are simply unsafe. The Department must bring together a number of important initiatives (particularly the consequences for misconduct and the Staff's use of skills learned in Direct Supervision training) in order to reverse this trend.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- The Nunez Compliance Unit audits the completion of FSIRs and DCSRs for Young Inmate Housing Areas (housing areas with inmates 16- to 18-years old). NCU further requires facilities to complete an Inmate Accountability Form, which lists the cells all 16- to 18- year olds are housed in. NCU then compares these cells to the list of down cells in the DCSR. If any inmate

is observed in a down cell, the Facility is notified and expected to either remove the inmate from the cell immediately or have the cell repaired so it may be occupied.

- NCU audited all housing units with young adults at RNDC and any housing units with 18-year-old inmates at AMKC (until October 2018)[155] and RMSC for the completion of the FSIR and DCSR forms and found they were nearly always complete and accurate. The NCU's onsite inspection of a sample of inoperable cells found they were not occupied most of the time.

ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

*Assessment of Locking Mechanisms*

- ***RNDC***

RNDC has two different types of rail and rack door locking systems that are antiquated and complicated. This older locking system requires routine and vigilant security assessments and maintenance to minimize a youth's unauthorized exit from his cell. Equally important, if a lock is found to be compromised, the cell must be taken off-line immediately so the lock can be repaired. When interviewed by the Monitoring Team, Staff voiced their frustrations about the lack of dependability of the locking mechanisms on some housing units. While youth's ability to exit their cells without authorization may not necessarily lead to a use of force, Staff still need to respond to the situation to convince youth to return to their cells. While the Monitoring Team's findings related to operational practices—discussed at length below—suggest that these frustrations could be minimized with more vigilant efforts to confirm that cells are locked when youth originally enter, Staff's confidence in the security features of the jails is an important dynamic to their work.

NCU conducts monthly audits to assess compliance with policy and the requirements of this provision. These audits found Staff are nearly always completing FSIRs and DCSRs as required. Further, during on-site inspections of a sample of inoperable cells, NCU confirmed most to be unoccupied. While these results are encouraging, the Monitoring Team's review of video at RNDC throughout the Monitoring Period found that Staff were not vigilantly checking locks as frequently as required by policies. As noted in previous Monitor's Reports, given the antiquated physical plant at RNDC, extra vigilance is required to ensure doors remain properly secured.

- ***RMSC***

At RMSC, which houses 18-year old female inmates, the NCU audit results demonstrate that, with the exception of a few days, the FSIR and DCSR forms were completed daily and only on two

---

[155] The audits at AMKC ended in October 2018 as 18-year-old inmates were no longer housed in the MO Units.

occasions over the Monitoring Period was an 18-year old inmate housed in a cell with an inoperable door/lock.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to use of force incidents. As noted in prior Monitor's Reports, cell door/lock manipulation may result in UOF in a few isolated incidents, but it is not a primary contributing factor to UOF at RNDC. During this Monitoring Period, the Monitoring Team identified only 10 such incidents reported in the CODs at RNDC and none at RMSC. Video footage was reviewed for a sample of these incidents. In some cases, cell door/lock manipulation did *not* appear to contribute to the need to use force, and thus the number of relevant incidents is even less than 10.

*Reasonably Safe and Secure Conditions*

This provision also requires the Department to conduct daily inspections to ensure the conditions are reasonably safe and secure. The Monitoring Team's assessment of the Department's efforts to maintain its locking mechanisms at RNDC revealed other operational issues that negatively impact the reasonably safe and secure conditions for 18-year-old inmates. In its random review of Genetec footage capturing evening activities at RNDC, the Monitoring Team noted only sporadic compliance with evening lock-in time. On numerous occasions, youth either were not locked in or youth exited their cells by opening their cell doors (which did not appear to be locked based on how easily the doors were opened) after the lock in time. Although Staff were monitoring these areas and activities, they did not respond immediately. In other cases, youth were milling around the housing unit many hours after lock-in with Staff passively observing. The Monitoring Team shared these observations with the Department, who made similar observations. In response, CASC began to conduct daily reviews of lock-ins at RNDC and NCU is considering how to incorporate this data into its audit.

Failing to manage lock-in times causes a number of operational issues. For example, several incidents occurred after youth should have been locked in for shift change or for the night. While cell door/lock manipulation did not precipitate the UOF, Staff's failure to encourage and enforce compliance with lock-in times often resulted in the Staff losing operational control and escalating the intervention in order to force youth to comply (*e.g.*, calling the Probe Team and using OC, both of which create additional operational burdens).

Given the Monitoring Team's operational concerns, the Department devised some additional processes to ensure youth are locked-in as required, which will be implemented during the next Monitoring Period. The Monitoring Team will continue to monitor this issue and NCU's audit as it expands in scope.

| **COMPLIANCE RATING** | **¶ 2. (18-year-olds)** Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    a.    all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted. [156]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See discussion below.

### ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates (i.e., part a).*

At the end of previous Monitoring Period, the requirement for this provision was modified by the Court based on a suggestion from the Monitoring Team to make the requirement more operationally feasible. The Monitoring Team communicated its expectation that the Department would draft written guidance for those responsible for conducting and documenting rounds and indicated that the Monitoring Team would begin to audit the facilities' performance. Although the Monitoring Team has reviewed logbooks and interacted with Wardens and Deputy Wardens often enough to know that at least occasional rounds are being conducted, the Department has yet to develop written guidance for Facility leadership or to develop a mechanism for its own audit of this requirement. For that reason, the Monitoring Team has not yet rated this provision. However, if no progress is evident during the Eighth Monitoring Period, the Department will be placed in Non-Compliance.

| COMPLIANCE RATING | ¶ 3. Not Yet Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department operates several "program houses" at RNDC, including Horticulture, I-CAN, and Reentry program houses. Because of the programs' intensity, some program houses do not have Program Counselors. In General Population units and ESH/Secure/TRU/SCHU, Program Counselors provide structured programming (*i.e.*, individual counseling, groups on issues that are common to this population) and structured recreation (*e.g.*, games and other leisure time

---

[156] This language reflects the revision ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

activities). Program Counselors are required to document these programs and activities on a daily basis.

- The Department continues to partner with a significant number of community-based organizations to provide programming to youth at RNDC, EMTC and RMSC.

- All 18-year-olds at RNDC, EMTC and RMSC have the opportunity to attend full-day school. Those in ESH or Secure have the opportunity to attend school 3-hours per day.

- Youth continue to be able to access digital tablets that include both education and entertainment applications. Counselors also occasionally provide "self-guided" worksheets to youth to complete during their free time.

- With the closure of GMDC, the Department began to rebuild the PEACE Center and YES Center at RNDC. These spaces will offer workforce development and vocational programming (*e.g.*, autobody shop) and structured leisure time activities (*e.g.*, recording studio, ping pong and other games). They are slated for completion in spring 2019.

**ANALYSIS OF COMPLIANCE**

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department is pursuing compliance with this provision by providing various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by a large number of community partners, leisure time activities (*e.g.*, tablets, board games and video games) and daily large muscle activities ('recreation'). The combination of education, mandated recreation, Program Counselor-led programming and programming delivered by community partners should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult. The reduced idle time will both reduce violence and enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing Program Counselor-led programming and activities and reviewing education attendance data.

*Education*

Although engagement in school is essential for positive youth outcomes, it is not mandatory for this age group. The Monitoring Team reviewed monthly attendance reports maintained by the NYC DOE for those eligible for education (*i.e.*, youth aged 18+ are eligible for school but are beyond the compulsory education age). As noted in previous Monitor's Reports, only a small segment of young adult students (age 18 to 21) are enrolled in school and fewer attend consistently. The Special Master of the *Handberry* litigation's most recent report found the Department in "partial compliance" with

regard to access to education for 18-21 year-olds, particularly for youth who are in the special housing units, and encouraged the Department to increase incentives for attending and to improve the reliability of escorts to ensure youth have dependable access. [157] The Department reports efforts to engage increasing proportions of young adult students and is examining strategies to encourage enrollment and to address barriers to attendance that are within its control.

Prior to transferring to RNDC, many young adult students participated in the wide array of career technical education ("CTE") programs that operated at GMDC. For this age group, not only do opportunities to participate in CTE programs reduce idle time but also contribute to positive post-release outcomes. The re-opening of the PEACE and YES Centers at RNDC, scheduled for April/May 2019, is much anticipated.

*Program Counselors & Community Based Programming*

Following a shortage of Program Counselors during the Sixth Monitoring Period, the Department filled its vacancies. Of the 20 program counselors, 6 (30%) were hired in late 2018. Among the 36 units housing 18-year-olds, 94% had an assigned Program Counselor, most of whom served multiple units (the remaining houses are "program houses" with an intensive level of specific types of programming). While it is positive that the vacant positions were filled, the recent tenure of Staff and the disruption caused by closing GMDC and transitioning to RNDC appears to have taken a toll on the Department's performance in this area.

Program Counselors do provide programming to youth that reduces their idle time on the housing units, though it does not appear to be at the volume expected by the Department (3 hours per unit per day, excepting Pass Days and holidays). Problems with some of the data provided to the Monitoring Team (*e.g.*, it did not include complete worksheets for all counselors on all days requested, and at times had questionable content) prevented a rigorous quantitative analysis. However, the worksheets showed that at least some programming was provided to each unit on at least half of the days in December 2018. Importantly, the worksheets clearly illustrate the substantial negative impact of disorder and violence in the Facility on the delivery of programming. Several counselors reported programming time that was riddled with interruptions or otherwise truncated due to operational problems such as alarms, Facility lock-downs, behavior issues and even specific threats of violence toward the counselors. These threats to safety prevented them from delivering the expected volume of programming. The Department simply cannot achieve compliance with this provision without providing a safe, orderly environment in which programming can occur.

---

[157] *See*, The Third Report of The Status of Education Services for Youth Aged 16-21 at Rikers Island by Special Master Peter Leone dated July 2, 2018 (96-cv-6161 S.D.N.Y.). As of the writing of this report, a subsequent report by Dr. Leone had not been issued.

The Department has yet to identify a comprehensive, dependable way to accurately evaluate the large volume of programming delivered by community partners, nor a format for the Program Counselors that lends itself to efficient analysis. Previously, the Department reported an attempt to move to a tablet-based tracking system, but it has yet to come to fruition. The Department must identify a way to collect, analyze and interpret these data to demonstrate proof of practice. The Monitoring Team will engage with the Department to develop a sound internal auditing strategy with the hope that ownership of the data, analysis and interpretation will stimulate progress.

Substantial Compliance depends on ensuring that all 18-year-old youth have the opportunity to attend programming that occupies the majority of youth's waking hours on both weekdays and weekends, over a sustained period of time.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department originally made the Facilities responsible for tracking housing transfers enacted to protect vulnerable youth, which they did with limited success for the first part of the Monitoring Period. Eventually, NCU assumed responsibility for this function. NCU audited these housing transfers in November and December 2018.

### ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The goal of this provision is to ensure that youth who are being bullied, threatened or are otherwise vulnerable are moved to a different housing unit where they will be safer. Facilities make housing transfers for a variety of reasons (*e.g.*, after intake and classification, to disrupt tensions, to provide access to a program house, etc.). NCU compiles a list of all housing transfers made by the Facility and then RNDC and NCU collaboratively identify transfers made in an effort to protect a vulnerable youth. At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Facilities must strike a delicate balance among making transfers to protect vulnerable inmates, intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff to develop skills for managing

interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Facilities' flexibility for programming, population management, etc.

The original auditing strategy requiring the Facilities to produce a list of all relevant transfers each month proved to be unreliable, as the lists appeared to underreport the number of such transfers. Now that NCU has assumed responsibility for auditing this process, the tracking process appears to have greater integrity, identifying a frequency that more closely approximates what RNDC reports in practice and the Monitoring Team observes during its routine review of data for other provisions (*e.g.*, transfers to another GP unit or Protective Custody following a fight; transfers made for the purpose of keeping specific youth separated).

That said, the initial data collected by NCU also highlighted the need to develop a joint understanding between the Monitoring Team and NCU about what sort of transfers should "count" when demonstrating proof of practice. This consensus will be established during the Eighth Monitoring Period and NCU will use the agreed-upon categories to monitor practices at RNDC, EMTC and RMSC, submitting data to the Monitoring Team for verification.

| COMPLIANCE RATING | ¶ 6. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (see Second Monitor's Report, at pgs. 131-132). Protective Custody units are located at RNDC (males) and RMSC (females).

- The Department drafted revisions, in consultation with the Monitoring Team, to the Protective Custody Directive to address the Monitoring Team's feedback about the substance of information found in the Protective Custody ("PC") documentation and timeliness of required interviews. The Department's revised practice allows OSIU staff to focus more directly on 18-year-olds and those who are disputing their placement in PC. The Department also decided to further revise the Directive to address the interplay between PC status and violent misconduct, particularly among adult inmates. The policy has yet to be finalized.

- NCU has fully implemented its internal audits of performance in this area and submits them to the Monitoring Team every two months, along with a running log of admissions and releases.

ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department maintained substantial compliance with this provision by demonstrating through NCU's audits that OSIU and facilities are complying with existing DOC policy and meeting the requirements of this provision for the use of PC for both male and female 18-year-olds.

During the current Monitoring Period, a total of 32 18-year-olds were placed in PC. Half (50%) were self-referred, while 22% were court-ordered and 28% were placed in PC at the Facility's discretion (five of these youth agreed with the placement and four were placed involuntarily). Nearly all (94%) were reviewed by OSIU within the two business days permitted by policy, and all but one youth were continued in PC. Half the youth (50%) remained in PC at the end of the Monitoring Period, with a median length of stay of 85 days. The other half had been removed from PC, most often because they were discharged (31%) or requested removal (31%). Their median length of stay was 24 days. The number of youth placed in PC, the variety of reasons, and OSIU's compliance with policy requirements remain the same as previous monitoring periods.

As noted above, NCU audits PC files each month to assess compliance with policy and the requirements of the Consent Judgment. NCU found high levels of compliance across the 32 files audited. Nearly 100% of the packets included:

- A statement from the youth detailing his/her concerns;
- Further information (incident report, etc.) to flesh out the youth's statement;
- Evidence that OSIU interviewed the youth within the two-business day timeline;
- Documentation that youth were promptly informed of OSIU's decision and their right to a hearing;
- Evidence that hearings were held timely and adjudication notices were provided to 4 of the 6 youth whose placements were involuntary; and
- Evidence that most 30- and 60-day reviews were timely and included youth's input into the reviews via a written statement.

These high levels of compliance are laudable, and the Monitoring Team is encouraged by the Department's ability to sustain Substantial Compliance. As recommended in the previous Monitor's Report, NCU now includes a calculated length of stay in its running log, though this information is not yet aggregated or included in the bi-monthly reports. The Monitoring Team also continues to encourage the NCU to expand its methodology to include interviews with youth on the PC units to

ascertain the extent to which youth feel safe, have any contact with youth in the general population, are engaged in school and other programming and understand the process for requesting removal from PC if desired.

The Monitoring Team intends to spot-check the NCU's audits and conduct youth interviews during the Eighth Monitoring Period.

| COMPLIANCE RATING | ¶ 7. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains Policy 4100R-D "Classification" which addresses the requirements of this provision.

- When housed at GMDC, 18-year-olds were classified and housed using the HUB. With GMDC's closure and transfer to RNDC, the 18-year-olds were classified using the Department's original scored classification tool as that was the tool being utilized at RNDC. Now that the adolescents have moved out of RNDC, the Department plans to transition to the HUB during the Eighth Monitoring Period.

- The Department continues to review housing assignments daily, identify any instances of co-mingling, and transfer youth to appropriate housing units within the 72-hours permitted by policy.[158]

**ANALYSIS OF COMPLIANCE**

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department's policy reflects the requirements of this provision. Temporary co-mingling of classification levels, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (*e.g.*, upon a birthday, or when an inmate has not had a violent incident in 60

---

[158] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Units like those noted in the text of the Provision. Female youth at RMSC are also exempt from this requirement because the very small number of 18-year-old girls makes this provision operationally infeasible.

days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility.

The Monitoring Team reviewed RNDC mis-housing records from October 2018, just after the adolescents were transferred to HOJC. Mis-housing continues to be a rare event among a population of approximately 120 18-year-olds. Only 1 or 2 youth were identified as mis-housed on only a couple of the days reviewed. Usually, the youth were not actually mis-housed, but appeared on the list due to delays in entering data into the information system. Handwritten notes explaining the situation suggested a thoughtful process for resolving identified issues. The protocol to identify and resolve instances of mis-housing works well at RNDC, as the small number of youth who are mis-housed are promptly transferred to an appropriate housing unit. Only a very small number of sentenced 18-year-olds (fewer than five) are housed at EMTC, whose mis-housing process will be audited during the next monitoring period.

| COMPLIANCE RATING | ¶ 8. (18-year-olds) Substantial Compliance |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 11 (VIDEO CAMERA COVERAGE) |
|---|
| ¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met. |

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) |
|---|
| ¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to use the Direct Supervision model, developed by NIC, as the foundation for a training program for supervising young adults. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Direct Supervision training continues for recruits and is underway for In-Service Staff, as described in the Training section of this report.

**ANALYSIS OF COMPLIANCE**

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

As noted in the Training section of this report, in-service training has begun but is not yet complete. The Monitoring Team has had several discussions with uniformed leadership and NCU about how they might implement and track the core practices of the Direct Supervision curriculum. Core practices include:

- achieving consistent assignment of Staff to housing units;
- providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;
- ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;
- expecting Staff to deliberately select a lower level of engagement when tensions arise;
- occupying youth with structured activities throughout the day; and
- engaging in proactive and interactive supervision.

Most recently, the Monitoring Team encouraged the Department to consider how these concepts could be integrated into the Graduated Sanctions program (discussed in Inmate Discipline ¶6, below) to expand options for immediate reinforcement/incentives and to shorten the timeframe for rewards to better match youth's developmental needs.

The Monitoring Team has tried several avenues to encourage the Department to make demonstrable progress but, to date, the Department has not made any substantive effort to implement the key aspects of Direct Supervision in a holistic fashion or to demonstrate proof of practice for the few fragments that reportedly exist (*e.g.*, allowing Staff to set up special activities to reward inmates for positive behavior). As always, the Monitoring Team is available to provide technical assistance upon request.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Recruits may make written requests to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration.
  - ○ 16 of the 17 recruits assigned to RNDC during this Monitoring Period requested that assignment. Seven of the 17 recruits also spent a few days at RNDC during On the Job Training.

223

- When GMDC closed, certain GMDC Staff were assigned to RNDC.

ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The overwhelming majority of Staff working with 18-year-olds are located at RNDC. Staff assigned to other units holding small numbers of youth are discussed in the Screening and Assignment of Staff section of this report, as their fitness for the position is addressed in the screening for Special Units.

During this Monitoring Period, Staff were assigned to RNDC as part of the redistribution of Staff from GMDC as well as the initial assignment of new recruits. The Staff from GMDC had relevant experience working with youth so their reassignment to RNDC satisfies the requirement of this provision. Nearly all recruits assigned to RNDC (all but one) expressed an interest in working at the Facility, which also satisfies the requirement of this provision. In prior Monitoring Periods, the Office of Administration coordinated with the Facilities that house Young Inmates to give Facility leadership an opportunity to interview recruits to gauge their interest and experience. For unexplained reasons, the Department failed to do this during the current Monitoring Period, despite assurances by the leadership of the Office of Administration that this process would be implemented. The Monitoring Team would strongly encourage the Department to revive this component of the assignment process. That said, the process for assigning Staff to RNDC during this Monitoring Period satisfies the requirements of this provision.

| COMPLIANCE RATING | ¶ 13. (18-year-olds) Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[159]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

    a.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

    b.    The ratio between Inmates and Direct Supervision floor officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year olds. The maximum living unit size shall be 30 Inmates.

---

[159] The Consent Judgment does not include a ¶ 15 for this Section.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff. Schedulers at the Facilities reported several ways that they minimize the frequency with which a unit is staffed only by probationers. They reported being conscious about Staff's probationary status and constructing the weekly schedule with this in mind (*i.e.*, the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years.

- The Department reported the average number of probationary Staff for the Facilities where the majority of 16-, 17-, and 18-year old youth are held: RNDC had 212 (which is approximately 28% of the reported 749 Staff assigned), RMSC had 186 (which is approximately 31% of the reported 593 Staff assigned to RMSC) and EMTC had 213 (which is approximately 31% of its reported 695 Staff assigned). Note that RMSC and EMTC have only a handful of units that house 18-year-olds.

- NCU transferred responsibility for collecting staffing data to the Facilities (RNDC, RMSC, OBCC and GRVC) during the previous Monitoring Period. Facility Staff complete both daily and monthly reports and upload the information to a shared drive for NCU to verify and compile. With the closure of GMDC and subsequent transfer of 18-year-olds, audits at AMKC (18-year-olds were housed at AMKC for only a short period of time) and EMTC began in June 2018. The Department reports that it met required Young Inmate staffing ratios on all shifts during the current Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*These provisions apply to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with these provisions with respect to 18-year-old inmates.*

The Department continued its internal audits to determine its level of compliance with the staffing provisions. During previous Monitoring Periods, the Monitoring Team found that the facilities'/NCU's internal audit process leads to valid conclusions about the state of compliance.

*Assignment of Probationary Staff* (¶ 14)

Regarding the **appropriate dispersion of probationary Staff** (*i.e.*, ensuring that probationary Staff are paired with veteran Staff on the housing units), most of the facilities housing small numbers of 18-year-olds (AMKC, GRVC, OBCC, RMSC) had high rates of compliance throughout the

Monitoring Period (85% of shifts or more). However, EMTC averaged only 58% compliance across the Monitoring Period, and RNDC experienced two months with low compliance rates (October 51% and November 36%) which rebounded to 70% in December. At RNDC, the decreases coincided with the opening of HOJC and transfer of a significant number of RNDC Staff, and the Department recently reported other factors such as Staff retention and promotion as having an impact. While these explanations make intuitive sense, the monthly audit reports made no comment on the anomalies as the explanations were offered only after the Monitoring Team's inquiry. The Department is encouraged to initiate investigations of this type of anomaly closer-in-time to the problem being observed in order to speed the implementation of remedial measures.

Because the exceptions at RNDC were relatively isolated and EMTC holds so few 18-year-olds, the Monitoring Team determined that the Department continues to meet the "best effort" requirement of this provision. That said, it is important that NCU take proactive steps to understand and explain poor results when they occur. This type of oversight and problem-solving is what will ultimately render external oversight unnecessary.

*Staffing Levels (¶ 16)*

Audits of **Staff-to-youth ratios** continue to reveal that all Facilities and units housing 18-year-olds were staffed within the ratios required by the Consent Judgment most of the time. The exceptions at RNDC and EMTC (about 3% of shifts audited) were reportedly caused by an imprecise auditing strategy that collapsed the two sides of a housing unit (*e.g.*, North and South side) into a single unit. NCU's follow-up investigation confirmed that required ratios were actually met on both sides of the units. The methodology will be adjusted in the January 2019 audit. The Department has maintained Substantial Compliance with the provision related to staffing ratios.

The Staff ratio provision also includes **limits on the size of units housing 18-year-old inmates**. In September 2018, the Monitoring Team became aware of a few 18-year-olds who had been mistakenly housed with adults at RNDC. While the Consent Judgment does not prohibit this type of comingling, it does require 18-year-olds to be housed in units no larger than 25 or 30 youth, depending on their classification level. The comingled units holding the 18-year-olds housed approximately 47 other inmates. In response to concerns raised by the Monitoring Team, the Department added an additional column to the 5am census that identifies the inmates' age to ensure that 18-year-olds are housed exclusively on units that conform to the maximum limits prescribed by the Consent Judgment. Because the deviations appeared to be isolated in nature, the Monitoring Team determined that the Department maintained Substantial Compliance with the provision related to unit size.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 14. (18-year-olds)** Substantial Compliance |
| | **¶ 16(a). (18-year-olds)** Substantial Compliance |
| | **¶ 16(b). (18-year-olds)** Substantial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department reports that all facilities are attempting to "steady up Staff," meaning to ensure that Staff work the same housing unit each day. This is accomplished through two mechanisms: awarded steady posts (where Staff apply and are awarded a consistent assignment) and informally (where schedulers simply assign Staff consistently to the same post).

### ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The overall purpose of consistently assigning Staff to the same housing unit is to facilitate constructive Staff-youth relationships. Indeed, consistent staffing is a hallmark of Direct Supervision. The Monitoring Team developed and enacted a strategy for assessing the extent to which Staff are consistently assigned to units housing 18-year-olds. The goal of "consistently assigned Staff" was examined from multiple angles. "Consistent Staffing on Paper" assessed whether during a 7-day period, a post was assigned to the same person at least 4 times. "Consistent Staffing in Practice" assessed whether the assigned Staff on paper actually worked the post on at least 3 days. "Full Consistent Staffing" assessed whether the same person was assigned on paper, worked the unit in practice, and was the same person week to week.

*RNDC*

RNDC schedules were examined for a two-week period in November 2018. Of the 222 housing unit posts reviewed, 74% were consistently staffed on paper, but only 56% were consistently staffed in practice. Only 40% of housing unit posts achieved week-to-week stability for the two-week period, or "full consistent staffing."

*EMTC*

EMTC schedules were examined for a four-week period in November 2018. Of the 56 housing unit posts reviewed, 71% were consistently assigned on paper and 71% were consistently staffed in practice. Only 43% of housing unit posts achieved week-to-week stability for the entire 4-week periods, or "full consistent staffing."

*RMSC*

RMSC schedules were examined for a four-week period in November 2018. Of the 96 housing unit posts reviewed, 74% were consistently assigned on paper and 66% were consistently staffed in

practice. Only 38% of housing unit posts achieved week-to-week stability for the entire 4-week period, or "full consistent staffing."

The results computed by the Monitoring Team suggested that while Staff assignments may appear to be relatively consistent on paper, in *practice*, substitutions were often made and the assigned Staff did not always work the assigned post. Further, week-to-week stability has not yet been achieved. During the subsequent monitoring period, the Monitoring Team will discuss its audit strategy with NCU and Facility schedulers to develop consensus on the various metrics and to discuss ways to reduce the frequency of substitutions and improve consistency across time.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Partial Compliance. |
|---|---|

## 15. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME),**
**¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 7. The Department shall not place any 18-year old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, Benjamin v. Ponte, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

*Provision XVI.1 applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Monitoring Team reviewed the Department's various disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (*i.e.*, 23-hour

lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with 18-year-olds during the current Monitoring Period, the Monitoring Team did not assess compliance with these provisions. Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation.

The Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot currently be rectified because the practice is no longer in place. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the Monitoring Team did not assess this provision while the practice was still in effect. Now that it has been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| **COMPLIANCE RATING** | **¶ 1. (18-year-olds)** Substantial Compliance (per the Second Monitor's Report).<br>**¶ 7.** Partial Compliance (per the Second Monitor's Report)<br>**¶ 8.** Substantial Compliance (per the Second Monitor's Report)<br>**¶ 9.** Not Currently Applicable. |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- The Department developed and implemented several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct (SCHU, TRU, Secure and YA-ESH).

  o The Department maintains policies for TRU and SCHU, which were approved by the Monitoring Team during the previous Monitoring Period.

  o The Department has policies in effect for both ESH and Secure but reports revisions to both policies are being considered.

- To address less serious and episodic violent misconduct, the Department continues to rely on the infraction process but has conceptualized a promising Graduated Sanctions program. An implementation plan has been developed, targeting a roll-out at RNDC during the Eighth Monitoring Period.

ANALYSIS OF COMPLIANCE

The overall goal of this provision is to ensure that misconduct is promptly addressed by an effective tool for holding 18-year-old inmates accountable.[160] Some misconduct is serious (*i.e.*, slashings, stabbings and assaults with injury) or chronic (*i.e.*, a repeated pattern), and for these situations, the Department established four Structured Supportive Housing units (SSHs; *see* pgs. 219-221 of the Third Monitor's Report for a description of each). These programs have been operational for approximately two years and appear to be properly targeting serious misconduct. They are discussed in detail below.

Fortunately, most misconduct is neither serious nor chronic (*e.g.*, fights without injury, serious disruptions to the orderly operation of the Facility, etc.), and for these negative behaviors, the Consent Judgment requires an adequate continuum of sanctions. The Department's progress toward this end is also discussed below.

*Responses to Serious and Chronic Violence*

During the current Monitoring Period, the Monitoring Team continued to review the flow of inmates in and out of the SSHs; the level of violence in the SSHs; and the quality of individualized behavior support planning and support team operations. The SSH data had a number of errors in data entry. Further, the Monitoring Team found that the agreed upon approach to tracking the data had a number of structural problems due to the frequency with which youth are transferred among programs. Accordingly, the Monitoring Team intends to recommend a revised structure for tracking program data so that it is more amenable to analysis and interpretation. Ideas for restructuring will be exchanged with NCU during the Eighth Monitoring Period.

- ***Admission, Release and Length of Stay***

There were 133 admissions of 18-year-olds to the SSHs during the current Monitoring Period.[161] These involved 94 unique youth, many of whom had multiple admissions and/or transfers among the various SSHs. Most of these youth spent time in either TRU or SCHU, programs that are focused on addressing violent misconduct but that do not restrict the youth's lock-out time or movement beyond what occurs in the general population. A total of 27 youth were exposed to ESH or Secure, which both utilize additional hardware (*i.e.*, restraint desks; partitions between quads) and other restrictive

---

[160] Previously, 18-year-olds could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

[161] These data are not comparable to previous Monitoring Periods because the analysis only includes 18-year-olds, whereas previous data included 16- and 17-year-olds as well.

procedures (*i.e.*, escorted movements, reduced lock-out times) to prevent subsequent violent misconduct.

In 31% of admissions, youth were transferred among the SSHs prior to exiting the programs. A similar proportion of youth had multiple separate admissions to the SSHs, with the remainder having only a single program admission. The frequency with which youth transfer among or re-visit SSHs highlights a key opportunity to ensure continuity and to leverage prior treatment to improve the approach taken with youth upon each new admission or transfer. As discussed below, this does not seem to be occurring in a formalized way, though the Support Team members are clearly familiar with youth who have been readmitted to a specific SSH.

Release types and length of stay (LOS) are difficult to compute accurately because of how the Department maintains the SSH data (*i.e.*, without combining transfers among programs into a single admission). This makes the LOS appear to be shorter than it actually is because the "release date" could simply be a transfer to another SSH. What is easier to discern is the LOS for the 25 youth who remained in the SSHs at the end of the Monitoring Period. About two-thirds of the youth (n=17) had been in the SSH less than 30 days. Most of the other 8 youth had been in the SSH less than 2 months, though three youth had been in the SSH for between 3 and 5 months (these youth had been transferred between Secure and ESH).

As noted above, the Monitoring Team will engage with the Department during the next Monitoring Period so that the Department becomes able to produce and interpret reliable metrics about program performance. Such data on the flow among the SSHs and the lengths of stay are critical to understanding whether the SSHs are operating as intended (*e.g.*, exposing participants to an expected level of programming, education and lock-in/lock-out hours) and accomplishing their key objectives (*e.g.*, reducing misconduct and violence among participants).

- ***Level of Violence***

The Consent Judgment requires that the responses to youth misconduct may not jeopardize Staff or youth safety. The table below presents data on the rates of violence and UOF in the SSHs. As noted in the introduction to this section, the overall rates of violence and UOF among 18-year-olds skyrocketed during this Monitoring Period (*i.e.*, six-month average rate of UOF was 56.7, average rate of violence was 48.3). This led to increases in admissions to the SSHs (*e.g.*, the ADP in Secure was about 14 youth in December, compared to about 8 youth in previous Monitoring Periods; in TRU, the December ADP was 40, compared to less than 20 youth in previous Monitoring Periods). Within-program data across Monitoring Periods appears in the table below. ESH and Secure experienced slightly less violence during the current Monitoring Period than previously, but violence increased significantly in TRU and SCHU, reflecting the high level of disorder that characterized RNDC during this Monitoring Period.

| ADP, Levels of Violence and UOF in SSH Units | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | | January–June 2018 | | | July–December 2018 | |
| Unit | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH[162] | 10 | 0.9 (9.0) | 1.8 (18.0) | 10 | 3.0 (30.0) | 3.7 (37.0) | 10 | 1.8 (15.7) | 2.7 (22.3) |
| Secure | 8 | 2.8 (35.0) | 4.6 (57.5) | 6 | 1.3 (21.6) | 1.67 (27.8) | 8 | 1.3 (11.5) | 2.2 (26.4) |
| YA TRU | 17 | 3 (17.6) | 4.5 (26.5) | 19 | 2.8 (14.7) | 4.0 (21.1) | 25 | 10.5 (42.0) | 11.3 (45.3) |
| YA SCHU | 8 | 0.3 (3.75) | 0.6 (7.5) | 5 | 0.7 (14.0) | 1.0  (20.0) | 8 | 1.8 (22.9) | 2.5 (31.3) |

- *Qualitative Review of Practice*

**Adjudication Process.** Two of the SSHs (ESH and Secure) include reduced lock out time and enhanced hardware to reduce violence. Because of the liberty interests at stake, the Monitoring Team closely reviewed the adjudication process. A sample of 10 records for 18-year-olds admitted to ESH or Secure during the Monitoring Period were reviewed. Two components need improvement: 1) In their findings, Adjudication Captains need to speak directly to the ESH/Secure admission criteria stated in policy regarding the severity of injury and/or whether the youth is being escalated from TRU/SCHU; and 2) hearings must be held within timelines required by policy (several of the 10 cases reviewed were beyond the "within 3-business days of placement" requirement).

**Behavior Support and Progress Reviews.** The Department has described the SSHs as individualized, treatment-oriented programs to address the underlying causes of violent misconduct, which brings with it a responsibility to provide treatment that will stimulate behavior change and to measure whether that change occurs as part of the requirements for program completion. The Department has established an infrastructure to support a treatment-focused response (by providing Program Counselors who are expected to deliver evidence-based cognitive behavioral programs with fidelity; requiring behavior support plans with behavior goals to structure the youth's progress through the program; holding support team meetings and progress reviews), but unfortunately has yet to implement these components with fidelity.

Reviews of youth files from ESH, Secure, TRU and SCHU confirmed that little progress in the quality of behavior support planning is evident and that frequent omissions of key information make the youth's progress/lack of progress in the program difficult to decipher in the files. As noted in previous

---

[162] The vast majority of inmates in YA-ESH are 19 to 21-years-old.

reports, while the Behavior Support Plans are completed timely, they lack an appropriate focus (*i.e.*, goals suffer from a lack of measurability, do not focus on discrete behaviors, prescribe a service rather than a behavior target, or do not address behaviors that hinder program advancement). New goals are sometimes suggested during support team meetings to respond to emerging problematic behaviors, but their structure suffers from the same deficiencies. Plans do not link goals to specific interventions designed to help the youth achieve them, and thus the general prescription to "attend programming," "follow all rules" or "respect staff" were offered as the panacea for all youth. Further, as noted in previous Monitor's Reports, better communication among SSHs would likely improve the quality of services. A significant proportion of youth were transferred among the programs, yet the files contain no evidence of the other SSHs' work with these youth. That said, the Secure and ESH reviews were a bit easier to decipher because those programs tend to promote youth in the absence of violent conduct since the prior review. ESH's requirements are more transparent in this regard, while the use of Behavior Support Plans in Secure can confuse the matter as it is unclear whether refraining from violent conduct is the deciding factor or whether the less serious misconduct, program engagement and/or the youth's BSP play a role in decisions about phase promotion.

The Monitoring Team observed Support Team meetings for all programs and found them to include an energetic group of knowledgeable professionals who are well-prepared, share information freely, seem to understand what is driving youth's behavior and have obvious respect for each other and a desire for each youth to succeed. That said, the team meetings continue to suffer from a lack of objective measurement of youth's progress. This subjectivity makes it difficult to discern whether the youth are moving through the program appropriately and therefore whether the programs are legitimate, effective responses to violent misconduct. The Monitoring Team has recommended to the Department that it may be time to rethink whether a treatment-focused approach is achievable and to consider more objective, transparent, and easily measurable methods for assessing progress and readiness to return to the general population (*e.g.*, refrain from violence for XX days, similar to what occurs in ESH).

- *Recommendations for SSHs*

The Monitoring Team intends to work with the Department in the Eighth Monitoring Period to revise the way in which program data (*i.e.*, admissions, transfers and releases) are tracked so that it can produce reliable statistics on the number of admissions, transfers between programs and length of stay. These data form the foundation of a critical first step in examining whether the SSHs are operating as designed and their impact on the levels of violence and other misconduct. Once admitted or transferred to an SSH, program staff need to leverage a youth's prior participation in another SSH when considering how to approach and better support the youth.

The Monitoring Team also encourages the Department to be vigilant about the intersection among the various SSHs. The four programs were developed over several years and evolved at different paces, which created the opportunity for elements to become disharmonious. For example, at times

during the current Monitoring Period, youth were reportedly admitted to Secure while they awaited placement in ESH (usually waiting another youth to exit the program to reduce the risk of interpersonal conflict). Both Staff and youth were unclear as to whether the time spent in Secure "counted" toward their satisfying the requirements of ESH for level promotion. In addition, Secure Staff reported that several youth requested transfer to ESH (and threatened to commit an act of violence in order to force the issue) because ESH has a higher commissary limit than Secure. Neither of these is a fatal program flaw, but they do illustrate the need for the Department to look at the success of the programs individually and also to assess their interaction to ensure that the entire continuum functions as it should. Once the Graduated Sanctions program is implemented (discussed below), such conversations will become even more essential.

        After several years of feedback from the Monitoring Team about the functioning of the SSHs and developing a consensus on the key markers of progress, the Department is now positioned to assume audits of youth's SSH files. NCU completed its first audit of the TRU/SCHU files during the current Monitoring Period and initial discussions were held about NCU's auditing approach for all of the SSHs, which will occur as staffing/expertise resources allow. The Department also needs to develop a set of metrics beyond the substance of youth files to assess the overall adequacy of the programs (*e.g.*, violence and use of force, infractions, outcomes following transfer to GP). As NCU assumes more responsibility for proof of practice and quality assurance, the Monitoring Team will shift to verifying the results obtained by NCU and will continue to provide technical assistance on the concept and delivery of the programs.

*Responses to Less Serious and Episodic Misconduct*

        As heavily encouraged in previous Monitor's Reports, the Department's continuum of responses to misconduct needs to be expanded to effectively address behaviors such as threatening Staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. These behaviors are not serious enough to warrant placement in an SSH, but an effective response is necessary to promote Facility safety.

        Historically, the Department's only individual-level response to these behaviors has been to write an infraction, where only two sanctions are available to be imposed by the Adjudication Captains—a $25 fine or a verbal reprimand. In the previous Monitoring Period, the Department attempted to track other sanctions that were reportedly applied when youth engaged in these less serious forms of misconduct. However, sanctioning practices were limited in scope, not uniformly applied and were not being tracked reliably. This strategy was abandoned during the current Monitoring Period, and the Department continues to have a dearth of effective strategies for shaping youth's behavior.

        While not an individual-level response to misconduct, the Department has attempted to encourage positive behavior using a group incentive program ("the Levels"). Every two weeks, Staff

and Facility leadership rate each housing unit on an array of factors (*e.g.*, incidents, infractions, respect for Staff, sanitation, cell compliance, uniform compliance, lock-in, court production and program engagement). Well-performing units are assigned a higher Level (Gold and Platinum) and gain access to an array of rewards (special activities, games, etc.), while units exhibiting problem behaviors are assigned a lower Level (Copper and Bronze) with more limited rewards. Previously, the Monitoring Team had observed good variation among the units in what appeared to be a mobile and responsive system. Given the change in population and leadership at RNDC, the Monitoring Team requested the underlying documentation that was used to substantiate the Level assignments for the two rating periods in December 2018. These documents were fraught with problems, lacking internal consistency and without any of the required details, and generally produced Level assignments that did not appear to be valid. Once notified of these problems, the Department took immediate action and developed several processes to reinforce the implementation of the concept and to ensure the rating process operates as designed. While the Department's responsiveness to the problem is very encouraging, the fact remains that the lack of internal oversight allowed this program to operate without integrity for a significant period of time.

Fortunately, the Department has developed a new—and better—concept to address less serious misconduct. The "Graduated Sanctions" program (currently being piloted at GRVC) will be implemented at RNDC during the Eighth Monitoring Period. This phase-based program provides individualized incentives (such as additional programing, family days, recreational activities and increased commissary limits) and sanctions (restrictions from earned incentives and decreases in commissary and barbershop). The concept reflects several good practices in behavior management with young people, and with consistent unit staffing and sufficient daily reinforcements and encouragement from Staff to supplement the schedule for phase advancement, could reduce violence and other types of disorder in the Facility. No matter which behavior management program the Department is using, internal oversight and quality assurance are essential to ensuring quality implementation. The Monitoring Team plans to closely monitor its development, training, implementation and tracking.

### *Solo Housing*

During the current monitoring period, Solo Housing was not used at all at RNDC, and was used relatively infrequently at RMSC. Of the 6 youth who were placed in Solo Housing for behavioral reasons during the current monitoring period, 3 had only single episodes spanning 1 to 13 days; 2 youth had a couple episodes each lasting between one and two weeks; and 1 youth had 9 episodes resulting in her spending 72 days in Solo Housing. Occasionally, youth were housed alone for short periods when other youth of the same status (*e.g.*, Protective Custody, sentenced, etc.) were discharged to the community. These were not considered "behavior-based" incidents of Solo Housing.

For those placements in Solo Housing that are in response to a youth's violent behavior, the Monitoring Team remains very concerned. Given the Department's failure to implement the required

procedures (discussed in the previous Monitor's Report at pg. 192), the Monitoring Team held a workshop with Staff at RNDC and RMSC to review expectations in September 2018. NCU also began to review the practice more closely. Unfortunately, the workshop and close monitoring of the process has yet to produce the desired results. Referral documentation remains incomplete, a Support Team is not being engaged to develop Behavior Plans, and log books do not document that mandated services are being provided. While recent efforts have been made to document the services of a Program Counselor and programming by community partners, these services are provided without the direction of a behavior plan that would ensure they are appropriately targeted to the youth's needs. The Monitoring Team remains very concerned about the poor implementation of this policy. The Department is not following the protocol established in collaboration with the Monitoring Team and has been unable to provide documentation showing that the youth placed in Solo Housing receive the various protections designed to assuage concerns about the length of stay, need for services and deleterious effects of social isolation. The Monitoring Team has communicated with NCU to re-establish requirements for internal oversight and corrective action when facilities do not follow policy requirements. Performance in this area must improve.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- 18-year-olds with serious mental illnesses (SMI) who commit violent infractions are excluded from Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH) and must be placed in an appropriate therapeutic setting.

- When a youth is referred to Secure or YA-ESH, medical and mental health staff are asked to "clear" the youth for program entry by verifying that he has no contraindications given the increased time in cell and use of restraint desks.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation (CAPS) and Program for Accelerated Clinical Effectiveness (PACE). CAPS addresses the needs of inmates with SMI who have committed an infraction. PACE also offers treatment to inmates with SMI but is completely separate from the infraction process.

### ANALYSIS OF COMPLIANCE

The Department submitted data on medical and mental clearance for all YA-ESH and Secure referrals throughout the Monitoring Period. A total of 45 18-year-olds were **referred to YA-ESH** and all were cleared by medical within one business day of the request. Four of the youth referred were not cleared by mental health, and the youth remained at RNDC. These 45 youth represent an 800% increase from the five 18-year-olds referred during the previous monitoring period. A total of 27 18-year-olds were **referred to Secure** and all were cleared by medical within one business day of the request. Two of the youth referred were not cleared by mental health and remained at RNDC, though one was re-evaluated by mental health and subsequently admitted. This too is a significant increase (350%) from the previous monitoring period when only six 18-year-olds were referred. These changes track the significant increase in violence among this age group, and also highlight the severity of much of the violence given that youth can only be referred to these programs if they engage in a slashing or stabbing or cause a serious injury.

The process to screen out youth with serious mental illness appears to be efficient, and also capable of identifying youth who are not suitable for placement in restrictive housing. Among all referrals (adult and youth) to ESH and Secure, about 12% were not cleared by either medical or mental health, suggesting that the approval is not pro forma.

No 18-year-olds were placed in CAPS or PACE during the current Monitoring Period. If a significant number of youth are placed in these programs in subsequent monitoring periods, the Monitoring Team will assess the appropriateness of these placements.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Although the Department promulgated an Ops Order regarding the use of "Satellite Intake" as a de-escalation tool in July 2018, it was not used during the current Monitoring Period.

ANALYSIS OF COMPLIANCE

*This provision applies to both adolescents and 18-year-old inmates, but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

Shortly after the Consent Judgment went into effect, the Monitoring Team met with the Department to sketch out the practices needed to meet the requirements of this provision. After several iterations, the substance of the Ops Order for "Satellite Intake" was drafted and eventually

promulgated. When youth engaged in misconduct that involved the Probe Team or otherwise resulted in removal from the housing unit, Staff had the option to place the youth in Satellite Intake (located in a housing unit that was otherwise unoccupied) pending re-housing. Satellite Intake was used at RNDC and GMDC for only a short period of time and the Department struggled to produce the required documentation to demonstrate that youth did not languish and that all required services were provided. Once GMDC was closed and the 18-year-olds were moved to RNDC, the Department stopped using Satellite Intake, possibly because the larger population depleted the stock of available housing units. From then on, the Department appears to have resumed its past practice—to take youth to Intake following violent incidents and/or Probe Team intervention. While this may accomplish the overall goal of providing youth time to calm down, it reinstates the burden on Intake which was one of the key reasons the Department decided to use Satellite Intake in the first place.

Since the Department did not use Satellite Intake at RNDC, RMSC or EMTC during the current monitoring period, this provision is not applicable. However, the Monitoring Team emphasizes the importance of a de-escalation tool in managing the immediate aftermath following an incident. Not only do youth require time to cool off, Staff need time and space to regain operational control of the area. Previously, the use of Satellite Intake served this function and also reduced the burden on Facility Intake areas. The Department is encouraged to reconsider this—or a similar—option as a viable strategy for post-incident response.

| COMPLIANCE RATING | ¶ 10. (18-Year-Olds) Not Applicable |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with an M-designation prior to holding a disciplinary hearing.

- The Department implemented Directive 0000R-A "Implementing Departmental Policy," as discussed in the Implementation section of this report.

- The Department sought clarification on the third recommendation from Dr. Beard, who explained that the review was suggested for the purpose of relaying relevant information to the Adjudication Captain and to determine whether H+H should be present during the hearings.

- In June 2018, the Department decided it would not implement this third suggestion, finding the recommendation to be unduly burdensome and believing that existing protections were sufficient.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team is seeking more information about the Department's existing practices and the decision not to implement Dr. Beard's third suggestion. The purpose of Dr. Beard's assessment was to ensure the process for adjudicating infractions is fair and reasonable, a standard that is essential for good correctional practice. Fairness can be compromised in situations where inmates—for a variety of reasons, mental health issues being one of them—do not adequately comprehend the procedural safeguards or the implications of a guilty finding. Dr. Beard's suggestion is one way to achieve this goal, but there are likely others. Early in the Seventh Monitoring Period, the Monitoring Team requested information about the Department's existing processes and outcomes related to mental health evaluations prior to infraction hearings. Over 7 months have elapsed since the original request and the Monitoring Team has not yet received the information. Accordingly, the Department is in Partial Compliance until the Monitoring Team can fully assess whether the Department's decision not to adopt Dr. Beard's recommendation is reasonable.

| **COMPLIANCE RATING** | **¶ 11.** Partial Compliance |
|---|---|

**• End •**

# Appendix A: Definitions

| Acronym or Term | Definition |
|---|---|
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques Training |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (e.g. ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BSP | Behavior Support Plan |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DCID | Deputy Commissioner of ID |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |

| Acronym or Term | Definition |
|---|---|
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| HOJC | Horizon Juvenile Center |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| LMS | Learning Management System |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |

| Acronym or Term | Definition |
|---|---|
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| PC | Protective Custody |
| PDR | Personnel Determination Review |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| SMI | Serious Mental Illness |
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |

| Acronym or Term | Definition |
| --- | --- |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking System |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

# Appendix B: Training Charts

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors | |
| | | *Status of Deployment* | Ongoing Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. | Completed - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Same Curriculum as for Officers | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Ongoing Provided in mandatory Pre-Service training | **Ongoing – To be complete by 5/31/2019** * Pre-Promotional Training * In-Service - A.C.T. | | **A.C.T. - Ongoing – To be completed in Eighth Monitoring Period** |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Consulted Monitoring Team and Finalized | Consulted Monitoring Team and Finalized | Same Curriculum as for Officers | Consulted Monitoring Team and Finalized |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | S.T.A.R.T. - Completed 9/2018 | | Completed - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |
| **SCM (Young Inmate Management) (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Consulted Monitoring Team and developed by JKM | Consulted Monitoring Team and developed by JKM | Same Curriculum as for Officers | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC or Horizon[163] | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | Electronic – iPad | hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Consulted Monitoring Team and Finalized | Consulted Monitoring Team and Finalized | Same Curriculum as for Officers | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Newly Assigned Staff** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |

---

[163] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams to complete in 2018; **Ongoing Training Obligation for Newly Assigned Staff** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Consulted Monitoring Team and Finalized | Consulted Monitoring Team and Finalized | | |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams to complete in 2018; **Ongoing Training Obligation for Newly Assigned Staff** | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* | | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | | |
| | | *Length of Training* | | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* | | Any new investigators assigned to ID | | |
| | | *Deployment* | | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* | | **TBD (see Investigations Section of this report)** | | |
| | | *Length of Training* | | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Lesson Plan finalized. | Curriculum finalized and Monitoring Team consulted. | | |
| | | *Length of Training* | No specified length in CJ | No specified length in CJ | | |
| | | *Frequency* | 3-hour training provided in mandatory Pre-Service training beginning with the class that matriculated in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | | |
|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Refresher** | **Supervisor Refresher** | **Executive Staff Training Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 4-hours | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | One year after S.T.A.R.T. Every other year thereafter | |
| | | *Status of Deployment* | A.C.T. - **Ongoing – Deadline to complete by 5/31/2019** | A.C.T. – Completed in 2018 | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | None | None | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | **Not Yet Developed** | **Not Yet Developed** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD | TBD |
| | | *Frequency* | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Consulted Monitoring Team and Finalized | | |
| | | *Length of Training* | 4-hours | | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | | |
| | | *Deployment* | A.C.T. - **Ongoing – Deadline to complete by 5/31/2019** | | |
| | | *Attendance (¶ 7)* | TTS Records | | |
| | | *Examination (¶ 6)* | N/A | | |
| **SCM (Young Inmate** | Staff assigned to | *Status of Curriculum* | Consulted Monitoring Team and developed by JKM | | |

| Status of Refresher Training Program Development and Deployment | | | | | |
|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Refresher** | **Supervisor Refresher** | **Executive Staff Training Refresher** |
| **Management) (¶3)** | work regularly in Young Inmate Housing Areas | *Length of Training* | 8-hours | | |
| | | *Frequency* | All Staff who work with Young Inmates | | |
| | | *Deployment* | Refresher training began in Fourth Monitoring Period; All Staff at RNDC | | |
| | | *Attendance (¶ 7)* | TTS Records | | |
| | | *Examination (¶ 6)* | hand-written | | |
| *There are no refresher requirements for Direct Supervision, Probe Team Training, Cell Extraction Team Training, Investigator Training, or Handheld Operator Training | | | | | |

| | Training Provided during Seventh Monitoring Period | | | | | Total Training Provided Nov. 2015 – December 2018 | |
|---|---|---|---|---|---|---|---|
| | Recruit Class December 2018 | Pre-Promotional Captains | Pre-Promotional ADWs | In-Service | Refresher | Initial Training | Refresher |
| **Use of Force Policy (¶ 1(a))** | 398 | 96 | N/A | N/A | 786 | **11,955** | **2,150** |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | 398 | 96 | N/A | 1391 | N/A | **6,530** | **N/A** |
| **Defensive Tactics (¶ 2(a))** | 398 | 96 | N/A | N/A | 786 | **12,364** | **2,150** |
| **Young Inmate Management ("SCM") (¶3)** | 398 | 96 | N/A | 282 | 599 | **7,893** | **2,723** |
| **Direct Supervision (¶4)** | 398 | 95 | N/A | 408 | N/A | **5,720** | **N/A** |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | 398 | 95 | N/A | 226 | N/A | **5,197** | **N/A** |
| **Cell Extraction (¶ 2(b))** | 398 | 95 | N/A | 381 | N/A | **4,221** | **N/A** |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | 398 | N/A | N/A | N/A | N/A | **2,516[164]** | **N/A** |
| **Investigator (¶ 2(c))** | All 33 investigators hired in this Monitoring Period received training | | | | | **154[165]** | **N/A** |

---

[164] This includes all Recruits beginning with the July 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

[165] This does not include those trained in the First Monitoring Period as the Monitoring Team had not begun verifying this information until the Second Monitoring Period.

## Appendix C: Oath Penalties

**Example Termination Penalty Cases from OATH:**

- *Dep't of Correction v. Bravo*, OATH Index Nos. 424/15 & 426/15 (May 14, 2015) (60-day suspension and termination recommended for two officers who engaged in excessive force based on officers' disciplinary history and levels of culpability).

- *Dep't of Correction v. Behari* OATH Index Nos. 781/14, 782/14, 783/14, 784/14, 785/14 & 786/14 (Sept. 25, 2014), aff'd, NYC Civ. Serv. Comm'n Case No. 2015-0162 (Nov. 10, 2015), appended, aff'd, 56 Misc. 3d 1203(A)(Sup. Ct. N.Y. Co. 2016) (termination of employment where Captain and correction officers were guilty of using unnecessary, impermissible, and excessive force against inmate Hinton, falsely reporting such force, and other violations).

- *Dep't of Correction v. Negron,* OATH Index No. 1844/11 at 20-22 (Sept. 16, 2011), *aff'd*, NYC Civ. Serv. Comm'n Item No. CD 12-04-SA (Jan. 20, 2012) (termination recommended where officer used excessive force on several inmates, submitted false and inaccurate reports, and failed to report a use of force; officer had a significant disciplinary history that included a 50-day suspension for violating the use of force reporting requirements).

- *Dep't of Correction v. Patterson*, OATH Index No. 2164/09 at 22-23 (Oct. 1, 2009) (termination recommended for correction officer who punched an inmate in the face and created an elaborate cover-up that included creating false documents and incident reports).

- *Dep't of Correction v. Woodson*, OATH Index Nos. 597/04 & 603/04 (July 1, 2004) (termination of employment where officer, with a lengthy disciplinary record, slapped, punched, and choked an inmate in response to a "smart remark" and then falsely denied the use of force).

- *Dep't of Correction v. Butler*, OATH Index Nos. 876-878/92 (Dec. 2, 1992) (termination recommended for respondent with extensive prior disciplinary record, who used impermissible force causing serious injury to restrained inmate and filed false report; 20-day suspensions imposed on respondents with no prior disciplinary history for false statements about use of force incident).

- *Dep't of Correction v. Winslow*, OATH Index No. 615/91 (June 12, 1991) (gratuitous use of force was punished by termination where respondent had significant prior discipline).

**Example Suspension Penalties from OATH**:

- *Dep't of Correction v. Ward* OATH Index No. 2137/18 (Dec. 31, 2018) (correction officer used excessive force when he briefly placed his hand around an inmate's neck, but did not submit a false or misleading written report. Penalty of 35 days suspension recommended).

- *Dep't of Correction v. Sinacore* OATH Index No. 1244/18 (May 4, 2018), modified on penalty, Comm'r Dec. (May 24, 2018), appended, aff'd, NYC Civ. Serv. Comm'n Case

No. 2018-0468 (Sept. 5, 2018), (60-day suspension recommended where correction officer used excessive force, physically and verbally abused an inmate, and made false written and oral statements about the incident).

- *Dep't of Correction v. Rothwell* OATH Index No. 1963/17 (Nov. 3, 2017), modified, Comm'r Dec. (Jan. 8, 2018), appended. (50-day suspension where correction captain used excessive force when she struck an inmate in the head and face area after inmate was subdued and prone on the floor, submitted a false and misleading written report, and made false and misleading statements at an investigative interview by failing to report the use of excessive force).

- *Dep't of Correction v. Cantelmo*, OATH Index No. 2562/17 (Oct. 12, 2017), *aff'd*, NYC Civ. Serv. Comm'n Case No. 2018-0135 (July 23, 2018), appended (30-day suspension where officer failed to report observing a Captain's use of 6 or 7 open and closed hand strikes to an inmate's face and subsequently made false and misleading statements at an investigative interview despite having an unobstructed view of the excessive force).

- *Dep't of Correction v. Reid*, OATH Index Nos. 1898/14 & 1901/14 (June 18, 2014), aff'd, NYC Civ. Serv. Comm'n Item Nos. 2014-1131 & 2014-1133 (Jan. 23, 2015) (30-day and 45-day suspensions imposed on officers who used impermissible force, failed to report the incident, failed to obtain medical attention, and made false reports and statements).

- *Dep't of Correction v. Pelle*, OATH Index No. 1410/07 at 7-8 (May 22, 2007), aff'd, NYC Civ. Serv. Comm'n Item No. CD 08-11-SA (Feb. 20, 2008) (35-day suspension imposed where officer, with three years of experience and no prior disciplinary record, ignored captain's order, placed inmate in an improper hold, and issued false or misleading reports; ALJ emphasized that employees should, wherever appropriate, receive the benefit of progressive discipline and receive an opportunity to modify their behavior).

- *Dep't of Correction v. Pannizzo*, OATH Index No. 1691/03 (Nov. 1, 2004), modified, NYC Civ. Serv. Comm'n Item No. CD 06-69-M (July 6, 2006) (40-day suspension where officer, who had a minor disciplinary record, struck inmate on side of the head, sprayed him with a chemical agent, and falsely claimed that force was used in self-defense).

- *Dep't of Correction v. Hills*, OATH Index No. 632/04 (Apr. 26, 2004) (20-day suspension recommended penalty for impermissible use of force and failure to report, noting respondent's 20-year tenure and lack of prior discipline).

- *Dep't of Correction v. Romero*, OATH Index No. 388/04 (Apr. 23, 2004) (40-day suspension recommended for excessive force in which multiple blows were made after inmate was subdued, where respondent had brief four-year tenure and no prior discipline).

- *Dep't of Correction v. Fulton*, OATH Index No. 513/02 (Mar. 13, 2002), aff'd, NYC Civ. Serv. Com'n Item No. CD03-92-5A (Sept. 18, 2003) (20-day suspension for excessive force while subduing unruly inmate and filing a misleading report about the incident).



**Appendix D: Flowchart of Promotions Process**