# Eighth Report of the *Nunez* Independent Monitor

**Eighth Monitoring Period**
**January 1, 2019 through June 30, 2019**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ........................................................................................................... **1**
    Background .......................................................................................................... 1
    Current Status of Reform .................................................................................... 3
    Next Steps ......................................................................................................... 14
    Organization of the Report............................................................................... 16

**Staff Use of Force and Inmate Violence Trends During the Eighth Monitoring Period** ..... **19**
    Overall UOF Rates........................................................................................... 19
    UOF Rates Across Facilities ............................................................................ 23
    UOF by Age ...................................................................................................... 25
    Inmates Frequently Involved in Uses of Force ................................................ 26
    UOF Locations ................................................................................................. 28
    Reasons Force is Used ...................................................................................... 28
    Department's Efforts to Improve Staff Understanding of UOF Policy Requirements..... 31
    Conclusion ........................................................................................................ 32

**Identifying & Addressing Use of Force Misconduct** ............................................ **34**
    Identifying Use of Force-Related Misconduct ................................................ 35
    Addressing Use of Force-Related Misconduct ................................................ 52

**Section by Section Analysis** .................................................................................. **68**
    1.     Use of Force Policy (Consent Judgment § IV) ................................... 68
    2.     Use of Force Reporting and Tracking (Consent Judgment § V) ......... 72
    3.     Training (Consent Judgment § XIII)................................................... 93
              Training Academy ............................................................................... 94
    4.     Anonymous Reporting System (Consent Judgment § VI)................... 113
    5.     Video Surveillance (Consent Judgment § IX) .................................... 114
    6.     Use of Force Investigations (Consent Judgment § VII)...................... 128
    7.     Risk Management (Consent Judgment § X) ........................................ 165
    8.     Staff Discipline and Accountability (Consent Judgment § VIII)........ 183
    9.     Screening & Assignment of Staff (Consent Judgment § XII) ............ 197
    10.    Staff Recruitment and Selection (Consent Judgment § XI)................ 208
    11.    Arrests of Inmates (Consent Judgment § XIV) ................................. 213
    12.    Implementation (Consent Judgment § XVIII) ................................... 215

**Current Status of 16- and 17-Year-Old Youth**................................................ **220**
    13.    Safety and Supervision of Inmates Under the Age of 19
              (Consent Judgment § XV) ................................................................. 226
    14.    Inmate Discipline (Consent Judgment § XVI)................................... 242
    15.    Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII).... 248

**Current Status of 18-year-olds Housed on Rikers Island** ............................... **250**
    16.    Safety and Supervision of Inmates Under the Age of 19
              (Consent Judgment § XV) ................................................................. 255
    17.    Inmate Discipline (Consent Judgment § XVI)................................... 274
**Appendix A: Definitions**................................................................................... **i**
**Appendix B: Training Charts** ............................................................................ **vi**
    Status of Initial Training Program Development and Deployment.....................vi
    Status of Refresher Training Program Development and Deployment.................x

i

Status of Training Provided Since the Effective Date …………………………………..xii

**Appendix C: Flowchart of Promotions Process** …………………………………………..xiii

# INTRODUCTION

This is the Eighth Report[1] of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York, the New York City Department of Correction ("the Department" or "DOC"),[2] the Administration for Children Services ("ACS"), and the Monitoring Team to advance the reforms in the Consent Judgment during the Eighth Monitoring Period, which covers January 1, 2019 to June 30, 2019 ("Eighth Monitoring Period").

*Background*

The Department manages 11 inmate facilities, eight of which are located on Rikers Island ("Facility" or "Facilities").[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The Department also jointly operates the Horizon Juvenile Center in the Bronx with ACS. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by

---

[1] A Special Report was also filed by the Monitor on March 5, 2018. (*see* Dkt. Entry 309). The Monitoring Team also submitted three letters to the Court on the status of HOJC on October 31, 2018 (Dkt. Entry 318), December 4, 2018 (Dkt. Entry 320), and February 19, 2019 (Dkt. Entry 325).

[2] All defined terms utilized in this report are available in ***Appendix A: Definitions***.

[3] There are three Facilities based in the City boroughs, Manhattan Detention Complex ("MDC"), Brooklyn Detention Complex ("BKDC"), and Vernon C. Bain Center ("VCBC") in the Bronx. The eight Facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture of violence in these Facilities, and to ensure the safety and proper supervision of inmates under the age of 19 ("Young Inmates"). The Department employs approximately 11,000 active uniformed Staff and 1,900 civilian employees, and detains an average daily population of 7,939 inmates.[4]

The Consent Judgment was entered by the Court on October 22, 2015.[5] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against inmates and reducing violence among inmates, particularly Young Inmates (*i.e.*, those under 19 years old). The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principles can take root without a culture change within the agency that embraces them.

---

[4] 28.8% of the inmate population is detained for four days or less, while 22.8% of the population is detained three months or more. The average length of stay for an inmate is 75 days. (See "August 2, 2019, NYC Department of Correction at a Glance – Information for the 12 months of FY 2019," <https://www1.nyc.gov/assets/doc/downloads/press-release/DOC_At_Glance_FY2019_072319.pdf>).

[5] The Effective Date of the Consent Judgment is November 1, 2015. (*see* Dkt. Entry 260)

*Current Status of Reform*

The conditions that gave rise to the Consent Judgment have not abated since the Effective Date. While the pace of reform is not stagnant and the Department has taken several steps to advance the reforms, the Department has not shown itself capable of devising and implementing effective strategies to fully institutionalize the use of force reforms required by the Consent Judgment. The Department continues to struggle to manage Staff's use of force and has failed to adequately implement the Use of Force Directive that was issued on September 27, 2017. Whether examining use of force ("UOF") trends systemwide, by Facility, or by age group, the number of incidents and rates have continued to climb, thus producing a concomitant high number of problematic incidents, and backlogs in both investigations and Staff discipline. The Department's use of force rates during the Eighth Monitoring Period reached their highest levels since the Consent Judgment went into effect. The themes and concerns regarding the Department's use of force detailed in the Seventh Monitor's Report continue to persist.[6] In terms of the dynamics characterizing Staff's use of force in the moment, the Monitoring Team continues to identify the same problems, none of which appear to be abating, including:[7]

- Staff's failure to appropriately manage the inmate population. This includes Staff-precipitated force, in which Staff's approach to a situation creates or exacerbates the need to use force. More specifically, Staff are often hyper-confrontational and respond to incidents in a manner that is hasty, hurried, thoughtless, reckless, careless, or in disregard

---

[6] *See* Seventh Monitor's Report (at pgs. 11-27).

[7] Exact data on the number of head strikes, uses of force on an inmate in restraints, and other troubling practices remain inaccessible because of the size of the Preliminary Review backlog (discussed in the Identifying & Addressing Use of Force Misconduct section of this report). This means both the Monitoring Team and the Department lack key details about the volume of misuse of force that are occurring currently.

of consequences. Conversely, there are situations where Staff under-react to incidents, demonstrate poor situational awareness, and/or poor skills in developing constructive, functional relationships with inmates;

- Staff utilizing unsafe and ineffective techniques, including head strikes, painful escort holds, and heavy-handed take downs;

- Staff dehumanizing inmates and exacerbating the use of force via their language, tone, and non-verbal communication;

- Over-reliance on the Probe Team to respond to less serious incidents, which generally only escalates the situation and guarantees that force will be used; and

- Staff engaging in insubordination, including in some instances exhibiting out-of-control behavior and physically assaulting supervisors who attempt to intervene in an inappropriate use of force. That incidents like these are occurring at all, and are not addressed immediately by management, clearly serves to perpetuate an already toxic environment.

In terms of the contextual elements underlying the use of force, the Monitoring Team continues to be concerned about the:

- Failure by agency personnel at virtually all levels to actively, directly, and consistently enforce the provisions of the Use of Force Directive;

- Failure to conduct timely and reliable investigations to identify potential misuses of force;

- Failure to impose meaningful and timely discipline for Staff who misuse force;

- Failure to consistently hold Supervisors accountable for the general level of disorder in the Facilities;

- Lack of consistent assignment of personnel to units/Facilities—from line Staff to Wardens—which leads to a lack of ownership of problems and their solutions, inhibits the development of constructive supervisory relationships, and results in little accountability for the lack of progress; and

- Failure to address key inmate dynamics in terms of a robust system of incentives and consequences and effective interventions for those frequently involved in uses of force.

An event that occurred during the latter part of this reporting period graphically captures virtually all of these aforementioned failures in a single case review:

> On May 22, 2019, a single Officer needlessly and recklessly escalated an event in a housing unit. The Officer was out-of-control in confronting an inmate, but when a fellow Officer attempted to intervene, she repeatedly and forcefully shoved the fellow Officer who relentlessly attempted to intervene to de-escalate the event. Ultimately, this exchange spawned five separate applications of force by other Staff as the environment became chaotic—some of which included improper applications of chemical agents and an unnecessary head strike. Countless Staff filed participant and witness statements, culminating in a 221-page Preliminary Review report. The Immediate Action Committee failed to initiate any action, notwithstanding the mountain of documentary evidence, including video evidence of the entire incident. Further, as of this writing, not a single Staff Member has been disciplined for their problematic conduct in this incident.[8] But for the Monitoring Team's review, this event would have languished virtually unnoticed among the hundreds of back-logged investigations in the Investigations Division ("ID").[9]

> Simply put, the system is overwhelmed. The Department's efforts during the Eighth

Monitoring Period did not initiate a change to the troubling conditions that have existed

---

[8] It is worth noting that while the investigation of this incident is still ongoing, the "out of control" Officer in this incident was recently terminated for unrelated misconduct.

[9] It should be noted that in another recent incident, a Captain was virtually assaulted by an Officer when she attempted to intervene to block the Officer from assaulting an inmate subject to the control of six other Officers. A number of those Officers had to assist the Captain in her attempts to intervene. The offending Officer was not suspended from duty and, to date, continues the same assignment.

throughout the time of the Consent Judgment. Furthermore, the Department has not made significant progress on planning or addressing the recommendations made by the Monitoring Team in the Seventh Monitor's Report (*see* Seventh Monitor's Report at pgs. 8 to 9). Therefore, the Department remains in Non-Compliance with four of the most consequential provisions of the Consent Judgment: (1) implementation of the Use of Force Policy (§ IV., ¶ 1); (2) timely and quality investigations (§ VII., ¶ 1); (3) meaningful and adequate discipline (§ VIII., ¶ 1) and (4) reducing violence among Young Inmates(§ XV., ¶ 1).

*Dynamics Underlying the Department's Lack of Progress*

The essential question grappled with in this report is—why? Why have the various reforms designed to improve the detection and response—and ultimately prevention of—UOF-related misconduct not been effective? The Department has been unable to gain traction when attempting to implement the various initiatives designed for this purpose, some of which never get off the ground.

The Monitoring Team's experience suggests that the process of reform has many stages. First, the system needs to be adequately resourced with well-trained Staff and needs sufficient data to understand the dimensions of the problems it is facing. On these points, the Department is progressing. The system has plenty of Officers to supervise inmates and high-quality training programs that introduce Staff to the knowledge and skills they will need to better manage the jails. The Department can now produce reliable information on the frequency of force, the types of misconduct that are prevalent, and the Facility, the shifts, locations, and people involved in these events. Through the installation of thousands of cameras and the implementation of live-video monitoring (*i.e.*, the Compliance and Safety Center ("CASC")) and other structures to identify poor practice (*e.g.*, Rapid Reviews, Preliminary Reviews), the Department has the

capability to identify both the misuse of force and the operational failures that underlie it as they occur. All of this is an accomplishment, as the Department did not have this capacity when the Consent Judgment went into effect.

However, the Department is not progressing past this first stage of reform. In particular, the Department does not effectively manage its Staff. The Department enjoys the largest staffing compliment for jails in the United States with an inmate-to-staff ratio of 1 to 1.3. This places the Department in a unique position in that it has more Staff than inmates and presents its own challenges and obstacles compared with most other systems that struggle to maintain adequate staffing.

The Department's supervisors have not demonstrated proficiency in the key tenets of effective management, including: (1) understanding and consistently applying the policies they are charged with implementing and reinforcing among their Staff; (2) actively coaching and managing Staff accordingly; and (3) timely identifying misconduct and holding Staff accountable when they fail to adhere to Department policies. Furthermore, (4) supervisors and Uniformed leadership are not held accountable for their failure to effectively manage, supervise, coach or discipline line Staff.

The synergy between these problems—a lack of Staff skill and a failure to effectively supervise and coach these Staff—has stymied the Department's ability to effectively use the resources and information that is available to produce the necessary *change in practice*. Not only must the misuse of force be identified, but an effective response to the poor practice must occur so that Staff handle a similar situation appropriately in the future (*i.e.*, a situation identified as avoidable after the fact should then be avoided in the future). Further, Staff must be equipped and compelled to actually apply the skills learned in training to change their practice and arrive

at a different outcome (*i.e.*, de-escalating a situation without using force or using force in an appropriate and proportional manner).

The Department has struggled to identify strong, reliable, and consistent leadership among the uniform Staff. While certain uniform leadership have demonstrated a commitment to advancing reform, many in the uniform leadership rank have simply been unable to implement the required reforms. This has necessitated a high turn-over among Uniform Leadership over the life of the Consent Judgment as demonstrated in the chart below. In this Monitoring Period, six of the 12 Facilities operated by the Department had one Warden; five of the 12 Facilities had two Wardens; and one of the 12 Facilities had three wardens.

| Assignment of Wardens between January 2016 and June 2019 | |
|---|---|
| Facility | Number of Wardens[10] |
| AMKC | 4 |
| BKDC | 3 |
| EMTC | 6 |
| GMDC[11] | 3 |
| GRVC | 4 |
| HOJC | 1 |
| MDC | 5 |
| NIC | 6 |
| OBCC | 5 |
| RMSC | 4 |
| RNDC | 4 |
| VCBC | 4 |
| WF | 4 |

---

[10] Note, these numbers do not necessarily reflect unique individuals. In many cases, one individual has served as a Warden at multiple facilities and/or also served multiple tenures as Warden at the same facility.

[11] GMDC was closed in June of 2018.

The revolving door of leadership has prevented the development of constructive relationships between Staff and supervisors and these transitions compromise continuity in messaging and supervision. These transitions have also obstructed progress in developing and implementing solutions to the particular issues facing each Facility. Of course, this is not to suggest that continuity of leadership should be prioritized over all other considerations for the selection and maintenance of leadership within a Facility, but it is critical that the Department anticipate this dynamic and ensure sustainable processes are in place so the transition of leadership does not further impact its efforts to advance reform.

Finally, the Department remains under significant scrutiny from the Monitoring Team and various City and State stakeholders and regulators. This has resulted in competing priorities and initiatives for the Department. Leadership is accordingly often pulled in many directions, which has made the development and implementation of a cohesive plan to implement the reforms difficult to deploy and sustain. That said, this level of scrutiny and pressure on the agency is likely to remain, so it is critical for the Department to have a foundation in place that can sustain focus on compliance.

- *Proper Application of UOF Policy Requirements*

Facility leadership does not appear to be able to discriminate between permissible, necessary force and unnecessary or excessive force. As a result, many after-action reviews (or decisions not to review) essentially sanction Staff misconduct after-the-fact. Line Staff also appear to struggle with implementing the requirements of the Use of Force Directive, as indicated by the pervasive misuse of force observed by the Monitoring Team. The Department implemented several initiatives in an attempt to improve Staff fluency with the UOF directive, none of which have been particularly effective. The lack of consensus about what constitutes a

9

misuse of force within, between, and among the Department's various divisions (Trials & ID, Training Academy, Facility-level leadership) stymies all aspects of reform, as these are the key questions at the heart of this case—whether and when force is necessary/unnecessary, avoidable/unavoidable, or excessive/proportional.

- *Active Management*

Uniform leadership from the top to bottom must be **actively and directly** engaged in managing Staff in a consistent and sustained manner to both guide and enforce agency rules and policies. To date, this—quite simply—has not occurred. While Staff are introduced to many skills in training, the application of those skills to the day-to-day task of managing inmates requires an intentional, person-directed program of reinforcement and shaping. This type of skill refinement is only possible when those supervising line Staff, and those supervising the supervisors, are expected to teach their subordinates how to improve their practice. Practice enhancements are needed not only with regard to using force appropriately, but also in basic operational tasks (*e.g.*, ensuring doors are locked, hallways are clear, etc.), as these failures often catalyze a use of force.

In order to change Staff behavior, it is critical that Supervisors actively and deliberately reinforce skills taught in training by issuing clear expectations *before* ("You are scheduled for refresher training and we are going to discuss what you learned when you return to the Facility"), *after* (by asking Staff during one-on-one supervision to discuss how they applied the skills they were taught; reinforcing skills via the Department's broad Staff communication strategy and during group convenings such as roll calls) and particularly *in the moment* (by having a constructive supervisory presence on scene whose primary task is to resolve the situation without using force, or to ensure that the type and amount of force used is appropriate to the situation).

Absent constructive and active supervision, practice is unlikely to change. Effective management is undermined in the following ways:

- Facilities do not consistently assign line Staff to the same posts. Further, Captains are assigned to supervise certain posts, not specific people.

- Effective supervisory relationships simply do not exist as Staff are assigned interchangeably and do not have relationship continuity with supervisors day-to-day.

- Captains are not actively and effectively supervised to hone their skills in coaching line Staff. A single Tour Commander is the sole point of contact for the entire building. As a result, Captains are left to operate independently in the Facility, without the structure or continuity of relationships where truly functional supervision—both up and down the chain of command—could occur.

- *Investigation and Disciplinary Backlog*

The negative impact of the increased number of uses of force is plainly evident. The sheer number of uses of force places a heavy burden on the system itself, such that the Department has become mired in a morass of ineffectual and unnecessarily cumbersome processes that produce little else but mountains of paperwork. The Department has not been able to keep pace with timely investigation of Staff misconduct and there is a backlog of approximately 6,815 investigations. The backlog delays the imposition of appropriate discipline for Staff misconduct. The impact of the backlog of investigations and corresponding discipline is further exacerbated by the Department's failure to maximize the available resources and information for effectively managing Staff to reduce the misuse of force. These problems are intertwined—poor supervision results in more unnecessary incidents which leads to an increased

11

backlog which leads to further misconduct when there is no effective response—and the system becomes crushed under its own weight.

- *Supervisory Accountability*

The Department struggles to adequately hold Staff accountable. This is broader than the imposition of formal discipline. Accountability means being answerable for actions or decisions. Holding Staff accountable means simply to hold them responsible for why they did or did not do something and is not necessarily synonymous with discipline. Because accountability requires introspection, it is critical to shaping behavior. Accountability must happen at all levels, including holding line Staff accountable by asking them to explain decision-making in a specific incident, and then responding through coaching, training, or discipline if Staff failed to adhere to Department policies. The Department must assure accountability for *all* its personnel, from line Staff to supervisors to leadership, by holding them responsible for the proper application of force and the proper supervision of their subordinates.

Those in charge of a unit, building, shift, or command must be held accountable for catalyzing the behavior change that is necessary to achieve the overall goal of decreased use of force. As noted above, the Department has several assets that help each actor understand the circumstances underlying the high rate of force and the misuse of force within their scope of responsibility. While this information is discussed in the Total Efficiency Accountability Management System ("TEAMS") meetings, during the weekly ID/Facility Coordinated Use of Force Analysis[12] meetings, or during the study of avoidable incidents, multi-level responsibility

---

[12] As described in the Sixth Monitor's Report (at pg. 22) ID scrutinizes all UOF at various Facilities (originally OBCC and GRVC, expanded to RNDC and AMKC in the Seventh Monitoring Period, further expanded to MDC, NIC/WF this Monitoring Period) to better align assessments conducted by uniform

is generally not assigned when an actor fails to produce results. The implementation of these strategies is not effectively monitored, actively supported, or fine-tuned until it is achieving the intended outcome. Too often these Facility-based initiatives fail to produce the desired results, and rather than responding to that failure with additional coaching, reshaping the intervention, and holding Supervisors accountable (as appropriate), the initiative dies on the vine. To the extent that there is a response, the Department often defaults to transferring the responsibility for the problem and its solution to someone else, either by replacing the Warden, transferring a program to be managed by another Division, or outsourcing the management of an incident to the Probe Team. These constant changes lead to a diffusion of responsibility and a constant regression of initiatives, which only further imperils the ability to improve Staff practice.

Thus, the lack of consensus among the Department's various divisions about what constitutes the improper use of force, the failure to properly supervise and actively coach Officers and Captains to improve their job performance, the failure to timely investigate and discipline Staff, and the failure to enforce accountability among Department personnel at all levels (*i.e.*, line Staff, mid-level supervisors, Wardens and Chiefs) are key dynamics in understanding why the use and misuse of force are not decreasing. These observations have been echoed by leadership within the Department. Over two years ago, a high-ranking official made the following observations about the Department upon their departure from the Agency:

> Subordinates generally respond to who or what can harm or help them. If senior management continues to manage from past culture sensibilities [. . .] DOC's culture will not appropriately change [. . .]

---

leadership via the Rapid Reviews with ID's analysis. On a weekly basis, ID compares its own analysis of each incident with the Facility's assessment and identifies cases where the appraisals are not compatible and/or incidents that are concerning for various reasons. These incidents are compiled into weekly reports that are shared with Facility leadership and discussed during bi-weekly meetings between ID and the Facility leadership.

Most troubling, when conversing with some wardens and their staff about particular interactions with inmates, uniform staff tends to justify their actions from a personal level, instead of policy guidelines. Staff slapping inmates due to inappropriate comments made by an inmate, staff feeling verbally disrespected, all leading to physical altercations, are a few examples of functioning from emotional levels. Emotional responses regarding the lack of respect from inmates, feelings of anger, or unmanaged fear, retard the expected professional separation from staff and inmates [. . . ]

Wardens and their command staff tend to be reactive to outcomes, versus proactive to affect the outcomes. Their belief of being overwhelmed by "new" duties is a legitimate feeling for the wardens and command staff. However, the lack of possessing the required skill sets of modern correctional managers, is most likely the main reason for this belief [. . .]

This cultural dynamic, which is better described as an occupational ideology, runs counter to modern and professional correctional practice. Ultimately, these failures perpetuate the toxic culture of the Facilities discussed in previous reports.

*Next Steps*

The Department has the ability to reduce its use of force; signs of progress were evident in early 2017, but alas were not sustained. More recently, the Department's increasing sophistication in compiling data (*e.g.*, the ID/Facility Coordinated Use of Force Analysis) and the "Transfer of Learning" initiative (which attempts to guide Staff more effectively by contextualizing the requirements of various UOF policies and directives through roll call trainings) are important first steps. However, fully turning the tide will require a holistic, sustained commitment to the robust implementation of the strategies to impact Staff's behavior discussed throughout this report.

On September 30, 2019, the Monitoring Team shared recommendations the Monitoring Team developed on proposed actions that could be taken by the City and Department to stimulate progress toward the overarching goals of the Consent Judgment ("September

Recommendations").[13] The September Recommendations focus on advancing reform in four key areas: (1) implementing the Use of Force Directive; (2) addressing the backlog of investigations and improving use of force investigations going forward; (3) improving Staff discipline and accountability; and (4) addressing the high level of disorder of the 18-year-old inmates at RNDC. The September Recommendations also contemplate that the Monitoring Team will make recommendations to modify certain Consent Judgment provisions to align them with some of the new initiatives that are being developed to address the September Recommendations and other concerns the Monitoring Team has raised and discussed in more detail throughout this report. Along with the September Recommendations, Counsel for the Plaintiffs' Class and SDNY submitted a Non-Compliance Notice to the City pursuant to Consent Judgment § XXI (Compliance, Termination, and Construction), ¶ 2 at the end of the Monitoring Period.[14]

The Monitoring Team intends to work with all stakeholders in the next Monitoring Period to determine the best path forward to address the September Recommendations and the Non-Compliance Notice. As an initial step, following the submission of the September Recommendation, the Monitoring Team met with representatives from the City, the Department, and Counsel for the Plaintiffs' Class and SDNY to discuss these recommendations in order to identify next steps and expectations to address the Monitoring Team's recommendations and the

---

[13] These recommendations were shared pursuant to Consent Judgment § XX ("Monitoring"), ¶ 19 and the Seventh Monitor's Report (at pgs. 8 to 9).

[14] In the Non-Compliance Notice, Counsel identified nine distinct provisions that Counsel to the Plaintiffs' Class and SDNY believed the Defendants were in Non-Compliance with for which they asked the Department to address in a response: (1) Implementation of Use of Force Directive (§ IV. , ¶ 1); (2) thorough, timely and objective investigations (§ VII., ¶ 1); (3) Preliminary Reviews (§ VII., ¶ 7); (4) Full ID Investigations (§ VII., ¶ 9); (5) ID Staffing (§ VII., ¶ 11); (6) Timely, Appropriate and Meaningful Discipline (§ VIII., ¶ 1); (7) Inmates Under the Age of 19, reducing violence among Young Inmates (§ XV., ¶ 1); (8) Inmates Under the Age of 19, Direct Supervision (§ XV., ¶ 12); (9) Inmates Under the Age of 19, Consistent Assignment of Staff (§ XV., ¶ 17).

Non-Compliance Notice. If there is a basis for optimism, it is that the work addressing the September Recommendations and the Non-Compliance Notice creates an opportunity for the Department to triage matters and to address the core components that are obstructing progress. By focusing on these components, the system may be able to achieve the level of stability that is needed in order to help the gears connect and get the whole machine moving in the right direction. These initiatives must be supported by effective management, in all of its various forms, from constructively supervising line Staff to holding Staff and managers accountable when the desired results are not achieved.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses detecting and responding to the misuse of force in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (*e.g.*, policy, reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Finally, the report examines recent changes and current trends regarding 16, 17, and 18-year-olds. Given the physical separation and different facility management structure for 16- and 17-year-olds and 18-year-olds (who remain on Rikers Island), the Monitor's Report now

has two separate sections organized by age group. Provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), § XVII (Housing Plan for Inmates Under the Age of 18) will be addressed depending on the applicability of the provision to each age group. A small group of provisions in §§ XV and XVI are addressed in other sections of this report (*e.g.*, § XV, ¶¶ 10, 11 camera coverage in facilities housing Young Inmates is addressed in the Video Surveillance section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Inmates is addressed in the Use of Force Investigations section of this report).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[15] (b) Partial Compliance,[16] and (c) Non-Compliance.[17] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[18] The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report

---

[15] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[16] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[17] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

[18] § XX (Monitoring), ¶ 18.

but, with each Monitoring Period, has increased the proportion of provisions for which the compliance level has been assessed.[19] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for completion falling after June 30, 2019.

---

[19] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

## STAFF USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE EIGHTH MONITORING PERIOD

The overall goal of the *Nunez* Consent Judgment is to reduce the frequency with which force is used, and more particularly, the use of unnecessary and excessive force. Whether examining UOF systemwide, by Facility, or by age group, rates have continued to climb, as have the raw number of uses of force. These trends are analyzed in this section of the report. Physical force by Staff in a correctional setting is at times necessary to maintain order and safety and the mere fact that physical force was used does not mean that Staff acted inappropriately. Conversely, a well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. That said, the use of force has many consequences for the relationships between Staff and inmates and the overall tenor and level of disorder in the Facility. Even uses of force that are within policy guidelines have an adverse impact on the culture of the Facility for those who work and live there. The work that flows from a UOF incident, even those that are appropriate, is ***enormously*** taxing on the system, preventing Staff from attending to other important duties in the care and custody of inmates.[20]

*Overall UOF Rates*

As shown in the table below, neither of the small dips in UOF observed in early 2017 and early 2018 proved to be the beginning of a downward trend. In fact, for the past 12 months, new high-water marks continued to be set.

---

[20] *See* the discussion about the Consequences of High UOF Rates in the Seventh Monitor's Report (at pgs. 27-28.



These high numbers of uses of force are occurring while the system's population has steadily decreased—now consistently below 8,000 inmates in comparison to 10,000 inmates when the Consent Judgment went into effect. That a larger number of uses of force have occurred with 20% fewer inmates means that the *rate of force* has increased even more significantly than the raw number. The average rate of force for the Eighth Monitoring Period was 7.41, an all-time high compared to other Monitoring Periods.



As shown in the table and graph below, the increases in the UOF rate observed in nearly every Monitoring Period have had a cumulative impact. Compared to the UOF rate when the Consent Judgment first went into effect (3.75), which was concerning enough on its own, the average UOF rate for the Eighth Monitoring Period was 7.41, **a 98% increase since 2016**.

| Six-month Average UOF Rates, 2016-2019 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** | **Jan-Jun 2019** |
| 6-month Average | 3.75 | 4.16 | 4.01 | 4.63 | 5.10 | 6.71 | 7.41 |
| % change | | +41% | -4% | +15% | +10% | +32% | +10% |
| | | | | | | **2016 to 2019 % change** | **+98%** |



The Department's practices create a risk of pain and/or injury to both Staff and inmates. The chart below shows the proportion of serious injuries over time. While the proportion of incidents resulting in an injury has decreased since the Effective Date (from about 40% to about 30%), and the proportion resulting in serious injury is quite small (less than 5% of all uses of force), the fact remains that about 900 people (both Staff and inmates) sustained an injury of some sort during the Eighth Monitoring Period. It is important to note that the fact that a Staff or inmate did not sustain an injury does not mitigate the concern about the use of force because incidents that *cause pain without causing injury* are equally destructive to the culture of the Facility.[21]

---

[21] *See* Seventh Monitor's Report (at pg. 30).



*UOF Rates Across Facilities*

The differences observed in the UOF rate across facilities are unsurprising as they are impacted by the interplay between the type of inmates housed, other contextual factors (*e.g.*, housing density, availability of programming, etc.), and the ability of the Staff to de-escalate tensions without the use of physical intervention. Facilities that house populations with higher rates of misconduct (*e.g.*, RNDC with its large concentration of inmates age 18 to 21) and those with special management units (*e.g.*, GRVC and, at one time, WF) have traditionally had higher rates of force, as shown in the bar chart below. Other Facilities, such as MDC and BKDC have increasing rates of UOF, for reasons that are not immediately obvious, but are nonetheless concerning.

23



| | AMKC | BKDC | EMTC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| ■ 2016 | 2.42 | 2.5 | 1.62 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.24 |
| ■ 2017 | 2.72 | 3.94 | 1.74 | 6.42 | 4.82 | 2.21 | 6.12 | 4.83 | 4.9 | 2.81 | 20.97 |
| ■ 2018 | 3.32 | 5.88 | 1.78 | 9.28 | 8.17 | 4.71 | 5.4 | 4.8 | 19.28 | 3.07 | 7.12 |
| ■ Jan-Jun 19 | 3.9 | 7.52 | 2.73 | 13.19 | 8.95 | 5.24 | 4.7 | 5.13 | 22.02 | 1.94 | 7.48 |

Over time, the situation at the various Facilities has steadily worsened, with some Facilities'
UOF rates doubling during the past three years. The table below shows the magnitude of change
in UOF rate from 2016 (annual rate) to 2019 (average rate Jan-Jun 2019) at each Facility.
Particularly discouraging is that even the Facilities without exorbitant changes have substantially
increased their use of force during this period of supposed reform when rates are supposed to be
declining. WF is the only Facility where force has decreased, likely due to the fact that the
Facility no longer houses difficult to manage inmates in the same manner it did in the past. Even
at OBCC, which has the smallest increase of all the Facilities, the UOF rate increased by 28% in
the past three years.

| Change in UOF Rates, by Year and by Facility | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | AMKC | BKDC | EMTC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
| 2016 | 2.42 | 2.5 | 1.62 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.2 |
| Jan-Jun 2019 | 3.9 | 7.52 | 2.73 | 13.91 | 8.95 | 5.24 | 4.7 | 5.13 | 22.02 | 1.94 | 7.48 |
| % change | +61% | +200% | +69% | +101% | +154% | +105% | +28% | +81% | +174% | +60% | -47% |

*UOF by Age*

Examining the UOF rates by age highlights the underlying reason that the Consent Judgment pays special attention to conditions impacting Young Inmates (*i.e.*, those age 18 and younger). UOF rates for these subpopulations (both 16- and 17-year-olds and 18-year-olds) are significantly higher than those for their adult counterparts. Rates for the 19-21 age group appear to be more moderated, though the Monitoring Team suspects that if rates for this group were disaggregated into discrete ages rather than grouped together, the UOF rate may show a more gradual decrease in UOF rate as age increases. These comparisons match what is known about the impact of adolescent brain development in terms of younger inmates' difficulties in moderating their behavior, controlling impulses, and managing interpersonal conflict. No matter where the age "cut-point" is drawn, what is clear is that the Department does not have an effective strategy for managing this particularly volatile group of young inmates.



Once again, the table below is illustrative not just in terms of the magnitude of increase in the UOF rate among populations with known management challenges, but also because it

highlights the significant increase in UOF rate among the *adult* inmate population (from 2.5 in early 2016 to 4.8 during the Eighth Monitoring Period; **a 92% increase**). This data suggests that the Department's strategy for managing a population with far less challenging behavior also remains ineffective.

| Six-month Average UOF Rates, 2016-2019, by Age | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** | **Jan-Jun 2019** | **% change 2016-19** |
| 16-17yo | 25.1 | 33.6 | 16.6 | 26.2 | 38.4 | 61.8 | 72.1 | +187% |
| 18yo | 17.5 | 21.9 | 21.1 | 14.3 | 16.1 | 56.7 | 52.8 | +202% |
| 19-21yo | 8.2 | 10.4 | 11.8 | 12.8 | 15.5 | 22.5 | 24.2 | +195% |
| 22+yo | 2.5 | 2.5 | 2.7 | 3.1 | 3.5 | 4.0 | 4.8 | +92% |

*Inmates Frequently Involved in Uses of Force*

A small group of inmates continue to be involved in high numbers of force.[22] Between January and June of this year, 48 inmates were each involved in more than 10 UOF incidents which accounted for 668 uses of force (20% of the total 3,399 total actual uses of force this Monitoring Period). Comparatively, in January to June 2016, 23 inmates were each involved in more than 10 UOF incidents which accounted for 346 uses of force (16% of the total 2,222 actual uses of force). It is worth noting that since 2016, the number of inmates involved in use of force incidents has also increased. In January to June 2016, 2,568 inmates, were involved in at least one use of force incident compared with 3,004 inmates involved in at least one use of force incident between January and June 2019.

---

[22] See the Third, Fourth, Fifth and Seventh Monitor's Report (at pgs. 24, 30-32, 17 and 22 respectively).

| Inmates Involved in UOF | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total Number of UOF across Monitoring Period per inmate | Number of inmates involved in Jan-June 2016 | | Number of inmates involved in Jul-Dec 2016 | | Number of inmates involved in 4th MP | | Number of inmates involved in 5th MP | | Number of inmates involved in 6th MP | | Number of inmates involved in 7th MP | | Number of inmates involved in 8th MP | |
| 1 to 2 | 2094 | 82% | 2055 | 79% | 2126 | 83% | 2174 | 81% | 2130 | 80% | 2201 | 74% | 2264 | 75% |
| 3 to 4 | 300 | 12% | 362 | 14% | 303 | 12% | 361 | 13% | 362 | 14% | 447 | 15% | 436 | 15% |
| 5 to 10 | 151 | 6% | 166 | 6% | 111 | 4% | 131 | 5% | 173 | 6% | 256 | 9% | 256 | 9% |
| 11 to 15 | 18 | 1% | 14 | 1% | 8 | 0% | 14 | 1% | 10 | 0% | 51 | 2% | 37 | 1% |
| 16 to 20 | 2 | 0% | 4 | 0% | 3 | 0% | 1 | 0% | 3 | 0% | 14 | 0% | 9 | 0% |
| More than 20 | 3 | 0% | 2 | 0% | 1 | 0% | 2 | 0% | 0 | 0% | 6 | 0% | 2 | 0% |
| Total number of inmates involved in UOF | 2568 | | 2603 | | 2552 | | 2683 | | 2678 | | 2975 | | 3004 | |
| Total actual UOF in that period | 2222 | | 2429 | | 2242 | | 2538 | | 2638 | | 3271 | | 3399 | |

The Monitoring Team has consistently recommended that the Department's UOF reduction efforts include targeted strategies to address those inmates with chronic behavior problems. Given this persistent issue, the Monitoring Team advised DOC and H+H officials of its continuing concerns that inmates frequently involved in force are not being adequately managed through the Department's current processes and that there is a pressing need for DOC and New York City Health + Hospitals ("H+H") to develop viable and specific strategies to ameliorate the problematic behaviors of this population as they often lead to significant and adverse consequences to both staff and inmates. In response, the Monitoring Team was advised that weekly meetings are still convened between Department uniform leadership, Health Affairs, and H+H to discuss particularly challenging inmates who have diagnosed mental health disorders (see Fourth Report at pgs. 30-32 for more detail). Although the Department had previously committed to expanding the format to include similarly challenging inmates who have been involved in high number of UOF (but not diagnosed with mental health disorders), this had not

27

occurred. The Department and H+H report that these meetings will be incorporating a discussion of these inmates in the Ninth Monitoring Period.

*UOF Locations*

The Department's data on the locations where UOF occurs offers no surprises and has not changed significantly since the Consent Judgment went into effect. In this Monitoring Period, over half of all uses of force (56%) occurred on the housing units, which is where inmates spend the majority of their time. This is why it is so essential for staff assigned to housing units to develop an effective rapport with inmates and to hone their skills in addressing interpersonal conflict and de-escalating tension. The next largest concentration of uses of force occurred in Intake (14%). In addition to reducing the likelihood that force will be used on the housing units, the Monitoring Team's recommendation to limit the use of the Probe Team would have the corollary benefit of reducing the chaos of Intake locations (because Probe Teams escort inmates to Intake following their intervention). The aftermath of incidents on the housing units could be more effectively managed by avoiding the transport of inmates to Intake and instead establishing a new de-escalation protocol (*e.g.*, one that occurs in a separate housing area where inmates can be held temporarily in individual cells while they await medical treatment).

*Reasons Force is Used*

The Department's data on the reasons force is used have not changed substantially over time either. In this Monitoring Period, the most frequently cited reason for using force is "Refusing Direct Orders" (30%), followed by "Inmate Fight" (26%), "Assaults on Staff" (15%) and "Resisting Restraint/Escort" (14%). Each of these requires its own set of problem-specific strategies. For example, efforts to reduce violence would have an obvious impact. Avoiding transporting inmates while they are escalated could reduce the frequency with which inmates

resist escort/restraints. Finally, enhancing staff skill in developing constructive rapport with inmates and in encouraging/motivating behavior could reduce the frequency with which staff resort to physical intervention in order to force compliance. As noted in the Current Status of Reforms section above, while the Department collects data and has the ability to identify these trends, it has yet to utilize the data to inform specific strategies that are implemented with any integrity or to coach line staff effectively to ensure a change in practice in any of the various high-risk circumstances identified above.

*Over Reliance on Probe Team Responses*

The Department over relies on the Probe Team to respond to incidents, which, as noted throughout the report, often escalates rather than defuses the need for force. Staff in the Facilities are equipped with personal body alarms, which they may use to seek additional help and support when a potential issue with an inmate arises. As noted in the Seventh Report (at pg. 23), "the demeanor of [the Probe Team] escalates the situation and virtually ensures that force will become necessary."

There are four different levels of response, but the two most common responses are a Level A or a Level B response (the other two responses are for significant disturbances or emergencies). A Level A response should be utilized most frequently as it is meant for disruptions such as medical emergencies, disruptive inmates who refuse to comply with Staff orders, inmate fights with no weapons, inmates smoking, contraband recovery, or uses of force (if Staff feel they can control the situation). Level A responses require Staff in the immediate area to respond and they are not suited like the Probe Team. A Level B alarm requires the response of the Probe Team and it is meant to respond to: inmates threatening Staff safety; assaults on Staff; inmate fights with weapons; multiple inmate fights or fights with potential to

escalate into larger, unmanageable disturbances; stabbings/slashings; unconscious inmates; uses of force (if Staff feels it rises to Level B); or any fire or security breach. By policy, a Probe Team is supposed to be a team of four to seven Officers and a Captain, including one camera operator. However, the Monitoring Team has found that the Probe Team often includes significantly more Staff, sometimes upwards of 15 to 30 Staff. The Probe Team are suited up in heavy riot gear which consists of: riot helmet, prison riot vest, baton, poly-carbon shield, MK-9 chemical agent, and breathing apparatus.

In this Monitoring Period there were approximately 8,100 alarms throughout the Department. Not surprisingly, there was a disproportionate number of Level B alarms (~83%) and a Level A alarm is infrequently called (in some Facilities a Level A alarm is never called). The Department's policy that allows any line Officer to request assistance from the Probe Team has resulted in its overuse, often contributing to unnecessary and excessive use of force. This broad permission is inconsistent with Monitoring Team's experience in systems around the country. The generally accepted practice is, when time and circumstances allow, for Staff to notify a Supervisor that assistance is needed, and the Supervisor evaluates the situation to determine the appropriate response. Given the Department's pattern of pre-mature and/or unnecessary Probe Teams deployment, the Monitoring Team recommended that the Department modify the Probe Team policy to align with generally accepted practice that a Supervisor evaluate the call for assistance to determine the appropriate response rather than allow the line Staff Member unfettered discretion for deployment of the Probe Team. The status of the revisions to the Probe Team policy are discussed in the Use of Force Policy section of this report. The Monitoring Team intends to closely scrutinize the Department's efforts to reduce the use of Probe Teams in the next Monitoring Period.

_Department's Efforts to Improve Staff Understanding of UOF Policy Requirements_

Two initiatives currently underway at the Department—Transfer of Learning and ID/Facility Coordinated Use of Force Analysis—are designed to improve line Staff and uniform leadership's understanding and implementation of the Use of Force Directive, which as described in the introduction to this report is foundational to the success of the reforms.

The Department developed and implemented Transfer of Learning ("TOL") in response to the Monitoring Team's recommendation in the Seventh Monitor's Report (at pg. 6) that the Department develop a strategy to address the persistent deficiencies in Staff's UOF practice. The Transfer of Learning initiative was designed to provide continuing education and training to Staff during Facility roll calls. Multiple short videos of actual use of force incidents—with corresponding talking points—were created for each topic area. Corresponding questions were also developed to accompany the presentation during roll calls. The videos are presented twice a week by Mentoring Captains and the Department used clicker technology to poll the Staff before and after the presentations to gauge Staff understanding of the video and questions posed. TOL was rolled out at GRVC, RNDC, BKDC, and MDC in the Spring of 2019, with plans to expand to AMKC, OBCC, and VCBC in the Ninth Monitoring Period.

The Transfer of Learning project addresses a number of topics, with a focus on reviewing core correctional practices and operations. Phase I of TOL addressed the following topics: Painful Escort Techniques; Alarm Responses; Use of Force situations; and Inmate Fights, with each topic being addressed for weeks at a time to ensure effective reinforcement (for example, Painful Escort techniques were taught for two weeks, Alarm Responses were taught for five weeks, and Use of Force situations were taught for eight weeks and divided into six sub-topics: Anticipated Use of Force situations; Passively Resistant inmates; Alternatives to Uses of

Force; Permissible Uses of Force; Uses of Force via Head Strikes; and Uses of Force via Chemical Agents Use). The Department has been consulting with the Monitoring Team on this initiative and provides draft copies of the lesson plans to the Monitoring Team to provide the opportunity for comment and feedback. TOL had only been occurring for a few months as of the end of the Eighth Monitoring Period, and the Monitoring Team will assess its effectiveness in the Ninth Monitoring Period.

ID has continued to create the weekly reports of the ID/Facility Coordinated Use of Force Analysis at OBCC, GRVC, AMKC, RNDC, MDC, and NIC/WF. These facilities were selected because they have the most concerning rates of UOF. The purpose of this initiative is to better align ID's and uniform Staff's understanding of the parameters surrounding the proper use of force. The reports are then discussed in weekly meetings held by the Chief of Department with other Facility leadership and representatives from ID and the Nunez Compliance Unit ("NCU"). These meetings are also utilized to review and discuss select UOF incidents and other *Nunez* related compliance initiatives. These reports and the subsequent meetings certainly provide an appropriate forum to develop internal consensus on the core principles guiding the appropriate use of force, and to enhance their skills in detecting misconduct. However, it does not yet appear to be supporting improved practice at the Facility level.

*Conclusion*

In summary, these data clearly describe the problem—that the UOF rate has continued to rise in each Facility and for each segment of the population, far beyond the serious conditions that gave rise to the Consent Judgment in the first place. Each of the trends discussed above carries with it a problem-specific solution. The Department must prioritize effective strategies

for addressing the underlying causes of each problem, whether related to age, the subset of inmates frequently involved in force, location or reason.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection and appropriate response to misconduct are essential for the Department to succeed in using force safely, proportionally, and only when necessary. In this section, the Monitoring Team provides an overview of the Department's ability to consistently identify misconduct and to respond with interventions that are likely to prevent re-occurrence. Effectively addressing use of force misconduct requires: (1) reliably identifying misconduct that occurs; (2) recommending proportional and effective responses to that misconduct; and (3) ensuring the responses are actually applied and in a timely manner.

While the Department continues to evaluate all UOF incidents through a variety of avenues described in this section, the evaluation of incidents does not reliably identify misconduct. In other words, Supervisors and investigators who evaluate these incidents are not consistently identifying whether and when force is necessary/unnecessary, avoidable/ unavoidable, or excessive/proportional. Accordingly, the misuse of force often goes undetected, and therefore unaddressed. Further compounding these issues is that the system is overwhelmed with the sheer volume of force so reliably identifying misconduct simply cannot occur on a timely or routine basis. As of the end of the Monitoring Period, there was a backlog of over 6,815 pending Preliminary Reviews, Facility Investigations, and Full ID Investigations–which results in a dearth of accountability for the incidents in the backlog and contributes to the Department's continued issues with implementing the UOF policy. That said, there was one bright spot of progress in this Monitoring Period. The Department improved the structures to ensure responses to identified misconduct are actually imposed. The Monitoring Team's September Recommendations are expected to support initiatives that will improve the Department's ability to: (1) reliably identify misconduct, (2) impose appropriate and timely

responses, and (3) ensure those responses are enacted. These efforts will be addressed in the next Monitoring Period.

*Identifying Use of Force-Related Misconduct*

The Department's various mechanisms for identifying misconduct are described below:

| INITIAL ASSESSMENT | | | INVESTIGATIONS | | |
|---|---|---|---|---|---|
| Rapid Reviews/ Avoidables | ID/Facility Coordinated Use of Force Analysis | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| **WHEN** | | | | | |
| Within 48 hours of incident | Within 7 days of the incident (meeting occur weekly) | Committee Meets Bi-Weekly | 5 Business Days[23] | 25 Business Days after referral from Preliminary Review | 120 Days after referral from Preliminary Review[24] |
| **BY WHOM** | | | | | |
| Warden, DWIC, DW | ID Supervisors | ID, Legal, Trials, Chiefs, Training Leadership | ID Staff | Facility Investigating Captain | ID Investigators |
| **INCIDENTS REVIEWED** | | | | | |
| Actual use of force incidents with video available, separate review conducted for each involved Staff Member | Actual use of force incidents with video available for AMKC, GRVC, MDC, NIC, RNDC, OBCC, and WF | Concerning incidents referred from variety of sources | All use of force incidents | Incidents that do not meet criteria for Full ID or PIC | Incidents that meet ¶ 8 criteria, or otherwise warrant Full ID Investigation |
| **INFORMATION REVIEWED FOR EACH INCIDENT** | | | | | |
| Video Only | Video Only (and Rapid Review) | Video, and other available evidence if necessary | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, conduct MEO-16 interviews (if needed) |
| **EIGHTH MONITORING PERIOD DATA** 3,574 Incidents from January 1, 2019-June 30, 2019 | | | | | |
| Rapid Reviews were conducted for 3,215 incidents that occurred between January 1, 2019 – | The ID/Facility Coordinated Use of Force Analysis was conducted for | Corrective action was recommended for 31 Staff. | 3,142 *Pending* Preliminary Reviews | 461 Facility Investigations closed in the | 888 UOF investigations closed during the Eighth Monitoring Period.[25] |

[23] Preliminary Reviews are taking far longer than five business days to be completed as discussed later in this report.

[24] ID is not currently able to complete Full ID Investigations within the 120-day time period as discussed later in this report.

[25] This number does not include cases that were lost to the statute of limitations—discussed more below.

| INITIAL ASSESSMENT | | | INVESTIGATIONS | | |
|---|---|---|---|---|---|
| Rapid Reviews/ Avoidables | ID/Facility Coordinated Use of Force Analysis | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| June 30, 2019, involving 11,085 Staff. | approximately 2,269 incidents | | 432 *Complete* Preliminary Reviews: | Eighth Monitoring Period | |

o **Initial Assessment of UOF Incidents**

  The combination of Rapid Reviews/Avoidables, ID/Facility Coordinated Use of Force

Analysis, the Immediate Action Committee, ad hoc review by Agency officials of use of force

incidents, and Preliminary Reviews creates multiple opportunities for identifying misconduct and

initiating timely and proportional corrective action (including discipline) when warranted.[26]

These processes provide a sufficient foundation to identify misconduct, but they are not

maximized due to the lack of consistent and reliable interpretation of the UOF policy.

o *Rapid Reviews*

  The Department continued its combined Rapid Reviews/Avoidables analysis this

Monitoring Period ("Rapid Reviews"). For every actual UOF incident captured on video,[27] the

Facility Warden must identify: (1) whether the incident was avoidable, and if so, how; (2)

whether the force used was necessary; (3) whether Staff committed any procedural errors; and

(4) for each Staff Member involved in the incident, whether any corrective action is necessary,

and if so, for what reason and of what type. The Rapid Reviews were also updated in January

2019 to include a specific question to identify whether unnecessary or painful escort techniques

---

[26] Depending on the severity or complexity of the violation, additional investigation may be required before corrective action can or should be imposed.

[27] The Rapid Reviews/Avoidables does not consider UOF allegations.

were utilized. The results of the reviews are forwarded up the chain of command for approval to the Bureau Chief of Facility Operations, whose office compiles the results and circulates the list to relevant stakeholders for review.

During this Monitoring Period, Rapid Reviews assessed 3,215 (95%) of the 3,399 actual uses of force involving 11,085 Staff actions.[28] Almost all incidents are now subject to a Rapid Review given the extensive video coverage in the Department. The chart below demonstrates the outcome of the Rapid Reviews over the last three Monitoring Periods.

| Rapid Review Outcomes – January 2018 to June 2019 | | |
|---|---|---|
| Jan. to June 2018[29] | July to Dec. 2018 | Jan. to June 2019 |
| Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations | | |
| **UoF Incidents Assessed** <br> 1,170 <br> (97% of actual incidents) | 3,087 <br> (94% of actual incidents) | 3,215 <br> (95% of actual incidents) |
| **Avoidable[30]** — 277 (24%) | 688 (22%) | 492 (15%) |
| **Unnecessary** — 104 (9%) | 186 (6%) | 126 (<1%) |
| **Procedural Violations** — 419 (36%) | 1,225 (40%) | 735 (22%) |
| Misconduct Identified[31] | | |
| **Staff Actions Assessed** — 3,745 | 12,129 | 11,085 |
| **Corrective Action Recommended[32]** — 841 <br> (22% of Staff Actions) | 2,754 <br> (23% of Staff Actions) | 2,072[33] <br> (19% of Staff Actions) |

---

[28] The fact that 11,085 staff actions were evaluated does not mean that 11,085 unique Staff Members were involved in UOF. Rather, this number reflects the Staff actions evaluated for all UOF reviewed and certain Staff were likely reviewed multiple times as they were involved in multiple use of force incidents.

[29] A revised version of Rapid Reviews was implemented beginning in April 2018 which combined Rapid Reviews with the "Avoidables" process which was previously separate. This data reflects only data following the implementation of the new process in April 2018.

[30] An incident may be found to be both avoidable and unnecessary.

[31] It is worth noting that corrective action was often not recommended in cases that were subject to a Full ID investigation because the Facility defers to the outcome by ID.

[32] For comparison purposes across Monitoring Periods in this chart, the "Corrective Action Recommended: Yes/No" field was used.

[33] The recommended corrective actions are intended to address any misconduct related to an incident that is found to be avoidable, unnecessary, or have procedural violations, and one incident may have corrective action for multiple Staff involved.

The table above demonstrates that Facilities leadership are identifying some situations where Staff have engaged in misconduct. However, the critical assessment of whether an incident was unnecessary and/or avoidable is not yet reliably identifying all incidents that fit in these categories. Notably, the number of identified avoidable incidents decreased in this Monitoring Period compared with the last Monitoring Period. Certainly, the overall goal of the reforms is to reduce the number of avoidable incidents, which should also result in a corresponding reduction in the number of overall UOF incidents. However, a finding that there are less avoidable UOF incidents is not consistent with the Monitoring Team's assessment that there has been no appreciable change in Staff practice to suggest there are less avoidable UOF incidents.[34] In fact, the overall increase in use of force incidents suggests that at least some of the increased number of incidents may also be unnecessary and/or avoidable.

The Department has improved its ability to confirm the misconduct identified through Rapid Reviews is actually addressed. NCU implemented a new process in this Monitoring Period to track cases where the Facility recommended corrective action should be taken and then whether the administrative actions were imposed. NCU's tracking process increased awareness and visibility of those cases that merited action, which supported improved practice by the Facilities in actually imposing the corrective action. In total, 1,672 recommendations for corrective were identified by NCU to be completed by the Facilities.[35] NCU confirmed 1,612 of

---

[34] The Monitoring Team has not been able to evaluate all UOF incidents in this Monitoring Period because of the backlog of Preliminary Reviews. That said, the review of incidents to date suggests that there has been no appreciable progress in the Department's practices related to use of force.

[35] This number is less than the number of corrective actions initially recommended by the Rapid Reviews because it removes any recommended corrective action that NCU determined should not or need not be imposed—either because it was put on hold in deference to the outcome of the Full ID investigation, or the recommendation for corrective action was a manual entry error (e.g. the Corrective Action

the 1,672 (96%) recommended responses were completed. NCU confirmed that 925 recommended administrative actions (*e.g.* counseling, re-training, suspensions, etc.)[36] were completed and 687 Command Disciplines were initiated in the Case Management System ("CMS"). It is worth noting that some Command Disciplines initiated in CMS do not result in the relinquishment of compensatory days either because they are resolved for corrective interviews or verbal reprimands, or they are dismissed (discussed in more detail in the Command Discipline section below).

In an effort to bolster and improve the Facilities' assessment of incidents through the Rapid Reviews, ID has continued and expanded the ID/Facility Coordinated Use of Force Analysis to seven Facilities. In weekly meetings between ID staff and Facility leadership, ID prepares and shares a summary of incidents that occurred at the Facility the prior week. The group discusses these findings, focusing on problematic incidents and/or incidents that ID and the Facility (based on the Rapid Review) viewed differently, in order to improve the Facility leaderships' ability to identify misconduct more reliably. One weakness of this initiative is there is no process in place to ensure that the Facilities address the cases where ID identifies misconduct occurred and a Facility response is necessary, but the Facility did not initially identify that corrective action was necessary in the Rapid Review.

---

Recommended field of the excel stated "Yes," but no type of corrective action was included in the relevant column).

[36] Due to the manual data-entry in the Rapid Reviews, the data is not tracked in a manner that allows the Monitoring Team to reliably breakdown the categories of recommendations without an individual assessment of each entry. That said, the majority of recommended action were counseling and re-training.

o *Immediate Action*

An immediate response (*e.g.* suspension, re-assignment, counseling, etc.) is necessary to address certain misconduct and ensure that Staff are held to a common understanding and expectation of how to reasonably utilize force. Given the current investigation backlog, immediate action is needed to adequately hold Staff accountable. The Department currently identifies and addresses misconduct for immediate action either through ad hoc review by uniform or civilian leadership and/or following an assessment of the incident by the Immediate Action Committee.[37] Cases are referred to the Immediate Action Committee by leadership, the ID/Facility Coordinated Use of Force Analysis, and/or Preliminary Reviews.

The Department is taking immediate action to address certain misconduct, but this process is underutilized. The Monitoring Team continues to find examples of incidents that are not elevated for consideration of Immediate Action and/or are not identified despite objective evidence of misconduct. An expanded scope of cases must be considered, including (1) incidents with objective evidence of Staff insubordination when the Staff Member is directed to disengage from the incident; (2) objective evidence of unnecessary force due to Staff's hyper-confrontational approach; and (3) incidents that involve a Staff Member who has been engaged in a repeated pattern of misconduct.

---

[37] The Immediate Action Committee continues to meet bi-weekly to review any cases in which immediate disciplinary action (*e.g.*, suspension or modified duty) should be considered, as identified by executive leadership (uniformed and civilian), ID, or staff of the Early Intervention, Support, and Supervision Unit ("E.I.S.S"). In particular, incidents are prioritized when it appears a Staff Member has more likely than not engaged in conduct that would merit potential termination pursuant to Consent Judgment § VIII, ¶ 2(d)(i) to (iii). The Department may elect to suspend or modify duty of a Staff Member for a variety of reasons beyond potential termination cases.

■ Immediate Action Committee

The table below demonstrates the responses recommended by the Immediate Action Committee as well as some of the ad hoc actions taken by leadership outside of the Immediate Action Committee.[38] The Monitoring Team has found that the Department's immediate action responses are generally reasonable when imposed.

| Immediate Action Committee Recommended Outcomes[39] | | | | | |
|---|---|---|---|---|---|
| | Fourth Monitoring Period | Fifth Monitoring Period | Sixth Monitoring Period | Seventh Monitoring Period | Eighth Monitoring Period |
| Total Use of Force - Incidents Considered | 29 | 34 | 51 | 42 | 34 |
| Total Staff Members - Immediate Action Recommended | 30 | 39 | 67 | 30 | 31 |
| *Suspension* | *7* | *9* | *18* | *7* | *10* |
| *Modified Duty/Re-assignment* | *5* | *5* | *8* | *11* | *10* |
| *Retraining* | *15* | *7* | *12* | *0* | *9* |
| *Counseling* | *10* | *24* | *29* | *16* | *6* |
| *Command Discipline* | *3* | *5* | *16* | *6* | *0* |
| *Other (including E.I.S.S. screening, PDR submissions or recommendation to Fast-Track Investigations)* | *0* | *0* | *12* | *14* | *20* |
| *The immediate action taken sometimes included a combination of responses—e.g., modified duty and re-training—so the action totals are greater than the total number of Staff.* | | | | | |

In this Monitoring Period, the Department established an internal mechanism to confirm the Immediate Action Committee recommendations are implemented as the Monitoring Team found that recommended immediate actions had not been consistently implemented in prior

---

[38] The ad hoc imposition of immediate action is also tracked through the work of the Immediate Action Committee, although some responses are inadvertently not tracked given the very nature of ad hoc responses.

[39] Immediate corrective action taken by the Facility through the Rapid Reviews process (as described above) is not included in this data.

Monitoring Periods. This process resulted in some improvement that recommended actions were completed, but the Monitoring Team had to diligently scrutinize this process to obtain the necessary confirmations. In particular, certain recommendations require multiple responses for the same Staff Member, which requires additional coordination to implement and track. While most recommendations were implemented, certain recommendations were not completed and/or remain pending and, in some cases, supplemental action was taken instead of the original recommendation. It appears the Department can implement certain responses more successfully (*e.g.* suspensions) while recommendations to "Fast Track" cases (cases that are pushed to Trials more quickly that can be closed via a negotiated plea agreement) and/or impose a PDR were not always implemented as recommended. For the 31 Staff Members with recommended Immediate Action this Monitoring Period, all but two Staff Members had some type of corrective action imposed (the two Staff Members with no implemented Immediate Action were recommended for re-training that was not yet provided as of the end of the Monitoring Period). Ultimately, it is encouraging that the Department was able to confirm that most Staff recommended for immediate action had at least some corrective action imposed. The Monitoring Team intends to work with the Department in the next Monitoring Period to further enhance the tracking process to ensure that recommendation for immediate action are implemented consistently and timely.

▪ <u>Suspension, Modified Duty and Re-Assignment</u>

During this Monitoring Period, the Monitoring Team verified that the Department suspended 23 Staff Members for use of force-related misconduct (compared with 11 Staff

Members in the last Monitoring Period), with suspensions lasting from one to 15 days.[40] The suspensions imposed over the last three Monitoring Periods are demonstrated in the chart below.

| Suspensions by Monitoring Period | | | |
|---|---|---|---|
| | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period |
| CO | 14 | 9 | 16 |
| Captain | 7 | 2 | 7 |
| ADW | 0 | 0 | 0 |
| Warden | 0 | 0 | 0 |
| **Total** | **21** | **11** | **23** |

The Department also recommended modification to Staff Members' duty, or re-assigned Staff several times during this Monitoring Period. Staff re-assignment or modification occurs via so many avenues that aggregating and comparing the data is difficult. As noted above, the Immediate Action Committee recommended the modification and/or reassignment of 10 Staff in this Monitoring Period. Further, the Department recommended the modification and/or reassignment of two Staff as part of its assessment under § XII ¶ 7 (discussed in Screening & Assignment of Staff section of this report). These administrative responses, particularly suspensions, are an important tool for addressing identified misconduct close-in-time to the incident and the Monitoring Team urges the Department to continue to maximize their use of these options.

- o **Investigating Use of Force-Related Misconduct**

Although the Consent Judgment requires three separate investigations for use of force incidents — Preliminary Reviews (including "No Further Action" cases), Facility Investigations,

---

[40] As per Department policy (Memorandum 01/99 - Suspension without Pay (Captain and Above)), all suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay.

and Full ID Investigations — the reality is that an investigation of a UOF incident is fluid and the workflows are interrelated and overlapping. The fundamental investigative steps conducted at the Preliminary Review stage often make the distinction between a Preliminary Review, Facility Investigation, and Full ID Investigation arbitrary. Further, in practice, Preliminary Reviews encompass all elements required for a Facility Investigation. In fact, the Monitoring Team continues to find that Facility Investigations add no value to the process of addressing Staff misconduct.

The Department has been unable to keep pace with the investigation of UOF incidents. Approximately 6,800 (69%) of the 9,900 UOF incidents that occurred between January 2018 and June 2019 are still pending.[41] The majority of these investigations are pending with ID (~6,300) and the majority of cases pending with ID are awaiting the completion of the Preliminary Review (~4,300). A small portion (~500) of investigations are awaiting the completion of a Facility investigation. The chart below provides the investigation status of all incidents that occurred between January 2018 and June 2019.

| Investigation Status as of July 15, 2019 | 6th Monitoring Period | | 7th Monitoring Period | | 8th Monitoring Period | | Grand Total | |
|---|---|---|---|---|---|---|---|---|
| **Total UOF Incidents** | **2,818** | | **3,485** | | **3,574** | | **9,877** | |
| **Pending Preliminary Reviews** | 3 | **<1%** | 1,187 | **34%** | 3,142 | **88%** | **4,332** | **44%** |
| **Closed Preliminary Reviews** | 2,815 | **~100%** | 2,298 | **66%** | 432 | **12%** | **5,545** | **56%** |
| *1.   Pending Facility Cases* | *102* | *4%* | *287* | *12%* | *81* | *19%* | *470* | *8%* |
| *2.   Pending ID Cases* | *1,051* | *37%* | *778* | *34%* | *184* | *43%* | *2,013* | *36%* |
| *3.   Investigation Closed (PICs, Facility, ID)* | *1,662* | *59%* | *1233* | *54%* | *167* | *39%* | *3,057* | *55%* |

---

[41] As of June 30, 2019, the statute of limitations has expired for all cases that occurred prior to January 1, 2018.

o Preliminary Reviews

Preliminary Reviews continue to serve as the Department's best resource for an assessment of what occurred during a use of force. Preliminary Reviews are the foundation of use of force investigations at the Department, and entail collecting, reviewing, and analyzing key evidence in an investigation including video surveillance, Staff and witness reports, medical documentation, inmate statements and interviews, and other documentation like logbook entries.

44% (4,332) of all incidents that occurred between January 2018 and June 2019 are pending completion of a Preliminary Review.[42] The table below identifies the status of the pending Preliminary Reviews for incidents that occurred in the Seventh and Eighth Monitoring Period. Of the 4,332 investigations pending Preliminary Reviews, 2,583 (60%) are awaiting Supervisory review and 1,749 (40%) are pending with the investigator.[43] Of the 2,581 cases pending Supervisory review, 755 (29%) cases were referred for closure on the Preliminary Reviews, 645 (25%) were referred for Facility investigations, and 1,181 (46%) cases were referred for Full ID investigations.

| Status of Pending Preliminary Reviews (by Incident Date) *As of July 15, 2019* | | | | |
|---|---|---|---|---|
| | 7th Monitoring Period | | 8th Monitoring Period | |
| Pending Investigator Review | 245 | 21% | 1503 | 48% |
| Referral for Closure on Preliminary Review - Supervisory Approval | 250 | 21% | 505 | 16% |
| Referral for Facility Investigation - Supervisory Approval | 232 | 20% | 413 | 13% |
| Referral for Full ID Investigation - Supervisory Approval | 460 | 39% | 721 | 23% |
| | 1187 | 100% | 3142 | 100% |

---

[42] Three incidents that occurred in the Sixth Monitoring Period are also pending Preliminary Reviews. Given the very small number of incidents they are not depicted in the charts of pending Preliminary Reviews.

[43] Preliminary Reviews pending with the investigators are in various stages of review—the investigators often conduct the initial call-out to interview the inmate within days of the incident, and conducting the summary and analysis of the additional evidence is in various stages (up through nearly complete).

Preliminary Reviews originated as a close in time assessment of use of force incidents (within five business days) which would funnel cases for further investigation by ID or the Facility, with a small portion closing following the completion of the Preliminary Review. The sheer volume of use of force incidents has resulted in a backlog of cases and Preliminary Reviews simply do not occur close in time to the incident date. Of the Preliminary Reviews that were closed between the Sixth and Eighth Monitoring Periods (n=5,545), 46% (n=2,536) took more than 60 business days to close, and 23% (n=1,275) took more than 90 business days to close. It is important to note that the time to complete Preliminary Reviews only captures 56% of UOF incidents that occurred between January 2018 and June 2019 (*e.g.* only 12% of the incidents from the Eighth Monitoring Period have closed Preliminary Reviews) given the large number of *pending* Preliminary Reviews.

| Timing of Closed Preliminary Reviews (by Incident Date) As of July 15, 2019 | | | | | | |
|---|---|---|---|---|---|---|
| *Business Days to Closure— From Date of Incident* | 6th MP Cases - Closed | | 7th MP Cases - Closed | | 8th MP Cases - Closed | |
| 0 to 10 Business Days | 186 | 7% | 39 | 1% | 9 | 0% |
| 11 to 30 Business Days | 862 | 31% | 354 | 10% | 44 | 1% |
| 31 to 60 Business Days | 750 | 27% | 647 | 19% | 118 | 3% |
| 61 to 90 Business Days | 690 | 24% | 424 | 12% | 147 | 4% |
| 91 to 120 Business Days | 292 | 10% | 390 | 11% | 107 | 3% |
| 121 to 150 Business Days | 28 | 1% | 236 | 7% | 7 | 0% |
| 151 to 180 Business Days | 4 | 0% | 178 | 5% | | |
| 181 to 210 Business Days | 2 | 0% | 26 | 1% | | |
| 211 to 240 Business Days | 1 | 0% | 4 | 0% | | |
| 241 to 270 Business Days | 0 | 0% | 0 | 0% | | |
| 271 to 300 Business Days | 0 | 0% | 0 | 0% | | |
| 301 to 330 Business Days | 0 | 0% | 0 | 0% | | |
| 331 to 360 Business Days | 0 | 0% | 0 | 0% | | |
| | | | | | | |
| **Total Use of Force** | **2,818** | | **3,485** | | **3,574** | |
| *Number of Closed Preliminary Reviews* | *2815* | *~100%* | *2298* | *66%* | *432* | *12%* |

In order to evaluate the overall time to complete Preliminary Reviews, the closed data must be analyzed in conjunction with the timing data for pending Preliminary Reviews. This data demonstrates that the time to complete a Preliminary Reviews is increasing. 65% of the Preliminary Reviews (n=1,798) for all incidents that occurred in the Sixth Monitoring Period

were completed in less than 60 business days with almost all Preliminary Reviews (n=982) completed within 90 business days. While this time frame to complete Preliminary Reviews is too long, the time to complete Preliminary Reviews has only continued to increase. Only 30% of Preliminary Reviews (n=1,040) for incidents that occurred in the Seventh Monitoring Period were completed in less than 60 business days. Further, almost 50% of Preliminary Reviews for incidents that occurred in the Seventh Monitoring Period were closed and/or pending beyond 120 days, which is the deadline to complete the Full ID investigation. The time to complete Preliminary Reviews for incidents that occurred in the Eighth Monitoring Period must be analyzed with caution as these incidents occurred more recently and the majority of Preliminary Reviews are pending so that combined with the large backlog suggest that the Preliminary Reviews will not be closed soon. At best, only 48% of incidents (n= 1,704) that occurred in the Eighth Monitoring Period will close within 60 business days, meaning at least 52% of incidents will have Preliminary Reviews closed beyond 60 business days, compared with 35% in the Sixth Monitoring Period.

| Timing of Pending Preliminary Reviews (by Incident Date) As of July 15, 2019 | | | | |
|---|---|---|---|---|
| *Business Days to June 30, 2019— From Date of Incident* | 7th MP Cases Pending | | 8th MP Cases Pending | |
| 0 to 10 Business Days | 0 | 0% | 269 | 8% |
| 11 to 30 Business Days | 0 | 0% | 493 | 14% |
| 31 to 60 Business Days | 0 | 0% | 771 | 22% |
| 61 to 90 Business Days | 0 | 0% | 725 | 20% |
| 91 to 120 Business Days | 0 | 0% | 674 | 19% |
| 121 to 150 Business Days | 449 | 13% | 210 | 6% |
| 151 to 180 Business Days | 431 | 12% | | |
| 181 to 210 Business Days | 281 | 8% | | |
| 211 to 240 Business Days | 24 | 1% | | |
| 241 to 270 Business Days | 2 | 0% | | |
| 271 to 300 Business Days | 0 | 0% | | |
| 301 to 330 Business Days | 0 | 0% | | |
| 331 to 360 Business Days | 0 | 0% | | |
| | | | | |
| **Total Use of Force** | **3,485** | | **3,574** | |
| *Number of Closed Preliminary Reviews* | *1187* | *34%* | *3142* | *88%* |

In order to address the growing backlog of Preliminary Reviews, the Monitoring Team recommended early in the Eighth Monitoring Period that ID prioritize certain pending Preliminary Reviews to triage the growing backlog. In response, the Department reported it would prioritize the closure of Preliminary Reviews for Class A incidents and leverage the work of the ID/Facility Coordinated Use of Force Analysis weekly reports to identify cases with serious misconduct to ensure the Preliminary Reviews for those matters were expedited. As a result of this work, almost all (93%) Class A incidents that occurred in the Eighth Monitoring Period have a completed Preliminary Review. ID also streamlined the supervisory review of Preliminary Reviews by eliminating the requirement that both a Supervisor and Deputy Director of Investigations ("DDI") must review every incident. The Supervisor will review all Preliminary Reviews, but the DDI will only review a sample of completed Preliminary Reviews. Given the concerning state of affairs, the Monitoring Team also assisted the Department by recommending the prioritization of Preliminary Reviews for certain cases identified through the Monitoring Team's routine assessment of incidents on the Central Operations Desk ("COD") reports, the ID/Facility Coordinated Use of Force Analysis weekly reports, and other ad hoc reviews. ID routinely expedited the completion of the Preliminary Reviews for the incidents recommended by the Monitoring Team.

The delays in completing Preliminary Reviews has a ripple effect on the Department's ability to address potential misconduct as it delays the referral of these investigations for a Facility or Full ID investigation and ultimate disposition. Further, it impacts the Department's (and Monitoring Team's) ability to identify trends and patterns regarding the Department's use of force, including potential trends in Staff use of force that may be addressed through programs like the Early Intervention, Support, and Supervision Unit ("E.I.S.S.").

    o  <u>Full ID Investigations</u>

The referral for a Full ID investigation is delayed because the Preliminary Reviews are not completed timely. In this Monitoring Period only a few hundred of the anticipated thousands of referrals for the Full ID investigations have been made. Further, the same investigators that conduct Preliminary Reviews are also responsible for completing the Full ID Investigation. It is therefore no surprise that ID is struggling to close these cases timely. For example, 20% of (n=1,397) incidents from the Seventh and Eighth Monitoring Period have Preliminary Reviews *pending beyond 120 days*—meaning any subsequent ID Investigation will be closed beyond the 120-day deadline to complete Full ID investigations.

ID closed more cases in this Monitoring Period than in prior Monitoring Periods (888 cases[44] closed compared with 583 in the last Monitoring Period). 48% of the cases closed related to incidents that occurred before June 30, 2018 with the remaining occurring in the last year, which is encouraging.

| ID Cases Closed in 8th Monitoring Period (by Date of Incident) *As of July 15, 2019* | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date of Incident | Jan. - Dec. 2016 | Jan. - June 2017 | July - Dec. 2017 | Jan. - June 2018 | July - Dec. 2018 | Jan. - June 2019 | Total[45] |
| **Total** | 10 (~1%) | 34 (4%) | 349 (39%) | 38 (4%) | 354 (40%) | 103 (12%) | 888 (100%) |

Unfortunately, the increased closure rate has not kept pace with the volume of cases that are referred for Full ID investigations. The overwhelming majority of investigations have not

---

[44] This number does not include cases that were lost to the statute of limitations—discussed more below.

[45] This includes 450 cases closed following the Preliminary Review as Expedited closure or PIC cases by the ID Investigator, and 438 cases closed as traditional Full ID cases.

closed within the Consent Judgment's original 180-day timeline, nor the new 120-day timeline

that went into effect on October 1, 2018. In fact, approximately 2,000 pending cases were lost to

the 18-month statute of limitations ("SOL"), meaning any potential misconduct has gone

unchecked.[46] ID summarily closed these cases in this Monitoring Period, which partially

accounts for the significant drop in the number of pending Full ID cases from last Monitoring

Period (2,400 cases pending compared with 4,500 pending cases from the prior Monitoring

Period). The growing backlog of Preliminary Reviews also accounts for fewer pending Full ID

cases.

The time Full ID investigations are pending with ID is best understood by looking at data

on both pending cases and those that have been closed. The table below demonstrates the length

of time cases were pending as of the last day of the Sixth, Seventh, and Eighth Monitoring

Periods, along with the number of cases closed in each Monitoring Period. Demonstrating the

inability of ID to comply with the 120-day deadline for investigations, 92% (n=2,212) of the

2,397 ID cases pending at the close of the Eighth Monitoring Period were already pending

beyond the 120-day deadline.

---

[46] The narrative of the Use of Force Investigation section provides an in-depth summary of this issue and
the efforts the Department has taken to mitigate the possibility that future cases are lost to the statute of
limitations going forward.

| Status of UOF Incidents Subject to ID Investigations | | | | | | |
|---|---|---|---|---|---|---|
| | Pending as of June 30, 2018 | Closed Between Jan. – June 2018 | Pending as of Dec. 31, 2018 | Closed Between July – Dec. 2018 | Pending as of June 30, 2019[47] | Closed Between Jan. – June 2019 |
| Within 120-days *post October 1, 2018* | 898 (24%) | 159 (26%) | 325 (7%) | 231 (41%) | 88 (4%) | 149 (17%) |
| 121 days to 180 days | | | 417 (9%) | 80 (14%) | 97 (4%) | 176 (20%) |
| 181 days to 18 months | 2,248 (59%) | 353 (57%) | 2,366 (52%) | 105 (19%) | 1,857 (77%) | 412 (46%) |
| 18 months to 2 years | 535 (14%) | 101 (16%) | 864 (19%) | 113 (20%) | 287 (12%) | 128 (14%) |
| Beyond 2 years | 125 (3%) | 5 (1%) | 600 (13%) | 34 (6%) | 68 (3%) | 23 (3%) |
| **TOTAL** | **3,806** | **618** | **4,572** | **563** | **2,397** | **888**[48] |

- Facility Investigations

Facility Investigations are also impacted by the delayed closure of Preliminary Reviews. Compounding the problem is that Facility Investigations do little to build upon the work of the Preliminary Review, are generally repetitive and often of poorer quality than the Preliminary Review, and thus appear to be unnecessary. Facility Investigations are required to be completed in 25 business days from the incident date, but the investigation does not even begin until well beyond the 25-business day deadline, given the Preliminary Review backlog, and therefore none of the Facility Investigations closed in this Monitoring Period were closed within that deadline. Of those Facility Investigations that have been closed, the average time to closure during the

---

[47] The data presented in this chart does not correspond with the data in the chart above under the heading "Delays in Completing Preliminary Reviews" because this chart is not limited to incidents from the Sixth, Seventh, and Eighth Monitoring Period.

[48] The 2,000 SOL cases that were summarily closed by ID are not included in the closed data below because those cases were closed on a technicality. The approximately 500 pending/closed cases that are reported to be pending/closed beyond the 18-month time frame for this Monitoring Period (highlighted in yellow) were not part of the group of cases summarily closed by ID in this Monitoring Period, and were either evaluated before the expiration of the SOL and had charges brought before the SOL expired, or closed past the SOL early in the Monitoring Period through the normal course of investigation prior to the SOL-closure project.

Eighth Monitoring Period was 95 business days from the incident date. The chart below illustrates the time to complete Facility Investigations once they are referred from the Preliminary Review in order to demonstrate how long the Facility takes to complete the investigation. Overall, only 13% of Facility Investigations were closed or pending within 25 business days of referral by the Preliminary Review.

| Status of Facility Investigations Closed or Pending within the 8th Monitoring Period *As of July 15, 2019* | | | | |
|---|---|---|---|---|
| **Investigation Status** | **Investigations Closed or Pending Within 25 Business Days from Preliminary Review Completion Date** | **Investigations Closed or Pending Between 26-40 Business Days from Preliminary Review Completion Date** | **Investigations Closed or Pending Beyond 40 Business Days from Preliminary Review Completion Date** | **Total Cases** |
| **Closed** | 41 (33%) | 64 (50%) | 380 (56%) | **485 (51%)** |
| **Pending** | 85 (67%) | 65 (50%) | 324 (46%) | **474 (49%)** |
| **Total** | **126 (13%)** | **129 (14%)** | **704 (73%)** | 959 |

*Addressing Use of Force-Related Misconduct*

Consistent, reliable, and proportional responses to identified misconduct is necessary to effectively shape Staff behavior and minimize the possibility that the misconduct will reoccur. The Department is struggling to adequately address use of force-related misconduct due to the Department's inconsistent identification of misconduct and the backlog of investigations and increasing workload within the Trials division. Currently, the informal and formal disciplinary process are both lengthy and unreliable. Accordingly, the Monitoring Team continues to strongly encourage the Department to utilize and enhance its entire spectrum of responses to stimulate necessary behavior change and ensure a *timely* and *proportional* response is ultimately *imposed*. The Department's ability to address misconduct is discussed in turn below.

    o   *Facility Referrals*

ID continued utilizing Facility Referrals, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to a Facility with instructions for the Facility to take appropriate action. Facility Referrals are a useful tool as they provide an opportunity to respond to minor misconduct at the Facility-level and hopefully mitigate the possibility of it re-occurring in the future. The table below depicts the number of Facility Referrals made during each Monitoring Period, and the average length of time for the Facility to respond. The number of Facility Referrals generated decreased 43% during the Eighth Monitoring Period from its previous level (155 and 270, respectively), likely due to ID's backlogs. Some Facility-based ID teams use Facility Referrals more than others, particularly HOJC, AMKC, BKDC, OBCC, VCBC and MDC.

| Facility Referrals, July 2017 to June 2019<br>*Status as of July 31, 2019* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **By Date of First Email Sent to Facility** | **July to Dec. 2017** | | **Jan. to June 2018** | | **July to Dec. 2018** | | **Jan. to June 2019** | | **Total** |
| **Total** | **235** | | **188** | | **270** | | **155** | | **848** |
| Use of Force Related | 229 | 97% | 176 | 94% | 231 | 86% | 142 | 92% | 778 | 92% |
| Non-Use of Force Related | 6 | 3% | 10 | 5% | 39 | 14% | 13 | 8% | 68 | 8% |
| Resolved | 233 | 99% | 183 | 97% | 183 | 68% | 102 | 66% | 701 | 83% |
| Average Length of Response for those Resolved (in Days) | 59 | | 39 | | 42 | | 43 | | 48[49] |
| Pending Response | 2 | 1% | 5 | 3% | 87 | 32% | 52 | 34% | 147 | 17% |

---

[49] The Facility Referral excel is a tracking excel that is managed manually so there are occasional entry errors—this timing data was generated after removing response dates that appeared to be entry errors (e.g. response dates before the date the Facility Referral was sent, etc).

o   *Counseling, Corrective Interviews, and Re-Training*

The Monitoring Team encourages the use of counseling, corrective interviews, and re-training when they are substantive and utilized appropriately. The Department reports it counsels and/or conducts a corrective interview with a significant number of Staff through the 5003 process and in response to Rapid Reviews.[50] In this Monitoring Period at least 1,300 Staff were counseled. The Monitoring Team has found that the Department often defaults to utilizing a counseling session to address identified misconduct even when the objective evidence suggests that the imposition of a more significant sanction is merited (*e.g.* a Command Discipline that relinquishes compensatory days). That said, in cases where more significant discipline is imposed, the *addition* of re-training, corrective interviews and/or counseling to support improved practice would also benefit the Staff Member.

The Department's ability to identify, track, and provide re-training has improved in this Monitoring Period. The computerized Service Desk system was implemented. This system is accessible to the Facilities and ID and all recommendations for Staff re-training can be inputted into the system directly by the individual making the recommendation. The majority of re-training requests are submitted by the Facility (47%) and ID (32%) with some requests coming from the Trials Division, E.I.S.S., the Chief's Office, and the Immediate Action Committee. Once the request is entered, the Academy and the Staff Member's assigned command are responsible for tracking the status of the training to ensure that the Staff Member attends the course. The Service Desk ticket is then closed once the Academy confirms re-training occurred.

---

[50] The Department appears to utilize the terms counseling and corrective interview interchangeably, but they both appear to be used by management as an opportunity for leadership to meet with Staff and discuss a use of force incident.

As described further in the Training section of this report (¶ 5), not all re-training requested through the Service Desk was provided before the ticket was closed out, although the process improved toward the end of the Monitoring Period. A total of 410 requests for re-training were submitted during the Eighth Monitoring Period, of which 295 requests (72%) were fulfilled by mid-July 2019. The training courses requested most often were Use of Force (29%), Chemical Agents (20%), Use of Force Report Writing (19%), and Situational Awareness (12%).

   o   *Command Discipline ("CD")*

The Monitoring Team has long encouraged the Department to use the Command Discipline process to impose disciplinary action, when appropriate, because it is a reasonable response to lower level misconduct and the process is less cumbersome than imposing formal discipline. A Command Discipline can range from verbal reprimand up to the forfeiture of five vacation/compensatory days. Command Discipline is governed by a detailed policy that, among other things, requires CDs to be issued and adjudicated within timeframes that are much shorter than those for formal discipline. Command Disciplines are utilized in two ways. The Facility may generate a Command Discipline within 30 days of an incident (to then be subsequently adjudicated). A Command Discipline may also be generated as part of a Negotiated Plea Agreement ("NPA") with a recommendation to adjudicate at the Facility level or with an agreed upon number of days (up to five days) to be forfeited by the Staff Member—this type of CD is discussed under the Formal Discipline section below under the heading "Imposition of NPAs".

The processing of Command Disciplines at the Facility level requires multiple steps: (1) the CD must be generated in CMS within 30 days of the incident date; (2) the case is adjudicated by a hearing Officer who determines the outcome of the CD (ranging from dismissal to a five-day penalty for Staff); and (3) if the penalty is a reduction in vacation or compensation days, HR

is notified and must remove the days from the Staff Member's official time bank ("CityTime"). As discussed in the Seventh Monitor's Report (at pgs. 40-42), the value of CDs was diminished because the Department struggled to consistently adjudicate (meaning the hearing to determine what discipline should be imposed does not occur) and/or impose (meaning that the recommended discipline is not actually instituted via CityTime deductions) the CD.

In this Monitoring Period, the Department made efforts to fortify the CD process. NCU now conducts routine assessments of Command Disciplines by tracking and collecting proof of practice for CDs that are recommended via Rapid Reviews (as the vast majority of CDs for UOF-related misconduct are identified through this process). NCU tracks all phases of this process using a centralized spreadsheet, that is accessible to all Facility leadership, so that the status of a CD can be easily identified so they are processed timely. The Facility leadership is responsible for ensuring a CD hearing is scheduled and adjudicated. This process required significant groundwork and oversight by NCU to get up and running. NCU's diligent tracking and monitoring resulted in increased focus and ownership by Facility leadership and significant improvement to the integrity of the CD process. As demonstrated in the table below, the number of CDs that were dismissed or closed administratively decreased from 50% in January to 7% in May, and 12% in June.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews *As of September 26, 2019* | | | | |
|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | Resulted in Days Deducted, Verbal Reprimand, or Corrective Interview | Closed Administratively, Never Entered into CMS, or Dismissed at Hearing |
| January 2019 | 207 | 6 (3%) | 100 (48%) | 101 (49%) |
| February 2019 | 100 | 1 (1%) | 51 (51%) | 48 (48%) |
| March 2019 | 85 | 6 (7%) | 71 (84%) | 8 (9%) |
| April 2019 | 95 | 0 (0%) | 86 (91%) | 9 (9%) |
| May 2019 | 122 | 0 (0%) | 114 (93%) | 8 (7%) |
| June 2019 | 148 | 6 (4%) | 124 (84%) | 18 (12%) |
| **Total** | **757** | **19 (3%)** | **546 (72%)** | **192 (25%)** |

NCU also liaisons with HR to ensure that the adjudicated CD is then entered into the Staff Member's personnel file, and CityTime bank deductions take place in a reasonable timeframe. The majority of Command Disciplines that result in the relinquishment of compensatory time for Staff are entered into the Staff Member's personnel file in an average of 42 days via CityTime as demonstrated in the chart below. Given the processing and work that must occur this timeframe appears reasonable. NCU was able to confirm proof of practice for nearly all finalized use of force-related CDs stemming from Rapid Reviews for the Eighth Monitoring Period, except for some CDs from June 2019 incidents which were recently processed so the fact that proof of practice was not yet available is understandable. To the extent that the time has not been entered, NCU continues to follow-up with HR to make sure the CD is processed.

| Status and Timing of CityTime Deductions | | | |
|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Resulting in Days Deduction | CityTime Deduction Confirmed | Average Time for Processing CityTime Deduction |
| January 2019 | 55 | 55 (100%) | 46 days |
| February 2019 | 32 | 31 (97%) | 48 days |
| March 2019 | 52 | 50 (96%) | 36 days |
| April 2019 | 66 | 65 (98%) | 37 days |
| May 2019 | 88 | 86 (98%) | 42 days |
| June 2019 | 89 | 66 (74%) | 42 days |
| Total | 382 | 353 (92%) | Average of 42 Days |

It is worth noting that CMS generated reports demonstrate that there are hundreds more additional Command Disciplines that are coded as related to use of force beyond those associated with a Rapid Review that have been entered into the system. Many of these hundreds of Command Disciplines do not appear to be adjudicated. The Monitoring Team has not had an opportunity to evaluate these CDs to determine why and how they were entered into the system and whether additional scrutiny is necessary to address these CDs. The Monitoring Team intends to investigate this in the next Monitoring Period.

The Monitoring Team also found that if a Memorandum of Complaint ("MOC") needed to be generated instead of a Command Discipline that there was both a glitch in CMS and miscommunications within the Facility to ensure the MOC was drafted and submitted to Trials for issuance. An MOC is generated from a CD if a Staff Member refuses the Command Discipline or the Facility determines an MOC versus a Command Discipline is the appropriate manner to address the misconduct. Once alerted to this problem, NCU developed a solution to routinely track MOCs stemming from a CD to hold the Facilities accountable for drafting and submitting the MOCs to Trials.

    o   *Personnel Determination Review ("PDR")*

In this Monitoring Period, the Department built upon the progress it made in the Seventh Monitoring Period to consistently and reasonably impose discipline for probationary Staff[51] via a Personnel Determination Review ("PDR"). Given the historically flawed process,[52] the Monitoring Team continues to closely scrutinize the imposition of PDRs and receives certain contemporaneous information on all PDRs. As part of the Department's efforts to improve the PDR process, the Department promulgated a revised PDR Directive, developed in consultation with the Monitoring Team, towards the end of this Monitoring Period.

The HR Department continues to track and process PDRs. The tracking protocol was revised at the beginning of the Monitoring Period and is much improved, more reliable, and now captures the overwhelming majority of UOF-related PDRs from January 2017 to the present. The review and approval of PDRs by the First Deputy Commissioner is now occurring in a more

---

[51] Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods.

[52] As described in the Sixth (pgs. 35 to 39) and Seventh Monitor's Report (pgs. 48 to 51)

timely and consistent manner as well. That said, the Monitoring Team will continue to scrutinize this process given its historical susceptibility to mismanagement.

In this Monitoring Period, all PDRs were processed before the Staff Member tenured, a significant improvement over prior Monitoring Periods in which at least 15 Staff tenured before the PDR could be imposed due to the flawed PDR process—which demonstrates the improved tracking of PDRs is having a positive effect.[53] It is worth noting that the backlog of cases pending with ID has resulted in at least a few cases where a Staff Member tenured before the PDR memo could be submitted by ID for processing. In these cases, an MOC will have to be drafted to address the misconduct identified.

In four cases, the probationary Staff Member resigned before the PDR for termination could be processed.[54] While Staff Members have the right to resign from their position at any time, the Monitoring Team was concerned by this practice given the previously flawed system. The Monitoring Team addressed these cases with the Commissioner to ensure that the system maintains its integrity. As a foundational matter, the Department advised the Monitoring Team that the Department does not affirmatively offer probationary Staff Members the opportunity to resign rather than be subject to termination. In terms of the circumstances surrounding these cases, in two cases (described in the Seventh Report at pgs. 49 to 50), it appears that the Staff Members would not have had the opportunity to resign if the PDR had been processed timely (the PDRs had been submitted before the process was revised). In the other two cases, the Staff

---

[53] One Staff Member did tenure while a PDR was pending at the beginning of the Ninth Monitoring Period, but this appears to be a case of poor timing because the timeframe to finalize that PDR was very short. This circumstance therefore did not raise concerns that there were potential failures in the processing of the PDR process as staff took a number of steps to try and avoid this outcome (although ultimately unsuccessful) and it appeared to be an isolated event.

[54] A fifth probationary Staff member resigned with a pending PDR for an extension of probation.

Members were subject to significant immediate corrective action following the UOF incident and may have resigned as they could have reasonably determined that their termination was imminent. The Department reported that any Staff that resigns with a pending PDR will have a copy of that PDR placed in their personnel file and their resignation will be coded as resigned with charges.

| Chart of PDRs *Not* Completed (by Date of Determination) *As of July 15, 2019* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Determination | Nov. 2015 - Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | Grand Total | |
| Total | 1 | | 1 | | 1 | | 10 | | 2 | | 3 | | 21 | |
| Tenured | 0 | 0% | 3 | 75% | 1 | 100% | 10 | 100% | 0 | 0% | 0 | 0% | 14 | 67% |
| Resignation | 1 | 100% | 1 | 25% | 0 | 0% | 0 | 0% | 2 | 100% | 3 | 100% | 7 | 33% |

In this Monitoring Period, the Department completed 35 PDRs, which is similar to the number of PDRs completed in the last Monitoring Period.[55] Of the PDRs completed in this Monitoring Period, about 55% were for extensions of probation, the others resulted in termination (37%) and the final two cases resulted in MOCs. The table below shows the outcome of the 119 PDRs completed since the Effective Date based on the date the PDR was signed by the First Deputy Commissioner.

| Chart of PDRs Completed (by Date of Determination) *As of July 15, 2019* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date PDR Completed | Nov. 2015 - Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | Grand Total | |
| Total | 4 | | 4 | | 12 | | 21 | | 41 | | 35 | | 119 | |
| Demotion | 0 | 0% | 0 | 0% | 1 | 8% | 0 | 0% | 5 | 12% | 0 | 0% | 6 | 5% |
| Extension of Probation - 3 Months | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 9 | 22% | 4 | 11% | 13 | 11% |
| Extension of Probation - 6 Months | 2 | 50% | 3 | 75% | 6 | 50% | 14 | 67% | 17 | 41% | 16 | 46% | 58 | 49% |
| Termination | 2 | 50% | 1 | 25% | 3 | 25% | 7 | 33% | 9 | 22% | 13 | 37% | 37 | 31% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% | 2 | 6% | 3 | 3% |
| No Action | 0 | 0% | 0 | 0% | 2 | 17% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 2% |

---

[55] A PDR may cover more than one UOF Incident.

In terms of the outcomes of the PDRs, the Monitoring Team found that the majority of the disciplinary recommendations from ID were reasonable and were ratified by the First Deputy Commissioner. The First Deputy Commissioner deviated from ID's recommendations in four of the cases referred by ID—in all four cases imposing a longer period of probation than had been recommended. Facility leadership referred five of the 35 cases completed in this Monitoring Period. For PDR referrals by the Facility, First Deputy Commissioner consults with the Deputy Commissioner of ID and Trials to determine the appropriate outcome. In all five cases, the outcome appeared reasonable.

Along with the Department's ability to demonstrate that it is consistently processing more PDRs, it is also encouraging that the vast majority of PDRs processed during this Monitoring Period related to incidents that took place in this Monitoring Period. As noted throughout this report, discipline is most meaningful when it is as close in time to the incident as possible. This is particularly critical during a Staff Member's probationary period when Staff learn the responsibilities and expectations of their position and are evaluated for their fitness for the role. The Department made significant progress in this regard, but not without significant pressure and continued oversight by the Monitoring Team.

| PDR Completed (by Date of Incident)<br>*As of July 15, 2019* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Nov. 2015 -<br>Dec. 2016 | | Jan. to<br>June 2017 | | July to<br>Dec. 2017 | | Jan. to<br>June 2018 | | July to<br>Dec. 2018 | | Jan. to<br>June 2019 |
| Total | 23 | | 16 | | 20 | | 26 | | 12 | | 30 | |
| Demotion | 0 | 0% | 0 | 0% | 2 | 10% | 3 | 12% | 1 | 8% | 0 | 0% |
| Extension of Probation - 3 Months | 1 | 4% | 2 | 13% | 4 | 20% | 1 | 4% | 2 | 17% | 3 | 10% |
| Extension of Probation - 6 Months | 15 | 65% | 7 | 44% | 10 | 50% | 16 | 62% | 3 | 25% | 6 | 20% |
| Termination | 6 | 26% | 6 | 38% | 4 | 20% | 5 | 19% | 4 | 33% | 11 | 37% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 8% | 2 | 7% |
| No Action | 1 | 4% | 1 | 6% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 1 | 8% | 8 | 27% |

o   *Formal Discipline*

The Department has lost ground in imposing formal discipline for tenured Staff[56] despite demonstrated improvement in prior Monitoring Periods. The process remains lengthy, cumbersome, and requires coordination across multiple divisions. The work of the Trials Divisions is intrinsically interrelated with the work of ID (and to a lesser extent the Facilities) as they are dependent on referrals from ID and the backlog in investigations, discussed throughout this report, impacts their work. A number of corresponding issues have also impacted Trials' ability to close cases more quickly. First, the Trials Division workload increased as it collaborated with ID to draft charges to preserve cases before the SOL expired and negotiate cases with Staff through the Fast Track process. Second, the Trials Division has also attempted to increase penalties in order to make the discipline imposed more proportional to the misconduct. The Trials Division reports that this has had a corresponding impact on the number of requests for Office of Administrative Trials and Hearings ("OATH") conferences as it has been suggested that Staff view these conferences as an opportunity to obtain a lower penalty following an ALJ's assessment of the misconduct.[57] As a result, the number of cases ultimately closed by Trials has decreased. These issues are discussed in more detail in the Staff Discipline and Accountability Section of this report.

The volume of formal discipline imposed during this Monitoring Period decreased by over 50% compared to the last Monitoring Period, and represents the smallest volume of discipline imposed in a six-month period since reliable tracking began in the Fourth Monitoring

---

[56] This does not include Staff who are on probationary status, which are handled via PDRs, explored above.

[57] The Monitoring Team previously raised concerns about the impact of OATH precedent on the Department's ability to impose meaningful discipline in the Seventh Monitor's Report (at pgs. 151-159).

Period. Only 98 discipline cases were closed during the current Monitoring Period, with 85% (n=83) closed via NPA, one Staff Member found not guilty at OATH, and the remaining cases (n=14) administratively filed or closed via deferred prosecution. As in other Monitoring Periods, cases that are administratively filed or closed via deferred prosecution (case dismissals) remain low.

| Discipline Imposed by Date of Ultimate Case Closure[58] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 4th MP Jan. to June 2017 | | 5th MP July to Dec. 2017 | | 6th MP Jan. to June 2018 | | 7th MP July to Dec. 2018 | | 8th MP Jan. to June 2019 | |
| Total | 209 | | 286 | | 272 | | 248 | | 98 | |
| NPA | 153 | 73% | 242 | 85% | 251 | 92% | 235 | 95% | 83 | 85% |
| Adjudicated/Guilty | 0 | 0% | 4 | 1% | 1 | 0% | 2 | 1% | 0 | 0% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% | 0 | 0% | 1 | 1% |
| Administratively Filed | 44 | 21% | 32 | 11% | 16 | 6% | 6 | 2% | 8 | 8% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 6% |

Furthermore, the time required to address UOF misconduct from the date of incident to the date the discipline is imposed remains far too long and the slight gains made in prior Monitoring Periods were lost during this Monitoring Period. Discipline was imposed within one year of the incident for only six Staff, compared to 53 in the Seventh Monitoring Period.

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Closure Date | 4th MP Jan. - June 2017 | | 5th MP July - Dec. 2017 | | 6th MP Jan. - June 2018 | | 7th MP July - Dec. 2018 | | 8th MP Jan. - June 2019 | |
| Total | 153 | | 242 | | 251 | | 235 | | 83 | |
| 0 to 6 months | 0 | 0% | 7 | 3% | 7 | 3% | 19 | 8% | 1 | 1% |
| 6 to 12 months | 7 | 5% | 21 | 9% | 33 | 13% | 34 | 14% | 5 | 6% |
| 1 to 2 years | 43 | 28% | 126 | 52% | 172 | 69% | 145 | 62% | 39 | 47% |
| 2 to 3 years | 42 | 27% | 58 | 24% | 28 | 11% | 26 | 11% | 31 | 37% |
| 3 + years | 61 | 40% | 30 | 12% | 11 | 4% | 11 | 5% | 7 | 8% |

---

[58] These are cases that have been signed off by the Commissioner.

Nearly all (96%) of the discipline imposed to date is for incidents that occurred prior to January 2018.[59] Only 43 (4%) of the 1,136 Staff disciplined since the Effective Date[60] related to incidents that occurred between January 2018 and June 2019. The amount of discipline imposed is entirely disproportionate with the Staff misconduct the Monitoring Team has identified that occurred during this same time period. Further, the Department only imposed formal discipline on a single Staff Member for misconduct that occurred during this Monitoring Period.

| Formal Discipline Imposed by Date of Incident *As of July 15, 2019* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Pre Nov. 2015 | | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | | Jan. - June 2019 | |
| Total | 429 | | 409 | | 173 | | 82 | | 35 | | 7 | | 1 | |
| NPA | 418 | 97% | 405 | 99% | 173 | 100% | 82 | 100% | 35 | 100% | 7 | 100% | 1 | 100% |
| Adjudicated/Guilty | 8 | 2% | 1 | 0% | 0 | 0% | 0 | 0% | 0 | ~ | 0 | 0% | 0 | ~ |
| Not Guilty | 3 | 1% | 3 | 1% | 0 | 0% | 0 | 0% | 0 | ~ | 0 | 0% | 0 | ~ |

In terms of the actual discipline imposed, the table below demonstrates the range of compensatory days relinquished via NPA. As demonstrated below, the proportion of discipline imposed for higher penalties did increase from last Monitoring Period (68% of discipline imposed in this Monitoring Period was for a penalty of 11 days or more compared with 29% in the last Monitoring Period).

| Penalty Imposed by NPA by Date of Ultimate Case Closure *As of July 15, 2019* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | |
| Total | 153 | | 242 | | 251 | | 235 | | 83 | |
| Refer for Command Discipline | 16 | 10% | 55 | 23% | 28 | 11% | 40 | 50% | 4 | 5% |
| Retirement/Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 5% |
| 1-10 days | 11 | 7% | 50 | 21% | 92 | 37% | 124 | 21% | 20 | 24% |

---

[59] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November of 2015.

[60] *See id.*

| 11-20 days | 34 | 22% | 51 | 21% | 54 | 22% | 26 | 11% | 22 | 27% |
| 21-30 days | 29 | 19% | 39 | 16% | 31 | 12% | 24 | 10% | 14 | 17% |
| 31-40 days | 9 | 6% | 6 | 2% | 14 | 6% | 4 | 2% | 3 | 4% |
| 41-50 days | 18 | 12% | 11 | 5% | 16 | 6% | 14 | 6% | 3 | 4% |
| 51+ days | 28 | 18% | 26 | 11% | 14 | 6% | 0 | 0% | 13 | 16% |

During this Monitoring Period, Trials implemented the Monitoring Team's recommendation to limit the use of CDs via NPA to the forfeiture of an agreed upon number of days, and so only four NPAs settled with a CD that required a hearing at the command-level to adjudicate. This is an improvement as the prior practice of returning the CD for a hearing at the command was subject to abuse and significant failures as described in the Seventh Monitor's Report (at pgs. 41 to 44). The majority of the 20 NPAs settled in this Monitoring Period for ten days or less were all NPAs for CD days.

Discipline imposed by Trials must be entered into the CityTime system on the Staff Members' personnel file in order to be finalized. The executed NPA is submitted by Trials to HR for processing in CityTime and NCU staff collect proof of practice to ensure that all discipline is entered correctly. The Department demonstrated significant improvement in this area during this Monitoring Period. All 75 of the 83 NPAs imposed in this Monitoring Period that were required to be entered in CityTime were entered in the system.[61] HR entered the majority of cases (68%) in CityTime within 30 days of the NPA's completion, as shown in the table below. Given the Department's prior struggles in managing discipline, this certainly is encouraging and demonstrates improved practice.

---

[61] Eight NPAs were not entered in CityTime because four NPAs were irrevocable retirement and four NPAs were for Command Discipline hearings, which occurred before Trials began issuing CDs with a specific number of days.

| NPA Deduction in CityTime For NPAs Finalized in the 8th Monitoring Period | |
|---|---|
| **Time to Enter in City Time** | **Number** |
| 0 to 10 days | 6 (8%) |
| 11 to 20 days | 21 (28%) |
| 21 to 30 days | 24 (32%) |
| 31 to 40 days | 7 (9%) |
| Over 40 days | 17 (23%) |

   o   *Disciplinary Probation*

     An NPA may also include additional terms, including a period of disciplinary probation.[62] Disciplinary probation can be imposed in six-month increments. As outlined in the table below, the number of Staff who entered into an NPA with a term of disciplinary probation in this Monitoring Period increased to 12 compared with four in the last Monitoring Period. The majority of the terms of disciplinary probation range between one and two years.

| Disciplinary Probation Data | | | | | | |
|---|---|---|---|---|---|---|
| | **Jan. to June 2018** | | **July to Dec. 2018** | | **Jan. to June 2019** | |
| Staff placed on Disciplinary Probation via NPA (by date of NPA) | **8** | | **4** | | **12** | |
| Number of Staff serving a term of Disciplinary Probation (during this time period) | **33** | | **35** | | **39** | |
| -   *6 Months Probation* | *2* | *6%* | *2* | *6%* | *0* | *0%* |
| -   *12 Months Probation* | *12* | *36%* | *12* | *34%* | *13* | *33%* |
| -   *18 Months Probation* | *2* | *6%* | *3* | *9%* | *4* | *10%* |
| -   *24 Months Probation* | *12* | *36%* | *12* | *34%* | *16* | *41%* |
| -   *36 Months Probation* | *1* | *3%* | *2* | *6%* | *2* | *5%* |
| -   *48 Months Probation* | *1* | *3%* | *1* | *3%* | *1* | *3%* |
| -   *60 Months Probation* | *2* | *6%* | *2* | *6%* | *2* | *5%* |
| -   *Probation for Full Term of Employment* | *1* | *3%* | *1* | *3%* | *1* | *3%* |

---

[62] A term of disciplinary probation can only be imposed via a settled NPA. A term of disciplinary probation cannot be imposed via the OATH process.

Staff on disciplinary probation are often enrolled in E.I.S.S. monitoring so they receive additional support and guidance. The Monitoring Team continues to recommend that Trials utilize disciplinary probation more often.

## SECTION BY SECTION ANALYSIS

### 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") has been in effect since September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017.[63] The New Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps Officers and their supervisors should take when responding to threats to safety and security. The Department's efforts to implement the New Directive is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

### IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and promulgated a new UOF Directive on September 27, 2017. The policy was approved by the Monitor.

#### ANALYSIS OF COMPLIANCE

The Consent Judgment requires the Department to develop, adopt, and implement a new UOF Directive. The Department previously developed a new UOF Directive approved by the Monitor and

---

[63] The Department developed the new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

adopted it during the Fifth Monitoring Period once all Staff received Special Tactics and Responsible Techniques Training ("S.T.A.R.T."). The Department has committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and is in the process of providing a refresher UOF Policy course through Advanced Correctional Techniques Training ("A.C.T"). Further, the Transfer of Learning initiative that occurred in four facilities during this Monitoring Period also provides an opportunity to educate and advise Staff on core correctional practices and how best to address potential use of force incidents.

The Department has achieved compliance with the developing and adopting components of this provision and has also trained Staff on the policy's requirements. However, the UOF policy has not been effectively implemented. Implementing the New Directive requires not only informing and training relevant Staff about the policy requirements, but also consistently instructing and applying the policy by following its mandates.[64] Therefore, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. The Department identifies and/or addresses common practices that need to be refined via Rapid Reviews, ID/Facility Coordinated Use of Force Analysis, and Transfer of Learning. While these initiatives are promising, their lessons have not been routinely applied given that Staff continue to routinely engage in unnecessary and excessive force. Uniformed leadership (including Bureau Chiefs, Assistant Chiefs, Wardens, and Deputy Wardens) does not appear to properly leverage the tools for identifying potential misconduct, nor take action to subsequently guide and encourage Staff to improve their practice. The dearth of routine, functional supervision for line Staff perpetuates their limited skills in operationalizing the requirements of the UOF policy. Simply put, the UOF policy has not been implemented, evidenced by Staff's consistent failure to use force within the prescribed guidelines.

| COMPLIANCE RATING | ¶ 1. (Develop) Substantial Compliance |
| | ¶ 1. (Adopt) Substantial Compliance |
| | ¶ 1. (Implement) Non-Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a to t (see pages 5 to 10 of the Consent Judgment].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

---

[64] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: spit masks, restraints, chemical agents, electronic immobilization shields, and tasers.

  o During this Monitoring Period, the Department consulted with the Monitoring Team to develop a standalone baton policy for the use of all batons. This policy incorporates the procedures for using the Monadnock Expandable Batons ("MEB") that were previously maintained in its own policy. The policy is expected to be finalized during the next Monitoring Period.

- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock-downs, searches for ballistic weapons, and the deployment of Facility Emergency Response Teams (formerly called Probe Teams).

  o During this Monitoring Period, the Department finalized the Operations Order regarding searches for ballistic weapons. The Department also consulted with the Monitoring Team to revise the policy related to Facility Emergency Response Teams and lock-downs, both of which are expected to be finalized during the next Monitoring Period.

## ANALYSIS OF COMPLIANCE

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment § IV, ¶ 3 (a-o, q-t) and is also aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly. In order to address the requirements of ¶ 3(p), the Department maintains a number of standalone policies to provide guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force. The Department has consulted the Monitoring Team on the development of many of these policies as noted in prior reports. The Department is continuing to consult with the Monitoring Team on the development of the Baton Policy and the Facility Emergency Response Team Policy, so the Department remains in Partial Compliance with ¶ 3(p). Outlined below is the status of the policy work completed during this Monitoring Period:

- *Baton Policy*

The Monitoring Team recommended in early 2018 that the Department develop a standalone comprehensive policy regarding the use of batons to better guide their use. The Monitoring Team also

recommended identifying who should be authorized to use each type of baton and contemplating whether every Probe Team member should be issued a baton. Previously, the Department had a standalone MEB policy, but only limited guidance for the use of other types of batons was in the UOF Policy. Initially, these recommendations languished, but the Department eventually drafted a standalone Baton Operations Order during this Monitoring Period, which contains guidance on (1) the three types of batons permitted for use by Staff; (2) which Staff are authorized to use which batons based on their Post (note, all Probe Team members will continue to be issued a baton); and (3) the appropriate target zones and circumstances in which the baton may be used. The Department evaluated the batons currently in use and decided to stop using the Celayaton and 36" Riot batons (previously used by the Probe Team). Staff in various posts will be authorized to use the following batons:

- **Transportation Baton**: A tactical 18-inch baton with a polycarbonate handgrip that can be used in less lethal applications. Only the Transportation Division is authorized to use this baton.
- **Multipurpose Baton**: A tactical polycarbonate 26-inch baton that can be used in less lethal applications and is authorized for use only when transporting inmates outside the Facilities or when responding to alarms within Facilities. This baton replaces the longer riot baton previously used by the Probe Team.
- **Monadnock Expandable Baton**: A tactical 22-inch baton (when fully expanded) for use in less lethal applications. This baton is authorized for use on limited posts such as the Emergency Services Unit ("ESU") and outside security posts.

The Department is in the process of procuring the multipurpose batons so they can be deployed when the policy is finalized and implemented. Further, the Department is consulting the Monitoring Team on a revised version of the lesson plan for the baton.

- *Facility Emergency Response Teams Policy (Probe Team Policy)*

As discussed in the Introduction to this report, the Department's policy that allows any line Officer to request assistance from the Probe Team has resulted in its overuse, often contributing to unnecessary and excessive use of force. Accordingly, the Monitoring Team recommended that the Department modify the Probe Team Policy. The Department deliberated at length, hesitating to change the current approach out of a concern for Staff safety. In the Monitoring Team's opinion, the concern about Staff safety was not well-founded as the recommended approach actually provides for a rapid evaluation of the situation by the Supervisor who may be able to personally resolve the situation, deploy a de-escalation team or ensure prompt response by the Probe Team (versus the current practice of waiting for the Probe Team to suit up before anyone responds to the scene). Following the close of the Monitoring Period, and after significant pressure from the Monitoring Team, the Department revised and finalized the policy to address the Monitoring Team's recommendations.

| | |
|---|---|
| | - *Other Policy Work* |
| | During this Monitoring Period, the Department also promulgated a revised Ballistic Search Command Level Order and revised the Lock-Down policy, both of which incorporated recommendations from the Monitoring Team. A revised draft of the Lock-Down policy was shared with the Monitoring Team near the close of the Monitoring Period and is expected to be finalized in the next Monitoring Period. |
| **COMPLIANCE RATING** | ¶ **2.** Substantial Compliance<br>¶ **3(a-o, q-t).** Substantial Compliance<br>¶ **3(p).** Partial Compliance |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43). The Department's Transfer of Learning initiative also continues to advise Staff about the requirements of the New Use of Force Directive. The Department consults with the Monitoring Team on the weekly Transfer of Learning lesson plans. Accordingly, the Department remains in Substantial Compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |

## 2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Reporting use of force accurately and timely, and tracking trends over time are critical to the Department's overall goal of effectively managing use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-6,[65] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13),

---

[65] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

"Tracking" (¶¶ 14-21[66]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).

*Alleged Use of Force*

The Department tracks alleged uses of force, which are claims that Staff used force against an inmate and the force was not previously reported. An allegation does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis discussed in the introductory section of this report.

The graph below presents the number of alleged uses of force reported every month from January 2016 through June 2019. While the reported numbers of Use of Force have continued to increase over the life of the Consent Judgment, the average number of allegations per month has decreased each year, from 39.3 in 2016, to 36.3 in 2017, to 32.8 in 2018, to 30.5 during the first six months of 2019 (a 22% decrease in the number of allegations from 2016).



---

[66] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.

*Assessment of UOF Data*

The Department's reporting of UOF incidents and trend data is under significant scrutiny by various stakeholders (including the Board of Correction, DOI, and the local legislature). The Monitoring Team also closely monitors the Department's reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). As part of this assessment, the Monitoring Team reviews any UOF incidents that have been downgraded,[67] which only occurred twice since July 2017 and did not occur in this Monitoring Period. The Monitoring Team has also found the Department in Substantial Compliance with the proper classification of UOF incidents (§ VI. (Use of Force Investigations), ¶ 5) for the last seven consecutive Monitoring Periods. Overall, the Monitoring Team has not identified evidence to suggest that there is a pattern or practice within the Department of manipulating UOF data. The Monitoring Team intends to continue to closely scrutinize the matter given the importance of accurate and transparent reporting.

The Monitoring Team's assessment of compliance is outlined below.

| V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF) |
| --- |
| ¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br><br>• The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.<br>• Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.<br><br>**ANALYSIS OF COMPLIANCE** |

---

[67] While no incidents were downgraded this Monitoring Period, there was a manual entry error of use of force "numbers" and 40 use of force numbers (U1660/2019 through U1699/2019) were skipped, meaning those numbers were inadvertently not assigned a use of force incident.

The number of reported UOF incidents in the Department has increased almost every Monitoring Period since the Effective Date with an all-time high during the Eighth Monitoring Period. The fact that over 3,000 uses of force were reported during this Monitoring Period suggests that Staff regularly follow the requirements of this provision—for the most part, they report when force is used. Furthermore, the Monitoring Team's review of UOF reports indicates that Staff routinely notify their supervisors when uses of force occur. [68]

The Department suggests that at least part of the increase in the number of UOF is due to improved reporting by Staff. This is likely true as the Department certainly emphasizes the importance of reporting through its regular communications, by clarifying what constitutes "force" in the New Directive, through its live-feed video monitoring and UOF report auditing. Progress in reporting incidents must be recognized, but it is not sufficient as an explanation for why the incidence of force continues to climb.

Of course, a compliance assessment with a provision that requires Staff to report a use of force/notify a supervisor must also look at whether there is any evidence that Staff are *not* reporting force as required. There are multiple avenues available to assess the frequency of unreported UOF (*i.e.,* UOF allegations). One avenue is to examine reports submitted by H+H staff and the Legal Aid Society ("LAS") of potentially unreported uses of force to ensure there is a corresponding investigation for each report. The incident is then evaluated to determine if it was originally reported by Staff, previously submitted by another source, or if the LAS or H+H report triggered an investigation into the incident. This Monitoring Period, H+H submitted reports covering 32 distinct UOF incidents and LAS submitted 23 allegations (12 reports were use of force-related and 11 were non-use of force). Of the 32 H+H use of force-related reports, most (n=30; 94%) were already being investigated by ID, and two incidents are being evaluated by ID to determine whether to open an investigation. Of the 30 cases already under investigation, 23 had already been reported as actual uses of force by Staff through the normal reporting channels, seven had previously been reported as allegations, and in two instances the H+H report triggered ID to open an investigation. The 12 use of force-related allegations submitted by LAS covered 14 individual incidents, 13 of which had already been reported as actual uses of force by Staff through the normal reporting channels and ID had already opened an investigation for those incidents. One additional report from LAS was reviewed by ID and determined to be unsubstantiated so a UOF investigation was not opened. Overall, the majority of use of force-related allegations made by H+H and LAS had previously been reported and had a corresponding investigation. That said, these reports certainly provide additional helpful context to the investigation.

---

[68] UOF reports have previously been audited to determine whether Staff completed the relevant sections of the forms. The Monitoring Team found in previous Monitoring Periods that Staff completed the relevant section of the forms fairly consistently (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)).

Second, the Monitoring Team closely scrutinizes investigations of alleged UOF (*i.e.*, unreported uses of force). Unfortunately, the backlog of Preliminary Reviews and Full ID investigations impedes the ability to fully assess the status of these cases. The Preliminary Review has not been drafted in CMS (and hence not reviewed by the Monitoring Team) for approximately 100 alleged UOF that were reported between January 2018 and June 2019. Further, given the large backlog of Full ID Investigations, the final resolution of many investigations of allegations remain pending as well. The Preliminary Reviews of allegations made in this Monitoring Period did identify three cases where video and other objective evidence strongly suggest that Staff failed to report a UOF incident, one incident had a pending ID investigation as of the end of the Monitoring Period, and two incidents had pending Preliminary Reviews.[69] Between January 2017 and June 2019, ID identified 24[70] specific incidents (including the three just noted) where video and other objective evidence strongly suggest that Staff failed to report a use of force incident. It is worth noting that the types of unreported incidents vary. Some of these incidents reflect minor UOF incidents, while the initial evidence of other incidents suggest a more covert cover-up of likely use of force violations. The Monitoring Team closely scrutinizes the corresponding investigations of these alleged uses of force (and others) to ensure they reached reasonable conclusions and that the Department disciplined Staff who failed to report a use of force. This analysis is discussed further in ¶ 8 below.

Unreported uses of force continue to be an important focus of the Monitoring Team, and specific, sometimes egregious, instances of failures to report have been identified in every Monitoring Period. Given that the number of reported UOF in this Department is so high, the number of unreported UOF may seem low in comparison. However, the most troubling uses of force are those that go unreported, because the extent to which the force was unnecessary or excessive is never assessed. The Department will achieve Substantial Compliance when allegations of UOF are routinely investigated in a timely manner and there are only very isolated or no instances of unreported uses of force.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance |
| --- | --- |

---

[69] The Department has imposed discipline on the two officers involved in one of the incidents with a pending Preliminary Review. In that case, Command Disciplines were issued for the two involved Staff Members for failure to report an incident where an inmate attempted to push past them and the Staff used minor force to hold the inmate back. The identification of this incident and the discipline imposed (especially close in time) appeared reasonable to address this reporting violation.

[70] Four cases were noted in the Fourth Monitor's Report at pg. 49, six cases were identified in the Fifth Report at pg. 45, five cases in the Sixth Monitor's Report (at pg. 45), and six cases in the Seventh Monitor's Report at pg. 58.

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, 5, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h), and ¶¶ 5, 6, and 7 above.

### ANALYSIS OF COMPLIANCE

The Monitoring Team assesses compliance with ¶¶ 2, 3, 5, & 6 together as these provisions, collectively, require Staff to submit independent and complete UOF reports. The Monitoring Team continued to review a significant number of Staff Reports as part of the Team's assessment of Preliminary Reviews, and ID and Facility Investigations. The current review revealed Staff's practices have not changed significantly from those reported in prior Monitoring Periods.[71]

The Monitoring Team's review of Staff Reports reveal that Staff continue to include information in all required fields, but the quality of that information varies. Some reports meet the requirements of these provisions, including examples where Staff accurately reported a potentially concerning UOF incident (*e.g.* accurately describing the use of head strikes). That said, the reports routinely reviewed by the Monitoring Team continue to: (1) utilize vague, boilerplate language like "upper body control holds" which does not accurately or fully reflect the nature, extent, and duration of the force used to control or restrain an inmate (particularly when this phrase is used instead of reporting the use of head strikes); (2) are incomplete, and while they often describe the conduct of the inmate, the reports often fail to describe Staff actions—particularly use of force violations even if likely witnessed by the report writer; (3) are not consistent with objective video evidence; or (4)

---

[71] The Monitoring Team assessed compliance with ¶¶ 2, 3, 5, & 6 in a prior Monitoring Period (*see* Fourth Monitor's Report at pgs. 51-52).

include false information, in direct contradiction to other evidence (for example, that an inmate struck first, when in fact Staff struck first). These are the same findings that were reported in prior Monitor's Reports. The Monitoring Team continues to emphasize the importance of Staff describing their recollection of events in their *own* words and specifying the exact tactics that were utilized (*e.g.,* where on the inmate's body the Staff's hands or arms were placed).

Given the importance of the perspective of *all* witnesses to an investigation of a UOF incident, it is essential for Staff to indicate all others who were present at the scene so witness statements can be collected. The Monitoring Team assesses whether DOC Staff's UOF or UOF witness reports accurately identify whether any non-DOC staff were present in the area during the UOF. Both reporting forms include a specific box for Staff to list "any uniform or non-uniform staff involved in or present at the time of the incident." A Staff Member can also report the presence of a witness in the narrative of what occurred. The Monitoring Team's previous reviews found that very few Staff reports include this essential information (*see* Seventh Monitor's Report at pg. 60). In response to this feedback from the Monitoring Team, during this Monitoring Period, the Chief of Department issued a Department-wide tele-type reminding Staff of their obligation to identify all witnesses to UOF incidents. The Monitoring Team subsequently reviewed 55 Staff UOF reports/UOF witness reports for incidents where video footage confirmed that non-DOC staff were present. Only 29 of the 55 reports (53%) noted the presence of non-DOC staff. While still not substantially complying with this requirement, the Department's current level of performance is an improvement over the last Monitoring Period where only 1 of 20 (5%) reports noted the presence of non-DOC staff confirmed to be in the area.

| COMPLIANCE RATING | ¶¶ 2, 3, 5, and 6. Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The *Nunez* Compliance Unit ("NCU") continues to audit the extent to which Staff Reports are submitted and uploaded within 24 hours of a use of force incident or within 72 hours of an

allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).

- The table below demonstrates the submission rates of Staff reports for actual and alleged UOF for the last three Monitoring Periods.

| Monitoring Period | Actual UOF | | | Alleged UOF | | |
|---|---|---|---|---|---|---|
| | Reports Uploaded Timely | Total Staff | % Uploaded within 24 Hours | Reports Uploaded Timely | Total Staff | % Uploaded within 72 Hours of the Allegation |
| **6th Monitoring Period** | 4735[72] | 6014 | 79% | 44 | 48 | 92%[73] |
| **7th Monitoring Period** | 7974 | 9158 | 87% | 81 | 91 | 89% |
| **8th Monitoring Period** | 9258 | 9930 | 93% | 68 | 100 | 68% |

ANALYSIS OF COMPLIANCE

Staff Reports describing what occurred during a use of force incident are critically important to the assessment of a UOF incident. As described throughout this report, the increased number of UOF incidents has a significant impact on the operations, including reporting obligations. As demonstrated above, nearly 800 more reports were required to be submitted and tracked this Monitoring Period compared to the last Monitoring Period. Even with the increase in reports to submit, the Department has demonstrated continued improvement in timely submission of the UOF reports. The work conducted by NCU beginning early in 2018 coincided with the implementation of CMS and electronic maintenance of UOF reports. The ability to systematically track reports in a centralized system, combined with NCU's audits, and collaboration and coordination by Facility-level staff, has supported sustained compliance with timelines for reported UOF.

The standard for submitting reports related to alleged UOF is a little more complicated. In these cases, the Staff Member must be advised that they need to submit a report, which is different from reporting of an actual UOF incident in which Staff were present and so presumably are aware of their reporting obligation. The receipt of an allegation also does not necessarily coincide with when a Staff Member is on duty. Therefore, the Department set the standard that generally reports related to allegations should be submitted within 72 hours of the allegation to provide reasonable time for notification to Staff of their reporting requirement and to then submit the report. Given the small number of reports required for allegations, the deviations across Monitoring Periods is not significant, but worth noting. Given the importance of investigating unreported UOF, the Monitoring Team will continue to closely scrutinize the submission of these reports.

---

[72] NCU began the process of auditing actual UOF reports in February 2018.

[73] NCU began collecting data for UOF allegations in May 2018

Investigators continue to report that certain investigations are delayed in order to obtain additional UOF reports, which includes both those reports not initially submitted within 24 hours (*e.g.* in this Monitoring Period, 672 reports were not submitted within 24 hours) and those from Staff who were identified as involved/witnesses after the fact.[74] While the collection of additional reports certainly frustrates the system for timely investigations, the Monitoring Team has not found this problem to be systemic.

This issue, however, did reveal a broader logistical issue regarding the process for ID to request additional information from the Facilities and to ensure a timely response. Currently the process is not centralized or reliable; instead it generally occurs in an *ad hoc* fashion, with an individual investigator either reaching out to the Facility and/or personally going to the Facility to attempt to get information. This often requires multiple attempts and repeated follow-up (and sometimes elevating request to supervisors) to get the necessary information. A coordinated and efficient process for requesting and sharing information is clearly critical and thus the Monitoring Team has recommended that the Department consider how to streamline this process in implementing the broader investigation-related recommendations from the Monitoring Team. The Monitoring Team will consult with the Department in the next Monitoring Period about how this recommendation may best be operationalized.

The Department has continued to maintain a centralized, reliable and consistent process for submitting and tracking UOF Reports. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion so the Department has maintained Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
| --- | --- |

### V. USE OF FORCE REPORTING AND TRACKING ¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE)

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8.

---

[74] NCU's tracking of submission of UOF reports is limited to those Staff members that are reported in the initial report of the incident to COD. Additional Staff may have participated and/or witnessed the incident and were not listed on the COD. In those cases, the Staff member may submit a report, but NCU will not track whether the report has been submitted in CMS. Staff also may not have submitted a report in which case the investigator must attempt to obtain the report.

**ANALYSIS OF COMPLIANCE**

Staff who exaggerate, lie, or fail to report a use of force thwart the overall goal to assess each use of force to determine whether force is only utilized when necessary. Accordingly, identifying and addressing reporting violations (*e.g.*, inaccurate, misleading, and false reporting or failure to report) is critical to maintaining the integrity to reporting and investigating UOF incidents. As noted in ¶ 1 above, investigators do identify reporting violations (*i.e.*, 24 UOF incidents have been investigated as incidents where Staff potentially failed to report the incident since January 2017). The failure to report may be addressed through Command Discipline, formal discipline, or PDRs. That said, the Department does not generally identify or address other types of reporting violations (especially in cases of inaccurate or misleading reports) nearly as often as they occur. Further, when discipline is imposed, the Monitoring Team has found that the discipline varies and is not always proportional to the severity of the violation.

Upon recommendation by the Monitoring Team, ID prioritized review of the 21 cases identified in prior Monitoring Periods[75] (and mentioned above in ¶ 1 box) where an initial review of video and other objective evidence strongly suggested that Staff deliberately failed to report a use of force. The status of these 21 cases is as follows: 11 cases are closed with no discipline imposed and/or formal discipline was imposed, and 10 cases have pending ID Investigations (of which six cases already have pending formal discipline). Of the 11 closed cases, five closed with no discipline and six closed with discipline. The Monitoring Team reviewed both sets of cases to determine whether the outcomes were reasonable.

The Department's assessment of cases with failure to report is mixed. Of the 11 cases reviewed, the outcome in eight cases was reasonable while the outcome in the other three cases was unreasonable. The Monitoring Team found that ID reasonably concluded in **five** cases that Staff failed to report a use of force. The corresponding discipline imposed in those five cases was also generally reasonable (ranging from suspension to an NPA for 35 compensation days (although bundled with other misconduct cases), with most discipline resulting in an NPA for less than 10 compensation days). In one of the five cases, the negotiated disciplinary outcomes via NPA appeared to be lighter than what should have been reasonably imposed given the specific circumstances of the case. Of the **six** cases closed without discipline, the Monitoring Team found that in three cases ID reasonably concluded that Staff did not fail to report. However, in the three other cases, the conclusion by ID that there was no reporting misconduct, or not to address the misconduct with charges, was unreasonable. In one case, ID addressed the inadequate investigation with the investigator and supervisor involved after the case

---

[75] Four cases were noted in the Fourth Monitor's Report at pg. 49, six cases were identified in the Fifth Report at pg. 45, five cases in the Sixth Monitor's Report at pg. 45, six cases in the Seventh Monitor's Report at pg. 58, and three cases in the Eighth Monitoring Period.

was raised by the Monitoring Team. In the other two cases, the Staff clearly failed to report using force but were not charged accordingly. In one of those cases, the force used was minor and was within guidelines. However, more concerningly, the other case involved unreported force that was likely excessive and unnecessary. In this this case, the investigator merely used a Facility Referral to address the failure to report when formal discipline was likely warranted. For these two cases, the Monitoring Team will consult ID in the Ninth Monitoring Period on how to address the misconduct and deficiencies in these investigations.

ID reported that it is prioritizing the review of reporting violations in the next Monitoring Period and intends to address certain violations through immediate action when merited. Given the fundamental importance to reporting, the Monitoring Team encourages this heightened scrutiny and attention. The Monitoring Team intends to continue to scrutinize cases with potential reporting violations to ensure that both the Staff misconduct is addressed, and any investigation deficiencies are addressed.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
| --- | --- |

---

## V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

### ANALYSIS OF COMPLIANCE

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses these requirements, and the "implement" component of this provision is assessed within the individual provisions in this report.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
| --- | --- |

---

## V. USE OF FORCE REPORTING AND TRACKING ¶ 10, 11 & 13 (NON-DOC STAFF REPORTING)

¶ 10. The City shall require that Non-DOC Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all

Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[76]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

¶ 13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) maintained its use of force reporting policy and process to address ¶¶ 10, and 11 of this section. This process includes:

  o Maintaining a dedicated email address for H+H staff to submit their reports. H+H also has a dedicated staff member who reviews and distributes those reports to ID to include in the use of force investigation; and

  o Reinforcing use of force reporting obligations to its staff in a number of ways:

    ▪ H+H's electronic medical record system continues to require any H+H staff who signs into the system to read and acknowledge a statement regarding their reporting obligations in order to gain access to the system. Staff must acknowledge this statement every time they sign into the system and access to the system is denied if the acknowledgement is denied; and

    ▪ For every UOF that occurs in areas where clinic staff were likely to have been present,[77] as a backstop, H+H operations staff reach out on a monthly basis to providers scheduled to work in those areas at the time/date of the reported UOF to determine if they directly witnessed a UOF and, if so, to elicit reports.

  o The number of reports submitted by H+H staff since January 2018 is presented in the table below.

---

[76] This language reflects the revised language ordered by the court May 14, 2018 (*see* Dkt. Entry 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."

[77] Clinic, Mental Observation Units, PACE, CAPS, RHU, ESHU, ESHU YA, SCHU, TRU, Secure, ARNT, BTB, or Bing/CPSU units.

| | Number of Witness Reports and/or Reports of allegations of UOF relayed from an Inmate | Number of actual or alleged incidents captured |
|---|---|---|
| July to Dec. 2017 | 4 | 4 |
| Jan. to June 2018 | 22 | 23 |
| July to Dec. 2018 | 54 | 46 |
| Jan. to June 2019 | 30 | 32 |

- o This Monitoring Period, H+H also developed a PDF fillable form for H+H Staff to submit their reports. The form was not yet implemented in this Monitoring Period.

- Department of Education ("DOE") Staff did not submit any UOF witness reports during this Monitoring Period. The City, representatives for DOE Staff and the Monitoring Team engaged in discussions about how DOE Staff may submit reports.

- ACS developed a centralized reporting process for Staff based at HOJC to submit UOF witness reports. This process was implemented part-way through this Monitoring Period. ACS Staff submitted two UOF witness reports related to two separate incidents.

  - o **Centralized Collection**: All ACS staff witnessing a use of force will complete an incident report and provide a copy 1) to the on-duty DOC Tour Commander and 2) to the on-site ACS Office of Incident Review. These reports are to be completed as soon as possible but no later than the end of tour during which the events were witnessed.

  - o **Centralized Distribution**: The on-site ACS Office of Incident Review will review reports by ACS staff to ensure that all staff named in the report, who were witness to the use of force, complete an incident report documenting the witnessed events. The on-site Office of Incident Review will email an electronic version of all reports within two business days of receipt to ID and the Monitoring Team.

ANALYSIS OF COMPLIANCE

The City of New York is required to take steps to ensure that non-DOC staff submit a report when they witness use of force incidents under ¶ 10 of this section of the Consent Judgment. Non-DOC Staff is defined as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates." *See* Consent Judgment § III (Definitions), ¶ 22. The three largest groups of Non-DOC staff reporters are H+H staff (who provide medical and mental health care in the New York City jails), DOE Staff (who provide educational services to inmates), and ACS Staff (who are jointly operating HOJC with DOC). H+H has been working on the implementation of this requirement since

2017, whereas DOE and ACS Staff began to implement this requirement during the Seventh Monitoring Period.[78]

*Medical Staff Reporting* (¶¶ 10 & 11)

Medical and mental health staff (H+H) have a unique vantage point to observe UOF to the extent an incident occurs in an area where treatment is provided. Given H+H staff provide treatment to inmates who may have been engaged in a UOF, they also may learn critical information about an incident (or that an incident even occurred) through the course of treatment. Therefore, H+H staff are a crucial group of non-DOC staff witness who are required to submit reports. Along with the requirements to report under ¶ 10, H+H Staff must also report when they have reason to suspect that an inmate has sustained injuries due to the Use of Force and the injury was not identified to the medical staff as being the result of a Use of Force (¶ 11).

During this Monitoring Period, H+H staff submitted fewer reports than in the prior Monitoring Period. It is difficult to know whether H+H staff submitted reports in every incident witnessed, but the large number of incidents occurring in the medical areas (at least 180 during this Monitoring Period) and the small number of reports submitted, indicate that H+H staff are not fulfilling their obligations.[79] Furthermore, the Monitoring Team reviewed video footage of 17 incidents that occurred in medical areas to determine whether any H+H staff can be seen observing the incident, and whether those staff submitted reports as required. In 7 of the 17 incidents (40%), H+H staff can be seen observing the UOF incident, but a witness report was not submitted for any of the incidents reviewed.[80] The Monitoring Team also shared similar examples from the last Monitoring Period with H+H in which there was video proof of their staff failing to report a witnessed use of force—both were cases where the observations of H+H staff appeared to be of critical importance to investigating the incident. H+H reported taking disciplinary action with the identified Staff in one of two incidents that was shared.[81]

The Monitoring Team reviewed all 30 H+H staff reports submitted to ID this Monitoring Period (20 reports appeared to describe an incident that was witnessed, 10 reports appeared to relay a suspected or alleged UOF based on inmate interaction).[82] Many of the reports submitted by H+H staff

---

[78] The obligation for ACS staff to report only began in October 2018 during the Seventh Monitoring Period with the opening of HOJC.

[79] It is worth noting that H+H Staff must report any witnessed UOF whether or not the incident occurred in a medical treatment area.

[80] The Monitoring Team intends to share the results of this audit with H+H in the Ninth Monitoring Period to discuss how these findings can best be addressed.

[81] The other instance was forwarded to the relevant division to follow-up with the staff member and address accordingly.

[82] The Monitoring Team's assessment of the Department's investigation of these allegations is discussed in ¶ 1 above.

lacked specificity. As a threshold issue, it was sometimes difficult to determine how the report should be categorized (event witnessed or reporting suspected/alleged UOF). Based on feedback provided by the Monitoring Team, H+H developed a PDF-fillable form for their staff to use when reporting use of force, which is intended to improve the quality of these reports because it will prompt the submission of more specific information. H+H plans to roll out the new PDF form to their staff during the Ninth Monitoring Period, in conjunction with a webinar training reminding their staff of their obligation to report.

Finally, H+H worked with the Monitoring Team this Monitoring Period to determine the best approach to demonstrate compliance with ¶ 13 (Reporting of Emergency Matters). This provision requires emergency matters involving an imminent threat to an inmate's safety or well-being to be reported. H+H consulted the Monitoring Team on how best to incorporate this requirement into policy in this Monitoring Period and plans to implement related policy changes and training in the Ninth Monitoring Period.

### DOE Staff Reporting

DOE staff provide educational services to inmates in certain DOC facilities, including RNDC, RMSC, EMTC, OBCC, GRVC, and HOJC. During this Monitoring Period, approximately 46 incidents occurred in the school areas. However, no DOE Staff submitted UOF witness reports. The Monitoring Team reviewed video footage of six of these 46 incidents that occurred in school areas to determine whether any DOE staff were present during the use of force incident. In three of the six incidents (50%) reviewed, DOE staff can be seen observing the UOF incident. This certainly compounds the concern that no DOE Staff witness reports were submitted since it is clear in at least some cases that DOE Staff did witness a UOF.

The City notified DOE during the Seventh Monitoring Period of their obligation to report and DOE subsequently notified their staff of the reporting obligations. However, DOE has not implemented the reporting obligation due to a variety of legal objections raised by counsel to the unions representing DOE Staff. The Monitoring Team intends to work with the Parties in the next Monitoring Period to address these concerns and determine the best path forward.

### ACS Staff Reporting

ACS's obligation to report began with the opening of HOJC, which ACS jointly operates with DOC. During the Seventh Monitoring Period, ACS notified HOJC staff of their obligation to report, and ACS staff submitted a handful of reports in December 2018. In March 2019, ACS established a centralized collection and distribution process (described above, and in consultation with the Monitoring Team) in order to encourage reporting. Despite the new process, ACS only submitted two witness reports during this Monitoring Period. Given the level of disorder on the housing units where ACS staff are routinely present, it certainly is expected that more than two witness reports would have been submitted. The Monitoring Team reviewed video footage of 10 UOF incidents that occurred on

housing units at times that ACS staff were most likely to be present in the area to determine whether any ACS staff can be seen observing the incident, and whether those staff submitted reports as required. In eight of the 10 incidents (80%), ACS staff can be seen observing the UOF incident, but a witness report was not submitted for any of the incidents reviewed. Coincidentally, H+H staff witnesses were present for three of these 10 incidents, all of whom submitted reports as required.

However, ACS reporting significantly improved in volume at the beginning of the Ninth Monitoring Period, so the process implemented part-way through the Eighth Monitoring Periods appears to have gained traction.

*Incorporation of Non-DOC Reports in DOC Investigations*

The Monitoring Team also worked with ID to ensure that when non-DOC staff reports are submitted, they are appropriately associated with the corresponding investigation, included in the investigation file and considered by investigators. The Monitoring Team identified 10 UOF incidents with corresponding reports from 10 H+H Staff, but found that only five of the UOF investigation files referenced and contained the H+H reports. The other half of the investigations did not reference or include them. These findings demonstrate a continued need for vigilance to ensure that *all* submitted reports are considered by the investigator and included in the file.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **10. (H+H)** – Partial Compliance<br>**(DOE)** – Non-Compliance<br>**(ACS)** – Non-Compliance<br>¶ **11.** Partial Compliance<br>¶ **13.** Not Yet Rated |

### V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS") which captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields. The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team previously confirmed that the majority of incident data was tracked accurately and reliably.[83] The data continues to be entered and maintained in IRS and fed into CMS. The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. Periodically, the Monitoring Team may re-verify that the Department continues to track the information as required. However, the deviations noted to date have been minor, and no change in tracking procedure occurred that would warrant a re-assessment.

| COMPLIANCE RATING | ¶ 14(a)-(n). Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Since December 2017, Facility Investigations are conducted directly in CMS, and CMS tracks the information related to Facility Investigations as required by ¶ 15(a)-(f).

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals, as required in ¶ 15(g).

### ANALYSIS OF COMPLIANCE

All Facility Investigations are now conducted directly in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 15(a)-(f).

| COMPLIANCE RATING | ¶ 15. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

---

[83] *See* Second Monitor's Report (at pg. 39); Third Monitor's Report (at pg. 61).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The information in ¶ 16(a)-(f) is tracked in CMS which went live in December 2017, and ID investigations for incidents occurring since then are conducted directly in CMS. The Investigation Trials Tracking System ("ITTS") continued to track ongoing ID investigations for incidents occurring before that date, and information is being systematically migrated over to CMS as those investigations close.

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals as required in ¶ 16(g).

**ANALYSIS OF COMPLIANCE**

All ID investigations are now tracked in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 16(a)-(f).

| COMPLIANCE RATING | ¶ 16. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Trials Division continues to utilize an Excel workbook to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The information in ¶ 17(a) to (c) is also tracked in CMS, which went live in December 2017.[84]

**ANALYSIS OF COMPLIANCE**

The required information is tracked in CMS. The Trials Division also maintains a more detailed Excel worksheet to track the status of a case while it is processed in Trials (*e.g.,* tracking the dates of service of charges and discovery, and timing of final approvals for case closure). The Monitoring Team relies heavily on this more detailed worksheet and has found it is accurate and easy to digest. It is clear the Trials Division also utilizes this tracking system to actively manage its cases. The Department is in Substantial Compliance with this requirement as it has demonstrated that this information is

---

[84] Only cases that occurred after CMS was implemented are tracked in CMS.

consistently tracked in a reliable, accurate, and computerized manner. The Trials Division reports it intends to rely on CMS more, by incorporating some of the information that is tracked manually.

| COMPLIANCE RATING | ¶ 17. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to inmate-on-inmate fights in the inmate "Fight Tracker," a computerized system that includes names and booking numbers of the inmates involved; date, time, and location of the fight or assault; and the nature of any injuries sustained by inmates.

- In addition, inmate-on-inmate fights and assaults that result in a use of force are reported in IRS and subsequently tracked as part of the use of force investigation.

- Further, an inmate-on-inmate fight or assault that involves a slashing or use of a weapon is reported in IRS which tracks all required information.

### ANALYSIS OF COMPLIANCE

The Department's Fight Tracker includes most of the information listed while other sources (IRS and use of force investigations) include a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence. Omissions have been isolated occurrences, therefore the Department continues to be in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 19. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[85] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

---

[85] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

- The Department maintains definitions of institutional violence, as reported in the First Monitor's Report (at pg. 35), that were developed in consultation with the Monitoring Team, and the Department has these definitions posted on the Department's intranet page, ensuring easy access for relevant stakeholders.

**ANALYSIS OF COMPLIANCE**

The Department maintains appropriate definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[86]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Prompt Medical Attention (¶ 22)**:

  o The Department maintained Directive 4516R-B "Injury to Inmate Reports", which requires inmates to be afforded medical attention as soon as practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight, and also sets forth guidelines for affording *expedited* medical treatment. Inmates who appear to have specific conditions or complain of having such conditions (*e.g.*, loss of consciousness, seizures, etc.) must be produced directly to a clinic (and not taken to an intake location) following a UOF or inmate-on-inmate fight.

  o The Department's progress in providing timely medical care following a UOF are outlined in the table below. During the current Monitoring Period, medical care was provided within four hours of a UOF in 78% of medical encounters.

---

[86] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* Dkt. Entry 316).

| Wait Times for Medical Treatment Following a UOF | | | | |
|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | Between 4 and 6 hours | 6 hours or more |
| 6th MP Totals | 4244 | 35% | 35% | 17% | 13% |
| 7th MP Totals | 5101 | 38% | 36% | 15% | 12% |
| 2018 Totals | 9345 | 36% | 35% | 16% | 12% |
| 8th MP Totals | 5559 | 42% | 36% | 12% | 10% |

- **Tracking Medical Treatment Times (¶ 23)**:
  - NCU continued to track and analyze medical wait times for inmates following a UOF.[87]
    - NCU tracks the medical wait times for each inmate involved in all reported UOF incidents using information from the Injury to Inmate Report.[88]

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). The Department has previously struggled with producing inmates timely and documenting these encounters. NCU's work to systematically collect medical wait time data was a critical step to support the Facilities improvement in ensuring medical treatment is provided in a timely fashion and addressing any delays. The Facilities have demonstrated sustained compliance in this area. Over the last three Monitoring Periods, the Department has made steady progress in producing inmates for medical treatment within four hours, improving from 57% of medical encounters in January 2018 to 78% during this Monitoring Period. Notably, only 10% of inmates are seen in excess of six hours.

Ultimately the goal is to ensure the wait for medical attention is as short as possible. While only 22% of inmates received medical treatment in excess of four hours, it is critical that patients with severe injuries are prioritized and provided medical attention as soon as possible (generally in less than four hours). In order to ensure that inmates who require medical treatment are seen as soon as possible, the Monitoring Team evaluated the 22% of cases in which medical treatment was provided in excess of four hours. In the majority of these cases, either the inmate had no injuries or ultimately refused medical treatment.

However, some number of inmates with injuries did wait in excess of four hours. NCU began to collect additional information for any inmate who received medical attention *beyond* four hours and

---

[87] It is important to note that this data only tracks when an inmate was seen and treated by medical staff in the clinic. This data does not capture de-contamination following OC spray exposure unless de-contamination occurred in the clinic. De-contamination of OC spray exposure generally occurs before the inmate is taken to the clinic for medical assessment after a UOF either in intake or in a shower on the housing unit.

[88] A small number of Injury to Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

those who *sustained injuries*, in response to a recommendation by the Monitoring Team. Even for this group of inmates, most injuries were minor (abrasions, swelling, contusions). Across the major commands, fewer than 10 inmates were seen in excess of four hours this Monitoring Period who had more serious injuries such as lacerations or broken bones. While these medical delays are outliers, they are the most concerning type of medical delay and therefore should be investigated to determine whether Staff action/inaction caused the delay, holding Staff accountable when warranted.

The Department has achieved Substantial Compliance with both ¶¶ 22 and 23. Medical treatment is generally provided within a reasonable period of time and medical wait times are tracked in a centralized, systematic and reliable manner. The Department's significant progress in this area is directly attributable to the work of NCU which has done a commendable job in collecting and analyzing the medical wait time data and working with the Facilities to improve performance.

| COMPLIANCE RATING | ¶ 22. Substantial Compliance<br>¶ 23. Substantial Compliance |
|---|---|

### 3. TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)).

During the Eighth Monitoring Period, the Department continued to deploy training as required by the Consent Judgment, while contemporaneously providing other In-Service training to Staff and comprehensive recruit training. The Department has deployed most of the initial trainings required by the Consent Judgment. Accordingly, the focus in this Monitoring Period has been on the significant work to maintain and achieve compliance with the Consent

Judgment's ongoing training requirements, including refresher trainings and ongoing training obligations for Staff newly assigned to specific posts (*e.g.*, Probe Team Training, Cell Extraction Team Training, SCM and Direct Supervision Training).

*Training Academy*

The Department continues to suffer from limited and sorely inadequate training space as described in detail in the First Monitor's Report (at pgs. 55-57). The Mayor announced in 2017 that the executive budget would include a commitment of $100 million for a Training Academy. These funds have not yet been put to use as the City has still not identified a potential site for the Training Academy. To be certain, this process is complicated and involves the consideration of many different requirements, a significant amount of bureaucracy, and coordination with a number of different entities and individuals. The City has kept the Monitoring Team apprised of its diligent efforts to identify the site, and ongoing considerations for design of the space once the site is selected. As the Monitoring Team anticipated, this is a long-term project. That said, it is critical that the City work with as much haste as possible to make this effort a reality. The Monitoring Team will continue to monitor this issue to ensure progress is made in providing the Department with appropriate training space.

*Training Deployment*

This Monitoring Period, the Deputy Commissioner of Training & Development provided greater oversight of *Nunez* requirements to ensure the Training Division can independently manage its training obligations—shifting away from an overreliance on the lawyers in the Complex Litigation Unit to manage the training obligations stemming from *Nunez*. In this Monitoring Period, the Deputy Commissioner and his team evaluated how much training has occurred, and assessed the training that needs to be provided to identify the additional work

required to achieve compliance. To support these efforts, the Deputy Commissioner of Training

& Development worked with representatives from across the agency to better understand the

staffing practices across Facilities to develop realistic mechanisms to track and provide targeted

training to specific Staff Members.

*Deployment of Advanced Correctional Techniques ("A.C.T")*

The Department continued to deploy In-Service A.C.T. Training to Staff throughout this

Monitoring Period. A total of 8,587 Staff received A.C.T. training between March 2018 and

October 15, 2019—89% of the total (9,681) Staff in the Department who are available for

training. The deadline for training completion was May 31, 2019, which the Department was

unable to meet despite its efforts in the Eighth Monitoring Period. In the Eighth Monitoring

Period, the Department ran six training sessions per week and provided 3,153 Staff Use of Force

Policy and Defensive Tactics refresher training and 2,235 Staff Conflict Resolution and Crisis

Intervention Training. As of mid-October 2019, approximately 1,100 available Staff have yet to

receive A.C.T. training, and the Department reports it will continue to roll-out the training to

these Staff in the Ninth Monitoring Period. It is worth noting the last group of Staff that require

the training are mostly in non-inmate facing posts—over 400 of the remaining Staff to be trained

are assigned to Headquarters, SOD, and the Transportation Division—while the majority of Staff

assigned to Facilities have received the training. 93% of all Staff assigned to Facilities have been

trained and the majority of Facilities have over 95% (and some up to 100%) of their Staff

trained.

The Department also provided A.C.T. training to the Department's uniform executive

leadership this Monitoring Period. 52 out of 53 (98%) executive leaders received the one-day

combination of Supervisor UOF Policy and Defensive Tactics refresher training, and 49 of 53

(92%) received the one-day Conflict Resolution and Crisis Intervention training.

See *Appendix B: Training Charts* for the status of development and deployment of initial

and refresher training programs required by the Consent Judgment, and for the total number of

Staff who have attended each required training program in this Monitoring Period and since the

Effective Date. The boxes below analyze the Department's progress in achieving compliance

with the training requirements.

| XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING) |
|---|

¶1. Within 120 days[89] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

      a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

            i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy [and provided in the timeframe outlined in 1. And 2.]

           ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

    The Department has achieved Substantial Compliance with ¶ 1(a) and ¶ 1(a)(i) by providing Use of Force policy training to recruits as part of the mandatory Pre-Service training and providing the training to all Staff as part of Special Tactics and Responsible Techniques ("S.T.A.R.T."). Operating together, these two training components reached all uniformed Staff.

    Regarding ¶ 1(a)(ii), the UOF Policy refresher training lesson plans for Staff and a separate refresher curriculum targeting Supervisors were finalized during the Sixth Monitoring Period. These continue to be deployed as part of A.C.T. as described above, with planned completion by October

---

[89] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

2019. The refresher training will then be incorporated into the ongoing In-Service training curriculum and provided at least every other year. The Monitoring Team intends to continue to consult with the Training Division on the content of the refresher training to determine if modifications may be necessary over time.

| **COMPLIANCE RATING** | **¶ 1(a).** Substantial Compliance<br>**¶ 1(a)(i).** Substantial Compliance<br>**¶ 1(a)(i)(1) & (2).** Substantial Compliance<br>**¶ 1(a)(ii).** Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶1. Within 120 days[90] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

        i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[91]

        iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

    The Department continues to meet the expectations of Consent Judgment ¶ 1(b)(i) by providing Crisis Intervention and Conflict Resolution training to all recruit classes. As discussed above, the In-Service training continues to be deployed as part of A.C.T., with planned completion by October 2019. During this Monitoring Period, the Training & Development Unit began planning for the development and deployment of Conflict Resolution and Crisis Intervention refresher. The

---

[90] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[91] This date includes the extension that was granted by the Court on April 24, 2018 (*see* Dkt. Entry 312).

Monitoring Team will consult with the Department on the development of the refresher lesson plan in the next Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance<br>**¶ 1(b)(i).** Substantial Compliance<br>**¶ 1(b)(ii).** Partial Compliance<br>**¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶1. Within 120 days[92] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[93] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

¶ 2. Within 120 days[94] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.    <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[95] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B*.

**ANALYSIS OF COMPLIANCE**

    During this Monitoring Period, the Department developed a more reliable process to routinely identify Staff in the select posts who are required to receive Probe Team Training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)) and schedule those Staff

---

[92] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[93] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

[94] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[95] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

for training.[96] This process includes monthly coordination between Facility-based scheduling Officers and the Academy. This Monitoring Period, a total of 582[97] Staff held posts that required these trainings, and the Department worked to provide the required trainings to this group of Staff who had not already received the trainings. Staff are frequently reassigned posts within the Facility so the Department will continue to evaluate Staff on the relevant posts to determine whether they require the training and then provide that training.

The Department had previously been unable to reliably identify, track, and demonstrate that this training was provided to Staff in the identified posts (as described in the Seventh Monitor's Report at pg. 81). The Monitoring Team's review of the attendance records for the Probe and Cell Extraction Team trainings did not identify the same concerns regarding the training records that were identified in the last Monitoring Period although there continues to be room for improvement as described in more detail in the box for ¶¶ 6 & 7 below ("In-Service Probe Team and Cell Extraction Team Training Examinations and Attendance").

_Probe Team Training_ (¶ 1(c))

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training, and provided on a targeted basis to Staff in In-Service training. As of the end of the Monitoring Period, 503 of the 582 (86%) Staff in the identified posts received Probe Team Training as recruits, in Pre-Promotional Training or through In-Service training—including 129 of whom received the In-Service training on a targeted basis this Monitoring Period. The Staff that are newly assigned to these posts (the 14% who had not yet received Cell Extraction Training) will be scheduled for these trainings in the Ninth Monitoring Period.

_Cell Extraction Training_ (¶ 2(b))

The Cell Extraction Team training continues to be included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. As of the end of the Monitoring Period, 514 of the 582 (88%) Staff in the identified posts received Cell Extraction Training as recruits, in Pre-

---

[96] Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with celled housing, but the Department determined during the last previous Monitoring Period that a number of other Facility-specific posts ("identified posts") including Intake, Security, Corridor, and Escort posts, and the relevant Facility-specific posts are the Staff who actually field serve on Facility Emergency Response (previously known as Probe Teams) and Cell Extraction Teams.

[97] These rosters are perpetually changing with new and shifting assignment of Staff in these posts, so the targets change over the course of the Monitoring Period. As done with the analysis of other required trainings (Direct Supervision and SCM Training), the Monitoring Team analyzes compliance based on a set point in time—being the end of the Monitoring Period.

Promotional Training or through In-Service training (the vast majority of which was received prior to this Monitoring Period, with only 15 Staff receiving In-Service Cell Extraction Team training this Monitoring Period).

The Department provided more In-Service Probe Team Training in this Monitoring Period over Cell Extraction Training as determined by the training needs identified at the beginning of the Monitoring Period, as described below (more Staff needed the Probe Team Training than the Cell Extraction Team training). As of January 2019, 97% of Staff assigned to relevant posts had received Cell Extraction Training and 89% of Staff assigned to posts that are likely to field the Probe Team had received Probe Team Training.

The Monitoring Team also encouraged the Department to prioritize In-Service Probe Team training over Cell Extraction training because (1) the volume of Cell Extractions that occur within the Department is significantly lower than that of Facility Emergency Response Team deployment, averaging only 26 extractions Department-wide on a monthly basis (described in more detail in the UOF Introduction to this report); (2) because extractions happen on a relatively infrequent basis the cell extraction teams are not as consistently fielded by Staff in the identified posts, but the low volume makes consistency and selecting and training a different subset of Staff impractical.

The Staff that are assigned to these posts change frequently and so the Staff that require the training are always a moving target, and change over the course of the Monitoring Period. Accordingly, as of the end of the Monitoring Period, 88% of the Staff in the identified posts had received the Cell Extraction training. The Staff that are newly assigned to these posts (the 12% who had not yet received Cell Extraction Training) will be scheduled for these trainings in the Ninth Monitoring Period.

*Revisions to Course Evaluations*

In this Monitoring Period, prompted by recommendations from the Monitoring Team, the Training & Development Unit considered a new approach to evaluate individual student participation in the Probe and Cell Extraction Team trainings given that these are more physical based trainings. The Monitoring Team recommended that the Department expand the evaluation beyond the pro-forma review that just confirmed that students were taught the specific concepts versus assessing the student's mastery of those concepts. The Training & Development Unit developed and rolled out post-simulation de-briefs for both trainings in which instructors used video segments from the scenario-based activities to provide feedback and explore how and why students reacted to a given situation. To further enhance the review/evaluation process at the close of these physical trainings, the Training & Development Unit reported it is working on designing and piloting updated qualitative evaluation forms along with employing the use of clickers to conduct pre- and post-training assessments, to enhance the Department's data gathering around whether or not the employees fully understand the practices. This initiative will continue in the Ninth Monitoring Period.

| COMPLIANCE RATING | ¶ 1(c). Probe Team Training (Pre-Service) Substantial Compliance |
|---|---|

| | ¶ **1(c). Probe Team Training (In-Service)** Substantial Compliance<br><br>¶ **2(b). Cell Extraction Training (Pre-Service)** Substantial Compliance<br><br>¶ **2(b). Cell Extraction Training (In-Service)** Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[98] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.  <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

        i.    The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.   The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B*.

### ANALYSIS OF COMPLIANCE

      The Department has achieved Substantial Compliance with ¶ 2(a)(i) by incorporating and deploying Defensive Tactics training as part of the mandatory Pre-Service training for recruits. Although not required by the Consent Judgment, the Department provided the three-day Defensive Tactics course to all Staff as part of S.T.A.R.T. A refresher training lesson plan for Staff was finalized during the Sixth Monitoring Period, and as discussed above, continues to be deployed as part of A.C.T., with planned completion by October 2019. The refresher training will then be incorporated into the ongoing In-Service training curriculum and provided yearly. The Monitoring Team intends to continue to consult with the Training Division on the content of the refresher training to determine if modifications may be necessary over time.

| COMPLIANCE RATING | ¶ **2(a)(i).** Substantial Compliance<br>¶ **2(a)(ii).** Partial Compliance |
|---|---|

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and

---

[98] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

a. The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

b. The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B*.

- The Department chose to provide Safe Crisis Management ("SCM") Training to *all* Staff assigned to work at RNDC, where most 18-year-old inmates are housed,[99] not just to those regularly assigned to work in Housing Areas with 18-year-old inmates, as required by the Consent Judgment.[100] As of the end of the Eighth Monitoring Period, 94% of RNDC Staff had received SCM Training (either as Pre-Service or In-Service) and 55% had also received SCM Refresher training.

| Facility | Total Staff Assigned to Facility as of June 30, 2019 | Staff Trained in SCM as of June 30, 2019 | Received Pre-Service SCM Training | Received In-Service or Pre-Promotional SCM Training | Received SCM Refresher Training |
|---|---|---|---|---|---|
| **RNDC** | 852 | 800 (94%) | 366 | 434[101] | 439 (55%) |

---

[99] RNDC housed adolescent inmates until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

[100] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

[101] This excludes those Staff Members who received SCM Training as part of both Recruit and In-Service training.

- The Department continues to provide newly assigned Facility leadership this training—two Wardens and nine Deputy Wardens still require the three-day core SCM curriculum.
- The Department has also provided a revamped SCM Training to all active 288 Staff initially assigned to work at Horizon Juvenile Center, which exclusively houses adolescent inmates.

**ANALYSIS OF COMPLIANCE**

*Training Content*

As described in the First Monitor's Report (at pgs. 52-53), this SCM training, combined with other trainings provided to Staff who work with Young Inmates, meets the content requirements of this provision for Young Inmate Management training.

The Monitoring Team continues to evaluate the implementation of SCM as part of its overall efforts to monitor the provisions related to Young Inmates. SCM implementation is discussed in further detail, particularly as it relates to Horizon, in the Current Status of 16- and 17-Year-Old Youth section of this report.

*SCM In-Service Training*

The Department has achieved Substantial Compliance with the requirement to deploy SCM In-Service training as all Staff assigned to HOJC have received SCM training and the majority of the Staff who work in the Facilities that house the largest number of 18-year-old inmates have received the SCM training.

*SCM Refresher Training*

- ***RNDC***

The Department rolled out the Monitor-approved SCM Refresher Training curriculum during the Fourth Monitoring Period and has provided it to Staff on a rolling basis. As of the end of the Monitoring Period, 55% of Staff from RNDC have received the SCM Refresher Training.

Given the various issues facing RNDC, the Monitoring Team has recommended that the Department consider re-purposing the refresher training hours to focus on broader Young Inmate Management strategies rather than focusing on refreshing Staff on SCM techniques. The Monitoring Team believes that there is a unique opportunity to develop and deploy a command-specific training focused on the skills RNDC Staff should hone to effectively manage this age group. A revised Young Inmate Management Refresher Training could leverage and reinforce skills from other training areas like Direct Supervision, and Crisis Intervention and Conflict Resolution, in addition to the related skills from the initial SCM Training, while supporting efforts described elsewhere in this report like the implementation of Graduated Sanctions. The Department has expressed receptivity to this concept and the Monitoring Team will work with the Department in the Ninth Monitoring Period on development of this training, and the Department will continue to provide the existing SCM Refresher training in the meantime.

| - **HOJC** |
| --- |

In order to reinforce the use of SCM at HOJC, the Department contracted with JKM Training, Inc., the creators of SCM, to provide additional on-site training at HOJC to support Staff skills in using SCM techniques. JKM was on site at HOJC in February and May of this Monitoring Period to provide SCM refresher training. During these sessions, JKM trainers reviewed videotaped footage of UOF incidents with Staff and discussed ways to improve Staff's response and the use of SCM techniques. JKM is scheduled to continue these on-site trainings in the Ninth Monitoring Period.

| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br>¶ **3(a).** Substantial Compliance<br>¶ **3(b).** (Development of Refresher Lesson Plan) Substantial Compliance<br>¶ **3(b).** (Deployment of Refresher Training) Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[102] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    b.    The Direct Supervision Training shall be a minimum of 32 hours.

    c.    By April 30, 2018,[103] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix B*.
- The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most 18-year-old inmates are housed,[104] not just to those regularly assigned to work in Housing Areas with 18-year-old inmates, as required by the Consent Judgment.

---

[102] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[103] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

[104] RNDC housed adolescent inmates until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

- As of the end of this Monitoring Period, 752 of the 852 (88%) Staff at RNDC had received Direct Supervision Training.

| Facility | Total Staff Assigned to Facility as of June 30, 2019 | Staff Trained in Direct Sup. as of June 30, 2019 | Received Pre-Service Direct Sup. Training | Received In-Service or Pre-Promotional Direct Sup. Training |
|---|---|---|---|---|
| RNDC | 852 | 752 (88%) | 300 | 452[105] |

- The Department continues to provide Direct Supervision to the Facility leadership of RNDC, and the Warden and one Deputy Warden are scheduled to receive the training early in the Ninth Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment ¶ 4 and ¶ 4(a). The Department has struggled to provide the In-Service Direct Supervision training to RNDC Staff. The Department previously did not have a targeted approach to identify and provide this training to RNDC Staff that has not already received it as a recruit or in prior In-Service training. While the Training & Development Unit has now developed a plan to identify those who require the training by working with command-based scheduling Officers, the training was not successfully deployed to those that were identified as requiring the training. The number of Staff that still require this training is small because the majority of Staff received the training as recruits or in prior In-Service training. That said, it is still important for the Department to have a reliable process to identify and deploy this training In-Service for those who did not already receive this training.

The Department will achieve Substantial Compliance when it can demonstrate a reliable and sustainable process to identify, track and provide this training on an ongoing basis to Staff newly assigned to RNDC.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance<br>¶ 4 (a). Substantial Compliance<br>¶ 4 (b). Partial Compliance |
|---|---|

---

[105] This excludes those Staff Members who received Direct Supervision Training as part of both Recruit and In-Service training.

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

e.   There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, Probe Team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department developed a stand-alone Handheld Camera Training Lesson Plan that was incorporated into the mandatory Pre-Service training, beginning with the class that graduated in November 2017.

- The Department provided the stand-alone Handheld Camera Training Lesson Plan to ESU, ESU support, and K-9 unit Staff during prior Monitoring Periods.

- The Department has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials.

- The Department previously deployed a separate short training and lesson plan with instructions for Staff on saving and uploading handheld video to the Department's main computer system.

### ANALYSIS OF COMPLIANCE

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations.

The Department provided the standalone handheld camera training to active ESU Staff in the Sixth Monitoring Period and continues to provide the training to all recruits. Further, as noted in *Appendix B* 5,772 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff which also includes training on the operation of handheld video cameras. The Monitoring Team has generally found that handheld video is available for incidents where it is required. To the extent issues have been identified with handheld video, it does not appear to be due to a Staff Member's lack of training on how or when to utilize a handheld camera.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

> a.   Such re-training must be completed within 60 days of the determination of the violation.
> b.   The completion of such re-training shall be documented in the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to utilize a computerized re-training request system ("Service Desk") for requesting and tracking re-training requests.

- Operations Order 13/18, "Academy Training Service Desk," that governs the use of the Service Desk, remains in effect. The policy mandates that all re-training required as a result of a Use of Force incident must be entered into and tracked through the Service Desk.

- The Academy and the Staff Member's assigned command are responsible for tracking the status of all training entered into the Service Desk to ensure that it is completed. The Service Desk ticket should be closed only after the Academy confirms that the Staff Member has successfully completed the re-training program.

### ANALYSIS OF COMPLIANCE

The Department made strides in this Monitoring Period to implement the Service Desk. This tool provides a centralized repository to identify and track Staff that have been recommended for re-training. Prior to the implementation of the Service Desk, the Department managed recommendations for re-training in an ad hoc manner that was paper based. This process lacked integrity and the Department was unable to demonstrate that most recommendations for re-training were actually fulfilled. The Service Desk is an online portal that is accessible by Facility Staff, civilian leadership, and the Academy. If an individual is recommended for re-training, that recommendation is entered into the system and then can be tracked. The system is then updated when re-training is provided. The Service Desk also has the ability to run aggregate reports. The implementation of the Service Desk is an improvement over prior practice.

For the first time, the Department can now systematically identify Staff that require re-training. The Monitoring Team reviewed a sample of Staff recommended for re-training by Rapid Reviews and found that they appeared on the Service Desk Report. In this Monitoring Period, 410 Staff were recommended for re-training via the Service Desk. As of the end of the Monitoring Period, the Department reported that 295 (72%) Staff recommended for re-training received the re-training.[106] Re-

---

[106] The Monitoring Team has not had an opportunity to independently verify this training was provided. An audit of re-training records will occur in the next Monitoring Period.

training was not provided to 89 (22%) Staff and the requests for re-training were closed. 26 (6%) Staff recommended for re-training were still awaiting the scheduling of that training as of the end of the Monitoring Period. The chart below depicts the number of re-training recommendations made by month in this Monitoring Period along with the re-training that was actually provided.

| Date of Request | Total Number of Requests | Re-Training Provided |
|---|---|---|
| January 2019 | 73 | 43 (59%) |
| February 2019 | 43 | 36 (84%) |
| March 2019 | 113 | 74 (65%)[107] |
| April 2019 | 43 | 42 (98%) |
| May 2019 | 58 | 51 (88%) |
| June 2019 | 80 | 49 (61%)[108] |
| 8th MP Totals | 410 | 295 (72%) |

The top four courses recommended for Staff re-training were Use of Force (29%), Chemical Agents (20%), Use of Force Report Writing (19%) and Situational Awareness (12%)—these re-training courses are sum and substance identical to the initial training course Staff received either as part of In-Service training or as Recruits. The majority of re-training requests were made by the Facility (47%) and from ID (32%) with the remainder of requests coming from the Trials Division, E.I.S.S., the Chief's Office, and the Immediate Action Committee.

While the Service Desk is a significant improvement over prior practice, the Monitoring Team found that some re-training requests were closed in the Service Desk system without explanation and the re-training was not provided. The Department attempted to provide an explanation about why some of the re-training was not provided after this issue was brought to their attention. In some cases, re-training was not provided because the Staff Member was no longer with the Department. However, there were some cases where the re-training was not provided and it is unclear why it was not completed. In at least some cases it appears that the re-training request was inappropriately closed (*e.g.* the Staff did not attend the originally scheduled re-training course and so the ticket was closed rather than re-scheduling the Staff Member for another session; or the Staff Member was never scheduled for training and the ticket closed out prematurely). Upon identification of this issue, the Department reported it would provide an explanation for all re-training that was closed and/or to re-schedule the re-training if not initially provided. Subsequent reports have demonstrated some improvement in this area, but some re-training requests still appear to be closed without explanation.

---

[107] Of the 39 Staff that have not received re-training, the provision of re-training is still pending for 1 Staff Member.

[108] Of the 31 Staff that have not received re-training, the provision of re-training is still pending for 25 Staff Members.

The overall goal of re-training Staff is to provide them with additional guidance and clarity to support improved practice. The Department has taken the first step in achieving compliance with this provision by developing a centralized process to identify and track Staff that are recommended for re-training. The Monitoring Team intends to consult with the Department about how re-training can best be leveraged in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to develop the Learning Management System ("LMS") which will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**:
  - **TTS:** The Department continues to use the Training Tracking Software ("TTS") as an interim solution until LMS is implemented. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings and all *Nunez*-required In-Service and Pre-Promotional trainings except those conducted by ESU (which includes Probe Team and Cell Extraction Team Training). TTS scans Staff's identification cards in the classrooms and then this information is manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

  - **Hand-Written Sign-in Sheets**: Attendance for In-Service and Pre-Promotional trainings conducted by ESU (which include Probe Team and Cell Extraction Team Training) continue to be captured by hand-written sign-in sheets this Monitoring Period. The Department reported that ESU implemented TTS in mid-April 2019 despite previously reporting it was implemented in November 2018.

- **Examination Tracking**:
  - o **Pre-Service**: Examinations for all *Nunez*-required Pre-Service courses are taken using a tablet and the results are tracked in Excel.
  - o **In-Service and Pre-Promotional**: In-Service exams are administered on paper or involve evaluations of physical skill assessments administered by the instructor and the results are captured on paper.
- **Development of Learning Management System**:
  - o During this Monitoring Period, the Department continued to work on the development of a centralized Learning Management System ("LMS"), including:
    - ▪ Working internally to generate a comprehensive catalogue of all courses offered across the Department, whether Pre-Service, In-Service or for non-employees (H+H employees, program provider employees, volunteers) in preparation for entering into the system;
    - ▪ Organizing existing data in preparation for migration (related to data for both prior course training records and data for the identification of Staff—which is critical to define employee/learner profiles within the system); and
    - ▪ Working with external consultants and the vendor to establish governance structure and formal protocols for determining how new courses get approved (including processes for submitting course proposals to Training/Academy LMS managers, as well as what kinds of reports will be established within the system and who will have the administrative rights to extract them).

ANALYSIS OF COMPLIANCE

*Review of Examination and Attendance Records* (¶¶ 6 & 7):

¶¶ 6 and 7 require that all Staff Members who complete the *Nunez*-required trainings must pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). This Monitoring Period, NCU reviewed training records to ensure attendance is tracked accurately and examinations are administered as required. The Monitoring Team reviewed NCU's assessment and verified the underlying documentation. NCU reported overall that they did not encounter significant issues in obtaining the required paperwork or information from the Academy to conduct the audits described below.

The results of the training audit are described in detail below and reveal continued improvement in attendance and examination records. However, ESU's training records continue to pose issues. For over a year the Monitoring Team has strongly recommended that the ESU's management of training records needed to be improved. Despite the fact that ESU reported to the

Monitoring Team that TTS was implemented in November 2018, that was not actually true. The Monitoring Team is not aware of any reasonable basis that the implementation of TTS has languished other than a lack of focus and accountability within ESU to complete this task. Following even more pressure from the Monitoring Team, the Department reports that TTS was implemented with ESU in mid-April 2019. The Monitoring Team intends to review the records in the next Monitoring Period to determine whether this occurred.

- **Recruit Training Examinations and Attendance**

The Department assessed, and the Monitoring Team verified, the examination and attendance records for all *Nunez*-required trainings for two companies that graduated in July 2019. All recruits in these companies attended the required training (as initially offered with their company, or as make-up classes). NCU reviewed the examination scores for: (1) exams taken electronically on iPads for UOF Policy, SCM, and Crisis Intervention and Conflict Resolution training, and (2) written performance evaluations for Cell Extraction, Probe Team Training, and an overall Defensive Tactics qualification by an instructor. Passing records, including make-up exams when necessary in some cases, were located for all evaluations and examinations for courses reviewed. Overall, the training records for the recruit class were maintained in an organized fashion and NCU found the records well maintained.

- **Pre-Promotional Training Examinations and Attendance**

NCU conducted, and the Monitoring Team verified, an internal audit of the *Nunez*-required trainings' examination and attendance records for all three Staff in the Assistant Deputy Warden ("ADW") Pre-Promotional Training class during this Monitoring Period. All examinations and evaluations were available.

- **In-Service and Refresher SCM Training Examinations and Attendance**

The Department conducted, and the Monitoring Team verified, an internal audit of the examination and attendance records for 10% of the Staff who received SCM Refresher training during this Monitoring Period. This meant NCU audited the training records for 47 of the 467 individuals who were reported as receiving the training. The audit revealed that 44 (94%) of the 47 Staff actually attended the one-day refresher course. Three Staff were listed on the e-scheduling transcripts as receiving the SCM refresher training, but they were inputted in error and actually received Basic Crisis Management Skills.[109] Of the 44 Staff that received the training, 37 (84%) passed the examination; two attended Instructor Re-Certification class and thus, no examination was required; and five exams could not be located.

- **In-Service Direct Supervision Attendance**

The Monitoring Team reviewed a sample of TTS sign-in sheets for Direct Supervision blocks of

---

[109] The Department reports the training records were revised to correct the error after it was identified.

training and confirmed that the RNDC Staff that had been reported as attending had corresponding TTS sign-in sheets for those dates.[110]

- ***A.C.T. Examinations and Attendance***

The Department conducted, and the Monitoring Team verified, an internal audit of attendance and examination records for one four-day A.C.T. training block. The audit demonstrated that the vast majority of Staff who participated in each block of training attended all four days as required (or attended make-up classes), and also took and passed the scantron Conflict Resolution and Crisis Intervention examination. However, while Staff took make-up classes, it is clear from the audit results that not all Staff attend as initially scheduled, and that creates wasted seats in the classes.

- ***In-Service Probe Team and Cell Extraction Team Training Examinations and Attendance***

The Monitoring Team found the attendance records for the Probe and Cell Extraction Team trainings improved in this Monitoring Team and did not identify the same integrity issues regarding the training records that were identified in the last Monitoring Period (*see* Seventh Monitor's Report at pg. 81 and pg. 90). The Monitoring Team reviewed *all* attendance records for Probe and Cell Extraction Team training provided to Staff in the identified posts this Monitoring Period. The Monitoring Team compared the Training & Development Unit's roster of Staff in the identified posts that received the training in this Monitoring Period with the physical sign-in sheets for the training. The Monitoring confirmed almost all Staff[111] listed on the roster as having received the training in the Eighth Monitoring Period had a corresponding sign-in sheet for the training. Overall, the attendance and evaluation records reviewed this Monitoring Period appeared accurate and more reliable than in prior Monitoring Periods, including the fact that the Department was able to produce requested documentation in a timely manner.

*Centralized System to Maintain Training Records* (¶ 8):

As noted in prior Monitor's Reports, a centralized electronic system to track training will significantly enhance the Department's ability to identify which Staff require training and when, the completion of required courses, and the overall maintenance of training records. The Department continues to provide the Monitoring Team with routine updates on the development of LMS. The development of the system requires significant coordination within the agency as well as the vendor. This inherently is a lengthy process given all the coordination of the different moving pieces. That said, progress reports

---

[110] Direct Supervision does not have a separate examination because the last module of the lesson plan is a dedicated review and practice module in which students respond to a series of questions about Direct Supervision, analyze scenarios for compliance with Direct Supervision concepts, and develop plans to address hypothetical situations.

[111] There was a small number of Staff listed on the roster as having received the training but there was no corresponding sign-in sheet, which is likely be due to human input error. The training dates reflected in the rosters are manually entered and so there may have been a typo on the training date in the roster.

| | |
|---|---|
| | provided of the project to date suggest some portion of LMS is likely to be launched in the Ninth Monitoring Period. |
| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance<br>¶ **7.** Partial Compliance<br>¶ **8.** Partial Compliance |

## 4. ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitoring Team, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all Use of Force incidents are properly reported without fear of retaliation and can be investigated. The Department has maintained an anonymous hotline since March 2016.

The Monitoring Team's assessment of compliance is outlined below.

### VI. ANONYMOUS REPORTING ¶ 1

¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect. The Division Order requires ID to initiate a preliminary investigation within three business days of receiving an anonymous report.

- The following number of reports have been received through the Anonymous Reporting Hotline since March 2016.

| | March to June 2016 | July to Dec. 2016 | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 |
|---|---|---|---|---|---|---|---|
| **Total Calls Received** | **3** | **11** | **21** | **28** | **18** | **23** | **19** |
| Number of UOF related calls | 0 | 0 | 1 | 0 | 1 | 0 | 2 |

- The Department continues to advertise the hotline telephone number in all facilities on large posters. The Department reports that the Anonymous Reporting Slides are posted on DOC TV and the Department's intranet home page.

- In July 2019, after being prompted by the Monitoring Team, each Facility conducted a routine check of the posters to confirm they are mounted in Lexan (polycarbonate) and remained in good condition in high traffic areas such as the Staff lounge ("KK"), administrative corridor and main entrance. During their routine check, Facility Staff reported that in all but one area, posters were mounted behind Lexan, remained in good condition and were not defaced. A new poster was placed in the area with the damaged poster.

**ANALYSIS OF COMPLIANCE**

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision. The Monitoring Team continued to observe the hotline advertised on DOC TV and posters in high-traffic areas throughout Facilities while conducting site visits. The Department receives calls through the hotline from Staff on a routine basis, which also demonstrates that Staff are aware that the hotline is available.

The Monitoring Team has reviewed the screening forms for all calls received by the hotline in this Monitoring Period and confirmed that only two calls received in this Monitoring Period were related to the use of force. One call referenced a use of force incident from 2015 that had previously been investigated. In the other call, the caller alleged being assaulted by an Officer. ID interviewed the caller who subsequently recanted the allegation. It is worth noting that the Department also continues to receive Use of Force concerns through a number of channels including direct reports by Staff and inmates to Facility and/or ID staff, calls to 311, reports from non-DOC Staff (*e.g.* H+H), inmate grievances, and from Legal Aid Society lawyers. The Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## 5. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires

the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f));[112] and preserve video from all sources for at least 90 days (¶ 4).

The Department's video surveillance capability is expansive and far greater than most correctional systems with which the Monitoring Team has experience. In total the Department has approximately 14,000 wall mounted video surveillance cameras Department-wide, and has installed over 10,000 cameras since the Effective Date of the Consent Judgment. Given the significant camera coverage, the vast majority of use of force incidents are captured on camera. Further, the widespread video surveillance capabilities across the Facilities allows the Department to utilize the camera footage proactively. In particular, the Department continues to maintain the Compliance and Safety Center ("CASC") to proactively identify potential security breaches and detect and prevent potential violence. The Chief of Department also maintains the video monitoring unit to observe practices within the Facilities. Further, the Department has utilized video of incidents during uniform leadership meetings and through the Transfer of Learning initiative. These initiatives are promising but—as noted in prior Monitoring Periods— have yet to achieve their desired effect in a meaningful manner.

The Monitoring Team's assessment of compliance is outlined below.

---

[112] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

## IX. VIDEO SURVEILLANCE ¶ 1 (STATIONARY CAMERA INSTALLATION)

¶ 1.

a. At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

    i. At least 25% of these additional cameras shall be installed by July 1, 2016.

    ii. At least 50% of these additional cameras shall be installed by February 1, 2017.

    iii. At least 75% of these additional cameras shall be installed by July 1, 2017.

b. The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

c. The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

d. Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

e. The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of June 30, 2019, the Department has installed 10,285 new wall-mounted surveillance cameras throughout the Facilities.[113]

- The Department maintains a comprehensive list of recommendations for additional wall-mounted stationary cameras, compiling recommendations from the Monitoring Team, Chief of Department, and other divisions within the Department.

**ANALYSIS OF COMPLIANCE**

The Department has installed a significant number of wall-mounted surveillance cameras, well beyond the 7,800 cameras required by the Consent Judgment and has achieved "Complete Camera Coverage" of all Facilities.

*Installation of stationary, wall-mounted cameras to ensure Complete Camera Coverage* (¶ 1(a), (c))

Given that cameras have been installed across multiple Monitoring Periods, the chart below illustrates the current status of installation and recommendations at each Facility.

---

[113] Hundreds of cameras that were previously installed in GMDC have since been removed after the Facility was closed. The cameras that have been removed are not included in this total.

- ***Status of Installation***

The Department has completed installation of cameras in almost all areas of the Facilities. Consequently, the overwhelming majority of incidents are captured on video, which the Monitoring Team confirmed by a review of a sample of Rapid Reviews, Preliminary Reviews, and UOF investigations.[114] The Monitoring Team has recommended a relatively small number of additional cameras are installed in certain areas of the Facilities to minimize potential blind spots. The Monitoring Team continues to receive regular updates from the Radio Shop as the Department installs additional cameras in address the Monitoring Team's recommendations. Cameras are being installed based on the order in which the recommendation was received.

| Facility[115] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[116] | Reference to Prior Monitor's Report Findings |
|---|---|---|---|---|---|
| GMDC[117] | Substantially Complete | Substantially Complete | No | N/A[118] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure) | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE[119] units may house 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| EMTC | Substantially Complete | Substantially Complete | Yes (sentenced 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| OBCC | Substantially Complete | Substantially Complete | Yes (ESH YA only) | In progress | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |

---

[114] It should be noted that it is not expected that 100% of incidents will be captured on camera as the Consent Judgment explicitly excludes certain areas from camera coverage. See ¶ 8 of Definitions.

[115] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[116] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras.

[117] As of the end of June 2018 the Department no longer houses inmates at GMDC.

[118] Given that GMDC has now closed, the need to address recommendations for camera installation is moot.

[119] Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE").

| RMSC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
|---|---|---|---|---|---|
| WF | Substantially Complete | Substantially Complete | No | Substantially addressed | Third Report (pg. 107) Sixth Report (p.83) |
| NIC | Substantially Complete | Substantially Complete | No | In progress | Second Report (pg. 66) Sixth Report (pg. 83) |
| HOJC | Substantially Complete | Substantially Complete | Yes | To be addressed | Seventh Report (pg. 94) |
| BKDC | Substantially Complete | Substantially Complete | No | In progress | Sixth Report (pg. 83) |
| DJCJC | N/A – no housing units | Substantially Complete | No | To be addressed | Sixth Report (pg. 83) |
| QDC | N/A – no housing units | N/A – not currently in use | No | N/A | N/A |

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds (¶ 1(b))*

As noted in previous Monitor's Reports, provision ¶ 1(b) overlaps with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. As demonstrated in the chart above, the Department installed cameras in HOJC which now houses 16- and 17-year-old residents and there were no changes to the Facilities housing 18-year-olds, and thus remains in Substantial Compliance.

*Use of Force incidents not captured on video and subsequent identification of blind spots (¶ 1(d))*

To date, neither the Department nor the Monitoring Team has identified a use of force incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot.

*Internal camera working group meeting (¶ 1(e))*

The internal camera working group is no longer needed because the project is complete as described in more detail in the Fifth Monitor's Report (at pg. 84). Should the need for a major installation of additional cameras arise in the future, the Department and the Monitoring Team will evaluate whether the meetings should be reinstated.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance<br>¶ **1(b).** Substantial Compliance<br>¶ **1(c).** Substantial Compliance<br>¶ **1(d).** Substantial Compliance<br>¶ **1(e).** Substantial Compliance (per Fifth Monitor's Report) |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.     Body-worn Cameras

  a.     Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned

118

to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

b.    The 100 body-worn cameras shall be distributed among Officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

c.    The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department initiated its body-worn camera ("BWC") pilot at GRVC on October 9, 2017. Staff assigned a BWC were provided training that was developed in consultation with the Monitoring Team. In this Monitoring Period, the Department expanded the use of BWC to 42 posts at HOJC.

  o   HOJC Staff were trained on the use of BWC in this Monitoring Period.

  o   The Department began to provide additional training on BWC to GRVC Staff at the end of this Monitoring Period.

- There are two policies governing the use of the BWC. The original BWC policy was updated to Operations Order 14/19 in this Monitoring Period, in consultation with the Monitoring Team, to include additional guidance on the logistics of managing the BWC. Operations Order 14/19 relates to the use of BWC at GRVC. The Department also developed a specific BWC policy for Horizon, Operations Order 03/19, in consultation with the Monitoring Team, that was promulgated in this Monitoring Period.

  o   Both policies require Staff to activate the body-worn cameras in specified situations (*e.g.,* use of force incidents, witnessing or responding to an inmate-on-inmate fight, or escorting inmates).

- At the end of the Monitoring Period, the Project Management Office ("PMO") was assigned to manage the BWC pilot. The PMO worked with leadership at GRVC to reinvigorate the use of BWC at GRVC. Towards the end of the Monitoring Period, the Department began to re-train Staff at GRVC on the use of the BWC.

- The BWCs were activated in response to fifty-three use of force incidents during the Eighth Monitoring Period, three of which occurred at GRVC and the rest were at HOJC.

- The Department is working on identifying a third Facility to utilize the BWC in the next Monitoring Period. There are sufficient cameras to expand the pilot, so the Department intends to identify and train the Staff in the third Facility during the next Monitoring Period.

## ANALYSIS OF COMPLIANCE

The BWC pilot expanded to HOJC and fell by the wayside at GRVC during this Monitoring Period. The failure to maintain the BWC at GRVC was not due to a concerted effort to abandon the pilot, but instead due to the lack of appropriate oversight of the pilot. The leadership in the Facility changed at least three times during the course of the pilot and there was no transition plan in place to ensure the pilot continued during the course of these leadership transitions. This of course is no excuse as maintaining appropriate transition plans is necessary, particularly because the transition of leadership within the Facilities occurs so routinely in this Agency. Towards the end of the Monitoring Period, the Department reported that PMO will now manage the pilot—in fact, PMO already instituted re-training for Staff on the BWC in order to reinvigorate and expand the use of BWC to all inmate-facing posts at GRVC in August of 2019. The BWC were used at HOJC and captured some UOF incidents. However, in at least some of the cases, it appears the BWC was only activated after the UOF incident occurred.

As noted in prior Monitor's Reports, the video captured by BWC can be a valuable source of audio and video that stationary and handheld cameras cannot provide. The fixed nature of BWCs results in audio that is often superior to handheld cameras and an angle that reflects the perspective of the involved Staff. Accordingly, it is critical that Staff activate the BWC as soon as possible.

The Department reports it intends to expand the BWC pilot further given the value of the video footage. As the pilot is expanded it is critical that the Department evaluate and address the reasons the pilot fell apart at GRVC to ensure a sustainable use of the BWC going forward. The Monitoring Team intends to routinely monitor the expansion of the pilot in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 2(a)-(c). Partial Compliance |
| --- | --- |

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

¶ 2.    Handheld Cameras

   d.    Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

   f.    When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team, remains in effect.

120

- The Facilities continued to document and track all alarms in an excel spread sheet. The spreadsheet also includes a reference to the file name of the corresponding handheld video that was uploaded.

- NCU continued its quality assurance ("QA") program of handheld camera footage across all Facilities to monitor the rate of upload. NCU audit also conducts a 10% sample review of the conclusory statement in the video to confirm the correct video was uploaded to the system.

- NCU reported that, of the 8,091 alarms[120] during the Eighth Monitoring Period, 7,959 (98.4%) of the corresponding handheld videos were uploaded as required.

- From January to June 2019, the Department reported that 21 Facility Referrals were generated for violations of the handheld video directive. Facility responses to these referrals focused on individual corrective action (*e.g.,* counseling or re-training).

- ID issued one Memorandum of Complaints ("MOC") to Staff during the Eighth Monitoring Period for *intentionally failing to capture incidents*. ID also issued two MOCs to Staff for *failing to properly operate the handheld camera* and one MOC to a Captain for *failing to supervise that a search was recorded with a handheld video*. The Department did not issue any discipline to Staff who *repeatedly failed to capture key portions of incidents due to failure to follow DOC policies* during this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*Policy* (¶ 2 (d))

The Department continues to maintain an adequate policy regarding the use of Handheld Cameras.

*Availability of Handheld Video* (¶ 2(d))

The Department continues to demonstrate that handheld video is largely captured in situations where required and that the footage is subsequently uploaded and available in a timely manner. To support this effort, NCU maintains its QA program to ensure handheld video is uploaded as required. The results of this audit are examined and discussed by leadership during the weekly *Nunez* meetings. NCU's audit methodology evolved in this Monitoring Period. Given the Facilities sustained compliance

---

[120] NCU includes both level A and B alarm responses because the Department's policy requires both level A and B alarms to be captured on handheld video. A UOF incident has two levels of responses depending on whether the incident escalates. Usually a level A alarm will be called first, and if the incident cannot be resolved by the level A response, a level B alarm is triggered which is when the Probe team will respond. The Consent Judgment requirement for handheld camera footage is limited to a level B alarm response.

with the uploading of handheld video, NCU, in consultation with the Monitoring Team, determined that daily audits were no longer necessary. Accordingly, beginning in March 2019, NCU reduced its audit to several days a month, which allowed NCU to deploy resources to other projects while also continuing to monitor the rate of uploads.[121]

The Monitoring Team conducted a review of NCU's audit, to test the accuracy of the audit results. To do this, the Monitoring Team selected a sample of incidents to confirm they were uploaded as required. The Monitoring Team verified these videos had been uploaded and they were referenced in the Preliminary Review of the incident. NCU's audit documentation continues to be very well organized and the documentation review supported NCU's audit results. Accordingly, the consistently high proportion of handheld videos uploaded during the Eighth Monitoring Period demonstrates that the Department has continued to meet its obligations in this area.

The quality of handheld video is addressed through the Preliminary Review or investigation (*e.g.*, if the camera appears to be intentionally turned off or pointed away at any point of the incident, it is noted by the reviewer or investigator). In this Monitoring Period, the Monitoring Team evaluated the quality of the handheld through its routine assessment of use of force investigations. The quality of handheld video is mixed – part of this is due to the nature of handheld video that can make it difficult to obtain a clear and unobstructed view while also ensuring Staff can effectively manage a situation (especially in close quarters). However, there are certainly at least some circumstances where it appears that Staff do not appear to make best efforts to obtain the clearest view of the incident. The Monitoring Team will continue to scrutinize this issue through its review of use of force incidents.

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities' sustained and prompt uploading of UOF-related handheld video has continued to support ID's access to the footage for the corresponding investigation of the incident. ID reports (and the Preliminary Reviews reflect) that the handheld video is generally available. In the event video footage cannot be located, the investigator contacts NCU which can usually assist the investigator in locating the appropriate video by referencing their log of alarm responses and the associated handheld video. The inability to locate the video is often an inadvertent filing error.

The Monitoring Team assessed a sample of cases where NCU confirmed the video was available and found that the investigator had access to the handheld video in the majority of cases reviewed. Overall, the Monitoring Team has found that handheld videos are generally filed and organized in a manner that make them easily accessible to investigators and has not identified any systemic issues preventing investigators from reviewing footage when completing their Preliminary Reviews or Full ID

---

[121] NCU reports it would re-instate a more comprehensive audit if the results of the modified audit suggest greater oversight is necessary.

Investigations. Accordingly, the Department has maintained Substantial Compliance with this provision as investigators have consistent and reliable access to the handheld video.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Facilities and ID are identifying and holding some Staff accountable for failing to ensure handheld video was adequately recorded and uploaded through corrective interviews, verbal counseling, and MOCs. The Preliminary Reviewers continue to find some poor-quality handheld videos. Given the backlog of investigations, it is hard to ascertain whether these issues may be addressed at the close of the final investigation. That said, neither the Department or the Monitoring Team have identified a pattern of a specific Staff Member or Facility failing to adequately capture incidents, or handheld video issues that suggest anything more than an expected amount of human error.

| COMPLIANCE RATING | ¶ 2(d). Substantial Compliance |
| | ¶ 2(f). Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[122]

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Operations Order 12/18 "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," which was developed in consultation with the Monitoring Team to address the requirements of the Court's August 10, 2018 order that modified Consent Judgment § IX, ¶ 3(c).

---

[122] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

- Assigned Staff and supervisors in each Facility continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into Enterprise Asset Management ("EAM") to trigger repair.

- NCU continues to conduct a QA program that was developed in consultation with the Monitoring Team. The QA program ensures the daily forms are complete and accurate (by reviewing a random sample of Genetec video). NCU also confirms whether a corresponding repair order was generated for any camera found to be inoperable. Discrepancies are documented in QA reports developed by NCU and discussed during weekly *Nunez* Compliance Meetings.

  o In January 2019, NCU worked directly with the Facilities to roll-out an audit process that will eventually just be managed by the Facilities. Currently, NCU initiates when the Facility conducts the audit and then double checks their work. The Facilities began their own Genetec camera audits of the MSS-1 forms to ensure that the forms were complete and accurate. The Facilities compare the forms with camera footage to ensure all down cameras have been identified. These self-audits are conducted once a week, with a total of four (4) audits a month.

  o NCU continued to conduct their own audit and compare it with the Facility findings. Any discrepancies are discussed in weekly compliance meetings. NCU also reaches out directly to the Facilities to discuss any significant discrepancies to resolve them and determine if re-training is necessary.

- The Department's Radio Shop is responsible for repairing the stationary cameras. Below is a chart of the timing to complete the repairs from January 2017 through June 2019.

| Time to Repair Inoperable Cameras | | | | | |
|---|---|---|---|---|---|
| | **Jan. to June 2017** | **July to Dec. 2017** | **Jan. to June 2018** | **July to Dec. 2018** | **Jan to June 2019** |
| *Total Repaired* | 3,934 | 5,378 | 6,195 | 5,867 | 7,903 |
| *Repaired within 2 weeks* | *3,678 (93%)* | *4,877 (91%)* | *5,540 (89%)* | *4,789 (82%)* | *6,480 (82%)* |
| *Repaired within 2 to 3 weeks* | *85 (2%)* | *137 (3%)* | *288 (5%)* | *473 (8%)* | *394 (5%)* |
| *Repaired within 3 to 5 weeks* | *87 (2%)* | *176 (3%)* | *174 (3%)* | *352 (6%)* | *480 (6%)* |
| *Repaired beyond 5 weeks* | *84 (2%)* | *188 (3%)* | *193 (3%)* | *253 (4%)* | *549 (7%)* |

**ANALYSIS OF COMPLIANCE**

In this Monitoring Period, the Department has continued to reasonably identify, track, and repair inoperable cameras. As expected with the large number of cameras in the system, on-going maintenance is required. Given the number of cameras in the system, the number of cameras requiring maintenance remains reasonable.

*Facility Assessment of Inoperable Cameras and Implementation of Genetec Audit*

- ***Daily Assessment of Inoperable Cameras (¶ 3(a)-(b)) & NCU and Facility QA Program (¶ 3(c))***

The process for identifying and reporting inoperable cameras has multiple steps. First, the Facilities complete daily assessments of stationary cameras to identify any cameras that may be inoperable and document those findings on the MSS-1 forms. Second, the Facilities then place work orders for any cameras that are identified as inoperable in the EAM system. Finally, this process is then audited by the Facilities and NCU. The Facilities audit the forms one day a week to ensure that the forms are complete and accurate. NCU also conducts an audit to ensure that the forms are completed and accurate. NCU also ensures that all work orders for identified inoperable cameras have been submitted.

The audit process for the inoperable cameras was modified in this Monitoring Period. First, as discussed above, the Facilities now conduct a self-audit. Further, NCU, in consultation with the Monitoring Team, decreased the frequency of its MSS-1 and EAM Work order audit from daily to five random days a month for each Facility in order to free up resources to focus on other projects while also reasonably monitoring the status of these assessments. Given the period of sustained compliance, the Monitoring Team agreed with NCU that this seemed like a reasonable approach as the random audits would still permit NCU to determine the state of compliance and additional audits could be conducted should issues arise. Accordingly, in May 2019 NCU moved to a random five days a month audit process.

- **Completion of Daily Forms**: In this Monitoring Period, NCU found that 2,302 of 2,309 of forms that were required to be completed by the Facilities on the days audited were submitted.[123]

- **Workorders for Inoperable Cameras**: Of 2,302 forms that were audited, NCU identified 46,871 aggregate inoperable cameras.[124] NCU confirmed that 46,828 (99.9%) of the 46,871 had corresponding work orders to fix the cameras.

- **Accuracy of MSS-1 Forms**: NCU audited a sample of the completed forms to ensure they accurately identified all inoperable cameras. Of the sample of forms reviewed, 1,192 (82%) of the 1,446 inoperable cameras identified were reported on the daily forms. 59 of the 254 cameras not listed on the form did have a work order despite not being listed on the daily form. Meaning 1,251 (87%) of the 1,446 inoperable cameras had been identified on the MSS-1 form and/or had a corresponding work order in EAM for repair.

---

[123] This includes all forms that were expected to be completed every day by all facilities in January to April of 2019 and then the five random days selected in both May and June of 2019.

[124] It is important to note that the 46,871 cameras that were identified as inoperable is an aggregate total and does not mean there were 46,871 individual cameras that were inoperable (many cameras were reported as inoperable on multiple days).

- **QA Program**
  - *NCU Audit*: The Monitoring Team verified a sample of original daily forms, work orders, and NCU's tracking spreadsheet and found the documents to be accurate and support the information reported on NCU's monthly Stationary Camera Audit Reports. NCU maintains an organized, accurate, and reliable tracking process. NCU's QA program is reasonable and supports the Department's efforts to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly
  - *Accuracy of Facility Audit*: The Monitoring Team will assess the accuracy of the Facility Audit in the Ninth Monitoring Period.

Overall, the Department has demonstrated that the daily MSS-1 forms are completed as required. Further, the QA program results demonstrate that the forms are generally reliable and identify the vast majority of inoperable cameras. Most importantly, the data demonstrates that the Department is generally submitting work orders to fix the inoperable cameras. There is certainly room for improvement to ensure the Department identifies all down cameras, which the QA programs are designed to identify and enhance at the Facility-level. Accordingly, The Monitoring Team will continue to work with NCU to ensure that the QA Program is identifying patterns and trends and ensuring inoperable cameras are identified, reported, and fixed and that Facilities are conducting accurate and reliable audits. The Department will achieve Substantial Compliance with ¶ 3(a)-(c) when the QA program is fully developed and implemented, and when it can demonstrate that the Facilities are accurately and timely identifying and reporting inoperable cameras.

*Maintenance of Inoperable Cameras* (¶ 3 (d))

The vast majority of inoperable video surveillance cameras are repaired within two weeks as demonstrated in the chart above and 90% of all cameras are fixed within three weeks or less. Monthly EAM reports showed that throughout the Monitoring Period, the Department repaired a total of 7,903 wall-mounted stationary cameras.[125] Many of the cameras requiring repair beyond three weeks are in locations that are currently under construction or in locations where inmates are not housed. Most importantly, the Monitoring Team has not found that inoperable cameras have impacted the Department's ability to capture use of force incidents as the majority of incidents continue to be captured on camera.[126] Given the extraordinary number of cameras in the Department, the number of reported inoperable cameras is consistent with what the Monitoring Team would expect and the rate at which cameras are repaired is reasonable. The Monitoring Team remains encouraged by the

---

[125] This includes repairs of all wall-mounted stationary camera in the Department (not just those cameras that have been installed as part of this initiative).

[126] *See* ¶ 1 of Video Surveillance.

| | |
|---|---|
| | Department's success in maintaining and quickly repairing inoperable cameras. |
| **COMPLIANCE RATING** | **¶ 3 (a)-(b)** Substantial Compliance<br>**¶ 3 (c).** Partial Compliance<br>**¶ 3 (d).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. Video Preservation

> The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," remains in effect which incorporates the requirements of this provision.

- The Department's computerized system automatically preserves all video for 90 days.

- The Department's Operation Order 02/19, "Video Monitoring Unit (VMU) and Video Review Unit (VRU)" governs the review of video managed by the Chief of Department's office. The Video Review Unit continues to preserve Genetec video beyond the 90-day period for UOF incidents subject to Facility investigations and at the request of Department leadership.

- The ID Video Unit has two dedicated Officers who preserve the Genetec video required for all UOF incidents. ID investigators submit requests for date/time/angles and the video is uploaded to a shared folder only ID, the Legal Division, and Trials and Litigation can access.

- Starting in October 2018, ID saves all Genetec and handheld video footage in the one centralized ID folder.

**ANALYSIS OF COMPLIANCE**

The Department has continued to maintain Substantial Compliance with this provision. The Monitoring Team confirmed that the Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent with the requirements set forth in Consent Judgment § IX, ¶ 4.

In order to test the Department's system for preserving video for 90 days, the Monitoring Team randomly selected Facility/unit/times of day and viewed footage from 89 days prior. In all instances, footage from multiple camera angles could be retrieved from the system and viewed without a problem.

With respect to preserving video beyond 90 days, the Department has continued to demonstrate Substantial Compliance over a sustained period. The Monitoring Team assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage, handheld, and body-worn camera video footage included in the use of force investigation files produced to the Monitoring Team, and (2) randomly assessing a sample of stationary and handheld video of incidents investigated by ID. Only a very small number of investigation packages have been produced to the Monitoring Team where some of the video (*e.g.* certain angles of the incident) was not preserved, often due to a clerical error. Further, the Monitoring Team's random testing found that all of the videos reviewed were adequately preserved.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### 6.   USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct. The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion. Investigations that reliably and consistently identify misconduct are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department.

*Current Status of Investigations & Next Steps*

ID continues to maintain a very strong leadership team. The Deputy and Assistant Commissioners are smart, creative, dedicated and reform-minded leaders who are committed to the reform effort. Further, the ID Initiatives Manager has helped improve ID's ability to manage and triage a number of different initiatives, many of which have been discussed throughout this report. There is also no question that ID Staff are committed and working hard to manage their caseloads.

128

Strong leadership within ID is critical as the division is in crisis given the significant workload. Approximately 70% of incidents (n=6,800) that occurred over the last year and a half (January 2018 to June 2019) remain pending.[127] The current state of affairs is the result of a combination of issues. First, ID's caseload has grown every consecutive Monitoring Period due to the rise of UOF incidents and the requirements of the Consent Judgment.[128] Second, there are inefficiencies in the investigation process (both Preliminary Reviews and Full ID investigations). A significant factor is that the majority of cases are referred for further investigation (either a Facility Investigation or Full ID case) because of the referral requirements in the Consent Judgment § VII (¶¶ 7 and 8) even when additional investigation is unnecessary. The majority of referrals are for Full ID investigations based on the enumerated criteria § VII, ¶ 8. Given the extensive video evidence available and significant investigation that occurs at the Preliminary Review stage, most cases do not require further investigation, but the referral requirements have created a perverse incentive for investigators to conduct further investigation rather than close out the case. Finally, there are insufficient resources to manage the workload. Accordingly, the current system is not only thwarting the Department's ability to adequately and timely address misconduct (and thus advance the reforms), but it is not sustainable. Therefore, it is critical for the Department to address the backlog of investigations and develop a streamlined process to conduct investigations going forward.

---

[127] 6,300 of the 6,800 pending investigations are pending with ID, including ~4,300 Preliminary Reviews; ~2,000 Full ID cases. Another ~500 cases are awaiting completion of a Facility investigation.

[128] Prior to the Effective Date of the Consent Judgment, ID conducted approximately 150 Full ID cases a year and did not conduct any Preliminary Reviews. ID is now required to conduct a Preliminary Review of every UOF incident and the number of Full ID cases has increased dramatically.

Following the close of the Monitoring Period, the Monitoring Team developed a plan to address the backlog of Preliminary Reviews and Full ID cases in collaboration with ID.[129] The goal of the backlog plan is to not only efficiently close cases, but also to maximize this truncated review of cases as an opportunity to hone the skills and judgment of investigators and supervisors in order to streamline investigations going forward. As part of the backlog plan, the Monitoring Team intends to work closely with ID on identifying the cases in the backlog that merit discipline to minimize the possibility that cases involving misconduct are overlooked through this process. The Monitoring Team has outlined the details of the backlog plan in its September Recommendations and intends to work with ID to ensure that an adequate structure with specific deadlines are in place to ensure the backlog is reduced as quickly as possible. The next Monitor's report will provide greater detail on the specifics of the backlog plan and its effectiveness in reducing ID's caseload.

As for improving investigations going forward, ID leadership devised a plan in this Monitoring Period to streamline the investigation process so cases are handled more efficiently. The plan requires the creation of a new dedicated unit within ID (the "Intake Squad") to conduct "Intake Investigations" of all use of force incidents.[130] The unit will not only include dedicated leadership and investigators, but attorneys from the Trials division will also be assigned to the unit to streamline the imposition of discipline. The Intake Investigations are expected to be

---

[129] Following the close of the Monitoring Period, the Department developed and implemented a plan to address the backlog of Facility Investigations with the goal of closing out the backlog of Facility-level investigations in the Ninth Monitoring Period.

[130] This plan contemplates that ID will exclusively conduct investigations of use of force incidents and that the Facility will no longer conduct investigation of UOF incidents. The Facility will of course continue to gather relevant information to provide to ID and review incidents for overall management of the Facility.

improved Preliminary Reviews and will replace the need for Facility Investigations all together. This streamlined approach will treat investigations on a continuum—without arbitrary categories of "Preliminary Reviews," "Facility Investigations," and "Full ID cases." All UOF incidents will receive an Intake Investigation and the facts of each case will be considered to determine whether additional investigation by ID is necessary to assess and address Staff use of force. This approach is a reasonable concept that certainly has the ability to address the concerns raised by the Monitoring Team. Accordingly, the Monitoring Team's September Recommendations provided an initial framework for implementation of the Intake Squad and the Monitoring Team and ID are continuing to work together to develop the necessary foundation (including adequate resources) so the Intake Squad can be implemented with fidelity.

*Statute of Limitations -- Full ID Investigations*

The backlog of Full ID Investigations resulted in a significant number of cases pending past the 18-month statute of limitations[131] ("SOL").[132] The Department is unable to discipline Staff if charges are not brought before the SOL expires, even if the investigation substantiates Staff misconduct, unless the misconduct constitutes a crime.[133] The number of the cases with expired SOLs also created collateral consequences as it diverted limited staff resources from more current cases. In total, **2,001 cases** were pending in the Eighth Monitoring Period that were

---

[131] *See* Seventh Monitor's Report (at pgs. 121-122).

[132] Pursuant to Civil Service Law - CVS § 75, ¶ 4, "no removal or disciplinary proceeding shall be commenced more than eighteen months after the occurrence of the alleged incompetency or misconduct complained of and described in the charges . . . such limitations shall not apply where the incompetency or misconduct complained of and described in the charges would, if proved in a court of appropriate jurisdiction, constitute a crime."

[133] This does not require that the respondent also be charged criminally, the charges are still brought through the administrative proceedings.

lost to the SOL. Some of these cases involved Staff misconduct so the fact that the Department is precluded from making that determination is of the utmost concern. It is important to note that 200[134] additional cases were pending past their SOL this Monitoring Period but charges and/or PDRs were already brought *before* the SOL expired and so they are not considered as part of the 2,001 cases lost to the SOL.[135]

The fact that such a large number of investigations were pending beyond the SOL is plainly unacceptable. In response to the Monitoring Team's strong recommendation, the Investigation Division worked to expedite the closure of the pending cases that passed the SOL in order to clear the docket. At the urging of the Monitoring Team, ID also developed a process to ensure future cases do not suffer the same fate. In April 2019, ID instituted a process called "SOLstat" to evaluate cases approaching the SOL to determine if the incident involves misconduct and discipline should be imposed.

### 4. *Cases Lost to the Statute of Limitations*

A total of 2,001 Full ID cases were pending beyond the SOL and did not have charges and/or PDRs issued before the SOL expired. The 2,001 cases lost to the SOL were identified in two waves—(1) those cases in which the SOL expired prior to January 2019 and (2) those cases in which the SOL expired between January 2019 and April 2019. The first wave of cases included 1,500 Full ID cases. It is difficult to assess what proportion of these 1,500 cases merited charges if the SOL had not expired without reviewing each case individually, which was not

---

[134] 48 additional cases had adjudicated Command Disciplines resulting in either lost days or a verbal reprimand for at least one Staff Member. (65 cases in total had Command Discipline imposed, but 17 also had either a Trials case or a PDR). These are not removed from the SOL analysis.

[135] 181 cases had charges with Trials; 10 cases had charges with Trials and PDR(s); and 9 cases had PDRs only

feasible given all the other pending work and limited value of the exercise. That said, 242 of these 1,500 cases were previously identified by the Monitoring Team as having potential objective evidence of wrongdoing ("Team Picks"). Accordingly, it is clear that the Department lost the opportunity to bring administrative charges (and impose appropriate discipline) in at least some of these cases because of the expiration of the SOL. As a triage measure, the Monitoring Team reviewed the 242 Team Picks to identify any cases where charges could be brought under the criminal exception. The Monitoring Team recommended that eight of the 242 cases should be considered by ID and Trials leadership to determine if they met the applicable standard. Ultimately, the Department determined that the misconduct in these cases did not meet the standard of the criminal exception. The Monitoring Team found this assessment to be reasonable.

ID initiated the "Expired SOL Project" in this Monitoring Period in order to close all cases pending beyond the SOL. Some work was needed to close out these cases to ensure the Department's records accurately reflected the status of the case and the basis for the closure. In order to conserve resources for cases that could be prosecuted, the Monitoring Team encouraged ID to address the expired SOL cases in the most expeditious and streamlined manner and so the cases were closed with a 600-AR memo that simply stated the case could no longer be pursued because the SOL expired. The overwhelming majority of these cases were paper files because they all occurred prior to the implementation of CMS, so ID also had to collect all the paperwork and organize the paperwork for filing and appropriate storage. Ultimately, the 2,001 cases (identified in two different waves as described above) were closed through the Expired SOL Project this Monitoring Period.

The graph below identifies when the SOL expired for each of the 2,001 cases regardless of when the case ultimately closed. For instance, the SOL expired for 212 of the 2,001 cases in March of 2019. All 2,001 cases were obviously pending for at least 547 days (18 months), with some pending for upwards of 1,000 days. As demonstrated below, the number of cases lost to the SOL increased significantly in the summer of 2018. This is not entirely surprising as there was a corresponding increase in the overall caseload within ID given the rise of UOF incidents.



- **SOLstat Project**

In this Monitoring Period, almost all cases whose SOL expired beginning April 28, 2019 were assessed as part of the SOLstat process and charges, if warranted, were drafted and served before the SOL expired.[136] SOLStat is a collaborative effort between ID and Trials. On a bi-

---

[136] Less than 10 cases were lost to the SOL at the very inception of SOLStat and were isolated events.

monthly basis, ID identifies the cases nearing their SOL. The investigators with any cases on the generated list conduct an initial assessment of their cases to determine if there was misconduct and if charges are merited. The results of this assessment are reviewed by ID supervisors and ultimately the cases are then discussed in weekly meetings between ID and Trials to determine whether charges are warranted. If a determination is made that Staff engaged in misconduct then charges are drafted and an MOC is issued before the SOL expires. ID reported that all 325 cases approaching their SOL between late April and June were assessed and evaluated for potential misconduct. The outcome of the SOLStat assessment is depicted in the chart below.

| Cases Evaluated through SOLStat Process | | | | |
|---|---|---|---|---|
| *Status of Cases as of July 15, 2019* | | | | |
| SOL Expiration Month | Number of Cases | Charges Served | Closed as of July 15, 2019 | Pending as of July 15, 2019 |
| April 2019 | 20 | 3 | 18 | 3 |
| May 2019 | 175 | 25 | 136 | 39 |
| June 2019 | 130 | 26 | 7 | 123 |
| **Totals** | **325** | **54 (17%)** | **161** | **165** |

Although the assessment and evaluation for all of these cases is completed, about half of the cases (n=165) were not officially closed in the Department's records before the SOL expired, meaning the closing paperwork was not entirely submitted and/or completed. This is mainly due to certain limitations in CMS that preclude the use of a more truncated closing memo, which was utilized in the Expired SOL Project.[137] The Department and the Monitoring Team are currently evaluating the structures in place to identify processes within CMS to close cases more efficiently within the system.

---

[137] As noted above, the cases evaluated through the Expired SOL project were paper based files because they occurred before the implementation of CMS.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID conducts a Preliminary Review of every use of force incident.

- ID and the Facilities investigate use of force incidents that are referred from the completed Preliminary Reviews.

### ANALYSIS OF COMPLIANCE

Investigations at all levels are not conducted in a reasonable timeframe, impacting the ability of the Department to evaluate the use of force within the agency and discipline Staff when necessary. As described in the Identifying and Addressing Misconduct section of this report, there is a significant backlog in the completion of Preliminary Reviews, which has resulted in a corresponding backlog of Facility and Full ID investigations. As of the end of the Monitoring Period, 6,815 investigations of use of force incidents from January 2018 to June 2019 remain pending (4,332 pending Preliminary Reviews, 470 pending Facility Investigations, and 2,013 pending Full ID Investigations). Almost all of these investigations are pending beyond the prescribed deadline for completion. In fact, the investigations backlog resulted in over 2,000 Full ID investigations not being completed before the expiration of the statute of limitations and therefore any potential misconduct could not be addressed. Accordingly, the Department is not conducting timely investigations.

As for the quality of those investigations that are completed, the Monitoring Team's continued evaluation of Preliminary Reviews and completed Facility and ID investigations in this Monitoring Period demonstrate that these investigations have remained relatively the same and the overall quality and concerns are the same as described in prior Monitor Reports.[138] The Preliminary Reviews and Full ID investigations completed by ID investigators remain better quality than Facility Investigations (which continue to be unreliable, with *pro forma* analysis, as described in prior reports[139]). The Preliminary Review is generally the most consistent and reliable description of what occurred during the use of force incidents, but, like with Full ID investigations, the investigations do not consistently and reliably assess whether Staff conduct was within guidelines. Facility investigations are generally unreliable and cases with objective evidence of misconduct go unaddressed.

---

[138] *See* Fifth Monitor's Report at pgs. 91-92; Sixth Monitor's Report at pgs. 94-5; Seventh Monitor's Report at pgs. 106-107.

[139] *See* Fifth Monitor's Report at pgs. 91-92 and 106-108; Sixth Monitor's Report at pgs. 94-5 and 108-110; Seventh Monitor's Report at pgs. 106-107 and 128-129.

Given these findings, along with those described in the narrative of this section and the Identifying & Addressing Use of Force Misconduct section above, the Department is not in compliance with this provision.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
|---|---|

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[140] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

        ii.    The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix B* for information on the deployment of ID Investigator Training.

- All new investigators must complete ID's 40-hour training before they may be assigned cases.

- All uniformed investigators received S.T.A.R.T. training and most civilian investigators received abbreviated S.T.A.R.T. training.

**ANALYSIS OF COMPLIANCE**

This provision is addressed in this section versus the Training section of the report because the training of investigators is intertwined with the other work described in this section.

*ID Investigator Training* (¶ 2(c)(i))

As reported in prior Monitor's Reports, the Department's ID Investigator Training lesson plan meets the requirements of this provision and it is provided to staff as required.[141] ID has also provided opportunities for investigators to receive specialized training for certain subject matter areas (*e.g.,*

---

[140] This date includes extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[141] See First Monitor's Report at pgs. 49-50, Second Monitor's Report at pgs. 59-60, and Third Monitor's Report at pg. 86.

Prison Rape Elimination Act ("PREA") or SCM training). However, as the entire investigation process is realigned to promote better and more timely outcomes, as described above, new training needs will likely emerge.

*Facility Investigator Training* (¶ 2(c)(ii))

The Department has not provided any Facility investigator training with the exception of training on CMS, and a limited targeted training in the Seventh Monitoring Period for Facility investigators at GRVC, OBCC, and RNDC, leveraging the ID/Facility Coordinated Use of Force Analysis. While the Department is in Non-Compliance with this provision because the training has not been provided, the use of Facility Investigations is waning and so development of this training at this juncture would not be prudent.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance<br>¶ 2(c)(ii). Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

   a. After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.
   b. When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.
   c. All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates involved in a use of force incident and those who witness the incident.

- This Monitoring Period, the Department rolled out the new Inmate Voluntary Statement forms that were revised during the Seventh Monitoring Period to codify the requirement of ¶ 2(b) that "the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation."

- Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

- Videotaped Inmate Interviews: Following the success of the video interview pilot, ID began utilizing body-worn camera technology in October of 2018 to offer the option to videotape all inmate interviews.[142]

**ANALYSIS OF COMPLIANCE**

The inmate interview requirements of ¶ 2 have a number of practical elements: (1) investigators must make and document reasonable attempts to interview inmates, as does the ADW who interviews inmates following medical treatment; (2) the Department shall assure inmates they will not be subject to retaliation for providing information in connection with an investigation; (3) investigators shall not unreasonably discredit inmate statements; and (4) investigators must conduct inmate interviews in a private and confidential location.

*Interview Attempts and Documentation*

The Monitoring Team continues to find that Preliminary Reviewers of UOF incidents attempt to interview inmates involved in actual uses of force within days of the incident (even if the closure of the Preliminary Review is protracted). In ID Closing Reports, investigators document their attempts to interview inmates, either by including a summary of the inmate's statement or by indicating that the inmate refused to be interviewed. To the extent an inmate does provide a statement, ID reports that inmates do not frequently avail themselves of the option to provide a statement by video and often prefer to provide a written statement or conduct an audio recorded interview. ID has been utilizing the new Inmate Voluntary Statement forms, which includes the disclaimer that an inmate will not be subject to any form of retaliation for providing information in connection with the investigation. As for the Facility investigations, Facility investigators also record the status of inmate statements in the relevant CMS field (either summarizing the inmate's statement, or, more often, documenting that the inmate refused to provide a statement to the Facility).

*Investigator Assessment of Inmate Statements*

The assessment of inmate statements by investigators continues to be of mixed quality as described in prior reports. The Monitoring Team continues to find that, too often, inmate statements are discredited without adequate explanation. Investigators often use insignificant inconsistencies from inmate interviews to discredit the inmate's version of events. This issue continues to speak to the overall quality of ID and Facility investigations, particularly the issue of analysis and findings not being justified based on the preponderance of the evidence. That said, the Monitoring Team has reviewed investigations where the investigators attempted to corroborate the inmate statements with video evidence, and inmate allegations and statements were appropriately credited (most often when

---

[142] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

there was corroborating evidence).

*Quality, Privacy, and Confidentiality of Inmate Interview*

Overall, the quality of inmate interviews has improved since the Effective Date, particularly related to the privacy of the setting which has an inherent positive effect on the quality of the interview. The locations to conduct inmate interviews is limited and there are inherent challenges in identifying private or confidential locations. That said, the Monitoring Team continues to see investigators document their attempts to provide more private or confidential locations (*e.g.*, pantries, dayrooms, or stairwells) for inmate interviews, enabling the inmates to provide uninhibited responses to investigator's questions. It is worth noting that there is room for improvement in the investigator's interview tactics of an inmate. In at least some cases, the Monitoring Team has found that investigators make statements that would discourage an inmate from cooperating, by using a chilling tone of voice or reminding the inmate of "violations" or "contributing" behavior by the inmate during the incident. Furthermore, investigators do not always appear to be able to understand or accommodate an inmate who has difficulty expressing themselves or who may have difficulty relating events coherently.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- The Department continued to coordinate monthly with DOI, and other relevant law enforcement offices on cases pending with those offices (as described in the Second Monitor's Report at pgs. 84-85).

- The Department maintains a tracking chart to ensure cases are tracked from the moment they are referred to law enforcement to its ultimate closure within the Department. The tracking chart is updated each month to identify who is currently evaluating the cases (DOI, law enforcement or returned to ID) as well as the status of that evaluation. To the extent the case has been returned back to the Department, they also track the status of the investigation and any pending discipline (to the extent necessary).

- 11 use of force cases were referred to or taken over by DOI during this Monitoring Period.

- 15 use of force cases were pending with law enforcement/DOI as of the end of the Monitoring Period: six use of force cases were pending before DOI (all six of which were related), nine use of force cases were pending before law enforcement or were being actively prosecuted (six with

the Bronx District Attorney ("DA"), two use of force cases were pending with the U.S. Attorney's Office for the Southern District of New York "SDNY", and one case was pending with the U.S. Attorney's Office for the Eastern District of New York "EDNY").

ANALYSIS OF COMPLIANCE

Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly and/or assumed by DOI. Since the Effective Date, DOI has taken over or been referred a total of 74 cases, 67 of these use of force incidents occurred after the Effective Date. Only a small portion (n=3) of this already limited group of cases has resulted in criminal charges.

*Tracking & Coordination of Cases*

The Department has maintained its improved tracking process for cases referred and/or taken over by DOI and subsequently City and Federal prosecutors' offices. The tracking is particularly crucial because these cases go through various layers of review across and within various agencies in order to determine whether to bring a criminal prosecution. Ultimately, this process helps ensure these cases are processed as expeditiously as possible, which is important since they represent some of the most troubling use of force incidents.

Monthly meetings between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and SDNY) continue to occur regularly and provide an adequate forum for coordinating cases. This includes ensuring the Department places its own investigations on hold while the criminal investigation is ongoing, while also ensuring that cases do not languish once referred to law enforcement. The Monitoring Team continues to participate in these meetings in order to stay apprised of the status of these cases.

*Length of Time to Evaluate Cases*

The improved tracking and communication appears to have resulted in a decreased time for review by outside agencies. In particular, DOI has been assessing cases more timely and either elevating them to prosecutors or clearing them back to the Department. In fact, as of mid-July 2019, DOI had no pending cases (the six cases that were pending at the end of the Monitoring Period were all related and subsequently returned to DOC without prosecution).

However, the total time required for outside agencies to consider cases for prosecution is still **too long**—and very few cases actually result in criminal prosecution. Since the Effective Date, **80 cases** have been considered by outside law enforcement agencies, of which only **four** have resulted in criminal prosecution. Of the 15 cases pending with outside law enforcement at the close of the Monitoring Period, only three were active prosecutions, and the other 12 were pending consideration for prosecution. These twelve include two cases from 2016 and one from 2017, all of which have been with DOI, the Bronx DA and SDNY or passing from one agency to the next for years.

The Monitoring Team remains quite concerned about the overall criminal evaluation process as

the vast majority of cases reviewed by law enforcement do not result in a criminal proceeding and are ultimately referred back to the Department for administrative processing and discipline. Any necessary administrative response and discipline for these matters are then very protracted, which decreases the meaningfulness of the response and some of the most troubling incidents are then most likely to languish. It is therefore imperative that law enforcement representatives make every effort to ensure cases are prosecuted, or returned to the Department, as expeditiously as possible.

*Department's Assessment of Cases Returned from Law Enforcement*

As noted above, law enforcement agencies decline to prosecute the vast majority of cases reviewed. When that occurs, the cases are referred back to the Department for administrative processing and discipline, as appropriate. Because ID investigations take so long to close, the Monitoring Team recommended that ID prioritize cases returned from law enforcement given the likelihood that they involve serious misconduct and a disciplinary response is likely warranted. To date, these serious cases, like most others, have languished in ID. The revised tracking process has allowed the Monitoring Team to scrutinize these cases more closely and ID has made some improvement in managing these cases in response to prompting from the Monitoring Team.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 4 (BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS)

¶ 4. Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department can discipline, instruct, or counsel those who conduct or sign-off on a biased, incomplete or inadequate investigation.

### ANALYSIS OF COMPLIANCE

The Department's investigators, particularly Facility investigators, often produce inadequate investigations. The Department rarely addresses these issues with the investigator or responds with appropriate discipline, instruction, or counseling. To the extent that instruction or counseling occur, it is done so informally so it is difficult for the Monitoring Team to track. Anecdotally, the Monitoring Team is aware that some instruction and counseling does occur (more frequently with ID investigators versus Facility investigators). The Monitoring Team has only identified a handful of cases where Facility investigators who conducted inadequate, incomplete, or biased investigations were disciplined, none of which occurred in this Monitoring Period.

Given the current state of affairs and the significant investigation backlog, it is not surprising that the Department is not able to consistently and reliably guide and/or discipline both investigators who conduct deficient investigations and supervisors who approve the subpar work-product. In an

effort to support the Department's efforts to instruct investigators, the Monitoring Team from time to time has conducted workshops to provide additional guidance and feedback to investigators and their supervisors.

| COMPLIANCE RATING | ¶ 4. Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[143] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.,* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

### ANALYSIS OF COMPLIANCE

*Classification of UOF Incidents*

The Department has continued to demonstrate, over several Monitoring Periods, that the overwhelming majority of use of force incidents are classified accurately. Following the initial classification of an incident, Preliminary Reviewers are continuing to evaluate whether an incident may need to be re-classified as required by Consent Judgment § VII (Use of Force Investigations), ¶ 7(b). In this Monitoring Period, the Preliminary Reviewers and/or Monitoring Team identified approximately 45 cases that merited consideration for re-classification.[144]

The Department previously did not have a reliable process in place to evaluate and re-classify incidents (if necessary) that were identified by the Preliminary Reviewers and/or the Monitoring Team. At the recommendation of the Monitoring Team, the Department reported it worked on streamlining the process of re-classifying incidents. As an initial step, the Department provided training to COD Staff on the classification of incidents in order to improve the initial classification of incidents. The office of the Bureau Chief of Security also committed to collaborating in a more timely fashion with

---

[143] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C

[144] There are approximately 1,700 incidents that Monitoring Team has not reviewed as either a pending or closed Preliminary Review for and so they have not yet been evaluated to determine if re-classification is warranted.

ID on cases that were identified for potential re-classification. Finally, the Department reported that it trained the staff in the Bureau Chief of Security's office on the process for re-classification so that cases are re-classified more quickly. The Monitoring Team intends to evaluate this process in the next Monitoring Period to determine whether it has been implemented with fidelity.

*Class P Assessment*

This provision requires incidents to be reclassified in a timely manner when injury information was not available at the time the initial classification determination was made. The Monitoring Team found that most incidents initially labeled Class P (*i.e.,* Pending) are reclassified in a timely manner, consistent with findings from prior Monitoring Periods, as shown in the table below.[145] During the current Monitoring Period, 224 of the 230 (97%) Class P incidents randomly selected by the Monitoring Team were reclassified within two weeks or less.[146]

| COD Sets Reviewed[147] | 2nd Monitoring Period | 3rd Monitoring Period | 4th Monitoring Period | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period |
|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 1,167 | 1,052 | 545 | 416 | 513 | 511 |
| **Incidents originally classified as Class P and subsequently reclassified within COD Period** | 329 of 372 (89%) | 542 of 574 (94%) | 286 of 299 (96%) | 160 of 168 (95%) | 209 of 221 (96%) | 224 of 230 (97%) |

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

**ANALYSIS OF COMPLIANCE**

In 2017, ID completed a year-long pilot program to video record interviews and concluded that

---

[145] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

[146] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance.

[147] This audit was not conducted in the First or Fifth Monitoring Periods.

videotaped interviews enhanced the quality of investigations (as discussed in the Fifth Monitor's Report at pgs. 96-97). The Department's efforts to implement videotaping inmate interviews systemwide is discussed in ¶ 2 above.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance (per Fifth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID uses CMS to conduct Preliminary Reviews of all use of force incidents.

- As of mid-July 2019, of the 3,574 incidents that occurred during the Eighth Monitoring Period, Preliminary Reviews were officially completed in CMS (meaning all sign-offs were complete) for only 432 (12%). Of the 3,142 incidents (88%) with pending Preliminary Reviews, 1,639 (52%) are pending some level of supervisory approval, and 1,503 (48%) are pending with the investigator.

- **Closure of Investigations on the Preliminary Review**

  o **"PIC" Case Closure**: ID closed 217 cases under Presumption that the Investigation is Complete (PIC) (described in detail in the Third Monitor's Report at pgs. 119-121) this Monitoring Period. 69 of these incidents occurred during this Monitoring Period.

  o **"Expedited Case Closure"**: Some cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. The Department reported that ID closed 233 cases through Expedited Closure during this Monitoring Period, in *addition* to the 217 closed as PICs—totaling 438 cases that were closed following the Preliminary Review.

### ANALYSIS OF COMPLIANCE

The Monitoring Team continues to review all Preliminary Reviews[148] as they remain the most reliable source of information about use of force incidents. The Department dedicates significant time and effort to completing quality Preliminary Reviews. The Preliminary Review includes most of the core components of the investigation, including a summary of what occurred based on an assessment of available video footage as well as Staff and witness reports and inmate interviews. The number of Preliminary Reviews completed in this Monitoring Period along with a breakdown of the status of those that are pending are discussed in the Identifying & Addressing Misconduct section of the report.

*Video & Written Documentation*

The Monitoring Team's evaluation of current practices demonstrated that information required for the investigation is not always available close in time to the incident for a variety of reasons. Although video is now available for at least a portion of almost all use of force incidents, and there has been improvement in the collection of UOF Reports, investigators must still follow up with Facility personnel to obtain certain missing documentation (*e.g.* inmate photographs that were not uploaded in CMS with the initial Facility package as required; additional witness reports the investigator determined were needed). The Facilities use an outmoded process of assigning different Captains to collect and upload relevant information for the incident to CMS, including Staff use of force and witness reports, inmate photographs, medical assessments, etc. Further, the Facility Staff must also attempt to interview all inmates after a UOF incident (§VII., ¶ 2). Many investigations remain pending because they are awaiting certain information in order to close out the case. Accordingly, a streamlined process to obtain additional and/or missing information should help the overall effort of closing investigations more efficiently.

*Closure of Investigations on the Preliminary Review*

Certain cases can be closed following the completion of the Preliminary Review, falling into two categories—PIC cases and Expedited Closure. Those cases that would have been a Facility Investigation, but could be closed based on the Preliminary Review, can be closed through the **PIC** process that is incorporated into CMS. Investigators' use of CMS has helped to identify cases that may meet the PIC criteria for closure, but unfortunately also limits the use of PICs to those specific criteria that were being utilized while CMS was being created. Only 217 cases were closed this Monitoring Period through PICs, compared to over 400 cases closed under PIC in the prior two Monitoring Periods. This drop in PICs closure is likely driven by the high number of cases still pending Preliminary Reviews, and not necessarily indicative of investigators using this option less frequently. Cases that would have been a Full ID investigation, but could be closed based on the Preliminary

---

[148] Given the backlog of completing Preliminary Reviews, the Monitoring Team's evaluation of Preliminary Reviews is a mixture of Preliminary Reviews fully completed in the system and draft versions in order to provide the Monitoring Team the ability to review incidents as contemporaneously as possible.

Review, are closed under the **Expedited Closure process**, which utilizes some CMS short cuts to close the case. 233 cases were closed via Expedited closure in this Monitoring Period. Like with PICs, there are likely additional cases that will be closed through this process that are currently pending.

The Monitoring Team routinely reviews PIC and Expedited Closure cases to ensure cases are not closed prematurely or without appropriate responses to Staff misconduct. As in previous Monitoring Periods, the Monitoring Team continues to find that a large number of cases can be closed following the completion of the Preliminary Review. The issue is that certain objective evidence is not adequately evaluated to identify the misconduct. This does not mean that further investigation is needed, but rather improvement in the investigator's judgement and ability to accurately assess Staff conduct and craft appropriate responses is needed. The Department and Monitoring Team's efforts to improve and streamline the overall investigation process is expected to address this issue.

_Conclusion_

Preliminary Reviews generally address the requirements of this provision and provide an accurate assessment of what occurred during an incident, even if the analysis of whether Staff engaged in misconduct is not as reliably identified. Accordingly, the Department is in Partial Compliance with the overall requirement to conduct Preliminary Reviews. However, the Department is in Non-Compliance with the timing requirement to complete Preliminary Reviews given the significant backlogs.

| COMPLIANCE RATING | ¶ 7. (timing) Non-Compliance |
|---|---|
| | ¶ 7. (all other provisions) Partial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID Investigations when they meet any of the criteria in Consent Judgment § VII, ¶ 8.

- o ID reports that additional cases are referred for a Full ID Investigation after the Preliminary Review process is complete if additional facts or circumstances that merit additional scrutiny are revealed, even if the facts of the case do not meet the specifically enumerated circumstances in this provision.

- 432 of the 3,572 use of force incidents (actual and alleged) that occurred during this Monitoring Period and were closed as of July 2019 were referred as shown in the chart below:

| Investigation Type | 6th Monitoring Period Incidents with Closed PR (n=2,815) | 7th Monitoring Period Incidents with Closed PR (n=2,298) | 8th Monitoring Period Incidents with Closed PR (n=432) |
|---|---|---|---|
| **Pending or Closed Full or Expedited ID Investigations** | 1,377 (50%) *-- 1,051 Pending* *-- 326 Closed* | 1,133 (49%) *-- 778 Pending* *-- 355 Closed* | 247 (57%) *-- 184 Pending* *-- 63 Closed* |
| **Pending or Closed Facility Investigations** | 954 (34%) *-- 102 Pending* *-- 852 Closed* | 764 (33%) *-- 287 Pending* *-- 477 Closed* | 116 (27%) *-- 81 Pending* *-- 35 Closed* |
| **Closed PICs** | 484 (17%) | *401 (18%)* | 69 (16%) |

*Note: The table utilizes the case status as of mid-July 2019. At that time, the Preliminary Review was still pending for 4,332 incidents occurring during the Sixth through Eighth Monitoring Periods.*

**ANALYSIS OF COMPLIANCE**

The Monitoring Team reviewed a sample of cases referred for Facility Investigations to ensure they did not qualify for Full ID Investigation as per ¶ 8 criteria. Consistent with prior reviews (*see* Second Monitor's Report at pg. 97, Third Monitor's Report at pg. 144, and Fourth Monitor's Report at pgs. 131-132), the Monitoring Team found that at least 98% of the sample had appropriate referrals for Facility investigation. The Department remains in Substantial Compliance with this provision as ID continues to refer cases for Full ID Investigations pursuant to the requirements of the provision. That said, as discussed above, the Monitoring Team is concerned that this requirement has created a perverse incentive to conduct further investigation even if further investigation is unnecessary— particularly because there is extensive video evidence available and significant investigation that occurs at the Preliminary Review stage. In fact, the majority of cases that were referred for further investigation did not actually require further investigation beyond the Preliminary Review. Accordingly, the Monitoring Team's recommendations in the forthcoming remedial plan envisions refining this process to create a more efficient system that focuses on whether or not further investigation is necessary.

| **COMPLIANCE RATING** | **¶ 8.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS)

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Investigators review all UOF reports and UOF witness reports as part of Preliminary Reviews, ID investigations, or Facility investigations.

### ANALYSIS OF COMPLIANCE

This provision is addressed in this section versus the Use of Force Reporting section of the report because this requirement relates to the work of investigators.

Investigators access to UOF reports has significantly improved and the investigation paperwork demonstrates that ID investigators, in particular, closely review Staff reports. In fact, most Preliminary Reviews include transcriptions of these reports. However, the Monitoring Team has found investigations rarely cite Staff collusion in findings of their investigations, which is curious given the Monitoring Team's findings, as described in the Use of Force Reporting and Tracking section of this report, that a large number of Staff reports are lacking, including the use of vague and boilerplate language, language inconsistent with video evidence, or the inclusion of false information. These findings suggest that in at least some cases there is likely to be collusion that goes unaddressed. As described in regard to Use of Force Reporting and Tracking, ¶ 8, while charges were *occasionally* brought for use of force reporting-related violations (including collusion) during this Monitoring Period, the frequency of such charges is not compatible with what the Monitoring Team would expect, based on the findings of its review of Staff Reports noted above.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.   *Timeliness* [. . .]
    b.   *Video Review* [. . .]
    c.   *Witness Interviews* [. . .]
    d.   *Review of Medical Evidence* [. . .]
    e.   *Report* [. . .]
    f.   *Supervisory Review* [. . .]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID continues to conduct investigations as described in the Fourth Monitor's Report (at pgs. 132-133). ID investigators are assigned to Facility-specific teams and are responsible for

conducting the Preliminary Reviews for all incidents and any cases subsequently referred for Full ID Investigation. Generally, the investigator who conducts the Preliminary Review is also responsible for the Full ID Investigation.

- All ID investigations of UOF incidents occurring during this Monitoring Period were conducted within CMS.

- ID closed 888 UOF investigations during this Monitoring Period (this excludes cases that were summarily closed because the SOL expired).

- **Facility Referrals**:

  o ID continued using Facility Referrals during this Monitoring Period, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to Facility leadership with instructions for the Facility to take appropriate action.

  o This Monitoring Period, ID tracked each Facility Referral and subsequent proof of remediation. Of the 155 Facility Referrals issued this Monitoring Period, the Facility provided a response to 102 as of mid-July. Facility responses to these referrals ranged from individual corrective action (*e.g.* counseling) to Facility-wide initiatives (*e.g.* addressing a repeated failure during roll call).

ANALYSIS OF COMPLIANCE

The sheer volume of UOF incidents that require investigation is daunting and overwhelming. Additionally, as discussed throughout this report, it is unclear whether additional investigation, beyond the Preliminary Review, is even necessary for most of these cases. The ID investigators simply have more work than can reasonably be completed in a timely manner. Their workload is only increasing over time as the number of uses of force has continued to increase. The investigators' high workloads will cause the quality of the investigations to suffer as evidence gets stale and may further lead to staff burnout. In fact, the significant backlog of cases resulted in over 2,000 Full ID cases languishing beyond the statute of limitations, as discussed in the introduction to this section of the report. Accordingly, cases must be prioritized using smart, creative strategies to ensure serious cases are dealt with appropriately and conserving resources when cases do not require additional scrutiny. While ID developed some triage methods, it is clear to the Monitoring Team that the backlog must be addressed with significant involvement from the Monitoring Team and these interim triage methods will not suffice—hence the forthcoming plan to approach the backlog with assistance from the Monitoring Team as part of the remedial plan.

*Quality of the Investigations*

The Monitoring Team has continued to find inconsistent quality among the Full ID Investigations reviewed. While the investigation of certain incidents is adequate and results in reasonable outcomes, some investigations revealed poor technique, particularly because the cases

languish for such long periods of time and evidence becomes stale. Full ID Investigations are very detailed and usually include a large volume of supporting documentation, but the investigators' analysis of the evidence is often superficial and conclusions and recommendations are inconsistent. Findings and conclusions normally address the incident's primary issues, but more peripheral procedural issues are overlooked or disregarded, even when they may have contributed to the use of force occurring. For example, investigators routinely fail to identify that the Staff Member's demeanor and actions contributed to the need to use force. In cases where the investigations appropriately identifies the misconduct of the primary actor(s), investigators often fail to address secondary issues like false or inaccurate reporting. Further, investigations often fail to identify violations beyond the primary actor of any kind—and rarely, if ever, identifying supervisory failures. Finally, the Monitoring Team found cases where head strikes were deemed justifiable as self-defense, even when other approved self-defense tactics would have been effective, and thus the head strikes were therefore not permissible and the Staff should have been cited accordingly.

Given the current backlog, a marked improvement in the overall quality of investigations is unlikely to occur in the short-term. But one short-term measure that was instituted this Monitoring Period was the Use of Force Priority Squad, to ensure that the most problematic cases are addressed by a team of qualified investigators in a timely manner.

- ***Use of Force Priority Squad***

Early in the Monitoring Period, the Investigation Division implemented an internal Use of Force Priority Squad ("UPS") to investigate serious and egregious uses of force and/or misconduct by Staff with concerning histories of misconduct in a timely fashion. UPS includes four investigators, one supervising investigator, and one Deputy Director, all of whom were chosen based on their skill set and experience. A fact-based assessment is used to assign cases to UPS and the ID Initiatives Manager maintains the docket of the cases assigned to the group. Cases are assigned to UPS based on their severity, whether they were considered by the Immediate Action Committee, and incidents involving certain Staff that have engaged in a pattern of concerning misconduct. The Monitoring Team also makes recommendations to ID to consider cases for investigation by UPS. Finally, the number of cases assigned to UPS must be appropriately balanced as it is important that the division maintain a manageable caseload to ensure the group is not overwhelmed as it is critical that these cases are managed in a timely manner. UPS is a sound concept and the Monitoring Team is encouraged that ID implemented this triage initiative to address this more discrete group of cases.

| All UPS Cases as of July 1, 2019 | |
|---|---|
| **Total Closed Cases** | **13** |
| -   *Closed with Charges* | *10* |
| -   *Closed without Charges* | *3* |
| **Total Pending Cases** | **56** |
| -   *Pending with Investigator* | *42* |
| -   *Pending Supervisor Review (Supervisor, DDI or Deputy Commissioner)* | *11* |
| -   *Pending with Law Enforcement* | *3* |
| **Total Cases** | **69** |

The Monitoring Team has not had the opportunity to closely scrutinize those cases closed by UPS as they are small in number, but intends to do so in subsequent Monitoring Periods.

*Conclusion*

ID & Trials' leadership and their staff have been working tirelessly and demonstrated significant commitment to achieving compliance with the Consent Judgment requirements and attempting to build an effective foundation for compliance. However, the fact remains that ID is failing to close cases timely. Accordingly, the Department is in Non-Compliance with the requirement to close Full ID investigations within 120 days. As for the cases that are closed, the quality of Full ID Investigations is inconsistent and so therefore is in Partial Compliance with the other provisions in this section.

| COMPLIANCE RATING | **¶ 9 (a).** Non-Compliance<br>**¶ 9. (b) to (f)** Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. [. . .]

ANALYSIS OF COMPLIANCE

The Monitoring Team verified that by the end of the Fourth Monitoring Period, the Department closed all of the ID cases that were open as of the Effective Date of the Consent Judgment.

| COMPLIANCE RATING | **¶ 10.** Substantial Compliance (per Fourth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department is actively seeking to hire both civilian and uniformed Staff as investigators and supervisors to fill the allocated personnel lines.
    - HR continues to recruit specifically for ID staffing positions.
    - ID interviewed over 100 investigator, supervisor and agency attorney candidates during this Monitoring period, and extended offers to 27 candidates. Of these, 20 were ultimately hired.
- In mid-June 2019, the City granted a request for additional staffing for the Investigation and Trials Division as part of the fiscal year 2020 budget cycle and awarded the Department an additional 62 staffing lines.
- The Department received hundreds of applications for supervisors and investigators to work within ID. ID subsequently conducted over 100 interviews for supervisors and investigators in this Monitoring Period.
- As of the end of this Monitoring Period, ID had the following staff working in the division:

| ID Staffing Levels *As of July 15, 2019* | | | |
|---|---|---|---|
| Position | June 2018 | Dec. 2018 | June 2019 |
| Deputy Commissioner | 1 | 1 | 1 |
| Assistant Commissioner | 1 | 1 | 1 |
| Director | N/A | 4 | 4 |
| Deputy Director Investigator (DDI) | 6 | 6 | 6 |
| Administrative Manager | 0 | 1 | 1 |
| Supervising Investigator | 9 | 13 | 17 |
| Supervisor ADW | 3 | 0 | 0 |
| Investigator Captain | 16 | 16 | 14 |
| Investigator Civilian | 58 | 77 | 87 |
| Investigator Correction Officer | 77 | 71 | 67 |
| Support Staff | 12 | 12 | 12 |
| **Total** | **183** | **201** | **210** |

- The chart below demonstrates that staffing for Facility based teams and the number of cases assigned to those teams.

| Facility Team Staffing & Case Breakdown<br>*As of July 1, 2019*[149] | | | |
|---|---|---|---|
| Team/Unit | Supervisors | Investigators | Cases Pending[150] |
| AMKC (3 Teams) | 3 | 14 | 1026 |
| BKDC (2 Teams) | 2 | 7 | 637 |
| EMTC/NIC | 1 | 5 | 290 |
| GRVC (2 Teams) | 2 | 12 | 1079 |
| Horizon | 1 | 6 | 425 |
| MDC (2 Teams) | 2 | 12 | 957 |
| OBCC (1 Team) | 1 | 5 | 621 |
| RMSC/WF (1 Team) | 1 | 4 | 235 |
| RNDC (2 Teams) | 2 | 13 | 1210 |
| UPS | 1 | 4 | 70 |
| VCBC, Cts. Hosp., CJB, Trans (1 Team) | 1 | 5 | 336 |
| **Total:** | | **104** | **6886** |

**ANALYSIS OF COMPLIANCE**

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. The City has provided funding to increase ID's staffing and the Department made significant efforts this Monitoring Period to recruit, interview, and hire additional investigators, supervisors, and leadership for ID. ID promoted six Supervisors and hired 15 new investigators in this Monitoring Period. This additional staffing only resulted in a net gain of eight staff given attrition within the Division.[151] Adequate staffing to conduct investigations is certainly critical given the increased caseload. That said, it is equally important that investigations are conducted efficiently. Therefore, the remedial plan to streamline investigations is expected to have the corresponding impact of maximizing the work of investigators. That said, the Monitoring Team continues to strongly encourage all divisions in the agency to work collaboratively to recruit, interview, and on-board the necessary staff, as it is imperative that ID has the resources it needs.

---

[149] The data of pending cases may not match exactly with the data reported in other charts because the data compiled for this chart is based on July 1, 2019 and other data reported is pulled from July 15, 2019.

[150] The majority of pending cases are Preliminary Review or Full ID cases. Most of the Facility teams have a small group (~4% of all pending cases) of Non-UOF cases.

[151] Following the close of the Monitoring Period, an additional net 28 Staff were hired to ID.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- CMS includes several mandatory fields to ensure Facility and ID investigators collect and analyze evidence systematically.

- Preliminary Reviews and investigations must be evaluated by supervisors before being finalized.

- The ID Initiatives Manager coordinates a number of initiatives to triage ID's efforts to manage the current caseload.

**ANALYSIS OF COMPLIANCE**

The significant backlog and increasing caseload of investigations impedes ID's ability to implement quality control systems and procedures to ensure the quality of ID investigations and reviews because the division is so overwhelmed. That said, ID has mechanisms in place to ensure supervisory review of Preliminary Reviews and Full ID investigations. There is certainly significant back and forth between supervisors and investigators. In particular, the comparison of draft Preliminary Reviews with those ultimately closed demonstrate that feedback and guidance is provided to investigators in order to improve the quality of the Preliminary Reviews. ID's SOLStat initiative also helps to ensure those investigations that are languishing are not ultimately lost to the SOL. The UPS division was also implemented to ensure that priority cases are managed by seasoned investigators. Further work is certainly needed to ensure ID conducts consistent and reliable investigations. It is expected that as ID implements a streamlined investigations process in connection with the remedial plan, quality control measures will be built in to the investigation process. Additionally, the development of a quality assurance program will be incorporated into the Division's long-term initiatives once the revised investigation process has taken root.

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.    All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations

conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

- a.  *Objectivity* [. . .]
- b.  *Timeliness* [. . .]
- c.  *Video Review* [. . .]
- d.  *Witness Statements* [. . .]
- e.  *Collection and Review of Medical Evidence* [. . .]
- f.  *Report* [. . .]
- g.  *Supervisory Review* [. . .]
- h.  *Recommended Disciplinary Action* [. . .]
- i.  *Referral to ID* [. . .]
- j.  *Role of Integrity Control Officer* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains a standalone Facility Investigations Policy.

- CMS is now used to conduct all aspects of Facility-level investigations for incidents that occurred since December 13, 2017.

**ANALYSIS OF COMPLIANCE**

*Status of Facility Investigations* ((¶ 13, (b))

The Identifying and Addressing Misconduct section of the report provides an overview of the current status of Facility Investigations. As noted in that section, the time to complete Facility investigations (¶ 13(b)) is beyond both the 25 Business Days of the date the incident occurred and/or when the case is referred by the Preliminary Review. Further, there is a backlog of ~500 Facility Investigations that remain pending

*Purpose and Quality of Facility Investigations* (¶ 13(a), (c), (f), (g), (h))

The Monitoring Team has continued to find that Facility investigations provide no greater insight or analysis than the Preliminary Reviews. This is not particularly surprising given the Monitoring Team's findings that uniform Staff at all levels continue to struggle with how to adequately implement the Use of Force policy. It is worth noting that Facility leadership will at least sometimes identify misconduct as part of the Rapid Review assessment, but that same misconduct will then go unaddressed in the Facility Investigation. Overall, the Monitoring Team continues to find Facility investigations completed in this Monitoring Period fail to demonstrate: objectivity in assessing the evidence (¶ 13(a)); review relevant video (¶ 13(c)); closing reports that are supported by the evidence (¶ 13(f)); supervisory review ensuring compliance with relevant policies and procedures (¶ 13(g)); or appropriate disciplinary action in light of the evidence (¶ 13(h)). That said, the volume of Facility Investigations is quite low compared to the Preliminary Review and Full ID investigations pending

with ID. Facility Investigations represent only 7% (n=500) of the ~6,300 pending UOF investigations for incidents that occurred between January 2018 and June 2019.

*Procedural Requirements* (¶ 13 (d), (e))

For the most part, Facility investigations adhere to the procedural requirements of this provision. The investigators generally, gather witness statement (¶ 13(d)) and collect and review medical evidence (¶ 13(e)) as required. Therefore, the Department is in Partial Compliance with these requirements.

*Next Steps*

Following the close of the Monitoring Period, the Department devised a process to address the backlog of Facility investigations in order to close out these cases. The Monitoring Team is also working with the Department to address how to manage the last of Facility Investigations before moving forward with a structure that no longer relies on Facility-based investigations.

| COMPLIANCE RATING | ¶ 13 (a)-(c), (f)-(h). Non-Compliance<br>¶ 13 (d)-(e). Partial Compliance<br>¶ 13 (i)-(j). Not Yet Rated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID has a dedicated team based at Horizon (the "Horizon Youth ID Team") that consists of a DDI, a Supervisor, five civilian investigators and a correction Officer investigator.

  - This team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced youth, age 16 or 17).

  - The Supervisor and all six investigators received the same Safe Crisis Management training as Horizon uniform Staff to provide the proper context for their UOF investigations.

    o   The Department also reports that the Horizon team coordinates with the New York State Justice Center when necessary to elevate incidents that may be considered abuse and/or neglect cases which the Justice Center is statutorily mandated to investigate.

**ANALYSIS OF COMPLIANCE**

*Youth ID Team & Full ID Investigations* (¶ 14, (a))

    The RNDC Facility Team was originally responsible for completing any Full ID cases for incidents involving 16- and 17-year-old inmates that occurred *before* the youth were transferred to Horizon, while the Horizon Youth ID Team conducts all Full ID Investigations for any incidents involving adolescents *since* they were transferred. Given the current backlog, there are still certain cases pending with the RNDC Team that involve 16- and 17-year old youth at RNDC before they were transferred. The Horizon Youth ID Team includes dedicated staff as required by ¶ 14 and conducts all Full ID Investigations of UOF incidents involving 16- and 17-year-old youth pursuant to ¶ 14 (a). The quality of the Full ID investigations is as discussed in ¶ 9 above and assessed holistically with other Facility teams as the process for investigation is the same.

    The chart below shows the current status of all 448 incidents that have occurred since the opening of Horizon. The majority of cases remain pending at the Preliminary Review stage so only a small number of Full ID and Facility Investigations have been closed.

| Case Status | Total as of July 15, 2019 |
|---|---|
| **Closed** | **68** |
| -  *Closed – Expedited* | -  *16* |
| -  *Closed - Facility Investigation* | -  *20* |
| -  *Closed - ID Investigation* | -  *1* |
| -  *Closed – PIC* | -  *31* |
| **Pending** | **380** |
| -  *Pending Facility Investigations* | -  *24* |
| -  *Pending Full ID Investigations* | -  *51* |
| -  *Pending Preliminary Reviews* | -  *305* |
| **Grand Total** | **448** |

*Youth ID Team Review of Closed Facility Investigations Involving Youth* (¶ 14(b))

    Prior to the 16- and 17-year-olds moving to Horizon, the Youth ID Team investigators at RNDC also reviewed all closed Facility investigations involving 16- or 17-year-old male and female inmates using the Investigation Review Team ("IRT") assignment process. ID investigators were assigned to assess the quality of completed Facility investigations through IRT once they were closed. Upon recommendation from the Monitoring Team, the Department suspended the IRT process at RNDC in the last Monitoring Period so as to conserve limited resources now that the 16- and 17-year-old youth are no longer housed there.

    The Monitoring Team recommended that the Horizon Youth ID Team focus on conducting Preliminary Reviews and Full ID investigations and not expand the use of IRTs at Horizon. The

expansion of IRTs at Horizon was not worth the expenditure of resources (and possibly diversion of resources from Preliminary Reviews and Full ID Investigations) given the small number of Facility investigations combined with the upcoming transfer of operational control of Horizon from DOC to ACS (see the Current Status of 16- and 17-Year-Old Youth section of this report) in the fall.

| COMPLIANCE RATING | ¶ 14. Substantial Compliance<br>¶ 14(a). Partial Compliance<br>¶ 14(b). Not Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- The Department continues its contract with The Moss Group, a highly-respected technical assistance provider, to provide support for issues related to sexual safety and implementing PREA.

- RMSC passed its PREA audit during the current Monitoring Period. None of the standards were rated "below expectations" (thus no corrective action was required) and four standards were rated "exceeds expectations," investigations (PREA standard 115.71) being one of them.

- ID has a dedicated PREA Team that is responsible for investigating all PREA-related allegations. While all incidents even remotely sexual in nature are referred to ID by the facilities and 311 as "PREA allegations," the PREA Team identifies which of these actually meet the definitions of sexual abuse and sexual harassment as defined by the PREA standards ("PREA reportable").[152] Those that do not meet the definition are still investigated by the PREA Team but are identified as "non-PREA reportable."

- The PREA Team continued to include a Director, Deputy Director, eight Supervisors, 30 investigators and two administrative staff.

---

[152] See https://www.prearesourcecenter.org/ec-item/1291/1156-definitions-related-to-sexual-abuse for the definitions in PREA standard 115.6.

- During this Monitoring Period, ID completely erased the backlog of pending cases for this age cohort. All cases pending at the close of the Monitoring Period were within the 60-business day timeline.

**ANALYSIS OF COMPLIANCE**

Although this provision pertains only to Young Inmates, it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations that are sexual in nature involving Young Inmates. Given that this provision targets "sexual assault," the Monitoring Team has used the PREA rubric as the best representation of the intended scope, although PREA cases also include sexual harassment in addition to sexual abuse. The Monitoring Team continues to review all closed investigations to ensure that the PREA/Non-PREA designation is reasonable and consults with ID whenever a difference of opinion is identified.

<u>Allegations</u>

As shown in the table below, of the 130 allegations involving Young Inmates since January 1, 2016, a total of 97 (75%) met the definition of sexual abuse or sexual harassment and were deemed "PREA reportable," while 33 (25%) did not meet the definition and were deemed "non-PREA reportable."

| Number of Allegations Involving Young Inmates, by Date of Report | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** | **Jan-Jun 2019** | **Total** |
| **Total Cases** | **13** | **21** | **16** | **10** | **4** | **29** | **37** | **130** |
| PREA | 10 *(77%)* | 12 *(57%)* | 7 *(44%)* | 9 *(90%)* | 2 *(50%)* | 21 *(72%)* | 36 *(92%)* | 97 *(75%)* |
| Non-PREA | 3 *(33%)* | 9 *(43%)* | 9 *(56%)* | 1 *(10%)* | 2 *(50%)* | 8 *(28%)* | 3 *(8%)* | 33 *(25%)* |
| *Note: PREA = allegation meets the definition of sexual harassment or sexual abuse from PREA Standard 115.6; Non-PREA = allegations of a sexual nature that do not meet the definition of sexual harassment or sexual abuse (e.g., consensual relationships, single occurrences of sexualized comments or remarks, etc.)* | | | | | | | | |

During the current Monitoring Period, 37 cases were referred, 34 of which (92%) were determined to be PREA-reportable and 3 of which (8%) did not meet the PREA definition of sexual abuse or harassment. The vast majority of all PREA allegations (n=26 of 34, 76%) were from HOJC, with the remainder from RNDC (n=3; 9%) and RMSC (n=5; 15%).[153] The table below presents the number of allegations flowing from each facility for the past seven Monitoring Periods.

---

[153] Of the 26 allegations reported by HOJC youth during this monitoring period, 20 alleged youth-on-youth abuse (n= 18) or harassment (n= 2) and 6 alleged staff-on-youth abuse (n=3) or harassment (n=3). Of the 3 allegations from RNDC, 2 alleged staff-on-youth abuse and 1 alleged staff-on-youth harassment. Of the 5 from RMSC, 2 alleged youth-on-youth harassment, 2 alleged youth-on-youth abuse and 1 alleged staff-on-youth abuse.

| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Total | % of 97 Total Allegations |
|---|---|---|---|---|---|---|---|---|---|
| Number of PREA Allegations by Young Inmates, by Facility | | | | | | | | | |
| BXCT | ~ | ~ | ~ | ~ | ~ | 1 | ~ | 1 | 1% |
| EMTC | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| GMDC | 4 | 4 | 2 | 2 | 1 | ~ | ~ | 13 | 13% |
| GRVC | ~ | ~ | 1 | ~ | ~ | ~ | ~ | 1 | 1% |
| HOJC | ~ | ~ | ~ | ~ | ~ | 17 | 26 | 43 | 44% |
| OBCC | 1 | ~ | ~ | ~ | ~ | ~ | ~ | 1 | 1% |
| RNDC | 3 | 6 | 3 | 7 | 1 | 3 | 3 | 26 | 27% |
| RMSC | 2 | 2 | 1 | ~ | ~ | 2 | 5 | 12 | 12% |

Even though HOJC has been operational for only 9 months, it accounts for 44% of the allegations received over the past 3.5 years. In the Monitoring Team's experience, a high rate of allegations is typical in Facilities with high levels of disorder and that undergo significant transitions, such as that occurring at HOJC. Upon investigation, most of the allegations from HOJC were found to have been false reports, called in by an anonymous third-party or someone impersonating the alleged victim in an effort to have other youth removed from the housing unit. This is discussed in more detail in the Current Status of 16- and 17-Year-Old Youth section of this report.

Of the 34 PREA allegations made during this Monitoring Period, 20 alleged *youth-on-youth abuse* (59%), 4 alleged *youth-on-youth harassment* (12%), 6 alleged *staff-on-youth abuse* (18%) and 4 alleged *staff-on-youth harassment (12%)*.

Closed Investigations

The following outcome analysis includes only those cases meeting the PREA definitions of abuse or harassment. Policy requires investigations of PREA allegations to be completed within 60 business days of the incident being reported. As shown in the table below, the Department significantly improved its performance here. Of the 35 PREA cases closed during the current Monitoring Period, 60% (n=21) were closed within the 60-business day timeline and 40% were closed beyond it (n=14). Previously, nearly all cases closed were far beyond the required timeline. Of the 9 PREA cases that remained pending at the end of the Monitoring Period, 89% (n=8) were within the 60-business day timeline and only 11% (n=1) was not. The table below clearly shows the continued improvement in timeliness across the last seven Monitoring Periods.

| Closed PREA Investigations, by Date Closed | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** | **Jan-Jun 2019** | **TOTAL** |
| **Total PREA Cases** | 0 | 7 | 1 | 4 | 25 | 15 | 35 | **87** |
| **Timing of Investigation** | | | | | | | |
| *< 60 business days* | ~ | ~ | ~ | 1 *(25%)* | ~ | 6 *(40%)* | 21 *(60%)* | 29 *(32%)* |
| *61-120 business days* | ~ | ~ | ~ | ~ | 1 *(4%)* | 3 *(20%)* | 13 *(37%)* | 18 *(20%)* |
| *121+ business days* | ~ | 7 *(100%)* | 1 *(100%)* | 3 *(75%)* | 24 *(96%)* | 6 *(40%)* | 1 *(3%)* | 40 *(44%)* |
| **Outcome of Investigation** | | | | | | | |
| *Unfounded* | ~ | 2 *(29%)* | 1 *(100%)* | 1 *(25%)* | 7 *(28%)* | 9 *(60%)* | 25 *(71%)* | 45 *(52%)* |
| *Unsubstantiated* | ~ | 2 *(29%)* | ~ | 3 *(75%)* | 16 *(64%)* | 6 *(40%)* | 10 *(29%)* | 37 *(43%)* |
| *Substantiated* | ~ | ~ | ~ | ~ | 2 *(8%)* | ~ | ~ | 2 *(2%)* |
| *Missing/Unknown* | ~ | 3[154] *(43%)* | ~ | ~ | ~ | ~ | ~ | 3 *(3%)* |

As shown in the table above, in nearly all of the cases referred and closed to date, the PREA allegation was unsubstantiated or unfounded (n=82 of 87; 95%). In some of these, staff were cited for other, non-PREA related policy violations. In the Monitoring Team's experience, it is not unusual for large proportions of cases to be unfounded or unsubstantiated, particularly in situations like HOJC where a large portion were determined to be false reports, though the quality of the investigation must certainly be adequate in order to feel confident about a low prevalence rate. For this reason, the Monitoring Team also assesses the quality of the investigations to ascertain whether all available evidence was collected and whether the investigators' findings were reasonable based on that evidence.

The Monitoring Team reviewed 60% of the cases closed during this Monitoring Period (n=21 of 35).[155] The Monitoring Team prioritized cases for review where the allegation was reported and the investigation was closed during this Monitoring Period in order to obtain the most accurate view of investigators' skill, which can be difficult to assess in cases with longer closure times. Prior Monitor's Reports have noted the failure to interview key witnesses, long delays to interview witnesses, and apparent failure to ask effective follow-up questions or to collect relevant evidence. The most current investigations revealed continued improvements over cases reviewed in the past, particularly in timely response to the scene (the same or next business day); interviews with alleged victims and youth

---

[154] Three of the cases closed during this Monitoring Period had outcomes that could not be easily discerned (e.g., merged with another case that closed during a different monitoring period, marked closed with no specific finding).

[155] The Monitoring Team reviewed cases classified as both meeting and not meeting PREA definitions in order to assesses the veracity of those classifications.

witnesses where investigators are asking key questions and relevant follow-up questions; and detailed synopses of what can be seen on Genetec or hand-held footage.

The key issues compromising the quality of the investigations are the long delays to interview accused staff and the absence of interviews with Staff witnesses (needed to provide essential contextual information about the allegation). While investigations are being closed within required timelines, interviews with accused staff do not generally occur until the tail end of that time period and accurate recall of the event in question is likely to be degraded. During this time, memories inevitably degrade and thus the delay compromises the quality of the investigation. This underlying cause of this problem is structural—inadequate numbers of attorneys being made available to represent staff during the interview with ID investigators. This same limitation impacts investigators' ability to conduct interviews with staff witnesses. Such long delays to interview staff and the failure to interview key witnesses are outside the generally accepted practice for administrative investigations of this kind.

The problem of staff interviews notwithstanding, the Monitoring Team found that investigators' findings regarding the large number of falsely reported allegations were reasonable based on the evidence. Investigators interviewed the alleged victims and alleged perpetrators (making multiple attempts if the youth first refused) and canvassed the units for other youth witnesses, all of whom denied the substance of the allegation. When available, Genetec footage was consistently mined to determine whether the circumstances reported actually occurred. In March 2019, one HOJC resident admitted to making a large number of false reports. These investigations of false reports—while relatively straightforward—were a significant drain on ID's resources. Thus, to date, most of the investigations reviewed by the Monitoring Team have not involved complicated allegations (*e.g.* where there is not clear evidence that the allegation is unfounded) and a greater number is needed to make firm conclusions about their quality. That said, two cases closed during this Monitoring Period required a more sophisticated and thorough investigation, and in both cases, the investigators quickly interviewed alleged victims and youth witnesses, asked questions that fleshed out the allegation and circumstances in detail, provided detailed summaries of what can be seen on Genetec footage, and eventually interviewed accused Staff. In one of these cases, while the PREA allegation itself was not sustained, the investigator cited staff for improper supervision and handling of youth and in another, the investigator made a Facility Referral for Staff's failure to ensure that an alleged victim received a medical assessment.

In summary, once the Department consistently produces quality investigations that utilize evidence efficiently obtained from all sources and the vast majority of investigations are completed within the 60-business day timeline, the Department will achieve Substantial Compliance.

| **COMPLIANCE RATING** | **¶ 9.** Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- The Department maintained the standalone Facility Investigations Policy issued during the Fifth Monitoring Period.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications. In the last Monitoring Period, the ID Initiatives Manager did considerable work to facilitate the collection, organization, culling, and revising of these policies and procedures, including:

  o Identifying and collecting over 70 individual memos, policies, procedures, directives or communications to investigators that have been governing the work of ID;

  o Rescinding over 50 of these, and maintaining, revising or replacing all others;

  o Drafting new policies or procedures.

**ANALYSIS OF COMPLIANCE**

*ID Investigations*

The ID Initiatives Manager has continued to spearhead this project and demonstrated a strong command of the issues and served as a reliable and valuable facilitator. ID developed an initial draft of policies this Monitoring Period. However, due to the impending change in structure/approach to investigations based on the Monitoring Team's recommendations, the finalization of these policies has been slowed in order to coincide with those changes. The Monitoring Team is working with the Department to ensure there is adequate written guidance for investigators in order to implement the revised investigation process.

*Facility Investigations*

The Facility Investigation Policy promulgated during the Fifth Monitoring Period addresses all of the requirements of Consent Judgment §VIII, ¶ 13. This policy will need to be revised as part of the overall revisions to the investigation process.

*Standardized system and format for organizing the contents of investigation files* (¶ 16)

| | |
|---|---|
| The Monitoring Team has generally found that ID files are well-organized. CMS has brought even greater structure to the investigation files and further improved accessibility of relevant information. | |
| **COMPLIANCE RATING** | **¶ 15.** Partial Compliance<br>**¶ 16.** Substantial Compliance |

### 7.   RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The varied risks facing the Department require flexible, comprehensive, and timely responses. These measures include developing and implementing an Early Warning System (¶ 1); conducting counseling meetings between Facility leadership and any Staff Member who engages in a concerning and/or repeated use of force incidents (¶ 2); identifying systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation and disciplinary data throughout the Department (¶ 6). Each of these is described in more detail below along with the Monitoring Team's assessment of compliance.

| |
|---|
| **X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)** |
| ¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.<br>    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.<br>    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The |

> Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.
>
> c.  On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Early Intervention, Support, and Supervision Unit ("E.I.S.S.") remains in the Department's Administration Division. The E.I.S.S. division is led by an Assistant Commissioner, and supported by a team of two Captains, a civilian Principal Administrative Associate, and two Correction Officers.

- The work of E.I.S.S. remains codified in Directive 5003R-C "Monitoring Uses of Force."

  - During this Monitoring Period, the Assistant Commissioner developed an outline for how E.I.S.S. is operationalizing the screening process described in the policy.

- Triggers to Identify Staff for Screening for Potential Monitoring:

  - The Directive includes specific triggers for E.I.S.S. to identify Staff who should be screened for monitoring. These various sources include Rapid Reviews, imposition of formal discipline, 5003 counseling history, consideration by the Immediate Action Committee, and imposition of Command Disciplines. These sources are then analyzed at regular intervals (*e.g.*, depending on the criteria, bi-weekly, bi-monthly, or monthly).[156]

  - E.I.S.S. also receives referrals from Facility leadership, the Chiefs, Department executives, and the Monitoring Team.

- Screening Staff to Determine Whether to Place on Monitoring:

  - Once Staff are identified, they are considered for E.I.S.S. monitoring via a review of their history with the Department, including, but not limited to, their assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, an assessment of recent use of force incidents, and the proportionality of force used. The purpose of the screening is to determine whether the E.I.S.S. monitoring program could improve a Staff Member's performance.

- Staff Placed on Monitoring:

  - The monitoring of a Staff Member is designed to be a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command.

---

[156] Preliminary Reviews are no longer utilized as a source trigger because it was determined that reviewing all Preliminary Reviews of incidents involving a potential candidate was time consuming and unduly burdensome. However, when screening a Staff Member for Monitoring, E.I.S.S. staff review the Preliminary Reviews of all UOF incidents involving that Staff Member.

- o During this Monitoring Period, E.I.S.S. implemented a standardized notification process to advise Staff of their placement on monitoring. When a Staff Member is placed on monitoring, his/her command provides Staff with the E.I.S.S. notification letter. The Staff Member then meets with the Assistant Commissioner of E.I.S.S. and E.I.S.S. staff to discuss the reason for their placement on monitoring, an overview of the monitoring program, and expectations of the Staff Member during the Monitoring Period. The Staff Member's uses of force and the Use of Force and Chemical Agents directives are also reviewed during this meeting.

  - o The monitoring process is designed to be a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command.

  - o The Facility leadership is responsible for reviewing the use of force of any Staff Member on monitoring in their Command, reviewing every use of force the Staff Member is involved in and meeting with the Staff and providing monthly written progress reports to E.I.S.S.

  - o E.I.S.S. staff meet with Wardens and other uniform leadership to outline their responsibilities in overseeing the Staff in E.I.S.S. monitoring in their Facilities. As part of this, E.I.S.S. staff prepare and share information on the Staff Member's use of force history with the Facility command.

  - o This Monitoring Period, E.I.S.S. also began meeting every other month with all Staff Members in monitoring (in small groups) to review uses of force and best practices to provide additional guidance to Staff.

- The table below depicts the work of E.I.S.S. during this Monitoring Period and the overall progress of the program since its inception in August 2017:[157]

| | 8th Monitoring Period | Program to Date |
|---|---|---|
| **Screening** | | |
| Staff Screened | 92[158] | 347 |
| Staff Selected for Monitoring[159] | 27 (29%) | 115 (33%) |

---

[157] It is worth noting that the more systematic work of E.I.S.S. began in the summer of 2018.

[158] This includes some Staff who were screened in prior Monitoring Periods and were re-screened in this Monitoring Period. The totals number reflects the total number of individual Staff screened so Staff who have been re-screened are only counted once.

[159] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff have subsequently left the Department before monitoring began. Other Staff have not yet been placed on

| Monitoring | | |
|---|---|---|
| Staff Began Monitoring Term | 12[160] | 106 |
| Staff Actively Monitored | 91[161] | |
| Staff Completed Monitoring | 22[162] | 37 |

ANALYSIS OF COMPLIANCE

*Overview*

The ultimate goal of E.I.S.S. is to support Staff who have been identified as requiring additional guidance regarding use of force and provide that guidance and additional mentorship before it escalates to more serious misconduct. In addition to identifying the appropriate Staff, the success of E.I.S.S.'s monitoring relies on the quality of mentorship and leadership at the Facility-level to counsel, guide, and reinforce best practices with Staff who need extra support. As described throughout this report, the Department's lack of consistent and appropriate supervision at the Facility-level impacts the effectiveness of this program. Facility Leadership do appear aware of the program as they do recommend Staff for consideration for monitoring, as discussed below. However, that is only the first step. Despite the efforts of the E.I.S.S. team, without Facility-mentorship, the monitoring program cannot effectively shape Staff behavior. These deficiencies will stymie the effectiveness of E.I.S.S. until Facility-level leadership at all levels embrace this program and consistently reinforce best practices with their Staff.

During this Monitoring Period, the strategy for and effectiveness of the monitoring program was the priority for E.I.S.S. staff. E.I.S.S. developed some initiatives this Monitoring Period to supplement Facility-level responsibility by: (1) holding initial introductory meetings with all Staff placed into Monitoring and providing them with the expectations of the monitoring program at an in-person meeting; (2) conducting bi-monthly meetings with Staff in monitoring to assess Staff Members' performance, discern where deficiencies continue to exist, and identify what assistance is needed, such

---

monitoring because they are extended leaves of absence (e.g. sick or military leave). A few Staff were not placed on monitoring in this Monitoring Period because they had not yet returned from a suspension, but will be placed in the program upon their return. Finally, E.I.S.S. does not begin a Staff's monitoring term if the Staff Member has subsequently been placed on a no inmate contact post because there are limited opportunities for mentorship and guidance.

[160] This includes two Staff Members who resigned this Monitoring Period.

[161] This includes the 12 Staff who began monitoring this Monitoring Period and the 22 Staff who completed monitoring this Monitoring Period.

[162] This includes three Staff Members who either resigned or were dismissed while actively engaged in the E.I.S.S. Monitoring program.

as training or improved supervision; and (3) identifying additional training opportunities that may be available for Staff. These efforts by E.I.S.S. are necessary, but this process cannot be fully outsourced from the Facility. Accordingly, without adequate and consistent leadership within the Facility, the success of the program will continue to be hindered.

While E.I.S.S. will ultimately need to be broadened to identify and offer support to additional Staff Members, at this juncture, the Monitoring Team hesitates to encourage expansion. Given the current circumstances, the Monitoring Team recommends the Department ensure that the program has the appropriate foundation in which to grow before it is expanded further.

Significant works remains to achieve Substantial Compliance, including bolstering all phases of this process—identifying Staff for screening, screening Staff in a timely and consistent manner, and most importantly effectively monitoring those selected.

*Identification of Staff for Screening*

The source triggers are the first step in identifying Staff who may benefit from E.I.S.S. monitoring. As expected, utilizing the triggers to identify Staff who should be screened and then screening those Staff is time intensive. As described in the Seventh Monitor's Report (at pg. 140), E.I.S.S. generally relied on using a more informal methodology than was outlined in the Policy to identify Staff Members for screening.

In this Monitoring Period, 92 Staff were identified for screening, 44 (48%) from Command Requests and 31 (34%) based on finalized NPAs. The remaining 17 (18%) came from a variety of other sources (*e.g.* recommendations from the Immediate Action Committee, other source criteria, and referrals from the Monitoring Team). In general, Facility leadership recommended Staff for screening who were involved in a large number of uses of force (often as members of the Probe or Cell Extraction Teams), irrespective of whether their conduct during the incident raised concerns.

During this Monitoring Period, E.I.S.S balanced the consideration of Staff identified via referrals and assessment of the formal triggers. By the end of this Monitoring Period E.I.S.S. staff began routinely assessing previously underutilized source triggers, such as the assessment of formal discipline (via the Trials Tracker) and recommendations from the Immediate Action Committee. That said, E.I.S.S. is still not routinely or consistently evaluating probationary Staff with recently imposed PDRs.[163] These Staff are likely to benefit from additional support and so the Monitoring Team recommends this source is considered more frequently going forward. E.I.S.S. is currently balancing identification of Staff via referrals and assessment of the formal triggers. As the system becomes more

---

[163] The Monitoring Team has not conducted a complete audit of all source triggers so additional triggers may not be evaluated to the extent they should be. The Monitoring Team will look at this more closely in the next Monitoring Period.

established, there is still work to be done for E.I.S.S. to consistently and routinely assess potential triggers to identify Staff for screening.

*Screening for Monitoring*

To determine whether Staff would benefit from monitoring, they are evaluated using a specific set of criteria to identify potential patterns related to the misuse of force. During this Monitoring Period, E.I.S.S. screened 92 Staff, and selected 27 Staff (29%) for monitoring. Of the 27 Staff selected for monitoring following the screening, six (22%) were screened based on Command Requests, 13 (48%) were screened who had a recently finalized NPA or PDR for extension of probation, and the other eight (30%) were screened based on other source criteria triggers (*e.g.* Immediate Action Committee) or recommendations from the Monitoring Team.

E.I.S.S.'s process for screening Staff to determine whether monitoring could improve their performance is generally reasonable, but there is room for improvement. In order to evaluate E.I.S.S.' assessment, the Monitoring Team reviewed 39 screening forms for Staff who were screened during this Monitoring Period but were *not* selected for Monitoring (the vast majority of Staff in this group were recommended by the Command because they had recently been involved in a significant number of uses of force).

As an initial matter, the criteria utilized by E.I.S.S. to evaluate the Staff's background is reasonable. However, the Monitoring Team found instances where the screening forms appear to have concluded a Staff Member should not be placed on Monitoring without evaluation of the Staff Member's disciplinary history. It was subsequently reported that the disciplinary histories of certain Staff Members were not evaluated because other sources reviewed did not demonstrate a pattern of misconduct. While review of recent uses of force may not reveal misconduct, the assessment of whether there is a pattern of misconduct must necessarily consider a Staff Member's disciplinary history in order to conclude there is not a pattern of misconduct. Therefore, the Monitoring Team recommended that the disciplinary records of all Staff screened should be reviewed going forward.

The Monitoring Team found that the majority of E.I.S.S.' determinations not to place a Staff Member on monitoring were reasonable based on E.I.S.S.' assessment and the information gathered in the screening forms (although, as noted above, some were missing disciplinary histories). However, objective evidence suggested that monitoring may have been prudent for a small number of Staff who were not recommended for monitoring (*e.g.* one Staff had a history of hyper-confrontational behavior). There were also some cases where E.I.S.S.' determination not to place the Staff Member on monitoring was questionable based on the available information, but in some of these cases, E.I.S.S. staff recommended the Staff Member be provided Probe or Cell Extraction Team re-training. For cases where the Command requested that a Staff Member be screened, but E.I.S.S. does not place on monitoring following the screening, the Assistant Commissioner reports that the E.I.S.S. team works with the Facility leadership to provide guidance on how to support that Staff Member in other ways—

including discussing their post and responsibilities within the Facility and whether re-training may be an option.

_E.I.S.S. Monitoring_

During this Monitoring Period, 91 Staff were engaged in the monitoring program, 12 of whom were enrolled during this Monitoring Period. Of these 91, 22 Staff completed monitoring during this Monitoring Period. As discussed above, the monitoring program is a joint effort between E.I.S.S. and the Facilities. During this Monitoring Period, E.I.S.S. focused on developing a strong foundation for the monitoring program.

Assessing the quality of the mentoring provided to Staff by the Facilities through the monitoring program is challenging given much of this work occurs during small in-person meetings and ad hoc discussions. The monthly progress reports submitted by the Facilities do provide a summary of meetings with Staff on monitoring and therefore provide some insight into the Facilities engagement with the Staff on monitoring. Accordingly, the Monitoring Team reviewed all available monthly progress reports submitted between January to May 2019 for the 17 Staff who were involved in four or more uses of force during this period.

An initial sign of improvement is that, in contrast to prior Monitoring Periods, the Department was able to produce the majority of the monthly progress forms (though not all of them—for example, MDC failed to produce nine requested forms). As identified in the prior Monitoring Period, most of the forms were of poor quality. They were _pro forma_, provided little detail regarding the content of the meetings and the specific uses of force that occurred during the month. There were some deviations across Facilities. For instance, while many of MDC's forms were missing, those submitted had included a greater level of detail and were more thoughtful than those submitted from other Facilities. GRVC submitted all required forms and each form included some level of detail about the uses of force the Staff Member were involved in, which suggested the Facility was actively assessing these incidents.

In terms of the Facility's assessment of UOF the Staff were engaged in, generally, it was found that when the Staff Member was involved in multiple uses of force in a month, the forms often had little detail or analysis of the incident. In cases where the Staff Member was involved in a problematic incident identified by Facility leadership, counseling was only recommended in two examples. Additionally, there were a number of examples that simply listed "ID takeover" as the outcome of the UOF review, which suggested that the Facility did not address these incidents with the Staff Member. The increased availability of these forms may suggest there is more interaction between Facility leadership and the Staff Member than in the past. However, the impact of these sessions is difficult to ascertain given the vague content. In order to better assess the Facility mentoring process, the Monitoring Team intends to speak with Staff and leadership about this process in the next Monitoring Period.

*Assessment of E.I.S.S.*

During this Monitoring Period, E.I.S.S. staff conducted an analysis of 21 Staff who completed E.I.S.S. monitoring to ascertain whether the program was effective in reducing their use of unnecessary and excessive force. The Monitoring Team intends to conduct a review of this analysis in the Ninth Monitoring Period.

*Staffing for E.I.S.S. Unit*

Obtaining staff for E.I.S.S. has proceeded slowly and the Division is still not fully staffed. E.I.S.S. has two additional positions to fill to round out the team—a Director and a Staff Analyst. The Director will hopefully support the ongoing work needed to coordinate and guide the Facilities in implementing the Facility-based aspect of E.I.S.S. The Assistant Commissioner reports E.I.S.S. is considering leveraging current internal personnel for the work of the Staff Analyst, and intends to post for the Director position in the Ninth Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 5003R-C "Monitoring Uses of Force" remained in effect and the requirements of ¶ 2 are captured in the policy.

- The Department continues to manage the 5003 counseling process, as described in the Fourth Monitor's Report at pg. 154.

- 5003 counseling sessions are discussed at the weekly NCU meetings and Facilities must routinely report their progress.

- NCU continued to compile the 5003 counseling session data across all Facilities by identifying: (1) the total number of Staff who qualified for a discretionary 5003 counseling session, (2) the

number of discretionary counseling sessions that occurred, (3) the number of Staff who qualified for a Class A mandatory counseling session, (4) the number of Class A mandatory counseling sessions that occurred, and (5) 5003 forms' completion.

- During this Monitoring Period, Facilities delivered mandatory counseling to 85 of the 91 Staff (93%) who met criteria for a Class A session. Facilities also delivered discretionary counseling to 1,361 Staff who met criteria for 5003 counseling.

| | Eighth Monitoring Period 5003 Counseling Data | | |
| | Mandatory Counseling | | Discretionary Counseling |
| | Number of Staff who qualified | Number of Staff counseled | Number of Staff counseled |
|---|---|---|---|
| *February 2019* | 34 | 31 (91%) | 584 |
| *April 2019* | 34 | 32 (94%) | 388 |
| *June 2019* | 23 | 22 (96%) | 389 |
| **TOTAL** | **91** | **85 (93%)** | **1,361** |

**ANALYSIS OF COMPLIANCE**

Counseling sessions required by the Consent Judgment are termed "5003 counseling sessions" in reference to the Directive that codifies the requirements.

It is critical to reiterate that counseling sessions are not disciplinary in nature, but rather an opportunity to provide feedback and guidance on using force appropriately and to reinforce non-physical methods for resolving conflicts. The requirements to identify Staff for counseling require significant organization and management of data. NCU continues to conduct the time-consuming and onerous process of identifying the Staff that the Facilities must consider and/or counsel under this provision. Given the various moving parts, NCU also audits this process after the Facility have been provided the 5003 counseling materials to ensure counseling sessions occurred as required. The Consent Judgment requirements regarding counseling are discussed in more detail below.

*Identifying Staff who Require Counseling*

- ***Mandatory Counseling Sessions***

Counseling sessions are required if, at any time during a six-month period, Staff was involved in three or more UOF incidents and one resulted in a Class A Injury to an inmate. The Department reports that 93% of Staff who required a mandatory counseling session during the Eighth Monitoring Period were counseled by the Facilities.

- ***Discretionary Counseling Sessions***

At the Warden's discretion, Staff who have been involved in three or more Use of Force incidents during a six-month period may be counseled when one of these incidents resulted in a Class B injury to a Staff Member or inmate, and none resulted in a Class A injury to an inmate. When Staff meet this requirement, the Warden is required to evaluate whether the Staff Member requires

counseling. Across all Facilities, the Wardens reportedly conducted over 1,300 counseling sessions for Staff that met this discretionary threshold.

The Monitoring Team reviewed a sample of Staff that the Facility elected not to counsel to assess the reasonableness of the Facility's decision to not counsel the Staff Member. Two thirds of the decisions to not counsel generally appeared reasonable based on the Staff's conduct in a sample of UOF incidents they were involved in. Approximately a third of the determinations reviewed appeared to be unreasonable. In those cases, the Staff's involvement in at least one incident identified suggested that the Staff Member would benefit from guidance and advice on how to avoid engaging in potential misconduct in the future. That said, while the Facilities do not appear to be identifying all Staff that could benefit from counseling, they are also selecting a large number of Staff for counseling.

Overall, this review demonstrated that the 5003 process is incredibly cumbersome and time consuming. For instance, the review of UOF incidents requires Facility leadership to review the video (and often reports) of each UOF incident to determine the Staff Member's involvement (the screening process only identifies whether the Staff Member was present) and assess their role and conduct in the incident. While Facility leadership likely reviewed the incident as part of the Rapid Review process, that review happened months ago so the incident had to be reviewed again for this assessment. Recommendations for an improved process are discussed in more detail below.

_Documenting the Counseling Sessions_

The Department is required to document all 5003 counseling decisions, this includes the basis for decisions _not_ to provide counseling, as described in the Seventh Monitor's Report (at pg.144).

- **_Facility Documentation Electing not to Counsel a Staff Member_**

The Monitoring Team reviewed a sample of forms for Staff where the Facility elected not to counsel the Staff Member. All forms had the required signatures, included the necessary identifying information, and the determination about whether or not to counsel was documented by checking the relevant pre-filled check box. The Facilities generally elected not to counsel because of a finding that Staff followed all DOC policies, or the UOF tactics utilized were appropriate or because of the assignment/location of the employee. The Wardens did not provide explanations as to why they elected not to counsel a Staff Member. While the forms were completed, as noted above, some of the outcomes appeared unreasonable given the Monitoring Team's assessment of the Staff Members involvement in the UOF (_e.g._, a Staff Member was identified to have engaged in misconduct, but the form found Staff followed all DOC policies and UOF tactics were appropriate)

- **_Counseling Forms_**

The Monitoring Team also reviewed a sample of completed forms for Staff who the Facility leadership counseled. These forms provided more detail than the forms for the Staff not counseled, however they varied in quality. Some forms were not fully completed, some forms only completed the pre-filled check-boxes, while others included information about the counseling session. In some cases,

pro forma language was used to describe the counseling sessions, while the description of a few counseling sessions demonstrated a more thoughtful assessment and discussion of the Staff's conduct. The counseling forms also include an option to recommend training, re-assignment or referral for discipline. None of these options were selected in the forms selected.

### E.I.S.S. Tracking of Counseled Staff

E.I.S.S. is required to track whether Staff Members participated in 5003 counseling meetings, and, if so: (a) the name of the individual who provided the counseling, and (b) the date on which it occurred. NCU manages the spreadsheet to track Staff who have been identified for either mandatory or discretionary counseling, as well as whether the counseling session occurred. This spreadsheet was updated by NCU in this Monitoring Period to streamline the tracking process. E.I.S.S. has access to this spreadsheet to conduct its work. The tracking spreadsheet generally mirrors the information from the counseling forms and includes the Warden's basis for not counseling, such as 'UOF tactics were appropriate.' The maintenance of this spreadsheet is sufficient to meet the Consent Judgment requirements as it is well-organized, easy to follow and accessible to E.I.S.S.

### Modifying Discretionary Counseling Sessions to Streamline and Improve the Quality of Counseling Sessions

The current requirements for discretionary 5003 counseling sessions as enumerated in this provision are unlikely to help the Department to achieve the overarching goal of counseling sessions—to provide guidance and support to Staff to reduce unnecessary or excessive uses of force. As drafted, the considerations for discretionary counseling sessions requires the Department to identify Staff with a pattern of misconduct and to apply an appropriate intervention. Not only does this duplicate other, more effective processes (*e.g.*, E.I.S.S.), but it wastes the opportunity to utilize counseling where it can have the greatest impact—just after the incident occurs.

During this Monitoring Period, thousands of Staff were evaluated to determine whether they should be counseled under the discretionary counseling framework and over 1,300 discretionary 5003 counseling sessions were conducted. Clearly, the current criteria for discretionary counseling (at least three incidents in six months) casts a wide net. The six-month review period means that many of these sessions address incidents that occurred several months prior, and Staff's accurate recall of the events and precipitating factors is therefore unlikely. Furthermore, the process to identify, screen and evaluate Staff for counseling is onerous and time-consuming and thwarts Facility leadership's ability to conduct the counseling session close-in-time to the incident, when they are far more likely to have an impact. In fact, the Department's continued high use of force rate suggests that these protracted counseling sessions are having little impact on Staff conduct.

The requirement to utilize a counseling session to improve Staff practice has obvious merit, but the process for identifying and selecting Staff must be streamlined so that the right Staff are identified quickly. There are current practices in place that can, and should be leveraged to identify Staff who

would benefit from counseling. In particular, Rapid Reviews, the ID/Facility Coordinated Use of Force Analysis, and the work of the Immediate Action Committee routinely identify Staff who should be counseled based on recently occurring behavior. Preliminary Reviews, when completed closer in time to the incident, are also a good tool for identifying Staff for counseling, close in time to when the behavior occurred. Identifying Staff through these processes would be a far superior approach to the current discretionary counseling process (at least 3 three incidents in six months). Once this process is streamlined, the Department can focus on the quality of the counseling sessions to ensure their effectiveness in modifying Staff behavior. Accordingly, the Monitoring Team intends to work with the Department in the next Monitoring Period to re-vamp this process to focus on close-in-time counseling sessions.[164]

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

---

[164] The Monitoring Team's recommendation is limited to modification of the discretionary counseling sessions. Required counseling sessions for Staff that have engaged in a use of force incident within the last six-month period that resulted in a Class A injury to inmates will continue.

- ID continues to assess UOF incidents on a weekly basis at AMKC, GRVC, OBCC, and RNDC and was expanded in this Monitoring Period to include MDC, NIC/WF[165]. The reports include the following:

  - <u>General Metrics</u>: (1) total use of force incidents, (2) head strikes, (3) use of force when an inmate is already in restraints, (4) OC spray, (5) reason for force, (6) Staff repeatedly involved in force, and (7) inmates repeatedly involved in force;

  - <u>Incident Characteristics and Trends</u>: time of incident (including tour), location of incident, reason for force and primary use of force type;

  - <u>Qualitative Assessment by ID</u>: ID prepares a summary of the majority of incidents that occurred that week with a focus on problematic incidents and/or incidents where ID and the Facility (based on the Rapid Review) have differing conclusions about the incident. The summary includes a description of both the Facility's and ID's findings and any misconduct identified. These summaries also identify any operational deficiencies that may have led to the need for force. To the extent that the Facility's and ID's assessments differ, ID provides an explanation of the differences and the basis for ID's conclusion.

    - A select number of these cases are discussed at weekly *Nunez* meetings, and in other forums such as TEAMs and Operational Leadership meetings.

- The Department uses aggregate use of force and investigations data to inform strategic initiatives within the following units and divisions: ID, Performance Metrics & Analytics (PMA) Office, Bureau Chief of Security, Bureau Chief of Facility Operations, COD, CLU, NCU, and E.I.S.S.

- Facility Leadership conduct "Rapid Reviews" of all UOF incidents captured on video within their Facility. Each incident is assessed for the following: (1) whether the incident was avoidable, and if so, how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type.

- NCU has continued to conduct an analysis of injuries that occur during use of force events, which is described in detail in the UOF Introduction of this report.

**ANALYSIS OF COMPLIANCE**

These two provisions are addressed together because the maintenance of consistent and reliable data combined with the qualitative assessment of this data and UOF incidents more generally provides

---

[165] ID combines the assessment of any UOF incidents at NIC and West Facility in one report.

the foundation upon which the Department can begin to identify potential patterns and trends that must be addressed.

*UOF Auditor* (§ X., ¶ 3)

An internal centralized capacity for data analysis and interpretation, beyond relying on investigations into individual UOF incidents, is critical to the Department's ability to understand and address the UOF issues that plague the agency. The Department is not currently seeking to fill the UOF Auditor position for the reasons described in the Sixth Monitor's Report at pgs. 119-120 and Seventh Monitor's Report at pgs.146-147. The Department has attempted to conduct a more qualitative assessment of UOF through the work of ID, NCU, and Rapid Reviews. This is certainly a first step in better understanding use of force within the agency. Although the Consent Judgment requires a UOF Auditor to analyze and interpret trends, the Monitoring Team believes that the expenditure of resources is not prudent at this juncture. The Department has several good sources of information on UOF trends (*e.g.*, NCU, ID/Facility Weekly UOF assessments) and should focus on utilizing the information available to improve practice before adding another level of analysis via the UOF Auditor. Once the Department's practices have improved, an important step toward reducing the need for external oversight will be the strategic use of the UOF Auditor position.

The Monitoring Team evaluated all of ID's weekly UOF reports developed during this Monitoring Period and continues to find that they provide invaluable information for understanding the pattern and trends of force within a particular Facility. These weekly reports provide a useful learning tool for Facilities to develop consensus about troubling patterns and properly identifying UOF violations and deficiencies. The Facilities work, through Rapid Reviews, continues to consistently identify incidents with operational issues and that could have been avoided. During this Monitoring Period, the Department also continued to critically evaluate its UOF injury data and preliminary reviews to parse out nuanced aspects of the incidents such as: was the incident avoidable, did ID identify an issue with the force used, and how this overlapped with inmate injuries.

It is important that the Department conducts this type of analysis. However, the Department's analyses are only effective to the extent that the information is then evaluated by leadership to identify where the issues lie; to develop and implement potential solutions, drive management decisions, and through on-going coaching and supervision of their Staff. As described throughout this Report, this does not appear to be occurring. For instance, there has generally been no progress in the use of force rate at the Facilities who receive the weekly ID reports (except at OBCC) and Staff appear to continue to engage in the same UOF and operational mistakes that have been consistently identified by the weekly reports. Facilities also continue to report that incidents could have been avoided, yet there has been no demonstrable progress that these incidents are then subsequently avoided. One likely contributing factor to this lack of progress is that civilian and executive uniform leadership (*e.g.* Chiefs) are not meaningfully requiring the leadership of the Facility to address these findings and/or holding that leadership accountable to the extent that improvements have not been implemented. The

change in Staff practice that is so desperately needed within the Department will only come about when leadership actually uses this information to drive management decisions.

*Use of Aggregate Reports to Enhance Oversight* (§ V., ¶ 20)

As demonstrated throughout this Report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and Inmate-on-Inmate Fight tracking to identify opportunities to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with UOF or inmate-on-inmate fights or assaults.

The weekly ID reports described above demonstrates how the data from ID has the potential to stimulate change in practice, *if* the information is properly leveraged by the Facilities. The TEAMS meetings are also a good example of how the Department uses security metrics (*e.g.,* UOF and inmate-on-inmate fights) from aggregate reporting to inform discussion about Staff practice. As described above, E.I.S.S. also utilizes informal and formal discipline data to inform screening and monitoring decisions. The Department has improved its capacity to collect and aggregate data from a variety of sources, but the next step is for the Department to interpret and apply it to specific practices to produce better outcomes.

| COMPLIANCE RATING | ¶ **3.** Partial Compliance<br>¶ **20.** Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel continues to provide the Department with quarterly reports of lawsuits filed and settled. During this Monitoring Period, the report from January to June 2019 was shared with the Department. The reports include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum of the lawsuit and description of the lawsuit.

- The Office of the Comptroller continues to provide the Department with reports regarding the payment of claims related to UOF incidents. During this Monitoring Period, the report covering January to June 2019 was shared with the Department.

- E.I.S.S. continued to assess the information provided by the Corporation Counsel and the Office of Comptroller. E.I.S.S. staff consolidated the information and identified all UOF related

cases. For UOF cases, E.I.S.S. obtained relevant information (*e.g.,* UOF incident numbers, Facility, Staff names, Staff shield number and classification of all injuries).

**ANALYSIS OF COMPLIANCE**

    The Department has remained in Substantial Compliance with this provision as the required information continues to be shared with Department on a routine basis. This information, of course, is only valuable to the extent that it is reviewed and analyzed by the Department. Accordingly, E.I.S.S.'s work to manage this information and its subsequent assessment of the data provided will help to identify potential trends and patterns that may need to be addressed. E.I.S.S. analyzed the January to March data following prompting from the Monitoring Team and reports it intends to conduct this assessment on a more routine basis going forward.

| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel reports that it continues to provide the Department with a list of all complaints relating to the excessive use of force and requests all investigation files and associated evidence.

- The assigned DOC Legal Division attorney evaluates each use of force allegation received to confirm whether an investigation has already been conducted. If a previous investigation cannot be confirmed, the DOC Legal Division attorney notifies a designated Assistant General Counsel who then shares the information with ID to consider whether a Full ID Investigation is warranted.

- During this Monitoring Period, the Department was not notified of any lawsuits involving alleged excessive force that had not already been subject to an ID investigation.

**ANALYSIS OF COMPLIANCE**

    The Monitoring Team confirmed the above process is still in place. The Department's process to identify via a lawsuit UOF allegations that were not previously investigated is reasonable and adequate and they remain in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | ¶ **5.** Substantial Compliance |
| --- | --- |

| X. Risk Management ¶ 6 (Case Management System) |
| --- |
| V. Use of Force Reporting and Tracking ¶ 18 (Components of Case Management System) |

¶ 6. By August 31, 2017,[166] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

**Department's Steps Towards Compliance**

- The Department maintains a Case Management System that has functionality for tracking use of force incidents and use of force investigations.

- The Department has conducted all Preliminary Reviews, Facility Investigations, and ID investigations in CMS for incidents that occurred on December 13, 2017 or later. The Department also uses CMS to generate and track Command Disciplines.

**Analysis of Compliance**

The development and implementation of the Case Management System was an enormous undertaking by the Department. It required significant coordination across various divisions within the agency and across the Facilities. This system has changed the way the Department conducts investigations and maintains relevant paperwork. The Department achieved Substantial Compliance with these provisions during the Seventh Monitoring Period as they successfully developed a computerized system to conduct use of force investigations and impose related discipline (the system is described in the Sixth Monitor's Report at pgs. 123-124)). Further, CMS created the ability to review and aggregate incident- and investigation-specific information as required by § V. ¶ 18. The Department has maintained Substantial Compliance with this provision as the system meets the technical requirements of these provisions. However, as described in more detail below, the system needs to be modified.

The implementation of CMS has created at least two distinct challenges. The first issue requires the Department to ensure that Staff are assigned to the appropriate workflows to complete their tasks

---

[166] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Dkt. Entry 297).

within CMS. Cases within CMS must be assigned to specific individuals, and if an individual's responsibilities change (due to re-assignment, retirement, etc.) the workflow status for all work assigned to that person must be manually changed by IT. Given the significant turnover of Staff assignments within the Facilities, work assignments (*e.g.,* finalizing MOCs, Command Discipline hearings, investigation sign-offs, etc.) frequently get "lost." As a result, constant vigilance is necessary to ensure workflows are promptly re-assigned. Reassignment does appear to occur more frequently in areas where the Department is strictly scrutinizing the project (*e.g.* Command Disciplines), but in other areas, work can get "lost" when it remains assigned to an individual who is no longer responsible for the particular task.

More importantly, an inherent difficultly with large computerized systems like CMS is that they were built with very specific requirements which are very difficult to change without individuals with specific technological expertise and/or a cost to change the underlying coding. CMS was built with stringent fields and workflows for investigations to address the many specific Consent Judgment requirements in the Use of Force Investigations section of the Consent Judgment, including complex workflows for investigations. The Department spent considerable time in building this system and consulted extensively with the Monitoring Team before the system was finalized. At the time it was implemented, the structure of the system was generally consistent with what the Department and Monitoring Team had agreed was reasonable. However, once implemented, it became clear that some of the requirements in the system inadvertently created inefficiencies. For instance, the ID workflow for Full Investigations has over 150 mandatory questions that must be answered before an investigation can be closed. Given the fluidity of an investigation, this hampers the ability to efficiently close cases that may not require such strict adherence to each piece of information. Further, specific supervisory review requires all layers of sign-off to occur before an investigation can be returned to the investigator to make edits. This is particularly frustrating if the first line supervisor has conducted an initial review of a draft investigation and wants to return it to the investigator before it proceeds up the chain of command.

The long-term sustainability of CMS requires the system have a certain amount of elasticity and to be modified to improve the efficiencies of investigations, address some of the known challenges and the forthcoming recommendations by the Monitoring Team. Unfortunately, the Department does not have the internal capability to make changes within CMS which must be made through the vendor either as change orders (which require additional expense to change items that were previously approved) or changed because they are deficiencies within the system. Either way, contracting issues with the vendor have halted the Department's ability to make any changes to the system.

In the interim, the Department has attempted to devise work-arounds to address some of these issues. While these may be an interim solution, they impact the ability to adequately track data that needs to be captured. Following the close of the Monitoring Period, the Monitoring Team began

| | consulting with the Department about potential modifications that may be needed within CMS to implement some of the Monitoring Team's forthcoming recommendations related to the Non-Compliance notice submitted on June 25, 2019. |
|---|---|
| **COMPLIANCE RATING** | ¶ **6.** Substantial Compliance<br>¶ **18.** Substantial Compliance |

## 8.   STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely accountability is an indispensable element of deterring Staff from using excessive and unnecessary force. The Department's formal disciplinary process is lengthy and the informal disciplinary process is inconsistently applied. Accordingly, the Department is not currently imposing discipline in a meaningful, reliable, or timely manner. As discussed throughout this report, the overwhelming number of use of force incidents and the corresponding backlog of investigations are contributing factors to the delay in the disciplinary process. Further, Trials efforts to issue more charges and impose higher disciplinary outcomes has reduced the overall number of cases closed out by the Division, as discussed in more detail below.

As discussed in the Seventh Monitor's Report (at pgs. 151 to 159), the discipline the Department may impose on Staff through the work of Trials is heavily influenced by the precedent imposed by the Office of Administrative Trials and Hearings ("OATH"). The adjudication of discipline for tenured Staff has been delegated by the Department to OATH, an administrative law court that conducts adjudication hearings pursuant to New York State Civil Service Laws § 75. The range of penalties an Administrative Law Judge ("ALJ") may recommend that the Commissioner impose are set by law and include a reprimand, a fine of up to $100, a suspension without pay of **up to** (but no more than) 60 days, demotion in title, or

termination.[167] The Commissioner has the authority to accept the factual findings and penalty recommendation or to modify them, as appropriate. The Commissioner's determination is subject to appeal to the Civil Service Commission.

The Monitoring Team remains concerned that the tension with OATH precedent results in disciplinary outcomes that are not proportionate with Staff misconduct and impacts the Department's ability to impose meaningful discipline as required by the Consent Judgment. (Seventh Monitor's Report at pgs. 151 to 159). Trials staff report that a large number of disciplinary cases have an initial conference with an Administrative Law Judge to discuss the matter in order to settle the case. In this Monitoring Period, Trials reports that Staff are increasingly requesting an initial conference with an ALJ, rather than settling the case via an NPA as they had routinely done in the last two Monitoring Periods. It appears Staff have determined that the input of the ALJ at the initial conference often leads to a more favorable penalty (ultimately codified in the NPA), and in some number of cases the ALJ may encourage the Trials Division to dismiss the case because it lacks sufficient evidence.[168] These conferences generally can only occur on one day a week and there are a limited number of slots so it can sometimes take months before the initial conference is scheduled. Almost all cases settle via NPA, but for those that do not, even more extensive delays occur when scheduling the trial. Ultimately, it appears that the OATH process is undermining the Department's overall effort to impose meaningful and timely discipline. The Monitoring Team's September Recommendations proposed the City consider ways to address the Monitoring Team's concerns regarding the OATH process.

---

[167] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[168] *See* discussion of administratively filed cases in ¶ 3 below.

The Monitoring Team's assessment of compliance is below.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

¶ 2.

e. If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has various structures to *__identify__* misconduct:
  - Close-in-time to the incident via Rapid Reviews, Preliminary Reviews (and corresponding Facility Referrals), and the Immediate Action Committee.
  - Through Facility investigations and ID investigations.
- The Department has various structures to *__respond__* to misconduct:
  - Corrective interviews, counseling, re-training, Command Discipline, and suspension.
  - Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff *and* PDRs for probationary Staff.
- The Department convenes the Immediate Action Committee to evaluate cases that meet the criteria of ¶ 2(e), as well as other concerning cases, close in time to when they occur. The committee considers whether immediate action should be taken (*e.g.*, suspension, modified duty) as well as whether the case should be expedited for investigation.

### ANALYSIS OF COMPLIANCE

¶¶ 1 and 2(e) are addressed together because when read together, they require timely, adequate, and meaningful discipline. The Identifying and Addressing Misconduct section of this report provides an in-depth assessment of the Department's accountability measures and the current state of affairs. Unfortunately, the Department does not impose meaningful corrective action nearly often enough to achieve compliance with ¶ 1. This is due to the Department's inability to consistently **identify** misconduct, and, even when misconduct is identified, the protracted nature of actually **addressing** the misconduct. While misconduct certainly does not occur in every use of force incident, the Department's findings of misconduct are out of sync with the objective evidence of wrongdoing identified by the Monitoring Team's work. Further, the Department does not maximize Rapid Reviews, Immediate Action and other ad hoc reviews of incidents close in time and thus does not consistently

185

address certain misconduct as soon as possible with suspensions, appropriate discipline, and/or modification of duty.

The Department must increase its use of the assortment of strategies designed to ensure that appropriate, meaningful, and timely discipline is imposed. The response to misconduct does require a spectrum of options, but the Department generally defaults to lower level responses (*e.g.* corrective interview or re-training, and Command Discipline) instead of utilizing suspensions and/or formal discipline. In executing appropriate discipline, the Department must find a balance between using close-in-time responses and lengthier formal discipline when serious misconduct warrants it. The Department must increase its use of close-in-time responses to misconduct, while these may be lower penalties than those that could potentially be sought later, the penalties must be *reasonable.* At the same time, those cases that involve more concerning misconduct must not be left to languish.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Non-Compliance<br>¶ **2(e).** Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgment (see pgs. 25-26 of the Consent Judgment for the full text).

- As of the end of the Monitoring Period, the Trials Division received a total of 338 cases related to incidents that *occurred* between October 27, 2017 and June 30, 2018.[169] Of these, only 60 (18%) were closed by June 30, 2019 (53 closed with NPAs and seven were administratively filed/deferred prosecution).

- During the current Monitoring Period, the Department decided 38 PDRs related to probationary Staff who engaged in misconduct with the following outcomes:

---

[169] As of the end of the Monitoring Period, the most recent case pending with Trials was from August 28, 2018.

| Outcome | # (%) |
|---|---|
| Demotion | 0 (0%) |
| Extension of Probation - 3 Months | 4 (11%) |
| Extension of Probation - 6 Months | 16 (42%) |
| MOC | 2 (5%) |
| Termination | 13 (34%) |
| No Action | 2 (0%) |
| Resignation | 3 (8%) |
| **Total** | **38** |

ANALYSIS OF COMPLIANCE

The Department is required to "act in accordance with the Disciplinary Guidelines." Because the disciplinary process is different for probationary and tenured Staff, the Monitoring Team addresses them separately below.

*Probationary Staff*

The Department has improved its processing of PDRs and many of the issues identified in prior Monitoring Periods have been addressed as described in detail in the Identifying and Addressing Misconduct section of the report. The enhancements to this process and additional layers of oversight have resulted in more reasonable outcomes that are consistent with the requirements of the Consent Judgment. While the Monitoring Team must continue to closely scrutinize this process, it is showing signs of fidelity.

*Tenured Staff*

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together. As discussed in the Seventh Monitor's Report, the Monitoring Team remains concerned about the impact of the OATH process on the Department's ability to impose timely and meaningful discipline (see Seventh Monitor's Report at pgs. 151 to 159).

The number of cases closed by Trials significantly decreased from 202 in the last Monitoring Period to 71 in this Monitoring Period. Within this smaller group of cases, the discipline imposed via NPA demonstrated a reduced reliance on the use of Command Disciplines (which are limited to five compensatory days) and an increase in the proportion of more severe penalties imposed as demonstrated in the chart below.

| Penalty Imposed by NPA by Date of Trials Closing Memo | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 4th Monitoring Period | | 5th Monitoring Period | | 6th Monitoring Period | | 7th Monitoring Period | | 8th Monitoring Period |
| Total | 170 | | 218 | | 281 | | 202 | | 71 |
| Refer for Command Discipline | 23 | 14% | 44 | 20% | 35 | 12% | 30 | 15% | 3 | 4% |
| Retirement or Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 6% |
| 1-10 days | 13 | 8% | 49 | 22% | 109 | 39% | 109 | 54% | 16 | 23% |
| 11-20 days | 37 | 22% | 50 | 23% | 53 | 19% | 24 | 12% | 20 | 28% |
| 21-30 days | 30 | 18% | 36 | 17% | 34 | 12% | 22 | 11% | 9 | 13% |
| 31-40 days | 8 | 5% | 6 | 3% | 15 | 5% | 3 | 1% | 4 | 6% |
| 41-50 days | 16 | 9% | 9 | 4% | 20 | 7% | 11 | 5% | 2 | 3% |
| 51+ days | 35 | 21% | 20 | 9% | 13 | 5% | 0 | 0% | 13 | 18% |

Only 13 of the 71 cases that Trials issued a Closing Memo for in this Monitoring Period took place since the Disciplinary Guidelines came into effect on October 27, 2017. That said, the Monitoring Team evaluated the outcomes of about half of the cases that were closed under the new guidelines and generally found the outcomes to be consistent with the Disciplinary Guideline requirements.

The Monitoring Team's evaluation of *all* discipline imposed via NPAs (meaning cases that occurred since the Effective Date, not just cases occurring on October 27, 2017 or after) remains consistent with other Monitoring Periods with at least half of the cases reviewed appearing to have reasonable outcomes. The outcomes of some cases were questionable, but, in at least some cases, considerations such as progressive discipline, mitigating factors, and imposing swifter discipline could arguably support the reduced penalty. Further, in some cases, certain factors emphasized by OATH precedent (*e.g.* the lack of serious harm inflicted on the inmate was weighted over the risk of serious injury posed by the use of a head strike) appeared to influence what appeared to be a lighter penalty.

To date, only one tenured Staff has been terminated via formal discipline for UOF-related misconduct since the Effective Date.[170] While the Monitoring Team has only identified a few cases that may meet the criteria of the mandatory termination provisions (¶ 2(d)(i) to (iv)), the Department is not limited to seeking termination on the cases that meet the standard enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases (beyond the one termination case) where a penalty of termination could appropriately be sought given the level and/or pattern of misconduct and for the Department to meet its commitment of a zero-tolerance policy for excessive and unnecessary force.[171] The Department's failure to terminate all but one Staff for use of force misconduct certainly suggests that

---

[170] The Department reported that there were a number of cases where the Department intended to seek termination, but the Staff member resigned.

[171] § IV. (Use of Force Policy), ¶3(a)(iii).

full spectrum of disciplinary options are not utilized and, in at least some cases, allows certain Staff to act with impunity.

Overall, the Department's efforts to impose discipline for tenured Staff is mixed. While many of the disciplinary outcomes are reasonable, there still remain cases where the discipline is not proportional to the misconduct.

| **COMPLIANCE RATING** | ¶ 2. (a) to (d) (Develop Guidelines) – Substantial Compliance<br>¶ 2. (a) to (d) (Act in Accordance with the Guidelines)<br>• *Probationary Staff* – Partial Compliance<br>• *Tenured Staff* – Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

    b.    If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

• ID Referral for Discipline

    o  <u>Tenured Staff</u>: When an ID investigator concludes a tenured Staff engaged in misconduct and formal discipline is warranted, the investigator recommends charges in the ID Closing Report, and an MOC is drafted by the ID investigator. The Deputy Commissioner of ID reviews both the Closing Report and the MOC and decides whether to approve or to decline any recommended discipline. The MOC is then forwarded to the Office of Administration, who reviews and signs the MOC and assigns an "MOC number." The MOC is then sent to

Trials. Once Trials obtains a signed MOC and the MOC number, they assess the evidence and draft charges.

- ▪ In an effort to address cases more quickly, ID and Trials will coordinate on certain cases where formal discipline is merited and Trials will draft and serve charges *before* the official MOC is received by Trials in order to move the case forward—a practice which appeared to have increased this Monitoring Period. Once charges are drafted they are served by the Facility where the subject Staff Member is assigned.

- o <u>Probationary Staff</u>: The process for ID to recommend discipline following the close of an investigation is different for probationary Staff. For probationary Staff, if an investigator recommends discipline, the closed investigation packet will also include a draft memo to HR outlining the misconduct and recommended discipline for the probationary Staff Member. Once the memo is approved by the Deputy Commissioner of ID, it is then forwarded to HR for processing (the PDR process is discussed in more detail in the Identifying & Addressing Misconduct section of the report).

- The Facilities refer MOCs to Trials if the investigator found that the case merits charges.
- Trials has continued certain strategies to manage cases:
  - o Trials serves changes as described on pgs. 176-177 of the Fourth Monitor's Report. In cases requiring the service of charges, Trials served <u>*all*</u> 84 charges within 30 days of receiving the MOC. 199 additional charges were served in this Monitoring Period within 30 days of Trials drafting of charges.[172]
  - o Trials continued to emphasize timely service of discovery.
- Trials completed **81** closing memos during this Monitoring Period.
  - o Trials closed 15 cases via Fast Track in this Monitoring Period.
  - o The Off-Calendar Disposition ("OCD") process[173] remained integrated in the Trials work flow and all cases are now evaluated to determine if resolutions can be negotiated without appearing before OATH.
- A total of **407** use of force cases were pending at the end of the Monitoring Period (17 of which are on hold due to pending law enforcement investigations).

---

[172] The date of receipt of MOC is unknown in these cases.

[173] This process was developed in the Fifth Monitoring Period as a strategy to address Trials' backlog and to address cases with charges drafted and served, that are assigned to a Trials attorney, but are not cases where the Department is seeking severe penalties or termination. Trials' attorneys and respondents negotiate cases meeting OCD criteria, circumventing the need to appear at OATH.

o   Based on the Trials Division tracking records, 308 of the 407 cases pending at the end of the Monitoring Period do not yet have official MOCs because they have been referred through SOLStat or Fast Track.[174]

**ANALYSIS OF COMPLIANCE**

*ID Referrals* (¶ 3(a))

The Consent Judgment requires the Deputy Commissioner or Assistant Commissioner to approve any investigations that recommend charges or PDRs within 30 days of the investigation's completion date. The Monitoring Team has found that the final approval of charges or PDR does occur, but there are some delays in review by ID leadership given their significant workload. Further, it is worth noting that the sign-off is often protracted from the date of incident due to the delays in completing the investigation. The Monitoring Team is not aware of any cases where the investigation concluded that charges should be brought and the Deputy Commissioner disagreed with that assessment.

*Facility Referral of MOC to Trials* (¶ 3(b))

The Facilities investigate less severe violations of the Use of Force Policy. However, if misconduct that merits charges is identified through the Facility investigation, the MOC is referred directly to Trials. As noted in the Command Discipline discussion of the Identifying and Addressing Misconduct section of the report, the submission of MOCs related to a CD have been delayed. Accordingly, the Department is in Partial Compliance with this requirement.

*Trials* (¶ 3(c))

-   *Administratively Filed Cases*

The Monitoring Team continues to evaluate all cases that are administratively filed. Cases are administratively filed for a number of reasons such as when the potential misconduct could not be proven by a preponderance of the evidence. All such cases are reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Commissioner of ID.

The Monitoring Team reviewed all eight cases that were closed between January and May 2019 and that had been administratively filed to determine whether Trials' decision not to pursue charges was reasonable, which it was in five of the eight cases. Two cases were administratively filed due to insufficient evidence after an OATH conference in which the ALJ questioned the sufficiency of evidence. In the other three cases, the Respondent provided evidence that exonerated them of the charges.

The determination to administratively file these cases was completed following review by the Commissioner and Chief of Department. While the Monitoring Team may have come to a different conclusion with how to proceed, the ultimate determination not to proceed with discipline was not

---

[174] The fact that the MOC has not yet been received by Trials does not preclude the Trials Attorney from moving forward with the case and serving charges and discovery.

unreasonable given the evidentiary burden at OATH (all three administratively filed cases related to the same Respondent, and were resolved on the eve of his promotion as discussed in more detail in regards to Staff Screening and Selection, ¶¶ 1 to 3 ("Promotions") below). Overall, the Monitoring Team has continued to find that the Department has utilized appropriate judgment when deciding to administratively file cases.

- *Deferred Prosecution*

    The Department defers prosecution if a Staff Member retires or resigns while charges are pending, though the case is re-opened and prosecuted if the Staff Member returns to work. The Monitoring Team has previously reviewed deferred prosecution cases and found the deferrals were appropriate.

- *Expeditious Prosecution of Disciplinary Cases*

    Assessing the expediency of prosecution requires a review of several processes. In order to achieve compliance, Trials must ensure timely service of charges and discovery and must have procedures for timely resolving cases without a trial, since trials require significantly more time and resources. This requires assessing the individual circumstances of each case and having multiple options to move a case forward.

    The Trials Division is struggling to balance the various competing interests of triaging old UOF cases, moving new cases forward, and imposing higher penalties. In this Monitoring Period, there was a significant decline in the number of cases closed while the number of cases pending increased exponentially from 172 cases in the last Monitoring Period to over 400 cases by the end of this Monitoring Period. Trials reports that one reason fewer cases were closed in this Monitoring Period is because Staff were more reluctant to settle cases in the initial phases for higher disciplinary penalties than had been offered previously for other cases. As reported in the Seventh Monitor's Report, certain cases were closed in the last Monitoring Period with lighter penalties than merited in an effort to close cases more timely. This then had a corresponding impact on the expectations of Staff that had to be recalibrated in this Monitoring Period as Trials attempted to impose more proportional discipline. Accordingly, Staff requested more OATH conferences which take longer to schedule and protract the finalization of discipline. These initial conferences essentially serve as settlement conferences and Trials generally resolves cases after these conferences (hence the small number of subsequent Trials). Further, Trials reported that fewer cases assigned to them could be addressed through the Fast Track process. This particular rationale does not comport with the Monitoring Team's assessment of cases meriting discipline. Of those cases that involve misconduct, there are a substantial number of cases with objective evidence that could reasonably be addressed through Fast Track. It does appear that the Monitoring Team and Trials leadership may have different views on which cases may be suited for Fast Track, which will be addressed in the next Monitoring Period.

- **Service of Charges**

The Trials Division has maintained a consistent, reliable, and sustainable process to timely serve charges since January 2017. All charges served during this Monitoring Period were served within 30 days as required. Accordingly, Trials has maintained Substantial Compliance with this requirement.

- *Service of Discovery*

The service of discovery appears to have significantly diminished. Discovery has only been served in about 33% of the 84 cases in which an MOC was received in this Monitoring Period as demonstrated in the chart below. Further, discovery has not been served in the majority of the approximately 300 cases that are pending with Trials as of the end of the Monitoring Period that do not have an MOC. That said, Trials reports that an error in its own internal tracking system resulted in dates for the service of certain discovery not being recorded. Accordingly, Trials reports that the available data underreports the amount of discovery served. Trials reports that this error will be corrected in the next Monitoring Period. The Monitoring Team will also more closely scrutinize this issue going forward.

| Date of MOC | Total | Pending (blank in discovery column) | Fast Track | 01 to 29 Days | 30 to 60 Days | 61 to 119 Days | 120 to 180 Days | Greater than 180 days | Closed before Discovery Served |
|---|---|---|---|---|---|---|---|---|---|
| Jan - June 2019 | 84 | 47 | 0 | 6 | 5 | 3 | 6 | 8 | 9 |
| | | 56% | 0% | 6% | 6% | 4% | 7% | 10% | 11% |

- *Status of Closed Cases*

The majority of cases continue to be resolved via NPA. The number of cases administratively filed continues to remain small suggesting improved assessment and coordination with ID before cases are recommended for discipline. Further, the number of not guilty verdicts remain a rare occurrence.

| Cases Closed by Trials by Date of Closing Memo | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | | Seventh Monitoring Period | | Eighth Monitoring Period |
| Type of Case Closure by date of Trials Closing Memo | 230 | | 256 | | 301 | | 219 | | 81 |
| NPA | 170 | 74% | 216 | 84% | 279 | 93% | 202 | 92% | 71 | 88% |
| Administratively Filed | 47 | 20% | 29 | 11% | 17 | 6% | 9 | 4% | 4 | 5% |
| Deferred Prosecution | 12 | 5% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 7% |
| Guilty Verdict | 1 | 0% | 3 | 1% | 1 | 0% | 2 | 1% | 0 | 0% |
| Not Guilty Verdict | 0 | 0% | 0 | 0% | 2 | 1% | 1 | 0% | 0 | 0% |

- *Time Cases are Pending & Time to Close Cases*

The time to impose discipline has not only increased, but a new backlog has emerged. Trials certainly has the ability to encourage an efficient processing of cases within the division. That said, the Trials Division does not have exclusive control in managing its caseload. For instance, if a case

requires and/or a Staff Member requests an initial (or subsequent) conference before OATH then this must be scheduled with OATH which can protract the process because OATH generally only provides conference time slots once a week for about 10 cases. Further, certain cases may be on hold while they are being evaluated by law enforcement, which can often be a protracted process as described in ¶ 3 of the Use of Force Investigations section of this report.

The number of pending cases has increased as of the end of the current Monitoring Period, a total of 407 cases were pending (more than double the number of cases pending as of the end of the last Monitoring Period (n=172)). Of these, only 99 have an MOC date so the time pending with Trials can only be assessed for this group of cases.[175] Of these 99 cases, nine cases are on hold because they are pending with law enforcement. The other 90 cases have been pending with Trials as follows: 30 (33%) cases pending less than 120 days (the same deadline for ID investigations), 30 (33%) cases pending between 120 days and six months (the original deadline for ID investigations), 11 (13%) cases pending between six months and 12 months; and 19 (21%) cases pending over one year.[176]

Regarding closed cases, the number of closed cases decreased in this Monitoring Period. An issue with Trials tracking data resulted in the fact that 41% of the cases closed could not be evaluated for how long they took to make their way through Trials. Of those that could be tracked, only a fraction closed within three months of the MOC date.

| Cases Closed by Trials by Monitoring Period (Time between Receipt of MOC and Signed Closing Memo Date) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closing Memos completed | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | | Seventh Monitoring Period | | Eighth Monitoring Period | |
| Total | 232 | | 260 | | 310 | | 240 | | 81 | |
| MOC received after closing memo submitted | | | | | | | | | 2 | 2% |
| 0 to 3 months | 28 | 12% | 40 | 15% | 146 | 47% | 166 | 69% | 15 | 19% |
| 3 to 6 months | 24 | 10% | 40 | 15% | 74 | 24% | 26 | 11% | 8 | 10% |
| 6 to 12 months | 48 | 21% | 76 | 29% | 34 | 11% | 31 | 13% | 12 | 15% |
| 1 to 2 years | 61 | 26% | 85 | 33% | 41 | 13% | 11 | 5% | 6 | 7% |
| 2 to 3 years | 53 | 23% | 17 | 7% | 6 | 2% | 3 | 1% | 0 | 0% |
| 3+ Years | 18 | 8% | 2 | 1% | 9 | 3% | 3 | 1% | 5 | 6% |
| Unknown | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 33 | 41% |

[175] The Department was unable to provide data on when the other 308 cases were assigned to Trials for prosecution.

[176] The majority of cases pending over one year either were awaiting an OATH decision or were recently returned from law enforcement. Trials is asked to hold any discipline in abeyance until Law Enforcement officials complete their assessment to determine whether criminal charges may be brought.

- *Fast Track and OCD Cases*

The Fast Track and OCD process have demonstrated that cases can and should be resolved more expeditiously. Approximately half of the cases closed in this Monitoring Period were closed via Fast Track or OCD. However, the small overall number of cases closed by Trials given the large docket does suggests that Trials is not utilizing the Fast Track and OCD processes as much as they could. Accordingly, the Monitoring Team intends to scrutinize the causes of this problem in the next Monitoring Period. Further, the Monitoring Team intends to consult with Trials leadership to identify potential initiatives to jump-start improved imposition of discipline.

- *Approval of Trials Closing Memos*

A closing memo must be drafted to close each case at Trials. The Monitoring Team evaluated the time required to draft, edit, and finalize the memo and for the Deputy General Counsel[177] to approve them to determine if the time frame is reasonable. During this Monitoring Period, 60% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within one month of the NPA being executed. The time to complete closing memos continues to increase over Monitoring Periods. While the time to complete most closing memos still is in the realm of a reasonable period of time, any further delays will be cause for concern. Accordingly, the Monitoring Team encourages Trials to continue to refine this process to ensure the majority of closing memos are completed within a month whenever possible.

- _Conclusion_

The work within the Trials Divisions is only going to increase given the rising number of UOF incidents and planned efficiencies in closing ID investigations. Accordingly, it is critical for Trials to find a balance to address cases in a timely manner that is proportional to the misconduct. Compared with prior Monitoring Periods, fewer cases were closed in a longer period of time while the number of pending cases continued to grow. The Intake Squad (see the Use of Force Investigations section of this report) is expected to improve the coordination of ID and Trials, which should result in more timely and consistent dispositions. The Monitoring Team's September Recommendations, submitted following the close of the Monitoring Period, also outlined a number of steps to improve the ability to hold Staff accountable close-in-time to the incident.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3(a)**. Partial Compliance<br>**¶ 3(b)**. Partial Compliance<br>**¶ 3(c)**.<br>  • Substantial Compliance (Charges)<br>  • Substantial Compliance (Administratively Filed) |

---

[177] Closing Memos were signed by a Trials Director until the new Deputy General Counsel for Trials was hired early in the Monitoring Period.

| | • Partial Compliance (Expeditiously Prosecuting Cases) |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, three Directors, 20 attorneys, and 14 support staff.
- During this Monitoring Period, a Community Coordinator and Legal Coordinator were hired and joined the division. Three Agency Attorney III offers were accepted and pending pre-employment processing as of the end of the Monitoring Period.
- As of the end of the Monitoring Period, the Department is continuing to recruit for two legal coordinators, an Agency Attorney IV, and a Director position.
  - Additionally, in mid-June 2019, the City granted the Department's request for an additional 62 staffing lines for the Investigations and Trials Division—including Agency Attorneys—to execute the Intake Squad plan, as described in the Investigations section of this report.

**ANALYSIS OF COMPLIANCE**

The staffing size of the Trials Division was static in the Eighth Monitoring Period, but as the Trials caseload is expected to increase dramatically due to forthcoming initiatives like the backlog plan and the Intake Squad, significant effort must be expended in recruiting and hiring additional staff in the Ninth Monitoring Period to execute those initiatives and meet the obligations of the Consent Judgment. Therefore, the Monitoring Team encourages the Department to maintain or increase its recruiting efforts to ensure the Department attracts the best possible candidates.

| **COMPLIANCE RATING** | **¶ 4.** Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The process to approve NPAs was modified in this Monitoring Period. All NPAs continue to be reviewed and approved by the Deputy General Counsel of Trials. The NPAs are then forwarded to the Deputy Commissioner of ID instead of the Deputy Risk Manager who resigned partway through this Monitoring Period. The Deputy Commissioner of ID sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for processing.

- 84 NPAs were approved by the Commissioner during this Monitoring Period. The approval process by the Deputy Commissioner of ID and the Commissioner was completed within one month for 81% of the cases, within two months for 17% of cases, and two cases were closed beyond two months.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assesses the Department's efforts to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) and to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) together in the ¶ 2 box above. The Department's process for approving NPAs continues to be efficient and timely even with the change in oversight. This review necessarily takes time given its importance and the significant responsibilities of the Deputy Commissioner of ID and the Commissioner. That said, the Deputy Commissioner of ID completed her review within one month for 87% of cases and the Commissioner completed her review and approval within three weeks in 98% of cases (with the overwhelming majority completed in one week). The Department remains in Substantial Compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 5. Disposition of NPAs and Recommendations to OATH Judges:** Partial Compliance<br>**¶ 5. Approval of NPAs:** Substantial Compliance |

## 9. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) or assignment to Special Units (¶¶ 4, 5). This section also requires the Department to consider a Staff Member's assignment on a Special Unit after being disciplined (¶ 6) and more generally whether a Staff Member should be re-assigned or placed on non-inmate contact after a Staff Member has been disciplined multiple times (¶ 7).

The Monitoring Team's compliance assessment is outlined below.

| |
|---|
| **XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)** |
| ¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the<br>      (a) [Use of Force history for the last 5 years]<br>      (b) [Disciplinary history for the last 5 years]<br>      (c) [ID Closing memos for incidents in the last 2 years]<br>      (d) [Results of the review are documented] |

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department addresses the requirements of ¶¶ 1 to 3 in Directive 2230, Pre-Promotional Assignment Procedures. Directive 2230 was revised during this Monitoring Period, in consultation with the Monitoring Team. The revised policy was finalized at the end of the Monitoring Period. The revisions to the policy include:
  - The Legal division will conduct a comprehensive assessment of a Staff's disciplinary record to ensure compliance with ¶ 2 and a Legal screening form was developed to document the outcome of this review.
  - The E.I.S.S. Division will now be afforded the opportunity to provide relevant information about a candidate's involvement with the program to the extent that information is available. A screening form was developed for E.I.S.S. to provide this information.
  - The screening forms will now be valid for the following time periods: four years for promotion to Warden, one year for promotion to Deputy Warden and until the promotion of the next class for ADWs and Captains.
- The Department has promoted the following Staff after conducting the necessary screening:

| | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 |
|---|---|---|---|---|---|
| Captains | 79 | 102 | 0 | 97 | 0 |
| ADWs | 0 | 4 | 13 | 0 | 3 |
| Deputy Wardens | 0 | 5 | 1 | 2 | 8 |
| Wardens | 2 | 0 | 3 | 4 | 1 |
| Chiefs | 2 | 1 | 1 | 1 | 2 |

- During this Monitoring Period, the experience requirement for promotion to Captain was increased from two to three years.

**ANALYSIS OF COMPLIANCE**

Strong leadership is crucial to the Department's efforts to reform the agency. The Monitoring Team continues to emphasize that the Staff the Department chooses to promote sends a message to line Staff about the leadership's values, the culture it intends to cultivate and promote, and their behavior sets an example for Officers. As noted throughout this report, there is a vacuum of strong and adequate leadership.

The screening requirements of the Consent Judgment were developed to guide the Department in identifying Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a Staff Member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including the screening requirements of this section of the Consent Judgment, and is depicted in *Appendix C: Flowchart of Promotions Process*.

*Assessment & Selection of Staff for Promotion*

The assessment of a Staff Member's use of force and disciplinary history is an important aspect of a candidate's fitness for promotion, and problematic use of force and disciplinary history may suggest a Staff Member is not suitable for a leadership position. These considerations are generally most relevant when considering promotions to either Captain or ADW as candidates for these positions were more recently in positions where they may have engaged in hands-on force. Candidates for promotions to Deputy Warden and above often do not have a relevant use of force or disciplinary history during the screening period because they are less likely to have engaged in hands on force in these roles in the time frame assessed.

On the other hand, the fact that a candidate does not have a history of problematic or concerning use of force or discipline, does not necessarily suggest a Staff Member is suitable for a leadership position and advancing reforms within the agency. The Department's limited ability to identify misconduct and impose appropriate discipline also limits the Department's ability to accurately assess the candidate's fitness for a position. Of course, improvements in the Department's ability to identify and impose timely discipline will mitigate this concern. Further, over the last five Monitoring Periods, the Monitoring Team has identified at least 12 promotions of Staff that cause concern. Of these 12 promotions, only a small number actually contravened the requirements of the Consent Judgment, but in others, the Monitoring Team had concerns about the candidate's suitability for promotion.[178]

---

[178] See the Fourth Monitors' Report at pgs. 187-188, Fifth Monitor's Report at pgs. 130-131 and Seventh Monitor's Report at pgs. 174-175.

In this Monitoring Period, the promotion of one Staff Member serves as an illustrative example of how the screening process can raise questions about a candidate's fitness for promotion.[179] As an initial matter, the Staff Member's disciplinary history met the criteria of ¶ 2 because the individual pled guilty three times in the past five years of specifically enumerated UOF misconduct. In this case, promotion of the Staff Member is prohibited unless the Commissioner documented the exceptional circumstances meriting promotion. While the Department reported significant consideration was given to this promotion, a written memo of the exceptional circumstances was not drafted until the Monitoring Team reminded the Department of its obligation to document this decision-making.

Not only did the Staff Member's promotion appear to conflict with the requirements of ¶ 2, but the Staff Member had five formal disciplinary charges pending that were resolved on the eve of the promotions decision and at least one investigation pending that may result in discipline. Charges for the five pending disciplinary matters were all disposed of just prior to the individual's promotion—two resulted in an NPA-CD, and three charges were administratively filed. The two cases resulting in an NPA-CD were relatively light penalties for the misconduct. However, the more concerning outcomes were the three cases that were administratively filed. In these cases, the Staff Member utilized expletives in addressing an inmate in one of the cases, and was charged with using unnecessary OC Spray in the two other cases. These three cases were subject to significant scrutiny and discussion among DOC leadership and it was ultimately concluded the charges for these three cases could not be proven by a preponderance of the evidence. This ultimate outcome was questionable as there appeared to be objective evidence of wrongdoing, but it could arguably have been difficult for the Department to prevail at OATH. While the outcome was questionable, the ultimate determination not to proceed with discipline was not unreasonable given the evidentiary burden at OATH. Finally, prior to promotion, the Staff Member was involved in at least one UOF incident in which it appears the individual precipitated the force with the inmate. This case remains a pending investigation, but certainly raises the possibility that additional discipline may be imposed. Although the promotion of this Staff Member did not violate the specific terms of the Consent Judgment, the promotion of this individual raised concerns about the culture the Department is trying to promote.

During this Monitoring Period, the Monitoring Team also analyzed 54 UOF incidents from January 2018 to May 2019 that involved 10 of the 12 Staff Members whose promotion caused potential concern to the Monitoring Team (2 promoted Staff were not involved in UOF during this time). 38 (70%) of the 54 UOF did not present issues either with the Staff's supervision of the incident or the

---

[179] Although the Staff Member was *promoted* in the Eighth Monitoring Period, the screening for this Staff Member occurred in the prior Monitoring Period and was discussed in the Seventh Monitor's Report at pg. 174.

hands on force used in the incident was not concerning or the Staff's supervision or was unrelated to any concerning force that occurred in the incident.[180] 16 (30%) of the 54 incidents raised potential concerns and involved 7 of the 12 Staff Members. The involvement of the Staff Member either raised concerns about their supervision of the incident or the force they employed potentially violated the UOF policy. For six of the seven Staff, these incidents occurred after they were promoted. Two of seven Staff have been disciplined (one was suspended by the Immediate Action Committee and the other was suspended and then demoted via PDR). The remaining five Staff were involved in eleven incidents, eight of which are still pending. The three closed investigations closed with no findings of misconduct. These findings demonstrate that these Staff would benefit from close supervision and guidance to ensure their conduct is within guidelines and they are adequately supervising and managing their subordinates. The Monitoring Team intends to continue to scrutinize any incidents involving these Staff and recommends the Department conduct a similar assessment.

As the Monitoring Team has long noted, the Consent Judgment requirements must be considered holistically and if a Staff Member is not recommended for promotion based on the screening, then that recommendation should be given considerable weight (even if it does not meet one of the Consent Judgment triggers). The Department has reported it will consult with the Monitoring Team in the next Monitoring Period about potential enhancements to the screening process to ensure that all recommendations for promotions are adequately considered and addressed. In particular, how best to address circumstances when a candidate for promotion is not recommended for promotion and how that recommendation should be addressed if leadership ultimately determines to promote that Staff Member.

*Assessment of Screening Materials*

To verify that the Department screened and promoted Staff according to these criteria, the Monitoring Team reviewed the screening documentation for the 14 Staff screened for promotion to ADW, DW, Warden and Chief. The Department promoted all candidates screened for these positions except one Staff screened for ADW who was ultimately not promoted. The Monitoring Team also reviewed the screening documentation for this Staff Member.

*Review of Candidates* (¶ 1)

The Monitoring Team's review of the screening materials found that the Department's assessment of each candidate satisfied the requirements of the "Review" as defined by ¶ 1. The screening forms completed for most of these candidates revealed that they did not have extensive use of force or disciplinary histories that implicated the standards identified in this requirement. This is not surprising as most of the Staff promoted during this Monitoring Period have been in senior positions

---

[180] Three incidents could not be assessed because there was no video and they were allegations or the incident had no evidence the Staff member in question was involved based on the preliminary review.

for at least a few years (as required by policy). In these roles, most of the Staff have not engaged in hands on force for many years and so their records are unlikely to meet the threshold for disqualification. That said, the background for each candidate was reviewed and documented on the screening forms by the relevant divisions, with all but two being recommended for promotion. These Staff were not recommended for promotion by ID or Trials (one because the Staff Member met the requirements of ¶ 3 and the other was not recommended for other reasons).[181] Despite not being recommended, no explanation was provided in the screening documentation for why the Staff Members were promoted anyway. Overall, the reviews completed by the Department demonstrated that the Divisions charged with screening reviewed the information and utilized discretion in making their recommendations for promotion. Accordingly, the Department remains in Substantial Compliance with this provision.

During this Monitoring Period, the Department addressed the Monitoring Team's recommendation to leverage the work of E.I.S.S. to further enhance the screening and assignment process by seeking input from E.I.S.S. prior to promoting Staff. The Department developed a screening form for E.I.S.S. to provide information on Staff Members who have worked with E.I.S.S. This information is incredibly insightful and provides additional context into a Staff Member's suitability for promotion. This addition to the screening process was incorporated into the policy that was finalized at the end of the Monitoring Period and will be implemented in the Ninth Monitoring Period.

The Department also implemented a standard process to ensure that the screening occurs as close in time to promotion as practicable so that the decision maker has the most current and relevant information for the basis of their decisions. The screening and promotion processes cannot occur simultaneously, so inherently there is a lag between the completion of the screening forms and the Staff Member's promotion. Accordingly, the screening forms are valid for four years for promotion to Warden, one year for promotion to Deputy Warden and until the promotion of the next class for ADWs and Captains. If the Staff Member is to be considered for a promotion beyond that time frame, the screening forms must be updated before a determination on whether to promote.

_Disciplinary History_ (¶ 2)

The Monitoring Team found that none of the Staff who were promoted had two or more guilty findings that met the criteria of ¶ 2. The Department continued to use the more ad hoc screening process to evaluate the imposition of discipline as described in the Seventh Monitor's Report, which does not allow for a holistic assessment of formal discipline along with PDRs and Command

---

[181] Of the 78 promotions reviewed by the Monitoring Team since 2018, ID and/or the Trials division has not recommended Staff for promotion in five cases and yet those Staff Members were still promoted. On the other hand, Trials did not recommend promotion in at least six additional cases and those Staff Members ultimately were not promoted.

Disciplines. That said, the Monitoring Team's evaluation of available documentation and data did not reveal any promotions that would have been called into question under ¶ 2 because of Command Disciplines and/or PDRs that had been imposed. Accordingly, the Department remains in Substantial Compliance with this provision.

During the Seventh Monitoring Period, the Department enhanced its screening procedures to address the Monitoring Team's concerns that all relevant disciplinary records (including PDRs and Command Disciplines) are considered together as part of the assessment (see the Seventh Monitor's Report at pg. 175). During this Monitoring Period, the Department decided that the Legal Division's screening form would include a holistic assessment of the candidate's disciplinary record and review all relevant PDRs, Command Disciplines, and NPAs to determine if the candidate's record met the requirements. An Administrative Associate is responsible for gathering the underlying disciplinary documentation related to each Staff Member being screened and will provide the information to the lawyer in the Legal Division who completes the screening form. The Legal Division is appropriately situated to conduct this assessment given its access to these records that are otherwise maintained by separate Divisions. The new process is expected to be more efficient and improve the integrity of the assessment. The Department remains in Substantial Compliance with this provision.

*Pending Disciplinary Matters (¶ 3)*

With one exception, all Staff Members promoted during this Monitoring Period did not have pending disciplinary charges at the time of promotion. The one exception was promoted to Deputy Warden prior to a pending disciplinary matter's resolution. The discipline was subsequently imposed about two months after the promotion. The Staff Member did not have any other disciplinary record. The Department must remain vigilant about pending disciplinary matters when making promotion decisions. That said, the Department routinely screens Staff as required by this provision and has only violated this requirement on one occasion.[182] Accordingly, the Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
| --- | --- |
| | ¶ 2. Substantial Compliance |
| | ¶ 3. Substantial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises

---

[182] The Department resolved pending disciplinary matters for five candidates who were subsequently promoted shortly after the resolution of their disciplinary matter (see Monitor's Fourth Report at pgs. 187 to 188).

concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 10/17 "Awarding Job Assignments within a Command," remains in effect and addresses the requirements of ¶¶ 4 to 6.

- The Chief's Office, with support from NCU, centralized the administration of screening of Staff for posts on Special Units. An excel chart was created for the Facilities to identify Staff to be screened. The excel chart was then used to track the outcome of the screening assessment. The Department determined that the assessment of the Staff Member's disciplinary history would be based on the 22R form which already contains the Staff Member's disciplinary history, rather than obtaining separate screening forms from various divisions.

- The Department completed the following screening for Special Units in this Monitoring Period:

| Facility | Units | Number of Staff Screened | Number of Staff Assigned | Number of Staff Screened Out |
|---|---|---|---|---|
| AMKC | MO, CAPS, PACE | 145 | 145 | 0 |
| EMTC | MO | 11 | 11 | 0 |
| GRVC | ESH, RHU, P-SEG, MO, Secure | 170 | 162 | 6 |
| OBCC | ESH, MO | 160 | 158 | 1 |
| RMSC | RHU, MO, Nursery, Rover, Transgender Unit | 43 | 43 | 0 |
| RNDC | TRU, Second Chance, MO | 55 | 54 | 1 |

## ANALYSIS OF COMPLIANCE

### *Screening for Assignment to Special Units (¶¶ 4, 5)*

In this Monitoring Period, the Department streamlined the screening process for Special Units to address the significant delays in screening Staff as described in the Sixth and Seventh Monitor's Reports (at pgs.138 and 177 respectively). The Bureau Chief and NCU worked together to develop the process described above. Once all Staff to be screened were identified, the Facilities screened the Staff

204

to determine whether appointment to these posts was appropriate. It is certainly progress that this screening process has started. NCU plans to audit the outcome of these screening determinations in the next Monitoring Period.

Following the close of the Monitoring Period, the Department provided the Monitoring Team with the screening assessment completed for Staff who were already assigned to Special Unit posts, which the Monitoring Team intends to evaluate in the next Monitoring Period. Although a substantive assessment of the screening process has not yet been completed, it is worth noting a very limited number of Staff were reassigned as a result of this screening process (as demonstrated in the table above). This certainly raises questions about whether the screening process is occurring with fidelity and/or the screening criteria is an appropriate measure to determine post assignment. The Monitoring Team intends to consider both of these questions when the screening materials are scrutinized in the next Monitoring Period. The Monitoring Team has not provided a compliance rating for these two provisions as a more comprehensive assessment of the Department's efforts to achieve compliance is needed before a compliance rating can be made.

*Reassignment of Staff following Disciplinary Action* (¶ 6)

The Department has not yet implemented this provision. Following the close of the Monitoring Period, the Department provided the Monitoring Team with its plans to operationalize this requirement and that process was subsequently implemented. The Monitoring Team will conduct an assessment of this evaluation in the next Monitoring Period.

| COMPLIANCE RATING | ¶ **4.** Not Rated |
| | ¶ **5.** Not Rated |
| | ¶ **6.** Non-Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 7 (REVIEW OF ASSIGNMENTS OF STAFF DISCIPLINED MULTIPLE TIMES)

¶ 7. The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department screened Staff who met the 2-in-5 threshold (outlined in ¶ 7) during the Eighth Monitoring Period using a revised and streamlined process for identifying and tracking the screening outcomes, developed in consultation with the Monitoring Team.

- o On a bi-monthly basis E.I.S.S. staff utilize the Trials Division's UOF discipline tracking chart (in conjunction with information from IRS and hard copy Trials files) to identify any Staff who meet the threshold of 2 dispositions within 5 years. E.I.S.S. staff then conduct a qualitative assessment of the incidents to determine whether they meet all the specific criteria of ¶ 7.

- o E.I.S.S. provides the list of Staff that meet the threshold to the appropriate Warden of each Facility in order to assess whether that Staff Member should be reassigned to positions with more limited inmate contact. This information is then returned to E.I.S.S. to track and review.

- o The outcomes of the Staff that met the threshold and the Department's assessment of this screening are outlined below.

| Disciplinary Time Period Evaluated | Screening Evaluation Completed | Total number of Staff who were identified as meeting the 2 in 5 criteria & post was evaluated[183] | Staff placed on limited inmate contact based on assessment | Staff already on limited inmate contact prior to assessment | Staff were deemed suitable for their current post |
|---|---|---|---|---|---|
| Through January 2018 | July 2018 | 35 | 5 (14%) | 19 (54%) | 11 (31%) |
| Through May 2018 | July 2018 | 37[184] | 12 (32%) | 12 (32%) | 13 (35%) |
| Through August 2018 | November 2018 | 15[185] | 3 (20%) | 8 (53%) | 4 (27%) |
| **Total Evaluated** | **7th Monitoring Period** | **87** | **20 (23%)** | **39 (45%)** | **28 (32%)** |
| Through October 2018 | March 2019 | 32[186] | 1 (3%) | 9 (28%) | 22[187] (69%) |
| Through January 2019 | April 2019 | 19[188] | 0 (0%) | 5 (26%) | 14 (74%) |

---

[183] As of the October 2018 screening, there were 14 Staff who met the 2-in-5 threshold but were not screened for their assignment because they were no longer with the Department, on medical leave or temporarily assigned to the Correction Academy.

[184] The number of Staff the Department identified was overinclusive than what was required.

[185] *See id*.

[186] *See id*.

[187] These numbers were the results of a qualitative assessment by the Monitoring Team and may not capture reassignments that occurred in earlier rounds of screening.

[188] 14 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

| Through March 2019 | April 2019 | 2[189] | 1 (50%) | 0 (0%) | 1 (50%) |
|---|---|---|---|---|---|
| **Total Evaluated** | **8th Monitoring Period** | **53** | **2 (4%)** | **14 (26%)** | **37 (70%)** |

ANALYSIS OF COMPLIANCE

The 2-in-5 screening process is complex and time consuming. The Monitoring Team provided significant technical assistance during this Monitoring Period to support the development of a more streamlined review of the disciplinary information to efficiently identify Staff who meet the threshold.

The Department's original approach to screening was inefficient, cumbersome, and required significant coordination and oversight. As a result, worrisome lags in screening occurred. During this Monitoring Period, the Department implemented a more streamlined process to conduct this assessment on a routine basis. E.I.S.S. now manages the process of identifying the Staff who meet the threshold and coordinates with Facility leadership to ensure the Staff Member's post assignment is properly re-evaluated.

*Identification of Staff who met the 2-in-5 threshold*

All Staff who met the 2-in-5 threshold between January 2018 and March 2019 have now been identified through the end of the Monitoring Period. Given the complexity in identifying Staff that met the threshold, the Department has often identified and screened Staff beyond what is required by this provision. The revised process implemented by the Department streamlined the identification process, so the Staff identified for screening was more reliable and only a small number of Staff were identified for screening beyond those that are required to be screened. The Monitoring Team found that E.I.S.S.' most recent screening of Staff demonstrated marked improvement and all Staff were correctly identified as meeting the 2-in-5 threshold.

*Review of Assignments for Staff who met the 2-in-5 threshold*

The Monitoring Team reviewed the Facilities' assessments of post assignments for the 53 Staff who met the 2-in-5 threshold and were reviewed in March and April of 2019. The outcomes were reasonable for the most part. The majority of Staff had either previously been reassigned through other avenues to limited inmate contact or they were deemed suitable for their current post. Only one Staff Member was reassigned as a result of this screening.

*Conclusion*

A total of 177 Staff have been identified as meeting the 2-in-5 threshold since this process began in early 2018. Facility leadership elected to keep 69 of the 177 Staff (39%) in their current posts. Another 58 Staff (33%) had already been placed on modified duty or re-assigned before the assessment

---

[189] 1 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

occurred. Only 22 Staff (12%) were placed on modified duty or re-assigned as a result of this assessment. This is a significant expenditure of resources for what appears to result in very little modification to the assignment and deployment of Staff. The Monitoring Team intends to consider whether this current process is achieving the desired effect or whether a modification is necessary to ensure that post assignments are appropriate while ensuring the Department's resources are deployed most effectively.

| **COMPLIANCE RATING** | **¶ 7.** Partial Compliance |
|---|---|

### 10. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The provisions in the Staff Recruitment and Selection section of the Consent Judgment focus on developing and maintaining a robust program to recruit new Staff to the Department (¶ 1) and the subsequent criteria to ensure that new Staff are appropriately screened and vetted during the hiring process and the two-year probationary period after hiring (¶¶ 2 and 3).

The Department's Correction Officer Recruitment Unit ("Recruitment Unit") and Applicant Investigation Unit ("AIU") continued their coordinated effort to identify and select qualified Staff to meet the Department's staffing needs. Over the last four years, these units have worked together to improve their practices and procedures in order to recruit a qualified candidate pool. This was particularly important given the Department's significant hiring effort beginning in 2015, which happened to coincide with the Effective Date of the Consent Judgment. As outlined in the graph and table below, 6,057 new Officers have graduated from the Training Academy since 2015 (5,561 graduated since November 1, 2015). The hiring over the last four years almost tripled compared to the prior four-year period (6,057 compared with between 2,603 from 2009 and 2014). The Department reports that they are not currently planning to recruit additional Correction Officers in the foreseeable future.



| Number of Officers Graduated from Training Academy Broken Down by Graduation Month | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Academy Class Graduation Date** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Total** | 212 | 0 | 398 | 863 | 645 | 485 | 1,099 | 1,329 | 2,044 | 1,213 | 382 |
| **Breakdown by Class Month** | 212 (Dec.) | 0 | 198 (Apr.) 200 (Sep.) | 260 (Apr.) 309 (Aug.) 294 (Dec.) | 306 (Apr.) 339 (Aug.) | 342 (Jan.) 143 (Aug.) | 144 (Feb.) 363 (June) 592 (Dec.) | 618 (May) 711 (Nov.) | 900 (May) 1,144 (Nov.) | 815 (June) 398 (Dec.) | 382 (July) |

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Recruitment Unit conducted outreach to potential candidates through career fairs and community events, participating in 303 such events during this Monitoring Period, including 20 diversity events.

- The Department continues to maintain a strong social media presence on Facebook, Twitter, Instagram and YouTube, and continues to obtain an adequate number of Department of Citywide Administrative Services ("DCAS") exam filers and takers.

**ANALYSIS OF COMPLIANCE**

In this Monitoring Period, the Department demonstrated that it has continued to consistently employ a recruitment program that is creative and thoughtful and attracts a large qualified applicant pool. The Department has maintained Substantial Compliance with the requirements of this provision since the Effective Date of the Consent Judgment for all eight Monitoring Periods (November 2015-June 2019).

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- AIU continues to process potential candidates by conducting in-depth background checks, medical and drug screening, and agility and psychological assessments that reference detailed standards as described in the first four Monitor's Reports.[190]

- AIU screened 1,733 potential candidates to fill the Academy class that graduated in July 2019. It is important to note that the screening and consideration of some candidates may occur across multiple recruit classes and the outcome of that candidate's selection process is only reflected for the class when the selection decision is finalized:

---

[190] *See* First Monitor's Report (at pgs.115-117); Second Monitor's Report (at pgs. 157-159); Third Monitor's Report (at pg. 244), and Fourth Monitor's Report at (at pgs. 192-196).

| ACADEMY GRADUATION DATE | Dec. 2015 | May 2016 | Nov. 2016 | May 2017 | Nov. 2017 | May 2018 | Dec. 2018 | July 2019 |
|---|---|---|---|---|---|---|---|---|
| **Total number of candidates screened**[191] | 2,222 (100%) | 2,473 (100%) | 2,283 (100%) | 3,441 (100%) | 3,306 (100%) | 3,330 (100%) | 1,974 (100%) | 1,733 (100%) |
| **Total number of candidates approved for hire**[192] | 630 (28%) | 665 (27%) | 746 (33%) | 950 (28%) | 1,220 (37%) | 864 (26%) | 440 (22%) | 415 (24%) |
| **Total number of candidates disqualified based on medical screening** | n/a[193] | | 120 (5%) | 135 (4%) | 177 (5%) | 88 (3%) | 81 (4%) | 82 (5%) |
| **Total number of candidates disqualified based on Psychological screening** | | | 71 (3%) | 92 (3%) | 183 (5.5%) | 182 (5.5%) | 196 (10%) | 345 (20%) |
| **Total number of candidates disqualified based on background investigation screening** | | | 42 (2%) | 53 (1.5%) | 6 (<1%) | 101[194] (3%) | 5 (<1%) | 68 (4%) |

- At the end of the Sixth Monitoring Period, AIU promulgated policies relating to Third-Party Employment Verifications and Field Team Visits as recommended by the Monitoring Team.

- During the Eighth Monitoring Period AIU finalized and distributed an AIU Investigator Manual, which provides comprehensive guidance to investigators on which tools to use in conducting background investigations and how to assess the information gathered from

---

[191] Many candidates are neither recommended nor disqualified, and fall into other categories such as the candidate declined to continue with the hiring process, withdrew from certification, etc.

[192] Not all candidates approved for hire will become Correction Officers. Some will decline the offer and others may not complete Academy training.

[193] The Department only began tracking the specific reason a candidate was disqualified (*i.e.* due to medical, psychological screening, background investigation) with the candidates screened for the class that graduated in November 2016. Previously the Department only tracked the number of candidates who were disqualified for any reason.

[194] The perceived spike in disqualified candidates for this class was merely the finalization of the screening process for candidates who had been pending across many classes and ultimately officially disqualified in mid-2017.

those tools and sources, as well as incorporating considerations and requirements outlined in DCAS's Notice of Exam for Correction Officers. The manual also incorporates the two policies noted above.

- AIU refers some new hires to ID for additional monitoring during their probationary period if their background investigation raises potential concerns about their suitability for the position but does not rise to the level that the candidate may be disqualified from hire. These Staff are then monitored by ID during their probationary period. ID's practices relating to monitoring of Staff are governed by the "Internal Monitoring of Staff" Policy.

- As the Department is not currently preparing for another recruit class, AIU staff have been offered opportunities to work in other areas within the Department. The Staff at AIU are also continuing to complete a variety of selection-related activities including:

  o **Candidate Relations**: completing backlog of data entry and organization of investigative and psychological unit files for candidates;

  o **Medical Unit**: completing backlog of data entry;

  o **Psychological Unit**: completing backlog of outstanding psychological evaluation reports; performing ongoing psychological evaluation responsibilities for certain categories of staff; managing ongoing pre-employment disqualification appeal caseload; conducting professionally required validation research; cross-training staff on updated psychological testing scoring software;

  o **Probationary Review/Phone Monitoring/Social Media Unit**: conducting final background check of candidates coming off probation and SECURUS call monitoring;

  o **Field Team tasks**: completing Field Visits of July 2019 graduating Academy Class;

  o **Internal Review Unit tasks**: managing ongoing pre-employment disqualification caseload and "not-recommended" caseload process;

  o **Investigative Squads tasks**: receiving and investigating as necessary cases assigned by Internal Review Unit, Probationary Review/ Phone Monitoring, Social Media Unit, and the field Unit;

  o **Agility Team tasks**: completing review of AIU Tracking system and updating candidate case records when necessary; and conducting equipment inventory and maintenance.

ANALYSIS OF COMPLIANCE

*Comprehensive Objective Process for Selection and Hiring* (¶ 2)

The Monitoring Team confirmed that the Department continues to maintain an objective process for selecting and hiring Staff, including extensive background investigations of potential candidates by trained investigators as enumerated in the First Monitor's Report.

212

This Monitoring Period, an AIU Investigator Manual was finalized and distributed electronically and in hard copy form to all AIU staff. The Monitoring Team worked with AIU leadership and the dedicated AIU Policy Writer to review and provide feedback on the draft manual early in this Monitoring Period. The manual provides sufficient guidance of all aspects of the process for selecting and hiring Staff.

*Assessment of Background Investigations* (¶ 3)

The Monitoring Team has previously audited a sample of AIU's background investigations of candidates who were selected for hire and found that the files demonstrated that appropriate investigatory tools were employed.[195] In future Monitoring Periods, if the Department continues to screen additional candidates, the Monitoring Team will audit a sample of those investigations to determine whether the screening process comports with the requirements of the manual promulgated at the end of this Monitoring Period.

In this Monitoring Period, the Monitoring Team evaluated whether AIU consistently and timely provided ID with the necessary information for Staff recommended for monitoring from the latest recruit class, and found that the information was shared with ID in a timely manner.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

## 11. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to recommend the arrest of an inmate in connection with a use of force incident. The larger purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team's assessment of compliance is outlined below.

| XIV. ARREST OF INMATES (¶ 1) |
| --- |
| ¶ 1. The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** |
| • The Department evaluated the policies that govern the process for arresting inmates in this Monitoring Period. The Department also began to revise Command Level Order 04/15 and |

---

[195] *See* Sixth Monitor's Report at pages 143 to 144 and Seventh Monitor's Report at pages 183 to 184.

CIB CLO Inmate Arrest Procedures. The Operations Order 52-89, Rikers Central Arrest Unit, was rescinded as it reflected practices that were out of date.

- The Department's Criminal Investigation Bureau ("CIB") is responsible for arresting inmates as well as for tracking and maintaining evidence, arrest packages, and arrest data.

- The Department arrested 228 inmates in the Eighth Monitoring Period. A chart of the reasons for arrest from January 2018 to June 2019 is below:

| Arrest of Inmates by Reason for Arrest | | | | | | |
|---|---|---|---|---|---|---|
| | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | |
| Aggravated Harassment | 33 | 12% | 18 | 7% | 17 | 7% |
| Arson | 0 | 0% | 0 | 0% | 0 | 0% |
| Assault on Staff | 98 | 35% | 87 | 33% | 79 | 35% |
| Assault Other | 6 | 2% | 0 | 0% | 0 | 0% |
| Contraband Drugs | 14 | 5% | 18 | 7% | 12 | 5% |
| Contraband Other | 10 | 4% | 5 | 2% | 7 | 3% |
| Contraband Weapon | 10 | 4% | 8 | 3% | 11 | 5% |
| Criminal Act | 3 | 1% | 13 | 5% | 6 | 3% |
| Destruction of Property | 5 | 2% | 2 | 1% | 0 | 0% |
| Escape | 0 | 0% | 1 | 0% | 1 | 0% |
| Extortion | 0 | 0% | 0 | 0% | 0 | 0% |
| Inmate Disturbance/ Riot | 0 | 0% | 0 | 0% | 0 | 0% |
| Obstruction Government Administration | 0 | 0% | 0 | 0% | 0 | 0% |
| Robbery | 0 | 0% | 0 | 0% | 1 | 0% |
| Serious Injury to Inmate | 2 | 1% | 12 | 5% | 9 | 4% |
| Serious Injury to Staff | 5 | 2% | 4 | 2% | 2 | 1% |
| Serious Verified Threat | 0 | 0% | 1 | 0% | 0 | 0% |
| Sexual Assault/Abuse | 5 | 2% | 2 | 1% | 9 | 4% |
| Slashing/Stabbing | 17 | 6% | 23 | 9% | 7 | 3% |
| Splashing | 76 | 27% | 68 | 26% | 67 | 29% |
| Witness Tampering | 0 | 0% | 0 | 0% | 0 | 0% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total** | **284** | | **262** | | **228** | |

- Below are the number of arrests that had an associated UOF number:

| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 |
|---|---|---|---|
| Number of UOF Incidents | 88 | 68 | 71 |
| Number of Arrests with Associated UOF Number | 109 (38%) | 79 (30%) | 77 (34%) |
| **Total Number of Arrests** | **284** | **262** | **228** |

214

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continued to work with the Department to evaluate the relevant policies governing the arrest of inmates to ensure they reflect the Department's current practices. There was some delay in the review given changing leadership within CIB. During this Monitoring Period, the Department shared a revised draft of the new comprehensive policy that will govern the arrest of inmates, visitors and juveniles with the Monitoring Team. The Monitoring Team reviewed the policy and shared some minor feedback to ensure the policy clearly captured the arrest process for inmates in custody. The Department is in the process of finalizing the policy and is expected to complete it in the next Monitoring Period.

As demonstrated in the data above, approximately a third of all arrests were associated with a UOF incident. The Monitoring Team began an initial review of certain inmate arrests associated with a UOF incident that also potentially involved Staff misconduct. In certain cases reviewed, the Monitoring Team found that the available objective evidence of the inmate's conduct suggested probable cause for the arrest did exist. However, the Monitoring Team must assess additional cases before a more concrete finding can be made. The Monitoring Team intends to scrutinize additional cases in the next Monitoring Period.

| Compliance Rating | ¶ 1. Partial Compliance |
|---|---|

## 12. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. Significant involvement and buy-in from all divisions of the Department is needed to successfully implement the enumerated reforms of the Consent Judgment. To date, the uniform Staff managing the jails and the Divisions tasked with specific *Nunez* requirements have not taken sufficient ownership of either the problems discussed throughout this report or the path forward. The Monitoring Team's experience suggests this type of ownership—and the resulting leadership—is the essential first step for the much-needed culture change. That said, there are certainly pockets of Staff who are actively engaged in reforming the agency.

The day-to-day management of compliance with the *Nunez* Consent Judgment continues to be jointly led by the Complex Litigation Unit ("CLU") and the *Nunez* Compliance Unit

("NCU"). The CLU and NCU continue to work directly with a broad range of staff on a daily basis and spearhead many of the problem-solving initiatives when there are obstacles to compliance. Given the enormity of the task of shaping practice, measuring performance, and demonstrating compliance, additional staff will be necessary to audit and improve practice as only a portion of the provisions from the Consent Judgment are internally monitored on a routine basis.

CLU manages the Monitoring Team's document and data requests and drives various policy initiatives to address the findings of, and recommendations from, the Monitoring Team. CLU regularly consults the Monitoring Team to ensure Department practice is consistent with the Consent Judgment and best practice. The Department's staff in CLU are hardworking, smart, conscientious, dependable and provide invaluable assistance to the Department and the Monitoring Team. The CLU has provided a valuable foundation upon which the Department can implement essential changes to practice.

NCU manages most of the quality assurance programs and problem-solving efforts. The unit frequently collaborates with the Monitoring Team and is a valuable resource to both the Monitoring Team and the Department. NCU has continued to devise and maintain solid QA programs and reporting mechanisms to illuminate Department practices that need to be maintained or improved so that the Department can achieve compliance with several requirements of the Consent Judgment. In many cases, the NCU Staff provide technical assistance to the Facilities to support improved practice. As demonstrated throughout this Report, NCU has supported many of the initiatives where the Department has demonstrated progress (*e.g.* UOF Reporting, Medical Wait Times, Command Discipline).

While the CLU and NCU are valuable resources, these two units alone cannot

operationalize the many reforms that are needed. They are neither responsible for nor have control of the Divisions that must actually implement the core use of force-related initiatives. In particular, the overreliance on CLU is not sustainable and will prolong the Department's pathway toward achieving Substantial Compliance. The Monitoring Team's assessment of compliance is outlined below.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[196]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- An extensive Excel chart cross-referencing each provision of the Consent Judgment to the relevant policies was developed collaboratively with the Monitoring Team.

- Throughout the duration of the Consent Judgment, the Department revised a number of policies and procedures to conform to *Nunez* requirements.

- The Department developed and implemented Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance, and routine review of Department policies.

- The Department reviewed over 200 Directives and corresponding procedures and over 300 Operations Orders to identify the subset that is related to the Consent Judgment and to determine whether any revisions are necessary or whether new policies need to be developed.

- The Department has completed most of the necessary revisions to Directives and Operations Orders and has developed all new Directives and Operations Orders identified by the review.

- The NCU and the Chief of Department's office identified over 800 Command Level Orders ("CLO") that need to be reviewed to determine whether any revisions are necessary.

---

[196] The Monitor approved an extension of this deadline to January 31, 2018.

- The Department continued its review of all Command Level Orders ("CLOs"). A network drive folder has also been created, where all Facility CLOs are scanned and uploaded digitally to make maintenance and tracking more efficient.

- The Department promulgated Operations Order 05/19, "Facility Information System ("FIS")". Pursuant to Operations Order 05/19, each Facility has a designated FIS Officer and staff who are responsible for reviewing and updating CLOs on a routine basis.

**ANALYSIS**

The Department continued to evaluate and revise policies, procedures, and trainings to ensure they are consistent with the requirements in the Consent Judgment and with each other. The review identified that, in general, the Department's policies are consistent with the Consent Judgment and only required minor revisions, most of which have been completed. In the last reporting period there were over 800 old CLOs identified as needing to be reviewed and updated. The Department reports that review was completed during the Eighth Reporting Period, and FIS staff found most CLOs to be outdated and the FIS Officers subsequently updated each Facility's CLOs to ensure consistency with existing Department Directives and Operations Orders. The Monitoring Team intends to assess a sample of this work in the next Monitoring Period.

Given the evolving nature of the reform efforts, it is expected that policies and procedures will continue to be revised and updated to ensure they comport with current practice and are consistent with one another. Therefore, the policies and procedures necessary to effectuate the Consent Judgment continue to evolve.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance<br>¶ **2.** Partial Compliance |
| --- | --- |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Assistant Commissioner of Quality Assurance and Deputy General Counsel share the responsibilities of the Compliance Coordinator.

- The CLU and NCU provided the Monitoring Team with responses to over 200 requests for information and handled over 75 memos containing recommendations from the Monitoring Team. Many of these were complex and required significant collaboration between the Department and the Monitoring Team to address. The CLU also produced over 400 use of force files (such as Preliminary Reviews, Facility investigations, and Full ID Investigations), PREA

files, and Trials closing memos. The CLU and NCU also produced over 80 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.

- During the Monitoring Period, the CLU scheduled and/or facilitated frequent meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC Staff Members, including Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens, Wardens, Chiefs, and Deputy Commissioners and also facilitated site visits to all of the Facilities.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team communicates daily (and often multiple times a day) with the Compliance Coordinators, members of the CLU and NCU teams, as well as other members of the Department. As described above, the Department's staff in CLU and NCU are hardworking, smart, conscientious, responsive and provide tremendous assistance to the Monitoring Team. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform. While the Monitoring Team recommends a shift away from relying on CLU and NCU to support the _implementation_ of reforms, CLU and NCU continue to provide invaluable assistance in _coordinating_ compliance with this Consent Judgment.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

# CURRENT STATUS OF 16- AND 17-YEAR-OLD YOUTH

All 16- and 17-year-old youth previously incarcerated on Rikers Island are now housed in the Horizon Juvenile Center ("HOJC"). This move occurred in the Fall of 2018, as described in the Seventh Monitor's Report (at pgs. 189-194) in order to comply with the State's Raise the Age ("RTA") law and also satisfied the Department's obligations under *Nunez* to seek an alternative housing site for these youth.[197] HOJC is currently jointly operated by the Department, which is responsible for youth supervision and movement and Facility safety and security, and the Administration for Children's Services ("ACS"), which is responsible for providing programming, case management and other types of support (*e.g.,* food services, barbershop, building maintenance, laundry, etc.).

The City reports it intends to ultimately transfer HOJC's management to ACS. Over the next several months, responsibility for operating HOJC will continue to shift to ACS, with the Department having a decreasing presence in the housing units and providing only operational support (*e.g.*, movement, incident response) and ultimately transferring full operational control to ACS. Once the Facility is operating in accordance with generally accepted practice in juvenile justice (which may not precisely coincide with the transfer to ACS—there is still much work to do), the transfer will certainly be in the best interest of the youth. In the meantime, shifting operational control from the Department to ACS is extraordinarily complex and also presents special challenges to the task of monitoring compliance.

---

[197] "The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site")." § XVII., ¶ 1.

This report includes the Monitoring Team's first assessment of HOJC's level of compliance with the various requirements of *Nunez*. Previously, the Monitoring Team offered technical assistance and issued several reports to the Court, detailing concerns about the transition and the prevalent threats to youth and staff safety.[198] During the current Monitoring Period, the Monitoring Team's technical assistance continued with a focus on safety and an eye toward prioritizing issues and practices that would perpetuate beyond the transition to ACS (*e.g.,* behavior management, addressing youth with frequent aggressive behaviors, classification, the appropriate use of room confinement, and programming). These provisions were assessed in far greater detail than some of the more peripheral provisions that may change as operational control shifts to ACS.

<u>Rates of Use of Force and Violence</u>

Throughout the Monitoring Period, HOJC continued to be plagued by high rates of violence and use of force, despite a declining population (from about 70 when the Facility opened to about 55 at the end of the Monitoring Period). A *rate per 100 youth* is used in order to neutralize the impact of changing Facility populations and also to permit comparisons to rates at Facilities of different sizes. As shown in the graph below, during this Monitoring Period, the rate of youth-on-youth violence (*i.e.,* fights and assaults) remained about the same, while the use of force trended upward throughout the Monitoring Period.

---

[198] The Monitoring Team submitted three letters to the Court on the status of HOJC on October 31, 2018 (Dkt. 318), December 4, 2018 (Dkt. 320), and February 19, 2019 (Dkt. 325).



The Monitoring Team's ongoing review of UOF incidents and sanctions for youth misconduct clearly revealed that a small segment of the HOJC population contributes a disproportionate share of violence and other types of disorder. As noted in previous reports, this is a common occurrence in juvenile Facilities that requires a targeted strategy to provide greater support, structure, and supervision to this select group of youth. Even though HOJC's population turns over constantly as youth are released or age out and transfer to Rikers Island, the profound negative impact of a small number of youth on the Facility's safety has been a constant. During the current Monitoring Period, a total of 17 youth had 10 or more uses of force during their time at HOJC. Together, these youth accounted for 225 uses of force. Accordingly, effective strategies are needed for supervising and supporting these youth to reduce the risk of harm they pose to other youth and staff.

Prior to being transferred to HOJC, this population was housed at RNDC, where the rates of violence and use of force were persistent causes for concern. Furthermore, the situation

worsened considerably following GMDC's closure and the transfer of 18-year-olds to RNDC in Summer 2018. From that point on, rates of violence and UOF continued to worsen as the 16- and 17-year-olds were transferred to HOJC and throughout the months they have been housed there.

| Average Rates of Youth-on-Youth Violence, 16/17-year-olds at RNDC | | | | | | HOJC | |
|---|---|---|---|---|---|---|---|
| Jan. – Jun. 2016 | Jul. – Dec. 2016 | Jan. – Jun. 2017 | Jul. – Dec. 2017 | Jan. – Jun. 2018 | Jul. – Sept. 2018 | Oct. – Dec. 2018 | Jan. – Jun. 2019 |
| 27.4 | 35.9 | 26.5 | 29.4 | 34.6 | 45.2 | 45.5 | 40.7 |
| Average: 33.2 | | | | | | Average: 43.1 | |

| Average Rates of Use of Force, 16/17-year-olds at RNDC | | | | | | HOJC | |
|---|---|---|---|---|---|---|---|
| Jan. – Jun. 2016 | Jul. – Dec. 2016 | Jan. – Jun. 2017 | Jul. – Dec. 2017 | Jan. – Jun. 2018 | Jul. – Sept. 2018 | Oct. – Dec. 2018 | Jan. – Jun. 2019 |
| 24.8 | 31.7 | 16.5 | 26.0 | 38.4 | 50.3 | 73.4 | 74.7 |
| Average: 31.3 | | | | | | Average: 74.1 | |

These high rates of violence and UOF have significant impacts on the safety of both youth and staff at HOJC. Among the 440 uses of force that have occurred at HOJC since it opened, injuries to youth or Staff were sustained in approximately half of the incidents (n=228, 6 A-level incidents and 222 B-level incidents).

These high rates of violence and UOF reflect deficiencies in several areas. First, the Facility's original behavior management system, STRIVE Community, did not provide an individual-level system for incentivizing positive behavior nor a continuum of options for responding to negative behavior (a more robust version, STRIVE+, became fully operational just after the Monitoring Period concluded). Second, HOJC staff's lack of skill in developing effective relationships and constructive rapport with youth, their lack of situational awareness, and their tendency to either over- or under-react to escalating tensions all contribute to the high rate of violence. Third, the Facility's classification system was not properly implemented (*i.e.*,

custody levels are not routinely updated following misconduct) and does not include protocols for supervising youth according to their risk of institutional misconduct (*i.e.,* supervision is not differentiated and maximum and minimum custody youth are sometimes housed together). Finally, despite being critical for restoring safety in the aftermath of an incident, the Facility's practices regarding the use of room confinement do not include effective internal controls for the appropriate use of this essential tool (nor does the use meet generally accepted practice or the Department's own policy).

Although the problems are serious and varied, a few important accomplishments occurred during the current Monitoring Period: Staff received Safe Crisis Management refresher training and have become accustomed to responding to incidents without the use of OC spray, DOC Staff assignments to housing units became more consistent, youth have the opportunity to attend a significant amount of programming delivered by ACS Program Counselors and community partners, and the design and training for STRIVE+ (the Facility's behavior management system) was finalized, allowing it to be implemented on July 1, 2019.

*Policy Development*

DOC and ACS have continued to develop policies to govern the operations of HOJC. This not only required coordination across the two agencies, but also required coordination with various regulations and regulators, including the Office of Children and Family Services ("OCFS"), the New York State Commission of Correction ("SCOC"), and the Board of Correction ("BOC"). HOJC policies and procedures must also comport with the relevant requirements of the Consent Judgment and require either consultation with and/or approval of the Monitor. Accordingly, the Monitoring Team reviewed and provided feedback on the policies

outlined in the chart below to the extent that they implicated obligations under the Consent Judgment.

| Policy | Policy Number | Status of Policy | Agency Lead |
|---|---|---|---|
| Behavior Management in Secure and Specialized Secure Detention | Policy and Procedure 2018/09 | Finalized – 12/3/18 | ACS |
| Case Management in Secure and Specialized Secure Detention | Policy and Procedure 2019/03 | Finalized – 03/18/19 | ACS |
| Educational Services | Policy and Procedure 2019/31 | Finalized – 10/2/19 | ACS |
| Exercise, Recreational & Leisure Activities in Secure and Specialized Secure Detention | Policy and Procedure 2019/04 | Finalized – 03/18/19 | ACS |
| Health Services for Youth in Secure and Specialized Secure Detention | Policy and Procedure 2019/15 | Finalized – 6/25/19 | ACS |
| Standards of Personal Hygiene for Youth in Secure and Specialized Secure Detention | Policy and Procedure 2018/10 | Finalized – 12/3/18 | ACS |
| Classification | | Remains in draft form while the instrument is updated. | DOC |
| Control and Search for Contraband | | Remains in draft form. | DOC |
| Mechanical Restraints in Specialized Juvenile Detention Facilities | | Remains in draft form | DOC |
| Rapid Response Teams in Specialized Juvenile Detention Facilities | | Remains in draft form. | DOC |
| Room Confinement Policy for Specialized Juvenile Detention | | Remains in draft form. | DOC |
| Safe Intervention Policy for Specialized Juvenile Detention | CLO 15/19 | Finalized – 1/28/19 | DOC |
| Supervision of Youth in Specialized Juvenile Detention | | Remains in draft form. | DOC |
| Suicide Prevention and Intervention Policy for Specialized Juvenile Detention | | Remains in draft form while awaiting review by OCFS. | DOC |

As indicated in the table above, many of the policies in which DOC took the lead remain in draft form. The Monitoring Team reviewed and provided comments on all of them; some await approval by the state licensing agencies.

*Looking Ahead*

The Monitoring Team remains committed to providing any technical assistance that would benefit the Department's and ACS' efforts to operate a safe Facility that promotes positive youth outcomes. The Facility's high rates of violence and UOF are of great concern to the Monitoring Team. The Monitoring Team's efforts to both assess the state of compliance and provide technical assistance have been frustrated by undue delays in receiving requested information (multiple requests are often necessary) and an apparent lack of diligence in addressing some of the issues the Monitoring Team identified. This has been particularly true with regard to DOC's use of room confinement, the Facility's classification practices, and the strategy for protecting vulnerable youth. The Department is encouraged to increase the speed with which recommendations are considered by auditing its own performance, making appropriate modifications to practice, and holding staff accountable as warranted.

The Department's efforts to achieve compliance with Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), and § XVII (Housing Plan for Inmates Under the Age of 18) related to 16- and 17-year-old youth is addressed below.

### 13. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** |
| • The Department continues to confront the high level of violence at the Facility (see narrative above). <br><br> • As detailed below, the Department and ACS have committed sufficient numbers of staff to operate the program and to provide access to education and other structured activities |

throughout the day. They also committed significant resources to training staff to manage youth's behavior and to utilize Safe Crisis Management techniques.

- Less than a year after the Facility opened, HOJC is again undergoing a major transition as operational control has begun to shift from DOC to ACS. The stress and uncertainty this creates for staff inevitably impacts how the building is managed.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17- and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Although the Department has committed significant resources to the operation of HOJC, as discussed in the introduction above, the Facility continues to be plagued by disorder, with rates of youth-on-youth violence and UOF continuing to increase for this population. Data on youth disciplinary sanctions also indicates high numbers of youth-on-staff assaults and other serious forms of misconduct. Together, these create a culture of disorder that will be difficult to transform. Given that the transfer of operational control to ACS will bring additional uncertainty and instability over the next several months, both agencies are encouraged to shore up practices for incentivizing positive behavior, responding to negative behavior, and ensuring that staff develop constructive relationships with youth and are properly equipped with the knowledge, skills, and support needed to create a safe environment.

| COMPLIANCE RATING | ¶ 1. (16- and 17-year-olds) Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- The Nunez Compliance Unit ("NCU") confirms the completion of FSIRs and DCSRs for all housing units at HOJC.

227

- NCU conducts on-site inspections on a few random days each month to determine whether any youth are housed in inoperable cells. The Facility is notified and expected to either remove the youth from the cell immediately or have the cell repaired so it may be safely occupied.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

*Assessment of Locking Mechanisms*

Just prior to opening, HOJC was renovated and all cell doors and locking mechanisms were upgraded. Not surprisingly, during staff's daily inspections and NCUs audits, cells were generally found to be in working order. Regular inspection and on-going audits are encouraged as Facility hardware inevitably deteriorates over time.

Although no issues have been discovered at HOJC, during the course of its regular audits of facilities on Rikers, NCU became concerned that its original audit methodology relied too heavily on whether staff simply *completed* the required forms and did not focus sufficiently on the *accuracy* of the forms. During the next Monitoring Period, the Monitoring Team and NCU will collaborate to refine the methodology to ensure it squarely addresses the quality of the information recorded on the forms.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to use of force incidents at HOJC. The Monitoring Team did not identify any UOF incidents where inoperable cell doors or locks contributed to or caused a UOF incident.

| **COMPLIANCE RATING** | **¶ 2. (16- and 17-year-olds)** Substantial Compliance |
|---|---|

---

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    b.   all Housing Areas with 16- and 17-year-old inmates at least twice per week, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented, and any general deficiencies shall be noted. [199]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department drafted the policy Supervision of Youth in Specialized Juvenile Detention which addresses the requirements of this provision. The policy has not yet been finalized.

**ANALYSIS OF COMPLIANCE**

---

[199] This language reflects the revision ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC (i.e., part b).*

The Monitoring Team's frequent conversations with the Facility's DOC and ACS leadership demonstrate that Facility leaders have extensive contact with youth. The Department and ACS have drafted written guidance to address this requirement. Given the Department's other obligations that are likely to have a greater impact on Facility safety, this provision has not been prioritized and the Monitoring Team has not yet rated it.

| COMPLIANCE RATING | ¶ 3. (16- and 17-year-olds) Not Yet Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION) AND ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of the adolescents and the security risks they pose.

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department contracted with a well-respected consultant to design and validate an initial and re-classification instrument, which was completed shortly after HOJC opened.

- The Department drafted a policy on the use of the Classification tool for HOJC. It has yet to be finalized given the need to refine a few of the risk factors and shore up some of the protocols for updating youth's classification levels, as discussed below. The draft policy reflects generally accepted practices for classifying adolescents based on their risk of institutional misconduct.

- The Department and ACS trained the relevant staff to implement the policy, held a refresher training, and received on-going technical assistance from the consultant who developed the tool.

### ANALYSIS OF COMPLIANCE

The classification instrument is valid for the target population, reflects a sound methodology, and adeptly engages the DOC, ACS, and mental health staff who need to provide input into scoring the variety of risk factors. The Department provided the Monitoring Team with a copy of the classification instruments and instruction manual for review and coordinated several conference calls with DOC and ACS staff and their consultant to refine the instrument and process based on the Monitoring Team's

feedback. While on-site in April 2019, the Monitoring Team met with DOC Classification staff and HOJC Leadership to discuss the instrument's scoring, to review individual cases, and to provide recommendations to fortify the system's implementation.

While the Department scores the tool for every youth upon admission, the Monitoring Team has identified several weaknesses in the implementation of the Classification process that need to be addressed. Among them:

- The Facility currently lacks a straightforward way to print a housing roster that includes the youth's classification level. Such a housing roster is critical to ensure that youth are housed appropriately and for basic projections on housing space needs. While HOJC Classification staff developed a decent workaround, the process is cumbersome and does not lend itself to proper management and oversight of the process. In fact, the Department was unable to produce back-dated housing rosters containing this information, and it appears they do not routinely prepare such a document. The Monitoring Team suggested a format for a stand-alone classification roster to improve the integrity of implementation.

- DOC and ACS staff misinterpreted how some of the risk factors should be scored and, contrary to what was expected during the design phase, key information for a risk factor pertaining to mental health has not been available. DOE staff are required to submit a worksheet that identifies each youth's education track. Some of the categories are not used at HOJC, and often, education information was simply not provided to classification staff. These issues were discussed on-site in April and during a conference call in late June 2019. DOC, ACS, and DOE are in the process of clarifying definitions and re-training relevant staff.

- HOJC did not properly implement the process to update a youth's classification level following institutional misconduct. This resulted in inaccuracies in many youth's classification levels (*i.e.*, remaining lower than they should have been) and thus caused the Facility Leadership to believe they had few, if any, maximum custody youth. The Monitoring Team's ongoing assessment of UOF and youth-on-youth fight data indicates that this simply cannot be true. The Department is in the process of developing a protocol to ensure that youth's classification levels are updated as required.

- HOJC has not followed requirements to house minimum and maximum custody youth separately.

- HOJC has not developed a strategy for differential supervision of youth with high versus low risks of misconduct. As stated in previous Monitor's Reports, simply completing a classification form does not create safety. Instead, housing units for maximum custody youth need to be more structured and supervised more closely to mitigate the risk of violence. The Monitoring Team has discussed several such strategies with HOJC leadership, but a protocol has yet to be developed.

In summary, while the Department succeeded in developing the tool required by this provision, its implementation lacks the integrity to contribute to the safe operation of the facility, and thus ¶ 4 remains in Partial Compliance. DOC staff did not appear to understand the provision requiring minimum and maximum custody youth to be housed separately and have not made provisions to put the required separation into effect, thus the Department is in Non-Compliance with ¶ 8. As the responsibility for implementing this provision shifts to ACS, the Monitoring Team encourages active supervision of Classification staff to ensure both they and Facility Leadership are accountable for improving performance in this area.

| COMPLIANCE RATING | ¶ 4. (16- and 17-year-olds) Partial Compliance<br>¶ 8. (16- and 17-year-olds) Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ACS is responsible for providing and coordinating structured programming to youth at HOJC. This is accomplished via Program Counselors and an array of community partners.

- Both Program Counselors and community partners record the amount and type of programming that is delivered to each housing unit on a daily basis.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year old youth at HOJC.*

The Monitoring Team reviewed housing unit schedules and several months' worth of programming records to estimate the volume of programming delivered to HOJC youth. Housing unit schedules suggest that, in addition to school, youth should receive about three hours of structured programming from Program Counselors and community partners on weekdays and about five hours on weekend days. These ambitious targets reflect best practice in juvenile facilities as they not only reduce idle time but also expose youth to a variety of activities and supportive adults who may assist them upon returning to the community. ACS has clearly made considerable efforts to hire staff to deliver programming (*e.g.*, several additional Program Counselor positions were created and filled to ensure proper coverage on pass days; a broad range of contracts with community partners are in effect) and DOC has provided solid operational support.

However, programming records indicated that the daily schedules are not always followed and these targets are not being consistently achieved. School attendance data appeared to reveal chronic tardiness (students were late on 50-75% of school days, averaging about an hour late). Given that school is such a large segment of HOJC youth's day, the Monitoring Team will further discuss this issue with ACS during the subsequent Monitoring Period.

Initially, audits of other programming data suffered from incomplete data as program counselors and community partners simply did not submit a full set of programming records and interruptions to programming from a variety of causes. The situation noticeably improved during June 2019, where nearly all units submitted a complete set of records. However, even this more complete data set demonstrated that program targets (three hours on weekdays and five hours on weekends) were met on only 55% of weekdays and 45% of weekend days. The Monitoring Team noted that some of the shortfall in programming appeared to be caused by community partners who did not report to the Facility as expected. ACS reports that programming suffered in June due to a transition in vendors.

Finally, assessing programming type/quality is currently difficult because the Program Counselors often use generic terms (*i.e.*, "programming") on the program tracking forms. ACS has agreed in the next Monitoring Period to provide the Monitoring Team with the Activity Plans each counselor prepares for the week, which includes far more detail on the specific activities that are planned. ACS has also asked the Counselors to document the reasons for any departures from the Activity Plan on the tracking forms (*e.g.*, operational problems; lack of engagement from the youth). These improvements in documentation will be useful to the effort to achieve substantial compliance.

| COMPLIANCE RATING | ¶ 5. (16- and 17-year-olds) Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES) AND ¶ 7 (PROTECTIVE CUSTODY)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department designed a process to ensure that youth who request Protective Custody, have safety concerns, experience trouble cohabitating with peers, or who are otherwise at risk of

harm are placed on a Safety Plan, supervised one-on-one by a Safety Watch Officer and/or promptly transferred to a different housing unit.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Toward the end of the Monitoring Period, the Department designed a procedure to meet its obligations under these provisions. The features of the protocol were subject to scrutiny not only by the Monitoring Team, but also OCFS and SCOC (the two State licensing agencies) which accounted for some of the delay. Unlike the practice on Rikers Island, where inmates with safety concerns are housed in a specific unit and have no contact with the general population, juvenile justice facilities generally *do not* use segregated housing for this purpose. Instead, most juvenile facilities alter the way in which a youth with safety concerns is housed and/or supervised in order to mitigate the risk of harm from other youth. The design of HOJC's procedure mirrors this standard.

Youth at HOJC have multiple ways to express their safety concerns, either by reporting them directly to HOJC staff, calling 311, submitting a grievance, or contacting the Justice Center. Once notified of a concern, the Department's stated procedure requires HOJC to construct an individualized Safety Plan that addresses the concern (*e.g.,* rehousing, "keep separate" orders, or one-on-one supervision by a Safety Watch Officer).

The Department provided the Monitoring Team with a variety of documents related to the evolving practice. The Monitoring Team's analysis revealed the following:

- A Safety Plan is completed during intake for all youth; in these Plans, youth identify triggers and actions that staff could take to help them de-escalate. Examples for about 90 youth were submitted to the Monitoring Team for review. In theory, a youth who had a specific concern for safety could report the concern on this plan, although none of those reviewed did so (perhaps because youth did not have any concerns, though it is unclear whether you are specifically asked about safety concerns when they are given the Plan to complete).
- Courts sometimes order a youth to be placed in Protective Custody. Records for three youth were submitted, but the documentation was not sufficiently organized to determine how HOJC addressed the Court's orders.
- 311 receives concerns from parents, attorneys, and youth. Five such examples were provided, along with the findings of inquiries into the matters conducted by Facility staff.
- Approximately 45 "Safety Plan Records" were submitted. This form appears to have originally been created to document the Facility's actions following a child abuse/neglect allegation, but also appears to be used to address safety concerns that arise throughout the youth's incarceration (*e.g.*, youth was the victim of an assault, or youth reported conflict with staff).

Actions included rehousing the involved youth in different units, separating youth from certain Staff, or assigning a Safety Watch Officer (though no documentation of the actual assignment, duration, or observations/actions of the Safety Watch Officer were provided).

It is difficult to discern whether the stated procedure has been properly implemented because the records were poorly organized, and many lacked essential details. As described, the strategy proposed by the Department seems to reflect the generally accepted practice for juvenile facilities, but several improvements to the documentation and practice are required to demonstrate that the Department has properly implemented its stated procedure:

1. Revise the "Safety Plan Record" to indicate the reason for the plan (*e.g.*, youth was the victim of an assault; concern was voiced by parent, attorney or youth) and the specific nature of the safety concern.

2. Create a protocol to ensure that all Staff are aware of the plan and their responsibility for implementing it (*e.g.*, when youth are rehoused to separate them from other youth or Staff, how are these arrangements perpetuated in the case of reclassification or rehousing?).

3. Create individual files for all youth for whom safety precautions are taken. The file should include the "Safety Plan Record" that details the nature of the concern and the strategy that was designed to address it; a copy of the court order, grievance or 311 complaint; and supporting documentation to show the housing transfer, assignment of a Security Watch Officer and the duration and observations during that assignment.

The plans made to date are only an initial starting point, and must be both robustly implemented and documented in an orderly fashion. The Monitoring Team will continue to provide technical assistance as necessary, support the Department and ACS's efforts to finalize a policy and encourage that both practice and record keeping demonstrate the proper implementation of the stated procedure.

| COMPLIANCE RATING | ¶ 6. (16- and 17-year-olds) Partial Compliance<br>¶ 7. (16- and 17-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID maintains a dedicated PREA team to investigate all PREA allegations, which is discussed in more detail in the Use of Force Investigations section of this report.

- The Department reports that ID and HOJC leaders and their colleagues from the Justice Center discussed the large number of unfounded youth-on-youth PREA allegations reported at HOJC.

It appears that a small number of youth (one in particular) made these allegations in an effort to influence housing assignments of peers. The Facility leadership committed to identifying mechanisms for youth to voice their complaints via a more appropriate avenue (*e.g.,* reporting peer conflict to Staff). The Facility reports it is addressing interpersonal disputes via peer mediation or housing transfers in an effort to improve peer relationships and to reduce the ID workload that flows from unfounded allegations.

- The table below summarizes the status of the 47 PREA and Non-PREA allegations that were received from HOJC youth between October 2018 and June 2019.

| Date of Allegation | Oct-Dec 2018 | | Jan-Jun 2019 | | Total | |
|---|---|---|---|---|---|---|
| Total | 20 | | 27 | | 47 | |
| Total PREA (Closed & Pending) | 17 | 85% | 26 | 96% | 43 | 91% |
| Total Non-PREA (Closed & Pending) | 3 | 15% | 1 | 4% | 4 | 9% |
| Status of Investigation (includes both PREA/Non-PREA Allegations) | | | | | | |
| *Closed PREA Cases* | *17* | *85%* | *19* | *70%* | *36* | *77%* |
| *Closed NON-PREA Cases* | *3* | *15%* | *1* | *4%* | *4* | *9%* |
| *Pending PREA Cases* | *0* | *0%* | *7* | *27%* | *7* | *15%* |
| *Pending Non-PREA Cases* | *0* | *0%* | *0* | *0%* | *0* | *0%* |
| Type of PREA Cases (Non-PREA Cases excluded) | | | | | | 43 |
| Total PREA Cases | 17 | | 26 | | 43 | |
| *Inmate on Inmate Sexual Abuse* | *13* | *76%* | *18* | *69%* | *31* | *72%* |
| *Inmate on Inmate Harassment* | *1* | *6%* | *2* | *8%* | *3* | *7%* |
| *Staff on Inmate Sexual Abuse* | *3* | *18%* | *3* | *12%* | *6* | *14%* |
| *Staff on Inmate Harassment* | *0* | *0%* | *3* | *12%* | *3* | *7%* |

**ANALYSIS OF COMPLIANCE**

While the Department's overall compliance with this provision is addressed in the Investigations section of this report (*see* the Use of Force Investigation section of this report, ¶ 9), the nuances of some of the allegations flowing from HOJC are examined here in an effort to include HOJC-related issues in a single section of the report. Allegations flowing from HOJC made up the bulk of those reported by Young Inmates and represented a significant portion of the ID PREA Team's workload for this segment of the population.

As shown in the table above, the Department received 27 allegations from HOJC during the current Monitoring Period, one of which did not meet PREA definitions and thus was ruled "Non-PREA." By the end of the Monitoring Period, 19 PREA cases had been closed, and seven were still pending. Of these 26, the majority were allegations of youth-on-youth sexual abuse or harassment (77%). All of the closed cases were either unsubstantiated or unfounded.

A considerable number of cases appeared to be false reports. When interviewed, the alleged victims denied making the report, insisting that the allegation was made by someone else and asserting that the report was made by an uninvolved youth in an effort to influence the housing assignment of youth they did not like. Because HOJC utilizes a phone system that does not allow ID to identify the caller, these claims could not be assessed via Securus as they would be on Rikers Island. To ascertain the veracity of the allegations, ID investigators interviewed alleged victims and perpetrators, canvassed other youth in the housing units and reviewed documentation (log books, housing assignments, etc.) to ascertain whether the allegations had any merit, ultimately determining that the allegations were unfounded or otherwise could not be substantiated. The Monitoring Team reviewed most of these investigation reports and found that ID investigators' conclusions appeared justified.

This situation is not uncommon. Policies that require alleged victims and perpetrators to be separated pending the outcome of the investigation, while necessary to protect alleged victims from further harm and retaliation, can be manipulated to move peers or staff to another area of the Facility. To its credit, HOJC continued to implement Safety Plans to separate alleged victims and perpetrators as required. When this type of apparent manipulation occurs at a high frequency, as it has at HOJC, it is incumbent upon Facility leadership to address the underlying cause of the youth's concerns and to identify appropriate avenues for these concerns to be addressed, such as peer mediation and other strategies for addressing interpersonal disputes, such as unit meetings and direct intervention by Staff. Facility leaders need to explain that while interpersonal disputes are inevitable, addressing them directly is the appropriate option so that resources for improving the culture and conditions of the Facility are not diverted elsewhere. The Department reports that several of the youth who frequently reported unfounded allegations have been released and the problem appears to have abated. To avoid its recurrence, the Facility is encouraged to continue to confront the issue deliberately and to identify additional strategies for addressing interpersonal conflict that get to the root of the problem.

While the Department and HOJC Staff appear to have managed this situation appropriately—separating alleged victims and perpetrators, investigating each allegation timely and promoting appropriate avenues for youth to voice their challenges with cohabitation—the compliance rating is assessed for the sum total of requirements under this provision (again, *see* the Use of Force Investigation section of this report, ¶ 9 for more information on the investigation component of this provision).

| COMPLIANCE RATING | ¶ 9. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 10 (VIDEO CAMERA COVERAGE)

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All youth receive an orientation to the Facility that includes information on the Facility rules and the behavior management program. Program Counselors work in partnership with DOC staff on the units, who reinforce the information presented during orientation.

- The Facility has taken steps to consistently assign staff to housing units.

- All staff have been trained in the full Safe Crisis Management curriculum. It includes tools for de-escalating conflict.

- Upon HOJC's opening, the Facility designed and implemented STRIVE Community, a group-level behavior management program. ACS, in conjunction with DOC and in consultation with the Monitoring Team, designed STRIVE+, a more robust individual-level program to be implemented during the next Monitoring Period. STRIVE+ features both incentives for positive behaviors and a continuum of sanctions that can be matched to the severity of misconduct. Staff are intimately involved in the application of both rewards and consequences.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Consent Judgment requires two training programs for staff managing young inmates—Young Inmate Management (§ XIII (Training), ¶ 3) and Direct Supervision (§ XIII (Training), ¶ 4). The Department and ACS utilize Safe Crisis Management in the operation of HOJC. The Monitoring Team believes that the introduction of Direct Supervision (which has several modules that present similar concepts to SCM, while using different language) would be needlessly duplicative and confusing. The Direct Supervision model has several hallmarks. These include: an orientation that describes the staff's role in creating safety and incentivizing/sanctioning behavior; consistent assignments of staff; ensuring staff de-escalate conflict and prevent violence; and a robust system for incentivizing positive behavior and responding proportionately to misconduct. In theory, a Facility could implement each of these elements under different rubrics and expect to see the same benefit as if they had implemented them under the umbrella of Direct Supervision. Neither the Department nor ACS has made a concerted effort to implement Direct Supervision, or to explain to the Monitoring

Team how they will meet the obligation by implementing the core tenets of Direct Supervision under a different rubric. That said, as discussed throughout this section of the report, some of HOJC's practices coincidently address some of the hallmarks of Direct Supervision. The Monitoring Team has not evaluated these practices under this Direct Supervision provision but has instead assessed each element under the relevant provisions throughout this section of the report.

| COMPLIANCE RATING | ¶ 12. (16- and 17-year-olds) Not Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department recruited Staff to work at HOJC by advertising the availability of transfer throughout the Facilities.

  o The Department reports that at least 80 Correction Officers requested transfers to HOJC.

- The Department assigned Staff to HOJC in the Fall of 2018 as follows:

  o One Warden and one Deputy Warden, who were both previously assigned to RNDC

  o Four Assistant Deputy Wardens, one of whom (25%) was previously assigned to RNDC

  o 26 Captains, eight of whom (31%) were previously assigned to RNDC

  o 263 Officers, 133 of whom (51%) were previously assigned to RNDC and 130 of whom (49%) were previously assigned to other Facilities.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The number of Staff assigned to HOJC is sufficient to fulfill the terms of the Consent Judgment. However, the Department has not provided information to demonstrate the selection of appropriately qualified or experienced Staff. Initially, the Department reported that it attempted to assign Staff who had experience or interest working with younger inmates either by reassigning Staff from RNDC (where the adolescents were previously housed) and/or allowing Staff to request transfer to HOJC. This initially included only 80 Officers; all other Staff were previously assigned to other Facilities and had not specifically requested transfer. Some of these may have worked at GMDC, where 18-year-olds

were housed before its closure in June 2018. While the Monitoring Team does not have reason to question HOJC staff's qualifications, the Department was unable to provide documentation to confirm its assertions.

The Department struggled to provide relevant staffing information in response to numerous Monitor requests. The Monitoring Team has serious concerns about the Department's record keeping practices and its assertions about staffing decisions. The Monitoring Team requested relevant documentation throughout the course of the Monitoring Period. Despite the Monitoring Team's diligent follow-up, the Department was unable to produce accurate records. When records were produced, they did not comport with prior information that had been submitted, which calls into question the Department's record keeping practices and the reliability of the Department's assertions.

| COMPLIANCE RATING | ¶ 13. (16- and 17-year-olds) Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[200]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

    a.    The ratio between Inmates and Direct Supervision floor Officers shall be no more than 15:1 in Young Inmate Housing Areas used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- To comply with OCFS regulations, the Department attempted to assign Staff to HOJC only if they had at least two years' of experience (*i.e.,* they were no longer on probation). However, the Department did not receive an adequate number of transfer requests to fully staff the Facility in this manner.

    - OCFS granted a waiver that allowed the Department to assign some Staff to HOJC who had only one year of experience instead of two.

- HOJC Scheduling Officers take care to distribute probationary Staff across housing units to ensure they are paired with veteran Staff and to ensure that required staff ratios are met.

- HOJC consistently meets both OCFS Standards and PREA Standards for staffing (1:6 and 1:12 for OCFS and 1:8 and 1:16 for PREA).

- HOJC has 10 housing units; six units have 15 beds and four units have eight beds or fewer.

**ANALYSIS OF COMPLIANCE**

---

[200] The Consent Judgment does not include a ¶ 15 for this Section.

*These provisions apply to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with these provisions with respect to 16- and 17-year-old youth at HOJC.*

HOJC consistently meets the staff ratio requirements of this provision. As noted above, the regulations governing staffing at HOJC are far richer than what is required by this provision (1:6 and 1:12 required by OCFS and 1:8 and 1:16 required by PREA). The Facility's physical plant also promotes compliance with this provision. NCU's monthly audits show compliance rates near 100% for the staffing ratio requirements throughout the Monitoring Period. The Monitoring Team's review of Staff schedules and UOF incidents support NCU's findings. Furthermore, HOJC ensured that probationary Staff were paired with veterans in over 90% of the hundreds of HOJC shifts audited by NCU during the current Monitoring Period. Accordingly, the Department has achieved compliance with both of these provisions.

| COMPLIANCE RATING | ¶ 14. (16- and 17-year-olds) Substantial Compliance<br>¶ 16(a). (16- and 17-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- DOC's Scheduling Officer takes care to ensure that staff are consistently assigned to the same housing unit.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The Monitoring Team reviewed staff schedules/assignments for a four-week period in May 2019 to assess the extent to which housing units were consistently staffed 1) on paper, 2) in practice, and 3) week-to-week. More specifically, whether the same person was *assigned* to the unit on at least four of seven days each week ("on paper"), whether the same person *worked* the unit on at least four of seven days each week ("in practice"), and whether at least one post per shift (each unit has an A, B, and C post each shift) was worked by the *same person on all four weeks* reviewed ("week-to-week", *i.e.,* "consistent staffing"). Across the 10 units and 298 posts/shifts reviewed:

- *On paper*, the same person was assigned to a post on four of seven days in 71% of the posts/shifts reviewed;

- *In practice,* the same person worked the post/shift at least four of seven days in 54% of the post/shifts reviewed;

- Consistent staffing (*i.e.,* on each shift, either the A, B, or C post was someone who had worked at least four of seven days per week for four weeks) was achieved for about half of the units (five of 10 units on 1st shift, four of 10 units on 2nd shift, and five of 10 units on 3rd shift).

It appeared that one of the main challenges to achieving consistent staffing at HOJC is the Facility's continually shrinking population and various construction projects, which cause housing units to be regularly taken off-line or reconfigured. This triggers changes to post assignments that can disrupt the regular placement of specific Staff on specific units. Further, while Staff may be assigned to a certain housing unit, frequent substitutions are made when Staff call-out, attend training, take vacation or otherwise were not available to work on a given day. That said, HOJC achieved one of the highest rates of consistent staffing among all of the DOC Facilities audited by the Monitoring Team.

| COMPLIANCE RATING | ¶ 17. (16- and 17-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 18 (INCENTIVES FOR STAFF TO WORK WITH ADOLESCENTS)

¶ 18. The Department, in consultation with the Monitor, shall continue to develop and implement measures, including financial incentives, to: (a) encourage experienced and qualified Staff to work in the Young Inmate Housing Areas that are used for Inmates under the age of 18; and (b) retain qualified Staff in the Young Inmate Housing Areas that are used for Inmates under the age of 18 and limit staff turnover. The Department shall maintain records sufficient to show the numbers of Staff transferring in and out of the Young Inmate Housing Areas that are used for Inmates under the age of 18, the years of experience with the Department of the Staff regularly assigned to these areas, and the qualifications of Staff regularly assigned to these areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department provided Specialty Pay to Staff assigned to work at HOJC.

- The Department designated adequate locker room space and put an additional trailer behind HOJC for Staff to use.

- The Department create a lounge for Staff at HOJC.

- The Department provided parking passes to HOJC Staff.

### ANALYSIS OF COMPLIANCE

As part of the transition from Rikers to HOJC, the Monitoring Team found that the City and the Department worked diligently with union representatives to develop reasonable incentives to encourage Staff to work at HOJC. The incentives were either financial in nature or designed to improve working conditions within the Facility and thus were reasonable to encourage experienced and qualified Staff to work at HOJC, to retain Staff and to limit staff turnover. Accordingly, the Department is in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 18. Substantial Compliance |
|---|---|

## 14. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

| XVI. INMATE DISCIPLINE<br>¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME)<br>¶ 2 (NO PUNITIVE SEGREGATION FOR INMATES UNDER THE AGE OF 18) |
|---|
| ¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration. |
| ¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation for 16- and 17-year-olds in December 2014.

**ANALYSIS OF COMPLIANCE**

*§ XVI. ¶ 1 applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The Department has not used Punitive Segregation for youth aged 16 or 17 since December 2014. The Monitoring Team regularly reviews behavior management records and room confinement records and has seen no evidence of this practice by any other name at HOJC.

| COMPLIANCE RATING | ¶ 1. (16- and 17-year-olds) Substantial Compliance<br>¶ 2. Substantial Compliance |
|---|---|

| XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: REWARDS AND INCENTIVES) AND ¶ 4 (INMATES UNDER THE AGE OF 18: DISCIPLINARY SYSTEM) |
|---|
| ¶ 3. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies and procedures shall be made in consultation with the Monitor. |
| ¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprived them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ACS has primary responsibility for HOJC's behavior management program and thus took the lead in the program's design, training, implementation and tracking. Of course, since youth

spend large portions of their day with DOC and DOE staff, each phase of development required close collaboration with the partner agencies.

- When HOJC opened, the Department/ACS had yet to design a behavior management program that featured individualized rewards and incentives and a continuum of sanctions for misconduct. As an interim strategy, the Facility implemented STRIVE Community, a group-level behavior management system that rewards housing units on a weekly basis for engaging in programming and refraining from misconduct. This program was in place throughout the current Monitoring Period.

- Simultaneously, ACS/DOC—with the help of a consultant with deep expertise in behavior management programs—designed an individualized behavior management program, STRIVE+. In addition to designing the program and corresponding tools (user's manual for staff, youth manual, point cards and weekly tracking forms), all staff from DOC, ACS and DOE were trained to implement the program. As required by the Consent Judgment, the Monitoring Team provided detailed feedback, monitored the key tasks and timelines of the workplan, and ultimately approved the STRIVE+ program. The program was formally implemented on July 1, 2019.

**ANALYSIS OF COMPLIANCE**

STRIVE Community

As noted above, HOJC implemented an interim behavior management program while STRIVE+ was being developed. STRIVE Community was in place throughout the current Monitoring Period. While this program includes the basic hallmarks of a behavior management program—it has rewards for positive behavior and denies youth access to those rewards when they engage in misconduct—its structure as a group-level program, rather than an individual-level program, limits its effectiveness in modifying youth's behavior and creating safety. More specifically, its structure is not sufficiently responsive to a youth's behavior throughout the day, does not provide incentives for sustained positive behavior and program engagement, and does not include a full range of sanctions that are proportional to the varying severity of youth misconduct.

Initially, the staff at HOJC struggled to ensure that sanctions were meted out in response to misconduct—youth who engaged in fights, staff assaults, contraband and other serious types of misconduct or who refused to go to school sometimes continued to access the rewards earned by their peers on the housing unit. These problems were caused by a number of things—staff failure to complete Tour Reports, lack of access to complete data on youth misconduct, and general start-up issues that are typical of new facilities. Over time, a system to ensure that youth who engaged in misconduct were restricted from special activities, leisure time games, or movies and food rewards was put into place. By the end of the Monitoring Period, STRIVE Community was properly implemented, but continued to be limited by the features of its design that prevented a responsive, proportional and

243

individualized system for encouraging positive behavior and discouraging negative or harmful behaviors.

STRIVE+

With the assistance of a consultant with deep expertise in behavior management programs and the skilled oversight of ACS administrators, the STRIVE+ program design reflects best practice in juvenile facilities. Each day, youth's behavior is shaped by clear behavioral expectations for each activity period (*e.g.*, wake-up/hygiene; line movement; meals; school; recreation and programming time; bedtime). Expectations are related to safety/refraining from violent behavior, treating others with respect, taking initiative, engaging in programming and school, and taking a leadership role among peers. These expectations are presented to the youth during Intake and should be constantly reiterated by staff at the beginning of each activity period. Youth who meet the expectations during each activity period are awarded points, up to 100 points per day. The system does not require immediate and total compliance, but rather affords the youth an opportunity to respond to cues from staff to align their behavior with expectations.

The youth's accumulation of points leads to promotion to higher "levels" (copper, bronze, silver, gold and platinum) that provide access to a rich variety of rewards and increasing privileges. These include phone calls, food and hygiene items from commissary, and access to games, radios, and special events. Once a specific point total is achieved, youth must continue to earn the required number of points per week and refrain from most misconduct (some of the levels permit one or two low-level rule violations before being demoted). In combination, these features make STRIVE+ a transparent, individualized and robust system for shaping youth's behavior throughout the day.

In the event that a youth violates a rule, the STRIVE+ response is proportional. The variety of misconduct is categorized according to severity into "tiers," each with a prescribed array of sanctions:

- Staff respond to minor rule violations (*e.g.*, failing to follow the routine, failure to participate in an activity, dress code issues) with verbal corrections, warnings, and 5-minute time outs. If youth respond to these prompts, they may earn the points associated with the activity.

- Staff respond to Tier 1 misconduct (*e.g.*, horseplay, bullying/inappropriate comments/disrespect) by withholding the points for the activity and imposing a restorative consequence, such as an apology letter or peer mediation.

- Staff respond to Tier 2 misconduct (*e.g.*, verbal threats, property damage, being in an unauthorized area, refusing school) by withholding points for the activity, calling the youth's parent, requiring the youth to complete a skill-based activity with a counselor or clinician, or imposing a restorative consequence. Tier 2 misconduct also results in a one-level demotion.

- Staff respond to Tier 3 misconduct (*e.g.*, the various types of misconduct that jeopardize safety, such as fighting, assault, possessing dangerous contraband, and sexual misconduct) by placing youth on a modified program (activity restrictions), reducing access to privileges associated with the youth's current level, restorative consequences, requiring the youth to complete a behavior analysis with a counselor and/or dropping youth to the lowest level (Copper). Tier 3 misconduct is addressed in a Disciplinary Hearing within 72 hours to determine the consequences.

- Youth are able to appeal any sanction that includes a level drop, and a decision is made within 72 hours.

As designed, STRIVE+ is an excellent example of best practice for behavior management in a juvenile facility and, because of its individual-focus and calibrated response, robust implementation should help to quell the high levels of disorder the Facility is currently experiencing. That said, the Monitoring Team has worked with many jurisdictions that implemented similar programs and cautions that the results are neither guaranteed nor immediate. Significant oversight, coaching and sometimes, revisions to the design and/or retraining, are required to ensure that Staff utilize the program to shape youth's behavior in the moment, and that both rewards and consequences are meaningful to youth.

ACS, DOC, and DOE invested considerable effort in developing and implementing STRIVE+ through staff training and setting up various systems to manage the implementation, ensuring staff have resources for getting their questions answered as the program rolls out. STRIVE+ was formally implemented on July 1, 2019. During the Ninth Monitoring Period, the Monitoring Team will assess the quality of implementation by reviewing point cards, ensuring both rewards and sanctions are delivered as intended, reviewing Disciplinary Hearing proceedings and interviewing staff and youth.

Youth with Significant Behavior Concerns

In juvenile facilities, it is commonplace for a segment of the youth population to be unwilling or unable to meet behavior expectations and to continue to engage in violent behavior or cause disruptions that result in a use of force. HOJC is no exception. Routine data on fights and uses of force identify a segment of the population—approximately 10 youth at any given time—who frequently engage in disruptive and violent behavior. In fact, during the current Monitoring Period, 17 youth were involved in 10 or more uses of force (note: not all of these youth were in custody at the same time or throughout the entire Monitoring Period). Similar patterns were observed in the Facility's data that tracks fights, assaults on staff and other serious misconduct.

The generally accepted practice for juvenile facilities is to implement a more intensive strategy to impact the behavior of these difficult to manage youth. At HOJC, a structure for reviewing these youth with Significant Behavior Concerns ("SBC") was developed early in the current Monitoring Period. The Monitoring Team reviewed monthly summaries of the weekly SBC meetings, observed a meeting while on-site, and provided written feedback and consultation in an effort to strengthen

HOJC's approach. The Facility was encouraged to fortify the SBC strategy by ensuring it is a multi-disciplinary effort. Not only is input from the full range of staff (DOC, ACS, DOE, MH) important to fully understand the youth's challenges, but these same people also need to be informed of their roles in supporting the youth and encouraging positive behavior going forward. Furthermore, the Facility should formalize the strategy by:

- Formalizing specific referral criteria;
- Identifying required attendees;
- Developing a process for SBC team members to submit detailed, written input in the case of absence;
- Creating and implementing a template for a plan that features enhanced support, and specifies what each team member's responsibilities are;
- Engaging youth in the development of the plan; and
- Creating a structured format and documentation requirements for reviewing youth's current status and response to interventions from the previous week.

These recommendations were submitted to ACS and DOC and a follow-up consultation is scheduled for early in the Ninth Monitoring Period. Facility Leadership also reported that other specialized interventions may be targeting these same youth. The Monitoring Team will investigate these other resources during the Ninth Monitoring Period. An effective strategy for addressing this small subset of difficult to manage youth is essential to reduce the rates of violence and use of force and to create the safe conditions that are the primary requirement of this section of the Consent Judgment.

| **COMPLIANCE RATING** | ¶ **3.** Partial Compliance |
| | ¶ **4.** Partial Compliance |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

(a) Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

(b) The Tour Commander of the facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

(c) The Inmate shall remain in confinement only for so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the inmate at least once every 3 hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department drafted a policy regarding the use of Room Confinement at HOJC. While Facility staff have been utilizing this tool, the policy has not yet been finalized.

ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

As written, the Department's draft policy on Room Confinement reflects the generally accepted practice in the field and meets the requirements of this provision. The policy requires that room confinement be used only in response to an imminent risk of harm and when lesser measures have failed or are impractical. Furthermore, a variety of protections are required to ensure that youth are released from room confinement as soon as the risk of harm has abated, to ensure that specialized services (counseling, medical, education) are provided while the youth is confined, and to reduce the risk of self-harm during the period of isolation.

The Monitoring Team's extensive experience with this issue in other jurisdictions indicates that room confinement for the purpose of de-escalation is an essential tool for safely managing the immediate aftermath of violent incidents. It allows time for youth to regain control, process their behavior with staff and/or mediate interpersonal conflict, and it also gives Staff time and space to regain operational control of the area. Given the level of disorder at HOJC, the Monitoring Team has encouraged the appropriate use of room confinement at HOJC and has provided strong guidance about ensuring that the various protections listed above are in place.

However, HOJC has continually failed to follow its policy for room confinement and it appears that neither staff nor supervisors/leadership are being held responsible for improving practice. The Monitoring Team has analyzed the room confinement documentation every month since the Facility opened, finding persistent, pervasive problems with the practice, and has provided written and verbal feedback to the Department. Problems include:

- Vague descriptions of the youth's behavior, such that the "imminent risk of harm" threshold cannot be assessed;
- Sporadic compliance with 15-minute safety and welfare checks;
- Virtually no compliance with requirements for 30- and 60-minute and 4-hour assessments of readiness for release by direct care and administrative Staff;
- Virtually no compliance with requirements for case management, mental health, medical or educational services for youth in confinement; and
- Occasional placement of youth in confinement without proper authorization.

Despite assurances about plans to re-train staff, supervise the use of room confinement more closely, and audit documentation, it does not appear that the Department has done any of these things

to cure the on-going and pervasive misuse of this practice. To date, room confinement has been used very infrequently, which is at odds with the level of disorder in the Facility and the need for staff to restore order following an incident. When it has been used, the duration of confinement has been relatively short (usually an hour or two). Longer periods were associated with a Facility lockdown or the need to rehouse a youth following an incident. None of the room confinements approached the 24-hour limit.

During a consultation at the end of the Monitoring Period, the Monitoring Team reiterated its concerns. While the Department has reported it intends to address these issues with reminders at roll call and a system of monthly audits, these strategies are unlikely to produce a change in practice of the magnitude that is required. Instead, the Monitoring Team recommends that Facility leadership develop a protocol for close-in-time supervision of the practice (*e.g.,* end of day or end of shift) and provide contemporaneous feedback, coaching, and/or accountability to Staff. Furthermore, the Department needs to develop a dependable procedure for notifying staff from ACS, Mental Health and DOE that a youth has been placed on room confinement so that these partner agencies can provide services as required. Monthly audits must be reconfigured to actually assess the extent to which staff are following policy. The appropriate use of this practice is essential for mitigating the risk of harm given the Facility's high level of violence.

| COMPLIANCE RATING | ¶ 10. (16- and 17-year-olds) Non-Compliance |
|---|---|

## 15. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

| XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 3 |
|---|

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The City completed the transfer of all the 16- and 17-year-olds off Rikers Island to Horizon Juvenile Center by October 1, 2018. The Facility is jointly operated by the Department and ACS.

### ANALYSIS OF COMPLIANCE

As described in the introduction to this section, the Department transferred 16- and 17-year-old youth to Horizon Juvenile Center (HOJC), an alternative housing site, off of Rikers Island. While the initial phase of operation has suffered from high levels of disorder, over the long term, once practices and operations fulfill the mandate of Raise the Age, the philosophical shift and physical transfer will absolutely be in the youth's best interest. The Monitoring Team is pleased that the City made this monumental change.

| COMPLIANCE RATING | ¶ **1.** Substantial Compliance<br>¶ **3.** Not Applicable |
|---|---|

# CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

This section describes the status of provisions related to 18-year-old youth. As noted in the previous section detailing the status of HOJC, this report discusses the status of Young Inmates in two separate sections. The 18-year-old youth remain housed on Rikers Island with the vast majority of males housed at RNDC and all female 18-year-olds housed at RMSC. Sentenced 18-year-old males are housed at EMTC; those who require the mental health services available via CAPS and PACE are housed at AMKC; and some males are housed either in ESH at OBCC or Secure at GRVC.[201]

During the previous Monitoring Period, housing for 18-year-olds endured a period of transition and upheaval as GMDC closed in June 2018 and youth and many Staff were transitioned to RNDC. Shortly after they arrived, the adolescents at RNDC were transferred to HOJC, along with many of the Staff who worked with them. These transitions sparked a high level of disorder, resulting in a Non-Compliance rating with a key safety indicator of the Consent Judgement (¶ 1) for this age group for the Seventh Monitoring period. As discussed below, the Facility has yet to recover from this period of upheaval, as the use of force rate remained high and the rate of violence increased substantially during the current Monitoring Period.

_Rate of Use of Force and Violence for 18-Year-Olds_

As shown in the table and graph below, the use of force rate among 18-year-olds slightly decreased a year or so after the Consent Judgment went into effect. However, in June 2018, the rate increased sharply and has remained significantly higher than the early phases of monitoring.

---

[201] The average daily population for each month of the Monitoring Period for 18-year-olds was 6 at GRVC and 7 at OBCC.

The UOF rate for 18-year-olds is of serious concern to the Monitoring Team, despite some fluctuation during the current Monitoring Period.



The table below presents the historical data from another angle and brings the gravity of the current situation into stark relief. The average UOF rates for each Monitoring Period when the majority of 18-year-olds were housed at GMDC are shown next to the average UOF rates since the majority of 18-year-olds have been housed at RNDC. The average RNDC rate is <u>three times higher</u> than the average rate between January 2016 and June 2018 (54.8 versus 18.0, respectively). It is essential to note that the 2016-2018 rates, while lower, were still of significant concern—in fact, these "lower" rates are similar to what gave rise to the Consent Judgment in the first place, and thus must be improved upon in a sustained and significant way in order to meet the requirements of *Nunez*. Also for the sake of comparison, the average UOF rate among 18-year-olds is 13 times higher than the average rate of UOF among adults, which also remains at concerning levels (52.9 versus 4.8 for the current Monitoring Period).

| Average UOF Rate, 18-year-olds | | | | | | |
|---|---|---|---|---|---|---|
| Majority of 18yo at GMDC | | | | | Majority of 18yo at RNDC | |
| Jan. - Jun. 2016 | Jul.- Dec. 2016 | Jan. - Jun. 2017 | Jul. - Dec. 2017 | Jan. - Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 |
| 17.4 | 21.7 | 20.7 | 14.3 | 16.1 | **56.7** | **52.9** |

Similar patterns are observed in the rate of violence among 18-year-olds. Since June 2018, violence has climbed to the highest levels since the Consent Judgment went into effect, particularly during the current Monitoring Period.



The average rate of youth-on-youth violence among 18-year-olds was 24.4 between January 2016 and June 2018; since then, the average rate has doubled, to 55.3.

| Average Rates of Youth-on-Youth Violence, 18-year-olds | | | | | | |
|---|---|---|---|---|---|---|
| Majority of 18yo at GMDC | | | | | Majority of 18yo at RNDC | |
| Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 |
| 21.6 | 31.0 | 25.6 | 22.7 | 21.3 | **48.3** | **62.3** |

The essential question here is **why**? Simply moving from one building to another should not create the sustained pattern of disorder that is reflected in this data. Certainly, immediately before and immediately after the shift, the uncertainty and stress of change could be expected to have a negative impact on Facility safety. However, the Facility closure and transfer took place a year ago, and the high level of disorder persists.

Several factors contribute to the high level of disorder. During the current Monitoring Period, the Facility had three Wardens, one of whom was on sick leave for a significant length of time. The lack of stable leadership at the Facility-level was discussed as a contributing factor to the Department's lack of progress in the previous Monitor's Report (*see* pgs. 25-26). Certainly, the Department's continued failure to enact a robust and effective continuum of disciplinary responses to misconduct is also a contributing factor. Other than establishing the Structured Supportive Housing units ("SSHs") (*e.g.,* ESH, Secure, TRU and SCHU[202])—which took place shortly after the Consent Judgment went into effect—the Department has made no appreciable progress in its strategy for managing inmate behavior. Although the Monitoring Team applauds the removal of Punitive Segregation as an option for this population, the fact that three years later it has not been replaced by effective alternatives to address mid-level misconduct is both inexcusable and dangerous. Further, the Monitoring Team's analysis of staffing assignments and practices revealed virtually no consistency, meaning that staff and inmates do not have the opportunity to become familiar with each other which severely limits staff's ability to detect rising tension and prevent it from escalating into violence. Similarly, the lack of constructive coaching relationships between supervisors and line Staff have limited Staff's ability to develop and hone these essential skills.

---

[202] *See Appendix A: Definitions* for the definitions of these Supportive Housing units.

Furthermore, even in the best of circumstances, 18-year-olds can be a challenging population. The uneven pace of brain development and their lack of experience in managing stressful situations mean that their response to the chaotic jail environment may be volatile. While not all 18-year-olds will respond to stressful situations with maladaptive behavior, it is certainly a risk—demonstrated by the small portion of 18-year-olds involved in a large number of uses of force. The Department is encouraged to implement strategies to provide additional structure and support to these youth, to curb their involvement in institutional misconduct.

The Department must address the persistent deficits that have contributed to the high level of disorder at RNDC. The Department has identified its Graduated Sanctions concept as the pathway to reduce the violence in the Facility. The Monitoring Team believes it is an important first step (though others, particularly those related to on-going, active supervision of staff to improve the quality of their interactions with youth and to ensure that the rubric of Graduated Sanctions is fairly applied, are essential). Graduated Sanctions requires steady staff assignments, provides an avenue for the tangible implementation of the hallmarks of Direct Supervision, and provides a range of consequences for misconduct. If adequately resourced, embraced by staff, and properly implemented, the Graduated Sanctions program should bring much needed structure to the system of behavior management and accountability and ultimately reduce the level of violence in the Facility. However, the Monitoring Team notes that the Department has not yet been successful in cultivating a spirit of reform that will be essential for Graduated Sanctions to have a positive effect on the Facility's culture and level of disorder. The introduction of Graduated Sanctions creates a much-needed opportunity to assess the interplay among the various SSHs to ensure that they serve discrete target populations, have properly calibrated commissary limits, and transparent criteria for admission, promotion and release.

These dynamics are discussed in detail in § XVI. ¶ 5, below. Given the centrality of Graduated Sanctions in the Department's plan to address the violence and disorder at RNDC, the Department has committed to closely collaborating with the Monitoring Team as this program is developed and implemented. The Monitoring Team will scrutinize the Department's progress very heavily to ensure that the relevant aspects of the Consent Judgment are addressed adequately.

### 16. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** |
| • The Department continued to face high levels of violence and disorder throughout the Monitoring Period, as discussed in the narrative above. <br>• The Department continues to design, implement, and refine a range of strategies intended to produce safer Facilities, as detailed in the following narratives about the many components of the reforms related to Young Inmates in § XV "Safety and Supervision" and § XVI "Inmate Discipline." |
| **ANALYSIS OF COMPLIANCE** |
| *This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.* |
| As discussed in the introduction to this section, the rate of violence among 18-year-olds was higher during the current Monitoring Period than during any other period since the Consent Judgment went into effect. The Facility's level of disorder and rate of use of force are simply unsafe and the Department's limited efforts to reduce them have thus far been ineffective. The Department must bring together a number of important initiatives (particularly Graduated Sanctions with its focus on consistent staffing, integration of Direct Supervision, and meaningful consequences for misconduct) in order to reverse this trend. |

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

**XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)**

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- NCU confirmed the completion of FSIRs and DCSRs for all housing units with 18-year-old inmates throughout the entire Monitoring Period at RNDC and RMSC, and in May and June 2019 at OBCC and GRVC.

- NCU conducted on-site inspections on a few random days each month to determine whether any 18-year-old inmate was housed in inoperable cells throughout the entire Monitoring Period at RNDC and RMSC, and in May and June 2019 OBCC and GRVC. If an inmate is assigned to an inoperable cell, the Facility is notified and expected to either remove the youth from the cell immediately or have the cell repaired so it may be safely occupied.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

*Assessment of Locking Mechanisms*

NCU's audit of locking mechanisms evolved during the Monitoring Period. During the course of its regular audits of facilities on Rikers, NCU became concerned that its original audit methodology relied too heavily on whether staff simply *completed* the required forms and did not focus sufficiently on the *accuracy* of the forms, or in other words, whether cell doors were actually secured by functional locking mechanisms. Accordingly, the audit is being refined to prioritize on-site assessments and a more intense scrutiny of cell doors. During the next Monitoring Period, the Monitoring Team and NCU will collaborate to refine the methodology to ensure it squarely addresses the quality of the information recorded on the form.

- **RNDC**

The locking mechanisms at RNDC are both antiquated and complicated. The lack of dependable locking mechanisms is a reported frustration for Staff. Accordingly, routine and vigilant security assessments and maintenance are necessary to minimize unauthorized exit from a cell. If a lock is found to be compromised, the cell must be taken off-line immediately so the lock can be repaired.

NCU's assessment of FSIRs and DCSRs confirmed these forms are generally completed on a daily basis as required. However, every month, NCU's on-site inspections revealed that at least some cells had inoperable locks and were occupied by inmates. It is unclear whether Staff in these cases had conducted checks as required and/or reported these findings. Of course, it is possible also for cell locks to be manipulated after Staff's checks have been completed. That said, the number of inoperable cells identified suggest that, at least in some cases, checks were not occurring as required and/or that Staff were not moving inmates when inoperable cells were identified.

- **RMSC**

At RMSC, which houses 18-year-old female inmates, the NCU confirmed the FSIR and DCSR forms were completed daily and 18-year-old inmates were housed in operable cells on all days audited throughout the Monitoring Period.

- **OBCC**

At OBCC, which houses 18-year-old male inmates in ESH, the NCU's on-site inspections found all 18-year-old inmates were housed in operable cells on the days audited in May and June 2019.

- **GRVC**

At GRVC, which houses 18-year-old male inmates in Secure, the NCU's on-site inspections found all 18-year-old inmates were housed in operable cells on the days audited in May and June 2019.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to UOF incidents. As noted in prior Monitor's Reports, cell door/lock manipulation resulted in UOF in a few isolated incidents but was not a primary contributing factor to UOF at RNDC. During this Monitoring Period, the Monitoring Team identified that only 11 of 645 incidents (2%) at RNDC during this Monitoring Period had some type of unauthorized exit by inmates (as reported in the COD). Only three of these had evidence of cell door lock manipulation. The Monitoring Team will continue to scrutinize these incidents.

*Reasonably Safe and Secure Conditions*

This provision also requires the Department to conduct daily inspections to ensure the conditions are reasonably safe and secure. As reported in the Seventh Monitor's Report, the Monitoring Team found other operational issues that negatively impact the reasonably safe and secure conditions for 18-year-old inmates. In particular, the Monitoring Team identified sporadic compliance

with evening lock-in time. Failing to manage lock-in times causes a number of operational issues. For example, several incidents occurred after youth should have been locked in for shift change or for the night. While cell door/lock manipulation did not precipitate the UOF, Staff's failure to encourage and enforce compliance with lock-in times often resulted in the Staff losing operational control and escalating the intervention in order to force youth to comply (*e.g.*, calling the Probe Team and using OC, both of which create additional operational burdens).This issue persisted throughout this Monitoring Period despite daily reviews of lock-ins at RNDC by CASC. Facility Leadership is encouraged to take ownership of both this problem and its solution.

| COMPLIANCE RATING | ¶ 2. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    a.   all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted. [203]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department added to the General Supervision section of its Rules and Regulations to incorporate the requirement of this provision.

- The Department issued a General Order on March 29, 2019 requiring Wardens and Deputy Wardens to conduct weekly tours of each housing area where 18-year-olds are housed (more frequently in those areas with operational challenges) and to correct any deficiencies noted.

- NCU incorporated a review of housing area log books into its existing audits of cell-locking mechanisms in order to identify the frequency of tours.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates (i.e., part a).*

In order to achieve compliance with this requirement, the Department issued a new rule and directive to reflect the requirements of this provision, which went into effect part way through the Monitoring Period. Per the Directive, all housing units are to be toured weekly, while housing areas with multiple fights, SRG violence, multiple uses of force or other types of disorder should be toured

---

[203] This language reflects the revision ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

more frequently. NCU's audits began on May 13, 2019 and revealed relatively high levels of compliance with the weekly tour component of the directive at all Facilities housing 18-year-olds. The Facilities' performance level was calculated by identifying the number of required events (number of units x number of weeks audited) to the number of notations entered in the unit log books by the Wardens/DWs. Facilities housing smaller numbers of 18-year-olds logically had a smaller number of events. Across all Facilities, documentation by Wardens/DWs was identified for 50 of 57 events (88%). Facility compliance levels ranged from 75% to 100%. This is a promising initial step. The Department will reach substantial compliance when similar performance levels are sustained over time, when the increased frequency of tours required for units experiencing high rates of disorder is documented, and when NCU's results have been verified by the Monitoring Team.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department operates several "program houses" at RNDC, including Horticulture, I-CAN, and Reentry program houses. Because of the programs' intensity, some program houses do not have Program Counselors. In General Population units at RNDC, RMSC and EMTC and in the SSHs (*i.e.,* ESH/Secure/TRU/SCHU), Program Counselors provide structured programming (*i.e.*, individual counseling, groups on issues that are common to this population) and structured recreation (*e.g.*, games and other leisure time activities). Program Counselors are required to document these programs and activities on a daily basis.

- The Department continues to partner with a significant number of community-based organizations to provide programming to youth at RNDC, EMTC and RMSC and the SSHs. The Department now has an accessible format for tracking and compiling data on the volume of programming provided by community partners.

- All 18-year-olds at RNDC, EMTC and RMSC have the opportunity to attend full-day school. Those in ESH or Secure have the opportunity to attend school three hours per day.

- Youth continue to be able to access digital tablets that include both education and entertainment applications. Counselors also occasionally provide "self-guided" worksheets to youth to complete during their free time.

- The Department rebuilt the PEACE Center and YES Center at RNDC which opened during the current Monitoring Period. These spaces offer workforce development and vocational

programming (*e.g.*, autobody shop) and structured leisure time activities (*e.g.*, recording studio, ping pong and other games).

ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department is pursuing compliance with this provision by providing various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by a large number of community partners, leisure time activities (*e.g.*, tablets, board games and video games) and daily large muscle activities ("recreation"). The combination of these programs should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult. Broad engagement in these activities will reduce both idle time and violence and will enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing Program Counselor-led programming and activities and reviewing education attendance data. As noted above, the Department now has accessible data on the volume of programming delivered by community partners which the Monitoring Team was able to assess for the first time.

*Education*

Although engagement in school is essential for positive youth outcomes, it is not mandatory for this age group. Those who are housed at RNDC, EMTC and RMSC have the option to attend full-day school, while youth in the SSHs have the opportunity to attend school for three hours per weekday. The Monitoring Team reviewed monthly attendance reports maintained by the NYC DOE for those eligible for education (*i.e.*, youth aged 18+ are eligible for school but are beyond the compulsory education age). As noted in previous Monitor's Reports, only a small segment of young adult students (age 18 to 21) are enrolled in school and fewer attend consistently. Facility/housing unit assignments are adjusted accordingly for youth who indicate a desire to attend school.

Many young adult students participated in the wide array of career technical education ("CTE") programs that operate out of the PEACE and YES centers. For this age group, not only do opportunities to participate in CTE programs reduce idle time but also contribute to positive post-release outcomes.

*Program Counselors & Community Based Programming*

The records audited for May 2019 revealed that all 33 of the units housing 18-year-olds at RNDC, RMSC, and EMTC had an assigned program counselor, as did the ESH and Secure programs. As encouraged by the Monitoring Team, the Department revised the format for its programming data so it is much easier to analyze than in previous Monitoring Periods. The Monitoring Team calculated

program hour totals (combining hours delivered by program counselors and community partners) for a sample of units, which revealed a significant volume of programming in most units. During May 2019, housing units for 18-year-olds in the general population received an average of 19 hours of programming per week, ranging from 10 to 45 hours, depending on the unit. In some units, program counselors provided the bulk of programming while in others, community partners provided most of it. Some units had an equal volume of programming provided by program counselors/community providers. Programming types included conflict resolution; Dialectical Behavioral Therapy; Interactive Journaling; communication skills; art, drama and music; yoga and other types of fitness; employment readiness and job skills, among many others.

If an 18-year-old inmate chose to attend school (six hours per day x five days = 30 hours) and engaged in the typical program offerings on an average unit (19 hours), about half of his/her out-of-cell hours (14 hours x seven days = 98 hours) would be occupied by structured programming led by an adult. This estimate omits time spent in recreation and religious services, which were not included in the data, and also does not account for other structured activities such as services from H+H clinicians, meals, showers, or visitation. In short, the level of programming provided meets the requirements of this provision.

Although the Department is in Substantial Compliance with this provision, the Monitoring Team encourages the Department to utilize its data for quality assurance purposes. For example, this data could be used to determine whether internal programming goals are being met and how it intersects with the level of violence and use of force (this would also support the Department's efforts to demonstrate compliance with this provision). Such oversight would also help the Department to identify operational issues that may disrupt programming, performance problems with counselors or community partners, and to identify programs that are sparsely attended in order to substitute them with something more attractive to this population. Program Counselor data can also be used to assess the extent to which counselors are delivering certain curricula (*e.g.,* DBT, conflict resolution, interpersonal skills) at a sufficient intensity to catalyze behavior change and to identify counselors who may over-rely on "self-guided" activities, which may occupy a youth's time with a constructive activity but are a less effective approach than delivering the material in person.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department originally made the Facilities responsible for tracking housing transfers enacted to protect vulnerable youth, which they did with limited success during the previous

Monitoring Period. In November 2018, NCU assumed responsibility for this function, by creating a list of all housing transfers and consulting with the Facility on the purpose of each one to identify those enacted for the purpose of protecting youth. NCU audited housing transfers throughout the current Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The goal of this provision is to ensure that youth who are being bullied, threatened, or are otherwise vulnerable are moved to a different housing unit where they will be safer. Facilities make housing transfers for a variety of reasons (*e.g.*, after intake and classification, to disrupt tensions, to provide access to a program house, etc.). At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent of this provision is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Facilities must strike a delicate balance among making transfers to protect vulnerable inmates, intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff to develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Facilities' flexibility for programming, population management, etc.

NCU's audit strategy is comprehensive and has integrity. Each month, a list of all housing transfers at RNDC is generated, and NCU staff consult with Facility Staff/Young Adult Response Team ("YART") members to ascertain the reason for the transfer. The NCU and Monitoring Team jointly developed criteria for the types of transfers that should "count" for the purpose of this provision. In general, transfers of the victim of an altercation to another GP house or to Protective Custody are highlighted to demonstrate proof of practice. Transfers of perpetrators of violence to TRU/SCHU as a disciplinary consequence are excluded from the tally.

During the current Monitoring Period, NCU identified 14 transfers effected to protect the victim of an altercation. Now that a full 6-months of data are available for review, the Monitoring Team believes the criteria could be expanded to include the transfer of aggressors *within* housing types (*e.g.,* to a different GP or TRU house), given that this action will also protect the victim and is not done for the purpose of disciplinary consequences (such as when the aggressor is transferred from GP to SCHU or TRU). Furthermore, other transfers were made to quell tensions on the housing unit, which are also likely to protect potential victims should the tensions escalate. If these criteria were included, another 34 housing transfers would be added, for a total of 48 transfers. In short, the Department has demonstrated a consistent practice in transferring youth among housing units at RNDC in order to protect victims or prevent tensions from escalating.

The Monitoring Team will collaborate with NCU to potentially refine the audit criteria now that more data is available. Given the small number of housing units and very few 18-year-old youth housed at EMTC (sentenced 18-year-olds) and RMSC (female 18-year-olds), the procedures required by this provision are not operationally feasible. GRVC (Secure) and OBCC (ESH) are excluded due to their function as special housing units and the resulting lack of flexibility in housing assignments.

| COMPLIANCE RATING | ¶ 6. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report, at pgs. 131-132). Protective Custody units are located at RNDC (males) and RMSC (females).

- During a previous Monitoring Period, the Department drafted revisions, in consultation with the Monitoring Team, to the Protective Custody Directive to address the Monitoring Team's feedback about the substance of information found in the Protective Custody ("PC") documentation and timeliness of required interviews. The Department's revised practice allows Operations Security Intelligence Unit ("OSIU") staff to focus more directly on 18-year-olds and those who are disputing their placement in PC. The Department also decided to further revise the Directive to address the interplay between PC status and violent misconduct, particularly among adult inmates. The policy has yet to be finalized.

- In response to a few isolated problems discovered during the Monitoring Team's verification audit, on May 10, 2019, the Chief of Security issued a memo to the Assistant Chiefs for each Facility directing that transfers into and out of PC may occur *only* with OSIU approval and must be carried out by the Facilities in a timely manner. Furthermore, NCU reported that it instituted a new procedure in which OSIU sends NCU the *entire* PC file so that NCU staff can identify issues that may be documented on something other than the official PC forms.

- NCU has fully implemented its internal audits of performance in this area and submits them to the Monitoring Team every two months, along with a running log of admissions and releases.

ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department maintained Substantial Compliance with this provision by demonstrating through NCU's audits that OSIU and Facilities are complying with existing DOC policy and meeting the requirements of this provision for the use of PC for both male and female 18-year-olds. During the current Monitoring Period, the Monitoring Team conducted its own audit of PC records to verify NCU's audit findings. A few issues were noted (described below), but the Department took quick action to close the various gaps in both practice and audit methodology.

During the current Monitoring Period, a total of 15 18-year-olds were placed in PC (all male; there were no female 18-year-olds in PC during the Monitoring Period). These 15 cases were evenly split across the requesting parties (*i.e.,* self-referred, court ordered, and placed at the Facility's discretion), and three of the 15 placements were involuntary. All placements were reviewed by OSIU within the two business days permitted by policy, and all were continued in PC. Three of the youth remained in PC at the end of the Monitoring Period, with a median length of stay of 80 days.

As shown in the table below, compared to previous Monitoring Periods, fewer 18-year-olds were admitted to PC during the current Monitoring Period. The reason for this change is worth exploring, though it could be for innocuous reasons (*e.g.*, fewer 18-year-olds being admitted to Rikers). Any time a youth or 3rd party verbalizes a concern for safety, the youth is immediately moved to Temporary PC, pending an interview by OSIU to determine whether protective custody or some other housing (*e.g.*, GPE, General Population Escort) is appropriate. This practice was reported by OSIU and has also been echoed in previous interviews with youth. Thus, the most likely cause of the lower number of admissions is that fewer youth requested protective custody. The Monitoring Team will explore this issue in more depth in subsequent Monitoring Periods.

While the number of youth released from PC is approximately the same as previous Monitoring Periods, a much larger proportion was removed for behavioral reasons (46%, compared to about 15% previously) during the current Monitoring Period. During subsequent Monitoring Periods, the Monitoring Team plans to examine these trends to identify changes in youth's behavior (*e.g.*, whether fewer youth are requesting PC during admission, or whether the reduction comes from fewer youth requesting PC after they had been in general population for a while) and to evaluate whether youth are somehow discouraged from requesting PC. Furthermore, rates of violence in these units will be explored to determine whether there has been an uptick or whether the changes witnessed during this Monitoring Period stem from a change to the response to violence (*i.e.*, youth with violent behavior may have been permitted to remain in PC more often during previous Monitoring Periods). This

examination is necessary in order to address whether PC continues to afford youth the level of safety and security required by this provision.

| 18-year-olds Admitted to and Released from Protective Custody, January 2018-June 2019 | | | |
|---|---|---|---|
| | Jan. – Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 |
| **Number of Admissions** | 28 | 32 | 15 |
| **Number of Releases** | 30 | 26 | 24 |
| **Reason for Release** Discharged Requested Removal Behavior (Fight, AOS) Other | 19 (63%) 5 (17%) 5 (17%) 1 (3%) | 12 (46%) 8 (31%) 4 (15%) 2 (7%) | 10 (42%) 2 (8%) 11 (46%) 1 (4%) |

As noted above, NCU audits PC files each month to assess compliance with policy and the requirements of the Consent Judgment. NCU found high levels of compliance across the 26 files audited (some youth who entered PC during the previous Monitoring Period were included in the audits). Nearly 100% of the packets included:

- A statement from the youth detailing his/her concerns;
- Further information (incident report, etc.) to flesh out the youth's statement;
- Evidence that OSIU interviewed the youth within the two-business day timeline;
- Documentation that youth were promptly informed of OSIU's decision and their right to a hearing;
- Evidence that hearings were held timely for involuntary placements (one youth was released prior to the hearing timeline's expiration, one youth waived his right to a hearing, and the other hearing was conducted as required by policy); and
- Evidence that most 30- and 60-day reviews were timely and included youth's input into the reviews via a written statement.

As noted above, the Monitoring Team's verification audit identified a few isolated problems including a lack of timely transfer out of PC for a couple youth, a single failure to address a request for PC, and a single unauthorized removal from PC. OSIU and NCU were receptive to the Monitoring Team's input and reported that it quickly put into place two remedies, as described in the bullets above.

The Monitoring Team continues to encourage the NCU to expand its methodology to include interviews with youth on the PC units to ascertain the extent to which youth feel safe, have any contact with youth in the general population, are engaged in school and other programming and understand the process for requesting removal from PC if desired. The Monitoring Team remains impressed by the

Department's ability to sustain Substantial Compliance and also by the timely corrective action that was put in place once the Monitoring Team identified the isolated issues described above.

| COMPLIANCE RATING | ¶ 7. (18-year-olds) Substantial Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department issued an interim Directive 4104R-F regarding the use of the Housing Unit Balancer ("HUB") at all facilities except RMSC and Horizon (effective 10/3/19).

- When they first arrived at RNDC in June 2018, 18-year-olds were classified using the Department's original scored classification tool. In late February 2019, RNDC transitioned to the Department's new classification system, the Housing Unit Balancer ("HUB"), which is a decision-tree that addresses an inmate's risk of institutional misconduct (Minimum, Medium-Medium, Medium-Maximum, and Maximum) and also balances the security risk groups ("SRGs") on each housing unit.

- Custody Management submits a list of inmates who are rehoused to each facility each business day. Facilities are required to respond to Custody Management the following business day, providing a current status/intended plan for each inmate on the list. Policy requires facilities to address mis-housing within 72 hours, either by rehousing the inmate appropriately or enacting an override of the custody level so that the inmate may be housed out-of-class.[204]

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department's policies reflect the requirements of this provision. Temporary co-mingling of classification levels, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (*e.g.*, upon a birthday, or when an inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues

---

[204] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Units like those noted in the text of the Provision. Female youth at RMSC are also exempt from this requirement because the very small number of 18-year-old girls makes this provision operationally infeasible.

restrict housing flexibility. As indicated above, the Department now uses the HUB to classify inmates at RNDC. In addition to custody level, the HUB also utilizes the inmates' SRG affiliation to identify appropriate housing. This adds complexity to the re-housing process—it is not just a matter of identifying a housing unit of the appropriate security level, but also one in which SRG affiliations will be appropriately balanced. Facilities are supposed to submit a memo to Custody Management each business day, explaining the reason for/plan to address mis-housing for each inmate who appears on the mis-housed list.

The Monitoring Team reviewed data on the number of youth who were mis-housed at RNDC and EMTC for the month of April 2019. At EMTC, 18-year-olds may be placed on one of two housing units, and none were mis-housed during the period reviewed. At RNDC, a very small percentage of 18-year-olds were mis-housed. A total of 19 18-year-olds were mis-housed during the period reviewed. Five of these (26%) youth were rehoused within the 72 hours permitted by policy (note, some may have also been discharged within that time period). Three youth (16%) were actually in an SSH during the time period they appeared on the mis-housed list, and thus were not actually mis-housed. However, this was determined by the Monitoring Team and was not indicated on RNDC's memo. Finally, 11 youth (58%) were mis-housed beyond 72-hours (range 4-22 days; average 11 days) without an explanation and without an override being applied.

While the beginning steps of this process—for Custody Management to identify youth who are mis-housed—appears to be working properly, the subsequent steps—for the facilities to explain the status/plan for each youth who appears on the list and to take steps to house the youth appropriately within 72 hours—is unreliable. Fortunately, NCU has taken initiative to address the complexity of the existing mis-housed process and to bring greater integrity to the process for Facility responses/action. Beginning in July 2019, the facilities now submit a spreadsheet listing each mis-housed inmate and detailing the way in which the situation was/will be resolved. This new structure should be a much more reliable way for the Department to ensure that Minimum and Maximum custody inmates are housed separately. The Department and Monitoring Team also agreed that the mis-housing of inmates aged 19-22 on units where 18-year-olds are housed will also be considered, given that mis-housing in those circumstances could potentially impact the safety of 18-year-olds.

| COMPLIANCE RATING | ¶ 8. (18-year-olds) Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 11 (VIDEO CAMERA COVERAGE)

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year-olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year-olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

Refer to the Video Surveillance section of this report (Consent Judgment § IX, ¶ 1(b)) for a detailed discussion of this issue.

| **COMPLIANCE RATING** | **¶ 11.** Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to use the Direct Supervision model, developed by NIC, as the foundation for a training program for supervising young adults. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Direct Supervision training continues for recruits and is underway for In-Service Staff, as described in the Training section of this report.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

As noted in the Training section of this report, most Staff have received the initial Direct Supervision training, but some Staff still require In-Service training. As noted in the previous Monitor's Report, the Monitoring Team has had several discussions with uniformed leadership and NCU about how they could implement and track the core practices of the Direct Supervision curriculum. Core practices include:

- achieving consistent assignment of Staff to housing units;
- providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;
- ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;
- expecting Staff to deliberately select a lower level of engagement when tensions arise;
- occupying youth with structured activities throughout the day; and
- engaging in proactive and interactive supervision.

In late 2018, the Monitoring Team encouraged the Department to consider how these concepts could be integrated into the Graduated Sanctions program (discussed in Inmate Discipline ¶ 6, below) to expand options for immediate reinforcement/incentives and to shorten the timeframe for rewards to better match youth's developmental needs.

The Monitoring Team has tried several avenues to encourage the Department to make demonstrable progress but, to date, the Department has not made any substantive effort to implement the key aspects of Direct Supervision in a holistic fashion or to demonstrate proof of practice for the few fragments that reportedly exist (*e.g.*, allowing Staff to set up special activities to reward inmates

for positive behavior). The Monitoring Team believes that integration of these concepts into the Graduated Sanctions program holds the most promise for timely implementation and is also one pathway toward reducing violence at RNDC.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Recruits may make written requests to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration.
  - RNDC Leadership had the opportunity to interview all 101 recruits who were ultimately assigned to the Facility.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The overwhelming majority of Staff working with 18-year-olds are located at RNDC. During this Monitoring Period, the Department reinstated the opportunity for Facility leadership to interview recruits for assignment to RNDC, an important assessment which had not been afforded to them during the last Monitoring Period for unexplained reasons. All recruits assigned to RNDC were either selected for placement following an interview with Facility leadership and/or participated in On the Job Training ("OJT") at the Facility. The process for assigning Staff to RNDC during this Monitoring Period continues to satisfy the requirements of this provision.

| COMPLIANCE RATING | ¶ 13. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[205]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

---

[205] The Consent Judgment does not include a ¶ 15 for this Section.

|     |     |
| --- | --- |
| b. | The ratio between Inmates and Direct Supervision floor Officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year-olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates. |
| c. | The ratio between Inmates and Direct Supervision floor Officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year-olds. The maximum living unit size shall be 30 Inmates. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department reports it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff. Schedulers at the Facilities reported several ways that they minimize the frequency with which a unit is staffed only by probationers. They reported being conscious about Staff's probationary status and constructing the weekly schedule with this in mind (*i.e.*, the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years.

- At the end of the Monitoring Period, large numbers of staff tenured, which significantly reduced the number of probationary Staff at the Facilities. Early in the Monitoring Period, about 30% of the Staff at the Facilities housing 18-year-olds were probationary; by June 2019, these proportions decreased significantly—RNDC had 8% probationary Staff, EMTC had 16%, GRVC had 17%, OBCC had 15% and RMSC had 12%.

- NCU audits have included all Facilities housing 18-year-olds since June 2018.

**ANALYSIS OF COMPLIANCE**

*These provisions apply Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with these provisions with respect to 18-year-old inmates.*

The Department continued its internal audits to determine the level of compliance with the staffing provisions. During previous Monitoring Periods, the Monitoring Team found that the Facilities'/NCU's internal audit process leads to valid conclusions about the state of compliance.

*Assignment of Probationary Staff (¶ 14)*

Regarding the **appropriate dispersion of probationary Staff** (*i.e.*, ensuring that probationary Staff are paired with veteran Staff on the housing units), nearly all of the Facilities housing 18-year-olds had high rates of compliance throughout the Monitoring Period (80% of shifts or more). RNDC was the only Facility that did not reach this threshold, averaging 70% for the Monitoring Period (from 62% in January to 88% in June). As noted above, a large class of Staff tenured at RNDC at the end of

May, which explains RNDC's improvement on this metric. Furthermore, NCU discovered a methodological problem at RNDC (only A, B, and C posts were being reported, omitting D and E posts. D- and E- posts are the counterparts to B- and C- staff, assigned to the floor of each side of a housing unit). Since some of the Staff filling D and E posts are likely to be tenured, historically, the rates reported for RNDC have likely been underestimates of the true level of compliance. This error was corrected in July 2019.

Given the high rates of compliance at most Facilities and the likelihood that RNDC's level of compliance is higher than it appears, the Monitoring Team determined that the Department continues to meet the "best effort" requirement of this provision. NCU is applauded for its ability to discover the reporting glitch as this type of internal scrutiny is what will ultimately render external oversight unnecessary.

*Staffing Levels* (¶ 16)

Audits of **Staff-to-youth ratios** continue to reveal that all Facilities and units housing 18-year-olds were staffed within the ratios required by the Consent Judgment (2:25 for Maximum custody youth and 1:30 for Medium custody youth) on nearly all of the thousands of shifts NCU audited. The methodological glitch that omitted D- and E-post Officers at RNDC impacted the audits of this provision as well. NCU used Genetec to audit a sample of shifts on housing units with more than 13 youth and found that two Officers were consistently present on the floor. This is the second methodological problem that NCU has detected at RNDC. The Monitoring Team applauds the NCU's careful scrutiny of incoming data and also notes that in both cases, the Facility was found to have been in compliance with this provision. The Department has maintained Substantial Compliance with the provision related to staffing ratios.

The Staff ratio provision also includes **limits on the size of units housing 18-year-olds**. The Bed Utilization Plan from June 30, 2019 indicated that all 18-year-old housing units RNDC had a capacity within the limits set by this provision (capacity of 25 or less in celled housing units where maximum custody youth could be held; capacity of 30 or less in modular units where medium risk youth could be held).

| **COMPLIANCE RATING** | ¶ 14. (18-year-olds) Substantial Compliance<br>¶ 16(a). (18-year-olds) Substantial Compliance<br>¶ 16(b). (18-year-olds) Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Consistent staffing can be achieved through two mechanisms: awarded steady posts (where Staff apply and are awarded a consistent assignment) and informal assignment (where schedulers simply assign Staff consistently to the same post).

- Towards the end of the Monitoring Period, leadership at RNDC developed a roster of Staff that were reported to be consistently assigned to posts for each shift on each housing unit of RNDC. The Monitoring Team has not yet assessed this roster nor its implementation but will do so during the next Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The overall purpose of consistently assigning Staff to the same housing unit is to facilitate constructive Staff-youth relationships. Indeed, consistent staffing is a hallmark of Direct Supervision, and is particularly important in units with youth who are difficult to manage (*i.e.,* the SSHs). However, in order for consistent assignment of Staff to reap the intended benefit in terms of violence reduction, youth also must be consistently assigned to the housing units and not constantly rehoused, which occurs all too often. This same theme—the benefit of developing relationships in order to change behavior—applies to consistent assignment of Captains as well, given their essential role in helping Staff to improve practice.

The Monitoring Team developed and enacted a strategy for assessing the extent to which Staff are consistently assigned to units housing 18-year-olds. The goal of "consistently assigned Staff" was examined from multiple angles. The Monitoring Team reviewed staff schedules/assignments for a four-week period in May 2019 to assess the extent to which housing units were consistently staffed 1) on paper, 2) in practice, and 3) week-to-week. More specifically, whether the same person was *assigned* to the unit on at least four of seven days each week ("on paper"), whether the same person *worked* the unit on at least four of seven days each week ("in practice"), and whether the post was worked by the *same person on all four weeks* reviewed ("week-to-week", *i.e.*, "consistent staffing").

*RNDC*

RNDC schedules were examined for a four-week period in May 2019. A random sample of six housing units (both North and South sides) were selected for review, calculating whether the floor and bubble Officers were consistent (A-, B- and C-posts only; D- and E-posts will be added to subsequent audits once the methodology is finalized). Of the 159 housing unit posts reviewed (6 units x 3 posts x 3 shifts x 4 weeks, minus 19 shifts x 3 posts where the information was not provided), 61% were consistently staffed on paper, but only 16% were consistently staffed in practice. Substitutions plagued

the implementation of the written schedule. "Fully consistent staffing," where the same person worked the post for all 4 weeks occurred only once (11-7 shift on one unit).

*EMTC*

EMTC schedules were examined for a four-week period in May 2019, calculating whether the floor Officers (B- and C- posts; other posts may be added once the methodology is finalized) were consistent. Of the 36 housing unit posts reviewed (2 units x 2 posts x 3 shifts x 3 weeks), 83% were consistently assigned on paper and 72% were consistently staffed in practice. Half of the housing unit posts achieved week-to-week stability for the entire 3-week period, or "full consistent staffing" (11-7 shift on both units and 3-11 shift on one unit).

*RMSC*

RMSC schedules were examined for a four-week period in May 2019, calculating whether the floor Officer was consistent (B-post; other posts may be added once the methodology is finalized). Of the 24 housing unit posts reviewed (2 units x 1 post x 3 shifts x 4 weeks = 24), 58% were consistently assigned on paper and 50% were consistently staffed in practice. None of the posts in either housing unit were staffed by the same person for all 4 weeks.

*Overall Findings*

Of the three Facilities audited, EMTC has achieved the most success in consistently staffing the units housing 18-year-olds, but even so, only achieved week-to-week consistency half the time. RNDC's results are very troubling—the assignment of staff to a post on paper seems to have little to do with who actually works the unit. Given that consistent staffing is a foundation of good correctional management and also key for the Department's plans for Graduated Sanctions, RNDC must develop effective roster management strategies. Continued poor performance at RNDC will result in a Non-Compliance rating. Furthermore, during the next Monitoring Period, the Monitoring Team will leverage the work completed to achieve compliance with § XII. ¶ 4 and 5 (Screening for Staff Assigned to Special Units) to assess the performance level of Secure and ESH.

This is the Monitoring Team's second robust audit of staffing practices and the methodology continues to be refined to improve the veracity and meaningfulness of the results. It is extremely complex and time consuming and given the centrality of this issue to so many of the Department's objectives, dependable metrics and audits are essential. In collaboration with the NCU, the Monitoring Team plans to further refine the audit strategy and to broaden it to include Captains' assignments during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Partial Compliance |
|---|---|

17. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME),**
**¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 7. The Department shall not place any 18-year-old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year-old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year-old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, Benjamin v. Ponte, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

*Provision XVI.1 applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Monitoring Team reviewed the Department's various disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (*i.e.*, 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with 18-year-olds during the current Monitoring Period, the Monitoring Team did not assess compliance with these provisions and so they are not rated.

These provisions were last rated in the Second Monitor's Report and ¶¶ 1 and 8 were placed in Substantial Compliance and ¶ 7 was placed in Partial Compliance. Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation. The Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot currently be rectified because the practice is no longer in place. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the

Monitoring Team did not assess this provision while the practice was still in effect. Now that it has been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Not Rated |
| | ¶ 7. Not Rated |
| | ¶ 8. Not Rated |
| | ¶ 9. Not Currently Applicable. |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- 18-year-olds with serious mental illnesses (SMI) who commit violent infractions are excluded from Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH) and must be placed in an appropriate therapeutic setting.

- When a youth is referred to Secure or YA-ESH, medical and mental health staff at H+H are asked to "clear" the youth for program entry by verifying that he has no contraindications given the increased time in cell and use of restraint desks.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of inmates with SMI who have committed an infraction. PACE also offers treatment to inmates with SMI but is completely separate from the infraction process.

### ANALYSIS OF COMPLIANCE

The Department submitted data on medical and mental health clearance for all ESH and Secure referrals throughout the Monitoring Period. A total of 78 18-year-olds were referred, and most were cleared by medical and mental health within a business day or two. A total of nine youth were not cleared by Mental Health, and most of these youth were placed in an alternative setting (either CAPS or they remained in their original housing unit). In a few cases, it does not appear that clearance was obtained prior to placing a youth in ESH or Secure as required, discussed in more detail below.

The number of referrals of 18-year-olds decreased a bit from the previous Monitoring Period (78 vs. 90, respectively) but still remains much higher than historical levels, when fewer than 20 18-year-olds were referred to these programs per Monitoring Period. The increases track the significant

increase in violence among this age group. The Monitoring Team cross-references the clearance list with other sources of data (Adjudication records for ESH and Secure and the SSH Admissions list) to ensure youth are cleared prior to placement in an SSH.

Although the process appears to work as intended much of the time, the Monitoring Team identified several youth who were initially placed in Secure/ESH without the required clearance from H+H (these youth were removed from ESH/Secure shortly thereafter). Some of these discoveries coincided with personnel changes in the Health Affairs Unit, and so the underlying system failure could not be identified with any specificity. These findings suggested that the procedures in place were *ad hoc* and dependent on a single individual. This is not sustainable or reliable to ensure compliance with this requirement. In response, the Monitoring Team recommended the Department create a written protocol for obtaining clearance and to include procedures for H+H to notify Health Affairs and OSIU of the screening outcome so that OSIU can make an appropriate housing decision. Furthermore, the protocol needed to include procedures for when an inmate required immediate removal from his housing unit, but an H+H determination could not be obtained that quickly. The Department submitted a written protocol which will be finalized during the next Monitoring Period with input from the Monitoring Team to ensure that both the protocol and the method for tracking referrals have adequate quality controls. Given the identified concerns, the Monitoring Team has also increased the frequency of data submissions so that compliance can be assessed more contemporaneously. The compliance rating in this provision was reduced to Partial Compliance because the intended protections failed for a number of inmates and further, the frequency of errors on the Department's tracking form and lack of back-up documentation suggested that it is no longer a reliable vehicle for demonstrating proof of practice.

The Monitoring Team is not aware of any 18-year-olds who were placed in CAPS or PACE during the current Monitoring Period. If a significant number of youth are placed in these programs in subsequent Monitoring Periods, the Monitoring Team will assess the appropriateness of these placements.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- The Department developed and implemented several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct (Second Chance Housing Unit ("SCHU"), Transitional Restorative Unit ("TRU"), the Secure Unit and Young Adult Enhanced Supervision Housing ("YA-ESH")).
  - o The Department maintains policies for TRU and SCHU, which were approved by the Monitoring Team during the Sixth Monitoring Period.
  - o The Department has policies in effect for both ESH and Secure but reports revisions to both policies are being considered.
- To address less serious and episodic violent misconduct, the Department continues to rely on the infraction process but has conceptualized a promising Graduated Sanctions program.

ANALYSIS OF COMPLIANCE

The overall goal of this provision is to ensure that misconduct is promptly addressed by an effective tool for holding 18-year-olds accountable that reduces the Department's reliance on Punitive Segregation.[206] Some misconduct is serious (*i.e.*, slashings, stabbings and assaults with injury) or chronic (*i.e.*, a repeated pattern), and for these situations, the Department established four Structured Supportive Housing units ("SSHs"; *see* pgs. 219-221 of the Third Monitor's Report for a description of each). These programs have been operational for approximately two years and appear to be properly targeting youth who engage in serious misconduct. They are discussed in detail below.

Fortunately, most misconduct is neither serious nor chronic (*e.g.*, fights without injury, serious disruptions to the orderly operation of the Facility, etc.), and for these negative behaviors, the Consent Judgment requires an adequate continuum of sanctions. The Department's limited progress toward this end is also discussed below.

*Responses to Serious and Chronic Violence*

During the current Monitoring Period, the Monitoring Team continued to review the flow of inmates in and out of the SSHs; the level of violence in the SSHs; and the quality of individualized behavior support planning and support team operations. As recommended in the previous Monitor's Report, the Department revised its mechanism for tracking the flow of inmates into and transfers among the SSHs. The new mechanism has far greater integrity and allowed for more precise analysis of

---

[206] Previously, 18-year-olds could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

admissions, releases and length of stay. Inmates who successfully complete a program are easier to identify, as are those who are transferred to another type of SSH before being returned to the general population (GP). The Department is encouraged to utilize this format for all inmates participating in the SSHs (the current file only includes 18-year-olds) in order to maintain basic metrics on program operations.

**Admissions and Transfers.** There were 148 admissions of 18-year-olds to the SSHs during the current Monitoring Period.[207] In terms of the initial program, 64% were admissions to TRU, 16% were admissions to SCHU, 9% were admissions to ESH and 9% were admissions to Secure. In 52 cases (35% of the total admissions), inmates were transferred to another type of SSH (usually a more restrictive one, likely due to additional misconduct[208]) prior to being released to the GP. Further, 23 inmates had multiple SSH admissions during the Monitoring Period, often close in time (less than a month apart). Now that the Department has more accurate data on program admissions and transfers, the reasons for these multiple admissions (including why previous SSH stays were less effective in preventing subsequent misconduct) should be explored.

**Length of Stay**. Of the 119 18-year-old inmates who exited one of the SSHs during the Monitoring Period, 15% were discharged prior to completing the program. Of the remaining inmates, the average length of stay ("ALOS") prior to moving to GP was about 64 days for those exiting ESH and Secure, 24 days for those exiting TRU, and 15 days for those exiting SCHU. Inmates who were transferred to another SSH prior to returning to GP had longer lengths of stay (ALOS 70 days, range 7-196 days). These ranges do not appear to be excessive given what is known about the program and the typical dynamics involved.

**Inmates Remaining in Program.** At the end of the Monitoring Period, 29 18-year-olds remained in the SSHs. Two were in SCHU (ALOS 17 days, range 10-23 days), 15 were in TRU (ALOS 11 days, range 2-32 days), 5 were in Secure (ALOS 67 days, range 8-175 days) and 7 were in ESH (ALOS 83 days, range 39-137 days). Those with longer lengths of stay had been transferred among multiple SSHs. These ranges do not appear to be excessive given what is known about the program and the specific dynamics involved.

**Quality of Intervention**. None of the programs involve the extended periods of isolation used in Punitive Segregation. TRU and SCHU are focused on addressing violent misconduct but do not restrict the youth's lock-out time or movement beyond what occurs in the general population. Secure and ESH

---

[207] These data are not comparable to previous Monitoring Periods because the analysis only includes 18-year-olds, whereas previous data included 16- and 17-year-olds as well.

[208] Occasionally, inmates were transferred between ESH and Secure, which is more likely to occur in an effort to manage the population or to keep certain inmates separated, rather than to change the level of restrictiveness.

both utilize additional hardware (*i.e.*, restraint desks; partitions between quads) and other restrictive procedures (*i.e.*, escorted movements, reduced lock-out times depending on the youth's level/phase) to prevent subsequent violent misconduct. While the SSHs vary a bit in terms of the type and volume of programming that is offered, inmates may receive several hours per day of school, recreation, services from the Program Counselor and community partners, if they choose to participate.

Some of the SSHs (SCHU, TRU and Secure) attempt to organize service delivery around a Behavior Support Plan ("BSP") which is intended to include individualized, behavior-focused goals and a set of interventions designed to catalyze behavior change. Echoing the findings in several previous Monitor's Reports, the BSPs remain ineffective for this purpose. Goals are generally not specific, not measurable, not observable and otherwise not amenable for use as a guide for an inmate's participation in an SSH. Progress toward specific goals is not measured week-to-week. As a result, the requirements for youth to exit these SSHs remain unclear and somewhat subjective. Given the Department's plan to design and implement Graduated Sanctions, the time is ripe to reconsider the structure, operation and interrelationship of the SSHs to ensure that the programs are mutually supportive and not unintentionally conflicting. Furthermore, given the persistent inability to craft BSP that are suited to the task, the Monitoring Team has recommended the Department refine the criteria for release/promotion by identifying objective, easily identifiable criteria. These recommendations will be discussed during the next Monitoring Period.

On a positive note, SSH files are well-organized, youth appear to be admitted for reasons permitted by policy (though more specificity is needed in the Adjudication Captains' narratives for ESH and Secure placements regarding the severity of injury, reasons that referral is not proximal to the incidents cited, and reasons for escalation from another SSH). Youth's behavior is recorded in a structured fashion (*i.e.,* stamp cards and a Behavior Log Book) and their program status is reviewed at the required intervals (which differ for each of the SSHs). Concerns about specificity in the Adjudication Captains narratives were reported in the previous Monitor's Report and were communicated by NCU to the Adjudication Captains late in the current Monitoring Period. Sufficient time has not passed to ascertain whether this consultation has improved practice.

**Level of Violence**. The table below presents data on the rates of violence and UOF in ESH and Secure. The specific units housing TRU and SCHU change frequently due to construction and physical plant issues and thus the process for collecting data is complex, unduly burdensome and resulted in data of questionable validity. The Monitoring Team agreed that the Department could temporarily suspend reporting this data for TRU and SCHU but expects the Department to resume its reporting once the Facility housing unit assignments have stabilized or as reliable internal metrics are put in place.

As noted in the introduction to this section, the overall rates of violence and UOF among 18-year-olds remained high during this Monitoring Period (*i.e.*, six-month average rate of UOF was 52.9, average rate of violence was 62.3). For all of the SSHs listed below, the average daily population

("ADP"), uses of force and incidents of violence were calculated for the entire unit, which also includes inmates age 19 to 21, in order to gain a sense of the level of disorder in the living environment. The rates of violence and UOF vary across Monitoring Periods in all SSH units but have generally been below those calculated for the entire population of 18-year-olds.

| | ADP, Levels of Violence and UOF in SSH Units | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | | January-June 2018 | | | July-December 2018 | | | January-June 2019 | | |
| Unit | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH Level 1 | 10 | 0.9 (9.0) | 1.8 (18.0) | 10 | 3.0 (30.0) | 3.7 (37.0) | 10 | 1.8 (18.0) | 2.7 (27.0) | 2.6 | .66 (25.4) | 2.5 (96.2) |
| YA-ESH Level 2[209] | | | | | | | | | | 15.7 | 1.83 (11.7) | 2.0 (12.7) |
| YA-ESH Level 3 | | | | | | | | | | 5.8 | .66 (11.4) | .83 (14.3) |
| Secure | 8 | 2.8 (35.0) | 4.6 (57.5) | 6 | 1.3 (21.6) | 1.67 (27.8) | 8 | 1.3 (16.3) | 2.2 (27.5) | 13.4 | 2.8 (20.9) | 3 (22.4) |
| YA TRU | 17 | 3 (17.6) | 4.5 (26.5) | 19 | 2.8 (14.7) | 4.0 (21.1) | 25 | 10.5 (42.0) | 11.3 (45.3) | | | |
| YA SCHU | 8 | 0.3 (3.75) | 0.6 (7.5) | 5 | 0.7 (14.0) | 1.0   (20.0) | 8 | 1.8 (22.5) | 2.5 (31.3) | | | |

**Metrics**. Now that the Department has implemented a solid database for tracking admissions, transfers and releases, it should examine the implications of the trends noted above (*e.g.,* length of stay, the number of transfers among programs, the significant proportion of youth who return to one of the SSHs shortly after transfer to GP). The Department should also undertake its own file reviews to determine whether key timelines, criteria for advancement, and other procedural requirements are being met—NCU has done so sporadically in the past. In addition, the Department needs to examine whether the SSHs are having a positive impact on participants' behavior by comparing levels of violent misconduct before, during and after program participation. These are essential questions in determining whether the Department is meeting its obligations under this provision. The Monitoring Team met with NCU and the Data Analytics and Research Unit during the current Monitoring Period and expects to review the initial analysis of SSH effectiveness during the next Monitoring Period.

*Responses to Less Serious and Episodic Misconduct*

---

[209] In previous Monitoring Periods, 18-year-olds were not placed in ESH Level 2 or Level 3 because those levels were blended with adults, and a BOC variance prevented 18-year-olds from being co-mingled with adults. The Department created YA-only ESH Level 2 and Level 3 houses and operated them throughout the current Monitoring Period and thus these data are now being reported by the Monitoring Team.

As heavily encouraged in previous Monitor's Reports, the Department's continuum of responses to misconduct needs to be expanded to effectively address behaviors such as threatening Staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. These behaviors are not serious enough to warrant placement in an SSH, but an effective response is necessary to promote Facility safety.

The Department's only individual-level response to these behaviors for 18-year-olds is to write an infraction, where only two sanctions are available to be imposed by the Adjudication Captains—a $25 surcharge or a verbal reprimand, neither of which are particularly effective in modifying behavior. Several Monitoring Periods ago, the Department attempted to track other sanctions that were reportedly applied when youth engaged in these less serious forms of misconduct. However, sanctioning practices were limited in scope, not uniformly applied, and were not being tracked reliably. This strategy was abandoned over a year ago.

While not an individual-level response to misconduct, the Department has attempted to encourage positive behavior using a group incentive program ("the Levels"). The program design requires Staff and Facility leadership to rate each housing unit on an array of factors (e.g., incidents, infractions, respect for Staff, sanitation, cell compliance, uniform compliance, lock-in, court production and program engagement) every two weeks. Well-performing units should be assigned a higher Level (Gold and Platinum) and gain access to an array of rewards (special activities, games, etc.), while units exhibiting problem behaviors should be assigned to a lower Level (Copper and Bronze) with more limited rewards. This removal of rewards/activities could, if properly implemented, begin to address the Department's obligations to have a range of consequences for misconduct, though the efficacy of group-level incentive programs for modifying individual behavior is somewhat limited.

The Monitoring Team has made multiple attempts to assess the legitimacy of the Levels program. Once the Facility began tracking the Level assignments on a routine basis (early 2018), the Monitoring Team requested information about how the units were assessed in order to verify the criteria used and veracity of the process. At first (in late 2018), the Department reported that it did not retain these records. Once a set of rating forms were compiled and submitted in February 2019, the Monitoring Team's review revealed that these documents were fraught with problems, lacking internal consistency and without any of the required details, and generally produced Level assignments that did not appear to be valid. To its credit, once notified of these problems, the Department took immediate action and developed several processes to reinforce the implementation of the concept and to ensure the rating process operated as designed. Unfortunately, changes in leadership at RNDC derailed the efforts to fix this longstanding problem. Information on the Levels program submitted for the current Monitoring Period revealed that none of the planned remedies had gone into place and the Levels program remains without integrity. The Monitoring Team has recommended the Department solve this problem once

again—this time with the Facility leadership at the center of the program design given their essential role in implementing the program. The Department's response is expected during the next Monitoring Period.

As noted in the previous Monitor's Report, the Department developed a promising concept to fill out its continuum of responses to misconduct—Graduated Sanctions—and once it is implemented, the Levels system will no longer be necessary. Graduated Sanctions is a phase-based program that provides individualized incentives (such as additional programing, family days, recreational activities and increased commissary limits) and sanctions (restrictions from earned incentives and decreases in commissary and barbershop). The concept reflects several good practices in behavior management with young people, and with consistent unit staffing and sufficient daily reinforcements and encouragement from Staff to supplement the somewhat delayed schedule for phase advancement (or, in the reverse, phase demotion), it could reduce violence and other types of disorder in the Facility. The Department originally indicated its intention to implement the program during the current Monitoring Period but failed to do so. The Department has cited this program as a pathway to reduce violence at RNDC, and the Monitoring Team believes the program has real merit. However, the program's ability to impact the high rates of disorder at the Facility will require both the planning and implementation to be adequately resourced, well-conceptualized and backed by the commitment of both Uniformed and civilian leadership at the highest levels of the Department, which must also insist on ownership by the Facility as well. The Monitoring Team plans to closely scrutinize its development, training, implementation and tracking, providing technical assistance as necessary. If the Department does not make substantive progress on this issue during the next Monitoring Period, a Non-Compliance rating will be assessed.

*Solo Housing*

During the current Monitoring Period, Solo Housing of 18-year-old youth was used infrequently. RNDC and EMTC did not use it at all; RMSC used Solo Housing as a response to behavior 3 times, for less than 1 week each time; and 4 youth were in Solo Housing at OBCC (ESH) due to attrition. Most of these episodes were just a few days, though one lasted 19 days.

As noted in several previous Monitor's Reports, the historically poor implementation of the Solo Housing policy for placements in response to a youth's violent behavior are a serious concern. Despite a workshop designed to clarify expectations and close review by both the Monitoring Team and NCU, placements in Solo Housing at the beginning of the current Monitoring Period suffered from the same problems noted previously. NCU committed to auditing the Solo Housing records more closely and conferring with Facility leadership whenever deficiencies were noted. The effectiveness of this oversight in improving practice cannot be ascertained because Solo Housing was not used as a response to behavior during the last half of the Monitoring Period (all uses were due to attrition, and all were very short). To the Department's credit, the documentation submitted for other purposes revealed RNDC's effort to *avoid* Solo Housing by transferring youth who would otherwise be housed alone in TRU because of attrition to another TRU unit where they would be able to interact with peers. The Monitoring

Team encourages the Department to avoid housing youth alone whenever possible. Should a Facility decide to place a youth in Solo Housing in response to his/her behavior, the Monitoring Team expects both proper implementation of the policy and robust oversight from NCU.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Although the Department promulgated an Ops Order regarding the use of "Satellite Intake" as a de-escalation tool in July 2018, it was not used during the current Monitoring Period.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

Shortly after the Consent Judgment went into effect, the Monitoring Team met with the Department to sketch out the practices needed to meet the requirements of this provision. After several iterations, the substance of the Ops Order for "Satellite Intake" was drafted and eventually promulgated. However, once GMDC was closed and the 18-year-olds were moved to RNDC, the Department stopped using Satellite Intake, possibly because the larger population depleted the stock of available housing units. From then on, the Department appears to have resumed its original practice— to take youth to Intake following violent incidents and/or Probe Team intervention. While this may accomplish the overall goal of removing youth from the housing unit in order to await medical assessment, it reinstates the burden on Intake which was one of the key reasons the Department decided to use Satellite Intake in the first place.

Since the Department did not use Satellite Intake at RNDC, RMSC or EMTC during the current Monitoring Period, this provision is not applicable. However, the Monitoring Team emphasizes the importance of a de-escalation tool in managing the immediate aftermath following an incident. Not only do youth require time to cool off, Staff need time and space to regain operational control of the area. Previously, the use of Satellite Intake served this function and also reduced the burden on Facility Intake areas. The Department is encouraged to reconsider this—or a similar—option as a viable strategy for post-incident response.

| COMPLIANCE RATING | ¶ 10. (18-Year-Olds) Not Applicable |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with a mental health designation ("M-designation") prior to holding a disciplinary hearing.

- The Department implemented Directive 0000R-A "Implementing Departmental Policy," as discussed in the Implementation section of this report.

- The Department sought clarification on the third recommendation from Dr. Beard, who explained that the review was suggested for the purpose of relaying relevant information to the Adjudication Captain and to determine whether H+H should be present during the hearings.

- In June 2018, the Department decided it would not implement this third suggestion, finding the recommendation to be unduly burdensome and believing that existing protections were sufficient.

### ANALYSIS OF COMPLIANCE

The purpose of Dr. Beard's assessment was to ensure the process for adjudicating infractions is fair and reasonable, a standard that is essential for good correctional practice. Fairness can be compromised in situations where inmates—for a variety of reasons, mental health issues being one of them—do not adequately comprehend the procedural safeguards or the implications of a guilty finding. Dr. Beard's suggestion is one way to achieve this goal, but there are likely others. In August 2018, the Monitoring Team sought to better understand the Department's position that existing protections were adequate and requested additional information about the processes and outcomes related to mental health evaluations prior to infraction hearings. Due to the Department's failure to respond, the Monitoring Team assessed Partial Compliance for the previous Monitoring Period. The Monitoring Team did not focus on this provision during this Monitoring Period given other priorities. The Monitoring Team intends to work with the Department and H+H during the next Monitoring Period to obtain the relevant information.

| **COMPLIANCE RATING** | **¶ 11.** Partial Compliance |
| --- | --- |

• **End** •

# Appendix A: Definitions

| Acronym or Term | Definition |
|---|---|
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques Training |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.* ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BOC | Board of Correction |
| BSP | Behavior Support Plan |
| BWC | Body-worn Camera |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CTE | Career Technical Education |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |

| Acronym or Term | Definition |
|---|---|
| DCID | Deputy Commissioner of ID |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Expedited Case Closure | Cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") that can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| Fast Track | Cases that are pushed from ID to Trials more quickly with less investigative steps that can closed via an NPA |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FIS | Facility Information System |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| HOJC | Horizon Juvenile Center |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |

| Acronym or Term | Definition |
|---|---|
| IRT | Incident Review Team |
| ITTS | Investigation Trials Tracking System—Department's legacy Trials and ID case tracking system |
| KK | Staff Lounge |
| LAS | Legal Aid Society |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OCD | Off-Calendar Disposition—processing of Trials case without scheduling or attending OATH conference. |
| OCFS | Office of Children and Family Services |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |

| Acronym or Term | Definition |
|---|---|
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| September Recommendations | On September 30, 2019, the Monitoring Team shared recommendations the Monitoring Team developed on proposed actions that could be taken by the City and Department to stimulate progress toward the overarching goals of the Consent Judgment. |
| Service Desk | Computerized re-training request system |
| SMI | Serious Mental Illness |
| SOL | Statute of Limitations |
| SOLstat | Project initiated within ID to evaluate cases approaching the SOL to determine if the incident involves misconduct and discipline should be imposed |
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |

| Acronym or Term | Definition |
|---|---|
| STRIVE Community | HOJC's original behavior management system |
| STRIVE+ | HOJC's more robust behavior management system (builds upon STRIVE Community) |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| Team Picks | Cases were previously identified by the Monitoring Team as having potential objective evidence of wrongdoing |
| TDY | Temporary Duty |
| TOL | Transfer of Learning—roll call trainings with the goal of guiding Staff more effectively by contextualizing the requirements of various UOF policies and directives. |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

# Appendix B: Training Charts

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors (including Executive Staff) | |
| | | *Status of Deployment* | Ongoing Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. | Completed - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Same In-Service Curriculum as Officers | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Ongoing Provided in mandatory Pre-Service training | **Ongoing** – To be complete by October 2019 * Pre-Promotional Training * In-Service - A.C.T. | | Complete June 2019 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | Same In-Service Curriculum as Officers | Finalized and consulted Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. - | | Completed - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |
| **SCM (Young Inmate Management) (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | Finalized and consulted Monitoring Team and developed by JKM | Same In-Service Curriculum as Officers | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC or Horizon[210] | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | Electronic – iPad | Hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | Same In-Service Curriculum as Officers | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |

---

[210] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| Training | Required Attendees | | Recruits | In-Service | Supervisor | Executive Staff Training |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams to complete in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams to complete in 2018; **Ongoing Training Obligation for Staff Newly Assigned to Post** | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |

| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
|---|---|---|---|---|---|---|
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* | | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | | |
| | | *Length of Training* | | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* | | Any new investigators assigned to ID | | |
| | | *Deployment* | | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* | | **TBD (see Investigations Section of this report)** | | |
| | | *Length of Training* | | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Finalized and consulted Monitoring Team. | Finalized and consulted Monitoring Team. | | |
| | | *Length of Training* | No specified length in CJ, but 3 hours | No specified length in CJ | | |
| | | *Frequency* | All recruit classes that matriculated beginning in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Ongoing Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | | |
|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Refresher** | **Supervisor Refresher** | **Executive Staff Training Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 4-hours | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | One year after S.T.A.R.T. Every other year thereafter | |
| | | *Status of Deployment* | A.C.T. - **Ongoing – To be Complete by October 2019** | A.C.T. – Completed in 2018 | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | None | None | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | **Not Yet Developed** | **Not Yet Developed** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD | TBD |
| | | *Frequency* | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 4-hours | | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | | |
| | | *Deployment* | A.C.T. - **Ongoing – To be Complete by October 2019** | | |
| | | *Attendance (¶ 7)* | TTS Records | | |
| | | *Examination (¶ 6)* | N/A | | |

x

| Status of Refresher Training Program Development and Deployment | | | | | |
|---|---|---|---|---|---|
| Training | Required Attendees | | Refresher | Supervisor Refresher | Executive Staff Training Refresher |
| **SCM (Young Inmate Management) (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | | |
| | | *Length of Training* | 8-hours | | |
| | | *Frequency* | All Staff who work with Young Inmates | | |
| | | *Deployment* | Refresher training began in Fourth Monitoring Period; All Staff at RNDC | | |
| | | *Attendance (¶ 7)* | TTS Records | | |
| | | *Examination (¶ 6)* | Hand-written | | |
| *There are no refresher requirements for Direct Supervision, Probe Team Training, Cell Extraction Team Training, Investigator Training, or Handheld Operator Training | | | | | |

| | Training Provided during Eighth Monitoring Period | | | | | Total Training Provided Nov. 2015 – June 2019 | |
|---|---|---|---|---|---|---|---|
| | Recruit Class July 2019 | Pre-Promotional Captains | Pre-Promotional ADWs | In-Service | Refresher | Initial Training | Refresher |
| **Use of Force Policy (¶ 1(a))** | 383 | N/A | 3 | N/A | 3,153 | **12,341** | **5,303** |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | 383 | N/A | 3 | 2,235 | N/A | **9,151** | N/A |
| **Defensive Tactics (¶ 2(a))** | 383 | N/A | 3 | N/A | 3,153 | **12,750** | **5,303** |
| **Young Inmate Management ("SCM") (¶3)** | 383 | N/A | 3 | 555 | 470 | **8,834** | **3,193** |
| **Direct Supervision (¶4)** | 383 | N/A | 3 | 239 | N/A | **6,345** | N/A |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | 383 | N/A | 3 | 189 | N/A | **5,772** | N/A |
| **Cell Extraction (¶ 2(b))** | 383 | N/A | 3 | 58 | N/A | **4,665** | N/A |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | 383 | N/A | | | | **2,899[211]** | N/A |
| **Investigator (¶ 2(c))** | All **22** investigators onboarded in this Monitoring Period received training | | | | | **176[212]** | N/A |

---

[211] This includes all Recruits beginning with the November 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

[212] This does not include those trained in the First Monitoring Period as the Monitoring Team had not begun verifying this information until the Second Monitoring Period.



**Appendix C: Flowchart of Promotions Process**

| | | | | |
|---|---|---|---|---|
| DCAS Exam | Civil Service Requirements: <br> > U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity <br> > educational or experience requirements <br> >drug test; medical, psychological & physical testing <br> > resident of NY or counties <br><br> **AIU Background Investigation** | **DOC In-House Disqualifiers:** <br> > dismissal from prior employment <br> > arrests total <br> > driving record total | Review of Candidate's History/Background Investigation by Director of AIU and Assistant Commissioner of AIU | **Correction Officer** |
| DCAS Exam (Completion of probation - 3 Years CO, unless extended) | Disqualifiers <br> > must hold valid drivers license <br> > resident of NY or counties <br> > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Captain** |
| DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) | Disqualifiers <br> > must hold valid drivers license <br> > resident of NY or counties <br> > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Assistant Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) | Review of UoF and Disciplinary History, and Performance Evaluations | Re-Assignment Board Review <br><br> Rating, Interview, Candidates Ranked | Chief & Commissioner to review candidates recommended by Re-Assignment Board | **Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 18 months in eligible title (Captain/ADW/DW), unless extended) | HR reviews UoF and Disciplinary History, and Performance Evaluations | Promotion Board Review, interview candidates and make recommendations | Chief & Commissioner to review candidates recommended by Promotion Board | Mayoral Approval |
| | | | | **Warden** |
| No specific time requirement that you have to be a Warden for, in order to be considered for a Chief-level appointment | Nunez Screening, including review of UoF and Disciplinary History | Commissioner and Chief of Staff | Mayoral Approval | **Chief** |