**VIA ECF**

The Honorable Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

      Re: *Nunez, et al. v. City of New York, et al.,* 11-cv-5845 (LTS) (JCF)

Dear Judge Swain,

      We are counsel to the plaintiff class in this litigation. We write to supplement the May 6, 2020 letter by the Monitor (Dkt. No. 338), which was submitted to provide the Court with information about the effect of the COVID-19 pandemic on operations in the New York City Department of Correction ("the Department" or "DOC") jails and the City's response to the pandemic. As the Monitor's letter largely transmitted the City defendants' reports about their COVID-19 policies, we write to supply additional information on the same topic to enhance the record before the Court. We do not understand any party to be seeking Court relief at this time about COVID-19.

      As a threshold matter, we note that we share the Monitor's appreciation of the significance of the huge decline in the number of people confined in DOC, both with respect to meeting the challenges of COVID-19 and eventual compliance with the Consent Judgment. By the close of 2019, the jail population had been dramatically reduced by the decarceration movement and consequent "Close Rikers" campaign and progressive state legislation such as Raise the Age and bail reform.[1] Since the onset of the COVID-19 pandemic, the census has dropped even further as state courts have granted writs of habeas corpus and other relief for individuals held in DOC custody (over the frequent opposition of the City) and New York State released individuals held in DOC custody on technical parole violations. As a result, DOC, which long *before* this crisis had the largest staffing complement for any jail in the United States,[2] now has even more resources to meet the needs of a historically low population faced with new demands of social distancing and health care. We believe it is too early to tell whether or how this change in scale will affect *Nunez* compliance, or whether the factors that have led to non-compliance are dispositive independent of scale, but welcome the benefits of decarceration.

---

[1] The number of people in custody decreased consistently as bail reform efforts achieved increasing success in 2019 and 2020: from a monthly average of 7,880 in January 2019, to 6,239 in December 2019, to 5,659 in January 2020. *See* Vera Institute of Justice, *Bail Reform's Impact on Jail Incarceration: What We Know Thus Far* (January 29, 2020), https://www.vera.org/downloads/publications/bail-reforms-impact-on-jail-incarceration.pdf (last visited March 13, 2020).

[2] *See* Eight Report of the *Nunez* Monitor, at 7 (Dkt. No. 332) (noting that at the time of filing of the Eighth Report in October 2019, "[t]he Department enjoy[ed] the largest staffing complement for jails in the United States with an inmate-to-staff ratio of 1 to 1.3.").

The City's self-reported policies to contain COVID-19 described in the Monitor's letter incorporate, albeit incompletely, Centers for Disease Control and Prevention ("CDC") and other public health guidance on infectious disease management in a correctional setting. The relevant information affecting the safety of all who work in and are confined in the jails involves the *implementation* of those policies. While that information is circumscribed by the dynamic nature of any epidemic response, and the lack of reliable data from the relevant government agencies, some preliminary information bearing on the topics addressed in the Monitor's letter is available from neutral oversight agencies such as the New York City Board of Correction (the entity mandated by the New York City Charter to regulate, monitor, and inspect the correctional facilities in New York City) and the plaintiff class. On May 11, 2020, the Board of Correction ("the Board" or "BOC") published a report addressing the City's implementation of some of the policies described in the Monitor letter, which we address below.[3]

**COVID-19 prevalence in the DOC Jails**

The extent of COVID-19 infection among the incarcerated people in the City jails remains unknown. The Monitor's letter provides what we, too, understand to be the most reliable public data about COVID-19 prevalence among clinical and correctional *staff,* but it does not similarly describe the prevalence among the plaintiff class of *incarcerated people,* which has not been publicly released.[4] This is because the data presented juxtaposes two separate infection measures: the cumulative *total* number of staff afflicted with the virus, but only the *non-cumulative* number of incarcerated people similarly affected, on any given day. For example, on May 7, 2020, 372 people who were then confined in the jails had been confirmed positive for COVID-19. But this is not the cumulative number of cases of incarcerated people who have contracted the virus during the pandemic: it does not include those who had COVID-19 while incarcerated and were then released or transferred. It also does not include those who have died while in custody. Certainly the true spread of the disease among the incarcerated population is far higher than the reported non-cumulative data. Even so, the infection rate of almost 10% of incarcerated people is still five times higher that of New York City generally.[5] Unless and until the City reports information about the *cumulative* numbers of people in custody with confirmed COVID-19 cases, as well as the underlying criteria for who receives tests, and numbers of tests administered to the incarcerated population, there is little, if any, reliable data for the Court on the full extent of the outbreak within DOC facilities.

**Testing, Diagnosis, and Infection Management**

The City reports that Correctional Health Services ("CHS") is testing vulnerable, high-risk, and symptomatic populations. CHS has not, however, to our knowledge shared who is

---

[3] The New York City Board of Correction, *Monitoring COVID-19 Responses in New York City Jails, April 5 – April 16, 2020* (May 11, 2020), at https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/COVID%20Housing%20Public%20Report%204.5-4.16%20DRAFT%205.11.20_FINAL_1.pdf (last visited May 13, 2020).

[4] The New York City Board of Correction publishes daily data on this figure. https://www1.nyc.gov/assets/boc/downloads/pdf/News/covid-19/Public_Reports/Board%20of%20Correction%20Daily%20Public%20Report_5_08_2020.pdf.

[5] The Legal Aid Society, *COVID-19 Infection Tracking in NYC Jails*, https://legalaidnyc.org/covid-19-infection-tracking-in-nyc-jails/ (last visited May 13, 2020).

deemed to be included in this population: that is, who actually *gets* the tests and how many have been administered.  Regardless of the testing criteria used, our office has received numerous reports from incarcerated people that they have not been able to get testing, or even basic medical care, even when exhibiting COVID-19-like symptoms.  Some of these reports have come from people who are at higher risk of serious illness according to CDC guidelines[6] due to age or underlying health conditions, and cases where the person's reported symptoms are severe.  The Legal Aid Society has contacted CHS and DOC on behalf of many of these individuals to request testing and appropriate care.

In addition, many clients also report facts indicating that infection isolation and management practices have not been implemented with fidelity.  As people in custody perform necessary job assignments like meal service and cleaning, they report concerns that they are spreading contagion between units due to poor or minimal opportunities to disinfect clothing or a lack of protective gear between units.  We continue to hear concerns from people in custody about potential exposure from staff as staff move about the facility or upon a shift change.  Clients tell us that officers who staff quarantine units one day are then staffing units not under quarantine shortly thereafter.

We also receive troubling reports from individuals who are housed in quarantine, due to a likely exposure to the virus, or symptomatic units that the revolving population of such units raises contamination concerns.  Numerous clients have told us that DOC continues to bring new people into units under quarantine.  We have also received reports that people who received negative COVID test results from the clinic were nonetheless placed back in the "presumed positive" unit awaiting transfer elsewhere.

**Social Distancing, Sanitation, and Hygiene**

Despite the extremely low population, incarcerated people continue to report that it is difficult and often impossible to practice "6-foot" social distancing.  In March and through the first weeks of April, we received nearly daily reports from people in custody that their housing units, including dorm units, were too crowded for such distancing.  A BOC audit of dorm units housing symptomatic or likely exposed people in mid-April showed that almost half of audited units were operating at a capacity above 50%.[7]  Though many dorms and single cell units are operating at various levels of reduced capacity, incarcerated people nonetheless share common spaces like dayrooms, telephones, and showers.  The BOC audit showed that in 50% of units observed, Board staff observed social distancing failures.[8]

While the City reports to the Monitor that "soap and cleaning supplies are available in every housing area, free of charge," we have received continuous complaints that basic hygienic materials such as soap, cleaning supplies, water, and paper towels are not available—meaning, as some clients have reported to us, that they have no choice but to purchase soap from commissary

---

[6] Centers for Disease Control and Prevention, *People Who Are at Higher Risk of Severe Illness*, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html (last visited May 11, 2020).
[7] BOC COVID-19 Monitoring Report, May 11, p. 7.
[8] *Id*. at p. 6.

with their own money, contrary to CDC guidelines.  We also received several reports that people have been kept in intake areas for extended periods of time, sometimes without running water.

People in the plaintiff class also tell us that their housing areas are dirty, and that the cleaning protocols that Defendants report to the Monitor are not being implemented.  Though the Monitor conveyed the Department policy that telephones and other "high-contact" surfaces are to be cleaned every two hours,[9] incarcerated people have been reporting to us for weeks that phones are not being cleaned regularly and that they are forced to hold them with socks if they want to risk using them to access legal counsel, medical care through the new CHS telehealth system, or loved ones.  When Board staff conducted monitoring of phone access and cleaning, they confirmed that holding phones with socks and other fabric was a "frequent" practice, and that of the 45 phone usages they observed, the phone was only cleaned 3 times prior to use.[10]

People in custody also report inadequate provision of masks and other personal protective equipment. We have received numerous reports that clients have had no choice but to use a single dirty mask for days or sometimes weeks.  Multiple incarcerated people performing job assignments requiring them to travel between units or be in frequent contact with others report a lack of adequate masks or gloves, including a person working in a facility medical clinic who asked that we make an anonymous request on his behalf for fear of retaliation.

**Health Education and Deescalation**

The City's claim that "strategies have been implemented to provide frequent, accurate information to those in the jails and to give guidance on best practice" is flatly untrue, according to reliable and consistent reports Legal Aid has received from our clients.  To the contrary, one of the largest problems our clients have faced is a dearth of patient health education during this crisis.  In some units, DOC has reportedly done little more than post signs telling people to wash their hands.  Incarcerated people have repeatedly complained that they have been moved to or held in quarantine or infected units for no apparent reason, and in a manner that appears to be inconsistent with isolation protocols.  Officers reportedly give conflicting information, or profess they lack information, to answer questions.  The lack of accurate information from credible messengers is causing enormous anxiety, fear and distrust in the housing units.  Informing incarcerated people about the medical basis for their housing placements, and the opportunities for self-care and clinical care—in other words, basic patient health education—takes on even greater importance in the jail setting to mitigate distrust being created as people feel they are left to manage life-threatening conditions alone.

**Access to Medical Care**

An overarching concern about the reliability of any of the infection management data comes from the significant barriers incarcerated people are encountering getting *access* to clinicians for medical care and guidance.  For context, in March, CHS announced that sick call would be done through a new telehealth system, whereby people in custody could "directly call CHS nurses about their concerns" and then be scheduled for any necessary clinical visits rather

---

[9] *See* docket 338 at p. 4.
[10] BOC COVID-19 Monitoring Report, May 11, p. 9.

than rely on the previous sick call system.[11]  This new system, which is unfortunately being implemented in the midst of a public health crisis, has been the source of a large volume of complaints to our office.  Members of the plaintiff class report that the phone lines are not answered, there is no way to leave a message, and for those able to report concerns, difficulty following up with medical staff.  Our clients tell us that mental health treatment is likewise plagued by these issues, as incarcerated people must utilize the telehealth system to request mental health attention unless they are housed in a Mental Observation or PACE unit where CHS staff are onsite.  Clients repeatedly tell us they have difficulty accessing a clinician through this system.

Barriers to medical and mental health care in the jails are serious at any time, but are particularly troubling during a public health crisis.

**Conclusion**

We believe it is too early to consider the nature or magnitude of the effect COVID-19 will have on the *Nunez* reforms.  Certainly, there will be an impact: for example, we have received reports that protests over COVID-19 conditions have resulted in uses of force.  But the full measure of the difficulties and burdens that the current pandemic places on incarcerated people and DOC and CHS staff remains untold.  Counsel for Plaintiffs will remain deeply engaged with the information we receive about conditions within the City jails during the COVID-19 pandemic, both from people in custody and other sources, and will continue to advocate for the health and safety of our clients.  We welcome any questions or requests for clarification from the Court.

Regards,

_/s/ Mary Lynne Werlwas_____
THE LEGAL AID SOCIETY
Mary Lynne Werlwas
Kayla Simpson
David Billingsley
199 Water Street, 6th Floor
New York, New York  10038
Telephone: (212) 577-3530
Email:  mlwerlwas@legal-aid.org
            ksimpson@legal-aid.org
            dbillingsley@legal-aid.org

---

[11] Correctional Health Services Update, presented at NYC Board of Correction Meeting, March 10, 2020, https://www1.nyc.gov/assets/boc/downloads/pdf/chs_boc_presentation_final.pdf at 5 (last visited May 13, 2020).

      /s/ Debra L. Greenberger
EMERY CELLI BRINCKERHOFF & ABADY LLP
Jonathan S. Abady
Debra L. Greenberger
600 Fifth Avenue, 10th Floor
New York, NY  10020
Telephone:  (212) 763-5000
Email:  jabady@ecbalaw.com
        dgreenberger@ecbalaw.com