# Ninth Report of the *Nunez* Independent Monitor

**Ninth Monitoring Period**
**July 1, 2019 through December 31, 2019**

### The Nunez Monitoring Team

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Introduction ............................................................................................................. 1
    Background ........................................................................................................... 1
    Current Status of Reform ..................................................................................... 3
    Efforts to Advance Reforms & Address Areas of Concern ................................. 5
    Organization of the Report ................................................................................... 9
    COVID-19 Impact ............................................................................................. 11

Use of Force and Inmate Violence Trends During the Ninth Monitoring Period ............... 13
    1.     Number and Rates of Use of Force ........................................................... 13
    2.     Use of Force by Facility ........................................................................... 15
    3.     Injury Rates .............................................................................................. 17
    4.     Location of Use Of Force Incidents .......................................................... 18
    5.     Reasons for Use of Force Incidents .......................................................... 21
    6.     Staffing & Supervision ............................................................................ 23
    7.     Staff Behaviors ........................................................................................ 25
    8.     Inmate Age ............................................................................................... 33
    9.     Inmates Frequently Involved in Use of Force .......................................... 34
    10.    Inmate Violence ....................................................................................... 37
    11.    Utilization of the Data ............................................................................. 38

Identifying & Addressing Use of Force Misconduct ............................................. 41
    Streamlining Investigations—Intake Squad Plan .............................................. 42
    Streamlining Investigations and Improved Efficiency to Impose Discipline ................... 48
    Identifying Use of Force-Related Misconduct ................................................... 49
    Addressing Use of Force-Related Misconduct .................................................. 65

Section by Section Analysis .................................................................................. 79
    12.    Use of Force Policy (Consent Judgment § IV) ........................................ 79
    13.    Use of Force Reporting and Tracking (Consent Judgment § V) ............... 82
    14.    Training (Consent Judgment § XIII) ...................................................... 110
            Training Space & Dedicated Training Academy ..................................... 111
    15.    Anonymous Reporting System (Consent Judgment § VI) ....................... 131
    16.    Video Surveillance (Consent Judgment § IX) ........................................ 133
    17.    Use of Force Investigations (Consent Judgment § VII) .......................... 149
    18.    Risk Management (Consent Judgment § X) ........................................... 184
    19.    Staff Discipline and Accountability (Consent Judgment § VIII) ............ 205
    20.    Screening & Assignment of Staff (Consent Judgment § XII) ................. 228
    21.    Staff Recruitment and Selection (Consent Judgment § XI) .................... 240
    22.    Arrests of Inmates (Consent Judgment § XIV) ...................................... 243
    23.    Implementation (Consent Judgment § XVIII) ........................................ 245

Current Status of 16- and 17-Year-Old Youth ................................................... 251
    24.    Safety and Supervision of Inmates Under the Age of 19
            (Consent Judgment § XV) ...................................................................... 259
    25.    Inmate Discipline (Consent Judgment § XVI) ....................................... 273
    26.    Housing Plan for Inmates Under the Age of 18 (Consent Judgment § XVII) .... 279

Current Status of 18-year-olds Housed on Rikers Island ................................... 281
    27.    Safety and Supervision of Inmates Under the Age of 19

i

(Consent Judgment § XV) ................................................................................... 288

28.    Inmate Discipline (Consent Judgment § XVI)................................................... 308

**Appendix A: Monitoring Team Recommendations (Parts 1, 2, and 3)**................................…i

**Appendix B: Definitions**..………………………………………………..……..iv

**Appendix C: Training Charts** …………………………...…………………………..…..ix

Status of Initial Training Program Development and Deployment…………………..…..ix

Status of Refresher Training Program Development and Deployment………………….xii

Status of Training Provided Since the Effective Date ……………………………..…..xiv

**Appendix D: Flowchart of Promotions Process** ………………………………………….. xv

# INTRODUCTION

This is the Ninth Report[1] of the independent court-appointed Monitor, Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York, the New York City Department of Correction ("the Department" or "DOC"),[2] the Administration for Children Services ("ACS"), and the Monitoring Team to advance the reforms in the Consent Judgment during the Ninth Monitoring Period, which covers July 1, 2019 to December 31, 2019 ("Ninth Monitoring Period").

*Background*

The Department manages 11 inmate facilities, eight of which are located on Rikers Island ("Facility" or "Facilities").[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The Department also jointly operates the Horizon Juvenile Center in the Bronx with ACS. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by

---

[1] A Special Report was also filed by the Monitor on March 5, 2018. (*see* Dkt. Entry 309). The Monitoring Team also submitted three letters to the Court on the status of HOJC on October 31, 2018 (Dkt. Entry 318), December 4, 2018 (Dkt. Entry 320), and February 19, 2019 (Dkt. Entry 325).

[2] All defined terms utilized in this report are available in ***Appendix B: Definitions***.

[3] There are three Facilities based in the City boroughs, Manhattan Detention Complex ("MDC"), Brooklyn Detention Complex ("BKDC"), and Vernon C. Bain Center ("VCBC") in the Bronx. The eight Facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

the Department ("Staff" or "Staff Member") and inmates, to dismantle the decades-long culture

of violence in these Facilities, and to ensure the safety and proper supervision of inmates under

the age of 19 ("Young Inmates"). The Department employs approximately 9,200 active

uniformed Staff and approximately 1,800 civilian employees, and detained an average daily

population of approximately 7,000 inmates as of the end of the Monitoring Period.[4] The

population in the jails has been drastically reduced since November 1, 2015, the Effective Date

of the Consent Judgment. The population has been further reduced following the close of the

Monitoring Period, as 3,997 inmates were incarcerated as of May 28, 2020. This represents a

60% reduction in population since the Effective Date of the Consent Judgment and is the lowest

DOC population since 1946.[5]

     The Consent Judgment was entered by the Court on October 22, 2015.[6] It includes over

300 separate provisions and requires the Department to develop, refine, and implement a series

of new and often complex policies, procedures, and training, all focused on reducing the use of

excessive and unnecessary force against inmates and reducing violence, particularly among

Young Inmates. The use of force-related procedural requirements enumerated in the Consent

Judgment's provisions are intended to promote the following principles of sound correctional

practice: (1) the best and safest way to manage potential use of force situations is to prevent or

resolve them by means other than physical force; (2) the amount of force used is always the

---

[4] 24.4% of the inmate population is detained for four days or less, while 26.7% of the population is detained three months or more. The average length of stay for an inmate is 88 days. (See "January 25, 2020, NYC Department of Correction at a Glance – Information for the first 6 months of FY 2020," <https://www1.nyc.gov/assets/doc/downloads/press-release/DOC_At_Glance_6_Months_FY2020.pdf >).

[5] The average daily population was 10,009 inmates in November 2015, 9,454 inmates in December 2016, 8,944 inmates in December 2017, 7,960 inmates in December 2018, 6,341 inmates in December 2019.

[6] The Effective Date of the Consent Judgment is November 1, 2015. (*see* dkt. entry 260)

minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principles can take root without a culture change within the agency that embraces them.

*Current Status of Reform*

This report occurs at a critical juncture in the life of the Consent Judgment, the Department having just completed four full years of implementation, with varying degrees of success, and with much yet to be done to achieve Substantial Compliance with the overall aims of the Consent Judgment. The Department has expended significant effort to develop an infrastructure for managing over 300 interrelated, complicated requirements. Although a lot of work has been done, a lot of work remains. The conditions that gave rise to the Consent Judgment have not abated since the Effective Date, and the desired outcomes are simply not yet evident. Whether examining use of force ("UOF") trends systemwide, by Facility, or by age group, the number of incidents and UOF rates have increased, thus producing a concomitant high number of problematic incidents, and backlogs in both investigations and Staff discipline over many Monitoring Periods. Further, the Department's use of force rates during the Ninth Monitoring Period reached their highest levels since the Consent Judgment went into effect.

The frequency of unnecessary and excessive force has not shown a marked decrease since the Effective Date. The prevalence of unnecessary and excessive force appears driven in large part by the overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and improper use of OC spray, and hyper-confrontational Staff behaviors. These problems are compounded by uniform leadership's inability to identify these

aspects of Staff misconduct, thus failing to address them with their subordinates. The Department remains in Non-Compliance with four of the most consequential provisions of the Consent Judgment: (1) implementation of the Use of Force Policy (§ IV., ¶ 1); (2) timely and quality investigations (§ VII., ¶ 1); (3) meaningful and adequate discipline (§ VIII., ¶ 1) and (4) reducing violence among Young Inmates(§ XV., ¶ 1).

The top priority in this Monitoring Period for the Department and the Monitoring Team was to formulate strategies to advance compliance with these core issues. In particular, the Department laid significant groundwork to overhaul and streamline the investigative process within the agency, to be implemented during the Tenth Monitoring Period. As part of this effort, the Monitoring Team, the Department and the Parties to *Nunez* have also identified initiatives that would be subject to heightened scrutiny by the Monitoring Team, considered potential modifications to the Consent Judgment, as well as potential additional remedial relief to address certain areas of sustained non-compliance as discussed in more detail below.

That said, stakeholders must not lose sight of what has been achieved thus far in creating a solid foundation for reforming Staff's use of force and reducing violence among the Facilities. Through the development, adoption, and training of an expansive body of policies, procedures, directives, operational orders, etc., the Department is now able to measure performance against concrete and objective standards of conduct related to use of force. While Supervisors' understanding and grasp of these concepts is inconsistent (*e.g.,* the ability to determine whether force is necessary/unnecessary, avoidable/ unavoidable, or excessive/proportional), agency officials at varying levels *have begun* to identify problematic behaviors and utilize a variety of approaches intended to both teach Staff how to avoid misusing force and to hold them

accountable if they fail to abide by agency rules. Those who do not grasp or embrace this reform effort are becoming increasingly easily identifiable and must be held accountable accordingly.

As these processes have been devised, a key focus is to address the protracted disciplinary process. Department officials, with support from the Monitoring Team, have been working to streamline the process to produce more timely dispositions. It is hardly surprising that with this increased scrutiny (imperfect as it may be) of Staff use of force, misconduct is identified at unprecedented levels and is taxing all divisions associated with processing those incidents. Hopefully, over time, this increasingly active and sustained oversight will filter down to the rank-and-file. While most high-ranking Department officials, both uniform and civilian, have developed a more comprehensive understanding of Staff use of force, the pathway for effectively transferring the necessary level of understanding to the rank-and-file officers has yet to be identified. Although much important foundational progress has been made, leaders at all levels in the Department must ensure that the rank-and-file officers develop this same level of understanding and incorporate that understanding into their daily behavior and actions, and when they fail to do so, that they are held fully accountable.

*Efforts to Advance Reforms & Address Areas of Concern*

The Monitoring Team has deliberated at length about how best to advance the overall goals of the Consent Judgment, in particular, how to address persistent areas of Non-Compliance raised by the Monitoring Team through various avenues (including prior reports) and by Counsel for the Plaintiffs' Class and SDNY, who submitted a Non-Compliance Notice to the City

pursuant to Consent Judgment § XXI. (Compliance, Termination, and Construction), ¶ 2) at the end of the Eighth Monitoring Period.[7]

The work to date has revealed areas of continued concern that must be addressed, as well as processes that warrant revision because they are not achieving the desired effect. To provide a framework for addressing these persistent areas of Non-Compliance, the Monitoring Team shared written recommendations with the Parties on September 30, 2019 proposing actions that the City and Department could take to stimulate progress toward the overarching goals of the Consent Judgment ("September Recommendations")[8] and were intended to address both the Monitoring Team's concerns and the issues raised in the Non-Compliance Notice. These recommendations were intended to advance reforms in four key areas: (1) implementing the Use of Force Directive; (2) addressing the backlog of investigations and improving use of force investigations going forward; (3) improving Staff discipline and accountability; and (4) addressing the high level of disorder at RNDC, where most of the 18-year-old inmates are housed. The Monitoring Team also convened a meeting in October 2019 with representatives from the City, the Department, and Counsel for the Plaintiffs' Class and SDNY to discuss the best path forward. In addition, Counsel for the Plaintiffs' Class and SDNY shared written feedback to the September Recommendations with the Monitoring Team and separately met with

---

[7] In the Non-Compliance Notice, Counsel identified nine distinct provisions that Counsel to the Plaintiffs' Class and SDNY believed the Defendants were in Non-Compliance with for which they asked the Department to address in a response: (1) Implementation of Use of Force Directive (§ IV. , ¶ 1); (2) thorough, timely and objective investigations (§ VII., ¶ 1); (3) Preliminary Reviews (§ VII., ¶ 7); (4) Full ID Investigations (§ VII., ¶ 9); (5) ID Staffing (§ VII., ¶ 11); (6) Timely, Appropriate and Meaningful Discipline (§ VIII., ¶ 1); (7) Inmates Under the Age of 19, reducing violence among Young Inmates (§ XV., ¶ 1); (8) Inmates Under the Age of 19, Direct Supervision (§ XV., ¶ 12); (9) Inmates Under the Age of 19, Consistent Assignment of Staff (§ XV., ¶ 17).

[8] These recommendations were shared pursuant to Consent Judgment § XX ("Monitoring"), ¶ 19 and the Seventh Monitor's Report (at pgs. 8 to 9).

the Monitoring Team in November 2019 to discuss these issues. Finally, the Monitoring Team worked very closely with the Department to develop initiatives and to identify practical, achievable implementation plans.

Thereafter, the Monitoring Team shared revised recommendations in December 2019 ("December Recommendations"). The substantive initiatives outlined in the December Recommendations were organized into three components: (1) initiatives the Department and Monitoring Team would develop collaboratively and which would receive heightened scrutiny by the Monitoring Team; (2) suggestions for initiatives to be addressed by imposing additional requirements in a new court order ("Remedial Order"); and (3) a recommended proposal of modifications to the provisions of the Consent Judgment listed in *Appendix A, Part 1*. The recommendations for potential additional requirements and/or the basis for recommendations to modify certain provisions are discussed in more detail in the relevant sections of this report. The Monitoring Team is working with the Parties to develop a proposal for the Court on how best to address the Monitoring Team's recommendations to potentially modify certain provisions of the Consent Judgment as well as other recommendations and proposals for a Remedial Order.

Following the submission of the December Recommendations, and in assessing the Department's compliance for the Ninth Monitor's Report, the Monitoring Team also gave consideration to provisions at the opposite end of the spectrum—problems that the Department has effectively solved and where Substantial Compliance has been sustained over time. The Department has built a number of foundational systems and processes that have become fully operationalized and therefore may be terminated and/or no longer require active monitoring. At this juncture, it is imperative to consider whether certain provisions remain necessary and narrowly drawn, and whether they continue to be the least intrusive means to remedy the

violations of inmates' Federal rights that the Consent Judgment is tailored to remedy.[9] The Monitoring Team's experience with monitoring other systems reaffirms this multi-faceted approach, that after a significant period of time of monitoring that evaluation, modification, limited monitoring and/or termination of certain requirements of the Consent Judgment is necessary as the circumstances and issues within the Agency evolve, and prioritization and focus must shift.

As an initial matter, there are certain provisions in which active monitoring is no longer necessary. These are provisions in which the Department has sustained compliance for 24 months or more, but these provisions may be intertwined with other provisions in which the Department is still working towards achieving compliance. Accordingly, termination of these provision at this juncture may not be appropriate, but active monitoring is not needed. These provisions are outlined in ***Appendix A, Part 2***. For this group of provisions, the Monitoring Team does not intend to actively monitor these provisions beginning in the Tenth Monitoring Period. The basis for this determination is discussed in the respective compliance assessment for the specific provisions in the report. The Monitoring Team intends to work with the Parties in the next Monitoring Period to determine how best to formalize these recommendations and any appropriate requests and/or filings that may need to be made with the Court.

Finally, the Monitoring Team has identified certain provisions that are no longer necessary and recommend are terminated because they are not needed to remedy the violations

---

[9] In pleadings, the Parties acknowledged under the terms of the Consent Judgment they may apply to terminate certain aspects of the relief, along with their ability to seek the Court's approval to modify certain terms of the Consent Judgment. *See* Joint Memorandum of All Parties in Support of Motion for Final Approval of Consent Judgment, page 15, fn. 12 (dkt. entry 233).

underlying the Consent Judgment. The provisions the Monitoring Team respectfully recommends for termination[10] are because the Department either: (1) successfully completed the specifically enumerated task required and/or (2) demonstrated sustained compliance for 24 months or more and the provision is no longer necessary to remedy the violations underlying the Consent Judgment. These provisions are listed in ***Appendix A, Part 3***.[11] The Monitoring Team intends to work with the Parties in the next Monitoring Period to seek their input on these recommendations with the goal of devising an agreed upon approach to submit to the Court for approval.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses detecting and responding to the misuse of force in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (*e.g.*, policy, reporting, investigations, Staff discipline, video surveillance, recruiting,

---

[10] *See*, Consent Judgment § XXI. (Compliance, Termination, and Construction), ¶ 2.

[11] The Monitor, in his prior capacity as Plaintiffs' expert in the *Nunez* Litigation, filed a declaration with the Court on October 2, 2015 finding that all provisions in the Consent Judgment were necessary. However, in a few areas, as outlined in the Report, the Monitor no longer believes that is the case.

training, etc.). Finally, the report examines recent changes and current trends regarding 16, 17, and 18-year-olds. Given the physical separation and different facility management structure for 16- and 17-year-olds and 18-year-olds (who remain on Rikers Island), the Monitor's Report now has two separate sections organized by age group. Provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), § XVII (Housing Plan for Inmates Under the Age of 18) will be addressed depending on the applicability of the provision to each age group. A small group of provisions in §§ XV and XVI are addressed in other sections of this report (*e.g.*, § XV, ¶¶ 10, 11 camera coverage in facilities housing Young Inmates is addressed in the Video Surveillance section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Inmates is addressed in the Use of Force Investigations section of this report).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[12] (b) Partial Compliance,[13] and (c) Non-Compliance.[14] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain

---

[12] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[13] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[14] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[15] The Monitoring Team did not assess compliance ("Not Yet Rated") for every provision in the Consent Judgment in this report but, with each Monitoring Period, the proportion of provisions assessed for compliance has increased.[16] Finally, the Monitoring Team did not assess compliance for any provision with a deadline for completion falling after December 31, 2019.

*COVID-19 Impact*

This Monitor's Report would be remiss not to acknowledge the global pandemic related to COVID-19. As with all aspects of life, the operations of the Department of Correction has been significantly impacted by the pandemic. This report covers the Ninth Monitoring Period (July 1 to December 31, 2019), prior to the pandemic and therefore the potential impact of COVID-19 on the Department's efforts to achieve compliance are not addressed. The Monitoring Team filed a letter on May 6, 2020 to provide a brief update to the Court on the impact that the dynamic and emergent circumstances relating to COVID-19 is having on the operations within the Department, and may have on the implementation of the *Nunez* reforms (*see* Dkt. 338). The efforts of both the Department of Correction along with Correctional Health Services to address the challenges under these extraordinary and incredibly stressful conditions must be acknowledged. The Monitoring Team is closely scrutinizing the extent to which the

---

[15] § XX (Monitoring), ¶ 18.

[16] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

pandemic may impact the Department's efforts to achieve compliance with the *Nunez* reforms and this will be addressed, as appropriate, in the next Monitor's Report.

# USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE NINTH MONITORING PERIOD

The overall goal of the *Nunez* Consent Judgment is to reduce the frequency with which force is used, and more particularly, the use of unnecessary and excessive force. As an initial matter, Staff appear to utilize force more often now than when the Consent Judgment first went into effect. While some Staff practices regarding force have evolved, the frequency of unnecessary and excessive force has not shown a marked decrease since the Effective Date. That said, the reform effort *has* moved past "square one." Some important milestones have been achieved in collecting data relevant to various processes and there is improved transparency of practices and procedures. However, progress toward key outcomes is not yet evident. Four years' of UOF data is now available to assess the impact of the Department's reforms, so in addition to identifying concerns that emerged during the current Monitoring Period, this report utilizes four-year trends to take a more global look at the Department's progress.

## 1. NUMBER AND RATES OF USE OF FORCE

The number and rate of use of force remains at an all-time high. The average raw number of uses of force per month in 2019 was 54% higher than 2016 (597.4 versus 387.6).



The increase in raw numbers coupled with significant decreases in the size of the jail population (from an ADP of 9,803 in 2016 to 7,389 in 2019) sent the average monthly use of force *rate* dramatically upward, for a 105% increase between 2016 and 2019 (4.0 versus 8.2).



Physical force by Staff in a correctional setting is at times necessary to maintain order and safety and the mere fact that physical force was used does not mean that Staff acted inappropriately, as emphasized in every Monitor's report to date. In fact, there are times in which Staff *must* use force. A well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and inmates from serious harm. That said, the use of force has many consequences for the relationships between Staff and inmates and the overall tenor and level of disorder in a Facility. Too often, Staff select approaches which escalate and exacerbate the problem (*e.g.*, painful escort, hyper-confrontation) rather than solve it, which increases both the likelihood that force will be used and the potential for harm. Even those uses of force that are within policy guidelines can have an adverse impact on the culture of a Facility for those who work and live there, especially given the high volume of incidents that are currently occurring within the Facilities.

The work that flows from a UOF incident, even those that are appropriate, is ***enormously*** taxing on the system, preventing Staff from attending to other important duties in the care and custody of inmates. For instance, in 2019, the over 7,000 uses of force triggered almost 7,000 Rapid Reviews by the Facilities, over 7,000 Preliminary Reviews (with subsequent referrals for Full ID and Facility Investigations), the submission of at least 22,000 reports by Staff who either engaged in or witnessed the use of force, and at least 11,800 medical encounters for inmates involved in these incidents. The Department will simply be unable to sustain reasonable and timely processes with this high level of use of force.

## 2. USE OF FORCE BY FACILITY

Facilities' use of force rates are different—some are higher, some are lower, but none of the Facilities has significantly decreased their use of force since the Effective Date. Between 2018 and 2019, sharp increases were observed at AMKC (+56%), EMTC (+76%), GRVC (+43%), and MDC (+66%).[17] During this Monitoring Period, the Monitoring Team heavily scrutinized the operations at GRVC,[18] HOJC,[19] and RNDC[20] given their concerning levels of force.

---

[17] Given the small number of inmates and changing circumstances of NIC and WF, UOF rates across time are not comparable to the rates of other Facilities.

[18] The Monitoring Team raised a number of concerns regarding the operation and management of GRVC at the end of the Monitoring Period, including concerns regarding the overall rate and number of use of force, lack of supervision evidenced by specific use of force examples, a pattern of failures to adhere to basic security protocols, and delays in providing medical attention to inmates following use of force.

[19] A more detailed discussion on the conditions at HOJC can be found in the Current Status of 16- and 17-Year-Old Inmates section of this report.

[20] A more detailed discussion on the conditions at RNDC can be found in the Current Status of 18-Year-Old Inmates section of this report.



| | AMKC | BKDC | EMTC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2.42 | 2.5 | 1.62 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.24 |
| 2017 | 2.72 | 3.94 | 1.74 | 6.42 | 4.82 | 2.21 | 6.12 | 4.83 | 4.9 | 2.81 | 20.97 |
| 2018 | 3.32 | 5.88 | 1.78 | 9.28 | 8.17 | 4.71 | 5.4 | 4.8 | 19.28 | 3.07 | 7.12 |
| 2019 | 5.19 | 7.13 | 3.14 | 13.26 | 11.95 | 7.84 | 5.595 | 5.145 | 20.925 | 3.775 | 3.74 |

The majority of practices related to misuse of force, as discussed further in this report, are seen throughout the system and are not limited to a specific Facility. The Department has created the macro-level tools, some of which are still being refined, needed to support a reduction in the use of force (*e.g.*, UOF policy, training curricula, improved data collection, investigation protocols, disciplinary guidelines). Department-wide initiatives addressing certain issues in all Facilities are likely more efficient and effective. That said, given the differences in inmate characteristics (*e.g.* high classification, need for enhanced security protocols, mental observation or protective custody), staffing levels and deployment, program availability, special housing units, and facility management styles, Facility leadership must analyze their own UOF data and refine potential initaitives to address the specific contours of their Facility. While Department-wide strategies are key, ultimately addressing these issues require the leadership in each Facility to have a strong command of their role and responsibilities and to champion intiatives that will advance the reforms within their command.

### 3.   INJURY RATES

The rate of injury across the Department is decreasing and so one positive development is that, overall, a smaller *proportion* of the Department's uses of force have resulted in an injury than in the past.[21] That said, too often, the Department's practices continue to cause injury or pain to both Staff and inmates. In 2019, 25% of uses of force caused an injury (Class A and B, combined, in the chart below), compared to 34% to 39% in 2018 and 2017 respectively. However, the overall increase in the number of incidents resulting in a use of force means that *more people* were injured each year. In 2019, the number of incidents involving at least one individual sustaining serious injuries as a result of the use of force (Class A) was more than twice as high as in 2016 (166 versus 74).[22]



---

[21] Note, this is a system-wide trend and the pattern does not necessarily hold for all Facilities.

[22] In August 2019, the Department introduced a revised serious injury policy with the goal of improving collaboration with Correctional Health Services (CHS) to better capture the final determinations of all potential serious injuries. This is discussed in more detail in the Use of Force Reporting section of the report.

It is worth noting that the fact that a Staff or inmate did not sustain an injury does not mitigate the concerns about the use of force if the force was nonetheless excessive or uncessary. In addition to injury, pain with no injury may also be the result of excessive and unnecessary force and is equally destructive to the culture of the Facility.

### 4. LOCATION OF USE OF FORCE INCIDENTS

The majority of use of force incidents occur in the housing units and Intake. The distribution of use of force incidents across locations has remained consistent over the past four years, with the most current year shown below.



Given that inmates spend most of their time on the housing units, the fact that the vast majority of UOF occur there is not surprising. The frequency of UOF on the housing units is driven by a lack of Staff skill in de-escalation and a tendency toward provocation, as well as a host of inmate characteristics (*e.g.*, frustration, aggression) and circumstances (*e.g.*, idle time) that are all ripe to be targeted with strategies for improvement.

The second most frequent location for UOF is Intake. Intake is a busy location because it the processing center for transporting inmates in and out of the Facility and the Department heavily relies upon it. The Department also escorts all inmates involved in a use of force to

Intake immediately following a use of force (often as a waiting area before the inmate obtains medical treatment). Even when force is not used, Staff frequently transport inmates to Intake following inmate-on-inmate fights, as a response to tensions in the housing unit, and as a stopover before transferring inmates to different housing units within the Facility. The Department's overreliance on the use of Intake for purposes unrelated to the task of processing inmates in and out of the facility creates a number of problems: (1) moving inmates, who are often agitated, to Intake following a use of force sometimes leads to an *additional* use of force during the transport and may also require halting all movement in the Facility (*i.e.*, lockdown) while the transport is occurring, (2) holding inmates in Intake post-UOF diverts Intake Staff from their primary duty of processing inmates in and out of the Facility; (3) placing an agitated inmate in the Intake pens brings unnecessary chaos and tension into the area, and sometimes erupts into additional violence; and (4) the inherently chaotic environment of Intake does not serve the de-escalation purpose for an agitated inmate.

The Monitoring Team has raised concerns about the Department's use of Intake since the Effective Date, noting the resources needed to transport inmates to Intake, the potential to exacerbate the situation, as well as delays related to providing medical treatment following a use of force. This latter concern has since improved and the Department has achieved Substantial Compliance with the provision related to timely medical care (as discussed in the Use of Force Reporting section of this report, ¶ 22). However, the initiatives to reduce the reliance on Intake following an incident have stalled and the concerns regarding the use of Intake remain.

In prior Monitoring Periods, the Department initiated two pilot projects to reduce the reliance on Intake: Satellite Intake and a Medical Triage Station.[23] Satellite Intake was developed as a separate location in the Facility for post-incident management to temporarily secure inmates pending further assessment and housing placement, as necessary. A policy was created on the use of Satellite Intake units and these units were utilized at GMDC and RNDC (as well as a few other facilities). By design, inmates were to be held in individual cells, their welfare was to be verified by Staff at frequent intervals, notifications to supervisors and health services were required, and the length of stay was intended to be short (*i.e.*, a few hours). In practice, the Monitoring Team found that some of the documentation needed to establish compliance with policy was difficult to decipher (*e.g.*, log book entries that tracked the reason for placement, entry and exit times, and welfare checks), although Facility leadership reported to the Monitoring Team at the time that they believed the option was a useful one to reduce the level of chaos in the Main Intake. The practice ceased at the end of the Sixth Monitoring Period.

The Department also devised a Medical Triage pilot at GRVC. The purpose of the pilot was to expedite the medical evaluation of inmates following an incident and to avoid placing inmates in Intake, in an effort to prevent them from languishing for an extended period of time while waiting to be seen by medical staff. The Medical Triage location was to be used when five or more inmates were involved in a use of force incident or inmate-on-inmate fight and did not have any visible injuries requiring medical treatment. For instance, inmates who only require decontamination following exposure to Chemical Agents may be placed in the Medical Triage

---

[23] *See* Third Monitor's Report at pg. 68, Fourth Monitor's Report at pgs. 28, 64-65, 248-249, Fifth Monitor's Report at pgs. 15-16, 56, 177-178, Sixth Monitor's Report at pgs. 13, 56-57, 193-194, Seventh Monitor's Report at pgs. 24, 27, 204, 237-238, Eighth Monitor's Report at pgs. 28, 283.

location. All inmates with visible injuries requiring treatment or who report of injuries requiring a further assessment were to be evaluated at the main Clinic location. The Medical Triage location was only activated twice during the Fifth Monitoring Period. Given its limited use and some operational challenges, the Department re-evaluated its utility during the Sixth Monitoring Period and suspended its use.

The short tenure of these two intiatives does not reflect their potential usefulness to reducing Facilities' reliance on Intake, even if the Department's initial attempt at implementation did not achieve the desired results. These and other ideas have strong potential to meaningfully reduce the burden on Intake and the ancillary violence and additional uses of force that often accompany the curent practice. The processing of inmates through Intake following an incident may be appropriate or necessary in some cases and so some operational flexibility is needed. However, the Department's *exclusive* reliance on the use of Intake for post-incident management is at best a questionable management practice often rife with dysfunctional outcomes and at worst creates unnecessary security risks. The Department must revise its practice to reduce its reliance on Intake as a post-incident holding area in order to ameliorate the concerns enumerated above and support the overall efforts to reduce the use of unnecessary and excessive force.

5.   REASONS FOR USE OF FORCE INCIDENTS

Force is used to respond to a variety of situations, some of them in response to violence (*e.g.,* assaults on Staff, inmate fights) and some as a strategy to enforce compliance (*e.g.,* resisting restraint/escort, refusing a direct order). In additon, the Monitoring Team often finds that use of force incidents also occur and/or are escalated due to Staff behaviors, as discussed in more detail in the "Staff Behaviors" section below. The distribution across the Staff's reported reason for using force during this Monitoring Period is shown in the chart below and have

remained relatively stable over the last four years. Reducing the use of force rate will require strategies that impact both the antecedent behaviors and the Staff's response to them.



The Monitoring Team has begun to more closely scrutinize use of force incidents involving self-harm. A subset of the 6% of UOF related to the prevention of the infliction of harm are incidents that involve inmates who engaged in self-harm.[24] As part of this assessment, the Monitoring Team reviewed a number of self-harm incidents,[25] as well as the Department's suicide prevention policies and training curricula. The Department's directives are outdated, do not reflect best practice for suicide prevention, and do not provide Staff with the necessary guidance for timely response to an inmate who is actively engaging in self-injurious behavior. Following the close of the Monitoring Period, the Monitoring Team made a series of recommendations for improving Staff's response in the moment, closely supervising those placed on suicide precautions, ensuring the availability of emergency response equipment,

---

[24] This category also includes inmate's attempts to harm others inmates and non-DOC staff.

[25] The Monitoring Team also evaluated the high-profile suicide attempt that occurred during the current Monitoring Period involving an 18-year-old inmate.

reporting self-harming behavior and conducting morbidity/mortality reviews following significant incidents of self-harm. In response, the Department has collaborated with the Monitoring Team and issued additional guidance to Staff, conducted an audit of all emergency equipment, and is working on revising its suicide prevention policies and procedures. The Monitoring Team intends to continue to work with the Department on addressing these recommendations and will continue to closely scrutinize these incidents.

6.  **STAFFING & SUPERVISION**

The Department continues to struggle to properly manage Staff's use of force. The Department maintains one of the largest, if not *the* largest, staffing complement for jails in the United States, which is particularly notable given the decreasing inmate population. Having significantly more Staff than inmates places the Department in a unique position. The Department does not struggle to meet minimum staffing requirements, but the abundance of Staff presents other challenges and obstacles. The Monitoring Team has considered the issue of Staff-inmate ratios and its relationship to Facility UOF rates. Many DOC Facilities with high UOF rates also have larger numbers of Staff assigned to them. Some of these Facilities (*e.g.* GRVC) house maximum custody inmates and those on certain statuses (*e.g.*, Enhanced Restraints or Punitive Segregation) that require additional security protocols that are Staff intensive. However, absent these protocols, there is certainly a point at which an overabundance of Staff becomes dysfunctional as it can create confusion, commotion and ultimately can escalate, rather than de-escalate, rising tensions. In the Monitoring Team's routine review of incidents, this dynamic of a large number of Staff responding to an incident is observed over and over again, particularly with regard to the large number of Staff on Probe Teams that respond to alarms.

With respect to staffing within the Facilities, there are five ranks of uniform staff. There are approximately 9,200 uniform staff (8,300 Correction Officers, 800 Captains, 68 Assistant Deputy Wardens, 31 Deputy Wardens, 13 Wardens).[26] Correction Officers are supervised by Captains, Captains are supervised by one or two Assistant Deputy Wardens. Each Facility then has two or three Deputy Wardens who supervise the ADWs and then there is one Warden assigned to each Facility.

In order to change Staff behavior, it is critical that Supervisors actively and deliberately reinforce skills taught in training by issuing clear expectations of their responsibilities *before* they go on shift, *in the moment* (by having a constructive supervisory presence on scene whose primary task is to resolve the situation without using force, or to ensure that the type and amount of force used is appropriate to the situation), and *after* (by adequately identifying both positive conduct and potential issues and addressing them with Staff).

While there are several exceptions, many Facility Supervisors do not lead by example, identify or correct problematic Staff behaviors, provide effective mentoring or otherwise embrace their supervisory role or responsibility. The Monitoring Team has found supervisory failures at multiple levels of uniform leadership. In terms of line supervisors, at the scene of an incident, supervisors often fail to intervene, allowing subordinate Staff to escalate incidents or become part of the problem themselves by antagonizing, using profanity, and otherwise behaving inappropriately. In addition to poor on-the-spot role modeling, higher-level supervisors are not

---

[26] It is worth noting that not all uniform Staff are assigned to a Facility. At least 1,000 Staff are assigned to positions in Divisions outside of the jail (*e.g.* Headquarters, Custody Management, Courts, SOD, ID, NCU, etc.). Further, certain uniform staff may be on restricted status due to medical or disciplinary reasons.

consistently identifying and addressing the misuse of force among their subordinates through the Rapid Review process which allows it to flourish, unchecked. It is axiomatic, but cannot be overemphasized, that each time a Deputy Warden or Warden fails to identify a Staff deficiency or act of wrongdoing, such behavior on the part of Staff cannot be addressed in a timely manner and may, in fact, be reinforced, thus becoming an entrenched, institutionalized pattern of misconduct. This is discussed in more detail in the Identifying and Addressing Misconduct Section of this report.

The *quality* of supervision is inherently intertwined with the *capacity* to supervise. Of course, insufficient numbers of supervisors in and of itself impacts the quality of supervision because the Supervisors do not have the necessary time to guide and coach staff. This is at least partly due to the fact that there are insufficient ADWs to supervise the Captains. Generally, there is only one or two ADWs assigned per shift and they are generally assigned the duty of Tour Commander (the sole point of contact for managing the tour for the entire Facility), which results in little to no supervision of Captains. Therefore, Captains are not actively and effectively supervised by their superiors to hone their skills in coaching line Staff. This level of superivison is essential to the Department's ability to improve Staff practice. Absent constructive and active supervision, Staff practice is unlikely to change. Accordingly, the Monitoring Team has recommended the allocation of additional ADWs to adequately supervise Captains and to support the overall effort to implement and advance the reforms.

### 7.  STAFF BEHAVIORS

Several Staff practices have been repeatedly found to increase the likelihood that force will be used. More specifically, a pattern of unprofessional conduct and hyper-confrontational behavior by Staff, an overreliance on alarms and the Probe Team, misuse of OC spray, use of

painful escort techniques, and improper use of head strikes have all plagued the agency's use of force since the Effective Date. Further, as noted in previous Monitor's Reports, the failure to adhere to standard security practices contributes to a significant volume of UOF incidents (*e.g.*, leaving cell doors open, failing to secure doors, failing to resolve inmate's issues which escalates to disruptive/violent behavior). Rather than diffusing tensions, these dynamics *create* situations in which force is likely to be misused.

- *Unprofessional Conduct and Hyper-confrontational Responses*

Too often, Staff are hyper-confrontational, aggressive, lack effective interpersonal communication skills and do not exhaust non-physical interventions before resorting to force. These traits are entrenched in the Staff culture, which does not appear to encourage or support avoiding conflict. Furthermore, the inmate culture centers on negative attributions about Staff and their intentions. Neither side appears to find any redeeming value or humanity in their counterparts—a situation which has deteriorated to the point that collisions and the resulting violence are bound to get worse absent effective intervention.

During this Monitoring Period, the Department made efforts to address the use of certain counterproductive _language_ in response to the Monitoring Team's previous concerns regarding the use of depersonalizing terms such as "bodies" or "packages" when referring to inmates. Through various communications, leadership made a concerted effort to advise Staff to cease the use of these terms and utilize alternative and more appropriate terminology when referring to inmates (*e.g.*, individuals or persons). As discussed above, active supervision, consistently modeling appropriate behavior and addressing unprofessional language is needed to support the overall goal to eradicate the use of counter-productive and de-humanizing terminology.

Anecdotally, the Monitoring Team has seen a reduction in the use of these terms since this guidance was issued.

- *Overreliance on Alarms and Probe Teams*

The Department over relies on calling alarms[27] to summon additional Staff to an area in order to address certain issues, in particular Level B alarms are called too often when there is no need. For example, Probe Teams are often called to the scene to address a single inmate who is passively resisting Staff orders (*e.g.*, refusal to hang up the telephone)—a situation which could be managed by a supervisor. The frequent deployment of Probe Teams far exceeds what the Monitoring Team has observed in other correctional settings.[28] In most places, this type of tactical response is used only when inmates are destroying property at a significant and accelerated rate and/or where Staff are at serious risk of losing control of an area, or potentially, the facility. In other agencies, Response Teams are seldom used on a daily basis, let alone multiple times during a single tour, as is often the case in this Department.

The Facilities' overreliance on the Probe Team not only exacerbates the severity of UOF incidents but also triggers a slew of other operational ramifications for both Staff and inmates. As an initial matter, certain alarms are simply unnecessary. Probe Teams are frequently called

---

[27] An "alarm" triggers a response by Staff to the area with the issue, and this response has different levels depending on the level of alarm called. A Level A alarm triggers a lower level response in which Staff in the immediate area, with no special equipment, respond to the area. Level A responses are expected to be utilized most frequently as they are meant to address most routine disruptions such as medical emergencies, disruptive inmates who refuse to comply with Staff orders, inmate fights with no weapons, inmates smoking, contraband recovery, or uses of force (if Staff feel they can control the situation). A Level B alarm requires the response of the Probe Team and it is meant to respond to inmates threatening Staff safety, assaults on Staff, inmate fights with weapons, multiple inmate fights or fights with potential to escalate into larger, unmanageable disturbances; stabbings/slashings; unconscious inmates; uses of force (if Staff feels it rises to Level B); or any fire or security breach.

[28] See also, Seventh Monitor's Report at pg. 23 and Eighth Monitor's Report at pgs. 29-30

for incidents where they were not required and that could have likely been resolved via unit Staff's efforts to de-escalate the situation with no alarm, or with a Level A response by a Supervisor to defuse and address the situation. When a Level B Alarm is activated, large numbers of Staff respond to a centralized location (generally in or near intake) to suit up in heavy riot gear (helmet, prison vest, baton, poly-carbon shield, MK-9, chemical agent and breathing apparatus). Although by policy, a Probe Team should consist of four to seven Officers and a Captain, often significantly larger numbers of Staff (up to 30) respond. The Probe Team response is often a show of force and can be disproportionate to what initially triggered the incident. Further, the deployment of the Probe Team triggers other operational issues such as 'movement stoppage' within the Facility. Even a single alarm disrupts the normal schedule, often precluding inmates' access to programs and services (*e.g.*, library, visits, recreation, medical services, etc.), which then has a domino effect in terms of causing inmate discontent and non-compliance, triggering discord and possible additional alarms.

Once on scene, Probe Teams often demonstrate an inability to establish a constructive dialog with inmates, which prevents Staff from identifying the source of the inmate's concern and precludes the opportunity to resolve the situation without physical intervention. Further, uninvolved inmates can also be impacted. For instance, there are many instances in which there is excessive use of chemical agents by the Probe Team and uninvolved inmates are exposed to OC spray and then require decontamination. Decontamination may then be delayed because there is a large number of inmates that require it. Further, inmates—whether directly involved or affected as a bystander—are then escorted to Intake where they are intermingled with other inmates, which introduces multiple risks of interpersonal violence. Inmates can spend long periods of time in Intake, waiting to be released for medical treatment and/or to be returned to

their housing units. Given this dynamic, the Monitoring Team has observed that inmates generally, *en masse*, have an antagonistic attitude towards the Probe Teams, which only exacerbates these issues.

The Monitoring Team strongly recommended that the Department revise its practices to limit the activation of the Probe Team and to ensure they are deployed only when necessary.[29] In response to a strong recommendation by the Monitoring Team, the Department updated the Probe Team policy in August, 2019 to refine the process for Probe Team deployment. The revised protocol requires a Supervisor to evaluate the call for assistance to determine the appropriate response, rather than giving line Staff unrestricted discretion in calling for a Level B response. Supervisors are supposed to conduct a rapid evaluation of the situation and either personally resolve the situation (or send another Supervisor), deploy a Level A response (intended to de-escalate the situation) or call the Probe Team. If reasonably implemented, these procedures should reduce the unnecessary deployment of Probe Teams and also result in a more immediate response to the scene. In most cases, the response by the Probe Team often takes time given the need for Staff to coordinate and suit up. In cases where a Supervisor or Level A response is deployed, the response time should be quicker, which should also help in reducing the need to utilize force as issues can be addressed more timely and tension does not escalate.

While the Monitoring Team appreciates that the policy requirements were revised, unfortunately, early results suggest the new policy is not yet having the intended effect. While the number of Level A alarms decreased significantly after the policy was put into effect (from 464 in July to 218 in December 2019, a 53% decrease), the number of Level B alarms remained

---

[29] *See* the Eighth Monitor's Report at pg. 71.

relatively consistent during the four months following the policy's release, meaning there was no reduction in the deployment of Probe Teams, and the proportion of Level B alarms *increased*. Department-wide alarms were activated an average of 1,200 alarms *each month* during 2019, about 73% of which were Level B alarms (which result in the deployment of the Probe Team). Additionally, certain Facilities utilize alarms at a very high rate. For instance, GRVC had almost 1,000 Level B alarms during the Ninth Monitoring Period, for an average of *five* Level B alarms per day in this one Facility. This suggests that the policy requirements have not been implemented as required. Accordingly, the Monitoring Team strongly recommends that the Department focus on the implementation of these revised procedures, including holding Supervisors accountable if these procedures are not adhered to.

- *Misuse of OC Spray*

The use of OC spray is permitted by policy and can be an effective tool to bring a situation under control. OC is now used in a smaller proportion of incidents than in the early days of the Consent Judgment. In 2016, 67% of all uses of force involved OC, compared to 33% in 2019. However, because the total number of uses of force has increased throughout the past four years, the actual reduction in the number of incidents involving OC is far more modest. The number of incidents involving OC use decreased 18% between 2016 and 2019 (3,137 versus 2,545 incidents, respectively). While the choice to utilize alternatives to OC spray is positive, the Monitoring Team continues to review incidents in which OC is misused, including being deployed at unsafe distances or in excessive amounts and being applied to passive/uninvolved inmates.

- *Painful Escort Techniques*

As noted in "Reasons for UOF" above, in 13% of the uses of force during the Ninth Monitoring Period, Staff reported that force was used because an inmate resisted a restraint or escort hold. As shown in the graph below, the number of uses of force that occurred because the inmate "Resist[ed] Restraint/Escorts" has increased steadily over the past four years. The average number of UOF per month that occurred for this reason tripled between 2016 and 2019, from an average of 27.6 per month in 2016 to an average of 81.9 per month in 2019.



While a portion of these uses of force are a legitimate response to inmate resistance, the Monitoring Team has identified a pattern in which Staff use unnecessarily painful escort techniques (*e.g.*, bending wrists or twisting arms) on an otherwise compliant inmate which *leads to* inmate resistance. The inmate's resistance is then often used as a basis to justify additional force to re-affirm the escort or restraint hold, when in fact, the painful hold caused the resistance in the first place. These are simply avoidable incidents. In other cases, the painful escort does not result in a use of force, but is an unnecessary infliction of pain, which is of equal concern.

The Monitoring Team raised concerns with the Department about the use of painful escort techniques beginning in late 2017. The Department's three-pronged response included: (1) addressing painful escort techniques in A.C.T. refresher training (rolled out in early 2018 and

31

nearly complete as of the end of this Monitoring Period); (2) revising the Rapid Review template to include a column to identify painful escort techniques (which began in January 2019); and (3) including modules on painful escorts in the Transfer of Learning initiative (addressed in sessions in March 2019, August 2019, and January 2020). While this multi-pronged strategy to convey the appropriate message is a solid approach, it did not appear to impact the practice in terms of the frequency of the problem, suggesting that Staff (particularly Supervisors) implementation and understanding of the use of appropriate escorts is still lacking.

Specifically, during Rapid Reviews, Facility Leadership rarely detects painful escort techniques. In 2019, of the 6,973 incidents reviewed, painful escort techniques were identified in only 1% of the cases (n=69). This low rate is at odds with the Monitoring Team's assessment of the frequency with which unnecessarily painful escort techniques are employed by Staff. The Monitoring Team has identified incidents in which video evidence of painful escort techniques is clear, but the Rapid Review did not identify painful escort issues for any involved Staff Member. Effective coaching and accountability for line Staff cannot occur until uniform leadership is able to detect the problem when it occurs, as discussed in the Identifying & Addressing Misconduct section of this report.

- *Head strikes*

When the Consent Judgement was first put into effect, the Monitoring Team observed that Staff frequently utilized head strikes as the default response to inmate resistance and in situations that were far outside the limited circumstances permitted by the New Use of Force Directive. Staff continue to use head strikes in situations not permitted by policy and where a less dangerous technique was available and would have been sufficient to neutralize the threat presented by the inmate. However, over the past four years, the Monitoring Team has observed

that the frequency of head strikes has declined, and that Staff are increasingly likely to use more appropriate techniques when responding to inmate resistance (*e.g.*, control holds, grasping or pushing inmates away to create distance).

## 8.   INMATE AGE

Younger inmates are far more likely to be involved in a UOF than older inmates, though the UOF has significantly increased among inmates of all ages. The table below shows the average monthly UOF rate for each year, 2016-2019, separated by age. As noted in previous Monitor's Reports, the UOF rate among 16-, 17- and 18-year-olds are over twice as high as the UOF among other age groups. With any age group, specific strategies must be devised to impact both Staff and youth behaviors in order to reduce the risk of harm.

| Average UOF Rates, 2016-2019, by Age | | | | | |
|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | % change 2016-19 |
| 16-17-year-olds | 29.4 | 21.4 | 50.1 | 67.9[30] | +131% |
| 18-year-olds | 19.7 | 17.7 | 36.4 | 53.8 | +173% |
| 19-21-year-olds | 9.3 | 12.3 | 19.0 | 24.4 | +162% |
| 22+ year-olds | 2.5 | 2.9 | 3.75 | 5.8 | +132% |

Of particular note is the recent increase in the UOF rate among adults, age 22 and over. During the previous Monitoring Period, the average monthly UOF rate for adults (22 years and older) was 4.8. During the current Monitoring Period, the average monthly UOF rate for adults (22 years and older) was 6.8—a 40% increase. It is particularly concerning that the adult UOF rate has more than doubled since the Effective Date of the Consent Judgment. In addition, of the

---

[30] Data for 16- and 17-year-olds is limited to January-October 2019, since ACS began supervising the HOJC housing units in November 2019.

3,770 UOF during the current Monitoring Period, adolescents contributed 153 (4%), 18-year-olds contributed 343 (9%), 19- to 21-year-olds contributed 716 (19%) and 2,558 (68%) of the UOF occurred among adults age 22 and older. While the *rates* are higher for the younger age groups, in sheer numbers, the vast majority of UOF occur among adults. This underscores the need for the Department to reduce the UOF among *all* populations, not just the younger inmates.

## 9.   INMATES FREQUENTLY INVOLVED IN USE OF FORCE

The data over the last four years demonstrates that a small number of inmates are involved in a large number of UOF (10 or more in a year). For instance, in 2019, 138 inmates were involved in 10 or more uses of force. The table below shows the number of unique inmates involved in UOF each year, categorized by the number of UOF they were involved in. Note, this chart does not include the large number of inmates who were *not* involved in any uses of force.

| Inmates Involved in UOF, 2016-2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2016 | | 2017 | | 2018 | | 2019 | |
| **Total Number of Inmates involved in Use of Force** | N=4544 | | N=4627 | | N=4986 | | N=5432 | |
| 1 or 2 UOF Incidents | 3,655 | 80% | 3,782 | 82% | 3813 | 76% | 3939 | 73% |
| 3 or 4 UOF Incidents | 520 | 11% | 549 | 12% | 663 | 13% | 827 | 15% |
| 5 to 10 UOF Incidents | 308 | 7% | 259 | 6% | 406 | 8% | 528 | 10% |
| 11 to 15 UOF Incidents | 44 | 1% | 24 | 1% | 71 | 1% | 91 | 2% |
| 16 to 20 UOF Incidents | 9 | <1% | 7 | <1% | 21 | <1% | 33 | 1% |
| 20+ UOF Incidents | 8 | <1% | 6 | <1% | 12 | <1% | 14 | <1% |

This data demonstrates the need to develop specific strategies to provide certain inmates with more intensive support and to provide Staff with better ways of working with inmates that may present certain challenges. The Monitoring Team has long recommended that the Department develop a specific strategy to address the high incidence of force among this small

group of inmates.[31] Because this type of behavior support and intervention is Staff intensive and often requires coordination across divisions and agencies (to the extent H+H may need to be consulted), it should be focused on those inmates with the highest levels of involvement (*e.g.*, those with multiple uses of force or problematic behaviors in a single month).

As part of its efforts to address this group of inmates, the Department continued to convene weekly Persons in Need of Support ("PINS") meetings that include Department uniform leadership, Health Affairs, and representatives from H+H. Originally, this multi-disciplinary team discussed challenging inmates who have diagnosed mental health disorders, but who were not necessarily among those with high-frequency UOF. The Monitoring Team encouraged the Department and H+H to consider including inmates frequently involved in UOF in these meetings to ensure inmates with chronic behavior problems receive the support they need to reduce these behaviors.[32] In response to this feedback, the Department added this as a referral criterion for PINS meetings in July 2019.

To evaluate the extent to which PINS captures those inmates with the most frequent UOF, the Monitoring Team identified the 20 inmates involved in the highest numbers of UOF during 2019.[33] Of these, 12 (60%) were discussed in the PINS meetings. Compared to a five-month period during the previous Monitoring Period where 8 (40%) of the top 20 were discussed at PINS, the new referral criterion appears to have increased the likelihood of an inmate with high-UOF coming to the attention of PINS.

---

[31] *See* the Third, Fourth, Fifth, Seventh and Eighth Monitor's Report at pgs. 24, 30-32, 17, 22 and 26-28 respectively.

[32] *See* pgs. 26-28 of the Eighth Monitor's Report for a more fulsome discussion of the issue.

[33] This group did not include youth incarcerated at HOJC because HOJC has a separate process for addressing youth behavior. This is discussed in more detail in the Current Status of 16 and 17-Year-Old Youth section of this report.

During the Ninth Monitoring Period, a total of 69 inmates were discussed at PINS meetings, between nine and 15 inmates each week. Eleven inmates were referred to PINS for mental health reasons, 49 were referred for frequent involvement in UOF, and nine were discussed at PINS meetings for both UOF and mental health reasons at different times during the Ninth Monitoring Period. Most of these inmates (n=49; 71%) were discussed at more than one meeting. The Department tracks the outcome of the PINS meeting using a spreadsheet. The notes related to the group's decisions for addressing the inmate's behavior varied in the level of thoughtfulness and detail. Some responses were limited to a factual description of the inmate's behavior (*e.g.*, "Inmate continues his disruptive and assaultive behavior towards Staff") that did not include any specific interventions for addressing the behavior. Others were more detailed (*e.g.*, "Inmate does not want to be housed in a mental health housing unit"; "Inmate engages with mental health staff and a treatment plan has been discussed that includes incentivizing good behavior"; "He is currently on the waiting list for CAPS"). In the Monitoring Team's experience in other jurisdictions, this type of multidisciplinary support team has the greatest impact on behavior when the team identifies specific interventions that address the underlying causes of an inmate's problem behaviors, follows through on those strategies, and assesses in subsequent weeks whether the interventions had the intended impact on the inmate's behavior.

Toward this end, in future Monitoring Periods, the Monitoring Team intends to more closely review the Department's referral criteria for PINS meetings, assessing the organizational structure and overall objectives of the meetings and evaluate whether the meetings are achieving their intended purpose. While it is encouraging that the Department has included frequent involvement in UOF as a referral criteria, current information is not sufficient to assess whether

the team has an intentional focus on the underlying causes of the inmates' problem behaviors and Staff's strategies for de-escalating tensions when they arise.

**10. INMATE VIOLENCE**

The rate of fights among inmates increased significantly between 2016 and 2019. As shown in the graph below, the average rate of fights was similar in 2016 and 2017, but then began to increase. Between 2016 and 2019, the monthly average rate of fights increased 37%, from 5.1 to 7.0.



More tangibly, in 2019, there were over 500 fights each month. Staff are duty bound to respond to these incidents when they occur, and often must use force to bring the situation under control. Thus, it is clear that efforts to reduce the use of force in any significant way must include efforts to reduce inmate-on-inmate violence. As part of the Department's RNDC Plan (see Current Status of 18-Year-Old Inmates section of this report), which is focused on the Facility and inmate population with one of the highest rates of inmate-on-inmate violence, the Department has developed the initial steps for positively impacting youth behavior. That said, each month, RNDC contributes less than 20% of the total number of fights each month, and so

broader strategies will be necessary to address the contribution of inmate violence to the overall UOF rate.

## 11. UTILIZATION OF THE DATA

The Department is still struggling with how best to utilize the available information to address issues related to UOF. While the Department collects data and has the ability to identify these trends, it has yet to effectively utilize the data to inform specific strategies that are implemented with any integrity or to coach line Staff effectively to ensure a change in practice in any of the various high-risk circumstances identified above. In an effort to leverage the available information to improve practice, during this Monitoring Period, the Department began to develop a computerized dashboard that will allow certain data to be available more contemporaneously and in a manner that can be easily reviewed by each Facility and Department-wide. The dashboard includes the numbers of uses of force by day, time, location, reason, and the Staff and inmates frequently involved in force. The Department is also trying to determine how it may be able to incorporate information from qualitative reviews into this dashboard, including the Rapid Reviews and Intake Investigations.

As discussed in detail in the Risk Management section of this report (¶ 3), the Department has taken initial steps to conduct Facility-level analyses and to stimulate Facility-level solutions using the information synthesized in the Dashboard, and the Facilities will be required to construct Action Plans to address the dynamics revealed by the data with support from the Project Management Office. While Department-wide initiatives are likely key to advancing reforms and addressing the use of force issues prevalent throughout the agency, initiatives like the Dashboard are also an important tool to facilitate leadership growth and command at the Facility-level.

- *Transfer of Learning Initiative*

The Transfer of Learning ("TOL") initiative is intended to improve Staff and uniform leadership's understanding and implementation of the Use of Force Directive. It was developed in response to the Monitoring Team's recommendation in the Seventh Monitor's Report (at pg. 6) that the Department needed a strategy to address the persistent deficiencies in Staff's UOF practice. It utilizes Facility roll call to provide continuing education and training to Staff using videos of actual use of force incidents. Video segments, talking points and discussion questions are created for each topic area. Staff are tested on their knowledge before and after each session using an audience response system (*i.e.*, clicker technology). Mentoring Captains deliver the TOL twice a week in each participating Facility (GRVC, RNDC, BKDC, and MDC began in Spring 2019 and AMKC, OBCC, and VCBC began during the current Monitoring Period).

TOL covers a variety core correctional practices and situations such as proper escort techniques, alarm responses, assessing use of force situations, and inmate fights. Each topic is discussed for several weeks to support effective reinforcement. The Monitoring Team provided feedback on the lesson plan drafts. As discussed further in the Use of Force Policy section of this report, the draft lesson plans revealed that, in some cases, uniform leadership and the Monitoring Team were not aligned in their interpretation of the New Use of Force Policy or Chemical Agents Directive, once again demonstrating the many obstacles to reform.

The Department collects and analyzes the answers from the audience response system and identified that more Staff correctly respond to the questions answered during the second week of instruction on a given topic compared with the first, demonstrating some level of Staff retention of the materials.

However, unfortunately, the overall goal of TOL—to improve Staff practice—has not yet come to fruition as described throughout this report in that Staff continue to use excessive and unnecessary force at rates far beyond what is expected in a safe jail system. Further, as discussed above, Facility leadership are not consistently identifying painful escort techniques as part of the Rapid Review as designed, which unfortunately impedes any quantitative analysis as to the effectiveness of the TOL on this topic. Based on review of hundreds of incidents, the Monitoring Team did not see any corresponding positive impact or reduction of painful escorts following the TOL modules on the topic.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to succeed in reducing the use of unnecessary and excessive force and encouraging the use of force safely and proportionally. In this section, the Monitoring Team provides an overview of the Department's ability to consistently identify misconduct and to respond with interventions that are likely to prevent re-occurrence. Effectively addressing the misuse of force requires: (1) reliably *identifying* misconduct that occurs; (2) *recommending proportional and effective responses* to that misconduct; and (3) ensuring the responses are *actually imposed*, in a *timely manner*.

The Department continues to evaluate all UOF incidents through a variety of avenues described in this section but does not reliably identify misconduct. The Department's ability to accurately determine that force is necessary/unnecessary, avoidable/ unavoidable, or excessive/proportional simply remains inconsistent, as described in prior reports. Accordingly, the misuse of force often goes undetected, and therefore unaddressed. Further compounding this problem is that the system remains overwhelmed by the sheer volume of incidents involving force, so identifying misconduct simply cannot occur on a timely or routine basis using the current processes. As of the end of the Monitoring Period, over 8,400 Preliminary Reviews and Full ID Investigations remained pending—which results in a dearth of accountability for the Staff who misuse force and contributes to the Department's slow progress in properly implementing the UOF policy.

During the Ninth Monitoring Period, the Department focused on laying the groundwork for a more efficient investigation process so that they could respond to misconduct more reliably and consistently. The Department revised its framework for investigating uses of force using the

41

newly formed "Intake Squad" and began to alleviate the backlog of Preliminary Reviews, Facility and Full ID investigations, as discussed in detail in the Investigating Use of Force section. These initiatives should allow the Department to improve practice going forward. Along with developing new procedures, the Department made progress in more consistently tracking and deploying re-training, imposing Command Disciplines, and tracking and imposing the recommendations for corrective action from Rapid Reviews.

*Streamlining Investigations—Intake Squad Plan*

The Monitoring Team's assessment of thousands of use of force incidents revealed a number of inefficiencies in the current system for investigations that must be streamlined. During this Monitoring Period, the Department, in consultation with the Monitoring Team, devised a new concept for conducting use of force investigations, the "Intake Squad," in order to conduct more efficient, timely, and higher quality investigations. Currently, the Consent Judgment requires three separate investigations for use of force incidents: Preliminary Reviews, Facility Investigations, and Full ID Investigations. As written, the arbitrary distinctions between and among them are at odds with the reality that an investigation of a UOF incident is fluid and the workflows are interrelated and overlapping, particularly because of the fundamental investigative steps conducted at the Preliminary Review stage. Further, the Preliminary Reviews encompass the same investigative steps of a Facility Investigation and thus Facility Investigations provide no additional value to the process of addressing Staff misconduct. These redundancies in the system are compounded by the volume of UOF incidents and have contributed to the Department's inability to meet its obligation to timely investigate UOF incidents.

The Consent Judgment requirements for Preliminary Reviews and Full ID investigations (§ VII. ¶¶ 7, 9) impose a variety of mandatory requirements for each investigation and create a

number of unintended negative consequences. The complex, multi-layered processes were intended to improve and supplant investigator judgment. However, a complex process cannot supplant judgment—in some cases, it merely prolongs the life of an investigation and does not enhance quality. For example, if an investigator deems a use of force incident that is captured entirely on video to be appropriate, further investigation or analysis is unlikely to lead the investigator to a different conclusion. However, the mandatory requirements for investigations appear to have discouraged investigators from utilizing their professional judgment and critical thinking skills—because even when an investigator can make a reasonable conclusion about Staff's conduct very early in the process, the requirement to refer the case for more investigation means the investigator must continue to investigate, even when those steps will not alter the conclusion in any way. This lack of flexibility in the process precludes a thoughtful analysis when the evidence is available to do so. This has resulted in an overwhelming and complicated process for ID that is further exacerbated by the large number of use of force incidents.

- Intake Investigations

The Intake Squad Plan creates a new, dedicated unit of investigators within ID (the "Intake Squad") to exclusively conduct "Intake Investigations" of all use of force incidents. As described in detail below, the Intake Investigation is designed to improve investigations and address current deficiencies and delays by: (a) reducing redundancies for multiple investigations by eliminating Facility Investigations, limiting Full ID referral requirements, and allowing Intake Investigators to leverage available evidence to determine whether more investigation is needed (thereby allowing more investigations to close with or without discipline closer in time to the incident); (b) streamlining the collection and review of evidence; (c) revamping and revising the narrative of Intake Investigations to better reflect thoughtful analysis versus a recitation of the

facts (compared with their Preliminary Review predecessor); and (d) enabling investigators to focus on either Intake Investigations or Full ID investigations.

The unit will not only include dedicated leadership and investigators, but also attorneys from the Trials division to streamline the imposition of discipline. The Intake Investigations will replace and improve Preliminary Reviews and Facility Investigations, and will be completed within 25 business days of the incident. Intake Investigators will review video, staff and witness reports, injury reports and photos, and inmate statements collected by the Facility. Intake Investigators can also conduct additional investigative steps (*e.g.*, interview inmates,[34] or tracking down missing documentation) if only minor follow-up is needed to make a final determination. The Intake Investigations will include the necessary components of the investigation that were previously conducted during the Preliminary Review—*e.g.*, per Consent Judgment §VII. Investigations (¶ 7), reviewing all information previously required to be reviewed by the Preliminary Reviewer, ensuring accurate classification of the incident, and referring cases for Full ID investigations when necessary. During the Intake Investigation, the investigator will also make important determinations about whether immediate administrative action is warranted, referring a case to law enforcement if necessary, and identifying and addressing issues with video surveillance that may arise. It is expected that the Intake Squad will

---

[34] Currently, Preliminary Review Investigators are required to obtain the statement of an Inmate "[i]n the event that the Inmate(s) subject to the Use of Force or alleged Use of Force has declined to provide a statement to the Facility, the Preliminary Reviewer shall attempt to interview the Inmate(s) concerning the Use of Force Incident." § VII, ¶ 7(a). The Monitoring Team recommends that the Facility continue to seek an inmate's account of the incident pursuant to § VII, ¶ 2. However, as Facility call-outs have been a significant drain on the resources of ID investigators, the Monitoring Team recommends that going forward whether the Intake Investigator attempts to obtain additional information from an inmate should be based on the facts of the case and not whether the Facility could obtain an account from the inmate or not.

be able to better focus on the development of the Intake Investigation as this will be their sole duty, versus juggling a caseload with a variety of different types of investigations.

Intake Investigators will also identify a number of critical data points for each incident including: the number of incidents involving excessive force, the number of incidents involving unnecessary force, the number of injuries occurring as a result of force, the number of inappropriate head strikes, the number of retaliatory force incidents, the number of avoidable incidents, whether allegations are substantiated or not, and the number of inappropriate escort techniques. This information will assist the Department in identifying patterns and practices regarding Staff use of force.

A more streamlined, succinct narrative of the incident will differentiate Intake Investigations from current Preliminary Reviews[35]—requiring investigators to analyze and summarize the available evidence instead of merely transcribing long verbatim descriptions of Staff reports and video evidence. Such decision-making and critical thinking are essential elements to improving the quality of investigations going forward. This structure for the investigation narrative will require investigators to utilize their judgment to assess the appropriateness of the Staff's use of force and will enhance the Supervisors' ability to more efficiently evaluate and review investigations as extraneous information will no longer be included. At the completion of the Intake Investigations, Investigators can either recommend closing a case with or without a disciplinary/administrative response or refer the case for further

---

[35] The narrative portion of the Preliminary Review are often very lengthy (generally over 10 pages) and describes the evidence in great detail, and oftentimes summarize (or in some cases include verbatim transcription) of each Staff report and all relevant video footage. Further, completion of Preliminary Reviews in CMS also requires many specific questions to be answered about the incident (*e.g.*, whether it was captured on video, involved head strikes, etc.).

investigative steps ("Full ID" investigation). The ability for the Intake Investigator to make these recommendations is expected to support the imposition of more timely discipline as more cases can be closed following the Intake Investigation versus the smaller number of cases that were permitted to be closed following the Preliminary Review. The cases required for Full ID referral are a more limited subset of the original requirements of Consent Judgment § VII, ¶ 8, and are intended to identify those cases where further investigation is truly merited. Under the Intake Squad Plan, the following cases would be referred for Full ID: (1) cases with Class A injuries;[36] (2) cases involving head strikes (*i.e.*, a strike or blow to the head of an inmate, or alleged strike or blow to the head of the inmate);[37] (3) when it is necessary to conduct interviews of Staff Members to complete a thorough investigation and determine whether Staff used excessive or unnecessary force or otherwise failed to comply with the New Use of Force Directive; and (4) when, due to the complexity of the incident or investigation, the nature of the conduct, or the evidence collected, it is necessary to conduct further investigative steps to determine whether Staff engaged in excessive or unnecessary force.[38] The Intake Squad Plan subsumes the need for Facility Investigations (§ VII., ¶ 13) and therefore cases would no longer be referred for Facility Investigations because they are duplicative of the work of the Intake Squad and provide no added value.[39]

---

[36] This is the same requirement under § VII, ¶ 8(a).

[37] This is the same requirement under § VII, ¶ 8(b).

[38] These last two categories build upon and subsume two current Consent Judgment § VII, ¶ 8 requirements: § VII, ¶ 8(i))—cases with unexplained facts including unexplained inmate injuries; portions of the incident are off camera and raise concerns which warrant inmate interviews, etc.; and § VII, ¶ 8(j))—any other cases where Full ID appears merited.

[39] Due to this recommendation to eliminate Facility Investigations, correspondingly there would be no need for Facility Investigation training as required by Consent Judgment § VIII. (Training) (¶ 2(c)(ii)).

- <u>Steps Towards Realization of the Intake Squad and Staffing</u>

Extensive planning is required to implement the Intake Squad and to ensure it has the necessary foundation for success. To date, this has included selecting experienced and qualified investigators to join the squad (from among current ID investigators), clearing the caseloads of those selected, developing the protocol for completing Intake Investigations, drafting related policies and procedures, and obtaining and preparing physical space and necessary hardware to support the Intake Squad. While the initial group of investigators assigned to the Intake Squad will be seasoned investigators, additional Staffing lines are needed to ensure caseloads of a reasonable size. Accordingly, in mid-June 2019, the City granted a request for an additional 62 staffing lines for the Investigation and Trials Division as part of the fiscal year 2020 budget cycle. During the Ninth Monitoring Period, ID identified investigators, supervisors and leadership for assignment to the Intake Squad. The Department also outfitted a functional dedicated space at GMDC with investigator offices, conference rooms, and installed phones, computers, and other necessary technology for the base for the new Intake Squad.

To support the overall goal of more efficient investigations, the Monitoring Team also recommended that the Department develop a more streamlined process for collecting documentation from the Facilities. Generally, documentation that is generated close in time to the incident is not difficult to obtain. However, if certain documentation was not submitted on time or the investigation reveals additional documentation was needed, the process to obtain that information was cumbersome and inefficient. Individual investigators were required to pursue missing documentation from different points of contact at each Facility, which required significant time and follow-up. With the advent of the Intake Squad, the Department reported it

47

was assigning Facility Captains at each Command who will serve as the central point of contact for the Intake Squad if/when additional documentation is needed from the Facility.

To fully implement the Intake Squad, certain provisions of the Consent Judgment will need to be modified. Accordingly, the Monitoring Team has recommended modifications to Consent Judgment § VII. (Investigations), ¶¶ 7, 8, and 13 to the Parties, as they are necessary to streamline investigations and peel away the unnecessary layers of process to allow conclusions to be made as evidence becomes available. ID leadership and staff made significant strides in the Ninth Monitoring Period to stand up this new process. The amount of planning and resources for this effort cannot be underestimated. This new approach is designed to catalyze more efficient and higher-quality investigations. The Intake Squad was launched early in the Tenth Monitoring Period (February 3, 2020) and the Monitoring Team intends to continue to closely collaborate with ID and Trials to support its successful implementation.

*Streamlining Investigations and Improved Efficiency to Impose Discipline*

The framework for the Intake Squad is designed to enable the Department to more efficiently assess use of force incidents and to identify and address Staff misconduct if appropriate. The Intake Squad will have assigned Trials attorneys to help guide investigators in determining whether charges may be warranted, and to consider what evidence may be necessary to ultimately prosecute the case to help determine whether further investigation of an incident may be warranted. Further, given the ability to close cases more quickly, formal charges may be brought at the conclusion of the Intake Investigation, and the need for prolonged Full ID investigations is diminished under this new framework. This will support the goal of both referring cases for charges more timely and also ensuring that those cases referred for charges have the necessary evidence to support the imposition of discipline. The Preliminary Review and

Full ID backlogs (described further below) have hamstrung the formal disciplinary process. The increased number of case referrals to Trials will certainly impose additional demands on the Trials Division, particularly as the Department works to clear out the investigation backlog. As a result, the Monitoring Team has recommended that improvements to support settlement of cases outside of the OATH process while also ensuring that OATH has sufficient capacity to manage those cases that require a pre-trial conference and/or a Trial. This is outlined in more detail in the Staff Discipline & Accountability section of this report.

*Identifying Use of Force-Related Misconduct*

The Department's various mechanisms for identifying misconduct in this Monitoring Period are described below:

| INITIAL ASSESSMENT | | | INVESTIGATIONS | | |
|---|---|---|---|---|---|
| Rapid Reviews/ Avoidables | ID Quickstats[40] Weekly Reports | Immediate Action | Preliminary Review | Facility Investigation | ID Investigation |
| WHEN | | | | | |
| Within 48 hours of incident | Within 7 days of the incident (meeting occur weekly) | Committee Meets Bi-Weekly | 5 Business Days[41] | 25 Business Days after referral from Preliminary Review | 120 Days after referral from Preliminary Review[42] |
| BY WHOM | | | | | |
| Warden, DWIC, DW | ID Supervisors | ID, Legal, Trials, Chiefs, Training Leadership | ID Staff | Facility Investigating Captain | ID Investigators |
| INCIDENTS REVIEWED | | | | | |
| Actual use of force incidents with video available, separate review conducted for each | Actual use of force incidents with video available for AMKC, GRVC, MDC, NIC, | Concerning incidents referred from variety of sources | All use of force incidents | Incidents that do not meet criteria for Full ID or PIC | Incidents that meet ¶ 8 criteria, or otherwise warrant Full ID Investigation |

[40] ID Quickstats Weekly Reports are reports prepared by ID in which ID shares a summary of incidents that occurred at the Facility the prior week, including descriptions of specific incidents and relevant data. This summary includes the Facility Rapid Review findings and whether ID concurs with that assessment or not.

[41] Preliminary Reviews are taking far longer than five business days to be completed, as discussed later in this report.

[42] ID is not currently able to complete Full ID Investigations within the 120-day time period as discussed later in this report.

| INITIAL ASSESSMENT | | | INVESTIGATIONS | | |
|---|---|---|---|---|---|
| **Rapid Reviews/ Avoidables** | **ID Quickstats[40] Weekly Reports** | **Immediate Action** | **Preliminary Review** | **Facility Investigation** | **ID Investigation** |
| involved Staff Member | RNDC, OBCC, and WF | | | | |
| INFORMATION REVIEWED FOR EACH INCIDENT | | | | | |
| Video Only | Video Only (and Rapid Review) | Video, and other available evidence if necessary | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, etc. | Video, Staff and Witness reports, injury reports, inmate statements, conduct MEO-16 interviews (if needed) |
| NINTH MONITORING PERIOD DATA 3,938 Incidents from July 1, 2019-December 31, 2019 | | | | | |
| Rapid Reviews were conducted for 3,684 of the 3,770 actual incidents that occurred between July 1, 2019 – December 31, 2019. | The ID Quickstats Weekly Reports were conducted for actual incidents at OBCC, GRVC, RNDC, AMKC, MDC, NIC, and West Facility. | Corrective action was recommended for 32 Staff by the Immediate Action Committee. | 3,532 *Pending* Preliminary Reviews  406 *Complete* Preliminary Reviews: | 583 Facility Investigations closed during the Ninth Monitoring Period | 1,703 UOF investigations closed during the Ninth Monitoring Period. |

 o **Initial Assessment of UOF Incidents**

   The combination of Rapid Reviews/Avoidables, ID Quickstats Weekly Reports, the

Immediate Action Committee, *ad hoc* review by Agency officials of use of force incidents, and

Preliminary Reviews creates multiple opportunities for identifying misconduct and initiating

timely and proportional corrective action (including discipline) when warranted.[43] These

processes provide a sufficient foundation to identify misconduct, but they are not maximized due

to the lack of consistent and reliable interpretation of the UOF policy.

   As discussed throughout this section of the report, identification of misconduct and close

in time response to that misconduct must be improved and remained inconsistent in the Ninth

---

[43] Depending on the severity or complexity of the violation, additional investigation may be required before corrective action can or should be imposed.

Monitoring Period. Fortunately, two initiatives that began in the Tenth Monitoring Period related to Intake Investigations and administrative reviews are designed to improve the identification of misuses of force and the corresponding implementation of immediate administrative action (as merited). First, the Intake Squad's streamlined approach to conducting an investigation requires immediate action to be considered close in time to every incident. This, along with the singular focus of the Intake Squad of only conducting Intake investigations, should encourage more timely, routine, and consistent recommendations for immediate action. Second, a planned improved Rapid Review framework to identify and track various issues, including express consideration of immediate administrative action (*e.g.* modification of post or suspensions) for all cases reviewed, should also bear fruit.

     o   *Rapid Reviews*

In this Monitoring Period, Facility leadership continued to conduct Rapid Reviews of all use of force incidents captured on video. A close-in-time assessment of use of force incidents by Facility Leadership is critical to properly managing any facility. While the investigation will make the ultimate determination about Staff conduct, administrative reviews are integral to uniform leadership's ability to appropriately manage their Staff and the Command. The Rapid Review process provides an opportunity for Facility leadership to document their initial assessment of an individual incident, consider whether an immediate response is necessary and/or whether operational issues need to be addressed.

Rapid Reviews are conducted for every actual UOF incident captured on video.[44] Given that the nature of these reviews is to make a close in time assessment, the review focuses almost

---

[44] The Rapid Reviews do not assess allegations of use of force.

exclusively on the video of the incident. In assessing the video of the incident and some preliminary reports (*e.g.* CODs), the Facility Warden must identify: (1) whether the incident was avoidable, and if so, how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; (4) whether the incident involved painful escort techniques; and (5) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type. The results of the reviews are forwarded up the chain of command for approval by the Bureau Chief of Facility Operations, whose office compiles the results and circulates the outcomes of the Rapid Reviews to relevant stakeholders for review.

Given the extensive video coverage in the Department, nearly all incidents have been subject to a Rapid Review for the past two years. During this Monitoring Period, Rapid Reviews assessed 3,684 (98%) of the 3,770 actual uses of force, involving 12,501 unique Staff actions.[45] The chart below demonstrates the Rapid Review outcomes for the past four Monitoring Periods.

| Rapid Review Outcomes – January 2018 to December 2019 | | | |
|---|---|---|---|
| | Jan. to June 2018[46] | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 |
| Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations | | | |
| **UoF Incidents Assessed** | 1,170 (97% of actual incidents) | 3,087 (94% of actual incidents) | 3,215 (95% of actual incidents) | 3,684 (98% of actual incidents) |
| **Avoidable[47]** | 277 (24%) | 688 (22%) | 492 (15%) | 323 (9%) |
| **Unnecessary** | 104 (9%) | 186 (6%) | 126 (4%) | 85 (2%) |
| **Procedural Violations** | 419 (36%) | 1,225 (40%) | 735 (22%) | 931 (25%) |

---

[45] The fact that 12,501 staff actions were evaluated does not mean that 12,501 unique Staff Members were involved in UOF. Rather, this number reflects the Staff actions evaluated for all UOF reviewed and certain Staff were likely reviewed multiple times as they were involved in multiple use of force incidents.

[46] A revised version of Rapid Reviews was implemented beginning in April 2018 which combined Rapid Reviews with the "Avoidables" process which was previously separate. This data reflects only data following the implementation of the new process in April 2018.

[47] An incident may be found to be both avoidable and unnecessary.

| Misconduct Identified[48] | | | | |
|---|---|---|---|---|
| Staff Actions Assessed | 3,745 | 12,129 | 11,085 | 12,501 |
| Corrective Action Recommended[49] | 841 (22% of Staff Actions) | 2,754 (23% of Staff Actions) | 2,072[50] (19% of Staff Actions) | 1,897 (15% of Staff Actions) |

The table above demonstrates that Facility leadership are identifying *some* situations where Staff have engaged in misconduct. The Monitoring Team has also found that *some* Rapid Reviews do identify situations where Staff have engaged in misconduct and/or the incident is unnecessary, excessive, and/or avoidable. However, as described throughout this report, Facility leadership's assessment of use of force incidents and Staff misconduct is inconsistent. The Rapid Reviews do not consistently identify whether the incident is necessary/unnecessary, avoidable/unavoidable, or appropriate/excessive, and whether an individual Staff Member engaged in misconduct. This is likely the result of the fact that uniformed Staff of all ranks and across divisions continue to struggle to develop a common understanding of when it is appropriate to use force. The lack of a common understanding has resulted in conflicting expectations, confusion among Staff and inconsistent accountability.

Another confounding issue is that in many cases, the Rapid Review may defer any determination about the incident to ID, or defer any recommendation about discipline to ID instead of recommending any type of response for misconduct identified. While ID will conduct

---

[48] It is worth noting that corrective action was often not recommended in cases that were subject to a Full ID investigation because the Facility defers to the outcome by ID.

[49] For comparison purposes across Monitoring Periods in this chart, the "Corrective Action Recommended: Yes/No" field was used.

[50] The recommended corrective actions are intended to address any misconduct related to an incident that is found to be avoidable, unnecessary, or have procedural violations, and one incident may have corrective action for multiple Staff involved.

the investigation, this approach for the administrative review allowed Rapid Reviewers to abdicate responsibility in identifying or addressing misconduct.

The number of incidents identified as avoidable continued to decrease in this Monitoring Period compared to prior Monitoring Periods. Certainly, the overall goal of the reforms is to reduce the number of avoidable incidents, which should also result in a corresponding reduction in the overall number of UOF incidents. In this Monitoring Period, the number of incidents continued to increase while the number of incidents identified as avoidable decreased. The Monitoring Team's assessment of incidents from this Monitoring Period suggests that this decrease of avoidable incidents may be in part to a lack of consistent identification of avoidable incidents as the Monitoring Team has not identified any marked change in the number of incidents that may be avoidable.

The Monitoring Team has identified too many examples of Rapid Reviews that were woefully inadequate as they failed to identify clear, objective evidence of wrongdoing. Some of the more glaring examples of Facility leadership's inability to identify objective evidence of wrongdoing were cases in which the *ad hoc* determinations by Department leadership (including by the Immediate Action Committee), the ID Quickstats Weekly Reports, or other sources identified the misconduct and took action, while the Rapid Review itself identified no such issues. These included incidents for which the Rapid Review found *no issues* and recommended *no response*, but the Immediate Action Committee took action. Three examples of these include incidents in which: (1) a Staff Member was suspended for 30 days for misconduct in the incident including unnecessary use of OC spray on a compliant inmate; (2) a Staff Member was suspended for 30 Days then ultimately terminated (via PDR) for the use of retaliatory and excessive head strikes; and (3) a Staff Member was suspended for 30 days for the use of

unnecessary head strikes. The Monitoring Team brought these examples of inadequate Rapid Reviews, among others, to the attention of Department leadership which were then addressed through counseling of those who conducted the inadequate Rapid Reviews.

Overall, the Rapid Review process must improve to ensure there is a consistent assessment of the incident and reasonable determinations are made. The Monitoring Team worked with the Department in the beginning of the Tenth Monitoring Period to begin the process of revising Rapid Reviews. First, the Facilities will no longer defer determinations to ID, and the Rapid Reviewer will assess each incident. The template for the Rapid Reviews was also revised to include specific questions to identify potential violations and potential corrective actions to address those violations. The goal for this new format is to prompt a more focused assessment. This revised template is promising, and the expectation is that enhancements to the process will help hone the Rapid Reviewers' (Deputy Wardens and Wardens) skills at identifying and addressing misconduct going forward.

The Rapid Review process also requires additional oversight to correct inadequate Rapid Reviews to ensure misconduct is identified close in time to an incident. One attempt the Department made to do this was through the ID Quickstats Weekly Reports, which continued this Monitoring Period at seven Facilities. ID developed a weekly report of the summary of incidents that occurred at the Facility the prior week. This summary includes the Facility Rapid Review findings and ID assessment of the incident including whether ID concurs with the Facility assessment or not. Select cases from these reports are then discussed during routine meetings between ID leadership and Facility leadership. While the ID Quickstats Weekly Reports provided an avenue for ID to identify inadequate Rapid Reviews, it did not translate to noticeable changed practice in the Facility Leadership's Rapid Reviews. While the ID Quickstats

may have identified deficiencies within the Rapid Reviews, the Facilities do not appear to have consistently adopted these findings and there is no indication that leadership was held accountable for inadequate or biased Rapid Reviews. With the creation of the Intake Squad, along with the proposed improvements to the Rapid Review process, the Department is well positioned to leverage these changes to develop an adequate oversight mechanism of the Rapid Reviews to support the development of a common understanding of when it is appropriate to use force and ensure that these administrative reviews are reliable. As part of this process, Rapid Reviewers must be held accountable for biased or inadequate Rapid Reviews. The Monitoring Team therefore recommends that more oversight is put in place to ensure suitable Rapid Review assessments are occurring.

■ Addressing Rapid Review Recommendations

NCU continued to track the instances in which the Facility recommended corrective action and to confirm whether those actions were imposed. NCU's tracking has increased awareness and visibility of the corrective action process, which has continued to support improved practice by the Facilities in actually completing the recommended corrective action. In total, 1,493 recommendations for corrective action were identified by NCU to be completed by the Facilities,[51] and NCU confirmed that 1,446 (97%) of those recommendations were either initiated (for recommended CDs) and/or were completed (for actions other than CDs such as

---

[51] This number is less than the number of corrective actions initially recommended by the Rapid Reviews because it removes any recommended corrective action that NCU determined should not or need not be imposed—either because it was put on hold in deference to the outcome of the Full ID investigation, or the recommendation for corrective action was a manual entry error (*e.g.* the Corrective Action Recommended field of the excel stated "Yes," but no type of corrective action was included in the relevant column).

counseling or re-training). NCU confirmed that 584 of 620 (94%) recommended administrative actions (*e.g.*, counseling, re-training, suspensions, etc.)[52] were completed and 862 of 873 (99%) Command Disciplines were initiated in the Case Management System ("CMS").[53] The Monitoring Team is encouraged by the improvement since the Seventh Monitoring Period in the processing of Command Disciplines recommended via Rapid Reviews.

    o   *Immediate Action*

An immediate administrative response (*e.g.*, suspension, re-assignment, counseling, etc.) is necessary to address certain misconduct close in time to the incident and ensure that Staff are held to a common understanding and expectation of how to reasonably utilize force. Given the current investigation backlog, the need for more immediate action is even greater to ensure certain misconduct is addressed in a timely fashion. The majority of misconduct identified for potential immediate action is identified through *ad hoc* review by uniform or civilian leadership, the ID Quickstats Weekly Reports, and/or Preliminary Reviews. Immediate action is imposed either on an *ad hoc* basis by leadership or after the case has been reviewed by the Immediate Action Committee ("Immediate Action").[54]

---

[52] Due to the manual data-entry in the Rapid Reviews, the data is not tracked in a manner that allows the Monitoring Team to reliably breakdown the categories of recommendations without an individual assessment of each entry. That said, the majority of recommended action were counseling and re-training.

[53] The initiation of a Command Discipline in CMS does not always result in the relinquishment of compensatory days as the CD must be adjudicated and the results of that adjudication may be the loss of days, but the CD may also be resolved with a corrective interview, verbal reprimand, or dismissed (discussed in more detail in the Command Discipline section below, which provides a breakdown of the outcome of these CDs).

[54] The Immediate Action Committee continues to meet bi-weekly to review any cases in which immediate disciplinary action (*e.g.*, suspension or modified duty) should be considered, as identified by executive leadership (uniformed and civilian), ID, or staff of the Early Intervention, Support, and Supervision Unit ("E.I.S.S"). In particular, incidents are prioritized when it appears a Staff Member has more likely than not engaged in conduct that would merit potential termination pursuant to Consent Judgment § VIII, ¶

▪ <u>Immediate Action Committee</u>

The Department does utilize some immediate administrative action, but this action is underutilized. The Monitoring Team continues to identify too many examples[55] of incidents that should at least be *considered* for Immediate Action, but were not despite objective evidence of misconduct (the chart below identifies those incidents that were in fact *considered*). The advent of the Intake Squad and improved Rapid Reviews, discussed above, are expected to support improved identification of cases to be considered for Immediate Action.

| Immediate Action Committee Recommended Outcomes[56] | | | | | | |
|---|---|---|---|---|---|---|
| | **Fourth Monitoring Period** | **Fifth Monitoring Period** | **Sixth Monitoring Period** | **Seventh Monitoring Period** | **Eighth Monitoring Period** | **Ninth Monitoring Period** |
| Total Use of Force Incidents *Considered* | 29 | 34 | 51 | 42 | 34 | 27 |
| Total[57] Staff Members - Immediate Action *Recommended* | 30 | 39 | 67 | 30 | 31 | 31 |

The table below presents the recommendations of the Immediate Action Committee as well as some of the *ad hoc* actions taken by leadership outside of the Immediate Action Committee.[58] Although not all of the misuse of force is detected, as discussed above, when actions are identified as improper, the Monitoring Team has found that the Department's

---

2(d)(i) to (iii). The Department may elect to suspend or modify duty of a Staff Member for a variety of reasons beyond potential termination cases.

[55] The Monitoring Team provides these cases, when identified, with ID & Trials leadership in order to help improve the identification of similar cases in the future. With respect to these individual cases, the Monitoring Team may also share recommendations for consideration to expedite closure of the investigation and imposition of discipline (if warranted upon the completion of the investigation).

[56] Immediate corrective action taken by the Facility through the Rapid Reviews process (as described above) is not included in this data.

[57] Some incidents include Immediate Action for more than one Staff Member.

[58] The *ad hoc* imposition of immediate action is generally tracked through the work of the Immediate Action Committee, though occasionally, some responses are not captured.

immediate action responses are generally reasonable—many of the responses include significant suspensions which appeared appropriate to address the misconduct identified.

| Immediate Action Committee Recommendations<br>*Ninth Monitoring Period* | | |
|---|---|---|
| **Recommended Action**<br>*Most Staff Received Multiple Actions* | **Total Recommended** | **Total Confirmed** |
| **Suspensions** | 24 | 24 |
| **Modified Duty** | 4 | 4 |
| **Fast-Track to Trials or MOC** | 10 | 7 |
| **Recommend UPS Investigation** | 3 | 3 |
| **PDR Recommendation** | 5 | 3 |
| **EISS Referrals** | 6 | 6 |
| **Counseling** | 1 | 1 |
| **Re-Training** | 3 | 3 |
| **Total Recommended Action**<br>*across 31 Staff Members* | **56** | **51** |

Given that incidents are referred for immediate action from various sources and that the recommended immediate action of those incidents involve different divisions (*e.g.*, E.I.S.S., Trials, ID, Training Academy, etc.), ensuring the recommendations are imposed requires coordination across several different divisions. Unfortunately, the Department has not implemented a reliable tracking process to ensure that all Immediate Action Committee recommendations are properly implemented. That said, most actions appear to be implemented, some types of action with more efficiency than others.[59] *Suspensions* and *Modified Duty* appeared to be implemented timely, which is particularly positive given the effectiveness of these tools to send clear messages to Staff. However, recommendations to *"Fast Track"* cases for discipline within Trials and/or the issuance of a *PDR* appeared to be implemented less efficiently and in some cases, the Department had difficulty providing evidence that these actions

---

[59] As reported in the Eighth Monitor's Report at pg. 41-42, the Department established an internal mechanism to confirm the Immediate Action Committee recommendations are implemented— unfortunately, this mechanism was simply not reliably implemented this Monitoring Period and certain types of Immediate Action Committee recommendations languished.

took place. In certain cases, no action appeared to have been taken until the Monitoring Team sought proof of practice, particularly for Fast-Track cases—as depicted in the chart above, three recommendations for Fast-Track did not occur, and two PDRs were not yet finalized as of the filing of this report.

▪ Suspension, Modified Duty and Re-Assignment

During this Monitoring Period, the Monitoring Team verified that the Department suspended 24 Staff Members for use of force-related misconduct (compared with 23 during the Eighth Monitoring Period, and 11 during the Seventh Monitoring Period), with suspensions lasting from five to 30 days.[60] The suspensions imposed over the last four Monitoring Periods are depicted in the chart below. The Monitoring Team's review of UOF incidents has found that there are additional cases in which consideration for suspension should be occurring.

| Suspensions by Monitoring Period | | | | |
|---|---|---|---|---|
| | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period | Ninth Monitoring Period |
| CO | 14 | 9 | 16 | 21 |
| Captain | 7 | 2 | 7 | 3 |
| ADW | 0 | 0 | 0 | 0 |
| Warden | 0 | 0 | 0 | 0 |
| Total | 21 | 11 | 23 | 24 |

The Department also modified Staff Members' duties or re-assigned Staff several times during this Monitoring Period. As noted above, the Immediate Action Committee recommended the modification and/or reassignment of four Staff in this Monitoring Period, but at least a handful of other modifications were recommended by Uniform Leadership and/or ID to move Staff with problematic behaviors to different positions and/or positions with limited or no inmate

---

[60] As per Department policy (Memorandum 01/99 - Suspension without Pay (Captain and Above)), all suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay.

contact pending the outcome of the investigations/discipline for serious incidents. The Monitoring Team recommended the Department also consider certain Staff for modification and those recommendations were considered and addressed as appropriate. These administrative responses, particularly suspensions, are an important tool for addressing identified misconduct close-in-time to the incident and the Monitoring Team urges the Department to continue to maximize their use.

- o **Investigating Use of Force-Related Misconduct**

The continuing increase of UOF incidents, along with the inefficient investigation processes (as discussed above), seriously hampers the Department's ability to keep pace with investigating UOF incidents. The table below provides the investigation status of all 13,817 UOF incidents occurring between January 2018 and December 2019. Only about 37% have been closed. Approximately two-thirds (n=8,656; 63%) are still pending investigation. The majority of the 8,656 cases are pending with ID (~8,473) most of which (~6,550) are awaiting the completion of the Preliminary Review versus a Full ID investigation (~2,100). Only a very small portion are awaiting the completion of a Facility investigation (~180)[61].

| Investigation Status of UOF Incidents Occurring Between January 2018 to December 2019 *as of January 15, 2020* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **6th Monitoring Period** | | **7th Monitoring Period** | | **8th Monitoring Period** | | **9th Monitoring Period** | | **Grand Total** | |
| **Total UOF Incidents[62]** | **2,818** | | **3,484** | | **3,577** | | **3,938** | | **13,817** | |
| **Pending Preliminary Reviews** | 0 | **0%** | 778 | **22%** | 2,242 | **63%** | 3,532 | **90%** | 6,552 | **47%** |
| **Pending ID/Facility Investigations** | 785 | **28%** | 874 | **25%** | 360 | **10%** | 85 | **2%** | 2,104 | **15%** |

---

[61] As of mid-March 2020, all of these Facility Investigations have been closed.

[62] Incidents are categorized by their occurred date, or alleged to have occurred date, therefore these numbers fluctuate very slightly each Monitoring Period even for prior Monitoring periods if allegations are made many months after the alleged occurred date.

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 1. *Pending Facility Cases* | *12* | *2%* | *118* | *14%* | *49* | *14%* | *4* | *5%* | *183* | *9%* |
| 2. *Pending ID Cases* | *773[63]* | *98%* | *756* | *86%* | *311* | *86%* | *81* | *95%* | *1,921* | *91%* |
| **Closed Investigations** | 2,033 | **72%** | 1,832 | **53%** | 975 | **27%** | 321 | **8%** | 5,161 | **37%** |

The delays in completing Preliminary Reviews has a ripple effect on the Department's ability to address potential misconduct as it delays the referral of these investigations for a Facility or Full ID investigation, as well as the closure and ultimate disposition of these matters. Further, it impacts the Department's (and Monitoring Team's) ability to identify trends and patterns regarding the Department's use of force, including potential trends in Staff use of force that may be addressed through programs like the Early Intervention, Support, and Supervision Unit ("E.I.S.S."). Accordingly, the Department and the Monitoring Team have worked together to develop a process to conduct investigations more efficiently through the Intake Squad (as described above) going forward. Further, a plan has been developed to address the backlog of investigations reasonably and efficiently (discussed in more detail in the UOF Investigation section of this report).

- Preliminary Reviews

ID completed 1,831 Preliminary Reviews during this Monitoring Period, of which 1,379 (75%) took 90 days or more to complete, *far surpassing* the five business day timeframe contemplated in the Consent Judgment. 47% (6,552) of all incidents that occurred between January 2018 and December 2019 are pending completion of a Preliminary Review, as identified in the chart above. Of the 6,552 investigations pending Preliminary Reviews (as shown in the

---

[63] ID reported that all of these cases were analyzed as part of the Department's SOLstat project to determine whether charges needed to be brought prior to the SOL expiring, described further in the Investigations section of this report, and so they must just be administratively processed for closure.

table above), about two-thirds (n=4,334; 66%) are awaiting Supervisory review and the remaining cases are pending with the investigator (n=2,218; 34%).[64] Of the cases pending Supervisory review, 1,588 (37%) cases were recommended by the investigator for closure on the Preliminary Reviews, 2,052 (47%) were recommended for Full ID investigations, and 694 (16%) were recommended by the investigator for Facility investigations.

Of the closed Preliminary Reviews of incidents from the Sixth through Ninth Monitoring Periods (n=7,265), 55% (n=3,993) took more than 60 business days to close, and 35% (n=2,549) took more than 90 business days to close. Given the large number of *pending* Preliminary Reviews, the timeliness of Preliminary Reviews is even worse than that suggested by the analysis of closed Preliminary Reviews. More specifically, 77% (5,059 of the 6,552) of the pending Preliminary Reviews for 2018 and 2019 incidents are *already pending beyond 60 days* as of mid-January 2020.

- Full ID Investigations

Despite the large number of cases pending a Full ID Investigation, ID closed more cases during this Monitoring Period than during prior Monitoring Periods (1,703 cases closed in this Monitoring Period, compared to 888 cases[65] closed in the Eighth Monitoring Period, and 583 in the Seventh Monitoring Period). Most were closed upon the completion of the Preliminary Review (approximately 1,242 of the 1,703 closures, or 73%) during this Monitoring Period. This is reasonable since the majority of investigative steps occur during the Preliminary Review, and also positive since the cases are generally closed closer in time to the incident and are not further

---

[64] Preliminary Reviews pending with the investigators are in various stages of review—the investigators often conduct the initial call-out to interview the inmate within days of the incident, and conduct the summary and analysis of the additional evidence (up through nearly complete).

[65] This number does not include cases that were lost to the statute of limitations—discussed more below.

delayed by going through the more traditional Full ID investigation. A portion of the cases that were closed in this Monitoring Period were procedurally closed after the SOL had passed, but had been evaluated through the SOLStat process before the SOL passed to determine whether charges should be brought. In these cases, charges, if warranted, were served before the SOL passed.

| UOF Incidents with Cases Closed by ID During the 9th Monitoring Period *As of January 15, 2020* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Date of Incident | Jan. - Dec. 2016 | Jan. - June 2017 | July - Dec. 2017 | Jan. - June 2018 | July - Dec. 2018 | Jan. - June 2019 | July - Dec. 2019 | Total[66] |
| Total | 2[67] | 8[68] | 83 | 309 | 338 | 679 | 284 | 1,703 |

- Facility Investigations

The Facilities have struggled to conduct timely and quality investigations, both because of delayed referrals by ID (post Preliminary Review) and delays within the Facility in conducting the investigations once the referrals are received. Given that Facility Investigations will no longer be conducted, the goal during this Monitoring Period (and moving into the Tenth Monitoring Period) was to close any pending Facility Investigations and to then efficiently manage the small number of referrals for Facility Investigations until the process was actually eliminated. At the end of the previous Monitoring Period, the Facilities had a backlog of over 500 cases, most of which were 2018 incidents. During this Monitoring Period, the Facilities closed 583 cases (including the majority of backlogged cases) and only about 180 cases were pending as of the end of the current Monitoring Period. As described in the UOF Investigation

---

[66] This includes 1,242 cases closed following the Preliminary Review as Expedited closure or PIC cases by the ID Investigator, and 594 cases closed as traditional Full ID cases.

[67] These cases were lost to the SOL in the *Eighth* Monitoring Period, but the back-end CMS closure occurred in this Monitoring Period.

[68] See above.

section of this report, NCU implemented a Facility Investigation backlog closure process and as of mid-March 2020, all of these Facility Investigations have been closed.

*Addressing Use of Force-Related Misconduct*

Consistent, reliable, and proportional responses to identified misconduct are necessary to effectively shape Staff behavior and minimize the possibility that the misconduct will reoccur. The Department is struggling to adequately address use of force-related misconduct due to inadequacies related to identifying misconduct during the initial stages of investigation and also the long delays (and corresponding backlog) in completing investigations. The Department can respond to identified misconduct in a variety of ways, including (1) immediate administrative responses (*e.g.*, counseling, re-training, modification of assignment and suspension), (2) Facility-level discipline via Command Discipline, (3) a Personal Determination Review for probationary Staff, and (4) formal discipline for tenured Staff imposed via the Trials Division. Currently, the formal disciplinary process is extremely lengthy, which is concerning given that the majority of significant discipline is imposed via formal discipline. Accordingly, the Monitoring Team continues to strongly encourage the Department to utilize immediate administrative responses and its entire spectrum of responses to stimulate necessary behavior change and ensure that a *timely* and *proportional* response is ultimately *imposed*. The Department's ability to address misconduct is discussed in turn below.

o   *Facility Referrals*

ID continued utilizing Facility Referrals this Monitoring Period, wherein ID refers a specific issue, identified through the Preliminary Review or Full ID Investigation, to a Facility with instructions for the Facility to take appropriate action by addressing the issue with the specific Staff Member. Facility Referrals are a useful tool as they provide an opportunity for the

Facility to respond to minor misconduct in a more timely manner, which will hopefully mitigate the possibility of reoccurrence in the future. Facility Referrals are often used to address procedural or operational issues like missing reports, issues with the operation or upload of handheld cameras, and delays in medical treatment. This process provides an opportunity for ID to advise Facility leadership of issues that are identified through an investigation and then allow the Facility to take responsibility for addressing them—often in the form of counseling Staff. Referrals for Staff re-training are no longer made via Facility Referrals, because ID can now directly recommend a Staff for re-training to the Training Academy through the Service Desk system (as discussed more below).

ID made 171 Facility Referrals in this Monitoring Period. Individual DDIs shared the Facility Referrals with the relevant commands and then tracked receipt of responses from the Facilities throughout the Monitoring Period. In the main, the Facilities do respond to these referrals, albeit sometimes on a lag. However, the aggregate tracking of Facility Referral *responses* became less consistent towards the end of the Monitoring Period. It appeared this tracking waned due to the loss of an administrative staff member in ID and an increased emphasis on preparing for the Intake Squad.

    o   *Counseling, Corrective Interviews, and Re-Training*

Counseling, corrective interviews, and re-training are all useful management tools to provide Staff additional support, context and guidance to effectively manage inmates and to use force appropriately. The Department counsels and/or conducts a corrective interview with a significant number of Staff who are identified either through the 5003 counseling process or

through Rapid Reviews,[69] and counseled at least 800 Staff this Monitoring Period. Depending on the circumstances, Counseling and/or Corrective Interviews are appropriate stand-alone responses and are also helpful as a *supplement* to other responses (*e.g.*, post modification, suspension, re-training or other discipline). That said, the Monitoring Team has found that the Department often defaults to utilizing a counseling session as a stand-alone response even when the objective evidence suggests that a more significant sanction is warranted (*e.g.* a Command Discipline that relinquishes compensatory days).

Providing additional training to Staff who have engaged in misconduct is another way to improve practice. The Department systematically tracks which Staff have been identified for re-training through the computerized Service Desk. The Service Desk is an online portal accessible to Facility Staff, civilian leadership, and the Training & Development Unit Staff. It is a centralized repository for tracking Staff who have been recommended for re-training (both the recommendation for and the receipt of training) and has the ability to run aggregate reports.

During this Monitoring Period, 839 Staff were recommended for re-training via the Service Desk, compared with 410 during the Eighth Monitoring Period. The growth is largely due to ID's increased use of this tool (517 requests during the Ninth Monitoring Period, compared to only 129 in the previous Monitoring Period), driven by the processing of more backlogged cases and the ease and availability of this tool to investigators. Not surprisingly, the majority of re-training requests in this Monitoring Period were made by ID (62%), followed by

---

[69] Corrective Interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. Counseling sessions (including 5003 counseling sessions) are not considered disciplinary in nature and are not included in a member's personnel file.

Facility leadership (25%) with the remainder of requests coming from other sources including the Trials Division (5%) and the Immediate Action Committee (1%). The courses recommended most often were Use of Force Report Writing (40%),[70] Use of Force (19%), Chemical Agents (13%), and Situational Awareness (9%). As of the end of the Monitoring Period, the Department reported that 731 of 839 (87%) Staff recommended for re-training received it. A more detailed analysis of the Service Desk and re-training requests, and the trends in the Ninth Monitoring Period, is provided in the Training section of this report (¶ 5).

    o  *Command Discipline ("CD")*

Command Disciplines provide the Department an opportunity to timely and proportionally respond to lower level misconduct with lighter disciplinary action (up to 5 compensatory days). This process is managed at the Facility level and is less cumbersome than the process for imposing formal discipline via Trials. Previously, the Department struggled to consistently adjudicate cases (meaning the hearing to determine what discipline should be imposed did not occur) and/or impose discipline (meaning that the recommended discipline was not actually imposed via CityTime deductions), as discussed in the Seventh Monitor's Report (at pgs. 40-42). However, over the past eight months, the Department has made significant progress, and Command Disciplines have become a reliable, close in time response to Staff misconduct.

A Command Discipline can range from verbal reprimand up to the forfeiture of five vacation/compensatory days. Command Disciplines ("CDs") are governed by a detailed policy that, among other things, requires CDs to be issued and adjudicated within timeframes that are much shorter than those for formal discipline. Command Disciplines are utilized in two ways.

---

[70] 58% (301 of 517) of the re-training requests from ID this Monitoring Period were for Use of Force Report writing.

The Facility may generate a Command Discipline within 30 days of an incident (to then be subsequently adjudicated). A Command Discipline may also be generated as part of a Negotiated Plea Agreement ("NPA") with a recommendation to adjudicate at the Facility level or with an agreed upon number of days (up to five days) to be forfeited by the Staff Member—this type of CD is discussed under the Formal Discipline section below under the heading "Imposition of NPAs". The processing of Command Disciplines at the Facility level requires multiple steps: (1) the CD must be generated in CMS within 30 days of the incident date; (2) the case is adjudicated by a hearing Officer who determines the outcome of the CD (ranging from dismissal to a five-day penalty for Staff); and (3) if the penalty is a reduction in vacation or compensation days, HR is notified and must remove the days from the Staff Member's official time bank ("CityTime").

NCU continued to track and collect proof of practice for Command Disciplines recommended via Rapid Reviews (the vast majority of CDs for UOF-related misconduct are identified through this process). Facility leadership are responsible for entering the CDs into the system and scheduling, conducting and deciding the CDs. A centralized spreadsheet allows CDs to be easily identified and processed timely.

During this Monitoring Period, Facility leadership recommended 878 Command Disciplines via Rapid Reviews. The status/outcome of all Command Disciplines recommended in 2019 are shown in the table below. Overall, the processing of Command Disciplines has significantly improved, and many of the issues first reported regarding the inconsistent processing of Command Disciplines have abated. During the Ninth Monitoring Period, 648 of 878 (74%) CDs recommended by Rapid Reviews were processed and resulted in imposed discipline (deducted days, MOC, Verbal Reprimand or Corrective Interview), similar to the Eighth Monitoring Period (in which 73% of the 757 recommended CD results in imposed

discipline). Processing times are generally consistent with the time frames required by policy and are completed in a reasonable period of time.

| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in Days Deducted | | Resulted in MOC | | Resulted in Verbal Reprimand or Corrective Interview | | Closed Administratively, Never Entered into CMS, or Dismissed at Hearing | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Status and Outcome of Command Disciplines Recommended by Rapid Reviews** *As of March 19, 2020* | | | | | | | | | | | |
| **19-Jan** | 207 | 0 | 0% | 60 | 29% | 7 | 3% | 39 | 19% | 101 | 49% |
| **19-Feb** | 100 | 0 | 0% | 32 | 32% | 4 | 4% | 15 | 15% | 49 | 49% |
| **19-Mar** | 85 | 1 | 1% | 54 | 64% | 10 | 12% | 10 | 12% | 10 | 12% |
| **19-Apr** | 95 | 0 | 0% | 66 | 69% | 4 | 4% | 16 | 17% | 9 | 9% |
| **19-May** | 122 | 0 | 0% | 88 | 72% | 12 | 10% | 14 | 11% | 8 | 7% |
| **19-Jun** | 148 | 4 | 3% | 90 | 61% | 22 | 15% | 14 | 9% | 8 | 5% |
| ***8th MP*** | *757* | *5* | *1%* | *390* | *52%* | *59* | *8%* | *108* | *14%* | *185* | *24%* |
| **19-Jul** | 172 | 3 | 2% | 107 | 62% | 13 | 8% | 26 | 15% | 23 | 13% |
| **19-Aug** | 135 | 2 | 1% | 82 | 61% | 12 | 9% | 18 | 13% | 21 | 16% |
| **19-Sep** | 110 | 0 | 0% | 66 | 60% | 8 | 7% | 16 | 15% | 19 | 17% |
| **19-Oct** | 162 | 1 | 1% | 93 | 57% | 18 | 11% | 9 | 6% | 41 | 25% |
| **19-Nov** | 160 | 9 | 6% | 74 | 46% | 10 | 6% | 15 | 9% | 52 | 33% |
| **19-Dec** | 139 | 13 | 9% | 54 | 39% | 13 | 9% | 14 | 10% | 45 | 32% |
| ***9th MP*** | *878* | *28* | *3%* | *476* | *54%* | *74* | *8%* | *98* | *11%* | *201* | *23%* |
| **2019 Total** | **1635** | **33** | **2%** | **866** | **53%** | **133** | **8%** | **206** | **13%** | **386** | **24%** |

The proportion of CDs that were dismissed or closed administratively increased slightly in the last three months of 2019 as identified in the chart above, but the overall number of CDs recommended in those months were also higher. NCU tracks the reasons CDs are dismissed or closed administratively in CMS Department-wide, and of the 163[71] closed administratively/dismissed in the Ninth Monitoring Period, 29 (18%) were because the Staff Member had resigned, 33 (20%) were due process violations, nine (6%) were due to ID

---

[71] Note this number does not included those never entered in CMS.

takeovers of the incident, and 87 (53%) had factual basis for the dismissal as presented in the hearing.

A Facility-specific analysis of CDs that were dismissed revealed that the overall increase in the number of recommended CDs and dismissals were attributable largely to one facility. For example, in October 2019, 67 of the 162 (42%) overall recommended CDs were from GRVC, and ultimately 22 of those 67 were dismissed—representing over half the dismissals (41 total) for that month Department-wide. NCU simultaneously conducted a similar analysis and found that many of the initial recommendations for CDs were not appropriate and so the CDs were ultimately dismissed because they should not have been recommended in the first place. Further, the increase in the number of recommended CDs created more work which then made it more difficult to process all CDs timely. In terms of the basis for the CD dismissals, the Monitoring Team reviewed the reason given for dismissals of 31 CDs in December 2019, and found they were generally reasonable (*e.g.* the facts presented at the hearing warranted dismissal, the Staff Member was no longer with the Department while the CD was pending, etc.).

Upon a determination that a Staff member must forfeit a certain number of compensatory days, the decision must be shared with HR so that the discipline can be imposed and entered in the Staff Member's personnel file. NCU tracks whether HR enters the adjudicated CD into the Staff Member's personnel file, and whether CityTime bank deductions take place in a reasonable timeframe. The Monitoring Team has reviewed this data and found that the majority of Command Disciplines that resulted in the relinquishment of compensatory time for Staff were entered into the Staff Member's personnel file and deducted from the Staff's CityTime bank in a reasonable period of time in both the Eighth and Ninth Monitoring Period.

Certain CDs may be transferred to a Memorandum of Complaint for formal discipline if a Staff Member refuses the Command Discipline, the Staff Member has accumulated three CDs within a year, or the Facility determines that a Memorandum of Complaint ("MOC") is a more appropriate response to address the misconduct. Based on recommendations from the Monitoring Team, during this Monitoring Period, NCU implemented a new process to ensure that any MOCs recommended at the Facility level were actually generated and processed. During this Monitoring Period, NCU confirmed that 83 of 114 (73%) Facility-generated MOCs were submitted via CMS and approved by the Office of Administration and were then referred to the Trials Division to process the cases. The remaining 27% (31) of MOCs remain pending in CMS and are being tracked by NCU to ensure they are processed.

As noted in the Eighth Monitor's Reports at pg. 57, there are CDs generated in CMS beyond those associated and tracked with a Rapid Review that are coded as use of force-related, some of these CDs are processed appropriately, and some of these are dismissed or not processed. The Monitoring Team revisited this issue during the current Monitoring Period to assess whether NCU should expand its verification efforts to include an assessment of these other CDs. The Monitoring Team concluded that expansion would be extremely burdensome as these CDs stem from a variety of sources, each of which has a variety of individual factors that impact processing. For example, CDs may not be processed because there were simple filing errors, are duplicative of other CDs, or for a variety of other legitimate (and illegitimate) reasons. Given that the bulk of CDs come from Rapid Reviews, the Monitoring Team is comfortable with the current scope of NCU's verification efforts.

Overall, CDs remain an important tool for the Facility to address Staff misconduct close in time to the incident. The improved processing of CDs has enabled this tool to be more

effective.[72] In terms of the CDs determinations, whether there is a verbal reprimand, corrective interview or the forfeiture of up to 5 days, is based on the nature of the offense, the Staff Member's prior discipline, mitigating and aggravating factors and consideration of disciplinary grid. The majority of CDs (54%) result in the relinquishment of compensatory days with the rest being verbal reprimands (11%), this is roughly the same proportion as in the Eighth Monitoring Period (52% and 14% respectively). Given the limited scope in disciplinary options, it is difficult to determine whether the outcomes may be unreasonable or not. That said, the Monitoring Team intends to review the outcomes of CDs more closely in future Monitoring Periods.

   o   *Personnel Determination Review ("PDR")*

Discipline is generally imposed on probationary Staff[73] via a Personnel Determination Review ("PDR"). A PDR can be recommended by Facility leadership or by ID to address UOF related violations and other issues (*e.g.*, excessive absence or other employment issues). The process to evaluate use of force-related PDRs has continued to improve since the Monitoring Team began significantly scrutinizing this process during the Sixth Monitoring Period.[74] Requests for PDRs are now consistently and timely evaluated, processed, and tracked by HR and decided by the First Deputy Commissioner and/or the Commissioner in a generally reasonable

---

[72] The Monitoring Team's assessment of CDs is limited to those recommended by Rapid Reviews. As noted above, Rapid Reviews do not consistently identify Staff misconduct therefore it is likely that the use of CDs may be expanded as the Department's assessment of incidents improves.

[73] Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods.

[74] *See* Sixth Monitor's Report at pgs. 35 to 39.

manner. The outcome of the PDR is limited to three options: (1) extension of probation,[75] (2) demotion or termination,[76] or (3) no action. Staff on probation can also be suspended (along with PDRs) and in the cases where the Department elects not to take action via PDR, the Department can elect to impose formal discipline through Trials.

In order for the discipline imposed via PDR to be meaningful, PDRs must not only be reliable and credible, but must be processed close in time to the incident. The Department previously waited until the end of a Staff Member's probation to complete the PDR. Now, they are now generally completed within 30 days of submission. While the investigation backlog does cause delay in the submission of PDRs, the chart below demonstrates that a significant portion of PDRs relate to incidents that occurred more recently. Of the 60 PDRs submitted in this Monitoring Period, all but eight were for incidents that occurred in 2019 (and 27 occurred during this Monitoring Period).

| Outcome of PDRs based on Date of Incident *As of January 15, 2020* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Nov. 2015 - Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | |
| Total | 36 | | 18 | | 21 | | 30 | | 18 | | 51 | | 27 | |
| Demotion | 0 | 0% | 0 | 0% | 2 | 10% | 3 | 11% | 1 | 7% | 3 | 6% | 1 | 4% |
| Extension of Probation - 3 Months | 1 | 4% | 2 | 13% | 4 | 20% | 1 | 4% | 2 | 13% | 7 | 14% | 6 | 22% |
| Extension of Probation - 6 Months | 15 | 65% | 7 | 44% | 10 | 50% | 17 | 63% | 7 | 47% | 20 | 39% | 12 | 44% |
| Termination | 6 | 26% | 6 | 38% | 4 | 20% | 5 | 19% | 4 | 27% | 14 | 27% | 2 | 7% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 7% | 2 | 4% | 0 | 0% |
| Deferred Decision | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 11% |
| No Action | 1 | 4% | 1 | 6% | 0 | 0% | 1 | 4% | 0 | 0% | 0 | 0% | 1 | 4% |
| Resignation | 2 | 15% | 0 | 0% | 1 | 100% | 2 | 67% | 3 | 100% | 4 | 8% | 2 | 7% |
| Tenured | 11 | 85% | 2 | 100% | 0 | 0% | 1 | 33% | 0 | 0% | 1 | 2% | 0 | 0% |

---

[75] Probation may be extended up to a total of six months. The probationary period may also be extended for any period of time the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[76] Correction Officers may be terminated via PDR. However, Captains and ADWs may only be demoted via PDR, termination must be completed through formal discipline as Staff is those positions have Civil Service protections.

    o   *Formal Discipline*

The number of cases pending in Trials continues to grow, impacted significantly by the recent reductions to the ID backlog. While Trials made some progress during this Monitoring Period—processing more cases than during the Eighth Monitoring Period—the time to process these cases lags behind what was observed prior to the Eighth Monitoring Period and the number of pending cases has dramatically increased. Not only has a large volume of cases suddenly been referred to Trials from ID, but the cases are often very stale from languishing in the ID backlog, which impacted Trials' ability to close cases timely.

The volume of formal discipline imposed in the Ninth Monitoring Period increased by 50% compared to the previous Monitoring Period (155 versus 100, respectively); however, the number closed is 25% fewer cases than were closed in the Fourth Monitoring Period (when reliable tracking began; 155 cases versus 209 cases). Of the 155 discipline cases closed during the current Monitoring Period, 82% (n=127) closed via NPA, none closed at OATH, and the remaining cases (n=28; 18%) administratively filed or closed via deferred prosecution. As in other Monitoring Periods, cases that are administratively filed or closed via deferred prosecution (case dismissals) remains relatively infrequent.

| Discipline Imposed by Date of Ultimate Case Closure[77] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | | Jan. - June 2019 | | July - Dec. 2019 | |
| **Total** | **209** | | **286** | | **270** | | **247** | | **100** | | **155** | |
| NPA | 153 | 73% | 242 | 85% | 249 | 92% | 234 | 95% | 84 | 85% | 127 | 82% |
| Administratively Filed | 44 | 21% | 32 | 11% | 16 | 6% | 6 | 2% | 9 | 8% | 23 | 15% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 6% | 5 | 3% |
| Adjudicated/Guilty | 0 | 0% | 4 | 1% | 1 | 0% | 2 | 1% | 0 | 0% | 0 | 0% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% | 0 | 0% | 1 | 1% | 0 | 0% |

---

[77] In these cases, discipline has been approved by the Commissioner.

Each Monitoring Period, relatively small proportions of cases closed within one year. Only 57% of cases closed within two years for both the Eighth and Ninth Monitoring Periods. Only 20 cases (16%) were closed within one year, an improvement on the six closed in the Eighth Monitoring Period, but not compared to 53 in the Seventh Monitoring Period.

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | | Jan. - June 2019 | | July - Dec. 2019 | |
| Total | 153 | | 242 | | 249 | | 234 | | 84 | | 127 | |
| 0 to 6 months | 0 | 0% | 7 | 3% | 7 | 3% | 19 | 8% | 3 | 4% | 6 | 5% |
| 6 to 12 months | 7 | 5% | 21 | 9% | 33 | 13% | 34 | 15% | 3 | 4% | 14 | 11% |
| 1 to 2 years | 44 | 28% | 123 | 52% | 164 | 69% | 145 | 62% | 42 | 50% | 52 | 41% |
| 2 to 3 years | 42 | 27% | 61 | 24% | 35 | 11% | 27 | 12% | 30 | 36% | 54 | 43% |
| 3 + years | 60 | 40% | 30 | 12% | 10 | 4% | 9 | 4% | 6 | 7% | 1 | 1% |

Nearly all (99%) of the discipline imposed to date is for misconduct in incidents that occurred prior to January 2019.[78] Only 17 (1%) of the 1,261 Staff disciplined since the Effective Date[79] related to incidents that occurred in 2019. Formal discipline has only been imposed on three Staff Members for misconduct that occurred during this Monitoring Period.

| Formal Discipline Imposed by Date of Incident | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Pre Nov. 2015 | | Nov. 2015 - Dec. 2016 | | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | | Jan. - June 2019 | | July to Dec. 2019 | | Totals | |
| Total | 419 | | 407 | | 194 | | 131 | | 61 | | 15 | | 14 | | 3 | | 1261 | |
| NPA | 406 | 97% | 403 | 99% | 194 | 100% | 131 | 100% | 61 | 100% | 15 | 100% | 14 | 100% | 3 | ~ | 1244 | 99% |
| Adjudicated/ Guilty | 10 | 2% | 1 | 0% | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 11 | 1% |
| Not Guilty | 3 | 1% | 3 | 1% | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 0 | ~ | 6 | 0.5% |

---

[78] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November of 2015.

[79] *See id.*

Drilling down into the number of days imposed via NPA, 42% of cases closed for 20 days or less in the Ninth Monitoring Period compared to 27% in the last Monitoring Period. Therefore, a greater proportion of cases are closing with lighter discipline. However, Trials closed almost 10% of cases with dispositions *of more than 40 days,* demonstrating continued use of both ends of the disciplinary spectrum, with fewer cases in the middle.

| Penalty Imposed by NPA by Date of Ultimate Case Closure *As of January 15, 2020* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | Jul. to Dec. 2019 | |
| Total | 153 | | 242 | | 249 | | 234 | | 84 | | 127 | |
| Refer for Command Discipline | 16 | 10% | 55 | 23% | 28 | 11% | 39 | 17% | 2 | 2% | 0 | 0% |
| Retirement/Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 5% | 3 | 2% |
| 1-10 days | 6 | 4% | 25 | 10% | 60 | 24% | 86 | 37% | 16 | 19% | 35 | 28% |
| 11-20 days | 5 | 3% | 25 | 10% | 30 | 12% | 38 | 16% | 7 | 8% | 18 | 14% |
| 21-30 days | 34 | 22% | 51 | 21% | 54 | 22% | 26 | 11% | 21 | 25% | 33 | 26% |
| 31-40 days | 29 | 19% | 39 | 16% | 31 | 12% | 24 | 10% | 12 | 14% | 14 | 11% |
| 41-50 days | 9 | 6% | 6 | 2% | 14 | 6% | 4 | 2% | 6 | 7% | 12 | 9% |
| 51+ days | 18 | 12% | 11 | 5% | 16 | 6% | 14 | 6% | 3 | 4% | 0 | 0% |

During this Monitoring Period, Trials did not settle any NPAs with a CD that required a hearing at the command-level to adjudicate. As described in the Seventh Monitor's Report (at pgs. 41 to 44), this practice was subject to abuse and significant failures. Approximately half of the NPAs settled in this Monitoring Period for 10 days or less were NPAs for CD days, which all included specified days to be taken and therefore did not require hearings.

NCU continued to collect proof of practice to ensure that all discipline is entered correctly into the CityTime system in the Staff Member's personnel file. The Department maintained the improvements it achieved during the last Monitoring Period, with all NPAs imposed in November and December 2019 entered correctly into CityTime. The Monitoring Team has found the timeframe in which the NPAs are entered into CityTime is reasonable and a significant improvement from previous Monitoring Periods.

o   *Disciplinary Probation*

An NPA may also include additional terms, including a period of disciplinary probation.[80] Disciplinary probation can be imposed in six-month increments. As outlined in the table below, only three Staff entered into an NPA with a term of disciplinary probation during this Monitoring Period, compared to 12 Staff in the previous Monitoring Period. The majority of the terms of disciplinary probation range between one and two years.

| Disciplinary Probation Data | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | |
| Staff placed on Disciplinary Probation via NPA (by date of NPA) | 8 | | 4 | | 12 | | 3 | |
| | | | | | | | | |
| Number of Staff serving a term of Disciplinary Probation (during this time period) | 33 | | 35 | | 39 | | 34 | |
| -    6 Months Probation | 2 | 6% | 2 | 6% | 0 | 0% | 0 | 0% |
| -    12 Months Probation | 12 | 36% | 12 | 34% | 13 | 33% | 9 | 26% |
| -    18 Months Probation | 2 | 6% | 3 | 9% | 4 | 10% | 3 | 9% |
| -    24 Months Probation | 12 | 36% | 12 | 34% | 16 | 41% | 16 | 46% |
| -    36 Months Probation | 1 | 3% | 2 | 6% | 2 | 5% | 3 | 9% |
| -    48 Months Probation | 1 | 3% | 1 | 3% | 1 | 3% | 1 | 3% |
| -    60 Months Probation | 2 | 6% | 2 | 6% | 2 | 5% | 0 | 3% |
| -    84 Months Probation | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 3% |
| -    Probation for Full Term of Employment | 1 | 3% | 1 | 3% | 1 | 3% | 1 | 3% |

Staff on disciplinary probation are enrolled in E.I.S.S. monitoring so they receive additional support and guidance. The Monitoring Team continues to recommend that Trials utilize disciplinary probation more often.

---

[80] A term of disciplinary probation can only be imposed via a settled NPA. A term of disciplinary probation cannot be imposed via the OATH process.

# SECTION BY SECTION ANALYSIS

### 12. USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and inmate safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") has been in effect since September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The New Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps Officers and their supervisors should take when responding to threats to safety and security. The Department's efforts to implement the New Directive is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

### IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and promulgated a new UOF Directive on September 27, 2017. The policy was approved by the Monitor.

#### ANALYSIS OF COMPLIANCE

The Consent Judgment requires the Department to develop, adopt, and implement a new UOF Directive. The Department has achieved compliance with the developing and adopting components of this provision and has also trained Staff on the policy's requirements. The Department previously developed a new UOF Directive approved by the Monitor[81] and it was adopted during the Fifth

---

[81] The New Use of Force Directive was developed by the Department and approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly

Monitoring Period after all Staff received Special Tactics and Responsible Techniques Training ("S.T.A.R.T."). The Department committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and has subsequently provided refresher training on the UOF Policy through the Advanced Correctional Techniques Training ("A.C.T"). The Transfer of Learning initiative that began in the Eighth Monitoring Period also provides an opportunity for the Department to educate and advise Staff on core correctional practices and how best to address potential use of force incidents.

The Department is still struggling with effectively implementing the New Use of Force Directive. Implementing the New Directive requires not only informing and training relevant Staff about the policy requirements, but also consistently instructing and applying the policy by following its mandates.[82] Therefore, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. As discussed in the Use of Force and Inmate Violence Trends section of this report, Staff utilize force more often now than when the Consent Judgment first went into effect, and the frequency of unnecessary and excessive force has not shown a marked decrease since the Effective Date. The prevalence of unnecessary and excessive force appears to be the result in large part of the overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and too close use of OC spray, and hyper-confrontational Staff behaviors. These trends are compounded by uniform leadership's inability to identify and address the Staff misconduct causing these trends and failing to address them with Staff as discussed in the Identifying & Addressing Misconduct section of this report.

| COMPLIANCE RATING | ¶ 1. (Develop) Substantial Compliance |
| | ¶ 1. (Adopt) Substantial Compliance |
| | ¶ 1. (Implement) Non-Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a – t (see pages 5 to 10 of the Consent Judgment)].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

---

implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

[82] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: spit masks, restraints, chemical agents, electronic immobilization shields, Monadnock Expandable Baton ("MEB"), and tasers.

  - The Department also developed a draft standalone baton policy for the use of all batons (including the MEB) in the Eighth Monitoring Period. The policy was not finalized in the Ninth Monitoring Period because, in this Monitoring Period, the Department developed, in consultation with the Monitoring Team, a comprehensive lesson plan on the use of all batons so that the implementation of the policy would coincide with the training.

- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock-in and lock-outs ("Lock-Down Policy"), searches for ballistic weapons, and the deployment of Facility Emergency Response Teams (formerly called Probe Teams).

  - The Department, in consultation with the Monitoring Team, finalized revisions to the Facility Emergency Response Team Policy early in this Monitoring Period, and a revised lock-down policy is currently a work in progress.

ANALYSIS OF COMPLIANCE

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment § IV, ¶ 3 (a-o, q-t) and is aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly.

In order to address the requirements of ¶ 3(p), the Department maintains a number of standalone policies to provide guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force. The Department has consulted the Monitoring Team on the development of many of these policies as noted in prior reports. This Monitoring Period, the Department finalized revisions to the Facility Emergency Response Team Policy, procured batons and developed a Lesson Plan to support the new standalone Baton Policy which was drafted in the Eighth Monitoring Period (as described in detail in the Eighth Monitor's Report, at pg. 71). The Department had previously shared a revised version of the Lock-Down policy with the Monitoring Team. Given competing priorities, the Monitoring Team did not have an opportunity to share feedback on the policy revisions with the Department until after the close of the Ninth Monitoring Period. The Monitoring

Team expects to work with the Department to finalize the revisions to the Lock-Down policy in the next Monitoring Period, which is being revised to include improved guidance to Supervisors on when to approve/direct different types of lock-ins (*e.g.* Housing Unit, Housing Segment Unit Lock-Ins, Facility Lock Downs), and provide improved guidance on when emergency lock-ins are to be utilized (*e.g.* only after all other alternatives have been considered and/or exhausted).

The Department remains in Partial Compliance with this provision as the baton policy has not yet been finalized and implemented.[83] The Department reports it expects to finalize the baton policy and implement the new training in the Tenth Monitoring Period.

| COMPLIANCE RATING | ¶ **2.** Substantial Compliance<br>¶ **3(a-o, q-t).** Substantial Compliance<br>¶ **3(p).** Partial Compliance |
| --- | --- |

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43). The Department's Transfer of Learning initiative also continues to advise Staff about the requirements of the New Use of Force Directive. The Department consults with the Monitoring Team on the weekly Transfer of Learning lesson plans. This consultation has provided a valuable opportunity for the Monitoring Team and Department leadership to align on policy interpretation and establish that the Transfer of Learning materials are sound. This consultation process has enabled the Monitoring Team to identify certain circumstances where the Department and Monitoring Team's interpretation of its use of force-related policies may not be fully aligned which has sparked important discussions regarding the consistent assessment of use of force techniques.

| COMPLIANCE RATING | ¶ **4.** Substantial Compliance |
| --- | --- |

## 13. USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

---

[83] This policy was finalized and promulgated mid-way through the Tenth Monitoring Period.

Reporting use of force accurately and timely, and tracking trends over time are critical to the Department's overall goal of effectively managing use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-6,[84] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-21[85]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).

*Alleged Use of Force*

Assessing the overall use of force that occurs in the Department requires a consideration of all force reported by Staff and any substantiated allegations of use of force to obtain a full picture of the force utilized within the Agency. The most troubling uses of force are those that go unreported, because the extent to which the force was unnecessary or excessive is never assessed. The Department tracks all allegations of uses of force, which are claims that Staff used force against an inmate and the force was not previously reported by Staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis discussed in the introductory section of this report.

While the reported numbers of Use of Force have continued to increase over the life of the Consent Judgment, the number of allegations has decreased each year. The frequency of UOF allegations are low (and those substantiated are even lower) and do not add appreciably contribute to the overall amount of force in the Department. The graph below presents the

---

[84] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

[85] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.

number of alleged uses of force reported every month from January 2016 through December 2019. In 2019, an average of 28 allegations of force were made each month compared with an average of 39 allegations every month in 2016. There has been a 30% decrease in the number of allegations from 2016 to 2019 with 471 allegations in 2016 compared with 331 allegations in 2019 as seen in the chart below.

| UOF Allegations by Year | | | | |
|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 |
| Average Number of Monthly Allegations Reported | 39 | 36 | 33 | 28 |
| Total Number of Allegations Reported | 471 | 436 | 393 | 331 |

*Tracking of Outcome of Allegations*

As part of the roll-out of the Intake Squad, ID intends to better track the outcome of its investigations, including investigations of allegations. Currently, the Department does not systematically track whether allegations are substantiated or not. In order to determine whether an investigation of an allegation has been substantiated an individual assessment of the case is needed. Currently, the only available data that could be derived is if the investigation is closed with a finding that discipline or some other corrective action is merited, which likely suggests that the force should have been reported (although the discipline could have been related to other issues identified in the investigation, and would need to be assessed on an individual basis to determine that). This is not only an imperfect method of tracking, but is also often a protracted process. Going forward, the Department will systematically track whether allegations are substantiated or not as part of the routine data collected from Intake Investigations.

*Assessment of UOF Data*

The Monitoring Team continues to closely monitor the Department's reporting mechanisms of use of force as described in the Third Monitor's Report (at pgs. 51-53). As part of this assessment, the Monitoring Team reviews any UOF incident that has been downgraded to a

logbook entry after the incident was initially reported. This has only occurred twice since July 2017 and did not occur at all in 2019. In this Monitoring Period, the Monitoring Team also scrutinized the Department's re-classification of certain Use of Force incidents that were initially classified as Class A incidents, but were subsequently determined to be Class B or C incidents, and found this re-classification was reasonable and appropriate (as described further below). Also described in more detail below, the Monitoring Team has consistently found the Department in Substantial Compliance with the proper classification of UOF incidents (§ VI. (Use of Force Investigations), ¶ 5) over the last eight consecutive Monitoring Periods.[86] The Department's reporting of UOF incidents is under significant scrutiny by various stakeholders (including the Board of Correction, DOI, and the local legislature) and the Monitoring Team will continue to closely scrutinize the matter given the importance of accurate and transparent reporting. That said, the Monitoring Team has not identified evidence to suggest that there is a pattern or practice within the Department of manipulating UOF data.

The Monitoring Team's assessment of compliance is outlined below.

**VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS)**
**V. USE OF FORCE REPORTING AND TRACKING ¶ 12 (INJURY CLASSIFICATION)**

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

---

[86] The Monitoring Team's assessment of compliance with this provision is addressed in the Use of Force Reporting section of this report versus the Use of Force Investigation section for purposes of continuity.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[87] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.,* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

- The Department together with H+H, revised the Injury to Inmate form this Monitoring Period to develop and implement a new framework for confirming injury classification information, enabling input from H+H staff to inform injury classifications as required by ¶ 12 of Use of Force Reporting.

**ANALYSIS OF COMPLIANCE**

*Injury Classification* (¶ 12)

During the Ninth Monitoring Period, the Department worked collaboratively with H+H to revise the injury to inmate form to ensure the Department and H+H are consistently tracking serious injuries in the same manner. The goal of the new form was to make sure that DOC and H+H are aligned on identifying and tracking serious injuries to inmates, regardless of whether they were associated with a use of force incident. The form includes checkboxes of various injuries to help identify the types and seriousness of injuries. The Department's Bureau Chief of Facility Operations and Chief of Department's offices worked together to ensure that all injury-to-inmate reports were timely submitted by the Facilities on a shared computerized drive. If H+H staff are unable to make a determination about the injury when the form is initially submitted because additional testing is needed, H+H marks the injury as "pending." H+H updates the Department on the outcome of the assessment once they obtain the final diagnosis. At the beginning of each month, H+H sends reconciled data to DOC indicating injuries from the prior month that were deemed to be serious injuries. To the extent that injury data may need to be re-classified, the Department reports it works with all Tour Commanders to ensure the injury data is revised and classified appropriately with COD. The Department and H+H prepare monthly reports for the Board of Correction to document this process. This process, along with the monthly reports, is sufficient for H+H to demonstrate compliance with ¶ 12 of Use of Force Reporting.

*Classification of UOF Incidents* (¶ 5)

---

[87] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C.

The Monitoring Team has found that the overwhelming majority of use of force incidents are classified accurately. The Monitoring Team and Preliminary Reviewers[88] combined only identified a small number of incidents that required re-classification beyond the Class A incidents that were separately identified for re-classification in this Monitoring Period (as described in more detail below). In this Monitoring Period, the Preliminary Reviewers and/or Monitoring Team identified approximately 37 cases that merited consideration for re-classification (45 were identified in the Eighth Monitoring Period).[89] Although only a small number, the Department is still struggling to evaluate and re-classify these incidents (as appropriate) in a timely and reliable manner. Despite reporting in the Eighth Monitoring Period that the Department has taken steps to improve the process of re-classifying incidents—including providing training to COD Staff and the Bureau Chief of Security collaborating more with ID on cases that were identified for potential re-classification, the Monitoring Team found no appreciable improvement in the timeliness of re-classification of incidents identified by Preliminary Reviewers and/or the Monitoring Team. While the number of cases that require re-classification is quite small, it is important to have a reliable process to re-classify incidents when necessary. Going forward, confirmation of incident classification will be part of Intake Investigations. The Monitoring Team recommends the process for re-classification is shored up as part of the overall implementation of the Intake Squad in the Tenth Monitoring Period.

*Class A Classification Confirmation Project*

The number of Class A incidents appeared to appreciably increase in August of 2019. The Monitoring Team inquired about these increases and recommended that these cases were scrutinized to determine the potential cause of this increase. Upon further scrutiny of these incidents, the Department determined that the Staff at COD may have incorrectly changed their approach for classifying UOF incidents and began to classify a UOF incident based on the presence of a serious injury even if it was obtained outside of the UOF (*e.g.*, an inmate-on-inmate fight) and was not the result of the UOF. This change in practice coincided with the Department's work to coordinate on determinations of serious injuries with H+H in August of 2019 (discussed above). The Department reports that efforts to align on serious injuries more generally with H+H resulted in a misunderstanding that the presence of a serious injury required a UOF incident to be classified as a Class A. As a result, a team from ID and the Legal Division evaluated all Class A incidents from August to December 2019 to determine whether the Class A designation was appropriate, or whether re-classification was necessary because the injury was

---

[88] Following the initial classification of an incident, Preliminary Reviewers are continuing to evaluate whether an incident may need to be re-classified as required by Consent Judgment § VII (Use of Force Investigations), ¶ 7(b).

[89] There are approximately 2,000 incidents that Monitoring Team has not reviewed as either a pending or closed Preliminary Review for and so they have not yet been evaluated to determine if re-classification is warranted.

not in fact the result of a use of force by Staff. In total, the Department evaluated 191 Class A incidents and determined that 103 incidents should be re-classified (five incidents to be changed to Class B and 98 incidents to be changed to Class C). Consequently, 88 of the 191 incidents remained classified as Class A. The Monitoring Team reviewed a sample of the incidents that the Department elected to re-classify and found the Department's analysis and re-classification was appropriate in all cases. Further, the revised Class A figures comport with the Monitoring Team's overall assessment of UOF incidents that does not suggest there was an appreciable increase in Class A injuries related to UOF incidents in this Monitoring Period. The data presented in this introduction of this report reflects the revised classification of UOF incidents.

*Class P Assessment* (¶ 5)

This provision requires incidents to be reclassified in a timely manner when injury information was not available at the time the initial classification determination was made. The Monitoring Team found that most incidents initially labeled Class P (*i.e.,* Pending) were reclassified in a timely manner, consistent with findings from prior Monitoring Periods, as shown in the table below.[90] During the current Monitoring Period, 210 of the 233 (97%) Class P incidents randomly selected for review by the Monitoring Team were reclassified within two weeks or less.[91]

| COD Sets Reviewed[92] | 2nd Monitoring Period | 3rd Monitoring Period | 4th Monitoring Period | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period | 9th Monitoring Period |
|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 1,167 | 1,052 | 545 | 416 | 513 | 511 | 541 |
| **Incidents originally classified as Class P and subsequently reclassified within COD Period** | 329 of 372 (89%) | 542 of 574 (94%) | 286 of 299 (96%) | 160 of 168 (95%) | 209 of 221 (96%) | 224 of 230 (97%) | 210 of 233 (90%) |

| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance<br>**¶ 12.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF)

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

---

[90] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

[91] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance.

[92] This audit was not conducted in the First or Fifth Monitoring Periods.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.

- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

- Almost 22,000 use of force and witness reports were submitted for incidents occurring in 2019.

**ANALYSIS OF COMPLIANCE**

The number of UOF incidents reported by Staff has increased almost every Monitoring Period since the Effective Date with the largest number of UOF incidents reported during the Ninth Monitoring Period. The fact that over 7,000 uses of force were reported in 2019 (with 22,000 corresponding reports) suggests that Staff regularly follow the requirements of this provision and, for the most part, they report when force is used or witnessed. Furthermore, the Monitoring Team's review of UOF reports indicates that Staff routinely notify their supervisors when uses of force occur.[93]

The Department suggests that at least part of the increase in the number of reported UOF is due to progress in reporting as a result of continued emphasis on the importance of reporting, a clear definition of what constitutes "force" outlined in the New UOF Directive, increased presence of video surveillance (and corresponding live-feed video monitoring), and routine and consistent auditing of UOF reporting by NCU. Progress in reporting incidents must be recognized, although it certainly is not the exclusive basis for why the incidence of force continues to climb.

In order to assess whether Staff are timely and reliably notifying a Supervisor of a UOF, the Monitoring Team also considers whether there is any evidence that Staff are *not* reporting force as required. In particular the Monitoring Team evaluates the allegations of UOF. The Monitoring Team closely reviews any allegations submitted by H+H staff and the Legal Aid Society ("LAS") of potentially unreported uses of force. This review revealed only a small number of alleged unreported uses of force. This Monitoring Period, H+H staff reported nine incidents which did not otherwise appear to have been reported by DOC Staff initially, and LAS reported three such incidents. These incidents will be investigated by ID to determine if the allegations are substantiated or not.

---

[93] UOF reports have previously been audited to determine whether Staff completed the relevant sections of the forms. The Monitoring Team found in previous Monitoring Periods that Staff completed the relevant section of the forms fairly consistently (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)).

Additionally, the Monitoring Team closely scrutinizes *all* investigations of alleged UOF. In total there have been 722 investigations of alleged incidents from 2018 and 2019. The Monitoring Team's review of these incidents have identified only a small number of cases that were potentially unreported. Preliminary Reviews conducted in this Monitoring Period identified one case where video and other objective evidence strongly suggest that Staff failed to report a (albeit minor) UOF incident—which was a pending Full ID investigation at the end of the Monitoring Period. Between January 2017 and December 2019, ID and the Monitoring Team have identified at least 25[94] specific incidents (including the one just noted) where video and other objective evidence strongly suggest that Staff failed to report a use of force incident. It is worth noting that the types of unreported incidents vary. Some of these incidents reflect minor UOF incidents, while the initial evidence of other incidents suggest a more covert cover-up of likely use of force violations. The Monitoring Team closely scrutinizes the corresponding investigations of these alleged uses of force (and others) to ascertain whether they reached reasonable conclusions and whether Department disciplined Staff who failed to report a use of force. This analysis is discussed further in ¶ 8 below.

Given the backlog of investigations, the Preliminary Review has not been drafted in CMS (and hence not reviewed by the Monitoring Team) for approximately 86 (12%) of alleged UOF in 2018 and 2019. In an effort to ascertain whether any of these allegations may be unreported UOF, the Monitoring Team recommended that ID conduct a triaged analysis of these incidents to identify whether there is: (a) video of the allegation and (b) if video was available, whether the video suggested there was possibly an unreported use of force. Through this analysis, nine incidents were identified as including video that possibly captured unreported UOF. A draft of these Preliminary Reviews were expedited based on this triage effort, and eight of the nine incidents confirmed that very minor unreported use of force incidents occurred, while one of the nine incident required further investigation to determine whether the allegation was founded or not. These investigations were pending as of the writing of this report (either Preliminary Reviews pending supervisor sign-offs or pending Full ID investigations). The Preliminary Reviewers recommended a range of responses for failing to report these minor uses of force, including re-training and charges, and some withheld recommendations pending the outcome of the Full ID Investigation. The outcome of these investigations and any related discipline will be assessed in ¶ 8 below in future reports when the outcomes are finalized.

The Department has achieved Substantial Compliance with this provision as Staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be relatively minor UOF

---

[94] Four cases were noted in the Fourth Monitor's Report at pg. 49, six cases were identified in the Fifth Report at pg. 45, five cases in the Sixth Monitor's Report at pg. 45, six cases in the Seventh Monitor's Report at pg. 58, and three cases in the Eighth Monitor's Report at pg. 76.

incidents. That said, even though the number of unreported UOF is low in comparison with the number of reported UOF, the Monitoring Team will continue to closely scrutinize allegations of UOF.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS) |
|---|

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h) & 6.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team assesses compliance with ¶¶ 2, 3, & 6 together as these provisions, collectively, require Staff to submit independent and complete UOF reports. The Monitoring Team continued to review a significant number of Staff Reports as part of the Team's assessment of Preliminary Reviews, Full ID and Facility Investigations. The current review revealed Staff's practices have not changed significantly from those reported in prior Monitoring Periods, and therefore the Department remains in Partial Compliance.

The Monitoring Team's review of Staff Reports reveal that Staff continue to include information in all required fields, but the quality of that information varies. Some reports meet the requirements of these provisions, including examples where Staff accurately reported a potentially concerning UOF incident (*e.g.*, accurately describing the use of head strikes). That said, the reports routinely reviewed by the Monitoring Team continue to: (1) utilize vague, boilerplate language like "upper body control holds" which does not accurately or fully reflect the nature, extent, and duration of the force used to control or restrain an inmate (particularly when this phrase is used instead of reporting the use of head strikes); (2) are incomplete, and while they often describe the conduct of the inmate, the reports often fail to describe Staff actions—particularly use of force violations; (3) are not consistent with objective video evidence; or (4) include false information, in direct contradiction to other evidence (for example, that an inmate struck first, when in fact Staff struck first). The Monitoring

Team continues to find that Staff Reports are vague and have seen no discernable improvement, these are the same findings that were reported in prior Monitor's Reports. The Monitoring Team continues to emphasize the importance of Staff describing their recollection of events in their *own* words and specifying the exact tactics that were utilized (*e.g.,* where on the inmate's body the Staff's hands or arms were placed).

*Reporting Presence of Non-DOC Witnesses* (¶ 3(e))

Given the importance of the perspective of all witnesses to an investigation of a UOF incident, it is essential for Staff to indicate all others who were present at the scene so witness statements can be collected. The Monitoring Team assesses whether DOC Staff's UOF or UOF witness reports accurately identify whether any non-DOC staff were present in the area during the UOF, as required by ¶ 3(e). Both reporting forms include a specific box for Staff to list "any uniform or non-uniform staff involved in or present at the time of the incident." A Staff Member can also report the presence of a witness in the narrative of what occurred. During the Eighth Monitoring Period, the Chief of Department issued a Department-wide tele-type reminding Staff of their obligation to identify all witnesses to UOF incidents to improve this practice. The Monitoring Team's review of UOF reports submitted by Staff that either engaged in or witnessed UOF demonstrates that Staff sometimes report the presence of witnesses, but not in all cases, so there is room for improvement.

| COMPLIANCE RATING | ¶¶ 2, 3, and 6. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The *Nunez* Compliance Unit ("NCU") continues to audit the extent to which Staff Reports are submitted and uploaded within 24 hours of a use of force incident or within 72 hours of an allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).

- The table below demonstrates the number and timeliness of Staff reports for actual and alleged UOF for the last four Monitoring Periods.

| | Actual UOF | Alleged UOF |
|---|---|---|

| Monitoring Period | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
|---|---|---|---|---|---|---|
| **6th Monitoring Period** | 6014 | 4735[95] | 79% | 48 | 44 | 92%[96] |
| **7th Monitoring Period** | 9158 | 7974 | 87% | 91 | 81 | 89% |
| **8th Monitoring Period** | 9930 | 9258 | 93% | 100 | 68 | 68% |
| **9th Monitoring Period** | 11860 | 11203 | 94% | 90 | 66 | 73% |

**ANALYSIS OF COMPLIANCE**

Staff Reports describing what occurred during a use of force incident are critically important to the assessment of that incident. As described throughout this report, the increased number of UOF incidents has a significant impact on jail operations, including Staff's reporting obligations. As demonstrated above, the number of reports required to be submitted and tracked continue to rise with the increased number of use of force incidents. Even with the increase in reports to submit, the Department has demonstrated continued improvement in the timely submission of the UOF reports. The work conducted by NCU beginning early in 2018 coincided with the implementation of CMS and electronic maintenance of UOF reports. The ability to systematically track reports in a centralized system, combined with NCU's audits, and collaboration and coordination by Facility-level staff, has supported sustained compliance with timelines for reported UOF.

The standard for submitting reports related to allegations of UOF is a little more complicated. In these cases, the Staff Member must be advised that they need to submit a report, which is different from the reporting of an actual UOF incident in which Staff were present and so presumably they are aware of their reporting obligation. The receipt of an allegation also does not necessarily coincide with when a Staff Member is on duty. Therefore, the Department set the standard that generally reports related to allegations should be submitted within 72 hours of the allegation to provide reasonable time for notification to Staff of their reporting requirement and to then submit the report. The majority of allegation reports are submitted during this time period. However, given the small number of reports required for allegations, the deviations across Monitoring Periods (demonstrated in the chart above) is not significant, but worth noting. Given the importance of investigating unreported UOF, the Monitoring Team will continue to closely scrutinize the submission of these reports.

---

[95] NCU began the process of auditing actual UOF reports in February 2018.

[96] NCU began collecting data for UOF allegations in May 2018

Although almost all UOF reports (94%) are available in a timely manner, the Investigation Division must still track down those reports that were not submitted. Given the volume of reports, this small percentage of reports that must be obtained does still require dedicated time as reported in the Eighth Monitor's Report (at pgs. 79-80). These missing reports include both those reports not initially submitted within 24 hours (*e.g.*, in this Monitoring Period, 657 reports were not submitted within 24 hours) and those from Staff who were identified as involved/witnesses after the fact.[97] While the collection of additional reports certainly protracts the investigation and frustrates the system for timely investigations, the Monitoring Team has not found a systemic issue of missing reports. However, this issue revealed a broader logistical issue regarding the process for ID to request *additional or missing* information from the Facilities and to ensure a timely response because there is not a centralized or reliable process to obtain this information (as described in the Eighth Monitor's Report) and so requests from ID were made in an *ad hoc* fashion, with individual investigators either reaching out to the Facility and/or personally going to the Facility to attempt to get information. In response to this concern, the Monitoring Team recommended that the Department identify Staff in each Facility who can serve as a point of contact for Intake Investigators to seek additional or missing documentation. The Department reported identifying and assigning such Staff for each Facility early in the Tenth Monitoring Period as part of the implementation of the Intake Squad.

Overall, the Department has continued to maintain a centralized, reliable and consistent process for submitting and tracking UOF Reports. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion, so the Department has maintained Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
| --- | --- |

| V. USE OF FORCE REPORTING AND TRACKING ¶ 5 (PROHIBITION ON REVIEWING VIDEO PRIOR TO WRITING UOF REPORT) |
| --- |

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

---

[97] NCU's tracking of submission of UOF reports is limited to those Staff members that are reported in the initial report of the incident to COD. Additional Staff may have participated and/or witnessed the incident and were not listed on the COD. In those cases, the Staff member may submit a report, but NCU will not track whether the report has been submitted in CMS. Staff also may not have submitted a report in which case the investigator must attempt to obtain the report.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive prohibits Staff from reviewing video of a use of force incident prior to completing their use of force report.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team to date has not identified any evidence in Staff reports that suggest that Staff are reviewing video footage of an incident prior to writing their Staff Reports. In fact, most reports are often vague, which suggest that review of video did not occur before the report was drafted. This is not surprising given that access to video is not easily obtained for most Staff, as line Staff assigned to the housing units and most supervisors do not have assigned computer terminals. Further, access to Genetec credentials, needed to view video, are also limited. The Department is therefore in Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

---

**V. USE OF FORCE REPORTING AND TRACKING ¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE)**

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8.

**ANALYSIS OF COMPLIANCE**

Staff who exaggerate, lie, or fail to report a use of force thwart the overall goal to assess each use of force to determine whether force is only utilized when necessary. Accordingly, identifying and addressing reporting violations (*e.g.*, inaccurate, misleading, and false reporting or failure to report) is critical to maintaining integrity for reporting and investigating UOF incidents. As noted in ¶ 1 above, investigators do identify reporting violations (*i.e.*, at least 34 UOF incidents have been investigated as incidents where Staff potentially failed to report the incident since January 2017, including the nine identified as part of the triage project for allegations with pending Preliminary Reviews). The failure to report may be addressed through immediate administrative actions, Command Discipline, formal discipline, or PDRs. ID enhanced scrutiny for reporting violations this Monitoring Period—including

suspending multiple Staff Members for egregious false reporting issues in order to support the overall message that false reporting will not be tolerated.

The Monitoring Team tracks the status of the investigations of these cases (introduced above in ¶ 1 box) where an initial review of video and other objective evidence strongly suggested that Staff deliberately failed to report a use of force, to ascertain the reasonableness of the outcomes of the investigations and discipline (if any). Of these 34, 14[98] have closed investigations and/or finalized formal discipline.

Of the 14 cases reviewed, the outcome in ten cases was generally reasonable while the outcome in the other four cases was unreasonable. However, within the reasonable outcomes, the imposition of discipline was sometimes inconsistent for similar misconduct.

ID reasonably closed ten cases. In seven of those cases, ID concluded that Staff failed to report a use of force. The corresponding discipline imposed in those seven cases was also generally reasonable (including suspension, an NPA for 35 compensation days (although bundled with other misconduct cases), demotion (although bundled with another case of misconduct), PDR termination, and NPA return to command), however it was not consistent. While there can be other factors involved, including a Staff Member's unique history, in one example tenured Staff who witnessed/participated in a use of force received NPA-CDs returned to command, but a probationary Staff Member who witnessed the incident was recommended by ID for a six month probation extension and was ultimately terminated (the PDR for termination that was processed by the Office of Administration cited to both this unreported incident and the Staff Member's attendance records). The initial recommendation for a PDR for a six-month extension appeared harsher than the return to command NPA-CD's meted out to the tenured Staff. In three other cases ID reasonably concluded that Staff did not fail to report and so the case was closed with no charges.

Four cases were closed with no discipline and these outcomes appeared unreasonable in light of the available evidence. In two cases, the investigation appeared to acknowledge that Staff failed to report the UOF, but those two cases were lost to the SOL in the Eighth Monitoring Period so charges could not be brought (although a Facility Referral was generated to address the failure to report issue in one case, but had the SOL not passed it would have warranted charges). In the other two cases the investigations unreasonably concluded there were no reporting violations.

20 incidents remain pending—eleven from the original group of 25 cases (nine have pending investigations and two are pending formal discipline) in addition to the nine incidents identified as part

---

[98] 11 closed in the Eighth Monitoring Period and the Monitoring Team outlined an assessment of in the Eighth Monitor's Report—finding the Department's assessment of cases with failure to report is mixed, and of the 11 cases reviewed, the outcome in eight cases was reasonable while the outcome in the other three cases was unreasonable (see the Eighth Monitor's Report at pgs. 81-82 for more detail).

of the pending Preliminary Review triage project described in ¶ 1 above. These cases will be assessed in future Monitor's Reports once the investigations are closed.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses these requirements, and the "implement" component of this provision is assessed within the individual provisions in this report.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶¶ 10 & 11 (NON-DOC STAFF REPORTING)

¶ 10. The City shall require that Non-DOC[99] Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[100]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[99] This definition includes Board of Education employees, as ordered by the court December 4, 2019 (*see* Dkt. Entry 334), and therefore "[a]ny Board employee who witnesses a Use of Force Incident must report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for investigating the incident. This shall include, but not be limited to, filling out the narrative section of any witness report."

[100] This language reflects the revised language ordered by the court May 14, 2018 (*see* Dkt. Entry 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."

- New York City Health + Hospitals ("H+H") (the healthcare provider for inmates in DOC custody) has maintained a process for Staff reporting, including implementing some improvements to its use of force reporting policy and process to address ¶¶ 10 and 11 of this section as outlined below:

  o Implementing a revised reporting policy in August 2019, which included a new PDF fillable form for H+H Staff to submit their reports. The report allows Staff to identify whether the report is a witness report (as required by ¶ 10) or reporting an injury where the injury was not identified by DOC as being the result of a use of force but the H+H staff member suspects that it was (as required by ¶ 11).

  o Maintaining a dedicated email address for H+H staff to submit their reports. H+H also has a dedicated staff member who reviews and distributes those reports to ID to include in the use of force investigation; and

  o Reinforcing use of force reporting obligations to its staff in a number of ways:

    ▪ Rolling out a revised webinar training to staff to introduce the new fillable PDF form described above.

    ▪ H+H's electronic medical record system continues to require any H+H staff who signs into the system to read and acknowledge a statement regarding their reporting obligations in order to gain access to the system. Staff must acknowledge this statement every time they sign into the system and access to the system is denied if the acknowledgement is denied;

    ▪ For every UOF that occurs in areas where clinic staff were likely to have been present,[101] as a backstop, H+H operations staff reach out on a monthly basis to providers scheduled to work in those areas at the time/date of the reported UOF to determine if they directly witnessed a UOF and, if so, to elicit reports; and

    ▪ Working with the Monitoring Team and Department to personally identify and discipline staff who failed to submit reports as required as identified by the Monitoring Team in prior audits.

  o The number of reports submitted by H+H staff since July 2017 is presented in the table below.

| | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 |
|---|---|---|---|---|---|
| *Witness Reports* | | | | | |
| Number of witness reports submitted | 2 | 19 | 34 | 20 | 19 |

---

[101] Clinic, Mental Observation Units, PACE, CAPS, RHU, ESHU, ESHU YA, SCHU, TRU, Secure, ARNT, BTB, or Bing/CPSU units.

| | | | | | |
|---|---|---|---|---|---|
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 20 | 33 | 20 | 18 |
| *Relayed Allegations from Inmates* | | | | | |
| **Number of reports of allegations of UOF relayed from an Inmate** | 2 | 4 | 20 | 10 | 11 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 4 | 18 | 12 | 11 |

- Department of Education ("DOE") Staff did not submit any UOF witness reports during this Monitoring Period. A Court Order clarifying the requirement for DOE to submit reports was filed December 4, 2019 (Dkt. 334), but no steps were taken in the Ninth Monitoring Period by DOE to comply with that order.

- ACS maintained a centralized reporting process for Staff based at HOJC to submit UOF witness reports. ACS Staff routinely submit reports via this method this Monitoring Period:

  - **Centralized Collection**: All ACS staff witnessing a use of force will complete an incident report and provide a copy 1) to the on-duty DOC Tour Commander and 2) to the on-site ACS Office of Incident Review. These reports are to be completed as soon as possible but no later than the end of tour during which the events were witnessed.

  - **Centralized Distribution**: The on-site ACS Office of Incident Review will review reports by ACS staff to ensure that all staff named in the report, who were witness to the use of force, complete an incident report documenting the witnessed events. The on-site Office of Incident Review will email an electronic version of all reports within two business days of receipt to ID and the Monitoring Team.

**ANALYSIS OF COMPLIANCE**

The City of New York is required to take steps to ensure that non-DOC staff submit a report when they witness use of force incidents under ¶ 10 of this section of the Consent Judgment. Non-DOC Staff is defined as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates." *See* Consent Judgment § III (Definitions), ¶ 22. The three largest groups of Non-DOC staff reporters are H+H staff (who provide medical and mental health care in the New York City jails), DOE Staff (who provide educational services to inmates), and ACS Staff (who are jointly operating HOJC with DOC). H+H has been working on the implementation of this requirement since 2017, ACS Staff began to implement this requirement during the Seventh Monitoring Period (upon the opening of HOJC),[102] and DOE has not yet implemented this reporting requirement.

---

[102] The obligation for ACS staff to report only began in October 2018 during the Seventh Monitoring Period with the opening of HOJC.

*Medical Staff Reporting* (¶¶ 10 & 11)

Medical and mental health staff (H+H) have a unique vantage point to observe UOF to the extent an incident occurs in an area where treatment is provided. Given H+H staff provide treatment to inmates who may have been engaged in a UOF, they also may learn critical information about an incident (or that an incident even occurred) through the course of treatment. Therefore, H+H staff are a crucial group of non-DOC staff witness who are required to submit reports. Along with the requirements to report under ¶ 10, H+H Staff must also report when they have reason to suspect that an inmate has sustained injuries due to the Use of Force and the injury was not identified to the medical staff as being the result of a Use of Force (¶ 11).

During this Monitoring Period H+H staff submitted 30 reports. It is difficult to know whether H+H staff submitted reports in every incident witnessed, but the large number of incidents occurring in the medical areas (at least 237 during this Monitoring Period) and the small number of reports submitted indicate that H+H staff are not always fulfilling their reporting obligations.[103] It is important to note that H+H staff may not be present for all incidents that occur in medical areas. For example, the Monitoring Team reviewed video footage of 15 incidents that occurred in the clinic, but for which no H+H staff submitted reports, and found that H+H staff were present in only four of the 15 incidents (27%). Although staff were only present in four of the cases reviewed, these four incidents are clear examples of H+H staff who witnessed a use of force incident, but failed to fulfill their reporting obligations. The Monitoring Team shared these four incidents with H+H in the Tenth Monitoring Period with a recommendation that the staff's failure to submit reports is addressed.

The Monitoring Team also shared similar examples from the last Monitoring Period with H+H in which there was video proof of their staff failing to report a witnessed use of force. H+H worked with the Department to review the video associated with these incidents to determine the identity of the present H+H staff, and as a result of this reported taking disciplinary action with regards to 19 of the identified Staff.[104] H+H also developed a process early in the Tenth Monitoring Period to facilitate this type of review going forward. ID has been assigned a dedicated contact at H+H to request written reports after-the-fact to aid in their investigations. Second, DOC will advise H+H if an investigation appears to demonstrate the failure of their staff to submit reports as policy requires, so H+H can take necessary administrative action.

---

[103] It is worth noting that H+H Staff must report any witnessed UOF whether or not the incident occurred in a medical treatment area.

[104] As this was the first known *Nunez* violation for these employees, they received formal counseling sessions or documented verbal warnings (verbiage varies based on whether the staff member is an H+H, Urgicare, or PAGNY employee).

The Monitoring Team reviewed all 30 H+H staff reports submitted to ID this Monitoring Period (19 reports appeared to describe an incident that was witnessed, 11 reports appeared to relay a suspected or alleged UOF based on inmate interaction).[105] Based on feedback provided by the Monitoring Team, H+H developed a PDF-fillable form for their staff to use when reporting use of force, which improved the quality of these reports compared with prior Monitoring Periods because it prompted the submission of more specific information.

_DOE Staff Reporting_

DOE staff provide educational services to inmates in certain DOC facilities, including RNDC, RMSC, EMTC, OBCC, GRVC, and HOJC. No DOE Staff submitted UOF witness reports this Monitoring Period, despite incidents occurring in school areas and likely witnessed by DOE staff. The process to implement a streamlined reporting process has been protracted. The City notified DOE during the Seventh Monitoring Period of their obligation to report any witnessed UOF incidents. DOE subsequently notified their staff of the reporting obligations and developed a draft policy and implementation plan. However, DOE did not implement the reporting obligation due to a variety of legal objections raised by counsel to the unions representing DOE Staff. A Court Order clarifying the requirement for DOE to submit reports was filed on December 4, 2019 (Dkt. 334), but no steps were taken by DOE in the Ninth Monitoring Period to comply with this requirement or the new Order. Following the close of the Monitoring Period, upon significant pressure and repeated follow-up from the Monitoring Team, DOE did provide the Monitoring Team with a draft training deck and reporting policy.

_ACS Staff Reporting_

At the beginning of the Ninth Monitoring Period, ACS staff began to routinely submit UOF reports. Initially, these reports were mainly witness reports, but, given the transition of management to ACS partway through this Monitoring Period, the reports submitted by ACS began to reflect their own use of physical restraints. The transition of management at HOJC is discussed in the "Current Status of 16- and 17-Year-Old Youth" section of this report). In total ASC staff submitted hundreds of reports related to over 110 incidents during this Monitoring Period. The Monitoring Team reviewed a sample of UOF incidents involving ACS staff at the end of the Monitoring Period. Three incidents in the sample of eleven did not include any reports (and some incidents only had certain reports) because there was "no restraint". However, in each case, there was evidence that Staff utilized physical interventions. In terms of the reports submitted for this sample of incidents, some reports were detailed, but failed to include a reasonably complete version of the event. Other reports were vague, and some were inaccurate. Staff reports also tended to focus on the youth's behavior while excluding Staff

---

[105] The Monitoring Team's assessment of the Department's investigation of these allegations is discussed in ¶ 1 above.

behavior which may have precipitated the event. In a few cases, inaccurate reports were filed by Staff who engaged in an inappropriate use of force.

*Incorporation of Non-DOC Reports in DOC Investigations*

The Monitoring Team also worked with ID to improve consideration of non-DOC staff reports when they are submitted, so that they are appropriately associated with the corresponding investigation, included in the investigation file and considered by investigators. The Monitoring Team reviewed 10 investigations for incidents with 10 corresponding reports from H+H Staff, but found that only five of the UOF investigation files referenced and contained the H+H reports submitted. These findings demonstrate a continued need for vigilance to ensure that all submitted reports are considered by the investigator and included in the file. The Monitoring Team intends to work with ID going forward to improve the consideration and availability of these reports as part of Intake Investigations.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 10. (H+H)** – Partial Compliance<br>**(DOE)** – Non-Compliance<br>**(ACS)** – Partial Compliance<br>**¶ 11.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 13 (REPORTING OF EMERGENCY MATTERS)

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

¶ 13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- H+H updated its use of force reporting policy and updated and rolled out a corresponding webinar training this Monitoring Period to address ¶ 13 of this section.

**ANALYSIS OF COMPLIANCE**

This provision requires emergency matters involving an imminent threat to an inmate's safety or well-being to be reported. H+H updated their use of force reporting policy and rolled out a corresponding webinar training which highlighted this reporting requirement for their staff. The policy and training establish that while the priority in emergency situations is to first ensure that the patient receives appropriate and timely medical care, including transfer to Urgicare or 911/Emergency if indicated, H+H staff are also expected to report emergency matters to their supervisor. The supervisor or H+H staff (if the supervisor is not available) will then report it to H+H Operations, and additional steps will be taken, if necessary, to address the imminent threat to the inmate's safety. For example, if a

patient expresses fear for his/her safety because of threats from another person who is incarcerated, reporting that to a Supervisor would allow DOC leadership to consider placing the patient in Protective Custody. H+H has demonstrated compliance with ¶ 13 by creating a discernable framework for their staff to follow in meeting this obligation and reinforcing this obligation through policy and training.

| COMPLIANCE RATING | ¶ **13.** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department tracks information related to use of force incidents in a computerized system called the Incident Reporting System ("IRS") which captures the information required by ¶ 14(a)-(i) and ¶ 14 (k)-(n) in individualized fields. The Department tracks information required in ¶ 14(j) in the incident description field in IRS.

**ANALYSIS OF COMPLIANCE**

Incident data is tracked accurately and reliably. The data continues to be entered and maintained in IRS and fed into CMS. The Monitoring Team continues to utilize reports generated from IRS to conduct various analyses and assessments. By tracking required Use of Force information in a reliable and accurate manner, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[106] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ **14(a)-(n).** Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the

---

[106] *See*, First Monitor's Report at pg. 33 (dkt. 269), Second Monitor's Report at pg. 39 (dkt. 291), Third Monitor's Report at pg. 61 (dkt. 295), Fourth Monitor's Report at pg. 59 (dkt. 305), Fifth Monitor's Report at pg. 51 (dkt. 311), Sixth Monitor's Report at pg. 52 (dkt. 317), Seventh Monitor's Report at pgs. 66 to 67 (dkt. 327), and Eighth Monitor's Report at pgs. 87 to 88 (dkt. 332).

Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Since December 2017, Facility Investigations are conducted directly in CMS, and CMS tracks the information related to Facility Investigations as required by ¶ 15(a)-(f).

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals, as required in ¶ 15(g).

**ANALYSIS OF COMPLIANCE**

All Facility Investigations are now conducted directly in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 15(a)-(f). Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Sixth Monitoring Period, for a total of 24 months.[107] As described previously in this report, Facility Investigations will no longer be conducted as per the Intake Squad Plan, so this provision will no longer be necessary. The Monitoring Team has therefore recommended this provision should be eliminated as part of the overall effort to modify certain provisions of the Consent Judgment described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 15. Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The information in ¶ 16(a)-(f) is tracked in CMS which went live in December 2017, and ID investigations for incidents occurring since then are conducted directly in CMS. The Investigation Trials Tracking System ("ITTS") continued to track ongoing ID investigations for

---

[107] *See*, Sixth Monitor's Report at pgs. 52-53 (dkt. 317), Seventh Monitor's Report at pg. 67 (dkt. 327), and Eighth Monitor's Report at pg. 88 (dkt. 332).

incidents occurring before that date, and information is being systematically migrated over to CMS as those investigations close.

- The Department separately tracks any use of force incident that was referred to (via ID), or taken over by, the Department of Investigations ("DOI") for further investigation and the date of such referrals as required in ¶ 16(g).

**ANALYSIS OF COMPLIANCE**

All ID investigations are now tracked in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 16(a)-(f). Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Sixth Monitoring Period, for a total of 24 months.[108] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| **COMPLIANCE RATING** | ¶ 16. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Trials Division continues to utilize an Excel workbook to track Use of Force cases before Trials. Information is manually entered and includes the information in ¶ 17(a) to (c).

- The information in ¶ 17(a) to (c) is also tracked in CMS, which went live in December 2017.[109]

**ANALYSIS OF COMPLIANCE**

The required information is tracked in CMS. The Trials Division also maintains a more detailed Excel worksheet to track the status of a case while it is processed in Trials (*e.g.,* tracking the dates of service of charges and discovery, and timing of final approvals for case closure). The Monitoring Team

---

[108] *See*, Sixth Monitor's Report at pgs. 53 (dkt. 317), Seventh Monitor's Report at pg. 68 (dkt. 327), and Eighth Monitor's Report at pgs. 88-89 (dkt. 332).

[109] Only cases that occurred after CMS was implemented are tracked in CMS.

relies heavily on this more detailed worksheet and has found it is accurate and easy to digest. It is clear the Trials Division also utilizes this tracking system to actively manage its cases. This demonstrates that the information is consistently tracked in a reliable, accurate, and computerized manner. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Fifth Monitoring Period, for a total of 30 months.[110] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 17. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department tracks information related to inmate-on-inmate fights in the inmate "Fight Tracker," a computerized system that includes names and booking numbers of the inmates involved; date, time, and location of the fight or assault; and the nature of any injuries sustained by inmates.

- In addition, inmate-on-inmate fights and assaults that result in a use of force are reported in IRS and subsequently tracked as part of the use of force investigation.

- Further, an inmate-on-inmate fight or assault that involves a slashing or use of a weapon is reported in IRS which tracks all required information.

### ANALYSIS OF COMPLIANCE

The Department's Fight Tracker includes most of the information listed while other sources (IRS and use of force investigations) include a brief description of the inmate-on-inmate fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence as required by this provision. Accordingly, the

---

[110] *See*, Fifth Monitor's Report at pg. 53 (dkt. 311), Sixth Monitor's Report at pgs. 53-54 (dkt. 317), Seventh Monitor's Report at pg. 69 (dkt. 327), and Eighth Monitor's Report at pgs. 88-89 (dkt. 332).

Department maintains Substantial Compliance with this provision, which the Department has sustained since the Fourth Monitoring Period, for a total of 36 months.[111] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 19. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 21 (DEFINITIONS OF INSTITUTIONAL VIOLENCE)

¶ 21. Within 90[112] days of the Effective Date, the Department, in consultation with the Monitor, shall review the definitions of the categories of institutional violence data maintained by the Department, including all security indicators related to violence (*e.g.*, "allegations of Use of Force," "inmate-on-inmate fight," "inmate-on-inmate assault," "assault on Staff," and "sexual assault") to ensure that the definitions are clear and will result in the collection and reporting of reliable and accurate data.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains definitions of institutional violence, as reported in the First Monitor's Report (at pg. 35), that were developed in consultation with the Monitoring Team, and the Department has these definitions posted on the Department's intranet page, ensuring easy access for relevant stakeholders.

### ANALYSIS OF COMPLIANCE

The Department maintains clear definitions for the categories of institutional violence through a number of policies and databases. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[113] The Department's sustained compliance has abated prior deficiencies, so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore

---

[111] *See*, Fourth Monitor's Report at pgs. 61-62 (dkt. 305), Fifth Monitor's Report at pg. 54 (dkt. 311), Sixth Monitor's Report at pgs. 54 to 55 (dkt. 317), Seventh Monitor's Report at pgs. 69 to 70 (dkt. 327), and Eighth Monitor's Report at pg. 90 (dkt. 332).

[112] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[113] *See*, First Monitor's Report at pg. 35 (dkt. 269), Second Monitor's Report at pg. 43 (dkt. 291), Third Monitor's Report at pgs. 65 to 66 (dkt. 295), Fourth Monitor's Report at pg. 62 (dkt. 305), Fifth Monitor's Report at pgs. 54-55 (dkt. 311), Sixth Monitor's Report at pg. 55 (dkt. 317), Seventh Monitor's Report at pg. 70 (dkt. 327), and Eighth Monitor's Report at pgs. 90 to 91 (dkt. 332).

recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 21. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[114]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Prompt Medical Attention (¶ 22)**:
    - The Department maintained Directive 4516R-B "Injury to Inmate Reports", which requires inmates to be afforded medical attention as soon as practicable, but no more than four hours following a UOF incident or inmate-on-inmate fight, and also sets forth guidelines for affording *expedited* medical treatment. Inmates who appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, etc.) must be produced directly to a clinic (and not taken to an intake location) following a UOF or inmate-on-inmate fight.
    - The Department's progress in providing timely medical care following a UOF are outlined in the table below. During the current Monitoring Period, medical care was provided within four hours of a UOF in 83% of medical encounters.

| | Wait Times for Medical Treatment Following a UOF | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| 6th MP Totals | 4,244 | 35% | 35% | 70% | 17% | 13% |
| 7th MP Totals | 5,101 | 38% | 36% | 73% | 15% | 12% |
| 8th MP Totals | 5,559 | 42% | 36% | 78% | 12% | 10% |
| 9th MP Totals | 6,250 | 44% | 39% | 83% | 10% | 7% |

- **Tracking Medical Treatment Times (¶ 23)**:

---

[114] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* Dkt. Entry 316).

- o   NCU continued to track and analyze medical wait times for inmates following a UOF.[115]

    - ▪   NCU tracks the medical wait times for each inmate involved in all reported UOF incidents using information from the Injury to Inmate Report.[116]

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). The Department has made significant improvement in producing inmates timely and documenting these encounters since January of 2018 (the Sixth Monitoring Period). This is particularly notable given that the number of inmates requiring medical treatment has also increased during this time period. The Facilities have demonstrated sustained compliance in this area and NCU's work to systematically collect medical wait time data was a critical step to support the Facilities improvement in ensuring medical treatment is provided in a timely fashion and addressing any delays. Over the last four Monitoring Periods, the Department has made steady progress in producing inmates for medical treatment within four hours, improving from 57% of medical encounters occurring within four hours in January 2018 to 83% of medical encounters occurring within four hours in the Ninth Monitoring Period. Notably, in this Monitoring Period, only 7% of inmates are seen in excess of six hours.

Ultimately the overall goal is to ensure the wait for medical attention is as short as possible. While only 17% of inmates received medical treatment in excess of four hours, it is critical that patients with severe injuries are prioritized and provided medical attention as soon as possible (generally in less than four hours). In order to ensure that inmates who require prioritized medical treatment are seen as soon as possible, NCU evaluates the cases in which medical treatment was provided in excess of four hours and continues to find that in the majority of these cases, either the inmate had no injuries or ultimately refused medical treatment.

However, some number of inmates with injuries did wait in excess of four hours. NCU collects additional information for any inmate who received medical attention *beyond* four hours and those who *sustained injuries*, in response to a recommendation by the Monitoring Team. In total there were 612 inmates who received medical treatment in excess of four hours this Monitoring period. Of those 612, 109 had some injury beyond just exposure to OC spray. For this group of inmates, most injuries were

---

[115] It is important to note that this data only tracks when an inmate was seen and treated by medical staff in the clinic. This data does not capture de-contamination following OC spray exposure unless de-contamination occurred in the clinic. De-contamination of OC spray exposure generally occurs before the inmate is taken to the clinic for medical assessment after a UOF either in intake or in a shower on the housing unit.

[116] A small number of Injury to Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

minor (abrasions, swelling, contusions, neck/back pain). GRVC accounted for 37 of these 109 (34%). Only a handful of inmates who were seen in excess of four hours this Monitoring Period had more serious injuries such as lacerations or broken bones. While these medical delays are outliers, they are the most concerning type of medical delay and therefore should be investigated to determine whether Staff action/inaction caused the delay, holding Staff accountable when warranted.

The Department has achieved Substantial Compliance with both ¶¶ 22 and 23. Medical treatment is generally provided within a reasonable period of time and medical wait times are tracked in a centralized, systematic, and reliable manner. As stated in the Eighth Monitor's Report, the Department's significant progress in this area is directly attributable to the work of NCU which has done a commendable job in collecting and analyzing the medical wait time data and working with the Facilities to improve performance, which continues to be appreciated and recognized.

| COMPLIANCE RATING | ¶ 22. Substantial Compliance |
| | ¶ 23. Substantial Compliance |

## 14. TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Inmate Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)).

During the Ninth Monitoring Period, the Department continued to deploy *Nunez*-required training, while contemporaneously providing a variety of other In-Service training programs to

Staff. The Department also completed training for most of the recruit class[117] early in the Ninth Monitoring Period (July 2019). The Department does not currently plan to have additional new recruit classes, which will provide Training Staff additional flexibility to deploy other training programs. The Department has deployed most of the initial trainings required by the Consent Judgment. Accordingly, the focus during this Monitoring Period was the development and deployment of refresher trainings and ongoing training obligations for Staff newly assigned to specific posts (e.g., Probe Team Training, Cell Extraction Team Training, and Direct Supervision Training).

*Training Space & Dedicated Training Academy*

The Department outfitted GMDC to provide additional training space in the form of additional classrooms, computer labs, and realistic scenario-based training opportunities in dorm and cell housing blocks in the former Facility—this space is a useful support to the Department's effort to deploy training. That said, while the Department has developed some creative and workable solutions to its training space deficits, they do not fully mitigate the Department's need for a dedicated and appropriate training space.

Almost three years ago, the Mayor announced that the executive budget would include a commitment of $100 million for a Training Academy but the City still has not identified an adequate space. The City has routinely updated the Monitoring Team on its many efforts to identify appropriate space, making clear that identifying appropriate space in New York City is very difficult. However, the Monitoring Team is concerned that this process has been going on for quite a long time, and it is not yet known when the reality of a Training Academy will come

---

[117] The confirmation of training provided to this class of recruits was detailed in the Training section of the Eighth Monitor's Report (at pgs. 93-112) and therefore is not included in this report.

to fruition. The Monitoring Team recommends the City prioritize the siting of the Academy—while also managing the response to the COVID pandemic—given its importance to long-term reform.

*Training Deployment*

This Monitoring Period, the Deputy Commissioner of Training & Development continued to oversee *Nunez* requirements to ensure the Training Division can independently manage its training obligations. Addressing a concern from previous Monitoring Periods, the Training & Development staff successfully implemented processes to provide and track Probe and Cell Extraction Team training to specific Staff Members. This required collaboration and coordination among the Academy, ESU, and Facility-based scheduling officers, as described further below.

The Training & Development office also continued to consider the training needs of all Staff Members by: (1) developing a framework for providing In-Service training (*Nunez*-required and otherwise) going forward, (2) a plan to provide annual UOF and Defensive Tactics refreshers once A.C.T. training is complete, and (3) developing an overall strategy to provide blended block trainings to maximize a Staff Member's time outside of the Facility and to leverage the new training space at GMDC (*e.g.*, combining certain computer-based training modules, with classroom-based trainings).

*Deployment of Advanced Correctional Techniques ("A.C.T")*

The Department continued to deploy In-Service A.C.T. Training to Staff throughout this Monitoring Period. A total of 8,756 Staff received A.C.T. training between March 2018 and December 31, 2019—therefore, 91% of the Staff in the Department (9,643) who are available for training have received it. During the Ninth Monitoring Period, the Department trained

approximately 1,200 Staff in Use of Force Policy and Defensive Tactics (refresher) and trained 809 Staff in Conflict Resolution and Crisis Intervention (refresher). The Department also finished providing A.C.T. training to all 50 available Department uniform executive leadership during this Monitoring Period.

Approximately 880 available Staff still require A.C.T. training.[118] Deploying the tail end of training is often the most difficult because scheduling a smaller group of individuals offers less latitude in filling open seats. Of those who require training, the most concerning group is ESU—only 29 of 111 (26%) ESU Staff had received the training as of the end of this Monitoring Period. A more targeted approach to train the remaining Staff became necessary and the Training & Development Unit began to execute a targeted plan to provide the training to ESU early in the Tenth Monitoring Period. The remaining Staff will reportedly be trained during the Tenth Monitoring Period.[119]

See *Appendix C: Training Charts* for the status of development and deployment of initial and refresher training programs required by the Consent Judgment, and for the total number of Staff who attended each required training program during this Monitoring Period and since the Effective Date. The Department's progress toward compliance with the training requirements is discussed in detail below.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)

---

[118] The majority of the last group of Staff who require the training are mostly in non-inmate facing posts—over 300 of the remaining Staff to be trained are assigned to Headquarters, SOD, and the Transportation Division. The majority of Staff assigned to Facilities have received the training: 94% of all Staff assigned to Facilities have been trained and the majority of Facilities have over 95% (and some have 100%) of their Staff trained.

[119] As of early March 2020, 83 of 111 (75%) ESU staff had received A.C.T. training.

¶ 1. Within 120 days[120] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

            1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

            2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix C*.

## ANALYSIS OF COMPLIANCE

### *Content of Initial In-Service Use of Force Policy Training* ¶ 1(a)

The Department achieved Substantial Compliance with ¶ 1(a) in the First Monitoring Period by developing the content of initial UOF Policy training as required (as described in the First Monitor's Report at pgs. 41-42). The content of the initial UOF Policy Training (¶ 1(a)) was approved by the Monitoring Team. The training, developed in consultation with the Monitoring Team, was competency- and scenario-based, and used video reflecting realistic situations (as described in the First Monitor's Report at pgs. 41-42). The lesson plans, teaching outlines, examinations, and written materials, covered all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements of the Consent Judgment. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

### *Provision of Initial In-Service Use of Force Policy Training* ¶ 1(a)(i)(1-2)

The Department subsequently achieved Substantial Compliance with ¶ 1(a)(i) (1-2) in the Fifth Monitoring Period by deploying the eight-hour Initial Use of Force Policy training to all current Staff

---

[120] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

as part of Special Tactics and Responsible Techniques ("S.T.A.R.T.") (as described in the Fifth Monitor's Report at pgs. 58-59, and pg. 64). The Department's sustained compliance has abated prior deficiencies, so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

_Pre-Service Use of Force Policy Training_ ¶ 1(a)(i)

Since the First Monitoring Period, the Department has met the expectations of the Consent Judgment ¶ 1(b)(i) by providing a 12-hour Use of Force Policy training in the mandatory Pre-Service training for recruits. The Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[121] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

_Refresher Use of Force Policy Training_ ¶ 1(a)(ii)

Regarding ¶ 1(a)(ii), the UOF Policy refresher training lesson plans for Staff and a separate curriculum targeting Supervisors were finalized during the Sixth Monitoring Period. These continue to be deployed as part of A.C.T., as described in the introduction above. This training had been provided to over 90% of line Staff and all Supervisors as of the end of the Monitoring Period, demonstrating Substantial Compliance with this requirement. The Department will continue to provide A.C.T. to those who require it and will also begin the next phase of refresher training, by incorporating the refresher training into the ongoing In-Service training curriculum to be provided at least every other year. The Training & Development Unit staff are consulting with the Monitoring Team on the planned rollout and revisions to the curriculum as the initial A.C.T. deployment concludes.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(a).** Substantial Compliance<br>**¶ 1(a)(i).** Substantial Compliance<br>**¶ 1(a)(i)(1) & (2).** Substantial Compliance<br>**¶ 1(a)(ii).** Substantial Compliance |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

---

[121] _See_, First Monitor's Report at pgs. 41-42 (dkt. 269), Second Monitor's Report at pgs. 50-51 (dkt. 291), Third Monitor's Report at pgs. 77-78 (dkt. 295), Fourth Monitor's Report at pgs. 73-74 (dkt. 305), Fifth Monitor's Report at pg. 64 (dkt. 311), Sixth Monitor's Report at pgs. 66-67 (dkt. 317), Seventh Monitor's Report at pgs. 78-79 (dkt. 327), and Eighth Monitor's Report at pgs. 96-97 (dkt. 332).

¶ 1. Within 120 days[122] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

b.  Crisis Intervention and Conflict Resolution Training: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

i.  The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

ii.  The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[123]

iii.  The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C*.

**ANALYSIS OF COMPLIANCE**

*Pre-Service Crisis Intervention and Conflict Resolution Training* ¶ 1(b)(i)

Since the First Monitoring Period, the Department has met the expectations of Consent Judgment ¶ 1(b)(i) by providing a 24-hour Crisis Intervention and Conflict Resolution training in the mandatory Pre-Service training for recruits. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[124] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

*Initial and Refresher In-Service Crisis Intervention and Conflict Resolution Training* ¶ 1(b)(ii-iii)

---

[122] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[123] This date includes the extension that was granted by the Court on April 24, 2018 (*see* Dkt. Entry 312).

[124] *See*, First Monitor's Report at pgs. 43-44 (dkt. 269), Second Monitor's Report at pgs. 53-54 (dkt. 291), Third Monitor's Report at pgs. 78-79 (dkt. 295), Fourth Monitor's Report at pgs. 75-77 (dkt. 305), Fifth Monitor's Report at pgs. 64-65 (dkt. 311), Sixth Monitor's Report at pgs. 67-68 (dkt. 317), Seventh Monitor's Report at pgs. 79-80 (dkt. 327), and Eighth Monitor's Report at pgs. 97-98 (dkt. 332).

As discussed above, the initial In-Service training continues to be deployed as part of A.C.T. This training had been provided to over 90% of line Staff and all Supervisors as of the end of the Monitoring Period, demonstrating Substantial Compliance with this requirement. The Department will continue to provide the training to those who require it on a more targeted basis in the Tenth Monitoring Period. During this Monitoring Period, the Training & Development Unit continued planning for the development and deployment of Conflict Resolution and Crisis Intervention refresher training. The Monitoring Team will continue to consult with the Department on the development and deployment of the refresher lesson plan going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(b).** Substantial Compliance<br>**¶ 1(b)(i).** Substantial Compliance<br>**¶ 1(b)(ii).** Substantial Compliance<br>**¶ 1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶1. Within 120 days[125] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[126] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

¶ 2. Within 120 days[127] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.    <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[128] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

---

[125] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[126] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

[127] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[128] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Department implemented a process developed in the Eighth Monitoring Period to more routinely and reliably identify Staff in the select posts who are required to receive Probe Team training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)) and schedule those Staff for training.[129] This process requires monthly coordination between Facility-based scheduling Officers and the Training & Development Unit Staff. This Monitoring Period, a total of 582[130] Staff held posts that required these trainings, and the Department worked to provide them to those who had not already received it. Posts are frequently reassigned, so the Department must continuously track whether Staff currently assigned to the relevant posts require training, and then provide it to those who do. The Department executed well on this strategy in this Monitoring Period, as described further below.

*Probe Team Training* (¶ 1(c))

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional training, and provided on a targeted basis to Staff in In-Service training when assigned to the relevant posts. As of the end of the Monitoring Period, 543 of the 582 (93%) Staff in the identified posts received Probe Team training as recruits, in Pre-Promotional training or through In-Service training. This includes 60 Staff who received the In-Service training on a targeted basis during this Monitoring Period.

*Cell Extraction Training* (¶ 2(b))

The Cell Extraction Team training continues to be included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. As of the end of the Monitoring Period, 555 of the 582 (95%) Staff in the identified posts received Cell Extraction Training as recruits, in Pre-

---

[129] Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with celled housing, but the Department determined during the last previous Monitoring Period that a number of other Facility-specific posts ("identified posts") including Intake, Security, Corridor, and Escort posts, and the relevant Facility-specific posts are the Staff who actually field serve on Facility Emergency Response (previously known as Probe Teams) and Cell Extraction Teams.

[130] These rosters are perpetually changing with new and shifting assignment of Staff in these posts, so the targets change over the course of the Monitoring Period. As done with the analysis of other required trainings (Direct Supervision and SCM Training), the Monitoring Team analyzes compliance based on a set point in time—being the end of the Monitoring Period.

Promotional training or through In-Service training. This includes 58 Staff who received the In-Service training on a targeted basis during this Monitoring Period.

*Revisions to Course Evaluations*

The Department reports that it still intends to evaluate and consider improvements for how to evaluate skill comprehension following the Probe and Cell Extraction Team training, but little progress was made on this front during the Ninth Monitoring Period. During the Eighth Monitoring Period, prompted by recommendations from the Monitoring Team, the Training & Development Unit considered a new approach for these evaluations, given their more physical nature. Rather than a *pro forma* review that simply confirmed that concepts were taught, the Monitoring Team recommended that the Department begin to assess the students' mastery of the concepts. The Training & Development Unit developed and implemented post-simulation debriefing for both trainings during which instructors used video segments from the scenario-based activities to provide feedback and explore how and why students reacted to a given situation. To further enhance the review/evaluation process, the Training & Development Unit reported it is designing and testing new qualitative evaluation forms and classroom response systems (*i.e.*, "clickers") to conduct pre- and post-training assessments in order to enhance the Department's data about whether or not students fully understand the concepts. While not required to achieve Substantial Compliance, the Monitoring Team encourages the Department to continue to explore improving these evaluations as it will enhance the training program overall for these courses.

| **COMPLIANCE RATING** | ¶ **1(c). Probe Team Training (Pre-Service)** Substantial Compliance |
|---|---|
| | ¶ **1(c). Probe Team Training (In-Service)** Substantial Compliance |
| | ¶ **2(b). Cell Extraction Training (Pre-Service)** Substantial Compliance |
| | ¶ **2(b). Cell Extraction Training (In-Service)** Substantial Compliance |

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[131] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

   a. <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

---

[131] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

| | |
|---|---|
| i. | The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy. |
| ii. | The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

*Pre-Service Defensive Tactics Training ¶ 2(a)(i)*

Since the First Monitoring Period, the Department has met the expectations of Consent Judgment ¶ 2(a)(i) by providing 24-hour Defensive Tactics training in the mandatory Pre-Service training for recruits. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[132] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

*Initial In-Service, and Refresher Defensive Tactics Training ¶ 2(a)(ii)*

Although not required by the Consent Judgment, the Department provided an initial In-Service three-day Defensive Tactics course to all Staff as part of S.T.A.R.T. A refresher training lesson plan for Staff was finalized during the Sixth Monitoring Period, and as discussed above, continues to be deployed as part of A.C.T. This training had been provided to over 90% of line Staff and all Supervisors as of the end of the Monitoring Period, demonstrating Substantial Compliance with this requirement. The Department will continue to provide the training to those who require it on a more targeted basis during the Tenth Monitoring Period.

The Department and Monitoring Team worked together this Monitoring Period to plan for the next phase of refresher training which will be incorporated into ongoing In-Service training curriculum and provided yearly. To that end, the Training & Development Unit staff developed, and consulted with the Monitoring Team about, an eight-hour Defensive Tactics Refresher Lesson Plan to be rolled out in 2020. It builds upon the refresher curriculum in A.C.T. training and provides an additional four hours of training (the current refresher was only four hours). This revised refresher training was bolstered with additional topics of focus to re-enforce tactics taught in the initial training, provide greater time to practice techniques (which supports development of physical skills), and addresses

---

[132] *See*, First Monitor's Report at pgs. 41-42 (dkt. 269), Second Monitor's Report at pgs. 50-51 (dkt. 291), Third Monitor's Report at pgs. 77-78 (dkt. 295), Fourth Monitor's Report at pgs. 73-74 (dkt. 305), Fifth Monitor's Report at pg. 64 (dkt. 311), Sixth Monitor's Report at pgs. 66-67 (dkt. 317), Seventh Monitor's Report at pgs. 78-79 (dkt. 327), and Eighth Monitor's Report at pgs. 96-97 (dkt. 332).

areas of operational deficiencies identified by the Monitoring Team (*e.g.*, how to properly escort inmates and avoid the use of painful escort techniques). The Monitoring Team is consulting with the Training & Development Unit staff regarding the planned rollout for this refresher training as the initial A.C.T. deployment concludes.

| COMPLIANCE RATING | ¶ 2(a)(i). Substantial Compliance |
|---|---|
| | ¶ 2(a)(ii). Substantial Compliance |

## XIII. TRAINING ¶ 3 (YOUNG INMATE MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix C.*

- The Department selected Safe Crisis Management ("SCM") training to fulfill the Young Inmate Management training required by the Consent Judgment.

- The Department chose to provide SCM Training to *all* Staff assigned to work at RNDC, where most 18-year-old inmates are housed,[133] not just to those regularly assigned to work in Housing

---

[133] RNDC also housed adolescent inmates (age 16 and 17) until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

Areas with 18-year-old inmates, as required by the Consent Judgment.[134] As of mid-February 2020, 96% of RNDC Staff had received SCM Training (either as Pre-Service, In-Service, or Pre-Promotional Training) and 57% had also received SCM Refresher training.

| Facility | Total Staff Assigned to Facility as of mid-February 2020 | Staff Trained in SCM as of mid-February 2020 | Received SCM Refresher Training |
|---|---|---|---|
| **RNDC** | 1,018 | 973 (96%) | 579 (57%) |

- The Department previously provided a revamped SCM Training to all active 288 Staff initially assigned to work at Horizon Juvenile Center, which exclusively houses adolescent inmates.

**ANALYSIS OF COMPLIANCE**

*Training Content and In-Service Training ¶ 3(a)*

As described in the First Monitor's Report (at pgs. 52-53), SCM training, combined with other trainings provided to Staff who work with Young Inmates, meets the requirements for the content of the Young Inmate Management training.

The Department has met the expectations of ¶ 3(a) by deploying the 24-hour SCM In-Service training to all Staff assigned to HOJC and to the majority of the Staff who work in the Facilities that house the largest number of 18-year-old inmates. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[135] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

*SCM Refresher Training ¶ 3(b)*

- ***RNDC***

---

[134] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

[135] *See*, First Monitor's Report at pgs. 50-53 (dkt. 269), Second Monitor's Report at pgs. 60-61 (dkt. 291), Third Monitor's Report at pgs. 87-90 (dkt. 295), Fourth Monitor's Report at pgs. 82-85 (dkt. 305), Fifth Monitor's Report at pgs. 69-71 (dkt. 311), Sixth Monitor's Report at pgs. 71-73 (dkt. 317), Seventh Monitor's Report at pgs. 82-84 (dkt. 327), and Eighth Monitor's Report at pgs. 101-102 (dkt. 332).

As reported in the Eighth Monitor's Report (at pg. 103), given the various issues facing RNDC, the Monitoring Team recommended that the Department consider re-purposing[136] the refresher training hours to focus on broader Young Inmate Management strategies rather than focusing on refreshing Staff on SCM techniques. A revised Young Inmate Management Refresher Training could leverage and reinforce skills from other training areas like Direct Supervision, Crisis Intervention and Conflict Resolution, in addition to the related skills from the initial SCM Training, while supporting efforts and new strategies under development described in the "Current Status of 18-year-olds Housed on Rikers Island" section of this report. These new strategies are centered on the Unit Management model and Direct Supervision curriculum. While these models incorporate similar concepts as those taught in SCM, creating a universal language and set of terms will streamline messaging and reduce Staff confusion. The Department and Monitoring Team will collaborate on the plan described in the "Current Status of 18-year-olds Housed on Rikers Island" section of this report, including ways to reconfigure the Young Inmate Management Refresher Training, during the Tenth Monitoring Period.

In the interim, in this Monitoring Period, the Department continued to roll out the Monitor-approved SCM Refresher Training curriculum. As of the end of the Ninth Monitoring Period, 57% of Staff from RNDC have received the SCM Refresher Training—over half of whom received it during the Ninth Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3.** Substantial Compliance |
| | **¶ 3(a).** Substantial Compliance |
| | **¶ 3(b).** (Development of Refresher Lesson Plan) Substantial Compliance |
| | **¶ 3(b).** (Deployment of Refresher Training) Partial Compliance |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[137] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

    b.      The Direct Supervision Training shall be a minimum of 32 hours.

    c.      By April 30, 2018,[138] the Department shall provide the Direct Supervision Training to all Staff
            Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff

---

[136] The Department suspended providing the current SCM Refresher Training late in the Ninth Monitoring Period (end of November 2019), in light of these recommendations and considerations.

[137] This date includes the extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

[138] This is the extension granted by the Court on April 4, 2017 (*see* Dkt. Entry 297).

member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*
- The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most 18-year-old inmates are housed,[139] not just to those regularly assigned to work in Housing Areas with 18-year-old inmates, as required by the Consent Judgment.
- As of mid-February 2020, 924 of the 1,018 (91%) Staff at RNDC had received Direct Supervision Training.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment ¶ 4 and ¶ 4(a). As of mid-February 2020, 91% of Staff assigned to RNDC received the Direct Supervision training as In-Service Training or as Recruits. In January-February 2020, a number of Staff were reassigned to RNDC from other Facilities that were closing or winding down (*e.g.,* BKDC and EMTC). The Training Academy leveraged the transition period to provide the Direct Supervision Training to a cohort of Staff *before* they were re-assigned to RNDC. The Department has achieved Substantial Compliance with this requirement because 91% of Staff that require this training have received it.

| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |
| | ¶ **4 (a).** Substantial Compliance |
| | ¶ **4 (b).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

e.      There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, Probe Team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

---

[139] RNDC housed adolescent inmates until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department developed a stand-alone Handheld Camera Training Lesson Plan that was incorporated into the mandatory Pre-Service training, beginning with the class that graduated in November 2017.

- The Department provided the stand-alone Handheld Camera Training Lesson Plan to ESU, ESU support, and K-9 unit Staff during prior Monitoring Periods.

- The Department has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials.

- The Department previously deployed a separate short training and lesson plan with instructions for Staff on saving and uploading handheld video to the Department's main computer system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations.

The Department provided the standalone handheld camera training to all active ESU Staff during the Sixth Monitoring Period and provides the training to all recruits. Currently, 105 of 114 (92%) Staff assigned to ESU received the training as Recruits or in In-Service Training during prior Monitoring Periods. Further, as noted in *Appendix C,* 5,835 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff, which also includes training on the operation of handheld video cameras. The Monitoring Team has generally found that handheld video is available for incidents where it is required. To the extent issues have been identified with handheld video, problems do not appear to be related to a Staff Member's lack of training on how or when to utilize a handheld camera.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.     Such re-training must be completed within 60 days of the determination of the violation.

    b.     The completion of such re-training shall be documented in the Staff Member's personnel file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to utilize a computerized re-training request system ("Service Desk") for requesting and tracking re-training requests.
- Operations Order 13/18, "Academy Training Service Desk," that governs the use of the Service Desk, remains in effect. The policy mandates that all re-training required as a result of a Use of Force incident must be entered into and tracked through the Service Desk.
- The Training & Development Unit Staff and the Staff Member's assigned command are responsible for tracking the status of all training entered into the Service Desk to ensure that it is completed. The Service Desk ticket should be closed only after the Training & Development Unit Staff confirms that the Staff Member has successfully completed the re-training program.

**ANALYSIS OF COMPLIANCE**

The Department can now systematically identify Staff that require re-training. The Department continues to implement the Service Desk, which is an improvement over prior practice. This tool provides a centralized repository to identify and track Staff who have been recommended for re-training and it has the ability to run aggregate reports. The Service Desk is an online portal accessible to Facility Staff, civilian leadership, and the Training & Development Unit Staff. When an individual is recommended for re-training, the recommendation is entered into the system and then can be tracked to completion. The system is then updated when the Staff member receives the re-training.

- *Re-Training Recommendations & Tracking*

During this Monitoring Period, 839 Staff were recommended for re-training via the Service Desk, compared to 410 Staff during the Eighth Monitoring Period. As of the end of the Monitoring Period, the Department reported that 731 of 839 (87%) Staff recommended for re-training had received it. Re-training was not provided to 23 (3%) Staff and the requests for re-training were closed. The remaining 86 (10%) Staff were waiting for re-training to be scheduled, most of which was requested in December 2019, as depicted in the table below.

For some re-training requests tracked through the Service Desk, re-training was not actually provided in response to the re-training request if that Staff Member had received training in that subject area within the prior 12-month period. These requests were recorded in the Service Desk as being fulfilled, which has a distorting effect on the data. The Department reported ceasing this practice partway through the Monitoring Period, and the Monitoring Team will assess the issue going forward to ascertain whether the practice continued.

The table below depicts the number of re-training recommendations by month, along with the proportion of re-training that was actually provided—this training was either provided in response to these re-training requests, or as described above, within the last 12-month period through the ordinary course of In-Service training programs.

| Re-Training Tracking – 2019 |
| --- |

| Month of Request | Number of Re-Training Requests | Trained | Not Trained | Open or Pending Tickets |
|---|---|---|---|---|
| January 2019 | 73 | 43 (59%) | 30 (41%) | 0 |
| February 2019 | 43 | 36 (84%) | 7 (16%) | 0 |
| March 2019 | 113 | 84 (74%) | 29 (26%) | 0 |
| April 2019 | 43 | 42 (98%) | 1 (2%) | 0 |
| May 2019 | 58 | 51 (88%) | 7 (12%) | 0 |
| June 2019 | 80 | 74 (93%) | 6 (7%) | 5 |
| July 2019 | 231 | 223 (97%) | 8 (3%) | 1 |
| August 2019 | 60 | 58 (97%) | 2 (3%) | 1 |
| September 2019 | 98 | 91 (93%) | 7 (7%) | 1 |
| October 2019 | 246 | 239 (97%) | 7 (3%) | 1 |
| November 2019 | 95 | 92 (97%) | 3 (3%) | 1 |
| December 2019 | 109 | 28 (27%) | 81 (73%) | 81 |
| **Grand Total** | **1249** | **1020** | **229** | **90** |

The high number of re-training requests in July 2019 and October 2019 were driven by requests from ID (67% and 79% of the requests each month, respectively). In fact, ID's referrals for re-training increased significantly during this Monitoring Period—ID made 517 requests for re-training during the Ninth Monitoring Period, compared to only 129 during the Eighth Monitoring Period. This increase was attributable to the processing of more backlogged cases, and the increased use of this tool by ID in the completion of those cases. During the Ninth Monitoring Period, ID requested the majority of re-training (62%), followed by Facilities (25%) and other sources such as the Trials Division (5%) and the Immediate Action Committee (1%). The top four courses recommended for Staff re-training were Use of Force Report Writing (40%), Use of Force (19%), Chemical Agents (13%), and Situational Awareness (9%). 58% (301 of 517) of the re-training requests from ID this Monitoring Period were for Use of Force Report writing.

- *Timing of Re-Training*

Of the 730 Staff who received re-training as requested during the Ninth Monitoring Period, 489 (67%) received the re-training within 60 days of the request and 26 (4%) received re-training within 60 to 119 days of the request. 216 (30%) of re-training requests had training dates that preceded the re-training request date. The Department attributed this to two factors: (1) as described above, the practice had been to not re-train a Staff Member in the same topic within a 12 month period, so the "training date" recorded in the Service Desk was sometimes the date the Staff Member had last received the training even if it pre-dated the re-training request; (2) due to the ID backlog, there were sometimes duplicate training recommendations, and the training had been previously requested closer in time to the incident by either the Facility or ID, so the duplicate request was closed with the prior "training date" recorded in the Service Desk.

- *Verification of Re-Training Provided*

The Monitoring Team requested attendance documentation for a sample of the re-training that was provided *after* the recommendation for re-training to verify that the re-training took place as

127

reported by the Service Desk—and found the documentation provided confirmed this training took place as reported in the Service Desk. Additionally, 23 tickets closed in the Ninth Monitoring Period without re-training dates recorded, though only two of the 23 entries had a reason recorded (*e.g.* MOS retired, duplicate request). While closed tickets in the Service Desk system without an explanation or re-training date is problematic, the volume is relatively low compared to the overall number of requests (21 of 839, or 2.5%).

- *Quality of Re-Training*

The overall goal of re-training Staff is to provide additional guidance and clarity to support improved practice. Training & Development Unit leadership reports that re-training sessions are held with Members of Service individually or in small groups. The re-training requests describe the UOF violations the re-training is designed to address, which Academy leadership reported was utilized during the re-training sessions to address the specific issues of the Staff Member. Training & Development Unit leadership reported that the re-training is conducted separately from typical training courses on the same topics.

While the implementation of the Service Desk is a positive first step in identifying Staff for re-training, the Department must ensure that both Staff are re-trained in response to these recommendations and that Staff in fact understand the reason for the re-training in order to improve and address areas of weakness.

| COMPLIANCE RATING | ¶ **5.** Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to develop the Learning Management System ("LMS") which will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**:

- **TTS:** The Department continues to use the Training Tracking Software ("TTS") as an interim solution to track deployment of training until LMS is implemented. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings and all *Nunez*-required In-Service and Pre-Promotional trainings except those conducted by ESU (which includes Probe Team and Cell Extraction Team Training). TTS scans Staff's identification cards in the classrooms and then this information is manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

- **Hand-Written Sign-in Sheets**: Attendance for In-Service and Pre-Promotional trainings conducted by ESU (which include Probe Team and Cell Extraction Team Training) continue to be captured by hand-written sign-in sheets.

- **Examination Tracking**:
  - **Pre-Service**: Examinations for all *Nunez*-required Pre-Service courses are taken using a tablet and the results are tracked in Excel.
  - **In-Service and Pre-Promotional**: In-Service exams are administered on paper or involve physical skill assessments administered by the instructor with the results captured on paper.

- **Development of Learning Management System**:
  - During this Monitoring Period, the Department continued to work on the development of a centralized Learning Management System ("LMS"), including:
    - Organizing, preparing, and migrating existing data into the new system (*e.g.*, prior course training records and Staff identifiers—which is critical to define employee/learner profiles within the system); and
    - Working with external consultants and the vendor to finalize a governance structure and formal protocols for determining how new courses will be approved (including processes for submitting course proposals to Training/Academy LMS managers, as well as what kinds of reports will be established within the system and who will have the administrative rights to extract them).
    - Other discussions during the period related to site configuration and functionalities, sourcing a new third-party application that would effectively replace TTS, and designing the landing pages MOS will see when they log into the site initially.

**ANALYSIS OF COMPLIANCE**

*Review of Examination and Attendance Records* (¶¶ 6 & 7):

¶¶ 6 and 7 requires all Staff Members who complete the *Nunez*-required trainings to pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). NCU reviewed the training records in the Fourth through Eighth Monitoring Periods to ensure attendance examinations were tracked/administered as required for Academy-based In-Service, Recruit, and Pre-Promotional training. The Monitoring Team reviewed NCU's assessment and verified the underlying documentation. NCU's reviews/audits did not identify significant issues. Over the last few Monitoring Periods (particularly in the Seventh and Eighth Monitoring Periods), the Training & Development Unit Staff have provided more organized materials to NCU, demonstrating continued improvement in maintenance of attendance and examination records. Given the Department's sustained compliance in the maintenance of records, and the fact that the Department reports their practices remain the same, audits were not repeated during the Ninth Monitoring Period. As necessary, these audits may be conducted in future Monitoring Periods.

- ***In-Service Probe Team and Cell Extraction Team Training***

As outlined in the Eighth Monitor's Report (at pg. 110), since 2018, the Monitoring Team strongly recommended that ESU adopt an improved tracking and management system, including the use of TTS to track attendance. Despite multiple reports that TTS was implemented in Fall 2018 and Spring 2019 to track attendance for ESU trainings, [140] the Monitoring Team's review of attendance records from the Ninth Monitoring Period revealed that hand-written sign-in sheets were still being used for ESU trainings in July and August 2019. Despite the frustration that ESU has not reliably implemented a TTS and is still using hand-written sign-in sheets, the Monitoring Team found the records for Probe Team training and Cell Extraction Team training attendance to be in good order. A review of the attendance records for half of all Probe Team training and Cell Extraction Team training provided during this Monitoring Period demonstrated good organization and accurate record keeping.

*Centralized System to Maintain Training Records* (¶ 8):

As noted in prior Monitor's Reports, a centralized electronic system to track training will significantly enhance the Department's ability to identify which Staff require training and when, to track course completion, and to maintain training records. The Department continues to provide the Monitoring Team with routine updates on the development of LMS, which requires significant coordination within the agency as well as with the vendor. Inherently, this is a lengthy process given the need to coordinate many moving parts. One area in particular that is taking longer than expected is preparing and "cleaning" existing data for migration into the new system, which is necessary so that

---

[140] ESU reported to the Monitoring Team that TTS was implemented in November 2018, but it was not used for any training attendance tracking between November 2018 and April 2019. ESU subsequently reported that it did not implement TTS as originally reported, but would begin using the tracking system in April 2019.

prior training and staff records continue to be accessible. Coordination with the vendor and an implementation consulting firm that acts as a go-between, has also been time-consuming. The Department reports disappointment with how the implementation consulting firm staffed this project. Current progress reports suggest some portion of LMS is likely to be launched towards the end of the Tenth Monitoring Period.

| **COMPLIANCE RATING** | ¶ **6.** Partial Compliance<br>¶ **7.** Partial Compliance<br>¶ **8.** Partial Compliance |
| --- | --- |

## 15. ANONYMOUS REPORTING SYSTEM (CONSENT JUDGMENT § VI)

This section of the Consent Judgment requires the Department, in consultation with the Monitoring Team, to establish a centralized system for Staff to report violations of the Use of Force Directive anonymously. The goal of this provision is to ensure that all Use of Force incidents are properly reported without fear of retaliation and can be investigated. The Department has maintained an anonymous hotline since March 2016. The Monitoring Team's assessment of compliance is outlined below.

| VI. ANONYMOUS REPORTING ¶ 1 |
| --- |
| ¶ 1. The Department, in consultation with the Monitor, shall establish a centralized system pursuant to which Staff Members can anonymously report to ID information that Staff Members violated the Department's use of force policies. ID shall initiate a Preliminary Review in accordance with Paragraph 7 of Section VII (Use of Force Investigations) into any such allegations within 3 Business Days after receiving the anonymous report. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Division Order #01/16R-A, developed in consultation with the Monitoring Team, remains in effect. The Division Order requires ID to initiate a preliminary investigation within three business days of receiving an anonymous report.

- The following number of reports have been received through the Anonymous Reporting Hotline since March 2016.

| | March to June 2016 | July to Dec. 2016 | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| **Total Calls Received** | 3 | 11 | 21 | 28 | 18 | 23 | 19 | 92 |

| Number of UOF related calls | 0 | 0 | 1 | 0 | 1 | 0 | 2 | 2 |
|---|---|---|---|---|---|---|---|---|

- The Department continues to advertise the hotline telephone number in all Facilities on large posters and mounted behind lexan (polycarbonate) shield. The Department reports that the Anonymous Reporting Slides are permanently posted on DOC TV and the Department's intranet home page.

**ANALYSIS OF COMPLIANCE**

The Department continues to maintain a comprehensive policy governing the Anonymous Hotline that satisfies the requirements of this provision. The Monitoring Team continued to observe the hotline advertised on DOC TV and posters in high-traffic areas throughout Facilities while conducting site visits. The Department receives calls through the hotline from Staff and inmates on a routine basis, which also demonstrates that the hotline is advertised, and Staff know it is available.

During this Monitoring Period, the number of calls to the Anonymous Reporting System increased. However, of the 92 calls received, 70 were from the same caller in a very short period of time. The other 22 calls were from various individuals and was consistent with the number of calls received in other Monitoring Periods. The Monitoring Team reviewed the screening forms for these 22 calls. One call was from an inmate regarding a 2015 Use of Force incident that had been previously investigated by the Facility, and the remaining 21 calls were non-UOF related. ID assessed the 70 calls placed by the single caller and found that one was related to a use of force. The Monitoring Team confirmed a UOF investigation was then opened. The Department also continues to receive Use of Force concerns through a number of channels including direct reports by Staff and inmates to Facility and/or ID staff, calls to 311, reports from non-DOC Staff (*e.g.* H+H), inmate grievances, and from Legal Aid Society lawyers.

The Department maintains Substantial Compliance with this provision as it has established and maintained an Anonymous Reporting System and initiates a preliminary investigation for any Use of Force incident received through an anonymous report that was not already investigated. The Department has sustained Substantial Compliance since the Second Monitoring Period, for a total of 46 months.[141] The Department's sustained compliance has abated prior deficiencies, so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

---

[141] *See*, Second Monitor's Report at pgs. 64 to 65 (dkt. 291), Third Monitor's Report at pgs. 97 to 99 (dkt. 295), Fourth Monitor's Report at pgs. 95 to 97 (dkt. 305), Fifth Monitor's Report at pgs. 78 to 80 (dkt. 311), Sixth Monitor's Report at pgs. 79 to 80 (dkt. 317), Seventh Monitor's Report at pgs. 91 to 92 (dkt. 327), and Eighth Monitor's Report at pgs. 113 to 114 (dkt. 332).

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
|---|---|

### 16. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f));[142] and preserve video from all sources for at least 90 days (¶ 4).

The Department's vast network of video surveillance throughout its Facilities is expansive and far greater than most correctional systems with which the Monitoring Team has experience. The availability of significant camera coverage has resulted in the vast majority of use of force incidents being captured on camera. Further, the widespread video surveillance capabilities across the Facilities allows the Department to utilize the camera footage proactively.

The Monitoring Team's assessment of compliance is outlined below.

---

[142] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

## IX. Video Surveillance ¶ 1 (Stationary Camera Installation) & XV. Safety and Supervision of Inmates Under the Age of 19 ¶¶ 10, 11 (Video Camera Coverage for Inmates Under the Age of 19)

¶ 1.

    a.    At least 7,800 additional stationary, wall-mounted surveillance cameras shall be installed in the Facilities by February 28, 2018.

        i.    At least 25% of these additional cameras shall be installed by July 1, 2016.

        ii.    At least 50% of these additional cameras shall be installed by February 1, 2017.

        iii.    At least 75% of these additional cameras shall be installed by July 1, 2017.

    b.    The Department shall install stationary, wall-mounted surveillance cameras in all areas of RNDC accessible to Inmates under the age of 18 and in all housing areas of Facilities that house 18-year-olds in accordance with the timelines as set forth in Paragraphs 10 and 11 of Section XV (Safety and Supervision of Inmates Under the Age of 19).

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

    e.    The Monitor and Plaintiffs' Counsel will be invited to participate in meetings of the Department's internal camera working group, which determines the prioritization and timeline for the installation of additional cameras in the Facilities.

### § XV. Safety and Supervision of Inmates Under the Age of 19

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

### Department's Steps Towards Compliance

- The Department has installed approximately 10,400 since the Department began the installation of cameras in 2015, including installing approximately 140 cameras in the Ninth Monitoring Period.

- The Department maintains a comprehensive list of recommendations for additional wall-mounted stationary cameras, compiling recommendations from the Monitoring Team, Chief of Department, and other divisions within the Department.

### Analysis of Compliance

_Installation of stationary, wall-mounted cameras_ (¶ 1(a))

The Department installed 7,800 cameras by February 28, 2018 as required by the Consent Judgment. The Department has therefore achieved and maintained Substantial Compliance with the requirement of ¶ 1(a) since the Sixth Monitoring Period, for a total of 24 months.[143] As a result, ¶ 1(a) is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends these provisions are terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

_Complete Camera Coverage_ (¶ 1(c))

The Department achieved "Complete Camera Coverage" of all Facilities by February 28, 2018. Given that cameras have been installed across multiple Monitoring Periods, the chart below illustrates the status of wall-mounted camera installation at each Facility. Further evidence of the Department's vast camera coverage within the Facilities is that Rapid Reviews were conducted for 3,684 (98%) of the 3,770 actual incidents that occurred between July 1, 2019 to December 31, 2019.[144] The Department has therefore achieved and maintained Substantial Compliance with the requirement of "Complete Camera Coverage" as required by ¶ 1(c) since the Sixth Monitoring Period, for a total of 24 months.[145] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

---

[143] _See_, Second Monitor's Report at pgs. 68 to 69 (dkt. 291), Third Monitor's Report at pgs. 104 to 107 (dkt. 295), Fourth Monitor's Report at pgs. 100 to 103 (dkt. 305), Fifth Monitor's Report at pgs. 81 to 84 (dkt. 311), Sixth Monitor's Report at pgs. 83 to 85 (dkt. 317), Seventh Monitor's Report at pgs. 94 to 95 (dkt. 327), and Eighth Monitor's Report at pgs. 116 to 118 (dkt. 332).

[144] It should be noted that it is not expected that _all_ Use of Force incidents will be captured on camera as the Consent Judgment explicitly excludes certain areas from camera coverage. See ¶ 8 of Definitions.

[145] _See_, Second Monitor's Report at pgs. 68 to 69 (dkt. 291), Third Monitor's Report at pgs. 104 to 107 (dkt. 295), Fourth Monitor's Report at pgs. 100 to 103 (dkt. 305), Fifth Monitor's Report at pgs. 81 to 84 (dkt. 311), Sixth Monitor's Report at pgs. 83 to 85 (dkt. 317), Seventh Monitor's Report at pgs. 94 to 95 (dkt. 327), and Eighth Monitor's Report at pgs. 116 to 118 (dkt. 332).

| Facility[146] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[147] | Reference to Prior Monitor's Report Findings |
|---|---|---|---|---|---|
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure) | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE[148] units may house 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| EMTC | Substantially Complete | Substantially Complete | Yes (sentenced 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| OBCC | Substantially Complete | Substantially Complete | Yes (ESH YA only) | In progress | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | In progress | Fourth Report (pg. 102) |
| RMSC | Substantially Complete | Substantially Complete | Yes | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially Complete | No | Substantially addressed | Third Report (pg. 107) Sixth Report (p.83) |
| NIC | Substantially Complete | Substantially Complete | No | In progress | Second Report (pg. 66) Sixth Report (pg. 83) |
| HOJC | Substantially Complete | Substantially Complete | Yes | To be addressed | Seventh Report (pg. 94) |
| DJCJC | N/A – no housing units | Substantially Complete | No | To be addressed | Sixth Report (pg. 83) |
| QDC | N/A – no housing units | N/A – not currently in use | No | N/A | N/A |
| **Closed Facilities** | | | | | |
| GMDC[149] | Substantially Complete | Substantially Complete | N/A | N/A[150] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |

---

[146] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[147] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras.

[148] Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE").

[149] As of the end of June 2018 the Department no longer houses inmates at GMDC.

[150] Given that GMDC has now closed, the need to address recommendations for camera installation is moot.

| BKDC | Substantially Complete | Substantially Complete | N/A | N/A [151] | Sixth Report (pg. 83) |

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (¶ 1(b))

Provision ¶ 1(b) requires compliance with two separate requirements under Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11. With respect to § XV (Safety and Supervision of Inmates Under the Age of 19), ¶ 10, the Department achieved Complete Camera Coverage at RNDC[152] within the required 90 days of the Effective Date and has been in Substantial Compliance since the First Monitoring Period, for a total of 50 months.[153] With respect to § XV (Safety and Supervision of Inmates Under the Age of 19), ¶ 11, the Department achieved Complete Camera Coverage of all housing areas that are accessible to 18-year-olds by July 1, 2016 as required and has sustained Substantial Compliance since the First Monitoring Period, for a total of 50 months.[154] As a result, § IX. (Video Surveillance) ¶ 1(b), § XV (Safety and Supervision of Inmates Under the Age of 19), ¶¶ 10 and 11 are no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends these three provisions are terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

*Use of Force incidents not captured on video and subsequent identification of blind spots* (¶ 1(d))

The Monitoring Team has recommended a relatively small number of additional cameras are installed in certain areas of the Facilities to minimize potential blind spots. The Monitoring Team continues to receive regular updates from the Radio Shop as the Department installs additional cameras to address the Monitoring Team's recommendations. Cameras are being installed based on the order in which the recommendation was received.

To date, neither the Department nor the Monitoring Team has identified a use of force incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot. Accordingly, the Department maintains Substantial Compliance with this

---

[151] BKDC closed shortly after the close of the 9th Monitoring Period and these recommendations are now moot.

[152] The Monitoring Team Confirmed that the Department achieved Complete Camera Coverage at HOJC, which now houses 16- and 17-year-old residents, before the Facility was opened in October 2018.

[153] *See*, First Monitor's Report at pgs. 61 to 62, 95 (dkt. 269), Second Monitor's Report at pgs. 69 to 71, 135 to 136 (dkt. 291), Third Monitor's Report at pgs. 107 to 108, 215 (dkt. 295), Fourth Monitor's Report at pg. 103, 226 (dkt. 305), Fifth Monitor's Report at pg. 84, 162 (dkt. 311), Sixth Monitor's Report at pg. 85, 178 (dkt. 317), Seventh Monitor's Report at pg. 96, 222 (dkt. 327), and Eighth Monitor's Report at pg. 118, 236 to 237, 267 to 268 (dkt. 332).

[154] *See* above.

provision, which the Department has sustained since the Sixth Monitoring Period (for a total of 18 months).[155]

*Internal camera working group meeting* (¶ 1(e))

The Department invited the Monitoring Team and Plaintiffs' Counsel to participate in meetings of the Department's internal camera working group between the First and Fourth Monitoring Period.[156] As described in more detail in the Fifth Monitor's Report (at pg. 84), the internal camera working group does not convene because the Department has achieved Complete Camera Coverage in the Facilities. As a result, ¶ 1(e) is longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision is terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a).** Substantial Compliance<br>¶ **1(b).** Substantial Compliance<br>¶ **1(c).** Substantial Compliance<br>¶ **1(d).** Substantial Compliance<br>¶ **1(e).** Substantial Compliance (per Fifth Monitor's Report) |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.    Body-worn Cameras

    a.    Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

    b.    The 100 body-worn cameras shall be distributed among Officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

    c.    The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Project Management Office ("PMO") has been assigned to manage the BWC pilot and its expansion.

---

[155] *See*, Sixth Monitor's Report at pg. 85 (dkt. 317), Seventh Monitor's Report at pg. 96 (dkt. 327), and Eighth Monitor's Report at pg. 118 (dkt. 332).

[156] *See*, First Monitor's Report at pgs. 62 to 63 (dkt. 269), Second Monitor's Report at pgs. 71 to 72 (dkt. 291), Third Monitor's Report at pg. 109 (dkt. 295), Fourth Monitor's Report at pg. 104 (dkt. 305), Fifth Monitor's Report at pg. 84 (dkt. 311), Sixth Monitor's Report at pg. 85 (dkt. 317), Seventh Monitor's Report at pg. 96 (dkt. 327), and Eighth Monitor's Report at pg. 118 (dkt. 332).

- The Department re-initiated a body-worn camera ("BWC") pilot at GRVC in June 2019, which was originally initiated in the fall of 2017. The PMO worked to re-train Staff at GRVC, raise awareness on the use of BWCs and develop a plan to increase accountability by tracking whether Staff were activating their BWCs.
  - o 90% of staff at GRVC received training on the BWC in the Ninth Monitoring Period.
  - o The Department reports 185 BWC were assigned to inmate facing posts at GRVC and an additional 43 have been requested.
- There are two policies governing the use of the BWC. There is one Operations Order which governs the use of BWC at DOC managed Facilities. The Department maintains a separate BWC policy for Horizon.
  - o Both policies require Staff to activate the body-worn cameras in specified situations (*e.g.,* use of force incidents, witnessing or responding to an inmate-on-inmate fight, or escorting inmates).
- The BWCs were activated in response to 128 use of force incidents during the Ninth Monitoring Period, 101 of these incidents occurred at GRVC and the rest were at HOJC.
- The PMO developed a plan to expand the use of BWC department wide in 2020.

**ANALYSIS OF COMPLIANCE**

The video captured by BWC continues to be a valuable source of audio and video that stationary and handheld cameras cannot provide. The video produced by BWC provides a helpful perspective on what occurred to determine the facts and events preceding, during and after a use of force incident. Accordingly, the Monitoring Team has recommended that the Department continue to utilize BWC and roll out the use of the cameras throughout the Department.

The BWC pilot began in 2017 at GRVC. While the Department has acknowledged the value and benefit of the BWC, the use of BWC at GRVC has been sporadic and inconsistent. As noted in the previous Monitor's report, the pilot's inconsistency was due to a lack of oversight and numerous changes in Facility leadership without a proper transition plan. The Department reinvigorated the use of the BWC at the end of the Eighth Monitoring Period under the management of the PMO to provide more structure and accountability on the use of BWCs at GRVC. In this Monitoring Period, PMO supported re-training for Staff at GRVC and increased awareness on the use of BWC. While there was an increase in Staff trained and the number of posts assigned to wear BWCs, the number of incidents caught on BWCs at GRVC did not match the number of incidents occurring at the Facility. PMO reported that the lower number of videos caught on BWCs was a result of Staff not activating their BWCs. As a result, PMO developed a communication plan to increase Staff awareness of the requirements of when to activate the BWC. PMO reports posters will be placed in commands and displayed on DOC TV and the Intranet. Additionally, to increase accountability, on a daily basis PMO began to track and monitor the number of

Use of Force incidents and the incidents caught on BWC to determine whether staff are activating BWCs. The Monitoring Team will continue to scrutinize the use of BWC at GRVC and the overall expansion across the Department.

BWC is particularly helpful in incidents where large numbers of Staff respond or incidents occurring in an area without stationary cameras (*e.g.*, inmate cells). The Emergency Services Unit responses usually fall into both of these categories and generally only include one handheld camera. Additional footage of these responses would be helpful to capture the salient parts of use of force incidents. In particular, the Monitoring Team recommends that ESU Staff utilize BWCs. As the Department works to expand the BWC pilot, the Monitoring Team has recommended that the Department prioritize the assignment of BWC to the ESU team. The Department reports that the current BWC mounting mechanism is not compatible with the ESU vest. The magnetic component is not stable or sustainable for use by ESU staff. The Monitoring Team has recommended that the Department prioritize a solution to this issue to ensure ESU staff can utilize BWC as soon as possible. The Department reports that it is considering a few different options to identify the solution that will allow for ESU to utilize BWC as soon as possible.

| COMPLIANCE RATING | ¶ 2(a)-(c). Partial Compliance |
| --- | --- |

| **IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)** |
| --- |

¶ 2.     Handheld Cameras

d.     Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

f.     When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team addresses the requirement of ¶ 2(d) and remains in effect.

- Staff are required by Department Policy to bring and record handheld video in response to all alarm calls. The Facilities continued to maintain an excel spreadsheet of all alarms that also

includes a reference to the file name of the corresponding handheld video that was uploaded to a shared drive.

- NCU continued its quality assurance ("QA") program of handheld camera footage across all Facilities to monitor the Facilities success in uploading all required handheld video to the Department's shared drive.[157] NCU's audit also reviewed the conclusory statement at the end of each handheld video for approximately 100 videos a month to confirm the correct video was uploaded to the system. The results of this audit are examined and discussed by leadership during weekly *Nunez* meetings.

- The Facilities reported that the handheld video requirement for 6,987 (99.4%) of the 7,028 alarm responses were uploaded as required during the Ninth Monitoring Period.

- From July to November 2019, the Department reported that more than 20 Facility Referrals were generated for violations of the handheld video directive. Facility responses to these referrals focused on individual corrective action (*e.g.,* counseling or re-training).

- ID issued four Memorandum of Complaints ("MOC") to one Captain and three Officers for *failing to properly operate the handheld camera* and one MOC to an ADW for *failing to ensure all electronic evidence was uploaded to the network drive as soon as possible, but no later than the completion of the tour of occurrence.* The Department did not issue any discipline to Staff for *intentionally failing to capture incidents* or to Staff who *repeatedly failed to capture key portions of incidents due to failure to follow DOC policies* during this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

<u>Policy (¶ 2 (d))</u>

The Department continues to maintain an adequate policy regarding the use of Handheld Cameras and the requirements of ¶ 2 (d).

<u>Availability of Handheld Video (¶ 2(d))</u>

The Department continues to demonstrate that handheld video is largely captured in situations where required and that the footage is subsequently uploaded and available in a timely manner. NCU maintains its QA program to ensure handheld video is uploaded as required, which confirmed over 99% of all required videos have been uploaded.

---

[157] NCU includes both level A and B alarm responses because the Department's policy requires both level A and B alarms to be captured on handheld video. Generally a level A alarm will be called first, and if the incident cannot be resolved by the level A response, a level B alarm is triggered which is when the Probe team will respond. The Consent Judgment requirement for handheld camera footage is limited to a level B alarm response.

To review NCU's audit the Monitoring Team tested a sample of incidents to confirm the handheld video was uploaded as required. The Monitoring Team verified these videos had been uploaded as referenced in the Preliminary Review. NCU's audit methodology is sound and the documentation continues to be well organized. As such, the Department maintains Substantial Compliance with this provision.

The quality of handheld video is addressed through the Preliminary Review or investigation (*e.g.*, if the camera appears to be intentionally turned off or pointed away at any point of the incident, it is noted by the reviewer or investigator). In this Monitoring Period, the Monitoring Team evaluated the quality of the handheld video through its routine assessment of use of force investigations. The quality of handheld video is mixed, partially due to the nature of handheld video that can make it difficult to obtain a clear and unobstructed view while also ensuring Staff can effectively manage a situation (especially in close quarters). However, there are certainly at least some circumstances where it appears that Staff do not appear to make best efforts to capture all of the incident. The Monitoring Team will continue to scrutinize this issue through its review of use of force incidents.

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities' sustained and prompt uploading of UOF-related handheld video has continued to support ID's access to the footage for the corresponding investigation of the incident. Preliminary Reviews of UOF incidents reflect that handheld video is generally available. ID reports that in the event that handheld video footage cannot be located, the investigator contacts NCU which can usually assist the investigator in locating the appropriate video by referencing their log of alarm responses and the associated handheld video. ID's inability to locate the video is often an inadvertent filing error, which is then remedied.

During the Monitoring Team's review of preserved handheld video, almost all handheld video referenced by the Preliminary Review could be located. The handheld videos are filed systematically and were easy to locate on site. The Monitoring Team has not identified any systemic issues preventing investigators from accessing handheld footage when completing their Preliminary Reviews or Full ID Investigations.

Accordingly, the Department maintains Substantial Compliance with this provision as investigators have consistent and reliable access to the handheld video.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Facilities and ID are identifying and recommending discipline for some Staff for failing to ensure handheld video was adequately recorded and uploaded through corrective interviews, verbal counseling, Facility Referrals, Command Disciplines, and MOCs. The Preliminary Reviewers continue to find a small number of missing or poor-quality handheld videos. Facilities and ID appear to be addressing issues with handheld cameras more consistently than in prior Monitoring Periods. That said, neither the Department or the Monitoring Team have identified a pattern or practice of a specific Staff

Member or Facility failing to adequately capture incidents. Of the handheld video issues that have been identified, most do not suggest that the failure to capture the incident was anything more than human error.

| **COMPLIANCE RATING** | **¶ 2(d).** Substantial Compliance<br>**¶ 2(f).** Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. <u>Maintenance of Stationary Cameras</u>

    a.    The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

    b.    Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

    c.    The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[158]

    d.    Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Facility Identification of Inoperable Cameras
  - The Department continues to maintain Operations Order 12/18 "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," which was developed in consultation with the Monitoring Team to address the requirement that Staff and supervisors assess stationary wall mounted cameras and that the Department develop a quality assurance program pursuant to the Court's August 10, 2018 order that modified Consent Judgment § IX, ¶ 3(c).
  - Assigned Staff and supervisors in each Facility continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into the Enterprise Asset Management ("EAM") system as work orders to trigger repair.
- Quality Assurance Program
  - The Department continues to assess the maintenance of cameras in a few ways:

---

[158] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

- ▪ **(1) NCU audit for Completion of Daily forms MSS1/worker orders** – NCU audits each Facility on five random days a month to confirm the Facility completed the daily forms and submitted corresponding work orders.
- ▪ **(2) Facility Self Audit** – NCU piloted a quality assurance program within each Facility in which the Facility conducts a self-audit of their completion of forms and corresponding work orders on four random days a month to confirm that the MSS-1 forms and corresponding work orders were completed and submitted as required.
- ▪ **(3) NCU Spot-Check of Down Cameras** – This audit is conducted by NCU on one of the same days that the Facility conducts conduct their self-audit to compare NCU findings with the Facility findings. This audit reviews Genetec video across Facilities to determine whether all inoperable cameras were included on the Daily forms.

- Repairs of Inoperable Cameras
  - o The Department's Radio Shop is responsible for repairing stationary cameras in the Facilities.
  - o The Department uses EAM to electronically track the number of cameras reported as inoperable, the amount of time the camera is out, and the date the camera was repaired. The system also has the ability to track why the camera repair is on hold.
  - o On a monthly basis, the Department provides the Monitoring Team the EAM reports that document all open work orders and work orders completed within the month.
  - o Below is a chart of the reported inoperable cameras and the time to complete the repairs from January 2017 through December 2019.

| Time to Repair Inoperable Cameras | | | | | | |
|---|---|---|---|---|---|---|
| | **Jan. to June 2017** | **July to Dec. 2017** | **Jan. to June 2018** | **July to Dec. 2018** | **Jan to June 2019** | **July to Dec. 2019** |
| *Total Repaired* | 3934 | 5378 | 6195 | 5867 | 7903 | 8339 |
| 0-14 days | 3678 (93%) | 4877 (91%) | 5540 (89%) | 4789 (82%) | 6480 (82%) | 4027 (48%) |
| 15-30 days | 143 (4%) | 256 (5%) | 423 (7%) | 758 (13%) | 779 (10%) | 1955 (23%) |
| 31-60 days | 78 (2%) | 144 (3%) | 110 (2%) | 193 (3%) | 397 (5%) | 1424 (17%) |
| 61-99 days | 17 (<1%) | 64 (1%) | 48 (1%) | 68 (1%) | 132 (2%) | 605 (7%) |
| 100 days or more | 18 (<1%) | 37 (1%) | 74 (1%) | 59 (1%) | 115 (1%) | 328 (4%) |

- 621 camera repairs remain pending as of the end of the Monitoring Period for the time periods outlined below.

| | |
|---|---|
| **15-30 days** | 103 (17%) |
| **31-60 days** | 144 (23%) |

144

| | |
|---|---|
| **61-99 days** | 109 (18%) |
| **100 days or more** | 265 (43%) |

ANALYSIS OF COMPLIANCE

In this Monitoring Period, the Department maintained its reasonable process to identify and track inoperable cameras. Given natural wear and tear, and the ageing of cameras, on-going maintenance of stationary cameras is expected. However, as explained below, the number of down cameras and the timing to repair inoperable cameras increased. Despite the increased delay in repairing inoperable cameras, the Monitoring Team has not identified any corresponding impact on the Department's ability to capture use of force incidents on video.

*Daily Assessment of Inoperable Cameras (¶ 3(a)-(b)) & NCU and Facility QA Program (¶ 3(c))*

The process for identifying and reporting inoperable cameras remained the same in the Ninth Monitoring Period (as described in detail in the Eighth Monitor's report at pgs. 123 to 126).

- **Completion of Daily Forms**: In this Monitoring Period, NCU found that 539 of 540 forms were completed and submitted by the Facilities on the days audited.[159]

- **Workorders for Inoperable Cameras**: On the 539 submitted forms, NCU identified 17,772 aggregate inoperable cameras.[160] NCU confirmed that 17,771 (99.9%) of the 17,772 reported inoperable cameras had corresponding work orders in the system.

- **Accuracy of MSS-1 Forms**: In this Monitoring Period, NCU's spot-check found 2,303 of the 2,383 (96.6%) inoperable cameras were reported on the daily forms. 22 of the 80 cameras that were not included on the MSS-1 forms did have a corresponding work order despite not being listed on the daily form. Meaning 2,325 (97.6%) of the 2,383 inoperable cameras had been identified on the MSS-1 form and/or had a corresponding work order in EAM for repair.

The NCU audit confirms that the majority of inoperable cameras are identified and entered in the system. The Monitoring Team evaluated NCU's audit process and confirmed that the quality assurance program is organized, includes a reliable tracking process, and is accurate. NCU's QA program is reasonable and supports the Department's efforts to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly. NCU has piloted a quality assurance program in the Facilities. Although this audit function is not expected to identify many errors given the Facility's high rate of accurately identifying and reporting inoperable cameras, the Monitoring Team's assessment of the internal Facility audit does not

---

[159] This includes all forms that were expected to be completed for five random days selected by facilities in July to December of 2019.

[160] It is important to note that the 17,772 cameras that were identified as inoperable is an aggregate total and does not mean there were 17,772 individual cameras that were inoperable (many cameras were reported as inoperable on multiple days in a row).

appear as dependable as the NCU audit. Notwithstanding the dependability of the Facility Audit, the NCU audit has proven to be a sufficient QA program. The Monitoring Team recommended that NCU consider in the next Monitoring Period whether the Facility audit should be bolstered and/or to maintain the audit function exclusively at NCU. NCU reported it intends to consider the appropriate approach in the next Monitoring Period.

Overall, the Department continues to demonstrate that the daily MSS-1 forms are completed as required. Further, the NCU audit results demonstrate that the forms are generally reliable and identify the vast majority of inoperable cameras. Most importantly, the data demonstrates that the Department is generally submitting work orders to fix any identified inoperable cameras.

*Maintenance of Inoperable Cameras* (¶ 3(d))

The Monitoring Team has not found that inoperable cameras have impacted the Department's ability to capture use of force incidents as the majority of incidents continue to be captured on camera. In fact, 3,684 (98%) of the 3,770 actual incidents that occurred between July 1, 2019 to December 31, 2019 were captured on camera. Given the vast number of cameras in the Agency, most incidents are captured on multiple angles such that one down camera does not preclude the incident from being captured on video by other cameras. Given the extraordinary number of cameras in the Department, the number of reported inoperable cameras is consistent with what the Monitoring Team would expect. The Department's process for identifying and electronically tracking inoperable cameras and the corresponding maintenance of those cameras affords the Department (and the Monitoring Team) the ability to reliably track cameras that require repairs, those where the repairs are languishing, and those cameras that have been fixed.

In this Monitoring Period, the Department repaired more inoperable cameras than any preceding Monitoring Period. Since January of 2017, the Department has demonstrated that it was capable of generally repairing cameras within the required timeframes. However, in this Monitoring Period, only 48% percent of the 8,339 total cameras repaired were repaired within two weeks compared with 82% of the 7,903 total cameras repaired within two weeks in the last Monitoring Period. While there was a decrease in the Department's ability to repair cameras within two weeks, it is worth nothing that 72% of all repairs occurred within *four* weeks.

The Department reported the majority of the delays in repairing cameras was due to limited Staffing (*e.g.* retirement of certain Staff and mandatory overtime restrictions) to address the number of inoperable cameras in the required timeframes. Following the close of the Ninth Monitoring Period, the Department reported that it has evaluated its staffing needs to maintain adequate camera repairs and has instituted some changes including lifting the overtime restrictions. The Radio Shop also assigned a Staff member to each Facility to review and respond to inoperable cameras on a daily basis. Cameras that are merely obstructed will be repaired by Facility maintenance so that the Radio Shop can focus on repairing more complicated camera issues related to technological issues. The Radio Shop Captain will

review the list of all inoperable cameras at each Facility on a daily basis to prioritize the repair of cameras accordingly.

The Monitoring Team evaluated the repair of cameras that occurred beyond thirty days in order to assess the scope of the issues. First, the Monitoring Team evaluated the number of unique cameras that were repaired. While 2,357 cameras were repaired (28%) beyond thirty days, the repairs reflected 1,988 unique cameras. This suggests that some of the more protracted repairs related to faulty cameras that continued to malfunction on multiple occasions versus unique cameras malfunctioning. Second, the Monitoring Team evaluated the repairs by Facility to determine if there were any patterns. 1,662 (71%) of the 2,357 repairs beyond 30 days occurred at five Facilities: BKDC (405),[161] MDC (395), OBCC (325), RNDC (308), and RSMC (229). It is worth noting at these Facilities that many repairs occurred within two weeks. The rest of the outstanding repairs beyond 30 days occurred in small numbers in the other Facilities. Finally, the Monitoring also evaluated the 328 cameras that took over 100 days to repair, which reflects 4% of the repairs completed within the Monitoring Period. A third of these cameras were repaired at RNDC, which has been undergoing various construction projects and most of the cameras were located in areas that were closed. Another 20% of the 328 cameras repaired beyond 100 days were at BKDC (n =~30) or HOJC (n=~30). The other 50% of the cameras repaired over 100 days were spread out in small numbers in various different parts of the Department.

Although repairs that remain outstanding for long periods of time are frustrating, the Department's efforts to triage repair requests to identify those that require maintenance versus cleaning for obstructions and addressing adequate staffing needs should alleviate the majority of the issues. For those cameras that remain inoperable for longer periods of time they either require additional time to complete due to technological issues and/or are in locations that are currently not in use. The Monitoring Team will continue to routinely scrutinize the repair of inoperable cameras and the Department's efforts to improve repair times.

| COMPLIANCE RATING | ¶ 3 (a)-(c) Substantial Compliance<br>¶ 3 (d). Partial Compliance |
| --- | --- |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. <u>Video Preservation</u>

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

---

[161] Given the upcoming closure of BKDC, it is not surprising that repairs at this Facility were not prioritized for completion in this Monitoring Period.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," remains in effect which incorporates the requirements of this provision.

- The Department's computerized system automatically preserves all video for 90 days.

- The Department's Operation Order 02/19, "Video Monitoring Unit (VMU) and Video Review Unit (VRU)" governs the review of video managed by the Chief of Department's office. The Video Review Unit continues to preserve Genetec video beyond the 90-day period for UOF incidents subject to Facility investigations and at the request of Department leadership.

- The ID Video Unit has two dedicated Officers who preserve the Genetec video required for all UOF incidents. ID investigators submit requests for date/time/angles and the video is uploaded to a shared folder only ID, the Legal Division, and Trials and Litigation can access.
  - Starting in October 2018, ID saves all Genetec and handheld video footage in the one centralized ID folder.

- Preservation of video at HOJC for UOF Incidents involving ACS Staff
  - DOC maintained control of video surveillance cameras and preservation of video at HOJC during this Monitoring Period. For incidents that only involve ACS Staff, ACS advises DOC when the incident occurs and requests that DOC preserve the relevant video.
  - ACS currently has access to view video within 90 days of the incident occurring via on-site and off-site logins to the Genetec system.
  - ACS is currently in the process of selecting a vendor to upgrade the equipment to include built-in video preservation and support for the Horizon Genetec system, before ACS assumes total control of video surveillance in the Spring of 2020 at HOJC.

**ANALYSIS OF COMPLIANCE**

The Department continued to adequately preserve video as required. The Monitoring Team tested the Department's system for preserving video for 90 days with a sample of Facilities, times and dates and viewed footage from 89 days prior. Footage from multiple camera angles were viewed without issues. The Monitoring Team assessed the Department's ability to preserve the relevant videos for use of force incidents beyond the 90-day period by: (1) reviewing the wall-mounted video footage, handheld, and body-worn camera video footage included in the use of force investigation files produced to the Monitoring Team, and (2) randomly assessing a sample of stationary and handheld video of incidents investigated by ID. A very small number of the investigation videos produced to the Monitoring Team were missing certain angles and all of the videos in the sample assessed were adequately preserved.

The Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or inmate-on-inmate violence, consistent with the requirements set forth in Consent Judgment § IX, ¶ 4. Accordingly, the Department has sustained Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months.[162] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

In terms of the preservation of video at HOJC, the Monitoring Team worked closely with ACS and DOC during the transition at HOJC to make sure that video continued to be preserved as required. As discussed above, ACS and DOC co-managed the preservation of video as ACS assumed control at HOJC. The Monitoring Team evaluated a sample of video capturing ACS staff exclusively involved in UOF and DOC was able to confirm that all video was preserved except in one case where the wrong date and time had been preserved. The Monitoring Team intends to work with ACS in the next Monitoring Period to ensure that video preserved as required as ACS assumes total control of video surveillance in the Spring of 2020 at HOJC. Therefore, the Monitoring Team will actively monitor this provision going forward for Pre-Raise the Age Youth at HOJC and recommends that this provision is applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
| --- | --- |

## 17. USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct.[163] The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of

---

[162] *See*, First Monitor's Report at pg. 65 (dkt. 269), Second Monitor's Report at pgs. 75 to 76 (dkt. 291), Third Monitor's Report at pgs. 116 to 117 (dkt. 295), Fourth Monitor's Report at pgs. 111 to 113 (dkt. 305), Fifth Monitor's Report at pgs. 90 to 91 (dkt. 311), Sixth Monitor's Report at pgs. 91 to 92 (dkt. 317), Seventh Monitor's Report at pgs. 102 to 104 (dkt. 327), and Eighth Monitor's Report at pgs. 127 to 128 (dkt. 332).

[163] The Department's efforts to achieve compliance with ¶ 5 is addressed in the Use of Force Reporting section of this report.

force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion. Investigations that reliably and consistently identify misconduct are essential to stemming the tide of unnecessary and excessive force that is so prevalent in the Department.

Significant work was done in this Monitoring Period to lay the foundation for the Intake Squad and clear the investigations backlogs as described in detail in the Identifying and Addressing Misconduct section of this report. The ID Leadership team continues to address the issues identified by the Monitoring Team by attending to concerns, developing creative solutions and propelling the development and implementation of the Intake Squad. Further, they continue to collaborate closely with the Monitoring Team on different initiatives, including managing the backlog. The entire ID Team's dedication is critical during this time and their commitment to achieving better results is recognized.

*Addressing Investigation Backlogs*

During the Monitoring Period, the Department, in consultation with the Monitoring Team, worked to address the significant backlog of cases at all phases of investigation. In particular, the Monitoring Team closely scrutinized the backlog of pending Preliminary Reviews and Full ID cases and consulted with the Department about how to evaluate these cases and close them more efficiently. Separately, the Monitoring Team evaluated the backlog of Facility Investigations and collaborated with NCU to devise a plan for efficient closure. Both of these plans are discussed below.

- *Triage of Pending Preliminary Reviews*

The large volume of cases under investigation has resulted in a delay in documenting the Preliminary Review. ID reports that an initial assessment of an incident generally occurs close in time to when the incident first occurred but may not be documented immediately because

investigators are simultaneously completing other Preliminary Reviews and Full ID
Investigations. The Monitoring Team has encouraged ID to triage cases to ensure that those
meriting increased scrutiny are prioritized. As a result, ID initiated two triage measures. First, ID
prioritizes certain pending Preliminary Reviews based on recommendations from the Monitoring
Team flowing from routine assessment of Central Operations Desk ("COD") reports, the ID
Quickstats weekly reports, and other *ad hoc* reviews. Second, beginning in December 2019,
investigators were instructed to draft more succinct Preliminary Reviews for straightforward
incidents without identified misconduct. These more succinct Preliminary Reviews ("Paragraph
Preliminary Reviews") are intended to avoid the recitation of unnecessary facts and details (*e.g.*
transcription of UOF reports) and should reduce the time required to complete them. The
Monitoring Team has reviewed many Paragraph Preliminary Reviews and has provided feedback
to ID to ensure sufficient information is included, as some of the initial drafts were too brief and
failed to adequately describe the nature of the force used. These initial brief drafts were
ultimately revised and included a reasonable assessment of the incident. Overall, the Monitoring
Team has found the Paragraph Preliminary Reviews to be both streamlined and reasonable and
that this initiative helps to preserve investigator resources for more important investigative work.
This strategy also supports the ID Backlog Plan, described in more detail below.

- *Closure of Preliminary Reviews and Full ID Cases*

The strategy to address the Preliminary Review and Full ID backlog was developed in
consultation with the Monitoring Team and is intended to both close out these pending cases and
provide the foundation for an improved process to conduct investigations going forward (the "ID
Backlog Plan"). Toward this end, the Monitoring Team consulted extensively with ID and
conducted interviews and sitework within ID to evaluate current practices. This included an

evaluation of three investigators' Full ID caseload to determine *why* cases were pending so long, and *if* further investigative steps were warranted.

In most cases, investigators had already investigated most aspects of the incidents during the Preliminary Review (*e.g.*, inmates had been interviewed, evidence had been gathered and analyzed) and, based on that evidence, a decision *could be* made about whether charges were appropriate, but simply had not been done. It appeared many cases were referred for further investigation, even when the available objective evidence was sufficient, because investigators and/or Supervisors were hesitant to take this step. Instead, they deferred making the final determination to some later point in time. Some investigators/Supervisors appeared to believe that the case could not be closed on the Preliminary Review because the case was required to be referred for a Full ID Investigation (including corresponding workflows built into CMS that impede the ability to close cases that fall into certain categories after the completion of the Preliminary Review). Discussions with investigators also revealed that the majority of *pending* Preliminary Reviews were in similar stages to the pending Full ID Investigations. Little distinction was evident in the investigators' work product between pending Preliminary Reviews and Full ID cases. This is why the ID Backlog Plan addresses both pending Preliminary Reviews and pending Full ID cases. The Monitoring Team recommended that investigators utilize the same rubric to evaluate both pending Preliminary Review and Full ID cases for closure.

Using this insight, the Monitoring Team and ID finalized the ID Backlog Plan. First, investigators categorize all of their pending Preliminary Reviews and Full ID cases into three groups: *Type 1* cases can be closed without further investigation because either (a) the incident did not violate policy or (b) misconduct has already been addressed (*e.g.* charges served or there is a confirmed response by the Rapid Review that sufficiently addresses the misconduct); *Type 2*

cases can be fast-tracked for discipline or prepared for closure with formal charges or other administrative action; and *Type 3* cases require further investigation or analysis (*e.g.,* additional interviews) in order to determine whether charges are necessary and/or can be supported. These categorizations are then reviewed by their Supervisors and shared with the Monitoring Team. The Monitoring Team reviews a sample of each investigator's categorizations. Based on this assessment, members of the Monitoring Team will meet with the investigators and conduct workshops[164] on specific cases to check that there is alignment in proposed next steps *and* proper application/interpretation of use of force-related policies to the Staff's conduct. Upon agreement on the categorizations, the cases are closed. Importantly, for most Type 1 and Type 2 cases, a more streamlined closure process in CMS is used to bypasses the very time-consuming required fields in the system. Further, instead of overly-detailed closing memos and analysis, a more concise narrative is employed.

The ID Backlog Plan was implemented during the Ninth Monitoring Period and will be rolled out in waves. The 20 investigators slated for the "Intake Squad" addressed their backlogs first, in order to create a clean slate prior to beginning their new assignments. Collectively, these investigators were handling approximately 1,600 cases. Through the ID Backlog Plan, approximately 1,300 cases were closed as of the end of January.[165] The remaining 300 cases were Type 3 and were re-assigned to non-Intake Squad Investigators in order to complete the investigations. As described above, part of the ID Backlog Plan includes consultation with the

---

[164] These workshops are intended to provide a learning opportunity for ID Staff by leveraging the expertise and oversight of the Monitoring Team to support improved quality of investigations and embolden investigators to manage their cases more efficiently.

[165] The majority of these cases were closed before January 15, 2020, however, some cases were closed in the last two weeks of January (before the Intake Squad was opened) and so the closure of these cases are not reflected in the Ninth Monitoring Period data.

Monitoring Team on the proposed bucketing of cases. The Monitoring Team reviewed a sample of the proposed bucketing of cases for these investigators before they were closed and found the proposed approach (*e.g.* whether to close with or without charges, or need for continued investigation) to most of these cases was reasonable. The Monitoring Team met with and reviewed cases with investigators in which the proposed approach did not seem reasonable, and for the most part additional information or facts shared by the investigator, or through review of video and other evidence on site with the investigator, the Monitoring Team concluded the proposed approach to those cases were in fact reasonable. There were only a handful of cases where feedback from the Monitoring Team may have altered the approach to how to proceed with a case. Generally, these were recommendations that a case could be closed and that further investigation was not needed as originally proposed.

During the next Monitoring Period, the Department will continue the ID Backlog Plan with multiple waves of investigators.

- Facility Investigations Backlog Plan

Given the Monitoring Team's recommendation that the Facilities no longer conduct UOF investigations, the goal for this Monitoring Period was to close out any pending Facility Investigations. The Monitoring Team recommended that the Department devise a plan to address the backlog of approximately 550 Facility Investigations pending as of August 2019. The Chief of Facility Operations and representatives from CLU and NCU set a series of deadlines for closing pending Facility Investigations, depending on their status (*e.g.* pending with investigator versus pending with Warden for approval). About half of the cases were closed in Fall 2019. NCU assisted in the closure of the final set of cases in this group, and also assisted with the closure of any new cases that were referred for Facility Investigation after August of 2019. NCU,

in consultation with the Monitoring Team, devised a truncated process to close out the remaining investigations (less than 200). This process leveraged any assessment of the incident that occurred as part of the Rapid Reviews and the ID Quickstats Weekly Reports (*e.g.* had Staff been re-trained or counseled and/or a Command Discipline been issued through those forums), which was incorporated into a truncated closing memo. The cases were closed administratively within CMS. As of mid-March 2020, all Facility Investigations pending as of the end of the Monitoring Period were closed.

*Statute of Limitations -- Full ID Investigations*

Because the Backlog Plan for Full ID investigations has not yet eliminated the backlog, ID must still ensure that the statute of limitations does not expire before charges are brought, if they are merited, using the SOLStat program. The Monitoring Team has previously reported on the loss of a significant number of cases to the Statute of Limitations. SOLStat is a collaborative effort between ID and Trials. On a bi-monthly basis, ID identifies the cases nearing their SOL. Investigators for these cases conduct an initial assessment to determine whether misconduct occurred and whether charges are merited. ID Supervisors review the results of this assessment, and then cases are discussed in weekly meetings between ID and Trials to determine whether charges are warranted. If ID/Trials determine that Staff engaged in misconduct, charges are issued before the SOL expires. ID reported that all 1,385 cases approaching their SOL between late April and December 2019 were assessed and evaluated for potential misconduct, and hundreds of charges were served to preserve the SOL as a result.

It is worth noting that a significant portion of cases were not administratively processed (*i.e.,* closed in the Department's records) before the SOL expired. In other words, although ID had determined whether or not to bring charges on the case and charges had been served as

applicable, the closing paperwork was not yet complete. These cases were not technically "lost" to the SOL because the final decision had been made; they simply lack administrative closure. This is an example of the type of case that should be categorized as "Type 1" in the ID Backlog Project described above: the case has been evaluated and determined not to warrant charges, and needs to be closed in CMS, via the new truncated process. This more efficient process was not utilized in SOLstat, though the Monitoring Team recommended ID do so in the future.

The Monitoring Team's assessment of compliance is below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID conducts a Preliminary Review of every use of force incident.
- ID and the Facilities investigate use of force incidents that are referred from the completed Preliminary Reviews.

### ANALYSIS OF COMPLIANCE

Investigations at all levels are not conducted in a reasonable timeframe, impacting the ability of the Department to evaluate the use of force within the agency and discipline Staff when necessary. As described in the Identifying and Addressing Misconduct section of this report, there is a significant backlog in the completion of Preliminary Reviews, which has resulted in a corresponding backlog of Facility and Full ID investigations. As of the end of the Monitoring Period, 8,656 investigations of use of force incidents from January 2018 to December 2019 remain pending (6,552 pending Preliminary Reviews, 183[166] pending Facility Investigations, and 1,921 pending Full ID Investigations). Almost all of these investigations are pending beyond the prescribed deadline for completion.

As for the quality of those investigations that are completed, the Monitoring Team's continued evaluation of Preliminary Reviews and completed Facility and ID investigations in this Monitoring

---

[166] All of these 183 cases closed in the beginning of the Tenth Monitoring Period as part of NCU's Facility Investigation backlog closure project as described in the introduction to this section of the report.

Period demonstrate that these investigations have remained relatively the same in terms of the overall quality and that the outcomes are generally inconsistent as described in prior Monitor Reports.[167] The Preliminary Reviews and Full ID investigations completed by ID investigators remain better quality than Facility Investigations (which continue to be unreliable, with *pro forma* analysis, as described in prior reports[168]). The Preliminary Review is generally the most consistent and reliable description of what occurred during the use of force incidents, but, like with Full ID investigations, the investigations do not consistently and reliably assess whether Staff conduct was within guidelines. Facility investigations are generally unreliable and cases with objective evidence of misconduct go unaddressed.

Given these findings, along with those described in the narrative of this section and the Identifying & Addressing Use of Force Misconduct section above, the Department is not in compliance with this provision. The Intake Squad Plan, and the Monitoring Team's corresponding recommendations for modifications to Consent Judgment §VII. (Use of Force Investigations), ¶¶ 7, 8, and 13, are designed to create a framework to support thorough, timely, and objective investigations of all use of force incidents going forward.

| COMPLIANCE RATING | ¶ 1. Non-Compliance |
| --- | --- |

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[169] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    c.    <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

        i.    ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

        ii.    The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

---

[167] *See* Fifth Monitor's Report at pgs. 91-92; Sixth Monitor's Report at pgs. 94-5; Seventh Monitor's Report at pgs. 106-107.

[168] *See* Fifth Monitor's Report at pgs. 91-92 and 106-108; Sixth Monitor's Report at pgs. 94-5 and 108-110; Seventh Monitor's Report at pgs. 106-107 and 128-129.

[169] This date includes extension that was granted by the Court on January 6, 2016 (*see* Dkt. Entry 266).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C* for information on the deployment of ID Investigator training.

- All new investigators must complete ID's 40-hour training before they may be assigned cases.

- All uniformed investigators received S.T.A.R.T. training and most civilian investigators received abbreviated S.T.A.R.T. training.

**ANALYSIS OF COMPLIANCE**

This provision is addressed in this section versus the Training section of the report because the training of investigators is intertwined with the other work described in this section.

*ID Investigator Training* (¶ 2(c)(i))

By providing over 40 hours of training which covers investigative procedures, skills, and techniques consistent with best practices and the Consent Judgment to Investigators before they begin investigating incidents, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months.[170] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

ID has also provided opportunities for investigators to receive specialized training for certain subject matter areas (*e.g.*, Prison Rape Elimination Act ("PREA") or SCM training). As a foundation for the Intake Squad, ID also provided specific training to investigators slated to go to the Intake Squad to assist in navigating CMS under the new Intake Investigation framework.

*Facility Investigator Training* (¶ 2(c)(ii))

The Department has not provided any Facility investigator training with the exception of training on CMS, and a limited targeted training in the Seventh Monitoring Period for Facility investigators at GRVC, OBCC, and RNDC, leveraging the ID Quickstats Weekly Reports. While the Department has not provided Facility Investigator training, it is also no longer necessary given the Monitoring Team's recommendation to eliminate the use of Facility Investigations in light of the creation of the Intake Squad. The Monitoring Team has therefore recommended that this provision should be eliminated as part of the overall effort to modify certain provisions of the Consent Judgment

---

[170] *See*, First Monitor's Report at pgs. 49-50 (dkt. 269), Second Monitor's Report at pgs. 59-60 (dkt. 291), Third Monitor's Report at pgs. 85-86 (dkt. 295), Fourth Monitor's Report at pgs. 81-82 (dkt. 305), Fifth Monitor's Report at pgs. 68-69 (dkt. 311), Sixth Monitor's Report at pgs. 70-71 (dkt. 317), Seventh Monitor's Report at pgs. 107-108 (dkt. 327), and Eighth Monitor's Report at pgs. 137-138 (dkt. 332).

described in the Efforts to Advance Reforms & Address Areas of Concern section of this report. Given this recommendation, this provision was not rated in this Monitoring Period.

| COMPLIANCE RATING | ¶ 2(c)(i). Substantial Compliance<br>¶ 2(c)(ii). Not Rated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INMATE INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

    a.  After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

    b.  When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

    c.  All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- Facility Staff consistently attempt to interview inmates following their involvement in a use of force, and document either the inmate's statements, or refusal to provide a statement, in the Facility package that is provided to the Preliminary Reviewer.

- The Inmate Voluntary Statement forms used to obtain inmate statements at the Facility-level informs the inmates and codifies the requirement of ¶ 2(b) that "the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation."

### ANALYSIS OF COMPLIANCE

The inmate interview requirements of ¶ 2 have a number of practical elements: (1) attempts must be made and recorded to get an inmate's statement following a use of force incident; (2) the Department shall assure inmates they will not be subject to retaliation for providing information in connection with an investigation; (3) investigators shall not unreasonably discredit inmate statements. This last consideration is most appropriately addressed as part of the overall assessment of the quality of investigations and is therefore not considered as part of the compliance assessment for this requirement.

Attempts are consistently made to get an inmate's statement following a use of force and those attempts are recorded. The Monitoring Team consistently identified documentation in all Preliminary Review, Facility and Full ID investigation files reviewed that the Facility makes attempts to obtain inmate statements following use of force incidents. The inmate voluntary statement form is

consistently available, and contains either the inmate's initial statement to the Facility or recorded inmate refusal to provide such statement. The Department has also codified and informs all inmate's through the Inmate Voluntary Statement form that they will not be retaliated against for any information provided in connection with the investigation. Accordingly, the Department is in Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- The Department continued to coordinate monthly with DOI, and other relevant law enforcement offices on cases pending with those offices (as described in the Second Monitor's Report at pgs. 84-85).

- The Department maintains a tracking chart to ensure cases are tracked from the time they are referred to law enforcement to the case's ultimate closure within the Department. The tracking chart is updated each month to identify who is currently evaluating the cases (DOI, law enforcement or returned to ID) as well as the status of that evaluation. To the extent the case has been returned back to the Department, they also track the status of the investigation and any pending discipline (to the extent necessary).

- Two use of force cases were referred to or taken over by DOI during this Monitoring Period.

- Eight use of force cases were pending with law enforcement/DOI as of the end of the Monitoring Period: four use of force cases were pending before DOI, four use of force cases were pending before law enforcement (one with the Bronx District Attorney ("DA"), two use of force cases were pending with the U.S. Attorney's Office for the Southern District of New York "SDNY", and one case was pending with the U.S. Attorney's Office for the Eastern District of New York "EDNY").

### ANALYSIS OF COMPLIANCE

The number of UOF incidents that may be potentially criminal in nature remain small, but are the most concerning. Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly and/or assumed by DOI. Since the Effective Date, DOI has taken over or been referred a total of 76 cases. Only a small portion (n=4) of this already limited group of cases has resulted in criminal charges.

| Date of Incident | 2014 & 2015 | Jan. to June 2016 | July to Dec. 2016 | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **9** | **11** | **5** | **8** | **19** | **6** | **12** | **4** | **2** | **76** | |
| Criminal Charges Brought/Trial Underway or Complete | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 0 | 0 | **4** | **5%** |
| Pending Consideration with Law Enforcement | 0 | 1 | 1 | 0 | 1 | 1 | 1 | 1 | 2 | **8** | **11%** |
| Returned to ID | 9 | 8 | 4 | 8 | 18 | 5 | 9 | 3 | 0 | **64** | **84%** |

*Tracking & Coordination of Cases*

The Department has maintained its improved tracking process for cases referred and/or taken over by DOI and subsequently City and Federal prosecutors' offices. The tracking is particularly crucial because these cases go through various layers of review across and within various agencies in order to determine whether to bring a criminal prosecution. Ultimately, this process helps ensure these cases are processed as expeditiously as possible, which is important since they represent some of the most troubling use of force incidents.

Monthly meetings between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and SDNY) continue to occur regularly and provide an adequate forum for coordinating cases. This includes ensuring the Department places its own investigations on hold while the criminal investigation is ongoing, while also ensuring that cases do not languish once referred to law enforcement. The Monitoring Team continues to participate in these meetings in order to stay apprised of the status of these cases.

*Length of Time to Evaluate Cases*

The improved tracking and communication appears to have resulted in a decreased time for review by outside agencies. In particular, DOI has been assessing cases more timely and either elevating them to prosecutors or clearing them back to the Department.

However, the total time required for outside agencies to consider cases for prosecution is still **<u>too long</u>**—and very few cases actually result in criminal prosecution. Since the Effective Date, **76 cases** have been considered by outside law enforcement agencies, of which only **<u>four</u>** have resulted in criminal prosecution. Of the eight cases pending with outside law enforcement at the close of the Monitoring Period, five of them occurred in 2017 and 2018, which have been with DOI, the Bronx DA and SDNY/EDNY or passing from one agency to the next for *years*.

The Monitoring Team remains quite concerned about the overall length of time to complete the criminal evaluation process as the vast majority of cases reviewed by law enforcement do not result in a criminal proceeding and are ultimately referred back to the Department for administrative processing and discipline. Any necessary administrative response and discipline for these matters are then very protracted, which decreases the meaningfulness of the response and some of the most troubling

incidents are then most likely to languish. It is therefore imperative that law enforcement representatives make every effort to ensure cases are prosecuted, or returned to the Department, as expeditiously as possible.

*Department's Assessment of Cases Returned from Law Enforcement*

As noted above, law enforcement agencies decline to prosecute the vast majority of cases reviewed. When that occurs, the cases are referred back to the Department for administrative processing and discipline, as appropriate. Because ID investigations take so long to close, the Monitoring Team recommended that ID prioritize cases returned from law enforcement given the likelihood that they involve serious misconduct and a disciplinary response is likely warranted. To date, these serious cases, like most others, have languished in ID, despite tracking of these cases designed to encourage prioritization of these investigations.

Overall, the Department is promptly referring use of force incidents to DOI and other law enforcement agencies for further investigation when the conduct of Staff appears to be criminal in nature. While the length of time these cases are considered by law enforcement is concerning as described above, the Department is adequately referring the cases timely and is therefore in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 4 (BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS)

¶ 4. Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department can discipline, instruct, or counsel those who conduct or sign-off on a biased, incomplete or inadequate investigation.

### ANALYSIS OF COMPLIANCE

The Department's investigators, particularly Facility investigators, often produce inadequate investigations which would warrant appropriate instruction, counseling, and/or discipline, but the Department rarely identifies this issue or employs these responses. To the extent that instruction or counseling occur, it is done so informally so it is difficult for the Monitoring Team to track. Anecdotally, the Monitoring Team is aware that some instruction and counseling does occur (more frequently with ID investigators versus Facility investigators). The Monitoring Team has only identified a handful of cases where Facility investigators who conducted inadequate, incomplete, or biased investigations were disciplined, and charges were served for one Staff Member this Monitoring Period for failing to conduct a Facility Investigation as assigned.

Given the current state of affairs and the significant investigation backlog, it is not surprising that the Department is not able to consistently and reliably guide and/or discipline both investigators who conduct deficient investigations and supervisors who approve the subpar work-product. In an effort to support the Department's efforts to instruct investigators, the Monitoring Team has shared feedback and/or recommendations with the leadership of ID to evaluate certain investigations and consider addressing certain investigators and their supervisors, as appropriate, to address investigations that appeared to be biased, incomplete, or inadequate.

| COMPLIANCE RATING | ¶ 4. Non-Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 6 (VIDEO PILOT PROJECT)

¶ 6. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall institute a six-month pilot program to video record interviews conducted in connection with investigations of Use of Force Incidents ("Interview Video Recording Pilot"). Within 60 days of the completion of the Interview Video Recording Pilot, the Deputy Commissioner of ID ("DCID") shall prepare and provide to the Commissioner and the Monitor a report evaluating the results of the Interview Video Recording Pilot, including whether video recording interviews enhanced the quality of investigations, any logistical challenges that were identified, and any other benefits or weaknesses associated with the use of video to record the interviews. The Department, in consultation with the Monitor, shall then determine whether the Department shall require the video recording of interviews conducted in connection with investigations of Use of Force Incidents, instead of the audio recording of such interviews.

### ANALYSIS OF COMPLIANCE

The Department has achieved Substantial Compliance (as discussed in greater detail in the Fifth Monitor's Report as pgs. 96-97) by completing the requirements of this provision as the Department: (1) completed a year-long pilot program to video record interviews conducted in connection with investigations; (2) analyzed the results at pilot; and (3) concluded that videotaped inmate interviews enhanced the quality of investigations and would be implemented throughout the division. As a result, this provision is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance (per Fifth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. Preliminary Reviews: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID uses CMS to conduct Preliminary Reviews of all use of force incidents.

- As of mid-January 2020, of the 3,938 incidents that occurred during the Ninth Monitoring Period, Preliminary Reviews were officially completed in CMS (meaning all sign-offs were complete) for only 406 (10%). Of the 3,532 incidents (90%) with pending Preliminary Reviews, 1,791 (51%) are pending some level of supervisory approval, and 1,741 (49%) are pending with the investigator.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team continues to review all Preliminary Reviews[171] as they remain the most reliable source of information about use of force incidents. The Department dedicates significant time and effort to completing quality Preliminary Reviews. The Preliminary Review includes most of the core components of the investigation, including a summary of what occurred based on an assessment of available video footage as well as Staff and witness reports and inmate interviews. The number of Preliminary Reviews completed in this Monitoring Period, a breakdown of the status of those that are pending, and the general state of affairs regarding Preliminary Reviews is discussed in the Identifying & Addressing Misconduct section of the report.

Preliminary Reviews generally address the requirements of this provision and provide an accurate assessment of what occurred during an incident, even if the analysis of whether Staff engaged in misconduct is not as reliably identified. Accordingly, the Department is in Partial Compliance with the overall requirement to conduct Preliminary Reviews. However, the Department is in Non-Compliance with the timing requirement to complete Preliminary Reviews given the significant delays in completing the Preliminary Reviews.

The Intake Squad Plan, and corresponding recommendations for modifications to Consent Judgment §VII. (Use of Force Investigations), ¶¶ 7, 8, and 13, are intended to leverage and improve the work previously done as Preliminary Reviews.

| **COMPLIANCE RATING** | ¶ **7.** (timing) Non-Compliance |
|---|---|
| | ¶ **7.** (all other provisions) Partial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

---

[171] Given the backlog of completing Preliminary Reviews, the Monitoring Team's evaluation of Preliminary Reviews is a mixture of Preliminary Reviews fully completed in the system and draft versions in order to provide the Monitoring Team the ability to review incidents as contemporaneously as possible.

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Preliminary Reviewers refer cases for Full ID Investigations when they meet any of the criteria in Consent Judgment § VII, ¶ 8.

- Use of force incidents (actual and alleged) that occurred during the Sixth through Ninth Monitoring Periods and had closed Preliminary Reviews as of January 2020 were referred as shown in the chart below:

| Investigation Type | 6th Monitoring Period Incidents with Closed PR (n=2,818) | 7th Monitoring Period Incidents with Closed PR (n=2,706) | 8th Monitoring Period Incidents with Closed PR (n=1,335) | 9th Monitoring Period Incidents with Closed PR (n=406) |
|---|---|---|---|---|
| **Pending or Closed Full or PIC/Expedited ID Investigations** | 1,864 (66 %) <br> *-- 773 Pending* <br> *-- 1,091 Closed* | 1,837 (68%) <br> *-- 756 Pending* <br> *-- 1,081 Closed* | 1,093 (82%) <br> *-- 311 Pending* <br> *-- 782 Closed* | 365 (90%) <br> *-- 81 Pending* <br> *-- 284 Closed* |
| **Pending or Closed Facility Investigations** | 954 (34%) <br> *-- 12 Pending* <br> *-- 942 Closed* | 868 (32%) <br> *-- 118 Pending* <br> *-- 750 Closed* | 241 (18%) <br> *-- 49 Pending* <br> *-- 192 Closed* | 41 (10%) <br> *-- 4 Pending* <br> *-- 37 Closed* |

*Note: The table utilizes the case status as of mid-January 2020. At that time, the Preliminary Review was still pending for 6,552 incidents occurring during the Sixth through Ninth Monitoring Periods.*

## ANALYSIS OF COMPLIANCE

The chart above demonstrates the significant burden on ID compared with the Facilities—ID investigates a larger percentage of incidents compared with the Facilities and is responsible for all Preliminary Reviews. The chart above also demonstrates the dwindling utilization of Facility Investigations as they became a smaller and smaller percentage of all referrals over the Monitoring Periods depicted above.

In prior Monitoring Periods, the Monitoring Team reviewed a sample of cases referred for Facility Investigations to check that they did not qualify for Full ID Investigation as per ¶ 8 criteria,

and has consistently found the Department to be in Substantial Compliance with this provision as ID consistently refers cases for Full ID Investigations pursuant to the requirements of the provision (*see* Second Monitor's Report at pg. 97, Third Monitor's Report at pg. 144, Fourth Monitor's Report at pgs. 131-132, and Eighth Monitor's Report at pg. 148). That said, as discussed throughout this report, this requirement has created a perverse incentive to conduct further investigation even if further investigation is unnecessary—particularly because there is extensive video evidence available and significant investigation that occurs at the Preliminary Review stage. As discussed throughout this report, the line between Preliminary Reviews and Full ID investigations is arbitrary and blurry under the current framework for investigations. Accordingly, the Intake Squad Plan, and corresponding recommendations for modifications to Consent Judgment §VII. (Use of Force Investigations), ¶ 8 are expected to reflect a more reasonable list of cases subject to referral for Full ID Investigations.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS) |
|---|

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Investigators review all UOF reports and UOF witness reports as part of Preliminary Reviews, ID investigations, or Facility investigations.

**ANALYSIS OF COMPLIANCE**

This provision is addressed in this section versus the Use of Force Reporting section of the report because this requirement relates to the work of investigators.

Investigators access to UOF reports has significantly improved and the investigation paperwork demonstrates that ID investigators, in particular, closely review Staff reports. In fact, most Preliminary Reviews include transcriptions of these reports. However, the Monitoring Team has found investigations rarely cite Staff collusion in findings of their investigations. The most telling examples of collusion involve Staff Reports that are not only conspicuously similar, but also inconsistent with video evidence—demonstrating collusion in representing the incident in the same inaccurate way. While these telling examples are not prevalent, they are not always identified or pursued by investigators. As described in regard to Use of Force Reporting and Tracking, ¶ 8, while charges were *occasionally* brought for use of force reporting-related violations (including collusion) during this

| | |
|---|---|
| Monitoring Period, the frequency of such charges is not compatible with what the Monitoring Team would expect, based on the findings of its review of Staff Reports. | |
| **COMPLIANCE RATING** | **¶ 7.** Partial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.   *Timeliness* [. . .]
    b.   *Video Review* [. . .]
    c.   *Witness Interviews* [. . .]
    d.   *Review of Medical Evidence* [. . .]
    e.   *Report* [. . .]
    f.   *Supervisory Review* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID continues to conduct investigations as described in the Fourth Monitor's Report (at pgs. 132-133). ID investigators are assigned to Facility-specific teams and are responsible for conducting the Preliminary Reviews for all incidents and any cases subsequently referred for Full ID Investigation. Generally, the investigator who conducts the Preliminary Review is also responsible for the Full ID Investigation.

- All ID investigations of UOF incidents occurring during this Monitoring Period were conducted within CMS.

- ID closed 1,703 UOF investigations during this Monitoring Period.

- **Facility Referrals**:

  o ID continued using Facility Referrals during this Monitoring Period, wherein ID refers a specific issue identified in a Preliminary Review or Full ID Investigation to Facility leadership with instructions for the Facility to take appropriate action.

  o This Monitoring Period, ID tracked each Facility Referral and subsequent proof of remediation. Of the 171 Facility Referrals issued this Monitoring Period, the Facility provided a response to 52 as of mid-January 2020. Facility responses to these referrals ranged from individual corrective action (*e.g.* counseling) to Facility-wide initiatives (*e.g.* addressing a repeated failure during roll call).

- **Inmate Interviews**:

  o The Preliminary Review Division Order 06-16RA requires the investigator conducting the Preliminary Review to attempt to interview inmates involved in a use of force incident and those who witness the incident.

    o   Assigned ID investigators or Facility investigators may also interview or make subsequent attempts to interview inmates as part of their investigations of use of force incidents.

    o   *Videotaped Inmate Interviews*: Following the success of the video interview pilot, ID began utilizing body-worn camera technology in October of 2018 to offer the option to videotape all inmate interviews.[172]

### ANALYSIS OF COMPLIANCE

The sheer volume of UOF incidents that require investigation is daunting and overwhelming. Additionally, as discussed throughout this report, it is unclear whether additional investigation, beyond the Preliminary Review, is even necessary for most of these cases. The ID investigators simply have more work than can reasonably be completed in a timely manner. Their workload is only increasing over time as the number of uses of force has continued to increase. The investigators' high workloads will cause the quality of the investigations to suffer as evidence gets stale and may further lead to staff burnout, which is why the Intake Squad Plan is so critical going forward. In the meantime, the cases in the backlog must be prioritized using efficient and creative strategies to ensure serious cases are dealt with appropriately and conserving resources when cases do not require additional scrutiny.

<u>Quality of the Investigations</u>

ID investigations are generally inconsistent in quality, which has remained unchanged from prior Monitoring Periods. Given the current backlog, a marked improvement in the overall quality of investigations is unlikely to occur in the short-term as the system is simply over-whelmed. One short-term measure to address those cases that merit greater scrutiny has continued this Monitoring Period. The Use of Force Priority Squad is designed to address the most problematic cases by a team of qualified investigators in a timely manner.

- ***Use of Force Priority Squad***

The Use of Force Priority Squad ("UPS") was established in the Eighth Monitoring Period to investigate serious and egregious uses of force and/or misconduct by Staff with concerning histories of misconduct in a timely fashion. UPS includes four investigators, one supervising investigator, and one Deputy Director, all of whom were chosen based on their skill set and experience. A fact-based assessment is used to assign cases to UPS. Cases are assigned to UPS based on their severity, whether they were considered by the Immediate Action Committee, and incidents involving certain Staff that have engaged in a pattern of concerning misconduct. The Monitoring Team also makes recommendations to ID to consider cases for investigation by UPS. Finally, the number of cases

---

[172] If an inmate elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

assigned to UPS must be appropriately balanced as it is important that the division maintain a manageable caseload to ensure the group is not overwhelmed as it is critical that these cases are managed in a timely manner. UPS is a sound concept and the Monitoring Team is encouraged that ID implemented this triage initiative to address this more discrete group of cases, and that misconduct is addressed with disciplinary charges when warranted.

| All UPS Cases as of January 1, 2020 | |
| --- | --- |
| **Total Closed Cases** | **40** |
| -    *Closed with Charges* | *32* |
| -    *Closed without Charges* | *8* |
| **Total Pending Cases** | **48** |
| -    *Pending with Investigator* | *37* |
| -    *Pending Supervisor Review (Supervisor, DDI or Deputy Commissioner)* | *9* |
| -    *Pending with Law Enforcement* | *2* |
| **Total Cases** | **88** |

- ***Inmate Interviews***

The locations to conduct inmate interviews is limited and there are inherent challenges in identifying private or confidential locations. The assessment of inmate statements by investigators continues to be of mixed quality as described in prior reports (*see* Eighth Monitor's Report at pgs. 139 to 140). However, overall, the quality of inmate interviews has improved since the Effective Date, particularly related to the privacy of the setting which has an inherent positive effect on the quality of the interview. A review of recorded inmate statements revealed that interviews are being conducted with more privacy when possible and the recordings themselves (sometimes including video) are of good quality.

*Timeliness of ID Investigations*

ID is not completing investigations timely under any standard. The delay in completion of the Preliminary Reviews are part of the overall protracted timeline – making timely closure at any stage an impossibility—for example, 3,480 incidents from 2018 and 2019 have Preliminary Reviews pending beyond 120 days—meaning any subsequent ID Investigation will be closed beyond the 120-day deadline to complete Full ID investigations.

ID continues to close more cases each Monitoring Period than in prior Monitoring Periods (1,703 cases closed in this Monitoring Period, compared with 888 cases closed in the Eighth Monitoring Period, and 583 in the Seventh Monitoring Period). However, the closure rate has not kept pace with the volume of cases that are referred for Full ID investigations. The overwhelming majority of investigations have not closed within the Consent Judgment's original 180-day timeline, nor the new 120-day timeline that went into effect on October 1, 2018, and most pending cases are already pending past these deadlines. ID has 6,552 pending Preliminary Reviews, many of which are already past the

120-day deadline for Full ID cases. ID has an additional 2,010 pending Full ID cases, 76% (n=1,529) of which are 2018 incidents.

*Conclusion*

ID & Trials' leadership and their staff have been working tirelessly and demonstrated significant commitment to achieving compliance with the Consent Judgment requirements and attempting to build an effective foundation for compliance. However, the fact remains that ID is failing to close cases timely. Accordingly, the Department is in Non-Compliance with the requirement to close Full ID investigations within 120 days. As for the cases that are closed, the quality of Full ID Investigations is inconsistent and so therefore is in Partial Compliance with the other provisions in this section.

| COMPLIANCE RATING | ¶ 9 (a). Non-Compliance<br>¶ 9. (b) to (f) Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 10 (USE OF FORCE INVESTIGATIONS BACKLOG)

¶ 10. The Department shall consult with the Monitor to develop a plan to effectively and efficiently complete all ID Use of Force investigations and reviews that are outstanding as of the Effective Date. [. . .]

**ANALYSIS OF COMPLIANCE**

The Department has achieved Substantial Compliance (as discussed in greater detail in the Fourth Monitor's Report at pg. 138) by completing the requirements of this provision as the Department: (1) developed a plan to effectively and efficiently complete all Full ID investigations outstanding as of the Effective Date; and (2) executed that plan and closed all of the ID cases that were open as of the Effective Date of the Consent Judgment. As a result, this provision is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 10. Substantial Compliance (per Fourth Monitor's Report) |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In mid-June 2019, the City granted a request for additional staffing for the Investigation and Trials Division as part of the fiscal year 2020 budget cycle and awarded the Department an

additional 62 staffing lines. The Department has continued to actively hire both civilian and uniformed Staff as investigators and supervisors to fill the allocated personnel lines.

- o HR continues to recruit specifically for ID staffing positions.

- o ID interviewed almost 200 investigator, supervisor and agency attorney candidates during this Monitoring Period, and extended offers to 38 candidates—of these 38 offers, 34 individuals were onboarded, two were still pending OMB approval/background investigations, and only two individuals declined the offers. This includes the promotion of 12 investigators to investigating supervisors.

- As of the end of this Monitoring Period, ID had the following staff working in the division:

| ID Staffing Levels<br>*As of January 15, 2020* | | | | |
|---|---|---|---|---|
| **Position** | **June 2018** | **Dec. 2018** | **June 2019** | **Dec. 2019** |
| Deputy Commissioner | 1 | 1 | 1 | 1 |
| Assistant Commissioner | 1 | 1 | 1 | 1 |
| Director/Acting Director | N/A | 4 | 4 | 6 |
| Deputy Director Investigator (DDI) | 6 | 6 | 6 | 8 |
| Administrative Manager | 0 | 1 | 1 | 1 |
| Supervising Investigator | 9 | 13 | 17 | 25 |
| Supervisor ADW | 3 | 0 | 0 | 0 |
| Investigator Captain | 16 | 16 | 14 | 15 |
| Investigator Civilian | 58 | 77 | 87 | 89 |
| Investigator Correction Officer | 77 | 71 | 67 | 89 |
| Support Staff | 12 | 12 | 12 | 10 |
| **Total** | **183** | **201** | **210** | **245** |

- The chart below demonstrates the breakdown of staffing within ID, reflecting the staffing changes made to accommodate the implementation of the Intake Squad:

| Facility Team Staffing & Case Breakdown<br>*As of February 4, 2020* | | |
|---|---|---|
| **Team/Unit** | **Supervisors[173]** | **Investigators** |
| Intake Squad | 9 | 30 |

---

[173] Eight DDIs oversee these teams which are not included in the Supervisor totals in this column.

| | | |
|---|---|---|
| AMKC (3 Teams) | 2 | 16 |
| BKDC (2 Teams) | 2 | 9 |
| EMTC/NIC | 1 | 4 |
| GRVC/OBCC (2 Teams) | 4 | 14 |
| Horizon | 1 | 6 |
| MDC (2 Teams) | 2 | 14 |
| RMSC/WF (1 Team) | 1 | 6 |
| RNDC (2 Teams) | 2 | 14 |
| UPS | 1 | 4 |
| VCBC, Cts. Hosp., CJB, Trans (1 Team) | 0 | 4 |
| PREA (7 Teams) | 9 | 29 |
| Intel, Arrests, Training | 3 | 12 |
| K-9 | 1 | 8 |
| Administration and Tracking | 2 | 16 |

**ANALYSIS OF COMPLIANCE**

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. The City has provided funding to increase ID's staffing and the Department made significant efforts this Monitoring Period to recruit, interview, and hire additional investigators, supervisors, and leadership for ID. As part of this effort, the Department has dedicated reasonable resources to recruit staff to the division through social media campaigns, job fairs and other strategies to attract candidates.

34 individuals who received offers in this Monitoring Period began working—20 investigators, one confidential investigator, 12 promoted supervising investigators, and one Executive Agency Counsel, in addition to four investigator and one supervising investigator who received offers in prior Monitoring Periods. This additional staffing resulted in a significant net gain in division staff this Monitoring Period, as the Division gained a total of 35 staff this Monitoring Period. The new investigators hired are a mixture of civilian and uniform Staff. In terms of staffing, the Monitoring Team has not identified a notable distinction in the quality of work between civilian investigators and uniform Staff investigators. Many new staff for the Division are from the uniform Staff ranks, and the Monitoring Team has seen that the experience and knowledge of these Staff can be an asset to the division.

Adequate staffing to conduct investigations is critical, and the Department made significant strides this Monitoring Period to hire additional staff. This was particularly critical in order to support the creation of the Intake Squad to be implemented in the next Monitoring Period.

This is a time of significant transition within ID as the process to conduct investigations is evolving and so the staffing needs of the Division are in flux. In particular, there are certain short-term efforts that must be made to address the significant backlog of Preliminary Reviews and Full ID cases, while simultaneously implementing the Intake Squad in order to conduct more streamlined initial investigations of all incidents as well as any referrals for Full ID investigations. Therefore, in the short term, the staffing needs must meet the demand of both of these types of caseloads. However, once the backlog is closed and the Intake Squad is up and running the staffing needs will likely change again and many of the staff currently working on the backlog can be re-deployed. The goal of the Intake Squad is to complete most investigations (except the limited type to be referred to Full ID) within 25 business days, so the larger caseload in ID will be that of the Intake Squad, while less staff will be needed to handle Full ID Investigations. Therefore, while the Department continues to recruit and onboard new investigators, there will also likely be the opportunity (and need) to move staff around within the Division to meet the changing nature of the caseloads going forward. The Monitoring Team intends to work with the Department to devise a standard for adequate caseloads for investigators once reasonable progress has been made to close out the backlog of cases and the Intake Squad has been in place for a reasonable period of time. It is simply pre-mature to devise a standard for adequate caseloads at this juncture as any standards set would be arbitrary.

That said, it is clear that ID will continue to need adequate resources and so the Monitoring Team continues to strongly encourage all divisions in the agency to work collaboratively to recruit, interview, and on-board the necessary staff, as it is imperative that ID has the resources it needs, and fills the lines made available.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 12 (QUALITY CONTROL)

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- CMS includes several mandatory fields to ensure Facility and ID investigators collect and analyze evidence systematically.

- Preliminary Reviews and investigations must be evaluated by supervisors before being finalized.

- A number of initiatives are being managed within ID to triage the current caseload.

**ANALYSIS OF COMPLIANCE**

The significant backlog and increasing caseload of investigations impedes ID's ability to implement quality control systems and procedures to ensure the quality of ID investigations and reviews because the division is so overwhelmed. That said, ID has mechanisms in place to ensure supervisory review of Preliminary Reviews and Full ID investigations, which are critical components to assessing and addressing the quality of investigations. There is certainly significant back and forth between supervisors and investigators. In particular, the comparison of draft Preliminary Reviews with those ultimately closed demonstrate that feedback and guidance is provided to investigators in order to improve the quality of the Preliminary Reviews. ID's SOLStat initiative also helps to ensure those investigations that are languishing are appropriately evaluated and not ultimately lost to the SOL. The UPS division was also implemented to ensure that priority cases are managed by seasoned investigators. Additionally, supervisors at all levels are heavily involved in the ID Backlog Plan.

While the current practices demonstrate Partial Compliance, further work is certainly needed to ensure ID conducts consistent and reliable investigations, and quality control measures will be incorporated into the new Intake Investigation process, and audit plans will be developed to ensure ID leadership sample certain types of cases (*e.g.* those without charges).

| COMPLIANCE RATING | ¶ 12. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.    All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

  a. *Objectivity* [. . .]

  b. *Timeliness* [. . .]

  c. *Video Review* [. . .]

  d. *Witness Statements* [. . .]

  e. *Collection and Review of Medical Evidence* [. . .]

  f. *Report* [. . .]

  g. *Supervisory Review* [. . .]

  h. *Recommended Disciplinary Action* [. . .]

  i. *Referral to ID* [. . .]

  j. *Role of Integrity Control Officer* [. . .]

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains a standalone Facility Investigations Policy.

- CMS is used to conduct all aspects of Facility-level investigations for incidents that occurred since December 13, 2017.

**ANALYSIS OF COMPLIANCE**

The Identifying and Addressing Misconduct section of the report provides an overview of the current status of Facility Investigations.

*Timeliness of Facility Investigations* (¶ 13, (b))

Facility Investigations are required to be completed in 25 business days from the incident date. Due to the backlog in Preliminary Reviews, Facilities do not even begin their investigations until *well beyond* the 25-business day deadline, and therefore none were closed within that deadline. The time to complete Facility investigations (¶ 13(b)) is beyond both the 25 Business Days of the date the incident occurred and/or when the case is referred by the Preliminary Review. 583 Facility Investigations closed this Monitoring Period as part of the backlog project described above, and 64% (n=373) were 2018 incidents, demonstrating the very protracted timeline for completion of Facility investigations.

*Purpose and Quality of Facility Investigations* (¶ 13(a), (c), (f), (g), (h))

The Monitoring Team's assessment of Facility investigations has not changed. Overall, the Monitoring Team has consistently found that Facility Investigations fail to demonstrate: objectivity in assessing the evidence (¶ 13(a)); review relevant video (¶ 13(c)); closing reports that are supported by the evidence (¶ 13(f)); supervisory review ensuring compliance with relevant policies and procedures (¶ 13(g)); or appropriate disciplinary action in light of the evidence (¶ 13(h)) and provide no greater insight or analysis than the Preliminary Reviews. Therefore, the Department is in Non-Compliance with these requirements. This is not particularly surprising given the Monitoring Team's findings that uniform Staff at all levels continue to struggle with how to adequately implement the Use of Force policy. It is worth noting that Facility leadership will at least sometimes identify misconduct as part of the Rapid Review assessment, but that same misconduct will then go unaddressed in the Facility Investigation. Given these findings, the Monitoring Team has recommended that investigations of all incidents are conducted by ID. In anticipation of the implementation of the Intake Squad the Department's reliance on Facility Investigations has dwindled.

*Procedural Requirements* (¶ 13 (d), (e))

For the most part, Facility investigations adhere to the procedural requirements of this provision. The investigators generally, gather witness statement (¶ 13(d)) and collect and review medical evidence (¶ 13(e)) as required. Therefore, the Department is in Partial Compliance with these requirements.

*Additional Requirements* (¶ 13 (i), (j))

The Monitoring Team has not rated these provisions, ¶ 13(i)—referral to ID within two business days when information gathered during the course of the Facility Investigation establishing

that a Full ID Investigation in required, and ¶ 13(j)—role of the integrity control officer. These requirements have not been assessed and will no longer be necessary under the Intake Squad Plan.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ 13 (a)-(c), (f)-(h). Non-Compliance<br>¶ 13 (d)-(e). Partial Compliance<br>¶ 13 (i)-(j). Not Yet Rated |

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INMATES UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

  a. The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

  b. The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID created a "Horizon Youth ID Team" when Horizon opened consisting of a DDI, a Supervisor, five civilian investigators and a correction Officer investigator to investigate HOJC incidents.

  o This team conducts all use of force investigations that meet the "Full ID" criteria (as outlined in Consent Judgment § VII (Use of Force Investigations), ¶ 8) involving adolescents (both male and female, pretrial detainees and sentenced youth, age 16 or 17).

  o The Supervisor and all six investigators received the same Safe Crisis Management training as Horizon uniform Staff to provide the proper context for their UOF investigations.

  o The Department reported that the Horizon team coordinates with the New York State Justice Center when necessary to elevate incidents that may be considered abuse and/or neglect cases which the Justice Center is statutorily mandated to investigate.

**ANALYSIS OF COMPLIANCE**

*Youth ID Team & Full ID Investigations* (¶ 14, (a))

The Youth ID Team has evolved. Originally, when the 16- and 17-year old youth were housed on Rikers, ID had a dedicated team of investigators at RNDC that conducted all investigations related to UOF incidents involving *all* 16 and 17-year old youth (most of whom were housed at RNDC, but some at RMSC and a few at other facilities). Given the current backlog, there are still a small number

of cases pending with the RNDC Team that involve 16- and 17-year old youth at RNDC before they were transferred to Horizon.

With the move to Horizon, ID has now assigned a group of dedicated investigators to investigate incidents at that Facility, including conducting Preliminary Reviews. The Horizon Youth ID Team conducts all Full ID Investigations for any incidents involving adolescents since they were transferred to Horizon. The number of use of force incidents involving DOC Staff (and thus needing to be investigated by this Team) declined in the Ninth Monitoring Period (only ~150 investigations compared with 448 in the Eighth Monitoring Period) as ACS began taking over responsibilities at Horizon (as discussed in more detail in the Current Status of 16- and 17-Year-Old Youth section of this report). If an incident does not involve any DOC Staff then it is not investigated by ID, and instead is reviewed by ACS and referred to the Justice Center when necessary if it is considered abuse and/or neglect which the Justice Center is statutorily mandated to investigate.

The Horizon Youth ID Team includes dedicated staff as required by ¶ 14 and conducts all Full ID Investigations of UOF incidents involving 16- and 17-year-old youth pursuant to ¶ 14 (a). The quality of the Full ID investigations is as discussed in ¶ 9 above and assessed holistically with other Facility teams as the process for investigation is the same.

The chart below shows the current status of all 600 UOF incidents that have occurred since Horizon opened in October 2018, only ~150 of which occurred in the Ninth Monitoring Period.

| Case Status | Total as of January 15, 2020 |
|---|---|
| **Closed** | **205** |
| - *Closed – Expedited/PIC/Full ID* | - *147* |
| - *Closed - Facility Investigation* | - *58* |
| **Pending** | **395** |
| - *Pending Facility Investigations* | - *17* |
| - *Pending Full ID Investigations* | - *76* |
| - *Pending Preliminary Reviews* | - *302* |
| **Grand Total** | **600** |

*Youth ID Team Review of Closed Facility Investigations Involving Youth* (¶ 14(b))

Prior to the 16- and 17-year-olds moving to Horizon, the Youth ID Team investigators at RNDC also reviewed all closed Facility investigations involving 16- or 17-year-old male and female inmates using the Investigation Review Team ("IRT") assignment process. ID investigators were assigned to assess the quality of completed Facility investigations through IRT once they were closed. Upon recommendation from the Monitoring Team, the Department suspended the IRT process at RNDC in the last Monitoring Period so as to conserve limited resources now that the 16- and 17-year-old youth are no longer housed there.

The Monitoring Team recommended that the Horizon Youth ID Team focus on conducting Preliminary Reviews and Full ID investigations and not expand the use of IRTs at Horizon. The expansion of IRTs at Horizon was not worth the expenditure of resources (and possibly diversion of resources from Preliminary Reviews and Full ID Investigations) given the small number of Facility investigations combined with the upcoming transfer of operational control of Horizon from DOC to ACS.

*Next Steps*

The Monitoring Team has recommended that the Department prioritize closing out the pending 395 HOJC investigations in advance of the complete transfer of operational control of Horizon from DOC to ACS (*see* the Current Status of 16- and 17-Year-Old Youth section of this report). In terms of the applicability of this specific provision to the management of AOs going forward, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward (*see* a more fulsome discussion on this issue in the Current Status of 16- and 17-Year-Old Youth section of this report).

| **COMPLIANCE RATING** | **¶ 14.** Substantial Compliance<br>**¶ 14(a).** Partial Compliance<br>**¶ 14(b).** Not Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against inmates. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- ID has a dedicated PREA Team that is responsible for investigating all PREA-related allegations. While all incidents even remotely sexual in nature are referred to ID by the facilities and 311 as "PREA allegations," the PREA Team identifies which of these actually meet the definitions of sexual abuse and sexual harassment as defined by the PREA standards ("PREA reportable").[174]

---

[174] See https://www.prearesourcecenter.org/ec-item/1291/1156-definitions-related-to-sexual-abuse for the definitions in PREA standard 115.6.

Those that do not meet the definition are still investigated by the PREA Team but are identified as "non-PREA reportable."

- The PREA Team continued to include a Director, Deputy Director, eight Supervisors, 27 investigators and two administrative staff.

- ID completely erased the backlog of pending cases for this age cohort. At the end of the current Monitoring Period, three PREA reportable cases were pending, all of which were within the 120 business-day timeline for closure. All of these had a preliminary finding of unsubstantiated.

**ANALYSIS OF COMPLIANCE**

Although this provision pertains only to Young Inmates, it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations that are sexual in nature involving Young Inmates. Given that this provision targets "sexual assault," the Monitoring Team has used the PREA rubric as the best representation of the intended scope, although PREA cases also include sexual harassment in addition to sexual abuse. The Monitoring Team continues to review all closed investigations to check that the PREA/Non-PREA designation is reasonable and consults with ID whenever a difference of opinion is identified.

<u>Allegations</u>

As shown in the table below, of the 148 allegations involving Young Inmates since January 1, 2016, a total of 107 (72%) met the definition of sexual abuse or sexual harassment and were deemed "PREA reportable," while 41 (28%) did not meet the definition and were deemed "non-PREA reportable."

| Number of Allegations Involving Young Inmates, by Date of Report | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **Jan-Jun 2016** | **Jul-Dec 2016** | **Jan-Jun 2017** | **Jul-Dec 2017** | **Jan-Jun 2018** | **Jul-Dec 2018** | **Jan-Jun 2019** | **Jul-Dec 2019** | **Total** |
| **Total Cases** | **13** | **21** | **16** | **10** | **4** | **29** | **37** | **18** | **148** |
| PREA | 10 (77%) | 12 (57%) | 7 (44%) | 9 (90%) | 2 (50%) | 23 (79%) | 34 (92%) | 10 (56%) | 107 (72%) |
| Non-PREA | 3 (33%) | 9 (43%) | 9 (56%) | 1 (10%) | 2 (50%) | 6 (21%) | 3 (8%) | 8 (44%) | 41 (28%) |

*Note: PREA = allegation meets the definition of sexual harassment or sexual abuse from PREA Standard 115.6; Non-PREA = allegations of a sexual nature that do not meet the definition of sexual harassment or sexual abuse (e.g., consensual relationships, single occurrences of sexualized comments or remarks, etc.)*

During the current Monitoring Period, 18 cases were referred, 10 of which (56%) were determined to be PREA-reportable and 8 of which (44%) did not meet the PREA definition of sexual abuse or harassment. Nearly all of the PREA allegations (n=9 of 10, 90%) were from HOJC, with the remaining one from RNDC. The table below presents the number of allegations flowing from each facility for the past eight Monitoring Periods.

| Number of PREA Allegations by Young Inmates, by Facility | |
|---|---|
| | |

| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | Total (% PREA Allegations) |
|---|---|---|---|---|---|---|---|---|---|
| BXCT | ~ | ~ | ~ | ~ | ~ | 1 | ~ | ~ | 1 (1%) |
| EMTC | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| GMDC | 4 | 4 | 2 | 2 | 1 | ~ | ~ | ~ | 13 (12%) |
| GRVC | ~ | ~ | 1 | ~ | ~ | ~ | ~ | ~ | 1 (1%) |
| HOJC | ~ | ~ | ~ | ~ | ~ | 17 | 25 | 9 | 51 (48%) |
| OBCC | 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 1 (1%) |
| RNDC | 3 | 6 | 3 | 7 | 1 | 3 | 4 | 1 | 28 (26%) |
| RMSC | 2 | 2 | 1 | ~ | ~ | 2 | 5 | ~ | 12 (11%) |
| TOTAL | 10 | 12 | 7 | 9 | 2 | 23 | 34 | 10 | 107 (100%) |

Even though HOJC has been operational for only 15 months, it accounts for 48% of the allegations received for this age group over the past four years. In the Monitoring Team's experience, a high rate of allegations is typical in Facilities with high levels of disorder and that undergo significant transitions, such as those occurring at HOJC. As in the past, upon investigation, most of the allegations from HOJC were found to have been false reports, called in by an anonymous third-party or someone impersonating the alleged victim in an effort to have other youth removed from the housing unit.

Of the 10 PREA allegations made during this Monitoring Period, 3 alleged *youth-on-youth abuse* (30%), 2 alleged *youth-on-youth harassment* (20%), 4 alleged *staff-on-youth abuse* (40%) and 1 alleged *staff-on-youth harassment* (10%).

Closed Investigations

The following outcome analysis includes only those cases meeting the PREA definitions of abuse or harassment. The Monitoring Team recognized an error in its previous interpretation of the Department's PREA Policy regarding the timeline for case closure. The policy does not actually impose a deadline for closure.[175] Further, neither the Consent Judgment nor Federal PREA regulations impose a specific deadline for closing investigations. Department policy and all relevant regulations *do* expect that investigations will be completed timely. To create consistency with the Consent Judgment's requirements for other types of ID investigations, the Monitoring Team will assess the closure of PREA cases using a 120-business day timeframe. Accordingly, the Monitoring Team has adjusted its analysis of the closure of PREA cases across Monitoring Periods in the data and tables below.

As shown in the table below, the Department has significantly improved its performance in closing cases over time. Of the 20 PREA cases closed during the current Monitoring Period, 90% (n=18)

---

[175] The only timeline enumerated in the policy is a requirement that the Investigator submit the closing report to a Supervisor within 60 business days.

were closed within the 120-business day timeline and 10% were closed beyond it (n=2). The previous Monitoring Period also witnessed high rates of compliance with the 120-business day timeline (97%). Of the three PREA cases that remained pending at the end of the Monitoring Period, all were within were within the 120-business day timeline. The table below clearly shows the continued improvement in timeliness across the last eight Monitoring Periods.

| Closed PREA Investigations, by Date Closed | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | TOTAL |
| **Total PREA Cases** | 0 | 7 | 1 | 4 | 25 | 15 | 35 | 20 | 107 |
| **Timing of Investigation** | | | | | | | | | |
| *Within 120 business days* | ~ | 2 (29%) | ~ | 1 (25%) | 1 (4%) | 9 (60%) | 34 (97%) | 18 (90%) | 65 (61%) |
| *121+ business days* | ~ | 5 (71%) | 1 (100%) | 3 (75%) | 24 (96%) | 6 (40%) | 1 (3%) | 2 (10%) | 42 (39%) |
| **Outcome of Investigation** | | | | | | | | | |
| *Unfounded* | ~ | 3 (43%) | 1 (100%) | 1 (25%) | 7 (28%) | 9 (60%) | 25 (71%) | 12 (60%) | 58 (54%) |
| *Unsubstantiated* | ~ | 1 (14%) | ~ | 3 (75%) | 16 (64%) | 6 (40%) | 10 (29%) | 6 (30%) | 42 (39%) |
| *Substantiated* | ~ | ~ | ~ | ~ | 1 (4%) | ~ | ~ | | 1 (1%) |
| *Referred to the Justice Center* | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 2 (10%) | 2 (2%) |
| *Missing/Unknown* | ~ | 3[176] (43%) | ~ | ~ | 1 (4%) | ~ | ~ | | 4 (4%) |

As shown in the table above, in nearly all of the cases referred and closed to date, the PREA allegation was unsubstantiated or unfounded (n=100 of 107; 93%). In a few of these, staff were cited for other, non-PREA related policy violations. In the Monitoring Team's experience, it is not unusual for large proportions of cases to be unfounded or unsubstantiated, particularly in situations like HOJC where a large portion were determined to be false reports, though the quality of the investigation must certainly be adequate in order to feel confident about a low prevalence rate. For this reason, the Monitoring Team also assesses the quality of the investigations to ascertain whether all available evidence was collected and whether the investigators' findings were reasonable based on that evidence.

---

[176] Three of the cases closed during this Monitoring Period had outcomes that could not be easily discerned (*e.g.*, merged with another case that closed during a different monitoring period, marked closed with no specific finding).

The Monitoring Team reviewed 75% of the cases closed during this Monitoring Period (n=15 of 20).[177] The Monitoring Team prioritized cases for review where the allegation was reported and the investigation was closed during this Monitoring Period in order to obtain the most accurate view of investigators' skill, which can be difficult to assess in cases with longer closure times.

Many of the cases reviewed were false allegations, called in by an anonymous third-party or someone impersonating the alleged victim in an effort to have other youth removed from the housing unit (n=10 of the 15 reviewed). The Monitoring Team found that investigators' findings in these cases were reasonable based on the evidence. Investigators had a timely response to the scene (the same or next business day); interviewed the alleged victims and alleged perpetrators (making multiple attempts if the youth first refused) and canvassed the units for other youth witnesses, all of whom denied the substance of the allegation. Investigators asked relevant questions and followed leads as appropriate. When available, Genetec footage was consistently mined to determine whether the circumstances reported actually occurred. The need for staff interviews in order for the investigator to make a reasonable finding was present in only a very small portion of PREA allegations investigated to date. In those cases, interviews with accused staff did not generally occur until the tail end of that time period, and specific practices for interviewing accused staff and staff witnesses were difficult to discern and/or DOC was not permitted to conduct the interview (*e.g.* DOC cannot compel interviews of ACS staff). Good practice requires accused staff and staff witnesses to be interviewed and for all interviews to occur within a reasonable timeframe to promote accurate recall. The Department reports that scheduling staff interviews can pose a challenge as there are an inadequate number of attorneys available to represent staff during the interview with ID investigators. The Monitoring Team continues to encourage the Department to utilize all tactics available to conduct interviews as timely as possible. The Monitoring Team will continue to closely monitor the staff interview issue to check that delays interviewing the accused and/or the failure to interview staff witnesses do not compromise the quality of completed PREA investigations.

The ID Division has made significant strides in investigating PREA cases since the Effective Date and erased the backlog of cases related to this age group. ID has appointed dedicated and highly qualified leadership to oversee the PREA Team, which has brought an increased focus on tracking cases and conducting more efficient, higher quality investigations. The Team has also been provided additional resources and staffing. In the vast majority of cases reviewed during this Monitoring Period, the investigators' practices were sound, the findings were reasonable, and cases were closed in a reasonable time period. For these reasons, the Department is in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
| --- | --- |

---

[177] The Monitoring Team also reviewed cases classified as not meeting PREA definitions in order to assesses the veracity of those classifications.

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- The Department maintained the standalone Facility Investigations Policy issued during the Fifth Monitoring Period.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications. In the Seventh Monitoring Period, the ID Initiatives Manager did considerable work to facilitate the collection, organization, culling, and revising of these policies and procedures, including:

  - Identifying and collecting over 70 individual memos, policies, procedures, directives or communications to investigators that have been governing the work of ID;

  - Rescinding over 50 of these, and maintaining, revising or replacing all others;

  - Drafting new policies or procedures.

- ID drafted an Intake Investigations Policy in the Ninth Monitoring Period.

### ANALYSIS OF COMPLIANCE

*ID Investigations*

With support and input from the Monitoring Team, the Department promulgated an Intake Investigation Policy in support of the Intake Squad Plan early in the Tenth Monitoring Period. The Monitoring Team will work with the Department going forward to establish that there is adequate written guidance for investigators in order to implement the revised investigation process to the extent additional policies are needed.

*Facility Investigations*

The Facility Investigation Policy promulgated during the Fifth Monitoring Period addresses all of the requirements of Consent Judgment §VIII, ¶ 13. That said, this policy will no longer be necessary once the Intake Squad is implemented.

| | |
|---|---|
| *Standardized system and format for organizing the contents of investigation files* (¶ 16) | |

     The Monitoring Team has generally found that ID files are well-organized. CMS has brought even greater structure to the investigation files, standardizing the system and format for organizing the contents of investigation files, and requiring each investigation file to include the relevant documents. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Sixth Monitoring Period, for a total of 24 months.[178] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| **COMPLIANCE RATING** | ¶ **15.** Partial Compliance |
|---|---|
| | ¶ **16.** Substantial Compliance |

## 18. RISK MANAGEMENT (CONSENT JUDGMENT § X)

     The Risk Management section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The varied risks facing the Department require flexible, comprehensive, and timely responses. These measures include developing and implementing an Early Warning System (¶ 1); conducting counseling meetings between Facility leadership and any Staff Member who engages in a concerning and/or repeated use of force incidents (¶ 2); identifying systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation and disciplinary data throughout the

---

[178] *See*, Sixth Monitor's Report at pg. 114 (dkt. 317), Seventh Monitor's Report at pg. 137 (dkt. 327), and Eighth Monitor's Report at pgs. 164 to 165 (dkt. 332).

Department (¶ 6). Each of these is described in more detail below along with the Monitoring Team's assessment of compliance.

*Monitoring Team Recommendations to Modify Certain Provisions*

As part of the Monitoring Team's overall consideration of the effectiveness of certain provisions, the Monitoring Team concluded that the requirements for ¶ 2 (Counseling Sessions) and ¶ 3 (UOF Auditor) of this section of the Consent Judgment were not effectively advancing reforms and creating safer facilities for Staff and inmates. Consequently, the Monitoring Team recommends modifications to these provisions, as described below.

- *Improving and Streamlining Staff Counseling Sessions* (¶ 2)

The Monitoring Team previously reported that the current requirements for the 5003 counseling sessions as enumerated in ¶ 2 are unlikely to help the Department achieve the overarching goal of counseling sessions—to provide guidance and support to Staff to reduce unnecessary or excessive uses of force. The Department's continued high use of force rate also suggests that the thousands of 5003 counseling sessions that have been conducted to date are having minimal impact on Staff behavior, despite the significant amount of effort expended to implement this requirement.

5003 counseling meetings should be an opportunity to provide feedback and guidance on using force appropriately and to reinforce non-physical methods for resolving conflicts. Counseling is most effective when it is provided close in time to the event so Staff Members can

better incorporate the feedback and learn from the incident or change their behavior.[179] This is

stifled under the current requirements. The triggers to identify Staff for counseling enumerated in

this provision are not appropriately targeted[180] and require significant administration to identify

those Staff, which is onerous and time-consuming and ironically impedes the overall objective of

providing close-in-time counseling following Staff's use of force (*see* Eighth Monitor's Report at

pgs. 172 to 176).

      In this Monitoring Period, the Monitoring Team recommended the Department modify

this process to require Facility leadership to consider whether Staff require counseling as part of

their contemporaneous assessment of use of force incidents within the Facility through Rapid

Reviews, the ID Quickstats Weekly Reports, and the work of the Immediate Action Committee.

Intake Investigations will also be an effective tool for identifying Staff for counseling as they

will occur closer in time to the incident. This revised process will hopefully facilitate the

development of a sustainable management process that will become a natural part of the

responsibilities of Facility Leadership as they assess Staff's conduct in order to provide

necessary intervention, guidance and/or mentorship close in time to the incident.

---

[179] While a review of incidents that a Staff member has been involved in over a specific period of time may have the ability to capture patterns or trends in behavior, the arbitrary time periods and standards set of the incidents to review does not achieve that goal. Further, the requirements for an Early Warning System pursuant to § X (Risk Management), ¶ 1 is designed to identify potential patterns or trends in behavior that must be addressed.

[180] Under the current requirements of the Consent Judgment, Staff must be counseled if the Staff Member engages in three or more times during a six-month period and one of those incidents resulted in a Class A Injury to an Inmate. Further Staff qualify for *consideration* for counseling if the Staff Member is involved in three incidents in six months and one or more of those incidents results in an injury to a Staff Member or Inmate. Facilities then must determine whether a counseling session is appropriate. Unfortunately, the accumulation of incidents means that the counseling sessions may occur several months after some of the incidents actually occurred. This affects the Staff's ability to recall the specifics of the event and the reasons they made certain decisions, and thus limits the benefit of the counseling session.

- *UOF Auditor* (¶ 3)

The overall goal of this provision is to identify, address, and ultimately reduce the misuse of force. This provision was conceived and developed by the Monitor in his prior capacity as Plaintiffs' expert on the *Nunez* litigation to support the development and implementation of an internal capacity for data analysis and interpretation, beyond information flowing from investigations of individual UOF incidents, to understand and address the UOF issues that plague the agency. The Department has worked since the Effective Date to develop a variety of tools and strategies to produce reliable information on the frequency of force, the types of misconduct that are prevalent and within each Facility, the tours, locations, and people involved in these events. Thousands of stationary cameras, live-video monitoring (*i.e.,* CASC) and other structures to identify poor practice (*e.g.*, Rapid Reviews, Preliminary Reviews) have created sufficient venues for identifying both the misuse of force and the operational failures that underlie it, as they occur.

Over the four years of the life of the Consent Judgment, it has become clear that two components of this provision have imposed unnecessary requirements. First, the requirement that the function for analysis rests solely with a single individual is unnecessary and cumbersome.[181] Of course, the Department must have the internal capacity for data analysis and interpretation, but this responsibility does not need to rest solely with one individual. In fact, during the past four years, it has become clear that the volume of work is simply untenable for a single person. Further, the quality of analysis would likely benefit more from a collective effort rather than

---

[181] At various points during the Consent Judgment, the Department has appointed different individuals to serve as the UOF Auditor.

being limited to a single person's interpretation and ideas. Second, the requirement for "quarterly reports" is unnecessarily specific, as a variety of report types (*e.g.*, statistical, analytical, problem-specific, etc.) produced at different intervals (*e.g.*, monthly, annually, *ad hoc*) will be necessary for the Department to adequately assess its use of force practices. The Department needs greater flexibility in how it codifies the analysis so that solutions can be developed and implemented contemporaneously. For this reason, the Monitoring Team does not believe the specific reporting time frame needs to be mandated by the Consent Judgment. Accordingly, the Monitoring Team has proposed Consent Judgment modifications to address these two issues.

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Early Intervention, Support, and Supervision Unit ("E.I.S.S.") remains in the Department's Administration Division. The E.I.S.S. unit is led by an Assistant Commissioner, and supported by civilian and uniformed Staff. As of the end of the Monitoring Period, two uniform Staff and one civilian were assigned to E.I.S.S. The Division actively recruited a Deputy Director during this Monitoring Period and also recruited for additional uniform Staff to support E.I.S.S.'s work.

- The work of E.I.S.S. remains codified in Directive 5003R-C "Monitoring Uses of Force."[182] The Directive includes specific triggers for E.I.S.S. to identify Staff who are then screened to determine whether they should be placed on monitoring.

- <u>Triggers to Identify Staff for Screening for Potential Monitoring</u>:

  o The triggers to identify Staff for screening include an assessment of Rapid Reviews, imposition of formal discipline and PDRs, 5003 counseling history, consideration by the Immediate Action Committee, UOF litigation settled for amounts over $50,000, and imposition of Command Disciplines. These sources are analyzed at regular intervals depending on the criteria (*e.g.*, bi-weekly, bi-monthly, or monthly).[183]

  o E.I.S.S. also receives referrals from Facility leadership, the Chiefs, Department executives, and the Monitoring Team for Staff to be considered for screening.

- <u>Screening Staff to Determine Whether to Place on Monitoring</u>:

  o Once Staff are identified, they are considered for E.I.S.S. monitoring via a review of their history with the Department, including, but not limited to, their assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, and an assessment of recent use of force incidents. The purpose of the screening is to determine whether the E.I.S.S. monitoring program could improve a Staff Member's performance.

- <u>Staff Placed on Monitoring</u>:

  o Monitoring a Staff Member is a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command.

  o E.I.S.S. maintained a standardized notification process to advise Staff of their placement on monitoring. The Staff Member's command provides Staff with the E.I.S.S. notification letter. The Staff Member then meets with the Assistant Commissioner of E.I.S.S. and E.I.S.S. staff to discuss the reason for their placement on monitoring, an overview of the monitoring program, and expectations of the Staff Member during the monitoring period. The Staff Member's use of force history (including videos of recent

---

[182] This policy was revised and this updated version was promulgated at the end of the Ninth Monitoring Period. The policy changes primarily addressed modifications to identifying staff for counseling meetings, as described further in the box for ¶ 2 below, but also included the addition that PDRs will serve as a trigger to screen Staff for E.I.S.S.

[183] Preliminary Reviews are no longer utilized as a *trigger* to identify candidates for screening because reviewing the Preliminary Review for every incident involving a potential candidate is time consuming and unduly burdensome. However, if a Staff Member is ultimately *screened* for Monitoring, E.I.S.S. staff review the Preliminary Reviews of all UOF incidents involving that Staff Member.

uses of force) and the Use of Force and Chemical Agents directives are also reviewed during this meeting.

o   The Facility Leadership are expected to meet with Staff on monitoring on a monthly basis and must also provide monthly written progress reports to E.I.S.S. The Facility leadership is also responsible for reviewing any incident in which the Staff on monitoring uses force and discuss those incidents during the monthly meetings.

▪   E.I.S.S. staff also routinely meet with Wardens and other uniform leadership to outline their responsibilities in supporting the Staff in E.I.S.S. monitoring in their Facilities. E.I.S.S. staff share information on the Staff Member's use of force history with the Facility command.

o   E.I.S.S. staff meet every other month with all Staff Members in monitoring in small groups to review example use of force incidents and discuss best practices in order to provide additional guidance to Staff.

• The table below depicts the work of E.I.S.S. during this Monitoring Period and the overall progress of the program since its inception in August 2017:[184]

| Overview of EISS Work – July 2017 to December 2019 | | | |
|---|---|---|---|
| | 8th Monitoring Period | 9th Monitoring Period | Program to Date |
| Screening | | | |
| Staff Screened[185] | 92 | 229 | 566 |
| Staff Selected for Monitoring[186] | 27 (29%) | 83 (36%) | 199 (35%) |
| Monitoring | | | |

---

[184] E.I.S.S. began in July 2017, but the more systematic work of E.I.S.S. began in Summer 2018.

[185] Screening numbers for each Monitoring Period include some Staff who were screened in prior Monitoring Periods and were re-screened in this Monitoring Period. The totals number reflects the total number of individual Staff screened. Staff who have been re-screened are only counted once.

[186] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff have subsequently left the Department before monitoring began. Other Staff have not yet been placed on monitoring because they are extended leaves of absence (*e.g.* sick or military leave). A few Staff were not placed on monitoring in this Monitoring Period because they had not yet returned from a suspension, but will be placed in the program upon their return. Finally, E.I.S.S. does not begin a Staff's monitoring term if the Staff Member has subsequently been placed on a no inmate contact post because there are limited opportunities for mentorship and guidance.

| | | | |
|---|---|---|---|
| Staff Began Monitoring Term | 12[187] | 29 | 132 |
| Staff Actively Monitored[188] | 91 | 96 | |
| Staff Completed Monitoring | 22[189] | 45 | 80 |

**ANALYSIS OF COMPLIANCE**

*Overview*

The goal of E.I.S.S. is to identify and support Staff whose pattern and/or practice in engaging in UOF would benefit from additional guidance or mentorship in order to improve practice and minimize the possibility that Staff's behavior escalates to more serious misconduct. E.I.S.S. uses a variety of triggers to identify Staff with concerning practices and/or problematic behaviors, and the screening process is designed to determine whether a *pattern* or *trend* in the Staff's behavior exists such that the monitoring program could best address this concerning behavior.

In addition to appropriately identifying Staff for monitoring, the success of E.I.S.S.'s monitoring program relies on the quality of mentorship and leadership at the Facility-level to counsel, guide, and reinforce best practices with Staff who need extra support. E.I.S.S. staff have worked diligently to provide the Facilities with a foundation to support appropriate monitoring. However, as described throughout this report, the Department's lack of consistent and appropriate Staff supervision at the Facility-level negatively impacts the effectiveness of this program. It appears that Facility Leadership are aware of the program as they recommend Staff to be considered for monitoring,[190] and are required to participate in monitoring of Staff within their command. However, the quality of their participation varies significantly across Facilities. The monitoring program can only be effective in shaping Staff's behavior with adequate, consistent Facility mentorship. The quality of the Facilities' mentorship and guidance must improve, this is particularly important as more Staff are enrolled in E.I.S.S. monitoring over time (twice as many Staff were screened during this Monitoring Period as compared to the Eighth Monitoring Period, which led to more Staff identified for enrollment in the program).

---

[187] This includes two Staff Members who resigned in the Eighth Monitoring Period.

[188] The total number of Actively Monitored Staff for each Monitoring Period include all Staff who initiated monitoring in this period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started) during the entire period.

[189] This includes three Staff Members who either resigned or were dismissed while actively engaged in the E.I.S.S. Monitoring program in the Eighth Monitoring Period.

[190] In this Monitoring Period, leadership from four Facilities referred 32 Staff for consideration for EISS.

Improving the quality of monitoring remained a priority for E.I.S.S. during this Monitoring Period. E.I.S.S. continued the initiatives designed in the Eighth Monitoring Period to supplement Facility-level responsibility by: (1) holding initial introductory meetings with all Staff placed into Monitoring and providing them with the expectations of the monitoring program at an in-person meeting; (2) conducting bi-monthly meetings with Staff in monitoring to assess Staff Members' performance, discern where deficiencies continue to exist, and identify what assistance is needed, such as training or improved supervision; and (3) identifying additional training opportunities that may be available for Staff. These efforts by E.I.S.S. are necessary, but this process cannot be fully outsourced by the Facilities.

*Identification of Staff for Screening & Screening Staff*

The source triggers are the first step in identifying Staff who may benefit from E.I.S.S. monitoring, while screening Staff who meet the triggers is the second step. The goal of utilizing this two-step process is to ensure that the resources utilized for screening individual Staff are focused on Staff more likely to benefit from monitoring in order to best conserve resources. E.I.S.S. improved the process for identifying Staff who meet the triggers, and ensuring those Staff are screened accordingly. More specifically, E.I.S.S. staff began to consistently evaluate Staff with completed PDRs and those involved with settled UOF litigation.

E.I.S.S.'s evaluation of the triggers resulted in the identification of 229 Staff who were then screened in this Monitoring Period. 83 (36%) of the 229 Staff that were screened were ultimately selected for the monitoring program. As shown in the table below, the two newly utilized categories—PDRs and settled UOF litigation—made up a significant portion of those Staff screened in this Monitoring Period.

| Source Trigger | *Screened* in 9th Monitoring Period | *Selected* in 9th Monitoring Period |
|---|---|---|
| Command Requests | 32 | 5 (16%) |
| Recommendations from Immediate Action Committee | 24 | 11 (46%) |
| Settled UOF Litigation[191] | 51 | 3 (6%) |
| PDRs (extension/demotion) | 53 | 48 (91%) |
| Other (finalized formal discipline, disciplinary probation, etc.) | 69 | 16 (23%) |
| **Total** | **229** | **83 (36%)** |

The Monitoring Team reviewed a sample of Staff screened in the Monitoring Period and were *not* selected for monitoring, and found the determination by E.I.S.S. not to place the Staff Member in monitoring were generally reasonable. These findings, as well as the data identified above, suggest that

---

[191] The trigger criteria for this source is Staff whose claims against them settled for over $50,000.

some source triggers are better at identifying Staff with a potential pattern of misconduct than others. Certain triggers appear to identify certain misconduct that either was isolated or occurred in the past and no subsequent (and more contemptuous misconduct) was identified. For instance, Staff with finalized formal discipline are screened, but most of the finalized discipline is for incidents that occurred more than a year ago. The screening forms reviewed for Staff that fall in this category suggest that Staff with single finalized disciplinary action, without any additional triggers, may not be the best indicator of a pattern of misconduct that would benefit from E.I.S.S. monitoring. An evaluation of the trigger for Staff involved in litigation that settled over $50,000 with no other triggers also does not appear to be a fruitful trigger on its own.[192] The Monitoring Team recommends that E.I.S.S. consider refinements to its evaluation of triggers to ensure that the resources deployed for screening will better identify and capture Staff that could benefit from monitoring. Another area that requires careful consideration are how to address Command Requests for consideration to E.I.S.S. Only five of the 32 Staff referred to E.I.S.S. through Command Requests were placed on monitoring. The Department reports that many of these Command Requests appear to be motivated by a finding that Staff simply have engaged in a large number of UOF. While the number of incidents a Staff Member has been involved in may be one consideration for E.I.S.S., it is important to consider the nature of these incidents, the appropriateness of those incidents and other issues to determine whether monitoring is needed.

The Monitoring Team will work with E.I.S.S. going forward to improve this process.

*E.I.S.S. Monitoring*

During this Monitoring Period, 96 Staff were engaged in the monitoring program, 29 of whom were enrolled during this Monitoring Period. Of these 96, 45 Staff (47%) completed monitoring during this Monitoring Period. The monitoring program is a joint effort between E.I.S.S. and the Facilities, as described above.

- *Monthly Warden Forms*

The Monitoring Team reviewed the Monthly progress reports completed by the Warden for July, August, September, and October 2019 for 19 Staff Members on EISS Monitoring during the Ninth Monitoring Period. The first page of the progress report includes general information about the Staff Member as well as areas to describe progress or issues for each Staff Member followed by pages

---

[192] The underlying cases for the settled litigation are often many years old, and many Staff who were involved in a UOF with settled litigation have subsequently had *no* recent use of force history. Additionally, the complaints related to incidents resulting in settled litigation may name multiple Staff Members, all of whom are screened for E.I.S.S., but some of these Staff Members may not all have been the primary actor in the incident which was the basis for the claim.

which include information about any incidents the Staff Member were involved in. The Staff Member and the Warden are also required to sign the form and confirm that a monthly meeting took place.

The progress reports were inconsistently submitted by the respective Wardens. Only one of the 19 Staff Members reviewed had completed progress reports for all four months. In most cases, the progress reports were submitted every other month. In terms of the description of the UOF incidents, they generally appear to repeat the findings from the Rapid Review or they do not appear to be fully completed. The signature line for the Staff Member is not consistently utilized—sometimes the Staff's name is just written in without an actual signature, raising a question as to whether monthly meetings occur as required. That said, for many forms reviewed, the Staff Member was not involved in any use of force incidents, so limited analysis on the forms is understandable. Overall, these forms are often pro-forma and it is simply difficult to ascertain based on their content whether any real substantive guidance is provided during these sessions. While the progress reports do provide some insight into the overall quality of the monitoring program, it does not provide the full picture, especially when the progress reports are not completed as thoroughly as they could be. Although improved progress reports certainly will certainly support a better record of these touch points, it is equally important to consider the Staff's overall conduct. As discussed in more detail below, a review of certain Staff that have completed the Monitoring Program suggest that they have obtained and implemented improved practices related to the use of force.

- *Completion of Monitoring*

45 Staff completed monitoring during the Ninth Monitoring Period. The Monitoring Team reviewed a sample of the completion of monitoring memorandums created by E.I.S.S.[193] The memos describe the Staff's behavior and progress while on E.I.S.S ("Completion of Monitoring Forms"). Of those Staff who completed monitoring during the Ninth Monitoring Period, there are examples of Staff who appear to have successfully improved their approach and adherence to the Use of Force Directive as well as a few examples of Captains whose overall supervisory skills appeared to have improved. This improvement will not only impact the individual Staff Member, but will support improvement in management and conduct of their subordinates going forward.

The Monitoring Team reviewed the Completion of Monitoring Forms for 13 Staff who completed monitoring in the Ninth Monitoring Period. These forms are designed to explain how the Staff member successfully completed monitoring. These forms provide a qualitative assessment of the incidents the Staff was involved in, an overall assessment and analysis of how the Staff Member did while on monitoring, and identifies any specific actions that were taken to address the issues which

---

[193] E.I.S.S. staff have reported to the Monitoring Team that one Staff on monitoring requested voluntary extension of their monitoring program because they felt very supported during the program and was not yet ready to cut off that extra support and attention.

precipitated the Staff Member's placement on monitoring (*e.g.* identifying if a Staff Member's post was changed, and/or if the Staff Member received specific re-trainings).

Overall, these Completion of Monitoring Forms demonstrated thoughtful assessment of the Staff's conduct during the monitoring term. In some cases, Staff Members were still involved in multiple uses of force while on monitoring, but those uses of force were found to be necessary and appropriate and often demonstrated that the Staff Members had improved in their approach to using force. These findings are a positive indication of the effectiveness of the monitoring program. Ultimately, most Staff will need to utilize force as part of their duties so obtaining a better understanding on when and how to use force appropriately is a key element to reforming Staff behavior. In other cases, the forms for certain Staff Members had less substantive information because the Staff Members had simply not been involved in many or any use of force during the course of their monitoring term. In these cases, Staff's attitude is a telling indicator of their willingness to modify their behavior, and so the assessment focused on whether the Staff Member had been generally receptive to the mentorship and counseling provided through EISS and from their Facility Leadership.

*Staffing for E.I.S.S. Unit*

Obtaining the necessary staffing E.I.S.S. has proceeded slowly and the Division is still not fully staffed. During this Monitoring Period, a Deputy Director was hired and the candidate will begin working in March 2020. The Deputy Director is expected to help coordinate and support Facility leadership in monitoring Staff as well as support the management of identifying Staff for monitoring. E.I.S.S. suffered a few staffing losses this Monitoring Period when a Temporary Duty Captain returned to their parent command and one Officer retiring. This reduced the unit's uniformed Staff level from four (two Captains and two Correction Officers) to two (a Captain and a Correction Officer). The Department is working to fill these positions.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall

track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The 5003 counseling process remained as described in the Fourth Monitor's Report (at pg. 154) until August 2019.

- The Directive 5003R-C "Monitoring Uses of Force" was revised and promulgated at the end of the Ninth Monitoring Period to incorporate the recommendations from the Monitoring Team (discussed in the introduction to this section).

  o The policy continues to require mandatory counseling for Staff who have been involved in three of more UOF incidents in the preceding six months when one of the incidents resulted in a Class A injury to an inmate as a result of force by a Staff member).

  o Under the revised directive, Commanding Officers now consider whether a Staff member should be counseled when evaluating *every* UOF incident (as part of the Rapid Review process) instead of considering Staff for counseling only if they were involved in three or more Class B or C uses of force within six months (*i.e.*, discretionary 5003 counseling meetings).

- NCU is responsible for identifying the Staff who require mandatory counseling on a bi-monthly basis and compiling the 5003 data, as described in the Eighth Report (at pgs. 172-173).

  o In October 2019, NCU streamlined its reporting to only include the number of Staff who met the mandatory criteria for counseling and the number of Staff who received a counseling session. NCU continued to analyze the Class A incidents and only consider in its reporting the Class A incidents that meet the specific criteria of ¶ 2 (Staff member was involved in a use of force resulting in a Class A injury to inmate).

  o NCU also continued to track and follow-up with Facility Leadership regarding the use of counseling meetings recommended through Rapid Reviews.

- During this Monitoring Period, Facilities delivered mandatory counseling to 58 Staff who met criteria for a Class A session. Facilities also chose to deliver discretionary counseling to 436 Staff who met criteria for 5003 counseling.

| Ninth Monitoring Period 5003 Counseling Data | | | |
|---|---|---|---|
| | Mandatory Counseling | | Discretionary Counseling |
| Month of Evaluation | Number of Staff who qualified | Number of Staff counseled | Number of Staff counseled |
| *August 2019* | 20 | 19 (95%) | 426 |
| *October 2019* | 14 | 12 (86%) | [194] |

[194] The Department ceased the discretionary counseling sessions after August 2019 in response to the Monitoring Team's recommendations.

| December 2019 | 30 | 27 (90%) | |
|---|---|---|---|
| **TOTAL** | **64** | **58 (95%)** | **426** |

**ANALYSIS OF COMPLIANCE**

Counseling sessions required by the Consent Judgment are termed "5003 counseling sessions" in reference to the Directive that codifies the requirements. As discussed in the Eighth Report (at pg. 173), counseling sessions are not disciplinary, but rather an opportunity to provide feedback and guidance on using force appropriately and to reinforce non-physical methods for resolving conflicts. The Department continued to conduct the mandatory counseling sessions required by this provision. However, given the Monitoring Team's findings that the current requirements for the 5003 counseling sessions were not achieving the desired effect and recommendations to revise the counseling meeting process going forward, the Department transitioned away from identifying Staff for consideration of 5003 discretionary counseling sessions part way through the Monitoring Period. Instead, the Department focused only on mandatory counseling sessions and counseling meetings that were recommended through Rapid Reviews, Facility Referrals or other referral sources. The Monitoring Team supported this approach as expending effort on a process that was clearly not working was simply an ineffective use of resources. Accordingly, The Monitoring Team analyzed a sample of mandatory counseling sessions (described below) and considered counseling as a Staff management tool through its routine assessment of all UOF incidents and the Department's responses to identified misconduct.

*Identifying Staff who Require Counseling*

- ***Mandatory Counseling Sessions***

Counseling sessions are required if, at any time during a six-month period, Staff was involved in three or more UOF incidents and one resulted in a Class A Injury to an inmate. The Department reports that 58 Staff met the mandatory counseling criteria and were counseled in this Monitoring Period. The Monitoring Team defers to the Department's assessment of which Staff met the criteria for mandatory counseling, based on audits completed in previous Monitoring Periods.

- ***Discretionary Counseling Sessions***

In total, 744 Staff were counseled in this Monitoring Period either through the 5003 assessment or identified through Rapid Reviews. In August 2019, 426 Staff received discretionary 5003 counseling, determined via the original requirement for discretionary meetings. An additional 318 Staff were identified for counseling via Rapid Reviews of incidents occurring between August and

December 2019, either through a counseling session or corrective interview.[195]. Also, a handful of Staff were counseled in response to Facility Referrals from ID and the Immediate Action Committee

*Evaluating the effectiveness of counseling sessions*

This provision is extremely difficult to assess. The overall quality of 5003 counseling sessions is very difficult to measure, and the Monitoring Team has struggled to identify an appropriate methodology. A Staff Member's use of egregious force after a counseling meeting is not necessarily an indicator of a poor counseling meeting. The Staff member may simply require more intensive management or scrutiny. Similarly, any improvement in a Staff Member's conduct post-counseling may not have been due to the counseling meeting. In addition to this, observation of a counseling session by the Monitoring Team will inevitably have a chilling effect on the counseling meeting and will impact the ability to have an open and honest dialogue and thus negating the value of the counseling meeting.

In this Monitoring Period, the Monitoring Team reviewed the 20 Staff who had a mandatory counseling meeting in August 2019 to get a general sense of their conduct following the counseling meeting. All 20 Staff that were counseled were subsequently involved in UOF between September and December 2019, three were involved in 10 or more UOF following the counseling session. Of these three Staff Members, one Staff member was involved in a UOF incident that appeared somewhat concerning, this finding, along with other factors, resulted in a recommendation by the Monitoring Team to screen this Staff member for E.I.S.S. Out of the remaining 17 Staff who had been involved in less than 10 UOF incidents in the intervening period, the Monitoring Team identified three of these Staff who had each been involved in at least one concerning incident. Two of the Staff had engaged in potentially concerning behavior and one Staff Member was involved in a concerning incident that resulted in a Corrective Interview from the Facility and was recommended for retraining by ID. Overall, these findings are more descriptive than explanatory. Beyond ascertaining what these Staff Members were involved in post counseling, the Monitoring Team has limited ability to draw conclusions about patterns, trends or the effectiveness of counseling meetings more broadly, without intimately tracking the behavior of the Staff Members on a day to day basis, both before and after the counseling meeting.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

---

[195] Corrective Interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. Counseling sessions (including 5003 counseling sessions) are not considered disciplinary in nature and are not included in a member's personnel file.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.

    c.    The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID continues to assess UOF incidents on a weekly basis at AMKC, GRVC, MDC, NIC/WF[196], OBCC and RNDC. The ID Quickstats Weekly Reports include the following:

  - <u>General Metrics</u>: (1) total use of force incidents, (2) head strikes, (3) use of force when an inmate is already in restraints, (4) OC spray, (5) reason for force, (6) Staff repeatedly involved in force, and (7) inmates repeatedly involved in force;

  - <u>Incident Characteristics and Trends</u>: time of incident (including tour), location of incident, reason for force and primary use of force type;

  - <u>Qualitative Assessment by ID</u>: ID prepares a summary of the majority of incidents that occurred during the week with a focus on problematic incidents and/or incidents where ID and the Facility (based on the Rapid Review) have differing conclusions about the incident. The summary includes a description of both the Facility's and ID's findings and any misconduct identified. These summaries also identify any operational deficiencies that may have led to the need for force. To the extent that the Facility's and ID's assessments differ, ID provides an explanation of the differences and the basis for ID's conclusion.

---

[196] ID combines the assessment of any UOF incidents at NIC and West Facility into one report.

> ▪ A select number of these cases are discussed at weekly *Nunez* meetings, and in other forums such as TEAMs and Operational Leadership meetings.

- Facility Leadership conducts "Rapid Reviews" of all UOF incidents captured on video within each Facility. Each incident is assessed for the following: (1) whether the incident was avoidable, and if so, how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) whether the incident involved painful escort techniques; and (5) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type.

- Towards the end of the Monitoring Period, the Department began to construct a Facility-Risk Dashboard with the goal to support data-driven decision-making processes in the Department. This dashboard offers snapshots of key use of force information across all facilities to provide high-level analysis of hotspots and use of force trends in each command.

- The Department began to pilot the development of UOF action plans for each Facility. The UOF action plans are created by Facility leadership, in conjunction with analysts from the Strategic Planning Unit and are reviewed and approved by the Chief of Staff and Commissioner before implementing. The action plans outline initiatives to address UOF-related concerns. Each Facility is assigned an analyst from the Strategic Planning Unit to support the roll-out of the plan.

**ANALYSIS OF COMPLIANCE**

These two provisions (§ X., ¶ 3, § V., ¶ 20) are addressed together because maintaining consistent and reliable data combined with the qualitative assessment of this data form the foundation upon which the Department can design and enact problem-specific solutions to its UOF issues.

*Use of Aggregate Reports to Enhance Oversight* (§ V., ¶ 20)

As demonstrated throughout this report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and Inmate-on-Inmate Fight Tracker to identify opportunities to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with UOF or inmate-on-inmate fights or assaults. As such, the Department is in Substantial Compliance with this provision.

*UOF Auditor* (§ X., ¶ 3)

The Monitoring Team has recommended changes to this provision to address certain structural limitations of the original language that had imposed unnecessary requirements and detracted from the intended goal of this provision, as described in the Efforts to Advance Reforms & Address Areas of Concern section and introduction to this section of the report.

The Department has achieved the first stage of reform, with sufficient data to understand the dimensions of the problems it is facing. The Department can now produce reliable information on the

frequency of force, the types of misconduct that are prevalent in the Facility, and the shifts, locations, and people involved in these events. However—a lack of Staff skill and a failure to effectively supervise and coach these Staff—has stymied the Department's ability to effectively use the resources and information that is available to produce the necessary change in practice. Not only must the misuse of force be identified, but an effective response to the poor practice must occur so that Staff handle a similar situation appropriately in the future (*i.e.*, a situation identified as avoidable after the fact should then be avoided in the future).

The Department has several good sources of information to identify UOF trends (*e.g.*, NCU, ID Quickstats Weekly Reports, Facility Risk Dashboards). The Monitoring Team evaluated all of ID's Quickstats Weekly Reports from the current Monitoring Period and they remain a valuable tool for reviewing use of force incidents close in time to when they occurred, particularly in light of the ID backlog. However, the ultimate value of these reports lies in how Facility leadership utilizes the information produced and addresses the issues that are raised. A gap remains between the Facilities' conception of "problematic uses of force" and that of ID and Trials (as described in detail in the Identifying and Addressing Misconduct section of this report), which suggests greater emphasis is needed within the Facilities to address the issues identified in these reports. As described in the Identifying and Addressing misconduct section of this report, the Rapid Review process provides Facility leadership an opportunity to conduct a close in time assessment of use of force incidents and whether an immediate response is necessary, but improvement is needed by the Facility leadership in routinely and consistently identifying all unnecessary and/or avoidable force.

There is significant potential for both the Facility-Risk Dashboard and UOF action plans to highlight Facility-specific contributors to problematic uses of force and to provide the Facilities with the necessary Departmental support to develop problem-specific initiatives to address each issue. Although this initiative only began at the end of the Monitoring Period, the Monitoring Team is encouraged by the initial information shared thus far.

| **COMPLIANCE RATING** | ¶ **20.** Substantial Compliance<br>¶ **3.** Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel continues to provide the Department with quarterly reports of lawsuits filed and settled. During this Monitoring Period, the report from July to

December 2019 was shared with the Department. The reports include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum of the lawsuit and description of the lawsuit.

- The Office of the Comptroller continues to provide the Department with reports regarding the payment of claims related to UOF incidents. During this Monitoring Period, the report covering July to December 2019 was shared with the Department.

- E.I.S.S. staff consolidated the information from the Office of the Corporation Counsel report listed above and identified all UOF-related cases from the July to December 2019. For UOF cases, E.I.S.S. obtained relevant information (*e.g.,* UOF incident numbers, Facility, Staff names, Staff shield number and classification of all injuries), and as described in ¶ 1 above, began screening Staff this Monitoring Period for placement into E.I.S.S. monitoring if their claims were settled for an amount greater than $50,000.

- The City has settled a total of 245 lawsuits with Use of Force related claims between January 1, 2016 and December 31, 2019 for a total of $15,854,180. These claims cover incidents that occurred between 2008 and 2018.

| UOF Settlement Cases<br>Cases Settled between January 1, 2016 and December 31, 2019<br>(Incident occurred between 2008 and 2018) | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Settlement | Jan. to June 2016 | | July to Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Total | |
| Total | 25 | | 25 | | 34 | | 33 | | 36 | | 43 | | 25 | | 24 | | 245 | |
| 0 to $9,999 | 8 | 32% | 5 | 20% | 7 | 21% | 19 | 58% | 13 | 36% | 15 | 35% | 15 | 60% | 8 | 33% | 85 | 35% |
| $10,000 to $49,999 | 13 | 52% | 15 | 60% | 22 | 65% | 10 | 30% | 17 | 47% | 18 | 42% | 6 | 24% | 12 | 50% | 98 | 40% |
| $50,000 to $99,999 | 1 | 4% | 4 | 16% | 3 | 9% | 4 | 12% | 2 | 6% | 7 | 16% | 3 | 12% | 1 | 4% | 21 | 9% |
| $100,000 or more | 3 | 12% | 1 | 4% | 2 | 6% | 0 | 0% | 4 | 11% | 3 | 7% | 1 | 4% | 3 | 13% | 16 | 7% |

| Total Amount Settled | $ 1,976,500 | $ 827,500 | $ 1,906,500 | $ 584,250 | $ 5,529,480 | $ 1,586,000 | $ 2,042,300 | $ 1,401,650 | $ 15,854,180 |
|---|---|---|---|---|---|---|---|---|---|

### ANALYSIS OF COMPLIANCE

The required information continues to be shared with Department on a routine basis, E.I.S.S. analyzed the July to December 2019 data and has developed a process to review this information routinely. By implementing a routine process for receiving and reviewing litigation information related to Use of Force incidents, the Department maintains Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 5 (ID INVESTIGATIONS OF LAWSUITS)

¶ 5. The Office of the Corporation Counsel shall bring to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation. ID shall review such allegations and determine whether a Full ID Investigation is warranted.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel reports that it continues to provide the Department with a list of all complaints relating to the excessive use of force and requests all investigation files and associated evidence.

- The assigned DOC Legal Division attorney evaluates each use of force allegation received to confirm whether an investigation has already been conducted. If a previous investigation cannot be confirmed, the DOC Legal Division attorney notifies a designated Assistant General Counsel who then shares the information with ID to consider whether a Full ID Investigation is warranted.

- During this Monitoring Period, the Department was notified of three lawsuits involving alleged excessive force that had not already been subject to an ID investigation. All three had passed the SOL and as such, ID declined to open investigations into these incidents.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team confirmed the above processes are still in place. The Department's process to identify a potential unreported UOF allegation that was not previously investigated via allegations made in a lawsuit is reasonable and adequate. The Office of the Corporation Counsel brings to the Department's attention allegations of excessive use of force in a lawsuit that have not been subject to a Full ID Investigation, and ID considers those allegations to determine if a Full ID investigation is warranted. Since the pendency of the Consent Judgment, the Law Department has alerted the Department of nine allegations of excessive force through lawsuits which had not previously been investigated. Five of the nine allegations had passed the statute of limitations. Out of the four allegations where the SOL had not passed, ID opened an investigation into one of these allegations. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Second Monitoring Period, for a total of 46 months.[197] The Department's sustained compliance has abated prior deficiencies, so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

---

[197] *See*, Second Monitor's Report at pgs. 121 to 122 (dkt. 291), Third Monitor's Report at pgs. 171 to 172 (dkt. 295), Fourth Monitor's Report at pg. 159 (dkt. 305), Fifth Monitor's Report at pg. 117 (dkt. 311), Sixth Monitor's Report at pgs. 121 to 122 (dkt. 317), Seventh Monitor's Report at pgs. 149 to 150 (dkt. 327), and Eighth Monitor's Report at pg. 180 (dkt. 332).

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)

¶ 6. By August 31, 2017,[198] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains a Case Management System that has functionality for tracking use of force incidents and use of force investigations.

- The Department has conducted all Preliminary Reviews, Facility Investigations, and ID investigations in CMS for incidents that occurred on December 13, 2017 or later. The Department also uses CMS to generate and track Command Disciplines.

### ANALYSIS OF COMPLIANCE

The development and implementation of the Case Management System was an enormous undertaking by the Department. It required significant coordination across various divisions within the agency and across the Facilities. This system has changed the way the Department conducts investigations and maintains relevant paperwork.

The Department achieved and has maintained Substantial Compliance with these provisions since the Seventh Monitoring Period. They successfully developed a computerized system to conduct use of force investigations and to impose related discipline (the system is described in the Sixth Monitor's Report at pgs. 123-124)). Further, CMS created the ability to review and aggregate incident- and investigation-specific information as required by § V. ¶ 18. As described in detail in the Eighth Monitor's Report at pgs. 181-182, the system's implementation does have challenges and requires

---

[198] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* Dkt. Entry 297).

some modification. The long-term sustainability of CMS requires sufficient elasticity so it can be modified to improve efficiency when conducting investigations (*e.g.* particularly regarding the new Intake Squad). Unfortunately, the Department does not have the internal capability to make changes within CMS which must be made through the vendor either as change orders for items previously approved (which carries an additional expense) or to correct deficiencies within the system. Either way, contracting issues with the vendor have halted the Department's ability to make any changes to the system.

In the interim, the Department created workarounds to address some of these issues, which supported the implementation of the Intake Squad early in the Tenth Monitoring Period. These interim solutions are adequate to capture most of the investigative work, but impact the ability to adequately track data that needs to be captured (for which the Department is instead relying on manually updated spreadsheets). The Department and Monitoring Team will continue to discuss modifications needed within CMS to implement the Intake Squad going forward, and work to develop a path forward to enable those modifications within the framework of CMS.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance<br>¶ 18. Substantial Compliance |
|---|---|

### 19. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Meaningful, consistent, and timely accountability is critical to deterring Staff from using excessive and unnecessary force and is a key component to ensuring Staff at all levels are fulfilling their duties. Active management and supervision are required to ensure Staff adequately complete their work, which includes guidance, training, counseling, and imposing discipline (when appropriate). The Identifying & Addressing Misconduct section of this report provides an overview of the various ways the Department ensures Staff are held accountable, including discipline. This section focuses on the Department's efforts to impose discipline (including PDRs, NPAs, and OATH Trials) after the misconduct has been identified and the investigation has been completed.

The overall imposition of discipline is hindered by the significant delays and missteps between the incident itself and the various precursors to the disciplinary action. Nearly all (99%)

of the formal discipline imposed as of January 15, 2020 for *tenured* Staff is for misconduct in incidents that occurred prior to January 2019, as discussed in detail in the Identifying and Addressing Misconduct section of this report. Further, formal discipline has only been imposed on three *tenured* Staff for incidents that occurred in this Monitoring Period. While the Department has improved its systems for imposing and tracking Staff discipline, in many cases, the process remains quite protracted, particularly for formal discipline. The failure to dependably identify misconduct and the backlog at the investigations stage mean that the Department's efforts to impose both informal and formal discipline are often unreliable and delayed, both of which undermine the ability to impose meaningful discipline.

- *Formal Discipline & OATH*

The Trials Division prosecutes cases for formal discipline of UOF violations committed by *tenured* Staff[199] by evaluating investigations that sustained UOF violations and drafting and serving charges as appropriate. The Trials attorney prepares discovery and seeks a disciplinary outcome either through a settlement or at Trial. The adjudication of discipline for *tenured* Staff has been delegated by the Department to the Office of Administrative Trials and Hearings ("OATH"), an administrative law court that conducts adjudication hearings pursuant to New York State Civil Service Laws § 75. The Administrative Law Judge ("ALJ") adjudicates any contested discipline the Department seeks to impose for *tenured* Staff. As an initial matter, the ALJ conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement cannot be reached, then a trial is scheduled in which an ALJ (and a different ALJ from the one that

---

[199] Tenured Staff are staff that have successfully completed their probationary period. The probationary period for Correction Officers is 2 years and the probationary period for Captains and Assistant Deputy Wardens is one year.

conducted the pre-trial conference) will assess the evidence to evaluate whether or not the Staff

member has violated policy. The ALJ will issue a written decision. If the ALJ determines that a

violation occurred, then the decision will also include a proposed penalty. The range of penalties

that the ALJ may recommend are set by law and include a reprimand, a fine of up to $100, a

suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[200]

Accordingly, most of the discipline imposed by DOC (either through settlement or following a

trial) is within this range of penalties. The Commissioner has the authority to accept the factual

findings and penalty recommendation of the ALJ or to modify them, as appropriate, in order to

resolve the case. The Commissioner's determination (and imposition of discipline as warranted)

is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

Although only a very small proportion of cases are ultimately adjudicated at a trial, a

large number of UOF-related disciplinary cases have an initial conference with an ALJ to discuss

the matter in an attempt to settle the case. Trials staff report that the proportion of Staff who

request a pre-trial conference, versus settling the matter before the case is reviewed by an ALJ,

continues to increase. At these pre-Trial conferences, the ALJ opines on the matter, the evidence,

and the impact of precedent on how these cases should be resolved. Conferences generally occur

one day each week and thus a limited number of slots are available (generally 12 or less).[201]

Therefore, it can sometimes take months before the initial conference is scheduled. Following a

conference, nearly all cases settle via NPA, but those that do not incur extensive delays to

schedule the trial.

---

[200] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[201] It is important to note that these OATH proceedings are utilized for any discipline the Department is seeking. This includes UOF and non-UOF related misconduct so these conferences do not exclusively address UOF related discipline matters.

The Monitoring Team remains concerned about the application of OATH precedent and the interplay with the New Use of Force Directive and Disciplinary Guidelines. These cases were decided under an entirely different framework and are simply not applicable to the evaluation of recent incidents which are subject to the current Use of Force Directive and the new Disciplinary Guidelines. A review of some recent OATH decisions and as well as guidance provided by ALJ's during pre-trial conferences suggest that the application of precedent on current cases has resulted in disciplinary outcomes that are not always proportionate to Staff misconduct and are not consistent with the New Use of Force Directive or the Disciplinary Guidelines. This impacts the Department's ability to impose meaningful discipline (via NPAs or after a trial) as required by the Consent Judgment (*see* Seventh Monitor's Report at pgs. 151 to 159).

The Monitoring Team's September Recommendations (as described in the Introduction of this report) recommended that the City ensure that OATH decisions are aligned with the requirements of the Consent Judgment and do not undermine the City and the Department's efforts to impose proportionate and meaningful discipline. Further, and equally important, the Monitoring Team recommended that the City ensure the OATH process is more efficient – long delays to schedule pre-trial conferences and trials only serve to undermine the overall goals of the Consent Judgment and therefore must be addressed. This includes, but is not limited to, increasing the number of slots available for pre-trial conferences, developing mechanisms to ensure pre-trial conferences can occur more timely, and identifying a process to prioritize certain cases on the OATH calendar.

The Monitoring Team's assessment of compliance is below.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶¶ 1, 2(e) (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of

Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

¶ 2.

    e.   If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department has various structures to ***identify*** misconduct:
  - Close-in-time to the incident via Rapid Reviews, Preliminary Reviews (and corresponding Facility Referrals), and the Immediate Action Committee.
  - Through Facility investigations and ID investigations.
- The Department has various structures to ***respond*** to misconduct including:
  - Corrective interviews, counseling, re-training, Command Discipline, and suspension.
  - Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff, and PDRs for probationary Staff.
- The Department convenes the Immediate Action Committee to evaluate cases that meet the criteria of ¶ 2(e), as well as other concerning cases, close in time to when they occur. The committee considers whether immediate action should be taken (*e.g.*, suspension, modified duty) as well as whether the case should be expedited for investigation.

## ANALYSIS OF COMPLIANCE

    ¶¶ 1 and 2(e) are addressed collectively because when read together, they require timely, adequate, and meaningful discipline. The Identifying and Addressing Misconduct section of this report provides an in-depth assessment of the Department's accountability measures and the current state of affairs. The Department does not impose appropriate or meaningful discipline timely enough to achieve compliance with ¶ 1. The issues discussed in the Identifying & Addressing Misconduct section of this report expands on the ways the Department has not been able to successfully identify or address misconduct.

    With respect to the imposition of formal discipline for tenured Staff, only 211 NPAs were imposed during 2019. This number represents less than half of the 483 NPAs imposed in 2018. This significant reduction in the number of NPAs is particularly alarming given that no reduction in the level of misconduct has occurred. Not only is the reduction in the *amount* of formal discipline alarming, it is further compounded by the fact that 85% of the 211 NPAs were imposed in response to misconduct that occurred at least a year before the NPA was issued. This, along with the findings discussed throughout this report, demonstrates that the mechanisms to identify and address misconduct are deficient and must be corrected to better identify misconduct ***and*** ensure more efficient and timely

imposition of appropriate sanctions. **This is absolutely essential in establishing accountability in the system, which is sorely lacking.**

As for addressing certain misconduct in a more immediate fashion (per ¶ 2(e)), the Department has sustained the progress it made in the Eighth Monitoring Period in the imposition of corrective action from Rapid Reviews and the Immediate Action Committee, including suspensions and modifications of duty. While the Department is more consistently *imposing* immediate responses to identified misconduct, this process still does not consistently *identify* all cases that would merit an immediate response. Improving identification of cases that merit an immediate response, and therefore addressing more cases through the Immediate Action Committee review, is critical because it helps ensure more meaningful discipline and avoids the delay of discipline caused by the investigation backlog.

A multi-faceted response is needed to address these findings. The upcoming implementation of the Intake Squad is expected to support improved and timely identification of misconduct. Depending on the misconduct, and the available evidence, cases can then be closed with charges and sent to the Trials Division. Further, the Monitoring Team has recommended that the Department shore up its practices to identify misconduct through improvements to the Rapid Reviews, more concerted reviews by Intake Investigators, and an increase focus by leadership to identify these types of cases. This will allow the Department to address misconduct in a more timely manner and ensure appropriate discipline is imposed. In order to improve the processes related to formal discipline for *tenured* Staff, as discussed above, the Monitoring Team has also recommended improvements to the OATH process to ensure that decisions are consistent with the requirements of the Consent Judgment and that there is sufficient availability of ALJ's.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Non-Compliance<br>¶ **2(e).** Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgment (*see* pgs. 25-26 of the Consent Judgment for the full text).

- The range of disciplinary responses available for:

- o *Tenured* Staff are the use of a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5 compensatory days), the loss of compensatory days via an NPA or OATH decision,[202] placement on disciplinary probationary,[203] demotion, or termination.

- o *Probationary* Staff are the use of a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5 compensatory days), and formal discipline is generally determined through the PDR process which allows for the probationary period to be extended either for 3 or 6 months,[204] demotion (if a Captain or ADW)[205] or summary termination for a Correction Officer. Probationary staff can also be referred for formal discipline (as noted in the bullet above) via the Trials Division instead of imposing discipline through the PDR process.

- *Tenured Staff*: As of the end of the Monitoring Period, at least 1,625 cases were submitted to Trials for incidents involving tenured Staff that occurred since the Effective Date.[206] As of the end of the Monitoring Period, the Trials Division had received about 618 cases related to incidents that *occurred* after October 27, 2017[207] (at least 100 of these cases were received during the current Monitoring Period) and therefore the imposition of discipline for this misconduct is governed by the Disciplinary Guidelines. Of these 618 cases, 479 (78%) remain pending. Of the 139 (22%) cases that had been closed as of December 31, 2019, 84 were closed

---

[202] The number of days that may be forfeited is generally capped at 60 days which is the maximum number of days that can be imposed via the OATH process pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3. However, Staff may agree to settle a disciplinary matter (outside of the OATH process) for more than 60 days.

[203] A Staff member may agree to settle for a term of disciplinary probation. However, pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3, a term of disciplinary probation may not be imposed via the OATH process.

[204] The probationary period may also be extended for any period of time the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[205] Probationary Correction Officers may be terminated via PDR. However, probationary Captains and ADWs may only be demoted via PDR, if termination is sought then this must be completed through formal discipline process.

[206] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and a half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November 2015.

[207] As of the end of the Monitoring Period, the most recent incident pending with Trials occurred on October 27, 2019.

during this Monitoring Period (60% of all cases closed). Of the 139 closed cases, 122 (88%) were resolved with an NPA and 17 (12%) were administratively filed or deferred prosecution.

- _Probationary Staff_: At least 203 PDRs[208] were submitted for incidents involving probationary Staff that occurred since the Effective Date through the end of the Monitoring Period (27 of these cases (13%) occurred during this current Monitoring Period). Of these 203 cases, 174 (86%) resulted in a determination, 14 (7%) Staff resigned, and 15 (7%) Staff tenured.[209] This includes the 60 PDRs submitted in the current Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The Department is required to "act in accordance with the Disciplinary Guidelines." As the disciplinary process is different for probationary and tenured Staff, the Monitoring Team addresses them separately below.

_Probationary Staff_

As discussed in the Identifying & Addressing Misconduct section of this report, the Department has maintained its improved processing of PDRs, which is now a more consistent and reliable mechanism for imposing discipline for probationary Staff. The enhancements to this process and additional layers of oversight have resulted in more reasonable outcomes that are consistent with the requirements of the Consent Judgment.

During this Monitoring Period, 60 PDRs were submitted (the largest number of PDRs submitted in a single Monitoring Period), 23 by a Facility and 37 by ID. PDRs submitted by ID include a recommendation for either extension of probation for a period of three or six months, demotion or termination. PDRs submitted by the Facility simply identify the misconduct and the determination is made by the First Deputy Commissioner (after consultation with the Deputy Commissioner of ID & Trials). All PDRs submitted during the Ninth Monitoring Period were decided by January 15, 2020 as outlined in the chart below.

| Submission of PDRs and Outcome<br>_As of January 15, 2020_ | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date PDR Submitted | Nov. 2015-<br>Dec. 2016 | | Jan. to<br>June 2017 | | July to<br>Dec. 2017 | | Jan. to<br>June 2018 | | July to<br>Dec. 2018 | | Jan. to<br>June 2019 | | July to<br>Dec. 2019 | |
| Total | 7 | | 17 | | 19 | | 38 | | 27 | | 35 | | 60 | |
| Demotion | 0 | 0% | 0 | 0% | 2 | 11% | 1 | 3% | 3 | 11% | 0 | 0% | 4 | 7% |
| Extension of Probation - 3 Months | 0 | 0% | 0 | 0% | 0 | 0% | 5 | 13% | 4 | 15% | 4 | 11% | 10 | 17% |
| Extension of Probation - 6 Months | 2 | 29% | 9 | 53% | 5 | 26% | 21 | 55% | 12 | 44% | 10 | 29% | 30 | 50% |
| Termination | 2 | 29% | 3 | 18% | 4 | 21% | 8 | 21% | 5 | 19% | 15 | 43% | 5 | 8% |
| Deferred Decision | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 5% |

---

[208] The tracking of PDRs vastly improved beginning in January 2017. However, the historical issues in tracking this information may mean that additional PDRs were submitted prior to January 2017 and were not tracked appropriately.

[209] _See_ Sixth Monitor's Report at pgs. 37 and 38, Seventh Monitor's Report at 49 to 50, Eighth Monitor's Report at 59 to 60.

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 2 | 6% | 0 | 0% |
| No Action | 1 | 14% | 0 | 0% | 1 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% |
| Resignation | 0 | 0% | 1 | 6% | 1 | 5% | 1 | 3% | 2 | 7% | 4 | 11% | 5 | 8% |
| Tenured | 2 | 29% | 4 | 24% | 6 | 32% | 2 | 5% | 0 | 0% | 0 | 0% | 1 | 2% |

Over 80% of the 60 PDRs submitted in this Monitoring Period resulted in some form of discipline. The Monitoring Team found that the majority of the disciplinary recommendations from ID were reasonable and were ratified by the First Deputy Commissioner. The First Deputy Commissioner deviated from ID's recommendations in four cases: in two cases, more significant discipline was imposed than what ID recommended and in the other two, the Department elected not to impose the recommended discipline (termination in one case, and demotion in the other). In the case of the recommended termination, the circumstances were convoluted and the Department ultimately elected to proceed with an MOC. In the case of demotion, the Commissioner personally evaluated the case and determined that demotion was not appropriate. Overall, the PDR outcomes are appropriate and reasonable and deviations from recommendations are generally reasonable and isolated.

Eleven of the 60 PDRs submitted during this Monitoring Period did not have a final outcome, due either to a deferred decision (n=3; 5%),[210] a decision for "no action" (n=2; 3%), Staff tenuring (n=1; 2%) or resigning (n=5; 8%).

Five Staff resigned before the PDR could be imposed, an issue the Monitoring Team has begun to monitor more closely.[211] ID recommended termination in one case, the extension of probation in another case, and three cases were referred by the Facility.[212] Staff Members certainly have the right to resign from their position at any time for any reason, and the Department advised the Monitoring Team that the Department does not offer probationary Staff Members the opportunity to resign rather than be subjected to termination. Resignation during a probationary period is not necessarily surprising given that the Staff Member may decide the position is not a good fit, especially in cases where Staff may have displayed problematic behavior. The Department reported that when any Staff resigns with a pending PDR, a copy of the PDR is placed in their personnel file and the resignation will be coded as "resigned with charges". However, the Monitoring Team found that such coding does not always occur

---

[210] All three of these PDRs related to one Staff Member. ID submitted a fourth, and final, PDR regarding this Staff Member in the Tenth Monitoring Period.

[211] In total 14 Staff Members have resigned before the PDR could be imposed since the Monitoring Team has started to monitor this issue. Of those 14 Staff Members, the PDR had recommended termination in five of those cases.

[212] PDRs referred by the Facility do not include a recommendation on how to proceed. In these cases, the First Deputy Commissioner consults with the Deputy Commissioner of ID & Trials on the appropriate outcome.

as required. The Monitoring Team intends to closely scrutinize HR's coding of personnel resignations going forward.

One Staff Member tenured before the PDR could be processed and therefore any discipline must now go through the formal disciplinary process. In this case, the PDR was submitted very close in time to the Staff Member's tenure date. The Department made efforts to process this case expeditiously, but the short timeframe allowed the Staff Member to tenure before the discipline was finalized. While the Monitoring Team has expressed great concern in prior Monitor's Reports about situations where Staff Members tenure before PDRs can be imposed, [213] this case appears to be an anomaly and does not suggest that further refinements are needed to the system. It is worth noting that the backlog of cases pending with ID has resulted in at least a few cases where a Staff Member tenured before a PDR memo could even be submitted by ID for processing. In these cases, an MOC will need to be drafted to address the identified misconduct.

The probationary period is a critical juncture in a Staff Member's career. During this time, Staff learn the responsibilities and expectations of their position and are evaluated for their fitness for the role. The Department now routinely processes the PDRs, which is an important first step. However, one final issue that must be addressed is ensuring that Staff Members are advised about any use of force related misconduct that results in a determination for the extension of probation. Staff Members are told that their probation has been extended, but often are not advised of the specific issues and concerns that resulted in the extension. The Department reports it intends to work on a solution during the next Monitoring Period.

_Tenured Staff_

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together. The ultimate imposition of discipline is not siloed within the Department and is also impacted by the OATH process. The Monitoring Team remains concerned that the OATH process impacts the Department's ability to impose timely and meaningful discipline as discussed in the narrative above and in the last two reports (_see_ Seventh Monitor's Report at pgs. 151 to 159 and Eighth Monitor's Report at pgs. 62, 184, 187).

- **Imposition of Discipline for Tenured Staff**

The number of cases resulting in NPAs increased to 127 during this Monitoring Period from 73 during the last Monitoring Period, a 74% increase. However, the number of cases closed is less than the number closed in most of the previous Monitoring Periods. As for NPA dispositions, as demonstrated below, Trials has eliminated the use of an NPA with a Command Discipline that requires

---

[213] _See_ Sixth Monitor's Report at pgs. 36 to 39.

a hearing at the Facility, in response to a number of concerns outlined in prior Monitor Reports. Any NPA for a Command Discipline now includes a specified number of days up to five days.

| Penalty Imposed by NPA by Date of Trials Closing Memo | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | 4th Monitoring Period | | 5th Monitoring Period | | 6th Monitoring Period | | 7th Monitoring Period | | 8th Monitoring Period | | 9th Monitoring Period |
| Total | 170 | | 216 | | 279 | | 202 | | 73 | | 127 |
| Refer for Command Discipline | 23 | 14% | 44 | 20% | 35 | 13% | 30 | 15% | 2 | 3% | 0 | 0% |
| Retirement or Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 5% | 3 | 2% |
| 1-5 days | 7 | 4% | 24 | 11% | 69 | 25% | 80 | 40% | 13 | 18% | 35 | 28% |
| 6-10 days | 6 | 4% | 25 | 12% | 38 | 14% | 29 | 14% | 6 | 8% | 18 | 14% |
| 11-20 days | 37 | 22% | 48 | 22% | 53 | 19% | 24 | 12% | 19 | 26% | 33 | 26% |
| 21-30 days | 30 | 18% | 36 | 17% | 34 | 12% | 22 | 11% | 8 | 11% | 14 | 11% |
| 31-40 days | 8 | 5% | 6 | 3% | 15 | 5% | 3 | 1% | 6 | 8% | 12 | 9% |
| 41-50 days | 16 | 9% | 9 | 4% | 20 | 7% | 11 | 5% | 2 | 3% | 0 | 0% |
| 51+ days | 35 | 21% | 20 | 9% | 13 | 5% | 0 | 0% | 13 | 18% | 12 | 9% |

*Disciplinary Continuum*

The Department must impose disciplinary sanctions that are proportional to the severity of Staff misconduct, and thus a continuum of options is required. The volume and type of cases pending before Trials has evolved given the expansion of cases investigated by ID. Trials used to generally only receive referrals for discipline in the cases with more significant misconduct as these were the majority of cases investigated by ID. The types of misconduct referred to Trials now reflects a broader spectrum of violations as the types of cases investigated by ID has broadened.

Certain incidents will require the imposition of significant discipline, including demotion, resignation or termination. While the Monitoring Team has continued to only identify a few cases that may meet the criteria of the mandatory termination provisions (¶ 2(d)(i) to (iv)), the Department is not limited to seeking termination on the cases that meet the standards enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases where a significant penalty of demotion or termination could appropriately be sought given the level and/or pattern of misconduct and for the Department to meet its commitment of a zero-tolerance policy for excessive and unnecessary force.[214]

---

[214] *See* § IV. (Use of Force Policy), ¶3(a)(iii) of the Consent Judgment.

Formal discipline has been imposed in at least 851 instances (involving approximately 660 individual Staff Members) on *tenured* Staff for misconduct related to incidents that occurred between the Effective Date and January 15, 2020. Of these 851 cases, 173 cases (20%) involved the imposition of significant discipline for 30 compensatory days or more,[215] or resulted in an NPA for irrevocable retirement/resignation, or termination as demonstrated in the chart below.

| Significant Discipline Imposed for Misconduct Related to UOF Incidents that Occurred Post November 1, 2015 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date Discipline Imposed | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Total |
| **30 to 39 Days** | 3 | 8 | 23 | 15 | 7 | 13 | **69** |
| **40 to 49 Days** | 3 | 8 | 10 | 10 | 3 | 0 | **34** |
| **50 to 59 Days** | 0 | 4 | 4 | 0 | 11 | 6 | **25** |
| **60 Days** | 3 | 8 | 6 | 0 | 5 | 6 | **28** |
| **61 days or more** | 3 | 0 | 0 | 0 | 0 | 0 | **3** |
| **Irrevocable Retirement** | 2 | 3 | 1 | 1 | 2 | 1 | **10** |
| **Irrevocable Resignation** | 0 | 0 | 0 | 0 | 1 | 2 | **3** |
| **Termination** | 0 | 0 | 1 | 0 | 0 | 0 | **1** |
| | 14 | 31 | 45 | 26 | 29 | 28 | **173** |

The Department cannot unilaterally terminate a tenured Staff Member as Staff Members are entitled to due process. The Department may *seek* termination at OATH, which can then be granted either through the OATH trial (and accepted by the Commissioner) or through an Action of the Commissioner following the completion of the OATH trial.[216] The Department reports that Staff facing significant discipline and/or the likelihood of termination sometimes choose to resign or retire rather than risk being terminated. In these cases, the Department may elect to settle the case with the Staff member for irrevocable retirement or resignation. The Monitoring Team considers these cases as essentially the same as those resulting in termination because they have the same effect of separating the Staff member from the Department.

Finally, some Staff may choose to leave the Department with charges pending and no resolution. In these cases, the Department defers prosecution. Since January 1, 2017, the Department deferred prosecution for a total of 25 cases related to incidents occurring since November 1, 2015. Of these 25 cases, in at least 7 cases, the Department identified serious misconduct. In all cases the Staff

---

[215] The maximum penalty that can be imposed by law via the OATH process is 60 days. Accordingly, the Monitoring Team considers imposition of discipline for 30 days or more to be a "significant penalty."

[216] The Staff member can appeal a decision of termination.

had resigned from the Department, but the Monitoring Team intends to closely scrutinize this process further going forward.

In terms of discipline for *probationary* Staff via PDR determinations, the Department has limited options. The table below shows the outcome of the 203 completed PDRs over the life of the Consent Judgment (separated between the 174 PDRs with substantive decisions and the 29 PDRs that were not decided due to external factors). In the majority of cases (112 of 180; 62%) the probationary period of the Staff member was extended.

| PDR Determinations between January 1, 2017 and January 15, 2020 | | |
|---|---|---|
| **Grand Total** | | **203** |
| Demotion | 10 | 6% |
| Extension of Probation - 3 Months | 23 | 13% |
| Extension of Probation - 6 Months | 89 | 51% |
| Termination | 42 | 24% |
| MOC | 3 | 2% |
| Deferred Decision | 3 | 2% |
| No Action | 4 | 2% |
| *Total* | | *174* |
| | | |
| Resignation | 14 | 48% |
| Tenured | 15 | 52% |
| *Total* | | *29* |

In terms of significant discipline imposed, the Department has imposed 159 NPAs with compensatory days of 30 days or more, 14 *tenured* Staff have separated from the Department as a result of UOF related misconduct (either via termination or irrevocable resignation/retirement), 10 *probationary* Supervisors have been demoted and 41 *probationary* Correction Officers have been terminated as a result of UOF-related misconduct. Given the backlog of investigations, certain cases remain pending that appear to involve serious misconduct that will likely merit the imposition of significant discipline, but discipline has not yet been imposed.[217] In other cases, the inconsistent identification of misconduct means there are at least some cases involving serious misconduct that may not be identified as such and therefore the disciplinary outcome may not be proportional to the violation.

---

[217] The Monitoring Team has identified certain cases that may meet this criteria and recommended that they are considered on a priority basis by the Department to resolve these matters.

An assessment of whether the Department has acted in accordance with the Disciplinary Guidelines is complex. It is further complicated by the backlog of pending cases, which impacts the ability to identify whether the Department is consistently acting in accordance with the guidelines and the meaningfulness of the discipline given the delays in concluding the case. In this Monitoring Period, the Department resolved 70 (55%) of the 127 NPAs for incidents that took place on or after October 27, 2017, the date the Disciplinary Guidelines came into effect.[218] The Monitoring Team assessed a sample of these cases in which the Monitoring Team had identified objective evidence of wrongdoing. In the majority of cases reviewed, the outcomes appeared consistent with the Disciplinary Guidelines. However, in at least some of these cases, the outcomes did not appear consistent with the Disciplinary Guidelines, despite objective evidence that suggested a more significant penalty should have been sought. Further, while many disciplinary outcomes are reasonable, the Monitoring Team has found that some examples (generally those cases with mid-range misconduct) result in discipline on the lower level of the spectrum of severity, when higher disciplinary responses would have been expected for the identified misconduct. This suggests that while the Department has made strides in acting in accordance with the Disciplinary Guidelines, additional work is needed in order to achieve Substantial Compliance.

*Conclusion*

The Department has a system in place to discipline both probationary and tenured Staff that addresses identified misconduct on a continuum depending on the severity of the violation. While discipline is imposed, the Department still struggles to consistently apply discipline that is proportional to the misconduct and therefore is in Partial compliance with this requirement. The Monitoring Team continues to encourage the Department to employ the full spectrum of disciplinary sanctions, including termination, when merited by the level and/or pattern of misconduct.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2. (a) to (d)** (Develop Guidelines) – Substantial Compliance<br>**¶ 2. (a) to (d)** (Act in Accordance with the Guidelines)<br>   • *Probationary Staff* – Partial Compliance<br>   • *Tenured Staff* – Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.      If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative

---

[218] The Monitoring Team also assessed the discipline imposed for incidents that occurred prior to October 27, 2017 and thus the new Disciplinary Guidelines did not apply. Generally, the outcome of those cases were reasonable with the exception of a small number of cases.

findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

b.   If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

c.   The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Referral for Discipline
    - <u>Tenured Staff</u>: The majority of cases referred for discipline come from ID once the investigation is closed. ID and Trials coordinate on certain cases where formal discipline is to be imposed in an effort to either fast track certain cases or to ensure that charges are served before the Statute of Limitations expires. In some cases, Trials will draft and serve charges before receiving the official MOC in order to ensure timely service. The Facility serves almost of the charges and ID staff serve the balance of any charges.
    - <u>Probationary Staff</u>: Discipline for probationary Staff is conducted through a PDR. Either the Facility or ID may submit a memo to HR seeking a PDR determination. The PDR is then evaluated and approved by the First Deputy Commissioner and/or the Commissioner.[219]
    - The Facilities can also refer MOCs to Trials if the Facility found that the case merits charges.
- Formal Disciplinary Process
    - Trials drafted and served 398 charges, as described on pgs. 176-177 of the Fourth Monitor's Report, in this Monitoring Period.
    - Trials leadership reported it continues to emphasize timely service of discovery.

---

[219] In certain cases, the First Deputy Commissioner must consult with ID before making a determination. There are also cases in which the Commissioner must review and approve the PDR.

    o   Trials reported that it continued to settle cases through Fast Track, Off-Calendar Dispositions, and settlements after pre-trial conferences between OATH.

    o   Trials completed 185 closing memos during this Monitoring Period.

         ■  The Off-Calendar Disposition ("OCD") process[220] remains in place and all cases are evaluated for a possible NPA without appearing before OATH.

         ■  Trials closed 15 cases via Fast Track in this Monitoring Period.

    o   A total of 663 use of force cases were pending at the end of the Monitoring Period (30 are pending final approvals and 17 are on hold pending law enforcement conducting an investigation on whether to bring criminal charges).

**ANALYSIS OF COMPLIANCE**

*ID Referrals* (¶ 3(a))

    The Consent Judgment requires the Deputy Commissioner or Assistant Commissioner to approve any investigations that recommend charges or PDRs within 30 days of the investigation's completion date. As discussed in the Eighth Report, the Monitoring Team has found that the final approval of charges or PDRs does occur, with occasional delays. Given the overall delays in completing the investigation, the final approval of the investigation is often significantly later than the incident date.

*Facility Referral of MOC to Trials* (¶ 3(b))

    The Facilities can refer cases for PDR directly to HR for *probationary* Staff and formal discipline or *tenured* Staff directly to Trials as the result of a completed Facility Investigation, although they rarely do so. The Monitoring Team has not assessed compliance with this provision given that the types of cases referred for Facility Investigation are lower level misconduct and therefore rarely warrant formal charges, and because Facility Investigations are being phased out.

*Trials* (¶ 3(c))

    The Monitoring Team's assessment of the Department's ability to impose appropriate and meaningful discipline is evaluated in ¶ 2 above. This assessment focuses on the work within the Trials division.

    ●  *Deferred Prosecution*

    The Department defers prosecution when a Staff Member retires or resigns while charges are pending. In this case, a letter is placed in the Staff Member's file that charges are pending, but could not be adjudicated because the Staff Member has left the Department. The case will be re-opened and prosecuted if the Staff Member does return to work at the Department. The Monitoring Team has

---

[220] This process was developed in the Fifth Monitoring Period as a strategy to address Trials' backlog and to address cases with charges drafted and served, that are assigned to a Trials attorney, but are not cases where the Department is seeking severe penalties or termination. Trials' attorneys and respondents negotiate cases meeting OCD criteria, circumventing the need to appear at OATH.

previously reviewed deferred prosecution cases and found the deferrals occurred because the Staff Member had retired or resigned with charges pending. In this Monitoring Period, five cases resulted in deferred prosecutions.

- *Administratively Filed Cases*

Cases are administratively filed when the Trials division determines that the charges cannot be substantiated (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence). All such cases are reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Commissioner of ID & Trials.

The Monitoring Team reviews all such cases. The number of cases administratively closed increased in this Monitoring Period from eight during the Eighth Monitoring Period to 23 during the Ninth Monitoring Period. Of the 23 cases administratively closed in this Monitoring Period, the reason that 19 were administratively filed was reasonable—for example, in some cases the evidence provided at the OATH conference exonerated the respondent, in another example the MOC was filed erroneously and duplicative of another case. Seven of these 19 cases related to two use of force incidents. In one incident, charges for three Staff were administratively filed because the ADW on the scene pled guilty to the issue at hand (failure to properly restrain the inmate). In the other incident, charges for four Staff were administratively filed because it was determined that the reporting error was due to an administrative issue. In a few cases, the charges were drafted and brought to preserve the statute of limitations but then further examination of the facts, or additional information learned in subsequent MEO-16's brought ID to a different conclusion so charges were no longer recommended by ID.

In four cases the Monitoring Team found that administratively filing the case and not pursuing charges was *questionable*. In two cases, experts from the Training Academy were consulted by the Trials Division and concluded the conduct was permissible under the Use of Force Directive so charges were not pursued. It was arguably reasonable that Trials dismissed these cases given the expert findings, but the expert's determination about the conduct was unreasonable and not consistent with the Use of Force Directive—an issue discussed further below. In two other cases, both related to the same incident, the Trials Division determination not to pursue charges did not appear reasonable as the evidence suggested that OC spray was utilized on a passive inmate and Staff made false reports.

Overall, the determination to administratively file cases does appear reasonable and so the Department remains in Substantial Compliance with this requirement. The small number of cases that have raised questions does not suggest that the Department has deviated significantly from the relevant requirements. The Monitoring Team shared the findings of this assessment with the leadership of the Trials Division and intends to discuss these cases in the next Monitoring Period to minimize these deviations in the future.

- *Expert Witnesses and Consultation*

The Trials Division's development of the disciplinary case may involve consultation and/or findings of expert testimony to establish whether the Staff Member's conduct violated the relevant policy. These experts include staff from the Training Academy and ESU leadership who develop and teach Staff on the relevant policy requirements (*e.g.,* Use of Force Policy, Chemical Agents). The experts may evaluate the Staff Member's conduct and opine on whether there is a violation. The Monitoring Team has identified circumstances in which the expert finding is not consistent with the conclusion of the ID investigation. The Monitoring Team intends to evaluate these cases more closely to assess the reasonableness of these determinations. Further, the Monitoring Team will assess the selection and qualifications of these experts to determine whether they can reasonably provide a neutral and independent assessment of the Staff conduct and have an appropriate understanding of the policies and procedures they are tasked with interpreting. This is clearly key to success in prosecuting charges.

- *Expeditious Prosecution of Disciplinary Cases*

Assessing the expediency of prosecution requires a review of several processes. This includes timely service of charges and discovery, and that Trials has options (beyond conducting a trial) to resolve cases timely. The prosecution of disciplinary cases involves a number of stakeholders, including the respondent, their counsel, and OATH. Therefore, significant coordination and various scheduling issues must be addressed in order to prosecute a case. The limited number of days that OATH operates impacts the ability to timely address cases that require the involvement of an ALJ for a Pre-Trial conference and/or Trial. All of this reinforces the need for Trials to have the ability to assess the individual circumstances of each case and have multiple options to move a case forward, so that the Department can expeditiously prosecute cases.

In this Monitoring Period, Trials has had to balance the evaluation and drafting of charges for a large number of case referrals (many identified through SOLStat and closing out the backlog) as well as the managing these new cases with the cases currently on their docket, while also ensuring that proportional penalties for misconduct are imposed. The influx of cases from the ID backlog and SOLstat project is going to create additional burden in the Trials Division. This corresponding increase of older cases in Trials is an inevitable outcome of the backlog closing and will need to be addressed through triage initiatives to ensure a corresponding backlog within Trials is mitigated.

Trials drafted and served hundreds of charges (more than in any other Monitoring Period) and closed more cases in this Monitoring Period than the last (127 compared to 73), which is encouraging. The influx of cases in which charges were served of course has resulted in an increase in the number of pending cases as of the end of the Monitoring Period. As of the end of the Monitoring Period, there were 663 cases pending as of December 31, 2019 compared with 407 cases pending as of June 30, 2019 and 172 cases pending as of December 31, 2018. The increase in the number of cases referred to Trials reflects ID's progress in identifying cases through SOLStat and closing out the backlog.

- *Service of Charges*

The Trials Division has maintained a consistent, reliable, and sustainable process to timely serve charges since January 2017. Charges are drafted by the Trials attorney after they have completed a thorough review and assessment of the investigation and identify the specific policy violations that have been substantiated. This is a critical component in bringing the case and is important contextual information for understanding the number of pending cases. The Trials Division served 398 charges in this Monitoring Period, the largest number of charges served in any Monitoring Period (301 were served in the 8th Monitoring Period, 489 were served in *all* of 2018 and 381 were served in *all* of 2017). In total, 96% of charges were served within 30 days of either receipt of the MOC or when the Trials attorney drafted the charge.[221] Accordingly, Trials has maintained Substantial Compliance with this requirement.

- *Service of Discovery*

The Trials division reports that it attempts to serve discovery close in time to the service of charges. In this Monitoring Period, discovery was served in at least 279 cases. Discovery involves receiving and collecting all relevant paperwork and evidence from ID once they close the case, reviewing all evidence, copying all evidence, making appropriate redactions and sending the case materials to opposing counsel. In an attempt to settle certain cases more quickly through the Fast Track process, where misconduct is generally clear on the video, the Trials Division will send the video and relevant paperwork to opposing counsel (as opposed to the complete discovery file). Some, but not all cases, may resolve the matter at this stage, which minimizes the administrative burdens of collecting all the materials. The Monitoring Team is closely examining the discovery process and will provide a more detailed assessment in the 10th Monitor's Report.

- *Status of Closed Cases*

The majority of cases closed in Trials continue to be resolved via NPA (82%) as demonstrated in the chart below and discussed in more detail in box ¶ 2 above. In this Monitoring Period, several Trials were scheduled, but adjourned for a variety of reasons, and two Trials were conducted but the decisions by the Administrative Law Judge were pending as of the end of the Monitoring Period.

| Cases Closed by Trials | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Fourth Monitoring Period | | Fifth Monitoring Period | | Sixth Monitoring Period | | Seventh Monitoring Period | | Eighth Monitoring Period | | Ninth Monitoring Period |
| Type of Case Closure by date of Trials Closing Memo | 230 | | 256 | | 301 | | 219 | | 84 | | 155 |
| NPA | 170 | 74% | 216 | 84% | 279 | 93% | 202 | 92% | 73 | 87% | 127 | 82% |

---

[221] 78 charges were served within 30 days of receipt of the MOC. 303 charges were served within 30 days of the charges being drafted. In these cases, generally the MOC was received after the charges were served, but the charges were served before the MOC was received to preserve the statute of limitations.

| | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Administratively Filed | 47 | 20% | 29 | 11% | 17 | 6% | 9 | 4% | 5 | 6% | 23 | 15% |
| Deferred Prosecution | 12 | 5% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 7% | 5 | 3% |
| Guilty Verdict | 1 | 0% | 3 | 1% | 1 | 0% | 2 | 1% | 0 | 0% | 0 | 0% |
| Not Guilty Verdict | 0 | 0% | 0 | 0% | 2 | 1% | 1 | 0% | 0 | 0% | 0 | 0% |

- *Time Cases are Pending & Time to Close Cases*

The Consent Judgment requires that Trials prosecute cases as expeditiously as possible, under the circumstances, but does not require cases to be closed within a specific period of time. An evaluation of the Trials workflow requires an assessment of both the time cases have been pending and the time it takes to resolve cases. The processing of cases certainly requires Trials to ensure it has processes to manage cases efficiently. That said, the Trials Division does not have exclusive control in managing its caseload. For instance, if a case requires and/or a Staff Member requests an initial (or subsequent) conference before OATH then this must be scheduled with OATH which can protract the process because OATH generally only provides conference time slots once a week for about 10 cases. Further, certain cases may be on hold while they are being evaluated by law enforcement, which can often be a protracted process as described in ¶ 3 of the Use of Force Investigations section of this report.

Trials' caseload has continued to grow across Monitoring Periods. As outlined in the chart below, a total of 663 cases were pending (a 63% increase from the number of cases pending as of the end of the last Monitoring Period (n=407)). The length of time or reason the cases are pending as of December 31, 2019 are outlined in the chart below.

| Cases Pending with Trials as of December 31, 2019 | | |
|---|---|---|
| Pending Service of Charges | 37 | 6% |
| Pending 120 days or less since service of charges | 186 | 28% |
| Pending 121 to 180 days since service of charges | 111 | 17% |
| Pending 181 to 365 days since service of charges | 202 | 30% |
| Pending 365 days or more since service of charges | 80 | 12% |
| Pending Final Approvals by DC of ID and/or Commissioner | 30 | 5% |
| Pending with Law Enforcement | 17 | 3% |
| **Total** | **663** | |

The Monitoring Team analyzed the cases pending for more than one year and found there are many factors at play. First, some cases are still pending with ID, either they remain open investigations in ID or have only recently closed. Their delay is a consequence of the backlog, these cases generally cannot be brought to fruition because the investigation is ongoing even though charges have been brought to preserve the SOL. This will continue to have an impact on the length of time cases take to close in Trials, until the backlog is resolved. Additional cases are pending with or recently released by Law Enforcement. Trials does not proceed with case while Law Enforcement is considering whether to bring criminal charges. Other cases are pending within Trials for a variety of reasons or due to

interrelated matters. These include cases awaiting scheduling -- either an OATH trial or date to conference with opposing counsel to settle the matter. Other cases were pending because the Staff member was involved in multiple incidents and some of the other incidents have pending cases. There were at least a few pending cases that may have just gotten lost in the shuffle. Finally, some cases were in fact closed and not pending, but due to record keeping errors were recorded as such.

Some of the reasons these cases are pending are within the control of Trials and some are not. None of the reasons these cases are pending are inherently unreasonable and generally reflect both the impact of the backlog and the large volume of cases that must be addressed. However these reasons do not adequately explain why they have been pending for over a year and the length of time these cases have been pending remains concerning. The Monitoring Team is working on a variety of initiatives with the Department to develop triage measures[222] as well as larger structural changes including, as described in the Identifying and Addressing Misconduct section of the report, streamlining investigations through the Intake Squad or adding more days at OATH. The Monitoring Team also recommends that the Trials Division routinely evaluate the docket of pending cases to identify cases that may be lagging and whether anything can be done to expedite them. This is particularly important at this juncture given the growing number of older cases coming through Trials as ID works through the backlog.

As for those cases that Trials completed in this Monitoring Period, it is worth noting that within Trials, the division completed about 100 more closing memos than in the prior Monitoring Period. About half of closing memos were completed within six months and 82% of cases were closed within a year of the service of charges. At the conclusion of the case once a disposition has been reached, a closing memo is drafted which is subsequently approved by the Deputy General Counsel of Trials, the Deputy Commissioner of ID & Trials and the Commissioner.

| Cases Closed by Trials by Monitoring Period | | | | |
|---|---|---|---|---|
| (Time between Service of Charges and Signed Closing Memo Date) | | | | |
| Closing Memos completed | Eighth Monitoring Period | | Ninth Monitoring Period | |
| Total | 84 | | 185 | |
| 0 to 3 months | 21 | 25% | 42 | 23% |
| 3 to 6 months | 20 | 24% | 49 | 26% |
| 6 to 12 months | 26 | 31% | 61 | 33% |
| 1 to 2 years | 10 | 12% | 21 | 11% |
| 2 to 3 years | 0 | 0% | 4 | 2% |
| 3+ Years | 5 | 6% | 0 | 0% |

---

[222] For example, the Monitoring Team identified pending Trials cases where Staff had more than one pending case and at least one case involved serious misconduct, as well as certain cases where there was objective evidence of serious misconduct or were possible Fast Track cases for Trials to prioritize for closure.

| Unknown | 2 | 2% | 8 | 4% |
|---|---|---|---|---|

- *Fast Track and Off Calendar Disposition ("OCD") Cases*

The Fast Track and OCD process have demonstrated that cases can and should be resolved more expeditiously. Most importantly, as with the Eighth Monitoring Period, approximately half of the cases closed in this Monitoring Period were closed via Fast Track or OCD. As the volume of cases pending before Trials continues to grow, the Monitoring Team continues to encourage the use of these strategies given their efficacy in closing cases more quickly and the volume of pending cases Trials is now facing.

- *Approval of Trials Closing Memos*

A closing memo must be completed for each case at Trials. The Monitoring Team evaluated the time required to draft, edit, finalize and approve the memo to determine if the time frame is reasonable. During this Monitoring Period, 74% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within one month of the NPA being executed (an increase of 14% from the Eighth Monitoring Period). The Department has improved on the time required for closing memos which is encouraging. The Monitoring Team encourages Trials to maintain this success going forward.

- <u>*Conclusion*</u>

In this Monitoring Period, Trials served more charges and closed more cases than in the prior Monitoring Period. That said, the overall volume of UOF incidents, as well as the movement of cases via SOLStat and the ID backlog has continued to place an increasing volume of work in the Trials Division. The forthcoming Intake Squad is expected to improve the timeliness of dispositions from the incident date since cases with clear misconduct that do not require length investigation will move directly from the Intake Squad to the Trials Division. Further, the Monitoring Team continues to recommend the use of strategies that prioritize addressing cases via settlement conferences outside of OATH.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3(a)**. Partial Compliance<br>**¶ 3(b)**. Not Yet Rated<br>**¶ 3(c)**.<br>    • Substantial Compliance (Charges)<br>    • Substantial Compliance (Administratively Filed)<br>    • Partial Compliance (Expeditiously Prosecuting Cases) |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, three Directors, 20 attorneys, and 13 support staff.
- During this Monitoring Period, a Confidential Agency Investigator was hired and joined the Division. A Director offer was accepted and pending pre-employment processing as of the end of the Monitoring Period.
- As of the end of the Monitoring Period, the Department is continuing to recruit for three Agency Attorney positions.

**ANALYSIS OF COMPLIANCE**

The Trials division's staffing size remained essentially the same in the Ninth Monitoring Period. Given the increasing flow of cases, the Monitoring Team recommends the Department increase its recruiting efforts and employ additional staff to avoid creating a backlog of cases meriting discipline.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAs)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All NPAs continue to be reviewed and approved by the Deputy General Counsel of Trials. The NPAs are then forwarded to the Deputy Commissioner of ID & Trials (designated by the DOC General Counsel). The Deputy Commissioner of ID & Trials then sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for processing.
- 127 NPAs were approved by the Commissioner during this Monitoring Period. All but one were approved by both the Deputy Commissioner of ID & Trials and Commissioner within one month (84 were completed within 2 weeks and 42 were completed within one month).

**ANALYSIS OF COMPLIANCE**

This assessment of compliance is limited to the second sentence of this provision that requires all NPAs to be approved by the DOC General Counsel (or their designee) and the Commissioner. The Monitoring Team assesses the Department's efforts to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) and to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) together in the ¶ 2 box above.

The Department maintained a process in which all negotiated pleas are approved as required. Overall, the review process by the DC of ID and the Commissioner took an average of 12 days after

the closing memo by Trials was completed. Despite the significant responsibilities of the Deputy Commissioner of ID & Trials and the Commissioner, the timeliness of review and approval is reasonable. The Department remains in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | **¶ 5. Disposition of NPAs and Recommendations to OATH Judges:** Partial Compliance<br>**¶ 5. Approval of NPAs:** Substantial Compliance |
| --- | --- |

### 20. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) or assignment to Special Units (¶¶ 4, 5). This section also requires the Department to consider a Staff Member's assignment on a Special Unit after being disciplined (¶ 6) and more generally whether a Staff Member should be re-assigned or placed on non-inmate contact after a Staff Member has been disciplined multiple times (¶ 7).

*Monitor Recommendations Regarding Screening Provisions ¶¶ 4 to 7*

In this Monitoring Period, the Monitoring Team has given considerable thought to whether the screening requirements and the corresponding effort to implement ¶¶ 4 to 7 are necessary to support the overall goal of advancing reforms and creating safer facilities for Staff and inmates. As a result of this consideration, the Monitoring Team has recommended modifications to these provisions, as described below.

- **Consideration of Re-Assignment or Referral for E.I.S.S. following Discipline for Staff with UOF Violations (¶¶ 6 & 7)**

In considering the effectiveness of this set of provisions, the Monitoring Team first began by considering more broadly how the Department can address Staff who have been found guilty or pled guilty to UOF violations to ensure they are in the appropriate post and/or receive the necessary support. The Monitoring Team's findings to date support the requirement that certain Staff—based on sustained UOF violations—should be evaluated for the suitability of their *post*

and considered for (1) re-assignment (including placement in a different post and/or placement on limited inmate contact), and/or (2) support by EISS (either in their current post or a different post).

The two relevant provisions (¶¶ 6, 7) related to this assessment do not adequately address this issue and/or are unnecessary because they are conducted through E.I.S.S. assessments. Thus, the Monitoring Team proposes broadening the requirements which will also simplify the screening process and improve internal consistency of the Consent Judgment. The current requirements of ¶ 6 are limited to assessing a Staff Member who has been disciplined and assigned to a Special Unit to determine whether they should remain on the Special Unit. The close-in-time assessment is clearly valuable, but the Monitoring Team believes this consideration should not be limited to Staff who are consistently assigned to Special Units—this is an important consideration for *any* post. As for ¶ 7, this provision requires the Department to evaluate a Staff Member's post if the Staff twice in five years engaged in specific UOF violations related to Class A or B UOF incidents. This requirement has an inordinately long timeline (especially given the protracted timing to investigate and finalize formal discipline), and risks excluding Staff with concerning UOF histories. Further, the specification of particular incident classifications (A and B) risks excluding misconduct that was unnecessary or excessive that did not result in injury.[223] Finally, the process for identifying Staff who meet the complex timeline/incident characteristic requirements has proven to be unduly cumbersome to implement and has only identified a very small number of Staff for evaluation. To the extent that one of the

---

[223] As described in almost all Monitor's Reports to date, Staff misconduct (and resulting discipline) and/or involvement in unnecessary and excessive force is not limited to incidents that result in actual injury. There are examples of Staff who have engaged in conduct that may warrant a different post and/or limited inmate contact, but for which the precipitating force/violation would not have triggered this provision.

intended goals of ¶ 7 was to identify Staff with a pattern or practice of misconduct that may warrant re-assignment or additional support, E.I.S.S. is best suited to conduct this assessment, using a more holistic assessment of criteria (beyond the limited group of violations and time period identified by this provision), as is already required by § X (Risk Management), ¶ 1.

To achieve the goal of reasonably and timely identifying Staff who may require re-assignment and/or more support through E.I.S.S., the Monitoring Team recommends combining and modifying the requirements of ¶¶ 6 and 7. This hybrid provision would require the Department to consider whether a Staff Member should be re-assigned (including to a different post and/or placement on limited or no inmate contact) and/or referred for screening by E.I.S.S. *after a Staff Member has pled guilty or been found guilty of a UOF violation*. This recommendation embraces the more timely assessment of Staff assignment following the imposition of discipline (already present in ¶ 6) and removes the requirement for two violations to occur within five years (the standard in ¶ 7). Further, it removes the limitation that these timely assessments occur only for Staff steadily assigned to Special Units (currently required by ¶ 6) and to only certain violations related to Class A or B UOF incidents (currently required by ¶ 7). The Monitoring Team's recommendations for ¶¶ 6 and 7 will expand the scope and will likely result in a larger volume of Staff being considered, but is expected to more effectively identify the Staff who require consideration, remove unnecessary bureaucratic processes, and to better support the overall goal of reducing violence in the Facilities and unnecessary and excessive use of force.

- **Screening of Staff for Assignment on Special Units (¶¶ 4 & 5)**

In evaluating the screening requirements for Staff steadily assigned to Special Units under ¶¶ 4 and 5, the Monitoring Team has found the process to be cumbersome and time

consuming and, in practice, has not meaningfully contributed to the overall goals of the Consent Judgment. The Department only recently began to screen Special Unit Staff and has limited the screening to those who are *steadily* assigned. Staff are assigned to work on Special Units in different ways. Some Staff are *steadily* assigned to work on a Special Unit (either informally on a consistent basis or through an official process of awarding Staff the post), while other Staff are assigned to work on a post in a Special Unit as needed for scheduling purposes. The Consent Judgment does not require the Department to consistently assign Staff to Special Units. Accordingly, the Monitoring Team's compliance assessment has focused on assessing the Department's efforts to screen those Staff who are steadily assigned to a Special Unit.

More importantly, given the broad discretion for this screening, the Department's screening process (though in its infancy) has only identified a small number of Staff who should not be steadily assigned to a Special Unit (either formally or informally) based on the screening. Furthermore, during the pendency of the *Nunez* monitoring, the Monitoring Team has *not* observed that Special Units have discernably higher rates of unnecessary or excessive force, nor that violence is any more prevalent on these units compared to general population units. Further, the Monitoring Team has not identified any specific issue of inappropriate assignment of Staff to Special Units.

Screening requirements and/or assignment decisions may be appropriate before placement on certain posts to mitigate an inappropriate Staff member for a specific post, but the findings to date simply do not support the continued implementation of the screening requirements as drafted. The current screening process is laborious and time consuming, and does not effectively contribute to the goals of the Consent Judgment. Therefore, the Monitoring Team recommends eliminating these two provisions because the effort required to conduct these

reviews saps resources from other priority initiatives that have a more meaningful impact on overall goals of the Consent Judgment.

The Monitoring Team's compliance assessment is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

  (a) [Use of Force history for the last 5 years]

  (b) [Disciplinary history for the last 5 years]

  (c) [ID Closing memos for incidents in the last 2 years]

  (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 2230, Pre-Promotional Assignment Procedures, addresses the requirements of ¶¶ 1 to 3 and remains in effect.

- The Department screened and promoted the following Staff between January 2017 and December 2019[224]:

| Overview of Staff Promotions | | | | | |
|---|---|---|---|---|---|
|  | **Jan. to June 2017** | **July to Dec. 2017** | **Jan. to June 2018** | **July to Dec. 2018** | **Jan. to June 2019** | **July to Dec. 2019** |
| Captains | 79 | 102 | 0 | 97 | 0 | 0 |
| ADWs | 0 | 4 | 13 | 0 | 3 | 0 |
| Deputy Wardens | 0 | 5 | 1 | 2 | 8 | 0 |
| Wardens | 2 | 0 | 3 | 4 | 1 | 0 |
| Chiefs | 2 | 1 | 1 | 1 | 2 | 1 |

### ANALYSIS OF COMPLIANCE

---

[224] This does not include the Staff the Department screened but decided not to promote or have not promoted yet.

The screening requirements of the Consent Judgment were developed to support the Department's efforts to identify Supervisors with the proper attributes. In particular, the Consent Judgment requires the Department to consider a Staff Member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including the screening requirements of this section of the Consent Judgment, and is depicted in *Appendix D: Flowchart of Promotions Process*.

*Assessment & Selection of Staff for Promotion*

As discussed in the Eighth Monitor's Report (at pgs. 199-201), the Department's limited ability to identify misconduct and impose appropriate discipline restricts the Department's ability to accurately assess the candidate's fitness for a position. Of course, improvements in the Department's ability to identify misconduct and impose timely discipline will mitigate this concern. The Monitoring Team had previously identified at least 12 promotions of Staff that cause concern. Of these 12 promotions, only a small number actually contravened the requirements of the Consent Judgment, but in others, the Monitoring Team had concerns about the candidate's suitability for promotion. The Monitoring Team continues to closely scrutinize the UOF incidents these Staff are involved in.[225]

During this Monitoring Period, the Monitoring Team analyzed 29 UOF incidents from June to October 2019, involving eight of the 12 Staff Members whose promotion concerned the Monitoring Team (the other four promoted Staff were not involved in a UOF during this time).[226] Most of the UOF (25 of the 29, or 86%) did not raise concerns about the Staff Members' use of force. However, four incidents—involving 2 of the 12 Staff Members—were concerning as there was some evidence that their actions may have violated the UOF policy[227]. The persistence of potentially concerning force among this group of Staff continues to be a concern to the Monitoring Team and further reiterates the importance of the Department conducting a similar assessment.

*Assessment of Screening Materials*

The Department only promoted one Staff Member, an Assistant Chief, in this Monitoring Period. To verify the Department screened and promoted Staff in accordance with required criteria, the Monitoring Team reviewed the screening documentation for the Assistant Chief promotion, as discussed below.

---

[225] See the Fourth Monitors' Report at pgs. 187-188, Fifth Monitor's Report at pgs. 130-131 and Seventh Monitor's Report at pgs. 174-175.

[226] These 12 Staff reflect the concerning promotions the Monitoring Team identified and are a subset of the much larger group of Staff who were promoted between the Fourth and the Ninth Monitoring Periods.

[227] The Monitoring Team has subsequently recommended the Department closely review one of these Staff Member's for EISS screening.

*Review of Candidates (¶ 1)*

The Department's assessment for the Assistant Chief promotion satisfied the requirements of the "Review" as defined by ¶ 1.

*Disciplinary History (¶ 2)*

The Staff who was promoted had not been found guilty or pled guilty to the specified violations two or more times in the past five-years.

*Pending Disciplinary Matters (¶ 3)*

The Staff who was promoted did not have any pending disciplinary charges at the time of promotion.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 10/17 "Awarding Job Assignments within a Command," remains in effect and addresses the requirements of ¶¶ 4 to 6.
- The Chief's Office, with support from NCU, administered the monthly screening for Staff for Special Unit posts. The Chief's Office and NCU identified the Staff to be screened each month by identifying the Staff steadily assigned to a Special Unit for the Facilities, which then screened Staff using the Staff's 22R form.
- The Department completed screening for approximately 610 Staff for placement on Special Units during this Monitoring Period.

- NCU identified Staff on Special Units for whom UOF-related discipline had been finalized and provided these names to the Facilities, which then assessed whether the Staff member should be reassigned or not.

- The Department conducted the post disciplinary action reassignment screening (required by ¶ 6) twice during the Ninth Monitoring Period, covering relevant discipline imposed between July and November 2019.
  - NCU runs a report of all UOF related finalized discipline for all Staff on Special Units and shares this with the Facilities to screen the Staff for potential reassignment.

- In October 2019, a total of 30 Staff on Special Units were identified as having finalized UOF-related discipline and of these 30, only one was reassigned. In November 2019, 12 Staff were identified as having finalized UOF related discipline and of these 12, none were reassigned.

**ANALYSIS OF COMPLIANCE**

Staff must be screened before they are assigned to a Special Unit and are precluded from assignment if they have any pending disciplinary charges for a use of force that resulted in an injury to an inmate or other person (¶¶ 4,5). If Staff assigned to Special Units are disciplined for use of force misconduct, their Special Unit assignment must be formally reconsidered (¶ 6).

*Facility Assessment of Screening for Assignment to Special Units (¶¶ 4, 5)*

The Department has struggled to implement a reliable and efficient process for screening Staff before they are assigned to Special Units. Several factors have contributed to this, from the lack of a centralized Division responsible for the screening to the often amorphous nature of Staff assignments within the Facilities (as described in the Seventh Report at pgs. 176-178 and the Eighth Report at pgs. 203-205, and also discussed in the introduction to this section).

During the current Monitoring Period, the Department implemented a screening process by conducting monthly screening for Staff for Special Unit posts. The Monitoring Team selected a sample of the July to October 2019 screenings (70 Staff), selecting a mixture of Staff with pending or finalized discipline and a random sample of Staff ultimately assigned and those who were not assigned. For the Staff who were *not* ultimately assigned (total of 8), these decisions appeared to be appropriate. For the Staff who had not provided a final determination on the screening outcome (total of 4), the Department confirmed these staff were no longer assigned to Special Units. For the Staff who *were* assigned to a Special Unit (total of 58):

- 31 appeared to be appropriately assigned;
- 16 had administrative issues (*e.g.* the Warden had referred to pending discipline that was not on any of the paperwork provided). These were resolved by reminding the Facilities of the requirements, or were resolved in later rounds of screening;

- 7 had potential issues because they had more recent finalized discipline. While they were not precluded from being assigned, they did warrant some consideration of the appropriateness of their post;
- 2 had pending CDs on their 22Rs but were assigned anyway; and
- 2 were assigned with formal discipline pending with Trials. The Department's position was that since these Staff were already assigned (this was the first round of Special Unit screening), the pending discipline did not require them to be removed but only a review of their assignment was required.

The streamlined screening process developed during the Eighth Monitoring Period was implemented and completed on a monthly basis in the Ninth Monitoring Period. As this was the first time this screening was completed, there were some inherent administrative issues that occurred as this process was rolled out. These issues were all relatively minor. Overall, the outcome of the screening process was generally reasonable, with a small number of the decisions to assign being questionable. As such the Department has achieved Partial Compliance with these provisions. It is expected that the Department would likely achieve Substantial Compliance in future Monitoring Periods as this process is rolled out, however, for the reasons described in the introduction to this section, the Monitoring Team is recommending these provisions are eliminated.

*Post Disciplinary Action Reassignment Screening* (¶ 6)

In addition to routinely screening Staff prior to their assignment to Special Units, the Department screened Staff who were already assigned to Special Units and who were found guilty of UOF-related misconduct between July and November 2019. Naturally, the Department needed to first reliably screen Staff before their assignment before they could begin the post-disciplinary action reassignment screening. Therefore, the Department first conducted the post disciplinary action reassignment screening in this Monitoring Period.

The Monitoring Team assessed both of the Department's post-discipline reassignment screening that took place in October and November 2019. As an initial matter, the Monitoring Team assessed a sample of the Department's process for identifying Staff to check that all necessary information had been captured for consideration. More specifically, the Monitoring Team: (1) assessed a sample of the Staff on Special Units identified with recent UOF-related discipline to check that all associated UOF-related discipline was included, and (2) assessed all recent UOF-related formal discipline to check that any Staff steadily assigned to a Special Unit with UOF-related discipline was identified for reassignment screening. The Monitoring Team found that the sample of Staff identified with misconduct was consistent with their finalized disciplinary records. The majority of Staff on a Special Unit with formal discipline were identified for screening, although a few staff were missed. 36 of the

42[228] Staff only had minor UOF-related discipline imposed and three Staff had closed Trials cases. Of the 42 staff screened, the Facilities only elected to reassign one Staff member. Given the low-level Discipline imposed for the majority of these Staff, the fact that only one was reassigned is not surprising. Overall, the Department reliably screened Staff on Special Units for reassignment for discipline that was imposed between July and November 2019 and the outcomes were reasonable. As such, the Department is in Partial Compliance with this provision and is likely to achieve Substantial Compliance in future Monitoring Periods as this process is routinely and consistently implemented. However, for the reasons described in the introduction to this section, the Monitoring Team is recommending this provision is modified in conjunction with ¶ 7 below.

| **COMPLIANCE RATING** | ¶ **4.** Partial Compliance |
| | ¶ **5.** Partial Compliance |
| | ¶ **6.** Partial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 7 (REVIEW OF ASSIGNMENTS OF STAFF DISCIPLINED MULTIPLE TIMES)

¶ 7. The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department screened Staff who met the 2-in-5 threshold (outlined in ¶ 7) during the Ninth Monitoring Period using the revised process described in the Eighth Report (at pgs. 205-206).

- The outcomes of the Staff who met the threshold and were screened are outlined below.

| Staff Evaluated for 2 in 5 Screening | | | | | |
|---|---|---|---|---|---|
| Disciplinary Time Period Evaluated | Screening Evaluation Completed | Total number of Staff who were identified as meeting the 2 in 5 | Staff placed on limited inmate contact based on assessment | Staff already on limited inmate contact prior to assessment | Staff were deemed suitable for their current post |

---

[228] Three of the 42 Staff had pending Trials cases at the time of screening, in addition to closed CDs. Presumably, the Staff assignment would be considered if discipline is imposed for those three cases.

| | | criteria & post was evaluated[229] | | | |
|---|---|---|---|---|---|
| Through January 2018 | July 2018 | 35 | 5 (14%) | 19 (54%) | 11 (31%) |
| Through May 2018 | July 2018 | 37[230] | 12 (32%) | 12 (32%) | 13 (35%) |
| Through August 2018 | November 2018 | 15[231] | 3 (20%) | 8 (53%) | 4 (27%) |
| **Total Evaluated** | **7th Monitoring Period** | **87** | **20 (23%)** | **39 (45%)** | **28 (32%)** |
| Through October 2018 | March 2019 | 32[232] | 1 (3%) | 9 (28%) | 22[233] (69%) |
| Through January 2019 | April 2019 | 19[234] | 0 (0%) | 5 (26%) | 14 (74%) |
| Through March 2019 | April 2019 | 2[235] | 1 (50%) | 0 (0%) | 1 (50%) |
| **Total Evaluated** | **8th Monitoring Period** | **53** | **2 (4%)** | **14 (26%)** | **37 (70%)** |
| Through May 2019 | July 2019 | 9[236] | 0 (0%) | 5 (56%) | 4 (44%) |
| Through July 2019 | September 2019 | 3[237] | 0 (0%) | 2 (67%) | 1 (33%) |
| Through September 2019 | November 2019 | 3[238] | 0 (0%) | 2 (67%) | 1 (33%) |

---

[229] As of the October 2018 screening, there were 14 Staff who met the 2-in-5 threshold but were not screened for their assignment because they were no longer with the Department, on medical leave or temporarily assigned to the Correction Academy.

[230] The number of Staff the Department identified was overinclusive than what was required.

[231] *See id.*

[232] *See id.*

[233] These numbers were the results of a qualitative assessment by the Monitoring Team and may not capture reassignments that occurred in earlier rounds of screening.

[234] 14 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

[235] 1 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

[236] 6 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

[237] 2 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

[238] 1 of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

| Total Evaluated | 9th Monitoring Period | 15 | 0 (0%) | 9 (60%) | 6 (40%) |
|---|---|---|---|---|---|

**ANALYSIS OF COMPLIANCE**

The 2-in-5 screening process continues to be complex and time consuming, with minimal benefit realized in the operation of the Facilities. Although the streamlined screening process developed in the Eighth Monitoring Period is more efficient, the screening did not result in any staff being identified for reassignment to limited inmate contact posts in the Ninth Reporting Period, and thus has limited utility toward the overall goals of the Consent Judgment.

*Identification of Staff who met the 2-in-5 threshold*

All Staff who met the 2-in-5 threshold between April and November 2019 were correctly identified. As described in the Eighth Report (at pgs. 207-208), given the complexity of identifying Staff who meet the threshold, the Department has often identified and screened Staff beyond what is required by this provision. The streamlined screening process did result in a decrease in the number of Staff identified for screening who did not actually meet the threshold.

*Review of Assignments for Staff who met the 2-in-5 threshold*

The Monitoring Team reviewed the Facilities' assessments of post assignments for the 15 Staff who met the 2-in-5 threshold and were reviewed between July and November 2019. The outcome of the Facilities' assessments appeared generally reasonable. All Staff had either previously been reassigned through other avenues to limited inmate contact or they were deemed suitable for their current post. No Staff Members were reassigned to limited inmate contact as a result of this screening.

*Conclusion*

The 2-in-5 screening process is complex and time consuming. A total of 155[239] Staff have met the 2-in-5 threshold since this process began in early 2018. Facility leadership elected to keep 71 of the 155 Staff (46%) in their current posts. Another 62 Staff (40%) had already been placed on modified duty or re-assigned before the assessment occurred. Only 22 Staff (14%) were placed on modified duty or re-assigned as a result of this assessment.[240] In other words, the Department is expending significant resources on a process that results in only a few modifications to the assignment and deployment of Staff. In the main, these assessments are reasonable. To ensure the Department's resources are deployed efficiently, and to ensure the Department is addressing the assignment of Staff in a reasonable period of time following misconduct, the Monitoring Team has recommended certain

---

[239] Due to the complex and cumbersome nature of the Department's 2 in 5 screening process, many of these Staff were identified multiple times for screening unnecessarily.

[240] An additional 28 Staff (15%) were not evaluated because they were no longer with the Department, were on extended medical leave, or temporarily assigned to the Correction Academy.

modifications of this provision to the Parties (along with those of ¶¶ 4 to 6) that are more efficient and more directly related to the goals of the Consent Judgment.

| COMPLIANCE RATING | ¶ 7. Substantial Compliance |
|---|---|

### 21. STAFF RECRUITMENT AND SELECTION (CONSENT JUDGMENT § XI)

The provisions in the Staff Recruitment and Selection section of the Consent Judgment focus on developing and maintaining a robust program to recruit new Staff to the Department (¶ 1) and the subsequent criteria to ensure that new Staff are appropriately screened and vetted during the hiring process and the two-year probationary period after hiring (¶¶ 2 and 3).

Over the last four years, the Department's Correction Officer Recruitment Unit ("Recruitment Unit") and Applicant Investigation Unit ("AIU") worked in a coordinated effort to identify and select qualified Staff to meet the Department's staffing needs, ultimately recruiting and hiring over 6,000 new Officers since 2015. The number of Officers that have graduated from the Academy over the last ten years are outlined in the graph and table below. Given the declining inmate population, the Department reports that they are not planning to recruit additional Correction Officers in the foreseeable future. Therefore, the Department has disbanded their uniform recruitment unit and reduced the staff in AIU.



| Number of Officers Graduated from Training Academy Broken Down by Graduation Month | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Academy Class Graduation Date** | **2009** | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** |
| **Total** | 212 | 0 | 398 | 863 | 645 | 485 | 1,099 | 1,329 | 2,044 | 1,213 | 382 |
| **Breakdown by Class Month** | 212 (Dec.) | 0 | 198 (Apr.) 200 (Sep.) | 260 (Apr.) 309 (Aug.) 294 (Dec.) | 306 (Apr.) 339 (Aug.) | 342 (Jan.) 143 (Aug.) | 144 (Feb.) 363 (June) 592 (Dec.) | 618 (May) 711 (Nov.) | 900 (May) 1,144 (Nov.) | 815 (June) 398 (Dec.) | 382 (July) |

The Monitoring Team's assessment of compliance is outlined below.

## XI. STAFF RECRUITMENT AND SELECTION ¶ 1 (RECRUITMENT OF STAFF)

¶ 1. The Department, in consultation with the Monitor, shall develop and maintain a comprehensive staff recruitment program designed to attract well-qualified applicants and keep the Department competitive with surrounding law enforcement and correctional agencies. The program shall provide clear guidance and objectives for recruiting Staff Members.

### ANALYSIS OF COMPLIANCE

The Department's uniform recruitment unit was disbanded in the Ninth Monitoring Period as the Department reported uniform Staff will not be recruited for the foreseeable future. However, the Department maintained a comprehensive staff recruitment program designed to attract well-qualified applicants through the end of the Eighth Monitoring Period. Accordingly, the Department maintained Substantial Compliance with the requirements of this provision from the Effective Date of the Consent

Judgment through the Eighth Monitoring Period, for a total of 44 months.[241] The Department's sustained compliance has abated prior deficiencies, so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance (as per Eighth Monitor's Report) |
| --- | --- |

## XI. STAFF RECRUITMENT AND SELECTION ¶¶ 2-3 (SELECTION OF STAFF)

¶ 2. The Department, in consultation with the Monitor, shall develop and maintain an objective process for selection and hiring that adheres to clearly identified standards, criteria, and other selection parameters established by laws and regulations. The process shall include certain factors that will automatically disqualify an applicant for employment as a Staff Member.

¶ 3. The Department shall conduct appropriate background investigations before hiring any individual, which shall include assessment of an applicant's criminal history, employment history, relationships or affiliation with gangs, relationships with current Inmates, and frequency of appearance in the Inmate visitor database. The background investigation shall also include medical screening (including drug tests), reviews of state and local child abuse registries accessible to the Department, reference checks, and financial records/credit checks. Staff responsible for conducting these background investigations shall receive appropriate training. The submission of materially false information on a candidate's application may be grounds for the Department's seeking termination of the Staff Member's employment at any future date.

### ANALYSIS OF COMPLIANCE

AIU has been pared down, as the Department is not currently preparing for another recruit class (as described in the Eighth Monitor's Report at pg. 212). AIU staff were offered opportunities to work in other areas within the Department. The Monitoring Team has previously audited a sample of AIU's background investigations of candidates who were selected for hire and found that the files demonstrated that appropriate investigatory tools were employed.[242] The Monitoring Team found that from the Effective Date through the end of the Eighth Monitoring Period that the Department maintained an objective process for selecting and hiring Staff as required by ¶ 2. The Monitoring Team also found that from the Third Monitoring Period through the end of the Eighth Monitoring Period that the Department maintained extensive background investigations of potential candidates by trained investigators, and developed a comprehensive investigator manual to support this objective framework as required by ¶ 3. Accordingly, the Department maintained Substantial Compliance with ¶ 2 for a total

---

[241] *See*, First Monitor's Report at pgs. 112 to 113 (dkt. 269), Second Monitor's Report at pgs. 156 to 157 (dkt. 291), Third Monitor's Report at pgs. 241 to 242 (dkt. 295), Fourth Monitor's Report at pgs. 190 to 191 (dkt. 305), Fifth Monitor's Report at pg. 132 (dkt. 311), Sixth Monitor's Report at pg. 141 (dkt. 317), Seventh Monitor's Report at pg. 181 (dkt. 327), and Eighth Monitor's Report at pgs. 209 to 210 (dkt. 332).

[242] *See* Sixth Monitor's Report at pages 143 to 144 and Seventh Monitor's Report at pages 183 to 184.

of 44 months,[243] and with ¶ 3 since for a total of 35 months.[244] The Department's sustained compliance in these areas has abated prior deficiencies, so these requirements are no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends these provisions be terminated as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance (as per Eighth Monitor's Report) |
| | ¶ 3. Substantial Compliance (as per Eighth Monitor's Report) |

## 22. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to consult with ID before recommending an inmate arrest for conduct that was also connected with a use of force incident. The larger purpose of this section is to ensure that inmate arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team's assessment of compliance is outlined below.

### XIV. ARREST OF INMATES (¶ 1)

¶ 1. The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Criminal Investigation Bureau ("CIB") is responsible for arresting inmates as well for tracking and maintaining evidence, arrest packages, and arrest data. A new Senior Correctional Administrator was appointed to lead CIB during this Monitoring Period.

---

[243] *See*, First Monitor's Report at pgs. 114 to 117 (dkt. 269), Second Monitor's Report at pgs. 157 to 160 (dkt. 291), Third Monitor's Report at pgs. 242 to 246 (dkt. 295), Fourth Monitor's Report at pgs. 192 to 197 (dkt. 305), Fifth Monitor's Report at pgs. 133 to 135 (dkt. 311), Sixth Monitor's Report at pgs. 141 to 144 (dkt. 317), Seventh Monitor's Report at pgs. 181 to 184 (dkt. 327), and Eighth Monitor's Report at pgs. 210 to 213 (dkt. 332).

[244] *See*, Second Monitor's Report at pgs. 157 to 160 (dkt. 291), Third Monitor's Report at pgs. 242 to 246 (dkt. 295), Fourth Monitor's Report at pgs. 192 to 197 (dkt. 305), Fifth Monitor's Report at pgs. 133 to 135 (dkt. 311), Sixth Monitor's Report at pgs. 141 to 144 (dkt. 317), Seventh Monitor's Report at pgs. 181 to 184 (dkt. 327), and Eighth Monitor's Report at pgs. 210 to 213 (dkt. 332).

- During this Monitoring Period, the Department, in consultation with the Monitoring Team, revised its arrest procedures and developed a new Command Level Order to govern the arrest of inmates. CLO 01/20 "Arrest of Incarcerated Individuals" was promulgated right after the close of the Monitoring Period. Additionally, the Department promulgated two new Command Level Orders to govern the arrest of visitors and arrest of Juveniles, CLO 02/20 "Adult Visitor or Live Arrest" and CLO 03/20 "Juvenile Arrest Procedures".

- The Department arrested 214 inmates during the current Monitoring Period. Out of the 214 total inmates arrested, 84 were arrested in connection to 79 unique UOF incidents.

| Total Arrests & Arrests Associated with a UOF | | | | |
|---|---|---|---|---|
| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 |
| UOF Incidents Associated with Arrests | 88 | 68 | 71 | 79 |
| Number of Arrests with Associated UOF Number | 109 (38%) | 79 (30%) | 77 (34%) | 84 (39%) |
| Total Number of Arrests | 284 | 262 | 228 | 214 |

- The reasons for all inmate arrests from January 2018 to December 2019 are presented in the table below.

| Arrest of Inmates by Reason for Arrest | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | |
| Aggravated Harassment | 33 | 12% | 18 | 7% | 17 | 7% | 11 | 5% |
| Arson | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Assault on Staff | 98 | 35% | 87 | 33% | 79 | 35% | 99 | 46% |
| Assault Other | 6 | 2% | 0 | 0% | 0 | 0% | 1 | 0% |
| Contraband Drugs | 14 | 5% | 18 | 7% | 12 | 5% | 16 | 7% |
| Contraband Other | 10 | 4% | 5 | 2% | 7 | 3% | 4 | 2% |
| Contraband Weapon | 10 | 4% | 8 | 3% | 11 | 5% | 5 | 2% |
| Criminal Act | 3 | 1% | 13 | 5% | 6 | 3% | 2 | 1% |
| Destruction of Property | 5 | 2% | 2 | 1% | 0 | 0% | 1 | 0% |
| Escape | 0 | 0% | 1 | 0% | 1 | 0% | 0 | 0% |
| Extortion | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Inmate Disturbance/ Riot | 0 | 0% | 0 | 0% | 0 | 0% | 6 | 3% |
| Obstruction Government Administration | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Robbery | 0 | 0% | 0 | 0% | 1 | 0% | 0 | 0% |
| Serious Injury to Inmate | 2 | 1% | 12 | 5% | 9 | 4% | 12 | 6% |
| Serious Injury to staff | 5 | 2% | 4 | 2% | 2 | 1% | 0 | 0% |
| Serious Verified Threat | 0 | 0% | 1 | 0% | 0 | 0% | 0 | 0% |
| Sexual Assault/Abuse | 5 | 2% | 2 | 1% | 9 | 4% | 6 | 3% |
| Slashing/Stabbing | 17 | 6% | 23 | 9% | 7 | 3% | 13 | 6% |
| Splashing | 76 | 27% | 68 | 26% | 67 | 29% | 38 | 18% |
| Witness Tampering | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Total | 284 | | 262 | | 228 | | 214 | |

**ANALYSIS OF COMPLIANCE**

The Department, in consultation with the Monitoring Team, finalized three new Command Level Orders this Monitoring Period that govern the arrest of inmates, juveniles, and visitors. These policies replace an outdated Operations Order (from 1989) and a Command Level Order (from 2015) and now comport with the Department's current practice and procedures regarding arrests. The new CLO regarding inmate arrests also requires CIB to consult with ID regarding any conduct that is related to a use of force incident. The Department reports that, generally, CIB consults with ID before arresting an inmate to ensure mutual agreement that sufficient probable cause exists to make the arrest. The Monitoring Team intends to assess and report on the coordination between CIB and ID going forward.

During this Monitoring Period, the Monitoring Team reviewed a sample of over 50 inmate arrests with a corresponding use of force incident to determine whether the arrests were supported by probable cause. These arrests occurred between July 2018 and December 2019. The Monitoring Team's assessment of the related UOF incidents supported CIB/ID's conclusion that there was probable cause for the arrest.[245] It is also worth noting that the number of inmate arrests have dropped every Monitoring Period from 284 inmate arrests in the Sixth Monitoring Period to 214 inmate arrests in the Ninth Monitoring Period.

The Department is in Partial Compliance with this provision as the new Command Level Orders were implemented after the end of the Ninth Monitoring Period and further assessment is needed to determine whether inmate arrests are made in consultation with ID, as required by this provision. It is expected that the Department will achieve Substantial Compliance during the next Monitoring Period given the Monitoring Team's finding that, to date, inmate arrests have been supported by probable cause.

| Compliance Rating | ¶ 1. Partial Compliance |
| --- | --- |

## 23. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. Significant involvement and buy-in from all Divisions of the Department is needed to successfully implement the enumerated reforms of the Consent Judgment. As reported

---

[245] It is worth noting that in many cases, the Monitoring Team found that Staff response to an inmate's potentially criminal behavior was not proportional and was at times excessive, unnecessary, and/or retaliatory.

previously, one barrier that has been identified in the Department's efforts to implementing reforms has been a lack of ownership and focus by uniform Staff in advancing the *Nunez* requirements. The Monitoring Team recommended that the Department designate a high-ranking uniform official to help manage the *Nunez* requirements in order to support the overall goal of increased ownership by the uniform Staff of the reforms, because the Complex Litigation Unit ("CLU") and the *Nunez* Compliance Unit ("NCU") alone cannot operationalize the many reforms that are needed, as they are neither responsible for nor have control of the Divisions that must actually implement the core use of force-related initiatives.

In the beginning of January 2020, the Department restructured the assignment of Assistant Chiefs and designated an Assistant Chief as the uniform liaison to the *Nunez* Monitoring Team. As part of this restructuring, NCU and the Division of Strategic Initiatives, who help support a number of UOF-related initiatives, were also assigned to report to this Assistant Chief. This creates a significant foundation for *Nunez* compliance work going forward, particularly as it relates to needing to coordinate among other uniform leaders and in addressing and implementing operational initiatives related to *Nunez*. The Monitoring Team has already observed the positive impact of this re-organization in the management and focus on operational initiatives.

In the Ninth Monitoring Period, the day-to-day management of compliance with the *Nunez* Consent Judgment continued to be a joint effort between CLU and NCU. CLU and NCU continue to work directly with a broad range of staff on a daily basis and spearhead many of the problem-solving initiatives when there are obstacles to compliance. Given the enormity of the task of shaping practice, measuring performance, and demonstrating compliance, a significant number of staff are necessary to audit and improve practice as only a portion of the provisions

from the Consent Judgment are internally monitored on a routine basis. The Monitoring Team continues to recommend the City provide the Department with the necessary resources, to the extent they are required.

CLU manages the Monitoring Team's document and data requests and drives various policy initiatives to address the findings of, and recommendations from, the Monitoring Team. CLU regularly consults the Monitoring Team to check that Department practice is consistent with the Consent Judgment and best practice. CLU has provided a foundation upon which the Department can implement essential changes to practice and the staff in the unit remain hardworking, smart, conscientious, dependable and provide invaluable assistance to the Department and the Monitoring Team

NCU manages most of the quality assurance programs and problem-solving efforts. NCU has continued to devise and maintain solid QA programs and reporting mechanisms to illuminate Department practices that need to be maintained or improved so that the Department can achieve compliance with several requirements of the Consent Judgment. In many cases, NCU staff provide technical assistance to the Facilities to support improved practice. As demonstrated throughout this report, NCU has supported many of the initiatives where the Department has demonstrated progress (*e.g.* timely submission of UOF reports, improved medical wait times, and consistent processing of command disciplines). The unit frequently collaborates with the Monitoring Team and is a valuable resource to both the Monitoring Team and the Department.

The Monitoring Team's assessment of compliance is outlined below.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material

revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[246]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department, in consultation with the Monitoring Team, completed an extensive Excel chart cross-referencing each provision of the Consent Judgment with the relevant policies addressing those requirements.

- Since the Effective Date, the Department revised a number of policies and procedures to conform to *Nunez* requirements.

  o The Department reviewed over 200 Directives and corresponding procedures and over 300 Operations Orders to identify the subset that is related to the Consent Judgment and to determine whether any revisions are necessary or whether new policies need to be developed.

  o The Department has completed most of the necessary revisions to Directives and Operations Orders and has developed all new Directives and Operations Orders identified by the review.

  o NCU and the Chief of Department's office identified and reviewed over 800 Command Level Orders ("CLO") to ensure they were still relevant and conformed to *Nunez* requirements, and updated or rescinded them accordingly.

- The Department developed and implemented two policies to address the overall management of policies and procedures within the Agency.

  o Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance, and routine review of Department policies.

  o Operations Order 05/19, "Facility Information System ("FIS") was promulgated. Pursuant to Operations Order 05/19, each Facility has a designated FIS Officer and staff who are responsible for reviewing and updating CLOs on a routine basis.

    ▪ A network drive folder is maintained, where all Facility CLOs are scanned and uploaded digitally to make maintenance and tracking more efficient.

**ANALYSIS**

There are two phases of implementation for the Department to achieve compliance with ¶ 1 of this section of the Consent Judgment. First, the Department had to conduct an initial review and revise (as appropriate) any existing policies, procedures, protocols, training curricula, and practices to ensure

---

[246] The Monitor approved an extension of this deadline to January 31, 2018.

conformity with *Nunez*. Second, the Department had to develop a reliable process in place to ensure ongoing assessments of these items as they necessarily may evolve to ensure continued conformity and relevance.

The Department has successfully implemented the first phase, and has evaluated and revised policies, procedures, and trainings to ensure they are consistent with the requirements in the Consent Judgment and with each other. This process included evaluating hundreds of Directives and Operation Orders and over 800 old CLOs—this latter review was conducted during the Eighth Monitoring Period, and FIS staff found most CLOs to be outdated and the FIS Officers subsequently updated each Facility's CLOs to ensure consistency with existing Department Directives and Operations Orders.

Regarding the second phase, the Department has taken steps to achieve compliance, but some work remains to achieve Substantial Compliance. First, the Department ensures that the Monitoring Team is provided an opportunity to review and comment on any proposed revisions to any *Nunez*-related policies before promulgating. While the Department has developed a process for ongoing assessments of policies on a routine basis (enumerated in Directive 0000R-A, "Implementing Departmental Policy")—including an annual review of a sample of policies and Operations Orders—this process has not yet been implemented. Further, while Ops Order 05/19 (Facility Information System) requires FIS Officers evaluate new policies/procedures on a monthly basis to determine whether CLOs are necessary (to ensure CLOs are then promulgated when appropriate), the Department has not devised a process to demonstrate that this process has been routinely implemented. The Department will achieve Substantial Compliance with ¶ 1 when these procedures for ongoing review and maintenance of policies and CLOs are reliably implemented.

As for the Department's compliance with ¶ 2, the Department has revised and developed written documents, such as logs, handbooks, manuals, and forms necessary to effectuate the terms of *Nunez*.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance<br>**¶ 2.** Substantial Compliance |
| --- | --- |

### XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Assistant Commissioner of Quality Assurance and Deputy General Counsel share the responsibilities of the Compliance Coordinator.
- The CLU and NCU provided the Monitoring Team with responses to over 200 requests for information and handled over 50 memos containing recommendations from the Monitoring

Team. Many of these were complex requests and required significant collaboration between the Department and the Monitoring Team to address. The CLU also produced over 600 use of force files (such as Preliminary Reviews, Facility investigations, and Full ID Investigations), PREA files, and Trials closing memos. The CLU and NCU also produced over 80 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.

- During the Monitoring Period, the CLU scheduled and/or facilitated frequent meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC Staff Members and also facilitated site visits.

**ANALYSIS OF COMPLIANCE**

The role of Compliance Coordinator cannot reasonably be filled by one individual given the significant work needed to address the requirements of the Consent Judgment, to manage and respond to the various requests from the Monitoring Team, and work with the Monitoring Team to address the feedback and initiatives recommended by the Monitoring Team. That said, the Department continues to maintain Substantial Compliance with the assignment of the Compliance Coordinator as the Department has assigned appropriate leadership and dedicated significant resources to ensuring there is adequate coordination with the Monitoring Team. The Monitoring Team continues to maintain a collaborative relationship with members of the CLU and NCU teams, as well as other members of the Department and communicates daily (and often multiple times a day) with members of the Department. The Department's staff in CLU and NCU are critical to supporting the Department's efforts to advance reforms in the agency and are hardworking, smart, conscientious, responsive and provide tremendous assistance to the Monitoring Team. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

# CURRENT STATUS OF 16- AND 17-YEAR-OLD YOUTH

The implementation of the State's Raise the Age ("RTA") law has continued to transform the City's management of incarcerated 16- and 17-year-old youth. Since Fall 2018, all 16- and 17-year-old youth previously incarcerated on Rikers Island and who remain detained have been housed at Horizon Juvenile Center ("HOJC"), which is jointly operated by the Department and ACS. Further, any 17-year-old youth arrested and detained between October 1, 2018 and September 30, 2019 are also housed at HOJC (collectively, "Pre-Raise the Age Youth"). The housing of Pre-Raise the Age Youth off of Rikers Island not only satisfies RTA, but also satisfies the Department's obligations under *Nunez* to seek an alternative housing site for these youth.[247] Once HOJC is stabilized, housing youth in a facility that operates in accordance with generally accepted practice in juvenile justice will certainly be in the best interest of the youth.

HOJC has been in a state of continuous transition since it opened, which has had a negative impact on facility safety. First, the physical location changed, responsibilities for managing the facility changed, the DOC staff assigned to this population changed, and a new set of regulations were promulgated by the State. These things did not happen just at once, but rather evolved continuously throughout the 15 months since HOJC opened its doors. During the first year of HOJC's operation (October 2018 to October 2019), the Department was primarily responsible for youth supervision and movement and facility safety and security, while ACS was responsible for providing programming, case management and other types of support (*e.g.,* food services, barbershop, building maintenance, laundry, etc.).

---

[247] "The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site")", § XVII., ¶ 1.

Beginning in October 2019 (halfway through the current Monitoring Period), ACS accelerated its transition toward full operational control of the facility. By the end of the Monitoring Period, in addition to its original responsibilities, ACS became solely responsible for supervising youth on the housing units with DOC Staff operating in a much more limited scope: on tactical response teams, some security control of hallways, as well as administrative positions. By the end of the Monitoring Period, the number of DOC Staff assigned to HOJC decreased from approximately 300 Staff when the facility opened in October 2018 to about 50 Staff as of the end of December 2019. The population of Pre-Raise the Age Youth continued to decline as youth either aged out[248] or were released—from about 90 youth when the facility opened, to about 55 youth at the end of the previous Monitoring Period, to about 20 at the end of the current Monitoring Period. The City projects that the number of Pre-Raise the Age Youth will continue to decrease, with the last youth slated to leave the facility in Summer 2020.

The constant state of transition has resulted in ongoing uncertainty, stress, and disruption for both youth and staff. Since HOJC opened, the Monitoring Team has issued several reports to the Court, detailing concerns about the transition and the prevalent threats to youth and staff safety.[249] The Monitoring Team remains concerned. As ACS began supervising housing units independently, the Monitoring Team also communicated directly with ACS leadership about continued concerns.[250] In addition to the high rates of violence and UOF, the Monitoring Team has been troubled by the faltering classification system that has not yet translated into

---

[248] Youth who remain detained when they turn 18 years old are transferred to Rikers/DOC custody.

[249] The Monitoring Team submitted three letters to the Court on the status of HOJC on October 31, 2018 (Dkt. 318), December 4, 2018 (Dkt. 320), and February 19, 2019 (Dkt. 325).

[250] The Monitoring Team held teleconferences with ACS leadership to discuss the high rates of disorder in October, November and December 2019.

meaningful differences in the way high-risk youth are supervised; the behavior management program that has not yet identified effective interventions to curb the frequency of aggressive behaviors among some youth; ACS staff's use of force and incident reporting; and the constant changes in staffing which, while necessary for the ultimate transition to ACS control, continue to disrupt staff-youth relationships that would otherwise be the key to stabilizing the facility.

ACS leadership has been responsive to the Monitoring Team's requests for information, has shared in the concern for the welfare of staff and youth and has identified several strategies to address the problems discussed above. The Monitoring Team has also provided technical assistance on issues most related to safety (*e.g.,* behavior management, addressing youth with frequent aggressive behaviors, classification, the appropriate use of room confinement, and programming).

This period of transition has also brought increasing complexity to the task of monitoring compliance with *Nunez*. During the first half of the Monitoring Period, most of the data used to monitor performance was submitted by DOC, as they were primarily responsible for supervising the housing units. During the second half of the Monitoring Period, the responsibility for providing this data shifted to ACS. There were inevitable issues in collecting data from two different agencies and reconciling their different reporting structures. Suffice to say, there have been some difficulties in merging data and information covering an ever-shifting landscape of housing units/portions of the building. Transitioning management from DOC to ACS also meant that some of the monitoring strategies that were relatively stable in previous Monitoring Periods had to evolve as ACS became solely responsible for additional practices (*e.g.*, ACS took over the classification function; ACS staff are now responsible for completing the youth's STRIVE+ point sheets and for properly documenting the use of room confinement). In some cases, this

report identifies the practices and data structures that *will be* the subject of monitoring going forward, but it does not go as far as assessing ACS' performance, given the fragmented nature of the facility's operation over the past six months.

### *Rates of Use of Force and Violence*

Throughout the Monitoring Period, HOJC continued to be plagued by disorder, despite its declining population. In the graph below, a *rate per 100 youth* is used in order to neutralize the impact of the decreasing facility population so that different time periods can be compared.[251] Compared to the previous Monitoring Period, the average rate of youth-on-youth violence (*i.e.,* fights and assaults) decreased about 15% (from 40.7 in the previous Monitoring Period to 34.6). However, the average use of force rate skyrocketed 54%, from 74.7 in the Eighth Monitoring Period to 114.7 in the current Monitoring Period.[252] Large increases in the UOF rate were witnessed during the second half of the Monitoring Period, as ACS began to assume full control of the housing units, youth began to test limits and ACS staff began to adjust to their duties. In summary, the period of transition from DOC to ACS has been a rocky road for both youth and Staff and has had significant negative consequences for facility safety.

---

[251] Rate per 100 youth = (# of incidents/ADP)*100

[252] This data tallies unique incidents that involved force used by DOC Staff, ACS Staff or both. Note that ACS' definition of a UOF differs from DOC's in that ACS does not report escorts. Accordingly, certain incidents that would have been reported by DOC as a UOF under the definition used by the Consent Judgment are not reported as such by ACS for incidents exclusively involving ACS staff. Therefore, the rate of UOF in the Ninth Monitoring Period could be even higher than what is reported depending on the number of ACS-only escorts.



Given the increasing responsibility ACS has for supervising youth, the Monitoring Team began to conduct video reviews of UOF incidents involving ACS staff, including a number of incidents that occurred in December 2019 and January 2020. While ACS staff are plentiful, present, patient and observant or engaged, the incident review also revealed a pattern of poor situational awareness, the failure to take reasonable steps to prevent incidents from occurring, and subpar incident reporting that leaves out essential facts and details, which inhibits the ability of administrative reviewers to detect problems. A variety of dangerous practices—including poor staff arm placement near/around youth's necks, entering youth's rooms without proper staff backup, opening doors when youth are poised to push past staff, and hyper-confrontational conduct from staff—all suggest that youth have been exposed to unnecessary and/or excessive force and that there is risk of harm that must be addressed.

The Monitoring Team's ongoing review of UOF incidents and sanctions for youth misconduct clearly revealed that a segment of the HOJC population contributes a

disproportionate share of violence and other types of disorder. In the previous Monitoring Period, this segment constituted about 15% of the total facility population. During the current Monitoring Period, the segment of the population frequently involved in serious misconduct expanded to include at least 30% of HOJC's Pre-Raise the Age population in any given month. As noted in previous reports, addressing youth with frequent serious misconduct demands a targeted strategy to provide greater support, structure, and supervision to this select group of youth. Some of these youth persisted in committing frequent, blatant assaults on staff, with few apparent consequences or interventions designed to decrease their aggressive behavior. During the last half of the Monitoring Period, there were 51 assaults-on-staff, 16 of which involved injury (31%).

While several of the facility's practices have shortcomings that contributed to the level of disorder (described above), the structural upheaval caused by the transition between agencies is a major factor that also cannot be understated. This transition has impacted every facet of the youth's and staff's daily lives and has seriously disrupted the interpersonal relationships between youth and staff that are so critical to facility safety.

The Department's efforts to achieve compliance with Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), and § XVII (Housing Plan for Inmates Under the Age of 18) related to 16- and 17-year-old youth is addressed below. When applicable, ACS' new role in certain practices is reviewed, along with a summary of plans to monitor ACS' compliance with *Nunez* in subsequent Monitoring Periods.

*Management of Pre-Raise the Age Youth & Adolescent Offenders*

The Tenth Monitoring Period will be yet another period of transition. The number of Pre-Raise the Age Youth will continue to decrease (as of April 2020, the ADP was 3) and ACS will

assume more and more control of the facility. Department staff are expected to conclude their role in the facility's management by Summer 2020. At the latest (though potentially sooner), by September 30, 2020, the last 16- or 17-year-old Pre-Raise the Age Youth will have exited the facility. In other words, none of the 16- and 17-year-old youth at HOJC will have been incarcerated as an adult, under previous law.

RTA created a new legal status, Adolescent Offenders ("AO"), for 16- and 17-years-olds who are arrested for a felony-level crime.[253] AOs' cases are heard in the Youth Part of Criminal Court. If an AO is detained, he/she must be housed in a specialized secure juvenile detention facility for older youth (rather than at Rikers).[254] Since October 1, 2018, all AOs have been housed at Crossroads Juvenile Center in Brownsville, Brooklyn, which is administered by ACS.

On January 9, 2020, HOJC became dually certified as a Specialized Juvenile Detention facility for Pre-Raise the Age Youth _and_ as a Specialized Secure Juvenile Detention facility to house AOs. Subsequently, the City began slowly moving AOs to Horizon, with approval to move 15 youth during the first six weeks following certification. Pre-Raise the Age Youth and AOs must be housed separately and may not co-mingle within HOJC.[255] Accordingly, Pre-Raise the Age Youth are housed on the second floor of HOJC and AOs are housed on the first floor of HOJC. The City also reports that AOs will be managed exclusively by ACS staff. The Monitoring Team is not currently monitoring the City's management of AOs at Crossroads Juvenile Center or HOJC.

---

[253] The implementation of this law was staggered and so this new category of offenders was applied to 16-year-old youth beginning on October 1, 2018 and 17-year-old youth on October 1, 2019.

[254] _See_, https://www.ny.gov/raise-age/raise-age-implementation#adolescent-offender.

[255] The current certification allows the City to house only 38 AOs at HOJC.

*Looking Ahead*

All Parties to the *Nunez* litigation agreed that the requirements of the *Nunez* Consent Judgment applied to Pre-Raise the Age Youth. However, the applicability of the requirements enumerated in *Nunez*, including on-going monitoring, to the AOs has not yet been determined. As an initial matter, the transfer to a new, more modern facility, off Rikers Island, with a different approach for managing youth has ameliorated some of the issues that were present at Rikers (discussed in more detail below). This move resulted in Substantial Compliance with the requirement to move the youth off of Rikers Island pursuant to § XVII. (Housing Plan for Inmates Under the Age of 18). As the goal of this section has now been achieved, the Monitoring Team recommends terminating this section of the Consent Judgment, as discussed in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

The Monitoring Team continues to have several concerns about the operation and current conditions of confinement at HOJC (as discussed above). The Monitoring Team has considered how to approach potential on-going monitoring of the AOs for over a year and has strongly encouraged the Parties to reach an agreement about how to proceed (subject to Court approval). To that end, the Monitoring Team took a critical eye to each of the provisions in the *Nunez* Consent Judgment, with a particular focus on the two sections of the Consent Judgment regarding Adolescents (§ XV. (Safety and Supervision of Inmates Under the Age of 19) and § XVI. (Inmate Discipline) (collectively "Adolescent Provisions"). The Monitoring Team identified certain provisions that were well-suited to the operation at RNDC and/or when the Department maintained operational control. However, they have lost their relevance or context with ACS operating HOJC, and the Monitoring Team therefore recommends that they are no longer necessary. Other provisions remain relevant, are meaningful within the context of a

juvenile facility and are at the center of the Monitoring Team's concerns about facility safety. Therefore, the Monitoring Team recommends that these provisions remain in effect (some possibly with modifications). Further, the Monitoring Team also considered the applicability of more general requirements to address § IV Use of Force Policy, § VII. Use of Force Investigations, and § VIII. Staff Discipline and Accountability.[256] Finally, the Monitoring Team also considered the applicability of § VII. Use of Force Investigations ¶ 14 (Investigation of Use of Force Incidents Involving Inmates Under the Age of 18) and § IX. Video Surveillance ¶ 4 (Video Preservation).[257]

To facilitate agreement among the Parties, in October 2019, the Monitoring Team shared these potential options for continued oversight. In November 2019, the Monitoring Team convened a meeting with representatives from the City, the Department, ACS, Counsel for the Plaintiffs' class and SDNY to discuss the matter further. Since then, the Parties and the Monitoring Team have had ongoing discussions, including the exchange of various written proposals, about how to proceed and intend to advise the Court in due course. Resolution on this matter must be prioritized and so the assessment of compliance, discussed below, incorporates the Monitoring Team's considerations and recommendations for potential ongoing oversight of this age group.

## 24. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

---

[256] The Monitoring Team's recommendations to the Parties included three provisions to address more generally the requirements of these three sections.

[257] The Monitoring Team's recommendations regarding the applicability of § VII. Use of Force Investigations ¶ 14 (Investigation of Use of Force Incidents Involving Inmates Under the Age of 18) and § IX. Video Surveillance ¶ 4 (Video Preservation) to the AOs is discussed in the respective boxes in those sections with the assessment of compliance.

| XV. Safety and Supervision of Inmates Under the Age of 19 ¶ 1 (Prevent Fight/Assault) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

**Department's Steps Towards Compliance**

- The Department and ACS continue to confront a high level of violence at the facility (see narrative above).

- The Department and ACS have jointly operated HOJC in order to provide programming, access to education and other structured activities throughout the day. ACS has also committed additional resources for consultation to improve the quality of youth supervision, to implement multi-disciplinary teams on each housing unit and to fortify the implementation of the behavior management program.

**Analysis of Compliance**

*This provision applies to Young Inmates (16-, 17- and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Although both agencies have committed significant resources to HOJC, the facility continues to be plagued by disorder, with UOF rates significantly increasing during the current Monitoring Period. The rate of youth-on-youth violence decreased somewhat compared to the previous Monitoring Period (-15%) but, taken together with the high number of youth-on-staff assaults, still creates considerable concern. The Monitoring Team is also concerned about the prevalence of unnecessary, excessive or poorly executed uses of force among ACS staff, based on the incidents reviewed toward the end of the Monitoring Period. Together, these create a culture of disorder that must be transformed by incentivizing positive behavior, responding appropriately to negative behavior, and ensuring that staff develop constructive relationships with youth and are properly equipped with the knowledge, skills, and support needed to create a safe facility. Hopefully, HOJC's environment will stabilize during the Tenth Monitoring Period as the magnitude of changes in operational control is set to decrease. Toward the end of the Monitoring Period, ACS enacted several strategies designed to improve facility safety including embedding a consultant within the facility to assist with developing and implementing multi-disciplinary unit teams designed to improve the quality of staff-youth relationships and to better support youth's behavior. The Monitoring Team will actively monitor this provision for Pre-Raise the Age Youth at HOJC and recommends that this provision is applied to the management of AOs going forward.

| Compliance Rating | ¶ 1. (16- and 17-year-olds) Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's policies and NCU audit practices continued to be in effect through October 2019. These are described in the Eighth Monitor's Report at pgs. 227-228.

- ACS utilizes a "Secure Detention Hall Inspection/Search Report" to ensure that the physical plant on each living unit—including cell locks—is in good working order. YDS staff on each tour are required to complete the form each day.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Just prior to opening, HOJC was refurbished and all cell doors and locking mechanisms were upgraded. Not surprisingly, during staff's daily inspections and NCUs audits, cells were generally found to be in working order. The NCU's monthly audits did not identify any problems in this area. NCU discontinued its HOJC audits when ACS assumed operational control of the living units in November 2019. Going forward, ACS plans to implement its existing process where staff inspect the physical plant of each housing unit on every tour to ensure the operability of cell locks. Regular inspection and on-going audits are encouraged as facility hardware inevitably deteriorates over time.

The Monitoring Team has not found inoperable locks to underlie problematic youth behavior or to drive uses of force since HOJC opened. The Department has been in Substantial Compliance with this provision for the two consecutive Monitoring Periods that this provision has been rated at HOJC. Given the newly refurbished setting, these findings, the transition of operational control to ACS, and the small number of Pre-Raise the Age Youth at HOJC, the Monitoring Team does not intend to actively monitor this provision during the next Monitoring Period. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 2. (16- and 17-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

> b. all Housing Areas with 16- and 17-year-old inmates at least twice per week, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented, and any general deficiencies shall be noted. [258]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The DOC's draft policy "Supervision of Youth in Specialized Juvenile Detention" addresses the requirements of this provision and remained in effect throughout most of the Monitoring Period. The Department's responsibility for this function ended when ACS assumed operational control of the housing units in November 2019.

- ACS reported that it expects either the Assistant Commissioner and/or the Executive Director for Operations (HOJC leadership analogous to the Warden/Deputy Warden) to visit each housing unit, to observe operations and to make themselves available to youth and staff at least four times per week. Responsibility for documenting these rounds was originally given to unit staff, though recently, the administrators were made responsible for entering their tours in the unit logbook.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC (i.e., part b).*

The Monitoring Team's frequent conversations with the facility's DOC and ACS leadership demonstrate that facility leaders have extensive contact with youth. However, a protocol to assess compliance with this provision was not developed nor prioritized by the Department or the Monitoring Team given the focus on other matters more likely to impact facility safety. ACS reportedly has an expectation that exceeds the requirement of this provision and has a process for documenting proof of practice, although the Monitoring Team did not evaluate the extent to which these expectations translated to dependable practice. Given the overall change in management structure for this age group, the Monitoring Team's observations that facility Leaders have routine contact with youth, ACS' standing policy that requires four tours per week, and the very small number of Pre-Raise the Age Youth at HOJC, the Monitoring Team does not intend to actively monitor this provision during the next Monitoring Period. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward as the current state of affairs does not indicate it is necessary.

| COMPLIANCE RATING | ¶ 3. (**16- and 17-year-olds**) Not Yet Rated |
|---|---|

---

[258] This language reflects the revision ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION) AND ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of the adolescents and the security risks they pose.

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department contracted with a well-respected consultant to design and validate an initial and reclassification instrument, which was completed shortly after HOJC opened.

- The DOC's draft policy for the use of the Classification tool at HOJC remained in effect throughout the Monitoring Period. The draft policy reflects generally accepted practices for classifying adolescents based on their risk of institutional misconduct.

- The Department and ACS trained the relevant staff to implement the policy, held a refresher training, and received on-going technical assistance from the consultant who developed the tool.

- While the Department was responsible for the classification function throughout the current Monitoring Period, ACS assumed responsibility for it in January 2020.

### ANALYSIS OF COMPLIANCE

The classification instrument is valid for the target population, reflects a sound methodology, and engages the DOC, ACS, and mental health staff who need to provide input into scoring the variety of risk factors. Since HOJC opened, the Department has coordinated several conference calls among the Monitoring Team, ACS staff and their consultant to refine the instrument and process based on the Monitoring Team's ongoing feedback.

Many of the problems noted in the previous Monitoring Period persisted during the current Monitoring Period (*e.g.*, inability to produce a housing roster that includes the youth's classification level; failure to update and reclassify youth at required intervals). Classification data submitted in November 2019 confirmed that while clarity in the process's requirements may have been achieved, the practice was still not dependable. Progress toward compliance was further compromised by the reduction in DOC staff, with the classification specialist deployed to HOJC only one day per week.

The Department reported prior to the transition to ACS that it took an initial step to house youth according to custody level, by designating a few housing units for maximum custody youth and notifying staff that minimum and maximum custody youth must be housed separately. However, given

that youth's classification levels were often incorrect because they were not updated as required, this structural change had little impact.

In summary, while the Department succeeded in developing the tool required by this provision, its implementation lacked the integrity to contribute to the safe operation of the facility, and thus ¶ 4 remains in Partial Compliance. While housing units for maximum custody youth were identified, the youth were not housed according to their classification level, which meant that this initial step had little significance. As a result, the Department remains in Non-Compliance with ¶ 8.

As ACS takes over this function beginning in the Tenth Monitoring Period, they are encouraged to consider whether any of the risk factors need to be reformulated to align with how delinquent history will be categorized post-RTA (*i.e.*, several items refer to DOC), finalize the user's manual with these clarifications, develop a process for routinely tracking youth's initial/update/reclassification, and ensure that maximum and minimum custody youth are housed separately. Furthermore, the main purpose of classification is to ensure that a youth's supervision level is commensurate with his/her level of risk. Simply completing a classification form does not create safety. Differential supervision strategies for youth with high versus low risks of misconduct need to be created and implemented.

The Monitoring Team will actively monitor these provisions for Pre-Raise the Age Youth at HOJC and recommends that these provisions are applied to the management of AOs going forward.

| **COMPLIANCE RATING** | **¶ 4. (16- and 17-year-olds)** Partial Compliance<br>**¶ 8. (16- and 17-year-olds)** Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ACS is responsible for providing and coordinating structured programming to youth at HOJC. This is accomplished via Program Counselors and an array of community partners.

- ACS endeavors to provide 5.5 hours of educational services each weekday and 3 hours of structured programming, 7-days per week.

- Both Program Counselors and community partners record the amount and type of programming that is delivered to each housing unit on a daily basis.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year old youth at HOJC.*

ACS has set ambitious targets for programming, which reflect best practice in juvenile facilities as they not only reduce idle time but also expose youth to a variety of activities and supportive adults who may assist them upon returning to the community. The Monitoring Team reviewed programming records and school attendance records for October and November 2019 to assess ACS' efforts in providing these services. As observed in previous Monitoring Periods, the volume of services delivered fell short of the targets.

Educational services continued to be hampered by chronic tardiness. In November 2019, on average, students were 57.5 minutes late to school each day. In December 2019, some slight improvements were noted, with 5 of the 8 housing units that were populated in both months showing a decrease in the average number of minutes tardy. That said, across all units, students were an average of 50 minutes late to school each day. In November 2019, DOE staff reported plans to improve attendance tracking so that specific operational problems—and potential solutions—could be identified more easily. DOC/ACS reported efforts to ensure that youth do not receive points in the behavior management program if they do not attend school, along with "morning rounds" by supervisory staff to encourage/persuade youth to go to school. That said, the shift from DOC to ACS staff on the housing units at the end of the Monitoring Period likely impeded progress.[259]

In terms of programming, a broad range of structured activities is provided, including cards/games, circuit training and other large muscle activity, movies, discussion groups about current issues (*e.g.,* domestic violence, breast cancer awareness, gang tensions), cooking, art projects, and peer- and staff-mediation. However, continued problems in meeting the identified 3-hour daily target were observed. To its credit, at the recommendation of the Monitoring Team, ACS audited its own programming records and identified problems with meeting targets, incomplete entries, a lack of standardization and a failure to submit forms as required. ACS then crafted several strategies to improve both program delivery and tracking to be implemented during the next Monitoring Period. These include the development of an electronic tracking system for both attendance and participation, which will prevent the loss of paper records that have stymied audits in the past. Daily oversight of these electronic records should improve both completion and accuracy. Further, program facilitators are also required to describe how the program went, if and why it did not occur or began late, and details about any other issues impacting delivery. ACS also reports plans to enhance the quality of programming by requiring strict adherence to approved activity plans, and by peer-coaching to expand counselors' skills. Finally, ACS reports it will conduct monthly meetings with its community partner

---

[259] The Monitoring Team believes the continued problems with school attendance are yet another side effect of the continuous changes at the facility—youth's tendency to test limits, and staff's inability to establish dependable, constructive relationships in the midst of it all.

(Center for Community Alternatives) to ensure that any problems with program delivery, engagement and documentation are addressed timely.

    The Monitoring Team will actively monitor this provision for Pre-Raise the Age Youth at HOJC and recommends that this provision is applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 5. (16- and 17-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES) AND ¶ 7 (PROTECTIVE CUSTODY)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department designed a process to ensure that youth who request Protective Custody, have safety concerns, experience trouble cohabitating with peers, or who are otherwise at risk of harm are placed on a Safety Plan, supervised one-on-one by a Safety Watch Officer and/or promptly transferred to a different housing unit. The Tour Commander is responsible for recording the implementation of the plan on a "Safety Plan Report Form," including how youth on Safety Plans were included in facility events.

- ACS reported its intention to assume responsibility for this process—utilizing the same protocol—during the subsequent Monitoring Period.

### ANALYSIS OF COMPLIANCE

    *This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

    In the previous Monitoring Period, the Department designed a procedure to meet its obligations under these provisions. Unlike the practice on Rikers Island, where inmates with safety concerns are housed in a specific unit and have no contact with the general population, juvenile justice facilities generally *do not* use segregated housing for this purpose. Instead, most juvenile facilities alter

the way in which a youth with safety concerns is housed and/or supervised in order to mitigate the risk of harm from other youth. The design of DOC's procedure for HOJC mirrors this standard.

In the previous Monitoring Period, the documents were very disorganized and incomplete, which made it difficult to discern whether the stated procedure was properly implemented. The Department was unable to produce proof of practice for the period between July and October 2019 (when they maintained control of the Facility) and thus was never able to demonstrate any level of compliance with this provision. That said, the Monitoring Team is unaware of any evidence that a significant number of HOJC youth have concerns for their safety. The population of Pre-RTA Youth at HOJC is so low that this provision has become impractical to operationalize and to actively monitor. Accordingly, the Monitoring Team does not intend to actively monitor this provision going forward for Pre-Raise the Age Youth at HOJC. Further, the Monitoring Team does not recommend that these specific provisions are applied to the management of AOs, although modified versions of these provisions may be appropriate.

| COMPLIANCE RATING | ¶ 6. (16- and 17-year-olds) Partial Compliance<br>¶ 7. (16- and 17-year-olds) Partial Compliance |
|---|---|

| **XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)** |
|---|
| ¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID maintains a dedicated PREA team to investigate all PREA allegations, which is discussed in more detail in the Use of Force Investigations section of this report.

- As ACS began to assume full control of the housing units, the process for demonstrating compliance with this provision evolved. ID referred allegations that involved only ACS staff (*i.e.*, no DOC staff) to the New York State Justice Center for investigation.

**ANALYSIS OF COMPLIANCE**

*PREA allegations and investigations involving HOJC staff are discussed in the Use of Force Investigations section of this report.*

During the current Monitoring Period, the Monitoring Team worked with ACS to define the process for reporting allegations and the outcome of investigations conducted by the Justice Center involving ACS staff to the Monitoring Team. In the subsequent Monitoring Period, PREA allegations and investigations involving youth and/or ACS staff will be reported here. If any allegations are made against DOC staff prior to their exit from the facility, these will continue to be reported in the PREA discussion in the Use of Force Investigations section of this report.

| | |
|---|---|
| The Monitoring Team will actively monitor this provision for Pre-Raise the Age Youth at HOJC and recommends that this provision is applied to the management of AOs going forward. | |
| **COMPLIANCE RATING** | **¶ 9.** Not Yet Reviewed |

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- HOJC's intended practices for youth orientation, consistent staffing, de-escalation, and behavior management mirror the tenets of Direct Supervision.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

This provision was drafted to address the way in which Young Inmates were managed in an adult jail. One of the benefits of transferring youth to a juvenile facility is that a new model—one in keeping with best practice in juvenile facilities—would be applied. The Department and ACS utilize Safe Crisis Management in the operation of HOJC, which is a widely accepted model for managing incarcerated youth. As a result, this provision is not applicable. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 12. (16- and 17-year-olds)** Not Applicable |

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 13 & 14 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF; PROBATIONARY STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- OCFS granted a waiver that allowed the Department to assign some Staff to HOJC who had only one year of experience instead of the two years required by the OCFS regulations. OCFS also granted a waiver to ACS which permits a combination of educational achievement and experience to satisfy the OCFS requirement.

- By the end of the Monitoring Period, only 55 DOC staff remained at HOJC. These included a Deputy Warden, 10 Captains and 44 officers.
  - When DOC Staff were responsible for managing the housing units, DOC Scheduling Officers reportedly took care to distribute probationary Staff across housing units to ensure they were paired with veteran Staff and to ensure that required staff ratios were met.
  - NCU's monthly audits (July-November 2019, at which point DOC no longer staffed the housing units) showed compliance with requirements for probationary staff distribution at or near 100%.
- ACS increased its assignment of managers, supervisors, YDS, and other staff throughout the current Monitoring Period in preparation for assuming full operational control of the facility. At the end of the current Monitoring Period, 20 Associate Youth Development Specialists (AYDS; Supervisors) and 168 Youth Development Specialists (YDS) were assigned to HOJC.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

<u>*Appropriately Qualified and Experienced Staff*</u> (¶ 13)

In the previous Monitor's Report, the Monitoring Team voiced its concern about the Department's record-keeping practices regarding the selection of Staff assigned to HOJC. During the current Monitoring Period, the Department submitted information that alleviated this concern. HOJC opened in October 2018, so DOC Staff now have at least one-year of experience working with adolescents and prior to that, the majority worked with youth at RNDC. Throughout the Monitoring Period, most DOC staff were transferred back to facilities on Rikers, leaving only 55 DOC staff at HOJC by the end of the current Monitoring Period. Ultimately, any concerns the Monitoring Team had were resolved by improved record keeping.

ACS' job requirements ensure that YDSs enter their position with significant experience working with youth and/or relevant education, thus eliminating a need to pair new staff with veteran staff, other than the orientation that occurs during on-the-job training. YDSs possess a combination of education and experience working with youth (*e.g.*, a high school diploma/equivalent plus two years working with youth; an associate degree plus one year and 3 months' experience with youth or additional coursework/credits; a baccalaureate degree plus coursework in counseling/social services/etc.). Given that YDSs apply for employment in one of two juvenile facilities, the requirement for "a particular interest in working with youth" is satisfied. Accordingly, the Monitoring Team does not intend to actively monitor this provision during the next Monitoring Period. Further, the

Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

*Probationary Staff* (¶ 14)

The Department continued to meet the "best effort" standard for ensuring that housing units are staffed with a mix of probationary and veteran staff. NCU's audits found 100% compliance throughout July-October 2019, when DOC was responsible for staffing the housing units. It is worth noting that ACS certified that all YDS/AYDS staff had been subject to multiple layers of screening and all meet these minimum qualifications and experience listed above. At the end of the Monitoring Period, when ACS began to supervise all housing units, ACS reported that new staff were routinely paired with veteran ACS staff as they began working at HOJC.

The Department maintained Substantial Compliance with this provision, which the Department has sustained since the Fifth Monitoring Period, for a total of 30 months.[260] Given the transition of operational control to ACS and the background requirements for YDS/AYDS staff, the Monitoring Team does not intend to actively monitor this provision during the next Monitoring Period. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 13. (16- and 17-year-olds) Substantial Compliance<br>¶ 14. (16- and 17-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 16 (STAFFING)[261]

¶ 16. Staffing Levels.

　　a.　　The ratio between Inmates and Direct Supervision floor Officers shall be no more than 15:1 in Young Inmate Housing Areas used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- DOC consistently met both OCFS Standards and PREA Standards for staffing on housing units (1:6 and 1:12 for OCFS and 1:8 and 1:16 for PREA).
  - NCU's monthly audits (July-November 2019, at which point DOC no longer staffed the housing units) showed compliance with requirements for staff ratio at or near 100%.
- HOJC has 10 housing units; six units have 15 beds and four units have eight beds or fewer.

---

[260] *See*, Fifth Monitor's Report at pgs. 164 to 166 (dkt. 311), Sixth Monitor's Report at pgs. 180 to 182 (dkt. 317), Seventh Monitor's Report at pgs. 224 to 225 (dkt. 327), and Eighth Monitor's Report at pgs. 239 to 240 (dkt. 332).

[261] The Consent Judgment does not include a ¶ 15 for this Section.

ANALYSIS OF COMPLIANCE

*These provisions apply to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with these provisions with respect to 16- and 17-year-old youth at HOJC.*

The state and Federal regulations regarding the staffing on housing units at HOJC (1:6 and 1:12 required by OCFS and 1:8 and 1:16 required by PREA) promote compliance as they are far richer than what is required by this provision. The facility's physical plant also promotes compliance with this provision as the maximum housing unit size is 15. The Department has consistently met the staff ratio requirements of this provision and has maintained Substantial Compliance with this provision since HOJC opened, and prior to that, while this population was housed at RNDC. During the current monitoring period, the Monitoring Team identified reliable sources of information to assess ACS' performance with these requirements. ACS also easily met the staff ratio requirements of this provision because it is aligned with the more rigorous PREA and OCFS standards. Given the Department's sustained compliance with this provision since the Fifth Monitoring Period (for a total of 30 months),[262] staffing regulations, the physical layout of HOJC, and the very small number of Pre-Raise the Age Youth at HOJC, the Monitoring Team does not intend to actively monitor this provision in the next Monitoring Period. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 16(a). (16- and 17-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- DOC's Scheduling Officer takes care to ensure that staff are consistently assigned to the same housing unit.

ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

---

[262] *See*, Fifth Monitor's Report at pgs. 164 to 166 (dkt. 311), Sixth Monitor's Report at pgs. 180 to 182 (dkt. 317), Seventh Monitor's Report at pgs. 224 to 225 (dkt. 327), and Eighth Monitor's Report at pgs. 239 to 240 (dkt. 332).

The struggle to consistently assign staff to the same housing unit intensified during the current Monitoring Period for a variety of legitimate reasons, particularly the transition from DOC to ACS as the primary agency for youth supervision. This transition required constant changes to the staffing complement on every housing unit as DOC staff rotated back to Rikers and ACS staff were transferred into HOJC. Concurrent with the agency transition, several housing units were closed for repair and later reopened. The constantly shifting landscape of housing units, DOC and ACS Staff made this provision difficult to implement (as well as audit and monitor).

With an eye toward the future, the Monitoring Team instead focused on identifying a protocol for assessing consistent assignments for ACS staff for the subsequent Monitoring Periods. ACS regularly maintains staffing logs for all three shifts that clearly indicate which staff were assigned to which housing units. Further, ACS administrators reported that the quality of relationships between youth and staff is a priority in their strategy to reduce violence. Toward that end, ACS reported its intention to consistently assign staff to the same housing units early in the next Monitoring Period.

The Monitoring Team will actively monitor this provision for Pre-Raise the Age Youth at HOJC and recommends that this provision is applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 17. (16- and 17-year-olds) Not Yet Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 18 (INCENTIVES FOR STAFF TO WORK WITH ADOLESCENTS)

¶ 18. The Department, in consultation with the Monitor, shall continue to develop and implement measures, including financial incentives, to: (a) encourage experienced and qualified Staff to work in the Young Inmate Housing Areas that are used for Inmates under the age of 18; and (b) retain qualified Staff in the Young Inmate Housing Areas that are used for Inmates under the age of 18 and limit staff turnover. The Department shall maintain records sufficient to show the numbers of Staff transferring in and out of the Young Inmate Housing Areas that are used for Inmates under the age of 18, the years of experience with the Department of the Staff regularly assigned to these areas, and the qualifications of Staff regularly assigned to these areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department provided specialty pay to Staff assigned to work at HOJC, designated adequate locker room space, installed an additional trailer for Staff, created a Staff lounge and provided parking passes for Staff at HOJC.

### ANALYSIS OF COMPLIANCE

As part of the initial transition from Rikers to HOJC, the City and the Department worked diligently with union representatives to develop reasonable incentives to encourage Staff to work at HOJC. The incentives were either financial in nature or designed to improve working conditions within the Facility and thus were reasonable to encourage experienced and qualified Staff to work at HOJC, to retain Staff and to limit staff turnover. These incentives remained in place throughout the current

Monitoring Period. Accordingly, the Department remains in Substantial Compliance with this provision.[263]

As for the applicability to ACS, Staff apply to work with ACS for the expressed purpose of working with adolescents, so the requirement to incentivize ACS staff to work with adolescents is not applicable. Accordingly, the Monitoring Team does not intend to actively monitor this provision during the next Monitoring Period. Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ 18. Substantial Compliance |
| --- | --- |

## 25. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE**
**¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME)**
**¶ 2 (NO PUNITIVE SEGREGATION FOR INMATES UNDER THE AGE OF 18)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation for 16- and 17-year-olds in December 2014.

**ANALYSIS OF COMPLIANCE**

*§ XVI. ¶ 1 applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

<u>*Owed Punitive Segregation Time (¶ 1)*</u>

The Department has not used Punitive Segregation for youth aged 16 or 17 since December 2014. Further, DOC regulations and those governing the management of Pre-Raise the Age Youth and Adolescent Offenders prohibit the use of Punitive Segregation. Accordingly, the concept of "owed Punitive Segregation time" did not apply to the 16- or 17-year-old youth when they were at RNDC or

---

[263] *See*, Eighth Monitor's Report at pgs. 241 to 242 (dkt. 332).

since they were housed at HOJC. [264] Further, the Monitoring Team recommends that this provision is not applied to the management of AOs going forward.

*Prohibition on Punitive Segregation (¶ 2)*

The Department has not utilized Punitive Segregation for 16- and 17-year-olds since December 2014. The Monitoring Team regularly reviews behavior management records and room confinement records and has seen no evidence of this practice by any other name at HOJC. Furthermore, OCFS regulations prohibit the use of disciplinary room confinement at HOJC. The Monitoring Team will continue to assess room confinement practices to ensure its use does not approximate Punitive Segregation or isolation, as required by ¶ 2, actively monitoring this provision for Pre-Raise the Age Youth at HOJC. Further, the Monitoring Team recommends that this provision is applied to the management of AOs going forward.

| **COMPLIANCE RATING** | ¶ **1. (16- and 17-year-olds)** Not Applicable<br>¶ **2.** Substantial Compliance |
| --- | --- |

### XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: REWARDS AND INCENTIVES) AND ¶ 4 (INMATES UNDER THE AGE OF 18: DISCIPLINARY SYSTEM)

¶ 3. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies and procedures shall be made in consultation with the Monitor.

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprived them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Since HOJC opened, ACS has had primary responsibility for the behavior management program and thus took the lead in the program's design, training, implementation and tracking. Of course, since youth spent large portions of their day with DOC and DOE staff, each phase of development required close collaboration with the partner agencies.

- On July 1, 2019, ACS/DOC implemented a more robust, individualized version of the behavior management program, STRIVE+. The program is guided by a user's manual for staff, youth

---

[264] *See*, First Monitor's Report at pg. 99 (dkt. 269), Second Monitor's Report at pg. 141 (dkt. 291), Third Monitor's Report at pgs. 221 to 222 (dkt. 295), Fourth Monitor's Report at pgs. 235 to 236 (dkt. 305), Fifth Monitor's Report at pgs. 168 to 169 (dkt. 311), Sixth Monitor's Report at pgs. 183 to 184 (dkt. 317), Seventh Monitor's Report at pgs. 228 to 229 (dkt. 327), and Eighth Monitor's Report at pg. 242 (dkt. 332).

manual, point cards and weekly tracking forms and all staff from DOC, ACS and DOE were trained to implement the program.

- Youth are able to dispute consequences imposed via the STRIVE+ Appeals Process, where key ACS and DOC staff reconsider the consequence imposed for misconduct. Approximately 30 youth appealed a consequence during the current Monitoring Period and a handful of appeals were found in the youth's favor. At times, the Appeals committee substituted a restorative consequence for the original drop in privilege level.

- Toward the end of the Monitoring Period, ACS sought additional support from the consultant who developed the STRIVE+ training in order to shore up the implementation of the program given ACS' increasing role in youth supervision. The consultant is scheduled to begin in February 2020.

- ACS' planned shift toward multi-disciplinary "Intact Teams" on each unit (the regularly-assigned YDSs, counselor, case manager, and mental health clinicians; representative from DOE) should better support staff in implementing STRIVE+, particularly with regard to holding youth accountable, and should create new options for addressing the subset of youth who frequently engage in violent misconduct. ACS has contracted with a specialist from the Missouri Youth Service Institute (MYSI), who was embedded in the facility beginning in December 2019, to support the implementation of the Intact Teams.

ANALYSIS OF COMPLIANCE

The STRIVE+ program is an individually-based behavior management program that reflects best practice in juvenile facilities (*see* the Eighth Monitor's Report, pgs. 244-245 for a detailed description of the program). As required by the Consent Judgment, the Monitoring Team provided detailed feedback, monitored the key tasks and timelines of the workplan, and ultimately approved the STRIVE+ program. Initially, STRIVE+ was jointly implemented by DOC and ACS, though as DOC transitioned out of HOJC, ACS became primarily responsible for its implementation. As with most things during the current Monitoring Period, the transfer of responsibility for STRIVE+'s implementation required the new segment of YDS staff working on the housing units to develop expertise in the program and its delivery. Even in facilities that are not undergoing a massive transition, the benefits of a behavior management program are neither guaranteed nor immediate. Significant oversight, coaching and sometimes, revisions to the design and/or retraining, are required to ensure that Staff utilize the program to shape youth's behavior in the moment, and that both rewards and consequences are meaningful to youth. While the problems observed in the implementation of STRIVE+ are not surprising, they must be addressed in order to stabilize the facility and improve safety.

The Monitoring Team reviewed STRIVE+ point cards for all youth at HOJC during December 2019. Several problems were identified: points awarded did not match misconduct records (*i.e.*, youth

received points even though they engaged in misconduct); staff failed to describe the reasons that youth received "0" points on the back of the card; point cards were occasionally blank for significant periods during the day; and staff rarely awarded bonus points to youth. These issues were discussed with ACS' administrative team, which had identified similar weaknesses in STRVIE+'s implementation. Most significantly, staff were not awarding zero-points in response to misconduct and were not engaging with youth to discuss their non-compliant behavior. As a result, some youth were achieving higher levels in STRIVE+ when their behavior clearly did not warrant it. In the subsequent Monitoring Period, ACS reports it plans to implement multi-disciplinary, unit-based teams ("Intact Teams") which may help to address this problem by providing staff with additional support for holding youth accountable.

ACS also found that implementing the privileges associated with each level was not practical as designed (*e.g.,* the volume/duration of phone calls awarded at the upper levels) and that the levels needed to be better distinguished from each other to better incentivize positive behavior (*i.e.*, some of the most valuable rewards were available on most of the levels, which diminished their power to encourage positive behavior—even youth with negative behaviors were able to access them). During the subsequent monitoring period, ACS, with the assistance of a consultant, reports it plans to recalibrate privileges to ensure rewards can be delivered dependably and that the levels are differentiated.

On the sanctions side, the problems mentioned above with staff failing to confront negative behavior undermined the effort to hold youth accountable for misconduct. In addition, a significant proportion of youth engage in frequent misconduct, apparently undeterred by consequences or unable to manage their behavior without additional support. Because youth are dropped to the lowest level (Copper) following their first violent act, the level system does not have the capacity to address subsequent misconduct (*i.e.*, their level cannot be dropped any further). In the original design, the level-drop was supposed to be augmented by restorative consequences, skill-building tasks and behavior analysis, all of which could be used to address negative behavior once the youth had exhausted the options available via the levels. The Monitoring Team recommends that ACS implement these elements as they revitalize the STRIVE+ program.

Further, the generally accepted practice for juvenile facilities is to implement a more intensive strategy to impact the behavior of difficult-to-manage youth. At HOJC, a weekly structure for reviewing these youth with Significant Behavior Concerns ("SBC") was developed early in the previous Monitoring Period and the Monitoring Team routinely reviews summaries of these meetings. In response to the Monitoring Team's feedback, the structure and content of the SBC meetings improved during the current Monitoring Period. They are reliably multi-disciplinary, team members appear to be better prepared, and the meeting notes often include key events for the youth being discussed (*e.g.*, family visits, interviews at placements, date on which youth will transfer to Rikers).

That said, the full value of the SBC has not been realized due to the paucity of specific interventions being crafted, utilized and evaluated for each youth, such as functional behavior assessments or behavior modification plans. Eventually, ACS reports it plans for the Intact Teams to replace the function of the SBC, which will include a behavior management component for youth who are exhibiting chronic behavior problems. The Intact Team is likely a better source of support because it includes the individual practitioners who work directly with the youth, rather than a representative of each discipline as in the SBC. ACS is encouraged to develop the capacity for functional behavior assessment and behavior modification plans so that specific interventions can be implemented for youth who frequently engage in misconduct.

An effective strategy for addressing this small subset of difficult to manage youth is essential to reduce the rates of violence and use of force and to create the safe conditions that are the primary requirement of this section of the Consent Judgment. Now that the transitional phase of operation is coming to an end, greater stability in team membership and a unit-based strategy will hopefully lead to more robust interventions for this subset of youth.

The Monitoring Team will actively monitor these provisions for Pre-Raise the Age Youth at HOJC and recommends that these provisions are applied to the management of AOs going forward.

| COMPLIANCE RATING | ¶ **3.** Partial Compliance<br>¶ **4.** Partial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

(a) Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

(b) The Tour Commander of the facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

(c) The Inmate shall remain in confinement only for so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the inmate at least once every 3 hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The DOC's draft policy regarding the use of Room Confinement at HOJC remained in effect throughout the Monitoring Period.

- Neither agency utilized Room Confinement throughout most of the Monitoring Period. DOC utilized Room Confinement with six youth during July 2019 and ACS placed two youth in Room Confinement during December 2019.

ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

As written, the Department's draft policy on Room Confinement reflects the generally accepted practice in juvenile facilities and meets the requirements of this provision. Room confinement is permitted only in response to an imminent risk of harm and when lesser measures have failed or are impractical. Furthermore, a variety of protections are required to ensure that youth are released from room confinement as soon as the risk of harm has abated, to ensure that specialized services (counseling, medical, education) are provided while the youth is confined, and to reduce the risk of self-harm during the period of isolation.

The Monitoring Team's extensive experience with this issue in other jurisdictions indicates that room confinement for the purpose of de-escalation is an essential tool for safely managing the immediate aftermath of violent incidents. It allows time for youth to regain control, process their behavior with staff and/or mediate interpersonal conflict, and it also gives Staff time and space to regain operational control of the area. Given the level of disorder at HOJC, the Monitoring Team has encouraged the *appropriate* use of room confinement and has provided strong guidance about ensuring that the various protections listed above are in place. As noted in previous Monitor's Reports, the Department continually failed to follow its policy and it appeared that neither staff nor supervisors/ leadership were being held responsible for improving practice.

Perhaps in response to the ongoing struggle to ensure that staff followed the Room Confinement policy, the practice was all but abandoned during the current Monitoring Period. DOC placed 6 youth in room confinement during July 2019 and ACS placed 2 youth in room confinement during December 2019. All of these placements lasted less than 6 hours. As found in previous Monitoring Periods, the use of room confinement did not reflect policy requirements regarding 15-minute safety checks, routine assessments of youth's readiness for release, required reauthorizations or the delivery of services at particular intervals. The Monitoring Team's efforts to encourage internal quality assurance and accountability as necessary never gained traction due to the transfer of responsibility from one agency to another. Moving forward, Staff of all disciplines need to be reminded of the policy requirements, supervised accordingly and held accountable when necessary. Furthermore, developing dependable procedures to notify staff who may not be present on the unit (mental health, education, case managers) that a youth has been placed on room confinement would likely improve practice.

While the Monitoring Team does not support the use of room confinement for punishment or absent an imminent risk of harm, the facility's inability to effectively address a subset of youth's frequent violent behavior raises the question of whether short periods of room confinement—in concert with a commitment to engaging with youth to discuss their behavior—could assist the effort to increase facility safety. ACS clearly invests considerable time talking with youth following an incident, however, given the high rates of subsequent violence for several youth, the efficacy of the current approach is ripe for examination. That said, the Monitoring Team is committed to providing system-level oversight and does not interfere in the management of individual youth. These observations were shared with ACS toward the end of the Monitoring Period.

A rating of Partial Compliance was assessed to recognize that room confinement is rarely used, and thus certainly not overused. However, stricter adherence to the requirements for protecting youth in room confinement is needed whenever room confinement is used.

The Monitoring Team does not recommend that this specific provision is applied to the management of AOs going forward, however a modified version of this provision may be appropriate.

| COMPLIANCE RATING | ¶ 10. (16- and 17-year-olds) Partial Compliance |
|---|---|

### 26. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 (CONSENT JUDGMENT § XVII)

**XVII. HOUSING PLAN FOR INMATES UNDER THE AGE OF 18 ¶¶ 1, 2, 3**

¶ 1. The Department and the Mayor's Office of Criminal Justice shall make best efforts to search for and identify an alternative site not located on Rikers Island for the placement of Inmates under the age of 18 ("Alternative Housing Site"). The Department and the Mayor's Office of Criminal Justice shall consult with the Monitor during the search process. The Alternative Housing Site shall be readily accessible by public transportation to facilitate visitation between Inmates and their family members, and shall have the capacity to be designed and/or modified in a manner that provides: (a) a safe and secure environment; (b) access to adequate recreational facilities, including sufficient outdoor areas; (c) access to adequate programming, including educational services; (d) the capacity to house Inmates in small units; and (e) a physical layout that facilitates implementation of the Direct Supervision Model.

¶ 2. The Department shall include in its Compliance Reports a summary of the efforts made during the Reporting Period to identify an Alternative Housing Site, a description of any site(s) under consideration, the anticipated next steps in the search process, and, if an Alternative Housing Site has been identified, the timeline for completion of any retrofitting or other work that is necessary before the site may be used to house Inmates.[265]

¶ 3. The Department shall make best efforts to place all Inmates under the age of 18 in an Alternative Housing Site, unless, after conducting a diligent search, the Department and the Mayor's Office of Criminal Justice determine that no suitable alternative site exists.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The City completed the transfer of all the 16- and 17-year-olds off Rikers Island to Horizon Juvenile Center by October 1, 2018. Any 17-year-old youth arrested and detained between

---

[265] Compliance Reports and Reporting Periods are referenced and defined in Paragraph 1 of Section XIX (Reporting Requirements and Parties' Right of Access).

October 1, 2018 and September 30, 2019 are also housed at HOJC. The Facility is jointly operated by the Department and ACS.

**ANALYSIS OF COMPLIANCE**

Since the Effective Date of the Consent Judgment, the City has worked diligently (and demonstrated "best efforts") to identify the appropriate location to house 16- and 17-year-old youth off of Rikers Island. Once the Horizon Juvenile Center ("HOJC") was identified, the City committed the appropriate resources to refurbish the Facility. Since October 1, 2018, all Pre-Raise the Age Youth have been housed at HOJC. Accordingly, the City maintains Substantial Compliance with this provision, which it has sustained for all nine Monitoring Periods (for a total of 50 months).[266] These three provisions are no longer necessary as the City and Department have transferred 16- and 17-year old youth off of Rikers Island, and it will not be subject to active monitoring. The Monitoring Team therefore recommends terminating this section, as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **2.** Not Applicable for rating<br>¶ **3.** Not Applicable |

---

[266] *See*, First Monitor's Report at pgs. 109 to 111 (dkt. 269), Second Monitor's Report at pgs. 154 to 155 (dkt. 291), Third Monitor's Report at pgs. 237 to 239 (dkt. 295), Fourth Monitor's Report at pgs. 251 to 252 (dkt. 305), Fifth Monitor's Report at pgs. 179 to 181 (dkt. 311), Sixth Monitor's Report at pgs. 195 to 196 (dkt. 317), Seventh Monitor's Report at pgs. 206 to 207 (dkt. 327), and Eighth Monitor's Report at pgs. 248 to 249 (dkt. 332).

# CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

This report discusses the status of Young Inmates in two sections. The previous section discussed the status of 16- and 17-year old youth now housed at HOJC, and this section discusses the status of 18-year-old youth who remain on Rikers Island. The vast majority of males are housed at RNDC (ADP of 76 for the current Monitoring Period) and all female 18-year-olds are housed at RMSC (ADP of 3.2 for the current Monitoring Period). Sentenced 18-year-old males are housed at EMTC (ADP of 3.5 for the current Monitoring Period); those who require the mental health services available via CAPS and PACE would be housed at AMKC (none during the current Monitoring Period); a few are housed either in general population or Secure at GRVC (ADP of 10.7 for the current Monitoring Period), and a few in ESH at OBCC (ADP of 2 for the current Monitoring Period).

During this Monitoring Period, RNDC continued to struggle with key safety indicators. The high rates of violence and UOF led to Non-Compliance ratings (¶ 1) for the past two Monitoring Periods (July 2018 through June 2019), with no appreciable improvement during this Monitoring Period. RNDC has been destabilized from a series of transitions since 2018 and has yet to obtain its footing. GMDC closed in June 2018 and most of the youth and many Staff were transitioned to RNDC. In September 2018, the adolescents housed at RNDC were transferred to HOJC, along with many of the Staff who worked with them. As discussed below, the Facility has yet to recover from this period of upheaval, as the use of force rate and rate of youth-on-youth violence both remain high.

### Rate of Use of Force and Violence for 18-Year-Olds

As shown in the table and graph below, the use of force rate among 18-year-olds slightly decreased a year or so after the Consent Judgment went into effect but then increased sharply and

has remained significantly higher than the early phases of monitoring. The UOF rate for 18-year-olds remains of serious concern to the Monitoring Team.



The table below presents historical UOF rates from another angle and brings the gravity of the current situation into stark relief. The 2016-2018 rates, while lower, were still of significant concern—in fact, these "lower" rates are similar to what gave rise to the Consent Judgment in the first place, and thus must be improved upon in a sustained and significant way in order to meet the requirements of *Nunez*. The UOF rate increased significantly in late 2018 and remained high throughout 2019. Also, for the sake of comparison, the average UOF rate among 18-year-olds is more than nine times higher than the average rate of UOF among adults, which also remains at concerning levels (53.8 versus 5.8 in 2019).

| Average UOF Rate, 18-year-olds | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jan. - Jun. 2016 | Jul.- Dec. 2016 | Jan. - Jun. 2017 | Jul. - Dec. 2017 | Jan. - Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul. -Dec. 2019 |
| 17.4 | 21.7 | 20.7 | 14.3 | 16.1 | 56.7 | 52.9 | 54.8 |

Similar patterns are observed in the rate of violence among 18-year-olds. Since June 2018, violence climbed to the highest levels since the Consent Judgment went into effect.



The average rate of youth-on-youth violence among 18-year-olds was 24.4 between January 2016 and June 2018; since then, the average rate has more than doubled, to 58.3.

| Average Rate of Youth-on-Youth Violence, 18-year-olds | | | | | | | |
|---|---|---|---|---|---|---|---|
| Jan. - Jun. 2016 | Jul.- Dec. 2016 | Jan. - Jun. 2017 | Jul. - Dec. 2017 | Jan. - Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul. -Dec. 2019 |
| 21.6 | 31.0 | 25.6 | 22.7 | 21.3 | 48.3 | 62.3 | 64.3 |

The essential question here is **why**? Simply moving from one building to another should not create the sustained pattern of disorder that is reflected in this data. Certainly, immediately before and immediately after GMDC's closure, the uncertainty and stress of change could be expected to have a negative impact on Facility safety. However, these changes took place 18 months ago, and the high level of disorder has yet to subside.

283

Several contributing factors were discussed in the previous Monitors Report (*see* Eighth Monitor's Report at pgs. 253-254). These included unstable leadership, sparse disciplinary options, lack of consistency in staff assignments to housing units and inadequate supervision of Staff. These dynamics, along with the high levels of violence and UOF and pervasive operational concerns (*e.g.*, alarms, Probe Team, hyper-confrontational response), have been the foundation of the Monitoring Team's concerns about safety at RNDC for several Monitoring Periods. As discussed in the Efforts to Advance Reforms & Address Areas of Concern section of this report, the Monitoring Team has consulted with the Department on several initiatives to remediate these problems. The Department's plan, described below, is intended to ameliorate these conditions.

*RNDC Plan to Reduce Violence and Use of Force*

In response to the Monitoring Team's concerns, the Department crafted the RNDC Plan to Reduce Violence and Use of Force ("RNDC Plan").[267] Initially, the Department planned to implement "Graduated Sanctions," a unit-based strategy designed to better respond to youth behavior by sanctioning misconduct. While sanctions are an important component of any behavior management program, the Department ultimately decided that the Graduated Sanctions program was impractical (unit-based strategies have inherent challenges because unit capacities are not always synchronized with the number of youth who attain each level). The Monitoring Team was also concerned that the process relied too heavily on the infraction process and did not sufficiently emphasize the role of incentives and rewards in shaping youth behavior. Thus,

---

[267] While some of the other Facilities that hold 18-year-olds have similar gaps (*e.g.*, lack of disciplinary options, inconsistent staff assignments), they have significantly lower rates of violence and UOF and house a very small number of 18-year-olds, and thus there is no basis to conclude that a specific plan to remediate conditions in those Facilities is necessary. Still other 18-year-olds are in special programs (*e.g.*, TRU, ESH, Secure, CAPS and PACE) which have their own program designs. Finally, all youth in other facilities will benefit from the Department's plans for global improvements described in other sections of this report.

during the latter half of the Monitoring Period and corresponding with new leadership at RNDC and in the Programming Division, the Department redesigned the plan.

The RNDC Plan includes four main components: (1) consistently assigning Staff to the same housing unit day-to-day; (2) implementing Unit Management; (3) bolstering incentives for positive behavior; and (4) fortifying the sanctions for misconduct. Each of these is summarized below, and further discussion is integrated into the relevant provisions in the remainder of this section. These pillars are interdependent and are also closely related to many of the drivers of the Facility's high UOF rate. They must be properly and fully implemented to have the intended impact on RNDC's safety.

- **Consistently Assigning Staff to the Same Housing Unit**

As discussed in detail in § XV. ¶ 17 (Consistent Assignment of Staff), below, the Department made significant progress during the current Monitoring Period to ensure that Staff are assigned to the same housing units day-to-day. This consistency is the foundation for developing more constructive staff-youth relationships and for enhancing staff's ability to detect and de-escalate rising tensions. In addition to changing the way staff are assigned to housing units, the NCU also developed a rigorous auditing tool. Consistently assigning staff to the same housing unit is a core requirement for achieving the goals of the other components of the plan, discussed below.

- **Improving Staff Supervision**

The Department plans to implement several strategies to improve the quality of Staff supervision at RNDC to respond to the Monitoring Team's concerns about the quality of guidance and supervision for both Supervisors and line staff; to assist staff implementing proactive supervision, de-escalation, rewards and sanctions (*i.e.*, core tenets of Direct

Supervision, see § XV. ¶ 12, below); and to increase cohesion among the multi-disciplinary unit teams (*i.e.*, corrections staff, counseling/program staff, rec staff, etc.). One strategy for improving Staff supervision is to build in additional lines of supervisions. The first Unit Manager has been selected and a training curriculum has been developed. The concept will be pilot tested in Building 6 and then expanded to the remaining housing units at RNDC.

- **Developing Incentives for Positive Behavior**

As discussed by the Monitoring Team in several prior reports (*see* Eighth Monitor's Report at pgs. 281-282), the Department's incentive programs (*i.e.*, the Levels and the Stamp Cards) have never been properly implemented and thus have not been effective strategies for managing youth behavior. The RNDC Plan includes a few tools for bolstering the incentive system to provide individual-level rewards for positive behavior, and the Department is encouraged to maximize Staff's options for providing on-the-spot rewards.

The Department continues to utilize its group incentive program ("the Levels"), though its implementation still needs to be fortified as discussed in § XVI. ¶ 6, below. Under the Levels program, Staff and Facility leadership rate each housing unit on an array of factors (*e.g.*, incidents, infractions, respect for Staff, sanitation, cell compliance, uniform compliance, lock-in, court production and program engagement) every two weeks. Well-performing units should be assigned a higher Level (Gold and Platinum) and gain access to an array of rewards (special activities, games, etc.), while units exhibiting problem behaviors should be assigned to a lower Level (Copper and Bronze) with more limited rewards.

The RNDC Plan recognizes the limitations of the Levels program and plans to supplement it with several individual-level incentives to further encourage positive behavior. These include two Honors Dorms (one dedicated specifically to inmates who agree to attend

school every day) that feature a robust array of incentives (extra visitation and recreation; late lock-in; more games, televisions and telephones; and premium access to the PEACE center). The School Honors Dorm opened in November 2019, and the general Honors Dorm opened in June 2019. The Department plans to add additional options for on-the-spot rewards (*e.g.*, free haircut coupons or entertainment delivered via tablets) and incentives for meeting individualized case plan goals.

- **Fortifying Sanctions for Misconduct**

As heavily encouraged in previous Monitor's Reports, the Department's continuum of responses to misconduct must be expanded to effectively address behaviors such as threatening Staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other inmates are compromised. These behaviors are not serious enough to warrant placement in an SSH, but an effective response is necessary to promote Facility safety. The infraction process, as currently applied, does not include effective sanctions for modifying behavior (*i.e.*, only a $25 surcharge or a verbal reprimand).

A major component of the RNDC Plan is the implementation of "Informal Resolutions" to address low- and mid-level misconduct to address the lack of options available via the infraction process. Under the new process—which is supported by the Unit Management model—unit staff will be able to provide an immediate consequence ("Informal Resolutions") which will include commissary spending limits, limits on the items that may be purchased through the commissary, limits on barbershop visits (to BOC Minimum Standards), tablet restriction and restrictions from unit activities such as extra recreation or visits to the PEACE Center. The plan includes procedures for supervisory oversight to ensure fairness and

proportionality, and procedures for documenting the sanction and its duration. Once implemented, these Informal Resolutions will allow staff to respond to youth's behavior in the moment and better shape youth's behavior. This part of the plan addresses a persistent deficit that has inhibited compliance with § XVI. ¶ 6, discussed in more detail below.

### 27. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

#### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continued to face high levels of violence and disorder throughout the Monitoring Period, as discussed in the narrative above.
- The Department continues to design, implement, and refine a range of strategies intended to produce safer Facilities, via the RNDC Plan described in the narrative above.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

As discussed in the introduction to this section, the rate of violence and use of force among 18-year-olds remained higher during the current Monitoring Period than during any other period since the Consent Judgment went into effect. The vast majority of 18-year-olds are housed at RNDC. The other facilities hold only small numbers of 18-year-olds and do not have rates of violence and UOF of the same magnitude. RNDC's level of disorder and rate of use of force are simply unsafe and the Department's efforts to reduce them have thus far been ineffective. The Department must bring together a number of important initiatives and commit to robust implementation of its RNDC Plan in order to reverse this trend.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

#### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly,

are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- NCU reported that the FSIRs and DCSRs forms for all housing units with 18-year-old inmates have generally been completed throughout the entire Monitoring Period at GRVC, OBCC, RNDC, and RMSC.

- NCU conducted on-site inspections on a few random days each month to determine whether any 18-year-old inmate was housed in inoperable cells throughout the entire Monitoring Period at GRVC, OBCC, RNDC, and RMSC. If an inmate is assigned to an inoperable cell, the Facility is notified and expected to either remove the youth from the cell immediately or have the cell repaired so it may be safely occupied.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

<u>*Assessment of Locking Mechanisms*</u>

Rather than focusing solely on the completion of required forms, as had been the practice in previous Monitoring Periods, NCU added an on-site inspection of cells to its monthly audit, tracking the number of times that inmates were found to be housed in a cell with an inoperable lock. RMSC, OBCC and GRVC had very high performance levels each month—the small number of 18-year-olds housed in these Facilities were all housed in cells with operable locks. On the other hand, RNDC struggled to reach an acceptable level of compliance. Across the Monitoring Period, youth were found to be housed in cells with inoperable locks in 60 of NCU's 322 (19%) randomly sampled cell checks. Monthly performance levels ranged from 7% to 25% of cell checks revealing a youth housed in a cell with an inoperable lock.

The locking mechanisms at RNDC are both antiquated and complicated. The lack of dependable locking mechanisms is a reported frustration for Staff. Accordingly, routine and vigilant security assessments and maintenance are necessary to minimize unauthorized exit from a cell. If a lock is

found to be compromised, the cell must be taken off-line immediately so the lock can be repaired. The Department is striving to improve performance in this area by ensuring that the RNDC Leadership is aware of the audit results each month, reminding staff how to do a quality cell inspection, and encouraging Captains to address poor performance with their Staff.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to UOF incidents. During this Monitoring Period, the Monitoring Team identified five incidents at RNDC (1% out of the 537 incidents at RNDC) that had some type of unauthorized exit by inmates (as reported in the COD) that resulted in a Use of Force incident. Based on the Monitoring Team's review, it is unclear whether the youth were able to leave their cell because the cell lock was manipulated or because the inmates were not securely locked into their cells following the lock in. As noted in prior Monitor's Reports, these findings suggest that inoperable cells contribute to only a very small fraction of incidents and therefore do not appear to be a major factor in the use of force at RNDC.

*Reasonably Safe and Secure Conditions*

This provision also requires the Department to conduct daily inspections to ensure the conditions are reasonably safe and secure. As reported in the Seventh and Eighth Monitor's Reports, the Monitoring Team found other operational issues that negatively impact the reasonably safe and secure conditions for 18-year-old inmates, particularly the failure to manage lock-in times which caused a number of operational issues. While cell lock failures may not contribute substantially to UOF, as noted above, they certainly contribute to the high level of disorder at the facility and make it far more difficult for Staff to manage their units.

During the latter part of the current Monitoring Period, RNDC began to implement sanctions for failing to lock-in. During November and December 2019, the Department issued 338 sanctions for youth who did not adhere to lock-in times (mostly during the overnight tour). About half of these (48%) were verbal warnings for the first offense, while the other half imposed commissary limits of different durations for subsequent offenses. About 30 sanctions were imposed on youth who had between 5 and 10 subsequent offenses. The Department is applauded for taking steps to address this operational issue and for the quality of its record-keeping. The Monitoring Team will continue to review these records to assess whether this response is effective in addressing inmates' failure to lock-in as required. It is also prudent for the Department to examine whether inmates are failing to lock-in at all, or whether they were able to manipulate their cell doors to exit the cell after originally locking in. The results would help to pinpoint whether the problem is one of inmate resistance, problems with the physical plant or improper securing practices by Staff that permit inmates to tamper with the cell locking mechanisms. Once the underlying causes of this problem have been determined, they must be addressed via accountability for staff who are not following required procedures, effective consequences for youth and upgrades to the physical plant.

| COMPLIANCE RATING | ¶ 2. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    a.   all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted. [268]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department added to the General Supervision section of its Rules and Regulations to incorporate the requirement of this provision.

- The Department issued a General Order on March 29, 2019 requiring Wardens and Deputy Wardens to conduct weekly tours of each housing area where 18-year-olds are housed (more frequently in those areas with operational challenges) and to correct any deficiencies noted.

- During the Seventh Monitoring Period, NCU incorporated a review of housing area log books into its existing audits of cell-locking mechanisms in order to identify the frequency of tours. During the current Monitoring Period, NCU refined its methodology by asking the Facilities to indicate the date/time on which tours occurred, which were then verified using log book entries and/or Genetec reviews.

- NCU audits the Facilities' performance level by comparing the number of required events (number of units x number of weeks audited) to the number of tours by the Wardens/DWs that could be confirmed. Facilities housing smaller numbers of 18-year-olds logically had a smaller number of events.

- Across all Facilities, Wardens/DWs' performance level averaged 94% for the Monitoring Period. RNDC's performance level was consistently above 90%. Some of the other facilities— which housed small numbers of young adults—had lower performance levels in a couple of the months reviewed, but toward the end of the Monitoring Period, all were performing at approximately 80% or higher.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates (i.e., part a).*

---

[268] This language reflects the revision ordered by the Court on August 10, 2018 (*see* Dkt. Entry 316).

In order to achieve compliance with this requirement, the Department issued a new rule and directive to reflect the requirements of this provision, which went into effect part way through the previous Monitoring Period. Per the Directive, all housing units are to be toured weekly, while housing areas with multiple fights, SRG violence, multiple uses of force or other types of disorder should be toured more frequently.

As noted above, the Facilities consistently met the weekly tour requirement of this provision, particularly at RNDC where the vast majority of youth are housed. This provision also requires units with higher rates of disorder to be toured more often. The Department has not yet established criteria for determining when more frequent tours are needed. Once established and audited by NCU, the Monitoring Team will verify NCU's findings to assess whether Substantial Compliance has been achieved.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Program Counselors are assigned to all general population units housing 18-year-olds at RNDC, RMSC, EMTC, and GRVC, as well as SSH units in GRVC and OBCC. They provide structured programming (*i.e.*, individual counseling, groups on issues that are common to this population) and structured recreation (*e.g.*, games and other leisure time activities). Program Counselors are required to document these programs and activities on a daily basis and the Department has a reliable mechanism for tracking the volume of services provided.

- The Department partnered with 41 community-based organizations that provided approximately 900 hours of programming per month to youth at RNDC, EMTC and RMSC and the SSHs during the current Monitoring Period. The Department now has an accessible format for tracking and compiling data on the volume of programming provided by community partners.

- All 18-year-olds at RNDC, EMTC and RMSC have the opportunity to attend full-day school. Those in ESH or Secure have the opportunity to attend school three hours per day.

- The Department rebuilt the PEACE Center and YES Center at RNDC which reopened during the previous Monitoring Period. These spaces offer workforce development and vocational programming (*e.g.*, autobody shop) and structured leisure time activities (*e.g.*, recording studio, ping pong and other games).

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department is pursuing compliance with this provision by providing various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by a variety of community partners, leisure time activities (*e.g.*, tablets, board games and video games), religious services and daily large muscle activities ("recreation"). The combination of these programs should ensure that, if an inmate chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult. Broad engagement in these activities will reduce both idle time and violence and will enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing data on programming delivered by Program Counselors and community partners, as well as education attendance data.

*Education*

Although engagement in school is essential for positive youth outcomes, it is not mandatory for this age group. Those who are housed at RNDC, EMTC and RMSC have the option to attend full-day school, while youth in the SSHs have the opportunity to attend school for three hours per weekday. The Monitoring Team reviewed monthly attendance reports maintained by the NYC DOE for those eligible for education (*i.e.*, youth aged 18+ are eligible for school but are beyond the compulsory education age). As noted in previous Monitor's Reports, only a small segment of young adult students (age 18 to 21) are enrolled in school and fewer attend consistently. Facility/housing unit assignments are adjusted accordingly for youth who indicate a desire to attend school. As of the end of the Monitoring Period, approximately 18 youth were participating in the School Honors Dorm, which opened in November 2019.

Many young adult students participated in the wide array of career technical education ("CTE") programs that operate out of the PEACE and YES centers. For this age group, not only do opportunities to participate in CTE programs reduce idle time but also contribute to positive post-release outcomes.

*Program Counselors & Community Based Programming*

The Department continues to close units at RNDC for physical plant improvements, and thus the number of open units fluctuated throughout the Monitoring Period, as did the Program Counselor assignments. As of the end of the Monitoring Period, all units housing young adults at RNDC, RMSC, and EMTC had an assigned program counselor, as did ESH at OBCC and Secure and general population units at GRVC.

The Monitoring Team analyzed programming data for October and November 2019 by calculating program hour totals (combining hours delivered by program counselors and community

partners) for general population housing units that operated throughout both months. This analysis revealed a significant volume of programming in many units. In some units, program counselors provided the bulk of programming while in others, community partners provided most of it. Some units had an equal volume of programming provided by program counselors/community providers. Programming types included conflict resolution; Dialectical Behavioral Therapy; Interactive Journaling; communication skills; art, drama and music; yoga and other types of fitness; employment readiness and job skills, among many others.

- At RNDC, units received an average of about 12 programming hours per week, ranging between 5 and 26 hours per week, depending on the unit.
- At RMSC, the two units housing young adults received an average of about 23 programming hours per week.
- At EMTC, the two units housing young adults received an average of about 21 programming hours per week.

Now that data on programming provided by Program Counselors and community partners is dependable and maintained in a format that is amenable to unit-level analysis, the Monitoring Team plans to craft a more rigorous and transparent auditing strategy during future Monitoring Periods. This will involve setting—in collaboration with the Department—a reasonable target for the proportion of waking hours in which structured programming is available or an expected number of hours per day, as well as a method for determining what proportion of housing units achieve the target. These will provide a more precise assessment of the level of compliance than the current aggregate/average programming hours provide. It will also enable the Monitoring Team to better understand the differences in programming hours across units, and to ensure that the results are not confounded by housing unit opening/closure. Significantly, more precise programming data will also contribute to the understanding of and potential solutions to the high level of disorder observed at RNDC.

The analysis conducted for the current Monitoring Period revealed that if an 18-year-old inmate chose to attend school (six hours per day x five days = 30 hours) and engaged in the typical program offerings on an average unit at RNDC (12 hours), about 42% of his out-of-cell hours (14 hours x seven days = 98 hours) would be occupied by structured programming led by an adult. The estimated proportion of waking hours during which programming is available was higher at RMSC (54%) and EMTC (52%). This estimate omits time spent in recreation and religious services, which were not included in the data, and also does not account for other structured activities such as services from H+H clinicians, meals, showers, or visitation. In short, the level of programming provided appears to meet the requirements of this provision and the Department remains in Substantial Compliance.

The Deputy Commissioner ("DC") of Programming has reported that a long-term goal of the RNDC Plan is to revitalize the way in which programming is delivered to young adults at RNDC. The DC's vision is that the Program Counselors will be trained in risk/needs assessment and will craft

individualized case plans that prescribe programs that address identified needs. Some will also deliver individual and group counseling, using one of a variety of evidence-based programs. The Department intends to incentivize programming by offering a variety of rewards for program engagement. Once properly implemented, deeper engagement in targeted programming may also help to combat the high rates of disorder at the facility.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In November 2018, NCU assumed responsibility for tracking housing transfers enacted to protect vulnerable youth at RNDC, by creating a list of all housing transfers and consulting with the Facility on the purpose of each one to identify those enacted for the purpose of protecting youth. NCU audited housing transfers throughout the current Monitoring Period.

- Each month, a list of all housing transfers at RNDC is generated, and NCU staff consult with Facility Staff/Young Adult Response Team ("YART") members to ascertain the reason for the transfer. Transfers are categorized accordingly.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The goal of this provision is to ensure that youth who are being bullied, threatened, or are otherwise vulnerable are moved to a different housing unit where they will be safer. Facilities make housing transfers for a variety of reasons (*e.g.*, after intake and classification, to disrupt tensions, to provide access to a program house, etc.). At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent of this provision is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Facilities must strike a delicate balance among making transfers to protect vulnerable inmates, intervening before tensions escalate into violence, not allowing inmates to dictate their housing assignments, and helping inmates and Staff develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Facilities' flexibility for programming, population management, etc.

NCU's audit strategy is comprehensive and has integrity. During the current Monitoring Period, NCU identified 33 transfers effected to protect the victim of an altercation. The Monitoring Team

consulted with NCU to assess the way transfers were classified to determine whether the criteria were too narrow (*see* Eighth Monitor's Report at pg. 262, where the Monitoring Team hypothesized that the transfers may have been undercounted). NCU reviewed the criteria with the YART team and concluded that each situation is fact-specific and could only be determined by reviewing each transfer of certain types individually (*e.g.*, transfers that occur following a fight). The Monitoring Team is satisfied that NCU is presenting accurate data in this regard. The Department consistently transfers youth among housing units at RNDC in order to protect victims or to prevent tensions from escalating and remains in Substantial Compliance.

Given the small number of housing units and very few 18-year-old youth housed in the general population at GRVC, at EMTC (sentenced 18-year-olds) and RMSC (female 18-year-olds), the procedures required by this provision are not operationally feasible. GRVC (Secure) and OBCC (ESH) are excluded due to their function as special housing units and the resulting lack of flexibility in housing assignments.

| **COMPLIANCE RATING** | **¶ 6. (18-year-olds)** Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report, at pgs. 131-132). Protective Custody units are located at RNDC (males) and RMSC (females).

- Based on feedback from the Monitoring Team, the Department previously revised its practice to allow Operations Security Intelligence Unit ("OSIU") staff to focus more directly on 18-year-olds and those who are disputing their placement in PC.

- The Department plans to revise the Directive to address the interplay between PC status and violent misconduct, particularly among adult inmates, but the policy has not yet been finalized.

- In response to a few isolated problems discovered during the Monitoring Team's verification audit in the previous Monitoring Period, on May 10, 2019, the Chief of Security issued a memo to the Assistant Chiefs for each Facility directing that transfers into and out of PC may occur

*only* with OSIU approval and must be carried out by the Facilities in a timely manner. Furthermore, NCU reported that it instituted a new procedure in which OSIU sends NCU the *entire* PC file so that NCU staff can identify issues that may be documented on something other than the official PC forms.

- NCU audits PC files each month to assess compliance with policy and the requirements of the Consent Judgment. NCU found high levels of compliance across the 35 files audited (some youth who entered PC during the previous Monitoring Period were included in the audits). Nearly 100% of the packets included:

  o A statement from the youth detailing his/her concerns;
  o Further information (incident report, etc.) to flesh out the youth's statement;
  o Evidence that OSIU interviewed the youth within the two-business day timeline;
  o Documentation that youth were promptly informed of OSIU's decision and their right to a hearing;
  o Evidence that hearings were held timely for involuntary placements; and
  o Evidence that most 30- and 60-day reviews were timely and included youth's input into the reviews via a written statement.

- NCU began to review denials of Temporary PC in November 2019.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department maintained Substantial Compliance with this provision by demonstrating through NCU's audits that OSIU and Facilities are complying with existing DOC policy and meeting the requirements of this provision for the use of PC for both male and female 18-year-olds.

During the current Monitoring Period, a total of 25 18-year-olds were placed in PC (all male; there were no female 18-year-olds in PC during the Monitoring Period). Most were referred from RNDC, though two inmates were placed in PC from general population at GRVC. About half (52%) of the placements were requested by the facility, 36% were self-referred and 12% were court-ordered. Six of the 25 placements (24%) were involuntary. All placements were reviewed by OSIU within the two business days permitted by policy, and all but nine (64%) were continued in PC. In each case, OSIU provided reasonable justifications for discontinuing PC placement—in most cases, a less restrictive option was identified (transfer to a different housing unit or facility; one youth was transferred to another jurisdiction, and others were without evidence of a legitimate threat). Four youth remained in PC at the end of the Monitoring Period, with a median length of stay of 82.5 days.

In the previous Monitoring Period, the Monitoring Team noted that the number of admissions had significantly declined. Consultation with NCU and Facility leadership did not uncover any specific

reason for the decline—it appeared to have been a fluke, particularly since the number of admissions increased during the current Monitoring Period. However, during that discussion, NCU and the Monitoring Team agreed it would be worthwhile to track the number of youth who request/are referred for PC but for whom OSIU declines to assign a PC number, as this could impact the rate of admissions. This occurs when inmates do not meet the basic criteria given their history of assaultive behavior or UOF, when evidence of a specific threat was not produced or when another housing unit can address the inmate's concern. NCU began to provide this information in December 2019. Two facility referrals for PC were denied by OSIU because the facility failed to provide the necessary evidence and information. The required information was subsequently provided and both inmates were admitted to PC.

As shown in the table below, the number of youth released from PC has remained approximately the same for the past four Monitoring Periods. While there is some variation in the reasons for removal (*e.g.*, the number of youth removed for behavioral reasons was higher in the previous monitoring period but returned to historical levels during the current Monitoring Period), after consulting with NCU, OSIU and Facility leadership, these fluctuations do not appear to be any cause for concern. PC continues to afford youth the level of safety and security required by this provision.

| 18-year-olds Admitted to and Released from Protective Custody, January 2018-June 2019 | | | | |
|---|---|---|---|---|
| | Jan. – Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul.-Dec. 2019 |
| **Number of Admissions** | 28 | 32 | 15 | 25 |
| **Number of Releases** | 30 | 26 | 24 | 29 |
| **Reason for Release** Discharged/Transfer Requested Removal Behavior (Fight, AOS) Other | 19 (63%) 5 (17%) 5 (17%) 1 (3%) | 12 (46%) 8 (31%) 4 (15%) 2 (7%) | 10 (42%) 2 (8%) 11 (46%) 1 (4%) | 17 (59%) ~ 6 (21%) 6 (21%) |

In the previous Monitoring Period, the Monitoring Team expressed concern about the timeliness of removing inmates from PC. NCU's audits now included detailed explanations for any transfer into/out of PC that did not occur timely. The very few cases in which this occurred revealed small glitches in the process, but no systemic failures. As discussed above, NCU's audits revealed high levels of compliance with policy across the 35 files reviewed during the current Monitoring Period.

The Monitoring Team remains impressed by the Department's ability to sustain Substantial Compliance and also by NCU's receptiveness to suggestions to expand the methodology to examine denials of PC requests and the timeliness of transfer into/out of PC.

| **COMPLIANCE RATING** | **¶ 7. (18-year-olds)** Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INMATES)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department issued an interim Directive 4104R-F regarding the use of the Housing Unit Balancer ("HUB") at all facilities except RMSC and HOJC (effective 10/3/19).

- The HUB is a decision-tree that addresses an inmate's risk of institutional misconduct (Minimum, Medium-Medium, Medium-Maximum, and Maximum) and also balances the security risk groups ("SRGs") on each housing unit.

- The HUB does not currently have the capacity to produce automated reports to ensure that inmates are housed according to their custody level and that low- and high-custody inmates are not co-mingled. Instead, Custody Management must compile this information manually each day. The Department reports that IT is currently working to automate this function.

- Although the protocol faltered a bit during the current Monitoring Period (as discussed below), Custody Management reports that it now submits a list of inmates who are mis-housed to each facility holding 18-year-olds each business day. Facilities are required to submit a memo to Custody Management each business day, explaining the reason for/plan to address mis-housing for each inmate who appears on the mis-housed list. In response to the Department's struggle to implement a dependable practice, during the current Monitoring Period, NCU created a spreadsheet to facilitate this process. The spreadsheet lists the inmates who are mis-housed, the reason for mis-housing, and the action taken to resolve the issue (*e.g.*, rehouse, apply an override, etc.).

- Policy requires facilities to address mis-housing within 72 hours, either by rehousing the inmate appropriately or enacting an override of the custody level so that the inmate may be housed out-of-class.[269]

### ANALYSIS OF COMPLIANCE

---

[269] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Units like those noted in the text of this provision. Female youth at RMSC are also exempt from this requirement because the very small number of 18-year-old girls makes this provision operationally infeasible.

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Department's policies reflect the requirements of this provision. Temporary co-mingling of classification levels, or mis-housing, occurs when (1) an inmate's classification level changes automatically overnight (*e.g.*, upon a birthday, or when an inmate has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility. As indicated above, the Department now uses the HUB to classify inmates at RNDC. In addition to custody level, the HUB also utilizes the inmates' SRG affiliation to identify appropriate housing. This adds complexity to the re-housing process—it is not just a matter of identifying a housing unit of the appropriate security level, but also one in which SRG affiliations will be appropriately balanced.

NCU's efforts to track mis-housed inmates, discussed above, has greatly simplified the task of monitoring compliance with this provision. The Monitoring Team reviewed data on the number of youth who were mis-housed at RNDC during October 2019. The rate of mis-housing continues to be very low. Overall, 43 inmates were mis-housed and most of them (n=33, or 77%) were rehoused or an override was applied within the 3 days permitted by policy. On any given day, between 4 and 10 inmates were mis-housed at RNDC, which is less than 5% of the facility's population. For the portion of inmates who were not re-housed within the required 3-day window, some languished before an override was applied, though the timeliness of overrides improved toward the end of the month. Finally, the remaining handful of inmates who were re-housed outside the 3-day window missed the deadline by only a day or so. Overall, it appears that RNDC's practices for housing inmates according to classification level—keeping low- and high-custody inmates separate from each other—are dependable.

As for the applicability of this provision to 18-year-olds at other Facilities, this provision only applies to those Facilities that house 18-year-olds in general population units.[270] Only a small number of 18-year-olds are housed at EMTC (ADP of 2.5), RMSC (ADP of 3.2), and GRVC general population (ADP less than 10). While the Monitoring Team encourages the Department to be vigilant about housing youth according to custody level in all facilities, the small numbers of 18-year-olds in these facilities suggests that operationalizing and actively monitoring this provision at those Facilities is not feasible and there is no basis to conclude that it is necessary given the small populations. As a result, the Monitoring Team does not intend to actively monitor this provision at RMSC, EMTC and general population units at GRVC going forward. This approach will be re-evaluated if the number of

---

[270] The SSHs, CAPS, and PACE are exempt from this provision, as written.

| | 18-year-old youth in general population increases significantly at Facilities outside of RNDC. This provision is in Substantial Compliance given the Monitoring Team's findings at RNDC. |
|---|---|
| **COMPLIANCE RATING** | **¶ 8. (18-year-olds)** Substantial Compliance |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to use the Direct Supervision model, developed by the National Institute of Corrections, as the foundation for a training program for supervising young adults. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Direct Supervision training continues for recruits and is underway for In-Service Staff, as described in the Training section of this report.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

As noted in the Training section of this report, most Staff at RNDC have received the initial Direct Supervision training. Under the RNDC Plan, the Department plans to integrate the core practices of the Direct Supervision curriculum into its expectations for staff implementing the Unit Management model. Core practices include:

- achieving consistent assignment of Staff to housing units;
- providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;
- ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;
- expecting Staff to deliberately select a lower level of engagement when tensions arise;
- occupying youth with structured activities throughout the day; and
- engaging in proactive and interactive supervision.

With its RNDC Plan, the Department now has a framework for addressing this provision. The Department has taken initial steps to emphasize the core concepts during roll-call. That said, fully implementing Unit Management will require significant coaching and Staff supervision to change the culture of the facility toward one that is more proactive, interactive and focused on de-escalating tensions and incentivizing good conduct rather than utilizing force to create compliance and positive behavior.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Recruits may make written requests to be assigned to a Young Inmate Facility through the Office of the Bureau Chief of Administration.

- No recruits were assigned to RNDC during the current Monitoring Period. Recruits graduating in July 2019 were discussed in the previous Monitor's Report.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

While no recruits were assigned to RNDC during the current Monitoring Period, some staff were transferred to RNDC from BKDC, HOJC and EMTC. Overall, the process for assigning Staff to RNDC continues to satisfy the requirements of this provision, as the Staff assigned to RNDC are appropriately qualified and experienced. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Fifth Monitoring Period, for a total of 30 months.[271] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 13. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[272]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

---

[271] *See* Fifth Monitor's Report at pgs. 163-164 (dkt. 311), Sixth Monitor's Report at pg. 179 (dkt. 317), Seventh Monitor's Report at pgs. 223-224 (dkt. 327), and Eighth Monitor's Report at pg. 269 (dkt. 332).

[272] The Consent Judgment does not include a ¶ 15 for this Section.

¶ 16. Staffing Levels.

b.    The ratio between Inmates and Direct Supervision floor Officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year-olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

c.    The ratio between Inmates and Direct Supervision floor Officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year-olds. The maximum living unit size shall be 30 Inmates.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department reports it continues to make best efforts to ensure that no shift is staffed exclusively by probationary Staff. Schedulers at the Facilities reported during previous Monitoring Periods several ways that they minimize the frequency with which a unit is staffed only by probationers. They reported being conscious about Staff's probationary status and constructing the weekly schedule with this in mind (*i.e.*, the weekly schedules use color-coding and numerical codes to indicate which Staff are probationary, so the mix is easier to execute). When Staff call-out or are otherwise unable to report to work, the probationary status of Staff who are held over is considered when making unit assignments for the overtime Staff. Finally, the schedulers recognize that all probationary Staff are not the same—some are fresh out of the academy while others are at the tail end of their probationary period and have been on the job for nearly two years.

- At the end of the *previous* Monitoring Period, RNDC had 8% probationary Staff, EMTC had 16%, GRVC had 17%, OBCC had 15% and RMSC had 12%. At the end of the *current* Monitoring Period, RNDC had 17% probationary Staff, EMTC had 18%, GRVC had 21%, OBCC had 18% and RMSC had 13%. The proportion of probationary staff ticked slightly upward compared to the previous Monitoring Period because Facilities received a new class of recruits in July 2019. RNDC, for example, added 54 recruits to its staff of approximately 760 (about 6%).

- NCU audits have included all Facilities housing 18-year-olds since June 2018.

- The Bed Utilization Plans from August, September and October 2019 indicated that all 18-year-old housing units at RNDC, EMTC and RMSC met the capacity limits set by this provision (capacity of 25 or less in celled housing units where maximum custody youth could be held; capacity of 30 or less in modular units where medium risk youth could be held).

## ANALYSIS OF COMPLIANCE

*These provisions apply Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with these provisions with respect to 18-year-old inmates.*

The Department continued its internal audits to determine the level of compliance with the staffing provisions. During previous Monitoring Periods, the Monitoring Team found that the Facilities'/NCU's internal audit process leads to valid conclusions about the state of compliance.

_Assignment of Probationary Staff_ (¶ 14)

Regarding the **appropriate dispersion of probationary Staff** (_i.e._, ensuring that probationary Staff are paired with veteran Staff on the housing units), on average, the Facilities housing 18-year-olds had very high rates of compliance (92%) during the current Monitoring Period. Individually, RNDC maintained a high rate of compliance (average 93%) throughout the Monitoring Period—a noticeable improvement from the previous Monitoring Period (from 62% in January 2019 to 88% in June 2019). The Department continues to meet the "best effort" requirement of this provision and sustained high performance levels throughout the Monitoring Period.

Accordingly, the Department maintains Substantial Compliance with this provision, which has been sustained since the Fifth Monitoring Period, for a total of 30 months.[273] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

_Staffing Levels_ (¶ 16 (b)-(c))

Audits of **Staff-to-youth ratios** continue to reveal that all Facilities and units housing 18-year-olds were staffed within the ratios required by the Consent Judgment (2:25 for Maximum custody youth and 1:30 for Medium custody youth) on 95% of the thousands of shifts NCU audited. Across the individual Facilities, young adult GP housing units at GRVC sometimes fell into the 65%-70% range, a finding tempered by the fact that these units typically hold fewer than 10 18-year-olds. NCU reminded the Facility of the higher staffing ratios required for 18-year-olds, and the Facility has submitted a request to the Budget Office to add a post to its Table of Organization to provide a more dependable resource to meet required ratios.

Further, the Department's housing records at RNDC, ETMC, and RMSC all reflect the housing size limits set by this provision. Therefore, Department has maintained Substantial Compliance with the provision related to staffing ratios and limitations on housing unit sizes, which have been sustained

---

[273] _See_ Fifth Monitor's Report at pgs. 164-167 (dkt. 311), Sixth Monitor's Report at pgs. 180-181 (dkt. 317), Seventh Monitor's Report at pgs. 224-226 (dkt. 327), and Eighth Monitor's Report at pgs. 269-271 (dkt. 332).

since the Fifth Monitoring Period, for a total of 30 months.[274] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period, as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 14. (18-year-olds) Substantial Compliance<br>¶ 16(a). (18-year-olds) Substantial Compliance<br>¶ 16(b). (18-year-olds) Substantial Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Consistent staffing can be achieved through two mechanisms: awarded steady posts (where Staff apply and are awarded a consistent assignment) and informal assignment (where schedulers simply assign Staff consistently to the same post).

- The Department made significant progress in consistently assigning RNDC regular staff ("four-day staff"), relief staff ("two-day staff") and Captains to the same units day-to-day. All but a small handful of units have steady officers of all three types.

- NCU has also developed a rigorous and comprehensive audit methodology to assess RNDC's level of performance and began auditing RNDC in October 2019.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The overall purpose of consistently assigning Staff to the same housing unit is to facilitate constructive Staff-youth relationships. Indeed, consistent staffing is a hallmark of Direct Supervision and Unit Management and is particularly important in units with youth who are difficult to manage (*i.e.,* the SSHs). This same theme—the benefit of developing relationships in order to change

---

[274] *See* Fifth Monitor's Report at pgs. 164-167 (dkt. 311), Sixth Monitor's Report at pgs. 180-181 (dkt. 317), Seventh Monitor's Report at pgs. 224-226 (dkt. 327), and Eighth Monitor's Report at pgs. 269-271 (dkt. 332).

behavior—applies to consistent assignment of Captains as well, given their essential role in helping Staff to improve practice.

The Department's progress toward compliance with this provision at RNDC accelerated during the current Monitoring Period. The commitment to achieve steady staffing among Department and Facility leadership is impressive not only because of the complexity of the task, but also because it is a major shift away from DOC's traditional practice in managing its Facilities. The Monitoring Team's experience is that changes like this—that fundamentally change the infrastructure needed to move toward constructive relationships between inmates and staff—can be a turning point in facilities' efforts to bring about culture change.

An important component of the implementation is an internal mechanism to assess the extent to which the assignments that are put on paper actually extend into practice. NCU has excelled in this arena. Its methodology for assessing compliance with post assignments is congruent with the Monitoring Team's strategy (discussed in the previous Monitor's Report at pg. 272) and adds another layer of verification via Genetec reviews. The Monitoring Team met with NCU to review the methodology and found it to be reliable, making only two suggestions for enhancement: (1) using a purposeful (rather than random) sampling strategy for its Genetec reviews to avoid auditing shifts where the assigned staff person was on a Pass Day; and (2) developing a strategy to assess consistency over time (*i.e.*, the extent to which the staff assignment roster changes) to ensure that authorized changes are not unintentionally undermining the overall goal of consistency.

With regard to scheduling staff *on paper* to the same housing unit day-to-day, the Department reported that in December 2019, 98% of posts across the three major tours at RNDC had a consistently assigned four-day Staff (*i.e.*, "*this* person will be assigned to *this* post on each day he or she works"). For the two-day relief staff, the Department reported that 84% of posts across the three major tours had consistently assigned staff. This is significant improvement over the 61% of posts steadily assigned in the Monitoring Team's audit during the previous Monitoring Period.

NCU assessed whether Staff actually worked their assigned post at RNDC by consulting the "legal schedule," which shows who actually worked each post. NCU audit outcomes for December 2019—which includes four-day and two-day staff assignments—are presented in the table below.[275]

| NCU Consistent Staffing Audit Results for RNDC, December 2019* | |
|---|---|
| **Total Posts Reviewed** | **N= 2611** |
| Posts Worked by Assigned Staff | 61% (n=1594) |

---

[275] NCU's improved upon the methodology used for the Oct/Nov audit. For the sake of clarity, only the results of the December 2019 audit are presented here.

| Posts NOT Worked by Assigned Staff | 39% (n=1017) |
|---|---|
| **Reason Post NOT Worked by Assigned Staff** | **N=1017** |
| No Steady Assigned | 12% (n=118) |
| Vacation/Leave/Time Due | 22% (n=93) |
| Assigned to Another Post | 24% (n=243) |
| Sick Day | 6% (n=65) |
| Training | 5% (n=46) |
| Mutual | 30% (n=308) |
| *\*Although this provision requires consistent staffing for 18-year-olds, the Department implemented and audits this strategy for all housing units at RNDC.* | |

Some of the reasons that the post was not worked by the assigned staff are likely to remain relatively consistent over time (*e.g.*, vacation, leave, time due, sick, training; totaling n=343 or 13% of the 2,611 posts audited). The proportion of posts with "No steady assigned" (n=118 or 5% of the 2,611 posts audited) is expected to decrease as the facility puts the final touches on its post assignments. A "Mutual" refers to a practice—protected by the union—wherein staff trade their shift with another staff person (*i.e.*, "shift trading" or "day trading"; 308 or 12% of the 2,611 posts audited). Finally, in 243 cases (9% of the 2,611 shifts audited) the assigned staff was reassigned to work another unit.

The Monitoring Team has encouraged the Department to consider strategies to minimize the impact of Mutuals on the goal of consistent staffing (*e.g.*, encouraging staff to attempt to trade with other staff who work on their same unit). The Monitoring Team also encouraged the NCU to delve into the reasons staff were assigned elsewhere to ascertain if a change in practice could reduce the impact on the overall goal of consistent staffing. All that to say, it is possible that small changes in some of these practices could increase the proportion of posts that are actually worked by the staff assigned to them. That said, the fact that 61% of staff <u>did</u> work their assigned post is a significant improvement from the 16% identified in the Monitoring Team's audit during the previous Monitoring Period.

From here, NCU plans to continue its monthly audits, enhance its protocol for Genetec confirmation by deliberately selecting days when the assigned staff was actually scheduled to work and plans to begin auditing the extent to which Captains work their assigned posts. The Monitoring team will continue to consult with NCU to devise a practical strategy to assess consistency over time.

Very small populations of 18-year-olds are housed at EMTC (ADP of 2.5), RMSC (ADP of 3.2) and general population units at GRVC (ADP less than 10). In addition, none of the Monitoring Team's routine data suggests that the 18-year-olds in these Facilities are subject to the safety and operational problems of the magnitude seen at RNDC. Therefore, there is no basis to conclude that this requirement is necessary or feasible to operationalize for this small subset of the population. This

| | |
|---|---|
| approach will be re-evaluated if the number of 18-year-old youth in general population increases significantly at Facilities outside of RNDC. | |
| **COMPLIANCE RATING** | **¶ 17. (18-year-olds)** Partial Compliance |

## 28. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME),**
**¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 7. The Department shall not place any 18-year-old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year-old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year-old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, Benjamin v. Ponte, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

*Provision XVI.1 applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

The Monitoring Team reviewed the Department's various disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (*i.e.*, 23-hour lock-in) was utilized. Accordingly, given that Punitive Segregation was not used with 18-year-olds during the current Monitoring Period, the Monitoring Team did not assess compliance with these provisions and so they are not rated.

With respect to ¶ 1, the Department was initially placed in Substantial Compliance for the Second Monitoring Period. However, Punitive Segregation was subsequently abolished for 18-year-olds. Even in the unlikely scenario that Punitive Segregation is reinstated, the possibility of imposing

Punitive Segregation time accumulated during a prior incarceration is not feasible given the small window for an individual to be admitted, accumulate Punitive Segregation time that is not served, be released, and then be reincarcerated while still 18 years old. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Tenth Monitoring Period, as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

As for the remaining provisions related to Punitive Segregation, ¶ 8 was placed in Substantial Compliance and ¶ 7 was placed in Partial Compliance for the Second Monitoring Period. Please see the Second Monitor's Report for an analysis of compliance during the waning days of the use of Punitive Segregation. The Partial Compliance rating for ¶ 7 (protecting against a serious risk of harm to inmates' physical or mental health) cannot currently be rectified because the practice is no longer in place. Only if the practice were to be reinstated would the Department need to address the deficits discussed in the Second Monitor's Report. Regarding the condition of cells used for Punitive Segregation (¶ 9), the Monitoring Team did not assess this provision while the practice was still in effect. Now that it has been prohibited, an assessment is not necessary. Should the practice be reinstated, the condition of cells will be assessed at that time.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1. (18-year-olds)** Substantial Compliance (per Second Monitor's Report) <br> **¶ 7.** Partial Compliance (per Second Monitor's Report) <br> **¶ 8.** Substantial Compliance (per Second Monitor's Report) <br> **¶ 9.** Not Currently Applicable. |

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- 18-year-olds with serious mental illnesses (SMI) who commit violent infractions are excluded from the Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH) and must be placed in an appropriate therapeutic setting.

- When a youth is referred to Secure or YA-ESH, medical and mental health staff at H+H are asked to "clear" the youth for program entry by verifying that he has no contraindications given the increased time in cell and use of restraint desks.

- The Department has two therapeutic units for inmates with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of inmates with SMI who have committed an infraction. PACE also offers treatment to inmates with SMI but is completely separate from the infraction process.

ANALYSIS OF COMPLIANCE

The Department submitted data on medical and mental health clearance for all ESH and Secure referrals throughout the Monitoring Period. A total of 53 18-year-olds were referred during the current monitoring Period, which is a significant decline from the two previous Monitoring Periods when 78 and 90 youth (respectively) were referred. Responses were provided by medical and mental health staff within a business day or two. Medical cleared 50 of the 53 youth (94%), and mental health cleared 43 of the 53 youth (81%). The Monitoring Team verified that those who were *not* cleared were *not* admitted to either ESH or Secure (nearly all remained in their existing housing unit, while a couple youth were placed in MO units). Conversely, all youth placed in ESH and Secure *were* cleared prior to admission. Revisions to the process for communicating the outcome of the mental health and medical screening appear to have resolved the issues described in the previous Monitor's Report (*see* pgs. 275-276).

The Monitoring Team sought clarification from H+H on the durability of mental health clearance (*i.e.*, how long clearance remains valid). H+H reported that their policy states clearance is good for one week. In subsequent Monitoring Periods, the Monitoring Team will assess the duration between clearance and admission to ensure that the mental health clearance was still valid at the time of admission.

The Monitoring Team is not aware of any 18-year-olds who were placed in CAPS or PACE during the current Monitoring Period. If a significant number of youth are placed in these programs in subsequent Monitoring Periods, the Monitoring Team will assess the appropriateness of these placements.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

- The Department developed and implemented several Structured Supportive Housing units (SSHs) to address those who commit serious or chronic violent misconduct (Second Chance Housing Unit ("SCHU")[276], Transitional Restorative Unit ("TRU"), the Secure Unit and Young Adult Enhanced Supervision Housing ("YA-ESH")).

  - The Department maintains policies for TRU and SCHU, which were approved by the Monitoring Team during the Sixth Monitoring Period.

  - The Department has policies in effect for both ESH and Secure but reports revisions to both policies are being considered, particularly as commissary limits are recalibrated to ensure alignment with the RNDC Plan.

  - During the current Monitoring Period, NCU began auditing compliance with ESH and Secure admission and review procedures and intends to expand these audits to include TRU during the subsequent Monitoring Period.

- To address less serious and episodic violent misconduct, the Department continues to rely on the infraction process but has conceptualized a promising approach via the "Informal Resolution" process. The RNDC Plan, discussed in the introduction to this section, describes the Department's plan to fortify the consequences imposed for less serious misconduct.

- During the current Monitoring Period, the Department began imposing commissary limits in response to cell non-compliance (*i.e.*, failing to lock-in, or exiting the cell after locking in). From November-December 2019, they issued 338 such sanctions. Of these, 48% were first offenses that received a verbal warning, and the remaining 52% imposed a commissary limit of varying durations for a subsequent offense.

ANALYSIS OF COMPLIANCE

The overall goal of this provision is to ensure that misconduct is promptly addressed by an effective tool for holding 18-year-olds accountable that reduces the Department's reliance on Punitive Segregation.[277] Some misconduct is serious (*i.e.*, slashings, stabbings and assaults with injury) or chronic (*i.e.*, a repeated pattern), and for these situations, the Department established four Structured Supportive Housing units ("SSHs"; *see* pgs. 219-221 of the Third Monitor's Report for a description of

---

[276] The Department stopped utilizing SCHU very early in the current Monitoring Period.

[277] Previously, 18-year-olds could be sentenced to Punitive Segregation for a range of infractions, including many that were non-violent. Directive 6500R-D permitted Punitive Segregation days for bribery; tobacco/alcohol/drug related rule violations; possessing money; delaying count; tampering with fire equipment; flooding; work stoppage; property destruction; verbal harassment; and stealing, among other things.

each).[278] These programs have been operational for over two years and appear to be properly targeting youth who engage in serious misconduct. They are discussed in detail below.

Fortunately, most misconduct is neither serious nor chronic (*e.g.*, fights without injury, serious disruptions to the orderly operation of the Facility, etc.), and for these negative behaviors, the Consent Judgment requires an adequate continuum of sanctions. The Department's has taken initial steps to introduce meaningful consequences for these behaviors, as discussed below.

*Responses to Serious and Chronic Violence*

During the current Monitoring Period, the Monitoring Team continued to review the flow of inmates in and out of the SSHs; the level of violence in the SSHs; and the quality of individualized behavior support planning and support team operations. The Department continues to track the flow of inmates into and transfers among the SSHs using a comprehensive spreadsheet. The Department is encouraged to utilize this format for all inmates participating in the SSHs (the current file only includes 18-year-olds) in order to maintain basic metrics on program operations and is encouraged to begin to analyze this data on its own.

None of the programs involve the extended periods of isolation used in Punitive Segregation. TRU is focused on addressing violent misconduct but does not restrict the youth's lock-out time or movement beyond what occurs in the general population. Secure and ESH both utilize additional hardware (*i.e.*, restraint desks; partitions between quads) and other restrictive procedures (*i.e.*, escorted movements, reduced lock-out times depending on the youth's level/phase) to prevent subsequent violent misconduct. While the SSHs vary a bit in terms of the type and volume of programming that is offered, inmates may receive several hours per day of school, recreation, and services from the Program Counselor and community partners, if they choose to participate.

**Admissions and Transfers.** There were 65 admissions of 18-year-olds to the SSHs during the current Monitoring Period, which is a 56% decrease from the previous Monitoring Period where 148 18-year-olds were admitted.[279] The Department is encouraged to examine the reasons for this trend. In terms of the initial program admission, 71% were admissions to TRU, 2% were admissions to SCHU, 11% were admissions to ESH and 17% were admissions to Secure. The Department continues to utilize TRU most often (where the conditions of confinement largely resemble GP units) and utilize the more restrictive SSHs (ESH and Secure) in about 25% of the SSH placements. This translates to about 20

---

[278] The Department stopped using SCHU very early in the current Monitoring Period.

[279] These data are not comparable to Monitoring Periods prior to the 7th Monitoring Period because the current analysis only includes 18-year-olds, whereas previous data included 16- and 17-year-olds as well.

18-year-olds who are exposed to the restrictive conditions of ESH and Secure in a given Monitoring Period.

In only five cases (8% of the total admissions) were inmates transferred to another type of SSH (usually a more restrictive one, likely due to additional misconduct[280]) prior to being released to the GP. This is a significant decrease from the previous Monitoring Period when 35% of admissions were subsequently transferred to another type of SSH. Further, nine inmates (14% of admissions) had multiple SSH admissions during the Monitoring Period, some of them close in time (several days apart). This is about the same proportion as during the previous Monitoring Period. The Department appears to be transferring youth among the SSHs less often—whether this reflects a deliberate change in practice is currently unknown, and the Department is encouraged to examine this dynamic.

**Length of Stay**. Of the 67 18-year-old inmates who exited one of the SSHs during the Monitoring Period, 13% were discharged prior to completing the program. Of the remaining inmates, the average length of stay ("ALOS") prior to moving to GP was about 60 days for those exiting ESH (n=5), 50 days for those exiting Secure (n=9), and 23 days for those exiting TRU (n=42). These lengths of stay do not appear to be excessive given what is known about the program and the typical dynamics involved and are consistent with previous Monitoring Periods.

**Inmates Remaining in Program.** At the end of the Monitoring Period, nine 18-year-olds remained in the SSHs. Two were in TRU (ALOS 93 days, range 74-112 days), five were in Secure (ALOS 66 days, range 62-71 days) and two were in ESH (ALOS 68 days, range 59-77 days). The ranges for ESH and Secure do not appear to be excessive given what is known about the program and the specific dynamics involved. Longer lengths of stay in TRU are not particularly concerning given that the program has the same lock-out time as a general population unit, but still warrant deeper examination to understand why the youth are languishing and what could be done to better support them.

**Quality of Intervention**. TRU and Secure attempt to organize service delivery around a Behavior Support Plan ("BSP") which is intended to include individualized, behavior-focused goals and a set of interventions designed to catalyze behavior change. Echoing the findings in several previous Monitor's Reports, the BSPs remain ineffective for this purpose. Goals are generally not specific, not measurable, not observable and otherwise not amenable for use as a guide for an inmate's participation in an SSH. Progress toward specific goals is not measured week-to-week. As a result, the requirements for youth to exit these SSHs remain unclear and somewhat subjective—this has been a

---

[280] Occasionally, inmates were transferred between ESH and Secure, which is more likely to occur in an effort to manage the population or to keep certain inmates separated, rather than to change the level of restrictiveness. One youth was transferred from SCHU to TRU as the Department phased out the use of SCHU.

long-standing problem raised in previous Monitor's Reports. As encouraged by the Monitoring Team, as part of its RNDC Plan, the Department intends to revise the behavior planning process with an emphasis on specific, measurable goals as the basis for exiting the program.

SSH files are well-organized and youth appear to be admitted to TRU for reasons permitted by policy. As discussed in previous Monitor's Reports, greater specificity is needed in the Adjudication Captains' narratives for ESH and Secure placements regarding the severity of injury, reasons that referral is not proximal to the incidents cited, and reasons for escalation from another SSH. As part of its ESH audits, NCU continued to work with Adjudication Captains to improve their descriptions of the reason for placement.[281] In ESH and Secure, youth's behavior is recorded in a structured fashion (*i.e.,* stamp cards and a Behavior Logbook) and their program status is reviewed at the required intervals (which differ for each of the SSHs). In TRU, the completeness and accuracy of the point cards was subpar among the files reviewed, although the weekly review schedule was followed consistently. The problems with the point cards and the lack of specificity in BSP goals further obscure the basis for the decision-making around retaining and releasing youth from TRU. The Monitoring Team will continue to consult with the Department to improve practice in this area.

**Level of Violence**. The table below presents data on the rates of violence and UOF in ESH and Secure. The specific housing units used for TRU changed frequently due to construction and physical plant issues and thus the process for collecting data is complex, unduly burdensome and resulted in data of questionable validity. The Monitoring Team agreed that the Department could temporarily suspend reporting this data for TRU but recommends that the Department begin to resume its reporting as soon as operations have stabilized.

As noted in the introduction to this section, the overall rates of violence and UOF among 18-year-olds remained high during this Monitoring Period (*i.e.*, six-month average rate of UOF was 54.8, average rate of violence was 64.3). For all of the SSHs listed below, the average daily population ("ADP"), UOF rate and rate of violence were calculated for the entire unit, which also includes inmates age 19 to 21, in order to gain a sense of the level of disorder in the living environment. The rates of violence and UOF vary across Monitoring Periods in all SSH units but have generally been significantly below those calculated for the entire population of 18-year-olds. This is particularly laudable given the assaultive histories of the youth placed in these units.

| ADP, Levels of Violence and UOF in SSH Units, 2017 to 2018 |
| --- |

---

[281] The impact of NCU's consultation with Adjudication Captains are not yet visible to the Monitoring Team because of the way ESH/Secure files are audited. The Monitoring Team reviews files as youth *exit* the programs, and most of the youth who were brought into the program after NCU's work with the Captains have not yet exited.

| Unit | 2017 | | | January-June 2018 | | | July-December 2018 | | |
|---|---|---|---|---|---|---|---|---|---|
| | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH Level 1 | 10 | 0.9 (9.0) | 1.8 (18.0) | 10 | 3.0 (30.0) | 3.7 (37.0) | 10 | 1.8 (18.0) | 2.7 (27.0) |
| YA-ESH Level 2[282] | | | | | | | | | |
| YA-ESH Level 3 | | | | | | | | | |
| Secure | 8 | 2.8 (35.0) | 4.6 (57.5) | 6 | 1.3 (21.6) | 1.67 (27.8) | 8 | 1.3 (16.3) | 2.2 (27.5) |
| YA TRU | 17 | 3 (17.6) | 4.5 (26.5) | 19 | 2.8 (14.7) | 4.0 (21.1) | 25 | 10.5 (42.0) | 11.3 (45.3) |
| YA SCHU | 8 | 0.3 (3.75) | 0.6 (7.5) | 5 | 0.7 (14.0) | 1.0  (20.0) | 8 | 1.8 (22.5) | 2.5 (31.3) |

| ADP, Levels of Violence and UOF in SSH Units, 2019 | | | | | | |
|---|---|---|---|---|---|---|
| | January-June 2019 | | | July-December 2019 | | |
| Unit | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH Level 1 | 2.6 | .66 (25.4) | 2.5 (96.2) | 3.8 | 0.5 (13.1) | 1.0 (26.3) |
| YA-ESH Level 2 | 15.7 | 1.83 (11.7) | 2.0 (12.7) | 8.6 | 1.2 (14.0) | 1.5 (17.4) |
| YA-ESH Level 3 | 5.8 | .66 (11.4) | .83 (14.3) | 2.7 | 0.2 (7.4) | 0.3 (11.1) |
| Secure | 13.4 | 2.8 (20.9) | 3 (22.4) | 11.7 | 2.2 (17.3) | 2.0 (17.1) |
| YA TRU | | | | | | |
| YA SCHU | | | | | | |

**Metrics**. Now that the Department has implemented a solid database for tracking admissions, transfers and releases, it should examine the implications of the trends noted above (*e.g.,* rate of referrals, long lengths of stay for some youth, youth who return to one of the SSHs shortly after transfer to GP). Further, as noted above, NCU began auditing ESH and Secure records to determine

---

[282] In previous Monitoring Periods, 18-year-olds were not placed in ESH Level 2 or Level 3 because those levels were blended with adults, and a BOC variance prevented 18-year-olds from being co-mingled with adults. The Department created YA-only ESH Level 2 and Level 3 houses and operated them throughout the current Monitoring Period and thus these data are now being reported by the Monitoring Team.

whether key timelines, criteria for advancement, and other procedural requirements are being met, finding high levels of compliance with policy. The Monitoring Team audited the same records and verified the accuracy of NCU's assessments. From here, the Department should compile and interpret the audits collectively to assess overall outcomes for ESH. The NCU plans to replicate the file audit process for TRU during the subsequent Monitoring Period.

As recommended previously by the Monitoring Team, the Department examined whether the SSHs were having a positive impact on participants' behavior by comparing levels of violent misconduct before, during and after program participation. The study examined outcomes for inmates (both adults and young adults) who were admitted to ESH/Secure from January 2018 through June 2019 and subsequently transferred to GP (*i.e.*, they were not discharged). In both Secure and ESH, the rates of fights, infractions, slashing/stabbing and UOF *decreased* following the inmates' completion of Secure/ESH, suggesting that the programs are effective in reducing violence.

The study also examined length of stay and housing transfers among inmates who participated in the programs. The median lengths of stay in ESH and Secure were 78 days and 72 days, respectively. Because this part of the study included inmates who were discharged from the programs, the lengths of stay do *not* represent the time required to complete each program. Large portions of the participants were discharged from the programs back to the community—47% of those in ESH and 30% of those in Secure. Interestingly, the study also found that a significant portion of participants in each program were later readmitted to ESH or Secure—23% of those who participated in ESH and 31% of those who participated in Secure. This finding merits further study to determine the factors contributing to inmates' subsequent return to the programs.

The Department is applauded for these efforts to assess the SSHs' operation and outcomes and is encouraged to utilize these findings to improve practice.

*Responses to Less Serious and Episodic Misconduct*

The Monitoring Team continues to assess the legitimacy of the Levels program, which has been fraught with implementation problems since its inception in 2018 (*see* pg. 281 of the Eighth Monitor's Report for a detailed description). For the current Monitoring Period, the Monitoring Team reviewed Levels data for each RNDC unit in October/November 2019. While the Levels are variable (not all units are rated the same, and individual units' levels change occasionally), it is sometimes difficult to understand the rationale behind the assigned level. Sometimes, a unit appeared to be performing well, but Bronze was assigned. More often, units with "multiple incidents" and low program engagement scores were assigned Platinum or Gold. Furthermore, in every review, every unit was assessed to be "in compliance" with uniform, lock-in and court production—this is contrary to data flowing from other sources (*e.g.*, commissary limits imposed for cell compliance discussed above) and thus suggest rote preparation. If the Department intends to continue using the Levels program, the Monitoring Team once again suggests reconsidering the program design to ensure all criteria are actually useful to the

task, and to make the rubric for scoring more transparent. The Monitoring Team will work through these issues with the Department in the subsequent Monitoring Period.

*Solo Housing*

During the current Monitoring Period, the Department did not utilize Solo Housing for the purpose of behavior management for any 18-year-old. A few 18-year-olds were the only inmates on a particular housing unit for a short period of time due to their being the only inmate of a particular classification or legal status. Therefore, none of these required the various procedures and protections articulated in the Solo Housing policy. The Monitoring Team encourages the Department to continue to avoid housing youth alone whenever possible. Should a Facility decide to place a youth in Solo Housing in response to his/her behavior, the Monitoring Team emphasizes the importance of both proper implementation of the policy and robust oversight from NCU.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Although the Department promulgated an Ops Order regarding the use of "Satellite Intake" as a de-escalation tool in July 2018, it was not used during 2019.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Inmates (16-, 17-, and 18-year-old inmates), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old inmates.*

Shortly after the Consent Judgment went into effect, the Monitoring Team met with the Department to sketch out the practices needed to meet the requirements of this provision. After several iterations, the substance of the Ops Order for "Satellite Intake" was drafted and eventually promulgated. However, once GMDC was closed and the 18-year-olds were moved to RNDC, the Department stopped using Satellite Intake, possibly because the stock of available housing units was depleted. From then on, the Department appears to have resumed its original practice—to take youth to Intake following violent incidents and/or Probe Team intervention. While this may accomplish the overall goal of removing youth from the housing unit in order to await medical assessment, it reinstates the burden on Intake which was one of the key reasons the Department decided to use Satellite Intake in the first place. A more fulsome discussion of the use of Intake and potential alternatives is discussed in the Use of Force and Inmate Violence Trends section of this report.

317

Since the Department did not use Satellite Intake at RNDC, RMSC or EMTC during the current Monitoring Period, this provision is not applicable. However, the Monitoring Team emphasizes the importance of a de-escalation tool for managing the immediate aftermath following an incident. Not only do youth require time to cool off, Staff need time and space to regain operational control of the area. Previously, the use of Satellite Intake served this function and also reduced the burden on Facility Intake areas. The Department is encouraged to reconsider this—or a similar—option as a viable strategy for post-incident response.

| COMPLIANCE RATING | ¶ 10. (18-Year-Olds) Not Applicable |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 11 (DISCIPLINARY PROCESS REVIEW)

¶ 11. Within 120 days of the Effective Date, the Department shall retain a qualified outside consultant to conduct an independent review of the Department's infraction processes and procedures to evaluate whether: (a) they are fair and reasonable; (b) Inmates are afforded due process; and (c) infractions are imposed only where a rule violation is supported by a preponderance of the credible evidence. Within 240 days of the Effective Date, the outside consultant shall issue a report setting forth the methodology used, the findings of the review, the bases for these findings, and any recommendations, which the Department shall implement unless the Commissioner determines that doing so would be unduly burdensome.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Dr. Beard conducted an independent review of the inmate disciplinary process and submitted a report to the Department on June 27, 2016, which in turn was submitted to the Monitor on July 6, 2016.

- Dr. Beard offered several suggestions: (1) regularly review policies to determine if any updates are necessary; (2) incorporate current Operation or Chief's Orders into policy so that all of the relevant issues appear in a single location; and (3) require a mental health review for anyone with a mental health designation ("M-designation") prior to holding a disciplinary hearing.

- The Department implemented Directive 0000R-A "Implementing Departmental Policy," as discussed in the Implementation section of this report.

- The Department sought clarification on the third recommendation from Dr. Beard, who explained that the review was suggested for the purpose of relaying relevant information to the Adjudication Captain and to determine whether H+H should be present during the hearings.

- In June 2018, the Department decided it would not implement this third suggestion, finding the recommendation to be unduly burdensome and believing that existing protections were sufficient.

**ANALYSIS OF COMPLIANCE**

The purpose of Dr. Beard's assessment was to ensure the process for adjudicating infractions is fair and reasonable, a standard that is essential for good correctional practice.[283] By and large, Dr. Beard found the infraction process to be fair and that inmates are afforded due process. He made several recommendations, some of which were implemented.

The Department has achieved Substantial Compliance by completing the requirements of this provision as the Department: (1) retained a qualified expert to conduct an independent review of their infraction process, the retained expert conducted the review as required, and issued a report on his findings and recommendations; (2) considered those recommendations; and (3) implemented those recommendations that were not unduly burdensome, and/or deciding that the remaining recommendations were adequately addressed by existing procedures. As a result, this provision is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends terminating this provision as described in the Efforts to Advance Reforms & Address Areas of Concern section of this report.

| COMPLIANCE RATING | ¶ 11. Substantial Compliance |
|---|---|

**• End •**

---

[283] It is worth noting that the infraction process is expected to have a more diminished role in the disciplinary process for the young adults housed at RNDC, as described above.

## Appendix A: Monitoring Team Recommendations[1]

### PART 1: RECOMMENDED PROVISIONS TO BE MODIFIED

- **§ V. (Use of Force Reporting and Tracking)**:
  - ¶ 15 (Tracking Facility Investigations)
- **§ VII. (Use of Force Investigations)**:
  - ¶ 7 (Preliminary Reviews)
  - ¶ 8 (Full ID Referrals)
  - ¶ 13 (Facility Investigations)
- **§ XIII. (Training)**:
  - ¶ 2(c) (Investigator Training)
  - ¶ 2(c)(ii) (Facility Investigator Training);
- **§ X. (Risk Management)**:
  - ¶ 2 (5003 Counseling Sessions)
  - ¶ 3 (UOF Auditor)
- **§ XII (Screening)**:
  - ¶¶ 4 – 5 (Screening for Special Units)
  - ¶¶ 6 – 7 (Screening of Staff Post-Discipline)

### PART 2: RECOMMENDED PROVISIONS FOR INACTIVE MONITORING

- **§ V. (Use of Force Reporting and Tracking)**:
  - ¶ 14 (Tracking of Use of Force Data)
  - ¶ 16 (Tracking for Full ID Investigations)
  - ¶ 17 (Tracking of Trials Data)
  - ¶ 19 (Tracking of Inmate-on-Inmate Fight Data)
- **§ VII. (Use of Force Investigations)**:
  - ¶ 16 (Organized ID Files)
- **§ IX. (Video Surveillance)**:
  - ¶ 1(c) (Complete Camera Coverage by 2/28/18)
  - ¶ 4 (Video Preservation)

---

[1] The Monitoring Team's recommendations and the basis for these recommendations are discussed in the respective section of the report for each provision and/or in the compliance assessment of each enumerated provision.

i

- **§ XIII. (Training)**:
  - ○  ¶ 1(a) (Content of Initial UOF Policy Training)
  - ○  ¶ 1(a)(i) (Pre-Service UOF Policy Training)
  - ○  ¶ 1(b)(i) (Pre-Service Crisis Intervention and Conflict Resolution Training)
  - ○  ¶ 2(a)(i) (Pre-Service Defensive Tactics Training)
  - ○  ¶ 2(c)(i) (ID Investigator Training)
  - ○  ¶ 3(a) (Initial Young Inmate Management Training)
- **§ XV. (Safety and Supervision of Inmates Under the Age of 19)**:
  - ○  ¶ 13 (Young Inmate Housing Areas shall be staff by Qualified and Experienced Staff)
  - ○  ¶ 14 (No Young Inmate Housing Area shall be staffed Exclusively by Probationary Staff)
  - ○  ¶ 16 (Staffing Levels)
- **§ XVI. (Inmate Discipline)**:
  - ○  ¶ 1 (No P-Seg Accumulated from Prior Incarceration)

## PART 3: RECOMMENDED PROVISIONS TO TERMINATE

- **§ V. (Use of Force Reporting and Tracking)**:
  - ○  ¶ 21 (Categories of Institutional Violence Data)
- **§ VI. (Anonymous Reporting System)**:
  - ○  ¶ 1 (Anonymous Reporting Hotline)
- **§ VII. (Use of Force Investigations)**:
  - ○  ¶ 6 (Video Interview Pilot)
  - ○  ¶ 10 (Clear out of Full-ID Backlog)
- **§ IX. (Video Surveillance)**:
  - ○  ¶ 1(a) (Installation of 7,800 cameras by 2/28/18)
  - ○  ¶ 1(b) (Installation of cameras in 16, 17 and 18-year-old inmate areas)
  - ○  ¶ 1(e) (Participate in Camera Working Group Meetings)
- **§ X. (Risk Management)**:
  - ○  ¶ 5 (Consideration for investigation of allegations in lawsuits)
- **§ XI. (Staff Recruitment and Selection)**:
  - ○  ¶ 1 (Recruitment Program)
  - ○  ¶ 2 (Selection Criteria)
  - ○  ¶ 3 (Background Investigations)

- **§ XIII. (Training)**:
  - ○ ¶ 1(a)(i)(1-2) (In-Service UOF Policy Training for current staff)
- **§ XV. (Safety and Supervision of Inmates Under the Age of 19)**:
  - ○ ¶ 10 (Complete Camera Coverage for Inmates under 18)
  - ○ ¶ 11 (Complete Camera Coverage for 18-year-olds)
- **§ XVI. (Inmate Discipline)**:
  - ○ ¶ 11 (Disciplinary Review Process)
- **§ XVII. (Housing Plan for Inmates Under the Age of 18)**:
  - ○ ¶ 1 (Search and Identify to Find Housing Off Island for 16- and 17-Year-Old Inmates)
  - ○ ¶ 2 (Description of Efforts to Find Off-Island Housing in Compliance Report)
  - ○ ¶ 3 (Best Efforts to Find Off-Island Housing)

# Appendix B: Definitions

| Acronym or Term | Definition |
| --- | --- |
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques Training |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.* ensuring doors are secured so inmates do not pop out of their cells, or employing better communication with inmates when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BOC | Board of Correction |
| BSP | Behavior Support Plan |
| BWC | Body-worn Camera |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CTE | Career Technical Education |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |

| Acronym or Term | Definition |
|---|---|
| DCID | Deputy Commissioner of ID & Trials |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Expedited Case Closure | Cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") that can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. |
| Facility or Facilities | One or more of the 12 Inmate facilities managed by the DOC |
| Fast Track | Cases that are pushed from ID to Trials more quickly with less investigative steps that can closed via an NPA |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FIS | Facility Information System |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| HOJC | Horizon Juvenile Center |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| ID Quickstats Weekly Reports | Reports prepared by ID in which ID shares a summary of incidents that occurred at the Facility the prior week, including descriptions of specific incidents and relevant data. This summary includes the Facility Rapid Review findings and whether ID concurs with that assessment or not. |
| IIS | Inmate Information System |

| Acronym or Term | Definition |
|---|---|
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| ITTS | Investigation Trials Tracking System—Department's legacy Trials and ID case tracking system |
| KK | Staff Lounge |
| LAS | Legal Aid Society |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OCD | Off-Calendar Disposition—processing of Trials case without scheduling or attending OATH conference. |
| OCFS | Office of Children and Family Services |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |

| Acronym or Term | Definition |
|---|---|
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| September Recommendations | On September 30, 2019, the Monitoring Team shared recommendations the Monitoring Team developed on proposed actions that could be taken by the City and Department to stimulate progress toward the overarching goals of the Consent Judgment. |
| Service Desk | Computerized re-training request system |
| SMI | Serious Mental Illness |
| SOL | Statute of Limitations |
| SOLstat | Project initiated within ID to evaluate cases approaching the SOL to determine if the incident involves misconduct and discipline should be imposed |

| Acronym or Term | Definition |
|---|---|
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| STRIVE Community | HOJC's original behavior management system |
| STRIVE+ | HOJC's more robust behavior management system (builds upon STRIVE Community) |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| Team Picks | Cases were previously identified by the Monitoring Team as having potential objective evidence of wrongdoing |
| TDY | Temporary Duty |
| TOL | Transfer of Learning—roll call trainings with the goal of guiding Staff more effectively by contextualizing the requirements of various UOF policies and directives. |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Inmates | Inmates under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

## Appendix C: Training Charts

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors (including Executive Staff) | |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. | Completed - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Ongoing** * Pre-Promotional Training * In-Service - A.C.T. | | Completed - June 2019 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | Finalized and consulted Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |
| | | *Deployment* | Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. - | | Completed - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **SCM (Young Inmate Management) (¶3)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | Finalized and consulted Monitoring Team and developed by JKM | | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC or Horizon[285] | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | Electronic – iPad | Hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Inmates | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by C.J.) | 8-hours (Only 2 hours required by C.J.) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |

[285] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to consistently implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to Post** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to consistently implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* |  | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | N/A | N/A |
| | | *Length of Training* |  | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* |  | Any new investigators assigned to ID | | |
| | | *Deployment* |  | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* |  | N/A (see Investigations Section of this report) | N/A | N/A |
| | | *Length of Training* |  | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Finalized and consulted Monitoring Team. | Finalized and consulted Monitoring Team. | N/A | N/A |
| | | *Length of Training* | No specified length in CJ, but 3 hours | No specified length in CJ | | |
| | | *Frequency* | All recruit classes that matriculated beginning in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 4-hours | 4-hours |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | One year after S.T.A.R.T. Every other year thereafter |

| | | | | |
|---|---|---|---|---|
| **Status of Refresher Training Program Development and Deployment** | | | | |
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| | | *Status of Deployment* | **Ongoing**<br>A.C.T. | Completed – 2018 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records |
| | | *Examination (¶ 6)* | None | None |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | **Not Yet Developed** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD |
| | | *Frequency* | One year after A.C.T.<br>Every other year thereafter | One year after A.C.T.<br>Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Original refresher provided as part of ACT; revised refresher developed in Ninth Monitoring Period | |
| | | *Length of Training* | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T.<br>Every other year thereafter | |
| | | *Deployment* | **Ongoing** - A.C.T. | |
| | | *Attendance (¶ 7)* | TTS Records | |
| | | *Examination (¶ 6)* | N/A | |
| **SCM (Young Inmate Management) (¶ 3)** | Staff assigned to work regularly in Young Inmate Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | |
| | | *Length of Training* | 8-hours | |
| | | *Frequency* | All Staff who work with Young Inmates | |
| | | *Deployment* | **Refresher training began in Fourth Monitoring Period but ceased in Ninth Monitoring Period (see box for ¶ 3 of the Training section of this report)**; All Staff at RNDC | |
| | | *Attendance (¶ 7)* | TTS Records | |
| | | *Examination (¶ 6)* | Hand-written | |

**Status of Training Provided Since the Effective Date**

| | Training Provided during Ninth Monitoring Period | | | | | Total Training Provided Nov. 2015 – Dec. 2019 | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Recruit Class N/A | Pre-Promotional Captains | Pre-Promotional ADWs | In-Service | Refresher | Initial Training | Refresher |
| Use of Force Policy (¶ 1(a)) | N/A | N/A | N/A | N/A | 1,252 | **12,341** | **6,555** |
| Crisis Intervention and Conflict Resolution (¶ 1(b)) | N/A | N/A | N/A | 809 | N/A | **9,960** | N/A |
| Defensive Tactics (¶ 2(a)) | N/A | N/A | N/A | N/A | 1,229 | **12,750** | **6,532** |
| Young Inmate Management ("SCM") (¶3) | N/A | N/A | N/A | 196 | 865 | **9,030** | **4,058** |
| Direct Supervision (¶4) | N/A | N/A | N/A | 227 | N/A | **6,572** | N/A |
| Probe Team ("Facility Emergency Response Training") (¶ 1(c)) | N/A | N/A | N/A | 63 | N/A | **5,835** | N/A |
| Cell Extraction (¶ 2(b)) | N/A | N/A | N/A | 60 | N/A | **4,725** | N/A |
| Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e)) | N/A | N/A | | | | **2,899**[286] | N/A |
| Investigator (¶ 2(c)) | All **54** Investigators onboarded in this Monitoring Period received training | | | | | **230**[287] | N/A |

---

[286] This includes all Recruits beginning with the November 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

[287] This does not include those trained in the First Monitoring Period as the Monitoring Team had not begun verifying this information until the Second Monitoring Period.



**Appendix D: Flowchart of Promotions Process**

Row 1:
- DCAS Exam →
- Civil Service Requirements: > U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity > educational or experience requirements > drug test; medical, psychological & physical testing > resident of NY or counties →
- DOC In-House Disqualifiers: > dismissal from prior employment > arrests total > driving record total   AIU Background Investigation →
- Review of Candidate's History/Background Investigation by Director of AIU and Assistant Commissioner of AIU →
- **Correction Officer**

Row 2:
- DCAS Exam (Completion of probation - 3 Years CO, unless extended) →
- Disqualifiers > must hold valid drivers license > resident of NYor counties > 60 college credits →
- Review of UoF, Disciplinary, and other background information →
- Chief & Commissioner to Review →
- **Captain**

Row 3:
- DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) →
- Disqualifiers > must hold valid drivers license > resident of NYor counties > 60 college credits →
- Review of UoF, Disciplinary, and other background information →
- Chief & Commissioner to Review →
- **Assistant Deputy Warden**

Row 4:
- Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) →
- Review of UoF and Disciplinary History, and Performance Evaluations →
- Re-Assignment Board Review   Rating, Interview, Candidates Ranked →
- Chief & Commissioner to review candidates recommended by Re-Assignment Board →
- **Deputy Warden**

Row 5:
- Tele-Type Announcement (Completion of probation - 18 months in eligible title (Captain/ADW/DW), unless extended) →
- HR reviews UoF and Disciplinary History, and Performance Evaluations →
- Promotion Board Review, interview candidates and make recommendations →
- Chief & Commissioner to review candidates recommended by Promotion Board →
- Mayoral Approval →
- **Warden**

Row 6:
- No specific time requirement that you have to be a Warden for, in order to be considered for a Chief-level appointment →
- Nunez Screening, including review of UoF and Disciplinary History →
- Commissioner and Chief of Staff →
- Mayoral Approval →
- **Chief**