```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                                             :
MARK NUNEZ, et al.,                                          :
                                                             :
                    Plaintiffs,                              :
                                                             :
    - against -                                              :
                                                             :
CITY OF NEW YORK, et al.,                                    :
                                                             :
                    Defendants.                              :
                                                             :   11 Civ. 5845 (LTS)(JCF)
------------------------------------------------------------ X
                                                             :
UNITED STATES OF AMERICA,                                    :
                                                             :
                    Plaintiff-Intervenor,                    :
                                                             :
    - against -                                              :
                                                             :
CITY OF NEW YORK and NEW YORK CITY                           :
DEPARTMENT OF CORRECTION,                                    :
                                                             :
                    Defendants.                              :
------------------------------------------------------------ X
```

**DECLARATION OF STEVE J. MARTIN**

**STEVE J. MARTIN** hereby declares as follows:

1. I submit this declaration in support of the Parties' Remedial Consent Order Addressing Non-Compliance ("Remedial Order"), attached as *Exhibit A*.

2. I am currently the Court-appointed Monitor of the *Nunez* Consent Judgment (dkt. 249) ("Consent Judgment") and I am responsible for assessing the Department's compliance with the Consent Judgment. The Monitoring Team includes professionals with substantial experience and commitment to advancing correctional reform (collectively, "the Monitoring Team"). Team members include the Monitor, Deputy Monitor, Associate Deputy Monitor, Associate Director, Senior Analyst, and three Subject Matter Experts all of whom reflect diverse professional backgrounds, experiences, and perspectives that help to ensure that the Monitoring Team's work is neutral, independent,

1

balanced, objective, fair, reasonable, and responsible. The Monitoring Team has developed significant expertise in the operations of the New York City Department of Corrections as it relates to the use of force.  Further, the Monitor and three Subject Matter Experts collectively have over one hundred years of experience in the management, operation, and monitoring of confinement facilities across the country.

3. I have worked as a corrections professional for over 45 years, including as a correction officer, General Counsel of the Texas State Prison System, and expert consultant for the United States Department of Justice, Civil Rights Division, and the United States Department of Homeland Security, Office of Civil Rights and Civil Liberties. I have visited or inspected over 700 confinement facilities in the United States and abroad, and have been continuously involved in institutional reform litigation. Since 1987, I have been retained as an expert witness and consultant in more than 200 cases involving correctional facilities, many of which involved allegations of excessive and unnecessary use of force. Notably, I served as one of two Joint Expert Consultants in the remedial phase of *Sheppard v. Phoenix*, 91 Civ. 4141 (RPP) (S.D.N.Y.), an earlier class action brought against Defendant The City of New York (the "City") with respect to use of force in the Central Punitive Segregation Unit. I also was retained as an expert by the plaintiffs in *Ingles v. Toro*, 01 Civ. 8279 (DC) (S.D.N.Y.), another action alleging a pattern and practice of excessive and unnecessary use of force in the City jails. I also have served as a federal court monitor in numerous prisons and state systems, large metropolitan jail systems, and juvenile justice facilities. I keep myself apprised of developments with respect to legal standards, as well as best practices, with respect to use of force by corrections staff.  A copy of my curriculum vitae is attached to this declaration as *Exhibit B*.

4. The Monitoring Team has filed nine reports with the Court (docket entries 269, 291, 295, 305, 311, 317, 327, 332, 341) that have covered the period of October 22, 2015 to December 31, 2019. The reports describe the efforts the Department has taken to implement the requirements of the Consent Judgment and evaluate the extent to which the Department has complied with each substantive provision of the Consent Judgment.

5. The Department has repeatedly been found in Non-Compliance[1] with Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (a) (Timeliness of Full ID Investigations); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); and Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision) (collectively "Non-Compliance Provisions"). *See* Chart of Non-Compliance Provisions, attached as *Exhibit C* for ease of reference.

6. I am aware that on June 25, 2019 counsel for the United States and Plaintiff Class provided Defendants with written notice, pursuant to Section XXI, ¶ 2 of the Consent Judgment, that they believed Defendants were not in compliance with the following provisions of the Consent Judgment: Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (Timeliness of Full ID Investigations); Section VII, ¶ 11 (ID Staffing); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision); and Section XV, ¶ 17 (Inmates Under the Age of 19, Consistent Assignment of Staff).

7. I provided extensive and detailed input on the nature and scope of the remedial measures included in the proposed Remedial Order based on my professional judgment. I, and the Deputy Monitor, also frequently consulted and relied upon the professional judgment of the other Monitoring Team members, regarding what changes are necessary to address the continued problematic use of force practices. This included consultation with the three Subject Matter Experts on our team who have extensive experience in the management and operation of confinement settings across the country.

8. I directly participated in the settlement negotiations for this Remedial Order. The Deputy Monitor, with support from the Associate Deputy Monitor, facilitated and

---

[1] As defined by Consent Judgment Section XX (Monitoring), ¶ 18.

participated in almost all of the negotiations among the Parties to reach agreement. This included conducting numerous telephonic phone meetings and extensive email communication over the course of several months. I understand that the proposed Remedial Order has been filed with the Court, but for convenience another copy is attached to this declaration as *Exhibit A*.

9. All of the provisions in the proposed Remedial Order were extensively negotiated, at arm's-length, and closely analyzed, with the parties mindful of the operational challenges and burdens associated with implementing the relief. Several senior Department officials, including DOC Commissioner Cynthia Brann when necessary, also were involved in the negotiation of this Remedial Order. When the Department raised legitimate operational concerns with the breadth of certain proposals, the parties engaged in productive discussions to ensure that the relief was appropriately tailored to address such concerns while still serving the goal of reducing excessive and unnecessary use of force and violence in the City jails.

10. Recognizing the requirement that remedies should represent the least intrusive means necessary, and be tailored to properly address the implicated rights and interests, the parties frequently included language in the proposed Remedial Order requiring the Department to develop and implement certain systems, policies, and trainings without specifying the precise elements of such systems, policies, and trainings. Instead, the proposed Remedial Order at times calls for the Department to develop these systems, policies, and trainings in consultation with the Court-appointed Monitor, thereby preserving the Department's ability to fashion these remedies (in consultation with the Monitor) in an appropriately targeted manner that takes into account any legitimate operational and logistical concerns.

11. As explained in more detail below, I believe that the relief included in the proposed Remedial Order is necessary to adequately address the continued violations occurring as a result of sustained Non-Compliance with provisions of the Consent Judgment, and is narrowly tailored to properly address the implicated rights and interests, and no more intrusive than is necessary to protect incarcerated individuals' constitutional rights. The provisions are targeted to remedy the deficiencies identified, and do not extend to other unrelated aspects of the operation of the City jails.

12. Moreover, the remedial measures included in the proposed Remedial Order should not have an adverse impact on public safety or the operation of the criminal justice system. The involvement of Department policymakers and operational personnel in negotiating the specific terms of relief has resulted in an agreement that is consistent with sound security practice. Moreover, because the remedies are designed to reduce violence in the City jails, the required changes are likely to promote public safety and protect both incarcerated individuals and DOC staff from unnecessary harm and injuries.

13. The proposed Remedial Order includes four overarching categories of remedial measures, including 19 specific provisions within those categories, as well as proposed modifications to certain Consent Judgment provisions. *See* Remedial Order §§ A-E. As described below, each provision and the modifications to the Consent Judgment are necessary and narrowly tailored to address the Non-Compliance Provisions.

14. **§ A: Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force**: The frequency of unnecessary and excessive force has not shown a marked decrease since the Effective Date, as outlined in the Ninth Monitor's Report (dkt. 341)[2] at pgs. 3-5, 13-38, and 80-83, attached as *Exhibit D* for ease of reference. The prevalence of unnecessary and excessive force appears driven in large part by the overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and improper use of OC spray, and hyper-confrontational Staff behaviors. These problems are compounded by uniform leadership's inconsistent ability to identify these aspects of staff misconduct, thus failing to address them with their subordinates. The provisions in this section are necessary to address the Department's sustained Non-Compliance with implementation of the Use of Force Policy (Consent Judgment Section IV, ¶ 1).

   i. *¶ A(1)—Use of Force Reviews*. This provision requires the Department to conduct close in time administrative reviews of all use of force incidents ("Use of Force Reviews") with appropriate oversight and accountability so

---

[2] The Ninth Monitor's Report covers the Ninth Monitoring Period—July 1, 2019 through December 31, 2019.

    that these reviews are conducted appropriately. Use of Force Reviews (previously known as "Rapid Reviews") must improve so there is a consistent assessment of the incident and reasonable determinations are made, as outlined in the Ninth Monitor's Report at pgs. 50-55.

ii. <u>¶ A(2)—Facility Leadership Responsibilities</u>. This provision requires Facility leadership to routinely analyze available data and information relating to use of force incidents in order to inform and improve management of the Facilities. The Department has sufficient data to understand the dimensions of the problems it is facing, and produces reliable information on the frequency of the use of force, the types of misconduct that are prevalent in the Facility, and the shifts, locations, and people involved in these events. However, a lack of the required staff skill and a failure to effectively supervise and coach these staff have stymied the Department's ability to effectively use the resources and information that is available to produce the necessary change in practice. Not only must the misuse of force be identified, but an effective response to the poor practice must occur so that staff handle a similar situation appropriately in the future (*i.e.*, a situation identified as avoidable after the fact should then be avoided in the future), as outlined in the Ninth Monitor's Report at pgs. 197-199.

iii. <u>¶ A(3)—Revised De-escalation Protocol</u>. This provision requires the Department to implement a de-escalation protocol to minimize the use of intake following use of force incidents. The Department's exclusive reliance on the use of intake for post-incident management is often rife with dysfunctional outcomes and creates unnecessary security risks, as outlined in the Ninth Monitor's Report at pgs. 17-20. Therefore, the minimization of the use of intake following use of force incidents is necessary to ameliorate security issues and support the overall efforts to reduce the use of unnecessary and excessive force.

iv. <u>¶ A(4)—Supervision of Captains</u>. This provision requires the Department to increase the number of Assistant Deputy Wardens ("ADWs") assigned to each Facility and improve the overall quality of supervision of Captains.

>
> While there are several exceptions, Facility leadership do not lead by example, identify or correct problematic staff behaviors, provide effective mentoring or otherwise embrace their supervisory role or responsibility, as outlined in the Ninth Monitor's Report at pgs. 22-24. The quality of upper level supervision is inherently intertwined with the capacity to supervise, because insufficient numbers of supervisors in and of itself impacts the quality of supervision as the supervisors do not have the necessary time to guide and coach staff in order to support improved use of force practices. There are currently an insufficient number of ADWs to supervise the Captains. Accordingly, both an increase in the number of ADWs and improved quality of supervision is needed.
>
> v. ¶ *A(5)—Incarcerated Individuals Involved in Numerous Use of Force Incidents*. This provision requires the evaluation of any incarcerated individual involved in a significant number of use of force incidents in a specified period by Correctional Health Services to determine if the mental health needs of the individual are being met, and requires the Department to assess whether existing security and management protocols are appropriate for these individuals. The Monitoring Team has found a small number of incarcerated individuals are involved in a large number of use of force incidents and so specific strategies are needed for staff to manage these individuals, as outlined in the Ninth Monitor's Report at pgs. 33-36, in order to reduce the number of use of force incidents these individuals are involved in.
>
> vi. ¶ *A(6)—Facility Emergency Response Teams*.  This provision requires the Department to improve their use of Facility Emergency Response Teams, or "Probe Teams." The Department over relies on the use of Probe Teams to address certain issues, many of which could be simply managed by a supervisor or detached responses. Probe Teams are frequently deployed in circumstances for which they are not necessary. The Department's overreliance on the Probe Team not only exacerbates the severity of UOF incidents but also triggers a slew of other operational ramifications for both

7

|     | staff and incarcerated individuals, as outlined in the Ninth Monitor's Report at pgs. 26-29. Therefore, improved practice, including reduced reliance on the deployment of Probe Teams, is necessary. |
|---|---|
| 15. | **§ B. Improved and Prompt Use of Force Investigations**: The current system for conducting use of force investigations must be streamlined and have necessary flexibility, as outlined in the Ninth Monitor's Report at pgs. 42-45, 60-63, and 149-156. This includes the development of a new framework (and unit) for conducting use of force investigations, the "Intake Squad," in order to conduct more efficient, timely, and higher quality investigations, and also includes addressing the extensive backlog of investigations. The provisions in this section are designed to address these areas and the Department's sustained Non-Compliance with the requirements to conduct timely and quality investigations (Consent Judgment Section VII, ¶ 1 (Thorough, Timely, Objective Investigations), ¶ 7 (Timeliness of Preliminary Reviews), and ¶ 9 (a) (Timeliness of Full ID Investigations)). |

   i. *¶ B(1)—Backlog of Use of Force Investigations*. This provision requires the Department to complete the backlog of use of force investigations by December 31, 2020. A thoughtful and methodical strategy is needed to address the backlog of investigations, as outlined in the Ninth Monitor's Report at pgs. 149-153 and 155-156. This deadline is both achievable and reasonably aggressive to complete the backlog of investigations.

   ii. *¶ B(2)—Intake Investigations*. This provision requires the Department to continue to operate the recently created "Intake Investigation Unit," which is responsible for conducting investigations of use of force incidents and determining whether Full ID Investigations are required. The Intake Investigation Unit is necessary to streamline investigations, as outlined in the Ninth Monitor's Report at pgs. 42-45.

   iii. *¶ B(3)—ID Staffing Levels*:  This provision requires the Department to work with the Monitoring Team to develop a case assignment system and reasonable target caseloads to support the completion of timely and quality investigations and minimize the possibility of investigation backlogs in the future, as outlined in the Ninth Monitor's Report at pgs. 60-63.

      iv.    ¶ *B(4)—Prioritizing Certain Use of Force Investigations*.  This provision requires the Department to prioritize the investigations of certain high priority incidents. Given the volume of use of force in the Department and history of backlogs, as outlined in the Ninth Monitor's Report at pgs. 60-63, the prioritization of investigations for certain incidents by a team of qualified investigators in an expedited and focused manner is necessary to address the most problematic cases.

      v.    ¶ *B(5)—Tracking and Reporting UOF Violations*.  This provision requires the Department to track specific data on the outcome of use of force investigations, including findings on whether incidents involve excessive or unnecessary force, which was not previously tracked. This additional data is necessary for the reasons outlined in the Ninth Monitor's Report at pgs. 44 and 83 as it will assist the Department in identifying patterns and practices regarding problematic use of force.

16.    **§ C. Timely, Appropriate, and Meaningful Staff Accountability**: Consistent, reliable, and proportional responses to identified misconduct are necessary to effectively shape staff behavior and minimize the possibility that the misconduct will reoccur. The overall imposition of discipline is hindered by the significant delays and missteps between the incident itself and the various precursors to the disciplinary action, as outlined in the Ninth Monitor's Report at pgs. 64-76, and 203-208. The provisions in this section are designed to address the Department's sustained Non-Compliance with the requirements to impose meaningful and adequate discipline (Consent Judgment Section VIII, ¶ 1).

      i.    ¶ *C(1)—Immediate Corrective Action*.  This provision requires the Department to identify and impose immediate corrective action for staff use of force misconduct when appropriate (including counseling or re-training, reassignment to a different position with limited or no contact with incarcerated individuals, placement on administrative leave with pay, or immediate suspension). Certain misconduct can and must be addressed close in time to the incident, especially given the delays in completing investigations and the process for imposing discipline as outlined in the

9

        Ninth Monitor's Report 57-59, and 207-208.

ii. ¶ *C(2)—Responding to Monitor Recommendations*.  This provision requires the Department to consider and address recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or expeditiously pursue disciplinary proceedings or other appropriate action when objective evidence of staff violations of the use of force directive are identified. For the reasons set out above, this provision is necessary.

iii. ¶ *C(3)—New Trials Division Protocols*.  This provision requires the Department to enhance protocols in the Trials Division in order to support timely imposition of formal discipline. The formal disciplinary process is protracted, as outlined in the Ninth Monitor's Report at pgs. 73-76 and 203-225, and strategies to address the delays within the Trials Division are therefore necessary, especially given the increase in the number of cases awaiting resolution with the closure of the investigation backlog.

iv. ¶ *C(4)—Expeditious OATH Proceedings*.  This provision requires Defendants to hold at least 50 pre-trial conferences before OATH regarding use of force violations each month. Delays in OATH proceedings contribute to the protracted formal disciplinary process, as outlined in the Ninth Monitor's Report at pgs. 204-206, and the requirement to increase the number of cases before OATH each month is necessary to reduce delays in formal disciplinary proceedings.

v. ¶ *C(5)—Applicability of Disciplinary Guidelines to OATH Proceedings*. This provision requires alignment of the Disciplinary Guidelines, developed pursuant to Section VIII, ¶ 2 of the Consent Judgment, with OATH proceedings related to use of force incidents in order to support appropriate and meaningful accountability for sustained use of force violations. The outcomes of OATH proceedings are not currently aligned with the City and Department's obligations to impose discipline as required by the Consent Judgment, as outlined in the Ninth Monitor's Report at pgs. 204-207. This provision is therefore necessary to support disciplinary outcomes that are

consistent with the new use of force directive and the Disciplinary Guidelines.

17. **§ D. 18-Year-Old Incarcerated Individuals at RNDC**: The Department continues to struggle with key safety indicators regarding management of 18-year-olds at RNDC. RNDC has been destabilized from a series of transitions since 2018 and the Facility has not yet fully recovered from this period of upheaval, as the use of force rate and rate of youth-on-youth violence for 18-year-old incarcerated individuals both remain high, as outlined in the Ninth Monitor's Report at pgs. 279-282. The provisions in this section are interdependent and intended to apply to housing units that may house 18-year-old incarcerated individuals in order to address the Department's Non-Compliance with the requirements to protect incarcerated individuals under the age of 19 from harm (Consent Judgment Section XV, ¶ 1) and implement Direct Supervision (Consent Judgment XV, ¶ 12).

   i. *¶ D(1)—Consistent Staff Assignments and Leadership*. This provision requires the Department to implement a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to housing units and tours and implement a quality assurance program to support this system. This consistency is the foundation for developing more constructive staff-youth relationships, enhancing staff's ability to detect and de-escalate rising tensions, and implementation of the System of Incentives & Consequences, as outlined in the Ninth Monitor's Report at pg. 283.

   ii. *¶ D(2)—System of Incentives & Consequences*. This provision requires the Department to implement a system under which staff will respond to an incarcerated individual's behavior through an established, structured system of rewards and consequences. The Department's incentive programs to date have not effectively managed youth behavior, and so the Department's continuum of responses to misconduct must be expanded to effectively address behaviors such as threatening staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other incarcerated individuals are compromised, as outlined in the Ninth Monitor's Report at pgs. 284-286.

      iii.    ¶ *D(3)—Direct Supervision*.  This provision requires the Department to improve its implementation of Direct Supervision as outlined in the Eighth Monitor's Report (dkt. 332) at pgs. 268-269 and the Ninth Monitor's Report at pgs. 301-302.  This improvement will include requiring supervisors to reinforce Direct Supervision with their staff through effective supervision (including counseling, etc), and requiring the Department to assess the implementation of Direct Supervision using qualitative and quantitative measures.

18.    **§ E. Modifications to Certain Consent Judgment Provisions**: This section addresses the Monitoring Team recommendations to modify certain provisions of the Consent Judgment, as specified in Exhibit A to the Remedial Order, for the reasons set forth below:

      i.    ¶ *E(1)—Investigations*. Revisions to Consent Judgment Section V (Use of Force Reporting), ¶ 15, Section VII (Use of Force Investigations), ¶¶ 7, 8, and 13, Section XIII (Training), ¶ 2(c), and Section XIX (Reporting Requirements and Parties' Right of Access), ¶ 5 are necessary for the reasons discussed in paragraph 15 of this Declaration above and because Intake Investigations will replace Preliminary Reviews and Facility Investigations, and will involve certain use of force incidents that previously required Full ID Investigations, for the reasons set forth in the Ninth Monitor's Report at pgs. 42-47.

      ii.    ¶ *E(2)—Counseling*. Revisions to Consent Judgment Section X (Risk Management), ¶ 2 are necessary to modify the circumstances that warrant a Counseling Meeting, for the reasons set forth in the Ninth Monitor's Report at pgs. 183-185.

      iii.    ¶ *E(3)—UOF Auditor*. Revisions to Consent Judgment Section X (Risk Management), ¶ 3, are necessary given the elimination of the Use of Force Auditor position, for the reasons set forth in the Ninth Monitor's Report at pgs. 185-186. In lieu of the Use of Force Auditor position, the Department will engage in a broader effort to routinely collect and analyze data relevant to assessing compliance with the Consent Judgment.

iv.   *¶ E(4)—Screening*. Revisions to Consent Judgment Section XII (Screening), ¶¶ 6 – 7 are necessary to address logistical difficulties associated with these provisions, for the reasons set forth in the Ninth Monitor's Report at pgs. 226-228. The revised provision will now require a review of the assignment of all Staff Members who have been found guilty or pleaded guilty to a violation arising from misconduct relating to a use of force incident and a determination as to whether such Staff should be placed in the Early Intervention, Support, and Supervision Unit ("E.I.S.S.") monitoring program.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on August 12, 2020.

          s/Steve J. Martin
Steve J. Martin
*Monitor*
