# Tenth Report of the *Nunez* Independent Monitor

**Tenth Monitoring Period**
**January 1, 2020 – June 30, 2020**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction**......................................................................................................... **1**
   Background ........................................................................................................ 1
   Current Status of Reform ................................................................................. 3
   Efforts to Advance Reforms & Address Areas of Concern ........................... 5
   COVID-19 Impact ............................................................................................ 8
   Organization of the Report............................................................................. 11

**Use of Force and Inmate Violence Trends During the  Tenth Monitoring Period** ............ **13**
   Use of Force Data .......................................................................................... 16
   Staffing & Supervision .................................................................................. 25
   Over-Reliance on the Facility Emergency Response Team .......................... 30
   Incarcerated Individuals and Use of Force ................................................... 32
   Addressing the Multi-Faceted Problem of Excessive and Unnecessary UOF ................ 36

**Identifying & Addressing Use of Force Misconduct**....................................... **39**
   Identifying Use of Force-Related Misconduct .............................................. 39
   Addressing Use of Force-Related Misconduct .............................................. 57

**Section by Section Analysis** ............................................................................... **74**
   1.     Use of Force Policy (Consent Judgment § IV) ............................... 74
   2.     Use of Force Reporting and Tracking (Consent Judgment § V) ......... 77
   3.     Training (Consent Judgment § XIII)............................................ 100
         Training Space & Dedicated Training Academy................................ 101
   4.     Video Surveillance (Consent Judgment § IX) ............................... 117
   5.     Use of Force Investigations (Consent Judgment § VII)................... 132
   6.     Risk Management (Consent Judgment § X) .................................. 163
   7.     Staff Discipline and Accountability (Consent Judgment § VIII)......... 175
   8.     Screening & Assignment of Staff (Consent Judgment § XII) ............ 204
   9.     Arrests of Inmates (Consent Judgment § XIV)............................... 213
   10.    Implementation (Consent Judgment § XVIII) ................................. 216

**Current Status of 16- and 17-Year-Old Youth**................................................ **221**
   11.    Safety and Supervision of Inmates Under the Age of 19
        (Consent Judgment § XV) ............................................................ 226
   12.    Inmate Discipline (Consent Judgment § XVI)................................ 233

**Current Status of 18-year-olds Housed on Rikers Island** ............................... **238**
   13.    Safety and Supervision of Inmates Under the Age of 19
        (Consent Judgment § XV) ............................................................ 251
   14.    Inmate Discipline (Consent Judgment § XVI)................................ 268
**Appendix A: Definitions**..........................................................................................i
**Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain**
   **Provisions**.......................................................................................................vi
**Appendix C: Training Charts** ...............................................................................x
   Status of Initial Training Program Development and Deployment............................x
   Status of Refresher Training Program Development and Deployment.....................xiv
   Status of Training Provided Since the Effective Date ...........................................xvi
**Appendix D: Flowchart of Promotions Process** ............................................... xvii

# INTRODUCTION

This is the tenth comprehensive report[1] of the independent court-appointed Monitor ("Tenth Monitor's Report"), Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York, the New York City Department of Correction ("the Department" or "DOC"),[2] the Administration for Children Services ("ACS"), and the Monitoring Team to advance the reforms in the Consent Judgment during the Tenth Monitoring Period, which covers January 1, 2020 through June 30, 2020 ("Tenth Monitoring Period").

*Background*

The Department manages 11 facilities, eight of which are located on Rikers Island ("Facility" or "Facilities").[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. The Department also jointly operated the Horizon Juvenile Center in the Bronx with ACS. The provisions in the Consent Judgment include a wide range of reforms intended to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and people in custody, to dismantle the decades-

---

[1] The Monitoring Team has filed a number of other reports and status letters with the Court.

[2] All defined terms utilized in this report are available in ***Appendix A: Definitions***.

[3] There are three Facilities based in the City boroughs, Manhattan Detention Complex ("MDC"), Brooklyn Detention Complex ("BKDC"), and Vernon C. Bain Center ("VCBC") in the Bronx. The eight Facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

long culture of violence in these Facilities, and to ensure the safety and proper supervision of youth under the age of 19 ("Young Incarcerated Individuals").

The Department employs approximately 9,400 active uniformed Staff and approximately 1,800 civilian employees, and manages an average daily population of approximately 3,949 incarcerated individuals as of the end of the Monitoring Period.[1] The population in the jails has been drastically reduced since November 1, 2015, the Effective Date of the Consent Judgment. The average daily population at the end of the Monitoring Period represents a 60% reduction in population since the Effective Date of the Consent Judgment and is the lowest DOC population since 1946.

The Consent Judgment was entered by the Court on October 22, 2015.[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against people in custody and reducing violence, particularly among Young Incarcerated Individuals. The use of force-related procedural requirements enumerated in the Consent Judgment's provisions are intended to promote the following principles of sound correctional practice: (1) the best and safest way to manage potential use of force situations is to prevent or resolve them by means other than physical force; (2) the amount of force used is always the minimum amount necessary to control a legitimate safety risk and is proportional to the resistance or threat encountered; (3) the use of excessive and unnecessary force is expressly prohibited; and (4) a zero-tolerance policy for excessive and unnecessary force is rigorously enforced. None of these principles can take root without a culture change within the

---

[4] The Effective Date of the Consent Judgment is November 1, 2015. (*see* dkt. 260)

agency that embraces them.

*Current Status of Reform*

There were three critical areas of focus in this Monitoring Period. First, the investigation of all use of force incidents transitioned to ID with the implementation of Intake Investigations, and ID worked diligently to reduce the backlog of investigations. Second, the Monitoring Team, Department, and the Parties worked on various initiatives to address the persistent concerns the Monitoring Team has previously reported on, most of which are reflected in the Remedial Order and/or modifications to the Consent Judgment (discussed in more detail below). Finally, operations across the Department were shifted in response to COVID-19 (discussed in more detail below).

The Department has continued to work collaboratively with the Monitoring Team and express receptivity to change practices and procedures in order to achieve compliance. The Department has implemented the foundational aspects of reform by developing relevant policies and procedures, training Staff, and developing and utilizing systems that allow the Department to consistently and routinely track and report on the use of force. However, in terms of the Department's use of force, the current state of affairs remains similar to those in prior Monitoring Periods. The Department has not yet demonstrated progress in reducing the frequency of unnecessary and excessive force. In fact, this Monitoring Period reflected the highest rate of use of force since the Effective Date. The driving forces of use of force remain the same—overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and too close use of OC spray, and hyper-confrontational Staff behaviors. This is compounded by lack of accountability due to both uniform leadership's inability to identify and address the Staff misconduct and the backlog of investigations, which

creates and exacerbates a corresponding delay in imposing formal discipline. The Department has made significant progress in addressing the issues relating to investigations and is on the path to conducting efficient, timely and reliable investigations. That said, the resolution of the investigation backlog will create a backlog in the imposition of discipline. Initiatives to address efficient, timely and meaningful accountability will be the top priority going forward. The areas and issues of concern (discussed throughout this report and in prior reports) have identified what needs to be fixed and the *Efforts to Advance Reforms & Address Areas of Concern* section below outlines the various initiatives and efforts (including requirements in the Remedial Order and modifications to the Consent Judgment) that will begin to be implemented to try and advance the overall reforms.

The City and Department have established a record of non-compliance in the most fundamental goals of the Consent Judgment, most especially regarding the use of force and accountability for violations of these requirements. This history of non-compliance is longstanding and substantial. The Monitoring Team has worked continuously and diligently with the Department on the development of a roadmap for achieving compliance. The Remedial Order represents the efforts of the Department, the Parties, and the Monitoring Team to identify and focus the Department's efforts on essential elements of compliance. Hopefully, these latest efforts will prove to be a watershed moment in the history of reform. However, as we move into the fifth year of monitoring, it is critical to acknowledge that if the DOC is unable to achieve demonstrable gains with the requirements of both the Consent Judgment and the Remedial Order that this overall approach to achieving sustainable and substantial compliance must be re-examined as the efforts by all may have been exhausted.

*Efforts to Advance Reforms & Address Areas of Concern*

One of the Monitoring Team's top priorities in the Tenth Monitoring Period was working with the City, Department, Counsel for the Plaintiffs' Class, and SDNY (jointly the "Parties") to address persistent areas of Non-Compliance raised by the Monitoring Team (discussed in prior reports) and by Counsel for the Plaintiffs' Class and SDNY, who submitted a Non-Compliance Notice to the City pursuant to Consent Judgment § XXI. (Compliance, Termination, and Construction), ¶ 2 at the end of the Eighth Monitoring Period.[5] This work focused on five distinct issues as described in the Ninth Monitor's Report (dkt. 341) at pgs. 5-9: (1) initiatives the Department and Monitoring Team would develop collaboratively and which would receive heightened scrutiny by the Monitoring Team; (2) proposed modifications to various provisions of the Consent Judgment; (3) proposed inclusion of additional requirements in a new court order ("Remedial Order"); (4) proposed placement of certain provisions into "inactive monitoring" or "abeyance"; and (5) proposed termination of certain provisions. Following the close of the Monitoring Period, the Parties and the Monitoring Team jointly filed a Proposed Remedial Order and proposed Modifications to the Consent Judgment (Exhibit A to the Remedial Order) (collectively dkt. 350). The Monitor also filed a declaration setting forth the rationale and basis for his belief that the remedial measures included in this Order are necessary, and explaining the approach taken in tailoring the proposal to properly address the implicated rights and interests

---

[5] In the Non-Compliance Notice, Counsel identified nine distinct provisions that Counsel to the Plaintiffs' Class and SDNY believed the Defendants were in Non-Compliance with for which they asked the Department to address in a response: (1) Implementation of Use of Force Directive (§ IV. , ¶ 1); (2) thorough, timely and objective investigations (§ VII., ¶ 1); (3) Preliminary Reviews (§ VII., ¶ 7); (4) Full ID Investigations (§ VII., ¶ 9); (5) ID Staffing (§ VII., ¶ 11); (6) Timely, Appropriate and Meaningful Discipline (§ VIII., ¶ 1); (7) Inmates Under the Age of 19, reducing violence among Young Incarcerated Individuals (§ XV., ¶ 1); (8) Inmates Under the Age of 19, Direct Supervision (§ XV., ¶ 12); (9) Inmates Under the Age of 19, Consistent Assignment of Staff (§ XV., ¶ 17).

(dkt. 348). The Parties and the Monitor also jointly submitted the Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The Court subsequently approved these orders on August 14, 2020. These documents are discussed in turn below.

- **Remedial Order and Modifications to the Consent Judgment**

The Remedial Order and modifications to the Consent Judgment are intended to advance reforms in four key areas: (1) implementing the Use of Force Directive; (2) addressing the backlog of investigations and improving use of force investigations going forward; (3) improving Staff discipline and accountability; and (4) addressing the high level of disorder at RNDC, where most of the 18-year-olds are housed.

The Remedial Order includes four overarching categories of remedial measures, including 19 specific provisions within those categories, which are designed to address the areas of sustained Non-Compliance. The Remedial Order also includes a fifth category that outlines the agreed upon modifications to the Consent Judgment. The five overarching categories of the Remedial Order are described below:

1. Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force: The provisions in this section are designed to improve the use of force and reduce the use of unnecessary and excessive force through bolstering the Rapid Reviews (including additional oversight and accountability for deficient reviews), increased ownership by Facility leadership of data analysis and initiatives driven by such analysis, implementing a de-escalation protocol which minimizes reliance on Intake, increasing supervision of Captains through the addition of more ADWs assigned to each Facility, better management of those frequently involved in force through alliance with mental health providers, and improving the use and deployment of the Facility Emergency Response Teams.

2. Improved and Prompt Use of Force Investigations: The provisions in this section are

designed to support the new framework (and unit) for conducting use of force investigations, the "Intake Squad," in order to conduct more efficient, timely, and higher quality investigations as discussed in more detail in the Use of Force Investigations section of this report, and also includes addressing the extensive backlog of investigations.

3. <u>Timely, Appropriate, and Meaningful Staff Accountability</u>: Consistent, reliable, and proportional responses to identified misconduct are necessary to effectively shape Staff behavior and minimize the possibility that the misconduct will reoccur. The overall imposition of discipline is hindered by the significant delays and missteps between the incident itself and the various precursors to the disciplinary action. The provisions in this section are designed to improve the imposition of meaningful and adequate discipline in a number of ways—through increased use of immediate corrective action for Staff use of force related misconduct when appropriate (including counseling or re-training, reassignment to a different position with limited or no contact with incarcerated individuals, placement on administrative leave with pay, or immediate suspension and includes consideration of Monitor recommendations to impose such action); developing enhanced protocols in the Trials Division to support timely imposition of formal discipline; and more expeditious and appropriate OATH proceedings (including the alignment of OATH proceedings with the Disciplinary Guidelines).

4. <u>18-Year-Old Incarcerated Individuals at RNDC</u>: The provisions in this section are interdependent and intended to apply to housing units that may house 18-year-old incarcerated individuals in order to improve the protection of those under the age of 19 from harm and implement Direct Supervision, including requirements to implement a Staff assignment system under which the same Correction Officers, Captains, and ADWs are consistently assigned to housing units and tours (and implement a quality assurance program to support this system); implement a system under which Staff will respond to an individuals' behavior through an established, structured system of rewards and consequences; and improve its implementation of Direct Supervision, and requiring the Department to assess the implementation of Direct Supervision using qualitative and quantitative measures.

5. <u>Modifications to Certain Consent Judgment Provisions</u>: Certain provisions of the Consent Judgment were modified as outlined in Exhibit A to the Remedial Order to support the Remedial Order and overall reform efforts, including revisions to Consent Judgment: § V (Use of Force Reporting), ¶ 15; § VII (Use of Force Investigations), ¶¶ 7, 8, and 13; § X (Risk Management), ¶¶ 2 and 3; § XII (Screening), ¶¶ 6 – 7; § XIII (Training), ¶ 2(c); and § XIX (Reporting Requirements and Parties' Right of Access), ¶ 5.

- **Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment**

The Parties have agreed to voluntarily terminate certain provisions, agreed that other provisions in the Consent Judgment would be placed in the status of "inactive monitoring,"[6] and placed two provisions in the status of "abeyance."[7] The compliance status of these provisions prior to January 1, 2020 is set forth in Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions. The provisions that have been terminated are not included in this report. However, placeholders for provisions in inactive monitoring or abeyance are included in the report.

*COVID-19 Impact*

The Tenth Monitoring Period reflected a period of unprecedented and unique circumstances for the City and the Department. The State of New York was under a State of

---

[6] Provisions in the "inactive monitoring" status means the Monitoring Team will, as of January 1, 2020, no longer be required to assess compliance with the provisions or provide the results of such assessments to the parties and the Court. However, Defendants are still required by the Consent Judgment to comply with these provisions, which shall remain in full force. These provisions also may be subject to active monitoring during future Monitoring Periods if deemed necessary.

[7] Provisions in the "abeyance status" are no longer required to be implemented, and will not be subject to active monitoring as of January 1, 2020.

Emergency order beginning March 7, 2020,[8] through the remainder of the Tenth Monitoring

Period (and beyond) due to the COVID-19 pandemic. As it has with all facets of life, the

COVID-19 crisis directly impacted operations at the Department of Correction and caused a

major shift in the way the Department did its work for most of the Monitoring Period covered in

this report. The Monitoring Team provided the Court with a status report on May 6, 2020 that

included an overview of the impact of COVID-19 on Department operations (dkt. 338).

The pandemic is simply unprecedented in the Monitoring Team's experience in operating

and monitoring confinement operations. This crisis tested all who work for the Department of

Correction and Correctional Health Services and has required a herculean effort to address the

crisis and adapt operations to meet the required public health guidance and requirements. The

Department's efforts to address these challenges under extraordinary and incredibly stressful

conditions must be acknowledged.

The Correction Officers, Captains, Assistant Deputy Wardens, Deputy Wardens,

Wardens, Chiefs, and staff from the Quality Assurance and Integrity, Maintenance, Health

Affairs, and Programming, as well as the staff from Correctional Health Services provided

invaluable support and made significant personal sacrifices to maintain the operations of the jails

while altering many practices related to sanitation and safety throughout this Monitoring Period.

The Monitoring Team was in close contact with the Executive leadership team, the Strategic

Partnership Division, the Complex Litigation Unit, the Nunez Compliance Unit, the

Investigations and Trials Division, the E.I.S.S. Division, as well as the Programming and the

Training Divisions throughout the Monitoring Period to work through how the Department's

---

[8] *See* Executive Order No. 202: Declaring a Disaster Emergency in the State of New York (available at
https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york).

COVID-19 response impacted *Nunez* requirements, and to discuss ways to reduce that impact when possible.

A large and significant change in operations occurred when the Department transitioned over 900 staff to tele-working. Social distancing requirements shifted roles and responsibilities in the way different divisions throughout the agency did their work. Further, many Staff suffered from COVID-19 and so the number of staff on sick leave, especially in the first few months of the pandemic, was incredibly high. While the population of people in custody decreased throughout the Monitoring Period, social distancing requirements meant that Staff and people in custody had to be appropriately re-assigned to adhere to social distancing requirements. Other examples of the operational impact included training programs that were temporarily suspended and reorganized to adhere to limitations on the number of Staff that could participate in training at one time. For ID, the civilian investigators were required to tele-work, while uniform Staff who serve as investigators were not able to enter the jails as easily as before to speak with Staff or people in custody. Further, most in-person meetings were at least temporarily suspended, which impacted a myriad of initiatives including E.I.S.S. (and the work they do with individual Staff), the Immediate Action Committee, the Trials Division since OATH was temporarily suspended for a portion of the Monitoring Period (virtual proceedings were convened toward the end of the Monitoring Period), and Program Counselors had limited ability to interface directly with people in custody and in-person programming by community partners was temporarily suspended. As discussed throughout the report, many *Nunez* initiatives and requirements faced various challenges, obstacles, and limitations as a result of the pandemic.

*Organization of the Report*

The following sections of this report summarize the Department's efforts to achieve the goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis of UOF trends. This data is presented to anchor the report in the context of the conditions that created the need for external oversight and to illustrate emerging trends. Next, the report evaluates the Department's mechanisms for identifying and responding to UOF-related misconduct. The Monitoring Team addresses detecting and responding to the misuse of force in a single section because the two actions are intrinsically intertwined, and while the Consent Judgment includes individual requirements across many different topics that touch on these areas, discussing them holistically emphasizes their interdependence.

This report then assesses compliance with the specific provisions related to Staff's use of force (*e.g.*, policy, reporting, investigations, Staff discipline, video surveillance, recruiting, training, etc.). Finally, the report examines recent changes and current trends regarding 16, 17, and 18-year-olds. Given the physical separation and different facility management structure for 16- and 17-year-olds at HOJC and 18-year-olds (who remain on Rikers Island), the Monitor's Report now has two separate sections organized by age group. Provisions in Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), § XVII (Housing Plan for Inmates Under the Age of 18) are addressed depending on the applicability of the provision to each age group. A small group of provisions in §§ XV and XVI are addressed in other sections of this report (*e.g.*, § XV, ¶¶ 10, 11 camera coverage in facilities housing Young Incarcerated Individuals is addressed in the Video Surveillance section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Incarcerated Individuals is addressed in the Use of Force Investigations section of this report).

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[9] (b) Partial Compliance,[10] and (c) Non-Compliance.[11] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[12] The Monitoring Team did not assess compliance for every provision in the Consent Judgment in this report. The Monitoring Team did not rate any provisions that have been placed in an "inactive monitoring" status ("Not Rated—Inactive Monitoring") or held in "abeyance" ("Not Rated—Abeyance"). Further, certain provisions were not rated because either they were in a transitional period this Monitoring Period because modifications to the requirements were under negotiation and expected to be changed or because the Monitoring Team was simply not in a position to rate the provision (the reasons for which are described in the specific provision).[13]

---

[9] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[10] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[11] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

[12] § XX (Monitoring), ¶ 18.

[13] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

## USE OF FORCE AND INMATE VIOLENCE TRENDS DURING THE TENTH MONITORING PERIOD

The Department has not yet achieved the overarching goal of the Consent Judgement—reducing the frequency with which force is used, and more particularly, the use of unnecessary and excessive force. The Monitoring Team has identified various factors contributing to the Department's lack of results (as outlined in prior Monitor's Reports), most of which continued in this Monitoring Period. The prevalence of unnecessary and excessive force appears to be driven in large part by the overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and improper use of OC spray, and lack of efforts to de-escalate situations including at times hyper-confrontational Staff behaviors. These problems are compounded by uniform leadership's frequent inability to properly identify Staff misconduct and the resulting failure to address it with their subordinates. One focus of the Tenth Monitoring Period was to develop initiatives that put actionable strategies in place to address the myriad concerns about Staff's use of force, many of which have been codified in the Remedial Order. In this section, the available data on UOF is categorized into sections that illustrate the Monitoring Team's main concerns.

The landscape of the Department's efforts to improve practice and address the concerns raised by the Monitoring Team were significantly impacted by the COVID-19 pandemic during this Monitoring Period. Not only did the Facilities face a variety of operational difficulties, but both Staff and incarcerated individuals were under enormous stress given their concerns for their own health and that of their loved ones. The Department was focused on adapting a variety of operational practices to mitigate the spread of COVID-19 during much of this Monitoring

13

Period. This is an important lens with which to view the statistics on use of force and violence, but, of course, this does not suggest that Staff are absolved from misconduct during this time.

The average daily population of the jails decreased significantly during the current Monitoring Period, from 5,625 in January 2020 to 3,949 in June 2020. While reducing the number of incarcerated individuals can be a precursor to improving the conditions of confinement, simply lowering the population does not improve incarcerated individuals' behavior or Staff's practice. The individuals remaining in the jails continue to face the stress of their court cases and being separated from their families (both exacerbated by COVID-19) and any challenges in managing interpersonal conflict or regulating their emotions remain. For Staff, any skill deficits in operational basics, managing behavior, and properly using physical intervention to respond to that behavior endure, especially with the suspension of training programs and other encounters that are designed to elevate practice. All that is to say, it is discouraging that the Department's use of force rate continued to increase during the current Monitoring Period.

Despite the complicated and uncertain challenges facing the Department during this Monitoring Period, the Department continued to collaborate with the Monitoring Team to develop strategies to improve practices related to using force. The problem of excessive and unnecessary UOF has both many causes and symptoms. This reality is reflected in both the Monitoring Team's qualitative analysis of individual UOF incidents and the aggregate UOF data that observes trends from various angles (*e.g.*, number/rate, injury, facility/location, reason, behavior of Staff and disproportionate UOF among incarcerated individuals). This assessment is particularly illuminating because it brings into stark relief the high degree of correlation between and among the various facets of the problem. For example, Probe Team activations cause a

disruption to the Facility's operation, which makes service delivery difficult, which increases frustration among incarcerated individuals because they are confined to their housing units, which is where most of the incidents occur and where Staff clearly need but lack skills in de-escalating tension, and, when their skills prove insufficient, the Probe Team is activated and the cycle starts all over again. There are any number of scenarios that unfold and perpetuate the problem in a similar way.

The Consent Judgement relies heavily on strategies designed to impact Staff's behavior—training, coaching, and accountability are all Staff-facing interventions designed to modify the way in which Staff manage tensions and respond to violence in the Facilities. As noted throughout this section, the typical use of force event at DOC unfortunately includes multiple Staff behaviors that continue to drive the unnecessary, excessive, and avoidable use of force. Recent additions to the Department's UOF-reduction strategies, some of which are codified in the Remedial Order, are designed to impact the way in which Staff are prepared for and ultimately make decisions on the job. Furthermore, many of the strategies to reduce the unnecessary use of force that were developed during this Monitoring Period (and codified in the Remedial Order) are interconnected. Not only do they depend on each other to catalyze change, but they also target multiple problems simultaneously. Together, strategies to improve UOF reviews and Facility leadership's use of data, to adjust de-escalation protocols and reduce the reliance on Intake, to limit the use of Probe Teams, and to improve the quality of supervision received by Staff of all ranks should trigger noticeable changes in Staff practice. This, combined with a more intentional focus on the needs of incarcerated individuals who are frequently involved in UOF incidents, should lead to more effective strategies for avoiding physical confrontation with these individuals. Many of these strategies have been codified in the

15

Remedial Order and will be the focus of both practice and monitoring in subsequent Monitoring Periods.

This section first discusses the various facets of the problem, as revealed by the Department's data and Monitoring Team's analysis. This section concludes with a description of the plan to enact a similarly multi-faceted set of strategies.

_Use of Force Data_

Although the last three months of this Monitoring Period saw the first decrease in the total _number_ of Uses of Force per month since the Effective Date, the UOF _rate_ continued to climb and was the highest of any Monitoring Period to date. The Monitoring Team also continued to identify an unreasonable number of unnecessary and excessive uses of force. The typical UOF incident in DOC is precipitated by multiple Staff needlessly closing distance on an incarcerated individual in a face-to-face confrontation, destined to produce perceived or actual resistance, which in turn, just as typically leads to forced takedowns or an immediate use of OC spray, followed by a continued struggle to place the incarcerated individual in physical restraints/flex-cuffs. The now-restrained individual is then subjected to further force in order to travel through multiple hallways to an Intake cell where they may sit for hours before they are then returned to a housing area. During institutional searches or orders for lockdown, multiple instances of force occur, and OC spray is often indiscriminately deployed on entire cellblocks. It is for these reasons that some Facilities experience as many as seven to ten UOF incidents in a single day. When such behavior and dynamics are so frequently in play, it is inevitable that inappropriate and/or unnecessary uses of force occur in high numbers.

Physical force by Staff in a correctional setting is at times necessary to maintain order and safety and the mere fact that physical force was used does not mean that Staff acted

inappropriately, as emphasized in every Monitor's report to date. In fact, there are times in which Staff *must* use force. A well-executed, well-timed use of force that is proportional to the observed threat can actually protect both Staff and incarcerated individuals from serious harm. That said, the use of force has many consequences for the relationships between Staff and incarcerated individuals and the overall tenor and level of disorder in a Facility. Too often, Staff select approaches which escalate and exacerbate the problem (*e.g.*, painful escort, hyper-confrontation) rather than solve it, which increases both the likelihood that force will be used and the potential for harm.

The work that flows from a UOF incident, even those that are appropriate, is ***enormously*** taxing on the system in terms of the time required to write Staff reports, provide medical care, review and investigate incidents. The work required has a compounding negative impact, preventing Staff from attending to other important duties in maintaining security and addressing the needs of those in their care. Thus, even those uses of force that are within policy guidelines can have an adverse impact on the culture of a Facility for those who work and live there.

- *Overall Use of Force Data*

The graph below shows the raw number of uses of force every year since November 1, 2015 when the Consent Judgment was signed into effect. The purple line, with the data highlighted in grey boxes, shows the data from the current Monitoring Period. In January and February 2020, the raw number of uses of force was somewhat lower than that witnessed at the end of 2019, though it spiked to an all-time high in March 2020 (which corresponded with the beginning of the COVID-19 pandemic). From there, the number of uses of force in April-June 2020 was drastically lower than in the previous two years, although this occurred with a concurrent substantial reduction in the size of the population in custody. This is why the use of

the *use of force rate* is extremely important for assessing actual changes in the frequency of the use of force.



- *Use of Force Rate*

The graph below shows the use of force *rate* for each year since the Consent Judgment was signed. Again, the purple line with data highlighted in grey boxes shows the rate for the current Monitoring Period. Looking at the number of uses of force in combination with the number of incarcerated individuals highlights that the number of uses of force *per person* was actually higher than any previous Monitoring Period. Although the decrease in the population was extremely positive on the macro-level, it did little to change the conditions of the confinement in the jails—the use of force rate remains unacceptably high.



- *Injury Sustained During Use of Force*

One positive trend is that, overall, a smaller *proportion* of the Department's uses of force have resulted in an injury than in the past.[14] In the first half of 2020, 19% of uses of force caused an injury (Class A and B, combined, in the chart below), compared to 25% to 39% in previous years. During the first half of 2020, 86 incidents resulted in at least one serious injury[15] compared to 105 incidents during the previous six-month period.

---

[14] Note, this is a system-wide trend and the pattern does not necessarily hold for all Facilities.

[15] The injury classification data reflects the fact that at least one individual involved in the use of force (Staff or incarcerated individual) obtained an injury. This data does not reflect the unique number of individuals that may have sustained an injury as a result of a Use of Force.



That said, too often, the Department's practices continue to cause injury or pain to the incarcerated individuals involved. It is also worth noting that the fact that no one sustained an injury does not mitigate the concerns about the use of force if the force was nonetheless excessive or uncessary. In addition to injury, pain with no injury may also be the result of excessive and unnecessary force and is equally destructive to the culture of the Facility.

- *Use of Force by Facility*

Facilities' use of force rates are different—some are higher (EMTC,[16] GRVC, MDC, NIC, RNDC) and some are lower (AMKC, OBCC, RMSC, VCBC, WF).[17] Most of the Facilities' use of force rates increased during the current Monitoring Period, as shown in the chart below.[18] Only RNDC and WF achieved substantial reductions during the current

---

[16] EMTC originally closed on March 1, 2020, was reopened later in March 2020 for the purpose of COVID quarantine and then was closed again at the end of June 2020.

[17] Given the small number of people in custody and changing circumstances of NIC and WF, UOF rates across time are not comparable to the rates of other Facilities.

[18] BKDC and GMDC have both been closed and thus are not included in the chart.

Monitoring Period. Further discussion regarding use of force and overall management of RNDC is discussed in the Current Status of 18-year-olds Housed on Rikers Island section of this report.



| | AMKC | BKDC | EMTC | GRVC | MDC | NIC | OBCC | RMSC | RNDC | VCBC | WF |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2016 | 2.42 | 2.5 | 1.62 | 6.91 | 3.53 | 2.56 | 3.67 | 2.83 | 8.04 | 1.21 | 14.24 |
| 2017 | 2.72 | 3.94 | 1.74 | 6.42 | 4.82 | 2.21 | 6.12 | 4.83 | 4.9 | 2.81 | 20.97 |
| 2018 | 3.32 | 5.88 | 1.78 | 9.28 | 8.17 | 4.71 | 5.4 | 4.8 | 19.28 | 3.07 | 7.12 |
| 2019 | 5.19 | 7.13 | 3.14 | 13.26 | 11.95 | 7.84 | 5.595 | 5.145 | 20.925 | 3.775 | 3.74 |
| 2020 | 9.02 | 0 | 15.5 | 15.7 | 20 | 14.3 | 7.8 | 5.1 | 14.8 | 3.6 | 0.8 |

Given the differences in populations housed at each Facility (*e.g.*, high classification, need for enhanced security protocols, mental observation or protective custody), staffing levels and deployment, program availability, special housing units, and facility management styles, Facility leadership must analyze their own UOF data and develop and champion initaitives that address the specific contours of their Facility. While there are differences across Facilities, generally speaking, the patterns and dynamics that drive unnecessary and excessive UOF are largely the same across the Department.

- *Reasons for Using Force*

The Department uses several categories to explain why force was used in each incident, some of them in response to violence (*e.g.,* assaults on Staff, incarcerated individual fights) and some as a strategy to enforce compliance (*e.g.,* resisting restraint/escort, refusing a direct order).

Often, the Staff's aggressive demeanor and lack of skills in de-escalation contributes to the event, as does the prevalent failure to implement basic safety protocols (*e.g.*, leaving doors unsecured, being off post). The Monitoring Team also finds that use of force incidents are frequently poorly managed, which escalates the incident and the risk of injury. This is discussed in more detail in the "Staffing & Supervision" section below.

The distribution across the Staff's reported reason for using force during this Monitoring Period is shown in the chart below and has remained relatively stable over the last four and a half years. Reducing the use of force rate will require strategies that impact both the antecedent behaviors and the Staff's response to them.



Previous Monitor's Reports have discussed the secondary factors that underlie these categories. These include Staff's tendency to use unnecessarily painful escort techniques (*e.g.*, bending wrists or twisting arms) on an otherwise compliant person, which *leads to* resistance. *See* the Ninth Monitor's Report (at pgs. 31-32) for more information about the Department's strategy to address this problem. Unfortunately, the necessary skill development and buy-in is not yet prevalent among Supervisors—who are responsible for modeling proactive and constructive supervision and interrupting and redirecting poor practice on-site when it occurs.

The Monitoring Team also continues to review self-harm incidents involving use of force[19]—including a particularly egregious incident that occurred in this Monitoring Period—and remains concerned about this emerging problem in which Staff fail to use force timely to intervene in acts of self-harm. As noted in the previous Monitor's Report (*see* pgs. 22-23), the Department issued a Teletype with detailed guidance to Staff regarding proper prevention protocols. The Monitoring Team continues to recommend that the Department update its suicide prevention policy to fortify requirements for supervising those placed on suicide precautions, reporting self-harming behavior and conducting morbidity/mortality reviews following significant incidents of self-harm. In addition to needing to improve the implementation of these procedures, the Monitoring Team also remains concerned about the number of suicide attempts occurring in Facility Intake units, particularly those that involve an attachment point in the ceiling, and encourages the Department to assess the physical plant and work with relevant state oversight bodies to obtain approval to modify any areas with vulnerabilities.

- *Use of Force Locations*

The majority of use of force incidents occur in the housing units and Intake. The distribution of use of force incidents across locations has remained consistent since the Consent Judgment went into effect, with the most current Monitoring Period shown below.

---

[19] In an incident where an Incarcerated Individual is trying to self-harm, staff may need to use force to prevent the person from doing so.



Given that incarcerated individuals spend most of their time on the housing units, the fact that the vast majority of UOF occur there is not surprising. The frequency of UOF on the housing units is driven by a lack of Staff skill in de-escalation and a tendency toward provocation, as well as a host of circumstances that impact those in custody (*e.g.*, frustration, aggression, idle time, unpredictable/changes to schedules) that are ripe to be targeted with strategies for improvement.

This problem is further compounded by Staff's tendency (including Supervisors) to outsource the task of solving problems on the housing unit to the Probe Team, which is activated far too often and creates additional problems with the application of force, as discussed below. The activation of the Probe Team also has a secondary impact that is particularly relevant to the dynamics on the housing unit. Every activation of the Probe Team interferes with the ability to deliver programs and services consistently, and thus the Probe Team's frequent use—in addition to often escalating the immediate event—further contributes to the incarcerated individuals' frustrations which then triggers a subsequent event. This vicious cycle must be interrupted.

As has been true historically, the second most frequent location for UOF is Intake. Intake is a busy location because it is the nucleus for processing incarcerated individuals in and out of the Facility and because Staff escort those involved in a UOF to Intake (where they wait to be

seen by medical staff), along with those involved in interpersonal conflict (where they wait to be transferred to a different housing unit). Previous Monitor's Reports have explained the problems associated with this practice and its contribution to the high volume of UOF and ancillary violence occurring in that location (*see* Ninth Monitor's Report at pgs. 18-21).

*Staffing & Supervision*

Several Staff practices have repeatedly been found to increase the likelihood that force will be used. For example, a pattern of unprofessional conduct and lack of efforts to de-escalate situations including at times hyper-confrontational Staff behaviors, a lack of adequate and quality supervision, an overreliance on alarms and the Probe Team, the misuse of OC spray, and the use of painful escort techniques have all plagued the agency's use of force practices since the Effective Date. The Monitoring Team has observed that the frequency of head strikes has declined since November 2015 and that Staff are increasingly likely to use alternative techniques when responding to resistance (*e.g.*, control holds, OC spray, and shields), although there are certain cases in which Staff use head strikes in situations not permitted by policy and an alternative technique was available and would have been sufficient to neutralize the threat presented by the incarcerated individual. That said, it appears that the Department's efforts to minimize the use of head strikes has resulted in a shift in practice and less head strikes are utilized.

Uniformed Staff hold one of six ranks: Correction Officers (COs) are supervised by Captains, who are supervised by Assistant Deputy Wardens (ADWs), who are supervised by Deputy Wardens (DWs), who ultimately report to the Warden. The Wardens report to Bureau Chiefs who ultimately report to the Chief of Department. The Department's jails enjoy one of the largest staffing complements among the systems with which the Monitoring Team has had

experience. The average daily population in June 2020 was 3,949. At that time, approximately 6,900 COs, 580 Captains, 54 ADWs, and 30 Deputy Wardens and 11 executive uniform Staff (DWIC through Chief of Department) were working within the Facilities. Furthermore, about 450 uniform Staff (about 415 COs, 30 Captains and 2 ADWs) hold positions outside of the Facilities, but have routine incarcerated individual contact (*e.g.* ESU and Transportation Division). Finally, about 1,385 uniform Staff (about 1,170 COs, 200 Captains, and 12 ADWs) hold positions with limited to no incarcerated individual contact (such as at the Academy, Headquarters, Investigation Division, Security Operations, and CIB).

The Monitoring Team's experience in other jurisdictions—where an insufficient number of staff is a persistent problem—is not the problem facing this Department. The Facilities certainly have an overabundance of line Staff to manage the number of incarcerated individuals. This overabundance of staff may very well be counterproductive in the management of the DOC population, a circumstance, which in the Monitor's experience, is unprecedented. This Department, rather than struggling to meet minimum staffing ratios like their counterparts across the country, instead struggles to elevate the base level of skill among its Staff, to manage its large n umber of Staff productively, and to supervise them responsibly. This has a direct impact on the Department's ability to reduce the use of unnecessary and excessive force. The overabundance of line Staff who respond to incidents results in confusion, chaos and further dysfunction. In addition to the quality-related supervision problems of failing to lead by example and overlooking problematic practices observed among subordinates, the Department also suffers from a lack of supervisory capacity in terms of numbers, particularly in the ADW rank and thus is unable to effectively supervise and mentor Captains.

The key to altering Staff practice is to ensure there are a sufficient number of Supervisors and to leverage their role as active resources for continuous coaching and skill-development. The Monitoring Team has previously described this role as having three components: (1) actively and deliberately reinforce skills taught in training by issuing clear expectations about Staff's responsibilities before they go on shift; (2) having a constructive supervisory presence in the moment of an incident when their primary task is resolving the situation without using force, or ensuring that the type and amount of force used is appropriate to the situation, and (3) after the incident by adequately identifying both positive conduct and potential problems and addressing them with Staff.

Supervisors should be among the most skilled and informed Staff in the Facility, and therefore have a critical role to play in advancing the reform. Unfortunately, to date, many Supervisors' performance has been largely disappointing. Throughout the life of the Consent Judgment, the Monitoring Team has consistently observed incidents that begin as less serious events (which are commonplace in a confinement setting) but that through mismanagement, escalate into more serious and sometimes chaotic and potentially dangerous events that create a risk of harm to everyone involved. Staff often do not exhaust opportunities for de-escalation and frequently outsource the problem, as described below.

Too often, on-site Supervisors (typically Captains), rather than taking deliberate and thoughtful actions to solve problems, opt for the immediate deployment of hands-on force, usually via a Probe Team. In most incidents, the Tour Commander (ADW) is not present (either because they are not called or do not come to the site of the incident), allowing the Captains to pursue a course that only escalates the events. Even when a Tour Commander is present, their failure to properly manage the event too often transforms a commonplace situation into a

dangerous, major event. Once physical intervention is deployed, the event immediately becomes unpredictable and containment and control are compromised. In other situations, Captains become directly involved in the use of force instead of supervising and managing the incident. In other words, on-site Supervisors, many of whom act precipitously, end up contributing to or catalyzing the poor outcomes that are of concern.

Consistently and pervasively, the Monitoring Team has identified supervisory failures at multiple levels of uniform leadership. Often, several Supervisors respond to an event and yet no one individual is identified as the Incident Commander. The failure to utilize the Incident Command structure frequently results in Supervisors giving conflicting orders to both Staff and the incarcerated individuals. To illustrate this pattern more tangibly, four events from the current Monitoring Period are set out below.

- *A group of seven Young Adults were crowded into a housing unit's vestibule with approximately eight Officers, a Captain and an ADW—physical contact was unavoidable. Young Adults and Staff (including the ADW) were jostling each other in a casual manner, bordering on undue familiarity. Playful touching of Staff by one Young Adult suddenly escalated to an altercation with closed-fist strikes exchanged by both parties, and which then erupted into a full-blown melee between the Staff and Young Adults. Two Staff immediately resorted to using OC spray and, because the bridge door had been left unsecured, everyone dispersed to different areas of the housing unit, including a number of cells where the doors had also been left unsecured. The Probe Team arrived, resulting in further applications of force and chemical agents.[20]*

- *Following a fight on a housing unit, one of the two people involved was placed in the vestibule to await the Probe Team. After the Probe Team arrived, another resident of the housing unit was placed in the vestibule where a confrontation ensued, resulting in the Probe Team Captain using OC spray and other members of the team using physical intervention. While this was occurring, the housing unit door was opened and additional residents of the housing unit entered the vestibule, completely unsupervised. One took an MK-9 cannister that had been left on a food cart, returned to the housing unit and*

---

[20] The Rapid Review concluded the Officer's head strikes were not within guidelines but did not recommend any corrective action. The investigation of the incident by ID is still pending.

*proceeded to spray Staff. This entire incident erupted upon the Captain's precipitous use of OC spray.[21]*

- *One evening at about 7:30pm, residents of a housing unit were in the day room engaged in leisure activities, watching TV. They were ordered to lock-in but refused, complaining about the heat in their cells and that on the day prior, they had been allowed to stay in the common space later into the evening. Further, they claimed that lock-in was occurring earlier than scheduled on that day. The Probe Team entered the housing unit and immediately forced a confrontation with the otherwise passive residents of the housing unit. During an attempted restraint, a chase ensued with Staff chasing one of the residents in a chaotic attempt to catch him. The other residents remained passive, sitting on or at the tables, watching the chase. Ultimately, all of the residents were gathered, unrestrained, into the vestibule, where a bevy of officers proceeded to secure them, but with too few flex cuffs available for the task. Instead, OC spray was deployed, and physical intervention was used to secure the residents.[22]*

- *During an institutional search, residents of a housing unit passively refused, stating they had just been searched the day prior. The Probe Team was present, along with other Staff who assisted with restraining residents who refused the search. They were rear-cuffed and escorted to the front of the housing unit. Throughout this incident, Staff and residents complained about the excessive heat, heard on hand-held video. Staff encouraged Supervisors to make a decision about moving the residents from the area. The heat, coupled with an extended delay in being escorted from the unit (about 20 minutes), increased the level of agitation among the residents. As they became disruptive, an ADW escalated the situation by pushing one of the residents, which set off a chain reaction of multiple uses of force and people being taken to the floor. Multiple staff were observed using prohibited holds and aggressive tactics, in addition to the overly close positioning of a canine. Neither the ADW nor Captain properly supervised or controlled the scene. As residents were escorted from the unit, Staff excessively bent and twisted residents' wrists and elevated residents' arms, causing them to resist escort. When several residents passively dropped to the floor near Intake, Staff unsafely carried them by their arms from gurneys to Intake cells. One Probe Team Officer raised and slammed a resident to the floor, while another dragged a person in restraints across the floor as a Captain sprayed him at point blank range in the face with an MK-9.[23]*

---

[21] The Captain and Officer who abandoned the MK-9 were suspended and a third Officer was charged with abandoning his post. The investigation of the incident by ID is still pending.

[22] The Rapid Review concluded that this was an unavoidable incident, and recommended corrective action in the form of a Command Discipline for the Captain for failing to supervise the incident. The Command Discipline is pending.

[23] The Rapid Review identified that the ADW "lacked situational awareness" and recommended that the Captain should be retrained in Probe Team response and escort techniques. The ID investigation closed with charges for both the ADW and Captain.

In each case, on-site Supervisors did not engage in efforts to avoid force; incidents that began as less serious events needlessly escalated to major applications of force; staff temporarily lost control after force was initiated; many incarcerated individuals were transferred to Intake, further burdening that area as discussed above; large numbers of officers were required to write long, time-consuming reports; and investigations of these incidents will not be completed for months, precluding the opportunity for close-in-time feedback.

During this Monitoring Period, the Department began to identify and promote Staff to the position of ADW in order to decrease the number of Staff being supervised by any single Tour Commander to improve the quality of supervision.

*Over-Reliance on the Facility Emergency Response Team*

As discussed at length in previous reports (*see* pgs. 27-30 of the Ninth Monitor's Report), the frequency of alarms far exceeds what the Monitoring Team has observed in other settings, particularly Level B alarms which activate the Probe Team. In most places, a Probe Team activation would rarely occur on a daily basis, let alone multiple times on a single tour, as is often the case in the Department.

Probe Team activations are Staff-intensive and significantly disrupt the normal operation of the Facility. Not only does the show of force tend to exacerbate the risk of violence, but the demeanor of the Probe Team often escalates the situation. During the Monitoring Team's routine review of incidents involving Probe Teams, some are observed exercising patience beyond expectations. However, far more frequently, Probe Team members demonstrate an inability to establish a constructive dialogue with the people involved and fail to identify or address the primary issue underlying the discontent. Probe Team Captains often appear unable to control the events or to provide constructive supervision to their team members. A large number of incidents

involve Probe Teams deploying OC on incarcerated individuals who remained passive,
aggressively applying restraints, bending/twisting arms during escort, and aggressively taking
incarcerated individuals to the floor. In addition, non-physical alternatives to resolve the situation
did not appear to be exhausted before proceeding to the use of force.

The Department has a system of alarms involving two levels: (1) Level A alarms bring a
Supervisor and other staff to the location in an effort to resolve issues without using physical
force and (2) Level B alarms activate a Probe Team, which consists of Staff who suit up in
protective gear and advance as a unit to the location making the distress call. Ideally, a Facility
should attempt to resolve issues by first using a Level A alarm assuming time is available to do
so. If those initial attempts are unsuccessful, or if the event involves an immediate risk of serious
physical harm (*e.g.*, someone being threatened with a weapon) a Level B alarm is then
appropriate. Although the Monitoring Team has encouraged the Department to identify strategies
to reduce the unnecessary deployment of Probe Teams, and the Department issued a policy in
August 2019 intended to shift practices toward a reliance on Level A alarms, the problem has
only worsened. The Department's alarm data do not provide any evidence that Level Bs are used
less frequently. In fact, they often appear to be used in isolation, without attempting a Level A to
resolve the situation when circumstances permit.

While the number of Level B alarms decreased about 30% (from 5,228 in the Ninth
Monitoring Period to 3,666 in the Tenth), so did the number of incarcerated individuals (Ninth
Monitoring Period ADP was 6,989 and Tenth was 4,698, for a decrease of 33%). To neutralize
the impact of the population reduction, the comparisons below use the *proportion* of all alarms
that involve Probe Team activations (Level B).

During the Tenth Monitoring Period, 82% of all alarms (3,666 of 4,462) were Level B/Probe Team activations, which is an *increase* from the Ninth Monitoring Period, when 71% were Level B/Probe Team. This same pattern holds across the Facilities, all of which have high proportions of Level B alarms (range 63% to 98%), and almost all of which proportionally increased their use of Level Bs compared to the previous Monitoring Period (AMKC +9, EMTC +22, GRVC +7, MDC +24, MNCT +8, OBCC +6 and RNDC +12). NIC was the only Facility to decrease its proportion of Level Bs (from 79% to 72%, or -7) and VCBC stayed the same at 98%. In short, the Department's efforts to reduce the activation of Probe Teams when assistance is required does not appear to be working.

*Incarcerated Individuals and Use of Force*

- *Age of Incarcerated Individuals and Use of Force*

The *Nunez* reforms have specific requirements related to 16-, 17- and 18-year-old youth, which necessitates disaggregating UOF data by age. Given the 16- and 17- year old population was fewer than five youths for most of the Monitoring Period, the Monitoring Team did not examine UOF rates for this age group. However, a description of the Monitoring Team's assessment of DOC and ACS' of management of this age group is discussed in the "Current Status of 16- and 17-Year-Old Youth" section of this report.

With the transfer of 16- and 17-year-olds off Rikers Island, 18-year-olds are now the youngest individuals in DOC custody. As shown in the data below, they are overrepresented in incidents involving a UOF and also have the highest UOF rate across age cohorts. The mandate of the Consent Judgment, along with the data showing their disproportionate involvement in UOF events, underlie the Monitoring Team's focus on this age group.

Over the past five years, the Department has enacted specific strategies targeting 19- to 21-year-olds (*e.g.,* abolishing Punitive Segregation for this age group and creating alternative sanctions). In some cases, the Department has leveraged its work with 18-year-olds to address the older Young Adults, but has also taken on separate initiatives, none of which are required by the Consent Judgment. Strategies focusing on young adults are grounded in adolescent brain development research which demonstrates that the uneven pace of development between the frontal lobe and limbic system underlies their impulsivity, difficulty regulating emotions, misreading of social cues, and failure to consider the consequences of their behavior, all of which may become frustrating or exasperating for Staff. These dynamics help to explain the data below that shows this age cohort's disproportionate involvement in UOF events.

Throughout the life of the Consent Judgment, UOF rates have significantly increased among incarcerated individuals of all ages, as shown in the table below (+174% for 18-year-olds, +200% for 19 to 21-year-olds and +240% for those age 22 and older). The data in the table below uses a *rate* which neutralizes the impact of the population size within each group.

| Average UOF Rates, 2016-2020, by Age | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **Jan.-Jun. 2020** | **% change 2016-20** |
| 16-17-year-olds | 29.4 | 21.4 | 50.1 | 67.9[24] | ~ | ~ |
| 18-year-olds | 19.7 | 17.7 | 36.4 | 53.8 | 53.9 | +174% |
| 19-21-year-olds | 9.3 | 12.3 | 19.0 | 24.4 | 27.9 | +200% |
| 22+ year-olds | 2.5 | 2.9 | 3.8 | 5.8 | 8.5 | +240% |

---

[24] Data for 16- and 17-year-olds is limited to January-October 2019, since ACS began supervising the HOJC housing units in November 2019.

33

Beyond the specific work with 18-year-olds, this data does not alter the Monitoring Team's assessment of the drivers of unnecessary and excessive UOF. While certain age groups may be more likely to be involved in a UOF, the Monitoring Team has not identified a pattern or practice that Staff target certain age groups when using force. Instead, the practices of greatest concern—excessive and unnecessary force—appear to be employed indiscriminately, regardless of one's age cohort. This reality underlies the Monitoring Team's support for the universal approaches to UOF-reduction, strategies that will be implemented across DOC's entire population, as described in more detail at the end of this section. At this time, age-specific strategies would be premature, as it behooves the Department to assess the extent to which the universal strategies have diminished the problem. That said, the Monitoring Team will continue to assess UOF trends by age to determine whether the universal strategies are equally effective across age groups.

- *Incarcerated Individuals Frequently Involved in Force*

As reported in previous Monitor's Reports and in the table below, the number of incarcerated individuals involved in large numbers of uses of force is relatively small (somewhere between 25 and 150 individuals during an entire calendar year).

| UOF Involvement Among Incarcerated individuals, 2016-2020 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of UOF Incidents per Person | 2016 N=4544 | | 2017 N=4627 | | 2018 N=4986 | | 2019 N=5432 | | Jan-Jun 2020 N=2685 | |
| 1 or 2 | 3,655 | 80% | 3,782 | 82% | 3813 | 76% | 3939 | 73% | 2048 | 76% |
| 3 or 4 | 520 | 11% | 549 | 12% | 663 | 13% | 827 | 15% | 412 | 15% |
| 5 to 10 | 308 | 7% | 259 | 6% | 406 | 8% | 528 | 10% | 191 | 7% |
| 11 to 15 | 44 | 1% | 24 | 1% | 71 | 1% | 91 | 2% | 25 | 1% |
| 16 to 20 | 9 | <1% | 7 | <1% | 21 | <1% | 33 | 1% | 5 | <1% |
| 20+ | 8 | <1% | 6 | <1% | 12 | <1% | 14 | <1% | 4 | <1% |

During the current Monitoring Period, the Department launched a new initiative to better understand and meet the needs of this relatively small group of incarcerated individuals. In December 2019, the Department's Strategic Planning Office began to develop a list each month of High Needs Individuals ("HNI")—those who have been involved in 6 or more use of force incidents in the prior 3 months. During the early implementation phase of this project, an assessment of the available information for each incarcerated individual revealed a common practice: the frequent transfer of these individuals among the various jails, generally in response to a use of force or other significant incident. Such a practice can be particularly destabilizing and counterproductive with incarcerated individuals with mental health issues, and thus the Department no longer permits interfacility transfers with incarcerated individuals on the HNI list unless the transfer is for the purpose of the person accessing a specific program. Just this initial change in practice seems to be producing positive results, as UOF involvement has substantially decreased for a significant number of incarcerated individuals on the HNI list.

Of the approximately 110 incarcerated individuals who have been categorized as HNI, approximately 23 (21%) were discharged, and 51 (46%) were removed from the list due to a subsequent decrease in UOF involvement (incarcerated individuals are removed from the list if, in the subsequent 3 months, they are involved in 5 or fewer UOF incidents). In particular, the Department has reported that involvement in UOF decreased substantially for a significant portion of incarcerated individuals placed on the HNI list (between 70% and 95%, after being placed on the HNI list). There are a number of reasons why a reduction in interfacility transfers could positively impact the UOF metric: it could trigger changes in the person's own behavior (*e.g.*, their behavior may stabilize with fewer changes in environment/Staff/peers) and may also trigger changes in Staff's behavior toward that person (*e.g.*, Staff may find more constructive

ways to work with the individual or may become more consistent in holding the person accountable). These and other effects of the HNI intervention will be explored in subsequent Monitoring Periods, along with an examination of how this approach may interface with the pre-existing PINS process (described in the Ninth Monitor's Report at pgs. 34-37).

*Addressing the Multi-Faceted Problem of Excessive and Unnecessary UOF*

The problems exposed by the Monitoring Team's observations and assessment of the Department's patterns and trends described above cannot be solved by discrete strategies implemented in a vacuum. Instead, the strategies must be similarly multi-faceted and capable of addressing multiple symptoms of the problem simultaneously. The Department and Monitoring Team have developed initiatives with this goal in mind (most of which have been codified by the Remedial Order, as noted parenthetically below).

While the problem of excessive and unnecessary use of force is ultimately one of Staff behavior, that behavior can be impacted from several directions.

- Most directly, each of the methods designed to increase Staff skill in constructive engagement with incarcerated individuals must carry a consistent message that current practices must change. This is true for classroom-based training, during routine interaction with one's Supervisor, and when providing feedback during post-incident reviews.

  o Thus, the Department will reconstitute its efforts to reinforce necessary skills among line Staff, improve its ability to identify misconduct when it occurs and enhance the quality of the feedback delivered via Rapid Reviews (¶ A.1 of the Remedial Order) and skills for Probe Team members to promote greater reliance on de-escalation tactics specifically designed to reduce violence (¶ A.6). The

36

capacity for routine interaction with Supervisors will first be expanded by increasing the number of Supervisors ( ¶ A.4), along with efforts to address how Staff may interact with younger incarcerated individuals who have disproprotionate UOF rates (¶ D.3).

- The more that is known about the incarcerated individuals who are frequently involved in UOF incidents, the more line Staff can adopt specific strategies to address their individual needs.

    o Thus, the Department will examine the sufficiency of treatment and security protocols for these individuals (¶ A.5 of the Remedial Order), and identify new strategies that focus on the age group with the highest UOF rates (¶ D. 1-3 of the Remedial Order, discussed in more detail in the "Current Status of 18-Year-Olds" section of this report).

- One step removed from line Staff, Supervisors at all levels must receive specific, pragmatic guidance about the types of problems that need to be addressed among their subordinates.

    o Thus, each Facility's leadership will develop a corrective action plan, so that not only are the situations and circumstances giving rise to problematic Staff behavior better articulated, but the Facility leadership will begin to have some ownership of both the problems and their solutions (¶ A.2 of the Remedial Order). It is expected that Supervisors will have a key role in implementing the plans.

- The dissection of these problems via the action plan will create the need to develop new operational practices.

o   One strategy is to address a practice that casts a web of undesireable outcomes—the Probe Team. The Department will evaluate the composition and deployment of Probe Teams to address the numerous problems that are triggered in the moment, as well as the negative side effect of their constant activation on the delivery of services to incarcerated individuals (¶ A.6 of the Remedial Order). Furthermore, the Department will deveop new protocols for de-escalation following a UOF incident that both calms tensions and also returns Intake areas to their primary purpose of processing incarcerated individuals in and out of the Facilities (¶ A.3). It is expected that the Facilities' action plans will give rise to additional strategies to address their unique vulnerabilities and operational problems.

Put simply, although the various provisions of the Remedial Order may target a single practice or set of actors, they must all be properly implemented in order to have the necessary ripple effect that goes beyond their specific objective and fundamentally alters Staff practice and their use of unnecessary and excessive force. As discussed in the next section, other initiatives (also codified in the Remedial Order) are expected to improve the Department's ability to identify the misuse of force as well as its ability to address UOF-related misconduct more meaningfully. These efforts will support and complement the operational initiatives described above.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to successfully reduce the use of unnecessary and excessive force and encourage safe and proportional use of force. In this section, the Monitoring Team provides an overview of the Department's ability to consistently identify misconduct and to respond with interventions that are likely to prevent re-occurrence. Effectively addressing the misuse of force requires: (1) reliably *identifying* misconduct that occurs; (2) *recommending proportional and effective responses* to that misconduct; and (3) ensuring the responses are *actually imposed*, in a *timely manner*.

*Identifying Use of Force-Related Misconduct*

The combination of Rapid Reviews, the Immediate Action Committee, *ad hoc* review by Agency officials of use of force incidents, Preliminary Reviews/Intake Investigations, and Full ID Investigations create multiple opportunities for identifying misconduct and initiating timely and proportional corrective action (including discipline) when warranted. These processes provide a sufficient foundation to identify misconduct, but they have historically not been maximized due to the lack of consistent and reliable interpretation of the UOF policy. In this Monitoring Period, the Department's mechanisms for identifying misconduct were in a state of transition, which, in some cases, was also compounded by the impact of COVID-19 as discussed in more detail below.

The Department took significant steps this Monitoring Period to improve the reliability of UOF incident assessments conducted via Rapid Reviews[25] and investigations of incidents by ID.

---

[25] Rapid Reviews are now referred to as "Use of Force Reviews" by the Department, but the moniker Rapid Reviews will continue to be used in this report for clarity.

39

The Department worked with the Monitoring Team to revise the Rapid Review template to clarify the expectations for Facility leadership in their assessment of each use of force incident. These revisions, in combination with the Department's ability to more reliably track and impose the recommendations for corrective action from Rapid Reviews, provide a stronger foundation for close in time assessments of UOF incidents by the Facilities.

The Department also transitioned from conducting Preliminary Reviews of every incident to conducting Intake Investigations using the "Intake Squad" to investigate all use of force incidents that occurred beginning February 3, 2020. This transition coincided with the elimination of Facility Investigations, so ID is now solely responsible for conducting investigations of use of force incidents, and Intake Investigations are a more streamlined and efficient investigation than Preliminary Reviews. Finally, ID also worked diligently, and made significant progress, in this Monitoring Period to reduce the backlog of Preliminary Reviews, and Full ID investigations, as discussed in detail in the Investigations section of this report. All of the work in this Monitoring Period has resulted in significant improvement of UOF incident investigations, as discussed throughout this report.

- **Rapid Reviews**

Rapid Reviews must be conducted for every actual UOF incident captured on video.[26] A close-in-time assessment of use of force incidents by Facility Leadership is critical to properly managing any facility. While the investigation will make the ultimate determination about Staff conduct, administrative reviews are integral to uniform leadership's ability to appropriately manage their Staff and the Command. The Rapid Review process provides an opportunity for

---

[26] The Rapid Reviews do not assess allegations of use of force.

Facility leadership to document their initial assessment of an individual incident, consider whether an immediate response is necessary and/or whether operational issues need to be addressed.

Given that the nature of these reviews is to make a close in time assessment, the review focuses almost exclusively on the video of the incident. In assessing the video of the incident and available preliminary reports (*e.g.,* CODs), the Facility Warden must identify whether the incident was avoidable, and if so, how; whether the force used was within guidelines; whether Staff committed any procedural errors; whether the incident involved painful escort techniques; for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type; and various other prompts about the nature of the incident. The Rapid Reviews are completed in an excel worksheet with individual columns for each of the relevant prompts which the Facility leadership can input their findings. The Rapid Reviews are conducted on a daily basis and forwarded up the chain of command for approval by the Bureau Chief of Facility Operations, whose office reviews and finalizes the Rapid Review assessments and compiles them into one excel spreadsheet which are then circulated to relevant stakeholders for review.

The extensive video coverage in the Department means that nearly all use of force incidents are subject to a Rapid Review. During this Monitoring Period, Rapid Reviews assessed 2,991 (99%) of the 3,036 actual uses of force, involving 9,748 unique Staff actions.[27] The chart below demonstrates the Rapid Review outcomes for the past five Monitoring Periods.

---

[27] The fact that 9,748 staff actions were evaluated does not mean that 9,748 *different* Staff Members were involved in UOF. Rather, this number reflects the *unique* Staff actions evaluated in every UOF incident reviewed. In many cases, Staff may have been reviewed multiple times as they were involved in multiple use of force incidents throughout the Monitoring Period.

| Rapid Review Outcomes – January 2018 to December 2019 | | | | | |
|---|---|---|---|---|---|
| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 |
| Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations | | | | | |
| UoF Incidents Assessed | 1,170 (97% of actual incidents) | 3,087 (94% of actual incidents) | 3,215 (95% of actual incidents) | 3,684 (98% of actual incidents) | 2,991 (99% of actual incidents) |
| Avoidable[28] | 277 (24%) | 688 (22%) | 492 (15%) | 323 (9%) | 209 (7%) |
| Unnecessary | 104 (9%) | 186 (6%) | 126 (4%) | 85 (2%) | N/A[29] |
| Procedural Violations | 419 (36%) | 1,225 (40%) | 735 (22%) | 931 (25%) | 502 (17%) |
| Misconduct Identified | | | | | |
| Staff Actions Assessed | 3,745 | 12,129 | 11,085 | 12,501 | 9,748 |
| Corrective Action Recommended[30] | 841 (22% of Staff Actions) | 2,754 (23% of Staff Actions) | 2,072[31] (19% of Staff Actions) | 1,897 (15% of Staff Actions) | 880 (9% of Staff Actions) |

While Rapid Reviews were conducted for nearly all incidents, the Rapid Reviews were inconsistent in identifying misconduct and recommending action when appropriate to address that misconduct. The data demonstrates that Facility leadership are identifying *some* situations where Staff have engaged in misconduct. However, the Rapid Reviews do not consistently identify whether the incident is necessary/unnecessary or appropriate/excessive, or whether an individual Staff Member engaged in misconduct. The Monitoring Team continued to identify examples in this Monitoring Period of Rapid Reviews that were inadequate as they failed to identify clear, objective evidence of wrongdoing. The Monitoring Team has not identified a particular pattern with respect to those deficient Rapid Reviews and/or that certain *types* of

---

[28] An incident may be found to be both avoidable and unnecessary.

[29] Based on the changes to the Rapid Review template mid-way through the Monitoring Period there is not consistent data to capture this information for the Tenth Monitoring Period. Data to capture similar information in the next Monitoring Period is expected.

[30] For comparison purposes across Monitoring Periods in this chart, the "Corrective Action Recommended: Yes/No" field was used.

[31] The recommended corrective actions are intended to address any misconduct related to an incident that is found to be avoidable, unnecessary, or have procedural violations, and one incident may have corrective action for multiple Staff involved.

conduct may not be identified. The one overarching concern about the Rapid Reviews is that they do not appear to comprehensively assess the available facts and evidence related to an incident. Of those, the Monitoring Team identified at least ten examples of egregiously inadequate, biased, or incomplete Rapid Reviews conducted this Monitoring Period, which were shared with the Department to address.[32]

Another important component of the Rapid Review process is identifying those incidents in which the force could be avoided all together. This is a critical component of the review as this provides Facility leadership the opportunity to work with individual Staff and/or improve operational practices to address situations in which force can be avoided in the future. Facility leadership did identify that *some* incidents are avoidable, but this assessment was not reliable. Facility leadership identified 209 incidents as avoidable from this Monitoring Period. However, ID determined that at least 43 additional incidents (occurring between February 3, 2020 and the end of the Monitoring Period) were avoidable through the Intake Investigation.[33] Although it may not be possible for the Facility to identify some incidents as avoidable at the Rapid Review stage, as a more detailed assessment or more information is needed, these findings suggest that a more critical assessment of whether an incident is avoidable is needed at the Rapid Review stage.

Finally, it is worth noting that it is likely that at least some of the reduction in the identification of misconduct through Rapid Reviews may have been due to some growing pains in this Monitoring Period. First, the template for the Rapid Reviews was disjointed in this Monitoring Period because it was changed several times, so capturing certain information and

---

[32] Department leadership reported they met with the relevant Facility leadership who conducted these reviews to discuss these findings and provide counseling.

[33] It is worth noting that the overall number of avoidable incidents may grow following the conclusion of those cases awaiting completion of the Full ID investigation.

data changed across the Monitoring Period, therefore certain misconduct may not have documented in the Rapid Review spreadsheet. Further, there was some confusion with Facility Leadership about their role in assessing the incident as part of the Rapid Reviews once ID took over all investigations in February 2020 and so there was a short period of time where the Facilities may not have fully completed the Rapid Reviews as required because they deferred determinations to ID.[34]

> o  <u>Rapid Review Template</u>

The Rapid Review template was updated three times this Monitoring Period to address both the Monitoring Team's findings and some confusion by Facility leadership. The first two sets of revisions were made to better capture certain information including: whether self-harm protocols were followed as required (if applicable), whether a Staff Member should be subject to a 5003 counseling session based on their conduct in the incident, whether Staff should be suspended for their conduct, and clarification about the overall assessment of incidents.

The Department determined through this initial revision process, and with feedback from the Monitoring Team and Facility leadership, that a broader overhaul of the template was needed in order to clarify the expectations for Facility leadership in completing the Rapid Reviews and to provide further instruction and guidance on the requested information to support improved assessments of the incident. The third set of revisions was a complete restructuring of the template which made a number of formatting changes, provided clear and appropriate guidance

---

[34] Following the implementation of the Intake Squad, and the elimination of Facility Investigations, Facility leadership often deferred determination of the incident to ID due to a misunderstanding that *only* ID can make a determination about the incident. Upon identification of this issue, the Department advised Facility leadership that an assessment of every incident must be completed and that this assessment does not conflict with the work of ID.

about the information being sought, and also included some new sections, such as addressing the use of Level B/Probe Teams.

These revisions were completed at the end of the Monitoring Period and implemented on July 1, 2020. The rollout of the new template was coupled with the development of a policy and various communications and meetings with all Wardens and Deputy Wardens regarding what needs to be done when conducting these assessments. The enhanced Rapid Review template will be supported by additional requirements in the Remedial Order (to be rolled out in the next Monitoring Period) that require oversight of Rapid Reviews and accountability for Supervisors found to have conducted a biased, incomplete, or inadequate Rapid Review. All of these initiatives are expected to improve the assessment of use of force incidents by Facility leadership and have a corresponding impact in reducing avoidable, excessive, and unnecessary Use of Force.

o   Addressing Rapid Review Recommendations

As part of the Rapid Review, Facility leadership may recommend corrective action for a Staff Member, including re-training, counseling/corrective interview, referral to E.I.S.S. and/or Correction Assistance Responses for Employees, suspension, or modified duty (collectively "administrative responses"), or issue a Command Discipline or a Memorandum of Complaint. It is worth noting that the Facility cannot issue a Command Discipline or Memorandum of Complaint regarding any identified misconduct that is a violation of the Use of Force or Chemical Agents Directive (these must be addressed through a PDR or charges via the Trials division if the incident is sustained by ID). However, in these cases, the Facilities are expected to initiate appropriate administrative responses depending on the facts of the case.

NCU continued to track the instances in which the Facility leadership recommended corrective action and to confirm whether those actions were imposed. NCU's tracking has increased awareness and visibility of the corrective action process, which has continued to support improved practice by the Facilities in actually imposing the recommended corrective action. The Monitoring Team has found that recommended corrective action outside of Command Disciplines (*e.g.*, re-training[35], corrective interviews, etc.) were completed and NCU was able to obtain relevant proof of practice. With respect to the imposition of recommended Command Discipline ("CD"), see the discussion in the CD section below.

- **Immediate Action**

An immediate administrative response (*e.g.*, suspension, re-assignment, counseling, etc.) is necessary to address certain misconduct close in time to the incident so that Staff are held to a common understanding and expectation of how to reasonably utilize force. Given the current investigation backlog, the need for more immediate action is even greater so that certain misconduct is addressed in a timely fashion. The majority of misconduct identified for potential immediate action is identified through Rapid Reviews, review by uniform or civilian leadership through routine assessment of incidents, and the Intake Investigations. Immediate action is then imposed following review of these cases by Department leadership.

During the first portion of the Monitoring Period, the Immediate Action Committee ("IAC") met bi-weekly to review any cases referred for immediate disciplinary action (*e.g.*, suspension or modified duty) by the avenues discussed above. The Immediate Action Committee includes representatives from the executive leadership team (uniformed and civilian), ID, and

---

[35] The Facility must enter the re-training request into the Academy Service Desk and the Academy will then arrange to schedule the re-training. The provision of re-training is discussed more generally below.

staff of the Early Intervention, Support, and Supervision Unit ("E.I.S.S"). The IAC meetings were suspended in March 2020 through the end of the Monitoring Period due to COVID-19 limitations on in-person meetings. While the formal meetings were on pause, ID and uniform leadership continued to identify and suspend or modify Staff to address use of force-related misconduct throughout the Monitoring Period. While the meetings were suspended, this did not necessarily impact the Department's assessment of cases that required potential immediate action. In fact, these *ad hoc* assessments by Department leadership resulted in the suspension of 29 Staff Members during this time.

Increasing the Department's focus on immediate corrective action is a goal of the Remedial Order, and two Remedial Order requirements relate to immediate corrective action as discussed in more detail in the Staff Discipline and Accountability section of this report.

o   <u>Suspensions and Modified Duty</u>

The Department took more immediate corrective action in this Monitoring Period compared with prior Monitoring Periods, despite the suspension of the IAC meetings for four of the six months of this Monitoring Period. In total, the Department took immediate action in response to 43 use of force incidents this Monitoring Period, including suspending 36 Staff,[36] and placing five Staff on modified duty.[37]

Recommendations to modify duty or suspend Staff are implemented timely. However, recommendations for other immediate corrective action (*e.g.* re-training, E.I.S.S. screening, fast

---

[36] Some Staff that were suspended and/or placed on modified duty were based on a Staff Members involvement in more than one incident.

[37] 13 of the 43 incidents assessed for immediate action were considered by the IAC in January and February. Further, seven of the 36 Staff suspended were suspended as a result of the IAC's review, and three of the five Staff placed on modified duty were placed on modified duty as part of the IAC's review.

track investigation or discipline) involve different divisions and therefore requires coordination with a few different groups. The Department has not yet implemented a reliable tracking process to ensure recommendations for these types of immediate action are implemented timely (see Eighth Monitor's Report at pgs. 41– 42 and Ninth Monitor's Report at pgs. 58 – 59). The Monitoring Team intends to work with the Department on this tracking process as part of the implementation of the Immediate Action requirements of the Remedial Order.

The table below presents the recommendations of the IAC as well as the *ad hoc* actions taken by leadership. When misconduct is identified close in time to an incident, the Monitoring Team has found that the Department's immediate action responses are generally reasonable. For instance, many of the responses include suspensions for a significant number of days, which appeared appropriate to address the misconduct identified.

| Immediate Action Recommendations – *by Staff Member*  *Tenth Monitoring Period* | | |
|---|---|---|
| **Recommended Action**  *Most Staff Received Multiple Actions* | **Total Recommended** | **Total Confirmed** |
| **Suspensions** | 36[38] | 36 |
| **Modified Duty** | 5 | 4 |
| **Fast-Track to Trials or MOC** | 2 | 2 |
| **Recommend UPS Investigation** | 6[39] | 6 |
| **PDR Recommendation** | 1 | 1 |
| **EISS Referrals or Extensions of Monitoring** | 3 | 1[40] |
| **Counseling** | 1 | 0[41] |
| **Re-Training** | 3 | 3[42] |
| **Total Recommended Action** | **57** | **53** |
| **Total UOF Incidents Covered** | **43** | |

During this Monitoring Period, the Monitoring Team verified that the Department suspended 36 Staff Members for use of force-related misconduct with suspensions lasting from five to 30 days.[43] This represents the highest number of Staff suspended for use of force related misconduct since tracking began in the Sixth Monitoring Period. The increase in the use of suspensions reflects progress in the Department's efforts to better identify and impose immediate

---

[38] Seven of these suspensions stemmed from the Immediate Action Committee meetings which took place in January and February 2020, while the remaining 29 stemmed from ad hoc Department leadership review throughout the remainder of the Monitoring Period.

[39] This represent four unique incidents covering Immediate Action for six Staff Members

[40] One of the three Staff Members was placed on EISS monitoring in October 2020, almost six months after the initial recommendation from the committee. The other two cases did not result in EISS monitoring because one Staff member was terminated via PDR so this recommendation was moot and in the other case, EISS staff and the Warden of the Facility determined EISS was not appropriate.

[41] This counseling recommendation was for the counseling to be conducted by a specific uniform Staff Member who then retired prior to conducting this counseling session.

[42] Two of three of these re-training requests were not made to the Academy until October 2020 and the requests are still pending.

[43] As per Department policy (Memorandum 01/99 - Suspension without Pay (Captain and Above)), all suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay.

action for use of force related misconduct. The suspensions imposed over the last five

Monitoring Periods are depicted in the chart below.

| Suspensions by Monitoring Period | | | | |
|---|---|---|---|---|
| | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period | 9th Monitoring Period | 10th Monitoring Period |
| CO | 14 | 9 | 16 | 21 | 32 |
| Captain | 7 | 2 | 7 | 3 | 4 |
| ADW | 0 | 0 | 0 | 0 | 0 |
| DW | 0 | 0 | 0 | 0 | 0 |
| Warden | 0 | 0 | 0 | 0 | 0 |
| Total | 21 | 11 | 23 | 24 | 36 |

The Department also modified Staff Members' duties or re-assigned Staff several times

during this Monitoring Period. In total four Staff were placed on modified duty (two as a result

of recommendations from the IAC and two from *ad hoc* leadership reviews) to different

positions and/or positions with limited or no incarcerated individual contact pending the outcome

of the investigations/discipline for serious incidents.

The use of suspensions and modified duty are both effective immediate corrective

responses to misconduct and the Monitoring Team will be working with the Department in the

Eleventh Monitoring Period to maximize the use of these tools as part of the Department's

overall efforts to identify and impose immediate corrective action as appropriate and as required

by the Remedial Order.

- **Investigating Use of Force-Related Misconduct**

The Department has significantly improved the investigation of use of force incidents in

this Monitoring Period. The Department successfully launched the Intake Squad this Monitoring

Period and eliminated the use of Preliminary Reviews and Facility Investigations. Intake

Investigations are designed to enable the Department to conduct more efficient, timely, and

higher quality investigations as described in the Ninth Monitor's Report at pgs. 41-47. The

benefits of this approach were already apparent in this Monitoring Period as investigations of

incidents occurring in this Monitoring Period were closed in a timely fashion and the backlog of

pending investigations decreased. The table below provides the investigation status of all 16,942

UOF incidents between January 2018 and June 2020.

ID closed significantly more cases in this Monitoring Period compared with last

Monitoring Period. ID closed over 7,000 investigations in this Monitoring Period (this includes

those closed through Intake Investigations, Preliminary Reviews, and Full ID Investigations)

compared with less than 3,000 closed in the Ninth Monitoring Period. As an initial matter, all

investigations of incidents that occurred prior to January 2019 have now been closed. This

improved closure rate also had a corresponding impact on the number of pending investigations.

The number of pending cases at of the end of the Tenth Monitoring Period is almost half of what

it was at the end of the Ninth Monitoring Period (4,451 cases compared with 8,656 cases). Of the

4,451 cases pending, the majority (53%) are pending Preliminary Reviews from the Ninth

Monitoring Period, which will be closed as part of the "ID Backlog Project" (discussed further

below and in the Use of Force Investigations section of this report).

| Investigation Status of UOF Incidents Occurring Between January 2018 to June 2020 as of July 15, 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **Jan. to June 2018** *6th Monitoring Period* | | **July to Dec. 2018** *7th Monitoring Period* | | **Jan. to June 2019** *8th Monitoring Period* | | **July to Dec. 2019** *9th Monitoring Period* | | **Jan. to June 2020** *10th Monitoring Period* | | **Grand Total** |
| **Total UOF Incidents**[44] | **2,818** | | **3,484** | | **3,574** | | **3,941** | | **3,125** | | **16,942** |
| **Pending Preliminary Reviews/ Intake Investigations** | 0 | **0%** | 0 | **0%** | 775 | **22%** | 2,350 | **60%** | 655 | **21%** | 3,780 | **22%** |
| **Pending ID/Facility Investigations**[45] | 0 | **0%** | 5 | **<1%** | 177 | **5%** | 119 | **3%** | 370 | **12%** | 671 | **4%** |
| **Closed Investigations** | 2,818 | **100%** | 3,479 | **~100%** | 2,622 | **73%** | 1,472 | **37%** | 2,100 | **67%** | 12,491 | **74%** |

    o  <u>Intake Investigations and Outcome Data</u>

The work of the Intake Squad has resulted in the completion of timely investigations of incidents and has created an important foundational step for the Department to identify and address use of force-related misconduct effectively. All 2,492 use of force incidents the occurred between February 3, 2020 and June 30, 2020 received Intake Investigations, all of which were *closed* by August 15, 2020, except for 35 cases. Intake investigations were conducted timely, with 2,412 of 2,457 (98%) of closed Intake Investigations closed within 25 business days as required. The outcome of the Intake Investigations is demonstrated in the chart below. It is important to note that the outcome of the Intake Investigations are tracked by their primary closure status or highest level of action—for example, while a case may be closed with an MOC *and* a Facility Referral, it only appears as closed with an MOC in the chart below. Of the 2,457 incidents with closed Intake Investigations from the Monitoring Period, 2,055 (83%) were closed

---

[44] Incidents are categorized by their occurred date, or alleged to have occurred date, therefore these numbers fluctuate very slightly each Monitoring Period even for prior Monitoring Periods if allegations are made many months after the alleged occurred date.

[45] There are 14 pending Facility Investigations in the system that must be officially closed in CMS.

following the conclusion of the Intake Investigation, with only 402 (16%) referred for further

investigation as Full ID investigations.

| Status of Investigations – Incidents 2/3/2020-6/30/2020 As of August 15, 2020 | |
|---|---|
| Pending Intake Investigation | 35 (1%) |
| Closed Intake Investigation | 2,457 (99%) |
| -     *No Action* | *1,070 (44%)* |
| -     *MOC* | *35 (1%)* |
| -     *PDR* | *6 (<1%)* |
| -     *Re-Training* | *144 (6%)* |
| -     *Facility Referrals* | *800 (33%)* |
| -     *Referred for Full ID* | *402 (16%)* |
| **Total** | **2,492** |

Intake investigations now include a more streamlined, succinct narrative of the incident.

Further, as discussed in more detail in the Use of Force Investigations section of this report, these

investigations have demonstrated that the majority of incidents can appropriately be addressed

through an Intake Investigation. The Monitoring Team generally found the Intake Investigations

appropriately identified specific issues in the incidents, and recommended appropriate action or

further investigation when necessary.[46] Intake Investigations also leverage the findings of Rapid

Reviews in some cases where the Intake Investigation identify the same issues and the

recommended corrective action is appropriate to address the identified issue. In those cases, ID

may close the Intake Investigation after confirming that the recommended corrective action from

the Rapid Review was enacted, because the recommended response by the Rapid Review is

---

[46] In a handful of cases, the Monitoring Team recommended ID leadership review a completed Intake Investigation to address or further investigate a potential use of force violation that appeared to be inadequately addressed. ID addressed each of the Monitoring Team's recommendations.

sufficient to address the incident. That said, in other cases, the Intake Investigations may note

deficiencies in the Rapid Reviews that should have been identified during that *initial* review.[47]

      The Intake Squad also began collecting data regarding the findings of Intake

Investigations this Monitoring Period.[48] The Intake Squad investigator makes a determination in

a number of categories upon closure of the Intake Investigation, when possible, but may defer a

determination and the corresponding data to be collected until after the Full ID investigation is

complete. The data collected includes whether incidents are avoidable, necessary, excessive,

whether there are violations identified (such as report writing issues, handheld camera violations,

chemical agent violations), whether allegations of unreported use of force by incarcerated

individuals are substantiated or not, etc. The Monitoring Team analyzed a sample of Intake

Investigations and corresponding data, and found the data collected about each incident to be

accurate (including whether the incident was avoidable, etc.). It is worth noting that the data

developed by the Intake Squad does not provide a comprehensive assessment of the incidents

that occurred in this Monitoring Period as there are about 400 incidents that are still pending Full

ID Investigations—data related to those incidents have not yet been captured as the investigation

must be completed in order to make certain assessments and finalize the findings (*e.g.* to

determine whether the incident was unnecessary or not). Therefore, it is important to

acknowledge that data developed by the Intake Squad discussed throughout this report may be

underinclusive because it is not a complete data set for *all* incidents that occurred in the Tenth

---

[47] As noted above, it is not expected that that Rapid Review will necessarily identify all issues and misconduct identified by ID since additional investigation and/or a more detailed assessment is needed in order to make such determinations.

[48] The Department is working to develop corresponding data for closed Full ID Investigations.

Monitoring Period, and generally do not include data for the more serious incidents which often require Full ID investigations.

o   <u>Full ID Investigations</u>

The number of cases referred for Full ID Investigations has decreased in this Monitoring Period, which was anticipated as part of the implementation of Intake Investigations. The Monitoring Team has long found that most investigations do not require a Full ID Investigation. The more streamlined and efficient Intake Investigations have reaffirmed this position. Only 402 (16%) of the 2,492 incidents that occurred since February 3, 2020 were referred for a Full ID Investigation. The majority of these cases (373) are still pending investigation.

Many of the pending cases warrant MEO-16 interviews, which were limited in this Monitoring Period due to COVID-19. Further, the investigators responsible for conducting these Full ID Investigations are also responsible for addressing the backlog of investigations. Therefore, these investigators will need to balance addressing these new cases while also closing out the backlog (discussed in more detail below). Therefore, not surprisingly, most of these investigations are pending beyond the 120-day deadline. The Monitoring Team is continuing to work with ID on how best to balance closure of these cases with the backlog. It is expected as the backlog is reduced and limitations due to COVID-19 dissipate, that ID will be in a position to close these cases more efficiently.

o   <u>Addressing the Backlog of Investigations</u>

There were 9,239 backlog investigations that needed to be addressed in this Monitoring Period. This backlog captures investigations of incidents that occurred prior to the implementation of the Intake Squad on February 3, 2020 (the status of investigations that occurred after this date are discussed above). ID made significant efforts to reduce the

investigation backlog, and closed 57% of the backlog in this Monitoring Period. The Monitoring Team has worked closely with the Department to develop a strategy to reasonably close out these cases while balancing efforts to address potential violations. A more fulsome assessment of the Department's efforts to close out the backlog is discussed in the Use of Force Investigations section of this report. It is expected that ID will close out all the backlog of investigations by the end of the year.

> ▪ *Closed Backlog Investigations*

ID closed the investigations for 5,298 backlogged incidents this Monitoring Period that occurred between January 2018 and January 2020. This included a combination of investigations closed following the completion of the Preliminary Review (n=3,461), and cases closed following a "Full ID" investigation (n=1,837). The majority of these cases were pending beyond the 120-day deadline, with only 546 (10%) closing in less than 120 days. Therefore, most of these cases were closed as part of the work to reduce the overall backlog of investigations. As described in prior reports, most of the investigation of incidents occurred during the Preliminary Review. In most cases there is little distinction between Preliminary Reviews and Full ID investigations of incidents that occurred prior to February 3, 2020, simply different workflows being used within CMS. Therefore, the Monitoring Team encouraged ID to close the majority of backlogged Preliminary Reviews without conducting a Full ID investigation unless the evidence suggested more investigation was necessary, given the need to reduce the backlog of investigations.

> ▪ *Pending Backlog Investigations*

There are 3,941 pending investigations for cases that occurred between September 2018 and February 3, 2020 and have been pending beyond 120-day as of the end of the Monitoring

Period. Of these, 3,639 are Preliminary Reviews (pre-Intake Squad incidents), and the initial

investigation is complete for about 80% (n=2,906), which are awaiting Supervisory review and

the remaining cases are pending with the investigator (n=733; 20%).[49] Of the cases pending

Supervisory review, 1,411 (48%) cases were recommended by the investigator for closure on the

Preliminary Reviews, and 1,495 (52%) were recommended for Full ID investigations. There are

an additional 302 pre-Intake pending Full ID investigations, of which 183 (61%) are pending

with the investigator, and 119 (39%) are pending Supervisory Review. All of these pending cases

will all be addressed as part of the ID Backlog Project (discussed further in the Use of Force

Investigations section of this report).

*Addressing Use of Force-Related Misconduct*

Consistent, reliable, and proportional responses to identified misconduct are necessary to

effectively shape Staff behavior and minimize the possibility that the misconduct will reoccur.

The Department can respond to identified misconduct in a variety of ways, including (1)

immediate administrative responses (*e.g.*, counseling, re-training, modification of assignment

and suspension), (2) Facility-level discipline via Command Discipline, (3) a Personal

Determination Review for probationary Staff, and (4) formal discipline for tenured Staff imposed

via the Trials Division. Currently, the formal disciplinary process is extremely lengthy, which is

concerning. The Remedial Order imposes a number of requirements that are expected to support

improvements to the formal disciplinary process to make it more efficient and timely as

described in more detail in the Staff Discipline and Accountability section of this report.

---

[49] Preliminary Reviews pending with the investigators are in various stages of review—the investigators often conduct the initial call-out to interview the inmate within days of the incident, and conduct the summary and analysis of the additional evidence (up through nearly complete).

- **Facility Referrals**

Facility Referrals are a useful tool as they provide an opportunity for the Facility to respond to minor misconduct in a more timely manner and will hopefully mitigate the possibility of reoccurrence in the future. Facility Referrals are generated by ID and shared with the Facilities to address a specific issue identified through the Preliminary Review (pre-February 3, 2020 incidents), Intake Investigation or Full ID Investigation. Facility Referrals are shared with the relevant command leadership by the DDI responsible for the investigation. The DDIs then track receipt of responses from the Facilities. The Facility is expected to take appropriate action to address the issue with the specific Staff Member. Facility Referrals are often used to address procedural or operational issues such as missing reports, operation or upload of handheld cameras, and delays in medical treatment where a more timely administrative response is most appropriate to address the issue—generally in the form of counseling Staff.

This Monitoring Period, the Intake Squad closed 800 Intake Investigations with a Facility Referral, compared with 171 Facility Referrals in the Ninth Monitoring Period. ID reports that Facilities respond to these referrals, sometimes on a lag, but the tracking of the Facility's *response* to a Facility Referral is tracked by the individual DDI (instead of a central repository). Based on the significant increase in the use of this tool by the Intake Squad, and important role these play in the absence of Facility Investigations, the Monitoring Team will work with the Department to devise a process to track Facility Referrals going forward.

- **Counseling and Corrective Interviews**

Counseling and corrective interviews[50] are useful management tools to provide Staff additional support, context and guidance to effectively manage incarcerated individuals and to use force appropriately. The Department counsels and/or conducts a corrective interview with Staff who are identified either through the 5003 counseling process or through Rapid Reviews. The Rapid Review template was updated in March 2020 to include a specific prompt to recommend 5003 counseling for Staff involved in the incident in order to support the revised requirements for identifying staff for counseling (Risk Management, ¶ 2). During this transition period, the Department counseled a much smaller number of Staff compared with prior Monitoring Periods, as discussed further in regards to ¶ 2 (Counseling Meetings) in the Risk Management section of this report.

- **Re-Training**

Providing additional training to Staff who have engaged in misconduct is another way to improve practice. The Department systematically tracks which Staff have been identified for re-training through the computerized Service Desk. The Service Desk is an online portal accessible to Facility Staff, civilian leadership, and the Training & Development Unit Staff. It is a centralized repository for tracking Staff who have been recommended for re-training (both the recommendation for and the receipt of training) and has the ability to run aggregate reports.

During this Monitoring Period, 995 Staff were recommended for re-training via the Service Desk, similar in volume to the Ninth Monitoring Period (839). Not surprisingly, the

---

[50] Corrective Interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. Counseling sessions (including 5003 counseling sessions) are not considered disciplinary in nature and are not included in a member's personnel file.

majority of re-training requests in this Monitoring Period were made by ID (80%) as was the case last Monitoring Period, followed by Facility leadership (13%) with the remainder of requests coming from other sources including the Trials Division (4%). The courses recommended most often were Use of Force Report Writing (37%), Use of Force (25%), Situational Awareness (12%), and Chemical Agents (11%). Due to COVID-19 limitations in providing training this Monitoring Period, the Department reported only about half of the Staff recommended for re-training received it as of the end of the Monitoring Period. A more detailed analysis of the Service Desk and re-training requests, and the trends in the Tenth Monitoring Period, is provided in the Training section of this report (¶ 5).

- **Command Discipline ("CD")**

Command Disciplines provide the Department an opportunity to timely and proportionally respond to lower level misconduct with lighter disciplinary action (up to five compensatory days). This process is managed at the Facility level and is less cumbersome than the process for imposing formal discipline via Trials. Command Disciplines have generally become a more reliable, close in time response to Staff misconduct, whereas previously, the Department struggled to consistently adjudicate cases (meaning the hearing to determine what discipline should be imposed did not occur) and/or impose discipline (meaning that the recommended discipline was not actually imposed via CityTime deductions), as discussed in the Seventh Monitor's Report (at pgs. 40-42).

A Command Discipline can range from verbal reprimand up to the forfeiture of five vacation/compensatory days. Command Disciplines ("CDs") are governed by a detailed policy that, among other things, requires CDs to be issued and adjudicated within timeframes that are much shorter than those for formal discipline. Command Disciplines are utilized in two ways.

The Facility may generate a Command Discipline within 30 days of an incident (to then be subsequently adjudicated). A Command Discipline may also be generated as part of a Negotiated Plea Agreement ("NPA") with a recommendation to adjudicate at the Facility level or with an agreed upon number of days (up to five days) to be forfeited by the Staff Member—this type of CD is discussed under the Formal Discipline section below under the heading "Imposition of NPAs".

Facility leadership are responsible for entering the CDs into the system and scheduling, conducting, and deciding the CDs. A centralized spreadsheet allows CDs to be easily identified and processed timely. The processing of Command Disciplines at the Facility level requires multiple steps: (1) the CD must be generated in CMS within 30 days of the incident date; (2) the case is adjudicated by a hearing Officer who determines the outcome of the CD (ranging from dismissal to a five-day penalty for Staff); and (3) if the penalty is a loss of vacation or compensation days, HR is notified and must remove the days from the Staff Member's official time bank ("CityTime"). NCU continued to track and collect proof of practice to confirm that Command Disciplines were imposed as recommended via Rapid Reviews.

The vast majority of CDs for UOF-related misconduct are identified through Rapid Reviews. In this Monitoring Period, Command Disciplines were recommended from Rapid Reviews less frequently than in prior Monitoring Periods, about half the number of CDs were recommended via Rapid Reviews in this Monitoring Period (492) compared with the Ninth Monitoring Period (878) or the Eighth Monitoring Period (757). This decrease in the recommendations for CDs is concerning, and may be attributable, at least in part, due to the decrease in the overall number of incidents in this Monitoring Period (there were over 700 less incidents in this Monitoring Period compared to the last), the impact of COVID-19, and some of

the issues regarding the transition and confusion about the revised Rapid Review template such that certain recommendations for corrective action may not have been made (discussed in more detail above). Further, at least one Facility (GRVC) continued to struggle early in the Monitoring Period with processing Command Disciplines.

The status and outcome of all Command Disciplines recommended between January 2019 through June 2020 are shown in the table below. During the Tenth Monitoring Period, 304 of 492 (61%) CDs recommended by Rapid Reviews were processed and resulted in imposed discipline (deducted days, MOC, Verbal Reprimand, or Corrective Interview).

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews As of September 15, 2020 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in Days Deducted | | Resulted in MOC | | Resulted in Verbal Reprimand or Corrective Interview | | Closed Administratively, Never Entered into CMS, or Dismissed at Hearing | |
| *8th MP* | *757* | *0* | *0%* | *391* | *52%* | *60* | *8%* | *109* | *14%* | *195* | *26%* |
| *9th MP* | *878* | *4* | *0%* | *488* | *56%* | *77* | *9%* | *103* | *12%* | *203* | *23%* |
| **2019 Total** | **1635** | **4** | **0%** | **879** | **54%** | **137** | **8%** | **212** | **13%** | **398** | **24%** |
| **20-Jan** | 70 | 2 | 3% | 31 | 44% | 3 | 4% | 3 | 4% | 31 | 44% |
| **20-Feb** | 47 | 4 | 9% | 22 | 47% | 2 | 4% | 4 | 9% | 15 | 32% |
| **20-Mar** | 82 | 4 | 5% | 37 | 45% | 3 | 4% | 3 | 4% | 35 | 43% |
| **20-Apr** | 83 | 6 | 7% | 49 | 59% | 4 | 5% | 7 | 8% | 17 | 20% |
| **20-May** | 94 | 12 | 13% | 48 | 51% | 7 | 7% | 11 | 12% | 16 | 17% |
| **20-Jun** | 116 | 33 | 28% | 42 | 36% | 9 | 8% | 10 | 9% | 22 | 19% |
| *10th MP* | *492* | *50* | *10%* | *234* | *48%* | *30* | *6%* | *40* | *8%* | *136* | *28%* |

In terms of the CDs determinations, whether there is a verbal reprimand, corrective interview or the forfeiture of up to five days, is based on the nature of the offense, the Staff Member's prior discipline, mitigating and aggravating factors and consideration of the disciplinary grid. As depicted in the chart above, 48% of recommended CDs result in the relinquishment of compensatory days, while 8% result in verbal reprimands, 6% result in MOCs

being generated, 28% were closed administratively, never entered into CMS, or dismissed at hearing, and 10% were still pending. The proportion of CDs imposed with days is similar to other Monitoring Periods (54% in the Ninth Monitoring Period and 52% in the Eighth Monitoring Period). However, the proportion of those closed with verbal reprimand or counseling declined (8% in the Tenth Monitoring Period, 11% in the Ninth Monitoring Period, and 14% in the Eighth Monitoring Period). The Monitoring Team intends to review the outcomes of CDs more closely in future Monitoring Periods.

It is equally important to assess those CDs recommended from Rapid Reviews that were never processed or were dismissed at the hearing. Of the 492 CDs recommended from Rapid Reviews, 136 (28%) were never processed or dismissed at the hearing. 43 of these 136 were never entered into CMS and there is no reason or explanation for that failure. Further, 93 of these 136 were dismissed and NCU tracks the reasons CDs are dismissed, as CDs may be dismissed for legitimate reasons. Of the 93 dismissed in the Tenth Monitoring Period, a handful were because the Staff Member had resigned, and others were dismissed because of due process violations, ID takeovers of the incident, or factual basis for the dismissal as presented in the hearing. Overall, NCU found that 59 of the 93 (63%) dismissals had a reasonable and/or articulated reason for dismissal, while 34 (37%) did not. Overall, 415 (84%) of the 492 CDs appear to have been processed and managed appropriately.

As depicted in the data above, many of the CDs that were closed administratively, never entered into CMS, or dismissed at the hearing occurred in the first half of the Monitoring Period. In particular, in January 2020, one Facility (GRVC) was responsible for 48% (15 of 31) of the dismissed cases, which the Department reports was partially due to recent leadership changes

that caused a breakdown in review and approval of CD hearing outcomes.[51] The higher dismissal rate for CDs that were issued in February and March 2020 are likely attributable to some of the staffing shortages due to COVID-19. CDs issued in February and March were scheduled to be heard in March and April when there were Staffing shortages due to high sick rates, this was further exacerbated because some Facility Leadership (primarily Deputy Wardens) who conduct these hearings were out on sick leave. There was an improvement in the processing of CDs for incidents that occurred in April 2020 and were scheduled to be heard in May 2020 (when there was more stability in the Facilities following the peak of COVID-19) and the number of CDs closed administratively, never entered into CMS, or dismissed at hearing *was reduced in half* for those CDs initiated in April through June 2020 compared to the CDs initiated in the first three months of the Monitoring Period. The dismissal rates in April through June 2020 actually demonstrates an improvement from prior Monitoring Periods, so the Department appears to be back on track in processing CDs after struggling during the COVID-19 response.

Upon a determination that a Staff Member must forfeit a certain number of compensatory days, the decision must be shared with HR so that the discipline can be imposed and entered in the Staff Member's personnel file. NCU tracks whether HR enters the adjudicated CD into the Staff Member's personnel file, and whether CityTime bank deductions take place in a reasonable timeframe. CityTime deductions have not been an issue since this tracking began.

Certain CDs may be transferred to a Memorandum of Complaint for formal discipline if a Staff Member refuses the Command Discipline, the Staff Member has accumulated three CDs within a year, or the Facility determines that a Memorandum of Complaint ("MOC") is a more

---

[51] It is worth noting that GRVC struggled with processing CDs in the Ninth Monitoring Period as well.

appropriate response to address the misconduct. NCU continued to track that any MOCs recommended at the Facility level are generated and processed through the Chief of Administration's office.

- **Personnel Determination Review ("PDR")**

Discipline is generally imposed on probationary Staff[52] via a Personnel Determination Review ("PDR"). A PDR can be recommended by Facility leadership or by ID to address UOF related violations and other issues (*e.g.*, excessive absence or other employment issues). The process to evaluate and impose use of force-related PDRs has improved since the Monitoring Team began significantly scrutinizing this process during the Sixth Monitoring Period.[53] Requests for PDRs are now consistently and timely evaluated, processed, and tracked by HR and decided by the First Deputy Commissioner and/or the Commissioner in a generally reasonable manner. The outcome of the PDR is limited to three options: (1) extension of probation,[54] (2) demotion or termination,[55] or (3) no action. Staff on probation can also be suspended (along with PDRs) and in the cases where the Department elects not to take action via PDR, the Department can elect to impose formal discipline through Trials.

In order for the discipline imposed via PDR to be meaningful, PDRs must not only be reliable and credible, but must be processed close in time to the incident. The Department

---

[52] Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods.

[53] *See* Sixth Monitor's Report at pgs. 35 to 39.

[54] Probation may be extended up to a total of six months. The probationary period may also be extended for any period of time the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[55] Correction Officers may be terminated via PDR. However, Captains and ADWs may only be demoted via PDR, termination must be completed through formal discipline as Staff is those positions have Civil Service protections.

previously waited until the end of a Staff Member's probation to complete the PDR. Now, they are now generally completed within 30 days of submission.

| Outcome of PDRs based on Date of Incident *As of July 15, 2020* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Nov. 2015 Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| **Grand Total** | **36** | | **18** | | **21** | | **32** | | **21** | | **64** | | **36** | | **13** | |
| Demotion | 0 | 0% | 0 | 0% | 2 | 10% | 3 | 9% | 1 | 5% | 4 | 6% | 1 | 3% | 0 | 0% |
| Extension of Probation - Day/Day | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 3% | 0 | 0% |
| Extension of Probation - 3 Months | 1 | 3% | 2 | 11% | 4 | 19% | 1 | 3% | 2 | 10% | 7 | 11% | 8 | 22% | 2 | 15% |
| Extension of Probation - 6 Months | 15 | 42% | 7 | 39% | 10 | 48% | 17 | 53% | 7 | 33% | 28 | 44% | 14 | 39% | 4 | 31% |
| Termination | 6 | 17% | 6 | 33% | 4 | 19% | 5 | 16% | 4 | 19% | 16 | 25% | 2 | 6% | 4 | 31% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 5% | 2 | 3% | 2 | 6% | 0 | 0% |
| Deferred Decision | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 8% | 0 | 0% |
| No Action | 1 | 3% | 1 | 6% | 0 | 0% | 1 | 3% | 0 | 0% | 0 | 0% | 1 | 3% | 0 | 0% |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% | 0 | 0% | 2 | 15% |
| Resignation | 2 | 6% | 0 | 0% | 1 | 5% | 4 | 13% | 6 | 29% | 5 | 8% | 4 | 11% | 1 | 8% |
| Tenured | 11 | 31% | 2 | 11% | 0 | 0% | 1 | 3% | 0 | 0% | 1 | 2% | 0 | 0% | 0 | 0% |

- **Formal Discipline**

Imposing formal discipline requires coordination with a number of stakeholders both within and outside the Department. As an initial matter, cases must be investigated so formal discipline is not initiated until ID completes its investigation. Given the backlog of cases, the cases referred to Trials have been delayed. However, as noted above, the progress ID has made in closing investigations has resulted in an increase in cases referred to Trials. This is also expected to result in more timely referrals for discipline (the beginnings of which have been seen with the Intake Squad). Once cases are referred for formal discipline, charges must be drafted, discovery served, and the Department must negotiate a disposition with the Respondent. This often also requires the involvement of OATH at a pre-Trial conference. Therefore, while the Department has control over much of the disciplinary process, there are components of this process that require external coordination and that the Department simply cannot control. This

reinforces the need for the Department's processes to be as efficient as possible to mitigate the possibility that discipline is further protracted.

The disciplinary process was impacted by COVID-19 in a number of ways. The statute of limitations was tolled beginning on March 20, 2020 through the end of the Monitoring Period. All OATH proceedings were also temporarily suspended between mid-March and the end of May. Beginning at the end of May, a limited number of virtual OATH proceedings were held once a week for the remainder of the Monitoring Period. Despite these limitations, the Department was able to resolve more disciplinary cases in this Monitoring Period than the previous one.

While the Department closed more cases in this Monitoring Period, the closure rate did not keep pace with the number of new cases that were referred for discipline. Approximately 600 cases were referred to Trials in this Monitoring Period. The increase in the number of referrals has had a corresponding impact on the number of cases pending in Trials, impacted significantly by the referrals generated by the reduction of the ID backlog. The investigations conducted by the Intake Squad resulted in UOF violations being referred to Trials for discipline more efficiently and in some cases subverting the need for a Full ID investigation before charges were brought. Additionally, those charges could be effectuated more efficiently as the Trials attorneys were involved earlier in the process (as Trials attorneys are assigned to the Intake Squad), helping to identify what additional evidence may be required to prosecute the case or whether further investigation was needed. As described in previous reports, the delays in closing Preliminary Reviews and Full ID investigations have significantly hampered the ability of Trials to impose formal discipline timely. Further, due to investigation backlogs, there are approximately 4,450 pending investigations (the majority of which have been pending over six

months) of use of force incidents so it is expected that the number of cases requiring discipline will increase once these investigations are completed. The status of cases in Trials by incident date are demonstrated in the chart below.

| Status of Cases in Trials by Date of Incident<br>As of July 15, 2020 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Total | |
| Total cases | 695 | | 489 | | 619 | | 750 | | 247 | | 77 | | 2877 | |
| Closed cases | 693 | 100% | 472 | 97% | 418 | 68% | 177 | 24% | 67 | 27% | 0 | 0% | 1827 | 64% |
| Total number of cases pending | 2 | 0% | 17 | 3% | 201 | 32% | 573 | 76% | 180 | 73% | 77 | 100% | 1050 | 36% |

Of the cases that are pending, it is not surprising that the majority of cases are related to incidents from 2017 and 2018 as these are the cases that were recently closed out through the backlog. It is expected that additional cases from 2019 will be referred for discipline as the backlog of those cases are completed throughout the rest of the year. The improvements in case closure of 2020 cases should result in quicker referrals for those cases compared with incidents from prior Monitoring Periods.

The Department needs a systematic, efficient, and creative approach to address the influx of cases to Trials as the Department did with the backlog of ID investigations. This will be a central focus of the Monitoring Team's work with the Department in the next Monitoring Period. This includes working with the Department to develop and refine initiatives to resolve cases outside of the OATH process and encouraging cases to settle as soon as possible. Further, the number of monthly OATH proceedings must increase. Finally, improved alignment is needed within OATH so that determinations by ALJ's are consistent with the City's obligations under the Consent Judgment.

o   <u>Status of Formal Discipline Imposed</u>

The volume of formal discipline that was resolved in the Tenth Monitoring Period increased by 16% compared to the previous Monitoring Period (194 versus 167, respectively); almost on par with the number of cases closed in the Fourth Monitoring Period (when reliable tracking began; 194 cases versus 201 cases) but not as many as were closed in the Fifth Monitoring Period which was the greatest since tracking began (288 cases).

Most cases continue to be resolved via NPA. Of the 194 discipline cases closed during the current Monitoring Period, 82% (n=159) closed via NPA, 1 resulted in a termination, 5 were resolved by OATH decision, and the remaining cases (n=30; 15%) were administratively filed or closed via deferred prosecution. As in other Monitoring Periods, cases that are administratively filed or closed via deferred prosecution (case dismissals) remains relatively infrequent.

| Discipline Imposed by Date of Ultimate Case Closure | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| Total | 201 | | 288 | | 266 | | 248 | | 100 | | 167 | | 194 | |
| NPA | 153 | 76% | 244 | 85% | 249 | 94% | 235 | 95% | 84 | 84% | 135 | 81% | 159 | 82% |
| Termination | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 1% | 0 | 0% | 2 | 1% |
| Administratively Filed | 36 | 18% | 32 | 11% | 12 | 5% | 6 | 2% | 8 | 8% | 25 | 15% | 20 | 10% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 6% | 6 | 4% | 8 | 4% |
| Adjudicated/Guilty | 0 | 0% | 4 | 1% | 1 | 0% | 2 | 1% | 0 | 0% | 0 | 0% | 1 | 1% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% | 0 | 0% | 1 | 1% | 1 | 1% | 4 | 2% |

The time to impose formal discipline continues to be protracted. As with prior Monitoring Period, relatively small proportions of cases are closed within one year of the date of the incident. Approximately 57% of cases closed within two years from the Eighth to the Tenth Monitoring Period. For instance, 76% of charges for incidents from 2018 are still pending. Until the backlog of cases is resolved, this issue is not expected to appreciably improve.

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | Jan. - June 2017 | | July - Dec. 2017 | | Jan. - June 2018 | | July - Dec. 2018 | | Jan. - June 2019 | | July - Dec. 2019 | | Jan. - June 2020 | |
| Total | 153 | | 244 | | 249 | | 235 | | 84 | | 135 | | 159 | |
| 0 to 6 months | 0 | 0% | 8 | 3% | 7 | 3% | 19 | 8% | 3 | 4% | 7 | 5% | 5 | 3% |
| 6 to 12 months | 7 | 5% | 21 | 9% | 33 | 13% | 34 | 14% | 3 | 4% | 14 | 10% | 21 | 13% |
| 1 to 2 years | 44 | 29% | 124 | 51% | 164 | 66% | 146 | 62% | 42 | 50% | 56 | 41% | 63 | 40% |
| 2 to 3 years | 42 | 27% | 61 | 25% | 35 | 14% | 26 | 11% | 30 | 36% | 57 | 42% | 64 | 40% |
| 3 + years | 60 | 39% | 30 | 12% | 10 | 4% | 10 | 4% | 6 | 7% | 1 | 1% | 6 | 4% |

All of the discipline imposed to date is for misconduct related to incidents that occurred prior to January 2020[56] and no formal discipline was imposed for misconduct that occurred in this Monitoring Period. The majority of discipline, 1,222 of the 1,428 Staff disciplined as of the end of the Monitoring Period related to incidents that occurred through December 2017 and only 53 (4%) of the 1,428 Staff disciplined since the Effective Date[57] related to incidents that occurred in 2019.

| Formal Discipline Imposed by Date of Incident As of July 15, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Pre Nov. 2015 | Nov. 2015 - Dec. 2016 | Jan. - June 2017 | July - Dec. 2017 | Jan. - June 2018 | July - Dec. 2018 | Jan. - June 2019 | July to Dec. 2019 | Jan. - June 2020 |
| Total | 421 | 419 | 207 | 175 | 104 | 49 | 34 | 19 | 0 |
| NPA | 408 97% | 410 98% | 207 100% | 174 99% | 104 100% | 49 100% | 34 100% | 19 100% | 0 |
| Adjudicated/ Guilty | 10 2% | 1 | 0 | 1 | 0 | 0 | 0 | 0 | 0 |
| Not Guilty | 3 1% | 8 2% | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

[56] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November of 2015.

[57] *See id*.

o   Penalties Imposed

In terms of the number of days imposed via NPA, slightly fewer (74%) cases were closed for 30 days or less in the Tenth Monitoring compared to 80% in the Ninth Monitoring Period. Certain NPAs are resolved with a Command Discipline.[58] Almost all of the NPAs settled in this Monitoring Period for 5 days or less were NPAs for CD days. On the other end of the spectrum, slightly higher discipline was imposed this Monitoring Period. 23% of cases were closed for more than 30 days in the Tenth Monitoring Period compared to 18% in the Ninth Monitoring Period.

| Penalty Imposed by NPA by Date of Ultimate Case Closure | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| Total | 153 | | 244 | | 249 | | 235 | | 84 | | 135 | | 159 | |
| Refer for Command Discipline | 16 | 10% | 55 | 23% | 28 | 11% | 39 | 17% | 2 | 2% | 0 | 0% | 0 | 0% |
| Retirement/Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 5% | 3 | 2% | 5 | 3% |
| 1-5 days | 6 | 4% | 26 | 11% | 60 | 24% | 87 | 37% | 16 | 19% | 37 | 27% | 44 | 28% |
| 6-10 days | 5 | 3% | 25 | 10% | 30 | 12% | 38 | 16% | 7 | 8% | 19 | 14% | 18 | 11% |
| 11-20 days | 34 | 22% | 52 | 21% | 54 | 22% | 26 | 11% | 21 | 25% | 38 | 28% | 38 | 24% |
| 21-30 days | 29 | 19% | 39 | 16% | 31 | 12% | 24 | 10% | 12 | 14% | 14 | 10% | 17 | 11% |
| 31-40 days | 9 | 6% | 6 | 2% | 14 | 6% | 4 | 2% | 6 | 7% | 12 | 9% | 17 | 11% |
| 41-50 days | 18 | 12% | 11 | 5% | 16 | 6% | 14 | 6% | 3 | 4% | 0 | 0% | 6 | 4% |
| 51+ days | 28 | 18% | 26 | 11% | 14 | 6% | 0 | 0% | 13 | 15% | 12 | 9% | 14 | 9% |

NCU continued to collect proof of practice to check that the discipline imposed by Trials is entered correctly into the CityTime system in the Staff Member's personnel file. The Monitoring Team reviewed NCU's findings for the 79 NPAs imposed in May and June 2020 and

---

[58] Trials did not settle any NPAs with a CD that required a hearing at the command-level to adjudicate. As described in the Seventh Monitor's Report (at pgs. 41 to 44), this practice was subject to abuse and significant failures.

was able to confirm that all were appropriately addressed and entered into CityTime (as appropriate) except in one case where the text on the relevant paperwork was illegible. Overall, the Department is consistently tracking and imposing the discipline agreed upon through an NPA.

- **Disciplinary Probation**

An NPA may also include additional terms, including a period of disciplinary probation.[59] Disciplinary probation can be imposed in six-month increments. As outlined in the table below, only three Staff entered into an NPA with a term of disciplinary probation during this Monitoring Period. The majority of the terms of disciplinary probation range between one and two years.

| Disciplinary Probation Data | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| Staff placed on Disciplinary Probation via NPA (by date of NPA) | 8 | | 4 | | 12 | | 3 | | 3 | |
| Number of Staff serving a term of Disciplinary Probation (during this time period) | 33 | | 35 | | 39 | | 34 | | 31 | |
| - *6 Months Probation* | *2* | *6%* | *2* | *6%* | *0* | *0%* | *0* | *0%* | *0* | *0%* |
| - *12 Months Probation* | *12* | *36%* | *12* | *34%* | *13* | *33%* | *9* | *26%* | *9* | *29%* |
| - *18 Months Probation* | *2* | *6%* | *3* | *9%* | *4* | *10%* | *3* | *9%* | *3* | *10%* |
| - *24 Months Probation* | *12* | *36%* | *12* | *34%* | *16* | *41%* | *16* | *46%* | *12* | *39%* |
| - *36 Months Probation* | *1* | *3%* | *2* | *6%* | *2* | *5%* | *3* | *9%* | *3* | *10%* |
| - *48 Months Probation* | *1* | *3%* | *1* | *3%* | *1* | *3%* | *1* | *3%* | *2* | *6%* |
| - *60 Months Probation* | *2* | *6%* | *2* | *6%* | *2* | *5%* | *0* | *0%* | *1* | *3%* |
| - *84 Months Probation* | *0* | *0%* | *0* | *0%* | *0* | *0%* | *1* | *3%* | *0* | *0%* |
| - *Probation for Full Term of Employment* | *1* | *3%* | *1* | *3%* | *1* | *3%* | *1* | *3%* | *1* | *3%* |

Staff on disciplinary probation are considered and enrolled in E.I.S.S. monitoring so they receive additional support and guidance if necessary. Of the three Staff placed on disciplinary

---

[59] A term of disciplinary probation can only be imposed via a settled NPA. A term of disciplinary probation cannot be imposed via the OATH process.

probation this Monitoring Period, two were enrolled in E.I.S.S. and one was not because the Staff Member had already successfully completed an E.I.S.S. monitoring term and the conduct he was placed on probation for preceded that monitoring term. The Monitoring Team continues to recommend that Trials pursue disciplinary probation more often in the negotiation of NPAs.

## SECTION BY SECTION ANALYSIS

### 1.   USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and incarcerated individual safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") has been in effect since September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The New Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps Officers and their supervisors should take when responding to threats to safety and security. The Department's efforts to implement the New Directive is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

### IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

#### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and promulgated a new UOF Directive on September 27, 2017. The policy was approved by the Monitor.

#### ANALYSIS OF COMPLIANCE

The Consent Judgment requires the Department to develop, adopt, and implement a new UOF Directive. The Department has achieved compliance with the developing and adopting components of this provision and has also trained Staff on the policy's requirements. The Department previously developed a new UOF Directive approved by the Monitor[60] and it was adopted during the Fifth

---

[60] The New Use of Force Directive was developed by the Department and approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly

Monitoring Period after all Staff received Special Tactics and Responsible Techniques Training ("S.T.A.R.T."). The Department committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and has subsequently provided refresher training on the UOF Policy through the Advanced Correctional Techniques Training ("A.C.T").

The Department has not effectively implemented the New Use of Force Directive. Implementing the New Directive requires both informing and training relevant Staff about the policy requirements and also consistently instructing and applying the policy by following its mandates.[61] Therefore, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. The prevalence of unnecessary and excessive force appears to be the result in large part of the overreliance on Probe Teams and alarms, the use of unnecessarily painful escort techniques, unnecessary and too close use of OC spray, and lack of efforts to de-escalate situations including at times hyper-confrontational Staff behaviors, compounded by uniform leadership's inability to identify and address the Staff misconduct causing these trends and failing to address them with Staff, as described in the Use of Force and Inmate Violence Trends section of this report above. However, these causes are interconnected and should not be viewed in a vacuum (*e.g.,* often unnecessary Probe Team response in one incident can disrupt services and lead to housing area conflicts which precipitate another incident). The Facilities are often in a state of turmoil due to poor execution of everyday procedures like institutional searches, orders for lockdown, and ensuring cell doors are secure frequently leading to incidents involving multiple Staff and incarcerated individuals which perpetuates the tumultuous state. These issues are further compounded by lack of consistent and appropriate supervision.

The Remedial Order includes requirements designed to address the Department's sustained Non-Compliance with this provision. These new requirements will begin to be implemented in the Eleventh Monitoring Period, and are designed to impact and reduce the use of unnecessary and excessive force through bolstering the Rapid Reviews (including additional oversight and accountability for faulty reviews), increased ownership by Facility leadership of data analysis and initiatives driven by such analysis, implementing a de-escalation protocol which minimizes reliance on Intake, increasing supervision of Captains through the addition of more ADWs assigned to each Facility, better handling incarcerated individuals frequently involved in force through alliance with

---

implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

[61] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

| | mental health providers, and improving the use and deployment of the Facility Emergency Response Teams. |
|---|---|
| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance <br> ¶ 1. **(Adopt)** Substantial Compliance <br> ¶ 1. **(Implement)** Non-Compliance <br> ¶ 1. **(Monitor Approval)** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a – t (see pages 5 to 10 of the Consent Judgment)].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: spit masks, restraints, chemical agents, electronic immobilization shields, batons, and tasers.

  - The Department finalized a standalone baton policy for the use of all batons (including the Monadnock Expandable Baton) this Monitoring Period, which took effect in March 2020. The Department also began deployment of a comprehensive lesson plan on the use of all batons that coincided with the implementation of the policy and provided such training to a handful of Staff at OBCC in March before training was temporarily suspended due to COVID-19. This training will re-commence in the next Monitoring Period.

- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock-in and lock-outs ("Lock-Down Policy"), searches for ballistic weapons, and the deployment of Facility Emergency Response Teams (formerly called Probe Teams).

  - The Department, in consultation with the Monitoring Team, continued to work on revisions to the Lock-Down Policy this Monitoring Period, finalizing such work early in the Eleventh Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment § IV, ¶ 3 (a-o, q-t) and is aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly.

In order to address the requirements of ¶ 3(p), the Department maintains a number of standalone policies to provide guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force. The Department has consulted the Monitoring Team on the development of many of these policies as noted in prior reports. This Monitoring Period, the Department finalized the new standalone Baton Policy and began deploying training to a first wave of Staff at OBCC on this training before that training was unfortunately temporarily suspended due to COVID-19. The Department and Monitoring Team continued to work together to revise the Lock-Down Policy this Monitoring Period to include improved guidance to Supervisors on when to approve/direct different types of lock-ins (*e.g.,* Housing Unit, Housing Segment Unit Lock-Ins, Facility Lock Downs), and provide improved guidance on when emergency lock-ins are to be utilized (*e.g.,* only after all other alternatives have been considered and/or exhausted). These revisions were finalized early in the Eleventh Monitoring Period.

The Department has achieved Substantial Compliance with this provision as the Department has developed the necessary standalone policies to supplement guidance in the New Use of Force Directive itself. Going forward, the Department's implementation of these standalone policies will be discussed in regards to ¶ 1 of this section.

| **COMPLIANCE RATING** | ¶ **2.** Substantial Compliance<br>¶ **3.** Substantial Compliance |
| --- | --- |

### IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43). The Department will continue to reinforce the content of the policy through formal refresher training as required by Consent Judgment § XIII. (Training), ¶ 1(a)(ii), and through informal coaching, etc.

| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |
| --- | --- |

### 2.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Reporting use of force accurately and timely, and tracking trends over time are critical to the Department's overall goal of effectively managing use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-6,[62] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 14-20[63]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).

*Alleged Use of Force*

Assessing the overall use of force that occurs in the Department requires consideration of all force reported by Staff and any substantiated allegations of use of force to obtain a full picture of the force utilized within the Agency. Therefore, the Department separately tracks all allegations of uses of force, which are claims that Staff used force against an incarcerated individual and the force was not previously reported by Staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis discussed in the introductory section of this report.

The chart below demonstrates that the number of allegations of UOF that were reported since January 2016. This Monitoring Period reflects the lowest number of reported allegations to date. In the first half of 2020 the Department averaged 16 allegations per month compared with 46 allegations per month in the first half of 2016. In the first half of 2017, 2018 and 2019 the department averaged 34, 30, and 31 allegations a month, respectively.

---

[62] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

[63] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.



While the frequency of allegations remains low and substantiated cases of unreported incidents, even lower, the most troubling uses of force are those that go unreported, because the extent to which the force was unnecessary or excessive is never assessed. The Intake Squad now more closely track the outcomes of UOF allegations, which will support enhanced assessment of these cases and whether there are any relevant patterns and trends as discussed further in ¶ 1 below.

*Assessment of UOF Data*

The Monitoring Team continues to closely assess the Department's reporting mechanisms of use of force as described in the Third Monitor's Report (at pgs. 51-53). To date, the Monitoring Team has not identified evidence to suggest that there is a pattern or practice within the Department of manipulating UOF data. As part of the Monitoring Team's assessment, the Monitoring Team reviews any UOF incident that has been downgraded to a logbook entry after the incident was initially reported. This only occurred twice in 2017 and 2018 and did not occur at all in 2019 or in the first half of 2020. Also described in more detail below, the Monitoring Team has consistently found the Department in Substantial Compliance with the

proper classification of UOF incidents (§ VI. (Use of Force Investigations), ¶ 5) over the last

nine consecutive Monitoring Periods.[64] The Department's reporting of UOF incidents is not only

scrutinized internally and by the Monitoring Team, but is also under significant scrutiny by

various stakeholders (including the Board of Correction, DOI, and the local legislature).The

Monitoring Team will continue to closely scrutinize the matter given the importance of accurate

and transparent reporting.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS) V. USE OF FORCE REPORTING AND TRACKING ¶ 12 (INJURY CLASSIFICATION)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[65] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.,* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

   - Following the initial classification of an incident, Preliminary Reviewers, and now Intake Investigators, continue to evaluate whether an incident may need to be re-classified as required by Consent Judgment § VII (Use of Force Investigations), ¶ 7(b).

- The Department utilizes the revised Injury to Inmate form (updated in the Ninth Monitoring Period) in this Monitoring Period, which supports the new framework for confirming injury

---

[64] The Monitoring Team's assessment of compliance with this provision is addressed in the Use of Force Reporting section of this report versus the Use of Force Investigation section for purposes of continuity.

[65] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C.

classification information, enabling input from H+H staff to inform injury classifications as required by ¶ 12 of Use of Force Reporting.

- o The goal of this form is to make sure that DOC and H+H are aligned on identifying and tracking serious injuries to incarcerated individuals, regardless of whether they were associated with a use of force incident. The form includes checkboxes of various injuries to help identify the types and seriousness of injuries.

- The Department's Bureau Chief of Facility Operations and Chief of Department's offices work together so that all injury-to-inmate reports are timely submitted by the Facilities on a shared computerized drive.

  - o If H+H staff are unable to make a determination about the injury when the form is initially submitted because additional testing is needed, H+H marks the injury as "pending." H+H updates the Department on the outcome of the assessment once they obtain the final diagnosis.

  - o At the beginning of each month, H+H sends reconciled data to DOC indicating injuries from the prior month that were deemed to be serious injuries. To the extent that injury data may need to be re-classified, the Department reports it works with all Tour Commanders so that the injury data is revised and classified appropriately with COD. The Department and H+H prepare monthly reports for the Board of Correction to document this process.

**ANALYSIS OF COMPLIANCE**

*Medical Staff - Injury Classification* (¶ 12)

This provision requires Medical Staff to advise their Supervisors (and subsequently the Department) if they believe that the injury classification for an incident is inaccurate. The processes outlined above, including collaboration between H+H and DOC and the monthly reporting, is sufficient for H+H to demonstrate compliance with ¶ 12 of Use of Force Reporting.

*Classification of UOF Incidents* (¶ 5)

The Monitoring Team continues to find that the vast majority of use of force incidents are classified accurately. The Monitoring Team and Preliminary Reviewers/Intake Investigators combined only identified a small number of incidents that were recommended for re-classification. As discussed below, the Department has remained in Substantial Compliance with ¶ 5.

In this Monitoring Period, 25 incidents (> 1% of all use of force incidents in the Monitoring Period) were reclassified as identified either by the Preliminary Reviewers, Intake Investigators or the Monitoring Team. In 2019, 39 incidents (~0.5% of all use of force incidents in 2019) were reclassified following an assessment of the Preliminary Review and/or recommendation by the Monitoring Team. Despite the small number of incidents requiring re-classification each Monitoring Period, the

Department continues to struggle to re-classify incidents in a timely manner. The Monitoring Team has previously advised the Department their reclassification process was too protracted and needed immediate improvement. To date, the Monitoring Team has not seen any significant improvement in the reclassification process. In this Monitoring Period, the Monitoring Team again shared feedback encouraging the Department to implement an adequate process to support the timely evaluation of potentially misclassification incidents. Given the advent of the Intake Squad, an efficient process for reclassification could easily be leveraged.

- **Class P Assessment**

This provision also requires incidents to be reclassified in a timely manner when injury information was not available at the time the initial classification determination was made. The Monitoring Team found that most incidents initially labeled Class P (*i.e.,* pending) were reclassified in a timely manner, consistent with findings from prior Monitoring Periods, as shown in the table below.[66] In the Tenth Monitoring Period, 205 of the 210 (98%) Class P incidents randomly selected for review by the Monitoring Team were reclassified within two weeks or less.[67]

| COD Sets[68] Reviewed | 2nd Monitoring Period | 3rd Monitoring Period | 4th Monitoring Period | 6th Monitoring Period | 7th Monitoring Period | 8th Monitoring Period | 9th Monitoring Period | 10th Monitoring Period |
|---|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 1,167 | 1,052 | 545 | 416 | 513 | 511 | 541 | 483 |
| **Initial classification of Class P and subsequently reclassification within 2 weeks** | 329 of 372 (89%) | 542 of 574 (94%) | 286 of 299 (96%) | 160 of 168 (95%) | 209 of 221 (96%) | 224 of 230 (97%) | 210 of 233 (90%) | 205 of 210 (98%) |

| **COMPLIANCE RATING** | ¶ **5.** Substantial Compliance |
|---|---|
| | ¶ **12.** Substantial Compliance |

---

[66] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

[67] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less was sufficient to demonstrate compliance.

[68] This audit was not conducted in the First or Fifth Monitoring Periods.

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF)

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.

- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

- Over 9,000 use of force and witness reports were submitted for incidents occurring in this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The overall number of reported UOF incidents each Monitoring Period is notable. The fact that over 3,100 uses of force were reported in the Tenth Monitoring Period with over 9,000 corresponding Staff reports suggests that Staff regularly follow the requirements of this provision and, for the most part, they report when force is used or witnessed. Furthermore, the Monitoring Team's review of UOF reports indicates that Staff routinely notify their supervisors when uses of force occur.[69]

The Department suggests that at least part of the increase in the number of reported UOF is due to progress in reporting as a result of continued emphasis on the importance of reporting, a clear definition of what constitutes "force" outlined in the New UOF Directive, increased presence of video surveillance (and corresponding live-feed video monitoring), and routine and consistent auditing of UOF reporting by NCU. Progress in reporting incidents must be recognized, although it certainly is not the exclusive basis for why the incidence of force has increased since the Effective date.

In order to assess whether Staff are timely and reliably notifying a Supervisor of a UOF, the Monitoring Team also considers whether there is any evidence that Staff are *not* reporting force as required. In particular the Monitoring Team evaluates the allegations of UOF, including reports submitted by H+H staff and the Legal Aid Society ("LAS") of potentially unreported uses of force to check that there is a corresponding investigation for each report. The incident is then evaluated to determine if it was originally reported by Staff, previously submitted by another source, or if the LAS or H+H report triggered an investigation into the incident. This Monitoring Period, H+H submitted

---

[69] UOF reports have previously been audited to determine whether Staff completed the relevant sections of the forms. The Monitoring Team found in previous Monitoring Periods that Staff completed the relevant section of the forms fairly consistently (*see* Third Monitor's Report (at pg. 54), and Fourth Monitor's Report at (pg. 49)).

reports covering 26 distinct UOF incidents and LAS submitted 14 reports related to use of force allegations. Overall, almost all of the use of force-related allegations made by H+H and LAS had previously been reported and had a corresponding investigation. Of the 26 H+H use of force-related reports, 25 were already being investigated by ID before the reports were submitted. Of the 14 use of force-related allegations submitted by LAS, 13 already had ID investigations because they were previously reported as either allegations or had been reported as actual uses of force by Staff through the normal reporting channels. ID opened investigations into the two H+H and LAS allegations that had not previously been reported or alleged.

The Monitoring Team also continues to closely scrutinize *all* investigations of alleged UOF. 624 (76%) of the 817 investigations of alleged incidents that were reported between January 1, 2018 to June 30, 2020, have been closed.[70] 46 (7%) of the 624 investigations were closed with formal charges or PDRs and covered 91 Staff Members (many of the cases had charges for multiple involved Staff Members), but not all of these charges/PDRs related to unreported uses of force. Some of these charges related to unreported uses of force that also involved excessive or unnecessary force, which are egregious violations of the Use of Force Policy, while some substantiated cases involved minor use of force and/or charges related to issues beyond an unreported use of force. For instance, some charges were for inefficient performance of duties where *other* issues were identified through the course of the investigation that did not necessarily relate to an unreported use of force.

As part of the roll-out of the Intake Squad, ID began specifically tracking whether allegations are substantiated or not. This Monitoring Period, the Intake Squad completed Intake Investigations for 58[71] of the 93 allegations reported in this Monitoring Period (the remaining cases are either still pending or pre-dated the Intake Squad so data is not available for those cases before February 3, 2020). Of these 58 cases, 7 (13.5%) were substantiated, 33 (56%) were unsubstantiated or unfounded, and 18 (30.5%) required a Full ID investigation of the incident to make that determination.

In terms of whether there were any patterns across Facilities and/or among certain Staff, the Monitoring Team examined the substantiated allegations, and found only a small number of unreported incidents occurred at each Facility. Therefore, there was no discernable pattern within each Facility (in terms of location or Staff) and/or across the Department that suggests there is a pattern or practice by Staff in failing to report use of force incidents.

The Department has achieved Substantial Compliance with this provision as Staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be relatively minor UOF

---

[70] The majority of the 193 pending investigations of allegations were reported in 2019.

[71] These 58 closed investigations are part of the overall 624 closed investigations referenced above.

incidents. That said, even though the number of unreported UOF is low in comparison with the number of reported UOF, the Monitoring Team will continue to closely scrutinize allegations of UOF.

| COMPLIANCE RATING | ¶ 1. Substantial Compliance |
| --- | --- |

| V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS) |
| --- |

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h) & 6.

### ANALYSIS OF COMPLIANCE

The Monitoring Team assesses compliance with ¶¶ 2, 3, & 6 together as these provisions, collectively, require Staff to submit independent and complete UOF reports. The Monitoring Team continued to review a significant number of Staff Reports as part of the Team's assessment of Preliminary Reviews, Intake Investigations, and Full ID Investigations. The sheer volume of reports submitted (over 9,000 reports in this Monitoring Period) demonstrate that many Staff are reporting as required. Further, the Monitoring Team's review of a large sample of reports demonstrate that Staff reports are independently prepared. The current review revealed the quality of reports remains mixed and Staff's practices are consistent with those from prior Monitoring Periods (*see* Ninth Monitor's Report at pgs. 89-91). The Monitoring Team continues to identify reports that are incomplete, inaccurate, or too vague. Some of these reporting issues are evidenced by the 234 incidents that Intake Investigations found involved report writing issues in this Monitoring Period, which are discussed in more detail in ¶ 8 below. Accordingly, the Department is in Partial Compliance with these requirements.

| COMPLIANCE RATING | ¶¶ 2, 3, and 6. Partial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The *Nunez* Compliance Unit ("NCU") continues to audit the extent to which Staff Reports are submitted and uploaded within 24 hours of a use of force incident or within 72 hours of an allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).

- The table below demonstrates the number and timeliness of Staff reports for actual and alleged UOF for the last four Monitoring Periods.

| Monitoring Period | Actual UOF | | | Alleged UOF | | |
|---|---|---|---|---|---|---|
| | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
| 6th Monitoring Period | 6014 | 4735[72] | 79% | 48 | 44 | 92%[73] |
| 7th Monitoring Period | 9158 | 7974 | 87% | 91 | 81 | 89% |
| 8th Monitoring Period | 9930 | 9258 | 93% | 100 | 68 | 68% |
| 9th Monitoring Period | 11860 | 11203 | 94% | 90 | 66 | 73% |
| 10th Monitoring Period | 9076 | 9816 | 92% | 45 | 66 | 68% |

### ANALYSIS OF COMPLIANCE

The Department has maintained its improvement in the timely submission of the UOF reports. The work conducted by NCU beginning early in 2018 coincided with the implementation of CMS and

---

[72] NCU began the process of auditing actual UOF reports in February 2018.

[73] NCU began collecting data for UOF allegations in May 2018

electronic maintenance of UOF reports. The ability to systematically track reports in a centralized system, combined with NCU's audits, and collaboration and coordination by Facility Staff, has supported sustained compliance with timeliness for reported UOF. The Department's timely submission rate for use of force reports in this Monitoring Period is particularly impressive given the disruption to operations in March and April (there was a slight dip in submissions during these two months). However, the timely submission of reports rebounded as operations began to normalize in May.

The standard for submitting reports related to allegations of UOF is a little more complicated. In these cases, the Staff Member must be advised that they need to submit a report, which is different from the reporting of an actual UOF incident in which Staff were present and so presumably they are aware of their reporting obligation. The receipt of an allegation also does not necessarily coincide with when a Staff Member is on duty. Therefore, the Department set the standard that generally reports related to allegations should be submitted within 72 hours of the allegation to provide reasonable time for notification to Staff of their reporting requirement and to then submit the report. The majority of allegation reports are submitted during this time period. However, given the small number of reports required for allegations, the deviations across Monitoring Periods (demonstrated in the chart above) is not significant, but worth noting. Given the importance of investigating unreported UOF, the Monitoring Team will continue to closely scrutinize the submission of these reports.

Although almost all UOF reports are available in a timely manner, the Investigation Division must still obtain those reports that were not originally submitted on time. Given the volume of reports, this small percentage of reports that must be obtained does still require dedicated time as initially reported in the Eighth Monitor's Report (at pgs. 79-80). These missing reports include both those reports not initially submitted within 24 hours and those from Staff who were identified as involved/witnesses after the fact.[74] While the collection of additional reports certainly protracts the investigation and frustrates the system for timely investigations, the Monitoring Team has not found a systemic issue of missing reports. However, this issue revealed a broader logistical issue regarding the process for ID to request *additional or missing* information from the Facilities, so that a timely response is received. There was not a centralized or reliable process to obtain this information (as described in the Eighth Monitor's Report) and so requests from ID were made in an *ad hoc* fashion, with individual investigators either reaching out to the Facility and/or personally going to the Facility to attempt to get information. The Department identified Staff in each Facility to serve as a point of

---

[74] NCU's tracking of submission of UOF reports is limited to those Staff Members that are reported in the initial report of the incident to COD. Additional Staff may have participated and/or witnessed the incident and were not listed on the COD. In those cases, the Staff Member may submit a report, but NCU will not track whether the report has been submitted in CMS. Staff also may not have submitted a report in which case the investigator must attempt to obtain the report.

contact for Intake Investigators to seek additional or missing documentation. ID leadership reported that the coordination between the Intake Squad and the Facilities to obtain documentation has gone smoothly since the inception of the Intake Squad.

Overall, the Department has continued to maintain a centralized, reliable, and consistent process for submitting and tracking UOF Reports. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion, so the Department has maintained Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 5 (PROHIBITION ON REVIEWING VIDEO PRIOR TO WRITING UOF REPORT)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive prohibits Staff from reviewing video of a use of force incident prior to completing their use of force report.

### ANALYSIS OF COMPLIANCE

The Monitoring Team to date has not identified any evidence in Staff reports that suggest that Staff are reviewing video footage of an incident prior to writing their Staff Reports. In fact, most reports are often vague, which suggest that review of video did not occur before the report was drafted. This is not surprising given that access to video is not easily obtained for most Staff, as line Staff assigned to the housing units and most supervisors do not have assigned computer terminals. Further, access to Genetec credentials and BWC footage, needed to view video, are also limited. The Department is therefore in Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE)

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8.

**ANALYSIS OF COMPLIANCE**

Staff who exaggerate, lie, or fail to report a use of force thwart the overall goal to assess each use of force to determine whether force is only utilized when necessary. Accordingly, identifying and addressing reporting violations (*e.g.*, inaccurate, misleading, and false reporting or failure to report) is critical to maintaining integrity for reporting and investigating UOF incidents. As noted in ¶ 1 above, investigators do identify reporting violations (*i.e.*, including substantiated allegations).

The Intake Squad, in addition to tracking and identifying substantiated allegations of force, also identifies whether reporting issues were found for each incident—these report writing issues range from minor violations such as a vague, but accurate descriptions of the incident, to deliberate failure to report certain events. Of the 2,457 Intake Investigations closed this Monitoring Period, investigators noted report writing issues in 234 incidents. Of these 234 cases, 134 closed with some type of corrective action (including Facility Referrals, Academy re-training, charges, or PDRs), while 100 did not; although the Monitoring Team is unable to report whether the 134 corrective actions for these incidents addressed the report writing issues or addressed other violations in the same incident. It should be noted, however, that some report writing issues are minor and may not warrant a response (like vague and boiler plate language).

The Monitoring Team has tracked allegations where an initial review of video and other objective evidence strongly suggested that Staff deliberately failed to report a use of force, to ascertain the reasonableness of the outcomes of the investigations and discipline (if any)—identifying 41 such cases that were reported between January 2017 and June 2020.[75] Of these 41 cases, 15 are still pending investigation. Of the 26 that have closed, 14 closed in prior Monitoring Periods and discussed in the Eighth Monitor's Report (pgs. 81-82) and Ninth Monitor's Report (at pg. 95). Twelve additional investigations were closed in this Monitoring Period, six were closed with charges/PDR and six were closed with no charges. The incidents of investigations closed with no charges were reasonable as they were very minor uses of force, and while no charges were filed, many of these cases were addressed

---

[75] Four cases were noted in the Fourth Monitor's Report at pg. 49, six cases were identified in the Fifth Report at pg. 45, five cases in the Sixth Monitor's Report at pg. 45, six cases in the Seventh Monitor's Report at pg. 58, three cases in the Eighth Monitor's Report at pg. 76, ten cases in the Ninth Monitor's Report at pg. 95, and seven cases were identified by the Intake Squad in the Tenth Monitoring Period.

with re-training or corrective interviews for the relevant Staff. Given the specific nature of those cases, and the minor force utilized, these outcomes were appropriate.

The charges for the six other incidents are in various stages with the Trials Division (four cases have pending discipline and discipline has been imposed in two cases). Overall, the discipline that has been imposed is reasonable (ranging from a CD for 5 days to 30 compensatory days), but sometimes the discipline for similar misconduct for different cases has been inconsistent. However, various factors may come into play in determining an appropriate NPA for a Staff Member, which may result in deviations in outcome. In cases with multiple Staff charged for the same incident, the Trials outcomes appeared consistent when warranted (*e.g.,* all three Staff signed NPAs for 15 compensation days for one incident; and in another incident one Staff Member signed an NPA return to command for five days while the other Staff Member signed a 30 day NPA, which was commensurate with their misconduct in the incident as one Staff merely failed to report the incident while the other Staff acted unprofessionally in addition to failing to report the incident). Overall, these responses appear reasonable for the charges closed.

| COMPLIANCE RATING | ¶ 8. Partial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES) |
|---|
| ¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE**<br><br>• The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.<br><br>**ANALYSIS OF COMPLIANCE**<br><br>This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses these requirements, and the "implement" component of this provision is assessed within the individual provisions in this report. |

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶¶ 10 & 11 (NON-DOC STAFF REPORTING) |
|---|

¶ 10. The City shall require that Non-DOC[76] Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[77]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for Staff reporting that address the requirements of ¶¶ 10 and 11 as described in the Ninth Monitor's Report at pgs. 96-97.

  o The number of reports submitted by H+H staff since July 2017 is presented in the table below.

| Submission of H+H Staff Reports | | | | | | |
|---|---|---|---|---|---|---|
| | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 |
| *Witness Reports* | | | | | | |
| Number of witness reports submitted | 2 | 19 | 34 | 20 | 19 | 22 |
| Number of actual or alleged UOF incidents covered by submitted reports | 2 | 20 | 33 | 20 | 18 | 21 |
| *Relayed Allegations from Inmates* | | | | | | |
| Number of reports of allegations of UOF relayed from an Inmate | 2 | 4 | 20 | 10 | 11 | 5 |
| Number of actual or alleged UOF incidents covered by submitted reports | 2 | 4 | 18 | 12 | 11 | 5 |

- The Department of Education ("DOE") developed a training for Staff and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Court Order clarifying the requirement for DOE to submit reports (dkt. 334).

---

[76] This definition includes Board of Education employees, as ordered by the court December 4, 2019 (*see* dkt. 334), and therefore "[a]ny Board employee who witnesses a Use of Force Incident must report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for investigating the incident. This shall include, but not be limited to, filling out the narrative section of any witness report."

[77] This language reflects the revised language ordered by the court May 14, 2018 (*see* dkt. 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."

The roll-out of this training and reporting requirement was stymied this Monitoring Period when DOE work in the Facilities was suspended due to COVID-19 in March 2020.

- ACS maintained a centralized reporting process for Staff based at HOJC to submit UOF witness reports. ACS Staff routinely submitted reports via this method this Monitoring Period:

  o **Centralized Collection**: All ACS staff witnessing a use of force will complete an incident report and provide a copy to (1) the on-duty DOC Tour Commander and (2) the on-site ACS Office of Incident Review. These reports are to be completed as soon as possible but no later than the end of tour during which the events were witnessed.

  o **Centralized Distribution**: The on-site ACS Office of Incident Review will review reports by ACS staff so that all staff named in the report, who were witness to the use of force, complete an incident report documenting the witnessed events. The on-site Office of Incident Review will email an electronic version of all reports within two business days of receipt to ID and the Monitoring Team.

ANALYSIS OF COMPLIANCE

The City of New York is required to take steps so that non-DOC staff submit a report when they witness use of force incidents under ¶ 10 of this section of the Consent Judgment. Non-DOC Staff is defined as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates." *See* Consent Judgment § III (Definitions), ¶ 22. The three largest groups of non-DOC staff reporters are H+H staff (who provide medical and mental health care in the New York City jails), DOE Staff (who provide educational services to incarcerated individuals), and ACS Staff (who are jointly operating HOJC with DOC). H+H has been working on the implementation of this requirement since 2017, ACS Staff began to implement this requirement in October 2018 (upon the opening of HOJC in the Seventh Monitoring Period), and DOE has not yet implemented this reporting requirement.

*Medical Staff Reporting* (¶¶ 10 & 11)

Medical and mental health staff (H+H) have a unique vantage point to observe UOF to the extent an incident occurs in an area where treatment is provided. Given H+H staff provide treatment to incarcerated individuals who may have been engaged in a UOF, they also may learn critical information about an incident (or that an incident even occurred) through the course of treatment. Therefore, H+H are a crucial group of non-DOC staff witnesses who are required to submit reports. Along with the requirements to report under ¶ 10, H+H Staff must also report when they have reason to suspect that an incarcerated individual has sustained injuries due to the Use of Force and the injury was not identified to the medical staff as being the result of a Use of Force (¶ 11).

The Monitoring Team reviewed all 27 H+H staff reports submitted to ID this Monitoring Period (22 reports appeared to describe an incident that was witnessed, five reports appeared to relay a

suspected or alleged UOF based on incarcerated individual interaction).[78] The PDF-fillable form developed in the Ninth Monitoring Period continued to be used, and the Monitoring Team continued to note the quality of these reports improved compared with prior Monitoring Periods because this form prompts the submission of more specific information.

During this Monitoring Period H+H staff submitted 22 *witness* reports covering 21 unique use of force incidents. It is difficult to know whether H+H staff submitted reports in every incident witnessed, but the large number of incidents occurring in medical treatment areas (at least 191 incidents occurred in clinics during this Monitoring Period) and the small number of reports submitted indicate that H+H staff are not always fulfilling their reporting obligations.[79] It is important to note that H+H staff may not be present for all incidents that occur in medical areas, but more reports are expected than currently submitted. To assess whether H+H staff are witness to use of force incidents and failing to submit reports, the Monitoring Team reviewed the video of 18 use of force incidents that occurred in clinic areas for which there were no reports submitted by H+H staff and determined that in four out of the 18 incidents, H+H staff witnessed the use of force and did not submit a witness report. H+H staff were not in the area to witness the use of force for the remaining 14 incidents and so reports would not be expected. As a result of this assessment, the Monitoring Team shared these four incident examples with H+H to be addressed with those staff. These findings reinforced the fact that while H+H staff do not witness *all* UOF incident in the clinic, and so witness reports would not be expected for all incidents in the clinic, that H+H staff are not consistently reporting UOF that are in fact witnessed.

H+H has been responsive in the past to addressing these examples identified by the Monitoring Team with their Staff. For example, this Monitoring Period, the Monitoring Team advised H+H leadership of a particularly egregious example of medical personnel who initiated a confrontation with an incarcerated individual, used force and did not report it. H+H responded swiftly to the Monitoring Team's referral, assessed the incident and terminated the medical personnel based on their review of the facts and circumstances surrounding the case.

*DOE Staff Reporting*

DOE staff provide educational services to incarcerated individuals in certain DOC Facilities, including RNDC, RMSC, OBCC, GRVC, and HOJC. There were five use of force incidents in classrooms in this Monitoring Period and in at least one incident it appears DOE staff may have been present. No DOE Staff submitted UOF witness reports during this Monitoring Period. In the first part of the Monitoring Period, DOE leadership worked with the Monitoring Team to finalize the reporting

---

[78] The Monitoring Team's assessment of the Department's investigation of these allegations is discussed in ¶ 1 above.

[79] It is worth noting that H+H Staff must report any witnessed UOF whether or not the incident occurred in a medical treatment area.

procedures and training for staff and had planned to roll out the training and policy in March 2020. Unfortunately, the planned rollout coincided with the suspension of classes due to COVID-19 and therefore was canceled as DOE staff were no longer present in the Facilities. Roll-out of the training and reporting requirements will occur when in-person instruction resumes. This provision is Not Rated because of the suspension of in-person instruction for the majority of the Monitoring Period due to COVID-19.

*ACS Staff Reporting*

ACS staff continued to submit reports of either their involvement or witness of use of force incidents at HOJC. The Monitoring Team reviewed a sample of UOF incidents involving ACS staff at the end of the Monitoring Period and the corresponding 38 reports submitted for eight incidents. In terms of the reports submitted for this sample of incidents, some failed to fully and accurately describe the amount of force used and the duration of the force, or failed to describe the actions of other staff members (*e.g.,* the role of a hyper-confrontational staff member).

*Incorporation of Non-DOC Reports in DOC Investigations*

The Monitoring Team conducted a two-part assessment to determine whether (1) ID was analyzing submitted non-DOC staff reports in their investigations of those incidents and (2) whether non-DOC reports were included in the investigation file for incidents in which non-DOC staff submitted reports. The Monitoring Team found that there was some improvement from prior Monitoring Periods in that more investigation files included the reports and the underlying investigation did consider the non-DOC staff reports. However, the Monitoring Team still found cases in which the file either did not have the non-DOC staff report even though it was submitted and/or it was not considered as part of the investigation. The Monitoring Team provided feedback to ID reinforcing both the importance of incorporating non-DOC reports in the Use of Force investigation file and referencing them in the investigation. In response to this feedback ID reported that the witness reports were not included in the file or referenced in the investigations because they were received by the ID supervisor but were not properly forwarded to the investigator. ID reported the involved (supervisors/investigators) would receive a corrective interview and a memorandum will be redistributed to ID staff reminding them of the importance of including the witness reports in their investigation and files.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **10.** <br> **(H+H)** – Partial Compliance <br> **(DOE)** – Not Rated <br> **(ACS)** – Partial Compliance <br> ¶ **11.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 13 (REPORTING OF EMERGENCY MATTERS)

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

¶ 13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- H+H updated its use of force reporting policy and updated and rolled out a corresponding webinar training the Ninth Monitoring Period to address ¶ 13 of this section.

### ANALYSIS OF COMPLIANCE

This provision requires emergency matters involving an imminent threat to an incarcerated individual's safety or well-being to be reported. H+H updated their use of force reporting policy and rolled out a corresponding webinar training which highlighted this reporting requirement for their staff in the Ninth Monitoring Period. The policy and training establish that while the priority in emergency situations is to first ensure that the patient receives appropriate and timely medical care, including transfer to Urgicare or 911/Emergency if indicated, H+H staff are also expected to report emergency matters to their supervisor. The supervisor or H+H staff (if the supervisor is not available) will then report it to H+H Operations, and additional steps will be taken, if necessary, to address the imminent threat to the incarcerated individual's safety. For example, if a patient expresses fear for his/her safety because of threats from another person who is incarcerated, reporting that to a Supervisor would allow DOC leadership to consider placing the patient in Protective Custody. H+H has demonstrated compliance with ¶ 13 by creating a discernable framework for their staff to follow in meeting this obligation and reinforcing this obligation through policy and training.

| COMPLIANCE RATING | ¶ 13. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 14 (TRACKING)

¶ 14. Within 30 days of the Effective Date, the Department shall track in a reliable and accurate manner, at a minimum, the below information [. . . enumerated in sub-paragraphs (a) to (n)] for each Use of Force Incident. The information shall be maintained in the Incident Reporting System ("IRS") or another computerized system.

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

| COMPLIANCE RATING | ¶ 14(a)-(n). Not Rated—Inactive Monitoring |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 15 (TRACKING FACILITY INVESTIGATIONS)

¶ 15. Within 30 days of the Effective Date, the Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Facility Investigation (as defined in Paragraph 13 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number and Facility; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Facility Investigation was commenced; (d) the date the Facility Investigation was completed; (e) the findings of the Facility Investigation; (f) whether the Facility recommended Staff Member disciplinary action or other remedial measures; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral.

As described previously in this report, Facility Investigations are no longer conducted, so this provision is no longer necessary. The Parties agreed to eliminate this provision effective in the Eleventh Monitoring Period as part of the Remedial Order, so this provision was not rated in the Tenth Monitoring Period.

| COMPLIANCE RATING | ¶ 15. Not Rated |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 16 (TRACKING ID INVESTIGATIONS)

¶ 16. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Full ID Investigation (as defined in Paragraph 8 of Section VII (Use of Force Investigations)): (a) the Use of Force Incident identification number; (b) the name of the individual assigned to investigate the Use of Force Incident; (c) the date the Full ID Investigation was commenced; (d) the date the Full ID Investigation was completed; (e) the findings of the Full ID Investigation; (f) whether ID recommended that the Staff Member be subject to disciplinary action; and (g) whether the Department referred the Use of Force Incident to DOI for further investigation, and if so, the date of such referral. This information may be maintained in the Department's ID computer tracking systems until the development and implementation of the computerized case management system ("CMS"), as required by Paragraph 6 of Section X (Risk Management).

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

| COMPLIANCE RATING | ¶ 16. Not Rated—Inactive Monitoring |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 17 (TRACKING OF TRIALS DISCIPLINE)

¶ 17. The Department shall track in a reliable, accurate, and computerized manner, at a minimum, the following information for each Use of Force Incident in which the Department's Trials & Litigation Division ("Trials Division") sought disciplinary action against any Staff Member in connection with a Use of Force Incident: (a) the Use of Force Incident identification number; (b) the charges brought and the disciplinary penalty sought at the Office of Administrative Trials and Hearings ("OATH"); and (c) the disposition of any disciplinary hearing, including whether the Staff Member entered into a negotiated plea agreement, and the penalty imposed. This information may be maintained in the computerized tracking

system of the Trials Division until the development and implementation of CMS, as required by Paragraph 6 of Section X (Risk Management).

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

| COMPLIANCE RATING | ¶ 17. Not Rated—Inactive Monitoring |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 19 (TRACKING OF INMATE-ON-INMATE FIGHTS)

¶ 19. The Department also shall track information for each inmate-on-inmate fight or assault, including but not limited to the names and identification numbers of the Inmates involved; the date, time, and location of the inmate-on-inmate fight or assault; the nature of any injuries sustained by Inmates; a brief description of the inmate-on-inmate fight or assault and whether a weapon was used; and whether video footage captured the inmate-on-inmate fight or assault.

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

| COMPLIANCE RATING | ¶ 19. Not Rated—Inactive Monitoring |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[80]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- **Prompt Medical Attention (¶ 22)**:

---

[80] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* dkt. 316).

- The Department maintained Directive 4516R-B "Injury to Inmate Reports", which requires incarcerated individuals to be afforded medical attention as soon as practicable, and no more than four hours, following a UOF incident or fight between incarcerated individuals. The policy also sets forth guidelines for affording *expedited* medical treatment in certain circumstances in which incarcerated individuals appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, etc.) to be produced directly to a clinic (and not taken to an intake location) following a UOF or fight between incarcerated individuals.

- The Department's progress in providing timely medical care following a UOF are outlined in the table below. During the current Monitoring Period, medical care was provided within four hours of a UOF in 81% of medical encounters, with a dip during March and April 2020 during the COVID-19 peaks which put significant strain on the medical infrastructure, which was then improved upon in May and June 2020.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| 6th MP Totals | 4,244 | 35% | 35% | 70% | 17% | 13% |
| 7th MP Totals | 5,101 | 38% | 36% | 73% | 15% | 12% |
| 8th MP Totals | 5,559 | 42% | 36% | 78% | 12% | 10% |
| 9th MP Totals | 6,250 | 44% | 39% | 83% | 10% | 7% |
| 10th MP Totals | 5,297 | 45% | 36% | 81% | 10% | 9% |

- **Tracking Medical Treatment Times (¶ 23)**:
  - NCU continued to track and analyze medical wait times for incarcerated individuals following a UOF.[81]
    - NCU tracks the medical wait times for each incarcerated individual involved in all reported UOF incidents using information from the Injury-to-Inmate Report.[82]

**ANALYSIS OF COMPLIANCE**

---

[81] It is important to note that this data only tracks when an inmate was seen and treated by medical staff in the clinic. This data does not capture de-contamination following OC spray exposure unless de-contamination occurred in the clinic. De-contamination of OC spray exposure generally occurs before the inmate is taken to the clinic for medical assessment after a UOF either in intake or in a shower on the housing unit.

[82] A small number of Injury to Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). The Department has provided medical attention as soon as practicable for incarcerated individuals and documenting these encounters since January 2018 (the Sixth Monitoring Period). In this Monitoring Period, COVID-19 impacted medical wait times following use of force incidents in March and April 2020 given the increased demand for medical services. However, medical wait times in the majority of the Monitoring Period (January, February, May, and June) were consistent with prior Monitoring Periods. Operations at the Facilities started to return to normal in May and the increased medical wait times seen in March and April began to dissipate.

The overall goal of this provision is for the provision of medical attention to occur as soon as possible. It is the Monitoring Team's understanding that the medical community does not have a generally accepted standard in which medical treatment must be provided. In order to assess whether medical treatment is provided as soon as practicable, the Monitoring Team consulted with medical professionals who found four hours to be an adequate benchmark, with the understanding that deviations (within a few hours) from this benchmark does not necessarily suggest the time to provide medical treatment was inadequate. As demonstrated in the data above, 81% of all medical encounters occurred within four hours and 91% of all medical encounters occurred within six hours. Accordingly, the vast majority of medical encounters occur as soon as practicable and the Department has sustained the progress it has made in providing prompt medical attention.

It is critical that patients with severe injuries are prioritized and provided medical attention as soon as possible (generally in less than four hours) and therefore it is important to assess the medical encounters that occur after four hours in order to determine whether incarcerated individuals who require prioritized medical treatment are seen as soon as possible. In total there were approximately 1,000 incarcerated individuals who received medical treatment in excess of four hours this Monitoring period. NCU evaluated these cases and found that in the vast majority of these cases (over 800) that either the incarcerated individual had no injuries or ultimately refused medical treatment. This suggests that those individuals that require prioritized medical treatment are in fact receiving it.

NCU collects additional information for the small number of encounters in which an incarcerated individual received medical attention *beyond* four hours and had *sustained injuries*. Approximately 3% of all medical encounters in this Monitoring Period (about 173 cases) had an injury beyond exposure to OC spray (so would require treatment outside of de-contamination which generally occurs outside of the clinic) and were seen after four hours. Of this group only 12 incarcerated individuals who were seen in excess of four hours this Monitoring Period appeared to have had more serious injuries such as lacerations. The majority of incarcerated individuals in this group had minor injuries (*e.g.,* abrasions, swelling, contusions, neck/back pain). While these medical delays are outliers, they are the most concerning type of medical delay and therefore the Department's efforts to investigate these cases is important in order to determine whether Staff action/inaction caused the delay and to hold Staff accountable when warranted.

| The Department has achieved Substantial Compliance with both ¶¶ 22 and 23. Medical treatment is generally provided within a reasonable period of time and medical wait times are tracked in a centralized, systematic, and reliable manner. | |
|---|---|
| **COMPLIANCE RATING** | **¶ 22.** Substantial Compliance<br>**¶ 23.** Substantial Compliance |

## 3.   TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Incarcerated Individual Management (¶ 3) ("Safe Crisis Management training"), Direct Supervision (¶ 4), and procedures, skills, and techniques for investigating use of force incidents (¶ 2(c)).

The Department has deployed most of the initial trainings required by the Consent Judgment. Accordingly, the focus during this Monitoring Period was deploying refresher trainings and the provision of training to Staff newly assigned to specific posts (*e.g.*, Probe Team Training, Cell Extraction Team Training, and Direct Supervision Training). Due to COVID-19 and associated state and City mandates to limit gatherings, training was significantly limited in this Monitoring Period, most training was temporarily suspended in March 2020 until the tail end of the Monitoring Period when the Department began to slowly provide training to Staff in smaller groups beginning the last week of June 2020. As part of the small group training that began at the end of June, the Department began training a new class of 10 ADWs at the close of the Monitoring Period. With most in-person training temporarily suspended, the Training

Academy focused on the creation and delivery of online only modules for Outward Mindset training, development of lesson plans (and corresponding train-the-trainer sessions) for training of Staff at RNDC, and completing the development of the Learning Management System (LMS) which went live at the end of the Monitoring Period.

*Outward Mindset Training*

The Department began to provide Staff with Outward Mindset training in the beginning of this Monitoring Period. The course is designed by the Arbinger Institute and is based on appropriate human relationship building with the goal of supporting culture-change at the Department. The main concept is that a "self-focused inward mindset" provokes resistance and mistrust in the people around us, while an "others-inclusive outward mindset" builds mutual commitment, resilience, and caring. This course was initially designed to be a two-day in-person immersion course, which the Department began to provide to Department leadership and Staff at RNDC in the beginning of this Monitoring Period. However, due to COVID-19 the in-person training was temporarily suspended shortly after it began, and the Department developed and rolled out an eight-week virtual series to deliver the same concepts.

*Training Space & Dedicated Training Academy*

The Department continued to use GMDC to provide additional training space this Monitoring Period, which was outfitted in the Eighth Monitoring Period to provide more room for training in the form of additional classrooms, computer labs, and realistic scenario-based training opportunities in dorm and cell housing blocks in the former Facility. That said, while the Department has developed some creative and workable solutions to its training space deficits, they do not fully mitigate the Department's need for a dedicated and appropriate training space.

The Monitoring Team recommends the City prioritize the siting of the Academy—while also managing the response to the COVID-19 pandemic—given its importance to long-term reform.

*Deployment of Advanced Correctional Techniques ("A.C.T")*

The Department continued to deploy In-Service A.C.T. Training to Staff. A total of 8,913 Staff received A.C.T. training between March 2018 and mid-March 2020 when training was temporarily suspended due to COVID-19—therefore, 92% of the Staff in the Department (9,703) who are available[83] for training have received it.

Approximately 790 available Staff still require A.C.T. training.[84] Deploying the tail end of training is often the most difficult because scheduling a smaller group of individuals must be targeted and offers less latitude in filling open seats. The complications in deploying this training has been exacerbated by the COVID-19 because training was put on hold for a few months and the in person training that began again in August 2020 is now limited to groups of ten Staff (instead of twenty-five Staff). Based on these limitations, while most A.C.T. training is slated to be complete for available Staff by the end of 2020, approximately 500 Staff will need to receive the training early in 2021. Of those who required the A.C.T. training as of the end of the Ninth Monitoring Period, the Monitoring Team was concerned about the large number of Staff assigned to ESU that still required the training. The Department worked in the beginning of the Tenth Monitoring Period to provide this training to ESU— as of early March 2020, 83 of 111

---

[83] Some Staff are not available for training because they are on some sort of leave or medical status and are not counted in the total Staff to be trained data.

[84] The majority of Staff who still require the training are mostly in non-inmate facing posts—over 300 of the remaining Staff to be trained are assigned to Headquarters, SOD, and the Transportation Division. The majority of Staff assigned to Facilities have received the training: 94% of all Staff assigned to Facilities have been trained and the majority of Facilities have over 95% (and some have 100%) of their Staff trained.

(75%) ESU Staff had received A.C.T. training, compared with only 29 of 111 (26%) as of the end of the Ninth Monitoring Period.

The status of development and deployment of initial and refresher training programs required by the Consent Judgment, and for the total number of Staff who attended each required training program during this Monitoring Period and since the Effective Date are outlined in *Appendix C: Training Charts*. The Department's progress toward compliance with the training requirements is discussed in detail below.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)

¶ 1. Within 120 days[85] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

            1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

            2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

<u>*Content of Initial In-Service Use of Force Policy Training* ¶ 1(a) & *Pre-Service Use of Force Policy Training* ¶ 1(a)(i)</u>

These provisions were placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of these

---

[85] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

provisions is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

<u>Refresher Use of Force Policy Training</u> ¶ 1(a)(ii)

  The UOF Policy refresher training lesson plans for Staff and a separate curriculum targeting Supervisors were finalized during the Sixth Monitoring Period as required by ¶ 1(a)(ii). These trainings continue to be deployed as part of A.C.T., as described in the introduction above. This training had been provided to 92% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department will continue to provide A.C.T. to those who require it, albeit with COVID-19 related limitations to class sized as described above, and will also begin the next phase of refresher training, by incorporating the refresher training into the ongoing In-Service training curriculum to be provided at least every other year. The Training & Development Unit staff are consulting with the Monitoring Team on the planned rollout and any possible revisions to the curriculum that may be needed for future iterations of the refresher training.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a).** Not Rated—Inactive Monitoring<br>¶ **1(a)(i).** Not Rated—Inactive Monitoring<br>¶ **1(a)(ii).** Substantial Compliance |

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

¶ 1. Within 120 days[86] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

 b. <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].

  i. The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

  ii. The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[87]

  iii. The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

---

[86] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[87] This date includes the extension that was granted by the Court on April 24, 2018 (*see* dkt. 312).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C*.

**ANALYSIS OF COMPLIANCE**

*Pre-Service Crisis Intervention and Conflict Resolution Training* ¶ 1(b)(i)

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*Initial and Refresher In-Service Crisis Intervention and Conflict Resolution Training* ¶ 1(b)(ii-iii)

As discussed above, the initial In-Service training of <u>Crisis Intervention and Conflict Resolution Training</u> continues to be deployed as part of A.C.T. This training had been provided to 92% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department will continue to provide the training to those who require it on a more targeted basis in the Eleventh Monitoring Period, albeit with COVID-19 related limitations to class sizes as described above. During this Monitoring Period, the Training & Development Unit continued planning for the development and deployment of Conflict Resolution and Crisis Intervention refresher training. The Monitoring Team will continue to consult with the Department on the development and deployment of the refresher lesson plan going forward.

| COMPLIANCE RATING | ¶ **1(b).** Substantial Compliance |
| --- | --- |
| | ¶ **1(b)(i).** Not Rated—Inactive Monitoring |
| | ¶ **1(b)(ii).** Substantial Compliance |
| | ¶ **1(b)(iii).** Requirement has not come due |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶1. Within 120 days[88] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.    <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[89] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned

---

[88] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[89] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

¶ 2. Within 120 days[90] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

   b.   <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[91] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

   • See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

The Department continued to routinely and reliably identify Staff in the select posts who are required to receive Probe Team training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)) and schedule those Staff for training between January and March of this Monitoring Period.[92] This process, developed in the Eighth Monitoring Period, requires monthly coordination between Facility-based scheduling Officers and the Training & Development Unit Staff. This process is necessary because posts are frequently reassigned, so the Department must continuously track whether Staff currently assigned to the relevant posts require training, and then provide it to those who do.

This Monitoring Period, a total of 549[93] Staff held posts that required these trainings, and the Department worked to provide the training to those Staff who had not already received it (until training was temporarily suspended due to COVID-19). The Department reports plans to reinstate this process and begin training Staff for Cell Extraction Team Training and Probe Team Training in August 2020.

---

[90] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[91] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

[92] Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with celled housing, but the Department determined during the last previous Monitoring Period that a number of other Facility-specific posts ("identified posts") including Intake, Security, Corridor, and Escort posts, and the relevant Facility-specific posts are the Staff who actually field serve on Facility Emergency Response (previously known as Probe Teams) and Cell Extraction Teams.

[93] These rosters are often changing with new and shifting assignment of Staff in these posts, so the targets change over the course of the Monitoring Period. As done with the analysis of other required trainings (Direct Supervision and SCM Training), the Monitoring Team analyzes compliance based on a set point in time—typically being the end of the Monitoring Period. In this case, due to delays and complications related to COVID-19, this was measured as of mid-August 2020.

*Probe Team Training* (¶ 1(c))

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional training, and provided on a targeted basis as part of In-Service training to Staff when assigned to the relevant posts. As of the end of the Monitoring Period, 472 of the 549 (86%) Staff in the identified posts received Probe Team training as recruits, in Pre-Promotional training or through In-Service training. This includes 13 Staff who received the In-Service training on a targeted basis in the beginning of this Monitoring Period.

*Cell Extraction Training* (¶ 2(b))

The Cell Extraction Team training continues to be included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training. As of the end of the Monitoring Period, 479 of the 549 (87%) Staff in the identified posts received Cell Extraction Training as recruits, in Pre-Promotional training or through In-Service training. This includes 12 Staff who received the In-Service training on a targeted basis in the beginning of this Monitoring Period.

*Revisions to Course Evaluations*

The Department reports that it still intends to consider improvements for how to evaluate skill comprehension following the Probe and Cell Extraction Team training, with plans to pilot a new qualitative tool in Cell Extraction courses in August 2020. While not required to achieve Substantial Compliance, the Monitoring Team encourages the Department to continue to explore improving these evaluations as it will enhance the training program overall for these courses.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(c). Probe Team Training (Pre-Service)** Substantial Compliance<br>**¶ 1(c). Probe Team Training (In-Service)** Substantial Compliance<br>**¶ 2(b). Cell Extraction Training (Pre-Service)** Substantial Compliance<br>**¶ 2(b). Cell Extraction Training (In-Service)** Substantial Compliance |

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[94] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.    <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall

---

[94] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

    i.      The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

    ii.     The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C*.

**ANALYSIS OF COMPLIANCE**

*Pre-Service Defensive Tactics Training ¶ 2(a)(i)*

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*Initial In-Service, and Refresher Defensive Tactics Training ¶ 2(a)(ii)*

Although not required by the Consent Judgment, the Department provided an initial In-Service three-day Defensive Tactics course to all Staff as part of S.T.A.R.T. A refresher training lesson plan for Staff was finalized during the Sixth Monitoring Period, and as discussed above, continues to be deployed as part of A.C.T. This training had been provided to 92% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department will continue to provide the training to those who require it during the Eleventh Monitoring Period.

The Department and Monitoring Team worked together this Monitoring Period to plan for the next phase of refresher training which will be incorporated into ongoing In-Service training curriculum and provided yearly. To that end, the Training & Development Unit staff developed, and consulted the Monitoring Team an eight-hour Defensive Tactics Refresher Lesson Plan. This training builds upon the refresher curriculum in A.C.T. training and provides an additional four hours of training (the current refresher was four hours). This revised refresher training was bolstered with additional topics of focus to re-enforce tactics taught in the initial training, provide greater time to practice techniques (which supports development of physical skills), and addresses areas of operational deficiencies identified by the Monitoring Team (*e.g.*, how to properly escort incarcerated individuals and avoid the use of painful escort techniques). The Monitoring Team is consulting with the Training & Development Unit staff regarding the planned rollout for this refresher training as the initial A.C.T. deployment concludes.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2(a).** Substantial Compliance<br>**¶ 2(a)(i).** Not Rated—Inactive Monitoring<br>**¶ 2(a)(ii).** Substantial Compliance |

## XIII. TRAINING ¶ 3 (YOUNG INCARCERATED INDIVIDUAL MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix C*.

- The Department selected Safe Crisis Management ("SCM") training to fulfill the requirement for Young Incarcerated Individual Management training and has chosen to provide SCM Training to *all* Staff assigned to work at RNDC, where most 18-year-old incarcerated individuals are housed,[95] not just to those regularly assigned to work in Housing Areas with 18-year-old incarcerated individuals, as required by the Consent Judgment.[96]

- The Department has focused on a broader skill set for the refresher training requirements ("Unit Management Training") and will deploy the refresher training curriculum to all RNDC Staff, beginning in the Eleventh Monitoring Period.

- During the current Monitoring Period, the Department worked with the Monitoring Team to develop the Unit Management Training lesson plan. This training focuses on basic operational practices, functioning as a consistent unit team, proactive supervision and de-escalation. It

---

[95] RNDC also housed adolescent inmates (age 16 and 17) until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

[96] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

familiarizes participants with new roles and responsibilities for Unit Managers, Captains and line Staff. Finally, it provides instruction in using the incentive/sanction program that is discussed in detail in the introduction to "Current Status of 18-Year-Olds Housed on Rikers Island."

**ANALYSIS OF COMPLIANCE**

*Training Content and In-Service Training* ¶ 3(a)

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*SCM Refresher Training* ¶ 3(b)

Given the various issues facing RNDC, the Monitoring Team recommended that the Department consider re-purposing the refresher training hours to focus on broader Young Incarcerated Individual Management strategies rather than focusing on refreshing Staff on SCM techniques, as reported in the Eighth Monitor's Report (at pg. 103). Accordingly, the Department suspended the SCM Refresher Training late in the Ninth Monitoring Period (end of November 2019). During the current Monitoring Period, the Department developed a new training program to serve as the Young Incarcerated Individual Management Refresher Training module— "Unit Management." This concept is described further in the "Current Status of 18-year-olds Housed on Rikers Island" section of this report, along with the Department's new system for incentives/sanctions, which is also covered during the Unit Management training. The Monitoring Team approved the Unit Management lesson plan just after the end of the Monitoring Period.

Deployment of the Unit Management training will be monitored going forward to assess the Department's compliance with the ongoing refresher obligations in ¶ 3(b).

| **COMPLIANCE RATING** | ¶ **3.** Substantial Compliance<br>¶ **3(a).** Not Rated—Inactive Monitoring<br>¶ **3(b).** Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[97] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

---

[97] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

|  | b. | The Direct Supervision Training shall be a minimum of 32 hours. |
|---|---|---|
|  | c. | By April 30, 2018,[98] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*
- The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most 18-year-old incarcerated individuals are housed,[99] not just to those regularly assigned to work in Housing Areas with 18-year-old incarcerated individuals, as required by the Consent Judgment.
- As of mid-July 2020, 960 of the 1,057 (91%) Staff assigned to RNDC had received Direct Supervision Training.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment ¶ 4 and ¶ 4(a). As of mid-July 2020, 91% of Staff assigned to RNDC received the Direct Supervision training as In-Service Training or as Recruits. 67 Staff assigned to RNDC received the Direct Supervision training in the beginning of this Monitoring Period before training was temporarily suspended due to COVID-19. 97 Staff remain to be trained, including the Warden and Deputy Warden, and Training & Development Unit staff will work with the Facility-based scheduling personnel to schedule sessions every other week in the Eleventh Monitoring Period to provide training to these remaining Staff by the end of the year. The Deputy Warden and Warden received the training in September 2020.

The Department has achieved Substantial Compliance with this requirement because 91% of Staff that require this training have received it.

| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance |
|---|---|
|  | ¶ **4 (a).** Substantial Compliance |
|  | ¶ **4 (b).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

---

[98] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

[99] RNDC housed adolescent inmates until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old inmates until June 2018 when the Facility was closed and 18-year-old inmates were subsequently moved to RNDC.

| | |
|---|---|
| e. | There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, Probe Team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

- The Department developed a stand-alone Handheld Camera Training Lesson Plan that was incorporated into the mandatory Pre-Service training, beginning with the class that graduated in November 2017.

- The Department provided the stand-alone Handheld Camera Training Lesson Plan to ESU, ESU support, and K-9 unit Staff during prior Monitoring Periods.

- The Department has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials.

- The Department previously deployed a separate short training and lesson plan with instructions for Staff on saving and uploading handheld video to the Department's main computer system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations.

The Department provided the standalone handheld camera training to all active ESU Staff during the Sixth Monitoring Period and provides the training to all recruits. As of the Ninth Monitoring Period, 105 of 114 (92%) Staff assigned to ESU received the training as Recruits or in In-Service Training during prior Monitoring Periods. Further, as noted in *Appendix C,* 5,877 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff, which also includes training on the operation of handheld video cameras. The Monitoring Team has generally found that handheld video is available for incidents where it is required. To the extent issues have been identified with handheld video, problems do not appear to be related to a Staff Member's lack of training on how or when to utilize a handheld camera.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

      a.     Such re-training must be completed within 60 days of the determination of the violation.

      b.     The completion of such re-training shall be documented in the Staff Member's personnel file.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department continues to utilize a computerized re-training request system ("Service Desk") for requesting and tracking re-training requests.

- Operations Order 13/18, "Academy Training Service Desk," that governs the use of the Service Desk, remains in effect. The policy mandates that all re-training required as a result of a Use of Force incident must be entered into and tracked through the Service Desk.

- The Training & Development Unit Staff and the Staff Member's assigned command are responsible for tracking the status of all training entered into the Service Desk so that it is completed. The Service Desk ticket should be closed only after the Training & Development Unit Staff confirms that the Staff Member has successfully completed the re-training program.

### ANALYSIS OF COMPLIANCE

The Department can now systematically identify Staff that require re-training. The Department continues to implement the Service Desk, which is an improvement over prior practice. This tool provides a centralized repository to identify and track Staff who have been recommended for re-training and it has the ability to run aggregate reports. The Service Desk is an online portal accessible to Facility Staff, civilian leadership, and the Training & Development Unit Staff. When an individual is recommended for re-training, the recommendation is entered into the system and then can be tracked to completion. The system is then updated when the Staff Member receives the re-training.

- *Re-Training Recommendations & Tracking*

During this Monitoring Period, 995 re-training requests were made via the Service Desk, compared to 839 Staff during the Ninth Monitoring Period. As of July 31, 2020, the Department reported that 476 of 995 (48%) Staff recommended for re-training had received it, and an additional 37 (4%) were closed due to being duplicate requests or because the Staff Member resigned, totaling 513 (52%) closed requests. The remaining 482 (48%) Staff were waiting for re-training to be scheduled, as depicted in the table below. Re-training requests were not fulfilled for most of the Monitoring Period given the suspension of training in mid-March 2020 due to COVID-19. This caused a backlog of re-training requests as of the beginning of June, however the Academy made a concerted effort in late June and July once training commenced again to provide re-training, reducing the backlog to 482, a

significant portion of which were only requested in June 2020. The Academy reported confidence that these requests can be handled despite the lag caused by COVID-19.

The table below depicts the number of re-training recommendations by month, along with the proportion of re-training that was provided as of July 31, 2020.

| Re-Training Tracking – 10th Monitoring Period *As of July 31, 2020* | | | |
|---|---|---|---|
| **Month of Request** | **Number of Re-Training Requests** | **Trained/Closed** | **Open or Pending Tickets** |
| January 2020 | 230 | 230 | 0 (0%) |
| February 2020 | 74 | 50 | 24 (32%) |
| March 2020 | 128 | 59 | 69 (54%) |
| April 2020 | 146 | 54 | 92 (63%) |
| May 2020 | 186 | 76 | 110 (59%) |
| June 2020 | 231 | 44 | 187 (81%) |
| **Grand Total** | **995** | **513** | **482 (48%)** |

During the Tenth Monitoring Period, ID requested the majority of re-training (80%), followed by requests by the Facilities (13%) and other sources such as the Trials Division (4%). The top four courses recommended for Staff re-training were Use of Force Report Writing (37%), Use of Force (25%), Situational Awareness (12%), and Chemical Agents (11%). ID made 798 re-training requests this Monitoring Period, compared with 517 in the Ninth Monitoring Period. 357 of these re-training requests stemmed from Intake Investigations for incidents that occurred after February 3, 2020. The Monitoring Team is encouraged that many of these re-training recommendations are close in time to the incident as re-training is most effective when recommended and implemented close in time to the incident date.

- *Timing of Re-Training*

Of the 476 Staff who received re-training as requested during the Tenth Monitoring Period, 363 (76%) received the re-training within 60 days of the request. Of the 482 pending requests, 295 (61%) are pending beyond 60 days of the request date as of July 31, 2020. As discussed above, these delays were due to the training hiatus caused by COVID-19 for much of the Monitoring Period.

- *Analysis of Re-Training Tracking*

The Department's re-training efforts and record keeping improved in this Monitoring Period even considering the issues related to COVID-19. The Monitoring Team did not identify any anomalies in the tracking sheet as had been the case for a significant portion (20%) of requests in the Ninth Monitoring Period. Additionally, there were only 37 examples where the training request was closed without training being provided. In each of these cases the tracking explicitly identified that the member of service had resigned or that the re-training request was duplicative of another request (and citing to such duplicative request for tracking purposes). These are significant tracking improvements from prior Monitoring Periods. The Monitoring Team was also encouraged by the Academy's

concerted effort to tackle the backlog of re-training requests as soon as re-training was able to re-commence at the end of the Monitoring Period.

The overall goal of re-training Staff is to provide additional guidance and clarity to support improved practice. Training & Development Unit leadership reported that the re-training is conducted separately from typical training courses on the same topics and are held with Staff individually or in small groups. The re-training requests describe the UOF violations the re-training is designed to address, which Academy leadership reported is provided to the trainers to be considered and/or used in the re-training sessions to address the specific issues of the Staff Member. Efforts are also made to group Staff in re-training sessions who had similar UOF violations so those issues can be targeted in how the material is delivered.

As noted above, re-training tracking has significantly improved in this Monitoring Period, although due to the backlog of requests most re-training was not provided within 60 days of the request, and the Department is therefore in Partial Compliance with this provision.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
|---|---|

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department implemented the Learning Management System ("LMS") at the end of this Monitoring Period, which will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**:

  o **TTS:** The Department continued to use the Training Tracking Software ("TTS") as an interim solution to track deployment of training this Monitoring Period. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings and all *Nunez*-required In-Service and Pre-Promotional trainings. except those conducted by ESU (which includes Probe Team and Cell Extraction Team Training). TTS scans Staff's identification cards in the classrooms and then this

information is manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

- o **Hand-Written Sign-in Sheets**: Attendance for In-Service and Pre-Promotional trainings conducted by ESU (which include Probe Team and Cell Extraction Team Training) continue to be captured by hand-written sign-in sheets in some cases as ESU has inconsistently utilized TTS.

- o **RapidLD**: This badge scanning technology will replace TTS and be integrated with LMS. This technology will be able to accommodate both Staff who are pre-scheduled for training and those Staff that may walk-in to a training, and incorporate custom fields to display the Staff's shield numbers and rank (where applicable) upon scanning into active training sessions.

- **Examination Tracking**:
  - o **Pre-Service**: Examinations for all *Nunez*-required Pre-Service courses are taken using a tablet and the results are tracked in Excel.
  - o **In-Service and Pre-Promotional**: In-Service exams are administered on paper or involve physical skill assessments administered by the instructor with the results captured on paper.

**ANALYSIS OF COMPLIANCE**

*Review of Examination and Attendance Records* (¶¶ 6 & 7):

¶¶ 6 and 7 requires all Staff Members who complete the *Nunez*-required trainings to pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). Over the last few Monitoring Periods the Department has demonstrated continued improvement in maintenance of attendance and examination records. While LMS was only finalized at the end of the Monitoring Period, part of the work done this Monitoring Period to support the LMS roll-out was the need to upload and sync pre-LMS training data into the system so it can accurately track training requirements going forward. The Monitoring Team was therefore able to review LMS-generated reports for training provided in January-March 2020 before training was temporarily suspended due to COVID-19. These LMS-generated reports were consistent with the information reported on an ad-hoc basis regarding post-specific training provided this Monitoring Period (including reviewing the records for Cell Extraction Training for Staff Members as described in regards to ¶ 2(b) above), as well as consistent with the training reports and records provided which track the Department's progress with A.C.T. (including review of training records for 43 ESU Staff who received A.C.T. training (in whole or in part) this Monitoring Period). Based on the consistent results of this review, in addition to the successful launch of LMS which will support these functions going forward, the Department has achieved Substantial Compliance with these provisions.

*Centralized System to Maintain Training Records* (¶ 8):

The Department successfully completed and launched LMS this Monitoring Period, its centralized electronic system to track training. The user-facing platform is referred to as "Cornerstone." LMS was live as of June 2020, and by mid-July 2020 Facility-based staff were actively using the Cornerstone technology to register Staff for In-Service trainings. Training on how to use this system for both Training Academy and Facility-based staff is still on going. The Department has provided multiple reports to the Monitoring Team generated through this new system, demonstrating its ability to aggregate and provide critical training records (including on historical trainings pre-LMS). However, the Department reports there is still a steep learning curve in terms of utilizing and running these reports, so the development of reporting functions is still an ongoing process. Additionally, rollout of RapidLD, the badge-scanning technology which will replace TTS and integrate with LMS, is still ongoing. Further, a critical element for tracking *Nunez*-required trainings going forward is by assigned post, as many trainings are post-specific, and LMS cannot support this function yet. Post-specific detail has not been established with employee profiles in the LMS yet, but the Department reports that their internal IT is working to incorporate this function.

The Department achieved a milestone with the implementation of LMS and the Monitoring Team encourages the Department to utilize the LMS technology to its fullest extent to support the tracking and providing of training going forward. The Monitoring Team expects the Department can achieve Substantial Compliance with this provision in the next Monitoring Period if LMS is fully implemented.

| **COMPLIANCE RATING** | ¶ **6.** Substantial Compliance<br>¶ **7.** Substantial Compliance<br>¶ **8.** Partial Compliance |
|---|---|

### 4. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to install sufficient stationary cameras throughout the Facilities to ensure complete camera coverage of each Facility (¶ 1); develop policies and procedures related to the

maintenance of those stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f));[100] and preserve video from all sources for at least 90 days (¶ 4).

The Department's vast network of video surveillance throughout its Facilities is expansive and far greater than most correctional systems with which the Monitoring Team has experience. The availability of significant camera coverage has resulted in the vast majority of use of force incidents being captured on camera. Further, the widespread video surveillance capabilities across the Facilities allows the Department to utilize the camera footage proactively.

The Monitoring Team's assessment of compliance is outlined below.

## IX. VIDEO SURVEILLANCE ¶ 1 (STATIONARY CAMERA INSTALLATION) & XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10, 11 (VIDEO CAMERA COVERAGE FOR INMATES UNDER THE AGE OF 19)

¶ 1.

    c.    The Department shall install stationary, wall-mounted surveillance cameras to ensure Complete Camera Coverage of all areas of all Facilities by February 28, 2018. When determining the schedule for the installation of cameras in the Facilities, the Department agrees to seek to prioritize those Facilities with the most significant levels of violence. The Department intends to prioritize the installation of cameras [in waves as described in i to iv]

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

### § XV. Safety and Supervision of Inmates Under the Age of 19

¶ 10. Within 90 days of the Effective Date, the Department shall install additional stationary, wall-mounted surveillance cameras in RNDC to ensure Complete Camera Coverage of all areas that are accessible to Inmates under the age of 18. Within 120 days of the Effective Date, the Monitor shall tour RNDC to verify that this requirement has been met.

¶ 11. By July 1, 2016, the Department shall install additional stationary, wall-mounted surveillance cameras in Facilities that house 18-year olds to ensure Complete Camera Coverage of all housing areas that are accessible to 18-year olds. By August 1, 2016, the Monitor shall tour these areas to verify that this requirement has been met.

---

[100] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has installed approximately 10,400 since the Department began the installation of cameras in 2015, including installing approximately 158 cameras in the Tenth Monitoring Period.

- The Department maintains a comprehensive list of recommendations for additional wall-mounted stationary cameras, compiling recommendations from the Monitoring Team, Chief of Department, and other divisions within the Department.

- The Department's steps towards compliance for these provisions remain unchanged from those described in the Monitor's Ninth Report at pgs. 134-138.

**ANALYSIS OF COMPLIANCE**

*Complete Camera Coverage* (¶ 1(c))

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*Surveillance cameras in all housing areas that house Adolescents and 18-year-olds* (XV. Safety & Supervision ¶¶ 10 & 11)

These provisions were placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of these provisions is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*Use of Force incidents not captured on video and subsequent identification of blind spots* (¶ 1(d))

The Monitoring Team has recommended a relatively small number of additional cameras are installed in certain areas of the Facilities to minimize potential blind spots. The Monitoring Team continues to receive regular updates from the Radio Shop as the Department installs additional cameras to address the Monitoring Team's recommendations. The Radio Shop continued to install cameras in the Tenth Monitoring Period despite the impacts of COVID-19 on Facility operations.

To date, the Monitoring Team has not identified a use of force incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot.

Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the Sixth Monitoring Period (for a total of 30 months).[101]

| Facility[102] | Installation in Housing Areas | Installation in Ancillary Areas | Housing for Adolescents or 18-Year-Olds? | Status of Monitoring Team Recommendations[103] | Reference to Prior Monitor's Report Findings |
|---|---|---|---|---|---|
| GRVC | Substantially Complete | Substantially Complete | Yes (Secure) | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| RNDC | Substantially Complete | Substantially Complete | Yes – 18-year-olds | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| AMKC | Substantially Complete | Substantially Complete | Yes (CAPS and PACE[104] units may house 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| OBCC | Substantially Complete | Substantially Complete | Yes (ESH YA only) | In progress | Third Report (pg. 106) |
| VCBC | Substantially Complete | Substantially Complete | No | To be addressed | Fourth Report (pg. 102) |
| MDC | Substantially Complete | Substantially Complete | No | In progress | Fourth Report (pg. 102) |
| RMSC | Substantially Complete | Substantially Complete | Yes – 18-year-olds | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially Complete | No | Substantially addressed | Third Report (pg. 107) Sixth Report (p.83) |
| NIC | Substantially Complete | Substantially Complete | No | In progress | Second Report (pg. 66) Sixth Report (pg. 83) |
| HOJC | Substantially Complete | Substantially Complete | Yes - Adolescents | To be addressed | Seventh Report (pg. 94) |
| DJCJC | N/A – no housing units | Substantially Complete | No | To be addressed | Sixth Report (pg. 83) |
| QDC | N/A – no housing units | N/A – not currently in use | No | N/A | N/A |
| **Closed Facilities** | | | | | |

---

[101] *See*, Sixth Monitor's Report at pg. 85 (dkt. 317), Seventh Monitor's Report at pg. 96 (dkt. 327), and Eighth Monitor's Report at pg. 118 (dkt. 332).

[102] The Facilities are organized and highlighted by installation wave as identified in ¶ 1 (c).

[103] The Department and the Monitoring Team routinely check-in regarding the assessment and progress of recommendations for installation of additional cameras.

[104] Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE").

| GMDC | Substantially Complete | Substantially Complete | N/A | N/A[105] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
|---|---|---|---|---|---|
| BKDC | Substantially Complete | Substantially Complete | N/A | N/A[106] | Sixth Report (pg. 83) |
| EMTC[107] | Substantially Complete | Substantially Complete | Yes (sentenced 18-year-olds) | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| **COMPLIANCE RATING** | ¶ **1(c).** Not Rated—Inactive Monitoring<br>§ **XV. ¶ 10**. Not Rated—Inactive Monitoring<br>§ **XV. ¶ 11**. Not Rated—Inactive Monitoring<br>¶ **1(d).** Substantial Compliance | | | | |

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.   Body-worn Cameras

    a.    Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

    b.    The 100 body-worn cameras shall be distributed among Officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

    c.    The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Project Management Office ("PMO") continued to manage the use of BWC and the expansion beyond GRVC to all Facilities within the Department, using a six-phase roll-out as outlined below. The BWC will be introduced in a Facility after at least 90% of the Staff have been trained on the use of BWC. The Department continued to train Staff and rollout the use of BWC in this Monitoring Period, but both the training and rollout were affected by COVID-19.

  o Phase 1: GRVC (Training Completed and BWC utilized within Facility at designated posts)

  o Phase 2: NIC, RMSC, RNDC (Training Completed)

---

[105] GMDC is closed and so these recommendations are now moot.

[106] BKDC is closed and so these recommendations are now moot.

[107] EMTC was closed on March 1, 2020. However, the Facility was re-opened later in March as part of the Department's response to COVID-19, then closed again on June 26, 2020.

- As of April 2020, BWC were issued to Staff at NIC following training.
- Staff at RNDC and RMSC were trained on BWC throughout this Monitoring Period. In July 2020, Staff at RNDC and RMSC were issued BWCs.
  - Phase 3: OBCC, AMKC, WF (Training in Progress)
    - As of the end of July 2020, approximately 46% of Staff assigned to AMKC and OBCC were trained on the BWC. The Department expects training at WF to be completed along with AMKC and OBCC.
  - Phase 4: MDC, VCBC and Transportation
  - Phase 5: EHPW, BHPW, QNCT, BXCT, and BKDC
  - Phase 6: ESU

- The Department reports it currently has sufficient numbers of BWC in order to rollout use of BWC Department-wide.

- DOC had six BWCs in rotation for Staff at HOJC who served on the tactical response teams during the current Monitoring Period (DOC Staff were no longer supervising the housing units). However, DOC staff were not involved in any uses of force at HOJC during this Monitoring Period, so there was no basis to activate BWCs. All BWCs were removed from HOJC in May 2020.

- The Department evaluated the use of BWC with the Emergency Services Unit ("ESU") and reports that BWCs cannot be affixed to the ESU vests currently in use. For ESU Staff to attach BWCs to their uniforms, the Department must procure new vests, a process which began during the current Monitoring Period and will reportedly require 10 months to complete.

- Two policies govern the use of the BWC. One is an Operations Order that governs the use of BWC at DOC-managed Facilities. The Department maintains a separate BWC policy for HOJC.
  - Both policies require Staff to activate BWC in specified situations (*e.g.,* use of force incidents, witnessing or responding to an incarcerated individual-on-incarcerated individual fight, or escorting incarcerated individuals).

**ANALYSIS OF COMPLIANCE**

PMO continued to manage the expansion of the use of BWC to additional Facilities. However, between March and May 2020, training for BWC was temporarily suspended due to COVID-19. Despite this setback, BWC were assigned to Staff at NIC partway through this Monitoring Period and were rolled out at RNDC and RMSC following the close of the current Monitoring Period as training was complete for those Facilities. Given COVID-19 restrictions, training classes are limited to half-capacity (due to social distancing protocols) compared to pre-COVID-19 protocols and thus delays in completing Staff

training are expected for Phase 3 Facilities. While the Department reported that it was fully committed to using BWCs at all Facilities, the expansion has been protracted over a number of years.

Full BWC implementation is important because BWC provide a unique visual and auditory perspective on use of force incidents that stationary and handheld cameras may not always provide. The Monitoring Team reviewed BWC footage through the routine review of use of force incidents and continues to find it valuable. It is worth noting that during the current Monitoring Period, UOF investigations revealed instances where Staff failed to activate or wear their BWCs as discussed further in regard to ¶ 2 below.

The Monitoring Team continues to strongly recommend that ESU Staff utilize BWCs. Many incidents involving ESU Staff occur in locations that are not required to be covered by wall mounted cameras and/or handheld video footage is difficult to obtain (*e.g.* in cells during an institutional search). As noted above, the Department has identified a new vest to accommodate BWC as ESU's current uniform is not compatible. The Monitoring Team is concerned about the protracted procurement process and strongly encourages the Department to identify a solution that would support the rollout of BWC for ESU as soon as possible.

An essential part of evaluating the effectiveness of BWC footage is the Department's ability to track use of force incidents captured on BWC. Early in the Tenth Monitoring Period, the Department reported that GRVC staff were not consistently adhering to protocols to tag UOF incidents captured on BWC in the Department's internal electronic tracking system. The Department reported it worked with GRVC leadership to improve practices for the tracking of these incidents. However, the tracking of BWC incidents was further complicated by the lack of an efficient search function in the Department's tracking system, making identifying UOF incidents with BWC footage difficult. This compromised the Department's ability to report on incidents captured by BWC in the aggregate.[108] Upon the Monitoring Team's request, the Department shared a targeted sample of incidents captured on BWC and reported that NCU was developing a routine audit to check that incidents are being caught on BWC. The Department further reported it was considering various solutions, including working with the system's vendor to make changes, or modifying the Department's internal reporting system to tag incidents that have BWC. The Monitoring Team will continue to work with the Department to support a reasonable and effective tracking process for use of force incidents captured on BWC.

The Monitoring Team is encouraged that the Department has worked to provide BWC training to Staff in order to expand its use, but the Department must ensure that Staff properly activate their BWCs and that use of force incidents captured on BWC are properly tracked. The Monitoring Team will

---

[108] The Department is able to search for individual incidents within the system so ID is able to identify and pull BWC footage for relevant investigations.

continue to work with the Department so that the efforts invested in the BWC pilot result in an effective and feasible program.

| COMPLIANCE RATING | ¶ 2(a)-(c). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

¶ 2.     Handheld Cameras

   d.     Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

   f.     When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved, and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team addresses the requirement of ¶ 2(d) and remains in effect.

- Staff are required by Department policy to bring equipment and record handheld video in response to all alarm calls. The Facilities continued to maintain an Excel spreadsheet of all alarms that includes a reference to the file name of the corresponding handheld video footage that was uploaded to a shared drive.

- NCU continued its quality assurance ("QA") program regarding handheld camera footage across all Facilities to monitor their success in uploading all required handheld video to the Department's shared drive.[109] NCU's audit also reviewed the conclusory statement at the end of each handheld video in approximately 100 videos a month to confirm that the correct video was uploaded to the system and that the video was properly labelled. The results of this audit are shared in NCU's reports during weekly *Nunez* meetings and discussed by leadership when an issue arises.

---

[109] NCU includes both level A and B alarm responses because the Department's policy requires both to be captured on handheld video. Generally, a level A alarm will be called first, and if the incident cannot be resolved by the level A response, a level B alarm is triggered, which is when the Probe team responds. The Consent Judgment requirement for handheld camera footage is limited to a level B alarm response.

- During the Tenth Monitoring Period, Facilities reported that the handheld video footage was uploaded as required for 4,418 of the 4,489 alarm responses (98.4%).[110]

- The Department identified the following violations regarding the use of handheld cameras or BWCs:

  - ID issued six Memorandum of Complaints ("MOC") to one Captain and five Officers for failing to properly operate the handheld camera, to one Officer for intentionally failing to capture incidents and three MOCs to a Captain and two ADWs for failure to supervise. The Department did not issue any discipline to Staff who repeatedly failed to capture key portions of incidents due to failure to follow DOC policies during this Monitoring Period.

  - The Intake investigators identified 161 incidents during the Tenth Monitoring Period with *some* type of handheld camera or BWC violation.

**ANALYSIS OF COMPLIANCE**

<u>Policy (¶ 2 (d))</u>

The Department continues to maintain an adequate policy regarding the use of handheld cameras and the requirements of ¶ 2 (d).

<u>Availability of Handheld Video (¶ 2(d))</u>

During this Monitoring Period, NCU maintained its QA program and reviewed a sample of incidents to check that handheld video was uploaded as required.

NCU reports that in the vast majority of incidents that require handheld video (98.4%), footage is properly uploaded. The Monitoring Team reviewed a sample of incidents in a virtual on-site audit and was able to confirm NCU's findings, incidents generally contained handheld video when it was required. The Monitoring Team's routine assessment of incidents also confirmed this finding. NCU's audits continues to be well-organized and thorough.

The Monitoring Team also continued to review the quality of handheld video through its routine assessment of Preliminary Reviews, Intake Investigations and Full ID investigations. The quality of handheld video continues to vary, for the most part due to the challenges of operating a handheld video camera during a use of force incident and balancing the need to maintain a safe distance from the activity while capturing the pertinent aspects of the incident. That said, there are still isolated incidents where the handheld camera operator is not making all efforts to reposition themselves in order to maintain a clear view of the incident. The Monitoring Team will continue to review incidents for this issue.

---

[110] NCU did not audit whether handheld videos at EMTC were uploaded during the short tenure the Facility was open between the end of March and June 2020.

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities consistently and promptly upload UOF-related handheld video to support ID's access to footage for the corresponding investigation of the incident. Preliminary Reviews or Intake Investigations of UOF incidents reflect that handheld video is generally available. ID reports that in the event that handheld video footage cannot be located, the investigator contacts the Facility (generally the Tour Commander) who can usually assist the investigator in locating the appropriate video by referencing their log of alarm responses and the associated handheld video name. ID's inability to locate the video is often due to an inadvertent filing error, which is then remedied.

During the Monitoring Team's review of preserved handheld video, all handheld video referenced by the Preliminary Review was preserved and could be located. The Monitoring Team also analyzed a sample of incidents where the Preliminary Reviewer was not able to locate expected handheld video (*e.g.* handheld video was seen on Genetec or the probe team responded to the incident). The Monitoring Team found that in some cases that the video did not appear to exist or had not been uploaded, however, in about half the cases reviewed, the video was located during the virtual on-site audit. This suggests that ID is still continuing to have some issues in locating the handheld video. Through its routine review of UOF incidents, the Monitoring Team finds a small number of handheld videos missing, generally consistent with the same rate of missing video that NCU finds through its handheld audits.

The Monitoring Team previously found that handheld videos were filed systematically and were easy to locate during the audit. The Monitoring Team has not identified any systemic issues preventing investigators from accessing handheld footage when completing their Preliminary Reviews or Full ID Investigations. Accordingly, the Department maintains Substantial Compliance with this provision as investigators have consistent and reliable access to the handheld video.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Department has continued to identify and recommend discipline (*e.g.*, corrective interviews, verbal counseling, Facility Referrals, Command Discipline and MOCs) for Staff who fail to adequately record or upload handheld video footage. The Intake Squad specifically looks for this issue and identified 161 instances in which there was some type of handheld camera violation in the incidents that were investigated this Monitoring Period. These violations ranged in scope from minor to more egregious (examples include failure to upload video as required, failure to bring a handheld camera to the scene when necessary, failure to record the escort following the use of force, etc.). The majority of these violations that have been identified appear to be minor (*e.g.* delays in uploading the handheld camera footage). Incidents with violations represent only a small proportion of the thousands of incidents that involve handheld of BWC. Further, the Monitoring Team continues to identify isolated incidents where the handheld video did not adequately capture the UOF incident, but neither a pattern nor practice of this has been identified. Accordingly, the Department maintains Substantial Compliance with this requirement.

| **COMPLIANCE RATING** | ¶ **2(d).** Substantial Compliance |
| | ¶ **2(f).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. <u>Maintenance of Stationary Cameras</u>

a. The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

b. Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

c. The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[111]

d. Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Facility Identification of Inoperable Cameras
  - The Department continues to maintain Operations Order 12/18 "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," which was developed in consultation with the Monitoring Team to address the requirement for Staff and supervisors to assess stationary wall mounted cameras and for the Department to develop a quality assurance program pursuant to the Court's August 10, 2018 order that modified Consent Judgment § IX, ¶ 3(c).
  - Assigned Staff and supervisors in each Facility continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into the Enterprise Asset Management ("EAM") system as work orders to trigger repair.
- Quality Assurance Program
  - The Department assess the maintenance of cameras using a two-prong strategy:
    - **(1) NCU audit for Completion of Daily MSS-1 forms/work orders** – NCU audits each Facility on five random days each month to confirm the Facility completed the daily forms and submitted corresponding work orders.

---

[111] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (*see* dkt. 316).

- ▪ **(2) NCU Spot-Check of Down Cameras** – This audit is conducted by NCU on one of the same days that the Facility conducts conduct their own self-audit so that NCU's findings can be compared to the Facility's findings. This audit reviews Genetec video across Facilities to determine whether all inoperable cameras were included on the daily MSS-1 forms.
  - ▪ In April 2020, NCU terminated the facility self-audit pilot for reasons outlined below.

- Repairs of Inoperable Cameras
  - o The Department's Radio Shop is responsible for repairing stationary cameras in the Facilities.
  - o The Department uses EAM to electronically track the number of cameras reported as inoperable, the amount of time the camera is inoperable, and the date the camera was repaired. The system also has the ability to track why needed camera repair may be on hold.
  - o On a monthly basis, the Department provides the Monitoring Team the EAM reports that document all open work orders and work orders completed within the month.
  - o Below is a chart of the reported inoperable cameras and the time complete repairs from January 2017 through June 2020.

| Time to Repair Inoperable Cameras | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **Jan. to June 2017** | **July to Dec. 2017** | **Jan. to June 2018** | **July to Dec. 2018** | **Jan to June 2019** | **July to Dec. 2019** | **Jan. to June 2020.** |
| *Total Repaired* | **3934** | **5378** | **6195** | **5867** | **7903** | **8339** | **6356** |
| 0-14 days | 3678 (93%) | 4877 (91%) | 5540 (89%) | 4789 (82%) | 6480 (82%) | 4027 (48%) | 4055 (64%) |
| 15-30 days | 143 (4%) | 256 (5%) | 423 (7%) | 758 (13%) | 779 (10%) | 1955 (23%) | 1100 (17%) |
| 31-60 days | 78 (2%) | 144 (3%) | 110 (2%) | 193 (3%) | 397 (5%) | 1424 (17%) | 577 (9%) |
| 61-99 days | 17 (<1%) | 64 (1%) | 48 (1%) | 68 (1%) | 132 (2%) | 605 (7%) | 302 (5%) |
| 100 days or more | 18 (<1%) | 37 (1%) | 74 (1%) | 59 (1%) | 115 (1%) | 328 (4%) | 322 (5%) |

- 409 camera repairs remained pending beyond 14 days as of the end of the Monitoring Period, as outlined below.

| | |
|---|---|
| **15-30 days** | 89 (22%) |
| **31-60 days** | 101 (25%) |
| **61-99 days** | 37 (9%) |
| **100 days or more** | 182 (44%) |

**ANALYSIS OF COMPLIANCE**

During this Monitoring Period, the Department continued to maintain a reasonable process to identify and track inoperable cameras. Further, the Monitoring Team has found that almost all use of force incidents are captured on video and has not identified systemic issues in the Department's ability to capture use of force incidents on video. Given natural wear and tear and the aging of equipment, on-going maintenance of stationary cameras is expected.

*Daily Assessment of Inoperable Cameras (¶ 3(a)-(b)) & NCU and Facility QA Program (¶ 3(c))*

The process for identifying and reporting inoperable cameras remained the same during the Tenth Monitoring Period (described in detail in the Eighth Monitor's report at pgs. 123 to 126).

- **Completion of Daily Forms**: During this Monitoring Period, NCU found that 450 of 483 MSS-1 forms (93%) were completed and submitted by the Facilities on the days audited.[112]

- **Work Orders for Inoperable Cameras**: Of the 450 submitted forms, NCU identified a total of 13,853 aggregate inoperable cameras.[113] NCU confirmed that 13,792 (99.9%) of the 13,853 reported inoperable cameras had corresponding work orders in the system.

- **Accuracy of MSS-1 Forms**: During this Monitoring Period, NCU's spot-check found 1,929 of 2,027 (95%) inoperable cameras were reported on the daily forms. Of the 98 that were not included on the MSS-1 forms, 60 cameras (61%) did have a corresponding work order. In total, 1,989 of the 2,027 inoperable cameras (98%) had been identified on the MSS-1 form and/or had a corresponding work order in EAM.

The Monitoring Team assessed a sample of NCU's QA findings regarding the daily forms and found the results of NCU's QA results were consistent with the underlying data. Further, the Monitoring Team conducted a targeted assessment of NCU's spot-check and determined that the results reported in the stationary camera report were accurate and reliable. Given the veracity of NCU's audit, the Monitoring Team supported NCU's decision to rely solely on this audit and to terminate plans to expand the self-audits within the Facilities. Not only were the self-audits redundant to NCU's work, but needlessly time consuming for the Facilities, especially given the high level of performance. As a result, the facility self-audit was determined not to be necessary. NCU continues to maintain a well-organized and consistent QA program.

The Department continues to demonstrate that the daily MSS-1 forms are completed as required and the NCU audit results demonstrate that the forms are generally reliable and identify the

---

[112] This includes all forms that were expected to be completed for five random days selected by Facilities in January to June of 2020.

[113] It is important to note that the 13,853 cameras that were identified as inoperable is an aggregate total and does not mean there were 13,853 individual cameras that were inoperable (many cameras were reported as inoperable on multiple days in a row).

vast majority of inoperable cameras. The data demonstrates that the Department is generally submitting work orders to fix any identified inoperable cameras.

*Maintenance of Inoperable Cameras* (¶ 3(d))

The Monitoring Team continues to find that inoperable cameras have not impacted the Department's ability to capture use of force incidents, as the majority of incidents are captured on camera. During the previous Monitoring Period, the Department reported an increase in the number of inoperable cameras and corresponding increase in the time required to repair inoperable cameras. Although there has been a decline in the number of cameras fixed within 14 days since the Eighth Monitoring Period, the proportion of cameras repaired within 14 days has improved, compared to the previous Monitoring Period.[114] However, improved vigilance is needed so that cameras are repaired in a timely manner. At the beginning of the Tenth Monitoring Period, the Department reported that one of the principal causes for the delay in repairing inoperable cameras was allayed by a suspension in shift reductions[115] for Radio Staff. This allowed staff to work longer to address the backlog of repairs. Additionally, Radio Staff developed a plan of action to prioritize these repairs.

However, the Radio Shop again faced staffing challenges beginning in March 2020 because staff were assigned to the Emergency Operation Center ("EOC") as a result of COVID 19. Further, six out of twelve Radio Shop staff were on medical leave at some point during this Monitoring Period. As a result, the number of cameras repaired decreased 57% between January 2020 (1,540 repaired) and May 2020 (667 repaired). Despite the limited staffing, this did not significantly impact the number of cameras that took longer to repair than two weeks. At the end of May 2020, the EOC was deactivated and Radio Shop staff returned to their pre-COVID-19 assignments. In June 2020, the Department reported a large increase in the number of cameras repaired (1,012) compared to May 2020. Further, fewer cameras pending were repaired as of the end of the Monitoring Period compared to the last Monitoring Period (409 vs. 621), indicating that a backlog of repairs did not amass despite the staffing challenges during this Monitoring Period.

Despite the impact of COVID-19, the Department continued to address and routinely report on camera repair. While the decline in cameras repaired during this Monitoring Period was understandable given the unique circumstances surrounding the Department's response to the pandemic, the Monitoring Team was encouraged by the Department's improvement in repairing cameras in June 2020, once staff resumed their normal assignments. It is also worth noting that the Department improved the time required to repair cameras compared to the previous Monitoring Period with an increase in the proportion of all cameras repaired within fifteen days (64% vs. 48%). Additionally,

---

[114] Some of the reasons that likely are attributable to the delay in camera repairs are discussed in the Ninth Report at pgs. 145 to 146.

[115] Shift reductions limit the amount of time staff can work in a single shift. SOD, Radio's parent command, confirmed these reductions were suspended on February 10, 2020.

during this Monitoring Period, 81% of cameras were repaired within thirty days. Barring other unforeseen circumstances in the future, these findings suggest that continued improvement in the time required to repair inoperable cameras should occur as the Radio Shop resumes normal operations and fully executes its original plan of action.

| COMPLIANCE RATING | ¶ 3 (a)-(c) Substantial Compliance |
|---|---|
| | ¶ 3 (d). Partial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 4 (VIDEO PRESERVATION)

¶ 4. Video Preservation

The Department shall preserve all video, including video from stationary, handheld, and body-worn cameras, for 90 days. When the Department is notified of a Use of Force Incident or incident involving inmate-on-inmate violence within 90 days of the date of the incident, the Department will preserve any video capturing the incident until the later of: (i) four years after the incident, or (ii) six months following the conclusion of an investigation into the Use of Force Incident, or any disciplinary, civil, or criminal proceedings related to the Use of Force Incident, provided the Department was on notice of any of the foregoing prior to four years after the incident.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's steps towards compliance for these provisions remain unchanged from the Ninth Monitor's Report (see pgs. 147-149).

- Preservation of video at HOJC for UOF Incidents involving ACS Staff was managed as follows:

   o DOC maintained control of video surveillance cameras and preservation of video at HOJC for the first part of the Monitoring Period. During this time, for incidents that only involve ACS Staff, ACS advised DOC when the incident occurs and requested that DOC preserve the relevant video. There was then a period of time in which ACS and DOC co-managed the maintenance of video surveillance cameras. ACS finally assumed control of maintenance and video preservation at HOJC on May 27, 2020.

   o ACS currently has access to view video within 90 days of the incident occurring via on-site and off-site logins to the Genetec system.

   o ACS reports all incidents of restraints, as well as child abuse and youth on staff assaults that occur at HOJC are archived on the server so that it is preserved after 90 days.

**ANALYSIS OF COMPLIANCE**

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

| | |
|---|---|
| *HOJC* | |
| At HOJC, the preservation of video transitioned from DOC to ACS as outlined above. The Monitoring Team evaluated a sample of video capturing UOF with ACS staff exclusively which was preserved either by DOC or ACS. The Monitoring Team was able to confirm that the requested videos were preserved by DOC or ACS except three incidents that had not been preserved by DOC during the transition. These three cases appeared to be isolated cases. Given the value of video footage, the Monitoring Team strongly encourages the continued preservation of video for incidents at HOJC. | |
| **COMPLIANCE RATING** | **¶ 4.** (DOC) Not Rated—Inactive Monitoring |

## 5. USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct.[116] The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion. Investigations that reliably and consistently identify misconduct are essential to reduce incidents of unnecessary and excessive force.

As described in the Identifying & Addressing UOF Misconduct section, the Department took significant steps this Monitoring Period to improve the investigations process by implementing Intake Investigations, eliminating Preliminary Reviews and Facility Investigations, and also reducing the investigation backlog. This is particularly notable given the unprecedented issues presented by COVID-19, which required significant changes to the way investigations had

---

[116] The Department's efforts to achieve compliance with ¶ 5 is addressed in the Use of Force Reporting section of this report.

been conducted from Staff working remotely (and all that entails) to limitations on personal interactions for interviews of Staff[117] and incarcerated individuals and access to the jails.[118]

There was also a restructuring of investigators within ID. The Intake Squad was developed to handle all Intake Investigations and investigators on this unit are solely responsible for completing Intake Investigations. The other investigators responsible for Use of Force investigations are teamed up by Facility and are responsible for closing out the backlog and completing newly referred Full ID investigations. This restructure, in combination with the some of the COVID-19 restrictions, presented a unique opportunity for investigators to focus on reducing the backlog.

The ID Leadership team continues to demonstrate a strong commitment to creative thinking, problem solving, and improving the work of the division and significant and impressive progress was made in this Monitoring Period on the timeliness and quality of investigations. The Monitoring Team continues to collaborate with ID to address the issues identified by the Monitoring Team, including reviewing investigations to address areas of concerns and/or recommendations from the Monitoring Team and developing creative solutions to address larger scale issues such as reducing the backlog. The entire ID Team's dedication is critical during this time and their commitment to achieving better results is recognized and appreciated.

---

[117] MEO-16 interviews were temporarily suspended for much of the Monitoring Period. This meant certain cases may be unable to move forward or close because they require a Staff interview. However, this limitation forced investigators to closely scrutinize whether an interview was needed. As discussed in prior reports, investigators would often default to scheduling MEO-16 interviews in cases where they may not be needed. Accordingly, this revised approach supported the overall initiative to reduce the reliance on MEO-16 interviews to only those where they were absolutely necessary given the time they take to schedule and complete.

[118] The investigation division also suffered the untimely and tragic passing of two investigators in this Monitoring Period.

*Addressing Investigation Backlogs*

During the Monitoring Period, the Department, in consultation with the Monitoring Team, worked to address the significant backlog of cases. The Monitoring Team closely scrutinized the backlog and consulted with the Department about how to evaluate these cases and close them more efficiently. There were over 9,000 backlogged cases pending at the beginning of this Monitoring Period, which included any pending cases that occurred prior to February 3, 2020 (when the Intake Squad was implemented). The pending cases in the backlog fall into three categories: (1) investigations where the Preliminary Review had not yet been drafted, (2) investigations where the Preliminary Review had been drafted, but was not yet complete, (3) investigations where the Full ID investigation was started, but was not yet complete.

- *Triage of Investigations with No Preliminary Reviews*

A small number of cases in the backlog did not have Preliminary Reviews drafted. In these cases, ID continued the initiative of drafting more succinct Preliminary Reviews for straightforward incidents without identified misconduct. These more succinct Preliminary Reviews ("Paragraph Preliminary Reviews") are intended to avoid the recitation of unnecessary facts and details (*e.g.* transcription of UOF reports) and should reduce the time required to complete them. The Monitoring Team has continued to review a sample of Paragraph Preliminary Reviews and found overall that they are both streamlined and reasonable and that this initiative helps to preserve investigator resources for more important investigative work. This approach to more efficiently complete these Preliminary Reviews also supported the overall effort to close backlogged investigations swiftly when no further investigative steps were necessary (as discussed in more detail below).

- *Closure of Preliminary Reviews and Full ID Cases*

The majority of the backlog are pending Preliminary Reviews and Full ID Investigations where some investigation has been done, but the case is not closed. The strategy to address the Preliminary Review and Full ID backlog was developed in consultation with the Monitoring Team and is intended to both close out these pending cases and provide the foundation for an improved process to conduct investigations going forward (the "ID Backlog Plan"). As described in the Ninth Monitor's Report at pgs. 150-153, the ID Backlog Plan was designed to leverage the fact that for most cases, investigators had already investigated most aspects of the incidents (*e.g.*, incarcerated individuals had been interviewed, evidence had been gathered and analyzed) and in some cases corrective action for identified misconduct had been initiated even though the investigation was still open. Further, it was found that there was little to no distinction between a pending Preliminary Review and Full ID investigation. Therefore, in most cases, based on that evidence, a decision *could be* made about whether charges were appropriate, but simply had not been done.

In order to efficiently address the backlog, and leverage the findings that have already been made, the Monitoring Team devised a framework for investigators to categorize <u>all</u> of their pending Preliminary Reviews and Full ID cases into three groups:

- *Type 1* cases are those that can be closed without further investigation because either (a) the incident did not violate policy or (b) misconduct has already been addressed (*e.g.* charges served or there is a confirmed response by the Rapid Review that sufficiently addresses the misconduct);

- *Type 2* cases are those cases in which misconduct has been identified and can be fast-tracked for discipline or prepared for closure with formal charges or other administrative action; and

- _Type 3_ cases require further investigation or analysis (_e.g.,_ additional interviews) in order to determine whether charges are necessary and/or can be supported.

Investigators review these categorizations with their Supervisors and share them with the Monitoring Team. The Monitoring Team then conducts a review of a sample of cases to check there is agreement upon the approach. Upon agreement on the categorizations, the cases are closed according to the categorization. Importantly, for most Type 1 and Type 2 cases, a more streamlined closure process in CMS is used to bypasses the very time-consuming required fields in the system. Further, a more concise narrative is employed for the closing memo instead of overly detailed memorandum.

The ID Backlog Plan was initially implemented _by investigator_ in waves, so groups of investigators were selected to categorize their entire caseloads for review and closure. The focus was on investigators who were slated to join the Intake Squad, in order to close out their caseload before beginning their new assignments. Upon the implementation of the Intake Squad, the approach shifted to focus on addressing the backlog by _incident date_, rather than by investigator.

The Monitoring Team supported the backlog closure project in this Monitoring Period in a few ways. First, the Monitoring Team split up the backlog into three waves based on the incident date[119] in order to prioritize closure of the oldest cases first and support the effort to close cases before the statute of limitations was set to expire. Second, the Monitoring Team recommended guidance on how to categorize the pending cases into the three types of cases (_e.g._

---

[119] The first wave included cases occurring between September 1, 2018-February 28, 2019 and investigations were required to be closed by May 31, 2020. The second wave included cases occurring between March 1, 2019-July 31, 2019 as well as all pending HOJC incidents and investigations were required to be closed by August 31, 2020, and the third wave included cases occurring between August 1, 2019 and February 2, 2020 and investigations are set to be closed by December 31, 2020.

identifying open cases where charges were already served that could be closed as Type 1 cases). The Monitoring Team also provided recommendations for hundreds of incidents that likely were Type 2 cases because objective evidence of wrong doing suggested that a violation occurred and discipline should be pursued.[120] Finally, the Monitoring Team recommended that ID leverage the status of certain cases to determine the categorization (*e.g.* pending investigations for which the Investigators recommended be closed as "Presumption Investigation Complete" could presumptively be treated as a Type 1 case). ID & Trials leadership worked with the investigators that had pending cases in the relevant time period and then set specific deadlines for closure of the cases based on the categorization.

This approach to the backlog is sound and reasonable and balances the various interests that must be considered in addressing a backlog of this magnitude. Misconduct must be addressed, but the backlog must be efficiently managed and reduced in order to create a pathway for ID to conduct timely investigations for incidents going forward. The Monitoring Team found that ID's categorization of cases, including its assessment and implementation of the Monitoring Team's recommended categorizations was reasonable. In particular, ID's assessment of the Monitoring Team Type 2 investigation recommendations were all addressed except in a small number of cases in which ID found that discipline was not warranted based on the evidence. In each of these cases, ID provided a reasonable basis that determination.

This Monitoring Period, ID was able to close over 3,000 incidents as part of the ID Backlog Plan and they are on track to close an additional 1,400 by the end of August 2020 as

---

[120] This determination was made by the Monitoring Team by leveraging a variety of sources including review of COD reports, Rapid Reviews, pending or closed Preliminary Reviews, and review of video and Staff Reports when information from those sources point to likely use of force violations.

part of the timelines/goals set in this project. Of these 3,000, at least 500[121] closed with charges or a PDR, demonstrating a pursuit of discipline for violations when identified, and an additional 176 closed with Facility Referrals to address minor violations or other issues. The significant formal disciplinary charges coming out of these case closures present a real opportunity for the Department to address identified misconduct that went unaddressed for too long. ID is on track to close out the backlog by the end of 2020 as required by the Remedial Order.

- *Assessment of Closed ID Investigations*

The Monitoring Team routinely reviews thousands of ID investigations each Monitoring Period. In the main, the Monitoring Team has found the quality of ID investigations are mixed. It is clear that ID expends significant effort to obtain relevant evidence and information. However, the assessment of that evidence varies. While flagrant violations of policy are typically identified, the Monitoring Team has found that ancillary issues may go unaddressed and often investigations focus on one or two Staff Members when many Staff may have violated policy.

In this Monitoring Period, along with the routine assessment of cases, the Monitoring Team also conducted a review of two distinct samples of investigations closed as part of the backlog to assess the quality of the investigations closed. For **sample one**, the Monitoring Team reviewed 22 incidents with *no charges*, but that the Monitoring Team had previously identified as having a higher likelihood of wrongdoing based on the Preliminary Review. These 22 incidents were reviewed to assess whether the determination not to bring charges was appropriate. The Monitoring Team ultimately found in *all* cases that it was reasonable that these investigations were closed without charges. However, in some cases there were some minor

---

[121] Of these 500, approximately 60 had already had charges served prior to this Monitoring Period.

violations that may have been appropriate to address if the cases were not so old. All of these cases were nearing the SOL at the time they were evaluated by ID (meaning they were close to a year and a half past the incident date) so at this juncture it did not appear prudent to address these minor issues. That said, overall, the Department's approach with these cases was not unreasonable and flagrant violations were not overlooked.

For **sample two**, the Monitoring Team reviewed a random sample of 30 investigations that were closed as part of the ID Backlog Plan and had *not* previously been identified by the Monitoring Team for review in any other context. Eight of the 30 investigations were closed with charges, and 22 did not have charges. The review of these closed investigations revealed the significant investigative work had been completed for these cases, and that all but one had a complete and thorough investigation. While these cases were closed as part of the ID Backlog Plan, it did not appear that ID had cut any corners or the overall investigation was diminished in any way because they were closed as part of the backlog. Of the 22 cases without charges, there were a few cases in which charges may have been warranted, but in each investigation the investigator addressed the potential misconduct and concluded the conduct did not warrant charges. The analysis in each of these cases was reasonable. Overall, the quality of the investigations closed as part of the ID Backlog Plan are consistent with the history of this case—the investigations were often thorough and demonstrated a significant amount of work done to collect, summarize, and analyze the evidence, but in a few examples did not come to the correct conclusion as to the appropriateness of the force used.

*Statute of Limitations -- Full ID Investigations*

The SOL for Staff misconduct was tolled due to COVID-19 for most of this Monitoring

Period.[122] That said, ID's approach to addressing the backlog by incident date meant that cases

that would have been nearing the SOL were prioritized. This obviated the need for SOLstat,

which had previously been employed to assess cases nearing the SOL and bring charges to

preserve the SOL when necessary (although the investigations themselves often remained open

past the SOL). ID's success in reducing the backlog has also meant that the threat of losing cases

to the expiration of the statute of limitations was vastly minimized.

The Monitoring Team's assessment of compliance is below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID conducted a Preliminary Review of every use of force incident through February 2, 2020 and an Intake Investigation of every use of force incident beginning on February 3, 2020.

- ID investigates use of force incidents that are referred from the completed Preliminary Review and/or Intake Investigation.

### ANALYSIS OF COMPLIANCE

The advent of the Intake Squad this Monitoring Period has resulted in the fact that incidents beginning February 3, 2020 have completed timely investigations. As for the quality of those investigations that are completed, the Monitoring Team has been satisfied with the quality of Intake Investigations as they generally identify violations, and recommend corrective action when warranted, and refer cases to Full ID investigations only when necessary as required by the revised ¶ 8 referral requirements (described in more detail in regards to ¶ 8 below). Intake Investigations reasonably and accurately summarize the available evidence, identify violations when present, recommend corrective

---

[122] The statute of limitations was tolled beginning on March 20, 2020 and was extended through the end of the Monitoring Period.

action when warranted, and refer for further investigation when necessary. In only a small number of Intake Investigations has the Monitoring Team found violations went unaddressed or the investigation was recommended to be closed without further investigation, but further investigation was warranted.

The work of the ID Backlog Plan also enabled ID to identify and address misconduct for incidents which previously had languished and paved the way to conduct more timely investigations going forward. The ID Backlog Plan has created a reasonable framework to address the backlog of investigations. This process has revealed that the most prominent violations of policy are being identified through this assessment and the significant efforts and work to close this large volume of cases must be recognized. That said, the triaging efforts may impact the quality of the investigation in some cases either because some violations may go unaddressed and/or because the passage of time may impact the veracity of the evidence and the impact of any discipline that may be imposed. However, this triage approach is a necessary trade-off to support the overall goal of reducing the backlog in order to allow ID to focus on more recent incidents. More work remains to close out the backlog by the end of the year, with the majority of pending cases being Preliminary Reviews of incidents from the Ninth Monitoring Period.

As described in the Identifying and Addressing UOF Misconduct section of this report, and the narrative above, the combination of the Intake Squad and significant reduction of the backlog has improved the Department's ability to appropriately assess use of force incidents and address potential misconduct as necessary. Case in point, 67% (2,100) of the incidents that occurred in the Tenth Monitoring Period have closed investigations as of the end of the Monitoring Period compared with only 8% (321) of the incidents that occurred in the Ninth Monitoring Period that had closed investigations at the end of the last Monitoring Period.

The Intake Squad, and the corresponding planned modifications to Consent Judgment § VII. (Use of Force Investigations), ¶¶ 7, 8, and 13, as well as the elimination of the backlog, will support thorough, timely, and objective investigations of all use of force incidents going forward. The significant progress made in this Monitoring Period has moved the Department out of Non-Compliance and into Partial Compliance with the requirements of this provision.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 2(c)(i) & (ii) (ID AND FACILITY INVESTIGATOR TRAINING)

¶ 2. Within 120 days[123] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

---

[123] This date includes extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

<table>
<tr><td>

c. <u>Investigator Training</u>: There shall be two types of Investigator Training: ID Investigator Training and the Facility Investigator Training. ID Investigator Training shall cover investigative procedures, skills, and techniques consistent with best practices and the terms of this Agreement. The Facility Investigator Training shall be based on relevant aspects of ID Investigator Training, and shall focus on those investigative procedures, skills, and techniques that are necessary to conduct effective Facility Investigations that are consistent with the terms of this Agreement.

    i. ID Investigator Training, including any revisions, shall be a minimum of 40 hours, and shall be provided to any new ID investigators assigned to ID after the Effective Date before they begin conducting investigations.

    ii. The Facility Investigator Training shall be a minimum of 24 hours. Within 9 months of the Effective Date, the Department shall provide such training to all Staff Members who serve as Facility Investigators. Staff Members who begin to serve as Facility Investigators more than nine months after the Effective Date shall complete the Facility Investigator Training prior to conducting Facility Investigations.

</td></tr>
</table>

*ID Investigator Training (¶ 2(c)(i))*

       This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

*Facility Investigator Training (¶ 2(c)(ii))*

       The Department ceased Facility Investigations in the Ninth Monitoring Period and the requirement for Facility Investigator Training was removed from the Consent Judgment as outlined in *Exhibit A* to the Remedial Order (dkt. 350)). Therefore, the provision was not rated as this requirement was eliminated following the close of the Monitoring Period.

| **COMPLIANCE RATING** | **¶ 2(c)(i).** Not Rated—Inactive Monitoring<br>**¶ 2(c)(ii).** Not Rated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INCARCERATED INDIVIDUAL INTERVIEWS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

    a. After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

    b. When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

    c. All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- Facility Staff consistently attempt to interview incarcerated individuals following their involvement in a use of force, and document either the incarcerated individual's statements, or refusal to provide a statement, in the Facility package that is provided to the Preliminary Reviewer/Intake Investigator. Despite COVID-19, this practice generally continued without interruption during the Monitoring Period.

- The "Inmate Voluntary Statement" forms used to obtain incarcerated individual statements at the Facility-level informs the incarcerated individuals, and codifies the requirement of ¶ 2(b), that "the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation."

- The investigation files include Inmate statements. Inmate refusals to provide a statement are documented and are in the investigation file.

**ANALYSIS OF COMPLIANCE**

The incarcerated individual interview requirements of ¶ 2 have a number of practical elements: (1) attempts must be made and recorded to get an incarcerated individual's statement following a use of force incident; (2) the Department shall assure incarcerated individuals they will not be subject to retaliation for providing information in connection with an investigation; (3) investigators shall not unreasonably discredit incarcerated individual statements. This last consideration is most appropriately addressed as part of the overall assessment of the quality of investigations (see ¶ 9 below) and is therefore not considered as part of the compliance assessment for this requirement.

Attempts by the Facility are consistently made to get an incarcerated individual's statement following a use of force and those attempts are recorded. The Monitoring Team consistently identified documentation in all Preliminary Reviews, Intake Investigations, and Full ID investigation files reviewed that the Facility makes attempts to obtain incarcerated individual statements following use of force incidents (although incarcerated individuals rarely make any such statement to the Facility). The incarcerated individual voluntary statement form is consistently available and contains either the incarcerated individual's initial statement to the Facility or recorded incarcerated individual refusal to provide such statement. The Department has also codified and informs all incarcerated individual's through the Inmate Voluntary Statement form that they will not be retaliated against for any information provided in connection with the investigation. Further, the Monitoring Team has not identified any evidence to suggest that inmates have been retaliated against for providing information in connection with a use of force incident. Accordingly, the Department is in Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
|---|---|

143

| VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI) |
|---|

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for further investigation when the Staff's conduct appears to be criminal in nature.

- The Department continued to coordinate monthly with DOI, and other relevant law enforcement offices on cases that may be pending consideration for prosecution by those offices (as described in the Second Monitor's Report at pgs. 84-85).

- The Department maintains a tracking chart so that cases are tracked from the time they are referred to law enforcement to the case's ultimate closure within the Department. The tracking chart is updated each month to identify who is currently evaluating the cases (DOI, law enforcement or returned to ID) as well as the status of that evaluation. To the extent the case has been returned back to the Department, they also track the status of the investigation and any pending discipline (to the extent necessary).

- Five new use of force cases were considered by DOI or outside law enforcement during this Monitoring Period.

- Seven use of force cases were pending with law enforcement as of the end of the Monitoring Period: three with the Bronx District Attorney ("DA") (including one case in which Staff were criminally indicted in June 2020), three use of force cases were pending with the U.S. Attorney's Office for the Southern District of New York "SDNY", and one case was pending with the U.S. Attorney's Office for the Eastern District of New York "EDNY").

**ANALYSIS OF COMPLIANCE**

The number of UOF incidents that may be potentially criminal in nature remain small but are the most concerning. Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly and/or assumed by DOI. The Monitoring Team has not identified any incidents that should be referred and were not. Since the Effective Date, DOI has taken over or been referred a total of approximately 90 cases. Only a small portion (n=5) of this already limited group of cases has resulted in criminal charges as demonstrated in the chart below.

| Date of Incident | 2014 & 2015 | Jan. to June 2016 | July to Dec. 2016 | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 | Total | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **9** | **11** | **5** | **8** | **19** | **6** | **12** | **10** | **5** | **5** | **90** | |
| Criminal Charges Brought/Trial Underway or Complete | 0 | 2 | 0 | 0 | 0 | 0 | 2 | 1 | 0 | 0 | **5** | **6%** |
| Pending Consideration with Law Enforcement | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 1 | 2 | 1 | **6** | **7%** |
| Returned to ID | 9 | 8 | 5 | 8 | 18 | 6 | 10 | 8 | 3 | 4 | **79** | **88%** |

*Tracking & Coordination of Cases*

The Department has maintained its improved tracking process for cases referred and/or taken over by DOI and subsequently City and Federal prosecutors' offices. The tracking is particularly crucial because these cases go through various layers of review across and within various agencies in order to determine whether to bring a criminal prosecution. Ultimately, this process helps ensure these cases are processed as expeditiously as possible, which is important since they represent some of the most troubling use of force incidents.

Monthly meetings between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and SDNY) continue to occur regularly and provide an adequate forum for coordinating cases. This includes ensuring the Department places its own investigations on hold while the criminal investigation is ongoing, while also ensuring that cases do not languish once referred to law enforcement. The Monitoring Team continues to participate in these meetings in order to stay apprised of the status of these cases.

*Length of Time to Evaluate Cases*

The improved tracking and communication appears to have resulted in a decreased time for review by outside agencies. In particular, DOI has been assessing cases more timely and either elevating them to prosecutors or clearing them back to the Department.

However, the total time required for outside agencies to consider cases for prosecution is still **too long**—and very few cases actually result in criminal prosecution. Since the Effective Date, **90 cases** have been considered by outside law enforcement agencies, of which only **five** have resulted in criminal prosecution. Of the seven cases pending with outside law enforcement at the close of the Monitoring Period, two of them occurred in 2016 and 2017, which have been with DOI, the Bronx DA and SDNY/EDNY or passing from one agency to the next for *years*.

The Monitoring Team remains quite concerned about the overall length of time to complete the criminal evaluation process as the vast majority of cases reviewed by law enforcement do not result in a criminal proceeding and are ultimately referred back to the Department for administrative processing and discipline. Any necessary administrative response and discipline for these matters are then very

protracted, which decreases the meaningfulness of the response and some of the most troubling incidents are then most likely to languish. It is therefore imperative that law enforcement representatives make every effort so that cases are prosecuted, or returned to the Department, as expeditiously as possible.

*Department's Assessment of Cases Returned from Law Enforcement*

For cases that law enforcement agencies decline to prosecute, they are referred back to the Department for administrative processing and discipline, as appropriate. Because ID investigations take so long to close, the Monitoring Team recommended that ID prioritize cases returned from law enforcement given the likelihood that they involve serious misconduct and a disciplinary response is likely warranted.

Overall, the Department is promptly referring use of force incidents to DOI and other law enforcement agencies for further investigation when the conduct of Staff appears to be criminal in nature. While the length of time these cases are considered by law enforcement is concerning as described above, the Department is adequately referring the cases timely and is therefore in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 4 AND 12 (ADDRESSING BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS, AND ID QUALITY CONTROL)

¶ 4. Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department can discipline, instruct, or counsel those who conduct or sign-off on a biased, incomplete, or inadequate investigation.

- CMS includes several mandatory fields which require that investigators collect and analyze evidence systematically.

- All Preliminary Reviews, Intake Investigations, and Full ID Investigations require multiple levels of supervisory review.

- A number of initiatives are being managed within ID to triage the current caseload.

### ANALYSIS OF COMPLIANCE

Preliminary Reviews, Intake Investigations, and Full ID investigations are all subject to supervisory review, which provides an opportunity for investigations to be assessed and inadequate

investigations to be addressed. ¶¶ 4 and 12 are addressed together because if there are adequate Quality Control mechanisms, there should be very few biased, inadequate, or incomplete finalized investigations.

*Addressing Biased, Incomplete, or Inadequate Investigations, ¶ 4*

Only a small proportion of ID investigations completed in this Monitoring Period were inadequate, which would warrant appropriate instruction, counseling, and/or discipline.[124] While the quality of ID investigations remains mixed, it is clear that there is a certain level of feedback between investigators and supervisors as the number of biased, incomplete, and inadequate investigations conducted by ID is relatively small. ID reports that instruction, counseling, and/or discipline are utilized when incomplete, biased, or inadequate investigations are identified, but this is mostly completed on an informal basis so it is not systematically tracked. The Monitoring Team is aware of certain cases in which investigators with a pattern of completing inadequate, incomplete, or biased investigations have been removed from the Investigations Division. The Monitoring Team also shares feedback and/or recommendations with the leadership of ID to evaluate certain investigations that appear biased, incomplete, or inadequate and therefore should be addressed with the investigator and/or their supervisors. In response, ID has addressed this feedback directly with those investigators and supervisors with counseling and discipline (as appropriate). The fact that investigations have been steadily improving demonstrates that there are processes in place to assess and address investigations of poor quality, but the fact that the Monitoring Team continues to identify at least some potentially biased, incomplete, or inadequate investigations suggests that more work remains to be done to minimize these issues.

*Quality Control, ¶ 12*

The significant backlog and increasing caseload of investigations impedes ID's ability to implement quality control systems and procedures to check the quality of ID investigations and reviews because the division is so overwhelmed. That said, ID has mechanisms in place to require supervisory review of investigations, which are critical components to assessing and addressing the quality of investigations. There is certainly significant back and forth between supervisors and investigators. The final versions of Preliminary Reviews and Intake Investigations demonstrate that feedback and guidance is provided to investigators in order to improve the quality of those investigations. The UPS division was also implemented so that priority cases are managed by seasoned investigators. Additionally, supervisors at all levels are heavily involved in the ID Backlog Plan.

---

[124] The Monitoring Team found in prior Monitoring Periods that a number of Facility Investigations were incomplete, biased, or inadequate and went unaddressed. However, Facility Investigations were eliminated in this Monitoring Period and therefore the need to address those investigations is moot.

While the current practices demonstrate Partial Compliance, further work is certainly needed to ensure ID conducts consistent and reliable investigations. Quality control measures are expected to be incorporated into the new Intake Investigation process as well as review of Full ID investigations once the backlog of investigations has been alleviated.

| COMPLIANCE RATING | ¶ **4.** Partial Compliance<br>¶ **12.** Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 7 (PRELIMINARY REVIEWS)

¶ 7. <u>Preliminary Reviews</u>: Within two Business Days of any Use of Force Incident, a member of ID shall conduct a preliminary review into the incident ("Preliminary Review") to determine: (i) whether the incident falls within the categories set forth in Paragraph 8 below and thus requires a Full ID Investigation (as defined in Paragraph 8 below); (ii) whether other circumstances exist that warrant a Full ID Investigation of the incident; (iii) whether any involved Staff Member(s) should be re-assigned to positions with no inmate contact or placed on administrative leave with pay pending the outcome of a full investigation based on the nature of the Staff's conduct; (iv) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Staff's conduct; (v) whether the matter should be immediately referred to DOI due to the potential criminal nature of the Inmate's conduct; and (vi) whether it is not necessary for the Facility to take any additional investigative steps because the incident meets criteria set forth in subparagraph (e) below. [During the course of the Preliminary Review, the ID investigator shall consider the items in (a) to (e)]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- All incidents prior to February 3, 2020 received a Preliminary Review (of which 3,125 remain pending as discussed in the Identifying & Addressing UOF Misconduct section above); all incidents occurring on or after February 3, 2020 received an Intake Investigation.

- ID uses CMS to conduct Preliminary Reviews or Intake Investigations of all use of force incidents.

### ANALYSIS OF COMPLIANCE

The Monitoring Team continues to review all Preliminary Reviews and Intake Investigations[125] as they remain the most reliable source of information about use of force incidents. The Department dedicated significant time and effort to completing quality Preliminary Reviews, and the advent of the Intake Squad has transformed the framework of ID's review of incidents, replacing Preliminary Reviews and enabling ID to leverage the significant work done at that stage of the investigation to close most incidents following the completion of the Intake Investigation. The previous requirements of this provision of the Consent Judgment technically remained in place during this Monitoring Period, as the Consent Judgment was not modified to reflect the new Intake Investigation framework until the Eleventh Monitoring Period (as outlined in Exhibit A to the Remedial Order (dkt. 350)). Given the

---

[125] In order to review incidents as contemporaneously as possible, the Monitoring Team reviews a mixture of fully completed Preliminary Reviews/Intake Investigations and draft versions depending on which version is available at the time of the Monitoring Team's routine review.

transition from Preliminary Reviews to Intake Investigations during this Monitoring Period, a compliance rating cannot be assessed, but will be assessed in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 7. Not Rated |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 8 (CLASSIFICATION AS FULL ID INVESTIGATIONS)

¶ 8. ID shall conduct a full investigation ("Full ID Investigation") into any Use of Force Incident that involves: (a) conduct that is classified as a Class A Use of Force, and any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force; (b) a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate; (c) kicking, or an allegation of kicking, an Inmate; (d) the use, or alleged use, of instruments of force, other than the use of OC spray; (e) a Staff Member who has entered into a negotiated plea agreement or been found guilty before OATH for a violation of the Use of Force Policy within 18 months of the date of the Use of Force Incident, where the incident at issue involves a Class A or Class B Use of Force or otherwise warrants a Full ID Investigation; (f) the Use of Force against an Inmate in restraints; (g) the use of a prohibited restraint hold; (h) an instance where the incident occurred in an area subject to video surveillance but the video camera allegedly malfunctioned; (i) any unexplained facts that are not consistent with the materials available to the Preliminary Reviewer; or (j) a referral to ID by a Facility for another reason that similarly warrants a Full ID Investigation. Such Use of Force Incidents shall be referred to ID within two Business Days of the incident. In the event that information is obtained later establishing that a Use of Force Incident falls within the aforementioned categories, the Use of Force Incident shall be referred to ID within two days after such information is obtained. ID shall promptly notify the Facility if it is going to conduct a Full ID Investigation of a Use of Force Incident, at which time the Facility shall document the date and time of this notification and forward any relevant information regarding the incident to ID.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- This Monitoring Period, Intake Investigators referred cases for Full ID investigations for incidents beginning February 3, 2020 based on the new criteria outlined in Exhibit A to the Remedial Order (dkt. 350).

- Of the 2,457 closed Intake Investigations from this Monitoring Period, 402 (16%) were referred for Full ID Investigations.

### ANALYSIS OF COMPLIANCE

The Full ID Investigation referral criteria was in transition in this Monitoring Period. Although technically the requirements of this provision of the Consent Judgment were not revised until the Eleventh Monitoring Period (as outlined in Exhibit A to the Remedial Order (dkt. 350)), the Monitoring Team encouraged ID to implement these requirements as part of the roll out of the Intake Investigations. The revised referral criteria incorporated three of the most important criteria for referral from the original Consent Judgment requirements—Class A incidents, incidents involving or alleged to have involved a head strike, and those incidents where additional investigation appeared necessary.

The Monitoring Team generally found that Intake Investigations were appropriately referred for Full ID investigations as required by the new criteria, except for a handful of cases which were

recommended to be closed on the Intake Investigations but warranted further investigation.[126] The Department therefore has maintained Substantial Compliance with this provision even during this transitional Monitoring Period.

| COMPLIANCE RATING | ¶ 8. Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS)

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Investigators review all UOF reports and UOF witness reports as part of Preliminary Reviews/Intake Investigations and ID investigations.

### ANALYSIS OF COMPLIANCE

*This provision is addressed in this section versus the Use of Force Reporting section of the report because this requirement relates to the work of investigators.*

Investigators access to UOF reports has significantly improved and the investigation paperwork demonstrates that ID investigators closely review Staff reports. This Monitoring Period, Intake Investigators appear to be better identifying and addressing concerns regarding Staff reporting. As described in Use of Force Reporting and Tracking, ¶ 8, charges are brought for use of force reporting-related violations (including collusion). The Intake Investigation of an incident this Monitoring Period identified a particularly egregious example of Staff collusion in which Genetec video depicted Staff gathering and discussing their reports and writing their reports together (the Full ID Investigation of this incident was pending as of the end of the Monitoring Period).

However, the Monitoring Team has found that not all reporting violations are identified. For instance, the most telling examples of collusion involve Staff Reports that are not only conspicuously similar, but also inconsistent with video evidence—demonstrating collusion in representing the incident in the same inaccurate way. While these telling examples are not prevalent, they are not always identified or pursued by investigators.

| COMPLIANCE RATING | ¶ 7. Partial Compliance |
| --- | --- |

---

[126] In this small number of cases, the Monitoring Team provided feedback to ID and the investigations were re-opened as appropriate.

| VII. Use of Force Investigations ¶ 9 (Full ID Investigations) |
|---|
| ¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]: |
|     a.   *Timeliness* [. . .] |
|     b.   *Video Review* [. . .] |
|     c.   *Witness Interviews* [. . .] |
|     d.   *Review of Medical Evidence* [. . .] |
|     e.   *Report* [. . .] |
|     f.   *Supervisory Review* [. . .] |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All ID investigations of UOF incidents occurring during this Monitoring Period were conducted within CMS.

- ID has maintained the Use of Force Priority Squad ("UPS"), which was established in the Eighth Monitoring Period to investigate serious and egregious uses of force and/or misconduct by Staff with concerning histories of misconduct in a timely fashion.

  - UPS includes four investigators, one supervising investigator, and one Deputy Director, all of whom were chosen based on their skill set and experience.

  - A fact-based assessment is used to assign cases to UPS. Cases may be assigned to UPS based on their severity, if they involve certain Staff that have engaged in a pattern of concerning misconduct, and referrals from the Immediate Action Committee, ID Staff, and Monitoring Team.

- **Incarcerated Individual Interviews**:

  - See ¶ 2 above regarding the Facility's attempts to obtain incarcerated individual statements following a use of force incident.

    - Assigned ID investigators may also attempt to interview incarcerated individuals as part of their investigations of use of force incidents; however, COVID-19 significantly limited the ability of ID to conduct incarcerated individual interviews this Monitoring Period.

  - The Intake Squad Division Order requires the investigator conducting the Intake Investigation, as needed based on the evidence, to attempt to interview incarcerated individuals involved in a use of force incident and those who witness the incident.

      o  *Videotaped Incarcerated Individual Interviews*: Following the success of the video interview pilot, ID began utilizing body-worn camera technology in October of 2018 to offer the option to videotape incarcerated individual interviews.[127]

**ANALYSIS OF COMPLIANCE**

The ID Division have been working tirelessly and demonstrated significant commitment to achieving compliance with the Consent Judgment requirements and attempting to build an effective foundation for compliance. As described throughout this report, this was a transitional Monitoring Period for ID. The Department took critical steps this Monitoring Period to address the backlog of investigations and implement the Intake Squad, which will allow ID to conduct timely and quality investigations going forward. That said, as of the end of the Monitoring Period, ID still has a significant backlog of cases that must be closed.

*Timeliness of ID Investigations*

Full ID Investigations are not currently being completed timely. This includes the Full ID cases that are part of the backlog as well as the Full ID Investigations that are referred for investigation by the Intake Squad as described in detail in the Identifying and Addressing UOF Misconduct section. Accordingly, the Department is in Non-Compliance with the requirement to close Full ID investigations within 120 days. The planned closure of the remaining backlog of Full ID investigations and pending Preliminary Reviews by the end of the year will pave a path toward compliance with the timeliness of investigations.

*Quality of the Investigations*

As described in regards to ¶ 1 above, the majority of Full ID investigations that were completed in this Monitoring Period were part of the ID Backlog Plan, which is discussed above. The quality of Full ID Investigations remains inconsistent and will continue to be impacted by the backlog as investigators will have to balance the closure of both their old cases and any new cases assigned. ID's approach to addressing the backlog is reasonable and has resulted in generally reasonable outcomes, but the quality of these investigations is impacted by both the delay in closing these cases and the triage measures needed to close this volume of cases. The Monitoring Team's assessment of investigations in this Monitoring Period is described in the narrative to this section above. The quality of investigations is not anticipated to improve until the backlog has been cleared. The Department is therefore is in Partial Compliance with provisions ¶ 9(b) to (f) in this section.

- **Use of Force Priority Squad**

The UPS is a useful tool for ID to manage some of the most serious use of force cases so that

---

[127] If an incarcerated individual elects not to provide a statement on video, then the inmate is afforded the opportunity to provide a written or audiotaped statement.

the investigations are both timely and appropriate. The number of cases assigned to UPS must be appropriately balanced as it is important that the division maintain a manageable caseload so that the group is not overwhelmed as it is critical that these cases are managed in a timely manner. UPS is a sound concept and the Monitoring Team is encouraged that ID implemented this triage initiative to address this more discrete group of cases, and that misconduct is addressed with disciplinary charges when warranted. The Remedial Order codifies the requirement to have such a mechanism, as ID is required to prioritize the investigations of certain incidents involving potentially serious and egregious uses of force and/or misconduct by Staff with a history of misconduct. While these cases may be the most serious, they often do not rise to the level of potential criminal misconduct and therefore must be addressed by the Department as soon as possible. As of the end of the Monitoring Period, there were 14 cases pending amongst the four investigators on the UPS Priority Squad.

- ***Incarcerated Individual Interviews***

As discussed in ¶ 2, statements from incarcerated individuals are obtained by the Facility and incorporated into the investigation by ID. ID may also conduct an interview of the incarcerated individual as well. ID's interviews occurred in January and February. However, interviews of incarcerated individuals by ID were conducted on a limited basis beginning in March due to COVID-19. Beginning in mid-March through the end of the Monitoring Period, Intake Investigators did not conduct interviews, and incidents which required interviews were referred for Full ID investigations. Some investigators within ID conducted interviews for serious situations during this time period (*e.g.* PREA, inmate deaths) but for the most part, if an interview was required for a more routine use of force incident then the interview was put on hold until entry to the Facilities was appropriate given the health crisis. Interviews by ID (for Intake Investigations and Full ID investigations) began again in the Eleventh Monitoring Period.

For incarcerated individual interviews that were conducted by ID early in the Monitoring Period, the Monitoring Team continues to find that overall, the quality of incarcerated individual interviews has improved since the Effective Date, particularly related to the privacy of the setting which has an inherent positive effect on the quality of the interview. A review of recorded incarcerated individual statements revealed that interviews are being conducted with more privacy when possible and the recordings themselves (sometimes including video) are of good quality. In terms of an assessment of allegations by an incarcerated individual, the Monitoring Team found that allegations are not often credited except when supported by other evidence (*e.g.* video).

| **COMPLIANCE RATING** | ¶ 9 (a). Non-Compliance |
|---|---|
| | ¶ 9. (b) to (f) Partial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- In mid-June 2019, the City granted a request for additional staffing for the Investigation and Trials Division as part of the fiscal year 2020 budget cycle and awarded the Department additional staffing lines. The Department has continued to actively hire both civilian and uniformed Staff as investigators and supervisors to fill the allocated personnel lines.

  o HR continues to recruit specifically for ID staffing positions.

  o ID interviewed almost 100 investigators in January-March 2020 Officers and offers were extended to 20 candidates for various positions within ID.

    ▪ As of the end of the Monitoring Period, 14 individuals were onboarded, two were still pending OMB approval/background investigations, one individual was ultimately not recommended for hire, and three individuals declined the offers.

  o ID also promoted 12 investigators to investigating supervisors this Monitoring Period.

- Interviewing, hiring, and onboarding of new staff was all limited in the second half of the

- Monitoring Period due to COVID-19. City budgetary considerations and hiring freezes were also imposed in this Monitoring Period which may impact hiring going forward.

- As of the end of this Monitoring Period, ID had the following staff working in the division:

| ID Staffing Levels *As of July 15, 2020* | | | | | |
|---|---|---|---|---|---|
| Position | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 |
| Deputy Commissioner | 1 | 1 | 1 | 1 | 1 |
| Assistant Commissioner | 1 | 1 | 1 | 1 | 1 |
| Director/Acting Director | 0 | 4 | 4 | 6 | 5 |
| Deputy Director Investigator (DDI) | 6 | 6 | 6 | 8 | 8 |
| Administrative Manager | 0 | 1 | 1 | 1 | 0 |
| Supervising Investigator | 9 | 13 | 17 | 25 | 25 |
| Supervisor ADW | 3 | 0 | 0 | 0 | 0 |
| Investigator Captain | 16 | 16 | 14 | 15 | 14 |
| Investigator Civilian | 58 | 77 | 87 | 89 | 100 |
| Investigator Correction Officer | 77 | 71 | 67 | 89 | 90 |
| Support Staff | 12 | 12 | 12 | 10 | 11 |
| **Total** | **183** | **201** | **210** | **245** | **255** |

- The charts below demonstrates the breakdown of staffing within ID, and caseload information for the teams with UOF cases:

| Facility Team Staffing & Case Breakdown for Team with UOF Caseloads *As of July 15, 2020* | | | | | |
|---|---|---|---|---|---|
| **Number of Assigned Staff** | | | **Number of Assigned Cases** | | |
| Team/Unit | Supervisors[128] | Investigators | Preliminary Reviews or Intake Investigations | FULL ID | Non-UOF |
| Intake Squad | 8 | 51 | 363 | 0 | 0 |
| AMKC/TD (3 Teams) | 3 | 14 | 818 | 129 | 76 |
| NIC/OBCC (3 Teams) | 3 | 14 | 655 | 111 | 70 |
| MDC & Cts. (3 Teams) | 3 | 17 | 866 | 129 | 76 |
| RMSC/GRVC (4 Teams) | 4 | 14 | 294 | 150 | 76 |
| RNDC/VCBC (3 Teams) | 3 | 17 | 571 | 73 | 15 |
| UPS | 1 | 4 | 0 | 18 | 2 |
| **Totals** | **25** | **131** | **3567** | **672** | **322** |
| **Other Teams** | | | | | |
| PREA (7 Teams) | 8 | 28 | | | |
| Intel, Training | 3 | 5 | | | |
| Arrest Team | 0 | 8 | | | |
| K-9 | 1 | 8 | | | |
| Administration and Tracking | 2 | 16 | | | |

**ANALYSIS OF COMPLIANCE**

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. The City has provided funding to increase ID's staffing and the Department has continued to make significant efforts to recruit, interview, and hire additional investigators, supervisors, and leadership for ID. As part of this effort, the Department has dedicated reasonable resources to recruit staff to the division through social media campaigns, job fairs and other strategies to attract candidates. As demonstrated above, over the last two years, ID has increased the

---

[128] Eight DDIs oversee these teams which are not included in the Supervisor totals in this column or the Supervisors column in the chart below.

overall staffing levels within the division by 72, which is impressive, considering that there has been some attrition during this time as well so the net gain of Staff is actually greater than 72.

This is a time of significant transition within ID as the process to conduct investigations is evolving and so the staffing needs of the Division are in flux. In particular, there are certain short-term efforts that must be made to address the significant backlog, while simultaneously conducting Intake Investigations and any corresponding Full ID referrals. Therefore, in the short term, ID must balance the staffing needs to meet both demands. However, once the backlog is closed by year end, many of the staff focused on the backlog can be re-deployed depending on the needs of the division at that time.

Adequate staffing and appropriate case assignment are critical to conducting timely and quality investigations. The Monitoring Team continues to encourage the City to ensure that the Department and ID have all the necessary resources so that it can fulfill the requirements of the Consent Judgment. The Monitoring Team will be working closely with ID leadership to assess the appropriate deployment of resources to support the overall goal that investigations are consistently and reliably completed as required.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY INVESTIGATIONS)

Facility Investigations

¶ 13.     All Use of Force Incidents not subject to a Full ID Investigation shall be investigated by the Facility where the incident is alleged to have occurred or where the Inmate(s) subject to the Use of Force is housed. All investigations conducted by the Facility ("Facility Investigations") shall satisfy the following criteria, provided that the Facility may close its investigation if the Preliminary Reviewer determines based on the Preliminary Review that it is not necessary for the Facility to take any additional investigative steps because all of the criteria set forth in Paragraph 7(e) above are satisfied, in which case the Preliminary Reviewer's documented determination would serve as a substitute for the Facility Report referenced in subparagraph (f) below.

     a.     *Objectivity* [. . .]
     b.     *Timeliness* [. . .]
     c.     *Video Review* [. . .]
     d.     *Witness Statements* [. . .]
     e.     *Collection and Review of Medical Evidence* [. . .]
     f.     *Report* [. . .]
     g.     *Supervisory Review* [. . .]
     h.     *Recommended Disciplinary Action* [. . .]
     i.     *Referral to ID* [. . .]
     j.     *Role of Integrity Control Officer* [. . .]

The Department ceased conducting Facility Investigations in the Ninth Monitoring Period. The Consent Judgment requirements for ¶ 13 were significantly altered as part of the overall Intake Squad implementation, as outlined in *Exhibit A* to the Remedial Order (dkt. 350)). Therefore, the provision was not rated during this transitional Monitoring Period.

| COMPLIANCE RATING | ¶ 13. Not Rated |
|---|---|

### VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INCARCERATED INDIVIDUALS UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a.    The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b.    The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID created a "Horizon Youth ID Team" when Horizon opened consisting of a DDI, a Supervisor, five civilian investigators and a correction Officer investigator to investigate HOJC incidents. The team was re-assigned in this Monitoring Period as DOC's presence in HOJC was drawn down this Monitoring Period. The investigators with pending cases maintained those cases on their docket in order to close them.

- There were no UOF incidents in the Tenth Monitoring Period involving DOC Staff at HOJC.

### ANALYSIS OF COMPLIANCE

With the limited presence of DOC Staff in HOJC this Monitoring Period, and the fact that there were no use of force incidents involving DOC Staff at HOJC, the need for the Youth ID Team has dissipated and so the investigators were re-assigned to other Facility teams. While the HOJC Team no longer technically exists, the investigators on the team must close out any cases that they were assigned and remain pending. The chart below demonstrates the current status of all 601 UOF incidents that have occurred since Horizon opened in October 2018, only ~150 of which occurred in the Ninth Monitoring Period, and zero occurred in the Tenth Monitoring Period.

| Case Status | Total as of July 15, 2020 |
|---|---|
| **Closed** | **355 (59%)** |
|   -  *Closed – Expedited/PIC/Full ID* | -  *280* |
|   -  *Closed - Facility Investigation* | -  *75* |
| **Pending** | **246 (41%)** |
|   -  *Pending Full ID Investigations* | -  *10* |
|   -  *Pending Preliminary Reviews* | -  *236* |
| **Grand Total** | **601** |

The Monitoring Team encouraged ID to focus on the closure of the 246 pending cases as part of the ID Backlog Project and these cases are expected to close in the early part of the next Monitoring Period. Given the process for conducting these investigations is the same as investigations across the Facilities, the assessment of the quality of the Full ID investigations for HOJC cases is captured by the

discussion in ¶ 9 above. The Monitoring Team will continue to monitor this issue until all cases at HOJC are closed.

There were no Facility Investigations conducted this Monitoring Period so ¶ 14(b) was not applicable.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 14.** Not applicable<br>**¶ 14. (a)** Partial Compliance<br>**¶ 14. (b)** Not applicable |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against incarcerated individuals. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- ID has a dedicated PREA Team that is responsible for investigating all PREA-related allegations. While all incidents even remotely sexual in nature are referred to ID by the Facilities and 311 as "PREA allegations," the PREA Team identifies which of these actually meet the definitions of sexual abuse and sexual harassment as defined by the PREA standards ("PREA reportable").[129] Those that do not meet the definition are still investigated by the PREA Team but are identified as "non-PREA reportable."

- The PREA Team continued to include a Director, Deputy Director, eight Supervisors, 28 investigators and two administrative staff.

- ID continued to complete investigations timely, and at the end of the Monitoring Period, no cases were pending.

**ANALYSIS OF COMPLIANCE**

Although this provision pertains only to 16-, 17-, and 18-year-old incarcerated individuals ("Young Incarcerated Individuals"), it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations that are sexual in nature involving Young Incarcerated Individuals. Given that this provision targets "sexual assault," the Monitoring Team has used the PREA rubric as the best representation of the intended scope,

---

[129] See https://www.prearesourcecenter.org/ec-item/1291/1156-definitions-related-to-sexual-abuse for the definitions in PREA standard 115.6.

although PREA cases also include sexual harassment in addition to sexual abuse. The Monitoring Team continues to review all closed investigations to check that the PREA/Non-PREA designation is reasonable and consults with ID whenever a difference of opinion is identified.

As noted in the "Current Status of 16- and 17-year-old Youth" section of this report, if a youth alleges mistreatment by ACS staff, the allegation is reported to the New York State Justice Center for screening/investigation. If a youth alleges mistreatment by DOC Staff, the allegation is reported to ID for investigation. There were no allegations involving DOC Staff from youth at HOJC during this Monitoring Period.

<u>Allegations</u>

As shown in the table below, of the 148 allegations involving Young Incarcerated Individuals since January 1, 2016, a total of 107 (72%) met the definition of sexual abuse or sexual harassment and were deemed "PREA reportable," while 41 (28%) did not meet the definition and were deemed "non-PREA reportable." There were no allegations of sexual abuse, harassment or any other allegation of a sexual nature during the current Monitoring Period.

| Number of Allegations Involving Young Incarcerated Individuals, by Date of Report | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 | Total |
| **Total Cases** | **13** | **21** | **16** | **10** | **4** | **29** | **37** | **18** | **0** | **148** |
| PREA | 10 *(77%)* | 12 *(57%)* | 7 *(44%)* | 9 *(90%)* | 2 *(50%)* | 23 *(79%)* | 34 *(92%)* | 10 *(56%)* | ~ | 107 *(72%)* |
| Non-PREA | 3 *(33%)* | 9 *(43%)* | 9 *(56%)* | 1 *(10%)* | 2 *(50%)* | 6 *(21%)* | 3 *(8%)* | 8 *(44%)* | ~ | 41 *(28%)* |

*Note: PREA = allegation meets the definition of sexual harassment or sexual abuse from PREA Standard 115.6; Non-PREA = allegations of a sexual nature that do not meet the definition of sexual harassment or sexual abuse (e.g., consensual relationships, single occurrences of sexualized comments or remarks, etc.)*

Typically, the Monitor's Reports have provided the number of allegations, by Facility, as shown in the first table below. However, given the changes in housing and supervising agency that have occurred (*i.e.,* during the next Monitoring Period, 16- and 17-year-olds will no longer be housed or managed by DOC)*, an examination of the number of allegations by age group is useful. In particular, the second table below highlights that allegations from 18-year-olds have historically comprised a smaller proportion of all allegations.

| Number of PREA Allegations by Young Incarcerated Individuals, by Facility | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 | Total |
| BXCT | ~ | ~ | ~ | ~ | ~ | 1 | ~ | ~ | ~ | 1 *(1%)* |
| EMTC | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ |
| GMDC | 4 | 4 | 2 | 2 | 1 | ~ | ~ | ~ | ~ | 13 *(12%)* |
| GRVC | ~ | ~ | 1 | ~ | ~ | ~ | ~ | ~ | ~ | 1 *(1%)* |
| HOJC | ~ | ~ | ~ | ~ | ~ | 17 | 25 | 10 | ~ | 52 *(48%)* |
| OBCC | 1 | ~ | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 1 *(1%)* |
| RNDC | 3 | 6 | 3 | 7 | 1 | 3 | 4 | 1 | ~ | 28 *(26%)* |
| RMSC | 2 | 2 | 1 | ~ | ~ | 2 | 5 | ~ | ~ | 12 *(11%)* |
| **TOTAL** | **10** | **12** | **7** | **9** | **2** | **23** | **34** | **11** | **~** | **108 *(100%)*** |

| Number of PREA Allegations by Young Incarcerated Individuals, by Age | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 | Total |
| 16-17yo | 5 (50%) | 8 (67%) | 4 (57%) | 7 (78%) | 1 (50%) | 19 (83%) | 24 (71%) | 9 (82%) | 0 | *77 (71%)* |
| 18yo | 5 (50%) | 4 (33%) | 3 (43%) | 2 (22%) | 1 (50%) | 4 (17%) | 10 (29%) | 2 (18%) | 0 | 31 (29%) |
| TOTAL | 10 | 12 | 7 | 9 | 2 | 23 | 34 | 11 | 0 | 108(*100%*) |

<u>Closed Investigations</u>

The following outcome analysis includes only those cases meeting the PREA definitions of abuse or harassment. As explained in the previous Monitor's Report (*see* pg. 180), the Monitoring Team uses a 120-business day timeframe to assess timely case closure.

The Department continued its solid performance in closing cases timely. Of the 4 PREA cases closed during the current Monitoring Period, 100% were closed within the 120-business day timeline. This marks the third Monitoring Period where upwards of 90% of cases closed timely.

| Closed PREA Investigations, by Date Closed | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Jan-Jun 2016 | Jul-Dec 2016 | Jan-Jun 2017 | Jul-Dec 2017 | Jan-Jun 2018 | Jul-Dec 2018 | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 | TOTAL |
| **Total PREA Cases** | **0** | **7** | **1** | **4** | **25** | **15** | **35** | **20** | **4** | **111** |
| **Timing of Investigation** | | | | | | | | | | |
| *Within 120 bus. days* | ~ | 2 (29%) | ~ | 1 (25%) | 1 (4%) | 9 (60%) | 34 (97%) | 18 (90%) | 4 (100%) | 69 (62%) |
| *121+ business days* | ~ | 5 (71%) | 1 (100%) | 3 (75%) | 24 (96%) | 6 (40%) | 1 (3%) | 2 (10%) | ~ | 42 (38%) |
| **Outcome of Investigation** | | | | | | | | | | |
| *Unfounded* | ~ | 3 (43%) | 1 (100%) | 1 (25%) | 7 (28%) | 9 (60%) | 25 (71%) | 12 (60%) | 1 (25%) | 59 (53%) |
| *Unsubstantiated* | ~ | 1 (14%) | ~ | 3 (75%) | 16 (64%) | 6 (40%) | 10 (29%) | 6 (30%) | 2 (50%) | 44 (40%) |
| *Substantiated* | ~ | ~ | ~ | ~ | 1 (4%) | ~ | ~ | | 1 (25%) | 2 (2%) |
| *Referred to the Justice Center* | ~ | ~ | ~ | ~ | ~ | ~ | ~ | 2 (10%) | ~ | 2 (2%) |
| *Missing/Unknown* | ~ | 3[130] (43%) | ~ | ~ | 1 (4%) | ~ | ~ | | ~ | 4 (4%) |

The Monitoring Team reviewed each of the four cases closed during this Monitoring Period.[131] In one case, Genetec footage was not preserved but, given the other evidence available, this error did not appear to compromise the veracity of the investigator's findings. In each case, the investigators' conclusions appeared to be reasonable given the evidence available. One case was sustained for youth-on-youth sexual harassment.

The ID Division has made significant strides in investigating PREA cases timely and fully erased the backlog of cases related to this age group. ID has appointed dedicated and highly qualified leadership to oversee the PREA Team, which has brought an increased focus on tracking cases and conducting more efficient, higher quality investigations. The Team has both sufficient resources and staffing. The Monitoring Team has found that generally the investigators' practices were sound, the findings were reasonable, and cases were closed in a reasonable time period. The Department has maintained Substantial Compliance with this provision.

---

[130] Three of the cases closed during this Monitoring Period had outcomes that could not be easily discerned (*e.g.*, merged with another case that closed during a different monitoring period, marked closed with no specific finding).

[131] The Monitoring Team also reviewed cases classified as not meeting PREA definitions in order to assesses the veracity of those classifications.

| **COMPLIANCE RATING** | ¶ **9.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15, 16 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

¶ 16. The Department shall develop and implement a standardized system and format for organizing the contents of investigation files. Each investigation file shall include at least the following: (a) all Use of Force Reports and witness statements; (b) written summaries, transcripts, and recordings of any witness interviews; (c) copies of any video footage and a written summary of video footage; (d) the Injury-to-Inmate Report; (e) relevant medical records (if applicable); (f) color photographs of any Inmate or Staff injuries; (g) the report summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary or other remedial measures, as well as documentation reflecting supervisory review and approval of this report; (h) records reflecting any disciplinary action taken with respect to any Staff Member or Inmate in connection with the incident; and (i) records of any other investigative steps taken.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- ID maintained the Preliminary Review Operations Order issued on November 30, 2016.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications. In the Seventh Monitoring Period, the ID Initiatives Manager did considerable work to facilitate the collection, organization, culling, and revising of these policies and procedures, including:

    o Identifying and collecting over 70 individual memos, policies, procedures, directives or communications to investigators that have been governing the work of ID;

    o Rescinding over 50 of these, and maintaining, revising or replacing all others;

    o Drafting new policies or procedures.

- ID promulgated an Intake Investigations Policy this Monitoring Period.

### ANALYSIS OF COMPLIANCE

#### *ID Investigations*

With support and input from the Monitoring Team, the Department promulgated an Intake Investigation Policy early in the 10th Monitoring Period to codify the requirements for Intake Investigations. The Monitoring Team will work with the Department going forward on additional policy revisions to both address the modifications of the Consent Judgment (as outlined in Exhibit A to the Remedial Order) and to support the overall effort to maintain a sustained process for conducting timely and quality investigations.

#### *Standardized system and format for organizing the contents of investigation files* (¶ 16)

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision

| | |
|---|---|
| is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*. | |
| **COMPLIANCE RATING** | ¶ **15.** Partial Compliance<br>¶ **16.** Not Rated—Inactive Monitoring |

## 6. RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The varied risks facing the Department require flexible, comprehensive, and timely responses. These measures include developing and implementing an Early Warning System (¶ 1); conducting counseling meetings between Facility leadership and any Staff Member who engages in a concerning and/or repeated use of force incidents (¶ 2); identifying systemic patterns and trends related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims related to the use of force (¶ 4); requiring the Office of the Corporation Counsel to notify the Department of all allegations of excessive force that have not yet been investigated by ID (¶ 5); and creating CMS to systematically track investigation and disciplinary data throughout the Department (¶ 6). Each of these is described in more detail below along with the Monitoring Team's assessment of compliance.

| X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM) |
|---|
| ¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.<br>    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.<br>    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.<br>    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Early Intervention, Support, and Supervision Unit ("E.I.S.S.") remains in the Department's Administration Division. The E.I.S.S. unit includes an Assistant Commissioner, Deputy Director and is supported by civilian and uniformed Staff. Uniform Staff assigned to E.I.S.S. were re-assigned for part of the Monitoring Period due to COVID-19 as described further below.

- The work of E.I.S.S. is codified in Directive 5003R-C "Monitoring Uses of Force." The Directive includes specific triggers for E.I.S.S. to identify Staff who are then screened to determine whether they should be placed on monitoring.

- During this Monitoring Period, the leadership of E.I.S.S. began to evaluate the current triggers and screening criteria to determine whether modifications may be necessary.

- Triggers to Identify Staff for Screening for Potential Monitoring:

  o The triggers to identify Staff for screening include an assessment of Rapid Reviews, imposition of formal discipline and PDRs, 5003 counseling history, consideration by the Immediate Action Committee, UOF litigation settled for amounts over $50,000, and imposition of Command Disciplines. These sources are typically analyzed at regular intervals depending on the criteria (*e.g.*, bi-weekly, bi-monthly, or monthly). Based on the Monitoring Team's recommendations, some triggers were put on hold during this Monitoring Period, as discussed further below.

  o E.I.S.S. also receives referrals from Facility leadership (including through Rapid Reviews), the Chiefs, Department executives, and the Monitoring Team for Staff to be considered for screening.

- Screening Staff to Determine Whether to Place on Monitoring:

  o Once Staff are identified, they are considered for E.I.S.S. monitoring via a review of their history with the Department, including, but not limited to, their assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, and an assessment of recent use of force incidents. The purpose of the screening is to determine whether the E.I.S.S. monitoring program could improve a Staff Member's performance.

- Staff Placed on Monitoring:

  o Monitoring a Staff Member is a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command.

  o The Department generally continued to implement E.I.S.S. monitoring as described in the Ninth Monitor's Report at pgs.187-188. However, the monitoring program was modified during COVID-19 by temporarily suspending in-person meetings in March 2020. This impacted both Staff's ability to participate in routine monitoring meetings

and the level of coordination between E.I.S.S. and the Facility leadership, as discussed further below.

- The table below depicts the work of E.I.S.S. during the last three Monitoring Periods and the overall progress of the program since its inception in August 2017:[132]

| Overview of EISS Work | | | | |
|---|---|---|---|---|
| | 8th Monitoring Period | 9th Monitoring Period | 10th Monitoring Period | Program to Date – August 2017 to June 2020 |
| *Screening* | | | | |
| Staff Screened[133] | 92 | 229 | 114[134] | 667 |
| Staff Selected for Monitoring[135] | 27 (29%) | 83 (36%) | 33 (29%) | 232 (35%) |
| *Monitoring* | | | | |
| Staff Began Monitoring Term | 12[136] | 29 | 50 | 177 |
| Staff Actively Monitored[137] | 91 | 96 | 96 | |
| Staff Completed Monitoring | 22 | 45 | 9 | 89[138] |

---

[132] E.I.S.S. began in July 2017, but the more systematic work of E.I.S.S. began in Summer 2018.

[133] Screening numbers for each Monitoring Period include some Staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual Staff screened. Staff are only counted once in the "Program to Date" column, even if the Staff Member was screened in multiple Monitoring Periods.

[134] Screening began for an additional 37 Staff during this Monitoring Period but was not completed before the end of the Monitoring Period. These Staff are not included in the total for the Tenth Monitoring Period.

[135] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff left the Department before monitoring began. Other Staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.* sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not begin a Staff's monitoring term if the Staff Member has subsequently been placed on a no inmate contact post due to the limited opportunity for mentorship and guidance.

[136] This includes two Staff Members who resigned during the Eighth Monitoring Period.

[137] The total number of Actively Monitored Staff for each Monitoring Period includes all Staff who initiated monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

[138] This includes five Staff Members who either resigned or were dismissed while actively engaged in the E.I.S.S. Monitoring program during the Eighth Monitoring Period.

ANALYSIS OF COMPLIANCE

The goal of E.I.S.S. is to identify and support Staff whose pattern and/or practice in engaging in UOF would benefit from additional guidance or mentorship in order to improve practice and minimize the possibility that Staff's behavior escalates to more serious misconduct. In addition to appropriately identifying Staff for monitoring, the success of E.I.S.S.'s monitoring program relies on the quality of mentorship and leadership at the Facility-level to counsel, guide, and reinforce best practices with Staff who need extra support, as discussed in the Ninth Monitor's Report as pgs. 189-190.

This Monitoring Period was a transitional period for E.I.S.S. First, as discussed more below, efforts to mitigate the spread of COVID-19 placed a number of limitations on the ability to implement the program as designed. The E.I.S.S. leadership utilized this time to begin to re-assess the triggers used to screen Staff for monitoring based on recommendations from the Monitoring Team.

*COVID-19 Impact*

The Monitoring Team maintained regular contact with E.I.S.S. leadership throughout the Monitoring Period, particularly regarding the impact of COVID-19. Efforts to mitigate the spread of COVID-19 impacted the work of E.I.S.S. in a number of ways. First, at the end of March 2020, two uniform Staff Members assigned to E.I.S.S. were re-deployed on an emergency basis to support the Department's efforts to receive and track reports from Staff who reported illness. These two Staff Members returned to their assignments at E.I.S.S. at the tail end of the Monitoring Period. Second, in-person E.I.S.S. meetings were temporarily suspended in March 2020.[139] This inhibited the ability to onboard Staff to the monitoring program and to mentor Staff on a bi-monthly basis. E.I.S.S. staff were able to conduct some limited remote onboarding with approximately 10 Staff during the second half of the Monitoring Period (compared to 40 Staff who were onboarded during the first half of the Monitoring Period). Onboarding these 10 Staff was prioritized because they were recommended for monitoring by the Chief of Department's Office or by the Monitor. They received a monitoring placement letter from their Facility leadership along with other written materials describing the purpose of E.I.S.S. E.I.S.S. staff were also able to communicate with and provide support to a handful of Staff who were already on monitoring through informal telephone conversations. Given that Facility leadership was focused on responding to COVID-19, coupled with the inability to have in-person meetings, few advancements were made with Staff placed in E.I.S.S. Furthermore, enhancing Facility-based support for Staff was not a focus during this Monitoring Period, though it remains an important priority for E.I.S.S. staff and the Monitoring Team going forward.

---

[139] In-person meetings between E.I.S.S. staff and Staff on monitoring resumed in July 2020.

*Identification of Staff for Screening & Screening Staff*

      E.I.S.S. uses a variety of triggers to identify Staff with concerning practices and/or problematic behaviors, and the screening process is designed to determine whether a *pattern* or *trend* in the Staff's behavior exists. The source triggers are the first step in *identifying* Staff who may benefit from E.I.S.S. monitoring, and *screening* Staff who meet the triggers is the second step. The goal of utilizing this two-step process is so that the resources utilized for screening individual Staff are focused on Staff more likely to benefit from monitoring in order to best conserve resources.

      The Monitoring Team's assessment of E.I.S.S.'s work found that some source triggers are better than others in identifying Staff with a potential *pattern* of misconduct rather than an isolated occurrence (*see* the Ninth Monitor's Report at pg. 191). The Monitoring Team recommended that E.I.S.S. consider refining the set of triggers to make them more precise, and recommended consideration of limiting certain source triggers which did not appear fruitful (*e.g.* involvement in incidents that resulted in a law suit that was ultimately settled). Following this recommendation, E.I.S.S. staff evaluated the efficacy of the triggers by reviewing the patterns and behavior of those selected for the monitoring program to identify those triggers that most reliably and consistently identified Staff who could benefit from E.I.S.S. This assessment was still ongoing at the end of the Monitoring Period and is expected to be completed during the Eleventh Monitoring Period at which point E.I.S.S. leadership reported it will consult with the Monitoring Team on potential modifications.

      Given the limitations on E.I.S.S.'s work due to the Department's COVID-19 response and likely modifications to the triggers going forward, E.I.S.S. employed a more streamlined screening process during the second half of the Monitoring Period, focusing only on Staff referred by certain sources and those with specific triggers. These triggers included an NPA or guilty verdict with a 30-day penalty or longer, all UOF-related PDRs, all individual recommendations from the Immediate Action Committee, the Commands, the Chief's Office, or ID and Trials. As shown in the table below, E.I.S.S. screened 114 Staff during this Monitoring Period, and selected 33 (29%) for monitoring. Most of those selected were triggered by "other" sources (*e.g.,* formal discipline) and PDRs.

| Source Trigger | *Screened* in 9th Monitoring Period | *Selected* in 9th Monitoring Period | *Screened* in 10th Monitoring Period | *Selected* in 10th Monitoring Period |
|---|---|---|---|---|
| Command Requests | 32 | 5 (16%) | 32 | 3 (9%) |
| Recommendations from Immediate Action Committee | 24 | 11 (46%) | 0 | 0 |
| Settled UOF Litigation[140] | 51 | 3 (6%) | 2 | 0 |
| PDRs (extension/demotion) | 53 | 48 (91%) | 8 | 8 (24%) |

---

[140] The trigger criteria for this source is Staff whose claims against them settled for over $50,000.

| | | | | |
|---|---|---|---|---|
| Other (finalized formal discipline including NPAs, disciplinary probation, etc.) | 69 | 16 (23%) | 72 | 22 (67%) |
| **Total** | **229** | **83 (36%)** | **114** | **33 (29%)** |

While some aspects of E.I.S.S. were understandably limited, the Department remains in Partial Compliance with the requirements of this provision as E.I.S.S. functioned as designed in the first half of the Monitoring Period, E.I.S.S. effectively utilized the second half of the Monitoring Period to be as productive as possible under the circumstances, and the foundation and structure of the program remained throughout the Monitoring Period. The time invested by E.I.S.S. staff in the assessment of the E.I.S.S. triggers will hopefully bear fruit during the next Monitoring Period, and COVID-19 related limitations were markedly diminished beginning early in the Eleventh Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. Whenever a Staff Member engages in the Use of Force three or more times during a six-month period and one or more of these Uses of Force results in an injury to a Staff Member or Inmate, the Facility Warden shall review the Staff Member's involvement in the Use of Force Incidents to determine whether it would be appropriate to meet with the Staff Member to provide guidance concerning the Use of Force ("Counseling Meeting"). When making this determination, the Facility Warden also shall review records relating to the Staff Member's Use of Force history over the past five years, including the number of Use of Force Incidents the Staff Member has been involved in, the severity of injuries sustained by Inmates in connection with those Use of Force Incidents, and any disciplinary action that has been imposed on the Staff Member. If the Facility Warden decides not to conduct a Counseling Meeting, he or she shall document the basis for that decision in the Staff Member's personnel file. Counseling Meetings shall be required if any of the Use of Force Incidents during the six-month period involved an instance where the Staff Member used force that resulted in a Class A Injury to an Inmate. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. The Facility Warden's review and the Counseling Meeting shall be separate from any disciplinary actions taken. The EWS shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 5003R-C "Monitoring Uses of Force" addresses the requirements of ¶ 2 and remains in effect.

- NCU identified the Staff who require mandatory counseling on a bi-monthly basis and compiled the 5003 data, as described in the Eighth Report (at pgs. 172-173), through March 2020.

  - In March 2020, this process was suspended because there were negotiations regarding modifications to this requirement (which were subsequently approved by the Court following the end of the Monitoring Period).

- During this Monitoring Period, Facilities delivered mandatory counseling to 30 of 34 Staff who met criteria for a Class A session (88%), as of February 2020.

- After March 2020, NCU continued to track and follow-up with Facility Leadership regarding the implementation of counseling meetings recommended through Rapid Reviews.
- Between March and June 2020, nine Facilities identified a total of 73 Staff (who were involved in a total of 52 UOF incidents) for counseling, via Rapid Review

**ANALYSIS OF COMPLIANCE**

Counseling sessions required by the Consent Judgment are termed "5003 counseling sessions" in reference to the Directive that codifies the requirements. Counseling sessions are not disciplinary, but rather an opportunity to provide feedback and guidance on using force appropriately and to reinforce non-physical methods for resolving conflicts as discussed in the Eighth Monitor's Report at pg. 173. The Monitoring Team recommended modifications to this provision because the triggers to identify Staff for counseling as originally enumerated in this provision are not appropriately targeted, identification is particularly onerous and ironically, the time-consuming process impedes the overall objective of providing close-in-time counseling following Staff's use of force (*see* Ninth Monitor's Report at pgs. 183 to 185). Following the close of the Monitoring Period, the Court approved modifications to this provision.

*Identifying Staff who Require Counseling*

- ***Mandatory Counseling Sessions***

Prior to suspending the mandatory counseling process on the recommendation of the Monitoring Team, the Department reported that Facilities conducted the mandatory counseling sessions in February 2020, with 88% of the Staff identified (30 of 34 Staff). The Monitoring Team did not conduct an assessment of these counseling sessions given that this process was suspended part way through the Monitoring Period.

- ***Counseling sessions identified through Rapid Reviews***

The Department continued to conduct counseling meetings that were recommended through Rapid Reviews, Facility Referrals or other referral sources.[141] The Department and the Monitoring Team began to scrutinize this process more formally in March 2020.

The number of Staff identified for counseling sessions was lower than expected. Given the response to COVID-19 and the need to limit close contact, some decrease was expected. Even so, Facility Leadership did not identify Staff for counseling as often as the Monitoring Team would

---

[141] The Department suspended identifying Staff for discretionary counseling as originally required by this provision part way through the last Monitoring Period, as described in the Ninth Monitor's Report at pg. 196. Under the original requirements of the Consent Judgment, Staff are *considered* for counseling if the Staff Member is involved in three incidents in six months and one or more of those incidents results in an injury to a Staff Member or Inmate. Facilities then must determine whether a counseling session is appropriate.

reasonably expect given its review of incidents. While setting a discrete target for the number of counseling sessions would not be appropriate, the fact that only 73 Staff (or 52 incidents) were counseled during a four-month period is lower than expected based on the number and nature of questionable conduct identified in UOF incidents the Monitoring Team reviewed.

The Monitoring Team analyzed a sample of 27 of the 35 counseling forms (from five Facilities) flowing from a Rapid Review recommendation. Of these, 24 (89%) had been completed. Of the three forms that were not completed, two were not actually recommended for counseling from the Rapid Review and the third was simply not completed. Among the 24 completed counseling forms, nearly all contained very generic or vague language, making the quality of the counseling session difficult to discern (although this is not necessarily proof of an effective or ineffective counseling session). The counseling meetings occurred between two and 127 days following the incident—obviously, the longer lengths of time undercut the goal of proximal feedback. While 15 counseling meetings (63%) occurred within 30 days of the incident, nine of the counseling meetings (38%) occurred more than 30 days after the incident.

Because of the inherent challenges and limitations of an external party evaluating the effectiveness of the counseling meetings, the Monitoring Team will not assess the quality of counseling meetings. Observing a counseling meeting will inevitably have a chilling effect on a Supervisor's discussion with Staff and reduce the likelihood of a completely open and honest dialogue, negating the purpose of the counseling session (see Ninth Monitor's Report at pg.198). However, the Monitoring Team will continue to assess whether the Department is properly identifying cases where counseling would be appropriate and whether the counseling sessions actually occur. The nature of the misconduct observed by the Monitoring Team in its routine assessment of UOF incidents suggests that the low number of counseling sessions is not commensurate with the number of counseling sessions that should be occurring. This provision is not rated for this Monitoring Period given the upcoming transition to modify the requirements of this provision.

| COMPLIANCE RATING | ¶ 2. Not Rated |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (UOF AUDITOR)

## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall designate a UOF Auditor ("UOF Auditor") who shall report directly to the Commissioner, or a designated Deputy Commissioner.

    a.    The UOF Auditor shall be responsible for analyzing all data relating to Use of Force Incidents, and identifying trends and patterns in Use of Force Incidents, including but not limited to with respect to their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors.

    b.    The UOF Auditor shall have access to all records relating to Use of Force Incidents, except that: (i) the UOF Auditor shall have access to records created in the course of a Full ID Investigation only after such Full ID Investigation has closed; and (ii) the UOF Auditor shall have access to records created by the

<table>
<tr><td></td><td>Trials Division only after the Trials Division's review and, where applicable, prosecution of a case has been completed.</td></tr>
<tr><td>c.</td><td>The UOF Auditor shall prepare quarterly reports which shall: (i) detail the UOF Auditor's findings based on his or her review of data and records relating to Use of Force Incidents; and (ii) provide recommendations to the Commissioner on ways to reduce the frequency of Use of Force Incidents and the severity of injuries resulting from Use of Force Incidents.</td></tr>
</table>

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID assessed UOF incidents on a weekly basis at AMKC, GRVC, MDC, NIC/WF[142], OBCC and RNDC in January 2020. ID discontinued this process upon the launch of the Intake Squad.

- The Department developed an enhanced weekly review of Nunez compliance issues where systemic Facility based operational issues are discussed with leadership from ID, NCU and the Facilities, which is expected to be implemented during the next Monitoring Period.

- Facility Leadership conducts "Rapid Reviews" of all UOF incidents captured on video at each Facility assessing (1) whether the incident was avoidable, and if so, how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) whether the incident involved painful escort techniques; and (5) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type.

- The Department also assessed the overall UOF within the 10th Monitoring Period.

**ANALYSIS OF COMPLIANCE**

These two provisions (§ X., ¶ 3, § V., ¶ 20) are addressed together because maintaining consistent and reliable data combined with the qualitative assessment of this data form the foundation upon which the Department can design and enact problem-specific solutions to its UOF issues.

*Use of Aggregate Reports to Enhance Oversight* (§ V., ¶ 20)

As demonstrated throughout this report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and the "Inmate-on-Inmate Fight Tracker" to identify opportunities to enhance the quality of incarcerated individual supervision or oversight of Staff Members. As such, the Department is in Substantial Compliance with this provision.

*UOF Auditor* (§ X., ¶ 3)

[142] ID combines the assessment of any UOF incidents at NIC and West Facility into one report.

The Monitoring Team recommended modifications to this Consent Judgment provision to streamline this requirement and check that it was achieving the intended goal (as described in the Ninth Monitor's Report at pgs. 184-188) and to allow the Department to engage in a broader effort to routinely collect and analyze data relevant to assessing compliance with the Consent Judgment. The revisions to this provision were approved by the Court as part of the Remedial Order described in the Introduction of this report, and the revised requirements will be applicable in the Eleventh Monitoring Period. As such, the Monitoring Team did not assess the Department's compliance with these requirements in this Monitoring Period.

| COMPLIANCE RATING | ¶ 20. Substantial Compliance<br>¶ 3. Not Rated |
|---|---|

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Office of the Corporation Counsel continues to provide the Department with quarterly reports of lawsuits filed and settled. During this Monitoring Period, the reports from January to June 2020 were shared with the Department. The reports include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum and description of the lawsuit.

- The Office of the Comptroller continues to provide the Department with reports regarding the payment of claims related to UOF incidents. During this Monitoring Period, the two reports covering January to June 2020 were shared with the Department.

- E.I.S.S. staff consolidated the information from the Office of the Corporation Counsel report and identified all UOF-related cases from January to March 2020. E.I.S.S. obtained relevant information (*e.g.,* UOF incident numbers, Facility, Staff names, Staff shield number and classification of all injuries).
  - E.I.S.S. staff previously utilized this information for determining whether Staff may need E.I.S.S. monitoring if their claims were settled for an amount greater than $50,000, however, as discussed in ¶ 1 above, E.I.S.S. staff are considering whether to continue to use this data point going forward.

- The City settled a total of 310 lawsuits with Use of Force related claims between January 1, 2016 and June 30, 2020 for a total of $18,298,180. These claims cover incidents that occurred between 2008 and March 2019.

| | UOF Settlement Cases — Cases Settled between January 1, 2016 and June 30, 2020 (Incident occurred between 2008 and March 2019) | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Settlement | Jan. to June 2016 | | July to Dec. 2016 | | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. To June 2020 | |
| Total | 25 | | 25 | | 34 | | 33 | | 36 | | 43 | | 25 | | 24 | | 65[143] | |
| 0 to $9,999 | 8 | 32% | 5 | 20% | 7 | 21% | 19 | 58% | 13 | 36% | 15 | 35% | 15 | 60% | 8 | 33% | 20 | 31% |
| $10,000 to $49,999 | 13 | 52% | 15 | 60% | 22 | 65% | 10 | 30% | 17 | 47% | 18 | 42% | 6 | 24% | 12 | 50% | 31 | 48% |
| $50,000 to $99,999 | 1 | 4% | 4 | 16% | 3 | 9% | 4 | 12% | 2 | 6% | 7 | 16% | 3 | 12% | 1 | 4% | 9 | 14% |
| $100,000 or more | 3 | 12% | 1 | 4% | 2 | 6% | 0 | 0% | 4 | 11% | 3 | 7% | 1 | 4% | 3 | 13% | 5 | 8% |

| Total Amount Settled | $ 1,976,500 | $ 827,500 | $ 1,906,500 | $ 584,250 | $ 5,529,480 | $ 1,586,000 | $ 2,042,300 | $ 1,401,650 | $2,444,000 |
|---|---|---|---|---|---|---|---|---|---|

**ANALYSIS OF COMPLIANCE**

The required information continues to be shared with Department on a routine basis and is evaluated by E.I.S.S. The assessment of this data is time consuming and burdensome and has not revealed any patterns or practices in Staff behavior that would suggest it is a useful metric for identifying whether Staff involved in cases with settled litigation may need additional support. For example, E.I.S.S. has not found that Staff with settled litigation also have been involved in a pattern of concerning incidents. Accordingly, E.I.S.S. is considering whether revisions to this criterion are necessary and will consult with the Monitoring Team during the next Monitoring Period on any proposal to amend the current approach. By implementing a routine process for receiving and reviewing litigation information related to use of force incidents, the Department maintains Substantial Compliance with this provision.

| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)

¶ 6. By August 31, 2017,[144] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall

---

[143] This data collected for this Monitoring Period is based solely on the Law Department's assessment of whether the settlement related to a UOF incident, but it has not been evaluated by the Department. In prior Monitoring Periods, the Department individually assessed each of these settlements to determine whether it was related to a UOF incident, but that was not done this Monitoring Period.

[144] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* dkt. 297).

incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains a Case Management System that has functionality for tracking Use of Force incidents and Use of Force investigations.

- The Department has conducted all Preliminary Reviews, Intake Investigations, Facility Investigations, and ID investigations in CMS for incidents that occurred since December 13, 2017. The Department also uses CMS to generate and track Command Disciplines.

**ANALYSIS OF COMPLIANCE**

The Department has maintained Substantial Compliance with these provisions since the Seventh Monitoring Period. They successfully developed a computerized system to conduct Use of Force investigations and to impose related discipline (the system is described in the Sixth Monitor's Report at pgs. 123-124)). Further, CMS created the ability to review and aggregate incident- and investigation-based information as required by § V. ¶ 18. As described in detail in the Eighth Monitor's Report at pgs. 181-182, the system's implementation has challenges and requires some modification. The long-term sustainability of CMS requires sufficient elasticity so that it can be modified to improve efficiency when conducting investigations, in particular, capturing the work of the new Intake Squad. Early in the current Monitoring Period, the Department created workarounds to address some of these issues and which support the implementation of the Intake Squad. Unfortunately, the Department does not have an internal capability to modify CMS; changes must be made through the vendor either as change orders for items previously approved (which carries an additional expense) or to correct deficiencies within the system. Either way, contracting issues with the vendor have impeded the Department's ability to make any changes to the system.

These interim solutions are adequate for capturing most of the investigative work, but the ability to adequately track necessary data is impacted. Instead, the Department is relying on manually updated spreadsheets. The Department and Monitoring Team will continue to discuss CMS modifications needed to fully implement the Intake Squad going forward and will develop a path forward to enable those modifications.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **6.** Substantial Compliance<br>¶ **18.** Substantial Compliance |

7.   **STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)**

Meaningful, consistent, and timely accountability is critical to deterring Staff from using excessive and unnecessary force and is a key component to ensuring Staff at all levels are fulfilling their duties. Active management and supervision are required to ensure Staff adequately complete their work; this includes guidance, training, counseling, and imposing discipline (when appropriate). The Identifying & Addressing Misconduct section of this report provides an overview of the various ways Staff are held accountable, including discipline. This section focuses on the Department's efforts to impose formal discipline (including PDRs, NPAs, and OATH Trials) once the misconduct has been identified and the investigation has been completed.

COVID-19 had a significant impact on the Department's ability to impose timely discipline during this Monitoring Period. The majority of Trials staff suddenly shifted to working from home, which required adapting to new technology/equipment for remote access to Department files. Operational disruptions at the Facility-level made meeting with Staff more difficult. OATH proceedings were suspended for nearly three months (March-May 2020) and once converted to a virtual platform, occurred in smaller numbers while virtual protocols were devised. It is particularly notable that even with these widespread challenges, the division was still able to close more Trials cases than during the Ninth Monitoring Period.

Even so, the Department's progress toward timely and appropriate Staff discipline has not appreciably improved since the Ninth Monitoring Period. Unfortunately, the projected influx of cases referred from ID (which is alleviating its backlog and conducting Intake Investigations more quickly than investigations in the past) may further impair the Division's ability to keep pace with the pending cases.

The high level of unnecessary and excessive force occurring at the Department translates into a large number of cases that require discipline to be imposed. So far, almost all formal discipline (88%) that has been imposed since the Effective Date occurred at least one year after the incident occurred. In 44% of the cases closed during this Monitoring Period, discipline was imposed more than two years from the incident date. In a few cases, *four years* separated the incident and the imposition of discipline. Further, 87% of the 1,050 cases pending the imposition of formal discipline occurred at least a year ago. The current state of affairs is simply unacceptable. These outcomes are far below what is needed to impose appropriate and meaningful discipline.

Concerted and creative solutions are needed to address the lack of accountability for Staff, as well as the anticipated exacerbation of a backlog of cases within Trials as cases begin to move through ID more quickly. Imposing timely and meaningful discipline requires both efficient investigations and an ability for the Trials Division to prosecute the cases as expeditiously as possible. The investigation processes are improving, but heightened focus is required and protocols to expedite the prosecution of disciplinary cases need to be developed. Under the Remedial Order, the Department is required to create efficiencies in the following procedures: (i) serving discovery, which is currently hampered by the sheer volume of materials that need to be assembled; (ii) the selection and use of expert witnesses; (iii) using specific criteria to prioritize and expedite the resolution of certain disciplinary cases, so that the more egregious cases have a more timely resolution; and (iv) to achieve settlements outside of the OATH process, in order to support processing cases more timely overall. Further, as discussed below, improvements to the OATH proceedings are needed—and required by the Remedial

Order—to expand its capacity and to address the Monitoring Team's concerns that OATH decisions do not align with the requirements of the Consent Judgment.[145]

Given the long delays in imposing formal discipline, the Monitoring Team also recommended that the Department focus on determining whether any immediate corrective action should be imposed as part of the initial assessment of a UOF incident, either through Rapid Reviews, Intake Investigations or other ad hoc reviews by leadership. Finally, the Monitoring Team may recommend specific cases for immediate corrective action, expedited investigations, and/or expedited disciplinary proceedings. All of the initiatives described above are codified in the Remedial Order and will be a focus during the Eleventh Monitoring Period.

*OATH Proceedings & Imposition of Formal Discipline*

The Trials Division prosecutes cases involving UOF violations and imposes formal discipline against *tenured* Staff[146] by evaluating investigations that identified UOF violations and drafting and serving charges as appropriate.

Understanding the delays and problems associated with the OATH process requires some familiarity with the context of these proceedings and the steps involved in the process. Following the service of charges, the Trials attorney prepares discovery and seeks a disciplinary outcome either through a settlement or at Trial. The adjudication of discipline for *tenured* Staff has been delegated to the Department to the Office of Administrative Trials and Hearings ("OATH"), an administrative law court that conducts adjudication hearings pursuant to New York State Civil Service Laws § 75. Tenured civil service employees are also afforded certain rights by New

---

[145] *See* Seventh Monitor's Report at pgs. 151-159.

[146] Tenured Staff are Staff that have successfully completed their probationary period. The probationary period for Correction Officers is two years and the probationary period for Captains and Assistant Deputy Wardens is one year.

York State Civil Service Law §75 (2). Any employee who is the potential subject of disciplinary action has the following rights, among others, before any disciplinary action is taken:[147]

- a right to representation, with advance notice of this right in writing;

- a reasonable period of time to obtain representation;

- a right to timely action and the statute of limitations to bring charges is 18 months after the alleged misconduct;[148]

- written notice of charges and at least eight days to submit an answer (however not required), with an option for short extension;

- a right to a hearing;

- a right to summon witnesses on the employee's behalf (including ability to examine and cross-examine)

Respondents may negotiate a settlement with or without proceedings before OATH. The Department is responsible for scheduling the pre-trial conferences before OATH and maintains the burden of proof by a preponderance of the evidence. OATH also maintains rules of procedure.[149] The ALJ conducts a pre-trial conference in an attempt to facilitate a settlement. If a settlement cannot be reached, a trial is scheduled in which an ALJ (and a different ALJ from the one that conducted the pre-trial conference) hears and assesses the evidence to evaluate whether or not the Staff Member has violated policy. The ALJ then issues a written report and

---

[147] An employee may be suspended without pay for up to 30 days after being notified of charges and awaiting the outcome of the hearing. If the charges are related to an arrest, Correction Officers can be suspended indefinitely.

[148] Due to COVID-19, the statute of limitations was tolled on March 20, 2020 through the end of the Monitoring Period.

[149] *See* OATH's Rules of Procedures at https://www1.nyc.gov/site/oath/trials/rules-of-practice.page.

recommendation to the Commissioner. If the ALJ determines that a violation occurred, the decision also includes a proposed penalty, with penalty ranges set by law to include a reprimand, a fine of up to $100, a suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[150] Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this range of penalties allowed under the NY Civil Service Law (*e.g.*, maximum penalty is limited to 60 compensatory days). The Commissioner makes the ultimate decision regarding the imposition of discipline and can accept the factual findings and penalty recommendation of the ALJ or may modify them, as appropriate, to resolve the case. The Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

Although only a very small proportion of cases are ultimately adjudicated at a trial, a large number of UOF-related disciplinary cases have a pre-trial conference with an ALJ to discuss the matter in an attempt to settle the case. It is the Monitoring Team's understanding that Staff often seek a pre-trial conference because they believe they can obtain more lenient penalties by negotiating cases at pre-trial conferences at OATH. Accordingly, Trials staff report that Staff are increasingly requesting a pre-trial conference. At these pre-Trial conferences, the ALJ opines on the matter, the evidence, and the impact of precedent on how these cases should be resolved. Pre-trial conferences are usually when witnesses and evidence to be used at trial are also identified. Conferences generally occur one day each week and thus a limited number of slots are available (generally 12 or less per week).[151] Therefore, it can sometimes take months

---

[150] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[151] It is important to note that these OATH proceedings are utilized for any discipline the Department is seeking. This includes UOF and non-UOF related misconduct, so these conferences do not exclusively address UOF related discipline matters.

before the pre-trial conference can be scheduled. Following a conference, many cases settle via NPA, but those that do not incur extensive delays before a trial can be scheduled.

With respect to the OATH case law precedent, that directly impacts the negotiation of disciplinary outcomes, the Monitoring Team remains concerned about these cases and the interplay with the New Use of Force Directive and Disciplinary Guidelines and the Department's ability to impose meaningful and timely discipline. The application of OATH precedent during settlement negotiations appears to result in outcomes that are not always proportionate to the Staff misconduct and/or result in more lenient penalties. [152] Further, the protracted nature of the OATH proceedings, on top of the investigation delays within the Department, results in discipline being imposed significantly after the incident occurred. All of this impacts the Department's ability to impose proportionate and meaningful discipline (via NPAs or after a trial) as required by the Consent Judgment.

Because proceedings before OATH remain a key dynamic in how the Department imposes discipline, the Monitoring Team made a number of recommendations, many of which were codified in the Remedial Order, to address the problems currently facing OATH proceedings. First, OATH's capacity to conduct pre-trial conferences must be expanded to meet the demand. Given the increasing number of cases before Trials and the increasing number of respondents availing themselves of OATH, it is vital that the Department ensures there are enough opportunities for cases to be heard. As a result, every month, OATH and the Department must convene at least 50 disciplinary proceedings involving UOF misconduct. Second, discipline imposed via Trials and via OATH must be aligned. For this reason, the Remedial Order specifies

---

[152] *See* Seventh Monitor's Report at pgs. 151 to 159, Eighth Report at pg. 184 and Ninth Report at pg. 208.

that the Disciplinary Guidelines apply to all OATH proceedings. The City, on a routine basis, will advise all ALJs who handle proceedings relating to UOF Violations of: (i) the applicability of the Disciplinary Guidelines to these proceedings; (ii) the City's obligations under the Consent Judgment and the Remedial Order; and (iii) any relevant findings from Monitor Reports. The Monitoring Team will also be closely scrutinizing the pre-trial conferences, OATH Trials and the impact of these proceedings on the ultimate resolution of disciplinary matters.

The Monitoring Team's assessment of compliance with each provision in this section is below.

---

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶¶ 1, 2(e)**
**(TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)**

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

¶ 2.

  e.  If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has various structures to ***identify*** misconduct:
  - Via Rapid Reviews, Preliminary Reviews, Intake Investigations (and corresponding Facility Referrals), the Immediate Action Committee, and through Full ID investigations.
- The Department has various structures to ***respond*** to misconduct including:
  - Corrective interviews, counseling, re-training, Command Discipline ("CD"), and suspension.
  - Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for tenured Staff, and Personnel Determination Reviews ("PDR") for probationary Staff.
- The Department evaluates cases that meet the criteria of ¶ 2(e), as well as other concerning cases, close in time to when they occur through ad hoc reviews by uniform and civilian

leadership and the Immediate Action Committee (which was temporarily suspended in March due to COVID-19 through the end of the Monitoring Period). As part of this process, the Department considers whether immediate action should be taken (*e.g.*, suspension, modified duty) as well as whether the case should be expedited for investigation.

**ANALYSIS OF COMPLIANCE**

¶¶ 1 and 2(e) are addressed collectively because when read together, they require timely, adequate, and meaningful discipline. There are many avenues for the Department to hold Staff accountable or provide support (*e.g.*, counseling, training). Discipline is a key factor in accountability and can be imposed via CDs, PDRs, or formal discipline. Suspension and CDs allow for timelier accountability, while PDRs and formal discipline allow for greater penalties. Below is a chart outlining the overall discipline that has been imposed in the last two Monitoring Periods. While the number of CDs imposed has decreased (discussed in more detail in Identifying & Addressing Misconduct), the Department's use of suspensions, PDRs, and NPAs has increased in this Monitoring Period. The Identifying and Addressing Misconduct section of this report provides an in-depth assessment of the Department's accountability measures and the current state of affairs and expands on the ways the Department has not been able to consistently or reliably identify and address misconduct through all of the avenues available to the Department. Further, there are approximately 4,450 pending investigations (the majority of which have been pending over six months) of use of force incidents so it is expected that the number of cases requiring discipline will increase once these investigations are completed.

| Overall Discipline Imposed | | |
| --- | --- | --- |
| | 9th Monitoring Period | 10th Monitoring Period |
| CD | 488 | 187 |
| Suspensions | 24 | 36 |
| PDRs | 40 | 62 |
| NPAs | 135 | 159 |
| **Total** | **687** | **444** |
| | | |
| *Pending Trials Cases (as of the end of the Monitoring Period)* | *633* | *1050* |

The Department does not impose appropriate or meaningful discipline timely enough to achieve compliance with ¶ 1. While the Department has imposed some discipline, the majority of discipline imposed is protracted which minimizes the meaningfulness of the discipline. No formal discipline has been imposed for any misconduct that occurred in the Tenth Monitoring Period and about 65 Staff have been disciplined for conduct that occurred in the last Monitoring Period. Of the approximately

1,800 cases in which formal discipline has been imposed since the Effective Date, 88% were closed a year or more after the incident occurred and almost 50% were closed two or more years after the incident occurred (see chart below). Compounding this further is the significant uptick in pending cases in Trials. There are about 800 cases *pending* that occurred at least a year and a half ago (approximately 570 cases from 2018, 215 cases from 2017 and a handful of cases are from 2016 or before). In total there are 1,050 cases pending with Trials as of the end of the Monitoring Period (an increase of 58% increase from the number of cases pending at the end of the Ninth Monitoring Period). The chart below identifies the status of all cases within Trials and the period of time between the incident date and the case closed or, for those pending cases, the time between the incident date and July 15, 2020.

| Formal Discipline Imposed by Date of Incident *As of July 15, 2020* | | | | | | |
|---|---|---|---|---|---|---|
| Time between incident date and case closure or pending as of July 15, 2020 | | | | | | |
| | | Closed Discipline | | Pending Discipline | | Total |
| 0 to 1 year from incident date | 222 | 12% | 136 | 13% | 358 | 13% |
| 1 to 2 years from incident date | 806 | 45% | 453 | 43% | 1259 | 44% |
| 2 to 3 years from incident date | 497 | 28% | 408 | 39% | 905 | 32% |
| More than 3 years from incident date | 265 | 15% | 53 | 5% | 318 | 11% |
| | 1790 | | 1050 | | 2840 | |

In terms of the discipline that has been imposed, the Department has imposed slightly more NPAs in this Monitoring Period (159) than the last (135) but fewer than the Fifth through Seventh Monitoring Periods (see chart below). While it is encouraging that the Department was able to at least impose more discipline than the last Monitoring Period (especially given the disruptions that COVID-19 created in this Monitoring Period), it is also not keeping pace with the volume of ID cases being referred to Trials.

| NPAs Imposed by Monitoring Period | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 |
| Total | 153 | 244 | 249 | 235 | 84 | 135 | 159 |

As for addressing certain misconduct in a more immediate fashion (per ¶ 2(e)), an immediate administrative response (*e.g.*, suspension, re-assignment, counseling, etc.) is necessary to address certain misconduct close in time to the incident and ensure that Staff are held to a common understanding and expectation of how to reasonably utilize force. The Department made some progress this Monitoring Period in identifying misconduct close in time to the incident and effectuating suspensions when necessary through ad hoc reviews (instead of through the Immediate Action

Committee which was temporarily suspended due to COVID-19). These efforts are discussed in the Identifying and Addressing Misconduct section of the report. That said, based on the Monitoring Team's review of use of force, the Department does not consistently identify all cases that would merit an immediate response. Given the current backlog of cases awaiting investigation and discipline, the need for more immediate action is even greater to ensure misconduct is addressed in a timely fashion. Increasing the Department's focus on immediate corrective action is a central goal of the Remedial Order, designed as one element to address the Department's sustained Non-Compliance with the requirements to impose meaningful and adequate discipline. As noted in the narrative above, beginning in the Eleventh Monitoring Period, the Monitor may make recommendations to the Department to consider incidents in which it may take immediate corrective action and the Department will be required to respond within 10 business days (*see* Remedial Order, ¶ C2). After the close of this Monitoring Period, the Monitoring Team began making these recommendations in earnest which will be discussed in future reports.

| COMPLIANCE RATING | ¶ 1. Non-Compliance<br>¶ 2(e). Partial Compliance |
| --- | --- |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgment (*see* pgs. 25-26 of the Consent Judgment for the full text).

- The range of disciplinary responses available for *tenured* Staff are the use of a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5

compensatory days), the loss of compensatory days via an NPA or OATH decision,[153] placement on disciplinary probationary,[154] demotion, or termination.

- The range of disciplinary responses available for *probationary* Staff is the use of a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5 compensatory days). Formal discipline is generally determined through the PDR process which allows for the probationary period to be extended either for 3 or 6 months,[155] demotion (if a Captain or ADW)[156] or summary termination for a Correction Officer. Probationary Staff can also be referred for formal discipline (described in the bullet above) via the Trials Division instead of imposing discipline through the PDR process.

- *Tenured Staff*: As of the end of the Monitoring Period, at least 2,200 cases that occurred since the *Effective Date* involving tenured Staff were submitted to Trials,[157] a 37% increase from the 1,596 at the end of the Ninth Monitoring Period. Since November 1, 2015, the Trials Division also resolved approximately 600 cases for incidents that occurred prior to the Effective Date.

  - About 1,211 of the 2,200 cases submitted to Trials as of the end of the Monitoring Period related to incidents that *occurred* after October 27, 2017[158] (therefore discipline imposed for these incidents is governed by the Disciplinary Guidelines). Of these 1,211 cases, 916 (76%) remain pending and 295 (24%) have been closed as of July 15, 2020. Out of these 295 cases, 253 (86%) were resolved with an NPA, one was guilty at OATH and 41 (14%) were administratively filed or resulted in deferred prosecutions.

---

[153] The number of forfeited days is generally capped at 60 days because it is the maximum number of days that can be imposed via the OATH process pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3. However, Staff may agree to settle a disciplinary matter outside of the OATH process for more than 60 days.

[154] A Staff member may agree to settle for a term of disciplinary probation. However, pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3, a term of disciplinary probation may not be imposed via the OATH process.

[155] The probationary period may also be extended for any period of time that the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[156] Probationary Correction Officers may be terminated via PDR. However, probationary Captains and ADWs may only be demoted via PDR, if termination is sought then this must be completed through the formal discipline process.

[157] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and a half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November 2015.

[158] As of the end of the Monitoring Period, the most recent incident pending with Trials occurred on May 28, 2020.

- o   In this Monitoring Period, the Department resolved 126 (79%) of the 253 NPAs for incidents that took place on or after October 27, 2017, the date the Disciplinary Guidelines came into effect.
- *Probationary Staff*: At least 243 PDRs[159] were submitted for incidents involving probationary Staff that occurred since the Effective Date through the end of the Monitoring Period (13 of these cases (5%) *occurred* during this Monitoring Period). Of these 243 cases, 205 (84%) resulted in a determination, 23 (9%) Staff resigned, and 15 (6%) Staff tenured.[160] This includes the 40 PDRs *submitted* in the current Monitoring Period (which covers incidents from a few different Monitoring Periods).

ANALYSIS OF COMPLIANCE

The Disciplinary Guidelines implemented on October 27, 2017 address the requirements of the Consent Judgment. As the disciplinary process is different for probationary and tenured Staff, the first two sections below provide an overview of the discipline imposed for *probationary* Staff and then *tenured* Staff. Following these two sections, the Monitoring Team evaluates the overall disciplinary continuum, OATH decisions, and supervisory accountability.

*Probationary Staff*

The probationary period is a critical juncture in a Staff Member's career. During this time, Staff learn the responsibilities and expectations of their position and are evaluated for their fitness for the role. As discussed in the Identifying & Addressing Misconduct section of this report, the Department has maintained its revised processing of PDRs, which is now a more consistent and reliable mechanism for imposing discipline for probationary Staff. The enhancements to this process and additional layers of oversight have resulted in more reasonable outcomes that are consistent with the requirements of the Consent Judgment.[161] Further, in this Monitoring Period, no Staff Member tenured before the PDR could be processed.[162]

---

[159] The historical issues in tracking this information may mean that additional PDRs were submitted prior to January 2017 and were not tracked appropriately. However, the tracking of PDRs vastly improved beginning in January 2017.

[160] *See* Sixth Monitor's Report at pgs. 37 and 38, Seventh Monitor's Report at pgs. 49 to 50, Eighth Monitor's Report at pgs. 59 to 60.

[161] *See* Seventh Monitor's Report at pgs. 48-50.

[162] *See* Sixth Monitor's Report at pgs. 36 to 39 for a discussion regarding the Monitoring Team's findings regarding the impact of delayed processing of probationary Staff. It is worth noting that the backlog of cases pending with ID has resulted in at least a few cases where a Staff Member tenured before a PDR memo could even be submitted by ID for processing. In these cases, an MOC will need to be drafted to address the identified misconduct.

During this Monitoring Period, 40 PDRs were submitted, 6 by a Facility[163] and 34 by ID. All PDRs submitted during the Tenth Monitoring Period, except 3, were decided by July 15, 2020 as outlined in the chart below. The table below shows the outcome of the 240 completed PDRs over the life of the Consent Judgment (202 PDRs with substantive decisions and the 38 PDRs that were not decided due to external factors). In most cases (130 of 202; 64%) the probationary period of the Staff member was extended.

| Date PDR Submitted | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **17** | | **19** | | **38** | | **27** | | **35** | | **60** | | **40** | |
| Demotion | 0 | 0% | 2 | 11% | 1 | 3% | 3 | 11% | 0 | 0% | 4 | 7% | 1 | 3% |
| Extension of Probation - Day/Day | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 3% |
| Extension of Probation - 3 Months | 0 | 0% | 0 | 0% | 5 | 13% | 4 | 15% | 4 | 11% | 9 | 15% | 5 | 13% |
| Extension of Probation - 6 Months | 9 | 53% | 5 | 26% | 21 | 55% | 12 | 44% | 10 | 29% | 28 | 47% | 16 | 40% |
| Termination | 3 | 18% | 4 | 21% | 8 | 21% | 5 | 19% | 15 | 43% | 5 | 8% | 6 | 15% |
| Deferred Decision | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 5% | 0 | 0% |
| MOC | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 4% | 2 | 6% | 1 | 2% | 1 | 3% |
| No Action | 0 | 0% | 1 | 5% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% | 0 | 0% |
| Resignation | 1 | 6% | 1 | 5% | 1 | 3% | 2 | 7% | 4 | 11% | 7 | 12% | 7 | 18% |
| Tenured | 4 | 24% | 6 | 32% | 2 | 5% | 0 | 0% | 0 | 0% | 1 | 2% | 0 | 0% |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 8% |

Overall, the PDR determinations in this Monitoring Period were appropriate and reasonable and deviations from recommendations are generally reasonable and isolated. There were a few cases which are worth noting. First, the Commissioner deviated from ID's recommendations in one case in which more significant discipline was imposed than what ID recommended. Second, seven of the 40 PDRs submitted during this Monitoring Period did not have a final determination because the Staff Member resigned before the PDR was effectuated.[164] Staff Members certainly have the right to resign from their position at any time for any reason, and the Department advised the Monitoring Team that the Department does not offer probationary Staff Members the opportunity to resign rather than be terminated. Resignation during a probationary period is not necessarily surprising given that the Staff Member may decide the position is not a good fit, especially in cases where Staff may have displayed problematic behavior. Six of the seven Staff who resigned did so before the PDR was even drafted, which is a result of the investigation backlog as the investigation was not completed before the Staff

---

[163] As ID now conducts all UOF investigations, it is expected that most UOF related PDRs will be generated by ID.

[164] In total 23 Staff Members have resigned before the PDR could be imposed since the Monitoring Team has started to monitor this issue. Of those 23 Staff Members, the PDR had recommended termination in five of those cases and in one case ID recommended that the Staff member should not be re-hired should they re-apply for a position within DOC

Member left the agency. In these cases, the Department reports that the PDR memo will be placed in the Staff member's file if they were to reapply for a position within DOC. The Monitoring Team previously found that this does not always occur, however the Monitoring Team found in this Monitoring Period the memos did appear as required in the personnel files. While a number of Staff have resigned before the PDR was either drafted or processed the assessment of these cases suggest that they generally occur in the ordinary course of business and do not suggest that these resignations were an attempt to avoid the imposition of discipline. The Monitoring Team intends to continue to closely scrutinize this issue and HR's management of personnel resignations going forward.

One final issue that must be addressed is ensuring that Staff Members are advised about any use of force related misconduct that results in their probation being extended. Staff Members are told that their probation has been extended, but often are not advised of the specific issues and concerns that resulted in the extension and therefore are not in a position to potentially correct the underlying issue that resulted in the imposition of discipline. The Monitoring Team intends to work with the Department in future Monitoring Periods on how this feedback can best be shared with Staff.

_Tenured Staff_

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together. The ultimate imposition of discipline is not siloed within the Department as the Department cannot unilaterally impose discipline and therefore must work with the respondent, and further adjudication within OATH is needed if the respondent is unwilling to settle the matter directly with the Department.

The number of cases resulting in NPAs increased to 159 during this Monitoring Period from 135 during the last Monitoring Period, a 18% increase. The number of cases closed in each Monitoring Period has fluctuated. While the number of cases closed has increased following a drop off in the first half of 2019, the number of cases closed must increase in order to keep pace with the number of cases that are coming in.

| Penalty Imposed by NPA by Date of Ultimate Case Closure[165] | | | | | | | | | | | | | |
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 153 | | 244 | | 249 | | 235 | | 84 | | 135 | | 159 | |
| Refer for Command Discipline | 16 | 10% | 55 | 23% | 28 | 11% | 39 | 17% | 2 | 2% | 0 | 0% | 0 | 0% |
| Retirement/Resignation | 8 | 5% | 4 | 2% | 2 | 1% | 3 | 1% | 4 | 5% | 3 | 2% | 5 | 3% |
| 1-5 days | 6 | 4% | 26 | 11% | 60 | 24% | 87 | 37% | 16 | 19% | 37 | 27% | 44 | 28% |
| 6-10 days | 5 | 3% | 25 | 10% | 30 | 12% | 38 | 16% | 7 | 8% | 19 | 14% | 18 | 11% |
| 11-20 days | 34 | 22% | 52 | 21% | 54 | 22% | 26 | 11% | 21 | 25% | 38 | 28% | 38 | 24% |
| 21-30 days | 29 | 19% | 39 | 16% | 31 | 12% | 24 | 10% | 12 | 14% | 14 | 10% | 17 | 11% |
| 31-40 days | 9 | 6% | 6 | 2% | 14 | 6% | 4 | 2% | 6 | 7% | 12 | 9% | 17 | 11% |
| 41-50 days | 18 | 12% | 11 | 5% | 16 | 6% | 14 | 6% | 3 | 4% | 0 | 0% | 6 | 4% |
| 51+ days | 28 | 18% | 26 | 11% | 14 | 6% | 0 | 0% | 13 | 15% | 12 | 9% | 14 | 9% |

*Disciplinary Continuum – assessment of sanctions imposed*

The Department must *seek* disciplinary sanctions that are proportional to the severity of Staff misconduct. As noted above, the Department (through Trials) cannot unilaterally impose a disciplinary sanction. An assessment of whether the Department has acted in accordance with the Disciplinary Guidelines is complex. The imposition of individual discipline must consider the facts of each the case, any aggravating and mitigating factors, prior disciplinary history, and also incorporate considerations of case precedent at OATH. The ability to identify potential patterns and trends with respect to the imposition of discipline by the Department is further complicated by the backlog of cases such that cases are addressed over a protracted period of time. In terms of evaluating the discipline imposed, the Monitoring Period considers whether discipline is imposed when merited (meaning the number of cases in which discipline is sought when a violation is identified - discussed below), the time taken to impose discipline (discussed throughout the report) and the severity of the sanction imposed (discussed below).

The majority of discipline imposed is the relinquishment of compensatory days (*e.g.*, vacation days) as demonstrated in the chart above. Given the volume and type of cases pending before Trials has evolved, the range of disciplinary responses has also grown. Prior to the Effective Date, Trials used to generally only receive referrals for cases with more significant misconduct as these were the majority of cases investigated by ID. The types of misconduct referred to Trials now reflects a broader spectrum

---

[165] This analysis is confined to discipline that was imposed and does not consider discipline that is almost imposed (*e.g.*, pending approvals) or that is in the process of being imposed.

of violations as the types of cases investigated by ID has broadened. For instance, Trials now settles certain cases for a Command Discipline with a specified number of days up to five days.[166]

The Monitoring Team assessed a sample of over 70 (36%) out of 194 total cases closed in this Monitoring Period to see if the discipline was reasonable or not. In the majority of cases reviewed, the outcomes were reasonable and appeared consistent with the Disciplinary Guidelines (for those cases that occurred after October 27, 2017).[167] A small number of cases closed with questionable outcomes and one case closed with an outcome that appeared unreasonable to the Monitoring Team. With respect to the cases that the Monitoring Team identified as questionable outcomes, these cases are ones in which the outcome was not necessarily unreasonable, but reasonable minds may differ on what the ultimate outcome should be. While the Monitoring Team's assessment of the case suggests that a different outcome may have been more appropriate, the final outcome was not unreasonable.

- **Significant Discipline**

Certain incidents will require significant discipline (including demotion, resignation, or termination) to be imposed. The Department cannot unilaterally terminate a tenured Staff Member as Staff Members are entitled to due process. The Department may *seek* termination at OATH, which can then be granted either through the OATH trial (and accepted by the Commissioner) or through an Action of the Commissioner following the completion of the OATH trial.[168] The Monitoring Team has continued to only identify a few cases that *may* meet the criteria of the *mandatory termination* provisions (¶ 2(d)(i) to (iv)). This, of course, is positive in that the conduct that requires *mandatory termination* does not appear to be routinely or consistently occurring.

The Department is not limited to seeking termination on the cases that meet the standards enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases where a significant penalty of demotion or termination could appropriately be sought given the level and/or pattern of misconduct and for the Department to meet its commitment of a zero-tolerance policy for excessive and unnecessary force.[169]

Formal discipline has been imposed in at least 999 instances (involving approximately 775 individual Staff Members) on *tenured* Staff for misconduct related to incidents that occurred between the Effective Date and July 15, 2020. Of these 999 cases, 222 cases (22%) involved the imposition of

---

[166] Trials no longer settles a case for undetermined number of Command Discipline days, which would require a hearing at the Facility for the reasons discussed in the Seventh Monitor's Report at pgs. 42-44.

[167] The Monitoring Team's assessment of the discipline imposed included incidents that occurred prior to October 27, 2017, thus the new Disciplinary Guidelines did not apply, as well as incidents that occurred after October 27, 2017 when the Disciplinary Guidelines went into effect.

[168] The Staff member can appeal a decision of termination.

[169] *See* § IV. (Use of Force Policy), ¶3(a)(iii) of the Consent Judgment.

significant discipline for 30 compensatory days or more,[170] an NPA for irrevocable retirement/ resignation,[171] or termination, as demonstrated in the chart below. The Department closed 75% more cases with significant discipline in this Monitoring Period (n=49) compared with the prior Monitoring Period (n=28) and this Monitoring Period closed the greatest number of cases with significant discipline than any other prior Monitoring Period since reliable tracking began.

In terms of significant discipline imposed (via Trials or PDR) since the Effective Date (see chart below), the Department has imposed 201 NPAs with compensatory days of 30 days or more, 69 Staff were separated from the Department[172] and 11 *probationary* Supervisors have been demoted. Given the backlog of investigations, certain cases remain pending that appear to involve serious misconduct that will likely merit the imposition of significant discipline, but discipline has not yet been imposed.[173]

| Significant Discipline Imposed for Misconduct | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Related to UOF Incidents that Occurred Post November 1, 2015 | | | | | | | | | |
| Date Discipline Imposed | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 | Total | |
| 30 to 39 Days | 3 | 8 | 23 | 15 | 7 | 13 | 15 | 84 | 30% |
| 40 to 49 Days | 3 | 8 | 10 | 10 | 3 | 0 | 8 | 42 | 15% |
| 50 to 59 Days | 0 | 4 | 4 | 0 | 11 | 6 | 5 | 30 | 11% |
| 60 Days | 3 | 8 | 6 | 0 | 5 | 6 | 14 | 42 | 15% |
| 61 days or more | 3 | 0 | 0 | 0 | 0 | 0 | 0 | 3 | 1% |
| Irrevocable Retirement | 2 | 3 | 1 | 1 | 2 | 1 | 4 | 14 | 5% |
| Irrevocable Resignation | 0 | 0 | 0 | 0 | 1 | 2 | 1 | 4 | 1% |
| Termination of Tenured Staff | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 3 | 1% |
| Termination of Probationary Staff | 3[174] | 3 | 7 | 9 | 13 | 5 | 8 | 48 | 17% |

---

[170] The maximum penalty that can be imposed by law via the OATH process is 60 days. Accordingly, the Monitoring Team considers imposition of discipline for 30 days or more to be a "significant penalty."

[171] The Department reports that Staff facing significant discipline and/or the likelihood of termination sometimes choose to resign or retire rather than risk being terminated. In these cases, the Department may elect to settle the case with the Staff member for irrevocable retirement or resignation. These cases have the same effect as termination because the Staff member is separated from the Department. These represent a small proportion of all significant discipline (about 10%).

[172] 48 *probationary* Correction Officers have been terminated as a result of UOF-related misconduct and 21 *tenured* Staff have separated from the Department as a result of UOF related misconduct (either via termination or irrevocable resignation/retirement).

[173] The Monitoring Team has identified certain cases that may meet these criteria and recommended that they are considered on a priority basis by the Department to resolve these matters.

[174] This includes two PDRs that closed between November 2015 and December 2016.

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Demotion of Probationary Supervisors | 0 | 1 | 0 | 5 | 0 | 4 | 1 | 11 | 4% |
| | 17 | 35 | 52 | 40 | 42 | 37 | 58 | 281 | |

Overall, the Department is imposing significant discipline in the cases that merit it, although, as noted above, there are some cases in which the outcome was questionable (discussed above under disciplinary continuum).

*OATH opinions*

As part of the Monitoring Team's assessment of the imposition of discipline, the Monitoring Team has evaluated both the OATH opinions rendered in this Monitoring Period as well as the outcome of a sample of OATH pre-trial conferences given the impact that OATH proceedings have on the Department's overall effort to impose meaningful and timely discipline.

The Monitoring Team reviewed the OATH decisions for the two use of force-related cases which had completed trials at OATH this Monitoring Period. In one case, the ALJ found the Staff Member guilty of utilizing an impermissible hold around the incarcerated individual's neck and recommended suspension without pay for 35 days. The Department ultimately resolved this case, and one other case involving the same Staff Member, for a penalty of 40 compensatory days and two years of disciplinary probation. The Monitoring Team found the decision and ultimate resolution as reasonable.

For the other case, the respondents were found Not Guilty. While the determination of Not Guilty was likely reasonable, the analysis of the objective evidence did raise some concerns. This case related to four Staff Members' failure to report a head strike utilized by another Staff Member. Upon review of the evidence for this case, the Monitoring Team found the video and other available evidence demonstrated a head strike occurred, but, the question of whether the respondents *saw* the head strike and therefore should have reported it was difficult to prove given the available evidence. The Court found that the Department did not prove the head strike occurred, which is a questionable determination given the evidence presented. The objective evidence was not definitive of whether the Staff Members *saw* the head strike and therefore the Not Guilty determination was not unreasonable *per se*, but the assessment of the objective evidence did raise concerns about the fidelity to which the evidence was credited and considered.

The Monitoring Team also assessed the impact of the ALJ's input during pre-trial conferences by reviewing the history and outcome of a full day's worth of cases presented for pre-trial conference in front of one Judge. Five use of force-related cases were presented for pre-trial conference over the course of the day, and all cases ultimately settled for NPAs with the guidance and encouragement of the Judge. It appeared from the notes of the conference that the Judge appropriately identified the strengths and weaknesses of each side's case to facilitate settlement. It is worth noting, while the

outcomes were generally reasonable, all NPAs completed following the pre-trial conference were more favorable to the respondent than the initial offer from the Trials attorney.

The Monitoring Team will continue to closely scrutinize OATH proceedings and any decisions rendered to assess the impact of OATH proceedings on the Department's ability to seek meaningful discipline and in line with the appropriate policies and guidelines required by the Consent Judgment (and the Remedial Order).

*Supervisory Accountability*

Supervisor accountability is imperative to changing the Department's culture and improving Staff conduct, as discussed throughout this report. Supervisors determine what behavior will or will not be tolerated in the many day to day interactions they have with their Staff and are responsible for a significant part of on the job learning for Staff.

As part of the assessment of discipline imposed, the Monitoring Team evaluated the discipline imposed by rank. Outlined below is the status of discipline within Trials based on Uniform Staff rank. Significantly more Correction Officers have been subject to discipline than supervisors, which by itself is not necessarily surprising. Correction Officers make up the largest proportion of Staff at the Department and are most likely to be involved in a use of force given their direct contact with incarcerated individuals. Supervisors are expected to be involved in fewer UOF incidents, by nature of their role and responsibilities. That said, the amount of formal discipline imposed for supervisors is less than what would be expected for the misconduct identified, including violations such as inadequate supervision and/or failure to supervise.

| Total Discipline by Uniform Staff Rank (incidents that occurred post Effective Date) As of July 15, 2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Correction Officers | | Captains | | ADW | | DWs | | Total |
| Closed Discipline | 733 | 70% | 254 | 24% | 58 | 6% | 2 | 0% | 1047 |
| Pending Discipline | 859 | 74% | 270 | 23% | 38 | 3% | 0 | 0% | 1167 |
| Total | 1592 | | 524 | | 96 | | 2 | | 2214 |

The Monitoring Team analyzed the supervisors who had been formally disciplined since January 2017 and the majority of discipline imposed relates to conduct that occurred prior to January of 2019. Based on the Monitoring Team's review of UOF incidents and observation of violations (*e.g.*, failure to supervise adequately, failure to de-escalate the incident or utilizing unnecessary and excessive force, etc.), it is concerning that discipline for supervisors is not occurring more frequently.

*Conclusion*

The Department has a system in place to discipline both probationary and tenured Staff that addresses identified misconduct on a continuum depending on the severity of the violation. Due to the lag between the incident occurring and the date discipline is imposed, the Department is unable to consistently apply discipline that is effectively addressing the misconduct, even though the Department has imposed generally reasonable sanctions and more significant discipline this Monitoring Period than

any prior Monitoring Period. Further, the Department will not achieve meaningful culture change nor address the persistent use of unnecessary and excessive force until supervisors are also consistently and timely held accountable. The Monitoring Team continues to encourage the Department to employ the full spectrum of disciplinary sanctions, including termination, when merited by the level and/or pattern of misconduct. The Department is therefore in Partial compliance with this requirement.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **2. (a) to (d)** (Develop Guidelines) – Substantial Compliance<br>¶ **2. (a) to (d)** (Act in Accordance with the Guidelines)<br> • *Probationary Staff* – Partial Compliance<br> • *Tenured Staff* – Partial Compliance |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS)

¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

    a.    If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

    b.    If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

    c.    The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

• Referral for Discipline

    o    *Tenured Staff*: ID refers the majority of cases for discipline. ID and Trials coordinate on certain cases in an effort to either fast track certain cases or to ensure that charges are served before the Statute of Limitations expires. In some cases, Trials will draft and serve charges before receiving the official MOC to ensure charges are served timely. The Facility serves almost all of the charges and ID staff serve the balance of any charges.

- o *Probationary Staff*: Discipline for probationary Staff is conducted through a PDR. Either the Facility or ID may submit a memo to HR seeking a PDR determination. The PDR is then evaluated and approved by the First Deputy Commissioner and/or the Commissioner.[175]
- Formal Disciplinary Process
  - o Trials drafted and served 534 charges in this Monitoring Period, using the process described on pgs. 176-177 of the Fourth Monitor's Report.
  - o Trials leadership reported it continues to emphasize timely service of discovery.
  - o Trials reported that it continued to settle cases outside of the OATH process and after pre-trial conferences at OATH.
  - o Trials completed 183 closing memos during this Monitoring Period.
  - o A total of 1,050 use of force cases were pending at the end of the Monitoring Period (of these, 9 are pending final approvals and 14 are on hold pending law enforcement conducting an investigation on whether to bring criminal charges).

**ANALYSIS OF COMPLIANCE**

*ID Referrals* (¶ 3(a))

The Consent Judgment requires the Deputy Commissioner or Assistant Commissioner of ID to approve any investigations that recommends charges or PDRs within 30 days of the investigation's completion date. While delays at all levels occurred within the investigation backlog, generally the leadership within ID approves charges or PDRs in a timely manner following the close of the investigation. Investigations conducted by the Intake Squad allows incidents to get to Trials more quickly. There were 35 investigations closed with charges by the Intake Squad during this Monitoring Period. All of these cases were closed and approved with charges in less than 26 business days from the incident date.

*Facility Referral of MOC to Trials* (¶ 3(b))

This provision is not applicable because all investigations are completed by ID.

*Trials* (¶ 3(c))

The Monitoring Team's assessment of the Department's ability to impose appropriate and meaningful discipline is evaluated in ¶ 2 above. This assessment focuses on the processes within the Trials Division to expeditiously prosecute cases.

- *Status of Closed Cases*

Outlined below is a chart of the discipline cases that have closed in Trials in this Monitoring Period. Most cases continue to be closed through NPA.

---

[175] In certain cases, the First Deputy Commissioner must consult with ID before making a determination. There are also cases in which the Commissioner must review and approve the PDR.

| Discipline Imposed by Date of Ultimate Case Closure | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | Jan. to June 2017 | | July to Dec. 2017 | | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| **Total** | 201 | | 288 | | 266 | | 248 | | 100 | | 167 | | 194 | |
| NPA | 153 | 76% | 244 | 85% | 249 | 94% | 235 | 95% | 84 | 84% | 135 | 81% | 159 | 82% |
| Termination | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 1% | 0 | 0% | 2 | 1% |
| Administratively Filed | 36 | 18% | 32 | 11% | 12 | 5% | 6 | 2% | 8 | 8% | 25 | 15% | 20 | 10% |
| Deferred Prosecution | 12 | 6% | 8 | 3% | 2 | 1% | 5 | 2% | 6 | 6% | 6 | 4% | 8 | 4% |
| Adjudicated/Guilty | 0 | 0% | 4 | 1% | 1 | 0% | 2 | 1% | 0 | 0% | 0 | 0% | 1 | 1% |
| Not Guilty | 0 | 0% | 0 | 0% | 2 | 1% | 0 | 0% | 1 | 1% | 1 | 1% | 4 | 2% |

- *Deferred Prosecution*

Inevitably, some Staff may choose to leave the Department with charges pending and no resolution. These cases are then deferred for prosecution. In this Monitoring Period, eight cases resulted in deferred prosecutions.[176] The case will be re-opened and prosecuted if the Staff Member does apply to work at the Department again. For this to occur successfully, it is important that the Staff Member's personnel file contains a letter outlining the pending charges that could not be adjudicated because the Staff Member left the Department. The Monitoring Team analyzed the records for 39 Staff (with a total of 48 cases) who had deferred prosecution since the Effective Date. Out of the 39 Staff, only 23% had the correct paperwork in their files, demonstrating a breakdown of this process in HR. While the volume of Staff with deferred prosecution cases is very small and the number of Staff who rejoin the Department is even smaller, the lapse in adequate compliance with these procedures is concerning. The Department reported that it intends to address these findings and improve its record keeping. The Monitoring Team will re-evaluate this process in future Monitoring Periods.

- *Administratively Filed Cases*

Cases are administratively filed when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a Staff Member resigns before charges can be served). All such cases are reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Commissioner of ID & Trials before they are closed. As discussed in more detail below, the Monitoring Team continues to find that in general the Trials' determination to administratively file certain cases is appropriate and reasonable as the evidence or circumstances did not support the imposition of discipline.

---

[176] The Monitoring Team confirmed these Staff Members were no longer employed by DOC.

There were 20 cases administratively closed this Monitoring Period, a similar volume as in the Ninth Monitoring Period (23). The Monitoring Team reviews all such cases. These 20 cases were administratively closed for different reasons: three because the Staff Member resigned, retired, or died; and 17 were administratively filed because Trials determined they could not sustain the charges for the following reasons: (1) the charges were served on the *wrong* Staff Member (mistaken identity during the course of the investigation) (four cases); (2) because there was not sufficient evidence to support charges stemming from a rejected Command Discipline (four cases);[177] (3) upon reconsideration of the facts of the underlying charge the Trials Attorney concluded the behavior of the Staff Member was not in fact a violation or Trials would not be able to meet their burden of proof that the violation occurred (nine cases).

Overall, the Monitoring Team found that the decision to administratively file 18 of these 20 cases was reasonable. However, it is worth noting that the four cases that were administratively filed due to mistaken identity highlights some concerns with the underlying investigation. Unfortunately, in all four cases, charges could not be brought against the correct Staff Member because either the correct Staff Member could not be identified or the statute of limitations had expired. With respect to the four rejected CD cases that were administratively filed, the decision to administratively file those cases was reasonable. Those cases all related to incidents in which OC spray was allegedly utilized within less than three feet in violation of the Chemical Agents Policy. In each of these cases, the objective evidence of the distance of deployment was not clear. While deployment of OC spray at a very close range (less than one foot) is of serious concern, the evidence in these cases did not appear to suggest OC spray was deployed at that close a range and further it could not be proven that it was less than three feet. The determination to administratively file the other remaining ten cases were reasonable because the Staff member either was no longer with the Department or the available facts did not support the imposition of discipline.

The decision to administratively file *two* of the 20 cases was questionable. In both cases, the question centered on whether the use of OC spray was necessary when it was deployed. In one example, it appeared the Staff Member may have precipitated the incident in which the use of OC spray was then used to prevent the incarcerated individual from splashing water on the Officer. In the other example it could be argued that the Staff Member may have used OC spray after the incarcerated individual's aggression ceased. These two questionable cases are the exception, however, and do not alter the overall finding that the determination that the cases administratively filed in this Monitoring Period were generally reasonable.

---

[177] A Staff Member may reject a Command Discipline. In that case, an MOC is then generated and formal discipline is initiated.

- *Expert Witnesses and Consultation*

The Trials Division's development of the case may involve consultation and/or findings of expert testimony to establish whether the Staff Member's conduct violated the relevant policy. These experts include staff from the Training Academy and ESU leadership who develop and teach Staff on the relevant policy requirements (*e.g.,* Use of Force Policy, Chemical Agents). The experts may evaluate the Staff Member's conduct and opine on whether there is a violation. The Monitoring Team has previously identified circumstances in which the expert finding was inconsistent with the ID investigation conclusion. Given these findings, the Monitoring Team recommended that the Department identify specific Staff to serve as experts and ensure they have adequate training and experience to serve in this capacity. The Monitoring Team will work with the Department in the Eleventh Monitoring Period to address the selection and use of expert witnesses as required by the Remedial Order.

- *Expeditious Prosecution of Disciplinary Cases*

Assessing the expediency of prosecutions requires the review of several processes. This includes timely service of charges and discovery, and that Trials has options (beyond conducting a trial) to resolve cases timely, and that there are sufficient conferences available should an OATH proceeding be required.

The prosecution of disciplinary cases involves a number of stakeholders, including the respondent, their counsel, and OATH. Therefore, significant coordination and various scheduling issues must be addressed in order to prosecute a case. This is further compounded by the fact that OATH pre-trial conferences occur only one day a week which impacts the ability to timely address cases that require the involvement of an ALJ for a Pre-Trial conference and/or Trial. All of this reinforces the need for Trials to have the ability to assess the individual circumstances of each case and have multiple options to move a case forward.

As expected, the influx of cases from ID contributed to a significant increase in the number of cases the Trials Division now has to process. The Trials Division received almost 600 new cases during this Monitoring Period, compared to the Seventh through Ninth Monitoring Periods, in which there were approximately 300 to 400 new cases in each Monitoring Period. For many of these 600 new cases, they are already very stale by the time they reach Trials and so there is additional pressure on Trials to close the case quickly to avoid adding even more delays to the imposition of discipline. As with previous Monitoring Periods, Trials has had to balance the evaluation and drafting of charges for a large number of case referrals as well as managing the cases currently on their docket. On top of this, COVID-19 imposed its own set of administrative challenges with working from home, the courts being closed and the Facilities being in a state of emergency dealing with COVID-19.

- *MOCs*

The first step to impose discipline is the approval of the Memorandum of Complaint ("MOC") that must be issued following the close of the ID Investigation. The MOC is drafted in CMS by the ID division and then it is submitted to the office of Chief of Administration's ("COA") tracking inbox. A Staff member in the COA's office reviews the MOC to ensure all information is correct and that it is not a duplicate MOC for the same incident, a supervisor then reviews the MOC for accuracy and the MOC is then shared with the Chief of Administration, who must approve the MOC and then provide it to Trials. In this Monitoring Period, the Monitoring Team conducted various analyses into the timing of Trials cases and found that there was a delay in the approval of MOCs by the Chief of Administration's (COA) office, in part due to the transition to the new process via CMS. The MOCs follow a specific workflow through CMS which requires the COA to approve the MOC before the case is officially assigned to Trials. The office of COA subsequently enhanced its process to routinely assess pending MOCs on a weekly basis instead of bi-monthly. The Monitoring Team subsequently tracked this enhanced process and found the issue quickly subsided and time for MOC approvals improved.

- *Service of Charges*

Since January 2017, the Trials Division has maintained a consistent, reliable, and sustainable process to serve charges timely. Charges are drafted by the Trials attorney after they have completed a thorough review and assessment of the investigation and identified the specific policy violations that have been substantiated. This is a critical component in bringing the case. The Trials Division served 534 charges in this Monitoring Period, exceeding its record set in the last Monitoring Period of the largest number of charges served in any Monitoring Period (398 were served in the 9th Monitoring Period, 301 were served in the 8th Monitoring Period, 489 were served in *all* of 2018 and 381 were served in *all* of 2017). In total, 97% of charges were served within 30 days of either receipt of the MOC or when the Trials attorney drafted the charge.[178] Accordingly, Trials has maintained Substantial Compliance with this requirement.

- *Service of Discovery*

Following the issuance of charges, discovery must be provided to the respondent. The Trials Division reports that it attempts to serve discovery close in time to the service of charges. In this Monitoring Period, discovery was served in at least 431 cases (a 54% increase from the Ninth Monitoring Period). Of the 1050 pending cases, 567 (54%) have had discovery served.

---

[178] 155 charges were served within 30 days of receipt of the MOC. 364 charges were served within 30 days of the charges being drafted. In these cases, generally the MOC was received after the charges served, but the charges were served before the MOC was received to preserve the statute of limitations.

The Monitoring Team has encouraged the Department to serve discovery as close in time to the service of charges to facilitate resolution of the matter. Discovery involves receiving and collecting all relevant paperwork and evidence from ID once they close the case, reviewing all evidence, copying all evidence, making appropriate redactions and sending the case materials to opposing counsel. In an attempt to settle certain cases outside of the OATH process, where misconduct is generally clear on the video, the Trials Division will send just the video and relevant paperwork to opposing counsel (as opposed to the complete discovery file). Some, but not all cases, may resolve the matter at this stage, which minimizes the administrative burdens of collecting and sharing all the materials. Historically, discovery was mailed to counsel for respondents. With COVID-19, the Department devised ways in which discovery could be more easily shared over e-mail, which has helped to support discovery being served in a timelier manner.

Of the 431 cases in the Tenth Monitoring Period where discovery was served, 2% of these were served before charges were served, 28% within 30 days of when charges were served and 69% more than 30 days after charges were served. While the overall number of cases in which discovery has been served has increased, the time to serve discovery must be improved. To support the expeditious prosecution of cases, the Department will be developing guidance in the Eleventh Monitoring regarding the disclosure of discovery.

- *Time Cases are Pending & Time to Close Cases*

The Consent Judgment requires that Trials prosecute cases as expeditiously as possible, under the circumstances, but does not require cases to be closed within a specific period of time. An evaluation of the Trials workflow requires an assessment of both the age of the pending cases as of the end of the Monitoring Period and the time it took to resolve cases that closed in the Monitoring Period. This assessment considers the time it takes for a case to be processed within Trials after the investigation has closed. The processing of cases certainly requires Trials to ensure it has systems to manage cases efficiently. That said, the Trials Division does not have exclusive control in managing its caseload. For instance, if a case requires and/or a Staff Member requests an initial (or subsequent) conference before OATH then this must be scheduled with OATH which can protract the process because OATH generally only provides conference time slots once a week. Further, a small number of cases may be on hold while they are being evaluated by law enforcement, which can often be a protracted process as described in ¶ 3 of the Use of Force Investigations section of this report.

At the conclusion of the case once a disposition has been reached (*e.g.,* NPA, administrative filing, deferred prosecution, etc.), a closing memo is drafted (providing the history of the Staff member's background and the proposed resolution) which is subsequently approved by the Deputy General Counsel of Trials, the Deputy Commissioner of ID & Trials and the Commissioner. Trials completed about the same number of closing memos as in the prior Monitoring Period, as demonstrated in the chart below. About half of closing memos were completed within six months of

charges being served. Another 28% of cases were closed between six months and a year of charges being served (slightly down from 33% in the previous Monitoring Period). Accordingly, the majority of cases closed by Trials (75%) in this Monitoring Period were closed within a year of receipt of the case. The time to close cases in Trials has not changed significantly in the past 18 months.

| Completed Trials Closing Memos<br>Timing between service of Charges & Closing Memo Date<br>As of July 15, 2020 | | | | | | |
|---|---|---|---|---|---|---|
| Closing Memos completed | Eighth Monitoring Period | | Ninth Monitoring Period | | Tenth Monitoring Period | |
| Total | 85 | | 186 | | 183 | |
| 0 to 3 months | 21 | 25% | 41 | 22% | 46 | 25% |
| 3 to 6 months | 17 | 20% | 48 | 26% | 40 | 22% |
| 6 to 12 months | 28 | 33% | 61 | 33% | 52 | 28% |
| 1 to 2 years | 10 | 12% | 25 | 13% | 36 | 20% |
| 2 to 3 years | 1 | 1% | 4 | 2% | 2 | 1% |
| 3+ Years | 6 | 7% | 0 | 0% | 2 | 1% |
| Unknown | 2 | 2% | 7 | 4% | 5 | 3% |

As noted throughout this report, Trials' caseload has continued to grow across Monitoring Periods. As outlined in the chart below, a total of 1,050 cases were pending (a 58% increase from the number of cases pending as of the end of the last Monitoring Period (n=663)). The length of time or reason the cases are pending as of June 30, 2020 are outlined in the chart below.

| Cases pending with Trials as of June 30, 2020 | | |
|---|---|---|
| *Pending service of charges* | 42 | 4% |
| *Pending 120 days or less since service of charges* | 373 | 36% |
| *Pending 121 to 180 days since service of charges* | 115 | 11% |
| *Pending 181 to 365 days since service of charges* | 278 | 26% |
| *Pending 365 days or more since service of charges* | 219 | 21% |
| *Pending Final Approvals by DC of ID and/or Commissioner* | 9 | 1% |
| *Pending with Law Enforcement* | 14 | 1% |
| **Total** | **1050** | |

In evaluating the status of cases pending with Trials, most cases (77%) have been pending within Trials for less than a year, with half of all cases pending less than six months. About 21% of cases have been pending more than a year since charges were served. While the time cases take to close and/or are pending within Trials may not yet be exorbitant, the underlying concern about the time cases are pending with Trials is the fact that a lot of these cases are already very old by the time they reach Trials due to the ID backlogs. While this is not entirely in Trial's remit, it is nonetheless critical

that Trials close cases as expeditiously as possible to support the imposition of discipline as close as possible to the incident.

- *Settling Cases Outside of the OATH process*

Trials has developed a number of initiatives in an attempt to settle cases outside of the OATH process. Historically, the Department would only settle cases after at least a pre-Trial Conference occurred at OATH. However, Trials' ability to settle cases outside of the OATH process has demonstrated that cases can and should be resolved more expeditiously and that not all cases require a proceeding before OATH. This Monitoring Period, less than a third of cases were closed outside of the OATH process, which is a decrease from the Eighth and Ninth Monitoring Periods in which half of the cases closed in each of those Monitoring Period were closed outside of the OATH process. As the volume of cases pending before Trials continues to grow, the Monitoring Team continues to encourage the use of these strategies given their efficacy in closing cases more quickly and the volume of pending cases Trials is now facing.

- *Approval of Trials Closing Memos*

A closing memo must be completed for each case at Trials. The Monitoring Team evaluated the time taken within Trials to draft, edit, finalize, and approve the memo to determine if the time frame was reasonable. During this Monitoring Period, 79% of all NPA closing memos were drafted and finalized by the Trials' attorney and approved by the Deputy General Counsel within one month of the NPA being executed (an increase of 19% from the Eighth Monitoring Period and 5% from the Ninth Monitoring Period). The Monitoring Team encourages Trials to continue to complete closing memos as soon as possible to maximize efficiency in imposing discipline.

- *Conclusion*

In this Monitoring Period, Trials served more charges (534 charges, 140 more than last monitoring period) while closing about the same number of cases than in the prior Monitoring Period. That said, the Trials Division has more cases than before given the significant increase in case referrals from ID. The Intake Squad has the potential to improve the timeliness of dispositions from the incident date but only if similar delays are not then created in the Trials Division. A concerted, proactive, and creative approach to addressing the resolution of these cases is required to close these cases timely, and with proportionate and appropriate discipline. These initiatives are discussed throughout the report, were incorporated into the requirements of the Remedial Order and will be a key focus in the Eleventh Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **3(a)**. Partial Compliance<br>¶ **3(b)**. Not applicable<br>¶ **3(c)**.<br>    • Substantial Compliance (Charges)<br>    • Substantial Compliance (Administratively Filed) |

| | • Partial Compliance (Expeditiously Prosecuting Cases) |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, three Directors, 17 attorneys, and 14 support staff. Trials has three fewer attorneys than as of the end of the prior Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The expeditious prosecution of cases requires systems and processes that ensure cases are managed efficiently and effectively, and that there are adequate staff to support these initiatives. Given the significant number of pending cases in Trials, described above, it is important that Trials has a full complement of staffing to adequately address the caseload. However, as noted throughout this section, the ultimate imposition of discipline is not exclusively managed by the Trials Division, which is why staffing within Trials is only part of the overall consideration on how to address the caseload. It is also an oversimplification of the issue to suggest the number of pending cases can merely be resolved with additional Trials staff as the backlog is a broader and more complex issue.

That said, the division lost three attorneys during this Monitoring Period from the last one. The Division certainly requires an adequate number of Staff and that has not been achieved. It is crucial for the Department to have adequate resources from the City to ensure that the Department is in a position to impose meaningful and timely discipline. At the end of the Monitoring Period, the City announced over a $9 billion loss in revenue and $7 billion in cuts from the budget due to the pandemic. The City has also reported that it is working to curtail spending for every agency (including DOC), implementing hiring freezes, and mandatory furloughs have been imposed for all City managers. This budget crisis is expected to have an impact on the Department, including the ability to hire additional Staff. The current state of affairs (and continued influx of cases) suggest that the staffing levels within Trials will not be able to meet these requirements. Accordingly, the Monitoring Team *strongly* recommends the City support the Department to ensure that the Division is adequately staffed.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All NPAs continue to be reviewed and approved by the Deputy General Counsel of Trials. The

NPAs are then forwarded to the Deputy Commissioner of ID & Trials (designated by the DOC General Counsel). The Deputy Commissioner of ID & Trials then sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for administrative processing.

- The Commissioner approved 166 NPAs during this Monitoring Period and 92% were approved within one month (74% were approved within two weeks) of submission by the Deputy General Counsel of Trials.
- The Deputy Commissioner of ID & Trials approved 193 NPAs and 93% were approved within one month (84% were approved within two weeks) of submission by the Deputy General Counsel of Trials.

ANALYSIS OF COMPLIANCE

This assessment of compliance is limited to the second sentence of this provision that requires all NPAs to be approved by the DOC General Counsel (or their designee) and the Commissioner. The Monitoring Team assesses the Department's efforts to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) and to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) together in the ¶ 2 box above.

The Department maintained a process in which all negotiated pleas are approved as required. Overall, the review process by both the Deputy Commissioner of ID & Trials and the Commissioner took an average of 15 days after the closing memo was completed by Trials. The time taken by the Deputy Commissioner of ID & Trials and the Commissioner to review and approve NPAs is reasonable. The Department remains in Substantial Compliance with the second sentence of this provision.

| COMPLIANCE RATING | ¶ 5. Disposition of NPAs and Recommendations to OATH Judges: Partial Compliance<br>¶ 5. Approval of NPAs: Substantial Compliance |
|---|---|

## 8. SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) or assignment to Special Units (¶¶ 4, 5). This section also requires the Department to consider a Staff Member's assignment on a Special Unit after being disciplined (¶ 6) and more generally whether a Staff Member should be re-assigned or placed on non-incarcerated individual contact after a Staff Member has been disciplined multiple times (¶ 7).

*Promotion of ADWs*

During this Monitoring Period, the Department began screening and promoting a class of ADWs to support the overall effort to improve supervision of Captains in the Facilities. Given the effort to mitigate the spread of COVID-19, the promotion classes had to be smaller (pre-promotional training could only accommodate 10 Staff at a time) and occurred on a staggered scheduled in order to maintain appropriate social distancing. The first class of 10 ADWs were promoted at the end of the Monitoring Period and entered pre-promotional training. Additional ADW classes are expected to be promoted during the next Monitoring Period.

The Monitoring Team's compliance assessment is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

    (a) [Use of Force history for the last 5 years]

    (b) [Disciplinary history for the last 5 years]

    (c) [ID Closing memos for incidents in the last 2 years]

    (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 2230, Pre-Promotional Assignment Procedures, addresses the requirements of ¶¶ 1 to 3 and remains in effect.

- The Department screened and promoted the following Staff between January 2017 and June 2020[179]:

| | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 | Total |
|---|---|---|---|---|---|---|---|---|
| **Overview of Staff Promotions** | | | | | | | | |
| Captains | 79 | 102 | 0 | 97 | 0 | 0 | 0 | **278** |
| ADWs | 0 | 4 | 13 | 0 | 3 | 0 | 10 | **30** |
| DW | 0 | 5 | 1 | 2 | 8 | 0 | 0 | **16** |
| Wardens | 2 | 0 | 3 | 4 | 1 | 0 | 2 | **12** |
| Chiefs | 2 | 1 | 1 | 1 | 2 | 1 | 0 | **8** |

**ANALYSIS OF COMPLIANCE**

The screening requirements of the Consent Judgment were developed to support the Department's efforts to identify Supervisors who embody and demonstrate the conduct expected of leaders in a reformed agency. In particular, the Consent Judgment requires the Department to consider a Staff Member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3). The promotion process is guided by multiple factors, including requirements from the Department of Citywide Administrative Services (DCAS) for testing and ranking applicants (see Third Monitor's Report at pgs. 190-192). The screening requirements of this section of the Consent Judgment are then imposed following the testing and ranking of applicants, and is depicted in *Appendix D: Flowchart of Promotions Process*.

*Assessment & Selection of Staff for Promotion*

Out of the many Staff who have been promoted over the past several Monitoring Periods, the Monitoring Team previously identified at least 12 Staff promotions that caused concern, as discussed in the Eighth Monitor's Report (at pgs. 199-201) and Ninth Monitor's Report (at pg. 233). This Monitoring Period, the Monitoring Team had serious concerns about three Staff who were promoted (one of these was previously promoted to Captain and part of the original 12 Staff identified). Of these 14 Staff who have been promoted over the past several Monitoring Periods, only a small number of the promotions contravened the requirements of the Consent Judgment. For the other promotions, the Monitoring Team also had concerns about some of the candidate's fitness for promotion based on their involvement in various use of force incidents and/or imposed discipline. The background of all of these Staff raise questions about their ability to serve appropriately as supervisors, the example they would

---

[179] This does not include the Staff the Department screened but decided not to promote or have not yet promoted.

set for those they supervise and the message these promotions send to subordinate Staff about how prior misconduct is sometimes rewarded with a promotion.

During this Monitoring Period, the Monitoring Team analyzed 45 UOF incidents from November 2019 to June 2020, involving seven of the 14[180] Staff Members whose promotion concerned the Monitoring Team (the other seven Staff who were promoted were not involved in a UOF during this time).[181] Most of the UOF (30 of the 39, or 77%) did not raise concerns about the Staff Members' fitness for promotion. However, 9 incidents—involving 4 of the 14 Staff Members—were concerning and contained some evidence that the Staff's actions may have violated the UOF policy.[182] The persistence of potentially problematic uses of force among the group of Staff that the Department considers fit for promotion continues to concern the Monitoring Team. As recommended in four prior Monitor's Reports,[183] the Monitoring Team continues to recommend the Department conducts a similar assessment of Staff that may require additional support (such as those identified by the Monitoring Team), ensures prompt feedback and guidance is provided and holds Supervisors accountable for misconduct.

*Assessment of Screening Materials*

The Department promoted two Wardens and 10 ADWs during this Monitoring Period. To verify the Department screened and promoted Staff in accordance with required criteria, the Monitoring Team reviewed each person's screening packet. As discussed in more detail below, the packets for those promoted to Warden did not raise any concerns. The screening packets for three of the 10 Staff who were promoted to ADW in June 2020 did raise concerns suggesting that promotion was not appropriate, as described in more detail below.

*Review of Candidates (¶ 1)*

The Department's screening for the Warden and ADW promotions satisfied the requirements of the "Review" as defined by ¶ 1.

*Disciplinary History (¶ 2)*

Staff Members may not be promoted if they have guilty findings on certain violations. The only exception to promoting a Staff Member in this case is if the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make

---

[180] One of these 14 Staff Members was subsequently demoted.

[181] These 14 Staff reflect the concerning promotions the Monitoring Team identified and are a subset of the much larger group of Staff who were promoted between the Fourth and the Tenth Monitoring Periods.

[182] The Monitoring Team has subsequently recommended the Department closely review one of these Staff Members for EISS screening.

[183] *See* the Fourth Monitors' Report at pgs. 187-188, Fifth Monitor's Report at pgs. 130-131, Seventh Monitor's Report at pgs. 174-175 and Ninth Monitor's Report at pg. 233.

such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

The two Wardens who were promoted in this Monitoring Period had not been found guilty or pled guilty to the specified violations two or more times in the past five years. However, among the Staff promoted to ADW, it is of great concern to the Monitoring Team that, for a second time, one Staff Member was promoted in contravention of this requirement. As an initial matter, it appears that the Department's screening process to identify this potential issue in the individual's disciplinary history failed. Following the Department's failure to properly identify this issue for someone promoted during the Eighth Monitoring Period, the Department reported in April 2019 that it had revised its process so that Staff were appropriately screened based on this requirement. However, the revised process failed to adequately detect and analyze whether a Staff Member had met the "2-in-5" threshold requirement.

After the promotion was made, the Monitoring Team alerted the Department that the promotion of this Staff Member triggered this provision and that the promotion was only appropriate if exceptional circumstances were present and documented by the Commissioner. In response, the Department provided a memo describing the exceptional circumstances meriting promotion of this Staff Member. The Department suggested that exceptional circumstances existed because one of the two incidents occurred almost five years ago, the Staff Member's misconduct in the specific incidents was not egregious and that generally, the uses of force were justified and therefore the imposition of discipline in these two cases should not preclude the promotion of this Staff Member. The determination of whether exceptional circumstances exist is a fact dependent assessment. The Department's position that exceptional circumstances were present, and that promotion was appropriate in this case is questionable. As a result, the Monitoring Team intends to closely evaluate future determinations of exceptional circumstances, to the extent that this provision is triggered, to determine whether there may be an emerging pattern or practice that such a determination may not be consistent with this standard.

The Monitoring Team advised the Department of our findings regarding the flawed screening process and that some of these promotions may not be appropriate. The Department acknowledged that the screening process was insufficient and has reported that it will revise the process to have the Trials Division conduct this assessment going forward. Given the deficient screening process this provision is assessed in Non-Compliance.

### _Pending Disciplinary Matters (¶ 3)_

The Department's screening process for promotion assesses whether the candidate has pending discipline. The Monitoring Team found that the Department's screening process does accurately identify whether a candidate may have pending discipline at the time of screening. Certain candidates have been disqualified because the Staff member had pending discipline at the time of promotion. The

Wardens who were promoted did not have any pending disciplinary charges at the time of promotion. However, three of the ten Staff promoted to ADW had pending disciplinary cases when they were initially screened for promotion. Between the initial screening in April and the subsequent promotion in June, the cases were closed, and discipline was imposed. Accordingly, none of the ten Staff promoted to ADW had pending discipline at the time of promotion. However, promoting a Staff Member immediately after imposing discipline can dilute the impact of the corrective action, possibly negating the effort to hold Staff accountable and instead providing a reward, a promotion. Two of the Staff promoted to ADW who had discipline imposed close in time to promotion were involved in incidents in which the identified misconduct raised concerns about the individual's fitness as a supervisor. Further, resolution of pending discipline close in time to the promotion also inhibits an efficient and meaningful screening process.

_Conclusion_

While the Department continues to screen Staff for promotions, and the screening does identify relevant issues, the evaluation of and decision-making in light of the information is concerning. These findings raise serious concerns about a developing pattern of questionable promotion decisions. Despite the Monitoring Team's feedback and technical assistance to improve performance in this area, the Monitoring Team is losing confidence that the Department has adequate procedures in place to screen Staff for promotion and that appropriate judgment is being utilized in making these decisions. The Monitoring Team recommends the Department improves the rigor of its promotion screening and explicitly addresses findings with a rationale for any final promotion decisions as appropriate.

| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance<br>¶ **2.** Non-Compliance<br>¶ **3.** Partial Compliance |
|---|---|

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 4-6 (ASSIGNMENTS TO SPECIAL UNITS)

¶ 4. Prior to assigning any Staff Member to any Special Unit, the Department shall conduct the Review described in Paragraph 1 above. The results of the Review shall be documented in a report that explains whether the Review raises concerns about the qualification of the Staff Member for the assignment, which shall become part of the Staff Member's personnel file.

¶ 5. No Staff Member shall be assigned to any Special Unit while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the assignment at that time.

¶ 6. If a Staff Member assigned to a Special Unit is disciplined for misconduct arising from a Use of Force Incident, the Warden, or a person of higher rank, shall promptly conduct an assessment to determine whether the Staff Member should be reassigned to a non-Special Unit. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member cannot effectively and safely perform the duties associated with the assignment. If a determination is made not to re-assign the Staff Member after the discipline, the basis for the determination shall be documented in a report, which shall become part of the Staff Member's personnel file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 10/17 "Awarding Job Assignments within a Command," remains in effect and addresses the requirements of ¶¶ 4 to 6.
- The Chief's Office, with support from NCU, administered the monthly screening for Staff for Special Unit posts. The Chief's Office and NCU identified the Staff to be screened each month by identifying the Staff steadily assigned to a Special Unit for the Facilities, which then screened Staff using the Staff's 22R form.
- The Department completed screening for approximately four Staff prior to their placement on Special Units in January and March 2020.
- The Department conducted the post-disciplinary action reassignment screening (required by ¶ 6) once during the 10th Monitoring Period, covering relevant discipline imposed between December 2019 and January 2020.
  - NCU runs a report of all UOF related finalized discipline for all Staff on Special Units and shares this with the Facilities to screen the Staff for potential reassignment.
- In January 2020, a total of six Staff on Special Units were identified as having finalized UOF-related discipline, although none were reassigned.

**ANALYSIS OF COMPLIANCE**

*Facility Assessment of Screening for Assignment to Special Units (¶¶ 4, 5)*

The screening requirements for Staff steadily assigned to Special Units is cumbersome, time consuming and in practice, this screening is not expected to meaningfully contribute to the overall goals of the Consent Judgment (as described in the Ninth Report at pgs. 230-232). Staff must be screened before they are assigned to a Special Unit and are precluded from assignment if they have any pending disciplinary charges for a use of force that resulted in an injury to an incarcerated individual or other person (¶¶ 4, 5). The Department conducted the screening for Special Units in January and March 2020. The Monitoring Team subsequently recommended that this requirement be placed in abeyance and not implemented for the reasons outlined in the Ninth Monitor's Report at pgs. 230-232.

The Monitoring Team did not assess whether the Department accurately identified the Staff who required screening.[184] However, the Monitoring Team did review the completed screening forms for the four Staff screened for Special Units in this Monitoring Period. The screening forms were completed as required, but some had administrative discrepancies or errors. None of the Staff who

---

[184] It is worth noting, the Monitoring Team believes that the number of Staff expected to be screened for these posts is likely larger than the number of Staff actually screened. However, the effort to identify whether additional Staff should have been screened is burdensome and unnecessary given these provisions are in abeyance.

were placed on Special Units had pending discipline and any finalized discipline was either minor or non-UOF related.

These provisions were held in abeyance as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of these provisions is set forth in *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions*.

### *Post Disciplinary Action Reassignment Screening* (¶ 6)

If Staff assigned to Special Units are disciplined for use of force misconduct, their Special Unit assignment must be formally reconsidered (¶ 6). In addition to routinely screening Staff prior to their assignment to Special Units, the Department screened Staff who were already assigned to Special Units and who were found guilty of UOF-related misconduct in January 2020. The Department subsequently eliminated this screening process given the impending modifications to this provision as part of the Remedial Order and that will be made to this provision as outlined in the Ninth Monitor's Report at pgs. 228-230. This provision is not rated for this Monitoring Period given the upcoming transition to modify the approach.

The Monitoring Team assessed the Department's January 2020 post-discipline reassignment screening. The Monitoring Team: (1) assessed all recent UOF-related formal discipline to check that any Staff steadily assigned to a Special Unit with UOF-related discipline had been identified for reassignment screening, and (2) assessed whether all UOF-related discipline was included for the Staff on Special Units identified for reassignment screening. The Monitoring Team found that all Staff on Special Units had been appropriately identified with misconduct and were consistent with disciplinary records. Four of the six Staff had closed Trials cases. The Facilities did not elect to reassign any of the six Staff. A compliance rating is not applied given the transition of this requirement.

| **COMPLIANCE RATING** | ¶ **4.** Not-Rated—Abeyance |
| | ¶ **5.** Not Rated—Abeyance |
| | ¶ **6.** Not Rated |

### XII. SCREENING & ASSIGNMENT OF STAFF ¶ 7 (REVIEW OF ASSIGNMENTS OF STAFF DISCIPLINED MULTIPLE TIMES)

¶ 7. The Department shall promptly review the assignment of any Staff Member who has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions within a five-year period: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force. The review shall include an assessment to determine whether the Staff Member should be reassigned to a position with more limited inmate contact. The Department shall reassign Staff Members when it determines that the conduct resulting in the discipline suggests that the Staff Member should have reduced inmate contact. The results of the review shall be documented and become part of the Staff Member's personnel file and a copy shall be sent to the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department screened Staff who met the 2-in-5 threshold (outlined in ¶ 7) in March 2020 using the revised process described in the Eighth Report (at pgs. 205-206).
- The outcomes of the Staff who met the threshold and were screened are outlined below.

| Staff Evaluated for 2 in 5 screening | | | | |
|---|---|---|---|---|
| Screening Evaluation Completed | Total number of Staff who were identified as meeting the 2 in 5 criteria & post was evaluated | Staff placed on limited incarcerated individual contact based on assessment | Staff already on limited incarcerated individual contact prior to assessment | Staff were deemed suitable for their current post |
| 7th Monitoring Period | 87[185] | 20 (23%) | 39 (45%) | 28 (32%) |
| 8th Monitoring Period | 53[186] | 2 (4%) | 14 (26%) | 37 (70%) |
| 9th Monitoring Period | 15[187] | 0 (0%) | 9 (60%) | 6 (40%) |
| 10th Monitoring Period | 7 | 0 (0%) | 3 (43%) | 4 (57%) |

**ANALYSIS OF COMPLIANCE**

The 2-in-5 screening process is complex and time consuming, with minimal benefit realized in the operation of the Facilities and limited utility towards the overall goals of the Consent Judgment, as described in the Ninth Monitor's Report (at pgs. 237-240). Accordingly, this screening was suspended part way through the Monitoring Period given the impending modification to this provision based on the Monitoring Team's recommendations.

*Identification of Staff who met the 2-in-5 threshold*

The Monitoring Team found that the Department correctly identified all Staff who met the 2-in-5 threshold in March 2020. Given the complexity of identifying Staff who meet the threshold, the Department had previously identified and screened Staff beyond what is required by this provision, as described in the Eighth Report (at pgs. 207-208). However, the streamlined screening process did not result in any false positives—all Staff who were identified did meet the threshold.

*Review of Assignments for Staff who met the 2-in-5 threshold*

The Monitoring Team reviewed the Facilities' assessments of post assignments for the seven Staff who met the 2-in-5 threshold and were reviewed in March 2020. All Staff had either previously

---

[185] The number of Staff the Department identified was overinclusive than what was required. of these Staff were erroneously screened by the Department (they had either already been screened in prior months or did not qualify for 2 in 5 screening) as a result of the inefficient and unnecessarily burdensome screening process previously used by the Department.

[186] *See id.*

[187] *See id.*

been reassigned through other avenues to limited incarcerated individual contact or they were deemed suitable for their current post. No Staff Members were reassigned to limited incarcerated individual contact as a result of this screening.

*Conclusion*

The Department is expending significant resources on a process that results in only a few modifications to the assignment and deployment of Staff, as described in more detail in the Ninth Report (at pgs. 237-240). This provision is not rated for this Monitoring Period given the upcoming transition to modify the approach.

| COMPLIANCE RATING | ¶ 7. Not Rated |
|---|---|

9. **ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)**

This section of the Consent Judgment requires the Department to consult with ID before recommending an incarcerated individual arrest for conduct that was also connected with a use of force incident. The larger purpose of this section is so that incarcerated individual arrests are based on probable cause, and not for retaliatory purposes. The Monitoring Team's assessment of compliance is outlined below.

| XIV. ARREST OF INMATES ¶ 1 |
|---|

¶ 1. The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's Criminal Investigation Bureau ("CIB") is responsible for arresting incarcerated individuals. CIB also tracks and maintains evidence, arrest packages, and arrest data.

- The Department maintains the following three Command Level Orders governing the arrest of incarcerated individuals, visitors, and juveniles:

  o CLO 01/20 Arrest of Inmates, this CLO also incorporates the requirements of this provision

  o CLO 02/20 Adult Visitor or Live Arrest

  o CLO 03/20 Juvenile Arrest Procedures

- On February 7, 2020, CIB issued a memo to all CIB staff advising them of the requirement that CIB must consult with ID before effecting the arrest of incarcerated individual in connection with a use of force incident.

- The Department developed and implemented a process to track that CIB is consulting with ID prior to arresting any incarcerated individual related to a use of force incident.

  o This process requires CLU be included in all communications when CIB requests clearance from ID for incarcerated individual arrests in connection with a use of force incident. CLU then reviews the communication to check it is accurate and occurring for all use of force related arrests. CLU provides the communications to the Monitoring Team along with the routine reports and arrest data.

- The Department arrested 61 incarcerated individuals during the current Monitoring Period. Out of the 61 total incarcerated individuals arrested, 23 were arrested in connection to 22 unique UOF incidents.

| Total Arrests & Arrests Associated with a UOF | | | | | |
|---|---|---|---|---|---|
| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 |
| Number of UOF Incidents Associated with Arrests | 88 | 68 | 71 | 79 | 22 |
| Number of Incarcerated Individual Arrests with Associated UOF Number | 109 (38%) | 79 (30%) | 77 (34%) | 84 (39%) | 23 (38%) |
| **Total Number of Incarcerated Individual Arrests** | **284** | **262** | **228** | **214** | **61** |

- The reasons for all incarcerated individual arrests from January 2018 to June 2020 are presented in the table below.

| Arrest of Incarcerated Individuals by Reason for Arrest | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 | | July to Dec. 2018 | | Jan. to June 2019 | | July to Dec. 2019 | | Jan. to June 2020 | |
| Aggravated Harassment | 33 | 12% | 18 | 7% | 17 | 7% | 11 | 5% | 2 | 3% |
| Arson | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Assault on Staff | 98 | 35% | 87 | 33% | 79 | 35% | 99 | 46% | 21 | 34% |
| Assault Other | 6 | 2% | 0 | 0% | 0 | 0% | 1 | 0% | 2 | 3% |
| Contraband Drugs | 14 | 5% | 18 | 7% | 12 | 5% | 16 | 7% | 3 | 5% |
| Contraband Other | 10 | 4% | 5 | 2% | 7 | 3% | 4 | 2% | 1 | 2% |
| Contraband Weapon | 10 | 4% | 8 | 3% | 11 | 5% | 5 | 2% | 5 | 8% |
| Criminal Act | 3 | 1% | 13 | 5% | 6 | 3% | 2 | 1% | 2 | 3% |
| Destruction of Property | 5 | 2% | 2 | 1% | 0 | 0% | 1 | 0% | 1 | 2% |
| Escape | 0 | 0% | 1 | 0% | 1 | 0% | 0 | 0% | 0 | 0% |
| Extortion | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Incarcerated Individual Disturbance/ Riot | 0 | 0% | 0 | 0% | 0 | 0% | 6 | 3% | 0 | 0% |
| Obstruction Government Administration | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Robbery | 0 | 0% | 0 | 0% | 1 | 0% | 0 | 0% | 0 | 0% |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Serious Injury to Incarcerated Individual | 2 | 1% | 12 | 5% | 9 | 4% | 12 | 6% | 0 | 0% |
| Serious Injury to Staff | 5 | 2% | 4 | 2% | 2 | 1% | 0 | 0% | 1 | 2% |
| Serious Verified Threat | 0 | 0% | 1 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Sexual Assault/Abuse | 5 | 2% | 2 | 1% | 9 | 4% | 6 | 3% | 1 | 2% |
| Slashing/Stabbing | 17 | 6% | 23 | 9% | 7 | 3% | 13 | 6% | 1 | 2% |
| Splashing | 76 | 27% | 68 | 26% | 67 | 29% | 38 | 18% | 20 | 33% |
| Witness Tampering | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 2 | 3% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total** | **284** | | **262** | | **228** | | **214** | | **61** | |

**ANALYSIS OF COMPLIANCE**

The Department continued to provide the Monitoring Team with routine reports and updates on the incarcerated individuals that were subject to arrest. The Department reported a significant decrease in the number of incarcerated individuals arrested in this Monitoring Period compared to previous Monitoring Periods. While the number of incarcerated individuals arrested has continually decreased over the past four Monitoring Periods, the Department reports the significant drop in arrests this Monitoring Period was also likely due to the impact of COVID-19.

The goal of this provision is to: (1) ensure ID is consulted on any arrest of an incarcerated individual related to a use of force incident so any information gathered in the investigation to date is considered as part of the arrest determination, and (2) that any recommendation to arrest an incarcerated individual is based on probable cause. With respect to the first requirement, in this Monitoring Period, CIB formalized its obligation to consult with ID, prior to the arrest of an incarcerated individual. The Monitoring Team's initial evaluation of CIB's tracking of this consultation requirement revealed some lapses in the administrative tracking and the process was revised to include CLU (as described above). Subsequently, as of February 2020, the Department improved its tracking and was able to provide documentation that ID was consulted prior to 15 arrests of incarcerated individuals made in connection with a use of force incident in this Monitoring Period.

In terms of whether an arrest of an incarcerated individual involved in a use of force is supported by probable cause, the Monitoring Team reviewed a targeted sample of the use of force incidents that resulted in an arrest of an incarcerated individual in this Monitoring Period. The Monitoring Team's assessment of those incidents, including both the conduct of the Staff and incarcerated individual, found there was probable cause for those arrests. This is consistent with the Monitoring Team's prior review of incidents between July 2018 and December 2019 (discussed in the Ninth Monitor's Report) that also found arrests of incarcerated individuals involved in use of force was supported by probable cause.

| | |
|---|---|
| The Department is in Substantial Compliance with this provision because arrests of incarcerated individuals made in connection with a use of force are done in consultation with ID and those arrests are supported by probable cause. | |
| **Compliance Rating** | **¶ 1.** Substantial Compliance |

### 10. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. Significant involvement and buy-in from all Divisions of the Department is needed to successfully implement the enumerated reforms of the Consent Judgment. The Monitoring Team continues to strongly encourage ownership and focus by uniform Staff in advancing the *Nunez* requirements, which has been lacking.

In order to support improved ownership and focus of *Nunez* matters by uniform Staff, the Department appointed an Assistant Chief of Strategic Partnerships in January 2020 to serve as the uniform liaison to the *Nunez* Monitoring Team and to help manage the *Nunez* requirements because the Complex Litigation Unit ("CLU") and the *Nunez* Compliance Unit ("NCU") alone cannot operationalize the many reforms that are needed, as they are neither responsible for nor have control of the Divisions that must actually implement the core use of force-related initiatives. As part of this restructuring, NCU and the Division of Strategic Initiatives, who help support a number of UOF-related initiatives, were also assigned to report to this Assistant Chief. This creates a significant foundation for *Nunez* compliance work going forward, particularly as it relates to coordinating other uniform leaders and in addressing and implementing operational initiatives related to *Nunez*. The Monitoring Team has already observed the positive impact of this re-organization in the management and focus on operational initiatives.

The day-to-day management of compliance with the *Nunez* Consent Judgment is a joint

effort between CLU,[188] NCU,[189] and the Project Management Office ("PMO").[190]. The Assistant Chief's office, CLU, NCU, and PMO teams work directly with a broad range of staff on a daily basis to identify the key challenges preventing compliance and assist in developing short term and long-solutions intended to achieve Substantial compliance with Nunez provisions. Given the enormity of the task of shaping practice, measuring performance, and demonstrating compliance, a significant number of staff are necessary to audit and improve practice. The Assistant Chief's office, CLU, NCU, and PMO has provided a foundation upon which the Department can implement essential changes to practice and the staff in these units are hardworking, smart, conscientious, dependable and provide invaluable assistance to the Department and the Monitoring Team. The Monitoring Team continues to recommend the City provide the Department with the necessary resources, to the extent they are required. The Monitoring Team's assessment of compliance is outlined below.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material

---

[188] CLU manages the Monitoring Team's document and data requests and drives various policy initiatives to address the findings of, and recommendations from, the Monitoring Team. CLU regularly consults the Monitoring Team to check that Department practice is consistent with the Consent Judgment and best practice.

[189] NCU manages most of the quality assurance programs and problem-solving efforts. NCU has continued to devise and maintain solid QA programs and reporting mechanisms to illuminate Department practices that need to be maintained or improved so that the Department can achieve compliance with several requirements of the Consent Judgment. In many cases, NCU staff provide technical assistance to the Facilities to support improved practice. As discussed throughout this report, the work of NCU has supported many of the initiatives where the Department has demonstrated progress (*e.g.* timely submission of UOF reports, improved medical wait times, and consistent processing of command disciplines).

[190] PMO manages many of the projects and initiatives throughout the Department from logistical support, to developing relevant analyses, and necessary coordination among stakeholders to support the overall implementation of these initiatives.

revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[191]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains a process for tracking policies and procedures, including necessary revisions, as outlined in the Ninth Monitor's report pgs. 246 to 247.

- In this Monitoring Period, the Department reported the management of policies was transferred from the CLU Division to the Policy and Procedure Unit ("PPU").

    o The routine assessment of policies was limited in this Monitoring Period due to impacts from COVID-19.

- The Department maintains two policies that govern management of policies and procedures within the Agency.

    o Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance, and routine review of Department policies.

    o Operations Order 05/19, "Facility Information System ("FIS") was promulgated. Pursuant to Operations Order 05/19, each Facility has a designated FIS Officer and staff who are responsible for reviewing and updating CLOs on a routine basis.

        ▪ A network drive folder is maintained, where all Facility CLOs are scanned and uploaded digitally to make maintenance and tracking more efficient.

**ANALYSIS**

There are two phases of implementation for the Department to achieve compliance with ¶ 1 of this section of the Consent Judgment. First, the Department had to conduct an initial review and revise (as appropriate) any existing policies, procedures, protocols, training curricula, and practices to ensure conformity with *Nunez.* Second, the Department had to develop a reliable process in place to ensure ongoing assessments of these items as they necessarily may evolve to ensure continued conformity and relevance.

The Department has successfully implemented the first phase which was described in detail the Ninth Monitor's report pgs. 246 to 247. Regarding the second phase, the Department has taken steps to achieve compliance, but some work remains to achieve Substantial Compliance. First, the Department makes sure that the Monitoring Team is provided an opportunity to review and comment on any proposed revisions to any *Nunez*-related policies before promulgating. While the Department has developed a process for ongoing assessments of policies on a routine basis (enumerated in Directive

---

[191] The Monitor approved an extension of this deadline to January 31, 2018.

0000R-A, "Implementing Departmental Policy")—including an annual review of a sample of policies and Operations Orders—this process has not yet been implemented. Further, while Ops Order 05/19 (Facility Information System) requires FIS Officers to evaluate new policies/procedures on a monthly basis to determine whether CLOs are necessary (so that CLOs are then promulgated when appropriate), the Department has not devised a process to demonstrate that this process has been routinely implemented. The Department will achieve Substantial Compliance with ¶ 1 when these procedures for ongoing review and maintenance of policies and CLOs are reliably implemented.

As for the Department's compliance with ¶ 2, the Department has revised and developed written documents, such as logs, handbooks, manuals, and forms necessary to effectuate the terms of *Nunez*.

| COMPLIANCE RATING | ¶ **1.** Partial Compliance |
| --- | --- |
| | ¶ **2.** Substantial Compliance |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In this Monitoring Period the Assistant Chief of Strategic Partnerships, Assistant Commissioner of Quality Assurance, and the Associate Deputy General Counsel[192] shared the responsibilities of the Compliance Coordinator.
- CLU and NCU provided the Monitoring Team with responses to over 150 requests for information and handled over 40 memos containing recommendations from the Monitoring Team. Many of these were complex requests and required significant collaboration between the Department and the Monitoring Team to address. CLU produced over 500 use of force files (such as Preliminary Reviews, Facility investigations, and Full ID Investigations), PREA files, and Trials closing memos. CLU and NCU also produced over 80 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.
- During the Monitoring Period, CLU, NCU and PMO scheduled and/or facilitated frequent meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC Staff Members and facilitated site visits.

**ANALYSIS OF COMPLIANCE**

---

[192] The Deputy General Counsel that normally serves in this role was on maternity leave in this Monitoring Period.

The role of Compliance Coordinator cannot reasonably be filled by one individual given the significant work needed to address the requirements of the Consent Judgment, to manage and respond to the various requests from the Monitoring Team, and work with the Monitoring Team to address the feedback and initiatives recommended by the Monitoring Team. The Department maintains Substantial Compliance with the assignment of the Compliance Coordinator as the Department has assigned appropriate leadership and dedicated significant resources to ensuring there is adequate coordination with the Monitoring Team. The Monitoring Team continues to maintain a collaborative relationship with members of the Assistant Chief of Strategic Partnerships, and the CLU and NCU teams, as well as other members of the Department and communicates daily (and often multiple times a day) with members of the Department. The Department's staff in Assistant Chief's office, CLU, NCU, and PMO are critical to supporting the Department's efforts to advance reforms in the agency and are hardworking, smart, conscientious, responsive and provide tremendous assistance to the Monitoring Team. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
| --- | --- |

## CURRENT STATUS OF 16- AND 17-YEAR-OLD YOUTH

Just after the close of the Tenth Monitoring Period, the last Pre-Raise the Age Youth[193] was released from HOJC, which marked a fundamental shift in the management of 16- and 17- year old youth in custody. When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were detained in an adult jail on Rikers Island which was managed by the Department, an adult correctional agency. Since then, the City, Department, and Administration for Children's Services ("ACS") have made significant changes to the management of this age group, which are intended to serve the best interest of the youth while in custody. In particular, over the last two years, this cohort of youth was moved to a new facility— off Rikers Island—that was designed with the needs of adolescents in mind. The responsibility for youth supervision was transferred from DOC to ACS, a juvenile justice agency, and so the approach to supervision is now focused on the support and rehabilitation of young people. With the departure of the Pre-Raise the Age Youth, ACS will now be solely responsible for managing youth under the age of 18 who are arrested and detained in New York City.

The Tenth Monitoring Period continued to witness a variety of changes at HOJC that impacted facility operations, as well as the scope and intensity of monitoring at HOJC.[194] The

---

[193] In compliance with the State's Raise the Age ("RTA") law, since Fall 2018, all 16- and 17-year-old youth previously incarcerated on Rikers Island who remained detained were housed at the Horizon Juvenile Center ("HOJC"), which was jointly operated by the Department and ACS. Further, any 17-year-old youth arrested and detained between October 1, 2018 and September 30, 2019 were also housed at HOJC. These youth—"Pre-RTA Youth"—remained at HOJC until they were released to the community/residential placement or turned 18-years-old, at which time they were transferred to Rikers Island.

[194] The monitoring effort at HOJC is a particularly unique situation. The Facility was originally co-managed by two separate agencies (DOC and ACS), required staff from two agencies with different philosophies and practices for managing youth to jointly supervise those youth and it housed a population

Facility has been in a state of transition since the youth were removed from Rikers Island, halfway through the Seventh Monitoring Period in October 2018.[195] During the first year of HOJC's operation (October 2018 to October 2019), the Department was primarily responsible for youth supervision and movement and facility safety and security, while ACS was responsible for providing programming, case management and other types of support (*e.g.,* food services, barbershop, building maintenance, laundry, etc.). Beginning in October 2019 (halfway through the Ninth Monitoring Period), ACS accelerated its transition toward full operational control of the facility. By the end of 2019, in addition to its original responsibilities, ACS became solely responsible for supervising youth on the housing units with DOC Staff operating in a much more limited scope: on tactical response teams, some security control of hallways, as well as administrative positions. As discussed in prior Monitor's Reports, this transition had a negative impact on facility safety. Now that the transfer of responsibility is complete, ACS' focus can shift to improving and sustaining good practice.

During January and February 2020, normal operations continued, though they continued to be shaped by the transition of management from DOC Staff to ACS staff as part of the continued transition to full ACS operational control of HOJC. In early March 2020, New York City was struck by the COVID-19 pandemic and facility operations were substantially modified to mitigate the spread of the disease among youth and staff and to address the resulting staff shortages. Simultaneously, the number of Pre-RTA Youth decreased to less than five youth in

---

that decreased significantly in size over the past two years. Any findings made by the Monitoring Team are thus unique and cannot be extrapolated to the practices by either DOC or ACS in other Facilities. Further, any recommendations by the Monitoring Team on issues requiring improvement are developed to specifically address the issues the Monitoring Team has identified at HOJC.

[195] See Seventh Monitor's Report at pgs. 192 to 207.

custody. As a result, it was impossible during this Monitoring Period to conduct valid statistical or trend analysis or to make conclusions about whether facility conditions improved, remained the same, or worsened. Accordingly, the Monitoring Team has not assessed compliance ratings for the provisions pertaining to Pre-RTA Youth at HOJC. However, as appropriate, the Monitoring Team has provided relevant information (primarily focusing on the facility's performance in January and February 2020) regarding DOC and ACS' efforts to implement the Consent Judgment provisions in the boxes below.

The Monitoring Team discontinued monitoring HOJC following the discharge of the last Pre-Raise the Age Youth, which occurred soon after the end of the current Monitoring Period. Given the changes in location, structure and practice, and the new legal status for 16- and 17-year old youth,[196] the Monitoring Team has continued to work with the Parties to consider a potential proposal regarding continued monitoring of the City's management of Adolescent Offenders ("AOs"). As discussed in the Introduction to this report, the COVID-19 pandemic impacted both agencies and the City. As a result, the negotiations regarding the future monitoring at HOJC were protracted. The Monitoring Team is anxious to resolve these matters and has been providing the Court with routine updates on the status of the discussion (see dkts. 343, 345, 352, 353, 355, and 357).

---

[196] RTA created a new legal status, Adolescent Offenders ("AO"), for 16- and 17-year-olds who are arrested for a felony-level crime. AOs' cases are heard in the Youth Part of the Criminal Court. If an AO is detained, he/she must be housed in a specialized secure juvenile detention facility. In the early days of RTA's implementation, AOs were housed exclusively at ACS' Crossroads Juvenile Center. Once HOJC was certified to house AOs in January 2020, the facility began to house AOs on its second floor, separate from the Pre-RTA youth. The Monitoring Team is not currently monitoring the City's management of AOs at Crossroads or HOJC.

*Rates of Use of Force and Violence*

One of the Monitoring Team's persistent concerns has been the high rate of disorder and violence at HOJC since the facility opened in October 2018. Early in the Monitoring Period, the rates of violence and uses of force began to decline, as shown in the graph below.[197] The raw number of youth assaults on staff also decreased to the single digits. These decreases are encouraging, but the circumstances surrounding the data (*i.e.,* short duration, very small number of youth) prohibit the ability to conclude that the serious problems with managing the facility and addressing youth's behavior have abated.



---

[197] In the graph below, a *rate per 100 youth* is used in order to neutralize the impact of the decreasing facility population so that different time periods can be compared. Rate per 100 youth = (# of incidents/ADP)*100. That said, the very small number of youth in custody beginning in March 2020 distorts the trends and thus is not reported from March-June 2020. This graph utilizes *incident-based data*, which counts the number of incidents in which physical restraint was used, in contrast to *youth-based data*, which counts the number of youth who were restrained.

Given the problems identified during the Ninth Monitoring Period with the way in which ACS utilized physical intervention, the Monitoring Team continued to review incidents (Genetec footage and ACS staff reports) and found few, if any improvements. Instead, current findings reflected previously identified patterns, including poor situational awareness, the failure to take reasonable steps to prevent incidents from occurring, and subpar incident reporting that leaves out essential facts and details, which inhibits the ability of administrative reviewers to detect problems. Furthermore, a variety of unsafe practices—including poor staff arm placement near/around youth's necks, entering youth's rooms without proper staff backup, opening doors when youth are poised to push past staff, and hyper-confrontational conduct from staff—were evident.

Overall, while ACS has made solid progress toward several of the required practices, a few areas remain in need of remediation. The on-going problems with ACS staff's use of force at HOJC, described above, suggest that improved practice is needed in order to achieve the overall goal of the Consent Judgment. Furthermore, improvements to the safe operation of HOJC requires staff skilled in de-escalation, a powerful and effective behavior management system (*e.g.*, STRIVE and the protocol for responding to youth with chronic misconduct) and differentiated supervision for youth of different classification/risk levels. Each of these remains a work-in-progress.

Updates on the City's efforts to achieve compliance with Consent Judgment § XV (Safety and Supervision of Inmates Under the Age of 19), § XVI (Inmate Discipline), and § XVII (Housing Plan for Inmates Under the Age of 18) related to 16- and 17-year-old youth are provided below.

11. **SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19**
    **(CONSENT JUDGMENT § XV)**

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- ACS continued to track the rate of youth violence and physical restraint throughout the Monitoring Period. However, these data are difficult to interpret given the very small number of Pre-RTA Youth in custody.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17- and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Because of the operational impact of COVID-19 and the very small number of youth in custody, data on the level of facility violence and disorder are difficult to interpret and thus conclusions about the status of facility safety cannot be made. That said, the Monitoring Team remains concerned about HOJC's ability to manage larger numbers of youth in a manner that protects both youth and staff safety. A review of videotaped footage of physical restraints employed by ACS staff renewed the Monitoring Team's concern about the prevalence of unnecessary, excessive, or poorly executed uses of force among ACS staff. Once normal operations resume, the culture of disorder at HOJC must be transformed by incentivizing positive behavior, responding appropriately to negative behavior, and ensuring that staff develop constructive relationships with youth and are properly equipped with the knowledge, skills, and support needed to create a safe facility.

| **COMPLIANCE RATING** | **¶ 1. (16- and 17-year-olds)** Not Rated[198] |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**ANALYSIS OF COMPLIANCE**

---

[198] For the reasons discussed in the Introduction to this section, conclusions cannot be made about whether the Facility's level of performance during this Monitoring Period improved, stayed the same or worsened compared to the conditions described in the Ninth Monitor's Report.

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The Monitoring Team did not actively monitor this provision during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pg. 261).

| COMPLIANCE RATING | ¶ 2. (16- and 17-year-olds) Not Actively Monitored |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    b.  all Housing Areas with 16- and 17-year-old inmates at least twice per week, making himself or herself available to respond to questions and concerns from Inmates. The tours shall be documented, and any general deficiencies shall be noted. [199]

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC (i.e., part b).*

The Monitoring Team did not actively monitor this provision during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pg. 262).

| COMPLIANCE RATING | ¶ 3. (16- and 17-year-olds) Not Actively Monitored |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 4 (CLASSIFICATION) AND ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INCARCERATED INDIVIDUALS)

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an age-appropriate classification system for 16- and 17-year-olds that is sufficient to protect these Inmates from an unreasonable risk of harm. The classification system shall incorporate factors that are particularly relevant to assessing the needs of the adolescents and the security risks they pose.

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE

- ACS assumed responsibility for the classification process in January 2020, utilizing the tool that was developed and validated by DOC.

---

[199] This language reflects the revision ordered by the Court on August 10, 2018 (*see* dkt. 316).

- After reclassifying all Pre-RTA Youth who had been in custody for more than 60 days, ACS submitted data on the classification level of all Pre-RTA Youth in custody in February 2020.

**ANALYSIS OF COMPLIANCE**

As noted in previous Monitor's Reports, the classification instrument is valid for the target population, reflects a sound methodology, and engages the ACS, education, and mental health staff who need to provide input into scoring the variety of risk factors.

Following ACS' assumption of this function at HOJC, the Monitoring Team reviewed the classification forms for all Pre-RTA youth in custody in February 2020 (n=16). When cross-referenced with the misconduct records of these youth, it appeared that ACS was reclassifying youth on the appropriate schedule (*i.e.*, after every incident, sometimes multiple times in a single week), but that certain youth with very high rates of misconduct still did not score sufficient points to be elevated into to maximum custody. This likely reflects a combination of nuances in the scoring criteria and may also involve errors on the part of the scorer. Once equipped with examples of youth in ACS custody without the confusing overlay of integrating DOC data into the scoring process, continued oversight of the process and consultation with the developer of the instrument is recommended.

The requirement to house maximum and minimum custody youth separately cannot be meaningfully accomplished until the challenges discussed above are resolved. The overarching practice of ensuring that a youth's supervision level is commensurate with his/her level of risk is strongly encouraged. Simply completing a classification form does not create safety. Differential supervision strategies for youth with high versus low risks of misconduct need to be created and implemented.

| **COMPLIANCE RATING** | **¶ 4. (16- and 17-year-olds)** Not Rated[200] <br> **¶ 8. (16- and 17-year-olds)** Not Rated[201] |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- ACS is responsible for providing and coordinating structured programming to youth at HOJC. This is accomplished via Program Counselors working in partnership with a community-based agency.

---

[200] See Footnote 4, above.

[201] See Footnote 4, above.

- ACS endeavors to provide 5.5 hours of educational services each weekday and 3 hours of structured programming, 7-days per week.
- Both Program Counselors and community partners record the amount and type of programming that is delivered to each housing unit on a daily basis.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year old youth at HOJC.*

During the first two months of the Monitoring Period, ACS continued to provide in-person programming in collaboration with community partners. Throughout January and February 2020, ACS reported that Pre-RTA Youth had the opportunity to participate in over 20 hours per week of programming via an assortment of 12 programs delivered by community partners, in addition to structured programming delivered by Program Counselors and recreation staff. Youth also had the opportunity to attend school full-time. While these reports suggest that ACS met its own internal programming targets and obligations under the Consent Judgment, the Monitoring Team did not verify these findings and did not reassess the Facility's previously documented struggle to ensure timely arrival of residents to school. In order to mitigate the risk of COVID-19 exposure, community partners temporarily suspended in-person programming at the facility in March 2020 and some converted to a virtual platform. Program Counselors provided self-guided rehabilitative activities (*i.e.*, worksheets and other activities to be completed independently) as well as additional leisure time activities such as movies, game carts and tablets. The DOE also transitioned to remote learning, with youth receiving tablets to access DOE's "Passages" website, where they completed assignments and quizzes for the classes in which they were enrolled. ACS reports that it has enhanced the tracking protocol for Program Counselors to better quantify whether scheduled program activities occurred, started on-time, and the level of youth interest.

| **COMPLIANCE RATING** | **¶ 5. (16- and 17-year-olds)** Not Rated[202] |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INCARCERATED INDIVIDUALS) AND ¶ 7 (PROTECTIVE CUSTODY)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the

---

[202] See Footnote 4, above.

Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The Monitoring Team did not actively monitor these provisions during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pg. 267).

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **6. (16- and 17-year-olds)** Not Actively Monitored |
| | ¶ **7. (16- and 17-year-olds)** Not Actively Monitored |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- ACS reports allegations of sexual abuse or harassment involving ACS staff to the New York State Justice Center for investigation. An allegation of sexual abuse or harassment involving DOC staff is reported to and investigated by the Department's Investigation Division ("ID"), as discussed in previous Monitor's Reports.

**ANALYSIS OF COMPLIANCE**

*PREA allegations and investigations involving HOJC youth and DOC staff are discussed in the Use of Force Investigations section of this report.*

During the current Monitoring Period, two PREA allegations involving ACS staff were reported by HOJC youth—one alleged sexual harassment, the other alleged sexual abuse. ACS reported that both allegations were called into the Justice Center for screening and/or investigation.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **9.** Not Rated[203] |

---

[203] See Footnote 4, above.

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) |
|---|

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- HOJC's intended practices for youth orientation, consistent staffing, de-escalation, and behavior management mirror the tenets of Direct Supervision.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

This provision was drafted to address the way in which Young Incarcerated Individuals were managed in an adult jail. One of the benefits of transferring youth to a juvenile facility is that a new model—one in keeping with best practice in juvenile facilities—would be applied. ACS utilizes Safe Crisis Management in the operation of HOJC, which is a widely accepted model for managing incarcerated youth. As a result, this provision is not applicable.

| COMPLIANCE RATING | ¶ 12. (16- and 17-year-olds) Not Applicable |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 13 & 14 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF; PROBATIONARY STAFF) |
|---|

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

The Monitoring Team did not actively monitor these provisions during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pgs. 268-270).

| COMPLIANCE RATING | ¶ 13. (16- and 17-year-olds) Not Rated—Inactive Monitoring |
|---|---|
| | ¶ 14. (16- and 17-year-olds) Not Rated—Inactive Monitoring |

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 16 (STAFFING)[204] |
|---|

¶ 16. Staffing Levels.

   a.   The ratio between Inmates and Direct Supervision floor Officers shall be no more than 15:1 in Young Inmate Housing Areas used for Inmates under the age of 18, except during the overnight shift when the ratio may be up to 30:1. The maximum living unit size shall be 15 Inmates.

**ANALYSIS OF COMPLIANCE**

*These provisions apply to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with these provisions with respect to 16- and 17-year-old youth at HOJC.*

The Monitoring Team did not actively monitor this provision during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pgs. 270-271).

| COMPLIANCE RATING | ¶ 16(a). (16- and 17-year-olds) Not Rated—Inactive Monitoring |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17<br>(CONSISTENT ASSIGNMENT OF STAFF) |
|---|

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- ACS reported that staff were consistently assigned to the three units housing Pre-RTA Youth during the current Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

Throughout the current Monitoring Period, while a small number of DOC staff remained at HOJC to provide support on response teams, perimeter security and administration, ACS staffed the housing units independently. ACS' model uses "Intact Teams" on each unit, which include Youth Development Specialists ("YDSs"), counselor, case manager, mental health clinicians and DOE representatives, all of whom are consistently assigned to the same unit to provide for continuity of care, multi-faceted support for youth and to maximize interdisciplinary working relationships. ACS reports that YDS staff were assigned to Intact Teams on all three Pre-RTA housing units following the

---

[204] The Consent Judgment does not include a ¶ 15 for this Section.

completion of training in mid-February 2020. These Teams were reportedly maintained throughout the Monitoring Period, even as facility staff were impacted by COVID-19.

| COMPLIANCE RATING | ¶ 17. (16- and 17-year-olds) Not Rated[205] |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 18 (INCENTIVES FOR STAFF TO WORK WITH ADOLESCENTS)

¶ 18. The Department, in consultation with the Monitor, shall continue to develop and implement measures, including financial incentives, to: (a) encourage experienced and qualified Staff to work in the Young Inmate Housing Areas that are used for Inmates under the age of 18; and (b) retain qualified Staff in the Young Inmate Housing Areas that are used for Inmates under the age of 18 and limit staff turnover. The Department shall maintain records sufficient to show the numbers of Staff transferring in and out of the Young Inmate Housing Areas that are used for Inmates under the age of 18, the years of experience with the Department of the Staff regularly assigned to these areas, and the qualifications of Staff regularly assigned to these areas.

### ANALYSIS OF COMPLIANCE

The Monitoring Team did not actively monitor this provision during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pg. 272-273).

| COMPLIANCE RATING | ¶ 18. Not Actively Monitored |
|---|---|

## 12. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

## XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME) ¶ 2 (NO PUNITIVE SEGREGATION FOR INMATES UNDER THE AGE OF 18)

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 2. The Department shall not place Inmates under the age of 18 in Punitive Segregation or Isolation.

### DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE

- ACS does not utilize Punitive Segregation, that is, room confinement for the purpose of punishment. However, it does utilize room confinement for short periods of time for the purpose of de-escalation, a practice which, by design, includes various protections so that it is used for only that purpose and its duration is calibrated to the youth's immediate risk of physically harming another person.

### ANALYSIS OF COMPLIANCE

---

[205] See Footnote 4, above.

*§ XVI. ¶ 1 applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

*Owed Punitive Segregation Time (¶ 1)*

The Monitoring Team did not actively monitor this provision during this Monitoring Period, as discussed in the Ninth Monitor's Report (*see* pgs. 273-274).

*Prohibition on Punitive Segregation (¶ 2)*

A total of five youth were placed in room confinement during the Monitoring Period. None of the episodes lasted longer than 3 hours, and thus none met the time threshold for isolation (as it is defined in the Consent Judgment). Furthermore, in all five cases, documentation verified that youth were placed in their rooms to mitigate an imminent threat of physical harm. In other words, ACS did not engage in any practice resembling the type of isolation that is prohibited by this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1. (16- and 17-year-olds)** Not Rated—Inactive Monitoring<br>**¶ 2.** Not Rated[206] |

**XVI. INMATE DISCIPLINE ¶ 3 (INMATES UNDER THE AGE OF 18: REWARDS AND INCENTIVES) AND ¶ 4 (INMATES UNDER THE AGE OF 18: DISCIPLINARY SYSTEM)**

¶ 3. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies, and procedures for Inmates under the age of 18 that reward and incentivize positive behaviors. These systems, policies and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies and procedures shall be made in consultation with the Monitor.

¶ 4. Within 90 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement systems, policies and procedures to discipline Inmates under the age of 18 who commit infractions in a manner that is: (a) consistent with their treatment needs; (b) does not deprived them of access to mandated programming, including programming required by the Board of Correction, standard out of cell time, recreation time, and any services required by law; and (c) does not compromise the safety of other Inmates and Staff.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- Since HOJC opened, ACS has had primary responsibility for the behavior management program and thus took the lead in the program's design, training, implementation and tracking.

- The facility's individual behavior management program, STRIVE+, is guided by a user's manual for staff, youth manual, point cards and weekly tracking forms and all staff from DOC, ACS and DOE were trained to implement the program.

- ACS obtained additional support from a nationally-recognized consulting team in order to shore up the implementation of the program given ACS' increasing role in youth supervision. A

---

[206] See Footnote 4, above.

variety of improvements to the program design have been devised and are slated for implementation during the next Monitoring Period.

- ACS' established multi-disciplinary "Intact Teams" on each unit (the regularly-assigned YDSs, counselor, case manager, and mental health clinicians; representative from DOE), which should better support staff in implementing STRIVE+, particularly with regard to holding youth accountable, and should create new options for addressing the subset of youth who frequently engage in violent misconduct.

**ANALYSIS OF COMPLIANCE**

The STRIVE+ program is an individually based behavior management program that reflects best practice in juvenile facilities (*see* the Eighth Monitor's Report, pgs. 244-245 for a detailed description of the program). As required by the Consent Judgment, the Monitoring Team provided detailed feedback, monitored the key tasks and timelines of the workplan, and ultimately approved the STRIVE+ program.

As noted in the Ninth Monitor's Report, ACS identified several weaknesses in the program's design and implementation (*see* pgs. 275-276) and sought the advice of a consultant to shore up the program in order to improve its effectiveness. The consultant's assessment, conducted during the current Monitoring Period, led to various refinements to the design to improve the accuracy of behavior ratings (by reducing the number of assessment periods each day) and to enhance the power of the system to impact youth's behavior (by including behavior ratings during the overnight hours and by refreshing the commissary items available to youth). These changes are reportedly scheduled to be implemented during the next Monitoring Period.

The STRIVE+ program is designed to reinforce, encourage and incentivize positive behavior, and to provide options for staff to respond to negative behavior in ways that are likely to reduce the occurrence of problem behaviors in the future. In addition to dropping a youth's STRIVE level in response to misconduct (and thus restricting access to the rewards associated with the higher levels), ACS staff also refer youth for more intensive interventions that are contemplated during weekly meetings for youth with Significant Behavior Concerns ("SBC"). The Monitoring Team reviewed the serious misconduct that occurred at HOJC each month. Most of the youth housed at HOJC received one or two serious misconduct reports each month, while a small number of youth (one or two) had chronic behavior problems resulting in a large number of misconduct reports, constant demotions in STRIVE+, and referrals to the SBC weekly meeting. As encouraged by the Monitoring Team in previous Monitoring Periods, the documentation surrounding the SBC meetings—which operated throughout the Monitoring Period--became more detailed and specific and detailed each youth's behavior challenges, triggers, protective factors, and next steps. The planned transfer of this function to the Intact Teams in the future should result in more accountability for the staff responsible for the

| | interventions and the application of rewards/sanctions and for the youth whose behavior will be monitored by a consistent group of staff. |
|---|---|
| **COMPLIANCE RATING** | ¶ **3.** Not Rated[207]<br>¶ **4.** Not Rated[208] |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with the following procedures when utilizing De-escalation Confinement:

(a) Prior to the confinement, the Department shall attempt to control the Inmate's behavior through less severe measures, time and circumstances permitting. Such measures shall be documented.

(b) The Tour Commander of the facility shall be notified within 30 minutes of the confinement and provided with the circumstances and facts that justify the confinement.

(c) The Inmate shall remain in confinement only for so long as he or she continues to pose a risk of immediate physical injury to the Inmate or others. A mental health care professional shall assess the inmate at least once every 3 hours to determine whether the Inmate continues to pose a risk of immediate physical injury to the Inmate or others. The period of confinement shall not exceed 24 hours, except in extraordinary circumstances which shall be documented, approved in writing by the Warden of the Facility, and approved in writing by the Corrections Health Care Provider supervising psychiatrist or supervising clinical psychologist.

**DEPARTMENT'S/ACS' STEPS TOWARDS COMPLIANCE**

- ACS utilized Room Confinement five times during the current Monitoring Period and provided the accompanying documentation to the Monitoring Team for review.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-olds), but the analysis and rating presented below apply only to the City's efforts to achieve compliance with this provision with respect to 16- and 17-year-old youth at HOJC.*

As observed in previous Monitoring Periods, room confinement is rarely used at HOJC, and thus is certainly not overused. Room confinement was used five times (January n=3, February n=1 and June n=1). In four of the five episodes, the duration was less than 3 hours; the fifth episode continued overnight, with the youth held in his room for a little less than three hours before bedtime and then remaining in his room for a little less than two hours upon waking.

The extent to which the duration of the confinement was determined by the youth's level of escalation and threat could not be ascertained from the available documentation. Some of the room confinement packets included only the Authorization Form, without any of the other documentation

---

[207] See Footnote 4, above.

[208] See Footnote 4, above.

necessary to show that the required protections or services had been implemented (*e.g.*, 15-minute checks; de-escalation visits from supervisors, mental health clinicians, teachers or counselors). While some packets included logbook entries, they were not sufficiently detailed and did not depict whether the youth remained agitated or was calm and ready to return to normal programming. Stricter adherence to the requirements for protecting youth in room confinement is needed whenever room confinement is used.

| COMPLIANCE RATING | ¶ 10. (16- and 17-year-olds) Not Rated[209] |
|---|---|

---

[209] See Footnote 4, above.

## CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

This section discusses the status of 18-year-old youth who remain on Rikers Island, the population of which has decreased significantly from the time the Consent Judgement went into effect when approximately 140 18-year-olds were in custody. The vast majority of 18-year-old males are now housed at RNDC (ADP of 56 for the current Monitoring Period) and all female 18-year-olds are housed at RMSC (ADP of 1.5 for the current Monitoring Period). Small populations of 18-year-old males are housed in GRVC (ADP of 6 for the current Monitoring Period; some in Secure and some in general population) and OBCC (ESH; ADP of 1.5 for the current Monitoring Period). A very small population of 18-year-olds were housed at AMKC or EMTC for some portion of the Monitoring Period so they could access particular programs (e.g., CAPS, PACE or MO) or as part of the Department's COVID-19 response.

*Rate of Use of Force and Violence for 18-Year-Olds*

As shown in the table and graph below, the use of force rate among 18-year-olds slightly decreased a year or so after the Consent Judgment went into effect but then increased mid-2018 and has remained higher since that time. After high levels of UOF early in the Monitoring Period, the UOF rate decreased during the last half, though remained higher than historical levels.



The table below presents UOF rates from another angle and offers historical contrast. The 2016-2018 rates, while lower, were still of significant concern—in fact, these "lower" rates are similar to what gave rise to the Consent Judgment in the first place, and thus must be improved upon in a sustained and significant way in order to meet the requirements of *Nunez*. For the sake of comparison, during the current Monitoring Period, the average UOF rate among 18-year-olds was about five times higher than the average rate of UOF among adults, which also remains at concerning levels (53.9 versus 10.7).

| Average UOF Rate, 18-year-olds | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan. - Jun. 2016 | Jul.- Dec. 2016 | Jan. - Jun. 2017 | Jul. - Dec. 2017 | Jan. - Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul. -Dec. 2019 | Jan.-Jun. 2020 |
| 17.4 | 21.7 | 20.7 | 14.3 | 16.1 | 56.7 | 52.9 | 54.8 | 53.9 |

Similar patterns are observed in the rate of violence among 18-year-olds. Since June 2018, the rate of violence steadily increased, despite occasional drops. During the latter half of the current Monitoring Period, the rate of violence decreased substantially for a three-month

period. Whether this is a time-limited decrease, or the beginning of a sustained, substantial drop in violence will become evident in the subsequent Monitoring Period.



As shown in the table below, the average rate of youth-on-youth violence among 18-year-olds reached an apex (64.3) during the previous Monitoring Period. The beginning of the current Monitoring Period was similar (January through March average rate was 64.5), but the rate of violence fell about 40% during the latter half (April through June average rate was 38).

| Average Rate of Youth-on-Youth Violence, 18-year-olds | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Jan. - Jun. 2016 | Jul.- Dec. 2016 | Jan. - Jun. 2017 | Jul. - Dec. 2017 | Jan. - Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul. -Dec. 2019 | Jan.-Jun. 2020 |
| 21.6 | 31.0 | 25.6 | 22.7 | 21.3 | 48.3 | 62.3 | 64.3 | 51.2 |

Factors contributing to the high levels of violence have been discussed at length in previous Monitor's Reports (*see* Eighth Monitor's Report at pgs. 253-254 and Ninth Report at pg. 284). These included unstable leadership, sparse disciplinary options, lack of consistency in staff assignments to housing units and inadequate supervision of Staff. These dynamics, along

with the high levels of violence and UOF and pervasive operational concerns (*e.g.*, alarms, Probe Team, hyper-confrontational response), have been the foundation of the Monitoring Team's concerns about safety at RNDC for several Monitoring Periods.

The Department has continued to collaboratively develop with the Monitoring Team a Plan to address these concerns at RNDC that includes several initiatives discussed in detail below ("RNDC Plan"). [210] Throughout the current Monitoring Period, the Department and Monitoring Team held regular calls (at least monthly) to discuss, problem-solve and support that progress. Implementation of the Plan was disrupted by the COVID-19 epidemic, but the planning phase continued in earnest. Key staff within the Department utilized this time as effectively as possible to check that each component of the Plan was robustly designed and that each of the steps required for implementation were identified and properly sequenced. Baseline metrics and progress toward implementation are discussed below.

*RNDC Plan to Reduce Violence and Use of Force*

RNDC's plan to reduce violence and UOF was developed during the Ninth Monitoring Period, though the implementation of the plan was temporarily suspended—with the Monitoring Team's support—so that the Department could focus on mitigating the spread of COVID. Implementation resumed in the Eleventh Monitoring Period. By way of background, RNDC houses several populations: 18-year-olds, who are housed with their older Young Adult

---

[210] While some of the other Facilities that hold 18-year-olds have similar operational problems as RNDC (*e.g.*, lack of disciplinary options, inconsistent staff assignments), they have significantly lower rates of violence and UOF and house a very small number of 18-year-olds (less than 10), and thus there is no basis to conclude that a specific plan to remediate conditions in those Facilities is necessary. Still other 18-year-olds are in special programs (*e.g.*, ESH, Secure, CAPS and PACE) which have their own program designs. Finally, all youth in other facilities will benefit from the Department's plans for global improvements described in other sections of this report.

counterparts aged 19 to 21, all of whom are kept separate from several units that house adults aged 22 and older. The Young Adult population is approximately 63% of the total facility population, with the remainder being adults. The Remedial Order includes a number of provisions focused on 18-year-olds and requires certain improvements in any housing unit that *may* house 18-year-olds. Given that the Department's current strategy is to co-mingle 18-year-olds with those aged 19 to 21, the strategies required by the Remedial Order will be implemented in all Young Adult housing units at RNDC.

An analysis of key trends in violence and UOF for the entire Facility, and separated by age group, is essential for tracking the effectiveness of the strategies required by the Remedial Order. The graphs below present data on the rates of UOF and violence at RNDC beginning in July 2018, which is when the 18-year-olds transitioned into that Facility from GMDC.[211]

- **RNDC Rate of UOF**

The Facility's UOF rate was at its peak at the end of 2018—with an average rate of 28.1 uses of force per 100 people in custody. From there, the average UOF rate has steadily decreased every six months, from 22.0 January-June 2019; to 19.8 from July-December 2019, and finally to 14.8 for the current Monitoring Period. Within this Monitoring Period, the rate at the beginning (19.3) was significantly higher than the rate during the final three months (10.4).

---

[211] Prior to this transition, RNDC did not house 18-year-old youth.



The table below illustrates the disproportional contribution of 18-year-olds to the Facility's UOF rate. Although 18-year-olds comprise less than one-fifth of the Facility's population, they contribute about half of the Facility's uses of force.

| RNDC UOF events and ADP, by Age, July 2018 to June 2020 | | | | |
|---|---|---|---|---|
| Age Group | 7th MP | 8th MP | 9th MP | 10th MP |
| *ADP* | | | | |
| 18-year-olds | 103 (30%) | 91 (19%) | 76 (17%) | 56 (14%) |
| Age 19 and older | 245 | 391 | 377 | 354 |
| *Total* | *348* | *482* | *453* | *410* |
| *# UOF Events* | | | | |
| 18-year-olds | 370 (69%) | 313 (49%) | 266 (50%) | 154 (43%) |
| Age 19 and older | 170 | 326 | 271 | 204 |
| *Total* | *540* | *639* | *537* | *358* |

- **RNDC Rate of Violence Among Incarcerated Individuals**

The rate of violence among incarcerated individuals has also decreased at RNDC over time, although not as steadily as the UOF rate. From July to December 2018, the average rate of

violence was 21.6 per 100 people in custody and increased a bit to 23.4 during the subsequent six months. From there, a more continuous downward trend is evident, from 19.1 between July and December 2019 to 13.0 between January and June 2020. Similar to other metrics reported in this section, the average rate of violence noticeably improved from the beginning of the current Monitoring Period (17.6 from January to March 2020) to a historical low point at the end (8.4 from April to June 2020).



The table below illustrates the disproportional share of fights contributed by 18-year-olds at RNDC. Although 18-year-olds comprise less than 20% of the facility's population, they contribute at least half of the number of fights.

| RNDC Fights and ADP, by Age, July 2018 to June 2020 | | | | |
|---|---|---|---|---|
| Age Group | 7th MP | 8th MP | 9th MP | 10th MP |
| *ADP* | | | | |
| 18-year-olds | 103 (30%) | 91 (19%) | 76 (17%) | 56 (14%) |
| Age 19 and older | 245 | 391 | 377 | 354 |
| *Total* | *348* | *482* | *453* | *410* |
| *# UOF Events* | | | | |
| 18-year-olds | 330 (64%) | 380 (56%) | 307 (59%) | 162 (50%) |
| Age 19 and older | 182 | 299 | 213 | 160 |
| *Total* | *512* | *679* | *520* | *322* |

The effectiveness of the RNDC Plan (described below) will be evaluated, in part, by assessing changes to these baseline metrics over time.

The RNDC Plan includes three core components: (1) consistently assigning Staff to the same housing unit day-to-day; (2) improving Staff supervision (*i.e.*, Unit Management); and (3) bolstering incentives for positive behavior and fortifying the sanctions for misconduct. The Department is slated to begin pilot testing the concepts in September 2020, at first in one building (which includes six discrete housing units) and then expanding to the other Young Adult housing units at RNDC. A timeline for this expansion will be developed during the Eleventh Monitoring Period, once the lessons learned from the pilot testing have been digested.

Each of the core components of the RNDC Plan is summarized below, and further discussion is integrated into the relevant provisions in the remainder of this section. When the COVID pandemic first began in March 2020, the Department decided—and the Monitoring Team fully supported—to hold off on the implementation of the RNDC plan given the instability in uniformed staffing, the fact that Program Counselors were working remotely, and the inability to train groups of staff. As a result, the remainder of the current Monitoring Period was utilized to further specify plans, refine training curricula, develop job aids and generally ensure that the

concepts were sound so that, once it was safe to do so, the RNDC Plan could be robustly deployed. These pillars are interdependent and are also closely related to other drivers of the Facility's high rate of UOF and violence, most of which are addressed in other provisions of the Remedial Order. They must be properly and fully implemented to have the intended impact on RNDC's safety.

- **Consistently Assigning Staff to the Same Housing Unit**

As discussed in detail below, the Department continued to make progress to check that Staff are assigned to and work on the same housing units day-to-day and NCU's audit methodology was strengthened, as discussed in detail in § XV. ¶ 17 (Consistent Assignment of Staff) below. Due to the significant operational disruption caused by COVID-19, the consistency of staff assignments was not evaluated from March to June 2020. Consistent staffing is the foundation for developing more constructive Staff-youth relationships and for enhancing Staff's ability to detect and de-escalate rising tensions. In addition to assigning line Staff to the same housing units, Captains and ADWs will be consistently assigned to supervise the same places and people, day-to-day. NCU made further refinements to its audit methodology to check transparency and consulted with the Monitoring Team to develop consensus regarding the compliance threshold. Consistently assigning staff to the same housing unit is a core requirement for achieving the goals of the other components of the plan, discussed below.

- **Improving Supervision of Captains and Line Staff**

The Department plans to implement several strategies to improve the quality of Staff supervision at RNDC to respond to the Monitoring Team's concerns about the quality of guidance and supervision for both Supervisors and line staff; to assist staff implementing proactive supervision, de-escalation, consistency in the management of housing units (*i.e.*, core

tenets of Direct Supervision, see § XV. ¶ 12, below); and to increase cohesion among the multi-disciplinary unit teams (*i.e.*, Uniformed Staff and Supervisors, counseling/program staff, and recreation staff).

One strategy for improving Staff supervision is to build in additional lines of supervision. During the current Monitoring Period, the first Unit Manager was identified, and some Captains were assigned to specific areas at RNDC. In addition, several staff were promoted to the rank of ADW, Department-wide. The Unit Manager's role is to oversee the implementation of multi-disciplinary teams ("unit teams") that will meet weekly to discuss the operation of the units, to role model effective supervision techniques in an effort to develop skills among their subordinates, and to ensure that the Informal Resolution process is implemented as designed. The specific ways in which supervision will be enhanced will be an area of focus during the next Monitoring Period.

- **Developing Incentives for Positive Behavior and Fortifying Sanctions for Misconduct**

The Department's original incentive programs (*i.e.*, the Levels and the Stamp Cards) were never properly implemented and thus were not effective strategies for managing youth behavior, as discussed by the Monitoring Team in several prior reports (*see* Eighth Monitor's Report at pgs. 281-282). Furthermore, the Department's continuum of responses to misconduct needs to be expanded to effectively address behaviors such as threatening Staff, fights or horseplay where no one is seriously injured, property destruction or theft, or continuous disruption to Facility operations such that services to other incarcerated individuals are compromised, as heavily emphasized in previous Monitor's Reports. These behaviors are not serious enough to warrant placement in an SSH, but an effective response is necessary to

promote Facility safety. The infraction process, as currently applied, does not include effective sanctions for modifying behavior (*i.e.*, only a $25 surcharge or a verbal reprimand).

The Department has adopted a strong conceptual approach wherein the incentives and sanctions are intertwined. The Department identified a set of desirable commodities (*e.g.,* commissary, special activities, electronics, access to the PEACE/YES centers, etc.) and access to them is either expanded (*i.e.,* used as an incentive) or restricted (*i.e.,* used to sanction misconduct). The response to misconduct can also be fortified using a variety of skill-based activities, such as CBT assignments or worksheets, and restorative justice practices, such as apology letters or community service. Intended practices for incentivizing and sanctioning behavior have been codified in a draft policy and are described in more detail below. The policy will be finalized, and the training will occur during the Eleventh Monitoring period.

   o *Incentivizing Positive Behavior*

The RNDC Plan includes several individual-level incentives to encourage positive behavior. First, upon admission, all youth will immediately have access to a variety of incentives including commissary spending of $125 and a broad range of items that can be purchased, frequent haircuts, tablets with educational and entertainment programming; Game Boys; extra recreation sessions; an evening snack; and weekly trips to the PEACE Center. Youth maintain access to all of these incentives unless they commit a rule violation, when they may be restricted from one or more of them for a short period of time. These consequences are discussed in more detail below. Over time, youth may also earn admission to one of two Honors Dorms (one dedicated specifically to incarcerated individuals who agree to attend school every day) that feature an even more robust array of incentives (extra visitation and recreation; late lock-in; more games, televisions and telephones; and premium access to the PEACE center). The School

Honors Dorm opened in November 2019, and the general Honors Dorm opened in June 2019. The Monitoring Team has not yet analyzed the flow of youth into/out of these units (given the stilted operations resulting from COVID mitigation efforts) but Facility leadership reports that they are popular, and that youth appear motivated to access the privileges and rewards available in the Honors Dorms. Eventually, the Department plans to add additional options for on-the-spot rewards (*e.g.*, free haircut coupons or entertainment delivered via tablets) and incentives for meeting individualized case plan goals. During the current Monitoring Period, the design and acquisition of supplies needed for the incentive program were completed, along with plans for implementation beginning in September 2020. Some of the new incentives (*e.g.,* tablets and Game Boys) have already been provided as part of the Department's efforts to provide structured, self-directed activities during the period of time when programming was temporarily suspended due to COVID-19.

       o   *Responding to Misconduct*

A major component of the RNDC Plan is the implementation of "Informal Resolutions" to address low- and mid-level misconduct and to supplement the very few options available via the infraction process. Under the new process, unit Staff will be able to provide an immediate consequence ("Informal Resolutions") which could include commissary spending limits, limits on the items that may be purchased through the commissary, limits on barbershop visits (to BOC Minimum Standards), and short-term restrictions from the variety of incentives that are discussed in the section above. Staff may also choose to impose a restorative sanction, such as an apology letter or some form of community service. The plan includes procedures for supervisory oversight to check fairness and proportionality, and procedures for documenting the sanction and its duration.

During the current Monitoring Period, the Department finalized the design of the Informal Resolution protocol, created the necessary job tools (*e.g.*, CLO, forms, log books), developed informative posters and written guidance for both staff and youth and created a spreadsheet for tracking Informal Resolutions when imposed. This spreadsheet will be the main source of information for NCU to assess implementation and audit performance levels and for the Monitoring Team to assess compliance with this portion of the Remedial Order. The Department also created a training module that was approved by the Monitoring Team.

The Department had an early start on a discrete practice that will ultimately be subsumed under the Informal Resolution process—applying commissary limits following a youth's involvement in a fight or assault and for failing to lock-in promptly. The lock-in component of the strategy is discussed in detail in § XV. ¶ 2, below, because of its close connection to providing reasonably safe conditions by ensuring Staff are properly managing lock-in times and hardware security. Regarding consequences for fights, data from January to June 2020 indicated the consistent application of this sanction, ranging between 73 (June) and 224 (March) sanctions per month. Many youth received multiple sanctions of increasing severity. While these data lay bare the high level of disorder at the facility, they also represent a fundamental step forward in holding youth accountable for their behavior. That said, given that the central component of the Informal Resolution process is the use of commissary limits, the Monitoring Team encourages the Department to consider ways to encourage staff to maximize the use of the other options available as well (*e.g.*, activity restrictions and restorative activities) and to consider that some individuals may need other, more intensive types of behavior support to reduce their aggressive behavior. Once fully implemented, the Informal Resolution process will allow staff to respond to

misconduct in the moment and will provide a more fulsome range of options for shaping youth's behavior.

Together, the three core components of the RNDC Plan should create safer conditions of confinement. The current status of each Consent Judgment provision regarding "Safety and Supervision of Inmates Under the Age of 19" and "Inmate Discipline" is detailed below.

### 13. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|
| ¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continued to face high levels of violence and disorder throughout the Monitoring Period, as discussed in the narrative above.
- The Department finalized the design and implementation strategy for the RNDC Plan, described in the narrative above.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

As discussed in the introduction to this section, aside from an encouraging drop at the end of the Monitoring Period, the rate of violence and use of force among 18-year-olds remained high during the current Monitoring Period. The vast majority of 18-year-olds are housed at RNDC and thus the strategy to address violence, use of force and other types of disorder among this age group are focused on this Facility. RNDC's level of disorder and rate of use of force remain unsafe, at levels well above those that gave rise to the Consent Judgment. The implementation strategy for the RNDC Plan to be piloted during the next Monitoring Period has been finalized but must be undertaken with fidelity and expanded throughout the building in order to substantially improve Facility safety.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

**XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)**

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly, are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- NCU monitors the completion of FSIRs and DCSRs for housing areas where young adults may be held. NCU also requires Facilities to complete an "Inmate Accountability Form" which lists the cell assignments of all 18-year-olds in custody and conducts on-site inspections of housing units holding young adults so that no one is assigned to an inoperable cell. If someone has been assigned to an inoperable cell, NCU debriefs with Facility Leadership and the individual is reassigned to a new cell (NCU receives confirmation of this).

- At GRVC, OBCC and RNDC, NCU conducted its on-site Cell Inspection/Locking Mechanism audits during January, February and the first week of March 2020, and then temporarily suspended the audits for the remainder of the Monitoring Period due to the COVID-19 crisis.[212] Throughout the Monitoring Period, CASC continued to monitor Facility operations to detect instances when people in custody were unsecured during lock-in times.

- RNDC continued its practice of sanctioning youth who were observed out-of-cell after established lock-in times.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

<u>*Assessment of Locking Mechanisms*</u>

Until the time audits were temporarily suspended in March 2020, NCU found that OBCC and GRVC had a 100% compliance rate each month—meaning the small number of 18-year-olds housed in

---

[212] RMSC is not included in this audit because young women are housing in dormitory-style units.

these Facilities were all housed in cells with operable locks. RNDC's performance level improved significantly compared to the previous Monitoring Period, when youth were assigned to cells with inoperable locks in 60 of NCU's 322 (19%) randomly sampled cell checks, for an 81% compliance rate. During the current Monitoring Period, RNDC's compliance rate increased to 90%, with only 11 of 109 randomly sampled youth housed in cells with inoperable locks. Monthly performance levels ranged from 89% to 100%.

The locking mechanisms at RNDC are both antiquated and complicated and Staff have reported their frustration with the lack of dependable locking mechanisms. Accordingly, routine and vigilant security assessments and maintenance are necessary to minimize unauthorized exit from a cell. If a lock is found to be compromised, the cell must be taken off-line immediately so the lock can be repaired. The Department is striving to improve performance in this area by ensuring that the RNDC Leadership is aware of the audit results each month, reminding staff how to do a quality cell inspection, and encouraging Captains to address poor performance with their Staff.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to UOF incidents. During this Monitoring Period, the Monitoring Team identified eight incidents at RNDC (2% of the 359 incidents at RNDC) that had some type of unauthorized exit by incarcerated individuals (as reported in the COD) that resulted in a use of force incident. Based on the Monitoring Team's review, it is unclear whether the youth were able to leave their cell because the cell lock was manipulated or because they were not actually secured in their cells at the established lock-in time. As noted in prior Monitor's Reports, these findings suggest that inoperable cells contribute to only a very small fraction of incidents and therefore do not appear to be a major factor in the use of force at RNDC.

*Reasonably Safe and Secure Conditions*

This provision also requires the Department to conduct daily inspections to check that the conditions are reasonably safe and secure. The Monitoring Team continues to be concerned about Staff failures to properly manage lock-in times, as it contributes to the level of disorder at the facility and may lead to other operational problems (*e.g.,* uses of force, Probe Team deployment, etc.). Although the practice has been in place for some time, during this Monitoring Period, the Monitoring Team began receiving reports from the CASC Unit summarizing their routine monitoring of evening lock-in times. An analysis of reports from January and June 2020 revealed pervasive problems with ensuring that young adults are properly secured in their cells at bedtime. During both months, nearly every day, CASC identified multiple units at RNDC where young adults were observed moving about the unit after the required lock-in time. In January 2020, this was observed in 14 housing units, some of which were identified on multiple occasions (*e.g.*, one unit was identified on 11 of the 31 audit days and three units were identified on 8 of 31 audit days). Similar patterns were observed in June 2020. It is unusual for a correctional system to have access to this type of real-time data, and its value lies in utilizing this

data to elevate the quality of staff practice. Although CASC usually contacts the unit Staff within 30 minutes after the footage is viewed, in addition to RNDC's Tour Commander, simply notifying Staff and leadership of the problem does not appear to have reduced its prevalence. The Monitoring Team intends to work with NCU, CASC and RNDC Leadership during subsequent Monitoring Periods to identify other strategies for utilizing this information that could lead to improved Staff performance in this area.

In addition to monitoring Staff practice, RNDC has also attempted to address the issue by sanctioning those young adults who are identified by CASC as being out of their cells after lock-in. As reported in the previous Monitor's Report (*see* pg. 290), RNDC issues a verbal warning for the first offense, followed by commissary limits of different durations for subsequent offenses. During the current Monitoring Period, RNDC issued 722 sanctions for failing to comply with lock-in times. A significant number of young adults received multiple sanctions for this behavior—about 30 youth received 5 or more sanctions during the 6-month period, and some received as many as 10 sanctions. The Department reported that it recognized that the effectiveness of this sanction was somewhat limited for certain individuals and expected that the availability of other types of sanctions available via the Informal Resolution process (see the discussion regarding "Fortifying Sanctions for Misconduct" in the narrative, above) would improve the situation. Given that the central component of the Informal Resolution process is the use of commissary limits, the Monitoring Team recommends the Department consider strategies to encourage Staff to maximize the use of the other, potentially more effective, options available (*e.g.*, activity restrictions and restorative activities) and to consider that some youth may need other, more intensive types of behavior support to encourage compliance.

The Monitoring Team also encourages the Department to conduct a more thorough analysis and interpretation of this data. As recommended previously, it would also be prudent for the Department to examine whether youth are failing to lock-in at all, or whether they were able to manipulate their cell doors to exit the cell after originally locking in. The results would help to pinpoint whether the problem is one of youth resistance, problems with the physical plant or issues with Staff's ability to properly manage lock-in times and properly secure doors. Once the underlying causes of this problem have been determined, they must be addressed via accountability for staff who are not following required procedures, effective consequences for youth and upgrades to the physical plant.

| COMPLIANCE RATING | ¶ 2. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

¶ 3. A Warden or Deputy Warden shall tour:

    a.  all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall

develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted.[213]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department added to the General Supervision section of its Rules and Regulations to incorporate the requirement of this provision.
- The Department issued a General Order on March 29, 2019 requiring Wardens and Deputy Wardens to conduct weekly tours of each housing area where 18-year-olds are housed and those with operational challenges (*e.g.*, multiple fights, SRG violence, multiple uses of force or other types of disorder) to be toured more frequently.
- NCU assesses the frequency of tours during its audits of cell-locking mechanisms. To do so, the Facilities report the date/time on which tours occurred and NCU verifies the reports using logbook entries and/or Genetec reviews.
- For the weekly tours, NCU audits the Facilities' performance level by comparing the number of required tours (number of units x number of weeks audited) to the number of tours by the Wardens/DWs that could be confirmed. Facilities housing smaller numbers of 18-year-olds logically had a smaller number of required tours. During the current Monitoring Period, NCU audited practices during January and February 2020 before temporarily suspending audits for the rest of the Monitoring Period due to COVID-19 (audits resumed in July 2020).
- In January and February 2020, across all Facilities, Wardens/DWs' performance level for the required weekly tours averaged 96% for the Monitoring Period. RNDC's performance level was 100% in January and 97% in February. The Facilities with smaller numbers of housing units holding 18-year-olds had slightly lower but still acceptable performance levels.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals (i.e., part a).*

For the first half of the Monitoring Period, NCU's audits found that Facilities consistently met the weekly tour requirement of this provision, particularly at RNDC where the vast majority of youth are housed.

This provision also requires units with higher rates of disorder to be toured more often. During the current Monitoring Period, the Department and Monitoring Team collaborated to identify

---

[213] This language reflects the revision ordered by the Court on August 10, 2018 (*see* dkt. 316).

appropriate parameters for this requirement. Data on fights in the housing units was utilized to identify housing units with consistently higher rates of violence. Beginning in July 2020, Facility leadership will be required to make an additional tour each week to any of the following that house 18-year-olds: TRU/Secure/ESH, new admission units, Mental Observation units and Protective Custody units. NCU will incorporate the additional rounds into its existing audit in July 2020.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Program Counselors are assigned to all general population and TRU units housing 18-year-olds at RNDC, RMSC, and GRVC, as well as SSH units in GRVC and OBCC. They provide structured programming (*i.e.*, individual counseling, groups on issues that are common to this population) and structured recreation (*e.g.*, games and other leisure time activities). Program Counselors are required to document these programs and activities on a daily basis and the Department has a reliable mechanism for tracking the volume of services provided. Part of the Department's strategy to mitigate the spread of COVID-19 required the Program Counselors to limit in-person contact. Instead of providing group and individual services, Program Counselors provided self-paced worksheets and utilized a system of written concerns/responses to communicate with youth on the units.

- The Department continued to partner with community-based organizations that provided programming to youth at RNDC and RMSC and to those in the SSHs at the beginning of the current Monitoring Period. These in-person services were temporarily suspended to mitigate the spread of COVID-19. The Department maintains an accessible format for tracking and compiling data on the volume of in-person programming provided.

- All 18-year-olds at RNDC and RMSC have the opportunity to attend full-day school. Those in ESH or Secure have the opportunity to attend school three hours per day. School was temporarily suspended in March 2020 due to COVID-19. DOC reported that after the suspension of in-person school that DOE prepared paper learning packets that were distributed to enrolled students with a hotline to provide direct connection to the DOE for additional support. At RNDC, beginning on June 15th, remote instruction via the tablets became available for the rest of the school year.

- The PEACE Center and YES Center at RNDC offer workforce development and vocational programming (*e.g.*, autobody shop) and structured leisure time activities (*e.g.*, recording studio, ping pong and other games).

- Toward the end of the current Monitoring Period, the Department took initial steps toward a new vision for the role of Program Counselors. Once reclassified and trained, counselors will be responsible for conducting needs assessments upon admission and crafting individualized case plans for each person in custody. These plans are intended to better align needs and services, which will be delivered by a combination of Department staff and community-based organizations. Youth's progress toward case plan goals are expected to be appropriately incentivized and rewarded.

ANALYSIS OF COMPLIANCE

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

The Department is pursuing compliance with this provision by providing various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by a variety of community partners, leisure time activities (*e.g.*, tablets, board games and video games), religious services and daily large muscle activities ("recreation"). The combination of these programs should ensure that, if an incarcerated individual chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult. Broad engagement in these activities will reduce both idle time and violence and will enhance positive youth development. During the current Monitoring Period, the Monitoring Team continued to assess compliance by reviewing data on programming delivered by Program Counselors and community partners, as well as education attendance data. Given that programming was significantly disrupted by COVID-19, the Monitoring Team focused on the delivery of program services during January/February 2020.

The Department achieved Substantial Compliance with this provision for the past two Monitoring Periods. In the past, general averages were used to determine compliance. However, as programming data has become easier to access and analyze, particularly programming hours *per unit*, the Monitoring Team modified its methodology accordingly. The Monitoring Team interpreted the requirements of this provision to mean "structured programming that occupies approximately 50% of the 14 waking hours/lock-out hours per day." This is a relatively ambitious threshold for programming expectations for this age group but is consistent with best practices as required by this provision. Roughly, the 50% threshold is calculated using the following formula:

- 14 hours per day x 7 days = 98 hours x 50% = 49 hours per week = Target
  - 6 hours (school) x 5 days = 30 hours
  - 1 hour (recreation) x 7 days = 7 hours
  - 49 hours (Target) – 37 hours (school/rec) = **12 hours per week to fill**

This formula does not account for other structured activities which are difficult to quantify in the aggregate (*e.g.*, visitation, mental health services, law library, special events and activities) though these also add valuable substance and structure to a person's time in custody. Thus, the data below may underestimate the actual volume of structured activity.

For each unit that may house 18-year-olds at RNDC and RMSC, programming hours for January/February 2020 were analyzed to identify the number of units that filled the 12-hour period with programming from either community partners or Department staff. Of the 23 RNDC Young Adult housing units that were open during this time, 19 units provided at least 12 hours of programming each week. Two additional units (both Mental Observation units) averaged about 6 hours per week, but likely have additional mental health programming that would bring the total programing hours into the desired range. Thus, only two of the 23 units (9%) did not meet the 12-hour threshold, though both were very close (one averaged 10.75 hours per week and the other averaged 11 hours per week). Both of the units that may hold 18-year-olds at RMSC met the 12-hour threshold.

The Monitoring Team's decision not to rate this provision is not a commentary on the Department's level of performance. In fact, the programming provided during the first two months of the Monitoring Period would be sufficient to support a Substantial Compliance rating, if not for the disruption caused by COVID-19. This provision is Not Rated because the delivery of programming changed in response to exigent circumstances and that change was necessary in order to mitigate the spread of COVID-19 among Staff and incarcerated individuals.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Not Rated |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- NCU tracks housing transfers enacted to protect vulnerable youth at RNDC, by creating a list of all housing transfers and consulting with the Facility on the purpose of each one to identify those enacted for the purpose of protecting youth. NCU audited housing transfers throughout the current Monitoring Period.

- Each month, a list of all housing transfers at RNDC is generated, and NCU staff consult with Facility Staff/Young Adult Response Team ("YART") members to ascertain the reason for the transfer. Transfers are categorized accordingly.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

The goal of this provision is to ensure that youth who are being bullied, threatened, or are otherwise vulnerable are moved to a different housing unit where they will be safer. Facilities make housing transfers for a variety of reasons (*e.g.*, after intake and classification, to disrupt tensions, to provide access to a program house, etc.). At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent of this provision is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Facilities must strike a delicate balance among making transfers to protect vulnerable incarcerated individuals, intervening before tensions escalate into violence, not allowing incarcerated individuals to dictate their housing assignments, and helping incarcerated individuals and Staff develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Facilities' flexibility for programming, population management, etc.

NCU's audit strategy is comprehensive and has integrity. During the current Monitoring Period, NCU identified 19 transfers effected to protect the victim of an altercation. Each situation is fact-specific and is determined by reviewing each transfer of certain types individually (*e.g.*, transfers that occur following a fight). The Monitoring Team is satisfied that NCU is presenting accurate data in this regard. The Department consistently transfers youth among housing units at RNDC in order to protect victims or to prevent tensions from escalating and remains in Substantial Compliance.

Given the small number of housing units and very few 18-year-old youth housed in the general population at EMTC, GRVC and RMSC, the procedures required by this provision are not operationally feasible. AMKC (CAPS, PACE, or MO), GRVC (Secure) and OBCC (ESH) are excluded due to their function as special housing units and the resulting lack of flexibility in housing assignments.

| COMPLIANCE RATING | ¶ 6. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (*see* Second Monitor's Report, at pgs. 131-132). Protective Custody units are located at RNDC (males) and RMSC (females).

- Based on feedback from the Monitoring Team, the Department previously revised its practice to allow Operations Security Intelligence Unit ("OSIU") staff to focus more directly on 18-year-olds and those who are disputing their placement in Protective Custody ("PC").

- The Chief of Security previously issued a memo to the Assistant Chiefs for each Facility directing that transfers into and out of PC may occur *only* with OSIU approval and must be carried out by the Facilities in a timely manner. Furthermore, NCU reported that it instituted a new procedure in which OSIU sends NCU the *entire* PC file so that NCU staff can identify issues that may be documented on something other than the official PC forms.

- NCU audits PC files each month to assess compliance with policy and the requirements of the Consent Judgment. NCU found high levels of compliance across the 35 files audited (some youth who entered PC during the previous Monitoring Period were included in the audits). Nearly all of the packets included:
  - A statement from the youth detailing his/her concerns;
  - Further information (incident report, etc.) to flesh out the youth's statement;
  - Evidence that OSIU interviewed the youth within the two-business day timeline;
  - Documentation that youth were promptly informed of OSIU's decision and their right to a hearing;
  - Evidence that hearings were held timely for involuntary placements; and
  - Evidence that most 30- and 60-day reviews were timely and included youth's input into the reviews via a written statement; and
  - Justifications for denying the initial request for Temporary PC or discontinuing PC upon interview were reasonable.

- NCU also reviews denials of Temporary PC.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

The Department maintained Substantial Compliance with this provision by demonstrating through NCU's audits that OSIU and Facilities are complying with existing DOC policy and meeting the requirements of this provision for the use of PC for both male and female 18-year-olds.

During the current Monitoring Period, a total of 19 18-year-olds were placed in PC (all male; there were no female 18-year-olds in PC during the Monitoring Period). The lower number of

admissions compared to previous Monitoring Periods may be due, at least in part, to the reduction in the size of the 18-year-old population overall. For example, the 18-year-old ADP for the 10th Monitoring Period was about 60, compared to about 80 for the Ninth Monitoring Period. Most were referred from RNDC, though two youth were placed in PC from general population at GRVC and two from MDC. About two-thirds (63%) of the placements were requested by the Facility, 26% were self-referred and 11% were court-ordered. Six of the 19 placements (33%) were involuntary. All placements were reviewed by OSIU within the two business days permitted by policy, and all but four (79%) were continued in PC. In each case, OSIU provided reasonable justifications for discontinuing PC placement—most often at the youth's request. Three youth remained in PC at the end of the Monitoring Period, with a median length of stay of 9 days (range 5-46).

During the previous Monitoring Period, NCU and the Monitoring Team agreed it would be worthwhile to track the number of youth who request/are referred for "Temporary PC" but for whom OSIU declines to assign a PC number. This occurs when youth do not meet the basic criteria given their history of assaultive behavior or UOF, when evidence of a specific threat was not produced or when another housing unit can address the person's safety concern. During the current Monitoring Period, four initial requests for Temporary PC were denied, primarily because of the youth's propensity for violence for which two youth were ultimately placed in the Secure Unit. When this occurs, the Monitoring Team recommends that threats to youth safety be considered when making housing decisions to other units.

As shown in the table below, 20 youth exited PC during the current Monitoring Period. Their median length of stay was 33.5 days, with a range of 1 to 125 days. While there is some variation in the reasons for removal over time (*e.g.*, a larger proportion of youth requested removal from PC during the current Monitoring Period), the fluctuations are not cause for concern. PC continues to afford youth the level of safety and security required by this provision.

| 18-year-olds Admitted to and Released from Protective Custody, January 2018-June 2020 | | | | | |
|---|---|---|---|---|---|
| | Jan. – Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul.-Dec. 2019 | Jan.-Jun. 2020 |
| **Number of Admissions** | 28 | 32 | 15 | 25 | 19 |
| **Number of Releases** | 30 | 26 | 24 | 29 | 20 |
| **Reason for Release** | | | | | |
| Discharged/Transfer | 19 (63%) | 12 (46%) | 10 (42%) | 17 (59%) | 9 (45%) |
| Requested Removal | 5 (17%) | 8 (31%) | 2 (8%) | ~ | 6 (30%) |
| Behavior (Fight, AOS) | 5 (17%) | 4 (15%) | 11 (46%) | 6 (21%) | ~ |
| Other | 1 (3%) | 2 (7%) | 1 (4%) | 6 (21%) | 5 (25%) |

As discussed above, NCU's audits revealed high levels of compliance with policy across the 35 files reviewed during the current Monitoring Period. The Department remains in Substantial Compliance.

| COMPLIANCE RATING | ¶ 7. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INCARCERATED INDIVIDUALS)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department issued an interim Directive 4104R-F regarding the use of the Housing Unit Balancer ("HUB") at all Facilities except RMSC and HOJC (effective 10/3/19).
- The HUB is a decision-tree that addresses each person's risk of institutional misconduct (Minimum, Medium-Medium, Medium-Maximum, and Maximum) and also balances the security risk groups ("SRGs") on each housing unit.
- The HUB does not currently have the capacity to produce automated reports to ensure that people are housed according to their custody level and that low- and high-custody youth are not co-mingled (that is, mis-housed). Instead, Custody Management must compile this information manually each day.
- Custody Management submits a list of people in custody who are mis-housed to each Facility holding 18-year-olds each business day. Facilities are required to submit a memo to Custody Management each business day, explaining the reason for/plan to address mis-housing for each person who appears on the mis-housed list. Facilities also complete a spreadsheet that lists the people who are mis-housed, the reason for mis-housing, and the action taken to resolve the issue (*e.g.*, rehouse, apply an override, etc.).
- Policy requires facilities to address mis-housing within 72 hours, either by rehousing the person appropriately or enacting an override of the custody level so that the person may be housed out-of-class.[214]

### ANALYSIS OF COMPLIANCE

[214] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old inmates housed in these Facilities are placed in Special Units like those noted in the text of this provision. Female youth at RMSC are also exempt from this requirement because the very small number of 18-year-old girls makes this provision operationally infeasible.

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

The Department's policies reflect the requirements of this provision. Temporary co-mingling of classification levels, or mis-housing, occurs when (1) a person's classification level changes automatically overnight (*e.g.*, upon a birthday, or when he has not had a violent incident in 60 days); (2) sufficient bed space is not available in the suitable housing area; and (3) separation issues restrict housing flexibility. As indicated above, the Department uses the HUB in all of its Facilities. In addition to custody level, the HUB also considers SRG affiliation when identifying appropriate housing. This adds complexity to the re-housing process—it is not just a matter of identifying a housing unit of the appropriate security level, but also one in which SRG affiliations will be appropriately balanced.

The Monitoring Team analyzed mis-housing data only for January and February 2020. The Monitoring Team did not analyze mis-housing for the rest of the Monitoring Period given that the housing assignment process was understandably disrupted by the need to limit COVID-19 exposure. During January and February 2020, a total of 102 youth appeared on the RNDC mis-housing list. This list included information on both 18-year-olds and 19- to 21-year-olds, given that the mis-housing of older young adults could potentially impact the safety of 18-year-olds on the same housing unit. Approximately one-third were not actually mis-housed (n=34, 28%)—they were assigned to units where people of any custody level are permitted to be housed (*e.g.*, TRU or Protective Custody). Most of the remaining 68 people who were actually mis-housed were rehoused or an override was put in place within the 3 days permitted by policy (n=53; 78%). The other 15 people in custody (22%) remained mis-housed beyond the 3-day timeline. An override was eventually generated for nearly all of these youth. Ensuring that overrides are generated timely would address nearly all instances of mis-housing beyond the 3-day timeline. Viewed from another angle, on any given day in January-February 2020, between 0 and 9 young adults were mis-housed at RNDC, averaging 4.4 mis-housed people per day, which is less than 5% of the facility's young adult population. Most were rehoused within policy guidelines. In summary, mis-housing continues to be a low-frequency event at RNDC and the Department continues to be in Substantial Compliance with this provision.[215]

| **COMPLIANCE RATING** | **¶ 8. (18-year-olds)** Substantial Compliance |
| --- | --- |

---

[215] As noted in the Ninth Monitor's Report (*see page XX),* The small number of 18-year-olds at other Facilities makes operationalizing this provision impractical and thus the Monitoring Team does not activity monitor this provision at facilities other than RNDC. This approach may be re-evaluated if the number of 18-year-olds in the general population increases significantly at other Facilities.

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) |
|---|
| ¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to use the Direct Supervision model, developed by the National Institute of Corrections, as the foundation for a training program for supervising young adults. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.
- Direct Supervision training continues for recruits and the majority of staff at RNDC have received this training (the training for the final group of In-Service Staff is described in the Training section of this report).
- The Department is in the process of rolling out a Unit Management strategy at RNDC which reflects the essential hallmarks of Direct Supervision, as described below. The Monitoring Team approved the training package during the current Monitoring Period. Staff at RNDC will be trained in the model and essential skills during the Eleventh Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

As noted in the Training section of this report, most Staff at RNDC have received the initial Direct Supervision training. Under the RNDC Plan, the Department plans to integrate the core practices of the Direct Supervision curriculum into its expectations for staff implementing the Unit Management/Informal Resolution models. Core practices include:

- achieving consistent assignment of Staff to housing units;
- providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;
- ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;
- expecting Staff to deliberately select a lower level of engagement when tensions arise;
- occupying youth with structured activities throughout the day; and
- engaging in proactive and interactive supervision.

Under its Unit Management concept, the Department now has a framework for addressing this provision and these concepts have been integrated into the Unit Management training. Progress toward the rewards/sanctions tenet of Direct Supervision is described in the section about "Informal Resolutions" in the narrative preceding this section of the report. Finally, as required by the Remedial Order, during the next Monitoring Period, the Department will develop a strategy for measuring the extent to which housing units are operated according to the daily schedule, which will reveal the

quality of practice regarding providing structured and predictable activities during the day. Clearly, fully implementing Unit Management will require significant coaching and Staff supervision to change the culture of the facility toward one that is more proactive, interactive and focused on de-escalating tensions and incentivizing good conduct rather than utilizing force to create compliance.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 13 (APPROPRIATELY QUALIFIED AND EXPERIENCED STAFF)

¶ 13. Young Inmate Housing Areas shall be staffed in a manner sufficient to fulfill the terms of the Agreement, and allow for the safe operation of the housing areas. Staff assigned to Young Inmate Housing Areas shall be appropriately qualified and experienced. To the extent that the Department assigns recently hired correction Officers or probationary Staff Members to the Young Inmate Housing Areas, the Department shall use its best efforts to select individuals who have either identified a particular interest in or have relevant experience working with youth.

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set for in *Appendix B: Status of Compliance—Inactive Monitoring or Abeyance of Certain Provisions.*

| COMPLIANCE RATING | ¶ 13. (18-year-olds) Not Rated—Inactive Monitoring |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 14 & 16 (STAFFING)[216]

¶ 14. The Department shall make best efforts to ensure that no Young Inmate Housing Area on any tour shall be Staffed exclusively by probationary Staff Members.

¶ 16. Staffing Levels.

    b.    The ratio between Inmates and Direct Supervision floor Officers shall be no more than 25:2 in Young Inmate Housing Area units used to house high classification 18-year-olds, except during the overnight shift when the ratio may be up to 25:1. The maximum living unit size shall be 25 Inmates.

    c.    The ratio between Inmates and Direct Supervision floor Officers shall be no more than 30:1 in Young Inmate Housing Area units used to house medium classification 18-year-olds. The maximum living unit size shall be 30 Inmates.

This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set for in *Appendix B: Status of Compliance—Inactive Monitoring or Abeyance of Certain Provisions.*

---

[216] The Consent Judgment does not include a ¶ 15 for this Section.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **14. (18-year-olds)** Not Rated—Inactive Monitoring |
| | ¶ **16(a). (18-year-olds)** Not Rated—Inactive Monitoring |
| | ¶ **16(b). (18-year-olds)** Not Rated—Inactive Monitoring |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Consistent staffing can be achieved through two mechanisms: awarded steady posts (where Staff apply for and are awarded a consistent assignment) and informal assignment (where schedulers simply assign Staff consistently to the same post).
- The Department has made significant progress in consistently assigning RNDC regular staff ("four-day staff"), relief staff ("two-day staff") to the same units day-to-day. All but a small handful of units have steady officers of both types. The extent to which assignments could be put into practice was impacted by COVID-19 in March through June 2020. Consistent assignments for Captains will be undertaken during the next Monitoring Period.
- NCU began auditing RNDC's performance level in October 2019, though temporarily suspended the audits in March 2020 due to the COVID-19 epidemic. During the current Monitoring Period, NCU worked with the Monitoring Team to establish thresholds for determining compliance. Audits are scheduled to resume in July 2020.

### ANALYSIS OF COMPLIANCE

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

The overall purpose of consistently assigning Staff to the same housing unit is to facilitate constructive Staff-youth relationships. Indeed, consistent staffing is a hallmark of Direct Supervision and is particularly important in units with youth who are difficult to manage (*i.e.*, the SSHs) or who struggle with mental illness. This same theme—the benefit of developing relationships in order to change behavior—applies to consistent assignment of Captains as well, given their essential role in helping Staff to improve practice.

During the current Monitoring Period, the Department continued its efforts to steadily assign staff at RNDC (*i.e.*, "*this* person will be assigned to *this* post on each day he or she works"). As of February 2020 (NCU's most recent audit prior to COVID-19), nearly all posts on all three shifts had steadily **assigned** 4-day officers (1st shift 93%, 2nd shift 93%, 3rd shift 91%). Significant proportions of posts on all three shifts also had steadily assigned 2-day officers (1st shift 69%, 2nd shift 89%, 3rd shift

73%). Because a proportion of Staff will go on leave, retire, transfer to another jail, etc., staff assignments will need continual vigilance so that the Department's obligations are consistently and reliably implemented long-term.

NCU audits each open post each day to determine whether the assigned 4-day/2-day staff worked the post as expected. Results are presented in the table below:

| RNDC Steady Staffing, per NCU audits, January & February 2020 | | | | | | |
|---|---|---|---|---|---|---|
| | 1st Shift (2300 x 0731) | | 2nd Shift (0700 x 1531) | | 3rd Shift (1500 x 2331) | |
| | Jan. | Feb. | Jan. | Feb. | Jan. | Feb. |
| % of posts where steady officer actually worked post | 65% | 62% | 64% | 56% | 54% | 56% |
| Reason Steady Officer Did Not Work Assigned Post | | | | | | |
| Mutual (Shift Trade) | 10% | 11% | 12% | 17% | 10% | 7% |
| No Steady Assigned | 10% | 12% | 6% | 7% | 18% | 15% |
| Leave/Vacation/Time Due/Sick | 9% | 2% | 9% | 7% | 7% | 7% |
| Posted Elsewhere | 4% | 6% | 4% | 7% | 8% | 8% |
| Training | 1% | 2% | 3% | 4% | 3% | 7% |
| Other | 1% | 5% | 2% | 2% | <1% | <1% |

As noted above, nearly all posts have a specific Staff person assigned to them on each tour. NCU's audits revealed that a little less than two-thirds of the posts were actually worked by the person assigned to them. Often, the assigned person did not work a post for a legitimate reason—they were sick, on vacation, in training, etc. Department Staff are also permitted to trade shifts with their peers (*i.e.*, "Mutual"), which occurred in about 10% of the posts audited in the table above. There are two places where the Department can increase the frequency with which the assigned person works a post—by ensuring that every post has a steadily assigned Staff (about 11% of the posts audited above did not have an assigned person, "No Steady Assigned") and by refraining from re-assigning housing unit Staff to another post on any given day (in about 6% of the tours audited above, the assigned staff was posted elsewhere).

As the Department responded to COVID-19, staffing patterns were understandably disrupted. For this reason, NCU temporarily suspended its audits of this provision beginning in March 2020. Throughout the remainder of the Monitoring Period, the Department consulted with the Monitoring Team to refine the audit methodology to hone the findings regarding specific housing units and to

identify the threshold required to reach Substantial Compliance. Beginning in the next Monitoring Period, NCU will audit three categories of housing units at RNDC: General Population units housing Young Adults (a random sample of at least half of the GP units open during the month), all TRU units and all MO units. Performance levels for these three categories will be calculated separately, with a threshold of 60% required for general population units and 70% required for TRU/MO units. This performance level must be achieved *each month*, absent a compelling justification. In other words, each month, at least 60/70% of the posts audited must be worked by the staff who was assigned to that post in order to achieve Substantial Compliance. During the next Monitoring Period, similar audits, sampling frames and performance thresholds will be determined for RNDC Supervisors.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Partial Compliance |
|---|---|

## 14. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE ¶ 1 (INMATES UNDER THE AGE OF 19: OWED PUNITIVE SEGREGATION TIME),**
**¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 1. No Inmates under the age of 19 shall be placed in Punitive Segregation based upon the Punitive Segregation time they accumulated during a prior incarceration.

¶ 7. The Department shall not place any 18-year-old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year-old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year-old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, Benjamin v. Ponte, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

*Provision XVI.1 applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

With respect to ¶ 1, This provision was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349). The status of compliance of this provision is set for in *Appendix B: Status of Compliance—Inactive Monitoring or Abeyance of Certain Provisions.*

As for the remaining provisions related to Punitive Segregation or Isolation, during the next Monitoring Period, the Monitoring Team plans to review the operation and daily schedules of TRU, Secure and ESH to re-assess whether any of the programs include practices that would trigger these provisions. The previous ratings from the Second Monitoring Period (while Punitive Segregation was still in use) remain in effect, including ¶ 8 which was placed in Substantial Compliance and ¶ 7 which was placed in Partial Compliance. The Monitoring Team did not assess the condition of cells for Punitive Segregation (¶ 9) while the practice was still in use, and thus the provision has not yet been rated.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Not Rated—Inactive Monitoring<br>¶ 7. Partial Compliance (per Second Monitor's Report)<br>¶ 8. Substantial Compliance (per Second Monitor's Report)<br>¶ 9. Not Currently Applicable |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.
- 18-year-olds with serious mental illnesses (SMI) who commit violent infractions are excluded from the Secure Unit and Young Adult Enhanced Supervision Housing (YA-ESH) and must be placed in an appropriate therapeutic setting.[217]
- When a youth is referred to Secure or YA-ESH, medical and mental health staff at H+H are asked to "clear" the youth for program entry by verifying that he has no contraindications given the increased lock-in time and use of restraint desks in these programs.

---

[217] At the end of the current Monitoring Period, the City expanded the exclusionary criteria for ESH and Secure to include a variety of health conditions (e.g., asthma, diabetes, etc.) which may increase the number of youth who are precluded from these units in the future.

- The Department has two therapeutic units for incarcerated individuals with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of incarcerated individuals with SMI who have committed an infraction. PACE also offers treatment to incarcerated individuals with SMI but is completely separate from the infraction process.

ANALYSIS OF COMPLIANCE

The Department submitted data on medical and mental health clearance for all ESH and Secure referrals throughout the Monitoring Period. A total of 28 18-year-olds were referred during the current Monitoring Period, which represents a continued decline in referrals from previous Monitoring Periods (Ninth n=53, Eighth n=78, and Seventh n=90). While the full gamut of underlying reasons is not entirely clear, the data do demonstrate that the Department is *referring* 18-year-old youth to restrictive housing less often than in the past. That said, as discussed in the ¶ 6 "Continuum of Disciplinary Options" below, roughly the same number of 18-year-old youth were *actually admitted* to an SSH as in the previous Monitoring Period.

Responses to a request for clearance were provided by medical and mental health staff within a business day or two. Medical cleared all of the youth, and mental health cleared 23 of the 28 youth (82%) for either unit, and an additional three youth (26 of 28; 93%) for Secure only. The Monitoring Team verified that those who were *not* cleared were *not* admitted to either ESH or Secure (nearly all remained in their existing housing unit, while several were placed in TRU). Conversely, all youth placed in ESH and Secure *were* cleared prior to admission. Revisions to the process for communicating the outcome of the mental health and medical screening appear to have resolved the issues described in the Eighth Monitor's Report (*see* pgs. 275-276).

During the previous Monitoring Period, the Monitoring Team sought clarification from H+H on the durability of mental health clearance (*i.e.*, how long clearance remains valid). H+H reported that their policy states clearance is valid for one week. Early in the Monitoring Period, clearance had expired prior to two youth's placements. For the remaining four months, all youth had valid clearance upon their placement in ESH or Secure.

Two 18-year-olds were admitted to CAPS in this Monitoring Period. If a significant number of youth are placed in these programs in subsequent Monitoring Periods, the Monitoring Team will assess the appropriateness of these placements.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be

subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.
- The Department operates several Structured Supportive Housing units ("SSH") to address those who commit serious or chronic violent misconduct, including Transitional Restorative Units ("TRU"), the Secure Unit and Young Adult Enhanced Supervision Housing ("YA-ESH")).[218]
- The original TRU policy was approved by the Monitoring Team during the Sixth Monitoring Period. The Department revised, and the Monitoring Team approved, the TRU Policy during the current Monitoring Period. It is expected to be implemented during the next Monitoring Period.
- The Department has policies in effect for both ESH and Secure but reports revisions to both policies are being considered, particularly as commissary limits are recalibrated for alignment with the RNDC Plan.
- NCU audits compliance with procedural requirements for all three programs by auditing the records of youth in SSH programs upon their transfer to the General Population or other specialized housing unit (*e.g.*, MO, PC, etc.).

**ANALYSIS OF COMPLIANCE**

The three SSHs vary in terms of their restrictiveness. TRU is focused on addressing violent misconduct but does not restrict the youth's lock-out time or movement beyond what occurs in the general population. Youth have 14-hours lock-out time, travel to school and recreation and do not have restrictions on visitation or other movement in the facility. Secure and ESH both utilize additional hardware (*i.e.*, restraint desks; partitions between quads) and other restrictive procedures (*i.e.*, escorted movements, reduced lock-out times depending on the youth's level/phase, no-contact visitation) to suppress violent misconduct. While the SSHs vary a bit in terms of the type and volume of programming that is offered, youth may receive several hours per day of school, recreation, and services from the Program Counselor and community partners, if they choose to participate. Both ESH and Secure utilize a Phase/Level system—as youth progress through the phases/levels, they are afforded longer lock-out times and a few additional privileges.

**Admissions and Transfers.** A total of 65 18-year-old youth were admitted to one of the three SSHs during the current Monitoring Period, continuing the overall downward trend noted previously. The table below shows the distribution in admissions among the three SSHs.

---

[218] See pgs. 219-221 of the Third Monitor's Report for a description of each program. The Department originally had a fourth option, Second Chance Housing Unit ("SCHU') but discontinued it mid-2019.

| 18-Year-Old Youth Admitted to TRU, Secure and ESH | | | |
|---|---|---|---|
| | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 |
| SCHU | 24 *(16%)* | 1 *(2%)* | ~ |
| TRU | 95 *(64%)* | 46 *(71%)* | 38 *(58%)* |
| Secure | 15 *(9%)* | 11 *(17%)* | 20 *(31%)* |
| ESH | 14 *(9%)* | 7 *(11%)* | 7 *(11%)* |
| TOTAL | 148 | 65 | 65 |

*Note: Prior to Jan 2019, SSH data also included 16- and 17-year-olds and thus are not comparable.*

The Department continues to utilize TRU most often in terms of raw numbers, though the proportion of youth who are admitted to the more secure options (Secure and ESH) has steadily increased (from 18% to 28% to 42%). Given the impact of COVID-19 during the current Monitoring Period, it is difficult to ascertain the underlying cause of this shift or to predict whether it will be an enduring trend.

Of the 66 youth who spent time in one of the SSHs during the current Monitoring Period, 15 (23%) were transferred to another SSH before being moved to the general population. The majority were transferred only once, and the transfers varied in terms of being to a more or less restrictive program. Several youth were also re-admitted to an SSH following a short stint in the general population. As noted in prior Monitor's Reports, the Department is encouraged to improve the continuity of care for youth who are transferred or re-admitted by summarizing/leveraging prior SSH exposure to inform the approach taken in a subsequent SSH placement.

**Length of Stay**. Data on length of stay, by SSH program and exit type, is presented in the table below.

| SSH Average Length of Stay, by Exit Type, January-June 2020 | | | |
|---|---|---|---|
| Exit Type | TRU (N=35) | Secure (N=19) | ESH (N=9) |
| To General Population | 22 days *(Range 1-55)* | 62 days *(Range 9-122)* | 50 days* *(Range 42-58)* |
| Discharge from DOC** | 23 days *(Range 22-23)* | ~ | 72 days *(Range 72)* |
| Transfer to another SSH | 16 days *(Range 1-60)* | 27 days *(Range 20-47)* | 35 days *(Range 15-91)* |

*\*Note: Only 2 youth were transferred from ESH to GP*
*\*\*Only 3 youth were discharged from DOC while housed in an SSH*

The lengths of stay for youth who transfer from an SSH to the general population have remained remarkably consistent over time—about 3 weeks for TRU and 50-60 days for ESH/Secure. Not surprisingly, the 15 youth who were transferred among the SSHs prior to going to general population had longer total lengths of stay (average length of stay 89 days, range 65-117). Finally, at the end of the Monitoring Period, three youth remained in TRU (length of stay for all three was 28 days), one youth remained in ESH and had been there for 46 days, and 10 youth remained in Secure (average length of stay was 83 days, ranging from 44 to 215 days).

**Level of Violence**. The table below presents data on the rates of violence and UOF in ESH and Secure. The specific housing units used for TRU change frequently due to construction and physical plant issues and thus the process for collecting data is complex, unduly burdensome and resulted in data of questionable validity. The Monitoring Team agreed that the Department could temporarily suspend reporting this data for TRU. The Department reported its intention to consistently operate TRU out of the same units and thus will resume reporting data for the TRU units in July 2020.

For each of the SSHs, the average daily population ("ADP"), UOF rate and rate of violence were calculated for the entire unit, which also includes incarcerated individuals age 19 to 21, in order to gain a sense of the level of disorder in the living environment. The rates of violence and UOF vary across Monitoring Periods in all SSH units but have generally been similar to or lower than those calculated for the entire population of 18-year-olds.

| ADP, Levels of Violence and UOF in SSH Units, 2017 to 2018 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2017 | | | January-June 2018 | | | July-December 2018 | | |
| Unit | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH Level 1 | 10 | 0.9 (9.0) | 1.8 (18.0) | 10 | 3.0 (30.0) | 3.7 (37.0) | 10 | 1.8 (18.0) | 2.7 (27.0) |
| YA-ESH Level 2[219] | | | | | | | | | |
| YA-ESH Level 3 | | | | | | | | | |
| Secure | 8 | 2.8 (35.0) | 4.6 (57.5) | 6 | 1.3 (21.6) | 1.67 (27.8) | 8 | 1.3 (16.3) | 2.2 (27.5) |
| YA TRU | 17 | 3 (17.6) | 4.5 (26.5) | 19 | 2.8 (14.7) | 4.0 (21.1) | 25 | 10.5 (42.0) | 11.3 (45.3) |
| YA SCHU | 8 | 0.3 (3.75) | 0.6 (7.5) | 5 | 0.7 (14.0) | 1.0   (20.0) | 8 | 1.8 (22.5) | 2.5 (31.3) |

---

[219] In previous Monitoring Periods, 18-year-olds were not placed in ESH Level 2 or Level 3 because those levels were blended with adults, and a BOC condition prevents 18-year-olds from being co-mingled with adults. The Department created YA-only ESH Level 2 and Level 3 houses and operated them throughout the current Monitoring Period and thus these data are now being reported by the Monitoring Team.

| ADP, Levels of Violence and UOF in SSH Units, 2019-2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | January-June 2019 | | | July-December 2019 | | | January-June 2020 | | |
| Unit | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month | ADP | Average # and (Rate per 100) of Violent Incidents per Month | Average # and (Rate per 100) of UOF per Month |
| YA-ESH Level 1 | 2.6 | 0.5 (13.1) | 1.0 (26.3) | 3.8 | 0.5 (13.1) | 1.0 (26.3) | 4.9 | 1.0 (20.4) | 1.5 (30.6) |
| YA-ESH Level 2 | 15.7 | 1.2 (14.0) | 1.5 (17.4) | 8.6 | 1.2 (14.0) | 1.5 (17.4) | 6.7 | 3.2 (47.8) | 3.2 (47.8) |
| YA-ESH Level 3 | 5.8 | 0.2 (7.4) | 0.3 (11.1) | 2.7 | 0.2 (7.4) | 0.3 (11.1) | 1.6 | 0.3 (20.6) | 0.3 (20.6) |
| Secure* | 13.4 | 2.2 (17.3) | 2.0 (17.1) | 11.7 | 2.2 (17.3) | 2.0 (17.1) | 15.3 | 6.3 (41.2) | 6.3 (41.2) |
| YA TRU | | | | | | | | | |
| YA SCHU | | | | | | | | | |

*Note: ESH data is reported by level because youth on different levels are housed in different units. In Secure, data for the entire unit is reported because youth on different phases are housed together.*

It is notable that the ADP for the Secure Unit has steadily increased over time, from fewer than 10 youth to 13 to 15 youth more recently. The density in the Secure quads (the unit is divided into four quadrants via chain-link fencing) is reportedly a concern for the Department and is part of the impetus to revisit the programming approach in that unit, as discussed below.

**Quality of Intervention**. The Monitoring Team reviewed a sample of files from youth released from TRU, Secure, and ESH during the current Monitoring Period. Problems regarding the quality of behavior support planning remain and the Department has crafted strategies to begin to address them in a more systematic way (*i.e.*, new template for support planning; intensive training for counselors and support team members; policy revisions). While it is discouraging that the quality of intervention has not improved, the Department took some decisive action during the current Monitoring Period to address these long-standing deficits and began to re-examine its approach to the SSHs.

On the heels of the restructuring at RNDC and the elimination of the Second Chance Housing Unit program, the TRU policy was revised. The new policy provides for improved accountability and clarity in the admission/release process, improved collaboration among Support Team members and makes much needed changes to the substance of the behavior plans and format for the Support Team meeting process and documentation. The Monitoring Team approved the policy changes and is very hopeful that these revisions will lead to improved practice that cures the long-standing deficits in these program functions.

Toward the end of the Monitoring Period, for a variety of reasons—including increased admissions/population, staff turnover, longer length of stay, violence and other concerns raised by the Monitoring Team in previous reports (*see* pg. 279 of the Ninth Monitoring Report)—the Department

and Monitoring Team began to hold regular calls to discuss the program approach in Secure. The outcome of these deliberations will be reported in subsequent Monitor's Reports.

      **Metrics**. In addition to reconsidering the design of TRU and Secure to respond to the Monitoring Team's concerns and improve program effectiveness, NCU continues to audit the files of 18-year-olds who are released from TRU, Secure, and ESH. NCU's audits focus on the extent to which key timelines are met and whether the youth's progress is reviewed timely (each unit has a different timeline and slightly different criteria for assessing progress/readiness for promotion). NCU reported that while compliance with document submission slipped during the latter part of the Monitoring Period (apparently due to staff turnover and the impact of COVID-19 on operations), NCU took steps to check that program staff upload documents as required so that NCU may resume its audits with a complete set of records.

      The Monitoring Team is pleased that the Department has taken specific action to assess the SSHs' operation and its willingness to revisit the programs' structure and operation. Ongoing evaluation of the operation and effectiveness of these programs is essential to ensure that the programs provide viable, effective alternatives to Punitive Segregation. Currently, the key tasks are to ensure program eligibility criteria are fully documented for all youth admitted, improve the integrity of the program interventions, meaningfully assess youth's progress, and improve documentation to ensure transparency. That said, evaluations of program performance should be *ongoing* and the Monitoring Team encourages the Department to continually reassess whether these programs are accomplishing their intended goals.

*Solo Housing*

      During the current Monitoring Period, the Department did not utilize Solo Housing for the purpose of behavior management for any 18-year-old. A few 18-year-olds were housed alone for a short period of time because they were the only young adult of a particular classification or legal status. None of these required the various procedures and protections articulated in the Solo Housing policy. The Monitoring Team encourages the Department to continue to avoid housing youth alone whenever possible. Should a Facility decide to place a youth in Solo Housing in response to his/her behavior, the Monitoring Team emphasizes the importance of both proper implementation of the policy and robust oversight from NCU.

| COMPLIANCE RATING | ¶ **6.** Partial Compliance |
| --- | --- |

| XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT) |
| --- |

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated an Ops Order regarding the use of "Satellite Intake" as a de-escalation tool in July 2018, but it was not utilized in the Eighth, Ninth, or Tenth Monitoring Periods.

**ANALYSIS OF COMPLIANCE**

*This provision applies to Young Incarcerated Individuals (16-, 17-, and 18-year-old incarcerated individuals), but the analysis and rating presented below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals.*

Shortly after the Consent Judgment went into effect, the Monitoring Team met with the Department to sketch out the practices needed to meet the requirements of this provision. After several iterations, the substance of the Ops Order for "Satellite Intake" was drafted and eventually promulgated. However, once GMDC was closed and the 18-year-olds were moved to RNDC, the Department stopped using Satellite Intake and for that reason, this provision is not applicable as no other specific de-escalation confinement is currently utilized. Since then, the Department resumed its original practice—taking youth to Intake following violent incidents and/or Probe Team intervention.

Previous Monitor's Reports have encouraged the Department to address the burden this practice places on Intake areas, which have proven to be a reliable hot-spot for uses of force. The Remedial Order addresses this problem by requiring a new De-Escalation Protocol (A.3). The requirements of this provision may intersect with the requirements of the Remedial Order and will be designed, implemented, and monitored accordingly.

| COMPLIANCE RATING | ¶ 10. (18-Year-Olds) Not Applicable |
|---|---|

**• End •**

# Appendix A: Definitions

| Acronym or Term | Definition |
| --- | --- |
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques Training |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.* ensuring doors are secured so incarcerated individuals do not pop out of their cells, or employing better communication with incarcerated individuals when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BOC | Board of Correction |
| BSP | Behavior Support Plan |
| BWC | Body-worn Camera |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CTE | Career Technical Education |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |

| Acronym or Term | Definition |
|---|---|
| DCID | Deputy Commissioner of ID & Trials |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Expedited Case Closure | Cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") that can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. |
| Facility or Facilities | One or more of the 12 Incarcerated individual facilities managed by the DOC |
| Fast Track | Cases that are pushed from ID to Trials more quickly with less investigative steps that can closed via an NPA |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FIS | Facility Information System |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| HOJC | Horizon Juvenile Center |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| ID Quickstats Weekly Reports | Reports prepared by ID in which ID shares a summary of incidents that occurred at the Facility the prior week, including descriptions of specific incidents and relevant data. This summary includes the Facility Rapid Review findings and whether ID concurs with that assessment or not. |

| Acronym or Term | Definition |
| --- | --- |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| ITTS | Investigation Trials Tracking System—Department's legacy Trials and ID case tracking system |
| KK | Staff Lounge |
| LAS | Legal Aid Society |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OCD | Off-Calendar Disposition—processing of Trials case without scheduling or attending OATH conference. |
| OCFS | Office of Children and Family Services |
| OLR | Office of Labor Relations |
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |

| Acronym or Term | Definition |
|---|---|
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| September Recommendations | On September 30, 2019, the Monitoring Team shared recommendations the Monitoring Team developed on proposed actions that could be taken by the City and Department to stimulate progress toward the overarching goals of the Consent Judgment. |
| Service Desk | Computerized re-training request system |
| SMI | Serious Mental Illness |
| SOL | Statute of Limitations |
| SOLstat | Project initiated within ID to evaluate cases approaching the SOL to determine if the incident involves misconduct and discipline should be imposed |

| Acronym or Term | Definition |
|---|---|
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| STRIVE Community | HOJC's original behavior management system |
| STRIVE+ | HOJC's more robust behavior management system (builds upon STRIVE Community) |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| Team Picks | Cases were previously identified by the Monitoring Team as having potential objective evidence of wrongdoing |
| TDY | Temporary Duty |
| TOL | Transfer of Learning—roll call trainings with the goal of guiding Staff more effectively by contextualizing the requirements of various UOF policies and directives. |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Incarcerated Individuals | Incarcerated individuals under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

## Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions

| Paragraph in Consent Judgment | Description of Provision | Inactive Monitoring or Abeyance | Monitor Report Citations |
|---|---|---|---|
| colspan Status of Compliance - Inactive Monitoring or Abeyance of Certain Provisions |||| 
| § V. Use of Force Reporting and Tracking |||| 
| 14 | Tracking of Use of Force Data | The Department maintains Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months, by tracking required Use of Force information in a reliable and accurate manner. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pg. 33 (dkt. 269), Second Monitor's Report at pg. 39 (dkt. 291), Third Monitor's Report at pg. 61 (dkt. 295), Fourth Monitor's Report at pg. 59 (dkt. 305), Fifth Monitor's Report at pg. 51 (dkt. 311), Sixth Monitor's Report at pg. 52 (dkt. 317), Seventh Monitor's Report at pgs. 66 to 67 (dkt. 327), Eighth Monitor's Report at pgs. 87 to 88 (dkt. 332), and Ninth Monitor's Report at pg. 102 (dkt. 341). |
| 16 | Tracking for Full ID Investigations | All ID investigations are now tracked in CMS, which is a reliable, accurate, and computerized system that allows for aggregate reporting of the information required by ¶ 16(a)-(f). Accordingly, the Department has maintained Substantial Compliance with this provision since the Sixth Monitoring Period, for a total of 24 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Sixth Monitor's Report at pgs. 53 (dkt. 317), Seventh Monitor's Report at pg. 68 (dkt. 327), Eighth Monitor's Report at pgs. 88-89 (dkt. 332), and Ninth Monitor's Report at pgs. 103-104 (dkt. 341). |
| 17 | Tracking of Trials Data | The required information is tracked in CMS. The Trials Division also maintains a more detailed Excel worksheet to track the status of a case while it is processed in Trials (e.g., tracking the dates of service of charges and discovery, and timing of final approvals for case closure). The Monitoring Team relies heavily on this more detailed worksheet and has found it is accurate and easy to digest. It is clear the Trials Division also utilizes this tracking system to actively manage its cases. This demonstrates that the information is consistently tracked in a reliable, accurate, and computerized manner. Accordingly, the Department has maintained Substantial Compliance with this provision since the Fifth Monitoring Period, for a total of 30 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fifth Monitor's Report at pg. 53 (dkt. 311), Sixth Monitor's Report at pgs. 53-54 (dkt. 317), Seventh Monitor's Report at pg. 69 (dkt. 327), Eighth Monitor's Report at pgs. 88-89 (dkt. 332), and Ninth Monitor's Report at pgs. 104-105 (dkt. 341). |
| 19 | Tracking of Incarcerated individual-on-Incarcerated individual Fight Data | The Department's Fight Tracker includes most of the information listed while other sources (IRS and use of force investigations) include a brief description of the incarcerated individual-on-incarcerated individual fight or assault; whether a weapon was used; and whether the incident was captured on video. The Monitoring Team has found the information contained in the various databases to be adequate for tracking the frequency and nature of institutional violence as required by this provision. Accordingly, the Department has maintained Substantial Compliance with this provision since the Fourth Monitoring Period, for a total of 36 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fourth Monitor's Report at pgs. 61-62 (dkt. 305), Fifth Monitor's Report at pg. 54 (dkt. 311), Sixth Monitor's Report at pgs. 54 to 55 (dkt. 317), Seventh Monitor's Report at pgs. 69 to 70 (dkt. 327), Eighth Monitor's Report at pg. 90 (dkt. 332), and Ninth Monitor's Report at pgs. 105-106 (dkt. 341). |
| § VII. Use of Force Investigations |||| 
| 16 | Organized ID Files | The Monitoring Team has found that ID files are generally well-organized. CMS has brought even greater structure to the investigation files, standardizing the system and format for organizing the contents of investigation files, and requiring each investigation file to include the relevant documents. Accordingly, the Department has maintained Substantial Compliance with this provision since the Sixth Monitoring Period, for a total of 24 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Sixth Monitor's Report at pg. 114 (dkt. 317), Seventh Monitor's Report at pg. 137 (dkt. 327), Eighth Monitor's Report at pgs. 164 to 165 (dkt. 332), and Ninth Monitor's Report at pg. 182 (dkt. 341). |
| § IX. Video Surveillance |||| 
| 1(c) | Complete Camera Coverage by 2/28/18 | The Department achieved "Complete Camera Coverage" of all Facilities by February 28, 2018. The Department has therefore achieved and maintained Substantial Compliance with the requirement of "Complete Camera Coverage" as required by ¶ 1(c) since the Sixth Monitoring Period, for a total of 24 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Second Monitor's Report at pgs. 68 to 69 (dkt. 291), Third Monitor's Report at pgs. 104 to 107 (dkt. 295), Fourth Monitor's Report at pgs. 100 to 103 (dkt. 305), Fifth Monitor's Report at pgs. 81 to 84 (dkt. 311), Sixth Monitor's Report at pgs. 83 to 85 (dkt. 317), Seventh Monitor's Report at pgs. 94 to 95 (dkt. 327), Eighth Monitor's Report at pgs. 116 to 118 (dkt. 332), and Ninth Monitor's Report at pgs. 133-134 (dkt. 341). |

| Paragraph in Consent Judgment | Description of Provision | Inactive Monitoring or Abeyance | Monitor Report Citations |
|---|---|---|---|
| | | **Status of Compliance - Inactive Monitoring or Abeyance of Certain Provisions** | |
| 4 | Video Preservation | The Department's current preservation policies, procedures, and automated processes require all video to be preserved for 90 days, or longer when the Department is notified of an incident involving use of force or incarcerated individual-on-incarcerated individual violence, consistent with the requirements set forth in Consent Judgment § IX, ¶ 4. Accordingly, the Department has maintained Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pg. 65 (dkt. 269), Second Monitor's Report at pgs. 75 to 76 (dkt. 291), Third Monitor's Report at pgs. 116 to 117 (dkt. 295), Fourth Monitor's Report at pgs. 111 to 113 (dkt. 305), Fifth Monitor's Report at pgs. 90 to 91 (dkt. 311), Sixth Monitor's Report at pgs. 91 to 92 (dkt. 317), Seventh Monitor's Report at pgs. 102 to 104 (dkt. 327), Eighth Monitor's Report at pgs. 127 to 128 (dkt. 332), and Ninth Monitor's Report at pg. 147 (dkt. 341). |
| | | **XII. Screening and Assignment of Staff** | |
| 4 | Screening for Special Units | The Monitoring Team has found the screening requirements for Staff steadily assigned to Special Units under ¶¶ 4 and 5 to be cumbersome and time consuming and, in practice, has not meaningfully contributed to the overall goals of the Consent Judgment. Screening requirements and/or assignment decisions may be appropriate before placement on certain posts to mitigate the chance of assigning an inappropriate staff member for a specific post, but the findings to date simply do not support the continued implementation of the screening requirements as drafted. Therefore, these two provisions will be held in abeyance because the effort required to conduct these reviews is no longer necessary. | Ninth Monitor's Report at pgs. 228-230 (dkt. 341). |
| 5 | | | |
| | | **XIII. Training** | |
| 1(a) | Content of Initial UOF Policy Training | The Department achieved Substantial Compliance with ¶ 1(a) in the First Monitoring Period by developing the content of initial UOF Policy training as required (as described in the First Monitor's Report at pgs. 41-42). The content of the initial UOF Policy Training (¶ 1(a)) was approved by the Monitoring Team. The training, developed in consultation with the Monitoring Team, was competency- and scenario-based, and used video reflecting realistic situations (as described in the First Monitor's Report at pgs. 41-42). The lesson plans, teaching outlines, examinations, and written materials, covered all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements of the Consent Judgment. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 41-42 (dkt. 269), and Ninth Monitor's Report at pg. 113 (dkt. 341). |
| 1(a)(i) | Pre-Service UOF Policy Training | Since the First Monitoring Period, the Department has met the expectations of the Consent Judgment ¶ 1(a)(i) by providing a 12-hour Use of Force Policy training in the mandatory Pre-Service training for recruits. The Department has maintained Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 41-42 (dkt. 269), Second Monitor's Report at pgs. 50-51 (dkt. 291), Third Monitor's Report at pgs. 77-78 (dkt. 295), Fourth Monitor's Report at pgs. 73-74 (dkt. 305), Fifth Monitor's Report at pg. 64 (dkt. 311), Sixth Monitor's Report at pgs. 66-67 (dkt. 317), Seventh Monitor's Report at pgs. 78-79 (dkt. 327), Eighth Monitor's Report at pgs. 96-97 (dkt. 332), and Ninth Monitor's Report at pgs. 113-114 (dkt. 341). |
| 1(b)(i) | Pre-Service Crisis Intervention and Conflict Resolution Training | Since the First Monitoring Period, the Department has met the expectations of Consent Judgment ¶ 1(b)(i) by providing a 24-hour Crisis Intervention and Conflict Resolution training in the mandatory Pre-Service training for recruits. Accordingly, the Department maintains Substantial Compliance with this provision, which the Department has sustained since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 43-44 (dkt. 269), Second Monitor's Report at pgs. 53-54 (dkt. 291), Third Monitor's Report at pgs. 78-79 (dkt. 295), Fourth Monitor's Report at pgs. 75-77 (dkt. 305), Fifth Monitor's Report at pgs. 64-65 (dkt. 311), Sixth Monitor's Report at pgs. 67-68 (dkt. 317), Seventh Monitor's Report at pgs. 79-80 (dkt. 327), Eighth Monitor's Report at pgs. 97-98 (dkt. 332), and Ninth Monitor's Report at pg. 115 (dkt. 341). |
| 2(a)(i) | Pre-Service Defensive Tactics Training | Since the First Monitoring Period, the Department has met the expectations of Consent Judgment ¶ 2(a)(i) by providing 24-hour Defensive Tactics training in the mandatory Pre-Service training for recruits. Accordingly, the Department has maintained Substantial Compliance with this provision since | First Monitor's Report at pgs. 41-42 (dkt. 269), Second Monitor's Report at pgs. 50-51 (dkt. 291), Third Monitor's Report at pgs. 77-78 (dkt. 295), Fourth Monitor's Report at pgs. 73-74 (dkt. 305), |

| Paragraph in Consent Judgment | Description of Provision | Inactive Monitoring or Abeyance | Monitor Report Citations |
|---|---|---|---|
| colspan="4" | Status of Compliance - Inactive Monitoring or Abeyance of Certain Provisions |||

| Paragraph in Consent Judgment | Description of Provision | Inactive Monitoring or Abeyance | Monitor Report Citations |
|---|---|---|---|
| | | the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fifth Monitor's Report at pg. 64 (dkt. 311), Sixth Monitor's Report at pgs. 66-67 (dkt. 317), Seventh Monitor's Report at pgs. 78-79 (dkt. 327), Eighth Monitor's Report at pgs. 96-97 (dkt. 332), and Ninth Monitor's Report at pgs. 118-119 (dkt. 341). |
| 2(c)(i) | ID Investigator Training | By providing over 40 hours of training which covers investigative procedures, skills, and techniques consistent with best practices and the Consent Judgment to Investigators before they begin investigating incidents. The Department has maintained Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 49-50 (dkt. 269), Second Monitor's Report at pgs. 59-60 (dkt. 291), Third Monitor's Report at pgs. 85-86 (dkt. 295), Fourth Monitor's Report at pgs. 81-82 (dkt. 305), Fifth Monitor's Report at pgs. 68-69 (dkt. 311), Sixth Monitor's Report at pgs. 70-71 (dkt. 317), Seventh Monitor's Report at pgs. 107-108 (dkt. 327), Eighth Monitor's Report at pgs. 137-138 (dkt. 332), and Ninth Monitor's Report at pg. 157 (dkt. 341). |
| 3(a) | Initial Young Incarcerated Individual Management Training | As described in the First Monitor's Report (at pgs. 52-53), SCM training, combined with other trainings provided to Staff who work with Young Incarcerated Individuals, meets the requirements for the content of the Young Incarcerated Individual Management training. The initial training has also been provided to the vast majority of Staff that work with 16-, 17- and 18-year-olds. Accordingly, the Department has maintained Substantial Compliance with this provision since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 50-53 (dkt. 269), Second Monitor's Report at pgs. 60-61 (dkt. 291), Third Monitor's Report at pgs. 87-90 (dkt. 295), Fourth Monitor's Report at pgs. 82-85 (dkt. 305), Fifth Monitor's Report at pgs. 69-71 (dkt. 311), Sixth Monitor's Report at pgs. 71-73 (dkt. 317), Seventh Monitor's Report at pgs. 82-84 (dkt. 327), Eighth Monitor's Report at pgs. 101-102 (dkt. 332), and Ninth Monitor's Report at pg. 121 (dkt. 341). |
|  | § XV. Safety and Supervision of Inmates Under the Age of 19 |||
| 10 | Complete Camera Coverage for Inmates under 18 | The Department achieved Complete Camera Coverage at RNDC within the required 90 days of the Effective Date and has been in Substantial Compliance since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 61 to 62, 95 (dkt. 269), Second Monitor's Report at pgs. 69 to 71, 135 to 136 (dkt. 291), Third Monitor's Report at pgs. 107 to 108, 215 (dkt. 295), Fourth Monitor's Report at pg. 103, 226 (dkt. 305), Fifth Monitor's Report at pg. 84, 162 (dkt. 311), Sixth Monitor's Report at pg. 85, 178 (dkt. 317), Seventh Monitor's Report at pg. 96, 222 (dkt. 327), Eighth Monitor's Report at pg. 118, 236 to 237, 267 to 268 (dkt. 332), and Ninth Monitor's Report at pgs. 135-136 (dkt. 341). |
| 11 | Complete Camera Coverage for 18-year-olds | The Department achieved Complete Camera Coverage of all housing areas that are accessible to 18-year-olds by July 1, 2016 as required and has sustained Substantial Compliance since the First Monitoring Period, for a total of 50 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | First Monitor's Report at pgs. 61 to 62, 95 (dkt. 269), Second Monitor's Report at pgs. 69 to 71, 135 to 136 (dkt. 291), Third Monitor's Report at pg. 107 to 108, 215 (dkt. 295), Fourth Monitor's Report at pg. 103, 226 (dkt. 305), Fifth Monitor's Report at pg. 84, 162 (dkt. 311), Sixth Monitor's Report at pg. 85, 178 (dkt. 317), Seventh Monitor's Report at pg. 96, 222 (dkt. 327), Eighth Monitor's Report at pg. 118, 236 to 237, 267 to 268 (dkt. 332), and Ninth Monitor's Report at pgs. 135-136 (dkt. 341). |
| 13 | Young Incarcerated Individual Housing Areas shall be staff by Qualified and Experienced Staff | [For 18-year-olds] Overall, the process for assigning Staff to RNDC continues to satisfy the requirements of this provision, as the Staff assigned to RNDC are appropriately qualified and experienced. Accordingly, the Department has maintained Substantial Compliance with this provision since the Fifth Monitoring Period, for a total of 30 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fifth Monitor's Report at pgs. 163-164 (dkt. 311), Sixth Monitor's Report at pg. 179 (dkt. 317), Seventh Monitor's Report at pgs. 223-224 (dkt. 327), Eighth Monitor's Report at pg. 269 (dkt. 332), and Ninth Monitor's Report at pg. 300 (dkt. 341). |

| Paragraph in Consent Judgment | Description of Provision | Inactive Monitoring or Abeyance | Monitor Report Citations |
|---|---|---|---|
| colspan=4 center: **Status of Compliance - Inactive Monitoring or Abeyance of Certain Provisions** |||| 
| 14 | No Young Incarcerated Individual Housing Area shall be staffed Exclusively by Probationary Staff | [For 18-year-olds] The Department continues to meet the "best effort" requirement of this provision for the appropriate dispersion of probationary Staff (*i.e.*, ensuring that probationary Staff are paired with veteran Staff on the housing units). The Department has maintained Substantial Compliance with this provision since the Fifth Monitoring Period, for a total of 30 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fifth Monitor's Report at pgs. 164-167 (dkt. 311), Sixth Monitor's Report at pgs. 180-181 (dkt. 317), Seventh Monitor's Report at pgs. 224-226 (dkt. 327), Eighth Monitor's Report at pgs. 269-271 (dkt. 332), and Ninth Monitor's Report at pg. 302 (dkt. 341). |
| 16 | Staffing Levels | [For 18-year-olds] The Department's housing records reflect the housing size limits set by this provision. Further, audits of Staff-to-youth ratios revealed that all Facilities and units housing 18-year-olds were staffed within the ratios required by the Consent Judgment (2:25 for Maximum custody youth and 1:30 for Medium custody youth). Therefore, the Department maintained Substantial Compliance with the provision related to staffing ratios and limitations on housing unit sizes since the Fifth Monitoring Period, for a total of 30 months. The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Fifth Monitor's Report at pgs. 164-167 (dkt. 311), Sixth Monitor's Report at pgs. 180-181 (dkt. 317), Seventh Monitor's Report at pgs. 224-226 (dkt. 327), Eighth Monitor's Report at pgs. 269-271 (dkt. 332), and Ninth Monitor's Report at pgs. 302-303 (dkt. 341). |
| colspan=4 center: **§ XVI. Inmate Discipline** ||||
| 1 | No P-Seg Accumulated from Prior Incarcerations | [For 18-year-olds] The Department was placed in Substantial Compliance for the Second Monitoring Period. Punitive Segregation was subsequently abolished for 18-year-olds. The Monitoring Team reviewed the Department's various disciplinary and operational practices and did not see any evidence that the central feature of Punitive Segregation (*i.e.*, 23-hour lock-in) since the Second Monitoring Period.<br><br>Even in the unlikely scenario that Punitive Segregation is reinstated, the possibility of imposing Punitive Segregation time accumulated during a prior incarceration is not feasible given the small window for an individual to be admitted, accumulate Punitive Segregation time that is not served, be released, and then be reincarcerated while still 18 years old. Accordingly, the Department has abated prior deficiencies, so active monitoring of this provision is no longer necessary. | Second Monitor's Report at pg. 141 (dkt. 291), Third Monitor's Report at pgs. 221-222 (dkt. 295), Fourth Monitor's Report at pgs. 235-236 (dkt. 305), Fifth Monitor's Report at pgs. 168-169 (dkt. 311), Sixth Monitor's Report at pgs. 183-184 (dkt. 317), Seventh Monitor's Report at pgs. 228-229 (dkt. 327), Eighth Monitor's Report at pgs. 274-275 (dkt. 332), and Ninth Monitor's Report at pgs. 306-307 (dkt. 341). |

## Appendix C: Training Charts

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors (including Executive Staff) | |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. | Completed - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | TTS Records | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Ongoing** * Pre-Promotional Training * In-Service - A.C.T. | | Completed - June 2019 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | Finalized and consulted Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |
| | | *Deployment* | Provided in mandatory Pre-Service training | Completed - 09/2018 - S.T.A.R.T. - | | Completed - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **SCM (Young Incarcerated Individual Management) (¶3)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | Finalized and consulted Monitoring Team and developed by JKM | | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC[220] | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | Electronic – iPad | Hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by C.J.) | 8-hours (Only 2 hours required by C.J.) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |

---

[220] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to consistently implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to Post** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets **ESU to consistently implement TTS (see box for ¶¶ 6-8 of the Training section of this report)** | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| Training | Required Attendees | | Recruits | In-Service | Supervisor | Executive Staff Training |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* | | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | N/A | N/A |
| | | *Length of Training* | | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* | | Any new investigators assigned to ID | | |
| | | *Deployment* | | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* | | N/A (see Investigations Section of this report) | N/A | N/A |
| | | *Length of Training* | | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Finalized and consulted Monitoring Team. | Finalized and consulted Monitoring Team. | N/A | N/A |
| | | *Length of Training* | No specified length in CJ, but 3 hours | No specified length in CJ | | |
| | | *Frequency* | All recruit classes that matriculated beginning in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 4-hours | 4-hours |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | One year after S.T.A.R.T. Every other year thereafter |
| | | *Status of Deployment* | **Ongoing** A.C.T. | Completed – 2018 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records |
| | | *Examination (¶ 6)* | None | None |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | **Not Yet Developed** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD |
| | | *Frequency* | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Original refresher provided as part of ACT; revised refresher developed in Ninth Monitoring Period | |
| | | *Length of Training* | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | |
| | | *Deployment* | **Ongoing** - A.C.T. | |
| | | *Attendance (¶ 7)* | TTS Records | |
| | | *Examination (¶ 6)* | N/A | |
| **SCM (Young Incarcerated** | Staff assigned to | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| **Individual Management) (¶ 3)** | work regularly in Young Incarcerated Individual Housing Areas | *Length of Training* | 8-hours | |
| | | *Frequency* | All Staff who work with Young Incarcerated Individuals | |
| | | *Deployment* | **Refresher training began in Fourth Monitoring Period but ceased in Ninth Monitoring Period (see box for ¶ 3 of the Training section of this report)**; All Staff at RNDC | |
| | | *Attendance (¶ 7)* | TTS Records | |
| | | *Examination (¶ 6)* | Hand-written | |

**Status of Training Provided Since the Effective Date**

|  | Training Provided during Ninth Monitoring Period | | Total Training Provided Nov. 2015 – June 2020 | |
|---|---|---|---|---|
|  | Initial Training | Refresher | Initial Training | Refresher |
| **Use of Force Policy (¶ 1(a))** | N/A | 562 | **12,341** | **7,117** |
| **Crisis Intervention and Conflict Resolution (¶ 1(b))** | 157 | N/A | **10,117** | N/A |
| **Defensive Tactics (¶ 2(a))** | N/A | 413 | **12,750** | **6,945** |
| **Young Incarcerated Individual Management ("SCM") (¶3)** | N/A | N/A | **9,030** | **4,058** |
| **Direct Supervision (¶4)** | 185 | N/A | **6,757** | N/A |
| **Probe Team ("Facility Emergency Response Training") (¶ 1(c))** | 42 | N/A | **5,877** | N/A |
| **Cell Extraction (¶ 2(b))** | 24 | N/A | **4,749** | N/A |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | N/A | | **2,899**[221] | N/A |

---

[221] This includes all Recruits beginning with the November 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

xvi

**Appendix D: Flowchart of Promotions Process**



| | | | | |
|---|---|---|---|---|
| DCAS Exam | Civil Service Requirements: > U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity > educational or experience requirements >drug test; medical, psychological & physical testing > resident of NY or counties | DOC In-House Disqualifiers: > dismissal from prior employment > arrests total > driving record total  AIU Background Investigation | Review of Candidate's History/Background Investigation by Director of AIU and Assistant Commissioner of AIU | **Correction Officer** |
| DCAS Exam (Completion of probation - 3 Years CO, unless extended) | Disqualifiers > must hold valid drivers license > resident of NYor counties > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Captain** |
| DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) | Disqualifiers > must hold valid drivers license > resident of NYor counties > 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Assistant Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) | Review of UoF and Disciplinary History, and Performance Evaluations | Re-Assignment Board Review  Rating, Interview, Candidates Ranked | Chief & Commissioner to review candidates recommended by Re-Assignment Board | **Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 18 months in eligible title (Captain/ADW/DW), unless extended) | HR reviews UoF and Disciplinary History, and Performance Evaluations | Promotion Board Review, interview candidates and make recommendations | Chief & Commissioner to review candidates recommended by Promotion Board | Mayoral Approval | **Warden** |
| No specific time requirement that you have to be a Warden for, in order to be considered for a Chief-level appointment | Nunez Screening, including review of UoF and Disciplinary History | Commissioner and Chief of Staff | Mayoral Approval | **Chief** |

xvii