# First Remedial Order Report of the *Nunez* Independent Monitor

**First Remedial Order Period**
**August 14, 2020 – September 30, 2020**

# THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

## Introduction

This is the first Remedial Order report by the Nunez Monitoring Team as required by the Court's August 14, 2020 Remedial Consent Order Addressing Non-Compliance (dkt. 305), Section F, ¶ 7, in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a *brief* update on the Department's progress toward the requirements of Sections A to D of the Remedial Order during the first 47-days of implementation (from August 14, 2020 ("Effective Date") through September 30, 2020), referred to as the "First Remedial Order Period" throughout this report. The Eleventh Monitor's Report (covering July to December 2020) will discuss each Remedial Order requirement in more detail, along with relevant data and a compliance assessment. This report is not intended to provide information on the broader issues of the Consent Judgment, which will be covered in the bi-annual Monitor's Reports.

During the First Remedial Order Period, the Department focused on developing, refining and/or implementing new practices and procedures to address the specific requirements of the Remedial Order.[1] For some requirements, implementation has just begun, while for others, the requirements are not yet due per the Remedial Order's timelines so implementation has not yet occurred.[2] In other areas, the Department began working on the Remedial Order's requirements prior to the Effective Date, and sections of the Tenth Monitor's Report are referenced to provide the relevant details. Given the short tenure of the Remedial Order, assessing the impact of the various practices is premature. That said, the Monitoring Team is actively engaged with the Department on the implementation of these requirements as they are all expected to impact the overall reform effort and the goal of reducing unnecessary and excessive force.

---

[1] During the First Remedial Order Period the Department's efforts to mitigate the spread of COVID continued to impact routine operations as discussed in the Tenth Monitor's Report at pages 8 to 10. For instance, training on new practices and procedures had to occur in smaller groups, meaning that more sessions—and more time—are required to ensure staff are trained in the essential skills required for proper implementation.

[2] Relevant data and information are provided to the extent available. In some cases, if the deadline for implementation of the requirement has not come due, then certain data is not included in this particular report but will be included in subsequent reports.

## Section A. Initiatives to Enhance Safe Custody Management, Improve Staff Supervision and Reduce Unnecessary Uses of Force

¶*A.1 Use of Force Reviews*. In July 2020, the Department began using the new Rapid Review template described in the Tenth Monitor's Report (*see* pgs. 40-45), which was designed to guide the reviewer's assessment of specific substantive issues. Rapid Reviews are generally completed within 24 hours of the incident and appear to be accurately identifying UOF policy violations more frequently than in the past. However, some reviews continue to overlook or fail to detect Staff misconduct. The identified lapses reflect widespread inconsistency, rather than any single practice or cluster of practices that regularly goes unidentified. In some cases, when the Monitoring Team identified Staff misconduct that was not otherwise identified by a Rapid Review, the Monitoring Team brought these cases to the Department's attention, and the Department reported it addressed the deficiencies with the Facility leadership who conducted the Rapid Review. The Department has also started to independently identify and address inadequate Rapid Reviews in meetings with Facility leadership. However, beyond group discussions in meetings, the Department has not addressed specific inadequate, unreasonable, or biased Rapid Reviews with individual Facility leaders.

¶*A.2 Facility Leadership Responsibilities*. Department leadership and Facility leaders meet weekly to discuss operational issues in the jails, leveraging analysis from various data sources to guide this discussion. These meetings would benefit from a more systematic and intentional focus on the themes gleaned from Rapid Reviews, as the Monitoring Team has observed that the same operational problems (*e.g.* failure to secure cell doors) repeatedly occur. Furthermore, Facility leaders need to construct and implement a more robust set of problem-solving tools, and subsequently assess whether those tools are effective. The Monitoring Team is working with the Department to develop a more fulsome approach to this requirement.

¶*A.3 Revised De-Escalation Protocol.* This requirement was not due as of September 30, 2020, the time period covered by this report, but will be discussed in the Eleventh Monitor's Report. In the interim, the Department is developing the parameters of a new protocol to employ following a use of force incident, in consultation with the Monitoring Team.

¶*A.4 Supervision of Captains*. This requirement was not due as of September 30, 2020, the time period covered by this report, but will be discussed in the Eleventh Monitor's Report. As of the

end of September 2020, 72 Assistant Deputy Wardens ("ADWs") and 559 Captains were assigned to work in the Facilities (compared to 52 ADWs and 576 Captains at the end of the Tenth Monitoring Period).[3] Additional promotions during the Eleventh Monitoring Period and the impending closure and consolidation of additional Facilities are expected to impact the assignment of ADWs and supervision of Captains, which will be discussed in the Eleventh Monitor's Report.

¶*A.5 Incarcerated Individuals Involved in Numerous Use of Force Incidents*. This requirement was not due as of September 30, 2020, the time period covered by this report, although progress was evident on this requirement even before the Effective Date of the Remedial Order. As noted in the Tenth Monitor's Report (*see* pg. 35), every month, the Department continues to develop a list of High Needs Individuals ("HNI"; those involved in 6+ uses of force in the prior three months). In September 2020, New York City Health + Hospitals began assessing the mental health services provided to each person on the list. A more detailed assessment of this requirement will be discussed in the Eleventh Monitor's Report.

¶*A.6 Facility Emergency Response Teams*. This requirement was not due as of September 30, 2020, the time period covered by this report, but the selection criteria, number of positions, circumstances for deployment and tactics utilized by the Facility Emergency Response Teams will be discussed in the Eleventh Monitor's Report. Across the Department, Facility Emergency Response Teams were deployed a total of 1,140 times in August and September 2020, with 565 deployments in August and 575 deployments in September.[4]

### Section B. Improved and Prompt Use of Force Investigations

The ID Division continues to make progress closing out its backlog, so that the goal of timely and quality investigations can be achieved. For incidents occurring from January 1, 2018 through September 30, 2020, 84% of the investigations were closed as of October 15, 2020. A more detailed picture of ID's caseload as of October 15, 2020 is presented in the table below.

---

[3] Relevant ADW data by Facility will be shared in future reports.

[4] Relevant data regarding the deployment of Facility Emergency Response Teams by month and Facility will be shared in future reports.

| Investigation Status of UOF Incidents Occurring Between January 1, 2018 and September 30, 2020 as of October 15, 2020 | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 *6th Monitoring Period* | | July to Dec. 2018 *7th Monitoring Period* | | Jan. to June 2019 *8th Monitoring Period* | | July to Dec. 2019 *9th Monitoring Period* | | Jan. to June 2020 *10th Monitoring Period* | | July to September 30, 2020 *Partial 11th Monitoring Period* | | Total |
| Total UOF Incidents | 2,818 | | 3,484 | | 3,573 | | 3,939 | | 3,125 | | 1,449 | | 18,338 |
| Pending Preliminary Reviews/ Intake Investigations | 0 | 0% | 0 | 0% | 23 | 1% | 1,472 | 37% | 479[5] | 15% | 291[6] | 20% | 2,265 | 12% |
| Pending ID/Facility Investigations[7] | 0 | 0% | 5 | <1% | 73 | 2% | 121 | 3% | 381 | 12% | 178 | 12% | 758 | 4% |
| Closed Investigations | 2,818 | 100% | 3,479 | ~100% | 3,477 | 97% | 2,346 | 60% | 2,265 | 72% | 980 | 68% | 15,365 | 84% |

¶B.1 *Backlog of Use of Force Investigations*. The Tenth Monitor's Report described the specifics of the ID Backlog Plan (*see* pgs. 134-139) and its implementation. The Department continues to make progress toward the Remedial Order's requirement to close investigations of incidents occurring on or before April 16, 2020 (*i.e.*, "more than 120 days prior to the Order Date") by the end of 2020. The Department has made significant progress in addressing the backlog of cases this year. Over the course of the Consent Judgment, at times, the backlog has been as high as 9,000 cases. As of October 15, 2020, only about 2,400 cases remained in the backlog. Given the current rate of case closure, the Department is on pace to resolve the remaining cases in the backlog, with few exceptions, by the end of 2020. The Monitoring Team is assessing the quality

---

[5] All 479 pending incidents occurred between January 1 and February 2, 2020 before the Intake Squad began on February 3, 2020. Closure of these cases will be addressed as part of the backlog initiative.

[6] Most of the 291 pending Intake Investigations are incidents that occurred in the second half of September 2020 and were still pending as of October 15, 2020, less than 25 business days from the incident date. These investigations were ultimately closed within 25 business days.

[7] There are 14 pending Facility Investigations in the system that must be officially closed in CMS.

4

of investigations that found no UOF violation to determine whether the finding was reasonable. These results will be reported in the Eleventh Monitor's Report.

¶B.2 *Intake Investigations*. The process for Intake Investigations is described in the Ninth Monitor's Report (*see* pgs.41-47). The policy was approved by the Monitor and went into effect on January 29, 2020. The Intake Squad began conducting Intake Investigations on February 3, 2020. Intake Investigations have created an important foundational step for the Department to identify and address use of force-related misconduct effectively, as discussed in more detail in the Tenth Monitor's Report (*see* pgs. 52-55). Intake Investigations continued to be completed timely—95% of the 803 (n=761) investigations of incidents that occurred during the 47-day period covered by this report were completed within 25 business days.[8] Of these 803 incidents, 136 (17%) were referred for Full ID Investigation.

¶B.3 *ID Staffing Levels*. This requirement is not due until March 1, 2021 (*i.e.*, "within 60 days of the end of the Eleventh Monitoring Period").[9]

¶B.4 *Prioritizing Certain Use of Force Investigations*. ID continues to prioritize incidents involving potentially serious and egregious use of force and incidents involving potential misconduct by Staff with a history of misconduct, as discussed in the Tenth Monitor's Report at pgs. 152 to 153. The Monitoring Team will be working with ID to consider an expansion of the cases assigned to this unit.

¶B.5 *Tracking and Reporting UOF Violations*. This requirement was not due as of September 30, 2020, the time period covered by this report. That said, the findings of Intake Investigations are being tracked and reported (*see* pgs. 52-55 of the Tenth Monitor's Report). A tracking and reporting system for the findings of Full ID Investigations was under development as of the end of September 2020.

### Section C. Timely, Appropriate and Meaningful Staff Accountability

The Remedial Order includes a number of provisions to support efficient processing of cases within the Trials Division, which is critical given the importance of timely accountability

---

[8] Of the 42 cases that were not completed within 25 business days, all but two were closed just two business days beyond the required timeline.

[9] Relevant data related to this requirement will be included in future reports.

and the large number of cases pending disposition. The number of cases meriting formal discipline within the Trials Division has continued to increase as ID's backlog has been addressed and more current investigations are closed more timely. The status of cases within the Trials Division is presented in the table below.

| Status of Cases in Trials by Date of Incident<br>*As of October 15, 2020* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Total | |
| **Total Cases** | 696 | | 490 | | 622 | | 770 | | 467 | | 135 | | 3180 | |
| **Closed** | 694 | *100%* | 475 | *97%* | 429 | *69%* | 210 | *27%* | 79 | *17%* | 5 | *4%* | 1892 | *59%* |
| **Pending** | 2 | *0%* | 15 | *3%* | 193 | *31%* | 560 | *73%* | 388 | *83%* | 130 | *96%* | 1288 | *41%* |

Certain requirements in the Remedial Order anticipated this increase in cases. In order to address the increasing number of pending cases, the Trials Division must prioritize and triage these cases (using similar tactics employed by ID to address its backlog). However, in contrast to addressing the ID backlog, addressing the cases pending with Trials has some additional contours as the Department cannot unilaterally address these cases. To resolve cases, the Department must work with the Respondent (and their counsel) and the OATH Division (to the extent a settlement cannot be achieved outside of the OATH process). Affording the Respondent due process is a critical component of imposing discipline. That said, providing due process cannot unnecessarily delay the imposition of discipline. As such, efficiencies must be identified that provide for both due process protections *and* efficient case processing and timely discipline. The Monitoring Team has been working with Department leadership to address these issues.

The focus during the First Remedial Order Period was to increase the number of OATH pre-trial conferences. The Remedial Order's requirement for 50 OATH pre-trial conferences per month is an increase from prior practice and is intended to allow more cases to be heard timely. The required number of conferences have been held, but the Department and City experienced several obstacles when trying to move this process forward as planned. Fortunately, solutions were identified, and the process is proceeding as designed.

In September 2020, part way through the First Remedial Order Period, the Correction Officer's union ("COBA") reported that it would be replacing its long-standing counsel, who represents individual officers at OATH, on November 1, 2020. During the transition period between September and November 2020, several issues impacted the ability to resolve pending

cases. In some cases, Staff refused to participate in the OATH pre-trial conferences until the new counsel was in place. In addition, settlement negotiations outside of the OATH process for Correction Officers were essentially halted in mid-September because the outgoing COBA counsel advised the Department they were not authorized by their clients to engage in any settlement negotiations outside of the OATH process during the transition period. As a result, very few matters were settled outside of OATH during this period.[10]

Once new counsel was installed on November 1, 2020, they objected to participating in pre-trial conferences on more than one day per week, even though additional days were needed in order to reach the 50-conferences-per-month benchmark set by the Remedial Order. Department and OATH leadership, along with support from counsel from the City, addressed these objections expeditiously and ultimately reached agreement with new counsel that OATH pre-trial conferences would occur on at least six days per month in order to achieve the 50-conferences-per-month benchmark.

The Monitoring Team appreciates and acknowledges that the City, the Department, and OATH have effectively addressed these various obstacles to minimize potential delays to these proceedings. That said, significant work remains to address the Trials Division's backlog. In particular, a key focus for the remainder of the Eleventh Monitoring Period is determining whether the Trials Division has sufficient staff to handle its caseload. The rising number of cases, combined with the amount of work needed to resolve these matters, suggests that additional staffing may be necessary. The City has reported it will work with the Monitoring Team to address any potential staffing issues once further analysis has been completed. The Monitoring Team's highest priority is working with the Department to address the mounting number of cases pending with Trials and to improve the overall timeliness of accountability. A more fulsome discussion of these issues will be included in the Eleventh Monitor's Report.

¶*C.1 Immediate Corrective Action.* The Department is applying Immediate Corrective Action for misconduct identified through various avenues including Rapid Reviews, Intake Investigations, and *ad hoc* reviews by DOC leadership. These corrective actions are documented and tracked, as shown in the table below:

---

[10] The Department reports that it is currently working to reinstate settlements outside of the OATH process now that COBA's new counsel is in place.

| Immediate Corrective Action Imposed, by Staff Member, August 14 to September 30, 2020 | |
|---|---|
| **Type of Corrective Action Imposed** | **Number** |
| Suspension | 12 |
| Modified Duty | 0 |
| Counseling | 214 |
| Re-Training | 95[11] |
| **Totals** | |
| Total Staff Members* | 266 |
| Total UOF Incidents with Immediate Corrective Action | 181 |
| *Note: Some Staff received multiple corrective actions.* | |

¶C.2 _Responding to Monitor Recommendations_. The Monitor has recommended the Department take Immediate Corrective Action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action related to four specific staff members involved in five separate incidents. In each case, the Department either responded timely and imposed reasonable corrective action, or expeditiously pursued discipline or completed the investigation of the incident, as recommended.

¶C.3 _New Trials Division Protocols_. This requirement was not due as of September 30, 2020, the time period covered by this report, but the Department has begun consulting with the Monitoring Team on the parameters of the required protocol.

¶C.4 _Expeditious OATH Proceedings_. The Department is meeting the requirement to hold at least 50 OATH pre-trial conferences per month for disciplinary cases involving UOF-related charges. Between August 14 and September 30, 2020, a total of 81 OATH pre-trial conferences were held for disciplinary cases involving UOF violation charges. Of these 81 pre-trial conferences, 24 were held in the latter half of August and 57 occurred in September 2020.

¶C.5 _Applicability of Disciplinary Guidelines to OATH Proceedings_. In collaboration with the Monitoring Team, the City drafted and provided a letter to OATH Administrative Law Judges as required by this provision. Going forward, 30 days after every quarter, the City will remind OATH Administrative Law Judges of the applicability of the Disciplinary Guidelines and will provide any relevant findings from current Monitor's Reports. The next letter will be shared on

---

[11] The majority of re-training requests are still pending as of the filing of this Report.

or before January 30, 2021. The Monitoring Team will provide the details of its analysis of OATH proceedings in the Eleventh Monitor's Report.

### Section D. 18-Year-Old Incarcerated Individuals at RNDC

The average use of force rate at RNDC has been decreasing for the past few Monitoring Periods (8th = 22.0; 9th = 19.8; 10th = 14.8), a trend which has continued thus far in the Eleventh Monitoring Period (July-September 2020 average = 8.3). The average rate of violence has also been decreasing (8th = 23.4; 9th = 19.1; 10th = 13.0), and recent data suggests this trend is continuing (July-September 2020 average = 6.8). These sustained decreases are very encouraging and if they continue, should amplify the effectiveness of the strategies discussed below.

¶D1. *Consistent Staff Assignments and Leadership*. As noted in the Tenth Monitor's Report (*see* pgs. 266-268) the Department had assigned approximately 92% of 4-day Staff and 77% of 2-day Staff to specific posts/units as of February 2020. That said, once accounting for the various reasons why Staff did not work as assigned (*e.g.*, shift trades, leave/vacation/sick, training, etc.), the proportion of posts actually worked by the assigned Staff averaged approximately 60% across all three shifts. In August 2020, 91% of 4-day Staff had been assigned to specific posts, along with 100% of 2-day Staff. However, the proportion of posts actually worked by assigned staff decreased to 52%. It is premature to draw any conclusions from two months' worth of data. A detailed analysis of NCU's findings for the full six-month period will be discussed in the Eleventh Monitor's Report. By the end of September 2020, the Department had not yet completed Captains' assignments to specific posts/units but plans to do so by the end of 2020. The provision regarding increasing the number of ADWs at RNDC (§A.4.i) was not due as of September 30, 2020, the time period covered by this report. Once it has come due, ADWs will be included in the consistent staffing analysis. Further, the Department anticipates that some of the existing 4-day and 2-day Staff assignments will be modified to accommodate the influx of new ADWs and upcoming Staff transfers following the closure of two DOC facilities.

¶D2. *System of Incentives and Consequences*. As discussed in the Tenth Monitor's Report (*see* pgs. 248-251), the Department has designed a system ("Informal Resolution") to incentivize positive behavior and to sanction negative conduct. The system includes both short-term and long-term rewards, and a range of consequences that can be imposed close in time to when

misconduct occurs. The Monitor approved the policy, and it was signed into effect on September 1, 2020. Training on Informal Resolution was bundled with Unit Management training (the Monitor approved both curricula in July 2020) and will be rolled out building-by-building (each building includes six housing units). RNDC Leadership and Staff —both uniform and civilian— from the first building were trained in late August/early September 2020. Both programs were deployed in the first building in early September 2020, with training and implementation in the other five RNDC buildings to be phased-in afterwards. The Department has developed Individual Resolution forms and a Tracking Log, from which data on utilization will be analyzed by the Monitoring Team and reported in the Eleventh Monitor's Report.

¶D3. *Direct Supervision.* The core concepts of Direct Supervision have been integrated into the Unit Management model, as discussed in the Tenth Monitor's Report (*see* pgs.264-265). In the first RNDC building to implement Unit Management, concepts taught in training are reinforced via the Daily Huddle (which includes steady Staff assigned to the units and the Unit Manager) and Weekly Unit Team Meetings (attended by steady Staff, unit counselors, recreation counselors, the Unit Manager and representatives from the DOC Programs Division), in addition to day-to-day supervision by the Unit Manager. Interviews with key RNDC leaders indicate that while cross-discipline collaboration among uniformed and civilian staff is a new practice for this Department, Staff have responded positively to the opportunity to work as a team, rather than solving problems in isolation. Further, Staff of all types are reportedly interacting more proactively, abating issues in real-time and are pleased by the ability to address negative behavior in the moment, rather than waiting for the infraction process to wind its way through the system. From the youth's perspective, all youth in the first Unit Management building received an Orientation about the units' new structure and are reportedly motivated to earn the various incentives and privileges that are now available. Training and implementation for the other five buildings at RNDC will be phased-in. The Department's Programs Office adopted a Unit Management Checklist to assess and support the quality of implementation and NCU is planning to construct a routine dashboard for each unit to track key outcomes. The Monitoring Team has been consulting with the Department to develop additional metrics for gauging the quality of implementation, including the extent to which each unit is consistently following the daily schedule.

• **End** •