# Eleventh Report of the *Nunez* Independent Monitor

**Eleventh Monitoring Period**
**July 1, 2020 – December 31, 2020**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ........................................................................................................... **1**
  **Background** ............................................................................................................ **1**
  **COVID-19 Impact** ................................................................................................ **3**
  **Current Status of Reform** ................................................................................... **4**
    • Challenges Regarding Facility Leadership ........................................... 8
    • Deployment of Staff and Overstaffing ................................................ 10
    • Failure to Hold Staff Accountable in a Timely Manner ....................... 14
    • Next Steps to Address Overarching Issues Stymying Reform .............. 14
  **Assessment of Compliance by the Monitoring Team** ..................................... **16**
    • Monitoring Team's Methodology .......................................................... 16
    • Organization of the Report ................................................................... 19

**Use of Force Trends During the Eleventh Monitoring Period** ........................... **22**
  **Use of Force Trends** .......................................................................................... **22**
  **Use of Force Data** ............................................................................................. **25**
    • Number of Uses of Force ...................................................................... 27
    • Use of Force Rate .................................................................................. 28
    • Injury Sustained During Use of Force ................................................... 29
    • Use of Force by Facility ........................................................................ 30
    • Age of Incarcerated Individuals and Use of Force ................................. 31
    • Reasons for Using Force ........................................................................ 32
  **Over-Reliance on Emergency Response Teams** ............................................... **38**
  **Incarcerated Individuals Frequently Involved in Force** ................................ **51**
  **High Needs Individuals ("HNI") initiative** ..................................................... **52**

**Identifying & Addressing Use of Force Misconduct** ............................................ **61**
  **Identifying Use of Force-Related Misconduct** ................................................ **62**
    • Rapid Reviews ...................................................................................... 63
    • Investigating Use of Force-Related Misconduct .................................... 68
  **Addressing Use of Force-Related Misconduct** ................................................ **75**
    • Immediate Corrective Action ................................................................ 76
    • Command Discipline ("CD") ................................................................. 81
    • Facility Referrals .................................................................................. 86
    • Personnel Determination Review ("PDR") ........................................... 87
    • Formal Discipline ................................................................................. 89

**Section by Section Analysis** .................................................................................. **104**
    1. Initiatives to Enhance Safe Custody Management, Improve Staff
       Supervision, and Reduce Unnecessary Use of Force (Remedial Order § A) ..... 104
    2. Use of Force Policy (Consent Judgment § IV) ...................................... 120
    3. Use of Force Reporting and Tracking (Consent Judgment § V) ......... 125
    4. Training (Consent Judgment § XIII) ..................................................... 148
       Training Space & Dedicated Training Academy ................................. 149
    5. Video Surveillance (Consent Judgment § IX) ....................................... 167
    6. Use of Force Investigations (Consent Judgment § VII) ......................... 179
    7. Risk Management (Consent Judgment § X) .......................................... 207

8.      Staff Discipline and Accountability (Consent Judgment § VIII)........................ 221
9.      Screening & Assignment of Staff (Consent Judgment § XII) ........................... 259
10.     Arrests of Inmates (Consent Judgment § XIV)................................................. 266
11.     Implementation (Consent Judgment § XVIII) .................................................. 269

**Current Status of 18-year-olds Housed on Rikers Island .......................................... 274**
12.     Safety and Supervision of Inmates Under the Age of 19
        (Consent Judgment § XV) ............................................................................... 289
13.     Inmate Discipline (Consent Judgment § XVI)................................................. 307
**Appendix A: Definitions**……………………………………………..…….......i
**Appendix B: Monitoring Team Recommendations**……………….……………… ….…......vi
**Appendix C: Training Charts** ……………………...…………………………...…vii
        Status of Training Provided Since the Effective Date ……………………….....…..vii
        Status of Initial Training Program Development and Deployment………………….viii
        Status of Refresher Training Program Development and Deployment…………………xiii
**Appendix D: Flowchart of Promotions Process** ……………………………………...xv

# INTRODUCTION

This is the eleventh comprehensive report[1] of the independent court-appointed Monitor ("Eleventh Monitor's Report"), Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York and the New York City Department of Correction ("the Department," or "DOC," or "Agency")[2] and the Monitoring Team to advance the reforms in the Consent Judgment during the Eleventh Monitoring Period, which covers July 1, 2020 through December 31, 2020 ("Eleventh Monitoring Period").

*Background*

The Department manages 10 facilities, eight of which are located on Rikers Island ("Facility" or "Facilities").[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding Facilities in the Criminal, Supreme, and Family Courts in each borough. At the beginning of the Monitoring Period, the Department concluded its joint operation of the Horizon Juvenile Center in the Bronx with ACS. As of the end of the Monitoring Period, the Department employed approximately 9,000 active uniformed Staff and approximately 1,700 civilian employees, and managed an average daily population of approximately 4,855 incarcerated individuals.

---

[1] The Monitoring Team has filed a number of other reports and status letters with the Court.

[2] All defined terms utilized in this report are available in *Appendix A: Definitions.*

[3] There are two Facilities based in the City boroughs, Manhattan Detention Complex ("MDC") and Vernon C. Bain Center ("VCBC") in the Bronx. The eight Facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

The provisions in the Consent Judgment and the Remedial Order include a wide range of reforms intended to dismantle the decades-long culture of violence in these Facilities and to create an environment that protects both uniformed individuals employed by the Department ("Staff" or "Staff Member") and individuals in custody. The Consent Judgment was entered by the Court on October 22, 2015 ("Effective Date").[4] It includes over 300 separate provisions and requires the Department to develop, refine, and implement a series of new and often complex policies, procedures, and training, all focused on reducing the use of excessive and unnecessary force against people in custody and reducing violence, particularly among 18-year-old individuals.[5] The Court entered a Remedial Order on August 14, 2020 to address persistent areas of Non-Compliance raised by the Monitoring Team and by Counsel for the Plaintiffs' Class and SDNY, who submitted a Non-Compliance Notice to the City pursuant to Consent Judgment § XXI. (Compliance, Termination, and Construction), ¶ 2 at the end of the Eighth Monitoring Period.[6] The Remedial Order is intended to advance reforms in four key areas: (1) implementing the Use of Force Directive; (2) addressing the backlog of investigations and improving use of force investigations going forward; (3) improving Staff discipline and accountability; and (4)

---

[4] The Effective Date of the Consent Judgment is November 1, 2015. (*see* dkt. 260)

[5] The Monitoring Team did not assess compliance with the Consent Judgment with respect to 16- and 17-year-old individuals in custody ("Adolescent Offenders") in this Monitoring Period. *See* Stipulation and Order Regarding 16- and 17-year-old Adolescent Offenders at Horizon Juvenile Center (dkt. 364).

[6] In the Non-Compliance Notice, Counsel identified nine distinct provisions that Counsel to the Plaintiffs' Class and SDNY believed the Defendants were in Non-Compliance with for which they asked the Department to address in a response: (1) Implementation of Use of Force Directive (§ IV. , ¶ 1); (2) thorough, timely and objective investigations (§ VII., ¶ 1); (3) Preliminary Reviews (§ VII., ¶ 7); (4) Full ID Investigations (§ VII., ¶ 9); (5) ID Staffing (§ VII., ¶ 11); (6) Timely, Appropriate and Meaningful Discipline (§ VIII., ¶ 1); (7) Inmates Under the Age of 19, reducing violence among Young Incarcerated Individuals (§ XV., ¶ 1); (8) Inmates Under the Age of 19, Direct Supervision (§ XV., ¶ 12); (9) Inmates Under the Age of 19, Consistent Assignment of Staff (§ XV., ¶ 17).

addressing the high level of disorder at RNDC, where most of the 18-year-olds are housed. *See* Tenth Monitor's Report at pgs. 6 to 8.

A number of provisions in the Consent Judgment have been terminated, eliminated, or placed in inactive monitoring or abeyance status[7] beginning in the Tenth Monitoring Period.[8] During the current Monitoring Period, the Monitoring Team identified a small number of *additional* provisions it recommends are terminated, eliminated, or placed in inactive-monitoring.[9] These provisions are listed in ***Appendix B: Monitoring Team Recommendations*** to this report and the basis for the recommendations are outlined in the specific compliance assessment for each provision. The Monitoring Team intends to seek input from the Parties in the next Monitoring Period on these new recommendations with the goal of developing a joint submission for Court approval.

<u>COVID-19 Impact</u>

The ongoing COVID-19 pandemic continued to impact the City and the Department's operations during this Monitoring Period. The State of New York remained under a State of Emergency order throughout the Monitoring Period, which began on March 7, 2020[10] and all non-essential staff were required to work from home. Over 900 staff continued to tele-work during this Monitoring Period. Social distancing requirements continued to impact both the

---

[7] *See* Stipulation and Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349) and Exhibit A to the Remedial Order (dkt. 350).

[8] *See* Tenth Monitor's Report with *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions.*

[9] The rationale for these recommendations is the same as those outlined in the Ninth Monitor's Report at pgs. 7 to 9.

[10] *See* Executive Order No. 202: Declaring a Disaster Emergency in the State of New York (available at https://www.governor.ny.gov/news/no-202-declaring-disaster-emergency-state-new-york).

housing and staffing assignments in the jails as well as how various stakeholders worked together. Uniform Staff also continued to suffer from COVID-19 and some were on sick leave. While the population of people in custody still remains lower than at the start of the Consent Judgment, social distancing requirements meant that Staff and people in custody had to be dispersed throughout the jails across the Department to adhere to social distancing requirements. Program Counselors continued to have limited ability to interface directly with people in custody and in-person programming by community partners remained suspended. Training programs were conducted in smaller groups and so the volume of training that can be deployed at any time was significantly curtailed. For ID, the civilian investigators continued to work remotely, while uniform Staff who serve as investigators were not able to enter the jails to speak with Staff or individuals in custody as easily as before. Certain functions have also been converted to a remote platform. For instance, Pre-Trial Conferences and Trials before OATH now occur virtually. Many leadership meetings also continue to occur virtually rather than in person. While COVID-19 has presented many challenges, the Department has shown the ability to adapt in many areas to face these challenges, and the Monitoring Team has observed that certain processes and procedures that were developed to address the pandemic may actually serve as efficient and useful tools going forward.

_Current Status of Reform_

The Monitoring Team remains very concerned about the overall state of reform within the Department. While certain troubling use of force tactics have been curtailed (_e.g.,_ fewer improper head strikes), the pervasive level of disorder and chaos in the Facilities is alarming. The conditions that gave rise to the Consent Judgment have not been materially ameliorated. It is frustrating and disappointing that change has not yet been realized, and so it is critical to

4

understand the current state of affairs and dynamics within the jails in order to determine *how* the changes that are sorely needed in the jails can be realized.

The Eleventh Monitoring Period marks five years since the Consent Judgment went into effect. It has become clear over this time that the issues and problems that plague the Agency are the result of a complex system of entrenched (and sometimes outdated) practices, often convoluted policies, and corresponding Staff culture that have developed over decades. The provisions in the Consent Judgment (and now the Remedial Order) include a variety of requirements and provisions that are expected and intended to improve the practices related to UOF, but the Department's progress has stagnated in key areas. As clearly illustrated by the current state of affairs, simply articulating the desired change (via the Consent Judgment, Remedial Order or change in policy) is not sufficient to actually *catalyze* the change in practice. This is not to say the Agency cannot be reformed; quite the contrary, it can and must be, but realizing that change requires significant, diligent, and continued efforts by all Staff and leadership within the Department.

During the last five years of monitoring, the Monitoring Team has balanced its responsibilities to assess the Department's progress with the need to provide technical assistance that helps the Department develop concrete and specific initiatives to actually *implement* the required reforms. The work needed to develop such initiatives and then actually implementing these plans cannot be underestimated, but when done properly they can result in positive and lasting change. The Department has achieved some significant milestones since November 1, 2015. The 16- and 17-year-old youth have been removed from Rikers Island. The Department has developed and deployed training to Staff on the relevant reforms. The Department has developed viable alternatives to the use of punitive segregation for young adults that, while in

need of improvement, successfully eradicated the harmful practice of long-term isolation for 18-to 21-year-olds. The ability to assess UOF incidents has also improved significantly. There is video footage for almost all incidents that occur in the Agency. Staff reports are now timely and routinely submitted for review. Facility leadership now conduct an initial assessment of all UOF incidents, and while the quality of the reviews still need improvement, they have come a long way from where they started. The investigation of UOF incidents has been overhauled and the advent of Intake Investigations means all UOF incidents now receive a timely review by ID, and the backlog of older investigations is nearly complete. The Department has also made strides in holding Staff accountable and transparency of the disciplinary process has improved, setting the stage for the Department to focus its efforts on *imposing* timely discipline. Not surprisingly, the efforts to eliminate the backlog of investigations has now resulted in a backlog of disciplinary cases that must be addressed.

Despite these accomplishments, the Department struggles to meaningfully reform the Agency. The type of change required will not occur by tinkering around the edges—a wholesale change in the way Staff approach individuals in custody is needed. It bears repeating that simply identifying and articulating what needs to change, and/or requiring the development of plans to change practice does not then magically make those changes occur—particularly when those changes must be adopted in practice by thousands of Staff Members and Supervisors across many jails. The issues plaguing the Department are systemic and deep-seated and have been passed down and accepted by all levels of Staff across the Agency. The changes that must occur require a granular focus on fundamental attitudes, correctional practices, and operations within the Agency. This requires significant technical assistance from the Monitoring Team, to assist leaders with re-framing and re-building the underlying foundation of basic correctional

management. On its own, the Agency appears to be unable to change practice without some guidance. This is particularly true where changes to policy and practice require a complete overhaul of the way things have been done historically. Staff and leadership have approached these tasks the same way for years, sometimes decades. Dismantling that culture is a slow, arduous task.

The Department has a number of both civilian and uniform leaders who have demonstrated a commitment to reform and are working hard to address the requirements of the Consent Judgement and Remedial Order. The Monitoring Team has worked with Commissioner Brann for almost the entire pendency of the Consent Judgment (and 4 years as Commissioner). She has always been honest, transparent, and forthright with the Monitoring Team about the problems plaguing the Agency and open to developing and working on solutions to address various areas of concern. The Commissioner set a clear expectation that all Staff must be open and honest with the Monitoring Team and ensured the Monitoring Team had unfettered access to the people and information needed to do its work, which allowed the Agency and the Monitoring Team to work collaboratively to develop various initiatives needed to advance the reforms.

Ultimately, the extent to which this Agency will be reformed depends on the skill and commitment level of the leadership in each jail. This work is neither glamorous nor easy and requires a strong command of what must be done, how to do it, why it is being done, and ownership of the results. These qualities among the Facilities' leadership are essential for the supervisors in each jail to provide consistent and unwavering reinforcement to Staff when modeling, guiding, training, and holding Staff accountable to do their responsibilities and duties. The Department is still in the first stage of reform in many respects—ensuring there is a foundation and understanding of appropriate practices among Facility leaders. Without a

common and accepted understanding of what must be done, the Agency will be unable to reform and the cycle of dysfunction and disorder will continue. The upcoming leadership changes at the highest level of the Department will impact the Agency for many months. Following Commissioner Brann's departure, an Acting Commissioner will be appointed in June 2021. Following that, the current mayoral administration ends in December 2021 and a new administration will assume the office in early 2022 and is expected to then appoint a new Commissioner. Although expected, there is no question that these transitions will only further disrupt the Department's work and their ability to focus on or advance the various initiatives required for progress toward the Consent Judgment's requirements. This only heightens the importance of addressing the overarching areas of concern outlined below.

There are three overarching issues that have stymied progress. First, the poor quality of Facility leadership hinders progress and must be addressed for the Agency to ever become successful. Second, the dysfunctional deployment and overstaffing of certain posts in the Facilities must be reevaluated to ascertain whether resources are properly assigned and whether the Staff assigned to each post actually meet their responsibilities consistently, without simply outsourcing the issue to a different group of Staff. Finally, the Department must have the ability to hold Staff accountable closer in time to the incident when they are not meeting their responsibilities and when misconduct occurs. The contours of each of these problems is discussed below, followed by recommendations to address each issue.

- **Challenges Regarding Facility Leadership**

The Department has long struggled with adequate supervision of its Staff in the effort to properly implement the UOF directive. Unfortunately, over the past five years, the Wardens and Deputy Wardens have not been successful in dismantling the culture that gave rise to the

Consent Judgment. While conceptually sound strategies to address identified problems have been developed throughout the life of the Consent Judgment, these initiatives often take a long time to be implemented, and some never get off the ground at all. For example, despite refined guidance to limit the circumstances for when and how an Emergency Response Team may be activated to assist with managing an event on a housing unit, Staff and leadership alike continue to over-rely on these teams to address even the most routine issues on the housing unit (*e.g.,* complaints from incarcerated individuals that they have not received commissary, etc.). This is but one example of a recurring pattern at the Department: the strategies are grounded in a nuanced understanding of the problem and require Facilities to apply a practical course of action. However, time and again, implementation falters. The implementation failures come from multiple, interrelated dynamics including:

- leadership with limited ability to inspire, encourage, and motivate Staff to embrace the new practices that are at the heart of the reform effort. The Monitoring Team's observation of Facility practices and various leadership meetings suggest that Facility Leadership has not embraced, and in some cases has not quite grasped, what is needed for the task at hand. While the current corps of Facility leaders each have various strengths, they do not seem to be capable of dismantling the dysfunctional/abusive culture at the Facilities and replacing it with one built on dignity, respect, and problem-solving.

- a lack of buy-in from Facility leaders at the concept phase, coupled with a sense that the Consent Judgment reforms are to be addressed by the civilian leadership (*e.g.*, ID, NCU, leadership in Headquarters, etc.). Facility leaders rarely emerge as champions of an idea or new practice and often seem to be myopic due to a lack of experience in other

jurisdictions. They simply do not know of other ways to solve problems besides "how we've always done it."

- near constant turnover among Facility leaders. Implementation stalls while new leaders are brought up to speed. Staff also know that Facility leadership turn over quickly, they observe Supervisors who are not modeling new practices, and are not exposed to leaders who expect or motivate change over the long haul. Staff who may have been intrigued by new practices then lose interest, lose faith, or move on to something else.

These dynamics, circulating from and around Facility leadership, are a major factor undercutting the success of the reform. The Monitoring Team believes that the current pipeline for Facility Leadership is insufficient and inadequate to inspire, guide and support line Staff in reforming practices. The Monitoring Team therefore recommends that the City and Department expand the corps of individuals who may serve in this role, as discussed in more detail in the "Next Steps" section below.

- **Deployment of Staff and Overstaffing**

The Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff. All of this has a direct impact on the Department's ability to reduce the level of violence and ensure the safety and well-being of Staff and incarcerated individuals. The size of the Department's complement of Staff,[11] particularly the number assigned to the jails, is highly unusual and is one of the richest staffing ratios among the systems with which the Monitoring

---

[11] Uniformed Staff hold one of six ranks: Correction Officers (COs) are supervised by Captains, who are supervised by Assistant Deputy Wardens (ADWs), who are supervised by Deputy Wardens (DWs), who ultimately report to the Warden. The Wardens report to Bureau Chiefs who ultimately report to the Chief of Department.

Team has had experience. This is true even with the unusually high number of Staff who have not reported to work due to chronic illness, COVID-19, and other reasons.

The Department has an unusually high number of Staff who are not available to work because they are on medically monitored restrictions, sick leave, maternity leave, military leave, Family Medical Leave Act, etc. As of March 27, 2021, approximately 2,040 Staff[12] were not available to work. In the Monitoring Team's experience, this is an extraordinarily large number of Staff that are unavailable to work.[13]

Notwithstanding the abnormally high absenteeism, the Department *still* has an extraordinarily large number of Staff to operate the jails. The chart below identifies the number of *available* uniform Staff as of March 27, 2021. Of particular note, there are 5,520 uniform Staff available to work in the Facilities while the monthly ADP of incarcerated individuals is 5,629.

| Number of Available Uniform Staff<br>*as of March 27, 2021* | | | | | | |
|---|---|---|---|---|---|---|
| | CO | Captain | ADW | DW | DWIC or above | Total |
| Available Staff Assigned to the Facilities | 5,042 | 398 | 62 | 15 | 6 | 5,520 |
| Uniform Staff with routine contact with incarcerated individuals, but not in Facilities (*e.g.*, ESU and Transportation Division) | 350 | 29 | 2 | 0 | 0 | 380 |
| Uniform Staff with positions with very limited or no contact with incarcerated individuals (*e.g.*, Academy, Headquarters, Investigation Division, Security Operations, CIB) | 732 | 137 | 12 | 1 | 0 | 882 |
| **Total Available Staff** | **6,124** | **564** | **76** | **16** | **6** | **6,782** |

---

[12] This includes approximately 1,825 COs, 186 Captains, 18 ADWs, and 12 Deputy Wardens and above.

[13] This figure suggests that an evaluation of the City and Department's policies and procedures regarding medical leave must be scrutinized.

Across the thousands of incidents that the Monitoring Team has reviewed, all too often, problems are precipitated, exacerbated, and catalyzed by the number of Staff who are present at the scene. A critical area of focus for the Department is to reform practices resulting in an excessive show of force that becomes counterproductive and likely catalyzes the need to use force in the first place. Even as Facility leadership and Staff claim that there is an insufficient number of Staff in the Facilities, time and again, the Monitoring Team observes more Staff than reasonably necessary responding to incidents. The image below is one example of many in which an extraordinary number of superfluous Staff respond to an event.[14]



The Monitoring Team has found that the dominant staffing models within the Facilities appear to promote the idea that the addition of *more Staff* will solve all problems. This creates a dynamic in which Facility leadership believes more Staff are always needed, when, in fact, it appears that Staff simply need to be deployed more effectively and need to apply a different skill

---

[14] This was an incident in which two incarcerated individuals in a secure day space recreation area were refusing to cuff-up. A Response Team arrived and immediately used OC spray on the two individuals who were standing passively facing the five-member Response Team (during the course of the incident five additional applications of OC were applied). The two individuals were quickly subdued. Separately, one Response Team member repeatedly used hard impact body and head strikes to an individual cornered in the back of the day space. After the individuals were restrained, the small day space was flooded by no less than 10 to 12 officers creating such a crowded milieu, that officers could be seen tripping over one another. That such a cadre of additional officers were not only available, but deployed to respond to this incident, raises a number of important questions regarding staffing management.

set to resolve tensions. More often than not, Staff and Supervisors default to requests for additional Staff to address issues that can and should be addressed by the Staff on the unit and their Supervisors. In most cases, it appears the Staff and Supervisors on the unit are simply unwilling or unable to accept and execute their core responsibilities, such as to provide basic services and resolve interpersonal conflict, and instead seek more Staff to address the problem. The Monitoring Team's observation of Facility operations reveal an unusually large number of Staff working in the Facilities despite some markers that could suggest understaffing (*e.g.*, high use of overtime; high rates of violence and use of force; problems with dependable service delivery including commissary, barbershop, recreation; difficulty releasing Staff who need to attend training), each of which leads to additional problems. These include environments that undervalue de-escalation and problem-solving and overuse physical intervention; frustration among people in custody that leads to negative behaviors; Staff calling out for their regularly assigned shift because they do not want to be held over for an additional shift; fatigue, impatience and morale problems among Staff who are working extra shifts; and an inadequately trained workforce.

The staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff. The way Staff are assigned to various posts does not appear to be efficient. It appears that more Staff than necessary are assigned to certain posts and overall Staff assignment is not aligned with the values that undergird the reform effort, such as de-escalation and reliable service provision on the housing units. These opposing perceptions about the number and deployment of Staff required for Facility safety and effective service delivery must be resolved given their close and direct connection to the Department's problems with use of

force. Accordingly, the Monitoring Team recommends a system-wide staffing analysis is undertaken, as described in more detail below.

- **Failure to Hold Staff Accountable in a Timely Manner**

The system is incredibly behind on addressing use of force violations. As of the filing of this report, almost 1,500 formal disciplinary cases are pending. Further, the accountability that is imposed is often far after, and often years, after the violation initially occurred, which undermines the effectiveness of the discipline. While the significant backlog of disciplinary cases demonstrates the Department has improved in identifying misconduct, this improvement is undermined by the fact that Staff accountability is simply not occurring in a timely fashion.

It is notable and disturbing that under a best-case scenario (which is assuming that the system is functioning properly, which it rarely is), that the current process to impose discipline can take over one year to achieve from the time of the incident (this includes the completion of the investigation, prosecution of the case and ultimate imposition of discipline). Such a system can only be described as inherently dysfunctional and ineffective. The disciplinary process must be improved as discussed in depth in the Formal Discipline section of the Identifying and Addressing Use of Force Misconduct section of this report. It will take a concerted and well-coordinated effort among the City, Department, OATH and all other relevant parties involved to develop a system that provides for timely accountability. These issues must be addressed for the goals of the Consent Judgment to be achieved.

- **Next Steps to Address Overarching Issues Stymying Reform**

The Monitoring Team *strongly* recommends the following actions to address these fundamental issues regarding the Facilities' management:

*Recommendation 1*: The Department must expand the criteria for who may serve on Facility leadership teams, so the Department is not limited to selecting individuals from the uniform ranks. Currently, the only individuals who may serve as Wardens and Deputy Wardens are those currently in the uniformed ranks. This creates a narrow field without many choices, selects from those with DOC-only experience, perpetuates DOC's culture, and excludes well-qualified candidates who have served in similar positions in other jurisdictions. Therefore, the Monitoring Team recommends that the Department broaden the criteria of candidates who may serve in these roles, which will allow for the selection of individuals based on their breadth of experience and demonstrated effectiveness as leaders. Only then, with the right people at the top of the Facility hierarchy, will the vision for elevating the quality of supervision further down the chain of command and the essential improvements to Staff practice become possible. The City has committed to consulting with the Monitoring Team before the end of the Twelfth Monitoring Period (June 30, 2021) on the various options that may be available to address this recommendation and develop a path forward.

*Recommendation 2*: A neutral and independent staffing analysis must be conducted by an individual, external to the Department and the City, with significant experience in conducting staffing analyses for correctional facilities. The Monitoring Team intends to facilitate this assessment, which must provide individual staffing plans for each jail. The evaluation must be consistent with the practices required to achieve the reforms envisioned by the Consent Judgment (as well as other requirements mandated by City and State law). The breadth of work to be completed is complex and time consuming and therefore is expected to require 6-8 months to complete. The Monitoring Team anticipates this project will begin in the Summer of 2021.

*Recommendation 3*: The City, the Department, and OATH must work with the Monitoring Team during the next Monitoring Period to devise various creative solutions to significantly shorten the time required to impose discipline following use of force-related misconduct (as discussed in more detail in the Considerations for Improving Disciplinary Process part of the Identifying and Addressing Use of Force Misconduct section of this report). This is a complex task that needs to be prioritized with appropriate resources from the Department, City, and OATH, and is essential to the Department's ability to improve performance in this area.

These foundational and systemic changes are necessary to catalyze the much-needed reforms in the Agency and ultimately achieve compliance with the aims of the Consent Judgment.

<u>Assessment of Compliance by the Monitoring Team</u>

- **Monitoring Team's Methodology**

The task of monitoring the Consent Judgment, and now the Remedial Order, is complicated given the hundreds of provisions, the interrelationship of the various requirements, and the size and complexity of the Agency. Over the past five years, the Monitoring Team's methodology has become more advanced as the Monitoring Team has gained further expertise in the Department operations and sources of information have been discovered and developed. Furthermore, the Parties have requested that the Monitoring Team consider whether additional indicators of progress could be developed in certain areas. For these reasons, the Monitoring Team's methodology is briefly reviewed here.

Over the past five years, the Monitoring Team has cultivated a strong and collaborative working relationship with the Department and the Department remains receptive to working with

the Monitoring Team. The Monitoring Team continues to provide significant technical assistance to support implementation of the various *Nunez* requirements.

The Monitoring Team's approach to assessing compliance includes a myriad of considerations. The Monitoring Team currently reviews all initial reports (*e.g.,* CODs) and Intake Investigations (formerly Preliminary Reviews) of all use of force incidents that occur in the Department, along with a variety of data regarding training, staffing, Facility operations and the implementation of specific procedures regarding Facility safety. This allows the Monitoring Team to understand the nature of the force being used throughout the Department at the incident level, as well as the variety of influences that lead to and flow from the use of force. The Monitoring Team's approach also identifies systemic trends and patterns. It is important to note that an assessment of an individual use of force requires a qualitative assessment of the specific facts of the case that inherently has some subjectivity, among which even experts may not always agree.

Every Monitor's Report to date has included a wide variety of both qualitative and quantitative data to measure and evaluate the Department's performance and progress. Multiple measures are required in each key area (*e.g.,* implementing the UOF directive, quality of investigations, meaningfulness of accountability, Facility safety, etc.) because no one metric adequately represents the multi-faceted nature of these requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric would not only be challenging, but is also not advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or Substantial Compliance has been achieved. For instance, proper implementation of

the Department's Use of Force Directive relies on a series of closely related and interdependent requirements (*e.g.*, adequate policy, training, Staff practice and supervision in the moment and after the fact, adequate assessment of the incident and accountability for poor performance and reinforcement for positive conduct) working in tandem to ultimately change Staff behavior. As such, there is no single number that would determine whether the UOF Directive has been implemented properly. The Monitoring Team therefore applies a combination of the quantity, the quality, the context, and the standard of practice to assess compliance with each of the Consent Judgment's and Remedial Order's requirements.

Two cautions are needed about the use of quantitative metrics. First, the use of numerical data suggests that there is a line in the sand that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which Staff are held accountable.[15] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Consent Judgment and Remedial Order requirements is more than simply the sum of its parts. This is why the experience and subject matter expertise of the Monitoring Team is so critical, for the ability to not only contextualize the information, but also to compare the Department's performance to their decades-long, deep experience with the operation of other jail systems.

Second, there are infinite options for quantifying the many aspects of the Departments' approach and results. Just because something can be quantified, does not mean it is useful for

---

[15] Notably, neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation nor Remedial Order, include metrics or qualitative measures related to the concerning practices identified or potential corrective measures.

understanding or assessing progress. The trick is to identify those metrics that actually provide

insight into the Department's processes and outcomes and that are useful to the task of problem

solving. If not anchored to a commitment to advance and improve the way the Department is

doing something or the results it is trying to achieve, the development of metrics becomes a

burdensome and bureaucratic task that distracts from the qualitative assessments needed to

understand and more importantly, improve, the processes and outcomes that underpin the

requirements of the Consent Judgment and Remedial Order. Poorly conceptualized metrics

create an unnecessary focus on "counting" instead of solving the actual problem at hand. In

short, while there are certain *ad hoc* requirements that are amenable to the development of

additional metrics, overall, the Monitoring Team strongly discourages a strategy that relies on a

single metric against which progress is measured.

The Monitoring Team is committed to being as transparent as possible and will continue

to explore the development of additional metrics to the extent that they are feasible, that they

meaningfully contribute to the task of problem-solving and that do not unnecessarily divert the

overall focus of the Monitoring Team's work. This commitment to develop additional metrics

comes with a parallel obligation to ensure that these data are interpreted within the proper

context. To the extent additional metrics are identified and developed, they will be included in

future reports.

- **Organization of the Report**

The following sections of this report summarize the Department's efforts to achieve the

goals of the Consent Judgment. First, the report provides a qualitative and quantitative analysis

of UOF trends. This data is presented to anchor the report in the context of the conditions that

created the need for external oversight and to illustrate emerging trends. Next, the report

evaluates the Department's mechanisms for identifying and responding to UOF-related

misconduct. This is done in a single section because the two actions are intrinsically intertwined,

and while the Consent Judgment includes individual requirements across many different topics

that touch on these areas, discussing them holistically emphasizes their interdependence. Finally,

the report assesses compliance with each of the Consent Judgment sections in turn.[16] As for the

assessment of compliance with the Remedial Order, Section A of the Remedial Order is

addressed in its own standalone section while the assessments of compliance with Sections B, C

and D of the Remedial Order are interpolated with the related sections of the Consent Judgment

(*e.g.,* Section B of the Remedial Order is addressed with the Use of Force Investigations section

in this report).

      The following standards were applied to each of the provisions that were assessed for

compliance: (a) Substantial Compliance,[17] (b) Partial Compliance,[18] and (c) Non-Compliance.[19]

It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply

during a period of otherwise sustained compliance, will not constitute failure to maintain

---

[16] A small group of Consent Judgment provisions are not addressed in their original section because their substance is more similar to another area of the Consent Judgment (*e.g.*, § V, ¶¶ 18 and 20 related to use of force reports are addressed in the Risk Management section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Incarcerated Individuals is addressed in the Use of Force Investigations section of this report).

[17] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[18] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[19] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

Substantial Compliance. At the same time, temporary compliance during a period of sustained

Non-Compliance shall not constitute Substantial Compliance."[20] The Monitoring Team did not

assess compliance for every provision in the Consent Judgment or the Remedial Order in this

report because the Monitoring Team was simply not in a position to rate the provision (the

reasons for which are described in the specific provision) or the requirement had not come due.[21]

Further, any provisions that have been placed in an "inactive monitoring" status or held in

"abeyance" are not included in this report.[22]

---

[20] § XX (Monitoring), ¶ 18.

[21] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

[22] *See* Tenth Monitor's Report *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions.*

# USE OF FORCE TRENDS DURING THE ELEVENTH MONITORING PERIOD

This section assesses the Department's use of force by utilizing quantitative and qualitative data extracted from the Department's use of force data and the Monitoring Team's independent review of incident reports, video footage, and investigations. Annual trends for the past five years permit general comparisons, which allow the Monitoring Team to draw conclusions about the Department's progress toward the goals of the Consent Judgment. This section addresses the following: (1) overarching use of force trends, (2) use of force data, (3) the Department's overreliance on Emergency Response Teams,[23] and (4) incarcerated individuals frequently involved in force.

## Use of Force Trends

As discussed in the Introduction of this report, an assessment of UOF must examine a variety of factors and considerations to evaluate the current state of affairs. The data presented in this section clearly demonstrates that physical force is currently used much more frequently than at the time the Consent Judgment went into effect. In fact, the average UOF rate in 2020 was 183% higher than the average UOF rate in 2016. The sheer volume of force is concerning given the underlying dynamics between Staff and people in custody are negatively impacted by these incidents and the system is significantly burdened and overloaded by the required ancillary procedures following each use of force (*e.g.*, Staff reports, investigations, etc.). As noted in the Introduction, the Monitoring Team continually searches for and develops new measures that

---

[23] There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of Facility-based Staff; (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the Facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches.

contribute to the understanding of the problems facing the Department. Some of these are discussed below.

Further compounding concerns about the frequency of force is that the Department has found that just over half of the incidents (1,623 of 3,076; 53%) that occurred during this Monitoring Period had either procedural errors or involved avoidable and/or problematic force.[24] At least 29% of incidents (904 of 3,076) that occurred during this Monitoring Period could have been avoided[25] and/or involved excessive or unnecessary force, and/or involved violations of the Use of Force Directive or Chemical Agents Directive. Furthermore, an additional 23% of incidents (719 of 3,076) involved a variety of procedural errors that ran the gamut from failure to don equipment properly (including the failure to wear personal protective equipment), to the failure to secure cell doors and control rooms or "bubbles", and/or the failure to apply restraints correctly. Although these 719 incidents with only procedural errors did not always include UOF violations, the poor operational practices contributed to the environment characterized by disorder, chaos and subsequent UOF in the Facilities. The high number of uses of force—the majority of which are problematic in some way—creates a vicious cycle of chaos and disorder within the Facilities. UOF incidents cause basic operations and service delivery within the Facility to be interrupted, which leads to anger and frustration among people in custody, which then erupts into subsequent incidents in which force is utilized.

---

[24] Although the Department's effort to identify *all* violations is not always accurate or complete, these findings are generally consistent with the Monitoring Team's assessment of incidents and certainly illustrates the pervasive problems occurring throughout the Agency. These findings are from the Rapid Reviews and the Intake Investigations.

[25] Given the overall concerns regarding Staff's misuse of force and the frequency of pain and/or injury, any incident that could have been avoided contributes to a risk for Staff-on-inmate violence and unsafe conditions.

The Monitoring Team's careful review of thousands of written reports and hours of videotaped footage reveals certain commonalities among the factors that contribute to Staff's decision to use physical force across the Department. These include:

- Poor supervision and inadequate support for Staff on the housing units (discussed in more detail in the Introduction to this Report);

- Poor operational practices (*e.g.*, failing to secure doors, failing to adhere to lock-in times) that create opportunities for disorder and often lead to a use of force;

- Failure to adequately provide for and/or address requests for basic services (*e.g.* access to commissary or recreation time) which results in incarcerated individuals expressing frustration. This then often results in extreme responses by housing unit Staff and/or Supervisors to address these requests for basic services by seeking an external Emergency Response Team (who often respond with an excessive number of Staff, discussed in more detail in the Introduction and below) when the issue could have been addressed by those Staff on the unit or their Supervisors;

- The presence of an abundance of Staff appear to diffuse Staff's sense of responsibility and leads them to believe that "someone else will handle the problem"—creating the classic 'bystander effect' in which Staff do not uphold standards of conduct nor call out the improper or misuse of force when they see it;

- Staff's hyper-confrontational demeanor, which often precipitates the need for force, including their mannerisms and conduct during searches, and their typical responses to rising tensions. These behaviors significantly increase the likelihood that situations will escalate to the point that physical force becomes necessary; and

- Poorly executed physical restraints (*e.g.,* painful escort techniques, improper use of OC spray, force that is disproportionate to the actual threat), in addition to violating the Use of Force Directive, are antithetical to the reform effort and further deteriorate the culture when Supervisors fail to intervene.

This combination—(1) situations that if managed properly would have avoided a use of force altogether and (2) the failure to properly temper the force to only what is necessary and proportional—continues the Department's trajectory in the opposite direction of what is required by the Consent Judgment. In particular, these practices violate the core principles of the Use of Force Directive: that the force used shall always be the minimum amount necessary and proportional to the resistance or threat encountered; the use of excessive and unnecessary force is expressly prohibited; the Department has a zero-tolerance policy for excessive and unnecessary force; and the best and safest way to manage potential use of force situations is to prevent or resolve them without physical force. In fact, many of the incidents reviewed by the Monitoring Team include conduct that is expressly prohibited by the UOF Directive (*e.g.*, the use of force to punish, discipline, assault, or retaliate against an Inmate and the use of racial, ethnic, or homophobic slurs towards Inmates; *see* Consent Judgment § IV., ¶ 3(c)).

<u>Use of Force Data</u>

The Tenth Monitor's Report found that the *number of uses of force* dropped significantly at the end of the Monitoring Period, but because fewer people were in custody, the *use of force rate* was higher. This pattern of lower numbers but higher rates continued during the current Monitoring Period —for the Department as a whole, across all age groups, and for many of the Facilities—as shown in the graphs and charts below. These data continue to tell the story of a Department that has thus far been unable to implement reform strategies at the scale and fidelity

needed to produce a significant and sustained reduction of the rate at which physical force is used to respond to people in custody.

As repeated in every Monitor's Report to date, a well-executed, well-timed use of force that is proportional to the observed threat protects both Staff and incarcerated individuals from serious harm. That said, given capable Staff and effective leadership, many risky situations can be avoided altogether or successfully managed without force of any kind. An important bit of progress is the Department's recognition that some uses of force are indeed avoidable, meaning that if the precursors had been handled differently, the need to use force could have been averted. During the Eleventh Monitoring period, the Department's Rapid Reviews and/or investigators found that at least 647 of the 3,076 (21%) uses of force were "avoidable".[26] Thus, one of the keys to achieving the goals of the Consent Judgment is to equip Staff with the skills, mindset, and motivation to address these precursors more constructively, driving down the number of situations in which force is necessary. Moreover, even when physical force is a reasonable response to an observed threat, Staff and their Supervisors and leadership must ensure that the type and amount of force used does not exceed what is necessary for Staff to restore safe conditions.

Finally, even necessary, proportional uses of force are enormously taxing on the system. Each use of force and associated follow-up prevents Staff from focusing on their primary duty— maintaining safety and facilitating services for those in custody—which, when neglected, becomes a vicious cycle of continued interruptions in service delivery and inattention to basic

---

[26] While a Rapid Review was completed for every UOF in this Monitoring Period, ID's investigations of 658 incidents that occurred in this Monitoring were still pending as of the end of the Monitoring Period. It is possible that ID's investigations will identify additional uses of force that were likely avoidable.

protocols, which lead to further disorder and uses of force. For all these reasons, not the least of which is the duty to do no harm, the Department must redouble its efforts to properly implement the array of strategies that are designed to reduce the use of force.

- **Number of Uses of Force**

The graph below shows the number of uses of force in 2020 (dark blue line with data values) compared to previous years since the Effective Date of the Consent Judgment. The Eleventh Monitoring Period began (July 2020) with promising lower numbers, but then, the number of uses of force climbed steadily throughout the remainder of the year.



Although the raw numbers depicted in the graph above look somewhat encouraging compared to previous years, they occurred during a time when the Department's average daily population was particularly low (ADP in 2016 was 9,803, compared to 4,544 in 2020). This is why it is so important to calculate the use of force *rate* to neutralize the impact of a changing population size when examining outcomes. A *rate per 100 individuals* is used in order to

neutralize the impact of the decreasing facility population so that different time periods can be compared.[27]

- **Use of Force Rate**

The graph below shows the use of force rate for each year since the Effective Date of the Consent Judgment. Again, the dark blue line with data values shows the rate during each month in 2020. Examining the number of uses of force in combination with the number of people in custody reveals that from July to December 2020, force was used more often on an incarcerated individual than in any previous Monitoring Period (Eleventh Monitoring Period average = 12.0; Tenth Monitoring Period average = 10.7).



In fact, as shown in the chart below, the annual average use of force rate has risen steadily each year since the Consent Judgment went into effect. The 2020 average rate (11.3) is 183% higher than the 2016 average rate (4.0).

---

[27] Rate per 100 individuals = (# of incidents/ADP)*100



This broad metric is an unfortunate commentary on the success of the reform effort to date, although as noted in the Introduction to this report, it does not tell the whole story nor is it particularly helpful for problem-solving. For that, one must understand the consequences of the high use of force rate and the various dynamics that contribute to it, all of which are discussed throughout this report. While several interim steps have been accomplished and the Department has some solid concepts for strategies to abate the current situation, the pace and quality of implementation remains deficient and thus the desired outcomes have yet to be achieved.

- **Injury Sustained During Use of Force**

One positive trend is the increasing proportion of use of force events that *do not* result in an injury. As shown in the chart below, during the early years of the Consent Judgment, about 62% of all uses of force did not result in an injury, compared to 82% in 2020. Conversely, injuries were sustained in a decreasing proportion of incidents, which is most pronounced in Class B category (less serious injuries; decreased from about 35% to about 15%).[28] The

---

[28] The injury classification data for use of force incidents reflects the fact that at least one individual involved in the use of force event (Staff or incarcerated individual) obtained an injury. This data does not reflect the unique number of individuals that may have sustained an injury during an incident involving a use of force.

proportion of incidents with Class A (more serious) injuries has remained stable over time (2 to 3%).

This is an area where the interpretation of numerical metrics can be challenging. While the *proportion* of incidents with Class A injuries has remained relatively stable over time, because the number of uses of force increased significantly between 2016 and 2020, the actual *number* of incidents with Class A injuries has significantly increased (from 74 in 2016 to 178 in 2020). Further, as with all metrics, these injury data need to be evaluated within the context of other trends or events within the Department, such as what caused the injury.



It is also important to note that the fact that a use of force did not result in an injury does not mean that it was an appropriate response to the circumstances. Furthermore, even without injury, using force may also cause pain and fear and is also destructive to the culture of a Facility and the relationships among Staff and incarcerated individuals.

- **Use of Force by Facility**

    Since the Effective Date of the Consent Judgment, use of force rates within each Facility have fluctuated a bit, but overall, have significantly increased across all Facilities. It is important

to recognize that the leadership, Staff and size and composition of the population in each Facility changes constantly. Some have been slated for closure and then re-opened, or have recently begun to downsize. For these reasons, understanding the specific contributing factors as to *why* the use of force rates increased at a certain point in time in the various Facilities is difficult and comparisons across time are relatively meaningless, and are therefore not analyzed in this report. That said, the Monitoring Team has found that the same practices contributing to the unnecessary and excessive uses of force are observed at *all* Facilities and thus the strategies discussed and recommended throughout this report are broadly applicable.

- **Age of Incarcerated Individuals and Use of Force[29]**

As shown in the table below, the use of force rate decreases significantly as age increases. In other words, younger individuals in the Department's custody are far more likely to be involved in a use of force than their older counterparts. This is unsurprising given recent research on the uneven pace of adolescent brain development that emphasizes the consequent likelihood of impulsivity among younger people. In 2020, the use of force rate for 18-year-olds (53.4) was over five times higher than that for older adults (9.6) and the rate for those aged 19 to 21 (26.7) was almost three times higher than the rate for older adults (9.6).

| Average UOF Rates, 2016-2020, by Age | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **% change 2016-20** |
| 18-year-olds | 19.7 | 17.7 | 36.4 | 53.8 | 53.4 | +171% |
| 19-21-year-olds | 9.3 | 12.3 | 19.0 | 24.4 | 26.7 | +187% |
| 22+ year-olds | 2.5 | 2.9 | 3.8 | 5.8 | 9.6 | +284% |

---

[29] Pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center ¶2 (dkt. 364), the Monitoring Team no longer assesses compliance with the Nunez provisions related to this age group. For this reason, adolescents are not discussed in this section.

While the rate of use of force among those age 22 and older is relatively low, it has increased more since 2016 than that of the other age groups (from 2.5 to 9.6, which is a 284% increase). The "22+ year old" age group is quite diverse, including both those emerging from late adolescence and those considered elderly. Furthermore, individuals in this age group are spread across all of the Department's Facilities. Because 80% of all 18-year-olds and over half of the 19- to 21-year-olds are held at RNDC, that Facility has focused on addressing the unique circumstances of this population. These dynamics are discussed in detail in the section of this report titled "Current Status of 18-year-olds Housed on Rikers' Island."

- **Reasons for Using Force**

The Department uses several categories to explain the *primary* reason force was used in each incident, some in response to violence (*e.g.,* assault on Staff, fights among incarcerated individuals) and some as a strategy to enforce compliance (*e.g.,* resisting restraint/escort, refusing a direct order). In addition to what is reported by Staff, the Monitoring Team also finds that often, Staff's aggressive demeanor and lack of de-escalation skill contributes to use of force events, as does the prevalent failure to implement basic security protocols (*e.g.*, leaving doors unsecured, leaving one's post) and poor supervision and incident management.

The distribution across Staff's reported *primary* reason for using force in 2020 is presented in the chart below and has remained relatively stable over the past five years.



It is important to note that secondary factors underlie the reasons for force, including interpersonal dynamics on the housing unit, Staff's failure to provide basic services, Staff's hyper-confrontational behavior and supervisor's failure to reinforce basic standards of conduct and job responsibilities among their subordinates. Unfortunately, the necessary skill development and buy-in is not yet prevalent among Supervisors, who are also responsible for modeling proactive and constructive supervision and interrupting and redirecting poor practice during use of force events, should it occur.

   o   *Self-Harm Incidents*

The Monitoring Team continues to review self-harm incidents that involve the use of force.[30] The Monitoring Team remains concerned that Staff are not responding in the moment with the necessary urgency and/or are not taking threats and self-harm gestures seriously.[31] The Staff response may not always involve an egregious delay, but *any* delay in preventing or

---

[30] When an incarcerated person attempts self-harm or suicide, Staff may need to use force to prevent the person from doing so.

[31] Following the close of the Monitoring Period, a Captain was indicted by the Manhattan District Attorney's office for criminally negligent homicide in the death of an incarcerated individual who hanged himself, in this Monitoring Period. It is alleged the Captain issued orders that prevented officers from saving the life of the individual and making false statements in her written account of the incident.

responding to self-harm is potentially significant. Further, Captains, when on scene, rarely direct Staff to enact proper protocols for addressing self-harming behavior. The cases reviewed also provided limited evidence of appropriate follow-up and intervention by mental health care staff.

The Monitoring Team has worked with the Department to strengthen its suicide prevention and intervention strategies. First, in response to the Monitoring Team's concerns about the presence of protrusions and other features of the physical plant in intake areas that create a risk of suicide by hanging, Staff from the Chief of Strategic Partnerships' office, Facility DWs and maintenance staff inspected each intake area and identified necessary physical plant modifications.[32] Second, three policies related to suicide prevention and intervention were updated to emphasize the importance of timely response to any suicide attempt, gesture, or ideation.[33] Third, the policy revisions codified a prohibition on using the phrase "manipulative gestures" to describe self-harm incidents. This phrase is troublesome, as it suggests an unfounded conclusion about an action, rather than a description of the person's behavior, and also suggests that such actions should not be taken seriously. Further, regardless of the person's underlying motivation, any gesture or attempt is potentially lethal. The Monitoring Team verified that this phrase was not used in any of the CODs issued during the current Monitoring Period.

The Rapid Review template was also updated during this Monitoring Period to identify use of force incidents involving self-harm and require Facility leadership to determine whether all DOC policies and procedures relating to self-harm were properly applied. If not, the Rapid Review template requires a description of all procedural violations related to self-harm.

---

[32] An update on the status of this evaluation will be included in the next Report.

[33] The polices went into effect during the Twelfth Monitoring Period.

However, an assessment of Rapid Reviews from incidents involving self-harm indicated that the template is not completed as required. Although Facility leadership often indicated that the Staff's intervention was deficient in the free form fields of the Rapid Review template, they did not reliably complete the self-harm section. For this reason, these data are not presented/analyzed here.

The Monitoring Team will continue to closely scrutinize these incidents and encourages the Department to reinforce the importance of adequate and timely responses to any individual who threatens or engages in self-harm behavior. To that end, the Monitoring Team will collaborate with the Department during the Twelfth Monitoring Period to develop a Transfer of Learning series to reinforce best practices to Staff.

   o   *Use of Force Locations*

The distribution of use of force incidents across locations within the Facilities has remained consistent since the Consent Judgment went into effect, with 2020 data shown below.



These proportions must be interpreted within the context of facility operations. More specifically, on one hand, the fact that most uses of force occur in the place where incarcerated individuals spend most of their time (housing units) is unsurprising. However, from the

Monitoring Team's vantage point, the large number of uses of force that occur on housing units also reflect Staff's inconsistent and unreliable service delivery which creates understandable frustration among incarcerated individuals. Use of force on the housing units often occurs due to Staff's lack of proficiency with tools for de-escalating tension, Staff's tendancy toward provocation and hyperconfrontational behavior and their overreliance on Emergency Response Teams.

The Remedial Order includes many strategies that should reduce the number of uses of force that occur on the housing units. More specifically, improvements in the quality of Staff supervision, strengthening the respones to Staff misconduct, and carving out a more limited purview for the use of Emergency Response Teams—if properly implemented—should lead to an environment in which force is used less often.

> o *Overreliance on Intake for Post-UOF Management*

The proportion of uses of force that occur in Intake areas (ranging between 14 and 17% of all uses of force for the past several years) remains at a level that creates concern about the extent to which the use of Intake for post-incident management contributes to the misuse of force. Using Intake for this purpose, in addition to a number of other functions, creates significant problems that distract from Intake's core processing function and increases the likelihood of ancillary uses of force, especially in those cases where individuals who require heightened security protocols are placed in an intake pen versus a more secure location, as explained in the Ninth Monitor's Report at pgs. 18-21.

Further, post-UOF management currently relies upon the use of Intake that only exacerbates the problem. Following a use of force, all individuals involved must obtain

necessary medical treatment[34] and also need an opportunity to de-escalate. The difficulty is that

the Department's practice is to *immediately* remove *everyone* involved in an incident from the

housing unit (or wherever the UOF occurred) and to *transport* them to the Intake area to wait for

medical treatment and/or re-housing. The combination of—(1) transporting agitated individuals

who were just subjected to a use of force; (2) moving them to an unsecured location (Intake pens

often hold multiple individuals in a single small space) where they must wait, (3) utilizing Staff

(often an Emergency Response Team) who typically default to a confrontational approach to

escort these inviduals; and (4) knowing that Staff in these circumstances tend to utilize painful

escort techniques—is a scenario that is doomed to fail by any measure and thus must be changed.

The Remedial Order requires the various processes that are negatively impacting Intake's

orderly operation to be identified and addressed (Remedial Order § A., ¶ 3). During the current

Monitoring Period, the Department created a working group to analyze this problem, consisting

of the Bureau Chief of Facility Operations, GRVC and AMKC Facility leadership, NCU, Chief

of Department and Project Management Office. The group found that people in custody regularly

travel in and out of Intake for reasons unrelated to admission and discharge (*e.g.*, pending

housing unit transfers, while awaiting a clinic appointment, search refusals, individuals who are

being disruptive, etc.), as well as the large volume of traffic related to post-incident management.

The working group also noted that individuals tend to languish in the Intake area and that

secondary uses of force typically arise from a refusal to obey orders (rather than from

interpersonal violence). Finally, the group noted that certain Facilities contribute a

---

[34] The Consent Judgment requires that all Staff and Incarcerated Individual who used force or upon whom force was used shall receive medical attention as soon as possible following any use of force Incident. See, §IV. ¶3(h)(i).

disproportionate share of uses of force in Intake, and thus need to be prioritized for solutions. From here, new processes that do not involve the use of Intake must be developed to address most of these circumstances. The Department, in consultation with the Monitoring Team, intends to draft a new policy governing the more narrow use of Intake areas and to provide Supervisors with options for managing situtations that have been traditionally managed via Intake.

As part of this work, the Monitoring Team recommends the Department re-evaluate the default response that *all* individuals involved in a use of force incident must be moved off the housing unit *immediately* and taken to Intake. The Department must contemplate alternatives that afford an opportunity for de-escalation, security management, and that do not run afoul of the requirement to provide timely medical care. For example, alternative protocols may not require immediate movement, could change the destination or could change the Staff involved in transportation. Further, consideration should be given to whether certain medical treatment could be provided either on the housing units or from a location other than the clinic. And, if individuals must be moved, Staff other than the Emergency Response Team may be better suited to the task of escorting. The Monitoring Team's will consult with the Department about these issues during the Twelfth Monitoring Period.

<u>*Over-Reliance on Emergency Response Teams*</u>

The Monitoring Team continues to find that most incidents could be resolved either by the Staff on the unit and/or their Supervisor or by calling other Staff to the location in an effort to resolve issues without using physical force (a Level A alarm). However, the Department continues to default to activating an Emergency Response Team, which consists of Staff who suit up in protective gear and advance *en masse* to the location requesting assistance (a Level B alarm). These teams are requested in response to problems or to conduct searches on the housing

units. There are at least three types of teams: (1) Probe Teams, which consist of Facility-based

Staff; (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of

the Facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated

with the Special Operations Division that conducts searches. The goal of Remedial Order

requirement § A, ¶ 6 is to improve the selection and number of individuals on Emergency

Response Teams and to reduce the reliance on these teams in order to minimize unnecessary or

avoidable Uses of Force.

Previous Monitor's Reports have discussed concerns about the frequency of Level B

alarms and the impact of these alarms on the houing unit (*see* Tenth Monitor's Report pgs. 30-

32). This practice has persisted. In general, the overuse of alarms, chaotic search practices,

outsourcing of basic facility operations to ESU teams, the composition of ESU teams, and the

questionable tactics of those teams all significnatly impact the Department's larger use of force

problem. Each is discussed in turn below.

- **Alarms**

More often than not, unit Staff and Supervisors default to requests for an Emergency

Response Team to address issues that they should be able to manage independently. Their

abdication of this duty creates a vacuum filled by Emergency Response Teams who are

summoned to handle even the most routine and commonplace management issues, including

addressing complaints about the provision of basic services such as commissary and recreation.

It appears Staff are simply unwilling or unable to fulfill their core responsibilities and

Supervisors are unwilling to support and/or manage Staff to ensure that these issues are

appropriately addressed.

During the Monitoring Team's extensive review of incidents and corresponding video footage, the disparity between the seriousness of the issue and the magnitude of the response is readily apparent. As discussed in previous Monitor's Reports, the sheer number of alarms far exceeds what the Monitoring Team has observed in other settings, particularly Level B alarms which activate an Emergency Response Team.[35] In most jurisdictions, this type of tactical response is used only when individuals are destroying property at a significant and accelerated rate and/or where Staff are at serious risk of losing control of an area, or potentially, the Facility. In other agencies, Emergency Response Teams are seldom used on a daily basis, let alone multiple times during a single tour, as is the case in this Department. Response team activations are Staff-intensive and significantly disrupt the normal operation of the Facility. Further, the demeanor of the Emergency Response Team often escalates the situation, which, combined with the show of force and overall chaos, tends to exacerbate the possibility that a use of force will occur.

Thus, the Monitoring Team's concerns about the Department's overreliance on Emergency Response Teams, and ESU in particular,[36] are intertwined with concerns about significant management failures by Facility leadership and their Staff who appear to have abdicated their basic duty to manage potential use of force situations. It defies logic why Facility leadership, who claim to have insufficient Staff, then deploy excessively large teams of Staff to address issues on the housing unit that could and should easily be managed by the Staff assigned to the location. This counterproductive cycle significantly increases the potential risks of harm to

---

[35] See Seventh Monitor's Report at pg. 23, Eighth Monitor's Report at pgs. 29-30, Ninth Monitor's Report at pgs. 26 to 29, and the Tenth Monitor's Report at pgs. 30-32.

[36] The Department has reported that ESU has increased its presence in various Facilities and responds to incidents in place of Probe Teams due to staffing shortages.

both people in custody and Staff and is particularly distressing given that many of the underlying events do not appear to represent the kinds of threats that ESU was originally intended to address.

In August 2019, the Department issued a policy intended to increase Facilities' use of Level A alarms, thereby reducing the reliance on Level B alarms, by requiring Tour Commanders and Facility leadership to first assess whether the use of a Level B/Probe Team is even warranted given the facts and circumstances of the incident, and to make this determination *before deploying the team.* This assessment is either not occurring or is inadequate and, as shown in the table below, the alarm situation has not improved.

| Alarms, July 2019 to December 2020[37] | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | 9th Monitoring Period Jul-Dec 2019 | | | 10th Monitoring Period Jan-Jun 2020 | | | 11th Monitoring Period Jul-Dec 2020 | | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate |
| Total Alarms | 7,268 | 6,989 | 17.3 | 4,462 | 4,698 | 15.8 | 4,683 | 4,389 | 17.8 |
| | # | % total | | # | % total | | # | % total | |
| *Level A* | 2,052 | 28% | | 796 | 18% | | 1,098 | 23% | |
| *Level B* | 5,216 | 72% | | 3,666 | 82% | | 3,583 | 77% | |
| *Rate is calculated using the following formula: (# Alarms in MP/6 months)/ADP * 100* | | | | | | | | | |

Compared to the number of alarms during the Ninth Monitoring Period (n=7,268), the number of alarms during the current Monitoring Period decreased by 36%. However, this decrease mirrors the reduction in the Department's average daily population. As shown in the table above, when considering the number of people in custody, the *rate* of alarms has remained relatively constant. The quantitative alarm data also supports the dynamic seen in the Monitoring

---

[37] The data by Facility demonstrates the Department's pervasive overreliance on Level B Alarms. As with use of force data by Facility, the Monitoring Team has not found a particular pattern or practice regarding the use of alarms by Facility that would make this data particularly informative.

Team's qualitative review of incidents—that Level B alarms are called for all manner of management issues, including those that could reasonably be addressed by the unit Staff and perhaps a Supervisor. Level B alarms constitute about 75% of the calls for Staff assistance.

The consistently disproportionate number of Level B alarms demonstrates the Facilities' penchant for a heightened response and suggests that no progress has been made to reduce the reliance on Emergency Response Teams. It is important to recognize that not all alarms result in a use of force. However, the Monitoring Team is concerned because when an alarm *does* involve a use of force, the Emergency Response Team's conduct tends to be problematic, which is discussed in more detail below. Given the frequency of activation and the Emergency Response Teams' typical approach and demeanor, the likelihood of use of force event (and possibly an unnecessary and excessive force event) increases significantly. Accordingly, it is critical that the Department ensure housing unit Staff maintain responsibility for managing conflicts and do not routinely outsource relatively minor issues to an Emergency Response Team by calling an unnecessary Level B alarm. Further, when Level B alarms are called appropriately, the number of Staff who comprise an Emergency Response Team must be reduced to a reasonable number. Emergency Response Team Staff must improve their use of de-escalation tactics and Supervisors need to mitigate confrontation and the disorderly and chaotic operations that follow a Level B alarm activation.

- **Searches**

Similarly concerning patterns are observed regarding the Department's search practices,[38] which may be conducted by Facility Search Teams, ESU, or SST. The sheer number of searches—often in the hundreds each month—conducted in the Facilities is unusual in the Monitoring Team's experience. Furthermore, many searches appear to have a questionable basis and often, the teams execute a more extensive search than is necessary (*e.g.,* conducting a unit-wide search instead of searching specific individuals). The Staff's demeanor when conducting the searches is often hyper-confrontational and the tactics employed are unorganized and chaotic (*e.g.,* the items searched are tossed and scattered around). Video footage of searches reveals an overall lack of planning for executing the search and a troubling lack of oversight by Facility leadership. This leads to a search operation that is chaotic and disorderly. From the Monitoring Team's vantage point, the number of Staff deployed to conduct a search is also far greater than necessary, given practices in other jurisdictions. This again raises questions regarding the frequent complaint about staffing shortages and suggests that the belief about a "shortage" may have emerged simply because Facilities have always relied upon an excessive number of Staff to address problems. The excessive number of Staff participating in searches, coupled with their combative and provoking manner, only heightens tensions and increases the possibility of confrontation with incarcerated individuals. Searches are a preventative measure—to both deter

---

[38] There are three general types of searches conducted within the Department: (1) *Scheduled Searches conducted by the Facility* which are conducted weekly, (2) *Scheduled Searches conducted by ESU or the SST* are conducted weekly and are not intended to take the place of facility-led institutional searches, but rather are additional searches that are scheduled through the Bureau Chief of Security's Office based on intelligence or trends, (3) *Unscheduled Searches conducted by ESU or the SST* that are typically in response to a violent incident such as a stabbing or slashing, or another significant incident such as a barricade. Unscheduled searches are typically requested by the facility warden and approved by the Bureau Chief of Security's Office depending on the circumstances.

the flow of contraband and/or to obtain contraband that individuals may have—but the current inefficient search procedures undermine the overall goal of the exercise and create a number of unintended consequences. Following the close of the Monitoring Period, the Monitoring Team provided several recommendations for potential improvements and enhancements to the Department's search policies and procedures. The Department reports efforts to refine its search policies and practices to address the Monitoring Team's concerns and will consult with the Monitoring Team before finalizing any revisions.

- **Selection of ESU Teams**

The practices of the Emergency Services Unit ("ESU") is of primary concern, especially given the ESU Teams were increasingly relied upon in this Monitoring Period to respond to Level B alarms and to conduct routine searches in the Facilities, often supplanting functions previously conducted by Facility-based Staff. The Monitoring Team examined various aspects of ESU's operation and Staff selection protocols.

The ESU Team is *expected* to be the most elite team of Staff in the Department. The ESU team is supervised by an ADW and technically falls under the command of the Special Operations Division. The Monitoring Team recognizes the need for and supports the utilization of a specialized and highly trained tactical squad within the Department. When properly utilized and deployed, such teams can neutralize serious risks of harm to both Staff and incarcerated individuals. This requires deep expertise in constructive problem solving and finessed tactics. ESU Teams have always been involved in DOC operations, but they have recently been engaged in more routine operations, ostensibly to address staffing shortages, which has heightened the Monitoring Team's concerns given the frequent inappropriate tactics that are employed (described in detail in the section below) that increases the risk of harm to both Staff and

incarcerated individuals. Despite its reputation as an elite team within the Department, ESU's pattern of unnecessary and excessive uses of force stand in obvious violation of the Use of Force Directive and the requirements of the Consent Judgment and the Remedial Order.

A concerning number of ESU Staff [39] have exhibited problematic behavior that should have either prevented their appointment to ESU in the first place or triggered their removal from the ESU Team pursuant to Operations Order 24/16 "Special Unit Assignment." This policy governs both the screening of Staff for placement on ESU, and post-assignment review which requires the removal of Staff from the ESU Team, when, among other things, disciplinary charges have been served and/or sustained related to excessive force and failure to report. First, it does not appear that screening Staff for ESU results in sound Staff selection decisions. The Monitoring Team reviewed a sample of screening materials for 15 ESU Team members assigned to the team in early 2020. Of those reviewed, five Staff (one Captain and four Officers) were not recommended for selection by ID and/or Trials because of serious disciplinary issues related to their behavior.[40] Despite these disciplinary issues, which directly relate to how Staff might comport themselves in a high-stress assignment like ESU, all five Staff members were

---

[39] The ESU Team is comprised of both a Permanent Team (Staff who are officially assigned to ESU) of about 100 Staff and a Support Team that includes another 100 Staff. Members of the Support Team are technically assigned to a Facility command and report to that command unless ESU needs additional Staff, at which point they will be redeployed to ESU instead. The Monitoring Team has found that a large number of Staff on the Support Team are routinely called to participate in ESU activities and are ostensibly part of the team full time. The Department reports that Staff placed on the Permanent or Support Team are screened prior to placement.

[40] Four Staff members were not recommended due to anticipated charges for use of force violations, pending completion of discipline for use of force violations, or discipline imposed for use of force violations and one Staff member was not recommended because of an arrest for disorderly conduct.

subsequently assigned to ESU.[41] Furthermore, the Monitoring Team's review of the disciplinary

histories of ESU team members demonstrates that a significant number of ESU Staff should have

been removed, pursuant to policy, because they had sustained disciplinary charges for excessive

force and failure to report following placement on the ESU Team. However, this post-

disciplinary screening of ESU Staff had not been conducted as required.

- **Problematic Tactics by ESU Staff**

The overall demeanor of ESU Staff and their use of force tactics raise significant

concerns. As discussed above, far too many ESU Staff report to a scene, creating an outsized

show of force that exacerbates rather than resolves problems. ESU Teams do not report to

Facility Leadership, appear to be afforded significant and undue deference by Facility leadership,

and thus ESU Staff and have little to no supervision by the Facility when responding to an

incident and/or conducting a search. ESU Supervisors are either not present and/or are of no use

when they fail to address problematic tactics employed by ESU Staff during an incident. Further,

ESU Teams do not appear to approach each situation with any type of tactical plan and often

their approach simply leads to chaos and, subsequently, to serious security breaches (*e.g.,*

unsecured doors, failure to utilize cuffing ports, etc.) that create further disorder and often

generate additional reasons to utilize force.

ESU Teams are far too frequently hyper-confrontational and unprofessional. They almost

always fail to first attempt de-escalation when they arrive on the scene and appear to presume

force will be required no matter the circumstance. When force is employed, ESU Staff often

---

[41] The Captain that was not recommended for placement on ESU was subsequently suspended in early 2021 for their inadequate supervision of a UOF incident conducted by ESU Team that resulted in unnecessary and excessive use of force.

utilize improper head-strikes, violent body slams and take downs, violent wall slams, painful and unsafe escort holds, unnecessary use of OC spray, and prohibited holds. Further, ESU Staff's default response is often exceedingly disproportionate to the level of threat, including the use of high impact strikes, OC grenades and/or batons.

ESU's typical response to incidents is all the more concerning because they now respond to more "routine" Facility issues that are far less serious than the emergency situations for which the team was designed. For instance, when ESU is used in lieu of a Facility-level response, certain tactics and tools (*e.g.,* OC grenades) which are supposed to be limited to incidents that legitimately warrant an emergency response, are often employed even though they would not otherwise be available or appropriate. Moreover, ESU Staff are not transparent about their activities, as they all too often file incomplete or false reports and fail to properly utilize handheld cameras, especially during in-cell applications of force. Together, these aggressive tactics and the misapplication of the Department's Use of Force Directive produce an unacceptable number of unnecessary, excessive, and/or avoidable uses of force, many of which also result in serious injury. As a result, ESU's involvement has a cascading negative impact that only elevates the level of chaos and disruption in both the housing units and the Facilities, far beyond the incidents themselves.

Three ESU case examples, rife with abuses, illustrate both ESU's concerning practices and their link to Facility management failures. All are situations in which an ESU Team supplanted a response from Facility Staff. In each case, ESU's operations were disorderly, chaotic, and unsafe and ultimately resulted in unnecessary and excessive force. These examples are, by no means, isolated cases.

o *ESU was conducting a "security inspection" of two cells on a housing unit. Two incarcerated individuals refused to lock-in, and ESU Staff spoke with both individuals in an attempt to persuade them to follow directives, successfully gaining compliance from one individual. The other incarcerated individual continued to refuse to lock-in and ultimately became aggressive, throwing a closed fist punch towards one ESU officer. Four ESU officers responded by using multiple holds (including a prohibited neck hold) to restrict the individual's movement. While these four ESU officers attempted to gain control over the individual's movement, a fifth ESU officer, out of nowhere, and with no discernable provocation or threat, reached over these officers and struck the individual in the head with a closed fist. An ESU Supervisor was on scene but the quality of supervision was debatable. The mere presence of ESU for this type of basic management issue was questionable and the sheer number of ESU Staff present to conduct this security inspection was unnecessary. Finally, the use of a head-strike by an out-of-control ESU officer was unnecessary and appeared retaliatory.*

o *An ESU Team conducted a scheduled search of a full housing unit based on intelligence that one incarcerated individual may be in possession of contraband related to a suspicious cash activity. ESU arrived on the dormitory-style housing unit in an aggressive and hyper-confrontational manner. The incarcerated individuals were low-medium custody and were simply going about their business, acting peacefully. There was no evidence that the ESU team had a tactical plan for the search and the ESU team did not communicate with the incarcerated individuals and/or did so ineffectively prior to and during the search. ESU Staff appeared intent on provoking this group of individuals who were otherwise passive and non-disruptive. One of these individuals was subjected to a very dangerous body slam and then subjected to repeated closed-fist head-strikes. The search resulted in multiple uses of excessive force, lasted many hours in which services for the housing unit were disrupted, and involved at least 28 strip searches. ESU did not uncover any contraband during the search, though ultimately a bag of cigarettes was discovered by a different search team. The search was an ill-conceived and failed operation and the havoc (and potential injuries) that ensued was entirely avoidable.*

o *Residents of a housing unit were upset about Staff's failure to provide services, especially commissary. A Captain spoke to the residents through the unit door but did not enter the unit to de-escalate the incident and left the area before the issue was resolved. Shortly thereafter, the residents began to stack chairs in front of the unit's front doorway—likely to draw attention to their complaint—but did not otherwise appear to be aggressive or threatening. An officer was present but did not take any verbal or physical action to intervene nor did he exit the housing unit while the option was available. He later claimed to have been a "hostage," but his conduct, objective video evidence, and residents' behavior does not corroborate this in any way. ESU arrived on the scene but did not appear to be briefed about the situation, nor did they develop a tactical plan to diffuse the situation or to safely remove the officer. Claims that the chairs placed in front of the unit door constituted a "barricade" are belied by the physical plant, in which the door to the unit opens out into the hallway. The ESU team easily entered the unit, began removing the furniture blocking the doorway and within 90 seconds of entry, began deploying chemical agents (including multiple chemical agent grenades) at the residents who were passively refusing to follow orders to return to their beds. This use of chemical agents served no tactical purpose; conversely, it further agitated the residents and exacerbated the risk of*

48

*harm to both Staff and residents. Once the housing unit officer safely exited the area, rather than pulling back to allow the chemical agent to take effect and order to be restored, ESU remained on the unit and engaged the remaining residents who had retreated to the back of the unit. This engagement led to multiple uses of unnecessary and excessive force, including continuous, vicious and malicious striking of passive residents with batons. In addition to the variety of missed opportunities for de-escalation and several actions that further exacerbated the conflict, multiple ESU Staff falsely and inaccurately reported what occurred.*

These incidents clearly illustrate why the Monitoring Team is so concerned about the Facilities' inclination to deploy ESU as the Emergency Response Team given the gravity of the repercussions when the event is poorly managed. Further, given the Team's reputation as an elite team, their behavior sets a troubling standard for line Staff. Despite ESU's behavior described in the preceding pages, the ESU Team is celebrated, as union leadership has recently done on social media.[42] This, in concert with ESU's ability to behave with impunity while in the Facilities, makes an impression on Facility Staff and suggests that ESU's harsh tactics and questionable decision-making are a model for how Staff should respond to incidents, when in fact, the culture change required by the Nunez reforms demands the exact opposite.

- **Recommendations for Improving ESU's Practices and Procedures**

A dangerous cycle has emerged in which ESU has an increasing presence in the Facilities and incarcerated individuals are being significantly harmed by ESU's actions. This cycle begins when ESU is deployed for routine searches or Facilities utilize Level B alarms for situations that, if unit Staff and Supervisors were sufficiently skilled and took responsibility for appropriate performance of their basic job duties, would not require this level of response. When ESU arrives on scene, their aggressive and confrontational behavior turns what is an essentially

---

[42] See, COBA (@NYCCOBA1), "ESU is the backbone of [the Department of Correction]…" and tribute video at https://twitter.com/NYCCOBA1/status/1367474917604790275.

routine event in any correctional setting into one that is not only more disruptive to the Facility's operation but one in which physical harm is routinely inflicted upon the incarcerated individuals in the area and raises the potential for Staff injuries. The absence of effective supervision of ESU's actions further exacerbates the problem.

This cycle simply cannot continue and must be addressed. Following the close of the Monitoring Period, the Monitoring Team raised these concerns with the Department and that the use of ESU Teams for more routine Facility operations presented an imminent risk of harm and are not in compliance with multiple provisions of the Consent Judgment (*e.g.,* § IV. (Use of Force Policy), ¶¶ 3(a)-(d), (g), and (h)) and §A., ¶ 6 of the Remedial Order. In order to address these concerns, the Monitoring Team recommended that the Department: (1) screen the current ESU Teams to ensure their fitness for this type of duty; (2) improve the supervision of the ESU Teams to extinguish their tendency toward confrontation and the disorganized and chaotic operations that follow; and (3) limit the use of ESU Teams for routine Facility operations (*e.g.,* searches[43] and responses to Level B alarms). As a result of these recommendations, the Department screened the current roster of the ESU Team (approximately 200 Staff Members) and removed over 50 Staff from the ESU Team that met the criteria for removal pursuant to Operations Order 24/16 "Special Unit Assignment" because they had sustained disciplinary charges for excessive force and/or failure to report. The use of ESU Teams for more routine Facility operations, and corresponding involvement in use of force incidents, also decreased in

---

[43] On February 1, 2020, the Monitoring Team recommended the Department temporarily suspend the use of ESU Teams for Non-Emergency Searches in order to address these areas of concern. In response to this recommendation (and others), the Department limited the use of ESU for routine Facility operations and removed a significant number of problematic Staff from ESU teams. Accordingly, the Monitoring Team determined that temporary suspension of the use of ESU for Non-Emergency searches was no longer needed at that time.

March and April 2021. The Monitoring Team encourages the Department to prioritize improving the standards of the ESU team and is closely monitoring the Department's response to the recommendations.

*Incarcerated Individuals Frequently Involved in Force*

Annual aggregate data reveal that each year, a small number of individuals are involved in a significant number of uses of force. In 2020, for example, 104 individuals were each involved in 11 or more uses of force during their time in custody, which is similar to prior years (*e.g.*, 2019 = 138, 2018 = 104). These 104 individuals were involved in a total of 1,588 UOF incidents during 2020, which is 26% of the total uses of force in 2020. Nearly all (n=95 of 104; 91%) have a "Brad H" mental health designation.[44] Better addressing the needs of these individuals and finding more effective ways to supervise and manage them would not only improve the circumstances of those individuals but would also significantly reduce the number of uses of force and attendant processes that must be managed by the Department.

---

[44] An incarcerated individual is classified with a Brad H designation if they are incarcerated for a period of confinement in the NYC Department of Correction for 24 hours or longer and meet one of the following criteria: (a) seen on two or more occasions by mental health unless, on the first or second occasion, the person is assessed as having no need for further treatment; or (b) have a prescription for antipsychotic and/or mood-stabilizing medication in order to treat a diagnosed psychiatric condition; or (c) have a clinical diagnosis that warrants admission following the initial mental health assessment to Mental Health Intake or Psychiatric Assessment but before the completion of the Comprehensive Treatment Plan (CTP), or (d) have been admitted to a mental health therapeutic housing unit following the initial mental health assessment (Mental Health Intake or Psychiatric Assessment) but before the CTP. Incarcerated individuals who are assessed as having no need for mental health treatment beyond the initial two mental health encounters do not have a Brad H designation.

| UOF Involvement Among Incarcerated individuals, 2016-2020 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Number of UOF Incidents per Person | 2016 N=4544 | | 2017 N=4627 | | 2018 N=4986 | | 2019 N=5432 | | 2020 N=5054 | |
| 1 or 2 | 3655 | 80% | 3782 | 82% | 3813 | 76% | 3939 | 73% | 3738 | 74% |
| 3 or 4 | 520 | 11% | 549 | 12% | 663 | 13% | 827 | 15% | 768 | 15% |
| 5 to 10 | 308 | 7% | 259 | 6% | 406 | 8% | 528 | 10% | 444 | 9% |
| 11 to 15 | 44 | 1% | 24 | 1% | 71 | 1% | 91 | 2% | 63 | 1% |
| 16 to 20 | 9 | 0% | 7 | 0% | 21 | 0% | 33 | 1% | 20 | 0% |
| 20+ | 8 | 0% | 6 | 0% | 12 | 0% | 14 | 0% | 21 | 0% |

*High Needs Individuals ("HNI") initiative*

The Department is required by the Remedial Order § A, ¶ 5 to identify those individuals who have been involved in a significant number of use of force incidents so that they can be evaluated: (i) by health care professionals to determine whether their mental health needs are being adequately addressed and (ii) by the Department to assess whether existing security and management protocols are appropriate for these individuals. In April 2020, the Department developed the High Needs Individuals ("HNI") initiative (as described in the Tenth Monitor's Report at pgs. 35-36). The overall goal of this initiative is to reduce the number of uses of force involving this subset of individuals by providing greater focus and additional tools for the Staff who work with these individuals, and to better support the individuals themselves. Beginning in April 2020, the Department, every month, identifies individuals who meet the HNI criteria (involvement in six or more UOF incidents during the prior three months). The Monitoring Team evaluated the Department's identification process during the current Monitoring Period and found that the HNI lists were generally being accurately compiled each month (*i.e.,* adding those who meet criteria and removing those who no longer meet criteria because they had been involved in five or fewer UOF incidents in the prior three months).

- **H+H Assessment of Individuals on HNI List**

Beginning in September 2020, on a monthly basis, the H+H Clinical Director of Mental Health reviews the individuals on the HNI list developed by the Department to assess whether the individuals' mental health needs are being adequately addressed. H+H reported that the Clinical Director reviews each patient's chart to determine whether the patient is being seen regularly and whether his/her diagnosis is clinically accurate (if there is a diagnosis). The reviewer may also reach out to the patient's treatment team to discuss his/her care. If the patient is not currently undergoing mental health treatment, the Clinical Director reviews the patient's chart to see why that determination was made. During the review, the Clinical Director examines the patient's mental health screening, confirms that any DOC referrals have been addressed, identifies behavioral patterns, and considers whether a more in-depth assessment is required. Starting in September 2020, H+H began to add the date of the clinical review to the HNI monthly spreadsheet. H+H reported that mental health staff conducted reviews for all 204 individuals[45] on the HNI lists between September and December 2020. Review dates indicated that the individuals were reviewed within a few days of the beginning of each month. The Monitoring Team is working with H+H to develop a more robust reporting mechanism that would also describe the result of these review (*e.g.,* whether changes to services were warranted as a result of the review) and hopes to identify reporting solutions in the subsequent Monitoring Period. The information provided to date precludes the Monitoring Team from assessing the extent to which the assessment led to substantive recommendations regarding the individual's treatment.

---

[45] The same individual may appear on multiple lists for different months if they meet the HNI criteria each month.

It is worth noting that H+H Staff also engage with the Department regarding the treatment of select individuals through the Persons in Need of Support ("PINS") meetings, discussed in more detail below, in which a subset of individuals from the HNI list are discussed to identify potential solutions and support for these individuals.

- **DOC's Security and Management Protocols**

  o *Inter-Facility Transfers*

In addition to the mental health review described above, currently, the Department's only other system-wide approach to managing the needs of HNI is to limit inter-Facility transfers. For individuals on the HNI list, inter-Facility transfers are permitted only with approval from the Commissioner. The Warden must personally make the application for transfer to the Commissioner with a description of the individual's history and why the Warden believes transfer is appropriate, the steps the Facility has taken to work with the individual, including any steps the Warden personally has taken, as well as any collaboration with H+H. The Commissioner then works directly with the Warden to determine whether transfer may be appropriate.

This strategy was implemented to discourage Facility leadership from simply outsourcing individuals who are difficult to manage to another Facility, and to instead require the Facilities to determine why these individuals were involved in so many UOF and to deploy appropriate strategies to better manage and support them. It is worth noting that this limitation is not intended to preclude the transfer of an individual to a special housing unit if their conduct merits such placement (*e.g.,* ESH, Secure, CAPs or PACE). The limitation is intended to preclude transfers across *Facilities* more generally. However, within a single Facility, individuals are often moved among housing units and Wardens or Deputy Warden assignments also change

frequently, both which disrupt any continuity or stability that could be achieved by remaining in one Facility.

To determine whether an individual's placement on the HNI list actually resulted in fewer Facility transfers, the Monitoring Team analyzed the inter-Facility transfers for a sample of individuals, comparing the rate of transfer *before* the individual was on HNI to the rate of Facility transfers *while on the HNI list.*[46] Overall, the placement of an individual on the HNI list did not appear to significantly decrease the rate at which he or she was transferred among Facilities. More specifically, of the 28 individuals sampled, the rate of transfer was reduced for only about half of the individuals (n=16, or 57%) once put on the HNI list, and these reductions were quite modest (approximately 10% fewer transfers). Furthermore, being on the HNI list coincided with a *higher* rate of Facility transfers for 12 individuals (43% of the sample), though that difference too was negligible (approximately 10% more transfers). Based on this sample, it does not appear that placement on the HNI list actually decreases the rate of Facility transfers. That said, the Commissioner's engagement with the Wardens as part of the Department's efforts to limit inter-Facility transfers is important and should remain an area of focus.

   o   *Person in Need of Support ("PINS") Meetings & Coordination*

Currently, the only time the Department employs a systematic strategy to evaluate and/or develop support for individuals on the HNI list is if that person is also identified for the PINS meetings. These meetings are a critical multi-disciplinary forum for multiple stakeholders to discuss the needs of a small group of individuals who are struggling in some way. But questions

---

[46] Transfer rate was calculated by dividing the number of transfers by the number of days during the time periods prior to/during the HNI period.

remain: do PINS meetings address all of the relevant High Needs Individuals? Are strategies properly implemented? How effective are the strategies in terms of outcomes?

The PINS meetings have been occurring for many years and have been discussed in previous Monitor's Reports (*see* Ninth Monitor's Report at pgs. 34-37). Department leadership, Health Affairs, and representatives from H+H convene weekly to discuss particular individuals who have mental health concerns (*e.g.,* it may include individuals with mental health concerns, but who do not have UOF related issues) and individuals who have been involved in a large number of UOF and need additional support. However, not all individuals that appear on the HNI list are discussed in PINS meetings. For example, of the 27 individuals discussed in the November and December 2020 PINS meetings, 15 (56%) were also on the HNI lists at some point. However, the HNI list included an additional 93 individuals who were not discussed at PINS meetings. It is unclear why certain individuals involved in a high number of UOF are discussed in PINS meetings while others are not.

As for those individuals who are discussed in the PINS meetings, most of the follow-up notes are focused on describing the individual's problematic behavior but lack specific, targeted solutions to address those behaviors (*e.g.,* "Individual is refusing escort to the clinic consistently" or "Individual displays assaultive behavior and is on suicide watch"). The meeting notes for a small number of PINS individuals offered some targeted recommendations to address the behavior, but generally did not go beyond placing the individual on a specialized mental health care unit or prescribing a meeting with a mental health provider. Overall, the limited substance of these meeting notes has not changed from what was described in the Ninth Monitor's Report (at pgs. 36-37).

The notes from PINS meetings do not demonstrate a concerted effort to identify concrete steps that the Facility leadership and Staff can take to improve outcomes for the individual and/or address the underlying causes of his or her behavior. Outlined below is an overview of the PINS meeting notes for one individual over a 4-week period. This exemplifies the boilerplate language often used, the lack of detail about the outcome of a conversation, typical affirmative statements of facts that do not suggest what the issue is and the lack of creative or effective solutions for an individual who is clearly in distress and needs support.

- o Week 1 – Individual is requesting a job, Deputy Warden said she would talk to the individual (no confirmation whether this conversation occurred or the outcome of the conversation).

- o Week 2 – Individual saw Mental Health the week before and is scheduled to see Mental Health next week (no indication of whether concrete steps were developed to address the individual's challenges).

- o Week 3 - Individual engaging in incidents because the individual wants to be transferred out of the Facility (no discussion about how the Facility will address the issue). Saw Mental Health last week and scheduled to see them next week.

- o Week 4 - Individual involved in three UOF, broke a telephone due to being upset at being sentenced 15 years, will be sent upstate soon (no discussion about how to help the individual manage his response to a legitimately traumatizing event).

These notes are representative of the individual discussions occurring at PINS meetings. Various problems are described but the interventions are generally limited to transferring the individual to another mental health unit, providing additional escort Staff to control any undesirable behavior, or engaging with mental health (including psychiatry) until the individual

is no longer in DOC's custody. What is sorely lacking is any contextual information about what that individual needs that would help address the problematic behavior (*e.g.,* what is the cause of the person's distress?) and the lack of strategic thinking or problem solving applied to how the Facility might manage these individuals. Furthermore, an individual may ultimately be removed from the PINS list, with no apparent evaluation of the factors underlying the individual's improvement. Finally, appropriately managing and supporting these individuals will require more specific and concrete solutions focused on the particular individual's unique needs.

As the Department works to better address this population, the Monitoring Team recommends beginning with clearly identifying the strategies that contributed to an individual's removal from the HNI list (*e.g.*, their improved behavior that reduced their involvement in UOF). Otherwise, none of these learnings can be incorporated into the Department's practice and efforts to reduce disorder. For instance, what are the factors that made the last week better for that individual? Is it something DOC can continue to do in the coming weeks? Did something work for this individual that could possibly inform the care and custody of other individuals on the HNI list or the Facilities more broadly?

o   *Individual Facility Plans*

While some of the individuals on the HNI list receive individualized assessment via the PINS meetings, not everybody on the HNI list is being evaluated through PINS and therefore the only Department-wide strategy employed for those individuals is the potential limitation on inter-Facility transfers (which does not appear to be occurring as intended, as discussed above). While not every person on the HNI list may need the support of PINS meetings, the Department does not routinely develop any other individualized assessment or strategies to determine how to better support these individuals. At the end of the Monitoring Period, each Facility developed a

sample security and management protocol to manage a select group of HNI. These plans ranged in scope (from a specific plan for an individual to a Facility-wide approach), detail and quality. Further, it is unclear whether H+H shares its assessment of HNI individuals who are not on the PINS meeting list.

As for those individuals on the HNI list who are also reviewed in PINS meetings, the lack of specific, targeted, problem-solving strategies and concrete solutions in the PINS meeting notes is concerning and inhibits the ability to reduce these individuals' involvement in uses of force.

- **Next Steps**

The Department has successfully defined and identified the target population and has designed two strategies to address the needs of people involved in a high number of uses of force: (1) restrictions for transferring people on the HNI list across Facilities and (2) the PINS meetings. The successful implementation of these strategies is either questionable (interfacility transfers do not appear to have meaningfully decreased for those on the HNI list) or difficult to discern (the PINS meeting notes do not include the necessary level of detail to assess whether/how service delivery has changed).

The Monitoring Team recommends the Department continue to develop specific strategies to address the high numbers of UOF in a small group of incarcerated individuals by: (1) continuing to limit inter-Facility transfers, (2) further specifying and assessing the effectiveness of the individual strategies developed via PINS meetings, and (3) assess whether the individuals on the HNI list should also be referred to the PINS meetings and/or whether separate security or management interventions may be needed, such as individualized security plans. For example, a security/management plan could include a description of the person's behavioral issues (*e.g.,* types of behavior issues, the circumstances under which they tend to

occur), a set of strategies to help the individual regulate emotions/control anger/etc. and guidance for Staff to de-escalate, guide or direct the person without exacerbating the problem or increasing the likelihood that force will be used. The security/management plan should follow the individual if he or she is transferred between Facilities or housing units within a Facility.

The next section discuses overall trends in the Department's progress toward developing an internal capacity to accurately identify and properly address Staff's use of force-related misconduct.

## IDENTIFYING & ADDRESSING USE OF FORCE MISCONDUCT

Timely detection of misconduct and adequate and timely responses to those identified issues are essential for the Department to successfully reduce its use of unnecessary and excessive force and to encourage the safe and proportional use of force. In this section, the Monitoring Team provides an overview of the Department's ability to consistently identify misconduct and to respond with interventions that are likely to prevent re-occurrence. Effectively addressing the misuse of force requires: (1) reliably *identifying* misconduct that occurs; (2) *recommending proportional and effective responses* to that misconduct; and (3) ensuring the responses are *actually imposed*, in a *timely manner*.

This section evaluates both the Department's ability to identify misconduct and to ultimately hold Staff accountable. These issues are discussed together because a holistic assessment is needed to determine the current state of affairs. The Monitoring Team's assessment considers a variety of factors, qualitative assessments, and relevant data, and compliance assessments incorporate a holistic view garnered from the review of thousands of investigations and the corrective actions employed along with other relevant data and information. Given the complexity of the issues, there is no one standard or data point that will determine whether the Department has achieved compliance as discussed in the Introduction of this report. Therefore, the Monitoring Team's assessment of corrective action does not identify a specific number of cases in which a certain type of action should or could have been taken. The volume and severity of misconduct varies and accountability comes in many forms. In particular, these determinations require not only a factual determination of each individual incident, but must also consider aggravating and mitigating factors and must adhere to concepts of progressive discipline, so concluding that a certain type of discipline must be utilized to address a certain

type of misconduct is imprudent. For instance, what might be an adequate response to the misuse of force by one Staff member may not be appropriate for another. Further, the same misconduct can be appropriately addressed in a number of ways, and so assessments require flexibility as there may not be only one correct path (*e.g.,* a Command Discipline and an NPA could both be effective responses). Therefore, quantifying specific performance levels for the *type* and *number* of each accountability measure that should be utilized month-to-month—in other words, setting quotas—would not provide the system with sufficient flexibility to adapt its response to the contours of the misconduct it is trying to address.

The Monitoring Team provides detailed discussions of the Department's progress in each area, below, instead of specific performance thresholds for each element of identifying and addressing misconduct for the reasons discussed above.

*Identifying Use of Force-Related Misconduct*

The Department has a reasonable foundation for identifying misconduct through a combination of Rapid Reviews[47], *ad hoc* review by Agency officials of use of force incidents, Intake Investigations, and Full ID Investigations. While certain misconduct is then addressed timely (*e.g.,* increased use of suspensions), the imposition of discipline is still protracted, as discussed later in this report. In this Monitoring Period, the Department has demonstrated continued improvement in its identification of misconduct through assessments of UOF incidents via Rapid Reviews and Intake Investigations and the backlog of investigations has almost been eliminated.

---

[47] Rapid Reviews are also referred to as "Use of Force Reviews" by the Department, but the moniker Rapid Reviews will continue to be used in this report.

- **Rapid Reviews**

Rapid Reviews are a close-in-time assessment of use of force incidents by Facility Leadership who conduct an initial assessment of an individual incident in order to identify any potential Staff misconduct and/or operational issues that must be attended to, in order to safely manage the Facility. Remedial Order § A., ¶ 1 codifies the requirement for the Department to conduct these reviews.

The Department took a number of steps designed to improve Rapid Reviews this Monitoring Period: (1) a new Rapid Review template, and corresponding policy, was implemented beginning July 1, 2020; (2) improved oversight of Rapid Reviews using (a) a daily call each business day to review every use of force incident in the Department and discuss the initial Rapid Review assessment; and (b) a process to address inadequate Rapid Reviews (as described in more detail in this report in regard to Remedial Order § A, ¶ 1).

Rapid Reviews must be conducted on a daily basis[48] for every UOF incident reported by Staff and captured on video[49]. Facility Leadership evaluates the video of the incident and the initial report of what occurred in the incident ("CODs"). The new Rapid Review template now provides clear and appropriate guidance about the information being sought in the Rapid Reviews, making expectations clear as to what determinations the Rapid Reviewers must make upon reviewing the incident. The Rapid Reviews are completed in an Excel worksheet with individual columns for each of the relevant prompts to identify the following:

---

[48] Rapid Reviews are conducted on a daily basis by the Facility and then forwarded up the chain of command for approval by the Bureau Chief of Facility Operations, whose office reviews and finalizes the Rapid Review assessments and compiles them into one Excel spreadsheet which are then circulated to relevant stakeholders for review.

[49] The Rapid Reviews do not assess allegations of use of force.

- whether certain procedures and protocols were appropriately adhered to (*e.g.,* if a Probe Team responded to an incident, whether the Level B Alarm was appropriate)

- whether the incident was avoidable, and if so, how;

- whether the force used was within guidelines;

- whether Staff committed any procedural errors;

- whether the incident involved painful escort techniques; and

- whether any corrective action is necessary for each Staff Member involved in the incident, and if so, for what reason and the type or corrective action recommend.

The new Rapid Review template prompts Facility Leadership to critically assess an incident and provides an opportunity for Facility Leadership to include more consistent information about those findings (which had not previously been assessed). Further, the guidance that is included in the new template makes the expectations of the Rapid Reviewer clear. Ultimately, while there is room for improvement, the revised template appears to have resulted in Facility Leadership conducting Rapid Reviews that provide more valuable information and are better at identifying issues that need to be addressed.

In order to improve oversight of the Rapid Review Process, the Bureau Chief of Facility Operations initiated a daily call with Facility Leadership and other relevant stakeholders (including staff from E.I.S.S. and the Intake Squad) to discuss the incidents from the prior day and the corresponding Rapid Review assessments. For each incident, the Facility representatives briefly describe the incident, whether it was avoidable and any identified procedural violations. Some incidents are discussed in more detail depending on what occurred and/or the severity of the issues identified. These calls provide an opportunity for the Bureau Chief (or her Staff) to

provide guidance on the appropriate response for identified issues and coach Facility leadership

to take appropriate action if such action is not already identified.[50] These calls also enable

coordination across Divisions as well. E.I.S.S. Staff are present, which facilitates their ability to

monitor certain Staff and/or identify Staff who may benefit from E.I.S.S.[51] ID representatives are

also involved to ensure any work at the Facility level does not interfere with ID's investigation.

These calls appear to provide useful support to improving the overall assessment of incidents

through Rapid Reviews.

During this Monitoring Period, Rapid Reviews assessed 3,076 (97%) of the 3,161 actual

uses of force, involving 25,427 unique Staff actions.[52] The chart below demonstrates the Rapid

Review outcomes for the past six Monitoring Periods.

---

[50] For instance, if the review by the Bureau Chief (or her Staff) of the incident identified misconduct that was not otherwise raised by Facility Leadership on the call, then the Chief will address that issue in real time on the call. The Chief may also weigh in on proposed corrective action for an identified issue.

[51] For instance, the E.I.S.S. leadership on the call may hear about an incident involving a Staff Member already enrolled in E.I.S.S. and can collaborate with Facility leadership on additional support to be provided to that Staff Member.

[52] "Staff actions" refers to each Staff Member involved in the incident (*i.e.* if three Staff Members used force to restrain an incarcerated individual in an incident, three "Staff actions" would be assessed as part of the Rapid Review.) The fact that 25,427 Staff actions were evaluated does not mean that 25,427 *different* Staff Members were involved in UOF. Rather, this number reflects the *unique* Staff actions evaluated in every UOF incident reviewed. In many cases, Staff may have been reviewed multiple times as they were involved in multiple use of force incidents throughout the Monitoring Period.

| Rapid Review Outcomes January 2018 to December 2020 | | | | | |
|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **Jan. to June 2020** | **July to Dec. 2020** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | |
| **UoF Incidents Assessed** | 4,257 (95% of actual incidents) | 6,899 (97% of actual incidents) | 6,067 (98% of actual incidents) | *2,991 (99% of actual incidents)* | *3,076 (97% of actual incidents)* |
| **Avoidable[53]** | 965 (23%) | 815 (12%) | 799 (13%) | *209 (7%)* | *590 (19%)* |
| **Unnecessary** | 290 (7%) | 1,057 (15%) | N/A[54] | | |
| **Violation of UOF or Chemical Agent Policy** | | | | | *345 (11%)* |
| **Procedural Violations[55]** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | *502 (17%)* | *1,333 (43%)* |
| **Misconduct Identified** | | | | | |
| **Corrective Action Recommended** | 3,595 | 3,969 | 2,966 | *880* | *2,086[56]* |

The use of the revised Rapid Review template, and corresponding oversight, has resulted in the completion of more accurate assessments. For instance, in this Monitoring Period, Rapid Reviews appear to be better identifying and recommending corrective action for Staff actions that must be addressed (compared to the last Monitoring Period), which is more consistent with the Monitoring Team's assessment of incidents. Further, Rapid Reviews identified that 19% of incidents (n=590) this Monitoring Period were avoidable, compared with only 7% (209) in the

[53] An incident may be found to be both avoidable and unnecessary.

[54] The new Rapid Review template (implemented in the Tenth Monitoring Period) does not capture this information, instead the template assesses whether there is a violation of the Use of Force Policy or the Chemical Agents policy, which is a more appropriate assessment of Staff conduct at this early phase of review with limited information.

[55] Procedural errors include a variety of instances in which Staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

[56] This captures the number of Staff Actions that warranted one *or more* corrective actions. Many Staff actions assessed have more than one corrective action recommended (see chart below which accounts for all action recommended).

last Monitoring Period. This increase in the identification of avoidable incidents does not necessarily mean that more incidents were avoidable in this Monitoring Period than the last, but rather demonstrates an improved assessment of incidents and is similar to the assessments made in 2018. Although the actual number of avoidable incidents is likely higher than what is found in Rapid Reviews,[57] the proportion of incidents identified as avoidable in this Monitoring Period (and those in 2018) is much more consistent with the Monitoring Team's assessment that a sizable proportion of the Department's incidents are avoidable.

A significant benefit of Rapid Reviews that accurately identify potential misconduct and recommend appropriate corrective action is that the investigations of these incidents become more efficient. Every Intake Investigation incorporates the findings of the Rapid Review and in some cases, if the Rapid Review identified and recommended appropriate corrective action for potential violations and/or procedural errors in an incident, the Intake Investigation can leverage those findings and responses to close the incident without additional action needed. The Monitoring Team identified a number of Intake Investigations that were appropriately closed based on the outcome of the Rapid Review.

While Rapid Reviews are improving, they still are not reliably and consistently identifying *all* issues that would reasonably be expected to be identified through an assessment of the video. In particular, the Rapid Reviewers do not reliably or consistently: (1) identify misconduct by *all* Staff members involved in the incident and instead focus on the misconduct of

---

[57] It is worth noting that ID determined in the Intake Investigation that at least 57 additional incidents that occurred in this Monitoring Period were avoidable, but were not identified as such through the Rapid Review. In some cases, this finding by ID suggested that the Rapid Review failed to identify the issue. ID's assessment of investigation of certain incidents that occurred in this Monitoring Period is ongoing so the number of additional incidents identified as avoidable may increase as those investigations are completed.

one or two Staff Members, (2) complete the template consistently (*e.g.* the Rapid Reviewer will describe Staff misconduct or a policy violation in the free form field analysis, but that finding is not captured in the qualitative data field entries which note that no policy violation was identified), and (3) in some cases, the Rapid Review is biased, unreasonable or inadequate as they fail to identify clear, objective evidence of wrongdoing. The identified lapses in the Rapid Reviews reflect widespread inconsistency, rather than any single practice or cluster of practices that regularly goes unidentified.

Rapid Reviews that are biased, unreasonable, or inadequate must be addressed because they go to the heart of Facility Leadership's ability to adequately manage their Staff and the Facility. While the efforts to improve the oversight of Rapid Reviews are expected to minimize the possibility that a Rapid Review is biased, unreasonable, or inadequate, those who conduct a biased, unreasonable, or inadequate Rapid Review must also be subject to either appropriate instruction or counseling, or the Department must seek to impose appropriate discipline as required by Remedial Order § A., ¶ 1(ii). Given the Monitoring Team's findings that certain Rapid Reviews are biased, unreasonable, or inadequate, the Monitoring Team worked with the Department to improve internal processes to identify and address problematic Rapid Reviews this Monitoring Period as discussed in more detail in the assessment of compliance of Remedial Order § A., ¶ 1.

- **Investigating Use of Force-Related Misconduct**

The Department continued to reap the benefit of ID's "Intake Squad" and all use of force incidents now receive close-in-time investigations, which is a major accomplishment for the Department. Intake Investigations are generally reasonable, occur within 25 business days of the incident, and most incidents (approximately 80%) are closed at the conclusion of the Intake

Investigation.[58] This means that only a small portion (approximately 20%) of incidents require a Full ID Investigation. Finally, ID continued to work diligently in this Monitoring Period to eliminate the backlog of Preliminary Reviews and Full ID investigations, as discussed in detail in the Investigations section of this report.

The table below provides the investigation status of all 20,196 UOF incidents that occurred between January 2018 and December 2020.[59] As demonstrated in the chart below, the Intake Squad is able to keep pace with the number of new incidents and ID is successfully clearing its backlog of investigations.

| Investigation Status of UOF Incidents Occurring Between January 2018 to December 2020 as of January 15, 2021 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2018** | | **2019** | | **2020** | | **Jan. to June 2020** *10th Monitoring Period* | | **July to Dec. 2020** *11th Monitoring Period* | |
| **Total UOF Incidents**[60] | **6,302** | | **7,494** | | **6,400** | | *3,123* | | *3,277* | |
| **Pending Preliminary Reviews/ Intake Investigations** | 0 | **0%** | 197 | **3%** | 452 | **7%** | *70* | *2%* | *382*[61] | *12%* |
| **Pending ID Investigations** | 1 | **<1%** | 78 | **1%** | 785 | **12%** | *306* | *10%* | *479* | *15%* |
| **Closed Investigations** | 6,301 | **~100%** | 7,219 | **96%** | 5,163 | **81%** | *2,747* | *88%* | *2,416* | *74%* |

[58] As discussed in more detail in the Use of Force Investigations section of this report, the Intake Investigations are capable of reasonably addressing the majority of incidents.

[59] All investigations of incidents that occurred prior to 2018 have been closed.

[60] Incidents are categorized by their occurred date, or alleged to have occurred date, therefore these numbers fluctuate very slightly each Monitoring Period even for prior Monitoring Periods if allegations are made many months after the alleged occurred date.

[61] All of these pending Intake Investigations occurred in December 2020.

ID closed a significant number of cases[62] this Monitoring Period (6,192), which is similar to the number of cases closed in the Tenth Monitoring Period (~7,000), and significantly more than the 3,000 cases that were closed in the Ninth Monitoring Period. The Department made significant progress toward eliminating the backlog[63] and only 499 cases in the backlog remain pending.[64] This is a significant improvement as the backlog has at times been as high as 9,000 cases. The outcome of the cases closed as part of the backlog and an assessment of the quality of those investigations is discussed in the Use of Force Investigations section of this report. ID's improved closure rate has had a corresponding positive impact on the number of pending investigations. At the end of the Monitoring Period, the number of pending cases was the lowest it has been in some time—only 1,513 cases were pending (649 were pending Intake Investigation and 864 pending Full ID investigations), compared to 4,451 cases pending at the close of the Tenth Monitoring Period and 8,656 cases pending at the end of the Ninth Monitoring Period.

   o   Intake Investigations

All use of force incidents that occurred in this Monitoring Period received Intake Investigations. Intake Investigations now include a more streamlined,[65] succinct, and reliable description of the incident and are conducted within 25 business days as required. While there is variation in quality among investigations, the Monitoring Team generally found that the Intake Investigations reasonably assess available evidence, and appropriately identified potential

---

[62] This includes completed Intake Investigations, Preliminary Reviews, and Full ID Investigations.

[63] The Remedial Order requires the Department to close investigations of incidents occurring on or before April 16, 2020 (*i.e.*, "more than 120 days prior to the Order Date") by December 31, 2021.

[64] Approximately 55% of these pending cases occurred in 2019 and 45% occurred in 2020. The statute of limitations was tolled beginning on March 20, 2020 and was extended through almost the end of the Monitoring Period.

[65] As described in more detail in the Ninth Monitor's Report at pgs. 42-45.

violations and recommended appropriate action or further investigation when necessary.[66] Intake Investigations also leverage or correct the findings of Rapid Reviews in some cases as discussed above.

The status and results of the Intake Investigations since its inception are demonstrated in the chart below. Of the 3,527 incidents that occurred in this Monitoring Period, 2,622 incidents have a closed Intake Investigations—2,182 (83%) were closed following the completion of the Intake Investigation and only 440 (17%) were referred for further investigation as Full ID investigations. Of the 2,182 investigations that closed following the completion of the Intake Investigation, 1,024 (47%) were closed with no action by the Intake Investigation,[67] while 1,158 were closed with some type of action (MOC, PDR, Re-Training, Facility Referral). It is important to note that the *results* of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart below.

---

[66] As discussed in more detail in regard to ¶ 7 of the Investigations section of this report, in a handful of cases, the Monitoring Team recommended ID leadership review a completed Intake Investigation to address or further investigate a potential use of force violation that appeared to be inadequately addressed. ID addressed each of the Monitoring Team's recommendations.

[67] As discussed above, an Intake Investigation may close with no action because the identified violation was appropriately identified and addressed by the Rapid Review.

| Status of Intake Investigations for 2020 Incidents *As of January 15, 2021* | | | |
|---|---|---|---|
| **Incident Date** | **February 3, 2020[68]- June 30, 2020 10th Monitoring Period** | **July 1, 2020- December 31, 2020 11th Monitoring Period** | **2020** |
| Pending Intake Investigation | 2 | 652 | 654 |
| **Closed Intake Investigation** | **2,490** | **2,622** | **5,112** |
| -    *No Action* | *1,058 (44%)* | *1,024 (39%)* | *2,082 (41%)* |
| -    *MOC* | *47 (2%)* | *35 (1%)* | *82 (2%)* |
| -    *PDR* | *6 (<1%)* | *2 (<1%)* | *8 (<1%)* |
| -    *Re-Training* | *148 (6%)* | *194 (7%)* | *342 (7%)* |
| -    *Facility Referrals* | *820 (33%)* | *927 (35%)* | *1,747 (34%)* |
| -    *Referred for Full ID* | *411 (16.5%)* | *440 (17%)* | *851 (17%)* |
| **Total** | **2,492** | **3,274** | **5,766** |

The Intake Squad also collects data regarding the findings of Intake Investigations.[69] The Intake Squad investigator makes a determination in a number of categories upon closure of the Intake Investigation, when possible, but may defer a determination and the corresponding data to be collected until after the Full ID investigation is complete. The data collected includes whether incidents are avoidable, necessary, excessive, whether there are violations identified (such as report writing issues, handheld camera violations, chemical agent violations), whether allegations of unreported use of force by incarcerated individuals are substantiated or not, etc. The chart below provides the status of all incidents that have been subject to an Intake Investigation since the Intake Squad began on February 3, 2020. The chart also includes data from all 4,261 incidents that were closed following the completion of the Intake Investigation:

---

[68] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[69] While the data from the completed Intake Investigations is illustrative, the Monitoring Team cannot draw conclusions simply from this data as discussed in more detail in the Introduction to this report. Further, this data does not reflect all incidents that occurred in this Monitoring Period because the investigation is still pending as either an Intake Investigation or Full ID Investigation for over 1,000 incidents that occurred in this Monitoring Period.

| Findings—Investigations Closed on the Intake Investigation _As of January 15, 2021_ | | | |
|---|---|---|---|
| **Incident Date** | **10th Monitoring Period** _Feb. 3[70] to June 2020_ | **11th Monitoring Period** _July to Dec. 2020_ | **Totals** _Feb. 3 to Dec. 2020_ |
| **Pending Intake Investigation** | 2 (<1%) | 652 (20%) | 654 |
| **Pending or Closed Full ID Investigations** | 411 | 440 | 851 |
| **Closed on Intake Investigation** | **2,079** | **2,182** | **4,261** |
| _Violations Identified in Closed Intake Investigations[71]_ | | | |
| - _Excessive, and/or Unnecessary, and/or Avoidable_ | _179_ | _371[72]_ | _550_ |
| - _Chemical Agent Violation_ | _164_ | _130_ | _295_ |

As a result of the more streamlined investigation process, the Department is now able to more reliably, consistently, and timely _identify_ misconduct for the majority of incidents. The improved Intake Investigations, and the ability to track more specific data, provides greater transparency and understanding to the use of force employed in the Department. As part of this effort, ID has begun to capture information related to the type of misconduct using broad categories for each incident. However, the number of categories must be appropriately limited,

---

[70] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[71] This data only captures the results of an investigation that was closed following the completion of the Intake Investigation and does not include any cases that were referred for Full ID or are still pending an Intake Investigation. Further, the violation data may overlap. An incident may be excessive, and/or unnecessary, and/or avoidable AND have a Chemical Agent Violation.

[72] It is worth noting that Intake Investigations identified more avoidable incidents in this Monitoring Period compared with last Monitoring Period. However, the increased number of avoidable incidents is likely due to a greater focus on this issue and/or an improved assessment of the incidents. As noted above and in the Use of Force Trends section, the concerning force employed by Staff has remained relatively consistent in recent Monitoring Periods, so it is unlikely that there are in fact significantly more avoidable incidents in this Monitoring Period compared to last, just that they are being identified more consistently.

and a single incident must be able to be scored in multiple categories when appropriate. Categorizing the type of violation identified requires balance—the number of categories must be sufficient to create distinctions among incidents and to be informative, but also must not stray into the minutiae to the point that problem-solving efforts are hindered. For example, a single category of "violation" obviously is too broad—it does not reveal anything about the behaviors that are of concern. Conversely, multiple categories related to the type of intervention that was misused (*e.g.*, OC too close, incorrect OC cannister, too much OC spray discharged) is not only burdensome, but also redundant for the task of problem solving (*i.e.*, all of these problems lead to the same conclusion about the need to enhance training and compliance with the OC policy). The development of appropriate types of misconduct is ongoing and remains an area of collaboration between the Department and the Monitoring Team to ensure the information is appropriately capturing the desired information and is useful to all stakeholders.

It is important to acknowledge that data developed by the Intake Squad is limited to those investigations in which the Intake Investigation concluded the investigation and does not capture the findings for *any* incident that was subject to a Full ID Investigation (which often are the more serious and concerning incidents). Accordingly, while some closed Intake Investigations identified Staff misconduct, it is likely that additional Staff misconduct and violations will be identified as more ID investigations are closed. A key focus of the next Monitoring Period for the Monitoring Team is to with work ID to further refine how this data is collected and reported.

o   <u>Full ID Investigations</u>

The number of cases referred for Full ID Investigations has decreased, as expected with the advent of the Intake Investigation, and now only those cases that truly merit further

investigation are referred for Full ID Investigations. Approximately 850 cases have been referred for Full ID investigations since the Intake Squad began on February 3, 2020.

Given the focus on eliminating the backlog of investigations, most of these "newer" Full ID cases are still pending investigation, as the investigators responsible for conducting these Full ID Investigations were also responsible for addressing the backlog of investigations. With the elimination of the backlog, and the lower number of cases referred for Full ID investigation, it is expected that the Department should be able to manage the Full ID Investigation caseload after the backlog is complete and the current pending cases are closed. Further, during the next Monitoring Period, the Department and the Monitoring Team intend to focus on the overall quality of Full ID investigations to determine what improvements are necessary. The Monitoring Team is also working with the Department on developing data regarding the outcomes of closed Full ID investigations. The Monitoring Team's assessment of compliance with Full ID investigations is discussed in more detail in the Investigations section, ¶ 9.

_Addressing Use of Force-Related Misconduct_

Consistent, reliable, and proportional responses to identified misconduct are necessary to effectively shape Staff behavior and minimize the possibility that the misconduct will reoccur. The Department can respond to identified misconduct in a variety of ways, including (1) immediate corrective action (_e.g._, counseling, re-training, modification of assignment and suspension), (2) Facility-level discipline via Command Discipline, (3) Facility referrals following an investigation of the incident, (4) a Personal Determination Review for probationary Staff, and (5) formal discipline for tenured Staff imposed via the Trials Division. Given the severity of misconduct, and the need to impose progressive discipline, this range of responses provides a solid foundation for the Department to appropriately address misconduct.

As discussed in more detail below, the Department has made progress towards addressing Staff behavior, but there are currently two limitations that are inhibiting the Department's ability to consistently and reliably impose meaningful and timely discipline. First, the issues discussed in the section regarding the inability to consistently and reliably *identify* misconduct means that certain violations continue to go unaddressed, particularly at the Rapid Review stage. However, the improvements with Intake Investigations have significantly limited this concern, as misconduct is being more reliably identified. Second, the protracted process for imposing formal discipline is of great concern. The Remedial Order imposes a number of requirements that are expected to support improvements to the formal disciplinary process to make it more efficient and timely. Further, the Monitoring Team continues to recommend that the Department utilize counseling, CDs, and suspensions as much as possible (under the appropriate circumstances) to fill the current gap of timely accountability.

- **Immediate Corrective Action**

Immediate corrective action (suspension, re-assignment, counseling, or re-training) is necessary to address blatant misconduct close in time to the incident so that Staff are held to a common understanding and expectation of how to reasonably utilize force, as required by Remedial Order § C. ("Timely, Appropriate, and Meaningful Staff Accountability"), ¶ 2. Rapid Reviews, *ad hoc* reviews by uniform or civilian leadership through routine assessment of incidents, and Intake Investigations all identify misconduct for immediate corrective action.[73]

---

[73] The Immediate Action Committee, as described in prior Monitor's Reports, has not convened since January 2020. The Department considered re-instating the committee early in the Twelfth Monitoring Period, however it was determined, through consultation with the Monitoring Team, that the Department's current processes are sufficient to identify and implement immediate corrective action and therefore there is no need for a specialized committee to address this issue.

NCU continues to track and confirm that any immediate corrective action recommended in the Rapid Reviews is imposed. NCU's tracking has increased awareness and visibility of the corrective action process, which has continued to support improved practice by the Facilities in actually imposing the recommended corrective action. The Monitoring Team has found that the vast majority of recommended immediate corrective action from Rapid Reviews was completed and NCU was able to obtain relevant proof of practice.

When misconduct is identified close in time to an incident, the Monitoring Team has found that the immediate corrective action imposed is generally a reasonable response to the type and severity of misconduct. The following immediate corrective action was imposed in this Monitoring Period:

| Immediate Corrective Action Imposed Eleventh Monitoring Period Incidents | |
| --- | --- |
| **Type of Corrective Action by Staff Member** | **Number** |
| Suspension | 42[74] |
| Non-Inmate Contact Post or Modified Duty | 1 |
| Counseling or Corrective Interviews | 1,090 |
| Re-Training | 422[75] |
| **Totals** | |
| Total UOF Incidents with at least one Immediate Corrective Action | 1,427 |

[74]The Monitoring Team verified that these 42 Staff Members were suspended for use of force-related misconduct with suspensions lasting from five to 30 days.

[75] The majority of re-training requests are still pending as of the filing of this Report, and discussed in detail as part of the compliance assessment of ¶ 5 of the Training section of this report.

Beyond the specified immediate corrective action, Rapid Reviews may also recommend referral to E.I.S.S. and/or Correction Assistance Responses for Employees[76] ("C.A.R.E."), Command Discipline,[77] and MOCs. This Monitoring Period, Rapid Reviews referred approximately 16 Staff to EISS, three Staff to C.A.R.E., Command Disciplines for 948 Staff, and MOCs for 34 Staff, in addition to the immediate corrective actions noted above. The imposition of Command Disciplines ("CDs") is discussed in the CD section below.

The Department's use of suspensions as an immediate corrective action is critical given the importance of a timely response to misconduct and the otherwise protracted disciplinary process. ID initiates the majority of suspensions; only ten of the 42 suspensions from this Monitoring Period were recommended by the Rapid Reviews. The suspensions imposed over the last six Monitoring Periods, by rank, are depicted in the chart below.

---

[76] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to Staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting Staff generally in the day-to-day aspects of their work-life as well as when unexpected situations including injury or serious emergency arise. The Unit also works with Staff to address morale, productivity, aid in stress management, and provide a wide variety of support, including Staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

[77] It is worth noting that the Facility cannot issue a Command Discipline or Memorandum of Complaint regarding any identified misconduct that is a violation of the Use of Force or Chemical Agents Directive (these must be addressed through a PDR or charges via the Trials division if the incident is sustained by ID). However, in these cases, the Facilities are expected to consider whether immediate corrective action may be appropriate depending on the facts of the case.

| Suspensions by Incident Date[78] | | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **Jan. to June 2020** *10th Monitoring Period* | **July to Dec. 2020** *11th Monitoring Period* |
| CO | 9 | 23 | 37 | 71 | *32* | *39* |
| Captain | 8 | 9 | 10 | 6 | *4* | *2* |
| ADW | 0 | 0 | 0 | 1 | *0* | *1* |
| DW | 0 | 0 | 0 | 0 | *0* | *0* |
| Warden | 0 | 0 | 0 | 0 | *0* | *0* |
| **Total** | **17** | **33** | **47** | **78** | *36* | *42* |

The fact that the Department suspended Staff more often in 2020 (totaling 78 Staff) compared with any other year is notable and reflects progress in the Department's efforts to impose appropriate immediate corrective action for use of force related misconduct. That said, there is still room for improvement as the Monitoring Team found additional incidents of misconduct that likely warrant suspensions, but these were not identified by the Department. This is discussed in more detail in regard to Remedial Order § C., ¶ 2, in the Staff Discipline and Accountability section of this report. The Monitoring Team does not raise with the Department *all* cases that may have merited immediate corrective action which was not taken, but only those serious examples identified close-in-time to the incident and immediate corrective action may still be able to be imposed. The fact that the Monitoring Team identifies such examples demonstrates that the Department is not identifying and imposing immediate corrective action for all cases that warrant it. In particular, the Department is not consistently identifying and addressing (1) all blatant *use of force*-related violations with suspensions (when warranted), (2) *a broader set of other* blatant violations that warrant suspension—including (a) serious unprofessional conduct (*e.g.,* use of racial slurs during an incident) and (b) serious security

---

[78] As per Department policy (Memorandum 01/99 - Suspension without Pay (Captain and Above)), all suspensions are without pay, however Captains may only be suspended without pay if the suspension begins on a weekend, so sometimes Captains are suspended mid-week *with* pay through the end of the week, and a longer period of suspension begins on the weekend without pay.

breaches due to Staff failures (*e.g.,* Staff being off-post resulting in large group disturbances ultimately necessitating use of force). Based on the significant supervisory failures discussed throughout this report, it is clear more suspensions can and should be utilized for those in the ranks of Captain or higher, as suspensions in those ranks accounted for only 8% (n=3) of the suspensions this Monitoring Period. Finally, as noted above, only 10 of the 42 suspensions effectuated this Monitoring Period were recommended by the Facility as part of the Rapid Review. Facility leadership must hold Staff accountable for the misconduct that occurs within their Facility (particularly as it relates to security breaches) and should recommend immediate corrective action more often, including suspension, when warranted. The Monitoring Team has discussed these broader recommendations with the Department who has reported they intend to more closely scrutinize these types of cases to determine if suspension may be merited.

With respect to imposing modified duty due to use of force related misconduct, a single Staff Member was placed on modified duty in response to an incident from this Monitoring Period and was made following a recommendation from the Monitoring Team to ID & Trials. While the Rapid Review template includes a prompt to consider whether to modify a Staff Member's duty to a position with no inmate contact, this option was not invoked by any Rapid Reviews in this Monitoring Period. The Monitoring Team's assessment of incidents suggests that there are more individuals, certainly more than one, who may need to be placed on modified duty pending the outcome of an investigation and would encourage the Department to utilize this option more frequently. While not a close-in-time response, the Department must also consider modifying Staff based on disciplinary matters, as required by Consent Judgment § XII (Screening and Assignment of Staff), ¶ 6(c)—discussed in that section of the report.

Two other important options for close-in-time responses to misconduct are counseling and re-training as they provide Staff important guidance on knowledge on how to improve practices going forward. A significant amount of counseling was recommended and provided in this Monitoring Period related to Rapid Reviews (1,090 counseling sessions) and is discussed further in detail in the Risk Management section of this report. Further, re-training is a frequent response to identified misconduct from Rapid Reviews (422 this Monitoring Period) and is discussed further in regard to ¶ 5 of the Training section of this report.

The Monitoring Team encourages the Department's increase use of immediate corrective action and intends to work with the Department in the next Monitoring Period on ways to expand its use. The Department's efforts to address immediate corrective action as required by the Remedial Order is discussed in more detail in the Staff Discipline and Accountability section of this report.

- **Command Discipline ("CD")**

Command Disciplines ("CDs") provide the Department an opportunity to timely and proportionally respond to lower-level misconduct with less severe disciplinary sanctions (CDs are limited to the relinquishment of five compensatory days). This process is managed at the Facility level and is less cumbersome than the process for imposing formal discipline via Trials. Command Disciplines are generally a reliable, close in time response to Staff misconduct. Given the protracted delays in imposing formal discipline, the use of CDs for lower-level misconduct is necessary and encouraged by the Monitoring Team.

A CD can range from verbal reprimand up to the forfeiture of five vacation/compensatory days. Command Disciplines are governed by a detailed policy that, among other things, requires CDs to be issued and adjudicated within timeframes that are much shorter than those for formal

discipline. Command Disciplines are utilized in two ways. The Facility may generate a Command Discipline within 30 days of an incident (to then be subsequently adjudicated). A Command Discipline may also be generated as part of a Negotiated Plea Agreement ("NPA") with an agreed upon number of days (up to five days) to be forfeited by the Staff Member[79]— this type of CD is discussed under the Formal Discipline section below.

Facility leadership is responsible for entering the CDs into the system and scheduling, conducting, and deciding the CDs. The processing of Command Disciplines at the Facility level requires multiple steps: (1) the CD must be generated in CMS within 30 days of the incident date; (2) the case is adjudicated by a hearing Officer who determines the outcome of the CD (ranging from dismissal to a five-day penalty for Staff); and (3) if the penalty is a loss of vacation or compensation days, HR is notified and must remove the days from the Staff Member's official time bank ("CityTime"). NCU continued to track and collect proof of practice to confirm that Command Disciplines were imposed as recommended via Rapid Reviews, as shown in the table below.

In this Monitoring Period, the Rapid Reviews included the largest number of Command Disciplines recommended over the last four Monitoring Periods. 948 CDs were recommended compared with 757 in the Eighth Monitoring Period, 878 in the Ninth Monitoring Period, and 492 in the Tenth Monitoring Period. This is particularly notable given that the number of incidents that occurred in the Eleventh Monitoring Period was lower than the number of incidents that occurred in Eighth or Ninth Monitoring Period, suggesting that Facilities increased

---

[79] As noted in the Eighth Monitor's Report Trials now limits the use of CDs via NPA to the forfeiture of an agreed upon number of days, and so only four NPAs settled with a CD that required a hearing at the command-level to adjudicate. See Eighth Monitor's Report at pg. 65.

not only the raw number of CDs but also the proportion of incidents in which a CD was recommended. The status and outcome of all Command Disciplines recommended between January 2019 through December 2020 are shown in the table below. During the Eleventh Monitoring Period, 532 of 948 (56%) CDs recommended by Rapid Reviews in July through December 2020 were processed and resulted in a disciplinary response (this ranges from a verbal reprimand, Corrective Interview, deduction of compensatory days, or a referral for an MOC for the case to be adjudicated by Trials).

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews<br>*As of March 15, 2020* | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/ Rapid Review | Number of UOF Incidents with Rapid Reviews [80] | Total # of CDs Recomm. | Still Pending in CMS | | Resulted in Days Deducted | | Resulted in MOC | | Resulted in Verbal Reprimand or Corrective Interview | | Closed Administratively, Never Entered into CMS, or Dismissed at Hearing | |
| *8ᵗʰ MP* | 3,215 | *757* | *0* | *0%* | *391* | *52%* | *60* | *8%* | *109* | *14%* | *195* | *26%* |
| *9ᵗʰ MP* | 3,684 | *878* | *2* | *0%* | *489* | *56%* | *77* | *9%* | *103* | *12%* | *204* | *23%* |
| **2019 Total** | **6,899** | ***1635*** | ***4*** | ***0%*** | ***880*** | ***54%*** | ***137*** | ***8%*** | ***212*** | ***13%*** | ***399*** | ***24%*** |
| *10th MP* | 2,991 | *492* | *4* | *1%* | *262* | *53%* | *30* | *6%* | *47* | *10%* | *149* | *30%* |
| 20-Jul | | 165 | 3 | 2% | 74 | 45% | 14 | 8% | 15 | 9% | 59 | 36% |
| 20-Aug | | 149 | 2 | 1% | 78 | 52% | 12 | 8% | 10 | 7% | 47 | 32% |
| 20-Sep | | 112 | 2 | 2% | 60 | 54% | 11 | 10% | 11 | 10% | 28 | 25% |
| 20-Oct | | 181 | 24 | 13% | 55 | 30% | 27 | 15% | 22 | 12% | 53 | 29% |
| 20-Nov | | 166 | 31 | 19% | 43 | 26% | 7 | 4% | 19 | 11% | 66 | 40% |
| 20-Dec | | 175 | 45 | 26% | 51 | 29% | 5 | 3% | 18 | 10% | 56 | 32% |
| *11th MP* | 3,076 | *948* | *107* | *11%* | *361* | *38%* | *76* | *8%* | *95* | *10%* | *309* | *33%* |
| **2020 Total** | **6,067** | ***1440*** | ***111*** | ***8%*** | ***623*** | ***43%*** | ***106*** | ***7%*** | ***142*** | ***10%*** | ***458*** | ***32%*** |

Overall, the Monitoring Team has found that CDs are utilized for certain procedural errors such as failure to activate a BWC, issues with maintaining secure doors, and adherence to protocols regarding PPE. CDs are an appropriate measure to address these procedural errors and

---

[80] It is worth noting that a Command Discipline may be recommended for more than one Staff Member involved in a UOF incident.

the Monitoring Team has found them to be consistently used. The Monitoring Team recommends that the use of CDs could be *expanded* to address lower-level misconduct such as use of OC Spray too close or a prohibited hold. In terms of the CDs determinations, whether there is a verbal reprimand, corrective interview, or the forfeiture of up to five days, is based on the nature of the offense, the Staff Member's prior discipline, mitigating and aggravating factors and consideration of the disciplinary grid. As depicted in the chart above, 456 CDs imposed a sanction (361 recommended CDs (38%) resulted in the relinquishment of compensatory days[81] and 95 recommended CDs (10%) resulted in verbal reprimands or corrective interview). Further, 76 recommended CDs (8%) resulted in MOCs being generated.

CDs recommended from Rapid Reviews that are never processed or are dismissed at the hearing must be assessed to determine whether cases that likely merited corrective action went unaddressed. Of the 948 CDs recommended from Rapid Reviews from July to December 2020, 309 (28%) were never processed or dismissed at the hearing. It is important to note that CDs can be dismissed for various legitimate factual reasons (*e.g.,* ID took over the case and wanted to process discipline, the Staff member resigned, a finding that the individual was not guilty, or errors in the original CD recommendations including the wrong Staff Member being served with the CD). Therefore, it is not expected that every recommended CD will result in a sanction, and the fact that some are dismissed for legitimate factual reasons demonstrates Staff Members are afforded due process through these hearings as intended.

---

[81] Upon a determination that a Staff Member must forfeit a certain number of compensatory days, the decision must be shared with HR so that the discipline can be imposed and entered in the Staff Member's personnel file. NCU tracks whether HR enters the adjudicated CD into the Staff Member's personnel file, and whether CityTime bank deductions take place in a reasonable timeframe. CityTime deductions are occurring as required since this tracking began.

However, CDs may also be dismissed or never processed due to a due process violation, meaning the CD hearing did not occur within the required timeframes outlined in policy. These are most concerning because administrative errors prevented the CD hearing from occurring and therefore the opportunity for disciplining Staff was lost. **In total 145, or 15% of all 948 CDs recommended in this Monitoring Period were never processed or were dismissed due to a due process violation, which accounts for about half of the 309 CDs that were dismissed.** Dismissal of CDs for due process violations occur in every Facility and must be avoided so processes must be improved to ensure CDs are processed as required.

The Monitoring Team reviewed a sample of CDs dismissed by GRVC in this Monitoring Period, because that Facility was responsible for a high proportion of dismissed CDs. The Monitoring Team reviewed the basis for dismissal for all 23 CDs dismissed at GRVC in October 2020 and found: 9 (39%) were dismissed for due process violations as the hearings were not conducted with 30 days of the violations, while the other 14 (61%) appeared to be appropriately dismissed based on the facts of the case. The Department reports that leadership changes again caused issues with timely processing of CDs at this Facility (as it did in the last Monitoring Period), which accounts for many of the dismissals for due process violations. As for those cases dismissed based on the facts of the cases, in five cases, the CDs were dismissed because it was determined that the charge of failure to activate the body-worn camera was not appropriate because the Staff member had a legitimate reason not to activate the cameras (*e.g.,* their post was not assigned a BWC).

NCU identifies and tracks the outcomes of CDs in an attempt to support the Facilities efforts to timely process CDs and catch any of those CDs that are languishing. In the beginning of the Twelfth Monitoring Period, NCU began targeted meetings with Facility leadership to

focus on the languishing CDs. At these meetings, the Facility leadership is required to provide a status update on any CDs which are languishing in order to support improved processing of CDs within the required time frames.

Finally, certain CDs may not be adjudicated and instead transferred to a Memorandum of Complaint for formal discipline if a Staff Member refuses the Command Discipline, the Staff Member has accumulated three CDs within a year, or the Hearing Officer determines that a Memorandum of Complaint ("MOC") is a more appropriate response to address the misconduct. NCU continued to check that any MOCs recommended at the Facility level are generated and confirmed that they are processed through the Chief of Administration's office for adjudication through the Trials Division.

Overall, the Department appears to generally process recommended CDs reasonably, and a significant volume of corrective action is being imposed through CDs. While it is not expected that every recommended CD will result in a sanction, as discussed above, there is still room for improvement to reduce the proportion of CDs not processed or dismissed for Due Process Violations (which represented approximately 15% of the total recommended CDs this Monitoring Period).

- **Facility Referrals**

Facility Referrals are a useful tool as they provide an opportunity for the Facility to respond to minor misconduct more quickly and will hopefully mitigate the possibility that misconduct will reoccur in the future. When an issue is identified through an Intake Investigation (formerly Preliminary Reviews) or Full ID Investigation, ID generates a Facility Referral so that a timely administrative response — generally in the form of counseling Staff — can be enacted to address the identified issue. Facility Referrals are often used to address procedural or

operational issues such as missing reports, failures to operate or failure to upload handheld camera video, and delays in medical treatment. Facility Referrals are delivered to the Facilities by the DDI responsible for the investigation. The DDIs then track receipt of responses from the Facilities. The Facility is expected to take appropriate action to address the issue with the specific Staff Member.

This Monitoring Period, the Intake Squad closed 947 Intake Investigations with a Facility Referral. ID reports that Facilities do respond to these referrals, though sometimes with a delay. The Facilities' responses to referrals are tracked by each individual DDI. Based on the significant reliance on this tool by the Intake Squad, and important role these play in addressing certain misconduct, the Monitoring Team strongly recommends that this process is tracked in a centralized and reliable fashion and will work with the Department to devise a centralized process to track Facility Referrals going forward.

- **Personnel Determination Review ("PDR")**

Discipline is generally imposed on probationary Staff via a Personnel Determination Review ("PDR"). The number of probationary Staff has continued to decline due to the passage of time since the graduation of the last recruit class graduated in July 2019 (and so the probationary status will lapse in July 2021) and the number of promotional classes have been small. Correction Officers have a probationary period of two years. Newly promoted Captains and ADWs have one-year probationary periods. The largest group of probationary Staff are Correction Officers. In the Eleventh Monitoring Period, there were approximately 780 probationary COs compared to approximately 1,600 probationary COs in the Tenth Monitoring

Period.[82] As a result, it is not surprising that the number of PDRs submitted has decreased (65 in 2020 compared with 95 in 2019) as the number of probationary Staff has significantly decreased.

A PDR can be recommended by Facility leadership or by ID to address UOF related violations and other issues (*e.g.,* excessive absence or other employment issues). The outcome of the PDR is limited to three options: (1) extension of probation,[83] (2) demotion or termination,[84] or (3) no action. Staff on probation can also be suspended (along with PDRs) and in the cases where the Department elects not to take action via PDR, the Department can elect to impose formal discipline through Trials.

The process to evaluate and impose use of force-related PDRs was improved in the Sixth Monitoring Period[85] and requests for PDRs are now consistently and timely evaluated, processed, and tracked by HR and decided by the First Deputy Commissioner and/or the Commissioner in a generally reasonable manner. The outcome of PDRs *by date of incident* are outlined in the chart below.

---

[82] This assumes all COs that graduated in the December 2018 and July 2019 classes are still working at DOC.

[83] Probation may be extended up to a total of six months. The probationary period may also be extended for any period of time the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[84] Correction Officers may be terminated via PDR. However, Captains and ADWs may only be demoted via PDR, termination must be completed through formal discipline as Staff in those positions have Civil Service protections.

[85] *See* Sixth Monitor's Report at pgs. 35 to 39.

| Outcome of PDRs based on Date of Incident As of January 15, 2021 | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | Nov. 2015 to 2016 | | 2017 | | 2018 | | 2019 | | 2020 |
| Grand Total | 36 | | 39 | | 53 | | 116 | | 22 |
| Demotion | 0 | 0% | 2 | 5% | 4 | 8% | 5 | 4% | 0 | 0% |
| Extension of Probation - Day/Day | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 1% | 0 | 0% |
| Extension of Probation - 3 Months | 1 | 3% | 6 | 15% | 3 | 6% | 16 | 14% | 3 | 14% |
| Extension of Probation - 6 Months | 15 | 42% | 17 | 44% | 24 | 45% | 45 | 39% | 10 | 45% |
| Termination | 6 | 17% | 10 | 26% | 9 | 17% | 21 | 18% | 7 | 32% |
| MOC | 0 | 0% | 0 | 0% | 1 | 2% | 4 | 3% | 0 | 0% |
| Deferred Decision | 0 | 0% | 0 | 0% | 0 | 0% | 3 | 3% | 0 | 0% |
| No Action | 1 | 3% | 1 | 3% | 1 | 2% | 1 | 1% | 0 | 0% |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 1% | 1 | 5% |
| Resignation | 2 | 6% | 1 | 3% | 10 | 19% | 18 | 16% | 1 | 5% |
| Tenured | 11 | 31% | 2 | 5% | 1 | 2% | 1 | 1% | 0 | 0% |

PDRs are now generally completed within 30 days of submission and the outcomes are reasonable given the Monitoring Team's review of the nature of the misconduct. That said, there is still a significant delay between the incident and the time the PDR is submitted for processing as the Department worked through eliminating the ID backlog. As noted throughout this report, the elimination of the backlog, and improvement in timely closure of investigations will result in the processing of PDRs closer in time to the incident.

- **Formal Discipline**

In addition to the corrective action measures discussed above, the Department has mechanisms for imposing formal discipline for *tenured* Staff. Most use of force violations (including the misuse of chemical agents) and use of force reporting violations are addressed through formal discipline via the Trials Division. Formal Discipline takes longer to impose because of various protections for Staff built into the procedures and because it is not imposed unilaterally by the Department (*i.e.*, formal discipline often involves OATH, as explained below). This section first discusses trends related to holding Supervisors accountable. Next, the section presents data on the cases being processed for formal discipline by Trials, highlighting the protracted nature of this process and discussing some nuances of NPAs. The section

concludes with an analysis of the protracted disciplinary process, where and how the delays occur, and considerations for next steps.

> o   Supervisory Accountability

Holding Captains, ADWs, DWs, and Wardens accountable for the failure to properly supervise Staff and/or for their active participation in UOF-related misconduct is imperative to changing the Department's culture and improving Staff conduct, as discussed throughout this report. Supervisors determine what behavior will or will not be tolerated in the many day-to-day interactions they have with their Staff and are responsible for a significant part of on-the-job learning for Staff. For these reasons, the Monitoring Team scrutinizes the way in which the Department holds Supervisors accountable for failures to uphold proper standards of conduct. The chart below identifies the discipline imposed by uniform rank.

| Resolved Disciplinary Cases (via Trials or PDR), by Rank and Year of Case Closure *As of January 15, 2021* | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2018** | | **2019** | | **2020** | | **Total** | |
| **Total Discipline Imposed** | **563** | | **300** | | **425** | | **1288** | |
| CO | 424 | 75% | 229 | 76% | 298 | 70% | 951 | 74% |
| Captain | 113 | 20% | 58 | 19% | 118 | 28% | 289 | 22% |
| ADW | 24 | 4% | 13 | 4% | 9 | 2% | 46 | 4% |
| DW | 2 | 0% | 0 | 0% | 0 | 0% | 2 | 0% |
| Warden | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |

The table above shows that the number of Staff receiving discipline has shifted significantly from year to year (2018 = 489; 2019 = 222; 2020 = 335). Correction Officers comprise the largest proportion of Staff at the Department and are most likely to be involved in a use of force given their direct contact with incarcerated individuals. Thus, it is logical that each year, discipline is imposed most often on this group of Staff. Although the number of Staff receiving formal discipline has varied year-to-year, the proportion of those at the rank of Captains increased by about 10% in 2020. While this is an encouraging trend, overall, the frequency of formal discipline for supervisors continues to be lower than what would be

expected given regularity with which the Monitoring Team's identifies poor supervision in the incidents it reviews. It is critical for the Department to not just hold line Staff accountable, but to also hold Supervisors accountable for their responsibilities as well.

o   <u>Imposition of Formal Discipline for Tenured Staff</u>

As discussed throughout this report, the number of cases referred to the Trials Division for formal discipline has exponentially increased. Historically, most incidents of use of force-related misconduct were investigated at the Facility-level which rarely identified misconduct warranting discipline. The Facility rarely referred identified misconduct to the Trials Division for formal discipline (which is what should occur with use of force-related violations), but would utilize a Command Discipline sporadically (which, as discussed in prior reports, were not imposed consistently). Now, ID investigates all use of force incidents. ID better identifies misconduct and appropriately refers those cases to the Trials Division, so the number and type of cases referred for formal discipline is far greater and broader than ever before. Thus, the large number of cases pending with the Trials Division is a reflection of more regular identification of misconduct that previously went unaddressed. While the fact of widespread misconduct offers no consolation, it does reflect an improvement in the Department's ability to self-police and at least identify the misconduct occurring. That said, the significant volume of pending disciplinary cases perpetuates the culture of impunity that contributes to the level of misconduct.

o   <u>Status of Formal Discipline Cases</u>

At the end of the current Monitoring Period, there were 1,445 cases pending with Trials, 1,235 (85%) of which arose from incidents that occurred more than one year ago. The chart below presents the status of pending investigations *by incident date*. The Trials' Division has focused on resolving the older cases and nearly all cases regarding incidents from 2017 or earlier

have been closed. 184 (10%) of the 1,775 cases from this time period remain pending. In

contrast, large portions of the cases from 2018 (67%), 2019 (82%) and 2020 (93%) remain

pending. **While efforts to address the oldest pending cases are critical, this must be balanced**

**with the need to address more recent cases in order to begin to impose discipline more**

**contemporaneously to the event.**

| Status of Disciplinary Cases by Date of Incident *As of January 15, 2021* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Case Status | Date of Incident | | | | | | | | | | | Total | |
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | | |
| | 682 | | 472 | | 621 | | 775 | | 648 | | 227 | | 3426 | |
| Staff Cases[86] Closed | 680 | 100% | 459 | 97% | 452 | 73% | 257 | 33% | 116 | 18% | 16 | 7% | 1980 | 58% |
| Staff Cases Pending Disposition | 2 | 0% | 13 | 3% | 169 | 27% | 518 | 67% | 532 | 82% | 211 | 93% | 1445 | 42% |
| Pending Investigations | | | | | | | | | | | | | | |
| UOF Incidents Pending Investigation | 0 | | 0 | | 0 | | 1 | | 275 | | 1,237 | | 1,513 | |
| *Note:* "Case" indicates an individual Staff member | | | | | | | | | | | | | |

Further illuminating the protracted resolution of cases, of the 227 cases referred for

discipline for incidents that occurred in 2020, the Department has only imposed formal discipline

in 15 cases (one additional case was administratively closed), while 211 cases for individual

Staff are still pending resolution. An additional 1,237 use of force incidents that occurred in 2020

are still pending the completion of ID's investigation, which will likely result in the referral for

additional discipline for incidents from this time period.

The table below shows that most cases referred to the Trials Division ultimately result in

the imposition of discipline. There are four possible outcomes for a case referred for discipline to

the Trials Division:

---

[86] This captures all cases closed by the Trials Division, including those cases that did not result in a
penalty (e.g., administratively filed cases and deferred prosecutions).

(1) *Discipline is imposed* via a Negotiated Plea Agreement ("NPA") or following a finding of guilt after a trial at OATH.

(2) *Cases are dismissed* (referred to as administratively filed cases within the Department) when it is subsequently determined that the conduct either did not occur as ID initially concluded and/or could not be proven beyond a preponderance of the evidence.

(3) *Discipline is not imposed because Staff Member is found not guilty* following a trial at OATH.

(4) *Discipline is not imposed because some Staff leave the Department before the disciplinary matter can be adjudicated* (referred to as deferred prosecution cases within the Department), and the prosecution of these cases is therefore deferred and will be adjudicated *if* the Staff Member ever returns to the Department.

It is relatively infrequent that a case referred to the Trials Division for discipline does not result in the imposition of some form of discipline once the case has been fully prosecuted, as depicted in the chart below. Only 9% of cases resolved in 2020 were closed because the case was either dismissed via administrative filing[87] or a not guilty finding. Almost all discipline is imposed via a Negotiated Plea Agreement ("NPA"), with only a very small number of cases going to trial (four trials were held in this Monitoring Period). In 2020, 87% of cases closed by the Trials Division resulted in the imposition of discipline. Finally, the prosecution of 4% of cases were deferred because the Staff member left the Department so the prosecution of the case

---

[87] As discussed in the Staff Discipline and Accountability section of this report, the Monitoring Team has generally found cases that the decision to dismiss a matter via administrative filing is appropriate.

will only occur *if* the Staff member returns to the Agency. In this group of cases, the Staff

member is coded as leaving the Department pending charges.

| Discipline Imposed by Date of Ultimate Case Closure | | | | | | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | Jan. to June 2020 | | July to Dec. 2020 | |
| Total | 489 | | 514 | | 267 | | 379 | | 194 | | 185 | |
| Discipline imposed (NPA, Termination or Guilty verdict) | 401 | 82% | 487 | 95% | 220 | 82% | 330 | 87% | 162 | 84% | 168 | 91% |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 30 | 8% | 20 | 10% | 10 | 5% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 4 | 2% | 0 | 0% |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 15 | 4% | 8 | 4% | 7 | 4% |

The table above shows that the Trials Division resolved about 40% more cases in 2020

than in 2019 (379 versus 267). In addition, the volume of work completed by the Trials Division

in 2020 is far greater than in any other year (*e.g.,* more charges served, discovery served, OATH

conferences convened, etc.), as discussed in more detail in the Staff Discipline and

Accountability section of this report. That said, the Trials Division cannot keep pace with the

1,445 pending cases, the *additional* case referrals that are expected to be made from the current

pending investigations (there are 1,513 pending investigations of use of force incidents from

2019 and 2020 in which at least some cases will be referred for formal discipline) and future

referrals from investigations completed more contemporaneously.

   o   Penalties Imposed

Meaningful accountability is derived from a combination of the severity of the penalty,

the impact on the individual, and the extent to which it is imposed close-in-time to the event.

Unfortunately, discipline is currently protracted to the point that it severely undermines the

meaningfulness of the attempt to hold Staff accountable. The backlog of investigations within ID

(*e.g.,* delays in completing the investigation) is inherited by Trials once the case is referred. The

table below underscores the time lag between the date of incident and the imposition of

discipline. In 2020, of the 324 cases closed via NPA, only eleven cases (3%) were closed within

6 months of the date of the incident, only 12% were closed within one year of the incident, 33% between one and two years after the incident, and 51% (165 cases) were closed more than two years after the incident occurred. This problem will only worsen since about 700 (48%) of the 1,445 pending Trials cases have been pending for two years or more since the incident date.

| Time to Close NPAs (Time between Incident Date & Date of Ultimate Closure) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closure Date | 2017 | | 2018 | | 2019 | | 2020 | | Total | |
| Total | 397 | | 484 | | 219 | | 324 | | 1424 | |
| 0 to 6 months | 8 | 2% | 26 | 5% | 10 | 5% | 11 | 3% | 55 | 4% |
| 6 to 12 months | 28 | 7% | 67 | 14% | 17 | 8% | 40 | 12% | 152 | 11% |
| 1 to 2 years | 168 | 42% | 310 | 64% | 98 | 45% | 108 | 33% | 684 | 48% |
| 2 to 3 years | 103 | 26% | 61 | 13% | 87 | 40% | 135 | 42% | 386 | 27% |
| 3 + years | 90 | 23% | 20 | 4% | 7 | 3% | 30 | 9% | 147 | 10% |

Imposing an appropriate penalty for misconduct is a complex endeavor. Along with ensuring it is at timely as possible, the appropriateness of the penalty is fact-specific and must balance aggravating and mitigating factors, progressive discipline, relevant caselaw, input from ALJs (to the extent provided), and the overall goal of resolving matters expeditiously. As shown in the table below, the majority of formal discipline imposed since 2017 was for 30 compensatory days or less,[88] and only a small portion of cases imposed 41 days or more (21% in 2017; 9% in 2018; 12% in 2019; and 16% in 2020). As discussed in more detail in the Staff Discipline and Accountability section of this report, the Monitoring Team has generally found that the penalties imposed appear to be reasonable in light of the specific facts of the cases. That said, while the severity of the penalty may generally be reasonable, the meaningfulness of the accountability is wholly undermined by the long delays in imposing discipline.

---

[88] The maximum penalty that can be imposed by law via the OATH process is 60 days. Accordingly, the Monitoring Team considers imposition of discipline for 30 days or more to be a "significant penalty."

| Penalty Imposed by NPA by Date of Ultimate Case Closure | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Penalty Imposed** | Date of Case Closure | | | | | | | |
| | **2017** | | **2018** | | **2019** | | **2020** | |
| | **397** | | **484** | | **219** | | **324** | |
| Refer for Command Discipline | 71 | 18% | 67 | 14% | 2 | 1% | 1 | 0% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% |
| 1-5 days | 32 | 8% | 147 | 30% | 53 | 24% | 80 | 25% |
| 6-10 days | 30 | 8% | 68 | 14% | 26 | 12% | 49 | 15% |
| 11-20 days | 86 | 22% | 80 | 17% | 59 | 27% | 70 | 22% |
| 21-30 days | 68 | 17% | 55 | 11% | 26 | 12% | 32 | 10% |
| 31-40 days | 15 | 4% | 18 | 4% | 18 | 8% | 30 | 9% |
| 41-50 days | 29 | 7% | 30 | 6% | 3 | 1% | 24 | 7% |
| 51+ days | 54 | 14% | 14 | 3% | 25 | 11% | 29 | 9% |

o   <u>Disciplinary Probation</u>

Some NPAs also include additional terms, such as a period of disciplinary probation imposed in six-month increments. A term of disciplinary probation can _only_ be imposed via a settled NPA (meaning the Staff Member must agree to be subject to disciplinary probation), as disciplinary probation cannot be imposed via the OATH process. Disciplinary probation is a useful accountability tool, especially in those cases where the misconduct is relatively serious but may not result in termination. A term of probation essentially provides the Staff Member a second chance to improve their behavior and places the Staff Member on notice that subsequent misconduct will be handled swiftly and with certainty. If the Staff Member engages in further misconduct, the Department is better positioned to address the violation immediately (and terminate the Staff Member). Therefore, the Monitoring Team continues to encourage the Department to incorporate a term of disciplinary probation as part of settled NPAs to the extent feasible (assuming the Respondent agrees).

The number of Staff who have agreed to a term of disciplinary probation has remained relatively constant—fewer than 20, or less than 5% of all NPAs imposed—over the last three years, as shown in the table below. Eight Staff entered into an NPA with a term of disciplinary probation during this Monitoring Period. The majority of the terms of disciplinary probation range between one and two years.

| Staff on Disciplinary Probation, 2018-2020 | | | | | | |
|---|---|---|---|---|---|---|
| | 2018 | | 2019 | | 2020 | |
| Staff Initially Placed on Probation Each Year | 12 | | 17 | | 16 | |
| Total Staff serving a term of Disciplinary Probation (includes those placed on probation in prior years) | 37 | | 44 | | 44 | |
| - 6 Months Probation | 2 | 5% | 0 | 0% | 2 | 5% |
| - 12 Months Probation | 13 | 35% | 15 | 34% | 15 | 34% |
| - 18 Months Probation | 4 | 11% | 4 | 9% | 3 | 7% |
| - 24 Months Probation | 13 | 35% | 19 | 43% | 16 | 36% |
| - 36 Months Probation | 2 | 5% | 3 | 7% | 3 | 7% |
| - 48 Months Probation | 1 | 3% | 1 | 2% | 2 | 5% |
| - 60 Months Probation | 0 | 0% | 0 | 0% | 0 | 0% |
| - 84 Months Probation | 1 | 3% | 1 | 2% | 1 | 2% |
| - Probation for Full Term of Employment | 1 | 3% | 1 | 2% | 2 | 5% |

Staff on disciplinary probation are also evaluated for placement on E.I.S.S. monitoring, which would intensify the support and guidance received during their term of probation. Of the eight Staff placed on disciplinary probation *in this Monitoring Period*, three are enrolled in E.I.S.S., three previously completed a monitoring term and E.I.S.S. concluded their more recent conduct did not warrant an additional term of E.I.S.S. support, and two were not placed in monitoring because they are on non-inmate facing posts (Staff on non-inmate facing posts are generally not placed into E.I.S.S.). Because of the additional support available and the ability to address subsequent misconduct more immediately (should it occur), the Monitoring Team encourages the expanded use of disciplinary probation whenever possible.

o   Tracking and Imposing Penalties

Once NPAs have been finalized, NCU confirms that the discipline imposed by Trials is entered correctly into the CityTime system in the Staff Member's personnel file to ensure the compensatory days are deducted from the Staff Member's account. The Monitoring Team reviewed a sample of NCU's findings for 22 NPAs imposed in October and November 2020 and confirmed that all NPAs were appropriately addressed and entered into CityTime. Overall, the Department appears to be consistently imposing the discipline negotiated via an NPA.

o   Protracted Disciplinary Process

Due to the variety of procedural requirements, parties involved and protections in place, imposing formal discipline is a naturally lengthy process, but it has been further prolonged by a number of current problems. First, the delays in ID's investigation process mean that the majority of cases in which misconduct is sustained are not referred for formal discipline for several years following the incident. Because misconduct is being more regularly identified now because ID's backlog has been resolved, and because investigations are now being completed more timely, the number of cases referred for formal discipline has ballooned and Trials' workload has increased exponentially. Each Trials attorney has a very large caseload, which impacts their ability to manage cases in a timely manner. Compounding the matter, the Trials Division's workflow was significantly impacted by COVID-19 as well as the transition of

COBA leadership and legal counsel, which has impacted Staff practices in settling cases. The full process, with associated timelines, is presented below and then discussed in turn.



Overall, the process to impose discipline could take over one year *if* typical processing times are met (demonstrated above), which, most often, they are not. This in and of itself is concerning. While the majority of disciplinary matters are settled and do not ultimately require a trial, the overall demand for Pre-Trial Conferences has increased. First, Pre-Trial Conferences were suspended for about three months in the last Monitoring Period due to COVID-19 and the transition to a virtual format took some time to get up and running, which created a backlog that now must be processed. Further, as COBA leadership and counsel transitioned, although Staff participated in OATH proceedings, they were unwilling to *settle* matters until new counsel was in place (discussed in the First Remedial Order Report at pgs. 6 to 7 and later in the Staff

Discipline and Accountability Section (§ C., ¶ 3) of this report). Further, following the change in COBA leadership, Staff generally no longer settle matters without at least an *initial* Pre-Trial conference, which has further increased the demand for Pre-Trial conferences. These dynamics further bog down a system that was already struggling to manage the influx of cases from ID. Although, the number of Pre-Trial Conferences *convened* increased significantly during this Monitoring Period and more than required by the Remedial Order (303 conferences were held in this Monitoring Period), this has been insufficient to meet the demand.

      The increasing preference for Pre-Trial Conferences in and of itself prolongs the process of imposing formal discipline. Conferences are often scheduled for months in the future because of the number of cases that need to be heard, the need for the Respondent to evaluate the available evidence, and the logistical challenge to ensuring all relevant parties are available.[89] These delays are further compounded when the result of the initial Pre-Trial conference is to schedule a subsequent proceeding, which happens in the majority of cases. During this Monitoring Period, only 111 (37%) of the 303 cases were settled after the initial Pre-Trial Conference, while at least another 168 (56%)[90] required a subsequent conference to discuss the matter (44 cases) or were scheduled for trial (124 cases). These subsequent proceedings are often scheduled many months after the initial Pre-Trial Conference, accumulating yet another delay.[91] By history, nearly all of these cases will eventually settle without the need for a trial, but the

---

[89] This includes ensuring the Staff member, their counsel, OATH, and the Trials attorneys are available. The number of individuals available to serve as Counsel for Staff is also limited and the Captain and ADW unions each only have a single lawyer.

[90] 24 (7%) additional cases didn't settle after the initial Pre-Trial conference for a variety of different reasons.

[91] It is worth noting that these subsequent proceedings are also often adjourned to an even later date further protracting the process.

delay in scheduling these subsequent proceedings only further delays the ability to reach an agreed upon resolution. In other words, progress toward achieving timely discipline is further degraded.

In addition to the process for scheduling a trial being lengthy and inefficient, the overall trial process is problematic once the trial does occur. Despite the high demand for trials, only four trials were conducted during the Eleventh Monitoring Period. As of April 27, 2021, the status of each case is below:

1. Trial 1 – UOF incident occurred in August 2017 and one day trial heard in September 2020. Decision still pending, over 7 months later.

2. Trial 2 – UOF incident occurred in September 2017 and one day trial heard in October 2020 with decision rendered approximately 50 days later. Wrongdoing was found and a penalty of 55 compensatory days was recommended, which DOC adopted.

3. Trial 3 – UOF incident occurred in January 2018 and two-day trial with one trial date in November 2020 and the other in December 2020. Decision still pending over 4 months later.

4. Trial 4 – three separate UOF incidents occurred in February, July and August 2018 and the trial covering all three incidents is still in progress. Three trial days took place in December 2020, an additional trial day in February 2021, another March 2021, and a final trial day is scheduled for June 2021. This six-day trial will take place over at least a six-month period.

**The status of these four trials illustrates a seriously flawed system.** First, the underlying incident for each of these cases occurred approximately 3 years before each trial. Further, the process for conducting a trial that requires multiple days is nonsensical. While consecutive trial days may not always be possible, it is entirely unreasonable that trial dates are separated by a month, or even worse, by six months. Further, the fact that decisions are pending for several months is unacceptable.

It is important to note that once the case is settled or a decision[92] is rendered by the ALJ following a trial, the case must then be further processed by the Trials Division which drafts a closing memo which must be signed by the Deputy General Counsel of Trials. The imposition of discipline must then be ratified by the Deputy Commissioner of ID & Trials, and finally must be signed by the Commissioner. Combined, these final approvals can take up to 60 days.

In summary, an already convoluted disciplinary process has been further complicated by a large influx of cases from ID that has outpaced the capacity of the current Trials workforce, an unanticipated demand for Pre-Trial Conferences that far exceeds the supply of necessary resources, and compounding delays for any subsequent proceedings and are not disposed expeditiously. These problems must be resolved for the Department to adequately hold Staff accountable for misconduct.

    o   <u>Considerations for Improving Disciplinary Process</u>

Since ID's investigation process has been fortified and ID has alleviated its backlog of cases, the focus must now turn to ensuring appropriate and meaningful discipline is imposed and to dispense the backlog of cases currently sitting in Trials. As discussed throughout this report, this will require multiple, multi-faceted strategies. It is helpful that the Department is increasing its use of immediate corrective action (*e.g.,* more suspensions were enacted in 2020 than ever before) and improving the integrity of the Command Discipline option (the Department now has a reliable and consistent process for imposing CDs which did not exist before 2019), but these will not alleviate the serious problems crippling the formal disciplinary process.

---

[92] The OATH Judge renders a Report and Recommendation with a proposed outcome of the matter to the Commissioner.

The current process for imposing formal discipline is not sustainable because it is not capable of handling the volume of cases that need to flow through it. It is unrealistic to expect Trials to utilize its customary processes to adequately manage a sudden and significant influx of stale cases from ID and to process them more expeditiously than it has been able to do in the past, even without the compounding problems described above. While some delay in closing the backlog of disciplinary cases is to be expected, simply tinkering with the existing Trials and OATH processes is unlikely to resolve these problems satisfactorily. As an initial matter, the Trials Division needs additional staff to address the large influx of cases. Further, at a minimum, an increased number of OATH Pre-Trial Conferences must occur each month so that the significant number of pending cases can be heard. The parties must also attempt to facilitate a meaningful settlement whenever possible at these proceedings. Further, for those cases that may require subsequent proceedings before OATH, these must occur closer in time to the initial Pre-Trial Conference. Finally, greater efficiency in scheduling multiple trial dates and rendering opinions is needed for those cases that do go to trial. The Monitoring Team intends to focus on this issue in the next Monitoring Period and will work with the City, OATH, and the Department to develop specific and concrete recommendations on how to address each of these issues.

## SECTION BY SECTION ANALYSIS

1. **INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE (REMEDIAL ORDER § A)**

This section of the Remedial Order is intended to advance reforms in implementing the Use of Force Directive, and are designed to improve the use of force and reduce the use of unnecessary and excessive force through bolstering the Rapid Reviews (including additional oversight and accountability for deficient reviews), increased ownership by Facility leadership of data analysis and initiatives driven by such analysis, implementing a de-escalation protocol which minimizes reliance on Intake, increasing supervision of Captains through the addition of more ADWs assigned to each Facility, better management of those frequently involved in force through alliance with mental health providers, and improving the use and deployment of the Facility Emergency Response Teams. The Department's efforts to implement these various initiatives are addressed throughout this report, including in the Use of Force Trends and the Identifying and Addressing Use of Force Misconduct sections of this report. The Monitoring Team's assessment of compliance is outlined below.

### REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS)

§ A., ¶ 1. *Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

   i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.

   ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- During this Monitoring Period, Rapid Reviews assessed 3,076 (97%) of the 3,161 actual uses of force, involving 25,427[93] unique Staff actions. Rapid Reviews recommended and implemented 2,349 immediate corrective actions covering 1,427 use of force incidents. *See detailed data provided in the Identifying & Addressing Use of Force Misconduct section of this report.*

- The Department revised the Rapid Review Template in this Monitoring Period as discussed in the Identifying and Addressing UOF Misconduct section of this report.

- The Department finalized and issued Operations Order "Uniform Leadership Assessment of Use of Force Incidents" in this Monitoring Period. This policy requires Facility Leadership[94] review available video for all actual use of force incidents to assess each individual Staff Member's involvement in the incident to identify procedural and operational issues and recommend corrective action when necessary.

  - The rollout of the policy and new Rapid Review template at the beginning of this Monitoring Period was coupled with various communications and meetings with all Wardens and Deputy Wardens about to complete the Rapid Reviews. Communications were shared on a rolling basis with Wardens and Deputy Wardens with reminders and tips for improving the completion of Rapid Reviews. For example, Facility leadership were reminded that a Rapid Review must be completed for an incident even if ID has requested that no corrective action is taken by the Facility for a specific incident.

  - Daily calls are convened every business day by the Bureau Chief of Operations (and her Staff) with Facility Leadership and representatives from E.I.S.S. and ID to review the incidents that occurred from the prior day and discuss any issues identified through the Rapid Reviews. For each incident, the Facility representatives very briefly describe the incident, whether it was avoidable and any identified procedural violations. Some incidents are discussed in more detail depending on what occurred and/or the severity of the issues identified.

- Potentially biased, unreasonable, or inadequate Rapid Reviews have been addressed at weekly *Nunez* meetings and/or addressed at individual meetings with ranking uniform Staff.

**ANALYSIS OF COMPLIANCE**

---

[93] The fact that 25,427 Staff actions were evaluated does not mean that 25,427 different Staff Members were involved in UOF. Rather, this number reflects the unique Staff actions evaluated in every UOF incident reviewed. In many cases, Staff may have been reviewed multiple times as they were involved in multiple use of force incidents throughout the Monitoring Period.

[94] Warden, Acting Warden, Deputy Warden-in-Command, Deputy Warden, or designated Commanding or Executive Office.

In this Monitoring Period, Rapid Reviews were conducted for nearly all use of force incidents, they were generally completed within 24 hours of the incident, and the recommended actions from these Reviews are generally imposed with the relevant Staff Member. The Department took a number of steps designed to improve Rapid Reviews this Monitoring Period: (1) a new Rapid Review template, and corresponding policy, was implemented beginning July 1, 2020; and (2) improved oversight of Rapid Reviews as (a) a daily call was initiated on business days to review every use of force incident in the Department and discuss the initial Rapid Review assessment; and (b) the Department began, in earnest, to address the completion of inadequate Rapid Reviews.

The efforts to improve Rapid Reviews, discussed in the Identifying and Addressing UOF Misconduct section of this report, have resulted in improvements and Rapid Reviews are now accurately identifying UOF policy violations more frequently than in the past. The revised Rapid Review template appears to have resulted in Facility Leadership conducting Rapid Reviews that provide more valuable information and are better at identifying issues that need to be addressed. However, the Rapid Reviews could still be improved, and the Monitoring Team finds the assessment of misconduct is inconsistent. While there is no single practice or cluster of practices that regularly go unidentified, the Rapid Reviews do not consistently and reliably identify potential misconduct and/or operational failures that led to or caused use of force incidents. Facility Leadership that conduct Rapid Reviews that cannot or will not identify these issues as part of their assessment is one of the many symptoms that result from the Facility leadership inadequacies discussed in the Introduction to this report.

While the number of Rapid Reviews that may be biased, unreasonable, or inadequate are limited, the fact that they occur with some frequency is problematic as they should almost never occur. The Department worked in this Monitoring Period to focus on developing processes to address these circumstances. As an initial step, the Department focused on two sets of Rapid Reviews that may be biased, unreasonable, or inadequate: (1) examples identified by the Monitoring Team[95] and (2) incidents in which a Staff Member was suspended by ID or other Facility Leadership, but the Rapid Review did not identify any potential violations or misconduct.[96]

---

[95] The Monitoring Team shared eight egregious examples of Rapid Reviews that appeared biased, unreasonable, or inadequate and would likely merit appropriate instruction or counseling, or the Department to seek to impose appropriate discipline for the individual that conducted the Rapid Review. These examples were not intended to serve as a comprehensive assessment of all Rapid Reviews that may meet this threshold but were a set of egregious examples the Monitoring Team identified during routine work.

[96] This category of cases was selected because of the strong likelihood that these cases involved objective evidence of wrongdoing that could and should have been captured in the Rapid Review.

The Department presented a number of examples of these Rapid Reviews at multiple weekly *Nunez* Meetings with all Facility Leadership in which the video of the incident was reviewed, the violations were identified, and the deficiencies in the Rapid Review were highlighted in the meetings. The Department also conducted at least a handful of individual counseling meetings with certain Facility Leaders to address biased, unreasonable, or inadequate Rapid Reviews. Following the counseling session, Facility Leadership were required to sign an acknowledgment form that stated further inadequate Rapid Reviews would result in corrective action.

In terms of a more systematic assessment of Rapid Reviews to identify any that may be biased, unreasonable, or inadequate, there are three processes in place or under development. First, the Bureau Chief of Operations reviews all collated Rapid Reviews and provides feedback. Second, Intake Investigations now incorporate the findings of the Rapid Review. If the Rapid Review *correctly* identified and recommended *appropriate* corrective action, the corrective action recommended by the Rapid Reviewer may be leveraged by the Intake Investigator (assuming no additional violations or issues were identified in the course of the investigation) and closed with no further action beyond the action taken by the Facility. The Intake Investigation will also identify the errors in the Rapid Reviews, however, during this Monitoring Period, this feedback was not subsequently shared with Facility Leadership. Finally, at the end of the Monitoring Period, the Department began systematically reviewing the Rapid Reviews for all incidents that resulted in a suspension for a Staff Member. This review assessed the outcome of the Rapid Review and whether the conduct that gave rise to the suspension could and *should* have been identified through the materials available to the individual conducting the Rapid Review. Uniform and Civilian leadership would then meet to discuss any cases in which it appeared that the Rapid Reviewer failed to adequately identify the violation and determine how best to address the issue with the individual. As this process only began at the end of the Monitoring Period, the Department only identified one Rapid Review that met this criteria and it was determined that the individual should be counseled.

To date, the Department has relied exclusively on counseling the relevant Facility Leadership when a potentially biased, unreasonable, or inadequate Rapid Review was identified. While counseling may be appropriate in some cases, the Monitoring Team has identified circumstances in which either the same Staff Member has conducted numerous biased, unreasonable, or inadequate Rapid Reviews and/or the Rapid Review was so problematic that a more severe response is warranted. For instance, a Command Discipline may be appropriate to address a pattern of biased, unreasonable, or inadequate Rapid Reviews, and if this pattern persists then that Staff Member may be removed from the responsibility of conducting Rapid Reviews in their Facility altogether. Addressing these cases will be a focus in the next Monitoring Period.

The Rapid Review process is a significant undertaking, especially given the high volume of incidents, involving large numbers of Staff. Rapid Reviews are conducted for nearly all incidents and a

significant amount of corrective action is recommended and imposed. However, Rapid Reviews do not reliably identify all relevant issues that occurred in the incident and whether an incident is avoidable. Further, appropriate corrective action for the relevant Staff Member is not always reasonably recommended. Finally, the Department must not only have a process to identify and address inadequate, unreasonable, or biased Rapid Reviews, but must more consistently take appropriate action with the individual that conducted the Rapid Review—including formal discipline if warranted—once identified.

| **COMPLIANCE RATING** | **§ A., ¶ 1.** Partial Compliance |
| --- | --- |

### REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES)

§ A., ¶ 2. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Department leadership and Facility leaders meet weekly ("*Nunez* meetings") to discuss operational issues in the jails and leverage analysis from various data sources to guide this discussion.
  - The content and format of these meeting evolved over the course of this Monitoring Period to enable Facility leadership to focus on specific persistent operational issues and develop strategies to address those issues.
- Six persistent operational issues across *all Facilities* were the focus of these meetings, analysis, and Facility-specific action plans in order to reduce/eliminate the following:
  - Unnecessary alarms,
  - Use of Force stemming from searches,
  - Security Issues from open cell doors,
  - Profanity and unprofessional conduct,
  - Inappropriate restraint application and painful escort holds, and
  - Failure to activate body-worn cameras.
- Facility leadership are responsible for formulating concrete action items to address the problems discussed, and subsequent meetings record the implementation progress of these action items, including comparison of data points to assess whether those action items were

successful in addressing the operational issue targeted (*e.g.,* frequency of unnecessary alarms assessed are compared to determine if action items designed to reduce the unnecessary alarms were successful).

- Facility leadership are also supposed to identify and address individual instances of these same operational issues on a daily basis through the Rapid Reviews.

**ANALYSIS OF COMPLIANCE**

Facility leadership appear unable or unwilling to implement and follow through with the multitude of strategies to address identified problems that have been developed throughout the life of the Consent Judgment. As discussed in detail in the Introduction to this report, Facility leadership do not appear to be adequately supervising their Staff and implementing the UOF Directive and have been unsuccessful in dismantling the culture that gave rise to the Consent Judgment. As discussed in the UOF Trends section of this report, the Department has faced persistent operational issues, across all Facilities, for many years which contribute to the use of excessive or unnecessary force and the frequency of UOF incidents in general. These persistent operational issues occur in each Facility and therefore the Monitoring Team has strongly recommended that every Facility focus on addressing these persistent operational issues because they underpin the issues in every Facility. Once these issues have been mitigated and/or eliminated, then there may be individual issues within a Facility that could merit some additional scrutiny.

*Routine Leadership Meetings*

The weekly *Nunez* meetings are a vehicle for Facility leadership to address the requirements of this paragraph. The Monitoring Team encouraged the Department to work with Facility Leadership to develop simple and straight forward action items that focus on active supervision—*e.g.,* how can Facility Leadership encourage supervisors at all levels within their jail to supervise Staff to reduce/eliminate these persistent operational issues. Each week, one or two specific operational issues are discussed, relevant data is presented, and individual Facility leaders must commit to concrete actions they will take to address the specific issue (*e.g.,* roll call trainings to remind Staff on when to activate a BWC or meetings with supervisors on when to call a Level B alarm, etc.). The presence of multiple Facility leadership in these meetings allows for collaboration across Facilities in order to devise appropriate initiatives to address these areas of concern.

The concrete action items discussed in the *Nunez* meetings are memorialized, and the prior week's action items are discussed, in an attempt to hold Facility leadership accountable for implementing them. As part of this work, the goal is also for there to be a synergy between the *Nunez* meetings and the Facility leadership's work in assessing individual use of force incidents as part of the Rapid Review. While the Rapid Reviews allow Facility leadership to address, on a daily basis, individual examples of operational concerns through corrective action imposed on specific Staff Member's, the *Nunez* meetings provide an opportunity to identify, formulate, and assess the success of

addressing these operational issues from a more global perspective. Both approaches are necessary to reduce (and hopefully eliminate) the persistent operational issues that have plagued the Agency.

The format and content of the *Nunez* meetings was a work in progress throughout the Monitoring Period. However, the materials provided to the Monitoring Team at the end of the Monitoring Period showed promise–both the materials presented at the meeting and the notes regarding the proposed action plans addressed concrete actionable items that were appropriately targeted to address the issue. It remains to be seen if these corrective action plans will both be implemented and effective going forward.

In this Monitoring Period, while some steps were taken by civilian and uniform leadership to create the foundation to address these issues, as described above, Facility leadership have simply made no progress in implementing initiatives to reduce the persistent operational issues which have plagued the Department. As no progress has been made to stymy the persistent operational issues to date and the Facility supervision is inadequate as describe throughout this report, the Department is in Non-Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 2. Non-Compliance |
| --- | --- |

## REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL)

§ A., ¶ 3. Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department convened a working group to analyze the Department's use of Intake, consisting of the Bureau Chief of Facility Operations, GRVC and AMKC Facility leadership, NCU, Chief of Department and Project Management Office. The findings of this working group are discussed in the UOF Trends section of this report.

- The Department drafted a revised policy on the use of Intake, which was shared with the Monitoring Team following the close of the Monitoring Period.

**ANALYSIS OF COMPLIANCE**

This provision of the Remedial Order requires the various processes that are negatively impacting Intake's orderly operation to be identified and addressed. The proportion of uses of force that occur in Intake areas (ranging between 14 and 17% of all uses of force for the past several years) is

concerning. Further, the use of Intake for post-incident management contributes to the misuse of force and exacerbates the problems within Intake as discussed in the UOF Trends section of this report. The Department's Intake analysis confirmed the Monitoring Team's assessment that Intake is inappropriately used for reasons unrelated to admission and discharge and heavily relied upon for post-incident management. The working group found further that individuals often languish in the Intake area and that likely contributes to uses of force in Intake (*e.g.* refusal to obey orders). This information, along with the Monitoring Team's perspectives about the immediacy, location and transport for post-incident management, should guide the Department's strategy for appropriately limiting the use of Intake, and developing appropriate alternatives for other functions that currently burden that location.

As part of the Department's efforts to alleviate the issues with Intake, and improve general incident management, the Monitoring Team recommended the Department re-evaluate the default response that *all* individuals involved in a use of force incident must be moved off the housing unit *immediately* and taken to Intake (discussed in the UOF Trends section). This will be an area of focus in the next Monitoring Period as part of the work to finalize a policy governing the more narrow use of Intake areas and to provide Supervisors with options for managing situations that have been traditionally managed via Intake. This information, along with the Monitoring Team's perspectives about the immediacy, location and transport for post-incident management, should guide the Department's strategy for appropriately limiting the use of Intake, and developing appropriate alternatives for other functions that currently burden that location. While the Department has taken a critical first step in evaluating the processes within Intake, progress has not yet been made on actually addressing those issues with new practices. Accordingly, the Department is in Non-Compliance with this provision.

| COMPLIANCE RATING | § A., ¶ 3. Non-Compliance |
| --- | --- |

---

**REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS)**

§ A., ¶ 4. The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned, and shall be subject to the approval of the Monitor.

    i. Within 60 days of the Order Date, RNDC, and at least two other Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    ii. Within 120 days of the Order Date, at least three additional Facilities to be determined by the Commissioner in consultation with the Monitor, shall satisfy the requirements of this provision.

    iii. By December 31, 2020, all Facilities shall satisfy the requirements of this provision.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Approximately 80 ADWs are now assigned to Facilities as outlined in the chart below (an increase of 26 ADWs since the end of the previous Monitoring Period).

| Number of ADWs in each Facility as of January 2, 2021[97] | |
| --- | --- |
| | Number of ADWs |
| AMKC | 21 |
| EMTC[98] | 0 |
| GRVC | 10 |
| MDC[99] | 2 |
| NIC | 8 |
| OBCC | 8 |
| RMSC | 6 |
| RNDC | 15 |
| VCBC | 6 |
| Court Commands (BKDC, BXDC, QDC) | 4 |
| **Total** | 80 |

- At the end of the Monitoring Period, the Department submitted a plan to the Monitoring Team for the deployment and utilization of additional ADWs in each Facility. The Department reported the goal of the plan is to improve supervision of line Staff and promote regular interaction between the staff and the people in custody to establish a rapport based on respect and collaboration. Further, the Department reported another goal for this model is for uniform and program staff to work together to support the engagement of the population in program groups and pro-social activities that are intended to reduce idle time and effectively prepare the individuals in custody for return to their home communities.

ANALYSIS OF COMPLIANCE

To address the pervasive and persistent issues facing the Department, the Monitoring Team has made many recommendations to develop more effective supervision of line Staff and Captains (see Tenth Monitor's Report at pgs. 25-30) to increase the likelihood that situations are resolved without the use of force and that when force is necessary, it is applied properly and proportionately. These

---

[97] As of the end of the Monitoring Period, the assignment of ADWs by housing unit was not finalized so this data simply demonstrates the number of ADWs per Facility.

[98] EMTC has been closed and opened in this Monitoring Period. As a result, Staff that work at EMTC are technically assigned to AMKC.

[99] MDC was utilized in a limited capacity at the end of the Monitoring Period and had an ADP of 87 in the month of December.

recommendations were codified in the Remedial Order § A., ¶ 4, which requires the Department to improve supervision by hiring additional ADWs and deploying and supporting ADWs within the Facilities to better supervise Staff.

The recent increase in the number of ADWs—and corresponding decrease in the number of Captains supervised by any one ADW—is an essential first step in delivering more constructive and effective Staff supervision. These ADW post assignments are a critical piece of the infrastructure needed to elevate the quality of Staff supervision. In the next Monitoring Period, the Monitoring Team intends to seek more information about the rationale for the distribution of ADW positions across Facilities and their expected responsibilities.

However, increased supervision is inherently complex and is not simply solved by the assignment of additional ADWs to a particular Facility, nor will this problem be solved overnight. The Monitoring Team's finding regarding poor incident management and supervision by Captains is what led to the recommendation to increase the deployment of ADWs throughout the Facilities. The newly promoted ADWs are drawn from the same corps of Captains who have generally struggled with these essential skills to begin with, so, simply promoting additional ADWs will not solve the problem. Instead, the ADWs will also need substantial first-rate coaching, supervision, and mentoring from their superiors to develop into the types of supervisors that are so desperately needed in this Department. The task of cultivating the ADWs will largely fall to the Deputy Wardens and Wardens in each command, which brings yet another layer of complexity to the task of reforming the Department's practices given the issues discussed in the Introduction of this report.

Furthermore, while the Monitoring Team clearly supports the overall goals of promoting a constructive rapport among Staff and people in custody, providing for reliable service delivery, reducing violence and the use of force, the Department must also focus squarely on the task of elevating the quality of *supervision*. To do so, the Monitoring Team encourages the Department to articulate the concepts of quality supervision that they want to promote among ADWs and Captains. In other words, how can supervisors best position themselves to elevate the practices of line Staff? What do the supervisors at each level actually need to do (*e.g.*, basic skill development, teaching mediation and problem-solving, role modeling)?

Given the complexity of these issues, improving the quality of Staff supervision will take time. At the end of the Monitoring Period, the Department shared a thoughtful plan on how to best deploy ADWs within the Facilities and improve the level of supervision. The Monitoring Team intends to work with the Department in the next Monitoring Period to on the implementation of this plan.

| **COMPLIANCE RATING** | **§ A., ¶ 4.** Partial Compliance |
| --- | --- |

| REMEDIAL ORDER § A., ¶ 5 (INCARCERATED INDIVIDUALS INVOLVED IN NUMEROUS USE OF FORCE INCIDENTS) |
|---|

§ A., ¶ 5. Within 60 days of the Order Date, the Department shall, in consultation with the Monitor and Correctional Health Services, develop, adopt, and implement a plan so that: (i) health care professionals individually evaluate any Incarcerated Individual who has been involved in a significant number of Use of Force Incidents during a Reporting Period to determine whether any mental health needs of the Incarcerated Individual are not being adequately addressed; and (ii) the Department assesses whether existing security and management protocols are appropriate for these Incarcerated Individuals. This plan shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department on a monthly basis continued identifying individuals that met the High Needs Inmate ("HNI") criteria each month (involvement in six or more UOF incidents during the prior three months). Any individual on this list required approval by the Commissioner before being transferred between Facilities.
  - o This small group of individuals accounts for approximately 1% of the total incarcerated individual population and is found to be responsible for nearly one third of the total UOF incidents across the Department each month. Most of these individuals are repeatedly appearing on the HNI list each month.
  - o The Department reports that less than 10% of the individuals on the list in this Monitoring Period were incarcerated for the first time. 24% of individuals have been involved in at least one fight, 55% individuals have been involved in two or more fights and most have been involved in multiple fights within the last six months of their stay in DOC.
- At the end of the Monitoring Period, the Facilities developed plans to manage the high needs individuals. Most were targeted to the specific individuals from the HNI list, but a few Facilities developed more generic plans to manage any individual that may be on the HNI list and housed in the Facility. Examples of some of the concrete steps to address these specific individuals included:
  - o  Respect individual's autonomy and allow him physical space and privacy as needed;
  - o Offer incentive for compliance and good behavior with commissary vouchers, enhanced recreation, additional clothing or increased non-clinical contact with mental health staff he has good rapport with;
  - o Mental health staff to provide daily rounds;
  - o Staff to tour individual's housing area each day; and
  - o ADW to meet daily with individual.
- In September 2020, H+H mental health staff began reviewing the individuals on the HNI list as outlined in the UOF Trends section of the report.
- The Persons in Need of Support ("PINS") meetings continued to occur each week. Department leadership, Health Affairs, and representatives from H+H convene weekly to discuss particular

individuals who have mental health concerns and/or select HNI individuals (but not all HNI individuals are discussed at PINS).

ANALYSIS OF COMPLIANCE

A fulsome assessment of DOC's and H+H's processes designed to the requirement of this provision and address the needs of HNI individuals is discussed in the Use of Force Trends section of this report and is relied upon to make this compliance assessment. It is critical for the Department to appropriately manage the small number of individuals that continue to be responsible for a large number of UOF. In 2020, for example, 104 individuals were involved in 11 or more uses of force during their time in custody, which is similar to prior years (*e.g.*, 2019 = 138, 2018 = 104). These 104 individuals were involved in a total of 1,588 unique UOF incidents during 2020, 26% of the total UOF in 2020.

As required by this provision, the Department identifies those individuals with a significant number of UOF incidents by creating a monthly HNI list of individuals involved in six or more UOF incidents during the prior three months. DOC has reported it has two processes in place to address and manage those individuals on the HNI list. First, transfer of these individuals across Facilities is limited, and the other is discussing these individuals in the PINS meetings. Finally, at the end of the Monitoring Period, the Facility's submitted specific plans with strategies to address certain HNI individuals and/or included broader strategies, which could serve as models for more routine and robust security plans going forward. In the next Monitoring Period, the Monitoring Team recommends the Department focus on the following: (1) continuing to limit inter-Facility transfers, (2) further specifying and assessing the effectiveness of the individual strategies developed via PINS meetings, and (3) assess whether the individuals on the HNI list should also be referred to the PINS meetings and/or whether separate security or management interventions may be needed, such as individualized security plans. The Commissioner's engagement with the Wardens as part of the Department's efforts to limit inter-Facility transfers is also important and should remain an area of focus.

As for the evaluation by health care professionals, beginning in September 2020, on a monthly basis, the H+H Clinical Director of Mental Health reviews the individuals on the HNI list developed by the Department to assess whether their mental health needs are being adequately addressed. The Monitoring Team was only able to confirm that H+H conducted this review for all individuals on the HNI list between September and December. The current information provided precludes the Monitoring Team from determining that anything other than a review occurred. The Monitoring Team consulted with H+H to develop a more robust reporting mechanism that would also describe the outcome of these review and hopes to identify solutions in the next Monitoring Period.

| COMPLIANCE RATING | § A., ¶ 5.<br>(i) Partial Compliance<br>(ii) Partial Compliance |
| --- | --- |

**REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS)**

§ A., ¶ 6. Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- There are at least two types of Emergency Response Teams:

  o Probe Teams consist of Facility-based Staff. The Department reports that generally the Probe Team Captain is typically also assigned to Intake. Further, each responding Probe Team usually includes at least some Staff from Intake. Separately, when an alarm is called, all available Staff (*e.g.,* Staff who are not directly responsible for managing incarcerated individuals such as those assigned to the Corridors, Security, and Escort posts, but other Staff in the Facility may be called as well) are expected to respond to a central staging location to prepare for deployment if necessary. The policy requires that Staff Members may not serve on the Probe Team if they have pending disciplinary charges related to a use of force violation and/or if discipline has been imposed for the use of unnecessary or excessive force.

  o The Emergency Services Unit ("ESU") is a separate and dedicated unit outside of the Facility. Staff who apply for a post within ESU are subsequently screened pursuant to Operations Order 24/16 (Special Unit Assignment), prior to assignment. The screening considers the applicant's overall record (including disciplinary history) and their specific skills. Once assigned to ESU, if disciplinary charges related to excessive force or failure to report are served and/or sustained, policy requires the removal of Staff from assignment to ESU.

- Emergency Response Teams are governed by Operations Order 25/19 (Facility Emergency Response Teams). This policy was revised in August 2019, in consultation with the Monitoring Team, and includes the following:

  o Staff may call for assistance via Personal Body Alarm ("PBA").

  o The response to a call for assistance is categorized into four alarm levels (Levels A to D).

    ▪ A **Level A** alarm triggers a lower-level response and does not include an Emergency Response Team. Instead, Staff in the immediate area respond to the

location, without the use of special equipment. Level A responses are expected to be utilized most frequently as they are meant to address most routine disruptions such as medical emergencies, disruptive individuals who refuse to comply with Staff orders, fights without weapons, incarcerated individuals smoking, contraband recovery, or uses of force (if Staff feel they can control the situation).

- A **Level B** alarm activates an Emergency Response Team and is for situations including: individuals threatening Staff safety, assaults on Staff, fights that involve weapons, multiple fights or fights with the potential to escalate into larger, unmanageable disturbances; stabbings/slashings; individuals who may be unconscious; uses of force (if Staff feels it rises to Level B); or any fire or security breach.

- A **Level C** alarm response is for situations such as an unreconciled count of people in custody, confirmed escapes, barricades, riots and hostage situations, death of Staff, and a bomb threat.

- A **Level D** alarm is for major disturbances such as a natural disaster, homicide, structural fire or damage, bomb discovery or discharge, chemical biological, radiological, or nuclear explosives.

o When Staff call for assistance, a Supervisor (generally an ADW) is required to evaluate the circumstances to determine the appropriate response, rather than giving the Staff Member seeking assistance sole discretion to determine what response is deployed. The Supervisor is responsible for conducting a rapid evaluation of the situation and either personally resolving it (or sending another Supervisor to do so), deploying a Level A response (intended to de-escalate the situation), or affirmatively ordering the deployment of an Emergency Response Team to respond to the area.

o The policy requires that the Emergency Response Team responding to a Level B Alarm should consist of at least one Captain and between two and four Correction Officers plus a handheld camera operator. Additional staff may also be assigned by the Tour Commander if needed.

- The number of alarms deployed Department-wide is discussed in the Use of Force Trends section of this report. The number of Level B alarm responses, by Facility, for each month of the Monitoring Period is provided in the table below.

| Number of Level B Alarm Responses By Facility & Month[100] | | | | | | |
|---|---|---|---|---|---|---|
| Facility | Jul-20 | Aug-20 | Sep-20 | Oct-20 | Nov-20 | Dec-20 |
| AMKC | 109 | 90 | 97 | 132 | 156 | 165 |
| BHPW | 4 | 10 | 2 | 5 | 3 | 5 |
| BXCT | 0 | 4 | 3 | 4 | 0 | 0 |
| EMTC | 0 | 0 | 0 | 0 | 21 | 21 |
| GRVC | 189 | 115 | 147 | 182 | 107 | 65 |
| MDC | 150 | 183 | 113 | 106 | 53 | 22 |
| MNCT | 0 | 2 | 1 | 0 | 1 | 0 |
| NIC | 38 | 30 | 60 | 27 | 23 | 20 |
| OBCC | 43 | 43 | 44 | 71 | 32 | 41 |
| QNCT | 0 | 0 | 0 | 2 | 1 | 41 |
| RMSC | 15 | 18 | 23 | 26 | 26 | 38 |
| RNDC | 48 | 36 | 56 | 75 | 101 | 145 |
| VCBC | 33 | 28 | 29 | 36 | 36 | 21 |
| WF | 0 | 6 | 0 | 0 | 2 | 2 |

- The Department's UOF Directive outlines the requirements that must be followed by *all* Staff (including Emergency Response Teams) when using force, including the use of conflict resolution and de-escalation tactics.

- The revised Rapid Review Template requires Facility Leadership to evaluate every incident to determine: (a) whether an Emergency Response Team responded to the incident, (b) if an Emergency Response Team responded, what level alarm was called, and (c) whether the deployment of the Emergency Response Team was necessary.

ANALYSIS OF COMPLIANCE

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. The current status of DOC's use of Emergency Response Teams is discussed at length in the Over-Reliance on Emergency Response Teams part of the Use of Force Trends section of this report and is relied upon to make this compliance assessment.

The Department overuses Emergency Response Teams. Most incidents could be resolved either by the Staff on the unit and/or their Supervisor or by calling other Staff to the location in an effort to resolve issues without using physical force (*i.e.,* a Level A alarm), but Facility leadership continue to

---

[100] The data Department wide is shared in the UOF Trends section of this report. The data by Facility demonstrates the Department's pervasive overreliance on Level B Alarms. As with use of force data by Facility, the Monitoring Team has not found a particular pattern or practice regarding the use of alarms by Facility that would make this data particularly informative.

deploy Emergency Response Teams to address nearly all issues. Staff often unnecessarily await the arrival of these Emergency Response Teams instead of handling minor issues involving incarcerated individuals. The Department's Operations Order for Facility Emergency Response Teams outlines the reasonable circumstances under which an Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision. However, it appears that Tour Commanders (and Facility Leadership in general) are undermining (or overruling) the principles outlined in policy, and appear to utilize poor judgment in making decisions where the policy affords discretion. Emergency Response Teams are routinely deployed in situations where they are not needed or warranted. Additionally, it appears that in practice multiple Emergency Response Teams are assembled and deployed in response to one incident, which is not contemplated by the current policy either.

As for the Emergency Response Teams (both the Probe Team and ESU Teams), the Monitoring Team has a number of concerns about their composition, size, and practices. Regarding Probe Teams, the Department's approach to staffing them is haphazard. First, some Probe Team Staff are pulled from the Intake which is inherently problematic given their responsibilities within the Intake. Joining the Probe Team diverts their time and attention from the routine duties of Intake, which are critical for the Facilities' smooth operation. Furthermore, the Department's practice of generally escorting all of those involved in uses of force to Intake after an incident then intersects with Intake Staff's returning to the same location following a Probe Team deployment. Given the stress and agitation for everyone involved in the incident, this is a particularly combustible mix. The primary Probe Team is also supported by additional *available* Staff (*i.e.,* any Staff who are not currently assigned to manage an incarcerated individual are expected to respond to the staging area for a Level B). This staffing approach is the antithesis of a cohesive team response. It also precludes the ability to ascertain and control Staff's fitness for duty on the Probe Team. While the Department's Operation Order precludes Staff Members from serving on the Probe Team if they have pending disciplinary charges and/or discipline has been imposed for the use of excessive force, there is no consistent or reliable way for a Facility, in the moment, to ensure adherence to this policy because of the teams are staffed ad hoc.

The Monitoring Team's concerns regarding the composition and size of ESU teams are discussed in the Selection of ESU Teams portion of the Use of Force Trends section of the report. In particular, ESU Staff's selection process did not always adhere to requirements designed to ensure Staff's fitness for duty on such a team. Furthermore, a review of ESU team members' disciplinary histories revealed that a significant number of ESU Staff should have been removed from the team subsequent to sustained disciplinary charges for excessive force and failure to report. The Department has not applied appropriate scrutiny to those tapped to serve on ESU Teams which may underlie some of the concerning behaviors that the Monitoring Team has observed.

Furthermore, the number of Staff deployed on Emergency Response Teams is often disproportionate to what is necessary to address the scenario at hand. For example, while policy

suggests a Level B team size of at least one Captain and between two and four Correction Officers plus a handheld camera operator, teams of that size are rarely observed. More often than not, the size of the team is much larger, often with as many as 20 or 30 Staff responding. Finally, Emergency Response Teams are aggressive, antagonistic, frequently hyper-confrontational, and unprofessional. The Emergency Response Teams almost always fail to *first* attempt de-escalation when they arrive on the scene, appear to presume force will be required no matter the circumstance, and too often abandon the requirement to use the minimum amount of force necessary to control the resistance or threat encountered (as required by Consent Judgment § IV. (UOF Policy), ¶ 3(a)(i)). This raises alarming concerns given the general deference afforded to these teams and the high-profile nature of their response when they arrive on the scene.

The Department unreasonably relies on Emergency Response Teams and the composition, size and practices of the Emergency Response Teams undermine the goal of the safe, orderly operation of a Facility. Too often, the teams utilize unnecessary and excessive levels of force. Accordingly, the Department is in Non-Compliance with this provision.

Finally, the Remedial Order requires the Facility leadership to regularly review a sample of instances in which Emergency Response Teams are deployed at each Facility. The revised Rapid Review Template was updated to include an assessment of the deployment of Emergency Response Teams and also captures an assessment of the conduct of each Staff Member involved in the incident. The Monitoring Team intends to work with the Department in the next Monitoring Period to determine whether the Rapid Reviews are adequate to meet this requirement, and/or determine whether other assessments may be necessary to achieve compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **§ A., ¶ 6.** Non-Compliance |

## 2. USE OF FORCE POLICY (CONSENT JUDGMENT § IV)

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and incarcerated individual safety. The new Use of Force Policy ("New Use of Force Directive," or "New Directive") has been in effect since September 27, 2017, with the corresponding New Disciplinary Guidelines effective as of October 27, 2017. The New Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps Officers and their supervisors

should take when responding to threats to safety and security. The Department's efforts to implement the New Directive is addressed throughout this report.

The Monitoring Team's assessment of compliance is outlined below.

## IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed and promulgated a new UOF Directive on September 27, 2017. The policy was approved by the Monitor.

### ANALYSIS OF COMPLIANCE

The Consent Judgment requires the Department to develop, adopt, and implement a new UOF Directive, and the current status of DOC's use of force is discussed in the Use of Force Trends section of this report and is relied upon to make this compliance assessment. The Department has achieved compliance with the developing and adopting components of this provision as a new UOF Directive was developed and approved by the Monitor[101] and it was adopted during the Fifth Monitoring Period after all Staff received Special Tactics and Responsible Techniques Training ("S.T.A.R.T."). The Department committed significant resources to training all Staff on the UOF policy through S.T.A.R.T. and has subsequently provided refresher training on the UOF Policy through the Advanced Correctional Techniques Training ("A.C.T").

The Department has not effectively implemented the New Use of Force Directive. Implementing the New Directive requires both informing and training relevant Staff about the policy requirements and also consistently *instructing* and *applying* the policy by following its mandates.[102] Although the initial training is complete, properly implementing the New Use of Force Directive requires continually reinforcing key concepts and clearly demonstrating that Staff's practices are aligned with policy and the Consent Judgment. Simply put, the policy is not consistently or reliably implemented by line Staff or Supervisors. The continued and sustained prevalence of unnecessary and excessive force demonstrate that the requirements of the policy are not reasonably adhered to. In

---

[101] The New Use of Force Directive was developed by the Department and approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

[102] See Consent Judgment § III (Definitions), ¶ 17, definition of "implement".

particular, Staff's hyper-confrontational behavior, and failure to routinely utilize de-escalation techniques, often creates situations in which force is used when it is not necessary. Further, when force is employed, it is often disproportionate to the level of resistance, and includes the use of unnecessarily painful escort techniques, unnecessary and too close use of OC spray, hard or violent take downs and the use of prohibited holds. The issues related to use of force are interconnected and with other failures of basic Facility management. The Facilities are often in a state of turmoil due to poor execution of everyday procedures like institutional searches, orders for lockdown, and ensuring cell doors are secure frequently leading to incidents involving multiple Staff and incarcerated individuals which perpetuates the tumultuous state. These issues are further compounded by lack of consistent and appropriate supervision and by uniform leadership's inability to identify and address the Staff misconduct causing these trends and failing to address them with Staff, as described in the Use of Force Trends section of this report above.

The Remedial Order includes requirements designed to address the Department's sustained Non-Compliance with implementing the new UOF Directive, and are designed to improve implementation of the policy and reduce the use of unnecessary and excessive force through bolstering the Rapid Reviews (including additional oversight and accountability for faulty reviews), increasing ownership by Facility leadership of management of their Facilities through routine data analysis and initiatives driven by such analysis, implementing a de-escalation protocol which minimizes reliance on Intake, increasing supervision of Captains through the addition of more ADWs assigned to each Facility, improving management of incarcerated individuals frequently involved in force through alliance with mental health providers, and improving the use and deployment of the Facility Emergency Response Teams. The Department's efforts to implement these Remedial Order requirements are discussed throughout this report.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1. (Develop)** Substantial Compliance <br> **¶ 1. (Adopt)** Substantial Compliance <br> **¶ 1. (Implement)** Non-Compliance <br> **¶ 1. (Monitor Approval)** Substantial Compliance |

## IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS)

¶ 2. The New Use of Force Directive shall be written and organized in a manner that is clear and capable of being readily understood by Staff.

¶ 3. The New Use of Force Directive shall include all of the following [. . . specific provisions enumerated in sub-paragraphs a – t (see pages 5 to 10 of the Consent Judgment)].

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The New Use of Force Directive remains in effect. It addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3(a) to (t), § V (Use of Force Reporting) ¶¶

1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

- The Department maintains a number of standalone policies regarding specific use of force tools and techniques including the use of: spit masks, restraints, chemical agents, electronic immobilization shields, batons, tasers, and the use of canines.
    - The Department finalized a standalone baton policy for the use of all batons (including the Monadnock Expandable Baton) in the Tenth Monitoring Period, and the Department continued efforts to provide baton training to Staff throughout the Department this Monitoring Period. Training was provided to over 300 Staff this Monitoring Period and will continue in the Twelfth Monitoring Period.
    - The Department and Monitoring Team worked on revisions to the Canine Policy this Monitoring Period.
    - ESU also maintains a number of standalone Command Level Orders ("CLOs") regarding various use of force tools (*e.g.,* Pepperball System and Sabre Phantom Fog Aerosol Grenade – AGPTM-10 and AGPTM-40).
- The Department also maintains several standalone policies governing security procedures, including policies on the use of lock-in and lock-outs ("Lock-Down Policy"), searches for ballistic weapons, and the deployment of Facility Emergency Response Teams (formerly called Probe Teams).
    - The Department, in consultation with the Monitoring Team, finalized revisions to the Lock-Down Policy early in this Monitoring Period and the revised policy was promulgated in October 2020.

**ANALYSIS OF COMPLIANCE**

The New Use of Force Directive is clearly written, organized, and capable of being readily understood by Staff. It is consistent with the requirements of the Consent Judgment § IV, ¶ 3 (a-o, q-t) and is aligned with best practice. This policy also provides Staff the necessary guidance to carry out their duties safely and responsibly.

In order to address the requirements of ¶ 3(p), the Department maintains a number of standalone policies that provide clear and adequate guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force. The Department has consulted the Monitoring Team on the development and revisions of many of these policies as noted in prior reports. In support of the global Baton Policy promulgated in the Tenth Monitoring Period, this Monitoring Period, the Department continued to rollout Baton training to Staff, and plans to issue new batons to Staff on a Facility-by-Facility basis once training is complete at a given Facility.

In this Monitoring Period, the Department promulgated a revised Lock-Down Policy this Monitoring Period that now includes improved guidance to Supervisors on when to approve/direct different types of lock-ins (*e.g.,* Housing Unit, Housing Segment Unit Lock-Ins, Facility Lock Downs), and provides improved guidance on when emergency lock-ins are to be utilized (*e.g.,* only after all other alternatives have been considered and/or exhausted).

The Department and Monitoring Team also worked on revisions to the Canine Unit Policy. Given the Department's interest in revising this policy, the Monitoring Team conducted a holistic review of the directive to ensure it was consistent with best practice. As way of background, to the extent that canines are used in a correctional setting, the use of canines must be limited to controlled settings with a specified need (*e.g.,* conducting a search for contraband based on intelligence). Canines are not as controllable and predictable as other tactics and so the use of canines must be taken with great care given the possibility of grave risk of harm to Staff and incarcerated individuals. The use of canines as an instrumentality of Staff use of force must be limited to only those circumstances in which there is an imminent and immediate threat of serious bodily injury or death ("SBI"). Further, the use of canines for cell extractions are not appropriate and must be prohibited (as they are in the DOC directive). The use of canines to punish, harass, intimidate, degrade, or threaten a person in custody must also be prohibited (as it is in the DOC directive).

The Monitoring Team's assessment of the policy found that the Department's policy should better clarify that the use of canines must be limited to situations involving the imminent or immediate threat of SBI. For instance, the directive initially permitted routine patrolling of housing areas with canines and suggested canine staff could assist in securing non-compliant incarcerated individuals during an altercation in a housing area. This could potentially create a situation in which a canine may be used in a non-SBI circumstance. Given the risk this poses, this potential policy ambiguity was removed. The Monitoring Team worked closely with the Department and provided a number of suggested revisions and edits so that the policy was clear and included adequate procedures and safeguards regarding the use of canines in the jails. These revisions will be finalized in the Twelfth Monitoring Period.

Following the close of the Monitoring Period, the Monitoring Team identified that ESU maintains a number of standalone CLOs, including use of specialized chemical agent tools like the Pepperball system, that must be reviewed and may need to be revised to align with the Use of Force Directive depending on the outcome of that assessment. ¶ 3(p) is therefore in Partial Compliance until these CLOs are reviewed and revised.

Going forward, the Department's implementation of these standalone policies will be discussed in regard to ¶ 1 of this section.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance<br>**¶ 3(a-o, q-t).** Substantial Compliance |

| ¶ 3(p). Partial Compliance |
|---|

## IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION)

¶ 4. After the adoption of the New Use of Force Directive, the Department shall, in consultation with the Monitor, promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive.

**ANALYSIS OF COMPLIANCE**

The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43). The Department will continue to reinforce the content of the policy through formal refresher training as required by Consent Judgment § XIII. (Training), ¶ 1(a)(ii), and through informal coaching, etc.

| **COMPLIANCE RATING** | ¶ 4. Substantial Compliance |
|---|---|

## 3.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Reporting use of force accurately and timely, and tracking trends over time are critical to the Department's overall goal of effectively managing use of force within the Department. The Use of Force Reporting and Tracking section covers three specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-6,[103] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).[104]

### *Alleged Use of Force*

Understanding the scope of the force utilized within the Department requires consideration of all force reported by Staff and any substantiated use of force allegations. Therefore, the Department separately tracks all allegations of uses of force, which are claims that Staff used force against an incarcerated individual and the force was not previously reported by

---

[103] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

[104] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.

Staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process. For this reason, data on alleged uses of force were not included in the UOF analysis discussed in the introductory section of this report.

The chart below demonstrates the annual number of allegations of UOF that were *reported* since January 2016. The number of allegations continues to decline year by year with 2020 having the lowest reported allegations of any full year since the start of the Consent Judgment.



While the frequency of allegations remains low and substantiated cases of unreported incidents, even lower, the most troubling uses of force are those that go unreported because the extent to which the force was unnecessary or excessive is never assessed. The improvements in more timely investigations, should over time, provide a more comprehensive and timely assessment of how many allegations of force are ultimately substantiated. For allegations reported on or after February 3, 2020 (the beginning of the Intake Squad), the Intake and/or Full ID investigations now track the outcomes of UOF allegations. From February 3, 2020 through

December 31, 2020 (the end of this Monitoring Period), 102 (60%) allegation cases of the 170 allegations reported in this period have completed Intake Investigations—93 closed following the completion of the Intake Investigation and nine closed as Full ID. Of the 102 completed allegation Intake Investigations, 95 cases were not substantiated (no unreported use of force occurred), 68 are still pending Full ID investigation, and 10 allegations were substantiated in whole or in part confirming an unreported use of force occurred. Most of the allegations substantiated in whole or in part of unreported uses of force were for minor uses of force that should have been reported but were not excessive or unnecessary. The Department's response to substantiated allegations is addressed in regard to ¶¶ 7 and 8 below.

_Assessment of UOF Data_

The Monitoring Team continues to closely assess the Department's use of force reporting mechanisms as described in the Third Monitor's Report (at pgs. 51-53). To date, the Monitoring Team has not identified evidence to suggest that there is a pattern or practice within the Department of manipulating UOF data. As part of the Monitoring Team's assessment, the Monitoring Team reviews any UOF incident that has been downgraded to a logbook entry after the incident was initially reported. This only occurred twice in 2017 and 2018 and did not occur at all in 2019 or in 2020. Also described in more detail below, the Monitoring Team has consistently found the Department properly classifies the vast majority of UOF incidents (§ VI. (Use of Force Investigations), ¶ 5).[105] The Department's reporting of UOF incidents is not only scrutinized internally and by the Monitoring Team but is also under significant scrutiny by various stakeholders (including the Board of Correction, DOI, and the local legislature). The

---

[105] The Monitoring Team's assessment of compliance with this provision is addressed in the Use of Force Reporting section of this report versus the Use of Force Investigation section for purposes of continuity.

Monitoring Team will continue to closely scrutinize the matter given the importance of accurate and transparent reporting.

The Monitoring Team's assessment of compliance is outlined below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 5 (CLASSIFICATION OF USE OF FORCE INCIDENTS) V. USE OF FORCE REPORTING AND TRACKING ¶ 12 (INJURY CLASSIFICATION)

¶ 5. The Department shall properly classify each Use of Force Incident as a Class A, Class B, or Class C Use of Force, as those categories are defined in the Department's Use of Force Directive, based on the nature of any inmate and staff injuries and medical reports. Any Use of Force Incident initially designated as a Class P shall be classified as Class A, Class B, or Class C within five days of the Use of Force Incident. If not classified within 5 days of the Use of Force Incident, the person responsible for the classification shall state in writing why the Use of Force Incident has not been classified and the incident shall be reevaluated for classification every seven days thereafter until classification occurs.

¶ 12. Medical staff shall advise a supervisor whenever they have reason to suspect that a Use of Force Incident was improperly classified, as those classifications are defined in the Department's Use of Force Directive. The medical staff member's supervisor shall then convey this information to the Tour Commander, who shall be responsible for providing the information to the Central Operations Desk ("COD").

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department immediately classifies all use of force incidents as Class A, B, C, or P[106] when an incident is reported to the Central Operations Desk ("COD").

- Once additional information is received (*e.g.,* results of a medical assessment), COD reclassifies incidents that were initially classified as Class P.

  - Following the initial classification of an incident, Intake Investigators, previously Preliminary Reviewers, continue to evaluate whether an incident may need to be re-classified as required by Consent Judgment § VII (Use of Force Investigations), ¶ 7(b).

  - If the Intake Investigation determines that an incident needs to be reclassified, the Bureau Chief of Security Office is advised to reclassify the incident.

- The Department utilized the revised Injury-to-Inmate form (updated in the Ninth Monitoring Period) in this Monitoring Period, which supports the new framework for confirming injury classification information, enabling input from H+H staff to inform injury classifications as required by ¶ 12 of Use of Force Reporting.

  - The goal of this form is to make sure that DOC and H+H are aligned on identifying and tracking serious injuries to incarcerated individuals, regardless of whether they were associated with a use of force incident. The form includes checkboxes of various injuries to help identify the types and severity of injuries.

---

[106] Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of report to COD to be classified as Class A, B, or C.

- H+H's revised witness reporting form (discussed in more detail ¶ 10 and 11 below) includes a checkbox and field to include a description of an injury resulting from a UOF, which they have reason to believe was improperly classified by DOC. In this Monitoring Period, H+H reported three such incidents.

- The Department's Bureau Chief of Facility Operations and Chief of Department's offices work together so that all Injury-to-Inmate reports are submitted by the Facilities timely on a shared computerized drive.

  - If H+H staff are unable to make a determination about the injury when the form is initially submitted because additional testing is needed, H+H marks the injury as "pending." H+H updates the Department on the outcome of the assessment once they obtain the final diagnosis.

  - At the beginning of each month, H+H sends reconciled data to DOC indicating injuries from the prior month that were deemed to be serious injuries. To the extent that injury data may need to be re-classified, the Department reports it works with all Tour Commanders so that the injury data is revised and classified appropriately with COD. The Department and H+H prepare monthly reports for the Board of Correction to document this process.

**ANALYSIS OF COMPLIANCE**

*Medical Staff - Injury Classification* (¶ 12)

This provision requires medical staff to advise their Supervisors (and subsequently the Department) if they believe that the injury classification for an incident is inaccurate. The processes outlined above, including collaboration between H+H and DOC, H+H's reporting form, and the monthly reporting, is sufficient for H+H to demonstrate compliance with ¶ 12 of Use of Force Reporting.

*Classification of UOF Incidents* (¶ 5)

The Monitoring Team continues to find that most use of force incidents are classified accurately, and that incidents initially designated as Class P are classified in a timely manner. As in prior Monitoring Periods, the Monitoring Team and Intake Investigators identified a small number of UOF incidents that were recommended for re-classification. However, the re-classification of this small number of incidents were not completed in a timely manner (despite significant encouragement from the Monitoring Team to do so) suggesting that the process for reclassification is not reasonable or reliable. Accordingly, the Department's compliance rating has changed from Substantial Compliance to Partial Compliance for the reasons outlined below.

- **Class P Assessment**

This provision requires all incidents to be classified based on the nature of any incarcerated individual and Staff injuries and medical reports, and classified or reclassified in a timely manner when injury information was not available at the time the initial classification determination was made. The Department has consistently demonstrated that most incidents are classified in a timely manner. Those incidents initially labeled Class P (*i.e.,* pending) were reclassified in a timely manner, consistent with findings from prior Monitoring Periods, as shown in the table below.[107] In the Eleventh Monitoring Period, all but 10 incidents were either classified or reclassified within the two-week period or less.[108] Accordingly, 99% of incidents were classified in the time period required.

| COD Sets[109] Reviewed | Mar. 2016 to July 2017 *2nd to 4th Monitoring Period* | Jan. to Dec. 2018 *6th & 7th Monitoring Period* | Jan. to Dec. 2019 *8th & 9th Monitoring Period* | Jan. to Dec. 2020 *10th & 11th Monitoring Period* |
|---|---|---|---|---|
| **Total Incidents Reviewed** | 2,764 | 929 | 1,052 | 1,094 |
| **Number of Incidents Classified Upon Call-In** | 1,519 (55%) | 540 (58%) | 589 (56%) | 585 (53%) |
| **Class P Incidents reclassified within COD Period** | 1,157 (42%) | 369 (40%) | 434 (41%) | 494 (45%) |
| **Incidents that were not classified within COD Period** | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) |

- **Reclassification of UOF Incidents**

In this Monitoring Period, 75 incidents (> 2% of all use of force incidents in the Monitoring Period) were identified for re-classification by either the Intake Investigator or the Monitoring Team. 61 (81%) of the 75 incident incidents were ultimately reclassified. The Department's decision not to reclassify the final 14 (19%) incidents appeared reasonable based on the information provided. The Monitoring Team has seen an improvement in Intake Investigators consistently evaluating and identifying misclassified incidents at the Intake Investigation stage (the majority of the 75 incidents identified in this Monitoring Period were identified by an Intake Investigator). However, when Investigators or the Monitoring Team submit requests for reclassification to the Bureau Chief of Security's office, these requests often go unaddressed for months. The Monitoring Team has communicated to the Department through numerous feedbacks and requests that the current reclassification process is too protracted and in need of improvement. Despite this feedback, over two

---

[107] As described in the Second Monitor's Report (at pg. 86), Third Monitor's Report (at pg. 133), and Fourth Monitor's Report (at pg. 124).

[108] The data is maintained in a manner that is most reasonably assessed in a two-week period. The Monitoring Team did not conduct an analysis on the specific date of reclassification because the overall finding of reclassification within two weeks or less is sufficient to demonstrate compliance.

[109] This audit was not conducted in the First or Fifth Monitoring Periods

monitoring periods, there has been no change in the process. While the number of incidents that require reclassification remain very low, it is critical that there is a process for reclassification when revisions are necessary. The overall reporting process is undermined if these changes are not made. Accordingly, the Monitoring Team strongly encourages the Department to implement a process to ensure that reclassification occurs in a timely manner. The Department's ongoing failure to address this issue has resulted in a Partial Compliance rating.

| COMPLIANCE RATING | ¶ **5.** Partial Compliance<br>¶ **12.** Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF)

¶ 1. Every Staff Member shall immediately verbally notify his or her Supervisor when a Use of Force Incident occurs.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive requires Staff to immediately notify his/her Supervisor when a use of force incident occurs.

- Form #5006-A (Use of Force Report) includes fields to capture this requirement, including a box to identify whether and which supervisor was notified before force was used, the name of any Staff Member who authorized and/or supervised the incident (if applicable), which supervisor was notified after the incident, and the time of notification.

- Almost 3,200 use of force incidents were reported by Supervisors to the Central Operations Desk in this Monitoring Period.

  o Nearly 9,000 use of force and witness reports were submitted for incidents occurring in this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

This provision requires Staff to verbally advise their Supervisor that a use of force incident occurred. Verbal notification triggers various reporting obligations, so in order to assess whether the verbal notification occurred, the Monitoring Team relies on written documentation that the incident was ultimately reported through the appropriate channels. The overall number of reported UOF incidents each Monitoring Period is significant. The fact that almost 3,200 uses of force were reported in the Eleventh Monitoring Period, most of which are reported within 2 hours to the Central Operations Desk by Supervisors on a daily basis demonstrate that Supervisors are generally notified when a use of force incident occurs. Further, the nearly 9,000 corresponding Staff reports (most of which are produced within 24 hours of the incident) support a finding that Staff regularly follow the requirements of this provision and, for the most part, they report when force is used or witnessed. Furthermore, the

Monitoring Team's review of UOF reports indicates that Staff routinely notify their supervisors when uses of force occur.[110]

In order to assess whether Staff are timely and reliably notifying a Supervisor of a UOF, the Monitoring Team also considers whether there is any evidence that Staff are *not* reporting force as required. The Monitoring Team evaluates the investigations of alleged use of force as well as any reports of use of force incidents from outside stakeholders (e.g., LAS and H+H). As discussed in more detail below, the number of use of force incidents that are found to be unreported are both small in number and generally represent minor uses of force.

The Monitoring Team reviews all investigations of alleged UOF. 853 (92%) of the 932 investigations of alleged use of force incidents that were reported between January 1, 2018 to December 30, 2020, have been closed as demonstrated in the chart below.

| Reported Allegations of Use of Force Incidents By Date Reported | | | | |
|---|---|---|---|---|
| Date Reported | 2018 | 2019 | 2020 | Total |
| Total Cases | 392 | 331 | 209 | 932 |
| Pending | 0 | 11 | 68 | 79 |
| Closed | 392 | 320 | 141 | 853 |
| *Closed with Charges or PDR* | *41* | *30* | *5* | *76* |
| *Closed without Charges or PDR* | *351* | *290* | *136* | *777* |

777 (91%) of the 853 closed cases were closed *without* charges for one of three reasons: (1) the investigation found that the incident was previously reported (as such the incident will be investigated as part of the reported case), (2) the investigation did not substantiate the allegation, and, (3) in at least some cases, the investigation may have found that Staff failed to report the use of force, but the reporting violation was minor and could be addressed with counseling or re-training. 76 (9%) of the 853 investigations were closed with formal charges or PDRs and covered 156 Staff Members (many of the cases had charges for multiple involved Staff Members). A review of a sample of the cases with charges revealed most charges were issued because either Staff failed to report a minor use of force incidents and/or other Staff misconduct was revealed in reviewing the allegation (*e.g.,* inefficient performance of duties). In a few rare cases the charges related to unreported uses of force that also involved the use of excessive or unnecessary force. These small number of cases represent the most

---

[110] UOF reports have previously been audited to determine whether Staff completed the relevant sections of the forms. The Monitoring Team found in previous Monitoring Periods that Staff completed the relevant section of the forms fairly consistently (*see* Third Monitor's Report, at pg. 54, and Fourth Monitor's Report, at pg. 49).

egregious violations of the Use of Force Policy and must be addressed. The Monitoring Team's assessment to date has not revealed that there is a pattern or practice of failure to report these types of cases.

The Intake Squad specifically tracks whether allegations are substantiated or not. From February 3, 2020 through December 31, 2020 (the end of this Monitoring Period), 102 (60%) of the 170 allegations reported in this period have completed investigations—93 closed following the completion of the Intake Investigation and nine closed following the Full ID investigation. Of the 102 completed allegation Intake Investigations, 95 cases were not substantiated (no unreported use of force occurred), 68 are still pending Full ID investigation, and 10 allegations were substantiated in whole or in part confirming an unreported use of force occurred. Most of the allegations substantiated in whole or in part of unreported uses of force were for minor uses of force that should have been reported but were not excessive or unnecessary. The Department's response to substantiated allegations is addressed in regard to ¶¶ 7 and 8 below.

The Monitoring Team also evaluates any reports submitted by H+H staff and the Legal Aid Society ("LAS") of potentially unreported uses of force to check that there is a corresponding investigation for each report. The incident is then evaluated to determine if it was originally reported by Staff, previously submitted by another source, or if the LAS or H+H report triggered an investigation into the incident. This Monitoring Period, H+H submitted 34 reports covering 25 distinct UOF incidents and LAS submitted 34 reports related to 36 distinct UOF incidents. Overall, almost all the use of force-related allegations made by H+H and LAS had been reported prior to the submission of the H+H or LAS report and had a corresponding investigation. Of the 25 use of force incidents related to H+H reports, all 25 were already under investigation by ID before the reports were submitted. Of the 36 use of force incidents related to allegations submitted by LAS, 34 already had an investigation by ID underway because they had been reported as actual uses of force by Staff through the normal reporting channels, one incident had an investigation opened following a report to 311 that came in before the LAS allegation, and finally one investigation was opened as a result of the LAS allegation. ID opened an investigation into the remaining LAS allegation that had not previously been reported or alleged.

The Department has achieved Substantial Compliance with this provision as Staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be relatively minor UOF incidents, and instances of unreported excessive or unnecessary force are rare. That said, even though the number of unreported UOF is low in comparison with the number of reported UOF, the Monitoring Team will continue to closely scrutinize allegations of UOF.

| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |
| --- | --- |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS)

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

¶ 3. All Use of Force Reports shall be based on the Staff Member's personal knowledge and shall include [. . . the specific information enumerated in sub-paragraphs (a) to (h).]

¶ 6. Staff Members shall independently prepare their Use of Force Reports based on their own recollection of the Use of Force Incident. Staff Members involved in a Use of Force Incident shall not collude with each other regarding the content of the Use of Force Reports, and shall be advised by the Department that any finding of collusion will result in disciplinary action. Staff Members involved in a Use of Force Incident shall be separated from each other, to the extent practicable, while they prepare their Use of Force Reports.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h) & 6.

### ANALYSIS OF COMPLIANCE

The Monitoring Team assesses compliance with ¶¶ 2, 3, & 6 together as these provisions, collectively, require Staff to submit independent and complete UOF reports. The Monitoring Team continued to review a significant number of Staff Reports as part of the Team's assessment of Preliminary Reviews, Intake Investigations, and Full ID Investigations. The sheer volume of reports submitted (nearly 9,000 reports in this Monitoring Period) demonstrate that many Staff are reporting as required. Further, the Monitoring Team's review of a large sample of reports demonstrate that Staff reports are generally independently prepared. The current review revealed the quality of reports remains mixed and Staff's practices are consistent with those from prior Monitoring Periods (*see* Ninth Monitor's Report at pgs. 89-91). The Monitoring Team continues to identify reports that are incomplete, inaccurate, or too vague. Some of these reporting issues are evidenced by the closed Intake Investigations. Of the 2,879 Intake Investigations closed in this Monitoring Period (covering incidents occurring between May and December 2020), 614 incidents (21%) were found to have involved report writing issues, as discussed in more detail in ¶ 8 below. The Monitoring Team continues to emphasize the importance of Staff describing their recollection of events in their *own* words and specifying the exact tactics that were utilized (*e.g.,* where on the inmate's body the Staff's hands or arms were placed). Accordingly, the Department is in Partial Compliance with these requirements.

| COMPLIANCE RATING | ¶¶ 2, 3, and 6. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

¶ 4. Staff Members shall prepare and submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force, and in no event shall leave the Facility after their tour without preparing and submitting their Use of Force Report, unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances, which shall be documented. The Tour Commander's permission shall be required for any Staff Member to leave the Facility without preparing and submitting his or her Use of Force Report. If a Staff Member is unable to write a report because of injury, the Staff Member must dictate the report to another individual, who must include his or her name and badge number, if applicable, in the report.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4.

- The *Nunez* Compliance Unit ("NCU") continues to audit the extent to which Staff Reports are submitted and uploaded within 24 hours of a use of force incident or within 72 hours of an allegation (additional time is allotted for a report stemming from an allegation because Staff may not be on tour when an allegation is received).[111]

- In this Monitoring Period, 8,762 (90%) of the 9,706 reports for actual UOF incidents were submitted within 24 hours and 62 (73%) of 85 reports for alleged UOF incidents were submitted within 72 hours.

- The table below demonstrates the number and timeliness of Staff reports for actual and alleged UOF from 2018 to 2020.

| | Actual UOF | | | Alleged UOF | | |
|---|---|---|---|---|---|---|
| Year | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |
| Jan. to Dec. 2018 | 15,172 | 12,709[112] | 83.77% | 139 | 125[113] | 89.93% |
| Jan. to Dec. 2019 | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| Jan. to Dec. 2020 | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |

---

[111] The standard for submitting reports related to allegations of UOF is a little more complicated. In these cases, the Staff Member must be advised that they need to submit a report, which is different from the reporting of an actual UOF incident in which Staff were present and presumably aware of their reporting obligation. The receipt of an allegation also does not necessarily coincide with when a Staff Member is on duty. Therefore, the Department set the standard that reports related to allegations should be submitted within 72 hours of the allegation to provide reasonable time for notification to Staff of their reporting requirement and to then submit the report.

[112] NCU began the process of auditing actual UOF reports in February 2018.

[113] NCU began collecting data for UOF allegations in May 2018.

**ANALYSIS OF COMPLIANCE**

The Department has demonstrated the timely submission of UOF reports within 24 hours since the Seventh Monitoring Period (the second half of 2018), which continued in this Monitoring Period. Overall, 8,824 (90%) of 9,791 of all UOF reports for actual or alleged incidents were submitted in the required time period. The ability to systematically track reports in a centralized system, combined with NCU's audits, and collaboration and coordination by Facility Staff, has supported sustained compliance with timeliness for reported UOF. Given the importance of investigating unreported UOF, the Monitoring Team will continue to closely scrutinize the submission of these reports.

Overall, the Department has continued to maintain a centralized, reliable, and consistent process for submitting and tracking UOF reports. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion, so the Department has maintained Substantial Compliance with this requirement.

| **COMPLIANCE RATING** | **¶ 4.** Substantial Compliance |
|---|---|

---

**V. USE OF FORCE REPORTING AND TRACKING ¶ 5 (PROHIBITION ON REVIEWING VIDEO PRIOR TO WRITING UOF REPORT)**

¶ 5. Staff Members shall not review video footage of the Use of Force Incident prior to completing their Use of Force Report. If Staff Members review video footage at a later time, they shall not be permitted to change their original Use of Force Report, but may submit a supplemental report upon request.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive prohibits Staff from reviewing video of a use of force incident prior to completing their use of force report.

- There is a limited exception to this prohibition during the first 90 days ("90-day grace period") body-worn cameras ("BWCs") are in use at each Facility. During this 90-day grace period, Staff may request[114] to review their BWC before writing their reports. The 90-day grace period was afforded when the BWC pilot was initiated at GRVC in October 2017 (as discussed in the Fifth Monitor's Report at pg. 85) and to NIC (which began in May 2020) and RNDC and RMSC (which began in July 2020) and AMKC (which began in December 2020). The implementation of BWCs is discussed in the Video Surveillance section of this report (¶ 2(a) to (c)).

---

[114] During the 90-day grace period Staff must inform the Tour Commander that they want to review body worn camera footage, the Tour Commander must then communicate with the Warden or Deputy Wardens' office and inform them that Staff would like to review Body Worn Camera footage. Finally, the Staff Member and Tour Commander would then arrange for the Staff Member to leave their post and to go Warden or Deputy Warden's office to review footage. Any footage review would have to be reviewed in the presence of staff from the Warden or Deputy Warden's office.

ANALYSIS OF COMPLIANCE

The Monitoring Team to date has not identified any evidence in Staff reports that suggest Staff are reviewing *Genetec or handheld video footage* of an incident prior to writing their Staff reports. This is not surprising given that access to Genetec and handheld video is not easily obtained for most Staff, as line Staff assigned to the housing units and most supervisors do not have assigned computer terminals. Further, the Genetec credentials needed to view and access video are limited.

The Monitoring Team also reviewed the reports of 20 cases with BWC footage spanning from August 2017 to January 2020 and did not identify any reports in which Staff reported that they reviewed the body worn camera footage prior to submitting the report or that suggested Staff had reviewed BWC footage prior to submitting their reports. That said, following the close of the Monitoring Period, a case occurred that demonstrated Staff had access to BWC footage outside of the authorized protocol and allowed Staff to review the BWC footage before and/or while Staff completed their reports as described below.

**Review of BWC Footage prior to Drafting UOF Reports**

- *90-Day Grace Period*

The Monitoring Team supported the Department's use of the 90-day grace period as BWCs were rolled out at Facilities because it supported Staff use of the BWC to gain familiarity and comfort with the technology and it was for a limited period of time. It was understood by Department leadership, and the Monitoring Team, that the only way to review BWC footage after it was taken is only after it has been downloaded to the system and Staff had to **request** to review BWC footage because the BWCs themselves did not have playback capability.

- *Review of BWC Footage Prior to Completion of UOF Reports*

Following the close of the Monitoring Period, Staff at GRVC were identified, following a UOF incident,[115] as having the ability to review and listen to BWC footage directly on their BWC after entering a passcode. Although Staff are not permitted by policy to review BWC footage before completing the reports, this incident revealed that Staff had the ability to do so on the BWCs. The passcode was not provided to Staff, however some Staff learned of the passcode and reviewed BWC footage while preparing their reports related to a UOF incident. There is currently no evidence of how widespread this practice was at GRVC or if it even occurred at the other Facilities with BWC footage

---

[115] The Monitoring Team evaluated the incident and Staff reports for this incident. The objective evidence demonstrated that Staff reviewed video footage prior to completing their reports and the fact that this footage was reviewed was not reported. That said, the content of the Staff Reports did not appear to have impacted the quality of the report as they were not substantially similar to one another and the language was generally vague with boiler-plate language (similar to the deficiencies identified in the majority of Staff Reports reviewed in this Agency).

(AMKC, NIC, RNDC, RMSC). In response to learning about this potential breach, the Department took a number of immediate steps: (1) immediately notified the Monitoring Team; (2) nine Correction Officers and one Captain were suspended (15 days for Officers and 14 days for the Captain) for their violation of policy; and (3) the Department evaluated the BWCs technology and took steps to ameliorate the functionality to review footage on the BWC—including temporarily removing all BWCs from GRVC and ultimately pushing through a software update to all BWCs utilized in the Facilities so the BWC footage can no longer be reviewed on the devices even with a passcode.

Therefore, while this issue is concerning, the Department's swift response to the Staff Members in question and elimination of this problematic functionality on the BWC Department-wide means the potential breaches were likely limited in scope, coupled with the fact that there was only a limited number of incidents captured on BWC that could have been impacted.[116]

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

| V. USE OF FORCE REPORTING AND TRACKING ¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS) & ¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE) |
| --- |

¶ 7. Use of Force Reports shall be reviewed by the individual assigned to investigate the Use of Force Incident to ensure that they comply with the requirements of Paragraphs 3 - 6 above, and that there is no evidence of collusion in report writing, such as identical or substantially similar wording or phrasing. In the event that there is evidence of such collusion, the assigned investigator shall document this evidence and shall undertake appropriate investigative or disciplinary measures, which shall also be documented.

¶ 8. Any Staff Member who engages in the Use of Force or witnesses a Use of Force Incident in any way and either (a) fails to verbally notify his or her Supervisor, or (b) fails to prepare and submit a complete and accurate Use of Force Report, shall be subject to instruction, retraining, or appropriate discipline, up to and including termination.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Investigators review all UOF Staff reports and UOF witness reports as part of Intake Investigations and ID investigations.

   o 614 of the 2,876 Intake Investigations closed this Monitoring Period (with incident dates ranging from May 2020 through December 2020) noted there was some type of report writing issue, which could range from minor violations to inaccurate, false or failure to report violations. The reporting violations identified are often for minor reporting violations, and may be addressed through recommendations for report writing re-

---

[116] At the time this issue was discovered (and ultimately resolved), the BWC were utilized at GRVC, NIC, RNDC, RMSC, and AMKC. AMKC was still under the 90-day-grace period. The 90-day-grace period at NIC, RNDC and RMSC was no longer in effect, but had lapsed between 2 and 3 months before this issue was identified.

training, or a Facility Referral, while other reporting violations may be addressed with
PDRs and/or charges.

- The Department's New Disciplinary Guidelines, and the New Use of Force Directive, address
  the requirements of ¶ 8.
  - Approximately 80 NPAs finalized in this Monitoring Period (covering incidents from
    July 2016 through August 2020) addressed inaccurate, false or failure to report
    violations.
  - Approximately 203 charges were brought against Staff in this Monitoring Period
    (covering incidents from November 2016 through October 2020) for inaccurate, false or
    failure to report violations.
- Over 400 Staff were recommended for report writing re-training this Monitoring Period by a
  combination of ID, Facility leadership and other stakeholders.

**ANALYSIS OF COMPLIANCE**

Staff who exaggerate, lie, or fail to report a use of force thwart the overall goal to assess each
use of force to determine whether force is only utilized when necessary. Accordingly, identifying and
addressing reporting violations (*e.g.,* inaccurate, misleading, and false reporting or failure to report) is
critical to maintaining integrity for reporting and investigating UOF incidents, which are the combined
requirements of ¶¶ 7 and 8.

- *Identifying Reporting Violations*

The Intake Squad, in addition to tracking and identifying substantiated allegations of force (as
noted in ¶ 1 above) in which Staff failed to report the incident in the first place, investigators evaluate
all use of force incidents for potential reporting violations by Staff. 614 of the 2,876 Intake
Investigations closed this Monitoring Period (with incident dates ranging from May 2020 through
December 2020) noted there was some type of report writing issue. It is important to note that these
findings mean that in at least 614 incidents that at least one Staff report submitted for those incidents
had an issue. In most incidents, multiple Staff reports are submitted and so these issues likely only
reflect a portion of the thousands of use of force reports that are submitted for these incidents. The
reporting issues that were identified range from failure to submit timely UOF reports before leaving the
Facility, to vague descriptions, inaccurate reports of the event, collusion in reporting, false reporting, or
deliberate failure to report certain events. Most of these 614 are for reporting violations were
appropriately addressed through recommendations for report writing re-training, or a Facility Referral,
with only a small number of these report writing issues rising to the level of requiring formal charges.
The Monitoring Team's routine assessment of all Intake Investigations has found that investigators are
more reliably and frequently identifying Staff reporting issues than previously. The Monitoring Team's
qualitative assessment of thousands of use of force reports suggests that Staff practices regarding

reporting has remained relatively constant over the last few years and that Staff's written description of incidents are mixed.

The most egregious reporting violations are those incidents which are deliberate failure to report cases. In particular, those incidents that were initially not reported by Staff, but were ultimately identified through an allegation report by an incarcerated individual, are the most concerning and are discussed below.

- _Addressing Failure to Report Cases_

The Monitoring Team closely analyzes investigations and discipline imposed for allegations where the review of video and other objective evidence strongly suggested that Staff _deliberately failed to report_ a use of force, to ascertain the reasonableness of the investigation outcomes and discipline (if any) given these are the most egregious reporting violations and therefore must be addressed appropriately.[117] As discussed in ¶ 1 above, the outcome of Intake Investigations tracks whether alleged incidents are substantiated or not. 102 (60%) of the 170 allegations reported since the inception of the Intake Squad on February 3, 2020 through December 31, 2020 (the end of the Eleventh Monitoring Period) have completed Intake Investigations. Of the 102 completed allegation Intake Investigations, 95 cases were not substantiated (no unreported use of force occurred), 68 are still pending Full ID investigation, and 10 allegations were substantiated in whole or in part confirming an unreported use of force occurred. The Monitoring Team reviewed the investigations for these 10 cases and found the investigations and the recommended corrective action was reasonable. In seven cases, the investigations identified that minor use of force, otherwise within guidelines, was used and not reported (_e.g._, light pushes, pulling, etc.), and re-training or counseling was the recommended corrective action to address that Staff did not report these incidents as required. In three cases charges were filed to address reporting failures, and in one of three cases there were also charges for excessive/unnecessary force for an Officer hitting an inmate with a rolled-up newspaper.

The Monitoring Team also reviewed the investigations for a sample of closed Full ID investigations of allegations that were completed in the Eleventh Monitoring Period that were _not substantiated_. These investigations were thorough and demonstrated an appropriate assessment of the available evidence to ascertain the veracity of the inmate's allegations and reach a credible conclusion that no unreported use of force occurred.

Finally, the Monitoring Team reviewed a sample of 30 completed investigations[118] of allegations that were reported in 2019 and 2020 in which ID referred the case for formal discipline, to

---

[117] In prior Monitoring Periods, the Monitoring Team reviewed the outcomes of investigations and discipline for incidents identified by the Monitoring Team or the Investigations Division that appeared the allegations would likely be substantiated. Overall, the Monitoring Team found the responses to those cases was reasonable—_see_ Tenth Monitor's Report at pgs. 89-90.

[118] These 30 cases involve the three cases referred above.

determine the type of misconduct that was identified in these investigations. The charges related to these 30 cases were for failure to report and inaccurate reporting, and only a small number of these 30 cases also had *additional* charges related to excessive force. The overwhelming majority of cases involved the failure to report minor uses of force such as soft-hand techniques, slapping or pushing, most of which was otherwise within guidelines. The fact that investigations are identifying and addressing even more minor reporting violations with charges demonstrates investigators take their obligation to identify and address reporting violations seriously.

Overall, it appears the Department is appropriately investigating and addressing cases in which Staff fail to report uses of force—particularly since the inception of the Intake Squad. For closed investigations, instances of Staff deliberately failing to report serious, unnecessary, or excessive force are rare. That said, more serious allegations of unreported use of force are likely those that require a Full ID investigation, and 68 Full ID investigations are still pending as described above. In cases in which a reporting violation has been substantiated, the Department recommended appropriate corrective action in the form of counseling, re-training, or disciplinary charges. With respect to the discipline imposed, the Monitoring Team has found that generally the discipline imposed for reporting violations proportional to the violation (which is a fact-specific assessment) and the individual's disciplinary history, however as discussed throughout this report, the imposition of *pending* formal discipline is languishing. The Department therefore remains in Partial Compliance

| **COMPLIANCE RATING** | **¶ 7.** Partial Compliance |
| | **¶ 8.** Partial Compliance |

### V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES)

¶ 9. The Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding use of force reporting that are consistent with the terms of the Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department's New Use of Force Directive addresses all requirements of the Consent Judgment § V (Use of Force Reporting and Tracking), ¶¶ 1-6, 8, 22 and 23.

**ANALYSIS OF COMPLIANCE**

This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses these requirements, and the "implement" component of this provision is assessed within the individual provisions in this report.

| **COMPLIANCE RATING** | **¶ 9.** Substantial Compliance |

### V. USE OF FORCE REPORTING AND TRACKING ¶¶ 10 & 11 (NON-DOC STAFF REPORTING)

¶ 10. The City shall require that Non-DOC[119] Staff Members who witness a Use of Force Incident to report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for providing the report to the individual responsible for investigating the incident. The City shall clearly communicate in writing this reporting requirement to all Non-DOC Staff, and shall advise all Non-DOC Staff that the failure to report Use of Force Incidents, or the failure to provide complete and accurate information regarding such Use of Force Incidents, may result in discipline.[120]

¶ 11. Medical staff shall report either to the Tour Commander, ID, the ICO, the Warden of the Facility, or a supervisor whenever they have reason to suspect that an Inmate has sustained injuries due to the Use of Force, where the injury was not identified to the medical staff as being the result of a Use of Force. The person to whom such report is made shall be responsible for relaying the information to ID. ID shall immediately open an investigation, to the extent one has not been opened, into the Use of Force Incident and determine why the Use of Force Incident went unreported.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for Staff reporting that address the requirements of ¶¶ 10 and 11 as described in the Ninth Monitor's Report at pgs. 96-97.

  o H+H Staff submitted a total of 34 reports in this Monitoring Period; 28 reports were H+H witness reports of UOF incidents and 6 reports relayed UOF allegations from an incarcerated individual.

  o The number of reports submitted by H+H staff since July 2017 is presented in the table below.

| Submission of H+H Staff Reports | | | | |
|---|---|---|---|---|
| | July to Dec. 2017 *5th MP* | Jan. to Dec. 2018 *6th & 7th MP* | Jan. to Dec. 2019 *8th & 9th MP* | Jan. to Dec. 2020 *10th & 11th MP* |
| *Grand Totals* | | | | |
| Toral Reports Submitted | 2 | 53 | 39 | 56 |
| Total UOF Incidents Covered | 2 | 53 | 38 | 46 |
| *Witness Reports* | | | | |
| Number of witness reports submitted | 0 | 29 | 18 | 45 |
| Number of actual or alleged UOF incidents covered by submitted reports | 0 | 31 | 15 | 36 |
| *Relayed Allegations from Incarcerated Individuals* | | | | |

---

[119] This definition includes Board of Education employees, as ordered by the court December 4, 2019 (*see* dkt. 334), and therefore "[a]ny Board employee who witnesses a Use of Force Incident must report the incident in writing directly to the area Tour Commander or to a supervisor who is responsible for investigating the incident. This shall include, but not be limited to, filling out the narrative section of any witness report."

[120] This language reflects the revised language ordered by the court May 14, 2018 (*see* dkt. 314), which removed language that only required Non-DOC Staff to report witnessing force that "resulted in an apparent injury."

| | | | | |
|---|---|---|---|---|
| **Number of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 |

- The Department of Education ("DOE") developed a training for Staff and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019 Court Order clarifying the requirement for DOE to submit reports (dkt. 334). The roll-out of this training and reporting requirement has been suspended since March 2020 due to COVID-19.

**ANALYSIS OF COMPLIANCE**

The City of New York is required to take steps so that non-DOC staff submit a report when they witness use of force incidents under ¶ 10 of this section of the Consent Judgment. Non-DOC Staff is defined as "any person not employed by DOC who is employed by the City or contracted by the City to provide medical and/or mental health care, social services, counseling, or educational services to Inmates." *See* Consent Judgment § III (Definitions), ¶ 22. The two largest groups of non-DOC staff who are present in the jails and may witness UOF and would need to report what they witnessed are H+H staff (who provide medical and mental health care in the New York City jails) and DOE Staff (who provided educational services to incarcerated individuals in the jails prior to COVID-19).[121] H+H has been working on the implementation of this requirement since 2017 and DOE has not yet implemented this reporting requirement due to COVID-19.

*Medical Staff Reporting* (¶¶ 10 & 11)

Medical and mental health staff (H+H) have a unique vantage point to observe UOF to the extent an incident occurs in an area where treatment is provided. Given H+H staff provide treatment to incarcerated individuals who may have been engaged in a UOF, they also may learn critical information about an incident (or that an incident even occurred) through the course of treatment. Therefore, H+H staff are a crucial group of non-DOC staff witnesses who are required to submit reports. Along with the requirements to report under ¶ 10, H+H staff must also report when they have reason to suspect that an incarcerated individual has sustained injuries due to the Use of Force and the injury was not identified to the medical staff as being the result of a Use of Force (¶ 11).

---

[121] The Monitoring Team no longer assesses ACS compliance with reporting obligations at HOJC pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).

The Monitoring Team reviewed all 34 H+H staff reports submitted to ID this Monitoring Period (28 reports appeared to describe an incident that was *witnessed* by the H+H staff and 6 reports appeared to relay a suspected or alleged UOF based on incarcerated individual interaction). The PDF-fillable form developed in the Ninth Monitoring Period continued to be used, and the Monitoring Team has found the quality of H+H's reports are much improved since these forms were implemented.

During this Monitoring Period H+H staff submitted 28 *witness* reports covering 20 unique use of force incidents. It is difficult to know whether H+H staff submitted reports in every incident witnessed, but there continues to be a disproportionate number of incidents occurring in medical treatment areas (at least 191 incidents occurred in clinics during this Monitoring Period) compared to the number of reports submitted. To assess whether H+H staff may have *witnessed* a use of force incident and failed to submit reports, the Monitoring Team reviewed 21 use of force incidents that occurred in clinic areas and no H+H staff reports were submitted and found the following:

- In 9 (43%) out of the 21 incidents it appeared Staff should have submitted reports and did not. In seven of the nine incidents there was video evidence that H+H staff witnessed the use of force and did not submit a witness report. In the remaining two incidents, there was no video evidence, but the ID investigation found that H+H staff were involved in the use force incident and failed to submit a report.
- Of the remaining 12 incidents (57%), H+H staff were not observed in the area to witness the use of force so reports would not be expected.

These findings confirmed that H+H staff do not witness all UOF incidents in clinic areas and so witness reports would not be expected for all incidents that occurred clinic areas. However, the findings also demonstrate H+H staff are not consistently reporting UOF incidents that are in fact witnessed.

The Monitoring Team shared the 9 incidents in which it appeared H+H staff did not submit reports as required with H+H Senior Leadership so that they can address the failure to report with the staff involved. H+H Senior Leadership reported that the staff involved in seven of the nine cases would be counseled. H+H reported that further follow up was needed in the two cases in which video evidence was not available to confirm that H+H staff were present, but ID's investigation confirmed they were involved in the incident. Continued efforts to ensure H+H staff report witnessing, or relaying use of force is necessary, and the Monitoring Team will continue to work collaboratively with H+H on this issue.

*DOE Staff Reporting*

DOE staff provide educational services to incarcerated individuals in certain DOC Facilities, including RNDC, RMSC, OBCC, and GRVC. However, in-person education services have been suspended since March 2020 due to COVID-19 as such implementing the training at this juncture is

not a prudent use of resources or focus. As a result, this provision is not rated as there are no DOE staff present in the jails and hence would not be a witness to a use of force incident.

*Incorporation of Non-DOC Reports in DOC Investigations*

Similar to the previous Monitoring Period, the Monitoring Team conducted a two-part assessment to determine whether (1) ID was analyzing submitted non-DOC staff reports in their investigations of those incidents and (2) whether non-DOC reports were included in the investigation file for incidents in which non-DOC staff submitted reports. The Monitoring Team found a small number of cases in which the file either did not have the non-DOC staff report even though it was submitted and/or it was not considered as part of the investigation. The Monitoring Team provided feedback to ID to reinforce the importance of incorporating non-DOC reports in the Use of Force investigation file and referencing them in the investigation.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 10.**<br>**(H+H)** – Partial Compliance<br>**(DOE)** – Not Rated<br>**¶ 11.** Partial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 13 (REPORTING OF EMERGENCY MATTERS)

¶ 13. Emergency matters involving an imminent threat to an Inmate's safety or well-being may be submitted at any time and shall be referred immediately to a Supervisor, who shall review the emergency matter with the Tour Commander as quickly as possible. If the Tour Commander determines that the safety or well-being of the Inmate may be in danger, the Department shall take any necessary steps to protect the Inmate from harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- H+H updated its use of force reporting policy and updated and rolled out a corresponding webinar training the Ninth Monitoring Period to address ¶ 13 of this section.

### ANALYSIS OF COMPLIANCE

This provision requires emergency matters involving an imminent threat to an incarcerated individual's safety or well-being to be reported. H+H updated their use of force reporting policy and rolled out a corresponding webinar training which highlighted this reporting requirement for their staff in the Ninth Monitoring Period. The policy and training establish that while the priority in emergency situations is to first ensure that the patient receives appropriate and timely medical care, including transfer to Urgicare or 911/Emergency if indicated, H+H staff are also expected to report emergency matters to their supervisor. The supervisor or H+H staff (if the supervisor is not available) will then report it to H+H Operations, and additional steps will be taken, if necessary, to address the imminent threat to the incarcerated individual's safety. For example, if a patient expresses fear for his/her safety because of threats from another person who is incarcerated, reporting that to a Supervisor would allow DOC leadership to consider placing the patient in Protective Custody. H+H has demonstrated

compliance with ¶ 13 by creating a discernable framework for their staff to follow in meeting this obligation and reinforcing this obligation through policy and training.

| COMPLIANCE RATING | ¶ 13. Substantial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[122]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- **Prompt Medical Attention (¶ 22)**:
  - The Department maintained Directive 4516R-B "Injury-to-Inmate Reports", which requires incarcerated individuals to be afforded medical attention as soon as practicable, and no more than four hours, following a UOF incident or fight between incarcerated individuals. The policy also sets forth guidelines for affording *expedited* medical treatment in certain circumstances in which incarcerated individuals appear to have specific conditions or complain of having such conditions (*e.g.,* loss of consciousness, seizures, etc.) to be produced directly to a clinic (and not taken to an intake location) following a UOF or fight between incarcerated individuals.
  - The Department's progress in providing timely medical care from January 2018 to December 2020 following a UOF are outlined in the table below. During the current Monitoring Period, there were 5,515 encounters related to a UOF and medical care was provided within four hours of a UOF in 82% of medical encounters, 10% of medical encounters occurred between 4 and 6 hours of the incident and 8% of medical encounters occurred beyond 6 hours.

| Wait Times for Medical Treatment Following a UOF | | | | | |
|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |

---

[122] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* dkt. 316).

| 2018 | 9,345 | 37% | 36% | 73% | 16% | 13% |
| 2019 | 11,809 | 43% | 38% | 81% | 11% | 9% |
| 2020 | 10,812 | 46% | 36% | 82% | 10% | 9% |

- **Tracking Medical Treatment Times (¶ 23)**:
  - NCU continued to track and analyze medical wait times for incarcerated individuals following a UOF.[123]
    - NCU tracks the medical wait times for each incarcerated individual involved in all reported UOF incidents using information from the Injury-to-Inmate Report.[124]

**ANALYSIS OF COMPLIANCE**

The Department must provide prompt medical attention following a use of force incident (¶ 22) and track its delivery (¶ 23). The Department has provided medical attention as soon as practicable for incarcerated individuals and documented these encounters since January 2018 (the Sixth Monitoring Period).

The overall goal of this provision is for the requirement of medical attention to occur as soon as possible. It is the Monitoring Team's understanding that the medical community does not have a generally accepted standard in which medical treatment must be provided. That said, in order to assess whether medical treatment is provided as soon as practicable, the Monitoring Team consulted with medical professionals who found four hours to be an adequate benchmark for assessment, with the understanding that deviations (within a few hours) from this benchmark does not necessarily suggest the time to provide medical treatment was inadequate. In this Monitoring Period, 82% of all medical encounters occurred within four hours and 92% of all medical encounters occurred within six hours. Accordingly, the vast majority of medical encounters occur as soon as practicable, and the Department has sustained providing prompt medical attention.

Prioritization of patient care is important and necessary. Therefore, it is critical that patients with severe injuries are prioritized and provided medical attention as soon as possible (generally in less than four hours) and therefore it is important to assess the medical encounters that occur after four

---

[123] It is important to note that this data only tracks when an incarcerated individual was seen and treated by medical staff in the clinic. This data does not capture de-contamination following OC spray exposure unless de-contamination occurred in the clinic. De-contamination of OC spray exposure generally occurs before the incarcerated individuals is taken to the clinic for medical assessment after a UOF either in intake or in a shower on the housing unit.

[124] A small number of Injury-to-Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

hours in order to determine whether incarcerated individuals who require prioritized medical treatment are seen as soon as possible. In total there were approximately 1,131 incarcerated individuals who received medical treatment in excess of four hours this Monitoring Period. NCU evaluated these cases and found that in the vast majority (over 900) either the incarcerated individual had no injuries or ultimately refused medical treatment.

NCU collects additional information for the small number of encounters in which an incarcerated individual received medical attention *beyond* four hours and had *sustained injuries*. Approximately 3% of all medical encounters in this Monitoring Period (about 148 cases) had an injury beyond exposure to OC spray (so would require treatment outside of de-contamination which generally occurs outside of the clinic) and were seen after four hours. Of this group only 6 incarcerated individuals who were seen more than four hours this Monitoring Period appeared to have had more serious injuries such as lacerations. Most incarcerated individuals in this group had minor injuries (*e.g.,* abrasions, swelling, contusions, neck/back pain). While these medical delays are outliers, they are the most concerning type of medical delay and therefore the Department's efforts to investigate these cases is important to determine whether Staff action/inaction caused the delay and to hold Staff accountable when warranted. Overall, the findings that the majority of cases are seen within four hours and that the cases with medical treatment beyond four hours do not involve more serious injuries suggests that adequate prioritization of medical treatment is in fact occurring.

The Department has achieved Substantial Compliance with both ¶¶ 22 and 23. Medical treatment is generally provided within a reasonable period of time and medical wait times are tracked in a centralized, systematic, and reliable manner.

| **COMPLIANCE RATING** | **¶ 22.** Substantial Compliance<br>**¶ 23.** Substantial Compliance |
|---|---|

### 4.  TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development and deployment of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility

Emergency Response training") (¶ 1(c)), Young Incarcerated Individual Management (¶ 3), Direct Supervision (¶ 4).

The focus during this Monitoring Period was deploying refresher trainings and continuing to provide training to Staff assigned to specific posts (*e.g.*, Probe Team Training, Cell Extraction Team Training, and provision of young adult-specific training to Staff at RNDC) given the majority of initial trainings required by the Consent Judgment have been deployed. The amount of training that could be deployed was limited due to COVID-19 and the associated State and City mandates to limit gatherings and encourage social distancing. As a result, the Department continued to provide training to Staff in smaller groups throughout this Monitoring Period. For instance, the Department provided pre-promotional training for 30 ADWs this Monitoring Period, whom were trained in three separate cohorts of 10 Staff to train in smaller class sizes. Additionally, the Department reports that, attrition and staff reassignment made it difficult to carry out the desired level of training during the Eleventh Monitoring Period. Specifically, 11 captains retired from the Department between March and September of 2020 and Training Division staff was often re-deployed to cover staff shortages in the Facilities rather than carry out their training duties. Finally, the Department focused efforts on optimizing the Learning Management System (LMS) which went live at the end of last Monitoring Period.

*Training Space & Dedicated Training Academy*

The Department's Training Academy space and conditions are severely lacking. The Department is now utilizing GMDC to provide additional training space, which was outfitted in the Eighth Monitoring Period to provide more room for training in the form of additional classrooms, computer labs, and realistic scenario-based training opportunities in dorm and cell housing blocks in the former Facility. That said, while the Department has developed some creative and workable solutions to its training space deficits, they do not fully mitigate the

Department's need for a dedicated and appropriate training space. Since the First Monitor's Report, the Monitoring Team has *strongly urged* the City to provide the Department with adequate training space as the deficiency in adequate training space impacts the Department's ability to train its Staff. The City has long reported a commitment to addressing the Department's inadequate training space, including the commitment of one hundred million dollars, in 2017, to fund a new training academy. However, almost four years have passed since the City committed funds to this initiative and the City has not made any progress in identifying an adequate solution to address the current issues with the Training Academy. The Monitoring Team continues to recommend the City prioritize the siting of the Academy given its importance to long-term reform.

Deployment of Advanced Correctional Techniques ("A.C.T")

The Department continued to deploy In-Service A.C.T. Training to Staff. As of mid-January 2021, over 9,000 Staff received A.C.T. training since March 2018—therefore, 93% of the Staff in the Department (9,713) who are available[125] for training have received it. Approximately 716 available Staff still require A.C.T. training, and of those remaining a significant number of personnel require only one or two specific days of the program (*e.g.,* they are missing one day of the three day Crisis Intervention and Conflict Resolution Training). In an effort to provide this training, the Academy continued to schedule/facilitate the comprehensive four-day program, while scheduling additional standalone days for those Staff who had only a portion of the training, and scheduled trainings on alternative tours/days (including weekends) to allow for more scheduling flexibility.

---

[125] Some Staff are not available for training because they are on some sort of leave or medical status and are not counted in the total Staff to be trained data.

Providing the tail end of this A.C.T. training has proven difficult. The complications in deploying this training have been exacerbated by COVID-19 because training was put on hold for the first few months of the pandemic and once in-person training began in August 2020, those classes were limited to groups of ten instead of twenty-five Staff. The Academy continues to work with the Monitoring Team to develop strategic and creative ways to meet these training needs. The majority of Staff who still require the training are mostly in posts that do not interface with incarcerated individuals on a regular basis—almost 300 of the remaining Staff to be trained are assigned to Headquarters, SOD, and the Transportation Division. Upon recommendation from the Monitoring Team, the Academy is focusing on prioritizing training for certain groups of Staff who either are more likely to engage with incarcerated individuals and/or involved in assessments of use of force incidents (*e.g.,* the uniformed Staff providing support to the Chiefs are a high priority of remaining Staff to receive this training due to the nature of their work). The Academy is working to finalize providing the A.C.T. for all remaining Staff by the end of the Twelfth Monitoring Period.

The Department's progress toward compliance with the training requirements is discussed in detail below. The status of development and deployment of initial and refresher training programs required by the Consent Judgment, and for the total number of Staff who attended each required training program during this Monitoring Period and since the Effective Date are outlined in *Appendix C: Training Charts*.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING)

¶ 1. Within 120 days[126] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.[127]

    a.    <u>Use of Force Policy Training</u>: The Use of Force Policy Training shall cover all of the requirements set forth in the New Use of Force Directive and the Use of Force reporting requirements set forth in this Agreement. The Use of Force Policy Training shall be competency- and scenario-based, and use video reflecting realistic situations. The Use of Force Policy Training shall include initial training ("Initial Use of Force Policy Training") and refresher training ("Refresher Use of Force Policy Training"), as set forth below.

        i.    The Initial Use of Force Policy Training shall be a minimum of 8 hours and shall be incorporated into the mandatory pre-service training program at the Academy.

            1.    Within 6 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all Supervisors.

            2.    Within 12 months of the Effective Date, the Department shall provide the Use of Force Policy Training to all other Staff Members.

        ii.    The Refresher Use of Force Policy Training shall be a minimum of 4 hours, and the Department shall provide it to all Staff Members within one year after they complete the Initial Use of Force Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

*Refresher Use of Force Policy Training* ¶ 1(a)(ii)

       The UOF Policy refresher training lesson plans for Staff and a separate curriculum targeting Supervisors were finalized during the Sixth Monitoring Period as required by ¶ 1(a)(ii). These trainings continue to be deployed as part of A.C.T., as described in the introduction above. This training had been provided to 93% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department will continue to provide A.C.T. to those who require it, albeit with COVID-19 related limitations to class sizes. The Department will also begin the next phase of refresher training, by incorporating the refresher training into the ongoing In-Service training curriculum to be provided at least every other year. The Training & Development Unit staff are consulting with the Monitoring Team on the planned rollout and any possible revisions to the curriculum that may be needed for future iterations of the refresher training.

| COMPLIANCE RATING | ¶ 1(a)(ii). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING)

---

[126] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[127] ¶ 1(a) and ¶ 1(a)(i) were placed in the status of "inactive monitoring" and ¶ 1(a)(i)(1) and (2) were terminated as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349).

¶ 1. Within 120 days[128] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    b.    <u>Crisis Intervention and Conflict Resolution Training</u>: The Crisis Intervention and Conflict Resolution Training shall cover how to manage inmate-on-inmate conflicts, inmate-on-staff confrontations, and inmate personal crises. The Crisis Intervention and Conflict Resolution Training shall be competency- and scenario-based, use video reflecting realistic situations, and include substantial role playing and demonstrations. The Crisis Intervention and Conflict Resolution Training shall include [. . .].[129]

        i.    The Initial Crisis Intervention Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.

        ii.    The In-Service Crisis Intervention Training shall be a minimum of 24 hours, unless the Monitor determines that the subject matters of the training can be adequately and effectively covered in a shorter time period, in which case the length of the training may be fewer than 24 hours but in no event fewer than 16 hours. All Staff Members employed by the Department as of the Effective Date shall receive the In-Service Crisis Intervention Training by May 31, 2019.[130]

        iii.    The Refresher Crisis Intervention Training shall be a minimum of 8 hours, and the Department shall provide it to all Staff Members within one year after they complete either the Initial Crisis Intervention Training or the In-Service Crisis Intervention Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

*<u>Initial and Refresher In-Service Crisis Intervention and Conflict Resolution Training</u> ¶ 1(b)(ii-iii)*

      The initial In-Service training of Crisis Intervention and Conflict Resolution Training continues to be deployed as part of A.C.T. This training had been provided to 93% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department continued to provide the training to those who require it on a more targeted basis this Monitoring Period, albeit with COVID-19 related limitations to class sizes. During this Monitoring Period, the Training & Development Unit continued planning for the development and deployment of Conflict Resolution and Crisis Intervention refresher training, including preparation of an initial draft of a refresher training lesson plan that is expected to be shared with the Monitoring Team for review and consultation in the Twelfth Monitoring Period.

| **COMPLIANCE RATING** | **¶ 1(b)(ii).** Substantial Compliance |
| --- | --- |
| | **¶ 1(b)(iii).** Requirement has not come due |

---

[128] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[129] ¶ 1(b)(i) was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349).

[130] This date includes the extension that was granted by the Court on April 24, 2018 (*see* dkt. 312).

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

¶1. Within 120 days[131] of the Effective Date, the Department shall work with the Monitor to [create] fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The content of these training programs shall be subject to the approval of the Monitor.

    c.   <u>Probe Team Training</u>: The Probe Team Training shall cover the proper procedures and protocols for responding to alarms and emergency situations in a manner that ensures inmate and staff safety. The Probe Team Training shall be a minimum of 2 hours, and shall be incorporated into the mandatory pre-service training at the Academy. By December 31, 2017,[132] the Department shall provide the Probe Team Training to all Staff Members assigned to work regularly at any Intake Post. Additionally, any Staff member subsequently assigned to work regularly at an Intake Post shall complete the Probe Team Training prior to beginning his or her assignment.

¶ 2. Within 120 days[133] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    b.   <u>Cell Extraction Team Training</u>: The Cell Extraction Team Training, including any revisions, shall cover those circumstances when a cell extraction may be necessary and the proper procedures and protocols for executing cell extractions, and shall include hands-on practice. The Cell Extraction Team Training shall be a minimum of 4 hours and shall be provided by December 31, 2017[134] to all Staff Members regularly assigned to Special Units with cell housing. The Cell Extraction Team Training also shall be incorporated into the mandatory pre-service training program at the Academy.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- See *Appendix C*.
- The identification and training of Staff for Facility Emergency Response and Cell Extraction trainings process recommenced in August 2020, following a temporary suspension in March 2020 due to COVID-19. A total of 536[135] Staff held posts that required Facility Emergency Response and Cell Extraction trainings.

### ANALYSIS OF COMPLIANCE

The Department now has a reliable process to identify Staff in the "identified posts for training" (as described below) who are required to receive Probe Team training (¶ 1(c)) (now called "Facility Emergency Response" training) and Cell Extraction training (¶ 2(b)) and schedule those Staff for training. This process, developed in the Eighth Monitoring Period, requires monthly coordination between Facility-based scheduling Officers and the Training & Development Unit Staff. This routine

---

[131] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[132] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

[133] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[134] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

[135] These rosters are perpetually changing with new and shifting assignment of Staff in these posts, so the targets of who to train change over the course of the Monitoring Period. The Monitoring Team analyzes compliance based on the end of the Monitoring Period as done with the analysis of other required trainings (Direct Supervision and SCM Training).

coordination is necessary because posts are frequently reassigned, so the Department must continuously track whether Staff currently assigned to the relevant posts require training, and then provide it to those who do.

_Background on Identified Posts for Training_

Under the Consent Judgment, Facility Emergency Response Training must be provided to all Staff assigned to work regularly at any Intake post, and Cell Extraction training (¶ 2(b)) must be provided to all Staff regularly assigned to Special Units with celled housing. In the Sixth Monitoring Period, the Department determined that a number of other Facility-specific posts including Intake, Security, Corridor, and Escort posts are the Staff most likely to serve on Facility Emergency Response Teams (previously known as Probe Teams) and Cell Extraction Teams (as described in the Sixth Monitor's Report at pg. 62) and therefore the training would be provided to all Staff in those identified posts for training (which is an expansion of the requirement under the Consent Judgment). The requirement to provide this training is driven by the Staff's post, but, as noted above in the report in regard to Remedial Order § A., ¶ 6, the Department has an ad hoc and chaotic approach to fielding Emergency Response Teams so not all Facility Emergency Response Team members may be in the identified posts for training. The Consent Judgment requirement appears to have recognized that identifying those who serve on these teams is not a straightforward assessment, as these teams were never staffed _exclusively_ by Staff assigned to the intake (which is the Consent Judgment standard), so it was not contemplated that all Staff who serve on these teams must receive the training. That said, it is important that as many Staff who may serve on the Facility Emergency Response Team in fact receive the appropriate training. Therefore, in addition to tracking training provided to Staff in the identified posts for training, the Monitoring Team also reviews the overall number of Staff in the Department that received the training.

_Probe Team Training_ (¶ 1(c))

The Department continues to maintain the eight-hour Facility Emergency Response training, which far exceeds the two-hour lesson plan required by this provision. It is included in the mandatory Pre-Service training for all recruits and in Pre-Promotional training and provided on a targeted basis as part of In-Service training to Staff when assigned to the identified posts for training. As of the end of the Monitoring Period, 473 of the 536 (88%) Staff in the identified posts for training received Probe Team training as recruits, in Pre-Promotional training or through In-Service training. This includes 34 Staff who received the In-Service training on a targeted basis in this Monitoring Period. Further, almost 50% of all active Staff in the Department have received Probe Team Training, so in combination with the approach for training those in the identified posts means that a large portion of Staff who field these teams will have received the required training. The Monitoring Team also reviewed the training records for a sample of Staff who recently responded to incidents as part of the

Facility Emergency Response Team and found that 70% of those Staff had received the required Probe Team training.

*Cell Extraction Training* (¶ 2(b))

The Cell Extraction Team training continues to be included in the mandatory Pre-Service training for all recruits and in Pre-Promotional Training and provided on a targeted basis as part of In-Service training to Staff when assigned to the relevant posts. As of the end of the Monitoring Period, 477 of the 536 (88%) Staff in the identified posts received Cell Extraction Training as recruits, in Pre-Promotional training or through In-Service training. This includes 22 Staff who received the In-Service training on a targeted basis in this Monitoring Period.

*Revisions to Course Evaluations*

Probe Team Training and Cell Extraction Team training both have a physical evaluation component in which instructors evaluate whether participants demonstrated proficiency in a range of skills during the course. Probe Team Training also includes a written evaluation for participants. The Department has worked to improve the evaluations at the end of these trainings in two ways. First, the Academy created a more succinct and relevant written evaluation for Probe Team Training that is expected to be implemented in the next Monitoring Period. Second, the Academy developed and rolled out a qualitative feedback tool (piloted during Cell Extraction Training in the Eleventh Monitoring Period), which is designed to evaluate the effectiveness of the course in preparing Staff for participating in Cell Extraction Teams and Probe Teams and identifying areas of needed improvement. Unlike a performance evaluation, this feedback is not designed to gauge an individual Staff Members participation in the course, but rather is intended to identify whether additional enhancements to the course content may be necessary. While not required by the Consent Judgment, the Monitoring Team appreciates this initiative, as the Academy reported learning valuable information and insight from this tool and plans to continue using it for Probe Team and Cell Extraction Team trainings going forward.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(c). Probe Team Training (Pre-Service)** Substantial Compliance (as per Eighth Monitor's Report)<br>¶ **1(c). Probe Team Training (In-Service)** Substantial Compliance<br>¶ **2(b). Cell Extraction Training (Pre-Service)** Substantial Compliance (as per Eighth Monitor's Report)<br>¶ **2(b). Cell Extraction Training (In-Service)** Substantial Compliance |

## XIII. TRAINING ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

¶ 2. Within 120 days[136] of the Effective Date, the Department shall work with the Monitor to strengthen and improve the effectiveness of the existing training programs [to] include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students.

    a.   <u>Defensive Tactics Training</u>: Defensive Tactics Training, including any revisions, shall cover a variety of defense tactics and pain compliance methods, and shall teach a limited number of techniques to a high level of proficiency. The Defensive Tactics Training shall be competency- and scenario-based, utilize video reflecting realistic situations, and include substantial role playing and demonstrations. The Defensive Tactics Training shall include initial training ("Initial Defensive Tactics Training") and refresher training ("Refresher Defensive Tactics Training"), as set forth below.

        i.   The Initial Defensive Tactics Training shall be a minimum of 24 hours, and shall be incorporated into the mandatory pre-service training program at the Academy.[137]

        ii.   The Refresher Defensive Tactics Training shall be a minimum of 4 hours, and shall be provided to all Staff Members on an annual basis.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C.*

**ANALYSIS OF COMPLIANCE**

*Initial In-Service, and Refresher Defensive Tactics Training ¶ 2(a)(ii)*

Although not required by the Consent Judgment, the Department provided an initial In-Service three-day Defensive Tactics course to all Staff as part of S.T.A.R.T. A refresher training lesson plan for Staff was finalized during the Sixth Monitoring Period, and as discussed above, continues to be deployed as part of A.C.T. This training had been provided to 93% of line Staff and all Supervisors, demonstrating Substantial Compliance with this requirement. The Department will continue to provide the training to those who require it during the Twelfth Monitoring Period.

The Department and Monitoring Team continue to work together to plan for the next phase of refresher training which will be incorporated into ongoing In-Service training curriculum and provided yearly. To that end, the Training & Development Unit staff developed, and consulted the Monitoring Team on an eight-hour Defensive Tactics Refresher Lesson Plan. This training builds upon the refresher curriculum in A.C.T. training and provides an additional four hours of training (the current refresher was four hours). This revised refresher training was bolstered with additional topics of focus to re-enforce tactics taught in the initial training, provide greater time to practice techniques (which supports development of physical skills), and addresses areas of operational deficiencies identified by the Monitoring Team (*e.g.*, how to properly escort incarcerated individuals and avoid the use of painful escort techniques). The Monitoring Team is consulting with the Training & Development Unit staff

---

[136] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[137] ¶ 2(a)(i). was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349).

| regarding the planned rollout for this new iteration of the refresher training as the initial A.C.T. deployment concludes. |
| --- |

| **COMPLIANCE RATING** | **¶ 2(a)(ii).** Substantial Compliance |
| --- | --- |

## XIII. TRAINING ¶ 3 (YOUNG INCARCERATED INDIVIDUAL MANAGEMENT TRAINING)

¶ 3. The Department shall provide Young Inmate Management Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. The Young Inmate Management Training shall include fully developed lesson plans and teaching outlines, examinations, and written materials, including written scenarios and exercises, to be distributed to students. The Young Inmate Management Training shall provide Staff Members with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. This training shall be competency-based and cover conflict resolution and crisis intervention skills specific to the Young Inmate population, techniques to prevent and/or de-escalate inmate-on-inmate altercations, and ways to manage Young Inmates with mental illnesses and/or suicidal tendencies. The Young Inmate Management Training shall [. . .]

    a.    The Initial Young Inmate Management Training shall be a minimum of 24 hours. The Department shall continue to provide this training to Staff Members assigned to regularly work in Young Inmate Housing Areas. Within 60 days of the Effective Date, the Department shall provide the Initial Young Inmate Management Training to any Staff Members assigned to regularly work in Young Inmate Housing Areas who have not received this training previously. Additionally, any Staff Member subsequently assigned to work regularly in a Young Inmate Housing Area shall complete the Initial Young Inmate Management Training prior to beginning his or her assignment.[138]

    b.    The Department will work with the Monitor to develop new Refresher Young Inmate Management Training, which shall be a minimum of 4 hours. For all Staff Members assigned to work regularly in Young Inmate Housing Areas who received this type of training before the Effective Date, the Department shall provide the Refresher Young Inmate Management Training to them within 12 months of the Effective Date, and once every two years thereafter. For all other Staff Members assigned to work regularly in Young Inmate Housing Areas, the Department shall provide the Refresher Young Inmate Management Training within 12 months after they complete the Initial Young Inmate Management Training, and once every two years thereafter.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C*.
- The Department has focused on providing "Unit Management Training" which provides a broader skill set for the refresher training requirements and began deploying the Unit Management Training to all RNDC Staff in this Monitoring Period. Of the 1,073 Staff assigned to RNDC and available for training,[139] 881 (82%) received the Unit Management training this Monitoring Period.

**ANALYSIS OF COMPLIANCE**

---

[138] ¶ 3(a). was placed in the status of "inactive monitoring" as of January 1, 2020, as per the Court's August 14, 2020 Order to Terminate, Amend Monitoring, or Hold in Abeyance Certain Enumerated Provisions of the Consent Judgment (dkt. 349).

[139] 55 Staff were unavailable for training due to their status (*e.g.* TDY outside of the Facility, on leave, etc.).

*Young Inmate Management Refresher Training* ¶ 3(b)

The Department began providing the Unit Management Training[140] to all Staff at RNDC this Monitoring Period. This training focuses on basic operational practices, functioning as a consistent unit team, proactive supervision, and de-escalation. It familiarizes participants with new roles and responsibilities for Unit Managers, Captains, and line Staff. Finally, it provides instruction in using the system of incentives and consequences (as required by Remedial Order § D(2)(iii)) discussed in detail in the "Current Status of 18-Year-Olds Housed on Rikers Island" section of this report. The Department rolled out Unit Management to most RNDC Staff this Monitoring Period (82% as noted above) and made substantial progress in a short period of time. In order to accomplish this, the Academy facilitated the Unit Management module to run four times per day (and on weekends) and, part way through the Monitoring Period, began providing the training in the RNDC school space so it was easier for the Facility to schedule their Staff to attend the training module. The Department will provide the remaining RNDC Staff with this training in the Twelfth Monitoring Period, and will also provide the training to newly assigned RNDC leadership who have not already received the training (the new Warden assigned in the Twelfth Monitoring Period was previously trained in Unit Management, but some newly assigned Deputy Wardens require the training).

| COMPLIANCE RATING | ¶ 3(b). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

¶ 4. Within 120 days[141] of the Effective Date, the Department shall work with the Monitor to develop a new training program in the area of Direct Supervision. The Direct Supervision Training shall cover how to properly and effectively implement the Direct Supervision Model, and shall be based on the direct supervision training modules developed by the National Institute of Corrections.

      b.    The Direct Supervision Training shall be a minimum of 32 hours.

      c.    By April 30, 2018,[142] the Department shall provide the Direct Supervision Training to all Staff Members assigned to work regularly in Young Inmate Housing Areas. Additionally, any Staff member subsequently assigned to work regularly in the Young Inmate Housing Areas shall complete the Direct Supervision Training prior to beginning his or her assignment.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See *Appendix C*.

---

[140] *See* Tenth Monitor's Report at pg. 101 for full background on the transition from SCM Refresher Training to the Unit Management Training.

[141] This date includes the extension that was granted by the Court on January 6, 2016 (*see* dkt. 266).

[142] This is the extension granted by the Court on April 4, 2017 (*see* dkt. 297).

- The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most 18-year-old incarcerated individuals are housed,[143] not just to those regularly assigned to work in Housing Areas with 18-year-old incarcerated individuals, as required by the Consent Judgment.
- As of mid-January 2021, 1,060 of the 1,073 (99%) available Staff assigned to RNDC received Direct Supervision Training.

**ANALYSIS OF COMPLIANCE**

The Department's Direct Supervision training program for In-Service Staff and recruits meets the requirements of the Consent Judgment ¶ 4 and ¶ 4(a). As of mid-January 2021, 99% of Staff assigned to RNDC received the Direct Supervision training as In-Service Training or as Recruits. The Deputy Warden and Warden received the training in this Monitoring Period as well. Going forward, the Department must continue to provide this training to any newly assigned Staff (or leadership) at RNDC.[144]

The Department has achieved Substantial Compliance with this requirement.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **4.** Substantial Compliance<br>¶ **4 (a).** Substantial Compliance<br>¶ **4 (b).** Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

¶ 2.

e. There shall be trained operators of handheld video cameras at each Facility for each tour, and there shall be trained operators in ESU. Such operators shall receive training on how to properly use the handheld video camera to capture Use of Force Incidents, cell extractions, Probe Team actions, and ESU-conducted Facility living quarter searches. This training shall be developed by the Department in consultation with the Monitor. The Department shall maintain records reflecting the training provided to each handheld video camera operator.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain the "Handheld Video Recording Equipment and Electronic Evidence" Directive 4523 that incorporates the training requirements outlined in the Consent Judgment ¶ 2(e).

---

[143] RNDC housed adolescent incarcerated individuals until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old incarcerated individuals until June 2018 when the Facility was closed and 18-year-old incarcerated individuals were subsequently moved to RNDC.

[144] A new Warden was assigned to RNDC early in the Twelfth Monitoring Period who will need to receive Direct Supervision Training.

- The Department developed a stand-alone Handheld Camera Training Lesson Plan that was incorporated into the mandatory Pre-Service training, beginning with the class that graduated in November 2017.

- The Department provided the stand-alone Handheld Camera Training Lesson Plan to ESU, ESU support, and K-9 unit Staff during prior Monitoring Periods.

- The Department has incorporated guidance on handheld camera operation into the Facility Emergency Response (Probe Team) Training materials.

- The Department previously deployed a separate short training and lesson plan with instructions for Staff on saving and uploading handheld video to the Department's main computer system.

**ANALYSIS OF COMPLIANCE**

The Monitoring Team has chosen to address this provision in this section rather than in the Video Surveillance section because it is more aptly considered along with the Department's other training obligations.

The Department provided the standalone handheld camera training to all active ESU Staff during the Sixth Monitoring Period and provides the training to all recruits. As of the Ninth Monitoring Period, 105 of 114 (92%) Staff assigned to ESU received the training as Recruits or in In-Service Training during prior Monitoring Periods. Further, as noted in *Appendix C,* 5,926 Staff have received the Facility Emergency Response training either as recruits or In-Service Staff, which also includes training on the operation of handheld video cameras. The Monitoring Team has generally found that handheld video is available for incidents where it is required. To the extent issues have been identified with handheld video, problems do not appear to be related to a Staff Member's lack of training on how or when to utilize a handheld camera.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

¶ 5. Whenever a Staff member is found to have violated Department policies, procedures, rules, or directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of Use of Force Incidents and retention of any use of force video, the Staff member, in addition to being subject to any potential disciplinary action, shall undergo re-training that is designed to address the violation.

    a.    Such re-training must be completed within 60 days of the determination of the violation.
    b.    The completion of such re-training shall be documented in the Staff Member's personnel file.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to utilize the Service Desk, a computerized re-training request system, for requesting and tracking re-training requests.

- Operations Order 13/18, "Academy Training Service Desk," that governs the use of the Service Desk, remains in effect. The policy mandates that all re-training required as a result of a Use of Force incident must be entered into and tracked through the Service Desk.
- The Training & Development Unit Staff and the Staff Member's assigned command are responsible for tracking the status of all training entered into the Service Desk so that it is completed. The Service Desk ticket should be closed only after the Training & Development Unit Staff confirms that the Staff Member has successfully completed the re-training program.

## ANALYSIS OF COMPLIANCE

The Department can now systematically identify Staff that require re-training. The Department continues to implement the Service Desk. This tool provides a centralized repository to identify and track Staff who have been recommended for re-training and it has the ability to run aggregate reports. The Service Desk is an online portal accessible to Facility Staff, civilian leadership, and the Training & Development Unit Staff. When an individual is recommended for re-training, the recommendation is entered into the system and then can be tracked to completion. The system is then updated when the Staff Member receives the re-training.

- *Re-Training Recommendations & Tracking*

During this Monitoring Period, 1,432 re-training requests were made via the Service Desk, compared to 995 in the Tenth Monitoring Period, and 839 Staff during the Ninth Monitoring Period. The table below depicts the number of re-training recommendations by month, along with the proportion of re-training that was provided as of January 2021.

| Re-Training Tracking – 2020<br>*As of January 2021* | | | |
|---|---|---|---|
| **Month of Request** | **Number of Re-Training Requests** | **Trained/Closed** | **Open or Pending Tickets** |
| *10th Monitoring Period* | *995* | *978* | *17* |
| July 2020 | 344 | 212 | 132 |
| August 2020 | 146 | 72 | 74 |
| September 2020 | 235 | 49 | 186 |
| October 2020 | 253 | 17 | 236 |
| November 2020 | 243 | 15 | 228 |
| December 2020 | 211 | 8 | 203 |
| *11th Monitoring Period* | *1432* | *373* | *1059* |
| **2020 Grand Total** | **2427** | **1351[145]** | **1076** |

---

[145] 177 of these requests were closed with no re-training provided because the requests were duplicates or the Staff Member resigned/retired.

During the Eleventh Monitoring Period, ID requested the majority of re-training (60%), followed by requests from the Facilities (32%), and other sources such as the Trials Division (4%). Of the re-training requests from ID, the majority are the result of the Intake Investigation. The Facilities requested many more Staff for re-training this Monitoring Period (460) compared with last Monitoring Period (~130) through Rapid Reviews, demonstrating increased recommendations for re-training in this Monitoring Period likely due to the revised Rapid Review template which now includes a specific prompt to consider re-training as a potential corrective action when violations are identified. The top four courses recommended for Staff re-training were Use of Force Report Writing (30%), Use of Force (24%), Situational Awareness (15%), and Chemical Agents (13%).

- *Timing of Re-Training*

This Monitoring Period, the Department fulfilled 821 re-training requests (539 of those fulfilled were requested between January and June 2020, and 282 of those fulfilled were requested in the Eleventh Monitoring Period). Of the 821 re-training requests fulfilled in the Eleventh Monitoring Period, 348 (42%) received the re-training within 60 days of the request. Of the 1,076 pending requests, 645 (60%) are pending beyond 60 days of the request date as of January 2021.

The Department is unable to keep up with the volume of re-training requests. The volume of re-training requests has also been steadily increasing, with almost 450 more re-training requests made this Monitoring Period compared with last Monitoring Period. There is now a backlog of over 1,000 re-training requests made in prior months, therefore the Department is in Non-Compliance with the required timeframes to provide re-training.

The Monitoring Team and Academy worked together at the end of the Eleventh Monitoring Period to develop a plan to address the re-training backlog. The goal was to address the backlog, while prioritizing the new re-training requests to ensure those trainings are provided more contemporaneously (*e.g.,* within 60 days of the request as required by the Consent Judgment). Of those cases in the backlog, the goal will be to prioritize providing re-training from the backlog for (1) those incidents that are closer in time; and (2) requests for substantive use of force-related re-training. The Monitoring Team is supportive of this approach, which will be finalized and implemented in the Twelfth Monitoring Period.

- *Quality of Re-Training*

The overall goal of re-training Staff is to provide additional guidance and clarity to support improved practice given the recommendation is based on an identified deficiency. The Training & Development Unit leadership reported that re-training is deployed separately from typical training courses on the same topics and are held with Staff individually or in small groups. The re-training is often conducted by Mentor Captains at the Facility, which allows for more flexibility in providing tailored training. The Academy leadership reports that they provide the basis for Staff's recommendation for re-training (which is included in the re-training request) to the trainer so that these

issues can be considered and/or used in the re-training sessions to address the specific issues of the Staff Member. Efforts are also made to group Staff in re-training sessions who had similar UOF violations for efficiency and to allow similar issues to be addressed in the same class.

During this Monitoring Period, the Academy analyzed the re-training process to determine how to improve the quality of the re-training. One area that significantly impacts the Academy's ability to provide adequate and tailored re-training is the detail provided in the re-training request to ensure there is an adequate description of the issue that needs to be addressed. To that end, the Academy worked closely with ID, which is the source of the majority of retraining requests, to improve and develop a revised form for requesting re-training to encourage improved detail on the potential violations that need to be addressed. These revised forms are intended to leverage the work of the Intake Investigation and provide improved detailed information regarding the issue the re-training is recommended to address, and, as relevant, references to the specific video angles and times of the UOF incident depicting the violation. The Mentor Captains can then use this additional detail, including incident videos, as a resource during the training itself. The Academy also shared information with ID on the specific types of re-training courses that are available so that ID investigators may recommend courses that are more tailored to the identified violation. The revised form was implemented in the beginning of the Twelfth Monitoring Period. The Academy reported it will similarly work with Facility Leadership in the Twelfth Monitoring Period to improve the information provided with re-training recommendations, given Rapid Reviews are the second most significant source of re-training requests.

Overall, there is a now a reliable system in place to identify, track, and provide re-training, but the backlog in re-training requests is problematic. The tracking of re-training remains consistent and improved from the issues identified in prior Monitoring Periods. However, the backlog of re-training requests means that most re-training is not provided within 60 days of the request as required by the Consent Judgment. The growing backlog is of concern to the Monitoring Team and could impact the Department's ability to maintain compliance with the overall requirements of ¶ 5 if left unaddressed in the Twelfth Monitoring Period.

| COMPLIANCE RATING | ¶ 5. Partial Compliance |
| | ¶ 5(a). Non-Compliance |
| | ¶ 5(b). Partial Compliance |

## XIII. TRAINING ¶¶ 6, 7 & 8 (TRAINING RECORDS)

¶ 6. After completing any training required by this Agreement, Staff Members shall be required to take and pass an examination that assesses whether they have fully understood the subject matter of the training program and the materials provided to them. Any Staff Member who fails an examination shall be given an opportunity to review the training materials further and discuss them with an appropriate instructor, and shall subsequently be required to take comparable examinations until he or she successfully completes one.

¶ 7. The Department shall require each Staff Member who completes any training required by this Agreement to sign a certification stating that he or she attended and successfully completed the training program. Copies of such certifications shall be maintained by the Department for the duration of this Agreement.

¶ 8. The Department shall maintain training records for all Staff Members in a centralized location. Such records shall specify each training program that a Staff Member has attended, the date of the program, the name of the instructor, the number of hours of training attended, whether the Staff Member successfully completed the program, and the reason the Staff Member attended the program.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department implemented the Learning Management System ("LMS") at the end of the Tenth Monitoring Period, which is a centralized system that will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all *Nunez*-required trainings.

- **Attendance Tracking**: There are three types of attendance tracking used by the Department as described below. This Monitoring Period, due to the continued transition to LMS, a combination of these attendance tracking methods were utilized.

  - **Hand-Written Sign-in Sheets**

  - **TTS**: Training Tracking Software ("TTS") has been used as an interim solution to track deployment of training. The Department's IT Division developed the software in-house to certify attendance for all recruit trainings and all *Nunez*-required In-Service and Pre-Promotional trainings. TTS scans Staff's identification cards in the classrooms and then this information is manually transferred to the Academy's e-scheduling software, which records attendance information for individual Staff in an electronic transcript.

  - **RapidLD**: This technology scans the Staff Member's badge and will ultimately replace TTS and be integrated with LMS. This technology will be able to accommodate both Staff who are pre-scheduled for training and those Staff that may walk-in to a training, and incorporate custom fields to display the Staff's shield numbers and rank (where applicable) upon scanning into active training sessions.

- **Examination Tracking**:

  - **Pre-Service**: Examinations for all *Nunez*-required Pre-Service courses are taken using a tablet and the results are tracked in Excel.

  - **In-Service and Pre-Promotional**: In-Service exams are administered on paper or involve physical skill assessments administered by the instructor with the results captured on paper.

**ANALYSIS OF COMPLIANCE**

*Review of Examination and Attendance Records* (¶¶ 6 & 7):

    ¶¶ 6 and 7 requires all Staff Members who complete the *Nunez*-required trainings to pass an examination at the conclusion of the training program (¶ 6) and that the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). Over the last few Monitoring

Periods the Department has demonstrated continued improvement in maintenance of attendance and examination records. The launch of LMS has required a transition to new methods of attendance tracking. The Department had been using electronic TTS for attendance tracking prior to LMS's rollout, and is now transitioning to using RapidLD which is a new electronic attendance tracking method. However, during the transition hand-written sign-in sheets were again employed instead of the more sophisticated electronic tracking (*e.g.,* all training for pre-promotional ADWs was tracked using handwritten sign-in sheets). That said, these sign-in sheets were available and provided to the Monitoring Team and appear to be in order.

The Monitoring Team reviewed a number of LMS-generated reports of attendance that were consistent with the information reported on an ad-hoc basis regarding post-specific training provided this Monitoring Period. The electronic tracking in LMS generally matched a sample reviewed for Staff who received Cell Extraction and Probe Team Training this Monitoring Period as well as those who received Direct Supervision Training. 44 of the 50 attendance records reviewed (88%) matched the routine reporting provided previously by the Department. It was determined that manual entry error caused the discrepancies for the six records that did not match.

Based on the consistent results of this review, and only minor deficiencies, which are expected to be addressed through the improved implementation of LMS, the Department has maintained Substantial Compliance with these provisions.

*Centralized System to Maintain Training Records* (¶ 8):

The Department utilized LMS throughout the Monitoring Period since it was implemented at the end of the last Monitoring Period. The user-facing platform is referred to as "Cornerstone." The Department has provided multiple reports to the Monitoring Team generated through this new system, demonstrating its ability to aggregate and provide critical training records (including on historical trainings provided before the implementation of LMS). However, the full functionality of LMS is still in progress and being implemented in phases. For example, the Department is still working on rolling out the system functionality that will allow Staff to be scheduled for training within the system (and consider the training needs of their posts in relation to this scheduling). Additionally, new or different Training Programs that were developed and rolled out in this Monitoring Period were not incorporated in to the LMS technology because the course names had not been uploaded into the system yet (for example, all ADW pre-promotional training courses were tracked using the handwritten sign-in sheets), and those attendance records will be manually entered into LMS for electronic record-keeping going forward.

Additionally, rollout of RapidLD, the badge-scanning technology which will replace TTS and integrate with LMS, is still ongoing and faced some hurdles during rollout. For example, there were issues with the electronic tracking caused by data exchange issues related to how the Department stored usernames and prefixes and where multiple individuals with the same name existed in the system. There was also some user error, demonstrating a learning curve which is expected with a new

system like this. The Department reported that as of the end of the Eleventh Monitoring Period, staff achieved greater familiarity with RapidLD and are demonstrating increased proficiency and consistency of use. The Monitoring Team will continue to track the progress of this technology, because the Department's ability to schedule Staff for training, track whether those Staff attended that training, and have that training seamlessly incorporated in that Staff Member's training records will be significantly benefited by this attendance tracking software.

The Department achieved a milestone with the implementation of LMS and the Monitoring Team encourages the Department to utilize the LMS technology to its fullest extent to support the tracking and providing of training going forward.

| **COMPLIANCE RATING** | ¶ **6.** Substantial Compliance<br>¶ **7.** Substantial Compliance<br>¶ **8.** Partial Compliance |
|---|---|

### 5.  VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to ensure potential blind spots of stationary cameras are addressed, as feasible (¶ 1(d)); develop policies and procedures related to the maintenance of stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); and develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)).[146]

The Department's vast network of video surveillance throughout its Facilities is expansive and far greater than most correctional systems with which the Monitoring Team has

---

[146] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

experience. The availability of significant camera coverage has resulted in almost all use of force incidents captured on camera, which supports both the investigations of incidents and also the ability to proactively use camera footage to review situations as a learning opportunity or overall surveillance.

The Monitoring Team's assessment of compliance is outlined below.

| IX. VIDEO SURVEILLANCE ¶ 1 (STATIONARY CAMERA INSTALLATION) & XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶¶ 10, 11 (VIDEO CAMERA COVERAGE FOR INMATES UNDER THE AGE OF 19) |
|---|

¶ 1.

    d.    Beginning February 28, 2018, if the Department or the Monitor determines that a Use of Force Incident was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot, such information shall be documented and provided to the Monitor and, to the extent feasible, a wall-mounted surveillance camera shall be installed to cover that area within a reasonable period of time.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has installed approximately 10,800 cameras since the Department began the installation of cameras in 2015, including installing approximately 187 cameras in the Eleventh Monitoring Period.

- The Department maintains a comprehensive list of recommendations for additional wall-mounted stationary cameras, compiling recommendations from the Monitoring Team, Chief of Department, and other divisions within the Department.

**ANALYSIS OF COMPLIANCE**

*Use of Force incidents not captured on video and subsequent identification of blind spots* (¶ 1(d))

The Monitoring Team has only recommended a relatively small number of additional cameras are installed in certain areas of the Facilities to minimize potential blind spots since the Effective Date as there is significant and vast camera coverage across the Department. The majority of recommendations by the Monitoring Team have already been addressed and/or are moot because the Facility is no longer operating or is about to close. The Monitoring Team's recommendations at VCBC and DCJC are the only recommendations that remain outstanding and were not addressed in this Monitoring Period. To date, the Monitoring Team has not identified a use of force incident that was not substantially captured on video due to the absence of a wall-mounted surveillance camera in an isolated blind spot.

| Facility | Complete Camera Coverage | Status of Monitoring Team Recommendations | Reference to Prior Monitor's Report Findings |
|---|---|---|---|
| AMKC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| BKDC | Substantially Complete | N/A [147] | Sixth Report (pg. 83) |
| DJCJC | N/A – no housing units | To be addressed | Sixth Report (pg. 83) |
| EMTC[148] | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| GMDC | Substantially Complete | N/A [149] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| MDC | Substantially Complete | In progress[150] | Fourth Report (pg. 102) |
| NIC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Sixth Report (pg. 83) |
| OBCC | Substantially Complete | In progress[151] | Third Report (pg. 106) |
| QDC | N/A – no housing units | N/A | N/A |
| RMSC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| RNDC | Substantially Complete | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| VCBC | Substantially Complete | To be addressed | Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially addressed | Third Report (pg. 107) Sixth Report (p.83) |

| COMPLIANCE RATING | ¶ 1(d). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

¶ 2.     Body-worn Cameras

   a.     Within one (1) year of the Effective Date, the Department shall institute a pilot project in which 100 body-worn cameras will be worn by Staff Members over all shifts. They shall be worn by Staff Members assigned to the following areas: (i) intake; (ii) mental health observation; (iii) Punitive Segregation units; (iv) Young Inmate Housing Areas; and (v) other areas with a high level of violence or staff-inmate contact, as determined by the Department in consultation with the Monitor.

---

[147] BKDC is closed and so these recommendations are now moot.

[148] EMTC has opened and closed twice in 2020. It was first closed on March 1, 2020. However, the Facility was re-opened later in March as part of the Department's response to COVID-19, then closed again on June 26, 2020. The Facility was re-opened on November 20, 2020.

[149] GMDC is closed and so these recommendations are now moot.

[150] MDC is slated for closure in 2021.

[151] OBCC is slated for closure in 2021.

b.     The 100 body-worn cameras shall be distributed among Officers and first-line Supervisors in a manner to be developed by the Department in consultation with the Monitor.

c.     The Department, in consultation with the Monitor, shall evaluate the effectiveness and feasibility of the use of body-worn cameras during the first year they are in use and, also in consultation with the Monitor, determine whether the use of such cameras shall be discontinued or expanded, and if expanded, where such cameras shall be used.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Project Management Office ("PMO") continued to manage the use of BWC and the expansion of the BWC pilot beyond GRVC to all Facilities within the Department. The use of BWC for Staff is introduced in a Facility after at least 90% of the Staff have been trained on the use of BWC. The status of the BWC roll-out is outlined below:

| Command | Status of Training | Roll-out of BWC |
|---|---|---|
| AMKC | Complete | Roll-out December 2020 |
| BHPW | To begin in 12th MP | Roll-out expected in 12th Monitoring Period |
| BKDC | To begin in 12th MP | Roll-out expected in 12th Monitoring Period |
| BXCT | To begin in 12th MP | Roll-out expected in 12th Monitoring Period |
| DJCJC | Complete | Roll-out expected in 12th Monitoring Period |
| EHPW | TBD | TBD |
| ESU | TBD | TBD |
| EMTC[152] | Closed | Closed |
| GRVC | Complete | Roll-out completed in 2017 |
| MDC | To begin in 12th MP | Facility slated for closure, but roll-out expected for Staff in Manhattan Courts in 12th Monitoring Period. |
| NIC | Complete | Roll-out April 2020 |
| OBCC | Complete | Roll-out postponed given imminent closure of Facility |
| QNCT | To begin in 12th MP | Roll-out expected in 12th Monitoring Period |
| RMSC | Complete | Roll-out July 2020 |
| RNDC | Complete | Roll-out July 2020 |
| VCBC | Complete | Roll-out expected in 12th Monitoring Period |
| Transportation Division | Complete | Roll-out expected in 12th Monitoring Period |
| WF | Complete | Roll-out November 2020 |

- Operations Order 15/20 governs the use of BWC at DOC-managed Facilities.

  o The policy requires Staff to activate BWC in specified situations (*e.g.,* use of force incidents, witnessing or responding to an incarcerated individual-on-incarcerated individual fight, or escorting incarcerated individuals).

---

[152] EMTC has opened and closed twice in 2020. It was first closed on March 1, 2020. However, the Facility was re-opened later in March 2020 as part of the Department's response to COVID-19, then closed again on June 26, 2020. The Facility was re-opened on November 20, 2020.

- For the first 90 days ("90-day grace period") body-worn cameras ("BWCs") are in use at each Facility Staff may request[153] to review their BWC before writing their reports. The 90-day grace period was afforded when the BWC pilot was initiated at GRVC in October 2017 (as discussed in the Fifth Monitor's Report at pg. 85) and to NIC (which began in May 2020) and RNDC and RMSC (which began in July 2020) and AMKC (which began in December 2020).

- When reporting a use of force to the Central Operation Desk ("COD"), staff must report whether the incident was captured on BWC and the information must be documented in the COD use of force incident report.

- The Department Tracks incidents tagged with BWC in their Digital Evidence Management Software ("DEMs") system. Additionally, BWC incidents are now tagged and tracked in the Department's IRS system.

- NCU developed an audit process to assess whether Staff are activating BWC and tagging BWC incidents as required.

**ANALYSIS OF COMPLIANCE**

As of the end of the Monitoring Period, GRVC, RMSC, NIC, WF, and AMKC had operationalized the use of BWC in these Facilities. The Department reports TD and VCBC will be operationalized early in the Twelfth Monitoring Period. The Monitoring Team also continues to strongly recommend that ESU Staff utilize BWCs. Many incidents involving ESU Staff occur in locations that are not required to be covered by wall-mounted cameras and/or handheld video footage is difficult to obtain (*e.g.,* in cells during an institutional search). The Department reports it is in the process of procuring new vests to accommodate BWC as ESU's current uniform is not compatible. The new vests are expected to be procured by June 2021.

The expansion of the use of BWC has provided significant benefit to the investigations of use of force incidents. The BWC footage provides a unique visual and auditory perspective of use of force incidents that is valuable to investigators and the Monitoring Team. However, the Department and Monitoring Team continue to identify a large number of Staff who fail to activate the BWC when required by policy. In response, the Department has increased its focus on compliance with BWC

---

[153] During the 90-day grace period Staff must inform the Tour Commander that they want to review body worn camera footage, the Tour Commander must then communicate with the Warden or Deputy Wardens' office and inform them that Staff would like to review Body Worn Camera footage. Finally, the Staff Member and Tour Commander would then arrange for the Staff Member to leave their post and to go Warden or Deputy Warden's office to review footage. Any footage review would have to be reviewed in the presence of staff from the Warden or Deputy Warden's office.

activation in Rapid Review assessments and through NCU audits of incidents to encourage increased use of BWC.

Equally important to the use of BWC is tracking those use of force incidents that are captured on BWC. In the previous Monitoring Period, the Department reported there were issues with tracking BWC footage because BWC footage was not being appropriately tagged in the DEMS system and the search function within DEMs could not easily search for these incidents. In this Monitoring Period, the Department addressed these issues in two steps. First the Department revised the BWC policy to require Staff to report whether an incident was captured on BWC to COD. The COD Staff are then required to document the BWC footage in the COD incident report. This allows the Department to search incidents through the IRS System and identify whether a use of force incident was captured on BWC. However, it is important to note that the process depends on Staff reliably reporting to COD that an incident was caught on BWC. In October 2020, the Department issued a memorandum and Teletype to remind Staff of the new requirement to report to COD. Second, NCU developed an audit to assess the incidents occurring at Facilities with BWC to ensure all incidents with BWC are appropriately tagged. The Monitoring Team collaborated with NCU on the approach for the audit and received NCU's first audit report at the very end of the Monitoring Period. The Monitoring Team intends to assess the audit and the findings in the next Monitoring Period. These initial steps appear to support improved tracking of incidents with BWC footage.

The Department has expended significant efforts to expand the use of BWC across the Agency. BWC footage is now more prevalent than in any other Monitoring Period. The Monitoring Team will continue to work with PMO and CLU as the Department works to close out the pilot and expand BWC to all commands.[154] The Monitoring Team also encourages the Department to ensure that Staff follow BWC procedures and that the BWC footage can be easily and efficiently be tracked.

| COMPLIANCE RATING | ¶ 2(a)-(c). Partial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

¶ 2.    Handheld Cameras

   d.    Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop, adopt, and implement written policies and procedures regarding the use of handheld video cameras. These policies and procedures shall [. . . include the information enumerated in provisions ¶¶ (i) to (vi).]

   f.    When there is a Use of Force Incident, copies or digital recordings of videotape(s) from handheld or body-worn video cameras that were used to capture the Use of Force Incident will be maintained and the ID Investigator or the Facility Investigator will have full access to such recordings. If, upon review by the Department of a handheld video camera recording made during a Use of Force Incident, such videotape does not reasonably and accurately capture the incident between the Staff Members and Inmates involved,

---

[154] The Monitoring Team continues to strongly recommend that the Department issue BWC to ESU staff. The Department reports that upon receipt of the new vests that BWC will be issued to ESU.

and the failure was not due to equipment failure, the Staff Member who operated the handheld camera shall be sent for re-training. If a Staff Member repeatedly fails to capture key portions of incidents due to a failure to follow DOC policies and protocols, or if the Department determines the Staff Member's failure to capture the video was intentional, the Staff Member shall be made the subject of a referral to the Trials Division for discipline and the Monitor will be notified.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Directive 4523, "Handheld Video Recording Equipment and Electronic Evidence," developed in consultation with the Monitoring Team, addresses the requirement of ¶ 2(d) and remains in effect.

- Staff are required by Department policy to bring equipment and record handheld video in response to all alarm calls. The Facilities continued to maintain an Excel spreadsheet of all alarms that includes a reference to the file name of the corresponding handheld video footage that was uploaded to a shared drive.

- NCU continued its quality assurance ("QA") program regarding handheld camera footage across all Facilities to monitor their success in uploading all required handheld video to the Department's shared drive.[155] NCU's audit also reviews approximately 100 handheld videos each month to confirm that there is a conclusory statement at the end of the video.

- During the Eleventh Monitoring Period, Facilities reported that the handheld video footage was uploaded as required for 4,160 of the 4,248 alarm responses (97.9%). NCU reported that the conclusory statement was present for over 90% of the sample video reviewed each month.

- The Department identified the following violations regarding the use of handheld cameras or BWCs:

  o ID issued six Memorandum of Complaints ("MOC") to two Captains and two Officers for failing to properly operate the handheld camera, to one Officer for intentionally failing to capture an incident, and one MOC to an Officer for failure to wear a body-worn camera. The Department did not issue any discipline to Staff who repeatedly failed to capture key portions of incidents due to failure to follow DOC policies during this Monitoring Period.

  o Out of the 5,112 Intake Investigations closed to date, the Intake investigators identified 543 incidents with *some* type of handheld camera **_or_** BWC violation (the majority of these issues appear to be minor and do not impact the overall goal that the incident is captured on camera).

**ANALYSIS OF COMPLIANCE**

---

[155] NCU's audit includes both level A and B alarm responses because the Department's policy requires responses to both level of alarms to be captured on handheld video. The Consent Judgment requirement for handheld camera footage is limited to a level B alarm response.

_Policy_ (¶ 2(d))

The Department continues to maintain an adequate policy regarding the use of handheld cameras and the requirements of ¶ 2(d).

_Availability of Handheld Video_ (¶ 2(d))

The Department has a significant amount of video footage available to review a UOF incident. Almost all incidents are captured by genetec footage (generally with many different angles). Separately, there is often handheld video and body-worn camera footage. In almost all incidents in which handheld video footage is required, the video is available. While certain violations have been identified (_e.g._, footage may not be uploaded within 24 hours, or the quality of the footage could be improved), overall, these identified issues are infrequent (only 11% of all incidents from February 3 to December 31, 2020 were identified to have _some type_ of potential handheld or BWC violation[156]) _and_ they are minor. In other words, there were no handheld or BWC violations in 89% of incidents that occurred between February 3 to December 31, 2020 and the Monitoring Team's qualitative assessment of thousands of cases has not found that these identified issues impede or impact the overall availability of video footage. To the contrary, the Monitoring Team has only identified rare cases in which the lack of available video evidence impeded the ability to review what occurred during an incident.

During this Monitoring Period, NCU maintained its QA program and reviewed a sample of incidents to check that handheld video was uploaded as required. NCU reported that for the almost all incidents that require handheld video (97.9%) in this Monitoring Period that the footage was properly uploaded. The Monitoring Team reviewed a sample of approximately 50 alarms in a virtual audit and was able to confirm NCU's findings that the alarms sampled had the associated handheld video uploaded and was appropriately documented. The audit supported NCU's findings that the Facilities are uploading videos for almost all alarms.

The Monitoring Team continued to review the quality of handheld video through its routine assessment of Preliminary Reviews, Intake Investigations, and Full ID investigations. As discussed in prior Monitor Reports, the quality of handheld video continues to vary, for the most part due to the challenges of operating a handheld video camera during a use of force incident and balancing the need to maintain a safe distance from the activity while capturing the pertinent aspects of the incident. That said, there are still isolated incidents where the handheld camera operator is not making all efforts to reposition themselves to maintain a clear view of the incident.

Overall, handheld video footage is consistently and routinely available. NCU's audits continue to be well-organized, thorough, and demonstrate handheld video is captured and saved as required. Further,

---

[156] The data currently tracked merges both potential violations for handheld cameras and BWC cameras. However, it is important to note the Consent Judgment requirements are limited to use, availability and violations related to handheld cameras.

the Monitoring Team's routine assessment of incidents also confirmed NCU's overall finding that handheld video is almost always available for a use of force incident. Accordingly, the Department remains in Substantial Compliance with this provision.

*Investigator Access to Handheld Video* (¶ 2(f))

The Facilities consistently and promptly upload UOF-related handheld video, as discussed above, which supports ID's access to footage for the corresponding investigation of the incident. The Monitoring Team's routine assessment of Preliminary Reviews, Intake Investigations, and Full ID Investigations of UOF incidents reflect that handheld video is generally available to the investigator. Further, for the vast majority of video requested by the Monitoring Team for review, the Department was able to provide the video as referenced by the investigator. The Monitoring Team continues to find that a small number of handheld videos may be missing from the investigation because the video was not taken and/or uploaded.

In terms of the management of handheld video, the Monitoring Team found that handheld videos were filed systematically in the shared IT folder and were easy to locate during a virtual audit of the system. The Monitoring Team has not identified any systemic issues preventing investigators from accessing handheld footage when completing their Intake Investigations, Preliminary Reviews or Full ID Investigations. Accordingly, the Department maintains Substantial Compliance with this provision as investigators have consistent and reliable access to the handheld video.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f))

The Department has continued to identify and recommend corrective action (*e.g.*, corrective interviews, verbal counseling, Facility Referrals, Command Discipline, and MOCs) for Staff who fail to adequately record or upload handheld video footage. The Intake Squad specifically looks for this issue and identified 543 (11%) incidents of the 5,112 Intake Investigations closed from February to December 2020 in which there was *some type of handheld or body-worn camera violation identified*.[157] These violations generally fell in to three categories: (1) minor issues with handheld video (examples include failure to upload the video footage within 24 hours, failure to record certain portions of the incident or failure to record the escort following the use of force, etc.), (2) violations related to BWC (which is not covered by this provision) and (3) more concerning examples (*e.g.*, failure to capture the entire incident on handheld video). The vast majority of these violations were either minor handheld camera violations or violations related to the use of BWC (again, which are not related to this provision) with only a very small number of more concerning violations. As noted above, the availability of the majority of handheld video and that 89% of incidents that occurred between February 3 and December 31, 2021 did not have any handheld camera or BWC violations support a finding that most violations related to handheld

---

[157] Current tracking does not allow for handheld and body worn camera violations to be separated.

camera issues are minor and limited. Finally, the Monitoring Team continues to identify only isolated incidents where the handheld video did not adequately capture the UOF incident, but neither a pattern nor practice of this has been identified. Accordingly, the Department maintains Substantial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2(d). Substantial Compliance |
| | ¶ 2(f). Substantial Compliance |

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

¶ 3. Maintenance of Stationary Cameras

a.   The Department shall designate a Supervisor at each Facility who shall be responsible for confirming that all cameras and monitors within the Facility function properly.

b.   Each Facility shall conduct a daily assessment (*e.g.*, every 24 hours), of all stationary, wall-mounted surveillance cameras to confirm that the video monitors show a visible camera image.

c.   The Department shall implement a quality assurance program, in consultation with the Monitor, to ensure each Facility is accurately identifying and reporting stationary, wall-mounted surveillance cameras that are not recording properly, which at a minimum shall include periodic reviews of video captured by the wall-mounted surveillance cameras and a process to ensure each Facility's compliance with ¶ 3(b) of this section.[158]

d.   Within 120 days of the Effective Date, DOC, in consultation with the Monitor, shall develop, adopt, and implement written procedures relating to the replacement or repair of non-working wall-mounted surveillance cameras. All replacements or repairs must be made as quickly as possible, but in no event later than two weeks after DOC learns that the camera has stopped functioning properly, barring exceptional circumstances which shall be documented. Such documentation shall be provided to the Warden and the Monitor. The date upon which the camera has been replaced or repaired must also be documented.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- *Facility Identification of Inoperable Cameras*
  - o   The Department continues to maintain Operations Order 12/18 "Command Level Assessment and Maintenance of Stationary Surveillance Cameras," which was developed in consultation with the Monitoring Team to address the requirement for Staff and supervisors to assess stationary wall mounted cameras and for the Department to develop a quality assurance program pursuant to the Court's August 10, 2018 order that modified Consent Judgment § IX, ¶ 3(c).
  - o   Assigned Staff and supervisors in each Facility continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into the Enterprise Asset Management ("EAM") system as work orders to trigger repair.
- *Quality Assurance Program*
  - o   The Department assesses the maintenance of cameras using a two-prong strategy:

---

[158] This language reflects the revised requirement so ordered by the Court on August 10, 2018 (*see* dkt. 316).

176

- ▪ **(1) NCU audit for Completion of Daily MSS-1 forms/work orders** – NCU audits each Facility on five random days each month to confirm the Facility completed the daily forms and submitted corresponding work orders.
  - ▪ **(2) NCU Spot-Check of Down Cameras** – NCU reviews archival Genetec footage from the same day Facilities conducts their daily assessments of down cameras. NCU compares its findings with the Facility's findings to determine whether all inoperable cameras were included on the daily MSS-1 forms.
  - ▪ NCU prepares monthly reports of their QA findings and shares them with the Monitoring Team.
- *Repairs of Inoperable Cameras*
  - o The Department's Radio Shop is responsible for repairing stationary cameras in the Facilities.
  - o The Department uses EAM to electronically track the number of reported inoperable cameras, the amount of time the camera is inoperable, and the date the camera was repaired. The system also has the ability to track why needed camera repairs may be on hold. Below is a chart of the reported inoperable cameras and the time to complete repairs from January 2017 through December 2020.

| Time to Repair Inoperable Cameras | | | | | | |
|---|---|---|---|---|---|---|
| | **2017** | **2018** | **Jan to June 2019** | **July to Dec. 2019** | **Jan. to June 2020** | **July to Dec. 2020** |
| *Total Repaired* | **9,312** | **12,062** | **7,903** | **8,339** | **6,356** | **7,613** |
| 0-14 days | 8555 (92%) | 10,329 (86%) | 6,480 (82%) | 4,027 (48%) | 4,055 (64%) | 5,928 (78%) |
| 15-30 days | 399 (4%) | 1,181 (10%) | 779 (10%) | 1,955 (23%) | 1,100 (17%) | 822 (11%) |
| 31-60 days | 222 (2%) | 303 (3%) | 397 (5%) | 1424 (17%) | 577 (9%) | 443 (6%) |
| 61-99 days | 81 (<1%) | 116 (<1%) | 132 (2%) | 605 (7%) | 302 (5%) | 181 (2%) |
| 100 days or more | 55 (<1%) | 133 (<1%) | 115 (1%) | 328 (4%) | 322 (5%) | 239 (3%) |

- 223 camera repairs remained pending beyond 14 days as of the end of the Monitoring Period, as outlined below.

| | |
|---|---|
| **15-30 days** | 40 (18%) |
| **31-60 days** | 42 (18%) |
| **61-99 days** | 26 (12%) |
| **100 days or more** | 115 (52%) |

**ANALYSIS OF COMPLIANCE**

The Department has continued to maintain a reasonable process to identify and track inoperable cameras. The vast majority of inoperable cameras (78%) were repaired in the time frame required (and 90% were repaired within 30 days or less) and the majority of those inoperable cameras that were repaired after prolonged periods of time are in areas that are not currently utilized to house incarcerated individuals. Given natural wear and tear and the aging of equipment, on-going maintenance of stationary cameras is expected.

*Daily Assessment of Inoperable Cameras (¶ 3(a)-(b)) & NCU and Facility QA Program (¶ 3(c))*

The process for identifying and reporting inoperable cameras remained the same during the Eleventh Monitoring Period (described in detail in the Eighth Monitor's report at pgs. 123 to 126).

- **Completion of Daily Forms**: During this Monitoring Period, NCU found that 423 of 450 MSS-1 forms (94%) were completed and submitted by the Facilities on the days audited.[159]

- **Work Orders for Inoperable Cameras**: Of the 450 submitted forms, NCU identified a total of 11,592 aggregate inoperable cameras.[160] NCU confirmed that 11,462 (99.9%) of the 11,592 reported inoperable cameras had corresponding work orders in the system.

- **Accuracy of MSS-1 Forms**: During this Monitoring Period, NCU's spot-check found 1,703 of 1,844 (92%) inoperable cameras were reported on the daily forms. Of the 141 that were not included on the MSS-1 forms, 66 cameras (47%) did have a corresponding work order. In total, 1,778 of the 1,844 inoperable cameras (96%) had been identified on the MSS-1 form and/or had a corresponding work order in EAM.

The Monitoring Team met virtually with NCU and reviewed a sample of NCU's QA findings regarding the daily forms and found the results of NCU's QA results were consistent with the underlying data. Further, the Monitoring Team conducted a targeted assessment of NCU's spot-check and determined that the results reported in the monthly audit reports were accurate and reliable. Overall, NCU continues to maintain a well-organized and consistent QA program.

The Department continues to demonstrate that the daily MSS-1 forms are completed as required and the NCU audit results demonstrate that the forms are generally reliable and identify the vast majority of inoperable cameras. Further, the data demonstrates that the Department is generally submitting work orders to fix any identified inoperable cameras. Accordingly, the Department remains in Substantial Compliance with these requirements.

---

[159] This includes all forms that were expected to be completed for five random days selected by Facilities in January to June of 2020.

[160] It is important to note that the 13,853 cameras that were identified as inoperable is an aggregate total and does not mean there were 13,853 individual cameras that were inoperable (many cameras were reported as inoperable on multiple days in a row).

*Maintenance of Inoperable Cameras* (¶ 3(d))

The Department has continued to improve the time to repair inoperable cameras and repaired the majority of inoperable cameras within 14 days as demonstrated in the chart above. Further, nearly 90% of the cameras fixed this Monitoring Period were repaired within 30 days. The limitations that impacted the Radio Shop in repairing cameras in the previous two Monitoring Periods did not impact their work in this Monitoring Period, notwithstanding Staffing shortages and COVID-19 impacting access to the jails. Further, the Department reports that the repair of cameras that require more time (*e.g.,* repairs occurring beyond 30 days) is due to exceptional circumstances such as the need to obtain additional parts or the cameras are not accessible because the housing unit is either inoperable or under construction. These are certainly a reasonable basis in which additional time to repair is needed. However, the Department's documentation of the reason certain repairs may take longer is not always consistent and so the Monitoring Team has recommended improved diligence in tracking repairs that may take a longer period of time.

In this Monitoring Period, the Department repaired *more* cameras within 14 days compared to the two previous Monitoring Periods and in a *faster* period of time. In fact, the 5,928 cameras repaired within 14 days this Monitoring Period is the second highest number of cameras repaired by the Radio Shop within a 14-day period since January of 2017. At the end of the Monitoring Period, the Department reported 223 cameras were out and needing repair, however, 35 of those cameras were in areas that are closed.

Finally, it is worth noting that the Monitoring Team has found that almost all use of force incidents are captured on video and has not identified systemic issues in the Department's ability to capture use of force incidents on video due to inoperable cameras—this reflects the fact the number of inoperable cameras is only a fraction of the functioning cameras in place throughout the Department.

The Monitoring Team is encouraged with the Department's improvement in camera repairs this Monitoring Period. However, continued vigilance will be necessary to ensure Radio Shop proceeds with the positive momentum following the exceptional circumstances recently faced.

| COMPLIANCE RATING | ¶ 3 (a)-(d) Substantial Compliance |
|---|---|

## 6.   USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)

The Use of Force Investigations section of the Consent Judgment covers a range of policies, procedures, and reforms relating to the Department's methods for investigating

potential use of force-related misconduct.[161] The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, and corrective action can be imposed in a timely fashion. Investigations that reliably and consistently identify misconduct are essential to reduce incidents of unnecessary and excessive force.

The Department now conducts Intake Investigations for all UOF incidents, making significant progress in conducting timely and quality investigations, and has almost eliminated the investigation backlog in this Monitoring Period. This progress is particularly notable given the ongoing COVID-19 health crisis that has raised unprecedented issues and continued to impact the way investigations are conducted from Staff working remotely (and all that entails) to limitations on personal interactions, which impacted access to the jails and logistical challenges in conducting interviews.

The ID Leadership team continues to demonstrate a strong commitment to creative thinking, problem solving, and improving the work of the division. ID continues to collaborate with the Monitoring Team to improve the timeliness and quality of investigations. As part of this work, the Monitoring Team has shared feedback with ID on certain cases in which the investigation should be prioritized and/or there is objective evidence that merits additional scrutiny by the investigators, and/or more global issues that should be considered for all investigations. The Monitoring Team has also continued to work closely with ID Leadership on the elimination of the backlog. The continued dedication of the entire ID Team has been critical to supporting the overall improvements within the Division and their commitment to diligently

---

[161] The Department's efforts to achieve compliance with § VII, ¶ 5 is addressed in the Use of Force Reporting section of this report.

addressing the backlog while simultaneously working to improve investigations going forward is recognized and appreciated.

The Monitoring Team's assessment of compliance is below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Intake Squad conducts timely Intake Investigations of every use of force.
- ID investigates use of force incidents that are referred from the completed Intake Investigation.

### ANALYSIS OF COMPLIANCE

The Intake Squad continues to be a strong foundation for timely investigations. As for the quality of the completed investigations, the Monitoring Team has been satisfied with the quality of Intake Investigations as they generally identify violations, recommend corrective action when warranted, and refer cases to Full ID investigations only when necessary as required by the revised ¶ 8 referral requirements (described in more detail in regard to ¶ 8 below). As discussed in the Identifying and Addressing UOF Misconduct section of this report (and in the Ninth Monitor's Report at pgs. 41 - 47), the Intake Investigation process has resulted in improved investigations. Intake Investigations reasonably and accurately summarize the available evidence, identify violations when present, recommend corrective action when warranted, and refer for further investigation when necessary. In only a small number of Intake Investigations has the Monitoring Team found that either potential violations went unaddressed, or the closure of the investigation was premature and further investigation was warranted.

The majority of Full ID investigations that were closed in this Monitoring Period were part of the backlog. The work of the ID Backlog Plan (discussed in regard to Remedial Order § B., ¶ 1 below) also enabled ID to identify and address misconduct for incidents which previously had languished and paved the way to conduct more timely investigations going forward. The ID Backlog Plan created a reasonable framework to address the backlog of investigations. This process has revealed that the most prominent policy violations are being identified through this assessment and the significant efforts and work to close this large volume of cases must be recognized. That said, the triaging efforts may impact the quality of the investigation in some cases either because some violations may go unaddressed and/or because the passage of time may impact the veracity of the evidence and the impact of any

discipline that may be imposed. However, this triage approach is a necessary trade-off to support the overall goal of reducing the backlog in order to allow ID to focus on more recent incidents.

As described in the Identifying and Addressing UOF Misconduct section of this report, the combination of the Intake Squad and significant reduction of the backlog has improved the Department's ability to appropriately assess use of force incidents and address potential misconduct as necessary. Case in point, 67% (2,196) of the incidents that occurred in the Eleventh Monitoring Period have closed investigations as of the end of the Monitoring Period, compared with only 8% (321) of the incidents that occurred in the Ninth Monitoring Period that had closed investigations at the end of that Monitoring Period.

The Intake Squad, and the continued implementation of revised Consent Judgment § VII. (Use of Force Investigations), ¶¶ 7, 8, and 13, as well as the elimination of the backlog, will support thorough, timely, and objective investigations of all use of force incidents going forward. The work completed in this Monitoring Period will enable ID to turn a new chapter in the Twelfth Monitoring Period.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## REMEDIAL ORDER § B., ¶ 1 (BACKLOG OF INVESTIGATIONS)

§ B., ¶ 2. *Backlog of Use of Force Investigations*. The Department shall complete its investigation of any Use of Force Incidents that occurred more than 120 days prior to the Order Date ("Backlog UOF Investigations") by December 31, 2020. Use of Force Incidents that have been referred to DOI or another law enforcement agency and are currently being investigated by that agency are not covered by this provision.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- This Monitoring Period, ID closed 3,669 incidents as part of the ID Backlog Plan.
- As of January 15, 2021, only 499 cases in the backlog remained pending.

**ANALYSIS OF COMPLIANCE**

ID's top priority in this Monitoring Period was to eliminate the significant backlog of cases (all pending cases that occurred on or before April 16, 2020 as per the Remedial Order § B., ¶ 1). In this Monitoring Period, ID closed 3,669 investigations and as of January 15, 2021, only 499 cases in the backlog remained pending. ID's success in reducing the backlog has also eliminated the threat of losing cases to the expiration of the statute of limitations. At its height, there were over 9,000 pending investigations. Of the 499 remaining cases, only 189 (38%) remain pending with the initial investigator and the other 310 (62%) are pending supervisory review. For those cases pending with the initial investigator, some remain as they require further investigative steps like MEO-16s, which have been challenging to schedule due to COVID-19 constraints, while others just had not been completed due to

the overwhelming volume of cases that had to be closed. The Department will close all remaining cases in the backlog by May 31, 2021.

Of the 3,669 investigations closed in this Monitoring Period, at least 287 closed with charges or a PDR, demonstrating a pursuit of discipline for violations when identified. The significant number of investigations that closed with recommended disciplinary charges allows the Department to address identified misconduct that went unaddressed for too long.

The pending cases in the backlog fell into three categories: (1) investigations where the Preliminary Review had not yet been drafted, (2) investigations where the Preliminary Review had been drafted, but was not yet complete, (3) investigations where the Full ID investigation was started, but was not yet complete. The Department continued to utilize a sound and reasonable approach to address the backlog ("ID Backlog Plan"), which was described in detail in the Tenth Monitor's Report at pgs. 134-138.

Additionally, the Monitoring Team conducted a review of a sample of 62 investigations *closed without charges* as part of the ID Backlog Plan, as required by Remedial Order § B, ¶ 1(i). These 62 incidents occurred between January 2019 and January 2020. Through this review, the Monitoring Team did not identify any misconduct that warranted referral for formal discipline. Overall, these findings demonstrate that cases closed through the backlog have generally been addressed appropriately under the circumstances, and the possibility that serious misconduct may have gone unaddressed is unlikely.

In the main, the investigations of these 62 incidents demonstrated that ID utilized a sound triage approach in closing investigations that were part of the backlog as cases that merited greater scrutiny (including more investigative steps like Staff interviews) received such scrutiny, while cases that could be addressed with more limited resources were because the use of force was either minor and/or it was possible to reach a conclusion more easily because the available objective evidence provided all the information needed to close out the case.

Of the 62 investigations reviewed by the Monitoring Team, the following was found:

- 54 investigations were reasonable and appropriate. For those more complex or serious incidents or allegations, the investigations were appropriately detailed and thorough. While those incidents where the use of force was minor and/or entirely captured on video (*e.g.,* OC used to break up an inmate-on-inmate fight; control holds used to separate two incarcerated individuals who were fighting), the investigation included an appropriately brief summary and analysis of the relevant facts. The review of this sample also demonstrated that certain investigations received a complete investigation (instead of a truncated version) as merited by the facts and that MEO-16 interviews were also conducted when warranted.

- There were eight additional cases in which the investigations themselves had issues, however, none of these cases warranted formal charges.

- o   4 investigations were incomplete (either the analysis of the available evidence was overly brief and/or the video evidence was not available). However, an independent assessment of these incidents did not reveal any misconduct that should or could have been identified or addressed with the information available.
- o   Two investigations failed to recommend appropriate corrective action (re-training or a Facility Referral for counseling would have been appropriate) for OC spray used too close. One of these also involved Staff conduct that may have precipitated the need to use OC spray. In both cases, charges were not necessary, but some form of corrective action would likely have been appropriate.
- o   Two investigations failed to address all the relevant issues. In one case, the investigator failed to address why the Probe Team was present on a housing unit, who ultimately used OC spray. In the other case, the investigation failed to address the use of head strikes by non-DOC staff and it is unclear whether the non-DOC staff's use of force was addressed.

As part of the efforts to address the backlog, the Monitoring Team also provided recommendations to ID on hundreds of investigations in the backlog that should be prioritized and/or scrutinized more closely for potential violations. The Monitoring Team identified these cases through routine review of incidents in which objective evidence of wrongdoing suggested that a violation occurred, and discipline should be pursued. In almost all of these cases, the outcome of ID's investigation were consistent with the Monitoring Team's recommendations. In a small number of cases, ID's assessment of all available evidence found that the potential violations could not be substantiated. In each of these cases, ID provided a reasonable basis for their determination, often involving an explanation of an assessment of the evidence that had not been available to and/or considered by the Monitoring Team. Overall, this collaboration (both in this Monitoring Period and the last one) demonstrated that ID's efforts to address the backlog was appropriately targeted and that cases in the backlog were reasonably managed under the circumstances.

Those investigations that were closed as part of the backlog were generally reasonable under the circumstances. While the majority of backlogged investigations were closed by December 31, 2020, 499 investigations remain pending beyond the deadline, accordingly, the Department is in Partial Compliance with this requirement.

| COMPLIANCE RATING | § B., ¶ 1. Partial Compliance |
| --- | --- |

## VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INTERVIEWS OF INCARCERATED INDIVIDUALS)

¶ 2. Inmate Interviews. The Department shall make reasonable efforts to obtain each involved Inmate's account of a Use of Force Incident, including Inmates who were the subject of the Use of Force and Inmates who witnessed the Use of Force Incident. The Department shall not discredit Inmates' accounts without specifying a basis for doing so.

a. After an Inmate has been taken for a medical assessment and treatment following a Use of Force Incident, an Assistant Deputy Warden shall give the Inmate an opportunity to provide an audio recorded statement describing the events that transpired, which shall be reviewed as part of the investigation of the incident.

b. When requesting an Inmate's statement or interview, the Department shall assure the Inmate that the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation. Requests for statements or interviews shall be made off the living unit and shall not be made within sight or hearing of other Inmates or Staff involved in the Use of Force Incident. Inmate interviews shall be conducted in a private and confidential setting.

c. All efforts to obtain Inmate statements shall be documented in the investigation file, and refusals to provide such statements shall be documented as well.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All of the requirements of this provision are addressed in the New Use of Force Directive.

- **Statements to the Facility:**

  o Facility Staff consistently attempt to interview incarcerated individuals following their involvement in a use of force, and document either the incarcerated individual's statements, or refusal to provide a statement, in the Facility package that is provided to the Intake Investigator. Despite COVID-19, this practice generally continued without interruption during the Monitoring Period.

  o The "Inmate Voluntary Statement" forms used to obtain incarcerated individual statements at the Facility-level informs the incarcerated individuals, and codifies the requirement of ¶ 2(b), that "the Inmate will not be subject to any form of retaliation for providing information in connection with the investigation."

- **ID Interviews of Incarcerated Individuals:**

  o Assigned ID investigators must also attempt to interview incarcerated individuals as part of their investigations of use of force incidents when warranted.

    ▪ The Intake Squad Division Order requires the investigator conducting the Intake Investigation, as needed based on the evidence, to attempt to interview incarcerated individuals involved in a use of force incident and those who witness the incident.

      • However, COVID-19 significantly limited the capacity of ID to conduct interviews of incarcerated individuals in this Monitoring Period. Only a select number of uniform investigators were permitted to enter the Facility to conduct interviews in the jails in this Monitoring Period due to COVID-19 protocols.

      • Therefore, cases in which an interview of an incarcerated individual was needed were referred for a Full ID Investigation and conducted by the Full ID investigator.

- o *Videotaped Interviews of Incarcerated Individual*: Since October 2018, ID offers incarcerated individuals the opportunity to have their interview taped via a body-worn camera worn by the investigator.[162]

- The investigation files include any incarcerated individual statements that were obtained, either by the Facility or ID. Incarcerated individual refusals to provide a statement are documented and are in the investigation file.

ANALYSIS OF COMPLIANCE

The interview requirements of incarcerated individuals under ¶ 2 have a number of practical elements: (1) attempts must be made and recorded to get an incarcerated individual's statement following a use of force incident; (2) the Department shall assure incarcerated individuals they will not be subject to retaliation for providing information in connection with an investigation; and (3) investigators shall not unreasonably discredit incarcerated individual statements.

*Statements to the Facility*

Attempts by the Facility are consistently made to obtain an incarcerated individual's statement following a use of force and those attempts are recorded. The incarcerated individual voluntary statement form is consistently available in the Preliminary Reviews, Intake Investigations, and Full ID investigation files reviewed by the Monitoring Team and the form contains either the incarcerated individual's initial statement to the Facility or their refusal to provide such statement. The Department has also codified and informs all incarcerated individuals through the "Inmate Voluntary Statement" form, that the individual will not be retaliated against for any information provided in connection with the investigation. The Monitoring Team has not identified any evidence to suggest that individuals have been retaliated against for providing information in connection with a use of force incident. Accordingly, the Department is in Substantial Compliance with this requirement.

*ID Interviews of Incarcerated Individuals and Crediting of Statements*

Statements from incarcerated individuals are obtained by the Facility and incorporated into the investigation by ID. If necessary, ID investigators may also elect to conduct an interview of incarcerated individuals. However, interviews of incarcerated individuals by ID were conducted on a very limited basis in this Monitoring Period due to COVID-19. Intake Investigators did not conduct any interviews, so if an Intake Investigator determined that an interview of an incarcerated individual was necessary to determine the outcome of a case then the incident was referred for a Full ID investigation. Only a small number of Full ID Investigators were then permitted to enter the jails to conduct these interviews. ID investigators prioritized conducting any interviews of incarcerated

---

[162] If an incarcerated individual elects not to provide a statement on video, then the individual is afforded the opportunity to provide a written or audiotaped statement.

individuals in troubling cases such as those cases with potential serious misconduct and/or the death of an incarcerated individual.

It is important to note that the overall availability of video evidence has dramatically improved the objective evidence available when investigating an incident. Therefore, while interviews of incarcerated individuals may still be needed, in the main, the video evidence and available reports and medical evidence most often provide sufficient evidence to make an appropriate determination regarding the incident. It appears that Intake Investigators were appropriately referring cases for further investigation if an interview of an incarcerated individual was necessary to determine the outcome of the case. That said, close-in-time interviews can be valuable if conducted by the Intake Squad and may negate the need for Full ID referrals of those cases if they can be completed at the Intake Investigation phase. The Department reports that the Intake Squad began conducting interviews in the Twelfth Monitoring Period for cases that would benefit from close-in-time interviews (*e.g.,* allegation of use of force, incidents that occurred without video surveillance, or incidents that involved ESU). The Monitoring Team did not assess the quality of ID's interviews of incarcerated individuals this Monitoring Period because few occurred.

Finally, the Monitoring Team's assessment of investigations has not found that investigators discredit incarcerated individual statements without a reasonable basis, and the prevalence of video evidence, as discussed above, is a critical corroboration tool used by investigators to determine whether to credit (or discredit) and statement. In investigations where statements that are not credited, the investigators have a reasonable basis in evidentiary findings for doing so.

| **COMPLIANCE RATING** | **¶ 2.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)

¶ 3. The Department shall promptly refer any Use of Force Incident to DOI for further investigation when the conduct of Staff appears to be criminal in nature.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID refers use of force cases to DOI for investigation when a Staff Member's conduct appears to be criminal in nature.

  o The Department continued to coordinate monthly with DOI, and other relevant law enforcement offices on cases that are pending consideration for potential criminal charges (as described in the Second Monitor's Report at pgs. 84-85).

  o The Department maintains a tracking chart of all cases that are referred to DOI from the time they are referred to the case's ultimate closure within the Department. The tracking chart is updated each month to identify the current status of the case, including whether it is still be evaluated for criminal charges and by whom (DOI, law enforcement or returned to ID). If the case has been returned back to the Department, the chart also

tracks the status of the Department's investigation and any pending discipline (to the extent necessary).

- Three use of force cases were referred to DOI or outside law enforcement during this Monitoring Period. Additional incidents may be considered by DOI, or outside law enforcement agencies, for very short periods of time (less than one month). These cases are not tracked as described above and ID is not usually asked to pause their investigation.

- Eight use of force cases were pending with law enforcement as of the end of the Monitoring Period: three with DOI, three with the Bronx District Attorney ("DA"), one with the U.S. Attorney's Office for the Southern District of New York ("SDNY"), and one case was pending with the U.S. Attorney's Office for the Eastern District of New York ("EDNY").

**ANALYSIS OF COMPLIANCE**

The number of UOF incidents that may potentially be criminal in nature remain small but are the most concerning. Staff UOF-related conduct that appears to be criminal in nature continues to be referred to DOI promptly by the Department and/or assumed by DOI.[163] The Monitoring Team has not identified any incidents that should have been referred and were not. Since the Effective Date, DOI has taken over or been referred a total of approximately 93 cases. Only a small portion (n=5) of this already limited group of cases has resulted in criminal charges as demonstrated in the chart below.

| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Total | |
|---|---|---|---|---|---|---|---|---|
| **Total** | **9** | **16** | **27** | **18** | **15** | **7** | **93** | |
| Criminal Charges Brought/Trial Underway or Complete | 0 | 2 | 0 | 2 | 1 | 0 | **5** | **5%** |
| Pending Consideration with Law Enforcement | 0 | 1 | 1 | 0 | 3 | 3 | **8** | **3%** |
| Returned to ID | 9 | 13 | 26 | 16 | 11 | 5 | **80** | **86%** |

*Tracking & Coordination of Cases*

The Department has maintained a reliable tracking process for cases referred and/or taken over by DOI and/or law enforcement agencies.[164] Reliable tracking is crucial because these cases go through various layers of review across and within various agencies in order to determine whether to bring a criminal prosecution.

---

[163] DOI conducts an independent assessment of all Class A use of force incidents, as well as some incidents on an ad hoc basis, and will advise ID if they intend to take over the case.

[164] In this Monitoring Period, the Monitoring Team identified one case that was taken over by DOI, and the investigation was on pause with ID during the evaluation, but the case did not appear on the tracking form. This issue was quickly remedied, and all involved parties re-committed to closely scrutinizing the tracking forms to ensure all cases are tracked appropriately.

Monthly meetings between the Department and all outside agencies (DOI, Bronx DA, Manhattan DA, Kings County DA, and SDNY) continue to occur regularly and provide an adequate forum for coordinating cases. This includes ensuring the Department places its own investigations on hold while the criminal investigation is ongoing, while also ensuring that cases do not languish once referred to law enforcement. The Monitoring Team also continues to participate in these meetings in order to stay apprised of the status of these cases.

This tracking process, in conjunction with the monthly coordination meetings, helps ensure these cases are processed as expeditiously as possible, which is important since they represent some of the most troubling use of force incidents.

*Length of Time to Evaluate Cases*

The improved tracking and communication among all stakeholders appears to have reduced the time outside agencies review these cases. In particular, DOI has been assessing cases timely and either elevating them to law enforcement or clearing them back to the Department. In this Monitoring Period, outside law enforcement agencies, in particular SDNY, cleared a number of cases back to the Department that had been languishing so they could be processed administratively by the Agency. However, the single case still pending with EDNY occurred in 2017 and the review continues to languish.

The Monitoring Team remains concerned about the overall length of time to complete the criminal evaluation process. The vast majority of cases reviewed by law enforcement do not result in criminal charges (only 5 of the 93 cases considered have been charged) and are ultimately referred back to the Department for administrative processing and discipline. Any necessary administrative response and discipline for these matters are then very protracted, which decreases the meaningfulness of the response and some of the most troubling incidents are then most likely to languish. It is therefore imperative that law enforcement representatives make every effort to conduct their evaluation of cases as expeditiously as possible.

*Department's Assessment of Cases Returned from Law Enforcement*

For cases that law enforcement agencies decline to prosecute, they are referred back to the Department for administrative processing and discipline, as appropriate. Because ID investigations historically have taken so long to close, the Monitoring Team recommended that ID prioritize cases returned from law enforcement given the likelihood that they involve serious misconduct, and a disciplinary response is likely warranted. As of the end of the Monitoring Period, ID has closed all cases, but two, that were returned by DOI/law enforcement after DOI/law enforcement had determined that they would not proceed with criminal charges in these cases. These two pending cases occurred in 2020, and were only recently returned, so the investigations do not appear to be languishing in ID.

Overall, the Department is promptly referring use of force incidents to DOI and other law enforcement agencies for further investigation when the conduct of Staff appears to be criminal in

189

nature. While the length of time these cases are considered by law enforcement is concerning, as described above, the Department is adequately referring the cases timely. Further, once returned these cases are now being addressed. Therefore, the Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

### VII. USE OF FORCE INVESTIGATIONS ¶¶ 4 AND 12 (ADDRESSING BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS, AND ID QUALITY CONTROL)

¶ 4. Any Staff Member found to have conducted a biased, incomplete, or inadequate investigation of a Use of Force Incident, and any Supervisor or manager who reviewed and approved such an investigation, shall be subject to appropriate discipline, instruction, or counseling.

¶ 12. Within 90 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement quality control systems and procedures to ensure the quality of ID investigations and reviews. These systems and procedures shall be subject to the approval of the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department can discipline, instruct, or counsel those who conduct or sign-off on a biased, incomplete, or inadequate investigation.

- CMS includes several mandatory fields which require that investigators collect and analyze evidence systematically.

- All Intake Investigations (and formerly Preliminary Reviews) and Full ID Investigations require multiple levels of supervisory review.

**ANALYSIS OF COMPLIANCE**

Intake Investigations (and formerly Preliminary Reviews), and Full ID investigations are all subject to supervisory review, which provides an opportunity for investigations to be assessed and inadequate investigations to be addressed. ¶¶ 4 and 12 are addressed together because if there are adequate Quality Control mechanisms, there should be very few biased, inadequate, or incomplete finalized investigations and those cases that are should be identified through this process.

*Addressing Biased, Incomplete, or Inadequate Investigations, ¶ 4*

This requirement is only applicable when an investigation may be biased, incomplete or inadequate. As an initial matter, now that all investigations are conducted by ID, the number of biased, incomplete, or inadequate investigations is very small.[165] While the quality of ID investigations remains mixed, it is clear that there is significant written feedback between investigators and supervisors to provide feedback and ensure adequate investigations are conducted. As a result of these efforts, the Monitoring Team has only identified a few ID investigations completed in this Monitoring

---

[165] The Monitoring Team had previously found that investigations conducted at the Facility level were often inadequate and incomplete and in many cases, were also biased.

Period that were inadequate, which would warrant appropriate instruction, counseling, and/or discipline. The Monitoring Team shared these cases with ID leadership in order for them to be addressed with the investigator and/or their supervisors. In response, ID leadership met with those investigators and supervisors and either counseled or discipline the staff (as appropriate). ID reports that instruction, counseling, and/or discipline is utilized when incomplete, biased, or inadequate investigations are identified, but this is mostly completed on an informal basis, so it is not systematically tracked. The Monitoring Team is aware of certain cases in which investigators with a pattern of completing inadequate, incomplete, or biased investigations have been removed from the Investigations Division. The fact that investigations have been steadily improving demonstrates that there are processes in place to assess and address investigations of poor quality. Accordingly, the Department has achieved Substantial Compliance with this provision.

*Quality Control,* ¶ 12

ID has mechanisms in place to require supervisory review of investigations, which are critical components to assessing and addressing the quality of investigations. There is certainly significant back and forth between supervisors and investigators. The final versions of Intake Investigations demonstrate that feedback and guidance is provided to investigators in order to improve the quality of those investigations. The UPS division continued to be implemented so that priority cases are managed by seasoned investigators. Additionally, supervisors at all levels are heavily involved in the ID Backlog Plan, but the overall quality of Full ID investigations is still mixed. However, outside of the supervisory review of cases there is not a formal quality control mechanism (*e.g.,* sample testing of cases, etc).

While the current practices demonstrate Partial Compliance, further work is certainly needed to ensure ID conducts consistent and reliable investigations. The Monitoring Team has begun discussions with ID & Trials regarding incorporating quality control measures into the Intake Investigation process as well as review of Full ID investigations and that work will continue in the Twelfth Monitoring Period.

| Compliance Rating | ¶ 4. Substantial Compliance |
| --- | --- |
| | ¶ 12. Partial Compliance |

## VII. Use of Force Investigations ¶¶ 7 & 8 (Intake Investigations and Full ID Referrals) & Remedial Order § B. ¶ 2 (Intake Investigations)

Remedial Order § B. ¶ 2. *Intake Investigations.* The Department shall continue to operate the recently created "Intake Investigation Unit," which shall be responsible for conducting investigations of Use of Force Incidents and determining whether Full ID Investigations are required ("Intake Investigation"). The Intake Investigation Unit shall collaborate with Trials Division attorneys on Intake Investigations. Because the Intake Investigations will replace Preliminary Reviews and Facility Investigations, and will involve certain Use of Force Incidents that previously required Full ID Investigations, certain provisions of the Consent Judgment shall be modified as outlined in Paragraph E.1 below.

i.  The Department, in consultation with the Monitor, shall develop, adopt, and implement a policy that sets forth the process for conducting Intake Investigations ("Intake Investigation Policy") for members of the Intake Investigation Unit. The Intake Investigation Policy shall be subject to the approval of the Monitor.

¶ 7. Intake Investigations.[166]

*Investigation of Use of Force.* The Intake Investigation Unit shall conduct an investigation into the circumstances surrounding every Use of Force Incident, including the circumstances that led up to and followed the Use of Force, to determine: [. . .]

a.  *Timeliness.* The Intake Investigation, including all supervisory review and approval, shall be completed no later than 25 Business Days from the date the Use of Force Incident occurred, absent unusual circumstances outside the Department's control that warrant an extension of the deadline. Any extension of the 25-Business Day deadline shall be documented and approved by a Deputy Director of the Intake Investigation Unit.

b.  *Investigation.* The Intake Investigator shall review at least the following information: [. . .]

c.  If necessary to determine whether Staff engaged in excessive or unnecessary Use or Force or otherwise failed to comply with the New Use of Force Directive, the Intake Investigator shall either (i) conduct interviews of the Inmate(s) subject to the Use of Force or alleged Use of Force and any Inmate or civilian who witnessed the Use of Force Incident or (ii) recommend that such interviews be conducted during the Full ID Investigation.

d.  The Intake Investigator shall document any non-functioning cameras, any unavailable video footage, or any other barrier to reviewing all relevant video footage. In the event that no or only materially incomplete video surveillance can be located even though the Use of Force Incident took place at a location under video surveillance, the Intake Investigator shall either (i) investigate why no or only materially incomplete video surveillance can be located, and document his or her findings, or (ii) recommend that such investigation occur during the Full ID Investigation.

e.  *Report.* At the conclusion of his or her investigation, the Intake Investigator shall prepare a report summarizing the findings of the Intake Investigation and the basis for these findings. [. . .]

f.  *Supervisory Review.* All Intake Investigation reports shall be reviewed and approved by the Intake Investigator's supervisor to ensure that they comply with the terms of this Agreement and other applicable Department procedures and requirements. The name of the supervisor who conducts this review, the date of the review, and the findings of the review shall be documented.

g.  The Intake Investigation Unit shall determine whether to recommend that a Staff Member should be subject to immediate corrective action (as required pursuant to subparagraph 7(a)(v)) as soon as possible after the Use of Force Incident, and shall convey this recommendation directly to Department supervisors authorized to impose the recommended immediate corrective action.

¶ 8. The Intake Investigation Unit shall promptly refer any Use of Force Incident to ID to conduct a full investigation ("Full ID Investigation") upon a determination that:[167]

a.  The Use of Force Incident involves conduct that is classified as a Class A Use of Force, or any complaint or allegation that, if substantiated, would be classified as a Class A Use of Force.

b.  The Use of Force Incident involves a strike or blow to the head of an Inmate, or an allegation of a strike or blow to the head of an Inmate.

c.  It is necessary to conduct interviews of Staff Members to complete a thorough investigation and determine whether Staff engaged in excessive or unnecessary Use or Force or otherwise failed to comply with the New Use of Force Directive.

d.  Due to the complexity of the incident or investigation, the nature of the conduct at issue, or the evidence collected, it is necessary to conduct further investigative steps to complete a thorough investigation and determine whether Staff engaged in excessive or unnecessary Use or Force or otherwise failed to comply with the New Use of Force Directive.

---

[166] This language reflects the Consent Judgment Modification approved by the Court on August 14, 2020 (*see* dkt. 350).

[167] This language reflects the Consent Judgment Modification approved by the Court on August 14, 2020 (*see* dkt. 350).

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All incidents occurring on or after February 3, 2020 received an Intake Investigation.
  - The "Intake Squad Operating Manual" is a Division Order that was approved by the Monitoring Team and went into effect on January 29, 2020 and governs the Intake Squad and addresses all requirements of the Consent Judgment § VII (Use of Force Investigations), ¶¶ 7 and 8.
    - Investigations that required an interview of an incarcerated individual were referred for a Full ID investigation in this Monitoring Period given COVID-19 limitations (*e.g.,* most civilian investigators must work from home and therefore are not on site to conduct interviews and/or protocols on limiting personnel who entered the jails), as described in ¶ 2 above.
  - 5,112 (89%) of the 5,766 incidents that occurred since the inception of the Intake Squad have closed Intake Investigations. Of the 5,112 closed, 4,932 (96%) closed within 25 business days. Of the 654 Intake Investigations that were pending at the end of the Monitoring Period, all but two were pending *less* than 25 business days.
  - 851 (17%) of the 5,112 closed Intake Investigations were referred for Full ID Investigations.
- ID uses CMS to conduct Intake Investigations of all use of force incidents, and records detailed data on each Intake Investigation in an excel spreadsheet.

**ANALYSIS OF COMPLIANCE**

*Intake Investigations*

The Intake Investigation Squad remains in place and conducts an investigation of all use of force incidents and either closes the case following the Intake Investigation or refers the case for further investigation. The Intake Investigation policy, which incorporates the relevant Consent Judgment and Remedial Order provisions, was approved by the Monitoring Team and remains in effect. Intake Investigations generally address all of the policy requirements for investigations and are subject to supervisory review. The Monitoring Team continues to review all Intake Investigations as they are the most reliable source of information about use of force incidents. Importantly, Intake Investigations are also completed within 25 business days as required by this provision. Intake investigations now include a more streamlined and succinct narrative describing the incident. Generally, Intake Investigators appropriately identify and analyze the evidence, recommended appropriate corrective action to address a potential violation, or recommend further investigation when necessary. Further, the tracking of investigations has improved and relevant data regarding the outcome of these investigations is now available.

The Monitoring Team has identified two areas in which Intake Investigations could be slightly improved. First, the Monitoring Team has recommended that Intake Investigators focus on identifying

additional cases for potential immediate action given the protracted process to impose discipline. While some cases are identified for potential immediate action, it appears that not all cases that merit *consideration* for immediate action are identified. For instance, the Monitoring Team recommended 10 cases for consideration for immediate action (pursuant to Remedial Order § C, ¶ 2) and it does not appear the Intake Investigation recommended consideration of immediate action in these same cases. These examples suggested that Intake Investigators were not identifying the full scope of cases that should be *considered* for immediate action. Accordingly, the Monitoring Team recommended to ID leadership that Intake Investigators air on the side of caution and recommend *any* case in which *consideration* for immediate action *may be* appropriate so ID leadership has the *opportunity to consider* immediate action and ensure all incidents with serious misconduct are evaluated. In response to the feedback from the Monitoring Team, ID leadership reported it worked with the Intake Investigators to encourage identifying a broader set of incidents for consideration of immediate action and to also record in the Intake Investigation any time a case that is raised to ID Leadership for consideration and to include the outcome of that determination.

Second, the Monitoring Team's assessment of closed Intake Investigations suggested that some cases appeared to be closed prematurely that warranted referral for a Full ID investigation (discussed in more detail below). Generally, the need for additional investigation for these cases were fact-specific and a pattern or practice of premature closure was not identified.

For the first time since the Consent Judgment came into effect, use of force incidents are now timely assessed and the majority of incidents are appropriately investigated through Intake Investigations. Accordingly, the Department has achieved Substantial Compliance with this provision as Intake Investigations are conducted as required and are timely, consistently, and reliably completed.

- *Full ID Referrals,* ¶ 8

Intake Investigations are appropriately referring almost all cases for Full ID investigations as required by the revised criteria under ¶ 8. As anticipated, the majority of investigations are appropriately managed through the Intake Investigation and only a small proportion of cases require further investigation. Approximately 17% of incidents have been referred for Full ID investigations since the inception of the Intake Squad. Cases involving Class A injuries (¶ 8(a)) and head strikes (¶ 8(b)) have all been appropriately referred. In a small number of cases, the Monitoring Team has found that some investigations would have benefited from additional investigation because an interview was necessary (¶ 8(c)) or the incident was complex (¶ 8(d)), but they were closed following the completion of the Intake Investigation. The Monitoring Team raised 13 examples of these type of cases to ID leadership and in each case ID leadership followed-up with the individual investigators and supervisors to review the case and ensure there is a common understanding of when additional investigation may be necessary. ID leadership also determined in some cases that the investigations should be re-opened so additional investigation could be conducted. These case examples were all fact-specific and no

discernable pattern emerged that suggested there was a systematic issue with respect to referrals. Accordingly, the Department remains in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | ¶ **7.** Substantial Compliance |
| | ¶ **8.** Substantial Compliance |
| | **§ B., ¶ 2.** Substantial Compliance |
| | **§ B., ¶ 2(i).** Substantial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

    a.    *Timeliness* [. . .]
    b.    *Video Review* [. . .]
    c.    *Witness Interviews* [. . .]
    d.    *Review of Medical Evidence* [. . .]
    e.    *Report* [. . .]
    f.    *Supervisory Review* [. . .]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All ID investigations of UOF incidents occurring during this Monitoring Period were conducted within CMS.

- ID's focused in this Monitoring Period on closing the backlog of investigations (including Full ID investigations).

- In total, approximately 3,750 cases were closed in this Monitoring Period. The majority, 3,699, were closed as part of the ID Backlog Project as described above.

- 629 investigations have been referred for Full ID Investigations by the Intake Squad that are not part of the backlog. The status of these investigations is outlined in the chart below:

| | Status of Full ID Investigations for incidents that *occurred* on or between April 17, 2020 and December 31, 2020 | | | | |
|---|---|---|---|---|---|
| | *Pending* less than 120 Days | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | **Total** |
| Post-Backlog Cases | 276 44% | 27 4% | 25 4% | 301 48% | 629 |

**ANALYSIS OF COMPLIANCE**

In this Monitoring Period, the ID investigators responsible for conducting Full ID Investigations were responsible for completing all investigations pending as part of the backlog (any pending investigation of an incident that occurred on or before April 16, 2020) as well as any cases referred for Full ID investigations that occurred after April 16, 2020.

*Status and Timeliness of Full ID Investigations*

The time to complete investigations is still a challenge and Full ID Investigations are not yet

being completed timely. In total, approximately 3,750 cases were closed in this Monitoring Period by ID investigators outside of the Intake Squad. The majority, 3,699, were closed as part of the ID Backlog Project and were not completed within the 120-day time requirement. Given the focus on addressing the backlog, understandably, a smaller proportion of Full ID Investigations for more recent incidents were closed.

There are 629 incidents that were referred for Full ID Investigations by the Intake Squad that were not part of the backlog (*e.g.,* incidents occurring April 17, 2020 or after). 52 of the 629 have closed. Overall, 52% of these 629 cases were closed or pending beyond the 120-day requirement. In total, there are 577 Full ID cases pending (44% of which are pending less than 120 days as of the end of the Monitoring Period).

Accordingly, the Department is in Non-Compliance with the requirement to close Full ID investigations within 120 days. It is worth noting that the elimination of the backlog will position ID to close Full ID Investigations in the time required and improvements are expected in the next Monitoring Period. Further, the overall number and proportion (~17%) of investigations that require a Full ID investigation is significantly lower than the number and proportion of cases previously referred (for instance in the Fourth and Fifth Monitoring Periods approximately 50% of cases were referred for Full ID investigations), which should allow ID to keep pace with closing these investigations going forward.

*Quality of the Investigations*

The majority of Full ID investigations that were completed in this Monitoring Period were closed as part of the ID Backlog Plan. The overall quality of Full ID investigations was not anticipated to improve while the Department focused on eliminating the backlog, that said, many Full ID investigations are thorough, complete, and represent sound judgment and analysis by investigators. However, the quality of these investigations is mixed. While violations warranting formal discipline are generally identified and addressed by the investigation, Full ID investigations do not consistently address ancillary issues and/or Staff misconduct that is not central to the use of force being reviewed. In some cases, the investigator loses sight of the big picture in terms of evaluating the circumstances that led up to the need for force in the first place, and identifying whether/if the incident could have been avoided. Finally, while ID's approach to addressing the backlog is reasonable and the outcome of those investigations were generally reasonable (*e.g.,* identifying violations when they occurred), the extreme delays in these investigations in the backlog did, in at least some cases, impact the available evidence. The Twelfth Monitoring Period presents an opportunity for ID to begin to move past the backlog and work on conducting quality and timely Full ID investigations of more recent incidents. The Department is therefore in Partial Compliance with provisions ¶ 9(b) to (f) in this section.

| **COMPLIANCE RATING** | **¶ 9 (a).** Non-Compliance<br>**¶ 9. (b) to (f)** Partial Compliance |
|---|---|

| REMEDIAL ORDER § B. ¶ 4 (PRIORITIZING CERTAIN USE OF FORCE INVESTIGATIONS) |
|---|

§ B., ¶ 4. *Prioritizing Certain Use of Force Investigations.* ID shall continue to prioritize the investigations of certain incidents involving potentially serious and egregious Uses of Force and/or misconduct by Staff with a history of misconduct.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID has maintained the Use of Force Priority Squad ("UPS"), which was established in the Eighth Monitoring Period.

  - The Use of Force Priority Squad includes three investigators, one supervising investigator, and one Deputy Director, all of whom were chosen based on their skill set and experience.

  - A fact-based assessment is used to assign cases to UPS. Cases may be assigned to UPS based on their severity, if they involve certain Staff that have engaged in a pattern of concerning misconduct, and can be identified by ID staff or the Monitoring Team.

- This Monitoring Period, UPS closed 21 cases, and 9 cases were pending as of the end of the Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The UPS is a useful tool for ID to manage some of the most serious and complex use of force cases as it helps ensures that these cases obtain the necessary scrutiny and focus and are conducted in a timely manner. The Remedial Order codifies the requirement for UPS, as ID is required to prioritize the investigations of certain incidents involving potentially serious and egregious uses of force and/or misconduct by Staff with a history of misconduct.

While the cases assigned to UPS are often the most serious, they often do not rise to the level of potential criminal misconduct and therefore can be addressed by the Department as soon as possible. Most of the cases closed by UPS in this Monitoring Period substantiated findings of misconduct and recommended disciplinary charges. Unfortunately, to date, the cases assigned to UPS appear to languish. Of the 21 cases closed in this Monitoring Period, all closed in over 150 days from the incident date, with some closing over a year after the incident date. Additionally, it appears that most of the cases assigned to UPS in this Monitoring Period were based on recommendations from the Monitoring Team. It does not appear that cases were otherwise assigned to UPS. This is curious given the Monitoring Team's routine assessment of cases referred for Full ID suggest that additional cases would merit assignment to UPS. The Monitoring Team will work with ID in the Twelfth Monitoring Period to establish an improved approach to assigning cases to UPS and how those investigations can be addressed in a more timely manner. ID Leadership reports to the Monitoring Team that they intend to focus on this more closely in the next Monitoring Period.

| **COMPLIANCE RATING** | **§ B., ¶ 4.** Partial Compliance |
|---|---|

---

### REMEDIAL ORDER § B., ¶ 5 (TRACKING AND REPORTING UOF VIOLATIONS)

§ B., ¶ 5. *Tracking and Reporting UOF Violations.* Within 60 days of the Order Date, the Department, in consultation with the Monitor, shall develop a process to track and report the findings of every Intake Investigation or Full ID Investigation (if the incident is referred for a Full ID Investigation) of a Use of Force Incident. This tracking and reporting shall include whether the investigation resulted in a finding that the incident involved excessive or unnecessary Use or Force or any other UOF Violation. This data shall be maintained in a manner that can be aggregated by Facility, type of investigation (i.e., Intake Investigation or Full ID Investigation), and type of violation.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Intake Squad tracks and reports the findings of Intake Investigations for all incidents beginning February 3, 2020.
  - o The data collected includes whether incidents are avoidable, necessary, excessive, whether there are violations identified (such as report writing issues, handheld camera violations, chemical agent violations), whether allegations of unreported use of force by incarcerated individuals are substantiated or not, etc.
  - o The outcome of the Intake Investigation is also tracked and reported and includes whether the incident closed with an MOC, re-training, and Facility Referral, or referral for a Full ID Investigation.
- ID tracks and reports the findings of Full ID Investigations including whether the incident involved excessive or unnecessary use of force, and whether the incident closed with an MOC or Facility Referral.
- All data is tracked and reported in a manner that can be aggregated by Facility and type of investigation.

**ANALYSIS OF COMPLIANCE**

With the advent of the Intake Squad, the Department began collecting findings on each use of force incident. This data is analyzed and provided in the Identifying & Addressing UOF Misconduct section of this report. The Intake Squad investigator makes a determination in a number of categories upon closure of the Intake Investigation, when possible, but may defer a determination and the corresponding data to be collected until after the Full ID investigation is complete. As noted in regard to ¶ 9 above, few Full ID Investigations have been closed since the advent of the Intake Squad, so the tracking for the outcomes for Full ID Investigations is still new and the available data is limited. The Department tracks and reports whether the Full ID Investigations found force to be unnecessary or excessive, and whether the incident closed with an MOC or Facility Referral. Given the development of this data only began in earnest in this Monitoring Period, the Monitoring Team needs additional

time to evaluate the available data and whether any additional revisions to the tracking process can and should be made. The Monitoring Team will work on this in the next Monitoring Period.

| **COMPLIANCE RATING** | § B., ¶ 5. Partial Compliance |
|---|---|

### VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING) & REMEDIAL ORDER § B. ¶ 3 (ID STAFFING LEVELS)

¶ 11. The Department, if necessary, shall hire a sufficient number of additional qualified ID Investigators to maintain ID Investigator caseloads at reasonable levels so that they can complete Full ID Investigations in a manner that is consistent with this Agreement, including by seeking funding to hire additional staff as necessary.

Remedial Order § B. ¶ 3. ID Staffing Levels: Within 60 days of the end of the Eleventh Monitoring Period, the Monitor shall complete a review of the ID case assignment process and caseloads for: (i) ID Investigators who are responsible for conducting Full ID Investigations of Use of Force Incidents; and (ii) Intake Investigators who are responsible for conducting Intake Investigations. Based on the results of this review, the Department, in consultation with the Monitor, shall develop improvements to the case assignment process, as well as reasonable caseload targets ("Caseload Targets") for investigators. These improvements and Caseload Targets shall be subject to the approval of the Monitor. Within 120 days of the end of the Eleventh Monitoring Period, the Department shall implement these improvements and consistently meet the Caseload Targets going forward. The Monitor shall also develop a methodology to be used in assessing compliance with the Caseload Targets.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Interviewing, hiring, and onboarding of new staff was on hold in this Monitoring Period due to COVID-19, and a hiring freeze was in place, so no new ID staff were interviewed, hired, or onboarded during this Monitoring Period.

- The ID staffing levels at the end of each Monitoring Period, since the Sixth Monitoring Period, are presented in the chart below:

| ID Staffing Levels<br>*As of January 15, 2021* | | | | | | |
|---|---|---|---|---|---|---|
| **Position** | **June 2018** | **Dec. 2018** | **June 2019** | **Dec. 2019** | **June 2020** | **Dec. 2020** |
| Deputy Commissioner | 1 | 1 | 1 | 1 | 1 | 1 |
| Assistant Commissioner | 1 | 1 | 1 | 1 | 1 | 1 |
| Director/Acting Director | 0 | 4 | 4 | 6 | 5 | 4 |
| Executive Director | 0 | 0 | 0 | 0 | 0 | 1 |
| Deputy Director Investigator (DDI) | 6 | 6 | 6 | 8 | 8 | 8 |
| Administrative Manager | 0 | 1 | 1 | 1 | 0 | 0 |
| Supervising Investigator | 9 | 13 | 17 | 25 | 25 | 26 |
| Supervisor ADW | 3 | 0 | 0 | 0 | 0 | 0 |
| Investigator Captain | 16 | 16 | 14 | 15 | 14 | 12 |
| Investigator Civilian | 58 | 77 | 87 | 89 | 100 | 91 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Investigator Correction Officer | 77 | 71 | 67 | 89 | 90 | 88 |
| Support Staff | 12 | 12 | 12 | 10 | 11 | 10 |
| **Total** | **183** | **201** | **210** | **245** | **255** | **242** |

- The chart below demonstrates the breakdown of staffing within ID, and caseload information for the teams with UOF cases as of the end of the Monitoring Period:

| Facility Team Staffing & Case Breakdown for Team with UOF Caseloads *As of January 15, 2021* | | | | | |
|---|---|---|---|---|---|
| **Number of Assigned Staff** | | | **Number of Assigned Cases** | | |
| **Team/Unit** | **Supervisors**[168] | **Investigators** | **Intake Investigations or Preliminary Reviews**[169] | **FULL ID** | **Non-UOF** |
| Intake Squad | 8 | 43 | 674 | 0 | 0 |
| AMKC/TD (3 Teams) | 3 | 12 | 131 | 225 | 91 |
| NIC/OBCC (3 Teams) | 3 | 16 | 16 | 147 | 49 |
| MDC & Cts. (3 Teams) | 3 | 17 | 29 | 195 | 79 |
| RMSC/GRVC (4 Teams) | 3 | 10 | 39 | 136 | 117 |
| RNDC/VCBC (3 Teams) | 2 | 15 | 58 | 114 | 18 |
| UPS | 1 | 3 | 2 | 8 | 2 |
| **Totals** | **23** | **116** | **949** | **825** | **356** |
| **Other Teams** | | | | | |
| PREA (7 Teams) | 8 | 26 | | | |
| Intel | 2 | 6 | | | |
| Training | 1 | 2 | | | |
| Arrest Team | 1 | 9 | | | |
| K-9 | 1 | 7 | | | |
| Administration and Tracking, Misc. | 4 | 16 | | | |

**ANALYSIS OF COMPLIANCE**

---

[168] Eight DDIs oversee the Supervisors of these teams. The DDIs are not included in the count of supervisors in this chart.

[169] All cases pending investigations with Facility Teams (e.g. AMKC) in this column are Preliminary Reviews, which are part of the investigation backlog.

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. The City's current hiring freeze, associated with the financial impact of COVID-19, has meant that there was a net loss in the number of ID staff this Monitoring Period. That said, the caseloads of each investigation team have significantly reduced due to the elimination of the backlog. This is a time of significant transition within ID as the process to conduct investigations is evolving and so the staffing needs of the Division are in flux. It is unclear what impact, if any, the current loss of ID Staff will have on the workflow going forward. A staffing analysis, as required by the Remedial Order § B., ¶ 3, will be conducted once the backlog of investigations is cleared in the Twelfth Monitoring Period.

Adequate staffing and appropriate case assignment are critical to conducting timely and quality investigations. The Monitoring Team will be working closely with ID leadership to assess the appropriate deployment of resources to support the overall goal that investigations are consistently and timely completed as required.

| **COMPLIANCE RATING** | **¶ 11.** Partial Compliance<br>**§ B., ¶ 3.** Requirement not yet due |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY COLLECTION OF UOF DOCUMENTATION)

¶ 13. The Department shall develop, adopt, and implement a streamlined and centralized process to collect the information enumerated in Section VII, ¶ 7(c)(i) - (vii) and ¶ 13 (a) and (b) below from each Facility in order to provide the Intake Investigation Unit with this information in an efficient and timely manner.[170]

    a.   *Witness Statements.* The Facility shall obtain written statements from relevant witnesses, including staff Use of Force Reports, statements from Inmates subject to the Use of Force or alleged Use of Force, and statements from Inmates or civilian staff who witnessed the incident. In the event that Inmates are unwilling to provide written statements but are willing to provide information verbally, the Facility shall document whatever information is provided verbally.

    b.   *Collection of Medical Evidence.* At least four color digital photographs of each Inmate involved in the Use of Force Incident, capturing any visible injuries, shall be taken shortly after the Use of Force Incident, unless the Inmate refuses to be photographed, in which case such refusal shall be documented. Color photographs also shall be taken of Staff Members who sustained injuries during the Use of Force Incident. Injury-to-Inmate Reports shall be completed by medical staff and included in the file provided to the Intake Investigation Unit.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- This Monitoring Period, the Department worked with the Monitoring Team to promulgate a revised Directive 7003R-A: Facility Response to Use of Force Incidents. The policy was updated to reflect the revised requirements under ¶ 13 and the Facilities other obligations now

---

[170] This language reflects the Consent Judgment Modification approved by the Court on August 14, 2020 (*see* dkt. 350).

that Facility Investigations have been eliminated. The policy was finalized in the Twelfth Monitoring Period.

**ANALYSIS OF COMPLIANCE**

The revised Directive 7003R-A: Facility Response to Use of Force Incidents includes all Facility-level requirements related to Facility obligations for use of force investigations including the collection of incarcerated individual statements and collection of medical evidence as required by this provision. ID leadership reported that the coordination between the Intake Squad and the Facilities to obtain this type of documentation has gone smoothly since the inception of the Intake Squad. Although almost all UOF reports are available in a timely manner, ID investigators must sometimes obtain reports that were not originally submitted. However, these cases have not impacted the overall ability to assess reports and information in a timely manner.

Overall, it appears Intake Investigators continue to have access to the documentation from the Facility that is necessary to conduct Intake Investigations in a timely manner, and the Department is therefore in Substantial Compliance with this provision.

| **COMPLIANCE RATING** | **¶ 13.** Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 14 (INVESTIGATION OF USE OF FORCE INCIDENTS INVOLVING INCARCERATED INDIVIDUALS UNDER THE AGE OF 18)

¶ 14. The Department shall maintain a designated ID team ("Youth ID Team") to investigate or review all Use of Force Incidents involving Inmates who are under the age of 18 at the time of the incident. The Youth ID Team shall be staffed with one Supervisor, and an appropriate number of qualified and experienced investigators.

    a.   The Youth ID Team shall conduct Full ID Investigations of all Use of Force Incidents involving Inmates under the age of 18 that fall within the categories specified in Paragraph 8 above.

    b.   The Youth ID Team shall review all Facility Investigations of any other Use of Force Incidents involving Inmates under the age of 18 to ensure that they were conducted in a manner consistent with the requirements of Paragraph 13 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID created a "Horizon Youth ID Team" when Horizon opened consisting of a DDI, a Supervisor, five civilian investigators and a correction Officer investigator to investigate HOJC incidents. The team was re-assigned to other duties in the Tenth Monitoring Period as DOC's presence in HOJC was coming to an end. The investigators on the Horizon Youth ID Team with pending cases maintained those cases on their docket in order to close them.

- All investigations of HOJC use of force incidents involving DOC Staff have been closed.

**ANALYSIS OF COMPLIANCE**

The investigators on the HOJC Youth ID Team have closed out all pending ID investigations of incidents that occurred at HOJC—these cases were prioritized for closure, by recommendation of the

Monitoring Team, as part of the ID Backlog Plan. All Facility Investigations of incidents at HOJC had been closed in prior Monitoring Period.

The need for the HOJC Youth ID Team is no longer necessary given DOC no longer engages in the day-to-day management of 16- and 17-year-old youth and there are no pending investigations of incidents involving this age group. Accordingly, the Monitoring Team recommends this provision should be eliminated as part of the overall effort to modify certain provisions of the Consent Judgment described in the Background section of this report.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ 14. Not applicable<br>¶ 14. (a) Substantial Compliance<br>¶ 14. (b) Not applicable |

| |
|---|
| **XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)** |

¶ 9. All allegations of sexual assault involving Young Inmates shall be promptly and timely reported and thoroughly investigated.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to maintain Policy 5011 "Elimination of Sexual Abuse and Sexual Harassment," which establishes procedures for preventing, detecting, reporting and responding to incidents of sexual abuse and sexual harassment against incarcerated individuals. The specific policy requirements are detailed in the Third Monitor's Report (at pgs. 212-213).

- ID has a dedicated PREA Team that is responsible for investigating all PREA-related allegations. While all incidents even remotely sexual in nature are referred to ID by the Facilities and 311 as "PREA allegations," the PREA Team identifies which of these actually meet the definitions of sexual abuse and sexual harassment as defined by the PREA standards ("PREA reportable").[171] Those that do not meet the definition are still investigated by the PREA Team but are identified as "non-PREA reportable."

- The PREA Team continued to include a Director, Deputy Director, eight Supervisors, 26 investigators and four administrative staff.

- There were no PREA allegations by 18-year-olds during the current Monitoring Period and also no pending or completed investigations.

**ANALYSIS OF COMPLIANCE**

---

[171] See https://www.prearesourcecenter.org/ec-item/1291/1156-definitions-related-to-sexual-abuse for the definitions in PREA standard 115.6.

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

Although this provision pertains only to 18-year-old incarcerated individuals, it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. The Department routinely provides data to the Monitoring Team about allegations that are sexual in nature involving Young Incarcerated Individuals. Given that 16- and 17-year-olds are no longer housed or managed by the Department, this data now includes only allegations from 18-year-olds. This provision targets "sexual assault" and the Monitoring Team has used the PREA rubric as the best representation of the intended scope, although PREA cases also include sexual harassment in addition to sexual abuse. The Monitoring Team continues to review all closed investigations to verify that the PREA/Non-PREA designation is reasonable and consults with ID whenever a difference of opinion is identified.

*Allegations*

As shown in the table below, of the 148 allegations involving Young Incarcerated Individuals since January 1, 2016, a total of 108 (73%) met the definition of sexual abuse or sexual harassment and were deemed "PREA reportable," while 40 (27%) did not meet the definition and were deemed "non-PREA reportable." There were no allegations of sexual abuse, harassment or any other allegation of a sexual nature by an 18-year-old during the current Monitoring Period.

| Number of Allegations Involving Young Incarcerated Individuals, by Date of Report | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Total** |
| **Total Cases** | **34** | **26** | **33** | **55** | **0** | **148** |
| PREA | 22 *(65%)* | 16 *(62%)* | 25 *(76%)* | 45 *(82%)* | ~ | 108 *(73%)* |
| Non-PREA | 12 *(35%)* | 10 *(38%)* | 8 *(24%)* | 10 *(18%)* | ~ | 40 *(27%)* |

*Note: PREA = allegation meets the definition of sexual harassment or sexual abuse from PREA Standard 115.6; Non-PREA = allegations of a sexual nature that do not meet the definition of sexual harassment or sexual abuse (e.g., consensual relationships, single occurrences of sexualized comments or remarks, etc.)*

Typically, the Monitor's Reports have provided the number of PREA allegations, by Facility, as shown in the first table below.

| Number of PREA Allegations Involving Young Incarcerated Individuals, by Facility | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Total** |
| BXCT | ~ | ~ | 1 | ~ | ~ | 1 *(1%)* |

| | | | | | | |
|---|---|---|---|---|---|---|
| EMTC | ~ | ~ | ~ | ~ | ~ | ~ |
| GMDC | 8 | 4 | 1 | | | 13 *(12%)* |
| GRVC | ~ | 1 | ~ | ~ | ~ | 1 *(1%)* |
| HOJC | | | 17 | 35 | ~ | 52 *(48%)* |
| OBCC | 1 | ~ | ~ | ~ | ~ | 1 *(1%)* |
| RNDC | 9 | 10 | 4 | 5 | ~ | 28 *(26%)* |
| RMSC | 4 | 1 | 2 | 5 | ~ | 12 *(11%)* |
| **TOTAL** | **22** | **16** | **25** | **45** | **0** | **108 *(100%)*** |

However, given the changes in housing and supervising agency that have occurred (*i.e.,* 16- and 17-year-olds are no longer housed or managed by DOC*)*, an examination of the number of allegations by age group is useful. In particular, the second table below highlights that allegations from 18-year-olds have historically comprised a smaller proportion of all allegations.

| Number of PREA Allegations Involving Young Incarcerated Individuals, by Age | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Total** |
| 16/17-year-olds | 13 | 11 | 20 | 33 | 0 | 77 *(71%)* |
| 18-year-olds | 9 | 5 | 5 | 12 | 0 | 31 *(29%)* |
| **TOTAL** | **22** | **16** | **25** | **45** | **0** | **108 *(100%)*** |

### *Closed Investigations*

The following outcome analysis includes only those cases meeting the PREA definitions of abuse or harassment. As explained in the Ninth Monitor's Report (at pg. 180), the Monitoring Team uses a 120-business day timeframe to assess timely case closure.

At the close of the Tenth Monitoring period, no investigations were pending and so, coupled with the fact that there were no new allegations, no investigations were closed during the current Monitoring Period. The chart below displays the timeliness of PREA investigation closure since 2016 and illustrates the Department's improvements over time. The Monitoring Team has reviewed a majority of closed PREA investigations since 2016 and has found that the investigators' conclusions were generally reasonable. The table shows that the vast majority of investigations found that allegations were either unfounded (53%) or could not be substantiated (40%). Only 2 allegations *(2%)* have been substantiated over the 5-year period.

| Closed PREA Investigations, by Date Closed | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Total** |

| Total PREA Cases | 7 | 5 | 40 | 55 | 4 | 111 |
|---|---|---|---|---|---|---|
| **Investigation Timeliness** | | | | | | |
| Within 120-business days | 2 *(29%)* | 1 *(20%)* | 10 *(25%)* | 52 *(95%)* | 4 *(100%)* | 69 *(62%)* |
| 121+ business days | 5 *(71%)* | 4 *(80%)* | 30 *(75%)* | 3 *(5%)* | ~ | *42* (38%) |
| **Investigation Outcome** | | | | | | |
| Unfounded | 3 *(43%)* | 2 *(40%)* | 16 *(40%)* | 37 *(67%)* | 1 *(25%)* | 59 *(53%)* |
| Unsubstantiated | 1 *(14%)* | 3 *(60%)* | 22 *(55%)* | 16 *(29%)* | 2 *(50%)* | 44 *(40%)* |
| Substantiated | ~ | ~ | 1 *(3%)* | ~ | 1 *(25%)* | 2 *(2%)* |
| Referred to Justice Center | ~ | ~ | ~ | 2 *(4%)* | ~ | 2 *(2%)* |
| Missing/Unknown | 3 *(43%)* | ~ | 1 *(3%)* | ~ | ~ | 4 *(4%)* |

ID appointed dedicated and highly qualified leadership to oversee the PREA Team, which brought an increased focus on tracking cases and conducting more efficient, higher quality investigations. The Team has both sufficient resources and staffing. The Monitoring Team has generally found the investigators' practices to be sound, the findings to be reasonable, and cases to be closed in a reasonable time period. Given there were no PREA allegations by 18-year-olds during the current Monitoring Period and also no pending or completed investigations, the compliance rating from the Tenth Monitoring Period remains.

| COMPLIANCE RATING | ¶ 9. Substantial Compliance (per Tenth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 15 (POLICIES & PROCEDURES)

¶ 15. Within 60 days of the Effective Date, the Department, in consultation with the Monitor, shall review and revise any policies relating to the investigation of Use of Force Incidents to ensure that they are consistent with the terms of this Agreement.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- ID maintained the "Intake Squad Operating Manual" that was approved by the Monitoring Team and went into effect on January 29, 2020 and governs the Intake Squad and addresses all requirements of the Consent Judgment § VII (Use of Force Investigations), ¶¶ 7 and 8.

- This Monitoring Period, the Facility Investigations Policy 7003R-A was revised, in consultation with the Monitoring Team, to govern Facility-level responsibilities to collect information and documentation for investigations as required by revised ¶ 13.

- ID maintains a series of policies and procedures in various directives, memorandum, and internal communications. In the Seventh Monitoring Period, the ID Initiatives Manager

completed considerable work to facilitate the collection, organization, culling, and revising of
these policies and procedures, including:

- o Identifying and collecting over 70 individual memos, policies, procedures, directives or
  communications to investigators that have been governing the work of ID;
- o Rescinding over 50 of these, and maintaining, revising or replacing all others;
- o Drafting new policies or procedures.

**ANALYSIS OF COMPLIANCE**

The Department maintains the Intake Investigation Policy, which was approved by the
Monitoring Team in the Tenth Monitoring Period. This Monitoring Period, the Monitoring Team
approved a policy to govern Facility-level responsibilities to collect information and documentation for
investigations as required by ¶ 13. In order for the Department to achieve Substantial Compliance, ID
must have comprehensive policies and practices regarding the completion of Full ID investigations and
the necessary Quality Control measures within ID. The Monitoring Team intends to focus on this effort
in the next Monitoring Period given the Intake Investigation Squad has been fully implemented and the
backlog of investigations will be complete, so it will be an appropriate time to codify the requirements
for Full ID investigations and Quality Control measures.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

## 7.  RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management section of the Consent Judgment requires the Department to create

systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The

varied risks facing the Department require flexible, comprehensive, and timely responses. These

measures include developing and implementing an Early Warning System (¶ 1); conducting

counseling meetings between Facility leadership and any Staff Member who engages in a

concerning and/or repeated use of force incidents (¶ 2); identifying systemic patterns and trends

related to the use of force (¶ 3); creating a reporting and tracking system for litigation and claims

related to the use of force (¶ 4); and creating CMS to systematically track investigation and

disciplinary data throughout the Department (¶ 6). Each of these is described in more detail

below along with the Monitoring Team's assessment of compliance.

| X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM) |
| --- |

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Early Intervention, Support, and Supervision Unit ("E.I.S.S.") remains in the Department's Administration Division. The E.I.S.S. Unit is managed by an Assistant Commissioner and a Deputy Director and is supported by one civilian and two uniform Staff Members (one Captain and one Officer). During this Monitoring Period, E.I.S.S. leadership also interviewed additional Officers to fill three vacant roles.

- The work of E.I.S.S. is codified in Directive 5003R-C "Monitoring Uses of Force." The Directive includes specific triggers for E.I.S.S. to identify Staff who are then screened to determine whether they should be placed on monitoring. Edits to this policy (described below) were made during this Monitoring Period, but the revised policy was not finalized until after the close of the Eleventh Monitoring Period.

- During this Monitoring Period, the leadership of E.I.S.S. worked with the Monitoring Team to evaluate the specific triggers for E.I.S.S. screening and edited the 5003 Policy to reflect a more streamlined approach regarding which Staff to consider for E.I.S.S.:

   o As revised, the triggers to identify Staff for screening for potential monitoring include:

       ▪ All Negotiated Plea Agreements (NPAs) or guilty findings at OATH that result in 15 or more days; any Staff placed on Disciplinary Probation; recommendations from Rapid Reviews; any Staff Member who receives a use of force-related suspension; any Staff Member who has a PDR for extension of probation or demotion; and any Staff Member named in UOF litigation where that Staff Member is not indemnified by the City.

   o E.I.S.S. also identifies Staff to screen who are referred from various sources including:

       ▪ Referrals from Facility leadership (including through Rapid Reviews), the Chiefs or Department executives;

- ▪ Referrals from ID & Trials based on the new requirements for Screening and Assignment of Staff ¶ 6(c); and
- ▪ Referrals from the Monitoring Team.

   o These sources are analyzed at regular intervals depending on the criteria (*e.g.*, bi-weekly, bi-monthly, or monthly).

- • Screening Staff to Determine Whether to Place on Monitoring:

   o Once Staff are identified, they are screened for potential placement on E.I.S.S. monitoring via a review of their history with the Department, including, but not limited to, their assigned Facility, assigned post, disciplinary history, training history, 5003 counseling history, and an assessment of recent use of force incidents. The purpose of the screening is to determine whether the E.I.S.S. monitoring program could improve a Staff Member's performance.

- • Staff Placed on Monitoring:

   o Monitoring a Staff Member is a collaborative effort between E.I.S.S. and the Facility leadership of the Staff Member's command.

   o The Department continued to utilize the E.I.S.S. monitoring program for Staff as described in the Ninth Monitor's Report at pgs.187-188. In-person check-in meetings between E.I.S.S. staff and Staff on Monitoring were restarted in July 2020, following a temporary suspension due to COVID-19.

- • The table below depicts the work of E.I.S.S. during the last four Monitoring Periods and the overall caseload of the program since its inception in August 2017:

| Overview of EISS Work | | | | |
|---|---|---|---|---|
| | 8th Monitoring Period | 9th Monitoring Period | 10th Monitoring Period | 11th Monitoring Period | Program to Date – August 2017 to December 2020 |
| *Screening* | | | | |
| Staff Screened[172] | 92 | 229 | 158 | 60 | 760 |

---

[172] The number of Staff screened for each Monitoring Period may include some Staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual Staff screened. Staff are only counted once in the "Program to Date" column, even if the Staff Member was screened in multiple Monitoring Periods.

| | | | | | |
|---|---|---|---|---|---|
| Staff Selected for Monitoring[173] | 27 (29%) | 83 (36%) | 38 (24%) | 35 (58%) | 267 |
| **_Monitoring_** | | | | | |
| Staff Began Monitoring Term | 12[174] | 29 | 50 | 36 | 204 |
| Staff Actively Monitored[175] | 91 | 96 | 96 | 106 | |
| Staff Completed Monitoring | 22 | 45 | 9 | 29 | 127 |

**ANALYSIS OF COMPLIANCE**

The goal of E.I.S.S. is to identify and support Staff whose use of force practices would benefit from additional guidance or mentorship in order to improve practice and minimize the possibility that Staff's behavior escalates to more serious misconduct. In addition to appropriately identifying Staff for monitoring, the success of E.I.S.S.'s monitoring program relies on the quality of mentorship and leadership at the Facility-level to counsel, guide, and reinforce best practices with Staff who need extra support, as discussed in the Ninth Monitor's Report at pgs. 189-190.

The limitations due to COVID-19 (as described in the Tenth Monitor's Report at pg. 165) did not impact the work of implementing E.I.S.S. this Monitoring Period as it had in the last Monitoring Period, as in person meetings between E.I.S.S. staff and Staff in monitoring re-commenced in July 2020. However, this Monitoring Period remained a transitional period for E.I.S.S. in that E.I.S.S. leadership worked with the Monitoring Team to: (1) analyze and update the source triggers for screening Staff for E.I.S.S. to make the screening more fruitful; and (2) improve the monitoring program itself. As necessary, the revisions discussed below were also incorporated into a revised version of the 5003 Directive. The Monitoring Team also reviewed completion of monitoring forms for Staff who completed the monitoring program this Monitoring Period.

_Identification of Staff for Screening & Screening Staff_

---

[173] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff left the Department before monitoring began. Other Staff have not yet been placed on monitoring because they are on extended leaves of absence (_e.g._ sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a Staff's monitoring term if the Staff Member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[174] This includes two Staff Members who resigned during the Eighth Monitoring Period.

[175] The total number of Actively Monitored Staff for each Monitoring Period includes all Staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

E.I.S.S. uses a variety of triggers to identify Staff with concerning practices and/or problematic behaviors, and the screening process is designed to determine whether a *pattern* or *trend* in the Staff's behavior exists. The source triggers are the first step in *identifying* Staff who may benefit from E.I.S.S. monitoring, and *screening* Staff who meet the triggers is the second step. The goal of utilizing this two-step process is so that the resources utilized for screening individual Staff are focused on those more likely to benefit from monitoring in order to best conserve resources.

The Monitoring Team's assessment of E.I.S.S.'s work in prior Monitoring Periods found that some source triggers were better than others in identifying Staff with a potential *pattern* of misconduct rather than an isolated occurrence (*see* the Ninth Monitor's Report at pg. 191). The Monitoring Team recommended that E.I.S.S. consider refining certain triggers to make them more precise and limiting other source triggers which did not appear fruitful (*e.g.,* involvement in incidents resulting in a lawsuit that was ultimately settled). Following this recommendation, E.I.S.S. reviewed Staff who had been selected for the monitoring program to identify patterns and trends in order to determine which triggers most reliably and consistently identified Staff who could benefit from E.I.S.S. The source triggers were revised (as described in the bullets above) and utilized during this Monitoring Period. As revised, the triggers proved much more fruitful (and efficient). Compared to prior Monitoring Periods, a higher percentage of Staff who were screened using the revised triggers were ultimately selected for inclusion in the E.I.S.S. monitoring program (35 of 60 (58%) during the current Monitoring Period, compared to 38 of 158 (24%) in the previous Monitoring Period). The revised triggers are therefore proving much more efficient and better targeted toward Staff who ultimately should be placed on monitoring. In fact, the Monitoring Team has generally found that when the Monitoring Team identify Staff that could benefit from E.I.S.S., that the Staff Member has been or will be screened by E.I.S.S. for monitoring because they had met the revised triggers. That said, evidenced by the use of force issues described throughout this report, more Staff could benefit from the support of E.I.S.S.

*EISS Monitoring Program*

The reinstatement of the in-person component of the E.I.S.S. monitoring program is encouraging, but additional improvements are still necessary. First, the program could benefit from increased focus on identifying the areas in which Staff need to improve their conduct and then assessing the Staff's progress towards that change, instead of the more general assessment that has been used to date (*e.g.,* improved use of force tactics). Second, Facility-leadership must be actively engaged in working with the Staff Member on monitoring and the Facility-level mentorship must be improved and as it is a critical component of the program to support Staff while they are on monitoring. The current Facility-level mentorship is inconsistent and appears to provide more generic support. These two areas of focus are intended to work in tandem as improved guidance on the areas the Staff Member must focus on, as well as improved mentorship by the Facility leadership, should support overall improved practice for the Staff Member.

Regarding point one, the Monitoring Team worked with E.I.S.S. leadership in this Monitoring Period to consider questions such as how success should be measured and how to encourage (and ultimately measure) behavior change on an individual level. The Monitoring Team recommended E.I.S.S. leadership set clear goals and objectives at the outset of the monitoring program for each Staff ("monitoring plan") and involve those Staff Members in the creation of that plan so that they are more invested in the process. The Monitoring Team recommended these plans should also identify the training and coaching needed to develop the skills needed to achieve these goals/objectives, which should also help Facility leadership to mentor their Staff. Finally, the Monitoring Team recommended the counseling sessions that occur between Wardens and Staff on monitoring should become more structured – by focusing discussions on the goals, objectives, and skills outlined in the monitoring plan and regularly assessing progress at the Facility-level.

As a result of this feedback, E.I.S.S. leadership made improvements to the structure of the monitoring program by formalizing monitoring plans for each Staff Member as they were onboarded to E.I.S.S. (including feedback and input from the Staff Members themselves). These monitoring plans will also be utilized throughout the program during the bi-monthly check-ins between E.I.S.S. staff and Staff Members in the monitoring program to track their progress in achieving interim goals, and tracking whether the recommended training or counseling in specific areas was actually provided as prescribed. These monitoring plans were developed and utilized at the very end of the Monitoring Period. The Monitoring Team has only completed a cursory review of a handful of the monitoring plans, given they have only just been implemented, but the plans appeared to incorporate the feedback described above. However, a more thorough assessment is needed.

Regarding the second area of focus, Facility-level mentorship and guidance is necessary to support Staff in monitoring while they conduct their regular duties. The engagement of Facility leadership (Wardens) requires improvement as it has been inconsistent and generic, but has not yet been a concentrated area of focus. E.I.S.S. staff report they plan to work with the Facility leadership on improved practices for conducting 5003 counseling sessions during the Twelfth Monitoring Period, which will lead to parallel improvements in E.I.S.S. mentoring as the tasks are similar.

*Completion of Monitoring*

E.I.S.S. monitoring of Staff is for specific periods of time (typically 12 months), and Staff may complete monitoring when their specific term has ended *and* the Staff Member's performance demonstrates improvement. A total of 29 Staff Members completed the monitoring program during the Eleventh Monitoring Period. The Monitoring Team sought to review a sample of the completion of monitoring memorandums created by E.I.S.S. for these Staff Members, however learned through this review that these forms were not completed prior to the completion of monitoring. The completion memos are supposed to describe the Staff's behavior and progress while on E.I.S.S. These forms are designed to explain *how* the Staff Member successfully completed monitoring by providing a

qualitative assessment of the Staff Member's conduct in relevant use of force incidents, analyzing any improvements in practice, and identifying specific actions that were taken to address the issues that precipitated the Staff Member's placement on monitoring (*e.g.,* identifying if a Staff Member's post was changed, and/or if the Staff Member received specific re-trainings). During this Monitoring Period, the Staff Member's completion memos were completed long after monitoring had ended, and only in response to the Monitoring Team's request. Instead, E.I.S.S. leadership reported that in this Monitoring Period, an informal review of the Staff Member's progress and input from the Warden was obtained and considered before determining that a Staff Member successfully completed the monitoring program, however no documented evidence of this assessment existed. The Monitoring Team did review a sample of the completion memos that were created after-the-fact and the forms demonstrated that those Staff Members did make progress in the program and provided a thoughtful analysis of that Staff's history in E.I.S.S. However, this analysis is most appropriately conducted *before* it is decided that a Staff Member successfully completed the monitoring program in order to demonstrate the consideration and thought process for deciding that the Staff Member should end their monitoring term. The Monitoring Team is concerned that the failure to document this assessment could mean it is not occurring as required and is of little value after-the-fact and, at best, is merely for record-keeping. E.I.S.S. reported that after the close of the Monitoring Period that completion memos are now being completed contemporaneously with the determination on whether or not to find that a Staff Member has successfully completed the monitoring program.

## Conclusion

One area of significant improvement this Monitoring Period was the screening of Staff for E.I.S.S. monitoring—more streamlined triggers for screening allow resources to be deployed more efficiently and E.I.S.S. better identified those Staff who are best suited for the program. The Department remains in Partial Compliance with the requirements of this provision because the monitoring program itself requires additional improvements (as discussed above) to ensure Staff have clear and adequate guidance on their areas of practice that must be improved and Facility-level support must be reliable, consistent and engaging. The E.I.S.S. program must grow over time to support more Staff once the program is improved. An increased use of the E.I.S.S. program requires the Department to be in a position to provide better quality Facility-level mentorship for Staff Members in the E.I.S.S. program. The overall improvement of staff Supervision is a key focus for the Monitoring Team.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

¶ 2. a. The review of all Use of Force Incidents occurring in the Facility conducted by the Facility Warden, or a designated Assistant Deputy Warden (or other official of higher rank), shall include a determination of whether it would be appropriate to meet with the Staff Member to provide guidance concerning Use of Force ("Counseling Meeting").

i. The Facility Warden, Deputy Warden, or Assistant Deputy Warden shall conduct a Counseling Meeting if a determination is made that the Staff Member is in need of additional guidance regarding compliance with the New Use of Force Directive or any other Use of Force-related policies, procedures, rules, or directives.

ii. Counseling Meetings shall include guidance on how to utilize non-forceful methods to resolve conflicts and confrontations when circumstances do not require immediate physical intervention. A summary of the Counseling Meeting and any recommended corrective actions shall be documented and included in the Staff Member's personnel file. Counseling Meetings shall be separate from any disciplinary actions taken.

iii. The Department shall track whether Staff Members participated in Counseling Meetings, and, if so: (a) the name of the individual who provided such counseling, and (b) the date on which such counseling occurred.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 5003R-C "Monitoring Uses of Force" was updated to reflect the revised Consent Judgment counseling requirements and revisions to the E.I.S.S. section (see above). The Monitoring Team was consulted on the revisions to the policy and provided feedback to the Department. The policy was finalized after the close the Eleventh Monitoring Period.

- At the end of the Monitoring Period, the Department issued guidance to Facility leadership during the weekly *Nunez* meetings, advising leadership of the new Remedial Order requirements as well as their responsibilities in determining whether to recommended 5003 counseling meetings during their completion of Rapid Reviews for each use of force incident. This guidance included one example of a counseling form with an appropriate description of the 5003 counseling meeting and another example of a form with a poor description of a 5003 counseling meeting.

- Between July and December 2020, a total of 1,165 Staff were recommended for either a corrective interview or counseling sessions and NCU confirmed 1,090 of these interviews or sessions occurred (778 corrective interviews and 312 counseling sessions).

- NCU continued to track and follow up with Facility Leadership to ensure recommended corrective interviews and counseling sessions occurred as identified through Rapid Reviews.

## ANALYSIS OF COMPLIANCE

Revisions to counseling session requirements were approved in the Eleventh Monitoring Period and focused on identifying Staff for potential counseling immediately following a UOF incident rather than trends or patterns occurring over a longer period of time (as described in the Ninth Monitor's Report at pgs. 183 to 185 and the 10th Monitor's Report at pgs. 168-170). As a result, the process is more efficient and likely more comprehensive, as every Staff Member involved in a use of force incident is assessed for a potential counseling meeting.

More specifically, Rapid Reviews require Facility Leadership to determine whether each Staff Member involved in a use of force incident requires counseling or a corrective interview based on their conduct in the incident. Corrective interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. In contrast, counseling sessions (including 5003 counseling sessions) are not necessarily considered disciplinary in nature and

are not included in a member's personnel file. 5003 counseling sessions can also be an opportunity to commend Staff on exemplary behavior. Although slightly different in nature, corrective interviews serve a very similar role to counseling sessions in providing feedback to Staff and so the Monitoring Team considers them under this requirement. Counseling sessions and corrective interviews cannot be viewed in a vacuum, given they are part of the spectrum of corrective action that can be taken, and the range of corrective action imposed on Staff must be proportional to the misconduct that occurred. Depending on the misconduct identified, certain responses may be more appropriate (*e.g.,* counseling) while more egregious conduct may be better be addressed by more a severe response (*e.g.* formal disciplinary charges).

The Monitoring Team's focus in assessing compliance is to assess whether the Department is properly identifying cases where counseling would be appropriate, whether the counseling sessions actually occur, and whether the counseling documentation provides a description of the nature of the misconduct and the issues discussed.[176]

*Counseling sessions identified through Rapid Reviews*

This Monitoring Period, a total of 337 Staff were recommended for counseling by the Facility leadership. Of these, NCU confirmed that 312 sessions (93%) occurred. While all Facilities recommended some counseling sessions, AMKC, GRVC, OBCC, and RNDC used them most often, which makes sense given that they are the Facilities with the largest number of UOF incidents. These 312 Staff were involved in a total of 228 UOF incidents (in other words, in some cases, multiple Staff involved in the same incident were counseled). Out of the 3,161 UOF incidents that occurred this Monitoring Period, 228 (7%) had at least one Staff Member recommended for a counseling session.

While the number of counseling sessions that occurred this Monitoring Period is higher than the previous Monitoring Period, the number of counseling sessions is still below what the Monitoring Team would expect, given the frequency of poor practices observed during the Monitoring Team's review of incidents and also based on what counseling sessions are designed to do – to provide guidance and support to Staff to reduce unnecessary or excessive uses of force. While it is impossible to conduct counseling sessions with all Staff involved in all incidents, the Monitoring Team would

---

[176] The Monitoring Team will not assess the quality of counseling meetings because of the inherent challenges and limitations of an external party evaluating the effectiveness of the counseling meetings. Observing a counseling meeting will inevitably have a chilling effect on a Supervisor's discussion with Staff and reduce the likelihood of a completely open and honest dialogue, negating the purpose of the counseling session (see Ninth Monitor's Report at pg.198). Further, it is impossible to assess the effectiveness of the counseling session on future conduct. A Staff Member's use of egregious force after a counseling meeting is not necessarily an indicator of a poor counseling meeting. The Staff Member may simply require more intensive management or scrutiny. Similarly, any improvement in a Staff Member's conduct post-counseling may not have been due to the counseling meeting.

expect a greater number of counseling sessions to have occurred, especially given the frequency with which unnecessary or excessive use of force occurs at the Department.

The Monitoring Team looked at a sample of 30 counseling forms to get a sense of the time between the incident and the counseling meeting occurring. For the sample reviewed, the counseling sessions occurred an average of 12 days after the incident occurred (with the sessions occurring between 0 and 47 days after the incident occurred). This is an improvement on the Tenth Monitoring Period when 38% of the counseling sessions reviewed occurred more than 30 days after the incident. This Monitoring Period, 97% occurred less than 30 days after the incident.

To get a sense of whether the Department is counseling Staff involved in the most concerning UOF incidents, of the 228 UOF incidents with a confirmed counseling session, only 35 (15%) incidents overlapped with cases identified by the Monitoring Team as being particularly troublesome. Since the start of the Consent Judgment, the Monitoring Team has identified specific incidents that require closer scrutiny of the video and further investigation, based on the preliminary review. These incidents are only a subset of the UOF incidents where Staff have engaged in misconduct. Misconduct in these incidents varied, however, these incidents represent the most concerning UOF at the Department. While it's important to acknowledge that counseling sessions are only part of the corrective action that can be utilized and this subset of concerning incidents likely warranted a more serious response (*e.g.,* formal discipline), the Monitoring Team would expect the rough percentage of counseling sessions from this subset to be higher than 15%.

The Monitoring Team closely reviewed a sample of 52 counseling forms related to 19 incidents, looking at the conduct of each key Staff Member involved, what misconduct there was (if any), whether those Staff Members were counseled, and if they were, whether the counseling form captured the misconduct identified by the Monitoring Team. For the most part, Facility Leadership appeared to accurately identify those Staff that engaged in misconduct during the incident for counseling.[177] For the 52 Staff counseled, it was hard to discern what the substance of the counseling session involved because most forms used boilerplate and vague language (*e.g.*, Staff told to avoid avoidable incidents or UOF directive was discussed) with no reference to the specifics of the incident in question or the Staff Member's conduct. Some forms contained a brief description of what had transpired in the UOF incident and why the counseling session was occurring. Finally, a small number of counseling forms contained even more detail, either the misconduct identified in the Rapid Review was documented on the form or the forms actually went into detail on what was discussed (*e.g.*, "Captain got physically involved in UOF which hindered her ability to supervise the incident" and Staff's response, such as "I

---

[177] Approximately 100 additional Staff were involved in these 19 incidents, but did not receive counseling. While it appears some of these 100 Staff may have also benefited from counseling, those Staff who were selected for counseling generally did appear most appropriate. It is important to note that these Staff may have also received other forms of discipline, both more and less severe options.

try to not get involved but if I see Staff need assistance in securing an individual, I step in."). Overall, the counseling forms are of mixed quality. Greater detail on these forms is needed to demonstrate the specific reason the Staff Member was identified for counseling and what practices must be improved as a result of this discussion.

*Corrective Interviews identified through Rapid Reviews*

During this Monitoring Period, the Department conducted corrective interviews for a total of 778 Staff.= The Monitoring Team has not yet evaluated corrective interviews, but intends to focus on use of corrective interviews during the next Monitoring Period.

*Next Steps*

The current process to identify Staff for counseling or corrective interviews is a good first step in adequately counseling those Staff that require additional support and guidance. However, the Department must ensure they sufficiently utilize this tool. As noted above, it is impossible to counsel all Staff following an incident so the Department must appropriately target their efforts to those cases and Staff who would most benefit from this intervention. For the most part, it appears that when counseling is identified as an option to respond to a problematic incident that the appropriate Staff are being identified for counseling as required. However, the Department must work on ensuring that they are adequately identifying all Staff who require counseling and on improving the counseling session documentation to accurately reflect the misconduct being addressed in the counseling session.

| **COMPLIANCE RATING** | **¶ 2.** Partial Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 3 (COMPLIANCE ASSESSMENTS)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

¶ 3. The Department shall continue to routinely collect and analyze data relevant and necessary to assessing compliance with this Agreement, including data relating to Use of Force Incidents, the investigation of these incidents, and any discipline imposed. The Department shall identify trends and patterns in Use of Force Incidents, such as their prevalence, locations, severity, and concentration in certain Facilities and/or among certain Staff Members, including Supervisors. On a routine basis, the results of these analyses shall be documented and provided to the Monitor.

¶ 20. Any computerized system used to track the information set forth in Paragraphs 14 – 19 above, including IRS and CMS, shall have the capability to generate aggregate reports. The Department shall utilize these computerized systems and their aggregate reports to determine whether there are ways to enhance the quality of inmate supervision or oversight of Staff Members, and to identify any systemic patterns associated with Use of Force Incidents or inmate-on-inmate fights or assaults, which the Department shall take appropriate steps to address in consultation with the Monitor.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Department leadership and Facility leaders meet weekly to discuss operational issues in the jails, leveraging analysis from various data sources to guide this discussion, as described further in regard to Remedial Order § A (¶ 2) above.

- Facility Leadership conduct Rapid Reviews of all UOF incidents captured on video at each Facility assessing (1) whether the incident was avoidable, and if so, how; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) whether the incident involved painful escort techniques; and (5) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type.

- NCU and CLU continues to routinely collect and analyze data necessary to assess compliance with many parts of this agreement, including data related to Use of Force Reporting, assessing the status of Command Disciplines, the outcome of Rapid Review assessments, confirming that recommendations from Rapid Reviews are completed, assessing inoperable cameras, assessing use of body worn and handheld cameras, assessing consistent staffing at RNDC, and many other areas discussed throughout this report. The results of these findings are used to identify and address discrete issues through communications and initiatives with Facility leadership.

- The Department maintains an electronic dashboard, available to all Facility leadership of relevant use of force data that can help to identify trends and patterns including dates and time of incidents, location, reasons, frequency of individuals involved. The Project Management Office also prepares a summary of this information that is reported at routine Facility leadership meetings.

**ANALYSIS OF COMPLIANCE**

These two provisions (§ X., ¶ 3, § V., ¶ 20) are addressed together because maintaining consistent and reliable data, analyzing and interpreting it form the foundation upon which the Department can design and enact problem-specific solutions to its UOF issues.

*Analysis of UOF Data (§ X., ¶ 3)*

This provision was modified to allow the Department to engage in a broader effort to routinely collect and analyze data relevant to assessing compliance with the Consent Judgment as recommended by the Monitoring Team and described in the Ninth Monitor's Report at pgs. 184-188. The Department has many sources of data which are routinely collected and analyzed by NCU and CLU. These data are essential for assessing compliance with the requirements of the Consent Judgment. The findings of these analyses are then utilized within the Department to identify areas that require additional focus and work to improve compliance. For example, NCU routinely assesses Command Disciplines and then works with Facility leadership if the rate of dismissals appears inconsistent with what would be expected. As discussed throughout this report (and previous reports), these efforts have supported improved and sustained progress by the Department in achieving compliance (for example, see the analysis in the Use of Force Reporting section of this Report in regard to timely submission of Staff use of force reports (¶ 4) and timeliness of medical care following a use of force (¶¶ 22 and 23)). Data collection and analysis is not only invaluable to the Department's ability to ascertain its own progress,

identify and target areas of weakness and spot patterns to be addressed, it also supports the Monitoring Team's work as well. The Monitoring Team often leverages these findings to work with the Department on developing strategies to address areas that may be struggling. CLU and NCU also work together to identify trends and patterns in Use of Force Incidents and provide that analysis as part of the compliance report at the end of every Monitoring Period. The PMO also routinely evaluates UOF data and presents this to Facility leadership meetings. Overall, the efforts of NCU, CLU, and PMO and their corresponding work with Facility Staff have achieved compliance with this requirement.

_Use of Aggregate Reports to Enhance Oversight_ (§ V., ¶ 20)

As demonstrated throughout this report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and the "Inmate-on-Inmate Fight Tracker" to identify opportunities to enhance the quality of incarcerated individual supervision or oversight of Staff Members. As such, the Department is in Substantial Compliance with this provision.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3.** Substantial Compliance<br>**¶ 20.** Substantial Compliance |

## X. RISK MANAGEMENT ¶ 4 (TRACKING LITIGATION)

¶ 4. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement a method of tracking the filing and disposition of litigation relating to Use of Force Incidents. The Office of the Corporation Counsel shall provide to the Legal Division of the Department, quarterly, new and updated information with respect to the filing, and the resolution, if any, of such litigation. The Department shall seek information regarding the payment of claims related to Use of Force Incidents from the Office of the Comptroller, quarterly.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Office of the Corporation Counsel continues to provide the Department with quarterly reports of lawsuits that are filed and settled. During this Monitoring Period, the reports from July to December 2020 were shared with the Department. The reports include case filing and disposition, names and shield numbers (if appropriate) of the defendants, incident details, dollar amount in controversy, forum and description of the lawsuit.

- The Office of the Comptroller continues to provide the Department with reports regarding the payment of claims related to UOF incidents. During this Monitoring Period, the two reports covering July and December 2020 were shared with the Department.

- The City settled a total of 310 lawsuits with Use of Force related claims between January 1, 2016 and December 31, 2020 for a total of $20,439,180. These claims cover incidents that occurred between 2006 and March 2019.

  o During this Monitoring Period, 46 cases were settled for a combined value of $2,141,000.

| |
|---|
| **UOF Settlement Cases** |

| Cases Settled between January 1, 2016 and December 31, 2020 (Incident occurred between 2006 and March 2019) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Settlement | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Total | |
| Total | 50 | | 67 | | 79 | | 49 | | 111 | | 356 | |
| 0 to $9,999 | 13 | 26% | 26 | 39% | 28 | 35% | 23 | 47% | 34 | 31% | 124 | 35% |
| $10,000 to $49,999 | 28 | 56% | 32 | 48% | 35 | 44% | 18 | 37% | 50 | 45% | 163 | 46% |
| $50,000 to $99,999 | 5 | 10% | 7 | 10% | 9 | 11% | 4 | 8% | 20 | 18% | 45 | 13% |
| $100,000 or more | 4 | 8% | 2 | 3% | 7 | 9% | 4 | 8% | 7 | 6% | 24 | 7% |

| Total Amount Settled | $2,804,000 | $2,490,750 | $7,115,480 | $3,443,950 | $4,585,000 | $20,439,180 |
|---|---|---|---|---|---|---|

## ANALYSIS OF COMPLIANCE

The required information continues to be shared routinely with the Department. As described in the Tenth Monitor's Report at pgs. 172-173, this data has not been useful for identifying Staff who may need additional support or for identifying patterns or trends regarding Staff engaging in concerning behavior. Its lack of utility is often due to time delays in both bringing and settling a lawsuit, which means that the incident/Staff in question often date back several years and thus do not inform current trends. Further, it is arbitrary which incidents an individual may bring a lawsuit for, which likely also contributes to the lack of findings of patterns or trends. Consequently, E.I.S.S. stopped evaluating this data during the Eleventh Monitoring Period. The Department has maintained Substantial Compliance with this provision since the Fourth Monitoring Period, for a total of 48 months.[178] The Department's sustained compliance has not identified any basis upon which this information is useful to the overall reform efforts so this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team therefore recommends this provision be terminated as described in the Background section of this report.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)

¶ 6. By August 31, 2017,[179] the Department, in consultation with the Monitor, shall develop CMS, which will track data relating to incidents involving Staff Members. The Monitor shall make recommendations concerning data fields to be included in CMS and how CMS may be used to better supervise and train Staff Members. The Department shall, in consultation with the Monitor, consider certain modifications to the EWS as it develops CMS. Such modifications shall

---

[178] *See*, Fourth Monitor's Report at pg. 158 (dkt. 305), Fifth Monitor's Report at pg. 116 (dkt. 311), Sixth Monitor's Report at pg. 121 (dkt. 317), Seventh Monitor's Report at pgs. 148 to 149 (dkt. 327), Eighth Monitor's Report at pgs. 179 to 180 (dkt. 332), Ninth Monitor's Report at pgs. 201 to 202 (dkt. 341) and Tenth Monitor's Report at pgs. 172-173 (dkt. 360).

[179] This date includes the extension that was granted by the Court on April 4, 2017, which also included that the Department *implement* CMS by December 31, 2017 (*see* dkt. 297).

incorporate additional performance data maintained by CMS in order to enhance the effectiveness of the EWS. CMS shall be integrated with the EWS, and CMS shall have the capacity to access data maintained by the EWS.

¶ 18. All of the information concerning Facility Investigations, Full ID Investigations, and disciplinary actions set forth in Paragraphs 15, 16, and 17 above shall be tracked in CMS, which shall be developed and implemented by December 1, 2016, in accordance with Paragraph 6 of Section X (Risk Management). CMS shall be integrated with IRS or any other computerized system used to track the Use of Force Incident information set forth in Paragraph 14 above, and CMS shall have the capacity to access data maintained by that system. In addition, the Department shall track in CMS whether any litigation was filed against the Department or the City in connection with a Use of Force Incident and the results of such litigation, as well as whether any claim related to a Use of Force Incident was settled without the filing of a lawsuit.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains a Case Management System that has functionality for tracking Use of Force incidents and Use of Force investigations.

- The Department has conducted all Preliminary Reviews, Intake Investigations, Facility Investigations, and ID investigations in CMS for incidents that occurred since December 13, 2017. The Department also uses CMS to generate and track Command Disciplines.

### ANALYSIS OF COMPLIANCE

The Department has maintained Substantial Compliance with these provisions since the Seventh Monitoring Period. The Department successfully developed a computerized system to conduct Use of Force investigations and to track related discipline (the system is described in the Sixth Monitor's Report at pgs. 123-124)) and created the ability to review and aggregate incident- and investigation-based information as required by § V. ¶ 18. However, as described in the Tenth Monitor's Report at pg. 174, the system lacks elasticity (*e.g.,* the ability to capture the new functionality of the Intake Squad), and unfortunately, the Department does not have an internal capability to modify CMS. The Monitoring Team continues to believe that the Department's ability to aggregate investigative information in CMS would benefit from the system being more dynamic and would recommend that it obtain an internal capability to modify the system.

| COMPLIANCE RATING | ¶ 6. Substantial Compliance<br>¶ 18. Substantial Compliance |
|---|---|

### 8. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII)

Deterring Staff from using excessive and unnecessary force is a key component to

ensuring Staff at all levels are fulfilling their duties and must include meaningful accountability,

which is achieved with consistent, proportional, and timely responses. Active management and

supervision are required to ensure Staff adequately complete their work; this includes guidance,

training, counseling, and imposing discipline (when appropriate). The Identifying & Addressing

UOF Misconduct section of this report provides an overview of the various ways Staff are held

accountable, including discipline. This section focuses on the Department's efforts to impose

corrective action (*e.g.,* counseling, re-training, Command Discipline, etc.) and formal discipline

(including PDRs, NPAs, and OATH proceedings) once the misconduct has been identified and

the investigation has been completed.

The Monitoring Team's assessment of compliance with each provision in this section is

below.

| VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1 |
| (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY) |

¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department has various structures to ***identify*** misconduct:
  - o Via Rapid Reviews, ad hoc review of incidents by civilian and uniform leadership, Intake Investigations (and formerly Preliminary Reviews), and through Full ID investigations.
- The Department has various structures to ***respond*** to misconduct including:
  - o Corrective interviews, counseling, re-training, Command Discipline ("CD"), suspensions, and placing an individual on modified duty.
  - o Personnel Determination Reviews ("PDR") for *probationary* Staff.
  - o Formal Discipline through Trials via NPAs and Office of Administrative Trials and Hearings ("OATH") proceedings for *tenured* Staff.

**ANALYSIS OF COMPLIANCE**

Understanding the Department's progress toward compliance with this provision requires an appreciation of two key pieces of contextual information. First, as noted previously, ID has largely eliminated its backlog of investigations, which is obviously positive; however, this means that the backlog of cases has simply moved downstream—it has not evaporated. Instead, Trials is now faced with an enormous number of cases to process. Second, Staff discipline comes in many forms and can be imposed by a variety of different actors within the Department, at various stages. All forms of accountability are important.

The Department has improved its imposition of close-in-time corrective action (*e.g.*, corrective interviews and Command Disciplines), which typically allows for informal discipline to be imposed more quickly for lower-level misconduct and/or procedural errors. Suspensions have also been utilized more often and can send a swift and certain message for more serious misconduct that may *also* warrant formal discipline.

However, most use of force violations (including the misuse of chemical agents) and use of force reporting violations are addressed through formal discipline via Trials, as they are referred once the ID investigation is complete. A small portion of discipline for probationary Staff is imposed via PDRs. Once the Department's system for Staff discipline is functioning properly, the combination of close-in-time corrective action and a more streamlined formal disciplinary process will allow the Department to implement responses that are both appropriate and proportional to the variety of misconduct that occurs.

*Overview of Accountability Measures*

The Monitoring Team does not set specific targets for the number or types of discipline that *should* be imposed in any given time period for the reasons discussed in the Identifying and Addressing UOF Misconduct section of this report. However, aggregate data is illustrative. The chart below provides an overview of the accountability that has been imposed between January 2019 and December 2020. As demonstrated in the chart below, the overall volume of corrective action (Corrective Interviews, CDs (resulting in either days deducted or a verbal reprimand), and suspensions) imposed increased substantially during the current Monitoring Period, compared to the previous three Monitoring Periods. As shown in the green shaded row below, 1,276 corrective actions were imposed during the current Monitoring Period—about four times as many imposed during the Tenth Monitoring Period. This increase is attributable to the Department's improvement in both identifying and addressing lower-level misconduct and/or procedural errors that led to use of force incidents, most of which had previously gone unaddressed. Further, almost all conduct addressed by corrective action is for conduct *that occurred during this* Monitoring Period.

By contrast, the majority of formal discipline imposed relates to misconduct that *occurred at least a year ago* (and often even longer). Further, while the imposition of formal discipline increased in 2020 compared to 2019 (373 versus 301) it has only addressed a small proportion of the pending Trials cases referred to Trials for formal discipline.

| Overall Staff Accountability Imposed January 2019 to December 2020 | | | | |
|---|---|---|---|---|
| | Jan.-June 2019 8th Monitoring Period | July-Dec. 2019 9th Monitoring Period | Jan.-June 2020 10th Monitoring Period | July-Dec. 2020 11th Monitoring Period |
| Support and Guidance Provided to Staff | | | | |

| 5003 counseling | 1,446[180] | 484[181] | 87[182] | 337 |
|---|---|---|---|---|
| Re-Training | ██████████ | | 1,174[183] | |
| **Corrective Action Imposed by a Variety of Entities within the Department** | | | | |
| Corrective interviews (recommended from Rapid Reviews) | 323 | 447 | 176 | 778 |
| CDs (resulting in verbal reprimand or corrective interview) | 109 | 103 | 47 | 95 |
| CDs (resulting in days deducted) | 391 | 489 | 262 | 361 |
| Suspensions | 23 | 24 | 36 | 42 |
| **Formal Discipline** | | | | |
| PDRs | 31 | 50 | 34 | 15 |
| NPAs | 84 | 135 | 159 | 165 |
| **Total Corrective Action and Discipline Imposed** | | | | |
| **Grand Total** | **961** | **1,248** | **714** | **1,456** |
| *Corrective Action Total* | *846* | *1063* | *521* | *1276* |
| *Formal Discipline Total* | *115* | *185* | *193* | *180* |

### Status of Formal Discipline Imposed

While the higher volume of corrective action for lower-level misconduct is encouraging, there is a significant void in addressing the majority of use of force policy violations through formal discipline. Backlogged cases from ID that are referred for PDRs or formal discipline (via Trials) means that the process of imposing discipline in these cases is already very protracted, even before the case is referred for formal discipline. This has only compounded problems related to timeliness that existed at the time the Consent Judgment went into effect.

- **Discipline Imposed via PDRs**

Only a small portion of use of force and reporting violations are addressed through PDRs. Given the dwindling number of probationary Staff (as no new classes of COs have been hired since 2019 and only a small number of Captains or ADWs have been promoted), the use of PDRs has decreased as would be expected. PDRs are generally resolved within 30 days after they are issued. The Department's management and use of PDRs has vastly improved since the Effective Date, however,

---

[180] Counseling that occurred in this Monitoring Period was focused on a more holistic assessment of the Staff Member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Eighth Monitor's Report at pgs. 172-173.

[181] The identification of Staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Ninth Monitor's Report at pgs. 194-196.

[182] The Department transitioned the process for identifying Staff for counseling during this Monitoring Period. *See* Tenth Monitor's Report at pgs. 168 to 170.

[183] This number reflects all re-training requested in 2020 that were also fulfilled in 2020.

because PDRs are such a small proportion of cases which require formal discipline, improvement in this one area has limited impact on the overall goal of timely discipline.

- **Discipline Imposed via the Trials Division**

As shown in the table below, the volume of cases pending with the Trials Division has increased significantly since ID began to clear its backlog—and refer many of those closed investigations to Trials—in 2019 (the Eighth and Ninth Monitoring Period).

| Cases Pending Trials<br>*As of January 15, 2021* | | | | |
|---|---|---|---|---|
| | Jan.-June 2019<br>8th Monitoring Period | July-Dec. 2019<br>9th Monitoring Period | Jan.-June 2020<br>10th Monitoring Period | July-Dec. 2020<br>11th Monitoring Period |
| **Pending Cases** | 407 | 633 | 1050 | 1445 |

While the Department imposed 48% more NPAs in 2020 (n=324) than 2019 (n=219), far *fewer* NPAs were imposed in 2020 than in 2017 or 2018. While there are several reasons for the decline, one of the key stressors to the system at this point is simply the number of cases that require action of some sort (*e.g.*, serving charges, negotiating with the parties, etc.) which in turn limits the time available to bring other cases to closure.

| NPAs Imposed, 2017-2020<br>*As of January 15, 2021* | | | | |
|---|---|---|---|---|
| **Year Finalized** | **2017** | **2018** | **2019** | **2020** |
| **Number of Cases** | 397 | 484 | 219 | 324 |

For the 324 NPAs that were imposed in 2020, only 15 (5%) addressed misconduct from 2020, 78 (24%) addressed misconduct from 2019, 144 (44%) addressed misconduct from 2018, 83 (26%) from 2017, 4 from 2016, and 1 case prior to 2016. As shown in the table below, of the nearly 2,000 cases in which formal discipline has been imposed by the Trials Division since the Effective Date, 87% were closed more than one year after the date of the incident, and 44% were closed more than two years after the date of the incident. Among pending cases, where delays will continue to accumulate until the case is finally closed, 85% are already one year out from the date of the incident and 49% are already two years out from the date of the incident.

| Time Between Incident Date and Case Closure or Pending as of January 15, 2021 | | | |
|---|---|---|---|
| | Closed Discipline | Pending Discipline | Total |

| | | | | | | |
|---|---|---|---|---|---|---|
| 0 to 1 year from incident date | 249 | 13% | 211 | 15% | 460 | 13% |
| 1 to 2 years from incident date | 857 | 43% | 532 | 37% | 1389 | 41% |
| 2 to 3 years from incident date | 580 | 29% | 518 | 36% | 1098 | 32% |
| More than 3 years from incident date | 292 | 15% | 184 | 13% | 476 | 14% |
| | **1978** | | **1445** | | **3423** | |

The chart below presents the same data above, but by *incident date*, to further illuminate how protracted the discipline is in the cases that are still pending. While 184 of the 1,775 pending cases stem from incidents that occurred in 2017 or earlier, over 1,000 of the 1,424 cases that occurred in 2018 or 2019 still have not reached resolution. Further, *only* 16 cases that occurred in 2020 have been closed.[184]

| Status of Cases in Trials by Date of Incident<br>*As of January 15, 2021* | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Total | |
| **Total cases** | **682** | | **472** | | **621** | | **775** | | **648** | | **227** | | **3426** | |
| **Closed cases**[185] | 680 | 100% | 459 | 97% | 452 | 73% | 257 | 33% | 116 | 18% | 16 | 7% | **1980** | **58%** |
| **Total number of cases pending** | 2 | 0% | 13 | 3% | 169 | 27% | 518 | 67% | 532 | 82% | 211 | 93% | **1445** | **42%** |
| | | | | | | | | | | | | | | |
| **Pending Investigations** | 0 | | 0 | | 0 | | 1 | | 275 | | 1,237 | | **1,513** | |

While the number of referrals to the Trials Division has likely peaked (given that most of the ID backlog has been eliminated and contemporaneous cases are being referred more quickly), it is worth noting that as of the end of the Monitoring Period, 1,513 investigations are pending with ID (most for incidents that occurred in 2020) and at least 870 of these cases are pending Full ID investigations. While disciplinary referrals are not expected to be made at the conclusion of every investigation, the likelihood of disciplinary charges is greater for those matters in which a Full ID investigation is being conducted, and therefore the influx of case referrals will continue.

*Conclusion*

The Department's use of corrective action in response to misconduct has improved, but the number of cases where the goal of consistent and timely formal discipline for use of force and

---

[184] One of the 16 cases that occurred in 2020 was administratively filed while discipline was imposed in the other 15 cases.

[185] This captures all cases closed by the Trials Division, including those cases that did not result in a penalty (e.g., administratively filed cases and deferred prosecutions).

reporting violations is *not* being achieved is significant. To effectively instruct Staff that their behavior was inappropriate, it is imperative that consequences and feedback is given close-in-time to the behavior. Without this, Staff misconduct has no repercussions. Therefore, the lack of timely accountability allows Staff to act with impunity and the culture of violence to persist.

Accordingly, the Department is in Non-Compliance with this requirement. The Monitoring Team recognizes that the protracted imposition of formal discipline will continue until the Trials Division can close the large volume of cases in its queue and can begin to keep pace with the influx of new cases. This is why, to the extent feasible, the Monitoring Team has recommended that the Department utilize close-in-time corrective actions whenever possible and that additional resources are deployed to support the imposition of formal discipline via the Trials Division. Most importantly, it is imperative that the City (including OATH) and the Department make all efforts to improve this process to both address the cases in the backlog and begin to hold Staff accountable as close as time as possible to when the misconduct occurred.

| **COMPLIANCE RATING** | **¶ 1.** Non-Compliance |
| --- | --- |

| **REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY) ¶ 1** **VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2(e)** **(TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)** |
| --- |
| § C., ¶ 1. Immediate Corrective Action. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations. |
| § VIII., ¶ 2. |
|     e.  If the Preliminary Review set forth in Paragraph 7 of Section VII (Use of Force Investigations) results in a determination that a Staff Member has more likely than not engaged in the categories of misconduct set forth in subparagraphs (d)(i) –(iii) above, the Department will effectuate the immediate suspension of such Staff Member, and, if appropriate, modify the Staff Member's assignment so that he or she has minimal inmate contact, pending the outcome of a complete investigation. Such suspension and modification of assignment shall not be required if the Commissioner, after personally reviewing the matter, makes a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor. |

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Rapid Reviews, *ad hoc* reviews by uniform or civilian leadership, and Intake Investigations all identify misconduct for immediate corrective action, as discussed in detail in the Identifying and Addressing UOF Misconduct section of this report.

- All Intake Investigations must determine whether individual immediate corrective action is merited for each incident, as required by Consent Judgment §VII., ¶ 7(a)(v).
- The revised Rapid Review template requires consideration of immediate corrective action for each Staff Member involved in each incident reviewed.

- The Department imposed the following number and types of immediate corrective actions during this Monitoring Period:

| Immediate Corrective Action Imposed Eleventh Monitoring Period Incidents | |
|---|---|
| **Type of Corrective Action by Staff Member** | **Number** |
| Suspension | 42[186] |
| Non-Inmate Contact Post or Modified Duty | 1 |
| Counseling and Corrective Interviews | 1,090 |
| Re-Training | 422[187] |
| **Incident-Level** | |
| Total UOF Incidents in 11th Monitoring Period | 3,277 |
| Total UOF Incidents with at least one Immediate Corrective Action | 1,427 |

## ANALYSIS OF COMPLIANCE

Consent Judgment § VIII, ¶ 2(e) and Remedial Order § C., ¶ 1 are addressed collectively because together, they require the use of immediate corrective action. Immediate corrective action (suspension, re-assignment, counseling, or re-training) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold Staff to a common standard for utilizing force, particularly when deviations from that standard are immediately obvious upon the incident's review. Given the current backlog of cases awaiting investigation and discipline, the need for more immediate corrective action is essential for ensuring that blatant misconduct is addressed in a timely fashion. The Department's efforts to address this requirement are discussed in detail in the Immediate Corrective Action section of the Identifying and Addressing UOF Misconduct section of this report, and thus are not repeated here. This information was relied upon in making the compliance assessment for these provisions.

The Department continues to make progress identifying misconduct close-in-time to the incident. The Department has also improved the imposition of immediate corrective action (*e.g.,* utilizing 78 suspensions for UOF-misconduct in 2020 compared with 47 in 2019). However, based on

---

[186]The Monitoring Team verified that these 42 Staff Members were suspended for use of force-related misconduct with suspensions lasting from five to 30 days.

[187] The majority of these re-training requests are still pending as of the filing of this Report. This issue is discussed in detail in ¶ 5 of the Training section of this report.

the Monitoring Team's review of use of force, the Department does not consistently identify *all* cases that would merit an immediate corrective action. The Monitoring Team identified at least 10 cases where immediate action should have been taken, but was not, as discussed in Remedial Order § C., ¶ 2, below.[188] In particular, the Department is not consistently identifying and addressing (1) all blatant *use of force-related* violations with suspensions (when warranted), (2) a broader set of *other* blatant violations that warrant suspension—including (a) serious unprofessional conduct (*e.g.* use of racial slurs during an incident) and (b) serious security breaches due to Staff failures (*e.g.* Staff being off-post resulting in large group disturbances ultimately necessitating use of force). Accordingly, the Department has achieved Partial Compliance with Remedial Order § C., ¶ 1 and Consent Judgment § VIII, ¶ 2(e).

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 2(e).** Partial Compliance<br>**§ C., ¶ 1.** Partial Compliance |

| |
|---|
| **REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS)** |
| § C., ¶ 2. Responding to Monitor Recommendations. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor. |
| **DEPARTMENT'S STEPS TOWARDS COMPLIANCE** |
| • During this Monitoring Period, the Department developed and implemented an organized process for tracking and responding to Monitor recommendations made pursuant to this provision of the Remedial Order. There were **22** recommendations made this Monitoring Period for incidents in which objective evidence suggested Staff Members violated the Use of Force Directive.<br>     ○ All recommendations were analyzed by the Deputy Commissioner of the Investigations & Trials Division and the Assistant Commissioner of ID. The Department responded to all 22 of the Monitoring Team's recommendations and adopted 20 of the recommendations. |

---

[188] The Monitoring Team does not raise with the Department *all* cases that may have merited immediate corrective action that was not taken, but only those serious examples identified close-in-time to the incident when immediate action may still be imposed. The fact that the Monitoring Team continues to identify such examples demonstrates that the Department is not identifying and imposing immediate corrective action for all cases that warrant it.

- o  10 recommendations were made for consideration of immediate corrective action. The Department imposed immediate corrective action in response to eight of the 10 recommendations, most often suspending Staff. In the two cases in which the Department did not adopt the Monitoring Team's recommendation, a reasonable basis for not proceeding with immediate action (*e.g.,* additional investigation was necessary before the Staff's misconduct could be determined) was provided in writing.

- o  12 recommendations were made for the Department to expeditiously complete the investigation and/or expeditiously pursue disciplinary proceedings for an incident. In seven[189] of these cases, the Department swiftly completed the investigation of the incident and served charges (when necessary) or addressed the misconduct with discipline through suspensions or a Facility Referral (for one case). However, in cases with charges served, the cases remain pending with the Trials Division. In five cases, while the Department agreed the investigations should be expedited, the investigations were still pending even months after the recommendations to expedite the investigation were made.

**ANALYSIS OF COMPLIANCE**

The Department appropriately responded to all of the Monitoring Team's recommendations as required, often implementing significant immediate corrective action once these incidents were brought to their attention. However, the Department's written responses were often delayed beyond required timelines (responses were received within 10 business days in only five of the 22 recommendations). That said, in some cases the corrective action was imposed (*e.g.,* suspension effectuated) and in many cases there was often considerable analysis and work occurring within ID & Trials to address the recommendations, including interim updates, *prior to the submission* of the formal written response. The Department reported that an improved process for providing written responses to the Monitoring Team's recommendations will be implemented in the Twelfth Monitoring Period to ensure required timelines are met.

Overall, the Department's responses to Monitor recommendations this Monitoring Period were reasonable and appropriate. The Department has appropriately addressed the recommendations for immediate action. However, greater attention is needed to address those recommendations for expeditiously completing investigations and pursuing disciplinary proceedings when recommended. Investigations into some incidents that were recommended to be expedited appeared to languish (five, as discussed above), although they are generally more complex cases so it is understandable that some

---

[189] It is worth noting that in some instances the Department had simultaneously closed an investigation and/or determined that charges were warranted prior to receiving the Monitor recommendation, demonstrating that the ID & Trials Division is at times aligned with the Monitoring Team in identifying incidents that warrant a swift response.

additional time to investigate may be needed. Further, the delay in expeditiously pursuing discipline is seriously hampered by the overall delays in formal discipline discussed throughout this report. The Department has therefore achieved Partial Compliance.

| COMPLIANCE RATING | § C., ¶ 2. Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

¶ 2. Within 60 days of the Effective Date, the Department shall work with the Monitor to develop and implement functional, comprehensive, and standardized Disciplinary Guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Disciplinary Guidelines shall set forth the range of penalties that the Department will seek to impose for different categories of UOF Violations, and shall include progressive disciplinary sanctions. The Disciplinary Guidelines shall not alter the burden of proof in employee disciplinary proceedings or under applicable laws and regulations. The Department shall act in accordance with the Disciplinary Guidelines [. . . specific requirements for the Guidelines are enumerated in (a) to (d)].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated the New Disciplinary Guidelines on October 27, 2017 after consulting with the Monitoring Team. The New Disciplinary Guidelines address all of the requirements outlined in ¶ 2(a) to (d) of the Consent Judgment (*see* pgs. 25-26 of the Consent Judgment for the full text).

- The range of disciplinary responses available for *tenured* Staff are the use of a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5 compensatory days), the loss of compensatory days via an NPA or OATH decision,[190] placement on disciplinary probation,[191] demotion, or termination.

- The primary disciplinary response available for *probationary* Staff is a Command Discipline (which may result in a Corrective Interview, Verbal Reprimand, or up to 5 compensatory days). From there, formal discipline is generally determined through the PDR process which allows for the probationary period to be extended either for 3 or 6 months,[192] demotion (if a Captain or ADW)[193] or summary termination for a Correction Officer. Probationary Staff can also be

---

[190] The number of forfeited days is generally capped at 60 days because it is the maximum number of days that can be imposed via the OATH process pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3. However, Staff may agree to settle a disciplinary matter outside of the OATH process for more than 60 days.

[191] A Staff member may agree to settle for a term of disciplinary probation. However, pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3, a term of disciplinary probation may not be imposed if the case is resolved via the OATH process.

[192] The probationary period may also be extended for any period of time that the probationary Staff is absent or does not perform the duties of the position during the probationary period.

[193] Probationary Correction Officers may be terminated via PDR. However, probationary Captains and ADWs may only be demoted via PDR, if termination is sought then this must be completed through the formal discipline process.

referred for formal discipline (described in the bullet above) via the Trials Division instead of imposing discipline through the PDR process.

- _Tenured Staff_: As of the end of the Monitoring Period, since the Effective Date of the Consent Judgment, at least 2,750 cases involving tenured Staff have been submitted to Trials.[194] The Trials Division also resolved approximately 600 cases for incidents that occurred prior to the Effective Date.

  o 1,788 of the 2,750 cases that have been submitted to Trials as of the end of the Monitoring Period related to incidents that _occurred_ after October 27, 2017[195] (therefore discipline imposed for these incidents is governed by the New Disciplinary Guidelines).

    ▪ Of these 1,788 cases, 1,332 (74%) remain pending and 456 (26%) had been closed as of January 15, 2021. Of these 456 closed cases, 397 (87%) were resolved with an NPA, three were found guilty at OATH (1%) and 56 were administratively filed or resulted in deferred prosecutions (12%).

  o 160 (40%) of the 397 NPAs that were resolved for post-disciplinary guidelines misconduct (October 27, 2017) were closed in this Monitoring Period.

- _Probationary Staff_: At least 268 PDRs[196] were submitted for incidents involving probationary Staff that occurred between the Effective Date and the end of the Monitoring Period (4 of these cases (1%) _occurred_ during this Monitoring Period). Of these 268 cases, 212 (82%) resulted in a determination (_e.g.,_ extension of probation, demotion, termination, etc.), 32 (12%) Staff resigned, and 15 (6%) Staff tenured.[197] This includes the 24 PDRs _submitted_ in the current Monitoring Period (which covers incidents from a few different Monitoring Periods).

ANALYSIS OF COMPLIANCE

The New Disciplinary Guidelines adopted on October 27, 2017 address the requirements of the Consent Judgment. Because the disciplinary process is different for probationary and tenured Staff,

---

[194] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and a half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November 2015.

[195] As of the end of the Monitoring Period, the most recent incident pending with Trials occurred on May 28, 2020.

[196] The historical issues in tracking this information may mean that additional PDRs were submitted prior to January 2017 and were not tracked appropriately. However, the tracking of PDRs vastly improved beginning in January 2017.

[197] _See_ Sixth Monitor's Report at pgs. 37 and 38, Seventh Monitor's Report at pgs. 49 to 50, Eighth Monitor's Report at pgs. 59 to 60.

there is a separate discussion regarding the process for imposing discipline for probationary Staff before addressing the overall disciplinary continuum.

*Probationary Staff*

The probationary period is a critical juncture in a Staff Member's career. During this time, Staff learn the responsibilities and expectations of their position and their fitness for the role is evaluated. As discussed in the Identifying & Addressing UOF Misconduct section of this report, the Department has maintained improved processing of PDRs, which is now a more consistent and reliable mechanism for imposing discipline for probationary Staff. The enhancements to this process and additional layers of oversight have resulted in more reasonable outcomes that are consistent with the requirements of the Consent Judgment.[198] Further, in this Monitoring Period, no Staff Member tenured before the PDR could be processed.[199]

During this Monitoring Period, 24 PDRs were submitted, one by a Facility[200] and 23 by ID. All PDRs submitted during the Eleventh Monitoring Period were decided by January 15, 2021 as outlined in the chart below. The table below shows the outcome of the 268 completed PDRs over the life of the Consent Judgment (221 PDRs with substantive decisions and 47 PDRs that were not decided because the Staff Member either resigned or tenured before a decision could be made). In most cases (144 of 221; 65%), the probationary period of the Staff Member was extended.

| Date PDR Submitted | 2017 | | 2018 | | 2019 | | 2020 | | Jan. to June 2020 | | July to Dec. 2020 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **36** | | **65** | | **95** | | **65** | | *41* | | *24* | |
| Demotion | 2 | 6% | 4 | 6% | 4 | 4% | 1 | 2% | *1* | *2%* | *0* | *0%* |
| Extension of Probation - Day/Day | 0 | 0% | 0 | 0% | 0 | 0% | 1 | 2% | *1* | *2%* | *0* | *0%* |
| Extension of Probation - 3 Months | 0 | 0% | 9 | 14% | 13 | 14% | 8 | 12% | *6* | *15%* | *2* | *8%* |
| Extension of Probation - 6 Months | 14 | 39% | 33 | 51% | 38 | 40% | 26 | 40% | *19* | *46%* | *7* | *29%* |
| Termination | 7 | 19% | 13 | 20% | 20 | 21% | 12 | 18% | *6* | *15%* | *6* | *25%* |
| Deferred Decision | 0 | 0% | 0 | 0% | 3 | 3% | 0 | 0% | *0* | *0%* | *0* | *0%* |
| MOC | 0 | 0% | 1 | 2% | 3 | 3% | 1 | 2% | *1* | *2%* | *0* | *0%* |
| No Action | 1 | 3% | 0 | 0% | 2 | 2% | 0 | 0% | *0* | *0%* | *0* | *0%* |
| Pending | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | *0* | *0%* | *0* | *0%* |
| Resignation | 2 | 0% | 3 | 5% | 11 | 12% | 16 | 25% | *7* | *17%* | *9* | *38%* |
| Tenured | 10 | 28% | 2 | 3% | 1 | 1% | 0 | 0% | *0* | *0%* | *0* | *0%* |

[198] *See* Seventh Monitor's Report at pgs. 48-50.

[199] *See* Sixth Monitor's Report at pgs. 36 to 39 for a discussion regarding the Monitoring Team's findings regarding the impact of delayed processing of probationary Staff. It is worth noting that the backlog of cases pending with ID has resulted in at least a few cases where a Staff Member tenured before a PDR memo could even be submitted by ID for processing. In these cases, an MOC will need to be drafted to address the identified misconduct.

[200] As ID now conducts all UOF investigations, it is expected that most UOF related PDRs will be generated by ID.

Overall, the PDR determinations in this Monitoring Period were generally appropriate and reasonable and deviations from recommendations are generally reasonable and isolated. There were a few cases which are worth noting. First, the Commissioner deviated from ID's recommendations in two cases – in both cases the discipline imposed was *more severe* than what ID recommended. Second, nine of the 24[201] PDRs submitted during this Monitoring Period did not have a final determination because the Staff Member resigned before the PDR was issued.

Staff Members certainly have the right to resign from their position at any time for any reason, and the Department advised the Monitoring Team that the Department does not offer probationary Staff Members the opportunity to resign in lieu of termination. Resignation during a probationary period is not necessarily surprising given that the Staff Member may decide the position is not a good fit, especially in cases where Staff may have displayed problematic behavior. In this Monitoring Period, nine PDRs were not decided because the Staff Member resigned. The Department reports that the PDR memo for any Staff who resigned before the PDR was effectuated will be placed in the Staff Member's file in case they were to reapply for a position within DOC. The Monitoring Team previously found that this does not always occur, and will evaluate this process in the next Monitoring Period. The majority of the Staff who resigned did so before the PDR was issued, often because the investigation of the case had been delayed as a result of the backlog.

All probationary Staff whose probation is extended due to a UOF violation are also enrolled in E.I.S.S. for a period of time to provide those Staff with additional support. Finally, in response to the Monitoring Team's recommendation, the Department reports that beginning in the next Monitoring Period, any Staff Member whose probation is extended as part of a PDR for a use of force violation will be counseled about the basis for this decision.

*Disciplinary Continuum*

The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together.

The Department must *seek* disciplinary sanctions that are proportional to the severity of Staff misconduct. An assessment of whether the Department has acted in accordance with the Disciplinary Guidelines is complex. First, as noted in the Identifying & Addressing UOF Misconduct section, the Department (through Trials) cannot unilaterally impose a disciplinary sanction and must work with other stakeholders (*e.g.,* the Respondent, their counsel and OATH (if needed)) in order to reach a resolution in order to afford Staff their due process rights. Second, when imposing discipline, decision-

---

[201] In total 32 Staff Members have resigned before the PDR could be imposed since the Monitoring Team has started to monitor this issue. Of those 32 Staff Members, the PDR had recommended termination of six Staff and two Staff should not be re-hired should they re-apply for a position within DOC.

makers must consider the facts of each case, any aggravating and mitigating factors, prior disciplinary history, the concepts of progressive discipline, and also incorporate considerations of OATH case precedent. All this to say, the response to a particular type of misconduct will vary for individual Staff Members. In terms of evaluating the Department's overall efforts to impose appropriate discipline, the Monitoring Team considers: (1) whether discipline is imposed when merited and when a violation has been identified (discussed below), (2) the time taken to impose discipline (discussed throughout the report) and (3) the proportionality of the sanctions imposed.

Nearly all formal discipline imposed for *tenured* Staff is resolved through an NPA involves the relinquishment of compensatory days (*e.g.,* vacation days) as demonstrated in the chart below. Formal discipline has been imposed in at least 1,443 instances (involving approximately 1,070 individual Staff Members) on *tenured* Staff between the Effective Date and December 31, 2021[202] (a portion of the discipline imposed was for incidents that occurred pre-Effective Date).

The volume and type of cases pending before Trials has evolved, and the range of disciplinary responses has similarly expanded. More specifically, prior to the Effective Date, Trials generally only received referrals for cases with more significant misconduct, as these were the majority of cases investigated by ID. The types of misconduct referred to Trials now reflects a broader spectrum of violations as the types of cases investigated by ID has broadened. For instance, Trials now settles some cases using a Command Discipline with a specified number of days (up to five days).[203] As demonstrated in the chart below, 25% of the discipline imposed in 2020 was for a sanction of 1 to 5 days, 47% of the discipline imposed was for a sanction of 6 to 30 days and the final 28% of discipline imposed was for a sanction to 30 days or more. This proportion of discipline imposed is consistent with the breakdown over the last four years (although 2018 had a slightly higher proportion of disciplinary sanctions imposed for 1 to 5 days).

| Penalty Imposed by NPA by Date of Ultimate Case Closure (Covering Incidents that occurred between 2011 and August, 2020) | | | | | | |
|---|---|---|---|---|---|---|
| Date of Formal Closure | | | | | | |
| | 2017 | 2018 | 2019 | 2020 | *Jan. to June 2020* | *July to Dec. 2020* |
| Total | 397 | 484 | 219 | 324 | *159* | *165* |

[202] The tracking of disciplinary data was not routinely kept until 2017 so additional discipline may have been imposed between the Effective Date and January 2017, but was not accounted for.

[203] Trials no longer settles a case for undetermined number of Command Discipline days, which would require a hearing at the Facility for the reasons discussed in the Seventh Monitor's Report at pgs. 42-44.

| Refer for Command Discipline[204] | 71 | 18% | 67 | 14% | 2 | 1% | 1 | 0% | 0 | 0% | 1 | 1% |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1-5 days | 32 | 8% | 147 | 30% | 53 | 24% | 80 | 25% | 44 | 28% | 36 | 22% |
| 6-10 days | 30 | 8% | 68 | 14% | 26 | 12% | 49 | 15% | 18 | 11% | 31 | 19% |
| 11-20 days | 86 | 22% | 80 | 17% | 59 | 27% | 70 | 22% | 38 | 24% | 32 | 19% |
| 21-30 days | 68 | 17% | 55 | 11% | 26 | 12% | 32 | 10% | 17 | 11% | 15 | 9% |
| 31-40 days | 15 | 4% | 18 | 4% | 18 | 8% | 30 | 9% | 17 | 11% | 13 | 8% |
| 41-50 days | 29 | 7% | 30 | 6% | 3 | 1% | 24 | 7% | 6 | 4% | 18 | 11% |
| 51+ days | 54 | 14% | 14 | 3% | 25 | 11% | 29 | 9% | 14 | 9% | 15 | 9% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 5 | 3% | 4 | 2% |

- **Assessment of Sanctions Imposed – Tenured Staff**

The Monitoring Team assessed approximately 60[205] of 145 total cases (41%) closed *with discipline* in this Monitoring Period and the incident occurred *after October 27, 2017* to assess whether the discipline imposed was reasonable and appeared consistent with the Disciplinary Guidelines (note, additional cases were closed in this Monitoring Period that occurred prior to October 27, 2017, but were not considered as part of this assessment). As an initial matter, in the majority of cases evaluated, discipline was imposed more than one year after the incident took place, which negatively impacts its meaningfulness and effectiveness. That said, with respect to the specific dispositions, most were reasonable. A very small proportion of cases closed with questionable outcomes, which is not to say that they were blatantly disproportional, but rather that a more severe penalty *may* have been appropriate. Finally, one isolated case appeared to have an unreasonable outcome (meaning, not at all proportional to the severity of the misconduct).

- **Imposition of Significant Discipline - Probationary and Tenured Staff**

Certain misconduct requires more severe discipline including relinquishing a significant number of days, demotion, resignation, or termination, which is imposed by either Trials or via PDR. Since the Effective Date (see chart below), 346 cases involved the imposition of significant discipline

---

[204] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the Staff Member's record for one year instead of five years).

[205] The Monitoring Team also reviewed a small sample of cases where the incident occurred prior to October 27, 2017.

236

for 30 compensatory days or more,[206] an NPA for irrevocable retirement/ resignation, or termination. This includes 256 NPAs with compensatory days of 30 days or more, 11 *probationary* Supervisors have been demoted, and 79 Staff were separated from the Department (discussed in more detail in the sub-bullet below).

The Department closed more cases with significant discipline for both tenured and probationary Staff in 2020 (n=123) compared with the prior year (n=79) and imposed the most significant discipline imposed in any year since reliable tracking began. It is also worth noting that additional cases are pending with Trials and appear to involve serious misconduct that will likely merit the imposition of significant discipline. In this Monitoring Period, the Monitoring Team identified certain cases that may meet these criteria and recommended that they be considered on a priority basis for resolution.[207]

| Significant Discipline Imposed for Misconduct Related to UOF Incidents that Occurred *Post November 1, 2015* | | | | | | |
|---|---|---|---|---|---|---|
| Date Discipline Imposed | 2017 | 2018 | 2019 | 2020 | *Jan. to June 2020* | *July to Dec. 2020* |
| 30 to 39 Days | 11 | 38 | 20 | 35 | *15* | *20* |
| 40 to 49 Days | 11 | 20 | 3 | 17 | *8* | *9* |
| 50 to 59 Days | 4 | 4 | 17 | 17 | *5* | *12* |
| 60 Days | 11 | 6 | 11 | 27 | *14* | *13* |
| 61 days or more | 3 | 0 | 0 | 1 | *0* | *1* |
| Irrevocable Retirement or Resignation | 5 | 2 | 6 | 9 | *5* | *4* |
| Termination of Tenured Staff | 0 | 1 | 0 | 2 | *2* | *0* |
| Demotion of Tenured Staff | 0 | 0 | 0 | 0 | *0* | *0* |
| Termination of Probationary Staff | 6 | 16 | 18 | 14 | *8* | *6* |
| Demotion of Probationary Supervisors | 1 | 5 | 4 | 1 | *1* | *0* |
| | 52 | 92 | 79 | 123 | 58 | 65 |

  o   **Termination and Irrevocable Retirement & Resignation – Tenured Staff**

---

[206] The maximum penalty that can be imposed by law via the OATH process is 60 days. Accordingly, the Monitoring Team considers imposition of discipline for 30 days or more to be a "significant penalty."

[207] In three cases that occurred in this Monitoring Period, the Staff conduct appeared to meet the mandatory termination criteria. Therefore, the Monitoring Team recommended these cases were addressed and resolved by the Department on a priority basis.

A total of 79 Staff were separated from the Department for use of force related violations between 2017 and 2020. Of these, 54 *probationary* Correction Officers have been terminated as a result of UOF-related misconduct and 25 *tenured* Staff have separated from the Department as a result of UOF-related misconduct (either via termination or irrevocable resignation/retirement). The Department must *seek* termination of any Staff that meet the criteria of the *mandatory termination* provisions (¶ 2(d)(i) to (iv)). However, the Department cannot unilaterally terminate a *tenured* Staff Member because they are entitled to due process. Accordingly, the Department must generally adjudicate the case with a trial at OATH and termination can then be recommended following the trial (if accepted by the Commissioner) or a Staff Member can be terminated through an Action of the Commissioner following the completion of the OATH trial.[208] The Department reports that Staff facing significant discipline and/or the likelihood of termination sometimes choose to resign or retire rather than risk being terminated. In these cases, the Department may elect to "settle" the case with the Staff Member for irrevocable retirement or resignation. The Monitoring Team considers these cases as essentially the same as those resulting in termination because they have the same effect of permanently separating the Staff Member from the Department.

The Monitoring Team assessed all cases that occurred post-Disciplinary Guidelines (where discipline was imposed) to determine whether the Staff's conduct met the criteria for mandatory termination. None of the cases reviewed met the standard for mandatory termination.

Overall, the number of cases in which termination must be sought remains low. However, the Department is not limited to seeking termination on the cases that meet the standards enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases where a significant penalty, demotion, irrevocable retirement/resignation, or termination could appropriately be sought given the level and/or pattern of misconduct and for the Department to meet its commitment of a zero-tolerance policy for excessive and unnecessary force.[209]

- **Deferred Prosecution – Tenured Staff**

Inevitably, some Staff may choose to leave the Department *with charges pending* and before the case is resolved. Such cases are deferred for prosecution as no final determination has been rendered. If the Staff Member should return to DOC then the Department would proceed with prosecuting the case. In this Monitoring Period, seven cases resulted in deferred prosecutions.[210] The case will be re-opened and prosecuted if the Staff Member returns to the Department again. The Monitoring Team previously found that only some Staff's personnel files included the correct paperwork (see Tenth Monitor's Report at pg. 196), which was concerning given the possibility a Staff Member could return to service

---

[208] The Staff member can appeal a decision of termination.

[209] *See* § IV. (Use of Force Policy), ¶3(a)(iii) of the Consent Judgment.

[210] The Monitoring Team confirmed these Staff Members were no longer employed by DOC.

and essentially evade the previous charges. Given the small number of cases that result in deferred prosecution during this Monitoring Period (n=7), the Monitoring Team will re-evaluate this process in subsequent Monitoring Periods as necessary.

- **Administratively Filed Cases – Tenured Staff**

Cases are administratively filed when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a Staff Member resigns before charges are served). In other words, these cases are dismissed. All such cases are reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Commissioner of ID & Trials before they are closed. Only 10 cases were administratively closed this Monitoring Period, compared to 20 in the Tenth Monitoring Period and 23 in the Ninth Monitoring Period. The Monitoring Team reviews all such cases and has found in prior Monitoring Periods that the decision to administratively file cases has been reasonable.

Of the 10 cases dismissed via administrative filing in this Monitoring Period, they were closed for the following reasons:

- Five cases were closed due to administrative errors (*e.g.,* duplicate charges for the same Staff Member) and the decision to administratively file was reasonable,
- four cases were closed following re-consideration of the evidence by Trials attorneys which determined that charges could not be sustained, and
- one case was closed because the Department's expert provided questionable advice that charges were not warranted for the conduct at issue. This case was finalized at the very beginning of the Eleventh Monitoring Period (July 2020) and the expert utilized has since retired. As described further below in regard to § C., ¶ 3(ii) (Expert Witnesses and Consultation) the Trials Division has now identified a more suitable expert.

Administratively closed cases remain a very small portion of closed cases—only 10 of the 185 cases closed in this Monitoring Period. The Monitoring Team has consistently found that most cases dismissed via administrative filing have an objectively reasonable basis and the Department has therefore maintained Substantial Compliance with this requirement (as noted in § VIII., ¶ 3(c) below).

*Conclusion*

The Department has a system in place to discipline both *probationary* and *tenured* Staff that addresses identified misconduct on a continuum depending on the severity of the violation. Further, the number of cases in which discipline is ultimately *not* imposed (*e.g.,* Deferred Prosecution and Administrative Filing) remains low. For the most part, the discipline imposed via Trials or PDR is reasonable and in proportion with the misconduct identified, and the Monitoring Team has identified only isolated cases where discipline was not proportional. However, the backlog of cases (within both ID and now Trials) impacts the ability to timely address misconduct.

The fact that most discipline is imposed long after the incident significantly undermines the meaningfulness and effectiveness of the response to misconduct. That Staff continue to operate in the Facilities—often for years—after engaging in misconduct is a major contributing factor to the toxic culture that pervades this Department. Furthermore, the Monitoring Team's ability to assess the Department's practices regarding Staff discipline is hindered by the fact that such a large number of cases remain pending. What conclusions can be drawn based on only a slim sample of the universe of cases in which discipline should be imposed. Therefore, while current assessments about proportionality are encouraging, an insufficient proportion of misconduct cases have received discipline to confidently assert that the Department is meeting its obligations. Effective and meaningful discipline is a key component of meaningful culture change. The Monitoring Team continues to emphasize the importance of imposing discipline both close enough in time (discussed in ¶¶ 1 and 3) and in proportion to the violation. This includes employing the full spectrum of disciplinary sanctions, including termination, when merited by the level and/or pattern of misconduct. The Department is therefore in Partial Compliance with this requirement.

| COMPLIANCE RATING | ¶ 2. (a) to (d) (Develop Guidelines) – Substantial Compliance<br>¶ 2. (a) to (d) (Act in Accordance with the Guidelines)<br>• *Probationary Staff* – Partial Compliance<br>• *Tenured Staff* – Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS) REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 3

§ VIII. ¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation:

a. If the investigation was conducted by the ID, the DCID or a designated Assistant Commissioner shall promptly review the ID Closing Memorandum and any recommended disciplinary charges and decide whether to approve or to decline to approve any recommended discipline within 30 days of receiving the ID Closing Memorandum. If the DCID or a designated Assistant Commissioner ratifies the investigative findings and approves the recommended disciplinary charges, or recommends the filing of lesser charges, he or she shall promptly forward the file to the Trials Division for prosecution. If the DCID or a designated Assistant Commissioner declines to approve the recommended disciplinary charges, and recommends no other disciplinary charges, he or she shall document the reasons for doing so, and forward the declination to the Commissioner or a designated Deputy Commissioner for review, as well as to the Monitor.

b. If the investigation was not conducted by ID, the matter shall be referred directly to the Trials Division.

c. The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner

for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

§ C., ¶ 3.   New Trials Division Protocols. Within 90 days of the Order Date, the Trials Division, in consultation with the Monitor, shall develop, adopt, and implement protocols to expedite the prosecution of disciplinary cases involving UOF Violations, which shall address, among other things, the following: (i) a timeframe for serving discovery after the service of charges; (ii) the selection and use of expert witnesses; (iii) criteria to prioritize and expedite the resolution of certain disciplinary cases; and (iv) ways to achieve a prompt agreed-upon resolution of disciplinary cases when appropriate.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Referral for Discipline
  - o *Tenured Staff*: The majority of cases referred for formal discipline are from ID. Charges must be personally served on Staff once finalized. Staff from the Facility physically serve almost all of the charges on the Respondent and ID staff serve the remaining charges.
  - o *Probationary Staff*: Discipline for probationary Staff is conducted through a PDR. Either the Facility or ID may submit a memo to HR seeking a PDR determination. The PDR is then evaluated and approved by the First Deputy Commissioner and/or the Commissioner.[211]

- Formal Disciplinary Process
  - o The Disciplinary Process for Uniformed Personnel directive (which governs the issuance of MOCs) was revised in consultation with the Monitoring Team in this Monitoring Period to codify the revised practice of issuing MOCs through CMS rather than via hard copy documentation (as was done previously). The directive now reflects the current process for approving MOCs.
  - o Tenured civil service employees are afforded certain rights by New York State Civil Service Law §75 (2) and any *tenured* Staff who is the potential subject of disciplinary action has the following rights, among others, before any disciplinary action is taken:[212]
    - ▪ a right to representation, with advance notice of this right in writing;
    - ▪ a reasonable period of time to obtain representation;
    - ▪ a right to timely action and the statute of limitations to bring charges is 18 months after the alleged misconduct;[213]
    - ▪ written notice of charges and at least eight days to submit an answer (however not required), with an option for short extension;
    - ▪ a right to a hearing;

---

[211] In certain cases, the Commissioner may consult with ID before making a determination.

[212] An employee may be suspended without pay for up to 30 days after being notified of charges and awaiting the outcome of the hearing. If the charges are related to an arrest, Correction Officers can be suspended indefinitely.

[213] Due to COVID-19, the statute of limitations was tolled on March 20, 2020 through the end of the Monitoring Period.

- ▪ a right to summon witnesses on the employee's behalf (including ability to examine and cross-examine)
  - o Trials drafted and served **524** charges in this Monitoring Period, using the process described on pgs. 176-177 of the Fourth Monitor's Report.
  - o Trials served discovery in **511** cases in this Monitoring Period, and leadership set the new goal (as required by the Remedial Order) of serving discovery within 45 days after serving charges.
  - o Trials attorneys convened **303** OATH pre-trial conferences for disciplinary cases involving charges related to UOF Violations (discussed in more detail in § C., ¶ 4 below)
  - o Trials attorneys conducted 4 virtual trials before OATH for UOF Violations (discussed in more detail in § C., ¶ 5 below)
  - o Trials reported that it attempted to settle cases outside of the OATH process and after pre-trial conferences at OATH.
  - o Trials completed **186** closing memos during this Monitoring Period.
  - o A total of **1,445** use of force cases were pending with Trials at the end of the Monitoring Period (of these, 9 are pending final approvals and 13 are on hold pending law enforcement conducting an investigation on whether to bring criminal charges).

**ANALYSIS OF COMPLIANCE**

Consent Judgment § VIII., ¶ 3 and Remedial Order § C., ¶ 3 are addressed collectively because together they address the various requirements related to the management of the Trials Division.

*ID Referrals* (§ VIII., ¶ 3(a))

The Consent Judgment requires the Deputy Commissioner of ID & Trials or the Assistant Commissioner of ID to approve any investigations that recommends charges or PDRs within 30 days of the investigation's completion date. While delays at various stages occurred within the investigation backlog, generally the leadership within ID approves charges or PDRs in a timely manner following the close of the investigation. Investigations conducted by the Intake Squad allow incidents to get to the Trials Division quicker. The Intake Squad closed 35 investigations with charges during this Monitoring Period. All of these cases were closed and approved with charges in less than 27 business days from the incident date.

*Facility Referral of MOC to Trials* (§ VIII., ¶ 3(b))

This provision is not applicable because all investigations are completed by ID, therefore this requirement is no longer necessary and will not be subject to active monitoring. The Monitoring Team recommends this provision is eliminated.

*Trials* (§ VIII., ¶ 3(c) & § C., ¶ 3)

The Monitoring Team's assessment of the Department's ability to impose appropriate and meaningful discipline is evaluated in ¶ 2 above. The assessment below focuses on the processes within the Trials Division to expeditiously prosecute cases.

- **Expeditious Prosecution of Disciplinary Cases**

Assessing the expediency of prosecutions requires several processes to be reviewed. This includes: (1) the approval of MOCs, (2) timely service of charges and discovery, (3) whether Trials has sufficient expertise to prosecute cases, (4) whether there are sufficient conferences available should an OATH proceeding be required (discussed in §C., ¶ 4 below), (5) whether the Trials Division has options (beyond conducting a trial) to resolve cases timely, and (6) when cases are closed and whether they are ultimately approved efficiently (discussed below and also in §VIII., ¶ 5 below). Given that the imposition of discipline is not limited to processes *within* the Department, the numerous stakeholders, including the respondent, their counsel, and OATH, must also be coordinated with as part of the overall effort to impose discipline.

- **Approval of MOCs**

The first step to impose discipline is the approval of the Memorandum of Complaint ("MOC") that must be issued following the close of the ID Investigation. The MOC is drafted in CMS by the ID Division, is submitted to the Chief of Administration's ("COA") office for approval and is then referred to the Trials Division. The COA's process for reviewing and approving the MOC is discussed in the Tenth Monitor's Report at pg.199. The COA office's process to approve MOCs was updated in the Tenth Monitoring Period in response to concerns identified by the Monitoring Team. This Monitoring Period, the Monitoring Team continued to closely track pending MOCs with the COA's office to identify any delays. During the 11th Monitoring Period, there were an average of 15 MOC's pending with the COA every two weeks. Overall, it appears that MOCs are now being processed timely, but the Monitoring Team will continue to monitor this issue in the next Monitoring Period.

- **Service of Charges**

Once the MOC has been submitted to the Trials Division, charges must be drafted and served on the Staff Member. This is a critical component in bringing the case. Given the various delays in completing investigations, the Trials Division coordinates with ID, and, in some cases, will serve charges *before* the MOC is submitted to ensure charges are served timely. Once the Trials Attorney has completed a thorough review and assessment of the investigation and has identified the specific policy violations that have been substantiated, the Trials Attorney drafts the charges.

Since January 2017, the Trials Division has maintained a consistent, reliable, and sustainable process to serve charges within 30 days of either receiving the MOC or when the Trials attorney drafted the charge, as required. The total number of charges served in 2020 (1,058)[214] is the largest number of charges served over the last 4 years (2017 = 381, 2018 =489, 2019 = 699) and is a 51%

---

[214] In this Monitoring Period, the Trials Division served 524 charges, almost the same number of charges as in the last Monitoring Period (534).

increase from 2019. Of the charges served in this Monitoring Period, 97% were served within 30 days of either receipt of the MOC or when the Trials attorney drafted the charge.[215] Accordingly, Trials has maintained Substantial Compliance with this requirement.

- **Service of Discovery (§ C., ¶ 3(i))**

Following the issuance of charges, discovery must be provided to the Staff Member. The Remedial Order requires Trials to set a timeframe for serving discovery after the service of charges. As a result, the Trials Division set a 45-day timeline. While the Monitoring Team has encouraged the Department to serve discovery as close-in-time to the service of charges as possible to facilitate resolution of the matter, it is not currently feasible to serve discovery in a shorter period of time given the workload, staffing, and limitations of tele-working due to COVID-19. Discovery involves collecting all relevant paperwork and evidence from ID once the case is closed, reviewing all evidence, copying all evidence, making appropriate redactions, and sending the case materials to opposing counsel. In some cases, where misconduct is clearly depicted on video, the Trials Division will send just the video and relevant paperwork to opposing counsel (as opposed to the complete discovery file) in an attempt to facilitate settlement. Historically, discovery was mailed to counsel for respondents. With COVID-19, the Department devised ways to share discovery more easily over e-mail, which has helped to support the overall service of discovery. Finally, the obligation to serve discovery was compounded by the fact that the transition of COBA legal counsel resulted in requests for the Trials Division to provide discovery again to new counsel, which created additional work for the Trials Division this Monitoring Period.

The Department served discovery in 511 cases this Monitoring Period (a 19% increase from the 431 cases with discovery served in the Tenth Monitoring Period). In total, discovery was served in approximately 942 cases in 2020 which is an 116% increase from the discovery served in 2019 (n=436). Of the 511 cases in which discovery was served in this Monitoring Period, 2% of cases discovery was served before charges were served, in 40% of cases discovery was served within 45 days of charges being served and in 58% of cases discovery was served more than 45 days after charges were served. Of the total 1,445 pending cases with Trials at the end of the Monitoring Period, 946 (65%) have had discovery served. While it is encouraging that Trials has increased the proportion of cases in which discovery was served timely, the performance level must still be improved.

- **Expert Witnesses and Consultation (§ C., ¶ 3(ii))**

The Trials Division often utilizes expert witnesses at trial to support its case. Beginning in 2019, and throughout 2020, the Trials Division encountered a reoccurring problem with finding an

---

[215] 223 charges were served within 30 days of receipt of the MOC. 283 charges were served within 30 days of the charges being drafted. In these cases, generally the MOC was received after the charges served, but the charges were served before the MOC was received to preserve the statute of limitations.

expert witness within the Department who could provide fair and unbiased testimony at trial and who had the requisite experience to be considered informed and reliable. In this Monitoring Period, the Trials Division collaborated with the Training Academy to identify an appropriate individual to serve in this role. In December 2020, the Trials Division selected a former Deputy Warden with 25 years of experience at the Department. Since this expert witness was selected, he has met with different Trials Attorneys to prepare for trial, but did not testify in any trials in this Monitoring Period. In addition, the expert witness has also made himself available to consult with the Trials Division Attorneys regarding cases where they seek an expert opinion, in order to determine appropriate settlement offers.

- **Criteria to prioritize and expedite the resolution of certain disciplinary cases (§ C., ¶ 3(iii)) & Initiatives to achieve a prompt agreed-upon resolution of disciplinary cases when appropriate (§ C., ¶ 3(iv))**

While the Department cannot unilaterally impose discipline, there are a number of initiatives that can and should be undertaken to ameliorate some of the delays when imposing discipline. In this Monitoring Period, the priority was addressing the impact of the new Correction Officer's Benevolent Association ("COBA") leadership and transition to new legal representation, given that the majority of pending cases involve Corrective Officers. First, the new union leadership refused to negotiate settlements outside of the OATH process (referred to as off-calendar dispositions ("OCD")), which had previously been a useful tool for resolving cases more efficiently. Second, the leadership change at COBA and the subsequent new legal counsel raised a number of issues. The new COBA leadership campaigned on a platform that "too much discipline" was imposed and once elected, union delegates were far more active in the NPA process. Many Staff were unwilling to settle cases at OATH until the new counsel was on board. Once on board, COBA's new counsel initially refused to participate in the additional OATH pre-trial proceedings required by the Remedial Order. While this was ultimately resolved and COBA's counsel are now participating in all scheduled OATH proceedings, as discussed in the First Remedial Order report at pgs. 6 to 7, this initial refusal to participate in additional OATH proceedings caused delays. Finally, while all sides attempted to minimize the impact of the transition of counsel, there were some inherent delays as counsel got up to speed as they familiarized themselves with Department practices and the specifics of the cases. The City, Department, and OATH worked diligently in this Monitoring Period to work with COBA's counsel to address these issues as quickly as possible and set the foundation for improved processing going forward.

The Monitoring Team has discussed with the Trials Division how cases could be better prioritized. Prioritization inherently requires the balancing of various factors and making difficult decisions about what cases can and should be completed over others. Various cases considered for prioritization have included those cases in which the conduct occurred the longest time ago (*e.g.,* 2016 or 2017), those with the most serious misconduct (either the oldest or the newest), and/or those cases in which the misconduct is less severe so a settlement may be easier to achieve. The Trials Division has

reported that prioritization of cases must also consider whether the Staff Member has other pending matters and/or if the incident involved other Staff Members who have been charged with misconduct. With respect to Staff with multiple pending matters, in some cases settling these matters piecemeal may not be an option either because the Trials Division believes strategically that these matters must all be addressed together, or the Staff Member refuses to settle cases individually. Further complicating matters is that an incident may involve multiple other Staff Members and so sometimes a holistic review of the matter is needed and individual resolutions cannot be achieved until the case is evaluated as a whole. Given the growing backlog of Trials cases, many Staff Members have more than one pending case—which in and of itself is concerning, but also creates significant logistical challenges in attempting to resolve cases as it is often difficult to address these cases in a piecemeal fashion.

With respect to its pending cases, the Trials Division has utilized a few different initiatives to address the backlog. First, the Trials Division has attempted to address certain lower-level misconduct using a CD (via NPA) or agreeing that the imposed discipline will only remain on the Staff Member's record for one year[216] versus five years.[217] These two options are critical given that the range of misconduct that is now directed through Trials covers a broader spectrum of violations (compared with historical practice in which ID was only investigating the most egregious cases and so only cases with egregious misconduct were referred to the Trials Division). It is important to note that these disciplinary options cannot be recommended by an ALJ and are not available if the Staff Member chooses to go to trial. At the end of the Monitoring Period, the Trials Division evaluated its current pending caseload and identified approximately 100 cases with lower-level misconduct that could be resolved with lower-level discipline. These settlement offers were conveyed to counsel for COBA. The settlement offers were all rejected.

As for those cases that require an OATH Pre-Trial conference (as discussed in more detail below), the Trials Division convened 303 use of force-related OATH Pre-Trial conferences, significantly more than in prior Monitoring Periods[218] and far more than the 225 that is required by the Remedial Order.[219] The Trials Division attempted to prioritize the cases heard for Pre-Trial conferences by focusing on those matters involving serious misconduct with the oldest incident date.

---

[216] The case will not be removed from the Staff Member's file if during this one year period, the Staff member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[217] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the Staff member's first offense.

[218] Approximately 40 use of force related OATH Pre-Trial conferences were held in the Tenth Monitoring Period.

[219] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

The City, Department, and OATH have successfully addressed the union challenges and implemented a more robust OATH pre-trial conference process in this Monitoring Period, but more work remains. The focus of the next Monitoring Period will be to identify additional creative solutions to more efficiently address cases in order to close more cases quickly.

- **Approval of Trials Closing Memos**

Once a disposition has been reached (*e.g.,* NPA, recommendation following an OATH trial, administrative filing, deferred prosecution, etc.), a closing memo is drafted (providing the Staff Member's disciplinary background and the proposed resolution) which is subsequently approved by the Deputy General Counsel of Trials, the Deputy Commissioner of ID & Trials and the Commissioner. The Monitoring Team evaluated the time taken within Trials to draft, edit, finalize, and approve closing memos to determine whether the time frame was reasonable. As outlined in the chart below, in 2020, 316 closing memos were submitted and approved by the Deputy General Counsel for Trials (166 were submitted in this Monitoring Period), which is a 58% increase of the closing memos submitted in 2019 (n=216). Approximately 74% of all closing memos were completed within 30 days of the agreed upon resolution with the Staff Member, which is a slight improvement from 2019 when 69% of memos were completed within 30 days. The Monitoring Team encourages Trials to continue to complete closing memos as soon as possible to maximize efficiency in imposing discipline.

| Time for Final Approval of NPA & OATH Decision | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Deputy General Counsel ("DGC") sign-off after NPA Execution (closing memo and NPA execution date) | | | | | | | | |
| Date DGC signed off (trials closing memo date) | **2017** | | **2018** | | **2019** | | **2020** | |
| **Total Cases Requiring Approval** | 388 | | 483 | | 200 | | 316 | |
| *Signed before NPA was executed* | 1 | 0% | 4 | 1% | 0 | 0% | 0 | 0% |
| *0 to 30 days* | 323 | 83% | 402 | 83% | 138 | 69% | 233 | 74% |
| *31 to 60 days* | 35 | 9% | 59 | 12% | 42 | 21% | 53 | 17% |
| *More than 60 days* | 27 | 7% | 18 | 4% | 20 | 10% | 26 | 8% |
| *Time Unknown* | 3 | 1% | 4 | 1% | 0 | 0% | 4 | 1% |

- **Closed Cases**

The chart below outlines the number of discipline cases that have been closed by the Trials Division, and how the cases were resolved. Most discipline is imposed via an NPA, which reinforces the need for multiple, efficient options to settle matters. As noted throughout this report, Trials closed 41% more cases in 2020 (n = 379) than in 2019 (n = 267), but not at the same level as in years prior to 2019. This is particularly notable given the amount of work to be completed within the Trials Division has increased exponentially (*e.g.,* increased need to serve charges and discovery and convene settlement conferences) which means Staff are pulled in multiple directions to address their caseloads.

| Discipline Imposed by Date of Ultimate Case Closure | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | Jan. to June 2020 | | July to Dec. 2020 | |
| Total | 489 | | 514 | | 267 | | 379 | | *194* | | *185* | |
| NPA | 397 | 81% | 484 | 94% | 219 | 82% | 324 | 85% | *159* | *82%* | *165* | *89%* |
| Termination | 0 | 0% | 0 | 0% | 1 | 0% | 2 | 1% | *2* | *1%* | *0* | *0%* |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 30 | 8% | *20* | *10%* | *10* | *5%* |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 15 | 4% | *8* | *4%* | *7* | *4%* |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 4 | 1% | *1* | *1%* | *3* | *2%* |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | *4* | *2%* | *0* | *0%* |

- **Timeframes Cases are Closed & Pending**

Trials must "prosecute disciplinary cases as expeditiously as possible" as required by ¶ 3(c), but there is no requirement for cases to be closed within a specific period of time given the many different factors that must be considered in order to reach resolution of a matter. The requirement to expeditiously prosecute cases certainly requires Trials to ensure it has systems to manage cases efficiently. That said, the Trials Division does not have exclusive control in managing its caseload. For instance, if a case requires and/or a Staff Member requests an initial (or subsequent) conference before OATH, then the matter must be scheduled with OATH which can protract the process as a mutually agreeable date must be identified for all individuals involved. Further, resolution can only be achieved if the Respondent is willing to settle the matter or a decision has been rendered following a trial. Finally, a small number of cases may be on hold while they are being evaluated by law enforcement, which can often be a protracted process as described in ¶ 3 of the Use of Force Investigations section of this report.

An evaluation of Trials' workflow requires an assessment of both the time required to resolve cases that closed in the Monitoring Period and the age of pending cases as of the end of the Monitoring Period. This assessment (and the chart below) is limited to the time it takes for a case to be processed within Trials *after* the investigation has closed.

While the number of cases closed by Trials in 2020 increased from the totals observed in 2019, the proportion of those cases that closed within a year of assignment to the Trials Division has decreased (approximately 68% of all closed cases closed within a year of assignment to Trials during the current Monitoring Period, versus 80% in the 2019).

| Cases Closed by Trials by Year |
|---|
| **(Time between MOC received date or Service of Charges and Signed Closing Memo Date)** |

| Closing Memos completed | 2017 | | 2018[220] | | 2019[221] | | 2020 | | Tenth Monitoring Period | | Eleventh Monitoring Period | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Total** | **492** | | **521** | | **271** | | **377** | | *183* | | *194* | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 73 | 19% | *46* | *25%* | *27* | *14%* |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 69 | 18% | *40* | *22%* | *29* | *15%* |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 117 | 31% | *52* | *28%* | *65* | *34%* |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 95 | 25% | *36* | *20%* | *59* | *30%* |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 12 | 3% | *2* | *1%* | *10* | *5%* |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | *2* | *1%* | *0* | *0%* |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 9 | 2% | *5* | *3%* | *4* | *2%* |

The time cases are pending within Trials provides further context for the workflow within the division. As noted throughout this report, the number of pending cases in Trials continues to balloon at a concerning pace, increasing 117%—to 1,445—from 663 at the end of 2019. The length of time or reason the cases in the Trials backlog were pending as of December 31, 2020 is outlined in the chart below.

| Cases pending with Trials at the end of the Monitoring Periods | | | | | | |
|---|---|---|---|---|---|---|
| | July to Dec., 2019 *9th Monitoring Period* | | Jan. to June, 2020 *10th Monitoring Period* | | July to Dec., 2020 *11th Monitoring Period* | |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% |
| *Pending Final Approvals by DC of ID and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% |
| **Total** | **663** | | **1,050** | | **1,445** | |

As shown in the table above, most cases (69%) have been pending within Trials for less than a year, which comports with the increase in the number of cases recently referred to Trials. A systematic

---

[220] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[221] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

triage approach will be required to address the enormous backlog of pending cases as efficiently as possible. About 29% of cases have been pending more than a year since charges were served. Trials has closed more cases in 2020 versus 2019 (which is a start), however, to keep pace with the volume of cases being referred to Trials from ID, additional efforts will be required to close cases as expeditiously as possible to achieve the goal of timely discipline.

*Conclusion*

The workload of the Trials Division has vastly increased. Further, the impact of COVID-19 along with the transition of union leadership and legal team created a number of obstacles for the Trials Division, which were adeptly handled throughout the year. Overall, it is impressive that the productivity of the Trials Division improved in 2020 compared with 2019, as outlined below:

- 1,058 charges served in 2020 (a 51% increase from 2019)
- 941 cases had discovery served in 2020 (a 116% increase from 2019)
- 375 OATH Proceedings convened in 2020[222] (303 of the 375 occurred in the 11th MP)
- 316 closing memos were completed by Trials Attorneys (a 58% increase from 2019)
- 379 cases closed in 2020 (a 41% increase from 2019)

Despite the progress within Trials to address the influx of cases, there were a total of 1,445 cases pending at the end of the Monitoring Period, a 37% increase of those cases that were pending at the end of 2019. Although the majority of backlogged investigations have been completed (and any charges stemming from those cases are reflected in the caseloads above), referrals from ID will be ongoing (either from the remaining backlog of investigations to be closed in 2021 or as more recent pending Full ID Investigations close), which will increase the number of pending Trials cases. Accordingly, efficiencies within the system can and must be a key focus going forward. The Monitoring Team intends to work with the Department to develop additional initiatives to address these issues.

| | |
|---|---|
| **COMPLIANCE RATING** | **§ VII., ¶ 3(a)**. Partial Compliance<br>**§ VII., ¶ 3(b)**. Not applicable<br>**§ VII., ¶ 3(c)**.<br>• Substantial Compliance (Charges)<br>• Substantial Compliance (Administratively Filed)<br>• Partial Compliance (Expeditiously Prosecuting Cases)<br>**§ C., ¶ 3**. Partial Compliance |

---

[222] It is important to note that due to COVID-19, OATH proceedings were temporarily suspended for about three months in 2020.

| REMEDIAL ORDER § C. (EXPEDITIOUS OATH PROCEEDINGS & APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶¶ 4, 5 |
| --- |

§ C., ¶ 4. Expeditious OATH Proceedings. All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least 50 disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continue to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the Order Date, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month.

§ C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings. The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

    i.    Within 30 days of the Order, and every quarter thereafter, the City shall in writing advise all OATH Administrative Law Judges who handle proceedings relating to UOF Violations of: (i) the applicability of the Disciplinary Guidelines to these proceedings; (ii) the City's obligations under Section VIII (Staff Discipline and Accountability) of the Consent Judgment and under Paragraphs C. 3 and C. 4 above; and (iii) any findings from Monitor Reports relating to compliance with Section VIII of the Consent Judgment or Paragraphs C.3 and C.4 above.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The adjudication of discipline for *tenured* Staff has been delegated by the Department to the Office of Administrative Trials and Hearings ("OATH"), an administrative law court that conducts adjudication hearings pursuant to New York State Civil Service Laws § 75.

- Discipline may be imposed on *tenured* Staff via a settlement directly negotiated between the Respondent Staff Member (and their counsel) and the Department (discussed in § C., ¶ 3 above), following a Pre-Trial Conference with an Administrative Law Judge ("ALJ"), or following a trial before an ALJ. The Department bears the burden of proof by a preponderance of the evidence. OATH also maintains rules of procedure.[223]

- If the Staff Member elects to have a proceeding with an ALJ then:
  - The Department is responsible for scheduling a Pre-Trial Conference with Respondent, their counsel,[224] and an attorney from the Trials Division before OATH so the ALJ can meet with the parties to attempt to facilitate a settlement.
  - If a settlement cannot be reached, then the case is either scheduled for another Pre-Trial Conference or a trial is scheduled in which an ALJ (a different ALJ from the one that conducted the pre-trial conference) hears and assesses the evidence to evaluate whether or not the Staff Member has violated policy.
  - If a trial occurs, then the ALJ issues a written report and recommendation to the DOC Commissioner. If the ALJ determines that a violation occurred, the decision also

---

[223] *See* OATH's Rules of Procedures at https://www1.nyc.gov/site/oath/trials/rules-of-practice.page.

[224] A union representative may also participate in the Pre-Trial Conference as well.

includes a proposed penalty, with penalty ranges set by law to include a reprimand, a fine of up to $100, a suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[225]

o   The DOC Commissioner makes the ultimate decision regarding the imposition of discipline and can accept the factual findings and penalty recommendation of the ALJ or may modify them, as appropriate, to resolve the case. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

- In this Monitoring Period, the following OATH proceedings occurred:
   o   303 cases had a Pre-Trial Conference relating to 198 Staff and 274 unique use of force incidents.
   o   4 trials were conducted in this Monitoring Period.
- The City sent a letter to all OATH Administrative Law Judges who handle proceedings relating to UOF Violations that incorporated the requirements of § C., ¶ 5(i).

**ANALYSIS OF COMPLIANCE**

*Expeditious OATH Proceedings* (§ C., ¶ 4)

The Department and OATH made significant strides in convening more Pre-Trial Conferences in this Monitoring Period than in the last Monitoring Period. Under the Remedial Order, OATH must convene at least 50 Pre-Trial Conferences per month, equating to 225 Pre-Trial Conferences required in this Monitoring Period.[226] 303 UOF-related cases were conferenced before OATH which is ***more than*** was required by the Remedial Order. These 303 Pre-Trial Conferences related to 274 unique use of force incidents, meaning certain cases had more than one conference. Further, these Pre-Trial Conferences involved 198 Staff Members, meaning some Staff had more than one pending matter that was heard by OATH. The outcome of the *initial* 303 Pre-Trial Conferences is demonstrated in the chart below.

| Results of Pre-Trial Conferences for UOF Cases July to December 2020 | | | | | | | Unique UOF Incidents | Staff Members |
|---|---|---|---|---|---|---|---|---|
| Settled | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | Total | | |
| 111 | 10 | 44 | 124 | 12 | 2 | **303** | 274 | 198 |
| 37% | 3% | 15% | 41% | 4% | 1% | **100%** | | |

---

[225] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[226] The Remedial Order requirement began on August 14, 2020 so it covered four and a half months of the six-month Monitoring Period.

In this Monitoring Period, there was an increased need for Pre-Trial Conferences given that counsel for correction officers (who have the majority of pending cases) generally refused to negotiate settlements of matters without a Pre-Trial Conference and have advised the Department that they do not intend to generally engage in settlement discussions prior to the Pre-Trial Conference (as discussed in ¶ 3 above). Further, the transition of COBA counsel also appeared to impact the ability to achieve settlements at the Pre-Trial Conferences. Fewer than 40% of cases were resolved following the *initial* Pre-Trial Conference, with a very high proportion scheduled for trial (41%). A large portion of the cases that did not settle after the *initial* Pre-Trial Conference occurred during the transition of COBA's counsel (which began in September and was complete in November). The Monitoring Team found that towards the end of the Monitoring Period, following the transition of COBA counsel, a larger proportion of cases were settled at the initial Pre-Trial Conference and the request for trials had decreased.

In evaluating the outcome of the *initial* Pre-Trial Conferences, the Monitoring Team found that any cases that required a subsequent conference and/or trial would be scheduled for follow-up many months after the initial Pre-Trial Conference. In this Monitoring Period, 81% of the cases that were scheduled for Trial after the Pre-Trial conference, were scheduled to occur at least 100 days after the *initial* Pre-Trial Conference. As of the filing of this report, for those cases scheduled for trial, about 63% of these cases are still pending and no trial has occurred,[227] 23% have settled (or in the process of being closed), and 10% have had a trial (or the trial is ongoing). These scheduling matters simply delay the ultimate disposition, especially given that most cases ultimately settle *without a trial* and could be resolved more quickly if the subsequent follow-up occurred closer in time to the initial Pre-Trial Conference.

The Department and OATH have undeniably made significant progress in convening additional Pre-Trial Conferences and conducted more Pre-Trial Conferences than required by the Remedial Order. However, the overall process is still too protracted. First, there are not enough Pre-Trial Conferences to address the pending matters with the Trials Division, especially given the limited willingness by Staff to settle matters outside of the OATH process. Second, it appears that the scheduling of subsequent proceedings following the initial Pre-Trial Conference needs improvement. While more Pre-Trial Conferences have been convened, the goal of this provision is to efficiently address cases before OATH. In order to achieve that goal, more Pre-Trial Conferences are needed[228] as

---

[227] In almost all of these pending cases, the date scheduled for trial has passed and the trial did not occur on the scheduled date.

[228] In the next Monitoring Period, the Monitoring Team intends to develop recommendations on the number of additional Pre-Trial Conferences that should be convened each month.

well as improvements in the scheduling of the subsequent proceedings, if the case is not settled after the initial Pre-Trial Conference.[229]

*Applicability of Disciplinary Guidelines* (§ C., ¶ 5)

The UOF Directive and Disciplinary Guidelines, which are over three years old, were developed to work in tandem, to effect culture change by imposing consistent, timely, meaningful, and appropriate discipline, and are the standards that must be utilized when assessing UOF violations. The Remedial Order affirms that the Disciplinary Guidelines developed pursuant to § VIII., ¶ 2 of the Consent Judgment apply to any OATH proceeding related to the Department's efforts to impose discipline for UOF Violations. This is necessary as the Consent Judgment requires the Department to follow the Disciplinary Guidelines in imposing discipline, and only depart from the guidelines under extraordinary circumstances, which must be documented in writing. Accordingly, any "Report and Recommendation" rendered by an ALJ must include a discussion of the Disciplinary Guidelines in the Report and Recommendation in order to allow the Department to perform their legal obligations. Existing OATH precedent relating to UOF Violations, based on prior iterations of the UOF Directive, may be part of an ALJ's reasoning, but must be considered in combination with the penalties sought by DOC attorneys in light of the Consent Judgment, Remedial Order and the resulting UOF Directive and Disciplinary Guidelines, which are now the operative policies governing Staff conduct.

It is important to acknowledge that the purpose of a proceeding before an ALJ is that they are an independent tribunal and Staff are entitled to due process. Therefore, ALJs are not bound by either the factual or legal arguments made by the attorneys from the Trials Division. Indeed, the Consent Judgment and Remedial Order were specifically crafted to preserve the ability to make independent determinations on a case-by-case basis given the applicable facts. Nevertheless, ALJs may not *ignore* the penalties sought by the Department pursuant to the Disciplinary Guidelines. If an ALJ determines that a recommend penalty other than those sought by DOC pursuant to the Disciplinary Guidelines is appropriate, then the ALJ must provide an *explanation* of circumstances that supports that departure.

- OATH Pre-Trial Conferences

The Monitoring Team assessed the impact of the ALJ's input during Pre-Trial Conferences by reviewing a full day's worth of cases presented for Pre-Trial Conferences in front of one Judge (a similar analysis was conducted in the last Monitoring Period and described in the Tenth Monitor's Report at pgs. 192-193). The Monitoring Team reviewed the 10 use of force-related cases presented over the course of the day, along with the notes from the conference, and the outcome of the proceedings. Of the 10 cases presented, only one case settled for an NPA while the other nine cases were scheduled for trial. It appeared from the notes of the conference that the Judge appropriately

---

[229] The Monitoring Team intends to consult with the City in the next Monitoring Period on how efficiencies could be implemented to improve the OATH scheduling process so any subsequent proceedings after the initial Pre-Trial Conference occur closer to the initial conference.

identified the strengths and weaknesses of each side's case to facilitate settlement and attempted to encourage Respondents to accept reasonable settlement offers in some cases, albeit unsuccessfully and the cases were therefore set for trial. A few cases involved serious misconduct where settlement was unlikely and so those cases were appropriately set for trial. While it is expected that certain cases may require a trial, the Monitoring Team strongly encourage ALJ's to make all efforts to work with the Parties to achieve settlement during the Pre-Trial Conference.[230]

- OATH Reports and Recommendations

The ALJ issues a written report and recommendation ("R&R") to the DOC Commissioner following the conclusion of a trial. If the ALJ determines that a violation occurred, the decision also includes a proposed penalty, with penalty ranges set by law to include a reprimand, a fine of up to $100, a suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[231] The DOC Commissioner makes the ultimate decision regarding the imposition of discipline and can accept the factual findings and penalty recommendation of the ALJ or may modify them, as appropriate, to resolve the case. The DOC Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

The Monitoring Team has analyzed a number of R&Rs in prior Monitor's Reports (see Seventh Monitor's Report at pgs. 152 to 158 and Appendix C, Eighth Monitor's Report at pgs. 183 to 184 and Ninth Monitor's Report at pgs. 206 to 208). In this Monitoring Period, the Monitoring Team focused on developing a comprehensive assessment of all R&Rs related to use of force incidents that have been adopted and/or modified by the Commissioner.

The Commissioner has adopted and/or modified 19 R&Rs[232] issued by ALJ's between the Effective Date (November 1, 2015) and the end of the Monitoring Period (December 31, 2020). 14 of the 19 decisions were rendered after the Effective Date, while 5 were rendered prior to the Effective Date, but were adopted and/or modified by the Commissioner after the Effective Date. In terms of the underlying use of force incidents, 10 occurred prior to the Effective Date, 7 occurred between the Effective Date and October 27, 2017 (when the disciplinary guidelines came into effect) and 2 occurred after October 27, 2017 (one on November 23, 2017 and the other on May 8, 2018). These cases involved the conduct of a total of 30 Staff Members. In terms of the decisions rendered, the ALJ

---

[230] The OATH day occurred during the transition to new COBA counsel and so it is possible that the ability to achieve settlement may have been impacted by certain external factors discussed above.

[231] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

[232] 15 of the R&Rs were rendered post-Effective date while 4 R&Rs were rendered prior to the Effective date, but adopted and/or modified by the Commissioner following the Effective date. All 19 R&Rs are considered as part of this analysis because the discipline was imposed following the Effective date.

found guilt in 13 of the 19 cases.[233] The 13 cases involved the conduct of 18 individual Staff Members. In terms of the sanctions recommended by the ALJ, generally the ALJ recommended a more lenient sanction than the sanction sought by the Department as outlined below:

- In 2 of 13 cases (involving 2 Staff), the ALJ adopted the recommended disciplinary sanction from the Trials Division.

- In 2 of 13 cases (involving 4 Staff), the ALJ adopted the recommended disciplinary sanction from the Trials Division for one staff in each case and deviated on the outcome for the other Staff Member.

- In 9 of 13 cases, (involving 12 Staff) the ALJ **deviated** from the recommended disciplinary sanction by the Trials Division as outlined below:

  o 4 cases (involving 4 staff) recommended 10 days less than the disciplinary sanction recommended by the Trials Division.

  o 1 case (involving 3 staff) recommended 15 days less than the disciplinary sanction recommended by the Trials Division.

    ▪ Note, in this case an Action of the Commissioner was taken (involving 3 staff) which imposed the number of days recommended by the Trials Divisions (30 days instead of the 15 days recommended by OATH).

  o 4 cases (involving 5 staff) recommended a sanction of compensatory days instead of termination, which the Department sought.

The Department sought termination in 6 of the 19 cases that went to trial. The ALJ found guilt in each of these 6 cases (so these 6 cases are a subset of the13 cases discussed above). Termination has only been recommended by an ALJ in cases in which the Department has also sought termination. However, the ALJ only recommended termination in 2 of the 6 cases as discussed below.

  o 1 in 6 cases the ALJ recommended termination.

  o 1 in 6 cases the ALJ recommended termination for one Staff, but recommended a sanction of compensatory days for the other Staff Member.

  o 4 in 6 cases the ALJ recommended a sanction of compensatory days instead of termination.

    ▪ In one of these 4 cases the Commissioner terminated the Staff Member through an Action of the Commissioner

---

[233] There were six cases with not guilty verdicts. One related to an incident that occurred prior to the Effective Date and the other five cases occurred after the Effective Date.

In total, only 14 R&Rs have been rendered by OATH ALJ's over the last 5 years, which demonstrates how few cases ultimately go to trial. That said, this small number of decisions have a direct impact on all settlement proceedings, in particular, during Pre-Trial Conferences in which an ALJ provides their assessment of how a case would be resolved should it go to trial. Accordingly, it is imperative that use of forces incidents are objectively and reasonably assessed by ALJs in the R&R so as not to undermine the overall goal of the Consent Judgment that Staff are held accountable for misconduct. The Monitoring Team will continue to closely scrutinize OATH proceedings and any decisions rendered to assess they are in line with the appropriate policies and guidelines required by the Consent Judgment (and the Remedial Order).

*Communication to OATH ALJ's* (§ C., ¶ 5(i))

The City advised all OATH Administrative Law Judges who handle proceedings relating to UOF Violations of the requirements of § C., ¶ 5(i). The City consulted with the Monitoring Team prior to finalizing the letter. Going forward, the letter will be issued every quarter to coincide with the filing of the Remedial Order Report and/or Monitor's Report. Accordingly, the City is in Substantial Compliance with this requirement.

| COMPLIANCE RATING | § C., ¶ 4. Partial Compliance<br>§ C., ¶ 5. Partial Compliance<br>§ C., ¶ 5(i). Substantial Compliance |
| --- | --- |

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, three Directors, 16 attorneys, 2 interns, 1 investigator, and 12 support staff. Trials has one less attorney than at the end of the prior Monitoring Period.

- The number of *pending* UOF related disciplinary matters with the Trials Division has increased from 194 *pending* cases as of January 2, 2019 to 1,445 *pending* cases as of December 31, 2020 (a 645% increase in *pending* UOF related disciplinary matters).

**ANALYSIS OF COMPLIANCE**

The expeditious prosecution of cases requires systems and processes that ensure cases are managed efficiently and effectively, and that there are adequate staff to support these initiatives. Given the significant and increased number of pending cases in Trials, it is important that Trials has a full complement of staffing to adequately address the current caseload, keep up with the new cases referred from ID, and address cases in a reasonable period of time. As noted throughout this section, the

ultimate imposition of discipline is not exclusively managed by the Trials Division, which is why staffing within Trials is only part of the overall consideration on how to address the caseload. It is also an oversimplification of the issue to suggest the number of pending cases can merely be resolved with additional Trials staff as the backlog is a broader and more complex issue. However, the current staffing levels in Trials will not adequately meet the demand of the current caseload.

The division lost a total of four attorneys this year (one of the four attorneys left in this Monitoring Period), but hired two interns to help support the additional case work. While the Trials Division has demonstrated improved productivity in light of the challenges from COVID-19, the unions, and the influx of the ID backlog into Trials, the current staffing is simply insufficient to address the current caseload and improve the productivity of the Trials Division. Concerningly, the City's budget cuts, hiring freezes and furloughs (all in an attempt to recover from the financial impacts of COVID-19) have directly impacted Trial's ability to fill existing vacancies and to hire *additional* Staff beyond those that had been originally assigned to the Trials Division. The Monitoring Team is equally concerned that the increase in staff workloads creates significant stress and burden on staff which can impact morale and possibly increase the risk of staff turnover (which of course further compounds the productivity of the Trials Division). The Monitoring Team continues to *strongly* recommend the City support the Department to ensure that the Division is adequately staffed by ensuring there is adequate funding and appropriate approvals across City agencies to ensure that qualified staff are identified and hired in a timely manner. Following the close of the Monitoring Period, the City and Department reported that it has posted for additional attorneys for the Trials Division and taken steps to ensure the hiring process occurs as quickly as possible.

| **COMPLIANCE RATING** | **¶ 4.** Non-Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

¶ 5. The Trials Division shall negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines. Negotiated pleas shall not be finalized until they have been approved by the DOC General Counsel, or the General Counsel's designee, and the Commissioner.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- All NPAs continue to be reviewed and approved by the Deputy General Counsel of Trials. The NPAs are then forwarded to the Deputy Commissioner of ID & Trials (designated by the DOC General Counsel). The Deputy Commissioner of ID & Trials then sends all approved NPAs to the Commissioner for final approval. Once approved, the Commissioner returns the NPA to Trials for administrative processing.
- The Commissioner approved 334 NPAs or OATH decisions in 2020, approximately 100 more (58%) than 2019. Of the 168 NPAs or OATH decisions completed in this Monitoring Period,

70% were approved[234] by the Deputy Commissioner of ID & Trials and the Commissioner within one month (96% were approved within two months) of submission by the Deputy General Counsel of Trials.

- A total of 379 cases were approved by the Deputy Commissioner of ID & Trials in 2020, an increase of 111 cases (41%) from 2019. The Deputy Commissioner of ID & Trials approved 186 NPAs in an average of 19 days. 83% were approved within one month (97% were approved within two months) of submission by the Deputy General Counsel of Trials.

ANALYSIS OF COMPLIANCE

This assessment of compliance is limited to the second sentence of this provision that requires all NPAs to be approved by the DOC General Counsel (or their designee) and the Commissioner. The Monitoring Team assesses the Department's efforts to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) and to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) together in the ¶ 2 box above.

The Department has maintained a process in which all negotiated pleas are approved in a timely manner as required since the Sixth Monitoring Period. In this Monitoring Period, the review process by both the Deputy Commissioner of ID & Trials and the Commissioner took an average of 26 days after the closing memo was completed by Trials. The approval time in this Monitoring Period was a little longer than the last, however it remains reasonable, especially given the many various demands and responsibilities that both individuals must juggle. Therefore, the Department remains in Substantial Compliance with the second sentence of this provision.

| COMPLIANCE RATING | **¶ 5. Disposition of NPAs and Recommendations to OATH Judges:** Partial Compliance<br>**¶ 5. Approval of NPAs:** Substantial Compliance |
|---|---|

## 9.   SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) and the new modified requirement to screen Staff after being disciplined (¶ 6).

*Promotion of ADWs*

---

[234] The Commissioner approved these 168 NPAs in an average of 26 days.

The Department continued promoting the class of ADWs it had begun screening in the Tenth Monitoring Period. This class of ADWs was screened and promoted over an extended period of time which spanned the Tenth and Eleventh Monitoring Periods. Given COVID-19, the promotion of ADWs occurred in three waves so that pre-promotional training was limited to 10 Staff at a time. Therefore, 10 Captains were promoted to ADWs in June 2020, 12 Captains were promoted to ADW in July 2020, and the final group of 13 Captains were promoted to ADW in September 2020.

The Monitoring Team's compliance assessment is outlined below.

## XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

    (a) [Use of Force history for the last 5 years]

    (b) [Disciplinary history for the last 5 years]

    (c) [ID Closing memos for incidents in the last 2 years]

    (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Directive 2230, Pre-Promotional Assignment Procedures, addresses the requirements of ¶¶ 1 to 3 and remains in effect. The Department revised the promotion screening forms for ID, Trials and the Legal Division to move the requirement to screen for ¶ 2 of the Consent Judgment to be conducted by Trials and ID instead of the Legal Division. These updated forms went into effect early in the Twelfth Monitoring Period.

- The Department screened and promoted Staff to the following ranks between January 2017 and December 2020[235]:

| Overview of Staff Promotions | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan. to June 2017 | July to Dec. 2017 | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to Dec. 2020 | July to Dec. 2020 | Total |
| Captains | 79 | 102 | 0 | 97 | 0 | 0 | 0 | 0 | **278** |
| ADWs | 0 | 4 | 13 | 0 | 3 | 0 | 10 | 25 | **55** |
| DW | 0 | 5 | 1 | 2 | 8 | 0 | 0 | 0 | **16** |
| Wardens | 2 | 0 | 3 | 4 | 1 | 0 | 2 | 0 | **12** |
| Chiefs | 2 | 1 | 1 | 1 | 2 | 1 | 0 | 0 | **8** |

**ANALYSIS OF COMPLIANCE**

The screening requirements of the Consent Judgment were developed to support the Department's efforts to identify Supervisors who embody and demonstrate the qualities and conduct of leaders who will support and create the culture change needed to reform the Department. In particular, the Consent Judgment requires the Department to consider a Staff Member's use of force and disciplinary history (¶ 1(a)-(d)). Further, the Consent Judgment mandates that Staff Members may not be promoted if they have guilty findings on certain violations (¶ 2) or pending UOF disciplinary charges (¶ 3).

*Assessment & Selection of Staff for Promotion*

The majority of screening for promotions conducted appear to have occurred as required. The Monitoring Team did not identify any concerns with the screening of the Staff promoted in this Monitoring Period. However, out of the many Staff who have been promoted over the past several Monitoring Periods, the Monitoring Team previously identified at least 14[236] Staff promotions that caused concern, as discussed in prior Monitor Reports (*see* Eighth Report at pgs. 199-201, Ninth Report at pg. 233 and Tenth Report at pgs. 206-207). The background of all of these Supervisors prior to their promotions raised concerns about their ability to serve appropriately as Supervisors and the example they would set for those they supervise. Their promotions could send a troubling message to subordinate Staff about how prior misconduct is sometimes rewarded with a promotion.

This Monitoring Period, of the 14 Supervisors whose promotions had previously concerned the Monitoring Team, the Monitoring Team found that one had engaged in serious misconduct (discussed in more detail below) and 3 others had engaged in questionable conduct and possibly violated the UOF

---

[235] This does not include the Staff the Department screened but decided not to promote or have not yet promoted.

[236] One of these 14 Staff Members was subsequently demoted.

policy. The Monitoring Team made this determination after analyzing all 34 UOF incidents from July to December 2020, involving nine of the 14 Supervisors whose promotion concerned the Monitoring Team (the other five Supervisors were not involved in a UOF during this time period). It is worth noting that in most of the UOF (30 of the 34, or 88%) incidents reviewed that the Supervisors generally demonstrated appropriate behavior. Assessing the conduct and the incidents Supervisors are involved in must be a crucial focus for the Department in its efforts towards reform and the Monitoring Team will continue to scrutinize these Supervisors closely. As recommended in four prior Monitor's Reports,[237] the Monitoring Team continues to recommend the Department conduct a similar assessment, to keep a watchful eye on Supervisors who may require additional support (such as those identified by the Monitoring Team), to ensure prompt feedback and guidance is provided and to hold Supervisors accountable for misconduct.

_Serious Misconduct by a Supervisor_

One of the 14 Supervisors that the Monitoring Team has been routinely assessing engaged in serious misconduct during a UOF incident towards the end of the Monitoring Period. The ADW was suspended by the Department for their actions. The Monitoring Team subsequently reviewed the video and Intake Investigation of the incident which outlined evidence that the ADW was hyper-confrontational, precipitated the need for force, and utilized head strikes where there was no evidence of imminent danger of death or serious bodily injury—in fact, the head strikes appeared to be punitive, retaliatory, or designed to inflict pain on an incarcerated individual, and constituted a needless risk of serious injury to the incarcerated individual.[238] Given the findings of the Intake Investigations and objective evidence, following the close of the Monitoring Period, the Monitoring Team submitted a recommendation to the Commissioner, pursuant to Remedial Order § C ¶ 2. The Monitoring Team recommended that the individual be placed on modified duty with minimal to no contact with incarcerated individuals pursuant to Consent Judgment § VIII, ¶ 2(e)[239] because the evidence suggests that the ADW more likely than not engaged in conduct that meets the standard[240] for the Department to

---

[237] _See_ the Fourth Monitors' Report at pgs. 187-188, Fifth Monitor's Report at pgs. 130-131, Seventh Monitor's Report at pgs. 174-175, Ninth Monitor's Report at pg. 233 and 10th Monitor's Report at pgs. 206-207

[238] "The Department strictly prohibits the use of high impact force, including: strikes or blows to the head [unless] a Staff Member or other person is in imminent danger of serious bodily injury or death, and where lesser means are impractical or ineffective." Use of Force Directive 5006R-D § II, ¶ G.

[239] The Commissioner may elect not to place the ADW on modified duty, but she must personally review the matter and make a determination that exceptional circumstances exist that would make suspension and the modification of assignment unjust, which determination shall be documented and provided to the Monitor.

[240] This standard appears in the Department's Disciplinary Guidelines 1.b and the Consent Judgment § VIII, ¶ 2.d.ii.

take all necessary steps to seek termination. Further, the Monitor recommended that the Department expeditiously complete the investigation and, if upon completion of the investigation, there is a finding that the ADW's actions were "punitive, retaliatory, or designed to inflict pain on an inmate, and constitutes a needless risk of serious injury to an inmate," that the Department expeditiously take all necessary steps to seek the ADW's termination as required by the Consent Judgment (§ VIII., ¶ 2(d)(ii)). In response to this recommendation, the Commissioner advised the Monitoring Team that the ADW would be placed on modified duty with minimal to no contact with incarcerated individuals following their return from suspension, and that the Department would expeditiously complete the investigation into the incident and intended to take all necessary steps to seek the termination of this ADW.[241]

_Assessment of Screening Materials_

The promotion process is guided by multiple factors, including requirements from the Department of Citywide Administrative Services ("DCAS") for testing and ranking applicants (_see_ Third Monitor's Report at pgs. 190-192). The screening requirements of this section of the Consent Judgment are then imposed and is depicted in _Appendix D: Flowchart of Promotions Process_. It is important to note that certain determinations on whether a Staff can be promoted are dictated by the DCAS process and so the Department must adhere to and is limited by these rules and regulations when making promotion determinations. For example, candidates must be considered for promotion in the order in which they have been ranked by DCAS after completing the promotion exams.

The Department promoted 25 ADWs during this Monitoring Period. To verify the Department screened and promoted Staff in accordance with required criteria, the Monitoring Team reviewed each person's screening packet to assess whether they met the requirements of ¶¶ 1, 2, 3 as discussed below. The Monitoring Team also reviewed the screening packets for a sample of the Staff screened for promotion, but who were not promoted to ADW. The review of these materials generally demonstrated that Staff were not promoted for a variety of reasons that appeared reasonable. In some cases, Staff were disqualified due to the requirements of ¶¶ 2 and 3. In other cases, the Staff Members were not promoted because of reasons outside of the requirements of the Consent Judgment. For example, other background information in their file suggested they may not be suitable for promotion (_e.g._, egregious UOF guilty dispositions that did not meet the specific criteria of ¶¶ 2, 3 or arrests). Overall, the assessment of the screening materials demonstrated a level of thoughtfulness and care by the Department.

---

[241] Following the suspension of this Staff Member, Staff organized a GoFundMe page to fundraise for this individual. The fundraiser generated more than $25,000 in donations. Despite the objective evidence of wrong doing, this overwhelming support of the Staff Member is representative of the entrenched cultural attitudes towards unnecessary and excessive force that must change.

*Review of Candidates (¶ 1)*

The Department's screening for the ADW promotions satisfied the requirements of the "Review" as defined by ¶ 1.

*Disciplinary History (¶ 2)*

The ADWs who were promoted in this Monitoring Period had not been found guilty or pled guilty to the specified violations two or more times in the past five years. In addition to this, there were Staff who were not promoted to ADW because they had been found guilty or pled guilty to the specified violations two or more times in the past five years, demonstrating that this evaluation is occurring and effectively barring Staff from being promoted who meet this criterion. These findings demonstrate that the Department potentially utilized more care and thoughtfulness when promoting Staff, including applying and adhering to the requirements of the Consent Judgment.

Given the concerns identified in prior Monitoring Period with this process, the Department moved the responsibility for this screening criteria from the Legal Division to both Trials and ID and updated all three relevant screening forms at the start of the Twelfth Monitoring Period. The Monitoring Team is encouraged to see that this requirement was implemented appropriately in this Monitoring Period. However, the Monitoring Team intends to closely review this requirement going forward given the difficulty the Department has historically had in consistently and reliably assessing candidates for promotion.

*Pending Disciplinary Matters (¶ 3)*

The ADWs who were promoted did not have any pending disciplinary charges at the time of promotion. Conversely, there were Staff screened for promotion to ADW with pending disciplinary charges that were not promoted. Further, there were no Staff who were promoted very close in time to their discipline being finalized this Monitoring Period—an improvement from prior Monitoring Periods, in which Staff appeared to have disciplinary matters resolved close in time to their promotion (*see* Tenth Monitor's Report at pgs. 208-209).

*Conclusion*

Overall, the screening process for the Staff promoted in this Monitoring Period appeared to conform with the requirements of the Consent Judgment and did not raise the same concerns that have been reported in prior Monitoring Periods. However, the Monitoring Team intends to continue to closely scrutinize this process as the issues identified in prior Monitoring Periods suggests that there have been some issues in implementing the screening requirements as required and/or that questionable judgment has been utilized in assessing the results of the screening requirements. The Monitoring Team continues to encourage the Department to carefully conduct the screening assessment and utilize appropriate and reasonable judgment in making promotion decisions going forward.

| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |
| --- | --- |

| | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 6 (POST-DISCIPLINARY ASSESSMENT OF STAFF)

¶ 6. Assessment After Discipline: If a Staff Member has been found guilty or pleaded guilty to a violation arising from misconduct relating to a Use of Force Incident, the following shall occur:

    a.   The Trials Division shall determine whether to recommend that the Staff Member be: (i) considered for reassignment to a different position (including but not limited to a position with limited or no inmate contact or a position outside a Special Unit) and/or (ii) placed in the Early Intervention, Support, and Supervision Unit ("E.I.S.S.") monitoring program.

    b.   When the Trials Division recommends that a Staff Member be considered for reassignment, the Department, including the Facility Warden or a designated Assistant Deputy Warden (or other official of higher rank), shall timely evaluate that recommendation. The Staff Member shall be reassigned when the Department determines that the Staff Member cannot effectively and safely perform the duties associated with the assignment and/or the Staff Member should have limited or no inmate contact. If such a determination is made, reassignment must occur promptly. The results of the evaluation shall be documented and become part of the Staff Member's personnel file and shall be sent to the Monitor.

    c.   When the Trials Division recommends that a Staff Member be placed in the E.I.S.S. monitoring program, the Department, including E.I.S.S., shall timely evaluate that recommendation, and promptly place the Staff Member in the E.I.S.S. monitoring program if warranted. The results of the evaluation shall be documented and become part of the Staff Member's personnel file and shall be sent to the Monitor.[242]

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Operations Order 10/17 "Awarding Job Assignments within a Command," was revised, in consultation with the Monitoring Team, to address the revised requirements of ¶ 6. The revised Operations Order was not yet finalized at the end of the Monitoring Period.
  - In December 2020, the Trials Division began assessing whether to recommend a Staff Member for placement in E.I.S.S. or reassignment to a post with limited contact with incarcerated individuals. This assessment also sometimes occurred while the case was still pending with Trials. If such an assessment occurs prior to the closure of the case, Trials conducts such an assessment, and makes any necessary recommendations following the closure of the case. Once the recommendation for placement on E.I.S.S. and/or modification of duty is made, E.I.S.S. will screen for placement on E.I.S.S. or Facility Leadership will assess the Staff Member to determine if the Staff Member's post should be modified to a position with less contact with incarcerated individuals.

### ANALYSIS OF COMPLIANCE

      Under the revised requirements of the Consent Judgment, the Department is now required to assess each Staff Member following a guilty UOF violation to determine whether they may benefit

---

[242] This language reflects the Consent Judgment Modification approved by the Court on August 14, 2020 (*see* dkt. 350).

from inclusion in E.I.S.S. or if they should be reassigned to a post with limited contact with incarcerated individuals given the facts of their case. The Trials Division also reported that it makes decisions about potential placement in E.I.S.S. or reassignment during the pendency of the case in Trials, meaning these decisions are not just limited to after the case is closed. The Monitoring Team supports this approach given the importance of both obtaining support and/or being placed on modified duty as soon as possible. This is particularly heightened given the current length of time a case takes to ultimately be resolved.

Following the adoption of this modified provision in mid-August 2020, the Department worked with the Monitoring Team to develop a process in which this assessment would occur routinely and efficiently given the need to engage various different stakeholders in this process. Once the process was developed, the relevant Operations Order was revised to reflect the process and codify the requirements of ¶ 6.

Prior to this process getting off the ground, the Monitoring Team pre-emptively recommended seven Staff with recently resolved disciplinary matters to be evaluated to assess whether they should be placed on modified duty. Following an evaluation, the Department reported that two Staff Members were already on no contact with incarcerated individuals and one was on probation so was already automatically screened by E.I.S.S. In two cases, the Department reported it was seeking termination for these Staff Members and the trials were imminently forthcoming. Trials has elected to defer consideration of modifying their posts until after their trials are complete. For one case, the Department reported it was seeking termination for the Staff Members and would make an assessment for E.I.S.S. or reassignment if termination did not occur. The Department reports that the other Staff Member would remain on their current post because an assessment of their conduct since the underlying incident occurred did not suggest that modification was necessary. Overall, the Department demonstrated thoughtful consideration of the Monitoring Team's recommendations.

The Department has reported that it has begun screening Staff for this requirement in December. As this process has only just been implemented, it is too early for the Monitoring Team to assess the appropriateness of screening for this requirement. The Monitoring Team will more thoroughly scrutinize the recommendations by Trials and the subsequent assessment of whether to place a Staff Member on E.I.S.S. and/or to be placed on modified duty in the next Monitoring Period.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
| --- | --- |

## 10. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to consult with ID before recommending an arrest of an incarcerated individual for conduct that was also connected with a

use of force incident. The larger purpose of this section is to ensure that arrests of incarcerated

individuals are based on probable cause, and not for retaliatory purposes. The Monitoring

Team's assessment of compliance is outlined below.

## XIV. ARREST OF INMATES (¶ 1)

¶ 1. The Department shall recommend the arrest of an Inmate in connection with a Use of Force Incident only after an investigator with the Correction Intelligence Bureau or ID, with input from the Preliminary Reviewer, has reviewed the circumstances warranting the potential arrest and has determined that the recommendation is based on probable cause.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department's Criminal Investigation Bureau ("CIB") is responsible for arresting inmates. CIB also tracks and maintains evidence, arrest packages, and arrest data.

- The Department maintains the following three Command Level Orders governing the arrest of inmates, visitors, and juveniles:

    o CLO 01/20 Arrest of Incarcerated Individuals, this CLO also incorporates the requirements of this provision

    o CLO 02/20 Adult Visitor or Live Arrest

    o CLO 03/20 Juvenile Arrest Procedures

- CIB communicates directly with ID to request clearance prior to arresting any incarcerated individual in connection with a Use of Force.

- The Department arrested 65 incarcerated individuals this Monitoring Period. Out of the 65 individuals arrested, 21 individuals were arrested in connection with 21 unique UOF incidents.

| Total Arrests & Arrests Associated with a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 | July to Dec. 2020 |
| Number of UOF Incidents Associated with Arrests | 88 | 68 | 71 | 79 | 22 | 21 |
| Number of Inmate Arrests with Associated UOF Number | 109 (38%) | 79 (30%) | 77 (34%) | 84 (39%) | 23 (38%) | 22 (34%) |
| Total Number of Inmate Arrests | 284 | 262 | 228 | 214 | 61 | 65 |

- The reasons for all inmate arrests from January 2018 to December 2020 are presented in the table below.

| Reason for Arrest | 2018 Total | | 2019 Total | | 2020 Total | |
|---|---|---|---|---|---|---|
| Agg. Harassment | 51 | 9% | 28 | 5% | 8 | 1% |
| Arson | 0 | 0% | 0 | 0% | 1 | 0% |

| | | | | | | |
|---|---|---|---|---|---|---|
| Assault on Staff | 185 | 34% | 178 | 33% | 44 | 8% |
| Assault Other | 6 | 1% | 1 | 0% | 5 | 1% |
| Contraband Drugs | 32 | 6% | 28 | 5% | 4 | 1% |
| Contraband Other | 15 | 3% | 11 | 2% | 1 | 0% |
| Contraband Weapon | 18 | 3% | 16 | 3% | 6 | 1% |
| Criminal Act | 16 | 3% | 8 | 1% | 4 | 1% |
| Destruction of Property | 7 | 1% | 1 | 0% | 2 | 0% |
| Escape | 1 | 0% | 1 | 0% | 0 | 0% |
| Extortion | 0 | 0% | 0 | 0% | 0 | 0% |
| Inmate Disturbance / Riot | 0 | 0% | 6 | 1% | 0 | 0% |
| Obstruction of Gov. Admin. | 0 | 0% | 0 | 0% | 0 | 0% |
| Robbery | 0 | 0% | 1 | 0% | 0 | 0% |
| Serious Injury to Inmate | 14 | 3% | 21 | 4% | 0 | 0% |
| Serious Injury to Staff | 9 | 2% | 2 | 0% | 1 | 0% |
| Serious Verified Threat | 1 | 0% | 0 | 0% | 0 | 0% |
| Sexual Assault/Abuse | 7 | 1% | 15 | 3% | 1 | 0% |
| Slashings/Stabbing | 40 | 7% | 20 | 4% | 35 | 6% |
| Splashing | 144 | 26% | 105 | 19% | 14 | 3% |
| Witness Tampering | 0 | 0% | 0 | 0% | 0 | 0% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% |
| | **546** | | **442** | | **126** | |

## ANALYSIS OF COMPLIANCE

A similar number of individuals were arrested in this Monitoring Period as in the Tenth Monitoring Period. There continues to be an overall decrease in arrests compared to previous Monitoring Periods. Specifically, the number of annual arrests dropped from 546 in 2018 to 126 in 2020. The Department reports the decrease in the number of arrests in 2020 was due to the impact of COVID-19 and the reduction in population of incarcerated individuals.

The Department continued to provide the Monitoring Team with routine reports and updates regarding arrests of incarcerated individuals. In this Monitoring Period, the Monitoring Team confirmed that CIB requested and received clearance from ID prior to the 21 arrests of incarcerated individuals in connection with a Use of Force.

The Monitoring Team reviewed a targeted sample of the use of force incidents related to the 21 arrests with a corresponding use of force incident to determine whether the arrests were supported by probable cause. The Monitoring Team reviewed a small number of incidents in which the available evidence (as part of the UOF investigation and arrest package) was inconclusive as to whether probable cause existed to support the arrest. Notwithstanding, the Monitoring Team has not identified a pattern of arrests occurring without probable cause since this assessment began in the

Seventh Monitoring Period. The Monitoring Team will continue to assess the arrests of incarcerated individuals to ensure they are based on probable cause.

The Department has demonstrated arrests of incarcerated individuals made in connection with a use of force are made in consultation with ID and the arrests are supported by probable cause. Therefore, the Department remains in Substantial Compliance with this provision.

| Compliance Rating | ¶ 1. Substantial Compliance |
|---|---|

## 11. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the overall implementation of the reforms encompassed by the Consent Judgment. Significant investment from all Divisions of the Department is necessary to successfully implement the reforms of the Consent Judgment. The day-to-day management of compliance with the *Nunez* Consent Judgment continues to be joint effort between CLU,[243] NCU,[244] the Project Management Office ("PMO"),[245] and the Assistant Chief of Strategic Partnership.

The Department reported it has been working on three specific measures to support overall compliance with the Consent Judgment. First, since the Fall of 2019, PMO, CLU, and NCU have routinely met to review compliance projects and catalogue provisions in order of

---

[243] CLU manages the Monitoring Team's document and data requests and drives various policy initiatives to address the findings of, and recommendations from, the Monitoring Team. CLU regularly consults the Monitoring Team to check that Department practice is consistent with the Consent Judgment and best practice.

[244] NCU manages most of the quality assurance programs and problem-solving efforts. NCU has continued to devise and maintain solid QA programs and reporting mechanisms to illuminate Department practices that need to be maintained or improved so that the Department can achieve compliance with several requirements of the Consent Judgment. In many cases, NCU staff provide technical assistance to the Facilities to support improved practice. As discussed throughout this report, the work of NCU has supported many of the initiatives where the Department has demonstrated progress (*e.g.* timely submission of UOF reports, improved medical wait times, and consistent processing of command disciplines).

[245] PMO manages many of the projects and initiatives throughout the Department from logistical support, to developing relevant analyses, and necessary coordination among stakeholders to support the overall implementation of these initiatives.

difficulty to achieve. PMO reports that they first prioritized the projects in which achieving compliance was easier so that they may then focus on the more difficult projects. Additionally, PMO reports every requirement in the Consent Judgment has been catalogued or merged into a single project and has been assigned a step-by-step work plan. PMO, CLU, and NCU work together to oversee these work plans. Second, to increase accountability, starting in the Winter of 2019, PMO has routinely met with different Division staff to review work plans, timeliness, and milestones and overall progress toward compliance. Finally, since December 2019, the Commissioner, Deputy Commissioners, Wardens, and executive staff have met monthly to assess how each division is doing in achieving compliance with their part of the consent decree. Senior staff assist in solving operational compliance issues in these meetings. This approach to managing and working toward compliance with the various Consent Judgment is reasonable, given the complexity and significant number of requirements needed to be addressed. In fact, the Monitoring team has taken a similar approach to our monitoring efforts as it is simply impossible to address and focus on all requirements simultaneously.

The Assistant Chief's office, CLU, NCU, and PMO remain committed to implementing the reforms in the Consent Judgment. The staff in these units are hardworking, smart, conscientious, dependable and provide invaluable assistance to the Department and the Monitoring Team. That said, the Department continues to struggle with implementing many of the *Nunez* requirements, which appears at least partly due to a lack of ownership and understanding of the requirements from uniform staff in the Facilities. These staff are integral to the success of *Nunez* reforms and the Monitoring Team encourages uniform staff to be committed and open to reforms.

The Monitoring Team's assessment of compliance is outlined below.

## XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

¶ 1. To the extent necessary and not otherwise explicitly required by this Agreement, within 6 months of the Effective Date, the Department shall review and revise its existing policies, procedures, protocols, training curricula, and practices to ensure that they are consistent with, incorporate, and address all provisions of this Agreement. The Department shall advise the Monitor of any material revisions that are made. The Department also shall notify Staff Members of such material revisions, and, where necessary, train Staff Members on the changes. The 6-month deadline may be extended for a reasonable period of time with the Monitor's approval.[246]

¶ 2. The Department shall revise and/or develop, as necessary, other written documents, such as logs, handbooks, manuals, and forms, to effectuate the terms of this Agreement.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains a process for tracking policies and procedures, including necessary revisions, as outlined in the Ninth Monitor's report at pgs. 246 to 247.

- The Policy and Procedure Unit ("PPU") is responsible for reviewing and maintaining all policies and Command Level Orders.

- The Department maintains two policies that govern management of policies and procedures within the Agency.

  - Directive 0000R-A, "Implementing Departmental Policy," which provides procedures for the promulgation, revision, maintenance, and routine review of Department policies.

  - Operations Order 05/19, "Facility Information System ("FIS") is in effect. Pursuant to Operations Order 05/19, each Facility has a designated FIS Officer and staff who are responsible for reviewing and updating CLOs on a routine basis.

    - This policy is undergoing revisions to incorporate PPU's role in managing CLO's. The Department expects to finalize and promulgate a revised policy in the Twelfth Monitoring Period.

### ANALYSIS OF COMPLIANCE

There are two phases of implementation for the Department to achieve compliance with ¶ 1 of this section of the Consent Judgment. First, the Department had to conduct an initial review and revise (as appropriate) any existing policies, procedures, protocols, training curricula, and practices to ensure conformity with *Nunez.* The Department implemented the first phase which was described in detail in the Ninth Monitor's report at pgs. 246 to 247. As part of that effort, the Department reported that a review of CLO's was done in coordination with FIS staff. However, the Department reports PPU subsequently conducted their own review of all CLOs within active commands. Out of all the CLO's reviewed, PPU determined over a third of the policies required minor revisions and updates (approximately 1,000 CLOs), which are now being updated and finalized. This is expected to be

---

[246] The Monitor approved an extension of this deadline to January 31, 2018.

completed in the Twelfth Monitoring Period. This process must be completed in order to ensure that a timely and reliable review of CLOs can occur going forward.

Second, the Department must have a reliable and ongoing process to assess the existing policies, procedures, protocols, training curricula, and practices to ensure conformity and relevance as they may necessarily evolve over time. The Department has made progress in implementing a routine assessment of policies and procedures in two ways. First, to the extent policies are subsequently revised, the Department continues to ensure that the Monitoring Team is provided an opportunity to review and comment on any proposed revisions to any *Nunez*-related policies before promulgating the revised policy. Second, the Department developed a process for ongoing assessments of policies (including CLOs and Operation Orders) on a routine basis (enumerated in Directive 0000R-A, "Implementing Departmental Policy")—including an annual review of a sample of policies and Operations Orders. The Department reported the results of the annual review to the Monitoring Team, while certain policies were reviewed as part of this assessment, further collaboration is needed to better understand the process and outcomes. Therefore, the Department remains in partial compliance with ¶ 1.

As for the Department's compliance with ¶ 2, the Department has achieved Substantial Compliance and revised and developed written documents, such as logs, handbooks, manuals, and forms necessary to effectuate the terms of *Nunez*.

| **COMPLIANCE RATING** | ¶ **1.** Partial Compliance<br>¶ **2.** Substantial Compliance |
| --- | --- |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

¶ 3. The Department shall designate a Department employee whose primary responsibility is to serve as Compliance Coordinator. The Compliance Coordinator shall report directly to the Commissioner, a designated Deputy Commissioner, or a Chief. The Compliance Coordinator shall be responsible for coordinating compliance with this Agreement and shall serve as the Department's point of contact for the Monitor and Plaintiffs' Counsel.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In this Monitoring Period the Assistant Chief of Strategic Partnerships, Assistant Commissioner of Quality Assurance, and the Associate Deputy General Counsel[247] shared the responsibilities of the Compliance Coordinator.

- The CLU and NCU provided the Monitoring Team with responses to over 160 requests for information and handled over 25 memos containing recommendations from the Monitoring Team. Many of these were complex requests and required significant collaboration between the Department and the Monitoring Team to address. The CLU and ID also produced over 600 use

---

[247] The Deputy General Counsel that normally serves in this role was on maternity leave in this Monitoring Period.

of force files (such as Intake Investigations and Full ID Investigations), and Trials closing memos. The CLU and NCU also produced over 110 routine data reports on a bi-weekly, monthly, bi-monthly, or quarterly basis to the Monitoring Team.

- During the Monitoring Period, the CLU, NCU and PMO scheduled and/or facilitated frequent meetings or calls between the Monitoring Team and the Commissioner, her executive staff, and other DOC Staff Members.

**ANALYSIS OF COMPLIANCE**

The Department maintains Substantial Compliance with the assignment of the Compliance Coordinator as the Department has assigned appropriate leadership and dedicated significant resources to ensuring there is adequate coordination with the Monitoring Team. The role of Compliance Coordinator cannot reasonably be filled by one individual given the significant work needed to address the requirements of the Consent Judgment, to manage and respond to the various requests from the Monitoring Team, and work with the Monitoring Team to address the feedback and initiatives recommended by the Monitoring Team. The Monitoring Team continues to maintain a collaborative relationship with the Assistant Chief of Strategic Partnerships, members of the CLU, NCU and PMO teams, as well as other members of the Department and communicates daily (and often multiple times a day) with members of the Department. The Department's staff in Assistant Chief's office, CLU, NCU, and PMO are critical to supporting the Department's efforts to advance reforms in the Agency and are hardworking, smart, conscientious, responsive and provide tremendous assistance to the Monitoring Team. The Department's approach to managing compliance with the Consent Judgment and maintaining an active and engaged relationship with the Monitoring Team continues to demonstrate the Department's commitment to achieving and sustaining reform.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

This section discusses the status of 18-year-old youth who remain on Rikers Island. The population of 18-year-olds has decreased significantly from the time the Consent Judgment went into effect, from approximately 200 to approximately 53 18-year-olds during the current Monitoring Period. The vast majority of 18-year-olds are housed at RNDC (ADP of 43 for the current Monitoring Period). The remaining 10 or so 18-year-olds were housed at RMSC (females; ADP of 2 for the current Monitoring Period), GRVC (Secure; ADP of 2.3), MDC (new admissions; ADP 2.3), AMKC (CAPS and PACE; ADP 1.8) and a few other Facilities (OBCC, EMTC, NIC, WF) that occasionally held an 18-year-old for short periods of time. For the most part, the 18-year-olds housed in Facilities other than RNDC were placed there to access specialized programs and services (*e.g.*, new admissions, mental health programs such as MO, CAPS and PACE, and restricted housing such as ESH and Secure).

An interesting shift is occurring in the Department at large, and within RNDC specifically. As the number of 18-year-olds decreases and as that small number is divided across Facilities, the size of the 18-year-old population—even at RNDC—approaches the point where statistics become unstable, and interpretations tend toward the anecdotal. While rates help to neutralize the impact of changes in the size of the population over time, there is a point at which rates become less useful for small subpopulations because even small changes in the number of events can cause dramatic fluctuations in the rate. This is particularly true for the very small group of 18-year-olds (generally less than 10) who reside at Facilities other than RNDC, which is one of the reasons why trends among these subsets of youth are not analyzed statistically (along with the fact that the Consent Judgment's requirements are operationally infeasible for such

small groups of youth). For all of these reasons, statistics regarding the subset of 18-year-olds must be interpreted with caution.

Furthermore, the landscape at RNDC has changed in important ways since the Effective Date of the Consent Judgment. Beginning in Summer 2018, GMDC was closed, and 18-year-olds were moved to RNDC. At that time, RNDC held two populations that were the focus of the Consent Judgment's Young Inmate section—adolescents (those aged 16 and 17) and 18-year-olds. Then, in Fall 2018, the 16- and 17-year-olds were moved to Horizon Juvenile Center.[248] Since then, the number of 18-year-olds at RNDC has decreased significantly, now numbering about 40. Throughout 2019 and 2020, large numbers of young adults (age 19-21) and older adults (age 22 and older) were transferred to RNDC. These shifts lead to various changes in the way in which data can be used to understand the conditions of confinement for 18-year-olds and thus represent a new era in the Monitoring Team's analysis of trends regarding use of force and violence at RNDC. While there are many things that are not yet fully understood, this section presents several dynamics that must be considered when monitoring the Department's progress toward the goals of the Young Inmate portion of the Consent Judgment.

---

[248] Since July 2020, the Administration for Children's Services ("ACS") has managed the day-to-day operations of Horizon ("HOJC"), and DOC no longer has a role in HOJC's management. Further, since July 26, 2020, there are no Pre-Raise the Age Youth housed at Horizon, although the facility continues to house Adolescent Offenders. The City has voluntarily entered into an Agreement concerning the operation of HOJC and the management and supervision of Adolescent Offenders housed at that facility. During the term of the Agreement, the Monitor will file with the Court three public reports describing the efforts ACS has undertaken to implement the requirements of the Agreement and assessing the extent to which ACS has complied with the requirements, applying the standard for Compliance set forth in the Agreement. For the duration of the Agreement, which will end when the Monitor files the third and final report, the Monitor shall not assess compliance with the Consent Judgment with respect to 16- and 17-year old youth at HOJC and the Plaintiff Class and the United States shall not seek judicial action to enforce the Consent Judgment with respect to these individuals. *See* Stipulation and Order Regarding 16- and 17-year-old Adolescent Offenders at HOJC (dkt. 364).

The Monitoring Team's assessment of the management of 18-year-olds is provided in three sections. First is an assessment of Department-wide statistics regarding use of force and violence among 18-year-olds. This is followed by an in-depth analysis of trends at RNDC, where most of the 18-year-olds are held. Finally, the Monitoring Team's compliance assessment for the relevant sections of the Consent Judgment (§XV. Safety and Supervision of Inmates Under the Age of 19 and § XVI. Inmate Discipline) and the Remedial Order (§ D. 18-Year-Old Incarcerated Individuals at RNDC)[249] is provided.

*Rate of Use of Force and Violence for 18-Year-Olds—Department-wide*

An important context for these data is the fact that as the number of 18-year-olds in the Department's custody has fallen considerably and the size, composition, and management of the population at RNDC has shifted noticeably over the last three years.

As shown in the table and graph below, the Department-wide use of force rate among 18-year-olds slightly decreased a year or so after the Consent Judgment went into effect but then increased mid-2018 (when most 18-year-olds were transferred from GMDC to RNDC) and has remained higher since that time. The decreasing trend in the use of force rate that began midway through the Tenth Monitoring Period continued for the first couple months of the current Monitoring Period, but then began to rise sharply.

---

[249] The compliance assessment of the Remedial Order provisions are interpolated in the compliance assessment of § XV and XVI given their interplay with those requirements.



The table below presents these Department-wide UOF rates for 18-year-olds from another angle and also offers historical contrast. The 2016-2018 rates (presented in black in the table below; when 18-year-olds were housed at GMDC), while lower, were still of significant concern. In fact, these "lower" rates approximate those that gave rise to the Consent Judgment in the first place, and thus must be improved upon in a sustained and significant way in order to meet the requirements of *Nunez*. While monthly fluctuations have occurred, the average UOF rates have remained consistently high for the past couple years (presented in red in the table below).

| Average UOF Rate, All 18-year-olds, 2016-2020 | | | | |
|---|---|---|---|---|
| 2016 | 2017 | 2018* | 2019 | 2020 |
| 19.7 | 17.8 | 36.9 | 53.8 | 53.4 |

\* The use of an annual rate obscures the significant increase in rate, from 16.1 in the first half of the year to 56.7 in the second half of the year. This increase coincided with the transfer of 18-year-olds from GMDC to RNDC.

Turning to youth violence, the previous Monitor's Report expressed hope that an encouraging three-month period of lower rates of violence would continue. Unfortunately, the

rate of violence among all 18-year-olds escalated sharply during the latter part of the current

Monitoring Period, ending December 2020 with the highest rate of violence seen in the previous

five years (rate 108.0).



As shown in the table below, the average rate of violence among 18-year-olds has been

significantly higher during the past two years. Because of the spike in December, the rate

reached an all-time high during the current Monitoring Period (65.6).

| Average Rate of Youth-on-Youth Violence, All 18-year-olds, 2016-2020 | | | | |
|---|---|---|---|---|
| 2016 | 2017 | 2018* | 2019 | 2020 |
| 26.3 | 24.2 | 34.8 | 63.3 | 58.4 |

* The use of an annual rate obscures the significant increase in rate, from 16.1 in the first half of the year to 56.7 in the second half of the year. This increase coincided with the transfer of 18-year-olds from GMDC to RNDC.

*RNDC Rates of Violence and Use of Force*

Factors contributing to the high levels of violence at RNDC have been discussed at length

in previous Monitor's Reports (see Eighth Monitor's Report at pgs. 253-254 and Ninth Report at

pg. 284) and continue to drive the Monitoring Team's concerns about the level of disorder and

lack of safety at RNDC. These include unstable leadership, sparse disciplinary options, lack of

consistency in staff assignments to housing units, and inadequate supervision of Staff. These

dynamics, along with the high levels of violence and UOF and pervasive operational concerns

(*e.g.*, alarms, Probe Team, hyper-confrontational Staff response), have been the foundation of the

Monitoring Team's concerns about safety for several Monitoring Periods.

During the current Monitoring Period, these operational problems were further

exacerbated by COVID mitigation strategies that, to reduce the spread of disease, significantly

limited the availability of structured programming for people in custody in all Facilities. During

the current Monitoring Period, in-person education services and programming from community

partners had not yet resumed and in-person programming by the Department's Program

Counselors returned only at the tail end of the current Monitoring Period. Although the

restrictions make sense from a public health perspective, they have the unfortunate side effect of

creating a lack of structure and predictability and excessive idle time, all of which are well-

known precursors to stress, anxiety, fear and violence among young people in custody.

As noted above, 16- and 17-year-old youth were removed from RNDC in Fall 2018 and

the population of 18-year-olds has decreased since then as well. However, during this period the

Facility's average daily population has significantly increased as large numbers of individuals

age 19 and older were moved to RNDC. As a result, 18-year-olds have represented a smaller and

smaller proportion of the people in custody at RNDC. Therefore, disaggregating the Facility's

key trends in violence and use of force by age group is essential for understanding the impact of

the strategies required by the Consent Judgment and Remedial Order. The Facility's history and

other contextual factors are similarly instructive. The years-long process of moving the 16- and

17-year-olds off Rikers Island was enormously disruptive to RNDC's culture, creating

uncertainty and stress among leadership, Staff and youth alike. At the tail end of this process, GMDC was closed, and 18-year-olds and other young adults were transferred into RNDC. This transition did not go smoothly (see Sixth Monitor's Report at pgs. 149-150). The year 2020 marked the first time when the Facility was not enduring some type of major upheaval in population management and it had stable Facility leadership throughout the year. Unfortunately, 2020 brought with it high levels of stress, operational challenges and program disruptions from the COVID-19 pandemic.

Finally, although the Board of Correction's (BOC) minimum standards prohibit the practice, for several years, the Department has received waivers to permit 19- to 21-year-olds to be co-mingled with older adults. The majority of 19- to 21-year-olds have been housed at RNDC, although at times, some young adults have been housed in other Facilities in an effort to manage their behavior by placing them with older adults who are thought to have a calming influence. In December 2020, the waiver lapsed and thus 19- to 21-year-olds must now be separated from their adult counterparts, except in a few unique situations. As a result, almost all 19- to 21-year-olds are now housed at RNDC, so that they are no longer co-mingled with older adults. RNDC's rate of violence has been problematic long before this occurred, and the Department cites this change in practice as one of the factors contributing to the spike in violence at the end of the Monitoring Period.

The graphs and tables below present the rates of use of force and violence at RNDC beginning in the Seventh Monitoring Period (July-December 2018), which is when the 18-year-olds transitioned into RNDC from GMDC. For all the reasons stated above, the data analysis requires new strands of inquiry and the interpretation merits caution.

- **Changes to the Size and Age Distribution of RNDC's Population**

Over the past couple of years, RNDC's average daily population has increased significantly (from 348 in the Seventh Monitoring Period to 627 in the Eleventh Monitoring period, an increase of 80%). The larger population means that RNDC's housing unit density is higher (*i.e.*, more people per unit). Furthermore, as noted above, the Department is required to separate 18- to 21-year-olds ("Young Adults") from adults age 22+, which means that the Facility has fewer housing units available for Young Adults and thus fewer options for separating those who do not get along.

In addition to the number of people housed at RNDC, the composition of RNDC's population has changed, with a much larger proportion of adults age 22 and older than in previous years. During the Seventh Monitoring Period, 18-year-olds comprised 30% of the Facility's population, while during the current Monitoring Period, 18-year-olds were only 7% of the Facility's population. On the other hand, adults age 22 and older now comprise over half of RNDC's population (58%).

| RNDC Population (ADP) by Age, July 2018 to December 2020[250] | | | | | |
|---|---|---|---|---|---|
| Age Group | Jul-Dec 2018 7th MP | Jan-Jun 2019 8th MP | Jul-Dec 2019 9th MP | Jan-Jun 2020 10th MP | Jul-Dec 2020 11th MP |
| ADP | | | | | |
| 18-year-olds | 103 (30%) | 94 (20%) | 76 (17%) | 56 (14%) | 43 (7%) |
| 19 to 21-year-olds | 86 (25%) | 241 (50%) | 246 (54%) | 200 (49%) | 221 (35%) |
| Age 22 and older | 159 (46%) | 150 (29%) | 131 (29%) | 154 (38%) | 363 (58%) |
| Total ADP | 348 | 482 | 453 | 410 | 627 |

---

[250] Adolescents aged 16 and 17 were excluded from this chart and all age-related analyses. While they were still present in the Facility's population until October 2018, they are not germane to the current discussion.

These shifts in the population are an important context for understanding the changes observed in the Facility's rates of use of force and violence, discussed below.

- **RNDC's Use of Force Rate**

The dynamics explored in the Use of Force Trends section of this report reflect the qualitative problems related to Staff's use of force at RNDC. This section focuses on the quantitative trends that are also important for understanding the size and scope of the problem. As shown in the graph below, the Facility's rate of use of force events was at its peak in the second half of 2018 (the Seventh Monitoring Period)—with an average rate of 28.1 use of force events per 100 people in custody. From there, the average use of force rate has steadily decreased, down to 9.7 for the Eleventh Monitoring Period. Despite the UOF rate's spike in November and December 2020, RNDC's average use of force rate in the current Monitoring Period is the lowest it has been since the 18-year-olds were first moved to the Facility.



The Facility's decreasing UOF rate was concurrent with a major shift in the size and composition of the population, as described above, and thus these metrics need to be examined together. The bars in the chart below show the shifts in the composition of the Facility's population (blue bar for 18-year-olds, a shrinking proportion of the population; grey bar for adults age 22 and older, an increasing proportion of the population; orange bar for young adults aged 19 to 21, which has averaged about 43%). The yellow line tracks the Facility's UOF rate. This chart illustrates that the Facility's decreasing UOF rate is synchronous with the increased proportion of adults age 22 and older and the very small proportion of 18-year-olds.



This makes sense given that older adults have much lower UOF rates than 18-year-olds, and thus their presence in large numbers would, purely based on mathematics, bring down the Facility's overall UOF rate. There may be other consequences as well—if large segments of the Facility population are relatively free from disorder, this could have a calming effect on others

who reside and work there, which could also reduce the use of force rate. The line graph below disaggregates the rate of use of force events by age.



This graph reveals that the decreasing use of force rate for RNDC—while certainly impacted by the large population of older adults with a low use of force rate—can also be attributed to reductions in the use of force rate among the younger populations. For 18-year-olds, the use of force rate has decreased 33%, from 60.5 in 2018 to 40.3 in the current Monitoring Period. The use of force rate also declined among young adults aged 19 to 21 (who make up about 40% of the Facility's population) by 43%, from 30.0 in 2018 to 17.9 in the current Monitoring Period. The Monitoring Team is very encouraged by this trend, but as discussed below, still seeks to better understand the dynamics that have contributed to this improvement.

- **RNDC's Rate of Violence Among Incarcerated Individuals**

The rate of violence (*i.e.*, fights and youth-on-youth assaults) among incarcerated individuals has also significantly decreased at RNDC over time. From July to December 2018, the average rate of violence was 21.6 per 100 people in custody and increased a bit to 23.4

during the subsequent six months. From there, a continuous downward trend in six-month rates is evident. RNDC's rate of violence was 9.7 during the current Monitoring Period—this is a decrease of 58% from the high point in January-June 2019 (23.4).



Secondary analysis that included the change in the composition of the population revealed an overall trend like that for the use of force rate, above, namely that the reduction in the rate of violence was concurrent with the increase in the number of adults age 22 and older housed at RNDC. Once again, understanding the contribution of the various age groups is important to dissect. The rate of fights for each age group is presented in the line graph below.



These disaggregated rates of violence lead to a very different conclusion than that for the Facility's use of force rates. As shown in the line graph above, the rate of violence has not changed significantly for any of the age groups—each of the dotted trend lines is nearly flat. This suggests that the significant reduction in the rate of fights observed at RNDC is most likely due to the influx of older adults, who have far lower rates of violence and are now present in much larger numbers than in 2018. In other words, the Facility's rate of violence has changed, not because of effective interventions for the younger population that reduced their rate of fights, but because of changes to the Facility's composition.

In summary, the changing context and composition of the population at RNDC requires changes to the way in which use of force and violence data regarding 18-year-olds is analyzed and interpreted. RNDC's rates of use of force and fights have significantly improved over the past two years. In large part, the improvements can be attributed to the influx of older adults, who have far lower rates of both events. The analysis also revealed encouraging reductions in the rate of use of force events among both 18-year-olds and young adults age 19 to 21, but they do

not temper the overall conclusion that the UOF rates among both populations are exceptionally high. Furthermore, the rate at which these groups are involved in fights has not similarly declined and are indicative of the unsafe conditions at the Facility.

The Monitoring Team does not fully understand the undoubtedly complex reasons for these changes and differences. Certainly, a deeper examination of the factors leading to the reduction in the use of force rates (not to mention the low use of force rate among older adults) is warranted, on the chance that discrete strategies can be identified broadly replicated. The Monitoring Team is also confident that the challenges hindering the implementation of the RNDC Plan, discussed in detail throughout the rest of this section, have likely contributed to the lack of progress in reducing violence and other types of disorder among 18-year-olds at RNDC. The RNDC Plan includes a robust set of strategies that are conceptually sound but for various reasons, the Facility has yet to properly implement them. Thus, the main challenge at this juncture is not to decide what to do, but rather to actually do what has been designed.

- **RNDC Plan to Reduce UOF and Violence**

The Department created the RNDC Plan to address the high rates of use of force, violence and other forms of disorder at the Facility. As discussed in the Tenth Monitor's Report (*see* pgs. 245-251), the Department was diligent in fleshing out the concepts and creating training curricula, job aids, policies and audit tools to support their implementation of the RNDC Plan. However, when the time came to implement the various strategies, the Facility began to falter. The various implementation problems are discussed in detail below, but generally involved a lack of buy-in from Facility leadership that undercut training; disrupted consistent Staff assignments; Supervisors who were not expected to/did not take responsibility for guiding and directing Staff's adoption of the new practices; and the extraordinarily slow roll-out of certain

practices (*e.g.*, Informal Resolutions, Direct Supervision, etc.). Finally, the Department reported that COVID-19 significantly disrupted their ability to properly implement the plan. The Facility leadership and Supervisors seemed unable to motivate and equip Staff with the skills needed to elevate practice for the day-to-day work and the strategies have yet to move beyond the single building that was intended to pilot test the new practices before rolling them out Facility-wide.

One bright spot is the proper implementation of some of the quality assurance tools, and the development of NCU's helpful Unit Management Reports that present both process- and outcome data in an easily digestible format for each housing unit/building. The entire Facility leadership team turned over at the end of the Monitoring Period, which will likely cause delays in further progress given the need to bring the new leadership team up to speed. The Monitoring Team hopes that this transition occurs quickly, and that the new leadership possesses both the required knowledge and demonstrated expertise needed to motivate and guide Staff to execute a reform effort of this magnitude.

The current status of each Consent Judgment provision regarding § XV (Safety and Supervision of Inmates Under the Age of 19)[251] and § (XVI Inmate Discipline), along with stand-alone provisions of the Remedial Order, is provided below.

---

[251] The Department's efforts to achieve compliance with § XV, ¶ 9 is addressed in the Use of Force Investigations section of this report.

12. **S**AFETY AND **S**UPERVISION OF **I**NMATES **U**NDER THE **A**GE OF 19
    (**C**ONSENT **J**UDGMENT § XV)

**XV. S**AFETY AND **S**UPERVISION OF **I**NMATES **U**NDER THE **A**GE OF 19 ¶ 1 (**P**REVENT **F**IGHT/**A**SSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**D**EPARTMENT'S **S**TEPS **T**OWARDS **C**OMPLIANCE

- Although RNDC's rate of use of force events and violence have decreased, the Facility, and the Department overall, continued to face use of force rates and levels of violence among 18-year-olds that are similar to the conditions that gave rise to the Consent Judgment, as discussed in the narrative above.

**A**NALYSIS OF **C**OMPLIANCE

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

As discussed in the introduction to this section, the vast majority of 18-year-olds continue to be housed at RNDC and thus the strategies to address violence, use of force and other types of disorder among this age group are focused on this Facility. Furthermore, given that a very small number of 18-year-old youth (averaging less than 3) are housed in other Facilities (AMKC, EMTC, GRVC, MDC, RMSC, OBCC) and generally for only short periods of time, statistics regarding use of force and violence in these Facilities are unstable and uninformative. Therefore, the Monitoring Team does not assess compliance with this provision in any Facility other than RNDC.

As discussed in detail in the narrative above, although the use of force rate among 18-year-olds at RNDC has continued to decrease, it remains higher than that which gave rise to the Consent Judgment in the first place. Furthermore, the rate of violence among 18-year-olds (both at RNDC and at other Facilities) has not decreased significantly and the level of chaos and disorder in the Facility has not abated.

As discussed in the remainder of this section, the strategies designed to respond to the Remedial Order, as well as those required by the Consent Judgment, must be implemented with fidelity in order to substantially improve safety.

| **C**OMPLIANCE **R**ATING | **¶ 1. (18-year-olds)** Non-Compliance |
|---|---|

**XV. S**AFETY AND **S**UPERVISION OF **I**NMATES **U**NDER THE **A**GE OF 19 ¶ 2 (**D**AILY **I**NSPECTIONS)

¶ 2. Staff shall conduct daily inspections of all Young Inmate Housing Areas to ensure the conditions are reasonably safe and secure. The Department shall take reasonable steps to ensure that the locking mechanisms of all cells function properly,

are adequate for security purposes, and cannot be easily manipulated by Inmates. In the event that a locking mechanism of a cell does not meet these criteria, the Department shall stop using the cell until the locking mechanism is repaired.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Operations Order 15/15 "Facility Security Inspection Report (FSIR)" continues to be in effect. It requires Officers in charge of a housing area to inspect all locks and other security areas at least twice during their tour of duty.

- Operations Order 4/16 "Inoperable/Down Cell Summary Report (DCSR)" continues to be in effect. It requires Officers to complete a report every evening, except Friday and Saturday, regarding inoperable and down cells. This report is used by maintenance staff to identify the cells that need repair and by the movement office to identify cells that need to be taken off-line so that youth are not housed in them.

- The CASC unit utilizes live video monitoring to support Facility's efforts to ensure that youth remain secured in their cells during lock-in times. When youth are observed moving about the unit during these times, the CASC officer notifies both housing unit staff and the Tour Commander.

- After a temporary suspension of audits in March 2020 due to the COVID-19 pandemic, NCU resumed its monthly audits in July 2020. Audits tally the proportion of 18-year-olds housed in cells with operable locks at RNDC (where most 18-year-olds are housed) and GRVC, OBCC, and RMSC (which generally have very small numbers of 18-year-olds).

- RNDC's practice of sanctioning youth who were observed out-of-cell after established lock-in times was inconsistent throughout the monitoring period, going unused/undocumented in both August and October 2020.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The antiquated physical plant at RNDC contributes to some of the issues discussed below. Maintenance of cell door locks require vigilance to ensure that individuals do not manipulate the locks to exit their cells during lock-in times. This obligation is intensified with aging hardware. That said, the Department's various sources of information suggest that greater attention to other contributing factors (e.g., Staff and Supervisor behavior, effectiveness of sanctions for people in custody) is needed to ensure the orderly operation of the housing units. During the past year, the Department replaced cell doors in a significant number of housing units, which helped to address the problems related to the physical plant, but also illuminated the extent to which problems managing lock-in times are impacted by human factors. The fact that locking mechanisms and Staff practices are unreliable has significant

consequences for both Staff and youth safety. At a minimum, youth who are not secured in their cells during lock-in times disrupt the orderly operation of the Facility. More significantly, these youth may also utilize the opportunity to assault both Staff and other youth and thus there is a compelling safety interest that underlies the Monitoring Team's concern with this issue.

*Reasonably Safe and Secure Conditions*

This provision requires the Department to conduct daily inspections to check that the conditions are reasonably safe and secure. The Monitoring Team continues to be concerned about Staff's failure to properly manage lock-in times and to ensure that all youth are properly secured in their cells, as it contributes to the level of disorder at the Facility and may lead to other operational problems (e.g., uses of force, Probe Team deployment, etc.). The Tenth Monitor's Report (see pgs. 253-254) discussed the CASC unit's audit results, which revealed pervasive problems with ensuring that young adults are properly secured in their cells at bedtime.

The CASC unit's audit results showed no improvement during the current Monitoring Period. Each month, CASC identified between 45 and 70 occasions where RNDC youth were out-of-cell after lock-in. During the six-month period, 5 units were cited over 20 times each. The CASC unit's data is useful for identifying this basic security issue, but simply counting the number of occurrences will not solve the problem.

When CASC detects that a young adult is moving about the unit after the required lock-in time, the CASC officer notifies both housing unit Staff and the Facility's Tour Commander. This notification system has failed to elevate Staff practice and thus a more intentional response to poor Staff practice is needed. It is worth noting that if properly implemented, various strategies enacted via the Remedial Order could potentially address this problem, particularly those related to elevating Staff practice via attentive, constructive Supervision and also those related to better responding to misconduct.

The Monitoring Team continues to encourage the Department to utilize this data and prioritize a response to this problem. NCU now includes CASC data in its Unit Management Reports, but it remains to be seen whether this information will be used by Facility leaders to improve practice. It would also be prudent for the Department to examine whether youth are failing to lock-in at all, whether the cells were not properly secured or whether youth were able to manipulate their cell doors to exit the cell after originally locking in. The results would help to pinpoint whether the problem is one of youth resistance, problems with the physical plant or issues with Staff's ability to properly manage lock-in times and properly secure doors. Once the underlying causes of this problem have been determined, they must be addressed via accountability for Staff who are not following required procedures, effective consequences for youth and upgrades to the physical plant.

In the past, RNDC has attempted to address the issue by sanctioning those young adults who are identified by CASC as being out of their cells after lock-in (see pg. 290 of the Ninth Monitor's Report and pgs. 253-254 of the Tenth Monitor's Report). This practice was inconsistently applied during the current Monitoring Period, with sanctions either unused or undocumented in August and October 2020.

Responses to misconduct are effective only when consistently applied. The Facility plans to incorporate cell non-compliance into its system of Informal Resolutions (see § D., ¶ 2, below), but as noted, the implementation of that program has stalled.

*Assessment of Locking Mechanisms*

NCU's audit strategy involves randomly sampling 18-year-olds at each Facility and physically inspecting their assigned cells to ensure the locks are operable. NCU's July to December 2020 audits revealed that compliance rates are generally high at Facilities where 18-year-olds are housed in small numbers (OBCC, GRVC and RMSC), meaning that in these Facilities, 18-year-olds are nearly always housed in cells with operable locks.

At the end of the current Monitoring Period, NCU modified its audit method at RNDC to focus more squarely on those units that *did not* receive new cell doors. For this reason, the performance level in November/December 2020 is not comparable to previous months. However, the November-December 2020 audit results clearly illuminate that the problem with ensuring all youth are housed in cells with operable locks persists in those units without upgraded hardware.

| NCU Cell-Lock Audit Results for RNDC, July-December 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | July | August | September | October | November | December | Average |
| % compliant | 67% | 83% | 91% | 96% | 68% | 64% | 78% |

Monthly rates of compliance varied, but on average, about 80% of 18-year-olds were housed in a cell with an operable lock. During the months when compliance rates dipped, problems were noted across the Facility, not just in one or two units. Although NCU reportedly brings audit results to the attention of RNDC Leadership each month, the issue has not yet been effectively addressed by Supervisors or Facility Leadership.

*UOF Related to Inoperable Cells*

The Monitoring Team tracks whether inoperable cell doors/locks contribute to UOF incidents. Despite the issues note above, during this Monitoring Period, the Monitoring Team identified only eight incidents at RNDC (2% of the 416 UOF incidents at RNDC) that had some type of unauthorized exit by incarcerated individuals (as reported in the COD) that resulted in a use of force incident. As noted in prior Monitor's Reports, these findings suggest that inoperable cells contribute to only a very small fraction of incidents and therefore do not appear to be a major factor in the use of force at RNDC. However, 3 of the 8 incidents included assaults on Staff and, in one incident, multiple youth manipulated their locks, exited their cells, and then manipulated the lock and entered the cell of another youth, whom they assaulted.

| COMPLIANCE RATING | ¶ 2. (18-year-olds) Partial Compliance |
|---|---|

**XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)**

¶ 3. A Warden or Deputy Warden shall tour:

    a.  all Housing Areas with 18-year-old inmates at least once per week, making himself or herself available to respond to questions and concerns from Inmates. The Warden or Deputy Warden shall conduct more frequent tours of Young Inmate Housing Areas with operational challenges. The Department, in consultation with the Monitor, shall develop criteria for determining when more frequent tours by the Warden or Deputy Warden are merited. The tours shall be documented and any general deficiencies shall be noted.[252]

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The General Supervision section of the Department's Rules and Regulations incorporate the requirement of this provision.

- The Department issued a General Order on March 29, 2019 requiring Wardens and Deputy Wardens to conduct weekly tours of each housing area where 18-year-olds are housed and those with operational challenges (e.g., multiple fights, SRG violence, multiple uses of force or other types of disorder) to be toured more frequently. This was further operationalized during the Tenth Monitoring Period to require twice weekly tours in TRU/Secure/ESH, Protective Custody, MO and New Admissions housing units.

- NCU assesses the frequency of tours during its audits of cell-locking mechanisms. To do so, the Facilities report the date/time on which tours occurred and NCU verifies the reports using logbook entries and/or Genetec reviews.

  - For the tours, NCU audits the Facilities' performance level by comparing the number of required tours (number of units x number of weeks audited x number of audits required) to the number of tours by the Wardens/DWs that could be confirmed. Facilities housing smaller numbers of 18-year-olds logically had a smaller number of required tours. After temporarily suspending audits due to COVID-19, the NCU resumed audits in July 2020.

  - NCU audited the once/twice weekly tour requirements throughout the Eleventh Monitoring Period.

**ANALYSIS OF COMPLIANCE**

    *The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

    NCU audited the once/twice weekly tour requirements throughout the Monitoring Period at all Facilities where 18-year-olds were held and those audits confirmed the following:

---

[252] This language reflects the revision ordered by the Court on August 10, 2018 (*see* dkt. 316).

- RNDC consistently met the weekly tour requirements (average 95%) as well as the twice weekly tour requirements in TRU/PC/MO/New Admissions (average 92%).
- RMSC consistently met the weekly tour requirements (average 100%) as well as the twice weekly tour requirements in TRU/PC/MO/New Admissions (average 98%), during the times that 18-year-olds females were in custody.
- Other Facilities occasionally housed 18-year-olds (GRVC, AMKC, MDC) and while they did not always properly document the rounds, NCU reported their belief that the tours were occurring as required. Either way, fewer than 10 18-year-olds are held in these facilities on any given day and thus the mediocre results from these Facilities does not change the compliance rating.

Now that the requirements for twice weekly rounds have been promulgated and consistent implementation has been established, the Department is now in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

¶ 5. Consistent with best practices in United States correctional systems, the Department shall develop and maintain a sufficient level of programming for Young Inmates, especially in the evenings, on weekends, and in the summer months, to minimize idleness and the potential for altercations that result in Inmate harm.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Program Counselors are assigned to all general population and TRU units housing 18-year-olds at RNDC and RMSC, as well as SSH units in GRVC and OBCC.
- Throughout most of the current Monitoring Period, the Department's Program Counselors did not provide in-person, on-unit services to people in custody, following the Department's COVID-19 mitigation strategies. Instead, they provided self-guided worksheets and responded in writing to concerns submitted by people in custody on their assigned units. Some of the Program Counselors at RNDC resumed on-unit, in-person services in December 2020.
- Staff from community partners did not provide in-person services during the current Monitoring Period due to the Department's COVID-19 mitigation strategies. Some provided self-guided packets to people in custody.
- The suspension of in-person services coincided with a reorganization of the Department's programming strategy. Several positions were reclassified so that some counselors will conduct needs assessments and develop individualized, "5-hour Program Plans" for each person in custody. The services required by the 5-hour Program Plans will be delivered by a combination of the Department's regular Program Counselors and a corps of community-based partners. During the Eleventh Monitoring Period, job classifications were adjusted, and Staff began

training for their new roles and responsibilities. Training will continue into the Twelfth Monitoring Period and the needs assessment/5-hour Program Plans are then expected to be implemented.

- School was suspended in March 2020 due to COVID-19 and has not yet resumed in-person, although technology upgrades for virtual learning in the RNDC classrooms (i.e., students present in the classroom with teacher appearing via videoconference) have been completed. Students may participate in remote instruction via tablets, until virtual learning begins or in-person school resumes.

- The PEACE Center at RNDC offers workforce development and vocational programming (e.g., autobody shop) and structured leisure time activities (e.g., recording studio, ping pong and other games). The Department plans to develop a mechanism to record access/usage to the PEACE Center as part of its incentive program and Unit Management quality assurance program discussed in detail in § D., ¶ 2 & § D., ¶ 3(ii), below.

ANALYSIS OF COMPLIANCE

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

This provision is Not Rated because program delivery was suspended in response to exigent circumstances and that change was necessary in order to mitigate the spread of COVID-19 among Staff and incarcerated individuals. In-person programming by Program Counselors resumed only at the tail end of the current Monitoring Period. Community partners are expected to provide services once it is deemed safe to do so and the contracting process is complete. Assessing the Department's compliance with the requirements of this provision will resume accordingly. Given the Department's restructured approach to service delivery described above, the Monitoring Team anticipates that the methodology and metrics for assessing compliance with this provision will need to be revised. This will be done in consultation with the Department.

In the interim, the Department is encouraged to develop daily unit schedules that include various types of programming: academic and career technical education, structured programming delivered by Program Counselors, structured programming delivered by a variety of community partners, leisure time activities (e.g., tablets, board games and video games), religious services and daily large muscle activities ("recreation"). The combination of these programs should ensure that, if an incarcerated individual chooses to participate, a large portion of out-of-cell time is consumed by structured programming and activities led by an adult. Broad engagement in these activities should reduce both idle time and violence and enhance positive youth development. Furthermore, to the extent that

COVID-related programming suspensions continue, the Department is encouraged to devise ways to better structure youth's time in the interim to the extent feasible.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Not Rated |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

¶ 6. The Department shall transfer any Young Inmate deemed to be particularly vulnerable or to be otherwise at risk of harm to an alternative housing unit or take other appropriate action to ensure the Inmate' safety, and shall document such action.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- Each month, a list of all housing transfers at RNDC is generated, and NCU staff consult with Facility Staff/Young Adult Response Team ("YART") members to ascertain the reason for the transfer. Transfers are categorized accordingly. NCU audited housing transfers throughout the current Monitoring Period.

### ANALYSIS OF COMPLIANCE

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The goal of this provision is to ensure that youth who are being bullied, threatened, or are otherwise vulnerable are moved to a different housing unit where they will be safer. Facilities make housing transfers for a variety of reasons (e.g., after intake and classification, to disrupt tensions, to provide access to a program house, etc.). At times, the aggressor may be transferred in order to keep potential victims safe. The overall intent of this provision is to ensure that housing assignments can be adjusted after the initial placement if unforeseen tensions arise. The Facilities must strike a delicate balance among making transfers to protect vulnerable incarcerated individuals, intervening before tensions escalate into violence, not allowing incarcerated individuals to dictate and/or manipulate their housing assignments, and helping incarcerated individuals and Staff develop skills for managing interpersonal conflict. Furthermore, an overreliance on a separation strategy can inadvertently limit the Facilities' flexibility for programming, population management and can undercut the benefits of consistent staff assignments.

The Monitoring Team focuses its assessment of this provision on transfers within RNDC. Given that very few 18-year-old youth are housed in the general population at EMTC, GRVC and RMSC, and the consequent small number of housing units dedicated to young adults, the procedures required by this provision are not operationally feasible to implement or monitor. AMKC (CAPS, PACE, or MO), GRVC (Secure) and OBCC (ESH) are excluded due to their function as special housing units and the resulting lack of flexibility in housing assignments.

NCU's audit strategy is comprehensive and has integrity. During the current Monitoring Period, NCU identified 36 transfers effected to protect the victim of an altercation, which is an increase of 47% compared to the prior Monitoring Period when 19 youth were transferred. Each situation is fact-specific and is determined by reviewing each transfer individually (e.g., transfers that occur following a fight). The Monitoring Team is satisfied that NCU is presenting accurate data in this regard.

The Department consistently transfers 18-year-olds deemed to be particularly vulnerable or otherwise at risk of harm to an alternative housing unit in order to protect victims and/or to prevent tensions from escalating and such action is appropriately documented. The Department remains in Substantial Compliance, which has been sustained since the Eighth Monitoring Period, for a total of 24 months.[253] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Twelfth Monitoring Period as described in the Background section of this report.

| COMPLIANCE RATING | ¶ 6. (18-year-olds) Substantial Compliance |
|---|---|

## XV. Safety and Supervision of Inmates Under the Age of 19 ¶ 7 (Protective Custody)

¶ 7. The Department shall promptly place Young Inmates who express concern for their personal safety in secure alternative housing, pending investigation and evaluation of the risk to the Inmate's safety and a final determination as to whether the Inmate should remain in such secure alternative housing, whether the Inmate should be transferred to another housing unit, or whether other precautions should be taken. The Department shall follow the same protocol when a Young Inmate's family member, lawyer, or other individual expresses credible concerns on behalf of the Inmate. The Department shall maintain records sufficient to show the date and time on which any Young Inmate expressed concern for his personal safety (or on which a family member, lawyer, or other individual expressed such concern), the date and time the Inmate was transferred to secure alternative housing, and the final determination that was made regarding whether the Inmate should remain in protective custody or whether other necessary precautions should be taken, including the name of the Staff Member making the final determination.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department maintains Directive 6007R-A "Protective Custody" that addresses the requirements of this provision (see Second Monitor's Report, at pgs. 131-132). Protective Custody units for 18-year-olds are located at RNDC (males) and RMSC (females).

- Based on feedback from the Monitoring Team, the Department previously revised its practice to allow Operations Security Intelligence Unit ("OSIU") staff to focus more directly on 18-year-olds and those who are disputing their placement in Protective Custody ("PC").

---

[253] *See*, Eighth Monitor's Report at pgs. 261 to 263 (dkt. 332), Ninth Monitor's Report at pgs. 246 to 247 (dkt. 341) and Tenth Monitor's Report at pgs. 258 to 259 (dkt. 360).

- The Chief of Security previously issued a memo to the Assistant Chiefs for each Facility directing that transfers into and out of PC may occur only with OSIU approval and must be carried out by the Facilities in a timely manner.
- NCU audits PC files each month to assess compliance with policy and the requirements of the Consent Judgment. OSIU sends NCU the entire PC file so that NCU staff can identify issues that may be documented on something other than the official PC forms.
- NCU found high levels of compliance across the 28 files audited (some youth who entered PC during the previous Monitoring Period were included in the audits). Nearly all packets included:
  - A statement from the youth detailing his/her concerns;
  - Further information (incident report, etc.) to flesh out the youth's statement;
  - Evidence that OSIU interviewed the youth within the two-business day timeline;
  - Documentation that youth were promptly informed of OSIU's decision and their right to a hearing;
  - Evidence that hearings were held timely for involuntary placements; and
  - Evidence that most 30- and 60-day reviews were timely and included youth's input into the reviews via a written statement.
- NCU also provides the Monitoring Team with information regarding OSIU's denials of Temporary PC and decisions to discontinue PC.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The Department maintained Substantial Compliance with this provision by demonstrating through NCU's audits that OSIU and Facilities are complying with existing DOC policy and meeting the requirements of this provision for the use of PC for both male and female 18-year-olds.

The Monitoring Team tracks the number of youth who request/are referred for "Temporary PC" but for whom OSIU declines to assign a PC number. This occurs when youth do not meet the basic criteria given their history of assaultive behavior or UOF, when evidence of a specific threat was not produced or when another housing unit can address the person's safety concern. During the current Monitoring Period, 6 initial requests for Temporary PC were denied. Requests for 3 of the 6 were ultimately accepted after the referring Facility provided additional information. One was denied because the youth was newly admitted and needed to quarantine, and two were denied because of a history of violence on the PC unit.

During the current Monitoring Period, a total of 16 18-year-olds were placed in PC (3 female youth from RMSC (one of whom was admitted on 3 separate occasions) and 11 male youth from

RNDC). Just over half (56%) of the placements were requested by the Facility, 38% were self-referred and 6% were court-ordered. Three of the 16 placements (19%) were involuntary. All placements were reviewed by OSIU within the two business days permitted by policy, and 88% (all but two) were continued in PC. PC was discontinued for two youth who reported they were not getting along with other youth on the PC unit. One 18-year-old remained in PC at the end of the Monitoring Period, with a length of stay of 41 days. The management of the request/referral and admission process appears to be appropriate.

As shown in the table below, 18 youth exited PC during the current Monitoring Period. Their average length of stay was 44 days, with a range of 2 to 178 days. While there is some variation in the reasons for removal over time, the fluctuations are not cause for concern. PC appears to afford youth the level of safety and security required by this provision.

| 18-year-olds Admitted to and Released from Protective Custody, January 2018-December 2020 | | | | | | |
|---|---|---|---|---|---|---|
| | Jan. – Jun. 2018 | Jul. – Dec. 2018 | Jan. - Jun. 2019 | Jul.-Dec. 2019 | Jan.-Jun. 2020 | Jul.-Dec. 2020 |
| Number of Admissions | 28 | 32 | 15 | 25 | 19 | 16 |
| Number of Releases | 30 | 26 | 24 | 29 | 20 | 18 |
| Reason for Release | | | | | | |
| Discharged/Transfer | 19 (63%) | 12 (46%) | 10 (42%) | 17 (59%) | 9 (45%) | 5 (27%) |
| Requested Removal | 5 (17%) | 8 (31%) | 2 (8%) | ~ | 6 (30%) | 1 (17%) |
| Behavior (Fight, AOS) | 5 (17%) | 4 (15%) | 11 (46%) | 6 (21%) | ~ | 8 (50%) |
| Other | 1 (3%) | 2 (7%) | 1 (4%) | 6 (21%) | 5 (25%) | 2 (11%) |

The Department promptly places youth in alternative housing when a youth or other interested parties (e.g., family members, the Court, lawyer, or the Facility) expresses concern for a youth's safety. This placement safely reduces the youth's contact with those in the general population and thus reduces the safety threat. PC placements are reviewed and documented as required by this provision. In addition, NCU conducts rigorous audits to ensure that the required procedures are followed. The Department has sustained Substantial Compliance since the Sixth Monitoring Period, for a total of 36 months.[254] The Department's sustained compliance has abated prior deficiencies, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Twelfth Monitoring Period as described in the Background section of this report.

---

[254] *See* Sixth Monitor's Report at pgs. 175 to 176 (dkt. 317), Seventh Monitor's Report at pgs. 219 to 221 (dkt. 327), Eighth Monitor's Report at pgs. 263 to 266 (dkt. 332), Ninth Monitor's Report at pgs. 294 to 297 (dkt. 341) and Tenth Monitor's Report at pgs. 259 to 262 (dkt. 360).

| **COMPLIANCE RATING** | ¶ 7. (18-year-olds) Substantial Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INCARCERATED INDIVIDUALS)

¶ 8. With the exception of the Clinical Alternatives to Punitive Segregation ("CAPS"), Restricted Housing Units ("RHUs"), Punitive Segregation units, protective custody, Mental Observation Units, Transitional Restorative Units ("TRU"), and Program for Accelerated Clinical Effectiveness ("PACE") units, the Department shall continue to house high classification Young Inmates separately from low classification Young Inmates.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department issued an interim Directive 4104R-F regarding the use of the Housing Unit Balancer ("HUB") at all Facilities except RMSC (effective 10/3/19).
- The HUB is a decision-tree that addresses each person's risk of institutional misconduct (Minimum, Medium-Medium, Medium-Maximum, and Maximum).
- The HUB does not have the capacity to produce automated reports to ensure that people are housed according to their custody level and that low- and high-custody youth are not co-mingled (that is, mis-housed). Instead, Custody Management must compile this information manually each day.
- Custody Management submits a list of young adults who are mis-housed to each Facility holding 18-year-olds each business day.[255] Facilities are required to submit a memo to Custody Management each business day, explaining the reason for/plan to address mis-housing for each person who appears on the mis-housed list. Facilities also complete a spreadsheet that lists the people who are mis-housed, the reason for mis-housing, and the action taken to resolve the issue (e.g., rehouse, apply an override, etc.).
- Policy requires Facilities to address mis-housing within 72 hours, either by rehousing the person appropriately or enacting an override of the custody level so that the person may be housed out-of-class.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

---

[255] Young Inmate housing at GRVC (Secure) and OBCC (YA-ESH) are exempt from this requirement because the 18-year-old incarcerated individuals housed in these Facilities are placed in Special Units like those noted in the text of this provision. Female youth at RMSC are also exempt from this requirement because the very small number of 18-year-old girls makes this provision operationally infeasible.

The Department's policies reflect the requirements of this provision. Temporary co-mingling of classification levels, or mis-housing, occurs when (1) a person's classification level changes automatically overnight (e.g., upon a birthday); (2) sufficient bed space is not available in a suitable housing area, particularly when transferring someone out of new admission housing; and (3) separation issues restrict housing flexibility. In general, at RNDC,[256] people whose HUB level is Low or Low-Med are housed in the "Mods" (i.e., dormitory housing) and those whose HUB level is Med-High and High are housed in units with individual cells. That said, several unit types may, by policy, house people of any HUB level (e.g., TRU, Rikers Rovers, MO units, etc.).

The Monitoring Team analyzed mis-housing data for young adult housing at RNDC during August, September and October 2020. Since 18-year-olds can be housed with those age 19 to 21, all mis-housed young adults at RNDC were included in this analysis. Mis-housing continues to be relatively rare. On any given day, between 0 and 10 young adults were in a housing unit that was not aligned with their custody level—which is about 3% of the young adult population or less. During the 3-month period, a total of 76 young adults were mis-housed. Overrides were generated timely for most of these individuals (44 of 76, or 57%) and most of the others were moved within the 72 hours permitted by policy (20 of 76, or 26%). A small proportion (9 of 76, or 12%) remained mis-housed for more than 72 hours, without being rehoused and without an override—an improvement over the Tenth Monitoring Period when 22% of those who remained mis-housed for more than 72-hours without an override. Most of these extended mis-housings occurred in late October 2020, when a personnel transition occurred at RNDC.

Compared to previous Monitoring Periods, the Department has tightened up its practices by (1) ensuring that overrides are generated timely; and (2) aligning Bed Utilization Plans with the units' actual function (e.g., TRU, MO, etc.) so that youth assigned to these units are not placed on the mis-housed list unnecessarily. The Department remains in Substantial Compliance with this provision.

| COMPLIANCE RATING | ¶ 8. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) REMEDIAL ORDER § D., ¶ 3 (REINFORCEMENT OF DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

§ D., ¶ 3. For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, the Department, including RNDC Supervisors, shall take necessary steps to improve the implementation of the Direct Supervision Model with an emphasis on the development of proactive and interactive supervision; appropriate relationship building; early intervention

---

[256] The small number of 18-year-olds at Facilities other than RNDC makes operationalizing this provision impractical and thus the Monitoring Team actively monitors this provision only at RNDC. This approach may be re-evaluated if the number of 18-year-olds in the general population increases significantly at other Facilities.

to avoid potential confrontations; de-escalating conflicts; rewarding positive behavior; and the consistent operation of the unit.

§ D., ¶ 3(i). The Department, including RNDC Supervisors, shall reinforce the implementation of the Direct Supervision Model with Staff through, among other things, appropriate staff supervision, coaching, counseling, messaging strategies, or roll call training.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department continues to train its Staff in the Direct Supervision model, developed by the National Institute of Corrections. The Monitoring Team approved the training curriculum during the Fourth Monitoring Period.

- Nearly all staff at RNDC have received Direct Supervision training. The training for the final group of In-Service Staff is described in the Training section of this report.

- As part of its obligations under the Remedial Order, the Department began to roll out a Unit Management strategy at RNDC during the current Monitoring Period. The Department's version of Unit Management incorporates the essential hallmarks of Direct Supervision in its design, as described below. The Monitoring Team approved the Unit Management training package during the Tenth Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

As noted in the Training section of this report, nearly all Staff at RNDC have received the initial Direct Supervision training. Key elements of Direct Supervision are also included in the Unit Management training, and most Staff at RNDC have also received this training. *See* the discussion in regard to Consent Judgment § XIII. (Training), ¶ 4 in this report for more detail on Training. Unit Management is an operational strategy focused on decentralization and delegation of authority to unit teams. At RNDC, a cluster of adjacent units are considered a "building" and each building is designated as a "unit" that may also include one or more modular/dormitory units. Each unit team is led by an ADW who is designated as the Unit Manager—these assignments were made in the latter part of the Monitoring Period. Teams include the uniformed staff assigned to the unit (*i.e.*, steady staff), program counselors (who now have offices on the units) and recreation specialists. The key objective of Unit Management is to improve communication among the staff of various disciplines working with people in custody, with the overall goal of better anticipating their needs and resolving interpersonal conflict. Toward this end, Unit Managers are tasked with reinforcing skills learned in training to improve Staff's ability to communicate appropriately, solve problems without using force and effectively respond to both positive and negative behavior among people in custody. If properly

implemented, Unit Management should provide a pathway by which the Department can implement the core concepts of Direct Supervision, which include:

- achieving consistent assignment of Staff to housing units;
- providing an orientation to each youth that describes the Officer's role in ensuring safety, providing rewards and imposing sanctions;
- ensuring Staff have the authority, autonomy and options to reward compliant and pro-social behavior;
- expecting Staff to deliberately select a lower level of engagement when tensions arise;
- occupying youth with structured activities throughout the day; and
- engaging in proactive and interactive supervision.

The Department intended to pilot Unit Management in one building at RNDC and then to roll out the program sequentially to the other five RNDC buildings. The entire RNDC workforce was intended to be trained in Unit Management by the end of 2020. Unfortunately, the initial pace of training for RNDC Staff was not sufficient to meet this goal, so the Department modified its training approach in November 2020. Rather than the 8-hour off-site, multi-disciplinary training (both Officers and program staff were to be trained at GMDC training center), many RNDC Staff received an on-site, 4-hour version of the original curriculum (same didactic materials, but minus the team-building exercises). While the Monitoring Team supports the team-building approach, it is technically not required by the Consent Judgment nor is it necessary in order for Staff to develop basic familiarity with the concepts. As always, deeper mastery of the skills will need to be promoted via on-going supervision and team building should be an essential component of weekly Unit Management meetings.

By the end of the Monitoring Period, 82% of RNDC Staff had received Unit Management training, although many of the Facility's supervisors had not yet participated in the training (i.e., only 45% of the ADWs only 7% of the Captains had received the training by 1/15/21) which undercuts their ability to effectively supervise the officers' performance. Implementation in the building targeted for pilot testing the Unit Management concept was further stymied by inadequate levels of consistent staff assignments (discussed in detail in ¶ 17, below); the lack of daily unit schedules needed to provide a consistent, predictable unit environment (discussed in § D., ¶ 2, below ; COVID-related limitations on structured programming (discussed in ¶ 5, above); the poor implementation of Informal Resolutions (discussed in § D., ¶ 2 below); and faltering implementation of the universal rewards/incentives that were part of the original design (discussed in § D., ¶ 2, below). In fact, the only segment of Direct Supervision that has reportedly been properly implemented is the housing unit orientation, and that occurs only for young adults assigned to the initial UM building. The Department reports they are addressing these problems sequentially, focusing first on consistent staff assignments. Once consistent

unit teams have been formed, the Department must begin to address objectives related to structured activities, rewards/incentives, proactive supervision and de-escalation.

By design, weekly Unit meetings would be the main vehicle for reinforcing key concepts and coaching Staff to properly implement UM/Direct Supervision. However, the effectiveness of these meetings is undercut by the lack of consistent staffing and the fact that many of RNDC's supervisors have not received this training. Accordingly, the Department has not yet meaningfully implemented the requirements of § D., § 3(i).

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Non-Compliance<br>§ D., ¶ 3. Non-Compliance<br>§ D., ¶ 3(i). Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF)
### REMEDIAL ORDER § D., ¶ 1 (CONSISTENT STAFFING)

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

§ D., ¶ 1. For all housing units at RNDC[257] that may house 18-year-old Incarcerated Individuals, the Department shall enhance the implementation of a staff assignment system under which the same correction officers, Captains, and ADWs are consistently assigned to work at the same housing unit and on the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- Consistent staffing can be achieved through two mechanisms: awarded steady posts (where Staff apply for and are awarded a consistent assignment) and informal assignment (where schedulers simply assign Staff consistently to the same post). RNDC's post assignments are reviewed on a regular basis by NCU, as they form the foundation of the monthly audits, discussed below.

- Following a period in which the Facility's practices significantly degraded, the Department is attempting to revitalize its effort to consistently assign RNDC regular staff ("four-day staff"), relief staff ("two-day staff") to the same units day-to-day.

- The Department made its initial assignments of Captains to specific areas in RNDC, along with assigning ADWs to serve as Unit Managers.

---

[257] The majority of 18-year-old Incarcerated Individuals are currently housed at RNDC. To the extent that the majority of 18-year-old Incarcerated Individuals are housed at another Facility in the future, the provisions in Section D shall apply to all housing units in that Facility that may house 18-year-old Incarcerated Individuals.

- After temporarily suspending audits in March 2020 due to COVID, NCU resumed auditing RNDC's performance level in July 2020.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The overall purpose of consistently assigning Staff to the same housing unit is to facilitate constructive Staff-youth relationships. Indeed, consistent staffing is a hallmark of Direct Supervision and is particularly important in units with youth who are difficult to manage and those who struggle with mental illness. This same theme—the benefit of developing relationships in order to change behavior—applies to consistent assignment of Captains as well, given their essential role in helping Staff to improve practice. Additionally, consistent assignments ensure that Staff know the unit's daily routine, are able to facilitate the smooth operation of the unit and ensure that all services are provided. Finally, consistent assignment helps to create a sense of ownership and investment in the unit's outcomes.

During the current Monitoring Period, the Facility's performance level degraded, largely because the Facility was not properly managing staff assignments. Although early in the Monitoring Period, on paper, nearly all RNDC housing unit posts were assigned to a specific Staff Member, in practice, posts were worked by the assigned person only about half the time. A variety of Facility-based practices negatively impacted performance, including pulling assigned Staff off of housing unit posts to fill gaps in coverage elsewhere and failing to re-assign posts when the assigned officer transferred, left the Department or otherwise became unavailable to work. In October and November 2020, these two problems accounted for about half (45%) of the situations where assigned Staff did not work the specific post. Furthermore, when Staffing was reduced at MDC and OBCC, Staff from those Facilities were assigned to RNDC and needed to be integrated into the post assignments. The Department reported that post assignments were being refreshed in early 2021 and that Unit Managers and Tour Commanders had been advised that they must ensure that the schedule and deployment of staff reflects the post assignments. The Monitoring Team notes that it is critical that Facility Leadership is held accountable for ensuring that Staff assignment rosters are properly maintained/gaps are filled timely and for ensuring that those deploying Staff day-to-day adhere to the Staff/post assignments.

The tables below illustrate the extent of the problem. As noted in the Tenth Monitor's Report, the following thresholds for compliance for the assignment of Correction Officers have been established: each month, 60% of posts must be worked by the assigned CO in GP units and 70% of posts must be worked by the assigned CO in TRU/MO units. This threshold was not met in any month

for the GP or TRU/MO units (as shown in the shaded columns in the "All" row in the tables below). Occasionally, a specific tour met the threshold, but this was not sustained for more than a month or two.

| | July | | August | | September | | October | | November | | December | | 11th MP Average | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **GP + Other Units—Proportion of Posts Worked by the Assigned CO July to December 2020** | | | | | | | | | | | | | | |
| Tour | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady |
| All | 1260 | 55% | 869 | 50% | 2099 | 44% | 2016 | 45% | 2646 | 42% | 2226 | 45% | 11,116 | 47% |
| 7-3 | 392 | 60% | 553 | 51% | 700 | 48% | 728 | 44% | 980 | 46% | 742 | 47% | 4,095 | 49% |
| 3-11 | 420 | 44% | 560 | 34% | 699 | 27% | 728 | 34% | 700 | 33% | 756 | 40% | 3,863 | 35% |
| 11-7 | 448 | 62% | 167 | 67% | 700 | 55% | 560 | 59% | 966 | 44% | 728 | 48% | 3,569 | 56% |

"% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post.

| | July | | August | | September | | October | | November | | December | | 11th MP Average | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **TRU/MO Units—Proportion Worked by the Assigned CO July to December 2020** | | | | | | | | | | | | | | |
| Tour | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady |
| All | 913 | 56% | 503 | 58% | 624 | 50% | 489 | 39% | 630 | 43% | 336 | 43% | 3.159 | 48% |
| 7-3 | 307 | 62% | 168 | 52% | 210 | 38% | 161 | 35% | 210 | 47% | 112 | 38% | 1,168 | 45% |
| 3-11 | 308 | 47% | 168 | 54% | 205 | 50% | 168 | 38% | 210 | 29% | 112 | 27% | 1, 171 | 41% |
| 11-7 | 298 | 60% | 167 | 67% | 209 | 62% | 160 | 44% | 210 | 54% | 112 | 64% | 1, 156 | 59% |

"% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post.

Steadily assigning Captains to specific zones at RNDC began in earnest at the end of the current Monitoring Period, and NCU began to audit the Facility's performance level in November 2020. RNDC is divided into 5 "zones" that are covered by Captains. A zone is either an entire building, modular unit or some combination of building units/modular units. In November 2020, specific Captains were assigned to 12 of the 15 (80%) 4-day Captain posts (5 zones x 3 tours) but to only 2 of the 15 (17%) 2-day Captain posts (17%). In terms of whether an assigned Captain actually worked the post, the table below shows that fewer than half of the Captains' posts were worked by an assigned Captain. These performance levels should improve once more of the 2-day Captains' posts are assigned to a specific person.

| Captains' Posts—Proportion Worked by the Assigned Captain November to December 2020 | | | | |
|---|---|---|---|---|
| Tour | November | | December | |
| | # posts | % steady | # posts | % steady |
| All | 525 | 46% | 420 | 37% |
| 7-3 | 175 | 55% | 140 | 55% |
| 3-11 | 175 | 51% | 140 | 34% |
| 11-7 | 175 | 33% | 140 | 22% |

"% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post.

Now that baseline performance levels and zone assignments for Captains are known, the Monitoring Team will work with the Department to identify appropriate thresholds for determining compliance.

The Remedial Order also requires ADWs to be consistently assigned to the same supervision zone. These assignments were made late in the current Monitoring Period and while NCU had developed its methodology, it had not yet begun to measure the Facility's performance level for ADWs.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Non-Compliance<br>§ D., ¶ 1. Non-Compliance |
|---|---|

### 13. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI)

**XVI. INMATE DISCIPLINE ¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

¶ 7. The Department shall not place any 18-year-old Inmate in Punitive Segregation unless a mental health care professional determines that the confinement does not present a substantial risk of serious harm to the inmate given his health condition, including his mental health, and needs. Such determination shall be documented and signed by the mental health care professional.

¶ 8. To the extent that an 18-year-old Inmate is placed in Punitive Segregation or Isolation, the Corrections Health Care Provider shall monitor the Inmate's medical and mental health status on a daily basis to assess whether the continued confinement presents a substantial risk of serious harm to the inmate's medical or mental health. The Corrections Health Care Provider will document its daily assessment in the Inmate's medical record. If the Corrections Health Care Provider's assessment indicates removing the Inmate from Punitive Segregation or Isolation based on the Inmate's medical or mental health condition, the Inmate shall be promptly transferred out of Punitive Segregation or Isolation.

¶ 9. The conditions of any cells used for Punitive Segregation or Isolation housing for 18-year-old Inmates shall not pose an unreasonable risk to Inmate's safety. This provision does not address issues covered in a separate ongoing lawsuit, Benjamin v. Ponte, 75 Civ. 3073, including but not limited to maintenance of ventilation systems or lighting or the sanitation of the units.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation (PSeg) with 18-year-olds in June 2016.

**ANALYSIS OF COMPLIANCE**

Punitive segregation is no longer utilized for 18-year-old youth. Accordingly, for ¶ 7 (PSeg clearance by mental health), the Partial Compliance rating from the Second Monitoring Period (when Punitive Segregation was still in use) remains in effect.

While Punitive Segregation is no longer utilized, these provisions also apply to the extent that an 18-year-old is placed in isolation pursuant to the definition of the Consent Judgment. Isolation is defined as any type of involuntary confinement in a locked room or cell for at least three consecutive hours during the day (excluding overnight lock-in and other lock-in periods that are applicable to the general population, such as lock-ins for count, shift changes, contraband sweeps, or emergency situations involving security concerns).[258] As noted in the previous Monitor's Report (see pg. 269), the Monitoring Team conducted a routine review of the daily schedules for TRU, Secure and ESH to re-assess whether any of the programs included practices that meet the Consent Judgment's definition of isolation. Youth in the TRU program receive the same number of lock-out hours (14) as youth in the General Population. In the Secure program, lock-in/lock-out times are staggered such that during waking hours, people in custody do not spend more than 3 hours at a time in their cells. In other words, the TRU and Secure program's procedures do not include the use of isolation as defined by the Consent Judgment, so the requirements of provisions ¶ 8 and ¶ 9 are not applicable.

However, current practices in ESH-Level 1 do meet the definition of isolation pursuant to the Consent Judgment. ESH-Level 1 utilizes two 7-hour lock-out periods that, for an individual person, alternate between AM and PM day-to-day in order to reduce the number of people out of their cells at any given time and to vary the time of day each person's out-of-cell time occurs. Under this alternating AM/PM schedule, people in ESH-Level 1 are in their cells for 9 hours, out of their cells for 7 hours, in their cells for 25 hours (note: 10 of these hours are considered "sleeping hours"), and then out of their cells for 7 hours. Thus, the requirements of ¶ 8 and ¶ 9 are applicable to the management of the ESH-Level 1.

Provision ¶ 8 requires the H+H to monitor the medical/mental health status of anyone in isolation on a daily basis and ¶ 9 specifies that cells used for the purpose of isolation "may not pose an unreasonable risk to safety" excluding issues covered by Benjamin (lighting, ventilation and sanitation). During the current Monitoring Period, an 18-year-old was in ESH-Level 1 for a few days at

---

[258] "Isolation" shall not include suicide watch, the confinement of an incarcerated individual to prevent the spread of disease, or "Seclusion" in compliance with the procedures set forth in 40 NYCRR § 2-06. *see* § III. Definitions ¶ 20 of the Consent Judgment

the beginning of July 2020, prior to the reporting mechanisms for ¶ 8 and 9 being established. Another 18-year-old was placed in ESH-Level 1 in mid-December 2020, at which point NCU began including the housing unit in its monthly cell inspection audits, finding 100% compliance with inspection/housing requirements regarding cell locking mechanisms.

No compliance rating is assessed given that this provision only applied to two individuals with short stays in the housing units. However, the Monitoring Team will continue to closely monitor the issue based on the following standards below:

(1) the extent to which daily assessments of medical and mental health status by H+H staff occur consistently; that the assessment reflects the standard of care (i.e., that people in custody have an opportunity to request care, medical providers are able to observe youth's physical condition and mental health status including their attitude/outlook; generally going beyond the initialing of housing rosters by documenting the person's condition on individual logs or cards that are filed in the patient's health record)[259]; and that 18-year-olds are promptly removed from ESH if so indicated by the assessment (¶ 8); and

(2) the consistency with which youth in ESH are placed in cells with operable locks (¶ 9).

| COMPLIANCE RATING | ¶ 7. Partial Compliance (per Second Monitor's Report) <br> ¶ 8. Not Rated <br> ¶ 9. Not Rated |
|---|---|

## XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

¶ 5. The Department shall not place 18-year-old Inmates with serious mental illnesses in Punitive Segregation or Isolation. Any 18-year-old Inmate with a serious mental illness who commits an infraction involving violence shall be housed in an appropriate therapeutic setting Staffed by well-trained and qualified personnel and operated jointly with the Corrections Health Care Provider.

### DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.
- 18-year-olds with serious mental illnesses ("SMI") who commit violent infractions are excluded from the Secure Unit and Enhanced Supervision Housing ("ESH") and must be placed in an appropriate therapeutic setting. At the end of the Tenth Monitoring Period, the City expanded the exclusionary criteria for ESH and Secure to also include a variety of physical health conditions (e.g., asthma, diabetes).

---

[259] These expectations are consistent with standards issued by the National Commission on Correctional Health Care (NCCHC); *see* https://www.ncchc.org/spotlight-on-the-standards-26-2 .

- Contemporaneously with the expanded criteria, the Department changed the procedure for ensuring that people with contraindications are not placed in these programs. Rather than "clearing" people upon referral to Secure or ESH, H+H now creates daily Medical Exclusion Lists. The list includes every person in custody who has one or more of the exclusionary conditions, which automatically prevents them from being referred/placed in ESH or Secure.
- The Department has two therapeutic units for incarcerated individuals with SMI: Clinical Alternatives to Punitive Segregation ("CAPS") and Program for Accelerated Clinical Effectiveness ("PACE"). CAPS addresses the needs of incarcerated individuals with SMI who have committed an infraction. PACE also offers treatment to incarcerated individuals with SMI but is completely separate from the infraction process.

ANALYSIS OF COMPLIANCE

The Department provided the Medical Exclusion Lists ("MEL") for each day in the Monitoring Period, with only a few exceptions as the new process was established at the beginning of the Monitoring Period. The Monitoring Team cross-referenced the MEL with the list of 18-year-olds admitted to Secure and ESH during the Monitoring Period, checking the day before/day of/day after the person's admission date, along with a random sample of 5-10 days throughout each person's time in the programs. Only one 18-year-old was admitted to PACE during this Monitoring Period, and none were placed in CAPS. None of the 18-year-olds who were admitted to ESH or Secure during the current Monitoring Period appeared on the MEL.

The Department has sustained Substantial Compliance with this provision for nine[260] of the eleven Monitoring Periods.[261] The Department's substantial compliance with this provision for 51 months has demonstrated that the prior deficiencies have been abated, so active monitoring of this provision is no longer necessary. The Monitoring Team therefore does not intend to actively monitor this provision beginning in the Twelfth Monitoring Period as described in the Background section of this report.

| COMPLIANCE RATING | ¶ 5. Substantial Compliance |
| --- | --- |

---

[260] *See* First Monitor's Report at pgs. 106-107 (dkt. 269), Third Monitor's Report at pgs. 234-235 (dkt. 295), Fourth Monitor's Report at pgs. 246-247 (dkt. 305), Fifth Monitor's Report at pgs. 176-177 (dkt. 311), Sixth Monitor's Report at pgs. 192-193 (dkt. 317), Seventh Monitor's Report at pgs. 236-237 (dkt. 327), Ninth Monitor's Report at pgs. 309-310 (dkt. 341) and Tenth Monitor's Report at pgs. 269-270 (dkt. 360).

[261] This provision was not rated in the Second Monitor's Report. See, Second Monitor's Report at pgs. 148-149 (dkt. 291). This provision was rated in Partial Compliance in the Eighth Monitor's Report. *See* Eighth Monitor's Report at pgs. 275-276 (dkt. 332). The Partial Compliance rating in the Eighth Monitoring Period was an aberration due to personnel change and performance rebounded thereafter.

| XVI. Inmate Discipline ¶ 6 (18-year-old Inmates: Continuum of Disciplinary Options) |
| --- |

¶ 6. Within 120 days of the Effective Date, the Department, in consultation with the Monitor, shall develop and implement an adequate continuum of alternative disciplinary sanctions for infractions in order to reduce the Department's reliance on Punitive Segregation as a disciplinary measure for 18-year-old Inmates. These systems, policies, and procedures shall be subject to the approval of the Monitor. Any subsequent changes to these systems, policies, and procedures shall be made in consultation with the Monitor.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department abolished the use of Punitive Segregation with 18-year-olds in June 2016.
- The Department operates several Structured Supportive Housing units ("SSH") to address those who commit serious or chronic violent misconduct, including Transitional Restorative Units ("TRU"), the Secure Unit and Young Adult Enhanced Supervision Housing ("ESH")).[262]
- The original TRU policy was approved by the Monitoring Team during the Sixth Monitoring Period. The Department revised, and the Monitoring Team approved, the TRU Policy during the Tenth Monitoring Period. The policy went into effect on 1/22/21, just after the end of the current Monitoring Period.
- The Department has policies in effect for both ESH and Secure but reports proposed revisions are currently on hold as there is broader consideration within the Department, and outside oversight, about changes to the original program designs.
- NCU audits compliance with procedural requirements for all three programs by auditing the records of youth in SSH programs upon their transfer to the General Population or other specialized housing unit (e.g., MO, PC, etc.).

**ANALYSIS OF COMPLIANCE**

Monitoring the current status of program operations and providing technical assistance to the SSHs is a complicated endeavor. The programs are subject to oversight by both the Monitoring Team and the Board of Corrections ("BOC"), both of which have specific requirements that are not always easy to align. The programs are impacted by frequent changes in Facility Leadership and the degree to which Facility leaders understand, adhere to and prioritize the unique attributes of each program. Most recently, the "intervention" (i.e., the programs delivered by Program Counselors and community partners) has been understandably but also severely hampered by the Department's COVID mitigation strategy. In the near future, the SSHs may be transformed into a different program approach altogether as a result of new BOC rulemaking. Together, these dynamics create a perpetual state of uncertainty about when and how to push for reforms to the various problems that have concerned the Monitoring Team since the programs' inception. The narrative below describes the programs' current operation and identifies some pervasive issues that continue to require attention.

---

[262] See pgs. 219-221 of the Third Monitor's Report for a description of each program. The Department originally had a fourth option, Second Chance Housing Unit ("SCHU') but discontinued it mid-2019.

The three SSHs vary in terms of their restrictiveness. TRU is focused on addressing violent misconduct but does not restrict the youth's lock-out time or movement beyond what occurs in the general population. Youth have 14-hours lock-out time, travel to school (when it is in session) and recreation and do not have restrictions on visitation or other movement in the Facility. Secure and ESH both utilize additional hardware (i.e., restraint desks; partitions between quads) and other more restrictive procedures (i.e., escorted movements, reduced lock-out times depending on the youth's level/phase, no-contact visitation) to suppress violent misconduct. While the SSHs vary a bit in terms of the type and volume of programming that is offered, youth may receive several hours per day of school (when in session), recreation, and services from a Program Counselor and community partners, if they choose to participate. Both ESH and Secure utilize a Phase/Level system—as youth progress through the phases/levels, they are afforded longer lock-out times and a few additional privileges. In-person programming and education services were suspended in all programs during most of the Monitoring Period due to COVID mitigation procedures.

**Admissions and Transfers.** A total of 44 18-year-old youth were admitted to one of the three SSHs during the current Monitoring Period, continuing the overall downward trend in the use of SSHs noted previously (see pgs. 271-272 of the Tenth Monitor's Report). In addition, the proportion of youth in the most restrictive settings (Secure and ESH) returned to historical levels (21%), suggesting that the 42% noted in the previous Monitoring Period may have been an unusual spike. The table below shows the number of youth admitted to the three SSHs.

| 18-Year-Old Youth Admitted to TRU, Secure and ESH | | | | |
|---|---|---|---|---|
| | Jan-Jun 2019 | Jul-Dec 2019 | Jan-Jun 2020 | Jul-Dec 2020 |
| SCHU | 24 (16%) | 1 (2%) | ~ | ~ |
| TRU | 95 (64%) | 46 (71%) | 38 (58%) | 35 (80%) |
| Secure | 15 (9%) | 11 (17%) | 20 (31%) | 7 (16%) |
| ESH | 14 (9%) | 7 (11%) | 7 (11%) | 2 (5%) |
| TOTAL | 148 | 65 | 65 | 44 |
| Note: Prior to Jan 2019, SSH data also included 16- and 17-year-olds and thus are not comparable. | | | | |

Of the 14 youth who spent time in Secure/ESH during the current Monitoring Period (some were admitted during the previous Monitoring Period), about half were admitted from TRU where they'd spent just a few days, likely waiting for the various parts of Secure/ESH admissions process to be completed. The other half were admitted from the general population following a hearing.

The vast majority of youth exiting TRU/Secure/ESH transitioned to the general population. During the current Monitoring Period, the historical practice of frequently moving youth between and among the three programs appeared to occur far less often. That said, several youth were later re-admitted to an SSH following a short stint in the general population. As noted in prior Monitor's

Reports, the Department is encouraged to improve the continuity of care for youth who are transferred or re-admitted by summarizing/leveraging information from prior SSH exposure to inform the approach taken in a subsequent SSH placement. During the current Monitoring Period, the Department's Ombudsman was placed in charge of each program's Support Team. His leadership may facilitate the continuity of care that has been recommended for several Monitoring Periods.

**Length of Stay.** Data on length of stay, by SSH program and exit type, is presented in the table below. As noted above, fewer youth were transferred among the SSHs than in the past. In addition, fewer youth were discharged from DOC from an SSH—the vast majority of youth from all programs were transitioned to a GP housing unit, as shown in the table below.

| SSH Average Length of Stay, by Exit Type, January-June 2020 | | | |
|---|---|---|---|
| Exit Type | TRU (N=39) | Secure (N=9) | ESH (N=1) |
| To General Population | (n=35; 90%) 24 days (Range 4-35) | (n=7; 78%) 97 days (Range 59-117) | (n=1; 100%) 54 days* (Range 0) |
| Discharge from DOC | 24 days (n=1) (Range 0) | 25 days (n=2) (Range 15-35) | ~ |
| Transfer to another SSH | 4 days (n=3) (Range 3-6) | ~ | ~ |
| *This youth was originally placed in ESH, transferred to Secure, and transferred back to ESH, mostly during the previous Monitoring Period. His total LOS in an SSH was 104 days. | | | |

The average lengths of stay ("ALOS") for youth who transfer from an SSH to the general population had been remarkably consistent over time—about 3 weeks for TRU and 50-60 days for ESH/Secure. During the current Monitoring Period, however, the ALOS in Secure was longer than is typical (97 days), likely due to youth remaining in Secure rather than being transferred to TRU and ESH. The net effect of a longer ALOS is that the number of youth in Secure at any one time was substantially higher than it has been in the past. In previous years, Secure's ADP was approximately 10 youth whereas for the past two Monitoring Periods, Secure's ADP has been approximately 15 youth. This has implications for the unit's safe operation, as discussed below.

At the end of the Monitoring Period, one youth remained in TRU (length of stay 9 days), one youth remained in ESH and had been there for 24 days, and 3 youth remained in Secure (average length of stay was 71 days, ranging from 24 to 108 days). The lengths of stay observed in these programs are not concerning, as long as the units' populations are at safe levels and as long as the criteria for promotion/exit are transparent and followed consistently (discussed in more detail below).

**Level of Violence and Use of Force**. Since 2017, the Department has routinely provided information on violent incidents and uses of force in the Young Adult SSHs.[263] The Monitoring Team calculates a UOF rate and rate of violent incidents each month in order to gain a sense of the level of disorder in the living environments of these programs. The rates vary, but in general have been similar to those calculated for the entire population of 18-year-olds and not particularly informative. That said, over the past 18 months or so, the Monitoring Team is aware of at least 10 instances where youth in ESH and Secure were able to obtain weapons used to slash another youth. Given the level of hardware security, limited movement and contact with others in the Facility and variety of search procedures in effect on these units, the on-going presence of dangerous weapons is both surprising and concerning.

**Quality of Intervention**. The Monitoring Team reviewed a sample of files for 18-year-olds who participated in TRU and Secure during the current Monitoring Period.[264]

The Tenth Monitor's Report noted that the TRU policy was revised to provide improved accountability and clarity in the admissions/release process, improved collaboration among Support Team members and much needed changes to the substance of behavior plans and format for the Support Team meeting process and documentation. Unfortunately, the policy was not signed into effect until after the end of the current Monitoring Period, so the impact of the new policy, procedure and forms has yet to be seen.

The Monitoring Team reviewed files for nine 18-year-olds participating in **TRU** in November 2020. Among the key findings:

- All nine youth met the criteria for placement, and most had complete admissions paperwork.
- The Behavior Cards that track youth's misconduct are poorly implemented. Almost none of the cards were properly completed (*e.g.*, large portions of the card were blank; Captain's signatures were sometimes missing, or were sometimes attached to a day/tour that was never completed to begin with).
- The program does not appear to be achieving its stated goal of providing individualized support:
  - Behavior Support Plan goals were somewhat better articulated than in the past (e.g., "manage anger" or "develop positive coping skills") but lacked detail for how progress toward them would be measured and over what period of time. Furthermore, goals for all youth were virtually the same, suggesting a lack of individualization.
  - The group interventions suffer from a similar lack of individualization, with all youth receiving the same groups. Furthermore, the groups appear to be regarded as

---

[263] The Department did not report this data for TRU for all of 2019 and the first half of 2020 but resumed routine reporting in July 2020.

[264] Only one 18-year-old was released from ESH during the current Monitoring Period. His file was not reviewed.

interchangeable, given that what is delivered often does not match what is prescribed in the Behavior Plan (if any groups are specifically prescribed) or responsive to what was recommended in a previous week's Support Team meeting.

- Transition forms for youth to exit TRU were not complete in 8 of the 9 files reviewed. Most were missing the youth's self-assessment, did not have a signature from Staff on all three tours, several had missing signatures from mental health clinicians, and the "date of last incident" was usually incorrect.

These same problems have been reported by the Monitoring Team for several years. The new **TRU** policy, if properly implemented, should address most of these problems. The Monitoring Team encourages the Department to emphasize clarity and transparency as it communicates with youth about the requirements for exiting the program and to reconsider the method for tracking youth's behavior to find an option that can be dependably implemented.

The Monitoring Team also reviewed case files for the nine 18-year-olds who were released from **Secure** during the current Monitoring Period. Key findings from this review include:

- Hearing/Notice timelines were met in all but two cases, both of which missed a timeline by only one day;
- All youth were cleared by H+H prior to being placed on the unit (when the Clearance process was still in place); for those admitted after 7/1/20, none appeared on the Medical Exclusion List;
- In 7 of the 9 case files, the youth's behavior met the criteria for placement, but in two cases, the reason for admission did not appear to be appropriate (i.e., incident was relatively non-serious; long delay between incident and placement that was unexplained);
- The Support Team meets weekly with every youth; though it was often difficult to discern, it appears that the discussion centers around whether the youth simply attends programs but does not analyze whether the youth is actually acquiring and using the skills taught in each program.
- Behavior cards were poorly implemented. For each youth, large portions of the behavior cards were not complete.
- While the 28-day reviews are completed timely—and often more quickly than required—the decisions to demote/retain/promote youth sometimes did not make sense. Some youth engaged in violent misconduct but were promoted anyway, while other youth were retained or demoted, and it was unclear why.

As discussed in the Tenth Monitor's Report (see pgs. 274-275), the Department's Program Division launched an effort to improve the quality of programming and operations in **Secure**. Many of the efforts are on-going as Programs begins to coordinate with GRVC and Department leadership but in general, the following issues are being targeted:

- <u>Staffing</u>—requesting that uniformed Staff are specially trained and steadily assigned; requesting a change to Captains' schedules to promote consistency and collaboration across tours; requesting that an internal team is used to respond to incidents rather than the Facility's Probe Team; engaging the Warden/DW/ADW in strategic planning sessions for the unit to ensure that operational issues receive the required attention and action;
- <u>Training</u>—holding multi-disciplinary training sessions so that uniformed/programming staff recognize the interdependence of their roles;
- <u>Operations</u>—ensuring the unit does not go beyond capacity of four youth per quadrant; revitalizing the unit orientation when youth are first admitted; shoring up practices for sanitation and searches;
- <u>Programming</u>—ensuring that structured recreation services are provided twice weekly; shoring up the delivery of the four main program components (DBT, Young Men's Work, Youth Communication and Anger Management); ensuring that youth who are enrolled in school have access to tablets;
- <u>Support Team</u>—reinvigorating membership and participation from all departments; appointing a consistent lead facilitator; training counselors in goal construction/support planning; fortifying requirements for documentation and tracking.

The case file reviews are only one part of a youth's experience on the Secure unit, and the Department's efforts to shore up the surrounding environment and Staff practice is equally important. The Monitoring Team plans to continue its routine monthly calls focused on these developments in Secure.

 **Quality Assurance**. In addition to the Department revising the TRU policy and reconsidering the operation of Secure to improve program effectiveness, NCU continues to audit the files of 18-year-olds who are released from TRU, Secure, and ESH. NCU's audits focus on the extent to which key timelines are met and whether the youth's progress is reviewed timely (each unit has a different timeline and slightly different criteria for assessing progress/readiness for promotion). The Monitoring Team compared the findings of its case reviews to NCU's audits and found a high degree of congruence in findings related to timeliness of notices, hearings and reviews and the problems described above regarding Behavior Cards. As the Department's plans to shore up staffing, operations and programming take shape, the Monitoring Team encourages the Programs Division/NCU to develop a strategy for auditing the extent to which the various objectives have been accomplished so that the quality assurance effort for the SSHs becomes more holistic.

<u>*Solo Housing*</u>

316

The Department used Solo Housing (i.e., housed an 18-year-old alone on a unit for the purpose of behavior management)[265] six times during the current Monitoring Period, five of which were for behavior management/security reasons. Three of the five placements were for less than 7 days, but two were of a length that would have required additional protections and documentation (9 days and 18 days). Whether short stays or long, the Department failed to follow the Solo Housing procedures for authorization, service provision and documentation. The Monitoring Team has reminded the Department of these requirements—which are memorialized in Department policy—multiple times over the years, held a technical assistance workshop in 2018 and provided a quality assurance tool in 2019. While NCU has provided what documentation was available from the Facility and has reportedly provided instructions to Facility leadership about the requirements for Solo Housing, Facility leaders continue to utilize the practice without following the required procedures.

The Monitoring Team is concerned about the fact that the required procedures are not being followed but is also sensitive to a number of mitigating factors: (1) the circumstances and reasons for using Solo Housing appear to be appropriate (most often, frequent assaultive behaviors toward other youth and Staff, regardless of the housing assignment); (2) a very small number of youth have been placed in Solo Housing; and (3) the ALOS is relatively short. That said, the Monitoring Team continues to encourage Facility leaders to ensure that proper procedures are followed and will maintain close scrutiny of this issue.

*Conclusion*

Although each of the program approaches suffer from a variety of problems, they do provide the Department with the ability to afford some element of protection to youth in the general population by separating youth who have engaged in serious violence. The programs have also reduced the Department's reliance on Punitive Segregation as a disciplinary measure, which is one of the core requirements of this provision. As a result, the Department remains in Partial Compliance.

| COMPLIANCE RATING | ¶ 6. Partial Compliance |
| --- | --- |

| REMEDIAL ORDER § D., ¶ 2 (SYSTEM OF INCENTIVES AND CONSEQUENCES) |
| --- |
| § D., ¶ 2. For all housing units at RNDC that may house 18-year-old Incarcerated Individuals, within 30 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a system under which Staff will respond to an Incarcerated Individual's behavior through an established, structured system of rewards and consequences (the "Incentives & Consequences System"). Consistent with the terms of Section XX, ¶¶ 10 and 22 of the Consent Judgment, the Monitor shall consult with Plaintiffs' Counsel on the Incentives & Consequences System in order to provide Plaintiffs' Counsel with an opportunity to provide input on the development and implementation of the system. The Incentives & Consequences System shall be subject to the approval of the Monitor. |

---

[265] This does not apply to situations where the individual is the only person of a certain legal status, such as an 18-year-old girl in Protective Custody.

(i) The Incentives & Consequences System will include a variety of short-term and long-term rewards and consequences that Staff may provide to Incarcerated Individuals to incentivize positive behavior and sanction negative conduct, close in time to when the conduct occurs. The Incentives & Consequences System shall be consistent with all applicable laws or regulations.

(ii) Staff shall appropriately document and track instances in which Incarcerated Individuals are provided rewards or consequences.

(iii) The Department, in consultation with the Monitor, shall develop, adopt, and implement a policy that sets forth the procedures and processes associated with the Incentive & Consequence System and a training program. The policy and training program shall be subject to the approval of the Monitor. The Department shall provide the training to all Staff that may work on any RNDC housing units that may house 18-year-old Incarcerated Individuals.

## DEPARTMENT'S STEPS TOWARDS COMPLIANCE

- The Department developed a strong conceptual approach in which incentives and sanctions are intertwined.
  - By design, a set of desirable commodities would be universally available to young adults at RNDC (e.g., commissary spending at $125 and a broad range of items for purchase, frequent haircuts, tablets with educational and entertainment programming, Game Boy videogames, extra recreation sessions, an evening snack, weekly access to the PEACE Center, etc.) to incentivize positive behavior. Over time, youth could earn attendance at a special event or admission to an Honors Dorms with an even more robust array of incentives. Eventually, the Department wants to provide on-the-spot rewards (e.g., free haircuts, or entertainment coupons) as incentives for meeting case plan goals.
  - These same items can be restricted for a short period of time in response to misconduct, via the Informal Resolution ("IR") program. This program was designed to address low- and mid-level misconduct and to supplement the very few options currently available (i.e., the infraction process, which does not include meaningful consequences; or the SSH programs, which are reserved for the most serious misconduct). Under the IR program, unit Staff would provide an immediate consequence for misconduct which could include commissary limits, limits on barbershop visits, and other short-term restrictions from the variety of incentives listed above. Staff could also choose to impose a restorative sanction, such as an apology letter or some form of community service.
- The original plan included procedures for supervisory oversight, tied to the Unit Management concept described in ¶ XV.12 (Direct Supervision) above.
- A variety of documents have been developed for Staff, including a CLO, IR forms and a database to track which IRs are currently active, as well as written materials and posters that describe the IR process for people in custody.

- The Department developed an IR training module, to be delivered with the Unit Management training discussed in ¶ XV.12 (Direct Supervision) above. The Monitoring Team approved the IR training module during the Tenth Monitoring Period.
  - As of the end of the Monitoring Period, about 82% of RNDC Staff had received the required training.
- NCU developed two quality assurance tools—a database for tracking IRs and a Unit Management Report for tracking key metrics.

ANALYSIS OF COMPLIANCE

While the Department has developed a sound concept for its incentives and consequences program, developed useful policies and job aids, created an appropriate training module and trained a significant number of staff, its implementation has faltered.

On the incentive side, the delivery of the range of incentives is absolutely essential to ensure that youth are encouraged to maintain positive behavior (so that they continue to receive the valued items/activities) and so that Staff are able to implement the IR program appropriately. There is nothing to restrict if the youth weren't getting the items/activities in the first place as a baseline. Other than commissary, it appears that very few of the items on the original list of incentives are being provided dependably. The Department reports problems delivering barbershop visits (due to COVID precautions) and extra recreation (due to staffing and space limitations, in addition to disruptions from alarms), the Honors Dorms are no longer used, a source of funding for an evening snack was not identified, and the Department has not yet established a method for tracking whether electronics are distributed dependably or whether each unit's visits to the PEACE Center occur as scheduled. The failure to properly implement the incentives likely has multiple causes including the lack of consistent staffing which limits staff's investment in the units' operation, a lack of daily unit schedules which would create shared expectations and a structure for delivering activities, low training numbers among Facility supervisors and Facility leadership's lack of commitment to and oversight of the program.

On the consequence side, the IR process is sorely underutilized. Although Staff working in the first building where IRs were rolled out initially gave both the concept and training positive reviews, the use of the IR process quickly tapered off. In this first building (which has 6 housing units) in September 2020, 14 IRs were issued during that first month (which is not many considering the number of fights, lock-in compliance problems and other types of misconduct, but it is a start). However, for the remainder of the Monitoring Period, only a handful of IRs were issued each month. Furthermore, the Facility's legacy system of commissary restrictions for fights/cell non-compliance (see pg. 254 of the Tenth Monitor's Report) was not implemented consistently throughout the Monitoring Period as described in ¶ XV.2 (Daily Inspections) above. Routine data on the number of uses of force, fights and lock-in non-compliance at RNDC show a significant number of all types of events, and these behaviors are exactly what the IR process was designed to target. Staff's failure to

properly implement this component of the system means that they did not effectively hold people accountable for their negative behavior, a key part of the overall plan to reduce violence and disorder at RNDC.

In addition to encouraging ownership of the outcomes of the RNDC Plan among Facility leaders and improving the consistency of staff assignments, the Department is encouraged to examine the underlying causes of the problems with the delivery of incentives and the imposition of consequences and to address them strategically.

| **COMPLIANCE RATING** | **§ D., ¶ 2(i). (Design of the Incentive/Consequences Program)** Substantial Compliance<br><br>**§ D., ¶ 2(ii). (Implementation)** Non-Compliance<br><br>**§ D., ¶ 2(iii). (Policy and Training)** Substantial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

¶ 10. Nothing in the section shall be construed to prohibit the Department from placing Young Inmates in a locked room or cell as a temporary response to behavior that poses a risk of immediate physical injury to the Inmate or others ("De-escalation Confinement"). The Department shall comply with [the procedures in (a) to (c) when utilizing De-escalation Confinement].

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- The Department promulgated an Ops Order regarding the use of "Satellite Intake" as a de-escalation tool in July 2018, but it has not been used since the Seventh Monitoring Period.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

Shortly after the Consent Judgment went into effect, the Monitoring Team met with the Department to sketch out the practices needed to meet the requirements of this provision. After several iterations, the substance of the Ops Order for "Satellite Intake" was drafted and eventually promulgated. However, once GMDC was closed and the 18-year-olds were moved to RNDC, the Department stopped using Satellite Intake and for that reason, this provision is not applicable as no other specific de-escalation confinement is currently utilized. Since then, the Department resumed its original practice—taking youth to Intake following violent incidents and/or Probe Team intervention.

Previous Monitor's Reports have encouraged the Department to address the burden this practice places on Intake areas, which have proven to be a constant hot spot for uses of force. The Remedial Order addresses this problem by requiring a new De-Escalation Protocol (¶ A.3). The

| | |
|---|---|
| requirements of this provision may intersect with the requirements of the Remedial Order and will be designed, implemented, and monitored accordingly. | |
| **COMPLIANCE RATING** | **¶ 10.** (18-Year-Olds) Not Applicable |

**REMEDIAL ORDER AUDIT PROVISIONS**
**§ D., ¶ 1(i) (QUALITY ASSURANCE FOR CONSISTENT STAFFING),**
**§ D., ¶ 2(iv) (METRICS FOR INCENTIVES AND CONSEQUENCES) AND**
**§ D., ¶ 3(ii) (ASSESSMENT OF DIRECT SUPERVISION)**

§ D., ¶ 1(i). The Department, in consultation with the Monitor, shall enhance the implementation of a quality assurance process to assess on a monthly basis the extent to which the Department complies with the consistent staffing requirements of this Paragraph. These monthly assessments shall include a review of the staffing of a substantial number of RNDC housing units and shall specify the percentage of the total tours for those units that were staffed by the same line correction officers, Captain, and ADWs. The Department shall report the results of its monthly assessments to the Monitor.

§ D., ¶ 2(iv). The Department, in consultation with the Monitor, shall develop, adopt, and implement a protocol, which shall include the use of relevant data, to assess how well the Incentives & Consequences System is implemented in the relevant RNDC housing units.

§ D., ¶ 3(ii). The Department, including RNDC Supervisors, shall periodically assess the extent to which the various aspects of the Direct Supervision Model are being implemented at the relevant RNDC housing units. The assessment shall include qualitative and quantitative measures that shall be developed in consultation with the Monitor. The assessment shall also include an appropriate examination of the extent to which Staff consistently follow the daily schedule in each housing unit. To the extent that deficiencies are identified through these assessments, Staff Members shall be provided with appropriate instruction, counseling, or re-training. The results of these assessments shall be documented.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- NCU created Unit Management Reports that include data about consistent staffing and the use of Informal Resolutions, along with outcome data including UOF, fights, and alarms. These Reports are being pilot tested in the first RNDC building to roll out Unit Management.

- NCU has had a robust audit process for assessing consistent staff assignments for several Monitoring Periods. This process has always included line officers, and Captains were recently added in November 2020. Although ADW/Unit Managers have been assigned to all areas of RNDC, NCU has not yet begun to audit the extent to which they actually work their assigned areas.

  o NCU's consistent staffing audits include all TRU and MO housing units, and a random sample of the remaining units (e.g., general population, programming, PC, new admission, etc.) each month. Aggregate data is reported to the Monitoring Team monthly and unit-specific results are available upon request.

- NCU has taken initial steps to assess the implementation of its system of consequences (*i.e.*, Informal Resolutions, "IR") by developing a tool for tracking each IR imposed. Meaningful analysis (*e.g.*, frequency, type of sanction, etc.) is not yet possible given that several of the incentives (which form the foundation for privilege restrictions) have not been implemented and Staff have not utilized the IRs with any regularity. NCU has yet to establish a protocol for

assessing the extent to which the various incentives are being reliably delivered, partly due to the Facility's lack of focus on these requirements.

- The Department's Programs Division began conducting Continuous Quality Improvement (CQI) audits in December 2020 to assess the implementation of Unit Management.
- NCU has yet to develop a protocol for assessing the extent to which daily unit schedules are being followed consistently, in part due to the Facility's failure to develop comprehensive schedules for each unit, discussed in ¶ XV.12 (Direct Supervision), above.

**ANALYSIS OF COMPLIANCE**

Note: the provisions discussed below are from three different provisions in Section D of the Remedial Order but are grouped together because they each address similar and overlapping tasks of quality assurance.

It is worth noting that the Department cannot make meaningful progress toward the quality assurance requirements of the Remedial Order until Facility leadership properly establishes the practices that are to be the subject of auditing. The efforts of NCU and the Programs Division in developing quality assurance strategies are appropriately targeted but can only go so far without a full commitment by Facility leadership to implementation. In the original design, implementation across all six buildings in RNDC was intended to be incremental (*i.e.*, one building at a time), but this staggered roll-out plan does not appear to have been well executed. Without solid practice in the pilot test site, the Department was unable to reap the benefits of troubleshooting and lessons learned that a properly executed sequenced roll-out would have provided.

**§ D., ¶ 1(i): Quality Assurance for Consistent Staffing**

NCU's audits of consistent staffing utilize a robust methodology and contain the level of detail required by this provision. Results are reported in a fashion that is amenable to locating specific problems, such as compliance by housing unit or type, tour and the reasons that Staff did not work their assigned posts. The Monitoring Team encourages the Department to utilize these audits in a strategic fashion to solve the problems that have been identified and to address consistently poor performance levels with meaningful accountability measures. The structure and implementation of NCU's audits meet the requirements of this section of the Remedial Order.

**§ D., ¶ 2(iv): Quality Assurance Incentives & Consequences**

While NCU has created a tracking tool for Informal Resolutions that will eventually serve as the quality assurance function for the consequence side of the equation, without regular use of IRs by housing unit Staff, the quality assurance function cannot operate as intended. As noted in § D., ¶ 2(ii) above, the Facility has not yet developed daily unit schedules nor established reliable practices for the delivery of incentives and thus the task of developing a quality assurance system for incentives has not yet been accomplished. For example, patterns across units and staff, choices among consequences and the extent to which consequences are effectively imposed cannot be calculated without proper usage by

staff. Finally, without reliable delivery of incentives, restrictions to these same commodities/services are not yet meaningful and thus the audit results lack substance.

### § D., ¶ 3(ii): Assessment of Direct Supervision

As noted in ¶ XV.12 (Direct Supervision), above, the Department integrated key components of Direct Supervision into its Unit Management concept. The Programs Division was intimately involved in developing the Unit Management concept and training and has also taken the lead in initial efforts to develop the quality assurance requirements for this part of the Remedial Order. Programs' CQI staff conduct weekly assessments to assess implementation progress. To date, these assessments have identified various implementation problems (e.g., Staff not steady or not yet trained; problems with barbershop services and recreation delivery; morale issues; delays in setting up Counselors' offices on the units) but have not delved into the specific aspects of Direct Supervision intended to be integrated into the Unit Management model (e.g., proactive supervision; unit structure/predictability; de-escalation; etc.). Finally, as noted in ¶ XV.12 (Direct Supervision), specific, comprehensive unit schedules need to be created for each unit in order to assess the extent to which Staff are providing a predictable environment in which services are reliably provided.

NCU's Unit Management Reports serve multiple purposes. These reports include both process-related (e.g., consistent staffing metrics, use of IR) and outcome-related (e.g., fights, alarms, uses of force) metrics. These quantitative measures, while useful, cannot explain the various nuances that underlie both challenges and progress. Therefore, qualitative measures—like those intended by the Program Division's CQI efforts—are essential for promoting progress. The Monitoring Team intends to work with the Department in the next Monitoring Period to solidify the methodology for assessing the extent to which incentives are delivered and unit schedules are followed.

| | |
|---|---|
| **COMPLIANCE RATING** | **§ D., ¶ 1(i). (Quality Assurance for Consistent Staffing)** Partial Compliance<br><br>**§ D., ¶2(iv). (Quality Assurance for Incentives/Consequences)** Partial Compliance<br><br>**§ D., ¶ 3(ii). (Assessment of Direct Supervision)** Partial Compliance |

• End •

# Appendix A: Definitions

| Acronym or Term | Definition |
| --- | --- |
| ACS | Administration for Children Services |
| A.C.T. | Advanced Correctional Techniques Training |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| ASFC | Adolescents Striving for Change |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.,* ensuring doors are secured so incarcerated individuals do not pop out of their cells, or employing better communication with incarcerated individuals when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BOC | Board of Correction |
| BSP | Behavior Support Plan |
| BWC | Body-worn Camera |
| CAPS | Clinical Alternatives to Punitive Segregation |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CIB | Correctional Intelligence Bureau |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| Closing Report | ID Investigator's detailed investigative closing report |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| CTE | Career Technical Education |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |

| Acronym or Term | Definition |
|---|---|
| DCID | Deputy Commissioner of ID & Trials |
| DCSR | Inoperable/Down Cell Summary Report |
| DDI | Deputy Director of Investigations |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| DYOP | Division of Youthful Offender Programs |
| EAM | Enterprise Asset Management |
| EEO | Equal Employment Opportunity Office |
| Emergency Response Teams | There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of Facility-based Staff ("Facility Emergency Response Teams"); (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the Facility; and (3) the Special Search Team ("SST"), a separate and dedicated unit associated with the Special Operations Division that conducts searches. |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESU | Emergency Service Unit |
| EWS | Early Warning System |
| Expedited Case Closure | Cases that qualify for Full ID Investigations (and therefore are not eligible for "PICs") that can be closed more timely with fewer investigative steps after the Preliminary Review because either: (a) the evidence demonstrates that there was no violation, or (b) the violation could be addressed at the Command Level through a Facility Referral. |
| Facility or Facilities | One or more of the 12 Incarcerated individual facilities managed by the DOC |
| Fast Track | Cases that are pushed from ID to Trials more quickly with less investigative steps that can closed via an NPA |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FIS | Facility Information System |
| FSIR | Facility Security Inspection Report |
| GMACC | Gangsters Making Astronomical Community Changes |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health + Hospitals |
| HOJC | Horizon Juvenile Center |
| Hotline | ID Information Hotline |
| HUB | Housing Unit Balancer |

| Acronym or Term | Definition |
|---|---|
| ICO | Integrity Control Officer |
| ID | Investigation Division |
| ID Quickstats Weekly Reports | Reports prepared by ID in which ID shares a summary of incidents that occurred at the Facility the prior week, including descriptions of specific incidents and relevant data. This summary includes the Facility Rapid Review findings and whether ID concurs with that assessment or not. |
| IIS | Inmate Information System |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |
| IRT | Incident Review Team |
| ITTS | Investigation Trials Tracking System—Department's legacy Trials and ID case tracking system |
| KK | Staff Lounge |
| LAS | Legal Aid Society |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MEB | Monadnock Expandable Baton |
| MEO | Mayors Executive Order |
| M-designation | Mental Health Designation |
| MOC | Memorandum of Complaint |
| MOCJ | Mayor's Office of Criminal Justice |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| NFA | No Further Action |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OCME | Office of Chief Medical Examiner |
| OC Spray | Chemical Agent |
| OCD | Off-Calendar Disposition—processing of Trials case without scheduling or attending OATH conference. |
| OCFS | Office of Children and Family Services |
| OLR | Office of Labor Relations |

| Acronym or Term | Definition |
|---|---|
| OMB | Office of Management and Budget |
| OJT | On the job training |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| PACE | Program for Accelerated Clinical Effectiveness |
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PIC | Presumption that Investigation is Complete at Preliminary Review Stage |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| QA | Quality Assurance |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the Facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| Recruitment Unit | Department's Correction Officer Recruitment Unit |
| RFP | Request for Proposal |
| RHU | Restrictive Housing Unit |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| RTA | Raise the Age |
| SCHU | Second Chance Housing Unit |
| SCM | Safe Crisis Management |
| SCOC | New York State Commission of Correction |
| SDNY | Southern District of New York |
| September Recommendations | On September 30, 2019, the Monitoring Team shared recommendations the Monitoring Team developed on proposed actions that could be taken by the City and Department to stimulate progress toward the overarching goals of the Consent Judgment. |

| Acronym or Term | Definition |
|---|---|
| Service Desk | Computerized re-training request system |
| SMI | Serious Mental Illness |
| SOL | Statute of Limitations |
| SOLstat | Project initiated within ID to evaluate cases approaching the SOL to determine if the incident involves misconduct and discipline should be imposed |
| SRG | Security Risk Group |
| SSHs | Supportive Structured Housing units |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Staff Reports | Staff Use of Force Reports |
| STRIVE Community | HOJC's original behavior management system |
| STRIVE+ | HOJC's more robust behavior management system (builds upon STRIVE Community) |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| Taser Devices or Taser | Taser X2 Conducted Electrical Devices |
| TEAMS | Total Efficiency Accountability Management System |
| Team Picks | Cases were previously identified by the Monitoring Team as having potential objective evidence of wrongdoing |
| TDY | Temporary Duty |
| TOL | Transfer of Learning—roll call trainings with the goal of guiding Staff more effectively by contextualizing the requirements of various UOF policies and directives. |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| UOF Auditor | Use of Force Auditor |
| Video Pilot | ID's Video Recording Pilot |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Incarcerated Individuals | Incarcerated individuals under the age of 19 |
| YA-ESH | Young Adult Enhanced Supervision Housing |

# Appendix B: Monitoring Team Recommendations[266]

## PART 1: RECOMMENDED PROVISIONS FOR INACTIVE MONITORING

- **§ XV. (Safety and Supervision of Inmates Under the Age of 19)**:
  - ¶ 6 (Vulnerable Inmates)
  - ¶ 7 (Protective Custody)
- **§ XVI. (Inmate Discipline)**:
  - ¶ 5 (18-Year-Old Inmates: Punitive Segregation and Serious Mental Illnesses)

## PART 2: RECOMMENDED PROVISIONS TO TERMINATE OR ELIMINATE

- **§ VII. (Use of Force Investigations)**:
  - ¶ 14 (Youth ID Team Requirements)
- **§ VIII. (Staff Discipline and Accountability)**:
  - ¶ 3(b) (Non-ID referrals to Trials Division)
- **§ X. (Risk Management)**:
  - ¶ 4 (Litigation Tracking)

---

[266] The Monitoring Team's recommendations and the basis for these recommendations are discussed in the respective section of the report for each provision and/or in the compliance assessment of each enumerated provision.

vi

# Appendix C: Training Charts

### Status of Training Provided Since the Effective Date

| | Training Provided during Ninth Monitoring Period | | Total Training Provided Nov. 2015 – December 2020 | |
|---|---|---|---|---|
| | Initial Training | Refresher | Initial Training | Refresher |
| Use of Force Policy (¶ 1(a)) | N/A | 1132 | **12,341** | **8,249** |
| Crisis Intervention and Conflict Resolution (¶ 1(b)) | 98 | N/A | **10,215** | N/A |
| Defensive Tactics (¶ 2(a)) | N/A | 908 | **12,750** | **7,853** |
| Young Incarcerated Individual Management—Unit Management (¶ 3) | N/A | 881 | **N/A** | **881** |
| Direct Supervision (¶4) | 104 | N/A | **6,861** | N/A |
| Probe Team ("Facility Emergency Response Training") (¶ 1(c)) | 49 | N/A | **5,926** | N/A |
| Cell Extraction (¶ 2(b)) | 166 | N/A | **4,915** | N/A |
| Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e)) | N/A | | **2,899**[267] | N/A |

[267] This includes all Recruits beginning with the November 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors (including Executive Staff) | |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Completed** - 09/2018 - S.T.A.R.T. | **Completed** - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets[268] | TTS Records/Sign-In Sheets | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Ongoing** * Pre-Promotional Training * In-Service - A.C.T. | | **Completed** - June 2019 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |

---

[268] During the transition to LMS a mix of attendance record mechanisms may have been utilized including hand-written sign-in sheets, TTS, or RapidLD technology.

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | Finalized and consulted Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |
| | | *Deployment* | Provided in mandatory Pre-Service training | **Completed** - 09/2018 - S.T.A.R.T. - | | **Completed** - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets | | TTS Records/Sign-In Sheets |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |
| **SCM (Young Incarcerated Individual Management) (¶3)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | Finalized and consulted Monitoring Team and developed by JKM | | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC[269] | | |

---

[269] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |
| | | *Examination (¶ 6)* | Electronic – iPad | Hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by C.J.) | 8-hours (Only 2 hours required by C.J.) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to Post** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* | | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | N/A | N/A |
| | | *Length of Training* | | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* | | Any new investigators assigned to ID | | |
| | | *Deployment* | | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* | | N/A (see Investigations Section of this report) | N/A | N/A |
| | | *Length of Training* | | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Finalized and consulted Monitoring Team. | Finalized and consulted Monitoring Team. | N/A | N/A |
| | | *Length of Training* | No specified length in CJ, but 3 hours | No specified length in CJ | | |
| | | *Frequency* | All recruit classes that matriculated beginning in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 4-hours | 4-hours |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | One year after S.T.A.R.T. Every other year thereafter |
| | | *Status of Deployment* | **Ongoing** A.C.T. | **Completed** – 2018 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | TTS Records/Sign-In Sheets |
| | | *Examination (¶ 6)* | None | None |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | **Not Yet Developed** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD |
| | | *Frequency* | One year after A.C.T. Every other year thereafter | One year after A.C.T. Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Original refresher provided as part of ACT; revised refresher developed in Ninth Monitoring Period | |
| | | *Length of Training* | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T. Every other year thereafter | |
| | | *Deployment* | **Ongoing** - A.C.T. | |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| | | *Examination (¶ 6)* | N/A | |
| **Unit Management (¶ 3)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | |
| | | *Length of Training* | Approximately 3 hours | |
| | | *Frequency* | All Staff who work with Young Incarcerated Individuals | |
| | | *Deployment* | **Ongoing** -All Staff at RNDC | |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | |
| | | *Examination (¶ 6)* | N/A | |



**Appendix D: Flowchart of Promotions Process**

| | | | | |
|---|---|---|---|---|
| DCAS Exam | Civil Service Requirements:<br>> U.S. citizen; 21 years old+; valid Driver's License etc; language requirement; proof of identity<br>> educational or experience requirements<br>> drug test; medical, psychological & physical testing<br>> resident of NY or counties | DOC In-House Disqualifiers:<br>> dismissal from prior employment<br>> arrests total<br>> driving record total<br><br>AIU Background Investigation | Review of Candidate's History/Background Investigation by Director of AIU and Assistant Commissioner of AIU | **Correction Officer** |
| DCAS Exam (Completion of probation - 3 Years CO, unless extended) | Disqualifiers<br>> must hold valid drivers license<br>> resident of NY or counties<br>> 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Captain** |
| DCAS Exam (Completion of probation - 1 Year as Captain, unless extended) | Disqualifiers<br>> must hold valid drivers license<br>> resident of NY or counties<br>> 60 college credits | Review of UoF, Disciplinary, and other background information | Chief & Commissioner to Review | **Assistant Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 1 Year as ADW, unless extended) | Review of UoF and Disciplinary History, and Performance Evaluations | Re-Assignment Board Review<br><br>Rating, Interview, Candidates Ranked | Chief & Commissioner to review candidates recommended by Re-Assignment Board | **Deputy Warden** |
| Tele-Type Announcement (Completion of probation - 18 months in eligible title (Captain/ADW/DW), unless extended) | HR reviews UoF and Disciplinary History, and Performance Evaluations | Promotion Board Review, interview candidates and make recommendations | Chief & Commissioner to review candidates recommended by Promotion Board | Mayoral Approval → **Warden** |
| No specific time requirement that you have to be a Warden for, in order to be considered for a Chief-level appointment | Nunez Screening, including review of UoF and Disciplinary History | Commissioner and Chief of Staff | Mayoral Approval | **Chief** |