# Second Remedial Order Report of the
## *Nunez* Independent Monitor

**Second Remedial Order Period**
**January 1, 2021 – March 31, 2021**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Introduction .................................................................................................................... 1

Key Priorities ................................................................................................................. 2

- Systemic Issues .................................................................................................... 3

- Operational Priorities ........................................................................................... 3

Current Status of Use of Force Investigations ............................................................... 5

Backlog of Pending Disciplinary Matters and Delayed Accountability ......................... 6

- Adjudication of Disciplinary Proceedings ............................................................ 7

- Status of Disciplinary Cases ................................................................................. 9

- Staffing of the Trials Division .............................................................................. 9

- Prioritization of Cases & Settlement Offers ......................................................... 10

- OATH Pre-Trial Conferences ............................................................................... 11

- Additional OATH Proceedings ............................................................................. 13

- OATH Trials ......................................................................................................... 15

**Addressing the Lack of Timely Accountability ......................................................... 16**

**Appendix A: Status of Trials conducted between September 1, 2020 and April 30, 2021 ...... i**

## Introduction

This is the Second Remedial Order Report by the *Nunez* Monitoring Team, as required by the Court's August 14, 2020 Remedial Consent Order Addressing Non-Compliance (dkt. 305), Section F, ¶ 7, in *Nunez v. City of New York et al.,* 11-cv-5845 (LTS) (Southern District of New York). The Remedial Order was entered by the Court to address persistent areas of Non-Compliance. This report is intended to provide a brief update on the issues underlying the Department's systemic problems that must be addressed in order for overall progress to be realized.

This Second Remedial Order Report is being filed during a period of significant transition for the Department. Commissioner Brann ended her four-year tenure just a few days before this report was filed, and Commissioner Vincent Schiraldi's tenure began two days ago on June 1, 2020. This change in leadership is expected to impact the Department's work given potential staffing changes and a shift in priorities and focus. In an effort to support the transition, once the new Commissioner's appointment was announced, the Monitor, Deputy Monitor and Associate Deputy Monitor met with Commissioner Schiraldi, and the Monitoring Team has also spoken with the Commissioner's transition team on various matters. The meeting with Commissioner Schiraldi was positive and informative and the Monitoring Team looks forward to working with him and his team and maintaining a collaborative and productive working relationship with the Department.

The Monitoring Team recently filed the Eleventh Monitor's Report (dkt. 368) which provided extensive data, examination, and analysis of the current state of affairs at the Department through December 2020. As discussed in the Eleventh Monitor's Report, in nearly every substantive area of the Consent Judgment, the Department's practices remain problematic, and progress remains insufficient. Furthermore, the Monitoring Team's analysis identified several systemic problems facing the Department that must be addressed to support meaningful improvements to practice. In this Second Remedial Order Period (January to March 2021), which encompasses the three months following the end of the Eleventh Monitoring Period, no significant changes occurred and thus the information provided in the Eleventh Monitor's Report

remains both accurate and pertinent for the time period this report is intended to cover.[1] Given the slow pace of reform and the systemic issues that must be addressed, significant changes (either positive or negative) are unlikely within a three month period. As a result, the Monitoring Team focused this report on problem-solving efforts designed to advance the overall reform, instead of expending its finite resources to provide updates on specific requirements. If the macro-level issues are not identified, examined, and resolved, Staff practice will not improve.

## Key Priorities

The Consent Judgment and Remedial Order impose hundreds of complex requirements on the Department, all of which are intended to improve practices related to the use of force. However, the Monitoring Team's years of work with the Department and experience with systems throughout the country indicate that it is critical to adopt an appropriate cadence in order to *catalyze* the necessary change in practice. The agency simply cannot attempt to fix everything at once. Expecting such ignores the need to properly sequence reform and underestimates the difficulty of making change while maintaining a 24/7 operation, particularly given a workforce with little exposure to other correctional systems and best practice. With respect to the Remedial Order, certain requirements are foundational and so they must be implemented before changes can be made. Many requirements are interrelated and thus one change can *positively* impact multiple issues. Therefore, each of the Remedial Order requirements cannot be implemented immediately, independently, and at the same pace. The Monitoring Team's work with the Department has reaffirmed that progress has been achieved only when initiatives are appropriately sequenced, incrementally, and thoughtfully planned out, and followed by a period of implementation in which performance is consistently reinforced and evaluated. It is therefore critical that a small number of strategic initiatives are prioritized. Accordingly, the Monitoring Team has identified three areas of focus related to overarching, largescale issues and two operational areas of focus that are expected to advance the overall reform effort once they are

---

[1] Remedial Order § F., ¶ 7(ii) requires specific data points to be reported in each Remedial Order Report. This report includes current data regarding § F., ¶ 7(ii)(i) and (j), but the Monitoring Team is not in a position to provide the data for § F., ¶ 7(a)-(h) and (k)-(l) from January to March 2020 at this time given the need to prioritize systemic issues. The full gamut of required data will be provided in the Twelfth Monitor's Report.

appropriately designed and adopted by the Department, and implemented by Staff. Each is discussed in turn below.

- *Systemic Issues*

Although the problems facing the Department are many and varied, three systemic issues underlie them: (1) poor Facility leadership, (2) poorly deployed Staff resources, and (3) failure to hold Staff accountable in a timely manner. The Monitoring Team made initial recommendations to address these areas in the Eleventh Monitor's Report at pgs. 14-16. Regarding Facility leadership, efforts are underway with the City to determine how and whether the criteria for selecting Wardens can be broadened. The Monitoring Team is working with the City's Law Department and the Department to identify the specific rules and regulations that govern this issue to develop concrete next steps for advancing this recommendation. Regarding Staff deployment, the Monitoring Team is in the process of identifying a consultant to conduct a staffing/post analysis and intends to begin the project in July 2021, with the goal of completing this project within 6- to 9-months thereafter. Finally, the Department must significantly shorten the time within which formal discipline is imposed following use of force-related misconduct, as explored in more detail in this report below.

- *Operational Priorities*

The Monitoring Team has identified two operational areas of focus that must also be prioritized to achieve the overall goal of reducing the misuse of force in the agency.

First, the Department's practices regarding Emergency Response Teams[2] must be overhauled given their central role in unnecessary and excessive uses of force, as described at length in the Eleventh Monitor's Report (*see* pgs. 38-51, 110-111). Reforming the way Emergency Response Teams are utilized will also minimize the use of Intake areas and will address the interrelated goals of § A., ¶ 3 (Revised De-Escalation Protocol) and § A., ¶ 6 (Facility Emergency Response Teams) of the Remedial Order. More specifically, the Department must reconstitute its approach by:

(1) improving the Supervisors' decision-making regarding the appropriate level of response to a call for assistance, in order to empower housing unit Staff to manage issues on the

---

[2] There are at least two types of Emergency Response Teams: (1) Probe Teams, which consist of Facility-based Staff; and (2) the Emergency Services Unit ("ESU").

housing unit (as appropriate) and to eliminate the default deployment of Emergency Response Teams when they are not necessary,

(2) increasing the use of *de-escalation* teams, thereby countering the current practice of using traditional Emergency Response Teams to resolve all issues,

(3) revising the deployment procedures for the Emergency Response Team by: (a) limiting the number of Staff who are deployed on a response team to only those actually required to regain control of the situation (*i.e.*, stop calling "all available Staff" to respond to an alarm), (b) no longer relying on Staff assigned to Intake to staff the Emergency Response Teams, and (c) ensuring Staff with inappropriate disciplinary histories are not assigned to Emergency Response Teams.

Reformulating the concept of and procedures for Emergency Response Teams and then implementing that approach is not a simple or quick undertaking. The Department's current practices are long standing and deep seated, so key staff at all levels of the agency must be involved in the effort to consider how these practices can and must change. The Monitoring Team recently shared extensive feedback with the Department with guidance for accomplishing these goals and intends to work closely with the Department to implement these changes.

Second, Supervisors' skilled oversight of use of force incidents—both in the moment and after the fact—is essential for providing real-time feedback and setting expectations for appropriate conduct and is also required by Remedial Order § A., ¶ 1 (Use of Force Reviews). This is why improving the execution of Rapid Reviews must be prioritized. As discussed in the Eleventh Monitor's Report (at pgs. 63-68 and 104-108), the Rapid Review process has improved, but more work is needed to ensure that the assessments are reliable. In particular, Rapid Reviews must more reliably identify all relevant issues that occurred in the incident and whether an incident is avoidable. Further, appropriate corrective action for the relevant Staff Member must be recommended more consistently when violations are identified, in particular for procedural violations (such as security breaches). Finally, the Department must not only have a process to identify and address inadequate, unreasonable, or biased Rapid Reviews, but must more consistently take appropriate action with the individual that conducted the Rapid Review— including formal discipline if warranted.

**Current Status of Use of Force Investigations**

Most cases that are referred for disciplinary action are first investigated by the Investigation Division ("ID"). Therefore, an update on the status of all use of force investigations is provided before delving into details regarding pending disciplinary matters. For incidents occurring between January 1, 2018 and March 31, 2021, 95% of the investigations were closed as of May 15, 2021. A more detailed illustration of ID's caseload as of May 15, 2021 is presented in the table below.

| Investigation Status of UOF Incidents Occurring Between January 2018 to March 2021 *as of May 15, 2021* | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2018** | | **2019** | | **2020** | | **Jan. to March 2021** | | **Total** | |
| **Total UOF Incidents** | **6,302** | | **7,500** | | **6,406** | | **2,092** | | *22,300* | |
| **Pending Preliminary Reviews/ Intake Investigations** | 0 | **0%** | 8 | **<1%** | 4 | **<1%** | **0** | **0%** | *12* | *<1%* |
| **Pending ID Investigations** | **0** | **0%** | 4 | **<1%** | 672 | **10%** | 397 | **19%** | *1,073* | *5%* |
| **Closed Investigations** | 6,302 | **100%** | 7,488 | **~100%** | 5,730 | **89%** | 1,695 | **81%** | *21,215* | *95%* |

Intake Investigations continue to be a critical close-in-time review of incidents. Further, as of May 31, 2021 (following the close of the Second Remedial Order Period on March 30, 2021), **the backlog[3] of ID investigations has been closed, meaning there are no pending investigations for incidents that occurred prior to April 16, 2020**. This is a critical accomplishment, and the elimination of the backlog and more contemporaneous Intake Investigations is obviously a key point of progress toward the goal of timely discipline, but it also means that the backlog of cases has moved out of ID and into the disciplinary process, creating a backlog in the Trials Division. This is discussed in detail below.

---

[3] The backlog of ID investigation is defined as any investigation of an incident that occurred on or before April 16, 2020.  *See* Remedial Order, § B., ¶ 1.

**Backlog of Pending Disciplinary Matters and Delayed Accountability**

The overall disciplinary process is convoluted and inefficient and the system is overwhelmed. The full process, with associated timelines, is presented below:



The process to impose discipline could take more than one year *if* typical processing timelines are met, which they rarely are. This in and of itself is concerning. However, a number of other factors further protract the imposition of discipline, including:

1. The number of cases referred for formal discipline has ballooned, and Trials' workload has increased exponentially. Each Trials attorney has a very large caseload, which impacts their ability to close cases in a timely manner.

2. Staff generally are no longer willing to settle disciplinary matters without at least an *initial* Pre-Trial conference,[4] which has substantially increased the demand for Pre-Trial conferences before the Office of Administrative Trials and Hearings ("OATH"), which is a separate agency from the Department.

3. OATH is not currently capable of timely managing the increased demand for both Pre-Trial Conferences and trials, which has exposed various shortcomings.

- *Adjudication of Disciplinary Proceedings*

Tenured civil service employees are afforded certain rights by New York State Civil Service Law §75 (2) prior to the imposition of discipline. Further, the Department bears the burden of proof to impose discipline by a preponderance of the evidence. Any employee who is the potential subject of disciplinary action has the following rights, among others, before any disciplinary action is taken:[5]

- a right to representation, with advance notice of this right in writing;

- a reasonable period of time to obtain representation;

- a right to timely action and the statute of limitations to bring charges is 18 months after the alleged misconduct;

- written notice of charges and at least eight days to submit an answer (however not required), with an option for short extension;

- a right to a hearing;

---

[4] *See also* Eleventh Monitor's Report at pgs. 246 to 247.

[5] Pursuant to New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3. an employee may be suspended without pay for up to 30 days after being notified of charges and awaiting the outcome of the hearing. If the charges are related to an arrest, Correction Officers can be suspended indefinitely.

- a right to summon witnesses on the employee's behalf (including ability to examine and cross-examine)

Discipline may be imposed on tenured Staff via a settlement directly negotiated between the Respondent Staff Member (and their counsel) and the Department, following a Pre-Trial Conference with an Administrative Law Judge ("ALJ"), or following a trial before an ALJ. The adjudication of discipline for tenured Staff has been delegated by the Department to the Office of Administrative Trials and Hearings ("OATH"), an administrative law court that conducts adjudication hearings pursuant to New York State Civil Service Laws § 75. The OATH Trials Division adjudicates cases referred by multiple City agencies, boards and commissions, not just DOC. Its caseload includes employee discipline and disability hearings for civil servants as well as cases dealing with the conflicts of interest law, the retention of police-seized vehicles prior to forfeiture proceedings, City-issued license suspensions and revocations, City vendor contract disputes, violations of consumer and worker protections laws, violations under the City Human Rights Law, among others. OATH proceedings are conducted by ALJs who are appointed to five-year terms.  OATH proceedings are governed by rules of procedure maintained by the OATH Trials Division.[6]

If a Staff Member elects to have their case heard by OATH, a Pre-Trial Conference is convened by an ALJ in an attempt to facilitate a settlement. If a settlement cannot be reached, a trial is scheduled in which an ALJ (and a different ALJ from the one that conducted the Pre-Trial Conference) hears and assesses the evidence to evaluate whether or not the Staff Member has violated policy. The ALJ then issues a written Report and Recommendation ("R&R") to the Commissioner. If the ALJ determines that a violation occurred, the R&R also includes a proposed penalty, with penalty ranges set by law to include a reprimand, a fine of up to $100, a loss of compensatory days (or suspension without pay) of up to 60 days, demotion in title, or termination.[7] The Commissioner makes the ultimate decision regarding the imposition of discipline and can accept the factual findings and penalty recommendation of the ALJ or may modify them, as appropriate, to resolve the case. The Commissioner's determination (and

---

[6] *See* OATH's Rules of Procedures at https://www1.nyc.gov/site/oath/trials/rules-of-practice.page.

[7] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

It is important to note that the range of penalties allowed under the NY Civil Service Law has an impact on **all** discipline imposed by the Department, particularly the fact that the maximum loss of compensatory days is capped at 60 days. Therefore, almost all cases that are settled and/or resolved for compensatory days are generally capped at 60 days or less. If the Department were to seek a greater penalty, the Staff Member could otherwise take their case to trial at OATH in which the sanction would be capped at 60 days, unless the ALJ recommends demotion or termination. Therefore, a Staff Member will rarely elect to settle a case for a disciplinary sanction beyond the 60 days permitted by law.

- *Status of Disciplinary Cases*

  Overall, the productivity of the Department's Trials Division increased in 2020 compared to 2019, as discussed in the Eleventh Monitor's Report at pg. 250. That said, the number of cases referred to the Trials Division for formal discipline has exponentially increased and continues to rise as demonstrated in the chart below. As of the end of March 2021, over 1,600 disciplinary cases were pending that relate to approximately 1,200 Staff (some Staff have more than one pending disciplinary matter) and approximately 1,030 UOF incidents. In the three months since the end of the Eleventh Monitoring Period, approximately 350 new cases were referred to the Trials Division, while only about 180 cases closed during the same period of time. As a result, the number of pending cases increased even further.

| Status of Disciplinary Cases by Date of Incident *As of April 15, 2021* | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Date of Incident | | | | | | | | | | | | | | Total | |
| Case Status | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | Jan. to March 2021 | | | |
| | 698 | | 490 | | 623 | | 780 | | 826 | | 326 | | 25 | | 3768 | |
| Staff Cases Closed | 696 | 100% | 479 | 98% | 477 | 77% | 307 | 39% | 150 | 18% | 33 | 10% | 0 | 0% | 2142 | 57% |
| Staff Cases Pending Disposition | 2 | 0% | 11 | 2% | 146 | 23% | 473 | 61% | 676 | 82% | 293 | 90% | 25 | 100% | 1626 | 43% |

- *Staffing of the Trials Division*

While the Trials Division has demonstrated improved productivity in light of the challenges from COVID-19 and the unions, and the influx of the ID backlog into Trials, the current staffing is simply insufficient to address the current caseload as the pending cases increased by 12% between December 31, 2020 and March 31, 2021. While certain efficiencies in the Trials

Division processes can and must be implemented, the critical focus is on obtaining more staffing. The staffing complement for the Trials Division remained largely the same as it was at the end of Eleventh Monitoring Period, there is one Deputy General Counsel, one Executive Director, two Directors, 16 attorneys, two interns, one investigator, and 12 support staff. One director left following the close of the Eleventh Monitoring period (which is why there are now two directors instead of three directors).

In April 2021, the City and the Department reinvigorated efforts to recruit, hire and onboard additional Staff for the Trials Division. The Department has posted these vacancies and is seeking to hire at least ten additional attorneys (with various experience levels) and some additional support staff. Increasing the size of Trials' Division workforce is critical to the Department's efforts to address the backlog of pending disciplinary matters and so the Monitoring Team will closely scrutinize the efforts to identify and recruit staff.

- *Prioritization of Cases & Settlement Offers*

Given the current state of affairs, prioritizing cases for adjudication is critical as the system simply cannot address all of the pending cases simultaneously. However, compared to previous efforts to address the backlog of investigations, addressing the backlog of disciplinary cases is much more complicated given that the Department must coordinate with the Respondent, their counsel, and often OATH. The selection of cases for prioritization must balance multiple concerns—the length of time a case has been pending, the severity of the misconduct, the extent to which the Staff Member has other pending matters[8] and/or if the incident involved other Staff Members who have been charged with misconduct.[9] Unfortunately, these considerations cannot be easily or cleanly ranked in terms of their importance. They are all important, and they intersect in infinite ways across the over 1,600 pending cases. As a result, the strategy must involve selecting a mixture of case types rather than using a single factor or criterion. The Trials Division has employed these considerations when prioritizing cases. Given the enormity and

---

[8] For Staff with multiple pending matters, in some cases settling these matters piecemeal may not be an option either because the Trials Division believes strategically that these matters must all be addressed together, or the Staff Member refuses to settle cases individually.

[9] For an incident that may involve multiple other Staff Members, a holistic review of the matter may be needed and individual resolutions cannot always be achieved until the case is evaluated as a whole.

importance of the task, the Monitoring Team intends to work with the Trials Division to support and refine the process for selecting which cases to prioritize.

As part of its effort to expedite closure, and encourage settlements of cases, the Trials Division has attempted to address certain lower-level misconduct using a Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to five compensatory days) or offering that the imposed discipline (generally between five and 20 days) will only remain on the Staff Member's record for one year[10] instead of five years.[11] These two options are reasonable given that the range of misconduct that is now directed through Trials varies in its severity (compared with historical practice in which ID was only investigating the most egregious cases and so only cases with egregious misconduct were referred to the Trials Division). Unfortunately, as discussed in the Eleventh Monitor's Report at pg. 245-246, counsel representing the Correction Officers rejected the approximately 100 settlement offers made by the Trials Division to address this lower-level conduct. The Trials Division reports that they plan to make another attempt to settle a group of cases with lower-level misconduct in the next month.

- *OATH Pre-Trial Conferences*

OATH has taken many steps to address the Remedial Order requirement § C., ¶ 4 that 50 use of force related Pre-Trial Conferences are convened each month. OATH worked with the Department to conduct all Pre-Trial Conferences virtually given COVID-19 and has worked through a number of logistical and technical issues to routinely conduct these proceedings. The monthly target of 50 use of force related Pre-Trial Conferences has been exceeded since the Remedial Order was entered.[12] In the Eleventh Monitoring Period, far more use of force related

---

[10] The case will not be removed from the Staff Member's file if during this one-year period, the Staff Member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[11] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the Staff Member's first offense.

[12] It is important to note that the Department and OATH also convene conferences and trials related to non-UOF matters. These are conducted above and beyond any conferences convened for UOF related matters.

Pre-Trial Conferences were convened than in prior Monitoring Periods.[13] Further, the number of Pre-Trial Conferences convened in three months of the Second Remedial Order Period (January to March 2021) was almost the same amount convened in *all six months* of the Eleventh Monitoring Period. The chart below demonstrates the outcome of the initial Pre-Trial Conferences from July 2020 to March 2021.

| Total Pre-Trial Conferences | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | Matters & Staff | |
|---|---|---|---|---|---|---|---|---|---|---|
| Required | Took Place | Settled | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | | Unique Matters | Staff Members |
| **July to December 2020 (Eleventh Monitoring Period)** | | | | | | | | | | |
| **225**[14] | **303** | *111* | *10* | *44* | *124* | *12* | *2* | | **274** | **198** |
| | 100% | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | | |
| **January to March 2021** | | | | | | | | | | |
| **150** | **291** | *148* | *3* | *71* | *64* | *4* | *1* | | **256** | **176** |
| | 100% | *51%* | *1%* | *24%* | *22%* | *1%* | *0%* | | | |
| **Total – July 2020 to March 2021** | | | | | | | | | | |
| **375** | **594** | *259* | *13* | *115* | *188* | *16* | *3* | | **503** | **362** |
| | 100% | *44%* | *2%* | *19%* | *32%* | *3%* | *1%* | | | |

The Monitoring Team appreciates and acknowledges that over 200 more conferences have been convened then required. However, despite the fact that 594 use of force related Pre-Trial Conferences (related to 503 unique disciplinary cases) have been convened between July 2020 and March 31, 2021, the current capacity for Pre-Trial Conferences is not sufficient to manage the large volume of pending disciplinary cases that require a conference with OATH, particularly given the union's general unwillingness to settle cases outside of the OATH process and the fact that many cases require more than one conference in order to settle. Accordingly, the minimum number of use of force-related Pre-Trial Conferences convened each month must be *further* increased. The Monitoring Team will work with the relevant stakeholders from the City, Department, and OATH to identify the specific number of use of force-related Pre-Trial Conferences that should occur each month, along with any additional resources that are necessary to support this increase.

---

[13] Approximately 40 use of force related OATH Pre-Trial Conferences were held during the *entire* Tenth Monitoring Period. However, during this time OATH was also suspended for almost three months due to COVID-19.

[14] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

- *Additional OATH Proceedings*

Unfortunately, the majority of cases are not settled after the initial Pre-Trial Conference. During the Second Remedial Order Period, 148 (51%) of the 291 cases with Pre-Trial Conferences were settled after the initial Pre-Trial Conference. This is an improvement over the Eleventh Monitoring Period in which it took six months (instead of three months) to settle less cases (111) after the *initial* Pre-Trial Conference. However, at least another 142 cases (49%) in this Second Remedial Order Period required additional work – including subsequent conferences to discuss the matter in 71 cases and trials in 64 cases. While it is encouraging that more cases settled in the last three months compared to the Eleventh Monitoring Period (148 cases versus 111 cases) in a shorter period of time, the number of cases that require at least one additional subsequent proceeding creates a significant burden on the system. Further compounding the issue is that these subsequent proceedings are often scheduled (and occur) many months after the initial Pre-Trial Conference, accumulating yet another delay.[15]

As an initial matter, the Monitoring Team encourages all stakeholders to work together to attempt to reach resolution of the matter during the initial Pre-Trial Conference. **In particular, with respect to the ALJ's, the Monitoring Team recommends that all efforts are exhausted to work with the stakeholders to settle the case at the initial Pre-Trial Conference**. To the extent that a subsequent conference is need, increasing the number of OATH Pre-Trial Conferences (discussed above) will likely enhance the ability to conduct subsequent proceedings (if needed) closer in time to the *initial* Pre-Trial Conference. However, additional steps must be taken to ensure that any follow-up conferences that are required occur close in time to the initial Pre-Trial Conference so that these cases can also be resolved timely.

There is significant demand for a trial date following a Pre-Trial Conference. Over 180 cases have requested a trial, although historical data suggests that most of these cases will eventually settle. That said, the system simply cannot handle the number of requests for trials. Over the five years since the Consent Judgment has been in effect, only a very small number of cases ultimately go to trial – 23 UOF trials occurred between November 1, 2015 and April 30, 2021. While 13 of these 23 trials have been convened in the last eight months (September 2020

---

[15] It is worth noting that these subsequent proceedings are also often adjourned to an even later date, further protracting the process.

and April 2021), the increased number of trials held does not demonstrate a capacity to accommodate the overall number of requests for trials. Further reinforcing this point, a total of 251 trials were conducted by the OATH Trials Division across *all* City agencies from July 2020 to January 2021. This highlights the need for all efforts to be made to settle cases.

The process currently used to schedule a trial is not reasonable, as it creates the opportunity to delay resolution of the matter as the trial date often looms far into the future, discouraging resolution of the case in the meantime. First, by way of example, 81% of 124 cases that were scheduled for trial during the Eleventh Monitoring Period were *scheduled* to occur at least 100 days after the *initial* Pre-Trial Conference. As of May 11, 2021, of those cases scheduled for trial, about 63% are still pending and the trial did not occur on the scheduled date and the case has been *further* adjourned. Of the remaining cases, 23% have settled (or are in the process of being closed), and 10% have had a trial (or the trial is ongoing).

Despite the high demand for trial dates, few trials actually move forward, and trials for use of force related matters are only conducted on a small number of days each month. Of the 13 trials that were conducted between September 1, 2020 and April 30, 2021,[16] trials were **only** conducted on 25 days during this time period as outlined in the chart below.[17]

| | September 2020 | October 2020 | November 2020 | December 2020 | January 2021 | February 2021 | March 2021 | April 2021 |
|---|---|---|---|---|---|---|---|---|
| Number of days in which a trial occurred | 1 | 1 | 1 | 4 | 3 | 3 | 7 | 5 |

The protracted scheduling of trials and the inefficient use of trial dates simply delay the ultimate disposition. These cases could be resolved more quickly if any subsequent proceedings occurred closer in time to the initial Pre-Trial Conference. Therefore, the process for scheduling a trial must be overhauled. Not only is time wasted between events scheduled for individual cases, but this process is ripe for abuse by Respondents who can easily delay the resolution of their cases. In particular, it appears that the actual scheduling of trials may need to be revised to

---

[16] Due to the COVID-19 pandemic, trials were not conducted between March and August of 2020.

[17] Four additional trial days are scheduled in May and June 2021 related to the three trials that are still pending.

allow for greater flexibility given that the majority of trials originally placed on the schedule later become unnecessary when the case settles.

- *OATH Trials*

The problems plaguing the OATH process extend beyond the long periods of time to actually schedule subsequent proceedings. The current status of the 13 trials that were conducted between September 2020 and April 2021 illustrate the fact that the process of conducting a trial takes too long. Of these cases, R&Rs have been issued in *only* two cases, R&Rs are pending for eight cases (five of which have been pending for at least two months), and trials are ongoing for three cases. It is worth noting the Department is seeking termination in seven of the 13 cases, while the relinquishment of compensatory days of 30 days or more is sought in the other six cases. The status of each individual trial is outlined in Appendix A.

Eight of the 13 trials that occurred since September 2020 required more than one trial day. Two trials requiring multiple days were concluded within a few weeks. However, the other six trials that required multiple trial days took at least a month to complete with four of these trials requiring at least two to six months to complete. The scheduling process for conducting a trial that requires multiple days is nonsensical. While consecutive trial days may not always be possible, it is entirely unreasonable that trial dates are separated by a month, or even worse, by six months. Further, in at least some cases, the record remains open following the trial, which further protracts the process. Finally, following the completion of the trial, the fact that the ALJ's R&Rs remain pending for several months is unacceptable.

Finally, the Monitoring Team has analyzed a number of R&Rs in prior Monitor's Reports (see Seventh Monitor's Report at pgs. 152 to 158 and Appendix C, Eighth Monitor's Report at pgs. 183 to 184 and Ninth Monitor's Report at pgs. 206 to 208). In the Eleventh Monitoring Period, the Monitoring Team developed a comprehensive assessment of all R&Rs related to use of force incidents that have been adopted and/or modified by the Commissioner (*see* Eleventh Monitor's Report at pgs. 255 to 257). Going forward, the Monitoring Team will closely scrutinize R&Rs to determine whether they have reasonably assessed the available evidence and, to the extent that misconduct has been identified, to assess whether the discipline imposed is appropriate, meaningful, and consistent with the Disciplinary Guidelines as required by Remedial Order § C., ¶ 5.

### Addressing the Lack of Timely Accountability

Notwithstanding the significant efforts that have been made to address the dearth of the accountability in the Department, it is simply not enough and illustrates the flaws in the system that must be rectified. As discussed above, the complexity of the formal discipline process, the number of cases requiring adjudication, and the various procedural shortcomings of the OATH process combine in a way that undermines the goal of timely discipline. In order to address the lack of timely accountability, the following steps must be taken:

- The City and Department must work as expeditiously as possible to recruit, hire, and onboard additional staff for the Trials Division to address the large influx of cases.
- Significantly more OATH Pre-Trial Conferences must be held each month so that the large number of pending cases can be heard expeditiously.
- If a case can reasonably be settled, all efforts should be made to reach a resolution at the *initial* Pre-Trial Conference, so additional resources are not utilized unnecessarily.
- For those cases that may require subsequent proceedings before OATH, these must occur closer in time to the initial Pre-Trial Conference.
- For those cases that do go to trial, greater efficiency in scheduling multiple trial dates is needed and the R&Rs rendered by the ALJs must be completed more quickly.

Following the close of the Second Remedial Order Period, the Monitoring Team shared detailed and specific recommendations with the City, OATH, and the Department to address these problems and began work to address them. The Monitoring Team will work closely with these stakeholders to develop concrete solutions to each of the problems discussed in this report.

_Appendix A: Status of Trials conducted between September 1, 2020 and April 30, 2021_

- Trial 1 – UOF incident occurred in August 2017 and one day trial heard in September 2020. Penalty sought: 60 days. R&R still pending, over 8 months later.

- Trial 2 – UOF incident occurred in September 2017 and one day trial heard in October 2020. Penalty sought: 55 days. R&R rendered about 50 days after trial; wrongdoing was found and a penalty of 55 compensatory days was recommended, adopted by the Commissioner and the discipline was imposed.

- Trial 3 – UOF incident occurred in January 2018 and two-day trial occurred with one trial date in November 2020 and the other in December 2020. Record remained open for about one month after close of trial. Penalty Sought: Termination. R&R still pending over 4 months after the record was closed.

- Trial 4 – Three separate UOF incidents involving the same Staff Member that occurred in February, July, and August 2018 and the eight-day trial covering all three incidents is still in progress. Three trial days took place in December 2020, an additional trial day in February 2021, another in March 2021, one trial day is scheduled for June 2021 and two trial days are scheduled for July 2021. This eight-day trial will take place over at least a seventh-month period. Penalty Sought: Termination.

- Trial 5 – UOF incident occurred in October 2019 and trial involved four separate Staff Members.[18] The three-day trial occurred over the span of one and a half-months, with two trial days in January 2021 and one in March 2021. Penalty Sought: Termination.[19] R&R still pending over 2 months later.

- Trial 6 – Two separate UOF incidents involving the same Staff Member occurred in March 2019 and October 2019 and a one-day trial occurred in January 2021. Penalty Sought: Termination. R&R still pending over 3 months later.

- Trial 7 – UOF incident occurred in March 2018 and two-day trial occurred with one trial date in February 2021 and one in April 2021. Penalty Sought: 40 days. R&R pending over 1 month.

- Trial 8 – UOF incident occurred in October 2018 and three-day trial occurred in February 2021 and March 2021. Penalty Sought: Termination. R&R rendered about one month after trial; wrongdoing was found and a penalty of 60 compensatory days was recommended. The Staff Member was terminated following an Action of the Commissioner.[20]

- Trial 9 – Two separate UOF incidents involving the same Staff Member that occurred in September 2017 and March 2020 and the four-day trial covering both incidents is still in progress. One trial day took place in March 2021, an additional trial day in April 2021,

---

[18] Three of the four Staff Members settled their cases during the trials.

[19] Termination was only sought for the Staff Member that ultimately stood trial. The Department sought compensatory days for the three Staff Members that ultimately settled the matter.

[20] An appeal of this decision is currently pending with the Department of Citywide Administrative Services.

another is scheduled for May 2021, and a final trial day is scheduled for June 2021. This four-day trial will take place over a three and a half-month period. Penalty Sought: Termination.

- Trial 10 – UOF incident occurred in May 2018 and two-day trial occurred in March 2021. Record remained open for about two weeks after close of trial. Penalty Sought: 50 days. R&R still pending over 1 month after record closed.

- Trial 11 – UOF incident occurred in January 2018 and one day trial occurred in April 2021. Penalty Sought: Termination. R&R pending over 1 month later.

- Trial 12 – UOF incident occurred in January 2020 and the two-day trial involving three separate Staff Members is still in progress. One trial day took place in April 2021 and an additional trial day is scheduled for June 2021. This two-month trial will take place over a two-month period. Penalty Sought: 30 days for each Staff Member.

- Trial 13 – UOF incident occurred in March 2019 and one day trial occurred in April 2021. Penalty Sought: 45 days. R&R pending over 1 month later.