## OFFICE OF THE MONITOR
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

Steve J. Martin
Monitor

Anna E. Friedberg
Deputy Monitor

178 Columbus Avenue, #230842
New York, NY 10023-9998
+1 646 895 6567 | afriedberg@tillidgroup.com

August 24, 2021

**VIA ECF**
The Honorable Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

Re: *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF)

Dear Judge Swain,

    The Monitoring Team writes to advise the Court of our grave concerns about the conditions and pervasive high level of disorder and chaos in the New York City jails. The Monitoring Team's long-standing concerns regarding the systemic dysfunction in the jail facilities have been detailed in the eleven Monitor's reports and two Remedial Order reports filed to date. This status report is being provided to the Court because the conditions reported therein have further deteriorated in the past few months with a steady increase in serious use of force incidents, a disturbing rise in the level of security lapses and unchecked breaches and failures of basic security protocols, and instances of inadequate supervision, all of which are compounded by staffing challenges. The pervasive and systemic issues currently impacting Facility safety are: (1) the mismanagement of staff deployment within the Facilities; (2) staff's failure to attend to basic security protocols and to provide basic services to people in custody; and (3) the lack of accountability for misconduct in this system.

*Current State of Affairs*

Over the past few months, the number and rate of use of force incidents continued to rise and remains unreasonably high. These incidents are marked by security lapses and breaches of the most fundamental duties of staff such as abandoning housing units, failing to secure doors, and allowing detainees access to highly secure areas that should never be entered by people in custody. To illustrate the interconnectedness of these failures and how one failure can spawn others, a series of incidents is set out below.

> June 23, 2021: An assailant threw scalding water on another detainee, causing 2nd degree burns all over the victim's body. The assailant was able to carry out this assault after passing through an unsecured door. This single incident was predicated on multiple security breaches and spawned multiple applications of force and multiple serious injuries to no less than four detainees and multiple officers.
>
> June 27, 2021: One of the assailants involved in the attack described above was himself stabbed after being transferred to the Department's "TRU"[1] unit as a consequence for his aggressive behavior.
>
> August 5, 2021: Following another security lapse, the assailant in the June 23rd incident, who was placed in a restrictive housing unit at another facility, assaulted and slashed a correction officer and then with the help of a confederate, assaulted another detainee. These assaults resulted in serious injuries to the staff member and two detainees (both the assailant and the victim sustained serious injuries).

Recently, a disturbing pattern has been noted within the Intake units in which individuals have languished in Intake well beyond 24 hours (the timeframe within which they should have been assigned to a housing unit). The delay in transferring detainees out of Intake has also resulted in significant delays in providing required medical services. Further, the Monitoring Team received reports that food and other basic services are not being routinely provided to detainees in Intake and that other services within the Facilities have also been compromised.

---

[1] The TRU unit is specialized program for youth with aggressive behaviors; it is not considered restrictive housing because youth in the TRU unit receive the same number of lock-out hours (14) as youth in the General Population.

Furthermore, the Department's response to detainee self-harm incidents continues to be of great concern to the Monitoring Team. The Monitoring Team is aware of at least four presumed in-custody suicides and other troubling self-harm incidents involving detainees since December 2020, with most, if not all cases, raising questions about the adequacy of staff's response to detainees who are at risk of self-harm.

What is most notable and very alarming about the current state of affairs is that the deterioration of basic security protocols and denial of basic services and protections coincides with a spike in employee absenteeism that began in April 2021. Excessive and unchecked staff absences has led to other officers having to work double and triple shifts, further compromising the safety of the Facilities. The size of the Department's complement of staff,[2] particularly the number assigned to the jails, is highly unusual and is one of the richest staffing ratios among the systems with which the Monitoring Team has had experience. As discussed in more detail below, there are also questions about whether staff are being efficiently and effectively assigned and deployed to posts within the Facilities.

Further compounding these staffing issues is the corresponding and incredibly high number of staff who are unavailable to work in the jails. DOC staff have unlimited sick time, which is being increasingly utilized and possibly abused. The Department's level of absenteeism, which has always been relatively high, grew considerably during March 2020 (when the COVID pandemic hit New York City) and has recently reached a crisis level beginning in Spring 2021.

---

[2] Uniformed staff hold one of six ranks: Correction Officers (COs) are supervised by Captains, who are supervised by Assistant Deputy Wardens (ADWs), who are supervised by Deputy Wardens (DWs), who ultimately report to the Warden. The Wardens report to Bureau Chiefs who ultimately report to the Chief of Department.

3

As of the end of July 2021, the Department reported that of the approximately 8,500 uniformed staff members, approximately 1,650 were out on sick leave and another 1,400 were medically monitored (in most cases meaning they may not work with incarcerated people). Further, at the end of July 2021, DOC reports that collectively, staff failed to report to another 2,300 *shifts* they were expected to work and did not notify the Department– effectively absent ("AWOL").[3] Thus, approximately 3,050 of the 8,500 staff have either called in sick, or are on restricted duty and not working with incarcerated people and, moreover, substantial numbers of AWOL staff are simply not reporting for work when scheduled, without providing notice or reason.

This state of seriously compromised safety has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn, generates high levels of fear among both groups with each accusing the other of exacerbating already challenging conditions. Turmoil is the inevitable outcome of such a volatile state of affairs.

*Systemic Issues Impacting Facility Safety*

The current state of affairs is the result of long-standing, systemic issues that undercut the implementation of proper security protocols and the provision of basic services. While the current staffing issues must be addressed as soon as possible, it must also be recognized that this particular staffing crisis is just one of many crises that has faced the Department over the years. While it may be the most current explanation offered by the Department, it is not the only cause of the unsafe conditions, nor is it the only underlying cause of the majority of dysfunction and

---

[3] Note, this number represents the number of *shifts* in which the assigned staff member was AWOL.  Some staff may only be AWOL for one shift and then return to work, some staff may be AWOL for multiple shifts in a row (not coming to work for days on end), and some Staff do not return to work at all.  This number captures all situations.  It is currently unclear how many individual staff are AWOL on a given day or for a period of time.

disorder within the Facilities. As noted in previous Monitor's Reports, three pervasive problems negatively impact Facility operations. Each of these issues is described below and each must be addressed by immediate strategies implemented by the City and Department, in addition to long-term, sustainable solutions that can support improved practice over time (some of which are already under development).

**(1) Deployment and Management of the staffing rosters is convoluted and outdated**

The Department's deployment and management of staff assignments to a specific post within a Facility is convoluted and is the result of decades of mismanagement. Therefore, the Monitoring Team has retained a nationally-recognized expert with significant experience in staffing correctional facilities to evaluate the Department's staffing model, as discussed below. The Department has never conducted a comprehensive, system-wide staffing analysis to assess both *where* Staff should be deployed within the Facilities and *how many* staff are necessary to then cover these posts across all shifts in a day. The Department has at least 3,400 recognized posts spanning at least 65 separate work locations, in addition to hundreds, if not thousands, of additional "unauthorized" posts that are created at the discretion of Facility Leadership. All posts must be evaluated to determine priority/necessity and the hours during which coverage is required. Further complicating matters is that rather than utilizing standard roster management software, staff scheduling is conducted and maintained using hand-written records at each Facility. The assignment of staff to posts within the Facilities and the process of making substitutions when an assigned person does not report to work, as expected, is both convoluted and disorganized. The Department, quite simply, cannot address the serious security and safety issues raised herein without effectively and appropriately deploying its staff within the Facilities

and the staffing analysis currently being conducted will provide the necessary framework to address the current staffing management failures.

Given that Facility staffing is the most fundamental issue impacting the conditions in the jails, and because the Department and City lack the requisite expertise to evaluate this issue, an assessment of the Department's staffing strategy must be conducted by a *neutral and independent* expert with significant experience in staffing analyses in correctional settings, as recommended in the Eleventh Monitor's Report at pg. 15. To this end, the Monitoring Team retained an expert who possesses all of these criteria and who has conducted hundreds of assessments in correctional systems throughout the country. The analysis, begun in July 2021, will be conducted methodically and thoughtfully in order to adequately assess the full scope of the issues and will provide credible and viable recommendations for the development and implementation of a sustainable staffing model. Given the enormity of the task, this assessment will require many months and cannot be rushed. Once completed, the City and the Department, in consultation with the Monitoring Team, must evaluate this analysis and work to implement its recommendations. The Monitoring Team will share an update on this project in the Twelfth Monitor's Report.

**(2) Neglecting basic security procedures and poor supervision**

Staff do not dependably adhere to basic, sound correctional management practices which is the direct cause of many of the problematic use of force incidents that are on the rise. Below is a list of the predominant correctional management failures identified by the Monitoring Team. It is important to note that these problems are pervasive due to supervisory failures in identifying and addressing them when they occur, leading staff to continue their problematic practices unchecked.

a. Door Security

- Failing to secure the doors for the A-Station, unit gates and individual cells.
- Failing to properly control entrance and egress through doors, gates and cells to prevent detainees from entering unauthorized areas or to gain access to other detainees for the purpose of doing harm.

b. Poor Situational Awareness and Lack of Vigilance While on Post

- Neglecting to maintain a safe distance from detainees and utilizing a defensive stance when interacting.
- Failing to listen to and observe the population to recognize escalating tensions or frustrations and/or failing to address problems that are well within Staff's control.
- Choosing a passive, stationary supervision style. Staff are rarely mobile throughout the housing units, do not intervene early in signs of horseplay or tensions between detainees, and often fail to disperse groups of detainees when clustered together in the housing units.
- Abandoning an assigned post without relief or permission.
- Failing to establish and reiterate clear expectations in the assigned area, including a published, structured daily schedule and behavioral expectations. The lack of clear expectations is compounded by a failure to hold either staff or detainees accountable when basic expectations are not met.
- Utilizing an unprofessional demeanor. Staff frequently use profanity, an aggressive tone and/or threatening non-verbal communication, and also make derogatory comments to those in their care.

c. Overreliance on Probe Teams

- Allowing events on the housing units to escalate out of control even when sufficient Staff are on hand to address an event quickly.
- Failing to intervene in interpersonal violence where harm is likely while awaiting the arrival of the Probe Team.

d. Failure to Act in Self-Harm Events

- Being slow-to-act when confronted with an emergency self-harm situation (*e.g.*, detainee has secured an object around his or her neck).

e. Failure to Provide Basic Services

- Inability to provide basic services while Staff attend to an incident or during a lockdown and failing to communicate about and later to provide compensatory services once the emergency has passed.

**(3) Failure to hold staff accountable in a timely manner**

As noted in the Second Remedial Order Report, a large number (currently over 1,800) of cases involving staff misconduct are currently awaiting discipline. This backlog, along with the unnecessarily complicated and convoluted process to impose discipline means that staff misconduct cannot be addressed timely as required.[4] This summer, after filing the Second Remedial Order Report, the Monitoring Team developed a series of detailed recommendations for the City, OATH, and the Department to consider in order to address both the backlog of disciplinary cases and to improve the process of imposing discipline going forward. The City, OATH, and the Department are currently evaluating these recommendations and will advise the Monitoring Team of their plans to address them in the coming weeks. The Monitoring Team intends to update the Court on the planned approach, and any additional recommendations that may be necessary, via status report by October 1, 2021.

*Next Steps*

The City and the Department must immediately address the fact that large numbers of Staff are not reporting to work, either due to abuse of sick leave or AWOL practices. Several options are available to address this issue and limit potential abuses, including procedures for verifying the health status of Staff who have called in sick, imposing immediate corrective action on AWOL staff, and considering whether the large number of Staff unavailable to work may constitute a job action that can and must be addressed appropriately by the City. The viability of each option must be evaluated and implemented, as appropriate, as soon as possible in order to address the imminent risk of harm faced by both detainees and staff due to the inadequate

---

[4] The Monitoring Team provided a detailed assessment of the failures of the disciplinary process in the Second Remedial Order Report (dkt. 373).

numbers of staff who are reporting for work in the jails on any given day. Concurrently, efforts to increase competency and elevate the quality of staff practice must be undertaken to avoid the many harms that flow from poor supervision and the failure to provide necessary services.

The Monitoring Team strongly believes that, for the time being, the City and the Department are best suited to address these issues. The options available to both the City and the Department have not yet been exhausted and the City and Department can and must identify and implement viable solutions immediately. To work toward solutions, the Monitoring Team recommends that representatives from the City, Department, Class Counsel, and the United States meet to discuss the relevant issues, in particular efforts to address the issues underlying staff's failure to report for work and abuses of sick leave and the related security failures and failures to provide basic services. This conversation should focus on the viability of immediate options within the City's and Department's control that can be implemented to address these serious problems.

The Monitoring Team will provide another status report in the near term to keep the Court apprised of the current state of affairs. The report will address proposed solutions and any subsequent steps to be taken following discussions among the Parties. The Monitoring Team will also provide an update on the work related to improving the disciplinary process as previously planned, no later than October 1, 2021.

                                              Sincerely,

                                              s/ Steve J. Martin
                                              Steve J. Martin, *Monitor*
                                              Anna E. Friedberg, *Deputy Monitor*
                                              Christina Bucci Vanderveer, *Associate Deputy Monitor*

Kelly Dedel, *Subject Matter Expert*

Dennis O. Gonzalez, *Senior Analyst*

Patrick Hurley, *Subject Matter Expert*

Simone R. Lee*, Associate Director*

Emmitt Sparkman, *Subject Matter Expert*