OFFICE OF THE MONITOR
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

**Steve J. Martin**
Monitor

**Anna E. Friedberg**
Deputy Monitor

178 Columbus Avenue, #230842
New York, NY 10023-9998
+1 646 895 6567 | afriedberg@tillidgroup.com

September 23, 2021

**VIA ECF**
The Honorable Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

*Re: Nunez, et al. v. City of New York, et al., 11-cv-5845 (LTS) (JCF)*

Dear Judge Swain,

The Monitoring Team writes to provide the Court with a third Status Report[1] on the

pervasive disorder and chaos in the New York City jails. We are gravely concerned that the

Department has made no appreciable progress to ameliorate the dangerous conditions in the jails

since our last report on September 2, 2021.  The Department has, thus far, failed to effectively

address the unsafe conditions that are posing an imminent risk of harm to those in custody and

Department Staff. This includes violence among incarcerated people, violence at the hands of

Staff and violence toward Staff, in addition to a disturbing rise in self-harming behavior.[2] These

---

[1] The Monitoring Team submitted a Status Report on August 24, 2021 (dkt. entry 378) and
September 2, 2021 (dkt. entry 380).

[2] The list of specific concerns regarding the lack of safety and management failures in the jails
are outlined in the August 24, 2021, Status Report to the Court at pages 6 to 7.

harmful conditions are directly linked to the Department's failure to comply with the

foundational requirements of the Consent Judgment and Remedial Order.[3]

### *State of Emergency*

The Department has a long history of systemic mismanagement and dysfunction that has

been documented in all eleven Monitor's Reports and two Remedial Order Reports.

Unfortunately, the conditions in the jails have significantly deteriorated in the past few months,

revealing a troubling and accelerated pace of mismanagement of the security operations in the

jails.  The harm flowing to incarcerated individuals and Staff are directly linked to and caused by

the Department leadership's failure to address a wide range of security failures including:

failures to properly secure doors on cells, vestibules and control stations; poor situational

awareness and lack of vigilance while on post; overreliance on Probe Teams; failures in

adequately securing incarcerated individuals following violent assaults; and failures to respond

to self-harming behavior.[4]  Supervisors' repeated failures to identify and address these problems

mean that Staff continue their dangerous practices unchecked. The current state of affairs is

nothing short of an emergency posing an immediate threat to the safety and well-being of

Inmates and Staff.

The Monitoring Team's review of recent use of force incidents and data on key security

indicators demonstrate a disturbing increase in serious events throughout 2021. More

specifically:

---

[3] See, *e.g.*, Consent Judgment Section IV, ¶ 1 (Implementation of Use of Force Directive);
Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); and Remedial Order § A.
¶ 2 (Facility Leadership Responsibilities), § A. ¶ 3 (Revised De-escalation Protocol), § A. ¶ 4
(Supervision of Captains), § A. ¶ 6 (Facility Emergency Response Teams).

[4] *See*, August 24, 2021, Status Report at pgs. 6 to 7.

- The use of force rate remains extremely high.

- The number of UOF incidents in Intake areas in August 2021 (n=190) was 170% higher than in August 2020 (n=70). This problem is particularly pronounced in OBCC's and AMKC's Intake areas.

- The Monitoring Team's assessment of recent use of force incidents demonstrates a troubling increase in the number of problematic incidents; including the use of head strikes and unnecessary uses of force, and use of OC spray (and associated violations).

- The majority of problematic use of force incidents reflects a corresponding lack of adequate supervision of Staff.

- A large number of use of force incidents are accompanied by or caused by security failures like those listed above, especially at RNDC and OBCC.

- The number of stabbings and slashings in August 2021 (n=39) was 450% higher than in August 2020 (n=7).

- Staff continue to fail to timely intervene during incidents in which incarcerated individuals threaten or engage in acts of self-harm. It is troubling that despite the Monitoring Team's repeated voiced and ongoing concerns about Staff failures to timely intereveve in acts of self-harm, particularly in intake areas, has only worsened in the past few months.[5]

This troubling state of affairs certainly calls in to question whether Department leadership possess the level of competency to safely manage the jails.

---

[5] See Tenth Monitor's Report at pgs. 22 to 23 and Eleventh Monitor's Report at pgs. 33 to 35.

**City and Department's Initiatives**

The City and Department have developed a number of initiatives (which are in various stages of implementation) focused on staffing,[6] reducing the number of people in custody,[7] and other operational steps such as reducing crowding in intake pens, repairing broken doors at RNDC, improving sanitation and reducing contraband. A complete list of the City's and Department's initiatives are described in *Appendix A: Overview of City and Department's Plan to Address the Current Conditions in the Jails*.  Since the Monitoring Team's last update, the City and Department have taken immediate and concrete steps to address the Department's mass absenteeism – including initiating a job action and immediately suspending Staff who are AWOL or abuse sick leave.  These initiatives will undoubtedly support the Department's efforts to get Staff to return to work and reduce the disorder and disruption in the jails caused by the lack of adequate staffing.

However, the City's and Department's plans have a significant **void**. They **do not** address the ubiquitous mismanagement and prevalent security failures within the jails. Stated bluntly, the City's and Department's plans are not sufficient to address the imminent risk of harm to people in custody and Staff flowing from the poor operation of the jails, including Staff failing to secure doors, abandoning their posts, or continuously engaging in a whole host of dangerous security

---

[6] It must be reiterated that the Department still maintains a significant number of Staff despite these challenges.  In fact, the Staff-to-inmate ratio has only **increased** over the course of the Consent Judgment.

[7] Any efforts to reduce the population of incarcerated individuals is laudable as it will reduce the number of individuals exposed to current conditions.  However, it is important to emphasize that the rate of use of force, violence, and general disorder in the jails was of concern even in June and July of 2020 when the average daily population of incarcerated individuals was at its lowest point and so there is no basis to conclude that the reduction of the population will reduce the violence in the jails.  *See* Tenth Monitor's Report at pages 18 to 19 and Eleventh Monitor's Report.

practices.  While initiatives that focus on the physical conditions of the jails are important, they

fail to address the basic management lapses and need for improved security.  For instance, while

repairing broken doors is critical, of equal importance is requiring Staff to secure those doors

once repaired. In short, the City and Department must take targeted action to immediately

ameliorate the harm occurring in the jails that are caused by the Department's mismanagement of

its basic security function.

**Monitoring Team's Recommendations**

The significant deterioration in safety, the ubiquitous poor management,[8] the systemic

dysfunction, and the corresponding harm to incarcerated individuals and Staff has led the

Monitoring Team to conclude that the Department does not have the requisite internal capacity to

manage the *security* functions necessary to implement the reforms under the Consent Judgment

and Remedial Order.  Case in point – the Monitoring Team has made multiple attempts to

implore the Department to immediately address these security failures. These attempts were

essentially rebuffed and ignored for almost a month with the City and Department claiming that

the initiatives underway were sufficient to address the Monitoring Team's concerns (as discussed

above, they were not). In a final attempt to persuade the City and Department to act, the

Monitoring Team, this week, developed a list of concrete strategies to more clearly illustrate the

types of steps we believe are necessary to ameliorate the array of problems (see *Appendix B:*

*Monitoring Team Safety Recommendations)*. In response, the City and Department have now

expressed a willingness to address these issues and adopt the recommended immediate actions,

and/or suggested that some of these recommendations were already the Department's current

---

[8] *See,* for example, the Eleventh Monitor's Report at pgs. 8 to 10.

practice.  While the Monitoring Team's recommendations may be consistent with Department

policy, the current state of affairs belies the assertion that the Department is currently abiding by

these procedures.  The exchanges with the City and Department over the last month only

reaffirmed the Monitoring Team's belief that the Department does not have the requisite

appreciation or expertise in security management to fully understand and/or be able to effectively

implement the recommendations.

Considering these findings, the Monitoring Team recommends the following:

1. **<u>Immediate Security Initiatives</u>**: In order to immediately address the current

   lapses in security management, the Department must do the following:

   a. Develop, in consultation with the Monitor, an *interim* Security Plan that

      describes, in detail, how various security breaches will be addressed by

      October 4, 2021.

   b. Communicate to staff their obligations under the Suicide Prevention and

      Intervention Policy by ordering staff to respond timely to self-harming

      behavior via tele-type, roll call and other forms of on-the-job supervision

      and guidance, beginning on September 27, 2021, and routinely (*e.g.*

      weekly) thereafter.

   c. Process new admissions through Intake and to an assigned housing unit

      within 24 hours by providing the necessary staff and space to do so by

      September 27, 2021.

d.  Maintain the video monitoring unit on all three tours with adequate staffing (with either uniform or civilian staff) and supervisors (uniform).[9]

e.  Implement a Post-Incident Management protocol, in consultation with the Monitor, to immediately secure those persons in custody involved in violent incidents, for up to 72 hours, pending a decision about appropriate disciplinary sanctions.

f.  Retain a consultant with expertise in the internal classification and safe housing of incarcerated persons to advise the Department on a strategy to safely house people in consideration of gang affiliation.

2.  **Expanded Criteria for Department Leadership**: The criteria for who may serve on Facility leadership teams (*e.g.*, Warden) must be expanded so that the Department is no longer limited to only selecting individuals from the current uniform ranks. Instead, the Department must have the ability to also seek managers, from the broader corrections community, with the required skills and willingness to improve the state of facility operations.[10]  Accordingly, the Monitoring Team recommends that the appropriate City officials confer with the relevant State leadership to determine how this recommendation may be adopted and report to the Monitoring Team and the Parties by October 11, 2021, with a proposed solution.  To the extent that there are impediments to implementation of

---

[9] While the Department currently maintains a video monitoring unit, the Department reports that it cannot fully staff these units due to the Staffing challenges.  Accordingly, the Monitoring Team recommends that the Department *prioritize* staffing of this unit because the number of Staff needed to man this unit is limited and the Staff on the unit can be maximized to have a broader impact across the entire Department.

[10] *See* Eleventh Monitor's Report at pgs. 8 to 10 and 15.

such an approach, the City and State must advise the Monitoring Team and the Parties how these obstacles may be alleviated.

3. **<u>Appointment of Security Operations Manager</u>**: The Monitoring Team recommends the appointment of an *external* Security Operations Manager with significant expertise in correctional security.  The Security Operations Manager must have the authority to develop and implement the Department's security protocols. The adoption of this recommendation necessarily requires discussion and input with the Parties to determine the viability, necessity, and scope of work before such a proposal may be brought to the Court.  Accordingly, the Monitoring Team will discuss this recommendation with the Parties and provide an update to the Court by October 28, 2021, on the status of these discussions and the positions of the Parties.

The Monitoring Team would welcome the opportunity to discuss these recommendations, or any other questions the Court may have, at the hearing tomorrow.

Sincerely,

s/ Steve J. Martin

Steve J. Martin, *Monitor*

Anna E. Friedberg, *Deputy Monitor*

Christina Bucci Vanderveer, *Associate Deputy Monitor*

Kelly Dedel, *Subject Matter Expert*

Dennis O. Gonzalez, *Senior Analyst*

Patrick Hurley, *Subject Matter Expert*

Simone R. Lee, *Associate Director*

Emmitt Sparkman, *Subject Matter Expert*

8

**Appendix A: Overview of City and Department's Plan to
Address the Current Conditions in the Jails**

1. **Addressing Conditions in the Jails**

   a. **Reducing Idle Time**

      i. *Tablets*: Tablets will be provided to all individuals in custody in the fall. The DOC reports receiving tablets on a rolling basis for this initiative. The Department reports that tablets are fully deployed in VCBC, NIC, and RMSC, and tablets will be fully deployed at RNDC, GRVC, and AMKC by October 1, 2021, with plans to roll out full deployment to the additional facilities.

      ii. *Recreation*: The Department is working with contract providers to provide programming to engage incarcerated individuals during recreation time.

   b. **Young Adults**

      i. *Young Adult Task Force*: DOC reinstated this task force, which is a group of DOC staff, incarcerated youth, community members, and other stakeholders, with the purpose of developing recommendations on safety and programming, to support youth and reduce violence.

      ii. *Co-Mingling*: Co-mingling of Young Adults and adults is permitted under the Mayor's Emergency Executive Order No. 241 (issued on September 15, 2021) ("Mayor's Executive Order").

      iii. *Restrictive Housing*: Enhanced Supervision Housing may now be utilized for Young Adults under the Mayor's Executive Order.

      iv. *Cell Door Repair*: Expediting repairs for cell doors at RNDC by working directly with the vendor to receive replacement doors for celled housing at RNDC.

   c. **Contraband Recovery**

      i. *Contraband Secretion*: Use of special housing to keep incarcerated individuals separated and monitored at GRVC to allow for assessment/secretion of suspected contraband.

      ii. *Digitized Mail*: The Department is working to identify a vendor to use scanners to digitize mail so as to reduce the flow of contraband.

   d. **Self-Harm**[11]

      i. *Policies*: The Department reported updating suicide policies[12] as part of its response to the current crisis. However, the revisions to the suicide policy

---

[11] The Department reports it recently spoke to a nationally recognized expert in suicide prevention in correctional facilities and learned that depression during the pandemic is pervasive across the country, but especially in correctional facilities. It is unclear if this discussion resulted in the development of any strategies for *how to prevent* suicide.

were made prior to the current emergency (finalized in early 2021), and at the insistence of the Monitoring Team, so suggesting that these policy revisions were developed to address the current emergency is misleading. To date, there is no evidence that the Department has taken any meaningful steps to implement the policy and ensure Staff meet their responsibilities

ii. *Suicide Aides*: The Department intends to appoint suicide aides (an incarcerated individual job) to Intake areas, and has posted advertisements for this job in housing areas for the past two weeks as an initial step to identify incarcerated individuals to serve in these roles.

e. **Intake and Medical Wait Times**

i. *OBCC/EMTC Intake Plan*: OBCC will no longer be used as Intake for new admissions. EMTC was re-opened on September 20, 2021, including two clinics and at least one housing area. ESU and Special Search Team Staff Members were assigned to OBCC to help the movement of any remaining new admissions into housing units.

ii. *On-the-Job Medical Care for Staff*: Opening an on-island clinic for Staff to address medical care on the job more efficiently and avoid disruptions that are caused in the clinic when Staff require medical attention and avoid absences when Staff must go off island to receive medical care following an incident.

iii. *Housing Unit Medical Care for Incarcerated Individuals*: DOC is assessing feasibility of providing medical care to inmates on the housing units, reducing need for escorts to the clinic for medical care.

f. **Meals & Sanitation**: DOC represents that all individuals in custody are provided three meals a day. Third-party sanitation support to be utilized at specific jails (including OBCC)—this began Thursday September 16, 2021.

2. **Department Staffing**

a. **Addressing Staff Absenteeism**

i. *Job Action Lawsuit*: The City's Law Department filed an Order to Show Cause and an application for a temporary restraining order in state court on September 20, 2021 alleging that COBA's actions in actively encouraging or condoning its staff not to report to work is a violation of the no strike provisions of both the Taylor Law (N.Y. Civil Service Law 209) and its collective bargaining agreement with the City. In order to resolve the City's lawsuit and to affirm understanding of and compliance with the Taylor Law, COBA agreed to issue the below statement to its members, and the City withdrew the action without prejudice, reserving all of legal rights and remedies going forward: "Officers who are fit for duty should show up for work as required by the law. COBA has never instructed anyone not to show up for work or walk off a post or bang in sick or claim a personal emergency-when that Correction Officer is in fact not sick nor experiencing a personal emergency."

    ii.  *Suspensions*

        1.  AWOL Staff and staff that abuse sick leave will now be immediately suspended for 30 days (as of September 20, 2021, 55 such suspensions have been issued).

    iii.  *Sick Leave Protocols*

        1.  Updated protocols require staff who call in sick to report for a Doctor's evaluation at Mount Sinai within 24 hours of calling in sick for their tour.

        2.  Staff on long term sick leave (out 30 days or more) are being evaluated by Mount Sinai to determine fitness to return to work.

        3.  Home Visits Task Force: Increased staffing and revised protocols to assess Staff on "chronic" sick leave (meaning they have been out sick 12 times or more in a 12-month period).

    iv.  *AWOL Discipline*: DOC pursuing formal discipline at OATH for Staff who have been long-term AWOL—this included requesting expedited trials at OATH for specific cases (these requests have been made for some cases, and the determination to expedite is under consideration by OATH).

    v.  *Improved Absence Data*: DOC is working with an outside consultant (the Institute for State and Local Government (ISLG)) to create a tool and process for DOC to analyze the specific types of leave that make up the large numbers of daily sick and other categories of people unable to work with incarcerated people or do overtime. DOC reports it will use this data to drive more real-time operational decision making on where and when staff leave issues are occurring so they can be addressed.

  b.  **Staffing Needs**

    i.  *Increasing Staff in the NYC jails*:

        1.  <u>Horizon</u>: All staff previously posted to Horizon Juvenile Detention Center (now run by Administration of Children's Services), have been returned to jails operated by DOC.

        2.  <u>Court Operations</u>: NYPD will provide 100 police officers to take over operation of the pre-arraignment sections in the Bronx and Manhattan Courts beginning September 23, 2021, with a fully transition excepted on September 27, 2021. This is expected to yield approximately 100 DOC staff who may return to Rikers Island Assignments.

        3.  <u>Additional Non-DOC Staff</u>: The Department reports identifying areas in which non-DOC staff can be utilized to perform functions that would free up more DOC staff to provide for the care, custody, and control directly for incarcerated individuals on Rikers Island. Workforces and functions being considered include the Sheriff, as well as private security for the provision of security functions, such

as the perimeter and gate posts (posts in which the person would not engage with incarcerated individuals). The Department is also examining how to restructure functions such as visits and commissary to reduce the reliance on uniformed staff so they can focus on their care, custody and control responsibilities.

4. <u>Recruitment (New Staff)</u>: DOC plans to hire 600 new Staff over the course of the next six months, beginning with an Academy class of approximately 200 staff in October 2021.

5. <u>Recruitment (Former Staff)</u>: Efforts have been made to recruit former Staff who resigned in good standing to offer returning to work at DOC.

6. <u>Re-deployment</u>: DOC has "re-deployed" staff who worked in DOC headquarters or other non-jail posts to work at least one shift per week in the jails (particularly over the weekends when the most staff are needed in the jails). Unfortunately, this practice has not yielded many more shifts covered in the jails as expected, because when staff are "re-deployed" they often claim illness, personal emergencies, or family medical leave.  We understand that DOC is considering potential incentives to seek Staff's cooperation with re-deployment

ii. *Addressing Overtime*

1. <u>Improving Fair Distribution of Overtime</u>: The Department is attempting to ensure that all available Staff have completed a double shift before a Staff member is assigned a triple shift.

2. <u>Incentives</u>: Food and transportation have been made available for Staff on overtime. The Department also recently reported monetary incentives for those who work double and triple shifts, and special assignment pay (increase of 6%) for those Staff permanently assigned to housing areas, Intake, or medical posts at AMKC, RNDC, OBCC, and GRVC.

3. **<u>Reducing Population of Incarcerated Individuals</u>**

a. *Less is More Act*: this state legislation has been signed, and will be fully implemented in the spring of 2022 which removes technical parole violations from custody. To date 165 inmates have been released under this framework.

b. *State Transfers*: City entered into Memorandum of Understanding with the State to move approximately 200 city sentenced incarcerated individuals to state custody, with the goal of transferring approximately 40 per day through September 24, 2021.

c. *Swifter Justice*: Department reports addressing case processing delays with relevant agencies across the City (*e.g.* Mayor's Office of Criminal Justices, Office of Court Administration, District Attorneys, etc.) to begin to process cases and address those cases languishing for long periods of time (*e.g.* one year or more).

iv

**Appendix B: Monitoring Team Safety Recommendations**

1. **Develop and Implement an *Interim* Security Plan**: The Department must immediately develop an interim security plan focused on "back to basics." In particular, this plan must address the following issues: unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of detainees around secure ingress/egress doors, proper management of vestibules, and properly securing of officer keys and chemical agents. As part of this work, the Department must prioritize security management efforts and initiatives at those facilities and/or locations where current indicators of violence and use of force incidents are most concerning. The Monitoring Team is available to provide support for the development of this plan.

   o **Revised DOC Security Plan**: The Department must revise its Security Plan. This cannot be done immediately as it will require a thoughtful assessment of current security practices and input from security experts. Given that this cannot occur immediately, an Interim Plan must be put in place (discussed above) as soon as possible. Further, the Monitoring Team intends to initiate a Security Audit to support the development of a new Security Plan for the Agency.

2. **Reinvigorate the Video Monitoring Units/Compliance and Safety Center ("CASC")**: The Department must ensure: (a) there is adequate staffing (either uniform or civilian[13]) on all three tours for these units, (b) the staff are adequately supervised and staff are focused on the key operational issues (security breaches, self-harm, alarms), and (c) any communication made to the Facilities about identified deficiencies is then addressed immediately.

3. **Improve Staff Supervision**: The following steps should be taken to adequately supervise Staff.

   o Reinstate roll call meetings before each tour.

   o Reassign as many supervisors to security posts as possible.

   o Ensure Staff are routinely supervised (if necessary, the Department and City should seek alternative measures to obtain additional supervisors as soon as possible).

   o Assess alarms.

4. **Reducing Overreliance of Probe Teams**

   o All alarms must be immediately assessed by a Supervisor (either at the Facility or via video monitoring) and then a determination must be made about how best to address the request for assistance. A Probe Team should not automatically be sent to respond to *all* alarms. For instance, consideration must be given to whether a supervisor or small team of staff can respond instead of the Probe Team.

---

[13] If necessary, the Department should assign (and train) civilian staff to this unit, if uniform Staff are not available.

5. **Reducing Incidents of Self-Harm**

   o Communicate with Staff about their obligations to respond to self-harm immediately, especially in intake (teletypes, roll call).[14]

   o Improve post-incident review of incidents by Facility Leadership via Rapid Reviews and ID to assess how the management of the incident could be improved in the future as it relates to an assessment of the self-harm incident and the sufficiency of the Staff member(s) response.[15]

   o Encourage Suicide Aides to ensure Staff are aware of any self-harm behavior.

6. **Escorts**

   o Deploy Staff previously dedicated to emergency response teams (or other tasks that provide significant "down" time) to serve as escorts for certain services (*e.g.* delivery of commissary, medical, etc.) to ensure continued delivery.

7. **Supervised/Staggered Lock-in**

   o Supervisors should be present in the housing units to observe lock-in.  Lock-in times should be staggered to allow supervisors and/or video observation via CASC/VMU to occur in an orderly manner.

8. **Intake & Medical Care**

   o Supervisors should conduct routine tours of intake to assess whether incarcerated individuals have been held too long in Intake.

   o Department to provide weekly updates on its efforts to improve the intake at OBCC, including the use of two clinics at EMTC.

   o On-island clinic for Staff – DOC reported this initiative is under development. DOC to provide an implementation plan for expeditious implementation.

   o Medical care on the housing units – DOC reported this initiative is under development.  DOC to provide an implementation plan for this initiative and timeline for expeditious implementation.

9. **Post-Incident Management**: The Department must immediately utilize De-escalation Confinement (up to 72 hours) for Young Adults who commit serious acts of assault to be followed by placement in restrictive housing.

10. **Assessment of Classification on Housing Units**: The Department must immediately assess its housing assignments for incarcerated individuals and the consideration of gang affiliation to determine whether modifications to the assignment process are necessary.

---

[14] The Monitoring Team would welcome the opportunity to provide suggestions for the content of such communications.

[15] The Monitoring Team would welcome the opportunity to serve as a resource to build out this initiative.