September 24, 2021

**VIA ECF**

The Honorable Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

      Re: *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF)

Your Honor,

This letter motion is made on behalf of the plaintiff class and the United States in the above-captioned matter, seeking entry of the attached Proposed Remedial Order attached as Exhibit A. The Proposed Remedial Order, which fully incorporates the recommendations of the Monitor made on September 23, 2021, is necessary to achieve compliance with the requirements of the Consent Judgment and Remedial Order, and to protect the plaintiff class from imminent harm.

Procedural Background

On October 22, 2015, this Court entered a Consent Judgment to remedy a pattern and practice of unnecessary and excessive force within the New York City jails, and to protect a sub-class of young men from Defendants' failure to protect them from violence from other incarcerated people and the Department's over-reliance on punitive segregation. (Dkt. Entry 249).

The Consent Judgment appointed the Monitor, who is charged with assessing the compliance of Defendants with this Court's orders. (See Dkt. Entry 249, Section XX, ¶ 1). After the Monitor, over nine reports between October 22, 2015 and December 31, 2019, "repeatedly found Defendants to be in non-compliance" with several core provisions of the Consent Judgment,[1] the Court entered a Remedial Order to address the sustained non-compliance on August 14, 2020. (Dkt. Entry 350).

The Tenth and Eleventh Reports of the *Nunez* Monitor ("Tenth Report" and "Eleventh Report") were filed on October 23, 2020 and May 11, 2021 respectively. (Dkt. Entries 360, 368). Despite entry of the Remedial Order and all subsequent efforts by the Monitoring Team and Defendants, the Eleventh Report found that "the pervasive level of disorder and chaos in the Facilities is alarming [and the] conditions that gave rise to the Consent Judgment have not been materially ameliorated." (Dkt. Entry 368, at 8).

On June 3, 2021, the Monitor filed a Second Remedial Order Report confirming that the abysmal non-compliance had continued, and that, "in *nearly every substantive area of the Consent*

---

[1] Namely, Section IV, ¶ 1 (Implementation of Use of Force Directive); Section VII, ¶ 1 (Thorough, Timely, Objective Investigations); Section VII, ¶ 7 (Timeliness of Preliminary Reviews); Section VII, ¶ 9 (a) (Timeliness of Full ID Investigations); Section VIII, ¶ 1 (Appropriate and Meaningful Staff Discipline); Section XV, ¶ 1 (Inmates Under the Age of 19, Protection from Harm); and Section XV, ¶ 12 (Inmates Under the Age of 19, Direct Supervision) (collectively "Non-Compliance Provisions").

*Judgment*, the Department's practices remain problematic, and progress remains insufficient." (Dkt. Entry 373. at 4).

On August 24 and September 2, 2021, the Monitor filed Special Reports with the Court identifying emergency threats to the plaintiff class. (Dkt. Entries 378, 380). On September 20, 2021, plaintiffs requested an emergency status conference with the Court. (Dkt. Entry 383-main). The Monitor filed a third report on September 23, 2021 (Dkt. Entry 387), and a conference was held on September 24, 2021 upon order of the Court. (Dkt. Entry 384).

The Record of Immediate Threat of Harm to Plaintiff Class And Persistent Non-Compliance With Court Orders

The record now before the Court—including the Monitor's special reports and status updates filed since the Eleventh Report—make clear that the non-compliance of Defendants, and the risk to class members posed by that non-compliance, requires immediate and urgent relief.[2]

On August 24, 2021, the Monitor reported to the Court a "deterioration of basic security protocols and denial of basic services and protections coincides with a spike in employee absenteeism that began in April 2021." (Dkt. Entry 378 at 3). These compounding failures have resulted in a "state of seriously compromised safety [that] has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn, generates high levels of fear among both groups with each accusing the other of exacerbating already challenging conditions. Turmoil is the inevitable outcome of such a volatile state of affairs." (Dkt. Entry 378 at 4). The situation is resultingly, marked by a "steady increase in serious use of force incidents, a disturbing rise in the level of security lapses and unchecked breaches and failures of basic security protocols." (Dkt. Entry 378 at 1).

Although these problems are the result of "a long history of systemic mismanagement and dysfunction," the situation has in recent months accelerated to "nothing short of an emergency." (Dkt. Entry 387, at 2). Class members are dying. Twelve people have died in DOC custody in 2021, with two in the past week alone.[3] Five of these are presumed suicides, after there were no

---

[2] This Court has ample authority to admit and fully credit the factual findings contained in the Monitor's Reports. *See*, *e.g.*, *Harte v. Ocwen Fin. Corp.*, No. 13-CV-5410, 2018 WL 1830811, at *23 (E.D.N.Y. Feb. 8, 2018), *report and recommendation adopted*, No. 13CV5410MKBRER, 2018 WL 1559766 (E.D.N.Y. Mar. 30, 2018) (Monitor's Reports could be admitted "under the public records exception to hearsay, under the residual exception to hearsay, or as party admissions"); *Juan F. By & Through Lynch v. Weicker*, 37 F.3d 874, 879 (2d Cir. 1994) (rejecting argument that "the monitor was not authorized to make findings of fact" and that "the district court erred because it did not make its own independent findings, but instead adopted the monitor's report").

[3] Jonah E. Bromwich and Jan Ransom, "12th Death in Custody This Year Signals Growing Crisis in N.Y.C. Jails", N.Y. Times, Sep. 22, 2021 (available at https://www.nytimes.com/2021/09/22/nyregion/nyc-jail-boat-death-rikers.html)

reported suicides at all in 2018, 2019, and most of 2020.[4] These deaths are clearly attributable to a total breakdown in essential operations across Department facilities. There is a persistent and urgent threat of death, injury, together with a need to abate the spiraling rates of use of force. The Monitor noted in the September 2, 2021 status report that Defendants must take steps "*immediately* to address the ongoing dangerous and unsafe conditions in the New York City jails[.]"  (Dkt. Entry 380 at 1) (emphasis in original).

Public statements of City officials likewise detail the urgent risk of harm to the plaintiff class. Dr. Ross MacDonald, Chief Medical Officer of Correctional Health Services, who irresponsible for overseeing medical care the New York City jails, wrote on September 10, 2021 that "in 2021, we have witnessed a collapse in basic jail operations, such that today I do not believe the city is capable of safely managing the custody of those it is charged with incarcerating in its jails, nor maintaining the safety of those who work there," resulting in "a situation that has resulted in death and threatens the health and well-being of everyone who works and resides in City jails." (Dkt. Entry 383-1).

Department of Correction Commissioner Schiraldi and his staff testified on September 15, 2021 to the breakdown in jail operations and the need for emergency remediation of staffing and security failures, admitting, *inter alia,* to unstaffed posts (("yesterday, there were approximately 70…housing units that did not have a B officer [the officer assigned to work the floor] in them;");[5] dramatic staff absenteeism (testifying that of 8,370 uniform members of service, 1,789 of them were out sick on September 14, 2021. 112 of those were newly out sick, 727 were on medically modified status, 68 staff members were out for personal emergency, 93 were out on AWOL, and 27 were out for an FMLA-related reason);[6] and that cell doors would remain broken for months ("we expect to be able to fix all the doors by February.").[7]

The Monitor's subsequent September 23, 2021 status report made clear that these operational deficiencies are having a woefully unacceptable, deleterious effect on the rates of force and violence at the heart of the Consent Judgment and Remedial Order:

- "The use of force rate remains extremely high."
- The number of UOF incidents in Intake areas in August 2021 (n=190) was 170% higher than in August 2020 (n=70). This problem is particularly pronounced in OBCC's and AMKC's Intake areas.

---

[4] New York City Board of Correction, "Statement on Recent Suicides in the New York City Jails" (Sept. 1, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/News/board-statement-on-recent-suicides-in-the-new-york-city-jails-20210901.pdf

[5] Oversight: The Condition in Our City's Jails: Hearing Before the Comm. on Criminal Justice, New York City Council (September 15, 2021), https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=890543&GUID=71B97366-3019-425E-813B-DA5DD20A68F1&Options=info|&Search=# (Testimony of Dana Wax, Chief of Staff, New York City Department of Correction, beginning at 1:08:20).

[6] September 15 City Council Hearing, *supra* (Testimony of Dana Wax, beginning at 1:35:06).

[7] September 15 City Council Hearing, *supra* (Testimony of Commissioner Schiraldi, beginning at 2:31:20).

- The Monitoring Team's assessment of recent use of force incidents demonstrates a troubling increase in the number of problematic incidents; including the use of head strikes and unnecessary uses of force, and use of OC spray (and associated violations).
- The majority of problematic use of force incidents reflects a corresponding lack of adequate supervision of Staff.
- A large number of use of force incidents are accompanied by or caused by security failures like those listed above, especially at RNDC and OBCC.
- The number of stabbings and slashings in August 2021 (n=39) was 450% higher than in August 2020 (n=7).
- Staff continue to fail to timely intervene during incidents in which incarcerated individuals threaten or engage in acts of self-harm. It is troubling that despite the Monitoring Team's repeated voiced and ongoing concerns about Staff failures to timely intervene in acts of self-harm, particularly in intake areas, has only worsened in the past few months."

(Dkt. Entry 387 at 3).

The rates of use of force and self-harm associated with intake areas raised particularly acute risks of harm.  (Dkt. Entry 368 at 38) (noting the Monitoring Team's "concerns about the presence of protrusions and other features of the physical plant in intake areas that create a risk of suicide by hanging").   The Department's over-reliance on intake areas was criticized extensively by the Monitor, who noted that individuals were staying in those areas for extended periods of time. 11th Monitor's Report at 37.  Counsel for the plaintiff Class have received and transmitted to the Department numerous complaints in the past month of class members held in intake in deplorable conditions for days on end.  As the Monitor noted, the use of force rate in intake areas in August, 2021 was 170% higher than in August of the previous year. Sept. 23, 2021 Letter to the Court Re Conditions, ECF 387 at 3. And, staff continue to fail to timely intervene in acts of self-harm, particularly in Intake areas; in fact, the Monitor reports that this lack of timely action when duty and basic human decency would mandate it has worsened in the past few months.  For these reasons, the Monitor recommended an immediate first step that intake stays be limited to 24 hours. Letter to the Court Re Conditions, ECF 387 at 6.

The Proposed Order is Necessary to Remedy the Harm

The Court should enter the proposed Emergency Remedial Order to redress these violations of the rights of the plaintiff class, pending the parties' on-going negotiation of further relief to redress the harms.  The record makes clear that this narrowly tailored order satisfies the requirements of the Prison Litigation Reform Act that prospective relief be "narrowly drawn, extend[] no further than necessary to correct the violation of the Federal right, and [] the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. 3625(a)(1)(a).

As the Monitor said plainly in his September 23 letter, a month of intensive negotiation with the City and two publicly filed Court reports had been fruitless:

> "We are gravely concerned that the Department has made no appreciable progress to ameliorate the dangerous conditions in the jails since our last report on September 2, 2021. The Department has, thus far, failed to effectively address the unsafe conditions that are posing an imminent risk of harm to those in custody and Department Staff. This includes violence among incarcerated people, violence at the hands of Staff and violence toward Staff, in addition to a disturbing rise in self-harming behavior. These harmful conditions are directly linked to the Department's failure to comply with the foundational requirements of the Consent Judgment and Remedial Order."

(Dkt. Entry 387 at 1-2) (emphasis supplied).

The security and safety failures in the Department likewise necessitate emergency relief targeted at improving the quality of supervision. The Monitor has described for years the persistently poor quality of leadership within the Department, including a detailed description of supervisory deficiencies in the Eleventh Report (See Dkt. Entry 368 at 12-14). As the Monitor described:

> "The Monitoring Team's observation of Facility practices and various leadership meetings suggest that Facility Leadership has not embraced, and in some cases has not quite grasped, what is needed for the task at hand. While the current corps of Facility leaders each have various strengths, they do not seem to be capable of dismantling the dysfunctional/abusive culture at the Facilities and replacing it with one built on dignity, respect, and problem-solving."

(Dkt. Entry 368 at 13). Those deficiencies require immediate, targeted intervention to improve the pool of supervisors from which Defendants can draw, a recommendation made months ago in the Eleventh Report. (Dkt. Entry 368 at 19).

Defendants themselves represented in today's conference before Your Honor that the City does not have objections to the reasonableness as to the majority of the Monitor's September 23 Recommendations, and acknowledged to the Court that it shares the concerns about the serious conditions within the jails.

A court order is necessary given the City's demonstrated years of non-compliance with its own policies and the recommendations of the Monitor. (See Dkt. Entry 368 at 13) (noting Department's failures to implement Monitor's recommendations as to Emergency Response Teams). As the Monitor noted in the status report he submitted yesterday, similar claims by the City have rung hollow:

> "[t]he City and Department have now expressed a willingness to address these issues and adopt the recommended immediate actions, and/or suggested that some of these recommendations were already the Department's current practice. While the Monitoring Team's recommendations may be consistent with Department policy, the current state of affairs belies the assertion that the Department is currently abiding by these procedures."

(Dkt. Entry 387 at 5-6).

Court action is necessary to compel Defendants to comply with this necessary and narrow relief. As the Monitor notes in his September 23, 2021 status report:

> "[T]he Monitoring Team has made multiple attempts to implore the Department to immediately address these security failures. These attempts were essentially rebuffed and ignored for almost a month with the City and Department claiming that the initiatives underway were sufficient to address the Monitoring Team's concerns (as discussed above, they were not)."

(Dkt. Entry 387 at 5). On a record where months if not years have passed without the City taking meaningful action on many of the Monitor's core recommendations, and when that inaction occurs in the face of dangerous conditions within the jails, Defendants' representations about intentions to comply are insufficient.

The Proposed Remedial Order is narrowly tailored to address very specifically identified practices that are directly preventing the Department implementing the remedies required by the court's prior orders. The operational provisions track the Monitor's recommendations in his September 23 Status Report. Given the City's agreement, as stated at the court hearing today, that measures "1a" through "1e" were reasonable, and the high degree of engagement with City actors that is contemplated by the additional measures, these very narrow provisions are anything but intrusive.

Conclusion

While we do not believe this relief to be sufficient to remedy this crisis, this is a bare minimum of what steps must be taken immediately. There is no illusion that the relief sought by this motion will bring accountability to the Department, but these remedial measures are a necessary predicate to effectuating the terms of the Consent Judgment and Remedial Order.

We thank the Court for your attention.

    Respectfully yours,
    /s/
    THE LEGAL AID SOCIETY
    PRISONERS' RIGHTS PROJECT
    Mary Lynne Werlwas
    Kayla Simpson
    David Billingsley
    199 Water Street, 6th Floor
    New York, New York 10038
    Telephone: 212-577-3530
    Email: mlwerlwas@legal-aid.org
    ksimpson@legal-aid.org
    dbillingsley@legal-aid.org

    /s/
    EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL

        Jonathan Abady
        Debra Greenberger
        Nairuby Beckles
        600 Fifth Avenue, 10th Floor
        New York, New York 10020
        Telephone: (212) 763-5000
        Email: jabady@ecbawm.com
              dgreenberger@ecbawm.com
              nbeckles@ecbawm.com


        AUDREY STRAUSS
        United States Attorney for the
        Southern District of New York

By:     /s/_____

        JEFFREY K. POWELL
        LARA K. ESHKENAZI
        Assistant United States Attorneys
        86 Chambers Street, 3rd Floor
        New York, NY 10007
        Telephone: (212) 637-2706/2758
        Email: Jeffrey.Powell@usdoj.gov
               Lara.Eshkenazi@usdoj.gov