OFFICE OF THE MONITOR
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

**Steve J. Martin**
Monitor

**Anna E. Friedberg**
Deputy Monitor

178 Columbus Avenue, #230842
New York, NY 10023-9998
+1 646 895 6567 | afriedberg@tillidgroup.com

October 14, 2021

**VIA ECF**
The Honorable Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

Re: *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF)

Dear Judge Swain,

      The Monitoring Team writes to provide the Court with a Status Report[1] regarding the current conditions in the New York City jails (pursuant to the Second Remedial Order (dkt. entry 398), ¶¶ 1(ii), 1(iii), and 2(i)), and the status of negotiations among the Parties regarding the Monitoring Team's recommendations outlined in the September 30, 2021 status report related to UOF discipline (pursuant to the Court's September 30, 2021 Order (dkt. entry 400).

*Current State of Emergency*

      The Monitoring Team remains gravely concerned about the dangerous conditions in the jails. While the Department has taken a few positive actions related to the Monitoring Team's

---

[1] The Monitoring Team has submitted Status Reports on the current conditions in the NYC jails on August 24, 2021 (dkt. entry 378), September 2, 2021 (dkt. entry 380), and September 23, 2021 (dkt. entry 387).

concerns in the past two weeks,[2] given the depth and dimension of the problems, these actions have not materially abated the high risk of harm prevalent in the daily operations of the New York DOC to both incarcerated persons and staff. The Monitoring Team remains concerned about whether Department leadership possess the level of competency to safely manage the jails. More specifically, an insular workforce that has very limited exposure to best practices is at a significant disadvantage in advancing reforms. Specific instructions and frequent feedback to line staff is exactly what is required to elevate the quality of practice. Yet supervisors lack the requisite perspective and experience to guide their staff toward better practice. Further compounding this issue is the limited supervision of Captains (and why the First Remedial Order requires the Department to substantially increase the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities). Finally, the dearth of accountability for use of force related misconduct creates an environment where staff can act with impunity.[3] These overarching issues will require systemic changes (including expanding the criteria for Facility leadership and the appointment of a Security Operations Manager) and Court-ordered relief in order to address these significant deficiencies.

As noted above and discussed in more detail below, while the Department has made a few positive steps forward, quantitative and qualitative data demonstrate that the situation remains as grave as previously reported. In September 2021:

---

[2] The City's efforts to address mass absenteeism, some of which appear to be having promising results, will be addressed in their submission.

[3] The Monitoring Team is working with the Parties on a proposed Remedial Order to address the City and Department's aggravated non-compliance with the imposition of meaningful and timely discipline.

- **Use of Force**: The number[4] (n=728) and rate[5] (n=12.42) of use of force remains extremely high, which poses significant risk of harm to both inmates and staff and is incredibly taxing on the system.[6] The high number of UOF incidents in Intake areas has continued with 183 incidents in September 2021 (only 7 less UOF incidents from August of 2021). This problem continued to be particularly pronounced in OBCC's and AMKC's Intake areas.

- **Operation Failures**: The Monitoring Team's review of recent incidents continues to reveal deficits in basic security practices, such as securing doors, officers being off post, failures to timely intervene, failures to properly restrain detainees, and failures to properly utilize equipment.

- **Stabbings and Slashings**: The number (n=51) and rate (n=87) of stabbings or slashings that occurred in September is alarming, including 18 stabbings or slashings in the month of September at RNDC. Further, there have been 11 stabbings or slashing at the Department in the first 12 days of the month of October.

---

[4] The use of force numbers for the month have not been finalized so the final number of UOF incidents in the month of September may vary slightly once the data is finalized.

[5] The rate of use of force is used to neutralize the impact of a changing population size when examining outcomes so that different time periods can be compared.
Rate per 100 individuals = (# of incidents/ADP)*100.

[6] The work that flows from a UOF incident, even those that are appropriate, is ***enormously*** taxing on the system in terms of the time required to write staff reports, provide medical care, review and investigate incidents. The work required has a compounding negative impact, preventing staff from attending to other important duties in maintaining security and addressing the needs of those in their care. Thus, even those uses of force that are within policy guidelines can have an adverse impact on the culture of a Facility for those who work and live there.

- **In-Custody Deaths**: There were three in-custody deaths in September, all presumptively medically related.[7] Further, the number of suicides in DOC custody from January to September 2021 (n=5) is more than the last five years combined (n=4). Below is a chart of the number and cause of deaths in DOC custody between 2016 and 2021.

| Number of In-Custody DOC Deaths | | | | | | | |
|---|---|---|---|---|---|---|---|
| | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Grand Total |
| COVID-19 | 0 | 0 | 0 | 0 | 3 | 0 | 3 |
| Medical Condition | 11 | 4 | 7 | 3 | 2 | 6[8] | 33 |
| Overdose | 2 | 1 | 0 | 0 | 0 | 1 | 4 |
| Suicide | 2 | 0 | 1 | 0 | 1 | 5[9] | 9 |
| Undetermined | 0 | 1 | 0 | 0 | 5[10] | 0 | 2 |
| Grand Total | 15 | 6 | 8 | 3 | 11 | 12 | 51 |

---

[7] The investigation into the cause of death is still ongoing.

[8] 5 of the 6 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

[9] One of the 5 cases occurred following compassionate release from custody. Two of the 5 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

[10] 4 of the 5 cases in this category includes four individuals who died while under the jurisdiction of the Department but were not under the supervision of DOC staff (*e.g.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs) at the time of their death and were not physically in the Department's custody. The cause of death for each of these individuals is not known.

**Status of Second Remedial Order Initiatives**

Upon the filing of the Second Remedial Order, the City and Department have been consulting[11] with the Monitoring Team on the development and implementation of the requirements as outlined below.

- *Immediate Security Initiatives (¶ 1(i))*:
    - Interim Security Plan (¶ 1(i)(a)): The Department, in consultation with the Monitor, developed an interim Security Plan as required. The plan includes initiatives to address unsecured doors, key control, abandonment of a post, escorted movement, and management of crowding in vestibules. The Department will also review and revise its post orders. With respect to communication, the Department has reinstated roll call to better communicate with staff on these issues. Further, the Department will reinstate the inmate council meetings to improve communication and engagement with individuals in custody. The Nunez Compliance Unit ("NCU") will be charged with tracking the Department's progress in implementing these initiatives.
    - Self-Harm (¶ 1(i)(b)): The Department developed and began implementing a plan to routinely communicate to staff their obligations under the Suicide Prevention and Intervention Policy ("Suicide Prevention Policy") as required by this provision. The plan includes reminding staff of their obligation to respond timely to self-harming behavior via a written tele-type (the content of the tele-type was developed in consultation with the Monitoring Team). The tele-type has been

---

[11] The Department has consulted with the Monitoring Team as required by the Second Remedial Order and timely provided all required information that has been requested. However, the open communication and strong collaborative relationship that the Monitoring Team has enjoyed with the Department has devolved over the last few months. While some communication lapses were expected during the leadership transition in early June, there is simply no excuse for some of the lapses that have occurred recently. In some cases, the recent lapses in communication have impacted our work and suggest that the Consent Judgment requirements that require the Department to provide timely and relevant information and consult with the Monitoring Team (e.g., § XIX., ¶ 7; § XX., ¶ 8) are not being faithfully adhered to. On numerous occasions, in different forums, the Monitoring Team has advised Department leadership, including the Commissioner, about our concerns that information and collaboration is not occurring in a manner that supports our work. We have received varying degrees of responses. That said, there has been some improvement in communication in the last two weeks, but the Monitoring Team remains concerned about the current dynamic with the Department. The Department, more than ever, needs significant support, which is best achieved through frequent exchanges of information and candid conversations about the current challenges in order to be best positioned to work on problem solving efforts.

repeatedly announced at roll calls beginning the week of September 27, 2021. The other elements of the communication plan include reinforcing the information in the tele-type by posting content on DOC televisions, hanging posters in highly trafficked areas (including at critical posts such as Intake), providing a new memo book insert printed for staff, and discussing these issues between Wardens and Captains at "Wonderful Wednesdays."

- Intake Tracking (¶ 1(i)(c)): The Department re-opened the intake at EMTC to manage all new admissions to DOC custody and no longer utilizes OBCC to process new admissions as of September 23, 2021. The Department currently tracks the time between when an individual is first taken into DOC's custody to when they are assigned to a housing unit. From September 24, 2021 to October 8, 2021, DOC reports that 449 individuals have been processed into DOC custody. On average, individuals were processed from the time of entry in custody to a housing unit in 13 hours and 26 minutes. The Department reports that no new admission was held in intake for over 24 hours during this time period. The Department is working to refine its tracking processes to track the time from when an individual arrives at intake and an update on that practice, and any corresponding data, will be shared in the next Status Report.

- Video Monitoring Unit (¶ 1(i)(d)): The Department has two units that conduct live video monitoring. The Video Monitoring Unit ("VMU") reports directly to the Chief of Department and currently has 10 Corrections Officers and 1 Captain assigned to the unit across two tours. The Compliance and Safety Center ("CASC") reports to the Deputy Commissioner of Quality Assurance and has 10 Correction Officers and 4 Captains assigned to the unit across three tours. The staffing for these units appears adequate. However, the Monitoring Team has recommended to the Department that the staff of VMU and CASC better coordinate in order to ensure they are not duplicating efforts.

- Post Incident Management (¶ 1(i)(e)): The Department has developed a post-incident management protocol, in consultation with the Monitor, that sets appropriate and stringent criteria for situations in which an incarcerated individual is immediately secured following their involvement in violent incidents, pending a decision about appropriate disciplinary sanctions (including placement into a restrictive housing unit). As part of this initiative, NCU has initiated a post-incident management review process to assess the Facility's response to a serious violent incident and identifies any security lapses and potential improvements to practice going forward. This later initiative is particularly promising and the Monitoring Team has been impressed by the pro-active initiative developed by NCU and the quality of these reviews.

- Classification Consultant (¶ 1(i)(f)): This requirement has not yet come due. However, the Department and the Monitoring Team have spoken about a potential candidate, with expertise in the internal classification and safe housing of incarcerated persons, to serve as the consultant to advise the Department on a

> strategy to safely house people in consideration of gang affiliation. The Department reports it is working to follow-up on retaining the consultant.

- *Expanded Criteria for Department Leadership (¶ 1(ii))*: The Monitor has recommended that the criteria for who may serve on facility leadership teams (*e.g.*, Warden) must be expanded so that the Department is no longer limited to only selecting individuals from the current uniform ranks and can have the ability to also seek managers, from the broader corrections community, with the required skills and willingness to improve the state of facility operations. The City has reported that there are a number of local and state laws and regulations that inhibit the City from immediately implementing this recommendation. Accordingly, the City's leadership at the highest levels has engaged the Governor's office to request an emergency order to suspend the relevant state law provision and administrative code provision to allow DOC to hire uniform leadership from outside the agency. The Monitoring Team applauds the City's efforts to seek this assistance. The City reports it will keep the Monitoring Team apprised of the status of these negotiations and the Monitoring Team will share a subsequent update on this process in our next Status Report.

- *Appointment of Security Operations Manager (¶ 1(iii))*: The Monitoring Team has had initial discussions with the Department regarding the appointment of an external Security Operations Manager. Additional time is needed to discuss the contours of such a role, including who may serve in this role, their responsibilities, and scope of authority, in order to determine whether the Department intends to adopt the Monitor's recommendation to appoint an external Security Operations Manager. A more comprehensive update will be shared in the November 15, 2021 Status Report.

**Proposed Third Remedial Order re: UOF Discipline**

The Monitoring Team has discussed its recommendations with the City, the Department, counsel for the Plaintiff Class and the United States. Subsequently, the Monitoring Team shared a proposed Remedial Order with all Parties focused on addressing accountability for UOF violations. The Monitoring Team believes that a short amount of additional time is needed in order to either present a joint proposed order to the Court or for the Monitoring Team to provide a status update to the Court on the issues that remain in dispute and the Parties' respective positions. We respectfully request an extension of time to October 20, 2021. The Monitoring Team has conferred with the Parties and they consent to this request.

**Transfer of the Female Population to Bedford Hills**

On October 13, 2021, Governor Kathy Hochul, in partnership with Mayor Bill de Blasio, announced an agreement between the State and City of New York to transfer nearly all of women- and trans-identified individuals currently incarcerated on Rikers Island to two State-run facilities in Bedford Hills, Westchester County, the Bedford Hills Correctional Facility and the Taconic Correctional Facility, both operated by the New York State Department of Corrections and Community Supervision. The Monitoring Team is in the process of gathering additional information regarding this transfer and how the management of this population will work

following the transfer in order to advise the Parties and the Court on any potential implications on our monitoring efforts. A further update will be shared in our next Status Report.

**Next Steps**

The Monitoring Team will continue to work with the City, Department, and the Parties to advance the initiatives discussed in this Report. As discussed above, the Monitoring Team respectfully requests an extension of time of the Court's September 30 Order (dkt. entry 400) to October 20, 2021. Further, the Monitoring Team will provide the Court with its next Status Report on November 15, 2021.

Sincerely,

s/ Steve J. Martin

Steve J. Martin, *Monitor*

Anna E. Friedberg, *Deputy Monitor*

Christina Bucci Vanderveer, *Associate Deputy Monitor*