```
 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    MARK NUNEZ, et al.,

 4                   Plaintiffs,

 5           v.                           11 CV 5845 (LTS)

 6    CITY OF NEW YORK, et al.,

 7                   Defendants.          Conference
                                          (via Microsoft Teams)
 8    ------------------------------x
                                          New York, N.Y.
 9                                        September 24, 2021
                                          10:00 a.m.
10
      Before:
11
                         HON. LAURA TAYLOR SWAIN,
12
                                          District Judge
13

14                          APPEARANCES

15    THE LEGAL AID SOCIETY
           Attorneys for the Plaintiff class
16    BY:  MARY LYNNE WERLAS
           DAVID BILLINGSLEY
17
      AUDREY STRAUSS
18         United States Attorney for the
           Southern District of New York
19         Attorney for Intervenor Plaintiffs
      JEFFREY K. POWELL
20    LARA K. ESHKENAZI
           Assistant United States Attorneys
21
      Also Present:  Steve J. Martin, Court Monitor
22                   Anna E. Friedberg, Deputy Court Monitor
                     Jonathan Abady
23                   Debra L. Greenberger
                     Nairuby Beckles
24

25
```

1          (Case called)

2          THE COURT:  Good morning.  We are here today for a

3   conference which was requested by plaintiffs' counsel with

4   defendants' consent to address grave concerns regarding

5   security, safety, and other conditions at Rikers Island that

6   are described in the monitor's August and September 2021 status

7   reports, plaintiff counsel's September 21, 2021 letter, and the

8   monitor's September 23, 2021 further status update.  Those are

9   docket entry numbers 378, 380, 383, and 387 respectively.

10          Last night the office of the New York State Attorney

11   General filed a letter in an amicus capacity calling for swift

12   remedial action with respect to the conditions at Rikers

13   Island.  That is docket entry No. 388.

14          Now I'll begin by asking the participants to state

15   their appearances, beginning with the members of the monitoring

16   team.

17          MR. MARTIN:  Good morning, your Honor.  My name is

18   Steve J. Martin, court monitor in the Nunez matter.

19          THE COURT:  Good morning, Mr. Martin.  Thank you.

20          Ms. Friedberg.

21          MS. FRIEDBERG:  Good morning, Judge Swain.  My name is

22   Anna Friedberg.  I'm a deputy court monitor in this case.

23          THE COURT:  Good morning, Ms. Friedberg.

24          Counsel for plaintiffs.

25          MS. WERLWAS:  Good morning, your Honor, I'm Mary Lynne

1  Werlwas from the Prisoner Rights Project of the Legal Aid

2  Society, counsel for the plaintiff class.

3          THE COURT:  Good morning, Ms. Werlwas.

4          Counsel for the intervenor plaintiffs.

5          MR. POWELL:  My name is Jeffrey Powell.  I'm here for

6  the government.  I'm here along with Lara Eshkenazi.  We

7  represent the government from the U.S. Attorney's Office.

8          THE COURT:  Good morning, Mr. Powell, and Ms.

9  Eshkenazi.

10          Counsel for defendants.

11          MS. JOYCE:  Good morning, your Honor, Kimberly Joyce

12  from the City of New York for the city defendants.

13          THE COURT:  Good morning, Ms. Joyce.

14          I greet other counsel, cocounsel, members of the

15  press, interested parties, and members of the public who may be

16  listening in.

17          I remind everyone that this is a public proceeding,

18  and I would ask that those who are listening in mute their

19  phones, if they are not already muted, on the AT&T line.  I

20  also ask that the video participants mute their phones when

21  they are not speaking so that we can minimize audio

22  interference.

23          I also remind everyone that, as provided in the

24  Court's January 19, 2021 standing order filed at docket entry

25  No. 21 MC 45, neither recording nor retransmission of any part

1    of this proceeding is permitted.

2         I'll be calling on each speaker during the conference.

3    Each time that you speak, please identify yourself by name for

4    clarity of the record and for the benefit of those who are

5    listening in.  Please don't interrupt each other or me during

6    the conference.  If we interrupt each other, it's difficult to

7    create an accurate transcript.  But having said that, I

8    apologize in advance for breaking this rule because I may

9    interrupt if I have questions.

10        I'll give the participants an opportunity to make

11   additional comments or ask questions at the end of the

12   conference.  But if anyone has any difficulty hearing me or

13   another participant, please say something right away.

14        The monitor whom I appointed pursuant to the consent

15   decree in this case in 2015, the deputy monitor, and their team

16   have been unsparing in their reports and unrelenting in their

17   work with the parties to achieve concrete, positive changes in

18   the use of force and safety conditions at Rikers Island.  The

19   most recent reports and the letters from plaintiffs' counsel

20   and the Attorney General describe deplorable conditions and

21   even failure to prevent self-harm by persons in custody.

22        The monitors' updated report filed yesterday includes

23   specific steps that the monitor has requested that defendants

24   undertake immediately.

25        I will now begin by calling on the monitoring team

1     representatives to begin this conference with an update on the

2     current status of conditions and discussions.

3               Mr. Martin.

4               MR. MARTIN:  Thank you, your Honor.

5               We continue to review information and data that comes

6     into our office daily from the Department of Corrections and,

7     they are very able and consistently do that, I might add.

8               The most recent data suggests that those concerns that

9     we have set out repeatedly over a long period of time now to

10    the defendants continue in various forms.

11              THE COURT:  Mr. Martin, for some reason your audio is

12    breaking up, at least for me.  I am not sure if the court

13    reporter is having the same problem.  But if you wouldn't mind

14    just starting again, I want to make sure that everybody can

15    hear every word.

16              MR. MARTIN:  I will, your Honor.

17              I had said that we continue to review on a daily,

18    almost hourly basis data reports, information coming in from

19    the Department of Corrections, which is, I would represent,

20    fairly comprehensive as to the state of affairs.  The

21    department, as I said, does a very able job in doing that, in

22    keeping us very much apprised as to even specific incidents

23    that I may want to scrutinize.  They are very cooperative in

24    accelerating and expediting that.

25              Having said that, the review of that data, those

1    materials, suggests that what the pattern that we have seen of

2    very serious security lapses continues and manifests.  Those

3    lapses manifest themselves through serious incidents of

4    inmate-on-inmate harm, staff-on-inmate applications of force,

5    the self-harm issue.

6           The suicide prevention issue is compelling in that

7    just two days ago I reviewed an incident in which officers

8    literally within six feet of a hanging inmate that was in their

9    direct line of sight did not detect that and, in fact, an

10   officer walked directly in front of the cell facing, did not

11   detect that, and they ultimately did turn around and look at

12   the hanging inmate and were able to get him down.  He was, of

13   course, in serious distress.

14          These matters of immediacy have been staff that either

15   failed to secure doors that must be secured, they failed to

16   control movement from ingress and egress into secured areas,

17   and we see too often officers or staff that literally abandon

18   their post inside a housing unit.  These things, when they are

19   done correctly, when you stay on post, when you control

20   movement, when you secure doors, it minimizes opportunities for

21   inmates to engage in untoward, sometimes violent behavior.  The

22   current state of operations are such that it's the polar

23   opposite of minimizing opportunities.  It's creating situations

24   in which inmates can very ably, quickly engage in behaviors

25   that cause harm.

 1          So the two areas in which we are most concerned with

 2  are those, what we call back to basics corrections 101

 3  requirements to safely operate a system of the size of the New

 4  York City Department of Corrections and the self harm

 5  absolutely must be aggressively met with appropriate protocols.

 6          What is so disturbing about the self-harm issue is not

 7  the identification of an inmate that may be gesturing suicidal

 8  acts.  It's their failure to intervene immediately when they

 9  make such observations, in my experience, unprecedented, where

10  an officer will observe gesturing or the preparation of a

11  ligature or possession of a ligature and not immediately

12  intervene.  That must be stopped.  It must be stopped now.  If

13  it requires active, very, very active superintendents and

14  direction by supervisors and by personnel, they must do it.

15  They simply -- failure to will continue to see this pattern.

16  We have made a series of recommendations, the first being the

17  development of an interim security plan.  Again, that security

18  plan is going to have to address these areas of immediacy of

19  strengthening the suicide prevention control movement, etc.

20          We also believe they should very more aggressively be

21  utilizing their state-of-the-art video monitoring systems, and

22  we recommend that it be done 24/7 and that adequate staff be in

23  place to do that and that is supervised very vigorously by

24  supervisors with a plan of action of how they are to do that,

25  when they are to do it, and what they look at.

1              We are also concerned and have had incidents in which

2      inmates have seriously assaulted both staff and other inmates

3      that are not immediately and properly secured so where for some

4      period of time that judgments can be made that they are not the

5      highest degree of threat, that they could then be moved from a

6      secure cell to a secure area in which they are out of cell

7      time, their congregate activity is limited.  We have had some

8      incidents that are just, for lack of a better term, extremely

9      frightening in which inmates were allowed to, after a violent

10     act, quickly, or within days, engage in a subsequent violent

11     act.

12             So the postincident management protocols must, without

13     fail, be put in place when they are necessary.  We are not

14     talking about locking up a bunch of folks here.  We are talking

15     about a relatively small number of actively violent offenders

16     and only so long as it is necessary to protect staff and

17     inmates.  And when you can make judgments that risk of harm has

18     lessened, then that person should come out of that cell, of

19     course.  No one favors long-term lockup.  I shouldn't say no

20     one.  The monitor's office does not favor locking people up in

21     a single cell for many hours of the day longer than necessary.

22             We also believe that the agency could benefit from a

23     top-flight expert consultant in management of security threat

24     groups or a/k/a gangs.  The department has a methodology and

25     they have their policies in place.  We are not confident that

they are being strictly adhered to, and adhered to in a very,

very reasoned fashion.  I don't believe that it's a question of

do you lock them all up together or you intersperse them.  It's

not that simple.  It's a more complicated process that has

always been an issue in this business, and there are those out

there that have had a tremendous amount of experience in other

systems that STG group is well managed.

            Those are the things kind of that we consider to be of

an immediate nature.  We have two other recommendations that we

believe are equally important, but they are not immediate

implementation matters.

            The second would be, we think the department should

have the authority to retain managers outside the current

uniform ranks.  That is, if there is a very qualified seasoned

manager that is willing to join DOC in a warden's position, a

deputy warden's position, that notwithstanding they have not

come up through the ranks, there should be no bar in bringing

that asset to bear on the agency, especially right now, or as

soon as that could be achieved.  So there are some apparent

impediments to that, whether they be regulatory or state law.

            Ms. Joyce is working with us on that, but we have been

working on that for some number of months.  If there are

impediments, identify them, seek out the state authority or

local authority to see if they can be modified or moved.

            The third recommendation is, we believe that the

1  agency should -- rather, I should say, that there should be in

2  place a security operations manager, again outside of the

3  uniform ranks, that has the authority to come in and identify

4  areas in security that need near-term, midterm attention and

5  development of appropriate protocols and be able to direct that

6  those be implemented in the agency.

7          I would be the first to acknowledge that such a

8  position has certain implications, consequences, but I would

9  envision that working in a fashion where they are not dictating

10  to the agency.  They are working in concert, in collaboration

11  with the agency to upgrade the security operations.  If you

12  join such an outside agent with uniform ranks that are willing

13  to engage in collaboration, there aren't going to be a lot of

14  differences.

15          A basic corrections in confinement operations is not

16  rocket science, but it does take diligence, it does take

17  adherence to identifiable operating procedures that are

18  embraced by the rank and file, and supervision models must be

19  in place to enforce those through the rank and file.

20          That's what we are not presently seeing.  We, quite

21  frankly, have not seen that in the five years of our monitoring

22  and it is simply these matters have simply become more evident

23  and aggravated by the absenteeism that the agency has

24  experienced primarily since the April, May time period through

25  the present day.

1       So I don't want to be so dramatic as suggesting it's a

2  perfect storm, but when you have flawed security practices,

3  they are going to be magnified if you've got a simultaneous

4  staffing issue.  So you not only have a flawed management

5  system, you have officers that are not in place that should be.

6  What is happening, quite frankly, is what one would expect to

7  happen, given the totality of circumstances that have come

8  together this past number of months.

9       I hope, your Honor, that satisfies your direction to

10  me.

11       THE COURT:  That does answer the status and

12  recommendation part of my question.  Are there any

13  understandings at this point with respect to these matters that

14  you would like to front, or should I next call on Ms. Joyce?

15       MR. MARTIN:  I would defer to Ms. Joyce at this point.

16  We have been in close communication.  As of this morning early,

17  Ms. Friedberg and Ms. Joyce -- and I have been briefed on that

18  discussion, but I don't want to relay information that she is

19  here to give and may even clarify for me the discussion that

20  she had with my deputy monitor earlier today.

21       THE COURT:  Thank you, Mr. Martin.

22       Ms. Joyce, good morning.

23       MS. JOYCE:  Good morning, your Honor.  Thank you,

24  Mr. Martin.

25       Yes, Mr. Martin is correct, the city, the law

```
 1   department, we are in constant contact with the monitoring team

 2   about their concerns, about their recommendations, and we are

 3   in continuing discussions about how best to address them.  We

 4   share the monitoring team's concerns about the serious

 5   conditions in the jails, and the city has taken a number of

 6   steps to address those in the near future and some more long

 7   term.

 8            We have shared what the city and the department are

 9   doing in the areas of staffing, population and conditions.  We

10   have shared that with the monitoring team, and also in advance

11   of this conference we shared a letter with the plaintiffs'

12   counsel, with both Legal Aid and Emery Celli, and the

13   Department of Justice, so that we are transparent in what we

14   are doing, and we wanted this to be a more efficient

15   conference.  We wanted everybody to be on the same page about

16   what the city was doing.

17            I can go more into that, if the Court would like, or I

18   can talk about the recommendations to clarify what Mr. Martin

19   was referring to as my conversations with Ms. Friedberg this

20   morning.  However the Court would like me to proceed.

21            THE COURT:  I would like you to tell me what is being

22   done now where something is being queued up on a timetable,

23   what you have shared as already in place or in progress, and

24   then I would like you to specifically respond with position and

25   status on the recommendations.
```

1          MS. JOYCE:  Sure.

2          Your Honor, we shared -- and just so that all the

3     parties are clarifying what I'm speaking about, we shared a

4     letter with the parties on September 22, 2021 with the city's

5     positions, which had certain responses to an appendix A and an

6     appendix B which the monitoring team attached their letter to

7     the Court, their status report.  We can go through that.

8          THE COURT:  That would be helpful.

9          MS. JOYCE:  To follow along.  It's docket entry No.

10    387, the monitoring team status report, and beginning page 9 of

11    14 discusses what the city's plan is, and then beginning on

12    page 13 is the city's responses to certain prior

13    recommendations of the monitoring team, and then we can go into

14    our immediate responses or immediate thoughts on the

15    recommendations.

16         But I did want to at some point ask the Court.  Since

17    these recommendations were shared officially with the parties

18    yesterday, I've been in contact with my clients.  We have

19    shared initial positions with the monitoring team.  But because

20    they are serious recommendations, some calling for consultants,

21    we would like to have, if possible, one week to respond to the

22    Court with our official positions.  In that time we would still

23    be having discussions with the monitoring team and proceeding

24    on certain recommendations that we don't have an issue with,

25    but there is some negotiation and some issues that we have that

1   would benefit from further conversation with the operational

2   folks and with myself and with the monitoring team.  That would

3   be the first ask.

4          THE COURT:  I understand the context.  I would prefer

5   to set the timetable after I've heard what's not controversial

6   and what's in place and then what would be outstanding, and

7   there is an opportunity to hear any comment on that and for me

8   to assess that before we set a firm timetable.

9          MS. JOYCE:  Completely understood.  Thank you, your

10  Honor.

11         I will begin on page 9.  The city has tried to address

12  conditions in the jail initially, A, by reducing idle time.  We

13  find it's really important that folks are engaged, less idle.

14  Busy hands -- I forget what the saying is.  But we are

15  expanding tablets fully to all facilities.  We have expanded

16  tablets.  They are fully deployed at VCBC at the Bronx; NIC and

17  RMFC, the female jail.  They will be fully deployed at RNDC,

18  the youth facility, GRVC, and AMKC by October 1 of this year,

19  with plans to fully deploy to the additional facilities in the

20  coming months.

21         In terms of recreation, the department is working with

22  external contract providers to provide programming to engage

23  the incarcerated individuals during the recreation time, and we

24  have already, I believe, brought in outside folks that are

25  already working with some of the inmates in the jail in terms

 1   of recreation.

 2          On the young adult front, we have reconstituted the

 3   young adult task force, which is a group of DOC staff,

 4   incarcerated youth and community members and other

 5   stakeholders.  And the purpose is of developing recommendations

 6   regarding the safety and programming for use to support them

 7   and to reduce violence.

 8          There were two overarching things that we did.  One

 9   was the mayor passed an executive order on September 15 that

10   suspended certain minimum standards, allowed for certain

11   procurement.  One thing it permitted us to do was to commingle.

12   It's a B2, commingling of young adults and adults permitted in

13   certain circumstances.

14          We have now, under the executive order and something

15   we are going to be discussing with the monitoring team, as

16   Ms. Friedberg knows, restrictive housing.  The executive's

17   order also permitted enhanced provision housing to be utilized

18   for young adults, which is something that had been removed as

19   of the past couple of months for the young adult population.

20          Door repair.  We are expediting repairs of cell doors,

21   especially at RNDC.  We have repaired at least 500 doors to

22   date, and we are working directly with the vendor to complete

23   the repairs of doors in the coming months.  We, the department,

24   actually made a trip to the manufacturer, I believe it was last

25   week, to try to get them to understand the importance of

```
 1   quickening the delivery of the doors.
 2          THE COURT:  Ms. Joyce, you mentioned 500 doors as
 3   already having been addressed, I believe.  What proportion of
 4   the total number of problematic doors is 500?  Are we talking
 5   30 percent, 50 percent, 70 percent?
 6          MS. JOYCE:  Your Honor, I apologize.  I should have
 7   that number for you.  I can get obtain that number.  I just
 8   don't have it for you at the moment as to how many doors that
 9   is.
10          I don't want to put Ms. Friedberg on the spot, but
11   sometimes she has information at the tip of her tongue that I
12   don't.  I see Mr. Martin laughing, so perhaps they know.  But I
13   can get that information.  I apologize for not having it right
14   now.
15          THE COURT:  Thank you.
16          Ms. Friedberg, do you know?
17          MS. FRIEDBERG:  I will look it up and get it for you
18   before the end of this conference, Judge.
19          THE COURT:  Thank you very much.
20          MS. JOYCE:  Thank you, Ms. Friedberg.
21          As to 1C, contraband recovery, we have special housing
22   to keep incarcerated individuals separated and monitored at
23   GRVC.  As the Court may know, sometimes inmates secrete
24   contraband that cannot be located, and we have access to body
25   scanners.  If someone doesn't clear the body scanner, they are
```

 1   put into separation housing until they give up the contraband.

 2   So we utilize that in certain few -- not widely utilize --

 3   certain instances.

 4           We are also working on digitizing the mail system at

 5   Rikers to lessen the flow of contraband.  So we are working to

 6   identify a vendor to use that would digitize the mail to reduce

 7   the flow of contraband.

 8           THE COURT:  So that would be scanning mail and

 9   providing the written content of the mail electronically to the

10   person in custody rather than an envelope that might have

11   something in it?

12           MS. JOYCE:  Yes, your Honor.

13           THE COURT:  I'm assuming there would be separate

14   appropriate procedures for legal mail?

15           MS. JOYCE:  Yes.  That would definitely be taken into

16   account.  We will work with the vendor, the identified vendor,

17   on that aspect.

18           THE COURT:  Thank you.  Please go on.

19           MS. JOYCE:  Now on to section D, which is self harm.

20   We obviously recognize and agree with Mr. Martin's concerns

21   with self harm, and the department has updated its suicide

22   policies as part of its response to the current crisis, and we,

23   in terms of the recommendation, there is a recommendation that

24   the monitor made with regards to self harm, and that is one

25   that we do not take issue with.  We will adopt that

1    recommendation.

2           We are also, in terms of -- there is a job at the

3    department for inmates called suicide prevention aides, which

4    are individuals that apply to be a suicide prevention aide.

5    Their application is reviewed, and they are selected and

6    trained on how to identify unusual, strange behavior.  They are

7    then also tasked with one-on-one observation of inmates who are

8    on suicide watch.

9           So the department has posted that job posting at the

10   department.  It has received a number of applications for

11   suicide prevention aide, is in the process of reviewing those

12   applications and determining if there are any security reasons

13   why a person should be excluded, and they will be selecting

14   suicide prevention aides in the near future to assist with

15   observing those who are on suicide watch.  Those are the

16   initial things that we are doing on suicide prevention, but,

17   again, we will be working with the monitor on other self-harm

18   initiatives.

19          In terms of intake and medical wait times, we reopened

20   the Eric M. Taylor Center on Rikers Island, I believe, last

21   week, which is going to be the intake facility for all new

22   admissions to Rikers Island.

23          What used to be OBCC used to be the new admission

24   intake facility.  It will no longer be.  It will be a facility

25   where people go to quarantine until they are determined to be

1    negative for COVID and then can get their appropriate housing

2    assignments.  We have opened up a new -- I visited CMCC this

3    week.  There are two new admission housing areas, there is a

4    new intake, new medical clinic opened up, and that was

5    September 20, in an effort to decrease the intake processing

6    time and get people out of intake, out of medical to their new

7    admission housing area as soon as possible.  These are actions

8    that were taken to decrease medical and intake wait times.

9         We also opened a medical facility on the island that

10   would care for staff because staff needs to be seen in the same

11   clinics as inmates, and it would increase the inmate wait time

12   for medical, so staff going to a separate clinic will decrease

13   the medical wait time for inmates overall.

14        The department is also assessing the feasibility of

15   providing medical care to inmates on their actual housing unit

16   rather than requiring them to be brought to intake, which would

17   require escorts and just longer wait time.

18        I am so sorry.  I apologize for the barking of the

19   dogs.

20        THE COURT:  This is the pandemic.  We all have such

21   issues.  No worries.

22        MS. JOYCE:  That is what we are doing.

23        In terms of meal and sanitation, we also in that

24   executive order, we are working with outside cleaning firms to

25   come in and clean the facility.  So we were able to not get rid

1    of, but bypass certain procurement rules so that we could

2    immediately contract with vendors to come in and clean the

3    facilities because I know the conditions are of grave concern

4    to everyone on this call.

5         That's what we are doing in terms of addressing the

6    conditions in the jail in appendix A.

7         Department staffing.  Staffing obviously is a huge

8    issue.  When staff is absent, when staff don't report to work,

9    there are colleagues that are actually on the job.  It makes it

10   harder for all of them.  They have to work triple shifts.  When

11   you are tired, you make security mistakes.  So staff

12   absenteeism is really putting a big burden on those who are

13   doing the job and actually going to work.

14        So what the city did this week is, we brought a *Taylor*

15   law action in state court against COBA, stating that they were

16   encouraging their staff to not report to work, to call in sick

17   when they weren't.  And that case was settled in that the city

18   withdrew it without prejudice because the attorneys for COBA

19   agreed to issue certain language to their staff saying that we

20   do not condone, we never did, people not reporting to work if

21   they are not sick.  I believe the actual -- I can get the

22   actual language to read to the Court in a moment.

23        THE COURT:  I just wanted to note, for all who are

24   listening, that there is quoted language in the last five lines

25   Roman II little i on page 10 of the ECF filing on 387.  Is that

1    the language that you are referring to?

2          MS. JOYCE:  Yes, your Honor.  Officers who are fit for

3    duty should show up for work as required by the law.  COBA has

4    never instructed anyone not to show up for work or walk off a

5    post for being sick or claim a personal emergency when that

6    correction officer is in fact not sick, nor experiencing a

7    personal emergency.  That was what was agreed to by the union,

8    in addition to the staff.

9          The department also amended its sick leave policy to

10   be more in line with NYPD and FDNY to close some loopholes.  If

11   you call in sick, you have to report to a certain medical

12   provider selected by the department, the health medical

13   division, to be assessed to see if you are actually sick or if

14   you can return to duty.

15         If you call in sick and you don't report to your next

16   tour, you don't report to the medical provider, you will be

17   deemed AWOL and suspended 30 days without pay and I believe, as

18   of today, we have at least 55 corrections officers who have

19   been suspended without pay for going AWOL, for not abiding by

20   the new sick leave policies.  Those are huge steps and changes

21   in the department in how they are treating sick leave and AWOL

22   to try to get people back to work.

23         We need more time to look at the data, but we have

24   seen a positive trend in people returning to work and in less

25   triple shifts being had, but we want to take a look at the data

 1    to make sure that that's continuing.

 2           We are also working with OATH to expedite certain AWOL

 3    cases.  There are people on the department staff who have been

 4    AWOL for a significant amount of time and should be terminated.

 5    So we are working with OATH to expedite those cases.

 6           We are also trying to increase staff.  This won't be

 7    an immediate fix, but the department is hiring 600 additional

 8    corrections officers.

 9           We are also working with the NYPD to take over

10    pre-arraignment court operations, so certain corrections

11    officers who are working those court posts could return to

12    posts on Rikers Island dealing with inmates.

13           We are also trying to privatize certain jobs that do

14    not have inmate contact, so perimeter security, visitation,

15    commissary.  We are looking at getting private contracts to

16    staff those positions so that the corrections --

17           THE COURT:  Ms. Joyce, your sound cut out for just a

18    minute there.  I heard, we are working to get privatized to

19    staff and then it cut out, at least on me, after that.

20           MS. JOYCE:  Apologies.  We are looking to privatize

21    staff in certain areas that don't have inmate contact:

22    Perimeter security visits, commissary, and we are looking --

23    thinking outside the box of other areas where we could get

24    private contracts to bring in additional support and have those

25    corrections officers and supervisors who are working in those

1     posts return to inmate-facing posts at Rikers Island.

2           We are also engaging in trying to -- again, because we

3     just want to staff up and get people back to work, the

4     department has been calling people who have recently retired

5     during COVID to see if they want to return to work.  It

6     wouldn't mean a very short retraining period and they could get

7     back on the job.  I believe about maybe about a dozen or so

8     people have agreed.  So there are recruitment of former staff

9     and new staff that's happening as well.  The department has

10    also redeployed people who worked at headquarters and other

11    areas back into the jails to take the inmate-facing posts.

12          To address overtime, we are incentivizing staff for

13    their overtime, trying to increase morale because they have

14    been doing a really hard job over the pandemic in these

15    circumstances.  So we have been providing monetary incentive

16    for those who worked double and triple shifts, special

17    assignment pay for those who work in certain housing areas,

18    intake, or medical posts.  We have been bringing food trucks

19    onto the island for them so they can bring home food to their

20    families because they have been working late hours.  Sometimes

21    if they have to work long shifts, we have given them ride

22    homes.  So we are trying to minimize the effects of the long

23    working hours for the staff.

24          And then, lastly, in appendix A was reducing the

25    population.  The governor thankfully signed the Less Is More

1    Act last week, and we entered into a memorandum of

2    understanding with the state for the state to take certain

3    individuals out of our custody.  To date, 165 inmates have been

4    released under this framework.

5            We also expect about, I believe, by the end of this

6    week the state to take 200 city sentenced incarcerated

7    individuals under this memorandum of understanding.  They were

8    taking about 40 individuals per day.  So I believe by today or

9    tomorrow the 200 individuals should be out of city custody and

10   in state jails.

11           We have also asked -- we need a system -- not

12   everything is within our control, so we need some assistance

13   from the state courts.  We have asked the state to --

14           THE COURT:  Your sound just cut out again.  I heard we

15   asked the state to and then no sound after that.

16           MS. JOYCE:  Can you hear me now?

17           THE COURT:  Yes.  You are back now.

18           MS. JOYCE:  We have asked the courts in the state

19   courts in the city and the DAs to expedite about 500 cases of

20   inmates who have been on Rikers for longer than a year.  Rikers

21   Island is not supposed to be a long-stay institution.  And

22   because of the courts not operating during the pandemic, and I

23   don't know if they are operating at full capacity, it's just

24   increasing by the day people whose length of stay is over one

25   year and it causes issues, so we would ask to expedite those

1    cases.

2         I think that covers what the city had previously

3    stated under appendix A that they were doing.

4         Ms. Friedberg, I don't know if you think I've missed

5    anything that we have discussed that you want to address.

6         MS. FRIEDBERG:  Sure.  I believe, Ms. Joyce, you have

7    covered all of the initiatives that we are aware of.

8         I did just want to provide the judge and the Court

9    some additional information with respect to your question

10   regarding the doors at RNDC.  I believe that another

11   approximately 500 doors need to be fixed.  I'm working to get

12   the final confirmation, but I at least wanted to give you an

13   interim update to that.

14        I also just wanted to make one point of clarification

15   before Ms. Joyce continues with respect to the submission by

16   the monitoring team.  As you may have noticed, we are about to

17   get to appendix B, which is a much more detailed recommendation

18   with respect to security operations.  The city has already

19   responded, at least initially, with respect to how they would

20   address those issues.  Many of those require some

21   back-and-forth conversations with the monitoring team on how

22   best to operationalize those.  Those conversations have just

23   started.

24        With respect to our submission to the Court today, we

25   prioritized those issues that we believe must be prioritized

 1    and triaged the most.  Those would be in item 1 of our

 2    recommendations.  I realize there are many different moving

 3    pieces.  That's because this is a dynamic process.

 4              For the Court's better understanding, I just wanted to

 5    clarify that, with respect to appendix B, we outlined the

 6    submission that we shared with the department on the specific

 7    operational initiatives.  We believe they need to undertake.

 8    They have said that they will engage working with us on those.

 9    For purposes of this conference and for the status report have

10    highlighted those that we believe require the most heightened

11    prioritization, and those are items 1 of our status report.

12              THE COURT:  Thank you, Ms. Friedberg.

13              Ms. Joyce.

14              MS. JOYCE:  Your Honor, I am not sure if the Court

15    wants me -- since there are overlapping items in appendix B and

16    of the recommendations that the monitor made on page 6, does

17    the Court want me to just go to the recommendations on page 6,

18    or to do -- to address all of appendix B?

19              THE COURT:  I guess I am not precisely clear on what

20    you are proposing to do.  Let me just say this and maybe it

21    will help you orient me.

22              Page Roman at V, which is 13 of the docket entry No.

23    387, is the beginning of appendix B on safety recommendations.

24    Ms. Friedberg said that item 1 is highest priority, which is

25    developing and implementing an interim security plan and that

1  covers some of the items that were specifically mentioned by

2  Mr. Martin, and Ms. Friedberg says that you are in discussions

3  about the recommendation, and I'm not sure whether speaking

4  about this at all is in your one-week-to-respond ask.  Then I

5  am going to go on for a minute before I ask you to respond to

6  me.

7        Then there are items 2, 3, and 4, which are more

8  granular as to security, the video observation, certain

9  specific steps on staff supervision, and addressing reliance on

10  probe teams.  And then turning the page, Roman at VI starts

11  with self-harm reduction and then goes on to certain other

12  matters, including intake and medical care, which you spoke

13  about in your remarks.

14        Having said all of that, what do you feel is

15  appropriate and feasible for you to discuss on the record now

16  in terms of what is agreed to or being implemented, what needs

17  to hold off pending further discussions, and what you think

18  you've already addressed?

19        MS. JOYCE:  Sure.

20        Ms. Friedberg, correct me if I'm wrong.  I think, your

21  Honor, if we focus on page 6, that appendix B is basically

22  subsumed into that, because appendix B is very much in the

23  weeds.  If we start at page 6, that will give us an overarching

24  view.

25        THE COURT:  Very good.  For those listening, page VI,

1   Roman at VI, the last page of the docket entry 387 filing.

2          So we will begin with talking about self-harm

3   reduction?  Am I following you?

4          MS. FRIEDBERG:  Your Honor, there are multiple

5   different pages.  We are actually talking about page No. 6 in

6   the body of the letter.

7          THE COURT:  Thank you.  I should have asked the

8   question better.

9          We are going back into page 6 in the body of the

10  letter where there is another list that begins with No. 1,

11  immediate security initiatives, rather than going through the

12  bullet -- the tighter bullet list in appendix B.

13         MS. JOYCE:  Correct.

14         THE COURT:  I'm with you now.  Thank you.

15         MS. JOYCE:  Your Honor, while I do still want the time

16  to respond in writing, because some of these recommendations

17  involve the hiring of external consultants that would have a

18  great deal of control over the operations of the department,

19  it's something that we still -- we have serious conditions

20  with.  I don't want anyone to -- it is just something that we

21  still want to talk about with the monitoring team, so that's

22  why we need additional time.

23         The things in No. 1 I've already conveyed to

24  Ms. Friedberg, that aside from perhaps the classification

25  recommendation 1F, that we don't have a problem with the

1  recommendations that Mr. Martin and Ms. Friedberg have made,

2  1A, 1B, 1C, 1D, 1E, with the caveat that we want to discuss

3  certain, perhaps, implementation dates or more granular details

4  about the recommendations, which is why a written submission

5  would be helpful so that I could put it all in writing, what

6  exactly the city and the department are agreeing to with regard

7  to the recommendations.

8         But for the Court's information, as I indicated to

9  Ms. Friedberg, 1A through E we are OK with.

10        THE COURT:  Good to hear.

11        You are not necessarily adopting or agreeing to the

12 timetable that is suggested in connection with those items and

13 there are some specifics of operationalization, if that's a

14 word, that you want to discuss with the monitoring team.  But

15 you accept that the steps that are listed in 1A through E are

16 appropriate and will be undertaken.  Is that fair?

17        MS. JOYCE:  That is a fair assessment, yes, your

18 Honor.

19        THE COURT:  Thank you.

20        For those listening -- I'm sorry.  Again, thinking of

21 those who are listening and may not have the paper in front of

22 them.  So 1A is the development of an interim security plan; 1B

23 is communicating to staff the obligations in connection with

24 the suicide prevention intervention policy by particular means;

25 1C is processing new admissions through intake within 24 hours;

 1   d is the 24/7 video monitoring; and E is the postincident

 2   management protocol.  F, which you have asked to address in the

 3   first instance in the supplemental submission, is the

 4   recommendation for retaining a classification consultant.

 5            MS. JOYCE:  Yes, your Honor.

 6            THE COURT:  Thank you.

 7            MS. JOYCE:  In terms of No. 2, expanded criteria for

 8   department leadership, this is something that we are completely

 9   on board with.  As Mr. Martin said, we have been having

10   discussions with the monitoring team about how to go about

11   this.  I will say I am not a labor law attorney, but it is

12   quite complicated with the local laws and the state laws

13   concerning civil service, so we will need the state's

14   assistance.  We will be reaching out to the state for its

15   assistance, which may be in the form of a legislative ask to

16   amend certain state provisions so that we can hire from outside

17   the uniform ranks.

18            We want to be able, as Mr. Martin said, pick the best

19   people for the job.  If that so happens to be a warden or a

20   captain or whatever they are called in Illinois and that person

21   wants to come and work in New York City, we want to be able to

22   hire that person.

23            But there are a lot of considerations and questions

24   that go along with that.  For example, does the person just get

25   to come on the job, or do they have to take a test, like the

1    rest of the people that want to apply to the job and be chosen

2    from a list.  So there are things that the department needs to

3    work out in terms of what exactly they want to do in terms of

4    the external hiring, and then the law department will have to

5    likely draft legislation.

6          We are working on this.  We are currently working on

7    this.  So it's not something that we are going to be working on

8    in the future, saying this is something that we want to get

9    done.  We want to get done as soon as possible.  We want the

10   department to be able to hire who they want to hire who is best

11   for the job.

12         So we will be continuing to engage with Ms. Friedberg

13   and Mr. Martin and the relevant stakeholders in the city from

14   City Hall, the Department, DCAS, Office of Labor Relations, my

15   office of legal counsel division, just to make sure we are

16   covering all bases, and we can hopefully -- the monitoring team

17   in this recommendation wants to provide an update to the Court

18   by October 11, and that's something that's fine with us.  We

19   hope to have a lot to report to the Court by then.

20         MS. FRIEDBERG:  Ms. Joyce, I wanted to make one point

21   of clarification with respect to the monitoring team's

22   representations.  We also recommend that the city and the state

23   consider whether there is any emergency actions, they may be

24   able to take such that this recommendation can be addressed as

25   expeditiously as possible.

1            We understand some of these considerations may take a

2    long period of time, and perhaps longer than any of us would

3    like, so we just want to clarify that we are also recommending

4    any emergency procedures that the city or state can take would

5    be very encouraged.

6            MS. JOYCE:  Yes.  I'm sorry.  I also meant to say that

7    we will look at any -- if there is any actions that the city

8    can take through a mayoral executive order, we will look into

9    those.  While I don't control the state, we will look into what

10   the state could do and suggest that they do it, and we will

11   report to you, and then you can report to the Court by October

12   11 as to that as well.  Yes.  I'm sorry.  I left that out.  I

13   mention that as well.

14           I am not sure if your Honor has questions on No. 2, or

15   if you just want me to move on to No. 3.

16           THE COURT:  Moving on to No. 3 will be fine.  Thank

17   you.

18           MS. JOYCE:  Your Honor, this is one that we have

19   serious concerns with, bringing in an external consultant to

20   basically come in and tell the jails how to do security 101.

21   We feel like we have people there to do this.  Obviously, the

22   discussion can continue.  We are not saying outright no.

23   That's why we want until next Friday to respond so that we can

24   give thought to this and maybe there can be clarifying

25   conversations had with the monitoring team and the operational

 1    folks.  But this is one that we do have serious concerns with.

 2              MS. FRIEDBERG:  Your Honor, I just wanted to clarify

 3    one point about our recommendation.

 4              THE COURT:  Yes, please, Ms. Friedberg.

 5              MS. FRIEDBERG:  We believe that this recommendation is

 6    going to require not only conversations with the city, but with

 7    the government and plaintiffs as well.  We had proposed that

 8    those conversations begin immediately and that we have until

 9    October 28 to complete those conversations.

10              So just to clarify, the focus of our recommendation,

11    we recognize what a large endeavor this may be and, obviously,

12    we have not had an opportunity yet to speak with plaintiffs or

13    the government either with respect to this recommendation.

14              So just to be clear as to what we were intending to do

15    with our recommendation here, was to initiate the conversation,

16    initiate them as soon as possible, and be able to report back

17    to the Court by October 28.

18              Our hope is, and it sounds like Ms. Joyce agrees, that

19    they will at least engage in conversations with that which then

20    will allow us to determine what everyone's position is with

21    respect to this recommendation and what I may look like, should

22    it be adopted.

23              THE COURT:  Thank you.

24              Again, for clarity, Ms. Friedberg, to the extent

25    Ms. Joyce is asking for additional time to report, the

1   monitoring team would not encourage me to expect any sort of

2   final position statement or indeed position statement in the

3   one-week, short-term supplemental report, that you envision a

4   process that would go through pretty much the end of October

5   with a report forthcoming at that point.  Is that correct,

6   Ms. Friedberg?

7          MS. FRIEDBERG:  Correct.  If all of the parties can do

8   and meet faster, we would certainly get back to you faster.

9   Our hope is, actually, that we would be engaging with the city

10   as early as today, if not on Monday, to begin these

11   conversations along with plaintiffs and the government.

12          So I'm not necessarily sure perhaps in the week -- I

13   don't want to speak for the city with respect to what they are

14   seeking for within a week, but I think with respect to this

15   third recommendation, there will be an opportunity for the city

16   and the parties to work together to determine what their

17   positions may be.

18          So I don't know if that in some way might also clarify

19   with respect to Ms. Joyce what her ask may be, but ultimately

20   our goal is that by October 28, and sooner if possible, we

21   would be advising the Court with respect to everyone's position

22   on this recommendation and have the opportunity to flesh out

23   what, if anything, this particular individual may be

24   responsible for doing, again, after consultation with all of

25   the parties on this call.

```
 1                THE COURT:  Thank you, Ms. Friedberg.

 2                Ms. Joyce.

 3                MS. JOYCE:  Thank you.

 4                Understanding that it's the beginning of conversations

 5    that they are asking for, we agree to speak.  I just would

 6    still like until Friday to respond to the entirety of the

 7    recommendations, and then perhaps I'll just, in addressing No.

 8    3, just say, we are engaging in conversations of some sort,

 9    knowing that Ms. Friedberg is going to provide a more full

10    report to the Court no later than October 28.

11                THE COURT:  Very good.  I appreciate your response on

12    the record today, and you would like to make a supplemental

13    written response by a week from today, which would be October

14    1, correct?

15                MS. JOYCE:  Yes, your Honor.

16                THE COURT:  Thank you.

17                Does the monitor have any concerns about waiting the

18    week for that supplemental response?

19                MR. MARTIN:  Your Honor, we do not.

20                THE COURT:  Thank you.

21                Does plaintiffs' counsel have any concerns about

22    waiting the week for the supplemental response, Ms. Werlwas?

23                MS. WERLWAS:  Yes, your Honor, we do.  This may lead

24    us into some bigger considerations, but we do.

25                The reason, your Honor, is this, and I'll be happy to
```

1   explain in more detail.

2          We think that it's very clear that the record before

3   your Honor is very clear that the Court could and should enter

4   the relief that -- enter as relief the recommendations that

5   were just described in the body of the monitor's report, the

6   pages in the narrative part that we have just been going

7   through, Nos. 1, 2, and 3, that those should be entered as

8   relief today.  And we can address some of the concerns that the

9   city raised about why they thought some of them might --

10  whether they are not ripe or should not be entered today, but

11  we think it's very clear that they are and that they should

12  because I will say --

13         THE COURT:  Ms. Werlwas, I didn't mean to interrupt

14  you midsentence, but it seems to me that you are kind of

15  previewing a more fulsome position statement and application

16  that you want to make.

17         So I will put a pin in the one-week supplemental

18  report ask and now turn to you for your comments and any

19  application that you may wish to make.  I'll then ask counsel

20  for the government, Mr. Powell, to respond to the reports and

21  to whatever statement and application that you are making and

22  hear from the monitor and anybody else I need to hear from

23  rather than having you do the preview and then do your

24  presentation.  Is that acceptable?  You have nodded yes.  So I

25  turn the floor to you, Ms. Werlwas.

1              MS. WERLWAS:  Thank you, your Honor.

2              To start and say more specifically with where this

3    began and what we should do here today, we will explain what we

4    can do and why we should do it.  We do know that the Court

5    appreciates the gravity of what brought us all here today, and

6    we appreciate the Court convening this conference on very short

7    notice.

8              Indeed part of why we wanted a conference rather than

9    initial motion proceedings is because this is a highly dynamic

10   process involving many actors and it has been dynamic even

11   since we put in our application to the Court.  The docket

12   certainly doesn't reflect the level of activity that has been

13   happening among the participants and other stakeholders and our

14   clients on this call.

15             In light of that, what brings us to where we are today

16   is the following.  This is an urgent matter of life and death

17   and it needs relief today.  Since we wrote our letter to you,

18   your Honor, earlier this week, two or more of our class members

19   have died in DOC custody.  There have been four class members

20   who have died in the one month since the monitor put in its

21   August 24 report to you and where we are now.  I'm not

22   suggesting this is due to any dilatory conduct on anyone's

23   part.  What it suggests is the extreme harm that the conditions

24   that have been described to you are causing to class members,

25   to the children who are losing parents in the jails.

1      Although we understand, certainly as lawyers, the

2  complexity of what's involved, and while much of this case, for

3  many years, as we believe your Honor is aware, we have engaged

4  in very detailed negotiations to try to get to very considered

5  positions for everything that comes before this Court, that is

6  reflected in the monitor's report today, the provisions about

7  which the city now seeks further time to either respond in

8  writing, confer with clients, I say are all on matters that

9  have been extensively discussed in this matter, previewed in

10  monitor's reports after monitor's reports.

11      In short, none of this is a surprise.  If it does,

12  however -- and the level -- if there are consultations with the

13  client that the city wishes to have based on the fact that this

14  particular document, this particular way of encapsulating these

15  recommendations was filed last night, then we would ask that

16  those principals, if possible, be brought onto this call, for

17  example.

18      This is a matter of such concern, and everyone knows

19  that this is about life or death, that having the clients,

20  having people who can speak for the agency on this call, or as

21  soon as possible in the room, is what is required in this

22  crisis.

23      Again, this can't be business as usual.  It's not.

24  It's not business as usual in the jails.  It's not business as

25  usual for our clients.  When I say business as usual, I mean

1   even with the horrible conditions that this consent judgment

2   and this Court, through its remedial order, have sought to

3   remedy.

4           To some of the specifics, I'd like to separate out two

5   things, which is a view on what we can do today to redress this

6   public safety crisis and humanitarian crisis and seek

7   collaboratively or get your Honor's guidance on the next steps.

8           What we can do today, among other things is, No. 1,

9   enter as relief the recommendations put forth in the narrative

10  portions of the monitor's report.  It is the fact that the city

11  has helped explain today that they do not disagree in substance

12  with being what I will call 1A through 1E although, as your

13  Honor noted, there are some questions about the timing.  It is

14  extremely helpful and I think we should take that.

15          The fact that we all agree that 1A, 1B, 1C, 1D, and 1E

16  are necessary to solve the problem, that they are the

17  government's agreement that these are appropriate responses to

18  the problem, addresses concerns about intrusiveness into

19  government operations and that these are very discrete, limited

20  forms of relief.  I think, as your Honor can see, what I'm

21  somewhat referencing is, and we would be prepared to discuss

22  the ways in which the record supports, more than amply supports

23  the requisite PLRA findings that govern prospective relief.

24          With respect to whether or not the city would like to

25  work to consider different timetables for implementation or

1    details or operational details, we would suggest that is

2    exactly the kind of thing that should not hold up a federal

3    court order to enforce relief.  These are very tightly drafted

4    by the monitoring team and can be ordered now.

5         We think that if there is a concern about some

6    timeliness issue or some detailed implementation issue, those

7    are the things that are typically subject to any court order,

8    worked out, and if there is a problem and it can't be worked

9    out, we come back to your Honor with the specifics.  But those

10   should not hold up the relief.

11        I was addressing just now the parts of the order that

12   the city agreed that they would -- would go to things that they

13   agree to do already.

14        As to the parts that require outside hiring, 1F, and

15   potentially 2 or 3, the fact that these may require a hiring

16   process that may be expensive, that the city may not like, is,

17   again, not a reason to delay relief that's necessary and that

18   the monitor has highlighted and put in some of the most stark

19   terms that I could see in a report, highlighted the immediate

20   necessity of beginning these processes.  Yet nothing in this

21   monitor's report says who is going to be hired or when, and

22   it's very clear about the processes that are being initiated to

23   lead to a result.

24        And we particularly take issue with some of the views

25   that the fact that this may require outside hiring is a topic

 1   of concern that the parties should discuss.  We are here today

 2   not at the beginning of a case.  We are here on a five-year

 3   record that shows that successive administrations in this city,

 4   it's not about specific individuals, have been unable to do the

 5   things the monitor is saying have to be done to implement

 6   relief.  It's clear that the agency has been given time, time,

 7   resources, technical assistance to implement these basic

 8   security functions that time and again the monitor's reports

 9   before the Court have recommended and have asked to be done.

10        It's clear that recommendations from the monitor alone

11   don't work and haven't worked, and we have five years to show

12   that.  It's clear that the existing cadre of problem solvers in

13   the department cannot or will not solve the problem.

14        And this extremely modest suggestion of the monitors

15   that New York City expand the available resources and expand

16   the cadre in which we are willing to look for guidance on how

17   to operate our jails, how to solve a crisis that makes our

18   jails one of the embarrassments in the nation, that's

19   offensive.

20        To the extent that there is the suggestion about --

21   actually, we think that it should go with the appointment of a

22   security operations manager.  Could go further.  I believe that

23   Mr. Martin's suggestion, and I'm paraphrasing, to be clear, but

24   was suggesting the nature of such a relationship, whether it

25   should be consultative or directive.  We would suggest that the

 1   record and the need for relief would more than support

 2   appointing a person who is not simply recommending matters to

 3   the department, but is ordering them.  And we say that fully

 4   knowing the gravity of that position.

 5           If I may, there are, however -- there are a few

 6   aspects of that recommendation and application which we are now

 7   making verbally, which is to enter as relief the language that

 8   begins beginning from where the monitor recommends the

 9   following and to enter that today.

10           There are one or two specifics to address with that,

11   and I want --

12           THE COURT:  Ms. Werlwas, just for, again, clarity of

13   the record, the stem that you just referred to, considering

14   these findings, the monitoring team recommends the following,

15   that's the line on page 6 that precedes the numbered list 1, 2,

16   and 3, correct?

17           MS. WERLWAS:  Correct, your Honor.

18           THE COURT:  Thank you.

19           MS. WERLWAS:  And through the conclusion of the

20   report.

21           THE COURT:  Yes.

22           MS. WERLWAS:  That is correct.

23           With a few modest suggestions in this connection.  The

24   first is the timetable we were just discussing about the

25   conversations regarding appointment of a security operations

1  manager.  We are certainly prepared to discuss anything --

2  engage in the process that this paragraph suggests immediately.

3          We would, however, suggest a much earlier date for

4  reporting on progress to the Court than October 28 because we

5  would want to be able to be in a position to have either an

6  agreed-upon order, if one is necessary, or some other form of

7  agreement, but relief no later than the end of October.  So it

8  is suggesting that the interim date of reporting on what has

9  happened happen earlier than October 28.

10          In that connection, we would also ask that the city,

11  including the principals for the city, come and report back to

12  the Court on the progress with -- and implementation of this

13  recommendation.  In other words, not simply the monitor in a

14  written recommendation, but we would like to have the city

15  report on the implementation as well.  We understand this is a

16  process that requires some discussion, but we need it to get to

17  resolution faster.

18          There are, however -- this is the conundrum that I say

19  we face in the quickly moving circumstances of obtaining this

20  report last night and saying this is what we can do today in

21  that there are some other -- there is some other aspects of

22  what needs to be done that it leaves untouched or

23  insufficiently addressed.

24          We do not think that that should inhibit entry of this

25  relief as Court-ordered relief right now, but it would be

1    remiss if we didn't address a few matters about which we would,

2    when we welcome some further explication.

3            This is, in particular, two things.  This is in some

4    ways responsive to some of the concerns the city raised about

5    what it is doing.

6            But I want to address first, though, self harm.  This

7    is our concern.  We do not oppose what the monitor recommended

8    in this report about -- that the department do to prevent self

9    harm.  But it is clear, and I don't think there is any dispute

10   about this, it's not enough and nowhere near enough, and we are

11   not suggesting the monitoring team presented this as an

12   ultimate solution, that we know they did not.

13           But, nonetheless, because of the intensity and the

14   gravity of the risks of suicide and self harm right now in

15   these jails, we think more immediate intervention is needed,

16   that what the monitor suggested here and the measures that the

17   city has said it has taken do not, in our view, adequately

18   protect individuals.  I don't see anything in those proposals

19   that would prevent the incident that the monitoring team very

20   disturbingly related from this morning.  I don't think a roll

21   call and some of the other training and supervision will make a

22   person who is standing in front of someone who is hanging in

23   front of them, the fact that they act with not just ordinary

24   human decency, but the professional obligation.  Those are

25   necessary.  They are not sufficient.

1          THE COURT:  What do you believe would be sufficient

2    and appropriate at this point in time where you are making an

3    oral application?

4          MS. WERLWAS:  With respect to the self harm in

5    particular or more generally?  We could do both.

6          THE COURT:  You've said that what has been proposed by

7    the monitor at this point on self harm is inadequate and could

8    not prevent what was described.  It seems to me you have in

9    mind something that you think could be implemented right away

10   that would prevent, so I'd like to hear what that is.

11         MS. WERLWAS:  Your Honor, we have spent enormous time

12   trying to come up with the answers to that of what would

13   protect our clients.  We think there is still a lot more to be

14   learned.  That is what led us not just about self harm, but, to

15   be clear, about some of the other areas of immediate urgency

16   that need to be addressed.

17         We do not see paths short of beginning the proceedings

18   that lead to release that will protect our clients.  We want to

19   see those.  We would like there to be some other measures that

20   would prevent this rash of suicides in the jails, and we are

21   entirely open to hearing from the correctional professionals in

22   the city, those on the call and others, what further measures

23   could be taken to do this.

24         Just to address one of them, the city's

25   recommendations with respect to hiring more suicide prevention

1    aides, again, while laudable, I do need to step back and say,

2    talk about the perversity of that being their front-line

3    defense against staff refusing to appropriately respond to

4    people in self harm.  Suicide prevention aides are incarcerated

5    workers.  They take their jobs seriously and they do them well.

6          They are people who nonetheless are subject to these

7    same conditions, the same living with nonworking toilets, with

8    not getting adequate food in unsafe areas, with no corrections

9    officer, that those are the people -- our front-line defense

10   against suicide in this system.  On this record and right now

11   that is just perverse.

12         As to what further steps to be taken, that's where we

13   are, your Honor, where we come to on this issue and some of the

14   other ones that would address the not seeing a correctional

15   response that can be implemented immediately to protect people

16   from self harm and from the violence that is running rampant in

17   the facilities short of release.  That is the immediate

18   concerns.

19         With all of our support for the recommendations in the

20   monitoring report and the basis of our application today, as

21   well as our ongoing engagement in Nunez, recognizes that

22   systemic reform takes time and that even these measures that

23   are intended to, and we think if implemented will, materially

24   improve the safety of our clients, are, by their nature,

25   necessarily not measures that will do so next week or the week

1   thereafter.

2          When we are having, unfortunately, class members dying

3   by the week, we cannot sort of come to this court, even when we

4   frankly wish we knew more of the perfect answers and could give

5   you a perfect kit of saying, this is exactly what we would want

6   to do, because one died even since we sent our letter, frankly,

7   that's why wanted to all come together and find out what we can

8   do right now for the immediate harm that is happening on Rikers

9   Island.  We would welcome having.  And if others need to be

10  part of the conversation, the principals of the agency, then we

11  would welcome that.  But that's just somewhat -- the emergency

12  is the position that has us coming to your Honor being frankly

13  candid about the things we think will work and wanting to be

14  candid about what we still don't know and are trying to figure

15  out but think that we should not all leave this room today

16  before we figure out because of the urgency of what's happening

17  on the island.

18          THE COURT:  Is there anything further that you want to

19  say now before I call on Mr. Powell?

20          MS. WERLWAS:  One quick glance at some of my notes,

21  but I generally think -- I think I would welcome sort of

22  hearing from our colleagues in the government at this point.

23          THE COURT:  Mr. Powell, before I ask you to speak, I

24  do want to pose a couple of issues for reflection by

25  Ms. Werlwas and perhaps also comment by Mr. Powell and the

1    others as people respond.

2         Rikers Island is clearly in a state of danger and

3    crisis on the safety front and with respect to many other

4    related issues, and the monitor has recommended steps now and

5    they were -- to be clear, those steps were presented to the

6    Court as recommendations under discussion in a letter that was

7    filed yesterday.  The monitor didn't make an application for a

8    court order requiring them and the letter that you and your

9    colleagues, Ms. Werlwas, wrote a couple of days ago requesting

10   the emergency conference did not specifically lay out anything

11   as a proposed order of this sort either and spoke in terms of

12   the potential release application under 3626(f).

13        So there is a record of findings and recommendations

14   by the monitor, but not an evidentiary record.  We have expert

15   assessments and opinions, not an evidentiary record.  The case

16   is in, I'll call it, a unique, but certainly a particular

17   procedural position.

18        The case was originally brought, I think, in 2011 as

19   individual actions relating to use of force and consequences of

20   use of force, ultimately evolved into a class action in which

21   the government intervened on behalf of young offenders focusing

22   on isolation confinement issues and confinement with adults,

23   and there was a settlement that involved the certification of a

24   settlement clause and a consent decree directed to use-of-force

25   policies, the housing of youthful offenders.  I realize that is

1    a term of art in New York, so I don't mean it in the term of

2    art sense.  I mean young adults, detainees, and inmates and

3    specific obligations under a consent decree which the Court

4    approved and upon which the Court enter judgment.

5              The consent decree has particular powers and

6    obligations of the monitor whom the Court appointed pursuant to

7    that consent decree, and it also has mechanics within it for

8    queuing up applications with respect to violation of the

9    consent decree over which the Court has retained jurisdiction.

10             We don't have an operative pleading in this case

11   because it has been subsumed by events and the judgment is what

12   is of record here.

13             So in talking about 3626, 3626 goes to relief in a

14   civil action with respect to prison conditions -- I am not

15   trying to be overly intellectual here, but there is a question

16   as to whether we have a civil action pending at all at this

17   point for relief specifically or generally with respect to

18   prison conditions that would implicate 18 U.S.C. Section 3626

19   or ongoing intensive activity and obligations to comply with

20   the settlement decree and subsequent amendments and remedial

21   orders, again, primarily focused on use-of-force policies.  And

22   for a prisoner release order, statutory predicates are orders

23   for less-intrusive relief that have failed to remedy the

24   deprivation of the federal rights sought to be remedied through

25   the prisoner release order having previously been entered and

 1    essentially failed.

 2            Talking today about the specific living conditions and

 3    this horrible, horrible situation of self harm, we have not, I

 4    believe, had orders specifically directed to those.  I think

 5    that you are trying to remedy that to a certain extent by

 6    asking for an order today to do the things that the monitor has

 7    recommended.  I think I may be reading you in that way.  But

 8    that's an issue.

 9            And 3626(a)(3) requires that even if that process is

10    initiated and there is a three-judge court, that court has to

11    find by clear and convincing evidence that crowding is the

12    primary cause of the violations sought to be remedied in that

13    no other relief would remedy the violation.

14            Insofar as you are relying on the findings in the

15    report of the monitor with respect to the predicate for a

16    release order, the monitor's most recent filing includes

17    observations that express skepticism as to whether crowding is

18    at the root of the problem or other things are at the root of

19    the problem.

20            So those are issues of concern to me specifically in

21    terms of looking to 3626, in addition to or as opposed to

22    continued work towards specific commitments in a context and on

23    a platform in which there has been some progress made on a

24    consensual basis.  The city is undertaking to take specific

25    steps that might A, lead to immediate action and, B, to perhaps

1   some stipulated relief that might or might not be relief that

2   the Court is immediately in a position to order.

3          The other thing that I need you all to know is that

4   there are so many unique features about the situation that we

5   are in, but one of them is that I have been the judge -- it has

6   been my privilege and concern of my head and my heart over the

7   past ten years now, and specifically since we entered into the

8   consent decree to preside over this action and work with the

9   monitor and work with the parties.  I do that in my capacity as

10  a judge and now the chief judge of the district court for the

11  Southern District of New York, which has a number of judges.

12         I was appointed in 2017, two years after this consent

13  decree, to be the sole judge in the United States responsible

14  for and empowered to preside over the financial restructuring

15  of Puerto Rico and its instrumentalities.  It's under a statute

16  that gave the chief justice the obligation to appoint one judge

17  and that's me.  I have no one I can transfer those powers to to

18  make substantive decisions, and I have been committed to a

19  timetable and a very heavy litigation schedule for months now

20  that points to a trial about confirmation of a proposed plan of

21  adjustment for the Commonwealth of Puerto Rico that is

22  scheduled to begin in early November with a very heavy

23  litigation schedule in October.

24         All of which is to say that if there is going to be a

25  need for evidentiary proceedings and proceedings that could

 1   lead to or would require the immediate engagement in litigation

 2   activity of a judge here, I am going to have to transfer the

 3   case to one of my colleagues so that it can get the appropriate

 4   immediate attention and availability that it is my great, great

 5   frustration that I would not be able to provide if we needed to

 6   go to days and days of proceedings and legal filings and that

 7   sort of litigation.  I have to put that out there for you.

 8           I'm not necessarily asking you, Ms. Werlwas, to

 9   respond to these points right away right now, but it's

10   important, both the legal and procedural considerations that I

11   outlined and the practical consideration that I have just

12   shared with you, it's important for you all to know that as you

13   consider what you want to ask, what you want to do, and what

14   you want to say further today.

15           MS. WERLWAS:  Your Honor, may I just respond very

16   briefly?

17           THE COURT:  Yes.

18           MS. WERLWAS:  I'll keep it brief.

19           Thank you, by the way, for those comments.  It's in

20   part why we styled this as a conference because we know there

21   are a lot of moving parts and actors involved in achieving

22   justice in this case.

23           Rest assured, we are not going to lay out for you here

24   our arguments or sort of the theories under 3626(a)(3), but

25   would give us the confidence that those procedural steps with

1   which we are indeed very familiar, why we think we can more

2   than meet our burden to establish those in this case.

3          We would be happy to address in writing the threshold

4   question, the one that would be before your Honor, which is

5   that your Honor would have to find -- about very less intrusive

6   relief has failed and that there has been a prior order.

7          To be clear, we think that those jurisdictional

8   questions that you raised of whether 3626 could be triggered in

9   this process, we would be happy to address in writing, should

10  that be the appropriate path in this case.  But we think that

11  this case could be ripe for that proceeding and that there are

12  the prior -- the consent judgment and the remedial order serve

13  as the requisite remedial order.

14         But leaving that aside, we will just say we are also

15  open to discussions sort of with the Court in ways of building

16  an evidentiary record and the means of doing so in the unusual

17  posture of remedial proceedings where we have the unusual fact

18  repository of what must now be probably 3,000 pages of

19  monitor's reports and data.  We have agreed that those are not

20  act of factual findings of the reports.  Those are the

21  monitor's reports.  The parties might work out, suggest more

22  streamlined measures for achieving factual findings in this

23  matter.

24         But we do appreciate sort of the guidance that the

25  Court of the giving and don't want to detain the United States

1    from getting their views heard.

2              THE COURT:  Thank you, Ms. Werlwas.

3              Let's all take close our cameras and put ourselves on

4    mute for ten minutes and reconvene here at -- by my clock, it

5    will be 12:02.  Thank you.

6              (Recess)

7              THE COURT:  I think we are ready to proceed.

8              Mr. Powell, I turn to you.

9              MR. POWELL:  Thank you very much, your Honor.  This is

10   Jeffrey Powell on behalf of the government.

11             The government is, of course, alarmed at the

12   extraordinary level of violence and disorder in the jails.

13   Many years and ongoing failure to comply with the core

14   provisions of the consent judgment, that's been well documented

15   and for which we needed to go and get a remedial order, which

16   is not being complied with either, and the overall current

17   state of affairs and chaos at Rikers Island.

18             We think that today we do support Ms. Werlwas'

19   application that the Court should direct today that the city

20   and the department implement the very specific and narrow

21   recommendations that the monitor has set forth on pages 6

22   through 8 of the letter he submitted last night.

23             We think that there is ample evidence in the record

24   through the monitor's reports, his monitor reports.  There are

25   three submissions since August 24 to support the imposition of

1    those remedies.  We think that much of the record also is

2    reflected in what has been openly acknowledged by the

3    department as a crisis, even by the commissioner himself.  We

4    don't think there is a need for an evidentiary hearing to order

5    and direct the department to implement these very specific

6    narrow recommendations that are now before the Court.

7         We are happy to go through each one and explain and

8    ask the city for its position on them now.  We believe that

9    they are directly related to and narrowly drawn to address the

10   ongoing noncompliance and the excessive levels of use of force

11   and violence that is going on in the facilities right now.

12        We are happy again to go through them, and I'd like to

13   do that, focusing this time on the actual language that the

14   monitor has crafted and which we are asking the Court to direct

15   the city to implement and follow.  We are still a little bit

16   unclear.  It seems like the city is consenting to much of this.

17   So given the emergency crisis, the emergency application that

18   Ms. Werlwas submitted, we still think that today is the time to

19   direct the city to implement these recommendations.

20        Looking at them specifically, on page 6, on the

21   immediate security initiatives, just a larger point on this, I

22   know the submission came in last night to the Court, and

23   Mr. Martin can certainly fill in the details here, but there is

24   very little new here that has not been raised with the

25   department before.  Months and months have gone by, years,

1    where Mr. Martin and his very detailed monitoring reports has

2    detailed these problems, the same problems that have been

3    detailed in the last few weeks, although they have certainly

4    gotten worse with the staffing issues.  But these

5    recommendations have been raised before.  They have been

6    provided to the department before.  It's simply a fact that

7    they haven't been implemented.  They are not new.

8          So going through them in turn, looking on page 6, at

9    the immediate security initiatives, the first one, develop in

10   consultation with the Monday an interim security plan that

11   describes in detail how various security breaches will be

12   addressed by October 4, 2021.  It's my understanding that the

13   city is consenting to that.  If that's not the case, we are

14   happy to hear it.

15         But this is basically what the monitor -- and

16   Mr. Martin can speak for himself, but is looking for a plan to

17   address what he has detailed in report after report, the basic

18   security breaches that are going on and leading to the

19   excessive violence that's in the jails, not ensuring that doors

20   are closed, that inmates are not free to roam around the

21   facility, that staff and corrections officers don't leave their

22   posts.  If they do, there is someone there to direct them back.

23   These are basic core security protocols.  So the recommendation

24   to develop a plan by October 4 to address these I think is

25   certainly reasonable, it's narrow, and I think the department

 1    and the city is consenting to that today.

 2         THE COURT:  Mr. Powell, if I can interject for a

 3    moment, I think I heard Ms. Joyce, who will be able to speak

 4    for herself, but I think I heard her say that they are

 5    consenting to this, but may have issues with the timetable and

 6    some refinements.

 7         What I'll ask, Mr. Powell, is for you to go through

 8    your position on each of them.  There has been a lot of

 9    discussion of the problems and the recommendations, so to the

10    extent that you can focus on particular issues or questions

11    that have not been brought out in earlier remarks before I turn

12    to Ms. Joyce for responses or something that you specifically

13    want her to speak to, that would be helpful.  I appreciate that

14    you have been patient for two hours.  I am not trying to cut

15    you short.  I am just trying to make sure that we all stay

16    focused on what we specifically need to address together.

17         MR. POWELL:  Sure.  We will do that.  I will do that,

18    your Honor.

19         As far as the deadline, I think that's what Mr. Martin

20    recommended and thought was reasonable.  If there is a

21    different deadline that the city wants to propose now, we are

22    happy to hear that.  I had planned to go through the specific

23    relief and recommendations as outlined by the monitor and why

24    we think they are reasonable and that the record supports the

25    adoption of those recommendations.  Do you want me to proceed

1   with that?

2          THE COURT:  Let me ask Ms. Joyce right now.

3          Ms. Joyce, do you have issues with the reasonableness

4   of recommendations 1A through E, leaving aside for a moment the

5   timetable which I expect you may want to speak to?  If you have

6   issues with the reasonableness of them, I will ask Mr. Powell

7   to make his arguments on them.

8          MS. JOYCE:  Your Honor, we don't have an issue with

9   the reasonableness of 1A through E, but I do want to just

10  briefly respond in that we received the status report with the

11  recommendations last night, and I gave my initial positions on

12  the recommendations to Ms. Friedberg this morning out of

13  respect for her relationship because I wanted her to have a

14  heads-up as to what the city's thinking was.  I gave the Court

15  our initial thoughts on the position because the Court asked.

16         But I did not in any way mean, as Mr. Powell is

17  apparently taking it, that the city was consenting right now to

18  the language, which is why I asked the Court for a week to

19  respond in writing with the exact language and dates that we

20  are agreeing to.

21         I don't agree with Mr. Powell's -- to negotiate these

22  things on the phone.  I think it's really important that

23  everything be put in writing and that's why I asked for next

24  week.  If Mr. Powell was understanding that we were just

25  consenting to everything right now, that was not what I meant.

1    I meant what I said when I said that we want more time to

2    continue discussing certain provisions with the monitor, but

3    that we agree to 1A through E, the overarching recommendation.

4    We need to work out some of the logistics.  To No. 2 we agreed.

5            I hope I answered the Court's question.

6            THE COURT:  Thank you for that clarification.

7            MS. JOYCE:  Your Honor, if I just may, I do also have

8    problems with the verbal applications that Ms. Werlwas and

9    Mr. Powell are now making.  I just wanted to put that on the

10   record that the city would request, respectfully, that they put

11   their requests in writing and that the city have an opportunity

12   to respond to their requests, and also just one final thing

13   because I don't want the Court to think that this is anything

14   about the city's objection.

15           Ms. Werlwas said something to the extent that it's

16   about the money.  This has nothing to -- the consultant has

17   nothing to do with money and with the city paying for

18   consultants.  We pay the monitoring team.  We pay their

19   staffing consultant that they just hired.  It's not about

20   payment or money.  So I don't want the Court to think that's in

21   any way a consideration that is going into our responses to

22   these recommendations.

23           That's all I have to say at this point.

24           THE COURT:  Thank you, Ms. Joyce.

25           Mr. Powell, please proceed as you believe appropriate,

 1      in light of Ms. Joyce's response.

 2              MR. POWELL:  Sure.  Just in light of that response,

 3      also, I point to the fact that, again, I understand the letter

 4      was submitted yesterday, but in that letter the monitor

 5      references how he is, I think, rebuffed by the city on some of

 6      these discussions and his recommendations over the last month,

 7      up until this court conference was scheduled.

 8              So, again, I just would like to make it clear, having

 9      been involved in the discussions with the monitor, and we

10      appreciate his candor with us and his updates to us on the

11      status of kind of his dialogue with the city, that what's in

12      here in this letter is not new, and we just are looking to move

13      forward with a directive that the city and the department

14      implement these fairly narrow and limited recommendations, and

15      we'd also ask that the city be directed to report to the court

16      and the monitor on a periodic basis the status of implementing

17      these recommendations as well as the status of the various

18      items that are outlined in appendix A to the monitor's letter

19      from yesterday.  That report, in our view, should include

20      specific data showing whether there has been progress made on

21      these initiatives.

22              Specifically, we think that there should be reporting

23      to show whether there is any more progress in limiting and

24      reducing the absenteeism levels at the department which have

25      grown, everyone agrees, to an unacceptable level.  We would

 1   request and we did request the monitor provide this, and we did

 2   receive it for last week.

 3         But they would be reporting on the number of staff who

 4   are out sick or AWOL or on medically modified leave on at least

 5   a weekly basis in order to track when there is actually real

 6   process that is being made.  The data that we received from the

 7   monitor last week showed that approximately one-third of the

 8   department's current uniformed staff fell into one of those

 9   three categories.  Indeed, the data that we got showed that

10   there was a slight worsening or increase in those numbers

11   between September 1 and I think it was September 13 or 14, when

12   we got the numbers.  We would request that in that reporting

13   that there be specific data showing whether these initiatives

14   are working or not working.

15         One other example with respect to the monitor's

16   recommendation that the city process new admissions through

17   intake within 24 hours.  Again, this, my understanding, is the

18   city's policy.  The monitor is just recommending that they

19   follow their own policy, and we are here asking that the Court

20   direct them to follow their own policy.  Again, it's not

21   groundbreaking.  This intake problem has been well documented

22   in the record, in the press, and the commissioner has

23   acknowledged that.

24         We would ask that in the periodic reports to the

25   report the city report out how many instances are inmates

 1   staying in intake for longer than 24 hours and, if so, why is

 2   that?

 3            Again, we think there is a crisis on the island.  It's

 4   very important that there be transparency and accountability,

 5   not just plans and words and letters back and forth.  We think

 6   that the public and the Court and the monitor has a right to

 7   know, is there progress being made on these initiatives.  We

 8   can go back and file a written application and have the city

 9   respond, but, again, these immediate security initiatives are

10   things that have been raised with the city before.  They go to

11   basic corrections practice.  We want to get the immediate

12   relief and have the city implement the recommendations as soon

13   as possible.  We are very disappointed hearing, and Mr. Martin

14   can speak for himself, about the lack of responses he was

15   getting over the last few weeks on some of these basic

16   recommendations.

17            As to, just briefly, the second and third

18   recommendations, categories of recommendations in Mr. Martin's

19   letter from yesterday, expanded criteria for department

20   leadership, we are very happy to see that the city fully agrees

21   with this recommendation.  But, again, we note that this

22   recommendation was laid out in detail in the monitor's report

23   that was filed in May.  Exact same recommendation directing the

24   city to consider it and figure out whether they can hire people

25   outside the department to fill what is clearly a gap in

1    leadership, and it's been well documented in each and every

2    report that Mr. Martin has submitted.

3           Here we are, on September 24 at a court conference

4    and, again, we are hearing, we will look into it.  We agree

5    with the idea.  I think it is time and the record sufficiently

6    supports that the Court direct the department to do what

7    Mr. Martin is recommending, which is only report back by

8    October 11, after conferring with the state, regarding how they

9    can implement this recommendation and a proposed solution.

10   That's all the recommendation is.  It's not requiring them to

11   do it.  It's putting a timeline and accountability on the

12   recommendations that Mr. Martin made four or five months ago

13   and which they say is a great idea.

14          The third category, appointment of security operations

15   manager, it's very clear from the record that the current

16   management of the department is incapable or unable to ensure

17   the basic security protocols are being followed by their staff.

18          Mr. Martin and his team are intimately familiar with

19   the system.  They review almost every incident.  They see the

20   video.  They come up with examples.  They write 300-plus page

21   reports.  It's very clear from the record that that the current

22   leadership of the department cannot implement what the monitor

23   is saying must be done.

24          Bringing in someone from outside, I know either

25   Mr. Martin or Ms. Joyce said that we want to talk to the

1   plaintiffs and the government about it.  Their position, our

2   position is that we agree with this recommendation.  This

3   should be done as soon as possible.  We don't want to hold up

4   the discussion in any way.  We agree that, obviously, the

5   details of what this person will do and their job function and

6   who they report to has to be worked out.

7           Again, all that Mr. Martin is recommending here is

8   that the parties provide an update by October 28 on the status

9   of discussions.  We think that deadline, we agree with

10  Ms. Werlwas, that should be moved up.  That's all that's being

11  directed here, is that they engage in discussions, don't rebuff

12  the monitor again, and report back to the Court on where they

13  are on this very important recommendation.

14          It's clear from the recent reports and submissions

15  from the monitor that he has lost faith in the ability of the

16  current leadership to implement basic security protocols and

17  make sure that the inmates and staff are safe.  So we think

18  this type of recommendation to bring in some outside assistance

19  is long overdue, and we think it's very reasonable at this

20  point to require the city to report back next month, more than

21  a month from now, on the status of discussions on efforts to

22  create this position.

23          A couple more things.  I know we have been going for a

24  long time this morning.  But just putting this all in a little

25  bit of context, and I think your Honor understands the context,

1    but this consent judgment was entered in 2015.  Report after

2    report has found that the department is in noncompliance with

3    the core provisions of the agreement, including implementing

4    their use-of-force policy, which basically means not engaging

5    in excessive and unnecessary force.  They have been found in

6    noncompliance with not timely disciplining their staff who

7    engage in excessive and unnecessary use of force.  They have

8    been repeatedly found in noncompliance with the failure to

9    comply with the requirement to properly supervise their young

10   inmates in a way to protect them from unreasonable risk of

11   harm.  That all happened well before this crisis.

12           There was a remedial order, as your Honor is aware and

13   noted, more than a year ago, last August, addressing -- trying

14   our best, after negotiating with the city for months and months

15   about what is the proper relief to address that noncompliance.

16   We reached an agreement.  We submitted it.  Your Honor approved

17   it last August.

18           Then the monitor reported they are not in compliance

19   with many provisions of that, including, notably, provisions

20   that directly link to the representations that you are hearing

21   now.  They were required under that order to implement a new

22   deescalation protocol to limit the use of intake areas.  Now we

23   are hearing people staying days and days in intake areas and it

24   being a source of disproportionate use of forces and absolute

25   chaos in those intake areas.  Here we are, a year later,

1    hearing that the situations that we tried to address on consent

2    with the city in a remedial order, addressing noncompliance

3    with the original court order, and it is getting worse.

4            We think that, in our view, and the government's view,

5    that the record is super clear and that the very narrow and

6    specific relief that the monitor is recommending here, most of

7    which has been presented to the city, is narrowly drawn and

8    supported by the record, and we are happy to address any

9    concerns that the Court has with the PLRA. We think, again,

10   that is satisfied. We would ask the city, if they consent,

11   that those conditions be satisfied when we come back to the

12   Court. But we think that this has to be considered in the

13   context of long-standing noncompliance with multiple court

14   orders by the city and the department.

15           Some of the initiatives that the city and Ms. Joyce

16   went through, while laudable, don't deal with the issues that

17   Mr. Martin is raising. He is talking about basic corrections

18   101, security protocols, closing doors, making sure shifts are

19   not unstaffed.

20           Some of what they are talking about is giving out

21   tablets to inmates, which we get it. We get that occupied

22   inmates are going to less likely to engage in violence, and we

23   don't take a position on whether that's a good initiative. But

24   what they are not addressing is his core kind of concerns.

25           I think our ask, just to be very, very clear here

1   today, is that the Court direct the city and the Department of

2   Corrections to implement the recommendations set forth in pages

3   6 through 8 of the letter submitted by Mr. Martin yesterday,

4   No. 1.  And, No. 2, that the Court direct the city and the

5   department to submit periodic reports to the Court on their

6   efforts to implement these recommendations, their efforts to

7   implement what is set forth in appendix A, which are their

8   initiatives that they have announced, and to include specific

9   data showing progress, including a number of inmates who are in

10  intake longer than 24 hours, the number of staff who are out

11  sick, medically modified, or AWOL, and the number of shifts

12  that are being left unstaffed due to staff shortages.  That is

13  our request today.

14          I'm happy to answer any questions your Honor has.

15          THE COURT:  Thank you.  I am going to turn to

16  Ms. Joyce at this point, and then I am going to ask the monitor

17  to comment as well.

18          Ms. Joyce.

19          MS. JOYCE:  Yes, your Honor.  Again, for the record, I

20  object to Mr. Powell's verbal request on the record to enter

21  the monitor's recommendations today into an order.

22          To be clear, the city consented to a status conference

23  at the request of Legal Aid.  If the parties had wanted the

24  Court to consider issuing an order, they should have raised it

25  with us or put it in writing to the Court so that we have

1   proper time to consider.  I don't agree to Mr. Powell's

2   request, and I really don't -- just to address some comments

3   that he made, the specific recommendations that we have issue

4   with, the one requiring the hiring of external consultants,

5   these are not things that have been -- correct me if I'm wrong,

6   Mr. Martin, Ms. Friedberg, the consultant requests haven't been

7   in the works or mentioned for months.  I think the first I

8   heard of it was Monday, this past Monday.

9           In terms of Mr. Powell's statement that we rebuffed

10  the monitor, I take offense to that.  I don't think anybody in

11  the city has been rebuffing Mr. Martin.  I myself, and I know

12  the operational team at the department and the folks at City

13  Hall have been working very diligently just on the operations

14  of the department, but also to get the monitor and his team

15  information that he needs.  So I hope Mr. Martin doesn't feel

16  like he was rebuffed.  If he does, I want to have a discussion

17  with him.  But I take offense to Mr. Powell's characterization

18  of our response or lack thereof to Mr. Martin.

19          Also, if Mr. Powell wants certain information, certain

20  reports, I don't know in theory -- we report all the time to

21  the monitor and his team, so they have this information.  But

22  if Mr. Powell and Ms. Werlwas want certain information, whether

23  it be informally to them directly or reported to the Court,

24  this was the first I'm hearing of it.  I really wish that these

25  requests could be made in writing to us.  It doesn't need to be

1    to the Court.  Send an e-mail to the city saying, could you

2    give us this information on such and such basis so we can

3    consider it.

4            But, again, in response to Mr. Powell's direct ask and

5    Ms. Werlwas' direct ask, we object to it and we just reiterate

6    our ask for one week to make a written submission to the Court,

7    after discussions with the monitoring team, about what the

8    specific language is and dates are that we are going to be

9    agreeing to.

10           To the extent that anyone thinks work will stop

11   between now and when we would submit a written response, that's

12   not the case, that the department is working on these very

13   issues.  If we can get working on them more between now and the

14   submission date, we will.  Work will not stop.  It's just we

15   received this.  Me and the principals, who I speak for, who

16   have been indirectly in the conversation, just want one

17   additional week from today to have further conversations with

18   the monitoring team to put our response in writing and respond

19   to any requests that Ms. Werlwas and Mr. Powell choose to put

20   in writing.

21           MR. POWELL:  If I can just respond to two points

22   quickly on that, Judge.

23           Just with respect to the term rebuff, I'm taking that

24   from Mr. Martin's letter.  On page 5, he says:  The monitoring

25   team has made multiple attempts to implore the department to

1    immediately address the security failures.  These attempts were

2    essentially rebuffed and ignored for almost a month with the

3    city and department claiming that the initiatives underway were

4    sufficient to address the monitoring team's concerns.  I am not

5    trying to characterize.  Mr. Martin can discuss that back and

6    forth or any frustrations that he has had before this

7    conference was scheduled.  I was just citing from the monitor's

8    own report.

9            I remain a little unclear as to what the city's

10   position is.  Is it in a week they will submit a written

11   response, or is it that they are going to report back on what

12   they agree to or a proposed order for the Court to direct?

13   What is the course that they are proposing?  Where our goal is

14   to have some Court-directed relief here that basically the

15   monitor will then be able to report back to the Court on

16   whether the things that are being ordered are being done.  I

17   just would like a little more clarity on what Ms. Joyce is

18   proposing.

19           As far as the data request, we did request the data on

20   staff absenteeism.  The monitor, I think, conveyed that request

21   to the city, gathered data, reported back to us.  That is data

22   we have requested.  Our ask here today is that the data be

23   submitted to the Court, also, so the Court can engage and see

24   whether there is actually being progress made on this crisis of

25   shortage of staff at the island.  Our ask is that this data,

1    and it's limited, be reported out to the Court so we can see

2    whether these initiatives outlined by the city are actually

3    having an impact on the island.

4              THE COURT:  Thank you.

5              Ms. Werlwas, you have your hand up, so I will call on

6    you.

7              MS. WERLWAS:  I just want to state that plaintiffs'

8    position on Mr. Powell's requests, so that the others can

9    respond, just to be clear, plaintiffs support the government's

10   requests for relief today and the reporting requests that were

11   made.

12             In terms of moving forward, we do have a proposal to

13   address the city's concerns.  What I would suggest is that

14   while we certainly can put exactly what we said in writing, we

15   could do so within an hour of this conference because what we

16   will do is cut and paste exactly the language in the monitor's

17   report in the e-mail and say, do you consent to this?  So there

18   is no ambiguity here, that is exactly what we want, is already

19   in writing, and all of us on the call have that in front of us

20   right now.  If it need to be in an e-mail, we can do that.

21             We could confer with the city today.  We could confer

22   with the city over the weekend or on Monday.  If there are any

23   parts of this that the city does not agree to, then we would

24   ask to come back to the Court on Tuesday and with the

25   principals whom are the decision makers, have the commissioner

1    here, and we could then go through what, if any, of the

2    remaining problems are as a control.  But we could get back to

3    the Court with an agreement on Monday night.

4              THE COURT:  Thank you, Ms. Werlwas.

5              Ms. Joyce.

6              MS. JOYCE:  Your Honor, just to respond briefly to

7    some points that Ms. Werlwas made, I am not sure why she keeps

8    pushing for the appearance of the principals.  The commissioner

9    is involved in all of these conversations.  I am speaking for

10   the commissioner and his position.  He doesn't need to be on a

11   call for the Court to hear exactly the same thing.  I speak for

12   the city, I speak for the principals, and the commissioner has

13   a jail to run.  So I am not sure why Ms. Werlwas keeps

14   insisting for the appearance of the principals.

15             Second, yes, I do want Ms. Werlwas and Mr. Powell to

16   have to, in writing, articulate their requests.

17             Third, in response to Mr. Powell's question for

18   clarification, as the Court noted, the monitor's letter is not

19   seeking a court order.  It is issuing recommendations and

20   asking whether or not the city accepts or rejects the

21   recommendations.

22             So what I thought I had been clear about to the

23   parties, and I apologize if I wasn't, my request would be for

24   one week to submit a letter to the Court stating our positions

25   about whether we accept or reject each recommendation, the

 1    exact language and date that we are accepting, and if we are

 2    rejecting, the reasons why and any steps that we have taken in

 3    regards to No. 2.  That is what the city's ask is.

 4         I am not sure if the Court has any clarification

 5    questions.

 6         THE COURT:  Not at this moment.  I would first like to

 7    hear from the monitor again.

 8         MR. MARTIN:  Yes, your Honor.

 9         I would first reference something that Mr. Powell said

10    that I want to maybe expand on or put in even more context.

11    It's at the crux of what I think we are dealing with and

12    addressing here.  He made reference to the city providing

13    laptops or app ads.  I don't know exactly what the reference

14    was.

15         The city has taken actions of significant magnitude in

16    many critical areas.  I know it's the product of a tremendous

17    amount of work by a lot of folks.  I don't wish to diminish

18    that at all.

19         The crux of the matter is, I'd like to draw on page 5

20    of our report toward the top of the page where -- this is a

21    sentence that I specifically wrote and insisted be in there

22    because I believed it crystallized the difficulty that we have

23    been having in seeking real immediate remedies from the city

24    where I say:  For instance, while repairing broken doors is

25    critical, of equal importance is requiring staff to secure

1    those doors once repaired.

2          To me, that illustrates what we are dealing with here

3    is two major tracks.  One, the depopulation, staff absenteeism,

4    those things are necessary and will have some effect.  But it

5    is the issue of what does the agency do and how they can

6    articulate what they are going to do now, once they get a

7    repaired door, of securing that when appropriate, to control

8    and limit movement of inmates.

9          As I said in my opening remarks, it's not complex in

10   the sense of these basic security operations we are talking

11   about.  It's diligence and commitment of upper management

12   through their supervisory chain of command to demand of their

13   staff that they stay on post, that they only open a door when

14   they should, and that they control unchecked movement by

15   inmates.  I can go on with a longer list, which may be the

16   product of some discussion, and will be, between my office and

17   the city and the agency.

18         But, for instance, systems have used what basically is

19   referred to as pin mapping in their institutions where they are

20   able to, in real time, identify the areas that are generating

21   the serious problems.  Again, this is not complicated.  Once

22   you identify those, then you sure up, through your personnel,

23   to address those high-incident areas.

24         I have not heard a single concrete response from the

25   Department of Corrections to date and still today of how they

1   are going to address these immediate security needs.  Not one.

2   Nothing.  That this should have to come from the monitor speaks

3   for itself about leadership in that agency.

4           Do we make a recommendation lightly of retention of an

5   external agent with demonstrated expertise?  No.  Your Honor

6   knows how I feel about intrusion.  She has always given me the

7   liberty to respect that.  But this is, so to speak, a red line

8   where intrusion is not an issue.  It's a compelling need.

9   Thank you, your Honor.

10          THE COURT:  Thank you, Mr. Martin.

11          These are immediate and pressing problems.  We did not

12  come here today to this conference with a specific request for

13  an order queued up.

14          What I am going to require is that the plaintiffs and

15  the government file their application for an order this

16  afternoon by 5:00, at the latest, that the parties meet and

17  confer immediately, including over the weekend, and that the

18  city respond -- that they meet and confer in an effort to craft

19  a consensual order with deadlines as to as many aspects of the

20  recommendations as can be consented to, with alterations in

21  language as may be necessary or appropriate, and that any

22  agreed language and the city's response to any aspects that are

23  not consented to be filed by noon on Tuesday and any necessary

24  reply be filed by noon on Wednesday.

25          I will set for 2:30 on Thursday, as long as Ms. Ng

1   doesn't tell me that doesn't work, a further conference and

2   hearing on the application for an order requiring compliance

3   with any aspects of the monitor's recommendations that are not

4   agreed.

5          The parties, to the extent there remain aspects of

6   these recommendations that are disputed, the parties must meet

7   and confer as to the procedures and content of the hearing and

8   the extent to which factual predicates can be stipulated and

9   filed by 5:00 on Wednesday.  I am just trying to make sure that

10  this all works mechanically for me so that I can be properly

11  prepared.  4:00 on Wednesday their proposal for the proceedings

12  on Thursday at 2:30, which will also be virtual, unless they

13  jointly request otherwise.

14         I think that that schedule covers an accelerated means

15  of addressing the issues that have been queued up, and I am

16  requiring you to be meeting and conferring about the specifics

17  of an order, but I do require and I expect that, as Ms. Joyce

18  has represented, there is undertaking of work and progress of

19  work on the substantive issues that are facing the individuals

20  who are confined at Rikers Island and that particularly

21  measures with respect to direction to the officers who are in

22  the units that it is absolutely unacceptable not to intervene

23  in observed self-harm behavior and it is unacceptable to be

24  willfully ignorant of self-harm behavior, to ignore self-harm

25  behavior or signs of it be communicated immediately.  There is

1   no good reason for anybody to think that that's acceptable.  To

2   the extent anybody misunderstands that, that has to be

3   communicated immediately.

4              Ms. Joyce, do you have any questions?

5              MS. JOYCE:  No, your Honor.  I completely understand

6   the Court's order.

7              I just have a question for Mr. Martin and

8   Ms. Friedberg, if you can --

9              THE COURT:  You're breaking up.  Start that again.

10             MS. JOYCE:  I would just ask if Mr. Martin and Ms.

11  Friedberg could send me the information about that incident,

12  the self-harm incident where the officers willfully ignored the

13  gesture.  If they could just send that to me offline, I'd

14  greatly appreciate it.

15             Yes, I understand the Court's order.

16             MS. FRIEDBERG:  Your Honor, we could send that to

17  Ms. Joyce within five minutes.

18             MS. JOYCE:  Thank you.

19             MR. POWELL:  Your Honor, just seeking some

20  clarification of what your Honor expects by 5:00 today.  Is

21  your Honor seeking a proposed order that we can submit?  I

22  understand that will be then discussed with the city.  But is

23  that the application that your Honor seeks, the language of a

24  proposed order?

25             THE COURT:  A proposed order with any further legal

 1   justification or reference to evidentiary record on which -- or

 2   documentary record on which the plaintiffs and the government

 3   are relying in requesting that order.  You have made oral

 4   remarks today.  You have made an oral application today.  But

 5   this is essentially an expedited motion on the schedule that I

 6   have set for entry of an order with the specific elements that

 7   you have laid out, and our local rules speak to the content of

 8   a motion, and you need to document that motion as thoroughly

 9   and as clearly as you can in the time that I have provided to

10   you.

11         Is there anything else that we all need to address

12   together this afternoon?

13         I'll just, for benefit of the record and the people

14   who are on audio, I will go one by one.

15         Mr. Martin, anything further?

16         MR. MARTIN:  No, your Honor.

17         THE COURT:  Thank you.

18         Ms. Werlwas, anything further?

19         MS. WERLWAS:  No.  Thank you, your Honor.

20         THE COURT:  Thank you.

21         Mr. Powell, anything further?

22         MR. POWELL:  No.  Thank you, your Honor.

23         THE COURT:  Ms. Joyce, anything further?

24         MS. JOYCE:  No.  Thank you, your Honor, for so much of

25   your time today.

 1              THE COURT:  Ms. Friedberg, anything further?

 2              MS. FRIEDBERG:  Nothing further, your Honor.

 3              THE COURT:  I thank you all, and I thank the monitor

 4     again and the deputy monitor for their candor, for their focus,

 5     for their documentation of the issues and conditions and their

 6     very specific consideration and proposal of steps, and I thank

 7     the parties' representatives and their clients for undertaking

 8     seriously to have movement and results here that will change

 9     the lives and conditions of the people who are confined in

10     Rikers Island.

11              This needs to be done now, needs to be done seriously,

12     and results need to be shown.  I believe there are, among the

13     listeners, representatives of staff at Rikers Island and it

14     will need the undertaking of everyone involved here to make a

15     difference in lives.  So that should be the goal, for safety,

16     for proper conditions, for people who are in custody and the

17     people who are charged with their care and safety at all

18     levels.

19              Again, thank you, all.  I will look forward to the

20     submissions.  I will expect and be hopeful that we will not

21     have to have a contested hearing next week.  I will be watching

22     the filings and my e-mail box for courtesy copies or any other

23     communications that may be appropriate through the e-mail box.

24              Thank you, all.  Strength and stamina for the hard

25     work that you have between now and next Thursday, and success

 1    in those endeavors for the benefit of those whose lives are in

 2    our collective care.

 3              We are adjourned.  Good afternoon.

 4              (Adjourned)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25