<u>Monitor's First Report on the Conditions of Confinement
for 16- and 17-Year-Old Adolescent Offenders
at the Horizon Juvenile Center (HOJC)</u>

First Reporting Period
November 12, 2020 to June 30, 2021

## The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Senior Analyst*

Pat Hurley, LCSW—*Subject Matter Expert*

Simone Lee—*Associate Director*

Emmitt Sparkman—*Subject Matter Expert*

Christina Vanderveer, J.D.—*Associate Deputy Monitor*

# Table of Contents

*Introduction* ............................................................................................................. *1*

    **Background** ....................................................................................................**1**

    **The HOJC Agreement** .......................................................................................**2**

    **Summary of the Current State of Affairs** ...........................................................**3**

*Compliance Assessment*.............................................................................. *13*

    **¶2(a). Protection from Unreasonable Risk of Harm** ........................................**13**

    **¶2(b). Use of Physical Restraints** .....................................................................**14**

    **¶2(c). Incident Report Review and Referral**......................................................**17**

    **¶2(d). Classification.** ........................................................................................**20**

    **¶2(e). Programming.** ........................................................................................**23**

    **¶2(f). Consistent Staffing**.................................................................................**25**

    **¶2(g). Behavior Management.**...........................................................................**28**

    **¶2(h). Room Confinement.**...............................................................................**34**

    **¶2(j). Staff Discipline**.......................................................................................**37**

*Appendix A: ACS's Comments to the Monitor's Report* ........................................... *i*

## Introduction

This is the Monitoring Team's first report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (HOJC), as required by the Voluntary Agreement ("HOJC Agreement") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entry 364 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the work completed by the City of New York and ACS to advance the reforms required by the HOJC Agreement from November 12, 2020 through June 30, 2021 ("current Monitoring Period"). During November and December 2020, the Monitoring Team consulted extensively with ACS to learn about current policy, practice and procedures and the type of data that was available to assist the monitoring effort. For the purpose of data collection, the Monitoring Team sampled cases and assessed staff practice from January through June 2021.

<u>Background</u>

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS)).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment included specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") and § XVI ("Inmate Discipline")) and separately required the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed a "Raise the Age" (RTA) law that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old charged on

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to HOJC, which was jointly operated by the Department and ACS. All 16- and 17-year-olds who were charged before the RTA effective dates for their age group are called, collectively, "Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at HOJC until they were released to the community, residential programs, or turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of HOJC also gradually shifted from a shared responsibility between the two agencies to the sole responsibility of ACS.

By the end of 2019, ACS had assumed full operational control of HOJC, save for a small number of DOC staff who operated the front security gate and held transportation positions. By mid-2020, the last Pre-RTA Youth was transferred out of HOJC, and the *Nunez* Monitoring Team discontinued its monitoring activities as the City, ACS, and the Parties to the *Nunez* Litigation determined the appropriate path forward given the change in circumstances. These final stages coincided with the onslaught of the COVID-19 pandemic, which also significantly impacted facility operations.

<u>The HOJC Agreement</u>

Given the change in circumstances, the City and ACS volunteered to enter into an Agreement concerning the supervision of 16- and 17-year-old AOs at HOJC. The Monitoring Team is responsible for assessing compliance with 10 substantive provisions of that Agreement. During this time, the Monitoring Team will *not* assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds and *Nunez* Plaintiffs and the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group while the HOJC Agreement is in effect. (*See* dkt. entry 364)

The HOJC Agreement includes 10 substantive provisions, all of which are discussed in detail in the next section of this report. For each provision, the Monitoring Team provides an assessment of current practice and applies a compliance rating. As is required by the Agreement, the Monitoring Team met with ACS' Commissioner during the Monitoring Period. In this meeting, the Monitoring Team offered a summary of the work completed to date and their key concerns, which were also reflected in periodic written feedback submitted to ACS/HOJC administrators.

The Monitoring Team is also required to file three reports during the pendency of the agreement. This is the first report of the three, covering the period November 11, 2020 (the date

of execution) to June 30, 2021. The second Monitoring Period is from July 1, 2021 to December 31, 2021, and the final Monitoring Period is January 1, 2022 to June 30, 2022. Once the Third Monitor's Report is filed, the Parties will meet to discuss any of the requirements that are not in compliance and whether the Agreement or portions of it should be extended or modified, or whether other steps should be taken to address the areas not in compliance.

Summary of the Current State of Affairs

The Monitoring Team is concerned about the level of youth violence and disorder at HOJC, staffing challenges hindering many aspects of compliance, and the lack of structure for reviewing staff's use of physical restraints at HOJC. Most concerning is the level of youth violence and overall disorder at the facility, and while successful implementation of several of the substantive provisions of the HOJC Agreement should have a direct impact on the level of violence, these initiatives remain a work in progress. For example, while the facility's behavior management program is well-conceptualized and certainly headed in the right direction, it is currently "under construction" and thus the facility lacks an organized approach for incentivizing and responding to youth's behavior with the depth and consistency needed to improve facility safety in the short-term.

- **The Substantive Provisions**

Robust implementation of the variety of tools required by the HOJC Agreement should lead to a safer facility in which both youth and staff can thrive. That said, there is considerable work to do to implement the behavior management program, to stabilize staff assignments to units, to restore the full array of educational and rehabilitative programming in the post-COVID era, and to build a multi-tiered incident review/investigation process. Throughout the Monitoring Period, ACS has been collaborative and responsive, organized and timely in its response to requests for information and most importantly, in many cases, has identified solutions to the problems discussed herein that appear to be workable, that are grounded in research on youth development and that resemble effective practices successfully implemented in other jurisdictions.

A fulsome discussion of each of the Agreement's 10 substantive provisions follows this Introduction, but in summary:

- ❖ **Protection from Harm (¶ 2(a)).** The facility environment is marked by high levels of youth violence against both peers and staff, in addition to other types of disorder. While the other provisions of the Agreement, once fully implemented, should improve facility safety, the current environment severely undercuts the facility's rehabilitative goals.

❖ **Physical Restraint (¶ 2(b))**. In general, staff appear to utilize or at least attempt to utilize trained SCM techniques. Although several problematic uses of physical restraint were identified by the Monitoring Team, the concern is less about the frequency of these problematic restraints and more about the facility's ability to detect and respond to incidents in which staff misuse force, or other supervision failures that create a situation where force is needed.

❖ **Incident Review and Referral (¶ 2(c))**. The facility lacks an adequate, structured system for reviewing incidents in which staff utilize physical interventions, in order to systematically identify poor practice or the misuse of force, including referring the staff involved for an appropriate level of corrective action or discipline when necessary.

❖ **Classification (¶ 2(d))**. HOJC has a structured, individualized process for determining which youth will be transferred to HOJC and then identifies the appropriate housing unit based on peer dynamics. All youth are initially admitted to Crossroads (ACS' admissions facility). Transfers from Crossroads to HOJC are triggered primarily by efforts to balance the populations, but proximity to the youth's family and court of jurisdiction are also major considerations. Transfer decisions are informed by an assessment of legal factors and behavioral observations and HOJC housing unit placements appropriately consider both individual needs and the constellation of peers on the receiving unit.

❖ **Programming (¶ 2(e))**. HOJC offers an array of rehabilitative and recreational programming each day, although the volume of programming provided has been negatively impacted by COVID. Program Counselor's services were sometimes interrupted for the purpose of quarantine, community vendors' programming was suspended for a period of time, and in-person education services were not delivered during the beginning of the Monitoring Period.

❖ **Consistent Staffing (¶ 2(f))**. HOJC does not currently have a sufficient number of staff to ensure that individual Youth Development Specialists (YDSs) and Associate Youth Development Specialists (AYDSs; Supervisors) are assigned to the same housing unit post day-to-day. ACS reports that hiring efforts are underway, but that the process is bogged down in bureaucracy and undercut by attrition. Consistent staffing is an underpinning of the facility's behavior management program, STRIVE[2], and therefore must be prioritized to support the proper implementation of that program.

---

[2] STRIVE refers to Safety + Teamwork + Respect + Integrity + Values + Engagement.

❖ **Behavior Management Program (¶ 2(g))**. Efforts to reformulate and fortify the facility's behavior management program, STRIVE, have begun. Program design, training modules, and an implementation strategy were finalized during the current Monitoring Period, and staff training in the initial two housing units is now underway. Implementation will be assessed in subsequent Monitor's Reports.

❖ **Room Confinement (¶ 2(h))**. HOJC does not use room confinement often—it is clearly not the default response to youth violence or other types of disorder. However, when a youth is placed in room confinement, staff do not consistently implement the various protections to mitigate the risk of self-harm and procedures to ensure that youth do not languish in room confinement that are required by policy.

❖ **Video Preservation (¶ 2(i))**. The process for preserving videotaped footage of incidents involving physical restraints is dependable and followed consistently. All that remains to achieve substantial compliance is to create a policy that formalizes the protocol.

❖ **Staff Discipline (¶ 2(j))**. There is simply a dearth of accountability for restraint-related staff misconduct. Although the Monitoring Team identified several incidents involving problematic staff behavior, ACS reported that no formal discipline was imposed for restraint-related misconduct during the Monitoring Period.

● **Quantitative and Qualitative Data Related to Youth Violence, Injury and Restraints**

The Monitoring Team reviewed both aggregate data and descriptions of individual incidents (*i.e.*, GOALS) each month. From January through June 2021, the number of youth in custody at HOJC averaged 37 youth (range 32 to 46). The graph below shows the number of youth-on-youth assaults (YOYA) and youth-on-staff assaults (YOSA) during the period of review. Taken together, the facility averaged about 24 violent incidents per month (range 10 to 45), with significant increases during the latter half of the Monitoring Period.



Because the number of youth in custody fluctuates, this type of data is best understood using a *rate per 100 youth* which neutralizes the impact of the changing size of the population and the variation in the number of days in a given month. The rate is calculated as follows: *Rate = ((# of incidents/# days in month)/ADP) * 100.*[3] The table below shows the rate of YOYA and YOSA from January to June 2021.

---

[3] Note that the formula used to calculate the *rate* is slightly different from the one reported in the Monitoring Team's previous reports on HOJC. The rate formula utilized here is the one ACS uses internally and includes the number of days in each Month. Rates using this formula are not comparable to rates utilizing a different formula, such as those in previous Nunez Monitor's Reports that discussed HOJC.



The average rate of YOYA was 1.06 and the average rate of YOSA was 1.02, and both trended upward during the Monitoring Period. Because this is the first report assessing the conditions at HOJC for AOs under exclusive ACS management these rates are essentially a baseline for future comparisons. That said, the Monitoring Team's experience in other jurisdictions suggests that this baseline reflects a facility that is marked by a significant amount of violence and other types of disorder, particularly during the latter half of the Monitoring Period, and must be reduced to adequately protect the safety of youth and staff at HOJC and in order for HOJC youth to be able to fully engage in the programs and services available to them.

The quantitative data—while useful for understanding the size and scope of the problem—lacks the nuance that is essential to understanding the Monitoring Team's concern about the facility's level of violence and disorder. Each month, the Monitoring Team reviews the descriptions (as reported by the Facility) of the fights and assaults occurring at the facility and also observes many of these incidents via videotaped footage. This review has revealed:

- Youth push/shove, wrestle, punch, kick and stomp the body, head, and face of other youth. Some of these assaults escalate from a verbal exchange, but many occur unprovoked. Two youth may engage in a mutual fight; a single youth may assault another youth; or a group of youth may attack a single victim. Assaults occur in the housing unit day rooms and also when multiple youth crowd into an individual cell. Further, an entire unit will engage in a brawl with another unit when they inadvertently encounter each other in the facility's common spaces.

- Youth have access to a variety of weapons, some of which are utilized during assaults and others are discovered via searches for contraband. This includes pieces of sharpened metal as well as hard objects placed in socks to be used as a bludgeon.

- Youth intimidate staff with verbal threats of physical harm (some of which include specific information about where the staff person lives and/or threats to their families) and regularly breach staff's personal space.

- Youth appear to have few qualms about reaching into staff pockets or equipment belts to obtain keys, radios, pens, or other personal items. They then engage in "keep away" or attempt to utilize keys to exit the housing unit.

- Some staff fail to maintain appropriate physical boundaries with youth, and youth appear to be comfortable putting hands on staff, play boxing or other physical horseplay. Youth frequently target staff who are new to the facility or who have not yet established clear boundaries and also target staff who appear to have a "short fuse" and can provide entertainment when provoked.

- During restraints, youth may throw elbows, kick at staff, bite/attempt to bite, spit on, and headbutt staff. Staff sometimes respond to these behaviors aggressively and a fight ensues, with other staff needing to use significant force to separate or keep staff from continuing to pursue or be aggressive with youth.

- In the latter part of the Monitoring Period, the Monitoring Team noted that youth appeared to have moved well beyond verbally intimidating staff given the increased frequency of pushing, shoving, punching, and striking staff in the body, head and face that was recorded in the incident reports.

All physical aggression brings with it a *risk* of harm, separate from whether an injury is actually sustained, and efforts to improve facility safety must minimize this risk. In addition, an environment with frequent violent behavior is stressful and potentially traumatizing to both the youth in custody and the staff who work at HOJC. That said, a significant proportion of the incidents occurring during the current Monitoring Period *did* result in injuries to youth or staff. Of the 76 YOYA during the current Monitoring Period, 50% did not result in an injury to youth (n=38), but 42% resulted in a minor injury to youth (n=32; Injury B) and 8% resulted in a serious

injury to youth (n=6; Injury A).[4] Similarly, 40% (28 of 70) of the YOSA resulted in staff injuries (the severity of staff injuries is not classified by HOJC medical staff given that most staff are treated off site).

In addition to violent incidents, HOJC also tracks the number of incidents involving physical threats and aggression. Between January and June 2021, HOJC experienced a total of 264 incidents involving physical threats and aggression toward others (or about 40 per month). Taken together, on average and with a population of about 37 youth, HOJC experienced approximately 69 violent/aggressive/threatening incidents each month (average 13 YOYA, 12 YOSA, 9 physical threats, and 35 acts of physical aggression). In response to these violent/aggressive/threatening behaviors, youth were involved in physical/mechanical restraints 204 times during the Monitoring Period.

ACS' restraint data tabulates the number of *youth* who were restrained in contrast to its data on YOYA and YOSA which tabulates the number of *incidents*. This means if 6 youth were involved in an assault and all six were restrained, the data related to that incident would include one assault and six restraints. It is also important to recognize that not all YOYA or YOSA lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands), and that restraints are also used to respond to youth behaviors other than YOYA/YOSA (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring).

The graphs below present the raw number and rate of both physical and mechanical restraints from January to June 2021. As noted above, this is the Monitoring Team's first assessment of conditions at HOJC since the facility was managed independently by ACS. As such, these data serve as a baseline for future comparisons.

ACS physical restraint data includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework. As guided by SCM developers, ACS' restraint data does **not** include escort holds, even if the escort is of a non-compliant resident and some physical coercion is needed. It also does **not** include incomplete ESPIs that do not result in a physical restraint (that is, a staff member attempts a specific restraint technique but fails and

---

[4] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.

does not restrain the resident, the event then terminates with the resident ultimately complying without the use of physical restraint). That said, ACS does provide the Monitoring Team with information about these types of events. Escort holds and incomplete ESPIs are not considered "physical restraints," but they are reportable events that are included in the GOALS reports shared with the Monitoring Team. Because escort holds are excluded from the physical restraint data below, this data should be considered under-inclusive in terms of understanding the frequency with which staff needed to use physical force with a non-compliant resident.

These graphs illustrate that, along with the rate of violent incidents, the rate of physical restraints also increased considerably at the end of the current Monitoring Period. Mechanical restraints also were slightly trending upward, which is also of concern considering mechanical restraints are reserved for instances in which less restrictive means of controlling a resident were not successful and demonstrate a significant physical intervention was necessary to control a resident.





All of this is enormously disruptive to a facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor or witness, the youth in custody at HOJC are regularly exposed to trauma in the facility environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including deeper penetration into the juvenile justice system. Staff are also negatively impacted by trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth effectively. Regardless of the quality of programming and services available at HOJC, the level of violence and disorder at the facility undercuts the benefit that HOJC youth may derive from it.

In addition to reviewing quantitative data and narrative incident descriptions, the Monitoring Team also reviewed the video footage of 24 incidents that occurred during March-May 2021 (this is 39% of the restraint incidents that took place during that timeframe), in addition to the video for seven other significant incidents not categorized as restraints. The video review was part of the Monitoring Team's assessment of HOJC staff's use of physical restraint (discussed in detail in ¶2(b), below), but also depicted a facility in which the behavior management program does not appear to be particularly compelling or effective with a large segment of HOJC youth, given their violent behavior against other youth and staff and routine property destruction.

- Impact of COVID-19

As is true in juvenile justice facilities throughout the nation, the COVID-19 pandemic continues to impact nearly every aspect of HOJC's operation. ACS described the impact of COVID on HOJC's operation in this way:

> *"The operational disruption caused by the extraordinary ripple effects of the pandemic seriously impacted ACS' ability to achieve substantial compliance in many key areas of the Agreement, notwithstanding the good faith efforts made…ACS was forced by COVID to rapidly prioritize the reconfiguring of programming and visitation for youth; adjust facility staffing patterns to account for dramatic losses of staff to illness and Workers Compensation; develop remote hiring and training protocols to ensure a steady stream of new staff onboarding during a Citywide hiring freeze; develop and implement entirely new protocols to address enhanced cleaning of housing and common areas, virus testing for youth, health screening for staff, extensive contact tracing and repeated quarantines in housing units.*

> *These specific examples represent only a small portion of the operational disruptions at HOJC brought on by COVID during this first monitoring period. And while these COVID-related disruptions were operationally all-consuming, they were further complicated and exacerbated by the emotional toll on both youth and staff [who are] living and working each day in a closed, socially distanced, custodial environment during a global outbreak of a deadly and rapidly spreading airborne virus. The disruption to normal routine, fear, separation and uncertainty introduced to the facility with the onset of COVID unquestionably raised levels of tension and anxiety among youth and staff. Nevertheless, in the face of this deadly virus, ACS steadily advanced the priorities contained in this Agreement and remained steadfastly committed to each substantive provision."*

Specific COVID-related modifications or challenges to the practices at the heart of the HOJC Agreement are discussed in more detail in the compliance assessment of each provision below.

## Compliance Assessment

The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback and requests for technical assistance, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrate ACS' deliberate good faith efforts to improve its practice (as required by ¶1 of the HOJC Agreement).

The Monitoring Team considered the broader context for our findings (particularly the significant obstacles presented by COVID) and gave due consideration to the totality of the circumstances when assessing ACS' level of compliance with the substantive provisions of the HOJC Agreement (as required by ¶5(c)). For each of the substantive provisions enumerated in ¶2 (a-k), ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The Compliance standard applied, pursuant to the HOJC Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring." As provided for in ¶ 5(b) of the HOJC agreement, ACS' comments to the Report are attached as Appendix A of this Report.

---

**¶2(a). Protection from Unreasonable Risk of Harm.** AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

ACS Policy & Practice.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of and pathway toward physical and emotional safety:
  - V.A "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
  - V.C "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility. Maintaining appropriate staff ratios at all times…"
  - V.D "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of

---

information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
- o Incident is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."
- Quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, and restraints are submitted to the Monitoring Team each month, along with narrative summaries of all incidents occurring at HOJC.

**Monitoring Team's Analysis**.

The number of violent incidents and other types of disorder occurring at the facility is cause for concern, as discussed in the narrative above.  The level of violence and disorder is enormously disruptive to the facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor or witness, the youth in custody at HOJC are regularly exposed to trauma in the facility environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including deeper penetration into the juvenile justice system. Staff are also negatively impacted by trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth effectively. Regardless of the quality of programming and services available at HOJC, its rehabilitative value is negatively impacted by the level of violence and disorder at the facility.

Robust implementation of the variety of tools required by the Voluntary Agreement should lead to a safer facility in which both youth and staff can thrive. That said, there is considerable work to do to before a safer facility is realized by implementing the behavior management program, stabilizing staff assignments to units, restoring the full array of educational and rehabilitative programming in the post-COVID era, and building a multi-tiered incident review/investigation process.

**Compliance Rating**. Non-Compliance

**¶2(b). Use of Physical Restraints.** ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting of such incidents, including Policy #2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leaderships Strategies (GOALS)"). The aforementioned policies shall be referred to herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.[5]

---

[5] NY State Law regarding the use of physical restraint (§180-3.15) has requirements that limit the circumstances in which it can be used; requirements for staff training; prohibitions on specific types of restraints; requirements for medical review; reporting; parent notification; and post-restraint debriefing protocols. NY State Law regarding the use of mechanical restraints (§180-

(i). The Monitoring Team Panel shall assess and provide feedback, in collaboration with ACS's division of Youth and Family Justice (DYFJ) senior managers, on ACS' staff reporting and use of Physical Restraints, and shall provide any necessary recommendations for enhancements to reporting, limiting physical interventions where possible and improvements with respect to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches to youth-on-youth violence, youth-on-staff violence, staff-on-youth violence, and other situations with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training and articulate general improvements to practice as necessary.

### ACS Policy & Practice.

- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that ACS staff employ Safe Crisis Management ("SCM"), a comprehensive approach to behavior management which requires substantial effort in prevention and non-physical interventions before staff may resort to Emergency Safety Physical Interventions ("ESPIs") to restrain residents.
  - This policy outlines the training requirements for implementing SCM, the proper administration of ESPIs, and considerations before, during, and after an ESPI is used.
  - Mechanical restraints may only be used when ESPI techniques are unsuccessful in controlling aggressive physical behavior and when staff have determined that such an intervention is in the best interests of the youth involved.
  - Overarching Principles:
    - The policy states that the primary purpose of any emergency intervention is to "protect the safety of the youth who is being restrained and all other youth, the staff, the community, and others who may be present within a context that promotes healthy relationships with youth, including employing effective communication, making empathetic connections, and establishing a structured, consistent environment."
    - The policy states that where physical interventions are necessary, staff shall use only the minimum amount of physical intervention necessary to stabilize the youth or situation.
    - The policy expressly prohibits the use of excessive force or inappropriate restraint techniques.
- Staff reporting of physical restraints is addressed regarding ¶ 2 (c) below.

### Monitoring Team's Analysis.

---

3.16) limits the type of equipment that can be used; requires staff to be trained; positions mechanical restraints as a last resort in the facility's restraint continuum; requires constant supervision of youth while in mechanical restraints; and requires authorization at various intervals.

Despite the overall level of disorder, ACS staff use of physical restraints are usually proportionate, and staff appear to utilize or at least attempt to utilize trained SCM techniques when physical intervention is necessary. That said, the Monitoring Team identified several problematic uses of physical restraints, and there is still significant room for improvement in the facility's ability to detect and respond to incidents in which staff misuse force, or other supervision failures that create a situation where force is needed. Of utmost concern is that when staff misuse force, it appears to go unaddressed.

The Monitoring Team reviewed video footage and related documentation such as staff reports and injury reports (collectively referred to as "packets") for 31 events occurring between January and June 2021 at HOJC—of these, 24 were classified as physical restraints, and 7 were other types of events captured by GOALS. Events were selected based on the initial description in GOALS where either a significant physical intervention occurred or some other type of interaction between staff and residents that appeared to warrant review by the Monitoring Team. The purpose of the review was to assess whether HOJC staff use physical restraint techniques that are safe, proportional, properly executed, and well-timed in response to behavior from youth that presents an imminent risk of physical harm to another person.

For the most part, ACS staff either use or attempt to use trained SCM techniques in response to situations involving an imminent risk of harm. Staff competency in applying these techniques is mixed. The Monitoring Team reviewed incidents that involved successful, appropriate application of SCM techniques, but also some incidents where staff's attempt did not succeed due to the staff's lack of skill mastery. SCM techniques can be difficult to perfect and require consistent practice over time.

While most restraints were primarily in response to youth-on-youth violence or aggressive, threatening behavior toward staff, HOJC staff sometimes escalated the situation and/or responded too aggressively. In addition, a small number of residents are repeatedly involved in aggressive, violent incidents, and staff appear to be more likely to respond aggressively toward those "known" residents. Staff appeared to be overly aggressive toward one resident in particular in circumstances when the resident was passive or mildly resistant, likely due to the resident's history of confrontational and aggressive behavior.

The Monitoring Team identified 11 incidents that involved the use of prohibited holds, staff escalation, the failure to temper force when necessary, and excessive or unnecessary force. Concerning incidents included:

- Using head strikes on a resident who posed no immediate threat.

- Multiple examples of staff members pursuing, agitating, and provoking residents.

- Staff provoking and escalating an incident which ultimately involved excessive force and required significant physical intervention to separate a staff member and resident.

- Two examples where Staff used an aggressive take down of residents including prohibited holds around the resident's neck, where lesser means of restraint would

have been appropriate (including in one example where the resident posed no immediate threat).

- Multiple instances of staff needing to physically separate or prevent other staff from going after residents after the situation had been brought under control.

Three of the 11 problematic incidents involved non-serious injuries (Injury B), and no injuries were sustained in the remaining 8 incidents. As described further in ¶ 2(c) below, the Monitoring Team did not detect any action on the part of HOJC supervisors that identified the staff's misconduct nor any corrective response to any of these incidents. Therefore, while staff misconduct during the use of physical intervention is not pervasive, it does occur, and HOJC's lack of a structured process to identify and address poor practice and misconduct impedes improved staff practice going forward.

**Compliance Rating**. Partial Compliance

---

**¶2(c). Incident Report Review and Referral.** ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies. ACS shall also refer any cases to the New York State Justice Center regarding staff use of Physical Restraints and/or Prison Rape Elimination Act ("PREA") allegations when required by applicable laws, regulations or policies.

**ACS Policy & Practice.**
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS reports are created for every incident occurring in the Facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.
- ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires:
  - (1) that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnesses the event must submit an Incident Report Form;
  - (2) a Supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form for at least one staff involved in the incident; and
  - (3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.
- For all incidents reported to GOALS (not just physical restraints), additional layers of supervisory review *can* occur on an *ad hoc* basis, including:
  - An Operation Manager's Report is supposed to be generated for critical incidents, which is generally those incidents involving a resident injury or alleged child abuse.
  - Review by an Incident Review Committee. By design, this committee is intended to randomly audit incidents, but ACS reports review by a committee is

not currently occurring. Instead, this review is conducted by one individual who reviews more serious incidents on a weekly basis.

- ACS Policy #2019/16 "Abuse/Neglect Reporting and Justice Center Compliance in a Secure and Specialized Secure Detention" requires any staff working within ACS' secure detention facilities to immediately report all events meeting specified criteria for abuse, neglect, or a significant incident to the Justice Center for the Protection of People with Special Needs ("Justice Center") Vulnerable Persons Central Register.
- ACS' "Safe Intervention Policy for Secure and Non-Secure Detention" also states that the use of excessive force or inappropriate restraint techniques must be reported to the Justice Center.
  - o ACS' Compliance Unit tracks referrals made to the Justice Center.
  - o During the current Monitoring Period, 19 incidents involving physical restraint were referred to the Justice Center.

**Monitoring Team's Analysis**.

*The assessment of compliance with this provision is divided into three sections.  First, ACS' internal assessment of incidents within the facility.  Second, an assessment of staff reporting of incidents they are involved in or witness to. Third, is an assessment of any referrals of specific incidents to the Justice Center.*

- *Leadership Assessment of Incidents*

HOJC has an adequate mechanism for reporting incidents internally, including all physical restraints, via GOALS. The GOALS reports provide a high-level summary of each incident that occurred at HOJC. However, HOJC lacks a systematic process for incidents to be *assessed* by a supervisor. While ACS leadership reported regularly reviewing incident videos and taking informal action when necessary, there is simply no systematic process to evaluate staff actions in incidents involving physical restraint.

There are currently two forms that provide an opportunity for written supervisory assessment. The "Supervisory Follow-Up" portion of a staff's Incident Report Forms, if completed, is confusing, often unclear and focuses only on resident-focused follow-up. The reviews do not assess staff's conduct during the incident. While Operation Manager's Reports are often more detailed, but they occurred only sporadically and are not tracked centrally. In other words, there is no mechanism to determine whether an incident was critiqued via an Operation Manager's Report other than its presence in the paperwork included in an incident packet.

Among the incidents reviewed by the Monitoring Team, 11 involving physical restraints were identified as problematic as discussed in ¶ 2(b) above, including three of the 11 in which residents were injured. For these 11 problematic incidents, there were no Operation Manager's Reports, the Supervisory Follow-up comments (if any) were lacking, no corrective action for staff was taken in response to any of these incidents, and none of the 11 were referred to the Justice Center (this issue is discussed further below).

Shortly after the close of the First Monitoring Period, the Monitoring Team recommended the development and implementation of a systematic and consistent review of GOALS[6] incidents.

1. <u>Improved Incident Report Forms</u>: The Monitoring Team suggested a structural change to the "Supervisory Follow-Up" portion of a staff's Incident Report Form, so that it can be easily located given the number of staff reports in an incident packet. The Monitoring Team also advised that supervisors focus more squarely on staff's conduct and clearly indicate whether any corrective action is recommended as part of the supervisor's assessment of an incident.

2. <u>Expanded Use of Operating Manager Reports</u>: In addition, the Monitoring Team suggested that ACS expand criteria (and consistently apply it) for when an incident requires an Operating Manager's Report. Instead of relying on resident injury as the criteria to trigger a report, the criteria should be expanded to include any incident where there is a *risk* of harm.

3. <u>Central Repository to Track Incident Assessments</u>: Finally, the Monitoring Team recommended that key data from these supervisory reviews should be tracked in a central repository so that follow-up actions taken for each incident are recorded and easily retrievable. For each incident, the tracking process should identify whether the supervisor identified or addressed any issues at the initial review stage, whether any corrective action was recommended in response to staff's conduct, whether an Operating Manager's Report was required and when it is completed, whether the incident was referred to the Justice Center, along with basic details about the incident including date, location, injuries, etc. Once a more systematic procedure is in place to identify those incidents that require further scrutiny, the current investigative process (*e.g.* Operating Manager's Reports) may also need to be refined to support more appropriate incident review.

ACS reports it is working to address the Monitoring Team's feedback in the next Monitoring Period. The Monitoring Team will work with ACS to develop and implement this systematic process going forward.

- *Staff Reporting*

The "Safe Intervention Policy for Secure and Non-Secure Detention" requires that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnesses the event must submit an Incident Report Form. The Incident Report Form has required fields including basic information such as date, time, and involved youth, and general narrative section as well as an

---

[6] Due to the various categorization of GOALS events (including that "physical restraints" does not capture escorts techniques, or incomplete/unsuccessful ESPIs), the Monitoring Team did not limit its recommendations for systematic review of incidents to "physical-restraint" incidents, and instead recommended this type of review is conducted and recorded for *all* GOALs events.

ESPI-specific portion of the form where staff must identify what type of physical restraint was utilized, for how long, and other information specific to the physical restraint. As noted above, the Monitoring Team reviewed the incident packets for 31 incidents, including 24 physical restraint incidents, and found in these packets that the Incident Report Forms for staff who participated in, or were witness to the incident, were often missing from the packets, and those included were often vague or incomplete. Review of staff reports, and identifying and addressing any deficiencies in Incident Report Forms, must also ultimately be included as part of the systemic review of incidents going forward.

- *Justice Center Referrals*

ACS policy articulates the requirements for Justice Center referrals, including a requirement to track incidents that are referred. HOJC appears to refer significant incidents (that are identified by ACS leadership) as required. However, while HOJC makes Justice Center referrals when significant incidents are identified, the lack of consistent supervisory review of all incidents, discussed above, means that some instances of problematic staff behavior that may warrant referral are not identified, and therefore they also may not be referred to the Justice Center as required. Many of the problematic incidents identified by the Monitoring Team identified (described above) may not require a referral to the Justice Center as they do not meet the technical definition for referral because they are not a significant incident (*e.g.* those incidents that involve Staff agitating or provoking a resident but do not result in significant force or injury). The Monitoring Team is working with ACS early in the next period to identify whether any of the 11 identified incidents should have been referred to the Justice Center, and to refer accordingly.

Improvements to the incident review process should have a corresponding impact on the number of incidents that are referred to the Justice Center. Once supervisors and Operations Managers are systematically focused on evaluating staff conduct, they are likely to identify a larger number of incidents that meet criteria for referral to the Justice Center.

**Compliance Rating**. Non-Compliance

---

**¶2(d). Classification.** ACS shall develop and implement an age-appropriate classification system for AO Youth that is sufficient to protect AO Youth from unreasonable risk of harm and informs and guides the appropriate housing of AO Youth, and permits the use of overrides to address youth's mental health, education or other individual needs.

**ACS Policy & Practice.**

ACS Policy

- Section VII. "Classification and Housing Assignment" of ACS Policy #2019/35 "Orientation and Classification in Secure and Specialized Detention" describes the processes by which ACS determines to which facility and housing unit each youth will be assigned. The standard procedures were modified slightly during the COVID-19 pandemic, but typically:

- o All AO youth entering secure detention do so via Crossroads Juvenile Center ("CR").
- o Within 5 days of admission, an Intake/Orientation case manager completes a Classification Guidance Form that includes a variety of risk and mitigating factors to assess the youth's risk level.
- o Intake/Orientation staff complete Behavior Observation Reports that characterize the way in which youth interact with peers and staff.
- o Each week, an interdisciplinary team that includes ACS leadership (who oversee both facilities) and CR/HOJC staff discuss the placement of the youth and determine who can be suitably transferred to HOJC. This process is driven partly by the youth's needs and partly by the need to balance population/bedspace at Crossroads (*e.g.*, when the Intake/Orientation unit is near capacity, the team will meet as needed to identify youth who can be transferred to HOJC).

ACS Practice

- The same level and type of services are available at both Crossroads and HOJC and thus facility placement should have no impact on the ability to address youth's mental health or education needs.
- ACS reports that the primary determinant for placement at HOJC is facilitating family engagement. Youth whose parents/guardians reside in Manhattan, Queens or the Bronx are typically transferred to HOJC. Secondarily, the court of jurisdiction for the youth's legal case is considered. Exceptions are made for individual circumstances, such as the youth's adjustment at Crossroads.
- At the weekly Classification meetings, in addition to the proximity of family, the group discusses youth's peer relationships, connections to staff, program engagement, adjustment to the facility, etc. to identify those for whom transfer would be appropriate and/or beneficial. These youth are placed in "the cue" and are transferred when the facility populations need to be balanced.
  - o This may take a few weeks, and so youth are not necessarily transported within days of the transfer decision—sometimes, they are transferred a couple weeks later.
  - o Occasionally, when Crossroads' population is already high, youth who are best suited for housing at HOJC may be admitted to Crossroads and then transferred quickly, before the classification committee's Thursday meetings. In these cases, the classification packet is sent to HOJC with the youth so that HOJC has the benefit of the information, and the youth is discussed at the next Thursday meeting to revisit/confirm the transfer decision
- At HOJC, all of the housing units are identical in terms of security/supervision level and the types of services and programs that can be accessed. At times, youth with certain characteristics (*e.g.*, particular vulnerabilities; lack of prior history in detention) are housed together. Usually, the primary determinant for housing unit assignment is the extent to which the youth assigned to the unit coexist peacefully.

- Upon transfer, the HOJC Operations Manager/Tour Commander review the recommended housing unit, assess whether the composition of youth on the unit is still amenable to safe placement, and make the final housing unit assignment.
- In mid-2020, HOJC was initially identified as the place where COVID-exposed youth would be quarantined, and thus most of the youth housed in HOJC at that time were transferred back to Crossroads to create space for quarantining needs. At the beginning of the Monitoring Period, HOJC admissions were still quite irregular due to ACS' continued efforts to mitigate the spread of COVID. However, the volume of youth who were exposed and/or became ill was nowhere near what was expected, so by early 2021, the COVID-exposure restriction was lifted, and youth were transferred to HOJC more regularly. By the end of the Monitoring Period, the classification and housing process stabilized, and transfer decisions reflected the criteria described above.

**Monitoring Team's Analysis**.

To assess ACS' practices in this area, the Monitoring Team reviewed information regarding transfer decisions for the 32[7] youth who were transferred to HOJC during April/May/June 2021.[8] The information included the Classification Guidance Form, notes from the weekly Classification meetings, Behavior Observations Forms, and the youth's Safety Plan. The primary reason that each youth was identified for transfer to HOJC was to be closer to family/court of jurisdiction (*i.e.*, the youth lived in the Bronx, Manhattan, or Queens). Each youth's file contained a Classification Guidance Form with specific, individualized information to guide housing unit assignments (*e.g.*, mental health issues, behavior while in custody at CR, peer alliances/tensions). However, several of the youth's files did not contain the required Behavior Observation Forms—an issue that ACS reported was due to a reliance on paper forms. To address this problem, ACS now requires Behavior Observations Forms to be scanned once complete, which has reportedly increased the availability of this information.

Once the committee identified a youth for transfer, a suitable housing unit at HOJC was proposed for each youth. Given that the dynamics on the various units change over time, the classification committee recently began describing the type of unit in which the youth would be most successful (*e.g.*, a unit where the youth do not have extensive experience in detention; a unit where the youth are highly engaged in school/programming; a unit with other youth who could be considered "vulnerable") rather than a specific housing unit (e.g., A Hall or B Hall). Proposed housing assignments were revisited upon the youth's arrival at HOJC and often modified based on the current youth composition on the units. Given that all of the HOJC housing units have the same level of security and structure and provide youth with the

---

[7] Five additional youth were temporarily transferred from CR to HOJC in order to accommodate a construction project at CR. They are not included in the analysis.

[8] The Monitoring Team also reviewed information for youth transferred in January 2021, but ultimately decided that the classification process was still substantially impacted by COVID and thus not representative of the typical or intended process.

same access to services and programs, HOJC's focus on peer dynamics in housing decisions is appropriate.

As noted above, exceptions to this sequence of events occur when HOJC-appropriate youth are admitted during the period between the weekly meetings and are transferred prior to discussion by the committee in order to balance the facility populations quickly. This occurred for 10 of the 32 youth reviewed (31%). ACS reported that the classification packet was compiled promptly by Crossroads staff and the information was forwarded to HOJC with the youth. Each youth was then discussed by the classification committee within a few days of his transfer. Upon arrival at HOJC, a housing unit was identified based on current peer configurations and dynamics. Since transfer, none of the youth has required a transfer back to Crossroads. Thus, although out of sequence in these 10 cases, the steps for determining an appropriate facility placement remained effective.

Given that the two facilities provide identical services, prioritizing the youth's connection to his family and his home community when making transfer decisions is a practice that is well supported by research on the importance of family engagement. Furthermore, because HOJC's housing units are currently undifferentiated in terms of security/supervision procedures and services that are available to youth, the choice among them focuses on safe peer relationships and other unique circumstances (*e.g.,* vulnerabilities, program engagement, etc.). Together, this amounts to a classification process that is appropriately individualized and sufficiently flexible to adapt to the changing circumstances of youth, particularly regarding peer conflict. Although the sequence of events is not always linear, it appears that the process for determining facility/housing unit assignments meets the requirements of this provision.

**Compliance Rating**. Substantial Compliance

---

**¶2(e). Programming.** ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- When school is in session, HOJC youth receive 5.5 hours of education programming from Department of Education ("DOE") staff. In addition, youth are slated to receive 3 hours of additional programming from ACS staff and/or community partners.
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention" requires a balance of structured recreational, exercise and leisure activities. In addition to programming that reduces idle time, promotes growth and development and well-being, the policy also requires at least two hours of physical activity per day, one of which must be large muscle exercise. The schedule of programs is to be posted, created, and distributed weekly on each housing unit.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" requires all youth of compulsory education age to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.

Youth with a diploma/GED also receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development. YDS staff are required to facilitate timely arrival and attendance.

- o From January to mid-March, 2021, HOJC youth received remote educational instruction, both synchronous (*i.e.*, meeting virtually during a scheduled meeting time) and asynchronous (*i.e.*, materials are posted on a remote learning website and students work through them on their own time with support offered via text or voice calls with a teacher).
- o Beginning in mid-March 2021, HOJC youth transitioned to part-time in-person learning, alternating with remote instruction.
- Four paid internships are available to HOJC youth (Barista, Book Club, Newsletter and Violence Interrupter/mediator). Participating youth can earn up to $600.

**Monitoring Team's Analysis.**

ACS' target for 3 hours of programming each day, in addition to educational programming from DOE staff when school is in session, exposes youth to essential rehabilitative services and substantially reduces idle time, and thus reflects best practice. Implementing a robust daily schedule full of engaging, structured activities is a powerful strategy for reducing facility violence and disorder. During its review of videotaped footage of incidents, the Monitoring Team frequently noted a lack of structured programming during the times that many of the incidents occurred, and thus progress toward full compliance with this provision should help to elevate the overall level of facility safety.

ACS noted the significant negative impact of COVID on facility programming and reported that a large portion of cancellations or disruptions of scheduled events occurred as a direct result of COVID, including forced quarantines of entire housing units for multiple days at a time; the exclusion of contracted program providers from the building; the consequent shift to remote education and programming for youth in all housing units; the NYC hiring delays and freeze during months of the pandemic; and the cancellation of all in-person visitation. All of these factors contributed to the level of stress, tension and disorder within the facility. When housing units were quarantined, Program Counselors did not provide in-person programming and instead dropped off activities and self-guided packets for youth to complete. During these times, housing units did not meet the 3-hour programming targets.

ACS Programming delivered by Program Counselors and community partners/vendors includes Teen Talk, Cooking, Dissecting Quotes, performing arts, Current Events, Gs to Gents, Conflict Resolution, homework assistance, music production/songwriting, personal fitness, movies/discussion groups, creative arts, horticulture and Goal Setting. These programs should appeal to a diversity of youth interests, are developmentally appropriate, and if the youth choose to attend, significantly reduce the volume of idle time during non-school hours.

The Monitoring Team utilized two snapshots of data to determine the volume of programming delivered to HOJC youth. For the months of January and April 2021, ACS submitted the number of hours of programming delivered each day on each Hall where youth were housed, along with the Program Tracking Forms for one week each month, selected by

the Monitoring Team. The Tracking forms were used to verify the hour totals contained in the monthly reporting.

In January 2021, 10 Halls were used to house youth on at least one day during the month. Of these, 8 of the Halls met the 3+ hour programming target on 80% of the days or more (average 88%). The other two Halls had lower rates at which programming targets were met (54% and 78%), but in both cases housed only one youth on the days in which the programming target was not met.

In April 2021, 8 Halls were used to housed youth on at least one day during the month. Of these, three met the 3+ hour programming target on 80% of the days or more (average 83%). The other five Halls had lower rates at which programming targets were met (73%, 70%, 63%, 35%, 53%), but in each case, most of the days on which targets were not met occurred at a time when the Halls were under quarantine as part of the COVID mitigation strategy. Furthermore, ACS experienced staff shortages during this time as program counselors exposed to COVID were self-quarantining, and vendor programming was also suspended. On these days, residents received modified programming in the form of leisure activities (movies, tablets, puzzles, cards, etc.) throughout the day. During April 2021, two supervisory positions that were involved in quality assurance activities for programming became vacant.

Programming at HOJC has been understandably negatively impacted by the need to mitigate the spread of COVID. In addition to the problems described above, schools in New York City began to provide hybrid in-person/remote instruction in March 2021, but are not scheduled to resume full-time, in-person instruction until September 2021. Once this occurs, the Monitoring Team will review the extent to which YDS staff facilitate timely arrival and attendance at school, which is required by ACS policy.

ACS appears to have clear expectations and daily schedules for required programming, the staff/vendor resources to meet the required targets, and a solid quality assurance process. When the Halls/staff were not affected by quarantine, HOJC youth routinely received the 3+ programming hours required by ACS policy. Once the operational impact of the pandemic has subsided and ACS reinstates the Quality Assurance capability to detect and resolve problems expeditiously, it appears likely that HOJC will consistently meet the requirements of this provision.

**Compliance Rating**. Partial Compliance

---

**¶2(f). Consistent Staffing**. ACS shall adopt and implement a staff assignment system under which a team of housing unit staff and supervisor(s) are consistently assigned to the same AO Youth housing unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), HOJC must abide by OCFS regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth." This regulation requires a 1:6 ratio of YDSs to youth, **and** also

requires that staff may not work alone. In practical terms, 2 staff must be present at all times on units that house between 1 and 12 youth.

- o It is important to recognize that the "staff may not work alone" requirement means that whether the facility holds 40 or 100 youth, the number of staff needed to supervise the housing units is generally the same. When the population is at the low end, HOJC's practice is to distribute youth across most of the 10 housing units, rather than consolidating them on one or two units at maximum capacity. The wide distribution of youth is the preferable strategy for safety, managing interpersonal conflicts, staff-youth rapport, programming etc., but necessarily requires more staff to execute.
- o In response to multiple incidents involving youth obtaining staff's keys, SCOC[9] requires HOJC to staff its 8-10 corridor posts at all times, in addition to its 12-14 housing unit posts and staff to supervise the clinic, for about 20-25 primary fill posts on each shift.

- HOJC plans to train and implement its behavior management program, STRIVE, using Unit Teams. This approach requires housing unit staff (YDSs) and supervisors (AYDSs) to be assigned to the same unit day-to-day.

**Monitoring Team's Analysis.**

A prerequisite to consistently assigning individual staff to the same unit day-to-day is having enough staff to cover all essential posts (*i.e.*, "primary fill posts"). HOJC has a sizable number of primary-fill posts (which has grown given additional requirements from OCFS/SCOC) which impacts flexibility when trying to ensure that individual staff are consistently assigned to the same housing unit post day-to-day. Compounding the challenge of consistently assigning staff to the same housing unit post day-to-day is a shortage of YDSs and AYDSs overall.

In March 2020, when the COVID outbreak began, the City imposed a hiring freeze that lasted about four months. Typically, ACS begins new recruit classes each month to bring new YDSs into the system. Monthly classes of new staff were temporarily halted in April 2020, although ACS leadership successfully advocated for the freeze to be lifted and they resumed in July 2020, albeit at a slower pace due to procedural delays brought about by COVID. As a result, ACS experienced a net loss as some staff resigned, retired, or otherwise left their jobs and ACS was unable to fill all of the vacancies. The lack of staff caused HOJC to transition from three 8-hour shifts to two 12-hour shifts (Team A and Team B, 7am-7pm and 7pm-7am).

Even before the pandemic, ACS identified the need to recruit and retain staff more effectively. To that end, ACS reported that it convened a YDS Staff Recruitment and Retention Task Force that has a number of initiatives focused on: 1) the candidate selection process, 2) training, 3) staff wellness and professional development; and 4) Workers' Compensation, etc. ACS has also tried to boost the YDS pipeline by pursuing additional processing support,

---

[9] SCOC (New York State Commission of Correction) is one of several oversight agencies that regulates ACS facilities.

refreshing its marketing campaign and strategy, engaging with community-based organizations and local colleges, and reviewing title specifications and regulations to ensure alignment with the type of candidate ACS seeks. Staff are regularly surveyed about their overall experience, training, and wellness needs, and ACS conducts exit surveys with separated staff. Finally, ACS reports that the Commissioner and senior leadership convene with Task Force leaders on a monthly basis to review activities, discuss data trends, evaluate program effectiveness, and set strategic direction for new and existing initiatives.

In the first half of 2021, ACS received permission to hire about 100 new staff for HOJC. However, only 52 YDSs were added to HOJC's roster during the current Monitoring Period. Reportedly, a large number of people have applied for ACS positions, but the process of hiring staff has been extraordinarily slow. ACS also lost 37 staff due to resignation and retirement, for a net gain of only 15 YDSs. In other words, for all ACS' effort to recruit and on-board staff, the overall goal of increasing the number of staff was undercut by COVID-related limitations, the protracted hiring process and attrition.

Furthermore, ACS has reported that a significant number of staff call-out each day (*i.e.*, staff not reporting to work when scheduled) on any given shift, particularly as a result of COVID and the level of violence and disorder that HOJC is currently experiencing.  When tallied with staff on leave, out sick, in training, etc., ACS estimated that approximately 20% of the staff who are scheduled do not report to work on any given day.

As noted above, HOJC has approximately 20-25 primary-fill posts on every shift and thus needs at least that many YDS to report to work on each of its 4 shifts (Team A/B, AM/PM). Early in the Monitoring Period, with only ~120 active YDSs and ~20 active AYDSs,[10] and about 3-5 staff calling out on each shift, HOJC had no cushion to address typical operational needs (*e.g.*, 1x1 supervision or providing additional support during programming or school). The number of active YDSs and AYDSs increased to about ~130 and ~26, respectively, toward the end of the Monitoring Period but these numbers are still insufficient to provide the type of consistent housing unit staff assignments required by this provision. Furthermore, HOJC does not yet have enough staff to transition back to three 8-hours shifts or to assign 3 YDS to each of the 10 housing units as desired to best implement STRIVE and

---

[10] ACS staff may be classified as "inactive" when they are not available to work (*e.g.*, FMLA, military leave, etc.). During the current Monitoring Period, HOJC had an average of 208 YDSs, 128 of whom (62%) were "active" and 80 of whom (38%) were "inactive," and an average of 33 AYDSs, 24 of whom (73%) were "active" and 9 of whom (27%) were "inactive." ACS reports it has internal processes to evaluate Worker's Compensation (WC) claims. ACS reports for every WC claim, DYFJ leadership reviews video footage to assess the employee's narrative. The Office of Human Resources (OHR) performs an additional review for claims of injuries alleged to have been caused by resident assaults. Claims exceeding 90 days are referred to the Law Department for an Independent Medical Examination (IME). Finally, OHR reviews every IME report to determine the appropriateness for potential litigation referral to the Law Department. Department of Investigations can also initiate investigations for instances of suspected fraud or abuse.

support programming. If the facility were operating at capacity, ACS estimates it would need approximately 337 YDSs and 56 AYDSs to fully staff HOJC, operate three 8-hour shifts (as it has agreed to do with the union), adequately implement STRIVE, and provide support to the requisite programming.

ACS has been able to meet the required staffing ratio of 1:6 given HOJC's youth population has been well below the total bed capacity (n=106). However, the youth population began to increase toward the end of the current Monitoring Period (from approximately 33 youth in January-March 2021 to approximately 46 youth in June 2021). Until the facility has the full complement of necessary staff, subsequent increases may limit HOJC's ability to achieve consistent staff assignments given the need to maintain proper staffing ratios.

Despite ACS's laudable efforts to recruit, hire, train, place and retain staff, HOJC's staffing challenges were exacerbated by COVID. The current staffing dynamics make assigning staff to the same housing unit posts day-to-day impossible to achieve at the moment, though ACS reports that consistency remains a central goal in the effort to restore staffing resources and to implement new tools to promote facility safety. Not only are consistent staff assignments fundamental to the design of the STRIVE program, they are also essential for creating the type of staff-youth relationships that effectively reduce the level of violence and disorder at the facility. Obtaining the required number of YDS/AYDS must be a top priority so that HOJC is then in a position to assign staff to the same housing unit posts-day-to-day.

**Compliance Rating**. Non-Compliance

---

**¶2(g). Behavior Management.** ACS shall develop and implement systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these systems, policies and procedures shall be individualized and consistent with any treatment needs for AO Youth, and shall not compromise the safety of other AO Youth or ACS staff.

ACS Policy & Practice.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should strive to teach youth self-regulation and problem-solving skills, and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:
  - Safety Plans
  - Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision)
  - Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy

- ACS is in the process of revitalizing its behavior management program, STRIVE, to ensure staff provide accurate behavior ratings using a simplified format, to provide a robust array of compelling incentives that can be reliably delivered, to deliver a skills-based intervention (CBT 2.0) that will be the foundation for de-escalating rising tensions and helping youth to better manage their behavior, and to respond to misconduct more holistically with a combination of privilege restrictions, skill-development exercises and restorative activities. The multi-disciplinary team involved in reviewing rule violations, consequences, and youth's cumulative disciplinary history is intended to ensure that consequences are consistent with youth's individual treatment needs.

**Monitoring Team's Analysis**.

- *Background*

When HOJC opened in October 2018, ACS designed and implemented a structure for incentivizing positive behavior and responding to negative conduct called STRIVE. The program reflects best practices in that it requires staff to assess youth's behavior throughout the day and to award points when youth demonstrate expected, positive behaviors. These points are tallied, and depending on the point total, youth are assigned to a "Level" that is associated with a certain array of rewards and privileges (*i.e.*, Copper, Bronze, Silver and Gold). When youth demonstrate unsafe behavior or do not meet stated behavioral expectations, they do not earn points and their access to rewards and privileges is restricted accordingly. Youth may also be required to complete a skill-development exercise or a restorative justice project as part of their consequence.

Although the original program design was well conceptualized, a robust and consistent implementation proved very difficult to achieve given the short training period and continual transition among agencies/staff that HOJC experienced as management of the facility shifted away from DOC to ACS. Implementation was further challenged by COVID and the resulting instability in the facility's staffing, discussed in ¶ 2(f), above. Staff also found some of the programs features to be overly cumbersome and had difficulty delivering all of the rewards as required. Furthermore, the full complement of consequences for negative behavior were never implemented—youth were dropped one or more levels in the program, but the skill-based and restorative components were never utilized. Together, these problems significantly undermined the effectiveness of the program and likely contributed to the level of violence and other types of disorder discussed throughout this report.

- *STRIVE Reboot*

Recognizing these challenges, ACS contracted with the National Partnership for Juvenile Services (NPJS) to assess whether changes to the program design were necessary and to develop and implement a plan to fully integrate it into the facility's operation. NPJS identified a series of modifications to the program design that would make it easier to use day-to-day, and that would reaffirm the commitment to teaching youth the skills needed to better manage their own behavior. Key changes to the program design included:

o   Refocusing the language and printed materials of the program to emphasize the behavior that is desired (*i.e.*, "behavior expectations") rather than focusing on rules, or a list of "don'ts."

o   Simplifying the rating scale by reducing the number of rating periods from 17 to 8.

o   Building in a daily reward (late bedtime) for youth who earn 80% of the daily points available.

o   Reconfiguring the levels to include a Restorative Status (used after a major rule violation, youth must complete a Restorative Activity, CBT assignment and Reentry Conference with Staff) and an Independent Status (where youth have more autonomy and freedom).

o   Better conceptualizing staff's role in addressing negative behaviors, including direction, redirection, and intervention.

o   Incorporating a time-out ("Chill Time" in a different area of the living unit and/or in an unlocked room) to remove potentially reinforcing aspects of the environment, to allow youth to regain control of behavior and emotions and to potentially prevent the need for room confinement.

o   Creating expectations for staff to model and teach pro-social skills in their day-to-day interactions with youth and to facilitate skill-based focus groups.

These modifications squarely address the problems experienced with the original version of STRIVE and better align the program with best practice, particularly because of the new emphasis on restorative activities and skill development. The program design is documented in detail in a "User's Manual for Staff" and a "Youth Manual". These manuals form the foundation of a variety of training materials created to introduce staff to the basic concepts and to incrementally support staff's mastery of needed skills.

Once the program design was finalized, staff training began in Summer 2020. ACS has rightly viewed training as a multi-level, ongoing process. While all staff need to understand the intricacies of the program, staff of different job classifications have different roles. YDSs need to master skills related to applying the program in their day-to-day management of youth, while mid- and upper-level managers need to master the ability to effectively guide, coach, and monitor staff as they apply the program. Furthermore, since behavior management programs are implemented by a team of professionals who work on individual housing units, the training and deployment of the program needs to focus on the unit level so that synergy is created among the various people who work with the youth. This approach also requires youth transfers among units to be kept to a minimum, which should also enhance staff-youth rapport.

In addition to the multi-tiered training plan outlined below, staff skill mastery is supported by an NPJS staff member who is embedded at HOJC. He began at HOJC in late May 2021 and is on-site several times per month to help unit teams and individual staff members utilize the skills introduced in training in their day-to-day interactions with youth. This type of

support, coaching and guidance is exactly what the Monitoring Team would recommend in order to expand upon the classroom training and to promote skill mastery among staff.

The training/implementation components are as follows:

- HOJC's Management Team was the first group trained, which included the Associate Commissioner, Executive Directors, Operations Managers, Tour Commanders, AYDSs, Sergeants, Programming Supervisors and Case Manager Supervisors.
  - Some completed a four-day training between June and September 2020, while others completed eight half-day trainings in February/March 2021. Of the 39 managers, 27 have been fully trained and 12 have been partially trained—their training will be completed during the Unit Staff training.

- STRIVE Champions were identified (those who demonstrated particular interest and mastery during the Management Team training) and then trained to deliver the curriculum to HOJC staff, completed July 2021.

- Training will be rolled out from Hall to Hall, with Champions training each Hall's staff and providing continued support until new norms have been established, before moving to the next Hall.

- Within each Hall, the first group to be trained is the Core Leadership Team, which consists of AYDSs, Tour Commanders and Operations Managers who are permanently assigned to the Hall.
  - Training for the first two Halls is scheduled to begin in the next Monitoring Period and expected to take about one month.

- From there, the line staff assigned to the Hall are trained by the NPJS partner and the Champion team.
  - Training for the first two Halls is scheduled to begin once the Core Leadership Team has been trained and will require approximately one week.

- Finally, the youth assigned to each Hall are taught how to navigate and succeed in the program. After about 3 months where both staff and youth receive ongoing support and guidance, the training program moves to the next Hall(s).

As noted throughout this report, the COVID pandemic also delayed the implementation of the STRIVE pilot program. ACS reports that positive COVID test results among youth and staff required changes to the training schedule and location and subsequent quarantines of the housing units identified as pilot sites caused further delay. ACS reports it plans to train Unit Teams to implement STRIVE in all 10 Halls at HOJC, using the same 3-month implementation support strategy described above. Implementation will occur sequentially, with full implemented expected in mid/late 2022. The extent to which ACS has achieved the relevant milestones and an initial assessment of STRIVE's implementation will be discussed in detail in subsequent reports.

- *Skill-Based Intervention: CBT 2.0*

In order to create a foundation for staff to routinely guide/coach youth throughout the day and to prescribe consequences for misconduct that help youth to acquire the skills needed to better manage their behavior, HOJC plans to provide a skills-based group interventions (CBT (a skills-based curriculum that teaches impulse management, critical and moral reasoning, problem solving, social skills, etc.) and CBT 2.0)[11] to all youth. Groups will be co-facilitated by YDSs and HOJC Program Staff. These skills are incorporated into the STRIVE program design and staff will be trained to deliver the curriculum once they've mastered the core concepts (points, incentives, etc.) of STRIVE, in mid/late 2022.

- *Consequences for Rule Violations*

When youth engage in mid-level and serious misconduct, ACS reports that youth are provided multiple opportunities to discuss their perception of the events. This includes a youth debriefing immediately following the event; further check-ins by various supervisors; and a "circle up" at the end of each shift where each youth's behavior is reviewed to ensure that they are aware of any consequences that have been imposed. This is an essential part of shaping youth's behavior—a close-in-time discussion of consequences so that the youth makes the connection between his harmful or inappropriate behavior and the sanctions that flowed from it.

Currently, the only sanction utilized at HOJC is a drop in the youth's STRIVE Level and with it, a reduction in the privileges, rewards and activities that can be accessed. While this type of privilege restriction is an essential part of an effective response to maladaptive behaviors, best practice suggests that sanctions should have additional facets including a restorative component (*i.e.*, an action that is designed to repair the harm that was inflicted on a person or the community, such as an apology or a community service project) and a skill-development activity that is designed to help the youth acquire the skills needed to handle a similar set of circumstances more appropriately in the future. Both of these components are part of the STRIVE program design for which training is currently underway, as described above, but these elements are not yet occurring in practice.

Twice weekly, a multidisciplinary team of HOJC staff (*e.g.*, behavior management team, case managers and mental health staff, with written input from unit YDSs) convenes to review the factual basis of each rule violation and the consequence imposed and collectively determines whether the response was appropriate or whether any other actions should be considered. This team is also the body that would consider a youth's appeal of a disciplinary action. Furthermore, the team looks at certain youth's behavior more cumulatively, discusses whether the youth's behavior is improving and if not, what other steps (*e.g.*, housing unit transfer) or services (*e.g.*, mental health) are needed to better support the youth.

---

[11] The CBT 2.0 curriculum was developed by Ideas42 for use in the Cook County Juvenile Detention Center and can be accessed online: http://www.ideas42.org/wp-content/uploads/2017/01/CBTCurriculum.pdf .

While this type of support-focused convening reflects best practice, HOJC could improve its approach in the following ways:

- Expanding the array of options available to respond to misconduct by implementing the restorative activities and skill-development focused tasks that are part of the new STRIVE program design. This will require the development of a system to track and supervise the youth's completion of these assignments to ensure the integrity of the system. Integrating additional options should not only permit HOJC to craft meaningful, individualized responses to the behavior of concern but should also improve the effectiveness of the consequences imposed.
- Ensuring that all disciplines are represented in the weekly convenings. ACS reported that the staffing challenges, exacerbated by COVID, have made it difficult to ensure robust participation by all members each week.
- Document the substance of the meetings using a format more suited to the task. HOJC currently uses a "Disciplinary Hearing Record" to substantiate that the conversation occurred, but it is structured for a process that is entirely different from how HOJC approaches the task (it reflects the standard process by which many facilities elicit the youth's perception, assess the severity of the misconduct, and choose among an array of consequences.) In addition to memorializing the rule violation and the consequence imposed, the documentation should record the input from each team member and also identify other steps or supportive services that will be applied to better support the youth.

A facility's response to youth's misconduct is an essential part of shaping youth's behavior. To be effective, responses should include the youth in the conversation about what happened and what to do; encourage meaningful input from unit staff/counselors who work closely with the youth; and prescribe consequences that involve a combination of privilege restriction, skill-development activities and restorative activities. During the next Monitoring Period, the Monitoring Team will assess the extent to which the youth's perception of the events is collected and recorded, assist ACS in designing a documentation strategy that captures the key elements of the multidisciplinary convenings and assess the implementation of the additional options for consequences that should be brought about by the revitalization of the STRIVE program in the pilot units.

- *Conclusion*

A robust behavior management program is essential for improving facility safety. HOJC, with its NPJS partners, made some thoughtful revisions to the STRIVE program design and its implementation plan—which relies on unit teams and takes an incremental approach across the housing units—is a strong model. That said, the program is complicated, and ACS reports it is committed to ensuring that the unit teams remain intact over time, throughout training and implementation. While the design of the incentive side of the equation is robust, equal attention must be paid to the response to misconduct to ensure a variety of sanctions are available (*e.g.*, privilege restrictions, skill-building and restorative activities), consistently applied and individualized to the unique circumstances of each youth.

| **Compliance Rating**. Partial Compliance |
| --- |

**¶2(h). Room Confinement.** ACS shall comply with applicable ACS policies and practices: (1) prohibiting the use of punitive segregation and (2) governing the use of room confinement.

**ACS Policy & Practice.**
- ACS Policy #2019/32 "Room Confinement Policy for Secure and Specialized Secure Detention" limits the use of isolation to circumstances in which a youth poses an imminent risk of physical harm to another person.
- Any use of room confinement must be authorized by the Facility Director/designee, and re-authorized at prescribed intervals (within 2 hours, and every 2 hours thereafter) and up the chain of command.
- Parents must be notified within 12 hours of room confinement being initiated.
- Youth's safety and welfare must be checked at 15-minute intervals and documented in a logbook.
- Youth must be assessed for their readiness for return to regular programming at 30-minute intervals by YDS and/or facility administrators. Supervisors must visit every 60 minutes to reassess.
- A variety of services must be provided to youth in room confinement (meals; case management if the youth remains in room confinement for more than 1 hour; mental health services within the first hour, preferably, but within 8 hours and then every 8 hours thereafter; medical within 3 hours and every 8 hours thereafter; education if the youth is in room confinement during school hours for more than one period). All services must be documented in a logbook.

**Monitoring Team's Analysis**.

Room confinement represents a serious deprivation of a youth's liberty and because of the harmful consequences of prolonged isolation it is critical it is used sparingly and according to policy. Therefore, the Monitoring Team heavily scrutinized HOJC's room confinement practices. During the current Monitoring Period, room confinement was utilized 36 times. Given the level of violence and disorder at the facility, these numbers provide evidence that room confinement is a relatively rare event and is certainly not the default response of ACS staff when managing youth's misconduct. However, though rarely used, the Monitoring Team identified a variety of problems with HOJC's practice that require remediation.

The Monitoring Team reviewed room confinement documentation from January, April, and May 2021 (n=26 youth, which is 72% of all room confinements during the Monitoring Period). Written feedback was provided following each review. In all cases, the imminent risk of physical harm posed by the youth that justified the use of room confinement was properly documented. Although some improvements were noted toward the latter part of the Monitoring Period, the use of room confinement did not adhere to policy requirements in important ways:
- The 15-minute checks were not documented as required. Instead of individualized assessments that include the youth's room number and behavior observations, staff

recorded general statements such as "Residents are safe and secure" or "active supervision" or "status remains the same." Staff sometimes made an entry regarding one of the youth in room confinement (*e.g.*, "Youth X went to the bathroom") but did not verify the welfare of the others. Furthermore, gaps of up to an hour between checks were noted in a few situations.

- The site visits and assessments were not documented as required. Although various staff were present on the Hall (AYDS, TC, OM), they did not appear to be making the type of individualized assessments required by policy. Instead, general statements such as "Residents are not ready to come out" or "Tone is still high" were entered. Assessments were not conducted at the required intervals.
- Meal delivery was not documented consistently.
- Parents were not always notified timely, if at all.
- Room confinement was not re-authorized by the prescribed individuals. Entries were often made on the Room Confinement Form, but they were frequently unsigned.
- When youth remained in Room Confinement beyond 4 hours, the required referral for a mental health assessment was not documented.
- Visits by Case Managers, Mental Health and Medical did not occur within required timelines and/or were not sufficiently legible in the logbook to discern who visited the youth and for what purpose.
- Youth were very rarely in room confinement during school hours, so the requirement regarding school could not be assessed.

While room confinement is not the automatic response to violent incidents at HOJC, even infrequent use must be guided by the protections described in policy. Youth in room confinement are at heightened risk of self-harm and the very act of placing a youth in their room during waking hours disrupts his engagement in programming and thus should be only of the duration necessary to ameliorate the risk of harm to others. Room confinement is clearly not overused at the facility, which is the main factor justifying the partial compliance rating even though the frequency problems described above could suggest a rating of non-compliance. At the end of the current Monitoring Period, ACS developed a plan to improve practice in the areas outline above. The plan's implementation, and its impact on the problems noted above, will be evaluated during the next Monitoring Period.

**Compliance Rating**. Partial Compliance

---

**¶2(i). Video Preservation**. ACS shall preserve all video at Horizon Juvenile Center for 90 days. When ACS is notified of a Physical Restraint within 90 days of the date of the incident, ACS shall preserve the video for a period of four years.

**ACS Policy & Practice.**
- ACS reports that an Operations Order to formalize video preservation practices is under development. ACS reported that, during this Monitoring Period, video was preserved using two separate methods. The first method is a long-standing practice

and involves preserving video on ACS's internal shared drive. The second method began in February 2021 and preserves video using Genetec's Clearance System, which is a digital evidence management system to preserve and review video.  Each method is described below:

- ○ <u>ACS Internal Shared Drive</u>- On a daily basis, staff from ACS's Central Office Incident Review team pull the GOALS report of incidents that occurred during the previous 24 hours. Staff then identify the time and location of each incident and pull the video from the appropriate camera angle in the Genetec Surveillance system. The video is then saved on ACS's shared drive and preserved for an indefinite period.
- ○ <u>Genetec Clearance System</u>- After a GOALS-reportable incident occurs, the HOJC Operations Manager responds to the area, immediately accesses the Genetec Surveillance system and identifies the camera angles and time of the incident. The Operations Manager then places the video in the Genetec Clearance System. Video is preserved in the Clearance system for at least 4 years.

- In early July 2021, ACS reported their full transition to the Genetec Clearance system and that the Central Office Incident Review Team no longer preserves video on the shared drive. The Central Office Incident Review team now serves in a quality assurance role by reviewing GOALS reports from the previous 24 hours and confirming that the incident video is present in the Genetec Clearance System and that the period/location captured is consistent with the time and place of the information noted in the GOALS report. If the team finds that video of an incident was not properly captured, the team member places the relevant footage on the Genetec Clearance System.

**Monitoring Team's Analysis**.

The Monitoring Team conducted an audit to evaluate ACS's practices regarding video preservation. The Monitoring Team reviewed GOALS reports from January to March 2021 and selected 12 incidents involving physical restraints that occurred more than ninety days prior to the day of the audit. The Monitoring Team remotely accessed the video in the Genetec Clearance terminal with the assistance of ACS. The audit found that video for ten of the 12 incidents (83%) was preserved on Genetec Clearance.

Although this audit confirmed that ACS is largely preserving video as required, it also revealed some procedural issues that need to be addressed (*e.g*., how to handle situations where the incident number has not yet been assigned; how to assign the incident category; how to indicate that an incident was not captured on video).  The Monitoring Team provided feedback to ACS about finessing practice for classifying restraints (see ¶ 2(b), above).

Overall, the procedures appear to be robust, and video was properly retrieved for nearly all of the incidents.  A similar audit will be repeated during the next Monitoring Period to further test procedures where Operations Managers are fully responsible for saving footage in the Genetec Clearance System. The only remaining task to be completed to achieve substantial compliance with this provision is to develop the video preservation Operations Order, as noted above.

| Compliance Rating. Partial Compliance |
| --- |

**¶2(j). Staff Discipline**. ACS shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, when staff members violate the ACS Physical Restraint Policies.

**ACS Policy & Practice.**
- ACS Code of Conduct prohibits the use of physical or mechanical restraints on residents that is not in accordance with the physical restraint policy (ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention") and specifies that any violation of the code subjects staff to discipline.
- ACS disciplinary options are based on the employment status of staff members:
  - *All Staff*: Any staff member may be subject to a formal disciplinary conference which is a conference between the staff member and a facility supervisor staff that is formally documented and filed in the staff's personnel file. During these sessions the supervisor reviews what the staff member did wrong and how to improve going forward.
  - *Permanent civil service staff with disciplinary rights*: Discipline for permanent civil service staff goes through the Employment Law Unit ("ELU"). These staff are subject to administrative charges and hearings via the Office of Administrative Trials and Hearings ("OATH"), although a pre-hearing suspension of up to 30 days may also be imposed.
  - *Provisional Staff*: ACS may terminate provisional staff (any Staff with fewer than two years of service) without a hearing or due process due to the probationary nature of their employment. During the current Monitoring Period, most ACS staff were provisional.
- ACS terminated 18 provisional staff members between January 1, 2021 and June 30, 2021, for misconduct related to workers compensation issues, absenteeism, contraband, and other misconduct. No staff were terminated for physical-restraint related misconduct.
- ACS reported there were no formal disciplinary conferences for any staff and no referrals to ELU for permanent civil service staff between January 1, 2021 and June 30, 2021 *for physical-restraint related misconduct*.

**Monitoring Team's Analysis.**

ACS did not report any corrective action for permanent or provisional Staff for any physical-restraint related misconduct during the current Monitoring Period. As noted above, the Monitoring Team identified several instances in which physical-restraint related misconduct by staff went unidentified and therefore unaddressed in terms of staff discipline. The Monitoring Team encourages ACS to use the formal disciplinary conference as a response to minor restraint-related conduct as that conduct should not go unaddressed. The use of suspensions is another option that the Monitoring Team would encourage ACS to utilize, as appropriate, for certain restraint-related misconduct. Given that a number of instances

involving poor practice or problematic conduct were identified by the Monitoring Team during its incident review, it is concerning that there have been no disciplinary actions taken with permanent or provisional staff to address this type of behavior. ACS is therefore in Non-Compliance with this requirement.

**Compliance Rating**. Non-Compliance

*Appendix A: ACS's Comments to the Monitor's Report*



**David A. Hansell**
Commissioner

**Joseph Cardieri, Esq.**
Deputy Commissioner/
General Counsel

**Office of the General
Counsel**
150 William Street
18th Floor
New York, NY 10038

212-341-0927 tel.
212-227-4675 fax.

October 18, 2021

Steve Martin, Esq.
The Tillid Group
135 West 41st Street, 5th floor
New York, NY 10036

Dear Mr. Martin,

Your updated first bi-annual Report covering the period from November 2020 through June 2021, provided to ACS yesterday has been received. This final Report, to be filed with the Court and parties on October 18, 2021, was modified to some degree in response to ACS' earlier correspondence (dated September 28, 2021, attached) commenting on your first draft iteration of the Report. Unfortunately, ACS continues to have major concerns with the Monitoring Team's premises, language, and substantive compliance findings contained in this Report. Primarily, as detailed more below, the Monitoring Team minimized or discounted the wide-ranging disruption caused by critical COVID impacts on our Horizon staffing, programming, and operations; the Monitoring Team did not visit Horizon once during the period under review, so its assessment is purely paper-based and thus limited; and finally, ACS entered into this Voluntary Agreement on the premise that we would work with the Monitoring Team on assessment and technical assistance, which seems to have been lost in the Report that reads to focus exclusively on "compliance" and neglects the assessment and technical assistance aspects of our Agreement. Therefore, under the Agreement (Section 5.b), ACS requests you append our September 28, 2021 response, and this letter, to this Report when filing with the Court.

First, on premises. ACS entered this voluntary Agreement with the Monitoring Team in order benefit from the skill and expertise of your team, and inform best practice, on the ground, in the Horizon facility. Section 3 of our Agreement relates that ACS agrees:

> *"...in the spirit of collaboration and in recognition of the deep mutual commitment to improving program and practice goals to continue to consult with the Monitoring Team Panel....to discuss the Monitoring Team Panel's observations and assessment of ACS program and practice issues at Horizon Juvenile Center"*

...in order to improve practice. Central to our consultative partnership was full consideration of *"ACS'...deliberate and good faith efforts to improve its practices regarding..."* the ten practice domains which form the substantive

1

focus of this Agreement.  That consideration of ACS' ample good faith efforts is not apparent, or certainly not detailed enough, in this Report.

On a call last week with ACS and Law department, a member of the Monitoring Team stated that the Monitors are "grading outcomes and not effort".  That is a fundamental mis-reading of this Agreement and unfortunately – while we might have chalked up that characterization to an approach too loosely described – we see that same premise weaved throughout this entire Report.  Frankly, if that comment or approach was put forth during our Agreement negotiations, ACS and the City would likely not have signed this Agreement.  To be clear, ACS has no issue with any review related to various outcome goals, but to the degree that such a review does not fully account for ACS' myriad, diligent, good faith efforts to reach practice goals, or to consider the unprecedented impact of COVID on our operations despite our best efforts to minimize that impact, then ACS has deep concerns about the fundamental premises that the Monitoring Team is operating under when reviewing our practices and drafting its Report of ACS activity.

As per Agreement, 5.c:

> "Each of the Monitor Reports shall provide relevant and appropriate context for its findings and give due consideration to the totality of the circumstances.  Further, as appropriate and relevant, the Monitor Report shall describe: (1) ACS' diligent and good faith efforts to implement 2.a-k of this Agreement; (2) generally accepted practice for 16 and 17-year old youth as it relates to this Agreement; and (3) any challenges or obstacles related to implementing 2.a-k of this Agreement".

ACS strongly holds that the Monitoring Team did not adhere to the Agreement's baseline collaborative premises to detail ACS' diligent and good faith efforts in each practice area, nor did the Monitoring Panel give anywhere near sufficient focus or attention to the contextual frame of the unprecedented COVID impact on operations, with little detail provided as to COVID-related disruptions to safety and security, staffing and hall monitoring, incident review, behavioral incentives and related programming.   While ACS, in its September 28, 2021 letter, fully articulated the dramatic COVID impact on virtually every aspect of this Agreement, there was scant or at best sidelong mention of that impact in this final Report.  The COVID impact is inextricably connected to ACS' diligent efforts toward achieving program aspirations in this period under review.   Any minimizing, or burying deep in the Report, of that critical and necessary context is counter to the Agreement parameters and intention of our work together.

Second, the language and tonal choices used throughout the Report are disappointing, misleading, and unfortunate.  In using phrases like "The level of violence and other types of disorder at the facility is cause for concern…and is enormously disruptive" while true as stated, the context is again ignored or minimized by language which follows, that "Robust implementation of the variety of tools required by this Voluntary Agreement should lead to a safer facility….there is considerable work to do before a safer facility is realized by implementing the behavioral management program, stabilizing staff assignments to units, restoring the full array of educational and rehabilitative programming in the post-COVID era, and building a multi-tiered incident review process".  Nowhere is it mentioned that fully two-thirds of all incidents at HJC during the monitoring period involved just seven youth. Also left

2

out entirely here is a good faith recognition or even adequate mention, despite being robustly detailed in ACS' September 28th response letter, of the impact of COVID on our ability to hire and retain staff (there was a City-wide hiring freeze during a four month period around this Reporting period, and many staff were on medical leave); on the challenges to implementing STRIVE (since various programming could not be brought on-site during the overlap of COVID and this Reporting period); and staffing a multi-tiered incident review process (again related to not enough staff on-board during the COVID hiring impact - which hiring freeze was only lifted due to ACS' committed and vigilant advocacy through our Commissioner). NONE of these critical, contextual, secondary-story factors were accounted for enough in your portrayal of ACS gaps and "violence and disorder". ACS efforts, which were in fact herculean during this difficult pandemic period went unmentioned and unrecognized. That is violative of the "good faith" assessment the Monitoring Panel is required to abide.

And lastly, the compliance findings. That the Monitoring Panel chose, during this extremely disruptive period caused by the pandemic, to issue non-compliance findings on four of ten items is received as gratuitous and unnecessary – particularly as those 4 non-compliance items related specifically and particularly to the COVID-related staffing challenges that we have shared with the Monitoring Team. Additionally, a member of the monitoring team told us that this Report would be about identifying issues, and any technical assistance would be in the second period. In this regard, as we suggested in our earlier letter, the Monitoring Team should have withheld making a compliance finding on each of the ten items, until the next reporting period, so as to have a better sense of ACS efforts and impact as the COVID displacement winds down. At the very least, under the frame of an "assessment and assistance" approach central to our Agreement, the four non-compliance items ought to have been resolved with a "to be determined" finding, reportable in the next review period. ALL of the four "non-compliance" findings center completely around staffing (2a, 2c, 2f, 2j), and ACS' inability to hire enough staff during the Reporting period, which had ripple effects across hall safety and security (2.a); timely and thorough review of incidents (particularly at the supervisory and managerial levels where staffing gaps existed during the Reporting Period (2.c)); consistent staff assignment system for housing units (2.f); and reporting of incidents for potential disciplinary action (2.j). Those non-compliance findings are not contextualized, and if they were so accounted for within the larger frame of ACS challenges during COVID, we believe a finding could have at the very least awaited the next review period.

Finally, it bears mentioning that the Monitoring Team did not visit the Horizon facility, in person, during the entirety of the Reporting Period. That should have been mentioned in the Report. While appreciating that COVID likely played an important role in that decision to review ACS operations from afar, on paper reviews, it does not explain why the Monitoring Team gave such short shrift to COVID's impact on ACS' own on-site challenges to implement practices to improve operations. It must be said, in the spirt of candor, that failure to visit the Horizon facility at all during the reporting period calls into question the process behind the findings issued here – as fulsome technical assistance requires eyes in the facility, alongside ACS management and staff, wrestling with the enormous and complicated challenges of managing a facility of incarcerated youth while juggling the severe impacts brought on by a global pandemic. A paper review can only assess what someone scribes to paper or computer; a video review can capture a snapshot of a particular limited space and moment. But we would all

3

agree that nothing replaces the experience of actually being on-site, feeling the flow and energy of staff and youth, in assessing how operations are proceeding.  We hope that in the upcoming Reporting Period, the Monitoring Team will visit the Horizon facility and spend considerable time there discussing with staff and management their insights and views on improving the youth experience, *while in the midst of that experience*.  In entering this Agreement, ACS envisioned just that type of working partnership.  While we did not experience that sense in the reading of this first reporting out, we will do our best to ensure it is actuated in the next reporting period.

Sincerely,

**Joseph Cardieri**

Digitally signed by
Joseph Cardieri
Date: 2021.10.18
11:37:13 -04'00'

Joseph Cardieri
Deputy Commissioner/General Counsel
Administration for Children's Services

4



**David A. Hansell**
Commissioner

**Sara Hemmeter, Esq.**
Deputy Commissioner
Division of Youth and
Family Justice

150 William Street,
18th floor
New York, NY 10038

212-442-6326 tel.
212-341-0916 fax

September 28, 2021

Steve Martin, Esq.
The Tillid Group
135 West 41st Street, 5th Floor
New York, NY 10036

Dear Mr. Martin,

ACS is grateful for the opportunity to provide comments on the draft version of the Monitor's first report on the status of ACS' compliance with the substantive provisions of the Voluntary Agreement entered into on November 11, 2020.  As you know, ACS voluntarily entered into this Agreement in order to receive the ongoing benefit of the Monitor's experience and insights, as we aspire to implement best practices in the Horizon facility, even in the midst of a global pandemic. Moreover, ACS (who was never a party to the Nunez litigation regarding concerns about the Department of Corrections' oversight of Riker's Island; nor does ACS have any relationship to the present monitoring of Riker's Island facility) made clear when discussing this Agreement that we were entering into it with a collegial and non-adversarial mindset, seeking only to reap the benefits arising from the mutual exchange with the Monitor and ACS. We hope to keep within and deepen that spirit in our responses to your feedback in this draft Report. Below, and inserted in the draft document, we have provided responses to questions raised by the Monitors, as well as offered comments and clarifications that we believe may prove helpful in assessing ACS' efforts to show substantial compliance in various areas of the Agreement.

We appreciate the Monitor's consistently collaborative approach to working with ACS in assessing our fidelity with the provisions of this Agreement, during a time when acute public health and safety concerns in our detention facilities have demanded our fullest attention to ensure the safety of all youth and staff.

We are also heartened to know that the Agreement itself (section 5c) calls for the Monitors to give due consideration to the totality of circumstances and any challenges or obstacles related to implementing the terms of the Agreement. As a contextual matter, ACS believes it is critically important that the Monitors underscore in their report that the entire monitoring period unfolded during the deadliest stages of a global pandemic.  The extraordinary operational impact of the pandemic on virtually all aspects for our facility operations simply cannot be overstated. Further, this operational disruption impacted ACS' ability to achieve substantial compliance in many key areas of the Agreement, despite good faith efforts. It is our position that the levels of compliance achieved by ACS, while managing facility operations during a deadly global pandemic, are noteworthy and clearly demonstrate ACS' determination and commitment to the underlying goals of the Agreement.

COVID forced the Monitors to dramatically alter their standard practice and develop fully-remote strategies for monitoring ACS' compliance with this Agreement.  Likewise, ACS was forced to:

- Rapidly prioritize the reconfiguring of programming and visitation for youth;
- Adjust facility staffing patterns to account for dramatic losses of staff to illness and workers compensation;
- Delay ongoing hiring of YDS due to a city-wide hiring freeze; and
- Develop and implement entirely new protocols to address enhanced cleaning of housing and common areas, virus testing of youth, health screening of staff, extensive contact tracing, and repeated quarantines in housing units.

These examples represent only a small portion of the operational disruptions at Horizon presented by COVID during this first monitoring period. And while these COVID-related disruptions have been consuming, they have been further complicated by the emotional toll on both youth and staff of living and working each day in a closed, custodial environment during a global outbreak of a deadly and rapidly spreading virus. The fear and uncertainty introduced to the facility with the onset of COVID unquestionably raised levels of tension and anxiety among youth and staff. Nonetheless, in the face of this deadly virus, ACS steadily advanced the priorities contained in this Agreement and has remained committed to each substantive provision.

We offer this statement of context as a backdrop against which we believe the accomplishments of ACS during the first monitoring period can be accurately and fairly judged.  While it is true that a great deal of work remains for ACS to achieve the high standards of operation we aspire to, we believe substantial progress in advancing the goals of this Agreement has been made during this time of unprecedented challenges. As such, and given the explicit language contained in section 5C of the Agreement, we would suggest that the Monitor either reclassify any "non-compliance" findings to "partial compliance" given ACS' good faith efforts amidst these unparalleled challenges; or if the Monitors cannot so re-classify, then to, at minimum, hold any judgment on those non-compliance items until the next reporting period.

ACS would also offer the following comment in response to the Monitors "Summary of the Current State of Affairs": Reducing violence and ensuring the safety of youth and staff at Horizon is our utmost priority.  On this point, we would note that ACS' practice is to document and share with the Monitors all "incidents" that occur at Horizon – those involving violence or the threat of violence, as well as those where no threat of violence was alleged.  This practice of documenting all incidents that occur at Horizon, and the sheer volume of incidents reported, can offer a somewhat distorted picture of "disorder" at the facility.

We also note that to the extent "disorder" at the facility is characterized as the frequency with which scheduled activities or planned events do not occur due to disruption in the facility – we would argue that a significant portion of cancellations or disruptions of scheduled events occurred as a direct result of necessary COVID safety protocols. Forced quarantines of entire housing units for multiple days at a time; the exclusion of contracted program providers from the building; the consequent shift to remote education and programming for youth in all housing units; and the cancellation of all in-person visitation, all contributed to "disorder" within the facility. Even the piloting of the new STRIVE, our behavior management program, was undermined and disrupted due to positive COVID test results among youth and staff, and subsequent quarantines of the housing units targeted as the halls in which the pilot was to roll out.

The successful implementation of such key provisions of the Agreement as consistent staffing in housing units, the consistent review of all physical incidents, even the implementation of a behavior management program, were severely hampered by COVID-related protocols that directly impacted ACS' ability to recruit, hire, train and retain staff. Chronic staffing shortages and our inability to rapidly hire and train new staff to fill

openings limited the number of supervisors available to review each incident, and to consistently assign staff to the same housing unit. These on-boarding challenges occurred as a direct result of a COVID-related fiscal crisis in the City, hiring slow-down and freeze. Despite the fiscal crisis, ACS worked hard with its City partners to reestablish the hiring of YDS at a time when hiring remained frozen in virtually all other City agencies.

Below is a summary of ACS' diligent efforts to ensure a steady flow of new YDS and other essential staff into Horizon at a time of COVID-inspired fiscal crisis and a resulting Citywide hiring freeze:

- The ability to hire additional staff is the core solution to address consistent staffing, and ACS has been maintaining monthly classes of 25- 30 candidates since November 2020, after the City's initial financial disruptions caused by COVID. Most recently, Cohort 31 started orientation on 8/30/21 with 32 YDS.
- ACS increased efforts to boost the YDS pipeline with various initiatives including pursuit of processing support, a marketing campaign refresh and strategy adjustment, continued engagement with community-based organizations and local colleges, and review of title specs and regulations to ensure alignment with candidate needs.
  - Recently reinvigorated by the City's improving fiscal outlook, ACS is identifying additional resource needs across training and human resources to support an uninterrupted pipeline of qualified, trained candidates. This includes additional in-service trainers, compliance and processing staff, and funds to sustain a marketing campaign to attract new applicants.
- As part of the rollout of the updated STRIVE model, ACS has heavily emphasized consistent staffing in the halls where the updated model is being 'piloted'.
  - Staff who work in the two pilot halls completed training and are planned to consistently staff these halls to the greatest extent possible. Future halls are expected to follow a similar approach. ACS promoted ten (10) AYDS in May 2021, eight (8) of whom received Supervisory Core training in July 2021. The eight (8) AYDS began duties as AYDS on 8/8. Five (5) of those AYDS have since been assigned to Horizon.
- Twenty-two (22) fully-trained Special Officers started at Horizon on 8/2/21, allowing ACS to assume all posts previously staffed by the Department of Correction (DOC).
- Four (4) Operations Manager (OM) candidates have accepted offers and are in various stages of processing.
- ACS recently promoted an OM to Director of Incident Review, a position created specifically to strengthen incident review and follow-up.
- DYFJ is filling key new detention positions, including a Senior Residential Operations Advisor, a Special Advisor for the Associate Commissioner of Detention, and an Investigations Manager.
- The YDS Staff Retention task force, begun pre-pandemic, continues advancing multiple initiatives aimed at reducing attrition and retaining staff with various workgroups focused on the 1) candidate selection process, 2) training, 3) wellness and development activities, 4) Workers' Compensation, etc.
- Staff are regularly surveyed around their overall experience, training, wellness needs, as well as exit surveys of separated staff. Survey results are analyzed and inform future planning.
- Robust internal processes to address Worker's Compensation (WC) claims also continue. For every WC claim, DYFJ leadership reviews video footage to confirm the employee's narrative. The Office of Human Resources (OHR) performs an additional review for claims of injuries alleged to have been caused by resident assaults. Claims exceeding 90 days are referred to the Law Department for Independent Medical Examination (IME) scheduling. Finally, OHR reviews every IME report to determine appropriateness for litigation referral to the Law Department. Department of Investigations can also initiate investigations for instances of suspected fraud or abuse.
- ACS retained NPJS to implement a leadership coaching and training initiative for mid-level managers, a critical staffing designation, many of whom have limited supervisory experience. Mid-level managers connected with mentors in July 2021 following assessments.

Our comments are highlighted in the attached draft report.  Thank you again for the opportunity to provide comments on the draft report.  Please contact me if you have questions or would like to discuss anything further.

Sincerely,


Sara J. Hemmeter
Deputy Commissioner, Division of Youth & Family Justice