# OFFICE OF THE MONITOR
*NUNEZ, ET AL. V. CITY OF NEW YORK, ET AL.*

**Steve J. Martin**
Monitor

**Anna E. Friedberg**
Deputy Monitor

178 Columbus Avenue, #230842
New York, NY 10023-9998
+1 646 895 6567 | afriedberg@tillidgroup.com

November 17, 2021

**VIA ECF**
The Honorable Chief Judge Laura T. Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

Re: *Nunez, et al. v. City of New York, et al.*, 11-cv-5845 (LTS) (JCF)

Dear Chief Judge Swain,

    The Monitoring Team writes to provide the Court with a Status Report[1] regarding the current conditions in the New York City jails pursuant to the Second Remedial Order (dkt. entry 398), and the status of negotiations among the Parties regarding the Monitoring Team's recommendations outlined in the September 30, 2021 status report related to UOF discipline (dkt. entry 399).

    The Monitoring Team remains concerned about the dangerous conditions in the jails. The risk of harm to both incarcerated persons and staff in the daily operations of the jails remains high. The Department has taken some positive actions to address the mass absenteeism of staff and the issues related to intake, but significant work remains to address the entrenched and

---

[1] The Monitoring Team has submitted Status Reports on the current conditions in the NYC jails on August 24, 2021 (dkt. entry 378), September 2, 2021 (dkt. entry 380), and September 23, 2021 (dkt. entry 387), and October 14, 2021 (dkt. entry 403). The Monitoring Team also submitted a status report regarding UOF related discipline on September 30, 2021 (dkt. entry 399).

troubling security practices, decades of mismanagement, and lack of accountability for staff misconduct as discussed below.

**Update on Department Initiatives**

The Department has a number of initiatives focused on conditions within the jails, staffing, and reducing the population of incarcerated individuals. These initiatives were first outlined in Appendix A of the Monitor's September 23, 2021 status report (dkt. 387), and the Department provided the Court an update on the status of these initiatives in their October 14, 2021 submission (dkt. 404). An updated status on these initiatives, to the extent the status has changed since the Department's October 14, 2021 submission, is included in *Appendix A: Status of Department Initiatives*. The Second Remedial Order also requires the production of certain data. This is included in *Appendix B: Data Pursuant to ¶ 2(ii)(a-e) of the Second Remedial Order*.

**Status of Second Remedial Order Initiatives**

In order to address the current conditions, the Second Remedial Order required the Department to implement immediate security initiatives, as well as work with the Monitoring Team on potential expansion of the candidate pool for facility leadership, and the appointment of a Security Operations Manager. Updates on each of these initiatives are outlined below.

- *Immediate Security Initiatives (¶ 1(i))*:
  - **Interim Security Plan (¶ 1(i)(a))**: The Department is continuing to implement the interim Security Plan, which was developed in consultation with the Monitoring Team. As part of this plan, the Department, in consultation with the Monitoring Team, developed written communication ("Teletypes") that contain guidance for staff on key issues of the plan. These Teletypes will be discussed during roll call and address the importance and responsibilities of Supervisor tours, post abandonment, escort procedures and door security. Additionally, the Department is working to update post-orders, facility leadership are evaluating

    key control procedures, and each facility is creating "no go zones" in the housing units to discourage incarcerated individuals from crowding vestibule areas. The Department, in consultation with the Monitoring Team, also developed a checklist of key security items for Supervisors to review before starting their post, which is expected to be rolled out soon.  The Nunez Compliance Unit ("NCU") is tracking the Department's progress in implementing these initiatives and sharing routine updates with the Monitoring Team.

- **Self-Harm (¶ 1(i)(b))**: The Department continues to routinely communicate to staff their obligations under the Suicide Prevention and Intervention Policy ("Suicide Prevention Policy") as required by this provision. The Department reports staff are reminded of these obligations during roll-call, supervisory tours and through a messaging campaign in the Facilities (*e.g.* posting content on DOC televisions, hanging posters in highly trafficked areas (including at critical posts such as intake)). The Department also printed and disseminated a new memo book insert outlining staff's obligations under the Suicide Prevention Policy for each staff member. Finally, the Department has convened a task force with internal and external stakeholders to evaluate the self-harm incidents that occurred this year, and identify and recommend any needed improvements to the Department's processes to prevent such incidents in the future.

- **Intake Tracking (¶ 1(i)(c))**:

    - *New Admissions*: The Department continues to process all New Admissions through EMTC. The Department tracks all new admissions through a computer program called the New Admissions Tracking Dashboard. Facility staff manually enter and manage the time a newly admitted incarcerated individual is processed through intake. For the month of October, 1,061 new admissions were processed through intake. The Department's data shows that 1,000 of the new admissions were processed within 24 hours[2] and that 61 individuals were processed outside of the 24-hour requirement. The Department reported that in each of the 61 cases, the data was inaccurate and that all 61 individuals were in fact processed within 24 hours.  The Department reported logbook records and Genetec and were reviewed to make this determination.  The Department states data issues in the dashboard are due to manual data entry errors and that some Staff utilizing the system were not as familiar with it. As a result, the Department reports IT has worked closely with EMTC staff to provide additional training on the data entry process, so staff understand how to use the dashboard correctly.

    - *Intra-Facility Transfers*: The Department utilizes the Inmate Tracking System to track any incarcerated individuals who is brought to intake other than as a new admission.  This system tracks the movement of

---

[2] Note that DOC's 24-hour clock is put on pause for certain events, such as when the individual leaves the intake process for a scheduled court appearance, for mental health evaluations, or for hospital transfers.

3

- incarcerated individuals through manual data entry by staff and through the scanning of incarcerated individual's bracelets. While the system is in place and capable of tracking movement, it is not consistently utilized by staff as data is not promptly entered and/or the incarcerated individual's bracelets are not scanned in. Therefore, the data developed by this system is not reliable. The Monitoring Team is working with the Department to better understand the system and how improved data and tracking can be achieved going forward.

  - **Video Monitoring Unit (¶ 1(i)(d))**: The Video Monitoring Unit ("VMU") and the Compliance and Safety Center ("CASC") are continuing to conduct live video monitoring. The Monitoring Team recommended that the Department maximize efficiency and reduce redundancy in these two units as the work in the two units appeared to overlap at times. As a result, the Chief of Department and the Deputy Commissioner of Quality Assurance have worked together on protocols intended to optimize efficiencies between both units. As part of this work, the Supervisors from both units meet before each tour to review their video schedules for the day to ensure there is no overlap. The Department is working to finalize the protocols for staff distribution.

  - **Post Incident Management (¶ 1(i)(e))**: The post-incident management protocol developed in consultation with the Monitoring Team has been adopted in a Command Level Order at RNDC. Further, NCU continues to conduct a post-incident management review of the facility's response to a serious violent incident and identifies any security lapses and potential improvements to practice going forward.

  - **Classification Consultant (¶ 1(i)(f))**: The Monitor approved the Department's retention of James Austin, a consultant to advise the Department on a strategy to safely house people in consideration of gang affiliation. Mr. Austin has significant expertise in the internal classification and safe housing of incarcerated persons.

- *Expanded Criteria for Department Leadership (¶ 1(ii)) & Appointment of Security Operations Manager (¶ 1(iii))*:

The Monitoring Team has recommended that: (1) the criteria for who may serve on facility leadership teams (*e.g.*, Warden) must be expanded so that the Department is no longer limited to only selecting individuals from the current uniform ranks and can have the ability to also seek managers, from the broader corrections community, with the required skills and

willingness to improve the state of facility operations,[3] and (2) the Department appoint a Security Operations Manager,[4] with deep expertise in correctional management.

The Monitoring Team's recommendations were made because it is critical to infuse the Department with the necessary knowledge to elevate practice and support the Department's development and implementation of improved, more effective security protocols for its jails. The Department's security practices are deeply flawed, inconsistent with best practice and, in some cases, nonsensical, as outlined in every Monitor's report filed to date.[5] This impedes the Department's ability to faithfully implement the requirements of the Consent Judgement and Remedial Orders. The Department leadership (civilian and uniform), as demonstrated by their inability to effectively address the longstanding, dysfunctional, and persistently reported failed security practices, simply require immediate help to build and put into place the foundational element that is the *sine qua non* of a safe confinement operation—bedrock security and control. An update on the status of the Monitoring Team's recommendations is outlined below.

- **Expanded Criteria for Department Leadership (¶ 1(ii))**: The City has reported that there are a number of local and state laws and regulations[6] that inhibit the City from implementing this recommendation and expanding the individuals that may be considered to serve in a facility leadership position. The City's leadership, at the highest levels, engaged the Governor's office to determine whether an emergency order could be utilized to support the Department's efforts to recruit and hire qualified candidates. The City was advised, at this juncture, that an emergency order would not be issued. The Monitoring Team strongly recommends the Parties consider whether any other options may be available to provide the City and the Department the ability to implement the Monitoring Team's recommendation.

---

[3] *See* Eleventh Monitor's Report at pgs. 8 to 16.

[4] *See* the Monitor's September 23 Status Report (dkt. entry 387) and the Second Remedial Order, ¶ 1 (iii).

[5] *See* Martin September 28, 2021 Declaration and Exhibits D and E (dkt. entry 397).

[6] Including, but not limited to: New York Civil Service Laws §§ 50, 51, 52, 56, and 65; New York City Administrative Code § 9-117; and New York State Correction Law § 120 (1) and (4).

- **Appointment of Security Operations Manager (¶ 1(iii))**: The Monitoring Team has worked with the Department to outline the responsibilities of the Security Operations Manager, including revising the Department's security protocols and practices and implementing plans for improving such practices, implementing a "back to basics" program to reinforce the foundational duties of a correctional officer and supervisor, and improving supervision of Captains and ADWs more generally. Upon consultation with the Department, the Monitoring Team has developed a draft list of responsibilities for this role which require further discussion and refinement. Further discussions of who may serve in this role, and the scope of authority that individual may have, are ongoing.

**Proposed Third Remedial Order re: UOF Discipline**

The Monitoring Team is pleased to report that the Parties have reached agreement on a proposed Third Remedial Order which addresses the Monitoring Team's September 30th recommendations related to UOF discipline. The Monitoring Team intends to file the proposed Third Remedial Order and a declaration from the Monitor by November 19, 2021.

**Transfer of the Female Population to Bedford Hills**

As of November 9, 2021, the Department has transferred 54 female incarcerated individuals to the Bedford Hills Correctional Facility ("Bedford Hills"). Incarcerated individuals who will be housed at Bedford Hills are transported there by DOC staff, but, upon arrival at Bedford Hills, the New York State Department of Correction subsequently takes custody of those individuals. Once the transfer is complete, the Monitoring Team does not monitor the New York State Department of Correction or incarcerated individuals transferred to their custody.

**Key Priorities Going Forward**

Since the Monitoring Team's first status report in August of 2021, the City, Department, and the Monitoring Team have been working at a breakneck pace to address these issues. The initiatives outlined in the Second Remedial Order (and forthcoming proposed Third Remedial Order) are appropriately targeted to address the current conditions and further support the efforts to dismantle the decades of mismanagement. While the work to date has resulted in some gains,

dismantling the decades of mismanagement in the jails will take more time. The focus going forward must be on the following **three key priorities**:

(1) Implementation of the immediate security initiatives discussed above to ameliorate the current unsafe conditions.

(2) Expand the pool of individuals that may serve as facility leaders and appoint a Security Operations Manager with deep expertise in correctional management to elevate the Department's security practices and protocols in order to safely operate the jails and reduce the use of unnecessary and excessive force.

(3) Implement an aggressive plan to address the enormous backlog of use of force related discipline as the dearth of accountability for use of force related misconduct creates an environment where staff can act with impunity.

## Next Steps

To emerge from this period of dysfunction, the Department and the Monitoring Team must focus on addressing the foundational elements to improve safety in the jails—this requires significant time and dedicated effort in order to support improved practices. The Monitoring Team has provided the Court with six status reports, negotiated two Remedial orders, and drafted the twelfth report since the crisis began this summer. Going forward, the Monitoring Team intends to provide the Court and the Parties updates through the bi-annual Monitor's Reports and the Remedial Order reports required by the First Remedial Order. To that end, the Twelfth

Monitor's Report will be filed no later than November 30, 2021[7] and the third Remedial Consent Order Interim report will be filed on December 22, 2021.

A status conference on these matters is scheduled for December 2, 2021 at 10 a.m. The Monitoring Team, with the consent of the Parties, respectfully requests that the conference is held virtually. Further, if the Court would like, the Monitoring Team would be happy to facilitate the development of a joint agenda with all the Parties for the status conference and provide such agenda to the Court no later than noon on December 1, 2021.

        Sincerely,

        s/ Steve J. Martin

        Steve J. Martin, *Monitor*

        Anna E. Friedberg, *Deputy Monitor*

        Christina Bucci Vanderveer, *Associate Deputy Monitor*

---

[7] The Twelfth Monitor's Report must be filed by December 3, 2021 pursuant to the Court's October 5, 2021 Order (dkt. entry 402). However, the Twelfth Monitor's Report will be filed a few days early given the upcoming status conference on December 2, 2021.

### *Appendix A: Status of Department Initiatives*

The updates in this Appendix are limited to any new information since the City provided its status report on October 14, 2021. This list is intended to supplement the prior information that has been provided so it only includes any *new* information since the last updates were provided by the Department on October 14. In other words, if an initiative is simply on going and the status quo remains, it is not listed below. Further, if the City and/or Department has completed the initiative or it was previously reported that the initiative is not going forward then it is not included in the list below.

1. **Addressing the Conditions in the Jails**
   a. *Tablets*: The Department will distribute tablets to OBCC once WiFi connectivity is complete.
   b. *Contraband Recovery*: The Department is exploring the use of additional machinery that could be used to identify contraband. Further, they are exploring the possibility of utilizing an electronic mail system.
   c. *Suicide Aides*: As of November 8, 2021, DOC has 95 Suicide Prevention Aides ("SPA") in place. DOC has determined that they will not utilize incarcerated individuals as SPA in the intake.
   d. *On-the-Job Medical Care for Staff*: The City and DOC determined it was cost prohibitive to open an on-island clinic for staff.
   e. *Sanitation*: The Department is still utilizing outside vendors to provide sanitation support for the Facilities on Rikers Island, but has determined they will not utilize outside vendors at VCBC at this time. The Department also plans to initiate the procurement with the cleaning contractors directly.

2. **Department Staffing**
   a. *Addressing Staff Absenteeism*
      i. *Suspensions*: As of November 4, 2021, a total of 119 staff have been suspended due to AWOL.
      ii. *Home visits of Staff on Sick Leave:* On November 1, the Mayor issued an Emergency Executive Order directing any DOC correction officer or supervising officer who is confined to their residence on account of reporting sick, and who is deemed in violation of their permitted "out-of-residence" hours, or is determined by DOC to have otherwise abused the Department's sick leave policy, shall be suspended for up to thirty days without pay pending a hearing and determination of disciplinary charges.

  iii. *Expedited AWOL Cases:* 10 staff cases involving egregious AWOL cases were set for expeditious processing of discipline via OATH.  Of those 10 cases, 6 staff resigned before the trial convened, 2 cases went to trial,[8] 1 request for an expedited trial is pending, and the final case requested for expedited trial was denied.

 b. *Increasing Staff in NYC Jails*

  i. *Additional Non-DOC Staff*: The City has not ruled out the possibility of retaining additional non-DOC staff to support work on certain posts that do not require direct management of incarcerated individuals (*e.g.* perimeter security).

  ii. *Court Operations*: 91 correction officers have been transferred back to the Facilities from their assignment at the courts as a result of NYPD staffing the Bronx and Manhattan courts.

  iii. *Recruitment*

   1. *New Staff*: A second cohort of 24 staff started in the Academy on October 21, 2021. 2,248 people of the 5,663 individuals who filed to take the exam actually *took* the exam.  1,614 (72%) of the people who took the exam passed the exam.

   2. *Former Staff*: So far, 2 retirees have agreed to return to DOC.

  iv. *Incentives*

   1. 300 staff who worked triple shifts (depending on the number of hours worked during the triple shift) between April 1 and September 30, 2021 received lump sum payments.

**3. Reducing Population of Incarcerated Individuals**

 a. *Less is More Act*: As of November 5, 2021, 259 individuals have been released under the Less is More initiative.

 b. *State Transfers*: As of November 5, 2021, 146 individuals have been transferred to the state system.

---

[8] In one case, a Report and Recommendation was issued by the ALJ recommending termination.  The decision is pending in the other case.

*Appendix B: Data Pursuant to ¶ 2(ii)(a-e) of the Second Remedial Order*

| Date | a) # new admissions in intake for longer than 24 hours[9] | b) # of uniformed staff out on sick leave | c) # of uniformed staff on medically monitored / restricted duty status | d) # of uniformed staff who did not report for a shift without providing a reason (i.e. AWOL) | e) # of instances when a housing unit had no staff/ insufficient staff (i.e. unmanned posts) |
|---|---|---|---|---|---|
| September 23, 2021 | 0 | 1,670 | 751 | 37 | 78 |
| September 24, 2021 | 0 | 1,682 | 731 | 52 | 103 |
| September 25, 2021 | 0 | 1,707 | 728 | 47 | 118 |
| September 26, 2021 | 0 | 1,746 | 733 | 44 | 112 |
| September 27, 2021 | 0 | 1,712 | 747 | 50 | 109 |
| September 28, 2021 | 0 | 1,659 | 770 | 33 | 108 |
| September 29, 2021 | 0 | 1,627 | 769 | 38 | 93 |
| September 30, 2021 | 0 | 1,628 | 765 | 30 | 93 |
| October 1, 2021 | 0 | 1,642 | 767 | 18 | 116 |
| October 2, 2021 | 0 | 1,631 | 762 | 17 | 118 |
| October 3, 2021 | 0 | 1,656 | 765 | 21 | 109 |
| October 4, 2021 | 0 | 1,624 | 765 | 22 | 114 |
| October 5, 2021 | 0 | 1,579 | 775 | 21 | 97 |
| October 6, 2021 | 0 | 1,566 | 780 | 24 | 103 |
| October 7, 2021 | 0 | 1,558 | 791 | 23 | 102 |
| October 8, 2021 | 0 | 1,544 | 773 | 32 | 113 |
| October 9, 2021 | 0 | 1,579 | 771 | 25 | 108 |
| October 10, 2021 | 0 | 1,628 | 777 | 38 | 115 |
| October 11, 2021 | 0 | 1,642 | 780 | 35 | 40 |
| October 12, 2021 | 0 | 1,583 | 773 | 33 | 99 |
| October 13, 2021 | 0 | 1,558 | 778 | 52 | 100 |
| October 14, 2021 | 0 | 1,522 | 783 | 25 | 113 |
| October 15, 2021 | 0 | 1,529 | 776 | 20 | 101 |
| October 16, 2021 | 0 | 1,541 | 771 | 23 | 94 |
| October 17, 2021 | 0 | 1,586 | 764 | 30 | 100 |
| October 18, 2021 | 0 | 1,561 | 774 | 31 | 91 |
| October 19, 2021 | 0 | 1,467 | 800 | 31 | 73 |
| October 20, 2021 | 0 | 1,462 | 802 | 29 | 76 |
| October 21, 2021 | 0 | 1,436 | 784 | 28 | 80 |
| October 22, 2021 | 0 | 1,463 | 792 | 26 | 60 |
| October 23, 2021 | 0 | 1,477 | 794 | 27 | 81 |
| October 24, 2021 | 0 | 1,497 | 801 | 46 | 56 |
| October 25, 2021 | 0 | 1,512 | 778 | 34 | 83 |
| October 26, 2021 | 0 | 1,521 | 781 | 36 | 65 |
| October 27, 2021 | 0 | 1,509 | 785 | 39 | 0 |
| October 28, 2021 | 0 | 1,543 | 788 | 41 | 27 |
| October 29, 2021 | 0 | 1,582 | 779 | 32 | 0 |
| October 30, 2021 | 0 | 1,607 | 779 | 42 | 47 |
| October 31, 2021 | 0 | 1,678 | 762 | 38 | 67 |

---

[9] The 24 hour period is from the time the individual was placed in DOC custody (e.g., at the courthouse) until the time the individual was placed into assigned housing. Note that DOC's 24-hour clock is put on pause for certain events, such as when the individual leaves the intake process for a scheduled court appearance, for mental health evaluations, or for hospital transfers.

| Date | a) # new admissions in intake for longer than 24 hours[9] | b) # of uniformed staff out on sick leave | c) # of uniformed staff on medically monitored / restricted duty status | d) # of uniformed staff who did not report for a shift without providing a reason (i.e. AWOL) | e) # of instances when a housing unit had no staff/ insufficient staff (i.e. unmanned posts) |
|---|---|---|---|---|---|
| November 1, 2021 | 0 | 1,638 | 770 | 49 | 65 |
| November 2, 2021 | 0 | 1,594 | 783 | 35 | 18 |
| November 3, 2021 | 0 | 1,515 | 797 | 39 | 21 |