# Twelfth Report of the *Nunez* Independent Monitor

**Twelfth Monitoring Period**
**January 1, 2021 – June 30, 2021**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Senior Analyst*

Patrick Hurley
*Subject Matter Expert*

Simone R. Lee
*Associate Director*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ..................................................................................................................... 1
   Background .................................................................................................................. 1
   COVID-19 Impact ...................................................................................................... 2
   Organization of the Report ......................................................................................... 5

**Current State of Reforms** ............................................................................................... 8
   Guiding Principles for Next Steps ............................................................................ 10
   Foundational Issues Stymying Reform Efforts ........................................................ 11
   Key Next Steps ........................................................................................................ 12
   Post-Twelfth Monitoring Period Status Reports ...................................................... 14
   Focus for 2022 ......................................................................................................... 15
   Security Indicators ................................................................................................... 17
      -     Use of Force ................................................................................ 20
      -     Alarms ......................................................................................... 25
      -     Fights .......................................................................................... 26
      -     Stabbings and Slashings ............................................................. 28
      -     Assaults on Staff ......................................................................... 29
      -     Self-Harm .................................................................................... 31
      -     Summary ...................................................................................... 32
   Staffing Update ........................................................................................................ 33

**Section by Section Analysis** ......................................................................................... 36
    1.      Initiatives to Enhance Safe Custody Management, Improve Staff
          Supervision, and Reduce Unnecessary Use of Force (Remedial Order § A) ....... 37
    2.      Use of Force Policy (Consent Judgment § IV) ..................................................... 51
    3.      Use of Force Reporting and Tracking (Consent Judgment § V) ......................... 56
    4.      Training (Consent Judgment § XIII) ..................................................................... 67
          Training Space & Dedicated Training Academy .................................................. 68
    5.      Video Surveillance (Consent Judgment § IX) ..................................................... 73
    6.      Use of Force Investigations (Consent Judgment § VII & Remedial Order § B) .. 79
    7.      Risk Management (Consent Judgment § X) .......................................................... 92
    8.      Staff Discipline and Accountability (Consent Judgment § VIII &
          Remedial Order § C) .......................................................................................... 96
    9.      Screening & Assignment of Staff (Consent Judgment § XII) ........................... 116
    10.    Arrests of Inmates (Consent Judgment § XIV) ................................................... 119
    11.    Implementation (Consent Judgment § XVIII) ..................................................... 120

**Current Status of 18-year-olds Housed on Rikers Island** ...................................... 123
    12.    Safety and Supervision of Inmates Under the Age of 19
          (Consent Judgment § XV  & Remedial Order § D) ............................................ 123
    13.    Inmate Discipline (Consent Judgment § XVI & Remedial Order § D) .............. 131
   **Appendix A: Definitions** .......................................................................................... i
   **Appendix B: Citations to Monitoring Team Findings re: Security Failures** ............. iv
   **Appendix C: Training Charts** ................................................................................. vi
   Status of Training Provided Since the Effective Date ................................................ vi
   Status of Initial Training Program Development and Deployment ............................. vii
   Status of Refresher Training Program Development and Deployment ....................... xii
   **Appendix D: Flowchart of Promotions Process** .................................................... xiv

# INTRODUCTION

This is the twelfth comprehensive report[1] of the independent court-appointed Monitor ("Twelfth Monitor's Report"), Steve J. Martin, as mandated by the Consent Judgment in *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS) (Southern District of New York ("SDNY")). This report provides a summary and assessment of the work completed by the City of New York and the New York City Department of Correction ("the Department," or "DOC," or "Agency")[2] and the Monitoring Team to advance the reforms required by the Consent Judgment and the First Remedial Order during the Twelfth Monitoring Period, which covers January 1, 2021 through June 30, 2021 ("Twelfth Monitoring Period").

*Background*

The Department manages 9 facilities, eight of which are located on Rikers Island.[3] In addition, the Department operates two hospital Prison Wards (Bellevue and Elmhurst hospitals) and court holding facilities in the Criminal, Supreme, and Family Courts in each borough. As of the end of the Monitoring Period, the Department employed approximately 8,500 active uniformed Staff and approximately 1,700 civilian employees and managed an average daily population ("ADP") of approximately 5,500 incarcerated individuals.

The Consent Judgment was entered by the Court on October 22, 2015 ("Effective Date") and includes over 300 separate provisions focused on reducing the use of excessive and

---

[1] The Monitoring Team has filed a number of other reports and status letters with the Court.

[2] All defined terms utilized in this report are available in *Appendix A: Definitions.*

[3] There is facility based in the City boroughs, Vernon C. Bain Center ("VCBC") in the Bronx. The eight facilities located on Rikers Island are: Anna M. Kross Center ("AMKC"), Eric M. Taylor Center ("EMTC"), George R. Vierno Center ("GRVC"), North Infirmary Command ("NIC"), Otis Bantum Correctional Center ("OBCC"), Robert N. Davoren Center ("RNDC"), Rose M. Singer Center ("RMSC"), West Facility - Contagious Disease Unit ("WF").

unnecessary force against people in custody and reducing violence, particularly among 18-year-old individuals. The Court entered a Remedial Order on August 14, 2020 to address persistent areas of Non-Compliance regarding the use of force, investigations, Staff discipline, and disorder at RNDC (where most 18-year-olds are housed) raised by the Monitoring Team and by Counsel for the Plaintiffs' Class and SDNY. Following the close of the Monitoring Period, a Second Remedial Order was entered on September 29, 2021, and a Third Remedial Order was entered on November 22, 2021.

*COVID-19 Impact*

The ongoing COVID-19 pandemic continued to impact the City and the Department's operations during this Monitoring Period and contributed to amplifying many of the issues facing the agency. Court processing delays have significantly impacted the time an individual remains in custody. Staff and people in custody must be dispersed throughout the jails to accommodate for social distancing requirements and so more resources are needed to manage this size population to mitigate the COVID-19 risks than would otherwise be needed. Program Counselors continued to have limited ability to interface directly with people in custody and in-person programming by community partners remained suspended. Training programs were conducted in smaller groups and so the volume of training that could be deployed was significantly curtailed. Certain civilian staff continued to tele-commute to work, while others reported back to work in person. For ID, the civilian investigators continued to work remotely, while uniform Staff who serve as investigators were not able to enter the jails to speak with Staff or individuals in custody as easily as before COVID-19. Certain functions have also remained on a remote platform. For instance, Pre-Trial Conferences and Trials before the Office of Administrative Trials and

Hearing ("OATH") now occur virtually. Further, many leadership meetings also continued to occur virtually rather than in person during the Monitoring Period.

*Monitoring Team's Methodology*

The Monitoring Team evaluates a combination of the quantity of events, qualitative aspects of their circumstances, the overall context, and the standard of practice to assess compliance with each of the Consent Judgment's and Remedial Order's requirements. The Monitoring Team's multi-faceted strategy also requires an assessment of the full range of interrelated issues, because each of the main Consent Judgment and Remedial Order requirements is more than simply the sum of its parts. The experience and subject matter expertise of the Monitoring Team is critical for the ability to not only contextualize the information, but also to compare the Department's performance to the Monitoring Team's decades-long, deep experience with the operation of other jail systems.

The Monitoring Team's approach to assessing compliance includes a myriad of considerations. The Monitoring Team currently reviews all initial reports (*e.g.,* Central Operations Desk ("COD") reports) and Intake Investigations (formerly Preliminary Reviews) of *all* use of force incidents that occur in the Department, along with a variety of data regarding training, staffing, facility operations and the implementation of specific procedures regarding facility safety.[4] The Monitoring Team also closely scrutinizes disciplinary matters regarding potential use of force misconduct. This allows the Monitoring Team to understand the nature of the force being used throughout the Department at the incident level, as well as the variety of

---

[4] It is important to note that an assessment of an individual use of force requires a qualitative assessment of the specific facts of the case that inherently has some subjectivity, and thus experts may not always agree.

influences that lead to and flow from the use of force. The Monitoring Team's approach also identifies systemic trends and patterns.

While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with the Consent Judgment's requirements into a single, one-dimensional, quantitative metric would not only be challenging, but is also not advisable. Further, the use of numerical data must be approached with caution as it could suggest that there is a line in the sand that specifies a certain point at which the Department passes or fails. For instance, there is no single number that could determine whether the Use of Force Directive has been implemented properly. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which Staff are held accountable.[5]

There are also infinite options for quantifying the many aspects of the Department's approach and results. Just because something can be quantified does not mean it is useful for understanding or assessing progress. The trick is to identify those metrics that actually provide insight into the Department's processes and outcomes and that are useful to the task of problem solving. The development of metrics can be a burdensome and/or bureaucratic task that distracts from the qualitative assessments needed to understand and more importantly, improve, the processes and outcomes that underpin the requirements of the Consent Judgment and Remedial Orders. Poorly conceptualized metrics create an unnecessary focus on "counting" instead of solving the actual problem at hand. For these reasons, the Monitoring Team carefully considers

---

[5] Notably, neither the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation nor Remedial Orders include metrics or qualitative measures related to the concerning practices identified or potential corrective measures.

and selects data points that are necessary, objective, and illustrative, and only provides numerical data in this report when it achieves those goals. Ultimately, the goal is to identify how pervasive a practice is and the Monitoring Team's assessment that something "always," "frequently," "rarely," or "never" occurs is equally sufficient to indicate how pervasive a practice may be. Throughout this report and in a variety of different ways, the Monitoring Team communicates the scope and magnitude of the problems the Department is facing with the best possible information available while balancing the considerations above.

*Organization of the Report*

Those who have read the Monitoring Team's previous reports will notice that the current report utilizes a slightly different, more condensed format. A more streamlined approach was deemed appropriate as the Department's policies, procedures, and practices have been described in detail in the previous eleven Monitor's Reports, and thus lengthy reports with an exhaustive review of every specific requirement is no longer necessary nor helpful to the reform process. To the extent the analysis in a particular section is more concise than in previous reports, it is because the Monitoring Team determined that more streamlined reporting was sufficient to describe the Department's progress (or lack thereof) toward compliance with that provision and further detail at this juncture was unnecessary. It is critical that the Monitoring Team balance its reporting obligations, and the significant time and resource demands that accompany it, with their responsibility to aid the Department in advancing the reform. Further, given its extensive monitoring to date and deep understanding of the information gathered, in some cases, the Monitoring Team may determine that the monitoring strategy for a specific provision would benefit from refinement or that a more straightforward methodology would provide the necessary information for evaluating practice. Measuring outcomes over and over again, without the

implementation of intervening strategies to improve practice, merely quantifies the status quo and does not help to improve practice.

This report comes at a unique time. Towards the close of this Monitoring Period, the continuing impact of COVID combined with aggravated staffing problems began significantly impacting operations. Following the close of the Monitoring Period, in order to ensure the Court was informed of the latest conditions, the Monitoring Team provided the Court with contemporaneous information about jail conditions that extended beyond the time frame covered by this report. Therefore, to avoid confusion and unintentional distortions, the Monitoring Team decided, in a few select areas, to include information in this report that goes beyond June 30, 2021, which is the end of the Twelfth Monitoring Period given the extensive reporting that the Monitoring Team has made to the Court *after* the Twelfth Monitoring Period ended, but, *before* the Twelfth Monitor's Report was filed.  While the time lag involved in drafting and filing Monitor's Reports always means that newer, more current information is available than what is discussed in those reports, typically, the more current information lies along the same trajectory as what occurred during the Monitoring Period. However, in this case, not only were conditions deteriorating along a new trajectory, the Court had already been informed about circumstances that arose after the conclusion of the Twelfth Monitoring Period.

This report first presents the Current State of Reform, which discusses the overarching themes that characterize the Department's functioning, the need to prioritize the most basic correctional practices if the goals of the Consent Judgment are to ever be achieved, and a roadmap for moving forward. This is followed by a presentation of Security Indicators, which illustrates the unsafe conditions in the facilities as well as an update on the staffing analysis that

is underway. The remainder of the report includes the section-by-section analysis of compliance with the requirements of the Consent Judgment[6] and Remedial Orders.

---

[6] A small group of Consent Judgment provisions are not addressed in their original section because their substance is more similar to another area of the Consent Judgment (*e.g.*, § V, ¶¶ 18 and 20 related to use of force reports are addressed in the Risk Management section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Incarcerated Individuals is addressed in the Use of Force Investigations section of this report).

# CURRENT STATE OF REFORMS

The filing of this report marks six years since the implementation of the Consent Judgment. The findings in this report bring into sharp focus that despite six years of striving to implement the required practices, the Department's efforts have been unsuccessful in remediating the serious problems that gave rise to the Consent Judgment. Instead, conditions have progressively and substantially worsened. This section discusses why these problems persist, why no demonstrable progress has been made on key outcomes, and suggests a path forward that prioritizes creating a foundation upon which progress can then be built.

The goals of the Consent Judgment are to create a safer environment for incarcerated individuals by reducing unnecessary and excessive use of force and violence and improving the management of young adults. These goals have not been achieved because the Department lacks the most rudimentary building blocks upon which progress could be built. The requirements in the Consent Judgment are well informed and reflect practices that have succeeded in reforming other jurisdictions. The problem is that even these requirements—so common in other systems—assume a crucial and basic level of capability, competence, and adherence to foundational corrections practices that the Department simply lacks.

The Department has *tried* to improve conditions and exerted significant effort to implement the reforms in the Consent Judgment, but this work has not catalyzed the necessary changes in practice. By the end of the Monitoring Period, the Department had been led by two[7] Commissioners with significant experience and expertise in corrections and a demonstrated

---

[7] A third Commissioner was appointed at the very end of the Twelfth Monitoring Period, thus it is premature to address his tenure.

commitment to reform, and support from a team of committed individuals.[8] For six years, the Department has worked hard to implement the requirements of the Consent Judgment. In a few discrete areas, their efforts have resulted in improved practice (*e.g.,* Staff consistently report use of force events, the Department now has a reliable process to timely investigate use of force incidents, and the Nunez Compliance Unit conducts reliable quality assurance measures); however, the overall conditions have not improved and achieving the overall goals of the Consent Judgment appears even further away.

The Department's decades of poor practices has produced a maladaptive culture in which deficiencies are normalized and embedded in every facet of the Department's work. The Department's multitude of nonfunctional systems, and ineffective practices and procedures combine to form a deeply entrenched culture. This traps the Department in a state of disrepair, where even the first step to improve practice is undercut by the absence of elementary skills—be it Staff deployment, safety and security, or managing/supervising Staff—and results in a persistently dysfunctional system.  This all leaves the Department in a place where many of the requirements of the Consent Judgment are simply unattainable, and the Consent Judgment requirements are unlikely to be successful in bringing about improvements because the basic foundations needed to improve practices does not exist. The conditions in the jails reveal that the demanding list of requirements and aggressive deadlines in the Consent Judgment and First

---

[8] This includes, among others, a number of former and current staff, including the current First Deputy Commissioner of Legal and Policy, a number of current and former individuals serving in uniform leadership roles, the Deputy Commissioner of Trials and Investigations, the Assistant Commissioner of Investigations, both the former and current General Counsel, the Assistant Commissioner of the Nunez Compliance Unit (along with the staff on the Nunez Compliance team), the dedicated lawyers and staff in the Complex Litigation Unit, the Deputy Commissioner of Information and Technology, the Deputy Commissioner of Programs and Community Partnerships, the former Chief of Staff to the Commissioner, and the former Deputy General Counsel.

Remedial Order have not catalyzed the necessary changes in practice to achieve the goals of the Consent Judgment, which cannot be achieved without foundational improvements to practice. The Monitoring Team, based on our combined correctional expertise and six years of experience with the Department and the *Nunez* orders, seeks in this section of the report to establish both the guiding principles needed at this juncture to cure the foundational patterns and practices that are stymying compliance and the steps necessary to eliminate those foundational impediments, thereby enabling the Department to move forward with reform.

*Guiding Principles for Next Steps*

**First, change must come from within**. The Department must be empowered with the ability to fix these problems from within. Sustainable reform in the agency has the greatest chance of success if those leading the agency and facility are the ones who own, guide, and deliver practice improvements, particularly among line staff.  In this case, the efforts of agency and facility leaders will necessarily require support from key external actors, such as the Security Operations Manager, an expanded pool of individuals who may serve in facility leadership roles, and the Monitoring Team.

**Second, key foundational issues must be prioritized**. The success in reforming the Department hinges on addressing a select and small group of key foundational issues as outlined above. The work over the last six years has confirmed that attempting to simultaneously address a multitude of requirements with the same level of vigor is not only impossible, but counterproductive. The Monitoring Team has identified the four foundational issues that have stymied progress and thus must be addressed first, before the Department can make further progress in reforming the agency. This approach inherently means that certain other requirements will not be prioritized, but the Monitoring Team believes it is the only path

forward. Continuing the attempt to implement hundreds of provisions without some prioritization will simply immobilize the Department and progress will likely not be achieved no matter how many remedial orders or other potential sanctions may be imposed. Accordingly, the Monitoring Team intends to work closely with the Department and the City to prioritize and focus on the areas discussed in the "Key Next Steps" section of this report below.

**Third, reasonable expectations must be set.** System reform does not require perfection in order to be meaningful. A realistic approach as to what can be achieved and sustained must be the foundation. Thus, expecting perfection or demanding additional guarantees or remediation when compliance with a given requirement is not achieved perfectly (*e.g.*, there are deviations for a small number of cases) runs counter to both the definition of "Substantial Compliance" and to the overall goal of creating a functioning system.

*Foundational Issues Stymying Reform Efforts*

The facilities are dangerous, leadership and supervisors do not inspire or motivate Staff to cultivate their skills, Staff are not deployed to the housing units in a manner that enhances safety, and consequences for poor attendance and other types of misconduct are rarely imposed. The Monitoring Team's extensive work with the Department has revealed four foundational issues that stymie the efforts to reform the agency and are directly contributing to the inability to reform the agency. These issues are interrelated and when combined, lead directly to the use of unnecessary and excessive force, violence among people in custody, and mismanagement of the Young Adult population.

The four foundational patterns and practices, listed below, together create an unsafe environment for incarcerated individuals and Staff:

(1) Security practices[9] and procedures that are deeply flawed, inconsistent with best practice and, in some cases, illogical,[10]

(2) Inadequate supervision of line Staff and facility leadership who do not possess the requisite expertise and ability to lead,

(3) Staffing practices and procedures that have resulted in ineffective deployment across the agency, and

(4) Limited, and extremely delayed, accountability for Staff misconduct.

Not only have these four dynamics acutely diminished safety, but the mutually reinforcing power of these four failures is what is at the core of the Department's dysfunction. Any one of them would represent a significant problem in a correctional environment, but operating together, the adverse impact is greatly magnified. Before the *Nunez* reforms can be materially advanced, these dysfunctional patterns and practices operating within the current system must be eliminated.

*Key Next Steps*

These foundational components—basic bedrock security and control, leadership and expertise, Staff availability and deployment, and basic accountability structures— are the *sine qua non* of a safe confinement operation. It is therefore essential, as a precondition to the maintenance of a normalized and predictable setting in which the Consent Judgment requirements can be implemented, to eliminate the unsafe conditions of confinement by addressing these key foundational issues as follows.

---

[9] For instance, failure to secure doors, poor situational awareness, frequent and excessive use of Emergency Response Teams, an overreliance on the use of Intake.

[10] *See Appendix B: Citations to Monitoring Team Findings re: Security Failures* and discussed in detail in the Security Indicators section below.

The City and Department must work with all due haste, but this work will, however, require significant time and resources. The immediate need to address these issues will have to be balanced with the reality that dismantling the decades of mismanagement will take time and that rushing the repair of these foundational issues will only set the Department further back. To address these issues, the Department must focus on the following:

**Improve Security Practices and Appoint Facility Leaders with Deep Correctional Experience**: The Department must improve its security practices. An overhaul of security practices[11] can only occur with an expansion of in-house expertise, particularly (a) those individuals who serve as facility leaders who are responsible for reinforcing sound practice and (b) the appointment of a security operations manager[12] with deep expertise in correctional management who can mentor and set new expectations for the facilities' leaders. An infusion of expertise should elevate basic security practices so that some semblance of safety may then be leveraged to reduce the use of unnecessary and excessive force. The Monitoring Team is well-positioned to support the Department in addressing its deficient security practices given the Monitoring Team's significant expertise in corrections and knowledge of the Department's inner workings.

**Improve Management and Deployment of Staff**: A detailed understanding of the Department's current staffing practices is the first step in untangling the multitude of bureaucratic and complicated practices and procedures. The Monitoring Team has initiated a

---

[11] This includes reducing the overreliance on Emergency Response Teams and the use of Intake spaces.

[12] Since the close of the Monitoring Period, the Monitor made recommendations regarding the creation of this role. *See* the Monitor's September 23 Status Report (dkt. entry 387) and the Second Remedial Order, ¶ 1 (iii).

staffing analysis to better understand the Department's practices and identify the initial areas that must be improved to create greater functionality, discussed in more detail in the "Staff Update" section of this report. This work will likely identify additional core practices that must be addressed to create the necessary foundation upon which sustainable reform can then be undertaken.

**Improve Processes for Holding Staff Accountable and Eliminating the Backlog of Cases**: Faithful implementation of the requirements of the Third Remedial Order by the City, Department, and OATH is critical to make the disciplinary process more efficient, eliminate the backlog of pending disciplinary cases for use of force violations, and ensure timely accountability for staff misconduct going forward.

*Post-Twelfth Monitoring Period Status Reports*

The final months of the Monitoring Period marked the beginning of a period of significant upheaval in the Department, due to a confluence of factors not the least of which was the continuing impact of COVID along with aggravated staffing problems that significantly impacted operations. During the five months following the end of the Monitoring Period (July to November 2021), the Monitoring Team submitted *seven* status reports[13] to the Court that described the concerning conditions and the imminent risk of harm that characterizes the Department's current functioning. In other words, these seven status reports conveyed information about operations and practices during the time period *after* the Twelfth Monitoring

---

[13] *See* August 24 Status Report (dkt. entry 378), September 2 Status Report (dkt. entry 380), September 23 Status Report (dkt. entry 387), September 30 Status Report (dkt. entry 399), October 14 Status Report (dkt. entry 403), November 17 Status Report (dkt. entry 420), and December 1 Status Report (dkt. entry 429).

Period ended on June 30, 2021. Further, following the close of the Twelfth Monitoring Period, but before the filing of this report, the Monitoring Team facilitated negotiations on two Remedial Orders that the Court approved this fall (see dkt. entries 398 and 424). The Second Remedial Order was devised to address the immediate security issues presented by the crisis this summer. The Third Remedial Order included various requirements to address the dysfunctional practices that have undermined accountability within the Department.

The City and the Department have expended significant effort to address the dire conditions in the jails that emerged this summer. The Department addressed the extremely dire conditions in intake, initiated work on an interim security plan for the jails, began to untangle the issues related to Staff absenteeism, reduced the number of people in custody, and distributed tablets throughout the facilities to reduce idle time. A more detailed discussion of the gains made in these areas, and additional work that is needed, are discussed in detail in the Monitor's December 1, 2021 Status Report (dkt. entry 429). While the City's and Department's efforts must be acknowledged, and the current situation (as of the filing of this report) is not as dire as it was in late summer and early fall, the Monitoring Team must emphasize its ongoing concerns about the conditions of confinement in the jails which remain at a level below the minimal progress that was emerging in spring 2021, before the crisis began this summer.

*Focus for 2022*

The foundational initiatives discussed in this report are consistent with the requirements of the First, Second, and Third Remedial Orders. These three Remedial Orders are designed to target the core problems facing the Department. The work that must now be done will require significant time, resources, and fortitude to dismantle the convoluted, complicated, and bureaucratic practices that have evolved over decades. **The Monitoring Team believes that**

**elimination of these dysfunctional foundational patterns and practices is an absolute prerequisite to achieving sustained compliance with the full terms of the *Nunez* Orders**. This complex and demanding work necessitates requisite skill sets that must be applied in an incremental, methodical, and persistent manner. Failure to address these foundational issues will simply perpetuate the cycle of failed, albeit well-intentioned, compliance efforts that have existed during the life of the remedial phase.

      The Department and the Monitoring Team must now, with very concentrated attention, focus on determining how best to implement these initiatives, identify and remove obstacles and barriers that have inhibited progress, and devise mechanisms that can disentangle current practices and reinforce the new practices that must take their place. Following the close of the Monitoring Period, there were significant negotiations and ad-hoc reporting that was mandated by the conditions from this summer and early fall. While the reporting and negotiations among the Parties was necessary to address those dire conditions, the focus must now shift towards doing the work of implementation. The Department, as currently structured, has been unable to fully implement and institutionalize the remedial measures. Accordingly, the Department and the Monitoring Team must now focus on the priority initiatives (and the corresponding requirements in the Remedial Orders) to dismantle the Department's long-standing and deeply entrenched dysfunctional practices and provide the agency with the necessary competencies upon which to build the reforms. Once these foundational issues are addressed, compliance with the *Nunez* requirements can be accelerated and fully implemented. The Monitoring Team can then shift its focus from providing substantial and time-consuming technical assistance and reporting to simply reporting on compliance.

## *Security Indicators*

The Department's facilities are unsafe due to the lack of basic security procedures which creates a negative cycle of violence and chaos. Over the life of the Consent Judgment, the harmful practices listed below have been *omnipresent* among the thousands of incidents the Monitoring Team has reviewed:

(a)  Door Security

- Failing to secure the doors for the A-Station, unit gates and individual cells.

- Failing to properly control entrance and egress through doors, gates and cells to prevent people in custody from entering unauthorized areas or to gain access to other individuals for the purpose of doing harm.

(b)  Poor Situational Awareness and Lack of Vigilance While on Post

- Neglecting to maintain a safe distance from incarcerated individuals and utilizing a defensive stance when interacting.

- Failing to listen to and observe the population to recognize escalating tensions or frustrations and/or failing to address problems that are well within Staff's control.

- Choosing a passive, stationary supervision style. Staff are rarely mobile throughout the housing units, do not intervene early in signs of horseplay or tensions among people in custody, and often fail to disperse groups of incarcerated individuals when clustered together in the housing units.

- Abandoning an assigned post without relief or permission.

- Failing to establish and reiterate clear expectations in the assigned area, including a published, structured daily schedule and behavioral expectations. The lack of clear

expectations is compounded by a failure to hold either staff or people in custody accountable when basic expectations are not met.

- Utilizing an unprofessional demeanor. Staff frequently use profanity, an aggressive tone and/or threatening non-verbal communication, and also make derogatory comments to those in their care.

(c) Overreliance on Probe Teams

- Allowing events on the housing units to escalate out of control even when sufficient Staff are on hand to address an event quickly.

- Failing to intervene in interpersonal violence where harm is likely while awaiting the arrival of the Probe Team.

(d) Failure to Act in Self-Harm Events

- Being slow-to-act when confronted with an emergency self-harm situation (*e.g.*, person in custody has secured an object around his or her neck).

(e) Failure to Provide Basic Services

- Inability to provide basic services while Staff attend to an incident or during a lockdown and failing to communicate about and later to provide compensatory services once the emergency has passed.

Most incidents involve multiple failures from this list, and the failings are constantly reinforced by the other core problems discussed above—inadequate supervision and lack of expertise from leadership, poor staff deployment and scarce consequences for misconduct. Safe facilities are not achievable with the observed level of poor practice and the systemic reinforcements of it.

It is axiomatic that an unsafe confinement setting generates abnormally high levels of fear among both Staff and people in custody. When day-to-day life is both unstable and unpredictable, untoward behaviors (by people in custody and by Staff) are naturally magnified and exacerbated. This becomes a vicious cycle. Staff are quicker to act on perceived threats and, in turn, people in custody respond with their own threatening behavior and resistance. Thus, a dangerous environment is created and perpetuated, keeping all the actors in the confinement setting on edge. Often, with only the slightest provocation (exacerbated by abnormally high levels of fear), the environment erupts in violence and physical encounters between and among people in custody and Staff. When the level of violence is high, so too will be Staff applications of force as Staff must intervene to interrupt an assault. Furthermore, when Staff are threatened (regardless of the level of threat or whether the threat is generated by a legitimate grievance), applications of force further increase. An officer who is fearful (justifiably or not) may act precipitously to counter the perceived threat. Conversely, but equally de-stabilizing, Staff fear can lead to *inaction* when faced with scenarios requiring immediate intervention like self-harm, or when immediate proportional action would prevent later escalation.

The cycle of fear, threat, and violence is the inevitable outcome of a pervasively unsafe setting manifested by extraordinarily high levels of assaults and incidents of force. It is therefore foundational, as a precondition to the maintenance of a normalized and predictable setting in which both Staff and incarcerated individuals can function without resorting to fear-based behaviors, to significantly reduce the level of violence and unnecessary and excessive uses of force in the jails.

In addition to the record-high numbers of uses of force, data on a variety of metrics regarding interpersonal violence underscore the Monitoring Team's deep concern about the

19

imminent risk of harm facing people in custody and those who work in the Department's facilities. Data on uses of force, fights, stabbings, and slashings among people in custody and assaults on Staff reveal that 2021 has been the most dangerous year since the Consent Judgment went into effect. These are discussed in turn below.

- ***Use of Force***

Use of force will inherently occur in all jails. A well-executed, well-timed use of force that is proportional to the observed threat protects both Staff and incarcerated individuals from serious harm. However, in this Department, the use of force is almost a forgone conclusion to address any issue and therefore occurs too frequently, and without the necessary attempts to resolve the situation without resorting to physical force. The use of force rate has increased every year since the Effective Date, as shown in the chart below. This chart shows the total number (the bars) and the average use of force rate (the line) for each year from 2016 to October 2021. During the current Monitoring Period, the use of force rate was over three times higher than in 2016 (12.56 versus 3.96). Concerningly, 2021 will likely result in having the largest number of uses of force in a single year to date.



The high number of uses of force is incredibly taxing on the operations of the jail. Further, of great concern is the proportion of the incidents that are excessive, and/or unnecessary, and/or avoidable. The Department's own data (via Rapid Reviews and Intake Investigations) has found that at least 20% of use of force incidents in this Monitoring Period were excessive, and/or unnecessary, and/or avoidable. The Monitoring Team's analysis of these same incidents suggests that the Department's assessment likely undercounts the pervasiveness of problematic uses of force. That said, even the Department's own data demonstrates that the proportion of excessive, and/or unnecessary, and/or avoidable is too high.

The Department reports that changes in the size and composition of the jails' population has impacted the UOF rate. More specifically, the Department posits that what is driving the higher UOF rate, *in part*, is that the smaller number of people in custody are more likely to be higher risk, with a higher propensity for challenging behaviors that are difficult for Staff to manage. The Department suggests that these challenging behaviors may then lead to uses of force which, when analyzed over a smaller number of people in custody, leads to a higher UOF

rate. That said, the fact that people in jail have challenging behaviors is not a unique circumstance—indeed, it is the hallmark of a confinement setting, and one that Staff must be equipped to approach with solid de-escalation skills and non-physical means of resolving conflict. Having a population that may be more difficult to manage only *heightens* the need for better practice and does not excuse the rate at which the Department's Staff use force.

Most people fare poorly in stressful and fear-provoking conditions, such as those that are emblematic of this Department. The jails' unsafe environments create extraordinary challenges for anyone to manage successfully and as discussed above, trigger a vicious cycle of fear, stress, trauma and violence. Due to their immaturity and impulsiveness, uneven pace of brain development, and lack of experience coping with the many pressures of being incarcerated, younger people are even more susceptible to the stressors of the confinement setting and tend to exhibit more challenging behaviors while in custody than their older counterparts. Staff who supervise younger populations must therefore be equipped with specific skills for managing their complex needs in order to effectively prevent violence and other types of disorder. This is an area in which the Monitoring Team has continually encouraged the Department to focus. The charts below illustrate the disproportionate contribution of Young Adults (those age 18 to 21) to the total number of uses of force. During the current Monitoring Period, Young Adults comprised only **8%** of the Department's average daily population but were involved in **22%** of the uses of force.





When poorly managed and when staff do not have the necessary skills, facilities housing younger people often see higher use of force rates, which historically has been true in this Department. A significant portion of the Young Adults in custody are housed at RNDC[14] where, as discussed in the "Current Status of 18-year-olds Housed on Rikers Island" section of this report, the Department has struggled unsuccessfully to restore programming that was suspended due to COVID mitigation protocols. If properly implemented, a robust array of engaging programs that minimize idle time is an important tool for facilitating safety in a confinement

---

[14] In June 2021, 332 of the 461 (72%) 18- to 21-year-olds were at RNDC.

setting. That the Department has been unable to meet this requirement of the Consent Judgment

has created a situation in which the opposite of what is desired occurs—an excess of idle time,

minimal civilian presence, a lack of services, and an abundance of boredom and stress that

manifests as frustration, desperation, and violence. Further, unfortunately, the security lapses that

are prevalent throughout the Department are particularly pronounced at RNDC, as shown in the

examples below. The following 18 incidents occurred at RNDC in July-August 2021 and

illustrate the calamity of issues and dangerous situation present in that jail.

- o *7/29/21—A detainee assaulted a Correction Officer ("CO") while the CO was asleep after having worked a double shift.*
- o *7/31/21—Eleven detainees were involved in a gang fight in the vestibule after two housing unit doors were left unsecured.*
- o *8/1/21—Two housing unit doors left unsecured and a detainee attempted to enter the control station necessitating a staff use of force.*
- o *8/2/21—Three detainees went through an unsecure housing door and made their way to a corridor where they advanced toward a CO who used OC to stop them.*
- o *8/2/21—CO left a housing unit door unsecure and detainees gathered in the vestibule and made their way to a corridor where they assaulted another CO.*
- o *8/2/21—A detainee entered an unsecured area through an unsecure door and forced was used to remove him.*
- o *8/6/21—A detainee in enhanced restraints made his way through an unsecure door after which he entered a corridor requiring staff to use force to re-secure him.*
- o *8/10/21—Detainees from two unsecure housing areas converged in a vestibule after which a gang fight ensued requiring a large group of Emergency Service Unit ("ESU") staff to secure the individuals. As the group of detainees were pushing their way through to the corridor one CO was heard to say, "Oh my fucking god."*
- o *8/10/21—A detainee passed through an unsecure pantry door took a food cart and rammed it through a housing unit door into the vestibule where staff used force to secure him.*
- o *8/11/21—A detainee passed through an unsecure housing door and made his way to a corridor where a security team used force to restrain him.*
- o *8/11/21—Detainees who were not properly restrained made their way to a corridor to attack detainees already in the corridor. OC was used to intervene in the attack.*
- o *8/15/21—A detainee who had previously been the subject of a violent attack was seriously assaulted by four inmates in housing unit and vestibule.*

- o *8/20/21—While a CO was off post with unsecure cells, a group of detainees assaulted other detainees requiring a major application of force by staff.*
- o *8/21/21—A detainee ran through two unsecure housing unit doors, made his way to a corridor without staff intervening. He entered another corridor where staff finally stopped him.*
- o *8/25/21—A detainee was able to move through multiple unsecure doors to assault a detainee. Two officers assigned the housing units were cited for failure to secure their doors.*
- o *8/26/21—Detainees who had breached a door to enter the vestibule then entered the control center while engaged in an altercation with other detainees. This altercation followed another multiple gang fight that occurred one hour earlier.*
- o *8/26/21—While an officer was off post for approximately 45 minutes with unsecure cells and a pantry door open detainees engaged in an assault on one another.*
- o *8/30/21—Inmate altercation involving no less than 11 detainees; prior to the incident no staff member present in housing area and housing door left unsecure allowing inmates to assault a CO. One detainee sustained 10cm laceration to his face while another detainee sustained a 5cm laceration to his neck. An Assistant Deputy Warden ("ADW") & Captain exited the area leaving staff w/o an on-the -scene supervisor after which another detainee was slashed. Five CO's left their posts after being overcome with OC.*

- **Alarms**

The Department continues to over-rely on the use of Emergency Response Teams (*i.e.* Level B alarms) to manage even routine issues within the jails, often creating even more chaos and disorder than the original issue (*see* Eleventh Monitor's Report at pgs. 39- 51 and Tenth Monitor's Report at pgs. 30-32). The table below presents the number of alarms from July 2019 to June 2021, and illustrates that the majority involve the deployment of an Emergency Response Team (a "Level B" alarm). While the rate of alarms has varied, the rate remains too high and a qualitative review of incidents triggering an alarm continues to indicate that the Department depends too heavily on these teams. The Monitoring Team's review of incidents in which a Level B alarm was activated continues to indicate that most of the incidents were not of a severity requiring an Emergency Response Team and instead, should have been handled by the unit staff, a supervisor and/or a call for a Level A alarm.

| Alarms, July 2019 to June 2021[15] | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | July-Dec. 2019 (9th MP) | | | Jan.-June 2020 (10th MP) | | | July-Dec. 2020 (11th MP) | | | Jan.-June 2021 (12th MP) | | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate |
| Total Alarms | 7,268 | 6,989 | 17.3 | 4,462 | 4,698 | 15.8 | 4,683 | 4,389 | 17.8 | 4,719 | 5,534 | 14.2 |
| | # | % total | | # | % total | | # | % total | | # | % total | |
| Level A | 2,052 | 28% | | 796 | 18% | | 1,098 | 23% | | 1,719 | 36% | |
| Level B | 5,216 | 72% | | 3,666 | 82% | | 3,583 | 77% | | 3001 | 64% | |
| *Rate is calculated using the following formula: (# Alarms in MP/6 months)/ADP * 100* | | | | | | | | | | | |

This problem has persisted for several years. The overuse of alarms, chaotic search practices, large and unnecessary number of Staff comprising the Emergency Response Teams, frequent outsourcing of basic facility operations to these teams, the composition of these teams, and the questionable tactics of Emergency Respones Teams all significnatly impact the Department's larger use of force problem.

- *Fights*

The chart below shows the number (the bars) and rate (the line) of fights across all DOC facilities, from 2016 through the first six months of 2021. Although the 2021 data includes only the first half of the year, the Department is on track to register the largest number of fights in a year since the Effective Date. Furthermore, since the number of fights has remained approximately the same but the number of people in custody has decreased over time, the *rate per 100 people* has increased substantially. The average rate for the first six months of 2021 (10.15) is double the rate of fights in 2016 (5.11).

---

[15] The data by facility demonstrates the Department's pervasive overreliance on Level B Alarms. As with use of force data by facility, the Monitoring Team has not found a particular pattern or practice regarding the use of alarms by facility that would make this data particularly informative.



The frequency of fights within individual facilities is shown in the chart below. Just two facilities accounted for more than half the fights —AMKC (32%) and RNDC (19%).



- ***Stabbings and Slashings***

As shown in the chart below, the number (the bars) and rate (the line) of stabbings/slashings increased exponentially in 2021 (includes data through October 2021). The rate in 2021, 5.56 per 100 people in custody, was more than double the rate in 2020 (2.66). Further, the number of stabbing/slashing events in the first 10 months of 2021 (n=353) was higher than the previous three years *combined* (2018 n=96, 2019 n=121, 2020 n=121, total n=338).



Given the constant changes to the size and composition of the facilities, changes over time at the facility-level are not particularly informative. In 2021 (January through October), just four facilities contributed about 90% of all stabbing/slashing events, as shown in the chart below.



- ***Assaults on Staff***

The chart below shows the number (the bars) and the rate (the line) of assaults on Staff by people in custody across the facilities. Between January and September 2021, there were 2,113 assaults on Staff in DOC facilities. This translates to nearly *8 assaults on Staff per day* during the 273-day period.

The significant number of assaults on Staff is troubling for a variety of reasons, not the least of which is the assaults' contribution to an unstable, unpredictable, unsafe environment that puts everyone on edge. The risk of physical assault at the hands of a person in custody is both frightening and stressful for Staff, and being victimized leads to fear, injury, and trauma, all of which create an emotional environment in which Staff are unlikely to perform optimally. That said, it is also true that some of these assaults on Staff are, in fact, generated by gratuitous and/or heavy-handed Staff conduct that needlessly escalates encounters, including, for example, inappropriate use of racial slurs or provocative/profane language, questionable applications of OC spray, and overly aggressive behavior that is not proportionate to the actual threat posed by the individual. Finally, assaults on Staff may also occur *during* an application of force when the

individual being restrained reflexively responds to that experience by lashing out physically, particularly when restraint techniques are inappropriately or painfully applied. In short, the factors contributing to the significant number of assaults on Staff are complicated and their prevalence is an important aspect for understanding the jails' current environments.

Of the total 2,113 assaults on Staff, 25% occurred at GRVC (n=524, about 1.9 per day), 20% occurred at AMKC (n=415, about 1.5 per day), 17% occurred at NIC (n=361, about 1.3 per day), 12% occurred at OBCC (n=256, just under 1 per day) and RNDC (n=254, just under 1 per day), and the remaining 14% (n=303) were spread across the other facilities. With the frequency of violence against Staff at this level, the goal of staffing DOC's facilities with a highly skilled and resilient workforce is severely undermined by the associated injury, fear, stress and trauma that officers encounter on a day-to-day basis.



- *Self-Harm*

The Department's inadequate response to self-harm incidents among people in custody continues to be of great concern to the Monitoring Team. Staff are not responding in the moment with the necessary urgency and/or are not taking threats and self-harm gestures seriously. For example, when individuals begin the process of tearing sheets, shirts, or other materials for the purpose of making a noose, the behavior is either undetected, underestimated or ignored by Staff. The Staff response may not always involve an egregious delay, but *any* delay in preventing or responding to self-harm is potentially significant. Even when individuals are observed with a noose around their neck, often tightened or attached to a fixed object, Staff sometimes leave the individual unattended, are slow to call for assistance, are slow to enter the cell, attempt to negotiate with the individual and/or fail to make an immediate intervention. These poor Staff practices, with potentially deadly consequences, go unnoticed across the various forms of incident review with the relevant supervisors and facility leaders failing to understand or appreciate the serious nature of events.

The number of deaths caused by suicide in the jails has skyrocketed (as illustrated in the table below). Six individuals passed away in 2021 due to suicide, which is the same number of individuals who passed away by suicide over the last six years (2015 to 2020) *combined*. The total number of individuals who passed away in 2021 continues to increase and at least some have been reported as jail-attributable by the Chief Medical Officer of Health + Hospitals, the medical provider to the New York City jails.[16]

_____

[16] Letter from Ross McDonald to Council Member Powers, dated September 10, 2021 (at https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf)

| Number of In-Custody DOC Deaths<br>January 2015 to October 2021 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan. to Oct. 2021[17] | TOTAL |
| COVID-19 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 3 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 7[18] | 43 |
| Overdose | 0 | 2 | 1 | 0 | 0 | 0 | 1 | 4 |
| Suicide | 2 | 2 | 0 | 1 | 0 | 1 | 6[19] | 12 |
| Undetermined | 0 | 0 | 1 | 0 | 0 | 5[20] | 0 | 6 |
| TOTAL | 11 | 15 | 6 | 8 | 3 | 11[21] | 14[22] | 68 |

- *Summary*

In summary, the security indicators discussed above describe a system that is rife with violence and disorder. Many of the underlying dynamics could be addressed with an intentional focus on the core competencies of basic security practices, more effective leadership, Staff accountability, and efforts to deploy uniformed Staff more appropriately and efficiently, as discussed in more detail below.

---

[17] 7 of the 14 cases in 2021 occurred following the close of the Monitoring Period between July and November 28, 2021.

[18] 6 of the 7 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

[19] 2 of the 6 cases occurred following compassionate release from custody. Two of the 6 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

[20] 4 of the 5 cases in this category includes four individuals who died while under the jurisdiction of the Department but were not under the supervision of DOC staff (*e.g.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs) at the time of their death and were not physically in the Department's custody. The cause of death for each of these individuals is not known.

[21] It is worth noting that 4 of the 11 individuals that passed away in 2020 were not technically in DOC custody at the time they pass away as they were participating in programs in the community.

[22] 2 of the 14 individuals that passed away in 2021 were released from Department custody before they passed away as a compassionate release.

*Staffing Update*

The Monitoring Team has long been concerned about the Department's deployment and management of its Staff.[23] During the current Monitoring Period, these long-standing problems were then compounded by higher-than-usual absenteeism (which accelerated during Summer 2021, following the close of the Monitoring Period). The most extreme illustration of the Department's inability to properly manage its Staff is that on any given day in October 2021, an average of approximately 80 posts went unmanned—including posts in which Staff directly supervise and facilitate services for people in custody.

The number of people in the Department's custody has decreased in recent years (from an average daily population of 9,800 in 2016 to 5,640 in 2021) while the size of the workforce (approximately 8,000) has stayed relatively constant,[24] leaving the Department with one of the richest staffing ratios in the country. Staff absenteeism, at its peak, included roughly 1,600 Staff calling out sick (about 19%) and another 100 or so (about 1%) simply not showing up for work (*i.e.*, AWOL). The underlying causes are multifaceted and include an unlimited sick time benefit, COVID-19, lackadaisical practices for verifying Staff's health and/or ability to return to work, and a lack of accountability for Staff who abuse the procedures. During this time, the number of unavailable Staff was higher than in previous years and simply could not be absorbed by the

---

[23] For instance, the Eleventh Monitor's Report highlighted the paradox between the exceptionally large number of uniformed staff employed by DOC and the Department's pervasive belief that it is "understaffed." The report noted that, from the Monitoring Team's vantage point, the *deployment of staff* rather than the *number of staff* is where the trouble begins.

[24] The number of uniform Staff was at an all-time high in August 2018 (10,761), but over the last ten years, the number of Staff has otherwise been between 7,000 and 8,800.

Staff who did report to work, in large part because the Department's staffing practices are so poorly managed.

The Monitoring Team identified a preliminary set of dynamics that appear to be contributing to the problem of inefficient Staff deployment. These include:

- Permitting Staff to utilize an unlimited number of sick days, combined with a lack of adequate practices for verifying Staff's health, which encourages abuse of this benefit.

- A large proportion of the workforce on medically modified duty ("MMR"), which restricts the ability to deploy them to posts that directly supervise people in custody.

- Constantly closing and reopening jail facilities.

- Repopulating jail facilities with different specialized populations.

- Sparsely populating individual housing units, which requires Staff to be distributed more widely across those units. The Department operates roughly 220 housing units, which require a large number of Staff to operate.

- Deploying excessive numbers of Staff to respond to the scene of an emerging conflict (*e.g.*, via the Probe Team or ESU).

- Unnecessarily transporting incarcerated individuals to intake for a medley of reasons.[25]

---

[25] The Department conducted its own analysis of this issue during the last Monitoring Period and concluded that movement to intake was excessive. While in some cases transporting a person to intake may be reasonable (*e.g.*, transfer to another facility or transport to Court), moving people to intake simply to await transport to a different location *within the facility* is illogical. Furthermore, transporting individuals to a different location—particularly when agitated—can often compound the management problem rather than resolve it.

- "Temporarily" assigning individual Staff to posts outside a facility ("TDY") but keeping the Staff on the facility's roster, when in fact many TDY assignments are long-term and thus the Staff should not be considered available to the facility in its resource planning.

- Staffing unauthorized posts that are not included in the facility's formal staffing plan but nonetheless consume Staff resources.

- Assigning uniformed Staff to positions that are not consistent with the duties for which they were hired (*e.g.,* administrative tasks, data entry, secretarial support, time keeping, social services, analytics, etc.).

Clearly, this conundrum —where the Department has an extraordinary number of Staff on its payroll, many of whom are deemed unavailable to work or are assigned to non-custodial duties, and yet facility leadership reports insufficient numbers of Staff to properly and safely operate the facilities—has a complex web of contributing factors that will be difficult to reverse and untangle. As discussed in the previous Monitor's Report, the Monitoring Team retained an independent expert in correctional staffing to conduct an analysis to identify the various practices and dynamics contributing to poor deployment and to put forth a set of recommendations to help the Department use its staffing resources more efficiently and effectively. That analysis is currently underway.

# Section by Section Analysis

This section-by-section analysis of the report assesses compliance with the requirements of the Consent Judgment[26] and the First Remedial Order. As for the assessment of compliance with the Remedial Order, Section A is addressed in its own standalone section while the assessments of compliance with Sections B, C, and D of the Remedial Order are interpolated with the related sections of the Consent Judgment (*e.g.,* Section B of the Remedial Order is addressed with Consent Judgment provisions regarding Use of Force Investigations). The foundational provisions of the Consent Judgment and First Remedial Order were targeted for a more comprehensive discussion, while more concise reporting was utilized to describe the Department's performance level on the remaining provisions.

The following standards were applied to each of the provisions that were assessed for compliance: (a) Substantial Compliance,[27] (b) Partial Compliance,[28] and (c) Non-Compliance.[29] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply

---

[26] A small group of Consent Judgment provisions are not addressed in their original section because their substance is more similar to another area of the Consent Judgment (*e.g.*, § V, ¶¶ 18 and 20 related to use of force reports are addressed in the Risk Management section of this report; and § XV, ¶ 9 investigating allegations of sexual assault involving Young Incarcerated Individuals is addressed in the Use of Force Investigations section of this report).

[27] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[28] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[29] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[30] The Monitoring Team did not assess compliance for every provision in the Consent Judgment or the Remedial Order in this report because the Monitoring Team was simply not in a position to rate the provision (the reasons for which are described in the specific provision) or the requirement had not come due.[31] Further, any provisions that have been placed in an "inactive monitoring" status or held in "abeyance" are not included in this report.[32]

1. **INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE (REMEDIAL ORDER § A)**

This section of the Remedial Order is intended to advance reforms in implementing the Use of Force Directive, and are designed to improve the use of force and reduce the use of unnecessary and excessive force through bolstering the Rapid Reviews (including additional oversight and accountability for deficient reviews), increased ownership by facility leadership of data analysis and initiatives driven by such analysis, implementing a de-escalation protocol which minimizes reliance on intake, increasing supervision of Captains through the addition of more ADWs assigned to each facility, better management of those frequently involved in force through alliance with mental health providers, and improving the use and deployment of the Facility Emergency Response Teams.

---

[30] § XX (Monitoring), ¶ 18.

[31] The fact that the Monitoring Team does not evaluate the Department's level of compliance with a specific provision simply means that the Monitoring Team was not able to assess compliance with certain provisions during this Monitoring Period. It should not be interpreted as a commentary on the Department's level of progress.

[32] *See* Tenth Monitor's Report *Appendix B: Status of Compliance – Inactive Monitoring or Abeyance of Certain Provisions.*

## REMEDIAL ORDER § A. ¶ 1 (USE OF FORCE REVIEWS)

This provision requires facility leadership to conduct a close in time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address with appropriate corrective action.

*Use of Force Reviews*: During this Monitoring Period, Rapid Reviews assessed 4,150 (96%) of the 4,345 actual uses of force, involving 23,204 unique Staff actions.[33] The chart below demonstrates the Rapid Review outcomes from January 2018 to June 2021 (covering the past seven Monitoring Periods).

| Rapid Review Outcomes *January 2018 to June 2021* | | | |
|---|---|---|---|
| | **2018** | **2019** | **2020** | **January–June 2021** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | |
| **UoF Incidents Assessed** | 4,257 (95% of actual incidents) | 6,899 (97% of actual incidents) | 6,067 (98% of actual incidents) | 4,150 (96% of actual incidents) |
| **Avoidable**[34] | 965 (23%) | 815 (12%) | 799 (13%) | 836 (20%) |
| **Unnecessary** | 290 (7%) | 1,057 (15%) | N/A[35] | |
| **Violation of UOF or Chemical Agent Policy** | | | 345 (11%) (July–December 2020 Only) | 495 (12%) |
| **Procedural Violations**[36] | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 1,872 (45%) |
| **Misconduct Identified – by Staff Member** | | | | |
| **Corrective Action Recommended** | 3,595 | 3,969 | 2,966 | 2,369 |

---

[33] "Staff actions" refers to each Staff Member involved in the incident (*i.e.* if three Staff Members used force to restrain an incarcerated individual in an incident, three "Staff actions" would be assessed as part of the Rapid Review.) The fact that 23,204 Staff actions were evaluated does not mean that 23,204 *different* Staff Members were involved in UOF. Rather, this number reflects the *unique* Staff actions evaluated in every UOF incident reviewed. In many cases, Staff may have been reviewed multiple times as they were involved in multiple use of force incidents throughout the Monitoring Period.

[34] An incident may be found to be both avoidable and unnecessary.

[35] The Rapid Review template (implemented in the Tenth Monitoring Period) does not capture this information, instead the template assesses whether there is a violation of the Use of Force Policy or the Chemical Agents policy, which is a more appropriate assessment of Staff conduct at this early phase of review with limited information.

[36] Procedural errors include a variety of instances in which Staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

A significant benefit of Rapid Reviews that *accurately* identify potential misconduct and recommend appropriate corrective action is that any subsequent investigation of these incidents can leverage this work and be more efficient. In particular, in cases where the Rapid Review appropriately identified and addressed minor misconduct, then the Intake Investigation can be closed with no additional action outside of what occurred from the Rapid Review. In this Monitoring Period, the Monitoring Team identified a number of Intake Investigations that were appropriately closed in this manner.

Rapid Reviews identify violations (over 2,300 violations in this Monitoring Period) and recommend corrective action for a considerable amount of Staff misconduct. Rapid Reviews also identify that a significant portion of incidents are avoidable (20%). That said, while Rapid Reviews identify and address a significant amount of issues, they still are not reliably and consistently identifying *all* issues that would reasonably be expected to be identified through a close in time assessment of the video.[37] In particular, Rapid Reviews often do not find incidents avoidable when there is objective evidence an incident could have been avoided—therefore it is important to note that likely more than 20% of incidents are in fact avoidable.[38]

*Recommended Corrective Action*: Rapid Reviews can recommend multiple types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspensions, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for

---

[37] *See* Eleventh Monitor's Report at pgs. 67-68 and 105-107.

[38] The Monitoring Team routinely identifies incidents not identified as avoidable by Rapid Reviewers that should have been identified as avoidable based on objective evidence available to the Rapid Reviewer. Additionally, ID determined in the Intake Investigation that *at least* 57 additional incidents that occurred in this Monitoring Period were avoidable, but were not identified as such through the Rapid Review. In some cases, this finding by ID suggested that the Rapid Review failed to identify the issue (although it must be noted some determinations about whether the incident was avoidable could only be made following a more thorough investigation). ID's investigations of certain incidents that occurred in this Monitoring Period is still ongoing so the number of additional incidents identified as avoidable may increase as those investigations are completed.

Employees[39] ("C.A.R.E."), Command Disciplines, and Memorandum of Complaints ("MOCs"). The corrective actions (outside of re-training requests[40]) are generally being imposed *when recommended*.[41]

*Command Discipline*: Command Disciplines ("CDs") are one of the most significant corrective actions that can be taken via a Rapid Review so a more detailed assessment is provided here. Command Disciplines are a useful accountability tool because they can be completed close-in-time following the Rapid Review. The chart below depicts all Command Disciplines recommended from Rapid Reviews since the Eighth Monitoring Period. As demonstrated in the chart below, more Command Disciplines have been recommended (n=1,231) in this Monitoring Period than any other.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews<br>*As of October 15, 2021* | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS | | Resulted in 1-5 Days Deducted | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
| *8th MP* | *757* | *5* | *1%* | *390* | *52%* | *50* | *7%* | *66* | *9%* | *42* | *6%* | *180* | *24%* | *15* | *2%* |
| *9th MP* | *878* | *2* | *0%* | *489* | *56%* | *72* | *8%* | *90* | *10%* | *11* | *1%* | *180* | *21%* | *26* | *3%* |
| *10th MP* | *492* | *3* | *1%* | *263* | *53%* | *30* | *6%* | *37* | *8%* | *10* | *2%* | *110* | *22%* | *39* | *8%* |
| *11th MP* | *948* | *12* | *1%* | *410* | *43%* | *78* | *8%* | *89* | *9%* | *22* | *2%* | *289* | *30%* | *43* | *5%* |
| *12th MP* | 1231 | 199[42] | 16% | 435 | 35% | 101 | 8% | 141 | 11% | 9 | 1% | 251 | 20% | 65 | 5% |

Of the 1,231 recommended CDs recommended from Rapid Review this Monitoring Period:

- 686 (56%) resulted in days deducted, a reprimand, corrective interview, or an MOC.
- 316 (25%) were dismissed for the following reasons:

[39] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to Staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting Staff generally in the day-to-day aspects of their work-life as well as when unexpected situations including injury or serious emergency arise. The Unit also works with Staff to address morale, productivity, aid in stress management, and provide a wide variety of support, including Staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

[40] Re-training recommended by Rapid Reviews is requested through the service desk as required, however a backlog of re-training requests (as discussed in the Training section of this report) has prevented these re-trainings from being imposed.

[41] See further discussion in the relevant sections of this report (Remedial Order § C. ¶ 1/Staff Discipline and Accountability ¶ 2(e) (Immediate Corrective Action), Risk Management ¶ 2 (Counseling Meetings), Training ¶ 5 (Re-Training))

[42] Most of these pending Command Disciplines are for incidents which occurred in June 2021.

- 177 (14%) were dismissed for factual reasons including following a hearing on the merits, because a Staff Member resigned/retired/was terminated, or the Investigations Division ("ID") asked the facility to stand-down on the Command Discipline.
- 74 (6%) were dismissed due to due process violations (meaning the hearing did not occur within the required timeframes outlined in policy).
- 65 (5%) were never entered into the Case Management System ("CMS") so they were never processed.

Overall, the Department appears to reasonably be managing the use of CDs by recommending them in appropriate situations and processing them appropriately. That said, the failure to address recommended CDs for due process violations or because they were not entered into CMS must be eliminated (11% of CDs this Monitoring Period)—these are most concerning because administrative errors prevented the CD hearing from occurring and therefore the opportunity for disciplining Staff was lost.

_Identifying and Addressing Biased, Unreasonable, or Inadequate Rapid Reviews_: Rapid Reviews do not reliably and consistently identify all relevant issues that occurred in the incident _and_ whether an incident is avoidable. However, while Rapid Reviews that are _patently_ biased, unreasonable, or inadequate do occur with some frequency, it is not pervasive.

To address the most egregious deficiencies in Rapid Reviews, the Department has focused on reviewing the Rapid Reviews for incidents in which a Staff Member was suspended for a use of force-related violation.[43] This review assesses the outcome of the Rapid Review and whether the conduct that gave rise to the suspension could and _should_ have been identified through the materials available to the individual conducting the Rapid Review. The Department determined that the misconduct in 6 of the 52 use of force-related suspensions (involving five unique incidents) that occurred in this Monitoring Period should have been identified by the Rapid Review, but was not. The Chief's and leadership from ID and Nunez Compliance Unit ("NCU") met with the facility leadership that conducted these problematic Rapid Reviews and discussed the issues and/or conducted corrective interviews with those leaders.

The overall quality of the Rapid Reviews must be elevated. This likely will only occur as facility leadership gain a stronger command of the security protocols and procedures that must be utilized day in and day out to faithfully implement the Department's policy and safely manage the jails.

_Conclusion_: The Rapid Review process is a significant undertaking, especially given the high volume of incidents, involving large numbers of Staff. Rapid Reviews are conducted for nearly all incidents and a significant amount of corrective action is recommended and imposed. The Monitoring Team is encouraged that Rapid Reviews continued to be completed timely (generally within 24 hours) and at such a high volume even with the many other challenges the Department was facing. However, Rapid

---

[43] The Staff Member suspension may have been the result of a recommendation from ID, a review by the Chief of Department's office or the Rapid Review. The majority of recommended suspensions are made by ID or from the Chief of Department's office.

Reviews do not reliably and consistently identify all relevant issues that occurred in the incident *and* whether an incident is avoidable. Further, appropriate corrective action for the relevant Staff Member is not always reasonably recommended, and the misconduct identified and addressed through Rapid Reviews to date simply has had no impact on preventing similar misconduct from re-occurring (*e.g.,* Rapid Review identify and recommend corrective action for multitudes of security lapses, yet those lapses persist Monitoring Period after Monitoring Period). Finally, the Department must not only have a process to identify and address inadequate, unreasonable, or biased Rapid Reviews, but must take appropriate action with the individual that conducted the Rapid Review—including formal discipline if warranted—once identified.

| COMPLIANCE RATING | § A., ¶ 1. Partial Compliance |
|---|---|

### REMEDIAL ORDER § A. ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES)

This provision requires facility leadership to routinely analyze available data and information regarding UOF, including the daily Rapid Reviews, to determine whether there are any operational changes or corrective action plans are needed to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. As noted above, facility leadership consistently conduct Rapid Reviews for every UOF incident. Further, Department leadership (both uniform and civilian) routinely meet to discuss the various issues facing the agency.[44]  However, facility leadership have been unsuccessful in dismantling the culture that gave rise to the Consent Judgment despite the significant efforts that have been outlined in every Monitor's report to date. Facility leadership appear unable or unwilling to implement and follow through with the multitude of strategies to address identified problems that have been developed throughout the life of the Consent Judgment. Across all of the facilities, there are persistent operational issues, including the use of inadequate or unreasonable security protocols, which contribute to the use of excessive or unnecessary force and the frequency of UOF incidents in general. Generally, the poor practices seen by the Monitoring Team appear to occur across all facilities with little distinction between them. Ultimately, the lack of sufficient supervision of Captains (discussed in more detail below), the lack of adequate security protocols and procedures, the constant change in priorities and focus, and the frequent change of facility leadership means that there is no opportunity to develop adequate operational changes or corrective action plans that may change practice. This is the reason that the Department is now required to obtain more ADWs to supervise captains (§ A. ¶ 4 below and adopted based on a

---

[44] For instance, there are monthly "TEAMS" meetings, executive leadership meetings, and Nunez meetings. Nunez meetings were suspended at the end of the Monitoring Period due to the change in leadership. It was reported that they would be initiated again in the next Monitoring Period.

Monitoring Team recommendation), that the Department must have the ability to select candidates to serve as facility leadership outside of the current chain of command, and that the Department appoint a Security Operations Manager, with relevant and deep correctional expertise in order to guide the development of adequate and appropriate security protocols.

| COMPLIANCE RATING | § A., ¶ 2. Non-Compliance |
|---|---|

### REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL)

This provision requires the various processes that are negatively impacting intake's orderly operation to be identified and addressed with new procedures, in particular with respect to management of incarcerated individuals following a use of force incident. The Department's intake analysis, conducted in the last Monitoring Period, foreshadowed the concering issues to come. The Department's work confirmed the Monitoring Team's assessment that intake is inappropriately used for reasons unrelated to admission and discharge and heavily relied upon for post-incident management following a use of force. The Department's work also found that individuals often languish in the intake area and that likely contributes to uses of force in intake (*e.g.* refusal to obey orders). The Department, however, has not taken any steps in this Monitoring Period to address its findings or limit the reliance on intake following a use of force incident. In fact, the Department's overreliance on the use of intake further devolved in this Monitoring Period, and subsequently got much worse following the close of the Monitoring Period, with incarcerated individuals spending in excess of 24 hours in overcrowded intake pens.[45]   The reports of the conditions of the intake were concerning and inhumane.

*Post Incident Management at RNDC*: Following the close of the Monitoring Period, the Monitoring Team focused on developing a protocol to manage incarcerated individuals at RNDC following a serious incident because the current practices were severely lacking and generally failing to secure the alleged perpetrators in a manner that protects them, and others, from harm. The Monitoring Team recommended that the Department create an option to place the alleged perpetrator(s) of an act of violence that causes or risks a serious injury in confinement for a short period (*e.g.,* up to 72 hours) to de-escalate the aggressor, provide an opportunity to investigate the incident, and protect other individuals and Staff from the aggressor. The main goal of this period of confinement is to create a safe environment during which the procedures for processing the individual into a more secure setting (*e.g.,* ESH, Secure, NIC, RMAS, etc.) can be completed. The Department and Monitoring Team collaborated on a protocol at RNDC to ensure that individuals involved in serious incidents are secured pending

---

[45] The Monitoring Team has reported on the Department's efforts to eliminate incarcerated individuals stay in intake beyond 24 hours in the October 14 and November 15 Status Reports. Future reports will include a more detailed assessment of the Department's efforts to track this information and eliminate a stay in intake beyond 24 hours.

transfer to a more restrictive setting to minimize potential harm to others. Until a permanent location for de-escalation is identified, for incidents occurring in celled housing areas, the perpetrators will be confined to their assigned cells and may only be transported to intake for the purpose of searches/body scans and must then be promptly returned to their assigned housing unit/cell pending transfer. When incidents occur in dormitory housing or those housing units with antiquated cell doors, the Department will utilize two designated single occupancy pens in RNDC's intake area to use for this purpose. Furthermore, the Department will develop procedures to accelerate the transfer of perpetrators of stabbings/slashings to a more restrictive setting that will include promptly notifying Operations Security Intelligence Unit ("OSIU") of the need for transfer and clarification that an individual may be transferred to a more restrictive setting even while the required paperwork and investigation are ongoing. Implementation of this procedure is expected to begin in the fall of 2021.

**COMPLIANCE RATING**   **§ A., ¶ 3.** Non-Compliance

**REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS)**

This provision requires the Department to improve supervision by hiring additional ADWs and deploying and supporting ADWs within the facilities to better supervise Staff. The chart below identifies the number of ADWs assigned in each facility at the beginning and at the end of the Twelfth Monitoring Period.

| Number of ADWs in each Facility[46] | | |
|---|---|---|
| | **Number of ADWs As of January 2, 2021** | **Number of ADWs As of June 26, 2021** |
| AMKC | 21 | 13 |
| EMTC[47] | 0 | 0 |
| GRVC | 10 | 11 |
| MDC[48] | 2 | 1 |
| NIC | 8 | 8 |
| OBCC | 8 | 8 |
| RMSC | 6 | 6 |
| RNDC | 15 | 15 |
| VCBC | 6 | 5 |

[46] As of the end of the Monitoring Period, the assignment of ADWs by housing unit was not finalized so this data simply demonstrates the number of ADWs per facility.

[47] EMTC has been closed and opened in this Monitoring Period. As a result, Staff that work at EMTC are technically assigned to AMKC.

[48] MDC was utilized in a limited capacity at the end of the Monitoring Period and had an ADP of 87 in the month of December.

| Court Commands (BKDC, BXDC, QDC) | 4 | 3 |
|---|---|---|
| **Total** | 80 | 70 |

Supervisory failures at multiple levels of uniform leadership are a consistent and pervasive issue within the Department. Specific instructions and frequent feedback to line Staff is required to elevate the quality of practice. However, supervisors lack the requisite perspective and experience to guide their Staff toward better practice. Additionally, Captains are not effectively supervised. In practice, most ADWs serve as Tour Commanders and not direct supervisors of Captains. This requirement was intended to fill the void of supervision of Captains. However, the number of ADWs in each facility essentially stayed the same this Monitoring Period, except for AMKC which lost eight ADWs. While the number of ADWs assigned to each facility (except AMKC) is more than the Department had assigned *prior* to this requirement being imposed (pre-January 2021), the number of ADWs is still not sufficient. This issue is further compounded because the limited number of ADWs currently in facilities are not deployed in a manner to effectively supervise Captains. Supervisors at all levels have a limited command of the Use of Force Directive, appear to act precipitously, and end up contributing to or catalyzing the poor outcomes that are of concern. The Department had developed a plan at the end of the last Monitoring Period in an attempt to address the requirements of this provision, but it has not been implemented—likely due to competing priorities, the Department's staffing crisis, and the leadership transition that occurred part way through this Monitoring Period.

| **COMPLIANCE RATING** | **§ A., ¶ 4.** Non-Compliance |
|---|---|

### REMEDIAL ORDER § A., ¶ 5
### (INCARCERATED INDIVIDUALS INVOLVED IN NUMEROUS USE OF FORCE INCIDENTS)

This provision requires the Department to identify those incarcerated individuals who have been involved in a significant number of use of force incidents so that they can be evaluated: (i) by health care professionals to determine whether their mental health needs are being adequately addressed and (ii) by the Department to assess whether existing security and management protocols are appropriate for these individuals.

*Individuals Involved in Force*: A small number of individuals continue to be disproportionally involved in a large number of use of force incidents. Between January and June 2021, 45 individuals were each involved in 11 or more uses of force over that time period. This number reflects a slight increase from the last two Monitoring Periods (n=28 in the Eleventh Monitoring Period and n=34 in the Tenth Monitoring Period). The 45 individuals involved in 11 or more uses of force accounted for a total of 643 UOF incidents, which is 15% of the total uses of force during this Monitoring Period. Nearly all

(n=43 of 45; 96%) have a "Brad H" mental health designation.[49] In total, 4,470 individuals were involved in at least one UOF incident in this Monitoring Period as demonstrated in the chart below.

| Incarcerated Individuals Involved in Use of Force Incidents<br>January 2016-June 2021 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| No. of UOF Incidents Involved In | **2016** | | **2017** | | **2018** | | **2019** | | **2020** | | **Jan-June 2021** | |
| 1 or 2 | 3655 | 80% | 3782 | 82% | 3813 | 76% | 3939 | 73% | 3738 | 74% | 3471 | 78% |
| 3 or 4 | 520 | 11% | 549 | 12% | 663 | 13% | 827 | 15% | 768 | 15% | 659 | 15% |
| 5 to 10 | 308 | 7% | 259 | 6% | 406 | 8% | 528 | 10% | 444 | 9% | 295 | 7% |
| 11 to 15 | 44 | 1% | 24 | 1% | 71 | 1% | 91 | 2% | 63 | 1% | 32 | 1% |
| 16 to 20 | 9 | 0% | 7 | 0% | 21 | 0% | 33 | 1% | 20 | 0% | 7 | 0% |
| 20+ | 8 | 0% | 6 | 0% | 12 | 0% | 14 | 0% | 21 | 0% | 6 | 0% |
| **TOTAL** (No. of Unique Individuals Involved in UOF) | **4544** | | **4627** | | **4986** | | **5432** | | **5054** | | **4470** | |

_High Needs Individuals ("HNI") initiative_: The Department maintains the High Needs Individuals ("HNI") initiative. On a monthly basis, the Department identifies the individuals who have been involved in six or more UOF incidents during the prior three months and this list is shared with facility leadership and New York City Health and Hospitals ("H+H"). Placement on this list is intended to initiate increased focus on the individual within the Department and trigger a review of the individual by H+H as discussed in more detail below.

_H+H Assessment of Individuals on HNI List (¶ 5(i))_: The H+H Clinical Director of Mental Health reviews the individuals on the HNI list to assess whether the individuals' mental health needs are being adequately addressed. H+H reports that most of the individuals on the HNI list are already receiving mental health care from H+H so generally this review allows the Clinical Director to determine whether any modifications to the treatment plan may be needed. Part way through the Monitoring

---

[49] An incarcerated individual is classified with a Brad H designation if they are incarcerated for a period of confinement in the NYC Department of Correction for 24 hours or longer and meet one of the following criteria: (a) seen on two or more occasions by mental health unless, on the first or second occasion, the person is assessed as having no need for further treatment; or (b) have a prescription for antipsychotic and/or mood-stabilizing medication in order to treat a diagnosed psychiatric condition; or (c) have a clinical diagnosis that warrants admission following the initial mental health assessment to Mental Health Intake or Psychiatric Assessment but before the completion of the Comprehensive Treatment Plan (CTP), or (d) have been admitted to a mental health therapeutic housing unit following the initial mental health assessment (Mental Health Intake or Psychiatric Assessment) but before the CTP. Incarcerated individuals who are assessed as having no need for mental health treatment beyond the initial two mental health encounters do not have a Brad H designation.

Period, H+H's tracking of this assessment was updated to include more detail about the outcome of their assessment. The chart below provides an overview of the assessments H+H completed in this Monitoring Period along with the outcome of those assessments.

| High-Needs Individuals assessed by H+H for additional mental health modifications | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Time Period UoF Incidents Occurred | Total Individuals Assessed by CHS | Review Treatment plan | Discuss with Mental Health team | Forward for medication review | Include in agenda for PINS | Transfer to therapeutic housing | Chart reviewed no action needed | No category selected |
| November 2020 - January 2021 | 77 | | | | | | | |
| December 2020 - February 2021 | 68 | | | | | | | |
| January - March 2021 | 90 | | | | | | | |
| February - April 2021 | 121 | 23 | 0 | 0 | 0 | 0 | 12 | 86[50] |
| March - May 2021 | 100 | 85 | 9 | 2 | 0 | 0 | 14 | 1 |
| April - June 2021 | 97 | 81 | 7 | 0 | 1 | 1 | 16 | 0 |

In this Monitoring Period, H+H conducted 553 assessments (some of which included *multiple* assessments of the same individual if they appeared on the HNI list over different months). H+H's improved tracking allows for a better understanding of how these reviews may impact its engagement with these individuals and allows for an additional touch point to H+H's routine mental healthcare. Most assessments resulted in a determination that some additional action should be taken (*e.g.,* reviewing the individual's treatment plan or further discussions with the mental health team). The Monitoring Team is encouraged that H+H is conducting these reviews as the individuals on this list are likely to benefit from additional support so this increased scrutiny from H+H will support the overall goal of supporting these individuals and hopefully limiting their involvement in use of force.

*DOC's Security and Management Protocols* (¶ 5(ii)): The Department does not have a sufficient process to systematically assess the specific reasons why individuals are meeting the HNI criteria or to develop security and management protocols for this group of individuals, when needed. The Department reported that inter-facility transfers continued to be limited for the individuals on the HNI list (as discussed in the Eleventh Report at pgs. 54-55). This strategy was implemented to discourage facility leadership from simply outsourcing individuals who are difficult to manage to another facility. The goal here is to require the facilities to determine *why* these individuals were involved in so many UOF incidents and to deploy appropriate strategies to better manage and support them. To that end, in

---

[50] The tracking process was updated to include categories towards the end of the month and so the majority of cases were not categorized in this month.

the last Monitoring Period, each facility developed a few sample security and management plans that outlined their approach to manage a select group of HNI. These plans ranged in scope (from a specific plan for an individual to a facility-wide approach), detail, and quality.

Although the Department's submission of a *sample* set of plans was a good first step, the Department did not have a robust strategy for addressing the needs of the HNI's, including identifying which individuals *may* need a security or management protocol–the manner in which the plans were developed and implemented was lackluster. Accordingly, the Monitoring Team recommended the Department develop an approach for how it intends to systematically address the HNIs. In response, and following the close of the Monitoring Period, the Department determined it must gain additional information about any HNI so that a targeted and concrete security or management plan could be developed and empower Staff with the appropriate context to resolve issues as they arise. Program and facility Staff developed a questionnaire to be completed by all HNI's. The questionnaire included questions such as, a list of hobbies, a list of goals, things that trigger the individual, ways to know the person is upset (*e.g.,* breathing changes, cursing, pacing, wanting to be alone), things that make them feel better (*e.g.*, talking to family, sleeping, exercising) and an opportunity for them to identify specific Staff or people who are helpful to them. The Monitoring Team shared feedback on the questionnaire to make it more targeted and recommended this process is piloted at one facility as a trial, before rolling it out system wide given the many competing demands right now. The Department reported it will roll-out this process in the fall of 2021 at RNDC.

The Department is continuing to hold the PINS meetings (discussed in detail in the Eleventh Report at pgs. 55-58), but only a subset of the individuals on the HNI list are discussed. The PINS meetings are a crucial opportunity for stakeholders to discuss and develop strategies to support this small group of individuals. However, the Monitoring Team has previously found that PINS meetings do not always demonstrate a concerted effort to identify concrete steps that the facility leadership and Staff can take to improve outcomes for the individual and/or address the underlying causes of his or her behavior. The Department has not reported that any further steps have been taken to address the Monitoring Team's concerns that these meetings lack the contextual information about what those individuals need that would help address the problematic behavior (*e.g.,* what is the cause of the person's distress?) as well as the lack of strategic thinking or problem solving applied to how the facility might manage these individuals. As part of the overall improvement of the PINS meetings, it may also be useful for the Department to streamline the process for selecting the individuals that are discussed at PINS and consult with the HNI list in order to maximize efforts to address the HNIs.

The Department's efforts to identify those individuals most frequently involved in force, and their current initiatives (limiting facility transfers, developing individual plans and participation in the PINs meetings) are sound and certainly support the overall goal to improve management of these individuals. However, these initiatives still have gaps. This is likely due, at least in part, to the same

issues that have plagued the Agency since the pendency of the Consent Judgment, a lack of engagement by facility leadership and Staff to spearhead and implement these initiatives. The current state of affairs has made matters worse by distracting facility leadership and Staff which has only compounded the underlying concerns about the Staff's ability to appropriately and adequately manage these individuals. As described above, some progress was made in the Thirteenth Monitoring Period which will be reviewed in detail in the next report.

| **COMPLIANCE RATING** | **§ A., ¶ 5.**<br>(i) Partial Compliance<br>(ii) Partial Compliance |
| --- | --- |

### REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS)

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are two types of Emergency Response Teams, a Probe Team, which is a team of facility-based Staff, or the Emergency Services Unit, an "elite" team of Staff specifically dedicated and trained to respond to emergencies across the Department. The Monitoring Team's concerns with the Department's excessive use of Emergency Response Teams, along with the concerns about the composition and demeanor of those teams, is extensively laid out in the Eleventh Monitor's Report at pgs. 38 to 50 and 116 to 120. Those concerns remained in this Monitoring Period.

The Department overly relies on calling Emergency Response Teams to resolve issues (*i.e.*, a Level B alarm). Most incidents could be resolved either by the Staff on the unit and/or their supervisor or by calling other Staff to the location in an effort to resolve issues without using physical force (*i.e.*, a Level A alarm), but facility leadership continue to deploy Emergency Response Teams to address nearly all issues. Staff often unnecessarily await the arrival of these Emergency Response Teams instead of handling minor issues involving incarcerated individuals on their own. Attempts to curb this practice have failed. When a call for assistance (referred to as an alarm) is made, supervisors are supposed to assess whether an Emergency Response Team is needed or whether the issue could be addressed in an alternative manner. In most cases, supervisors appear to automatically default to sending an Emergency Response Team (by activating a Level B Alarm) to address any and all issues. Further, it is not surprising that, this particular practice appears most prevalent at RNDC in which 785 Level B alarms were called in this Monitoring Period. A chart of the number of Level B alarm responses by facility and month in this Monitoring Period is below.

| Number of Level B Alarm Responses By Facility & Month[51] | | | | | | | |
|---|---|---|---|---|---|---|---|
| Facility | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Total |
| AMKC | 146 | 80 | 65 | 78 | 72 | 111 | **552** |
| BHPW | 5 | 5 | 4 | 2 | 6 | 3 | **25** |
| BXCT | 1 | 0 | 1 | 4 | 0 | 1 | **7** |
| EMTC | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| GRVC | 52 | 36 | 124 | 20 | 72 | 66 | **370** |
| MDC | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| MNCT | 1 | 0 | 0 | 0 | 0 | 0 | **1** |
| NIC | 33 | 27 | 24 | 39 | 81 | 63 | **267** |
| OBCC | 68 | 86 | 52 | 54 | 79 | 88 | **427** |
| QNCT | 1 | 0 | 0 | 1 | 0 | 2 | **4** |
| RMSC | 42 | 27 | 28 | 26 | 36 | 24 | **183** |
| RNDC | 107 | 166 | 181 | 111 | 104 | 116 | **785** |
| VCBC | 36 | 36 | 63 | 45 | 59 | 92 | **331** |
| WF | 4 | 7 | 3 | 11 | 18 | 6 | **49** |

Once an Emergency Response Team is called, the teams are fielded by an overabundance of Staff (and far more than are necessary). It also often appears that multiple Emergency Response Teams are deployed, as a *simultaneous* call goes out for "all available Staff" to report to the staging area whenever a Level B is called. Based on incident reviews, it often appears that multiple Emergency Response Teams (20+ Staff) are present on the scene for a single alarm that often did not require a Level B response at all. Finally, due to the haphazard nature of the fielding of Emergency Response Teams, there is no concerted or consistent effort to prevent Staff who should be disqualified from service on these teams (*e.g.,* their disciplinary history may not make them well suited for the task) from serving on the Emergency Response Team to then suit-up and participate on the team.

Facility leadership conduct an assessment of the deployment of Emergency Response Teams and the conduct of each Staff Member involved in the incident as part of the Rapid Reviews. The goal of these assessments is for leadership to identify those instances in which an Emergency Response Team should not have been called in order to curb the practice in the future. However, this assessment is not currently facilitating improved practice because of the Department's entrenched practices that

---

[51] The data Department wide is shared in the UOF Trends section of this report. The data by facility demonstrates the Department's pervasive overreliance on Level B Alarms. As with use of force data by facility, the Monitoring Team has not found a particular pattern or practice regarding the use of alarms by facility that would make this data particularly informative.

over rely on Emergency Response Teams, which can result in an incorrect assessment the response team was appropriate in any given scenario.

*ESU*: The Monitoring Team has had long standing concerns regarding the practices of ESU – inadequate supervision, aggressive tactics, and the misapplication of the Department's Use of Force Directive produce an unacceptable number of unnecessary, excessive, and/or avoidable uses of force, many of which also result in serious injury. In this Monitoring Period, the Department utilized ESU more frequently in various facilities to respond to incidents in place of Probe Teams due to staffing shortages. While the Department reduced reliance on ESU, as the Monitoring Period came to a close, the use of ESU was still utilized at a far higher rate than is necessary. As for the composition of the ESU teams, in this Monitoring Period, the Department screened the Staff assigned to ESU to ensure their assignment to the unit was appropriate. This assessment is required by the Department's *own policy*, but only occurred after the Monitoring Team reminded the Department about this obligation. As a result of this post-assignment screening, about 50 Staff were removed from ESU because of their disciplinary history. This represented the removal of almost a quarter of ESU (both the permanent and support teams).

*Conclusion*: The frequency of activation and the Emergency Response Teams' typical approach and demeanor, significantly increases the likelihood of a use of force event (and possibly an unnecessary and excessive force event). Accordingly, it is critical that the Department ensure housing unit Staff maintain responsibility for managing conflicts and do not routinely outsource relatively minor issues to an Emergency Response Team by calling an unnecessary Level B alarm. Further, even when Level B alarms are called appropriately, the number of Staff who comprise an Emergency Response Team must be reduced to a reasonable number. Those Staff on the Emergency Response Teams also must improve their use of de-escalation tactics and supervisors need to mitigate confrontation and the disorderly and chaotic operations that follow a Level B alarm activation. The Monitoring Team shared extensive feedback and recommendations with the Department at the close of the Monitoring Period to address the many deficiencies with the Department's approach to staffing and calling for Emergency Response Teams. The Department has not addressed the Monitoring Team's feedback or otherwise improved the practices of the Emergency Response Team.

| COMPLIANCE RATING | § A., ¶ 6. Non-Compliance |
|---|---|

2.  **USE OF FORCE POLICY (CONSENT JUDGMENT § IV)**

The Use of Force Policy is one of the most important policies in a correctional setting because of its direct connection to both Staff and the safety of incarcerated individuals. Under the Consent Judgment, the Use of Force Policy was revised and went into effect on September

27, 2017, with corresponding Disciplinary Guidelines going into effect on October 27, 2017. [52]

The current UOF Directive is not based on new law, nor does it abandon core principles from its predecessor. It reflects the same principles while providing further explanation, emphasis, detail, and guidance to Staff on the steps officers and their supervisors should take when responding to threats to safety and security. The Department's efforts to implement the Use of Force Directive is addressed below and throughout this report.

## IV. USE OF FORCE POLICY ¶ 1 (NEW USE OF FORCE DIRECTIVE)

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force. Trends in the Department's use of force rate and the factors contributing to the unnecessary and excessive use of force, discussed in detail in this report and all prior eleven Monitor's Reports, are relied upon to make this compliance assessment.

The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment. However, for six years, the proper implementation of the policy has been undercut by subpar efforts to instruct and supervise Staff to ensure the proper application of the policy, which is also exacerbated by other failures of employee management and basic security protocols discussed throughout this report, resulting in the Monitoring Team's assessment that a significant proportion of uses of force are problematic in some way. As a result, the Department has remained in Non-Compliance with the implementation of the Use of Force Policy since the Fifth Monitoring Period for eight consecutive Monitoring Periods.

The chart below shows the total number and average use of force rates for each year from the Effective Date to October 2021. The 2021 data includes only the first 10 months of the year and will likely result in 2021 having the highest number of uses of force in a single year, to date. Concurrent reductions in the number of people in custody throughout this time period means that the uses of force are spread across a smaller denominator, which results in a higher *rate per 100 people.* During the

---

[52] The Department developed the new Use of Force Policy ("New Use of Force Directive," or "New Directive") and it was approved by the Monitoring Team prior to the Effective Date of the Consent Judgment. Given the importance of properly implementing the New Use of Force Directive, during the First Monitoring Period, the Monitor and the Department agreed that the best strategy was to provide Staff with the necessary training before the New Directive and corresponding disciplinary guidelines took effect.

current Monitoring Period, the rate was over three times higher than the rate in 2016 (12.56 versus 3.96).



- **Injury severity**: UOF incidents are classified according to injury severity (A = serious injury; B = less serious injury; C = no injury). While the proportion of Class A incidents has remained relatively stable over time (2-5%), because the number of UOF incidents has increased so significantly, the number of incidents involving serious injuries has increased substantially (*e.g.*, 38 in Jan-Jun 2016, compared to 239 in Jan-Jun 2021). While the increase in injuries is concerning, it is important to note that the fact that a UOF did *not result in an injury* does not mean that it was an appropriate response to the incident, nor should the possibility that a UOF causes pain and fear or its negative impact on facility culture be discounted.

- **UOF by Facility**: Because the contextual variables surrounding the UOF at the facility level vary constantly (*e.g.*, size and composition of facility population; leadership and staff assigned to each Command), UOF rates at the facility level are not particularly illuminating in terms of changes to Staff practice over time. During the current Monitoring Period, individual facility use of force rates were not significantly different from each other (range 10.2 to 19.3).

- **Age**: Use of force rates are over 200% higher *across all age groups* than they were at the time of the Effective Date, as shown in the table below.

| Average UOF Rates, January 2016 to June 2021, by Age | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **Jan. - Jun 2021** | **% change 2016-21** |
| 18-year-olds | 19.7 | 17.7 | 36.4 | 53.8 | 53.4 | 63.2 | +221% |
| 19-21-year-olds | 9.3 | 12.3 | 19.0 | 24.4 | 26.7 | 32.4 | +248% |
| 22+ year-olds | 2.5 | 2.9 | 3.8 | 5.8 | 9.6 | 11.39 | +356% |

- The 22+ age group is broad and includes both those emerging from late adolescence and those considered elderly. Furthermore, individuals in this age groups are spread among all of the Department's facilities. About two-thirds of those in the 19- to 21-year-old age category are housed at RNDC, along with about 75% of all 18-year-olds. Clusters of 18-year-olds and 19- to 21-year-olds at other facilities are too small for reliable facility-level analysis, and also have specific contextual variables (*e.g.*, in specialized units for people will mental illnesses or units for those who commit serious violent infractions) that preclude generalizations.

- **Reason**: During the current Monitoring Period, the Staff's reported *primary* reason for using force reflected historical trends: 30% were in response to a fight, 24% were in response to a person's refusing a direct order, 15% were in response to a person resisting restraint/escort, 14% were in response to an assault on Staff, 7% were to prevent the infliction of harm, and the remaining 10% were for other reasons.

- **Location**: During the current Monitoring Period, the location of use of force events reflected historical trends: 59% occurred in a housing unit, 15% occurred in an intake unit, 9% occurred in a corridor, 7% occurred in the clinic, 5% occurred in a vestibule, and the remaining 5% occurred elsewhere.

- **Underlying Dynamics**: A number of factors across the Department contribute to Staff using force when it is unnecessary and could otherwise be avoided, and they include:
  - Poor supervision and inadequate support for Staff on the housing units;
  - Poor operational practices;
  - Poorly executed physical restraints;
  - Overreliance on external Emergency Response Team and an overabundance of Staff to respond to all issues;
  - Staff's hyper-confrontational demeanor, which often precipitates the need for force; and
  - Failure to adequately provide for and/or address requests for basic services (*e.g.,* access to commissary or recreation time) which results in incarcerated individuals expressing frustration.

In summary, the Department's six-year trend of increasing use of force rates and pervasive underlying problematic Staff behaviors demonstrate the significant lack of progress toward implementing its Use of Force Policy, as required by this provision. The combination of — (1) situations that if managed properly would have avoided a use of force altogether and (2) the failure to properly temper the force to only what is necessary and proportional—continues the Department's trajectory in the opposite direction of what is required by the Consent Judgment.

| **COMPLIANCE RATING** | ¶ 1. (Develop) Substantial Compliance |
| | ¶ 1. (Adopt) Substantial Compliance |
| | ¶ 1. (Implement) Non-Compliance |
| | ¶ 1. (Monitor Approval) Substantial Compliance |

| IV. USE OF FORCE POLICY ¶¶ 2 AND 3 (NEW USE OF FORCE DIRECTIVE REQUIREMENTS) |
| --- |

This provision requires the new Use of Force Policy to be written (¶ 2) and organized in a manner that is clear and capable of being readily understood by Staff and to include specific provisions enumerated in ¶ 3 of the Consent Judgment. The new Use of Force Policy meets these requirements and provides Staff with the necessary guidance to carry out their duties safely and responsibly.[53]

*Standalone Policies*: In order to address the requirements of ¶ 3(p), the Department maintains a number of standalone policies that provide clear and adequate guidance on the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, and lethal force. As discussed below, ¶ 3(p) is in Partial Compliance until ESU's Command Level Orders ("CLOs") are reviewed and revised.

- **Baton Policy**: The Department previously developed a global Baton Policy (*see* Eighth Monitor's Report at pgs. 70-71 and Tenth Monitor's Report at pgs. 76-77). However, the Department has still not rolled out the use of the new batons because Staff have not received the requisite training, which has lagged for several years and was not prioritized during the current crisis.
- **Canine Policy**: A revised canine policy was promulgated in late May 2021 as described in the Eleventh Monitor's Report at pg. 124.
- **ESU CLO**: ESU maintains about 10 standalone CLOs, including two which govern the use of specialized chemical agent tools (*i.e.*, Pepperball system and the Sabre Phantom Fog Aerosol Grenades). The Monitoring Team reviewed these two CLOs and found they lacked sufficient guidance on the tools' place in the use of force continuum. Subsequent feedback included recommended revisions, which the Department reports it will work on incorporating. The Monitoring Team will evaluate the remaining CLOs during the next Monitoring Period.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance<br>¶ 3(a-o, q-t). Substantial Compliance<br>¶ 3(p). Partial Compliance |
| --- | --- |

---

[53] The policy addresses the following requirements in the Consent Judgment: § IV (Use of Force Policy) ¶ 3 (a-o, q-t), § V (Use of Force Reporting) ¶¶ 1 – 6, 8 and 22, § VII (Use of Force Investigations) ¶¶ 2, 5, 7, 13(e), and § IX (Video Surveillance) ¶¶ 2(d)(i) and 4.

| IV. USE OF FORCE POLICY ¶ 4 (NEW USE OF FORCE DIRECTIVE - STAFF COMMUNICATION) |
|---|
| This provision requires the Department to promptly advise Staff Members of the content of the New Use of Force Directive and of any significant changes to policy that are reflected in the New Use of Force Directive. The Department previously advised Staff about the content of the New Use of Force Directive through a rollout messaging campaign, as described in the Fifth Monitor's Report (at pg. 43) and Sixth Monitor's Report (at pgs. 42-43). and continues to reinforce the content of the policy through formal refresher training (as required by Consent Judgment § XIII. (Training), ¶ 1(a)(ii)), informal coaching and other communication methods. |

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|

### 3.   USE OF FORCE REPORTING AND TRACKING (CONSENT JUDGMENT § V)

Reporting use of force accurately and timely and tracking trends over time are critical to the Department's overall goal of effectively managing use of force within the Department. The Use of Force Reporting and Tracking section covers four specific areas, "Staff Member Use of Force Reporting" (¶¶ 1-6,[54] and 9), "Non-DOC Staff Use of Force Reporting" (¶¶ 10-13), "Tracking" (¶¶ 18 & 20[55]), and "Prompt Medical Attention Following Use of Force Incident" (¶¶ 22 and 23).

The number of reported use of force incidents continues to rise. The Department continues to suggest that at least part of the overall increase in the number of reported UOF incidents over the life of the Consent Judgment is due to progress in reporting as a result of continued emphasis on the importance of reporting, a clear definition of what constitutes "force" outlined in the New UOF Directive, increased presence of video surveillance (and corresponding live-feed video monitoring), and routine and consistent auditing of UOF reporting by NCU. This

---

[54] The Department's efforts to achieve compliance with ¶ 7 (identification and response to collusion in Staff reports) is addressed in the Use of Force Investigations section of this report.

[55] The Department's efforts to achieve compliance with ¶¶ 18 and 20 is addressed in the Risk Management section of this report.

progress in reporting has been recognized in prior reports, and likely was a contributing factor to the increase in use of force reports in the early days of implementation of the Consent Judgment (especially in 2016 and 2017). Progress in reporting incidents must be recognized, and the Department has sustained the improved reporting that occurred in 2016 and 2017, but the increase in use of force incidents that has occurred in the last few years cannot be attributed solely to increased reporting, and is the result that in fact more force is being used than ever before.

*Alleged Use of Force*

Understanding the scope of the force utilized within the Department requires consideration of all force reported by Staff and any substantiated use of force allegations. Therefore, the Department separately tracks all allegations of uses of force, which are claims that Staff used force against an incarcerated individual and the force was not previously reported by Staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process.

It is notable that the number of allegations has continued to decline since 2016 and reinforces the overall findings that Staff appear to be reporting use of force consistently and reliably. In this Monitoring Period, there were 101 allegations of UOF. The chart below demonstrates the annual number of allegations of UOF that were *reported* since January 2016. The number of reported allegations in the first half of 2021 is consistent with the downward trend of reported allegations since 2016.



An assessment of the investigations of the 356 allegations that have occurred between February 3, 2020 (the inception of the Intake Squad) and June 30, 2021 (the end of this Monitoring Period) revealed the following:

- 124 cases are pending investigation (111 are pending Full ID Investigations, and 13 are pending Intake Investigations)

- 21 of the 233 cases with closed investigations were substantiated. Of the 21 cases with substantiated allegations, 8 closed with charges and/or a Personnel Determination Review ("PDR")—five were charges for unreported minor uses of force, while 3 charges included excessive or unnecessary force that went unreported. 13 of the 21 were resolved following the close of the Intake Investigation and the reporting violations were minor in nature and addressed through Facility Referrals or re-training.

Overall, there are only a small number of unreported use of force incidents. Of this small group of cases, they are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare.

## VII. Use of Force Investigations ¶ 5 (Classification of Use of Force Incidents)
## V. Use of Force Reporting and Tracking ¶ 12 (Injury Classification)

*Classification of UOF Incidents* (¶ 5): This provision requires the Department to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C. While some additional time may be needed to identify the injury classification for an incident (*e.g.,* the results of a medical assessment must be obtained before the incident can be classified), the delays in classification increased in this Monitoring Period and incidents remained "Class P" for longer periods of time. The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to June 2021.

| COD Sets[56] Reviewed | **Mar. 2016 to July 2017** *2nd to 4th Monitoring Period* | **Jan. to Dec. 2018** *6th & 7th Monitoring Period* | **Jan. to Dec. 2019** *8th & 9th Monitoring Period* | **Jan. to Dec. 2020** *10th & 11th Monitoring Period* | **Jan. to June 2021** *12th Monitoring Period* |
|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 2,764 | 929 | 1,052 | 1,094 | 754 |
| **Number of Incidents Classified Upon Call-In** | 1,519 (55%) | 540 (58%) | 589 (56%) | 585 (53%) | 58 (8%) |
| **Class P Incidents classified within COD Period** | 1,157 (42%) | 369 (40%) | 434 (41%) | 494 (45%) | 479 (63%) |
| **Class P Incidents that were not classified within COD Period** | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 217 (29%) |

Of the sample of 754 incidents reviewed in this Monitoring Period, very few (58, or 8%) were initially classified as A, B, or C upon call-in, and the rest received the temporary classification Class P. Of the 696 (92%) initially classified as Class P, 479 (63%) received an injury classification (A, B, or C) within two weeks, while 217 (29%) did not receive an injury classification within the required two-week period. The time to classify a use of force incident has increased significantly compared to previous Monitoring Periods in which only a handful of Class P incidents took more than two weeks to receive an injury classification. The incidents are ultimately classified and generally the Monitoring Team has found the classifications are appropriate.[57] However, the delays in injury classifications has impacted the Department's monthly reporting of UOF data because such classification is taking over a

---

[56] This audit was not conducted in the First or Fifth Monitoring Periods

[57] To the extent an incident must be reclassified, the process is protracted as discussed in the Eleventh Report.

month to complete. The Department reports that the delays in classification are due to delays in the completion of injury reports, which the Department claims is caused by the current staffing issues and an increase in the number of use of force incidents that plagued the Department this Monitoring Period. The Department's compliance rating with ¶ 5 has been downgraded to Partial Compliance because of the delays in timely classifying all incidents.

_Medical Staff - Injury Classification_ (¶ 12): This provision requires medical staff to advise their supervisors (and subsequently the Department) if they believe that the injury classification for an incident is inaccurate. In this Monitoring Period, H+H reported six incidents that they believe may have been improperly classified by DOC. After a review of the evidence by the Intake Investigators, only one incident required additional investigation for possible misclassification. Further, the Department reports they continue to collaborate with Correctional Health Services ("CHS") to ensure injuries are accurately reported and that injury data is accurately classified. The collaboration between H+H and DOC, H+H's reporting form, and the monthly reporting, is sufficient for H+H to demonstrate compliance with ¶ 12 of Use of Force Reporting.

| **COMPLIANCE RATING** | **¶ 5.** Partial Compliance |
| | **¶ 12.** Substantial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶ 1 (NOTIFYING SUPERVISOR OF UOF)

This provision requires that every Staff Member immediately verbally notify his or her supervisor when a Use of Force Incident occurs. Almost 4,400 use of force incidents were reported by supervisors to the Central Operations Desk and nearly 9,620 use of force and witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether Staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is any evidence that Staff are not reporting force as required. As noted above, overall, allegations are rarely substantiated, when they are substantiated, they are typically for failing to report minor uses of force, and unreported instances of excessive or unnecessary force are rare. Reports from outside stakeholders (_e.g.,_ H+H and LAS) about potential unreported UOF are infrequent. In this Monitoring Period, all 61 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, only 4 of the 31 UOF allegations submitted by LAS had not been previously reported. The Department has maintained Substantial Compliance with this provision as Staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be relatively minor UOF incidents, and instances of unreported excessive or unnecessary force are rare.

| **COMPLIANCE RATING** | **¶ 1.** Substantial Compliance |

## V. USE OF FORCE REPORTING AND TRACKING ¶¶ 2, 3, & 6 (INDEPENDENT & COMPLETE STAFF REPORTS)

The Monitoring Team assesses compliance with ¶¶ 2, 3, & 6 together as these provisions, collectively, require Staff to submit independent and complete UOF reports. The Department's New Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force (¶ 2), and addresses all requirements listed in ¶¶ 3(a)-(h) & 6. The sheer volume of reports submitted (nearly 9,620 reports in this Monitoring Period) demonstrate that many Staff are reporting as required. Further, the Monitoring Team's review of a large sample of reports demonstrate that Staff reports are generally independently prepared. However, the quality of reports continues to be mixed and Staff's practices are consistent with those from prior Monitoring Periods (*see* Ninth Monitor's Report at pgs. 89-91). The Monitoring Team continues to identify reports that are incomplete, inaccurate, or too vague. Of the 4,219 Intake Investigations closed in this Monitoring Period (covering incidents occurring between November 2020 and June 2021), 999 incidents (24%) were found to have involved report writing issues, as discussed in more detail in ¶ 8 below. The Monitoring Team continues to emphasize the importance of Staff describing their recollection of events in their own words and specifying the exact tactics that were utilized (*e.g.*, where on the incarcerated individual's body the Staff Member's hands or arms were placed).

| COMPLIANCE RATING | **¶¶ 2, 3, and 6.** Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 4 (DUTY TO PREPARE AND SUBMIT TIMELY UOF REPORTS)

This provision requires Staff members to submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances. The Department's New Use of Force Directive explicitly incorporates the requirements of ¶ 4. The table below demonstrates the number and timeliness of Staff reports for actual and alleged UOF from 2018 to June 2021.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| Year | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 24 Hours | Total Staff Reports Expected | Reports Uploaded Timely | % Uploaded within 72 Hours of the Allegation |

| Jan. to Dec. 2018 | 15,172 | 12,709[58] | 83.77% | 139 | 125[59] | 89.93% |
|---|---|---|---|---|---|---|
| Jan. to Dec. 2019 | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| Jan. to Dec. 2020 | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| Jan to June 2021. | 12,195 | 9,591 | 78.64% | 67 | 28 | 41.79% |

The Department's record of timely submission of UOF reports lapsed this Monitoring Period, as the Department reports staffing challenges impacted the ability to timely upload reports. While the Intake Investigations appeared to generally have access to reports with enough time to conduct the investigation, in this Monitoring Period, 9,591 (79%) of the 12,195 reports for *actual* UOF incidents were submitted within 24 hours and 28 (42%) of the 67 reports for *alleged* UOF incidents were submitted within 72 hours. The Department reports that 89% of all reports were submitted within 2 days of the incident. As for the reports for allegations of uses of force, it is also worth noting the significant decline in timely submission of UOF reports for alleged use of force incidents. The Department reported the lapse in timely submission was due to the staffing issues and increase in use of force incidents this Monitoring Period. The Department's compliance rating with ¶ 4 has been downgraded to Partial Compliance because of the increased time to submit use of force reports.

| COMPLIANCE RATING | ¶ 4. Partial Compliance |
|---|---|

## V. USE OF FORCE REPORTING AND TRACKING ¶ 5
## (PROHIBITION ON REVIEWING VIDEO PRIOR TO WRITING UOF REPORT)

This provision prohibits Staff members from reviewing video footage of the Use of Force Incident prior to completing their Use of Force Report. This requirement is codified in the Department's Use of Force Directive. The Monitoring Team to date has not identified any evidence in Staff reports that suggest Staff are reviewing Genetec or handheld video footage of an incident prior to writing their Staff reports.[60] This is not surprising given that access to Genetec and handheld video is not easily obtained for most Staff, as line Staff assigned to the housing units and most supervisors do

---

[58] NCU began the process of auditing actual UOF reports in February 2018.

[59] NCU began collecting data for UOF allegations in May 2018.

[60] As described in the 11th Report, the Monitoring Team is aware of one case in which Staff presumptively reviewed body worn camera footage before submitting their UOF reports. While the investigation of this incident is still ongoing, one probationary Staff member was terminated for his involvement in this incident. Further, another CO involved in this incident was terminated for his involvement in *another* UOF incident. Finally, another CO in this incident has resigned before completion of the investigation.

| | not have assigned computer terminals. Further, the Genetec credentials needed to view and access video are limited. |
|---|---|
| **COMPLIANCE RATING** | **¶ 5.** Substantial Compliance |

| **V. USE OF FORCE REPORTING AND TRACKING**<br>**¶ 7 (IDENTIFICATION AND RESPONSE TO COLLUSION IN STAFF REPORTS) &**<br>**¶ 8 (DISCIPLINE OR OTHER CORRECTIVE ACTION FOR FAILURE TO REPORT USES OF FORCE)** |
|---|

These two provisions (¶¶ 7 and 8) combined require the Department to identify reporting violations (¶ 7) and appropriately respond to those violations through corrective action (¶ 8). All UOF Staff reports and UOF witness reports are evaluated in the Intake Investigations and further scrutinized in Full ID Investigations (if the case is referred). Further, the Department's New Disciplinary Guidelines, and the New Use of Force Directive, address the requirements of ¶ 8. In this Monitoring Period, following the completion of the Rapid Reviews and the Department's investigations of UOF incidents the following recommendations were made:

- Over 507 Staff were recommended for report writing re-training this Monitoring Period by a combination of ID, facility leadership, and other stakeholders.
- 999 incidents (24%) of the 4,219 Intake Investigations closed in this Monitoring Period (covering incidents occurring between November 2020 and June 2021) were found to have involved report writing issues. The reporting violations identified are often for minor reporting violations. The violations identified then may be addressed through recommendations for report writing re-training, a Facility Referral, a PDR and/or charges depending on the severity of the violation.

Instances of Staff deliberately failing to report serious, unnecessary, or excessive force are rare. Since the inception of the Intake Investigations, investigators generally identify cases with reporting issues and subsequently review and investigate Staff reports to ensure those reports comply with the Consent Judgment. In cases where a reporting violation had been substantiated, the Department recommended appropriate corrective action in the form of counseling, re-training, or disciplinary charges. With respect to the discipline imposed, the Monitoring Team has found that generally the discipline imposed for reporting violations proportional to the violation (which is a fact-specific assessment) and the individual's disciplinary history. However, as discussed throughout this report, the imposition of formal discipline continues to be protracted, and re-training is also not being provided timely.

| **COMPLIANCE RATING** | **¶ 7.** Substantial Compliance<br>**¶ 8.** Partial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 9 (ADOPTION OF POLICIES) |
| --- |
| This provision requires the Department to develop policies and procedures consistent with the reporting requirements in the Consent Judgment § V, ¶¶ 1-6, 8, 22 and 23. The Department's New Use of Force Directive addresses these requirements, and the "implement" component of this provision is assessed within the individual provisions in this report. |

| COMPLIANCE RATING | ¶ 9. Substantial Compliance |
| --- | --- |

| V. USE OF FORCE REPORTING AND TRACKING ¶¶ 10 & 11 (NON-DOC STAFF REPORTING) |
| --- |

These provisions (¶¶ 10 and 11) require that Non-DOC Staff Members who witness a Use of Force Incident to report the incident in writing directly to a supervisor and that medical staff report to a supervisor when they have reason to suspect that an Inmate has sustained injuries due to a use of force but the injury was not identified as such to the medical staff.

*H+H Reporting*: New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting that address the requirements of ¶¶ 10 and 11 as described in the Ninth Monitor's Report at pgs. 96-97. In this Monitoring Period, H+H conducted a Webinar training for staff regarding their reporting obligations. H+H staff submitted a total of 71 reports in this Monitoring Period; 51 reports were H+H witness reports of UOF incidents and 20 reports relayed UOF allegations from an incarcerated individual. The number of reports submitted represents a large increase from previous Monitoring periods. In fact, H+H staff submitted more reports in this six-month period than any *previous full year* of reporting.

- Similar to previous Monitoring Periods, the Monitoring Team conducted a two-part assessment to determine whether (1) ID was analyzing submitted non-DOC staff reports in their investigations of those incidents and (2) whether non-DOC reports were included in the investigation file for incidents in which non-DOC staff submitted reports. The Monitoring Team saw an improvement from previous Monitoring Periods and found that most incidents audited included the non-DOC staff reports in the investigation file and that the non-DOC report was considered as part of the investigation.
- The number of reports submitted by H+H staff since July 2017 is presented in the table below.

| Submission of H+H Staff Reports | | | | |
|---|---|---|---|---|
| | July to Dec. 2017 *5th MP* | Jan. to Dec. 2018 *6th & 7th MP* | Jan. to Dec. 2019 *8th & 9th MP* | Jan. to Dec. 2020 *10th & 11th MP* | Jan to June. 2021 *12th MP* |
| *Grand Totals* | | | | |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 71 |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 61 |
| *Witness Reports* | | | | |
| **Number of witness reports submitted** | 0 | 29 | 18 | 45 | 51 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 46 |
| *Relayed Allegations from Incarcerated Individuals* | | | | |
| **Number of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 20 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 15 |

- It is difficult to know whether H+H staff submitted reports in every incident witnessed. While the number of reports from H+H staff have increased, there still appears to be room for improvement. In this Monitoring Period, 294 incidents occurred in clinic areas and 17 of those incidents had a corresponding H+H report. However, just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. Further, it is worth noting that H+H submitted reports for 44 incidents that were categorized as occurring in other parts of the jail and later taken to the clinic and additional force was witnessed or relayed. Still, it would be expected that at least some H+H staff observed more force than what is reported. That said, the Monitoring Team is encouraged by in the increase in H+H reports submitted this Monitoring Period. However, continued vigilance is needed to ensure the H+H witness reporting is consistent.

*DOE Staff Reporting:* School was suspended in this Monitoring Period due to COVID-19 and so no DOE Staff were present in the jails during this Monitoring Period. The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to

address the requirements of this provision and the December 4, 2019, Court Order (dkt. entry 334) clarifying the requirement for DOE to submit reports. However, shortly after the procedures and training were developed, school was suspended at RNDC due to COVID-19. Following the close of the Monitoring Period, in-person school began again, and DOE reported that staff were provided the training. Now that DOE staff have completed training, and school has resumed at RNDC, the Monitoring Team plans to evaluate whether DOE are reporting as required.

| **COMPLIANCE RATING** | **¶ 10.** <br> **(H+H)** – Partial Compliance <br> **(DOE)** – Not Rated <br> **¶ 11.** Partial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶ 13 (REPORTING OF EMERGENCY MATTERS)

This provision requires emergency matters involving an imminent threat to an incarcerated individual's safety or well-being to be reported. H+H updated their use of force reporting policy and rolled out a corresponding webinar training which highlighted this reporting requirement for their staff in the Ninth Monitoring Period. H+H has demonstrated compliance with ¶ 13 by creating a discernable framework for their staff to follow in meeting this obligation and reinforcing this obligation through policy and training.

| **COMPLIANCE RATING** | **¶ 13.** Substantial Compliance |
|---|---|

### V. USE OF FORCE REPORTING AND TRACKING ¶¶ 22 & 23 (PROVIDING AND TRACKING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT)

*Prompt Medical Attention* (¶ 22): This provision requires that Staff Members and incarcerated individuals upon whom force is used, or who used force, receive medical attention by medical staff as soon as practicable following a Use of Force Incident. The Department's progress in providing timely medical care from January 2018 to June 2021 following a UOF are outlined in the table below. During the current Monitoring Period, there were 8,043 encounters related to a UOF and medical care was provided within four hours of a UOF in 72% of medical encounters, 12% of medical encounters occurred between 4 and 6 hours of the incident and 16% of medical encounters occurred beyond 6 hours. The Department struggled to provide medical attention as soon as practicable for incarcerated individuals this Monitoring Period. Therefore, the compliance rating for (¶ 22) has been downgraded to Partial Compliance.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| **2018** | 9,345 | 37% | 36% | 73% | 16% | 13% |
| **2019** | 11,809 | 43% | 38% | 81% | 11% | 9% |
| **2020** | 10,812 | 46% | 36% | 82% | 10% | 9% |
| **2021 (Jan. to June)** | 8,043 | 40% | 33% | 72% | 12% | 16% |

_Tracking Medical Treatment Times_ (¶ 23): This provision requires the Department to electronically record the time when an incarcerated individual arrives at the medical clinic following a use of force incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. NCU continued to track and analyze medical wait times for incarcerated involved in all reported UOF incidents using information from the Injury-to-Inmate Report.[61] The findings from NCU's tracking indicate the Department is tracking the time individuals arrive at the clinic following a use of force.

| **COMPLIANCE RATING** | ¶ **22.** Partial Compliance<br>¶ **23.** Substantial Compliance |
|---|---|

## 4.  TRAINING (CONSENT JUDGMENT § XIII)

This section of the Consent Judgment addresses the development and deployment of new training programs for recruits in the Training Academy ("Pre-Service" or "Recruit" training) and current Staff ("In-Service" training), and requires the Department to create or improve existing training programs covering a variety of subject matters, including the New Use of Force Directive ("Use of Force Policy Training") (¶ 1(a)), Crisis Intervention and Conflict Resolution (¶ 1(b)), Defensive Tactics (¶ 2(a)), Cell Extractions (¶ 2(b)), Probe Teams (now called "Facility Emergency Response training") (¶ 1(c)), Young Incarcerated Individual Management (¶ 3), and Direct Supervision (¶ 4). The Department's progress toward compliance with the training

---

[61] A small number of Injury-to-Inmate reports do not have the data needed for this analysis because of incomplete data entry, and those reports are not included in NCU's analysis.

requirements is discussed in detail below. The status of development and deployment of initial and refresher training programs required by the Consent Judgment, and the total number of Staff who attended each required training program during this Monitoring Period and since the Effective Date are outlined in *Appendix C: Training Charts*.

*Training Space & Dedicated Training Academy*

The City has long reported a commitment to addressing the Department's inadequate training space, including the commitment of one hundred million dollars, in 2017, to fund a new training academy. The City announced in August 2021 that a location had been identified for the new training academy, after a multi-year search. The new academy will include a facility to train its officers and on-site parking and will be located next to the NYPD's Police Academy on College Point Boulevard and 28th Avenue in College Point, Queens. The expected completion of the new academy facility is 2027.

## XIII. TRAINING ¶ 1(a) (USE OF FORCE POLICY TRAINING), ¶ 1(b) (CRISIS INTERVENTION AND CONFLICT RESOLUTION TRAINING), & ¶ 2(a) (DEFENSIVE TACTICS TRAINING)

*Advanced Correctional Techniques ("A.C.T.") Training*: As of June 2021, 95% (8,405 of the 8,898) of Staff[62] have received A.C.T. training – which includes four-hour refresher courses on UOF Policy Training and Defensive Tactics, and an eight-hour course on Crisis Intervention and Conflict Resolution. The completion of A.C.T. training satisfied the Department's obligation to provide the first round of refresher training for UOF policy and Defensive Tactics and the initial In-Service training for Crisis Intervention and Conflict Resolution. Each of these trainings is taken in turn below.

- ***Refresher Use of Force Policy Training ¶ 1(a)(ii)***: The first round of refresher In-Service training on the UOF policy is complete. The Department worked with the Monitoring Team this Monitoring Period to update the UOF Policy refresher training lesson plan for delivery in future refresher trainings. The revised lesson plan will be used in the ongoing refresher training curriculum that will be provided at least every other year.

---

[62] The small percentage of Staff who did not receive the UOF Policy or Defensive Tactics refresher trainings as part of A.C.T. will receive it as the refreshers continue to be provided as part of routine In-Service training going forward.

68

- ***Refresher Defensive Tactics Training ¶ 2(a)(ii)***: The first round of refresher In-Service training is complete. The Department worked with the Monitoring Team this Monitoring Period to revise the Defensive Tactics refresher training lesson plan for delivery in future refresher trainings. The revised lesson plan will be used in the ongoing refresher training curriculum that will be provided at least every year.

- ***Crisis Intervention and Conflict Resolution Training ¶ 1(b)(ii-iii)***: Initial In-Service training is complete. Given the initial In-Service training has now been provided to Staff, the Department has started work on development of a refresher training course. The Academy developed a refresher course for this training that will include concepts surrounding emotional intelligence, which seeks to teach Staff how to listen and empathize and communicate effectively with incarcerated individuals to avoid conflicts. The Training Academy is working on a draft lesson plan for this revised curriculum and is expected to provide it to the Monitoring team the next Monitoring Period.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1(a)(ii).** Substantial Compliance<br>¶ **1(b)(ii).** Substantial Compliance<br>¶ **1(b)(iii).** Not Yet Rated<br>¶ **2(a)(ii).** Substantial Compliance |

## XIII. TRAINING ¶ 1(c) (PROBE TEAM TRAINING) & ¶ 2(b) (CELL EXTRACTION TEAM TRAINING)

In this Monitoring Period, a total of 364 Staff held posts that required Facility Emergency Response (or "Probe Team") and Cell Extraction trainings (*see* the Eleventh Monitor's Report at pgs. 154-155 for discussion on which posts require such training). The number of Staff in the identified posts dropped significantly in this Monitoring Period compared to the last (364 compared with 536 in the Eleventh Monitoring Period). The Department reports that there are less Staff in the identified posts because of the various staffing challenges it is facing. The process for identifying the Staff that require this training is imperfect due to the ad hoc nature from which these teams are fielded, and combined with the staffing issues has made the process of identifying and training those Staff who field these teams cumbersome. The Monitoring Team intends to work with the Department going forward to update and refine the process to train Staff who field these teams as part of the work described in Remedial Order § A., ¶ 6.

- **Probe Team Training**: As of the end of the Monitoring Period, 304 of 364 (84%) Staff in the identified posts received Probe Team training as recruits, in Pre-Promotional training or through In-Service training. In this Monitoring Period, this includes 50 Staff who received the In-Service training because they were on the identified post and had not previously received the training. Further, 3,555 active Staff in the Department have received Probe Team Training, so in combination with the approach for training those in the identified

posts means that a large portion of Staff who field these teams will have received the required training.

- **Cell Extraction Training**: As of the end of the Monitoring Period, 345 of the 364 (95%) Staff in the identified posts received Cell Extraction Training as recruits, in Pre-Promotional training or through In-Service training. In this Monitoring Period, this includes 19 Staff who received the In-Service training because they were on the identified post and had not previously received the training. Further, 5,705 active Staff in the Department have received Cell Extraction Training, so in combination with the approach for training those in the identified posts, this means that a large portion of Staff who field these teams will have received the required training.

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 1(c). Probe Team Training (Pre-Service)** Substantial Compliance (as per Eighth Monitor's Report)<br>**¶ 1(c). Probe Team Training (In-Service)** Substantial Compliance<br>**¶ 2(b). Cell Extraction Training (Pre-Service)** Substantial Compliance (as per Eighth Monitor's Report)<br>**¶ 2(b). Cell Extraction Training (In-Service)** Substantial Compliance |

## XIII. TRAINING ¶ 3 (YOUNG INCARCERATED INDIVIDUAL MANAGEMENT TRAINING)

The Department has chosen to provide Unit Management Training as the refresher training to provide Staff with the knowledge and tools necessary to effectively address the behaviors that Staff Members encounter with the Young Inmate population. The Department has also chosen to provide this training to *all* Staff assigned to work at RNDC, where most 18-year-old incarcerated individuals are housed,[63] not just to those regularly assigned to work in housing areas with 18-year-old incarcerated individuals, as required by the Consent Judgment. 973 (91%) of the 1,070 Staff available for training at RNDC received the Unit Management training as of the end of this Monitoring Period, 228 of whom received the training in this Monitoring Period. The Department must provide this training to the remaining RNDC Staff that need it, including leadership at RNDC who have not already received the training, once the training re-commences (the Department reported that continued delivery of the Unit Management courses are "on pause" due to the on-going staffing concerns within the Department).

| | |
|---|---|
| **COMPLIANCE RATING** | **¶ 3(b).** Substantial Compliance |

---

[63] RNDC housed adolescent incarcerated individuals until October 2018 when they were moved to Horizon Juvenile Detention Center. GMDC housed most 18-year-old incarcerated individuals until June 2018 when the facility was closed and 18-year-old incarcerated individuals were subsequently moved to RNDC.

## XIII. TRAINING ¶ 4 (DIRECT SUPERVISION TRAINING)

The Department has chosen to provide Direct Supervision Training to *all* Staff assigned to work at RNDC, where most 18-year-old incarcerated individuals are housed,[64] not just to those regularly assigned to work in housing areas with 18-year-old incarcerated individuals, as required by the Consent Judgment. As of mid-July 2021, 98% of Staff assigned to RNDC received the Direct Supervision training either as part of recruit training or In-Service Training. The Department must provide this training to the remaining RNDC Staff that need it, including leadership at RNDC who have not already received the training, once the training re-commences (the Department reported that continued delivery of the Direct Supervision courses are "on pause" due to the on-going staffing concerns within the Department).

| COMPLIANCE RATING | ¶ 4. Substantial Compliance<br>¶ 4 (a). Substantial Compliance<br>¶ 4 (b). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2(e) (HANDHELD CAMERA TRAINING)

The Department provided the standalone handheld camera training, which also includes training on the operation of handheld video cameras, to all active ESU Staff during the Sixth Monitoring Period. Further, 3,555 active staff received the Probe Team training (which includes handheld camera training) either during In-Service training or as recruit. The Monitoring Team has generally found that handheld video is available for incidents where it is required. To the extent issues have been identified with handheld video, those issues do not appear to be related to a Staff Member's lack of training on how or when to utilize a handheld camera.

| COMPLIANCE RATING | ¶ 2(e). Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 5 (RE-TRAINING)

The Department must provide re-training within 60 days to a Staff member who is found to have violated Department policies, procedures, rules, or directives relating to the use of force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, or directives relating to the reporting and investigation of use of force incidents and retention of any use of force video.

- **Re-Training Recommendations & Tracking**: During this Monitoring Period, 1,221 referrals for re-training were made via the Service Desk, which is similar to the number of requests made in prior Monitoring Periods. ID requested the most of the re-training this

---

[64] *See* Id.

Monitoring Period (54%), followed by requests from the facilities (27%), and other sources such as the Trials Division and E.I.S.S. make up the remaining requests (19%). Of the re-training requests from ID, the majority are referrals following the completion of the Intake Investigation. The top three courses recommended for Staff re-training were Use of Force Report Writing (42%), Use of Force (20%), and Chemical Agents (16%). The table below depicts the number of re-training recommendations by month, along with the proportion of re-training that was provided as of July 2021.

| Re-Training Tracking – 2020-2021 *As of July 2021* | | | | | |
|---|---|---|---|---|---|
| Month of **Request** | Number of Re-Training Requests | Re-Training Provided | Tickets Closed for Administrative Reasons[65] | Tickets Closed as Part of Backlog Initiative | Open or Pending Tickets |
| *Jan. to June 2020 10th MP* | 995 | 886 | 108 | 1 | 0 |
| *July to Dec. 2020 - 11th MP* | 1,432 | 709 | 171 | 161 | 391 |
| *Jan. to June 2021 - 12th MP* | 1,221 | 157 | 90 | 190 | 784 |
| **Grand Totals** | **3,648** | **1,752** | **369** | **352** | **1,175** |

- **Timing of Re-Training**: The Department is simply unable to provide the necessary re-training to Staff, or in the required 60-day time period. In this Monitoring Period, the Department fulfilled only 321 re-training requests (164 of those fulfilled were requested in 2020, and 157 of those fulfilled were requested in the Twelfth Monitoring Period). Of the 321 re-training requests fulfilled in this Monitoring Period, 111 (35%) received the re-training within 60 days of the request. Of the 1,175 pending requests, almost all are pending beyond 60 days of the request date as of July 2021.

- **Addressing the Backlog of Re-training Requests**: The Monitoring Team and Academy developed a plan at the end of the last Monitoring Period to address the re-training backlog. The goal was to triage the backlog, while prioritizing the re-training related to more recent incidents to ensure those trainings are provided more contemporaneously with the referral (*e.g.,* within 60 days of the request as required by the Consent Judgment). The backlog plan prioritizes providing re-training to those Staff who were involved in incidents that occurred most recently and requests for substantive use of force-related re-training (*e.g.,* any re-training requests for incidents from July 2020-December 2020 for use of force policy, cell extraction, IPC skills, use of restraints, defensive tactics, and Facility Emergency Response Teams will be fulfilled and any requests for other training programs will not be fulfilled).

---

[65] This includes those closed that were duplicates of other requests, closed because the Staff Member resigned or retired, and/or closed because the re-training request had errors or lacked sufficient detail to be able to fulfill the request.

Further, the Academy *administratively closed* and would not provide re-training for any requests where the incident occurred in June 2020 or earlier. 352 re-training *requests* (made between January 2020 and June 2021) were administratively closed under this plan. The Academy is still unable to keep pace with the re-training requested, even after this triage plan, and is therefore in Non-Compliance with this provision of the Consent Judgment.

| COMPLIANCE RATING | ¶ **5.** Non-Compliance |
|---|---|

## XIII. TRAINING ¶¶ 6 & 7 (TRAINING RECORDS)

All Staff Members who complete the Nunez-required trainings are required to pass an examination at the conclusion of the training program (¶ 6) and the Department must ensure that all Staff certify attendance in the required training programs (¶ 7). Over the last few Monitoring Periods the Department has demonstrated it maintains adequate attendance and examination records in a reliable format and system. Therefore, it was unnecessary to conduct an audit of these records in this Monitoring Period. The Monitoring Team will revisit this provision in future Monitoring Periods to ensure this progress is maintained.

| COMPLIANCE RATING | ¶ **6.** Substantial Compliance<br>¶ **7.** Substantial Compliance |
|---|---|

## XIII. TRAINING ¶ 8 (CENTRALIZED SYSTEM FOR TRAINING RECORDS)

This provision requires the Department to maintain training records for all Staff Members in a centralized location. The Department implemented the Learning Management System ("LMS") at the end of the Tenth Monitoring Period, which is a centralized system that will track key aspects (*e.g.*, attendance and exam results) of all trainings, including all required trainings. While the Department achieved a milestone with the implementation of LMS, the full functionality of LMS is still a work in progress (*e.g.,* integration of capability to have assigned posts drive training needs). The Monitoring Team continues to encourage the Department to utilize the LMS technology to its fullest extent to support the tracking and providing of training going forward.

| COMPLIANCE RATING | ¶ **8.** Partial Compliance |
|---|---|

## 5. VIDEO SURVEILLANCE (CONSENT JUDGMENT § IX)

The provisions in the Video Surveillance section of the Consent Judgment require video surveillance throughout the Facilities in order to better detect and reduce levels of violence. The obligations related to video surveillance apply to three different mediums, each having their own corresponding requirements under the Consent Judgment: (1) stationary, wall-mounted

surveillance cameras; (2) body-worn cameras; and (3) handheld cameras. This section requires the Department to ensure potential blind spots of stationary cameras are addressed, as feasible (¶ 1(d)); develop policies and procedures related to the maintenance of stationary cameras (¶ 3); develop and analyze a pilot project to introduce body-worn cameras in the jails (¶ 2(a-c)); and develop, adopt, and implement policies and procedures regarding the use of handheld video cameras (¶ 2(d-f)).[66]

## IX. VIDEO SURVEILLANCE ¶ 1 (STATIONARY CAMERA INSTALLATION)

The Department has installed more than 10,000 cameras and approximately 108 cameras were installed in the Twelfth Monitoring Period. The Monitoring Team has only recommended a relatively small number of additional cameras are installed in certain areas of the facilities to minimize potential blind spots since the Effective Date as there is significant and vast camera coverage across the Department. The status of camera coverage and the Monitoring Team's recommendations is listed in the chart below.

| Facility | Complete Camera Coverage | Status of Monitoring Team Recommendations | Reference to Prior Monitor's Report Findings |
|---|---|---|---|
| AMKC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) Sixth Report (pg. 83) |
| BKDC | Substantially Complete | N/A [67] | Sixth Report (pg. 83) |
| DJCJC | N/A – no housing units | In progress | Sixth Report (pg. 83) |
| EMTC[68] | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| GMDC | Substantially Complete | N/A [69] | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| GRVC | Substantially Complete | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |

---

[66] The provision regarding training for handheld video (¶ 2(e)) is addressed in the Training section (Consent Judgment § XII) of this report.

[67] BKDC is closed and so these recommendations are now moot.

[68] EMTC has opened and closed multiple times since 2020. The facility was first closed in March 2020 and was subsequently reopened a few weeks later following the outbreak of COVID-19. EMTC was then closed again in June 2020, but was then re-opened in November 2020. EMTC was then closed again in May 2021, but reopened in September of 2021.

[69] GMDC is closed and so these recommendations are now moot.

| MDC | Substantially Complete | In progress[70] | Fourth Report (pg. 102) |
|---|---|---|---|
| NIC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Sixth Report (pg. 83) |
| OBCC | Substantially Complete | In progress | Third Report (pg. 106) |
| QDC | N/A – no housing units | N/A | N/A |
| RMSC | Substantially Complete | Substantially addressed | Second Report (pg. 66) Fourth Report (pg. 102) |
| RNDC | Substantially Complete | Substantially addressed | First Report (pg. 58), Second Report (pg. 66), Third Report (pg. 105-106) |
| VCBC | Substantially Complete | In progress | Fourth Report (pg. 102) |
| WF | Substantially Complete | Substantially addressed | Third Report (pg. 107) Sixth Report (p.83) |

As demonstrated in the chart above, the majority of recommendations by the Monitoring Team have already been addressed and/or are moot because the facility is no longer operating or is about to close.

| COMPLIANCE RATING | ¶ 1(d). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (a) (b) & (c) (BODY-WORN CAMERAS)

This provision requires the Department to develop a Body-worn Cameras ("BWC") pilot and in consultation with the Monitor, evaluate the effectiveness and feasibility of the BWC's. The Department has continued to work towards rolling out the use of BWC across the facilities. BWCs are assigned to inmate facing posts identified by the leadership at each facility. Further, with respect to tracking the use of BWC, the Department continues to track whether BWC is available for an incident through the Incident Reporting System ("IRS") and the DEMS system. Shortly after the end of the Monitoring Period, the Department reported that Staff at all open facilities have completed BWC training. The status of the roll-out of BWC is outlined in the chart below.

| Status of BWC Roll-Out As of September 30, 2021 | | |
|---|---|---|
| Command | Status of Training | Status of BWC |
| AMKC | Complete | Use of BWC began in December 2020 |
| BHPW | Complete | Awaiting Delivery of BWC |
| BKDC | Complete | Awaiting Delivery of BWC |
| BXCT | Complete | Awaiting Delivery of BWC |
| DJCJC | Complete | Use of BWC began in February 2021 |
| EHPW | Complete | TBD |
| ESU | In progress (Will be conducted through 13th Monitoring Period) | Expected in the 13th MP |

---

[70] MDC closed in April 2021.

| EMTC[71] | N/A | Awaiting Delivery of BWC |
|---|---|---|
| GRVC | Complete | Use of BWC began in 2017 |
| NIC | Complete | Use of BWC began in April 2020 |
| OBCC | Complete | Awaiting Delivery of BWC |
| QNCT | Complete | Awaiting Delivery of BWC |
| RMSC | Complete | Use of BWC began in July 2020 |
| RNDC | Complete | Use of BWC began in July 2020 |
| VCBC | Complete | Use of BWC began in February 2021 |
| Transportation Division | Complete | Use of BWC began in February 2021 |
| WF | Complete | Use of BWC began in November 2020 |

*BWC & ESU*: The Monitoring Team continues to strongly encourage the use of BWC by ESU as many incidents involving ESU staff occur in locations that are not required to be covered by wall-mounted cameras and/or handheld video footage is difficult to obtain (*e.g.* in cells during an institutional search). The Department reports that ESU received new vests to accommodate BWC and that ESU staff will complete training on the BWC in the Thirteenth Monitoring Period at which time the use of BWC will begin.

*Conclusion*: BWC footage continues to provide a unique visual and auditory perspective on use of force incidents that stationary and handheld cameras may not provide. The Monitoring Team reviewed BWC footage through the routine review of use of force incidents and continues to find it valuable. However, it is worth noting that the Department and Monitoring Team continue to identify incidents where Staff fail to activate the BWC when required by policy. The Department continues to focus on compliance with BWC activation in Rapid Review assessments and through NCU audits to support improved practice. That said, the Department's use of BWC goes beyond the requirements of the Consent Judgment that simply requires the Department to pilot the use of BWC. Accordingly, while the Department has additional work to do to ensure that the use of BWC is fully implemented, the requirements of this provision have been met.

| COMPLIANCE RATING | ¶ 2(a)-(c). Substantial Compliance |
|---|---|

## IX. VIDEO SURVEILLANCE ¶ 2 (d) & (f) (USE & AVAILABILITY OF HANDHELD CAMERAS)

*Availability of Handheld Video* (¶ 2(d)): The Department has a significant amount of video footage available to review a UOF incident. Almost all incidents are captured by Genetec footage (generally with many different angles). Separately, there is often handheld video and body-worn camera footage. In almost all incidents in which handheld video footage is required, the video is available. The Facilities reported that handheld video footage was uploaded as required for 4,228 of the 4,533 alarm responses

---

[71] EMTC has opened and closed twice in 2020. It was first closed on March 1, 2020. However, the facility was re-opened later in March 2020 as part of the Department's response to COVID-19, then closed again on June 26, 2020. The facility was re-opened on November 20, 2020.

during the Twelfth Monitoring Period (93.3%). Overall, handheld video footage is consistently and routinely available.

*Investigator Access to Handheld Video* (¶ 2(f)): The facilities consistently and promptly upload UOF-related handheld video which supports ID's access to footage for the corresponding investigation of the incident. The Monitoring Team's routine assessment of Intake Investigations and Full ID Investigations of UOF incidents reflect that handheld video is generally available and evaluated by the investigator of the incident. Prior assessments have found that handheld videos were filed systematically in the shared IT folder and were easy to locate during a virtual audit of the system.

*Discipline for Intentional or Repeated Failure to Capture Handheld Footage* (¶ 2(f)): The Department has continued to identify and recommend corrective action (*e.g.*, corrective interviews, verbal counseling, Facility Referrals, Command Discipline, and MOCs) for Staff who fail to adequately record or upload handheld video footage. The Intake Squad specifically looks for this issue and identified *some type of handheld or body-worn camera violation*[72] in 660 (16%) incidents of the 4,219 Intake Investigations closed from January to June 2021. In prior Monitoring Period, the Monitoring Team has found that the vast majority of these violations were either minor handheld camera violations or violations related to the use of BWC (which are not related to this provision) with only a very small number of more concerning violations. Further, ID issued a total of 26 MOCs to: one Captain and 11 Officers for failing to properly operate the handheld camera; two Officers for intentionally failing to capture an incident; five Captains for supervisory failure; five ADWs for failing to ensure handheld video was uploaded electronically; and one MOC to an Officer for failure to wear a body-worn camera. The Department did not issue any discipline to Staff who repeatedly failed to capture key portions of incidents due to failure to follow DOC policies during this Monitoring Period. Overall, the Department appears to be adequately addressing potential misconduct related to the use of handheld or body-worn cameras.

| **COMPLIANCE RATING** | ¶ **2(d).** Substantial Compliance<br>¶ **2(f).** Substantial Compliance |
| --- | --- |

## IX. VIDEO SURVEILLANCE ¶ 3 (MAINTENANCE OF STATIONARY CAMERAS POLICY)

This provision requires facilities to assess stationary cameras to confirm that the cameras function properly. The Department is also required to develop a quality assurance program to ensure each facility is accurately identifying and reporting inoperable cameras. The Department must also develop and adopt procedures to replace or repair inoperable cameras as quickly as possible, but in no event later than two weeks after, barring exceptional circumstances.

---

[72] Current tracking does not allow for handheld and body worn camera violations to be separated.

*Facility Identification of Inoperable Cameras and Quality Assurance Program*: The process for identifying and reporting inoperable cameras remained the same during the Twelfth Monitoring Period (described in detail in the Eighth Monitor's report at pgs. 123-126). Facility staff continue to assess stationary cameras and record their findings on daily MSS-1 forms, which are then entered into the Enterprise Asset Management ("EAM") system as work orders to trigger repair. NCU then conducts audit of forms and a spot check of internal cameras to ensure facility Staff are completing the required forms and are identifying down cameras.

- **Completion of Daily Forms**: During this Monitoring Period, NCU found that 369 of 450 MSS-1 forms (82%) were completed and submitted by the facilities on the days audited.[73]

- **Work Orders for Inoperable Cameras**: Of the 450 submitted forms, NCU identified a total of 8,777 aggregate inoperable cameras.[74] NCU confirmed that 8,746 (99.7%) of the 8,777 reported inoperable cameras had corresponding work orders in the system.

- **Accuracy of MSS-1 Forms**: During this Monitoring Period, NCU's spot-check found 1,476 of 1,697 (92%) inoperable cameras were reported on the daily forms. Of the 221 that were not included on the MSS-1 forms, 114 cameras (52%) did have a corresponding work order. In total, 1,583 of the 1,697 inoperable cameras (93%) had been identified on the MSS-1 form and/or had a corresponding work order in the Enterprise Asset Management ("EAM") system.

Overall, the Department continues to demonstrate, as outlined above, that the daily MSS-1 forms are completed as required and the NCU audit results demonstrate that the forms are generally reliable and identify the vast majority of inoperable cameras. Further, the data demonstrates that the Department is generally submitting work orders to fix any identified inoperable cameras.

*Repairs of Inoperable Cameras*: The Department's Radio Shop is responsible for repairing stationary cameras in the facilities. The Department uses the EAM system to electronically track the number of reported inoperable cameras, the amount of time the camera is inoperable, and the date the camera was repaired. The system also has the ability to track why needed camera repairs may be on hold. Below is a chart of the reported inoperable cameras and the time to complete repairs from January 2017 through June 2021.

---

[73] This includes all forms that were expected to be completed for five random days selected by Facilities in January to June of 2021.

[74] It is important to note that the 8,777 cameras that were identified as inoperable is an aggregate total and does not mean there were 8,777 individual cameras that were inoperable (many cameras were reported as inoperable on multiple days in a row).

| Time to Repair Inoperable Cameras | | | | | |
|---|---|---|---|---|---|
| | **2017** | **2018** | **2019** | **2020** | **Jan. to June. 2021** |
| *Total Repaired* | **9,312** | **12,062** | **16,242** | **13,969** | **8,276** |
| 0-14 days | 8,555 (92%) | 10,329 (86%) | 10,507 (65%) | 9,983 (72%) | 7,412 (90%) |
| 15-30 days | 399 (4%) | 1,181 (10%) | 2,734 (17%) | 1,922 (14%) | 338 (4%) |
| 31-60 days | 222 (2%) | 303 (3%) | 1,821 (11%) | 1,020 (7%) | 345 (4%) |
| 61-99 days | 81 (<1%) | 116 (<1%) | 737 (5%) | 483 (4%) | 63 (1%) |
| 100 days or more | 55 (<1%) | 133 (<1%) | 443 (2%) | 561 (3%) | 118 (1%) |

The Department repaired the overwhelming majority of cameras within 14 days and even more camera within 30 days. The Department repaired more cameras within 14 days in this Monitoring period than any previous Monitoring Period (note the data for 2107 to 2020 above is *by year*). The Monitoring Team is encouraged with the Department's improved performance in repairing cameras this Monitoring Period.

| COMPLIANCE RATING | ¶ 3 (a)-(d) Substantial Compliance |
|---|---|

## 6. USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII & REMEDIAL ORDER § B)

The Use of Force Investigations section of the Consent Judgment combined with the remedial measures in Remedial Order § B covers a range of policies, procedures, and reforms relating to the Department's methods for investigating potential use of force-related misconduct.[75] The overall goal of this section is for the Department to produce thorough, objective, and timely investigations to assess Staff's use of force so that any potential violations can be identified, to allow corrective action to be imposed in a timely fashion.

The ID & Trials Leadership team continues to demonstrate a strong commitment to creative thinking, problem solving, and improving the work of the division, and have been an

---

[75] The Department's efforts to achieve compliance with § VII, ¶ 5 is addressed in the Use of Force Reporting section of this report.

invaluable asset to the reform effort.[76] In particular, the Deputy and Assistant Commissioners are smart, creative, dedicated and reform-minded leaders who have successfully guided the significant reform of the ID Division and have helped identify and support initiatives to elevate the level of practice needed in the facilities. The continued dedication of the entire ID Team has been critical to supporting the requirements of the Consent Judgment and their success in eliminating the backlog while simultaneously working to investigate all new use of force incidents is recognized and appreciated.

The Monitoring Team's assessment of compliance is below.

## VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS)

All use of force incidents now receive close-in-time investigations via the Intake Squad. Intake Investigations are generally reasonable, and completed close in time to the incident—this is a major accomplishment for the Department as there is now a reasonable and reliable process for investigating use of force incidents. Intake Investigations are capable of reasonably addressing the majority of incidents and so most incidents (approximately 80%) are closed at the conclusion of the Intake Investigation. This means that only a small portion (approximately 20%) of incidents require further investigation through a Full ID Investigation. The table below provides the investigation status of all UOF incidents that occurred between January 2018 and June 2021.[77]

---

[76] *See* Fifth Monitor's Report at pg. 92 (Dkt. 311), Sixth Monitor's Report at pgs. 92-93 (Dkt. 317), Seventh Monitor's Report at pgs. 104-105 (Dkt. 327), Eighth Monitor's Report at pgs. 128-129 (Dkt. 332), Ninth Monitor's Report at pg. 150 (Dkt. 341), Tenth Monitor's Report at pg. 133 (Dkt. 360), and Eleventh Monitor's Report at pg. 180 (Dkt. 368).

[77] All investigations of incidents that occurred prior to 2018 have been closed.

| Investigation Status of UOF Incidents Occurring Between January 2018 to June 2021 *as of July 15, 2021* | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Incident Date** | **2018** | | **2019** | | **2020** | | **Jan. to June 2021 (12th MP)** |
| **Total UOF Incidents**[78] | **6,302** | | **7,494** | | **6,399** | | 4,479 |
| **Pending Intake Investigations** | 0 | 0% | 0 | 0% | 0 | 0% | 527[79] | 12% |
| **Pending Full ID Investigations** | 0 | 0% | 0 | 0% | 506[80] | 8% | 688 | 15% |
| **Closed Investigations** | 6,302 | 100% | 7,494 | 100% | 5,893 | 92% | 3,264 | 73% |

ID is processing an enormous volume of cases. In this Monitoring Period, ID officially closed out the backlog of investigations (*e.g.,* investigations of any incidents on or before April 16, 2020) that was required to be completed under the Remedial Order (discussed in more detail below). The Intake Squad is also reasonably managing the case load (even with the ever-increasing number of UOF incidents) completing over 4,000 Intake Investigations this Monitoring Period (for incidents from the Eleventh and Twelfth Monitoring Periods). Although the 1,194 pending Full ID investigations is less than the 1,649 pending Full ID investigations in the last Monitoring Period, these pending cases must be scrutinized to prevent a *new* backlog from forming.[81] The current cases pending are not yet at risk for exceeding the statute of limitations, but far exceed the 120-day Consent Judgment deadline to close these cases, and ID must reinvigorate efforts to timely address Full ID investigations. To that end, as discussed in ¶ 11 below, the ID Division needs additional resources to manage its caseload, especially given the continuing rise of use of force incidents. Overall, although more work is needed, ID has improved in conducting thorough, timely, and objective investigations of all use of force incidents to determine whether Staff engaged in the excessive or unnecessary use of force or have otherwise failed to comply with the New Use of Force Directive.

| **COMPLIANCE RATING** | **¶ 1.** Partial Compliance |
|---|---|

---

[78] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

[79] Most of the 527 pending Intake Investigations are for incidents that occurred in June and so the 25 business days had not yet passed as of July 15, 2021.

[80] All pending cases for 2020 incidents occurred after April 17, 2020 and therefore are not part of the backlog.

[81] The possibility of a new backlog is an area of concern, but, the magnitude of the problem is minimized by the fact that most investigations are closed via Intake Investigations (and therefore never referred for a Full ID investigation) and those Intake Investigations are closing in a reasonable period of time.

**REMEDIAL ORDER § B., ¶ 1 (BACKLOG OF INVESTIGATIONS)**

As of May 31, 2021, ID successfully eliminated the backlog of Preliminary Reviews and Full ID investigations (those incidents occurring on or before April 16, 2020) by closing the remaining 467 backlogged cases. Almost all of the backlog was closed in prior Monitoring Periods (for example ~3,700 backlogged investigations were closed in the last Monitoring Period). ID's approach to managing the backlog was developed in consultation with the Monitoring Team and reasonably managed the competing interests of closing out the cases as soon as possible while minimizing the possibility that those cases with potential violations are overlooked. The Monitoring Team's assessment of cases closed in the backlog without violations generally found that those investigations were reasonably completed. *See* the Eleventh Monitor's Report at pgs. 182-184 for a description of the work undertaken to clear this backlog, including the input, involvement, and assessment from the Monitoring Team throughout the process.

| COMPLIANCE RATING | § B., ¶ 1. Substantial Compliance |
|---|---|

**VII. USE OF FORCE INVESTIGATIONS ¶ 2 (INTERVIEWS OF INCARCERATED INDIVIDUALS)**

The interview requirements of incarcerated individuals under ¶ 2 have a number of practical elements: (1) attempts must be made and recorded to get an incarcerated individual's statement following a use of force incident; (2) the Department shall assure incarcerated individuals they will not be subject to retaliation for providing information in connection with an investigation; and (3) investigators shall not unreasonably discredit incarcerated individual statements. Written statements (or refusals to provide statements) from incarcerated individuals are obtained by the facility following the incident. Subsequently, Intake Investigators conduct interviews in cases where the incident is not captured on video or where there are unexplained inmate injuries, and other incidents requiring an interview are referred for a Full ID Investigation. The Monitoring Team's assessment of investigations has not found that investigators discredit incarcerated individual statements without a reasonable basis, and the prevalence of video evidence is a critical corroboration tool used by investigators to determine whether to credit (or discredit) the statement. In investigations where statements that are not credited, the investigators have provided a reasonable basis in evidentiary findings for doing so.

| COMPLIANCE RATING | ¶ 2. Substantial Compliance |
|---|---|

**VII. USE OF FORCE INVESTIGATIONS ¶ 3 (PROMPT REFERRAL TO DOI)**

This provision requires ID to promptly refer to the Department of Investigation ("DOI") any Staff Member whose conduct in a use of force incident appears criminal in nature. The Monitoring Team has consistently found that most Staff conduct does not merit such a referral, but, when it does that ID has promptly made these referrals. Law enforcement agencies continue to collaborate and communicate about the status of cases that are referred for potential prosecution. Since the Effective Date, DOI has taken over or been referred a total of approximately 101 cases, and only a very small

portion (n=6) of this already limited group of cases has resulted in criminal charges as demonstrated in the chart below.

| Incidents Considered by Law Enforcement | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | Jan. to June 2021 | Total | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **14** | **1** | **101** | |
| Criminal Charges Brought (a Trial may be pending, underway or completed) | 0 | 2 | 0 | 2 | 1 | 1 | 0 | **6** | **6%** |
| Pending Consideration with Law Enforcement | 0 | 0 | 1 | 1 | 3 | 2 | 0 | **7** | **7%** |
| Returned to ID | 9 | 14 | 26 | 16 | 11 | 11 | 1 | **88** | **87%** |

As of the end of the Monitoring Period, seven use of force cases were pending with law enforcement: two with DOI, three with the Bronx District Attorney ("DA"), one with the U.S. Attorney's Office for the Southern District of New York ("SDNY"), and one case was pending with the U.S. Attorney's Office for the Eastern District of New York ("EDNY"). The Monitoring Team continues to emphasize that the evaluation of these referrals must occur as quickly as possible because those cases that do not result in criminal prosecution must then be returned to the Department so that any potential violations can be addressed. A lengthy review period (with no prosecution) only compounds the delay in accountability when it is then returned to the agency.

| COMPLIANCE RATING | ¶ 3. Substantial Compliance |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶¶ 4 AND 12 (ADDRESSING BIASED, INCOMPLETE, OR INADEQUATE INVESTIGATIONS, AND ID QUALITY CONTROL)

These provisions (¶¶ 4 and 12) together require adequate quality control mechanisms to ensure there are very few (if any) biased, inadequate, or incomplete finalized investigations, and when such cases do exist that they are identified and rectified. Intake Investigations and Full ID investigations are all subject to supervisory review, which provides an opportunity for investigations to be assessed and inadequate investigations to be addressed. Now that all investigations are conducted by ID, the number of biased, incomplete, or inadequate investigations is very small. There is significant back and forth between supervisors and investigators conducting both Intake Investigations and Full ID Investigations. The final versions of both sets of investigations demonstrate that feedback and guidance was provided to investigators to improve the quality of those investigations. ID has mechanisms in place that require supervisory review of investigations, which is a critical component to assessing and addressing the quality of investigations. However, other formal quality control measures are also needed to ensure ID conducts consistent and reliable investigations.

| COMPLIANCE RATING | ¶ 4. Substantial Compliance |
|---|---|
| | ¶ 12. Partial Compliance |

## VII. Use of Force Investigations ¶¶ 7 & 8 (Intake Investigations and Full ID Referrals) & Remedial Order § B. ¶ 2 (Intake Investigations)

These provisions require all use of force incidents to receive an Intake Investigation and to be referred for further investigation if certain criteria are met. All use of force incidents that occurred in this Monitoring Period received an Intake Investigation. Intake Investigations now include a more streamlined,[82] succinct, and reliable description of the incident.

- *Timing to Close Intake Investigations*: Intake Investigations are required to be complete within 25 business days. In this Monitoring Period, while less than half of Intake Investigations closed within 25 business days, all but a handful were closed within 30 business days of the incident (less than .5% of all closed were closed in over 30 business days). Of the 130 pending Intake Investigations as of July 31, 2021,[83] only eight were pending more than 30 business days. Overall, the time to close Intake Investigations is not a significant deviation from the required timeframe and likely the result of the increased workload given the rise in UOF incidents. However, it is worth closely monitoring to ensure no further slippage.

- *Referral for Full ID Investigations*: As of July 31, 2021, 4,340 Twelfth Monitoring Period incidents have a closed Intake Investigation—3,583 (83%) were closed following the completion of the Intake Investigation and 757 (17%) were referred for further investigation as Full ID investigations. In this Monitoring Period, the Monitoring Team recommended nine Intake Investigations were re-opened as they required further analysis or more investigation. The Monitoring Team continues to find that most cases are reasonably closed following the Intake Investigation and that referrals for further investigation are occurring as required.

- *Outcome of Intake Investigations*: Of the 3,583 Intake Investigations that closed without a referral for a Full ID investigation, 1,352 (38%) were closed with no action by the Intake Investigator,[84] while 2,231 were closed with some type of action (MOC, PDR, Re-Training, Facility Referral). It is important to note that the *results* of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC *and* a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart below.

---

[82] As described in more detail in the Ninth Monitor's Report at pgs. 42-45.

[83] Other investigation data is this report is reported *as of* July 15, 2021 while the Intake Investigation data is also reported *as of* July 31, 2021 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake cases therefore varies between data provided "as of July 15, 2021" and "as of July 31, 2021," depending on which tracker was utilized to develop the necessary data.

[84] As discussed above, an Intake Investigation may close with no action because the identified violation was appropriately identified and addressed by the Rapid Review.

The Intake Squad also collects data regarding the findings of Intake Investigations, as discussed further below regarding Remedial Order § B., ¶ 5.

| Status of Intake Investigations by Incident Date As of July 31, 2021 | | | |
|---|---|---|---|
| **Incident Date** | **February 3, 2020[85]– June 30, 2020 (10th MP)** | **July 1, 2020– December 31, 2020 (11th MP)** | **January 1, 2021–June 30, 2021 (12th MP)** |
| Pending Intake Investigation | 0 | 9 | 130 |
| **Closed Intake Investigation** | **2,492** | **3,266** | **4,340** |
| -    *No Action* | *1,060* | *1,278* | *1,352* |
| -    *MOC* | *47* | *38* | *54* |
| -    *PDR* | *6* | *2* | *0* |
| -    *Re-Training* | *148* | *226* | *339* |
| -    *Facility Referrals* | *820* | *1,156* | *1,838* |
| -    *Referred for Full ID* | *411* | *566* | *757* |
| **Total** | **2,492** | **3,275** | **4,470** |

- *Overall Assessment*: The Monitoring Team reviews all Intake Investigations. The Monitoring Team's extensive review of these investigations has revealed that while there is variation in quality among investigations, the Monitoring Team continues to find that the Intake Investigations reasonably assess available evidence (¶ 7(a) and (c)), and appropriately identified potential violations and recommended appropriate action or further investigation when necessary (¶ 7(d), (e), (f) and (h)). Finally, as noted in ¶¶ 4 and 12 above, there is significant back and forth between supervisors and investigators conducting Intake Investigations and the final versions of Intake Investigations demonstrate that feedback and guidance was provided to investigators to improve the quality of those investigations (¶ 7(g).

| **COMPLIANCE RATING** | ¶ **7.** Substantial Compliance |
|---|---|
| | ¶ **8.** Substantial Compliance |
| | § B., ¶ **2.** Substantial Compliance |
| | § B., ¶ **2(i).** Substantial Compliance |

## VII. USE OF FORCE INVESTIGATIONS ¶ 9 (FULL ID INVESTIGATIONS)

This provision requires ID to complete Full ID investigations within 120 business day of an incident. This Monitoring Period, ID closed a total of 689 investigations, including 222 Full ID investigations of incidents that occurred after April 17, 2020, and 467 backlog investigations (which are a combination of Preliminary Reviews and Full ID Investigations). While the number of incidents requiring Full ID Investigations is a more manageable number now that the massive backlog has been closed, a new backlog is potentially growing.

---

[85] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

- *Timing*: The time to complete Full ID investigations has long been protracted. All cases in the backlog were closed beyond the 120-day deadline. Further, 73% of the 1,440 Full ID investigations that occurred between April 17, 2020 (post-backlog) and June 30, 2021 were closed or pending past the 120-day deadline as demonstrated in the chart below. Therefore, the Department is in Non-Compliance with the requirement to close Full ID investigations within 120 days.

| Status of Full ID Investigations for incidents that *occurred* on or between April 17, 2020 and June 30, 2021 *As of July 15, 2021* | | | | | |
|---|---|---|---|---|---|
| | *Pending* less than 120 Days | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| Post-Backlog Cases | 349 | 34 | 212 | 845 | 1,440 |

- *Quality* (¶ 9(b) to (f)): The quality of these investigations is mixed, and remains consistent with prior Monitoring Periods. Many Full ID investigations are thorough, complete, and represent sound judgment and analysis by investigators, but the overall quality of Full ID investigations was not anticipated to improve until the backlog was eliminated and ID could then focus on conducting quality investigations of more contemporaneous incidents. While ID's approach to addressing the backlog is reasonable and the outcome of those investigations were generally reasonable (*e.g.,* identifying violations when they occurred), the extreme delays in these investigations in the backlog did, in at least some cases, impact the available evidence. As for more recent Full ID investigations, violations warranting formal discipline are generally identified and addressed by the investigation, but Full ID investigations do not consistently address ancillary issues and/or Staff misconduct that is not central to the use of force being reviewed. In some cases, the investigator loses sight of the big picture and fails to evaluate the circumstances that led up to the need for force in the first place and identifying whether/if the incident could have been avoided.

*Conclusion*: As discussed throughout this report, the rise in use of force incidents has a corresponding impact on the work of the rest of the agency. Case in point, while there are less Full ID referrals *proportionally*, the overall higher numbers of use of force incidents means the workload of Full ID investigations is still high. In this Monitoring Period only 17% (n=757) of cases required a Full ID investigation compared with 50% in the Fifth Monitoring Period (n=1,253). While the reduction in overall Full ID Investigations is positive, the number of investigators to conduct Full ID Investigations has decreased which has impacted ID's ability to timely manage these cases as discussed in more detail in ¶ 11 below.

| COMPLIANCE RATING | ¶ 9 (a). Non-Compliance |
|---|---|
| | ¶ 9. (b) to (f) Partial Compliance |

**REMEDIAL ORDER § B. ¶ 4 (PRIORITIZING CERTAIN USE OF FORCE INVESTIGATIONS)**

This provision requires ID to prioritize the investigations of certain incidents involving potentially serious and egregious uses of force and/or misconduct by Staff with a history of misconduct. The Use of Force Priority Squad ("UPS") is a useful tool to manage some of the most serious and complex use of force cases as it helps ID ensure that these cases obtain the necessary scrutiny and attention. ID expanded the use of UPS this Monitoring Period and improved in identifying cases for referral for UPS. 32 cases were referred to UPS in this Monitoring Period compared with only 8 in the prior Monitoring Period. Cases assigned to the UPS include certain egregious incidents including cases in which a Staff Member was suspended, cases returned to ID following an assessment for criminal charges by law enforcement, and recommendations from the Monitoring Team. Eight of the 32 referrals in this Monitoring Period were recommended by the Monitoring Team. UPS closed 11 cases in this Monitoring Period, nine of these 11 cases closed with charges, and each of these 11 incidents closed in well over 120 days. As of end of this Monitoring Period, UPS had 32 pending cases (compared with only 9 cases pending as of end of last Monitoring Period), half of which were already pending over 120 days. While the Department has improved reliance on UPS, it has unfortunately not yet proven to be a mechanism to ensure investigations are also conducted timely.

**COMPLIANCE RATING** | **§ B., ¶ 4.** Partial Compliance

**REMEDIAL ORDER § B., ¶ 5 (TRACKING AND REPORTING UOF VIOLATIONS)**

This provision requires ID to develop and implement a process to track and report the findings of every Intake Investigation or Full ID investigation (if the incident is referred for a Full ID Investigation) of a use of force incident.

- _Intake Investigations_: The Intake Squad investigator makes a determination in a number of categories upon closure of the Intake Investigation. If the case is referred for a Full ID investigation, then the data regarding the ultimate conclusion of the case will be deferred until after the Full ID investigation is complete. The data collected for Intake Investigations includes whether: (1) the incident was avoidable, unnecessary, excessive, (2) there are violations identified (such as report writing issues, handheld camera violations, chemical agent violations), and (3) allegations of unreported use of force by incarcerated individuals were substantiated or not.

  - The chart below provides the status of all use of force incidents that have been subject to an Intake Investigation between February 3, 2020 (when the Intake Squad began) and June 30, 2021. The second half of the chart includes the data of the conclusions from the 8,364 incidents that were closed following the completion of the Intake Investigation:

| Status of Investigations Closed on the Intake Investigation As of July 31, 2021 | | | |
|---|---|---|---|
| **Incident Date** | **10th MP** *Feb. 3[86] to June 2020* | **11th MP** *July to Dec. 2020* | **12th MP** *Jan. to June 2021* |
| **Pending Intake Investigation** | 0 | 9 | 130 |
| **Pending or Closed Full ID Investigations** | 411 | 566 | 757 |
| **Closed on Intake Investigation** | **2,081** | **2,700** | **3,583** |
| *Data Regarding the Findings of the 8,364 Closed Intake Investigations* | | | |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *713 (20%)* |
| *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *254 (7%)* |

- *Full ID Investigations*: The Department tracks and reports whether the Full ID Investigations found force to be unnecessary or excessive for those incidents referred since the inception of the Intake Squad. The Department reports that of the 1,733 Use of Force incidents which were referred for a Full ID investigation by the Intake Squad between February 3, 2020 and June 30, 2021, only 523 have been closed to date. Of the 523 closed Full ID cases, a total of 81 were found to be excessive and/or unnecessary. However, as noted in the "New Data Violation Categories" below, the Monitoring Team is working with ID to ensure consistency of what these categories are intended to capture, as there is room for improvement in the current data collection.

- *New Data Violation Categories*: The Department and Monitoring Team collaborated extensively this Monitoring Period on the development and implementation of additional data for Intake Investigations and Full ID Investigations. The categorization of these issues and the development of corresponding data is complex, especially because it is quantifying subjective information in which even a slight variation of the facts can impact the categorization of an incident. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistency across the board. Therefore, the Monitoring Team and ID collaborated on additional categories, and the definition of the type of conduct that would "count" in order to be bucketed in each category to ensure consistency and support additional transparency of the misconduct identified. The goal is to roll out the revised tracking in the next Monitoring Period.

| **COMPLIANCE RATING** | **§ B., ¶ 5.** Partial Compliance |
|---|---|

---

[86] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

## VII. USE OF FORCE INVESTIGATIONS ¶ 11 (ID STAFFING) & REMEDIAL ORDER § B. ¶ 3 (ID STAFFING LEVELS)

This provision requires the City to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignment are critical to conducting timely and quality investigations. The ID staffing levels at the end of each Monitoring Period, since the Sixth Monitoring Period, are presented in the chart below:

| ID Staffing Levels *As of July 15, 2021* | | | | | | | |
|---|---|---|---|---|---|---|---|
| Position | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 |
| Deputy Commissioner | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Assistant Commissioner | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Director/Acting Director | 0 | 4 | 4 | 6 | 5 | 4 | 3 |
| Executive Director | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| Deputy Director Investigator (DDI) | 6 | 6 | 6 | 8 | 8 | 8 | 9 |
| Administrative Manager | 0 | 1 | 1 | 1 | 0 | 0 | 0 |
| Supervising Investigator | 9 | 13 | 17 | 25 | 25 | 26 | 26 |
| Supervisor ADW | 3 | 0 | 0 | 0 | 0 | 0 | 0 |
| Investigator Captain | 16 | 16 | 14 | 15 | 14 | 12 | 12 |
| Investigator Civilian | 58 | 77 | 87 | 89 | 100 | 91 | 82 |
| Investigator Correction Officer | 77 | 71 | 67 | 89 | 90 | 88 | 85 |
| Support Staff | 12 | 12 | 12 | 10 | 11 | 10 | 9 |
| **Total** | **183** | **201** | **210** | **245** | **255** | **242** | **229** |

- *Recruitment Efforts*: There was a net loss of ID staff this Monitoring Period, of particular note is the net loss of 9 Civilian Investigators. The Department is actively recruiting for this role, received a significant number of applicants, and conducted 24 interviews this Monitoring Period. No offers were extended for Civilian Investigator positions in this Monitoring Period, but offers were made following the close of the Monitoring Period.

- *Caseloads*: The caseloads for investigators conducting use of force investigations must be evaluated in three buckets: (1) intake investigations, (2) Full ID investigations, and (3) the UPS squad. The chart below demonstrates the breakdown of staffing within ID, and caseload information for the teams with UOF cases as of the end of the Monitoring Period:

| Facility Team Staffing & Case Breakdown for Team with UOF Caseloads *As of July 15, 2021* | | | | | |
|---|---|---|---|---|---|
| Number of Assigned Staff | | | Number of Assigned Cases | | |
| Team/Unit | Supervisors[87] | Investigators | Intake Investigations | FULL ID | Non-UOF |
| Intake Squad | 12 | 52 | 880 | 0 | 0 |
| Full ID Group 1 (3 Teams) | 3 | 17 | 0 | 408 | 38 |
| Full ID Group 2 (3 Teams) | 3 | 16 | 0 | 381 | 83 |
| Full ID Group 3 (3 Teams) | 3 | 18 | 0 | 374 | 45 |
| UPS | 1 | 3 | 0 | 33 | 3 |
| **Totals** | 22 | 106 | 880 | 1196 | 169 |
| Other Teams | | | | | |
| PREA (7 Teams) | 8 | 22 | | | |
| Intel | 2 | 7 | | | |
| Training | 1 | 2 | | | |
| Arrest Team | 1 | 9 | | | |
| K-9 | 1 | 6 | | | |
| Administration and Tracking, Misc. | 4 | 14 | | | |

- *Intake Investigations*: ID has a significant number of investigators assigned to the Intake Squad, enabling them to investigate a large number of use of force incidents in a timely manner. The fluctuation in the number of UOF incidents means that there will always be a need to balance resources, but the current complement of Intake Squad investigators appear to reasonably accommodate the current caseloads.

- *Full ID*: There were only 51 investigators on the Full ID teams at the end of this Monitoring Period compared with 70 investigators at the end of last Monitoring Period. The loss of Full ID investigators is the result of the fact that civilian investigators left ID and were not yet replaced and certain investigators were transferred to the Intake Squad unit. As a result, while the backlog of cases has been eliminated, the reduced number of investigators dedicated to Full ID investigations has meant that there was an increase in caseload for each investigator. At the end of the Monitoring Period, each Full ID investigator had an average of 23 cases compared to an average of 16 cases per investigator at the end of last Monitoring Period.

---

[87] Nine DDIs oversee the supervisors of these teams. The DDIs are not included in the count of supervisors in this chart.

- *UPS*: UPS has a small number of cases assigned to it than other ID teams (approximately 12 cases each) as the complexity and/or seriousness of these cases warrants this more targeted focus. However, as noted in § B. ¶ 4 above, UPS investigations are still quite protracted. However, this does not seem to be a result of limited staffing, but, perhaps some inefficiencies in the way in which these cases are managed by UPS.

- *Next Steps*: ID needs additional Staff to ensure Intake Investigations are conducted timely and to reduce the increasing caseload of Full ID investigations. It is clear the ID Division needs to recruit and hire more staff to off-set attrition and the increasing number of UOF incidents that require investigation. Further, now that the backlog of investigations is cleared, it is now feasible for the Monitoring Team to complete a review of the ID case assignment process and caseloads as required by the Remedial Order § B., ¶ 3.

| COMPLIANCE RATING | ¶ 11. Partial Compliance |
|---|---|
| | § B., ¶ 3. Not Yet Rated |

## VII. USE OF FORCE INVESTIGATIONS ¶ 13 (FACILITY COLLECTION OF UOF DOCUMENTATION)

This provision requires the Department to have a centralized and streamlined approach to collect the relevant documentation for UOF investigation. Overall, it appears Intake Investigators continue to have access to the relevant documentation from the facility that is necessary to conduct Intake Investigations in a timely manner, although it appears that the current issues in the facilities are causing some overall delays at the facility-level (as discussed in detail in the Use of Force Reporting and Tracking section of this report in regard to submission of Staff use of force reports (V.,¶ 4), and classification of use of force incidents (V., ¶ 12, and VII. ¶ 5).

| COMPLIANCE RATING | ¶ 13. Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 9 (ALLEGATIONS OF SEXUAL ASSAULT)

This provision requires all allegations of sexual assault involving Young Inmates to be promptly and timely reported, and thoroughly investigated. This provision pertains only to 18-year-old incarcerated individuals,[88] but it is included in this section of the Monitor's Report to consolidate discussions about ID in one place. This provision targets "sexual assault" and the Monitoring Team has

---

[88] The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).

used the Prison Rape Elimination Act ("PREA") rubric as the best representation of the intended scope, although PREA cases are a broader category than what is required by the Consent Judgment as it also includes sexual harassment in addition to sexual abuse. There were no allegations of sexual abuse, harassment, or any other allegation of a sexual nature by an 18-year-old during the current Monitoring Period and none since the end of 2019. Given there were no PREA allegations by 18-year-olds during the current Monitoring Period, and also no pending or completed investigations, the compliance rating from the Tenth Monitoring Period remains.

| COMPLIANCE RATING | § XV., ¶ 9. Substantial Compliance (per Tenth Monitor's Report) |
|---|---|

## VII. USE OF FORCE INVESTIGATIONS ¶ 15 (POLICIES & PROCEDURES)

This provision requires the Department to maintain relevant policies for its investigation procedures. To that end, the Department maintains the Intake Investigation Policy in accordance with ¶ 7, and a separate policy to govern facility-level responsibilities to collect information and documentation for investigations as required by ¶ 13. However, in order for the Department to achieve Substantial Compliance, ID must have comprehensive policies and practices regarding the completion of Full ID investigations and the necessary Quality Control measures within ID.

| COMPLIANCE RATING | ¶ 15. Partial Compliance |
|---|---|

### 7. RISK MANAGEMENT (CONSENT JUDGMENT § X)

The Risk Management section of the Consent Judgment requires the Department to create systems to identify, assess, and mitigate the risk of excessive and unnecessary use of force. The varied risks facing the Department require flexible, comprehensive, and timely responses. These measures include developing and implementing an Early Warning System (¶ 1); conducting counseling meetings between facility leadership and any Staff Member who engages in a concerning and/or repeated use of force incidents (¶ 2); identifying systemic patterns and trends related to the use of force (¶ 3); and creating CMS to systematically track investigation and disciplinary data throughout the Department (¶ 6).

## X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM)

This provision requires the Department to have a system to identify and correct Staff misconduct at an early stage. The Department continued to implement the Early Intervention, Support, and Supervision Unit ("E.I.S.S."), which is comprised of three civilian staff and four uniform Staff.

The goal of E.I.S.S. is to identify and support Staff whose use of force practices would benefit from additional guidance and mentorship in order to improve practice and minimize the possibility that Staff's behavior escalates to more serious misconduct. Staffing issues both within the division and Department-wide further hampered this struggling program. In this Monitoring Period, the four uniform Staff assigned to E.I.S.S. were often re-deployed into the Facilities, uniform staff participating in the program often were unable to attend scheduled meetings due to staffing shortage, and distracted facility leadership were not fully focused on the program.

*Overview of E.I.S.S. Work*: The table below depicts the work of E.I.S.S. during the last five Monitoring Periods and the overall caseload of the program since its inception in August 2017:

| Overview of E.I.S.S. Work | | | | | | |
|---|---|---|---|---|---|---|
| | Jan. to June 2019 (8th MP) | July to Dec. 2019 (9th MP) | Jan. to June 2020 (10th MP) | July to Dec. 2020 (9th MP) | Jan. to June 2021 (12th MP) | Program to Date – August 2017 to June 2021 |
| *Screening* | | | | | | |
| Staff Screened[89] | 92 | 229 | 158 | 60 | 82 | 836 |
| Staff Selected for Monitoring[90] | 27 (29%) | 83 (36%) | 38 (24%) | 35 (58%) | 53 (65%) | 320 |
| *Monitoring* | | | | | | |
| Staff Began Monitoring Term | 12[91] | 29 | 50 | 36 | 38 | 242 |
| Staff Actively Monitored[92] | 91 | 96 | 96 | 106 | 91 | |
| Staff Completed Monitoring | 22 | 45 | 9 | 29 | 17 | 144 |

[89] The number of Staff screened for each Monitoring Period may include some Staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual Staff screened. Staff are only counted once in the "Program to Date" column, even if the Staff Member was screened in multiple Monitoring Periods.

[90] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff left the Department before monitoring began. Other Staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.* sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a Staff's monitoring term if the Staff Member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[91] This includes two Staff Members who resigned during the Eighth Monitoring Period.

[92] The total number of Actively Monitored Staff for each Monitoring Period includes all Staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

*Identification of Staff for Screening & Screening Staff*: E.I.S.S. staff screened (or re-screened) 82 Staff this Monitoring Period, selecting 53 (65%) Staff for the monitoring program based on those screenings. These Staff were selected for screening exclusively through referrals from the facilities (including via Rapid Reviews), the Trials Division (including all those Staff who signed a Negotiated Plea Agreement ("NPA") this Monitoring Period) and ID.

*EISS Monitoring Program*: In this Monitoring Period, 38 staff were placed in E.I.S.S. monitoring. As part of placement in the E.I.S.S. program, monitoring plans are developed for each Staff Member (including input from the Staff Member) which are designed to guide and track the Staff Member's progress in achieving their goals for improved practice. These monitoring plans are also designed to help guide facility leadership in their mentorship and discussions with these Staff Members. The E.I.S.S. program necessarily requires facility-level mentorship and guidance to support Staff while they conduct their regular duties. The engagement of facility leadership (Wardens) has been lacking since the program was developed, but further devolved in this Monitoring Period given the various issues plaguing the agency. In general, it appears Wardens did not provide basic E.I.S.S. support such as monthly meetings with the Staff in their facility or bi-monthly check-ins with E.I.S.S. staff as contemplated by the program.

*Conclusion*: While the E.I.S.S. Unit did their best to continue moving forward with this program, staffing shortages, and competing priorities negatively impacted the effectiveness of this program. Further, the recommended improvements to this program, particularly at the facility-level (as outlined in the Eleventh Monitor's Report at pgs. 211-213) were not incorporated into practice. As a result, the Department is in Non-Compliance with this provision.

| COMPLIANCE RATING | ¶ **1.** Non-Compliance |
| --- | --- |

## X. RISK MANAGEMENT ¶ 2 (COUNSELING MEETINGS)

Rapid Reviews require facility leadership to determine whether each Staff Member involved in a use of force incident requires counseling or a corrective interview based on their conduct in the incident.[93] Department leadership continue to identify Staff for counseling via an assessment of every UOF incident through the Rapid Review process. The Department reported the following Staff were counseled via either 5003 counseling sessions or a corrective interview in the Twelfth Monitoring

---

[93] Corrective interviews are considered part of the disciplinary continuum and become part of a Staff Member's personnel file for a specified period of time. In contrast, counseling sessions (including 5003 counseling sessions) are not necessarily considered disciplinary in nature and are not included in a member's personnel file. 5003 counseling sessions can also be an opportunity to commend Staff on exemplary behavior. Although slightly different in nature, corrective interviews serve a very similar role to counseling sessions in providing feedback to Staff and so the Monitoring Team considers them under this requirement.

Period. In total, counseling was conducted for at least one Staff member involved in 987 of the UOF incidents in this Monitoring Period.

| Counseling of Staff January to June 2021 | | |
|---|---|---|
| | Number of Staff who were Counseled or received a Corrective Interview | Number of Staff recommended for Counseling or a Corrective Interview, but did not receive one |
| *January* | 272 | 17 |
| *February* | 217 | 34 |
| *March* | 267 | 44 |
| *April* | 285 | 66 |
| *May* | 267 | 93 |
| *June* | 186 | 86 |
| **Total** | 1494 | 340 |

Counseling sessions are an opportunity for supervisors to provide feedback and guidance, which is the key component of effective and good leadership. As discussed in previous reports, the quality of a counseling session is nearly impossible to effectively measure or quantify. Based on the current state of affairs at DOC, and the Monitoring Team's overall assessment of supervision in the Department, there is a dearth of strong and effective leadership at DOC. Which means the quality of the counseling sessions are not currently expected to be particularly effective. That said, the fact that the Department is identifying Staff that require counseling, and that these meetings are happening, is a critical *first* step in improving the management of Staff.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

## X. RISK MANAGEMENT ¶ 3 (COMPLIANCE ASSESSMENTS)
## V. USE OF FORCE REPORTING AND TRACKING ¶ 20 (USE OF AGGREGATE REPORTS TO ENHANCE OVERSIGHT)

These two provisions (§ X., ¶ 3, § V., ¶ 20) are addressed together because maintaining, analyzing, and interpreting consistent and reliable data form the foundation upon which the Department can design and enact problem-specific solutions to its use of force issues. The Department continues to routinely collect and analyze data necessary to assess compliance with many parts of the Consent Judgment, Remedial Order, and ad hoc status letters to the court. This includes but is not limited to, Rapid Reviews, weekly operational meetings and the numerous reports and detailed analyses produced by NCU. Overall, the efforts of NCU, the Complex Litigation Unit ("CLU"), and the Project Management Office ("PMO") and their corresponding work with facility Staff have achieved compliance with ¶ 3. Further, as demonstrated throughout this report, the Department has the capacity to generate aggregate data as required by ¶ 20. The Department utilizes data from IRS, ID Investigations, Trials, and the "Inmate-on-Inmate Fight Tracker" to identify opportunities to enhance

| | the quality of incarcerated individual supervision or oversight of Staff Members. As such, the Department is in Substantial Compliance with both of these provisions. |
|---|---|
| **COMPLIANCE RATING** | **¶ 3.** Substantial Compliance<br>**§ V., ¶ 20.** Substantial Compliance |

| **X. RISK MANAGEMENT ¶ 6 (CASE MANAGEMENT SYSTEM)**<br>**V. USE OF FORCE REPORTING AND TRACKING ¶ 18 (COMPONENTS OF CASE MANAGEMENT SYSTEM)** | |
|---|---|
| | The Case Management System developed specifically for and by the Department remains in place (the system is described in the Sixth Monitor's Report at pgs. 123-124) and created the ability to review and aggregate incident- and investigation-based information as required by § V. ¶ 18. However, as described in the Tenth Monitor's Report at pg. 174, the system lacks elasticity (*e.g.,* the ability to capture the new functionality of the Intake Squad), and unfortunately, the Department does not have an internal capability to modify CMS. The Monitoring Team continues to believe that the Department's ability to aggregate investigative information in CMS would benefit from the system being more dynamic and would recommend that it obtain an internal capability to modify the system. That said, the current CMS system is satisfactory for Substantial Compliance with this provision. |
| **COMPLIANCE RATING** | **¶ 6.** Substantial Compliance<br>**§ V., ¶ 18.** Substantial Compliance |

## 8. STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII & REMEDIAL ORDER § C)

The Department's disciplinary process is currently not structured to timely and consistently hold Staff accountable for misconduct related to use of force. The current system is awash in unresolved cases, some of which are years old, and the Department has been and remains in abject and sustained non-compliance with imposing timely discipline. The current situation is particularly aggravated as the system, as structured, is dysfunctional and, consequently, is overwhelmed. Case in point, the Department is on track to resolve about 400 disciplinary cases this year, while, as of the end of the Monitoring Period, there are over 1,900 cases pending resolution. At this rate it would take *over 4 years* to resolve these pending cases; this does not account for any new disciplinary cases that will inevitably be referred for discipline.

The analysis and data presented in this section of the report will demonstrate that the Department's Trials Division is working harder and more efficiently than ever before, but it is not nearly enough to keep pace with the volume of cases that need to be processed. Accordingly,

the Monitoring Team has recommended that additional remedial relief is necessary to resolve this backlog of cases and devise a more efficient system going forward. In particular, the Department and OATH need additional resources to process cases to support their reasonable attempts to settle cases with Staff or adjudicate them before OATH. To that end, significantly more OATH proceedings are needed, and those proceedings must be conducted more efficiently. Overall, deadlines must be set to ensure that the significant backlog of cases is appropriately managed and ultimately eliminated. In order to accomplish all of this, a competent manager with demonstrated expertise in the disciplinary process and commitment to reforming the process must be responsible for this process given the complexity and enormity of the task.

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1 (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

This provision requires the Department to impose timely, appropriate, and meaningful accountability for UOF related violations. Staff discipline comes in many forms and can be imposed by a variety of different actors within the Department, at various stages. All forms of accountability are important. Overall, the Department does not currently hold Staff accountable in a timely manner, which inherently undermines the meaningfulness of the discipline and ability to impact future behavior.

The Department _**identifies**_ misconduct via Rapid Reviews, ad hoc review of incidents by civilian and uniform leadership, Intake Investigations (and formerly Preliminary Reviews), and through Full ID investigations. The Department has various structures to _**respond**_ to misconduct, including: corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, and placing an individual on modified duty. PDRs are utilized to address misconduct of _probationary_ Staff. For _tenured_ Staff, formal discipline is imposed through the Department's Trials Division, generally via an NPA.

_Overview of Accountability_: The chart below provides an overview of the accountability that has been imposed between January 2019 and June 2021. As demonstrated in the chart below, the Department has conducted a significant number of counseling sessions in this Monitoring Period while the number of re-training programs that occurred was essentially non-existent in this Monitoring Period (see more details in the Training section of this report). With respect to corrective actions, the Department continues to utilize Command Disciplines and suspensions. Both of these tools allow for accountability to occur closer in time to the incident and can make them a more effective accountability tool. As for the imposition of NPAs, as discussed throughout this report and this section, the Department simply is woefully behind in imposing formal discipline and most NPAs address misconduct that is at least a year old.

| Overall Staff Accountability Imposed<br>January 2019 to June 2021 | | | | | |
|---|---|---|---|---|---|
| | Jan.-June 2019<br>8th Monitoring Period | July-Dec. 2019<br>9th Monitoring Period | Jan.-June 2020<br>10th Monitoring Period | July-Dec. 2020<br>11th Monitoring Period | Jan.-June 2021<br>12th Monitoring Period |
| **Support and Guidance Provided to Staff** | | | | | |
| Corrective interviews and 5003 counseling | 1,769[94] | 931[95] | 263[96] | 1,115 | 1,494 |
| Corrective interviews (resulting from CDs) | 41 | 11 | 10 | 22 | 9 |
| Re-Training | ██████████ | ██████████ | 1,595[97] | | 157[98] |
| **Corrective Action—Command Discipline & Suspensions Imposed by a Variety of Entities within the Department** | | | | | |
| CD – Reprimand | 66 | 90 | 37 | 89 | 141 |
| CDs (resulting in 1-5 days deducted) | 390 | 489 | 263 | 410 | 435 |
| Suspensions | 25 | 24 | 38 | 42 | 48 |
| **Formal Discipline** | | | | | |
| PDRs | 31 | 50 | 34 | 15 | 2 |
| NPAs | 84 | 135 | 159 | 165 | 188 |
| **Total Corrective Action and Formal Discipline Imposed** | | | | | |
| **Grand Total** | **596** | **788** | **531** | **721** | **814** |
| *Corrective Action Total* | *481* | *603* | *338* | *541* | *624* |
| *Formal Discipline Total* | *115* | *185* | *193* | *180* | *190* |

_Status of Cases Pending Formal Discipline_: Formal discipline has been imposed in at least 2,187 instances (involving approximately 1,650 individual Staff Members) on _tenured_ Staff between November 1, 2015 and June 30, 2021[99]. **The amount of formal discipline imposed over the last five years (2,187) spanning the life of the Consent Judgment -- November 2015 to June 2021 -- is almost the same**

---

[94] Counseling that occurred in this Monitoring Period was focused on a more holistic assessment of the Staff Member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. _See_ Eighth Monitor's Report at pgs. 172-173.

[95] The identification of Staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. _See_ Ninth Monitor's Report at pgs. 194-196.

[96] The Department transitioned the process for identifying Staff for counseling during this Monitoring Period. _See_ Tenth Monitor's Report at pgs. 168 to 170.

[97] This number reflects all re-training requested in 2020 that were fulfilled through July 1, 2021.

[98] This number reflects all re-training requested in 2021 that were fulfilled through July 1, 2021

[99] The tracking of disciplinary data was not routinely kept until 2017 so additional discipline may have been imposed between November 1, 2015 and January 2017, but was not formally accounted for.

**number of cases that are currently pending (1,917)**. The chart below presents the status of all cases referred for formal discipline, by *incident date*, to illuminate the depth of the issue and how protracted discipline is in the cases that are still pending. While the number of pending cases that stem from incidents that occurred in 2017 or earlier (145) is relatively small, over 1,200 are two years or older and still have not reached resolution. Further, *only* 47 cases of misconduct that occurred in 2020 have been closed and none have closed for misconduct that occurred in 2021.

| Status of Cases of Disciplinary Cases & Pending Investigations by Date of Incident | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 (Jan–Jun) | | Total | |
| **Total cases** | 682 | | 472 | | 621 | | 775 | | 648 | | 227 | | 122 | | 3426 | |
| **Closed cases**[100] | 680 | 100% | 461 | 98% | 487 | 79% | 335 | 43% | 177 | 18% | 47 | 10% | 0 | 0% | **2187** | **53%** |
| **Total number of cases pending** | 2 | 0% | 11 | 2% | 132 | 21% | 447 | 57% | 781 | 82% | 422 | 90% | 122 | 100% | **1917** | **47%** |
| | | | | | | | | | | | | | | | | |
| **Pending Investigations** | 0 | | 0 | | 0 | | 0 | | 0 | | 506 | | 1,215 | | **1,721** | |

While the number of referrals to the Trials Division has likely peaked (given that most of the ID backlog has been eliminated and contemporaneous cases are being referred more quickly), it is worth noting that as of the end of the Monitoring Period, 1,721 investigations are pending with ID (most for incidents that occurred in 2021) and at least 1,194 of these cases are pending Full ID investigations. While disciplinary referrals are not expected to be made at the conclusion of every investigation, the likelihood of disciplinary charges is greater for those matters in which a Full ID investigation is being conducted, and therefore the influx of case referrals will continue.

The increasing growth of pending cases over the last three years is demonstrated in the chart below. This increase is a combination of the fact that ID's closure of its backlog resulted in referral of more cases for discipline, all UOF incidents are now investigated by ID (versus the facilities who almost never referred cases for formal discipline), and the Trials Division simply does not have enough Staff to manage the incoming case load. Since the Ninth Monitoring Period, approximately 400-500 new cases are being referred to Trials every six months.

---

[100] This captures all cases closed by the Trials Division, including those cases that did not result in a penalty (e.g., administratively filed cases and deferred prosecutions).

| Disciplinary Cases Pending *as of June 2021* | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan.-June 2018<br><br>6th MP | July-Dec. 2018<br><br>7th MP | Jan.-June 2019<br><br>8th MP | July-Dec. 2019<br><br>9th MP | Jan.-June 2020<br><br>10th MP | July-Dec. 2020<br><br>11th MP | Jan.-June 2021<br><br>12th MP |
| **Pending Cases** | 146 | 172 | 407 | 633 | 1,050 | 1,445 | 1,917 |

*Discipline Imposed*: The Department has resolved more cases via NPAs in this Monitoring Period compared with the last two (n=188 versus 160 and 166). While it is certainly an improvement that more cases were resolved via NPA in this Monitoring Period, the Trials Division cannot keep pace with the number of pending cases.

| Discipline Imposed by Date of Ultimate Case Closure | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Date of Formal Closure** | **2017** | | **2018** | | **2019** | | **2020** | | **Jan. to June 2021** |
| **Total** | **489** | | **514** | | **267** | | **383** | | *206* |
| NPA | 397 | 81% | 484 | 94% | 219 | 82% | 326 | 85% | *188* | *91%* |
| Termination | 0 | 0% | 0 | 0% | 1 | 0% | 2 | 1% | *1* | *0%* |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 4 | 1% | *1* | *0%* |
| | | | | | | | | | | |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 31 | 8% | *7* | *3%* |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 16 | 4% | *9* | *4%* |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | *0* | *0%* |

For the 188 NPAs that were imposed in 2021, 30 (16%) addressed misconduct from 2020, 52 (28%) addressed misconduct from 2019, 69 (37%) addressed misconduct from 2018, 36 (19%) from 2017 and 1 case from 2016. As of the end of this Monitoring Period, 88% of cases were closed more than one year after the incident occurred, and 46% were closed more than two years after the incident occurred (in the previous report, 87% were closed more than one year after the incident date and 44% were closed more than two years after the incident date). Similarly with pending cases, 84% are already one year out from the incident date and 51% are already two years out from the incident date (this was 85% and 49% respectively at the end of the Eleventh Monitoring Period).

| Time Between Incident Date and Case Closure or Pending as of June 30, 2021 | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Discipline | | Pending Discipline | | Total | |
| 0 to 1 year from incident date | 263 | 12% | 300 | 16% | 563 | 14% |
| 1 to 2 years from incident date | 911 | 42% | 635 | 33% | 1546 | 38% |
| 2 to 3 years from incident date | 663 | 30% | 668 | 35% | 1331 | 32% |
| More than 3 years from incident date | 350 | 16% | 314 | 16% | 664 | 16% |
| | **2,187** | | **1,917** | | **4,104** | |

_Conclusion_: The Department is in crisis. A crucial foundation for effective leadership is adequate supervision and accountability. At the moment, both are severely lacking. Accountability is a critical component to addressing the culture of violence within the jails and the current backlog permits Staff to act with impunity.

| COMPLIANCE RATING | ¶ **1.** Non-Compliance |
| --- | --- |

---

### REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY) ¶ 1
### VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2(e)
### (TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)

These provisions together require the Department to use immediate corrective action. Immediate corrective action (suspension, re-assignment, counseling, or re-training) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold Staff to a common standard for utilizing force, particularly when deviations from that standard are immediately obvious upon the incident's review. Command Disciplines also occur close-in-time to the incident, and result in either days deducted, corrective interviews, or reprimands. Rapid Reviews, _ad hoc_ reviews by uniform or civilian leadership through routine assessment of incidents, and Intake Investigations all identify misconduct for immediate corrective action.[101] The Department utilized the following immediate corrective actions during this Monitoring Period:

| Immediate Corrective Action Imposed Twelfth Monitoring Period Incidents | |
| --- | --- |
| **Type of Corrective Action by Staff Member** | **Number** |
| Suspension | 52 |
| Non-Inmate Contact Post or Modified Duty | 3 |
| Counseling and Corrective Interviews | 1,503 |
| CD – Reprimand | 141 |
| CDs (resulting in 1-5 days deducted) | 435 |
| Re-Training | 157 |

---

[101] The Immediate Action Committee, as described in prior Monitor's Reports, has not convened since January 2020. The Department considered re-instating the committee early in the Twelfth Monitoring Period, however it was determined, through consultation with the Monitoring Team, that the Department's current processes are sufficient to identify and implement immediate corrective action and therefore there is no need for a specialized committee to address this issue.

The Department's continued use of suspensions is noteworthy—there were 52 suspensions for UOF-misconduct in this Monitoring Period. This is similar to the amount used in the 10th and 11th Monitoring Period and surpasses the total number of suspensions utilized in 2019 (n=47). While this increased use of suspensions is promising, the Department still does not consistently identify all cases that would merit immediate corrective action, including some as discussed regarding § C. ¶ 2 below. While there has been some improvement in this area, overall, the Monitoring Team continues to find that the Department does not consistently or reliably identify and immediately address: (1) all blatant use of force-related violations with suspensions (when warranted), (2) a broader set of other blatant violations that warrant suspension—including (a) serious unprofessional conduct (*e.g.* use of racial slurs during an incident) and (b) serious security breaches due to Staff failures (*e.g.* Staff being off-post resulting in large group disturbances ultimately necessitating use of force).

| **COMPLIANCE RATING** | **¶ 2(e).** Partial Compliance<br>**§ C., ¶ 1.** Partial Compliance |
|---|---|

## REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS)

This provision requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Monitoring Team is judicious in the recommendations that it makes to identify only those cases where immediate action should be considered *and* the incident is not yet too stale for such immediate action to be taken. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a recommendation is not shared because the opportunity for immediate action has passed. The recommendations shared are therefore only a subset of cases where immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to support the Department's ability to consistently and reliably identify these cases close in time.

In this Monitoring Period, the Monitoring Team made a total of 21 recommendations. Of these recommendations, 11 were recommendations to take immediate action, and 10 were recommendations to either expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Department reasonably responded to all 21 recommendations. The Department either adopted the recommendation, provided a reasonable alternative (*e.g.,* ID elected to prioritize an investigation for discipline instead of imposing immediate action since the time between the incident and the recommendation was protracted), or provided a satisfactory explanation about why it would not be appropriate to adopt the recommendation (*e.g.,* ID provided additional information about an incident which obviated the need

to implement the recommendation). In the cases where the Department agreed to complete the investigations of certain incidents more quickly or to pursue discipline faster, the investigations and service of charges were generally completed more quickly than they would under normal circumstances, but the process to complete the investigation and/or impose discipline is still protracted as described throughout this report. The Department's response to the Monitoring Team's recommendations were provided in an average of 12 business days.

| **COMPLIANCE RATING** | **§ C., ¶ 2.** Partial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 2 (NEW DISCIPLINARY GUIDELINES)

This provision requires the Department to develop and implement functional, comprehensive, and standardized disciplinary guidelines designed to impose appropriate and meaningful discipline for Use of Force Violations (the "Disciplinary Guidelines"). The Monitoring Team assesses the Department's efforts to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2) and to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) together because they are interrelated (the compliance rating for ¶ 5 will be noted in the discussion of ¶ 5 below). The Monitoring Team's analysis of compliance necessarily requires an assessment of: (1) the Department's use of a disciplinary continuum; (2) an assessment of the sanctions imposed; and (3) those cases in which the Department ultimately elects that discipline should not be imposed despite an initial referral.

This assessment will be focused on the imposition of discipline for tenured Staff because the Department only sought and imposed discipline for two probationary Staff in this Monitoring Period. It is also important to note that while the Monitoring Team evaluates the sanctions imposed in this section, the time it takes to impose discipline is inherently intertwined with the ultimate disposition. The significant delays in imposing discipline has a direct impact on the meaningfulness of the discipline imposed and, until the processing of discipline is improved, the ability to impose meaningful discipline is severely compromised, irrespective of the actual sanction imposed.

_Disciplinary Continuum_: It is critical for the Department to have a continuum of discipline so that it can impose progressive discipline (as appropriate) and because the severity of misconduct varies. As demonstrated in the chart below, the Department imposes a broad spectrum of sanctions from Command Disciplines with a specified number of days (up to five days)[102] to more severe sanctions. In this Monitoring Period, 12% of the discipline imposed via NPA was for a sanction of 1 to 5 days, 50% of the discipline imposed was for a sanction of 6 to 30 days and the final 30% of discipline imposed

---

[102] Trials no longer settles a case for undetermined number of Command Discipline days, which would require a hearing at the facility for the reasons discussed in the Seventh Monitor's Report at pgs. 42-44.

was for a sanction of 30 days or more. Overall, the array of discipline imposed is consistent with the range of misconduct identified by the Monitoring Team.

| Penalty Imposed by NPA by Date of Ultimate Case Closure (Covering Incidents that occurred between 2011 and September, 2020) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | | | | | | | | | | |
| | 2017 | | 2018 | | 2019 | | 2020 | | Jan. to June 2021 | |
| Total | 397 | | 484 | | 219 | | 324 | | 187 | |
| Refer for Command Discipline[103] | 71 | 18% | 67 | 14% | 2 | 1% | 1 | 0% | 2 | 1% |
| 1-5 days | 32 | 8% | 147 | 30% | 53 | 24% | 80 | 25% | 22 | 12% |
| 6-10 days | 30 | 8% | 68 | 14% | 26 | 12% | 49 | 15% | 35 | 19% |
| 11-20 days | 86 | 22% | 80 | 17% | 59 | 27% | 70 | 22% | 29 | 16% |
| 21-30 days | 68 | 17% | 55 | 11% | 26 | 12% | 32 | 10% | 29 | 16% |
| 31-40 days | 15 | 4% | 18 | 4% | 18 | 8% | 30 | 9% | 20 | 11% |
| 41-50 days | 29 | 7% | 30 | 6% | 3 | 1% | 24 | 7% | 17 | 9% |
| 51+ days | 54 | 14% | 14 | 3% | 25 | 11% | 29 | 9% | 19 | 10% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 14 | 7% |

Certain misconduct requires more severe discipline including relinquishing a significant number of days, demotion, resignation, or termination, which is imposed by either Trials or via PDR. Since the Effective Date (see chart below), 432 cases had significant discipline imposed. Significant discipline is defined as NPAs for 30 compensatory days or more,[104] NPAs for irrevocable retirement/ resignation, or termination. Since 2017, a total of 324 NPAs have been issued for a loss of compensatory days of 30 days or more, 11 *probationary* supervisors have been demoted, and 97 Staff were separated (terminated, resigned or retired) from the Department for use of force related violations that occurred after November 1, 2015. Of these, 56 *probationary* Correction Officers have been terminated as a result of UOF-related misconduct and 41 *tenured* Staff have separated from the Department as a result of UOF-related misconduct (either via termination or irrevocable resignation/retirement[105]).

---

[103] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the Staff Member's record for one year instead of five years).

[104] The maximum penalty that can be imposed by law via the OATH process is 60 days. Accordingly, the Monitoring Team considers imposition of discipline for 30 days or more to be a "significant penalty."

[105] The Department reports that Staff facing significant discipline and/or the likelihood of termination sometimes choose to resign or retire rather than risk being terminated. In these cases, the Department may elect to "settle" the case with the Staff Member for irrevocable retirement or resignation. The Monitoring Team considers these cases as essentially the same as those resulting in termination because they have the same effect of permanently separating the Staff Member from the Department.

| Significant Discipline Imposed for Misconduct Related to UOF Incidents that Occurred *Post November 1, 2015* | | | | | |
|---|---|---|---|---|---|
| **Date Discipline Imposed** | **2017** | **2018** | **2019** | **2020** | ***Jan. to June 2021*** |
| **30 to 39 Days** | 11 | 38 | 20 | 35 | *22* |
| **40 to 49 Days** | 11 | 20 | 3 | 17 | *22* |
| **50 to 59 Days** | 4 | 4 | 17 | 17 | *5* |
| **60 Days** | 11 | 6 | 11 | 27 | *11* |
| **61 days or more** | 3 | 0 | 0 | 1 | *8* |
| **Irrevocable Retirement or Resignation** | 5 | 2 | 6 | 9 | *14* |
| **Termination of Tenured Staff** | 0 | 1 | 0 | 2 | *2* |
| **Demotion of Tenured Staff** | 0 | 0 | 0 | 0 | *0* |
| **Termination of Probationary Staff** | 6 | 16 | 18 | 14 | *2* |
| **Demotion of Probationary Supervisors** | 1 | 5 | 4 | 1 | *0* |
| | **52** | **92** | **79** | **123** | **86** |

_The Department's Efforts to Act in Accordance with the Disciplinary Guidelines_: The Disciplinary Guidelines were adopted on October 27, 2017 and address the requirements of the Consent Judgment. Only violations that occurred after this date are subject to the Disciplinary Guideline requirements. As of the end of the Monitoring Period, a total of about 3,450 cases involving tenured Staff have been submitted to Trials for incidents that occurred after November 1, 2015 (the Effective Date of the Consent Judgment).[106]  2,470 of these 3,450 cases _occurred_ after October 27, 2017[107] and therefore discipline imposed for these incidents is governed by the Disciplinary Guidelines. The Department has resolved a total of 645 (26%) of the 2,470 cases governed by the Disciplinary Guidelines – 566 (88%) were resolved with an NPA, five cases closed following a guilty finding at OATH (1%) and 74 were administratively filed or resulted in deferred prosecutions (11%).

In this Monitoring Period, 185 cases closed related to misconduct that _occurred after_ October 27, 2017. The status of closed cases that occurred after October 27, 2017 are demonstrated in the chart below.

---

[106] The Monitoring Team notes that the Department's record keeping of formal discipline was not recorded reliably during the first year and a half of the Consent Judgment. Accordingly, this data does not accurately reflect all cases closed by Trials during the pendency of the Consent Judgment. That said, the Monitoring Team believes that this data reflects the vast majority of formal discipline imposed for incidents that occurred since November 2015.

[107] As of the end of the Monitoring Period, the most recent incident pending with Trials occurred on May 28, 2020.

| Trials Closure of *Post*-Disciplinary Guidelines Cases *Only* (post October 27, 2017) by Monitoring Period | | | | |
|---|---|---|---|---|
| | NPA | OATH | Admin. Filed or Deferred Prosecution | Total |
| Closed between Jan. to June 2020 (10th Monitoring Period) | 127 | 0 | 22 | 149 |
| Closed between July to Dec. 2020 (11th Monitoring Period) | 143 | 3 | 16 | 162 |
| Closed between Jan. to June 2021 (Closed in the 12th Monitoring Period) | 168 | 1 | 16 | 185 |

In terms of evaluating the Department's overall efforts to impose appropriate discipline and that it is consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the specific facts of the case (including the aggravating and mitigating factors, the Staff's prior history, and other circumstances as appropriate), (2) the time taken to impose discipline (discussed throughout the report), and (3) the proportionality of the sanctions imposed. The Monitoring Team assessed 74[108] of the 185 total cases closed *with discipline* in this Monitoring Period *and the incident occurred after October 27, 2017* to determine whether the discipline imposed was reasonable and appeared consistent with the Disciplinary Guidelines (note, additional cases were closed in this Monitoring Period that occurred prior to October 27, 2017, but were not considered as part of this assessment).

The Monitoring Team's evaluation of the specific sanctions were generally reasonable. A small proportion of cases closed with questionable outcomes, which is not to say that they were blatantly disproportional, but rather that a more severe penalty *may* have been appropriate. Finally, a few isolated cases appeared to have an unreasonable outcome (meaning, not at all proportional to the severity of the misconduct).

The Monitoring Team also evaluates cases referred for discipline to ascertain whether termination may be appropriate. While the number of cases that may merit such a sanction is relatively low, it is critical for the Department to exercise this option when necessitated by the facts, to ensure that the disciplinary continuum is functional and robust. For the Department to terminate a *tenured* Staff Member, they must be afforded due process. Accordingly, the Department must generally conduct a trial in any case in which it seeks to terminate the *tenured* Staff Member. The Staff Member may then only be terminated if the Administrative Law Judge ("ALJ") recommends termination following the trial (and it is accepted by the Commissioner), or a Staff Member can be terminated through an Action of the Commissioner following the completion of the OATH trial.[109]

---

[108] The Monitoring Team also reviewed a small sample of cases where the incident occurred prior to October 27, 2017.

[109] The Staff member can appeal a decision of termination.

Under the Consent Judgment, the Department must *seek* termination of any Staff that meet the criteria of the *mandatory termination* provisions (¶ 2(d)(i) to (iv)). The number of cases that may meet this particular standard remain low and none were identified in this Monitoring Period. However, it is important to note, the Department is not limited to seeking termination on the cases that meet the standards enumerated in ¶ 2(d)(i) to (iii). There certainly are additional cases where a significant penalty, demotion, irrevocable retirement/resignation, or termination could appropriately be sought given the level and/or pattern of misconduct and for the Department to meet its commitment of a zero-tolerance policy for excessive and unnecessary force.[110]  In this Monitoring Period, the Department conducted three trials before OATH in which they sought termination of the Staff Member. The ALJ subsequently recommended termination in two cases and a penalty of 60 days in the other case (the Commissioner then utilized an "Action of the Commissioner" and elected to terminate this Staff Member). The Department's decision to seek and ultimately terminate all three Staff Members following the trial at OATH was reasonable.

*Discipline Not Imposed*: Certain cases referred for discipline may not ultimately result in a sanction imposed either because the Staff member leaves before the prosecution is compete or because the charges are dismissed. This is a relatively infrequent occurrence as discussed below.

- <u>Deferred Prosecution</u>: In this Monitoring Period, nine cases resulted in deferred prosecutions. These are cases in which the Staff chose to leave the Department *with charges pending* and before the case is resolved. Such cases are deferred for prosecution because no final determination has been rendered. If the Staff Member should return to DOC, then the Department would proceed with prosecuting the case.

- <u>Administratively Filed Cases</u>: In this Monitoring Period, only 7 of the 206 cases closed in this Monitoring Period were administratively filed because the Trials Division determined that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a Staff Member resigns before charges are served). In other words, these cases are dismissed. All such cases are reviewed and approved by the Deputy General Counsel of Trials and then by the Deputy Commissioner of ID & Trials before they are closed. The Monitoring Team has consistently found that most cases dismissed via administrative filing have an objectively reasonable basis and the Department has therefore maintained Substantial Compliance with this requirement (as noted in § VIII., ¶ 3(c) below).

*Conclusion*: The Department has a system in place to discipline both *probationary* and *tenured* Staff that addresses identified misconduct on a continuum depending on the severity of the violation.

---

[110] *See* § IV. (Use of Force Policy), ¶3(a)(iii) of the Consent Judgment.

Further, the number of cases in which discipline is ultimately *not* imposed (*e.g.,* Deferred Prosecution and Administrative Filing) remains low. For the most part, the discipline imposed via Trials is reasonable and proportional to the misconduct identified, and the Monitoring Team has identified only isolated cases where discipline was not proportional. However, the backlog of cases (within both ID and now Trials) continues to impact the ability to timely address misconduct and therefore undermines the meaningfulness of the discipline and creates a dynamic in which Staff believe they can act with impunity.

| COMPLIANCE RATING | ¶ 2. (a) to (d) (Develop Guidelines) – Substantial Compliance<br>¶ 2. (a) to (d) (Act in Accordance with the Guidelines)<br><ul><li>*Probationary Staff* – Partial Compliance</li><li>*Tenured Staff* – Partial Compliance</li></ul> |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (USE OF FORCE VIOLATIONS) REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 3

These provisions require the Department to expeditiously prosecute cases of UOF related misconduct and includes a number of specific requirements related to the management of the Trials Division to achieve that goal. The process to impose discipline was outlined in the Second Remedial Order Report at pgs. 6-8.

*ID Referrals* (§ VIII., ¶ 3(a)): The Consent Judgment requires the Deputy Commissioner of ID & Trials or the Assistant Commissioner of ID to approve any investigations that recommends charges or PDRs within 30 days of the investigation's completion date. ID leadership generally approve charges or PDRs in a timely manner following the close of the investigation. Investigations conducted by the Intake Squad allow incidents to get to the Trials Division quicker. The Intake Squad closed 54 investigations with charges during this Monitoring Period. All but a handful (eight) of these cases were closed and approved with charges in less than 30 business days from the incident date, and therefore well within 30 days of the investigation's completion date.

*Facility Referral of MOC to Trials* (§ VIII., ¶ 3(b)): This provision is not applicable because all investigations are completed by ID, therefore this requirement is no longer necessary and will not be subject to active monitoring.

*Trials* (§ VIII., ¶ 3(c) & § C., ¶ 3)

**Expeditious Prosecution of Disciplinary Cases:** Assessing the expediency of prosecutions requires several processes to be reviewed. This includes: (1) the approval of MOCs, (2) timely service of charges and discovery, (3) whether Trials has sufficient expertise to prosecute cases, (4) whether there are sufficient conferences available should an OATH proceeding be required (discussed in § C., ¶ 4

below), (5) whether the Trials Division has options (beyond conducting a trial) to resolve cases timely, and (6) when cases are closed, whether they are ultimately approved efficiently (discussed below and also in § VIII., ¶ 5 below). Given that the imposition of discipline is not limited to processes *within* the Department, the numerous stakeholders, including the respondent, their counsel, and OATH, must also be coordinated with as part of the overall effort to impose discipline.

**Approval of MOCs:** The first step to impose discipline is the approval of the MOC. The MOC is drafted in CMS by the ID Division, is submitted to the Chief of Administration's ("COA") office for approval and is then referred to the Trials Division. In this Monitoring Period, the Monitoring Team analyzed a sample of 156 MOCs that were approved between May and June, 2021. The majority were pending with the COA's office for 20 days or less and all but a few were approved within 51 days of being drafted by either the facility or ID. While the time to approve an MOC has increased, there is not yet reason for concern. However, given the number of challenges facing the Department in this Monitoring Period, the delays in approving MOCs are yet another example of the impact of the backlog on the routine operations of the agency.

**Service of Charges:** Since January 2017, the Trials Division has maintained a consistent, reliable, and sustainable process to serve charges within 30 days of either receiving the MOC or when the Trials attorney drafted the charges, as required. Trials has continued to ably manage the service of charges despite the significant increase in the number of cases referred to the Trial Division. In this Monitoring Period, Trials served 580 charges, which is the highest number of charges served to date (524 were served in the 11th Monitoring Period and 534 in the 10th Monitoring Period). Of the charges served in this Monitoring Period, 93% were served within 30 days of either receipt of the MOC or when the Trials attorney drafted the charge.[111]

**Service of Discovery (§ C., ¶ 3(i)):** Of the 1,917 pending cases with Trials at the end of the Monitoring Period, 1,319 (69%) have had discovery served. The Department served discovery in 516 cases this Monitoring Period (on par with the 511 cases with discovery served in the previous Monitoring Period). Of the 516 cases in which discovery was served in this Monitoring Period, 1% of cases discovery was served before charges were served, in 51% of cases discovery was served within 45 days of charges being served and in 48% of cases discovery was served more than 45 days after charges were served.

**Expert Witnesses and Consultation (§ C., ¶ 3(ii)):** Early in this Monitoring Period, the Trials Division engaged as an expert a retired Deputy Warden for one trial and a Captain from the Chief's

---

[111] 347 charges were served within 30 days of receipt of the MOC. 193 charges were served within 30 days of the charges being drafted. In these cases, generally the MOC was received after the charges were served, but the charges were served before the MOC was received to preserve the statute of limitations.

Office in another trial. Trials also consulted with this retired Deputy Warden (DW) on cases prior to trial, however the DW's experience was somewhat limited because the DW retired before the New UOF Directive was implemented. The Trials Division has found that the need for an expert at trial is limited. When needed, some ID investigators have been "qualified" as an expert by the ALJ. In one or two cases, the ID investigator put forth as an expert was not qualified by the ALJ, however, this ultimately did not impact the Department's case or the outcome of the matter.

**Criteria to prioritize and expedite the resolution of certain disciplinary cases (§ C., ¶ 3(iii)) & Initiatives to achieve a prompt agreed-upon resolution of disciplinary cases when appropriate (§ C., ¶ 3(iv)):** As part of its effort to expedite closure, and encourage settlements of cases, the Trials Division has attempted to address certain lower-level misconduct using a Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to five compensatory days) or offering that the imposed discipline (generally between five and 20 days) will only remain on the Staff Member's record for one year[112] instead of five years.[113] These two options are reasonable given that the range of misconduct that is now directed through Trials varies in its severity (compared with historical practice in which ID was only investigating the most egregious cases and so only cases with egregious misconduct were referred to the Trials Division). During this Monitoring Period, counsel representing the Correction Officers generally refused to settle cases outside of the OATH process as discussed in the Eleventh Monitor's Report at pg. 245-246.[114]   Therefore, the Trials Division, in consultation with the Monitoring Team, is working on the selection of cases for prioritization. This work necessarily requires consideration of the length of time a case has been pending, the severity of the misconduct, the extent to which the Staff Member has other pending matters[115] and/or if the incident involved other Staff Members who have been charged with misconduct,[116] and the Staff member's role in the incident.

---

[112] The case will not be removed from the Staff Member's file if during this one-year period, the Staff Member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[113] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the Staff Member's first offense.

[114] As discussed in the Monitoring Team's September 30, 2021 Status Report to the Court (dkt. entry 399), there has been some progress in this area following the close of the Monitoring Period and some cases are now settling without the need for an OATH Pre-Trial Conference.

[115] For Staff with multiple pending UOF related matters, in some cases settling these matters piecemeal may not be an option either because the Trials Division believes strategically that these matters must all be addressed together, or the Staff Member refuses to settle cases individually.

[116] For an incident that may involve multiple other Staff Members, a holistic review of the matter may be needed and individual resolutions cannot always be achieved until the case is evaluated as a whole.

**Approval of Trials Closing Memos:** In the Twelfth Monitoring Period, 254 closing memos were submitted and approved by the Deputy General Counsel for Trials (378 were submitted in all of 2020), as outlined in the chart below. This demonstrates progress as the number submitted in this six-month period is a 27% increase of the closing memos submitted in *all of 2019* (n=200)). At this rate, the Trials Division is on track to close significantly more cases in 2021 than it closed in 2019 or 2020. Approximately 60% of all closing memos were completed within 30 days of the agreed upon resolution with the Staff Member, which is a slight decline from 2019 and 2020 (69% and 66% respectively).

| Time for Final Approval of NPA & OATH Decision Deputy General Counsel ("DGC") sign-off after NPA Execution (closing memo and NPA execution date) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date DGC signed off (trials closing memo date) | **2017** | | **2018** | | **2019** | | **2020** | | **Jan. to June 2021** | |
| **Total Cases Approved** | 388 | | 483 | | 200 | | 378 | | 254 | |
| *Signed before NPA was executed* | 1 | 0% | 4 | 1% | 0 | 0% | 2 | 0% | 2 | 1% |
| *0 to 30 days* | 323 | 83% | 402 | 83% | 138 | 69% | 248 | 74% | 152 | 60% |
| *31 to 60 days* | 35 | 9% | 59 | 12% | 42 | 21% | 53 | 17% | 47 | 19% |
| *More than 60 days* | 27 | 7% | 18 | 4% | 20 | 10% | 32 | 8% | 32 | 13% |
| *Time Unknown* | 3 | 1% | 4 | 1% | 0 | 0% | 45 | 1% | 23 | 9% |

**Cases Closed:** Most discipline is imposed via an NPA, which reinforces the need for multiple, efficient options to settle matters. Trials closed more cases this Monitoring Period than the previous two Monitoring Periods (12th Monitoring Period, n=206; 11th Monitoring Period, n=188, 10th Monitoring Period, n=195). However, this is not as many that were closed in the Monitoring Periods prior to 2019. It is encouraging to see this increase given the immense backlog of cases, however a greater pace is required to keep pace with the influx of backlog cases.

**Timeframes to Close Cases:** The Trials Division must coordinate with multiple stakeholders to resolve a case, including the respondent (and their counsel) as well as OATH (to the extent a Pre-Trial Conference or trial is needed). This assessment (and the chart below) is limited to the time it takes for a case to be processed within Trials *after* the investigation has closed and the matter has been referred to the Trials Division.

While the number of cases closed by the Trials Division in the Twelfth Monitoring Period was almost as many as the entire year prior, the length of time it took for the Trials Division to close those cases has increased. Almost half the cases closed (n=120) in this Monitoring Period took a year or more to complete after being referred compared with 2018 in which almost half of the cases referred (n=282) were closed within three months of referral. In this Monitoring Period, only 13 (5%) of cases were completed within three months of referral. This of course is not surprising given that the Trials

Division has significantly more work to do, but the increased time it takes to close cases is of great concern.

| Cases Closed by Trials by Year (Time between MOC received date or Service of Charges and Signed Closing Memo Date) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closing Memos completed | 2017 | | 2018[117] | | 2019[118] | | 2020 | | Twelfth Monitoring Period | |
| Total | 492 | | 521 | | 271 | | 380 | | 256 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 72 | 19% | 13 | 5% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 36 | 14% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 119 | 31% | 87 | 34% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 26% | 97 | 38% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 17 | 7% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 2 | 1% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 10 | 3% | 4 | 2% |

**Timeframes of Pending Cases:** As noted throughout this report, the number of pending cases in Trials continues to balloon at an alarming rate, increasing 189%—to 1,917—from 663 at the end of 2019. The time cases are pending is also increasing with almost 40% of cases pending within the Trials Division for over a year.

| Cases pending with Trials at the end of the Monitoring Periods | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 9th MP | | Jan. to June, 2020 10th MP | | July to Dec., 2020 11th MP | | Jan. to June, 2021 12th MP | |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% |
| *Pending Final Approvals by DC of ID and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% |
| **Total** | **663** | | **1,050** | | **1,445** | | **1,917** | |

---

[117] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[118] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

*Conclusion*

In summary, the following formal discipline was managed in this Monitoring Period.

- o **Charges**: 606 charges were served – more than any other Monitoring Period.

- o **Discovery**: Trials served discovery in over 500 cases.

- o **Pre-Trial Conferences**: Trials attorneys convened **541** OATH pre-trial conferences (discussed in more detail in § C., ¶ 4 below) for disciplinary cases involving charges related to UOF Violations, the most in any Monitoring Period and a 79% increase from the prior Monitoring Period.

- o **Trials**: Trials attorneys conducted 29 days of virtual trials before OATH for UOF Violations (discussed in more detail in § C., ¶ 5 below).

- o **Closing Memos**: Trials completed **256** closing memos during this Monitoring Period.
- o **Case Management**: The caseload has ballooned – there are over **1,900** pending cases and the time to close cases is continuing to increase.

It is clear that the Trials Division Staff is working harder and more efficiently than ever before. That said, it is just simply not enough to keep pace with the influx of cases and expeditiously prosecute cases as required. The Trials Division needs additional support and resources (discussed in more detail in ¶ 4 below) in order to achieve compliance with this provision.

| **COMPLIANCE RATING** | **§ VIII., ¶ 3(a)**. Partial Compliance<br>**§ VIII., ¶ 3(b)**. Not applicable<br>**§ VIII., ¶ 3(c)**.<br>   • Substantial Compliance (Charges)<br>   • Substantial Compliance (Administratively Filed)<br>   • Non-Compliance (Expeditiously Prosecuting Cases)<br>**§ C., ¶ 3**. Non-Compliance |
|---|---|

**REMEDIAL ORDER § C. (EXPEDITIOUS OATH PROCEEDINGS & APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶¶ 4, 5**

*OATH Pre-Trial Conferences* (§ C., ¶ 4): This provision requires all UOF violation cases before OATH to proceed in an expeditious manner. Further, every month, there shall be at least 50 pre-trial conferences before OATH involving charges related to UOF Violations. A total of more than 1,000 OATH Pre-Trial conferences occurred between July 1, 2020 and September 30, 2021. The City, OATH and the Department have exceeded convening the required number of Pre-Trial Conferences to occur at OATH each month (50 each month) as demonstrated in the chart below.

| Pre-Trial Conferences related to UOF Violations July 2020 to September 2021 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Total Pre-Trial Conferences** | | **Results of Pre-Trial Conferences for UOF Cases** | | | | | | | **UOF Matters & Staff** | |
| Required | Took Place | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | Unique UOF incidents | Staff Members |
| **July to December 2020 (Eleventh Monitoring Period)** | | | | | | | | | | |
| **225**[119] | 303 | *0* | *111* | *10* | *44* | *124* | *12* | *2* | **274** | **198** |
| | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| **January to June 2021 (Twelfth Monitoring Period)** | | | | | | | | | | |
| **300** | 541 | *0* | *282* | *4* | *85* | *136* | *33* | *1* | **367** | **331** |
| | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| **July to September 2021 (*half of the* Thirteenth Monitoring Period)** | | | | | | | | | | |
| **150** | 162 | 56 | 64 | 1 | 3 | 20 | 17 | 1 | **120** | **124** |
| | 100% | 35% | 40% | 1% | 2% | 12% | 10% | 1% | | |

As discussed in the Eleventh Monitor's Report, the demand for OATH Pre-Trial conference has increased due to both the large number of pending cases and the stated preference by counsel for correction officers (who have the majority of pending cases) that they would not negotiate settlements of matters without a Pre-Trial Conference. Further, the scheduling of subsequent proceedings following the initial Pre-Trial Conference is inefficient and convoluted and needs improvement as discussed in the Eleventh Report and Second Remedial Order Report. There have been some signs of progress in the efficacy and efficiency of OATH proceedings, especially since July 2021 with a higher percentage of cases settling (75% of cases settled after the conference) and a fewer proportion of cases are referred for trial (12% in July to September 2021 compared with 41% in July to December 2020). While the requirement to convene 50 Pre-Trial Conferences has been met, the disciplinary cases before OATH involving charges related to UOF violations cannot proceed in an expeditious manner because there are not enough Pre-Trial Conferences each month to keep pace with the sheer volume of cases pending. Accordingly, the Monitoring Team has recommended that the number of Pre-Trial Conferences for UOF violations every month must be increased.

*OATH Proceedings* (§ C., ¶ 5): This provision reaffirms the applicability of the Disciplinary Guidelines to OATH proceedings. In this Monitoring Period, the Monitoring Team has observed that OATH proceedings and Report and Recommendations issued following a trial have evaluated and considered the Disciplinary Guidelines in reaching their recommendations. A summary of the status of the UOF related Trials in this Monitoring Period was included in the Monitoring Team's September 30, 2021 Status Report and is incorporated by reference in these findings here.

*Communication to OATH ALJ's* (§ C., ¶ 5(i)): This provision requires the City to advise all OATH Administrative Law Judges who handle proceedings relating to UOF Violations of the requirements of

---

[119] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Eleventh Monitoring Period.

§ C., ¶ 5(i). The City has prepared quarterly letters, in consultation with the Monitoring Team, and sent them to all of the ALJs at OATH.

| **COMPLIANCE RATING** | **§ C., ¶ 4.** Partial Compliance<br>**§ C., ¶ 5.** Partial Compliance<br>**§ C., ¶ 5(i).** Substantial Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 4 (TRIALS DIVISION STAFFING)

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. As demonstrated above, there is simply an insufficient number of staff assigned to the Trials Division. As of the end of the Monitoring Period, Trials' staffing complement included one Deputy General Counsel, one Executive Director, two Directors, 15 attorneys, three interns, one investigator, and 12 support staff. The number of staff in the division has remained essentially the same over the last three years, despite the significant increased number of cases and significant pressure from the Monitoring Team that additional staffing was needed to manage the workload. The City and Department have repeatedly reported that efforts were being made to obtain additional staffing for the Trials Division, most recently in spring of this year, the City and Department reported that hiring for the Trials Division was a priority.[120]   As of the filing of this report, there has been no net increase in the number of Trials Division staff. Accordingly, despite the assurances from the City and the Department, they have simply failed to make any progress towards obtaining the staff necessary and the Trials Division has insufficient staff to expeditiously prosecute cases.

| **COMPLIANCE RATING** | **¶ 4.** Non-Compliance |
|---|---|

## VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 5 (NPAS)

This assessment of compliance is limited to the second sentence of this provision that requires all NPAs to be approved by the DOC General Counsel (or their designee) and the Commissioner. The Monitoring Team assesses the Department's efforts to "negotiate plea dispositions and make recommendations to OATH judges consistent with the Disciplinary Guidelines" (the first sentence of ¶ 5) and to "act in accordance with the Disciplinary Guidelines" (the last sentence of ¶ 2 of this section) together in the ¶ 2 box above. The Department has maintained a process in which all negotiated pleas are approved by both the Deputy Commissioner of ID & Trials and then the Commissioner. The review process by both the Deputy Commissioner of ID & Trials and the Commissioner took longer on

---

[120] *See* Second Remedial Order Report (dkt. entry 373) at pgs. 9 to 10.

average than in previous Monitoring Periods, at least some of which is due to the leadership transition towards the end of the Monitoring Period. In this Monitoring Period, the Deputy Commissioner of ID & Trials approved 252 cases in an average of 32 days from submission of the case from the Trials Division. The Commissioner approved 197 cases in an average of 42 days from submission by the Trials Division. This is an increase from the last Monitoring Period in which it took an average of 26 days to obtain the final approval by the Commissioner.

| **COMPLIANCE RATING** | **¶ 5. Disposition of NPAs and Recommendations to OATH Judges:** Partial Compliance |
| | **¶ 5. Approval of NPAs:** Substantial Compliance |

9. **SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)**

This section of the Consent Judgment addresses requirements for screening Staff prior to promotion (¶¶ 1 to 3) and the new modified requirement to screen Staff after being disciplined (¶ 6).

| **XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS)** |
| :--- |

The Department promoted three Staff (one Warden and two Chiefs) in this Monitoring Period. The chart below identifies the Staff that have been screened and promoted, and to which ranks, between January 2017 and June 2021. The promotions process is depicted in *Appendix D: Flowchart of Promotions Process*.

| | **Overview of Staff Promotions** | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan. to June 2017** | **July to Dec. 2017** | **Jan. to June 2018[121]** | **July to Dec. 2018[122]** | **Jan. to June 2019** | **July to Dec. 2019** | **Jan. to June 2020** | **July to Dec. 2020** | **Jan. to June 2021** | **Total** |
| **Captains** | 79 | 102 | 0 | 97 | 0 | 0 | 0 | 0 | 0 | **278** |
| **ADWs** | 0 | 4 | 13 | 0 | 3 | 0 | 10 | 25 | 0 | **55** |
| **DW** | 0 | 5 | 1 | 2 | 8 | 0 | 0 | 0 | 0 | **16** |
| **Wardens** | 2 | 0 | 2 | 3 | 1 | 0 | 2 | 0 | 1 | **11** |
| **Chiefs** | 2 | 1 | 1 | 1 | 2 | 1 | 0 | 0 | 2 | **10** |

The Monitoring Team found that the Staff promoted in this Monitoring Period were screened according to policy and the promotion of these three Staff did not raise any concerns. To verify the Department screened and promoted Staff in accordance with required criteria, the Monitoring Team

---

[121] The number of Wardens promoted in January to June 2018 was previously incorrectly reported as 3.
[122] The number of Wardens promoted in January to June 2018 was previously incorrectly reported as 4.

reviewed each person's screening packet to assess whether they met the requirements of ¶¶ 1, 2, 3. The Department's screening for promotions of the three Staff satisfied the requirements of the "Review" as defined by ¶ 1. The Staff who were promoted in this Monitoring Period had not been found guilty or pled guilty to the specified violations two or more times in the past five years and therefore were not barred from promotion under ¶ 2. Finally, the Staff who were promoted did not have any pending disciplinary charges at the time of promotion and therefore were not barred from promotion under ¶ 3.

In the Eleventh Report, the Monitoring Team highlighted serious misconduct by a particular supervisor. In that case, the Department prioritized the resolution and agreed upon an NPA for irrevocable retirement following the close of the Monitoring Period. The resolution of this case was reasonable given the many underlying factors at issue. Notably, the case was resolved in a timelier manner than most cases, although it still took almost 8 months to close after the incident occurred.

| | |
|---|---|
| **COMPLIANCE RATING** | ¶ **1.** Substantial Compliance |
| | ¶ **2.** Substantial Compliance |
| | ¶ **3.** Substantial Compliance |

## XII. SCREENING & ASSIGNMENT OF STAFF ¶ 6 (POST-DISCIPLINARY ASSESSMENT OF STAFF)

This provision requires the Department to assess each Staff Member following a guilty UOF violation to determine whether they may benefit from inclusion in E.I.S.S. or if they should be reassigned to a post with limited contact with incarcerated individuals given the facts of their case. The revised requirements of ¶ 6 were implemented in December 2020 and throughout this Monitoring Period.

*Screening of Staff with Closed Cases*: In this Monitoring Period, 148 (99%) of the 150 Staff with closed disciplinary cases were screened by the Trials Division as demonstrated in the chart below. Of those 148 screened, 18 Staff were referred to E.I.S.S., to then be screened by E.I.S.S. for inclusion in that program. Of the 18 Staff referred to E.I.S.S., they were all placed in E.I.S.S. monitoring (or were already in E.I.S.S. monitoring at the time of the referral) except for one Staff member. The one Staff Member who was not placed in E.I.S.S. received a personalized counseling session by E.I.S.S. staff instead of placement in the program. Two of the four Staff recommended for reassignment were ultimately reassigned.

| Cases Closed in the 12th Monitoring Period – Required to be Screened by the Trials Division | | |
|---|---|---|
| | **Closed cases** | **Number of unique individuals[123]** |
| **Referral to EISS** | 34 | 18 |
| **Referral for Consideration for Reassignment** | 8 | 4 |
| **No Recommendation** | 161 | 126 |
| **Total Screened** | **203** | **148** |
| **Closed Trials Cases, but no screening completed** | 2 | 2 |

*Screening of Staff with Pending Cases*: In addition to the 148 Staff that were screened with closed cases described above, the Department has screened an additional 92 people this Monitoring Period with *pending* disciplinary cases, as outlined in the chart below. Of the 25 Staff referred to E.I.S.S., 20 Staff were placed in E.I.S.S. monitoring, four were not placed in E.I.S.S. monitoring, and one was not yet screened by E.I.S.S. The Staff member recommended for reassignment by Trials was reassigned to a different post.

| Total number of pending cases screened by Trials *Pending as of June 30, 2021* | | |
|---|---|---|
| | **Total number of pending cases** | **Number of unique individuals screened** |
| **Referral to E.I.S.S.** | 60 | 25 |
| **Referral for Consideration for Reassignment** | 1 | 1 |
| **No Recommendation** | 87 | 66 |
| **Total** | **148** | **92** |

*Conclusion*: In total, 240 Staff have been screened (either with pending or closed cases). In this Monitoring Period, the Trials Division screened all but two Staff who were required to be screened (148 out of 150). Further, the Trials Division went beyond the Consent Judgment requirements and *also* screened 92 Staff with pending cases to assess whether they may benefit from E.I.S.S. or should be reassigned. Of those Staff referred to E.I.S.S., all but one were placed in E.I.S.S. monitoring program which should provide added support for those staff. Out of the five Staff recommended for reassignment this Monitoring Period, three were reassigned. That said, for the overall number of Staff screened, the number of referrals to E.I.S.S. and for potential modification or reassignment of duty is proportionally low given the general misconduct that is occurring and addressed through closed cases via Trials. Accordingly, the Monitoring Team will more closely scrutinize the referral decisions in future Monitoring Periods, particularly those with no recommendations for E.I.S.S. or re-assignment.

| **COMPLIANCE RATING** | **¶ 6.** Partial Compliance |
|---|---|

---

[123] An individual Staff member may have multiple disciplinary cases, so this column identifies the specific Staff member that was screened.

## 10. ARRESTS OF INMATES (CONSENT JUDGMENT § XIV)

This section of the Consent Judgment requires the Department to consult with ID before recommending an arrest of an incarcerated individual for conduct that was also connected with a use of force incident. The larger purpose of this section is to ensure that arrests of incarcerated individuals are based on probable cause, and not for retaliatory purposes. The Monitoring Team's assessment of compliance is outlined below.

### XIV. ARREST OF INMATES (¶ 1)

This provision requires the Department to consult with ID on any case in which an incarcerated individual may be arrested for their involvement in a use of force incident to ascertain whether probable cause exists. In this Monitoring Period, 32 of the 78 arrests of incarcerated individuals were made in connection with 29 unique UOF incidents. The chart below provides an overview of the total number of arrests and those associated with a use of force incident from January 2018 to June 2021.The Monitoring Team's assessment of arrest reports and data continue to demonstrate arrests are made in consultation with ID and are supported by probable cause.

| Total Arrests & Arrests Associated with a UOF | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan. to June 2018 | July to Dec. 2018 | Jan. to June 2019 | July to Dec. 2019 | Jan. to June 2020 | July to Dec. 2020 | Jan to June 2021 |
| Number of UOF Incidents Associated with Arrests | 88 | 68 | 71 | 79 | 22 | 21 | 29 |
| Number of Inmate Arrests with Associated UOF Number | 109 (38%) | 79 (30%) | 77 (34%) | 84 (39%) | 23 (38%) | 22 (34%) | 32 (41%) |
| **Total Number of Inmate Arrests** | **284** | **262** | **228** | **214** | **61** | **65** | **78** |

- The reasons for all inmate arrests from January 2018 to June 2021 are presented in the table below.

| Reason for Arrest | 2018 Total | | 2019 Total | | 2020 Total | | Jan. to June 2021 Totals | |
|---|---|---|---|---|---|---|---|---|
| Agg. Harassment | 51 | 9% | 28 | 6% | 8 | 6% | 8 | 10% |
| Arson | 0 | 0% | 0 | 0% | 1 | 1% | 0 | 0% |
| Assault on Staff | 185 | 34% | 178 | 40% | 44 | 35% | 30 | 38% |
| Assault Other | 6 | 1% | 1 | 0% | 5 | 4% | 0 | 0% |
| Contraband Drugs | 32 | 6% | 28 | 6% | 4 | 3% | 0 | 0% |
| Contraband Other | 15 | 3% | 11 | 2% | 1 | 1% | 0 | 0% |
| Contraband Weapon | 18 | 3% | 16 | 4% | 6 | 5% | 0 | 0% |
| Criminal Act | 16 | 3% | 8 | 2% | 4 | 3% | 3 | 4% |
| Destruction of Property | 7 | 1% | 1 | 0% | 2 | 2% | 2 | 3% |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Escape | 1 | 0% | 1 | 0% | 0 | 0% | 0 | 0% |
| Extortion | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Inmate Disturbance / Riot | 0 | 0% | 6 | 1% | 0 | 0% | 0 | 0% |
| Obstruction of Gov. Admin. | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Robbery | 0 | 0% | 1 | 0% | 0 | 0% | 0 | 0% |
| Serious Injury to Inmate | 14 | 3% | 21 | 5% | 0 | 0% | 0 | 0% |
| Serious Injury to Staff | 9 | 2% | 2 | 0% | 1 | 1% | 1 | 1% |
| Serious Verified Threat | 1 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Sexual Assault/Abuse | 7 | 1% | 15 | 3% | 1 | 1% | 4 | 5% |
| Slashings/Stabbing | 40 | 7% | 20 | 5% | 35 | 28% | 3 | 4% |
| Splashing | 144 | 26% | 105 | 24% | 14 | 11% | 27 | 35% |
| Witness Tampering | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Other | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| **Total** | **546** | | **442** | | **126** | | **78** | |
| **Compliance Rating** | **¶ 1.** Substantial Compliance | | | | | | | |

## 11. IMPLEMENTATION (CONSENT JUDGMENT § XVIII)

This section focuses on the both the need to generally review policies and procedures to ensure they are consistent with the Consent Judgment and a requirement that the Department have dedicate personnel to ensure that there is consistent, reliable, and transparent communication and transfer of information between the Department and the Monitoring Team.

### XVIII. IMPLEMENTATION ¶¶ 1 & 2 (REVIEW OF RELEVANT POLICIES)

The two paragraphs in this section are intended to ensure that the Department's policies, procedures, practices, protocols, training curricula and corresponding documents, and logs and handbooks are consistent with the requirements of the Consent Judgment to the extent that such requirements are not explicitly stated in other provisions in the decree.

- ¶ 1: There are two phases of implementation for the Department to achieve compliance with ¶ 1 of this section.
  - The first phase requires an initial review to revise (as appropriate) any existing policies, procedures, protocols, training curricula, and practices to ensure conformity with *Nunez*. The Department completed the initial review of all Directives and Operations Orders and made any updates in prior Monitoring Periods. In the Twelfth Monitoring Period, the Department reported the Policy and Procedure Unit ("PPU") conducted a review of all Command Level Orders ("CLO") to identify those CLOs that may need to be updated. In total 3,373 CLOs were reviewed and 1,248 required updates and an additional 828 were rescinded. As of the end the Twelfth Monitoring Period there were

still 284 CLOs pending updates as the Department's staffing challenges precluded them from focusing on this effort.

o The second phase of implementation with ¶ 1 requires the Department to have a reliable and ongoing process to assess existing policies, procedures, protocols, training curricula, and practices to ensure conformity and relevance as they may necessarily evolve over time. In the Twelfth Monitoring Period the Department reported PPU is conducting a review of all Directives and Operations order to identify any outdated polices. The Department intends to share the results of this review in the Thirteenth Monitoring Period and the Monitoring Team will review the findings and work with PPU to ensure the review was effective and reasonable.

- ¶ 2: As for the Department's compliance with ¶ 2, the Department has revised and developed written documents, such as logs, handbooks, manuals, and forms necessary to effectuate the terms of the Consent Judgment.

|  | ¶ 1. Partial Compliance |
|  | ¶ 2. Substantial Compliance |

## XVIII. IMPLEMENTATION ¶ 3 (COMPLIANCE COORDINATOR)

This provision requires the Department to assign a Compliance Coordinator to work with the Monitoring Team. The role of Compliance Coordinator cannot reasonably be filled by one individual given the significant work needed to address the requirements of the Consent Judgment and so a number of individuals in the Complex Litigation Unit ("CLU") and the Nunez Compliance Unit ("NCU") serve in this capacity. The Department has historically assigned appropriate leadership and dedicated significant resources to ensuring there is adequate coordination with the Monitoring Team. In particular, the Deputy General Counsel and the Assistant Commissioner of NCU have a demonstrated commitment to reform, a strong understanding of the issues, and provided invaluable support to the Department and the Monitoring Team.

The Department provides a significant amount of information to the Monitoring Team, including routine data, information, and reports on a weekly, bi-weekly, and monthly basis. Further, the Monitoring Team is in frequent communication with members of the Legal Division, NCU and the ID & Trials Unit and has maintained a collaborative and constructive relationship with the individuals in those divisions. However, the Department's obligations to share information is not limited to the production of routine information and data.

While the Monitoring Team continued to receive requested routine information, there was a noted shift in access to other relevant information towards the end of the Monitoring Period with the

transition to new leadership. Understandably, the transition brought about a number of changes.[124] This resulted in strained communication and coordination on the Department's initiatives, priorities, and the various other dynamic issues at play. In some cases, the lapses in communication impacted the work of the Monitoring Team and suggested that the Consent Judgment requirements that require the Department to provide timely and relevant information and consult with the Monitoring Team (*e.g.*, § XIX., ¶ 7; § XX., ¶ 8) were not being faithfully adhered to.

The lapse in communication and sharing of information appeared to be a microcosm of the general state of affairs within the agency. Many of the leaders within the Department are constantly in a state of crisis and are constantly responding to one emergency after another. In some cases, it appears that these issues are so consuming that the necessary focus and attention on *Nunez* requirements is not occurring as it should. The Monitoring Team has noted improvement on the flow of information following the close of the Monitoring Period and Department officials began to more proactively engage the Monitoring Team and more consistently communicate.

The Monitoring Team has raised our concerns about these issues with numerous Department stakeholders all of whom have committed to improving these dynamics and ensuring full transparency with the Monitoring Team. The Department, more than ever, needs significant support, which is best achieved through frequent exchanges of information and candid conversations about the current challenges in order to be best positioned to work on problem solving efforts.

| COMPLIANCE RATING | ¶ 3. Partial Compliance |
| --- | --- |

---

[124] For instance, the Deputy General Counsel resigned shortly after the close of the Monitoring Period. She is a responsible, dynamic, and creative professional and provided invaluable assistance and leadership to the Department in managing the reform effort.

# CURRENT STATUS OF 18-YEAR-OLDS HOUSED ON RIKERS ISLAND

This section discusses the status of 18-year-old youth in DOC custody. The population of 18-year-olds remains low after decreasing significantly from the time the Consent Judgment went into effect, from approximately 200 to approximately 43 18-year-olds during the current Monitoring Period. The Monitoring Team's compliance assessment for the relevant sections of the Consent Judgment (§XV. Safety and Supervision of Inmates Under the Age of 19 and § XVI. Inmate Discipline)[125] and the Remedial Order (§ D. 18-Year-Old Incarcerated Individuals at RNDC)[126] is provided below.

### 12. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV & REMEDIAL ORDER § D)

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT) |
|---|

This provision requires the Department to supervise 18-year-olds at all times to prevent fights, de-escalate confrontations and generally protect youth from an unreasonable risk of harm. RNDC is the focus of monitoring efforts for this provision because the vast majority of 18-year-olds are housed at RNDC (*i.e.*, of the 43 ADP system-wide in the current Monitoring Period, 33 were at RNDC), and most of the male 18-year-olds at other facilities flow into and out of RNDC at some point.[127] During the current Monitoring Period, UOF rates and interpersonal violence increased among all age groups at RNDC, as discussed below.

Not only did the rates of use of force for 18-year-olds increase significantly from their already high levels during the current Monitoring Period, but so did the rates of use of force for Young Adults

---

[125] The analysis and compliance ratings in this section apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the *Nunez* provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the *Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center*, ¶2 (dkt. 364).

[126] The compliance assessment of the Remedial Order provisions are interpolated in the compliance assessment of § XV and XVI given their interplay with those requirements.

[127] All female 18-year-olds are housed at RMSC, but the ADP was only 0.5 during the current Monitoring Period and no female 18-year-olds were in custody during 4 of the 6 months. The population is too small to reasonably conduct any analysis and/or identify patterns or trends related to management of this group.

aged 19 to 21, with whom 18-year-olds are housed. The line graph below disaggregates RNDC's rate of use of force events by age for the past six Monitoring Periods.



A similar pattern is observed in the rate of fights among all age groups. Rates for both 18-year-olds and Young Adults aged 19 to 21 were at or near all-time highs during the current Monitoring Period.



RNDC's unstable leadership, sparse disciplinary options, lack of consistency in Staff assignments to housing units, inadequate supervision of Staff and excess of unstructured free time have resulted in high rates of violence and have driven the Monitoring Team's concerns for several years. These problems continued to worsen during the current Monitoring Period as the facility found little traction to implement its Unit Management structure, structured programming, universal incentives and consequences for misconduct. In fact, much of the work to implement these interventions designed to improve safety went completely dormant.

| **COMPLIANCE RATING** | **¶ 1. (18-year-olds)** Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 2 (DAILY INSPECTIONS)

This provision requires the Department to take reasonable steps to ensure that cell locks function properly and prohibits housing people in cells with inoperable locks. The Department continues to have procedures that require Staff to ensure locks are operable and to secure the housing units at prescribed lock-in times.

Oversight of Staff practice via the Compliance and Safety Center ("CASC") unit [128] continued to reveal frequent violations of the lock-in policy during the 3rd shift in January through March 2021 (the CASC unit was temporarily suspended in April 2021 and was restarted after the end of the Monitoring Period). Of the 36 units at RNDC, CASC identified violations (*i.e.*, individuals who were not secured in their cells after the 9pm lock-in time) on three or more days during the month in 8 units in January (22%), 7 units in February (19%) and 9 units in March (25%). Further, NCUs audits revealed that RNDC's practices regarding taking cells with inoperable locks off-line were inconsistent. In two of the five months reviewed, audits showed that nearly all 18-year-olds were assigned to properly functioning cells, but across the other three months, 53% of the identified inoperable cells had an 18-year-old assigned to them (37 of 70 inoperable cells). Furthermore, in its routine review of UOF incidents, the Monitoring Team tracks whether cell locks and lock-in failures contributed to facility violence and disorder. The review of cases in January/February 2021 identified at least 19 incidents at RNDC in which the Intake Investigation identified cell compliance issues in which a youth who was not secured during lock-in times assaulted a peer or Staff.

The Department has committed to replacing all cell doors at RNDC to address the antiquated physical plant. DOC reports that 300 doors have been replaced as of October 10, 2021 and an additional 250 will be replaced by February 2022. While this is positive, both CASC's and NCU's work revealed that while physical plant issues contribute to the problem, Staff's poor practice regarding inspections and managing lock-in times are and will remain significant obstacles to compliance. Finally, RNDC does not currently have any effective strategies to hold people in custody accountable for compliance with lock-in procedures.

| COMPLIANCE RATING | ¶ 2. (18-year-olds) Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 3 (DAILY ROUNDS)

This provision requires facility leadership to make weekly rounds to general population housing units and twice weekly rounds to specialized units (*i.e.*, Transitional Restorative Unit ("TRU"), Secure, ESH, Protective Custody, Mental Observation ("MO"), and New Admissions). NCU's audits revealed

---

[128] The Compliance and Safety Center ("CASC") does live video monitoring to identify security issues. One of the areas CASC reviews is the extent to which people in custody are properly secured in their cells after the 9pm lock-in.

that RNDC's performance level slipped considerably during the current Monitoring Period (from 90+% compliance in previous Monitoring Periods to 54% compliance in GP units and 41% compliance in specialized units). Performance at other facilities ranged from about 50% to 100%, but the number of 18-year-olds in those facilities is very small and thus are not amenable to analysis to identify any pattern or practices.

| COMPLIANCE RATING | ¶ 3. (a) Partial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 5 (PROGRAMMING)

This provision requires the Department to provide a sufficient level of programming to minimize idleness and the potential for interpersonal violence.

Although the Department's Program Division staff were expected to resume on-unit, in-person services at the end of the Eleventh Monitoring Period, the Program Division experienced unexpected staff absences as well as some resistance to the requirement to return to in-person services post-COVID, all of which severely limited the number of counselors available to provide services to youth at RNDC. Only six Program Counselors were available to provide group-based programming to the entire RNDC population (approximately 40 housing units, both Young Adults and adults) during this Monitoring Period. This was woefully insufficient as typically, a single Counselor provides services to two housing units. Group programs were shortened and held less often, and eventually services to adults were suspended so that Counselors could focus on the Young Adults. Tablets (which are certainly superior to no programming at all, but a less than ideal solution for providing programming long term given that their use is not interactive) were initially distributed to the Young Adult population, but subsequent access became unreliable. Contracts for community agencies to deliver programming had been drafted but still had not been signed into effect as of the end of the Monitoring Period. The implementation of any programming approach at RNDC also requires the support of housing unit officers. As the staffing issue further degraded (described in the Introduction to this report), Department leadership reported that programming became increasingly unreliable.

NCU pilot tested an audit strategy to determine the extent to which scheduled programming was actually delivered, which identified a variety of problems. NCU audited a single unit's adherence to the daily schedule for a 5-day period in March 2021 and a 6-day period (and a different unit) in April 2021. The March audit revealed an excess of unstructured free time and significant failures to provide basic services and programming. For example, recreation was provided only once during the 5-day period, Program Counselors did not provide any group programming, a recreation counselor simply observed youth playing video games rather than leading a structured activity and tablets did not appear to be in use. On the positive side, meals, linen exchange, commissary and access to the PEACE Center were provided as scheduled. The April audit revealed a bit more programming—recreation was provided on 5 of the 6 days, the Program Counselor led groups on 4 of the 6 days, and individual social services were provided on 2 of the 6 days. However, none of these programs or activities were delivered on the day/time of the unit's daily schedule. NCU's audit strategy appears to be a useful tool

for identifying problems, but it will be incumbent upon the facility leadership to address the problems identified in order to progress toward substantial compliance.

The Department's new Commissioner has reported Young Adult programming is a priority of his administration, but the concepts for increasing programming remain under development and had only begun to take shape at the end of the current Monitoring Period when the Young Adult Task force was reconvened by the Department. The youth at RNDC have a dearth of programming and an excess of idle time which contributes to the frustration, chaos, disorder and violence at the facility and is in direct conflict with the requirements of this provision.

| COMPLIANCE RATING | ¶ 5. (18-year-olds) Non-Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 6 (VULNERABLE INMATES)

This provision requires the Department to take appropriate action to ensure the safety of youth deemed to be particularly vulnerable, by transferring the victims or those who are creating the safety risk to another housing unit. The current levels of violence at RNDC suggest that many youth are at risk of harm, and thus broad efforts to reduce the overall level of violence and disorder must be prioritized—this includes an appropriate behavior management program, decreasing idle time, improving staff's ability to de-escalate tensions, etc., all of which are discussed throughout this section. That said, this provision speaks to the Department's use of a more targeted effort to protect youth who are being bullied, threatened or victimized by adjusting the assigned housing unit of those being victimized or the perpetrators of the aggression. During the current Monitoring Period, NCU identified 25 housing unit transfers of 18-year-olds that were executed to protect the victim of an altercation. That said, the current state of operations in the wider facility context suggests that *all youth* face a continued risk of harm that is the focus of several Remedial Orders and other emergency measures.

| COMPLIANCE RATING | ¶ 6. (18-year-olds) Substantial Compliance |
| --- | --- |

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 7 (PROTECTIVE CUSTODY)

This provision requires the Department to place youth who express concern for their personal safety in secure alternative housing (*i.e.*, Protective Custody). The Department continues to operate Protective Custody units for both male and female Young Adults and has comprehensive policies and audit procedures designed to assess compliance with policy.

NCU's audits continued to find high levels of compliance with requirements regarding statements from youth regarding their concerns, supporting documentation, evidence that OSIU interviewed the youth within two-business days, documentation that youth were promptly informed of OSIU's decision and their right to a hearing, timely hearings for involuntary placements, and timely 30- and 60-day reviews that included youth's input via a written statement.

During the current Monitoring Period, nine 18-year-olds were placed in Protective Custody ("PC"). The observed decrease in the number of 18-year-olds accessing PC over time is proportional to the overall reduction of 18-year-olds in custody. In addition, eight initial requests for Temporary PC were denied, usually because of the youth' history of violence against peers and staff. These justifications appeared to be reasonable given the behaviors cited by OSIU. All but one of these youth appeared multiple times on the Housing Transfer List (see ¶6, above), indicating that the facility continued to attempt to address safety concerns using tools other than Protective Custody. While the Department is in substantial compliance with the requirements regarding Protective Custody, the current state of operations in the wider facility context suggests that *all youth* face a continued risk of harm that is the focus of several Remedial Orders and other emergency measures.

| COMPLIANCE RATING | ¶ 7. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 8 (SEPARATION OF HIGH AND LOW CLASSIFICATION YOUNG INCARCERATED INDIVIDUALS)

This provision requires the Department to ensure that minimum-custody and maximum-custody incarcerated individuals are not housed in the same units. The Department classifies each youth's custody level using the Housing Unit Balancer's ("HUB") and policy prohibits the comingling of minimum- and maximum-custody youth. The Custody Management and Centralized Movement Unit ("CMCMU") identifies mis-housed individuals which must be resolved by the facility within 72 hours, either by rehousing the individual or applying an override. The Monitoring Team analyzed mis-housing data for Young Adults housed at RNDC during March/April/May 2021. Mis-housing continues to be relatively rare, with only about 3% or less of the Young Adult population assigned to a housing unit that was not aligned with their custody level of any given day. Mis-housing occurred less frequently than in prior Monitoring Periods, with improvements appearing to be driven by the fact that mis-housings are being resolved more quickly. Of the 67 Young Adults who were mis-housed during the review period, overrides were generated timely for 96% of these individuals.

| COMPLIANCE RATING | ¶ 8. (18-year-olds) Substantial Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION) REMEDIAL ORDER § D., ¶ 3 (REINFORCEMENT OF DIRECT SUPERVISION)

These provisions of the Consent Judgment and Remedial Order require the Department to train its Staff in Direct Supervision (¶12), to regularly reinforce key concepts (¶3(i)) and to implement a Unit Management strategy (¶3, which includes the hallmarks of Direct Supervision as described on pgs. 302-303 of the Eleventh Monitor's Report). Nearly all Staff received training in Direct Supervision and Unit Management at some point in previous Monitoring Periods, but the program's implementation has faltered. The facility has not established a staffing structure to support the model (*e.g.*, long delays to appoint Unit Managers and then turnover among those who had been selected;

Staff assignments to housing units that changed constantly and thus the team concept could not be achieved). Such a significant period of time passed since Staff were originally trained that the information imparted has likely gone stale, regular reinforcement of key concepts does not occur and thus, few Staff are likely to be prepared to implement the core practices. Previous challenges to Staff assignments, dependable daily unit schedules, programming and universal incentives/consequences (all core components of the Unit Management strategy) were only magnified during the current Monitoring Period. The absence of unit teams and the failure to properly implementation the key program elements mean that the Department has made little, if any, progress in this area.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Non-Compliance<br>§ D., ¶ 3. Non-Compliance<br>§ D., ¶ 3(i). Non-Compliance |
|---|---|

## XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19, ¶ 17 & REMEDIAL ORDER § D., ¶ 1 (CONSISTENT STAFFING)

These provisions of the Consent Judgment and Remedial Order require the Department to consistently assign individual Staff to the same housing unit day-to-day, which is a core component of Direct Supervision and is particularly important in units with youth who are difficult to manage and those who struggle with mental illness. This same theme—the benefit of developing relationships in order to change behavior—applies to the consistent assignment of Captains/ADWs as well, given their essential role in helping Staff to improve practice.

During the current Monitoring Period, RNDC's performance level degraded even further below the levels observed in the previous Monitoring Period. On average, only 27% of GP housing unit posts were worked by the assigned Staff person and only 15% of housing unit posts in specialized units (*i.e.*, MO and TRU) were worked by the assigned Staff person. During the latter part of the Monitoring Period, the MO/TRU units' performance was below 10%. The tables below illustrate the extent of the problem in more detail.

| GP + Other Units—Proportion of Posts Worked by the Assigned CO | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tour | 11th MP Average | | January | | February | | March | | April | | May | | June | |
| | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady |
| All | 11,116 | 47% | 2233 | 39% | 2257 | 35% | 2604 | 27% | 2486 | 28% | 2772 | 18% | 3427 | 15% |
| 7-3 | 4,095 | 49% | 735 | 37% | 728 | 32% | 861 | 29% | 812 | 29% | 924 | 13% | 1155 | 11% |
| 3-11 | 3,863 | 35% | 756 | 37% | 784 | 32% | 875 | 23% | 806 | 25% | 924 | 17% | 1145 | 12% |
| 11-7 | 3,569 | 56% | 756 | 43% | 745 | 41% | 868 | 29% | 868 | 29% | 924 | 24% | 1127 | 22% |
| "% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post. | | | | | | | | | | | | | | |

129

| TRU/MO Units—Proportion Worked by the Assigned CO | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tour | 11th MP Average | | January | | February | | March | | April | | May | | June | |
| | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady |
| All | 3,159 | 48% | 588 | 28% | 657 | 21% | 630 | 14% | 585 | 9% | 581 | 9% | 728 | 8% |
| 7-3 | 1,168 | 45% | 196 | 32% | 203 | 15% | 210 | 8% | 195 | 13% | 196 | 10% | 238 | 6% |
| 3-11 | 1,171 | 41% | 196 | 18% | 252 | 10% | 210 | 7% | 195 | 1% | 196 | 0% | 245 | 2% |
| 11-7 | 1,156 | 59% | 196 | 36% | 202 | 39% | 210 | 26% | 195 | 11% | 189 | 19% | 245 | 15% |

"% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post.

The factors that challenge and/or undermine the facility's performance level include: housing units posts without a specific Staff assigned to them, Staff assignments that are not updated when someone becomes unavailable to work, Tour Commanders who pull Staff who are assigned to a specific housing to cover a vacancy elsewhere in the facility, and a lack of accountability for ensuring that housing unit posts are prioritized for assignment. In June 2021, the Department reported that only 63% of Young Adult housing unit posts had a 4-day staff assigned to them and only 33% of the posts had a 2-day staff assigned. Assignments of 4-day and 2-day staff to *all* Young Adult housing unit posts is an obvious and essential first step toward compliance.

Steadily assigning Captains to specific zones in the facility began in earnest in late 2020. However, during the current Monitoring Period, these assignments were effectuated only about 30% of the time, as shown in the table below.

| Captains' Posts—Proportion Worked by the Assigned Captain January-June 2021 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tour | January | | February | | March | | April | | May | | June | |
| | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady | # shifts | % steady |
| All | 420 | 29% | 455 | 31% | 525 | 33% | 420 | 32% | 420 | 29% | 525 | 24% |
| 7-3 | 140 | 33% | 140 | 44% | 175 | 49% | 140 | 46% | 140 | 46% | 175 | 33% |
| 3-11 | 140 | 31% | 140 | 37% | 175 | 36% | 140 | 29% | 140 | 21% | 175 | 16% |
| 11-7 | 140 | 22% | 175 | 15% | 175 | 13% | 140 | 20% | 140 | 20% | 175 | 22% |

** "% steady" refers to the proportion of shifts in which the assigned staff (whether formally awarded or informally assigned) actually worked their assigned post.

The Remedial Order also requires ADWs to be consistently assigned to the same supervision zones. At the end of the current Monitoring Period, a total of 15 ADWs were assigned to RNDC. Of these, 6 were not available to work due to leave of absence, FMLA, TDY, etc. Of the remaining 9 ADWs, only 3 were assigned as Unit Managers, one of whom supervised two buildings. This left two zones unassigned, which is concerning given that several other ADWs remained available to work. NCU has not yet begun to audit facility performance for assigning ADWs or maintaining those assignments day-to-day.

These problems cannot be addressed until Staff report to work as expected, all housing unit posts have both a 4-day and 2-day Staff assigned, all zones have an assigned Captain and ADW, Tour Commanders try in earnest to maintain the structure and, when substitutes are needed, Staff who work the same unit in another capacity are prioritized. This is a critical problem to solve as most of the other strategies to address facility violence and disorder rely on individual housing unit Staff to work the same post day-to-day so that they are familiar with the unit schedules, individual people assigned to the unit and the dynamics among them. Furthermore, highly skilled Supervisors who are assigned to the same zone day-to-day are needed for both accountability purposes and to elevate the skill level of housing unit officers.

| **COMPLIANCE RATING** | **¶ 17. (18-year-olds)** Non-Compliance |
| | **§ D., ¶ 1.** Non-Compliance |

### 13. INMATE DISCIPLINE (CONSENT JUDGMENT § XVI & REMEDIAL ORDER § D)

**XVI. INMATE DISCIPLINE ¶ 7 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS RISK OF HARM),**
**¶ 8 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND DAILY MONITORING) AND**
**¶ 9 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND CELL CONDITIONS)**

These provisions address the use of Punitive Segregation and Isolation, pursuant to the definitions in the Consent Judgment. Punitive Segregation is no longer utilized for 18-year-olds, thus ¶ 7 is no longer rated. Isolation is defined as any type of involuntary confinement in a locked room or cell for at least three consecutive hours during the day (excluding overnight lock-in and other lock-in periods that are applicable to the general population such as lock-in for count, shift change, contraband sweeps or emergency situations involving security concerns). As discussed in the previous Monitor's Report (see pg. 308), the TRU and Secure programs' procedures do not include the use of isolation as defined, but current practices in ESH-Level I do. Therefore, the requirements of ¶ 8 and ¶ 9 apply when an 18-year-old is housed in that program.

Program records and information from H+H demonstrated that daily monitoring of the medical/mental health status was conducted as required for the single 18-year-old youth who was housed in ESH-Level 1 at the beginning of the current Monitoring Period. Furthermore, that single individual was housed in a cell with an operable lock. Together, these indicate appropriate procedures to address the requirements of ¶ 8 and ¶ 9. In February 2021, the Department discontinued the use of ESH-Level 1 for this population. As the Department transitions its disciplinary options to other programs (*e.g.*, Risk Management and Accountability System ("RMAS") and NIC), the Monitoring Team will assess the applicability of these requirements.

| **COMPLIANCE RATING** | **¶ 7.** No Longer Rated |
| | **¶ 8.** Substantial Compliance |

| ¶ **9.** Substantial Compliance |
| --- |

---

### XVI. INMATE DISCIPLINE ¶ 5 (18-YEAR-OLD INMATES: PUNITIVE SEGREGATION AND SERIOUS MENTAL ILLNESSES)

This provision prohibits the Department from housing 18-year-olds with serious mental illnesses in Punitive Segregation or Isolation and requires them to be placed in an appropriate therapeutic setting. The Department creates daily Medical Exclusion Lists ("MEL") that identify every person in custody who has one of the contraindicating medical/mental health conditions and excludes from placement in Secure and ESH. The Monitoring Team cross-referenced these lists with lists of those admitted to Secure and ESH and found that none of the 18-year-olds who were placed in ESH or Secure during the current Monitoring Period appeared on the MEL.

| COMPLIANCE RATING | ¶ **5.** Substantial Compliance |
| --- | --- |

---

### XVI. INMATE DISCIPLINE ¶ 6 (18-YEAR-OLD INMATES: CONTINUUM OF DISCIPLINARY OPTIONS)

This provision requires the Department to develop and implement an adequate continuum of alternative disciplinary sanctions to reduce its reliance on Punitive Segregation. Punitive Segregation for Young Adults was replaced by several specialized housing units—Enhanced Supervision Housing ("ESH") the Secure Unit ("Secure") and the Transitional Restorative Unit ("TRU"). In April 2021, the Department issued an Operations Order "North Infirmary Command—Young Adult Housing" to replace Young Adult ESH Level-1.

Most youth who engage in serious/frequent violent behaviors (about 80%) are placed in one of RNDC's TRU units. They are thus concentrated in units that appear to be poorly equipped to manage them safely. TRU units operate much like GP units with the same freedom of movement, limited structure and, particularly during this Monitoring Period, disrupted programming. These units have been challenged by on-going facility leadership transitions and a variety of implementation problems since their inception. During the current Monitoring Period, these concerns were further exacerbated by larger populations/housing density, lack of adherence to Staff training requirements, no consistency in Staff assignments and poor security protocols.

The result has been catastrophic in terms of safety. Over a three-month period (March/April/May 2021), 20 stabbings/slashings occurred across the three TRU units. While several promising actions were developing at the beginning of the period (*i.e.*, implementing the newly revised policy, additional staff training, consistent staff assignments and supervisor schedules, population management), the trajectory for most of these developments plateaued early in the Monitoring Period and unit operations degraded.

Looking at all three specialized housing units (ESH, Secure and TRU), metrics such as admissions, length of stay, and the proportion of youth with repeated admissions were all similar to

prior Monitoring Periods. While the specialized housing units are properly targeting those youth who frequently engage in violence and those who commit serious assaults, and although Secure Unit hearing timelines were met routinely and youth with serious mental health conditions were properly excluded from Secure/ESH, the *interventions* in all of the specialized housing units have not improved in terms of adherence to program design, transparency in release criteria nor effectiveness in reducing violence. In particular, youth records from both TRU and Secure revealed significant problems with administering the behavior management and support components of the specialized housing units.

These specialized housing units have reduced the Department's reliance on Punitive Segregation as a disciplinary measure (one of the core requirements of this provision) and also provide the Department with the ability to afford some element of protection to youth in the general population by separating them from youth who have engaged in frequent/serious violence. However, the Department is also responsible for providing a safe environment for the people *in* the specialized housing units and for ensuring Staff's practice and programming approaches mirror policy requirements. In both areas, the results are of great concern. Not only have the program approaches long suffered from a variety of problems, the specialized housing unit in which most of the youth are placed (TRU) witnessed extraordinarily high levels of serious violence during the current Monitoring period. The Department is planning to transition its approach to a new program design (*i.e.*, the Risk Management and Accountability System (RMAS)) and the use of the new units at NIC). These will be reviewed in subsequent Monitoring Periods.

| Compliance Rating | ¶ 6. Non-Compliance |
|---|---|

## Remedial Order § D., ¶ 2 (System of Incentives and Consequences)

This provision of the Remedial Order requires the Department to implement a structured system to incentivize positive behavior and to respond to negative behavior with proportional consequences. The Department designed a strong conceptual approach in early 2020 and trained most of RNDC's Staff. However, its initial implementation faltered, never becoming fully implemented even in the pilot units, and only worsened during the current Monitoring Period. By the end of the Monitoring Period, staff training had occurred so far in the past that it was unlikely that Staff would be able to recall the requirements for implementing the program.

First, except for commissary, the planned universal incentives were not routinely delivered throughout most of the Monitoring Period, which was not only frustrating to people in custody who were not receiving the activities and other privileges that had been advertised, but also completely undercut the consequence side of the equation. Without universal incentives, no consequences were available (*i.e.*, restricting someone from an activity that was rarely provided anyway does not work as a disincentive for misconduct).

Second, whether because they realized that the tool could not be effective or they had not been trained or the practice was not reinforced by supervisors, Staff all but gave up on responding to

misconduct with the intended action (*i.e.*, "Informal Resolutions"). In the pilot site that included 6 housing units, over a six-month period, only 67 Informal Resolutions were issued in response to 20 incidents (most of which involved more than one person), with 96% of those occurring in the first half of the Monitoring Period. Over this same time period, the pilot site recorded 13 assaults on Staff, 29 fights (most of which involved multiple youth), 33 use of force incidents (most of which involved multiple youth), and 93 alarms. This translates to well over 100 lost opportunities to respond with the new behavior management tool. Furthermore, the facility's legacy system of commissary restrictions for fights/non-compliance with lock-in was not utilized at all, leaving only the ineffective infraction process and the occasional transfer to Secure/TRU as the only accountability measures. Routine data on the number of uses of force, fights and lock-in non-compliance at RNDC show a significant number of all types of events, and these behaviors are exactly what the Informal Resolutions were designed to address. Staff's failure to properly implement this component of the system means that they did not effectively hold people accountable for their negative behavior, a key part of the overall plan to reduce violence and disorder at RNDC.

| COMPLIANCE RATING | **§ D., ¶ 2(i). (Design of the Incentive/Consequences Program)** Substantial Compliance<br>**§ D., ¶ 2(ii). (Implementation)** Non-Compliance<br>**§ D., ¶ 2(iii). (Policy and Training)** Partial Compliance |
| --- | --- |

## XVI. INMATE DISCIPLINE ¶ 10 (DE-ESCALATION CONFINEMENT)

This provision permits the Department to utilize confinement for 18-year-olds as a temporary response to behavior that poses a risk of immediate physical injury to another person and also requires several protections as enumerated in ¶ 10. This provision is not applicable in this Monitoring Period as no specific de-escalation confinement protocol was utilized for 18-year-olds.

| COMPLIANCE RATING | **¶ 10.** (18-Year-Olds) Not Applicable |
| --- | --- |

## REMEDIAL ORDER AUDIT PROVISIONS
## § D., ¶ 1(i) (QUALITY ASSURANCE FOR CONSISTENT STAFFING),
## § D., ¶ 2(iv) (METRICS FOR INCENTIVES AND CONSEQUENCES) AND
## § D., ¶ 3(ii) (ASSESSMENT OF DIRECT SUPERVISION)

These provisions require the Department to develop systems to track key outcomes related to consistent staffing, incentives/consequences and the implementation of Direct Supervision/Unit Management at RNDC. It is worth noting that the Department cannot make meaningful progress toward the quality assurance requirements until RNDC leadership properly establishes the practices that are to be the subject of NCU's auditing.

- NCU's audits of consistent staffing (§D., ¶ 1(i)) utilize a robust methodology and contain an appropriate level of detail. Results are reported using a framework that is amenable to locating specific problems, such as compliance by housing unit or type, tour, and the reasons that Staff

did not work their assigned posts. The audits need to be expanded to include ADWs to meet the requirements of this provision.

- NCU created a tracking tool for <u>Informal Resolutions</u> that could have served a useful quality assurance function, but the program appears to be defunct and thus there is nothing to be audited. Similarly, <u>universal incentives</u> were never delivered reliably enough to develop an appropriate auditing tool.

- Although the Department's Program Division had taken the lead in initial efforts to audit the implementation of <u>Unit Management (§D., ¶ 3(ii))</u>, the audit tools focused on issues that were largely unrelated to the specific program requirements (the Program Division's CQI unit was later disbanded, in July 2021). NCU's audits of the implementation of the daily schedule (discussed in ¶5, above) are a promising quality assurance strategy, but daily unit schedules were only developed for the pilot sites and have not been developed for all Young Adult housing units at RNDC.

| | |
|---|---|
| **COMPLIANCE RATING** | **§ D., ¶ 1(i). (Quality Assurance for Consistent Staffing)** Partial Compliance<br><br>**§ D., ¶ 2(iv). (Quality Assurance for Incentives/Consequences)** Non-Compliance<br><br>**§ D., ¶ 3(ii). (Assessment of Direct Supervision)** Partial Compliance |

• **End** •

# Appendix A: Definitions

| Acronym or Term | Definition |
| --- | --- |
| A.C.T. | Advanced Correctional Techniques |
| ADP | Average Daily Population |
| ADW | Assistant Deputy Warden |
| AIU | Application Investigation Unit |
| ALJ | Administrative Law Judge |
| AMKC | Anna M. Kross Center |
| Avoidable Incidents | Incidents that could have been avoided altogether if Staff had vigorously adhered to operational protocols, and/or committed to strategies to avoid force rather than too quickly defaulting to hands-on force (*e.g.,* ensuring doors are secured so incarcerated individuals do not pop out of their cells, or employing better communication with incarcerated individuals when certain services may not be provided in order to mitigate rising tensions). |
| BHPW | Bellevue Hospital Prison Ward |
| BKDC | Brooklyn Detention Center |
| BWC | Body-worn Camera |
| CASC | Compliance and Safety Center |
| CD | Command Discipline |
| CHS | Correctional Health Services |
| CityTime | Staff Member's official time bank of compensatory/vacation days etc. |
| CMS | Case Management System |
| CO | Correction Officer |
| COD | Central Operations Desk |
| CLU | Complex Litigation Unit |
| CLO | Command Level Order |
| DA | District Attorney |
| DCAS | Department of Citywide Administrative Services |
| DOC or Department | New York City Department of Correction |
| DOI | Department of Investigation |
| DWIC | Deputy Warden in Command |
| EAM | Enterprise Asset Management |
| Emergency Response Teams | There are at least three types of Emergency Response Teams: (1) Probe Teams, which consist of facility-based Staff ("Facility Emergency Response Teams"); (2) the Emergency Services Unit ("ESU") which is a separate and dedicated unit outside of the facility; and (3) the Special Search Team ("SST"), a separate and |

| Acronym or Term | Definition |
| --- | --- |
| | dedicated unit associated with the Special Operations Division that conducts searches. |
| EMTC | Eric M. Taylor Center |
| E.I.S.S. | Early Intervention, Support, and Supervision Unit |
| ESH | Enhanced Security Housing |
| ESU | Emergency Service Unit |
| Fast Track | Cases that are pushed from ID to Trials more quickly with less investigative steps that can closed via an NPA |
| Full ID Investigations | Investigations conducted by the Investigations Division |
| FSIR | Facility Security Inspection Report |
| GMDC | George Motchan Detention Center |
| GRVC | George R. Vierno Center |
| H+H | New York City Health and Hospitals |
| HOJC | Horizon Juvenile Center |
| HUB | Housing Unit Balancer |
| ID | Investigation Division |
| In-Service training | Training provided to current DOC Staff |
| Intake Squad | A new dedicated unit within ID to conduct intake investigations of all use of force incidents |
| IRS | Incident Reporting System |
| LMS | Learning Management System—advanced training tracking platform |
| MDC | Manhattan Detention Center |
| MO Unit | Mental Observation Unit |
| MOC | Memorandum of Complaint |
| NCU | *Nunez* Compliance Unit |
| New Directive or New Use of Force Directive | Revised Use of Force Policy, effective September 27, 2017 |
| Non-Compliance | "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. |
| NPA | Negotiated Plea Agreement |
| OATH | Office of Administrative Trials and Hearings |
| OBCC | Otis Bantum Correctional Facility |
| OC Spray | Chemical Agent |
| OSIU | Operations Security Intelligence Unit |
| Parties to the *Nunez* Litigation | Plaintiffs' Counsel, SDNY representatives, and counsel for the City |
| Partial Compliance | "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components |

| Acronym or Term | Definition |
| --- | --- |
|  | of the relevant provision of the Consent Judgment, but significant work remains |
| PC | Protective Custody |
| PDR | Personnel Determination Review—disciplinary process for probationary Staff Members |
| PMO | Project Management Office |
| PREA | Prison Rape Elimination Act |
| Preliminary Reviewer | ID investigator conducting the Preliminary Review |
| Pre-Service or Recruit training | Mandatory Training provided by the Training Academy to new recruits |
| Rapid Review / Avoidables Process | For every actual UOF incident captured on video, the facility Warden must identify: (1) whether the incident was avoidable, and if so, why; (2) whether the force used was necessary; (3) whether Staff committed any procedural errors; and (4) for each Staff Member involved in the incident, whether any corrective action is necessary, and if so, for what reason and of what type |
| RMSC | Rose M. Singer Center |
| RNDC | Robert N. Davoren Complex |
| SCM | Safe Crisis Management |
| SDNY | Southern District of New York |
| Service Desk | Computerized re-training request system |
| S.T.A.R.T. | Special Tactics and Responsible Techniques Training |
| Staff or Staff Member | Uniformed individuals employed by DOC |
| Substantial Compliance | "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision |
| TEAMS | Total Efficiency Accountability Management System |
| TDY | Temporary Duty |
| TRU | Transitional Restorative Unit |
| Trials Division | Department's Trials & Litigation Division |
| TTS | Training Tracking Software system |
| UOF | Use of Force |
| VCBC | Vernon C. Bain Center |
| WF | West Facility |
| Young Incarcerated Individuals | Incarcerated individuals under the age of 19 |

## Appendix B: Citations to Monitoring Team Findings re: Security Failures

| Monitor Report Section | Pages |
|---|---|
| **First Monitor's Report (dkt. 269)** | |
| Introduction | Pgs. 1 to 20 |
| Use of Force in the First Monitoring Period | Pgs. 8 to 18 |
| Safety and Supervision of Inmates Under the Age of 19 | Pgs. 87 to 96 |
| **Second Monitor's Report (dkt. 291)** | |
| Introduction | Pgs. 1 to 9 |
| Use of Force and Inmate Violence During the Second Monitoring Period | Pgs. 9 to 27 |
| Risk Management | Pgs. 108 to 123 |
| Safety and Supervision of Inmates Under the Age of 19 | Pgs. 123 to 138 |
| **Third Monitor's Report (dkt. 295)** | |
| Introduction | Pgs. 1 to 8 |
| Use of Force and Inmate Violence During the Third Monitoring Period | Pgs. 10 to 33 |
| Use of Force Policy | Pgs. 35 to 43 |
| Risk Management | Pgs. 157 to 174 |
| **Fourth Monitor's Report (dkt. 305)** | |
| Introduction | Pgs. 1 to 16 |
| Staff Use of Force and Inmate Violence Trends During the Fourth Monitoring Period | Pgs. 18 to 39 |
| Staff Discipline and Accountability | Pgs. 161 to 182 |
| Trends in Use of Force | Pgs. 205 to 209 |
| **Fifth Monitor's Report (dkt. 311)** | |
| Introduction | Pgs. 1 to 8 |
| Staff Use of Force and Inmate Violence Trends During the Fifth Monitoring Period | Pgs. 10 to 25 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 25 to 38 |
| Current Status of Young Inmates | Pgs. 140 to 150 |
| **Sixth Monitor's Report (dkt. 317)** | |
| Introduction | Pgs. 1 to 8 |
| Staff Use of Force and Inmate Violence Trends During the Sixth Monitoring Period | Pgs. 8 to 18 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 19 to 30 |
| Current Status of Young Inmates | Pgs. 149 to 162 |
| **Seventh Monitor's Report (dkt. 327)** | |
| Introduction | Pgs. 1 to 9 |
| Staff Use of Force and Inmate Violence Trends During the Seventh Monitoring Period | Pgs. 11 to 31 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 31 to 52 |
| Transfer and Management of 16- and 17-Year-Old Youth | Pgs. 190 to 208 |
| Status of 18-Year-Olds Housed on Rikers Island | Pgs. 208 to 228 |
| **Eighth Monitor's Report (dkt. 332)** | |
| Introduction | Pgs. 1 to 16 |
| Staff Use of Force and Inmate Violence Trends During the Eight Monitoring Period | Pgs. 19 to 33 |

| Monitor Report Section | Pages |
|---|---|
| Identifying & Addressing Use of Force Misconduct | Pgs. 34 to 52 |
| Current Status of 16- and 17-Year-Old Youth | Pgs. 218 to 249 |
| Status of 18-Year-Olds Housed on Rikers Island | Pgs. 248 to 272 |
| **Ninth Monitor's Report (dkt. 341)** | |
| Introduction | Pgs. 1 to 13 |
| Use of Force and Inmate Violence Trends During the Ninth Monitoring Period | Pgs. 13 to 41 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 41 to 77 |
| Use of Force Policy | Pgs. 78 to 81 |
| Current Status of 16- and 17-Year-Old Youth | Pgs. 253 to 283 |
| Status of 18-Year-Olds Housed on Rikers Island | Pgs. 283 to 290 |
| **Tenth Monitor's Report (dkt. 360)** | |
| Introduction | Pgs. 1 to 13 |
| Use of Force and Inmate Violence Trends During the Tenth Monitoring Period | Pgs. 13 to 39 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 39 to 74 |
| Use of Force Policy | Pgs. 74 to 77 |
| Current Status of 16- and 17-Year-Old Youth | Pgs. 221 to 33 |
| Status of 18-Year-Olds Housed on Rikers Island | Pgs. 238 to 268 |
| **First Remedial Order Report (dkt. 365)** | |
| Section A. Initiatives to Enhance Safe Custody Management, Improve Staff Supervision and Reduce Unnecessary Uses of Force | Pgs. 2 to 3 |
| **Eleventh Monitor's Report (dkt. 368)** | |
| Introduction | Pgs. 1 to 22 |
| Use of Force Trends During the Eleventh Monitoring Period | Pgs. 22 to 61 |
| Identifying & Addressing Use of Force Misconduct | Pgs. 61 to 104 |
| Use of Force Policy | Pgs. 120 to 125 |
| Status of 18-Year-Olds Housed on Rikers Island | Pgs. 274 to 307 |
| **Second Remedial Order Report (dkt. 373)** | |
| Key Priorities | Pgs. 2 to 4 |

# Appendix C: Training Charts
## Status of Training Provided Since the Effective Date

| | Training Provided during Ninth Monitoring Period | | Total Training Provided Nov. 2015 – July 2021 | |
|---|---|---|---|---|
| | Initial Training | Refresher | Initial Training | Refresher |
| Use of Force Policy (¶ 1(a)) | N/A | 775 | 12,341 | 9,024 |
| Crisis Intervention and Conflict Resolution (¶ 1(b)) | 770 | N/A | 10,985 | N/A |
| Defensive Tactics (¶ 2(a)) | N/A | 722 | 12,750 | 8,575 |
| Young Incarcerated Individual Management—Unit Management (¶ 3) | N/A | 228 | N/A | 1,109 |
| Direct Supervision (¶4) | 14 | N/A | 6,875 | N/A |
| Probe Team ("Facility Emergency Response Training") (¶ 1(c)) | 169 | N/A | 6,095 | N/A |
| Cell Extraction (¶ 2(b)) | 49 | N/A | 4,964 | N/A |
| Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e)) | N/A | | 2,899[129] | N/A |

---

[129] This includes all Recruits beginning with the November 2017 graduating class, and 159 ESU Staff who were provided the training in prior Monitoring Periods.

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | |
| | | *Length of Training* | 12-hours (only 8 hours required by CJ) | 8-hours | 8-hours | |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | All Supervisors (including Executive Staff) | |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Completed** - 09/2018 - S.T.A.R.T. | **Completed** - 09/2018 - S.T.A.R.T. | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets[130] | TTS Records/Sign-In Sheets | |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | Scantron | |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | All Staff (who did not receive as Recruits) | | Executive Staff |
| | | *Status of Deployment* | Provided in mandatory Pre-Service training | **Completed** – 06/2021 – A.C.T. | | **Completed** - June 2019 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | TTS Records |
| | | *Examination (¶ 6)* | Electronic – iPad | Scantron | | Scantron |

---

[130] During the transition to LMS a mix of attendance record mechanisms may have been utilized including hand-written sign-in sheets, TTS, or RapidLD technology.

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | Finalized and consulted Monitoring Team |
| | | *Length of Training* | 24-hours | 24-hours | | 8-hours |
| | | *Frequency* | All recruit classes | Not Required by Consent Judgment ("CJ") | | Not Required by CJ |
| | | *Deployment* | Provided in mandatory Pre-Service training | **Completed** - 09/2018 - S.T.A.R.T. - | | **Completed** - 09/2018 - S.T.A.R.T. |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets | | TTS Records/Sign-In Sheets |
| | | *Examination (¶ 6)* | Certification by Instructor | Certification by Instructor | | Scantron |
| **SCM (Young Incarcerated Individual Management) (¶3)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team and developed by JKM | Finalized and consulted Monitoring Team and developed by JKM | | |
| | | *Length of Training* | 24-hours | 24-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | In-Service to any Staff at RNDC[131] | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records | | |

---

[131] SCM and Direct Supervision requirements for regularly assigned Staff outside of RNDC were not assessed this Monitoring Period for the reasons set forth in the Sixth Monitor's Report (at pg. 74).

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Examination (¶ 6)* | Electronic – iPad | Hand-written | | |
| **Direct Supervision (¶4)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | | |
| | | *Length of Training* | 32-hours | 32-hours | | |
| | | *Frequency* | Not required by Consent Judgment | All Staff who work with Young Incarcerated Individuals | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Provided to most Staff at RNDC in 2018; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |
| | | *Attendance (¶ 7)* | TTS Records | TTS Records/Sign-In Sheets | | |
| | | *Examination (¶ 6)* | None - Last Module has Review | None - Last Module has Review | | |
| **Probe Team (¶ 1(c))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and approved by Monitoring Team | Finalized and approved by Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by C.J.) | 8-hours (Only 2 hours required by C.J.) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to RNDC** | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Cell Extraction (¶ 2(b))** | Intake, Security, Corridor and Escort Posts | *Status of Curriculum* | Finalized and consulted Monitoring Team | Finalized and consulted Monitoring Team | N/A | N/A |
| | | *Length of Training* | 8-hours (Only 2 hours required by CJ) | 8-hours (Only 2 hours required by CJ) | | |
| | | *Frequency* | All recruit classes | All Staff currently with post and any new Staff assigned to post | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | Ongoing Pre-Promotional Training; In-Service for Staff with various posts who regularly field these teams; **Ongoing Training Obligation for Staff Newly Assigned to Post** | | |
| | | *Attendance (¶ 7)* | TTS Records | Sign-In Sheets | | |
| | | *Examination (¶ 6)* | Written Performance Evaluation | Written Performance Evaluation | | |
| **Investigator Training (¶ 2(c))** | ID | *Status of Curriculum* | | Curriculum finalized. Training provided on an as-needed basis as new investigators join ID | N/A | N/A |
| | | *Length of Training* | | No Specified Length in CJ, but 40 hours | | |
| | | *Frequency* | | Any new investigators assigned to ID | | |

| Status of Initial Training Program Development and Deployment | | | | | | |
|---|---|---|---|---|---|---|
| **Training** | **Required Attendees** | | **Recruits** | **In-Service** | **Supervisor** | **Executive Staff Training** |
| | | *Deployment* | | Ongoing Incorporated into ID Orientation | | |
| **Facility Investigators** | Facility | *Status of Curriculum* | | N/A (see Investigations Section of this report) | N/A | N/A |
| | | *Length of Training* | | Required to be 24 hours | | |
| **Handheld Camera Operator Training (§ IX (Video Surveillance) ¶ 2(e))** | ESU and Camera Operators at each Facility | *Status of Curriculum* | Finalized and consulted Monitoring Team. | Finalized and consulted Monitoring Team. | N/A | N/A |
| | | *Length of Training* | No specified length in CJ, but 3 hours | No specified length in CJ | | |
| | | *Frequency* | All recruit classes that matriculated beginning in June 2017. | In-Service - Operators in Each Facility: ESU | | |
| | | *Deployment* | Provided in mandatory Pre-Service training | All ESU Staff received - July 2018 | | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| **Use of Force Policy (¶ 1(a))** | All Staff | *Status of Curriculum* | Initial Refresher Finalized and approved by Monitoring Team<br>***Second Revised Refresher Under Development*** | Finalized and approved by Monitoring Team |
| | | *Length of Training* | 4-hours | 4-hours |
| | | *Frequency* | One year after S.T.A.R.T.<br>Every other year thereafter | One year after S.T.A.R.T.<br>Every other year thereafter |
| | | *Status of Deployment* | **Initial Refresher Complete** – 06/2021 – A.C.T.<br>***Ongoing Requirement Every Other Year*** | **Completed** – 2018 - A.C.T. |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | TTS Records/Sign-In Sheets |
| | | *Examination (¶ 6)* | None | None |
| **Crisis Intervention & Conflict Resolution (¶ 1(b))** | All Staff | *Status of Curriculum* | ***In Development*** | **Not Yet Developed** |
| | | *Length of Training* | 8-hours | TBD |
| | | *Frequency* | One year after A.C.T.<br>Every other year thereafter | One year after A.C.T.<br>Every other year thereafter |
| | | *Status of Deployment* | Will develop then commence after initial In-Service A.C.T. is completed. | Will develop then commence after initial In-Service A.C.T. is completed. |
| | | *Attendance (¶ 7)* | TBD | TBD |
| | | *Examination (¶ 6)* | TBD | TBD |
| **Defensive Tactics (¶ 2(a))** | All Staff | *Status of Curriculum* | First refresher provided as part of ACT; Second refresher developed in Ninth Monitoring Period<br>***Third Revised Refresher Under Development*** | |
| | | *Length of Training* | 4-hours | |
| | | *Frequency* | One year after S.T.A.R.T.<br>Every other year thereafter | |

| Status of Refresher Training Program Development and Deployment | | | | |
|---|---|---|---|---|
| **Training** | **Required Attendees** | | **In-Service Staff Refresher** | **Supervisor Refresher** |
| | | *Deployment* | **Initial Refresher Completed** – 06/2021 – A.C.T. *Ongoing Requirement Every Year* | |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | |
| | | *Examination (¶ 6)* | N/A | |
| **Unit Management (¶ 3)** | Staff assigned to work regularly in Young Incarcerated Individual Housing Areas | *Status of Curriculum* | Finalized and consulted Monitoring Team | |
| | | *Length of Training* | Approximately 3 hours | |
| | | *Frequency* | All Staff who work with Young Incarcerated Individuals | |
| | | *Deployment* | **Ongoing** -All Staff at RNDC | |
| | | *Attendance (¶ 7)* | TTS Records/Sign-In Sheets | |
| | | *Examination (¶ 6)* | N/A | |

