LC28NUNC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

MARK NUNEZ, et al.,

                    Plaintiffs,

            v.                              11 Cv. 5845 (LTS)

CITY OF NEW YORK, et al.,

                    Defendants.             Remote Conference

------------------------------x

                                            December 2, 2021
                                            10:00 a.m.

Before:

                    HON. LAURA TAYLOR SWAIN,

                                            Chief Judge

                            APPEARANCES

THE LEGAL AID SOCIETY
        Attorneys for Plaintiff Class
BY:  MARY LYNNE WERLWAS
        KAYLA SIMPSON
        DAVID BILLINGSLEY

EMERY CELLI BRINCKERHOFF ABADY WARD & MAAZEL LLP
        Attorneys for Plaintiff Class
BY:  JONATHAN S. ABADY
        DEBRA L. GREENBERGER
        NAIRUBY BECKLES

DAMIAN WILLIAMS
        United States Attorney for the
        Southern District of New York
JEFFREY K. POWELL
LARA K. ESHKENAZI
        Assistant United States Attorneys

LC28NUNC

1                          APPEARANCES (Continued)

2     GEORGIA PESTANA
            Corporation Counsel of the City of New York
3     BY:  KIMBERLY JOYCE
            Assistant Corporation Counsel
4
      STEVE J. MARTIN
5           Court Monitor

6     ANNA E. FRIEDBERG
            Deputy Court Monitor
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

LC28NUNC

```
 1              (The Court and parties appearing by videoconference)
 2              (Case called)
 3              THE COURT:  I would now ask the video participants who
 4    will be speaking for the parties and the monitor to introduce
 5    themselves, to state their appearances, beginning with the
 6    monitor.
 7              MR. MARTIN:  Good morning, your Honor.  My name is
 8    Steve J. Martin, court monitor, in the matter of Nunez v. City
 9    of New York.
10              THE COURT:  Good morning, Mr. Martin.
11              The deputy monitor.
12              MS. FRIEDBERG:  Good morning, your Honor.  My name is
13    Anna E. Friedberg, and I am the deputy monitor on the
14    monitoring team.
15              THE COURT:  Good morning, Ms. Friedberg.
16              Counsel for plaintiffs.
17              MS. WERLWAS:  Good morning, your Honor.  Mary Lynne
18    Werlwas, from the Prisoners Rights Project of the Legal Aid
19    Society, for the plaintiff class.
20              THE COURT:  Good morning, Ms. Werlwas.
21              Counsel for the U.S. Attorney's Office, for the
22    government.
23              MR. POWELL:  Good morning, your Honor.  Jeffrey Powell
24    with the U.S. Attorney's Office.
25              THE COURT:  Good morning, Mr. Powell.
```

LC28NUNC

1           Counsel for the defendants.

2           MS. JOYCE:  Good morning, your Honor.  This is

3  Kimberly Joyce for the City of New York and the defendants.

4           THE COURT:  Good morning, Ms. Joyce.

5           I greet other counsel, members of the press, and

6  members of the public who may be listening in since this is a

7  public proceeding.  And I would ask that all who are listening

8  in keep their phones muted.  And I would ask that the video

9  participants also keep themselves muted when they are not

10  speaking.

11          I remind everyone that as provided in the Court's

12  January 19, 2021 standing order, neither recording nor

13  retransmission of any part of this conference is permitted.

14          I will be calling on each speaker during the

15  conference.  Each time that you speak, please identify yourself

16  by name for clarity of the record and for the benefit of those

17  who only have audio access.  Please don't interrupt each other

18  or me during the conference.  If we interrupt each other, it's

19  difficult to create an accurate transcript.  But having said

20  that, and as usual, I apologize for breaking the rule because I

21  may interrupt if I have questions.

22          I will give the attorneys an opportunity to make

23  additional comments or ask questions at the end of the

24  conference, but if anyone has difficulty hearing me or another

25  participant, please say something right away.

LC28NUNC

1          Since the emergency conference in September, the

2    monitoring team, the city and the department have been working

3    at pace to address the issues the monitor has highlighted in

4    its recent status reports.  The monitoring team has reported

5    that the work to date has resulted in some gains, and the Court

6    expresses its appreciation to the monitoring team and the

7    parties for their diligent efforts in addressing the severe

8    conditions in the city jails.  The Court expects to hear more

9    today about what has changed, what hasn't, and the specific

10   steps that are being taken to improve safety and ensure humane

11   conditions.

12         Today's conference was scheduled to discuss the

13   defendants' efforts to implement the monitoring team's

14   recommendations included in the second remedial order, which is

15   docket entry number 398, and the city's ongoing initiatives

16   included in Appendix A to the monitoring team's September 23,

17   2021 report, which is docket entry number 404.

18         The monitor has submitted status reports setting forth

19   the stages of implementation of these recommendations and

20   initiatives, which can be found at docket entries 403 and 420.

21         The defendants submitted a status report detailing

22   their efforts to implement the ongoing initiatives articulated

23   in Appendix A, and that is at docket entry number 404.

24         In addition, the parties proposed, and the Court

25   adopted, a third remedial order focusing on ensuring timely

LC28NUNC

```
 1   accountabilities for use-of-force violations and addressing a

 2   substantial backlog in proceedings concerning use-of-force

 3   violations.  That is at docket entry number 424.

 4        The Court has attended carefully to these reports as

 5   they have come in.

 6        I would like to begin by asking the monitor for a

 7   general status update on current conditions and areas of focus

 8   from their perspective.

 9        MR. MARTIN:  Thank you, your Honor.  This is Steve

10   Martin.  In order to conserve the Court's time, and hopefully

11   to make my remarks more measured and thoughtful, I have

12   prepared a statement that I will read, if it's all right with

13   the Court.

14        THE COURT:  Yes.

15        MR. MARTIN:  Thank you, your Honor.

16        The downward spiral toward patently unsafe conditions

17   in DOC that brought us before the Court in late September has

18   been to some degree ameliorated by measures taken by the

19   governor's office, city officials, and, most importantly, the

20   Department of Corrections.  To varying degrees these measures

21   have diminished the dire conditions set out before the Court on

22   September the 24th.  This is not to say that the very serious

23   issues of unsafe conditions have been eliminated.  Make no

24   mistake, much remains to be done to render safe living

25   conditions to both staff and detainees in the DOC.
```

LC28NUNC

1          During my presentation before your Honor on September

2     the 24th, I spoke of the need to move toward "a

3     back-to-basics/corrections 101" approach to managing detainees.

4     I also talked of the importance of managing immediately

5     dangerous detainees after they have engaged in seriously

6     assaultive behaviors.  I then advocated for the infusion of

7     correctional management expertise into the system to accelerate

8     a move toward sound correctional practices.  Allow me to now

9     report out DOC's movement towards these aims.

10         We recommended a series of interim security measures

11    or a back-to-basics approach.  The department has issued

12    directives on staff remaining on posts, they have reinstituted

13    roll call with emphasis on door security, they have instituted

14    suspensions for officers who have abandoned posts during

15    assaults on other detainees, they have mandated strict

16    adherence to restraint practices for seriously assaultive

17    offenders, they have reiterated policies related to security

18    inspections, they have instituted directives on limiting

19    detainees access to secure areas, and they have instituted

20    safeguards on key control and other security equipment that too

21    often fall into the hands of detainees.  Can I attest that

22    these measures are bearing fruit?  No.  But I can attest it is

23    a start.

24         Let me now return to another issue of great importance

25    of harm to the plaintiff class detainees -- intake.  There is

LC28NUNC

1  no question that the new admission intake process was broken.

2  Conditions were clearly inhumane.  The DOC moved the new

3  admissions process to the Eric M. Taylor facility, or EMTC, as

4  it is called.  This move almost immediately ameliorated the

5  dire conditions.  Is the new admissions process cured?  No.

6  But this move clearly eliminated pervasive harm.  Are some

7  detainees not processed within 24 hours?  Yes.  But they are

8  far fewer than what we saw at the time of the hearing.  Are

9  there still processing issues remaining?  Yes.  But we are

10  pressing DOC to address them.

11        Another issue of safety and harm was the DOC's

12  management of detainees who engage in serious acts of violence

13  toward other inmates.  We refer to this as post-incident

14  management.  In other words, what do you do with detainees in

15  the immediate aftermath of them harming other detainees?  We

16  cited incidents in reports to the Court that DOC was not

17  properly managing such detainees; in other words, they were

18  left to reengage in further acts of violence.  Since September,

19  a specific protocol was developed and put into place to manage

20  such offenders.  A very able member of the DOC Nunez compliance

21  team has monitored vigorously the implementation of this

22  protocol and meets frequently with executive staff to guide

23  their implementation of the protocol.  Again, are there

24  problems with this protocol?  Yes.  But the agency is now aware

25  of their obligation to manage these offenders.  Heretofore,

LC28NUNC

1  they were basically left unchecked in some instances to engage

2  in further acts of violence.

3          A final word on specific issues.  My office

4  recommended the retention of a recognized expert on strategies

5  to manage detainees with gang affiliations.  They are presently

6  in the process of retaining such an expert who is a recognized

7  leader in offender classification.  I can attest that he will

8  bring much needed expertise to DOC on this issue.

9          I will now defer to the deputy court monitor to add

10  detail to other critical areas of DOC's efforts to move toward

11  improving the safe operation of the New York City jails and to

12  outline our recommendations for a path forward.

13          THE COURT:  Thank you, Mr. Martin.

14          Ms. Friedberg.

15          MS. FRIEDBERG:  Good morning, your Honor.  My name is

16  Anna Friedberg.

17          Following up on Mr. Martin's statement, I wanted to

18  walk through where we go from here.  How and why did we get

19  here and where do we go?  We have spent probably the last six

20  years thinking through that, the last 100 days since we first

21  sent this status report in August of this year, and the last 60

22  days in which both the second and third remedial orders have

23  been entered by the Court.

24          There were three guiding principles as we started to

25  think through how best to recommend moving forward.  The first

LC28NUNC

1   is that we really strongly believe that change must come from

2   within the agency itself.  Those that work within the

3   department have to be empowered to change and fix it.  Of

4   course, they are going to need support in doing that, and that

5   reinforces two of the recommendations that the monitoring team

6   made both at the end of the eleventh monitoring period and

7   throughout this period now.  One is the expansion of the

8   criteria in which the department can obtain wardens such that

9   they can recruit and identify individuals to serve in these

10  leadership roles that do not necessarily come up through the

11  uniform rank.  The second is the potential appointment of a

12  security operations manager who can help serve and mentor those

13  staff and set the new expectations of what is necessary.

14      The second is that we need to focus on certain

15  foundational issues.  And those must be prioritized before we

16  move forward trying to address the plethora of requirements in

17  the consent judgment and the three remedial orders.  I will get

18  to those in a second, but I just raise that, as we thought

19  forward, we had to identify what is achievable and what can be

20  done to build the foundation upon which the department can

21  continue to improve and have sustainable reform.

22      Finally, we recognize that reasonable expectations

23  must be set, such that we understand perfection is not

24  ultimately the goal here, but a realistic approach to what can

25  be achieved.  That really drove the monitoring team to think

LC28NUNC

1    through how do we get where we need to go?  That identified yet

2    another list, that is, the foundational issues that we think

3    really need to be built in order for us to move forward.  Those

4    four are:

5          Security practices and procedures are deeply flawed.

6    They must be addressed.

7          Second, the inadequate supervision of line staff as

8    well as the inadequate expertise that they have in which to

9    guide those staff in doing what they must do and get

10   back-to-basic corrections 101, as Mr. Martin spoke about

11   earlier.

12         The third is with respect to the department's staffing

13   practices and procedures and the ineffective deployment of

14   staff throughout the agency.

15         The fourth is limited and extremely delayed

16   accountability for staff misconduct.

17         I will take each of those in turn very quickly.

18         With respect to staffing practices and procedures, I

19   already briefly noted that we have made recommendations with

20   respect to both the expansion of the criteria for facility

21   leadership and a security operations manager.  Mr. Martin also

22   spoke about some of the interim security plans already

23   underway.  Those certainly will need to be expanded and become

24   in line with many of the initiatives outlined in the first

25   remedial order.  We will talk through each of those as we walk

LC28NUNC

1    through the conference later, so that's just a preview on that

2    particular item.

3           With respect to staffing practices, the monitoring

4    team has initiated a staffing analysis, which, again, I am

5    happy to go into a little bit more detail as we go through the

6    conference, but we recommend that that work is done in order to

7    determine how best to deploy staff.

8           Then, finally, the practices with respect to imposing

9    timely discipline must be revised and reworked.  That work has

10   been outlined in the third remedial order, which was signed

11   very recently by the Court, and that work has already begun

12   with the monitoring team and the department and time is now

13   necessary for us to work forward.

14          So that's just an outline of where we think we need to

15   go to move forward, and we expect that in the coming weeks,

16   months, that will be where we spend our time and focus with the

17   department.

18          I look to forward any questions you may have or any

19   other information you require from us, your Honor.

20          THE COURT:  Thank you, Ms. Friedberg.

21          I will first hear the status statements from the other

22   parties, starting with counsel for the city.

23          Ms. Joyce.

24          MS. JOYCE:  Yes, your Honor.  Good morning.

25          I also prepared a brief written statement that I will

LC28NUNC

1  read.  I know Mr. Martin and Ms. Friedberg have covered some

2  ground already and I am not sure how specific the Court wants

3  me to get, so I will read this and then I welcome any

4  questions.

5       Good morning, your Honor.  The department, the city,

6  in collaboration with the monitoring team, have been working

7  tirelessly to improve conditions for the people incarcerated at

8  department facilities and for the officers who continue to come

9  to work every day despite the challenges they face.  While

10  there is much work to be done, and we are committed to that

11  work, there have been improvements that give hope that the

12  conditions that gave rise to the monitoring team writing the

13  Court over the summer are moving in the right direction.  We

14  are committed to continuing our collaborative and transparent

15  relationship with the monitor and the monitoring team as we

16  work to tackle these challenges.

17       Early indicators are that violence and use-of-force

18  data are bending in the right direction, as the population

19  declines, with fewer unstaffed posts and fewer triple shifts

20  for officers.  The department and the city made great efforts

21  to decrease the detainee population, which is down from about

22  6,000 detainees in September to about 5200 currently.  There

23  have also been declines in triple shifts, in AWOLs, absent

24  without leave, and then the number of unstaffed posts.  And we

25  anticipate seeing greater declines in those areas in the coming

LC28NUNC

1    weeks and months.

2              The mayor additionally signed two executive emergency

3    orders.  One on September 15, which now I cannot recall if that

4    was before or after our last conference.  I apologize.

5              THE COURT:  That would have been before the last

6    conference.

7              MS. JOYCE:  That emergency order, your Honor, covered

8    AWOLs and suspensions of staff without pay for 30 days, it

9    concerned improving the sick leave policies, it allowed NYPD to

10   take over court operations, and it suspended certain

11   procurement rules and regulations so that the department could

12   hire certain staff without having to go through the city's

13   procurement procedures.

14             This past week's executive order also allowed the

15   department to amend its tour schedules, going to 12-hour tours,

16   which we believe will alleviate the triple shifts and overtime.

17   This is just a short-term solution to the problem that we

18   believe is going to bear fruit.

19             Finally, the department has new staff beginning in

20   late December as well as mid-January, with a new entry class at

21   the academy beginning in March of 2022.  While the size of that

22   class is unclear, 1600 people passed the test needed to enter

23   the academy, so that will be the outer limit of what the class

24   size is.  So six months from then, in August or September of

25   2022, you should therefore have another class of officers

LC28NUNC

1   beginning at the academy.

2           Since the last conference also, in the efforts to

3   decrease the population, the department has transferred the

4   women from the Rose M. Singer Center to the Bedford Hills

5   Correctional Facility in Westchester, New York, and has ensured

6   that services are continuing for the women that are at that

7   facility.  And that was an effort to help decrease the

8   population.

9           So, your Honor, I know that Mr. Martin and Ms.

10  Friedberg talked about the efforts to improve security so I

11  don't want to retread ground there, but that is essentially

12  where we are at this moment.  We are continuing the

13  relationship with the monitoring team.  We are being as

14  transparent as possible.  We are working, and when I say "we,"

15  I mean the department are working very hard, in very

16  challenging circumstances, and we will continue to work hard to

17  improve the lives of those who live on Rikers Island and who

18  work there.

19          And I welcome any questions from the Court or the

20  monitoring team when you feel appropriate.

21          THE COURT:  I will just ask you one now.

22          What are you able to say about the status of the

23  response to the recommendations to bring in outside expertise?

24          MS. JOYCE:  When you say outside expertise, do you

25  mean contract staff or actual wardens or above at the

LC28NUNC

1    department?

2              THE COURT:  I understand that there are two issues.

3    So one is being able to bring people in as wardens.  Well, I

4    guess three issues.  Then there is a classification consultant

5    recommendation, and a person to come on staff as the security

6    operations manager.  I referred to them all as outside because

7    they presume people coming in from outside of current staff and

8    regular channels.

9              MS. JOYCE:  Yes, your Honor.

10             So as Mr. Martin and Ms. Friedberg indicated, we are

11   in the process of retaining the two experts, the classification

12   expert and the security operations manager expert.

13             Ms. Friedberg, correct me if I am misspeaking.

14             MS. FRIEDBERG:  I'm sorry.  Say that again.

15             MS. JOYCE:  I just wanted to say that the department,

16   in terms of the classification expert, we are in the process of

17   retaining that person, and we are in agreement with the

18   security operations manager.  So it's just in terms of getting

19   those two people on board.

20             MS. FRIEDBERG:  With respect to the classification

21   expert, that is true.  My understanding from my work with the

22   department is that they have begun working with him.  I think

23   there may be some contractual issues, but I think otherwise

24   that work has started at least in earnest.

25             With respect to the security operations manager, the

LC28NUNC

1    department has been engaging with the monitoring team to

2    determine the contours of what that role has been.  It has been

3    an active engagement between the monitor, myself, and both the

4    commissioner and other high-ranking officials within the

5    department.  As to what that role exactly looks like, we are

6    not yet certain, whether it might be one individual or a team

7    of people.

8            So that's just the only caveat I would share, is that

9    those discussions are still ongoing with respect to exactly how

10   that role will work.  But that work has been ongoing and, in

11   fact, was subject to discussions that the monitor and I had

12   with the commissioner as early as yesterday, or as late as

13   yesterday.  So that work continues, but it is one that cannot

14   be entered into lightly.  So we have been giving it a lot of

15   thought with respect to what that role would look like, what

16   their responsibilities would be, and what would their areas of

17   focus be, both within the agency itself and the specific topic

18   areas that they may be covering.

19           THE COURT:  So do I correctly understand, then, that

20   someone has been identified for the classification expert role

21   and is beginning to work with the department even while the

22   formalities of the role are being attended to; is that correct?

23           MS. FRIEDBERG:  Yes, your Honor.  Mr. James Austin has

24   been selected.  We actually recently modified the remedial

25   order to reflect the fact that he has been selected, and the

LC28NUNC

1    department consulted with the monitor prior to that

2    determination, and that work has started.

3              THE COURT:  Thank you.

4              As to the security operations manager, it is still in

5    the stage of defining the role and not in the stage of

6    identifying a specific person or people to occupy that role;

7    would that be correct?

8              MS. FRIEDBERG:  Maybe a slight modification, your

9    Honor.  It's somewhat of a simultaneous discussion.  There have

10   been particular individuals under consideration, but that

11   partly relates to what the responsibilities would be.  So it's

12   a little bit of a -- it has to be a parallel track of

13   discussion.  And ultimately we anticipate that we also will be

14   needing to consult with the plaintiff class and the U.S.

15   Attorney's Office on this as well.  We just have not been able

16   to develop a full package yet to get there, but those

17   discussions are ongoing, both in considering potential

18   individuals for the role as well as what that role would

19   entail.  What the role entails may determine who the person is.

20   Who the person is may impact some of the responsibilities as

21   well.  So that's why it's being done a little bit in tandem

22   right now.

23             THE COURT:  Thank you.

24             Ms. Joyce, I think you were beginning to speak and I

25   cut you off, so please.

LC28NUNC

1          MS. JOYCE:  No, that's fine.  I was just going to

2     confirm that the classification consultant has the contract in

3     hand, it's almost finalized, and he is already receiving data.

4     So he is, in fact, working even though some of the logistical

5     things have not yet been finalized.

6          THE COURT:  Thank you, Ms. Joyce.  That's all I had

7     for you by way of questions at this stage.  Is there anything

8     else you wanted to say at this point?

9          MS. JOYCE:  Not at this moment, your Honor.  Thank

10    you.

11         THE COURT:  Thank you, Ms. Joyce.

12         So I will turn now to counsel for the government.

13         Mr. Powell.

14         MR. POWELL:  Good morning, your Honor.  It's Jeffrey

15    Powell for the government.

16         Just some brief words to start.  The government

17    obviously remains extremely concerned about the ongoing

18    extraordinary level of violence and disorder at the jails, the

19    ongoing alarming high staff absenteeism rates which have shown

20    little improvement over the last couple of months -- and I will

21    talk about that in a second -- and the ongoing failure, the

22    recognized failure, to comply with core provisions of the

23    consent judgment and the remedial orders recently entered.

24         The department's failure to follow basic security

25    protocols, competently manage its line staff, and adequately

LC28NUNC

1    supervise detainees, as has been documented in detail in the

2    monitors' many thorough reports, continues to create an unsafe

3    environment and an ongoing imminent risk of harm for inmates as

4    well as department staff and anyone who has to work or be in

5    the jails.

6        We understand that some improvement has been made

7    recently, but we would like to bring the Court's attention to

8    certain data that makes it clear how much work still needs to

9    be done.

10        Our understanding, based on the information we have

11    from the monitor and recent data reported, is that the rate of

12    use of force in the jails is higher than it has ever been.

13    Just since September alone, there were 728 use-of-force

14    incidents.  The rate of force is multiples of what it was when

15    this consent judgment was entered in 2015, where there were

16    unconstitutional conditions at the facility.  The rate of

17    inmate-on-inmate fights is higher than it's ever been.  The

18    rate of stabbings and slashings is higher than it's ever been.

19    According to the data we had, there were 51 stabbings or

20    slashings in the jails in September alone.

21        Some words have been said about absenteeism and we

22    understand the department has made efforts and has suspended

23    many folks for being AWOL, but the data shows little

24    improvement in the numbers.  It has been consistent and the

25    recent data we have, it goes all the way through November 25.

LC28NUNC

1   It still remains that about 30 percent of the uniform staff at

2   the department are out sick on any given day, AWOL, or on

3   medically restricted status where they can't interact with

4   inmates.  The numbers have moved a little bit in the 30 percent

5   range day-to-day, but they are pretty constant from what they

6   were when we were before your Honor back in September.

7           On November 25, according to the data reported by the

8   city, of the 8,051 uniform staff, 1523 were out sick, 818 were

9   on medical restricted status, and 50 were AWOL.  This has led

10  to a high number of unmanned shifts, where at a post there will

11  be no uniform staff assigned to a post at all for a shift.

12  Those numbers have gone up and down a little bit over the last

13  couple of months, but on multiple occasions there were over 100

14  unmanned posts in the city jail system in October.

15          There have also continued to be double and triple

16  shifts that have been way too frequent, and it is just too much

17  to ask of a correction officer to manage inmates in a safe way

18  working 16, 24 hours at a time.  I understand the city has

19  shifted to a 12-hour work shift in light of the vaccine mandate

20  and the staffing challenges, but the hours are still the same;

21  you will have staff either working 12 hours or sometimes 24

22  hours.  It still is asking too much of correction officers.

23          And what I would like to hear the city discuss today

24  is, is this the new normal, where basically close to a third of

25  their uniform staff are not going to be interacting with

LC28NUNC

1    inmates on a given day and available to work?  If that is the

2    case, then they need to plan accordingly, and we need to have a

3    plan for that.  But we are not seeing, despite good faith

4    efforts by the department, suspensions of folks who have been

5    AWOL for many months.  We still don't see the number

6    significantly decreasing.  And the policy is still that

7    correction officers have unlimited sick leave.  And we

8    understand the challenges that presents for the department, but

9    it is a reality.

10           Finally, as far as data, there is still -- the monitor

11   has talked about this -- an ongoing failure to adhere to basic

12   core security protocols and get very straightforward things

13   done.  One example, back in September it was identified that

14   900 cell doors in RNDC, the facility that houses the youngest

15   inmates and others, 900 cell doors needed to be replaced.

16   According to the report submitted by the city on October 14,

17   300 of those doors have been replaced.  They plan to replace

18   another 250 by February of 2022, and there was no deadline for

19   the other doors.

20           I am just bringing up this example because these are

21   simple things that raise serious concerns.  If the department

22   cannot promptly fix inoperable doors of cells in the jails,

23   it's hard to expect things to improve dramatically no matter

24   what the good faith efforts of the monitors, they certainly

25   have put in hours and hours of time working with the department

LC28NUNC

1    to get things done, but things still are not getting done

2    efficiently.

3            Just to conclude, two issues I would like to raise

4    with respect to the remedial order entered back in September

5    after we last appeared before your Honor.

6            We remain extremely frustrated by the lack of progress

7    that has been made in implementing the monitors'

8    recommendations to deal with the deficiencies in the

9    corrections expertise at the management level in the facility.

10   Your Honor alluded to the monitors' recommendation and what was

11   contemplated in the remedial order was to expand the criteria

12   for hiring facility leadership positions -- wardens, deputy

13   wardens -- so that the department could look outside the

14   uniform ranks to find the most qualified, experienced people to

15   run their jails.  My understanding is that has reached a

16   roadblock.  The city's position, I think, and I want to hear

17   from them today, and I would ask them to respond, is that there

18   are legal impediments, state and local laws, that prevent them

19   from hiring folks with expertise to run their jails outside of

20   the uniform ranks.  So I think we would like to understand, is

21   the city saying that it is unable to do that, to hire outside

22   folks?  Do they need your Honor to issue an order requiring

23   them to do that to remedy the constitutional violations that

24   are ongoing?  Would the city consent to such an order?  Those

25   are the issues that I think are very important, as we sit here

LC28NUNC

1    today, that that initiative is stalled, as far as I understand

2    it, and we would just like to take this opportunity to get a

3    better understanding of what can be done to move that forward.

4            The other issue, and the city has addressed this a bit

5    earlier, was the recommendation to hire an outside expert to be

6    the security operations manager.  We are pleased to hear today

7    that the city has firmly committed to hire such person or

8    people.  We are happy to hear that.  We understand that it's a

9    complex process to figure out the precise role and to find the

10   right candidate, but this is desperately needed.  I would like

11   the city to address what a proposed time frame might be or a

12   time to report back to the Court as to what the role would be,

13   who will fill it, and what a timeline is for hiring that

14   person.  Because as each day passes, more use-of-force

15   incidents happen, more slashings, more correction officers are

16   injured, and more staff are harmed.  So we would like some

17   specifics on the plan to implement that recommendation today.

18           So the core recommendations of the monitor were to

19   bring in outside help.  And we understand the consultant has

20   been hired to look at that particular issue of how to house

21   gang members in units most safely, but that is one small piece

22   of the overall need to infuse this department with much more

23   expertise in the basics of corrections, and that's where we

24   think we need to go from here.  And if the city can't hire

25   people outside to bring them in, the government will need to

LC28NUNC

1    consider with plaintiff class other alternatives to get past

2    these legal impediments.

3              Thank you, your Honor.

4              THE COURT:  Thank you, Mr. Powell.

5              I will go back to Ms. Joyce on these questions before

6    I call on Ms. Werlwas so that we have the best information base

7    we can have before Ms. Werlwas speaks.

8              Actually, Ms. Friedberg has her hand up.  So I will

9    call on Ms. Friedberg first and then Ms. Joyce.

10             MS. FRIEDBERG:  Thank you, your Honor.

11             I just wanted to clarify one piece of information

12   mentioned by the government.  I believe that the way in which

13   the monitor produced certain data led to a potential

14   miscommunication.

15             With respect to the fixing of the cell doors at RNDC,

16   the department has committed to fixing all 900 doors within the

17   facility.  That does not actually mean that all 900 doors

18   within the facility are, in fact, inoperable.  That certainly

19   is probably a lack of clarity in the way in which I produced

20   that report to the Court.  So I just wanted to clarify that,

21   while not every door has been replaced, the goal of replacing

22   the doors is to ensure that there are doors that are less

23   likely to be manipulated.  But that does not mean that because

24   they are replacing all 900 doors, that, in fact, those doors

25   are in fact inoperable.  They just tend to be of an older type

LC28NUNC

in which manipulation of that door could be more likely.  And

so that is why the process of replacing doors is occurring

throughout the facility.

Right now the department does not even utilize every

cell door within RNDC.  I, unfortunately, at this time don't

have data for you with respect to how many doors may be

inoperable at this given moment and whether or not they are in

use with an incarcerated individual.  But I just did want to

clarify that our reporting out of the replacement of 900 doors

was not intended to reflect the fact that all 900 doors were

inoperable.  So I apologize for that lack of clarity in our

communications to the Court and to the parties.

THE COURT:  Thank you for that clarification.

So, Ms. Joyce, first, the status of the recommendation

to hire people from outside into warden positions.

MS. JOYCE:  Well, your Honor, could I flip them

because I believe Ms. Friedberg is the one that would have the

best information about how long the timeline will take for the

security operations manager, which was one of the questions

Mr. Powell asked.

THE COURT:  So that's the one that you want to start

with?

MS. JOYCE:  Yes.  Only because Ms. Friedberg just

spoke about how they are simultaneously on the path of

discussing the contours of the role, as well as candidates for

LC28NUNC

1    the role depending on the contours.  So I don't have a timeline

2    for when that will be completed.  I think that timeline is best

3    within Mr. Martin and Ms. Friedberg's hands as to the

4    definition of the role and who they identify is appropriate.

5    Plus, they indicated that they would need to have conversations

6    with plaintiffs' counsel and the government.  So I am not sure

7    how long they intend that to take.  So that's not something

8    that's within my knowledge frame.

9              THE COURT:  Understood.  Thank you.

10             Ms. Friedberg, if you could take this in at least two

11   chunks.  First, how long do you believe it will take to be

12   ready for the conversations with the government and plaintiffs'

13   counsel.  And then I understand that you wouldn't be able to

14   project precisely how long those conversations would take, but

15   assuming that at some point that results in an agreement on a

16   strategy, how long do you think it would then take to implement

17   the strategy?

18             MS. FRIEDBERG:  Sure, your Honor.

19             I have not fully vetted a timeline even with Mr.

20   Martin himself, so I am going to have to say that some of this

21   will be subject to some internal conferring after the fact, but

22   at least to advise the Court that certainly this is the highest

23   priority of the monitoring team.  I would anticipate that

24   within the next two weeks -- we owe a report to the Court on

25   December 22 -- that we would be in a position to identify the

1    status of the discussions with the city and then provide a

2    timeline from there.

3            One factor I must note that gives me some hesitancy

4    with committing to a timeline right now is that we are about to

5    enter into a new administration for the city.  What impact, if

6    any, that may have on these discussions, especially given the

7    impact of this role, must be considered.  I cannot in good

8    conscience ignore that fact right now.  The city has remained

9    committed in discussing this role, but I think that ultimately

10   Mr. Martin and I will have to confer with respect to how long

11   it may take to ultimately flesh this out and the timeline, of

12   which I would propose that we share that in our next report on

13   December 22.

14           THE COURT:  Thank you.

15           Ms. Werlwas, did you want to speak on the record?  I

16   saw your mouth moving and you were muted.  I didn't want to

17   skip over you.

18           MS. WERLWAS:  Thank you, your Honor.  My co-counsel is

19   here in the office with me, Ms. Simpson, and others are on the

20   line.

21           If we may briefly, your Honor, if now is appropriate.

22           THE COURT:  Well, I wasn't about to call on you in the

23   ordinary course now.  I thought you might have wanted to make a

24   comment on what Ms. Friedberg had said.

25           MS. WERLWAS:  No, your Honor.  Thank you.

LC28NUNC

1          THE COURT:  So I will go back to Ms. Joyce then on the

2     first question, which is the city's perspective on legal

3     liability at this point of hiring outside people into warden

4     positions.

5          MS. JOYCE:  Yes, your Honor.  Thank you.

6          Believe me, your Honor, there is nothing that we would

7     like more than to be able to easily bring in outside expertise

8     to the level of warden through chief of department, but the

9     current legal landscape prevents that.  Unfortunately, I have

10    learned a lot more about employment law over the past couple of

11    months than I would have liked, and we have had extensive

12    discussions with Ms. Friedberg on this, but there are certain

13    civil service laws, state civil service laws, city

14    administrative code, correction law provisions, that prevents

15    the department from hiring outside of the current uniform ranks

16    for the uniform positions of warden through chief of

17    department.  I have discussed with my colleagues and legal

18    counsel the options to get around those laws and it's not as

19    easy as the snap of a finger.  My office engaged with the

20    state, and while there may be some wiggle room -- and, Ms.

21    Friedberg, we should continue those discussions -- I don't

22    believe that the state is willing to suspend those laws,

23    especially when we don't have any candidates for the position.

24    It might be different if we had people who were interested in

25    coming to the department to be wardens, but so far

LC28NUNC

1   conversations have been a little fruitless.

2        Additionally, I did speak to my colleagues about the

3   potential for your Honor to just sign an order suspending the

4   laws that would then allow us to hire from outside, and it's

5   not as easy as that either.  I was told that there are

6   significant separation of powers questions.  There are

7   federalism concerns with this option.  There are public policy

8   concerns.  So those were all considered in our analysis that

9   it's just not something that we can do right now with the laws

10  the way that they are.

11       I see Mr. Powell has his hand raised.  I am happy to

12  have a conversation offline with Mr. Powell and Ms. Werlwas

13  with those who could better explain the interplay between the

14  civil service laws, the admin codes, our inability to hire, and

15  what the obstacles are.

16       THE COURT:  Thank you, Ms. Joyce.

17       Mr. Powell.

18       MR. POWELL:  Your Honor, I would just like to point

19  out that, in our view, and I think the legal counsel for the

20  class may add to this, but under the PLRA, it's our view that

21  your Honor could enter an order requiring the city to hire

22  outside folks if the federal law requires such relief, which we

23  believe it does.  The relief is necessary to correct the

24  violation of a federal right, which given the monitors'

25  detailed, repeated over the years, documentation of the lack of

LC28NUNC

1  quality supervision in these facilities, we think that criteria

2  can be met, and that no other relief will correct the

3  violation.  I am just repeating what is in 18 U.S.C.

4  3626(a)(1)(B).

5       So we think that order is within what your Honor could

6  authorize.  We initially would want to engage with the city,

7  and I think this question has been posed to the city before

8  this call, and I understand it's a complex one and Kim has to

9  talk to her client, but our first question is whether the city

10  would consent to such an order that would, in essence, waive

11  any applicable state or local law that would prevent them from

12  making these hires.

13       So that is an issue we think is ripe for discussion.

14  We want to move forward on that issue.  I am happy to talk to

15  the city and their experts.  But ultimately, even if their view

16  is that the law, as a labor law matter, poses an impediment, we

17  do think that your Honor can issue an order, given these

18  egregious conditions, that can basically waive those laws.

19       Just one other point.  I am not sure what the city or

20  the department has done with outreach to find folks who may be

21  qualified.  I am not doing the outreach, I don't know, but if

22  the question is getting candidates and then presenting them to

23  the state and having laws waived based on specific candidates,

24  then I wonder what efforts the city has made to identify those

25  candidates across the country.  I didn't realize those outreach

LC28NUNC

1    efforts have been made, but if there are candidates, I think

2    that would strengthen the position if they actually selected

3    candidates who were interested and qualified.

4         Thank you.

5         THE COURT:  Ms. Werlwas has her hand up now, and so I

6    will call on her before going back to Ms. Joyce.

7         MS. WERLWAS:  Your Honor, my apologies, but the

8    mechanical raise-hand function does not seem to be working.

9         THE COURT:  The physical one worked just fine.

10        MS. WERLWAS:  Your Honor, for the order of the

11   conference, I did want to contribute to this discussion very

12   specifically about this particular topic and can confine my

13   remarks just to this right now or talk more generally.

14        THE COURT:  I would like to be able to close the loop

15   on an action and consultation plan with respect to the wardens

16   issue, and so I would invite your comments on that now.  I will

17   go back to Ms. Joyce about a meet-and-confer and sharing

18   information moving forward.

19        MS. WERLWAS:  Thank you.  This can be brief.

20        We fully endorse what the government just spoke about

21   the paths forward.  We, as the city noted, have had extensive

22   conversations with the monitor about this topic, but I profess

23   some deep concern that we certainly, despite months of

24   discussing this issue, have yet to receive anything but a

25   rather cursory explanation of their legal position.  That is

LC28NUNC

1   not to say we necessarily disagree with their views on the

2   application of state and local laws.  We simply just don't know

3   what they are.

4          That being said, what we think is critical to come out

5   of today understanding is, as Mr. Powell noted, using the

6   provisions of the PLRA that specifically understand and

7   contemplate that courts in this position, needing to implement

8   relief, prospective relief, that does intersect with state and

9   local law, have a path forward.  It's a statutory path that

10  Mr. Powell identified.  We think abundantly clear that the need

11  for this relief is well established on this record.  The

12  question is whether the city will consent to seeking an order

13  from your Honor, as we have negotiated and approached your

14  Honor with negotiated stipulated relief to date, or whether

15  that is not a path forward.  And we think it's very critical

16  that we understand their position on whether or not they will

17  join us in seeking a path forward or whether that is something

18  that we will have to seek from the Court through a contested

19  motion.

20          THE COURT:  Thank you, Ms. Werlwas.

21          Ms. Joyce.

22          MS. JOYCE:  Yes, your Honor.  Thank you.

23          If I may make a proposal, because as Mr. Powell and

24  Ms. Werlwas alluded to, I will need to speak to stakeholders in

25  my office about their proposal.  I think some of our concerns

LC28NUNC

1   internally was also about the Court's willingness to endorse

2   such request if it was to be brought before the Court.

3          So I believe the monitoring team has another report

4   due on the 22nd.  So I would propose that I engage with my

5   stakeholders on the specific question that Mr. Powell and Ms.

6   Werlwas raised about whether or not we would consent to an

7   order under 18 U.S.C. 3626(a)(1)(B) on this specific topic,

8   that I have that conversation with my stakeholders and report

9   back to the parties, and that we can inform the Court on or

10  about December 22 about whether or not we consent to that

11  application, oppose the application, or whether or not there is

12  some other path forward.  And during that time I can also

13  endeavor to do my best to explain or get colleagues on the

14  phone to help explain our views on the legal impediments to

15  Mr. Powell and Ms. Werlwas.

16         THE COURT:  So is the December 22 time frame

17  coincident with a reporting date?  I'm sorry.  I haven't

18  memorized the calendar at this point.  So that would be 20 days

19  out from now.

20         MS. JOYCE:  I think that's when Ms. Friedberg will be

21  submitting the third remedial order report on the first and

22  second remedial order.

23         THE COURT:  Ms. Friedberg is nodding yes.

24         MS. FRIEDBERG:  It's the third remedial order report

25  about the first, second, and third remedial orders.

LC28NUNC

1          THE COURT:  Thank you.

2          Ms. Werlwas.

3          MS. WERLWAS:  Your Honor, just for clarity, I am not

4    certain that I understand the city's position or proposal about

5    what should transpire.  Is it that by December 22 the city will

6    inform the parties of their consent to an order?  And if so,

7    why do we need to wait until December 22?  It seems, if we

8    could get their position, then we could report to the Court by

9    December 22 whether the issue has been resolved or whether it

10   will need motion practice.

11         MS. JOYCE:  Your Honor, that was my intent, to inform

12   the Court in the December 22 status report, which would thereby

13   presume that Ms. Werlwas and Mr. Powell would have gotten our

14   positions in advance of that so Ms. Friedberg can inform the

15   Court on December 22.

16         THE COURT:  So you anticipate providing more

17   information of the basis of your position, doing your internal

18   consultations, and informing Mr. Powell and Ms. Werlwas, and

19   presumably the monitoring team, as to whether the city

20   anticipates being in a consent posture sufficiently in advance

21   of the December 22 reporting date that that December 22 report

22   will be able to reflect the parties' respective positions as to

23   whether we are heading in a consent direction or whether we

24   would be heading in a litigation direction, and I guess in

25   either case, propose mechanics and timetable.  Is that a fair

LC28NUNC

summary of what you are proposing, Ms. Joyce?

MS. JOYCE:  Yes, your Honor.

THE COURT:  Thank you.

Mr. Powell has his hand up.

MR. POWELL:  If I may just follow up on that.  I understand it's a complex issue.  It is arising out of a recommendation the monitor made as early as May of this year, but I understand the city has to confer.  My only question is, if that is the proposal, given the realities of the timing here and the end of this current administration, whether it will be feasible, if the city is in a consent position, to execute a consent order and have appropriate sign-off before the change in the administration and how that would play out.

I guess our preference would be, if there is consent from the city, that's obviously up to them, that December 22 be set as a deadline to submit an actual proposed order.  It will be fairly straightforward hopefully.  So we would just request that the deadline be December 22 to actually submit a proposed order.  If there is no agreement, obviously there is no agreement, and then the monitor would set forth the parties' positions.  That would be my respectful proposal to your Honor just given the timing here.

THE COURT:  So the goal would be, in your proposal, a consent order, if that's going to happen, by December 22.  And in the absence of the consent order, the joint report, which

LC28NUNC

1    would in your view then anticipate litigation given the time

2    frame.  Am I hearing you correctly?

3            MR. POWELL:  Yes, your Honor.  I think it would be the

4    monitors' report, they would set forth the parties' positions,

5    like they have done in prior instances with your Honor, and

6    then we would evaluate how to go from there, whether it's

7    litigation.  But it would set forth either as a consent order

8    for you to sign off, if you deem appropriate, or the parties'

9    positions if they don't reach a consent order.  That would be

10   our proposal.

11           THE COURT:  Ms. Joyce, considering the timing and the

12   change of administrations, that seems certainly the most

13   practical goal from the perspective of being able to get

14   something on the books.  Is that a goal that you can undertake

15   now and to which I can express an expectation and direction

16   coming out of this conference?

17           MS. JOYCE:  Yes, your Honor.  Because if it's going to

18   be a yes, it should be fairly easy to put together a consent

19   order.  I think it will be fairly easy to meet that December 22

20   date, to have a consent order if it's going to be on consent.

21           THE COURT:  So we will say proposed consent order, if

22   any, by December 22 -- of course, if it does go quickly, there

23   is nothing that would prevent you from submitting it before

24   December 22 -- regarding outside leadership for facilities.

25   And in absence of consent order, positions to be included in

LC28NUNC

 1    the monitors' December 22 report.

 2              Is that language acceptable, Ms. Friedberg?

 3              MS. FRIEDBERG:  Thank you, your Honor.  I just had one

 4    question with respect to the fact, if the parties are in a

 5    position to submit a consent order, will you be requesting any

 6    information from the monitor with respect to other prior

 7    orders?  There have been times when you have requested a

 8    declaration.  I just thought I might as well ask these

 9    logistical questions now.  Certainly, should you require one,

10    we would be happy to furnish one.  I don't know if it will be

11    necessary in this case or not, but I thought we might as well

12    think that through while we are here as well.

13              THE COURT:  I appreciate you raising the question

14    because these are fast-moving discussions.  I haven't thought

15    that all the way through, but it certainly wouldn't be

16    something detrimental to the process.  So my answer to you at

17    this point would be, yes, I would request a monitors'

18    declaration in support of the consent order.

19              Ms. Werlwas, you raised your physical hand.

20              MS. WERLWAS:  Your Honor, just to offer our view,

21    which is certainly that there are efficient ways we think in

22    this case for the parties to agree upon or to stipulate, for

23    example, to facts that might minimize the burden on the

24    monitoring team to reproduce by declaration many of the facts

25    that we believe would support this order.  We think those are

LC28NUNC

1    already the facts that the monitoring team has amply laid out.

2    We understand the formal mechanism of essentially taking those

3    facts into admissible evidence is what is at issue, but may we

4    simply offer that we are happy to talk with the monitoring team

5    and the parties about even more streamline mechanisms that

6    would provide the record the Court needs?

7         THE COURT:  So a consent order that would incorporate

8    recitals by way of stipulation obviating the need for a

9    separate monitor declaration?

10        MR. WERLWAS:  Yes.

11        THE COURT:  The Court would welcome that if the

12   parties are able to do that.

13        Someone called Jeff had had a hand raised, but then

14   that hand went away.

15        I am sorry.  That was you.

16        MR. POWELL:  We know there is a lot on the plate of

17   the monitor, and if they want to submit a declaration shortly

18   after the consent order is submitted, I think that would be

19   perfectly fine.  My concern was more to have sign off.  If we

20   are going to get sign off before the change in administration,

21   I do think I would support the monitor submitting a

22   declaration, given the labor-related issues here and the legal

23   issues and the factual findings that need to go with this type

24   of relief, but certainly open to whatever time frame for that

25   declaration that works for the monitor's team.

LC28NUNC

1          THE COURT:  I will just ask you all to work together

2     in the most efficient way.  And, of course, if the monitors'

3     declaration would come afterward, then that would also affect

4     the Court's ability to act on the proposed consent order.  So I

5     think it's everybody's goal, and certainly in the interests of

6     all of the people affected by this, for the process to go as

7     smoothly and simply and quickly as it can, if it is going in

8     the direction of a consent order.

9          Ms. Friedberg, you have your electronic hand up.

10         MS. FRIEDBERG:  I just want to mention I very much

11    appreciate Mr. Powell's consideration of our time, but should a

12    declaration be needed by the 22nd, we certainly would be in a

13    position to furnish it on that date.

14         To the extent that we can minimize negotiation given

15    the short time frame, I certainly would support that.  I think

16    the development of a declaration has always been one that the

17    monitoring team can efficiently provide.  So I just would

18    strongly recommend for the parties, with respect to my

19    experience negotiating these matters, to minimize what needs to

20    be negotiated in order to ensure we can be in a position to

21    have a consent order within 20 days, that we do that.  So if

22    that means that the monitor shall provide a declaration, we

23    certainly would be happy to do that and could easily put one

24    together.

25         THE COURT:  Very good.  Thank you.

LC28NUNC

1              Ms. Joyce, did you want to say anything further before

2     I return to Ms. Werlwas for her remarks?

3              MS. JOYCE:  No, thank you, your Honor.

4              THE COURT:  Thank you, Ms. Joyce.

5              Ms. Werlwas.

6              MS. WERLWAS:  Thank, your Honor.

7              This has been a very helpful conversation and

8     discussion so far.  We do want to make clear in our remarks

9     that we recognize there has been no dearth of industriousness

10    or activity on the parts of the city, the monitor, and the

11    parties since we all met last.  And although the specific

12    topics arising from the remedial orders that we are discussing

13    today, which are of course but a subset of the relief that is

14    necessary to correct the violations in this case, is a limited

15    approach, we want to make clear that we do think this kind of

16    prompt and sustained attention that we are giving these

17    specific issues today is critical.  We are very concerned about

18    ensuring that the relief that these remedial orders secured to

19    the plaintiff class is faithfully and fully implemented.  And

20    to that end, we think that today's opportunity to exchange

21    information is critical to charting the path forward.

22              In particular, we welcome the information that the

23    monitoring team has provided concerning its views of progress

24    made to date.  We absolutely welcome progress.  We think that

25    decisions about paths forward would benefit from some further

LC28NUNC

1    explication or updates of the facts that were previously

2    presented to the Court, such as, for example, the effect of the

3    city's inability to ensure that its workforce shows up to work

4    and how that impacts its ability to comply with the

5    court-ordered obligations in this case.

6          To be sure, we do understand today the facts are

7    highly dynamic and the relief is highly dynamic.  Indeed, just

8    yesterday, we received a report from one of our clients who we

9    represent in their criminal matter, who has been in the intake

10   unit at GRVC, or was in the intake unit at GRVC over that

11   Thanksgiving week, from Tuesday until Saturday, transferred to

12   then VCBC, and had been there for five days in intake since.

13   These are the kind of fluid, quickly moving facts about

14   compliance with the remedial order that necessarily mean

15   whatever we all present today is just a snapshot in time but

16   that we hope the city can address today.

17         We don't want the factual updates to subsume our

18   recognition that, despite the activity and the enormous

19   activity around these issues as the October report, the

20   situation remains dire.  We welcome the progress, though,

21   frankly, from where we were in August and September, there is

22   almost no room to go but up.  And even where we are now, the

23   facts that Mr. Powell presented to the Court demonstrate to us

24   that there is a persistent and quite horrific pattern of

25   violence persisting in our jails.  Our plaintiff class members

LC28NUNC

1    are being sprayed.  They are being beaten on a daily basis.

2    This is rendering even very short stays in custody traumatic,

3    violent, and life threatening.

4         The remedial measures that we are discussing today are

5    unequivocally both necessary and important to obtaining

6    progress in abating these violations, but we must note that the

7    stubborn fact remains that six years into this case, the very

8    harms that we have all sought to abate in entering this consent

9    judgment have only gotten worse.  And the current approach, the

10   six years of initiatives that have been pursued, with best

11   efforts and great dedication, have not corrected the

12   constitutional violations.

13        From the presentations today, it appears to us that

14   with respect to how to move forward on the issues we have

15   discussed so far, most particularly, the external hiring that

16   has been the principal focus of the conversation thus far, we

17   await and will continue conversations with the monitoring team

18   and the city about what the proposed relief will look like, in

19   particular, a security monitor.  We think it's premature

20   frankly for us to have a significant view on that proposal

21   because it still is very much in formation, and we look forward

22   to learning more so that we can understand what relief that

23   could secure and what it leaves essentially uncovered, if you

24   will.  And we look forward to hearing more from the city, in

25   particular, about what points of agreement there are, the role

LC28NUNC

1    a security manager would play, and where this relatively robust

2    proposal is problematic for the city.  We, quite frankly, don't

3    know what their view is on what that proposal intends to build

4    out.  But we expect that the conversations that we will have

5    with the city and the monitors over the next few weeks will

6    provide some further information from which we can know where

7    to go forward.

8            We have looked forward to discussing any particular

9    issues on this agenda, particularly the ones also that we have

10   not had an opportunity to address as a group discussion

11   regarding compliance with the intake requirements, or the

12   updates on the staffing that were principal focuses of the last

13   conference, and we welcome that opportunity.  But we also look

14   forward to the conversations that we will have over the next

15   few weeks with the parties and focusing as well on what we need

16   to do to immediately address the harm that is being visited

17   every day on the plaintiff class.

18           THE COURT:  Thank you, Ms. Werlwas.

19           Today we are running into a problem of time, as this

20   conference was allocated an hour and a half.  I think that we

21   have made very, very important progress with pinpointing both a

22   process and time frame for the further development of

23   information about the security position and that being shared

24   with the government and the plaintiffs' class, and also,

25   importantly, the time frame for rapid, focused and action on

LC28NUNC

1   consent approach to the outside hires for the uniformed

2   position, if that's going to be feasible.

3           I will now hear from Ms. Friedberg before I make a

4   suggestion as to how to proceed.

5           So Ms. Friedberg.

6           MS. FRIEDBERG:  Thank you.

7           I just wanted to share with the Court two pieces of

8   information that may impact how you think we should move

9   forward.  One with respect to staffing, the other with respect

10  to intake.  Just an overarching comment that the monitoring

11  team has engaged a nationally recognized expert to conduct a

12  staffing analysis.  That began in July.  A very short summary

13  of that work to date will be included in the twelfth monitors'

14  report that will be filed on December 6.  Additional work is

15  needed before that complex project is completed.  It certainly

16  overlaps with a lot of the work with respect to absenteeism,

17  but neither one of these things can be seen in a vacuum.  The

18  way in which staff may or may not be coming to work, but also

19  how they are being deployed, those are kind of mutually

20  connected, and so that work does remain, just to give you some

21  additional context with respect to staffing.

22          With respect to intake, I will note that the

23  monitoring team has seen progress in that area.  There are sort

24  of two different issues with respect to intake.  One, the use

25  of intake for new admissions, and the rest what you would refer

LC28NUNC

1    to as either inter- or intra-facility transfers.  The

2    monitoring team recently received some information, both with

3    respect to some stays for new admissions that go beyond the

4    time period allotted; separately, we have received some

5    information with respect to individuals that are in intake

6    longer than 24 hours in the bucket of inter/intra-facility

7    transfer.  Those are tracked and managed both a little

8    differently, that's why I separate those out.  We are going to

9    review that information, but just to echo the sentiments of Mr.

10   Martin, certainly what we have seen with respect to processing

11   and intake overall, there has been a vast improvement from what

12   ultimately brought about the conditions for the requirements in

13   the second remedial order, not to take away that there is much

14   more work to be done, but I did just want to provide the Court

15   with that brief update before we ended today.

16            THE COURT:  Thank you, Ms. Friedberg.

17            What I suggest -- I am sorry.  Mr. Powell.

18            MR. POWELL:  I was just going to note very briefly

19   that the one area in the security initiatives in the September

20   order that we were here to discuss, there was a requirement

21   that the 24-hour cap does apply to, as Ms. Friedberg said, both

22   new admissions and intra-facility transfers.  We do have

23   serious concerns with the report of the monitor noting the

24   system to track the time of an inmate's stay in an intake

25   facility during the intra-facility, and just to explain what

LC28NUNC

1    that is.  It said if it's a new admission, it's someone who is

2    in the jail, needs to be removed, maybe they were involved in

3    an incident, they are put in intake.  It seems, based on the

4    monitor's reporting, that there still is no reliable system to

5    track the time that inmates stay in intake.  That was required

6    by the remedial order.  It seems like that has not been

7    complied with.  We don't have to do it now, but we are

8    interested in the city's progress on making sure, if they can't

9    comply with the requirement to cap the period of 24 hours, if

10   they can accurately track the period.  So that is one other

11   concern in the remedial order that we wanted to flag for the

12   Court.  Sorry to interrupt, your Honor.

13           THE COURT:  Not an interruption.  An important

14   interjection.

15           So what I was going to suggest is that, there is quite

16   a remaining agenda, but that you meet and confer offline on the

17   specific concerns and data points that if we had more time we

18   would have been able to discuss now.  See if you can either

19   identify sufficient progress so that another specific proposal

20   doesn't have to be brought to the Court, or if not, formulate

21   specific issues to take up with the Court.  And in connection

22   with the December 22 report, or before that as may be

23   appropriate, let the Court know whether you believe another

24   near-term conference to continue some of these discussions is

25   necessary or whether you are -- I will put it that way.  If

LC28NUNC

1    you're making sufficient progress in the meet-and-confer, I

2    won't put the burden on you of making a "we don't need a

3    conference" report to the Court.  But if you do believe that

4    you need a conference, then we will set something up.  And I am

5    going to be getting the twelfth monitoring report and the

6    December 22 report, and I am hoping a consent order that

7    addresses the outside hiring into uniform positions, or at

8    least knowledge of what needs to be the path forward on that

9    issue.

10           Ms. Werlwas.

11           MS. WERLWAS:  Your Honor, we welcome that approach and

12   certainly will continue to meet and confer immediately to

13   resolve the issues, if possible, that are on the agenda.

14           With respect to your questions about what further

15   action may be needed, I did simply think it would be remiss if

16   we did not note our view as plaintiffs that even if there is a

17   resolution of the specific issues that are the topics for

18   today's conference, we do simply want to raise our concern that

19   we do believe that further proceedings relatively soon or

20   further conference with the Court may be necessary, because in

21   our view the need for relief exceeds the scope of this

22   particular remedial order and the issues that we were seeking

23   to resolve today.  And we do not want to leave with the

24   impression that we think that the resolution of these

25   particular issues alone will set us on the entire course needed

LC28NUNC

1    going forward, and would welcome certainly discussing among the

2    parties, and, if necessary, to seek the Court's guidance on the

3    ways in which we can proceed given what, in our view, appears

4    to be the city's inability to resolve the problems and the

5    questions of what further remedies, beyond the remedies we are

6    discussing today, whether it is receivership, whether it is

7    changing the parameters of the appointees that are being

8    discussed today, are necessary.  So we did not want to leave

9    the Court with the impression that we think that this

10   meet-and-confer will resolve all of the matters that have

11   brought us to the Court today.

12           THE COURT:  Thank you.  While I am very optimistic

13   about the meet-and-confer, I did not view it as something that

14   would solve all of the problems going forward, and the monitor

15   hasn't suggested that either.  The monitor has suggested a

16   plan, a sequenced plan of action, and has identified what the

17   monitor believes to be fundamental problems that need to be

18   addressed in order to be able to effectively move on the many

19   other important and immediate, if you will, issues that have to

20   be addressed for the implementation of the relief that has

21   already been ordered and, further, to ameliorate the

22   conditions.  And so, that is to say that I am hearing, I think,

23   all around here that there is work going on, there is work that

24   is clearly agreed to be necessary, that there is deep and

25   appropriate concern about the conditions in which the inmates

LC28NUNC

1   are living and the staff are working, and there may be

2   disagreements about the particular sequence of activities or

3   whether very specific things should be addressed in a specific

4   way or in a different way in the short-term.

5           So as you meet and confer, work collaboratively, as

6   you have done, and I want to commend you all for doing that,

7   and commend particularly the monitoring team for their

8   leadership and their creativity in proposing and undergirding

9   progress toward solutions and accountability.  There is much

10  more to be done.  So be as specific on questions or proposals

11  that you wish to introduce to this mix as you can be, so that

12  your discussions can be focused and productive, and let me know

13  when you think it is necessary and appropriate to come back

14  together for another conference such as this, whether it's

15  before or after the upcoming winter holidays.  But I will

16  certainly look forward to receiving the two reports that we

17  have talked about, and I know that I am leaving these specifics

18  and ongoing discussions in the hands of people who are deeply

19  concerned, deeply talented, and all very, very much focused on

20  the conditions that are being faced by everyone involved with

21  Rikers and the city jails now.  So I am not leaving this

22  conference believing in any way, or thinking it is in any way

23  appropriate for there to be stasis or thinking that there will

24  be inactivity.  I expect that there will be ongoing, focused,

25  effective and productive activity, and I thank you all for

LC28NUNC

1    that.

2            Is there anything else that we should discuss before

3    we adjourn?  It's now a little after 11:30.

4            Thank you.  Seeing no hands raised, I again thank you

5    all.  I look forward to the submissions.  I wish you progress

6    and personal safety and good health.

7            Thank you, all.

8            (Adjourned)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25