# Special Report of the
# *Nunez* Independent Monitor

**March 16, 2022**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Introduction ............................................................................................................................ 1

Section I. Entrenched Culture of Dysfunction ..................................................................... 3

Section II. Persistently Unsafe Conditions Caused by Deficient Staffing & Security Practices .... 7

    DOC's Staffing Challenges ............................................................................................. 8

    Use of Force and Violence Data .................................................................................. 13

    Assessment of Recent Incidents in 2022 .................................................................... 15

    RNDC ............................................................................................................................ 17

    Status of Efforts to Improve Basic Security Practices .............................................. 21

    Dire Conditions in Intake ............................................................................................ 22

    Department's Management of Compliance and Its Consultation with Monitoring Team ........ 24

Section III. Update On Monitoring Team's Staffing Analysis ............................................ 30

    Initial Findings of Staffing Analysis ........................................................................... 32

    Impact of Staffing Deficiencies on Department Operations ..................................... 39

Section IV. Update on Department's Efforts to Achieve Compliance with the Second Remedial Order .... 44

    Interim Security Plan (¶ 1(i)(a)) .................................................................................. 44

    Responding to Incidents Involving Self-Harm (¶ 1(i)(b)) ........................................ 46

    Video Monitoring Unit (¶ 1(i)(d)) .............................................................................. 49

    Managing People in Custody ....................................................................................... 50

    Post Incident Management (¶ 1(i)(e)) .......................................................................... 52

    Classification Consultant (¶ 1(i)(f)) ............................................................................ 53

    Expansion of Eligibility for Candidates to Serve as Wardens and Above (¶ 1(ii)) ......... 56

    Appointment of Security Operations Manager (¶ 1(iii)) ............................................ 57

Section V. Third Remedial Order Update ........................................................................... 58

    Dismissal of Disciplinary Manager ............................................................................ 58

    Staffing Needs for the Trials Division ........................................................................ 60

    Status of Efforts to Operationalize the Requirements of the Third Remedial Order ......... 62

    Model for Additional Relief ......................................................................................... 63

Section VI. Reporting & Assessment of Compliance ........................................................ 63

Section VII. Recommended Actions to Accelerate Reform ............................................... 66

Conclusion ........................................................................................................................... 74

## INTRODUCTION

The Monitoring Team is issuing this Special Report to advise the Court and the Parties of the continued imminent risk of harm to incarcerated individuals and staff in the New York City jails. The first few months of 2022 have revealed the jails remain unstable and unsafe for both inmates and staff. The volatility and instability in the jails is due, in no small part, to unacceptable levels of fear of harm by detainees and staff alike. Despite initial hopes that the Second Remedial Order (dkt. 398), entered in September 2021, would help the Department gain traction toward initiating reform on the most immediate issues, the Department's attempts to implement the required remedial steps have faltered and, in some instances, regressed. These failures suggest an even more discouraging picture about the prospect for material improvements to the jails' conditions. Furthermore, the Department's staffing crisis continues and the New York City Mayor's Emergency Executive Order, first issued on September 15, 2021, and still in effect (through multiple extensions) as of the filing of this report, acknowledges that, among other things, "excessive staff absenteeism among correction officers and supervising officers has contributed to a rise in unrest and disorder."[1] The Monitoring Team's staffing analysis, discussed in detail below, reveals that the Department's staff management and deployment practices are so dysfunctional that if left unaddressed, sustainable and material advancement of systemic reform will remain elusive, if not impossible, to attain.

The goal of the Consent Judgment and corresponding Remedial Orders is to ensure that the City and Department operate safe jails that meet Constitutional standards. **It is the responsibility of the City and the Department to develop and implement the reforms**

---

[1] Mayor Eric Adams, Emergency Executive Order No. 57, March 14, 2022.

**required by the Consent Judgment, which, to date, the City and Department have failed to do**. The Monitoring Team's responsibility is to provide the Court and the Parties with a neutral and accurate assessment of the current state of affairs, identify any obstacles to reform, provide compliance ratings, and provide recommendations for addressing areas where compliance has not yet been achieved. The Monitoring Team is also a resource and provides technical assistance to the Department on the development of initiatives required by the Consent Judgment and Remedial Orders. The Monitoring Team's work with the Department over the last six year has revealed a depth of dysfunction, created over decades of mismanagement, that permeates the entire system, and, in some cases, extends beyond the Department. The issues underpinning the Department's ability to reform have created a polycentric problem and represent a complicated set of dysfunctional practices unlike any jail system with which the Monitoring Team has had experience. The issues stymying reform are complex, with a number of interrelated "problem centers" for which the solution to each is dependent upon finding the solution to some, if not all, of the others. It is therefore impossible for the Department to improve the practices targeted by the Consent Judgment without first addressing four foundational issues: (1) ineffective staff management, supervision, and deployment; (2) poor security practices; (3) inadequate inmate management; and (4) limited and protracted discipline for staff misconduct.[2] Solving these four underlying problems requires a combination of deep expertise in corrections, an enduring vision, and creativity to navigate the quagmire of bureaucracy and dysfunctional practices that have developed over time. As discussed in more detail below, solving these problems cannot be

---

[2] *See* Twelfth Monitor's Report at pgs. 10 to 16 for a detailed description of the four foundational issues that are directly contributing to the Department's inability to reform its practices.

2

accomplished by the City and Department alone and will require the addition of some outside expertise.

The gravity of the current situation demands a comprehensive and tangible shift in the City's and Department's focus and priorities, and a corresponding shift in the work of the Monitoring Team in order to catalyze the necessary reforms as soon as possible. The Monitoring Team has concluded that simply proceeding with monitoring-as-usual (*i.e.,* bi-annual reporting on the panoply of requirements, providing recommendations and the requisite technical assistance) would only further protract the reform process and lead to the extension of oversight, rather than hastening its end. Instead, more contemporaneous in-depth reporting on a more limited set of issues, a change in focus with concrete steps and timelines, and appropriate enforcement mechanisms and external resources are necessary if the agency is ever to be reformed.

In order to support the Court's and Parties' efforts to devise the appropriate remedial scheme, this report provides a summary of the entrenched dysfunctional culture, a description of the persistently unsafe conditions caused by deficient security and staffing practices, initial findings of the Monitoring Team's staffing analysis, an update on the Department's efforts to implement the Second and Third Remedial Orders, and finally, recommendations for next steps.

## SECTION I. ENTRENCHED CULTURE OF DYSFUNCTION

The Department's multitude of nonfunctional systems and ineffective practices and procedures combine to form a deeply entrenched culture of dysfunction. Deficiencies in core foundational practices have been normalized and embedded in every facet of the Department's work. Indeed, recent site work (in February 2022) by the Monitoring Team reaffirmed this notion as staff seemed to have accepted their lack of control and inability to create safety within the

3

current environment. The Department is trapped in a state of persistent dysfunctionality, where even the first step to improve practice is undercut by the absence of elementary skills and the convolution of basic correctional practices and systems. This leaves the Department at an impasse—in a place where many of the requirements of the Consent Judgment are simply unattainable, and even the basic steps required by the Second Remedial Order are inaccessible because the basic foundation needed to improve practice simply does not exist. The current conditions—six years after the Consent Judgment went into effect—bring into stark relief that the agency has shown itself, to date, incapable of implementing the changes in practice necessary to achieve the goals of the Consent Judgment and the First and Second Remedial Orders.

Normally, those in uniformed supervisory positions would be key facilitators for transforming practice in any reform effort. Unfortunately, DOC supervisors have been unable to lead this change due to lack of expertise and skills, limitations in their numbers compared with the line staff they oversee, and illogical deployment practices which do not deploy them where they could be most effective in supervising others. Supervisors are needed to elevate staff skill in adhering to basic security practices (*e.g.* consistently locking doors), quelling disorder, reducing interpersonal conflict, and ensuring that basic services are provided, all of which are precursors to the fear and frustration among people in custody that lead to uses of force and violence. The First Remedial Order attempted to fill the void in supervision by requiring the Department to increase the number of Assistant Deputy Wardens and to ensure these supervisors were more visible and active throughout the facility in order to elevate staff practice among their subordinates. However, few, if any, additional ADWs have actually been deployed to supervise

staff on the housing units.[3] A similar theory was behind the Monitoring Team's frequent recommendations to fortify the role of Captains in managing the housing units. In theory, if supervisors have a consistent presence on the housing units, they can ensure staff are properly posted and positioned, guide and develop staff's practice, and hold staff accountable for properly executing their duties. Unfortunately, the Monitoring Team's staffing analysis revealed that a large proportion of Captains are assigned to positions that do not involve supervising the housing units, and thus are of limited value to the task of elevating staff skill.

Further exacerbating the problem, the Monitoring Team's ongoing review of key records and observation of operational practices reveals that a large proportion of the Department's uniformed supervisors either do not have the aptitude and/or willingness to properly supervise their subordinates, have limited engagement with staff on the housing units and do not provide adequate supervision. A recent incident of inadequate supervision during a use of force incident illustrates many of these issues.

- *On January 31, 2022, an incarcerated individual removed his own restraints and resisted efforts to be re-restrained. A Deputy Warden was present and witnessed staff use a prohibited hold to take the incarcerated individual down. Staff then used a chokehold on the incarcerated individual to keep him down as they restrained him. Once restrained, staff tried to lift the incarcerated individual off the ground, but the individual collapsed. Body worn camera footage captured that while the incarcerated individual was on the ground that the supervising Deputy Warden, standing over the collapsed individual stated that the individual was doing a "very good acting job right now" and then stated "you're not a very good actor just want to let you know, but I'll bring the gurney down anyway." The Deputy Warden overseeing the incident failed to act professionally, failed to supervise staff, failed to intervene on the use of a prohibited takedown and chokehold, and failed to render appropriate aid to the incarcerated individual. From start to finish this incident was a clear example of failed staff supervision.*

---

[3] Generally, only one or two ADWs are on duty each shift and they are generally assigned the post of Tour Commander (the sole point of contact for managing the tour for the entire Facility), which results in little to no direct supervision of Captains. Therefore, Captains are not actively or effectively supervised by their superiors and thus are not able to hone their skills in coaching line staff.

As discussed in more detail below, the lack of adequate supervision is what prompted the creation of a supervisory checklist as part of the Second Remedial Order, although the Monitoring Team observed while on site that it does not appear to be utilized by supervisors. There are certainly some Supervisors who have the requisite skill set and/or willingness to change, but some appear to have become resigned to the dismal state of affairs and dysfunction that permeates so much of the system. In other words, what seemed like a viable strategy toward reform turned out to be ineffective because of inaccurate assumptions regarding the core expectations for Supervisors—that they are sensibly deployed, possess a certain level of skill-mastery, and can effectively direct and regulate the conduct of their subordinates. This is a microcosm of the larger problem inhibiting reform—that a seemingly viable strategy is rendered ineffective because of the absence of key elements of basic practice.

To the extent that Supervisors themselves require sound guidance in effective strategies for improving staff practice, the Department recently demonstrated its own inability to provide this guidance by issuing an order that created an imminent risk of harm just six days ago. As way of background, in December 2021, the Department in collaboration with the Monitoring Team, developed a teletype intended to help Supervisors effectively target poor staff practices, including, among other items, properly securing doors and control stations. Unbeknownst to the Monitoring Team, last week, the Department revised this teletype and *removed* some of the very requirements that were needed to properly supervise staff on the housing units. Specifically, the revised teletype inexplicably removed requirements for supervisory tours on housing units that were unmanned or a staff member was off post. It also removed the requirements that supervisors ensure that doors were properly secured. In other words, in the revised teletype, agency leaders gave direction to supervisors that *increases* the risk of harm to people in custody

6

and directly *contradicted* efforts to address one of the basic safety concerns, seemingly sanctioning Supervisors abdication of responsibility for these issues. This simply defies sound correctional practice. The circumstances surrounding the revision and issuance of the teletype also raise serious concerns about the Department's strategy for interfacing with the Monitoring Team. These concerns are discussed in more detail in the "Management of Compliance" section below.

These foundational areas of dysfunction are not new and created over decades and across many administrations. This is why it is critical to reform the core foundational practices that can and must endure beyond a single administration. To date, with each new administration and/or leadership change, the Department restarts the clock of reform, and initiatives built on solid correctional practice are revised or abandoned before benefits are ever realized. This has been particularly true over the past year in which three different administrations have cycled through the agency, further destabilizing an already unstable agency. A durable pathway to reform must be developed, one that focuses squarely on the underlying causes of the current conditions, and which is mirrored by a new strategy for monitoring and enforcement that will endure across administrations.

## SECTION II. PERSISTENTLY UNSAFE CONDITIONS CAUSED BY DEFICIENT STAFFING & SECURITY PRACTICES

The Department's facilities are unsafe. The use of force and violence in the jails are inextricably linked to the Department's mismanagement of staffing and its significant security failures. The Department needs immediate security upgrades and quality staff management to effectively and safely manage the incarcerated population. Instead, the Department is under significant strain. The pandemic created a crisis on top of a crisis and has exacerbated the serious

issues facing the agency. Staff are exhausted and stressed and have not been properly supported with guidance and coaching to do the difficult work that is asked of them. Incarcerated individuals are under extraordinary stress due to the surrounding chaos and violence in the jails, a disruption in basic services, and because case processing has become unreasonably protracted.[4]

An in-depth examination of the various dynamics at play within the jails is provided below. This includes a summary of the DOC's staffing challenges, aggregate use of force and violence data, a qualitative assessment of recent use of force incidents, the status of efforts to improve security practices, the continued over-reliance on intake areas, and the Department's efforts to manage compliance.

_DOC's Staffing Challenges_

The Department's staffing-related problems are directly linked to its deficient security practices and directly impact the Department's ability to achieve compliance with many of the Consent Judgment requirements. Few if any gains have been made in returning staff to work, as a significant portion either do not report to work or are on a modified status that does not allow them to work directly with incarcerated individuals. The table below reveals that approximately 30%[5] of the workforce is not coming to work and/or is not available to work with incarcerated individuals, with little change evident between August 2021 (when the Monitoring Team first issued a report regarding this crisis) and the end of January 2022.

---

[4] The current overall length of stay for an incarcerated individual is about 100 days, which is three times the national average (which is 30 days) and significantly exceeds most other large jail systems.

[5] The Department reports that some staff on MMR3 status may also be on additional status (e.g. sick, PE, FMLA, AWOL, LWOP) so there could be _some_ double counting of staff on MMR3 and another status.

| Date | Significance of Date | Total # Uniform Staff | Total # and % UNAVAILABLE [6] | | Reason Unavailable | | | |
|------|---------------------|----------------------|-------------------------------|---|-----------------------------------|---|------|---|
| | | | | | Sick, PE, FMLA, AWOL, LWOP | | MMR3 | |
| August 24, 2021 | Filing of Monitor's First Status Report | 8,434 | 2,415 | 28.63% | 1675 | 20% | 740 | 9% |
| September 15, 2021 | Date of Mayor's First Executive Order | 8,351 | 2,796 | 33.48% | 2085 | 25% | 711 | 9% |
| December 1, 2021 | Date of DOC Vaccine Mandate | 7,798 | 2,578 | 33.06% | 1748 | 22% | 830 | 11% |
| December 31, 2021 | Peak of Staff Unavailability | 7,770 | 3,522 | 45.33% | 2864 | 37% | 658 | 8% |
| January 26, 2022 | Date that Data was Last Provided[7] | 7,674 | 2,321 | 30.24% | 1586[8] | 21% | 735 | 10% |

It is true that 1,000 staff returned to work between the end of December 2021 and the end of January 2022. But, as shown in the table above, the number of staff unavailable for work spiked to over 3,500 at the end of December 2021, and thus the decrease observed at the end of January 2022, simply returned the number of unavailable staff to August 2021 levels, a level that had already been established as a significant crisis.

The largest number of staff unavailable are out on sick leave, and the table below provides a detailed look at staff unavailable only for that reason. While the number of staff on sick leave has indeed come down from its peak on December 31, 2021, only marginal gains have been made compared to August 24, 2021, when the crisis was first reported to the Court. As of March 7, 2022, the number of staff on sick leave had only decreased by 71 staff from the August 24, 2021, level, which is 0.05% of the staff out sick on August 24, 2021. Over the last six weeks,

---

[6] *See* footnote above.

[7] Beginning on January 27, 2022, the Department stopped providing the Monitoring Team with certain routine staffing data, although it continued providing sick leave data. Following significant negotiation, on March 7, 2022, the Department committed to producing the information again.

[8] This number does not include any staff on Leave without Pay ("LWOP") as the information for this day was not available. Therefore, the number of staff unavailable on this day is likely higher than 1586.

since the Department first began to report that this situation had "improved" at the end of January, the number of staff out sick has decreased only 0.02% (22 staff). These changes are nowhere near the magnitude necessary to constitute "improvement."

| Date | Significance of Date | Total # Uniform Staff | Total Number of Staff on Sick Leave | |
|---|---|---|---|---|
| August 24, 2021 | Filing of First Monitor's Report | 8,434 | 1531 | 18.15% |
| September 15, 2021 | Date of Mayor's First Executive Order | 8,351 | 1725 | 20.66% |
| December 1, 2021 | Vaccine Mandate Date | 7,798 | 1562 | 20.03% |
| December 31, 2021 | Peak of Staff Unavailability | 7,770 | 2580 | 33.20% |
| January 26, 2022 | Last Date that Most Data was Provided | 7,674 | 1482 | 19.31% |
| March 7, 2022 | Most Recent Sick Data | ~ | 1460 | ~ |

The City and Department's approach to reducing the number of staff that are unavailable to work with incarcerated individuals and enforcing Department policies as they relate to staff absences is in flux with the recent change of administration, and some initiatives are different from what was reported to the Court in fall 2021.[9] For example, at the end of January, the Department stopped tracking absenteeism data in a centralized manner. The Department has reported it will focus on addressing staff on sick leave and suspended about 30 staff for sick leave abuse and one staff as AWOL in the first two months of 2022. The Department has also revised its sick leave policy to require certain verification to occur on the *third day* out sick rather than on the *first day*. The Department reported this change was made given that the previous policy appeared to have the unintended consequence of keeping staff out of work longer than necessary because of the difficulty in getting an appointment to verify their illness. A Senior Deputy Commissioner who was focused on these issues left the Department in January 2022 and

---

[9] *See* Monitor's November 17, 2021 Status Report to the Court on Conditions (dkt. 420), and City's October 14, 2021 Letter to Court on Conditions (dkt. 403).

it is unknown whether his responsibilities have been transferred to another individual. Finally, it is unclear what strategies, if any, the Department has currently deployed to address these staffing issues, but the data above demonstrates that the City and Department have not been able to adequately address the bloated number of staff out on sick leave.

The Department's staffing issues are perplexing and are driven by deeply ingrained patterns of mismanagement and dysfunction. In relation to the size of the incarcerated population it manages, the Department has more staff resources than any other correctional system with which the Monitoring Team has had experience. The Department's budget for fiscal year 2021 was $1.25 billion. This included over $153 million for uniform staff overtime—some of which may be unavoidable, but overall is indicative of the pervasive mismanagement of the Department's key resource. A significant portion of the budget is allocated to staff wages and benefits with 86% of the 2020 budget going to these line items.[10] The total average spending per incarcerated individual per year skyrocketed to an all-time high of $556,539 in fiscal year 2021,[11] a per capita cost that is simply unparalleled. A national comparison of the per capita costs of incarceration completed by the Vera Institute[12] last year, when the Department's spending per incarcerated individuals was $438,000 ($118,000 *less* than the current cost), found not only that the Department spends more per incarcerated individual than any city in the nation,

---

[10] Vera Institute of Justice, "A Look Inside the New York City Correction Budget," May 2021, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[11] New York City Comptroller's Office (Budget Bureau), "NYC Department of Correction FYS 2011-21 OPERATING EXPENDITURES, JAIL POPULATION, COST PER INCARCERATED PERSON, STAFFING RATIOS, PERFORMANCE MEASURE OUTCOMES, AND OVERTIME," December 2021, https://comptroller.nyc.gov/wp-content/uploads/documents/DOC_Presentation_FY_2021.pdf.

[12] Vera Institute of Justice, "A Look Inside the New York City Correction Budget," May 2021, https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

but that it was at least three times higher than the next highest city and over 350% higher than the cost per incarcerated individual in Los Angeles, California and Cook County, Illinois.



Source: The Vera Institute of Justice analyzed corrections budget data from the 50 largest cities in the United States and used their average daily jail population (ADP) to calculate the cost of incarceration per person. For more complete information on jail budgets, see Vera Institute of Justice, *What Jails Cost: A Look at Spending in America's Large Cities* (New York: Vera Institute of Justice, 2021), https://perma.cc/S2VF-V3WE.

Despite the bloated size of its workforce and its extraordinary budget, the agency has not seen an appreciable improvement in the appalling conditions of confinement that are at the heart of the Consent Judgment. Since 2018, the Department has been on the New York City Comptroller's "watch list," which leads to closer scrutiny of agencies whose spending increases rapidly year to year with only meager measurable results.[13] While the Comptroller

---

[13] New York City Comptroller (Bureau of Budget), "FY 2022 Agency Watch List - Department of Correction," March 2021, https://comptroller.nyc.gov/reports/agency-watch-list/fy-2022/department-of-correction-fy2022/.

acknowledged that "the [Department's] budget has begun to contract [from 2017 to present, but] the pace is far slower than declines in the jail population, leading to higher per-person costs." This cost data is shared to demonstrate that the issues facing the agency cannot be attributed to insufficient resources (although additional resources are needed in a few areas, such as the Trials Division, as discussed below), but rather raises the question of why, given the agency's outsized budget, it has consistently failed to improve conditions. Finally, the Department's current staffing practices also call in to question whether the Department is adequately managing its resources.

### _Use of Force and Violence Data_

The Department's poor practices regarding the use of force and its level of violence caused concern for the Monitoring Team at the inception of the Consent Judgment, and the Monitoring Team's level of alarm has only increased over time as these rates continued to climb. Use of force incidents are rife with examples of inadequate staff practice. An incident that occurred just last month illustrates the multitude of issues driving the current state of affairs and the adverse impact on both staff and incarcerated individuals.

> _At OBCC, staff were rehousing an incarcerated individual when the individual was suddenly slashed by another incarcerated individual without provocation. An officer initially placed himself in front of the victim, but then the officer moved away from the victim, allowing yet another incarcerated individual to stab the victim. Another officer then used OC spray to break up the incident. After the staff escorted the victim out of the area, an incarcerated individual appears to remove personal items from the victim's bag (no staff appeared to be present). The victim sustained a 2.5cm deep laceration that crossed from his ear to the top of his head, and a 2cm laceration to the eyebrow. Reports from counsel to the incarcerated individual claim he ultimately required emergency brain surgery to address the injury. During the incident, all security cameras were blocked or partially covered with tissue and toothpaste. The unit logbook contained many concerning entries from officers prior to the incident. One entry claimed that there was not an_

13

*officer on post until after the incident occurred. Further, throughout the day prior, multiple entries stated that multiple cell doors were unsecured, all cameras were covered, and the staff phone was inoperable. In two entries, the writer reported feeling "unsafe" and notified their supervisor. Despite these logbook entries, within 10 minutes of the incident occurring, a logbook entry indicated a Captain conducted an unannounced tour and stated, "no incidents [were] reported."*

In 2016, the Department's average use of force rate was 4.02, and given that the many protections and practices required by *Nunez* had not yet been implemented, this represented a de facto baseline. A decrease in the use of force rate over time was expected as reforms took hold. Unfortunately, the exact opposite has occurred. The average use of force rate has increased each year, and in 2021, the rate (12.23) was the highest it has ever been, approximately 200% higher than the rate in 2016 (4.02) that gave rise to the Consent Judgment.[14] Similarly, data on fights among people in custody, especially the number of stabbings and slashings that have occurred, reveal that the jails have become more dangerous over time. More specifically, despite an average daily population that is 40% lower than in 2016, there were *more* fights among people in custody in 2021 (6,007 in 2016 versus 6,264 in 2021). The beginning of 2022 has started out no better; the 48 stabbing/slashings that occurred in January 2022 ranked as the second highest monthly total since the Consent Judgement took effect.

An unfortunate and dangerous side effect of these high rates of use of force and violence is that they have become normalized and have seemingly lost their power to instill a sense of urgency among those with the power to make change. **The Monitoring Team must emphasize that these high rates are *not* typical, they are *not* expected, they are *not* normal.** Quite the

---

[14] The monthly use of force rate has fluctuated throughout the life of the Consent Judgment and so the Monitoring Team cautions against assessing progress via changes over a month or two. The Department must *sustain* substantial reductions in the rate of use of force to demonstrate progress in staff practice.

contrary: they are abnormal, they in no way conform to generally accepted practices in the field, and thus they must catalyze an urgency that befits the gravity of the situation. As shown in the chart below, the rate of violence in the City's jails is seven to eight times higher than those observed in other correctional systems.[15]



_Assessment of Recent Incidents in 2022_

In addition to the very troubling quantitative data, the Monitoring Team's review of incidents from January 2022 revealed that poor staff practices continue. Staff's inability or lack of willingness to utilize basic security practices leads directly to violence among people in custody and to uses of force that were completely preventable.

In January 2022, the Department reported at least 40 incidents in which incarcerated individuals exited unauthorized from cells, pens, housing units or other areas and approximately

---

[15] Personal communication, Dr. James Austin, March 7, 2022.

60 instances of security breaches resulting in incidents of force and violence among people in custody—all in a single *month*. Security breaches included basic errors such as unsecured doors, leaving incarcerated individuals unsupervised, allowing individuals to congregate in vestibules, officers going off post, A-station breaches, improper use of restraints, and failing to intervene as tensions escalated. Despite these clear staff failures, there have been only two suspensions of staff for use of force-related misconduct in January and February 2022 (a concerning decline, especially given the levels of misconduct identified).

Three incidents involving incarcerated individuals exiting areas unauthorized occurred during a 5-day period in early January at three separate facilities that illustrate the pervasiveness of these problems. While commonplace in the New York City jails, these incidents would be considered *major events* in any other jail system.

- *On 1/3/22 at EMTC, incarcerated individuals had complained of not receiving required meals for two days. Approximately 25-30 individuals barricaded themselves, prompting approximately 15 ESU and Probe Team staff to enter the housing unit. Their entry was nonetheless delayed due to not having the correct key to open the housing unit door. Chemical agents (including OC grenades) were deployed, after which medical services were delayed due to staff shortages.*

- *On 1/5/22 at GRVC, approximately 30 incarcerated individuals were involved in a disturbance when staff failed to secure doors, including a pantry door. This allowed some of the individuals to gain entry to an adjacent housing unit. Various assaults ensued. Approximately 30 ESU and Probe Team staff responded, dispersing OC grenades and chemical agents. Several detained individuals sustained injuries and medical attention was once again delayed.*

- *On 1/8/22 at RNDC, approximately 30 incarcerated individuals entered a corridor unauthorized and 28 staff deployed chemical agents, OC grenades and hands-on force to secure the individuals. Once secured, the group of individuals were returned to their housing units, where a Captain advised that the unit's doors could not be secured. A number of incarcerated individuals sustained Class A injuries, but medical attention was once again delayed. Reportedly one individual required sutures, but a 16-hour delay to receive medical attention meant the sutures could not be applied. Another individual who was rear-cuffed, kneeling and facing a dayroom wall was gratuitously struck in the head by an officer who used enough force to knock the individual prone to the floor.*

*RNDC*

The Monitoring Team continues to closely scrutinize the operations of RNDC, where the majority of 18-year-olds and all young adults are living and, unfortunately, where a large portion of violence, disorder, poor practice, and avoidable uses of force continues to occur. The condition of this facility has been of grave concern since the inception of the Consent Judgment and has only increased as, time after time, strategies to quell violence, increase programming and incentives, properly manage young adults' behavior, and improve staff practice have failed or been abandoned with the revolving door of agency and facility leaders. While the discussion below focuses on RNDC, the problems are not confined to this one facility but rather occur throughout the facilities managed by the Department.

A review of Department records and assessments of RNDC incidents from *a single month*—January 2022—revealed a large number of troubling events triggered by staff's failure to adhere to basic security practices.

- Incarcerated individuals took an officer's OC cannister and assaulted him, causing a scalp contusion, concussion with loss of consciousness, nasal deviation, and knee strain.

- On four separate occasions, groups of between 6 and 38 incarcerated individuals exited their housing areas unauthorized, and some were able to gain entry to other housing units that had been left unsecured.

- On January 2, 2022, an individual was stabbed after a staff member walked off their post. The housing area lights were also off, which is against protocol. These staffing and security breaches created the opportunity for the stabbing to occur. After the incident, the perpetrator was observed without flex cuffs during multiple escorts and was placed in intake for over 24 hours. In intake, he was placed in the wrong pen, and then placed in a

pen with another individual. It took two days to transfer the perpetrator, and at one point, he was brought back to his original dorm where he was left unsecured and able to interact with other incarcerated individuals. The perpetrator was not body scanned until after he went to the clinic, giving him time to hide or dispose of the weapon. None of the four expectations of the Department's Post-Incident Management protocol were met: the perpetrator was not properly isolated from others after the incident; the potential to exchange or abandon contraband was not properly limited because the individuals were not body scanned as soon as possible; and the individuals were not properly transferred to more secure locations consistent with the protocol.

- Multiple incidents were identified where staff members were off post, leading to serious violence among the incarcerated individuals. If staff members are off post, it is axiomatic that timely interventions in acts of violence are impossible. It also gives rise to questions of how much violence goes unreported given the frequency of unmanned posts. A few examples of incidents that occurred in late January while staff were off post and/or unmanned are below:

  o *Incarcerated individuals were sitting at and crowding an empty B-post desk. Several individuals then got up and entered a cell with an unsecured door, chased another individual out of that cell, and violently assaulted him. Video confirmed that the individuals were armed with weapons. The incarcerated individuals then dragged the victim toward the B-post area, and violently continued their assault near the housing unit's door. After a prolonged period of time, an officer exits the A station and sprays OC through the door to move the assailants away from the victim. A Command Discipline was issued for the officer who was off post. The officer said he was off post because the incarcerated individuals threatened him with a weapon, so he was scared for his safety and notified his supervisor.*

  o *Two individuals were fighting near the B-post/ "No Go" zone and no staff were present. Video captured multiple unsecured cell doors and other cameras were partially obstructed. As the individuals fought, two staff members can be seen exiting the A station. When staff enter the housing area, they briefly leave the*

*vestibule door unsecured. Once in the housing area, they separated the individuals and ordered others to remove the camera obstructions. A Command Discipline was issued for the officer who was off post.*

o   *The B-post in one housing unit was unmanned and several nearby doors were unsecured, allowing individuals from that unit to exit the unit and move freely through corridors and stairways in an effort to get to housing unit across the way. Several of the individuals were also able to obtain broomsticks and hot water tanks. These individuals from the first housing unit kicked open the door to the other housing unit, but staff from that unit deployed OC to force the individuals to retreat.*

o   *Another incident occurred on a housing unit that was unmanned due to insufficient staffing as both officers assigned to a unit were reassigned. The cell doors on the unit were not secured. A fight began in the housing area hallway and escalated when multiple individuals pushed the victim into an unsecured cell. The victim sustained a 9cm laceration to his cheek, a 3cm laceration near his eye, a 2cm laceration on his shoulder and a 1.5cm laceration on his bicep. He also had multiple abrasions on his neck and hand. Staff did not arrive on the housing unit until 25 minutes later and during this window, multiple individuals entered the unlocked cell and appeared to leave with commissary items. When staff finally arrived to lock in the unit, no cell doors were ever secured. No corrective action or discipline was taken against any officer or supervisor.*

o   *While staff were off post, an individual was slashed in the face. The incident was not captured on security cameras, as the cameras were obstructed. At one point, staff even arrived to wipe the obstructed cameras, but the staff did not discover the victim within his cell. For at least an hour and a half prior to the incident, no staff appeared on post on the floor. Multiple individuals were observed going in and out of cells without assistance or authorization from an officer. Before the victim was discovered, staff came to the housing unit on three separate occasions without noticing him. The first staff appearance was to wipe the obstructed cameras. The second staff appearance was to facilitate providing meals (which were not conducted in accordance with DOC policies or procedures). The third staff appearance was to gather individuals for recreation time. The victim was discovered on the fourth staff appearance, when a Captain arrived to do a tour of the area and opened his cell door. The victim exited his cell with multiple face lacerations and is observed wiping blood with a towel. The housing unit was not secured for approximately four and a half hours after the victim was discovered, during which time individuals roamed freely amongst the cells and housing unit. According to the post-incident management policy, the housing unit should have*

19

> *been placed under lockdown immediately after the victim was discovered. No*
> *perpetrator was ever identified.*

In addition to these dangerous incidents precipitated by staff's blatant security failures, NCU conducted an assessment of staff resources at RNDC using a one-day snapshot from January 2022 to illustrate why the Department was demonstrating so little progress with the consistent staffing requirements of the Consent Judgment and Remedial Order for this facility.[16] As an initial matter, NCU found a number of discrepancies in the various sources of information (*e.g.*, facility records, HR records, and the Office of Administration) relating to the status of the officers and the number of officers actually assigned to RNDC. This is consistent with the Monitoring Team's staffing analysis which found that the Department cannot accurately identify where staff are assigned or their status at any given time.

For its analysis, NCU's best estimate was that 929 officers were assigned to RNDC. Of these, nearly *half* (n=454, or 49%) were unavailable to be assigned directly to a post engaged with incarcerated persons because they were either out on indefinite sick leave (out for 30 days or more), on restricted or modified duty, out for family medical leave, assigned on temporary duty to another command, or out on military leave. At best, only half of the facility's workforce was available for coverage and, on any given tour, that number is then further reduced by those who call in sick, attend training, take scheduled vacation, etc. NCU's findings confirmed a key element of the Monitoring Team's staffing analysis—that a significant proportion of the workforce has been deemed "unavailable to work." Thus, without considerable and targeted improvements in the efficiency, oversight and management of these job statuses, the Department

---

[16] § XV (Safety and Supervision of Inmates Under the Age of 19) ¶ 17 of the Consent Judgment and § D (18-Year-Old Incarcerated Individuals at RNDC), ¶ 1.

will continue to be unable to stabilize its workforce, properly staff its facilities and achieve many of the requirements of the Consent Judgment and Remedial Orders.

To its credit, in late February 2022, the Department developed some targeted action steps to curtail the violence that has plagued RNDC. The steps require concurrent efforts from the Department's Programs Division, the Office of the Chief of Security, Custody Management and Facility Leadership, and include actions to redistribute Security Risk Group ("SRG")-affiliated people so that affiliates of any one SRG are not concentrated in individual housing units; to restrict the facility's ability to re-house people autonomously; conducting security sweeps; increasing the number of staff assigned to certain housing units; redeploying some of the uniformed staff assigned to non-custodial posts; increasing programming designed to reduce violence delivered by both internal and external providers; increasing supervision by Captains; and ensuring that those who commit violence are held accountable via the infraction process. These are all steps in the right direction to improve the level of safety at RNDC. Their successful implementation will require a new level of tenacity and creativity to overcome the many barriers that have historically thwarted similar strategies. The Monitoring Team intends to closely monitor these initiatives and is prepared to offer any type of support or assistance to increase the likelihood of success.

*Status of Efforts to Improve Basic Security Practices*

The effort to reduce the use of force and quell disorder must begin with a focus on basic security practices, as the Monitoring Team has emphasized repeatedly, most recently in its Twelfth Report and numerous Court filings last fall and winter. An interim security plan was developed pursuant to the Second Remedial Order which included reasonable and sensible initiatives to address security-related practices. However, to date, the Department has failed to

meaningfully implement solutions to any of the immediate problems such as unsecured doors, post abandonment, poor key control, outdated post orders, escorted movement with restraints when required, incarcerated individuals congregating around secure ingress/egress doors, poorly managed vestibules, and poorly secured OC spray.

Separately, the Monitoring Team has also provided the Department with written feedback to promote the development of a long-term robust security strategy, including improved search practices (February 2021), Emergency Response Team practices (June 2021), and to address the use of chemical grenades and the Pepperball System (August 2021). While the Department began some initial work to address its search procedures, the initiative was halted in spring 2021 and has not been reinvigorated. With respect to Emergency Response Teams, the Monitoring Team met with Department leadership in June 2021 and appeared to achieve consensus that these practices needed immediate focus; however, the Department took no subsequent action. The Department recently reported its intention to address all three sets of feedback once a leadership team is put in place in 2022.

The Monitoring Team fully appreciates that the current dearth of security expertise limits the agency's ability to adequately address these issues, which only reinforces the immediacy of the need to address the Monitoring Team's recommendations regarding the Security Operations Manager and expanded criteria for selecting Wardens. These recommendations were made nearly six and ten months ago, respectively, but have yet to be addressed by the agency. This issue illustrates the poly-centric nature of the Department's issues—that the solution to one problem depends heavily on the solution of another.

_Dire Conditions in Intake_

The Department's overreliance on the use of intake continues to create a dangerous and chaotic environment for incarcerated individuals. Last summer, the conditions of the facilities' intake units further imploded. Some incarcerated individuals remained in intake for days, if not weeks, in horrifying conditions. These chaotic conditions directly resulted in harm to incarcerated individuals. The Monitoring Team's February 2022 site visit found the conditions at one intake to be particularly distressing – a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens. If staff were aware of these problems prior to the Monitoring Team's visit, they did nothing to correct the situations. In addition to poorly supervised spaces and unsanitary conditions in these units, the risk of violence to individuals in intake is also a continuing cause for concern. Two disturbing incidents of unreported misconduct were identified as a result of heightened scrutiny from the Monitoring Team.

- *In August 2021, an incarcerated individual held in an intake cell was beaten by another detainee and suffered significant injuries—he is paralyzed from the neck down and had multiple broken ribs and a collapsed lung which necessitated a ventilator. This assault was not reported and so it was not investigated through the normal channels; instead, Monitoring Team's inquiries brought this otherwise unreported assault to light. The facility did not report the assault and no injury report was generated. The Department of Investigations reports it is now investigating the incident.*

- *In January 2022, during an audit requested by the Monitoring Team and conducted by NCU, an individual held in intake at a Facility for at least 5 days was observed engaging in sexual misconduct with individuals in intake on multiple occasions. None of the misconduct was detected by facility intake staff and came to light only as a result of NCU's audit.*

The problem with the overuse of intake is linked to a number of other issues that are subject to Remedial Order requirements. First, one of the underlying causes of the chaos in intake units is the facilities' routine practice of transporting individuals to intake following a use of force. This problem is meant to be addressed, among other things, by the development of a

revised de-escalation protocol (per the First Remedial Order, § A, ¶ 3), the implementation Post-Incident Management protocol (per the Second Remedial Order, ¶ 1(i)(e)), and improved housing practices (per the Second Remedial Order, ¶ 1(i)(f)). The Department has reported, and the Monitoring Team's site work confirmed, that many individuals are left in intake because the facility is unable to house the individuals on a housing unit. One of the reasons that facilities report rehousing to be difficult is that SRG-affiliated residents of various housing units often refuse to allow an individual to be housed there, at which point the individual is returned to the intake unit to await a different housing assignment. The concentration of SRG-affiliated individuals in certain housing units is discussed in more detail in the Classification section, below. The problems plaguing intake illustrate yet another poly-centric issue.

*Department's Management of Compliance and Its Consultation with Monitoring Team*

Transparency, proactive coordination, and cooperation between the Department and the Monitoring Team are necessary to advance the reforms and for the Monitoring Team to do its work. It is for this reason that to perform his duties, the Monitor (and his team) is provided access to, among other things, non-privileged documents and information, and the right to conduct confidential interviews of staff members outside the presence of other staff members pursuant to Consent Judgment § XX, ¶ 8 of the Consent Judgment. The Department must also encourage all staff members to cooperate fully with the Monitor and his staff (Consent Judgment § XX, ¶ 13). These requirements support a transparent and candid relationship between the Department and the Monitoring Team and is intended to advance reforms as efficiently as possible. The Consent Judgment and Remedial Orders also require the Department to consult with the Monitoring Team, and in some cases obtain approval from the Monitor, on a significant number of requirements in the Consent Judgment and Remedial Orders, which requires

24

coordination and document sharing. Further, access to the relevant information and open, transparent communication both facilitate compliance—and, ultimately, the end of external oversight. This is why the Monitoring Team has long advocated for communicating directly with facility operators and staff in key Divisions as it helps those individuals to better understand *Nunez's* requirements and creates ownership and accountability in the reforms.[17]

The work of the Nunez Compliance Unit ("NCU") is a bright spot in the otherwise dismal state of affairs and must be acknowledged and commended. NCU is led by a smart, dedicated, reform-minded individual who, despite the many challenges in this Department, has managed a team that has supported the development of critical and reliable information about the Department's efforts to implement the various requirements of the Consent Judgment and Remedial Orders, which is referenced in this report and prior Monitor reports. The work of NCU is an important step to advancing reforms as it provides the Department the ability to internally identify the current state of affairs, which, in turn, allows the Department to address obstacles and barriers to compliance and ultimately support the pathway to end external oversight.

Since the New Year, the Department has altered its management of its compliance efforts *with the Monitoring Team* to essentially eliminate the proactive and collaborative approach that previously existed, reduced its level of cooperation, and limited its information-sharing and access in ways which inhibit the work of the Monitoring Team. Nearly all of the Monitoring Team's communications are now managed by the Department's Legal Division (with relevant

---

[17] *See* Tenth Monitor's Report at pgs. 216: "Significant involvement and buy-in from all Divisions of the Department is needed to successfully implement the enumerated reforms of the Consent Judgment. The Monitoring Team continues to strongly encourage ownership and focus by uniform staff in advancing the Nunez requirements, which has been lacking." *See also* Fourth Monitor's Report at pg. 202, Fifth Monitor's Report at pg. 139, Sixth Monitor's Report at pg. 148, Seventh Monitor's Report at pgs. 188-189, Eighth Monitor's Report at pg. 215, and Ninth Monitor's Report at. Pgs. 245-246.

information shared by NCU). The Department's approach to filter most information through the Legal Division inhibits the Monitoring Team's access to information and hinders its efforts to provide factually accurate information to the Parties and the Court and to facilitate improvement. Further, while the Department previously *proactively* identified initiatives underway to seek input and/or collaborate, that no longer occurs as it should. Below are a few examples of the issues the Monitoring Team has encountered in the last few months:

- *Refusal to Provide Staffing Data*: The Department recently refused to provide staffing data related to staff absenteeism, which had *previously* been shared on a routine basis, under the erroneous position that the Monitoring Team was not entitled to the information. The Monitoring Team expended significant time and effort to obtain this data which clearly, under the terms of the Consent Judgment and the Second Remedial Order, must be provided. After over a month of discussions, the City and Department acknowledged that the Monitoring Team is entitled to the information and reported that the data will now be produced beginning in late March.

- *Interference with Communications with DOC Staff*: In late January an Interim Deputy Commissioner of ID was appointed, but the Monitoring Team was not advised of this appointment until the Monitoring Team inquired about the leadership for ID, a division with significant *Nunez* responsibilities. Two members of the Monitoring Team sought to have an introductory phone conversation with the Interim Deputy Commissioner upon learning of her appointment. The Department initially attempted to delay providing the Monitoring Team with her contact information and then claimed that a member of the Department's leadership team must be present on the call. The Monitor advised the Department that the ability to speak with DOC staff confidentially and outside the

presence of other DOC staff was permitted under the terms of the Consent Judgment (discussed above) and necessary for the Monitor to have candid and transparent conversations, so the presence of a member of the DOC executive team on the call would be inappropriate and unacceptable.[18]

- *Refusal to Provide Briefing on Safety & Security Initiatives*: In mid-February, the Monitoring Team requested a briefing on any safety and security initiatives underway given the lack of information provided proactively by the Department. The Department advised that there was no time to provide such a briefing to the Monitoring Team, but, a few weeks later (in early March), the Department shared a memo regarding certain security initiatives underway at RNDC. Over a month later, as of the filing of this report, a detailed briefing on any safety and security initiatives underway in the Department has not been provided to the Monitoring Team.

- *Refusal to Consult & Advise on Orders Posing an Imminent Risk of Harm:* Yesterday, the day before filing this report, the Monitoring Team discovered that a week ago, on March 9, the Department had materially altered instructions for supervisory tours. The original version of this order had been developed in consultation with the Monitoring Team, as discussed in the "Entrenched Culture of Dysfunction" section, above. The Monitoring Team was not consulted (as it should have been) on the revisions, was not advised (as it should have been) that the order was promulgated, and was not advised (as it should have been) when agency leaders themselves recognized that the revised teletype ran afoul of *Nunez* requirements, created an imminent risk of harm, and needed to be rescinded. In

---

[18] The introductory call was subsequently scheduled with the Monitor, Deputy Monitor and interim Deputy Commissioner of ID.

fact, it appears a decision was made ***not*** to inform the Monitoring Team that a problem had been detected. Department leadership have since reported that it intended to "quickly" address the issue by rescinding the order, drafting revisions to the order, and *then* it would consult and advise the Monitoring Team. However, the veracity of these claims are suspect, at best. The order was not rescinded in the five days after it was identified by Department leadership and it was only rescinded yesterday after the Monitoring Team expressed significant concerns about the imminent risk of harm the revised policy presented. Further, revisions to the order have not been provided nor was any information provided to suggest revisions are under development.

It is unclear whether there is a concerted effort to minimize the information being shared with the Monitoring Team or whether the individuals responsible for coordinating with the Monitoring Team are not privy to the relevant information. Either way, the lack of open and transparent communication and information is deeply troubling. The Department's current approach to working with the Monitoring Team is counterproductive and circumvents obligations to consult with the Monitor and to ensure that new practices or tools do not run afoul of *Nunez* requirements. This type of faulty, untenable approach—of avoiding consultation and hiding the discovery of problems—seriously compromises the Monitoring Team's confidence in the information it is provided. It is critical for the Monitoring Team to have current and reliable information in order to accurately assess the current state of affairs.

Prior to this sea change, the City and Department were able to balance the ability to contemporaneously share information, manage its other responsibilities, and maintain a collaborative relationship with the Monitoring Team so it is clearly not only possible, but feasible for the Department to maintain a transparent, collaborative, and cooperative relationship

with the Monitoring Team. The Monitoring Team has attempted to improve relations with the Department and shared its concerns and frustrations about these issues with Department leadership on numerous occasions. The Monitoring Team has also met with the City's new Corporation Counsel and her team about the ways in which the Department's approach to working with the Monitoring Team is impeding our work. In an effort to mitigate these issues, the Monitoring Team also encouraged the Department to reinforce the Department's obligations to maintain an open and transparent relationship with the Monitoring Team in hopes this would alleviate some of these issues. The Department advised the Monitoring Team that Staff were already aware of their obligations.

Despite these efforts, little to no progress has been made, and the Monitoring Team is incredibly disappointed to report that it has lost confidence that it has access to all of the relevant and reliable information necessary to perform its duties. The Monitoring Team believes we have exhausted our ability to address this issue and that clear and direct orders from the Court are necessary to ensure the Monitoring Team obtains the information needed to perform our responsibilities under the Consent Judgment and Remedial Orders. Accordingly, the Monitoring Team respectfully requests that the Court direct the Department to return to fully proactive and transparent communication practices with the Monitoring Team. Specifically, the Department must:

1. Timely provide all information requested by the Monitoring Team necessary to fulfill its duties.

2. Engage in proactive consultation when new practices or staff guidance are being contemplated that relate to requirements of the Consent Judgment and Remedial Orders.

3. Provide the Monitoring Team with unencumbered, direct access to Department staff at all levels.

4. Proactively inform the Monitoring Team when problems have been detected that impact the Department's compliance with Consent Judgment and Remedial Orders, including any issues that may result in the risk of harm to people in custody.

## SECTION III. UPDATE ON MONITORING TEAM'S STAFFING ANALYSIS

The Monitoring Team has long identified significant problems with the Department's efforts to manage its workforce responsibly, deploy its workforce appropriately, and supervise its workforce capably. These problems are mutually reinforcing in myriad ways as described throughout this report and every Monitor's Report to date.[19] The poor condition and capacity of the Department's workforce is the core reason why the efforts to integrate the responsibilities and requirements of the Consent Judgment (and Remedial Orders) into staff practice have failed time after time.

A recent incident provides a vivid example of staff dysfunction within the Department on several levels and the resulting major use of unnecessary and excessive force by staff. The badly mismanaged incident was avoidable, precipitated, and exacerbated by staff-related ineptitude and over-confrontational behavior all too common in the Department.

- *On January 30, 2022, at EMTC, a detainee in a dorm housing unit went into medical distress convulsing on his bed. Detainees immediately attempted to attend to him while others went to summon help. As there was no officer in the housing unit, detainees appealed to the A-Station officer to summon medical assistance. The detainees became increasingly agitated during the almost ten minutes when there was no response from staff to attend to the medical emergency, at one point throwing a trash container against the A-Station window in an apparent attempt to prompt the officer to respond to the*

---

[19] *See* Seventh Monitor's Report at pg. 24-25, Eighth Monitor's Report at pg. 7, Ninth Monitor's Report at pg. 23, Tenth Monitor's Report at pgs. 25-29, Eleventh Monitor's Report pg. 10-14, and Twelfth Monitor's Report at pgs. 33-35.

*medical emergency. A cadre of ESU personnel entered the housing unit approximately ten minutes after the emergency occurred. The detainees were moved toward the back of the dorm at which point an ESU officer precipitously used a MK-9 cannister directly spraying a detainee who was simply standing alongside other detainees. At least two other officers immediately used their OC cannisters to wantonly start spraying the entire group of detainees who had retreated to the back of the housing unit. Further, a chemical munitions grenade was also thrown amongst the detainees, which are supposed to be limited to incidents that legitimately warrant an emergency response. Incredibly, thereafter the entire housing unit population was escorted to intake. Several detainees were refused medical attention because they had not been decontaminated. The investigator concluded that the incident was "unavoidable" and that none of the detainee witnesses needed to be interviewed as it would not alter the outcome of the finding of no violations by staff. The investigator never addressed or even raised the issue of why no officers were present or available to attend to the detainee convulsing on his bed.*

In this incident, had the housing unit been properly staffed, an officer(s) could have immediately summoned medical attention and rendered what aide they could to the distressed detainee. In lieu of medical attention, a tactical team was summoned which simply escalated the event to a direct confrontation between detainees and the ESU staff and culminated in a massive application of chemical agents and the movement of an entire housing unit to intake because these detainees were frustrated that a fellow detainee was in distress without any staff rendering assistance. It should be noted that three of the ESU officers in this incident have disciplinary histories related to use of force violations, one of whom, the ESU Captain, has pending charges for failure to supervise an incident that was similar to this incident. Finally, this exemplar is also applicable to a number of other sections of this report such as those relating to the over-deployment of staff, continuing concerns about Emergency Response Teams and ESU, misapplication of OC spray, and delayed access to medical treatment.

In the two sections below, the various structural and management problems with the Department's workforce are discussed, followed by specific examples of how—as a result of these problems—the facilities and other Department divisions do not have staff when and where they need them. In other words, the Department's staffing framework is so fundamentally flawed

31

that is has thwarted progress time and time again and makes it objectively impossible for the Department to comply with *Nunez* requirements.

<u>*Initial Findings of Staffing Analysis*</u>

The Department has approximately 7,900 uniformed staff and 1,700 civilians to supervise an average of 5,600 people in custody. The 7,900 uniform staff are assigned to 65 separate work locations (*i.e.*, facilities, divisions, departments) where approximately 3,400 authorized uniformed post assignments operate during various tours (*i.e.*, shift assignments). In addition, there are a number of unauthorized post assignments which are routinely being filled throughout the department.

The level of dysfunction within the Department's staffing framework is unmatched by any jurisdiction with which the Monitoring Team has had experience. The dysfunction is so profound and pervasive that even a basic post analysis identifying where staff should be and when is impossible to conduct at this time for the reasons outlined below. Instead, even more basic structures must be unpacked first. The Monitoring Team engaged a consultant with deep expertise in staff deployment and management in correctional facilities to conduct a staffing analysis. The analysis began in Summer 2021 and is ongoing, but the key findings, outlined below, illustrate a web of dysfunctional staffing structures that must be untangled before the Department can rely on the availability and proper deployment of its workforce to implement the hard work of reform. Below is a high-level summary of the issues that characterize the Department's byzantine approach to staffing identified by the Monitoring Team's staffing analysis.

1. The Department does not have the ability to accurately and easily identify what facility a staff member is assigned to, what tour and/or post they may work or what their status is

(*e.g.,* active duty, sick, MMR, etc.). This information is maintained by different divisions and the data across divisions is not consistent. For instance, some staff may be marked as "active" in one database while tracked as "sick" in another. Further, staff listed as assigned to a certain facility in one database are actually assigned to a different facility altogether.

2. Most staff management structures, from rosters to tracking staff's availability/unavailability, are almost exclusively maintained by untrained staff using inefficient and unreliable manual practices. At best, some staff received on-the-job training from other staff, but no formal workforce management training is provided. Further, the majority of staff managing these structures are uniform staff, whose duties as a correctional officer do not include these tasks.

3. Facility staffing levels are not determined via a workload analysis, but rather through a complicated and ad hoc assessment that institutionalizes the various poor practices discussed below. Furthermore, the Department appears to tolerate a culture that allows staff to circumvent assignments to housing units.

4. The Department does not maintain a post assignment classification system that identifies the critical post assignments (*e.g.,* housing unit posts) that must be filled prior to the filling of other post assignments.[20] Instead, the Department allows non-essential post assignments to be filled prior to filling posts required to meet core Department responsibilities. This is simply unheard of in a correctional setting. A post assignment classification system and critical post list are central to the safe operation of any facility

---

[20] The Department differentiates between post assignments based on whether they are: (1) budgeted, (2) not budgeted, but approved on a temporary basis, or (3) not budgeted and not approved.

and the lack of such a structure creates a disorganized and unregulated staffing pattern that can easily lead to imminent danger.

5. The Department frequently repopulates jail facilities (*e.g.* EMTC, OBCC, GRVC and RMSC) with different specialized populations and regularly re-opens and closes facilities. Particularly given its shoddy recordkeeping regarding facility assignments and employee status, this further compounds the problem of identifying staffing needs for any given jail. Furthermore, shifting specialized populations to other locations makes it even more difficult to ensure there is an appropriate number of staff assigned to those facilities and that the staff assigned to these units have the proper training to fulfill their job duties.

6. The Department's staffing policies, practices, and procedures are outdated and insufficient and therefore subject to selective and inconsistent enforcement with staff who are: out sick, on medically restricted status, or on an unexcused absence (*e.g.*, AWOL, unscheduled leave without pay, or personal emergency). Many of the Department's practices are not codified in policy and similarly, the Department does not necessarily follow those practices that *are* in policy. For instance, staff on "Medical Restriction 3" (the most restricted status) is universally interpreted to mean staff are prohibited from having contact with people in custody, even if the individual's medical restriction does not specifically note that such contact must be limited.

7. Among the Department's 7,900 uniform staff, almost 30% is not available to work with the incarcerated population and many of them likely do not have any other responsibilities. Given these structural failings, it is no surprise that as of January 26, 2022, that about 30% of the Department's workforce was unavailable to work with the incarcerated population and that the City and Department have made little to no progress

in ameliorating the staffing crisis that began last summer. There is simply no accountability. The two largest types of "unavailability":

a. "Sick" (which includes new sick, long term sick, and chronic sick): Roughly 1,400 staff are out on sick leave on any given day. Staff may be out sick for a few days ("new sick"), for more than 30 days ("indefinite sick") or intermittently sick throughout the year ("chronic sick"). The Department does not have any systematic policies and procedures to confirm the legitimacy of these statuses. The processes that are in place are complicated and cumbersome and the Department has insufficient staff to adequately manage this process. Further, accountability for staff that abuse the system is limited and infrequent.

b. Medically Restricted Duty: This status is assigned when staff's work must be restricted in some manner due to medical issues. The number of staff on this status has skyrocketed over the last two years and has increased almost 150% from 285 staff on this status in 2020 to approximately 700 staff on this status in 2022. The Department's ability to identify posts for individuals on this status is convoluted at best, which means at least some portion of this group likely has no work to do at all. Furthermore, the on-going assessment of whether a level/restriction should continue to apply to a given individual is sporadic at best and likely means that individuals remain on this status when they can in fact return to work with no restriction.

c. The Department's ability to impose discipline and/or separate staff who may abuse sick leave, or other leave statuses, or restricted duty must also go through the formal discipline process, including proceedings before OATH. As outlined in

numerous reports, the Department and OATH caseloads are already overwhelmed

with a significant number of cases. As a result, these abuses, like use of force

miscount, appear to continue with little accountability in a timely manner.

8.  The Department further limits the number of staff available to supervise incarcerated

individuals on the housing units in the following ways.

a.  In most correctional systems, staff may bid for a particular tour/shift, but not for a

specific post within the facility. In this Department however, staff may bid for a

specific post assignment which means they may not be assigned to work in any

other location.[21] As of August 2021, approximately 1,650 staff have been

awarded a specific post, approximately 650 of which are outside the main jail

facilities. This practice significantly inhibits the flexibility to assign staff where

they are needed, and because posts are awarded based on seniority, results in

many of the most experienced staff being assigned to posts where they do not

supervise housing units.

b.  The Department assigns uniform staff to positions that can reasonably be

undertaken by civilians, thus squandering an essential resource. This is true for

both positions within facilities (*e.g.*, administrative and clerical positions in the

jails) and those outside the facilities (*e.g.*, Data input operators, data analytics,

receptionists, administrative support, timekeeping, public information). While it is

reasonable that some uniformed staff may be required to hold certain roles

---

[21] Staff on awarded posts may be redeployed on a short-term basis, such as for overtime, during emergencies or as part of the official HQ redeployment program which currently occurs one day per week.

typically held by civilians, the number of staff that hold such roles (over 700) is a significant and higher than is typically seen in other systems. This is because these are positions that do not typically require the special training or match the specialized duties of a correctional officer, which is to "maintain [. . .] security within correctional facilities and is responsible for the custody, control, care, job training and work performance of inmates in detention and sentenced correctional facilities."

9. The Department may temporarily deploy staff to another work location ("TDY"). However, rather than being a temporary assignment, nearly all TDY staff (94%) have been deployed for more than 6 months, and the majority have been deployed for over a year.

10. The Department does not conduct routine assessments of its staffing needs. It is unclear when the Department's shift relief factor (*i.e.*, a metric that identifies the number of staff needed for a single post that must be covered continuously) was last calculated, but reports were at least 7 years ago, with others reporting it may have been as long as 30 years go.

11. The Department's practice for identifying facility staffing levels is convoluted. The Department's practice for identifying facility staffing levels is based on a combination of factors including the following: the recognition of filling department and city endorsed authorized post assignments (budgeted), supplemented by department approved post assignments (non-budgeted), facility approved short-term unauthorized post assignments (non-budgeted), the long-standing redeployment practice of assigning uniformed personnel to meet non-facility responsibilities and compensating for elevated staff leave-

time usage, absenteeism and the growing number of uniformed staff on restricted duty status.

12. The Department does not utilize roster management software to manage daily staff assignments, which is particularly concerning given the size of the agency and the individual facilities and the number of modifications required. Daily shift schedules are modified by hand-written notes and manually manipulated. Facility rosters are disorganized, are constantly adjusted and are difficult to decipher. It is extremely difficult, if not impossible, to clearly track where all scheduled staff were assigned. Facilities do not reconcile their daily rosters to ensure that all staff who are present are assigned to a post. For instance, a staff member may be marked as present, removed from the roster for their assigned post, but not re-assigned to another post.

13. Finally, the impact of COVID-19 must also be acknowledged. It has impacted both the physical health and emotional well-being of staff and has resulted in large numbers of staff being unavailable due to exposure and infection. Further, mitigation procedures have required the Department to spread the incarcerated population across additional facilities and housing units which increases the number of staff who are needed to properly supervise those in custody.

**In short, the Department's most critical resource—its staff—is so poorly administered that even the most basic aspects of workforce management have been neglected and/or circumvented for decades. This mismanagement has directly caused a sea of inadequacies and impediments to reform, as discussed in detail in the section below.**

*Impact of Staffing Deficiencies on Department Operations*

A prerequisite to a safe and functional correctional system is a well-trained workforce, that is deployed appropriately to key posts throughout the facilities, and reports to work in sufficient numbers to provide for the safety of and to deliver basic services to people in custody. The Department's mismanagement of staff is inextricably linked to the high rates of use of force and violence in the jails. Below is a non-exhaustive list of the multiple ways in which the Department's staffing practices are negatively impacting the Department's operations.

- Poor management, deployment and supervision of staff negatively impacts the Department's ability to support its own workforce with training, guidance via Roll Call, and on-going supervision. The Department has reported to the Monitoring Team that on site, training, Roll Call and on-going supervision are essentially not occurring. Furthermore, the Department's staff mismanagement means that staff must work hundreds of overtime shifts and work without the expected number of coworkers on a unit to compensate for the Department's inability to ensure that staff report to work as expected. This leaves staff stressed, overworked, tired and, in some cases, despondent. This certainly contributes to poor staff conduct (*e.g.*, hyper-confrontational, lack of adherence to rules, and going off post).

- Both the over-deployment (*e.g.*, too many staff responding to an alarm) and under-deployment (*e.g.*, unmanned posts or insufficient numbers of staff to support proactive supervision) have been consistent contributing factors to the unnecessary and excessive use of force and violence (*e.g.*, inmate on inmate fights and stabbings and slashings) on the housing units. Large numbers of staff continue to respond to alarms and needlessly

escalate the severity of the situation, while in other incidents, a single cuffed detained may be escorted from a housing unit down a corridor by approximately 25 officers.

- Staff's irregular post assignments, hyper-confrontational style, lack of constructive engagement with people in custody (often as a result of irregular post assignment and poor supervision) and inadequate skills for de-escalating interpersonal conflict contribute to both the unnecessary and excessive use of force and the level of violence.

  o Staffing shortages lead to an increased reliance on both ESU and Probe Teams, which are already overused, contributing to increased excessive and unnecessary force.[22]

- The lack of supervision of incarcerated individuals either due to unmanned posts or staff off post directly relate to harm, as described in the RNDC section above. Another recent example, on January 22, 2022, 6 incarcerated individuals, while unsupervised by staff, made their way into a corridor where an assault occurred in which the victim sustained puncture wounds about his back and stomach.

- Problems related to the availability of staff have a direct impact on incarcerated individuals and potential tension on the housing units. For instance, delayed access to medical treatment, delayed or canceled access to programming and recreation, and delayed access to commissary are frequently found by the Department to have caused tension that ultimately leads to uses of force and violence on the housing units.

- Staffing levels and overtime have limited deployment of In-Service Training throughout the life of the Consent Judgment, and are even worse now, as a sufficient number of staff

---

[22] *See* Eleventh Monitor's Report pg. 39-42 and Twelfth Monitor's Report at pg. 51.

must be available to backfill posts in the facility when staff are pulled out to receive
training.

- o *Nunez* requirements for In-Service training were strained by an ongoing overtime
  crisis.[23]

- o More recently, the Department reported putting certain In-Service training on
  hold due to staffing shortages, including Unit Management and Direct
  Supervision Training.[24]

- o The haphazard nature of staff facility assignments and deployment have made it
  difficult to identify staff for post-specific trainings for Young Inmate
  Management,[25] and Probe and Cell Extraction Team Training.[26]

- Staffing shortages prevented the consistent assignment of staff to the same housing units
  day-to-day (i.e., "consistent staffing") in Young Adult housing units.[27]

---

[23] *See* Second Monitor's Report at pg. 45.

[24] *See* Twelfth Monitor's Report at pg. 70 and 71.

[25] *See* Second Monitor's Report at pg. 61 and Third Monitor's Report at pg. 87 (Department ultimately
choose to provide required Young Inmate Management training to all staff assigned to Facilities that
house Young Inmates).

[26] *See* Fifth Monitor's Report at pg. 66 (the Facilities determined that many of the staff members who held
the awarded posts required to receive these trainings were in fact either on terminal leave, transferred, or
simply no longer worked in the area although they officially held the post.), Eleventh Monitor's Report at
pg. 155, and Twelfth Monitor's Report at pg. 69.

[27] *See* Second Monitor's Report at pg. 125, Fourth Monitor's Report at pg. 231, Fifth Monitor's Report at
pg. 166, Sixth Monitor's Report at pg. 182, Seventh Monitor's Report at pg. 228, Eighth Monitor's
Report at pg. 273, Eleventh Monitor's Report at pg. 309 (staffing issues exacerbated consistent staffing
and DOC in Non-Compliance with ¶ 17), and Twelfth Monitor's Report at pg. 131 (DOC remained in
Non-Compliance).

- Staffing shortages have also impacted the Investigations Division, E.I.S.S., and the Training Division.[28] All three of these divisions have long struggled to ensure they have adequate staffing to meet its obligations under the Consent Judgment [29] and rely on a combination of civilian and uniform staff to fulfill essential duties. The uniform staff assigned to these divisions have been redeployed[30] back into the Facilities (generally one or two days a week), further impacting their staffing levels with no commensurate change in the number of civilians assigned to these posts.

- The E.I.S.S. program was also impacted by the staffing crisis in other ways as facility staff are unable to attend meetings with E.I.S.S. staff, which is a core aspect of the E.I.S.S. monitoring program, and overall, the Facility leadership have been unable to focus on E.I.S.S.[31]

---

[28] *See* Eleventh Monitor's Report at pg. 149: "Additionally, the Department reports that, attrition and staff reassignment made it difficult to carry out the desired level of training during the Eleventh Monitoring Period. Specifically, 11 captains retired from the Department between March and September of 2020 and Training Division staff was often re-deployed to cover staff shortages in the Facilities rather than carry out their training duties."

[29] Regarding ID Staffing, *see* Third Monitor's Report at pgs. 152-153, Fourth Monitor's Report at pg. 140, Fifth Monitor's Report at pgs. 104-105, Sixth Monitor's Report at pg. 106, Seventh Monitor's Report pgs. 126-127, Eighth Monitor's Report at pg. 154, Ninth Monitor's Report at pgs. 170-173, Tenth Monitor's Report at pgs. 155-156, Eleventh Monitor's Report at pgs. 199-201, and Twelfth Monitor's Report at pgs. 89-91. Regarding E.I.S.S. Staffing *see* Fifth Monitor's Report at pg. 112, Sixth Monitor's Report at pg. 116, Seventh Monitor's Report at pg. 139, Eighth Monitor's Report at pg. 172, Ninth Monitor's Report at pg. 195, Tenth Monitor's Report at pg. 164-165, Eleventh Monitor's Report at pg. 208, and Twelfth Monitor's Report at pg. 93.

[30] *See* Tenth Monitor's Report at pg. 196 and Twelfth Monitor's Report at pg. 93 regarding E.I.S.S. staff re-deployments.

[31] *See* Twelfth Monitor's Report at pg. 93: "Staffing issues both within the division and Department-wide further hampered this struggling program. In this Monitoring Period, the four uniform Staff assigned to E.I.S.S. were often re-deployed into the Facilities, uniform staff participating in the program often were unable to attend scheduled meetings due to staffing shortage, and distracted facility leadership were not fully focused on the program."

- Staffing shortages have impacted information regarding use of force incidents, including delays in properly classifying[32] use of force incidents and delays in the submission of use of force reports by staff.[33] Staffing shortages have also been blamed for the Department's failure to re-classifying incarcerated individuals' classification status for housing purposes.

- The staffing crisis has impacted accountability in a number of ways.

  o The number of Command Disciplines that are dismissed has increased because staff involved were absent from work for extended periods of time.[34] In other cases, CDs have been transitioned to an MOC because of staffing issues, further increasing the workload of the Trials Division. For instance, in February 2022, almost 150 MOCs were issued in cases where a CD could have been issued, further burdening the Trials Division that is managing a large backlog of cases.

  o The Department has also reported that certain staff have *not* been suspended or placed on modified duty for use of force-related misconduct because of staff shortages. As a result, despite the significant amount of misconduct identified (and discussed throughout this report), the Department has only initiated two suspensions for staff misconduct between January and February.

---

[32] *See* Twelfth Monitor's Report at pg. 59**:** "The Department reports that the delays in classification are due to delays in the completion of injury reports, which the Department claims is caused by the current staffing issues and an increase in the number of use of force incidents that plagued the Department this Monitoring Period. The Department's compliance rating with ¶ 5 has been downgraded to Partial Compliance because of the delays in timely classifying all incidents."

[33] *See* Twelfth Monitor's Report at pg. 62: "The Department's record of timely submission of use of force reports lapsed this Monitoring Period, as the Department reports staffing challenges impacted the ability to timely upload reports."

[34] Tenth Monitor's Report at pg. 64

It is clear that the reform effort must take a step even further back to diagnose and address structures that impact the availability and management of this workforce, before its behaviors can be successfully transformed.

## SECTION IV. UPDATE ON DEPARTMENT'S EFFORTS TO ACHIEVE COMPLIANCE WITH THE SECOND REMEDIAL ORDER

The Monitoring Team is disappointed to report that the initiatives required by the Second Remedial Order, entered in September 2021, to address the dire and emergent conditions in the jails and the Department's persistent Non-Compliance with the requirements of the Consent Judgment have largely fallen flat. While the Monitoring Team reported some early signs of progress in December 2021, these procedural developments appear to have stalled, with no appreciable improvement to the appalling conditions in the jails. A synopsis of current performance on each of the Second Remedial Order's requirements is provided below.

### Interim Security Plan (¶ 1(i)(a))

The Department's interim Security Plan, developed in consultation with the Monitoring Team in October 2021, included viable strategies to improve security through communications at Roll Call, via post orders and memo book inserts; visible reminders for incarcerated individuals not to crowd doorways; and requirements for a more robust supervisory presence on the housing units. However, the actual implementation has been sporadic and of such poor quality that unsafe staff practices remain rampant. More specifically, a few teletypes were developed to be discussed at Roll Call, but at best Roll Call occurs infrequently and, in some facilities, not at all. Most of the required Post Orders have not been updated and, of greater concern, are generally unavailable to staff. Few, if any, hard copies are present on post. Some post orders are available electronically, but this is illogical as most staff on the housing units do not have access to a

computer. Memo book inserts have not been completed. The Department provided drafts of the inserts to the Monitoring Team, which found that they often *reinforced*, rather than repaired poor practice. The memo book inserts remain incomplete as the Department works to address the Monitoring Team's feedback. Taped-off "No Go" zones around doorways were created in some, but not all facilities, but are not consistently enforced in the facilities where they do exist. Finally, supervisors' presence on the housing units remains inadequate to the task of guiding staff practice, with the Monitoring Team observing perfunctory tours while on site. For example, immediately after a Supervisor completed their tour, the Monitoring Team visited the same housing unit only to find multiple unsecured doors and covered cell windows. Additionally, while the Monitoring Team worked with the Department to develop a user-friendly checklist for supervisors to use during their tours, it is simply not being utilized. It does not appear that Supervisors were aware of the tour checklist and those asked about it onsite reported no knowledge of it.

Although the Department has broadly failed to put the required security plans into practice, the Nunez Compliance Unit ("NCU") has done a commendable job of auditing whether the various practices were evident in facility operations. For example, NCU conducted a one-day video review snapshot in December 2021 of three facilities (AMKC, GRVC, RNDC) in December 2021 and identified multiple security breaches at all facilities (*e.g.*, officers who were off post, unsecured doors, A-station breaches, incarcerated individuals out of cell during lock-in, etc.). NCU's auditing strategies are a significant asset, but Department leadership must be willing to utilize NCU's findings to hold facility leadership accountable in order for practice to improve. While NCU's findings are shared with uniform leadership, there is no evidence that identified issues are addressed nor have they been incorporated into problem-solving efforts

going forward. This is discouraging as it is yet another example of the Department's failure to avail itself of critical, timely, and readily available information upon which it could base its remedial actions.

*Responding to Incidents Involving Self-Harm (¶ 1(i)(b))*

The Department developed some informational posters and television content to remind staff of their obligations under the Suicide Prevention policy but has made no further efforts to help staff to improve their practices when responding to incidents involving self-harm (*e.g.*, further messaging, guidance, support or coaching). Furthermore, the posters and other job aids that were developed to improve practice were not visible to the Monitoring Team during a recent site visit. Additionally, inserts for staff memo books which address staff's obligations regarding self-harm developed in coordination with the Monitoring Team were never printed or disseminated to staff despite being finalized in October 2021. Further, while the Department reported that staff are reminded of their obligations during Roll Call and supervisory tours, these claims are suspect given that Roll Call occurs infrequently if at all and that supervisory tours, when they do occur, do not appear to be substantive in nature.

*Intake (¶ 1(i)(c))*

The Second Remedial Order's requirements regarding intake units were designed to address the overuse of intake and to improve intake processing times. All processing through intake must be completed within 24 hours. This includes new admissions to the Department, which are processed at EMTC for male incarcerated individuals and RMSC for female incarcerated individuals. In contrast, intake units in the individual jails process "inter-facility transfers" (*i.e.*, transfers between jails) and "intra-facility transfers" (*i.e.*, people in custody who are transferred from one housing unit to another within an individual jail), and the same 24-hour

timeline applies. The Second Remedial Order requires the Department to develop a centralized tracking process, to use both as a management tool and to provide data on the extent to which the Department is achieving the goals of this provision. A variety of indicators suggest that intake units continue to be poorly managed.

First, although the Department has developed a centralized tracking tool for new admissions, the New Admissions Dashboard, it is only able to provide data regarding one part of the problem. While the Department also has the Inmate Tracking System that would allow for tracking of inter and intra-facility transfers of incarcerated individuals, it is not being used. It is the Monitoring Team's understanding that individual facilities maintain individual tracking forms, but the information gleaned from them suggests that they are not updated regularly and/or are not being used to manage the units effectively. For example, on a recent site visit, the Monitoring Team was provided with an Intake Monitoring Form at one facility on the day of the visit. Of the 20 individuals listed on the form, 18 had been in intake beyond the 24-hour threshold. One individual had been in intake *almost two weeks* and multiple others had languished for over a week. The lack of a tracking tool that is not centrally managed limits the problem-solving efforts to those within a facility and oversight by agency leaders does not appear to occur. These *ad hoc* tracking tools do not appear to be supporting the overall goal of promoting compliance by ensuring that individuals are housed within 24 hours and not left in intake for long periods of time.

Given that the Department was unable to provide valid system-wide data, the Monitoring Team asked NCU to conduct an audit of intake units across a number of facilities in January

2022 to better understand the scope of the issue. Upon examining intake processing at AMKC,[35] GRVC, RNDC, the NCU found that 14 of the 32 incarcerated individuals surveyed were held more than 24 hours (2 were held for 5 days, 1 for 4 days, 3 for 2 days). These findings reinforced the need for the Department to address the many factors contributing to individuals staying within intake for 24 hours, which the Department reports is frequently a result of an inability to identify appropriate housing.

The Department has developed De-Escalation Units to reduce the reliance on intake, for example to house individuals pending their rehousing or transfer to a more restrictive setting. The first three De-Escalation Units at OBCC, RMSC, and RNDC opened this year, with additional units planned to open on a rolling basis.

The Monitoring Team recently toured the De-Escalation Unit with the Deputy Warden for Security at OBCC. The identified unit has an ideal physical plant for this purpose in that it contains secured showers for decontamination following OC exposure, has a mini-clinic to facilitate the required medical assessments, has an area designated for searches, and individual cells with good lines of sight. The Deputy Warden was knowledgeable about the policy's requirements and had recently engaged with Department leadership to troubleshoot issues in order to facilitate the expansion to other facilities (*e.g.*, identified the need for a transportation van and staff to promptly transport individuals to more restrictive housing when indicated).

---

[35] NCU conducted an audit of AMKC's intake on two separate days and found on one day that 13 individuals were in intake with one individual in intake beyond 24 hours. The audit did not identify whether the 13 individuals were tracked in the system or why the one individual was in intake beyond 24 hours. The audit of the second day found that there were no individuals in intake at the time the audit was conducted. The Monitoring Team appreciates that the issues within intake may ebb and flow as these subsequent audits revealed. However, the findings of the initial audit demonstrate that the Department not only doesn't have a reliable tracking process, but is also struggling to adequately manage incarcerated individuals to ensure that they are not in intake beyond 24 hours.

However, despite OBCC having approximately 15 uses of force during the two weeks the unit had been operational, the De-Escalation Unit had been used only twice. Insufficient staff resources and inability to free up staff to report to the unit when needed were identified as the cause of the unit's underutilization—once again highlighting how important it is for the Department to resolve its myriad dysfunctional staffing practices in order to comply with the various Nunez requirements. A similar situation was reported for the De-Escalation Unit at RMSC, which had been used only 9 times during the first month of its operation.

*Video Monitoring Unit (¶ 1(i)(d))*

The Remedial Order requires the Department to ensure that the various video monitoring units are properly staffed so that they can adequately support the facilities' operations by notifying staff when security breaches or staffing problems are observed. The Video Monitoring Unit ("VMU") and the Compliance and Safety Center ("CASC") continue to conduct live video monitoring, but have not implemented recommended efficiencies, nor do they appear to be particularly helpful in remediating the various security and staffing problems discussed throughout this report.

In response to the Monitoring Team's recommendation to develop a protocol that maximizes efficiency and reduces redundancy across the two units, the Department reported that it developed a protocol, which the Monitoring Team noted in its November 2021 report to the Court. The protocol requires Supervisors from VMU and CASC to meet before each tour to review their video schedules for the day to ensure there is no overlap. However, it does not appear that the meetings occur as required, nor does it appear that either unit is substantially reducing the various security and staffing problems as intended.

*Managing People in Custody*

In addition to the many staff-facing provisions in the Consent Judgement and Remedial Orders that are designed to improve practice, the Department's violence reduction effort must address various aspects of the way its facilities manage those in custody. This includes when and how they are classified according to their risk of institutional misconduct and how they are managed following an incident of violence both in the immediate aftermath and any sanctions that are applied. Each of these is discussed below.

Since the inception of the Consent Judgment, the Department has struggled to hold people in custody accountable for their misconduct. This is a cornerstone of any strategy to reduce violence and is severely lacking in this agency. Not only are the current options for sanctioning misconduct inadequate, but the Department does not appropriately manage the serious safety risks posed by individuals in the immediate aftermath of a violent incident. In response to recommendations from the Monitoring Team (and as required by the Remedial Order), the Department developed a protocol for managing people who commit serious, violent misconduct (*i.e.*, Post-Incident Management) and stood up separate units (*i.e.,* De-Escalation Units) to ensure these individuals are managed and processed in areas outside of intake.

As part of this work, the Department is also continuing to develop restrictive housing options. Following a long period of development, in January 2022, the Department began planning for the implementation of the Risk Management and Accountability System ("RMAS") to provide a coherent and humane strategy for sanctioning misconduct. The Department reported its intention to implement RMAS by July 1, 2022, and provided the Monitoring Team with a briefing on its progress in mid-February 2022. The RMAS model leverages various aspects of existing restrictive housing programs that reflect good practice but have historically been

difficult for the Department to implement with integrity. Previous Monitor's Reports have identified chronic problems with the transparency of criteria for admission and promotion to less restrictive phases and a variety of operational and security problems in the existing housing units for 18-year-olds.[36] In short, they have not effectively neutralized the actors or the dynamics driving the high rates of violence in the jails.

RMAS provides an opportunity to improve upon these shortcomings but the Department must be vigilant about similar pitfalls. The Department must ensure that an adequate number of staff are assigned to these units with the requisite training and appropriate supervision. Over time, the Department must assess whether the program is reducing violence among its participants and having the intended impact on the larger jail environment, and if not, must adapt the model in order to increase the ability to do so. The Monitoring Team will closely scrutinize these units and is prepared to offer any necessary technical assistance.

Beyond the development of certain housing units to address misconduct, it is also worth emphasizing that the Department continues to utilize an ineffective infraction process to respond to mid-level misconduct, which is intended to address the misconduct that does not warrant the restrictions of the Department's current restrictive housing models (and soon to be RMAS). The Department also still lacks an effective strategy for incentivizing positive behavior at RNDC. These deficiencies have been outlined in several Monitor's Reports to date, and an effective program is required by the Consent Judgment and First Remedial Order, but the Department remains in Non-Compliance.

---

[36] See Seventh Monitor's Report at pgs. 229-236, Eighth Monitor's Report at pgs. 276-282, Ninth Monitor's Report at pgs. 310-317, Tenth Monitor's Report at pgs. 270-275, Eleventh Monitor's Report at pgs. 311-317, Twelfth Monitor's Report at pgs. 132-133.

Eventually, the operation of the Post-Incident Management protocol and De-Escalation Units will become intertwined with the Department's strategy for restricted housing in that the individuals involved in serious violence will be transferred from a De-Escalation Unit to pre-hearing detention for RMAS. The Monitoring Team remains very focused on helping the Department to develop and implement a viable programming for managing the small subset of individuals who cause the majority of violence within the jails, including those who are frequently involved in uses of force.

*Post Incident Management (¶ 1(i)(e))*

Properly securing individuals immediately after they are involved in violent misconduct is necessary to prevent further violence and/or retaliation. The Department developed a post-incident management protocol for RNDC that addresses 4 key expectations of staff: (1) isolate the perpetrators of acts of violence as quickly as possible in secure cells or designated pens, (2) limit the potential to exchange or abandon contraband, (3) search and body scan individuals as soon as possible after an incident, (4) transfer individuals involved to more secure locations consistent with their behavior following proper authorization. NCU is currently evaluating RNDC's efforts to implement this protocol by assessing a sample of stabbing/slashing incidents each month. These assessments are illuminating and serve as a valuable resource to identify the operational deficiencies and areas that must be addressed.

NCU's assessments revealed that overall, staff are not coming close to meeting the Post-Incident Management protocol. Not a single incident out of the five incidents in January 2022 that were evaluated by NCU achieved all four of the main expectations.[37] Further, there are often

---

[37] Only one incident achieved three out of the four expectations. One incident achieved two out of the four expectations; one incident achieved one out of the four expectations; and two incidents achieved none of the four expectations.

unsafe environments before and after the stabbing and slashing incidents. In at least four of the incidents, there were unsecured doors, both before and after the incidents. In three incidents, there were staff off-post, or no staff assigned to the post at all. In one incident, staff were off post for so long with individuals left unsecured, that the victim of a stabbing was not discovered for hours, despite multiple staff walking through the housing area for various reasons, including gathering individuals for recreation time. The Monitoring Team cannot calculate how long the individual was left undiscovered, as all the cameras were obstructed. In another incident, the floor officer was on-post but multitasking, stepping out for food pans while allowing individuals out of cells, leading to a violent stabbing. This is not the proper protocol for serving meals, as the individuals should have been secured in their cells before being allowed out for the meal. The inability to follow basic protocol directly led to these two stabbings. Another major concern is that after stabbings, individuals are spending extensive periods in intake, including one victim who was in intake for 3 days before being rehoused. There are multiple incidents where staff failed to search and body scan individuals. Once again, it seems the problem extends beyond this individual protocol, and speaks to the polycentric problems with the basic functioning and operation of the facility. The protocol is simply unattainable without addressing the foundational issues throughout the Department.

### _Classification Consultant (¶ 1(i)(f))_

As required by the Remedial Order, the Department engaged Dr. James Austin, an expert in the classification and safe housing of incarcerated persons, to advise the Department on a safe strategy for addressing gang affiliations when making housing assignments. Dr. Austin's approach focused on the Department's classification process and also examined the way in which people who are gang-affiliated are distributed throughout the facilities' housing units. Dr.

Austin identified three issues that must be addressed: (1) a decentralized classification process, (2) the use of duplicative classification tools, and (3) a practice of housing incarcerated individuals by gang affiliation despite prohibition by policy.

Dr. Austin found that the classification process is fragmented across the jails and lacks a central authority to ensure sufficient staff resources, monitor each jail's performance, and generally ensure compliance with the Department's Classification policy. Classification officers who work within each jail report to the facilities' Wardens, and thus may be pulled off-task at the Wardens' discretion. As a result, Dr. Austin recommended the following:

(1) Centralize all classification functions under the Custody Management Unit ("CMU"), to include staff who may be located at individual jails but who report to CMU leadership.

(2) Centrally manage inter-facility and intra-facility transfers to ensure people are housed in units that are commensurate with their custody level and to ensure adherence to the Department's strategy for widely dispersing people who are affiliated with a Security Risk Group ("SRG"; meaning, a gang) (see recommendation #7, below).

(3) Appoint a Deputy Commissioner to command the CMU who is authorized to secure resources, ensure there are dedicated staff to do this work, enforce compliance with policy and monitor facility outcomes. The Department reported that it is actively recruiting for a Deputy Commissioner of Classification per Dr. Austin's recommendation.

Dr. Austin further found that the Department lacks a coherent strategy for classifying people in custody according to their risk of institutional misconduct. Two separate classification instruments have been used simultaneously—one that conforms to National Institute of Corrections guidance ("the NIC-style tool") and one that does not (the Housing Unit Balancer, or

"HUB"). Reclassifications under either tool are not occurring at the required interval and the reclassification forms are often not completed properly, with key items often left blank. Delays in reclassification are reportedly due to Classification officers being redeployed within their assigned facilities to fill other roles. As a result, Dr. Austin recommended the following:

(4) Discontinue the use of the HUB and utilize only the NIC-style tool for the purpose of classifying people according to their risk of institutional misconduct. The Department reported that it discontinued the use of the HUB on January 31, 2022, per Dr. Austin's recommendation.

(5) Following their initial classification, reclassify people in custody at 60-day intervals. Continue the practice of tracking reclassifications that are overdue and manage the performance of each facility accordingly.

(6) Reprogram the Inmate Information System ("IIS") to require all fields on the reclassification form to be filled out before the form can be completed.

Finally, although Department policy requires SRG affiliates to be distributed broadly across housing units, certain housing units currently have very high concentrations of people who are affiliated with the same SRG ("Security Risk Group"). This concentration did not occur by accident, but rather as Facility Leadership either tacitly or overtly approved subverting policy with the misguided belief that concentrating affiliates of an SRG in a single housing unit would lead to less violence. Instead, this housing strategy transfers the power/authority of housing unit staff to the influential SRG members and makes the housing units extremely difficult for staff to manage and unsafe for those who are not affiliated or who are affiliated with rival SRGs. As a result, Dr. Austin recommended the following:

(7) The Department must develop a strategy, relying on individuals with expertise in classification, security and SRGs, to safely distribute those affiliated with SRGs across a larger number of housing units, such that no one SRG has a large concentration on an individual housing unit. Further, as part of the centralized Classification strategy described above, the Department must continually monitor its housing assignment process to ensure that SRG affiliates remain properly distributed across housing units. The Department reported it intends to first address this practice at RNDC, but it is not yet clear how this strategy will be operationalized.

While the Department has begun to implement some of these recommendations, it has not yet resolved most of the problems detected by Dr. Austin. Significant planning will be required to develop and effectuate a safe strategy for dispersing SRG-affiliates more broadly across the housing units.

*Expansion of Eligibility for Candidates to Serve as Wardens and Above (¶ 1(ii))*

The Monitoring Team first recommended that that the Department expand its eligibility criteria for promoting staff to facility leadership teams (*e.g.*, Wardens and above) <u>over ten months ago</u>. The purpose of this recommendation was to allow the Department to select individuals from *either* the current uniform ranks or from the broader corrections community[38] given the concern that Facility leadership do not appear to possess the requisite expertise, willingness or ability to lead the reform effort in the individual jails. Essentially, the Monitoring Team encouraged the City to create a mechanism for the Department to identify and select individuals with the required skills and willingness to improve the state of facility operations,

---

[38] *See* Eleventh Monitor's Report at pgs. 8 to 16.

from *wherever* they can be found. It has taken a significant period of time to obtain the City's position on this recommendation given the various transitions among agency administrators. The City reported in January 2022 that, at this juncture, it believes that there is an insufficient basis to seek an order from the Court to obtain this relief. Instead, the Department reports that it is evaluating alternatives to this recommendation. On February 2, 2022, the Department began recruiting for Senior Correctional Institution Administrators for assignment to each Warden who will then provide support and mentorship to the Wardens. This program is a modified version of an initiative utilized by former Commissioner Ponte during his tenure, but the advisers reported to the Commissioner instead of the Warden, as will be done in this model. The Department reports that one candidate has been identified, and a second candidate is being considered for an interview, but, overall, reports challenges with recruiting ideal candidates for the role. While this alternative may have theoretical merit, if it cannot be implemented, it is of little use. Simply put, the importance of this initiative is significant, and all resources must be expended to develop a recruiting effort and identify candidates for the role.

### *Appointment of Security Operations Manager (¶ 1(iii))*

The Monitoring Team recommended the appointment of a Security Operations Manager almost six months ago. The purpose of this recommendation is to create a position in which an individual, with appropriate credentials, would have the authority to develop, guide and manage the implementation of the Department's security protocol and to create a new capacity to mentor and develop the requisite in-house correctional expertise. Obtaining the Department's position on the appointment of Security Operations Manager has been protracted as discussions have occurred across two separate agency administrations. Given its importance, the Monitoring Team has met with Commissioner Molina on at least two occasions to discuss this recommendation.

The Commissioner appeared receptive to the recommendation and reported that the Department has extended an offer to a candidate for the newly created position of the Deputy Commissioner of Security Operations, who the Department proposes serve in the role of the Security Operations Manager. The Department's creation of this position is promising, but the current state of affairs demonstrates that the responsibilities and authority of individual in this the position, along with access to necessary resources, are key to ensure the success of this role. This is discussed in more detail in Section VII (Recommended Actions to Accelerate Reform) below.

## SECTION V. THIRD REMEDIAL ORDER UPDATE

The Third Remedial Order was entered on November 22, 2021, and is focused on addressing the significant backlog of staff discipline. It includes several requirements pertaining to disciplinary procedures and expanding the system's capacity to address the current backlog. It also required the appointment of a Disciplinary Manager to handle the complex operation that involves several stakeholders and timelines. Such an individual is essential given its centrality to problems that *Nunez* was designed to solve. Although the Third Remedial Order has only been in effect for about three months, an update is warranted given the Department's dismissal of the Disciplinary Manager in January 2022 and the Monitoring Team's concerns about whether the Trials Division has adequate staff to support the efforts to address the disciplinary backlog.

### *Dismissal of Disciplinary Manager*

The Department's Disciplinary Manager, Deputy Commissioner Sarena Townsend, was appointed to the position pursuant to the Third Remedial Order, but was abruptly terminated on January 3, 2022, the first business day of the new Commissioner's tenure at DOC. The sudden removal of such a key player in the Department's reform effort without having a comparable and appropriate replacement even, under the best of circumstances, would negatively impact the

Department's efforts to achieve compliance with provisions in the Consent Judgment and the

First and Third Remedial Orders. Pursuant to the Third Remedial Order ¶ 5(iii), the Disciplinary

Manager may only be replaced under carefully prescribed conditions.

> *"Should the Department have a bona fide need to replace the Disciplinary Manager, the Department shall inform the Monitor of the basis for that replacement and consult with the Monitor to identify an appropriate replacement with adequate experience and credentials to serve in this role."*

Following Deputy Commissioner Townsend's termination, the Monitoring Team

requested that the Department provide evidence of the *bona fide* need to replace the Disciplinary

Manager, as required by the Remedial Order. The Department reported:

> *"In order to facilitate reforms, including improvements to the Department's disciplinary process, the new administration has a critical interest in implementing certain policy, operational, and personnel changes. These changes include bringing new leadership with new perspectives to our disciplinary work and rethinking how it is organized. As a result, the Disciplinary Manager position will be replaced. This decision was the product of a thoughtful and focused process which looked at both the Division and the Department as a whole. At our upcoming meeting on January 11, the Commissioner intends to share additional information about his plans to restructure the Division.*
>
> *Per the Third Remedial Order, the Department is committed to working with the Monitor to identify an appropriate replacement with adequate experience and credentials to serve in the Disciplinary Manager role."*

The Monitor and Deputy Monitor subsequently met with the Commissioner who

reiterated the information from the email, adding that the Commissioner, as part of the Mayor's

transition team and prior to his appointment as Commissioner, conducted "numerous meetings

with various stakeholders," although no further information about what these meetings may have

suggested, or if they raised any issues regarding the Disciplinary Manager, was provided. The

timing of the Deputy Commissioner's termination further calls in to question whether there was a

*bona fide* reason for the termination given it occurred on the Commissioner's first day in office.

It is also worth noting that the Department did not consult with, nor advise, the Monitoring Team

about the decision to replace the Disciplinary Manager. The Department only advised the Monitoring Team of this action in response to a request for this information from the Monitor. The Monitoring Team is not satisfied that the Department met the requirements of this provision when it terminated the Disciplinary Manager given that no evidence of a *bona fide* reason has been presented.

That said, the Department consulted with the Monitoring Team on the appointment of an interim Disciplinary Manager. Further, the Department has kept the Monitoring Team apprised of its efforts to recruit a new Deputy Commissioner of Trials as it intends for the individual in this role to also serve as the Disciplinary Manager. The Monitoring Team appreciates that the Department is now abiding by this consultation requirement of the Third Remedial Order, but the Department's abrupt removal of the Disciplinary Manager was troubling. First, it raised questions about the Department's commitment to abide by the terms of the Remedial Order. Further, the termination of Deputy Commissioner Townsend at the very least interrupted and complicated the Department's progress in this critical area of reform. Prior to her departure, Deputy Commissioner Townsend worked closely with her team to implement the requirements of the Third Remedial Order. It is this work, as discussed below, along with the efforts of the interim Disciplinary Manager, that has ensured that the disciplinary process has not come to a grinding halt.

### *Staffing Needs for the Trials Division*

The Trials Division needs more staff, in particular, in order to address and resolve the disciplinary backlog, as discussed in the Twelfth Monitor's Report and the Third Remedial Order Report. The Third Remedial Order required the Department to assign at least eight additional attorneys and two support staff by December 31, 2021. Over the last few months, the Department

and City have expended significant effort recruiting, reviewing, and interviewing candidates (virtually and in-person) for attorney positions in the Trials Division. Recruitment efforts included advertising attorney position openings on third-party job platforms (Indeed.com, Lawjobs.com, etc.), developing and posting materials to social media, and direct contact with local law schools and bar associations. As of February 28, 2022 (and since August 30, 2021), seven attorneys have started in the Trials Division (four permanent hires, and three contract attorneys), and one new legal coordinator started. Additionally, two attorneys (one permanent hire and one contract attorney) and two Legal Coordinators (one permanent hire, one contract support staff) have accepted offers and are awaiting start dates or approval from the Office of Management and Budget ("OMB"). Unfortunately, one attorney who accepted a permanent offer withdrew while awaiting OMB approval, reportedly due, at least in part, to the delay for approval and the recent media reports regarding Deputy Commissioner Townsend's removal. Three other contract attorneys initially accepted offers, but their employment with the Department did not work out for various reasons (including the mask policy, remote work policy, and a miscommunication about hourly rate).

As noted above, the approvals to hire certain Trials attorneys and support staff via the City's Office of Management and Budget has been delayed with the change in administration. The Monitoring Team encouraged the Department to be tenacious when seeking approval, and the Department's efforts appear to have had some impact, with two approvals coming through in the last few weeks after a long delay.

While seven new attorneys have been assigned over the last seven months, there has also been attrition within the division. The Trials Division currently has 18 attorneys (including one agency attorney intern and two contract attorneys), and the division overall has 32 staff.

Unfortunately, despite the significant efforts to obtain additional staff, it has not had any impact on increasing the *total* number of staff within the division. In fact, the Trials Division has less staff than June of 2021, (35 total staff in June 2021 compared with 32 total staff now)[39]. Since 2019, the Department has consistently maintained over 10 open lines for new Trials Attorneys that have gone unfilled.

Given the current workload demands, the Trials Division is not positioned to adequately manage its workload with the staff assigned and more staff are needed. The Monitoring Team cannot emphasize enough the need for the Department to develop a robust recruitment effort, including identifying creative ways to attract qualified candidates (*e.g.*, pay incentives, remote work, etc.), the City and Department must also explore all options for identifying attorneys that can support the Trials Division, such as assigning staff from other agencies to support the trials division on a temporary basis. The Department simply will not be in a position to address the backlog of discipline cases and manage new cases that come in with the current compliment of staff assigned to the Trials Division.

### *Status of Efforts to Operationalize the Requirements of the Third Remedial Order*

The Monitoring Team provided an interim update on the City, Department and OATH's progress in the Third Remedial Order Report filed on December 22, 2022. As noted in that report, the various procedures developed as part of the Third Remedial Order, in collaboration with the Monitoring Team, have been implemented and are expected to result in significant case processing efficiencies. The Department and OATH continue to work through the 400+ cases

---

[39] The Monitoring Team appreciates that the Department has attempted to utilize contract attorneys, but, overall, this temporary work force has only provided limited support as it has been difficult to identify candidates and at least two who were assigned have left (one after one day, and one after a few months).

involving staff members with pending charges related to use of force violations that have been prioritized for closure and to impose appropriate and meaningful discipline ("Priority Backlog Disciplinary Cases"), in a manner consistent with the Disciplinary Guidelines. These Priority Backlog Disciplinary Cases must be closed by April 30, 2022. The Monitoring Team will issue a report on June 30, 2022, that contains an assessment of the Department's effort to resolve these cases. The report will also include the recommended steps, including relevant timeframes, to resolve the rest of the cases in the disciplinary backlog.

## *Model for Additional Relief*

Concerns regarding the Disciplinary Manager aside, the process for developing remedial measures to stimulate progress with Staff Discipline in the Third Remedial Order can be used as a model for how the various systemic barriers related to staff availability, deployment and management could be addressed to stimulate progress with the other substantive portions of *Nunez.* This approach required transparent and collaborative work between the Monitoring Team, Trials Division, and representatives from the City and OATH and included the dissection of the problems surrounding the imposition of staff discipline, brokering agreements with various stakeholders, setting achievable performance goals and identification of a competent manager with deep expertise in the subject matter. The Monitoring Team believes that the requirements negotiated for the Third Remedial Order have strong potential to resolve problems that have been decades in the making.

## SECTION VI. REPORTING & ASSESSMENT OF COMPLIANCE

Since the inception of the Consent Judgment, the Monitoring Team has provided extensive reporting on the conditions in the jails and the Department's efforts to ameliorate them, including the submission of twelve lengthy and detailed bi-annual reports (the last of which was

submitted on December 6, 2021) and three Remedial Order reports (the last of which was submitted on December 22, 2021). Concern about the rapidly deteriorating conditions in the jails led the Monitoring Team to increase its frequency of reporting to the Court and Parties in August of 2021. Over the past seven months, seven status reports, a bi-annual Monitor's Report, a Remedial Order report, and this Special Report have all been submitted to the Court. These reports have provided significant information about the current state of affairs from January 2021 to the present. In addition to providing a detailed record of the facilities' conditions, these reports highlighted the Department's inability to advance reform, identified the contributing factors, explained that the addition of even more basic remedial measures have collectively failed to catalyze the necessary progress, and provided specific and concrete recommendations on how to address the current conditions. While the Monitoring Team's assessment of compliance of over three hundred provisions in the Consent Judgment and many more under the three Remedial Orders provides insight into the progress being made on individual requirements, tallies of the number of provisions in compliance is misleading because the requirements are not similarly weighted and some are far more complex than others. This is not to say that the assessment of compliance is not a useful tool. In fact, it has tremendous value, but, at this juncture, where the very foundation upon which to build reform is irretrievably broken, the value of assessing compliance of each individual provision distracts from the work that must get done *first*.

Because the work of the Department must be focused on the four foundational issues, the Monitoring Team's work must also shift accordingly to focus deeply on supporting those efforts. The Monitoring Team's continued practice of reporting on *each* of the requirements of the Consent Judgment and Remedial Orders is therefore not productive at this juncture. First, the production of the traditional bi-annual reports requires tremendous resources from both the

Monitoring Team and their contacts within the Department who are asked to produce, interpret, and explain the mountain of routine data that is provided. Writing the reports requires significant staff time from multiple Monitoring Team members. Second, by the time the reports are published, much of the information is outdated because conditions have further deteriorated or the Department's plans have materially changed in the subsequent three or four months. Finally, and most importantly, the continued focus on all of the provisions in the Consent Judgment **_and_** the three Remedial Orders draws the Department's focus away from the foundational issues that are so important for them to correct—and to what end? **Substantial compliance with the requirements of the Consent Judgment is simply not attainable until the foundational issues are addressed in a focused, tangible, and sustained fashion.** Repeatedly assessing the problems does nothing to fix them, distracts from the necessary work to address the foundational issues as fixing these issues is simply not possible until these foundational issues are addressed.

Therefore, the Monitoring Team has concluded that assessing compliance as it is traditionally done via the bi-annual report utilizing the same format, scope, and strategy of the past is neither appropriate nor productive. The Monitoring Team's seven status reports and this report confirms that, at best, the compliance ratings for the requirements in the Consent Judgment and Remedial Order, for the period between July and December 2021 (the Thirteenth Monitoring Period), remain the same as they did for the Twelfth Monitoring Period or in many cases has gotten worse as the Department's conditions have deteriorated even further. Further, with respect to the Thirteenth Monitoring Period (July to December 2021), many of the plans that were developed in that time period have essentially been scrapped with the change in administration and so simply reporting on plans that are no longer in development, and subject to change *again*, is not prudent in light of the current state of affairs. Accordingly, the time-

65

consuming process to assess compliance for each individual provision must be suspended beginning with July 2021 through *at least* December 31, 2022. Producing yet another bi-annual report that shows the four foundational issues' continued interference with progress will not do anything to support the Department in its efforts to improve practice—in fact, it will only further detract from all stakeholders' ability to meaningfully contribute to the cause.

The Monitoring Team believes that reform is best advanced via a different reporting structure that focuses on the City and Department's efforts to address the foundational issues that must be resolved. A reporting structure — like this current report — that provides *more frequent*, *tailored* commentary, focusing primarily on the four foundational issues is more appropriate. This approach will provide a more contemporaneous assessment of the work the Department is doing to address staffing, security issues, managing the behavior of those in custody and disciplining staff misconduct—all things that must occur in order for compliance with the specific requirements of the Consent Judgment to be achieved. Such a structure will also allow the Department to identify and address obstacles more contemporaneously. The Department and Monitoring Team will then be able to focus their resources on these core issues without expending futile energy assessing poor performance in other areas that will not get resolved until these core issues are addressed. This approach is also devised to support the overall goal of stimulating reform and achieving compliance more quickly. As discussed throughout this report, the reforms required by the Consent Judgment and Remedial Orders should be more easily adopted and implemented once the Department has a strong foundation upon which to build. Then compliance can be achieved and sustained. The Monitoring Team's proposal for an improved reporting structure is included in the next section.

## SECTION VII. RECOMMENDED ACTIONS TO ACCELERATE REFORM

The City and Department must take immediate steps to improve the safety in the jails for both staff and people in custody that is causing the long-standing Non-Compliance with the Consent Judgment and Remedial Orders. <u>The depth of dysfunction and mismanagement permeates the entire agency and simply awaiting the implementation of yet another set of initiatives by a new administration, without specific tasks that address the fundamental issues, concrete deadlines, appropriate oversight and appropriate enforcement mechanisms as necessary will simply allow the current conditions to remain.</u>

As discussed throughout this report, there are foundational issues which act as a barrier to reforming the agency and which must be addressed *first*. Each of the foundational issues described in this report have their own complicated morass that must be untangled in order to identify the pathway forward. The immediate need to address these issues will have to be balanced with the reality that dismantling the decades of mismanagement will take time and that rushing the repair of these foundational issues will only set the Department further back. To that end, the Monitoring Team makes the following recommendations to initiate progress as soon as possible:

1. **<u>Creation of Adequate Staffing Practices</u>**:

    a. <u>Remedial Relief</u>: By May 15, 2022, a remedial scheme, including specific requirements and timeframes, must be devised to address the Department's dysfunctional staffing practices, including, but not limited to, the following:

        i. *Appointment of Staffing Manager*: The Department must appointment an external Staffing Manager with significant expertise in correctional operations and staffing administration who would, among other things,

have the authority to implement initiatives to address the dysfunctional staffing practices as outlined below.

ii. *Roster Management Unit*: Create a dedicated Roster Management unit equipped with appropriately trained personnel and appropriate software that is the central repository of information related to staff assignments, status, and scheduling across all facilities.

iii. *Addressing Unavailable Staff*: Develop and implement appropriate policies and procedures to evaluate and address staff who are unavailable to work (*e.g.*, sick, AWOL, unscheduled leave without pay, personal emergency) and/or staff placed on modified duty (including medically restricted status).

1. A plan to periodically re-evaluate the staff *currently* on indefinite sick (30 days or more), chronic sick, and medically restricted duty level 3 must be implemented to determine whether the staff may return to work, should be separated from the Department and/or if discipline may need to be imposed for any potential abuse. This shall also include a plan to provide the Department with the necessary resources to address any potential discipline that may need to be imposed for abuse of these statuses and/or staff that may need to be separated from the department.

iv. *Deployment of Staff in Facilities*: Develop a reasonable process to maximize deployment of staff within the facilities, in consultation with the Monitoring Team, including, but not limited to, the following:

1. Creating a post assignment classification system for every command, to ensure that staff are appropriately deployed throughout the facilities, that experienced Staff are adequately deployed in the Housing Units, and that critical posts are filled before non-essential posts.

2. Evaluating the current work schedules for uniformed staff.

3. Evaluating the practice of assigning staff to civilian posts, including TDY, and developing a plan to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians.

4. Developing a revised post analysis that is rooted in correctional best practices and does not further reinforce or incorporate the Department's current staffing dysfunction. It will be necessary to consider and coordinate staffing determinations with the Department's other efforts to revise and improve security practices, to ensure staffing determinations are based on reasonable operational need and do not inadvertently reinforce the poor practices that are entrenched in the system (*e.g.*, the "all available" response to all alarms).

b. <u>Improved Supervision</u>:

    i. *Expanded Criteria for Department Leadership*: By June 1, 2022, the City and Department must address the Monitoring Team's recommendations to expand criteria for Department Leadership (¶ 1(ii) of the Second Remedial

Order) or implement a reasonable alternative that is subject to the approval of the Monitor.

    ii. *Supervision Levels:*

       1. By June 1, 2022, the Department must evaluate the assignment of all Captains to develop a plan to prioritize assignment to the housing units, subject to the approval of the Monitor.

       2. By June 1, 2022, the Department must improve the level of supervision of Captains so that Housing Area Captains in each facility are adequately supervised.

c. <u>Referral of Potential Abuses</u>: The Monitoring Team recommends that the Department of Investigation and the Mayor's Office of Risk Management and Compliance evaluate the Department's staffing practices, including staff absenteeism and overtime, to address potential areas of abuse and waste.

2. **<u>Addressing Security Practices</u>**

a. <u>Security Operations Manager</u>: By April 15, 2022, the Department must appoint and maintain the position of a Security Operations Manager (¶ 1(iii) of the Second Remedial Order). The Department must consult with the Monitoring Team on *any* individual to serve in this position. The Security Operations Manager must have: (1) appropriate authority to manage and implement the initiatives enumerated below, (2) adequate resources to conduct their work, and (3) a scope of work to address, at a minimum, the security deficiencies identified by the Monitoring Team including the items below.

    i.   The Security Operations Manager shall be responsible for managing, at a minimum, the following:

        1.   the interim Security Plan pursuant to the Second Remedial Order, ¶ 1(i)(a).

        2.   addressing the issues related to intake pursuant to the First Remedial Order, § A, ¶ 3 and Second Remedial Order, ¶ 1(i)(c).

        3.   Emergency Response Teams pursuant to the First Remedial Order, § A, ¶ 6.

        4.   Procedures on how searches are conducted.

        5.   Self-harm pursuant to the Second Remedial Order, ¶ 1(i)(b).

        6.   Post Incident Management protocols pursuant to the Second Remedial Order, ¶ 1(i)(e).

    ii.   The Security Operations Manager will routinely evaluate the audits completed by the Nunez Compliance Unit and address the deficiencies identified.

    iii.   By June 1, 2022, the Security Operations Manager must develop initiatives, subject to the approval of the Monitor, to address the responsibilities described in 2(a)(i) above. These initiatives must be implemented no later than July 1, 2022.

b.   <u>Improved & Revised Practices for Emergency Response Teams & Search Procedures</u>: By June 1, 2022, the Department must implement procedures for emergency response teams and searches, subject to the approval of the Monitor, to

address the feedback previously provided by the Monitoring Team, the issues

outlined in this report, and ensuring there is adequate supervision of these teams.

c. <u>Expand Capabilities for the Nunez Compliance Unit</u>: By June 1, 2022, the NCU

shall have sufficient staffing to ensure it has the capacity to conduct reasonable

audits and assessments of the Department's efforts to achieve compliance with the

initiatives managed by the Security Operations Manager. The Department shall

also ensure that the findings of the NCU audits are utilized by staff leadership to

better understand the obstacles to reform in each area, and also to track the

Department's progress toward each objective.

d. <u>Reporting to the Monitor</u>: Beginning on June 1, 2022, the Security Operations

Manager and the leader of the Nunez Compliance Unit must report to the Monitor

on a bi-weekly basis with a status update on their work. The Security Operations

Manager and the lead of the Nunez Compliance Unit will collaborate with the

Monitoring Team on the type of report and the information that is provided.

3. **Improved Management of RNDC**: Beginning on April 15, 2022, the Department shall

provide the Monitoring Team with routine progress reports on its February 22, 2022

initiative for Decreasing Violence at Robert N. Davoren Complex. The Department will

collaborate with the Monitoring Team on the type of report and the information that is

provided on a routine basis.

4. **Prioritize the Management of People in Custody**:

a. *Classification & Dispersing SRG-affiliates*: By June 1, 2022, the Department, in

consultation with the Monitoring Team, shall implement the recommendations to

improve the Department's classification process and to cease the practice of concentrating SRG-affiliates in certain units.

b. *Assessment of Management of Incarcerated Individuals*: By July 1, 2022, the Department must implement a system by which it adequately manages incarcerated individuals following a violent incident. By October 15, 2022, the Monitoring Team will evaluate the Department's efforts to manage incarcerated individuals following a violent incident (though Post-Incident Management, De-Escalation, RMAS, and any other relevant initiatives) and provide an assessment of whether those individuals are adequately managed such as the risk of harm is appropriately neutralized.

5. **Staff Accountability**

a. *Implementation of the Third Remedial Order*: The City, Department, and OATH must continue to implement the Third Remedial Order as required.

b. *Increased Staffing for Trials Division*: By April 15, 2022, the City and Department must provide the Monitoring Team with a detailed analysis of the total number of attorneys and support staff needed to adequately conduct the work of the Trials Division. The plan for additional staff must be approved by the Monitor. By June 1, 2022, the City and Department shall assign the number of attorneys and staff to the Trials Division pursuant to the approved plan.

6. **Assessment of Compliance & Reporting in 2022**: The Monitoring Team recommends that the traditional assessment of compliance with *each* of the Consent Judgment and Remedial Order provisions is suspended from July 2021 through at least December 31, 2022 and that the structure, focus, and timing of the Monitor's Reports are altered to

focus on the Department's efforts to address the four foundational issues, including the recommendations in this section of the report, in a format and structure like this Special Report, on the schedule below:

- June 30, 2022

- October 15, 2022

- January 31, 2023

- March 16, 2023

## CONCLUSION

This report reveals a crisis of patently unsafe conditions in the jails. This agency is the most complicated and dysfunctional system that the Monitoring Team has worked with, spanning the country and decades of experience. It is for this reason that identifying and developing the remedial relief necessary has been complex and time consuming, and has resulted in three Remedial Orders on top of a Consent Judgment with over 300 provisions. Actions by the City and Department have failed to address the underlying problems, despite these issues having been raised by the Monitoring Team over and over again, for years. If nothing else, the failure to correct even the most basic security practices—such as securing doors and remaining on post— underscores the Department's inability to manage the multitude of complex requirements. Further, the Department's inability to properly manage and support its workforce does not bode well for the Department's ability to achieve a reform that is to be carried out day-to-day by these same people.

**The Monitoring Team's work has confirmed that elimination of the various core dysfunctions is an absolute prerequisite to achieving substantial compliance with the full terms of the *Nunez* requirements, let alone to sustaining any progress that is achieved**.

Failure to address these foundational issues will simply perpetuate the cycle of unsuccessful, albeit sometimes well-intentioned, compliance efforts that have existed during the life of the remedial phase and puts the goal of ending oversight even farther out of reach. The only pathway forward is a long-lasting endeavor that focuses on the most basic underlying problems and that systematically untangles the morass of interconnected dynamics and regulations. It is critical that significant concrete steps, with appropriate leadership and oversight, with aggressive timeframes are adopted and implemented in order to reverse the Department's current tailspin and alter the course of reforms.

It is therefore critical that work begin as soon as possible to address the recommendations in this report. To that end, during the next three weeks, the Monitoring Team intends to discuss these recommendations with counsel for the Plaintiff Class and the United States as well as representatives from the City of New York and Department to ascertain the viability of these recommendations and whether any modifications may be necessary. The Monitoring Team then intends to convene *at least* one meeting of all Parties to discuss these recommendations and a pathway forward.

In light of the foregoing, the Monitoring Team respectfully requests: (1) the Court address the Monitoring Team's request outlined in the Management of Compliance Section of this report, and (2) schedule a status conference for the week of April 18th in order for the Parties and the Monitoring Team to discuss the contents of this report and the status of the Monitoring Team's recommendations. This timing will allow the Monitoring Team and the Parties an adequate opportunity to meet and confer before appearing before the Court. If the Court elects to schedule a status conference, the Monitoring Team would be happy to provide the Court with a proposed agenda for the status conference.