# Status Report of the *Nunez* Independent Monitor

**April 20, 2022**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Current Conditions................................................................................................................ 2

Department's Management of Compliance and Its Consultation with Monitoring Team............. 3

Status of Monitoring Team's Recommendations ........................................................... 4

- Status of Discussions with All Parties ................................................................ 5

- Position of SDNY and Counsel for the Plaintiff Class ...................................... 6

- Next Steps for Monitoring Team's Recommendations ...................................... 6

Conclusion .......................................................................................................................... 9

The Monitoring Team provides this status report to advise the Court of the efforts made to address the Monitoring Team's recommendations outlined on pages 67 to 74 of the Monitoring Team's March 16, 2022 Special Report (dkt. 438) ("Monitoring Team's Recommendations") in anticipation of the status conference on April 26, 2022, at 2:00 pm.

Current Conditions

The conditions in the jails remain unstable and unsafe for both incarcerated individuals and staff and have not materially changed since the Special Report was issued on March 16, 2022. The Monitoring Team remains deeply troubled by the violent incidents routinely occurring in the jails, including a number over the past few weeks involving significant weaponry that resulted in several serious injuries to incarcerated individuals. Further, the number of stabbings and slashings in March 2022 was the highest to date with 66 incidents occurring. These alarming conditions are particularly acute at RNDC.

The Monitor directly raised his concerns about the conditions at RNDC with the Commissioner last week. Within 24 hours of that discussion, the Commissioner presented the Monitoring Team with an emergency action plan to be immediately implemented to address the significant prevalence of weapons and the lack of adequate supervision of incarcerated individuals. The emergency action plan contained several initiatives that could be implemented immediately, including those to detect and confiscate contraband, provide more staff support and supervision to the facility, and to reassess individuals' Security Risk Group ("SRG") affiliations.

While the RNDC emergency action plan was only implemented within the last few days, a member of the Monitoring Team visited RNDC yesterday and was able to confirm that implementation of the plan was underway and it appeared, in at least some housing units, that an improved level of stability had been achieved at RNDC. Given the immediate need for stability,

2

any viable initiative that brings about some degree of order and safety is positive. That said, these initiatives must be replicated and sustained across all RNDC housing units in order to stabilize the facility as a whole. Widespread stability and safety across the Department remains a concern as the Monitoring Team's site visit to two other facilities revealed a number of housing units that did not have staff on post, some that were in disarray and filthy, and many that appeared unsafe. In short, immediate initiatives to bring safety and stability, beyond RNDC, is necessary. The Department has advised the Monitoring Team that they intend to evaluate the RNDC emergency action plan to determine whether it can be expanded, with possible refinements, to a few other facilities that are experiencing the highest rates of violence. The Monitoring Team has requested that the Department advise the Monitoring Team by tomorrow for a timeline on when this broader plan will be shared with the Monitoring Team.

<u>Department's Management of Compliance and Its Consultation with Monitoring Team</u>

The Monitoring Team previously outlined its concerns regarding transparency with the Department and access to information in the Special Report. While some gains have been made during the last few weeks, including the production of staffing data on a routine basis and additional communication with Department leadership on initiatives underway, a gap remains in the Monitoring Team's access to information related to the development and implementation of operational initiatives that directly relate to the Monitoring Team's work. The Monitoring Team has repeatedly advised the Department of the need to ensure that adequate information is being provided to the Monitoring Team. The Monitoring Team again reiterates the need for the Department to:

1. Timely provide all information requested by the Monitoring Team necessary to fulfill its duties.

2. Engage in *proactive* consultation when new practices or staff guidance are being contemplated that relate to requirements of the Consent Judgment and Remedial Orders.

3. Provide the Monitoring Team with unencumbered, direct access to Department staff at all levels.

4. *Proactively* inform the Monitoring Team when problems have been detected that impact the Department's compliance with the Consent Judgment and Remedial Orders, including any issues that may result in a risk of harm to people in custody.

These are essential elements of a productive relationship with the Monitoring Team and critical for the shared objective to advance reform. The Monitoring Team strongly recommends that the City and Department immediately assign sufficient personnel to work with the Monitoring Team to improve communication and collaboration on relevant initiatives and the delivery of requested information is provided as soon as possible.

Status of Monitoring Team's Recommendations

The Monitoring Team's Recommendations are designed to untangle deeply dysfunctional, long-standing foundational practices so that the Department is best situated to implement the requirements of the Consent Judgment and Remedial Orders. That said, there is no simple, easy, or foolproof remedy that will resolve the issues facing this system. There simply are no quick fixes. The City and Department must immediately institute aggressive, focused, dedicated, and creative initiatives to combat the morass of dysfunction and bureaucratic obstacles to reform in order to begin the seismic shift in practice that is needed to address the instability and unsafe conditions permeating the jails.

The Monitoring Team's Recommendations take a multi-faceted approach intended to: (1) address immediate security threats with appropriate, swift action, (2) focus the work of the

Department (and the Monitoring Team) on four core and foundational issues, (3) inject outside expertise on correctional staffing and security to structure the Department's approach, and (4) create specific implementation plans that will successfully untangle and make substantive improvements to practices in each area.

- *Status of Discussions with All Parties*

Since the Special Report was issued on March 16, 2022, the Monitoring Team has convened at least 15 meetings with counsel for the Plaintiff Class, counsel for the Southern District of New York ("SDNY"), counsel for the City and counsel and representatives from the Department. The Monitoring Team has also met with the Commissioner on at least three occasions in the last few weeks to discuss the appointment of the Disciplinary Manager and Staffing Manager; to provide a briefing on the Monitoring Team's staffing analysis; and to discuss significant security concerns at RNDC. The Monitoring Team has also facilitated two meetings with all Parties together. A third meeting with all Parties is scheduled to take place tomorrow.

The Monitoring Team's discussions with all Parties have revealed there is general consensus that the Monitoring Team's Recommendations are critical and necessary for the City and Department to address. Further, the City and Department have agreed in principle with the Monitoring Team's Recommendations, with some modifications to address various operational issues and considerations.

The City's and Department's stated commitment to address the Monitoring Team's Recommendations is an important and critical *first* step to devising the path forward. However, understandably, there is significant skepticism and concern among counsel for SDNY, Plaintiffs' class counsel, and the Monitoring Team about the City's and Department's commitment and

capability to adequately implement these recommendations given the six-year history of this case and the current state of affairs most recently described in the Special Report.

- *Position of SDNY and Counsel for the Plaintiff Class*

Counsel for SDNY filed a letter with the Court yesterday detailing their concerns and questions. Further, counsel for the Plaintiff Class have advised the Monitoring Team that they are deeply alarmed about the unacceptable and dangerous conditions in the jails. They also believe that the City's response to the Monitoring Team's Recommendations has been impermissibly vague and that the City's verbal assurances that they will implement robust reforms immediately are not satisfactory, given their unwillingness during negotiations to commit to specific operational terms and their demonstrated resistance to faithfully implementing necessary changes that may implicate labor issues. Finally, counsel for the Plaintiff Class has advised the Monitoring Team that given the "longstanding noncompliance and dysfunction in the City's management of DOC," that they have not seen indications that the City is willing to disturb the ineffectual structures necessary to cure the foundational issues raised by the Monitoring Team and to bring this agency into compliance with the Consent Judgment and Remedial Orders.

- *Next Steps for Monitoring Team's Recommendations*

Addressing the Monitoring Team's Recommendations requires more than just an agreement in principle. The City and Department must have a plan with specific tasks, concrete deadlines, appropriate oversight, and necessary enforcement mechanisms to ensure accountability that these recommendations are implemented. The failure to have such a structure, with corresponding accountability to the Court, will only allow current conditions and ineffective management to persist. Given the dire conditions and safety risks of the current operations, it is

simply unacceptable for the City and Department to contend that proposed initiatives may be inhibited by red tape, bureaucratic assessments, or complicated rules and procedures that prohibit the Department's ability to manage its staff ably and effectively. The City and Department must bring all resources to bear to change the current course and eliminate any constraints that are inhibiting the City and Department from fully addressing the Monitoring Team's Recommendations and thus bringing stability and safety to the jails.

The Monitoring Team has started work with the City and Department on translating the recommendations into a specific implementation plan, but this work is as complex as the problems themselves. While the contours of a framework for the City and Department to implement these recommendations has begun to take shape, it is not fully formed. These initiatives must be coordinated and synchronized by the City and Department with appropriate input from the Monitoring Team. Attempting to address these issues in a vacuum and providing information on a piecemeal basis will only result in poorly informed strategies that fail to address the root causes of the problems. The issues facing the Department are decades in the making and are polycentric, which is why it is imprudent to develop a discrete strategy to address one problem in isolation from the others.

The cornerstone of the Monitoring Team's Recommendations is the introduction of external expertise on staffing, security, classification, and individual facility leadership to the Department. This is a major shift in the management of the Department, which has primarily relied on internal expertise that is steeped in the DOC practices which gave rise to the current conditions. While the Monitoring Team appreciates the desire for the Department to develop initiatives immediately, such an approach would create some inherent tension that would inadvertently perpetuate the very practices that must be dismantled. Instead, an infusion of

external expertise is necessary for the Department to create credible and reliable plans to implement specific requirements that reflect sound correctional practice. Thus, it is critical for the Department to utilize all necessary resources to recruit and retain qualified individuals to fill these roles as soon as possible. Further, a clear scope of work for each individual that addresses the Monitoring Team's Recommendations is necessary to ensure that they begin their engagements armed with complete, accurate information and a clear description of the tasks that must be managed and the practices that must be reformed. Clearly, asking the Department to immediately produce specific initiatives to address *each* of the Monitoring Team's Recommendations before outside expertise has been engaged will only replicate the circumstances that have resulted in so many failed strategies to date.

Furthermore, rushing to meet arbitrary short-term deadlines without an overarching strategy will only further entrench poor practices that for too long have flourished. To facilitate the development of a concrete path forward to address the Monitoring Team's Recommendations, the Monitoring Team shared a detailed proposal with the City and Department *today* that provided the framework for an implementation plan that includes the following three features to address the Monitoring Team's Recommendations.

First, initiatives that address the imminent threat of physical harm must be prioritized (*e.g.,* security initiatives to address SRG-led violence and the prevalence of dangerous weapons at RNDC and other Facilities with the highest rates of violence) and implemented immediately.

Second, initiatives to better organize and consolidate existing information that is critical to improving practice must be developed now, to create a foundation for longer term and more sustainable solutions. For example, developing an interim list of current staff assignments, developing a strategy to maximize the number of Captains assigned to supervise staff on the

housing units, and reconsidering the status of staff who are currently deemed unavailable to work with the incarcerated population because they are on sick leave or on medically restricted status.

Third, the Department must begin the process of attracting and retaining the external leaders to serve as the Staffing Manager, Security Manager, and Deputy Commissioner of Classification. The goal is for these individuals to begin their engagement with the Department armed with organized and accurate underlying information with an adequate scope of work so that the development of the implementation plans may begin in earnest.

<u>Conclusion</u>

We are at a crossroads and extraordinary remedies must be given deliberate consideration. An option that may offer a viable pathway for the City and the Department to retain management of the City Jails is to immediately begin taking concrete steps to actually implement the Monitoring Team's Recommendations, and for the City and Department to immediately and aggressively remove all barriers to implementation of initiatives that are necessary to bring safety and stability to the jails. Given the daily risk of harm to incarcerated individuals and staff, nothing less should be tolerated. Accordingly, the Monitoring Team intends to work with the City and Department to determine if a viable plan can be expeditiously developed and will discuss this further at the Status Conference.

Significant work will continue over the next few days and the Monitoring Team looks forward to addressing these important matters with the Court at the status conference on April 26, 2022. A proposed agenda for the status conference will be submitted to the Court no later than April 25, 2022, at noon.