<u>Monitor's Second Report on the Conditions of Confinement
for 16- and 17-Year-Old Adolescent Offenders
at the Horizon Juvenile Center (HOJC)</u>

Second Reporting Period
July 1, 2021 through December 31, 2021

## The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Associate Director*

Pat Hurley, LCSW—*Subject Matter Expert*

Alycia Karlovich—*Analyst*

Emmitt Sparkman—*Subject Matter Expert*

Christina Vanderveer, J.D.—*Associate Deputy Monitor*

# Table of Contents

Introduction ................................................................................................................................ 1

    Background ............................................................................................................................... 1

    The HOJC Agreement ............................................................................................................ 2

    Summary of the Current State of Affairs ........................................................................... 4

Compliance Assessment ........................................................................................................ 11

    ¶2(a). Protection from Unreasonable Risk of Harm ...................................................... 11

    ¶2(b). Use of Physical Restraints ...................................................................................... 14

    ¶2(c). Incident Report Review and Referral ................................................................... 18

    ¶2(d). Classification ........................................................................................................... 22

    ¶2(e). Programming. ......................................................................................................... 26

    ¶2(f). Consistent Staffing ................................................................................................. 28

    ¶2(g). Behavior Management. .......................................................................................... 31

    ¶2(h). Room Confinement. ............................................................................................... 36

    ¶2(i). Video Preservation. ................................................................................................. 38

    ¶2(j). Staff Discipline ........................................................................................................ 39

## Introduction

This is the Monitoring Team's second report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (HOJC), as required by the Voluntary Agreement ("HOJC Agreement") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entry 364 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the good faith efforts and work completed by the City of New York and ACS to achieve compliance and advance the reforms required by the HOJC Agreement from July 1, 2021 through December 31, 2021 ("current Monitoring Period" or "Second Monitoring Period").

### Background

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment included specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") & § XVI ("Inmate Discipline")) and separately required the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed a "Raise the Age" (RTA) law that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to HOJC, which was jointly operated by the Department and ACS. All 16- and 17-year-olds who were charged before the RTA effective dates for their age group are called, collectively,

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

"Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at HOJC until they were released to the community or residential programs, or they turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of HOJC also gradually shifted from a shared responsibility between the two agencies to the sole responsibility of ACS.

By the end of 2019, ACS had assumed full operational control of HOJC, save for a small number of DOC staff who operated the front security gate and held transportation positions.[2] By July 27, 2020, the last Pre-RTA Youth was transferred out of HOJC, and the *Nunez* Monitoring Team discontinued its monitoring activities while the City, ACS, and the Parties to the *Nunez* Litigation determined the appropriate path forward given the change in circumstances. These final stages coincided with the onslaught of the COVID-19 pandemic, which continues to significantly impact facility operations.

## The HOJC Agreement

Given the change in circumstances, the City and ACS volunteered to enter into an Agreement concerning the supervision of 16- and 17-year-old AOs at HOJC ("the Agreement"). The Monitoring Team is responsible for assessing good faith efforts and progress toward compliance with that Agreement. During this time, the Monitoring Team will not assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds and *Nunez* Plaintiffs and the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group while the HOJC Agreement is in effect (*See* dkt. entry 364).

The HOJC Agreement includes 10 substantive provisions, all of which are discussed in detail in the next section of this report. For each provision, the Monitoring Team provides an assessment of current practice and applies a compliance rating.[3] At the close of the current Monitoring Period, ACS provided a narrative description of their compliance efforts and next steps, and engaged in multiple collaborative discussions during the current Monitoring Period and afterwards with the Monitoring Team to respond to questions and provide further detail as to their steps towards compliance and plans for improving in all areas going forward.

As is required by the Agreement, the Monitoring Team met with ACS's now former Commissioner Hansell during the Monitoring Period. During this meeting, the Monitoring Team

---

[2] As of August 2021, no DOC staff were deployed to HOJC.
[3] While the Monitoring Team used a three-tiered approach to compliance ratings in the First Monitor's Report (dkt. 409) including "Non-Compliance," "Partial Compliance," and "Substantial Compliance," as it was a useful tool to demonstrate the range of compliance for the First Monitoring Period, in this report we have adopted a two-tier compliance approach to better align with the HOJC Agreement.

offered a summary of the work completed to date and the key concerns, which were also reflected in periodic written feedback submitted to ACS/HOJC administrators. In January 2022, New York City's mayor appointed a new ACS Commissioner—Jess Dannhauser, and the Monitoring Team looks forward to continuing and deepening the collaborative relationship with ACS under his leadership. The Monitoring Team's interactions with the new Commissioner early in 2022 demonstrated a focus on detention issues and a marked commitment to continue improving in the areas discussed throughout this report.

The Monitoring Team is also required to file three reports during the pendency of the Agreement. The first Monitoring Period covered November 11, 2020 (the date of execution) to June 30, 2021. This report covers the second Monitoring Period from July 1, 2021 to December 31, 2021, and the final Monitoring Period is January 1, 2022 to June 30, 2022. As the Third Monitor's Report is filed, the Parties will meet to discuss what, if any, requirements are not in compliance and whether the Agreement or portions of it should be extended or modified, or whether other steps should be taken to address the areas not in compliance (*See* dkt. 364).

## Impact of COVID-19

As is true in juvenile justice facilities across the nation, the COVID-19 pandemic continued to significantly impact nearly every aspect of HOJC's operation as ACS continued to implement mitigation strategies including screening and testing protocols, cleaning contracts and hygiene protocols, and procedures for quarantine and isolation as indicated. These protocols were both essential and effective in protecting youth and staff from infection and illness but had the unfortunate side-effect of significantly disrupting HOJC's staffing, training and education and programming provided by HOJC staff and community vendors. Added to this facility disruption caused by COVID, the court processes impacting the disposition of youth's criminal cases were substantially slowed due to COVID, which lengthened the stays of youth at HOJC and impacted youth and facility stability. The toll that COVID continues to take on staff, youth and families was clearly apparent, particularly in the frustration with the procedures that triggered at least some of the youth's challenging behaviors. The Monitoring Team has yet to observe HOJC under "normal conditions," but has certainly observed good-faith efforts to implement the requirements of the Agreement even under the dark cloud of the pandemic. Specific COVID-related modifications or challenges to the practices at the heart of the HOJC Agreement are discussed in more detail in the compliance assessment of each provision below.

Summary of the Current State of Affairs

Although progress in all areas was evident during the current Monitoring Period, the Monitoring Team remains concerned about the level of youth violence at HOJC and the ability of HOJC staff to respond to and manage that violence.  Some of these issues may be directly linked to the continued staffing shortages among both YDS and programming staff that have impacted the extent to which youth are engaged in structured activities, and the COVID-related delays in implementing the new STRIVE behavior management program. Having a sufficient number of program staff and well-trained YDSs who are consistently assigned to the same units day-to-day, a robust array of structured activities during non-school hours, and the full implementation of a behavior management program that effectively incentivizes positive behavior and responds appropriately to negative behavior should be priorities going forward. ACS has demonstrated a strong understanding of the need for these next steps and has articulated concrete plans to address them. On the positive side, HOJC staff appear to use physical restraint safely and proportionately and do not rely on the use of room isolation to manage youth behavior, both of which are important hallmarks of facilities that strive to promote positive relationships among youth and staff.

- The Substantive Provisions

Throughout the current Monitoring Period, ACS continued to collaborate with and be responsive to the Monitoring Team. At the end of the Monitoring Period, ACS prepared a written narrative for each substantive provision and offered a detailed videoconference presentation attended by HOJC subject matter experts that meaningfully informed the Monitoring Team's assessment of conditions at HOJC and outlined ACS's plans for continued improvement in each substantive area of the Agreement. These acts of transparency, combined with observable progress on many of the substantive provisions of the Agreement, suggest that ACS is continuing the journey toward implementing its vision of quality care. While significant work remains—particularly regarding managing and responding to youth's behavior—ACS has clearly articulated a strategy for solving the problems discussed throughout this report. Without a doubt, progress could be accelerated if the pandemic were to recede, as the toll it has taken on staff availability and youth's access to spaces and activities off their housing units has seriously compromised ACS's ability to achieve the things it has set out to do. Overall, while a path forward and commitment to achieve compliance is clear in the substantive areas, the current status of the facility demonstrates that more time is needed for these efforts to fully bear fruit.

A fulsome discussion of each of the Agreement's 10 substantive provisions follows this Introduction, but in summary:

❖ **Protection from Harm (¶ 2(a)).** The level of violence decreased from the high levels witnessed in Summer 2021, but still remains troubling as staff appear ill-equipped or reluctant to manage violent and disruptive youth. The problem of youth violence is multi-faceted, and a reduction will require improvements in staff skill and relationship building, robust tools for managing youth's behavior, and consistent access to programming.

❖ **Physical Restraint (¶ 2(b))**. In general, staff appeared to utilize or at least attempt to utilize trained SCM techniques, and the Monitoring Team has not observed a pattern or practice of unnecessary or excessive physical intervention. Conversely, the Monitoring Team is more concerned about the instances in which staff *did not or exhibited reluctance to* intervene promptly in response to an imminent risk of physical harm. Problematic uses of physical restraint and/or supervision failures that create a situation in which physical intervention becomes necessary do occur occasionally, but ACS should be properly positioned to address them once its incident review process is fully implemented (described below).

❖ **Incident Review and Referral (¶ 2(c))**. ACS drafted a policy that, once implemented, will provide a structured system for reviewing incidents to identify poor staff practice or the mis- or underuse of physical intervention. During the current Monitoring Period, however, the existing *ad hoc* process (which involved randomized reviews of video and irregular meetings with management and staff to discuss observations and lessons) continued, which carries a risk that opportunities to improve staff practice and/or impose necessary corrective action will not be detected.

❖ **Classification (¶ 2(d))**. HOJC continued to utilize a structured, individualized process for determining which youth will be transferred from Crossroads (ACS' admission facility) to HOJC and then identified an appropriate housing unit based on peer dynamics and each youth's individual needs.

❖ **Programming (¶ 2(e))**. HOJC continued to strive to provide a robust array of rehabilitative and recreational programming each day, meeting its internal 3+ hours of daily programming about two-thirds of the time. However, program delivery continued to be significantly impacted by COVID (*e.g.,* frequent housing unit quarantines that limited youth's access to programming spaces; program staff/YDSs/vendors who could not report to work when exposed or infected). Furthermore, approximately half of HOJC's Program Counselor positions were vacant during the current Monitoring Period which decreased the availability of program services to many HOJC youth, despite efforts to provide coverage to all housing units.

❖ **Consistent Staffing (¶ 2(f))**. ACS successfully negotiated and implemented an attendance bonus for its staff that was announced in November 2021 and began at the end of the current Monitoring Period and will continue into the first half of 2022. Recruitment and hiring efforts have also begun to pay off. During the current Monitoring Period, HOJC gained 41 YDSs (80 hired, 39 lost to attrition), for a total net gain of 56 YDSs since the Agreement went into effect. While a large number of YDSs are still needed to achieve "full staffing," HOJC successfully demonstrated its commitment to consistently assign staff to the same housing units day-to-day in the two units that are pilot testing the new behavior management program, STRIVE.

❖ **Behavior Management Program (¶ 2(g))**. Armed with a reconstituted design for its behavior management program, STRIVE, the facility completed training and began to pilot test the model in two housing units at the end of the current Monitoring Period. The impact of COVID on the availability of staff for training has delayed the expansion efforts, but ACS reported it intends to roll the program out to the other eight housing units during 2022. The absence of an effective behavior management program for a large portion of HOJC youth is a significant contributing factor to the level of violence at the facility, and more time is needed for this program's full implementation.

❖ **Room Confinement (¶ 2(h))**. HOJC reported only one instance of room confinement during the current Monitoring Period, and thus sufficient cases were not available to assess the impact of the various job aids and new protocols that were developed and put in place during the Monitoring Period to ensure that staff properly implement the various protections contained in policy. However, as discussed further below, interviews with staff and youth suggested that some staff may in fact utilize short periods of isolation but have not labeled or reported these events as room confinement. This will be further explored during the subsequent Monitoring Period.

❖ **Video Preservation (¶ 2(i))**. ACS developed a draft Operations Order to preserve video footage and received feedback from the Monitoring Team at the end of the current Monitoring Period, but the Order has not yet gone into effect. An audit of video preservation practices revealed that the required protocol was not followed in approximately one-third of the incidents selected for an audit, indicating the need for improved adherence to the preservation protocol. Implementation of the new protocol in the Third Reporting Period, and monitoring practice thereafter, is necessary to ameliorate these concerns.

❖ **Staff Discipline (¶ 2(j))**. ACS took disciplinary action against six staff for restraint-related misconduct, the first since the Agreement went into effect. This is a positive

development that, when coupled with planned improvements for identifying and tracking disciplinary referrals that should go into effect during the next Monitoring Period, should lead to a system in which staff are effectively and proportionally held accountable for the misuse of physical restraint. Additional time is needed to effectively implement and adhere to those new protocols before the process will bear fruit.

- **Overview of Youth Violence**

While quantitative data is useful for understanding the frequency of violence at HOJC, it lacks the nuance that is essential to understanding the Monitoring Team's concern about the facility's level of violence and disorder. The Monitoring Team reviewed the full array of incidents (*i.e.*, GOALS) each month, a large sample of disciplinary records and observed many incidents via videotaped footage. These revealed the following dynamics:

- A small number of residents were repeatedly involved in aggressive, violent incidents, and staff did not appear to have effective tools, or to use them consistently, to manage these residents' behavior.

- Fights between two residents were the most common type of violence, with 10-20 fights occurring each month. Fights occurred primarily on the housing units—either in the units' day rooms or when youth entered a cell undetected by staff—but also occurred in the facility's common spaces (corridors, classrooms, gym and cafeteria).

- Group violence against other residents and staff was also of concern.

  o Several incidents involved situations where groups of residents punched, kicked and/or stomped a single victim. These group assaults appeared to occur either unprovoked, or as retaliation from a previous dispute that was not fully resolved.

  o Groups of residents attacked staff or stole their keys in order to access rivals, and staff appeared to be overwhelmed and unable to prevent youth from assaulting each other.

  o In several incidents, staff failed to use ESPIs to control residents who had stolen staff's keys.

  o Some youth showed no inhibition to assault staff or to interfere when staff were attempting to restrain another resident.

- Individual residents also assaulted staff by grabbing staff from behind, throwing staff to the floor, spitting in staff's face/eyes, splashing with liquid (*e.g.,* soap, urine), throwing

hard objects, kicking, punching, and bludgeoning with a sock filled with pieces of rock. In one incident, a staff lost two teeth after being punched in the face by a resident.

- Youth continued to have access to a variety of improvised weapons, some of which were utilized during assaults and others that were discovered via searches for contraband. These included pieces of sharpened metal as well as hard objects placed in socks to be used as a bludgeon.

- Youth intimidated staff with verbal threats of physical harm, regularly breached staff's personal space, and threatened staff with harm if they would not agree to bring contraband items to youth.

- **Quantitative Data on Youth Violence and Injuries**

In terms of the quantitative data, from July to December 2021, the number of youth in custody at HOJC increased considerably from the previous Monitoring Period (1st Monitoring Period ADP = 37; 2nd Monitoring Period ADP = 62). The graph below shows the number of youth-on-youth assaults (YOYA) and youth-on-staff assaults (YOSA) for CY2021. These raw numbers are difficult to interpret without the context of the changing size of the facility's population, however.



A better way to understand aggregate data regarding changes in facility safety is to utilize the *rate per 100 youth,* shown in the graph below. The rate is calculated as follows: *Rate = ((# of*

*incidents/# days in month)/ADP) \* 100.*[4] The graph below shows the rate of YOYA and YOSA for CY2021.



On average, the rate of YOYA during the current Monitoring Period (1.13) was similar to the first Monitoring Period (1.06), though recently there was less variation month-to-month. Encouragingly, the average rate of YOSA was significantly lower during the current Monitoring Period compared to the previous one (0.51 versus 1.02, a 50% decrease). However, the Monitoring Team remains concerned about the overall level of violence and disorder observed through specific incidents, and the injury, stress and trauma that flows from it.

A significant proportion of the incidents occurring during the current Monitoring Period resulted in injuries to youth or staff. Of the 128 YOYA during the current Monitoring Period, 40% resulted in a minor injury to youth (n=51; Injury B) and 2% resulted in a serious injury to youth (n=2; Injury A).[5] Fortunately, in 59% of the youth-on-youth assaults, no one was injured. In addition, 42% (24 of 57) of the YOSA resulted in staff injuries (the severity of staff injuries is not classified by HOJC medical staff given that most staff are treated off site). It is worth noting that

---

[4] Note that the formula used to calculate the *rate* is slightly different from the one reported in the Monitoring Team's reports on HOJC in 2018-2020. The rate formula utilized here is the one ACS uses internally and includes the number of days in each Month. Rates using this formula are not comparable to rates utilizing a different formula, such as those in previous Nunez Monitor's Reports that discussed HOJC.

[5] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.

all physical aggression brings with it a *risk* of harm, separate from whether an injury is actually sustained, and efforts to improve facility safety must minimize this risk.

All of this is enormously disruptive to a facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor or witness, the youth in custody at HOJC are regularly exposed to violence in the facility environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including deeper penetration into the juvenile justice system. Staff are also negatively impacted by trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth. Regardless of the quality of programming and services available at HOJC, the level of violence at the facility undercuts the benefit that HOJC youth may derive from it.

## Compliance Assessment

In this report, when assessing ACS' level of compliance with the substantive provisions of the Voluntary Agreement, as required by ¶ 5(c), the Monitoring Team considered and described the broader context for our findings, including the challenges and obstacles presented (particularly those related to COVID) to implementing the requirements of the Voluntary Agreement as well as the generally accepted practices for 16- and 17-year-old youth. Further, the Monitoring Team also gave due consideration to ACS' diligent and good faith efforts to implement the requirements of the Voluntary Agreement and, the totality of the circumstances. For each of the substantive provisions enumerated in ¶ 2 (a-k), ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The Compliance standard,[6] as defined in the HOJC Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring."

The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback and requests for technical assistance, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrated ACS' deliberate good faith efforts to improve its practice (as required by ¶ 1 of the HOJC Agreement). These good faith efforts demonstrate ACS's potential and willingness to remediate any identified practice and performance gaps during the next reporting period and beyond.

> **¶2(a). Protection from Unreasonable Risk of Harm**. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

**ACS Policy & Practice.**
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" provides guidelines for staff to follow "when they are required to contain the acute physical behavior of youth." It emphasizes that the primary purpose of emergency interventions is to protect the safety of youth and staff. While staff must utilize the

---

[6] While the Monitoring Team used a three-tiered approach to compliance ratings in the First Monitor's Report (dkt. 409) including "Non-Compliance," "Partial Compliance," and "Substantial Compliance," as it was a useful tool to demonstrate the range of compliance for the First Monitoring Period, in this report we have adopted a two-tier compliance approach to better align with the HOJC Agreement.

least amount of force necessary, the policy also reinforces that staff have a duty to act to protect youth or staff from harm due to assaultive or violent behavior.

- ACS utilizes Safe Crisis Management (SCM) to promote safety and to guide physical interventions when needed.
- SCM's practice guidelines include more than the use of physical intervention. They also require staff to utilize "primary strategies" to prevent incidents from occurring (*e.g.*, structured daily schedule, behavior management system that teaches necessary skills, etc.); a range of non-verbal and verbal "secondary strategies"; and trained physical intervention techniques.
- SCM requires both youth and staff to engage in a de-briefing protocol within 24 hours of a physical intervention.

- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of and pathway toward physical and emotional safety:
  - V.A. "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
  - V.C. "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility, maintaining appropriate staff ratios at all times…"
  - V.D. "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."

- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
  - An "incident" is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."

- ACS maintains quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, and restraints along with narrative summaries of all incidents occurring at HOJC.

**Monitoring Team's Analysis**.

The Monitoring Team remains concerned about the level of violence at HOJC, as discussed in the narrative above. The level of violence disrupts the facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor, or witness, the youth in custody at HOJC are regularly exposed to trauma in the facility environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including deeper penetration into the juvenile justice system. Staff are also negatively impacted by

trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth effectively.

The HOJC Agreement includes an array of components that, if fully implemented, should increase the level of facility safety (*e.g.*, consistent assignments of staff to the same housing unit day-to-day; robust programming; behavior management program that incentivizes positive behavior and effectively responds to negative behavior). Although progress is evident in each area, the continuing impact of COVID slowed the pace of implementation of these critical structures. As a result, many of these tools are not yet functioning at a level where they are able to counteract the dynamics that lead to violence at HOJC, and the staff currently appear ill-equipped or reluctant to manage disruptive and violent youth.

Furthermore, one of the things that stands out about many of the incidents that occurred at HOJC during the current Monitoring Period is that staff often appeared reticent to intervene physically in situations where a risk of physical harm clearly existed and/or did not utilize sound strategies in the immediate aftermath of an incident to ensure the risk of harm had fully abated. This may be partially explained by the fact that a significant proportion of staff were hired within the past year (35% of YDSs and 15% of AYDSs) and thus have yet to establish their "presence" and become adept with the trained techniques. Good practice certainly requires facilities to be judicious in their use of restrictive measures such as physical restraint and room confinement. However, the Monitoring Team's experience in many other jurisdictions throughout the country suggests that facilities tend to over-correct when attempting to limit their use of these tools. Both physical restraint and room confinement have a legitimate safety purpose, and while their use needs to be carefully prescribed and closely monitored, failing to use these tools where appropriate can be as dangerous as overusing them. The Monitoring Team's review of incidents identified situations where an imminent threat of harm was clearly present and yet staff hesitated to intervene physically when it would have been appropriate and/or failed to secure the youth in room confinement following an act of violence so that the youth and the surrounding milieu could be effectively de-escalated. While the Monitoring Team certainly recommends only *thoughtful and appropriate* uses of these tools, ACS is encouraged to expand staff's understanding, capability and willingness to utilize them in response to dangerous acts of violence. The consequences of HOJC staff's reticence in this area are painfully obvious when one examines a cascade of incidents that flow from the failure to properly abate an ongoing threat of harm.

Finally, in the Monitoring Team's experience, what happens *after* an incident of violence occurs is extremely important to the ability to prevent future violence from occurring. This includes fully de-briefing the incident with both youth and staff; consistently applying an effective and proportional sanction; and targeting identified skill-deficits with an evidence-based skill-focused curriculum. During the subsequent Monitoring Period, the Monitoring Team will further engage with ACS in these areas to help fortify existing practices.

Robust implementation of the variety of tools required by the HOJC Agreement should lead to a safer facility in which both youth and staff can thrive. There is considerable work to do before a safer facility is realized by implementing the behavior management program,

stabilizing staff assignments to units, restoring the full array of educational and rehabilitative programming in the post-COVID era, and building a multi-tiered incident review/investigation process. A high-profile event in January 2022 in which youth took control of a housing unit, and staff were unable to enter or exit the unit, and the NYPD was ultimately needed to resolve the situation illustrated the consequences of the confluence of deficiencies in each of the requirements of the Agreement. During the Monitoring Team's recent quarterly meeting with the new ACS Commissioner, it was clear that ACS is also concerned about the frequency and severity of violent incidents at the facility and reported its commitment to focus efforts to improve safety and security of youth and staff along the lines discussed above.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(b). Use of Physical Restraints.** ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting of such incidents, including Policy #2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leaderships Strategies (GOALS)"). The aforementioned policies shall be referred to herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.[7]

(i). The Monitoring Team Panel shall assess and provide feedback, in collaboration with ACS's division of Youth and Family Justice (DYFJ) senior managers, on ACS' staff reporting and use of Physical Restraints, and shall provide any necessary recommendations for enhancements to reporting, limiting physical interventions where possible and improvements with respect to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches to youth-on-youth violence, youth-on-staff violence, staff-on-youth violence, and other situations with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training and articulate general improvements to practice as necessary.

ACS Policy & Practice.
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that ACS staff employ Safe Crisis Management ("SCM"), a comprehensive approach to behavior management which requires substantial effort in prevention and non-physical interventions before staff may resort to Emergency Safety Physical Interventions ("ESPIs") to restrain residents.
  - This policy outlines the training requirements for implementing SCM, the proper administration of ESPIs, and considerations before, during, and after an ESPI is used.

---

[7] NY State Law regarding the use of physical restraint (§180-3.15) has requirements that limit the circumstances in which it can be used; requirements for staff training; prohibitions on specific types of restraints; requirements for medical review; reporting; parent notification; and post-restraint debriefing protocols. NY State Law regarding the use of mechanical restraints (§180-3.16) limits the type of equipment that can be used; requires staff to be trained; positions mechanical restraints as a last resort in the facility's restraint continuum; requires constant supervision of youth while in mechanical restraints; and requires authorization at various intervals.

- o Mechanical restraints may only be used when ESPI techniques are unsuccessful in controlling aggressive physical behavior and when staff have determined that such an intervention is in the best interests of the youth involved.
  - o Overarching Principles:
    - ▪ The policy states that the primary purpose of any emergency intervention is to "protect the safety of the youth who is being restrained and all other youth, the staff, the community, and others who may be present within a context that promotes healthy relationships with youth, including employing effective communication, making empathetic connections, and establishing a structured, consistent environment."
    - ▪ The policy states that when physical interventions are necessary, staff shall use only the minimum amount of physical intervention necessary to stabilize the youth or situation.
    - ▪ The policy expressly prohibits the use of excessive force or inappropriate restraint techniques.
- Training staff in SCM:
  - o ACS targeted efforts in the Second Monitoring Period to enhancing staff skill in physical intervention through additional support and training in SCM.
  - o ACS worked with third-party providers to certify additional staff to provide formal and informal SCM refresher trainings, although COVID-related protocols and staff absences limited the volume of SCM training that could be provided.
- Staff reporting of physical restraints is discussed in ¶ 2 (c) below.

**Monitoring Team's Analysis.**

ACS staff's physical restraints were usually proportionate, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force by ACS staff. If anything, staff are more likely to be *hesitant* to intervene physically, even when it is objectively *necessary*. Physical intervention by staff in a secure setting is at times required to maintain order and safety—there are times in which staff must utilize a physical restraint to prevent harm or avoid further harm from occurring. A well-executed, well-timed physical restraint that is proportional to the observed threat can actually protect both staff and residents from serious harm. This issue is particularly pronounced given the overall level of violence in the facility as discussed throughout this report. In addition, the facility's ability to detect and respond to incidents in which staff misuse force (discussed further in ¶ 2(c) below) still needs to be strengthened.

ACS maintains restraint data that tabulates the number of *youth* who were restrained (in contrast to data on youth violence reviewed in the Introduction above, which tabulates the number of *incidents*). This means if 6 youth were involved in an assault and all six were restrained, the data related to that incident would include <u>one</u> assault and <u>six</u> restraints. It is also important to recognize that not all acts of violence lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands) and that restraints are

also used to respond to youth behaviors other than acts of violence (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring).

ACS physical restraint data includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework.[8]

The graphs below present the raw number and rate of both physical and mechanical restraints for January to December 2021. These graphs illustrate that the number and rate of restraints decreased significantly during the current Monitoring Period. More specifically, the average rate of physical restraints (which factors in the increasing size of the HOJC population) decreased 32% (2.5 during the first Monitoring Period versus 1.7 during the current Monitoring Period). Mechanical restraints have a lower base rate (*i.e.*, are not used as often) but also showed a significant decrease (down 35%; from an average of 0.43 in the first Monitoring Period to an average of 0.28 during the current Monitoring Period).



<hr />

[8] As guided by SCM developers, ACS' restraint data does not include escort holds, even if the escort is of a non-compliant resident and some physical coercion is needed. It also does not include incomplete ESPIs that do not result in a physical restraint (that is, a staff member attempts a specific restraint technique but fails and does not restrain the resident, the event then terminates with the resident ultimately complying without the use of physical restraint). That said, ACS does provide the Monitoring Team with information about these types of events. Escort holds and incomplete ESPIs are not considered "physical restraints," but they are reportable events that are included in the GOALS reports shared with the Monitoring Team. Because escort holds are excluded from the physical restraint data in this report, this data should be considered under-inclusive in terms of understanding the frequency with which staff needed to use physical force with a non-compliant resident.



To assess the necessity, execution, and proportionality of HOJC's use of physical interventions, the Monitoring Team reviewed video footage and related documentation such as staff reports and injury reports (collectively referred to as "packets") for 43 events occurring between July and December 2021 at HOJC. Of these, 23 were classified as physical restraints, and 20 were other types of events captured by GOALS. Events were selected based on the initial description in GOALS where either a significant physical intervention occurred or some other type of interaction between staff and residents that appeared to warrant review and feedback by the Monitoring Team.

For the most part, ACS staff either used or attempted to use trained SCM techniques in response to situations involving an imminent risk of harm. Staff skill in applying these techniques was mixed. The Monitoring Team reviewed incidents that involved successful, appropriate application of SCM techniques, but also some incidents where staff's attempts were ineffective due to the staff's lack of skill mastery. SCM techniques can be difficult to properly execute and require consistent practice over time. The following trends were noted:

- Staff sometimes appeared hesitant or slow to use ESPIs or other intervention as a means to enforce important rules (*e.g.,* not allowing residents to congregate in other residents' rooms) or to prevent the destruction of property that threatens safety, particularly in situations where the property destruction allows youth to enter/exit areas unauthorized, provides access to materials that can be used as weapons, and provides opportunities for self-harm or significant disruption of facility operations. Staff were present and aware of the activity and sometimes made casual attempts to deescalate and gain compliance, but often relented and appeared to allow these activities to continue.

- A lack of boundaries between youth and staff was often visible and the line between horseplaying and more serious misconduct sometimes became blurred. This was particularly evident in cases where youth showed no inhibition to taking staff's keys by force or to interfering with staff's application of ESPIs on other youth. This lack of boundaries made it difficult for those staff who did attempt to enforce rules and restrictions to be successful and often led to a need to use physical restraints that would otherwise have been avoided if boundaries had been established and if horseplay had been appropriately prohibited.

- While most restraints were primarily in response to youth-on-youth violence or aggressive, threatening behavior toward staff, HOJC staff sometimes escalated the situation and/or responded too aggressively—and a few examples were noted in which staff escalated events after demonstrating patience for a prolonged time.

- In terms of the actual ESPIs used or attempted, staff appeared to default to actions that more resemble bear hugs or takedowns than true ESPIs, and on occasion were in positions that raised positional asphyxia concerns (*e.g.,* multiple staff piled on to the head or torso of a resident in an attempted restraint).

As described in ¶ 2(c) and ¶ 2(j) below, while more corrective action and discipline was enacted during this Monitoring Period compared to the previous Monitoring Period, there is still room for improvement in identifying and addressing poor practice. Therefore, while staff misconduct during the use of physical intervention is not pervasive, it does occur, and HOJC's lack of a structured process to identify and address poor practice and misconduct impedes improved staff practice going forward.

Finally, the Monitoring Team appreciates that ACS is poised to be able to provide more SCM-related support and guidance to staff through onsite master trainers once staffing challenges ease.

**Compliance Rating**. Compliance

---

**¶2(c). Incident Report Review and Referral.** ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies. ACS shall also refer any cases to the New York State Justice Center regarding staff use of Physical Restraints and/or Prison Rape Elimination Act ("PREA") allegations when required by applicable laws, regulations or policies.

ACS Policy & Practice.
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS

reports are created for every incident occurring in the Facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.

- ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires:

    (1) that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnesses the event must submit an Incident Report Form;

    (2) a Supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form; and

    (3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.

- For all incidents reported to GOALS (not just those involving ESPIs as described above), additional layers of supervisory review *can* occur on an *ad hoc* basis, including:

    o An Operation Manager's Report is supposed to be generated for critical incidents, which is generally those incidents involving a resident injury or alleged child abuse.

    o One reviews more serious incidents on a weekly basis (this had, by design, initially been an "Incident Review Committee," intended to randomly audit incidents, but ACS reports review by a committee is not currently occurring).

- ACS Policy #2019/16 "Abuse/Neglect Reporting and Justice Center Compliance in a Secure and Specialized Secure Detention" requires any staff working within ACS' secure detention facilities to immediately report all events meeting specified criteria for abuse, neglect, or a "significant incident"[9] to the Justice Center for the Protection of People with Special Needs ("Justice Center") Vulnerable Persons Central Register.

- ACS' "Safe Intervention Policy for Secure and Non-Secure Detention" also states that the use of excessive force or inappropriate restraint techniques must be reported to the Justice Center.

    o ACS' Compliance Unit tracks referrals made to the Justice Center.

    o During the current Monitoring Period, 10 incidents involving physical restraints were referred to the Justice Center (these were often referred for incidents in which significant physical intervention was necessary due to significant youth resistance), along with 18 other types of significant incidents (including one in which staff took a fighting stance and attempted to punch a resident in response to a head strike by the youth).

**Monitoring Team's Analysis.**

The assessment of compliance with this provision is divided into three sections: (1) HOJC's internal assessment of incidents within the facility, (2) an assessment of staff reporting of

---

[9] Significant incidents include any incident, other than an incident of abuse or neglect, that because of its severity or the sensitivity of the situation may result in, or has the reasonably foreseeable potential to result in, harm to a youth's health, safety, or welfare. Significant incidents fall into wo distinct categories: Conduct Among or Between Youth and Staff Conduct. *See* NYS SSL § 488 (1) (i).

incidents they are involved in or witness, and (3) an assessment of referrals of specific incidents to the Justice Center.

   *(1) HOJC's Internal Assessment of Incidents*

   HOJC has an adequate mechanism for reporting incidents internally, including all physical restraints, via GOALS. The GOALS reports provide a high-level summary of each incident that occurred at HOJC. However, as reported in the First Monitor's Report, HOJC lacks a systematic process for incidents to be *assessed* by a supervisor. ACS worked with the Monitoring Team this Monitoring Period to develop a draft policy that creates a more systematic incident review process that includes these supervisory reviews, which is discussed in more detail below.

   o   *Current Practices*

   The *ad hoc* incident reviews and elevation of problematic incidents described in the First Monitor's Report (*see* pg. 18) continued throughout this Monitoring Period. ACS leadership reported regularly reviewing incident videos and taking action, including referrals when potential misconduct is identified that warrants consideration for discipline by the Employment Law Unit ("ELU referrals") (as discussed further in ¶ 2(j) below).

   While ACS was formulating a more systematic process to review incidents in order to meet the requirements of this provision, the Monitoring Team drew ACS's attention to several problematic incidents reviewed during the normal course of monitoring and requested information on referrals or corrective action that had been imposed. ACS reported that ELU referrals and other corrective action (including counseling or refresher training) were made, but based on the timing of the referral or the corrective action, it is unclear whether these steps would have been taken if the Monitoring Team had not drawn attention to the incident. Some examples of misconduct identified (and corresponding action taken by ACS) for incidents this Monitoring Period included:

- A staff member was hyper-confrontational during an incident, took a resident to the floor and held the resident down for several minutes. The staff member also re-engaged with the resident after the initial struggle had ended. The staff member was referred to ELU.
- A staff member who was physically held back by another staff member after a resident assaulted him received a disciplinary conference.
- A staff member restrained a resident using a control hold that did not resemble the reported upper torso assist (an approved SCM technique). The staff member was required to take SCM refresher training.

   The Monitoring Team remains concerned that the *ad hoc* reviews by facility leadership are not identifying *all* incidents that warrant further scrutiny and potential corrective action. In addition to incidents from the latter half of the Monitoring Period discussed above, the Monitoring Team also identified a similar group of problematic incidents that occurred between March and August 2021. The incidents had been reviewed by ACS leadership, but the Monitoring Team asked for additional information to verify whether (1) all necessary

corrective action had been imposed; and (2) all necessary referrals to the Justice Center had been made. In response to this inquiry, ACS made seven additional Justice Center Referrals, and identified the need for 13[10] disciplinary conferences not previously conducted.

That said, ACS did make several ELU referrals and took corrective action for incidents not raised by the Monitoring Team in contrast to the previous Monitoring Period when neither type of action occurred (discussed further in ¶ 2(j) below).

o *New Policy and Procedure*

ACS created a draft Operations Order to formalize a structured process for reviewing all facility incidents. To aid ACS in the development of this draft, the Monitoring Team provided overall guidance and recommendations, as well as sample policies and procedures from other jurisdictions. The new procedures will formalize various levels of supervisory review (and timeframes for those reviews), including a process to identify and elevate more serious incidents for further scrutiny. Upon recommendation from the Monitoring Team, the procedures will also include the use of a tracking sheet to identify the level of supervisory review each incident received and any recommended corrective action, and the review process will leverage forms to guide and record the outcomes of supervisory review of incidents. The draft policy was shared with the Monitoring Team early in the Third Monitoring Period, and the finalization of this policy and implementation of a systematic and consistent review of GOALS[11] incidents will be a priority during the Third Monitoring Period. Once finalized, robust implementation of these procedures is necessary to meet the requirements of this provision.

*(2) Staff Reporting*

The "Safe Intervention Policy for Secure and Non-Secure Detention" requires that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnesses the event must submit an Incident Report Form. The Incident Report Form has required fields including basic information such as date, time, and youth involved; a general narrative section; and an ESPI-specific portion where staff must identify the type of physical restraint utilized, its duration, and other information specific to the physical restraint.

As noted above, the Monitoring Team reviewed the incident packets for 43 incidents, including 23 physical restraint incidents, and found that the Incident Report Forms from staff who participated in or witnessed the incident were often missing, and those that were included were often vague or incomplete. While staff appear to accurately detail the actions of youth, staff's reports are often vague or inaccurate regarding their own actions and/or

---

[10] In eight cases, the staff remains out on Worker's Compensation and the disciplinary conference has not occurred yet.

[11] Due to the various categorization of GOALS events (including that "physical restraints" does not capture escorts techniques, or incomplete/unsuccessful ESPIs), the Monitoring Team did not limit its recommendations for systematic review of incidents to "physical-restraint" incidents, and instead recommended this type of review is conducted and recorded for *all* GOALs events.

those of other staff. Reviewing staff reports, and identifying and addressing any deficiencies, is part of the new systemic review protocol discussed above.

*(3)  Justice Center Referrals*

ACS policy articulates the requirements for Justice Center referrals, including a requirement to track incidents that are referred. ACS provided this information to the Monitoring Team. When ACS identified a significant incident, the incident was referred as required. However, the lack of consistent supervisory review of all incidents discussed above means that some instances of problematic staff behavior that may warrant referral may not be identified, and therefore they also may not be referred to the Justice Center as required. The new review protocol discussed above, if robustly implemented, should solve this problem.

There was an uptick in Justice Center referrals during this Monitoring Period (28) compared with the previous Monitoring Period (19), even though there were fewer incidents overall during this Monitoring Period. This may be attributable to the heightened focus on problematic incidents described above. Improvements to the incident review process should have a corresponding impact on the number of incidents that are referred to the Justice Center. As noted above, ACS identified seven incidents that warranted Justice Center Referrals from March-August 2021 that were not initially referred close in time to the incident, as required. The referrals for staff behavior included use of non-approved restraint techniques, a staff member taking a "questionable" defensive stance before engaging in a physical restraint, and a potentially prohibited neck hold used during a restraint.

Once supervisors and Operations Managers are systematically focused on evaluating staff conduct, they are likely to identify a larger number of incidents that meet criteria for referral to the Justice Center.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(d). Classification.** ACS shall develop and implement an age-appropriate classification system for AO Youth that is sufficient to protect AO Youth from unreasonable risk of harm and informs and guides the appropriate housing of AO Youth, and permits the use of overrides to address youth's mental health, education or other individual needs.

**ACS Policy & Practice.**
ACS Policy
- Section VII. "Classification and Housing Assignment" of ACS Policy #2019/35 "Orientation and Classification in Secure and Specialized Detention" describes the processes by which ACS determines to which facility and housing unit each youth will be assigned. The standard procedures were modified slightly in response to the COVID-19 pandemic, but typically:
  - All AO youth entering secure detention do so via Crossroads Juvenile Center ("CJC").

- o Within 5 days of admission, during Intake/Orientation, a case manager completes a Classification Guidance Form that includes a variety of risk and mitigating factors to assess the youth's risk level.
- o Intake/Orientation staff complete Behavior Observation Reports that characterize the way in which youth interact with peers and staff.
- o Each week, an interdisciplinary team that includes ACS leadership (who oversee both facilities) and CJC/HOJC staff discuss the placement of the youth and determine who can be suitably transferred to HOJC. This process is driven primarily by the need to balance population/bed space at Crossroads (*i.e.*, when the Intake/Orientation unit is near capacity, the team will meet as needed to identify youth who can be transferred to HOJC), but also considers the youth's individual needs/proximity to family.

ACS Practice

- In mid-2020, HOJC was initially identified as the place where COVID-exposed youth would be quarantined, and thus most of the youth housed in HOJC at that time were transferred back to CJC to create space for quarantining needs. At the beginning of the previous Monitoring Period, HOJC admissions were still quite irregular due to ACS' continued efforts to mitigate the spread of COVID. However, the volume of youth who were exposed and/or became ill was nowhere near what was expected, so by early 2021, the COVID-exposure restriction was lifted, and youth were transferred to HOJC more regularly. Throughout the current Monitoring Period, the classification and housing process remained stable, and transfer decisions reflected the criteria described above.
- The same level and type of services are available at both CJC and HOJC and thus facility placement should have no impact on the ability to address youth's mental health or education needs.
- Although family proximity is a key component of ACS' facility assignment strategy, population management is the primary driver. When CJC's population, particularly in the intake units, increases to approximately 10 youth above the desired capacity, youth whose families reside in the Bronx/Queens/Manhattan or whose cases are being heard in Bronx/Queens/Manhattan courts are transferred to HOJC. This focus on population means that transfers do not occur on a regular schedule, but rather depend on the ebb and flow of youth into and out of both facilities and the resulting population size.
- At the weekly Classification meetings, in addition to the proximity of family, the group discusses youth's peer relationships, connections to staff, program engagement, adjustment to the facility, etc. to identify those for whom transfer would be appropriate and/or beneficial. These youth are placed in "the cue" and are transferred when the facility populations need to be balanced.
  - o The need to balance the facility populations does not occur on a set schedule, and so youth are not necessarily transported within days of the transfer decision—sometimes, they are transferred a couple of weeks later.

- At HOJC, all of the housing units are identical in terms of security/supervision level and the types of services and programs that can be accessed. The classification committee provides a recommended housing unit type, such as a unit housing more vulnerable youth, one with youth with/without prior detention history, or one where youth are highly engaged in school or programming. From there, the primary determinant for housing unit assignment is the extent to which the youth assigned to the unit coexist peacefully.
- Upon transfer, the HOJC Operations Manager/Tour Commander review the recommended housing unit type, assess whether the composition of youth on the unit is amenable to safe placement, and make the final housing unit assignment.

**Monitoring Team's Analysis.**

It is somewhat unusual for a jurisdiction to have multiple detention facilities, and those that do (typically larger jurisdictions) either have centralized intake like ACS or have geographical catchment areas for each facility, and youth are seldom transferred among facilities. As long as the youth's service needs are met, either model can be utilized. Using family engagement as a criterion for determining facility transfer certainly enhances the centralized model, and it is encouraging that transfers to HOJC are made relatively swiftly.

Obviously, a speedy transfer to the facility that is proximal to family and court is the goal, but family engagement can also be accomplished while the youth is at CJC via videoconferencing, which has become more familiar to youth and families and more frequent as a result of COVID. Also, CJC and HOJC offer the same set of services and thus youth's access is not impacted one way or the other by the speed of the transfer. That said, a facility transfer is both stressful and disruptive to the youth and family, and thus is not ideal. ACS will explore the creation a borough-based intake, which would avoid the potentially de-stabilizing impact of the current centralized intake process.

Although COVID-19 continued to impact facility operations, the processes for intake, classification and housing operated consistently and constructively throughout the current Monitoring Period. During the six-month period, a total of 74 youth were transferred from Crossroads Juvenile Center ("CJC"; ACS' sole intake facility) to HOJC. To assess ACS' practices in this area, the Monitoring Team reviewed the key dates for the 30 youth transferred to HOJC in August, September, and October 2021 (41% of all youth transferred during the current Monitoring Period), along with the Classification packets for the 14 youth transferred in September 2021.

As described above, every week, CJC staff convene a multi-disciplinary Classification meeting to determine the appropriate facility/unit placement. Across the 30 youth in the sample, the Classification meeting was held for 83% (n=25 youth) within 14 days of their admission to CJC.

Once the youth were discussed in the Classification meeting[12], the exact date of transfer depended on when the CJC population needed to be re-balanced. For example, youth were transferred from CJC to HOJC on one day in August, five days in September and four days in October. About two-thirds of the youth (63%, n=19) were transferred within one week, with the others transferred within about three weeks. This cadence resulted in some HOJC youth having longer lengths of stay at CJC than others, but overall, nearly all youth (87%, n=26) were transferred to HOJC within 21 days of their admission to CJC.

In addition to the timeliness of these transfers, the Monitoring Team reviewed information regarding the specific housing decision once the youth reached HOJC. The information included the Classification Guidance Form, notes from the weekly Classification meetings, and the Transfer Summary prepared for each youth. The primary reason that each youth was identified for transfer to HOJC was to be closer to family/court of jurisdiction (*i.e.*, the youth lived in the Bronx, Manhattan, or Queens). Each youth's file contained a Classification Guidance Form with specific, individualized information to guide housing unit assignments (*e.g.*, mental health issues, behavior while in custody at CJC, peer alliances/tensions).

Once the committee identified a youth for transfer, a suitable housing unit type at HOJC was proposed for each youth. Given that the peer dynamics on the various units change constantly, rather than prescribing a specific unit (*e.g.*, A Hall or B Hall), the classification committee identifies the <u>type</u> of unit in which the youth would be most successful (*e.g.*, a unit where the youth do not have extensive experience in detention; a unit where the youth are highly engaged in school/programming; a unit with other youth who could be considered "vulnerable"). Proposed housing assignments were revisited upon the youth's arrival at HOJC and often modified based on the current youth composition on the units. Given that all of the HOJC housing units have the same level of security and structure and provide youth with the same access to services and programs, HOJC's general focus on peer dynamics in housing decisions is appropriate. Among the cases reviewed, one youth was on suicide precautions during his stay at CJC and another had a medical issue. HOJC was made aware of both youth's circumstances and identified an appropriate housing unit upon the youth's arrival.

Given that the two facilities provide identical services, prioritizing the youth's connection to his family and his home community when making transfer decisions is a practice that is well supported by research on the importance of family engagement. Furthermore, because HOJC's housing units are currently undifferentiated in terms of security/supervision procedures and services that are available to youth, the choice among them focuses on safe peer relationships and other unique circumstances (*e.g.*, vulnerabilities, program engagement, etc.). Together, ACS' classification protocols and decisions combine to create a process that is appropriately individualized and sufficiently flexible to adapt to the changing circumstances of youth, particularly regarding peer conflict.

---

[12] In the previous Monitoring Period, about one-third of the youth reviewed were transferred to HOJC *prior to* the Classification meeting. During the current Monitoring Period, the steps toward facility transfer were followed in their intended sequence in nearly all cases (29 of 30 youth).

| Compliance Rating. Compliance |
| --- |

**¶2(e). Programming.** ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention," which requires a balance of structured recreational, exercise and leisure activities that are posted on a daily unit schedule, remains in effect.
  - ○ This policy requires one hour of large muscle activity per day.
  - ○ ACS has set an internal target of at least 3 hours of programming per day during non-school hours.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" remains in effect.
  - ○ Youth of compulsory education age (*i.e.*, age 16 or younger) are to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.
  - ○ Youth with a diploma/GED are to receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development.
  - ○ YDS staff are required to facilitate timely arrival and attendance.
  - ○ In-person education services were re-introduced during the summer school session—July 2021—and continued into the 2021-2022 school year. Remote education services were only offered during periods of COVID quarantine.
- 30 youth participated in the Summer Youth Employment Program in July and August 2021, during which they were paid $15 per hour for a range of summer jobs in the facility.
- ACS operated a summer enrichment program ("Freedom School") during a six-week period in Summer 2021 in which all HOJC youth participated. ACS also offered a variety of other special Career Pathway programs, including dog training, culinary arts and audio pictures.

**Monitoring Team's Analysis.**

ACS' internal target of 3 hours of programming each day, in addition to educational programming from DOE staff when school is in session, exposes youth to essential rehabilitative services and substantially reduces idle time, and thus reflects best practice. Implementing a robust daily schedule full of engaging, structured activities is a powerful strategy for reducing facility violence and disorder. Programming at HOJC is provided by Program Counselors, community partners and the YDSs assigned to each housing unit. Most of the programming facilitated by YDSs is semi-structured leisure time activities (*e.g.*, card games, video games, movies), while Program Counselors and vendors provide rehabilitative

and skills-based programs such as creative arts, performing arts, cooking, personal fitness, goal setting, decision making and conflict resolution.

During the current Monitoring Period, resources for programming were significantly impacted by COVID, either because of staff vacancies and absences, a temporary suspension of in-person services by outside vendors, and by recurring limitations on the extent to which youth could travel to spaces within HOJC to access programming (*i.e.*, youth were quarantined after exposure and/or isolated following a positive COVID test).

The Monitoring Team audited programming records for September 2021 to assess the extent to which programming targets were met. ACS provided aggregate data showing that across the 10 housing units, the 3+ hour programming targets were met on 66% of the days. These aggregate data were validated using Program Tracking Forms for a one-week period during that time. While many of the aggregate totals were verified, there were some discrepancies, which ACS reported were due primarily to YDSs not recording structured programming they delivered to youth on their assigned Halls. ACS has identified an Operations Manager to improve the protocol and YDS practice in this area. Furthermore, ACS's electronic program tracking tool will be rolled out in early 2022. These efforts should allow ACS to monitor program delivery more precisely going forward.

Success in meeting programming targets was significantly impacted by both unfilled vacancies among ACS' 12 Program Counselor and two Supervisor positions, and absenteeism (due to COVID and other factors) among those same staff. During the current Monitoring Period, at best, only about half of the 12 Program Counselors were available to conduct programming on any given day. At the end of the Monitoring Period, ACS reported that Program Counselor positions had been offered to 5 individuals, although 2 Supervisor positions remained vacant. Ensuring all positions are filled, combined with a reduction in COVID-related absenteeism, is essential to ensuring HOJC youth have a robust array of structured activities to meet their needs and to reduce idle time.

Programming data also revealed that large muscle activity ("LMA") was not delivered consistently, with daily access to LMA recorded on only 71% of the days across all housing units. Access to LMA was compromised when an insufficient number of YDS staff were available to support the use of outdoor spaces and the resulting difficulty of trying to rotate all 10 housing units through the limited indoor gymnasium space.

Although HOJC's education program is not subject to monitoring, it is an important component of HOJC's efforts to meaningfully engage youth in activities that promote success and positive growth. At ACS' request, the Monitoring Team provided technical assistance regarding tracking timely school arrival and consistent attendance to increase the rate at which HOJC youth are engaged in full-day educational services as required by policy. During the current Monitoring Period, ACS made efforts to identify engaging activities that will successfully appeal to youth who have attained a high school diploma/equivalency. These include offering credit-bearing college courses and, college and career exploration workshops through local community college partnerships with Kingsborough Community College, LaGuardia Community College and Hostos Community College. ACS has developed a

Memorandum of Understanding with CUNY to formalize these services and currently offers credit bearing college courses and vocational certificate programming. During the monitoring period, ten youth earned three college credits by successfully completing CUNY's College Now Freedom Prep semester-long *Reading the Biography* course offered in-person at HOJC. Finally, ACS introduced tutors to support students both in class and during non-school hours and is planning to expand opportunities for asynchronous instruction utilizing technology.

Finally, during its review of videotaped footage of incidents, the Monitoring Team frequently noted a lack of structured programming during the times that many of the incidents occurred on the housing units, and thus progress toward full compliance with this provision should also help to elevate the overall level of facility safety. Documents submitted by ACS in response to requests for information about the behavior management program (¶2(g) below) also identified the lack of a properly structured environment on the housing units contributed to several incidents of violence.

ACS has made substantial efforts to provide an array of programming to youth at HOJC by dedicating significant resources to engage youth in structured activities led by an adult. When the Halls/staff were not affected by COVID-related quarantine and absences, the 3+ hour targets were easier to achieve. However, the enduring impact of COVID and the shortage of Program Counselors and Supervisors and staff to supervise large muscle activities meant that these targets could not be met consistently throughout the current Monitoring Period. ACS' new program tracking tools should ensure that program delivery is recorded more reliably. Most significantly, as the operational impact of the pandemic subsides and as the vacant Program Counselor and Supervisor positions are filled, program delivery itself should become more dependable.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(f). Consistent Staffing**. ACS shall adopt and implement a staff assignment system under which a team of housing unit staff and supervisor(s) are consistently assigned to the same AO Youth housing unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), HOJC must abide by OCFS regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth." This regulation requires a 1:6 ratio of YDSs to youth and requires that staff may not work alone. In practical terms, 2 staff must be present at all times on units that house between 1 and 12 youth.
  - It is important to recognize that the "staff may not work alone" requirement means that whether the facility holds 40 or 100 youth, the number of staff needed to supervise the housing units is generally the same. When the population is at the low end, HOJC's practice is to distribute youth across most of the 10 housing units, rather than consolidating them on one or two units at maximum capacity. The wide distribution of youth is the preferable strategy for

safety, managing interpersonal conflicts, staff-youth rapport, programming etc., but necessarily requires more staff to execute.

- o In response to multiple incidents involving youth obtaining staff's keys and attempting to move through the facility's corridors, SCOC[13] requires HOJC to staff its 8-10 corridor posts at all times, in addition to its 20-25 housing unit posts and staff to supervise the clinic, for about 30-35 primary fill posts on each shift.

- ACS is exploring the feasibility of installing electronic locking mechanisms on doors throughout the corridors, which would free up staff who currently must be posted in the hallways per SCOC.
- HOJC plans to train staff and youth and implement its behavior management program, STRIVE, using Unit Teams. This approach requires housing unit staff (YDSs) and supervisors (AYDSs) to be assigned to the same unit day-to-day.
- To improve recruitment and attendance, ACS successfully lobbied to obtain funding to provide bonuses to staff who begin working at ACS and who meet ambitious attendance targets. The first bonus period coincided with the end of the current Monitoring Period (November-December 2021).
- ACS' Staff Recruitment and Retention Task Force remains active. In particular, workgroups focused on staff wellness and leadership development have developed initiatives to support staff, increase safety and increase on-the-job skill development.

**Monitoring Team's Analysis.**

A prerequisite to consistently assigning individual staff to the same unit day-to-day is having enough staff to cover all essential posts (*i.e.*, "primary fill posts"). HOJC has a sizable number of primary-fill posts which, when combined with insufficient numbers of YDSs, impacts flexibility when trying to ensure that individual staff are consistently assigned to the same housing unit post day-to-day. Compounding the challenge of consistently assigning staff is a shortage of YDSs and AYDSs overall, not to mention constant fluctuations in the number of staff available to work on any given day due to COVID exposure.

As discussed in the First Monitor's Report, staffing shortages exacerbated by COVID caused HOJC to transition from three 8-hour shifts to two 12-hour shifts (Team A and Team B, 7am-7pm and 7pm-7am). Reverting to 8-hour shifts is an ACS priority and requires concerted efforts to both hire and retain staff. Ambitious hiring targets have been set and ACS reports it is working to meet them. During the reporting period, ACS retained a recruitment vendor and services commenced in February 2022. ACS also extensively advertised YDS positions during the reporting period, using platforms such as Facebook, Instagram, Google display + search, and LinkedIn in all 5 boroughs, plus Westchester and Nassau. These positions were also advertised in Spanish in all five boroughs as well as on radio, ESPN, Univision, and LaMega. In addition, ACS plans to hire a candidate assessment vendor and to hire additional candidate processing resources in an effort to increase the flow of new YDSs into the system. New

---

[13] SCOC (New York State Commission of Correction) is one of several oversight agencies that regulates ACS facilities.

cohorts of recruits are expected each month going forward, with clear commencement dates established for the months of March-August 2022.

Compared to the previous Monitoring Period when HOJC gained only 15 YDS (hired 52, lost 37 to attrition), YDS hiring increased significantly during the current Monitoring Period, when HOJC gained 41 YDS (80 hired, 39 lost to attrition). Taken together, a net gain of 56 new YDSs have been added to the HOJC staff roster since the Agreement's effective date. During the current Monitoring Period, HOJC averaged 218 YDS on the payroll, which remains well short of the 337 YDS ACS estimates it would need to fully staff HOJC, transition back to three 8-hour shifts (as it has agreed to do with the union), adequately implement STRIVE, and provide support to the requisite programming.

Further compounding the shortage of YDSs on the payroll is the large proportion of YDSs who are "inactive."[14] During the current Monitoring Period, an average of 37% of the YDSs on the payroll (approximately 80 YDS) were not available to work each month, leaving an average of only 138 YDS to fill the facility's roster on any given day. When combined with the average number of YDSs who called out for a scheduled shift—which increased compared to the previous Monitoring Period (5.9 per day, current; 3.7 per day, previous)—the facility remains strapped for available YDS staff.

Similar patterns were observed in the AYDS rank, which is a slightly different situation because AYDS are *promoted* rather than hired from outside the agency. ACS estimates that 56 AYDSs are needed to operate the facility at full capacity, with three 8-hour shifts. HOJC increased the number of AYDS on the payroll from 33 during the previous Monitoring Period to 38 in the current Monitoring Period. Positively, the number of "inactive" AYDS decreased from a monthly average of 27% in the previous Monitoring Period to 17% during the current Monitoring Period. ACS recently partnered with the National Partnership for Juvenile Services (NPJS) to provide leadership support for these mid-level managers.

A particularly innovative and encouraging development is ACS' successful negotiation for attendance bonuses for its staff. Existing staff were eligible for a $2,500 bonus if they worked at least 90% of their scheduled tours between 11/1/21 and 12/31/21. A total of 112 YDS and AYDS staff at HOJC earned this bonus. A second bonus of $5,000 is available to staff who work 90% of their scheduled tours between 1/1/22 and 6/30/22. New staff who begin employment prior to 6/30/22 are eligible for a $5,000 bonus if they work 90% of their scheduled tours during their first six months. Hopefully this will attract additional staff to ACS,

---

[14] ACS staff may be classified as "inactive" when they are not available to work (*e.g.*, FMLA, military leave, etc.). During the current Monitoring Period, HOJC had an average of 208 YDSs, 128 of whom (62%) were "active" and 80 of whom (38%) were "inactive," and an average of 33 AYDSs, 24 of whom (73%) were "active" and 9 of whom (27%) were "inactive." ACS reports it has internal processes to evaluate Worker's Compensation (WC) claims. ACS reports for every WC claim, DYFJ leadership reviews video footage to assess the employee's narrative. The Office of Human Resources (OHR) performs an additional review for claims of injuries alleged to have been caused by resident assaults. Claims exceeding 90 days are referred to the Law Department for an Independent Medical Examination (IME). Finally, OHR reviews every IME report to determine the appropriateness for potential litigation referral to the Law Department. Department of Investigations can also initiate investigations for instances of suspected fraud or abuse.

help retain staff already on board, and shore up HOJC's ability to consistently assign staff to the same housing units day-to-day.

As noted in the previous monitor's report, HOJC's roll-out of the STRIVE behavior management program requires a team of staff to be consistently assigned to the STRIVE pilot Halls. As such, it provides an excellent pathway for incrementally assessing compliance with the "consistent assignment" requirement of this provision. During the current Monitoring Period, two Halls began to pilot STRIVE. Staff assignment data for the AM and PM shifts for both Halls were reviewed for each day in November 2021. This data revealed that on both Halls/shifts, a small group of core staff were consistently assigned to each Hall, and that on nearly every day/every shift in the month (98%), at least one of these core staff worked each Hall.[15] In other words, each day, at least one staff person who was very familiar with the youth on the Hall, the Hall's daily schedules, and the components of the new STRIVE program was present. This type of consistency is essential to improve facility safety. HOJC's level of performance on the STRIVE pilot Halls is particularly impressive given the staff shortages discussed above and the impact of COVID exposure on staff's ability to report to work. As additional STRIVE Halls are rolled out, the Monitoring Team will use the same strategy to assess the consistent assignment of staff. The Monitoring Team also encourages ACS to increase the number of staff (*i.e.*, more than just one lead staff) who are consistently assigned to a particular unit day-to-day, as feasible.

While additional work is needed to ensure that HOJC has a sufficient number of staff who are available to work, to transition back to three 8-hour shifts, and to consistently assign those staff to the same units day-to-day, HOJC has made notable progress toward these goals during the current Monitoring Period.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(g). Behavior Management.** ACS shall develop and implement systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these systems, policies and procedures shall be individualized and consistent with any treatment needs for AO Youth, and shall not compromise the safety of other AO Youth or ACS staff.

**ACS Policy & Practice.**
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" remains in effect. It guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should strive to teach youth self-regulation and problem-solving skills and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:

---

[15] This method for assessing consistency is congruent with standards the Monitoring Team has utilized in other jurisdictions.

- o   Safety Plans
- o   Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision)
- o   Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy
- The National Partnership for Juvenile Services (NPJS) helped ACS to address various design flaws of its behavior management program, STRIVE, intended to provide reliable incentives for desirable, prosocial behavior and meaningful consequences for negative behavior.
- ACS is still in the early stages of implementing the revitalized program. The roll-out includes pilot testing in a small number of Halls, with extended periods of support from a team of consultants, before moving on to another set of Halls. NPJS continues to embed consultants within the facility to support the implementation of the program.
- During the current Monitoring Period, ACS continued to implement the program in the initial two pilot Halls but experienced some delay in the projected training schedule due to staff absences from COVID. All staff assigned to these two pilot Halls should be trained by early 2022.
- ACS plans to work with NPJS to implement a skills-based group intervention, called "CBT 2.0"—a curriculum that teaches youth to pause and reflect instead of reacting automatically and helps youth to substitute prosocial behaviors for previous maladaptive ones. Training is scheduled to begin in late 2022.

**Monitoring Team's Analysis.**

The previous Monitor's Report (*see* pgs. 29-31) discusses the evolution of the STRIVE model, how the model's design has been strengthened, and the initial timeline for implementation which began with training key managers during Summer 2020. As noted throughout this report, COVID's impact on staffing made the delivery of regular programming difficult, and substantially undercut ACS staff's ability to attend scheduled trainings and to take the time necessary to cultivate new practices. As a result, the implementation of the new STRIVE model has not expanded as quickly as ACS hoped it would.

In the first two pilot Halls, implementation began in November 2021 once most of the staff and youth had been trained on the new model and the revised point card format went into use. As noted in ¶ 2(f) above, a small set of core staff who were fully trained to deliver the new STRIVE program were routinely assigned to each pilot Hall in November 2021. Initial assessments of implementation and staff and youth satisfaction will occur when the Monitoring Team travels on-site to HOJC in March 2022.

The next two pilot Halls have been identified, but training had not yet begun by the end of the current Monitoring Period. Until a Hall begins to pilot the new STRIVE program design, it continues to use the previous version of STRIVE, which has a variety of structural and implementation problems that have limited its effectiveness (which is what led to the revitalization effort). Albeit in a less-than-ideal manner, the old version of STRIVE *is* functioning, as evidenced by all youth being assigned to a STRIVE level that changes

commensurate with their behavior, the delivery of some of the privileges associated with the levels, and the use of level-drops to address misconduct. Youth can appeal consequences implemented via STRIVE (both the old version and the new version).

In order to create a foundation for staff to routinely guide/coach youth throughout the day and to prescribe consequences for misconduct that help youth to acquire the skills needed to better manage their behavior, HOJC plans to provide a skills-based group intervention (CBT 2.0, which teaches youth to pause and reflect instead of reacting automatically and helps them to substitute prosocial behaviors for previous maladaptive ones)[16] to all youth. Groups will be co-facilitated by YDSs and HOJC Program Staff. These skills are incorporated into the STRIVE program design and staff will be trained to deliver the curriculum once they've mastered the core concepts (points, incentives, etc.) of STRIVE, in late 2022.

– *Incentives for Positive Behavior*

The lack of reliability in the incentive component of the original STRIVE program was one of the things that led to its redesign and reboot. COVID-related challenges (*e.g.*, frequent unit quarantines) and delays in the implementation of the new STRIVE program meant that any improvements in this area could not be assessed during the current Monitoring Period. ACS reports that Operations Managers are now responsible for ensuring that the commissary incentive is properly implemented. The reliability of the incentive program will be a focus of the Monitoring Team's review during the subsequent Monitoring Period.

– *Sanctions for Misconduct*

When youth engage in mid-level and serious misconduct, ACS reports that youth are provided multiple opportunities to discuss their perception of the events. This includes a youth debriefing immediately following the event; further check-ins by various supervisors; and a "circle up" at the end of each shift where each youth's behavior is reviewed to ensure that they are aware of any consequences that have been imposed. This is an essential part of shaping youth's behavior—a close-in-time discussion of consequences so that youth make the connection between their harmful or inappropriate behavior and the sanctions that flowed from it.

Currently, the only sanction utilized at HOJC is a drop in the youth's STRIVE Level and with it, a reduction in the privileges, rewards and activities that can be accessed. While this type of privilege restriction is an essential part of an effective response to maladaptive behaviors, best practice suggests that sanctions should have additional facets including a restorative component (*i.e.*, an action that is designed to repair the harm that was inflicted on a person or the community, such as an apology or a community service project) and a skill-development activity that is designed to help the youth acquire the skills needed to handle a similar set of circumstances more appropriately in the future. Both of these components are

---

[16] The CBT 2.0 curriculum was developed by Ideas42 for use in the Cook County Juvenile Detention Center and can be accessed online: http://www.ideas42.org/wp-content/uploads/2017/01/CBTCurriculum.pdf .

part of the new STRIVE program design for which training is currently underway, as described above, but a structure for implementing these components has not yet been designed. Upon ACS' request, the Monitoring Team provided written technical assistance for ACS to consider when developing this segment of the STRIVE program.

The Monitoring Team requested disciplinary records for serious youth misconduct occurring between July and December 2021 to assess what actions were taken in response to violent behavior. First, as noted above, it does not appear that the facility is properly reviewing/ensuring the application of sanctions to all incidents of violence. Aggregate data indicated that there were 185 youth-on-youth and youth-on-staff assaults during this period, but only 63 disciplinary hearing records were provided. ACS reports that this function of the STRIVE program has not been implemented in the systematic way it needs to be due to staffing levels (just two staff are responsible for conducting all disciplinary reviews) and the slow roll-out of the new STRIVE program. That only about 34% of serious youth misconduct included a review by disciplinary managers to ensure the proper application of sanctions is concerning.

Among the 63 hearing records, most youth received sanctions (usually a drop to Copper level; occasional, mediation, Safety Plans, rehousing or arrest were imposed) in response to their serious misconduct (55 of 63 incidents, or 87%). In the other eight cases (2 assaults on staff, 5 fights and one search refusal), the disciplinary committee identified that staff failed to implement the required level-drop. Certainty of consequences is an important element of an effective behavior management program, and the facility should strive to ensure that appropriate sanctions are imposed following <u>all</u> incidents of serious misconduct. These records also highlighted the fact that a small number of youth are involved in a disproportionate amount of violence at HOJC, and should be targeted for more intensive interventions, as discussed below.

HOJC may also submit an Adjustment Report to the court of jurisdiction to keep a youth's Judge apprised of the youth's conduct when requested by the youth's Judge. The Monitoring Team reviewed the 17 reports HOJC submitted between July-December 2021. Most of the reports gave a summary of the incidents in which the youth had been involved, made general statements about the youth's relationships with peers and staff, and some provided useful details about school and programming. Others simply provided basic, rote entries about school and program attendance but did not offer much in the way of details about the youth's adjustment. To better leverage the Court's ability to encourage prosocial behavior, the Monitoring Team encourages HOJC to provide more detailed, individualized accounts of the youth's behavior—both positive and negative—and encourages the integration of information about the youth's performance in the STRIVE program once it has been robustly implemented.

Further, when youth frequently engage in misconduct, HOJC may utilize a bi-weekly multidisciplinary team (*e.g.*, behavior management team, case managers and mental health staff, with written input from unit YDSs) that reportedly convenes to review these youth's behavior more cumulatively, discuss whether the youth's behavior is improving and if not, what other steps (*e.g.*, housing unit transfer) or services (*e.g.*, mental health) are needed to

better support the youth. The Monitoring Team requested the MDT meeting minutes for any youth for whom this intervention had been employed during the current Monitoring Period. Only three youth were identified for the MDT intervention between July and December 2021, which is concerning given that a much larger group of youth appear to engage in frequent misconduct according to the GOALS reports and other disciplinary data reviewed by the Monitoring Team. Across the three MDT meeting packets, it appeared that a serious incident triggered the MDT's review, but the documents did not describe the youth's behavioral history, whether the youth's behavior was deteriorating or improving, the function of or circumstances surrounding the youth's misconduct. That said, the Case Plans flowing from the meeting were both individualized and detailed, but it was unclear whether any follow-up occurred to discuss their implementation and effectiveness. This type of intervention—where a multi-disciplinary group of staff analyze the youth's behavior and implement a variety of supports and services—has been useful in other jurisdictions, and the Monitoring Team encourages HOJC to maximize the use of this strategy for youth with recurrent maladaptive behaviors. Any intervention designed must have consistent follow-up to assess and adjust the plans as indicated by the youth's subsequent behaviors. ACS is considering how such a structure could be integrated into the new STRIVE program.

Finally, in the most serious cases of misconduct, HOJC may also recommend arrest and prosecution for serious offenses committed while in custody. Between July and December 2021, youth were referred for prosecution 7 times for either assaulting staff and/or forcibly taking facility keys from staff.

    &minus;  *STRIVE Appeals*

Youth may appeal the sanction received in response to misconduct by using the STRIVE appeals process. The Monitoring Team reviewed 40 appeals submitted by youth between July and November 2021. Of these, 9 were granted in the youth's favor (23%) and 31 were denied (77%). Most of the appeals were processed within 2 days of their submission.

Though timely, the documentation for the appeal lacked specificity in a variety of areas. About one-quarter of the appeal forms (23%) provided a rationale for the decision (both granting and denying), either by indicating that evidence provided via the incident report, school documentation or staff witness statements either corroborated or refuted the youth's statement. About half of the appeal forms (48%) only provided the source of the evidence (*e.g.*, video review) but did not otherwise explain what the evidence showed or the reasoning for granting or denying the youth's request. The evidence section was left blank on 30% of the forms. The section for Leadership Review was left blank on nearly all of the forms (98%). Finally, youth acknowledged being notified of the outcome of the appeal in only a small number of cases (18%) and most were not dated so the timeliness of the notification could not be discerned. The youth signature portion was left blank on the remaining 83% of the forms.

The Monitoring Team made several recommendations to fortify the appeal process, including ensuring that the rationale for the decision is explained, ensuring that leadership reviews all appeals, and ensuring that youth are timely informed of the outcome of the

appeal. Although it was difficult to understand the reasoning for granting and denying the youth's appeal, the fact that appeals are sometimes ruled in the youth's favor suggests that the appeals process is deliberative and not perfunctory.

— *Summary*

The original timeline for rolling out the new STRIVE program has been significantly delayed due to COVID-related challenges impacting staff availability and frequent youth quarantines. Progress is occurring, but the pace is understandably slow. The implementation schedule for new STRIVE is deliberate and intentional, with support being provided for several weeks before coaching, training and supervision resources are deployed to the next set of pilot Halls. As a result, the full implementation of the new STRIVE program will not be complete before the 18-month window for the HOJC Agreement has expired. On a positive note, training on the new STRIVE program will be incorporated into the pre-service training for new recruits, which should help the remaining Halls to be stood up more quickly as new YDSs are added to HOJC's staffing roster. The Monitoring Team encourages ACS to develop a full implementation schedule, identifying dates and resources that will be used to support each of the remaining Halls at HOJC and to develop strategies to bring greater integrity to the disciplinary and appeals process as discussed above.

**Compliance Rating**. Progress Made, but Compliance Not Yet Achieved

**¶2(h). Room Confinement.** ACS shall comply with applicable ACS policies and practices: (1) prohibiting the use of punitive segregation and (2) governing the use of room confinement.

**ACS Policy & Practice.**
- ACS Policy #2019/32 "Room Confinement Policy for Secure and Specialized Secure Detention" remains in effect. The policy limits the use of isolation to circumstances in which a youth poses an imminent risk of physical harm to another person and prescribes various protections for youth in confinement.
- Any use of room confinement must be authorized by the Facility Director/designee, and re-authorized at prescribed intervals (within 2 hours, and every 2 hours thereafter) and up the chain of command.
- Parents must be notified within 12 hours of room confinement being initiated. ACS plans to extend the timeline to 24 hours, which remains within the generally accepted practice.
- Youth's safety and welfare must be checked at 15-minute intervals and documented in a logbook.
- Youth must be assessed for their readiness for return to regular programming at 30-minute intervals by YDS and/or facility administrators. Supervisors must visit every 60 minutes to reassess.
- A variety of services must be provided to youth in room confinement including meals; case management if the youth remains in room confinement for more than 1 hour; mental health services within the first hour, preferably, but within 8 hours and then

every 8 hours thereafter; medical within 3 hours and every 8 hours thereafter; education if the youth is in room confinement during school hours for more than one period. All services must be documented in a logbook.

**Monitoring Team's Analysis**.

HOJC took several steps during the current Monitoring Period to better educate staff at all levels on the requirements of the *Room Confinement* policy. First, HOJC developed and deployed a *Room Confinement Policy Job Aid* that provides guidance on the full range of requirements (*e.g.*, 15-minute safety checks, 30/60 minute assessments of readiness for release, ancillary service provision) in an accessible format for staff. HOJC also developed a template for notifying the relevant people who have responsibilities under the *Room Confinement* policy via email that a youth has been placed in room confinement and reminds each person of their specific responsibilities. HOJC deployed both tools in January 2022. Finally, HOJC reported that it provided refresher training for key supervisory staff (*i.e.*, Operations Managers and Tour Commanders) in 2021 and plans to refresh training for other supervisors (*i.e.*, AYDSs) and frontline staff (*i.e.*, YDSs) in 2022.

During the current Monitoring Period, HOJC reported only one episode of room confinement lasting about 4 hours, which is a significant decrease from the 36 episodes reported for the previous Monitoring Period. While there were a few deviations from policy observed in the documentation accompanying the single episode of room confinement during the current Monitoring Period, the deviations were not particularly significant, and most of the policy requirements were met. The single reported use of room confinement does not provide a sufficient number of cases to assess HOJC's adherence to policy requirements.

As discussed in regard to ¶2(a) above in this report, when properly utilized and rigorously monitored, the use of room confinement following a serious incident is an important safety tool. Not only does it provide an opportunity for the youth involved to de-escalate, it also provides the necessary time and space for uninvolved youth and staff to regain their footing, de-escalate, restore a sense of order and return to programming. Given the number of serious incidents that occurred at HOJC and the fact that only one use of room confinement was reported, it initially appeared that the facility was underutilizing this important tool. However, interviews with staff and youth while on site in March 2022 suggested that some staff may in fact utilize short periods of isolation but have not labeled or reported these events as room confinement. While isolation may have been an appropriate response to the youth's behavior, the failure to label the event as "room confinement" means that the various notifications and protections required by policy were not in place. This will be further explored during the subsequent Monitoring Period.

While the avoidance of room confinement may effectively limit the risk of harm to youth that can come from prolonged periods of isolation, short periods of room confinement may in fact meaningfully contribute to facility safety. The Monitoring Team encourages ACS to revisit the circumstances in which room confinement is legitimately justified and to utilize the practice when needed, while affording all of the protections prescribed by policy.

The low usage of room confinement demonstrates Compliance with this provision in that it is clearly not *overused*. That said, the Monitoring Team is of the opinion that utilizing

room confinement *more often* following serious incidents—while providing all of the protections prescribed by policy—could help to enhance facility safety by ensuring full de-escalation and preventing incidents from cascading into additional violence and disorder throughout the day.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(i). Video Preservation.** ACS shall preserve all video at Horizon Juvenile Center for 90 days. When ACS is notified of a Physical Restraint within 90 days of the date of the incident, ACS shall preserve the video for a period of four years.

**ACS Policy & Practice.**
- During this Monitoring Period, ACS continued to develop the Operations Order to formalize video preservation practices. A draft of the Operations Order was shared with the Monitoring Team in December 2021.
- ACS maintained its process for preserving video in the digital evidence management system, Genetec Clearance System. The process requires:
  - After a GOALS-reportable incident occurs, the HOJC Operations Manager must respond to the area, immediately access the Genetec Surveillance system, and identify the relevant camera angles and time of the incident. The Operations Manager must create a case number for the incident and must place the video in the Genetec Clearance System. Video is preserved in the Clearance system for at least 4 years.
- ACS reports that the Central Office Incident Review team continues to serve in a quality assurance role by reviewing GOALS reports from the previous 24 hours and confirming that the incident video is present in the Genetec Clearance System and that the period/location captured is consistent with the time and place of the information noted in the GOALS report. If the team finds that video of an incident was not properly captured, the team member then captures and places the relevant footage on the Genetec Clearance System.

**Monitoring Team's Analysis**.
*Draft Operations Order*
        The Monitoring Team reviewed the draft Operations Order provided by ACS and provided feedback at the end of this Monitoring Period. Overall, the draft required more detail, specificity, and timelines for the tasks outlined, and the Monitoring Team recommended that the Order provide guidance on what to do when an incident occurred out of range of video cameras. The Monitoring Team will work with ACS during the Third Monitoring Period to finalize this policy.

*Video Preservation Audit*
        Like the previous Monitoring Period, the Monitoring Team conducted an audit to evaluate ACS's practices regarding video preservation. The Monitoring Team reviewed GOALS reports from August to November 2021 and selected 15 incidents involving physical restraints

to assess whether the video was preserved in the system. The Monitoring Team remotely accessed the video in the Genetec Clearance terminal with the assistance of ACS. The audit found that video for 10 of the 15 incidents (66%) were preserved on Genetec Clearance, but that five incidents did not appear to be preserved. This is a significant decrease from the success rate from a similar audit conducted in the First Monitoring Period, when 10 of 12 incidents (83%) had been properly preserved.

The Monitoring Team shared these findings with ACS, and ACS reported that in all 5 incidents in which the video was not preserved, the Operations Manager failed to upload the videos as required. ACS was later able to identify and upload the video for 3 of the 5 incidents. ACS was not able to able to locate the video for the remaining two incidents because they were beyond the allowable timeframe for uploading older videos to the system. This highlights the importance of Operation Managers uploading video timely, as failing to do so can resolve in the video being irretrievable. The audit's outcome also highlights the important role that the Central Office Incident Team should be playing to catch any errors at the Operation Manager level. ACS reported that corrective action would address the Operation Managers who failed to timely upload the video.

Despite the failure to preserve video for 5 incidents, for 10 of the incidents audited, the Genetec Clearance System did have all video available, as well the staff reports and incident description. While a robust process for correctly and appropriately preserving video through the Genetec Clearance system exists at ACS, it is not being consistently applied. ACS's video preservation process and use of Genetec Clearance appears practical, but ACS needs to finalize and implement its Operations Order and the Operations Managers and Central Office Incident Review Team needs to consistently adhere to the process.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(j). Staff Discipline**. ACS shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, when staff members violate the ACS Physical Restraint Policies.

**ACS Policy & Practice.**
- ACS Code of Conduct prohibits the use of physical or mechanical restraints on residents that is not in accordance with the physical restraint policy (ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention") and specifies that any violation of the code subjects staff to discipline.
- ACS disciplinary options are based on the employment status of staff members:
  - *All Staff*: Any staff member may be subject to a formal disciplinary conference, which is a conference between the staff member and a facility supervisor that is formally documented and placed in the staff's personnel file. During these sessions, the supervisor reviews what the staff member did wrong and how to improve going forward.
  - *Permanent civil service staff with disciplinary rights*: Discipline for permanent civil service staff goes through the Employment Law Unit ("ELU"). These staff

are subject to administrative charges and hearings via the Office of Administrative Trials and Hearings ("OATH"), although a pre-hearing suspension of up to 30 days may also be imposed.

- o *Provisional Staff*: ACS may terminate provisional staff (any staff with fewer than two years of service) without a hearing or due process due to the probationary nature of their employment. During the current Monitoring Period, most ACS staff were provisional.

- ACS took steps during this Monitoring Period to improve the tracking of disciplinary cases, including a tracking system for ELU referrals from the facility, which will become part of the incident review process going forward.
  - o ACS identified a liaison within detention who is responsible for, among other things, maintaining a record of corrective actions flowing from the incident review process.
    - ▪ The liaison receives all proposed Detention/ELU referral packets, ensures their completeness and that appropriate procedures were followed. The liaison is the single point of contact for facility leadership to submit ELU referrals, reducing opportunities for miscommunication or lost referrals.
  - o ACS reported that incidents naming specific staff that are reported to the Justice Center are regularly reviewed by HOJC leadership in consultation with ELU regarding potentially opening a disciplinary case.
  - o ACS reported that HOJC and ELU have established monthly meetings to review and track all pending referrals, with an eye toward expediting case resolution and penalty where appropriate, and as consistent with civil service rules and processes.
- ACS terminated four provisional staff members between July 1, 2021 and December 31, 2021 for misconduct related to workers compensation issues, a drug-related arrest outside of work, and disability separation. No staff were terminated for physical restraint related misconduct.
- ACS reported 29 referrals to ELU for permanent civil service staff between July 1, 2021 and December 31, 2021, including 6 ELU referrals *for physical restraint related misconduct*.

**Monitoring Team's Analysis**.

ACS reported more corrective action for permanent staff regarding physical restraint-related misconduct during this Monitoring Period (6 ELU referrals) compared to the previous Monitoring Period when no cases were referred. ACS also established procedures to better track and process disciplinary cases going forward. As noted in ¶ 2(c) above, some of these actions may have been prompted by the Monitoring Team's highlighting problematic incidents to ACS leadership, and the Monitoring Team's work identified misconduct that required corrective action not previously taken. At this point, the increase in referrals appears to be

related to improved scrutiny by both ACS and the Monitoring Team, rather than an increase in problematic conduct.

In addition, HOJC leadership identified and recommended disciplinary action for staff who appeared to encourage and participate in a wrestling match with residents. However, in response to an inquiry from the Monitoring Team, ACS discovered that the follow-through on recommended disciplinary referral did not occur for many months. This prompted ACS to establish better tracking and processing of disciplinary referrals. ACS established new procedures in this area swiftly, and without prompting from the Monitoring Team. While ACS identified the need for and built out a tracking process for corrective action during this Monitoring Period, the new tracking system did not capture all actions from the current Monitoring Period, and thus ACS was not able to provide a complete report of disciplinary responses for physical restraint-related misconduct when requested by the Monitoring Team. Thus, the volume of disciplinary conferences for physical restraint-related misconduct remains unknown. ACS reported that a more complete and accurate report will be available for the next Monitoring Period so that the Monitoring Team can assess the integrity of the process.

Appropriate corrective action for staff misconduct necessarily hinges on a robust and reliable process to *identify* misconduct, which was a work in progress this Monitoring Period as described in ¶ 2(c) above. It also requires a reliable process for tracking referrals for staff discipline and good record-keeping when discipline is referred or imposed. While these components are not yet in place, ACS is on the path to better identification of misconduct through a more robust and systematic incident review process, which coupled with a heightened attention and tracking of disciplinary responses, should improve practice moving forward.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved