OFFICE OF THE MONITOR
*Nunez, et al. v. City of New York, et al.*

**Steve J. Martin**
Monitor

**Anna E. Friedberg**
Deputy Monitor

178 Columbus Avenue, #230842
New York, NY 10023-9998
+1 646 895 6567 | afriedberg@tillidgroup.com

May 17, 2022

**VIA ECF**

The Honorable Chief Judge Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

*Re: Nunez, et al. v. City of New York, et al., 11-cv-5845 (LTS) (JCF)*

Dear Chief Judge Swain,

We write to provide the Court with a copy of the City's and Department's Action Plan

that was developed to address the Monitoring Team's Recommendations outlined in the March

16, 2022 Special Report (dkt. entry 438). The current state of affairs in the jails presents an

unprecedented challenge and, as such, there is no fail-safe path forward. This Action Plan is a

well-informed effort to identify specific immediate steps the City and Department of Correction

("DOC") must take to reduce the risk of harm in the City's jails right *now* and to lay the

groundwork that begins to disentangle the decades of dysfunction and mismanagement that

characterizes this agency. The Monitoring Team does not believe there are *any* ready-made,

quick or easy solutions that can ameliorate the poly-centric problems facing the agency. The

practical reality is that reformation of this Department cannot occur in mere months given the

level of dysfunction, mismanagement, and decrepit physical plants that exist, and that sustainable

institutional reform is inherently both a complex and an extended process.

The Monitoring Team believes it must be acknowledged that, in addition to internal

mismanagement and dysfunction, the jails suffer the consequences of a variety of dysfunctions that reside in other entities outside of the City's and Department's control. An example of these consequences is clearly illustrated by the long case processing times for large numbers of people in custody. As of May 2, 2022, 1,538 people (approximately 28% of the population) have been in custody for over one year, and 278 people have been in custody for over three years. It is very notable that this group of incarcerated individuals are significantly over-represented in acts of violence and incidences involving uniform staff use of force during their long stays in DOC custody. These long lengths of stay are the result of decisions made and barriers (not the least of which is COVID) among other justice system actors, but the Department—to say nothing of the people who are languishing in the jails—bear the brunt of these external dysfunctions on a daily basis. The Monitoring Team implores the City, the local District Attorney's Offices, and the Office of Court Administration to work collaboratively and creatively to address this case backlog.

***Current State of Affairs***

The conditions in the jails continue to be of grave concern, as outlined in the March 16, 2022 Special Report. Because these conditions remain so severe and potentially life-threatening, the Action Plan's initial focus is on initiatives and strategies that have a direct impact on these conditions. The Monitoring Team's recent assessment, including on-site inspections of the jails last week, has suggested that the Commissioner's Emergency Action Plan at RNDC is having an impact. These plans appear to have been implemented with fidelity and early results suggest their effectiveness in reducing the level of fear among staff and people in custody, in recovering a large volume of contraband (particularly drugs and weapons), and in a significant reduction in the number of stabbing and slashings. It is also worth noting that the Department's updates to the

Monitoring Team on the conditions at RNDC revealed thoughtful preparation, included a diversity of perspectives, and featured objective data to fortify the qualitative perceptions of the strengths and challenges of the approach. While these steps alone are not sufficient to fully ameliorate the unsafe conditions at RNDC, the actions are critically needed and the fact that the Department has taken them reflects real measurable progress toward achieving a reduction in harm to incarcerated individuals and Staff.

Along with the RNDC Emergency Plan, the Department and the City have recently taken several actions that suggest a new willingness to address bureaucratic obstacles and a new level of creative thinking in crafting solutions to the deeply entrenched dysfunction. While several actions in the early days of the current administration's tenure were cause for concern (*i.e.*, termination of the Disciplinary Manager without a *bona fide* reason and a concerning lack of transparency), as discussed in more detail in the section below, the City and the Department have since taken concrete steps to address some of the deeply entrenched dysfunction in the Department. A few examples of the concrete and substantive steps taken:

- **Revamped Leadership Structure**: The Commissioner has created a new leadership structure that will bring in external correctional expertise to lead the Department's Security, Staffing, and Facility Operations management and provide support to each Command. Certain keys posts have been filled and active recruitment to fill the other posts is underway.

- **Focus on Security Initiatives**: There is an increased focus on security initiatives. Increased Tactical Search Operations and Strategic Response Teams to address security concerns in the facilities with the most violence have been instituted – recovering over 2,200 contraband weapons.

- **Combatting Staff Absenteeism**: For the first time since the staffing crisis began in August of 2021, there has been an appreciable and sustained reduction in the number of staff out on sick leave. At the time the crisis began, approximately 1,530 staff members were out sick; this number ballooned to 2,500 staff members by the end of last year. The numbers quickly dropped back down to about 1,500 staff members in January 2022. Since then, the numbers out on sick leave have continued to drop and now approximately 1,100 staff members are out sick on a given day. This number is still far too high, but it must be acknowledged that the number of staff out sick has

been reduced by almost 40% since the crisis began in the summer of 2021. To support this progress, the Commissioner has done the following:

- o Almost 100 staff members have been suspended this year for sick leave abuse.

- o 150 medical incompetence cases have been referred for discipline (almost the same number referred for discipline in *all* of last year). Processing of the more egregious cases is being expedited starting next week.

- o Staff members have been referred to DOI for potential abuse of sick leave.

- o Revamping the Health Management Division ("HMD"). The Commissioner removed the Warden and replaced HMD with new leadership. Further, a full assessment of HMD is ongoing with plans to hire additional doctors to conduct medical appoints and to hire civilians to manage the unit to ensure neutral and independent assessments of staff out on leave and provide necessary support to those staff that need it. HMD has held 2,824 appointments with staff in April alone. Moreover, in the first week of May, they conducted 619 appointments.

- o Policy revisions to critical leave policies are underway. Notably, the policy on home confinement visits has been changed to eliminate the nonsensical and bureaucratic requirements to confirm whether someone is home while on leave.

- o The Commissioner is developing a plan to reduce the number of staff on medically monitored duty and to more efficiently deploy those staff that are legitimately on a restricted duty status.

- o The Department is evaluating all staff out on sick leave and restricted status to determine whether they can return to work, if discipline should be imposed for any abuse of leave, and/or whether the individual should be separated from the Department.

- **Addressing the Disciplinary Backlog**: Significant work is underway to address the disciplinary backlog. The Trials Division has prepared and convened over 800 cases (use of force-related and non-use of force-related) for OATH Pre-Trial Conferences (or obtained settlements prior to the conference) in the first four months of the year almost doubling the number of cases heard during the same time last year. The Commissioner has signed-off on over 800 disciplinary matters. Of those cases, the Commissioner has terminated 15 staff members, while another 13 staff member's disciplinary cases resulted in either irrevocable resignation or retirement.

  - o Over the next two months, the City is retaining more staff and attorneys to support the disciplinary process within the Trials Division and OATH to eliminate the disciplinary backlog (as discussed more above).

- **Cell Doors at RNDC**: The installation of 550 new doors at RNDC will be completed within the next 2 months. This year, 125 new doors have been installed at RNDC and 75 more doors will be installed by the end of July.

4

*Addressing Structural Barriers to Reform*

In order to implement the Action Plan, the City and Department must reconsider long-standing structures that contribute to and/or perpetuate the numerous deficiencies in the Department's current operation. This includes working around any perceived legal and regulatory barriers to unpack the dysfunction. An effective approach must work towards a solution and must convert the City's and Department's historical lack of ability and political will to untangle this dysfunction to an approach that takes specific actions.

The Monitoring Team has also had candid discussions with all Parties about whether all viable pathways to reform have been exhausted such that it may be necessary to petition the Court to install a Receiver to dismantle these structural barriers. The City and Department have reported that they believe they have the will and capacity to address these issues and that the City and Department have not fully exhausted their pathways to reform the Agency. An opportunity still exists for the City and the Department to exercise their respective authority in overcoming these obstacles *if* they commit, utilize, <u>and</u> dedicate aggressive, vigorous, and creative strategies to the problems facing the agency. Two examples are shared below to illustrate some initial steps taken by the City and Department recently to improve the Department's leadership structure and, separately, to improve the process to impose appropriate staff discipline. These examples both illustrate the intricacies of each initiative and the significant work that will be needed to implement such strategies with fidelity.

First, the Monitoring Team has long recommended that the Department infuse its leadership with external correctional expertise, both at the top levels of the Department and at the facility level. This recommendation languished through two administration changes amid concerns that certain state and local laws may impede the Department's ability to bring in

outside expertise. However, the Commissioner recently identified a reasonable solution to enable this infusion of external correctional expertise that the City reports works within the contours of these laws and regulations. Revamping the current system of uniform leadership, the Commissioner intends to make civilian appointments to Deputy Commissioner positions that will assume the traditional roles and responsibilities of the top uniformed Chief positions. These individuals will be supported by Associate and Assistant Commissioner positions to carry out their duties and to provide essential leadership, guidance, and accountability to facility Wardens. This restructuring appears to be a reasonable approach to addressing the overall goal of ensuring that the Department's operations are guided by individuals with deep correctional expertise and broad experience in managing correctional systems. The Department has already hired two of the many candidates needed to fill these essential positions and has formulated a viable transition plan. This is one area where the City must leverage its considerable power and resources to help the Department identify and attract candidates from jurisdictions across the nation and to alleviate the bureaucratic barriers that have historically made it difficult to on-board such people expeditiously. It must be acknowledged that a leadership transition of this magnitude can be de-stabilizing and even when the new leadership is in place, things will not change overnight as these individuals must have the opportunity to evaluate, develop and implement the improved practices and procedures so sorely needed.

The second example highlights the required problem-solving capability needed to improve the ability to impose timely staff discipline. The Department began to create structures to make accountability more meaningful and reliable under the first Disciplinary Manager. This work was expanded upon this year, and under the leadership of the Acting Disciplinary Manager, the Monitoring Team has observed that the Trials Division is more efficient and is processing

discipline more quickly. The OATH process has also become more efficient and OATH's reports and recommendations are now better aligned with the Disciplinary Guidelines and appear to be a reasonable and proportional response to the severity of the staff's misconduct. While there is more work to be done, it is important to acknowledge these significant gains. Because the disciplinary backlog is voluminous and the Department and OATH do not currently have a sufficient number of staff to process it, these improvements have not yet been sufficient to achieve the level of timely staff accountability that is required. The Action Plan outlines additional steps to continue to advance progress in this area by obtaining necessary staffing for the Trials Division and OATH. The strategy to address the backlog includes steps to ensure that recent egregious misconduct is addressed via an expedited docket so that these cases do not languish in the backlog. Historically, the discussion about strategies to achieve timely discipline got bogged down by claims that civil service laws guaranteeing Due Process to staff accused of misconduct presented intractable barriers to timely discipline. However, these essential rights can still be maintained while achieving timely discipline *if* the City and Department commit the resources to provide a sufficient number of staff in the Trials Division and improve efficiencies in OATH processing. The City recently launched a creative initiative to attract lawyers from other City agencies and the private sector to the Trials Division by incentivizing the position with incentives including, providing for cash overtime payments in lieu of compensatory time. The City is also funding additional resources for the OATH Division.

These examples are provided in order to assist the Court's understanding of the Action Plan with insight into the strategy and necessary measures that underlie the larger action steps. This work suggests that the Department is beginning to develop an ability to dissect problems and develop targeted solutions in a way that may well produce the desired results. It must be

acknowledged and emphasized that these initial gains are wholly different from sustained progress, but long-term improvement to the dire conditions in the jails is not possible without these first crucial steps. In other words, the City's and Department's commitment to an Action Plan that includes such measures does not solve the long-standing problems or suddenly create the desired outcomes. However, they represent some concrete and categorical changes in the City's and Department's stance in addressing the Department's problems that can ultimately provide the necessary foundation for sustainable institutional reform.

The City and Department will undoubtedly face obstacles when undertaking to implement this Action Plan, but from the Monitoring Team's perspective, none of these obstacles are insurmountable *if* the City and the Department approaches them with the courage to meet each obstacle creatively, aggressively, and with the requisite perseverance. Toward that end, the City must utilize its extraordinary resources and power to support the Department and direct the operation of a variety of adjacent agencies whose work directly impacts the Department (*e.g.*, OMB—budget, OLR—labor, OATH—staff discipline, DCAS—hiring), all of which can become trapped in their own bureaucratic quagmires. Further, the City must approach this work with a neutral and independent position and must not pander to any one constituency. While the input of labor advocates and advocates for those in custody are essential, the City cannot be driven solely by these interests. The City must instead act in the best interest of the Department so that the jails can operate in a manner that ensures a safe and humane environment for both incarcerated persons and staff.

Similarly, the Department must not be hamstrung by tradition or past practice, nor dissuaded by the likelihood that new ideas may initially be unpopular. Instead, the Department must be willing to assess its problems from a perspective that leads to sound correctional

practice. Over the last two months, the Commissioner has had frequent and substantive communications with the Monitor and Deputy Monitor and has demonstrated a keen ability to both conceptualize the Department's problems and formulate viable solutions. The Commissioner has also recently appointed and empowered several individuals to work closely with the Monitoring Team (*i.e.*, the Acting General Counsel, a Senior Counsel focused on *Nunez* issues, and the Assistant Commissioner of the *Nunez* Compliance Unit). Their commitment to transparency, engagement, and collaborative problem-solving has significantly improved the dynamic with the Monitoring Team and eliminated the concerns regarding communication, collaboration, and transparency that were first reported in the Fall 2021 and continued through the early part of 2022.

### The Action Plan

The Action Plan provides a roadmap for addressing the four foundational issues that the Monitoring Team described at length in its Special Report filed on March 16, 2022 (dkt. 438). Implicit in the word "foundational" is the reality that these four issues provide the framework upon which the larger reform effort will rest, and that these issues must be resolved before the Department can make further progress on the many prescriptions contained in the Consent Judgment and Remedial Orders (although key elements of the requirements of the Remedial Orders are also incorporated into the Action Plan). In other words, the Department must focus its efforts and resources on designing and *fully and systematically* implementing the initiatives laid out in the Action Plan.

The poly-centric nature of the core issues that have stymied reform also characterizes the proposed action steps, as they are similarly complex and interrelated. The Action Plan's initiatives reflect sound correctional practice, but the pervasive level of dysfunction at all levels

means that the action items cannot simply be implemented quickly, nor will overall conditions necessarily improve immediately. The Action Plan details the focus of the work ahead, along with specific timelines in which the strategic work will be initiated, but the Action Plan also affords necessary flexibility. As each problem is unpacked, the solutions will become more fulsome to meet the contours of the problem, not all of which can be anticipated or fully articulated at this juncture. Furthermore, implementing this many major initiatives cannot occur simultaneously, nor can any single initiative be implemented in a perfectly linear fashion or sequence. In short, the implementation of the remedies to these foundational issues will be imperfect and protracted, which is all the more troubling given the on-going level of harm in the jails. That said, there is simply no extant mechanism that can achieve immediate reform. This reality weighs heavily on the Monitoring Team but it is the nature of the hard work of reform. This is why it is so critical that the immediate initiatives are addressed with vigor and that the City and the Department devote significant time, resources and effort to the work on the foundational issues as the decades of mismanagement will require sustained and concentrated diligence in order for gains to be realized and more importantly, maintained, and institutionalized.

What distinguishes this Action Plan from previous efforts is the steps that will be taken to confront and unpack the bureaucratic quagmires and unreasonable policies and procedures that have been in place for far too long. Further, the Action Plan focuses on the core problems themselves, rather than remedial measures that targeted only the symptoms of those problems. Finally, this Action Plan contemplates changes to the Department's core leadership structure and an infusion of correctional expertise into all facets of the Department's operations to support the reform effort. It includes six core components:

- **Section A: Initiatives to Address the Immediate Risk of Harm**. This section includes initiatives that must be undertaken immediately in order to begin to address the immediate risks of serious harm to people in custody and DOC staff, to revamp the Department's leadership structure, to improve the supervision of Department staff at all levels, and to improve staff utilization in the short term (both by returning staff to work and by prioritizing assignments to housing units). It also includes the several precursors that must be accomplished before the full implementation of certain initiatives can begin in earnest.

- **Section B: Citywide Initiatives to Support Reform**. This section includes initiatives to ensure that the City brings all its resources to bear and removes potential bureaucratic obstacles. This includes strategies to improve the functioning of certain aspects of adjacent City agencies—such as those involved in recruiting for particular positions, hiring practices, and expediting case processing—that directly impact the Department's ability to reform its practices. It also includes leveraging the City's authority to expedite case processing so that individuals do not languish in the jails waiting for their cases to be disposed.

- **Section C: Staffing Practices**. This section requires the Department to appoint a Staffing Manager who must develop and implement a staff management system that maximizes staff availability and proper deployment in the long-term. The particular components of the system will need to be appropriately prioritized and sequenced so that the Department can effectively facilitate the assignment of staff to housing units and develop a dependable, available workforce. The Department also is also working to create an

electronic system to track staff assignments and their status (*e.g.*, vacation time, sick leave, etc.).

- **Section D: Security Practices**. This section requires the Department to retain an individual with deep expertise in corrections who must direct a variety of security initiatives that correct long-standing deficiencies in the approach to securing facility spaces and responding to incidents. The individual who will serve as the Security Operations Manager has been selected and began working on May 16, 2022.

- **Section E: Managing People in Custody**. This section includes the appointment of a Classification Manager who must develop and implement initiatives to properly classify incarcerated persons according to their risk of institutional misconduct, to broadly disperse SRG affiliates among the housing units to disrupt their concentration of power, to decrease Intake processing time, and to effectively manage those who engage in serious violence while in custody. The individual who will serve as the Classification Manager has been selected and will begin work this summer.

- **Section F: Staff Accountability**. This section requires additional resources for the Trials Division, expeditious resolution of cases involving egregious conduct, a reduction in the disciplinary backlog, and efforts to streamline the OATH process. It also includes requirements to revise Command Discipline procedures and to impose discipline for those who abuse the Department's policies regarding various type of leave and restricted duty.

- **Section G**: **Assessment of Compliance and Reporting.** This section describes the Monitoring Team's shift to more frequent reporting on this more narrow scope of issues, so that the Parties and the Court are fully informed about the intricacies of each initiative.

In addition, it is proposed that after each quarterly report, the Court will convene a Status Conference so that the Court and the Parties may determine on an expedited basis whether the Action Plan is effective and sufficient.

*Next Steps*

The Action Plan is a complex set of requirements, and the work will be incredibly demanding and take a significant period of time and resources to fully implement. The work will be dynamic and fluid as it involves a whole host of actors and a wide array of constituent interests. While the Action Plan provides a viable pathway forward, the over-arching issue is whether the City and Department can and will implement the Action Plan with fidelity. The record in this case certainly raises questions about whether this work can be done within the City's and Department's current structures. The Commissioner has demonstrated a strong understanding and command of the issues and appears capable of managing the Action Plan. The final component that is necessary in this Action Plan is to ensure that the Commissioner has sufficient *tools* and the *necessary authority* to support the full implementation of these initiatives in a meaningful and timely manner and to navigate the inevitable obstacles that will occur. It is for this reason that the Monitoring Team will be convening meetings with all Parties this week to work creatively to ensure that the Commissioner and the Department can actually effectuate the full scope of the Action Plan. If the Parties and the Monitoring Team can formulate a means to allow the Commissioner and the Department to have the tools and the necessary authority to overcome the obstacles that may present themselves during the course of implementation, only then can the Monitoring Team support this demanding enterprise with the necessary confidence that it can succeed.

More frequent reporting and the proposed periodic Status Conferences will allow, in

short order, all Parties to assess whether the changes that the City and the Department have begun to make are sustained over the longer period of time that will be necessary to achieve improvements in these foundational issues. These regular appearances before the Court should also protect against a waning of the current level of commitment and action. The DOC and the City appear to be gaining some degree of momentum toward meaningful reform. However, as implementation of the Plan progresses in the coming months and through the reporting periods, if there is evidence that this momentum and commitment are not being sustained, the Parties will in all likelihood have to entertain more extraordinary remedies to enforce the Court's Orders.

The Monitoring Team will continue to consult with the Parties on this Action Plan in advance of the May 24, 2022, Status Conference. If those discussions lead to any modifications to the proposed Action Plan, the Monitoring Team will submit an updated proposed Action Plan by Monday, May 23, 2022, by 12:00 pm. The Monitoring Team would also be happy to supply the Court with a proposed agenda for the Status Conference by Monday, May 23, 2022, by 12:00 pm as well.

Sincerely,

s/ Steve J. Martin

Steve J. Martin, *Monitor*

Anna E. Friedberg, *Deputy Monitor*

Christina B. Vanderveer, *Associate Deputy Monitor*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                                              :
MARK NUNEZ, et al.,                                           :
                                                              :
                              Plaintiffs,                     :
                                                              :
    - against -                                               :
                                                              :
CITY OF NEW YORK, et al.,                                     :
                                                              :
                              Defendants.                     :
                                                              :  **11 Civ. 5845 (LTS)(JCF)**
------------------------------------------------------------ X
                                                              :
UNITED STATES OF AMERICA,                                     :
                                                              :
                              Plaintiff-Intervenor,           :
                                                              :
    - against -                                               :
                                                              :
CITY OF NEW YORK and NEW YORK CITY                            :
DEPARTMENT OF CORRECTION,                                     :
                                                              :
                              Defendants.                     :
------------------------------------------------------------ X


**[PROPOSED ORDER] ACTION PLAN**


**[PREAMBLE TO BE DRAFTED AT A LATER DATE]**

# TABLE OF CONTENTS

Section A: Immediate Initiatives to Address Harm ................................................................. 1

   1.   Security ................................................................................................................. 1

   2.   Staffing .................................................................................................................. 2

   3.   Supervision .......................................................................................................... 4

Section B: Citywide Initiatives to Support Reform ................................................................ 6

   1.   Citywide Task Force: ........................................................................................... 6

   2.   Recruitment Efforts for DOC ............................................................................... 6

   3.   Hiring & Onboarding New Staff ............................................................................ 6

   4.   Routine Coordination with Law Enforcement Agencies to Expedite Case Processing of Individuals Incarcerated 365 Days or More ...................................................... 7

Section C: Uniform Staffing Practices .................................................................................... 8

   1.   Appointment of Staffing Manager ........................................................................ 8

   2.   Responsibilities of the Staffing Manager ............................................................. 8

   3.   Implementation of Staffing Initiatives ................................................................ 10

   4.   Single Source Tracking System of Staff ............................................................ 11

Section D: Security Practices ................................................................................................ 12

   1.   Security Operations Manager ............................................................................ 12

   2.   Responsibilities of the Security Operations Manager ........................................ 12

   3.   Evaluating Assessments of Compliance ........................................................... 13

   4.   Implementation of Security Initiatives ............................................................... 13

   5.   Expanded Capacity for the Department's Internal Assessment of Security Initiatives ..... 13

   6.   Reporting to the Monitor .................................................................................... 14

   7.   Cell Doors & Perforated Metal Window Covering .............................................. 14

Section E: Prioritize the Management of People in Custody ................................................. 15

   1.   Classification Manager ...................................................................................... 15

   2.   Responsibilities of the Classification Manager .................................................. 15

   3.   Implementation of Security Initiatives ............................................................... 16

   4.   Intake ................................................................................................................ 16

   5.   Management of Incarcerated Individuals Following Serious Incidents of Violence ......... 16

Section F: Staff Accountability ........................................................................................ 18

   1.   Staffing for Trials Division ................................................................................ 18

   2.   Expeditious Resolution of Egregious Conduct and/or Multiple Serious Violations ......... 18

   3.   Revised Procedures for Command Discipline ................................................... 19

   4.   Addressing the Disciplinary Backlog ............................................................... 19

   5.   Addressing Discipline for Abuse of Staff Leave or Restricted Duty Policies ................. 20

   6.   Immediate Corrective Action ............................................................................ 20

   7.   Responding to Monitor Recommendations ...................................................... 20

   8.   Disciplinary Manager ....................................................................................... 20

   9.   Streamlined OATH Process .............................................................................. 20

Section G: Assessment of Compliance & Reporting in 2022 ......................................... 21

   1.   Monitor Reports ............................................................................................... 21

   2.   Court Status Conference ................................................................................... 21

   3.   Content of Reports ........................................................................................... 21

   4.   Compliance Assessment ................................................................................... 22

   5.   Department's Implementation of Action Plan .................................................. 23

   6.   Monitor's Final Assessment of City and Department's Compliance with Action Plan .... 23

## Section A: Immediate Initiatives to Address Harm

1. *Security*

    a.  *RNDC*: The Department, in consultation with the Monitor, shall continue to implement the Commissioner's violence reduction plan at the Robert N. Davoren Complex.  The violence reduction plan includes changes to housing practices, improvements to staff supervision, enhanced programming and services, and increased searches and tactical search operations.

    b.  *Expanded Security Initiatives to Other Facilities*: Within 60 days of this Order, the Department, in consultation with the Monitor, shall expand the Commissioner's violence reduction plan, with any necessary revisions and modifications, in order to reduce the violence and risk of harm in those facilities with the highest levels of violence and security deficiencies as determined collectively by the Department and the Monitor.

    c.  *Cell Doors & Perforated Metal Window Covering*: By July 29, 2022, the Department shall install 75 new cell doors to complete the installation of new cell doors in all housing units that house young adults at RNDC. [Additional language (pertaining to Perforated Metal Window Coverings) forthcoming by Monday, May 23]

    d.  *Improved Routine Tours*: The Department shall immediately institute improved practices to ensure that routine touring is occurring, including the use of the "tour" wand by Correction Officers during each tour conducted.  The Office of the Commissioner shall audit the electronic records of tours conducted by uniform staff to ensure compliance with touring requirements.

2.  *Staffing*

    a.  *Interim Post-Priority List*: Within 30 days of the Order, the Department must develop an interim post-priority list to ensure that the posts most directly related to the safety of the incarcerated population are prioritized and duly designated as mandatory posts.

    b.  *Interim List of Uniform Staff Available to Work*: Within 60 days of the Order, the Department must develop an interim list of uniform staff that are available to work a shift.

    c.  *Scanning of Post Assignment*: Within 90 days of the Order, the Department shall pilot at RNDC an electronic scanning system to monitor uniform staff on priority posts in the facility.

    d.  *Revised Policies to Address Staff Absenteeism, Restricted Duty, and Abuse:*

        i.  *Revised Home Confinement Visits*: Within 30 days of the Order, the Department shall implement its recently revised policies and procedures so that home confinement visits are conducted in a reasonable and efficient manner.

        ii.  *Medically Modified/Restricted Duty Status*: Within 60 days of the Order, the Department shall implement a process to eliminate the abuse of this designation by revising policies and procedures, implementing a strategic plan to limit the use of this status going forward, and to seek medical separation of staff that have been in this status [Additional language to be forthcoming by Monday, May 23].

2

iii. *Revised Sick Leave & Absence Control*: Within 90 days of the Order, the Department, in consultation with the Monitor, shall revise its policies and procedures regarding sick leave and absence control.

e. *Improved Management of the Health Management Division*: Within 90 days of this Order, the Department shall complete an assessment of the Health Management Division ("HMD") in order to identify any deficiencies or inefficiencies in practices and implement a plan to ensure HMD works efficiently and reliably and consistently manages and supports uniform staff who are out of work on leave.  Further, the Department shall utilize civilian staff to conduct the work of HMD.

f. *Evaluation of Current Uniform Staff on Sick Leave & Medically Restricted Status*: Within 120 days of this Order, the Department must evaluate all uniform staff currently out on sick leave more than 30 days, in the status of chronic sick, and medically restricted duty level 3, as of the date of this order, to determine whether the staff may return to work, should be separated from the Department, if discipline may need to be imposed for any potential abuse, and/or if the conduct merits referral to DOI because the abuse is potentially criminal in nature.

i. *Expedited Discipline*: By May 23, 2022 the Department shall seek expeditious processing of at least 20 medical incompetence cases before OATH.  OATH shall expeditiously process these cases so that they are resolved as quickly as possible with an agreed upon settlement or a report and recommendation is issued following a trial.

g. *Referral of Staff Abuse of Sick Time or Restricted Status:* The Department shall immediately refer any cases of staff abuse of sick time or restricted status to the Department of Investigation for further investigation when the conduct of staff appears to be criminal in nature.

3. *Supervision*

a. *Re-assignment of Captains to Supervision of Correction Officers*: Within 30 days of this Order, the Department will evaluate the approximately 45 Captains on Temporary Duty Assignment and re-assign most, if not all, of these Captains to posts that supervise officers assigned to housing unit posts.

b. *Department Leadership*: The Department shall revise the Table of Organization as follows:

   i. The Commanding Officer of each facility and command will report directly to the Commissioner.

   ii. The Commissioner shall appoint a Senior Deputy Commissioner who shall report to the Commissioner.  The following positions will report to the Senior Deputy Commissioner:

      1. Deputy Commissioner of Security – this position will include, at a minimum, the responsibilities of the Security Operations Manager outlined in Section D (Security Practices) of this Order.

      2. Deputy Commissioner of Classification, Custody Management, and Facility Operations – this position will include, at a minimum, the responsibilities of the Deputy Commissioner of Classification

4

outlined in Section E (Prioritize the Management of People in Custody) of this Order.

    a. At least two Associate Commissioners of Operations will report to the Deputy Commissioner of Classification, Custody Management, and Facility Operations

    b. An individual Assistant Commissioner of Operations will be appointed to each facility and will report to the Associate Commissioner of Operations.

3. Deputy Commissioner of Administration – this position will include, at a minimum, the responsibilities of the Staffing Manager outlined in Section C (Uniform Staffing Practices) of this Order.

   iii. The Health Management Division shall report to the First Deputy Commissioner.

c. *Expanded Use of Early Intervention, Support and Supervision Unit*: The Early Intervention, Support and Supervision Unit ("E.I.S.S.") shall be expanded to also support any staff on disciplinary probation (for any reason) and for Supervisors during their probationary period.  The Department shall also develop an initiative in which each facility has at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform staff that are on the E.I.S.S. program and address any deficiencies in supervision of those staff that are identified.

### Section B: Citywide Initiatives to Support Reform

1. *Citywide Task Force:* In order to ensure the Department may timely and meaningfully address the requirements of this Order, the Consent Judgment, and three Remedial Orders, the City shall routinely convene representatives from all City agencies[1] that support the Department budget and funding, the Department's physical plant and any corresponding repairs, the Department's accountability process for staff and incarcerated individuals, and the Department's labor issues to ensure the requirements of this order are implemented in a timely and meaningful manner.

2. *Recruitment Efforts for DOC*: Within 30 days of this Order, the City and Department shall launch a new, full scale recruitment campaign focused on attracting and identifying qualified candidates for the following positions: (1) individuals with correctional expertise to serve in leadership positions, (2) attorneys and support staff for the Trials and Legal Division, (3) staff to backfill civilian roles previously held by uniform staff (with a particular emphasis on staff for the Health Management Division), and (4) physicians to evaluate whether uniform staff who are out on leave are able to return to active duty. The recruiting campaign must include unique, creative measures to attract qualified candidates, including incentives and other measures, not previously utilized.

3. *Hiring & Onboarding New Staff*: The City and Department shall ensure that the process for interviewing, extending offers, and vetting candidates (as necessary) is refined and improved to ensure an efficient hiring process. On a case-by-case basis the City must also evaluate whether a waiver of certain requirements (*e.g.* residency requirements) may be

---

[1] This shall include, at a minimum, the City's Department of Citywide Administrative Services, the Office of Labor Relations, the Office of Management and Budget, Office of Administrative Trials & Hearings.

afforded to a candidate in order to ensure that the City and Department may hire the most qualified individuals for the position.

4. _Routine Coordination with Law Enforcement Agencies to Expedite Case Processing of Individuals Incarcerated 365 Days or More_: The Department shall develop a list every month of all incarcerated individuals that have been incarcerated for at least one year or more.  This list shall also identify those individuals that have engaged in the last year in Violent Grade I infractions and use of force incidents.  This list shall be produced to the Mayor's Office of Criminal Justice and, in turn, provided to representatives of each District Attorney's Office and the Office of Court Administration in order to facilitate efforts for these cases to be processed as quickly as possible. [Additional language forthcoming by Monday, May 23]

## Section C: Uniform Staffing Practices

1. *Appointment of Staffing Manager*: Within 90 days of this Order, the Department must select a Staffing Manager to develop a sound correctional staffing management scheme, including oversight of the Roster Management Unit and authority to implement initiatives to maximize the deployment of uniform staff as outlined in § C., ¶ 2 of this order below. The Staffing Manager must have significant expertise in correctional operations *and* correctional staffing administration in other systems outside of the New York City Department of Correction.  The Department must consult with the Monitor on the selection of the Staffing Manager.

2. *Responsibilities of the Staffing Manager*: The Staffing Manager shall be responsible, at a minimum, for the following:

    a. *Roster Management Unit*: A dedicated and centralized Roster Management Unit to manage the schedules for uniform staff across the agency.  The Roster Management Unit must be equipped with appropriately trained personnel to manage the number of staff authorized to work and the assignment of uniform staff.

    b. *Deployment of Staff in Facilities*: The Staffing Manager, along with the staff of the Roster Management Unit, must, in consultation with the Monitor, work to maximize deployment of uniform staff within the facilities, including, but not limited to the items outlined below:

        i. *Improved Management of Staff Rosters*: Devise a central Roster Management system that tracks uniform staff by assignment to a command, including streamlining the master and daily rosters, and

creation of a post assignment classification system for every command, to ensure that uniform staff are appropriately deployed throughout the facilities and that critical posts are filled before non-essential posts.

ii. *Increased Assignment of Captains in the Facility*: Complete a full evaluation of the assignment of all Captains and develop a plan to prioritize assignment of Captains to supervise housing units to increase Captain presence on housing units.

iii. *Improved Supervision of Captains*: Substantially increase the number of Assistant Deputy Wardens currently assigned to the facilities or a reasonable alternative to ensure that there is adequate supervision of Captains.

iv. *Deployment of Experienced Staff in Housing Units*: Create an assignment process in which sufficiently experienced uniform staff are deployed to housing units.

v. *Awarded Posts:* Shall minimize the use of awarded posts so they are primarily utilized for those positions in which a particular skill set is required. A staff member with an awarded non-mandatory post must be re-deployed to a mandatory post if there are staffing shortages.

vi. *Maximize Work Schedules*: Must create alternatives to the work schedule for uniform staff assigned to work in the facilities in order to minimize the use of a 4 by 2 schedule and optimize staff scheduling.

vii. *Reduction of Uniformed Staff in Civilian Posts*: Must reduce the assignment of uniform staff to civilian posts, including Temporary Duty

Assignment, in order to minimize the reliance on uniform staff for tasks that can and should be reasonably completed by civilians.

viii.  *Post Analysis*: Conduct a post analysis, in consultation with the Monitor, that is rooted in correctional best practices and addresses the lapses in the Department's current staffing practices. The analysis will consider and coordinate staffing determinations the Department has made to revise and improve security practices, in order to staff posts based on reasonable operational need and avoid inefficient staffing practices currently in place (*e.g.*, the "all available" response to all alarms).

ix.  *Relief Factor*: Create a plan, with concrete and specific timelines, of the staffing initiatives that must be completed in order to develop a reliable and reasonable relief factor.

3.  <u>*Implementation of Staffing Initiatives*</u>: No later than 90 days after the Staffing Manager joins the Department, the Staffing Manager, in consultation with the Monitor, must develop strategies and initiatives in order for the Staffing Manager to address and implement the requirements of § C., ¶ 2 of this Order. These strategies and initiatives must be appropriately sequenced and prioritized with corresponding timelines to ensure that they are appropriately and reasonably addressed in a logical and practical manner.  If the Department's system, plan, or initiative fails to adequately and reasonably address the requirements of the particular provision, the Monitor, within 15 business days of receipt of the plan, must advise the Department in writing that the system, plan or initiative is insufficient to achieve compliance with this provision.  The Department, in consultation with the Monitor, will refine the system, plan or initiative as necessary to ensure

compliance with this provision.  The Department must then implement the revised

system, plan or initiative, including any additional requirements from the Monitor.

4. _Single Source Tracking System of Staff_: By August 15, 2022, the Department shall license

   appropriate software and technology to automate uniform staff scheduling and tracking,

   and create a central repository of information related to uniform staff assignments, status

   (e.g. active, restricted, in-active, long-term inactive and restricted), and scheduling across

   all facilities.  This system must also have the capability for tracking, collecting, and

   securing data designed to identify a reasonable and reliable relief factor. The automated

   system should be based on the collection of internal data and the application of an

   algorithm that takes into consideration operating days, work schedules, post frequency,

   off-post time, and leave-time.  [Additional language forthcoming about pilot of system by

   Monday, May 23]

## <u>Section D: Security Practices</u>

1.  *<u>Security Operations Manager</u>*: The Department must maintain the appointment of an individual with significant expertise in correctional operations and security as the Security Operations Manager.  The Department must consult with the Monitor before *any* individual is appointed to serve in this position. The Security Operations Manager must have: (1) appropriate authority to manage and implement the responsibilities enumerated below, and (2) adequate resources to conduct their work.

2.  *<u>Responsibilities of the Security Operations Manager</u>*: The Security Operations Manager shall be responsible, at a minimum, for managing the following:

    a.  the interim Security Plan pursuant to ¶ 1(i)(a) of the Second Remedial Order;

    b.  reduced reliance on the use of the intake following a use of force incident pursuant to § A, ¶ 3 of the First Remedial Order.  The Security Operations Manager shall also work in collaboration with the Deputy Commissioner of Classification regarding processing of incarcerated individuals within 24 hours in Intake, as noted in § E, ¶ 4 of this Order (below);

    c.  Emergency Response Teams pursuant to § A, ¶ 6 of the First Remedial Order;

    d.  procedures on how searches are conducted;

    e.  improved escort techniques to eliminate the unnecessary use of painful escort holds;

    f.  self-harm procedures and policies pursuant to ¶ 1(i)(b) of the Second Remedial Order; and

    g.  Post Incident Management protocols pursuant to ¶ 1(i)(e) of the Second Remedial Order.

3. *Evaluating Assessments of Compliance*: The Security Operations Manager must routinely evaluate the assessments conducted by the Nunez Compliance Unit (or any comparable unit) and address the security deficiencies identified.

4. *Implementation of Security Initiatives*: No later than 90 days after the Security Operations Manager joins the Department, the Security Operations Manager must develop initiatives, in consultation with the Monitor, to address the requirements of § D., ¶ 2 of this order. The initiatives related to Emergency Response Teams and searches must address and incorporate the Monitor's feedback that was provided in 2021.  The initiatives developed to address the requirements of § D., ¶ 2 must be implemented within 150 days of when the Security Operations Manager joins the Department.  The initiatives created by the Security Operations Manager to address the requirements of § D., ¶ 2 of this order above must be provided to the Monitor once finalized.  If the Department's initiative(s) fail to adequately and reasonably address the requirements of § D., ¶ 2 above, the Monitor, within 15 business days of receipt of the plan, must advise the Department in writing that the plan is insufficient to achieve compliance with § D., ¶ 2 above.  The Monitor may direct the Department to refine the initiative(s) as necessary to ensure compliance with § D., ¶ 2 above.  The Department must then implement the revised initiative(s), including any additional requirements from the Monitor.

5. *Expanded Capacity for the Department's Internal Assessment of Security Initiatives*: By August 1, 2022, the Department shall have sufficient staff dedicated to conducting reasonable assessments of the Department's efforts to implement the initiatives described in § D., ¶ 2 above.  The Department shall ensure that the findings of said assessments are

utilized by staff leadership to improve practice and any obstacles to implementing these initiatives.

6. _Reporting to the Monitor_: Beginning on June 1, 2022, the Security Operations Manager and the leader of the Nunez Compliance Unit (or comparable unit) must regularly provide updates to the Monitor regarding their work.  The Security Operations Manager and the leader of the Nunez Compliance Unit will collaborate with the Monitor on the format and frequency of the updates, allowing for changes in such format and frequency as the work progresses.

7. _Cell Doors & Perforated Metal Window Covering_: [Language forthcoming by Monday, May 23]

## Section E: Prioritize the Management of People in Custody

1. _Classification Manager_: By August 1, 2022, the Department shall appoint a Classification Manager to oversee the Custody Management Unit.  The Classification Manager must be authorized to secure necessary resources, ensure there are dedicated staff to do this work, and enforce compliance with the relevant policies and procedures and devise a process to monitor outcomes of compliance with the initiatives outlined in the responsibilities below.

2. _Responsibilities of the Classification Manager_: The Classification Manager shall be responsible for managing, at a minimum, the following:

    a. _Centralized Unit_: a centralized Custody Management Unit ("CMU") for all classification functions.  The CMU shall centrally manage inter-facility and intra-facility transfers to ensure people are housed in units that are commensurate with their custody level and to ensure adherence to the Department's strategy for widely dispersing people who are affiliated with a Security Risk Group ("SRG").  CMU may include staff who are located at individual facilities, but they must report directly to CMU leadership.

    b. _Reclassification_: a reclassification process in which people in custody are reclassified at 60-day intervals following their initial classification and manage the performance of each facility accordingly.

    c. _Updated Tracking System_: addressing concerns identified by the Classification Consultant, James Austin, regarding the reclassification form in the Inmate Information System ("IIS").

      d.  *Re-balancing Housing Units*: Development of a reasonable and adequate plan to reduce the practice of concentrating SRG-affiliates in certain housing units. The Department, in consultation with the Monitor, shall develop a phased-in implementation plan to reduce the concentration of SRG-affiliates in certain housing units.

3.  <u>*Implementation of Security Initiatives*</u>: No later than 90 days after the Classification Manager joins the Department, the Classification Manager must develop initiatives, in consultation with the Monitor, to address the requirements of § E., ¶ 2 of this order. These initiatives must be implemented within 150 days of when the Deputy Commissioner of Classification joins the Department.

4.  <u>*Intake*</u>:

      a.  *Processing Incarcerated Individuals Through Intake Within 24 Hours*: The Department shall continue to implement the requirements of ¶ 1(i)(c) of the Second Remedial Order.

      b.  *Initiatives to Reduce Reliance on Intake*: The Classification Manager and the Security Operations Manager shall collaborate on initiatives under each of their respective scopes of work to reduce the reliance on intake and ensure incarcerated individuals are processed through intake in a timely manner.

5.  <u>*Management of Incarcerated Individuals Following Serious Incidents of Violence*</u>: Within 60 days of this Order, the Department, in consultation with the Monitor, must develop a housing and management strategy that will safely and adequately manage those incarcerated individuals that have engaged in serious acts of violence and pose a heightened security risk to the safety of other incarcerated individuals and staff. This

housing and management strategy must comply with the HALT Act, reflect sound correctional practice, and is subject to the approval of the Monitor. This housing and management strategy must be implemented within 30 days of receipt of approval.

### Section F: Staff Accountability

1. _Staffing for Trials Division_: By July 29, 2022, the Defendants must assign at least thirteen _additional_ agency attorneys, two _additional_ legal coordinators, four _additional_ support staff and two _additional_ directors to the Trials Division.

   a. The City shall thereafter ensure that the Department's Trials Division maintains at least 25 agency attorneys and 4 directors, unless and until the Department can demonstrate to the Monitor with an internal staffing analysis that fewer agency attorneys and directors are necessary to timely address the disciplinary matters pending with the Trials Division.

2. _Expeditious Resolution of Egregious Conduct and/or Multiple Serious Violations_: The City, Department and OATH shall develop, in consultation with the Monitor, a process by which appropriate and meaningful discipline, up to and including termination, for any staff member can be imposed in any case involving: (1) conduct that would merit the Department seeking termination pursuant to the Disciplinary Guidelines, and (2) egregious conduct that resulted in the risk of serious harm to an incarcerated individual. The Monitor may refer cases to the Department for resolution in this expedited manner.

   a. A case identified to be resolved in an expedited manner must be resolved as follows:

      i. _Investigations_: The investigation(s) of the matter must be completed within 30 business days of identification.

      ii. _Referral for Discipline_: The case must be processed for discipline, including completion of the MOC, referred to the Trials Division, charges

18

served on the Respondent, discovery produced to the Respondent, an offer

for resolution must be provided to the Respondent, the case filing with

OATH, and a pre-trial conference must be scheduled within 20 business

days of the closure of the investigation.

iii. *Adjudication of Discipline*: Any and all disciplinary proceedings,

including, but not limited to, convening a pre-trial conference, conducting

a trial before OATH, and submission of a Report and Recommendation

from the OATH ALJ must be completed within 35 business days of the

case being filed with OATH.

iv. *Imposition of Discipline*: The Commissioner must impose the final

disciplinary action within 15 business days of receiving the Report and

Recommendation from OATH.

3. <u>*Revised Procedures for Command Discipline*</u>: By August 1, 2022, the Department, in

consultation with the Monitor, shall revise the policy regarding Command Discipline to

maximize the use of a Command Discipline for lower level misconduct and ensure

efficiency in the processing of Command Disciplines.

4. <u>*Addressing the Disciplinary Backlog*</u>: By June 30, 2022, the Monitor shall provide the

Court with the status of the Department's efforts to resolve the Priority Backlog

Disciplinary Cases and the Other Backlog Disciplinary Cases in the fourth Remedial

Consent Order Interim Report. This report, pursuant to ¶ 1(iii) of the Third Remedial

Order, will also include the Monitor's assessment of the Department's efforts to resolve

the Priority Backlog Disciplinary Cases and the steps that the Monitor recommends be

taken, including relevant timeframes, to resolve the Other Backlog Disciplinary Cases.

5. _Addressing Discipline for Abuse of Staff Leave or Restricted Duty Policies:_ The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any staff member who violates Department policies, procedures, rules, and directives relating to sick leave, restricted or modified duty, or absence without official leave.

6. _Immediate Corrective Action._ The Department shall continue to implement § C, ¶ 1 of the First Remedial Order.

7. _Responding to Monitor Recommendations._ The Department shall continue to implement § C, ¶ 2 of the First Remedial Order.

8. _Disciplinary Manager._ The Department shall maintain a Disciplinary Manager pursuant to ¶ 5 of the Third Remedial Order.

9. _Streamlined OATH Process:_ The OATH Division shall continue to implement the following provisions:

    a. _Expeditious OATH Proceedings_ pursuant to § C ¶ 4 of the First Remedial Order.

    b. _Applicability of Disciplinary Guidelines to OATH Proceedings_ pursuant to § C ¶ 5 of the First Remedial Order.

    c. _Increased Number of OATH Pre-Trial Conferences_ pursuant to ¶ 2 of the Third Remedial Order.

    d. _New OATH Procedures and Protocols_ pursuant to ¶ 3 of the Third Remedial Order.

## Section G: Assessment of Compliance & Reporting in 2022

1. *Monitor Reports*: The structure, focus, and frequency of the Monitor's Reports covering the period of January 1, 2022 through December 31, 2022 will be altered.  During this period of time, four Monitor's Reports will be filed per the schedule below:

    i.  June 30, 2022

    ii.  October 28, 2022

    iii.  January 31, 2023

    iv.  March 16, 2023

2. *Court Status Conference*: The Court shall convene a status conference with the Parties and the Monitor approximately 3 weeks after the filing of each Monitor's Report.

3. *Content of Reports*: Each report will include the following:

    a.  *City and Department's Efforts to Reform the Agency*: The Monitor's evaluation and assessment of the City and Department's efforts to address the following foundational issues that corresponds with the five distinct sections of this plan. This assessment shall identify whether sufficient and sustainable progress has been made on the following:

        i.  Immediate Initiatives to Address Harm

        ii.  Citywide Initiatives to Support Reforms

        iii.  Uniform Staffing Practices

        iv.  Security Practices

        v.  Prioritizing the Management of People in Custody

        vi.  Staff Accountability

      b.  An assessment of the City and Department's efforts to address the specific requirements in this Order

4. *Compliance Assessment*: Given the Monitor's findings in the Monitor's March 16, 2022 Special Report, (pages 63 to 65), the Monitor's assignment of compliance ratings, (pursuant to § XX, ¶ 18 of the Consent Judgment), or the Consent Judgment and the First Remedial Order are suspended for the time period covering January 1, 2022 to December 31, 2022 except for those provisions incorporated in to this Action Plan and the provisions listed below.

      a.  The Monitor shall assign compliance ratings, pursuant to § XX, ¶ 18 of the Consent Judgment, for the following provisions from the Consent Judgment and the First Remedial Order:

         i.  Consent Judgment § IV. (Use of Force Policy), ¶ 1;

        ii.  Consent Judgment § V. (Use of Force Reporting & Tracking), ¶¶ 2 & 22;

      iii.  Consent Judgment § VII. (Use of Force Investigations), ¶ 1;

      iv.  Consent Judgment § VIII. (Staff Discipline and Accountability), ¶ 1;

       v.  Consent Judgment § XII. (Screening and Assignment of Staff), ¶ 1 to 3;

      vi.  Consent Judgment § XV. (Safety and Supervision of Inmates Under the Age of 19), ¶ 1; and

     vii.  First Remedial Order § A. (Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force), ¶¶ 1 & 2.

      b.  The following reports will include the compliance assessments for this select group of provisions as outlined below:

i.  The October 28, 2022 report will include the compliance assessment for the period covering January 1, 2022 to June 30, 2022.

ii.  The March 16, 2023 report will include the compliance assessment for the relevant provisions for the period covering July 1, 2022 to December 31, 2022.

5.  _Department's Implementation of Action Plan_: [Language forthcoming by Monday, May 23, following discussion with Parties]

6.  _Monitor's Final Assessment of City and Department's Compliance with Action Plan_: [Language forthcoming by Monday, May 23, following discussion with Parties]


Stipulation Pursuant to the Prison Litigation Reform Act, 18 U.S.C. § 3626: [Language forthcoming by Monday, May 23, following discussion with Parties]




SO ORDERED this _____ day of _____, 2022



_____

LAURA TAYLOR SWAIN

Chief United States District Judge




23