M5OGnunC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   MARK NUNEZ, et al.,

 4                 Plaintiffs,

 5           v.                              11 Civ. 5845 (LTS)

 6   CITY OF NEW YORK, et al.,
                                             Remote Conference
 7
                 Defendants.
 8
     ------------------------------x
 9                                           New York, N.Y.
                                             May 24, 2022
10                                           2:30 p.m.

11   Before:

12                    HON. LAURA TAYLOR SWAIN,

13                                           District Judge

14                            APPEARANCES

15   THE LEGAL AID SOCIETY
          Attorneys for Plaintiffs
16   BY:  MARY LYNNE WERLWAS

17   EMERY CELLI BRINCKERHOFF & ABADY, LLP
          Attorneys for Plaintiffs
18   BY:  DEBRA L. GREENBERGER

19   OFFICE OF THE UNITED STATES ATTORNEY
          Attorneys for Plaintiff-Intervenors
20   BY:  JEFFREY K. POWELL
          LARA K. ESHKANAZI
21
     NEW YORK CITY LAW DEPARTMENT
22        Attorneys for Defendants
     BY:  KIMBERLY JOYCE
23            SHERYL NEUFELD

24   STEVEN J. MARTIN, Monitor
          ANNA F. FRIEDBERG, Deputy Monitor
25
```

M5OGnunC

1           (The Court and all parties present remotely)

2           THE DEPUTY CLERK:  This case is Mark Nunez, et Al v

3    City of New York, et al.  The Honorable Chief Judge Laura

4    Taylor Swain presiding.

5           THE COURT:  Good afternoon.  We are here today for a

6    status conference.  Today's conference was scheduled to discuss

7    the City and the Department of Corrections' proposed action

8    plan filed on May 17th, 2022 at Docket No. 454 as well as the

9    status of negotiations and any areas of disagreement that exist

10   among the parties about the content of the proposed plan.

11          I'm now going to ask the video participants to state

12   their appearances, beginning with the monitor and the deputy

13   monitor.

14          MR. MARTIN:  Yes.  Hello, your Honor.  My name is

15   Steve J. Martin, the monitor.

16          THE COURT:  Good afternoon, Mr. Martin.

17          MR. MARTIN:  Good afternoon.

18          MS. FRIEDBERG:  Good afternoon, your Honor.  My name

19   is Anna E. Friedberg, the deputy monitor.

20          THE COURT:  And now, counsel for the plaintiffs.

21          MS. WERLWAS:  Good afternoon, your Honor.  Mary Lynne

22   Werlwas of the Legal Aid Society Prisoners' Rights Project for

23   the plaintiffs.  And with me in the office is Madison Levin

24   from the Legal Aid Society.  And on the audio is Kayla Simpson

25   of the Legal Aid Society.

M5OGnunC

1           THE COURT:  Good afternoon, Ms. Werlwas, Ms. Levin and
2     Ms. Simpson.
3           Ms. Greenberger.
4           MS. GREENBERGER:  Good afternoon, your Honor.  This is
5     Debra Greenberger.  I have joined with me on the phone my
6     colleagues, Jonathan Abedy and Nairuby Beckles.
7           THE COURT:  Good afternoon, Ms. Greenberger, Mr. Abedy
8     and Ms. Beckles.
9           And now from the United States Attorney's Office for
10    the Southern District of New York.
11          MR. POWELL:  Good afternoon, your Honor.  My name is
12    Jeffrey Powell, and I'm appearing on behalf of the government.
13    And I'm joined today by AUSA Lara Eshkenazi as well.
14          THE COURT:  Good afternoon, Mr. Powell and
15    Ms. Eshkenazi.
16          Counsel for the City and the Department of
17    Corrections.
18          MS. JOYCE:  Good afternoon, your Honor.  Kimberly
19    Joyce from the New York City Law Department for the City of New
20    York.  I have my cocousenl, Cheryl Neufeld sitting off camera
21    to my left.
22          MR. MR. MOLINA:  Louis A. Molina, commissioner for the
23    department of corrections.
24          THE COURT:  Good afternoon Mr. Commissioner and good
25    afternoon Ms. Joyce and Ms. Neufeld.

M5OGnunC

1          I greet any other members of the counsel or public who

2   may be listening in since this is a public proceeding.  I ask

3   counsel who are on video keep their audio muted when they are

4   not speaking.  I see that you have all done that.  Thank you

5   very much.

6          I also remind everyone, both listeners and video

7   participants, that neither recording or retransmission of any

8   part of this proceeding is permitted.  That is a provision of

9   the Court's January 19, 2021 standing order and it is also

10  national judicial conference policy.

11         I'll be calling on each speaker.  Each time that you

12  speak, please make sure that you have been identified by name

13  for clarity of the record and for the benefit of those who only

14  have audio access.  Please don't interrupt each other or me

15  during the conference.  If we interrupt each other, it's

16  difficult to create an accurate transcript.  But having said

17  that, and as usual, I apologize in advance for breaking the

18  rule because I may interrupt if I have questions.  If anyone

19  has any difficulty hearing me or another participant, please

20  say something right away.

21         I have a couple of introductory remarks.

22         We came together in this case on April 26th, 2022 for

23  a conference to discuss the monitoring team's special report

24  issued on March 16th, 2022, which described the patently unsafe

25  conditions in the jails, provided an overview of the

M5OGnunC

1    foundational issues currently facing the City and the

2    Department and laid out the monitoring team's proposed

3    recommendations for areas of focus.

4         The commissioner attended the conference and expressed

5    his commitment to making effective changes, pointing to certain

6    measures that had already been implemented.  At that April 26th

7    conference, the monitor informed the Court that the monitoring

8    team was working with the City and the Department to develop an

9    implementation plan to address the ongoing crisis at Rikers.

10        After much frank discussion, the Court directed the

11   monitoring team to file the proposed plan within three weeks

12   time, by May 17th, and encouraged the City, the Department and

13   the monitoring team to work in a focused way to develop

14   specific, tangible steps that the City and the Department could

15   take in the immediate term to address the unstable and unsafe

16   conditions in the jail, as well as longer term, structural

17   problems that exist.

18        The Court thanks the monitoring team and the

19   defendants for their timely submission of a proposed action

20   plan, which incorporates tangible steps that the City and the

21   Department have agreed to take in order to ameliorate the

22   current crisis, also addresses the allocation of responsibility

23   and directive of specific timelines for compliance.  The

24   proposed action plan and explanatory letter from the monitoring

25   team are filed at Docket No. 454.

1              The Court has also received and reviewed a May 23rd,

2      2022 status update from the monitoring team, which is filed at

3      Docket No. 458.  The monitoring team informs the Court that the

4      City and the Department have begun working toward the

5      implementation of several elements of the proposed action plan

6      to be discussed in greater detail at today's conference.

7              The monitoring team also informs the Court that the

8      parties have engaged in numerous discussions over the past week

9      about whether the proposed action plan is sufficiently specific

10     about how legal and other structural issues that defendants

11     have previously cited as barriers to effective reform will be

12     overcome in order to implement the measures outlined in the

13     proposed action plan.  To put it plainly, the commissioner, the

14     City and the Department must have the necessary tools and

15     authority to support the plan's implementation in a meaningful

16     and timely manner.  Confirming that this is the case and

17     ensuring that the plan reflects the accurate scope of resources

18     and authority is of the utmost importance.

19             I'll now turn to the parties for their views on where

20     we are now, what next steps can be taken, and the timetable on

21     which we can move rapidly to improve the safety situation at

22     Rikers in particular.  And I will begin by calling on the

23     monitor and the deputy monitor.

24             MR. MARTIN:  Thank you, your Honor.

25             I'm going to jettison my early remarks because you

M5OGnunC

1    have done such a comprehensive job of setting out what led us

2    to this point.  So I'm simply going to skip over those for the

3    sake of time.

4         Before I share my remark on the proposed action

5    plan -- which I acknowledge at the outset is not a completed

6    plan, which my deputy monitor will address in her review -- let

7    me share some observations of the current state of conditions

8    of confinement in the DOC; I'm sure the commissioner will also

9    provide.  In brief, the conditions remain unsafe for both the

10   staff and detainee population.  As recent as the first of this

11   month, on two consecutive day, a detainee committed suicide and

12   another detainee was severely assaulted by other detainees and

13   sustained serious of injuries, including second degree burns.

14   There's evidence that the suicide may have been preventable and

15   the detainee assault may have involved officer complicity.

16        In late April, early May, there were five stabbings,

17   slashings at five facilities.  In four of these incidents,

18   security lapses, failure to supervise or untimely intervention

19   were at play.  The commissioner will no doubt relate that

20   slashings and stabbings were reduced from March to April.  That

21   indeed is the case.  However, it is equally important to note

22   that this reduced number is still extraordinarily high and in

23   fact was the fourth highest since January of 2020.

24        As the commissioner will also no doubt relay, there

25   are some downward trends in violence metrics.  For instance,

M5OGnunC

1    from January to April of this year, use of force incidents are

2    down, as are detainee violence and assaults.  Notwithstanding

3    these, the numbers are still extraordinarily high.  Based on

4    the most recent data and recent site work conducted by the

5    monitoring team, the patterns in practice that generate harm

6    remain firmly in place in the DOC.

7         Let me at this point comment on some information that

8    I received late in the day yesterday regarding several

9    significant personnel changes; namely, both the chief of the

10   department and chief of facility operations, the two most

11   senior uniformed positions in the agency, will be leaving in

12   the near term.  The announcement of these changes may be -- a

13   teletype at 6:30 p.m. yesterday -- will undoubtedly generate

14   consternation throughout the agency and may give rise to

15   reverberations, some of which may serve to further destabilize

16   an already troubled and unstable agency.  I relate this

17   information to remind us of a potential for untintented

18   consequences for in an agency that is in a state of profound

19   flux and one that has not shown itself as especially adept of

20   managing such a disruption in the past.

21        Having said that, I want to deviate from my prepared

22   remarks again, if the Court will permit me.  To give a shout

23   out to the Department of Corrections on a very topical matter,

24   I just reviewed earlier today the US Department of Justice

25   promulgation of an updated use of force policy.  That policy

M5OGnunC

1    included an affirmative duty to intervene and stop excessive

2    force.  It also includes a duty to de-escalate before using

3    force.

4            Approximately five years ago, the use of force

5    directive was approved by the Court.  That directive includes

6    both provisionsof the new US Department of Corrections policy.

7    I think it can fairly be said that the DOC in some fashion was

8    some five years ahead of the curve on this one.  I just wanted

9    to acknowledge that.

10           Now, allow me to make some general remarks on the

11   action plan before the Court and the parties.  My deputy

12   monitor will momentarily articulate the reason the action plan

13   is not yet a finished product and the reasons to push it across

14   the finish line knowing time is of the essence.

15           As the monitoring team has reported ad nauseam

16   barriers and obstacles to reform during the six and one half

17   years of monitoring, this persistent problem has never been

18   more in play than it has at this moment with the action plan.

19   I have lost count of the times our office has been told by DOC

20   and representatives of city agencies that we would like to do

21   this, but we can't.  The variations on this theme have been

22   endless and persistent.

23           The great reservation my deputy monitor and I have

24   with the action plan is not with the substance of it, where it

25   sets out necessary measures to our reform this function, our

M5OGnunC

```
1   reluctance is directly related to the issue of a means through

2   which these necessary measures can be fully effectuated to

3   bring about sustainable reform.  That is, if the City and the

4   commissioner have the necessary mechanisms readily at hand to

5   overcome legal, procedural and contractual barriers to fully

6   implement the substantive provisions of the action plan and

7   will they act or will they in a few weeks or months yet again

8   claim that some legal, contractual impediment makes it

9   impossible for them to act or they have to develop a workaround

10  that further delays reform.  Six and a half years into that

11  effort, that same refrain begins to wear thin.

12          As we said in our cover correspondence to the May 17th

13  submission and reiterated in yesterday's cover correspondence,

14  the monitoring team does not believe the action plan is viable

15  without the inclusion of some narrowly drawn mechanisms to move

16  through inevitable barriers that will arise during

17  implementation of this huge and complex enterprise, which must

18  ultimately address the implicated rights and interests of the

19  plaintiff class.

20          Let me comment on barriers to reform.  They may, in my

21  view, take at least three forms.  First, barriers within the

22  control of the commissioner.  I'll call these agency barriers,

23  the bureaucratic practices and procedures that are entrenched

24  in the agency.  The current commissioner has already

25  demonstrated a willingness to tackle agency barriers and he has
```

M5OGnunC

1   created some workarounds that may work.  But in the final

2   analysis, these approaches are Band-Aids, not cures, and they

3   unfortunately needlessly destabilize an already precarious

4   agency.

5          The second form of barriers are those that exist

6   within the City bureaucracies, it's what my office has tabbed

7   as red tape impediments.  City officials have likewise recently

8   demonstrated a commitment to tackle these barriers.  While this

9   movement is certainly to be welcomed and encouraged, my office

10  has reservations about whether their commitments to act can be

11  successfully carried out in a complex bureaucratic setting

12  where time is of the essence.  The parties will no doubt weigh

13  in on this issue.

14         Finally, it is the third form of barrier that gives us

15  our greatest cause for concern.  Those over which the City and

16  the commissioner have no control, such as state laws,

17  regulations, labor contractual issues, DOC requirements,

18  procurement issues, contractual issues and other unanticipated

19  barriers that might divert or impede the ability to timely

20  address the requirements of the action plan and other court

21  orders.  No commitment on the part of the commissioner or the

22  City, regardless of how genuine it may be, can overcome some of

23  these entrenched legal measures that will inevitably arise,

24  hence our overarching concern about the viability of the action

25  plan if the City and the department do not have a structure and

M5OGnunC

1       the authority to manage these.

2               My deputy monitor will now speak in more detail as to

3       what the process to produce the action plan as finished product

4       in the earlier discussion on the barriers to reform.

5               Thank you, your Honor.

6               THE COURT:  Thank you, Mr. Martin.

7               Ms. Friedberg.

8               MS. FRIEDBERG:  Good afternoon, your Honor.  My name

9       is Anna Friedberg, and I am the deputy monitor.

10              I echo the sentiments of the monitor and reiterate the

11      gravity of these issues that are ever present in the city

12      jails.  The impact of the current conditions in the city jails

13      are real and have resulted in an ongoing risk of harm to both

14      incarcerated individuals and staff.  This includes serious

15      physical injuries, severe trauma and mental anguish and, in

16      some horrifying cases, death.  This has remained at the

17      forefront of the monitoring team's work and considerations on

18      next steps.

19              In my remarks, I plan to first share an overview of

20      the action plan.  I then plan to address three overarching

21      issues that must be addressed to make the action plan a viable

22      pathway forward and one in which the monitoring team can

23      support and in turn provide the necessary findings to this

24      court that the action plan properly addresses the implicated

25      rights and interests.  We believe the input from the Court at

M5OGnunC

1    today's status conference is critical to help determine whether

2    a viable action plan can be developed.

3           Before I get into the substance of the action plan, I

4    must highlight one issue that implicates stakeholders beyond

5    those here today.  The length of stay for an incarcerated

6    individual has increased exponentially since the beginning of

7    COVID.  Over 1,500 people are currently in jail over a year and

8    almost 300 people have been in custody over three years.  While

9    the City has reported it is working with local DA's offices,

10   which have heard similar refrains of backlogs, limited

11   resources and limited court capacity.  While we appreciate the

12   practical reality of these issues, the current state of affairs

13   demands that local DAs and the courts work with the City to

14   find ways to address this ever increasing backlog of cases now.

15          I will now turn to the substance of the action plan.

16   The action plan has two critical components.  First, it

17   identifies initiatives to be implemented as soon as possible to

18   address the current risk of harm.  And second, it builds the

19   foundation for reform.  I will take each in turn.

20          First, with respect to addressing immediate harm, the

21   action plan includes operational initiatives that are most

22   likely to ameliorate that harm.  Some examples include using

23   technology to ensure touring of the housing units actually

24   occurs by requiring electronic touch pints within the housing

25   units to show that an officer was in fact up and physically

M5OGnunC

1   walking around the housing unit.  This is combined with more

2   captains who will be assigned to working in the facilities to

3   supervise officers on the housing units and ensure more

4   meaningful tours occur.  Further, the department is working

5   strategically to deploy staff to specific facilities and units

6   with high levels of violence to conduct more searches and

7   support staff on those housing units.  This work, along with

8   many other initiatives in the action plan, which I'm sure the

9   City and department will discuss today has already started and

10  must continue today, tomorrow and into the future with as much

11  haste as possible.

12       Second, the action plan sets about to build a strong

13  foundational structure for the department that the monitoring

14  team has long identified is missing from this agency.  For this

15  reason, the overall content of the action plan may not appear

16  new or particularly novel.  That is not to take away from the

17  initiatives outlined in the action plan, as they are robust,

18  critical, must be prioritized and, in some cases, reflect

19  incredibly significant changes to current practice.

20       For instance, the department has laid out a new

21  leadership structure that contemplates the infusion of external

22  correctional expertise.  If done right, this will provide

23  mentorship, guidance and support to staff and catalyze a new

24  way of doing business rather than remaining entrenched in the

25  way things have always been done.

M5OGnunC

1          The action plan also specifically addresses the

2     department's mismanagement of staff and the many initiatives

3     needed to maximize the deployment of staff and eliminate abuse

4     that has been causing a quagmire of dysfunction.  These two

5     examples are significant and the magnitude of their impacts

6     cannot be minimized.  As the monitor described earlier, many of

7     these initiatives may have a reverberating and possibly

8     destabilizing impact on the agency.  So the implementation and

9     transition of these revised practices must be appropriately

10    sequenced and devised to avoid further destabilizing the system

11    and inadvertently undermining the very initiatives intended to

12    bring about change.

13         The operational features of the action plan still

14    require some refinements and consideration of the input from

15    counsel for the Southern District of New York and plaintiffs'

16    class counsel, which is underway.  For instance, consideration

17    of adding details about the implementation of certain

18    initiatives such as touring, searches for contraband and

19    addressing unlocked doors have been made.  There have also been

20    discussions about the current disciplinary process and further

21    refinements to it.

22         Finally, recommendations have been made to refine the

23    ability to assess the efficacy and oversight of the action

24    plan, including codifying additional site work done by the

25    monitoring team, identifying certain data to be reported out

M5OGnunC

1    and the approach to assess the compliance with a more select

2    group of provisions.

3           We appreciate the Court may also have some questions

4    or feedback that must also be incorporated into the action

5    plan.  We believe based on our almost decade of experience in

6    working and negotiating with these very parties in this case

7    that agreement can be reached on these outstanding operational

8    issues in the very near term.  However, the overarching issues

9    of removing barriers to implementing these initiatives and

10   sustaining progress is necessary for this action plan to

11   actually be a viable pathway to reform.  We are otherwise

12   destined to continue the circular process that has mired

13   reforms to date, and we will just simply be restarting the

14   clock again.

15          There is absolutely no question that the City and

16   department are working incredibly hard and taking some

17   significant and important steps, but that alone is simply not

18   enough at this juncture, even if this momentum is sustained for

19   the long haul.  The six and a half year history of this case in

20   combination with the dire conditions in the jails do not afford

21   any of us the luxury to just try again, even with the

22   commitment to try harder with some new ideas and renewed vigor

23   and passion to get the job done.

24          So what more is needed?

25          Likely, the most desirable outcome would be an action

M5OGnunC

plan that provides the City and the department the necessary

authority to manage the jails while also creating the ability

to cut the red tape and overcome legal and contractual barriers

to reform.  Of course, this is all dependent on if such a

scheme can be created.  There is no playbook or readymade

solution on how to disentangle the complicated web of

dysfunction that has created these polycentric problems facing

the department.

There is no playbook or readymade

          The monitoring team has evaluated the small number of

remedial models from jails and prisons across the country that

have faced problems similar to this department and found

components that may work.  But ultimately, we believe that a

unique and creative approach must be devised specifically for

this system that can also capitalize on the City and

department's efforts to date and interest in maintaining as

active management of the system as possible.  We fervently

believe that this group of stakeholders and this court are up

to the challenge and that this work must be confronted head on

right now.

          There are three specific items that must be tackled.

I will take each in turn.

          First, addressing the legal and contractual barriers

to to reform.  This falls into two buckets; those that we know

now and those that will come up in the future.  Those barriers

that we are aware of now, they must be removed.  I will share a

M5OGnunC

few examples.

First, with respect to the leadership of every facility, the monitoring team has been recommending for over a year that the department have the ability to select the right person to serve as the warden of each facility regardless of whether they had previously served in the uniform ranks. Currently, by law, the warden of each facility must be selected from the current uniform ranks and report to the highest ranking uniformed officer in the agency.  While the department has developed a workaround to improve the overall leadership structure, it is just that, a workaround with some confusing reporting structures and the inability to select outside of uniformed ranks for the position of warden remains.  This is not to say that all wardens must be replaced or removed.  We are not saying that at all.  But the commissioner must not be constrained in who he selects to serve in this role, given how critical it is to managing and running each of these facilities.

The record is clear that leadership in the facilities are lacking and the workaround developed is simply insufficient at this stage.  Court relief to remove the legal barriers precluding the commissioner from selecting the most viable candidate for the role of warden is needed.  We note that additional barriers likely exist with respect to the department's ability to maximize the deployment of staff as

M5OGnunC

1   outlined in the action plan and that must be addressed head on.

2   The record to date of the City's efforts to address legal

3   barriers and contractual issues related to staffing is tepid at

4   best and insufficient to make the changes contemplated in the

5   action plan, which is why an affirmative agreement or order is

6   needed now that these barriers will not impede progress.

7       With respect to barriers that may arise -- there is

8   absolutely no question that they will arise in the

9   implementation of the action plan -- but we cannot yet

10  anticipate each and every one of them.  While viable

11  workarounds may be developed in some cases, in other instances,

12  the authority to execute a particular provision outside the

13  present or existing authority of the commissioner or the City

14  will be necessary.

15      One way this can be addressed is that when these

16  obstacles are identified by the City, the department or the

17  monitoring team, that the parties must be immediately advised

18  and thereafter that there is an affirmative obligation for the

19  City and the department to make an application to the Court for

20  relief to remove those barriers and that that application is

21  made as soon as possible.

22      The second overarching issue that we must address is

23  how will progress be assessed during the pendency of the action

24  plan.  As noted at the outset, the City and the department must

25  do all it can right now to address the conditions in the jails.

M5OGnunC

 1    Given the decades of mismanagement that has occurred, the

 2    overall state of the department will not be changed overnight

 3    or even in the near term.  Significant and sustained momentum

 4    is needed now to move things forward.  But simply setting

 5    arbitrary deadlines at the outset will not magically make these

 6    problems disappear.  The right people need to be recruited,

 7    brought in and have the opportunity to not only get up to speed

 8    but the work on operational initiatives cannot be done in a

 9    vacuum and it must be done in concert with one another and the

10    various leaders that are both recruited and currently situated

11    within the agency.  This will also require some significant

12    trial and error.  Of course, deadlines are necessary.  But we

13    cannot emphasize enough that this work must be appropriately

14    synchronized to actually be impactful and for the progress to

15    be made and realized.

16        I'd like to share a short anecdote of a case study

17    that was presented during a recent Columbia University

18    symposium about institutional reform for correctional systems.

19    The Chicago juvenile system struggled with similar issues that

20    we are faced with today.  Their path toward reform involved a

21    litany of different oversight and legal mechanisms, many of

22    which failed.  But success was ultimately achieved when the

23    parties devised a plan with necessary legal structures and one

24    that all parties could embrace.  I highlight this case to

25    illustrate how long it takes for progress to be realized.  Even

M5OGnunC

after the agreed upon relief was ordered, it was reported that

the system, which includes just one facility with 300 beds,

required two years to be stabilized and six to seven years to

be reformed.  That brings into stark focus the uphill challenge

that we are facing and that there is no solution that will

bring about change as fast as we would all like it to happen.

        We think this case example reinforces the need that

the parties and the Court have the ability to reasonably assess

the current state of affairs on a routine basis, but it also

underscores the need for realistic expectations to be devised

to allow the action plan to take hold and determine if the

current pathway is leading towards reform or whether a change

in approach may be needed.

        I should note that we do not intend to suggest that

the Chicago model is the one that must be used in New York.  In

fact, we think a unique structure must be developed

specifically for this system, which maintains eight facilities,

one hospital ward and average daily population of 5,500

incarcerated individuals and 9,000 uniform and civilian staff

combined.

        This leads the monitoring team to the final component

that is necessary to the success of the action plan, which is a

collective path forward.  We strongly believe it is critical

that all parties support the pathway forward.  The parties must

not be in a position to endorse this plan -- excuse me -- the

M5OGnunC

```
1    parties must be in a position to endorse this plan and not
2    simply state they will not object to it.  Such a halfhearted
3    approach to a plan of such import is doomed to fail and simply
4    creates the legal construct akin to checking the box and makes
5    further legal wrangling and litigation in the near term
6    inevitable.
7              In closing, the monitoring team fully appreciates the
8    three overarching issues:  One, addressing legal and
9    contractual barriers; two, assessing progress over time; and
10   three, developing a collective pathway forward are complex and
11   complicated and that there are likely significant transaction
12   costs as we work to devise an action plan that is viable.  But
13   we believe this work cannot be avoided and creative legal
14   mechanisms are necessary and that input from the Court during
15   this conference is needed today to determine whether a solution
16   can be crafted to get the department on the pathway to reform
17   that everyone can embrace.  We simply cannot kick the can down
18   the road once again with essentially a fourth remedial order
19   and we in good conscience cannot support that approach.  The
20   record has already demonstrated that is not enough.
21             If agreement cannot be reached, then we believe it's
22   for the parties to outline their positions to the Court so the
23   Court can determine the best path forward now.  While I
24   appreciate that we will discuss next steps at the end of this
25   conference, I wanted at the outset to respectfully recommend
```

M5OGnunC

1    that following this conference that the parties work together

2    and advise the Court by June 8th if such an agreement can be

3    reached and a final action plan is submitted or whether

4    additional input and/or motion practice from the Court may be

5    required.  We appreciate time is of the essence and balance the

6    necessary time to do the work we have set out and believe

7    June 8th is the appropriate time to accomplish that.

8              I appreciate the Court's time, and I'm happy to answer

9    any questions you may have.

10             THE COURT:  Thank you, Ms. Friedberg.  I will hold my

11   questions until I have heard from everyone.

12             Now, we'll turn to counsel for the government.

13   Mr. Powell.

14             MR. POWELL:  Thank you.  For the record, this is

15   Jeffrey Powell for the government.

16             The government would like to share its general views

17   on the action plan, and then we'll address the issues with

18   respect to the potential barriers that Mr. Martin and

19   Ms. Friedberg have raised.

20             But before doing that, we would be remiss not to note

21   that since we were all last here before your Honor about four

22   weeks ago, two inmates have died, bringing the total deaths

23   this year in City custody to five and the total since last year

24   to 21.

25             About two weeks ago, the board of correction issued a

M5OGnunC

1    report setting forth its investigative findings related to the

2    first three deaths of this year.   The report identified clear

3    deficiencies in the staffing of the units where these inmates

4    were housed and in how these units were monitored.   The board

5    found that there were no floor officers present on the units on

6    the dates that two of the inmates experienced the medical

7    emergencies that led to their deaths.   With respect to the

8    third death, the board found that the department staff did not

9    conduct the required rounds every 30 minutes for over an hour

10   before the inmate's medical emergency and, in fact, did not

11   even check on the inmate's cell for at least three hours prior

12   to his death.

13          That is the backdrop.   That's where we are.   The

14   conditions at Rikers continue to be dangerous and unsafe, as

15   the monitor stated, and in too many instances life threatening.

16          Moving to the action plan itself, at its core, it is

17   largely a commitment to develop largely unspecified plans,

18   initiatives, policies, strategies and other steps to address

19   longstanding systematic failures.   We acknowledge that some of

20   the provisions in the plan include new and old action.

21   Particularly, the commitment to restructure the leadership of

22   the department, can finally bring in outside corrections

23   professionals into the top ranks of this department.   This is

24   long overdue.   The department is in desperate need of this type

25   of outside expertise, as the monitor and the deputy monitor and

M5OGnunC

1    others have repeatedly advised this court now for more than one

2    year.  Unfortunately, the plan is not specific about the

3    timeline for onboarding these people into these very important

4    positions.  We expect that the City will act with all due haste

5    to fill these positions, but no timeline is set forth.

6         Although we understand that it's not practical for the

7    department to lay out every operational detail in a plan

8    submitted to the Court -- we would not expect that -- we had

9    expected to see more specifics and some shorter timelines for

10   certain action items.  I believe at the last conference your

11   Honor requested that there be specific and concrete steps.

12        Last week, as everyone here knows, we engaged in many,

13   many hours of discussions with the City, the department,

14   including Commissioner Molina and the monitoring team to try to

15   obtain more details on the specific operational steps and

16   actions that the department plans to take.  It is clear that

17   many of these details have not been worked out yet.  That is

18   why we're not in a position to necessarily endorse this plan or

19   whatever agreed upon language that we reach in the next week or

20   two.

21        Ultimately, we understand the very specific

22   operational details of how this plan is going to be carried out

23   is probably not going to be memorialized in an agreement or a

24   court order, and to be honest, no one has time for lawyers to

25   haggle out and come up with that exact language.

M5OGnunC

1          We do think the plan addresses the major systemic
2   dysfunctional areas that have been identified over and over by
3   the monitor.  It leaves certain questions, though.  For
4   instance, it states the department shall revise its policies
5   and procedures regarding sick leave and absence control.
6   That's not clear to us.

7          Is the department planning on revising the policy that
8   correction officers have unlimited sick leave due to previous
9   abuses of this policy?  Is the department going to require
10  additional proof of illness from staff who repeatedly call out
11  sick?  We don't necessarily require that that be outlined in
12  the plan, but the specifics need to be addressed and we don't
13  really have the answers to that right now.

14         Secondly, the plan talks about appointing assistant
15  commissioners of operations for every facility at the jail.
16  However, as we have talked about with the City and the
17  department, the relationship between this new position and the
18  role of the wardens of every jail is very unclear.  Who
19  ultimately is going to be responsible for overseeing the
20  day-to-day operations of each jail?  To whom will the
21  corrections staff at the jail report?

22         We are very concerned that the ambiguity between the
23  rolls of these new positions and the existing wardens could
24  undermine the ability of these new hires to effectively achieve
25  real reforms inside the jails.

M5OGnunC

1          We understand that one reason for doing it this way

2     was concerns with various state and local laws restricting who

3     you can hire into uniformed ranks.  We appreciate the City is

4     finally bringing outside people in, but how that's going to

5     work remains a little unclear.

6          Finally, the plan says, the department shall

7     immediately institute improved practices to ensure that routine

8     touring is occurring, including the use of the tour wands by

9     correction officers.  Those are wands, my understanding is,

10    that are touched on some sort of location throughout the jail

11    to indicate that the officer has reached that point.  But it is

12    unclear what these other improved practices will be.  This is

13    really the core issue that we have now is whether staff are

14    showing up at their jobs, doing their required rounds and

15    checking on the safety of the inmates.  And moreover, whether

16    captains and other leaders at the facility level are making

17    sure that this gets done.  Given how important this issue is,

18    we would have expected some more details to have been

19    incorporated in this action plan that was weeks in the making.

20         Ultimately -- and I'm not going to go through for

21    reasons of time constraints the various general issues and

22    questions we have, we have relayed those to the monitor and we

23    appreciate their patience with us in doing that -- ultimately,

24    regardless of the final version of this plan, the key point is

25    that the success of these contemplated reforms have to be

M5OGnunC

1    measured by actual outcomes and results achieved in the coming

2    weeks.  The real question will be whether the harm to inmates

3    and corrections staff is substantially reduced in the very near

4    future.  At this point, results are the only thing that

5    matters; not plans, not good ideas, not propositions, not the

6    specific language that a bunch of lawyers may put on a piece of

7    paper.

8         On Thursday, this past Thursday, we provided -- and I

9    think Ms. Friedberg referenced this -- we provided the

10   monitoring team with our proposed list of four quantitative

11   measures that we think should be included either in future

12   monitor reports looking at how this plan is being implemented

13   or in separate reports submitted by the department to the

14   Court.  These measures in large part will track the areas of

15   the plan, including the commitment to curb sick leave abuse,

16   improve the way inmates are supervised, the need to redeploy

17   staff, including captains, where they are most needed and to

18   impose timely discipline on corrections staff who engage in

19   misconduct.  These are the key areas of the plan.

20        We also propose that the data include specific

21   indicators that relate to violence in the facilities.  We also

22   propose that the report include specific indicators and metrics

23   that would allow us to track whether the current extraordinary

24   levels of violence are being reduced.

25        The monitor and the deputy monitor mentioned that they

M5OGnunC

1    made some improvements this month compared to last month.  But

2    as the monitor also pointed out, that doesn't mean that the

3    numbers aren't at extraordinarily high levels when viewed in

4    the context of the last few years.  So we have asked the

5    monitor to include both data showing outcome measures on the

6    specific components of the action plan, as well as on the

7    levels of violence, so we can see if real change is happening

8    and whether conditions are improving and whether inmates and

9    staff are safer.

10          Moreover, we know that the monitor and his team will

11   continue to make regular visits in the coming weeks to the

12   jails to assess whether the operational changes referenced in

13   the plan are actually being implemented, whether the posts are

14   adequately staffed, whether basic security protocols were being

15   followed and whether the dangerous and unsafe conditions are

16   being addressed.  These firsthand observations of actual

17   progress will be invaluable in allowing us, the public and the

18   Court to evaluate whether this plan is making a difference and

19   translating it to safer conditions in the jail.  In short, the

20   more eyes in these facilities the better.

21          I was going to address the obstacles or barriers that

22   the monitor and deputy monitor referred to and our views on

23   those.  At the last conference, we noted that extraordinary

24   remedies are likely to be necessary to address the entrenched

25   dysfunction of bureaucracy that have stymied prior reform

M5OGnunC

efforts.  We proposed two ideas.  One was a possibility of

executive orders by the mayor or the governor to remove the

legal or bureaucratic hurdles.  We also talked about the

possibility of a stipulated court order that would allow the

department to take actions that may arguably be inconsistent

with certain state or local law or contractual requirements in

order to address ongoing constitutional violations, which the

PLRA allows for.  The plan does not include either of those two

options.

            The government shares the monitor's well articulated

concern about whether the department will be able to achieve

real reform without more explicitly addressing how it will

overcome existing barriers, including laws, regulations or

contractual provisions that have led to years of dysfunction.

Just like the monitor, over the last six plus years, we have

been repeatedly told that many of the needed reforms and the

monitor's recommendations couldn't be implemented because of

various legal rules, laws or CBA provisions.  Prior

well-meaning commissioners -- and we have heard from them --

have indicated that they have run into these obstacles in

trying to reform the agency.  We strongly agree with the

monitor that now is the time to tackle these obstacles and

barriers to reform.

            Indeed, the government views the appointment of a

federal receiver as one way to address these barriers and is

M5OGnunC

1    continuing to consider that option, if the City cannot figure

2    out on its own how to overcome these obstacles.  We have

3    proposed specific language to the City last week to address the

4    two points that Ms. Friedberg made.  One, to deal with current

5    legal limitations that may present obstacles to addressing

6    staff absenteeism and revising staff assignment and deployment

7    practices.  We have also addressed language to deal with the

8    issue of how to address potential future legal obstacles as the

9    department tries to implement other reforms and changes.  To

10   date, we have not received from the City an agreement on that

11   language or a counterproposal.

12        Now, in May 2022 -- and I expect you'll hear this from

13   the City -- the City appears to be taking the position that

14   there are actually no legal barriers to implementing all of the

15   items in the action plan.  They can confirm that when they

16   talk, of course.  This causes us to question whether the

17   contemplated reform efforts are actually substantially

18   different than what has been tried and failed before and

19   whether the actions to be taken will be sufficiently aggressive

20   and drastic to achieve the necessary level of change.

21        Finally -- and then I will stop talking -- we would

22   note that, like everyone else, putting aside all my other

23   comments, the government very much hopes that this plan will

24   succeed.  We hope that this commissioner who is definitely

25   engaging in good-faith efforts to reform this agency is able to

M5OGnunC

1    quickly address the unsafe conditions.  The administration,

2    including the mayor and this commissioner, have asked us to

3    give them a chance to implement their own plan to address the

4    department's systemic failures.  However, given the long

5    history of failed reform efforts at Rikers, the government must

6    be and is prepared to seek further relief, including

7    potentially the appointment of a federal receiver, if

8    necessary.  Such an application will be necessary if, in the

9    coming weeks and months, the department fails to make

10   substantial and demonstrable progress in implementing the

11   reforms, initiatives, systems and practices outlined in the

12   action plan or if these efforts do not result in a substantial

13   reduction to the risk of harm currently facing inmates and

14   staff.

15          Indeed, last week, we asked the City to include

16   specific language in the ultimate action plan to be submitted

17   to this court that would state that if the monitor makes the

18   determination at some point that substantial progress is not

19   being made that the City would agree to the appointment of such

20   a receiver.  The City has declined to include such language and

21   rejected that approach.  Unfortunately -- and we hope we don't

22   get there -- this may lead to protracted legal proceedings

23   before the Court at some point in the future.  In this case,

24   more time means more harm for inmates, staff and everyone in

25   the jails.  We would like to ask the City to reconsider its

M5OGnunC

1  position.

2          If your Honor has any questions, we'll be happy to

3  address them.

4          THE COURT:  Thank you, Mr. Powell.  I will, again, go

5  on to hear everyone before I ask any questions.

6          So we'll turn now to counsel for the plaintiff class.

7  Ms. Werlwas.

8          MS. WERLWAS:  Good afternoon, your Honor and fellow

9  counsel and parties.

10          When we were here before your Honor last month, the

11  plaintiff class expressed our grave concerns that the City's

12  proposed plans at that time were not sufficient to remedy six

13  years of noncompliance with this court's order and to protect

14  the plaintiff class.  Those plans were too vague, too

15  shortsighted, too weak.  We shared the view then of the United

16  States government, as expressed in its letter to the Court last

17  month, that -- and I'm quoting here -- absent a commitment to

18  expeditiously make the dramatic systemic reforms identified by

19  the monitor and to revamp the agency's operations and

20  satisfying practices -- I'm ending that quote -- but we would

21  be left with no option other than to seek appointment of an

22  independent receiver to implement reforms.

23          We left that conference last month looking forward to

24  receiving from the City a plan that would articulate a

25  different path, that would show the approach needed to resolve

M5OGnunC

1    these problems short of receivership.  We were hoping to

2    receive a plan that would demonstrate that the City could

3    succeed now where it has failed for six years.

4            Unfortunately, it would be an understatement to say

5    that we found the action plan profoundly disappointing.  We

6    will not be consenting to entry of this plan as a proposed

7    order of the Court.

8            We have conferred very extensively with the parties

9    and the monitor over the last several days sharing our many

10   concerns and, frankly, have found the City's intransigence and

11   resistance to collective problem solving to be very troubling.

12   Where we are left is concluding that the City's action plan

13   does not show us a different path forward.  It does not

14   persuade us that the City appreciates the magnitude of the

15   challenge it faces, nor has the political will to meet it.

16           It's absolutely true that there are some changes the

17   City promises to make in this plan that will likely be

18   improvements.  The replacement of the central office uniformed

19   leadership with civilian commissioners is significant.  We hope

20   that is helps and agree entirely that is long overdue.

21           So too the plan points to potential changes in staff

22   deployment and staff absenteeism that might abate the horrific

23   crisis of unstaffed jails.  But in too many respects, the plan

24   does not commit the City to making those changes about

25   staffing.  It does not commit the City to making deep or

M5OGnunC

foundational changes that the City itself agrees are needed.
It shrinks from or defers the hard choices.  Instead of taking
this opportunity to remove barriers, the City has resorted to
the learned helplessness that creates danger for people in
custody.

        In our view, the action plan is essentially a plan for
an action plan and that is largely where we were last month.
There's no question that plans are necessary for action, but at
this late stage plans for more plans are not enough.  The
magnitude of the harm that our plaintiff class is suffering
demands more.

        We want to give a few examples of some to concretely
illustrate some of the deep deficiencies that we have seen in
the plan.  Throughout the plan, there are unacceptably vague or
largely unenforceable provisions.  As the United States
government raised, the provision on sick leave, which is
critical, critical to resolving the crisis right now, states
merely that the department shall revise its policies regarding
sick leave.  It's frankly impossible to discern how this
provision mandates change, provides a plaintiff class with any
relief or why it will take three months to accomplish in the
midst of a very dangerous crisis, when these are issues that
have been identified for months.

        Secondly, the plan, while it does include deadlines
that were largely unspecified in last month's plan, those

M5OGnunC

1    deadlines are inexplicable and protracted.  As one example, why

2    should it take two months for the City to determine which of

3    its paid uniformed work staff are actually available to work a

4    shift.  It is hard to imagine a competent workplace that would

5    need two months to identify its workforce, let alone how this

6    represents responsible stewardship of the agent's significant

7    custodial and fiscal duties.

8          Similarly, the plan suggests 90 days to appoint a

9    staffing manager and another 90 days after that person has

10   joined the agency to present a plan to deploy staff, and

11   thereafter, a process of about three weeks for the monitor

12   potentially to object to the plan and still more time for the

13   department to respond, and only then are the changes to

14   deployment and staff required to be implemented with no

15   deadlines thereafter.  Under this schedule, it will be December

16   before the City is even arguably required to take action to

17   change the staffing practices that are described in this plan.

18   And that is simply too late for something that is a core

19   correctional function and is the baseline for keeping people

20   safe in the jails.

21         I mean, there are actions a plan could prescribe now.

22   To be sure, we agree entirely with the federal government, not

23   all the actions can be spelled out in the plan and, frankly,

24   nor should they be.  But there are known problems the City can

25   commit to solving today.  For example, DOC struggles to staff

M5OGnunC

1    housing units and priority posts.  And Mr. Austin, the

2    consultant, and the monitor have identified a number of awarded

3    posts in DOC as a barrier to flexibility and getting staff

4    where they need to be.  The City has said, it has the

5    managerial authority under the labor laws to reassign staff

6    with awarded posts now.  So why can't they do it in 30 days?

7          They're bringing in a staffing manager, who can no

8    doubt help create good processes and make fixes that are

9    necessary, but that doesn't mean the City should wait six

10   months to address a known issue it can resolve now.  That would

11   have an immediate impact on the staffing available to protect

12   the plaintiff class.

13         Finally, we'll just make one other illustration of the

14   deficiencies in the plan and those that we have raised with the

15   City, and that is regarding the absence of a meaningful plan

16   for remedying the impunity for staff who commit misconduct due

17   to the failure of the disciplinary system.  As the

18   circumstances that led to the third remedial order of this

19   court made clear, the City's noncompliance with the consent

20   judgment's requirements that it impose timely and meaningful

21   discipline have caused the use of force violations at the core

22   of this consent judgment to continue.  The added dimension of

23   protracted, widespread absenteeism and the need to prevent

24   abuses of unlimited sick leave further illustrate the critical

25   need for a functional, timely disciplinary system.  Yet, other

M5OGnunC

```
1    than addressing timelines for the small minority of serious and

2    egregious cases and promising a recruiting strategy for trials

3    division staff, the plan does not provide a path forward or

4    meaningfully address either the backlog of approximately 1,900

5    cases that still exist, nor the City's inability to impose

6    discipline prospectively in a timely fashion.  We made clear

7    discipline is not the only or even the primary function of

8    workplace management, but the impunity for rule violations that

9    the current workforce enjoys does pose a direct barrier to

10   meaningful relief and we do not see the plan as providing a

11   path forward.

12        We, in short -- and to sum up -- we did not see in

13   this plan or in the discussions that we had in the weeks since

14   the plan as providing a tenable alternative to a receivership

15   remedy.  We welcome creative problem solving.  And we would

16   certainly be open to hearing creative solutions that could

17   point a path forward.  We very much hope that there is one.

18        But as we raised last month, the idea or the prospect

19   of dual tracks, we think that where we are left now is that,

20   while the City certainly should continue to make all of these

21   changes and every change that it can -- and we know that many

22   people are working very hard to do so -- and we will continue

23   to engage with the monitor and with the City to make these

24   measures more robust.  And we look forward to receiving

25   information that shows that significant progress has been made.
```

M5OGnunC

1   But we also believe that, at the same time, we will be

2   preparing a receivership application that we hope we do not

3   have to file.  We would like to see changes that abate such a

4   need.  And we look forward to seeing rapid and immediate

5   improvements in the protection for our clients, but the

6   experience of the last week and the plan that we have seen do

7   not give us optimism that this mechanism will be sufficient.

8              Thank you.

9              THE COURT:  Thank you, Ms. Werlwas.

10             Ms. Greenberger.

11             MS. GREENBERGER:  I am not going to add anything to

12  Ms. Werlwas' comments at this time.  Thank you, your Honor.

13             THE COURT:  Thank you.

14             I now turn to Ms. Joyce and the commissioner.

15             MS. JOYCE:  Good afternoon, your Honor.  And thank you

16  for the opportunity to appear before you today.

17             First, I want to reiterate that the City of New York

18  is fully committed to this action plan and to taking the

19  necessary steps, both immediately and in the long-term, to fix

20  the problems that are plaguing Rikers.  The City recognizes the

21  urgency of the situation.  Neither the status quo nor business

22  as usual is acceptable.  Rather, significant and drastic

23  changes need to be made now.  We have begun making those

24  changes and are committed to continuing making those changes.

25             While we, the parties, may not all agree on what those

M5OGnunC

changes need to be, I think we can all agree that we have the

same goal, which is safe and humane jails for all that are

detained at Rikers and all who work there.  The City's action

plan, which was submitted to the Court last week, lays out the

steps necessary to achieve those mutual goals.

One of the most public steps that the City has taken

to show its commitment to problem solving and immediate action

is the formation of the Rikers interagency task force, which is

co-chaired by the deputy mayor of public safety and chief

counsel to the mayor, Brendan McGuire.  The purpose of this

task force is to make sure that every relevant city agency

prioritizes all Rikers-related matters brought to their

attention and cooperates fully to resolve the issues identified

by the monitoring team in the Nunez litigation and to

accomplish the objectives of the action plan in a timely,

efficient and effective manner.

As a colleague described it in basic terms, the task

force turns red and yellow lights to green lights and is

available to expeditiously respond to requests from the

department of correction and the law department.  The task

force is made up of members from city hall, the law department,

the department of correction, the department of citywide

administrative services, the department of design and

construction, the office of labor relations, the office of

management and budget, the office of administrative trials and

M5OGnunC

1     hearings and correctional health services.

2             In the few weeks that the task force has been meeting,

3     it has taken necessary and drastic actions -- some of which I

4     will discuss in a moment -- to immediately address issues

5     occurring at Rikers.  This is not an exhaustive list and it is

6     not in any order of importance, but the agencies on the task

7     force have accomplished the following:  We have received the

8     commitment of the Bronx district attorney's office to expedite

9     cases for those who have been detained forked over 365 days.

10    We have referred cases of sick abuse to the department of

11    investigation.  We have received commitments from other city

12    agencies to provide trial attorneys to the department's trials

13    division to process the backlog of cases.  We have increased

14    incentives for those working with the department's trials

15    division, including the waiving of the residency requirement,

16    providing compensation for overtime worked, the piloting of a

17    compressed work schedule and a reprieve of the two for one

18    hiring requirements of the City.

19            The task force has also secured $20 million in funding

20    to fix the broken cell doors at RMDC and RMKC.  We have

21    obtained approval from OMB for additional resources for OATH

22    and for the department's health management division within

23    days.

24            We have expedited both vettings and appointments both

25    at OMB and city hall so that the department could onboard staff

M5OGnunC

1   from the outside more quickly, including the deputy

2   commissioner of security, who has already begun, the deputy

3   commissioner of trials, who begins on May 31st, the deputy

4   commissioner of investigations, who began on May 9th, and the

5   deputy commissioner of classification, custody management and

6   facility operations, who will join the department in July after

7   a job transition.

8           The department has also posted for the jobs of

9   associate commissioner of operations, assistant commissioner of

10  operations, senior deputy commissioner and deputy commissioner

11  of administration.  When candidates are chosen for those

12  positions, they too will be expedited at vetting and

13  appointments.  We have received commitment to invest and

14  prioritize mentorship, training and professional development

15  for staff to give them the support that they need to be

16  successful in this agency.  Your Honor, this list of

17  accomplishments will continue to grow as the group meets weekly

18  to address the very pressing issues plaguing Rikers.

19          Mayor Adams brought on Commissioner Molina five months

20  ago with a mission to reform the agency and Commissioner Molina

21  is doing just that.  He is a fresh set of eyes coming into the

22  department to take a holistic review of how things are done and

23  shaking up business as usual.  While we recognize that the City

24  is an institutional defendant and that failure by the

25  institution to take meaningful action over the last six years

M5OGnunC

1    cannot be ignored, since January 1st, there are new people

2    responsible for ensuring that the institution does in fact take

3    swift and significant action to instate the necessary reforms.

4    As I have mentioned and as you will hear shortly from

5    Commissioner Molina, the City under the Adams administration is

6    already moving in the correct direction.

7         The other parties' desire to not permit the action

8    plan to go forward without more is a step backward rather than

9    a step forward, and it is a hitting of the restart button.

10   Given the record of what the City and the department has

11   accomplished over the past five months, we respectfully request

12   that your Honor allow the defendants to continue to work to

13   bring Rikers into compliance with all of the orders this court

14   has issued.

15        We left the conference with your Honor three weeks ago

16   tasked with developing a plan of action to make necessary

17   changes to make the jails a safer place.  We have not only

18   developed that plan, but as the commissioner will describe, he

19   has already begun to execute many of its components.  And he

20   and the City are ready, willing and able to continue the hard

21   work of taking the department in a new and different direction.

22        Your Honor, in short, as has been raised by some of

23   the parties, we do not need any extraordinary authority ordered

24   by the Court nor the appointment of a receiver, not for all or

25   any part of the jails' operations.  Moreover, we respectfully

M5OGnunC

1    submit that we do not believe there is a sufficient factual

2    basis at this time for your Honor to make the findings

3    necessary to support ordering such extraordinary relief, either

4    by waiving or suspending provisions of state or local law or by

5    appointing a receiver.

6           Under the prison litigation reform act, relief must be

7    narrowly drawn, extend no further than necessary to correct the

8    harm and be the least intrusive means to correct the harm such

9    that no other relief will correct the violation.  We have not

10   reached that point.  The actions being taken by the City in

11   accordance with the action plan, which was drafted in

12   conjunction with the monitoring team, are necessary to address

13   the issues outlined in the various court orders in this case.

14   For that reason, the extraordinary remedy of waiving laws or

15   appointing a receiver does not conform with the requirements of

16   the PLRA.  All of the actions that are necessary to be taken to

17   reform the department are within the City and the department's

18   power and authority and we are ready, willing and able to

19   execute that power and that authority.  By asking for the City

20   to consent to extraordinary relief now, we are being asked to

21   anticipate potential legal challenges to the action plan or

22   parts of the action plan, but we do not believe there is a

23   sufficient factual basis for the Court to find under the PLRA

24   based upon speculation.  As I noted before, speculating that

25   the City will fail based upon past actions of people who are no

M5OGnunC

1    longer city employees is not warranted.  Moreover,

2    extraordinary powers is not the solution.  It is not a panacea

3    or a quick fix.

4            As Ms. Friedberg mentioned a few moments ago, it took

5    two years for a receiver in Cook County to stabilize a single

6    juvenile detention facility housing no more than 300 10 to 16

7    year olds.  Let us not speculate on how long it would take an

8    outside receiver to stabilize an agency detaining over 5,400

9    adults and over 7,000 employees.  It would not happen overnight

10   and stabilization certainly would not happen in a few short

11   months.

12           The City has an action plan that it has already begun

13   to implement with some demonstrated success and is going to

14   continue implementing.  We are taking concrete actions right

15   now and we have a plan that we believe will work.

16           Thank you very much for your time, your Honor.  I'm

17   going to in a moment turn it over to my colleague, Commissioner

18   Molina, and at the appropriate time I will be happy to answer

19   whatever questions the Court may have.

20           THE COURT:  Thank you, Ms. Joyce.

21           Commissioner Molina.

22           MR. MOLINA:  Good afternoon.  My name is Louis Molina,

23   the Commissioner of the Department of Correction for the City

24   of New York.  Your Honor, thank you for opportunity to address

25   the Court again and share with the Court where the department

M5OGnunC

1    is today as we begin to implement the action plan developed

2    jointly with the monitor.

3           I first would like to point out that, since my

4    appointment, I have not been granted any extraordinary

5    authority.  But as I have previously stated, with the support

6    of Mayor Adams coupled with my commitment to use all of the

7    powers inherent in the office of the commissioner, I will share

8    with you quantitatively what the department has been able to

9    accomplish within approximately five months.  It has been

10   mentioned that the time frame is brief, but it is the time

11   frame that this administration has been in charge.

12          Since a multi-strategy violence plan, which was

13   focused on the Robin and Danvers center, also known as RMDC,

14   went into effect, slashings and stabbings in April of this year

15   versus March of this year have decreased 45 percent.  When you

16   compare April of this year to April of last year, the decrease

17   is 24 percent.  And month to date, May 1st to May 23rd, versus

18   the same time last year, the decreases of slashings and

19   stabbings at RMDC are 67 percent.  The impact department-wide

20   in April of this year versus March of this year also

21   experienced a decrease of 35 percent.  And month to date,

22   department-wide versus the same time frame last year, the

23   decrease is 52 percent.

24          The reinstatement of facility searches and tactical

25   search operations, not only another RNDC, but at GRVC, has

M5OGnunC

decreased slashings and stabbings at GRVC in April of this year

versus March of this year by 45 percent.  And when April of

this year is compared to April of last year, the decrease is

also 45 percent.  And May 1st to May 23rd of this year,

compared to the same time frame last year shows a decrease at

GRVC of 80 percent.  Note that these two facilities had been

leading the department in slashings and stabbings.

When it comes to use of force incidents, which I

recognize are still high, we have experienced double digit

decreases since January of 2022 ranging from 15 to 35 percent.

In calendar year to date, force incidences have decreased 27

percent.  RNDC, where the majority of our young adults are

housed, has experienced month-to-month decreases since March.

And department-wide assaults on uniformed staff calendar year

to date have decreased 31 percent and assaults on nonuniformed

staff have also decreased 32 percent.

I stated the last time I was in your court, Judge

Swain, the importance of accountability and discipline in a law

enforcement agency; two critical traits that were absent for

far too long.  In my time as commissioner, we have submitted

calendar year to date, 150 medical incompetency cases to OATH

for adjudication.  In all of 2021, only 160 cases were

submitted.  I have finalized over 820 disciplinary cases to

hold staff accountable, while at the same time closing out

matters that allow the majority of staff members closure and

1  the ability to improve their professional careers.  These 820

2  plus cases represent significantly more than what was done

3  under the last two commissioners combined in the same time

4  frame.

5         Your Honor, what the new leadership team has been able

6  to accomplish in the last few months represents what can be

7  accomplished under the mayor's leadership to leverage different

8  departments of New York City government.  This is further

9  strengthened by his issuance of an executive order instructing

10  specific departments to focus on the department of corrections'

11  needs and by a commissioner with the will to exercise the

12  expansive powers inherent within the office of the

13  commissioner.

14         The action plan, which is crafted by the monitor, with

15  significant input from my team lays out the work that is needed

16  to address the four foundational issues raised by the monitor.

17  This action plan addresses security practices, inadequate

18  supervision, staffing practices and staff accountability.  Your

19  Honor, as the monitor has repeatedly stated, change must come

20  from within.  And with the support of Mayor Adams and my

21  commitment and record of success in implementing reforms, when

22  I successfully guided Westchester County Jail out of federal

23  oversight, this department is no longer neglected and is now

24  empowered under my leadership and the support of Mayor Adams

25  with the ability to fix these problems from within.

M5OGnunC

1          We all, your Honor, are committed to this action plan.

2     The labor leaders that represent uniformed staff, the president

3     of the assistant deputy warden and deputy warden command

4     association, the president of the correction captains

5     association and the president of the correctional officers

6     benevolent association have all publicly supported the mayor

7     and I in implementing this action plan.

8          I also want to talk about facility leadership, our

9     wardens.  For too long, they have been placed in the position

10     to manage facilities that have been underinvested for years.

11     The wardens kept together the majority of staff that were

12     coming to work under a global pandemic that destabilized every

13     person in the world's way of life.  They accomplished this by

14     mere gut.  Because historically, they have been provided little

15     to no investment in their own development as managers.  The

16     wardens and their teams were expected to perform miracles.

17          Quite frankly, given that the department was abandoned

18     during the 2020 and 2021 years of the pandemic by the prior

19     administration, oversight bodies and many others that stayed at

20     home working remotely, as bad as things were, they could have

21     been significantly worse.  The wardens and acting wardens did

22     all they could to keep day-to-day operations functioning,

23     fighting against a pandemic and outside that created a system

24     of chaos that manufactured an ecosystem of destabilization to

25     advance the surety that Rikers Island would be closed by any

M5OGnunC

means necessary, no matter what the cost to staff and persons in custody.

Your Honor, what I have been able to accomplish to date has been with the assistance of the wardens, acting wardens and their respective teams.  This has produced violence reductions and force reductions that I shared with the Court. Under my direct supervision and support, along with the infusion of other outside correctional professionals that will make up the new command staff structure of operations, which will include a senior deputy commissioner, deputy commissioners, associate commissioner and assistant commissioners working in concert with the wardens and their respective teams, I am confident that they will, as they have over the last few short months rise to the moment and meet the standards expected by this court, the mayor, myself and the societal expectations of a humane jail system.

The infusion of outside correctional professionals that will have under my authority the ability to reform the framework of the administration of these facilities to a model of success beyond a Nunez consent judgment.  We are at a historic moment and this court will determine if we are given the opportunity to continue.

I am asking the Court to allow me the time I need to continue to build on what I have done via the action plan. Your Honor, we have not exhausted all remedies.  And for once,

M5OGnunC

what we have today that is critically different is Mayor Adams

and myself, two people who advocated for reform.  If you look

at our histories, we have been so committed to reform that we

have placed the protection of vulnerable populations before

even our own past positions in law enforcement.  Why?  Because

we were not willing to compromise our principles because it was

literally our communities that were impacted.

        Your Honor, the mayor and myself come from the same

ZIP codes as the women and men that work at the department of

corrections and are placed in the custody of the department of

corrections on Rikers Island.  And for too long, that is why it

was so easy for the prior administration to abandon us.  Past

administration can talk about how they want a jail that if

their own family members were there, they would want them to be

safe.  The difference between them and me, your Honor, is that

my family was there.  I did not live a life of privilege where

every opportunity was handed to me in my life.  I fought for

this position and where I am today.  And it's through that lens

and life experiences that I view the importance of this work.

It is not just about slogans for me or the mayor.  It is about

action and outcomes and holding people accountable.  Your

Honor, today is different day.  And we have shown in a short

time that we are different from the past.  I absolutely believe

in this action plan and do not need extraordinary authority to

implement the remainder of the plan to achieve success.  I am

M5OGnunC

1   confident that we will succeed.

2           Thank you, your Honor, for the opportunity to share

3   those brief remarks with you.  I'll make myself available for

4   questions.

5           THE COURT:  Thank you, Mr. Commissioner.

6           What do you say to the objections to the sort of

7   general, vague undertaking language in the action plan and the

8   absence of concrete data points or measurable steps in the

9   action plan as submitted now?

10          It is certainly commendable and encouraging of hope

11  that things may change, but people are dying, people are being

12  hurt right now.  Staff are still not deployed in a logical way.

13  And the parties here and the monitor are asking for ways in

14  which they and I can, at very specific near term intervals,

15  know what is going to happen and be able to assess whether real

16  change reducing the violence and risk is happening in real

17  time.

18          MS. JOYCE:  I think we can both address that.  I will

19  start first, your Honor.

20          I know that Mr. Powell mentioned metrics, measurable

21  metrics.  Those have not been shared with the City or with the

22  department.  So if the department of justice would like to

23  share the metrics that he was speaking about that would

24  demonstrate to them that we are moving along in the action plan

25  for us to consider, we would be happy to consider those.  They

M5OGnunC

1   just have not been shared with us yet.

2           What I will say to the parties' characterizations of

3   vagueness, I would respectfully disagree and state that this

4   action plan, as set forth, sets forth concrete steps that the

5   department needs to take.  And where it does not set forth

6   concrete steps, it has at reasonable timeline, which is an

7   outside timeline -- where things can be done faster -- for

8   these people who are coming in from the outside and infusing

9   their expertise into the department for them to be able to come

10  in, give their assessment so that those concrete steps can also

11  be taken.

12          So it's not that the plan is vague, it's there are

13  concrete steps to be taken now.  And when this infusion of

14  external people starts coming in, starting in May through July,

15  other additional steps will be taken based on the needs that

16  they see the department has.

17          MR. MOLINA:  If I could just add, your Honor, as it

18  relates to the plan and being specific, there are specificities

19  to the plan.  When we talk about the expansion of the security

20  plan, which I initiated at RNDC, we did provide dates of when

21  we will be expanding that plan to other facilities and we

22  provided a date on or about June 20th.  With these plans, we're

23  required the shifting of staff.

24          When it comes to infrastructure improvements, whether

25  they be cell doors, installing polymer along plexiglas windows,

M5OGnunC

1    we do have time frames of that construction being done.  As

2    we're getting time frames of when other materials will be

3    arriving and the work will be done, we will be sharing with the

4    monitoring team a schedule of that work being done.

5           Some of the provisions within the plan are technology

6    solution oriented.  We're in the process of talking with

7    vendors, doing an RFP, evaluating their ability to satisfy the

8    needs to deal with scheduling, staff accountability, scanning

9    and equipment like that.  Some of that has to be installed.

10   And of course, we would inform and share with the monitoring

11   team the time frame of when those issues are being done.

12          As it relates to policy issues, policies have been

13   changed and we have shared policies, for example, like our home

14   visit policy, which was already revised and promulgated

15   yesterday.  We shared that with the monitoring team.

16          When it comes to our health management division, I

17   took swift action at the health management division, removing

18   the prior warden, installing temporary new leadership at the

19   health management division.  We're talking about doctors, other

20   healthcare providers that are providing services to ensure that

21   we have checks and balances for our staff that is out.  So that

22   is not something we will be sharing with the monitoring team as

23   we get permanent leadership within the health management, as

24   well as any new technology solutions to account for checks and

25   balances and accountability of staff.

M5OGnunC

1          We talked about expedited discipline.  When it came to

2     discipline --

3          THE COURT:  Mr. Commissioner, I'm sorry, I think that

4     I didn't hear you clearly.  When you said that, as to new plans

5     for the health management division and technology of the

6     division, it wasn't clear to me the specifics of that plan will

7     be shared with the monitoring team or would not.

8          MR. MOLINA:  They would be shared with the monitoring

9     team.  So I have been in regular communication with the

10    monitoring team as we have developments.  Since some of the

11    technology solutions would be on a time frame, we would share

12    that schedule with them.  If it's technology oriented, if it's

13    staffing oriented, we would do the same, your Honor.

14         THE COURT:  Thank you.

15         Please go on.

16         MR. MR. MOLINA:  Other than that, to the new

17    organizational command structure that we developed, the deputy

18    commissioner of security began on May 16th.  As the Court will

19    recall, this was a request for a remedial order to have a

20    securities operations manager.  When that was brought to my

21    attention, when I was first appointed, we immediately made sure

22    that that position would have power and authority in order to

23    make decisions as well as deploy staff.  That's when we agreed

24    with the support of the monitoring team to make that individual

25    a deputy commissioner of security.

M5OGnunC

1          It took time to find this individual and to vet

2    candidates.  Just to remind the Court, we are a law enforcement

3    agency, so it does take time not only to find good, qualified

4    candidates, but we need to make sure we're vetting these

5    individuals because they're in high executive positions within

6    the agency.

7          And recommendations that are made by Dr. James Austin

8    regarding gang housing, when that recommendation was made, I

9    immediately began rebalancing gang housing, which was something

10   that I was going to do from the onset of my appointment.  It

11   was something that was talked about during my interview

12   process.  As well as when he recommended the discontinuation of

13   the hub that was implemented by McKenzie and Co., I did that

14   immediately.

15         And we have selected a finalist for the deputy

16   commissioner of classification and custody management, which

17   was a recommendation that Dr. Austin made, and that individual

18   is transitioning from one job to come work with us.  So

19   sometimes, we have to manage other individual's schedules

20   through this process.

21         But we will be as aggressive in doing recruitment in

22   order to find the most highly qualified and experienced

23   individuals to be part of our command structure.

24         THE COURT:  What will be the relationship and

25   specifically the division of authority as between wardens and

1     these new deputy commissioners and staff?

2              Who, at the end of the day, decides how the wardens'

3     facilities are managed day-to-day?

4              MR. MOLINA:  That would be myself, your Honor.

5              So the way the structure would work is the wardens

6     will report directly to me.  That became effective yesterday,

7     with the anticipation of the newchanges in leadership within

8     our current command structure with the chiefs.  We would have a

9     structure where we would have a senior deputy commissioner of

10    operations.  Down from that structure, we would have three

11    deputy commissioners; a deputy commissioner of security a

12    deputy commissioner of classification and custody management

13    and facility operations -- that is one person -- and a deputy

14    commissioner of administration.  Assisting with the management

15    of sort of macro facility operations, we would have two

16    associate commissions that would be reporting up to the deputy

17    commissioner of custody management and facility operations and

18    we will be embedding assistant commissioners within all of the

19    facilities.  So I'll be meeting one-on-one with the wardens and

20    managing them directly to include the assistant commissioners

21    that would be at these facilities.

22             THE COURT:  Mr. Commissioner, you said that you have

23    the support of the unions.  And Ms. Joyce, you said that you

24    believe there are no barriers.  And so am I to understand that

25    to mean that you do not expect to have collective bargaining

M5OGnunC

1    agreement based pushback on the elimination of the rules that

2    have allowed people to choose nonhousing unit spots and the

3    other problems that have led to units not being manned and

4    other staffing-related problems?

5           MR. MOLINA:  Thank you for the question, your Honor.

6           No, the issues of deployment of staff, I do not see

7    any collective bargaining barriers to that.  We have within our

8    policy managerial discretion to be able to deploy staff as

9    needed to housing posts.

10          THE COURT:  Thank you, Mr. Commissioner.

11          Turning back to the monitor and the deputy monitor for

12   further response, in light of these comments, and then let's

13   see where we go from there.  I'll ask that people be as concise

14   and pointed as possible in areas of further inquiry and

15   proposed next steps, just looking at the clock.  I

16   unfortunately need to have a hard stop here by 4:45 at the

17   latest and want to have clarity about where we're going next.

18          So Mr. Martin or Ms. Friedberg.

19          MR. MARTIN:  Yes, this is Steve Martin.

20          THE COURT:  Please continue, Mr. Martin.

21          MR. MARTIN:  Yes, thank you.

22          The commissioner has taken what I would describe as a

23   fairly hard, confident posture that he, with support by the

24   City, can manage this agency with some success and dispatch,

25   emphasis on dispatch.  Because he does and has acted in certain

M5OGnunC

1  areas with a degree of certainty and speed to effectuate his

2  vision.

3        It may be, as I was listening to the parties and the

4  questions of the Court, that if the parties can construct a set

5  of metrics that reliably report out on the level of safety and

6  at the same time monitoring the progress of the agency on these

7  initiatives, that would maybe lessen the requirement to flesh

8  out these timelines, to flesh out more information that the

9  plaintiffs are rightfully and validly requesting.  I'm not

10 discounting the import of what the SDNY and LAS said.

11       But these matters are so cumbersome to cross all the

12 Ts and dot all the Is, aren't we really, in the final analysis,

13 interested in harm and reduction of harm with some dispatch?

14 That's the ultimate outcome.  If we have metrics that can

15 measure that weekly, biweekly, monthly, whatever and gauge

16 reliably that reduction in harm with the commitment, strategies

17 and so forth the commissioner and the City have made here

18 today, I'm not -- I mean, it's to the parties and the Court,

19 I'm just almost thinking out loud here -- and I know SDNY has

20 submitted a set of metrics that Ms. Joyce, I think, rightfully

21 said have not been shared them, I know I have reviewed those

22 metrics.  My office is knee deep in metrics.  And I think a set

23 of really refined, reliable metrics can be developed.

24       Put them out there and let the commissioner go.  Let

25 him see if his vision and confidence can be realized.  And I'm

M5OGnunC

1  not so sure he needs to be wed or constricted or restrained by

2  a lot of minutia that can find their way into these types of

3  plans.  I'm not saying I embrace it.  I'm just saying I'm

4  putting it out there for something that the parties can

5  consider because I heard LAS and SDNY, they're interested in

6  outcomes and the reduction of harm.  And they want to be able

7  to determine that as we move through this.  So if that's the

8  case -- now, we certainly can refine the action plan and so

9  forth -- but I think where I would put -- what I would advise

10  the Court and the parties, let's set about to define with as

11  much precision and reliability as we can these metrics.

12          Put them out there.  It's a score card.  The

13  commissioner is going to be so aware of what he's doing at any

14  point in time on those metrics that where they are not trending

15  or moving as they should, he is going to direct his

16  attention -- I would assume, commissioner -- to why they're

17  trending up or not trending down as much as you would like to

18  see.

19          Is that not fair, what you would be doing with

20  metrics, commissioner?

21          THE COURT:  Mr. Commissioner, please respond.

22          MR. MOLINA:  Yes, Mr. Martin, I would agree with you

23  on that.

24          MR. MARTIN:  Okay.

25          MR. MOLINA:  If I could just add, Mr. Martin, that's

M5OGnunC

1    why one of the first things I did was want to develop an office

2    of management, analysis and planning because I wanted us to be

3    a department that was very evidence-based in its

4    decision-making and tracking of our successes.

5           MR. MARTIN:  As your Honor and the parties all know, I

6    rely heavily on my deputy monitor.  I certainly want to give

7    her an opportunity here to comment too.  So if you would permit

8    her to do that.  Anna.

9           THE COURT:  Thank you.

10          Ms. Friedberg.

11          MS. FRIEDBERG:  Thank you, your Honor.  This is Anna

12   Friedberg speaking.

13          I think, ultimately, the monitoring team's position

14   with respect to where the lapses in the plan may remain, but to

15   the extent we're trying to discuss how do we proceed in the

16   next coming days, weeks and months, I certainly think that

17   Mr. Martin's suggestion that we work collaboratively with the

18   parties to develop some metrics so that they can have some more

19   contemporaneous information to see how things are going right

20   now certainly is a feasible option.

21          I think there are some components of the action plan

22   that do still merit some work, both because the City and the

23   department when they proposed the plan on the 17th had some

24   placeholders in there, as the judge herself may have noted, as

25   well as the fact that the parties have raised a few issues

M5OGnunC

1    between discussion among all probably do make sense to

2    incorporate in some fashion.

3           I certainly echo, though, Mr. Martin's comments as

4    well as actually Mr. Powell's that at a certain juncture, we

5    need to kind of end the quote, unquote haggling over the plan

6    and so finding some happy medium could be appropriate.

7           As I recommended at the outset, I believe that an

8    approach in which we could come back within two weeks, by

9    June 8th, with where we are on those pieces would allow the

10   parties to flesh out their positions, whatever it may be.

11   Certainly, everybody here was incredibly candid and frank with

12   where they all thought this may go and what should happen next.

13   And I think this may allow for that.  So that would be my

14   suggestion to you, your Honor.

15          THE COURT:  Ms. Werlwas has her hand up, so I'll call

16   on her first.  And then it looked like Mr. Powell was beginning

17   to speak.

18          Ms. Werlwas.

19          MS. WERLWAS:  Thank you, your Honor.

20          We wanted to address two things.  And certainly, we

21   welcome discussions with the monitoring team about the

22   contemporaneous information that Ms. Friedberg mentioned and us

23   getting information of what is happening in the jails and

24   wanted to make clear that we do support the SDNY's request for

25   information and separately establishing indicators of success.

M5OGnunC

1           I raised my hand to address the issue that the

2    commissioner and the City and the monitors had addressed

3    regarding barriers to relief.  And I do so now because,

4    initially, we withheld those topics because of the agenda sort

5    of was set up differently, but in the discussions, we have all

6    addressed those and did want to respond to the City's assertion

7    and the monitor's framing about barriers very briefly because

8    we think it's essential to understanding what happens next.

9           We appreciate the monitor's and share the monitor's

10   identification of the issue of and the critical importance of

11   identifying barriers to relief and think the monitor astutely

12   identified some types of barriers.  It's critical because in

13   our discussions with the plan, in our view, the City has been

14   unwilling to address the barriers that do exist.  We want to

15   try to cut through some of the muck here today.  First, I would

16   suggest that let's be honest about something that is one of the

17   principal things that we mean by the sometimes euphemism

18   barrier.  And that is in great part the collective bargaining

19   laws and the civil service laws.  Those are certainly not the

20   only legal barriers, constraints in which we all operate, but I

21   think it's fair to say, quite honestly, those are very

22   significant ones at this juncture of the case and given the

23   action plan in front of us.

24           And the City has asserted today that there are no

25   legal obstacles to implementing its action plan.  And in a very

M5OGnunC

1    narrow, technical sense, that is true, in our view, of most of

2    these provisions of the plan, precisely because they don't

3    require much, if any, action.  When the only action required is

4    to create a plan, then of course the City has managerial

5    rights.  It has managerial rights to create plans.  The plan

6    states that the City will revise its sick leave policy.  We

7    agree with the City, some such revisions would certainly not

8    implicate labor rights, but clearly others patently would.

9    This is not about speculation.

10           The sick leave policy is at the core of the

11   instability in the jails right now, as it has been the source

12   of massive staff absenteeism and unstaffed posts.  It is not

13   realistic to assume that making the dramatic and immediate

14   changes that are needed to get enough officers in the housing

15   areas to address the rampant absenteeism in this workforce,

16   changing the allocation of posts and significantly accelerating

17   what minimal employee discipline exists will be on consent of

18   the unions.

19           So the vagueness and, frankly, insufficiency of the

20   plan seems to be the only thing that saves it from collision

21   with the admittedly very gray area that is the scope of

22   collective bargaining agreements, which, for a very long time,

23   in our negotiations, up until this past week, the City has

24   identified as one of sources of its obstacles to implement

25   change.

M5OGnunC

1          The concern and the reason that we shared with the
2     City several proposals to mitigate these collisions that we
3     think are very much ripe were designed to, in some way, to deal
4     with problem that we see in the plan, which is that the
5     prospect of labor and civil service conflict is distorting the
6     relief that is suggested.  We think this is very clear in the
7     provision about facility leadership.  The record undeniably
8     makes clear and the parties have been negotiating for months
9     about hiring external wardens and the barrier the City has
10     asserted for the longest time has been certain correction law
11     120 and other relevant laws.  Yet, at the end of the day,
12     rather than take very reasonable suggestions of ways to address
13     those concerns have simply developed this inexplicably complex,
14     convoluted structure of dual reporting in the facilities.
15     That's what we mean by workarounds.  And that is part of the
16     dynamic that we think will plague this plan going forward and
17     needs to be resolved now.  It is the elephant in the room and
18     it is causing great harm if we do not address it right now.

19          And just the last, as I know time is brief, we would
20     add one other type of barrier to the monitor's list that we
21     think otherwise ably described the different kinds of barriers,
22     and that's the political barrier.  And by that, one of the
23     fundamental problems we see with this action plan -- and it's
24     about it philosophically, not about wording -- is its reliance
25     upon hiring new people and external people, who are very much

1    needed and the City would very much benefit from their

2    expertise to work for the department, yet what we have seen so

3    far is that -- as we saw with the firing of the disciplinary

4    manager -- that these individuals will serve at the will of the

5    New York City mayor and are subject to political controls on

6    their ability to implement reform.  And by kicking the hardest

7    choices that are to be made down the line to these individuals

8    who are not independent of the administration, but who are

9    subject to the dissatisfaction of different constituencies, we

10   raise the prospect that much of this reliance on these people

11   will be for naught.  And after they have -- they serve at will

12   and will be dismissed.  And if they are, then we're back to

13   square one.

14          Those are the barriers we wanted to raise.  We tried

15   to come up with solutions to work around those.  We would

16   happily engage others, but we don't see any others on the table

17   that the City hasn't rejected already in resolving those

18   barriers to relief, and we think they're fundamental to the

19   ability of this plan to succeed.

20          THE COURT:  Thank you.

21          Mr. Powell, did you wish to speak?

22          MR. POWELL:  Yes, your Honor.

23          I guess if I could just set forth our position as to

24   what we would recommend or be agreeable for a path forward

25   here -- I know time is getting short -- it's just the SDNY's

M5OGnunC

```
1    position, to be clear, the plan that was submitted is the

2    City's plan, that's their reform plan, that's how we view it.

3    The monitor was certainly very involved in crafting it, but

4    this is the City's plan of reform to fix the issues that have

5    been identified over and over again.  In our view, we were

6    provided an opportunity to provide input, which we have done.

7    We have provided that input, that feedback to the City and to

8    the monitor.  We think that the monitor and the City should

9    take that feedback and finalize their plan and submit it to the

10   Court as soon as possible.  If it takes another couple weeks, I

11   guess it takes another couple of weeks.  We thought we made it

12   very clear, we're not signing that and endorsing that plan as a

13   fix.  We just can't be in a position to do that.  There's going

14   to be a lot of operational stuff that's not in there.

15           So our proposal would be that that input be

16   considered.  We're happy to have further conversations.  We're

17   not trying to remove ourselves from the process.  But that plan

18   be finalized and submitted to the Court and be so ordered.  We

19   did provide a list of our thoughts on metrics and outcome

20   measures that we think should be included in that plan.  I

21   believe we mentioned to the City that we had done that, but we

22   had not provided those metrics to them.  We are happy to do so.

23   Because, again, we were providing input back to the monitor on

24   our thoughts.  I think that that plan should include a series

25   of metrics that measure how they're doing on each of the items
```

M5OGnunC

1    in that plan and how they're doing at protecting the safety and

2    well-being of inmates and staff.

3            What those metrics are, the monitoring team has far

4    more expertise than I do in that.  We've thrown out our ideas.

5    We'll circulate them after this call.  And our recommendation

6    would be that the plan include those metrics, that those

7    metrics be included in the periodic reports that the monitor

8    provides on a regular basis to the Court and that that be our

9    path forward and that that be so ordered by the Court.

10           With respect -- final point -- with respect to the

11   barrier issue, what I hear the City to be saying, and I just

12   want it to be clear for everyone here, is that they do not

13   foresee any legal, contractual, regulatory, state law barriers

14   in reforming this department and bringing it into compliance

15   with the consent decree and the remedial orders.

16           Legal Aid society raised an issue about there's no

17   problem with coming up with a plan, that that wouldn't conflict

18   with law.  That's not what I'm hearing them say.  If what I'm

19   hearing is incorrect, they should clarify.  But what I am

20   hearing is their take, based on their own labor experts, is

21   that there is no legal obstacle to implementing all of the

22   steps and reforms that they think are necessary to bring the

23   system into compliance with the Court's orders.  And if that's

24   correct, we can't second guess that, right.  They have their

25   labor lawyers, they're making a determination.

M5OGnunC

```
1          We would still request that and think that the plan
2    should at the very least include some procedural mechanism that
3    if barriers are identified in the future, that there be a
4    mechanism in place, that if the monitor or the City determines
5    there are potential legal obstacles that need to be dealt with,
6    that they promptly bring that to the attention of the Court and
7    the parties so that it can be dealt with through a potential
8    court order or otherwise.  That's the very least that I think
9    need to be in there to give the monitor some comfort that if
10   these barriers are out there that they be rapidly and promptly
11   dealt with.
12          So that would be our proposal, again, that the plan be
13   finalized with our input, that it be submitted to the Court as
14   soon as possible, that it include metrics that are agreed upon
15   between the monitor and the City with our input and that it
16   include some mechanism for barriers that are identified in the
17   future to deal with.  And I think that is our position after
18   hearing all parties today and the monitor.
19          THE COURT:  Thank you.
20          I do want to give Ms. Joyce and the commissioner an
21   opportunity to respond directly to Mr. Powell's question about
22   barriers, which goes further than the question that I asked.
23          Is it your position that there are no legal,
24   contractual, regulatory or state law barriers that you perceive
25   coming into compliance with the consent decree via the
```

M5OGnunC

1   proposals that you have made as to these core issues as a

2   starting point?

3              MS. JOYCE:  Yes, your Honor, that is accurate.

4              Everything that we have agreed to in the action plan,

5   we believe that there are no legal impediments to us fulfilling

6   our obligations under the action plan.

7              THE COURT:  Thank you.

8              So what I would propose, taking up on what I've heard

9   from Mr. Martin, Mr. Powell, Ms. Friedberg and Ms. Werlwas, is

10  that you take, under the monitor's leadership, two more weeks

11  to develop a further fleshed out proposed order that includes

12  metrics and mechanisms for metrics, because I don't expect you

13  to be able to identify each and every metric that would

14  necessarily be helpful here.  And I don't want this process to

15  take too long.  But it does certainly make sense for there to

16  be metrics for realtime, concrete disclosure and measurement of

17  progress.  The proposed order should also include any further

18  clarification of the language and expansion or change of the

19  language that the proponents of the proposed order believe

20  necessary or appropriate in the circumstances.

21             In the meantime, the department and the City must

22  continue to proceed apace in implementing the changes that are

23  being proposed and contemplated.  This isn't a time out, but

24  this is a matter of defining what will be court-imposed

25  standards.  And as they say, the proof of the pudding is in the

M5OGnunC

eating, and so some more pudding making and some opportunities

for testing and tasting along the way will be necessary, I

think, to gain the confidence of the necessary stakeholders and

of the Court.  So that must be part of the process as well.

So there should be discussions.  There should be a

submission to the Court by June 8th.

Now, it may be that there is some explanatory document

in identification of further issues at that time, but what can

be presented to be so ordered must be.  To the extent that the

plaintiffs and the government believe that the proposal is so

inadequate -- and I hope this doesn't happen -- but if they

believe that it is so inadequate that we should have a third

parallel track of the development of motion practice seeking

particular relief from the Court and explaining to the Court

the factual and legal basis on which the particular relief is

sought, then a proposed timetable for and description of such

contemplated motion practice should also come in on June 8th.

I'm hoping that that won't be necessary.  But it would be

better, in my view, at this point, to have something besides

general conceptual notions of there being a path for everyone

to focus on in addition to the proposed action plan.

Ms. Joyce, you have your hand up.

MS. JOYCE:  Thank you, your Honor.

I know that the deputy monitor and the Court suggested

June 8th, but could we have until June 10th for the submission

M5OGnunC

1   to the Court.  I think those extra few days would be critical

2   for us in a submission.

3            THE COURT:  So that would be the Friday of that week?

4            MS. JOYCE:  Yes, your Honor.

5            THE COURT:  Is there any objection by the monitor or

6   anyone else to the Friday?

7            MS. FRIEDBERG:  Your Honor, can I just ask -- this is

8   why these dates are always so troubling, if it could be --

9   actually, nevermind, leave it the 10th.  I was going to move

10  the date.  Nevermind, leave it the 10th.  No objection from me.

11           THE COURT:  June 10th is the submission date.  And

12  that submission should also include a proposal for reporting.

13  And to the extent there is going to be a request for another

14  conference in the near term, that should be included in the

15  submission.  And chambers can be alerted by the monitor as well

16  to the extent that dates need to be worked out.

17           So I have described what I am looking for here on the

18  record.  So to bottom line it, by June 10th, a submission of a

19  fleshed out proposed order to include metrics.  And should a

20  party or parties desire a proposed timetable for motion

21  practice as well with any further explanatory information,

22  affidavit in support, declaration in support of the order or

23  request for further conference or court action that may be

24  deemed necessary by the proponents of the order, that to be

25  submitted by close of business on June 10th.  And if you expect

M5OGnunC

1    it to be contested, give me a proposed schedule for any further

2    submissions that you see as essential for my consideration

3    before acting on the proposed order.

4              Ms. Werlwas, your hand is up.

5              MS. WERLWAS:  Very quickly, your Honor, our team was

6    conferring and looking at calendars while this discussion was

7    happening, and we would request that the original date of the

8    8th remain.  The 9th and the 10th are both extraordinarily

9    challenging for us, but the 8th would work.

10             MS. JOYCE:  Your Honor, the 6th and the 7th are

11   challenging for us, and it's the City and the monitoring team

12   that are doing the bulk of the heavy lifting, so we really

13   would ask for June 10th, if that's acceptable to the Court.

14             THE COURT:  It will stay June 10th.  You will need to

15   work out your communications.  It sounds like there's going to

16   be a lot of pressure on the Wednesday of that week, but I leave

17   it to you to work out the specifics.

18             Ms. Friedberg.

19             MS. FRIEDBERG:  Your Honor, just one clarification

20   with respect to what you're looking for in the submission of

21   the 10th, I know that Mr. Powell had also raised one question

22   with at least an issue of whether the action plan addresses the

23   prospective barrier requirements.  I did not hear in your list

24   of items whether or not that was something you wanted addressed

25   by June 10th or not.  I would certainly submit that that should

M5OGnunC

```
1    be something that should be considered, but certainly that's up

2    to you, your Honor.  I just wasn't sure if that was intentional

3    or not to remove that request that he made.

4           I did not intentionally remove that.  I think that you

5    should endeavor to include a provision that provides some

6    mechanism.  Now, whether that mechanism is a contemplated

7    submission to the Court that's not fleshed out in all of its

8    mechanics or not, I can't say.  But we certainly shouldn't lose

9    sight of that point, and you should endeavor to include as

10   meaningful a provision in that respect as you can in the

11   timetable.

12          MS. FRIEDBERG:  Thank you for the clarification, your

13   Honor.

14          THE COURT:  Thank you all for your undertakings and

15   for your work.  As many people have said, we are ultimately

16   about results here that achieve reform and that, in the very

17   near term, provide greater safety for those in custody,

18   particularly at Rikers and those who work at Rikers.  So I

19   thank you for what you have brought before me today and for the

20   very hard work that you are going to be doing over the next two

21   weeks.  I look forward to that further progress in this very,

22   very crucial undertaking.  And I thank the City for proposing

23   these new structures and approaches and for the steps that have

24   been taken, and I want to see the results.  I am hoping that we

25   will all see results that are meaningful.
```

M5OGnunC

1           Ms. Friedberg, you have your hand up again.

2           MS. FRIEDBERG:  Your Honor, this is embarrassing.  I

3     don't know how to turn it off.

4           THE COURT:  Just hit the same button and it goes off.

5           MS. FRIEDBERG:  I tried to do that a few times and

6     failed.  Thank you.

7           THE COURT:  That's fine.

8           So is there anything further that we need to take up

9     in the two minutes or so that I have left before we have to

10    call this closed?

11          MS. WERLWAS:  No.  Thank you.

12          THE COURT:  Thank you.  Stay safe, be well, work hard.

13    And again, thank you.

14          (Adjourned)

15

16

17

18

19

20

21

22

23

24

25