

Prisoners' Rights Project
199 Water Street
New York, NY 10038
T (212) 577-3530
www.legal-aid.org

Alan Levine
*President*

Justine M. Luongo
*Attorney-in-Chief*
*Criminal Defense Practice*

June 10, 2022

**Via ECF**

The Honorable Chief Judge Laura Taylor Swain
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10006

Re:     *Nuñez v. City of New York,* 11-cv-5845 (LTS)(JCF)

Your Honor:

Plaintiffs write pursuant to the Court's order dated May 24, 2022 to address the Proposed Order and Action Plan (Dkt. No. 462) ("Plan") submitted today by the Monitor, and to propose a briefing schedule for further motion practice we believe necessary to provide relief for the Plaintiff class.

Plaintiffs do not object or consent to entry of the Plan as a court order.  The parties and Monitor have conferred extensively in an effort to craft an order that would provide meaningful relief to the Plaintiff class.  Plaintiffs provided substantive proposals and extensive comments on successive versions of the Plan and sought information from the City about the actions they are taking and will take to implement the Plan or other remedial measures. We sincerely hope the City has been moving with utmost speed and diligence to implement the Plan and other measures given the dangerous conditions in the jails.

We do not object to any of the specific measures set forth in the Plan, as they largely address important priority areas of concern identified by the Monitor and describe processes that are reasonable steps forward.  However, the Plan's significant deficiencies render it insufficient to redress the ongoing harm.  Regrettably, our negotiations with the City did not provide us with a reasonable basis to believe that further discussions will yield more concrete or robust commitments.  Through this process, the City has not demonstrated the will or ability to make the difficult choices necessary to meet the demands of the moment.

Most illustrative is the Plan's failure to implement the Monitor's longstanding recommendation that the City expand the pool of potential wardens of jail facilities to include correctional leaders

1

from other jurisdictions.  The Monitor has long described how the profound deficiencies in facility leaders—all of whom came up through this abusive, dysfunctional system—have frustrated compliance with the Consent Judgment and First Remedial order, and therefore made a formal recommendation *over a year ago* to expand the warden hiring pool.[1]   The Second Remedial Order on September 29, 2021 sought to advance this recommendation, ordering the City to confer with state officials about *how*—not whether—the recommendation could be implemented.[2]  The City's primary opposition has been the view that such relief could be inconsistent with state and local laws.[3]

Yet instead of agreeing to take the steps available to overcome this obstacle—seeking an order pursuant to 18 U.S.C. § 3626(a)(1)(b) to permit external warden hiring—the City instead proposes a convoluted dual leadership structure, with both civilian leaders and uniformed wardens having undefined shared responsibilities and separate chains of command.  This nonsensical structure will not cure the longstanding pattern of implementation failures at the facility level.  As Deputy Monitor Anna Friedberg noted in the May 24, 2022 court conference, "The record is clear that leadership in the facilities are lacking and the workaround developed is simply insufficient at this stage."  Transcript of May 24, 2022 Court Conference at 18:19-21 (Dkt. No. 460).  In its letter to the Court today, the Monitor stated that such relief is "*necessary* to ensure the success of the reform effort."  Letter to Court, June 10, 2022 **(**Dkt. No. 462**),** at 3 (emphasis supplied). Given the City's fundamental unwillingness to agree to such relief, its promises that the Plan will result in meaningful change ring hollow.  While the Plan may offer a "road map," the City has shown it is unwilling or unable to take the necessary steps along the road.

In that connection, the City's refusal to entertain any remedial measure that would conflict with state or local laws demonstrates the limits of their commitment to reform.  In our negotiations, the City wholesale rejected *any* such proposed relief—simply by declaring that each such measure was not substantively warranted, a dubious conclusion considering the structural overhauls necessary in areas like sick leave and discipline**.**  Their proposal set forth on page two of their letter to the Court dated today (Dkt. No**.** 463) regarding abrogation of local laws is meaningless.  It simply reiterates the status quo: that *if* the City decides it wants to seek a waiver of state or local law, it will do so.  This is not a commitment to do anything at all.

The Plan's failure to tackle head-on the changes needed in the disciplinary system reflects another difficult decision deferred.  The correctional workforce has for too long enjoyed

---

[1] Eleventh Monitor's Report, May 11, 2021 (Dkt. No. 368), at 8-10, 15.
[2] "The Monitor has recommended that the criteria for who may serve on facility leadership teams (e.g., Warden) must be expanded so that the Department is no longer limited to only selecting individuals from the current uniform ranks and can have the ability to also seek managers, from the broader corrections community, with the required skills and willingness to improve the state of facility operations. The appropriate City officials shall confer with the relevant State leadership to determine how this recommendation may be adopted." Second Remedial Order (Dkt. No. 398) ¶ 1(ii).
[3] In a previous filing the Monitor relayed the City's concerns about New York Civil Service Laws §§ 50, 51, 52, 56, and 65; New York City Administrative Code § 9-117; and New York State Correction Law § 120 (1) and (4). *See* Status Report, Nov. 17, 2021 (Dkt. No. 420), at 5, FN6.

2

impunity for violating the Department's rules because the City fails to impose timely, meaningful discipline for use of force violations.[4] Yet the Plan does not disturb the *structural* impediments to timely discipline nor demonstrate how even a well-resourced process would be able to resolve the astonishing backlog of 1,900 disciplinary charges *pending* resolution. The added dimension of protracted, widespread absenteeism and the need for action to address abuses of unlimited sick leave further illustrate the critical need for a functional, timely disciplinary system.  The Plan offers merely a vague recruiting strategy for positions the City has been unable to fill, tightened timelines for discipline in a small number of cases, additional staffing that had already been required by prior court orders, and additional evaluations of the disciplinary process. (Plan § F).  The City's unwillingness to make the significant changes needed to hold staff and leadership accountable for abuse and misconduct reflects a lack of political will or imagination that is necessary to overcome entrenched dysfunction.

More globally, the Plan is replete with vague commitments to revise policies in undefined ways, but it is almost silent on concrete actions or timelines for implementation of these new policies. This is most glaring in the provisions that seek to address the most immediate and extraordinary barrier to relief: the absence of sufficient staff to provide basic daily supervision of the jails.  In response, the Plan's provision on sick leave provides: "Within 90 days of the Order, the Department, in consultation with the Monitor, shall revise its policies and procedures regarding sick leave and absence control...[and the revisions] shall be implemented thereafter." (Plan § A ¶ 2(d)(iii)).  It is frankly impossible to discern how this mandates any change, provides any relief, when it will actually be implemented, or why policy revisions will require three *more* months amidst a crisis that has persisted for a year.  Other examples of vague provisions[5] that lack substantive implementation requirements[6] abound.

Finally, the Plan now has *virtually no deadlines* for critical security, staffing, and population management initiatives.  Those sections set timelines for the hiring or appointment of external Staffing, Security, and Classification Managers, but not the initiatives they are tasked with developing and executing. (Plan §§ C ¶ 1; D ¶ 1; E ¶ 1).  Without meaningful deadlines and specific requirements, the provisions of the Plan cannot serve as a reliable metric for compliance or improvement.

---

[4] *See e.g.*, Non-compliance ratings found in Twelfth Monitor's Report, Dec. 6, 2021 (Dkt. No. 431), at 101; Eleventh Monitor's Report, May 11, 2021 (Dkt. No. 368), at 227; Tenth Monitor's Report, Oct. 23, 2020 (Dkt. No. 360), at 184; Ninth Monitor's Report, May 29, 2020 (Dkt. No. 341), at 210; Eighth Monitor's Report, Oct. 28, 2019 (Dkt. No. 332), at 186; Seventh Monitor's Report, April 18, 2019 (Dkt. No. 327), at 161; Sixth Monitor's Report, Oct. 17, 2018 (Dkt. No. 317), at 126; Fifth Monitor's Report, April 18, 2018 (Dkt. No. 311), at 120; Fourth Monitor's Report, Oct. 10, 2017 (Dkt. No. 305), at 174.

[5] For example, awarded posts and reliance on 4 by 2 schedules must be respectively "reduce[d]" and "mimimize[d]," assignment of uniform staff to civilian posts must only be "reduce[d]" without naming any particular posts or units other than the Health Management Division, despite the Monitoring Team and staffing consultant identifying these issues months ago and our repeated requests to provide a baseline of additional detail. (Plan § C ¶¶ 3(v), 3(vi), 3(vii); § A ¶ 2(e)).

[6] The Plan states that within 4 months, the City will "evaluate" chronically absent or medically restricted staff to identify what further remedial action (such as return to work or discipline) is warranted — but has no requirements for subsequent action other than the expedited processing of 20 medical competence cases. (Plan § A ¶ 2(f)).

In sum, while the Plan describes some worthwhile measures that, if implemented with fidelity, could improve operations in the jails, it does not provide a full and adequate remedy for the ongoing violations of the Court's orders. Time and again, the City has failed to implement the plans developed with the Monitor and ordered by the Court. There is a six-year history of unexecuted plans, failed protocols, and abandoned initiatives, some strikingly similar to those in the City's current Plan.[7]

The City committed to the reforms in the Consent Judgment almost seven years ago this month. In light of the City's continuing failure to comply with the Consent Judgment and remedial orders and our view that the Action Plan will not cure the unconstitutional and unsafe conditions for our clients, Plaintiffs believe it is necessary to move for contempt and for appointment of a receiver and/or other remedies as may be necessary. Plaintiffs currently intend to support their motion with undisputed facts from the Monitor's reports and other evidence, without need for an evidentiary hearing. That said, the procedural mechanism for establishing facts and obtaining the relief sought will depend on the City's response to our anticipated motion (and, potentially, further clarification of our views during the drafting process).

We propose that Plaintiffs' motion be filed by August 11. We have conferred with the City and it asks that its response be due October 14. Given the urgent unsafe conditions at the jails and that it is *Plaintiffs* that have the burden to establish entitlement to relief, Plaintiffs' position is that 60 days to oppose the application is excessive. We ask that the City's response be due September 15, with Plaintiffs' reply due September 30. Given that the factual context will be dynamic, with the Monitor filing reports while Plaintiffs' motion is being briefed, the parties may need to supplement or adjust their submissions, and will confer about the most efficient way to do so.

        Respectfully submitted,

        Mary Lynne Werlwas
        Kayla Simpson
        David Billingsley
        Legal Aid Society Prisoners' Rights Project

        Jonathan S. Abady
        Debra L. Greenberger
        Nairuby L. Beckles
        Emery Celli Brinckerhoff Abady Ward & Maazel LLP

        Counsel for plaintiffs

---

[7] For example, pursuant to the Second Remedial Order, an interim security plan was developed to address deficiencies in security-related practices. However, the Monitor reported in March that "the Department has failed to meaningfully implement solutions to any of the immediate problems." Special Report, March 16, 2022 (Dkt. No. 438), at 21-22. This plan "included viable strategies to improve security … However, the actual implementation has been sporadic and of such poor quality that unsafe staff practices remain rampant." *Id.*, at 44.

4