# Status Report of the *Nunez* Independent Monitor

**June 30, 2022**

### THE NUNEZ MONITORING TEAM

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

Table of Contents

Introduction ........................................................................................................................... 1

Action Plan ............................................................................................................................ 2

Current State of Affairs ......................................................................................................... 5

- Citywide Rikers Task Force ...................................................................................... 6

- Department Leadership ............................................................................................. 7

- Staff Management and Deployment .......................................................................... 9

- Current State of Use of Force and Violence .......................................................... 13

- Facility Updates ...................................................................................................... 17

  o *RNDC* .................................................................................................................. *18*

  o *GRVC* ................................................................................................................. *20*

- Responding to Serious Acts of Violence ................................................................ 22

Staff Discipline for Use of Force Related Misconduct ....................................................... 27

- Status of DOC's Efforts to Address the Backlog .................................................... 29

- Next Steps for Addressing the Trials Division's Backlog ...................................... 35

- Looking Ahead for Staff Discipline ........................................................................ 38

Conclusion .......................................................................................................................... 39

Appendix: Key Data Points Over the Course of the Consent Judgment ......................................... i

Security Indicators & Operations Data ...................................................................................... ii

Staffing Data ...................................................................................................................... xvii

Staff Accountability ........................................................................................................... xx

## Introduction

This report is the first filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465), just three weeks ago. The jails remain dangerous and unsafe, and the conditions are volatile. While some progress has been made in addressing staff absenteeism and the conditions at RNDC, and the Commissioner is in the process of overhauling the Department's leadership structure, and the Trials Division is processing more disciplinary cases than ever before, the overall situation in the jails remains chaotic and incidents involving serious harm and tragic fatalities are all too frequent. This year alone, nine incarcerated individuals have died.

This report provides an overview of the Action Plan, a summary of the current state of affairs, and a discussion about the Department's efforts to address the staff disciplinary backlog. Given that the Action Plan has only been in effect for less than three weeks, a comprehensive analysis of each provision of the Action Plan is premature. Instead, the goal of this report is to provide an update on the conditions that gave rise to the Action Plan and the Third Remedial Order. These conditions include Department leadership, staff absenteeism, the use of force and level of violence, and the current status of several jails where dangerous conditions warrant heightened scrutiny. The final section of this report discusses the Department's recent efforts to process the staff disciplinary backlog.

In addition, an Appendix to this report provides trend data on key outcomes over the prior six years, 2016 through 2021. These data illustrate the conditions at the time the Consent Judgment went into effect through the apex of the current crisis. This data provides a useful context for the more recent qualitative and quantitative data that is discussed throughout the narrative section of this report.

**Action Plan**

The Action Plan is a roadmap for addressing the foundational issues inhibiting the Department's progress towards implementing the provisions of the Consent Judgment and subsequent Remedial Orders. While the Action Plan represents a feasible path forward, its viability will depend on the Department's faithful implementation and enduring commitment. The conditions in this Department are the byproduct of decades of mismanagement and complex bureaucratic structures that often work at cross-purposes, all of which are worsened by a culture of brutality and impunity. For this reason, the Action Plan constitutes an extraordinary undertaking that will require a significant investment of time and resources to implement in order to build the foundations necessary to transform this agency. The difficulty in addressing these complex issues is compounded by the fact that the Department is under significant scrutiny, via regulation and advocacy across all sectors from internal stakeholders (*e.g.,* staff representatives), federal, state and local policymakers, multiple oversight bodies, advocates for the incarcerated population, and multiple legal proceedings, including this matter. Further, the agency must comply with myriad federal, state, and local regulations. This sea of adamant and sometimes divergent positions can be difficult to navigate. This is one of the many reasons the Monitoring Team has emphasized the fact that implementation of the Action Plan will inevitably meet obstacles. These often divergent pressures impact the City's and Department's decision-making and focus, and will need to be addressed head-on as they implement the Action Plan.

The City and Department continue to contend that the ability to properly implement the Action Plan is entirely within the powers of the Commissioner and Mayor. This means that the City and Department will undoubtedly need to make difficult decisions that may not be politically beneficial, and the City and Department will need to act with clarity, consistency, and

decisiveness to implement the Action Plan. As discussed later in this report, the City and

Department are already confronting challenges that will test the City's and Department's resolve.

Consequentially, the assertion that the implementation of the Action Plan is within the City's and

Department's power and authority must be followed by a commitment of the necessary

resources, rather than claims of insufficient resources or using the fact that certain positions are

vacant to excuse or justify a lack of action.

This is not to say that everything in the Action Plan can or must happen at once. **The

initiatives in the Action Plan must be appropriately synchronized and prioritized to bring

stability to the agency. In other words, certain initiatives (especially those outside the scope

of the Action Plan) should not be attempted until stability has been achieved.** In fact,

rushing to implement certain initiatives or attempting to do all things at once may have the

unintended consequence of creating an even more dangerous and unsafe system. The guiding

principle during this time must be to appropriately select the key initiatives most likely to bring

about safety in the short term, guided *exclusively* by sound correctional practice. Additionally,

external and internal stakeholders alike must be laser focused on alleviating problems and

removing structural barriers, key among them to process people's court cases more quickly so

they do not continue to languish in the dangerous environment of the jails.

The Action Plan addresses six substantive sections:

- **Section A: Initiatives to Address the Immediate Risk of Harm**. This section includes

  initiatives that must be undertaken immediately to address the imminent risks of serious

  harm to people in custody and DOC staff, to revamp the Department's leadership

  structure, to improve the supervision of Department staff at all levels, and to improve

  staff utilization in the short term (both by returning staff to work and by prioritizing

3

assignments to the housing units). It also includes several precursors that must be accomplished before the full implementation of certain initiatives can begin in earnest.

- **Section B: Citywide Initiatives to Support Reform**. This section includes initiatives to ensure that the City brings all its resources to bear and removes potential bureaucratic obstacles. This includes strategies to improve the functioning of certain aspects of adjacent City agencies—such as those involved in recruiting for particular positions, hiring practice and expediting case processing—that directly impact the Department's ability to reform its practices. It also includes leveraging the City's authority to encourage expedited case processing to prevent so many people from languishing in the jails waiting for their cases to be disposed.

- **Section C: Staffing Practices**. This section requires the Department to appoint a Staffing Manager who will guide the Department's efforts to develop and implement a staff management system that maximizes staff availability and proper deployment in the long-term so that the Department can effectively facilitate the assignment of staff to housing units and develop a dependable, available workforce. The Department is also working to create an electronic system to track staff assignments and their status (*e.g.*, vacation time, sick leave, etc.). The Department is actively recruiting for the Staffing Manager position.

- **Section D**: **Security Practices**. This section requires the Department to retain a Security Operations Manager who must direct a variety of security initiatives that correct long-standing deficiencies in the approach to securing facility spaces and responding to incidents. The Security Operations Manager has been retained and began working in May 2022.

- **Section E: Managing People in Custody**. This section includes the appointment of a Classification Manager who will support the Department's efforts to develop and implement initiatives to properly classify incarcerated persons according to their risk of institutional misconduct, to broadly disperse Security Risk Group ("SRG") affiliates among the housing units to disrupt their concentration of power, to decrease intake processing time, and to effectively manage those who engage in serious violence while in custody. The Classification Manager has been selected and is scheduled to begin working with the Department in July 2022.

- **Section F: Staff Accountability**. This section requires additional resources for the Trials Division, expeditious resolution of cases involving egregious misconduct, a reduction in the disciplinary backlog, and efforts to streamline the OATH process. It also includes requirements to revise Command Discipline procedures and to impose discipline for those who abuse the Department's policies regarding various types of leave and restricted duty.

The Action Plan also includes a section that discusses the Monitoring Team's reporting schedule, the reports' content, and compliance assessments (Section G: Assessment of Compliance and Reporting in 2022), which is discussed briefly in the Conclusion of this report.

<u>**Current State of Affairs**</u>

The Monitoring Team has provided numerous and extensive reports to the Court on the conditions since Summer 2021, including a number of reports in the last few months. Given the limited time between reports, the conditions have remained relatively the same. As a result, this section provides a few updates, but is mainly focused on providing a baseline against which the work of the Action Plan can be measured.

- *Citywide Rikers Task Force*

The Action Plan requires the City to take all appropriate action to support the Department's reform effort. The goal is to ensure that there is sufficient communication across city agencies and to eliminate potential obstacles to implementing the requirements of the Action Plan. Toward that end, the City convened a Task Force comprised of representatives from key City agencies. The Task Force is co-chaired by Chief Counsel to the Mayor Brendan McGuire and Deputy Mayor Philip Banks, and members include representatives from the Department of Correction, the City's Law Department, the Mayor's Office of Criminal Justice, Correctional Health Services, Mayors Office of Contract Services City's Department of Citywide Administrative Services, the Office of Labor Relations, the Office of Management and Budget, the Department of Design and Construction.[1] The City notes that the Task Force may add other relevant agencies to the Task Force as is necessary depending on the issues being addressed. The member agencies support the Department's budget and funding, physical plant and any corresponding repairs, accountability process for staff and incarcerated individuals, and labor issues. Since May 9, 2022, the Task Force has met weekly, with additional meetings of various stakeholders occurring as necessary between meetings. The City reports that the Task Force addresses issues raised by the member agencies and by the Monitoring Team, including obtaining additional funding, expedited vetting and appointments, union issues, obtaining trials attorneys for the Department, and any other issue that is appropriate for the Task Force to address given its mandate. The Monitoring Team recently referred a few issues for the Task Force's consideration. Its effectiveness as a problem-solving resource on these and other issues will be discussed in subsequent Monitor's Reports.

---

[1] The City reports that the Task Force also liaise with the Office of Administrative Trials & Hearings

-   ***Department Leadership***

The Commissioner is in the process of making some significant changes to the agency's leadership, removing the uniformed Chiefs, and replacing them with civilian leaders. These changes were made to address the Monitoring Team's long-standing recommendation that the Department must complement its current workforce with individuals with correctional expertise from outside of the agency in order to infuse and support correctional best practice. The current system is insular, which makes the adoption of new ways to solve old problems difficult for uniformed leadership to conceptualize and attain. Poor practice has become so ingrained and so few in the Department have had the benefit of exposure to other correctional systems that changing the uniformed leadership's mindset for developing and adopting new ideas grounded in sound correctional practice has been a constant struggle.

The new leadership structure (shown in the graphic below) is similar to the structure of the uniformed Chiefs in some ways, but the key difference is the use of civilians in these posts who have correctional expertise and insight via their work in other jurisdictions.[2]

---

[2] As required by the Action Plan, the Commanding Officer of the Health Management Division now reports to the First Deputy Commissioner.



While this new leadership structure may be beneficial in many ways and deploying this type of creativity to address a specific constellation of problems is encouraging, it does not address the current restrictions on who may serve in the position of Warden, which is limited to the current uniform ranks. Thus, these steps may be insufficient to catalyze the deep injection of new ideas about both practice and culture that are sorely needed *within* the facilities to provide day-to-day support to improve operations.

The Commissioner has begun to identify and hire leaders to fill the roles discussed above as well as other critical positions in the last few months. The Commissioner has appointed the Deputy Commissioner of Security, the Deputy Commissioner of ID, the Deputy Commissioner

of Trials & Litigation, and the Assistant Commissioner of the Applicant Investigation Unit. The Commissioner reports that he has selected a Deputy Commissioner of Classification, Custody Management, and Facility Operations who is scheduled to begin work in Summer 2022. The Commissioner has consulted with the Monitoring Team on candidates for the role of the Deputy Commissioner of Administration, but an individual for the position had not been selected at the time this report was drafted. The Department is also actively recruiting for at least two Associate Commissioners of Operations, as well as a number of Assistant Commissioners of Operations who will be assigned to each facility and report to one of the two Associate Commissioners of Operations.

- ***Staff Management and Deployment***

One of the many underlying causes of the Department's problems regarding violence and lack of access to mandated services is its mismanagement of uniform staff, including infrastructure (*i.e.*, rosters, tracking), absenteeism, deployment, and lack of supervision. Staffing data from 2020 to June 2022 provides useful comparisons for understanding the size of the Department's workforce and the extent to which they are available to work. The chart below shows that the total headcount of uniform staff decreased approximately 20% from 2020 to 2022 (n=9302 to n=7405).

In addition, data on staff absenteeism illustrates one way in which the decrease in total headcount is compounded by decreases in the number of staff who are actually available to work. The number of staff who were not available to work due to being out sick comprised an increasingly larger proportion from 2020 to 2022. As shown in the chart below, in 2020, an average of 11.5% of staff were out sick on any given day, compared to 2021 when an average of 17.7% were out sick, and during the first six months of 2022 when an average of 18.3% were out

9

sick. In other words, the proportion of staff who were out sick on any given day increased 59% between 2020 and 2022, at the same time as the total headcount decreased.[3] The proportion of staff out sick at the Department also far outpaces adjacent City agencies that have similar sick leave policies. The NYC Comptroller's FY 2023 report noted that the proportion of DOC staff out sick/line-of-duty injury absences "far surpassed" that of FDNY and NYPD, which have the same generous sick leave policies as the Department.[4]



The 2022 average number of staff out sick, however, obscures some important decreases that occurred since the current Commissioner began his tenure. In January 2022, an average of 2,005 staff (26% of total headcount) were out sick on any given day, compared to an average of 963 (13.5% of total headcount) in June 2022—a reduction of approximately 50%. Overall, tangible progress in reducing the number/proportion of staff out sick has occurred in 2022. The

---

[3] Detailed data on Staff Absenteeism is provided in the Appendix to this report.

[4] New York City Comptroller, Bureau of Budget (2022). *Agency Watch List: Department of Correction (DOC)*. Available at: https://comptroller.nyc.gov/wp-content/uploads/documents/Agency_Watch_List_DOC_FY2023.pdf .

Department reports that this is the result of several initiatives developed over the last few months, including the following steps:

- Revisions to the *Home Confinement Visit* policy and *Suspension* policy. The *Home Confinement Visit* policy was revised to make the process for home visits more reasonable and efficient by reducing the burden on investigators. The revisions reduced the number of door knocks and phone call rings that must be completed in order to ascertain if an individual who is out sick is at their home.

- The Health Management Division has new leadership that reports to the First Deputy Commissioner.

- The number of available doctor's appointments for staff who are out sick have increased.

- Suspensions for violations of the *Home Confinement Visit* policy have increased. During the first five months of 2022, a total of 114 staff were suspended for violating the *Home Confinement Visit* policy, compared to 148 staff suspended during the entire year in 2021.

- Since January 1, 2022, the Trials Division has opened 298 medical incompetence cases[5] (compared with 160 brought during the entire year in 2021) and 55 medical separation[6] cases.

  While this progress is notable, more work remains. For example, the Department continues to be unable to cleanly identify staff who are not available to work for reasons other

---

[5] These are cases when a staff member is unable to perform the full duties of their position as demonstrated by their excessive use of sick leave absences either by: (a) reporting sick 40 or more work days within a 12 month period or (b) reporting sick on 15 or more occasions within a 12 month period.

[6] Medical separation cases are non-disciplinary actions and are based on New York Civil Service Law Sections 71-73. Staff may be medically separated when the staff member has been out sick continuously or unable to work full duty for a set period of time depending on the nature of the condition or illness (*e.g.* work-related or non-work related).

than being out on sick leave. Data regarding staff on medically monitored/restricted duty ("MMR") is not deduplicated (meaning that the same staff person may also be counted as "out sick") and does not distinguish between staff on MMR who do not report to work and those who do but are not permitted to work directly with people in custody. While MMR data thus cannot be presented alongside the data on staff out sick, it does indicate that the number of staff unavailable to work on any given day is even *higher* than what is shown in the chart above. This is one of the many reasons that the Action Plan requires the Department to develop a reliable process and mechanism to track staff statuses and assignments and, most importantly, through policy revision and better enforcement, to increase the number and proportion of staff who are available to work each day. The Department reports it has identified three potential vendors to develop a new staff tracking system and the vendor will be selected within the next two months. If the Department can continue the current trajectory of reducing the number of staff out sick, the current shortage of staff available to work in the housing units would likely be alleviated.

Another element of appropriate staff management is to ensure staff are properly supervised. Historically, the jails have not had enough supervisors to provide the intensity of guidance needed to transform staff practice in the manner required by the Consent Judgment. Furthermore, the few supervisors who were assigned to the jails were not particularly active in their efforts to coach staff, and were responsible for such a large number of units that the time and attention needed for proper supervision was simply not available. Over the years, the Department has created more ADW positions, and has made changes to the way in which Captains are deployed as well as to their job expectations. Most recently, 18 Captains who had been temporarily assigned elsewhere (*e.g.*, the Academy) were returned to their parent jails so

that they can now contribute to the effort to increase staff supervision and support in the facilities.

- ***Current State of Use of Force and Violence***

The Department has not made any progress toward the overall goal of reducing the use of force and violence since the Consent Judgment went into effect in late 2015—in fact, the opposite has occurred. The overarching goal of the Consent Judgment was to improve upon the conditions of confinement and level of facility safety that existed *at that time*. Data on key outcome indicators for January-April 2022 show notable decreases from the apex of the crisis in 2021, but these outcomes remain at a level *significantly worse* than those observed in 2016 when the Consent Judgment went into effect. Specifically:

- The January to April 2022 average monthly use of force rate was 9.23, compared to 12.23 in 2021, and 3.96 in 2016. In other words, 2022 data represents a laudable 25% reduction in the rate of use of force from 2021, although the 2022 use of force rate is 2.3 times higher than the rate that gave rise to the Consent Judgment.

    o The raw number of uses of force also remains high, particularly when compared to other jurisdictions. For example, the Department had 426 uses of force in January 2022, while the LA County Jail *for a three-month* period in 2021 had a total of 450 incidents, with a much larger average detainee population of 14,886.

- In January to April 2022, there were 189 stabbings and slashings, compared to 100 during the first four months of 2021, and 48 during the first four months of 2016. In other words, the number of stabbings and slashings has continued to increase into 2022 and is approximately 4 times higher than the number that gave rise to the Consent Judgment.

13

- In January to May 2022, the Department seized 2,790 weapons by increasing the frequency and effectiveness of searches. This represents a 186% increase from the 973 weapons seized from Jan-May 2021. The rise in stabbings/slashings in 2022 has been attributed to the availability of weapons, and thus recent efforts to locate and confiscate them is an important aspect of the Department's efforts to improve safety.

- In January to April 2022, the average monthly rate of fights was 7.33, compared to 9.32 in 2021, and 5.11 in 2016. In other words, 2022 data represent a critical 21% decrease from 2021, although the 2022 rate of fights is 1.4 times higher than the rate that gave rise to the Consent Judgment.

- In January to April 2022, there were 265 assaults on staff, compared to 351 during the first four months of 2021, and 267 during the first four months of 2016.[7] In other words, assaults on staff were reduced by 25% from their high point in 2021, but remain at virtually the same level as that which gave rise to the Consent Judgment.

Thus, it is true that in recent months the Department has made important progress toward reducing the level of violence in the jails compared to the conditions that existed in 2021. However, the sufficiency of the current outcomes must be measured against those that existed at the time the Consent Judgment went into effect in late 2015 in order to assess whether the Department is meeting its obligations under the Consent Judgment and Remedial Orders.

These quantitative metrics are best understood in combination with qualitative information gleaned from the Monitoring Team's comprehensive review of use of force reports and videotaped footage. Serious incidents of unnecessary and excessive force are continuing

---

[7] This reports only assaults on staff *with force*, since the Department did not maintain data on assaults on staff *without force* in 2016.

apace and consistent with the Monitoring Team's prior findings discussed in previous Monitor's Reports. Noteworthy trends evident in the incidents occurring between January to May 2022 include:

- Too frequent use of head strikes, including head strikes on restrained individuals;
- Violent tactics such as wall slams, dangerous takedowns and neck restraints;
- Delayed medical attention after a use of force; and
- Unprofessional conduct associated with unnecessary and excessive force incidents, including by Emergency Services Unit ("ESU") Team Members.

An equally disturbing pattern directly related to both the sheer number of incidents and the frequency of use of force violations is the very high incidence of force associated with security lapses, *i.e.*, avoidable incidents of force. In May 2022, the close-in-time reviews of use of force incidents conducted by facility leadership (known as "Rapid Reviews") identified an astonishing number of avoidable incidents with an equally astonishing array of security lapses. For example, a typical scenario is people in custody being left unsupervised with an officer off post and in unsecured cells. An assault on a person in custody ensues, prompting officers and tactical teams to intervene by using force. Quite often such force involves multiple people in custody with multiple officers utilizing all manner of tactical equipment such as OC canisters, tasers, batons, chemical agent grenades, etc. In other instances, officers are slow to intervene. In some instances, officers have means of egress to summon supervisors but fail to do so and immediately resort to using force. The following list of security lapses identified in May 2022 is typical of what is seen every month:

- Incarcerated individuals left to loiter in a vestibule
- Failure to intervene in a timely manner
- Unsecured pantry door
- Failure to lock-in people in custody

- Unsecured food slots
- Improper restraints
- Supervisor leaving the scene
- Unsecured people in custody
- Unsecured cell doors
- Failure to de-escalate
- Officer off post
- Failure to summon supervisor
- Undue escalation of incident
- Failure to secure A-Station (in one of these incidents, an incarcerated individual was left in the A-Station for 18 minutes)
- Unprofessional/provocative conduct including use of racial epithets
- Using OC on passive people in custody
- Unsecured dayroom door
- Unsecured housing door
- Unsecured cross gate
- Unsecured equipment

The Nunez Compliance Unit began conducting security audits of random housing units across the Department in December 2021 to assess current practices and identify any security failures that can lead to use of force or violence. In over half of these audits, NCU found either staff off post, cell doors unsecured or manipulated, or institutional lock-in not enforced. Further, nearly half of the audits found that staff conducted inadequate tours of the housing units or were not touring at all. A third of the audits found issues with people in custody in unauthorized areas. These findings echoed the findings of facility leadership in their Rapid Reviews of use of force incidents. For instance, Rapid Reviews at AMKC from December 2021 through April 2022 found that a security lapse was associated with nearly one in three use of force incidents. Further, stabbings and slashings frequently were associated with some type of security breach. Fights and

assaults, which typically lead to staff using force, were likewise associated with security lapses such as unsecured cell doors that provided access to the victim by his assailant(s). **It cannot be emphasized enough that fewer security lapses will result in fewer incidents of force which in turn will reduce the opportunities for staff to involve themselves in the misuse of force**. This is why routine touring of the housing units and improved supervision is so critical. To that end, in June 2022, the Department has reinstated the use of the tour wand. The tour wand is a device that staff must tap against an electronic sensor positioned in critical spots in the housing unit to ensure that staff physically walked around the housing unit. The electronic records permit an audit of whether these tours occur as required.

While these problems are likely exacerbated by the staffing issues that continue to plague the jails, they also reveal that a culture of violence, an overreliance on using force to gain compliance or address issues, and the potential for that force to be excessive, all continue, unabated.

- *Facility Updates*

In addition to assessing the various global measures needed to improve the Department's overall functioning, the Monitoring Team is also keeping close tabs on certain protocols and facility-specific plans to increase safety. The Monitoring Team continues to assess strategies to ensure people do not languish in intake, along with efforts to better manage the aftermath of violent incidents (*i.e.*, Post-Incident Management). Notably, in the last few weeks, OBCC was depopulated and no longer houses incarcerated individuals so that its staff resources could be redeployed to other jails. The Monitoring Team has closely scrutinized both RNDC and GRVC because these two jails have particularly high rates of both use of force and violence, and each facility houses a special population (*i.e.*, RNDC houses about 75% of the Department's younger

people in custody and GRVC houses most of the individuals in restricted housing). Dynamics at each facility are discussed in detail below.

       o  *RNDC*

In February 2022, the Commissioner initiated a violence reduction plan at RNDC, which includes enhancements to staffing by redeploying staff from the front gate to support the B-officers on the housing units with highest rates of violence, and by deploying Special Response Teams ("SRT") and ESU teams to increase the frequency of searches for contraband and routine facility patrols to ensure people in custody are properly secured during lock-in times. This supplemental staffing has reportedly increased staff's perceptions of safety and increased the volume of dangerous contraband (weapons and drugs) that has been confiscated. Further, the SRG-balancing strategy remains fully implemented and has received constant oversight and collaboration between Custody Management Unit ("CMU") and RNDC leadership. Finally, a total of 525 new cell doors have been installed at RNDC since 2019, this includes 175 doors that have been installed this year. Another 25 doors are scheduled to be installed by the end of this summer. These are all essential security upgrades and improvements.

In addition, the Programs Division has taken important steps to improve the delivery of programming at RNDC by assigning Program Counselors to each housing unit (although several vacancies remain), posting a daily schedule on each unit, and implementing a quality assurance strategy to ensure that Program staff are delivering the required programming. Programs Division leaders are also coaching Program Counselors to teach the soft skills necessary to convene groups effectively and are encouraging Program Counselors to see themselves as key actors in the effort to de-escalate tension and reduce violence on the units. Programs leadership

has reported that recently, scheduled programming by both Programs staff and community-based vendors has been disrupted less often.

These actions appear to have contributed to a recent reduction in stabbings/slashings and the use of force rate, although whether this is an anomaly or the start of an enduring trend is unknown at this time. During 2022, RNDC had 12 stabbings/slashings in January, 13 in February, 24 in March, and 13 in April—followed by 5 in the month of May and 3 as of June 29, 2022. RNDC's use of force rate has also recently decreased. The use of force rate for May 2022 was 15.09, compared to 16.08 in 2021 and 20.51 in 2020. Facility leadership and line staff have recently reported that facility operations (*e.g.,* movement to meals, religious services, and access to other mandated service) have noticeably improved and so the facility is not as chaotic, particularly with the supplemental staff in place. This sentiment is shared by the Monitoring Team members who have spent time on site each month. In the Monitoring Team's experience, this change in tenor at a facility will often precede the desired changes in quantifiable outcomes and may prove to be notable precursors of improved safety at RNDC.

The Monitoring Team has long been concerned about deficiencies in practice to safely manage the aftermath of serious, violent incidents (*i.e.*, stabbings/slashings) at RNDC. To address these concerns, procedures were developed and codified in an RNDC Command Level Order (CLO") which has four key components: (1) Isolate the perpetrators of acts of violence as quickly as possible in secured cells or designated pens; (2) Limit the potential to exchange or abandon contraband; (3) Search the scene and body scan individuals as soon as possible after an incident; and (4) Transfer individuals involved to more secure locations consistent with their behavior, after receiving proper authorization.

NCU audits a sample of stabbing/slashing incidents at RNDC each month to assess compliance with the CLO, using Genetec footage, any investigation done by the Investigation Division, and consultation with others where appropriate. Between January and April 2022, NCU audited 21 of the 62 (34%) stabbings/slashings that occurred at RNDC. Overall, these audits revealed very poor compliance with the CLO's requirements—none of the incidents met all four components. While some improvements were noted in searching locations, the use of the body scanner, and the attempt to rehouse individuals, nearly all of the audits revealed poor security practices (*e.g.,* failure to isolate, allowing perpetrators to roam freely about intake or their housing unit, leaving cell doors unsecured, etc.) and a clear lack of attention to the CLO's requirements which were designed to keep staff and incarcerated individuals safe. Without strict adherence to the requirements of the CLO, the potential for additional harm, retaliation, exchange of weapons, and a blatant lack of accountability for violent conduct remains.

- o *GRVC*

In the early part of 2022, the use of force rate at GRVC decreased compared to prior years (16.2 in 2020, 15.2 in 2021 and 12.7 in Jan-Apr 2022). However, in May and June 2022, use of force and violence increased sharply at GRVC, resulting in the Commissioner directing an expansion of several of the strategies used at RNDC. In particular, beginning June 20, 2022, SRT units were deployed to GRVC to increase the frequency and thoroughness of searches for contraband (weapons and drugs, in particular). The need for these steps was only heightened by an in-custody death by a suspected overdose at GRVC on Sunday, June 19, 2022. In addition, although SRG-blending had been partially accomplished several months ago, the full implementation of this strategy only began in earnest in early June 2022. As at RNDC, the initial blending and on-going rebalancing will require constant oversight from CMU and daily

collaboration with GRVC leadership. Not only does the initial effort to blend the units typically trigger an uptick in violence, but the constant flow of people being admitted to and discharged from the facility means that proportions of affiliates from any one SRG on a housing unit quickly fall out of balance. Furthermore, CMU's housing unit assignments must be informed by on-the-ground intelligence about alliances and interpersonal conflicts from GRVC staff members, and thus constant supervision and communication by staff are essential.

GRVC houses a large proportion of the Department's restrictive housing, Enhanced Supervision Housing (ESH). Several internal and external stakeholders reported that core elements of the ESH model were not being properly implemented. Most concerning, people in ESH were spending nearly the entire day locked in their cells because procedures to afford an opportunity for lock-out and protocols to ensure safety in the common areas were not being followed. An ESH unit for younger people was operating so poorly that the Commissioner closed the unit and transferred the individuals to RNDC where the staffing complement and operational support has been supplemented as described above. A new Deputy Warden was selected to lead the ESH program, and greater scrutiny from Department leadership is being applied. The Department's future plans for ESH are constantly evolving and a broader plan for how to proceed with restrictive housing is currently underway (as discussed further below). Regardless of what housing model is used going forward, the Monitoring Team encourages the Department to develop detailed insight into the reasons for and mechanisms by which lock-out procedures failed so that this understanding may guide the implementation of other restrictive housing strategies to guard against similar failures.

- ***Responding to Serious Acts of Violence***

One of the essential elements of a safe facility is a structure for promptly and effectively responding to serious acts of violence. This structure is *even more* critical for this Department given the rampant violence. An effective strategy to respond to people in custody who commit serious violence enhances the safety of both people in the general population and staff, who are thereby protected from potential assailants. An effective strategy also holds perpetrators of violent misconduct accountable, which, when done correctly, can reduce the likelihood of subsequent violent misconduct. It is for these reasons that the Action Plan requires that "the Department, in consultation with the Monitor, must develop a housing and management strategy that will safely and adequately manage those incarcerated individuals that have engaged in serious acts of violence and pose a heightened security risk to the safety of other incarcerated individuals and staff" (§ E., ¶ 4). To address this requirement, the Department has opted to implement the Risk Management and Accountability System ("RMAS"), pursuant to the Board of Correction minimum standards, and has reported the program will be implemented by July 1, 2022.[8] The Monitoring Team's collective 100 years of experience in correctional management, expertise in the development of credible programs serving as alternatives to punitive segregation, and deep knowledge of this Department has led to a consensus that proceeding with RMAS to address this requirement is not prudent and poses significant safety concerns. Accordingly, the Monitoring Team does not, at this juncture, approve the Department's proposal that the

---

[8] RMAS was developed collaboratively by a previous Department administration and the Board of Corrections and was codified in the BOC's Restrictive Housing Final Rule on June 8, 2021. Implementation of this program has been delayed by both the prior and current administrations. The RMAS rules can be found at:
https://www1.nyc.gov/assets/boc/downloads/pdf/Meetings/2021/June/6.8%20RULE%20AND%20SBP%20FOR%20PUBLICATION%20%20for%20CITY%20RECORD.pdf

implementation of RMAS will satisfy this requirement of the Action Plan for the reasons outlined below.

- **The Department is not ready to adequately implement RMAS, which is a complicated, staff-intensive program model**.

  - *Implementation on a single day*. A complex program like RMAS is best implemented incrementally, with housing units brought on line over a period of time. Attempting to implement the entire RMAS program—which will encompass many separate housing units—on a single day is not a viable strategy. The Monitoring Team's experience in several jurisdictions suggests that such an approach is rife with danger.

  - *Staffing*. The group of individuals targeted by this provision includes some of the most challenging individuals in the agency who have complex needs and often dangerous interpersonal dynamics. For this reason, an adequate number of staff who are steadily assigned, carefully selected, and thoroughly trained are necessary to safely manage the population. While the Monitoring Team understands that some training has occurred over the last six months, the Department's current staffing problems (discussed in detail earlier in this report) calls into question whether it has the necessary resources to appropriately and adequately manage these units.

  - *Leadership*. As observed in the Department's other attempts to implement restricted housing programs as alternatives to Punitive Segregation, program leadership matters a great deal. While the Department reports that the Deputy Warden over RMAS was carefully vetted and is enthusiastic

about the assignment, the individuals selected to fill the key roles of ADW and Captain are equally important. Given the historical deficiencies in supervision, steps must be taken to ensure that the individuals who are selected to supervise can, in fact, adequately supervise. These individuals are critical to ensuring the program consistently operates according to design.

- o *Core Skills*. The Department has long struggled to provide the type of proactive supervision, adherence to security protocols and de-escalation skills required to safely operate housing units with large concentrations of individuals with known propensities for serious violence. Further, in other restricted housing programs, the Department was unable to develop Behavior Support Plans that were relevant to the task. As discussed in more detail below, given the particular design of RMAS, these skills are particularly critical.

- **The RMAS design appears to be unlikely to deliver on the core tenets of an effective model of restricted housing**—to hold people **accountable** for violent misconduct in a **safe** and **effective** manner.

  - o *Idle Time*. In the post-solitary confinement era, programs for people with a known propensity for violence create safety through structure and a robust array of engaging activities. In contrast, the RMAS model provides for only 5 hours of programming per day and does not require people to participate in those programs or incentivize program engagement in any way. As a result, people in RMAS will have an abundance (5-10 hours per

24

day) of unstructured free time which is a well-known precursor to violence.

o *Unit Size and Staff Ratio*. The RMAS model prescribes maximum unit sizes of 12 in Level 1 and 20 in Level 2. The Department has reported that everyone will be offered lock-out during the same time periods, which means there will be a large number of individuals in the common areas at any given time. While the prescribed staffing complement of 5 floor officers is richer than in the General Population housing units, the Monitoring Team has grave concerns about its sufficiency, particularly given the lack of structured activities as described above.

o *Behavior Change*. The RMAS model requires the creation of Individualized Behavior Support Plans, but has no nexus to how the plans will drive behavior change because program engagement ***is not required*** for level progression. Furthermore, the expected length of stay of 28 days is not sufficient for the type of behavior change envisioned by the program model. As a result, the RMAS model creates the potential for an individual to refuse all programming, exit RMAS in 28 days, and return to the general population in much the same condition/mindset as when they entered RMAS. Even if one disregards the behavior change ambition, which isn't advisable, the model's current configuration is unlikely to be compelling from a deterrence perspective either. The program model appears to want to change behavior and/or deter future misconduct, but the model appears inadequate to accomplish either objective.

For the past six years, the Monitoring Team has observed a pattern of hasty, ill-planned implementation of these types of critical programs. Inevitably the program fails because the time needed to develop a strong foundation was short circuited (*e.g.,* staff selection and training), in combination with poor fidelity to design. The Department must adopt lessons learned from previous attempts to address serious misconduct and develop both a credible program model and invest the time necessary to select, train, guide, and coach staff. The City's and Department's efforts to eliminate the use of solitary confinement as a disciplinary strategy are important and necessary, but the inability to identify and implement a viable program to fill the void of the elimination of solitary confinement is not only frustrating, but of serious concern. However, implementing a flawed program model at this juncture, and one that appears destined to fail, is not only unsafe, but also a waste of the Department's limited and critical resources.

It is for these reasons that the Monitoring Team recommends that the Department retain a consultant with the requisite expertise to support the creation of a program model to address this requirement of the Action Plan. The program model must provide the necessary structure and security on the housing units and an implementation plan that avoids the pitfalls of the past. The Department has retained Dr. James Austin, a renowned corrections expert, to support its work under the Second Remedial Order and who is well positioned to support the Department on the creation of a program model to ensure that the Action Plan's requirement is met and that the model avoids the harms associated with prolonged periods of isolation. The Monitoring Team intends to work closely with the Department and Dr. Austin on the development of a program that can ultimately be approved by the Monitor.

The particular contours of this issue illustrates the difficult work and complicated conflicts that have and will arise in advancing reform and implementing the Action Plan. For

over a year, the Monitoring Team has explained the concerns outlined above to top executives in both the prior and current administrations of the Department and the City. While administrators may have shared some or all of these concerns, our feedback and the issues we have repeatedly raised remain unaddressed and unresolved. Ultimately, the City and Department must decide how this requirement will be addressed which will speak volumes about how they intend to prioritize and focus the work going forward. This may be the first hurdle encountered when implementing the Action Plan, but it surely will not be the last. The City and Department must position themselves to move forward with the necessary diligence, determination and focus needed to work through these complicated issues.

**Staff Discipline for Use of Force Related Misconduct**

One of the managerial necessities required for the type of culture change the Department must achieve to reach the overarching goals of the Consent Judgment is timely and proportional discipline for use of force related misconduct. To date, the process for imposing discipline remains starkly protracted which not only creates a culture of impunity where staff rarely face consequences for actions that violate policy, but also allows those actors to continue their behavior unchecked and without appropriate guidance. The focus of this discussion is limited to use of force related misconduct, although it should be noted that timely and proportional discipline for other types of misconduct (*e.g.,* abuse of sick leave) is also important in order for the Department to meet its obligations under the Action Plan.

Understanding the current status of the disciplinary process requires some background and context. Three core components of the Consent Judgement were to revise the Use of Force Policy, develop Disciplinary Guidelines, and improve the level of scrutiny applied to use of force incidents. As the Department worked to implement the investigation requirements of the Consent

27

Judgment, it became clear that the process initially conceived was not operationally feasible. First, use of force investigations conducted at the facilities were not reliable and too often failed to detect misconduct even when there were obvious indications present.[9] Further, the Consent Judgment's original concept for investigations by the Investigations Division ("ID") was inefficient and did not provide the necessary flexibility to apply different levels of scrutiny depending on the facts of the case. As a result, ID became overwhelmed by the volume of cases requiring investigation and a huge backlog of cases accumulated. ID's inability to handle this volume of work resulted in the expiration of the statute of limitations on thousands of cases, and the difficult option not to pursue charges in certain cases in an effort to eliminate the backlog. Over time, ID eventually cleared the backlog of cases requiring investigation (*see* Tenth Monitor's Report at pgs. 134-140 for a description of how that came about) and implemented a more streamlined process for conducting investigations going forward. This background is relevant to the discussion of staff discipline because as the backlog of investigations was cleared, a portion of that backlog moved to the Trials Division. Notably, the Trials backlog excludes cases that–even though misconduct was sustained–were lost to the statute of limitations or were not fully addressed as part of the strategy to resolve the ID backlog.

Clearly, there have been many roadblocks to the timely *identification and investigation* of staff misconduct that have significantly protracted the process of staff discipline, delays which are being further compounded by the Trials backlog. Collectively, the effort to achieve timely accountability is an example of the complicated nature of institutional reform and what must

---

[9] Facility leadership now conduct an initial assessment of every use of force incident via "Rapid Reviews" to identify whether any misconduct occurred that requires immediate disciplinary action or other protective measures. Even after several years, the quality of the facilities' Rapid Reviews still requires improvement, though they are more reliable than when the process began.

occur to unpack and disentangle various processes and procedures. Improving staff accountability has been a focus for years, and the various problems and delays encountered while trying to do so ultimately culminated in the Third Remedial Order entered by the Court in November 2021. The Third Remedial Order was designed to address the delays and deficiencies in the staff disciplinary system which were necessary to address the Department's sustained Non-Compliance with implementing Appropriate and Meaningful Staff Discipline (Consent Judgment Section VIII, ¶ 1), Non-Compliance with the Trials Division staffing requirements (Consent Judgment Section VIII, ¶ 4), and resolve the disciplinary case backlog. The Third Remedial Order has five distinct sections, including requirements to: address the backlog of disciplinary cases involving use of force violations (¶ 1), increase the number of OATH Pre-Trial Conferences (¶ 2) and develop new OATH procedures and protocols (¶ 3), increase staffing for the Department's Trials Division (¶ 4), and appoint a Disciplinary Manager (¶ 5).

As part of the requirements to address the overall backlog of use of force related disciplinary cases (¶ 1 of the Third Remedial Order), the Department was required to identify, in consultation with the Monitoring Team, a group of 400 cases that should be prioritized for closure by April 30, 2022 ("Priority Backlog Disciplinary Cases"). This provision also required the Monitoring Team to provide this report, by June 30, 2022, which assesses the Department's efforts to resolve the Priority Backlog Disciplinary Cases, and the recommended steps to be taken (including relevant timeframes) to resolve any backlog that remains.

- ***Status of DOC's Efforts to Address the Backlog***

Until it is resolved, the Trials backlog perpetuates the pattern of failing to impose timely staff accountability and undercuts the effort to change the Department's culture and history of harmful practices. Misconduct dating back years remains unaddressed, sending a troubling

message to both the staff who engaged in misconduct as well as those who suffered from it. The extraordinary number of cases that the Trials Division is currently struggling to process is just that—*extra* ordinary. Once the backlog has been addressed, the volume of cases will be nowhere near current levels and thus the system will be under considerably less strain. The Trials Division has made efforts over the last two years to create efficiencies to manage the increasing backlog, but the backlog also has the unfortunate side effect of obscuring the baseline functioning of the Trials Division, making it difficult to identify procedures and protocols that should be further adjusted for greater efficiency. It is for these reasons that the backlog must be addressed as soon as possible so that the Trials Division can begin to function in a normalized way.

As of May 2022, over 1,500 cases with a sustained investigation of staff's misuse of force are pending in the Trials Division. These cases are a combination of very old cases, with misconduct occurring December 31, 2020, or earlier (*i.e.*, "the backlog"; which comprises about 1,100 cases, 85% of the pending cases), and more recent cases of misconduct that continue to flow in.[10] While there is much work to do, the Department has created a number of efficiencies over the past year and has closed a significant number of cases in the seven months since the Third Remedial Order went into effect. While the number of use of force related matters pending discipline is still very large, the 1,542 cases currently pending resolution represents a 19% reduction from the 1,911 that were pending as of December 31, 2021. This is still a considerable volume of work that must be completed in order to normalize the Trials Division and to be able

---

[10] There are currently 900 pending Full ID investigations for use of force incidents that occurred in 2021 and 2022 that may result in the issuance of charges. While disciplinary referrals are not expected to be made at the conclusion of every investigation, the likelihood of disciplinary charges is greater for those matters in which a Full ID investigation is being conducted, and therefore the influx of a large number of referrals to Trials is expected continue.

to turn the corner to more efficient case processing, but the reduction in pending cases does reflect progress.

Between November 1, 2021 and May 31, 2022, Trials closed 726 cases, easily surpassing the Third Remedial Order's requirement to close 400 cases. Performance during this seven-month period outpaced the number of cases closed in any calendar year since the Consent Judgement went into effect (492 in 2017; 521 in 2018; 271 in 2019; 380 in 2020). The vast majority were closed with a Negotiated Plea Agreement ("NPA", akin to a plea bargain). Notably, six Staff members have been terminated for use of force related misconduct between January and May of this year. The number of staff terminated in the first five months of this year exceeds the number of staff terminated for use of force related misconduct in every year since the Consent Judgment went into effect.

The Third Remedial Order was also designed to increase the capacity of the Office of Administrative Trials and Hearings ("OATH", the body that hears staff disciplinary cases), requiring 825 conferences to be scheduled during the first seven months. This target was also surpassed, as 892 conferences were scheduled between December 15, 2021 and May 31, 2021. Unlike in the previous 18-month period when most cases required, at a minimum, a pre-trial conference,[11] the majority of cases during this period (62%) were settled after the pre-trial conference was scheduled but before it was convened. This better aligns practice with a hallmark of efficient case processing, that most cases are resolved directly between the Department and the staff member.

---

[11] This is an improvement from prior practice in which staff were generally not settling matters without at least an initial pre-trial conference (*see* Eleventh Monitor's Report at pgs. 99-103).

That said, almost 18% of pre-trial conferences had to be rescheduled. The majority of these were cases involving Captains, as the Captains' union only has one lawyer, which hinders the ability to hear the volume of cases requiring resolution. This understaffing limited the ability to conduct hearings efficiently in the first place and then was further magnified when the lawyer fell ill and was unable to work for many weeks. This underscores the importance of all components of the system having sufficient capacity and flexibility to respond to unforeseen events without seriously disrupting the system. Discipline cannot be delayed or protracted because staff have selected representation with limited availability. Accordingly, the Monitoring Team has referred this issue to the Task Force to address. The City has advised that it is working to address this issue and will be advising the Monitoring Team on how the City can ensure that disciplinary cases involving Captains will not be impeded by this issue.

Although most cases are now being resolved via an NPA, 11% of cases were scheduled for trial. This is a significant reduction in the proportion of cases seeking a trial compared to prior monitoring periods, but still represents a large number of cases (96).  While many cases scheduled for trial ultimately do settle, a significant number of cases may still require a trial and therefore reaffirms the need to ensure that OATH also has sufficient capacity to efficiently and timely conduct trials and render decisions.

The Monitoring Team's recent assessment of cases brought before OATH has revealed that OATH's capacity to hear cases has improved. Between January 1, 2022 and May 31, 2022, the Trials Division started 12 trials[12] before OATH (which is more use of force related trials than were conducted in 2017, 2018, 2019 or 2020 and on pace with the total number of trials conducted in 2021). OATH issued 17 Report and Recommendations ("R&Rs") (relating to 19

---

[12] All but one trial has concluded and R&Rs have been issued in the 11 cases that have been completed.

staff and 28 unique use of force incidents) between January 1, 2022 and June 21, 2022. This represents a significant increase in the number of use of force related R&Rs that were issued – it is one more than the total number of R&Rs issued in all of 2021 and more than the combined total of use of force related R&Rs issued in the four years between 2017 and 2020. Trials are now being scheduled more efficiently (*e.g.*, trials are closer in time to the pre-trial conference; trials dates are occurring closer in time to one another).  Further, all but one of the Administrative Law Judge's ("ALJ") Report and Recommendations for trials that were initiated after January 1, 2022, were issued within 45 days of the close of trial.

With respect to the outcomes of the trials, of the 17 R&Rs rendered since January 1, 2022, the Trials Division obtained guilty verdicts in all cases.[13] With respect to the 9 cases in which DOC sought termination, the ALJ recommended termination in 6 cases. In one case, the ALJ recommended termination for one staff, but recommended a 60-day penalty for the other staff as they found a lesser penalty was merited. However, the Commissioner issued an Action of the Commissioner and terminated that staff member. In the final two cases, the ALJ recommended a penalty of 60 days suspension without pay and 30 days suspension without pay. The Commissioner's final determination of these two cases was still pending as of early June. A more in-depth analysis of the R&Rs will be provided in future Monitor's Reports.

While progress has been made, a few issues remain with respect to OATH's work. There are currently 6 R&Rs that are outstanding for trials that all occurred *before* January 1, 2022. All 6 R&Rs are outstanding more than 100 days since the record closed, with 2 R&Rs outstanding over a year. All 6 matters involve misconduct that occurred at least two years ago. The City has

---

[13] In 8 of the 17 cases, while the ALJ found guilt, some use of force-related charges in each case were dismissed.

advised in each of these cases that a decision will be rendered no later than the end of July 2022, and that the delays in completion were due to resource constraints. As noted throughout this report, claims of resource constraints are troublesome, particularly in this context where the Monitoring Team has raised the resource issue repeatedly. The City and OATH, as recently as the day before the filing of this report, has assured the Monitoring Team that staffing is sufficient to address the requirements of the Third Remedial Order and the Action Plan.[14] Further, while case processing within OATH is better than it was in the past, improvements on the prior inefficient processes does not mean this process is now efficient and more work is needed to ensure that the process is both timely and efficient. Currently, the time between a pre-trial conference and the rendering of an R&R, even under the best of circumstances, can take upwards of five months.

Overall, the effort and progress of the Department's Trials Division must be acknowledged. They have been working at a breakneck pace for over a year, and even more so in the last seven months. During that same time, the Department's Trials Division has had a number of challenges, including the transition of administrations, the abrupt departure of the Deputy Commissioner of the Trials Division (who also served as the Disciplinary Manager) without a *bona fide* reason, and a significant increase in volume of work (due to the Third Remedial Order) with essentially no increase in staff resources. The acting Disciplinary Manager, the Trials Division leadership team, and the attorneys and staff of the Trials Division must be commended for their significant efforts, tireless work, and the demonstrable progress they made in reducing the backlog of disciplinary cases.

---

[14] The City reports that OATH is in the process of hiring three new staff members to support the work of the Action Plan – the Calendar Unit Coordinator is due to start on July 11th, and interviews for the Administrative Law Judge and Law Clerk are underway.

- ***Next Steps for Addressing the Trials Division's Backlog***

The Third Remedial Order requires the Monitoring Team to identify and recommend steps that the City, Department, and OATH must take to close the cases remaining in the backlog. The first step was for the Department to define and close the Priority Backlog Disciplinary Cases (*i.e.*, the 729 that were closed in the previous five months). The next step will be to focus on the 1,100 cases of use of force misconduct that occurred in 2020 or earlier. These cases must be closed by the end of 2022. The Monitoring Team believes this to be achievable, but, clearly, the City, OATH and the Department will need to accelerate the pace of case closure to meet this target. The Monitoring Team is helping the Department develop a strategy for eliminating the backlog, mirroring the strategy used to assist the Investigation Division in addressing its backlog of over 8,000 cases. The key components of the strategy are described below:

1. **Ensure Adequate Resources for the Trials Division and OATH**. Both the Trials Division and OATH need adequate resources to process the backlog and incoming disciplinary cases. Lack of resources in the Trials Division has long been an issue (*see* Eleventh Monitor's Report at pgs. 257 to 258 (dkt. 368), Second Remedial Order Report at pg. 9 (dkt.373), and Twelfth Monitor's Report at pg. 115 (dkt. 431)). For this reason, the Third Remedial Order and the Action Plan (§ F., ¶ 1) required additional resources for the Trials Division. Further, the Third Remedial Order also requires OATH to have adequate resources (¶ 3) because, as carefully detailed in the Monitor's September 30, 2021, Status Letter to the Court (dkt. 399), the OATH processes simply could not manage its pending caseload. Recruitment and hiring efforts are underway, and the provision of adequate resources remains a foundational

prerequisite to successfully addressing the backlog and new disciplinary cases going forward.

2. **Categorize Cases in Backlog to Aid Closure**. Over the next month, the Trials Division leadership, in consultation with the Monitoring Team, will guide the attorneys in evaluating and categorizing all cases in the backlog, similar to the categorization process used to address the ID backlog. The categories will then be leveraged to systematically resolve cases. The categories may also be used to identify certain cases that may be most appropriate for reassignment to the new attorneys who will join the Trials Division in the coming months. The Trials Division is in the process of developing the specific categories and will be consulting the Monitoring Team before finalizing the strategy for grouping cases together.

3. **Identify Efficiencies and Improve Practice**. In order to support resolution of the backlog, Trials Division leadership, in consultation with the Monitoring Team, is identifying opportunities to create efficiencies. For example, cases resolved as part of the backlog will be closed with more truncated closing memorandums, which does not impact the ultimate outcome, but saves the Trials Division attorneys time and effort. The Department must also work to eliminate other barriers to efficiency, such as ensuring that case resolution is not inhibited by a lack of resources for staff representations (as discussed above).

4. **Identify a Dedicated Group of Attorneys for New Cases**. The Department must create a dedicated team of Trials Division attorneys to begin working on new cases of misconduct beginning in mid-August 2022, as required by § F (Staff Accountability), ¶ 5 of the Action Plan. As described above, procedural improvements put in place

over the past few years mean that new cases will be able to proceed more expeditiously, and thus will begin to set the Department on the right course. Additional initiatives to improve practice will be identified and implemented over the coming months as required by § F (Staff Accountability), ¶ 6 of the Action Plan. A group of attorneys focused on new cases will allow for staff disciplinary matters to begin being resolved closer-in-time to the incident date, and will no longer allow the backlog of cases to delay all discipline. While efforts to address the oldest pending cases are critical, the strategy must be balanced with efforts to address more recent cases so that discipline can be imposed more contemporaneously to the event.

5. **Maximize Use of Modified Duty and Suspensions**. Even when staff discipline is efficient (which it currently is not), the Department's use of suspension or placing staff on modified duty as an immediate corrective action is critical. These actions are part of a timely response to misconduct and also can minimize the risk of harm to incarcerated individuals and other staff. In particular, suspensions provide close-in-time accountability that sends the critical message that misconduct will not be tolerated, and use of modified duty is essential for staff awaiting the resolution of serious disciplinary charges to ensure that they are not in a position to further misuse their authority. For example, if a staff member is awaiting prosecution of charges for which termination is warranted, they should be removed from contact with incarcerated individuals immediately.

The Monitoring Team believes that closing the remaining cases in the backlog by the end of 2022 is feasible if these steps are faithfully implemented. It bears emphasis that these pending cases must be resolved with an actual disposition and not simply dismissed (unless the facts

presented merit dismissal). While the virtue of timeliness is lost when imposing discipline for misconduct that occurred years ago, the process of acknowledging misconduct and holding staff accountable for the harms they have caused is equally important and must not be overlooked. In other words, any strategy involving dismissing charges to simply eliminate the backlog would only reinforce the culture of impunity that already exists and cannot be tolerated or supported by the Monitoring Team.

- ***Looking Ahead for Staff Discipline***

Beyond the work related to the Trials Division, the Department is in the process of revising the Command Discipline Policy to increase the number of days that can be deducted in this type of disciplinary hearing, which is an opportunity to address certain types of misconduct more efficiently. Further, while the Monitoring Team's work to date has focused on only use of force-related discipline, the focus will be expanded to include discipline for abuse of sick leave and restricted duty policies per § F (Staff Accountability), ¶ 7 of the Action Plan. An initial critical step will be establishing reliable tracking for these types of disciplinary cases.

Once the use of force related disciplinary backlog is eliminated, the City and Department must have a system to impose staff discipline that is flexible and dynamic to address the ranges of severity of misconduct from a basic reprimand up to, and including, termination. Delegating staff discipline cases to an external entity, such as OATH, is not a prerequisite for a functional disciplinary system, but given its role in the City's process, OATH must be efficient, have adequate resources, and produce reasonable outcomes. Processing delays within OATH cannot be used as an excuse for the delayed imposition of discipline. While there has been improvement in both, OATH's capacity to hear cases and efficiencies in managing cases from the prior state of

affairs, more work is needed to get OATH to function as efficiently as necessary to ensure the imposition of discipline is not further protracted due to delegation of authority to this unit.

Most misconduct and, by extension, discipline, *can* and must be addressed internally by the Department, while ensuring that staff have an opportunity to be heard. The Department has made notable progress in this area, which reaffirms the Monitoring Team's experience that functional systems must have the ability to internally manage discipline and that the leader of the Agency, the Commissioner in this case, has the ultimate authority to impose discipline. However, it is clear that additional processing-related efficiencies are necessary because even when the system works seamlessly as it is not uncommon for an entire year to elapse between the misconduct and discipline being imposed. This will be the focus of additional work over the next few months, as required by the Action Plan.

## Conclusion

The City and Department must first and foremost focus on stabilizing the Department. This is no easy task given the basic deficiencies in staffing and lack of proficiency in security protocols which is why implementing the Action Plan is so critical. The Department's ability to achieve compliance with the requirements of the Consent Judgment (and relevant provisions of the subsequent Remedial Orders) is simply not attainable until the foundational issues are addressed in a focused, tangible, and sustained fashion as discussed in the Monitoring Team's Special Report (dkt. 438). At best, the level of compliance with the Consent Judgment and Remedial Orders remains the same as reported in the 12th Monitor's Report, although likely it has regressed even further as the jails remain in a state of crisis as described in this report (and the reporting since the 12th Report). It is for this reason that the Action Plan narrows both the scope of issues to be addressed and the provisions that will receive a compliance rating to focus

on a subset of provisions from the Consent Judgment and Remedial Orders. The Monitoring

Team's next report, to be filed on October 28, 2022, will include a compliance assessment of the

Department's work towards implementing the Action Plan and the subset of provisions in the

Consent Judgment and Remedial Orders as outlined in § G., ¶ 5 of the Action Plan.

**<u>Appendix: Key Data Points Over the Course of the Consent Judgment</u>**

This Appendix provides trend data on key outcomes over the prior six years, 2016 through 2021. These data illustrate the conditions at the time the Consent Judgment went into effect through the apex of the current crisis and provides a baseline for the work of the Action Plan to be measured against. This Appendix has three broad sections: (1) Security Indicators & Operations Data, which includes data on the population in the jails, number and rates of various violence indicators, and data on investigations of use of force; (2) Staffing Data; and (3) Staff Accountability Data, including data on pending and closed discipline cases throughout the life of the Consent Judgment.

## Security Indicators & Operations Data

### Total DOC Population

The chart below shows that the Department's average daily population (ADP) has decreased significantly over the past six years.



### Number & Rate of UOF

The chart below shows that Department-wide, the total number and average monthly rate of use of force has increased significantly since 2016.[15]



---

[15] Throughout this document, average monthly rates per 100 people in custody for each year were calculated using the following formula: rate = ((total # events in a year)/12)/average ADP for the year)*100.

## Number of Incidents Involving Injuries & Injury Classification

A use of force's injury classification is derived from the most serious injury sustained by anyone involved in the injury (staff or person in custody). In other words, it does not count all injuries sustained by multiple individuals, it only counts the most serious one. The chart below shows that the proportion of UOF with no injury (Class C; blue bar) has increased over the past six years, but also shows that the proportion and number of UOF with serious injuries (Class A; grey bar/red numbers) has increased significantly.



## Stabbings and Slashings

The chart below shows that the total number and average monthly rate of stabbings and slashings increased exponentially in 2021.



## Number and Rate of Fights

The chart below shows that the average monthly rate of fights has climbed steadily over the past six years.



## Assaults on Staff

The Department has always collected data on Assaults on Staff ("AOS") that occur during incidents *involving a UOF* (blue bar below). The green line in the table below shows that the average monthly rate of these types of assaults is more than double what it was in 2016 (1.67 versus 0.72). In 2020, the Department also began collecting data on Assaults on Staff that occur *without a UOF* (orange bar below). When the two types are combined (yellow line), the overall average monthly rate of assault on staff is even higher—3.93 in 2021.



## Key Age Groups, Department-wide

The table below shows the changes in the composition of the Department's population. Specifically, the Department no longer houses 16- and 17-year-olds, the number of 18-year-olds has declined considerably over the past six years (is now 23% of what it was in 2016), and the number of 19 to 21-year-olds is about half what it was in 2016. In recent years, the population of 18 to 21-year-olds (young adults) has comprised a little less than 10% of the total population.

| Average Daily Population, by Age, 2016-2021 | | | | | | |
|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** |
| 16/17-year-olds | 190 | 140 | 101 | ~ | ~ | ~ |
| 18-year-olds | 183 | 171 | 129 | 101 | 62 | 42 |
| 19-21-year-olds | 873 | 784 | 612 | 501 | 341 | 420 |
| 22+ year-olds | 8,542 | 8,178 | 7,595 | 6,741 | 4,158 | 5,139 |
| TOTAL | 9,788 | 9,273 | 8,437 | 7,343 | 4,561 | 5,601 |

The table below shows that the UOF rates among the younger age groups are significantly higher than the rate for older adults. Over the past six years, UOF rates have significantly increased among all age groups.

| Average UOF Rates, 2016 to 2021, by Age | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **% change 2016-21** |
| 18-year-olds | 19.7 | 17.7 | 36.4 | 53.8 | 53.4 | 57.7 | +193% |
| 19 to 21-year-olds | 9.3 | 12.3 | 19.0 | 24.4 | 26.7 | 30.4 | +227% |
| 22+ year-olds | 2.5 | 2.9 | 3.8 | 5.8 | 9.6 | 10.6 | +324% |

## RNDC's Uses of Force & Fights

RNDC has received special focus from the Monitoring Team because of its high rates of use of force and fights among people in custody. Since GMDC closed and Raise the Age went into effect (late 2018), RNDC has typically housed about 75% of the 18-year-olds in custody and about 75% of the 19 to 21-year-olds in custody. As shown in the tables above, both of these groups have higher rates of UOF and violence than older people in custody.  The next two charts below break out the use of force rate and rate of fights at RNDC by age.





## Number & Rate of Alarms

The table below presents the number and rate of alarms from July 1, 2019 to December 31, 2021. Throughout this period, most alarms were called as Level B, which involves the deployment of an Emergency Response Team. Notably, in July-December 2021, the rate of alarms fell to less than half of what it had been in previous periods.

| | | Alarms Department-Wide | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July-Dec. 2019 (9th MP) | | | Jan.-June 2020 (10th MP) | | | July-Dec. 2020 (11th MP) | | | Jan.-June 2021 (12th MP) | | | July-Dec. 2021 (13th MP) | | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate |
| **Total Alarms** | 7,268 | 6,989 | 17.3 | 4,462 | 4,698 | 15.8 | 4,683 | 4,389 | 17.8 | 4,719 | 5,534 | 14.2 | 2,141 | 5,614 | 6.4 |
| | # | % total | | # | % total | | # | % total | | # | % total | | # | % total | |
| *Level A* | 2,052 | 28% | | 796 | 18% | | 1,098 | 23% | | 1,719 | 36% | | 545 | 25% | |
| *Level B* | 5,216 | 72% | | 3,666 | 82% | | 3,583 | 77% | | 3001 | 64% | | 1,596 | 75% | |
| <u>*Rate*</u> *is calculated using the following formula: (# Alarms in time period/# of months in period)/ADP * 100* | | | | | | | | | | | | | | | |

## Contraband Recovery

The table below depicts the volume and type of contraband recovered each month during 2021.

| 2021 Contraband Recovery | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Jan.** | **Feb.** | **Mar.** | **Apr.** | **May** | **Jun.** | **Jul.** | **Aug.** | **Sep.** | **Oct.** | **Nov.** | **Dec.** | **Total** |
| Drugs | 254 | 128 | 122 | 101 | 72 | 54 | 78 | 65 | 45 | 47 | 50 | 33 | **1049** |
| Weapons | 167 | 105 | 235 | 206 | 260 | 338 | 226 | 237 | 319 | 321 | 450 | 280 | **3144** |
| Escape-Related Item | 9 | 9 | 10 | 8 | 13 | 7 | 19 | 29 | 14 | 26 | 23 | 29 | **196** |
| Other | 109 | 39 | 86 | 192 | 42 | 62 | 34 | 62 | 46 | 98 | 71 | 37 | **878** |
| **Total** | **539** | **281** | **453** | **507** | **387** | **461** | **357** | **393** | **424** | **492** | **594** | **379** | **5267** |

***Note***: *The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered.  For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure.  In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.*

<u>In-Custody Deaths</u>

The table below identifies the number of people who died in custody from 2015 to June 2022, categorized by the cause of death. Since 2019, in-custody deaths have increased at an alarming pace. Thus far in 2022, the number of in-custody deaths is on pace to exceed that of 2021.

| Number of In-Custody Deaths, January 2015 to June 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **Jan. to June 2022** |
| Accidental | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| COVID-19 | 0 | 0 | 0 | 0 | 0 | 3 | 0 | 0 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 6[16] | 2 |
| Overdose | 0 | 2 | 1 | 0 | 0 | 0 | 4 | 4 |
| Suicide | 2 | 2 | 0 | 1 | 0 | 1 | 6[17] | 2[18] |
| Undetermined | 0 | 0 | 1 | 0 | 0 | 5[19] | 0 | 0 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11[20]** | **16[21]** | **9[22]** |

*<u>**Note**</u>: To the extent the information is available, the data above includes the death of any person that occurred following a compassionate release.*

---

[16] 2 of the 6 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

[17] 2 of the 6 cases occurred following compassionate release from custody.

[18] 1 of the 2 cases occurred following compassionate release from custody.

[19] 4 of the 5 cases in this category include individuals who died while under the jurisdiction of the Department but who were not under the supervision of DOC staff at the time of their death and were not physically in the Department's custody (*i.e.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs). The cause of death for each of these individuals is not known.

[20] 4 of the 11 individuals that passed away in 2020 were not technically in DOC custody at the time they pass away as they were participating in programs in the community.

[21] 2 of the 16 individuals who passed away in 2021 were released from Department custody before they passed away as a compassionate release.

[22] 1 of the 9 cases occurred following compassionate release from custody. Additionally, 6 cases are still being reviewed by the Medical Examiner and so the cause of death has not been confirmed.

<u>Average Length of Stay</u>

While consulting with the Department, Dr. James Austin evaluated the impact of the average length of stay on the size of the NYC jail population by reviewing a data file that consists of all people released from the NYC jail system in 2021. The average length of stay was 101 days.  As shown in the chart below, NYC's average length of stay is three times the national average (101 days versus 30 days) and significantly higher than other major jail systems.



## Processing Time for New Admissions

The table below shows the number/proportion of male new admissions whose processing time at EMTC exceeded 24 hours, from October 2021 through May 2022. Processing time for new admissions is tracked in the Department's New Admissions Dashboard. The Department reports individuals in intake exceeding 24 hours in the table below were not actually in intake past 24 hours but were the result of data entry issues in the dashboard or staff issues related to not pausing the clock during certain events.

| Processing Time for New Male Admissions at EMTC | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Oct. 2021 | Nov. 2021 | Dec. 2021 | Jan. 2022 | Feb. 2022 | Mar 2022 | Apr 2022 | May 2022 |
| **New Admissions** | 1061 | 985 | 1087 | 1129 | 1208 | 1317 | 1289 | 1405 |
| **Number and % over 24 hours** | 61 (6%) | 13 (1%) | 12 (1%) | 11 (1%) | 17 (1%) | 19 (1%) | 14 (1%) | 16 (1%) |

**_Note_**: *The 24-hour period is calculated from the time the individual was placed in DOC custody (e.g., at the courthouse) until the time the individual was placed into assigned housing. Note that DOC's 24-hour clock is put on pause for certain events, such as when the individual leaves the intake process for a scheduled court appearance, for mental health evaluations, or for hospital transfers.*

## Inter/Intra-Facility Transfers in Intake

The Department requires inter/intra facility transfers to be tracked using the Inmate Tracking System, but facility compliance has been inconsistent. Instead, each facility maintains a different manual tracking mechanism that does not produce aggregate data for analysis. To measure the Department's performance, NCU conducted 4 audits of intake areas in three different facilities in January 2022 and February 2022 and found that 33% of individuals (15 of 45) had stays in intake longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours.

| Facility | # individuals | # (%) more than 24 hours | 24 to 48 Hours | 48 to 72 hours | Over 72 Hours |
|---|---|---|---|---|---|
| **RNDC** | 14 | 5 (36%) | 2 | 1 | 2 |
| **AMKC** | 13 | 8 (62%) | 2 | 2 | 4 |
| **GRVC** | 5 | 1 (20%) | 0 | 0 | 1 |
| **AMKC** | 13 | 1 (8%) | 0 | 1 | 0 |
| **Total** | **45** | **15 (33%)** | **4** | **4** | **7** |

New Cell Door Installation at RNDC

The Department installed 500 new cell doors at RNDC between April 2019 and June 2022.  The pace of installation increased in October 2021. An additional 25 new cell doors are scheduled to be installed in Summer 2022.

| RNDC New Cell Door Installation, 2019-2022 | |
|---|---|
| **Time Period** | **Number of Doors** |
| Apr 2019 - Aug 2019 | 50 |
| Sept 2019 - Feb 2020 | 50 |
| Feb 2020 – Aug 2020 | 50 |
| Sept 2020 – Jan 2021 | 50 |
| Feb 2021 – Jun 2021 | 50 |
| Aug 2021 – Oct 2021 | 50 |
| Oct 2021 – Jan 2022 | 100 |
| Jan 2022 – June 2022 | 125 |
| **Total** | **525** |

## Investigations of UOF Incidents

The table below provides the investigation status of all use of force incidents that occurred between January 1, 2018 and December 31, 2021.  As shown in the bottom row of the table, the investigations for all incidents occurring in 2020 or earlier have been closed. ID continues to be responsible for investigating a large number of incidents (over 8,000 from incidents in 2021 alone) and while the vast majority of cases have been closed, the number of pending Full ID investigations must be closely monitored to ensure a new backlog does not develop.

| Investigation Status of UOF Incidents Occurring Between January 2018 and December 2021 as of April 15, 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Incident Date | 2018 | | 2019 | | 2020 | | 2021 | | Jan. to June 2021 (12th MP) | | July to Dec. 2021 (13th MP) | |
| Total UOF Incidents[23] | 6,302 | | 7,494 | | 6,399 | | 8,420 | | 4,481 | | 3,939 | |
| Pending Intake Investigations | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% |
| Pending Full ID Investigations | 0 | 0% | 0 | 0% | 0 | 0% | 904 | 11% | 345 | 8% | 559 | 14% |
| Closed Investigations | 6,302 | 100% | 7,494 | 100% | 6,399 | 100% | 7,516 | 89% | 4,136 | 92% | 3,380 | 86% |

---

[23] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

<u>Intake Investigation Outcomes</u>

The table below depicts the findings of all Intake Investigations for cases that were closed at that point/not referred for Full ID Investigation. The Monitoring Team is working with the Department to refine the outcome categorizations to ensure consistent and shared understanding of what "unnecessary," "excessive," and "avoidable" are intended to capture. Finalizing this work has been protracted given the many changes to leadership within the ID Division over the last six months. Once complete, the Monitoring Team will report outcomes for Full ID investigations as well.

| Investigations Closed on the Intake Investigation *As of April 15, 2022* | | | | |
|---|---|---|---|---|
| **Incident Date** | *Feb. 3[24] to June 2020* (10th MP) | *July to Dec. 2020* (11th MP) | *Jan. to June 2021* (12th MP) | *July to Dec. 2021* (13th MP) |
| Total Number of Cases | 2,081 | 2,700 | 3,687 | 3,285 |
| *Findings* | | | | |
| *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *734 (20%)* | *737 (22%)* |
| *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *260 (7%)* | *324 (10%)* |

---

[24] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

## Rapid Review Outcomes

The table below presents the Rapid Review outcomes from 2018 through 2021. Rapid Reviews continue to identify that a large proportion of UOF incidents involve procedural errors (nearly 50% in 2021), and that a significant proportion (about 15% in 2021) involve material policy violations or were avoidable (about 20% in 2021). The Rapid Reviews have thus recommended corrective action for thousands of staff members.

| Rapid Review Outcomes, 2018 to 2021 | | | | | | |
|---|---|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **Jan-June 2021** | **July-Dec 2021** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 4,150 (96% of all UOF) | 3,822 (99.5% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 836 (20%) | 897 (23%) |
| **Violation of UOF or Chemical Agent Policy** | | | *345 (11%) (July-December 2020 Only)* | 1,233 (16%) | 495 (12%) | 738 (19%) |
| **Procedural Violations[25]** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 1,872 (45%) | 1,957 (51%) |
| **Corrective Action Imposed** | | | | | | |
| **Number of Staff** | 3,595 | 3,969 | 2,966 | 5,748 | 2,369 | 3,379 |

---

[25] Procedural errors include a variety of instances in which Staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

## **Staffing Data**

### Number of Available Supervisors & Assignment to Facilities

The table below provides multiple one-day snapshots of the total number of Assistant Deputy Wardens ("ADW") and Captains that are currently available to work and the number assigned to the facilities.

| ADW and Captain, Number and Availability, 2020 to 2022 | | | | | | |
|---|---|---|---|---|---|---|
| **Snapshot Date** | **ADWs** | | | **Captains** | | |
| | **Total Available** | **# in Facilities and Court Commands** | **% in Facilities and Court Commands** | **Total Available** | **# in Facilities and Court Commands** | **% in Facilities and Court Commands** |
| July 18, 2020 | 66 | 52 | 79% | 810 | 558 | 69% |
| January 2, 2021 | 95 | 80 | 84% | 765 | 527 | 69% |
| June 26, 2021 | 88 | 70 | 80% | 751 | 505 | 67% |
| January 1, 2022 | 80 | 64 | 80% | 670 | 474 | 71% |
| May 21, 2022 | 76 | 58 | 76% | 637 | 444 | 70% |

<u>Staff Sick & Medically Monitored/Restricted Data</u>
The tables below provide the monthly averages from January 2020 to June 2022 of the total staff headcount, the average number of staff out sick and the average number of staff on medically monitored/restricted duty.

| 2020 | | | | | | |
|---|---|---|---|---|---|---|
| Month | Headcount | | Average Daily Sick | Average Percentage of Daily Sick | Average Daily MMR3 | Average Percentage of Daily MMR3 |
| January 2020 | 9732 | | 586 | 6.02% | 367 | 3.77% |
| February 2020 | 9625 | | 572 | 5.94% | 388 | 4.03% |
| March 2020 | 9548 | | 1408 | 14.75% | 373 | 3.91% |
| April 2020 | 9481 | | 3059 | 32.26% | 278 | 2.93% |
| May 2020 | 9380 | | 1435 | 15.30% | 375 | 4.00% |
| June 2020 | 9302 | | 807 | 8.68% | 444 | 4.77% |
| July 2020 | 9222 | | 700 | 7.59% | 494 | 5.36% |
| August 2020 | 9183 | | 689 | 7.50% | 548 | 5.97% |
| September 2020 | 9125 | | 694 | 7.61% | 586 | 6.42% |
| October 2020 | 9079 | | 738 | 8.13% | 622 | 6.85% |
| November 2020 | 9004 | | 878 | 9.75% | 546 | 6.06% |
| December 2020 | 8940 | | 1278 | 14.30% | 546 | 6.11% |
| **2020 Average** | **9302** | | **1070** | **11.49%** | **464** | **5.02%** |

| 2021 | | | | | |
|------|------|------|------|------|------|
| Month | Headcount | Average Daily Sick | Average Percentage of Daily Sick | Average Daily MMR3 | Average Percentage of Daily MMR3 |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% |
| August 2021 | 8197 | 1416 | 17.27% | 767 | 9.36% |
| September 2021 | 8081 | 1703 | 21.07% | 744 | 9.21% |
| October 2021 | 8005 | 1558 | 19.46% | 782 | 9.77% |
| November 2021 | 7852 | 1498 | 19.08% | 816 | 10.39% |
| December 2021 | 7750 | 1689 | 21.79% | 775 | 10.00% |
| **2021 Average** | **8372** | **1470** | **17.65%** | **699** | **8.41%** |

| 2022 | | | | | |
|------|------|------|------|------|------|
| Month | Headcount | Average Daily Sick | Average Percentage of Daily Sick | Average Daily MMR3 | Average Percentage of Daily MMR3 |
| January 2022 | 7668 | 2005 | 26.15% | 685 | 8.93% |
| February 2022 | 7592 | 1457 | 19.19% | 713 | 9.39% |
| March 2022 | 7432 | 1402 | 18.86% | 617 | 8.30% |
| April 2022 | 7353 | 1255 | 17.07% | 626 | 8.51% |
| May 2022 | 7233 | 1074 | 14.85% | 634 | 8.77% |
| June 1-25, 2022 | 7147 | 964 | 13.49% | 623 | 8.72% |
| **2022 Average** | **7404** | **1360** | **18.27%** | **650** | **8.77%** |

## Staff Accountability

### Immediate Corrective Action Imposed for Use of Force Related Misconduct

The table below presents data on immediate corrective action that was taken against individual staff members for any use of force related misconduct identified in incidents occurring in 2020 and 2021.

| Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date | | | | |
|---|---|---|---|---|
| Type | Jan.- June 2020 | July-Dec. 2020 | Jan.- June 2021 | July-Dec. 2021 |
| Suspension | 38 | 42 | 52 | 23 |
| Non-Inmate Contact Post or Modified Duty | 4 | 1 | 3 | 3 |
| Counseling and Corrective Interviews | N/A[26] | 1,337 | 1,509 | 1,731 |
| CD – Reprimand | 37 | 89 | 149 | 115 |
| CDs (resulting in 1-5 days deducted) | 263 | 410 | 508 | 276 |
| **Total** | **342** | **1,879** | **2,221** | **2,148** |

[26] As noted in the Tenth Monitor's Report at pgs. 168-170 this was a transitionary time for counseling sessions so this data is not useful for comparative purposes for this chart.

Staff Suspensions

The table below shows all staff suspensions between January 1, 2020 and May 31, 2022. The use of suspensions in response to staff absenteeism (*i.e.*, sick leave, AWOL) and unbecoming conduct increased significantly during the past 18 months.

| Staff Suspensions, 2020 to May 2022 | | | |
|---|---|---|---|
| Reason | 2020 | 2021 | Jan to May 2022 |
| Sick Leave | 39 | 138 | 130 |
| Conduct Unbecoming | 92 | 128 | 38 |
| Use of Force | 78 | 82 | 28 |
| AWOL | 0 | 165 | 22 |
| Arrest | 60 | 70 | 12 |
| Inefficient Performance | 44 | 30 | 12 |
| Electronic Device | 18 | 4 | 5 |
| NPA | 10 | 6 | 7 |
| Other | 6 | 4 | 3 |
| Contraband | 7 | 5 | 0 |
| Erroneous Discharge | 5 | 0 | 2 |
| **Total** | **359** | **632** | **259** |

## Staff Accountability for Use of Force Related Misconduct

The table below provides an overview of staff accountability imposed from 2019 through 2021. The volume of corrective action (Corrective Interviews, CDs, and suspensions) increased each Monitoring Period until the 13th Monitoring Period.

| Staff Accountability for Use of Force Related Misconduct Imposed, 2019 to 2021 | | | | | | |
|---|---|---|---|---|---|---|
| | Jan.-June 2019 8th MP | July-Dec. 2019 9th MP | Jan.-June 2020 10th MP | July-Dec. 2020 11th MP | Jan.-June 2021 12th MP | July-Dec. 2021 13th MP |
| **Support and Guidance Provided to Staff** | | | | | | |
| Corrective interviews and 5003 counseling | 1,769[27] | 931[28] | 263[29] | 1,115 | 1,494 | 1,711 |
| Corrective interviews (resulting from CDs) | 42 | 11 | 10 | 22 | 15 | 20 |
| **Corrective Action—Command Discipline & Suspensions** | | | | | | |
| CD – Reprimand | 66 | 90 | 37 | 89 | 149 | 115 |
| CDs (resulting in 1-5 days deducted) | 390 | 489 | 263 | 410 | 508 | 276[30] |
| Suspensions | 24 | 24 | 38 | 42 | 52 | 23 |
| *Total* | *480* | *603* | *338* | *541* | *709* | *414* |
| **Formal Discipline** | | | | | | |
| PDRs | 31 | 50 | 34 | 15 | 2 | 0 |
| NPAs | 84 | 135 | 159 | 165 | 214 | 224 |
| *Total* | *115* | *185* | *193* | *180* | *216* | *224* |
| **All Staff Accountability** | | | | | | |
| *Total* | *595* | *788* | *531* | *721* | *925* | *638* |

---

[27] Counseling that occurred in this Monitoring Period was focused on a more holistic assessment of the Staff Member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Eighth Monitor's Report at pgs. 172-173.

[28] The identification of Staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Ninth Monitor's Report at pgs. 194-196.

[29] The Department transitioned the process for identifying Staff for counseling during this Monitoring Period. *See* Tenth Monitor's Report at pgs. 168 to 170.

[30] Based on the most recent information the Monitoring Team had as of the writing of this report, 251 CDs were still pending from this time period.

## Status of Use of Force Related Disciplinary Cases by Incident Date

This table presents the status, *as of* December 31, 2021, of all staff disciplinary matters related to use of force misconduct for incidents that occurred prior to December 31, 2021. The report provides a detailed discussion of the status of discipline *as of May 2022* and so the data below is presented as a baseline of the status of cases as of December 31, 2021.

| Status of Use of Force Related Disciplinary Cases by Date of Incident *As of December 2021* | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | |
| Total cases | 682 | | 472 | | 620 | | 784 | | 991 | | 637 | | 306 | |
| Closed cases | 682 | 100% | 466 | 99% | 522 | 84% | 456 | 58% | 328 | 33% | 107 | 17% | 20 | 7% |
| Pending Cases | 0 | 0% | 6 | 1% | 98 | 16% | 328 | 42% | 663 | 67% | 530 | 83% | 286 | 93% |

## Resolution of Use of Force Disciplinary Cases, by Year

More cases were resolved in 2021 than in any of the previous 5 years. Compared to 2019, the number of cases resolved with an NPA doubled in 2021.  The number of deferred prosecutions also increased as a result of a number of Staff members who left the Department before their disciplinary matters could be resolved. Should they return to DOC employment, the case will be prosecuted.

| Resolution of Use of Force Disciplinary Cases by Date of Case Closure | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Year | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | |
| Total Cases | 489 | | 514 | | 267 | | 383 | | 567 | |
| NPA | 397 | 81% | 484 | 94% | 219 | 82% | 326 | 85% | 438 | 77% |
| Termination | 0 | 0% | 0 | 0% | 1 | 0% | 2 | 1% | 8 | 1% |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 4 | 1% | 7 | 1% |
| | | | | | | | | | | |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 31 | 8% | 31 | 5% |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 16 | 4% | 73 | 13% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% |
| Return to Command | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | 9 | 2% |

## Penalties Imposed for Use of Force Related Misconduct

The table below shows the penalty imposed by NPA for use of force related cases closed between 2017 to 2021. The table also includes the number of tenured staff that have been terminated for use of force related misconduct.

| Penalty Imposed for UOF Related Misconduct by Date of Ultimate Case Closure | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | | | | | | | | | | |
| | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | |
| Total | 395 | | 484 | | 219 | | 326 | | 438 | |
| Refer for Command Discipline[31] | 71 | 18% | 67 | 14% | 2 | 1% | 1 | <1% | 4 | 1% |
| 1-5 days | 31 | 8% | 147 | 30% | 53 | 24% | 80 | 25% | 63 | 14% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 28 | 6% |
| 10-19 days | 62 | 16% | 100 | 21% | 57 | 26% | 83 | 25% | 106 | 24% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 31 | 10% | 43 | 10% |
| 40-49 days | 27 | 7% | 30 | 6% | 3 | 1% | 17 | 5% | 47 | 11% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 40 | 9% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 25 | 6% |
| | | | | | | | | | | |
| Termination | 0 | | 1 | | 1 | | 2 | | 5 | |

*Note: This table includes incidents that occurred between 2011 and May 2021.*

---

[31] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the Staff Member's record for one year instead of five years).

## Use of Fore Related Cases Closed by Trials Division

The table below presents the number of use of force related cases closed by the Trials Division from 2017 through 2021. The table also shows the length of time cases were pending within the Trials Division from the date either the MOC was received or charges were served (depending on which data point was available) and the date the closing memo was signed within the Trials Division (the closing memo must then be ratified by the Disciplinary Manager and the Commissioner). As shown, over 50% of the cases closed in 2021 had been with the Trials Division for over a year before they were finalized.

| Length of Time Use of Force Related Cases Were Pending with Trials Division, 2017 to 2021 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Closing Memos completed | 2017 | | 2018[32] | | 2019[33] | | 2020 | | 2021 | |
| Cases Closed | 492 | | 521 | | 271 | | 380 | | 687 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 72 | 19% | 38 | 6% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 81 | 12% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 119 | 31% | 196 | 29% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 26% | 265 | 39% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 77 | 11% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 2% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 10 | 3% | 19 | 3% |

---

[32] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[33] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

## OATH Pre-Trial Conferences

The table below presents the number of use of force related pre-trial conferences that have been scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. Notably, the number of scheduled pre-trials conferences has increased considerably as well as the number of cases that have settled before the scheduled pre-trial conference was set to occur. Further, the proportion of cases referred for a trial has significantly decreased.

| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| # Required | # Held | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
| **July to December 2020 (11th MP)** | | | | | | | | | | |
| 225[1] | 303 | 0 | 111 | 10 | 44 | 124 | 12 | 2 | 274 | 198 |
| | 100% | 0% | 37% | 3% | 15% | 41% | 4% | 1% | | |
| **January to June 2021 (12th MP)** | | | | | | | | | | |
| 300 | 541 | 0 | 282 | 4 | 85 | 136 | 33 | 1 | 367 | 331 |
| | 100% | 0% | 52% | 1% | 16% | 25% | 6% | 0% | | |
| **July to December 2021 (13th MP)** | | | | | | | | | | |
| 350 | 379 | 185 | 87 | 4 | 18 | 58 | 26 | 1 | 284 | 239 |
| | 100% | 49% | 23% | 1% | 5% | 15% | 7% | 0% | | |
| **January to May 2022 (Partial 14th MP)** | | | | | | | | | | |
| 750 | 821 | 496 | 66 | 10 | 152 | 94 | 3 | 9 | | |
| | 100% | 60% | 8% | 0% | 19% | 11% | 0% | 1% | | |

---

[1] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

<u>Trials Division Staffing</u>

The table below shows the total number of Trials Division staff, by position, as of the end of each Monitoring Period since 2018.  While the Department continues to recruit, hire and on-board new staff, due to attrition, the total number of staff, and the total number of agency attorneys, has decreased over time.

| Trials Division Staffing | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| As of… | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 |
| Deputy General Counsel | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Executive Manager Director | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Director | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 |
| Administrative Manager | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| Executive Coordinator | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Office Manager | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Agency Attorney | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 |
| Agency Attorney Intern | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 |
| Legal Coordinator | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 |
| Investigator | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 |
| Clerical Associate | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Program Specialist | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 |
| Intern | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Front Desk Officer | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| Community Coordinator | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Total** | **40** | **38** | **39** | **38** | **36** | **36** | **35** | **34** |