<u>Monitor's Third Report on the Conditions of Confinement
for 16- and 17-Year-Old Adolescent Offenders
at the Horizon Juvenile Center</u>

Third Reporting Period
January 1 – June 30, 2022

## The Monitoring Team

Steve Martin, J.D.—*Monitor*

Kelly Dedel, Ph.D.—*Subject Matter Expert*

Anna Friedberg, J.D.—*Deputy Monitor*

Dennis Gonzales—*Associate Director*

Pat Hurley, LCSW—*Subject Matter Expert*

Alycia Karlovich—*Analyst*

Emmitt Sparkman—*Subject Matter Expert*

Christina Vanderveer, J.D.—*Associate Deputy Monitor*

# Table of Contents

Introduction ......................................................................................................................... 1

  Background ........................................................................................................................ 1

  The Horizon Agreement .................................................................................................... 2

  Summary of the Current State of Affairs ........................................................................... 3

    •  New ACS and Facility Leadership ............................................................................. 3

    •  Nature of Youth Violence at Horizon ........................................................................ 4

    •  Quantitative Data on Youth Violence and Injuries ..................................................... 5

    •  Staffing Levels ........................................................................................................ 9

    •  Impact of COVID-19 ............................................................................................... 12

    •  Summary of Compliance with the Substantive Provisions of the Horizon Agreement 13

    •  Next Steps ............................................................................................................. 16

Compliance Assessment ........................................................................................................ 17

  ¶2(a). Protection from Unreasonable Risk of Harm ............................................................ 17

  ¶2(b). Use of Physical Restraints ....................................................................................... 20

  ¶2(c). Incident Report Review and Referral ....................................................................... 25

  ¶2(d). Classification. ........................................................................................................ 29

  ¶2(e). Programming. ........................................................................................................ 32

  ¶2(f). Consistent Staffing ................................................................................................. 35

  ¶2(g). Behavior Management. .......................................................................................... 36

  ¶2(h). Room Confinement. ............................................................................................... 39

  ¶2(i). Video Preservation ................................................................................................. 41

  ¶2(j). Staff Discipline ....................................................................................................... 42

  Appendix: New Voluntary Agreement ............................................................................... i

# Introduction

This is the Monitoring Team's third report on the conditions of confinement for 16- and 17-year-old Adolescent Offenders at the Horizon Juvenile Center (Horizon), as required by the Voluntary Agreement ("the Agreement") between the Monitor, the City of New York (the "City"), and the Administration of Children Services ("ACS") (dkt. entry 364 of 11-cv-5845 (LTS)). This report provides a summary and assessment of the good faith efforts and work completed by the City of New York and ACS to achieve compliance and advance the reforms required by the Horizon Agreement from January 1, 2022 through June 30, 2022 ("current Monitoring Period" or "Third Monitoring Period") as well as a summary of data, trends and patterns from the entire 18-month period.

<u>Background</u>

The Monitoring Team first began to evaluate the conditions of detained 16- and 17-year-olds under the *Nunez* Consent Judgment (dkt. entry 249 of 11-cv-5845 (LTS).[1] When the Consent Judgment went into effect in November 2015, incarcerated 16- and 17-year-olds were legally classified as adults and detained in an adult jail on Rikers Island, which is managed by the New York City Department of Correction ("the Department"). The Consent Judgment included specific provisions regarding the management of this age group (§ XV ("Safety and Supervision of Inmates Under the Age of 19") and § XVI ("Inmate Discipline")) and separately required the Department to seek off-island housing for youth younger than 18 ((§XVII "Housing Plan for Inmates Under the Age of 18", ¶1-3)). In 2017, New York State passed a "Raise the Age" (RTA) law that raised the age of criminal responsibility to 18-years-old and created a new legal status for youth called "Adolescent Offenders," (AOs), which is defined as 16- and 17-year-olds who are charged with a felony-level offense. RTA was implemented in stages, with the AO category applying to any 16-year-old charged on or after October 1, 2018, and any 17-year-old charged on or after October 1, 2019. RTA also prohibited housing 16- and 17-year-olds on Rikers Island as of October 1, 2018.

By October 1, 2018, all 16- and 17-year-olds who were incarcerated on Rikers Island were transferred to Horizon, which was jointly operated by the Department and ACS, where the

---

[1] *See* Monitor's First *Nunez* Report at pgs. 87 to 111, Second *Nunez* Report at pgs 123 to 155, Third *Nunez* Report at pgs. 196 to 238, Fourth Nunez Report at pgs. 203 to 252, Fifth *Nunez* Report at pgs. 140 to 180, Sixth *Nunez* Report at pgs. 149 to 196, Seventh *Nunez* Report at pgs. 192 to 207, Eighth *Nunez* Report at pgs. 218 to 247, Ninth *Nunez* Report at pgs. 253 to 282, Tenth *Nunez* Report at pgs. 221 to 237.

Department was responsible for the care and custody of the 16- and 17- year-olds and ACS was responsible for programming and managing the provision of medical and mental health services. All 16- and 17-year-olds who were charged before the RTA effective dates for their age group are called, collectively, "Pre-Raise the Age (RTA) Youth." All Pre-RTA Youth remained at Horizon until they were sentenced, released to the community or residential programs, or they turned 18-years-old, at which time they were transferred to Rikers Island. The day-to-day management of Horizon also gradually shifted to become the sole responsibility of ACS.

By the end of 2019, ACS had assumed full operational control of Horizon, save for a small number of DOC staff who operated the front security gate and held transportation positions.[2] By July 27, 2020, the last Pre-RTA Youth was transferred out of Horizon, and the *Nunez* Monitoring Team suspended its monitoring activities while the City, ACS, the Monitoring Team, and the Parties to the *Nunez* Litigation determined the appropriate path forward given the change in circumstances. These final stages coincided with the onslaught of the COVID-19 pandemic, which significantly impacted facility operations throughout the 18-month period of the Agreement.

The Horizon Agreement

The City and ACS volunteered to enter into an Agreement with the Monitoring Team concerning the supervision of 16- and 17-year-old AOs at Horizon ("the Agreement"). The Monitoring Team is responsible for assessing good faith efforts and progress toward compliance with that Agreement. During this time, the Monitoring Team will not assess compliance with the *Nunez* Consent Judgment's provisions pertaining to 16- and 17-year-olds and *Nunez* Plaintiffs and the United States have agreed not to seek judicial action to enforce the portions of the *Nunez* Consent Judgment pertaining to this age group while the Horizon Agreement is in effect (*See* dkt. entry 364).

The Horizon Agreement includes 10 substantive provisions, all of which are discussed in detail in the next section of this report. For each provision, the Monitoring Team provides an assessment of current practice and applies a compliance rating.[3] During the current Monitoring Period, ACS provided all requested documents and engaged in multiple collaborative discussions with the Monitoring Team to respond to questions and provide detail about their steps toward compliance and facility improvement plans.

---

[2] As of August 2021, no DOC staff were deployed to Horizon.

[3] While the Monitoring Team used a three-tiered approach to compliance ratings in the First Monitor's Report (dkt. 409) including "Non-Compliance," "Partial Compliance," and "Substantial Compliance," as it was a useful tool to demonstrate the range of compliance for the First Monitoring Period. In the Second Monitor's Report a two-tiered compliance approach was used to align with the Agreement. This report continues to utilize the two-tiered compliance framework.

The Monitoring Team is required to file three reports during the pendency of the Agreement. The first Monitoring Period covered November 11, 2020 (the date of execution) to June 30, 2021 and the second Monitoring Period covered July 1, 2021 to December 31, 2021. This third report describes facility conditions from January 1, 2022 to June 30, 2022.

<u>Summary of the Current State of Affairs</u>

As discussed in detail below, the Monitoring Team's primary concern is the level of violence at the facility and the ability of Horizon staff to appropriately respond to and manage youth's behavior. This Monitoring Period was marked by continuing high levels of violence and many group disturbances that at times ACS staff appeared ill-equipped to handle. Reducing this violence requires a multi-faceted approach. While the Monitoring Team believes that the new ACS administration has a robust set of strategies and plans to address all facets of the problem, the fact remains that several of these strategies remained in the planning phase at the end of the Monitoring Period and thus the quality of their implementation and the impact on the level of facility violence is not yet known.

- **New ACS and Facility Leadership**

A new mayoral administration came into office at the beginning of this Monitoring Period and a new Commissioner was appointed to ACS. In January 2022, Mayor Adams appointed Jess Dannhauser as ACS Commissioner, who has demonstrated a strong commitment to improving conditions at Horizon and a keen ability to advocate on behalf of his agency with relevant stakeholders. His advocacy builds upon some important accomplishments of the previous ACS administration. For example, to improve recruitment and attendance, ACS successfully lobbied to obtain funding to provide bonuses to staff who begin working at ACS (Recruitment Bonus) and those who return to work and current employees who meet ambitious attendance targets (Retention Bonus). Three bonus programs with varying eligibility dates operated from November 1, 2021 through June 30, 2022. Furthermore, ACS reported that the City recently authorized a $38 million encumbrance for the design to upgrade Horizon's physical plant. ACS has also reported that $161 million in the Commitment Plan to fund the design, construction management, and the construction to upgrade Horizon's physical plant. One of the planned improvements captured in the $38 million design cost will be to install corridor doors with electronic locking mechanisms, which will create much needed flexibility in the facility's staffing plan.

Throughout the Monitoring Period, Commissioner Dannhauser made key changes in leadership, including replacing the Deputy Commissioner for the Division of Youth and Family Justice ("DYFJ"; the arm of ACS that oversees the operation of secure detention facilities, among several other juvenile justice programs) in April 2022. The new Deputy Commissioner of DYFJ,

Nancy Ginsburg, is a highly respected member of the NYC juvenile justice advocacy community who possesses a unique understanding of the dynamics and contours of the broader system and the impact of case processing issues on youth in secure detention, and by extension, the staff who work at Horizon. The Monitoring Team has been impressed that she recognizes the need for additional expertise in facility operations and that she quickly retained several consultants and advisors to help shore up the facility's safety and security practices. She has also begun to reformulate DYFJ's organization and facility leadership to better support her vision. Accordingly, during this Monitoring Period, the agency was in a re-building phase.

The Monitoring Team feels confident that ACS leadership appreciates the gravity of the situation, understands the complexity of the problems, and has identified viable strategies to increase safety. Of course, the potential of these strategies to transform the facility into one that is safe for both youth and staff depends on the tenure of these leaders and their ability to convert plans into quality implementation of new practices.

- **Nature of Youth Violence at Horizon**

The Monitoring Team's overarching concern is the level of violence and the substantial risk of harm for both youth and staff at Horizon. Each month, the Monitoring Team reviewed the full array of incidents (*i.e.*, as reported via the GOALS reporting structure), a large sample of disciplinary records, and observed many incidents via videotaped footage. These revealed the following positive staff practices:

- Staff use, or attempt to use, trained techniques for physical restraint (*i.e.,* Safe Crisis Management, "SCM").

- Physical restraints are generally in proportion to the observed threat and unnecessary and/or excessive uses of force are rare.

- Staff often exhibit extraordinary patience when managing and responding to aggressive behavior among youth.

However, the nature of the violence is very concerning:

- Fights between two residents were the most common type of violence, with 10-20 fights occurring each month. Fights occurred primarily on the housing units—either in the units' day rooms or when youth entered a cell undetected by staff—but also occurred in the facility's common spaces (corridors, classrooms, gym, and cafeteria).

- Group violence against other residents and staff remains a concern.

- o Several incidents involved situations where groups of residents punched, kicked and/or stomped a single victim. These group assaults appeared to occur either unprovoked, or as retaliation from a previous dispute that was not fully resolved.

- o Groups of residents attacked staff or stole their keys in order to access rivals, and staff appeared at times to be overwhelmed and unable to prevent youth from assaulting each other.

- o Some youth showed no inhibition to assault staff and no inhibition to interfere when staff were attempting to restrain another resident. These attacks routinely involved grabbing staff, throwing staff to the floor, spitting on staff, splashing with liquids, kicking, punching, and using weapons (*e.g.,* hard objects in socks). Several attacks involved even more serious violence such as group assaults on staff and the use of strangulation holds.

- A small number of residents were repeatedly involved in aggressive, violent incidents, and staff did not appear to have effective tools, or to use them consistently, to manage these residents' behavior.

- Youth continued to have access to a variety of improvised weapons, some of which were utilized during assaults and others that were discovered via searches for contraband. These included pieces of sharpened metal and pieces of glass or plexiglass.

- Youth intimidated staff with verbal threats of physical harm, regularly breached staff's personal space, and threatened staff with harm if they would not agree to bring contraband items to youth.

- Occasionally, staff were hyper-confrontational with youth, sometimes after prolonged periods of patience.

The nature of violent incidents, coupled with their frequency (discussed below), presents a substantial risk of harm to youth and staff at Horizon and underscore the importance of specific actions to increase staffing levels, implement quality behavior management practices, ensure that youth do not have an excess of idle time and to conduct internal incident reviews to identify opportunities to improve staff practices that could enhance safety and security. ACS' progress toward implementing these strategies is discussed throughout this report.

- Quantitative Data on Youth Violence and Injuries

The number of youth in custody at Horizon increased considerably during the 18-month period of the Agreement (1st Monitoring Period ADP = 37; 2nd Monitoring Period ADP = 62; 3rd Monitoring Period = 67). The increase has several underlying causes. In early 2021, ACS

experienced a lower-than-anticipated need for COVID quarantine and thus Horizon's housing units could be fully dedicated to housing youth in the general population. In addition, virtually all youth at Horizon are held on exceptionally serious charges, nearly 70% on charges of murder or attempted murder. Their complicated charges and the backlog in court adjudications caused by COVID create long lengths of stay at Horizon. In June 2022, nearly 60% of the youth at Horizon had been in custody for more than 200 days. Their serious charges, long lengths of stay and often hostile pre-existing relationships with other youth in custody are underlying factors in the high rates of violence witnessed at the facility.

The best way to both illustrate and understand key trends in facility safety over time is to utilize the rate per 100 youth, shown in the graph below. The rate is calculated as follows: *Rate = ((# of incidents/# days in month)/ADP) * 100*.[4] The graph below shows the rate of YOYA and YOSA for CY2021.



With the benefit of the chart illustrating the *rate* of YOYA and YOSA over time, the raw numbers, in the context of the changing size of the facility's population, are easier to understand. The graph below shows the *number* of youth-on-youth assaults (YOYA) and youth-on-staff assaults (YOSA) for the 18-month period of the Agreement. During the current Monitoring Period,

---

[4] Note that the formula used to calculate the *rate* is slightly different from the one reported in the Monitoring Team's reports on Horizon in 2018-2020. The rate formula utilized here is the one ACS uses internally and includes the number of days in each month. Rates using this formula are not comparable to rates utilizing a different formula, such as those in previous Nunez Monitor's Reports that discussed Horizon.

Horizon experienced between 19 and 59 violent events each month, some more serious than others.



During the 18-month period, the *rate* of YOYA had significant variation month-to-month but an examination of the average rate for each 6-month Monitoring Period shows that the YOYA rate was essentially unchanged (1.06 in the 1st Monitoring Period, 1.13 in the 2nd Monitoring Period, and 1.06 in the 3rd Monitoring Period). In other words, while the level of violence did not *increase* during the 18-month period, the early concerns expressed by the Monitoring Team about youth violence in the First Monitoring Period *persisted* throughout the 18-month period.

The average rate of YOSA, on the other hand, declined somewhat (1st Monitoring Period = 1.02, 2nd Monitoring Period = 0.51, 3rd Monitoring Period = 0.77). While staff assaults became somewhat less frequent, the nature of that violence showed a concerning increase in severity, with more serious actions (*e.g.*, chokeholds, group assaults) and more severe injuries (*e.g.*, lacerations requiring sutures, a staff person's lips needed to be removed from her braces) as discussed in more detail below.

About half of the of the YOYA incidents at Horizon resulted in an injury to one or more youth involved. Of the 129 YOYA during the current Monitoring Period, 40% resulted in a minor

injury to youth (n=52; Injury B, orange bars) and notably, only 5% resulted in a serious injury to youth (n=6; Injury A, grey bars).[5] Fortunately, in 55% of the youth-on-youth assaults, no one was physically injured (blue bars). These proportions were relatively unchanged across the 18-month period.



Staff who intervened in incidents often suffered injury when applying physical restraints, separate from any specific action of the youth involved. Unfortunately, staff also suffered injuries when directly assaulted by Horizon youth. ACS tracks the *number* of staff injuries, but the severity of staff injuries is not tracked given that most staff are treated off site. During the 1st Monitoring Period, 40% of YOSA resulted in an injury to staff (n=28 of 70), 42% resulted in an injury to staff during the 2nd Monitoring Period (n= 24 of 57), and 54% resulted in an injury to staff during the 3rd Monitoring Period (n=50 of 93). Thus, although the *rate* of YOSA has decreased, the number and proportion of incidents in which a staff member was injured has increased.

---

[5] Injury A includes injuries requiring clinical treatment beyond what can be provided by a layperson with over-the-counter products. Injury B includes injuries that are treatable by a layperson with over-the-counter products such as ibuprofen, antibiotic ointment, ice packs, etc. All injury classifications are made by medical staff.



Some of the violent incidents may be triggered by pre-existing hostilities and acts of retribution spilling over from the community, but in many others, circumstances within the facility itself likely contributed to their occurrence. This includes an excess of idle/unstructured time on the housing units, poor supervision and security practices among staff, and the lack of a robust system for managing youth's behavior that teaches and reinforces positive behavior and effectively sanctions negative behavior.

Coupled with the continuing effect of COVID on ACS' ability to provide adequate programming, all of this is enormously disruptive to a facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor or witness, the youth in custody at Horizon are regularly exposed to violence in the facility environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including facing additional criminal charges.  Staff are also negatively impacted by trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth and has been identified as one of the key challenges to retaining YDS staff. Regardless of the quality of programming and services available at Horizon, the level of violence at the facility undercuts the benefit that Horizon youth may derive from it. It is also worth noting that all physical aggression brings with it a *risk* of harm, separate from whether an injury is actually sustained, and efforts to improve facility safety must minimize this risk. In other words, the level of violence and youth and staff injury remained at the high levels that gave rise to the Agreement, the overarching goal of which was to *increase* safety, not to maintain the level present at that time.

- **Staffing Levels**

One of the key dynamics underlying Horizon's challenges regarding youth violence and the difficulties it has had implementing several of the substantive provisions of the Agreement is the fact that the facility does not have enough staff or supervisors. In its work with jurisdictions around the country, the Monitoring Team has observed that many jurisdictions are struggling to properly staff their facilities—a fundamental requirement that has always been challenging, but which has become even more so following the onset of the COVID pandemic given the tight labor market. Horizon's low staffing levels are further stretched by the day-to-day impact of COVID, discussed in more detail below. Having an adequate number of well-trained staff and supervisors is the most critical tool for the safe operation of any correctional facility. Without adequate staff, proactive supervision is difficult to execute, constructive relationships with youth are difficult to develop, access to programming is difficult to guarantee, and effective behavior management techniques are difficult to apply. In short, the shortage of staff and supervisors has undercut ACS' progress in all areas of the Agreement. For these reasons, the new ACS leadership has identified staffing as its "first priority."

At the beginning of the Agreement, ACS estimated that approximately 337 YDS were needed to staff the facility at full capacity, with all 10 living units being operational. At the end of the current Monitoring Period, approximately 245 YDS were on Horizon's payroll, although about 36% were "inactive" (*i.e.*, unavailable to work due to Workers Compensation, FMLA, Military Leave, etc.).[6] This left only about 150 YDS to staff the facility, meaning that staff must work overtime and some housing units were staffed at the minimum level (2 YDSs, instead of the more optimal 3 YDSs that ACS desires). These shortages made it difficult to properly staff the facility day-to-day, let alone to pull staff from coverage to deliver the training that is central to several of the planned practice enhancements. When interviewed, staff reported that regularly working multiple overtime shifts per week was one of the things they disliked most about their jobs (the risk of being assaulted by youth was another).

A similar situation characterized the AYDS/Supervisor rank. ACS estimated that approximately 56 AYDSs were needed to properly staff the facility with supervisors. At the end of the Monitoring Period, approximately 36 AYDS were on Horizon's payroll, although about 24% were "inactive." When interviewed, AYDSs described their role as that of "firemen,"

---

[6] ACS reports it has internal processes to evaluate Worker's Compensation (WC) claims. ACS reports for every WC claim, DYFJ leadership reviews video footage to assess the employee's narrative. The Office of Human Resources (OHR) performs an additional review for claims of injuries alleged to have been caused by resident assaults. Claims exceeding 90 days are referred to the Law Department for an Independent Medical Examination (IME). Finally, OHR reviews every IME report to determine the appropriateness for potential litigation referral to the Law Department. Department of Investigations can also initiate investigations for instances of suspected fraud or abuse.

running from one crisis to the next, and unable to spend significant time assisting with the management of a small number of housing units as ACS intends.

These shortages were exacerbated when staff called out (*i.e.*, did not report to work as scheduled due to illness or personal reasons). During the current Monitoring Period, on average, 8.7 YDSs called out on any given day, which was significantly higher than previous monitoring periods (1st Monitoring Period = 3.7, 2nd Monitoring Period = 5.9). Among AYDSs, 1 call-out per day was a consistent average across the 18-month period.

Increases to the corps of available staff have come slowly, as the number of newly hired staff was offset by the number who resigned/were terminated. Across the 18-month period, Horizon promoted 6 staff to AYDS/Supervisor positions, but lost 5, for a net of only 1.  Horizon began the 18-month period with 196 YDS on the payroll, and thus needed to gain 141 YDS to reach "full staffing." A total of 192 YDS were hired for Horizon, but 129 YDSs resigned or were terminated, for a net gain of only 63. In addition, work to improve morale and job satisfaction (which appeared via staff interviews to be significantly impacted by staff's concerns for their own safety) remains key to reducing attrition.

On September 4, 2022, shortly after the conclusion of the 18-month period of this Agreement, Horizon transitioned back to three 8-hour shifts (Horizon operated two 12-hour shifts throughout the 18-month period). The impact of this transition on recruiting, retention, and staff morale is yet unknown. When interviewed, some staff were encouraged by the change, while others feared having to work "even more overtime" if they were held over for an additional 8-hour shift. As this report was drafted, ACS reported that shift assignments had been finalized but validated overtime usage would not be available before mid-October.

ACS has taken/plans to take several creative and substantive actions to increase the size of and improve retention within its workforce, including:

- In February 2022, ACS contracted with a recruitment vendor to attract qualified YDS candidates. Of the 164 candidates identified, ACS made employment offers to 129, systemwide.
- ACS also plans to contract with a candidate interviewing firm to support the higher volume of candidates. An additional 17 Office of Human Resources candidates are also in various stages of approval and hiring to ensure timely background clearance before on-boarding.
- Given the expected more frequent and larger academy classes, ACS also received approval for three additional academy trainers.
- ACS provided a compelling hiring and retention bonus structure, mentioned above.

- The Deputy Commissioner has plans to build an enhanced staffing structure and better integrate Special Officers (*i.e.*, "ACS Police") into daily operations and to improve collaboration with YDSs. Candidates for various leadership positions within the Special Officer ranks are also being identified, trained and on-boarded. Special Officers are also eligible for the retention bonuses described above.
- ACS created additional AYDS/Supervisor positions (five) and Tour Commander positions (two) to better support line staff at Horizon. Candidates to fill eight AYDS vacancies are at various stages of processing. Recruiting for five Operation Manager ("OM") vacancies is underway.
- ACS has also restructured the facility's leadership hierarchy to include an Associate Commissioner, who will be supported by two Assistant Commissioners (one for Youth Behavior and one for Security), along with an Executive Director of Operations, Director of Operations and Special Assistant. Individuals to fill these various roles are at various stages of identification/processing/onboarding. The Deputy Commissioner also created a position for and hired a Senior Advisor for Juvenile Justice to assist with the reform effort.
- On August 1, 2022, ACS appointed a new facility leadership team at Horizon. Intentional efforts are underway to provide training and support to staff, improve staff attendance, expand programming opportunities and implement enhanced safety measures.
- ACS' Staff Recruitment and Retention Task Force remains active. Workgroups are focused on staff wellness and leadership development in addition to needed enhancements to the physical restraint curriculum, training, rapid response team operations and equipment upgrades.
- ACS expanded its partnership with the National Partnership for Juvenile Services (NPJS, a well-respected group of juvenile justice experts) to deliver leadership coaching and training for mid-level managers in basic operational practices ("Back to Basics Training"). Planning is currently underway for this work.

- **Impact of COVID-19**

    As is true in juvenile justice facilities across the nation, the COVID-19 pandemic continued to significantly impact nearly every aspect of Horizon's operation as ACS continued to implement mitigation strategies including screening and testing protocols, cleaning contracts and hygiene protocols, and procedures for quarantine and isolation as indicated. These protocols were both essential and effective in protecting youth and staff from infection and illness but had the unfortunate side-effect of significantly disrupting Horizon's staffing, training and education and programming provided by Horizon staff and community vendors. The toll that COVID continues to take on staff, youth and families was clearly apparent, particularly among youth whose frustration with quarantine procedures triggered at least some of the youth's challenging

behaviors. The Monitoring Team has yet to observe Horizon under "normal conditions" unaffected by the COVID pandemic, and this Monitoring Period marked another period of highs and lows and ever-changing COVID protocols as new waves of the virus continued to disrupt the operations of the facility. However, the Monitoring Team has certainly observed good-faith efforts to implement the requirements of the Agreement even under the dark cloud of the pandemic.

- **Summary of Compliance with the Substantive Provisions of the Horizon Agreement**

Throughout the remainder of this report, current practice in each of the substantive areas of the Voluntary Agreement is assessed. This assessment was informed by the analysis of a variety of documents, collaborative discussions with ACS leadership, observations and interviews conducted during two on-site visits, ACS's written assessment of practice in each area and a detailed videoconference presentation attended by ACS/Horizon subject matter experts and the Monitoring Team. This methodology provided a multi-faceted vantage point from which both progress and areas in need of continued improvement could be identified. Throughout the Monitoring Period, ACS was both transparent and candid about its journey toward implementing its vision of quality care. Without a doubt, progress could be accelerated if the pandemic were to recede, as the toll it continues to take on staff availability and youth's access to spaces and activities off their housing units has seriously compromised ACS's ability to achieve the things it has set out to do. Overall, while a path forward and commitment to achieve compliance is clear in the substantive areas, the current status of the facility demonstrates that more time is needed for the new administration's vision to translate to practice.

A fulsome discussion of each of the Agreement's 10 substantive provisions follows this Introduction, but in summary:

❖ **Protection from Harm (¶ 2(a)).** The risk of harm to youth and staff at Horizon is significant. The level of youth-on-youth violence has remained about the same since the beginning of the 18-month period, although there is some variation month-to-month. Youth-on-staff violence decreased somewhat, but an increase in the severity of these assaults is cause for concern. The problem of youth violence is multi-faceted, and a reduction will require increasing the number of staff and supervisors and improvements to basic security practices. Many staff have been hired, but attrition significantly undercut the net gains in the number of YDSs. Horizon also lacks an appropriate number of supervisors who are desperately needed to assist new YDSs in developing the requisite skill set, and who also provide essential assistance when responding to incidents. Violence can also be reduced by ensuring staff properly

implement effective behavior management tools and by providing youth consistent access to structured programming throughout the day.

❖ **Physical Restraint (¶ 2(b))**. In general, staff appeared to utilize or at least attempt to utilize trained SCM techniques, and the Monitoring Team has not observed a pattern or practice of unnecessary or excessive physical intervention. Conversely, the Monitoring Team is more concerned about the instances in which staff *did not or exhibited reluctance to* intervene promptly in response to an imminent risk of physical harm. Additionally, staff's use of physical restraint often appears simply inadequate to quell or control youth during mass disturbances and is a concerning issue contributing to the high risk of harm referenced above. While this trend continued to be noted in the beginning of the Monitoring Period, overall improvements were observed toward the end of the period as staff took more definitive steps to intervene or to place residents in their rooms when managing the aftermath of an incident.

❖ **Incident Review and Referral (¶ 2(c))**. ACS drafted a policy that, once implemented, will provide a structured system for reviewing incidents to identify poor staff practice or the misuse of physical restraints. During the current Monitoring Period, however, the existing *ad hoc* process (which involved randomized reviews of video and irregular meetings with management and staff to discuss observations and lessons) continued, which carries a risk that opportunities to improve staff practice and/or impose necessary corrective action will not be detected.

❖ **Classification (¶ 2(d))**. Horizon continued to utilize a structured, individualized process for determining which youth will be transferred from Crossroads (ACS' admission facility) to Horizon and then identified an appropriate housing unit based on peer dynamics and each youth's individual needs. Recent changes to the way in which youth are assigned to housing units (to break up concentrations of youth with the same gang affiliations) have reportedly helped to decrease assaults on staff, as well as the level of tension on the housing units, empowering staff to confront negative behaviors more assertively. Unfortunately, these changes occurred too late in the 18-month period to verify staff's perceptions with quantitative data.

❖ **Programming (¶ 2(e))**. Horizon continued to strive to provide a robust array of rehabilitative and recreational programming each day, and to limit the amount of idle time during non-school hours. Horizon's recent implementation of an electronic program tracking tool is a positive step, but typical problems with the accuracy of data in the early phases prevented an audit of current practice. During the current

Monitoring Period, program delivery continued to be impacted by COVID (*e.g.,* housing unit quarantines that limited youth's access to programming spaces; program staff/YDSs/vendors who could not report to work when exposed or infected). Most significantly, nearly two-thirds of Horizon's Program Counselor positions were vacant during the current Monitoring Period which decreased the availability of program services to many Horizon youth, despite efforts to provide services to all housing units.

❖ **Consistent Staffing (¶ 2(f))**. While a significant number of YDSs and AYDSs are still needed to achieve "full staffing," Horizon continued to demonstrate its commitment to consistently assign staff to the same housing units day-to-day in the two units that are pilot testing the new behavior management program, STRIVE.

❖ **Behavior Management Program (¶ 2(g))**. Two housing units continue to deliver the newly reconstituted STRIVE program, but staff shortages and absences delayed training for the large number of staff needed to bring the program facility-wide. Toward the end of the current Monitoring Period, the new Deputy Commissioner directed the facility—and its corps of consultants—to accelerate training. The training effort will continue beyond the 18-month period of this Agreement, with facility-wide implementation planned for late 2022/early 2023. The absence of an effective behavior management program for a large portion of Horizon youth is a significant contributing factor to the level of violence at the facility.

❖ **Room Confinement (¶ 2(h))**. As encouraged by the Monitoring Team, Horizon increased its use of room confinement as a de-escalation tool during the current Monitoring Period but continued to struggle to properly and consistently document room confinement events and the protections that must be afforded by policy. ACS reported that a Compliance Officer was recently hired whose duties will include "mini-audits" of room confinement practices so that leadership can better guide and coach staff practice in this area.

❖ **Video Preservation (¶ 2(i))**. ACS finalized an Operations Order to preserve video footage shortly after the close of this Monitoring Period. An audit of video preservation practices revealed that the required protocol was not followed in more than half of the incidents selected for an audit, indicating the need for improved adherence to the preservation protocol and the quality assurance mechanism that was designed to address any omissions in preserving video at the facility level.

❖ **Staff Discipline (¶ 2(j))**. ACS initiated disciplinary action against 20 staff for restraint-related misconduct, a significant uptick compared to the six actions taken in the prior

two Monitoring Periods *combined*. This is a positive development that, when coupled with planned improvements to the incident review process, should lead to a system in which staff are effectively and appropriately held accountable for the misuse of physical restraint. More importantly, improved incident reviews should lead to more opportunities for teachable moments that may fall short of "discipline" but are of equal importance to mentor and coach staff and improve overall job performance. Additional time is needed to effectively implement and adhere to the new incident review protocol before the process will bear fruit.

- Next Steps

The Compliance Assessment section below articulates the steps ACS has taken to improve facility safety and describes the status of the various projects underway.  Many remain a work in-progress which, when fully implemented, will hopefully stabilize the facility and reduce violence. While a significant amount of work has occurred at Horizon, many initiatives are only just beginning to be implemented or need more time to take hold. For these reasons, ACS and the Monitoring Team have extended the Voluntary Agreement ("New Voluntary Agreement" attached as an Appendix to this report) for an additional 12-months, through June 30, 2023. The New Voluntary Agreement has some modifications from the original version of the agreement to best align the work of the Monitoring Team to support the reform effort. Importantly, this agreement allows the Monitoring Team to continue working with limited interruption through June 2023, and provides transparency to all parties about the efforts to advance the reforms at Horizon through two public reports filed in April 2023 and October 2023. Given the New Voluntary Agreement, the Monitoring Team recommends that the stipulation and order regarding 16- and 17-year-old Adolescent Offenders at Horizon Juvenile Center, (dkt. 364) ("Stipulation") entered by the *Nunez* Parties is extended to correspond with the New Voluntary Agreement.  The Monitoring Team does not believe that a meet and confer regarding the state of compliance, pursuant to ¶ 4 of the Stipulation, is necessary given the extension of the Voluntary Agreement and that the *Nunez* Parties are in a position to quickly and efficiently work together to extend the Stipulation and present it to the Court.

## Compliance Assessment

In this report, when assessing ACS' level of compliance with the substantive provisions of the Voluntary Agreement, as required by ¶ 5(c), the Monitoring Team considered and described the broader context for our findings, including the challenges and obstacles presented (particularly those related to COVID and changes to the City's and ACS's leadership) to implementing the requirements of the Voluntary Agreement as well as the generally accepted practices for 16- and 17-year-old youth. Further, the Monitoring Team also gave due consideration to ACS' diligent and good faith efforts to implement the requirements of the Voluntary Agreement and, the totality of the circumstances. For each of the substantive provisions enumerated in ¶ 2 (a-k), ACS' efforts to implement the required practices are described, generally accepted practices are referenced, and key challenges and obstacles are highlighted. The Compliance standard,[7] as defined in the Horizon Agreement, ¶ 5, is whether "ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material or recurring."

The scope and quality of information shared with the Monitoring Team, ACS' openness to feedback, and the various steps ACS has undertaken or plans to undertake to elevate the level of performance in each of the substantive areas demonstrated ACS' deliberate good faith efforts to improve its practice (as required by ¶ 1 of the Horizon Agreement). These good faith efforts demonstrate ACS's potential and willingness to remediate identified practice and performance gaps. However, as noted in the Introduction, they have yet to result in substantial improvements to the key outcome of interest—youth violence.

---

**¶2(a). Protection from Unreasonable Risk of Harm**. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

**ACS Policy & Practice.**
- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" provides guidelines for staff to follow "when they are required to contain the acute physical behavior of youth." It emphasizes that the primary purpose of emergency interventions is to protect the safety of youth and staff. While staff must utilize the

---

[7] While the Monitoring Team used a three-tiered approach to compliance ratings in the First Monitor's Report (dkt. 409) including "Non-Compliance," "Partial Compliance," and "Substantial Compliance," as it was a useful tool to demonstrate the range of compliance for the First Monitoring Period, in the Second Monitor's Report we adopted a two-tier compliance approach to better align with the Horizon Agreement. This report continues to use the two-tiered framework.

least amount of force necessary, the policy also reinforces that staff have a duty to act to protect youth or staff from harm due to assaultive or violent behavior.

- o ACS utilizes Safe Crisis Management (SCM) to promote safety and to guide physical interventions when needed.
- o SCM's practice guidelines include more than the use of physical intervention. They also require staff to utilize "primary strategies" to prevent incidents from occurring (*e.g.*, structured daily schedule, behavior management system that teaches necessary skills, etc.); a range of non-verbal and verbal "secondary strategies"; and trained physical intervention techniques.
- o SCM requires both youth and staff to engage in a de-briefing protocol within 24 hours of a physical intervention.
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Secure Detention" articulates the importance of and pathway toward physical and emotional safety:
  - o V.A. "When youth sense that they are at risk of harm, the entire rehabilitative process is undermined."
  - o V.C. "Staff shall be deployed in a manner that maximizes visibility and maintains a high degree of supervision throughout the facility, maintaining appropriate staff ratios at all times…"
  - o V.D. "Predictability and structure are hallmarks of a safe and therapeutic environment. Staff of multiple disciplines and varying levels of seniority shall work together to develop daily programming and activities that are meaningful to youth and minimize idle time on the living unit."
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership Strategies (GOALS)" outlines procedures necessary for comprehensive, accurate reporting of incidents that occur in ACS facilities. This type of information is essential for creating an accurate record of what occurred, and it is also critical to ensure uniform, valid data on key indicators regarding facility safety.
  - o An "incident" is defined as "any event which might adversely affect the health, safety, and/or security of residents, staff, or the communication or with impacts on a facility, the agency, or agency property."
- ACS maintains quantitative data regarding youth-on-youth assaults, youth-on-staff assaults, physical aggression, threats, and restraints along with narrative summaries of all incidents occurring at Horizon.
- The new Deputy Commissioner is working to ensure that all direct care staff at Horizon (*i.e.*, YDS, AYDS, OM, TC and Special Officers/ACS Police) collaborate effectively to improve safety and security at the facility.

**Monitoring Team's Analysis.**

The Monitoring Team remains concerned about the level of violence at Horizon, as discussed in the narrative above. The level of violence disrupts the facility's operation and has serious consequences for everyone involved. Whether in the role of victim, aggressor, or witness, the youth in custody at Horizon are regularly exposed to trauma in the facility

environment. They may also experience injury, fear, or distress, and those who are the aggressors in any given incident face a variety of negative consequences, potentially including deeper penetration into the juvenile justice system. Staff are also negatively impacted by trauma/injury/fear/distress, which undercuts their ability to effectively develop rapport and deliver services to youth effectively. A vicious cycle is apparent—facility violence underlies difficulties in attracting and retaining staff, and low staffing contributes to facility violence.

The Horizon Agreement includes an array of components that, if fully implemented, should increase the level of facility safety (*e.g.*, sufficient staffing; robust programming; effective behavior management program that incentivizes positive behavior and effectively responds to negative behavior). ACS's new leadership has articulated thoughtful plans and strategies to improve practice in each of these areas but given the short tenure of this administration and the continuing strain of COVID, these tools are not yet functioning at a level where they are able to counteract the dynamics that lead to violence at Horizon, and the staff continue to appear ill-equipped or reluctant to manage disruptive and violent youth.

In the previous Monitor's Report, the Monitoring Team discussed concerns about apparent reticence to utilize SCM techniques (including de-escalation techniques and ultimately physical restraint when necessary) and/or room confinement in response to incidents that presented an imminent risk of harm. Although staff practice improved somewhat during the current Monitoring Period, several incidents continued to suggest that staff often lack the skills/confidence/teamwork needed to effectively respond before, during, or after an incident of violence. The relative inexperience of YDS staff is likely a contributing factor to their apparent lack of skill and/or confidence. Just over one-third (35%) of all YDSs had been in their positions for one year or less as of June 30, 2022 (This figure has remained consistent throughout the duration of the Agreement).

Good practice certainly requires facilities to be judicious in their use of restrictive measures such as physical restraint and room confinement. However, the Monitoring Team's experience in many other jurisdictions throughout the country suggests that facilities tend to over-correct when attempting to limit their use of these tools. Both physical restraint and room confinement have a legitimate safety purpose, and while their use needs to be carefully prescribed and closely monitored, failing to use these tools where appropriate can be as dangerous as overusing them. The consequences of Horizon staff's reticence in this area are painfully obvious when one examines a cascade of incidents that flow from the failure to properly abate an ongoing threat of harm.

A high-profile event in January 2022 (in which youth took control of a housing unit, staff were unable to enter or exit the unit, and the NYPD was ultimately called to assist) is one example of the consequences of the confluence of deficiencies in the requirements of the Agreement. While ACS leadership were seriously concerned about this incident when it occurred, change appeared slow in the aftermath of this incident to resolve any areas of weakness. Part of this may stem from the changes within the agency's leadership that occurred soon after the incident (described in more detail in the introduction to this report). Once appointed in April of 2022, the new Deputy Commissioner made the security issues at the heart of and surrounding this incident a priority and has identified Security Consultants to

assess current practice and advise on ways to strengthen a broad range of security protocols (such as door and key control, the command structure of the ACS Police, live video monitoring protocols, better coordination with the NYPD, and ensuring staff are issued properly functioning equipment).

Finally, in the Monitoring Team's experience, what happens *after* an incident of violence occurs is extremely important to the ability to prevent future violence from occurring. This includes fully de-briefing the incident with both youth and staff; consistently applying an effective and proportional sanction for youth misconduct; targeting identified skill-deficits with effective guiding and coaching for staff; and applying staff discipline when appropriate. ACS has enshrined these elements in its most recent draft Incident Review Operations Order (discussed further in ¶ 2 (c), below) and its reboot of the STRIVE behavior management program, but neither strategy has been fully trained or implemented.

Robust implementation of the variety of tools required by the Horizon Agreement and under development by the new ACS administration should lead to a safer facility in which both youth and staff can thrive. There is considerable work to do before a safer facility is realized by implementing the behavior management program, increasing the size of Horizon's workforce and stabilizing staff assignments to units, restoring the full array of educational and rehabilitative programming in the post-COVID era, and implementing a multi-tiered incident review/investigation process.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(b). Use of Physical Restraints.** ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting of such incidents, including Policy #2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leaderships Strategies (GOALS)"). The aforementioned policies shall be referred to herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.[8]

(i). The Monitoring Team Panel shall assess and provide feedback, in collaboration with ACS's division of Youth and Family Justice (DYFJ) senior managers, on ACS' staff reporting and use of Physical Restraints, and shall provide any necessary recommendations for enhancements to reporting, limiting physical interventions where possible and improvements with respect to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches to youth-on-youth violence, youth-on-staff violence, staff-on-youth violence, and other situations

---

[8] NY State Law regarding the use of physical restraint (§180-3.15) has requirements that limit the circumstances in which it can be used; requirements for staff training; prohibitions on specific types of restraints; requirements for medical review; reporting; parent notification; and post-restraint debriefing protocols. NY State Law regarding the use of mechanical restraints (§180-3.16) limits the type of equipment that can be used; requires staff to be trained; positions mechanical restraints as a last resort in the facility's restraint continuum; requires constant supervision of youth while in mechanical restraints; and requires authorization at various intervals.

with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training and articulate general improvements to practice as necessary.

**ACS Policy & Practice.**

- ACS Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires that ACS staff employ Safe Crisis Management ("SCM"), a comprehensive approach to behavior management which requires substantial effort in prevention and non-physical interventions before staff may resort to Emergency Safety Physical Interventions ("ESPIs") to restrain residents.
    - o This policy outlines the training requirements for implementing SCM, the proper application of ESPIs, and considerations before, during, and after an ESPI is used.
    - o Mechanical restraints may only be used when ESPI techniques are unsuccessful in controlling aggressive physical behavior and when staff have determined that such an intervention is in the best interests of the youth involved.
    - o Overarching Principles:
        - ▪ The policy states that the primary purpose of any emergency intervention is to "protect the safety of the youth who is being restrained and all other youth, the staff, the community, and others who may be present within a context that promotes healthy relationships with youth, including employing effective communication, making empathetic connections, and establishing a structured, consistent environment."
        - ▪ The policy states that when physical interventions are necessary, staff shall use only the minimum amount of physical intervention necessary to stabilize the youth or situation.
        - ▪ The policy expressly prohibits the use of excessive force or inappropriate restraint techniques.
- Reinforcement of SCM:
    - o A total of 5 ACS staff have received specialized training to become "SCM Coaches." The role of these coaches is to provide additional support and training in SCM at the facility-level through informal coaching. These coaches work throughout the facility and facilitate short, skill-building sessions to reinforce SCM best practices.
    - o NPJS, the organization working with ACS to enhance their incident review process as discussed in ¶ 2 (c) below, is also working to train and integrate the SCM coaches into the revised incident review process. The SCM coaches' knowledge will be leveraged to help support identification of proper and improper techniques, gaps in knowledge/practice, areas of success and to follow up with staff as needed.
- Staff reporting of physical restraints is discussed in ¶ 2 (c) below.

**Monitoring Team's Analysis.**

Physical intervention by staff in a secure setting is at times required to maintain order and safety—there are times in which staff must utilize a physical restraint to prevent harm or avoid further harm from occurring. A well-executed, well-timed physical restraint that is proportional to the observed threat can actually protect both staff and residents from serious harm.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force utilized by ACS staff. ACS staff's use of physical restraints has been observed to generally be proportional to address the issue, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary.

- *Physical and Mechanical Restraint Data*

In assessing the data regarding the use of restraints, there are some important considerations to highlight. First, ACS maintains restraint data that tabulates the number of *youth* who were restrained (in contrast to data on youth violence reviewed in the Introduction above, which tabulates the number of *incidents)*. This means if 6 youth were involved in an assault and all six were restrained, the data related to that incident would include <u>one</u> assault and <u>six</u> restraints. Second, it is also important to recognize that not all acts of violence lead to a restraint (*e.g.*, the youth involved could cease their activity based on staff's verbal commands). Further, restraints are also used to respond to youth behaviors other than acts of violence (*e.g.*, a youth who is physically aggressive and posing an imminent risk of physical harm to another's safety may be restrained prior to an assault actually occurring). Finally, ACS physical restraint data only includes a very specific category of physical intervention used by staff on residents—known as Emergency Safety Physical Interventions ("ESPIs") under the Safe Crisis Management ("SCM") framework.[9] Because escort holds are excluded from the physical restraint data in this report, this data should be considered under-inclusive in terms of understanding the frequency with which staff needed to use physical force with a non-compliant resident. For all of these reasons, the Monitoring Team's assessment of risk of harm, as outlined in the introduction and the box above, considers a much broader array of information beyond the restraint data.

The graphs below present the raw number and rate of both physical and mechanical restraints for the 18-month period of the Agreement. These graphs illustrate that the number and rate of restraints decreased significantly during the Second Monitoring Period, then spiked in the middle of the Third Monitoring Period. Mechanical restraints have a lower base rate (*i.e.*, are not used as often) but showed the same trend—a decrease in the Second Monitoring Period (down 35%; from an average of 0.43 in the first Monitoring Period to an

---

[9] ACS' restraint data does not include escort holds, even if the escort is of a non-compliant resident and some physical coercion is needed. It also does not include incomplete ESPIs that do not result in a physical restraint (that is, a staff member attempts a specific restraint technique but fails and does not restrain the resident, the event then terminates with the resident ultimately complying without the use of physical restraint). ACS' approach to categorizing and calculating the restraint data is guided by the well-respected organization (JKM Training, Inc.) that developed ACS' curriculum for responding to aggressive behaviors (Safe Crisis Management, or SCM). While escort holds and incomplete ESPIs are not considered "physical restraints," they are *reportable events* and are included in the GOALS reports shared with the Monitoring Team.

average of 0.28 during the current Monitoring Period), then a slight uptick in the middle of the Third Monitoring Period.



### Number of Physical and Mechanical Restraints
#### January 2021 - June 2022

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 16 | 25 | 15 | 30 | 40 | 44 | 52 | 27 | 20 | 39 | 26 | 25 | 31 | 21 | 37 | 48 | 32 | 20 |
| Mechanical | 3 | 3 | 1 | 5 | 8 | 11 | 7 | 2 | 5 | 5 | 3 | 10 | 7 | 5 | 8 | 13 | 8 | 4 |



### Rate of Physical and Mechanical Restraints
#### January 2021 - June 2022

| | Jan 21 | Feb 21 | Mar 21 | Apr 21 | May 21 | Jun 21 | Jul 21 | Aug 21 | Sep 21 | Oct 21 | Nov 21 | Dec 21 | Jan 22 | Feb 22 | Mar 22 | Apr 22 | May 22 | Jun 22 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Physical | 1.51 | 2.69 | 1.51 | 2.81 | 3.33 | 3.22 | 3.16 | 1.46 | 1.04 | 2.02 | 1.3 | 1.18 | 1.35 | 1.1 | 1.78 | 2.37 | 1.62 | 1.06 |
| Mechanical | 0.28 | 0.32 | 0.1 | 0.45 | 0.63 | 0.8 | 0.43 | 0.11 | 0.26 | 0.26 | 0.15 | 0.47 | 0.31 | 0.26 | 0.39 | 0.64 | 0.4 | 0.21 |

- *Trends in Physical Interventions*

To assess the necessity, execution, and proportionality of Horizon's use of physical interventions, the Monitoring Team reviewed video footage and related documentation such as staff reports and injury reports (collectively referred to as "packets") for 53 events

occurring between January and June 2022 at Horizon. Of these, 32 were classified as physical restraints, and 21 were other types of events captured by the GOALS reports. Events were selected based on the initial description in the GOALS reports where either a significant physical intervention occurred or some other type of interaction between staff and residents that appeared to warrant review by the Monitoring Team.

For the most part, ACS staff either used or attempted to use trained SCM techniques in response to situations involving an imminent risk of harm. The following trends were noted:

- Staff previously appeared hesitant or slow to use ESPIs or other intervention as a means to enforce important rules (*e.g.,* not allowing residents to congregate in other residents' rooms) or to prevent the destruction of property that threatens safety. While this trend continued to be noted in the beginning of the Monitoring Period, overall improvements were observed toward the end of the period as staff took more definitive steps to intervene or to place residents in their rooms when managing the aftermath of an incident.

- Most restraints were in response to youth-on-youth violence or violence directed at staff, and staff were quick to respond in this monitoring period. As noted in the Introduction of this report, group disturbances were common, as were very concerning assaults on staff that included head strikes and strangulation holds. In spite of this, staff often showed professionalism and maintained their composure following an assault and did not hesitate to intervene to protect residents from youth-on-youth violence—often putting themselves in harm's way to protect victims of assault.

- The Monitoring Team noted successful de-escalation attempts used by staff, including by Horizon Special Officers (also called "ACS Police"), which avoided the need for ESPIs.

- Staff often appear simply overwhelmed, and without effective tools to address mass disturbances. These mass disturbances often necessitate force and could then result in staff *misuse* of force. For example, in an incident that occurred during this Monitoring Period, residents from one Hall were being escorted to their unit from the gym and they walked over to the door to another Hall and began to exchange threats. Residents from that Hall took the keys from one of the YDSs after repeated struggles and opened the unit's door to access the residents who were making the threats. Once the youth gained access, multiple fights broke out. Youth struck staff while other youth attempted to assault each other. The staff were overwhelmed. For about 90% of the incident, staff exercised caution while using force. There were a few uses of significant force, but it was warranted, except for on one occasion a youth struck an officer, and the officer drove the youth backwards over and onto a group of chairs with the YDS's hand on or near the youth's neck. These mass disturbances are chaotic and often necessitate significant force to subdue.

- Although rare, incidents did occur in which staff were hyper-confrontational and inappropriate when using force. For example, a Special Officer completely lost control and became aggressive toward a resident who threw an open milk container toward the staff member, leading to the resident and staff exchanging punches. This incident was promptly referred to the Justice Center and the staff resigned days later. In another example, a staff member was hyper-confrontational with a number of residents and his partner attempted to intervene and re-direct his conduct, but was unsuccessful, and an avoidable use of force followed. This staff member was coincidentally found unqualified by DCAS and terminated soon after. Finally, a very serious incident involving hyper-confrontational staff behavior and likely unnecessary and excessive force (including staff striking and kicking a youth) was referred to the Justice Center and being considered for criminal prosecution by the Bronx DA.

Overall, the Monitoring Team has not observed a pattern or practice of excessive or unnecessary force utilized by ACS staff. ACS staff's use of physical restraints has been observed to generally be proportional to address the issue, and staff appeared to utilize or at least attempted to utilize trained SCM techniques when physical intervention was necessary. If anything, staff are more likely to be *hesitant* to intervene physically, even when it is objectively *necessary*. When interviewed, staff explained their hesitance as primarily being driven by fear for their own safety and sometimes by a lack of trust or confidence in their staff partners on the unit. This issue is particularly pronounced given the overall level of violence in the facility as discussed throughout this report. In addition, the facility's ability to detect and respond to incidents in which staff misuse force (discussed further in ¶ 2(c) below) still needs to be strengthened.

| |
|---|
| **Compliance Rating**. Compliance |

| |
|---|
| **¶2(c). Incident Report Review and Referral.** ACS shall conduct timely and thorough reviews of incidents involving Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies. ACS shall also refer any cases to the New York State Justice Center regarding staff use of Physical Restraints and/or Prison Rape Elimination Act ("PREA") allegations when required by applicable laws, regulations or policies. |

**ACS Policy & Practice.**
- ACS Policy #01/2012 "Reporting of Incidents and Data Management for Group Oriented Analysis Leadership of Strategies (GOALS)" creates a procedure for comprehensive, accurate reporting of incidents that occur in ACS facilities. GOALS reports are created for every incident occurring in the Facility, including physical restraints, mechanical restraints, etc. as noted in ¶ 2(a), above.
- ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention" requires:

  (1) that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report Form;

(2) a supervisor must complete the "Supervisory Follow-Up" portion of the Incident Report Form; and

(3) Executive Directors must review all Incident Report Forms involving an ESPI within 48 hours.

- For all incidents reported to GOALS (not just those involving ESPIs as described above), additional layers of supervisory review *can* occur on an *ad hoc* basis, including:
    - o An Operations Manager's (OM's) Report that is supposed to be generated for critical incidents, which are generally those incidents involving a resident injury or alleged child abuse.
    - o OMs review more serious incidents on a weekly basis (this had, by design, initially been an "Incident Review Committee," intended to randomly audit incidents, but ACS reports review by a committee is not currently occurring).
- ACS Policy #2019/16 "Abuse/Neglect Reporting and Justice Center Compliance in a Secure and Specialized Secure Detention" requires any staff working within ACS' secure detention facilities to immediately report all events meeting specified criteria for abuse, neglect, or a "significant incident"[10] to the Justice Center for the Protection of People with Special Needs ("Justice Center") Vulnerable Persons Central Register.
- ACS' "Safe Intervention Policy for Secure and Non-Secure Detention" also states that the use of excessive force or inappropriate restraint techniques must be reported to the Justice Center.
    - o ACS' Compliance Unit tracks referrals made to the Justice Center.
    - o During the current Monitoring Period, 33 incidents involving physical restraints were referred to the Justice Center.

**Monitoring Team's Analysis**.

The assessment of compliance with this provision is divided into four sections: (1) Horizon's internal assessment of incidents within the facility, (2) an assessment of staff reporting of incidents they are involved in or witness, (3) an assessment of referrals of specific incidents to the Justice Center, and (4) data on sustained allegations of staff on youth assault.

*(1) Horizon's Internal Assessment of Incidents*

Horizon has an adequate mechanism for reporting incidents internally, including all physical restraints, via GOALS. The GOALS reports provide a high-level summary of each incident that occurred at Horizon. However, as reported in the First Monitor's Report, Horizon lacks a systematic process for incidents to be *assessed* by a supervisor. ACS continued work this monitoring period to develop a draft policy that creates a more systematic incident review process that includes these supervisory reviews, which is discussed in more detail below. While staff misconduct during the use of physical intervention is not pervasive as discussed in

---

[10] Significant incidents include any incident, other than an incident of abuse or neglect, that because of its severity or the sensitivity of the situation may result in, or has the reasonably foreseeable potential to result in, harm to a youth's health, safety, or welfare. Significant incidents fall into two distinct categories: Conduct Among or Between Youth and Staff Conduct. *See* NYS SSL § 488 (1) (i).

2(b) above, improvement is needed in identifying and addressing poor practice when it does occur.

o   *Current Practices*

The *ad hoc* incident reviews and elevation of problematic incidents for further investigation described in the prior reports continued throughout this Monitoring Period. ACS leadership reported regularly reviewing incident videos and taking action, including referrals when potential misconduct was identified that warranted consideration for discipline by the Employment Law Unit ("ELU referrals") (as discussed further in ¶ 2(j) below). However, *ad hoc* reviews by facility leadership are simply not sufficient to identify *all* incidents that warrant further scrutiny and potential corrective action. This should be improved once the policy and procedures regarding these reviews (as discussed below) is implemented.

In July 2022, ACS also worked with a third-party consultant (NPJS) to launch an incident review pilot project, in which an NPJS "Back-to-Basics" coordinator reviewed incident videos and developed feedback and teachable moments to be shared with staff at roll call. ACS reports that NPJS will be helping in the launch of the broader incident review process, discussed below, as well.

o   *New Policy and Procedure*

ACS continued work this Monitoring Period on a draft Incident Review Operations Order to formalize a structured process for reviewing all facility incidents. In the last Monitoring Period, a draft policy was shared with the Monitoring Team and the Monitoring Team shared initial feedback. In this Monitoring period, the change in agency leadership slowed the process in finalizing these policies and procedures as the new leadership team took the opportunity to weigh in. In August 2022, ACS provided a revised draft policy that addressed some of the Monitoring Team's feedback and recommendations. The revised policy outlines a reasonable process for multiple levels of review including expanding managerial review to include every incident, with increased supervisory review for more serious incidents. Operations Managers, trained in SCM, must assess staff's conduct during the incident, and must clearly record any recommended corrective action as part of the final assessment of the incident. The policy also now ensures that any staff disciplinary recommendations are clear, succinct, and easily identifiable as part of the incident reviews.

ACS is in a foundational stage of this work, having only recently developed a robust policy and procedure, and significant work lies ahead to achieve implementation. This includes finalizing the policy, hiring additional supervisors to conduct these reviews, training staff to do this work, and conducting quality assurance activities to ensure the work is done with fidelity. The hiring of supervisors to support this work, alone, is a significant endeavor that is unlikely to be completed in mere months. While staff misconduct during the use of physical intervention is not pervasive, there is room for improvement in identifying and addressing poor practice when it does occur.

*(2) Staff Reporting*

The "Safe Intervention Policy for Secure and Non-Secure Detention" requires that any use of an ESPI on a resident must be immediately reported to a supervisor or Tour Commander, and each staff member involved in or who witnessed the event must submit an Incident Report Form. The Incident Report Form has required fields including basic information such as date, time, and youth involved; a general narrative section; and an ESPI-specific portion where staff must identify the type of physical restraint utilized, its duration, and other information specific to the physical restraint.

As noted above, the Monitoring Team reviewed the incident packets for 53 incidents that occurred in January-June 2022, including 32 that included the use of physical restraint, and found that the staff Incident Report Forms who either participated in or witnessed the incident were often missing, and those that were included were often vague or incomplete. While staff appear to accurately detail the actions of youth, staff's reports are often vague or inaccurate regarding their own actions and/or those of other staff. Reviewing staff reports, and identifying and addressing any deficiencies, is part of the new systemic review protocol discussed above and practice is expected to improve once these procedures are in place and appropriately reviewed and addressed.

*(3) Justice Center Referrals*

ACS policy articulates the requirements for referring cases of suspected abuse or neglect and other significant incidents to the Justice Center, including a requirement to track incidents that are referred. The Monitoring Team found that when ACS suspected abuse or neglect or identified a significant incident, the incident was referred as required.  The Monitoring Team also found that all cases of concerning staff behavior identified by the Monitoring Team had been properly referred to the Justice Center. However, the Monitoring Team only reviews a sample of incidents and the lack of consistent supervisory review of all incidents discussed above means that some instances of problematic staff behavior that may have warranted referral may not have been identified, and therefore may not have been referred to the Justice Center as required. Supervisors and Operations Managers must be systematically focused on evaluating staff conduct in order to ensure that all incidents that meet criteria are properly referred to the Justice Center.

(4)  Substantiated Staff on Youth Assaults

Once an incident is referred, the Justice Center investigates the allegation and determines whether it can be substantiated (also called "indicated").  ACS shared data related to substantiated child abuse allegations during the 18-month period of the Agreement.  In comparison to facility violence perpetrated by youth, staff-on-youth violence is significantly less frequent, but it does occur. Between January 2021-June 2022, physical abuse at the hands of staff was substantiated nine times, and 10 other allegations of physical abuse that occurred during this period remain pending. This rate of occurrence is similar to the prior Monitoring Period. While less frequent than youth-on-youth violence, *any* substantiated case of physical abuse in facilities is cause for concern. During its reviews of incidents, the Monitoring Team observed that physical retaliation against youth occurred more often during the current Monitoring Period than had been previously observed. This may be a sign that the level of

stress, fear or frustration among some staff reached an apex, a sentiment that was shared by some of the staff interviewed by the Monitoring Team.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(d). Classification.** ACS shall develop and implement an age-appropriate classification system for AO Youth that is sufficient to protect AO Youth from unreasonable risk of harm and informs and guides the appropriate housing of AO Youth, and permits the use of overrides to address youth's mental health, education or other individual needs.

**ACS Policy & Practice.**

ACS Policy

- Section VII. "Classification and Housing Assignment" of ACS Policy #2019/35 "Orientation and Classification in Secure and Specialized Detention" describes the processes by which ACS determines to which facility and housing unit each youth will be assigned. The standard procedures were modified slightly in response to the COVID-19 pandemic, but typically:
    - o All AO youth entering secure detention do so via Crossroads Juvenile Center ("Crossroads").
    - o Within 5 days of admission, during Intake/Orientation, a case manager completes a Classification Guidance Form that includes a variety of risk and mitigating factors to assess the youth's risk level.
    - o Intake/Orientation staff complete Behavior Observation Reports that characterize the way in which youth interact with peers and staff.
    - o Every other week, an interdisciplinary team that includes ACS leadership (who oversee both facilities) and Crossroads/Horizon staff discuss the placement of the youth and determine who can be suitably transferred to Horizon. This process is driven primarily by the need to balance population/bed space at Crossroads (*i.e.*, when the Intake/Orientation unit is near capacity, the team will meet as needed to identify youth who can be transferred to Horizon), but also considers the youth's individual needs/proximity to family.

ACS Practice

- In mid-2020, Horizon was initially identified as the place where COVID-exposed youth would be quarantined, and thus most of the youth housed in Horizon at that time were transferred back to Crossroads to create space for quarantining needs. In late 2020, Horizon admissions were still quite irregular due to ACS' continued efforts to mitigate the spread of COVID. However, the volume of youth who were exposed and/or became ill was nowhere near what was expected, so by early 2021, the COVID-exposure restriction was lifted, and youth were transferred to Horizon more regularly. Throughout the remainder of the 18-month period of this Agreement, the classification and housing process remained stable, and transfer decisions reflected the criteria described above.

- The same level and type of services are available at both Crossroads and Horizon and thus facility placement should have no impact on the ability to address youth's mental health or education needs.
- Although family proximity is a key component of ACS' facility assignment strategy, population management is the primary driver. When Crossroads' population, particularly in the intake units, increases to approximately 10 youth above the desired capacity, youth whose families reside in the Bronx/Queens/Manhattan or whose cases are being heard in Bronx/Queens/Manhattan courts are transferred to Horizon. This focus on population means that transfers do not occur on a regular schedule, but rather depend on the ebb and flow of youth into and out of both facilities and the resulting population size.
- At the bi-weekly Classification meetings, in addition to the proximity of family/court jurisdiction, the group discusses youth's peer relationships, connections to staff, program engagement, adjustment to the facility, individual needs, etc. to identify those for whom transfer would be appropriate and/or beneficial. These youth are placed in "the queue" and are transferred when the facility populations need to be balanced.
- At Horizon, all of the housing units are identical in terms of security/supervision level and the types of services and programs that can be accessed. The classification committee provides a recommended housing unit type, such as a unit housing more vulnerable youth, one with youth with/without prior detention history, or one where youth are highly engaged in school or programming. During the current Monitoring Period, Horizon established a living unit for youth pursuing post-secondary education.
- Upon transfer, the Horizon Operations Manager/Tour Commander review the recommended housing unit type, assess whether the composition of youth on the unit is amenable to safe placement, and make the final housing unit assignment.
- During the majority of the 18-month period of the Agreement, the primary determinant for housing unit assignment was the extent to which the youth assigned to the unit were familiar with one another and got along. However, during the latter part of the period, Horizon shifted its housing strategy to spread youth with the same gang affiliations more broadly across the housing units.

**Monitoring Team's Analysis.**

It is somewhat unusual for a jurisdiction to have multiple detention facilities, and those that do (typically larger jurisdictions) either have centralized intake like ACS or have geographical catchment areas for each facility, and youth are seldom transferred among facilities. As long as the youth's service needs are met, either model can be utilized. Using family engagement as a criterion for determining facility transfer certainly enhances the centralized model, and it is encouraging that transfers to Horizon are made relatively swiftly.

The processes for intake, classification and housing operated consistently and constructively throughout the current Monitoring Period. A total of 63 youth were transferred from Crossroads to Horizon. To assess ACS' practices in this area, the Monitoring

Team reviewed the key dates for the 28 youth transferred to Horizon in February, March and April 2022 (44% of all youth transferred during the current Monitoring Period), along with the Classification packets for the 13 youth transferred in April 2022.

*Timeliness of Facility Transfer*

As described above, every other week, Crossroads staff convened a multi-disciplinary Classification meeting to determine the appropriate facility/unit placement. Most of the time, youth were reviewed by the committee within a week or so of their admission to Crossroads and transferred to Horizon within a week or so thereafter. Very occasionally, youth were reviewed well after their admission to Crossroads if the family requested a transfer, if the youth's behavior deteriorated at Crossroads, or if the youth's legal status changed and necessitated transfer. Also, youth occasionally transferred to Horizon *before* the committee reviewed them when a more urgent need to balance facility population arose. This occurred for 8 of the 28 youth reviewed during this Monitoring Period (29%), and the committee reviewed each transfer at the next regularly scheduled meeting. ACS reported that each of these 8 youth adjusted well to Horizon and none were subsequently transferred back to Crossroads.

The cadence of intra-facility transfers varied. For example, youth were transferred from Crossroads to Horizon two days in February, five days in March and five days in April. This cadence resulted in some Horizon youth having longer lengths of stay at Crossroads than others, but overall, nearly all youth (86%, n=24) were transferred to Horizon within 21 days of their admission to Crossroads.

*Attention to Individual Needs*

In addition to the timeliness of these transfers, the Monitoring Team reviewed information regarding the specific housing assignments for the 13 youth who were transferred to Horizon in April 2022. The information included the Classification Guidance Form, notes from the weekly Classification meetings, and the Transfer Summary prepared for each youth. The primary reason that most of the youth (11 of 13; 85%) were identified for transfer to Horizon was to be closer to family/court of jurisdiction (*i.e.*, the youth lived in the Bronx, Manhattan, or Queens). One youth was transferred because his legal status changed from JD to AO, and another youth was transferred in an attempt to stabilize his behavior, which had deteriorated while at Crossroads. Each youth's file contained a Classification Guidance Form with specific, individualized information to guide housing unit assignments (*e.g.*, mental health issues, behavior while in custody at Crossroads, peer alliances/tensions, program interests).

*Horizon Housing Unit Assignment*

Once the committee identified a youth for transfer, a suitable housing unit type at Horizon was proposed for each youth. Given that the peer dynamics on the various units change constantly, rather than prescribing a specific unit (*e.g.*, A Hall or B Hall), the classification committee identifies the <u>type</u> of unit in which the youth would be most successful (*e.g.*, a unit where the youth do not have extensive experience in detention; a unit

where the youth are highly engaged in school/programming; a unit with other youth who could be considered "vulnerable"). Proposed housing assignments were revisited upon the youth's arrival at Horizon and often modified based on the current youth composition on the units. Given that all of the Horizon housing units have the same level of security and structure and provide youth with the same access to services and programs, Horizon's general focus on peer dynamics in housing decisions is appropriate.

Toward the end of the current Monitoring Period, Horizon adjusted its strategy for assigning youth to housing units in an effort to improve facility safety, particularly for staff. Previously, the facility attempted to populate each Hall with youth who were familiar with each other (i.e., from the same neighborhood). Although well-intentioned, this strategy concentrated youth with shared gang affiliations in a specific unit, which created a dangerous power differential between youth and housing unit staff. In late May 2022, the facility re-assigned many youth to different housing units to disrupt these peer alliances. During the Monitoring Team's on-site visit in July 2022, both youth and staff reported that these changes caused significant upheaval at first, but more recently, the facility's tenor began to settle. Many staff reported they felt safer given the new housing unit compositions. ACS also reported that this housing strategy will have the secondary benefit of allowing a youth's needs and interests to be prioritized in the housing unit assignment process, rather than peer dynamics. Unfortunately, this shift in housing strategy occurred at the tail end of the 18-month period for this Agreement, so its impact on facility violence and classification/housing decisions could not be assessed.

Given that Crossroads and Horizon provide identical services, prioritizing the youth's connection to his family and his home community when making transfer decisions is a practice that is well supported by research on the importance of family engagement. At the conclusion of the Monitoring Period, Horizon's housing units were not differentiated in terms of security/supervision procedures and access to services, and thus a focus on peer dynamics and/or individual needs and interests were appropriate determining factors. Together, ACS' classification protocols and decisions combine to create a process that is appropriately individualized and sufficiently flexible to address youth's unique needs and circumstances.

**Compliance Rating**. Compliance

---

**¶2(e). Programming.** ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

**ACS Policy & Practice.**
- ACS Policy #2019/04 "Exercise, Recreational and Leisure Activities in Secure and Specialized Secure Detention," which requires a balance of structured recreational, exercise and leisure activities that are posted on a daily unit schedule, remains in effect.
  - This policy requires one hour of large muscle activity per day.

- o ACS has set an internal target of at least 3 hours of programming per day during non-school hours.
- ACS Policy #2019/31 "Educational Services in Secure and Specialized Secure Detention" remains in effect.
  - o Youth of compulsory education age (*i.e.*, age 16 or younger) are to receive educational programming for 5.5 hours per day, Monday through Friday when school is in session.
  - o Youth with a diploma/GED are to receive 5.5 hours of instruction per weekday, which includes literacy, math, life skills and workforce development.
  - o YDS staff are required to facilitate timely arrival and attendance.
  - o During the current Monitoring Period, Horizon offered a variety of extracurricular and post-secondary programming including a "College Week," college courses, and academic tutoring.
- ACS operated a summer enrichment program ("Freedom School") during a six-week period in Summer 2022 in which all Horizon youth participated. ACS also offered a variety of other special Career Pathway programs, including dog training, culinary arts and audio pictures.
- Subsets of Horizon youth also participated in the Summer Youth Employment Programming, facility beautification programs, a week-long intensive music programming and re-entry services. ACS has engaged with several Violence Interrupter and Credible Messenger groups to support communication and interpersonal conflict resolution among factions of youth embroiled in disputes originating in both the community and facility.

**Monitoring Team's Analysis**.

Implementing a robust daily schedule full of engaging, structured activities is a powerful strategy for reducing facility violence and disorder. ACS' internal target of 3 hours of programming each day, in addition to educational services from DOE staff when school is in session, expose youth to essential rehabilitative services and substantially reduce idle time. This goal reflects best practice.

Programming at Horizon is provided by Program Counselors, community partners, behavioral health staff and the YDSs assigned to each housing unit. Most of the programming facilitated by YDSs is semi-structured leisure time activities (*e.g.*, card games, video games, movies), while Program Counselors and vendors provide rehabilitative and skills-based programs such as creative arts, performing arts, cooking, personal fitness, goal setting, decision making and conflict resolution. Behavioral health staff provide group psychotherapy.

One of the main challenges in consistently delivering the internal target of 3+ hours of structured programming per day is a lack of programming staff. Of the 17 Program Counselor positions, only seven were filled at the end of the current Monitoring Period, and two of the three Program Supervisor positions were vacant. While these seven Program Counselors do provide services to all 10 housing units, they are not sufficient in number to provide the

intended volume of programming, nor do they have the on-going presence and deep engagement in a single unit's operations that ACS desires.

Unfortunately, it is not currently possible to assess the extent to which programming targets are being met. In April 2022, ACS launched an electronic scheduling and program tracking tool that had been under development for nearly two years. The Program Assessment and Tracking System (PATS) will track program delivery by Program Counselors, YDSs and vendors and will be capable of reporting programming levels for each housing unit. As is typical with new systems, the early months of implementation revealed a variety of data entry problems that both under- and over-counted the number of programming hours delivered. Although ACS continues to troubleshoot issues and coach Horizon staff in PATS' requirements, ACS was unable to produce valid data on program delivery for April, May or June 2022. When interviewed, both staff and youth could identify interesting programming offerings but universally reported that more programming was needed to improve the youth's experience and reduce violence at Horizon. Technological advancements often require a transition period, so these setbacks are expected, and the long term pay-off of an electronic tracking system will be significant.

Although Horizon's education program is not subject to monitoring, it is an important component of Horizon's efforts to meaningfully engage youth in activities that promote success and positive growth. At several points throughout the Monitoring Period, ACS/Horizon engaged with the Monitoring Team to discuss challenges related to educational space, timely arrival, and consistent attendance. Limiting recreational activities during school hours for youth who refuse to attend and identifying school liaisons to encourage participation were put into place during the current Monitoring Period. Previously reported issues with classroom space were resolved during the Monitoring Period and all classrooms are now functional, permitting the scheduling of full-day school for all youth at Horizon. On-site GED testing is now available, which has reportedly increased student interest in this option. The extent to which youth actually attend and are constructively engaged while in the classroom continues to be a challenge. ACS and DOE continue to seek strategies to address these problems, and representatives of both agencies recently attended a workshop by the well-respected Center for Educational Excellence in Alternative Settings (CEEAS) where they reportedly gained a number of novel approaches and promising ideas. As of the beginning of the 2022-2023 school year, school starts later in the morning, the array of career readiness programming has been expanded, and the number of tutors available to students has increased.

ACS reported its intention to broaden program offerings to respond to the fact that, as a result of Raise the Age, youth at Horizon tend to be older and thus have different interests and needs than pre-RTA youth. In addition to expanding its post-secondary options, ACS also plans to expand its vocational offerings to appeal to and adequately prepare those youth who do not intend to go to college for successful community re-entry. Recently, ACS reported that the City authorized $38 million for the design to upgrade Horizon's physical plant. ACS also has reported that $161 million in its Commitment Plan to fund the design, construction management, and the construction to upgrade Horizon's physical plant to adequately support these programs by adding vocational, program and recreational space.

ACS has made substantial efforts to provide an array of programming to youth at Horizon by dedicating significant resources to engage youth in structured activities led by an adult. However, the enduring impact of COVID (staff absences and occasionally quarantines when youth were restricted to their units and thus unable to access a variety of programs) and the shortage of Program Counselors, Supervisors and YDS staff to transport youth to activities suggest that the internal 3+ hour targets may not have been met consistently throughout the current Monitoring Period. ACS' new program tracking tool is an important innovation, and once properly implemented, should provide ACS with essential data to assess programming activity and engagement.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(f). Consistent Staffing**. ACS shall adopt and implement a staff assignment system under which a team of housing unit staff and supervisor(s) are consistently assigned to the same AO Youth housing unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**ACS Policy & Practice.**
- As a Specialized Secure Detention Facility that is authorized to house Adolescent Offenders (AOs), Horizon must abide by OCFS regulation 9 CRR-NY 180-3.11 "Staffing and Supervision of Youth." This regulation requires a 1:6 ratio of YDSs to youth <u>and</u> requires that staff may not work alone. In practical terms, 2 staff must be present at all times on units that house between 1 and 12 youth.
  - It is important to recognize that the "staff may not work alone" requirement means that whether the facility holds 40 or 100 youth, the number of staff needed to supervise the housing units is generally the same. When the population is at the low end, Horizon's practice is to distribute youth across most of the 10 housing units, rather than consolidating them on one or two units at maximum capacity. The wide distribution of youth is the preferable strategy for safety, managing interpersonal conflicts, staff-youth rapport, programming etc., but necessarily requires more staff to execute.
  - In response to multiple incidents involving youth obtaining staff's keys and attempting to move through the facility's corridors, SCOC[11] requires Horizon to staff its 8-10 corridor posts at all times, in addition to its 20-25 housing unit posts and staff to supervise the clinic, for about 30-35 primary fill posts on each shift.

**Monitoring Team's Analysis.**

A prerequisite to consistently assigning individual staff to the same unit day-to-day is having enough staff to cover all essential posts (*i.e.*, "primary fill posts"). Horizon has a sizable number of primary-fill posts which, when combined with insufficient numbers of YDSs,

---

[11] SCOC (New York State Commission of Correction) is one of several oversight agencies that regulates ACS facilities.

impacts flexibility when trying to ensure that individual staff are consistently assigned to the same housing unit post day-to-day. Compounding the challenge of consistently assigning staff is a shortage of YDSs and AYDSs overall, not to mention constant fluctuations in the number of staff available to work on any given day due to COVID exposure.

The STRIVE behavior management program (discussed in detail below) requires a team of staff to be consistently assigned to each living unit. Staff assignments to the STRIVE pilot Halls for each day in May 2022 were analyzed to assess the consistency of staff assignments. Similar to the November 2021 analysis reported in the previous Monitor's Report, this data revealed that on both Halls/shifts, a small group of core staff were consistently assigned to each Hall, and that on nearly every day/every shift in the month (91%), at least one of these core staff worked each Hall.[12] In other words, each day, at least one staff person who was very familiar with the youth on the Hall, the Hall's daily schedule, and the components of the new STRIVE program was present. This type of consistency permits rapport and trust to develop between staff and youth, allows staff to develop more individualized approaches (e.g., reading the youth's behavior cues, knowing how to calm a particular youth down) and thus enhances facility safety. Horizon's level of performance on the STRIVE pilot Halls is particularly impressive given the staff shortages discussed above and the impact of COVID exposure on staff's ability to report to work.

In summary, the staffing problem at Horizon closely resembles what the Monitoring Team is currently observing in other jurisdictions—a nationwide shortage of youth care workers that has significantly worsened in the past year. Importantly, ACS has designed and implemented a robust array of creative strategies designed to increase the number of available staff at Horizon, discussed in the Introduction to this report.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(g). Behavior Management.** ACS shall develop and implement systems, policies and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these systems, policies and procedures shall be individualized and consistent with any treatment needs for AO Youth, and shall not compromise the safety of other AO Youth or ACS staff.

**ACS Policy & Practice.**
- ACS Policy #2018/09 "Behavior Management in Secure and Specialized Detention" remains in effect. It guides the delivery of a multi-tiered behavior management system that cultivates a "therapeutic institutional culture." The policy states that staff interactions with youth should teach youth self-regulation and problem-solving skills and emphasizes that youth with aggressive behaviors are the ones most in need of positive relationships with staff rather than punitive approaches to behavior management. These are important philosophical underpinnings to the facility's approach to behavior management. The policy specifically requires:

---

[12] This method for assessing consistency is congruent with standards the Monitoring Team has utilized in other jurisdictions.

  - o   Safety Plans
  - o   Level System with incentives and consequences, that is consistent with each youth's Safety Plan (which is consistent with the requirements of this provision)
  - o   Therapeutic groups, individual interventions and opportunities for youth empowerment and self-advocacy
- In 2020, the National Partnership for Juvenile Services (NPJS) helped ACS to address an identified need to integrate more best practices to STRIVE, particularly around the building of new skills, and the need to provide reliable incentives for desirable, prosocial behavior and meaningful consequences for negative behavior.
- ACS developed an excellent manual to guide implementation of Restorative Justice activities that includes restorative circles and an array of group-based activities.
- The new Deputy Commissioner accelerated the training and implementation plan for STRIVE. Whereas previously, Horizon intended to pilot test the program in two Halls followed by a staggered roll-out to the additional Halls, the current plan is to train all remaining staff to implement STRIVE concurrently and to roll out the program simultaneously in the remaining Halls.
- NPJS consultants were redeployed from providing on the ground implementation support to the two STRIVE pilot Halls to facilitate training sessions for all staff. Training includes the mechanics of the program (strategies to increase appropriate behaviors such as praise, point cards and privilege levels; strategies to decrease inappropriate behaviors using a continuum of interventions that are calibrated to the severity of misconduct) and the skill-building components (e.g., cognitive behavioral therapy groups) and Restorative Justice activities. Scenario-based activities are included to facilitate the application of the various concepts.
- NPJS is also training each unit team's core members (Core Leadership Team or "CLT") to effectively facilitate the various community meetings, groups and activities central to STRIVE's program design. A Workforce Coach, available to ACS through a partnership with the Silberman School of Social Work at Hunter College, has also been deployed to assist CLT members in group facilitation. However, as of the drafting of this report, there is only one functioning CLT at Horizon.
- STRIVE training was incorporated into YDS pre-service training in February 2022, so new staff arrive at Horizon with this training completed. Pre-service trainers will also be taught to deliver Restorative Justice content in the coming months.
- ACS is developing an app that will automate many of the tasks commonly completed manually by staff. This unique and sophisticated approach to implementation may help Horizon to avoid many of the "operator errors" that undercut the delivery of behavior management programs in other jurisdictions.
- ACS plans to work with NPJS to implement a skills-based group intervention, called "CBT 2.0," which is a curriculum that teaches youth to pause and reflect instead of reacting automatically and helps youth to substitute prosocial behaviors for previous maladaptive ones. Training is scheduled to begin in mid-2023.

**Monitoring Team's Analysis**.

A robust behavior management program is an essential element of a safe facility. Such a program should teach skills that promote prosocial behavior (e.g., skills for resolving interpersonal conflict, managing anger and resisting impulsive actions) and should incentivize and reinforce positive behavior with an array of meaningful rewards. A behavior management program should also provide for appropriate, proportional, skill-based responses to negative behaviors that hold youth accountable and that lessen the likelihood of subsequent misconduct. In addition to having a sufficient number of well-trained staff and an engaging array of programming, a well-designed and consistently implemented behavior management program is the cornerstone of a safe facility.

The First Monitor's Report (*see* pgs. 29-31) discussed the evolution of the STRIVE model, how the model's design was strengthened, and the initial timeline for implementation which began with training all managers during Summer 2020. As noted throughout the Monitor's Second Report, COVID's impact on staffing made the delivery of regular programming difficult (a key component of behavior management), and substantially undercut Horizon staff's ability to attend scheduled trainings and to take the time necessary to cultivate new practices. As a result, the implementation of the new STRIVE model did not expand as quickly as ACS hoped it would.

Two pilot Halls implemented STRIVE in November 2021 and continue to deliver the new version of the program. The remaining Halls currently deliver various components of the original version of STRIVE, which has various shortcomings and by all accounts (facility leaders, staff and youth) was not implemented with consistency or fidelity. For these reasons, the new Deputy Commissioner decided to accelerate the training for the improved STRIVE program so it could be implemented more quickly, to address weaknesses in staff practice and to promote consistency facility-wide. While the original, slower roll-out had benefits (particularly in providing support to staff as they implemented the new program), progress toward full implementation had become protracted and progress toward the requirements of this provision had stagnated. The Monitoring Team fully supports ACS' new approach.

Thus, the focus of monitoring during the current 6-month period has been on the effort to train all Horizon staff to prepare for the facility-wide launch of the STRIVE program. All YDSs, AYDS, Program Counselors, Case Managers, OMs, and Tour Commanders must be trained in STRIVE. A training schedule that extends through the end of August 2022 has been devised, and ACS estimates that the majority of staff will have completed STRIVE training by that date, with the remainder to be trained in the subsequent months (the exact schedule cannot be constructed until the 8-hour shift assignments have been finalized).

STRIVE Champions (YDSs, AYDSs, TCs or OMs who are committed to supporting the roll out) have been trained to facilitate a series of five learning groups to educate youth on each Hall about the new STRIVE program. In addition to these groups for youth, Learning Bursts, facilitated by NPJS and STRIVE Champions during roll call, will provide short opportunities for staff to practice or refresh knowledge of critical points in STRIVE.

STRIVE should bring ongoing reinforcement of positive behavior (via point cards and incentives) and opportunities to learn and practice new skills (via CBT groups). It should also

provide a structure and forum for addressing youth's negative behaviors. A structure for imposing proportional consequences for misconduct has been developed and will be implemented by each unit's Core Leadership Team (CLT), which will discuss youth's misconduct and impose appropriate consequences and restorative activities. While the pilot Halls have begun to implement these features, the remaining Halls cannot do so until all staff have been trained and CLT's are brought to fruition.

While Horizon has made important progress in staff training during the current Monitoring Period, a large segment of the facility has not yet implemented the revitalized STRIVE. Staff continue to struggle to apply effective behavior management strategies (both those designed to increase positive behavior and to decrease negative behavior) consistently with the youth population.

**Compliance Rating**. Progress Made, but Compliance Not Yet Achieved

---

**¶2(h). Room Confinement.** ACS shall comply with applicable ACS policies and practices: (1) prohibiting the use of punitive segregation and (2) governing the use of room confinement.

ACS Policy & Practice.
- ACS Policy #2019/32 "Room Confinement Policy for Secure and Specialized Secure Detention" remains in effect. ACS shared proposed revisions to this policy with the Monitoring Team just after the Monitoring Period ended. The policy limits the use of isolation to circumstances in which a youth poses an imminent risk of physical harm to another person and prescribes various protections for youth in confinement.
- Any use of room confinement must be authorized by the Facility Director/designee, and re-authorized at prescribed intervals (within 2 hours, and every 2 hours thereafter) and up the chain of command.
- Parents must be notified within 12 hours of room confinement being initiated. ACS plans to extend the timeline to 24 hours, which is within the generally accepted practice.
- Youth's safety and welfare must be checked at 15-minute intervals and documented in a logbook.
- Youth must be assessed for their readiness for return to regular programming at 30-minute intervals by YDS and/or facility administrators. Supervisors must visit every 60 minutes to reassess. These assessments must also be documented in a logbook.
- A variety of services must be provided to youth in room confinement including meals; case management if the youth remains in room confinement for more than 1 hour; mental health services within the first hour, preferably, but within 8 hours and then every 8 hours thereafter; medical within 3 hours and every 8 hours thereafter; education if the youth is in room confinement during school hours for more than one period. All services must be documented in a logbook.
- During the previous Monitoring Period, Horizon took several steps to better educate staff at all levels on the requirements of the *Room Confinement* policy, including a job

aid, an email template to alert the relevant people who have responsibilities under the *Room Confinement* policy that a youth has been placed in room confinement, and refresher training for key supervisory staff.

**Monitoring Team's Analysis**.

While isolation is not an effective *disciplinary strategy* (*i.e.*, not effective when used as a consequence for a rule violation), short periods of room confinement are an essential tool for responding to an imminent risk of harm to another person's safety and/or manage the aftermath of a violence incident. The Monitoring Team has encouraged Horizon to consider and better utilize room confinement as part of its response to incidents, especially to contain situations where an ongoing risk of harm remains (*e.g.*, retaliation, chaos from large group events, inability to return to regular programming, etc.). When properly utilized and rigorously monitored, the use of room confinement following a serious incident is an important safety tool. Not only does it provide an opportunity for the youth involved to de-escalate, it also provides the necessary time and space for uninvolved youth and staff to regain their footing, de-escalate, restore a sense of order and return to programming.

During the current Monitoring Period, Horizon did utilize room confinement more often than observed previously. A total of 49 youth were placed in room confinement in response to 9 major events that occurred between January and April 2022. There was some evidence of improved practice—email notifications were generally timely and most used the new template designed to remind staff of their various responsibilities and extensions to room confinement were usually authorized appropriately. However, a significant number of protections required by policy were inconsistently applied. More specifically:

- Documentation did not always adequately describe the imminent risk of harm posed by each youth.
- 15-minute safety checks were inconsistent.
- 30/60-minute assessments were inconsistent and when they did occur were not individualized, using only general statements in a logbook such as "unit tone is low" of "tone is still high." At times, even though it appeared that youth were calm, room confinement continued without a stated reason.
- AYDS/OM/TC/Superintendent visits with youth in room confinement did not occur as required.
- Case Manager and Mental Health staff visits occurred in a few, but not all instances when they were required. Education services were not provided in the one event in which room confinement occurred during school hours.

ACS reported that it recently hired a Compliance Officer whose duties will include "mini-audits" of room confinement practices to ensure compliance with policy. This is an important step forward to improve staff practice as it will create an *internal* capacity to identify and solve problems. To improve staff practice, the Monitoring Team encourages ACS to provide more targeted, close-in-time feedback to staff who are responsible for implementing the various protections required by policy.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

**¶2(i). Video Preservation.** ACS shall preserve all video at Horizon Juvenile Center for 90 days. When ACS is notified of a Physical Restraint within 90 days of the date of the incident, ACS shall preserve the video for a period of four years.

**ACS Policy & Practice.**
- In July 2022, shortly after the close of this Monitoring Period, ACS finalized and implemented Video Preservation Operations Order 2022/01.
- The Video Preservation Operations Order requires all video related to an incident to be uploaded and retained in the digital evidence management software, Genetec Clearance. The process is outlined below:
  - After a GOALS-reportable incident occurs, the Horizon Operations Manager must respond to the area, immediately access the Genetec Security System, and identify the relevant camera angles and time of the incident. The Operations Manager must create a case and place the video in the Genetec Clearance System. Video is preserved in the Clearance system for at least 4 years.

**Monitoring Team's Analysis.**
*Video Preservation Audit*

Like in previous Monitoring Periods, the Monitoring Team conducted an audit to evaluate ACS's practices regarding video preservation. The Monitoring Team randomly selected 13 incidents from January to June 2022 involving physical restraints to assess whether the video was preserved in Genetec Clearance. The audit revealed that video for only 6 of the 13 incidents (46%) was preserved in Genetec Clearance. The remaining 7 incidents had not been saved to Genetec Clearance. However, the video for 6 of these 7 incidents was still accessible in the Genetec Security system. The Genetec Security System is used to review live video and all video captured is automatically saved for six months and then permanently deleted unless preserved elsewhere. The remaining incident that was not saved to Genetec Clearance nor accessible in the Genetec Security System was preserved separately in ACS's internal shared drive.

While video for all 13 incidents was available to view at the time of the audit, it is important to emphasize that the video for 7 incidents was not saved to Genetec Clearance as required by policy. This is concerning for two reasons. First, it indicates a process failure for ACS staff to preserve video as required, and second, any video not in Genetec Clearance is at risk of being permanently deleted. In fact, the one video that was not in Genetec Clearance or the Genetec Security System would have been completely erased if ACS had not saved it internally because the incident was more than six months old. Shortly after the audit, ACS reported that the video for all 7 incidents had been uploaded to Genetec Clearance to ensure the video was preserved and consistent with ACS policy.

The audit findings this Monitoring Period revealed a drop in compliance compared to previous Monitoring Periods. These findings suggest ACS staff, specifically, Operations Managers, are not complying with ACS policy of preserving video in Genetec Clearance

immediately following a reportable incident. Moreover, it indicates ACS' Quality Assurance process may not be consistently applied. Previously, ACS reported that the Central Office Incident Review team served in a quality assurance role by reviewing GOALS reports from the previous 24 hours and confirming that the incident video had been uploaded to the Genetec Clearance System.  If the video had not been uploaded by the Operations Manager, the Central Office Incident review team would upload it to Genetec Clearance. This Monitoring Period's audit findings suggest this quality assurance mechanism may not be dependable.

That said, the Monitoring Team has had access to video for all incidents requested from ACS close-in-time to the incident. While this is not surprising given all video is preserved for at least six months automatically and our requests are received and fulfilled within six months of the incident date, it does demonstrate availability of video for incident investigation exists for at least some period of time and the longer-term preservation issues described above has not impacted the Monitoring Team's ability to review video.

*Operations Order*

The Final Operations Order regarding video presentation, that was promulgated after the close of the Monitoring Period, includes revisions based on recommendations made by the Monitoring Team's assessment of a previous draft of the policy.  These revisions include detailed Case Type Definitions, a step-by-step process for uploading video into the Genetec Clearance System, and specific deadlines of when the video must be uploaded. Now that the Operations Order has been completed, the Monitoring Team encourages ACS to ensure that relevant staff understand their responsibilities and implement the policy as designed. ACS should also review its Quality Assurance process to better understand the failures revealed by the Monitoring Team's audit and make any necessary revisions to ensure the QA process is capable of identifying lapses in practices and addressing it quickly so practice is improved going forward.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

---

**¶2(j). Staff Discipline**. ACS shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, when staff members violate the ACS Physical Restraint Policies.

**ACS Policy & Practice.**
- ACS Code of Conduct prohibits the use of physical or mechanical restraints on residents that is not in accordance with the physical restraint policy (ASC Policy #2014/10 "Safe Intervention Policy for Secure and Non-Secure Detention"), and prohibits striking or using unauthorized physical force or attempted physical force, and specifies that any violation of the code subjects staff to discipline.
- ACS' disciplinary options are based on the employment status of staff members:
  - *All Staff*: Any staff member may be subject to a formal disciplinary conference, which is a conference between the staff member and a facility supervisor that is formally documented and placed in the staff's personnel file. During these

sessions, the supervisor reviews the staff's problematic behavior and discusses
how to improve practice going forward.

- o *Permanent civil service staff with disciplinary rights*: Discipline for permanent
  civil service staff is processed through the Employment Law Unit ("ELU"). These
  staff are subject to administrative charges and hearings via the Office of
  Administrative Trials and Hearings ("OATH"), although a pre-hearing
  suspension of up to 30 days may also be imposed.
- o *Provisional Staff*: ACS may terminate provisional staff (any staff with fewer than
  two years of service) without a hearing or due process because they are still in
  their probationary period. During the current Monitoring Period, most Horizon
  staff were still in their probationary period.

- During the current Monitoring Period, ACS continued to utilize a tracking system for
  ELU referrals from the facility to track cases as outlined below:
  - o The facility Executive Director of Operations ("EDO") is responsible for, among
    other things, maintaining a record of all corrective actions involving staff
    (including both ELU referrals and other internal steps), as appropriate, based
    on the incident review process.
  - o The EDO receives all proposed Detention/ELU referral packets from the facility
    and ensures appropriate procedure and completeness of the proposed
    Detention/ELU referral packets before sharing with ELU.
  - o ACS reported that incidents identifying specific staff who are reported to the
    Justice Center are regularly reviewed by Horizon leadership in consultation with
    ELU regarding potentially opening a disciplinary case.
  - o ACS reported that Horizon and ELU have established monthly meetings to
    review and track all pending disciplinary referrals, with the goal of expediting
    case resolution and penalty where appropriate, and as consistent with civil
    service rules and processes.

- In total, ACS terminated 22 staff members (both provisional and permanent staff)
  between January 1, 2022 and June 30, 2022 for misconduct related to workers
  compensation issues, failure to supervise, physical restraint-related misconduct, code
  of conduct violations including contraband, security breaches, and/or due to DCAS
  finding the employee not qualified for the YDS title for provisional staff. This includes
  one staff terminated for physical restraint related misconduct.

- ACS reported 39 disciplinary referrals to ELU for permanent civil service staff between
  January 1, 2022 and June 30, 2022, including 20 ELU referrals for physical restraint
  related misconduct.

**Monitoring Team's Analysis**.

ACS reported significantly more corrective action for permanent staff regarding
physical restraint-related misconduct during this Monitoring Period (20 ELU referrals)
compared to the previous Monitoring Period where only six referrals were made. The increase
in referrals appears to be related to improved scrutiny by both ACS and the Monitoring Team,

rather than an increase in problematic staff conduct. ACS also established procedures to better track and process disciplinary cases going forward.

The revised Incident Review Policy draft discussed in ¶ 2(c) above now includes a section with guidance on a progressive disciplinary model for staff misconduct, to give Horizon leadership and staff clear expectations going forward. ACS reported its intention to transition to a more graduated range of corrective and training actions that can and should be taken when staff fail to use authorized SCM techniques when applying restraints or depart from acceptable practice as defined by policy. ACS wants to maximize the use of corrective actions to support improved staff practice and does not simply want to default to immediately terminate staff (particularly probationary staff) if it appears that staff are in a position to improve their practice going forward. The Monitoring Team supports this approach, since coaching, mentoring, and training are important tools for enhancing staff skill in response to less serious policy violations. ACS provided the Monitoring Team with information on all 53 requested incident packets described in ¶ 2(b) as to whether any corrective action was taken, and training and counseling was frequently invoked. It was also noted that a number of staff resigned or were terminated for reasons other than their conduct in potentially concerning incidents. Staff resignations following egregious misconduct are not unusual. While their resignation serves the purpose of limiting their contact with youth, it does have potentially negative implications for the ability to record appropriate disciplinary action on these staff's employment records (meaning, when they quit, the staff could get hired in another youth-serving position that they may not be suitable for). That said, this dynamic cannot necessarily be avoided.

Appropriate corrective action for staff misconduct necessarily hinges on a robust and reliable process to *identify* misconduct, which was a work in progress this Monitoring Period as described in ¶ 2(c) above. It also requires a reliable process for tracking referrals for staff discipline and good record-keeping when discipline is referred or imposed. While ACS is on the path to better detection of misconduct through a more robust and systematic incident review process, which coupled with a heightened attention and tracking of disciplinary responses should improve practice moving forward, much work remains to stand this system up and implement it with consistency and fidelity.

**Compliance Rating**. Progress Made, but Compliance not yet Achieved

Appendix: New Voluntary Agreement

**Second Agreement with Monitoring Team Panel
to Monitor 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center**

This Agreement ("Agreement") is voluntarily entered into by the Monitor appointed in the *Nunez* Consent Decree (11-cv-5845, docket entry 249) as defined in § XX, ¶ 1 & 6 (the "Monitoring Team Panel" or "Monitor"), the City of New York (the "City"), and the Administration of Children Services ("ACS"), for the period from July 1, 2022 to June 30, 2023. This Agreement concerns the management and supervision of Adolescent Offenders, as defined under Criminal Procedure Law § 1.20(44), who are or will be housed at the Horizon Juvenile Center ("AO Youth"), and the operation of that facility.

(1) ACS will make deliberate and good faith efforts to improve its practices regarding the enumerated provisions in ¶ 2 below.

(2) ACS agrees to the following:

    a. AO Youth shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a timely manner to prevent youth-on-youth fights and assaults, and to de-escalate youth-on-youth confrontations, as soon as it is practicable and reasonably safe to do so.

    b. ACS shall comply with applicable ACS policies governing staff's use of physical interventions and restraints (collectively "Physical Restraints") and any required reporting of such incidents, including Policy # 2014/10 ("Safe Intervention Policy for Secure and Non-Secure Detention") and Administrative Order #01/2012 ("Reporting of Incidents and Data Management for Group Oriented Analysis of Leadership Strategies (Goals)"). The aforementioned policies shall be referred herein as "the ACS Physical Restraint Policies." The City and ACS shall also agree to comply with 9 NY-CRR §§180-3.15 and 180-3.16.

        i. The Monitoring Team Panel shall assess, in collaboration with ACS's Division of Youth and Family Justice ("DYFJ") senior managers, on ACS' Staff reporting and use of Physical Restraints, and shall provide feedback and any necessary recommendations for enhancements to reporting, limiting physical interventions where possible, and improvements to the use of Physical Restraints. This assessment shall include a review by the Monitoring Team Panel of a reasonable number of incidents involving the use of Physical Restraints (including the review of staff reports and/or video footage), to provide feedback on de-escalation and restraint approaches in response to youth-on-youth violence, youth-on-staff violence, staff on youth violence, and other situations with an imminent threat of harm. The Monitoring Team Panel shall make recommendations about staff training, and articulate general improvements to practice as necessary, in consultation with DYFJ senior management.

    c. ACS shall conduct timely and thorough reviews of Physical Restraints to determine whether the intervention was appropriate and whether ACS staff complied with the ACS Physical Restraint Policies.

    d.  ACS shall develop, track, and maintain a sufficient level of programming for AO Youth, consistent with best practices for adolescents and young adults.

    e.  ACS shall maintain systems, policies, and procedures for AO Youth that: (i) reward and incentivize positive conduct and (ii) sanction negative conduct. The application of these procedures shall be individualized, consistent with any treatment needs for AO Youth and shall not compromise the safety of other AO Youth or ACS staff.

    f.  ACS shall comply with applicable ACS policies and practices governing the use of room confinement.

(3) ACS agrees, in the spirit of collaboration and in recognition of the deep mutual commitment to improving program and practice goals, to continue to consult with the Monitoring Team Panel regarding the areas set forth above in Paragraphs 2(a)-(f). The Monitoring Team Panel will meet on a quarterly basis with the ACS Commissioner and relevant associated senior staff, to discuss the Monitoring Team Panel's observations and assessment of ACS program and practice at Horizon Juvenile Center, improvements made or not, and to relate any other information that the Monitoring Team Panel deems relevant and appropriate for enhancing ACS' practice at Horizon Juvenile Center.

(4) During the period of this Agreement, the Monitoring Team Panel may, as necessary, provide technical assistance to ACS regarding the terms of this Agreement.

(5) The Monitor will assess compliance with the requirements set forth above in Paragraphs 2(a)-(f). For purposes of this Agreement, the Monitor shall find ACS to be in "Compliance" with a provision if the Monitor finds that ACS has consistently complied with the relevant requirement and any violations of the relevant requirement are only minor or occasional and not systemic, material, or recurring. The Monitor will file two public reports ("Monitor Reports") on the docket 11-cv-5845 (LTS) (S.D.N.Y.) assessing ACS' compliance with these requirements during two reporting periods.

    a.  There shall be two reporting periods during the term of this Agreement. The first reporting period shall cover July 1, 2022 to December 31, 2022. The second reporting period shall cover January 1, 2023 to June 30, 2023.

    b.  The Monitor shall issue a report within 80 business days following each reporting period. Within 30 days from the end of each Reporting Period detailed in subdivision (a) of this Section, ACS will share a Written Compliance Assessment, followed by a presentation/meeting with the Monitoring Team describing ACS efforts, successes and challenges in meeting the expectations detailed in Paragraphs 2(a-f) of this Agreement. The Monitor Reports shall be provided to the City and ACS in draft form for comment at least 30 business days prior to their issuance. The City and ACS shall provide the Monitor with their comments, if any, within 15 business days after receipt of the draft Monitor Report. The Monitor shall consider the comments, and make any changes deemed appropriate, before issuing the final report. The Monitor Reports shall be written with due regard for the privacy interests of individual AO Youth and ACS staff members; federal, state and local laws regarding the privacy of such information; and the interest of ACS in protecting against the disclosure of non-public or privileged information.

Consistent with such interests and laws, the Monitor shall redact individual-identifying information from Monitor Reports and any documents submitted with those reports, and shall give due consideration to ACS requests to edit or redact any other information. The Monitor shall provide the final report and redline comparing the final report with the draft Monitor Report to ACS 5 business days prior to issuing the final report. To the extent the Monitor declines to make the edits or redactions requested by ACS, ACS can append any comments to the Monitor Report that is submitted by providing such appendix to the Monitor by noon on the day the final report is to be issued.

c. Each of the Monitor Reports shall provide relevant and appropriate context for its findings and give due consideration to the totality of the circumstances. Further, as appropriate and relevant, the Monitor Reports shall describe: (1) ACS' diligent and good faith efforts to implement ¶ 2 (a)-(f) of this Agreement, (2) generally accepted practice for 16- and 17-year old youth as it relates to this Agreement, and (3) any challenges or obstacles related to implementing ¶ 2 (a)-(f) of this Agreement.

d. ACS will be afforded the opportunity to append a response to the final Monitor Report filed with the Court.

(6)  In furtherance of this Agreement, the City shall bear all reasonable fees, costs, and expenses of the Monitor, including payments to the Monitor's staff as required under the *Nunez* Consent Judgment § XX, ¶ 5 and consistent with the Monitoring Team Panel's payment structure with the City that is in place for the *Nunez* Consent Judgment.

(7) ACS will provide the Monitoring Team Panel reasonable and timely access to relevant information and documents in order to perform the responsibilities of this Agreement. The January 7, 2021 confidentiality agreement between the Monitoring Team Panel and ACS, which delineates the acquisition and appropriate use by the Monitoring Team Panel of confidential information, prohibitions on secondary dissemination, record retention during the period of this Agreement, and destruction of records provided to the Monitoring Team Panel at the end of the period of this Agreement, remains in effect.

Date: September 29, 2022

**FOR THE CITY OF NEW YORK AND**
**THE ADMINISTRATION FOR CHILDREN'S SERVICES:**
SYLVIA O. HINDS-RADIX
Corporation Counsel for the City of New York

*kjoyce*
_____
Kimberly Joyce

**FOR THE MONITOR:**

s/ Steve J. Martin
_____
Steve J. Martin, *Monitor*
Anna E. Friedberg, *Deputy Monitor*
Christina B. Vanderveer, *Associate Deputy Monitor*