# Second Status Report on DOC's Action Plan by the *Nunez* Independent Monitor

**October 28, 2022**

**THE NUNEZ MONITORING TEAM**

Steve J. Martin
*Monitor*

Kelly Dedel, Ph.D.
*Subject Matter Expert*

Anna E. Friedberg
*Deputy Monitor*

Dennis O. Gonzalez
*Associate Director*

Patrick Hurley
*Subject Matter Expert*

Alycia M. Karlovich
*Analyst*

Emmitt Sparkman
*Subject Matter Expert*

Christina Bucci Vanderveer
*Associate Deputy Monitor*

**Introduction** ........................................................................................................ 1

   Current State of Affairs ......................................................................................... 2

      -    Length of Stay ................................................................................. 4

      -    Long-Term Nature of Viable Solutions .......................................... 5

   Department Leadership Changes .......................................................................... 6

   Department's Engagement, Focus, and Collaboration on Action Plan ................. 7

   Assessment of Progress ........................................................................................ 9

   Structure of the Report ....................................................................................... 11

**Progress Update on the Action Plan** ............................................................. 13

      Recruitment Efforts ...................................................................................... 13

      Deaths of Individuals in Custody ................................................................. 17

      Uniform Staffing Practices ........................................................................... 32

      Security Practices .......................................................................................... 56

      Managing People in Custody ........................................................................ 82

      Staff Accountability ..................................................................................... 94

      Conclusion & Next Steps ............................................................................. 99

**14th Monitoring Period Compliance Assessment for Select Provisions of the Consent Judgment and First Remedial Order** ............................................ 103

      Initiatives to Enhance Safe Custody Management, Improve Staff Supervision, and Reduce Unnecessary Use of Force (Remedial Order § A) ....................... 105

      Use of Force Policy (Consent Judgment § IV) ............................................ 120

      Use of Force Reporting and Tracking (Consent Judgment § V) .................. 122

      Use of Force Investigations (Consent Judgment § VII) ............................... 131

      Risk Management (Consent Judgment § X) ................................................. 141

      Staff Discipline and Accountability (Consent Judgment § VIII & Remedial Order § C) .......................................... 145

      Screening & Assignment of Staff (Consent Judgment § XII) ...................... 170

      Safety and Supervision of Inmates Under the Age of 19  (Consent Judgment § XV) ... 171

**Appendix A: Data Appendix** .........................................................................

   Staffing Data ........................................................................................................ i

      -    Unmanned Posts & Triple Tours ..................................................... i

      -    Uses of Force Involving Unmanned Posts ..................................... iii

      -    Sick Leave, Medically Monitored/Restricted, and AWOL Data .............................. iv

   Staff Accountability ........................................................................................... vii

      -    Staff Suspensions ......................................................................... vii

      -    OATH Pre-Trial Conferences ...................................................... viii

   Individuals Who Died While in the Custody of the New York City DOC .............................. ix

**Appendix B: Excerpts of Completed External Agency Investigations of In-Custody Deaths** ........................................................ xii

# INTRODUCTION

This report is the second filed by the Monitoring Team since the Action Plan was ordered by the Court on June 14, 2022 (dkt. 465). Throughout this time, the Monitoring Team has been actively monitoring and engaged with the Department of Correction ("DOC" or "Department"), has participated in discussions with all Parties, and has met with the Court twice. The conditions in the jail remain dangerously unsafe and the Monitoring Team remains gravely concerned about the alarming number of in-custody deaths, violence among people in custody, lack of an effective restrictive housing model, and various facets of the Department's use of force practices and operational practices.

The DOC faces a wide array of compliance objectives that fall on a continuum from those that are comparatively simple and achievable in the foreseeable future to those that are inherently more complex and unquestionably more difficult to attain. The pace of reform is governed to a large extent by both the will of the agency to embrace and commit to reform and to its ability to marshal the support of all governing elements, both internal and external, to achieve compliance. As in all complex institutional reform cases, time is of the essence when issues of constitutional dimension are at play. The seven-year span of the present reform effort has been long and arduous, and while some progress has been made in improving various processes (*e.g.*, the investigation process), the current state of affairs remains tenuous and troubling. The purpose of this report is to provide a neutral and independent assessment of the Department's efforts to achieve compliance with the Action Plan requirements, and other relevant orders, and to inform the Court and the Parties on the current state of affairs.

There is no question it will take a long time to achieve the goals of the Consent Judgment as in the Monitoring Team's experience, large systemic reform is the result of small

achievements that accumulate over time. For this Department, erecting a foundation upon which better staff practice can be built is an essential first step. For this reason, the report focuses squarely on the Department's efforts to untangle and remediate the various staffing, security, and staff discipline problems that underlie its ability to reduce violence and use of force.

### *Current State of Affairs*

The Monitoring Team has consistently reported its concerns about the poor security practices and disordered operation that characterize the jails' environments. These problems contribute to the high levels of violence and are the underpinning of the Consent Judgment's focus on unnecessary and excessive uses of force. Problematic practices include poor supervision and inadequate support for staff on the housing units, poorly executed physical restraints, a lackadaisical approach to basic security measures like securing doors and dispersing crowds, and a general lack of situational awareness. Staff's often hyper-confrontational demeanor contributes to incidents spiraling out of control, and the overreliance on Emergency Response Teams and the response by an overabundance of staff means that force is often precipitated and/or exacerbated by staff's own behavior. In addition, the disordered environment and staffing problems discussed in the "Staffing" section of this report result in the constant disruption of even the most basic services (*e.g.*, recreation, laundry, commissary, barbershop), which creates additional frustration among the people in custody, who are already stressed by the level of facility violence, separation from their loved ones, and uncertainty in their court proceedings to name a few.

The Monitoring Team has dissected the litany of problems facing the Department and the corresponding decades of mismanagement in extensive reporting over the past seven years. The onset of the pandemic in 2020 further taxed an already broken system and many of the issues that had been laid bare were further exacerbated. During this time, the City also closed several

jails, some of which were later reopened to address unanticipated needs.[1] This created significant disarray in staff facility assignments and confusion about the overall mission, as improvements to the decaying physical plant were also temporarily suspended due to both the pandemic and limited funding allocated by the City given the planned closure of Rikers in 2027. Within the jails, in-person visitation was suspended for over a year, along with programming from both Department staff and community vendors. Finally, during the past 17 months, the Department was led by three different Commissioners and their teams, each of whom had a different vision and priorities for the Department. Changes of this magnitude, particularly when they occur in such quick succession, are incredibly destabilizing, especially for a system that, at baseline, was already struggling. The system is only now beginning to recover from that perfect storm.

Decades of mismanagement have created a deep-seated culture that is steeped in poor practices, illogical procedures, and little accountability for the humane treatment of people in custody. In practical terms, this means that nearly every facet of the jails' operations, procedures and practices needs to be dismantled and reconstituted to reflect quality practice. **At its core, successful reform will require an all-encompassing cultural and behavioral change among thousands of Staff for whom poor practice has been embedded and normalized for decades**. Many of the needed improvements do not require wholesale changes to policy (though many policies do need some modification and revision) or rules and regulations (although certain rules and regulations also need some modification and revision) and will not be solved by making

---

[1] MDC stopped housing individuals in April 2021 and OBCC stopped housing individuals in June 2022. Further, EMTC has opened and closed at least three times in 2020 and 2021 and remains open now. Further, for a few months in the fall some women from RMSC were moved off Rikers before the program was suspended in December and then discontinued in early 2022.

additional written declarations of what needs to occur, as changes *in practice* are what is needed. If it were simply a matter of requiring certain things to occur via a regulation or court order, the Department's problems would have been resolved many years ago. That said, there are likely certain legal and/or regulatory barriers that may need to be considered by the Court for possible intervention. For example, as discussed in this report, the Commissioner's ability to expand the pool of candidates who may serve as a warden. Additional issues may arise as the reform effort continues.

The Consent Judgment did not anticipate the depth of dysfunction in staffing and basic security operations and, thus, the guidance offered by that document presupposed a foundational layer that did not, in fact, exist. The perfect storm of the past two years further destabilized a system that was already in crisis, one reeling from a poor foundation weakened by decades of neglect and internal and external mismanagement.

Understanding the tasks that lie ahead also requires an appreciation of two important contextual variables: the impact of length of stay among people in custody and the long-term nature of any viable solutions to the Department's many problems.

-   ***Length of Stay***

A discussion of Rikers' problems and potential solutions cannot occur without recognizing the systemic failures involving case processing through the courts that are causing people to languish in New York City's jails at levels never seen before. Because people are not exiting the jails expeditiously, the jails' population remains higher than necessary and exacts pressure on all aspects of the jails' functioning. More people in custody means more staff are needed to supervise, manage, and transport these individuals. More people in custody means program staff and community partners are spread more thinly across a larger number of housing

units, and that medical and mental health services must address the needs of a larger number of individuals. More people in custody means more opportunity for interpersonal conflicts to erupt into violence. And, as has been tragically witnessed over and over again for the past several years, more people in custody means that more people are at risk of the ultimate harm—death while in custody. An individual's length of stay in jail is the product of actions by a variety of stakeholders—the courts, prosecutors, defense counsel, and jail transportation staff. With so many agencies and individual actors involved, all too often, the responsibility for addressing delays and other structural problems becomes diffuse and uncoordinated. All are responsible for the problem and yet none is directly responsible for the solution. This problem is larger than that of the *Nunez* litigation but has such a direct impact on the jails' conditions that the Monitoring Team would be remiss not to note it as a key contextual variable and implore those responsible to improve practice to reduce length of stay.

- ***Long-Term Nature of Viable Solutions***

One of the most troubling facts about the prospect of reforming this agency is that solutions to these complicated problems always require far longer to implement than the inherent danger of the system should afford. Emergency situations call for action to be taken quickly, but the necessary action is rarely something that can actually be *completed* quickly. This report, and all of those that preceded it, outlines the many nuanced issues that underpin the foundational problems facing this agency. The problems are so deeply entrenched and complicated that no single person, power, or authority will be able to fix them on the rapid schedule that the gravity of the problems demand. A quick fix is simply not possible. Systematically, the basic practices of the systems must each be individually dissected, corrected, and then ultimately adopted by the staff.

Once the path forward in any given area has been designed in detail, the Department must focus on the fidelity of implementation, on the quality of practice, and on the choices that staff make moment-to-moment. In a department with thousands of staff who must do the inherently challenging work of maintaining safety and providing services in a correctional environment, changing practice is a formidable task. To do so, the prospect of reform must embrace the fact that "reform," at its core, occurs at the staff level and thus the solutions to the various problems must consider, embrace, encourage, reinforce and support the Department's workforce.

The Action Plan has been in effect for a mere four months, which is obviously an insufficient amount of time to expect either full implementation or to expect significant changes to key outcome metrics. However, the Monitoring Team believes that four months *is* sufficient to assess whether some of the prerequisites to effective leadership, problem-solving and successful implementation have been put into place. These are discussed below.

<u>*Department Leadership Changes*</u>

For many years, the Monitoring Team has emphasized that reforming a deep-seated culture requires leaders with an objective, independent, and external vantage point. Not only must the Department and facility leaders have subject matter expertise that allows them to quickly detect and call attention to poor practice, but they must also have experience from outside this Department, from a correctional system in which poor practice has not been normalized in the day-to-day work of its staff. As of the filing of this report, the Commissioner has appointed eight Deputy Commissioners, eleven Assistant Commissioners, six Associate Commissioners, one Executive Director, a Chief of Staff and a Deputy Chief of staff. In particular, the Deputy Commissioners for Staffing, Security, and Operations all have significant experience managing correctional systems and facilities in other jurisdictions and many others in

the leadership team have significant experience in corrections and/or law enforcement. A Senior Deputy Commissioner will be appointed on October 31, 2022 who also has substantial experience with other correctional systems. Since the Commissioner's tenure began in January 2022, the insular nature of the Department's leadership has begun to change, evidenced by their candid, insightful, well-informed plans to fundamentally alter the way the Department operates. Both individually and collectively, these 28 Department leaders reflect a sea-change that bodes well for the development of solutions that fit the contours of the complex problems. Importantly, armed with experience in other systems, the new leadership team has been able to enter the system, begin to analyze problems and conceptualize solutions that have at their core the connection to correctional best practice that the Monitoring Team has been harping about for years.

The success of these new Department leaders will depend on their ability to engage facility leadership and the larger workforce in a manner that catalyzes behavior change on the front lines. While the Assistant and Associate Commissioners have clear responsibilities to engage closely with the existing facility leadership teams, to the extent that the benefit of experience from outside this Department can be brought inside the facilities to the rank of Warden, the Monitoring Team continues to believe that the prospect of culture change and consistent messaging would be that much stronger as discussed in more detail in this report.

*Department's Engagement, Focus, and Collaboration on Action Plan*

Given its unusual combination of breadth and specificity, the Action Plan represents an onerous task. The Department's leadership team has demonstrated their understanding of both the big picture of what must be achieved *and* the nuance and sequence of all the things that must change to achieve it. They clearly understand their obligations and have produced impressive

problem analyses that lead to reasonable solutions—this is particularly true in the areas of staffing and classification, which are both discussed in significant detail in this report. Throughout the Monitoring Team's work with this Department over the past seven years, the task of *Nunez* compliance has been managed jointly by Department leadership, the Legal Division[2] and the Nunez Compliance Unit. Although many of the individuals in these roles have changed, the commitment to promoting compliance remains. Since the filing of the Action Plan, the Monitoring Team has seen greater engagement by facility leadership as well as other Department leaders and personnel who are actually responsible for the protocols and practices that are being reconstituted.

In addition, the Department is collaborating well with the Monitoring Team by communicating frequently and facilitating the Monitoring Team's regular site visits to the jails.[3] Not only do the various leaders keep the Monitoring Team informed of their progress, but they are also candid about problems they have encountered and have been quick to admit to and rectify missteps when they make them. To further promote organization and responsiveness, the Department has contracted with the consulting firm KPMG, which seems to be a useful addition to the effort to synchronize various moving parts and deadlines. Finally, it appears that the City's Task Force has effectively resolved a number of issues that required multi-agency collaboration and cooperation.

_____

[2] The Commissioner has recently hired a new General Counsel who has demonstrated a strong command of the issues and the ability to adeptly manage the various issues related to this matter.  The support of the Deputy General Counsel, Executive Agency Counsel, and Supervising Assistant General Counsel to the Monitoring Team's work and advancing the reforms must also be acknowledged and commended.

[3] This fall, the Monitoring Team also toured the jails with the U.S. Attorney for the Southern District of New York and several of his staff.

Thus, while it is clearly too soon to expect full implementation of the Action Plan's many requirements, the Commissioner's hiring decisions, clear mandates to his staff about what must occur, courage to make unpopular changes, and creativity in his approach to solving decades-old problems does provide some degree of confidence among the Monitoring Team that the Department is now poised to begin to build the foundation on which future improvements to staff practice will need to rest.

### Assessment of Progress

Multiple measures are required to assess progress in each key area of the Action Plan (*e.g.*, staffing, safety and security, staff discipline) because no one metric adequately represents the multi-faceted nature of these requirements. While quantitative data is a necessary component of any analysis, relegating a nuanced, complex, qualitative assessment of progress towards achieving compliance with these requirements into a single, one-dimensional, quantitative metric is not practical or advisable. Data—whether qualitative or quantitative—cannot be interpreted in a vacuum to determine whether progress has been made or Substantial Compliance has been achieved. For example, meeting the requirements of the Staffing section of the Action Plan relies on a series of closely related and interdependent requirements (*e.g.*, unpacking the source of the dysfunction regarding abuse of leave, modernizing systems for scheduling staff, and teaching facility leaders how to properly deploy staff to meet the Department's core responsibilities) working in tandem to ultimately increase the number of staff who are available to work directly with incarcerated individuals. As such, there is no single number that could determine whether the Staffing section of the Action Plan has been properly implemented. Analogous situations appear throughout this report, whether focused on discussions about improving safety in the facilities or making the process for imposing staff discipline timelier and more effective. The

Monitoring Team therefore uses a combination of quantitative data, qualitative data, contextual factors, and the standard of practice to assess compliance with each of the Action Plan's requirements. For these reasons, and because of the mere four months that have elapsed since the Action Plan was ordered, the Monitoring Team does not assign compliance ratings to the Action Plan requirements in this report.

Further, two cautions are needed about the use of quantitative metrics. First, the use of numerical data suggests that there is a line in the sand that specifies a certain point at which the Department passes or fails. There are no national standards regarding a "safe" use of force rate, a reasonable number of "unnecessary or excessive uses of force" nor an "appropriate" rate at which Staff are held accountable.[4] The Monitoring Team's multi-faceted strategy for assessing compliance requires an assessment of all inter-related issues, because each of the main Action Plan requirements is more than simply the sum of its parts. For this type of analysis, the experience and subject matter expertise of the Monitoring Team is critical, to not only contextualize the information, but also to compare the Department's performance to their decades-long, deep experience with the operation of other jail systems.

Second, there are infinite options for quantifying the many aspects of the Departments' approach and results. Just because something can be quantified, does not mean it is useful for understanding or assessing progress. The task is to identify those metrics that actually provide insight into the Department's processes and outcomes and are useful to the task of problem solving. If not anchored to a commitment to advance and improve the way the Department is

---

[4] Notably, this is why the Consent Judgment, the underlying *Nunez* litigation, CRIPA investigation the Remedial Orders, nor the Action Plan include specific metrics the Department must meet with respect to operational and security standards that must be achieved.

doing something or to the results it is trying to achieve, the development of metrics merely becomes a burdensome and bureaucratic task that distracts from the qualitative assessments needed to understand and more importantly, improve, the processes and outcomes that underpin the requirements of the Consent Judgment and Remedial Order. Poorly conceptualized metrics create an unnecessary focus on "counting" instead of solving the actual problems at hand. In short, while there are certain *ad hoc* requirements that are amenable to the development of metrics, overall, the Monitoring Team strongly discourages a strategy that relies on a single metric against which progress is measured. As a cautionary observation, it should be noted that solutions which are overly encumbered by legalese, or are hyper-technical or arbitrary, often imposed under the guise of problem-solving, can sometimes have the unintended effect of undermining the reform effort rather than strengthening it.

At this early stage of the Action Plan's implementation, assessing the Department's progress towards rebuilding its staffing conventions, attracting leadership that is capable of catalyzing improvements in the skill sets of thousands of corrections officers, *et cetera* will necessarily rely more heavily on qualitative measures versus quantitative.

<u>Structure of the Report</u>

This report has three sections. The first section focuses on the work related to the Action Plan and the current state of affairs, including: Recruitment Efforts, In-Custody Deaths, Uniform Staffing Practices (§ C of the Action Plan), Security Practices (§ D of the Action Plan), Management of People in Custody (§ E of the Action Plan), and Staff Accountability (§ F of the Action Plan). Relevant information regarding Immediate Initiatives to Address Harm (§ A of the Action Plan) and Citywide Initiatives to Support Reform (§ B of the Action Plan) are interwoven as appropriate. Following each major section, the Monitoring Team offers concrete

recommendations for the Department's focus in the near term. The second part of the report provides compliance ratings for select provisions of the Consent Judgment and Remedial Order requirements for the Fourteenth Monitoring Period.[5] Finally, the third section of the report is an Appendix containing additional information and data not otherwise covered in this report.

---

[5] § G., ¶ 5 of the Action Plan requires the Monitoring Team to assess compliance with the following provisions for the period covering January 1 – June 30, 2022: Consent Judgment § IV., ¶ 1 (Use of Force Policy); § V., ¶¶ 2 & 22 (Use of Force Reporting and Tracking); § VII., ¶¶ 1 & 9(a) (Use of Force Investigations); § VIII., ¶¶ 1, 3(c) and 4 (Staff Discipline and Accountability); § X., ¶ 1 (Risk Management); § XII., ¶¶ 1, 2 and 3 (Screening and Assignment of Staff); § XV., ¶¶ 1, 12 and 17 (Safety and Supervision of Inmates Under the Age of 19); as well as First Remedial Order § A., ¶¶ 1 to 4 and 6 (Initiatives to Enhance Safe Custody Management, Improve Staff Supervision and Reduce Unnecessary Use of Force) and § C., ¶¶ 1, 2, 4 and 5 (Timely, Appropriate and Meaningful Staff Accountability).

## PROGRESS UPDATE ON THE ACTION PLAN

- **RECRUITMENT EFFORTS**

    The Department needs a strong recruitment and efficient hiring process to support the reform effort. Of greatest importance is for the Department to recruit individuals with correctional expertise from other jurisdictions to serve in leadership positions, Trials Division staff to support timely accountability, attorneys to support the Legal Division, physicians to evaluate whether uniform staff who are out on leave are able to return to active duty, and civilian staff to backfill positions previously held by uniform staff.[6] Recruiting qualified candidates to work at this Department is particularly challenging given it is located in a residential area in Queens, the public discourse about the agency, and general constraints of City employment (including lengthy onboarding processes, no remote work options, residency requirements, etc.). It is for these reasons that a creative recruitment effort, with attractive benefits, is needed to attract qualified candidates.

    To support the recruitment effort, the Department hired a new full-time Director of Recruitment who began work in September 2022. DOC also awarded a contract to an executive search firm that has at least five years of experience in placing executives with correctional experience with city agencies, public service providers, and law enforcement agencies. In addition, DOC has begun working with the selected vendor that will support hiring individuals with correctional expertise from other jurisdictions to serve in leadership positions. The HR Division has also engaged in recruiting efforts by attending job fairs and engaging in online

---

[6] As required by the Action Plan, § B ¶ 2.

marketing for various positions. Finally, the Department, working with the Task Force, has also obtained a waiver of residency requirements from DCAS for all new hires effective June 9, 2022.

In addition to the steps noted above, in order to attract and recruit attorneys to work with the Trials Division and Legal Division, the Department has begun working with an executive search firm that specializes in recruiting attorneys. To make the positions more attractive, the Department has started to offer a compressed work week in which attorneys will have one workday off in each two-week pay period and will work slightly longer hours during the other days of the week. Finally, in order to recruit the necessary number of attorneys for the Trials Division, the Department worked with other City agencies that permitted several attorneys to work at DOC "on loan." The Department is also working to obtain financial incentives for these positions. The staffing for the Trials Division is further discussed in the Discipline section and the 14th Monitoring Period Compliance Assessment sections of this report.

- *Civilianization and Location Changes for Certain Roles*

The Department, spearheaded by the Staffing Manager, is in the process of identifying roles that will be converted to civilian positions. As part of this effort, certain divisions have moved to DOC headquarters in Queens from locations on Rikers Island. The goal of these moves is to make the work location more accessible for potential candidates as DOC's headquarters can be reached more easily by public transportation, provides more onsite parking, and has fewer security restrictions than work locations on the island, making it an overall more convenient place to work. For example, the Timekeeping Unit will move to headquarters as a first step in civilianizing the unit which previously had a significant number of uniform staff in positions better suited to civilians. The Health Management Division has also started to recruit for civilians to work in the unit.

- *Leadership Recruitment*

Despite the many limitations on recruiting for positions within DOC, the Department has successfully hired a number of qualified individuals this year, especially in leadership positions. As of the filing of this report, the Commissioner has appointed one Executive Director, 11 Assistant Commissioners, six Associate Commissioners, eight Deputy Commissioners, a Chief of Staff and Deputy Chief of Staff. In addition, a Senior Deputy Commissioner is scheduled to begin work on October 31, 2022. These civilian leaders are part of the new leadership structure implemented by the Commissioner in which he eliminated the Chief positions, as described on pg. 8 of the Monitor's June 30 Status Report (dkt. 467). This means that Wardens are now the highest level of uniform leadership in the agency.[7] The table below identifies the positions that have been filled this year and the date of their appointments. The Department worked with the City, and other agencies such as Office as Management and Budget to streamline the processing, vetting, and approval of candidates.

| DOC Leadership Appointments *January to October 2022* | | | |
|---|---|---|---|
| **Title** | **Division** | **Date of Appointment** | **Date of Departure (if applicable)** |
| Chief of Staff | Commissioner's Office | 2/14/22 | N/A |
| Assistant Commissioner | Programs | 3/14/22 | N/A |
| Associate Commissioner | Program & Community Partnership | 3/14/22 | N/A |
| Assistant Commissioner | Program Operations | 3/18/22 | N/A |
| Associate Commissioner | Human Resources | 4/7/22 | N/A |
| Assistant Commissioner | Advancement and Enrichment Program | 4/7/22 | N/A |
| Deputy Chief of Staff | Commissioner's Office | 4/11/22 | N/A |
| Assistant Commissioner | Preparedness and Resilience | 4/11/22 | N/A |

---

[7] As required by the Action Plan, § A ¶ 3(b)(i).

| DOC Leadership Appointments *January to October 2022* | | | |
|---|---|---|---|
| **Title** | **Division** | **Date of Appointment** | **Date of Departure (if applicable)** |
| Deputy Commissioner | Management Analysis & Planning | 4/18/22 | N/A |
| Deputy Commissioner | Investigation Division | 5/9/22 | N/A |
| Deputy Commissioner | Security Operations | 5/16/22 | N/A |
| Deputy Commissioner | Trials | 5/31/22 | N/A |
| Assistant Commissioner | Applicant Investigation Unit | 6/16/22 | N/A |
| Assistant Commissioner | Human Resources | 6/16/22 | N/A |
| Deputy Commissioner | Office of Public Information | 7/1/22 | N/A |
| Associate Commissioner | Data Quality & Metrics | 7/3/22 | N/A |
| Assistant Commissioner | Criminal Investigations Bureau | 7/11/22 | N/A |
| Deputy Commissioner | Classification, Custody Management and Facility Operations | 7/25/22 | N/A |
| Associate Commissioner | Trials Division | 8/8/22 | N/A |
| Deputy Commissioner/ General Counsel | Legal Division | 8/8/22 | N/A |
| Assistant Commissioner | Human Resources | 8/8/22 | N/A |
| Executive Director, Intergovernmental & Policy | Intergovernmental & Policy | 8/8/22 | N/A |
| Associate Commissioner | Information Technology | 8/8/22 | N/A |
| Associate Commissioner | Operations | 8/22/22 | N/A |
| Assistant Commissioner | Data Analytics and Research | 8/29/22 | N/A |
| Deputy Commissioner | Administration | 9/6/22 | N/A |
| Assistant Commissioner | Training/Academy | 9/6/22 | 9/17/22 |
| Assistant Commissioner | Operations Research | 9/12/22 | N/A |
| Senior Deputy Commissioner | Commissioner's Office | 10/31/222 | N/A |

- **DEATHS OF INDIVIDUALS IN CUSTODY**

The Monitoring Team is alarmed and disturbed by the number of deaths among individuals in custody. The number of deaths, particularly those due to suicide and drug overdoses, are deeply troubling. Thus far this year, the number of in-custody deaths has already surpassed the number of deaths in 2021 and is the highest number of deaths in a single year since 2013.

Beginning this year, Department leadership, most often the Commissioner, has provided timely briefings to the Monitoring Team on each in-custody death and compassionate release that has been granted. These briefings have provided salient and concrete information about each incident and the Department has been fully transparent with available information. It is important to note that the Monitoring Team cannot draw conclusions about the specific underlying causes of any death as the Monitoring Team is not authorized to investigate these incidents. However, patterns and trends about the current conditions that give rise to these events are informative and thus are explored below.

## In-Custody Deaths

Deaths in custody have increased in jail systems across the country during the past two years.[8] While national data on in-custody deaths is limited, the Justice Department's Bureau of Justice Statistics ("BJS") has reported that deaths increased in jails 11% from 2000 to 2019.[9]

---

[8] *See* Maher, K., & Frosch, D. (2022, October 18). *Inmate suicides rose sharply in U.S. prisons, jails during pandemic*. The Wall Street Journal. Retrieved October 25, 2022, from https://www.wsj.com/articles/u-s-prisons-jails-see-jump-in-suicides-11666098966?st=4ylpfw6it2so528&reflink=desktopwebshare_permalink.

[9] *See* Carson, E. A. (2021, December). *Mortality in local jails, 2000–2019 – statistical tables*. Bureau of Justice Statistics. Retrieved October 27, 2022, from https://bjs.ojp.gov/library/publications/mortality-local-jails-2000-2019-statistical-tables.

Public reporting, and the Monitoring Team's experience with multiple systems around the country, suggests that deaths in custody have continued to increase nationwide since 2019. Further, in 2019, the last year for which nationwide data is available, deaths related to alcohol and drugs were at their highest point in the 20 years since this data has been collected.

The number and causes of deaths from January 2015 to October 28, 2022, at the Department are presented below. The number and rate of in-custody deaths at the Department by suicide, overdose, and a variety of physical health problems has increased significantly in the past few years. So far this year, there have been 2 suicides and 3 suspected suicides (pending confirmation from the Office of the Chief Medical Examiner ("OCME")) as well as 3 overdoses and 2 suspected overdoes (pending confirmation from the OCME). Appendix A of this report includes a list with the name and date of death for each individual that has died in custody[10] since November 2015.

---

[10] This list also includes any individual who was compassionately released and then died in 2021 or 2022.

| NYC DOC Causes of Death, *2015 to October 28, 2022* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **Jan.-Oct. 2022** | **Total** |
| Accidental | | | | | | | | 1 | 1 |
| COVID-19 | | | | | | 3 | 2 | | 5 |
| Medical Condition | 9 | 11 | 4 | 7 | 3 | 2 | 4 | 2 | 42 |
| Overdose | | 2 | 1 | | | | 4 | 3 | 10 |
| Suicide | 2 | 2 | | 1 | | 1 | 4 | 2 | 12 |
| Drowned | | | | | | | | 1 | 1 |
| Pending OCME Confirmation | | | | | | | | 6 | 6 |
| Undetermined Due to Death Outside DOC Custody | | | | | | 4[11] | 2 | 2 | 8 |
| Undetermined by OCME | | | 1 | | | 1 | | | 2 |
| **Total** | **11** | **15** | **6** | **8** | **3** | **11** | **16** | **17** | **87** |

The table below identifies DOC's mortality rate from January 2010 to October 28, 2022. The sharp increase in deaths, beginning in 2020, is troubling and the current mortality rate is the highest it has been in over a decade.

| Mortality Rate | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **2010** | **2011** | **2012** | **2013** | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** | **2021** | **Jan. to Oct. 2022** |
| **Annual ADP** | 13,026 | 12,421 | 12,083 | 11,692 | 10,913 | 9,890 | 9,802 | 9,224 | 8,397 | 7,388 | 4,543 | 5,574 | 5,497 |
| **Number of Deaths** | 17 | 12 | 21 | 24 | 10 | 11 | 15 | 6 | 8 | 3 | 11 | 16 | 17 |
| **Mortality Rate** | 1.31 | 0.97 | 1.74 | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.09 |
| *Note: Mortality Rate per 1000 people in custody uses the following formula: Rate = (# of deaths/# of people in custody)*1000* | | | | | | | | | | | | | |

---

[11] 4 of the 11 individuals who passed away in 2020 were not technically in DOC custody at the time they passed away as they were participating in programs in the community and were not under the supervision of DOC staff at the time of their death and were not physically in the Department's custody (*i.e.*, they were participating in Brooklyn Justice Initiatives, Specialized Model for Adult Reentry and Training (SMART), and Work release programs). The cause of death for each of these individuals is not known and categorized as "Undetermined."

Major jail systems throughout the country have seen a similar increase in the rate of deaths in custody. While national data is not readily available, the Monitoring Team was able to obtain data from three other systems outside of New York City. The chart below shows the rate of death in New York City jails, and jails in San Diego County, Los Angeles County, and Miami-Dade County.[12] This chart reveals a concerning increase in deaths in jails across the country.



Rate of Death in Custody, 2013 to 2022

|  | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|---|---|---|---|---|---|
| NYC | 2.05 | 0.92 | 1.11 | 1.53 | 0.65 | 0.95 | 0.41 | 2.42 | 2.87 | 3.09 |
| San Diego | 2.16 | 3.01 | 2.41 | 2.8 | 2.64 | 2.71 | 2.84 | 2.86 | 4.58 | 4.79 |
| Los Angeles | 1.82 | 1.43 | 1.23 | 1.2 | 1.53 | 1.77 | 2.17 | 2.88 | 3.77 | 2.39 |
| Miami |  | 1.29 | 1.68 | 1.4 | 2.84 | 1.27 | 1.62 | 2.4 | 3.4 | 2.83 |

■ NYC   ■ San Diego   ■ Los Angeles   ■ Miami

---

[12] Sources: *Interim Monitor Report in the matter U.S. v. Miami Dade, et. al.,* 13-cv-21570 (S.D.Fla.) dated August 12, 2022 (dkt. 246) pg. 7; Los Angeles County Office of Inspector General. (2022). *Reform and Oversight Efforts: Los Angeles County Sheriff's Department, April to June 2022,* pgs. 14-17; Los Angeles County Sheriff's Department. (2022) *Custody Division Population Quarterly Report, April-June 2022.* pg.3; San Diego County's Sheriff's Department (2022). *San Diego County Sheriff's Department Daily Population Report, 10/28/2022;* and Davis, K. And J. McDonald. (2022). "Fight among detainees at Otay Mesa jail results in 19th death this year, marking grim record." *The San Diego Union-Tribune,* October 6, 2022.

With respect to the deaths in New York DOC custody in 2022, in most cases, practice failures were readily apparent across the agencies involved in the management of incarcerated individuals and likely contributed to the deaths of these individuals. It appears that many of these deaths were at least partly attributable to poor security practices (including inadequate touring by staff, ineffective searching, failures in securing of doors, and failures in ensuring the removal of sight obstructions, such as cell window coverings), staff mismanagement (including posts that are unmanned), operational deficiencies, failed suicide prevention measures, and potential staff inaction. These issues were often compounded by disjointed and dysfunctional coordination between the Department and Health + Hospitals ("H+H"). The Monitoring Team's many findings and concerns about poor security and operational practices among DOC staff have been described in the Monitoring Team's reports for years. These overall findings are underscored by the public reports of in-custody deaths by the BOC[13], the SCOC[14], and the Attorney General[15].

Further, the availability of mental health and medical information to DOC is limited even when it is critical to support the needs of a person in custody. The Monitoring Team has

---

[13] *See*, Board of Corrections, City of New York, *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* (September 12, 2022). Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf.

*See also*, Board of Corrections, City of New York, *February & March 2022 Deaths in DOC Custody Report and Recommendations* (May 9, 2022) Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf.

[14] See Commission of Correction, *SCOC Mortality Reports* (regarding Javier Velasco, Christopher Cruz, Wilson Diaz-Guzman, Hector Rodriguez and Junior Granados, Lebarnes Mcclure, and David McPeck), Retrieved October 27, 2022, from https://scoc.ny.gov/mor.htm.

[15] *See*, New York State Attorney General Office of Special Investigations, *Second Annual Report Pursuant to Executive Law Section 70-b.* (October 1, 2022), Retrieved October 27, 2022, from https://ag.ny.gov/sites/default/files/2022_osi_annual_report.pdf.

observed this disconnect in information sharing in many circumstances over the course of our monitoring (*e.g.*, Support Team meetings for TRU, Secure and ESH; the PINS process). In these situations, H+H has reported that relevant information may not be shared because it is prohibited by the Health Insurance Portability and Accountability Act ("HIPAA").[16] The real and perceived barriers to cross-discipline collaboration between the Department and H+H must be identified and resolved, most especially as it relates to cases of in-custody death.

## Investigations of In-Custody Deaths

A key component to understanding the causes of these deaths and ensuring adequate accountability for lapses and/or failures in practices is an adequate assessment of each incident. As with most issues related to this agency, oversight with respect to in-custody deaths is complicated and convoluted. Investigations of in-custody deaths are disjointed, untimely and/or unavailable and therefore do not help to identify systemic failures that, if addressed, could reduce the risk of future in-custody deaths. The investigations impede accountability for individual actors whose failures may have contributed to and/or caused the death. The following agencies currently investigate or have the authority to investigate in-custody deaths in some manner.

- **Department of Correction via the Investigation Division ("ID")** conducts an investigation of every in-custody death and facilitates/provides support for ongoing criminal investigations as well.

---

[16] At this juncture, the Monitoring Team is not in a position to ascertain the veracity of such a position. However, the Monitoring Team does note that HIPAA does permit disclosures of protected health information in "[c]orrectional institutions and other law enforcement custodial situations" which appears to permit sharing of the necessary information between the Department and H+H. *See* 45 CFR § 164.512(k)(5).

- **Health + Hospitals ("H+H")** recently reported to the BOC[17] that in 2016, it established the Joint Assessment and Review ("JAR") in collaboration with DOC. H+H reports that the two agencies review "negative patient outcomes" (the scope of negative outcomes reviewed is unknown). H+H reports that JAR focuses on systemic operational and environment issues. H+H also noted that "[c]linical care is appropriately reviewed by the health authority and neither should nor can be reviewed by the non-clinical, security agency, DOC; or by the BOC which, by its own admission, is not a clinical body."[18]

- **The Office of the Chief Medical Examiner ("OCME")** investigates cases of individuals who die in New York City from criminal violence, by accident, by suicide, suddenly when in apparent health, when unattended by a physician, in a correctional facility or in any suspicious or unusual manner. The Office of Chief Medical Examiner is responsible for determining the official cause of death for any in-custody death.

- **The New York State Commission of Correction ("SCOC")** is an Executive Department correctional oversight and technical services agency. The Commission's services are delivered to all state and county correctional facilities, police department detention facilities, and facilities operated by the Department. Its organization, functions, powers, and duties are set forth in Article 3 of the New York State Correction Law. As part of these duties, the Commission investigates in-custody deaths and provides a report with its findings.

- **The New York City Board of Correction ("BOC")** is a nine-person, non-judicial oversight board that regulates, monitors, and inspects the City's correctional facilities. The Board of Correction carries out independent oversight and enacts regulations related to minimum standards. The BOC has a duty to investigate the death of any individual in DOC custody according to §3-10(c)(2) of title 40 of the Rules of the City of New York. These investigations focus on identifying areas for improvement to help prevent future deaths.

- **The Department of Investigation ("DOI")** is a city law enforcement agency responsible investigating and referring for criminal prosecution cases of fraud, corruption and other illegal activities by City employees, contractors and others who do business with the

---

[17] *See*, Board of Corrections, City of New York, *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* (September 12, 2022). Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf.

[18] *See Id*.

City. DOI supports various law enforcement agencies (e.g., the AG's Office, the SDNY) in coordinating with the Department of Correction to obtain necessary information for these investigations. The DOI does not conduct its own separate investigation of in-custody deaths.

- **The New York State Attorney General's Office of Special Investigations ("OSI")** is the division responsible for investigating the deaths of incarcerated individuals to determine whether criminal misconduct occurred. The OSI was established on April 1, 2021, by New York State Executive Law Section 70-b. The Attorney General has authority under Section 70-b to investigate deaths caused by corrections officers and other peace officers who work in jails, prisons, and holding facilities throughout the state.

- **US Attorney's Office - Southern District of New York ("SDNY")** has a unit dedicated to the criminal prosecution of civil rights violations and has the authority to evaluate cases involving, among other things, the excessive use of force, the deprivation of medical care, and in-custody deaths.

Though several agencies have clear responsibilities to investigate in-custody deaths, not all investigations have actually been completed. In fact, many investigations of deaths in 2022 are still pending, as are several investigations related to the deaths in 2021. The status of investigations for the 16 deaths in 2021 and 17 deaths in 2022 are outlined below.

| Status of Investigations by External Agencies *2020 to October 2022* | | | | | |
|---|---|---|---|---|---|
| | **Total Deaths** | **SCOC Completed Investigations** | **AG Completed Investigations** | **Office of Chief Medical Examiner** | **BOC Completed Investigations** |
| **2022** | 17 | 1 | 2 | 9[19] | 3 |
| **2021** | 16 | 2 | 10[20] | 14[21] | 10 |
| **2020** | 11 | 2 | | 7[22] | 1 |

---

[19] 2 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

[20] The Attorney General's Office only began investigating in-custody deaths on April 1, 2021, so the Attorney General's office would only investigate 13 of the 16 deaths that occurred in 2021.

[21] 2 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

[22] 4 individuals that died were not in physical DOC custody at the time of their death so the OCME will not determine the official cause of death in those cases.

24

- Most of DOC's internal investigations of the deaths in 2021 and all deaths in 2022 are pending (mostly because ID is awaiting clearance for completion until after the external investigations are complete)[23].

- DOC reported to the Monitoring Team that H+H has only convened one JAR meeting in 2022. It is unclear whether H+H conducts an internal assessment of in-custody deaths, including a review of any deficiencies in clinical care.

- The OCME's determinations of the official cause of death have been completed for all in-custody deaths in 2021 and the cause of death for 6 of the in-custody deaths in 2022 are pending.

- BOC issued a report[24] about some of the 2021 deaths (suicides and drug overdoses only; they did not investigate deaths from other causes) on September 12, 2022. Some of the deaths discussed in that report occurred more than a year prior to the report's release date. BOC's investigations of 3 deaths that occurred in February and March 2022 were released on May 9, 2022.[25] BOC has not completed the investigation of the other deaths that occurred in 2022.

- SCOC has completed the investigation of two of the deaths that occurred in 2021. All other investigations for in-custody deaths and/or compassionate releases in 2021 and all in-custody deaths and/or compassionate releases in 2022 are pending.

- The OSI is still conducting the investigations for 18 of the 30 deaths that occurred between April 1, 2021 to the present. In the 12 investigations that have been completed, the OSI advised the Bronx District Attorney that OSI does not have investigative

---

[23] ID reported that they must receive clearance from the AG's office, as well as the relevant District Attorney's Office and the Department of Investigation before proceeding with an internal investigation.

[24] *See*, Board of Corrections, City of New York, *Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody* (September 12, 2022). Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf.

[25] *See also*, Board of Corrections, City of New York, *February & March 2022 Deaths in DOC Custody Report and Recommendations* (May 9, 2022) Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf.

authority or criminal jurisdiction over either matter because there was insufficient
evidence that any act or omission of an officer caused the deaths.

- Local and Federal Prosecutors also have or may have cases pending potential criminal
  prosecution.[26]

It is important to note that while there are various separate investigations of each death, a
process for a comprehensive, holistic assessment of each incident does not exist. Each agency's
review has different parameters and scope of inquiry. For instance, some investigations only
assess whether criminal conduct occurred, while others assess whether practices conformed to
applicable policy. Further, for those assessments intended to review more operational issues, the
relevant agencies appear to have various constraints that prevent them from evaluating the
incident holistically. For instance, DOC and BOC[27] do not have access to clinical information.
Further, given the various competing investigations, at times, DOC's internal investigation may
be temporarily suspended while a criminal investigation proceeds. This creates a concerning
situation in which a close-in-time assessment of the incident does not occur, and therefore
deficiencies are not identified or addressed quickly. It is critical that close-in- time assessments
are conducted that assess both the security and clinical care of the individual who passed away.
In other words, timely Morbidity-Mortality Reviews must be convened with relevant

---

[26] In April 2021, a Captain was indicted by the Manhattan District Attorney's office for criminally
negligent homicide in the death of an incarcerated individual who hanged himself in November 2020. It is
alleged that the Captain issued orders that prevented officers from saving the life of the individual and
making false statements in her written account of the incident.  Further, in July 2022, the Bronx District
Attorney's office indicted one Captain and three Correction Officers for failing to help a person in
custody who had attempted suicide by hanging in a holding cell on Rikers Island in 2019.

[27] *See*, Board of Corrections, City of New York, *Report and Recommendations on 2021 Suicides and
Drug-Related Deaths in New York City Department of Correction Custody* (September 12, 2022) at pgs. 9
and 32. Retrieved October 27, 2022, from https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-
Reports/2021-suicides-and-drug-related-deaths-report-and-chs-response.pdf.

stakeholders with the pertinent security and medical information, as discussed in more detail in the Next Steps section.

### Incidents of Self-Harm & Suicide

As of 2019, suicide was the leading cause of death in jails around the country.[28] The number of suicides in this Department, and in confinement settings around the country, have risen sharply since the onset of the pandemic in 2020.[29] This has coincided with increased frequency of suicide in the community as well as the ongoing effects of the pandemic which have had a significant impact on the conditions of confinement.[30] At DOC, since 2015, 12 individuals have died by suicide. Of these 12 cases, 6 occurred during the last two years and at least 3 additional deaths are suspected suicides in 2021 and 2022 (the cause of death has not been confirmed or will not be determined by the OCME).

The Monitoring Team has long raised concerns about the supervision and response to people at risk of self-harm in this Department.[31] Problems in applying primary intervention for reducing the risk/opportunity for self-harm are apparent, including safety and welfare checks and medication management. Staff also fail to implement proper rescue procedures and/or render first aid. The investigations completed by the BOC and SCOC have also revealed questions

---

[28] *See* Carson, E. A. (2021, December). *Mortality in local jails, 2000–2019 – statistical tables*. Bureau of Justice Statistics. Retrieved October 27, 2022, from https://bjs.ojp.gov/library/publications/mortality-local-jails-2000-2019-statistical-tables.

[29] Maher, K., & Frosch, D. (2022, October 18). *Inmate suicides rose sharply in U.S. prisons, jails during pandemic*. The Wall Street Journal. Retrieved October 25, 2022, from https://www.wsj.com/articles/u-s-prisons-jails-see-jump-in-suicides-11666098966?st=4ylpfw6it2so528&reflink=desktopwebshare_permalink.

[30] *See* Id.

[31] *See* Ninth Monitor's Report at pg. 21-22, Tenth Monitor's Report at pg. 25, Eleventh Monitor's Report at pg. 33-34, and Twelfth Monitor's Report at pg. 31-32.

about the screening and management of individuals at risk of self-harm by both DOC and H+H upon admission and throughout their time in custody. Appendix B to this report includes the publicly available descriptions of the circumstances related to 21 of the in-custody deaths from 2020 to 2022 by either the BOC, SCOC, or the AG's office.

The Security Manager[32] has been working with staff to address the issues of ensuring timely and appropriate staff responses in situations involving self-harm, eliminating the use of the term "manipulative gestures", and ensuring that there is adequate coordination with H+H. While these measures are welcome and necessary, the number of suicides, and the different circumstances in which they occurred, strongly suggest that additional steps to strengthen practices for preventing, identifying, and addressing the risk of suicide beyond the policy updates and staff messaging that occurred via the Second Remedial Order and the Action Plan are necessary. Specific recommendations are discussed below.

**Next Steps**

A wide variety of circumstances and issues contribute to these tragic deaths, spanning from the decision to confine an individual in jail, to their length of stay, to the conditions of their confinement. There is no fixed understanding as to why in-custody deaths have increased so precipitously at DOC and nationwide in the last two years. It is essential to recognize that these deaths are related, at least in part, to the convergence of poor operational and clinical practices, inadequate supervision, and management failures that have characterized the day-to-day operation of the jails for decades, and are compounded by the ongoing and lingering effects of

---

[32] Appointment of the Security Manager was made pursuant to Action Plan § D, ¶ 1.

COVID-19, and the increasing prevalence of synthetic drugs in the jails.[33] While there are no "quick-fixes" for the myriad of issues and dysfunctional systems at play here, there are a number of practical steps the City, Department and H+H can take to address these issues now.

Significant efforts, resources, and time will be needed to fully address the deficiencies that have resulted in the loss of life, as these are multi-faceted issues that touch upon a variety of practices in the Department. Certain immediate steps must be taken as outlined below.

- **Eliminate Barriers to Sharing Critical Information Between H+H and DOC**: The City must immediately, and no later than one month after the issuance of this report, assess what specific barriers, if any, exist with respect to the sharing of relevant information under HIPAA and provide the written determination of that assessment to the Monitoring Team.

- **Initiate Morbidity-Mortality Reviews**: Morbidity-Mortality Reviews regarding operational and clinical care for all in-custody deaths **and** any cases involving compassionate release must occur, as the JAR process is clearly insufficient. These reviews must occur close in time to the event, include relevant stakeholders from DOC and H+H, and must require all parties to share relevant information to ensure that a holistic and timely assessment of these events occur.[34]

---

[33] Schwartzapfel, B., and Jenkins, J. (2021, July 15). *Inside the nation's overdose crisis in prisons and jails.* The Marshall Project. Retrieved October 27, 2022, from https://www.themarshallproject.org/2021/07/15/inside-the-nation-s-overdose-crisis-in-prisons-and-jails.

[34] Guidance on appropriate reviews can be found at: Hayes, L. (2007). "Reducing Inmate Suicides Through the Mortality Review Process." In R. Greifinger (Ed.) *Public Health Behind Bars: From Prisons to Communities*. Springer New York, NY. Pgs. 280-292. Available at: https://www.researchgate.net/profile/Robert-Greifinger/publication/226088272_Treatment_of_Mental_Illness_in_Correctional_Settings/links/004635 26990b79e6f0000000/Treatment-of-Mental-Illness-in-Correctional-Settings.pdf#page=279

- **Eliminate the Phrase "Manipulative Gestures"**: The use of the phrase "manipulative gestures" is prohibited by policy to describe self-harm incidents. This phrase is troublesome, as it suggests an unfounded conclusion about an action, rather than a description of the person's behavior, and also suggests that such actions are not to be taken seriously. Further, regardless of the person's underlying motivation, any gesture or attempt at self-harm is potentially lethal. This phrase continues to be utilized in Department reports and records and must be eliminated.

- **Review Incidents of Self-Harm on a Weekly Basis**: Any reports involving a person in custody's use of a sheet, shirt, pants, sweater, T-shirt, shoestring, or other clothing or bedding as part of a self-harm event should be reviewed on a weekly basis by Facility leadership and other relevant Department Leadership.

- **Focus Investigation Division Resources on Self-Harm Events**: ID should have a dedicated group of investigators who are appropriately trained to evaluate incidents of self-harm to identify any gaps in practice.

- **Centralize the Coordination of In-Custody Death Reviews**: The Department must have a centralized point of contact to manage the many different agencies investigating in-custody deaths to ensure that these agencies obtain the necessary information, to ensure that DOC's own investigations do not impede and/or are permitted to proceed, and finally to ensure that any findings of these investigations are reviewed, evaluated and translated to improved practice.

- **Develop Comprehensive Protocols and Procedures for Preventing, Assessing and Responding to Self-Harm**. The Monitoring Team intends to facilitate this assessment

with a nationally recognized expert in the field.[35] This neutral and independent assessment is necessary to develop the specific and concrete operational steps that the City and Department must implement to ensure adequate suicide prevention policies and practices.[36] The evaluation must be consistent with the practices required to achieve the reforms envisioned by the Consent Judgment, the Remedial Orders, and Action Plan (as well as other requirements mandated by City and State law). This assessment must include, but is not limited to, the following:

o   Assessing DOC and H+H policies related to Suicide Prevention to ascertain whether they reflect generally accepted practice.

o   Assessing H+H protocols for screening, assessing, and treating the risk of suicide and DOC protocols for responding to suicidal ideation/referrals and for monitoring those who are on suicide precautions to determine whether they are adequate.

o   Assessing DOC staff's practices and responses to self-harm incidents.

o   Assessing current H+H and DOC protocols and practices to identify where performance is subpar.

o   Assessing the Morbidity-Mortality Review process to ensure that it reflects the generally accepted practice and relevant professional standards.

---

[35] The Monitoring Team's expert must have access to all relevant information for such an assessment, including relevant medical and mental health records and information.  The Monitoring Team will consult with the City to determine if there are any impediments to access to such information and will advise the Court if additional authority is necessary to assess these materials.

[36] The Monitoring Team retained a nationally recognized expert to conduct a similar assessment on the Department's staffing practices which identified concrete, specific and relevant issues regarding the Department's staffing practices that must be addressed.

- **UNIFORM STAFFING PRACTICES**

While the Department has a very large workforce, poor staff deployment practices and poor management of staff who are unavailable to work with the incarcerated population have the practical impact of the Department currently *operating as if* the facilities are short-staffed. This problem reached an apex in 2021. Although progress has been made, the convergence of poor staff scheduling and deployment practices, and the lack of adequate control and enforcement of leave and modified duty procedures leave the facilities without sufficient staff to provide adequate safety and access to services. First, on any given day, a significant proportion of the Department's workforce is out sick or on modified duty, which limits the number of staff who are available to work in the facilities. Within the facilities, on a daily basis, some housing unit posts continue to not have any staff assigned to them (known as "unmanned posts") and staff regularly work overtime (at least double, if not *triple shifts*), both of which occur due to the dysfunction in the Department's staff management practices. Furthermore, due to poor staff supervision, assigned staff at times abandon their housing unit posts. In addition to the obvious result that incarcerated people are without supervision, the problem is compounded when staff who would have been assigned to posts that facilitate service delivery (*e.g.*, recreation posts, posts responsible for moving and supervising people in the barbershop, law library, or visitation) are then re-deployed to housing units to cover these vacancies. These vacancies and reassignments are a core reason why services are not provided dependably, which is a central frustration among those in custody, and contributes to the chaos and disorder prevalent in the facilities.

While these staffing problems are complex, the results required by the Action Plan are achievable with proper expertise, resources, creativity, and persistence. That said, the solutions

are complicated, with multiple interrelated practices that must change. While an individual component of the broader solution may not itself be complicated, the significant number of new practices that must be properly implemented across multiple facilities with thousands of staff means that both individual components and the broader solution will not be executed overnight. The Department has begun to focus on the core practices that need to change and has begun to put the process for implementing those changes in motion. To that end, important progress has been made in reducing the number of staff on sick leave and/or on modified duty.

As an initial matter, the Department's workforce has decreased significantly in size over the past few years—from 10,577 staff in January 2019 to 6,994 staff in September 2022, a decrease of 34%. This situation is not unique to this Department, as correctional systems throughout the country are enduring similar challenges. The job is difficult, complicated, stressful, and dangerous—a fact which is repeatedly emphasized in daily media reports about facilities on Rikers Island. There is no doubt that the challenges of the work itself and the current conditions of the jails contribute to attrition, and the Department must attend to staff wellness as an important component of reform. The system simply cannot operate without staff who are healthy, well-supported, and confident in their skill sets to manage the challenges of the job.

The table below provides several data points corresponding to various key events during the past several years. These include the size of the workforce, and the average proportion out sick, on modified duty (*i.e.*, MMR) and AWOL on any given day. The number and proportion of **staff on sick leave** is currently at its lowest point since the apex of the staffing crisis in September 2021 (12% versus 21%), an overall decrease of 43%. The number of **staff on MMR** also decreased substantially between September 2021 and September 2022 (744 to 535, a decrease of 28%), although as a proportion of the workforce, the reduction has been a more

modest decrease of 11% (from 9% to 8% of the workforce). However, the **proportion of staff unavailable to work** (either sick or MMR) remains about double what it was prior to the pandemic. Finally, while those who simply failed to come to work ("AWOL") received a lot of attention and publicity, they were very few in number and comprised only about 1% of the workforce. Recently, the number of staff who are AWOL has decreased considerably and is essentially negligible.

| Sick Leave, Medically Modified Duty and AWOL, January 2019 to September 2022 | | | | |
|---|---|---|---|---|
| Month | Total Headcount | Avg. # Sick (%) | Avg. # MMR (%) | Avg. # AWOL (%) |
| January 2019<br>*Pre-COVID* | 10,577 | 621 (6%) | 459 (4%) | Not available |
| April 2020<br>*Apex of COVID* | 9,481 | 3,059 (32%) | 278 (3%) | Not available |
| September 2021<br>*Apex of Staffing Crisis* | 8,081 | 1,703 (21%) | 744 (9%) | 77 (1%) |
| January 2022<br>*New Commissioner* | 7,668 | 2,005 (26%) | 685 (9%) | 42 (1%) |
| September 2022<br>*Most recent data* | 6,994 | 819 (12%) | 535 (8%) | 6   (<1%) |

The remainder of this section provides a detailed discussion of the steps the Department is taking to maximize the number of staff in the jails and to address its overall staffing problem.

***Summary of the Issues***

The Monitoring Team has long raised concerns about the Department's staffing practices, well before the staffing crisis that emerged in the Summer 2021. In fact, the Monitoring Team contracted with a neutral, independent expert who both confirmed the presence of significant departures from sound correctional practices and also helped to identify issues that could be prioritized to untangle the morass of problems (*see* Monitor's March 16, 2022 Special Report, dkt. 438). Given the complexity of the task, the Monitoring Team recommended—and the Action Plan requires—the appointment of a Staffing Manager who possesses the requisite

expertise to spearhead the solutions to these issues and to overhaul practices related to managing the segment of staff who are unavailable to work with incarcerated individuals.

Three core dysfunctions produce the staffing problems that underlie the Monitoring Team's concerns about safety and service delivery. First, the Department lacks an appropriate framework and basic tools for properly administering its **staff scheduling**. It lacks an accurate roster of staff assigned/available, utilizes indecipherable facility schedules to identify who is expected and who actually reports to work on any given day, and lacks a fair and consistent mechanism for assigning staff to work overtime. Second, the Department's **deployment** practices do not make best use of its workforce, because uniformed staff are routinely utilized for job duties that can be performed by civilians or are temporarily deployed elsewhere, conventions for post assignments (*e.g.*, "priority posts" and "awarded posts") and work schedules (*e.g.*, days on/off, split shifts) do not logically reflect essential job responsibilities, and none of these core functions are routinely monitored by Department supervisors.

Finally, the Department has mismanaged statuses related to staff's **availability to work** (*e.g.* sick leave and other conventions). These statuses exempt staff from working posts that have direct contact and interaction with incarcerated individuals. Sick leave, modified duty, approved time off (*e.g.*, vacation) and other forms of leave (*e.g.*, FMLA) are essential tools for promoting and maintaining staff wellness, but if they are not properly managed, they can be abused by staff and undercut an agency's ability to properly utilize the staff on its payroll. Any system put in place must be capable of identifying those whose use of the benefit is legitimate, and those whose use of the benefit is unnecessary or excessive. The Monitoring Team's staffing consultant identified myriad weaknesses in the Department's practices in this area including how medically modified status is designated and monitored, substandard monitoring of those on sick leave, and

poor enforcement of policy violations. The Department's recent assessment of the functioning of its Health Management Department ("HMD") and steps taken to improve its functioning are discussed in detail below.

These problems individually are challenging, but operating in combination, they have contributed to a terribly inefficient Department with excessive overtime expenditures and significant workplace fatigue among staff who must constantly work overtime. They have also contributed to grave operational deficiencies that lead to unnecessarily high levels of stress, frustration, violence, and injury among incarcerated individuals and staff.

***Initiatives to Improve Staff Scheduling and Deployment***

The challenges related to maximizing the number of staff who are assigned to work in the jails are being managed directly by the Department's new Deputy Commissioner for Administration ("Staffing Manager") who began his tenure in September 2022.[37] Before the Staffing Manager's hire, the Commissioner invited the Monitor and Deputy Monitor to meet candidates for the position and has also encouraged the Monitoring Team to have routine contact with the individual who was selected for the position. The Department's Staffing Manager has an obvious command of correctional best practices, has identified appropriate priorities, and has begun to unpack the underlying problems. In fact, the Staffing Manager's initial assessment identified several issues that had not been identified by the Monitoring Team but will be essential to the success of the strategy. Even with the recent decrease in headcount and the large number of staff who are unavailable to work directly with people in custody, DOC still has a significant number of staff and remains one of the largest workforces with which the Monitoring

---

[37] As required by the Action Plan, § C ¶ 1.

Team is familiar. If the number of staff currently in the Department's headcount were effectively scheduled and deployed, most of the issues related to "staff shortages" would likely be resolved. The problems related to scheduling, deployment and managing those who are unavailable require specific, unique expertise to untangle, and their resolution is essential considering the direct connection to both safety and service provision. It is why the work of the Staffing Manager is so critical at this juncture.

Below is a non-exhaustive list of the issues the Staffing Manager has tackled during his first six weeks with the Department to improve and maximize deployment of staff:[38]

- Created a Roster Management Unit to focus on the task of improved staff scheduling and deployment.[39] The Unit also includes staff members who will teach, direct, and support the work of facility Wardens and Deputy Wardens to ensure that staff scheduling and deployment is executed according to new directives and is consistent across facilities. In addition, a number of analyst positions have been posted to attract new staff with the prerequisite skills.

- Began assessing the supervisory structure within the Department to determine whether there is appropriate leadership present in the Facilities beyond the day shift. Initial findings revealed that there is limited presence of Deputy Wardens and often other leadership in the Facilities later in the day, on weekends, and on holidays. The Staffing Manager is working to identify ways to alter the schedules to cover these gaps.

---

[38] As required by the Action Plan, § C, ¶ 3.

[39] As required by the Action Plan, § C, ¶ 2.

- Began assessing Wardens and Deputy Wardens at each facility to identify opportunities for growth, skill sets that need to be developed, and each command's current process for allocating staff across the posts in their facilities.

- Began educating Wardens and Deputy Wardens about sound practices for allocating staff, streamlining the documents needed to monitor the daily scheduled lineup, and ensuring that each post has clearly designated responsibilities.

- Began leadership training for Deputy Wardens in order to change the operational culture to one centered on caring, compassion and understanding for people in custody and for structure and accountability for managers and staff.

- Developed a template for Wardens and Deputy Wardens to begin using to assign staff to each post in the facility. This template mimics the staff scheduling module of the electronic scheduling system that will be utilized until the automated system is ready to deploy.

- Reviewing the interim priority post list that was created for each facility prior to the Staffing Manager's tenure[40] and evaluating whether other posts might also meet the "priority" criteria and whether any of the identified posts can be removed from the priority list because they do not actually correspond to an operational priority.

- Assessing whether each facility post requires a standard 8-hour shift, or whether a split shift or alternative hours would better suit the job responsibilities/post orders.

---

[40] As required by the Action Plan, § A, ¶ 2(a).

- Working with Human Resources to identify civil service titles for support staff in the facilities to end the practice of assigning uniformed staff to these positions.[41]

- Working with HMD to heavily scrutinize the list of staff designated as unavailable[42] for a variety of reasons, and to return to full duty those staff who should be able to work with the incarcerated population.

- Scrutinizing the list of staff on Temporary Duty Status[43] to identify Captains who should be returned to posts that supervise officers assigned to housing units. Further, assignment of any staff member assigned to a temporary duty position has been consolidated and must be approved by the Staffing Manager (versus the more diluted process in the past where it could be done by multiple different leaders across the agency).

- Suspended the use of Awarded Posts.[44] The Staffing Manager also intends to evaluate the 1,631 staff (1,414 officers, 202 Captains, and 15 ADWs) on awarded posts to determine whether such assignments are appropriate.

The Department has also procured "inTime," an automated workforce management software package that will automate uniform staff scheduling and create a central repository of information related to uniform staff assignments, status (*e.g.*, active, restricted, in-active, long-term inactive and restricted), and scheduling across all facilities.[45] The Staffing Manager will be

---

[41] As required by the Action Plan, § C, ¶ 3(vii).

[42] As required by the Action Plan, § A, ¶ 2(b).

[43] As required by the Action Plan § A, ¶ 3(a), 15 Captains on Temporary Duty Assignment were re-assigned to posts that supervise officers assigned to housing unit posts. The Department determined that 28 captains remain on Temporary Duty Assignment because they are in critical need posts that were not otherwise budgeted and so they must remain on this status.

[44] As required by the Action Plan, § C, ¶ 3(v).

[45] As required by the Action Plan, § C, ¶ 5.

collaborating with IT to work on building it out to meet DOC's unique needs. Further, the Department has begun a pilot test of an electronic scanning system designed to ensure uniform staff are on post as expected. The pilot was initiated at RNDC, and the Staffing Manager is working with IT and other Divisions to evaluate the results of the pilot. Plans are already underway for expansion of the program with EMTC slated to be the next facility to utilize this system.[46]

The Department is in the process of analyzing its staffing data to determine optimal staffing levels by evaluating the impact of alternative schedules for staff and the impact of staff on leave for any reason, as well as the additional work the Staffing Manager is engaged in (discussed above). With respect to scheduling of staff, currently the majority of staff is on a 4x2 schedule (4,863 or 70% of uniform staff)[47]. Most systems utilize a 5x2 schedule where staff work five consecutive 8.5-hour workdays, followed by 2 consecutive days off. Staff on 4x2 schedules work four consecutive 8.5-hour workdays, followed by 2 consecutive days off. Not accounting for staff on leave, 300 staff working 4x2 schedules are able to fill 2,800 posts over the course of 2 weeks, but 300 staff working 5x2 schedules are able to fill 3,000 posts over 2 weeks. This difference is solely due to the differing work schedules and assigned days off.

It must be recognized that each of the Department's facilities and commands has hundreds of posts that must be assessed and configured, and each facility has hundreds—sometimes thousands—of staff who must be deployed across these positions. Not only is the volume of individual data points enormous, but so is the magnitude of effort needed to

---

[46] As required by the Action Plan, § A, ¶ 2(c).

[47] As of September 23, 2022, 4,485 Officers, 338 Captains, and 40 ADWs were on 4x2 schedule.

completely transform scheduling and deployment practices that have not evolved to keep pace with technology. Even when guided by an individual who is highly competent and intimately familiar with the variety of staffing models, tools, and expectations common to other jurisdictions, aligning the Department with sound correctional practice is not a short-term project. Until the Staffing Manager was brought on board, the Department did not have the ability to undertake this project and so the infusion of the Staffing Manager's expertise and leadership has been critical to developing and implementing a reasonable process for scheduling and deploying staff.

### *Initiatives to Manage Staff on Sick Leave or Modified Duty*

Facility operations have been crippled by the number of staff out sick (which includes work-related and non-work-related illnesses and injuries) combined with the number who have a restricted medical status (again due to either non-work related or work-related issues) and, to a much lesser extent, staff who fail to come to work as scheduled ("AWOL"). Sick leave benefits are provided to staff for an important reason and this benefit must be protected for those who legitimately need it. While it is true that the benefit is ripe for abuse given how poorly it has been managed, it is an essential employment benefit for those who legitimately need it. The system that is put in place must be capable of accurately identifying those who need and use the benefit for a legitimate reason and those whose benefit use is unnecessary or excessive. In an agency where job responsibilities are inherently dangerous and stressful, staff will always need to utilize sick leave benefits. However, the number of staff on sick leave and modified duty increased so significantly in the past two years that it is undeniable that poor management of both of these staff benefits is contributing to the accumulating problem of a lack of available staff. Naturally,

the pandemic in early 2020 caused a steep drop in staff availability, and the problem only worsened as the pandemic continued.

In the years just prior to the pandemic, the proportion of DOC staff out sick (including absences for line of duty injuries) averaged between 5% and 7% of the workforce, which was similar to the rate at the Fire Department (FDNY) and the Department of Sanitation (DSNY).[48] Absenteeism rates across the City significantly increased with the onset of the pandemic in early 2020 and so *some* increase in rate of absenteeism over pre-pandemic levels was expected, consistent with other correctional systems across the country. Even during the best of times, the work of DOC staff is incredibly challenging. During the pandemic, with the onset of illness, plus the stress and anxiety of working in an indoor congregate setting, the seeming inevitability of being tapped to work overtime and the progressively deteriorating level of physical safety, the difficulty of the staff's work environment during that time simply cannot be overstated. In the early days of the pandemic, DOC's absenteeism rate soared – in April 2020, an average of 32% of DOC staff were out sick on any given day. Further, as the NYC Comptroller noted "[i]n the first four months of FY 2022 (July-October 2021), DOC's uniformed absentee rate skyrocketed to 27%, far surpassing the 10% rate at FDNY and the 11% rate at DSNY."[49] Notably, the Department's absenteeism rate has decreased to about 12% (the current rate of absenteeism at the FDNY and DSNY is unknown). While these agencies are "comparable" in that they are bound

---

[48] Lander, B. (2022). *Agency Watch List: Department of Correction, FY2023.* New York City Bureau of Budget: New York, NY, pg. 10.  Available at:  https://comptroller.nyc.gov/reports/agency-watch-list/fy-2023/department-of-correction-fy-2023/.

[49] *Id.*

by similar regulations and employee benefits, the substance of the work itself is obviously not the same and thus may underlie some of the differential here.

The Department's data on staff's reported reasons for using sick leave in 2022 indicate that on-the-job injuries are prevalent among staff. The table below illustrates the types of physical health problems reported by those who called out sick during a 7-month period in 2022 (February 1 to September 1, 2022). By far, the largest category was "trauma," which was offered as the reason for 27% of the over 51,000 call outs. The "trauma" category includes injuries such as fractures, lacerations, broken bones, back pain, sprains, and eye injuries. "Trauma" was followed by "line of duty injuries" which comprised about 20% of all sick codes. This is a striking, though sadly not surprising, commentary on the current state of affairs.

| OCCASIONS SICK CODES USED February 1 to September 1, 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| SICK CODES | CO | CAPT | ADW | DW | DWIC | WARDEN | CIVILIAN |
| TRAUMA | 12,680 | 834 | 35 | 1 | 0 | 0 | 69 |
| LINE OF DUTY INJURIES ("LODI") | 9,675 | 655 | 17 | 1 | 0 | 0 | 60 |
| GASTROINTESTINAL | 8,596 | 443 | 50 | 6 | 0 | 0 | 0 |
| GENERAL SYMPTOMS | 7,773 | 479 | 50 | 3 | 0 | 0 | 4 |
| OBSTETRICS | 1,741 | 281 | 47 | 0 | 0 | 0 | 0 |
| GYNECOLOGY | 1,566 | 138 | 8 | 0 | 3 | 0 | 0 |
| DENTAL | 1,152 | 82 | 8 | 0 | 0 | 0 | 0 |
| FLU/COLD | 1,039 | 92 | 13 | 0 | 0 | 0 | 233 |
| AMBULATORY SURGERY | 616 | 56 | 4 | 0 | 0 | 0 | 0 |
| RESPIRATORY | 501 | 22 | 2 | 0 | 0 | 0 | 1 |
| SIDE EFFECTS - VACCINE | 483 | 36 | 4 | 1 | 0 | 0 | 5 |
| PSYCH | 317 | 22 | 4 | 0 | 0 | 0 | 0 |
| HOSPITALIZATION | 265 | 32 | 2 | 0 | 0 | 0 | 0 |
| CARDIAC | 182 | 7 | 0 | 0 | 0 | 0 | 0 |
| HYPERTENSION | 140 | 9 | 3 | 0 | 0 | 0 | 0 |
| MATERNITY DISABILITY | 126 | 14 | 2 | 0 | 0 | 0 | 0 |
| MOTOR VEHICLE ACCIDENT | 113 | 5 | 0 | 0 | 0 | 0 | 0 |
| DERMATOLOGY | 84 | 4 | 0 | 0 | 0 | 0 | 1 |
| ENDOCRINOLOGY, RHEUMATOLOGY, ONCOLOGY, DIABETIC | 49 | 3 | 0 | 0 | 0 | 0 | 0 |
| GENITOURINARY | 48 | 2 | 2 | 0 | 0 | 0 | 0 |
| OPHTHALMOLOGY | 34 | 0 | 0 | 0 | 0 | 0 | 0 |
| INFECTIOUS DISEASE | 17 | 2 | 0 | 0 | 0 | 0 | 0 |
| E.A.P. | 14 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | |
| TOTALS | 47,211 | 3,218 | 251 | 12 | 3 | 0 | 373 |

Prior to the pandemic, the Department's exceptionally large workforce was able to obscure many of the weaknesses of its management practices surrounding staff availability because sufficient staff were available to compensate for those who were not available. When the pandemic arrived and staff absenteeism increased, the structural flaws of the management practices reached a breaking point. The "band-aid" of using overtime to address staff shortages began to create a vicious cycle of a stressed and exhausted workforce that likely further contributed to staff calling out sick and triggering additional overtime among those who had reported to work. Facility conditions deteriorated quickly.

It is the structural flaws in the Department's management of staff availability that must be addressed. The policies and procedures governing these issues are mired in unnecessary complications and bureaucracies, and rendered ineffective by few controls and a lack of adherence to requirements for verifying staff's status. Significant progress toward maximizing the number of available staff can be made by resolving dysfunctional practices as demonstrated by the gains that have already been made this year. It must be acknowledged that Staff have generous sick leave benefits. However, reporting that Staff have "unlimited sick leave benefits" has not been properly contextualized until now, especially as it relates to reports that it is the sole factor impeding appropriate staffing levels. First, all City law enforcement agencies and some municipal services operate under the same sick leave benefit. The fact that other agencies operate under the same basic framework yet do not experience staff absenteeism of the same magnitude belies the argument that these benefits and regulations are the source of DOC's problems. These benefits are at least in part a reflection of the fact that recruiting and retaining qualified staff in dangerous and stressful working conditions is difficult. And certainly, some City agencies appear to be able to properly manage their workforce even within the presence of the generous benefit.

Furthermore, these same benefits, laws, and policies have been in effect for many years, yet DOC's own staffing problems were not of the same magnitude before the pandemic. This context is extremely important for understanding that the generous benefit may create an *opportunity* for a staffing crisis to emerge if a certain set of circumstances are present and the benefit is not properly managed, but the benefit itself did not cause the problem, and thus dismantling it may not need to be part of the solution.

Second, New York Civil Service Laws and DOC policy actually *do* provide some constraints on the use of leave. For example, although there are a few exceptions, Department policy clearly permits disciplinary action (*i.e.*, "Medical Incompetence" cases) in response to a variety of patterns or behaviors related to abuse of sick leave benefits. Furthermore, New York state law permits "Medical Separation," which is a non-disciplinary termination of an employee who has been cumulatively/continuously out sick or unable to fulfill work duties for a significant period of time, generally one or two years (*see* New York Civil Service Laws §§71 to 73). Finally, New York City Administrative Code § 9-113 (Resignation by members of the uniformed force of the department of correction) permits the separation of staff who have been AWOL on five occasions or more. The Department failed to recognize and enforce these constraints consistently, so the benefit certainly appeared to be "unlimited."

In short, poor management of this important staff benefit is the major driving force of the Department's staffing problems. What began as a long history of mismanagement escalated to a crisis, one that threatens to fully collapse the system if it is not addressed forthwith, hence the Action Plan's emphasis on this issue. Since the Commissioner took office in January 2022, the Department has undertaken the following initiatives.

- The First Deputy Commissioner was assigned to supervise **the Health Management Division's ("HMD") practices**[50] and immediately began to aggressively evaluate all of the practices of the unit.

- The First Deputy Commissioner and her team **evaluated HMD practices**[51] to identify weaknesses and deficiencies. In the Monitoring Team's opinion, the assessment of HMD is one of the most candid, insightful, and transparent projects undertaken by the Department in the past seven years. Among the problems identified were:

  o HMD's uniform leadership provided poor supervision to HMD staff so, in the spring 2022, HMD's uniform leadership was removed and demoted, and an interim leader was installed.

  o The size of HMD's workforce was simply too small to be able to manage and monitor the large number of staff out sick and/or on restricted duty.

  o Staff assigned to HMD were not properly supervised, which resulted in a variety of performance problems including:

    ▪ Staff routinely failed to request, review, and evaluate medical documentation from staff on leave, resulting in unnecessarily long absences because their status was not updated timely.

    ▪ In some cases, certain HMD staff usurped the established process and protocols and engaged in a variety of dishonest practices that served to extend staff's leave (*e.g.*, continually rescheduling doctors' appointments to a later date, reassigning staff to

---

[50] As required by the Action Plan § A, ¶ 3(b)(iii).

[51] This was conducted as required by the Action Plan § A, ¶ 2(e).

doctors who might acquiesce to staff's request to stay out longer than necessary, and advising staff on strategies to prolong their modified duty status).

▪ Disciplinary action for poor and/or deceitful practices by staff failing to come to work was rarely recommended and could be avoided by HMD staff who had a connection to HMD supervisors.

▪ Information was not shared across HMD units, and the lack of coordination stymied efficient processing.

▪ HMD did not coordinate well with the facilities, which further protracted the return to work or otherwise compounded the problems. For example, when staff were advised that they were fit to return to duty, HMD may not have notified the facility. When those staff did not return to work as required, the facility did not know to report them as AWOL.

This assessment substantially deepened the Department's and the Monitoring Team's understanding of the various layers of dysfunction that are contributing to the large number of staff deemed unavailable to work. Now armed with this information, the Department has launched solutions that fit the specific contours of these problems. First steps toward this end are discussed below.

• Key **policies** have been revised or are in the process of being revised:

  o *Home Confinement Visits*: When staff call out sick, policy requires them to limit their out-of-home time. This policy is intended to deter the abuse of sick leave benefits, to allow the Department to evaluate medical conditions, and to investigate officers suspected of feigning illness. The prior procedures for confirming that an individual was at home were so onerous that not only was it incredibly time consuming, but also difficult

to confirm that someone was in fact not at home. The policy was revised to set more sensible requirements to determine whether someone was home (less knocks on fewer doors at the person's home and fewer phone calls) and to bring efficiency to the process of verifying compliance with home confinement requirements.[52]

o *Sick Leave policies*: Revisions to the Sick Leave and Absence Control policies, which have not been updated in over 20 years, are under development.[53] The Monitoring Team has provided several suggestions for sections that should be reconsidered and revised.

o *MMR policy*: The Department intends to update its MMR policy so that, beginning in 2023, restricted duty status will be limited to only those staff who have suffered an on-the-job injury that a doctor has confirmed requires modified job responsibilities. Restricted duty will also be permitted for pregnant staff members.

- Leveraging the HMD Assessment, the Department made several adjustments to HMD's **management, supervision, and staffing**.

  o The Department is in the process of onboarding a Deputy Commissioner who will manage Health Affairs and HMD. The Department is also recruiting an Assistant Commissioner for HMD.

  o The Department has created a comprehensive list of *additional* staff positions for HMD and is working toward converting some to civilian positions and/or automating certain job tasks (*e.g.*, sick call) instead of utilizing uniformed staff.

  o Uniformed staff currently assigned to HMD will be rotated out of the division every 90 days in order to reduce undue familiarity that can lead to dishonest practices.

---

[52] As required by the Action Plan § A, ¶ 2(d)(i).

[53] As required by the Action Plan § A, ¶ 2(d)(iii).

o Access to HMD's information management system has been restricted and fortified. Previously, 250 staff had *full* administrative access—this level of access has been reduced to just 35 staff. Further, the 160 staff who have some level of restricted access to the system has been reduced to 91 staff.

o Worked with Supervisors to improve HMD practices

- The Department has taken steps to improve various **discrete practices**.

  o HMD staff have been directed to increase their scrutiny of those on sick leave and modified duty to ensure that these staff are providing timely documentation and attending all scheduled medical appointments.

  o The Home Confinement Visit protocol and practices have been fortified.

    ▪ A larger number of staff are now permitted to conduct Home Confinement Visits. In addition to Captain Investigators assigned to HMD, Captains assigned to headquarters and staff from ID and DOI are now able to conduct visits.

    ▪ Visits are more efficient. The new policy requires fewer doorbell rings/knocks on door and less time spent waiting for someone to answer the door.

    ▪ Visits are more frequent. Home Confinement Visits have been prioritized for the following categories: (a) staff who are out sick for 8 consecutive days are visited on the 9th day, (b) staff who are out sick for at least 12 days within a 12 month rolling-period (*i.e.*, "chronic absence"), and (c) staff who are designated as "indefinite sick" (sick 30 days more).

    ▪ HMD Investigators also "double-back" by revisiting a staff's home that was visited earlier in the same day.

o   Protocols to **monitor staff designated as "indefinite sick" and MMR** have been fortified.[54]

■   Those who were designated as "indefinite sick" or placed on MMR some time ago were asked to provide current documentation of their medical conditions. As a result, many staff were returned to full duty and/or their status in the MMR system was downgraded (which permits them to be assigned to a broader range of posts). As of October:

■   490 staff are now designated as "indefinite sick" compared to 1,099 in January 2022. This represents a 55% decrease over the past 10 months.

■   516 staff are now designated as MMR compared to 767 in August 2021. This represents a 33% decrease over the past 13 months.

■   Those designated MMR since April 1, 2022 and who were assigned to "no-contact posts" in the facilities are being routinely evaluated. HMD has deployed doctors within the Facilities so that the staff members' status can be monitored/updated more quickly when they become able to return to positions where they have contact with people in custody.

■   When staff indicate that they want to return to work, HMD prioritizes their medical appointments so they can be designated as available to work more quickly.

■   Staff on "indefinite sick" are referred for discipline if they miss a scheduled medical appointment.

o   HMD also focused on **identifying staff with "chronic absences"** (*i.e.*, those out sick for 12 days or more in a rolling 12-month period) which had not occurred routinely as required.

---

[54] The work was conducted as required by the Action Plan § A, ¶ 2(f).

When staff are designated as a chronic absentee, they may lose their discretionary benefits and privileges, such as a steady tour or post assignment, access to voluntary overtime, promotion, secondary employment, assignment to preferred special units or commands, and an inability to transfer to other commands/units. Forfeiting these privileges should serve as a disincentive for unnecessary long-term sick leave and bring staff back to work more quickly when possible.

### *Addressing Unavailability of Staff*

As noted in the Introduction to this section, preliminary outcomes from the various initiatives discussed above are promising. More detailed monthly data is also available in Appendix A to this report. The Department has several options for addressing staff who are chronically unavailable or who have abused sick leave policies, including non-disciplinary separation proceedings,[55] disciplinary proceedings (known as Medical Incompetence)[56], and suspensions.[57] Between January and September 2022, the Department took the following actions:

- **92** staff were **separated, terminated, resigned, or retired** from the Department.

---

[55] Medical and AWOL Separation is a non-disciplinary action (pursuant to Civil Service Laws §§ 71 to 73 and New York City Administrative Code § 9-113) to separate an employee who has been cumulatively/continually out sick, unavailable to work, AWOL 5 days or more, or unable to fulfill work duties for a significant period of time, generally one or two years.

[56] Medical Incompetence is a disciplinary action in response to a variety of patterns of behaviors related to the abuse of the sick leave benefit. The Department has significantly increased its use of this tool.

[57] The work outlined in the bullets includes the Department's efforts to address the 170 cases outlined in Action Plan § A, ¶ 2 (d)(ii) and approximately 20 cases outlined in § A, ¶ 2(f)(i). The resolution of the approximately 20 medical incompetence cases identified on May 23, 2022 to be expedited have all been resolved and the outcomes of these cases are subsumed in the updates provided in the bullets.

- o  29 staff were separated pursuant to Civil Service Law §§ 71 or 73 (*i.e.*, Medical Separation).

- o  21 staff were Medically Separated, and their Medical Incompetence disciplinary action was put in abeyance should they return to the Department.

- o  30 staff were separated pursuant to New York City Administrative Code § 9-113 because they have been AWOL for 5 days or more.[58]

- o  6 staff were terminated following a trial at OATH.

- o  3 staff resigned.

- o  2 staff retired who were subject to these proceedings.

- **318** staff were **suspended.**

  - o  249 staff were suspended for Home Confinement violations thus far in 2022. This is an increase of almost 70% over the number of suspensions that occurred during all of 2021, and 2022 is not yet over.

  - o  69 staff were suspended for being AWOL.[59]

- **Medical Incompetence** cases have increased.

  - o  390 charges have been brought on Medical Incompetence cases thus far in 2022, a 94% increase over the number of charges that occurred during all of 2021, and 2022 is not yet over.

  - o  244 Medical Incompetence cases have been resolved.

---

[58] During the height of the staffing crisis in 2021, the Monitoring Team repeatedly recommended to the City and Department that they enforce this regulation with staff repeatedly on AWOL status (*see e.g.* September 2, 2022 Status Report dkt. entry 380), but it was never utilized until this year.

[59] In 2021, a total of 165 staff were suspended for being AWOL. The reduction in suspensions for AWOL may be due in part to fewer staff being AWOL (i.e., only 6 staff in September 2022), as shown in the table above.

- 6 staff were terminated via a guilty finding at OATH (as noted above).

- 118 cases (48%) resulted in a Negotiated Plea Agreement (which typically leads to the forfeiture of compensatory days).

- 101 cases (41%) resulted in a Deferred Prosecution (staff member is no longer employed by DOC but will be prosecuted should they return); and

- 19 cases (8%) were dismissed.

  o 387 cases of Medical Incompetence are pending resolution as of October 2022.

- 38 staff were identified **for unpaid leave** pursuant to New York Civil Service Law 72 which can be applied when a staff member is on "indefinite sick" or MMR for a year or more for non-work-related reasons.

  o 28 staff returned to full duty once placed on this status.

  o 6 staff will be placed on unpaid leave if they do not return to full duty.

  o 1 case was initiated too early, and then the staff returned to full duty before notification was sent.

  o 1 staff was terminated for AWOL.

- 1,029 staff have been identified as being chronic absentees (compared with 100 staff at the beginning of the year). As discussed above, greater vigilance in utilizing this designation is a deterrent because many of these individuals to return to work to avoid the designation as a chronic absentee. However, the facilities are backlogged in processing this designation and only about 50% of staff identified as chronic absence have been processed as such.

- 14 staff have been referred to the Department of Investigation where there was suspected staff abuse of sick time or restricted status for further investigation because the conduct

of the staff member appears to be criminal in nature.[60] The First Deputy Commissioner also routinely meets with DOI about the status of these cases to ensure that they are addressed.

*Next Steps*

The Department has taken the initial steps in the effort to overhaul its staff management practices to permit the facilities to maximize the number of staff available to work with incarcerated people as contemplated by the Action Plan. Priority next steps include:

- Maximizing the number of staff in the facilities by improving deployment and scheduling.

- With respect to the availability of staff:

  o Finalizing revisions to Sick Leave, Absence Control, and MMR policies.

  o Assigning new leaders to HMD and civilianizing its workforce.

  o Continuing to monitor and evaluate the status of all staff on sick leave with the same level of urgency shown over the past several months.

  o Processing staff identified as "chronic absence" must be completed by December 31, 2022.

- Improvements to Medical Separation and Medical Incompetence cases.

  o The Department must ensure timely processing of sick leave and absence-related disciplinary cases. The large number of pending cases does not bode well for their timely disposition. Accordingly, the following must occur:

    ▪ The Trials Division must have adequate staff to manage these cases.

---

[60] As required by the Action Plan, § A, ¶ 2(g).

- ▪ OATH proceedings must be as efficient as possible.[61]

- ▪ The pending medical incompetence cases must be resolved within the next six months.

---

[61] The Monitoring Team strongly recommends that the efficiencies devised by OATH to timely address UOF cases should equally apply to these cases.

- **SECURITY PRACTICES**

As described in the introduction to this report, the Monitoring Team has long lamented the poor security practices and disordered operation that characterize the jails' environments. These problems contribute to the high levels of violence and are the underpinning of the Consent Judgment's focus on unnecessary and excessive uses of force. Problematic practices include poor supervision and inadequate support for staff on the housing units, poorly executed physical restraints, a lackadaisical approach to basic security measures like securing doors and dispersing crowds, and a general lack of situational awareness. Staff's often hyper-confrontational demeanor contributes to incidents spiraling out of control, and the overreliance on Emergency Response Teams and the response by an overabundance of staff means that force is often precipitated by Staff's own behavior. In addition, the disordered environment and staffing problems discussed in the "Staffing" section of this report result in the constant disruption of even the most basic services (*e.g.*, recreation, laundry, commissary, barbershop), which creates additional frustration among the people in custody, who are already stressed by the level of facility violence, separation from their loved ones, and uncertainty in their court proceedings to name a few.

Thus, the Department has remained trapped in a state of persistent dysfunction, where even the first step to improve practice has been undercut by the absence of elementary skills and the convolution of basic correctional practices and systems. The newly appointed, well-qualified three Deputy Commissioners of Staffing, Security, and Classification/Operations and Associate Commissioner of Operations have begun to untangle the morass, beginning first with the many illogical obstacles and new procedures that must be designed and put into place. Although no small feat in itself, the challenge of developing new systems pales in comparison to the difficulty

of dismantling an entrenched culture that departs so remarkably from sound practice. The type of culture change required for successful reform will necessitate an all-encompassing behavior change among thousands of Staff.

While several security-related policies have been updated and some further revisions are necessary, the problems in this area are not centered on a poor system design or poorly articulated policy but rather the behavioral choices that Staff make moment to moment. For this reason, strong leaders who instantly recognize and are able to correct poor practice are needed. The new Deputy Commissioners of Staffing, Security and Operations and Associate Commissioner of Operations embody these skills, which they will need to push farther down the chain of command, to the Wardens, Deputy Wardens, ADWs and Captains whose core task is to guide good practice among Staff on the housing units. This goes beyond simply advising Staff what to do, and will require consistent expectations, frequent drill and practice, reinforcement and recognition of improved practice, and accountability and discipline for those whose practice does not evolve as required. In short, this is a long-term, multi-step process and the Department has only recently become poised to *begin* the work in this area. Behavior change is what will trigger reductions in the level of interpersonal violence and to the frequency and quality of use of force, and behavior change will need to occur across thousands of Staff before the desired changes in key metrics will become visible. Changes will be gradual, but the Monitoring Team is focused on sustaining the support required for this to occur.

As discussed below, small changes in the various quantitative metrics regarding violence and use of force have been observed thus far in 2022. While some concerning increases were noted (*e.g.*, the rate of stabbing/slashing), some encouraging decreases were also observed (*e.g.*, the rate of assault on Staff). The Monitoring Team's experience suggests that progress toward

safe facilities becomes evident via small improvements that accumulate over a long period of time. Changes of the magnitude necessary to transform the jails simply cannot be accomplished quickly or in large leaps and bounds, regardless of the strength of leadership involved. Trends in various metrics are discussed in detail below, along with the status of a variety of other security-related initiatives (*e.g.*, cell doors, searches, housing unit tour wands).

*Individuals in Custody & Length of Stay*

An important point of reference is the size of the Department's average daily population. The number of people in custody has decreased about 40% since 2016, and the age composition has also changed over time. The Department no longer houses 16- and 17-year-olds, and the proportion of young adults (age 21 and younger) in the total population has decreased very slightly (from 13% in 2016 to 9% in 2022). That said, it is likely that the average daily population would be even lower if not for the extraordinarily long lengths of stay among people in custody. In 2021, the Department's average length of stay was 101 days, which is three times the national average of 30 days.

The table below provides a one-day-snapshot (September 15, 2022) of the number of individuals who have been in DOC custody for longer than one year. Of the total population, 1,084 (18.5%) had been in custody for longer than one year. About 100 people have been in custody for 4 years or longer.

| Length of Stay | 1 to 2 years | 2 to 3 years | 3 to 4 years | 4 to 5 years | 5 to 6 years | 6 to 7 years | 8 to 9 years | 9 to 10 years | Total >1year | Total Population |
|---|---|---|---|---|---|---|---|---|---|---|
| Number of Individuals | 601 | 256 | 127 | 82 | 14 | 2 | 1 | 1 | **1,084** | **5,871** |
| % of Total Population | 10.2% | 4.4% | 2.2% | 1.4% | 0.2% | <0.1% | <0.1% | <0.1% | **18.5%** | **100%** |

In an effort to reduce the number of individuals who have long stays in DOC custody, the Department routinely compiles a list for MOCJ of individuals in custody for a year or longer, along with other information such as pending charges, whether the individual has assaulted staff, and other information.[62] MOCJ then reviews the list and selects a subset of individuals whose cases should be prioritized. Because the number of people who have been in custody for a year or more is over 1,000 people, not all cases can be prioritized. The cases that have been prioritized are organized by borough and MOCJ sends each borough-specific list to the corresponding District Attorney's Office to encourage case processing to be expedited.

MOCJ held a general meeting with all DA's Offices on October 11, 2022 to discuss the role of the Action Plan and the need to expedite case processing for the individuals on each list. MOCJ's office has since coordinated directly with each DA's Office to review each case in order to gain insight into the reason the cases are languishing and what can be done to process them more quickly. If an individual has cases in multiple boroughs, MOCJ convenes a meeting with the respective boroughs to ensure the cases are coordinated effectively. This process is ongoing, and more individuals will be prioritized as the cases on the initial list are resolved. The Monitoring Team intends to evaluate the impact of this work on case processing times and length of stay in future reports.

Finally, the City reports that the Office of Court Administration ("OCA") reports it has its own initiative aimed at expediting processing for individuals who have been in custody for two years or more. MOCJ has reported that it has also informed OCA about its role in and projects for the Nunez Action Plan.

---

[62] As required by the Action Plan § B, ¶ 4.

*Use of Force & Injuries*

The focus of this case is use of force and so the number and rate of **uses of force** ("UOF") is an important factor to consider. The chart below shows that the total number (blue bars) and average monthly rate (yellow line) of UOF increased significantly through 2021.[63]



The 2022 bar includes the number of UOF through September and thus is not comparable to previous years; however, the yellow line presents an average monthly rate which can be used as a point of comparison for other years. In 2022, the average monthly UOF rate was about 16% lower than the 2021 average monthly UOF rate and 9% lower than 2020 (although higher than pre-pandemic rates and the 2016 rate which reflects the conditions that gave rise to the Consent Judgment). An instant, significant decrease in the use of force rate is not expected, given the

---

[63] Throughout this document, average monthly rates per 100 people in custody for each year were calculated using the following formula:  rate = ((total # events in a time period/number of months in time period))/average ADP for the time period) * 100.

many practices that contribute to this single metric and the reality that some staff will improve practice more quickly than others. Instead, a prolonged, sustained accumulation of small improvements is the most likely path to achieving the safety outcomes required by the Consent Judgment and the most common way that system reform becomes evident in quantitative data.

The Monitoring Team continues to be concerned about the prevalence of poor practice, avoidable, unnecessary and excessive uses of force. The Monitoring Team's comprehensive review of uses of force in 2022 continued to reveal problems similar in scope and magnitude to what has been observed and reported extensively over the past 7 years. This includes:

- Practices that **lack adherence to basic security protocols**, such as securing cell doors, securing doors to control centers, proper key control, officers being off post, failures to timely intervene, poor escorted movement, crowding in vestibules, failures to properly restrain people in custody, and failures to properly utilize equipment.
- **Poor situational awareness** and lack of vigilance while on post such as neglecting to maintain a safe distance and/or utilize a defensive stance when interacting with people in custody; failing to listen/observe/recognize escalating tensions and frustrations; neglecting to address problems that are well within staff's control; choosing a passive, stationary supervision style; failing to disperse groups of incarcerated individuals when clustered together in the housing units; failing to establish and reiterate clear expectations in the housing units; and utilizing an unprofessional demeanor, profanity, aggressive tone and threatening non-verbal communications.
- An **overreliance on response teams** (Probe Teams and ESU) and allowing events on the housing units to escalate out of control even when sufficient staff are available to address an event quickly. This is discussed in more depth in the section of this report that assesses compliance with the First Remedial Order § A., ¶ 6.

Over time, improvements to basic security practices, situational awareness and incident response should result in significantly lower use of force rates, which in turn, should provide the

space and time for staff to hone their skills regarding de-escalating interpersonal conflict and provide services more dependably.

In addition to the frequency with which force is used, another key metric is the **frequency of serious injuries** during incidents that involve a use of force. A use of force's injury classification is derived from the most serious injury sustained by anyone involved in the incident (person in custody or staff). In other words, it does not count all injuries sustained by anyone involved in an incident, it counts only the most serious one. The chart below shows that the proportion of UOF with no injury (Class C; blue bar) has increased over the past 7 years, but also shows that the proportion and number of UOF with serious injuries (Class A; grey bar/red numbers) has increased significantly. Thus far in 2022, the 353 Class A injuries represented 6.9% of all uses of force, compared to just 2.9% of uses of force that were Class A in 2020.



This increase in the level of injury severity in incidents involving a use of force is mirrored by increases in the **level of severity involved in interpersonal violence**. The chart

below shows that the total number and average monthly rate of stabbings and slashings increased exponentially in 2021 and increased even further thus far in 2022. The blue bars show the number of stabbings and slashings each year (again, 2022 is a partial year), and the red line shows the average monthly rate of these events. The rate thus far in 2022 is about 16% higher than the rate in 2021, and over five times higher than 2016.



On a more positive note, while the average monthly rate of **fights** climbed steadily over the past 7 years, it has decreased thus far in 2022. The average monthly rate of fights in 2022 (8.07) was 13% lower than the average monthly rate of fights in 2021 (9.32).



Further, a notable decrease in the average monthly rate of **assaults on staff** has also been witnessed thus far in 2022. The Department has always collected data on assaults on Staff that occur during incidents *involving a use of force* (blue bar). The green line in the chart below shows that the average monthly rate of this type of assault on staff thus far in 2022 is about 29% lower than the average monthly rate in 2021 (1.19 versus 1.67), though it remains significantly higher than in 2016. In 2020, the Department began collecting data on assaults on Staff that occur *without a use of force* (orange bar). The yellow line in the chart shows that the average monthly rate of this type of assault thus far in 2022 is about 44% lower than the average monthly rate in 2021 (1.27 versus 2.26).



Throughout its seven-year history monitoring the conditions of this Department, the Monitoring Team has given increased scrutiny to certain facilities that have exceptionally high rates of violence and uses of force. Most recently, the Monitoring Team has focused on RNDC (where the majority of people aged 21 and younger are housed) and GRVC (where most of the Department's restricted housing is located). Key metrics for these two facilities are presented below.

**<u>RNDC</u>**

Since GMDC closed and Raise the Age went into effect (late 2018), RNDC has housed about 75% of those aged 21 and younger who are committed to the custody of the Department. This age cohort has particularly high rates of violence and uses of force when compared to their older counterparts. While the age composition has varied significantly over the years, currently, RNDC's average daily population of about 800 people is about half those aged 22 and older and half those aged 21 and younger.

The charts below clearly illustrate the reasons for the Monitoring Team's concern and the reason that RNDC was the first facility targeted by the Commissioner's Violence Reduction Plan in early 2022.[64] First, in 2021, stabbings and slashings occurred at a rate more than 10 times higher than previous years, with 138 such events in a 12-month period. RNDC's average monthly rate of such events has remained high thus far in 2022, although 70% of the events occurred between January and April 2022. Since May 2022, the number and rate of stabbings and slashings have been significantly lower.



In addition, thus far in 2022, the rate of fights at RNDC decreased about 17% from their 2021 level. This is the lowest rate of fights at RNDC for the past several years.

---

[64] As required by the Action Plan § A, ¶ 1(a).



Regarding the use of force, in early 2022, the facility's monthly UOF rate increased significantly as the facility initiated its strategy to disperse those affiliated with Security Risk Groups ("SRG") across a larger number of housing units such that no one group dominated a single unit. The increase in UOF rate also coincided with the facility's more frequent searches to detect and seize dangerous contraband. However, by August/September 2022, the UOF rate had decreased significantly, leading to an average monthly UOF rate that is comparable to that of 2021.



In 2022, the early upticks and more recent decreases in violence and uses of force correspond to the timing of the Commissioner's Violence Reduction Plan. While work remains to improve security practices and increase programming, these initial results are encouraging.

**GRVC**

Like RNDC, GRVC has received special attention from the Monitoring Team because of its high rates of use of force and violence. For these same reasons, the Commissioner expanded the Violence Reduction Plan to GRVC during the Summer 2022.[65] While many components of GRVC's plan were similar to RNDC (*e.g.*, SRG Blending, increasing tactical search operations to detect and seize dangerous contraband, and some additional support for large group movements), a couple key differences are worth noting. First, although GRVC's average daily population has been approximately 650 for several years, GRVC's population is currently comprised largely of those who have committed serious violence and are currently in or recently released from restricted housing. A large concentration of people with a known propensity for serious violence obviously suggests that the rates of such events will be higher than other facilities whose populations are more heterogenous in this regard. Second, thus far in 2022, the facility has had multiple leadership changes as the Department attempts to control violence. While these changes may ultimately be positive, they are destabilizing. Third, GRVC's complement of supplementary officers to increase presence on the housing units was not quite as robust as RNDC. Finally, for reasons that are unknown at this juncture, GRVC's population appeared to have responded to the SRG Blending with more violence and for a more sustained period of time. These factors, along with the fact that the Violence Reduction Plan did not go into effect until mid- to late-Summer in 2022 means that GRVC has not yet seen the types of improvements discussed above for RNDC.

---

[65] As required by the Action Plan § A, ¶ 1(b).

More specifically, as shown in the chart below, the average monthly rate of UOF reached an all-time high thus far in 2022 (17.8; yellow line in the chart below). In 2022, the average monthly UOF rate was more moderate in the early part of the year, but then skyrocketed in June and July 2022 as the facility implemented the SRG Blending. The rates have since decreased a bit toward the latter part of the time period.



In addition, GRVC has had a very concerning uptick to its already high number/rate of stabbings and slashings. As shown in the chart below, thus far in 2022, the average monthly rate of stabbings/slashings has increased 86% from the 2021 rate.



In addition, the average monthly rate of fights has remained significantly higher than the rates in 2016, which reflect the conditions that gave rise to the Consent Judgment.



GRVC Number and Rate of Fights, 2016-September 2022

In response to these indications that the Violence Reduction Plan at GRVC was not having its intended effect, the Department has made some additional moves to fortify the effort to reduce the level of violence. An Associate Commissioner of Operations has been deployed to guide and support the facility's new Warden. After consulting with several experts, the Monitoring Team and other jurisdictions, the Deputy Commissioner of Classification, Custody Management and Facility Operations crafted a plan to reduce lock-out hours by alternating time out of cell between the upper and lower tiers of each general population housing unit (*i.e.*, each would get 7-hours lockout). This strategy would reduce the number of incarcerated individuals in the housing units' dayrooms at any given time, which could in turn reduce the incidence of violence. The proposed lockout time does not run afoul of HALT (*i.e.*, State Law regarding the use of solitary confinement) and also reflects practices for managing maximum custody individuals common to other jurisdictions. Given that this change would result in people spending longer periods of time in their cells, tablets are being procured to provide portable educational and entertainment content during lock-in hours. Finally, facility Security Teams/SRT/ESU will provide more support to officers on the housing units to ensure basic

70

protocols for locking doors, restricting access, etc. are being followed. Such strategies are likely necessary given the extreme disorder witnessed at the facility in the past couple months. Once the violence has been quelled and the facility is on more stable footing, the plan can and should be revised.

Finally, it also bears repeating that these metrics represent core outcomes, and thus cannot demonstrate the incremental progress in procedures and practices that are at the core of any type of institutional reform, particularly this effort which for many years lacked a proper foundation, as discussed in multiple recent Monitor's Reports. Outcomes related to safety are of course important, but they do not tell the whole story nor explain *how* certain things are changing more incrementally. The remainder of this report attempts to address these nuances by providing a more complete analysis of the Department's functioning thus far in 2022.

### *Facility Searches*

Searches are an essential component of any security operation to stem the flow of dangerous contraband into a facility. In 2021, the Monitoring Team advised the Department to refine its practices to reduce the level of confrontation, provide greater controls and to increase the effectiveness of search procedures. These recommendations and a requirement to improve search procedures are included in the Action Plan § D., ¶ 2(d).

Through October of this year, DOC has conduct a total of 166,545 searches (165,420 completed by the Facility and 1,125 special searches[66]) These searches have resulted in the detection and seizure of a significant volume of dangerous contraband, as shown in the table

---

[66] This includes searches by the Emergency Services Unit, the Special Search Team, the Canine Use and/or Tactical Search operations.

below. Thus far in 2022, the Department has already seized 40% more weapons and 90% more escape-related items than in all of 2021, although 14% fewer drugs and 18% "other contraband" have been seized. Any successful effort to remove weapons from a facility is obviously positive but the relatively low-rate of return (*i.e.,* contraband seized per searches conducted) and observations of videotaped footage of search technique and procedure suggests to the Monitoring Team that additional work to refine practice remains necessary.

| Contraband Recovery, 2021-2022[67] | | |
|---|---|---|
| | **2021** | **Jan-Sept. 2022** |
| Drugs | 1,049 | 903 |
| Weapons | 3,144 | 4,406 |
| Escape-Related Item | 196 | 376 |
| Other | 878 | 722 |
| **Total** | **5,267** | **6,407** |

*Housing Unit Tours & Tour Wands*

Beginning in June 2022, the Department began actively implementing its policy to use tour wands during all tours.[68] The tour wand is a device that staff must tap/swipe against an electronic sensor positioned in critical spots in the housing unit to ensure that staff physically walked around the housing unit at least every 30 minutes as required by Department policy. The electronic records provide close-in-time data on swipe times and compliance with 30-minute swipes, which then permit oversight of staff's performance levels on each housing unit. Each day, the Commissioner's Office conducts an audit of the tour wand data from the prior day and

---

[67] The calculation of the data for contraband recovery varies depending on the type of contraband that is recovered.  For example, drug contraband is counted by incident, not the actual number of items seized. For example, if three different types of drugs were recovered in one location, this is counted as a single seizure.  In contrast, when weapons are seized, each item recovered is counted separately. For example, if three weapons were seized from a single individual, all three items are counted.

[68] As required by the Action Plan § A, ¶ 1(d).

identifies missing and late wand swipes. The Commissioner's Office then communicates with each facility to determine the reason(s) for the missing and late wand tours, and where appropriate, reviews Genetec surveillance video and housing unit logbooks to confirm and investigate the noncompliance. Staff are given corrective interviews when they fail to conduct proper tours, and staff who repeatedly fail to conduct proper and timely tours are given a Command Discipline ("CD"). The initial audits conducted by the Commissioner's Office illuminated many logistical and data challenges within the first few months of the tour wand rollout.

To collect data from each tour wand, the tour wand must be physically connected to a downloader, which retrieves the data stored in the tour wand and converts it into an Excel file that is shared with the offices reviewing, tracking, and auditing this data. In the first few months of the tour wand rollout, most of the downloader stations were located outside of the housing units within the control room for the entire facility. This meant that the tour wands had to be physically brought off the housing units to produce data for others to review. Tour Commanders were tasked with retrieving the tour wands, but given the Tour Commander's many competing priorities and the logistical challenges this presented, the Tour Commanders were often unable to bring the tour wands to the downloaders in a timely manner. This resulted in delayed and unreliable data as well as staff in housing units being left without tour wands. To solve this problem, the Department installed downloaders within the A Stations in all housing units with celled housing. This means that the A station officer can now upload the tour wand data without leaving the housing unit or placing this burden on the Tour Commander. Staff are now uploading data more regularly, which is leading to more reliable and effective reviews and audits.

Now that the tour wands have been implemented and the logistical challenges expected from any new procedure have been addressed, the Department can begin to utilize the tour wand data as a useful, real-time tool to ensure staff compliance with conducting tours every 30 minutes. The Deputy Commissioner for Classification, Custody Management and Facility Operations and his team are working on implementing new procedures and data sharing to make tour wand data available to the Tour Commanders, who will be responsible for holding line staff accountable if they fail to conduct timely tours. Once these new procedures are in place, the Tour Commander will review the tour wand data every tour and complete a form to flag any non-compliance. This form will then be forwarded to Department leadership to initiate staff discipline. The Deputy Commissioner's team will also conduct monthly audits of the tour wand data, relieving the Commissioner's Office from this task. As these new procedures are being developed, the Commissioner's Office continues to conduct its daily audits to ensure that staff know their tour wand swipes are being scrutinized and staff who fail to conduct 30-minute tours will be held accountable. The Department reports recent improvements in the consistency with which timely tours are being conducted.

_New Cell Door Installation_

The Action Plan requires several upgrades to cell doors in order to strengthen the security hardware of the jails (§ A. ¶ 1(c), a July 2022 deadline for RNDC and § D. ¶ 5 pertaining to RNDC and AMKC through 2024). The City has budgeted $20.2 million (between FY 2023 and 2024) for new cell doors, which includes procuring the actual door, new locking mechanisms, separate control panels for the A Station, and the costs associated with installing the doors and control panels. Obtaining and installing new cell doors requires multiple vendors to produce

these items and multiple tradespeople with different expertise to install the doors and address the various electrical needs.

Only a small number of vendors produce cell doors and the corresponding locking mechanisms and control panels. Given both the nationwide demand for these items as well as nationwide supply chain issues and delays in freight shipping, the vendors utilized by the Department report they are producing these items as quickly as they possibly can. At the end of 2021, the Department reached out to additional vendors to determine if they may be able to produce these items more quickly. The Department reports that two of the other vendors surveyed were not able to produce the items any quicker and in fact were more expensive. The third vendor surveyed did not respond to the bid request.

Once DOC receives the necessary doors, locking mechanisms and control panels, the housing unit must be closed down so that the doors can be replaced and the control panel in the A station can be updated. At the same time, the Department completes any other maintenance work on the housing units, in order to effectively and efficiently utilize the time the unit is closed down. This work requires various types of tradespeople with the necessary expertise to refurbish and repair the units. The City has also arranged for the Department of Design and Construction to partner with DOC to help facilitate obtaining any additional supplies needed for installation of the doors, control panels and other work needed on the housing units. The logistics of refurbishing these units are complicated, as the housing unit cannot be utilized during this time and the Department must rehouse the individuals assigned to the unit. Given the closure of BCDC, MDC, OBCC and GMDC in the past few years, space is at a premium at a time that the jails' population is on the rise.

While installation of new cell doors can and must remain a priority, it appears the City and Department have taken all available steps to maximize the procurement of new doors and have taken the necessary steps to complete the project as efficiently as possible.

As shown in the table below, a total of 550 new cell doors were installed at RNDC between July 2019 and July 2022. The pace of installation accelerated significantly between January and June 2022, when 250 new cell doors were installed.[69]

| RNDC Cell Door Installation—Completed | |
| --- | --- |
| **Date Installation Completed** | **Number Installed** |
| July to December 2019 | 50 |
| January to December 2020 | 100 |
| January to December 2021 | 150 |
| January to July 2022 | 250 |
| **Total Doors Installed** | **550** |

Another 950 doors are scheduled to be installed between July 2022 and July 2024.[70]

| RNDC Cell Door Installation—Planned | |
| --- | --- |
| **Due Date** | **Number to be Installed** |
| By December 31, 2022 | 190 |
| By October 31, 2023 | 285 |
| By April 30, 2024 | 238 |
| By July 31, 2024 | 237 |
| **Total to be Installed** | **950** |

While replacing and/or repairing broken doors is critical, of equal importance is ensuring that staff consistently secure all doors. The Monitoring Team's observations while on site

---

[69] As required by the Action Plan § A, ¶ 1(c).

[70] As required by the Action Plan § D, ¶ 5.

indicate that while the new cell doors have made it easier to detect when a cell door has not been properly secured, staff practice in actually securing the doors must still be improved.

## Interim Security Plan

The Action Plan (§ D., ¶ 2(a)) requires the Department to implement the interim Security Plan that was developed under the Second Remedial Order (¶ 1(i)(a)). This plan focuses on basic correctional practices such as unsecured doors, abandonment of a post, key control, post orders, escorted movement with restraints when required, control of undue congregation of people in custody around secure ingress/egress doors, proper management of vestibules and properly security officer keys and OC spray. The Monitoring Team's interactions with the various newly hired Deputy Commissioners reveal that they, through their own intuition and experience, regularly identify these same deficiencies and have incorporated them into their plans for practice improvement and this will be a key focus going forward.

## Internal Assessments of Security Initiatives

The work of the Nunez Compliance Unit ("NCU") has long been a bright spot in the Department's reform efforts. NCU's Assistant Commissioner[71] resigned in Summer 2022 and was replaced by an equally smart, dedicated, and reform-minded individual who has worked in NCU for many years. Her selection allowed for a smooth transition and very limited interruption in the work of the unit. NCU has continued to develop critical and reliable information about the Department's efforts to implement the various requirements of the Consent Judgment, Remedial Orders, and Action Plan, including analyzing data and preparing reports on medical wait times,

---

[71] The Monitoring Team has long commended the work of the Assistant Commissioner of NCU and the work he completed with his team at NCU. He was a critical component of the Department's reform effort.

Command Disciplines, and use of force reports and continues to conduct security-related audits. NCU's work is a component of the reform because it provides the Department with an internal pathway to identify and solve problems, which, in turn, supports the effort to end external oversight. The Monitoring Team continues to encourage the Department to utilize the information produced by NCU and to ensure NCU has sufficient staffing levels to conduct the broad range of audits required to fully support the Department's efforts.[72]

*Supervision*

Supervisory failures at multiple levels of uniform leadership are a consistent and pervasive issue within the Department. Specific instruction, guidance and coaching are all essential to elevate the quality of practice at all levels of the chain of command. In this system, this goal is particularly difficult to achieve because the number of supervisors is limited and because the supervisors generally lack the requisite perspective and experience to guide their subordinates toward better practice. The Monitoring Team's observations over the past seven years indicate that supervisors at all levels have a limited command of the restrictions and prohibitions of the Use of Force Directive, appear to act precipitously, and many ultimately end up contributing to or catalyzing the poor outcomes that are of concern.

The Department's supervisory structure differs from most correctional settings in that in most systems, the chain of command has additional levels—correctional officers are typically supervised by sergeants/lieutenants, who are supervised by Captains, who are supervised by ADWs. Thus, DOC has fewer levels of supervision than is seen in most correctional systems. Further, in most places, ADWs traditionally serve as the tour commander and do not generally

---

[72] As required by the Action Plan § D, ¶ 4.

supervise Captains directly. In addition, the new leadership team's assessment of facility practices revealed limited presence of Deputy Wardens in the evenings, weekends, and on holidays, which further contributes to the challenge of providing quality supervision to all levels of uniformed staff.

Pursuant to New York City Administrative Code § 9-117 (Composition of uniformed force of department of correction; uniform) the Department has five uniform ranks – (1) Correction Officers, (2) Captains, (3) Assistant Deputy Wardens, (4) Deputy Wardens, and (5) Wardens. The only individuals eligible to fill the position of Captains and above are individuals "from a list promulgated as a result of a promotion examination" and "only members of the uniformed force shall be eligible to compete [for the promotion examination]." § 9-117(b)(1). In other words, the individuals serving in the roles of Captain and above can only be promoted from an examination list, and only uniformed force members are eligible to take the exam, meaning that Captains/ADWs/DWs/Wardens can only be hired from within the New York City Department of Correction.

This conflicts with the Monitoring Team's long-held position that the Department needs to imbed leaders with strong expertise in sound correctional practice so that leadership can call-out and untangle staff's poor practices and address the poor culture directly with staff. Such an infusion of expertise is the most viable pathway to improve the practice among both staff and supervisors. Most of areas in need of skill development are basic correctional practice but infusing them to the point that they become reflexive practice among thousands of staff and hundreds of supervisors is a monumental undertaking.

This is why the Monitoring Team is quite encouraged by the newly hired Deputy Commissioners (of Security and of Classification, Custody Management and Facility

Operations) because the Monitoring Team's frequent interaction with these individuals has revealed them to be highly capable individuals who fully grasp the enormity of the task, and who have already identified tangible and practical solutions to address the myriad of issues. Many of their initiatives are outlined throughout this report.

The Commissioner has also recently hired a Senior Deputy Commissioner who will serve in a role similar to a Chief of Department. The Monitor and Deputy Monitor met with this individual during his candidacy and were impressed with his knowledge of correctional best practice and his experience supporting large scale reform efforts at large municipal jails. His hire further contributed to the Monitoring Team's sense that the group of new agency leaders are both capable of and motivated to make the necessary changes.

_Current State of Affairs & Moving Forward_

The Department-wide and facility-specific data (along with the data on in-custody deaths presented in a different section of this report) suggest that the facilities remain patently unsafe, particularly when measured against 2016 which reflect the conditions that gave rise to the Consent Judgment. The average monthly rate of stabbings and slashings and the proportion of Class A injuries in use of force incidents have both increased. That said, a few glimmers of progress can be detected. Department-wide, the average monthly rate of uses of force, fights, and assaults on staff have decreased thus far in 2022 compared to their 2021 levels. This latter finding is encouraging, although whether these lower numbers are an anomaly or the beginning of a sustained trend toward increasing safety is unknown at this point. The Department continues to target individual facilities with high rates of violence with reasonable plans to address the underlying causes, though the plans have only been in effect for several months and thus their long-term effectiveness is as yet unknown.

The Department has made progress on underlying security issues such as seizing contraband, verifying regular housing unit tours via tour wands, and replacing cell doors. These are important improvements but are only the first of a large number of security practices that must be enhanced. As emphasized earlier in this section, while the variety of poor practices are easy to list, stimulating behavior change among a workforce of thousands is certainly a long-term project that will require layer upon layer of focus and persistence.

The Department is also trying to make better use of its information technology. In order to address longstanding operational inefficiencies and poorly focused management strategies, the Department created the Office of Management, Analysis and Planning (OMAP) that is comprised of data analytics, operations research, strategic planning, project management and program evaluation functions. OMAP has attracted and hired staff with deep experience in this type of work, and also engages consultants who have developed effective strategies for FDNY and various law enforcement agencies. They will be an important asset for unpacking various dysfunctions and for assessing the effectiveness of strategies discussed throughout this report.

The Commissioner's leadership team will play a critical role in addressing the underlying dynamics of the various security issues (*e.g.*, staffing, searching and other security practices, etc.). While there are no "quick-fixes," let alone a single solution to the myriad of issues and dysfunctional systems, high-quality supervision of staff at all levels is a key component. The Monitoring Team continues to believe that the Department's ability to expand the pool of individuals who can be hired to serve as the Warden to provide essential leadership at the facility level would necessarily compliment this effort. Accordingly, fortifying the Warden role by having the ability to seek the most capable and qualified candidates, including those from outside the Department, is necessary to ensure success of the reform effort.

- **MANAGING PEOPLE IN CUSTODY**

The turmoil in the management of the jails has a direct impact on the individuals in custody. The current state of affairs and potential risk of harm is threatening and even traumatic for some individuals in custody (and staff). Further, access to medical treatment, programming and recreation, commissary, barbershop and visits have all been significantly impacted since the onset of COVID. While there has been improvement in access to all of these areas since the Summer and Fall of 2021 (as COVID protocols were relaxed, in-person visitation was reinstated and outside program vendors started to provide services again), access to these critical services is still frequently delayed and/or canceled. While the entire Monitoring Team was on site in the jails in early October 2022, interviews with people in custody revealed that unreliable access to basic services was the primary concern. These comments were striking both for their universality but also because the requests for clean laundry, haircuts, time outdoors are so *simple*. The services themselves may be basic, but their frequent cancellation without explanation leads to extraordinary frustration among those in custody which too often results in both staff's use of force and interpersonal violence among those in custody. The variety of topics in this section (New Admissions, Classification and Restricted Housing) share a core requirement—that of timely service provision. The connection between services and safety simply cannot be ignored.

**Managing New Admissions**

The timely processing of incarcerated individuals through intake is required by the Action Plan § D, 2 (b), § (E) ¶ (3)(a) and by ¶ 1(i)(c) of the Second Remedial Order, covering both new admissions and inter/intra-facility transfers. As way of background, in 2020, following the start of the COVID-19 pandemic, the Department elected to centralize intake in one facility for all male new admissions in order to consolidate healthcare operations (*i.e.* testing and

quarantine). In the summer of 2021, OBCC served as the central intake for male new admissions. A disturbing pattern emerged in which individuals languished in overcrowded intake units well beyond 24 hours, resulting in significant delays in providing required medical services, food and other basic services as intake is not designed for long-term housing.[73] Violence also spiked during this period. Between June and September 2021, there were 271 uses of force in the intake at OBCC. Following reports from the Monitoring Team, a Second Remedial Order, including requirements related to intake was so ordered by the Court. The processing of new admissions is discussed in this section of the report, while time in intake for inter/intra-facility transfers is discussed in regard to the First Remedial Order § A., ¶ 3 in this report.

**Centralization of Processing New Admissions at EMTC**

On September 20, 2021, just before the issuance of the Second Remedial Order, the central intake for new admissions was moved to EMTC. This move immediately ameliorated some of the particularly troubling issues at OBCC as the physical plant was better suited for processing of new admissions, including the location of the clinic, and the pens were better suited for intake processing. The positive impact of utilizing EMTC over OBCC was further demonstrated by the fact that the use of force within intake from June to September 2022 is down 61% (n= 107) at EMTC compared to that same time period last year at OBCC. That said, there is still a need for significant improvement in the processing of new admissions. Further, the number of new admissions has continued to increase each month since EMTC was opened as outlined in the graph below. The number of new admissions has accelerated at a rapid pace having increased over 50% between October 2021 and September 2022.

---

[73] These concerns regarding OBCC were outlined in a string of status reports to the Court on August 24, 2021 (dkt. 378), September 2, 2021 (dkt. 380), and September 23, 2021 (dkt. 387).



However, currently, on average, about 50 new admissions a day are brought through EMTC, and EMTC is not equipped to manage the increasing number of new admissions that need to be processed. This burden was particularly pronounced over the summer, as a number of issues within EMTC emerged including limited staffing, new admissions not being processed within 24 hours, unsanitary conditions in intake pens, incarcerated individuals being held in unsuitable de-contamination shower spaces for lengthy periods of time, and finally, evidence that the new admission intake tracking data was not reliable.

The conditions in the EMTC intake have improved since Summer 2022 and some of the particularly egregious issues such as unsanitary conditions, over-crowding and longer lengths of stay have not been occurring at the same frequency. That said, the Department appears to need to expand its intake capacity beyond what is available at EMTC to ensure new admissions are consistently processed through intake within 24 hours because EMTC is not capable of processing the volume of male new admissions that come into the system every day. The Monitoring Team routinely tours EMTC, meets with facility leadership and reviews various documents and

information regarding intake at EMTC. The leadership team at EMTC appears to have a strong command of the issues and has been proactive in identifying and addressing issues that arise in intake and trying to alleviate bottlenecks as best they can.

**Tracking Processing Times of New Admissions**

Tracking individuals within intake is a key component to ensuring that individuals are processed in a timely manner and moved to a housing unit. The Department tracks the time in intake for all new admissions using a live web program, "The New Admissions Dashboard." The Department calculates the 24-hour period from the time the individual was placed in DOC custody (*i.e.*, at the courthouse) until the time the individual was placed into assigned housing. However, the Department puts the 24-hour period an individual is in intake on pause when the individual ***leaves*** intake for certain events, such as when the individual leaves the intake process for a scheduled court appearance, for a mental health evaluation, or for a hospital transfer. This is not unreasonable as there are certain circumstances in which an individual must leave intake for legitimate reasons and therefore the traditional intake processes cannot occur. Further, it is important to note that the 24-hour standard is to ensure the individual is **not** in intake for protracted periods of time (as it is sustained uninterrupted periods of time in spartan confinement settings that give rise to potentially harmful conditions) and that is not occurring under these circumstances. Placing an individual in a housing unit as soon as possible is necessary and critical, but these operational considerations can and must be accommodated. Facility staff manually enter and manage the time a newly admitted incarcerated individual is processed through intake, to track and ensure that the processing occurs within 24 hours.

Since re-opening EMTC in September 2021, the Department provided data on the processing of new admissions through intake.[74] However, this summer, the Board of Correction identified data discrepancies in about 16 cases that raised questions about the veracity of this tracking data.[75] The Department evaluated these discrepancies and other cases and determined that staff failed to utilize the dashboard system consistently and reliably, and that EMTC systematically practiced poor record keeping because there was no oversight or supervision for the officers who manually entered the information. It appears this is due to a confluence of issues stemming from poor practices by staff, especially when staff are not consistently assigned to the area and/or there is limited staff assigned to the intake, as well as poor supervision of staff. The Monitoring Team's site work and evaluation of materials, including discussions with intake staff and supervisors, suggests that the use of the dashboard was haphazard with little oversight and no consistency. For example, *any* staff member can manually enter the time for the custody time, arrival time, medical exam time, court time, process time, etc. and can stop the clock in the system for reasons such as "Court," "Hospital," "Medical referral," "Urgi-care," etc. Staffing shortages also impacted staff's use of this system as responsibilities were being shared among staff when intake was short-staffed. However, the Monitoring Team does not know of a definitive reason or motivation as to *why* there are cases where the data was altered in the system as the information available is simply inconclusive. Ultimately, the Department determined that information was not always inputted accurately and the information could be altered, thereby

---

[74] See Monitor's June 30, 2022 Special Report, (dkt. 467), pg. xii.

[75] BOC Meeting July 12, 2022, 1:33:15 (Available at https://www.youtube.com/watch?v=aIkxto4XQWM)

making the data currently captured by the system unreliable and unusable.[76] Given these findings, the Monitoring Team is not in a position to provide the data captured in the New Admissions Dashboard regarding the processing of new admissions, as that data cannot be relied upon. While there is no reliable *data*, the Monitoring Team's site work has not identified a pattern of extreme lengths of stay in the EMTC intake.[77] However, the extent of the Department's adherence to processing new admissions within 24 hours is simply unknown.

### Addressing the Processing of New Admissions

Given the current state of affairs, the Monitoring Team recommended that the Department take steps to improve the processing of new admissions, including implementation of an improved tracking system. Beginning in Summer 2022, after this issue was identified, the Department dedicated resources to determining how the processing and tracking of new admissions can be improved and refined. A number of the members of the new leadership team (almost all of whom started after this issue was identified) have focused their attention on improving the processing of new admissions. This includes the Deputy Commissioner of Operations, the Deputy Commissioner of Administration, Deputy Commissioner of Management Analysis & Planning, and the General Counsel among many others. They have been working

---

[76] The Department's assessment of the data also revealed that the dashboard lacks the necessary capabilities to track the new admission process from the time DOC obtains custody of the individual, to tracking the provision of medical care and medical screening by CHS to the ultimate housing of the individual.

[77] The Monitoring Team is aware of at least a few cases in which the stays in intake appeared to be longer than 24 hours and allegations that the conditions in the intake pens were incredibly concerning. Further, in the Fall of 2021 and again in the Summer of 2022, counsel for the Plaintiff Class provided the Monitoring Team with at least 6 allegations of new admissions who may have overstayed in Intake beyond 24 hours. Upon review, the Department reported that some of these allegations were not in fact overstays of 24 hours. Evidence in other cases suggest the individuals may have stayed in intake beyond 24 hours. However, the Monitoring Team does not currently have evidence that there is a pattern or pervasive issue that new admission are in intake beyond 24 hours.

together on evaluating the intake processes to develop solutions to improve the processing times and conditions of intake. As a result, the Department reported it will be taking the following steps:

- **New Admissions will be Processed by Multiple Facilities**: Young adult new admissions will be processed through RNDC and any male new admission arrested in Bronx County will be processed through VCBC. This is expected to reduce the volume of individuals processed through EMTC by about 20%.
- **Request for Increased CHS Support**: The Department will work with CHS to increase the number of CHS staff who conduct medical screenings to align with peak processing times, including pursuing a new Memorandum of Understanding with CHS that specifies minimum staffing levels and hours for new admissions processing facilities.
- **Improved IT Tracking Solution**: Initiate technical revisions to the New Admissions Dashboard to (1) differentiate CHS wait times and DOC wait times to be able to distinguish between DOC or CHS process failures, (2) increase internal tracking of user inputs and expand access to intake Captains to supervise dashboard inputs.
- **Improved Data Input**: The Department will train Staff in intake on dashboard inputs, and also assign MMR staff to intake to support data entry so that the Staff working in intake can focus on processing individuals.
- **Consistent Staffing & Staffing Levels**: The Department will establish minimum staffing levels at new admissions intakes to better align with peak processing times, including supervisory Staff, and align steady staff with specific work tasks and responsibilities, and train supervisory staff to ensure tasks are completed consistently.

It must be emphasized that this plan was developed exclusively by the Department, without input from the Monitoring Team, and is a reflection of the new leadership that has been installed. It is a reasonable approach, rooted in sound correctional practice. As with many issues facing this agency, the work necessary to eliminate the poor practices cited herein is reasonably straight-forward but requires professionals with expertise in sound correctional practice to devise realistic and effective solutions to streamline the work of the agency. This particular initiative

demonstrates the impact that leadership with correctional expertise can bring to reform and address persistent issues within the agency.

Overall, the conditions at the EMTC intake are certainly improved over the conditions that brought rise to the Second Remedial Order. But, as outlined in this section, more work is needed to ensure that new admissions are managed in safe conditions and processed within a reasonable period of time, especially given the significant increase in the number of new admissions. The Department's plans to address these issues are reasonable and are expected to address these issues if they are implemented with fidelity. The Monitoring Team will continue to closely scrutinize new admissions intake processing times and the conditions of intake going forward.

### Classification

The Department retained Dr. James Austin,[78] a nationally recognized expert on classification and safe housing of incarcerated persons, to advise the Department on a strategy for addressing gang affiliations when making housing assignments. This work led to several recommendations to address the Department's fragmented classification process, poorly implemented reclassification procedure, and ill-advised practice of concentrating people with similar gang affiliations in the same housing units (*see* March 16, 2022 Special Report, dkt. 438, pgs. 53-56). To address these issues, the Action Plan requires the Department to hire a Deputy Commissioner of Classification, Custody Management and Facility Operations.[79] The Department identified and hired a highly qualified individual with deep expertise in correctional

---

[78] As required by the Second Remedial Order ¶ 1(f)(i).

[79] As required by the Action Plan § A, ¶ 3(b)(ii)(2).

best practice who began his tenure in July 2022. This individual serves as the "Classification Manager" who oversees the centralized Custody Management Unit ("CMU") required by the Action Plan.[80] This unit manages the internal classification and reclassification process, direct housing unit assignments for all people in custody, and orchestrates and maintains the effort to broadly disperse people affiliated with Security Risk Groups ("SRG") across housing units to avoid their concentration (i.e., "SRG blending").

Since the Classification Manager's tenure began, the following steps have been undertaken:

- To address the fact that **reclassification** was not occurring at the prescribed 60-day intervals/upon court return, a memo was issued to reiterate job responsibilities and expectations and about 40 classification staff were re-trained. On a weekly basis, facility-specific reports are generated that identify which reclassifications are due and whether the reclassification has been completed. Any deficiencies are addressed with each facility by an Assistant Commissioner assigned to the CMU. The Department estimates that about 90% of reclassifications are now completed timely.[81]

- In addition, the Department also identified problems with timely completion of **initial classification** during the intake process. Timely completion is essential so that facility and housing unit assignments can be properly informed. Previously, EMTC staff who were assigned this duty were being redeployed to cover staff shortages in other areas of the facility. Now, CMU staff have been assigned this function, overseen by an ADW who

---

[80] As required by the Action Plan § E, ¶ 1 and § E, ¶ 2(a).

[81] As required by the Action Plan § E, ¶ 2(b).

is also assigned to CMU. The Department estimates that about 90% of initial classifications are now being completed within 24 hours of a person's admission.

- In February 2022, **SRG Blending** began at RNDC and was followed by SRG Blending at GRVC in Summer 2022. This requires daily oversight from CMU and extensive coordination with the DW for Security and Security Teams at each facility. In order to maintain the proper balance in each unit, any reassignment of persons in custody to a new housing unit must be first approved by CMU. Previously, facilities functioned largely autonomously in this regard, but all moves must now be called in to CMU for approval and must be recorded on an Internal Change Form. CMU has also developed an "SRG Dashboard" which identifies people's affiliations with smaller subsets of a larger SRG and has useful visual cues when a housing unit has fallen out of balance.[82] All facilities have been blended except for AMKC.

- The **Inmate Information System ("IIS")** which, among other things, tracks housing assignments of people in custody has been modified so that it can serve as an oversight tool. IIS now identifies both the CMU approved housing unit and the individual's actual housing assignment to quickly identify when the approval protocol described above has been circumvented. In addition, IIS also highlights instances where an individual's housing unit assignment is not aligned with the individual's classification level.[83]

The Department's progress in this area is due in large part to the competence and subject matter expertise of the Classification Manager. Now that systems to ensure timely initial classification and reclassification and to impose and maintain a proper SRG blend have been

---

[82] As required by the Action Plan § E, ¶ 2(d).

[83] As required by the Action Plan § E, ¶ 2(c).

implemented, the Monitoring Team will collaborate with the Department to identify and request data that can be used to monitor ongoing performance levels in each area. The Monitoring Team also encourages vigilance regarding the extent to which the SRG blending strategy continues to achieve its goal of reducing violence against both other incarcerated people and staff.

**Managing Incarcerated Individuals Following Serious Incidents of Violence**

An essential component of safety for people and staff in correctional facilities is having a reliable, effective response to serious interpersonal violence. Not only should the response effectively separate those with a propensity for serious violence from potential victims, but it should also be structured to provide safety to the individuals who perpetrate violence as well as supervision and services that decrease the likelihood of subsequent violent acts. This is why the Action Plan requires such a program and that it must be approved by the Monitor pursuant to § E ¶ 4.[84] In the Monitor's June 2022 Status Report (dkt. 467), the Monitor reported that it was not in a position to approve the Risk Management and Accountability System ("RMAS") because of design flaws with the program model itself (e.g., excessive idle time, no incentive for program engagement) and because of a lack of readiness (e.g., rapid implementation schedule, insufficient staff resources and absence of core skills). As a result, the Department elected not to implement the program. Since then, as recommended by the Monitoring Team, the Department contracted with Dr. James Austin, a nationally recognized expert in the design and development of

---

[84] RNDC is continuing to implement the Post-Incident Management protocols pursuant to § D, ¶ 2(h) of the Action Plan, but it is expected that these protocols may be moot once this new program is finalized and implemented.

restricted housing programs[85], to assist the Department in developing a restrictive housing model that comports with state law and reflects industry-recognized best practices.

The complexity of the task cannot be overstated—programs for people with known propensities for serious violence who are concentrated in a specific location have unique and essential security requirements, and also have an obligation to provide programming and services that reduce the risk of subsequent violence. Throughout the past several months, the Department, Dr. Austin and the Monitoring Team have collaborated on multiple draft policies and also met in person in mid-October 2022 to further advance the program's design. The Department's new Deputy Commissioner for Classification, Custody Management and Facility Operations, the Deputy Commissioner of Programming, the Assistant Commissioner of Programming, the Department's General Counsel, the Department's Executive Agency Counsel and the Assistant Commissioner of Strategic Initiatives have all been deeply involved in the program's development. Work is on-going, and the Monitoring Team will update the Parties and the Court as the work progresses. Given the level of violence discussed in the "Security" section of this report, it is clear that the Department sorely needs this operational tool and time is of the essence. However, if the program is not well-designed and thoughtfully implemented, the program risks contributing to the problem rather than being part of the solution as has been the case with several of the Department's previous attempts at designing and implementing such a program.

---

[85] Dr. Austin has designed and evaluated restrictive housing programs in many correctional systems for both plaintiffs and defendants, including the Federal Bureau of Prisons, the states of Ohio, Illinois, Mississippi, Colorado, California, New Mexico, Kentucky, and the local California jails of Sacramento, Santa Clara, and Alameda counties. The goal of Dr. Austin's work has been to eliminate solitary confinement, increase out of cell time, increase access to rehabilitative programs, reduce the number of people assigned to restrictive housing, and reduce the level of violence in these systems.

- **STAFF ACCOUNTABILITY**

The Department's *formal* disciplinary process has made significant strides since the Twelfth Monitor's Report (which covered January to June 2021) in which the Monitoring Team reported that "[t]he current system is awash in unresolved cases, some of which are years old, and the Department has been and remains in abject and sustained non-compliance with imposing timely discipline. The current situation is particularly aggravated as the system, as structured, is dysfunctional and, consequently, is overwhelmed." Since then, the confluence of efforts made to achieve compliance with the First Remedial, Third Remedial Order, and the Action Plan now suggest that many of the convoluted and dysfunctional components of the disciplinary system are in the process of being corrected and that the Department is on its way to having a more timely, reasonable and reliable disciplinary process.

The Department is on track to close the backlog of pending cases for incidents that had occurred as of December 31, 2020 ("the 2020 backlog") by the end of 2022, a feat that did not seem achievable a year ago. In October 2021, over 1,900 cases were pending with the Trials Division, and the Department was on pace to resolve about 400 disciplinary cases in that year (although it ultimately closed about 560 cases in 2021). At that rate, the Monitoring Team projected it would take *over 4 years* to resolve the entire backlog of cases. However, progress in addressing the backlog accelerated throughout 2022. More specifically, the remedial relief that was put in place in response to the Monitoring Team's recommendations has resulted in the following:

- **Case Closures**: the Trials Division has closed 1,649 cases between January and September of this year which is almost as many cases closed in the last four years (2018 to 2021) *combined*.

- An assessment of backlog cases closed, as of June 2022, demonstrated that the accelerated pace of case closure did not appear to have a negative impact on the appropriateness of the dispositions as the Monitoring Team found that most of the discipline imposed (whether through NPAs or OATH) was reasonable and proportional to the misconduct identified.

- **Eliminating the Backlog**: For the first time in over 2 years, the number of pending cases with the Trials Division is shrinking instead of growing. A total of 764 cases are pending as of the end of September. This is the fewest number of pending cases since December of 2019. The Trials Division is also on track to close the 2020 backlog by the end of the year.[86]

- **Staffing**: The number of attorneys assigned to the Trials Division increased for the first time since the Consent Judgment went into effect.[87]

- **Pre-Trial Conferences**: 1,500 Pre-Trial Conferences have been convened for use of force related matters between January and September 2022. The Department is on track to put forward more than double the number of cases to convene Pre-Trial Conferences than last year.

- **Trials**: Trials at OATH are occurring closer in time to the Pre-Trial Conference and are conducted more efficiently when they are convened. The Report and Recommendations from the ALJs are completed in a more timely fashion and now generally appropriately reflect an assessment and analysis of the Department's disciplinary guidelines.

- **Expedited Case Closures**: Between mid-June and the filing of this report, 19 cases, covering the conduct of 18 unique Staff Members, involved in 13 unique use of force incidents, have been identified for expedited closure pursuant to § F., ¶ 2 of the Action Plan. Seven of the 19 cases have been resolved, eight are pending (these cases were recently identified for expedited closure), and four are pending potential criminal

---

[86] As required by the Action Plan, § F, ¶ 4, the Monitoring Team recommended the Department close the backlog of cases of use of force misconduct that occurred in 2020 or earlier by December 31, 2022 in the Monitor's June 30, 2022 report (dkt. entry 467) at pgs. 35 to 37.

[87] The requirements pursuant to Action Plan, § F, ¶ 1 is discussed in more detail in the Section by Section Analysis in conjunction with the compliance assessment for Consent Judgment, § VIII., ¶ 4.

prosecution. The specifics of these cases are discussed in the section-by-section analysis with the First Remedial Order § C, ¶ 2.

- **Revised Command Discipline Policy**: The Department has promulgated a revised Command Discipline Policy.[88] The revised policy expands the potential penalty of a Command Discipline to 10 days from the current 5-day penalty limit, provides more specific penalty guidelines for specific types of violations, and expands the pool of supervisors who may serve as hearing officers. These policy revisions are expected to provide a welcome path toward increased close-in-time discipline for lower-level use of force violations.

- **Addressing Unavailable Staff**: The Department has reinvigorated efforts to address Staff unavailable to work with the individuals in custody through medical separation, medical incompetence cases, and other methods pursuant to Action Plan, § F., ¶ 7 as described in more detail in the staffing section of this report.

The Department's work this Monitoring Period has culminated in an important step. For the first time, the Department has moved out of Non-Compliance with the requirement to impose timely, appropriate, and meaningful accountability as required by Consent Judgment § VIII., ¶ 1, and meeting the requirements of this section of the Consent Judgment appears achievable. That said, it must be emphasized significant work remains in order to capitalize on these achievements and ensure a reliable and sustainable disciplinary process is in place to create a fully functional disciplinary system.

The Monitoring Team's evaluation of the disciplinary procedures has been occurring for years, and pursuant to the Action Plan § F., ¶ 6, a summary of the initiatives that are underway to support the Department's work toward achieving Substantial Compliance with the Consent Judgment, Remedial Orders, and Action Plan is outlined below:

---

[88] As required by the Action Plan § F, ¶ 3.

- **Evaluation of the Trials' Division Procedures**: The Monitoring Team's evaluation of the disciplinary procedures has been ongoing to identify concrete and specific practices that can be refined in order to expedite the prosecution of disciplinary cases. For example, the Monitoring Team worked with the Trials Division leadership to develop a more streamlined closing memorandum template which will enable Trials attorneys greater flexibility in closing their cases. As the backlog is cleared, there is an opportunity to further refine practices and improve efficiencies and so the Monitoring Team's evaluation is ongoing and additional recommendations will be provided as the work continues.

- **Sufficient Staffing & Capacity to Manage Cases**: As of October 2022, the Trials Division now has *28 attorneys*, almost double the number of attorneys as the division has had at times over the course of the Consent Judgment. This increased staffing, coupled with the dwindling number of cases in the backlog, and OATH's increased capacity, means the division now has the opportunity to address cases more quickly than ever. Finally, the Trials Division reported it has assigned a dedicated group of attorneys to exclusively prosecute disciplinary referrals made beginning in August of 2022.[89]

- **Scheduling Efficiencies with OATH**: The increased number of OATH Pre-Trial Conferences in and of itself has created an opportunity to resolve cases more quickly. If cases do not settle before or at the initial Pre-Trial Conference, then the case continues to move toward resolution with a second Pre-Trial Conference scheduled close-in-time to the first and/or a Trial Date is set to ensure that the case is either settled or resolved via trial. The Monitoring Team provided recommendations to OATH to further improve the scheduling process for those cases that do not settle before or at the initial Pre-Trial Conference to further refine the processes outlined by the Third Remedial Order (see Third Remedial Order Report at pg. 10 to 12 and June 30 report at pgs. 30 to 34). First, OATH will be re-invigorating practices to have the parties work together to achieve settlement if they are unable to resolve the case after

---

[89] As required by the Action Plan, § F, ¶ 5.

the initial Pre-Trial Conference. Further, OATH will now schedule trials within 80 days (instead of 90 days) of the initial Pre-Trial Conference which will encourage the Parties to work towards a resolution as the eve of trial approaches more quickly.

- **Expanded use of CDs**: Expanding the use of Command Disciplines to include use of force violations warranting up to 10 days of penalty will ensure lower-level cases are addressed by the facility. This supports the ultimate goal that facility leadership quickly address these issues and ensures the Trials Division's caseload is focused more on those serious cases warranting the formal disciplinary process. Over time, as the CD process becomes more reliable, this will allow cases that Trials would have resolved with a low-level penalty (*e.g.* an NPA for 1 to 10 days or a return to command) to not appear on their docket and instead be resolved via a CD more efficiently.

*Looking Ahead*

Overall, the Department has made a number of notable strides in its efforts to eliminate the use of force disciplinary backlog and create a system that will support timely accountability. The Department and OATH's efforts to achieve compliance in the Fourteenth Monitoring Period (which covers January to June 2022) with the relevant provisions of the Consent Judgment and Remedial Order are outlined in the section-by-section analysis of the report. As the Department continues to implement the initiatives described above, the Monitoring Team intends to more closely scrutinize the use of force incidents that occurred in 2022 to ensure that the Investigation Division is making referrals for disciplinary charges when necessary, consider whether additional efficiencies in this referral process can be achieved, whether additional efficiencies in the imposition of discipline can be identified, and to ensure imposed discipline is proportional and consistent with the Disciplinary Guidelines. Further, as outlined in the staffing section of this report, the Trials Division must also work to efficiently manage the cases related to Staff absenteeism.

- **CONCLUSION & NEXT STEPS**

The Monitoring Team remains disturbed and concerned about the state of the jails and continued high risk of harm to staff and incarcerated individuals as outlined throughout this report and prior Monitor's reports. As such, the entire Monitoring Team convened last week to tour the jails, meet with DOC leadership, and meet among themselves prior to filing this report. The Monitoring Team's work over the past few months, in conjunction with the recent sitework, has revealed the beginning of some momentum to resolve these decades-long problems. DOC's leadership has and will continue to confront obstacles and may make missteps along the way, but this leadership team has demonstrated a strong understanding of the issues and what work must be prioritized.  The leadership team has initiated concrete and tangible solutions for how to move reform forward. It is clear that there has been an infusion of leadership with the capability and correctional expertise needed to develop and ultimately implement concrete solutions grounded in sound correctional practice. Such leadership is an essential precursor to reforming the operations of the jails and making positive on-the-ground changes. Finally, the new leadership team has demonstrated the tenacity and courage to grapple with and untangle many of the convoluted and complicated issues and red tape that underpin the poor operations of this agency. In real terms, this means tough decisions have been and will continue to be made, and these decisions will not always be embraced by the dizzying array of stakeholders in this matter, including staff (and their representatives), city and state legislators, local oversight bodies, and incarcerated individuals and their advocates.

Whether this leadership team and their actions will ultimately be able to transform the entrenched culture within the jails remains to be seen because as explained throughout this report is no "silver bullet" that can magically or quickly reform this agency. Further, it should be

acknowledged that it is still a very real possibility that even with the efforts described in this report, certain legal and/or regulatory barriers, as they arise, may need consideration and intervention by the Court.

The process of reform will be a long, often convoluted and inherently difficult road, and must be achieved at a sustained pace. It is, in fact, a daunting prospect propelled by an ever-present sense of urgency. However, this report has discussed several areas in which recent efforts have begun to show some evidence that material change and transformation can be realized.

In terms of immediate next steps, the Monitoring Team and the Parties will meet and confer, as directed by the Court, following the issuance of this report. Further, the Monitoring Team will file a status update by November 14, 2022 at 12:00 pm (noon) in advance of the Court conference on November 17, 2022 at 2:30 pm. With respect to the Court conference, the Monitoring Team respectfully recommends that the Commissioner and appropriate members of his leadership team participate in the conference with the Parties and the Monitoring Team.

In addition, with respect to the Monitoring Team's future reports, the Monitoring Team respectfully recommends that the Court revise the dates for the next two reports required by the Action Plan § G, ¶¶ 2(iii) and (iv) with new due dates of March 31, 2023 and July 28, 2023.[90] This revised schedule will allow the Monitoring Team to provide a more substantive update in each report because it will provide the time needed for substantive action by the Department to occur and it will allow the Monitoring Team to collect, analyze, and interpret the necessary data about those efforts. The current reporting schedule does not afford sufficient time to do so and as

_____

[90] Action Plan § G, ¶¶ 2(iii) and (iv) currently requires reports to be filed on January 31, 2023 and March 16, 2023.

such would hinder the quality of the reporting to the Court and limit the reports' usefulness to inform decision-making about the adequacy of the Department's progress. The proposed schedule preserves the Court's and the Parties' opportunity to receive more contemporaneous information than the Consent Judgment's original reporting requirements and maximizes the usefulness of the information. If circumstances require, the Monitoring Team will issue *Special Reports* as needed and has been done over the past seven years.[91] The Monitoring Team respectfully requests that the Court revise the Action Plan § G, ¶¶ 2(iii) and (iv) to March 31, 2023 and July 28, 2023.

Finally, the Monitoring Team respectfully recommends that the Court order the City to provide this report, by November 14, 2022, to the relevant stakeholders whose work directly impacts court processing times including but not limited to District Attorneys, the Office of Court Administration and relevant public defender organizations. The Monitoring Team suggests that the Court urge the various stakeholders to work together to address the long delays in case processing times described in this report in order to reduce the length of stay among people incarcerated in DOC's jails and/or to maximize the use of jail diversion options. The Monitoring Team believes it is imperative for these stakeholders to collaborate to quickly and creatively find ways to process cases more expeditiously through the court system and to otherwise limit the use of secure detention (e.g., via joint action review committees, diversion programs, etc.). As noted in the Introduction to this report, the problem of case processing delay is complicated and involves multiple system actors. However, this same group of stakeholders collaborated

---

[91] For example, beginning in August 2021, the Monitoring Team issued 10 such reports to highlight imminent risks of harm and in order to ensure that the Court was equipped with the most contemporaneous information needed for decision-making.

effectively at the onset of COVID-19 to significantly reduce the jails' populations, so such actions are clearly possible. A comparable level of haste is required to limit exposure to and relieve pressure on the jails.

# 14ᵀᴴ MONITORING PERIOD COMPLIANCE ASSESSMENT FOR SELECT PROVISIONS OF THE CONSENT JUDGMENT AND FIRST REMEDIAL ORDER

This section of the report assesses compliance with a *select group* of provisions from the Consent Judgment and First Remedial Order as outlined in the Action Plan § G: Assessment of Compliance & Reporting in 2022, ¶ 5(b). This compliance assessment is for the period covering January 1, 2022 to June 30, 2022 ("Fourteenth Monitoring Period").[92]  The following standards were applied: (a) Substantial Compliance,[93] (b) Partial Compliance,[94] and (c) Non-Compliance.[95] It is worth noting that "Non-Compliance with mere technicalities, or temporary failure to comply during a period of otherwise sustained compliance, will not constitute failure to maintain Substantial Compliance. At the same time, temporary compliance during a period of sustained Non-Compliance shall not constitute Substantial Compliance."[96]

---

[92] The Monitoring Team did not assess compliance with any provisions of the Consent Judgment or Remedial Orders for the period between July 1, 2021 and December 31, 2021 (the "Thirteenth Monitoring Period"). The Court suspended the Monitoring Team's compliance assessment during the Thirteenth Monitoring Period because the conditions in the jails during that time were detailed to the Court in seven status reports (filed between August and December 2021), a Remedial Order Report (filed on December 22, 2022) as well as in the Special Report filed on March 16, 2022 (dkt. 441). The basis for the suspension of compliance ratings was also outlined in pages 73 to 74 of the March 16, 2022 Special Report (dkt. 438).

[93] "Substantial Compliance" is defined in the Consent Judgment to mean that the Department has achieved a level of compliance that does not deviate significantly from the terms of the relevant provision. *See* § XX (Monitoring), ¶ 18, fn. 2. If the Monitoring Team determined that the Department is in Substantial Compliance with a provision, it should be presumed that the Department must maintain its current practices to maintain Substantial Compliance going forward.

[94] "Partial Compliance" is defined in the Consent Judgment to mean that the Department has achieved compliance on some components of the relevant provision of the Consent Judgment, but significant work remains. *See* § XX (Monitoring), ¶ 18, fn. 3.

[95] "Non-Compliance" is defined in the Consent Judgment to mean that the Department has not met most or all of the components of the relevant provision of the Consent Judgment. *See* § XX (Monitoring), ¶ 18, fn. 4.

[96] § XX (Monitoring), ¶ 18.

The Monitoring Team's assessment of compliance for all other provisions of the Consent Judgment (required by § XX, ¶ 18 of the Consent Judgment) and the First Remedial Order that are not outlined below are suspended for the time period covering January 1, 2022 to December 31, 2022. While compliance assessments for these provisions are not included in this report, the Monitoring Team continues to collect and analyze relevant information regarding the Department's obligations under the Consent Judgment and the Remedial Orders on a routine basis. The current conditions suggest that the Department's compliance with these provisions of the Consent Judgment and First Remedial Order, at best, have remained the same and in some cases may have gotten worse.

- **INITIATIVES TO ENHANCE SAFE CUSTODY MANAGEMENT, IMPROVE STAFF SUPERVISION, AND REDUCE UNNECESSARY USE OF FORCE (REMEDIAL ORDER § A)**

| REMEDIAL ORDER § A., ¶ 1 (USE OF FORCE REVIEWS) |
| --- |

§ A., ¶ 1. *Use of Force Reviews*. Each Facility Warden (or designated Deputy Warden) shall promptly review all Use of Force Incidents occurring in the Facility to conduct an initial assessment of the incident and to determine whether any corrective action may be merited ("Use of Force Review"). The Department shall implement appropriate corrective action when the Facility Warden (or designated Deputy Warden) determines that corrective action is merited.

    i. The Department, in consultation with the Monitor, shall implement a process whereby the Use of Force Reviews are timely assessed by the Department's leadership in order to determine whether they are unbiased, reasonable, and adequate.

    ii. If a Facility Warden (or Deputy Warden) is found to have conducted a biased, unreasonable, or inadequate Use of Force Review, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline.

This provision requires facility leadership to conduct a close-in-time review of all use of force incidents ("Rapid Reviews" or "Use of Force Reviews"). Further, this provision requires the Department to routinely assess Rapid Reviews to identify any completed reviews that may be biased, unreasonable, or inadequate and address with appropriate corrective action.

**Use of Force Reviews:** During this Monitoring Period, Rapid Reviews assessed 3,183 (98%) of the actual uses of force. The chart below demonstrates the Rapid Review outcomes from January 2018 to June 2022 (covering the past nine Monitoring Periods).

| Rapid Review Outcomes, 2018 to June 2022 | | | | |
|---|---|---|---|---|
| | **2018** | **2019** | **2020** | **2021** | **Jan-June 2022** |
| **Incidents Identified as Avoidable, Unnecessary, or with Procedural Violations** | | | | | |
| **Number of Rapid Reviews** | 4,257 (95% of all UOF) | 6,899 (97% of all UOF) | 6,067 (98% of all UOF) | 7,972 (98% of all UOF) | 3,183 (98% of all UOF) |
| **Avoidable** | 965 (23%) | 815 (12%) | 799 (13%) | 1,733 (22%) | 549 (17%) |
| **Violation of UOF or Chemical Agent Policy** | | | *345 (11%) (July-December 2020 Only)* | 1,233 (16%) | 515 (16%) |
| **Procedural Violations[97]** | 1,644 (39%) | 1,666 (24%) | 1,835 (30%) | 3,829 (48%) | 1,686 (53%) |
| **Corrective Action Imposed by Staff Member** | | | | | |
| **Number of Staff** | 3,595 | 3,969 | 2,966 | 5,748 | 1,748 |

Rapid Reviews can recommend multiple types of corrective action, including counseling (either 5003 or corrective interviews), re-training, suspensions, referral to Early Intervention, Support and Supervision Unit ("E.I.S.S."), Correction Assistance Responses for Employees[98] ("C.A.R.E."), Command Disciplines (as further outlined in the Staff Accountability section of this report), and Memorandum of Complaints ("MOCs"). The corrective actions (outside of re-training requests)[99] are generally being imposed *when recommended.*

---

[97] Procedural errors include a variety of instances in which Staff fail to comply with applicable rules or policies generally relating to operational functions, such as failure to don equipment properly (such as utilizing personal protective equipment), failure to secure cell doors, control rooms, or "bubbles," and/or the failure to apply restraints correctly.

[98] C.A.R.E. serves as the Department's Wellness and Employment Assistance Program. C.A.R.E. employs two social workers and two psychologists as well as a chaplain and peer counselors who provide peer support to Staff. The services of C.A.R.E. are available to all employees of the Department. The Department reports that the members of the unit are tasked with responding to and supporting Staff generally in the day-to-day aspects of their work-life as well as when unexpected situations including injury or serious emergency arise. The Unit also works with Staff to address morale, productivity, aid in stress management, and provide a wide variety of support, including Staff experiencing a range of personal or family issues (*e.g.* domestic violence, anxiety, family crisis, PTSD), job-related stressors, terminal illness, financial difficulties, and substance abuse issues. The C.A.R.E. Unit also regularly provides referrals to community resources as an additional source of support for employees. Staff may be referred to the C.A.R.E. use by a colleague or supervisor or may independently seek assistance support from the unit.

[99] Re-training recommended by Rapid Reviews is requested through the service desk as required, however as of September 2022, 714 re-training requests for 2021 incidents remain open, and 324 re-training requests for 2022 incidents remain open. Over 1,000 older re-training requests were administratively closed as part of a backlog closure plan due to the age of the incident.

Rapid Reviews identify violations (over 1,600 violations in this Monitoring Period) and recommend corrective action for a considerable amount of Staff misconduct. Rapid Reviews also identify that a significant portion of incidents are avoidable (17%). That said, while Rapid Reviews identify and address a significant amount of issues and are relied upon (rightly so) by both the Department and the Monitoring Team to identify patterns and trends, they still are not reliably and consistently identifying *all* issues that would reasonably be expected to be identified through a close in time assessment of the video.

Two particular areas in which Rapid Reviews often fail to adequately identify potential issues are (1) an assessment of whether self-harm procedures were followed appropriately in an incident, and (2) an assessment of whether the presence of the Probe Team was necessary and/or its practices were appropriate. The Rapid Review template includes specific questions to address these issues in order to target these core problems and encourage facility leadership to focus on identifying and addressing violations in these areas. However, the Rapid Reviews simply do not capture or address these issues well. Further, there are Rapid Reviews that are *patently* biased, unreasonable, or inadequate. While not *pervasive,* the Department does not have a systematic process to identify and address these deficient Rapid Reviews.

More broadly, while the Rapid Review do identify a significant amount of issues and trends that much be addressed, to date this simply has not served as a resource for correcting and preventing similar misconduct from re-occurring (*e.g.,* Rapid Review identify and recommend corrective action for multitudes of security lapses, yet those lapses persist Monitoring Period after Monitoring Period).

Overall, while the quality of the Rapid Reviews could be elevated, a good portion of the pervasive misconduct is identified via the Rapid Reviews. If it were appropriately corrected there would be a significant reduction in the pervasive harm in the jails. This likely will only occur as facility leadership, especially the direct supervisors of Correction Officers, gain a stronger command of the security protocols and procedures that must be utilized day in and day out to faithfully implement the Department's policy and safely manage the jails.

| **COMPLIANCE RATING** | **§ A., ¶ 1.** Partial Compliance |
| --- | --- |

**REMEDIAL ORDER § A., ¶ 2 (FACILITY LEADERSHIP RESPONSIBILITIES)**

§ A., ¶ 2. Each Facility Warden (or designated Deputy Warden) shall routinely analyze the Use of Force Reviews, the Department leadership's assessments of the Use of Force Reviews referenced in Paragraph A.1(i) above, and other available data and information relating to Use of Force Incidents occurring in the Facility in order to determine whether there are any operational changes or corrective action plans that should be implemented at the Facility to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents. Each Facility Warden shall confer on a routine basis with the Department's leadership to discuss any planned operational changes or corrective action plans, as well as the impact of any operational changes or corrective action plans previously implemented. The results of these meetings, as well as the operational changes or corrective action plans discussed or implemented by the Facility Warden (or designated Deputy Warden), shall be documented.

The goal in this provision is to ensure that the leadership in each facility is consistently and reliably identifying operational deficiencies, poor security practice, and problematic uses of force and that they address these issues so supervisors and staff alike get the guidance and advice necessary to improve practice. Facility leadership are required to routinely analyze available data and information regarding UOF, including the daily Rapid Reviews, to determine whether there operational changes or corrective action plans may be needed to reduce the use of excessive or unnecessary force, the frequency of Use of Force Incidents, or the severity of injuries or other harm to Incarcerated Individuals or Staff resulting from Use of Force Incidents.

As noted above, facility leadership consistently conduct Rapid Reviews for every use of force incident. Further, Department leadership (both uniform and civilian) routinely meet to discuss the various issues facing the agency. However, facility leadership have been unsuccessful in dismantling the culture that gave rise to the Consent Judgment despite the significant efforts that have been outlined in every Monitor's report to date. Across all of the facilities, there are persistent operational issues, including the use of inadequate or unreasonable security protocols, which contribute to the use of excessive or unnecessary force and the frequency of use of force incidents in general. Generally, the poor practices observed by the Monitoring Team appear to occur across all facilities with little distinction between them. Ultimately, the lack of sufficient supervision of Captains, the lack of adequate security protocols and procedures, the constant change in priorities and focus, and the frequent change of facility leadership means that there is no opportunity to develop adequate operational changes or corrective action plans that may change practice.

Following the close of the Monitoring Period, the Commissioner brought in a new executive leadership team to address security, staffing, classification and operations and to work alongside facility leadership to address these issues. It remains to be seen whether the support facility leadership receive from the new leadership structure being built by the Commissioner will make a difference in raising the quality of the facility leaderships teams in place.

| **COMPLIANCE RATING** | § A., ¶ 2. Non-Compliance |
| --- | --- |

## REMEDIAL ORDER § A., ¶ 3 (REVISED DE-ESCALATION PROTOCOL)

§ A., ¶ 3. Within 90 days of the date this Order is approved and entered by the Court ("Order Date"), the Department shall, in consultation with the Monitor, develop, adopt, and implement a revised de-escalation protocol to be followed after Use of Force Incidents. The revised de-escalation protocol shall be designed to minimize the use of intake areas to hold Incarcerated Individuals following a Use of Force Incident given the high frequency of Use of Force Incidents in these areas during prior Reporting Periods. The revised de-escalation protocol shall address: (i) when and where Incarcerated Individuals are to be transported after a Use of Force Incident; (ii) the need to regularly observe Incarcerated Individuals who are awaiting medical treatment or confined in cells after a Use of Force Incident, and (iii) limitations on how long Incarcerated Individuals may be held in cells after a Use of Force Incident. The revised de-escalation protocol shall be subject to the approval of the Monitor.

The Department has overrelied on the use of intake, unnecessarily transporting incarcerated individuals to intake for a medley of reasons, including following a use of force. While in some cases transporting a person to intake may be reasonable (*e.g.*, transfer to another facility or transport to Court), moving people to intake simply to await transport to a different location *within* the facility is illogical, and using intake as a de-facto holding area for individuals following use of force is problematic. Furthermore, transporting individuals to a different location—particularly when agitated—can often compound the management problem rather than resolve it. Finally, using intake as a catch-all hub for individuals creates a chaotic and disorganized intake environment. Therefore, this provision requires the various processes that are negatively impacting intake's orderly operation to be identified and addressed with new procedures, in particular with respect to management of incarcercated individuals following a use of force incident to avoid using intake for post incident management.

This provision focuses on the efforts related to the use of intake in the general operation of the jails and not the new admissions process (which is addressed in another section of this report). This box addresses the requirements of Action Plan § (E) ¶ (3)(a) and (b) as it relates to intra/inter-facility transfers and reducing the reliance on intake.

To ascertain how the Department has done in minimizing the use of intake, this box provides observations from Monitoring Team site visits of intake areas, assesses use of force in intake, assesses available data of time individuals stay in intake areas, and assesses the Department's implementation of De-escalation Units used to manage individuals *outside* of intake.

## Conditions of Intake

The Monitoring Team's site work this Monitoring Period initially found at least some intake pens in certain facilities to have unsanitary conditions. However, beginning in the spring of 2022, the Monitoring Team's site work revealed that intake pens were in better condition. Further, random onsite reviews of intake did not identify individuals in intake beyond 24 hours. Generally, the small number of individuals seen in the intake areas were typically waiting to be rehoused or were waiting for court production. The Monitoring Team also spoke with facility leadership and these staff reported that they were relying less on the intake area following a use of force and were instead trying to bring individuals back to their cell. Additionally, the Monitoring Team's review of all COD incidents and a large portion of intake investigations and have noted a reduction in escort to intake after a use of force incident. As outlined in the information provided below, the Monitoring Team's work has reaffirmed

certain information provided by the Department that it is relying less on intake areas following a use of force and that the chaotic nature of intake has improved since the winter[100] and early spring of 2022.

## Use of Force Incident in Intake Areas

The number of use of force incidents occurring in intake is the second highest number for any location in the jails. Importantly however, there were significantly less use of force incidents occurring in intake areas in this Monitoring Period than the previous two Monitoring Periods. That said, further reductions in use of force in intake areas is necessary as the instances of use of force this Monitoring Period is comparable to the number of incidents that occurred in intake between July and December 2020, conditions which gave rise to the First Remedial Order and this requirement in the first place. Therefore, while reductions in the use of force in intake areas in the last six months is positive, additional improvement is necessary.

|  | Jan. to June 2020 | July to Dec. 2020 | Jan. to June 2021 | July to Dec. 2021 | Jan. to June 2022 |
|---|---|---|---|---|---|
| Number of Use of Force Incidents in Intake Area | 472 | 520 | 659 | 824 | 487 |
| Total UOF | 3306 | 3161 | 4355 | 3839 | 3241 |
| % of UOF in Intake | *14%* | *16%* | *15%* | *21%* | *15%* |

## Intake Data Tracking and NCU Intake Audits

The Department requires inter/intra facility transfers to be tracked using the Inmate Tracking System, but facility compliance has been inconsistent. Instead, each facility maintains a different manual tracking mechanism that does not produce aggregate data for analysis. The lack of a tracking tool that is not centrally managed limits the problem-solving efforts to those *within* a facility, making it difficult to promote the overall goal of ensuring that individuals are not left in intake for long periods of time.

Given that the Department is unable to provide valid system-wide data for individual stays in intake, the Monitoring Team asked NCU to conduct audits of intake units across a number of facilities beginning in January 2022 to better understand the scope of the issue for intake stays for non-new admissions. Such audits were conducted in January and February 2022 and again in August 2022 of Intake Areas at AMKC, GRVC and RNDC for non-new admissions. As noted in the Monitor's June 30 Status Report, NCU conducted 4 audits of intake areas in three different facilities in January 2022 and February 2022 and found that 33% of individuals (15 of 45) had stays in intake longer than 24 hours. Almost half of these (7 of 15) extended beyond 72 hours. In comparison, in August 2022 NCU found

---

[100] In the winter of 2021, counsel for the Plaintiff class advised the Monitoring Team of allegations of 10 cases in which individuals in custody (non-new admissions) purportedly stayed in intake areas beyond 24 hours in various different Facilities.

that 13% of individuals (4 of 30) were held for more than 24 hours (but all 4 were held in intake less than 48 hours). 3 of the 4 individuals were held in intake awaiting Mental Health Housing, and one for issues with disrupting his housing unit. These audit results, in conjunction with site work and other information available to the Monitoring Team, demonstrate there has been some improvement in reducing the length and number of overstays in intake for inter-intra facility transfers.

**Reduced Reliance on Intake & De-Escalation**

- *De-Escalation Policy*

In January 2022, the Department promulgated Directive 5016 "De-escalation Unit," which establishes the Department's policy and procedures for conducting de-escalation outside of facility intakes. The policy details the rules and criteria governing the use of de-escalation areas and notes that the placement of individuals in de-escalation is to be done instead of taking the individual to an intake area. The policy further indicates that intake should only be used for inter-facility transfers, court processing, discharges, transfers to medical appointment, cadre searches, body-scan and new admissions.

- *De-Escalation Units*

In this Monitoring Period, the Department opened De-Escalation Units to reduce the reliance on intake, for example to house individuals pending their rehousing or transfer to a more restrictive setting following a use of force incident. The table below identifies the date in which the de-escalation unit opened at each facility.

| Facility | Date De-Escalation Unit Opened |
|---|---|
| AMKC | 4/13/22 |
| EMTC | 6/29/22 |
| GRVC | 6/7/22 |
| NIC/WF | 7/1/22 |
| OBCC | 2/1/22[101] |
| RMSC | 1/24/22 |
| RNDC | 7/1/22 |
| VCBC | 5/2/22 |

- *NCU De-Escalation Audits*

NCU conducted audits of every facility's adherence to the de-escalation policy between May and July of this year to determine how facilities are managing individuals in custody following a use of force incident. NCU reviewed Genetec video to track the movement of individuals involved in a use of

---

[101] OBCC has since closed.

force incident following the incident. The goal is to determine if staff are following the policy on de-escalation protocol (*i.e.* not placing individuals in intake pens after incidents).

Overall, NCU tracked the movement of 94 individuals and found that 48 individuals (51%) were not taken to intake and instead were taken back to their cell to de-escalate or immediately rehoused. 39 individuals were brought to intake areas and 7 individuals were placed in De-Escalation Units. While there were still a number of individuals taken to intake pens following a use of force, this audit revealed more that more than half of the individuals were not taken to intake pens and that facilities are using alternatives like de-escalation or immediately rehousing individuals more than they have in the past. This is consistent with the Monitoring Team's review of incidents as noted above. The de-escalation areas likely can be utilized more than they are and so the Monitoring Team encourages greater use of these units instead of intake pens.

**Conclusion**

The Department has taken steps to reduce reliance on the use of intake after a use of force. A policy was developed regarding de-escalation and the Department has created de-escalation units in every facility. NCU audits, and the Monitoring Team's work, demonstrate that the Department has made progress in implementing the de-escalation policy by utilizing intake less for post-incident management. Further, the number of use of force has decreased since last Monitoring Period. Finally, the number of individuals in intake for extended periods of time also appears to have been reduced. However, more work remains as the Department must be able to track individual stays in intake, and continued efforts are needed to utilize intake less after a use of force. The Department is therefore in Partial Compliance with this requirement.

| COMPLIANCE RATING | § A., ¶ 3. Partial Compliance |
|---|---|

## REMEDIAL ORDER § A., ¶ 4 (SUPERVISION OF CAPTAINS)

¶ 4. *Supervision of Captains.* The Department, in consultation with the Monitor, shall improve the level of supervision of Captains by substantially increasing the number of Assistant Deputy Wardens ("ADWs") currently assigned to the Facilities. The increased number of ADWs assigned to each Facility shall be sufficient to adequately supervise the Housing Area Captains in each Facility and the housing units to which those Captains are assigned, and shall be subject to the approval of the Monitor.

This provision requires the Department to improve staff supervision by hiring and deploying additional ADWs within the facilities to better supervise Captains. The Department's supervisory structure differs from most correctional settings in other jurisdictions as discussed in more detail in the security section of this report. Since this provision went into effect in January 2021, the number of Officers, Captains, and ADWs have declined, both across the department and specifically within facilities and court commands. The number of ADWs in facilities is declining at a faster rate than the number of Captains in facilities when it should be increasing. This means that as the declining number

of Captains try to manage the growing population of individuals in custody, even fewer supervisors are being designated to lend their assistance and expertise. Notably, the proportion of Captains assigned to the facilities (as opposed to those assigned to other locations) has remained relatively steady (about 69% of all Captains), but the proportion of ADWs assigned to the facilities has decreased (from 84% in January 2021 to 73% in June 2022).

The goal of this provision is to compensate for the more compact chain of command by ensuring that Captains are properly supervised, coached and guided. This requirement is also intended to elevate the skill sets of Captains by increasing the number of ADWs available to supervise them. The table below identifies the number of ADWs assigned to each facility from July 2020 to June 2022. The significant increase the number of ADWs shown in the January 1, 2021 column in the table was a result of a concerted effort to promote and deploy more ADWs into the jails as required by this provision. More specifically, between July 2020 and January 2021, a total of 40 ADWs were added across the department, 28 of whom (70%) were assigned to the facilities and court commands. But since then, the total number of ADWs, both department-wide and those assigned to facilities/court commands, has steadily decreased. For example, the total number of ADWs in the Department decreased 30% between January 2021 and June 2022 (from 95 to 67). In addition to the smaller number, the proportion of ADWs assigned to facility commands has also decreased by 11 percentage points (from 84% to 73%). This reduction in ADWs can also be seen at the facility level, such as the 57% decrease in the number of ADWs assigned to AMKC (from 21 to 9) and the 53% reduction in the number of ADWs assigned to RNDC (from 15 to 7).

| Number of ADWs & Assignments in the Department[102] | | | | | |
|---|---|---|---|---|---|
| Facility | # of ADWs As of July 18, 2020 | # of ADWs As of January 2, 2021 | # of ADWs As of June 26, 2021 | # of ADWs As of January 1, 2022 | # of ADWs As of June 18, 2022 |
| AMKC | 9 | 21 | 13 | 12 | 9 |
| EMTC[103] | 0 | 0 | 0 | 0 | 0 |
| GRVC | 6 | 10 | 11 | 9 | 8 |
| MDC[104] | 6 | 2 | 1 | 1 | 0 |
| NIC | 6 | 8 | 8 | 5 | 7 |
| OBCC[105] | 6 | 8 | 8 | 14 | 7 |

[102] As of the end of the Monitoring Period, the assignment of ADWs within the Facility is not available so this data simply demonstrates the number of ADWs per facility.

[103] EMTC has been closed and opened in these Monitoring Periods. Currently, Staff that work at EMTC are technically assigned to AMKC.

[104] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021.

[105] OBCC was slated for closure in the Fourteenth Monitoring Period and had an ADP of 81 in the month of June 2022. OBCC was closed by July 2022. Staff were then reassigned to other commands.

| | | | | | |
|---|---|---|---|---|---|
| RMSC | 5 | 6 | 6 | 5 | 4 |
| RNDC | 7 | 15 | 15 | 10 | 7 |
| VCBC | 4 | 6 | 5 | 5 | 4 |
| Court Commands (BKDC, BXDC, QDC) | 3 | 4 | 3 | 3 | 3 |
| **Total # of ADWs in Facilities and Court Commands** | **52** | **80** | **70** | **64** | **49** |
| **Total # of ADWs Available Department-wide** | **55** | **95** | **88** | **80** | **67** |
| **% of ADWs in Facilities and Court Commands** | **79%** | **84%** | **80%** | **80%** | **73%** |

Throughout this period, the number of Captains has steadily declined, both department-wide and within facilities and court commands. From July 2020 to June 2022, there were over 200 fewer Captains department-wide and 142 fewer Captains within facilities and court commands. Despite this reduction in the number of Captains, the percentage of Captains working within facilities and court commands has remained relatively steady from 69% in July 2020 to 69% in June 2022. The table below identifies the number of Captains assigned in each facility from July 2020 to June 2022.

| Number of Captains & Assignments in the Department [106] | | | | | |
|---|---|---|---|---|---|
| **Facility** | **# of Captains As of July 18, 2020** | **# of Captains As of January 2, 2021** | **# of Captains As of June 26, 2021** | **# of Captains As of January 1, 2022** | **# of Captains As of June 18, 2022** |
| AMKC | 91 | 111 | 97 | 87 | 81 |
| EMTC[107] | 0 | 0 | 0 | 0 | 0 |
| GRVC | 75 | 72 | 86 | 86 | 81 |
| MDC[108] | 72 | 39 | 15 | 12 | 11 |
| NIC | 51 | 45 | 45 | 56 | 45 |
| OBCC[109] | 85 | 81 | 78 | 77 | 38 |

[106] As of the end of the Monitoring Period, the assignment of Captains within the Facility is not available, so this data simply demonstrates the number of Captains per facility.

[107] EMTC has been closed and opened in these Monitoring Periods. Currently, Staff that work at EMTC are technically assigned to AMKC.

[108] MDC was utilized in a limited capacity at the end of the Twelfth Monitoring Period and was closed by June 2021.

[109] OBCC was slated for closure in the Fourteenth Monitoring Period and had an ADP of 81 in the month of June 2022. OBCC was closed by July 2022. Staff were then reassigned to other commands.

| | | | | | |
|---|---|---|---|---|---|
| RMSC | 51 | 50 | 49 | 36 | 34 |
| RNDC | 58 | 56 | 60 | 63 | 70 |
| VCBC | 27 | 25 | 27 | 25 | 23 |
| Court Commands (BKDC, BXDC, QDC) | 39 | 37 | 35 | 32 | 33 |
| **Total # of Captains in Facilities and Court Commands** | **558** | **523** | **499** | **474** | **416** |
| **Total # of Captains Available Department-wide** | **810** | **765** | **751** | **670** | **607** |
| **% of Captains in Facilities and Court Commands** | **69%** | **68%** | **66%** | **71%** | **69%** |

The "adequate number of ADWs" required by this provision is a dynamic target given that the number of Correction Officers and the number of Captains change constantly, along with the number of facilities that must be staffed and the number of people in custody. Further, the number of COs and supervisors needed will depend on the type of housing unit. For instance, a general population housing with minimum custody individuals will require different supervision levels than a housing unit with maximum custody individuals.

In addition to the number of available ADWs across the department declining since 2021, a greater proportion of ADWs are also being assigned to posts outside the facilities/court commands which means they are not in a position to serve the objective of increasing Captains' skill through quality supervision. This issue is further compounded because even those ADWs who are assigned to facilities/court commands are first utilized as Tour Commanders, rather than direct supervisors. It is certainly understandable that ADWs are assigned this task because it is an essential function to the operation of the jails. However, as noted above, this Department does not have the additional levels of supervisory staff common to other systems, and thus utilizing ADWs as Tour Commanders leaves the Captains unsupervised in any constructive manner. Most other systems would have an additional level of supervisors under the Tour Commander.

It is clear that the current number of ADWs is not sufficient to both serve as Tour Commanders and to provide adequate supervision of Captains. While a specific ratio of ADWs to Captains is neither required nor practical (because the unique tasks of each Captain and housing unit impact how many Captains a single ADW can supervise), this provision did intend to increase both the number and percentage of ADWs available within facilities, neither of which have been maintained since this provision went into effect in January 2021. Following the close of the Monitoring Period, the Department reported that 25 current staff will be promoted to ADWs. This will result in a net gain of about 18 new ADWs as 7 *current* ADWs will be promoted to Deputy Warden.

| | |
|---|---|
| **COMPLIANCE RATING** | § A., ¶ 4. Non-Compliance |

| REMEDIAL ORDER § A., ¶ 6 (FACILITY EMERGENCY RESPONSE TEAMS) |
| --- |
| § A., ¶ 6. Within 90 days of the Order Date, the Department shall, in consultation with the Monitor, develop, adopt, and implement a protocol governing the appropriate composition and deployment of the Facility Emergency Response Teams (i.e., probe teams) in order to minimize unnecessary or avoidable Uses of Force. The new protocol shall address: (i) the selection of Staff assigned to Facility Emergency Response Teams; (ii) the number of Staff assigned to each Facility Emergency Response Team; (iii) the circumstances under which a Facility Emergency Response Team may be deployed and the Tour Commander's role in making the deployment decision; and (iv) de-escalation tactics designed to reduce violence during a Facility Emergency Response Team response. The Department leadership shall regularly review a sample of instances in which Facility Emergency Response Teams are deployed at each Facility to assess compliance with this protocol. If any Staff are found to have violated the protocol, they shall be subject to either appropriate instruction or counseling, or the Department shall seek to impose appropriate discipline. The results of such reviews shall be documented. |

This provision requires the Department to minimize unnecessary or avoidable uses of force by Emergency Response Teams. There are three types of Emergency Response Teams: a Probe Team, which is a team of facility-based Staff, the Emergency Services Unit ("ESU"), an "elite" team of Staff specifically dedicated and trained to respond to emergencies across the Department, and Security Response Teams ("SRT") which function similarly to ESU and are deployed to facilities as part of operational security efforts.

**Overview of Alarm Data**

The table below presents the number and rate of alarms from July 1, 2019 to June 30, 2022. Throughout this period, most alarms that were called were Level B, which involves the deployment of an Emergency Response Team. The rate of alarms in the 14th Monitoring Period (January-June 2022) was 6.8, similar to the rate of the 13th Monitoring Period (the last half of 2021). While the overall number of alarms that have been called has decreased, the Department still disproportionately calls for Level B alarms and over relies on the Emergency Response Teams.

| July 2019-December 2020 Alarms Department-Wide | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | July-Dec. 2019 (9th MP) | | | Jan.-June 2020 (10th MP) | | | July-Dec. 2020 (11th MP) | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate |
| **Total Alarms** | 7,268 | 6,989 | 17.3 | 4,462 | 4,698 | 15.8 | 4,683 | 4,389 | 17.8 |
| | # | % total | | # | % total | | # | % total | |
| *Level A* | 2,052 | 28% | | 796 | 18% | | 1,098 | 23% | |
| *Level B* | 5,216 | 72% | | 3,666 | 82% | | 3,583 | 77% | |

| January 2021- June 2022 Alarms Department-Wide | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Jan.-June 2021 (12th MP) | | | July-Dec. 2021 (13th MP) | | | Jan.-June 2022 (14th MP) | | |
| | # | ADP | Rate | # | ADP | Rate | # | ADP | Rate |
| Total Alarms | 4,719 | 5,534 | 14.2 | 2,141 | 5,614 | 6.4 | 2,254 | 5,491 | 6.8 |
| | # | % total | | # | % total | | # | % total | |
| Level A | 1,719 | 36% | | 545 | 25% | | 753 | 33% | |
| Level B | 3001 | 64% | | 1,596 | 75% | | 1,501 | 67% | |
| *Rate is calculated using the following formula: (# Alarms in time period/# of months in period)/ADP * 100* | | | | | | | | |

## Concerns Regarding Emergency Response Teams

The Monitoring Team has long raised concerns about the Department's overreliance and conduct of Emergency Response Teams—both at the Facility-level through the use of "Probe Teams" and ESU (including SRT, which are now being used akin to ESU).[110] These concerns fall into the following categories for all Emergency Response Teams:

- Overreliance on these specialized teams to address issues that could and should be addressed by either uniform staff on the housing unit or facility-level supervisors.
- Hyper-confrontational nature of these teams which often exacerbate conflict and lead to unnecessary and/or excessive use of force.
- Overabundance of staff on these teams so that an excessive number of staff arrive on scene which often raises tensions (including chaotic nature of fielding Probe Teams using an "all call for assistance.")
- Composition of these teams to ensure only those who are qualified, and do not have a history of unnecessary and/or excessive force serve on these teams.
- Concerning security procedures – these teams often utilize concerning security practices such as painful escort holds.
- These teams (and others) are also often relied upon to conduct searches, which are completed in a manner that are inefficient and chaotic and can result in unnecessary use of force.

---

[110] These concerns have been extensively laid out in the Eleventh Monitor's Report at pgs. 38 to 50 and 116 to 120, Twelfth Monitor's Report at pgs. 49-51, and the Second Remedial Order Report at pgs. 3-4.

**ESU**

The practices of ESU has long been a concern of the Monitoring Team. Of particular focus in this Monitoring Periods were issues regarding the unprofessional conduct of ESU staff, the use of tasers by ESU Captains, and the ongoing obligation to appropriately screen staff who are part of the ESU team.

The Monitoring Team has continued to identify situations in which ESU Staff exhibit unprofessional behavior such as using inappropriate language and/or utilizing an unprofessional tone. The ESU Team is *expected* to be the most elite team of Staff in the Department. Accordingly, the lack of adherence to professional practice is particularly troubling. These concerns were taken seriously by ESU leadership who held conversations with each involved staff member and noted the examples the Monitoring Team identified of this unprofessional behavior would be used for training purposes going forward. It is critical that there is ongoing reinforcement by ESU's supervisors that staff are professional and act appropriately.

The use of tasers by ESU had ceased in 2017.[111]  However, on December 17, 2021, ESU used the taser for the first time since July 2017. ESU started regularly using the taser shortly thereafter. The taser was displayed 6 times and used 8 times between January and July of this year. It appeared in at least some of these cases the taser was being used or displayed in situations where there was no immediate need for compliance because de-escalation attempts had not been exhausted, and/or the level of resistance by the incarcerated individual did not warrant its use.

The Monitoring Team raised these concerns with the ID leadership and the Commissioner. Multiple training meetings with ESU staff then occurred and culminated with a meeting between ESU Staff and the Commissioner. At these meetings, the proper circumstances of when a taser may be used was discussed and it was reiterated that tasers should never be used for the purpose of pain compliance. The taser has not been used since the end of August, but, if the taser is utilized again, the Monitoring Team will closely scrutinize any case where the taser is displayed or used.

Finally, the routine screening of ESU staff to determine their fitness to serve on the team had not been repeated since the spring of 2021.[112] At the recommendation of the Monitoring Team, the screening was initiated and a plan to routinely screen ESU staff going forward was developed. The outcome of the screening was pending as of the completion of this report. The Monitoring Team will closely scrutinize the outcome of this screening.

**Next Steps**

The Security Operations Manager was appointed following the close of the Fourteenth Monitoring Period and the Department has reengaged in discussions about how to address the practices

---

[111] S*ee* the Second Monitor's Report at pgs. 31-32, Third Monitor's Report at pgs. 38-39, and Fourth Monitor's Report at pg. 40

[112] See Twelfth Monitor's Report at pg. 51.

of the Emergency Response Teams. The Security Operations Manager has demonstrated a strong command of the issues and concerns with current practices. As a starting point to begin this work, the Monitoring Team provided a comprehensive document to the Security Operations Manager capturing the Monitoring Team's findings, concerns, and recommendations to date to improve the use of these teams. This document included an overview of the Monitoring Team's concerns, all prior feedback shared including recommendations on improving the deployment and composition of the teams, improving ESU's search procedures, and screening for ESU and SRT teams to ensure Staff with a history of excessive and unnecessary force do not serve on these teams, and finally previously shared (and yet unaddressed) feedback on ESU command level orders which must be updated to comport with the requirements of the Consent Judgment and other Department policies.

**COMPLIANCE RATING**   **§ A., ¶ 6.** Non-Compliance

- **U**SE OF **F**ORCE **P**OLICY (**C**ONSENT **J**UDGMENT § IV)

| **IV. U**SE OF **F**ORCE **P**OLICY ¶ 1 (**N**EW **U**SE OF **F**ORCE **D**IRECTIVE) |
|---|

¶ 1. Within 30 days of the Effective Date, in consultation with the Monitor, the Department shall develop, adopt, and implement a new comprehensive use of force policy with particular emphasis on permissible and impermissible uses of force ("New Use of Force Directive"). The New Use of Force Directive shall be subject to the approval of the Monitor.

This provision of the Consent Judgment requires the Department to develop, adopt, and implement a comprehensive Use of Force Policy with particular emphasis on permissible and impermissible uses of force. The Department previously achieved Substantial Compliance with the development and adoption of the Use of Force Policy, which received the Monitor's approval prior to the Effective Date of the Consent Judgment.

**Standalone Policies**

The Department maintains a number of standalone policies, along with the UOF policy, regarding the proper use of security and therapeutic restraints, spit masks, hands-on-techniques, chemical agents, electronic immobilizing devices, kinetic energy devices used by the Department, batons, lethal force, and canines. ESU also maintains about 10 Command Level Orders ("CLOs"), including two which govern the use of specialized chemical agent tools (*i.e.*, Pepperball system and the Sabre Phantom Fog Aerosol Grenades). In at least some cases, these CLOs lack sufficient guidance on the tools' place in the use of force continuum and need to address feedback from the Monitoring Team. The Monitoring Team intends to raise these issues with Department leaders who are well situated to work on revisions.

**Implementation of UOF Policy**

The Department has been unable to implement the UOF policy. It has been undercut by subpar efforts to instruct and supervise Staff to ensure the proper application of the policy as discussed in every Monitor's Report to date. These issues have been exacerbated by other failures in adhering to basic security protocols also outlined in every Monitor's Report to date. The Monitoring Team has reported on these issues for over six years and little to no improvement has been made regarding the use of force in this agency. The Monitoring Team's review of use of force incidents suggests that many are problematic in some way.

The Department remains in Non-Compliance with the implementation of the Use of Force Policy. The Monitoring Team's March 2022 report (dkt. 438 at pgs. 13 to 16) and June 2022 report (dkt. 467 at pgs. 13 to 17) continued problematic trends regarding the use of force in this Monitoring Period. Those reports also emphasized the continually increasing use of force rate and general lack of progress toward the overall goal of reducing the use of force and violence. These problems have only worsened since the Consent Judgment went into effect in late 2015. Data on key outcome indicators for January-June 2022 show decreases from the apex of the crisis in 2021, but these outcomes remain at a level significantly worse than those observed in 2016 when the Consent Judgment went into effect. The Department's use of force and violence data is discussed in the Security Practices section of this report.

| | |
|---|---|
| | Elements of the Action Plan are designed to improve Staff skills in de-escalating conflict and the proper use of physical intervention through an infusion of outside expertise and improved supervision, along with myriad other factors (*e.g.*, staffing levels, housing and classification, etc.) that are necessary to reduce the overall frequency with which force is used. |
| **COMPLIANCE RATING** | ¶ 1. **(Develop)** Substantial Compliance<br>¶ 1. **(Adopt)** Substantial Compliance<br>¶ 1. **(Implement)** Non-Compliance<br>¶ 1. **(Monitor Approval)** Substantial Compliance |

- **U**SE OF **F**ORCE **R**EPORTING AND **T**RACKING (**C**ONSENT **J**UDGMENT § V)

| V. USE OF FORCE REPORTING AND TRACKING ¶ 2 (INDEPENDENT STAFF REPORTS) |
|---|

¶ 2. Every Staff Member who engages in the Use of Force, is alleged to have engaged in the Use of Force, or witnesses a Use of Force Incident, shall independently prepare and submit a complete and accurate written report ("Use of Force Report") to his or her Supervisor.

The Department is required to report use force accurately and timely as part of their overall goal to manage use of force effectively. The assessment below covers five critical areas related to reporting force: notifying Supervisors that a use of force occurred, submission of complete, independent and timely reports, the classification of UOF incidents, allegations of Use of Force, and reporting of use of force by non-DOC staff who either witnessed the incident and/or are relaying reports from incarcerated individuals

**Notifying Supervisor of UOF**

From January to June 2022 almost 3,300 use of force incidents were reported by supervisors to the Central Operations Desk and slightly over 7,000 use of force and witness reports were submitted for incidents occurring in this Monitoring Period. To assess whether Staff are timely and reliably notifying a supervisor of a UOF, the Monitoring Team considers whether there is any evidence that Staff are not reporting force as required. This includes consideration of all the number of allegations as well as reports from outside stakeholders (e.g., H+H and LAS) about potential unreported UOF. These sources suggest that unreported uses of force are an infrequent occurrence. In this Monitoring Period, 27 out of the 29 reports from H+H staff alleging UOF were already under investigation by ID before H+H's reports were submitted. Further, only 8 of the 53 UOF allegations submitted by LAS had not been previously reported. This further reinforces that Staff are routinely and consistently reporting UOF and there are only a small number of incidents that appear to go unreported. Of those incidents that have gone unreported, many appear to be relatively minor UOF incidents, and instances of unreported excessive or unnecessary force are rare.

**Independent, Complete, and Timely Staff Reports**

Staff members are required to submit independent and complete UOF reports. The Department's Use of Force Directive requires Staff to independently prepare a Staff Report or Use of Force Witness Report if they employ, witness, or are alleged to have employed or witnessed force. The total volume of reports submitted (over 7,000 reports in this Monitoring Period) demonstrate that many Staff are reporting as required. Further, the Monitoring Team's review of a large sample of reports demonstrate that Staff reports are generally independently prepared. However, the quality of reports continues to be mixed and Staff's practices are consistent with those from prior Monitoring Periods (see Ninth Monitor's Report at pgs. 89-91). The Monitoring Team continues to identify reports that are incomplete, inaccurate, or too vague. Of the 2,569 Intake Investigations closed in this Monitoring Period (covering

incidents occurring between December 2021 and June 2022), 427 incidents (17%) were found to have report writing issues. The Monitoring Team continues to emphasize the importance of Staff describing their recollection of events in their own words and specifying the exact tactics that were utilized (*e.g.*, where on the incarcerated individual's body the Staff Member's hands or arms were placed).

Staff members are also required to submit their Use of Force Reports as soon as practicable after the Use of Force Incident, or the allegation of the Use of Force unless the Staff Member is unable to prepare a Use of Force Report within this timeframe due to injury or other exceptional circumstances. The table below demonstrates the number and timeliness of Staff reports for actual and alleged UOF from 2018 to June 2022.

| Timeliness of Staff Report | | | | | | |
|---|---|---|---|---|---|---|
| | Actual UOF | | | Alleged UOF | | |
| *Year* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 24 Hours* | *Total Staff Reports Expected* | *Reports Uploaded Timely* | *% Uploaded within 72 Hours of the Allegation* |
| **Jan. to Dec. 2018** | 15,172 | 12,709[113] | 83.77% | 139 | 125[114] | 89.93% |
| **Jan. to Dec. 2019** | 21,595 | 20,302 | 94.01% | 190 | 134 | 70.53% |
| **Jan. to Dec. 2020** | 19,272 | 17,634 | 91.50% | 136 | 94 | 69.12% |
| **Jan to Dec. 2021** | 22,103 | 17,064 | 77.20% | 111 | 45 | 40.54% |
| **Jan to June 2022** | 8,472 | 6,992 | 82.53% | 45 | 19 | 42.22% |

---

[113] NCU began the process of auditing actual UOF reports in February 2018.

[114] NCU began collecting data for UOF allegations in May 2018.

The Department's timely submission of UOF reports improved this Monitoring period after the previous Monitoring Period in which the Department claimed that the staffing challenges impacted the timely submission of reports. The Intake Investigations appeared to generally have access to reports with enough time to conduct the investigation. In this Monitoring Period 6,992 (83%) of the expected 8,472 reports for actual UOF incidents were submitted within 24 hours and 19 (42%) of the 45 reports for alleged UOF incidents were submitted within 72 hours. The Department reports that 88% of all reports were submitted within 2 days of the incident. As for the reports for allegations of uses of force, less reports are being submitted within 72 hours of the allegation as required. However, obtaining reports for allegations inherently takes more time as the Staff members alleged to be involved must be identified and advised that a report is necessary and then the report must be produced. The Staff member may or may not be working on a specific day, so it generally takes longer to obtain reports of allegations. That said, the time to obtain reports for allegations must improve. Overall, the Department has continued to maintain a centralized, reliable, and consistent process for submitting and tracking UOF Reports. The number of reports submitted by Staff is tremendous and the majority of those reports are submitted and uploaded in a timely fashion.

## **Classification of UOF Incidents**

The Department is required to immediately classify all use of force incidents as Class A, B, C, or P when an incident is reported to the Central Operations Desk ("COD"). Class P is a temporary classification used to describe use of force incidents where there is not enough information available at the time of the report to COD to receive an injury classification of Class A, B, or C. While some additional time may be needed to identify the injury classification for an incident (*e.g.,* the results of a medical assessment must be obtained before the incident can be classified), the Department's has seen an increase of incidents with a protracted designation of Class P.

The chart below identifies the Monitoring Team's assessment of a sample of the Department's incident classifications from March 2016 to June 2022.

| COD Sets[1] Reviewed | Mar. 2016 to July 2017 *2nd to 4th Monitoring Period* | Jan. to Dec. 2018 *6th & 7th Monitoring Period* | Jan. to Dec. 2019 *8th & 9th Monitoring Period* | Jan. to Dec. 2020 *10th & 11th Monitoring Period* | Jan. to June 2021 *12th Monitoring Period* | July to Dec. 2021 *13th Monitoring Period* | Jan. to June 2022 *14th Monitoring Period* |
|---|---|---|---|---|---|---|---|
| **Total Incidents Reviewed** | 2,764 | 929 | 1,052 | 1,094 | 754 | 890 | 709 |
| **Number of Incidents Classified Upon Call-In** | 1,519 (55%) | 540 (58%) | 589 (56%) | 585 (53%) | 58 (8%) | 183 (20%) | 126 (18%) |
| **Class P Incidents classified within COD Period** | 1,157 (42%) | 369 (40%) | 434 (41%) | 494 (45%) | 479 (63%) | 506 (57%) | 378 (53%) |
| **Class P Incidents that were not classified within COD Period** | 88 (3%) | 20 (2%) | 29 (3%) | 15 (1%) | 217 (29%) | 201 (23%) | 205 (29%) |

Since January 2021 the time to classify a use of force incident has increased compared to previous Monitoring Periods as demonstrated in the chart above. These delays impact several essential workflows and result in vital information being received in a prolonged cycle. As a result of these consistent delays, the Monitoring Team shared feedback with the Department on many occasions in 2021 and 2022 that it must take steps to understand and address the delay in classifications. In response to this feedback the Department reported the classification delays were due to delays by H+H in updating injury reports and facilities failing to obtain these updates within the prescribed five-day time frame.

Further, to address these issues, the Department reported that the Deputy Commissioner of Security and Operations shared a communication to facility leadership reminding them that all Use of Force incidents must be classified as either an A, B, or C, within five days of their occurrence. If an incident remained unclassified after five days, the facility leadership is required to submit a written explanation to the appropriate Division Chief indicating why the incident has not been classified. The Deputy Warden of Security and Operations also required that the incident is reevaluated for classification every seven days until classification occurs. Finally, to ensure that staff are complying with the policy, the Deputy Commissioner of Security and Operations requested that facility leadership submit a daily written update to the Acting Assistant Chief of Security and Deputy Commissioner of Security and Operations confirming that all UOF incidents from the previous day have been reviewed, and that all the incidents were appropriately classified or the reason why incidents were not classified.

---

[1] This audit was not conducted in the First or Fifth Monitoring Periods

Since these requirements were rolled out, the Monitoring Team has found that UOF incidents are being classified in a timelier fashion. However, the Monitoring Team identified one instance where an incident was not classified within five days, and the process outlined above was not adhered to. The classification of incidents is critical, and the Department must remain vigilant in ensuring incidents are classified in a timely manner.

**Alleged Use of Force**

Understanding the scope of the force utilized within the Department requires consideration of all force reported by Staff and any substantiated allegations of use of force. Therefore, the Department separately tracks all allegations of uses of force, which are claims that Staff used force against an incarcerated individual and the force was not previously reported by Staff. An allegation that a use of force occurred does not always mean that force was actually used—that is determined through the investigations process.

The number of allegations has declined since 2016 as demonstrated in the chart below.



**Use of Force Allegations**

| Year | Allegations |
|------|-------------|
| 2016 | 471 |
| 2017 | 436 |
| 2018 | 393 |
| 2019 | 331 |
| 2020 | 208 |
| 2021 | 210 |
| Jan. to June 2022 | 130 |

Overall, the number of allegations of force is small compared to the total number of uses of force reported by Staff. In 2022, there were 130 allegations of force while 3,241 uses of force were reported by Staff. The Monitoring Team has found that generally, of the small group of allegations, only a fraction is substantiated, and they are typically for failing to report minor uses of force, and instances of excessive or unnecessary unreported uses of force are rare. That said, all allegations of use of force can and must be appropriately investigated.

**Non-DOC Staff Reporting**

Non-DOC Staff Members who witness a Use of Force Incident are required to report the incident in writing directly to a supervisor and medical staff are required to report to a supervisor when they have

reason to suspect that an Inmate has sustained injuries due to a use of force, but the injury was not identified as such to the medical staff.

_DOE Staff Reporting_: In-person school has resumed in the jail after being suspended due to COVID-19. The Department of Education ("DOE") previously developed staff training and reporting procedures, in consultation with the Monitoring Team, to address the requirements of this provision and the December 4, 2019, Court Order (dkt. entry 334) clarifying the requirement for DOE to submit reports. However, shortly after the procedures and training were developed, school was suspended at RNDC due to COVID-19. The Monitoring Team has not received any reports from DOE Staff that may have witness a UOF. The Monitoring Team intends to evaluate whether DOE are reporting as required in the subsequent Monitoring Period.

_H+H Reporting_: New York City Health + Hospitals ("H+H") (the healthcare provider for incarcerated individuals in DOC custody) has maintained a process for staff reporting. H+H staff submitted a total of 29 reports in this Monitoring Period; 20 reports were H+H witness reports of UOF incidents and 9 reports relayed UOF allegations from an incarcerated individual. The chart provides an overview of the reports provided by H+H Staff since July of 2017.

| Submission of H+H Staff Reports | | | | | | |
|---|---|---|---|---|---|---|
| | July to Dec. 2017 (5th MP) | 2018 (6th & 7th MP) | 2019 (8th & 9th MP) | 2020 (10th & 11th MP) | 2021 (12th & 13th MP) | Jan to June 2022 (14th MP) |
| *Grand Totals* | | | | | | |
| **Total Reports Submitted** | 2 | 53 | 39 | 56 | 97 | 29 |
| **Total UOF Incidents Covered** | 2 | 53 | 38 | 46 | 85 | 21 |
| *Witness Reports* | | | | | | |
| **Number of witness reports submitted** | 0 | 29 | 18 | 45 | 70 | 20 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 0 | 31 | 15 | 36 | 64[115] | 11[116] |
| *Relayed Allegations from Incarcerated Individuals* | | | | | | |
| **Number of reports of allegations of UOF relayed from an Incarcerated Individuals** | 2 | 24 | 21 | 11 | 27 | 9 |
| **Number of actual or alleged UOF incidents covered by submitted reports** | 2 | 22 | 23 | 10 | 22[117] | 12[118] |

It is difficult to know whether H+H staff submitted reports in every incident witnessed. But there still appears to be room for improvement, especially given the reduction in reports in this Monitoring Period (n=29) compared to the same time period last year (n=71). In this Monitoring Period, 150 incidents occurred in clinic areas and 4 of those incidents had a corresponding H+H report. However, just because an incident occurred in the clinic area does not mean H+H staff witnessed the incident. Further, it is worth noting that H+H submitted reports for 15 incidents that were categorized as occurring

---

[115] On one occasion for one use of force incident, we received both a witness report and a relayed allegation report for the same incident.

[116] On two separate occasions for two separate use of force incidents, we received both a witness report and a relayed allegation report for the same incident.

[117] See footnote 4.

[118] See footnote 5.

in other parts of the jail and later taken to the clinic and additional force was witnessed or relayed. Still, it would be expected that at least some H+H staff observed more force than what is reported.

**Conclusion**

The requirements related to reporting use of force are multi-faceted. Overall, the fact that a use of force incident occurred is being reported as required, but the time to classify these incidents needs to improve. Further, thousands of individual Staff are submitted, but these reports need to more reliably and consistently report what occurred.

| COMPLIANCE RATING | ¶ 2. Partial Compliance |
|---|---|

| V. USE OF FORCE REPORTING AND TRACKING ¶ 22 (PROVIDING MEDICAL ATTENTION FOLLOWING USE OF FORCE INCIDENT) |
|---|

¶ 22. All Staff Members and Inmates upon whom force is used, or who used force, shall receive medical attention by medical staff as soon as practicable following a Use of Force Incident. If the Inmate or Staff Member refuses medical care, the Inmate or Staff Member shall be asked to sign a form in the presence of medical staff documenting that medical care was offered to the individual, that the individual refused the care, and the reason given for refusing, if any.

¶ 23. DOC shall electronically record the time when Inmates arrive at the medical clinic following a Use of Force Incident, the time they were produced to a clinician, and the time treatment was completed in a manner that can be reliably compared to the time the UOF incident occurred. DOC shall record which Staff Members were in the area to receive post-incident evaluation or treatment.[119]

Staff Members and incarcerated individuals upon whom force is used, or who used force, are required to receive medical attention by medical staff as soon as practicable following a Use of Force Incident. The Department's progress in providing timely medical care from January 2018 to June 2022 following a UOF are outlined in the table below.

| Wait Times for Medical Treatment Following a UOF | | | | | | |
|---|---|---|---|---|---|---|
| | # of Medical Encounters Analyzed | 2 hours or less | Between 2 and 4 hours | % Seen within 4 hours | Between 4 and 6 hours | 6 hours or more |
| **2018** | 9,345 | 37% | 36% | 73% | 16% | 13% |
| **2019** | 11,809 | 43% | 38% | 81% | 11% | 9% |
| **2020** | 10,812 | 46% | 36% | 82% | 10% | 9% |
| **2021** | 14,745 | 39% | 30% | 70% | 11% | 20% |
| **2022** *(Jan. to June)* | 5,986 | 46% | 25% | 71% | 10% | 20% |

During the current Monitoring Period, there were 5,986 encounters related to a UOF and medical care was provided within four hours of a UOF in 71% of medical encounters, 10% of medical encounters occurred between 4 and 6 hours of the incident and 20% of medical encounters occurred

---

[119] This language reflects the Consent Judgment Modification approved by the Court on August 10, 2018 (*see* dkt. 316).

beyond 6 hours. While the Department improved upon provision of medical treatment within 4 hours in this Monitoring Period compared to the last (71% compared with 65% in the Thirteenth Monitoring Period), the overall provision of medical treatment within 4 hours has decreased since the end of 2020. The Department reports, at least in part, that this is due to staffing issues. Provision of prompt medical treatment is critical and so the Department must continue to work to ensure Staff members and incarcerated individuals receive prompt medical attention.

| **COMPLIANCE RATING** | ¶ **22.** Partial Compliance |
|---|---|

- **USE OF FORCE INVESTIGATIONS (CONSENT JUDGMENT § VII)**

| |
|---|
| **VII. USE OF FORCE INVESTIGATIONS ¶ 1 (THOROUGH, TIMELY, OBJECTIVE INVESTIGATIONS) & ¶ 9 (A) (TIMING OF FULL ID INVESTIGATIONS)** |

¶ 1. As set forth below, the Department shall conduct thorough, timely, and objective investigations of all Use of Force Incidents to determine whether Staff engaged in the excessive or unnecessary Use of Force or otherwise failed to comply with the New Use of Force Directive. At the conclusion of the investigation, the Department shall prepare complete and detailed reports summarizing the findings of the investigation, the basis for these findings, and any recommended disciplinary actions or other remedial measures. All investigative steps shall be documented.

¶ 9. All Full ID Investigations shall satisfy the following criteria [. . . as enumerated in the following provisions]:

      a.   *Timeliness* [. . .]

As part of this compliance assessment, the Monitoring Team provides an overview of the status of investigations for all UOF incidents through June 30, 2022, the quality and timing of Intake Investigations and Full ID Investigations, the status of ID staffing, the status of law enforcement referrals for potential criminal misconduct, and details on the Use of Force Priority Squad.

**Status of Investigations**

The table below provides the investigation status, *as of July 15, 2022*, of all UOF incidents that occurred between January 2018 and June 2022.[120] This data demonstrates that ID is processing an enormous volume of cases. All use of force incidents receive close-in-time investigations via the Intake Squad. The Intake Squad is reasonably managing the caseload completing *thousands* of Intake Investigations this Monitoring Period, almost all within 30 business days or less. It is important to note that the 549 pending Intake Investigations in the chart below are for incidents that occurred in May and June 2022 and so the 30 business day had not yet passed as of July 15, 2022 when this data was created (it is worth noting almost all of these cases have subsequently closed in 30 business days or less). The majority of UOF incidents can be reasonably assessed and analyzed by Intake Investigations and so most UOF incidents are closed at the conclusion of the Intake Investigation. This means that only a small portion of the more complex incidents require further investigation through a Full ID Investigation. While only a small proportion of cases are subject to Full ID Investigations, the timeliness and quality of Full ID Investigations must be improved. In this Monitoring Period, ID closed 522 Full ID investigations—93% (n=488) of which were closed in over 120 days. As depicted below, there are over 1,000 pending Full ID Investigations.

---

[120] All investigations of incidents that occurred prior to 2018 have been closed.

| Investigation Status of UOF Incidents Occurring Between January 2018 and June 2022 as of July 15, 2022 | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Incident Date** | **2018** | | **2019** | | **2020** | | **2021** | | **Jan. to June 2022 (14th MP)** | |
| **Total UOF Incidents[121]** | 6,302 | | 7,494 | | 6,399 | | 8,413 | | *3,350* | |
| **Pending Intake Investigations** | 0 | 0% | 0 | 0% | 0 | 0% | 0 | 0% | *549* | *16%* |
| **Pending Full ID Investigations** | 0 | 0% | 0 | 0% | 0 | 0% | 724 | 9% | *302* | *9%* |
| **Closed Investigations** | 6,302 | 100% | 7,494 | 100% | 6,399 | 100% | 7,689 | 91% | *2,499* | *75%* |

## Intake Investigations

All use of force incidents that occurred in this Monitoring Period received an Intake Investigation. Outlined below is an assessment of those Intake Investigations.

- *Timing to Close Intake Investigations*: Intake Investigations are required to be completed within 25 business days of the incident date. In this Monitoring Period, while less than half of Intake Investigations closed within 25 business days, all but a handful of investigations were closed within 30 business days of the incident. Less than 1 % of all intake investigations are closed in over 30 business days. Timely investigations are critical and so the Monitoring Team will continue to closely scrutinize this. Overall, however, the fact that the time to close Intake Investigations is a few days after the 25-day deadline is not a significant deviation or cause for concern at this time.

- *Outcome of Intake Investigations*: The Intake Investigation can be closed by recommending no action, referring the case for further investigation via a Full ID investigation, or referring the case for some type of action (MOC, PDR, Re-Training, Facility Referral).[122] Since the inception of Intake Investigations in 2020, of all Intake Investigations conducted (17,331) 34% (n=5,867) were closed with no action,[123] 16% were referred for a Full ID Investigation, 44% were closed with a Facility Referral, 5% were closed with a re-training recommendation, and

---

[121] Incidents are categorized by the date they occurred, or date they were alleged to have occurred, therefore these numbers fluctuate very slightly across Monitoring Periods as allegations may be made many months after they were alleged to have occurred and totals are updated later.

[122] It is important to note that the results of the Intake Investigations, for the purpose of this chart, only identify the highest level of recommended action for each investigation. For example, while a case may be closed with an MOC and a Facility Referral, the result of the investigation will be classified as "Closed with an MOC" in the chart below.

[123] An Intake Investigation may close with no action because the identified violation was appropriately identified and addressed by the Rapid Review.

the smallest proportion are closed with an MOC or PDR (1%). While the proportion of cases closed with an MOC or PDR is small, this is likely because many of the cases requiring an MOC or PDR are often referred for a Full ID Investigation.

| Outcome of Intake Investigations as of July 31, 2022[124] | | | | | | |
|---|---|---|---|---|---|---|
| **Incident Date** | **February 3, 2020[125]-June 30, 2020 (10th MP)** | **July 1, 2020-December 31, 2020 (11th MP)** | **January 1, 2021-June 30, 2021 (12th MP)** | **July 1, 2021-December 31, 2021 (13th MP)** | **January 1, 2022-June 30, 2022 (14th MP)** | **Totals** |
| Pending Intake Investigation | 0 | 0 | 0 | 0 | 171 | 171 |
| **Closed Intake Investigation** | **2,492** | **3,272** | **4,468** | **3,916** | **3,183** | **17,331** |
| • *No Action* | *1,060* | *1,279* | *1,386* | *947* | *1,195* | *5,867* |
| • *MOC* | *47* | *28* | *48* | *36* | *21* | *180* |
| • *PDR* | *6* | *2* | *0* | *0* | *1* | *9* |
| • *Re-Training* | *148* | *226* | *342* | *91* | *32* | *839* |
| • *Facility Referrals* | *820* | *1,159* | *1,903* | *2,208* | *1,583* | *7,673* |
| • *Referred for Full ID* | *411* | *567* | *781* | *634* | *351* | *2,744* |
| **Total** | **2,492** | **3,272** | **4,468** | **3,916** | **3,354** | **17,502** |

o *Action Taken Following Close of Intake Investigations*: About half (n=1,583) of the Intake Investigations in this Monitoring Period closed with a Facility Referral for some level of misconduct found. The proportion of cases closed with a Facility Referral is consistent with the data in both Monitoring Periods in 2021. The second largest proportion of Intake Investigations are closed with no action[126] (38%). The proportion of cases closed with no action in this Monitoring is consistent with the proportion of cases closed with no action in the last two Monitoring Periods. Only about 1% of cases were referred for re-training. The number of cases referred for re-training has steadily

---

[124] Other investigation data is this report is reported *as of* July 15, 2021 while the Intake Investigation data is also reported *as of* July 31, 2021 because the data is maintained in two different trackers that were produced on two different dates. The number of pending Intake cases therefore varies between data provided "as of July 15, 2021" and "as of July 31, 2021," depending on which tracker was utilized to develop the necessary data.

[125] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[126] As discussed above, an Intake Investigation may close with no action because the identified violation was appropriately identified and addressed by the Rapid Review.

decreased. Only a small proportion of cases are closed with a referral for an MOC or PDR, which has been the case since Intake Investigations began in 2020.

o  *Referral for Full ID Investigations*:  In this Monitoring Period, about 89% of the 3,183 closed Intake Investigations of incidents from this Monitoring Period were closed following the completion of the Intake Investigations, while a little over 11% were referred for a Full ID Investigation. The Monitoring Team continues to find that *most* (but not all) cases are reasonably closed following the Intake Investigation and that referrals for further investigation are occurring as required. In this Monitoring Period, the Monitoring Team recommended 11 Intake Investigations were re-opened as they required further analysis or more investigation. It is worth noting that the proportion of cases referred for Full ID Investigations dropped in this Monitoring Period compared to the last two Monitoring Periods (17% in the Twelfth Monitoring Period, and 16% in the Thirteenth Monitoring Period). This reduction in referral for Full ID Investigations merits additional examination, which the Monitoring Team will undertake, to ensure that those cases requiring further investigation are referred for Full ID investigations.

o  *Findings of Intake Investigations with no Full ID Investigations*: The table below depicts the findings of all closed Intake Investigations as of July 31, 2022 **and** were not referred for Full ID Investigation, including whether the incident was "unnecessary," "excessive," and "avoidable." The Department and the Monitoring Team have not finalized an agreed up definition of these categories The definition of these findings and the development of corresponding data is complex, especially because it is quantifying subjective information where even a slight variation of the facts can impact the categorization of an incident. A concrete, shared understanding of what these categories are intended to capture is necessary to ensure consistency of assessment across the board. While efforts were made in the summer of 2021 to finalize this common definition, it was never finalized and languished at the end of 2021. It has not been reinvigorated given the focus on higher priority items this year and so this categorization process has also not been expanded to Full ID Investigations. While work remains to refine these categories (and expand to Full ID Investigations), it is notable that consistently about 20% of closed Intake Investigations (that are not referred for Full ID investigations) find that the force used was excessive, unnecessary, and/or avoidable. This does not account for the 2,744 (16% of all UOF incidents) with Full ID investigations, a proportion of which are also expected to fall in this category as well.

| Investigations Status<br>*As of July 31, 2022* | | | | | | |
|---|---|---|---|---|---|---|
| **Incident Date** | *Feb. 3[127]<br>to June<br>2020<br>(10th MP)* | *July to<br>Dec. 2020<br>(11th MP)* | *Jan. to<br>June 2021<br>(12th MP)* | *July to<br>Dec. 2021<br>(13th MP)* | *Jan. to<br>June 2022<br>(14th MP)* | *Totals* |
| **Closed Intake Investigations** | **2,492** | **3,272** | **4,468** | **3,916** | **3,183** | **17,331** |
| - *Referred for Full ID* | 411 | 567 | 781 | 634 | 351 | 2,744 |
| - *Investigations Closed at Intake* | 2,081 | 2,700 | 3,687 | 3,285 | 2,843 | 14,596 |
| *Findings of Investigations Closed at Intake* | | | | | | |
| Investigations Closed at Intake | 2,081 | 2,700 | 3,687 | 3,285 | 2,843 | 14,596 |
| • *Excessive, and/or Unnecessary, and/or Avoidable* | *180 (9%)* | *477 (18%)* | *734 (20%)* | *737 (22%)* | *521 (18%)* | *2,649 (18%)* |
| • *Chemical Agent Violation* | *164 (8%)* | *163 (6%)* | *260 (7%)* | *324 (10%)* | *276 (10%)* | *881 (6%)* |

- *Overall Assessment of Intake Investigations*: The Monitoring Team reviews thousands of Intake Investigations. Intake Investigations are an improvement from Preliminary Reviews (its predecessor) and have evolved since 2020 to include a more streamlined,[128] succinct, and reliable description of the incident. The Monitoring Team's extensive review of these investigations has revealed that while there is variation in quality among investigations, most Intake Investigations reasonably assess available evidence, appropriately identified potential violations and recommended appropriate action or further investigation when necessary. However, there is still room for improvements as the Monitoring Team continues to find cases in which the analysis of the available evidence was lacking, and as noted above are concerned by the outcome of some Intake Investigations. For example, in some cases Intake Investigations fail to identify operational or security failures that lead to an unnecessary force, particularly when an Emergency Response Team is involved. Other Intake Investigation deficiencies include failing to refer cases for a Full ID Investigation when the complex nature of the incident

---

[127] Incidents beginning February 3, 2020 received Intake Investigations, so those incidents from the early part of the Tenth Monitoring Period are not included in this data.

[128] As described in more detail in the Ninth Monitor's Report at pgs. 42-45.

or inmate allegations warrants further investigation. Further, the Monitoring Team is working with ID to determine whether the work and analysis for minor UOF incidents can be further streamlined since some cases reflect a significant amount of work that is not necessary. This would allow ID to conserve resources and deploy them for cases in which additional work is needed. Intake Investigations are clearly scrutinized within the ID Division as there continues to be significant back and forth between supervisors and investigators conducting Intake Investigations and the final versions of Intake Investigations demonstrate that feedback and guidance was provided to investigators to improve the quality of those investigations.

**Full ID Investigations**

Full ID Investigations are conducted for those cases that merit additional investigation beyond the Intake Investigation. The ID Division is struggling to complete Full ID investigations in a timely manner. ID has maintained a pending caseload of over 1,000 cases at the end of the last three Monitoring Periods (12th Monitoring Period (1,194), 13th Monitoring Period (1,182) and 14th Monitoring Period (1,026)). While the number of pending cases is not growing, and therefore it does not appear that a new backlog is accruing, the timing of Full ID investigations is protracted and must be improved.

- *Timing*: ID is required to complete Full ID investigations within 120 days of an incident. This Monitoring Period, ID closed a total of 522 Full ID investigations—93% (n=488) of which were closed in over 120 days. Further, of the 1,768 Full ID Investigations for incidents occurring between January 2021 and June 30, 2022, only 15% (n=263) were pending or closed within the time frame as demonstrated in the chart below.

| Status of Full ID Investigations for incidents that *occurred* between January 2021-June 2022 *As of July 15, 2022* | | | | |
|---|---|---|---|---|
| *Pending* less than 120 Days | *Closed* within 120 Days | *Closed* Beyond 120 Days | *Pending* Beyond 120 Days | Total |
| 204 | 59 | 623 | 882 | 1,768 |

- *Quality of Full ID Investigations*: The quality of Full ID investigations is mixed. Many Full ID investigations are thorough, complete, and represent sound judgment and analysis by investigators. However, others fail to properly analyze the available evidence, or take necessary investigative steps like interviewing staff and inmates. For example, in this Monitoring Period, the Monitoring Team recommended that five Full ID investigations be re-opened because the investigations were inadequate or incomplete. These five cases are only a sample of the inadequate investigations reviewed, and represent egregious instances of inadequate investigations. Many other investigations fall short of requiring the Monitoring Team's intervention, but nonetheless do not represent best practice. Further, the Monitoring Team identified that in at least some important cases that ID's assessment of the available evidence failed to reasonably consider whether Department policy had been violated. The Monitoring Team spoke directly with ID leadership about these cases, and while discussions were fruitful,

the findings in these cases suggest further scrutiny by the Monitoring Team must (and will) occur as additional improvements to the investigations are necessary.

## ID Staffing

The City is required to ensure that the Department has appropriate resources to conduct timely and quality investigations. Adequate staffing and appropriate case assignment are critical to conducting timely and quality investigations. The ID staffing levels at the end of each year since 2018 are presented in the chart below, as well as June of 2022, the end of the 14th Monitoring Period. The number of civilian and uniform staff serving as investigators has decreased from a high in 2020 (a combined 179) to a combined 157 in June 2022.

| ID Staffing Levels | | | | | |
|---|---|---|---|---|---|
| Position | Dec. 2018 | Dec. 2019 | Dec. 2020 | Dec. 2021 | June 2022 |
| *Executive Supervisors* | *12* | *16* | *15* | *15* | *13* |
| • Deputy Commissioner | 1 | 1 | 1 | 1 | 1 |
| • Assistant Commissioner | 1 | 1 | 1 | 1 | 1 |
| • Director/Acting Director | 4 | 6 | 4 | 4 | 3 |
| • Executive Director | 0 | 0 | 1 | 1 | 0 |
| • Deputy Director Investigator (DDI) | 6 | 8 | 8 | 8 | 8 |
| *Supervisors* | *30* | *41* | *38* | *36* | *35* |
| • Administrative Manager | 1 | 1 | 0 | 0 | 0 |
| • Supervising Investigator | 13 | 25 | 26 | 24 | 22 |
| • Supervisor ADW | 0 | 0 | 0 | 0 | 0 |
| • Investigator Captain | 16 | 15 | 12 | 12 | 13 |
| *Investigators* | *148* | *178* | *179* | *158* | *157* |
| • Investigator Civilian | 77 | 89 | 91 | 80 | 83 |
| • Investigator Correction Officer | 71 | 89 | 88 | 78 | 74 |
| *Support Staff* | *12* | *10* | *10* | *9* | *8* |
| **Total** | **201** | **245** | **242** | **217** | **213** |

- *Staff Assignments*: Outlined below is the assignment of Staff within the ID Divisions.

| Facility Team Staffing & Case Breakdown for Team with UOF Caseloads *As of July 15, 2022* | | |
|---|---|---|
| Number of Assigned Staff | | |
| Team/Unit | Supervisors[129] | Investigators |
| Intake Squad | 10 | 51 |
| Full ID | 8 | 35 |
| UPS | 0 | 4 |
| Totals | 18 | 90 |
| Other Teams | | |
| PREA (7 Teams) | 7 | 23 |
| Intel | 2 | 9 |
| Training | 1 | 1 |
| Arrest Team | 0 | 9 |
| K-9 | 1 | 4 |
| Administration and Tracking, Misc. | 3 | 12 |

- *Intake Investigators*: A significant number of investigators (n=51) are assigned to the Intake Squad, enabling them to investigate a large number of use of force incidents in a timely manner. The fluctuation in the number of UOF incidents means that there will always be a need to balance resources, but the current complement of Intake Squad investigators appear to reasonably accommodate the current caseloads.

- *Full ID Investigators*: As of the end of the Monitoring Period, there were only 35 investigators assigned to conduct Full ID Investigations compared with 51 in July 2021. At the end of the Monitoring Period (July 2022), each Full ID investigator had an average of 28 compared to an average of 23 cases per investigator in July 2021. This rising caseload is likely contributing to ID Divisions inability to timely close Full ID investigations.

- *Recruitment*: The Department is actively recruiting and hiring civilian investigators, for example 24 offers were extended for Civilian Investigator positions in this Monitoring Period, and this effort must continue with vigor. It is clear the ID Division needs to recruit and hire more staff if Full ID investigations are ever to be conducted within the 120-time frame required by the Consent Judgment.

---

[129] Nine DDIs oversee the supervisors of these teams. The DDIs are not included in the count of supervisors in this chart.

**Law Enforcement Referrals**

ID is required to promptly refer to the Department of Investigation ("DOI") any Staff Member whose conduct in a use of force incident appears criminal in nature. The Monitoring Team has consistently found that while there is significant concern about Staff conduct that most Staff conduct does appear to rise to the level of criminal in nature. This is consistent with the very small number of criminal prosecutions brought to date. In those cases that do require a referral, ID has promptly made these referrals. The Department and the relevant law enforcement agencies continue to collaborate and communicate about the status of cases that are referred for potential prosecution. In almost seven years since the effective date of the Consent Judgment, DOI has been referred (or taken over) a total of approximately 114 use of force cases. Of that already small group of UOF cases, only **eight** cases have resulted in criminal charges (with another eight still being considered) over the life span of the Consent Judgment as demonstrated in the chart below.

| Law Enforcement Referrals | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Date of Incident | 2014 & 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | Jan. to June 2022 | Total | |
| **Total** | **9** | **16** | **27** | **19** | **15** | **16** | **7** | **5** | **114** | |
| Criminal Charges Brought/ Trial Underway or Complete | 0 | 2 | 0 | 2 | 2 | 2 | **0** | **0** | 8 | 7% |
| Pending Consideration with Law Enforcement | 0 | 0 | 0 | 0 | 0 | 1 | **2** | **5** | 8 | 7% |
| Returned to ID | 9 | 14 | 27 | 17 | 13 | 13 | **5** | **0** | 98 | 86% |

As of September 2022, eight cases were pending investigation with law enforcement: two with DOI, five with the Bronx District Attorney ("DA"), and one with the U.S. Attorney's Office for the Southern District of New York ("SDNY").

Most of the cases considered for criminal prosecution will not be prosecuted. 90% or more of cases referred for possible criminal prosecution are returned to the Department with no criminal charges. That said, these cases often represent very concerning conduct that can and must be addressed administratively. It is why it is frustrating when any of these cases languish as they are passed from agency to agency to consider for potential criminal charges and then none are brought and, in the meantime, there is no accountability for the misconduct. A lengthy review period (with no prosecution) only compounds the delay in accountability when it is then returned to the agency. It is for this reason that the Monitoring Team has long recommended that the process to evaluate cases for criminal prosecution needs to occur as quickly as possible and all steps should be taken to minimize if not limit the impact on the Department's ability to proceed administratively with a matter.

**Use of Force Priority Squad**

The Use of Force Priority Squad ("UPS") is a useful tool to manage some of the most serious and complex use of force cases as it helps ID ensure that these cases obtain the necessary scrutiny and attention. ID expanded the use of UPS this Monitoring Period and the number of cases referred to UPS increased. 22 cases were referred to UPS in this Monitoring Period. Cases assigned to the UPS include

certain egregious incidents including cases in which a Staff Member was suspended, cases returned to ID following an assessment for criminal charges by law enforcement, and recommendations from the Monitoring Team. Five of the 22 referrals in this Monitoring Period were recommended by the Monitoring Team. UPS closed 15 cases in this Monitoring Period, eight of these 15 cases closed with charges, and each of these 15 incidents closed in well over 120 days. As of end of this Monitoring Period, UPS had 28 pending cases, most of which were already pending over 120 days. While the Department continues to rely on UPS, it has unfortunately not yet proven to be a mechanism to ensure investigations are conducted timely.

## Conclusion

The Department has overall made progress improving the timing and quality of investigation of use of force over the life of the Consent Judgment, thanks in large part to the elimination of Facility Investigations and development and implementation of the Intake Squad (as described in more detail in the Ninth Monitor's Report at pgs. 42-45). That said, significant work remains to ensure that Intake Investigations appropriately identify misconduct and refer cases to Full ID when warranted, and to improve the quality and timeliness of the investigations for the most serious and complex incidents which warrant Full ID investigations.

| COMPLIANCE RATING | ¶ 1. Partial Compliance<br>¶ 9 (a). Non-Compliance |
|---|---|

- **RISK MANAGEMENT (CONSENT JUDGMENT § X)**

| X. RISK MANAGEMENT ¶ 1 (EARLY WARNING SYSTEM) |
|---|

¶ 1. Within 150 days of the Effective Date, in consultation with the Monitor, the Department shall develop and implement an early warning system ("EWS") designed to effectively identify as soon as possible Staff Members whose conduct warrants corrective action as well as systemic policy or training deficiencies. The Department shall use the EWS as a tool for correcting inappropriate staff conduct before it escalates to more serious misconduct. The EWS shall be subject to the approval of the Monitor.

    a.    The EWS shall track performance data on each Staff Member that may serve as predictors of possible future misconduct.

    b.    ICOs and Supervisors of the rank of Assistant Deputy Warden or higher shall have access to the information on the EWS. ICOs shall review this information on a regular basis with senior Department management to evaluate staff conduct and the need for any changes to policies or training. The Department, in consultation with the Monitor, shall develop and implement appropriate interventions and services that will be provided to Staff Members identified through the EWS.

    c.    On an annual basis, the Department shall review the EWS to assess its effectiveness and to implement any necessary enhancements.

This provision of the Consent Judgment requires the Department to have a system to identify and correct Staff misconduct at an early stage which the Department has elected to do through the Early Intervention, Support and Supervision ("E.I.S.S.") Unit. Further, § A, ¶ (3)(c) of the Action Plan, which came into effect at the close of the Monitoring Period, requires the expansion of E.I.S.S. to support any staff on disciplinary probation and supervisors during their probationary period, and requires that each facility has at least one supervisor responsible for working with the E.I.S.S. Unit to support the uniform Staff that are in the E.I.S.S. program and address any deficiencies in supervision of those Staff that are identified.

**Overview of E.I.S.S. Work**

The goal of E.I.S.S. is to identify and support Staff whose use of force practices would benefit from additional guidance and mentorship in order to improve practice and minimize the possibility that Staff's behavior escalates to more serious misconduct. The table below depicts the work of E.I.S.S. between January 2020 and June 2022, the last five Monitoring Periods, and the last column in the table depicts the overall caseload of the program since its inception in August 2017. Between July and December 2021 (the 13th Monitoring Period), staffing issues both within the division and Department-wide significantly hampered the division's work. During this time, the uniform Staff assigned to E.I.S.S. were often re-deployed into the facilities. As such, E.I.S.S. leadership reported the unit elected to concentrate its work on the mentorship, education, and support of personnel undergoing monitoring versus screening and onboarding new Staff to the program, which is evident in the low number of staff screened and onboarded in the 13th Monitoring Period data below. As staffing issues subsided in the new year, E.I.S.S. screened and onboarded more Staff into the program—screening (or re-screening) 64 Staff, and selecting 50 (78%) Staff for the monitoring program based on those screenings. These Staff were selected for screening through referrals from the facilities (including via Rapid Reviews),

the Trials Division (including all those Staff who signed a Negotiated Plea Agreement ("NPA") this Monitoring Period) and ID (including Staff who were suspended for UOF related reasons).

| Overview of E.I.S.S. Work | | | | | | |
|---|---|---|---|---|---|---|
| | **Jan. to June 2020 (10th MP)** | **July to Dec. 2020 (11th MP)** | **Jan. to June 2021 (12th MP)** | **July to Dec. 2021 (13th MP)** | **Jan. to June 2022 (14th MP)** | **Program to Date – August 2017 to June 2022** |
| *Screening* | | | | | | |
| Staff Screened[130] | 158 | 60 | 82 | 35 | 64 | 929 |
| Staff Selected for Monitoring[131] | 38 (24%) | 35 (58%) | 53 (65%) | 24 | 50 | 465 |
| *Monitoring* | | | | | | |
| Staff Began Monitoring Term | 50 | 36 | 38 | 8 | 35 | 281 |
| Staff Actively Monitored[132] | 96 | 106 | 91 | 37 | 80 | |
| Staff Completed Monitoring | 9 | 29 | 17 | 4 | 12 | 160 |

**EISS Monitoring Program**

- *Monitoring Plans*: As part of placement in the E.I.S.S. program, monitoring plans are developed for each Staff Member by E.I.S.S. Staff with input from the Staff Member. The monitoring plans are designed to guide and track the Staff Member's progress in achieving their goals for improved practice. Leveraging these monitoring plans as a guide, E.I.S.S. continued bi-monthly meetings with all Staff in the monitoring program, and worked with the Academy to develop and roll out a use of force report writing tool to assist in the mentorship of Staff who historically had issues with report writing. These monitoring plans are also designed to help

---

[130] The number of Staff screened for each Monitoring Period may include some Staff who were screened in prior Monitoring Periods and were re-screened in the identified Monitoring Period. The "Program to Date" column reflects the total number of individual Staff screened. Staff are only counted once in the "Program to Date" column, even if the Staff Member was screened in multiple Monitoring Periods.

[131] Not all Staff selected for monitoring have been enrolled in the program. Certain Staff left the Department before monitoring began. Other Staff have not yet been placed on monitoring because they are on extended leaves of absence (*e.g.* sick or military leave) or are serving a suspension. Finally, E.I.S.S. does not initiate a Staff's monitoring term if the Staff Member has subsequently been placed on a no-inmate contact post due to the limited opportunity for mentorship and guidance.

[132] The total number of Actively Monitored Staff for each Monitoring Period includes all Staff who began monitoring during the period, remained in monitoring throughout the Monitoring Period, completed monitoring, or had been enrolled in monitoring (but not yet started).

guide facility leadership in their mentorship and discussions with the Staff Members in the program.

- *Engagement by Facility Leadership*: The E.I.S.S. program necessarily requires facility-level mentorship and guidance to support Staff while they conduct their regular duties. The engagement of facility leadership (Wardens) has been lacking since the program was developed, and suffered significantly in 2021 (the 12th and 13th Monitoring Periods) during the height of the staffing crisis. E.I.S.S. leadership reported renewed efforts to engage the facility leadership in the 14th Monitoring Period that led to more engagement from the Wardens. This included reinstating monthly meetings between E.I.S.S. and the Wardens at each facility and recommencing the requirement that Wardens provide written progress reports to E.I.S.S. To support the Wardens in the development of these reports, E.I.S.S. provided all Wardens with a template detailing the type of content and analysis a progress report should contain. E.I.S.S. leadership reported content in the progress reports has improved after sharing these templates. That said, the Wardens have many other competing priorities, so their bandwidth to provide individual mentorship to Staff in E.I.S.S. remains limited. Other facility supervision is necessary as discussed below.

- *Staff Participation*: An ongoing challenge for the unit is ensuring Staff attend the bi-monthly meetings scheduled with E.I.S.S. leadership. E.I.S.S. leadership reported Staff often do not attend these meetings as scheduled. E.I.S.S. is working with facility leadership and Department leadership to ensure better accountability and necessary backfilling of posts so that Staff can and do attend these meetings as scheduled.

**Expansion of Program Under Action Plan**

Following the issuance of the Action Plan, and after the close of the Monitoring Period, the E.I.S.S. unit began the process of expanding the monitoring program to include any Staff on disciplinary probation and supervisors during their probationary period. E.I.S.S. staff is coordinating with various stakeholders in the agency to gain access to the necessary information regarding those Staff on disciplinary probation including the reason for the probationary period so that monitoring plans can be developed and tailored to address the underlying conduct that resulted in the imposition of probation. The Monitoring Team recommends this coordination is prioritized and information is shared with E.I.S.S. as efficiently as possible. The unit also developed a job description and recruited for seven ADW positions who will serve as facility-based liaisons between the E.I.S.S. unit and the uniform staff that are in the E.I.S.S. program and provide on the ground support to those staff members. Interviews for this position will begin in the fall of 2022.

**Staffing for E.I.S.S. Unit**

While the new ADW positions will add significant support to the E.I.S.S. program, the unit itself continues to require additional support, particularly as the expansion of the program to include all

Staff on disciplinary probation may result in double the number of Staff currently monitored under E.I.S.S. The unit currently consists of three civilian staff and two uniform Staff (in prior Monitoring Periods there were four uniform Staff supporting the unit). The unit currently has lines to add three additional civilian employees, but progress towards filling these roles has been slow.

**Conclusion**

The Department's E.I.S.S. unit is now back to conducting the work of the unit after a period of limited work in the 12th and 13th Monitoring Periods when the staffing crisis halted facility-based support for the program and stymied the efforts of the E.I.S.S. unit as their dedicated uniform staff were pulled back into the facilities. The unit appears to be turning a corner in this transformation phase, but that must be supported with adequate resources in order to succeed, and requires support from stakeholders throughout the Department to execute the expanded scope under the Action Plan. It remains to be seen whether the necessary resources, support, and overall expanded execution can succeed.

| COMPLIANCE RATING | ¶ 1. Partial Compliance |
|---|---|

- **STAFF DISCIPLINE AND ACCOUNTABILITY (CONSENT JUDGMENT § VIII & REMEDIAL ORDER § C)**

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 1**
**(TIMELY, APPROPRIATE AND MEANINGFUL ACCOUNTABILITY)**

**REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY) ¶ 1**
**(IMMEDIATE CORRECTIVE ACTION)**

**VIII. STAFF DISCIPLINE AND ACCOUNTABILITY ¶ 3 (C) (USE OF FORCE VIOLATIONS)**

§ VIII. ¶ 1. The Department shall take all necessary steps to impose appropriate and meaningful discipline, up to and including termination, for any Staff Member who violates Department policies, procedures, rules, and directives relating to the Use of Force, including but not limited to the New Use of Force Directive and any policies, procedures, rules, and directives relating to the reporting and investigation of Use of Force Incidents and video retention ("UOF Violations").

§ C. ¶ 1. *Immediate Corrective Action*. Following a Use of Force Incident, the Department shall determine whether any involved Staff Member(s) should be subject to immediate corrective action pending the completion of the Use of Force investigation, which may include counseling or re-training, reassignment to a different position with limited or no contact with Incarcerated Individuals, placement on administrative leave with pay, or immediate suspension (collectively, "immediate corrective action"). The Department shall impose immediate corrective action on Staff Members when appropriate and as close in time to the incident as practicable. The Department shall document and track any immediate corrective action taken, the nature of the initial corrective action recommended, the nature of the corrective action imposed, the basis for the corrective action, the date the corrective action is imposed, and the date of the Use of Force Incident resulting in the immediate corrective action. The requirements in this provision are not intended to alter the rights of Staff or the burden of proof in employee disciplinary proceedings under applicable laws and regulations.

§ VIII. ¶ 3. In the event an investigation related to the Use of Force finds that a Staff Member committed a UOF Violation: . . .

    c.  The Trials Division shall prepare and serve charges that the Trials Division determines are supported by the evidence within a reasonable period of the date on which it receives a recommendation from the DCID (or a designated Assistant Commissioner) or a Facility, and shall make best efforts to prepare and serve such charges within 30 days of receiving such recommendation. The Trials Division shall bring charges unless the Assistant Commissioner of the Trials Division determines that the evidence does not support the findings of the investigation and no discipline is warranted, or determines that command discipline or other alternative remedial measures are appropriate instead. If the Assistant Commissioner of the Trials Division declines to bring charges, he or she shall document the basis for this decision in the Trials Division file and forward the declination to the Commissioner or designated Deputy Commissioner for review, as well as to the Monitor. The Trials Division shall prosecute disciplinary cases as expeditiously as possible, under the circumstances.

## Section by Section Analysis

This compliance assessment evaluates the provision the requires the Department to impose timely, appropriate, and meaningful accountability for use of force related violations (Consent Judgment § VII., ¶ 1), the Department's use of immediate corrective action (First Remedial Order § C., ¶ 1), as well as the expeditious prosecution of cases for formal discipline by the Trials Division (Consent Judgment § VII., ¶3(c) together. The introduction of this report includes relevant data through September 2022. However, this compliance assessment only covers the Fourteenth Monitoring Period, which covers January to June 2022.

145

**Accountability**

Staff discipline comes in many forms and can be imposed by a variety of different actors within the Department, at various stages. All forms of accountability are important. Overall, although the Department is on a path toward improvement, the Department does not currently hold Staff accountable in a timely manner, which inherently undermines the meaningfulness of the discipline and ability to impact future behavior.

The Department ***identifies*** misconduct via Rapid Reviews, ad hoc review of incidents by civilian and uniform leadership, Intake Investigations (and formerly Preliminary Reviews), and through Full ID investigations. The Department has various structures to ***respond*** to misconduct, including: corrective interviews, 5003 counseling, re-training, Command Disciplines ("CD"), suspensions, and placing an individual on modified duty. PDRs are utilized to address misconduct of *probationary* Staff. For *tenured* Staff, formal discipline is imposed through the Department's Trials Division, generally via a Negotiated Plea Agreement ("NPA").[133]

*Overview of Accountability*: The table below provides an overview of the accountability for use of force related misconduct imposed between January 2019 and June 2022. In general, the Department issued more use of force related accountability (n=1,260) during the Current Monitoring Period than previously. The combination of corrective interviews, Command Discipline and formal discipline means that Staff are being held accountable more often when their conduct violates the Use of Force policy. That said, as discussed throughout this section, much of the accountability is being issued for incidents that occurred in the distant past (particularly formal discipline, where Trials is working through a significant backlog of cases). Furthermore, as discussed in detail below, a significant number of Command Disciplines are not being issued due to technical/clerical errors. Finally, the Monitoring Team's review of incidents continues to suggest that at least some misconduct may go undetected by the various investigatory structures. Thus, while a greater number of accountability actions were taken during the current Monitoring Period, it is likely that additional accountability was also warranted in a significant number of cases. Each type of accountability measure is discussed in more detail below.

---

[133] A Negotiated Plea Agreement is an agreed upon settlement between the Respondent uniform Staff and the Trials Division attorneys.

| Staff Accountability for Use of Force Related Misconduct Imposed, 2019 to 2022 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Jan.-June 2019 8th MP | July-Dec. 2019 9thMP | Jan.-June 2020 10th MP | July-Dec. 2020 11th MP | Jan.-June 2021 12th MP | July-Dec. 2021 13th MP | Jan.-June 2022 14th MP |
| Support and Guidance Provided to Staff | | | | | | | |
| Corrective interviews and 5003 counseling | 1,769[134] | 931[135] | 263[136] | 1,115 | 1,494 | 1,711 | 1,631 |
| Corrective interviews (resulting from CDs) | 42 | 11 | 10 | 22 | 15 | 20 | 22 |
| Corrective Action—Command Discipline & Suspensions | | | | | | | |
| CD – Reprimand | 66 | 90 | 37 | 89 | 149 | 115 | 110 |
| CDs (resulting in 1-5 days deducted) | 390 | 489 | 263 | 410 | 508 | 276[137] | 233 |
| Suspensions | 24 | 24 | 38 | 42 | 52 | 23 | 26 |
| *Total* | *480* | *603* | *338* | *541* | *709* | *414* | *369* |
| Formal Discipline | | | | | | | |
| PDRs | 31 | 50 | 34 | 15 | 2 | 0 | 0 |
| NPAs | 85 | 135 | 161 | 166 | 214 | 227 | 891 |
| *Total* | *116* | *185* | *195* | *181* | *216* | *227* | *891* |
| All Staff Accountability | | | | | | | |
| *Total* | *596* | *788* | *533* | *722* | *925* | *641* | *1,260* |

- *Command Discipline*

A Command Discipline ("CD") is one of the most significant corrective actions that can be imposed at the facility-level. They are a useful accountability tool because they can be completed so close-in-time to when an incident occurs and result in either days deducted, corrective interviews, or reprimands. Overall, the Monitoring Team supports the use of Command Discipline as a sizable number of the misconduct identified relates to lower level operational and procedural errors so a sanction via a Command Discipline is appropriate and allows for facility leadership to take ownership and respond to

---

[134] Counseling that occurred in this Monitoring Period was focused on a more holistic assessment of the Staff Member's conduct pursuant to specific standards set by § X (Risk Management), ¶ 2 that has been subsequently revised. *See* Eighth Monitor's Report at pgs. 172-173.

[135] The identification of Staff for counseling was in transition in the Ninth Monitoring Period as a result of a recommendation by the Monitoring Team. *See* Ninth Monitor's Report at pgs. 194-196.

[136] The Department transitioned the process for identifying Staff for counseling during this Monitoring Period. *See* Tenth Monitor's Report at pgs. 168 to 170.

[137] Based on the most recent information the Monitoring Team had as of the writing of this report, 251 CDs were still pending from this time period.

their staff's misconduct in a fair and quicker manner than the formal discipline process. (*See e.g.* Eleventh Monitor's Report at pgs. 81-82). In fact, because of the prior limitations on CDs, the Trials Division created a mechanism to essentially mimic and expand the use of Command Disciplines so it could more appropriately address certain lower-level misconduct using a Command Discipline via a Negotiated Plea Agreement (which can impose a sanction of up to five compensatory days) or offering that the imposed discipline (generally between five and 20 days) will only remain on the Staff Member's record for one year[138] instead of five years.[139] It is for these reasons that revisions to the Command Discipline policy, described in the introduction to this section of the report, which would allow for the expanded use of this essential accountability tool, is appropriate and necessary to ensure that the Department has a practical, effective mechanism to respond to the variety of use of force misconduct. That said, as demonstrated in the data below, the Department must fortify the reliability of the CD process to ensure that recommended CDs are in fact adjudicated and imposed.

The table below includes all CDs referred from Rapid Reviews since the Eighth Monitoring Period. For the Fourteenth Monitoring Period, **408** of 907 recommended CDs (45% of all referrals) resulted in days deducted, a reprimand, a corrective interview, or a MOC.

These data highlight that CDs must be properly managed to ensure they are appropriately adjudicated. For instance, while large numbers of CDs have been recommended during the past several Monitoring Periods, about one-third of them were dismissed. While a dismissal of a CD may be appropriate at times, the high dismissal rate suggests that something is amiss with the process. Of the 345 cases dismissed or not processed during the current Monitoring Period:

o   30% (n=104) were dismissed for factual reasons including in response to a hearing on the merits, or because a Staff Member resigned/retired/was terminated.

o   70% (n=241) were dismissed because of due process violations (meaning the hearing did not occur within the required timeframes outlined in policy), because of a clerical error which invalidated the CD, or because the CD was not entered into CMS at all or not drafted within the required timeframe. It is this 70% of dismissals that are of concern to the Monitoring Team because they signal a lack of proper management of an essential accountability tool.

---

[138] The case will not be removed from the Staff Member's file if during this one-year period, the Staff Member is served with new charges on a Use of Force incident occurring after the date of signature on the Negotiated Plea Agreement.

[139] Cases are generally considered for this type of resolution when the proposed discipline is for approximately 6 to 15 compensatory days and it is the Staff Member's first offense.

| Status and Outcome of Command Disciplines Recommended by Rapid Reviews As of June 2022 | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Month of Incident/Rapid Review | Total # of CDs Recommended | Still Pending in CMS* | | Resulted in 1-5 Days Deducted | | Resulted in MOC | | Resulted in Reprimand | | Resulted in Corrective Interview | | Dismissed at Hearing or Closed Administratively in CMS | | Never Entered into CMS | |
| 8th MP | 757 | 5 | 1% | 390 | 52% | 50 | 7% | 66 | 9% | 42 | 6% | 180 | 24% | 15 | 2% |
| 9th MP | 878 | 2 | 0% | 489 | 56% | 72 | 8% | 90 | 10% | 11 | 1% | 180 | 21% | 26 | 3% |
| 10th MP | 492 | 3 | 1% | 263 | 53% | 37 | 8% | 10 | 2% | 110 | 22% | 39 | 8% |
| 11th MP | 948 | 12 | 1% | 410 | 43% | 78 | 8% | 89 | 9% | 22 | 2% | 289 | 30% | 43 | 5% |
| 12th MP | 1229 | 41 | 3% | 511 | 42% | 131 | 11% | 150 | 12% | 15 | 1% | 318 | 26% | 65 | 5% |
| 13th MP | 1126 | 43 | 4% | 282 | 25% | 150 | 13% | 118 | 10% | 22 | 2% | 411 | 37% | 96 | 9% |
| 14th MP | 907 | 154 | 17% | 233 | 26% | 43 | 5% | 110 | 12% | 22 | 2% | 260 | 29% | 85 | 9% |

*CDs pending more than a year are not tracked in the CD reports analyzed for this chart and therefore may still appear pending although it is likely they have since been dismissed.

A significant proportion of the cases referred for Command Discipline (n=154, or 17%) were still pending as of the end of the Monitoring Period as they were referred towards the end of the Monitoring Period and so the time to complete adjudication has not occurred yet.

In summary, Rapid Reviews often rely on Command Disciplines as the recommended corrective action for a violation, which is a reasonable and appropriate response. However, improvement is needed to minimize administrative errors and management failures from being processed as it creates a significant lost opportunity to hold staff accountable for poor conduct.

- *Immediate Corrective Action*

The need for immediate corrective action is essential for ensuring that blatant misconduct is addressed in a timely fashion. Rapid Reviews, *ad hoc* reviews by uniform or civilian leadership through routine assessment of incidents, and Intake Investigations all identify misconduct for immediate corrective action. Immediate corrective action (suspension, re-assignment, counseling, and Command Disciplines) is a necessary tool for addressing misconduct because it allows the Department, close-in-time to the incident, to hold Staff to a common standard for utilizing force, particularly when deviations from that standard are immediately obvious upon the incident's review. The Department utilized the following immediate corrective actions during this Monitoring Period:

| Immediate Corrective Action Imposed for UOF Related Misconduct by Incident Date | | | | | |
|---|---|---|---|---|---|
| Type | Jan.-June 2020 | July-Dec. 2020 | Jan.-June 2021 | July-Dec. 2021 | Jan.-June 2022 |
| Counseling and Corrective Interviews | N/A | 1,337 | 1,509 | 1,733 | 1,653 |
| CD – Reprimand | 37 | 89 | 150 | 118 | 110 |
| CDs (resulting in 1-5 days deducted) | 263 | 410 | 511 | 282 | 233 |
| Suspension | 38 | 42 | 52 | 23 | 27 |
| Non-Inmate Contact Post or Modified Duty | 4 | 1 | 3 | 3 | 12 |

| | | | | | |
|---|---|---|---|---|---|
| *Suspensions & Non-Inmate Contact Post or Modified Duty* | *42* | *43* | *55* | *26* | *39* |
| **Grand Total Immediate Action** | **342** | **1,879** | **2,221** | **2,148** | **2,035** |

The Department identifies a significant number of instances that merit immediate action. Counseling sessions are the most recommended response to identified misconduct as they are an opportunity for supervisors to provide feedback and guidance, which is the key component of effective and good leadership. As discussed in previous reports, the quality of a counseling session is nearly impossible to effectively measure or quantify. Based on the current state of affairs at DOC, and the Monitoring Team's overall assessment of supervision in the Department, there is a dearth of strong and effective leadership at DOC. Which means the quality of the counseling sessions are not currently expected to be particularly effective. That said, the fact that the Department is identifying Staff that require counseling, and that these meetings are happening, is a critical *first* step in improving the management of Staff. As noted above, the use of CDs is reasonable and can and should be expanded, including improvement in ensuring that CDs are processed as required. Finally, the Department's use of suspensions and/or non-inmate contact/modified duty as an immediate corrective action is critical given the importance of a timely response to misconduct and the otherwise protracted disciplinary process. While the Department's use of suspensions began to decline in the summer of 2021 during the staffing crisis, the use of non-inmate contact and modified duty increased in this Monitoring Period so overall the number of Staff that received a significant close in time response (suspension, non-inmate contact post, or modified duty) increased in this Monitoring Period compared with last (n=39 compared with 26 in the last Monitoring Period).

- *Status of Cases Referred for Formal Discipline*

Overall, between November 1, 2015 and June 30, 2022, formal discipline has been imposed on tenured Staff in at least 3,710 *cases* (involving approximately 2,306 individual Staff Members).[140] The table below presents the status of all cases referred for formal discipline (by *incident date*). These data illustrate that over 700 cases regarding incidents that took place more than a year ago (*i.e.*, 2020 or earlier) remain pending, and thus the opportunity for *timely* discipline has clearly been lost.

It is important to note that the number of cases pending are related to individual staff actions versus use of force incidents. For instance, in 2020, there are 678 individuals cases that cover 459 use of force incidents. With respect to cases related to incidents from 2021 and 2022, many of the investigations of more recent incidents have not been closed yet and where misconduct is substantiated has been

---

[140] The tracking of disciplinary data was not routinely kept until 2017 so additional discipline may have been imposed between November 1, 2015 and January 2017, but was not formally accounted for.

referred to the Trials Division. The bottom row of the table below illustrates this: a total of 724 incidents from 2021 remain under investigation, along with a total of 851 incidents that occurred between January and June 2022.

Addressing cases closer in time to the incident will only consistently occur once the Trials backlog has been eliminated and ID is able to close cases more quickly. The data on the number of cases from January to June 2022 that have been *referred* for formal discipline (n=37) is lower than expected, particularly when compared to prior years' data (*e.g.*, at this same point in 2021, 122 cases had been referred for formal discipline; *see* pg. 99 of the Twelfth Monitor's Report). The Monitoring Team intends to apply additional scrutiny to better understand this apparent decrease.

| Status of Cases of Disciplinary Cases & Pending Investigations by Date of Incident *As of June 2022* | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Pre-2016 | | 2016 | | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | Jan. to June 2022 | | Total | |
| Total Individual Cases | 682 | | 471 | | 620 | | 785 | | 1010 | | 678 | | 556 | | 37 | | **4839** | |
| Closed Cases | 682 | 100% | 467 | 99% | 577 | 93% | 662 | 84% | 708 | 70% | 378 | 56% | 230 | 41% | 6 | 16% | 3710 | 77% |
| Pending Cases | 0 | 0% | 4 | 1% | 43 | 7% | 123 | 16% | 302 | 30% | 300 | 44% | 326 | 59% | 31 | 84% | 1129 | 23% |
| Unique UOF Incidents | | | | | | | 458 | | 599 | | 459 | | 442 | | 35 | | | |
| Pending Investigations | 0 | | 0 | | 0 | | 0 | | 0 | | 0 | | 724 | | 851 | | **1,575** | |

As noted in the Twelfth Monitor's Report, the number of referrals to the Trials Division peaked in 2021 following the elimination of the ID backlog (which at its height was 8,000 cases). Because these referrals were generated from the backlog of investigations, they tended to address misconduct that had occurred several years prior. Now that the ID backlog has been resolved, the cases being referred to Trials are more contemporaneous, but the speed with which cases are investigated and referred must still be improved. As of the end of the current Monitoring Period, 1,575 investigations were pending with ID (half of which occurred in 2021 and the other half occurred in 2022). At least 1,026 of those 1,575 cases are pending Full ID investigations versus the less arduous Intake Investigation. While disciplinary referrals are not expected to be necessary at the conclusion of every investigation, the likelihood of disciplinary charges is greater for those matters in which a Full ID investigation is being conducted, and therefore the number of referrals for formal discipline is expected to increase. Once again, this suggests that additional scrutiny is needed to fully interpret the 2022 data in the table above.

The reduction in the number of cases pending with Trials is presented in the chart below. As of the end of June 2022, the number of cases pending was 40% lower than the number pending at the end of 2021. This decrease is due to two factors: (1) now that the investigation backlog has largely been

resolved, ID is now referring fewer cases and (2) the Trials Division closed a significant number of cases (n=1,096) during the current Monitoring Period, as discussed in more detail in the next section.

| Disciplinary Cases Pending *as of June 2022* | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| As of the last day of… | June 2018 (6th MP) | Dec. 2018 (7th MP) | June 2019 (8th MP) | Dec. 2019 (9th MP) | June 2020 (10th MP) | Dec. 2020 (11th MP) | June 2021 (12th MP) | Dec. 2021 (13th MP) | June 2022 (14th MP) |
| Pending Cases | *146* | *172* | *407* | *633* | *1,050* | *1,445* | *1,917* | *1,911* | *1,129* |

- *Discipline Imposed*

The table below shows the number of disciplinary cases closed by the Department every year since 2017 and the type of disposition. The Trials Division closed more cases during the first six months of 2022 (n=1,096) than in any other ***full year*** of monitoring. In fact, the number of NPAs imposed during the first six months of 2022 (n=891) is more than the number of NPAs imposed in 2020 and 2021 **combined** (n=777).

| Disciplinary Cases Closed by Department By Date of Ultimate Case Closure | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | Jan to June 2022 | |
| Total Cases Resolved | 487 | | 513 | | 268 | | 382 | | 575 | | 1,096 | |
| NPA | 395 | 81% | 483 | 94% | 221 | 82% | 327 | 86% | 450 | 78% | 891 | 81% |
| Adjudicated/Guilty | 4 | 1% | 3 | 1% | 0 | 0% | 4 | 1% | 16 | 3% | 21 | 2% |
| | | | | | | | | | | | | |
| Administratively Filed | 68 | 14% | 18 | 4% | 33 | 12% | 31 | 8% | 33 | 6% | 58 | 5% |
| Deferred Prosecution | 20 | 4% | 7 | 1% | 12 | 4% | 16 | 4% | 75 | 13% | 125 | 11% |
| Not Guilty | 0 | 0% | 2 | 0% | 2 | 1% | 4 | 1% | 1 | 0% | 1 | 0% |

Among the 891 NPAs imposed during the first half of 2022, 129 (12%) addressed misconduct that occurred within one year of case closure, 251 (23%) addressed misconduct that occurred between 1 and 2 years prior, 349 (32%) addressed misconduct that occurred 2 to 3 years prior, and 367 (33%) addressed misconduct that occurred more than three years before the case was ultimately resolved. The fact that discipline is so divorced in time from when the misconduct occurred critically detracts from the meaningfulness of the discipline and the ability to intervene timely and prevent subsequent misconduct. For now, the delays are inescapable given the volume of cases in ID and the backlog in Trials.

| Time Between Incident Date and Case Closure or Pending as of June 30, 2022 | | | | | | |
|---|---|---|---|---|---|---|
| | Closed Discipline | | Pending Discipline | | Total | |
| 0 to 1 year from incident date | 129 | 12% | 186 | 16% | 315 | 14% |
| 1 to 2 years from incident date | 251 | 23% | 317 | 28% | 568 | 26% |
| 2 to 3 years from incident date | 349 | 32% | 317 | 28% | 666 | 30% |
| More than 3 years from incident date | 367 | 33% | 309 | 27% | 676 | 30% |
| Total | 1,096 | | 1,129 | | 2,225 | |

- *Disciplinary Continuum*

It is critical for the Department to have a continuum of disciplinary options because the severity of misconduct varies, and so that discipline can become progressively more severe for subsequent misconduct by an individual. As shown in the table below, the Department imposes a broad spectrum of sanctions from Command Disciplines of up to a maximum of 5 day penalty,[141] to more significant penalty days via formal discipline, to termination. During this Monitoring Period, 27% of the discipline imposed via NPA was for a sanction of 1 to 9 days, 40% of the discipline imposed was for a sanction of 10 to 29 days and the final 30% of discipline imposed was for a sanction of 30 days or more. Overall, the range of penalties imposed appears to be congruent with the severity of misconduct identified by the Monitoring Team.

| Penalty Imposed for UOF Related Misconduct NPAs | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Date of Formal Closure | 2017 | | 2018 | | 2019 | | 2020 | | 2021 | | Jan to June 2022 | |
| Total | 395 | | 483 | | 221 | | 327 | | 450 | | 891 | |
| Refer for Command Discipline[142] | 71 | 18% | 66 | 14% | 3 | 1% | 1 | >1% | 4 | 1% | 13 | 1% |
| 1-5 days | 31 | 8% | 147 | 30% | 53 | 24% | 80 | 24% | 64 | 14% | 189 | 21% |
| 6-9 days | 14 | 4% | 19 | 4% | 6 | 3% | 14 | 4% | 29 | 6% | 51 | 6% |
| 10-19 days | 62 | 16% | 100 | 21% | 57 | 26% | 83 | 25% | 109 | 24% | 261 | 29% |
| 20-29 days | 74 | 19% | 58 | 12% | 42 | 19% | 46 | 14% | 64 | 15% | 95 | 11% |
| 30-39 days | 42 | 11% | 42 | 9% | 21 | 10% | 32 | 10% | 43 | 10% | 97 | 11% |
| 40-49 days | 27 | 7% | 30 | 6% | 4 | 1% | 17 | 5% | 53 | 11% | 69 | 8% |
| 50-59 days | 14 | 4% | 4 | 1% | 17 | 8% | 17 | 5% | 18 | 4% | 40 | 5% |
| 60 days + | 48 | 12% | 12 | 2% | 11 | 5% | 28 | 9% | 42 | 9% | 72 | 8% |
| Retirement/Resignation | 12 | 3% | 5 | 1% | 7 | 3% | 9 | 3% | 24 | 6% | 4 | 0% |
| | | | | | | | | | | | | |
| Termination | 0 | | 1 | | 0 | | 0 | | 4 | | 6 | |

[141] Trials no longer settles a case for undetermined number of Command Discipline days, which would require a hearing at the facility for the reasons discussed in the Seventh Monitor's Report at pgs. 42-44.

[142] As discussed in the Seventh Monitor's Report (at pgs. 42-44), NPAs referred for CDs were previously adjudicated at the Facilities after being referred from the Trials Division which was rife with implementation issues. This problem has been corrected and now the Trials Division will negotiate a specific number of days (1 to 5) to be imposed and those specific days will be treated as a CD, rather than an NPA (the main difference is the case remains on the Staff Member's record for one year instead of five years).

In terms of evaluating the Department's overall efforts to impose appropriate discipline and that it is consistent with the Disciplinary Guidelines, the Monitoring Team considers: (1) the specific facts of the case (including the aggravating and mitigating factors, the Staff's prior history, and other circumstances as appropriate), (2) the time taken to impose discipline (discussed throughout the report), and (3) the proportionality of the sanctions imposed. The Monitoring Team assessed almost 400 of the cases closed *with discipline* in this Monitoring Period *and the incident occurred after October 27, 2017* to determine whether the discipline imposed was reasonable and appeared consistent with the Disciplinary Guidelines (note, additional cases were closed in this Monitoring Period that occurred prior to October 27, 2017, but were not considered as part of this assessment).

The Monitoring Team's evaluation of the specific sanctions were generally reasonable, with the Monitoring Team finding around 80% of the cases (approximately 315 cases) had reasonable outcomes. About 19% of cases closed with questionable outcomes, which is not to say that they were blatantly disproportional, but rather that a more severe penalty *may* have been appropriate, but mitigating factors of the individual cases and the interest in resolving the cases more quickly (versus further time in negotiations and prosecution) may have favored closure of the case with a lower sanction. Finally, a few isolated cases (only 5 cases) appeared to have an unreasonable outcome — meaning, the disposition did not appear proportional to the severity of the misconduct. These findings are similar to those made in other Monitoring Periods where fewer cases were closed.

With respect to termination of Staff for use of force misconduct, it is worth noting that more tenured Staff have been terminated in this Monitoring Period than in the last five years combined (in which 5 staff were terminated between 2017 and 2021). As discussed in more detail below, this is also likely a reflection that the Report & Recommendations from OATH ALJ's more closely align with the disciplinary guidelines.

- *Discipline Not Imposed*

At times, cases referred for discipline may not ultimately result in a sanction imposed either because the Staff member resigns or retires before the prosecution is complete or because the charges are dismissed.

- Deferred Prosecution: These are cases in which the Staff chose to leave the Department *with charges pending* and before the case is resolved. Such cases are categorized as "deferred prosecution" because no final determination has been rendered but the facts suggest the case should not be dismissed. This disposition has become increasingly common and appears to be related to the large number of Staff who have left the Department in recent years. During this Monitoring Period, 11% of cases (n=125) and 13% of cases in 2021 (n=75) were resolved with a deferred prosecution, compared to an average of 4% in prior years. When this occurs, the Department defers prosecution, which would then proceed if the Staff Member were to

return to the Department in the future. If the Staff Member should return to DOC, then the Department would proceed with prosecuting the case.

- <u>Administratively Filed Cases</u>: Administrative filings occur when the Trials Division determines that the charges cannot be substantiated or pursued (*e.g.*, when the potential misconduct could not be proven by a preponderance of the evidence, or when a Staff Member resigns before charges are served). In other words, these cases are dismissed. During this Monitoring Period, 58 cases were closed with administrative filings, which represents about 5% of case closures. This is within the realm of reasonable and similar (although slightly smaller) proportion of cases administratively filed cases in the last two years. The Monitoring Team has consistently found that most cases dismissed via administrative filing have an objectively reasonable basis and the Department was therefore maintained Substantial Compliance with this requirement in the Twelfth Monitoring Period. The Monitoring Team intends to prioritize evaluation of the administratively filed cases in the next Monitoring Period.

**Expeditious Prosecution of Cases**

The Department's ability to prosecute cases expeditiously has been of significant concern for years and the slow rate of progress has resulted in requirements to address the many facets of the disciplinary process through the First Remedial Order (§ C. ¶¶ 3 to 5), the Third Remedial Order, and now the Action Plan (§ F).[143] The Trials Division must coordinate with multiple stakeholders to resolve a case, including the respondent (and their counsel) as well as OATH (to the extent a Pre-Trial Conference or trial is needed). The Monitoring Team's timeliness assessment (and data in the tables below) begins *after* the investigation has been closed and referred and examines the time required to process a case *within* the Trials Division.

Ultimately, expeditious prosecution of cases will not occur until the backlog of cases has been eliminated and the process to resolve cases is streamlined. That said, important progress has been made on both fronts. These improvements are the result of many different practices, policies, and procedures that had to be closely scrutinized, dissected and then revamped over the years as outlined in multiple Monitor's Reports. A significant amount of this work was led by the former Deputy Commissioner of ID and Trials (and the first Disciplinary Manager), in close collaboration with the Monitoring Team, and continued upon her termination. The retooling of the disciplinary process first began with revising the process for the service of charges, which was found to be in Non-Compliance in the Third Monitoring Period because charges were being served beyond the time allowed. In relatively short order, the

---

[143] The process for imposing discipline was outlined in the Second Remedial Order Report at pgs. 6-8.

Department developed and implemented a process to serve charges timely and has now been in Substantial Compliance for 5 years (and 8 Monitoring Periods).[144]

Overall, the Trials Division's delay in prosecuting cases has generally never been a question of effort and the Monitoring Team has noted in multiple reports that the Trials staff have worked harder and more efficiently with each passing year and there is no question that their determination continued during this Monitoring Period, led by the Acting Disciplinary Manager during the first 6-months of the year,[145] and the results are commendable. A new leadership team for the Trials Division was installed following the close of this Monitoring Period and the Commissioner appointed a new Disciplinary Manager.

Detailed below are the steps taken in this Monitoring Period[146] to expeditiously prosecute cases.

- **Closed Cases**: As discussed above, Trials closed 1,096 cases during the current Monitoring Period, which is more than the number of cases closed in 2020 and 2021 combined. This increase in the number of cases closed has had a corresponding impact on the size of the Trials backlog. The number of pending cases (n=1,129) is down 40% from the end of the previous Monitoring Period. The increased number of closed cases means that the number of cases pending with the Trials Division is finally decreasing demonstrating the impact of case closures on the backlog.

- **Time to Close Cases:** The length of time to case closure—measured from the date the case was referred from ID—has increased every Monitoring Period since 2019 when the referral of cases from the ID backlog began and Trials' own backlog began to grow. During this Monitoring Period, 65% (n=668) of cases were closed more than a year after referral from ID. While clearly not ideal, this was expected given the nature of a backlog. This reinforces the point the Monitoring Team has stressed that the backlog must be resolved in order for cases to be processed in a timely manner.

---

[144] Given the long track record of Substantial Compliance, the Monitoring Team did not assess the time to serve charges in this Monitoring Period. The Monitoring Team will assess the service of charges in future Monitoring Periods as appropriate.

[145] Towards the end of the Fourteenth Monitoring Period, a new Deputy Commissioner of the Trials Division was appointed who would also serve as the Disciplinary Manager. Following the close of the Fourteenth Monitoring Period, the former Acting Disciplinary Manager and one Executive Director both left the Department and a new leadership team was installed.

[146] The Monitoring Team incorporates by reference the update on the disciplinary process outlined in the June 30, 2022 report (dkt. entry) at pgs. 27 to 39.

| Time from Referral to Trials to Complete Closing Memo 2017 to 2022 | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 2017 | | 2018[147] | | 2019[148] | | 2020 | | 2021 | | Jan to June 2022 | |
| Cases Closed | 492 | | 521 | | 271 | | 387 | | 736 | | 1034 | |
| 0 to 3 months | 68 | 14% | 282 | 54% | 62 | 23% | 75 | 19% | 40 | 5% | 59 | 6% |
| 3 to 6 months | 64 | 13% | 92 | 18% | 65 | 24% | 65 | 17% | 88 | 12% | 84 | 8% |
| 6 to 12 months | 124 | 25% | 54 | 10% | 89 | 33% | 121 | 31% | 210 | 29% | 223 | 22% |
| 1 to 2 years | 146 | 30% | 51 | 10% | 35 | 13% | 98 | 25% | 284 | 39% | 434 | 42% |
| 2 to 3 years | 70 | 14% | 10 | 2% | 5 | 2% | 14 | 4% | 81 | 11% | 162 | 16% |
| 3+ Years | 20 | 4% | 9 | 2% | 6 | 2% | 2 | 1% | 11 | 1% | 34 | 3% |
| Unknown | 0 | 0% | 23 | 4% | 9 | 3% | 12 | 3% | 22 | 3% | 38 | 4% |

- **Pending Cases**: Another way to examine timely prosecution is to examine how long cases have been pending with Trials. For the past couple of years, large portions of cases remain pending with Trials for more than a year since charges were served. The length of time that cases are pending with Trials will remain a concern until the backlog is eliminated and Trials demonstrates a consistent ability to process recent cases more expeditiously. This is why eliminating the backlog is so important.

| Cases pending with Trials at the end of the Monitoring Periods | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | July to Dec., 2019 | | Jan. to June, 2020 | | July to Dec., 2020 | | Jan. to June, 2021 | | July to Dec. 2021 | | Jan. to June, 2022 | |
| | 9th MP | | 10th MP | | 11th MP | | 12th MP | | 13th MP | | 14th MP | |
| *Pending service of charges* | 37 | 6% | 42 | 4% | 47 | 3% | 64 | 3% | 84 | 4% | 55 | 5% |
| *Pending 120 days or less since service of charges* | 186 | 28% | 373 | 36% | 325 | 22% | 420 | 22% | 217 | 11% | 137 | 12% |
| *Pending 121 to 180 days since service of charges* | 111 | 17% | 115 | 11% | 165 | 11% | 145 | 8% | 64 | 3% | 70 | 6% |
| *Pending 181 to 365 days since service of charges* | 202 | 30% | 278 | 26% | 467 | 32% | 511 | 27% | 501 | 26% | 182 | 16% |
| *Pending 365 days or more since service of charges* | 80 | 12% | 219 | 21% | 413 | 29% | 701 | 37% | 930 | 49% | 616 | 55% |
| *Pending Final Approvals by DC of Trials and/or Commissioner* | 30 | 5% | 9 | 1% | 15 | 1% | 66 | 3% | 109 | 6% | 66 | 6% |
| *Pending with Law Enforcement* | 17 | 3% | 14 | 1% | 13 | 1% | 10 | 1% | 6 | 0% | 3 | 0% |
| **Total** | **663** | | **1,050** | | **1,445** | | **1,917** | | **1,911** | | **1,129** | |

---

[147] Data for 2017 and 2018 was calculated between MOC received date and date closing memo signed.

[148] Data for 2019 and 2020 was calculated between date charges were served and date closing memo signed.

- **<u>Initiatives to achieve a prompt agreed-upon resolution of disciplinary cases when</u>**
  **<u>appropriate</u>:** The Monitoring Team has long advocated that cases can and should be resolved
  between the Department and the Staff Member (and their representative, if needed) without
  having to proceed to a trial. For much of 2021, counsel representing the Correction Officers
  generally refused to settle cases outside of the OATH process (as discussed in the Eleventh
  Monitor's Report at pgs. 245-246 and Twelfth Monitor's Report at pg. 110) which further
  protracted an already lengthy disciplinary process. To address this issue, two initiatives have been
  prioritized. First was to increase the number of OATH proceedings so that, if a settlement could
  not be reached, the Parties could address the cases with an Administrative Law Judge ("ALJ).
  Second was to continue to encourage cases to settle pre-trial and to expedite case closure by 1)
  addressing certain lower-level misconduct using a Command Discipline via a Negotiated Plea
  Agreement (which can impose a sanction of up to five compensatory days) or 2) offering that the
  imposed discipline (generally between five and 20 compensatory days) would only remain on the
  Staff Member's record for one year[149] instead of five years.[150] As the Monitoring Team has
  previously reported, these two options are reasonable given that the range of misconduct that is
  now directed through Trials varies in its severity (compared with historical practice in which ID
  was only investigating the most egregious cases and so only cases with egregious misconduct
  were referred to the Trials Division). Combined, these initiatives are certainly two of the most
  important dynamics underlying the Department's progress in resolving cases during this
  Monitoring Period.

**<u>Conclusions</u>**

*<u>Consent Judgment § VIII., ¶ 1</u>:* The Department has taken many steps to impose appropriate and
meaningful discipline, up to and including termination. While the meaningfulness of the discipline is
undercut by many of the backlogs, the significant steps taken are sufficient to move the Department out
from Non-Compliance. Significant and sustained work is needed to ensure that the Department remains
in compliance and can move towards Substantial Compliance, but, the Department is on its way to having
a reliable system in place.

*<u>First Remedial Order § C., ¶ 1</u>:* The Department has a number of avenues to take corrective action and
takes immediate corrective action in a sizable number of cases. There is still room for improvement in

---

[149] The case will not be removed from the Staff Member's file if during this one-year period, the Staff
Member is served with new charges on a Use of Force incident occurring after the date of signature on the
Negotiated Plea Agreement.

[150] Cases are generally considered for this type of resolution when the proposed discipline is for
approximately 6 to 15 compensatory days and it is the Staff Member's first offense.

identifying cases for immediate action, providing adequate guidance to staff when misconduct is identified, and ensuring that Command Disciplines are processed as they should be.

*Consent Judgment § VIII., ¶ 3(c)*: Trials staff continue to be both productive and efficient as the Division has capitalized on the many improvements made to the system over the past few years and the elimination of the backlog will occur by the end of the year. The Trials Division has closed more cases than ever before in less time and generally the dispositions of cases are reasonable. Overall, this work has demonstrated that the initiatives prescribed by the Remedial Orders and Actions Plan are bearing fruit and progress can be achieved by working with multiple stakeholders in different roles (*e.g.* the Department, OATH, staff and their representatives).

| | |
|---|---|
| **COMPLIANCE RATING** | **Consent Judgment § VIII., ¶ 1.** Partial Compliance |
| | **First Remedial Order, § C., ¶ 1.** Partial Compliance |
| | **Consent Judgment § VIII., ¶ 3(c)**<br><br>• Substantial Compliance (Charges per the 12th Monitor's Report)<br>• Substantial Compliance (Administrative Filing per the 12th Monitor's Report)<br>• Partial Compliance (Expeditiously Prosecuting Cases) |

## REMEDIAL ORDER § C. (TIMELY, APPROPRIATE, AND MEANINGFUL STAFF ACCOUNTABILITY), ¶ 2 (MONITOR RECOMMENDATIONS)

§ C., ¶ 2. Responding to Monitor Recommendations. Upon identification of objective evidence that a Staff Member violated the New Use of Force Directive, the Monitor may recommend that the Department take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. Within ten business days of receiving the Monitor's recommendation, absent extraordinary circumstances that must be documented, the Department shall: (i) impose immediate corrective action (if recommended), and/or (ii) provide the Monitoring Team with an expedited timeline for completing the investigation or otherwise addressing the violation (if recommended), unless the Commissioner (or a designated Assistant Commissioner) reviews the basis for the Monitor's recommendation and determines that adopting the recommendation is not appropriate, and provides a reasonable basis for any such determination in writing to the Monitor.

The First Remedial Order introduced a provision (§ C., ¶ 2) that requires the Department to respond within 10 business days to any recommendations from the Monitor to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Action Plan also introduced an additional requirement (§ F., ¶ 2) for the Department to expedite egregious cases on specific timelines to ensure those cases are closed as quickly as possible. Given these two requirements are inextricably linked, they are addressed together.

**Monitor Recommendations for Immediate Action, etc. (Remedial Order § C., ¶ 2)**

The Monitoring Team is judicious in the recommendations that it makes to the Department and only identifies those cases where immediate action should be considered *and* the incident is not yet

stale for *immediate* action to be taken. For instance, if the Monitoring Team identifies an incident that warranted immediate corrective action (and none was taken), but the incident occurred many months prior, a recommendation is not shared because the opportunity for immediate action has passed. The recommendations shared are therefore only a subset of cases where immediate action was likely warranted but not taken. The Monitoring Team's overall goal is to support the Department's ability to consistently and reliably identify these cases close in time.

Between January and June 2022 (the Fourteenth Monitoring Period), a total of **26 recommendations pursuant to § C., ¶ 2** of the First Remedial Order were submitted by the Monitoring Team.

- **Investigations: 18 of these 26** recommendations related to inadequate investigations or recommendations for incidents to be investigated by the UPS squad due to the seriousness of the misconduct, and these are discussed in more detail in the Use of Force Investigations section of this report in regard to ¶ 1.

- **Immediate Corrective Action/Expeditious Investigations/Expeditious Discipline: 8 of these 26** recommendations were to take immediate corrective action, expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action.
  - 2 of the 8 were recommendations for consideration to modify the staff member's position and the Department elected to modify those staff member's positions.
  - 6 of the 8 recommendations were to either expeditiously complete the investigation, and/or otherwise address the violation by expeditiously pursuing disciplinary proceedings or other appropriate action. The Department agreed to complete the investigations of certain incidents more quickly or to pursue discipline faster in the 6 identified cases. While the Department's response to the Monitoring Team's recommendations were provided timely, for the 6 cases for expedited discipline the process to complete the investigation and/or impose discipline is quite protracted and these recommendations do not appear to have the intended impact. Fortunately, the new ¶ § F., ¶ 2 recommendations process, described below, has proven a much more fruitful and effective tool to ensure expeditious pursuit of discipline and the Monitoring Team will be expecting those corresponding timelines for investigations and disciplinary proceedings to be met going forward.

## Expeditious Resolution of Egregious Misconduct (Action Plan § F., ¶ 2)

The Action Plan § F., ¶ 2 ("F2") sets aggressive timelines for the investigation and prosecution of egregious cases. This requirement went into effect in mid-June 2022. Pursuant to the Action Plan, a case identified to be resolved in an expedited manner under must be resolved as follows:

- ***Investigations***: The investigation(s) of the matter must be completed within 30 business days of identification.
- ***Referral for Discipline***: The case must be processed for discipline — including completion of the MOC, referred to the Trials Division, charges served on the Respondent, discovery produced to the Respondent, an offer for resolution must be provided to the Respondent, the case filing with OATH, and a pre-trial conference must be scheduled within 20 business days of the closure of the investigation.
- ***Adjudication of Discipline***: Any and all disciplinary proceedings, including, but not limited to, convening a pre-trial conference, conducting a trial before OATH, and submission of a Report and Recommendation from the OATH ALJ must be completed within 35 business days of the case being filed with OATH.
- ***Imposition of Discipline***: The Commissioner must impose the final disciplinary action within 15 business days of receiving the Report and Recommendation from OATH.

Between mid-June and mid-October 2022, there have been a total of 19 cases, covering the conduct of 18 unique Staff Members, involved in 13 unique use of force incidents, identified as "F2" cases that must be processed on this truncated timeline. The Monitoring Team identified 16 of the 19 cases and the Department identified the other three. In all cases, ID closed their investigation within 30 business days of the identification or the investigation was already closed when the case had been identified for "F2" status. With respect to the imposition of discipline, the status of the 19 cases is below as of October 15, 2022:

- Four are pending with law enforcement and the Department has been advised it cannot proceed with administrative proceedings at this time.
  - o The Monitoring Team is in the process of working with these outside agencies to ensure these cases are efficiently evaluated so that either DOC is permitted to proceed while the criminal investigation continues and/or if criminal charges are not pursued that the cases are cleared back to DOC as soon as possible.
- Six cases closed with significant discipline (NPAs ranged from 45 to 60 days and each including at least one year of probation as part of the NPA).
  - o In each of the six cases, the penalty included a penalty of at least 45 compensatory days or more and each case included a period of disciplinary probation for the staff member.
  - o All of these closed NPAs were finalized within less than two months of identification as an "F2" case and within a average range of 88 days (ranging from 20 to 183 business days) of the incident dates. All of which are significant improvement over the average time to address identified misconduct.
- One Staff Member resigned.
- One case had a pre-trial conference.

- The other 7 cases are recent F2 referrals with investigations closed in October 2022.

Overall, the timelines required by the Action Plan are generally being met and support the need to resolve cases closer in time to the incident. It is now critical that the Department is in a position to identify these cases on its own. Until then, the Monitoring Team will continue to identify and recommend such cases and appreciates the collaborative work of ID, Trials, and OATH to ensure these cases are processed accordingly.

**Conclusion**

The recommendations to expedite cases under the First Remedial Order § C., ¶ 2 has not been as fruitful as expected. While certain cases were processed more quickly, not all were. Given the small number of recommendations this is not reasonable. However, the Department has demonstrated significant effort and success in implementing the more specific timelines under § F., ¶ 2 of the Action Plan. The Monitoring Team will continue to utilize § C., ¶ 2 for immediate action recommendations, but will leverage the "F2" process going forward for expedited discipline and investigations. While the Department has succeeded in processing "F2" cases identified to date, the Monitoring Team encourages ID to self-identify more incidents for this process going forward.

| COMPLIANCE RATING | First Remedial Order § C., ¶ 2. Partial Compliance |
|---|---|

---

| **FIRST REMEDIAL ORDER § C. 4/THIRD REMEDIAL ORDER ¶ 2 (EXPEDITIOUS OATH PROCEEDINGS) & FIRST REMEDIAL ORDER § C. (APPLICABILITY OF DISCIPLINARY GUIDELINES TO OATH PROCEEDINGS), ¶ 5** |
|---|

Third Remedial Order ¶ 2. _Increased Number of OATH Pre-Trial Conferences_. Paragraph C.4 of the First Remedial Order shall be modified to increase the minimum number of pre-trial conferences that OATH must conduct each month for disciplinary cases involving charges related to UOF Violations. Specifically, as of December 15, 2021, Paragraph C.4 shall be revised to read as follows: "All disciplinary cases before OATH involving charges related to UOF Violations shall proceed in an expeditious manner. During each month, Defendants shall hold pre-trial conferences before OATH for at least **150** disciplinary cases involving charges related to UOF Violations, absent extraordinary circumstances that must be documented. If there continues to be delays in conferencing cases despite this calendaring practice, OATH will assign additional resources to hear these cases. The minimum number of case conferences required to be held each month under this Paragraph may be reduced if the Monitor makes a written determination, no earlier than one year after the date of this Order, that disciplinary cases involving UOF Violations can continue to proceed expeditiously with a lower number of conferences being held each month."[151]

§ C., ¶ 5. Applicability of Disciplinary Guidelines to OATH Proceedings. The Disciplinary Guidelines developed pursuant to Section VIII, ¶ 2 of the Consent Judgment shall apply to any OATH proceeding relating to the Department's efforts to impose discipline for UOF Violations.

---

[151] The Action Plan requires a compliance assessment with First Remedial Order § C. (Timely, Appropriate, and Meaningful Staff Accountability), ¶ 4. However, this provision was modified by the Third Remedial Order, ¶ 2 so a compliance rating with Third Remedial Order, ¶ 2 is provided instead.

When the Department is unable to settle a disciplinary matter directly with the Staff Member, the case must be adjudicated. The Department to the Office of Administrative Trials and Hearings ("OATH"), an administrative law court, adjudicates any contested discipline for *tenured* Staff, pursuant to New York State Civil Service Laws § 75. As an initial matter, the ALJ conducts a Pre-Trial Conference in an attempt to facilitate a settlement. If a settlement cannot be reached, then a trial is scheduled so an ALJ (and a different ALJ from the one who conducted the Pre-Trial Conference) can assess the evidence to evaluate whether or not the Staff Member has violated policy. The ALJ then issues a written decision. If the ALJ determines that a violation occurred, the decision also includes a proposed penalty. The range of penalties that the ALJ may recommend are set by law and include a reprimand, a fine of up to $100, a suspension without pay of up to (but no more than) 60 days, demotion in title, or termination.[152] Accordingly, most of the discipline imposed by DOC (either through settlement or following a trial) is within this same range of penalties. The Commissioner has the authority to accept the factual findings and penalty recommendation of the ALJ or to modify them, as appropriate, in order to resolve the case. The Commissioner's determination (and imposition of discipline as warranted) is subject to appeal to the Civil Service Commission or as an Article 78 proceeding.

OATH is designated as the "deputy or other person" to hear disciplinary matters for the Department of Correction and stands in the shoes of the Commissioner, with the same powers and constraints as the Commissioner. Accordingly, OATH's work is obligated to comply with Consent Judgment, Remedial Orders, and Action Plan. The Monitoring Team has raised a number of concerns in the past regarding OATH's practices, and much progress has been made by OATH to address these concerns. The practices which required improvement included a lack of sufficient capacity to manage and convene the number of Pre-Trial Conferences necessary to address the Department's caseload, that the Pre-Trial Conferences were not conducted in a manner that facilitated resolution, that any subsequent proceedings were protracted, and, if a trial was necessary, that the trial was scheduled too far out, was conducted inefficiently (*e.g.*, a trial requiring multiple days would occur over many months), and the ALJ's Report and Recommendation took an unreasonably long time to be issued (*e.g.*, more than a year). Finally, the Monitoring Team found that the Report and Recommendations issued by the ALJs as well as guidance provided by ALJ's during Pre-Trial Conferences suggested that the application of precedent on current cases had resulted in disciplinary outcomes that were not always proportionate to Staff misconduct and were not consistent with the New Use of Force Directive

---

[152] New York State Civil Service Laws § 75 (removal and other disciplinary action), ¶ 3.

or the Disciplinary Guidelines.[153] As discussed in more detail below, progress has been made to address these concerns.

**OATH Pre-Trial Conferences**

OATH's capacity to hear cases has increased significantly. For many years, at best, OATH Pre-Trial Conferences were held 6 days per month and likely covered between 20 and 40 UOF-related cases during that time (cases involving other matters would be heard as well). Now, OATH convenes conferences four days per week, every week and hears at least 150 use of force-related cases per month. A table including OATH use of force-related Pre-Trial Conference data is provided in Appendix A. During this Monitoring Period, almost 1,500 OATH Pre-Trial Conferences were scheduled for DOC cases, including scheduling 990 use of force cases. The 990 use of force cases scheduled for Pre-Trial Conferences is more than the 900 cases required to be scheduled. Further, the 990 use of force cases scheduled for Pre-Trial conferences in this six-month period is more than the number of Pre-Trial Conferences scheduled in **all** of 2021 (n=920). Notably, over 600 of the 990 use of force cases scheduled for Pre-Trial Conferences settled before the OATH Pre-Trial Conference – more than ever before and a 235% increase from the number of cases that settled before the Pre-Trial Conference in the last Monitoring Period (n=185). This is a significant and important gain as the Monitoring Team has long advocated that cases could and should be resolved between the Department and the Respondent without the need for OATH's involvement through a Pre-Trial Conference.

**Trials at OATH**

As a result of the First and Third Remedial Orders, the overall number of use of force trials has increased. Over the last two years, a large number of trials were conducted. 2021 was the peak with 27 trials convened and 68 days on which OATH trials were conducted (many trials require more than one day at OATH). 14 trials have been convened between January and August 2022 and OATH trials have occurred on 41 days. 2022 is on track to surpass the total number of use of force trials started in 2017 to 2020 combined (n=17)

| Number of UOF Trials Started | |
|---|---|
| **Year the First Day of UOF Trial was Conducted** | **Grand Total by Year the Trial Started** |
| 2017 | 8 |
| 2018 | 2 |
| 2019 | 3 |
| 2020 | 4 |
| 2021 | 27 |
| 2022 | 14 |
| **Grand Total by Case Status** | **58** |

---

[153] *See*, for example, Ninth Monitor's Report at pg. 206.

Previously, trials were not only scheduled far after the Pre-Trial Conference, but often a trial requiring a few days could occur over multiple months. On average, all trials that started in 2022 occurred within 102 days of the Pre-Trial Conference. Further, trials are now generally completed within 3 weeks of when they start. The time between a use of force incident and a trial is still incredibly lengthy. For the 14 trials that were convened in 2022, they addressed 23 use of force incidents that occurred as follows:  1 occurred in 2017, 6 in 2018, 9 in 2019, 4 in 2020, and 3 in 2021. As discussed throughout this report, protracted discipline will continue to occur until the backlog in Trials is eliminated and ID completes full ID investigations more quickly. Finally, all but one R&R was issued within 45 days of the end of the Trial. This is noteworthy because in the past it has taken over a year for OATH to complete R&Rs in some use of force cases.[154]  The progress with respect to UOF cases is certainly important. However, it must be emphasized there are non-use of force cases in which the time to complete R&Rs continues to languish and take beyond a year to complete.[155]  This is simply unreasonable.

OATH issued 26 R&Rs related to UOF cases so far in 2022 (covering the trials in 2021, 2022, and one that started in 2020). Of these cases, the ALJ found guilt in 24 of the 26 cases and recommended dismissal in the other 2 cases. Of those 24 cases where the ALJ found guilt, there was 1 case where the ALJ did not recommend a specific penalty because the Staff Member was terminated on other grounds, 11 cases where the ALJ recommended the penalty sought by the Trials Division, and 12 cases where the penalty recommended by the ALJ differed from what was sought by the Trials Division. In 11 of those 12 cases with a differing penalty, the recommended penalty was lower than what was sought by the Trials Division because the ALJ did not substantiate *all* the charges brought by Trials. In 1 of those 12 cases the ALJ recommended termination, a higher penalty than the 60 days sought by the Trials Division.

The Trials Division sought termination for 15 Staff Members in 26 of the cases that had an R&R issued this year (some cases and R&Rs had multiple respondents). For 11 of those 15 Staff Members, the ALJ also recommended termination. For the other 4 Staff Members, the ALJ substantiated at least some of the charges, but recommended suspension days instead of termination. Of those 4 cases, one Staff Member resigned by the time the R&R was issued. In the other 3 cases, the Commissioner accepted the recommended penalties by the ALJ (2 Staff Members received 60 days suspension, and one Staff Member received a 30 days suspension).

---

[154] For instance, the OATH R&Rs for 6 use of force related trials that started in 2021 took at least 6 months to complete following the close of trial. 2 of the 6 R&Rs took over a year to complete.

[155] For instance, currently there are three cases in which all are pending a year (or almost a year). In fact, one case, the trial was complete almost two years ago and a report and recommendation still hasn't been issued.

Finally, it is worth noting that in three cases, the Commissioner has initiated an Action of the Commissioner whereby he does not accept the proposed recommendation by the ALJs. In two cases, the Commissioner imposed a penalty higher than recommended by the ALJ (in one of the two cases OATH had dismissed the charge and the commissioner substantiated the charges and imposed a penalty). In the third case the Commissioner imposed a lower sentence than what the ALJ had recommended.

Overall, OATH has demonstrated a willingness to refine and improve its practices that have resulted in progress in conducting its work related to use of force cases more efficiently. The large number of Pre-Trial Conferences available has supported the Trials Division's ability to close their backlog of cases. That said, further improvements of their processes is needed to support efforts for the parties to achieve settlement without a trial and, in cases where a trial is needed, that the trial occurs as close in time to the Pre-Trial Conference as possible. Similar efficiencies should also be applied to any discipline related to staff absenteeism.

**Assessment of Disciplinary Guidelines**

The Monitoring Team's assessment of the ALJ's assessment of cases during the Pre-Trial Conference as well as analysis in the Report and Recommendations demonstrates that there has been improvement in the application and consideration of the disciplinary guidelines. The Monitoring Team will conduct a more fulsome assessment in the next Monitoring Period, including an assessment of all OATH R&Rs in which the case was dismissed or the recommended sanction differed from the sanction sought by DOC.

**Conclusions**

*First Remedial Order § C., ¶ 4 & Third Remedial Order ¶ 2*: The requirement to convene 150 Pre-Trial Conferences has been met. Proceedings are more efficient than before as subsequent proceedings (including trials) are now scheduled in a logical and efficient manner. However, further enhancements to the scheduling process are necessary in order to achieve Substantial Compliance with this provision.

*First Remedial Order § C., ¶ 5*: The Monitoring Team's assessment of OATH proceedings is that the Disciplinary Guidelines have been appropriately applied.

| COMPLIANCE RATING | **First Remedial Order § C., ¶ 4. & Third Remedial Order ¶ 2.** Partial Compliance<br>**First Remedial Order § C., ¶ 5.** Partial Compliance |
|---|---|

## VIII. Staff Discipline and Accountability ¶ 4 (Trials Division Staffing)

¶ 4. The Department shall staff the Trials Division sufficiently to allow for the prosecution of all disciplinary cases as expeditiously as possible and shall seek funding to hire additional staff if necessary.

This provision requires the City and the Department to ensure the Trials Division has sufficient staff to expeditiously prosecute all disciplinary cases. While the Department continues to recruit, hire and on-board new staff, due to attrition, the total number of staff, and the total number of agency attorneys has remained essentially the same since June 2018, which covers the last nine Monitoring Periods as demonstrated in the table of Trials Staffing below. At the end of the Monitoring Period (end of June), the Trials Division had a total of 36 staff, including 5 supervisors, 19 attorneys, 5 managers, and 5 administrative staff as identified in the chart below. As noted throughout this section, the Trials Division completed a significant amount of work in this Monitoring Period. The amount of work completed with the staff available suggested that progress from the last Monitoring Period had occurred in efforts to prosecute cases as expeditiously as possible.

| Trials Division Staffing | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| As of… | June 2018 | Dec. 2018 | June 2019 | Dec. 2019 | June 2020 | Dec. 2020 | June 2021 | Dec. 2021 | June 2022 | Oct. 11, 2022 |
| **Supervisors & Leadership** | **4** | **5** | **5** | **5** | **5** | **5** | **4** | **4** | **5** | **5** |
| - *Deputy Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 |
| - *Associate Commissioner* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| - *Deputy General Counsel* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| - *Executive Manager Director* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 |
| - *Director* | 3 | 3 | 3 | 3 | 3 | 3 | 2 | 2 | 2 | 3 |
| **Administrative Support** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **6** | **5** | **5** |
| - *Administrative Manager* | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 | 4 |
| - *Executive Coordinator* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Office Manager* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| **Attorneys** | **21** | **20** | **20** | **20** | **17** | **18** | **18** | **17** | **19** | **29** |
| - *Agency Attorney* | 21 | 20 | 20 | 20 | 17 | 16 | 15 | 14 | 17 | 21 |
| - *Agency Attorney Intern* | 0 | 0 | 0 | 0 | 0 | 2 | 3 | 3 | 0 | 1 |
| - *Contract Attorney* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 0 |
| - *Attorneys on Loan from Other Agencies* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7 |
| **Other Support** | **9** | **8** | **8** | **7** | **8** | **7** | **7** | **7** | **5** | **7** |
| - *Legal Coordinator* | 4 | 4 | 3 | 2 | 2 | 2 | 2 | 2 | 3 | 4 |
| - *Investigator* | 3 | 1 | 0 | 0 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Clerical Associate* | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Program Specialist* | 1 | 1 | 1 | 1 | 1 | 0 | 0 | 0 | 0 | 0 |
| - *Intern* | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *Front Desk Officer* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| - *Community Coordinator* | 0 | 0 | 1 | 1 | 1 | 1 | 1 | 1 | 0 | 0 |
| - *City Research Scientists* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 |
| **Grand Total** | **40** | **39** | **39** | **38** | **36** | **36** | **35** | **34** | **34** | **47** |

The Department is in Partial Compliance with this provision. The Trials Division must work to process newer cases more quickly to ultimately demonstrate timely discipline is being imposed. Additional staff are necessary to close out the backlog and keep up with the work going forward. This is why, as noted in the introduction to this report, the Department made significant strides in hiring and onboarding additional attorneys to the Trials Division after the close of the Fourteenth Monitoring Period and had a total of **28** attorneys as of October 2022. One area of focus must be to ensure that

there is adequate supervision of the attorneys in the unit. There are currently two supervisory vacancies that must be filled.

| **COMPLIANCE RATING** | ¶ **4.** Partial Compliance |
| --- | --- |

SCREENING & ASSIGNMENT OF STAFF (CONSENT JUDGMENT § XII)

| XII. SCREENING & ASSIGNMENT OF STAFF ¶¶ 1-3 (PROMOTIONS) |
|---|

¶ 1. Prior to promoting any Staff Member to a position of Captain or higher, a Deputy Commissioner shall review that Staff Member's history of involvement in Use of Force Incidents, including a review of the

    (a) [Use of Force history for the last 5 years]

    (b) [Disciplinary history for the last 5 years]

    (c) [ID Closing memos for incidents in the last 2 years]

    (d) [Results of the review are documented]

¶ 2. DOC shall not promote any Staff Member to a position of Captain or higher if he or she has been found guilty or pleaded guilty to any violation in satisfaction of the following charges on two or more occasions in the five-year period immediately preceding consideration for such promotion: (a) excessive, impermissible, or unnecessary Use of Force that resulted in a Class A or B Use of Force; (b) failure to supervise in connection with a Class A or B Use of Force; (c) false reporting or false statements in connection with a Class A or B Use of Force; (d) failure to report a Class A or Class B Use of Force; or (e) conduct unbecoming an Officer in connection with a Class A or Class B Use of Force, subject to the following exception: the Commissioner or a designated Deputy Commissioner, after reviewing the matter, determines that exceptional circumstances exist that make such promotion appropriate, and documents the basis for this decision in the Staff Member's personnel file, a copy of which shall be sent to the Monitor.

¶ 3. No Staff Member shall be promoted to a position of Captain or higher while he or she is the subject of pending Department disciplinary charges (whether or not he or she has been suspended) related to the Staff Member's Use of Force that resulted in injury to a Staff Member, Inmate, or any other person. In the event disciplinary charges are not ultimately imposed against the Staff Member, the Staff Member shall be considered for the promotion at that time.

The Department promoted five Staff (one Deputy Warden, three Wardens and two Chiefs) in the Thirteenth Monitoring Period and no Staff were promoted in this Monitoring Period. The chart below identifies the Staff that have been screened and promoted, and to which ranks, between January 2017 and June 2022. The promotions process is depicted in the Twelfth Monitor's Report (dkt. entry 431) at *Appendix D: Flowchart of Promotions Process.*

| Overview of Staff Promotions | | | | | | | |
|---|---|---|---|---|---|---|---|
|  | 2017 | 2018 | 2019 | 2020 | 2021 | Jan. to June 2022 | Total |
| Captains | 181 | 97 | 0 | 0 | 0 | 0 | 278 |
| ADWs | 4 | 13 | 3 | 35 | 0 | 0 | 55 |
| DW | 5 | 3 | 8 | 0 | 1 | 0 | 17 |
| Wardens | 2 | 5 | 1 | 2 | 4 | 0 | 14 |
| Chiefs | 3 | 2 | 3 | 0 | 4 | 0 | 12 |

The Department was found in Substantial Compliance with ¶¶ 1 to 3 in the Twelfth Monitor's Report, the last report in which a compliance assessment was made. As no Staff were promoted in this Monitoring Period, the Monitoring Team did not assess compliance with these provisions for the Fourteenth Monitoring Period.

| COMPLIANCE RATING | ¶ 1. No Compliance Rating Assessed |
|---|---|
| | ¶ 2. No Compliance Rating Assessed |
| | ¶ 3. No Compliance Rating Assessed |

170

- **SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 (CONSENT JUDGMENT § XV)**

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 1 (PREVENT FIGHT/ASSAULT)

¶ 1. Young Inmates shall be supervised at all times in a manner that protects them from an unreasonable risk of harm. Staff shall intervene in a manner to prevent Inmate-on-Inmate fights and assaults, and to de-escalate Inmate-on-Inmate confrontations, as soon as it is practicable and reasonably safe to do so.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- In February 2022, the Department designed and implemented the Commissioner's Violence Reduction Plan for RNDC.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The Monitoring Team has been concerned about violence at RNDC, where the majority of young adults are held, for several years. The Monitoring Team's March 2022 report (dkt. 438) discusses RNDC's serious incidents, management problems, and staffing issues (see pgs. 17-21). This assessment was further updated in the Monitoring Team's June 2022 report (dkt. 467), which discussed the various components of the Commissioner's Violence Reduction Plan for RNDC and use of de-escalation units (see pgs. 18-20). The more detailed information about the facility's use of force and violence data and impact of the Violence Reduction Plan is included in the Security Section of this report.

Taken together, while the facility's UOF rate and rates of fights remain unacceptably high, progress has been observed in the recent significant reduction in the number of slashings/stabbings, improvements in staffing and searches achieved through the Commissioner's supplemental staffing plan, and efforts to deliver programming. Whether these improvements can be maintained when the supplemental staffing period concludes is as yet unknown.

| COMPLIANCE RATING | ¶ 1. (18-year-olds) Non-Compliance |
|---|---|

### XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 12 (DIRECT SUPERVISION)

¶ 12. The Department shall adopt and implement the Direct Supervision Model in all Young Inmate Housing Areas.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this*

*Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

The focus in this Monitoring Period has been on the Commissioner's Violence Reduction Plan for RNDC. Accordingly, this provision was not monitored in this Monitoring Period and so a rating is not provided.

| COMPLIANCE RATING | ¶ 12. (18-year-olds) Not Rated |
|---|---|

| XV. SAFETY AND SUPERVISION OF INMATES UNDER THE AGE OF 19 ¶ 17 (CONSISTENT ASSIGNMENT OF STAFF) |
|---|

¶ 17. The Department shall adopt and implement a staff assignment system under which a team of Officers and a Supervisor are consistently assigned to the same Young Inmate Housing Area unit and the same tour, to the extent feasible given leave schedules and personnel changes.

**DEPARTMENT'S STEPS TOWARDS COMPLIANCE**

- See the narrative above for a description of how the Department is addressing the staffing-related requirements of the Action Plan.

**ANALYSIS OF COMPLIANCE**

*The analysis and compliance rating below apply only to the Department's efforts to achieve compliance with this provision with respect to 18-year-old incarcerated individuals. The Monitoring Team will not assess compliance with the Nunez provisions related to 16- and 17-year-olds in this Monitoring Period pursuant to the Stipulation and Order Regarding 16- and 17-Year-Old Adolescent Offenders at Horizon Juvenile Center, ¶ 2 (dkt. 364).*

Meeting the requirements of the Action Plan must precede the Department's effort to address the requirements of this provision. Only when the Department has a coherent structure for assigning, tracking and scheduling staff can efforts to consistently assign officers and Captains to the same housing units day-to-day be accomplished and assessed.

| COMPLIANCE RATING | ¶ 17. (18-year-olds) Non-Compliance |
|---|---|

• End •

# APPENDIX A: ADDITIONAL DATA

# Staffing Data

**Unmanned Posts & Triple Tours**

The table below provides the monthly averages from January 2021 to September 2022 of the total uniform staff headcount, unmanned posts (a post in which a staff member is not assigned), and triple tours. The number of unmanned posts and triple tours have both decreased since the start of January 2022 and from prior peaks in 2021. On average, there were 60 fewer unstaffed posts per day in September 2022 compared to the previous peak in October 2021. There were also 24 fewer triple tours on average in September 2022 compared to the previous peak in August 2021.

| Average Number of Unmanned Posts & Triple Tours per Day | | | |
|---|---|---|---|
| **Month** | **Headcount** | **Unmanned Posts** | **Triple Tours[156]** |
| **January 2021** | 8,872 | | 0 |
| **February 2021** | 8,835 | | 3 |
| **March 2021** | 8,777 | | 5 |
| **April 2021** | 8,691 | | 4 |
| **May 2021** | 8,576 | | 4 |
| **June 2021** | 8,475 | | 4 |
| **July 2021** | 8,355 | | 15 |
| **August 2021** | 8,459 | | 25 |
| **September 2021** | 8,335 | | 22 |
| **October 2021** | 8,204 | 82 | 6 |
| **November 2021** | 8,089 | | 6 |
| **December 2021** | 7,778 | | 23 |
| **January 2022** | 7,708 | 59 | 24 |
| **February 2022** | 7,547 | 23 | 3 |
| **March 2022** | 7,457 | 29 | 1 |
| **April 2022** | 7,353 | 13 | 0 |

---

[156] This column contains data for the number of staff who worked 3.5 hours or more of their third tour. This chart does not contain data for staff who have worked less than 3.5 hours of their third tour.

| Average Number of Unmanned Posts & Triple Tours per Day | | | |
|---|---|---|---|
| Month | Headcount | Unmanned Posts | Triple Tours[156] |
| **May 2022** | 7,233 | 31 | 1 |
| **June 2022** | 7,150 | 27 | 2 |
| **July 2022** | 7,138 | 20 | 2 |
| **August 2022** | 7,068 | 24 | 2 |
| **September 2022** | 6,994 | 22 | 1 |

**Uses of Force Involving Unmanned Posts**

The table below provides the number and proportion of uses of force involving "unmanned posts" as identified by the Department, between January and June 2022. These incidents involve posts to which no staff member was assigned *or* instances where the assigned officer left their post without being relieved (collectively "unmanned posts"). The first two columns list the number of uses of force involving unmanned posts and the proportion of <u>all</u> uses of force that this number represents. The third and fourth columns identify the number and proportion of uses of force that involved unmanned posts **and** were avoidable (as identified by the Department) specifically due to the lack of staff on post.  In other words, had a staff member been present, these incidents likely could have been avoided. While the number of incidents involving an unmanned post were relatively small (approximately 4.66% of all uses of force in this 6-month period), the Department found that over half of these incidents could have been avoided had staff been present.

| Uses of Force involving Unmanned Posts: January-June 2022 | | | |
|---|---|---|---|
| Facility | # of Total UOF Incidents involving Unmanned Posts | % of Total UOF Incidents involving Unmanned Posts[157] | # of UOF Incidents that UOF incidents involving Unmanned Posts & Were Avoidable | % of Total UOF Incidents involving Unmanned Posts & Were Avoidable[158] |
| AMKC | 48 | 1.48% | *39* | *81.25%* |
| EMTC | 22 | 0.68% | *10* | *45.45%* |
| GRVC | 13 | 0.40% | *6* | *46.15%* |
| NIC | 2 | 0.06% | *1* | *50.00%* |
| OBCC | 19 | 0.59% | *7* | *36.84%* |
| RMSC | 6 | 0.19% | *2* | *33.33%* |
| RNDC | 40 | 1.23% | *22* | *55.00%* |
| VCBC | 1 | 0.03% | *1* | *100.00%* |
| **TOTAL** | **151** | **4.66%** | **88** | **58.28%** |

---

[157] There were 3,241 total actual uses of force between January and June 2022. This number does not include alleged uses of force because the Department does not provide avoidable reasons for alleged uses of force.

[158] *Id.*

**Sick Leave, Medically Monitored/Restricted, and AWOL Data**

The tables below provide the monthly averages from January 2019 to September 2022 of the total staff headcount, the average number of staff out sick, the average number of staff on medically monitored/restricted duty, and the average number of staff who were AWOL[159]. The Monitoring Team's assessment of this data is included in the Staffing section of this report.

| 2019 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Month** | **Head-count** | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| January 2019 | 10577 | 621 | 5.87% | 459 | 4.34% | | |
| February 2019 | 10482 | 616 | 5.88% | 457 | 4.36% | | |
| March 2019 | 10425 | 615 | 5.90% | 441 | 4.23% | | |
| April 2019 | 10128 | 590 | 5.83% | 466 | 4.60% | | |
| May 2019 | 10041 | 544 | 5.42% | 501 | 4.99% | | |
| June 2019 | 9953 | 568 | 5.71% | 502 | 5.04% | | |
| July 2019 | 9859 | 538 | 5.46% | 496 | 5.03% | | |
| August 2019 | 10147 | 555 | 5.47% | 492 | 4.85% | | |
| September 2019 | 10063 | 557 | 5.54% | 479 | 4.76% | | |
| October 2019 | 9980 | 568 | 5.69% | 473 | 4.74% | | |
| November 2019 | 9889 | 571 | 5.77% | 476 | 4.81% | | |
| December 2019 | 9834 | 603 | 6.13% | 463 | 4.71% | | |
| **2019 Average** | **10115** | **579** | **5.72%** | **475** | **4.71%** | | |

---

[159] The AWOL data is only available for August 1, 2021-January 26, 2022 and April 2022-September 2022.

| 2020 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2020 | 9732 | 586 | 6.02% | 367 | 3.77% | | |
| February 2020 | 9625 | 572 | 5.94% | 388 | 4.03% | | |
| March 2020 | 9548 | 1408 | 14.75% | 373 | 3.91% | | |
| April 2020 | 9481 | 3059 | 32.26% | 278 | 2.93% | | |
| May 2020 | 9380 | 1435 | 15.30% | 375 | 4.00% | | |
| June 2020 | 9302 | 807 | 8.68% | 444 | 4.77% | | |
| July 2020 | 9222 | 700 | 7.59% | 494 | 5.36% | | |
| August 2020 | 9183 | 689 | 7.50% | 548 | 5.97% | | |
| September 2020 | 9125 | 694 | 7.61% | 586 | 6.42% | | |
| October 2020 | 9079 | 738 | 8.13% | 622 | 6.85% | | |
| November 2020 | 9004 | 878 | 9.75% | 546 | 6.06% | | |
| December 2020 | 8940 | 1278 | 14.30% | 546 | 6.11% | | |
| 2020 Average | 9302 | 1070 | 11.49% | 464 | 5.02% | | |

| 2021 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Month | Head-count | Average Daily Sick | Average Daily % Sick | Average Daily MMR3 | Average Daily % MMR3 | Average Daily AWOL | Average Daily % AWOL |
| January 2021 | 8872 | 1393 | 15.70% | 470 | 5.30% | | |
| February 2021 | 8835 | 1347 | 15.25% | 589 | 6.67% | | |
| March 2021 | 8777 | 1249 | 14.23% | 676 | 7.70% | | |
| April 2021 | 8691 | 1412 | 16.25% | 674 | 7.76% | | |
| May 2021 | 8576 | 1406 | 16.39% | 674 | 7.86% | | |
| June 2021 | 8475 | 1480 | 17.46% | 695 | 8.20% | | |
| July 2021 | 8355 | 1488 | 17.81% | 730 | 8.74% | | |
| August 2021 | 8197 | 1416 | 17.27% | 767 | 9.36% | 90 | 1.05% |
| September 2021 | 8081 | 1703 | 21.07% | 744 | 9.21% | 77 | 0.92% |
| October 2021 | 8005 | 1558 | 19.46% | 782 | 9.77% | 30 | 0.37% |
| November 2021 | 7852 | 1498 | 19.08% | 816 | 10.39% | 42 | 0.52% |
| December 2021 | 7750 | 1689 | 21.79% | 775 | 10.00% | 42 | 0.54% |
| 2021 Average | 8372 | 1470 | 17.65% | 699 | 8.41% | 56 | 0.68% |

| 2022 | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Month** | **Head-count** | | **Average Daily Sick** | **Average Daily % Sick** | **Average Daily MMR3** | **Average Daily % MMR3** | **Average Daily AWOL** | **Average Daily % AWOL** |
| January 1-26, 2022 | 7668 | | 2005 | 26.15% | 685 | 8.93% | 42 | 55% |
| February 2022 | 7592 | | 1457 | 19.19% | 713 | 9.39% | | |
| March 2022 | 7432 | | 1402 | 18.86% | 617 | 8.30% | | |
| April 2022 | 7353 | | 1255 | 17.07% | 626 | 8.51% | 23 | 0.31% |
| May 2022 | 7233 | | 1074 | 14.85% | 634 | 8.77% | 24 | 0.34% |
| June 2022 | 7150 | | 951 | 13.30% | 624 | 8.73% | 16 | 0.22% |
| July 2022 | 7138 | | 875 | 12.26% | 608 | 8.52% | 19 | 0.26% |
| August 2022 | 7068 | | 831 | 11.76% | 559 | 7.91% | 17 | 0.24% |
| September 2022 | 6994 | | 819 | 11.71% | 535 | 7.65% | 6 | 0.09% |

## Staff Accountability

**Staff Suspensions**

The table below shows all staff suspensions between January 1, 2020 and September 31, 2022. The number of suspensions in 2022 is on track to be the highest of the last three years and already exceeds the total number of suspensions in 2020. The Department's use of suspensions is discussed throughout this report.

| Staff Suspensions _2020 to September 2022_ | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Reason** | **Jan. to June 2020** | **July to Dec. 2020** | **Total 2020** | **Jan. to June 2021** | **July to Dec. 2021** | **Total 2021** | **Jan. to Jun 2022** | **July to Sept. 2022** | **Total Jan. to Sept. 2022** |
| Sick Leave | 27 | 12 | **39** | 48 | 90 | **138** | 162 | 79 | **241** |
| Conduct Unbecoming | 32 | 60 | **92** | 44 | 84 | **128** | 47 | 25 | **72** |
| Use of Force | 36 | 42 | **78** | 52 | 30 | **82** | 29 | 6 | **35** |
| AWOL | 0 | 0 | **0** | 0 | 165 | **165** | 34 | 35 | **69** |
| Arrest | 21 | 39 | **60** | 38 | 32 | **70** | 19 | 4 | **23** |
| Inefficient Performance | 25 | 19 | **44** | 25 | 5 | **30** | 20 | 17 | **37** |
| Electronic Device | 4 | 14 | **18** | 2 | 2 | **4** | 5 | 0 | **5** |
| NPA | 5 | 5 | **10** | 0 | 3 | **3** | 8 | 5 | **13** |
| Other | 2 | 4 | **6** | 1 | 3 | **4** | 3 | 5 | **8** |
| Contraband | 4 | 3 | **7** | 4 | 1 | **5** | 0 | 0 | **0** |
| Erroneous Discharge | 5 | 0 | **5** | 0 | 0 | **0** | 2 | 0 | **2** |
| **Total** | **161** | **198** | **359** | **214** | **415** | **629** | **329** | **176** | **505** |

## OATH Pre-Trial Conferences

The table below presents the number of use of force related pre-trial conferences that were scheduled in each Monitoring Period since July 1, 2020 and the results of those conferences. The Monitoring Team's assessment of this information is discussed in the Staffing Accountability section and 14th Monitoring Period Compliance Assessment of the report.

| # Required | # Held | Settled Pre-OATH | Settled at OATH | On-Going Negotiation | Another Conference | Trial | Other | Admin Filed | # UOF Incidents | # Staff Members |
|---|---|---|---|---|---|---|---|---|---|---|
| Pre-Trial Conferences Related to UOF Violations | | | | | | | | | | |
| | | Results of Pre-Trial Conferences for UOF Cases | | | | | | | UOF Matters & Staff | |
| **July to December 2020 (11th MP)** | | | | | | | | | | |
| **225**[160] | **303** | *0* | *111* | *10* | *44* | *124* | *12* | *2* | **274** | **198** |
| | 100% | *0%* | *37%* | *3%* | *15%* | *41%* | *4%* | *1%* | | |
| **January to June 2021 (12th MP)** | | | | | | | | | | |
| **300** | **541** | *0* | *282* | *4* | *85* | *136* | *33* | *1* | **367** | **331** |
| | 100% | *0%* | *52%* | *1%* | *16%* | *25%* | *6%* | *0%* | | |
| **July to December 2021 (13th MP)** | | | | | | | | | | |
| **350** | **379** | 185 | 87 | 4 | 18 | 58 | 26 | 1 | **284** | **239** |
| | 100% | *49%* | *23%* | *1%* | *5%* | *15%* | *7%* | *0%* | | |
| **January to June 2022 (14th MP)** | | | | | | | | | | |
| **900** | **989** | 612 | 76 | 3 | 174 | 105 | 3 | 16 | **574** | **417** |
| | 100% | *62%* | *8%* | *0%* | *18%* | *11%* | *0%* | *2%* | | |
| **July to September 2022 (*Partial* 15th MP)** | | | | | | | | | | |
| **450** | **511** | 345 | 30 | 0 | 97 | 33 | 0 | 6 | | |
| | 100% | *68%* | *6%* | *0%* | *19%* | *6%* | *0%* | *1%* | | |

---

[160] The Remedial Order requirement came into effect on August 14, 2020 so was applicable for four and a half months in the Monitoring Period.

Individuals Who Died While in the Custody of the New York City DOC

The list below identifies the individuals who died (or were granted compassionate release[161]) while in DOC custody between November 2015 and October 28, 2022.

| Date of Death | Name |
|---|---|
| 1/1/2015 | Cruz, Fabian |
| 1/8/2015 | Lear, Kenneth |
| 3/8/2015 | Cagliostro, Richard |
| 4/6/2015 | Nelson, Alvin |
| 5/31/2015 | Santiago, Richard |
| 6/10/2015 | Davis, Kenan |
| 8/17/2015 | Cruz, Yvonne |
| 10/13/2015 | Sparkes, Randolph |
| 10/14/2015 | Gonzalez Richard |
| 11/5/2015 | Blassingame, Fred |
| 12/4/2015 | Migliozzi, Martin |
| 1/17/2016 | Marrero, Maria |
| 1/29/2016 | Perez-Rios, Angel |
| 2/24/2016 | Adedji, Omole |
| 3/14/2016 | Polanco- Munoz, Jairo |
| 4/16/2016 | Bryant, Kareen |
| 4/18/2016 | Zhang, Zhi |
| 5/19/2016 | Ruiz, Kenny |
| 5/27/2016 | Deshields, Michael |
| 6/3/2016 | Tirado, Carlos |
| 6/10/2016 | Jones, Clarence |
| 8/7/2016 | Quiles, Manuel |
| 8/17/2016 | Acosta, Martin |
| 8/26/2016 | Webb, Davis |
| 12/14/2016 | Serrano, Mark |
| 12/28/2016 | Castelle, Eugene |
| 1/26/2017 | Johnson, Richard |
| 3/7/2017 | Cardona, Luis |
| 3/8/2017 | Bachtobj, Mohamed |
| 3/24/2017 | Luski, Eli |
| 8/27/2017 | Henderson, Wayne |
| 10/19/2017 | Feratovic, Selmin |

---

[161] This list only includes individuals who were compassionately released in 2021 and 2022. The Monitoring Team does not have information about whether individuals were compassionately released prior to their death before January 1, 2021.

ix

| Date of Death | Name |
|---|---|
| 1/4/2018 | Foster, Joseph |
| 1/30/2018 | Swanson, Grant |
| 3/4/2018 | Haynes, Russell |
| 7/9/2018 | Holloway, Casey |
| 8/27/2018 | McPeck, David |
| 9/18/2018 | Sanchez, Sebastian |
| 10/1/2018 | Johnson Jr., Maurice |
| 11/4/2018 | McClain, Chiki |
| 6/7/2019 | Cubilette-Polanco, Daniel |
| 6/9/2019 | Rivera, Jose |
| 11/23/2019 | Mcclure, Lebarnes |
| 4/5/2020 | Jones, Arniel |
| 4/5/2020 | Tyson, Michael |
| 4/11/2020 | Ance, Walter |
| 4/16/2020 | Branch, Milton |
| 4/23/2020 | Delrosario Kevin |
| 5/22/2020 | Kang, Scott |
| 5/28/2020 | Granados, Junior |
| 6/21/2020 | Rodriguez, Hector |
| 10/9/2020 | Cruz, Christopher |
| 11/23/2020 | Wilson, Ryan |
| 11/26/2020 | Skervchak, Esther |
| 1/23/2021 | Diaz-Guzman, Wilson |
| 3/2/2021 | Comacho, Carlo Tomas |
| 3/22/2021 | Velasco, Javier |
| 4/19/2021 | Braunson III, Thomas |
| 5/1/2021 | Blake, Richard |
| 6/10/2021 | Mejia, Jose |
| 6/30/2021 | Jackson, Robert |
| 8/10/2021 | Rodriguez, Brandon |
| 8/30/2021 | Guallpa, Segundo |
| 9/7/2021 | Johnson, Esias |
| 9/19/2021 | Isaabdul, Karim |
| 9/22/2021 | Khadu, Stephen |
| 10/15/2021 | Mercado, Victor |
| 10/18/2021 | Scott, Anthony |
| 12/10/2021 | Boatwright, Malcolm |
| 12/14/2021 | Brown, William |
| 2/27/2022 | Youngblood, Tarz |
| 3/17/2022 | Pagan, George |
| 3/18/2022 | Diaz, Herman |
| 5/7/2022 | Carter, Dashawn |

| Date of Death | Name |
|---|---|
| 5/18/2022 | Yehudah, Mary |
| 5/28/2022 | Sullivan, Emanuel |
| 6/18/2022 | Bradley, Antonio |
| 6/20/2022 | Carrasquillo, Anibal |
| 6/21/2022 | Drye, Albert |
| 7/11/2022 | Muhammad, Elijah |
| 7/15/2022 | Lopez, Michael |
| 8/15/2022 | Cruciani, Ricardo |
| 8/30/2022 | Nieves, Michael |
| 9/14/2022 | Bryan, Kevin |
| 9/20/2022 | Acevedo, Gregory |
| 9/22/2022 | Pondexter, Robert |
| 10/22/2022 | Tavira, Erick |

# APPENDIX B:
# EXCERPTS OF COMPLETED EXTERNAL AGENCY INVESTIGATIONS OF IN-CUSTODY DEATHS

Completed Summaries of External Agency Investigations of In-Custody Deaths

- *Summary of completed investigations for In-Custody Deaths in 2021 and 2022*: Pg. 1 New York State Office of the Attorney General, Office of Special Investigation, Second Annual Report Pursuant to Executive Law Section 70-b dated October 1, 2022 (pg. 19-29)

- *Summary of completed investigations for 2021 Suicides and Drug-Related Deaths*: Pg. 13 Board of Correction Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody dated September 12, 2022 (pg. 1-20).

- *Summary of completed investigations for 3 deaths in 2022*: Pg. 33 Board of Correction February & March 2022 Deaths in DOC Custody Report and Recommendations dated May 9, 2022 (pg. 1-5).

- *Summary of death of Junior Garanados (died on May 28, 2020)*: Pg. 38 Final Report of The New York State Commission of Correction in the Matter of the Death of Junior Garanados, an incarcerated individual of the Robert N. Davoren Center dated March 29, 2022 (Pg. 1-5).

- *Summary of death of Hector Rodriguez (died on June 21, 2020)*: Pg. 43 Final Report of The New York State Commission of Correction in the Matter of the Death of Hector Rodriguez, an incarcerated individual of the Robert N. Davoren Center dated March 29, 2022 (Pg. 1-13)

- *Summary of death of Christopher Cruz (died on October 9, 2020)*: Pg. 56 Final Report of The New York State Commission of Correction in the Matter of the Death of Christopher

Cruz, an incarcerated individual of the Anna M. Kross Center dated June 28, 2022 (Pg. 1-29)

- _Summary of death of Wilson Diaz-Guzman (died on January 22, 2021)_: Pg. 85 Final Report of The New York State Commission of Correction in the Matter of the Death of Wilson Diaz-Guzman, an incarcerated individual of the Otis Bantum Correctional Center dated June 28, 2022 (Pg. 1-6)

- _Summary of death of Javier Velasco (died on March 19, 2021)_: Pg. 91 Final Report of The New York State Commission of Correction in the Matter of the Death of Javier Velasco, an incarcerated individual of the Anna M. Kross Center dated June 28, 2022 (pg. 1-6)

# New York State Office of the Attorney General

# Office of Special Investigation

October 1, 2022

# Second Annual Report Pursuant to Executive Law Section 70-b



**Letitia James**
**NYS Attorney General**

OSI recommended that Monroe County Sheriff's cars be outfitted with dash cam.

Wesley Soper was white. At the time of his death he was 32 years old. The Soper report can be read here: Wesley Soper.

Janet Jordan, March 14, 2022, Monroe County.

At 2:08 am on March 14, 2022, security video and other evidence show that an off-duty RPD sergeant entered Janet Jordan's home by the front door and left an hour later. When Ms. Jordan's husband came home in the morning, from his night shift as a deputy sheriff at the Monroe County Jail, he found her dead of a gunshot wound and called 911. A subsequent search for the sergeant found him dead in his car of a self-inflicted gunshot wound. On autopsy, a key to Ms. Jordan's front door was found in the sergeant's trouser pocket.

Although the murder weapon was never found, .22 caliber shell casings with a distinctive crosshair logo, and with the sergeant's DNA, were found in Ms. Jordan's house, and .22 caliber shell casings with the same logo were found in the sergeant's car. Jail video and electronic records establish that Ms. Jordan's husband was physically at the jail from the beginning to the end of his shift (10:53 pm to 6:56 am).

OSI concluded there is no reason to believe anyone other than the sergeant was responsible for Ms. Jordan's death.

Janet Jordan was Black. At the time of her death she was 35 years old. The Jordan report can be read here: Janet Jordan.

## 4. New York City Department of Correction

NYC DOC operates detention facilities on Rikers Island and in a nearby barge. Persons in the custody of NYC DOC are detainees awaiting trial, detainees awaiting sentencing, prisoners sentenced to one year or less of jail time, and prisoners sentenced to more than a year of prison time and awaiting transfer to a state prison. NYC DOC also has custody of persons in transit to or from an NYC DOC facility, persons at courthouses awaiting court appearances, and persons being treated in hospitals. According to the August 2022 Fact Sheet published by the New York Division of Criminal Justice Services ("DCJS"), the NYC DOC population was just under 5600.[17]

All jails and prisons in New York are required to report deaths and other significant incidents to the New York State Commission of Correction ("SCOC") for review. SCOC is an independent oversight body, which sees that jails and prisons throughout the state uphold minimum standards under the

---

377 (2008) [inner quotation marks omitted].

[17] See the DCJS Jail Population by Month Report. A detailed description of NYC DOC's facilities can be found at NYC DOC Facilities Overview.

state's constitution, statutes, and regulations. SCOC issues an annual report,[18] describing its activities and findings, and issues reports on deaths in NYC DOC facilities.[19]

The New York City Board of Correction ("NYC BOC") is an independent oversight body for the jails in New York City, which sees that they comply with minimum standards in conditions of confinement and health and mental health care. NYC BOC conducts investigations and issues reports on deaths in NYC DOC custody, jail conditions, housing density, and access to health and mental health care.[20]

Conditions at Rikers Island have been the subject of innumerable news stories.[21] In June, 2015, United States District Judge Laura Taylor Swain appointed a monitor to oversee reforms to NYC DOC facilities, including reducing unnecessary uses of force, increasing video monitoring, and addressing staffing concerns.[22] Since that time the monitor has issued 12 reports on conditions at Rikers Island, with dozens of recommendations for improvement.[23] The United States Department of Justice has intervened in the litigation.[24] Judge Swain recently held hearings on whether to remove NYC DOC from managerial control of the jails and to give that control to a receiver.[25]

The Independent Commission on New York City Criminal Justice and Incarceration Reform, chaired by Jonathan Lippman, the former Chief Judge of the State of New York, published reports about inhumane conditions at Rikers Island, including violence, environmental hazards, and preventable mortality.[26] In its July 2021 report, the Commission proposed a plan to close the jails on Rikers Island and to transition NYC DOC to a borough-based system of jails.[27]

In this section OSI summarizes investigations it has completed to date into the deaths of persons in NYC DOC custody, occurring since April 1, 2021, the effective date of Section 70-b. If not described in this section, OSI's investigations into the deaths of persons in the custody of NYC DOC remain active. Table C in the Appendix has data on all NYC DOC notifications OSI received from April 1, 2021 through August 31, 2022. In Section 5 below, OSI makes recommendations concerning suicide prevention and drug overdose prevention in the state's jails and prisons. The investigation summaries are below:

---

[18] See SCOC Annual Reports.
[19] See SCOC Incarcerated Individual Mortality Reports.
[20] See NYC Board of Correction Reports.
[21] See, e.g., news articles from: New York Times (February 22, 2015); Daily News (April 6, 2017); New York Times (January 1, 2022); New York Times (January 13, 2022); New York Times (February 2, 2022); New York Times (May 18, 2022).
[22] See the Consent Judgment for the Nunez Monitorship and Politico (June 20, 2015) for more details
[23] Monitor's reports can be found here: Nunez Monitor Reports
[24] See United States Department of Justice August 6, 2020 press release and Rikers Island Remedial Order addressing NYC DOC non-compliance.
[25] See NBC New York (April 20, 2022); NYC Public Advocate Press Release (2022); AMNY (May 16, 2022); Politics NY (May 24, 2022); and Gothamist (June 28, 2022).
[26] See Commission Reports.
[27] See Closing Rikers Island – A Roadmap for Reducing Jail in New York City.

Thomas Braunson, April 19, 2021.

Thomas Braunson was arrested for a parole violation on April 16, 2021 and housed at the Eric M. Taylor Center ("EMTC") on Rikers Island. Prior to his transport to Rikers Island, a corrections officer assessed Mr. Braunson for suicide risk, mental health risk, and substance use history at the Queens Detention Complex. Mr. Braunson denied drug use at that time.

On the morning of April 19, 2021, according to handwritten logs and inmate interviews, a fight broke out between two incarcerated persons in the area of EMTC where Mr. Braunson was housed. Later that morning, a corrections officer conducting rounds saw Mr. Braunson lying unresponsive in his bed. The officer called a medical emergency, and staff attempted life-saving measures. Mr. Braunson was pronounced dead 15 minutes later by an urgent care doctor. Heroin and heroin residue were later found on Mr. Braunson and in his cell.

The medical examiner determined the cause of death to be acute intoxication from combined effects of fentanyl, heroin, and phencyclidine; the medical examiner's report also noted evidence of chronic substance use. Two incarcerated persons housed near Mr. Braunson said in interviews that they observed him swallow a quantity of apparent heroin before his death. One said Mr. Braunson "got scared and swallowed everything" when officers entered the housing area following the fight earlier that morning.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Braunson's death.

Mr. Braunson was Black. At the time of his death he was 35 years old.

Richard Blake, April 30, 2021.

Richard Blake was arrested for criminal possession of a controlled substance on February 11, 2021 and housed in the Otis Bantum Correctional Center ("OBCC") on Rikers Island.

On April 27, 2021, Mr. Blake had a seizure, was treated in a medical unit, and was returned to his housing. On April 30, 2021, at 10:47 pm, several persons housed near Mr. Blake summoned a corrections officer because Mr. Blake appeared to be having a medical emergency. The responding officer called for assistance from the medical unit but did not directly try to assist Mr. Blake until the arrival of a second officer seven minutes later. When the second officer arrived at 10:54 pm Mr. Blake was no longer breathing. The second officer and an incarcerated person moved Mr. Blake to the floor, where the officer performed chest compressions until the medical unit arrived at 10:56 pm. (Mr. Blake's housing unit lacked an automated external defibrillator.) Mr. Blake never regained consciousness.

The medical examiner determined the cause of death to be hypertensive and atherosclerotic cardiovascular disease. In an interview with OSI the medical examiner said Mr. Blake had

significant cardiovascular disease, which obstructed adequate supply of blood to his heart, and that, due to the severity of Mr. Blake's heart disease, he would have needed to be on an operating table almost immediately to have survived his cardiac arrest.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Blake's death.

Mr. Blake was Black. At the time of his death he was 45 years old.

Brandon Rodriguez, August 10, 2021.

Brandon Rodriguez was arrested on August 4, 2021, for Strangulation in the Second Degree and other crimes, and housed at OBCC.

On August 5, 2021, at OBCC, a corrections officer assessed Mr. Rodriguez for suicide risk and found no suicide risk. Mr. Rodriguez was held in an overcrowded OBCC Intake holding pen for the next two and a half days, until, on August 8, at 9:45 am, he was assaulted by other incarcerated persons (captured on video) and removed for medical care. Mr. Rodriguez was initially treated at a clinic on Rikers Island and was later taken to Elmhurst Hospital for treatment of a broken bone around his eye; he was returned to OBCC in the morning of August 9.

Later on August 9 a doctor and a social worker assessed Mr. Rodriguez's physical and mental condition; neither found him to be a suicide risk, though both indicated he needed mental health follow-up. Mr. Rodriguez's medical records, from prior stays on Rikers Island, indicated he had attempted suicide previously. It is not clear whether the two professionals who evaluated Mr. Rodriguez on August 9 saw or had access to those records at the time of the evaluations.

On the same day, after the evaluations, Mr. Rodriguez assaulted an incarcerated person (captured on video) and corrections officers took him to the Segregation Intake housing area; when he physically resisted transport to the area, corrections officers used force to handcuff him and place him on a gurney to take him to the area (captured on video). Upon arrival in the Segregation area, shortly before 4:00 pm, corrections officers put Mr. Rodriguez in a shower cell, explaining that the regular cells had not been cleaned.

According to an officer's incident report, at about 7:20 pm, corrections officers came to Mr. Rodriguez, still in the shower cell, told him they were going to take him to a medical clinic to be evaluated because of the earlier use of force, and began to place handcuffs on him through a cuffing port. However, with only one wrist cuffed, Mr. Rodriguez pulled his arms back and refused to allow his other wrist to be cuffed. The corrections officers demanded that he allow them either to cuff the other wrist or to take their cuffs back, but Mr. Rodriguez refused. Some, though not all, nearby incarcerated persons said in investigative interviews that Mr. Rodriguez said he would kill himself and that one of the officers responded, I don't care if you kill yourself, I need my cuffs back.

22

Video surveillance (which does not have audio) confirms that officers arrived about 7:20 pm, spoke to Mr. Rodriguez in the cell, and appeared (from a vantage point behind the officers) to attempt to cuff him and then struggle with him. One of the officers involved in the cuffing incident refused, via her attorney, OSI's request for an interview; the other officer has left NYC DOC employment and OSI has not succeeded in locating and interviewing him.

After the cuffing incident, video shows that Mr. Rodriguez spoke often with other incarcerated persons, and that a corrections officer frequently checked on Mr. Rodriguez. Video also captured Mr. Rodriguez appearing to prepare to take his own life, taking off his shirt, twisting it, putting it around his neck, and tying it to something in the cell. There are moments in the video, especially after midnight, when it appears that Mr. Rodriguez ceased his preparatory actions because another person was nearby and might have been able to see him. Although the video does not capture an incarcerated person or the corrections officer noticing these actions, one incarcerated person, in a later interview, said he saw these actions but did not realize Mr. Rodriguez was going to hang himself.

Video shows that at 12:03 am, the corrections officer assigned to the Segregation Intake housing area looked directly into Mr. Rodriguez's cell for 20 seconds, from the gallery above and across from the cell, and then left the area. Video shows that at 12:33 am the officer re-entered the gallery above and across from Mr. Rodriguez's cell, looked into the cell, went down to the cell, opened it, moved Mr. Rodriguez, used his radio, and began chest compressions on Mr. Rodriguez. The NYC DOC incident report states that the officer found Mr. Rodriguez hanging at 12:30 am. Based on recorded transmissions, the officer made three radio calls for medical to come ASAP while he continued to perform chest compressions. Medical staff arrived at 12:43 am and continued attempts to resuscitate Mr. Rodriguez.  Medical staff declared Mr. Rodriguez dead at 1:08 am. The medical examiner determined the cause of death to be hanging.

The officer who found Mr. Rodriguez refused, via his attorney, OSI's request for an interview.

Despite the many failures that preceded Mr. Rodriguez's death, OSI did not find reason to believe that a corrections officer caused his death. The excessive time he spent in the Intake pens, during which he was assaulted, was a systemic failure; more than 40 incarcerated persons were in a similar situation, apparently the result of a staffing shortage when OBCC corrections officers called in sick.[28] The doctor and the social worker who failed to recognize Mr. Rodriguez's suicide risk were not corrections officers; even if they could be considered to have contributed to the cause of Mr. Rodriguez's death by failing to put him on suicide watch, Section 70-b does not authorize OSI to investigate or prosecute their conduct. And the evidence is not conclusive whether a corrections officer said, "I don't care if you kill yourself." Assuming such a statement was made, and as harsh

---

[28] See New York City Board of Corrections report on suicides and drug-related deaths, Gothamist (August 12, 2021) news article, and The City (August 26, 2021) news article.

and improper as it would have been, it is hard to conclude that the statement would have caused Mr. Rodriguez to take his own life.

However, the failures in Mr. Rodriguez's case were significant, and they are part of the basis for a recommendation, detailed in Section 5.4 below, on reducing suicide risk in New York's jails and prisons.

Brandon Rodriguez was Hispanic. At the time of this death he was 25 years old.

Segundo Guallpa, August 30, 2021.

Segundo Guallpa was arrested on August 18, 2021, for Strangulation in the Second Degree and was housed in the West Facility on Rikers Island.

A corrections officer performed a standard screening for suicide risk, which the officer assessed as zero. Mr. Guallpa was initially assigned to medical housing, due to the heightened Covid risk presented by his asthma; during his time in medical housing he was seen a number of times by medical staff, who noted no apparent physical or mental health issues in their records before clearing him, on August 29, for transfer to regular housing.

Shortly after 1:00 am on August 30, corrections officers conducting a round failed to get a response from Mr. Guallpa when they turned on the light in his cell and knocked on the door. Upon entering the cell, corrections officers found Mr. Guallpa hanging, in a seated position, from a ligature made of socks and attached to the bed frame. Correctional and medical staff were unable to revive him, and medical staff declared Mr. Guallpa dead shortly after 1:30 am. Mr. Guallpa was in early-stage rigor mortis when he was found. The medical examiner determined the cause of death to be hanging but would not opine on how long Mr. Guallpa was dead before he was found.

OSI requested interviews with the corrections officers assigned to Mr. Guallpa's housing area during the time in question, and, through their lawyers, each refused to speak with us.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Guallpa's death. Although video shows that corrections officers assigned to Mr. Guallpa's housing area on the night of August 29 and the early morning hours of August 30 missed scheduled rounds (the officers falsely reported having done those rounds, and four officers – including two captains – were disciplined), OSI could not conclude that Mr. Guallpa's death would have been prevented had all rounds been properly conducted. Based on interviews with medical examiners in a number of cases, it appears that brain death can occur within a few minutes when a person begins to hang.[29] Based on OSI's review of a number of suicides in jails and prisons, even in cases where video shows officers made regular rounds, incarcerated persons were able to hang themselves in the space of a few minutes, without being noticed, between those rounds. (See, later in this section,

---

[29] Goldstein, S. (2020, December 3). Hanging Injuries and Strangulation. *Medscape.* Retrieved from: https://emedicine.medscape.com/article/826704-overview?reg=1.

the case of Antonio Bradley.) Therefore, even if the officers in the case of Mr. Guallpa had made regular rounds, OSI cannot conclude they would have prevented Mr. Guallpa's death.

Segundo Guallpa was Hispanic. At the time of his death he was 58 years old.

Esias Johnson, September 7, 2021.

Esias Johnson was arrested on August 6, 2021, for Menacing in the Second Degree, and housed at the Anna M. Kross Center on Rikers Island.

On September 7, 2021, corrections officers found Mr. Johnson in his bed and unresponsive at 9:11 am. When medical staff arrived they saw that Mr. Johnson was not breathing and in early-stage rigor mortis; they declared him dead at 9:43 am. The medical examiner determined the cause of death to be acute methadone intoxication.

Video shows that Mr. Johnson went to bed a few minutes after 1:00 am and appeared to stop breathing about 6:00 am. The medical examiner opined that, assuming Mr. Johnson had taken a fatal dose of methadone shortly before going to bed, it might have been possible to save him with Naloxone if administered soon after, with the chances of success decreasing over time; if corrections officers had noticed that he stopped breathing at 6:00 am, it would probably have been too late to save him.[30]

OSI examined allegations that prior to his death Mr. Johnson was denied medical care for digestive problems but could not substantiate them. Rikers medical records indicate medical staff saw Mr. Johnson on August 11, 19, and 26, and September 1, and that on August 17 and September 6 Mr. Johnson refused medical care; the medical notes do not indicate Mr. Johnson complained of digestive problems.

Video shows that the corrections officer assigned to conduct rounds every 30 minutes in Mr. Johnson's housing area from at 3:15 am to 9:15 am on September 7 only conducted four rounds (three of which were incomplete) and failed to conduct seven rounds; the officer falsely noted in the logbook that "active supervision" was conducted every 30 minutes as required. (Under NYC DOC rules, active supervision requires, among other things, checking each incarcerated person individually for signs of life.) Three corrections officers (including a captain) were reassigned pending disciplinary proceedings. OSI requested interviews with four officers, each of whom refused, via counsel.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Johnson's death.

Esias Johnson was Black. At the time of his death he was 24 years old.

---

[30] Naloxone is an opioid antagonist used to rapidly reduce the effects of opioid overdose by attaching to opioid receptors, blocking the effects of other opioids, and quickly restoring normal breathing if administered quickly enough. Naloxone has no known adverse effects if administered on someone who does not have opioids in their system. See National Institute on Drug Abuse – Naloxone Drug Facts

<u>Karim Isaabdul, September 19, 2021</u>.

Karim Isaabdul was arrested on August 18, 2021 on a parole warrant and was housed in Dorm 3 of the North Infirmary Command on Rikers Island, a housing area for persons needing special medical attention. Mr. Isaabdul had been on parole from a state prison sentence for Criminal Sale of a Controlled Substance in the Third Degree.

On September 19, 2021, as captured on video, Mr. Isaabdul, who was wheelchair-bound, was in a common area, speaking with other incarcerated persons, when, at 6:37 pm, he seemed to slump and suffer pain. At 6:42 pm a medical response team arrived and, at 6:48 pm, took Mr. Isaabdul on a gurney to an adjacent clinic. Medical records show that medical staff administered Narcan and epinephrine to Mr. Isaabdul at the clinic, but failed to revive him. He was pronounced dead at 7:35 pm.

OSI looked into allegations that Mr. Isaabdul complained of feeling ill and failed to get treatment, but could not substantiate them. According to the Correctional Health Service ("CHS")[31] medical records, Mr. Isaabdul was seen by medical and mental health staff on 25 of the 32 days he was incarcerated, and, on many of those days, was seen more than once.

According to medical records, medical staff evaluated Mr. Isaabdul on August 21, 2021 and diagnosed him with asthma, spinal fusion, seizure disorder, hypertension, diabetes, and schizoaffective disorder. Staff developed a treatment and medication plan for each diagnosis, including a diet and follow-up lab work for diabetes, medication for hypertension and seizure disorder, an inhaler for asthma, medication and regular appointments with mental health professionals for schizoaffective disorder, and a wheelchair to assist with mobility. Medical staff reevaluated Mr. Isaabdul several times to assess his medications; on three occasions Mr. Isaabdul told a physician he was non-compliant with his medication. On August 25, 2021, Mr. Isaabdul tested positive for Covid-19 and was quarantined before moving to Dorm 3. When medical staff saw Mr. Isaabdul on September 16, 2021, he complained of pain to his arm and chest, and they ordered a chest x-ray for September 20, the day after he died. Medical staff saw Mr. Isaabdul the next day, September 17, 2021.

The medical examiner found that Mr. Isaabdul died of "pulmonary emboli due to right lower extremity deep vein thrombosis complicating Covid-19 in a person with decreased mobility due to degenerative spine disease."

Based on the investigation OSI did not find reason to believe that a corrections officer caused Mr. Isaabdul's death.

Records vary as to whether Mr. Isaabdul was Black or Hispanic. At the time of his death he was 41 years old.

---

[31] CHS is part of the New York City Health & Hospitals Corporation, not NYC DOC.
https://www.nychealthandhospitals.org/correctionalhealthservices/

<u>Steven Khadu, September 22, 2021</u>.

Stephen Khadu was arrested on December 19, 2019 for Murder in the Second Degree and was housed at the Vernon C. Bain Center ("VCBC"), a jail barge docked at the southern shore of the Bronx.

On July 6, 2021 Mr. Khadu suffered a seizure and was treated at Lincoln Hospital from July 6 to July 12. On September 22, 2021, as captured on video, Mr. Khadu suffered another seizure, at 8:15 am; medical staff arrived at 8:25 am, brought him to the infirmary and treated him with medication; his condition seemed to improve, but then he suffered another seizure. According to medical records, a team from Emergency Medical Services arrived at the infirmary at 9:39 am and a second team of emergency medical technicians, who were trained in advanced life support, arrived at 9:42 am. The two teams of EMTs moved Mr. Khadu out of the clinic at 9:52 am and took him by ambulance to Lincoln Hospital. Mr. Khadu suffered a heart attack en route and, despite the EMTs' efforts in the ambulance, including intubating Mr. Khadu and performing cardiopulmonary resuscitation, he was pronounced dead at 10:55 am, five minutes after arrival at the hospital.

The medical examiner determined that Mr. Khadu died of complications of lymphocytic meningitis. In an interview with OSI, the medical examiner said that meningitis increases the risk of seizure because it causes inflammation of the brain, and that any prolonged seizure can lead to difficulty breathing, which in turn can lead to cardiac arrest and death, as happened to Mr. Khadu.

OSI examined allegations that Mr. Khadu did not receive adequate medical care but could not confirm them. According to medical records, upon Mr. Khadu's return to VCBC after his hospital stay for the July seizure, he saw medical staff on July 12, July 14, August 4, August 12, and August 14, 2021. From September 15 to September 20, 2021, Mr. Khadu made eight recorded phone calls, which OSI reviewed; he did not say he was being denied medical care.

Based on the investigation OSI did not find reason to believe that a corrections officer caused Mr. Khadu's death.

Mr. Khadu was Black. At the time of his death he was 24 years old.

<u>Victor Mercado, October 15, 2021</u>.

Victor Mercado was arrested on July 21, 2021 for Criminal Possession of a Controlled Substance in the Third Degree and Criminal Possession of a Weapon in the Second Degree. After testing positive for Covid-19 on October 8, 2021, he was transferred from the North Infirmary Command to the Communicable Disease Unit ("CDU") of the West Facility, on Rikers Island.

On the day he tested positive, Mr. Mercado did not have a high fever or difficulty breathing. On the next day, October 9, according to medical records, he had a fever of 102.1, which dropped after he took Tylenol. From October 10 through 13, Mr. Mercado's temperature did not exceed 100.5 degrees, and his blood oxygen level did not drop below 95%. Medical records show that medical

staff in the CDU checked on Mr. Mercado at least twice a day on October 9, 10, 11, 12, and 14, and once on October 13.

On the morning of October 14, 2021, according to a logbook entry, Mr. Mercado complained of difficulty breathing at 9:45 am. Medical records show corrections officers made an emergency medical call for Mr. Mercado at 10:05 am, and that a doctor and a nurse responded, examined Mr. Mercado, and determined he should go to the hospital. Video shows that oxygen and an IV drip were brought to Mr. Mercado's cell at 10:17 am, that Emergency Medical Services arrived at 10:40 am, and that EMS left with Mr. Mercado for the hospital at 10:55 am. Medical records show that Mr. Mercado arrived at Elmhurst Hospital at 11:36 am and was immediately intubated. He was pronounced dead at the hospital the next day, at 12:39 pm.

The medical examiner determined that Mr. Mercado's Covid-19 infection caused lung consolidation, which in turn caused sepsis, renal failure, and death. Mr. Mercado had a number of underlying medical conditions that put him at a higher risk for severe Covid-19 outcomes.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Mercado's death.

Mr. Mercado was Hispanic. At the time of his death he was 64 years old.

<u>Malcolm Boatwright, December 10, 2021.</u>

Malcolm Boatwright was arrested on November 11, 2021 for Sexual Abuse in the First Degree and was housed in the PACE Unit of the Anna M. Kross Center ("AMKC"), on Rikers Island. PACE stands for Programs to Accelerate Clinical Effectiveness and is a unit for persons with significant mental health or behavioral issues.

Video shows that Mr. Boatwright was playing a card game with other incarcerated persons in the PACE Unit on December 8, 2021 when, at 1:14 pm, he had a seizure, which lasted for three to four minutes. A nurse was present and called a medical emergency. Medical staff brought Mr. Boatwright to a clinic, where he was examined by a doctor, who sent him to Elmhurst Hospital for evaluation and testing. In the hospital, at midnight, as he was about to have an X-ray, Mr. Boatwright had another seizure. After further evaluations, doctors sent Mr. Boatwright to Bellevue Hospital for a further testing; he arrived at Bellevue midday on December 9. (Mr. Boatwright was in the prison wards of both hospitals.) At Bellevue, on the 9th and into the 10th, video shows corrections officers made regular rounds of the ward where Mr. Boatwright was housed. At 4:15 am on the 10th, corrections officers summoned medical staff to Mr. Boatwright's room after finding him unresponsive on the floor. Medical staff arrived at 4:18 am, but their efforts failed, and Mr. Boatwright was declared dead at 5:36 am.

Although Mr. Boatwright had no history of seizure disorder before December 8, he had been taking medications for mental illness. On December 4, under the guidance of physicians at AMKC, Mr. Boatwright finished tapering off Clozapine, and had not started any new medications. On autopsy, the medical examiner found no evidence of external trauma, or of meningitis or Covid-19; the

cardiac pathologist did not find indications of disease; neuropathology was negative; and microscopic genetic analysis was negative for abnormality that could explain death. In an interview with OSI, the medical examiner said that the medical taper of Clozapine could have been a contributing factor to Mr. Boatwright's seizures. The final autopsy report said the cause of death was complications of non-traumatic seizure disorder of undetermined etiology (origin), and that the manner of death was "natural."

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Boatwright's death.

Mr. Boatwright was Black. At the time of his death he was 28 years old.

Antonio Bradley, June 18, 2022.

Antonio Bradley was arrested on October 13, 2021 for Criminal Possession of a Weapon in the Second Degree and was housed at the Anna M. Kross Center on Rikers Island.

On the morning of June 10, 2022, Mr. Bradley was transported from Rikers Island to a holding cell in the Bronx courthouse to await a scheduled court appearance. A recorded phone call between Mr. Bradley and his father, from earlier in the morning of the same day, indicated that Mr. Bradley hoped to be released as a result of the court appearance. The appearance, however, was postponed, which Mr. Bradley learned in a conversation with his lawyer at about 12:15 pm, while he was still in the holding cell in the courthouse. Video shows that corrections officers spoke with Mr. Bradley at 4:18 pm and 4:22 pm, while he was in the holding cell. At 4:23 pm, video shows Mr. Bradley began to twist his sweatshirt into a ligature; he tied it around his neck and to the cell bars and knelt down; he repositioned himself and knelt down again. At 4:25:13 pm his body went limp. At 4:33 pm corrections officers came to take Mr. Bradley back to Rikers Island but found him hanging. A corrections officer opened the cell door and officers used an automated external defibrillator and performed cardiopulmonary resuscitation. Emergency Medical Services arrived at 4:52 pm and took Mr. Bradley to Lincoln Hospital where he continued to receive emergency treatment. Brain death began on June 13, and a doctor pronounced Mr. Bradley dead on June 18, 2022.

Based on the investigation, OSI did not find reason to believe that a corrections officer caused Mr. Bradley's death.

Antonio Bradley was Black. At the time of his death he was 28 years old.



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# Report and Recommendations on 2021 Suicides and Drug-Related Deaths in New York City Department of Correction Custody[1]

## September 12, 2022

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández, in collaboration with Director of Special Investigations Rahzeem Gray and Special Investigations Coordinator Imahnni Jeffries. Former Deputy General Counsel Kate McMahon, Appeals Coordinator Joshua Acquaye, Director of Public Accountability Barbie Melendez, Director of Violence Prevention Bart Baily, and Deputy Executive Director of Oversight and Evaluation Nashla Rivas Salas were instrumental in bringing this report to production. Many thanks to Executive Director Amanda Masters, General Counsel Jasmine Georges-Yilla, and Deputy Executive Director of Research Chai Park for their insight and comments, and to the members of the Jail Death Review subcommittee of the Board of Correction: Committee Chair Jacqueline Sherman, Interim Board Chair Julio Medina, Dr. Robert Cohen, and Dr. Steven Safyer.

## I.    INTRODUCTION & METHODOLOGY

Sixteen people died in New York City Department of Correction ("Department" or "DOC") custody in 2021. They were between 24 to 64 years old and had court cases pending in five boroughs: New York County (n=3), Bronx (n=2), Kings (n=4), Queens (n=5), Richmond (n=1), plus one jailed due to a New York State Department of Parole technical parole violation. Four of the decedents had been in custody for one to five days before they died. Meanwhile, Isa Abdul Karim had been in custody the longest, at one year and nine months for a technical parole violation.

Office of the Chief Medical Examiner ("OCME") records state that six of the decedents had died by suicide, four from acute drug intoxication, two from COVID-19 complications, two from cardiovascular disease, one due to complications of meningitis, and one from complications of a nontraumatic seizure disorder.

Tomas Carlo Camacho and Anthony Scott died shortly after being granted a compassionate release after they attempted suicide while incarcerated. Had Mr. Camacho and Mr. Scott been expected to survive their suicide attempts, they would have remained in custody. Had they recovered after their compassionate releases, they likely would have been re-arrested and returned to jail. The Department and Correctional Health Services ("CHS") have a duty to provide safe care to individuals in their custody. Part of that duty is determining what jail-attributable factors played a role in these deaths and ensuring that those missteps are not repeated.

The New York City Board of Correction ("Board" or "BOC") is required, by statute, to investigate the circumstances of deaths in custody.[2] These investigations focus on identifying areas for improvement to help prevent future tragedies. There have been ten[3] fatalities in City jails since the Board's May 9, 2022 report, including two confirmed[4] deaths by suicide, two suspected suicides, two deaths due to acute fentanyl intoxication, and two suspected drug-related deaths. The Board is investigating these deaths and will publish a report with our findings.

Given the number of deaths and limited Board resources, this report focuses on the four drug-related deaths and six suicides that occurred in 2021. Although this report will not delve into details regarding the remaining six deaths, it highlights problems or issues that have been common to most deaths in DOC custody in the past.

As part of its investigation, Board staff conducted interviews with people in custody and staff, reviewed video footage in the jails, DOC records, CHS and NYC Health + Hospitals ("H+H") medical records, OCME records, press coverage, and New York State Commission of Correction ("SCOC")

---

[2] Defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.

[3] As of the report date.

[4] Suicide and drug intoxication deaths are confirmed based on OCME records.

final reports on the deaths of Wilson Diaz-Guzman and Javier Velasco. The Board provided CHS and DOC with advance copies of this report and an opportunity to comment. Their written responses are appended to this report.

## II.   SUICIDES

### 1. WILSON DIAZ-GUZMAN

| | |
|---|---|
| Name and Age | Wilson Diaz-Guzman, 30 |
| Date of death | January 22, 2021 |
| DOC admission date | January 17, 2021 |
| Cause of death | Hanging |
| Facility at time of death | Otis Bantum Correctional Center ("OBCC"), general population housing |
| Bail amount, if any | $50,000 |

The Department of Correction recorded its first 2021 death in custody on January 22, 2021. Wilson Diaz-Guzman died within 24 hours of his transfer to a new housing area and after five days in DOC custody. Correctional Health Services clinicians conduct medical and mental health evaluations of people who enter DOC custody to determine the most appropriate housing assignment based on their medical needs, separate from DOC's security screening for classification. People can be placed in general population housing,[5] under Mental Observation ("MO"),[6] or in facilities for those in need of an elevated level of medical care. These latter facilities include the Contagious Disease Unit ("CDU") in West Facility, also known as "the Sprungs", the North Infirmary Command ("NIC"),[7] the substance use or mental health units at the Anna M. Kross Center ("AMKC"), and the hospital prison wards at Elmhurst Hospital and Bellevue Hospital. CHS clinicians determine whether individuals in custody require additional medical or mental health assessment or treatment is necessary.

During his initial intake assessment on January 17, Mr. Diaz-Guzman reported that he felt hopeless or worthless and thoughts of hurting or killing himself. He was referred for an immediate mental health assessment. That assessment, conducted on January 17, was not signed by a clinician and CHS supervisor until February 17, more than a month after Mr. Diaz-Guzman died. During that assessment, he denied suicidal thoughts or any psychosis symptoms. He further reported feeling stressed due to the nature of the arrest and being separated from his family. Mr. Diaz-Guzman was placed in a general population housing unit with a referral for mental health follow-up.

[5] General population housing is designated by custody level for individuals who have completed classification and new admission processing, including medical and mental health screening, and do not require special housing. Non-medical special housing generally refers to restrictive housing (e.g., Punitive Segregation, Enhanced Supervision Housing, Transition Repair Unit, Secure Unit, and Separation Status).
[6] Mental observation units house those individuals whose mental condition requires a higher level of observation than those in general population or are at increased risk of suicide.
[7] Houses people in custody with acute medical conditions requiring infirmary care or have a disability that requires Americans with Disabilities Act-compliant housing. NIC also houses some general population detainees.

3

On January 19, Mr. Diaz-Guzman was seen by mental health staff after he reported that he made superficial scratches to his arm during the previous night because he feared for his safety due to his charges and "wanted someone to pay attention to him." At that clinical encounter, Mr. Diaz-Guzman stated that he felt safe and made a friend. He also denied suicidal ideation or experiencing auditory or visual hallucinations. Mr. Diaz-Guzman was hopeful about posting bail at his upcoming court appearance on January 22. CHS clinical staff found him to be future-oriented, goal-directed, easily engaged, and not appearing to be in acute distress. Thereafter, clinical staff diagnosed him with adjustment disorder and did not place him on suicide watch. At that point, according to SCOC's Medical Review Board, Mr. Diaz-Guzman "should have been referred to psychiatry and placed on increased supervision." The SCOC Medical Review Board has also found that there was a failure by CHS to recognize and treat Diaz-Guzman's acute suicidal ideation and that had Diaz-Guzman received proper psychiatric referrals and treatment, his death may have been prevented.[8]

On January 21, one day before his death, Mr. Diaz-Guzman complained to a nurse that he felt unsafe again.

At 5:47 pm on January 22, approximately one hour before Mr. Diaz-Guzman was pronounced dead, a DOC captain and a "B" post officer[9] entered his flooded cell, removing a mattress that had been blocking the cell door window. Statements differ on whether the flooding was due to an overflowing toilet bowl or a sprinkler break. According to statements from people in custody to DOC investigators, Mr. Diaz-Guzman tried to get the attention of correction officers so that he could get his medication but was ignored, which led him to set off the fire sprinkler in his cell. According to DOC records, officers asked Mr. Diaz-Guzman to step out of his cell, but he refused. At around 5:51 pm, DOC staff shut off the water supply. Nine minutes later, fire safety officers entered the area to take photographs of the cell. None of these events were properly recorded in the housing unit's logbooks.

Mr. Diaz-Guzman was unsupervised from 6:18 pm to 6:54 pm, when an officer touring the unit stopped by the cell, looked inside, then reported his observations over the radio.[10] Mr. Diaz-Guzman was found with a bedsheet wrapped around his neck and tied to the sprinkler. Based on BOC staff's review of footage, two officers entered the cell at 6:56 pm – two minutes after the

---

[8] Final Report of the New York State Commission of Correction: In the Matter of the Death of Wilson Diaz-Guzman, an incarcerated individual of the Otis Bantum Correctional Center, dated June 28, 2022.

[9] "B" post officers or floor officers interact directly with people in custody and are posted inside the living area. "A" post officers remain inside the "A" station, colloquially known as the "bubble." It is the housing area's secured control room and cannot be accessed by people in custody.

[10] Per DOC Directive #4517R, Inmate Count Procedures, effective June 18, 2014, correction officers are responsible for the care, custody, and control of people in custody. Officers shall remain in their assigned areas and conduct visual observations at 30-minute intervals (in general population areas).

initial discovery. One of the officers stepped out five minutes later to make a telephone call. Given the camera angle, Board staff were unable to independently verify whether the officers performed first aid. DOC records reflect that an officer performed CPR. Medical staff arrived approximately thirteen minutes after Mr. Diaz-Guzman was found with a bedsheet wrapped around his neck and moved him to the floor outside his cell to perform CPR and chest compressions. He was pronounced dead at 7:30 pm.

### 2. TOMAS CARLO CAMACHO AKA CARIO TOMAS

| Name and Age | Tomas Carlo Camacho, 48 |
|---|---|
| Date of death | March 16, 2021 (after attempting suicide[11] in custody on March 2, 2021) |
| DOC admission date | August 14, 2020 |
| Cause of death | Complications following cardiac arrest including anoxic brain injury due to or as a consequence of compression of neck |
| Facility at time of death | AMKC, mental observation housing |
| Location of death | Elmhurst Hospital |
| Bail amount, if any | $25,000 |

During his initial health screening upon entering DOC custody in August 2020, Mr. Camacho disclosed several mental health conditions, psychiatric hospitalization history, and past suicide attempts. However, he denied having any current thoughts of harming or killing himself. Clinicians prescribed Mr. Camacho medication to manage his psychiatric diagnoses, but, according to CHS records, he refused most doses after November 2020.

According to CHS records, Mr. Camacho missed at least 26 medical appointments from August 15, 2020 to March 2, 2021, and missed at least one medication appointment. Seventeen of the appointments were canceled because DOC did not produce Mr. Camacho, seven because he allegedly refused to attend, and two because CHS canceled.

Mr. Camacho was placed on suicide watch once—from October 9, 2020 to October 13, 2020— during his seven-month incarceration, after he swallowed a pen "because he [was] depressed." In addition, between December 28, 2020 to February 4, 2021, Mr. Camacho was admitted to the Bellevue Hospital Prison Ward for inpatient psychiatric services. According to his hospital discharge summary, Mr. Camacho's "chronic risk of harm to self and others remain[ed] elevated due to chronic mental illness, noncompliance, and legal history. However, his risk of harm to self and others, acutely, remain[ed] low due to resolution of acute psychiatric symptoms, good response to treatment, and no suicidality."

CHS records state that Mr. Camacho denied suicidal ideation and "[did] not appear to be a danger to [him]self and others at this time" when he returned from Bellevue. He was placed in mental observation housing, as he had been prior to his admission to Bellevue. He denied suicidal ideation at his last psychiatric appointment with CHS on March 2, the day he attempted to

---

[11] OCME classified Mr. Camacho's manner of death as a suicide.

commit suicide. His treatment plan included continued psychotherapy, continued medications, and a scheduled CHS visit on March 4.

Mr. Camacho was placed in a Hart's Island Clinic[12] pen at approximately 11:35 am on March 2, following a medication reevaluation. The clinic was staffed with five officers, who were required to tour every 30 minutes but did not do so. During tours, officers must walk around the housing area, check each cell, and verify that persons in custody are breathing and alive. Indeed, between 5:28 pm and 7:12 pm, no correction officer checked on Mr. Camacho, and, at approximately 6:53 pm, Mr. Camacho stuck his head through the pen door's cuffing port/food slot, dropped to his knees, stretched his legs out, and appeared to asphyxiate.

The assigned floor officer reported that he was not present at that time because he was "rehousing" another person in custody as ordered by the area supervisor. Mr. Camacho was found with his head through the slot at 7:12 pm—more than seven hours after he was placed in that pen, awaiting an escort officer to take him back to his assigned housing area. Correction officers did not render immediate first aid. Instead, they opened the cell and waited for CHS staff to arrive. Relevantly, DOC policy—DOC Directive #4521R-A, Suicide Prevention and Intervention—requires uniformed staff to commence emergency first aid, without delay, and to continue administering aid until medical assistance arrives in situations when an individual appears to be injured or has stopped breathing.

CHS staff and EMS arrived at 7:14 pm and 7:20 pm, respectively.  Mr. Camacho was unresponsive but had a pulse. EMS departed the facility with Mr. Camacho at 8:11 pm and transported him to Elmhurst Hospital. He was granted a compassionate release the next day, on March 3, and died at Elmhurst Hospital on March 16.

Several weeks after Mr. Camacho's death, DOC issued two new Command Level Orders ("CLO") regarding the Hart's Island Clinic. The first[13] of the two orders established that mental health evaluations in the clinic "should happen within two hours and within 15 minutes for emergency referrals." That CLO also stated that mental health and nursing staff "will monitor the inmates' gross behavior and progress through the evaluation and disposition" and that "if the evaluation or disposition is delayed for more than 4 hours, nursing staff shall take action in effort to resolve the delay." Appropriate actions include inquiring about the reasons for the delay, discussing the person's movement to their unit with the tour commander, and notifying Prison Health Services operations or the administrator on duty. CHS stated that they were unaware of any discussion between CHS and DOC about this CLO or about its issuance.

---

[12] People in custody waiting to be seen by Hart's Island clinic staff are placed in pens within the clinic. This clinic is used by CHS to provide mental health services in AMKC.

[13] The CLO established policies and procedures for people in custody who were referred to Hart's Island for a mental health evaluation at the Anna M. Kross Center. (Command Level Order #02/21, Hart's Island Clinic, effective March 23, 2021)

The second order[14] established that supervisors and tour commanders must review the logbook for accuracy and that the status of any person in custody placed in the Hart's Island clinic pens will be reviewed every two hours and documented in the logbook. Lastly, the new policy specified that those awaiting an Injury Report for an accident and/or self-inflicted injury can be placed in the Hart's Island Clinic pens, with the area supervisor's review and approval.

### 3. JAVIER VELASCO

| Name and Age | Javier Velasco, 37 |
|---|---|
| Date of death | March 19, 2021 |
| DOC admission date | March 5, 2021 |
| Cause of death | Hanging |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount, if any | $10,000/held on a warrant |

At approximately 3:05 am on March 16—three days before his death—Mr. Velasco attempted to hang himself when he tied a bed sheet around his neck and attached it to a door in the bathroom. An officer responded to the scene after he heard a loud sound coming from the bathroom. Medical staff arrived at the scene, finding Mr. Velasco ambulatory. He refused medical attention, but he disclosed a history of anxiety and depression, and reported feeling hopeless and helpless to CHS staff. However, Mr. Velasco denied being prescribed psychiatric medication. He also disclosed a history of self-harm and that he had tried to hang himself at least three times when he previously was in custody, in May 2017. Clinical staff noted that he had been goal-directed in suicidal attempts in the past and was not psychotic at the time of the assessment. Accordingly, medical staff concluded that Mr. Velasco presented "a danger to [him]self and others."

On March 16, Mr. Velasco was transferred from the Eric M. Taylor Center ("EMTC") to AMKC, and, after a mental health evaluation that morning, he was placed on suicide watch. During a suicide watch round the next day, at approximately 2:00 pm, Mr. Velasco reported to CHS staff that he "wasn't really suicidal" and that his suicide attempt was a moment of weakness because he wanted to go to Bellevue Hospital. According to CHS records, Mr. Velasco came willingly to the interview room to speak to clinical staff and was engaged in the interview. He denied suicidal ideation and hallucinations. Clinical staff found that Mr. Velasco showed no evidence of any thought disorder, his speech was clear and coherent, and he was future-oriented. He also reported eagerness to return to general population housing and work. CHS discontinued the suicide watch. In all, Mr. Velasco was under suicide watch for approximately 30 hours.

On March 18—one day before his death—clinical staff met with him and assessed his comprehensive treatment needs. According to mental health staff, he willingly engaged with them. Staff found him fully oriented, coherent, and talkative about his criminal case. Mr. Velasco reported experiencing anxiety and frustration related to his incarceration, feeling depressed and

---

[14] The stated purpose of Command Level Order #03/21, Hart's Island Clinic Pens/Logbook, effective date March 23, 2021, is to "ensure that staff members are aware and adhere to guidelines set forth regarding the utilization of the holding pens in the Hart's Island Clinic Area."

hopeless, and physical pain due to a torn ligament in his right shoulder. Thereafter, CHS referred him to a clinician, a social worker, and a substance abuse program.

Mr. Velasco was last seen outside of his cell at around 8:57 pm on March 18. A Suicide Prevention Aide (SPA)[15] was present in the area that night. SPAs must tour the housing area at irregular intervals not to exceed ten minutes between tours (minimum of six rounds per hour). Meanwhile, correction officers assigned to Mental Observation units must tour every 15 minutes when SPAs are not present in the housing units, and every 30 minutes when they are present.

The SPA assigned to Mr. Velasco's housing area retired to his cell at around 2:00 am on March 19. Thereafter, according to logbook entries made by DOC staff, officers toured the housing area every 30 minutes. However, surveillance video footage showed that the correction officers assigned to Mr. Velasco's housing area that night failed to tour every half hour when the SPA was on the floor and failed to tour every 15 minutes after the SPA had retired for the night. Although the correction officers walked up and down the area periodically, they did not check individual cells to verify that the people locked inside were alive and breathing. In addition, DOC Rules and Regulations section 2.25.010, requires captains to conduct tours at "frequent intervals," yet the last recorded captain's tour of Mr. Velasco's housing unit was at 11:05 pm on March 18.

A correction officer making a tour of the unit discovered Mr. Velasco with institutional linen affixed to an air vent tied around his neck at 5:11 am. Instead of rendering immediate aid, the correction officer walked away from Mr. Velasco's cell, towards the front of the housing area, and returned four minutes later, with other officers. An officer activated their body-worn camera at approximately 5:19 am and filmed an officer performing chest compressions and CPR. According to an SCOC report about Mr. Velasco's death, the "A" post officer on duty at the time of the incident was unfamiliar with the procedures for reporting medical emergencies, and, according to CHS records, the clinic received an emergency call at 5:20 am—nine minutes after Mr. Velasco was discovered with the linen tied around his neck. Clinical staff and FDNY EMS arrived at 5:27 am and 6:07 am, respectively. Mr. Velasco was pronounced dead at 6:15 am.

SCOC interviewed correctional and medical staff and found that staff provided conflicting accounts of who should have been responsible for calling EMS. One captain stated that the "A" post staff in the clinic or the tour commander had that responsibility. Meanwhile, a correction officer believed that only medical clinic personnel was responsible for making that notification. On the other hand, two medical staff said that the nurses called EMS, while another clinical staff

[15] Suicide Prevention Aides (SPA) are people in custody who are trained to monitor incarcerated individuals identified as suicide risks and to recognize the warning signs of suicidal behavior in incarcerated individuals who had not previously been identified. All detained and sentenced facilities shall maintain an Observation Aide Program unless it is a Maximum Security Housing Area (excluded because of the unique number of uniformed personnel assigned) or is granted a variance from an Order or Directive. (Directive #4017R-D on Observation Aide Program effective April 8, 2022)

8

member stated that they were unsure. CHS policies require medical staff, the Patient Care Coordinator ("PCC"), or charge nurse to telephone 911 as soon as it is determined that an ambulance must be summoned.[16]

Unlike the SCOC, Board staff are not afforded the opportunity to interview CHS staff as part of its investigation. CHS refers Board staff to an operational telephone hotline instead. The Board's death review investigations would benefit from being allowed to discuss deaths in custody with CHS. The Board needs significant collaboration between the agencies to fulfill our charter-mandated duty to address the crisis within the jails.

### 4. BRANDON RODRIGUEZ

| Name and Age | Brandon Rodriguez, 25 |
|---|---|
| Date of death | August 10, 2021 |
| DOC admission date | August 5, 2021 |
| Cause of death | Hanging |
| Facility at time of death | OBCC Central Punitive Segregation Unit[17] |
| Bail amount, if any | $5,000 |

Brandon Rodriguez was held in OBCC's intake area awaiting a housing assignment from August 6, at 1:30 am, to at least August 8, at 9:45 am, in violation of Department policy.[18] On the morning of August 8, he was transported to Elmhurst Hospital following a fight in the intake area, where he was treated for a closed orbital fracture. He returned to the OBCC intake that same day at 11:00 pm.

During his initial mental health assessment on August 9, at 1:45 pm, Mr. Rodriguez disclosed that he had been "jumped" in the OBCC intake pen and did not feel safe there, and he requested a transfer. Mr. Rodriguez also reported a history of mental illness for which he had been prescribed medication, but had not received medication for five to six years at the time of that assessment. A note entered by medical staff during this assessment show that Mr. Rodriguez denied suicidal ideation or experiencing hallucinations. He presented as restless, fidgety, and under increased stress, venting appropriately about his stressors, "mainly being in main intake where he was jumped [the previous day]." Staff characterized him as cooperative, coherent, alert, and willing to continue with talk therapy during his incarceration. Mr. Rodriguez was provisionally diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. CHS determined he was to be housed in a general population unit with mental health follow-up.

---

[16] CHS Policy#: INT 33 on Emergency Runs – EMS and DOC
[17] Although this was not Mr. Rodriguez's official assigned housing area, it was the unit he was in at the time of his death, following the use of force incident.
[18] New admissions shall complete security and medical screening upon arrival to a new admission facility and receive a housing assignment within 24 hours of entering DOC custody. (Operations Order #22/07, Processing and Monitoring New Admissions, effective December 14, 2007) Along with Mr. Rodriguez, 40 other people were kept in intake for more than 24 hours.

9

Mr. Rodriguez's intake paperwork did not include a Suicide Prevention Screening Guidelines Form, suggesting it was never completed. This DOC form includes a set of questions designed to identify potential suicide risks for individuals in the first 24 to 72 hours of their incarceration.

Later that day, at 3:35 pm, while being escorted to his newly assigned housing area, Mr. Rodriguez refused to walk and, as a result, became involved in a use of force[19] incident.  The Department's Emergency Service Unit (ESU)[20] responded to the scene. Body-worn camera footage shows that Mr. Rodriguez attempted to kick an ESU officer and that correction officers then secured him against a wall multiple times, and eventually secured him on a gurney. Instead of placing Mr. Rodriguez in a secured cell, DOC staff placed him in a shower pen in the Central Punitive Segregation Unit ("CPSU")[21] intake at around 3:51 pm, because Mr. Rodriguez's cell allegedly was covered in fecal matter.

DOC records state that, due to insufficient staffing, the Department was unable to assemble an extraction team[22] to remove Mr. Rodriguez from the shower pen so that he could be examined by medical staff following the use of force incident, as required. Moreover, people in custody told DOC investigators that Mr. Rodriguez clearly was mentally ill and in need of help, and that he repeatedly yelled, from the shower pen in which he was confined, that he wanted to kill himself.

Mr. Rodriguez was last observed moving inside the shower pen at 12:13 am, on August 10. Board staff reviewed video surveillance footage which showed that the correction officer in the CPSU unit did not check each cell when conducting rounds to verify that people inside those cells were alive and breathing. Moreover, there were no correction officers in the CPSU unit between 12:03 and 12:33 am. The correction officer assigned to that area left his post and the CPSU unit entirely during that period.

When the correction officer returned to the housing area at 12:33 am, he found Mr. Rodriguez, still inside the shower pen, unresponsive, with a shirt tied around his neck and to the cuffing port. The correction officer entered the shower cell and performed chest compressions. However, a medical emergency was not called in until 12:40 am, after a captain entered the CPSU unit. CHS

---

[19] A "use of force" is any instance where staff use their hands or other parts of their body, objects, instruments, chemical agents, electronic devices, firearms, or any other physical method to restrain, subdue, or compel a person in custody to act or stop acting in a particular way. The term "use of force" does not include moving, escorting, transporting, or applying restraints to a compliant Inmate. (Directive #5006R-D, Use of Force, effective September 27, 2017)

[20] The Emergency Service Unit is charged with responding to emergency calls.

[21] This area is no longer open in OBCC. At the time of Mr. Rodriguez's death, it was the largest punitive segregation unit on Rikers Island. Individuals held in punitive segregation, also known as solitary confinement, are confined to their cells for 23 hours or more per day.

[22] A procedure whereby DOC staff forcibly restrains or removes a person from a cell area when they refuse to comply with an order. An extraction is a use of force.

arrived at 12:43 am, took over chest compressions, and used a defibrillator. FNDY EMS arrived at the CPSU unit at 1:07 am. Mr. Rodriguez was pronounced dead at 1:08 am.

### 5. SEGUNDO GUALLPA

| Name and Age | Segundo Guallpa, 58 |
|---|---|
| Date of death | August 30, 2021 |
| DOC admission date | August 19, 2021 |
| Cause of death | Compression of Neck |
| Facility at time of death | West Facility CDU |
| Bail amount, if any | $7,500 |

Mr. Guallpa refused initial tuberculosis testing and, as a result, was housed in the Contagious Disease Unit ("CDU") at West Facility.

His initial mental health assessment was scheduled and canceled twice. On August 23, 2021, CHS administratively canceled the visit and rescheduled it due to "insufficient staffing" in the facility. According to CHS records, on August 25, CHS staff saw DOC staff and Mr. Guallpa engage in a loud discussion inside the housing area because he "apparently [was] denied" access to a telephone. CHS staff also noted that Mr. Guallpa appeared frustrated and irritated, refused CHS staff attempts to engage, waved his hands, and shook his head as he walked away from the cell door. Mental health staff noted that Mr. Guallpa did not appear to be in acute distress or psychosis at the time. Given this, the second assessment was canceled, and a third referral was submitted for a mental health assessment by CHS staff. A note entered on Mr. Guallpa's medical records on August 29 states that he was to be transferred to a general population unit. However, by August 30, he was still in West Facility and no mental health assessment had been completed.

On the evening of August 29, video surveillance footage showed Mr. Guallpa pacing inside his cell, running his hands over his head, moving his mouth, as if he were speaking to himself, and waving his arms. He paced inside his cell multiple times. His last contact with correction officers appears to be at 6:00 pm that evening, when DOC staff provided him with a tray of food through the cell door's cuffing port.

By 9:00 pm, at least three correction officers were present in the unit, however, correction officers and captains did not tour the unit consistently, let alone at least every 30 minutes, as required. Moreover, no correction officer or captain toured the unit at all between 9:53 pm and 11:02 pm. Even when officers walked through the unit, they did not look inside the individual cells to verify that the people inside were alive and breathing.

Board staff's review of video surveillance footage revealed that Mr. Guallpa turned on the television in his cell at approximately 10:04 pm. At 1:11 am, DOC staff found Mr. Guallpa in a seated position on the floor with a ligature made from socks wrapped around his neck and the bed frame. Video surveillance footage also revealed that two officers and a captain entered Mr. Guallpa's cell and appeared to be talking and looking at Mr. Guallpa's body, rather than rendering aid.

11

Medical staff arrived at 1:16 am and Mr. Guallpa was pronounced deceased at 1:30 am. Medical records state that Mr. Guallpa's body was pulseless, stiff, cold, and pale by that point. The condition of Mr. Guallpa's body suggests that he was deceased for some time before he was found.

## 6. ANTHONY SCOTT

| Name and Age | Anthony Scott, 58 |
|---|---|
| Date of death | October 18, 2021 (after attempting suicide in custody on October 14, 2021) |
| DOC admission date | October 14, 2021 |
| Cause of death | Complications of hanging |
| Facility at time of death | Manhattan Court Facility, New Admission Holding Pen |
| Location of death | New York-Presbyterian Hospital |
| Bail amount, if any | $15,000 |

Anthony Scott was transferred from NYPD to Department custody on October 14, 2021. An article in the New York Times stated that Mr. Scott's attorney reported that Mr. Scott "was on the autism spectrum and suffered from mental illness."

Mr. Scott was placed in a new admission holding pen in the Manhattan Court Facility at approximately 12:57 pm. An Arraignment and Classification Risk Screening Form,[23] which should have been completed by DOC staff by the time he was placed in the holding pen, was not included with Mr. Scott's records. Further, a Suicide Prevention Screening Guidelines Form, which the Department's court divisions are required to complete, was not among Mr. Scott's records.

Individuals identified as being at risk of suicide or self-harm must be interviewed privately by a supervisor, and certain items such as their belts, drawstrings, neckties, and shoelaces must be confiscated and safeguarded.[24]

Three correction officers were on post in the area on the day Mr. Scott died, and his assigned pen was directly across from a correction officer's desk. Correction officers assigned to Court Divisions are required to perform routine tours of their assigned posts and observe all individuals in custody for unusual incidents, behavior, or conditions, at a minimum of every 15 minutes.[25] During these tours, staff are required to remain alert for any behavior that could indicate that an individual in custody is mentally ill or suicidal.

---

[23] This form identifies whether a person in custody has (1) any immediate medical needs; (2) whether the securing order or commitment papers request medical or mental health attention; (3) officer's observation of any obvious indication of immediate medical needs or any display of extreme nervousness or depression; (4) physical condition as stated by the person in custody; (5) whether documents indicate Suicide Watch and/or Protective Custody; (6) any reasons to consider special housing, among other personal characteristics and details.
[24] DOC Directive #4521R-A, Suicide Prevention and Intervention.
[25] *Id.*

On the afternoon when Mr. Scott died, DOC staff toured the area at 1:37 pm, 2:27 pm, and at 3:36 pm. At 3:58 pm, a correction officer provided Mr. Scott with a pen, which Mr. Scott returned at 4:05 pm. This was the last contact correction officers had with Mr. Scott.

Video surveillance footage shows that, at 4:08 pm, while a correction officer had his back to the pen, Mr. Scott removed a drawstring from his clothes and began fiddling with it. At 4:13 pm, Mr. Scott began jamming the pen's locking mechanism with what appears to be multiple strips of paper, and he continued doing so, without intervention, for the next three minutes. At 4:17 pm, while seated on the bench, Mr. Scott placed the string around his neck. At 4:21, he laid on the floor, partially out of camera view, and remained in the same position until he was found. Presumably unaware of Mr. Scott's actions, around the same time—4:22 pm—correction officers left the area completely, and no DOC staff were on post until 4:44 pm, when an officer and a captain returned to the area.

One minute after they returned to their post, the correction officer saw Mr. Scott on the floor, and DOC staff tried to enter the pen, but were unable to do so because the locking mechanism was jammed. Thereafter, DOC staff tried to cut the ligature through the bars of the holding pen by attaching a 911 knife (a specially designed rescue tool for safe and fast cutting) to a mop handle; their efforts were unsuccessful.

FDNY paramedics were notified by DOC staff at 4:52 pm and arrived at 5:04 pm.  Two minutes after arriving, FDNY personnel opened the cell using a crowbar or a similar instrument. They removed the ligature from Mr. Scott's neck, initiated chest compressions, inserted an IV, and intubated him before departing the facility at 5:32 pm. Mr. Scott was transported to New York-Presbyterian Hospital, where he arrived in cardiac arrest, and was placed on a mechanical ventilator. While he was still in the hospital, Mr. Scott was released on his own recognizance on October 15 and was pronounced dead on October 18, 2021.
DOC suspended three correction officers following Mr. Scott's suicide.

Mr. Scott was in a new admission holding pen for nearly four hours by the time he was discovered with a ligature around his neck. Relevantly, DOC Operations Order #22/07 on Processing and Monitoring New Admissions states:

> All new admission, adult male detainees shall be transferred to a new admission facility within four (4) hours.  All special cases (i.e., special housing – AMKC, City-sentenced males – EMTC, male adolescents – RNDC, females – RMSC and parole violators – corresponding borough's new admission facility) shall be transferred to appropriate Rikers Island facilities or as directed by New Admission Movement Control Unit (NAMCU) Supervisor, within four (4) hours.

13

## III.    ACUTE DRUG INTOXICATION

### 1.  THOMAS BRAUNSON

| Name and Age | Thomas Braunson, 35 |
|---|---|
| Date of death | April 19, 2021 |
| DOC admission date | April 16, 2021 |
| Cause of death | Acute intoxication due to the combined effects of fentanyl, heroin, and phencyclidine |
| Facility at time of death | EMTC, general population housing |
| Bail amount, if any | Held on a warrant |

The circumstances around Mr. Braunson's death highlight the devastating consequences of inadequate touring and supervision by correctional staff. Mr. Braunson was housed in a dormitory-style unit in EMTC—an open room with rows of beds and no assigned lockable cells. At approximately 9:00 pm on April 18, video surveillance footage show Mr. Braunson ingest a substance from a bucket at least twice and show him provide a substance to another person in custody, who proceeded to sniff it. That night and the morning of Mr. Braunson's death, video surveillance footage show that DOC staff were off-post at times and did not tour every 30 minutes.

Based on OCME's Investigation Report and video surveillance footage reviewed by Board staff, it was clear that Mr. Braunson and at least one other person in custody kept and used drugs in what would have been plain sight of DOC staff, had staff been on post.

The correction officer assigned to the unit toured the housing area at 5:00 am, 5:07 am, and 5:24 am. However, during those tours, DOC staff simply walked up and down the room with a flashlight and did not check each bed to ensure that the people in custody were alive and breathing. [26] Nevertheless, logbook entries made every 30 minutes by multiple officers and one captain indicated that general supervision of the unit was done and that there was nothing to report. Moreover, a review of video surveillance from the units reveals that between 5:26 am and 8:10 am on April 19, the assigned floor officer did not consistently conduct rounds.

At approximately 5:50 am, a fight broke out between people in custody, but the correction officer on post in the dorm did not intervene, and, instead, waved his arms. Meanwhile, people in custody intervened, in an apparent attempt to disrupt the fight, and a probe team[27] eventually responded to the unit. According to OCME's investigation report, Mr. Braunson was last seen alive at 6:30 am, at which time he told other people in custody that "he [had] consumed a large

---

[26] Active supervision applies to all non-cell housing areas at all times, and includes but is not limited to: (a) direct and uninterrupted communication with each inmate; (b) tour at 30-minute intervals; (c) ability of the officer on post to immediately respond to emergency situations; and (d) if a facility housing area houses 20 or more inmates, the continuous presence of an assigned correction officer within that housing area to ensure optimal safety and security are provided. (Directive #4514R-C, Housing Area Logbooks, effective October 13, 2015)

[27] Operations Order #01/15, Facility Probe Teams, effective March 11, 2015, states that the probe team is solely responsible for the immediate and coordinated response to all emergency alarms sounded within a facility.

amount of heroin," purportedly because he did not want to get caught with contraband by the probe team. Among Mr. Braunson's belongings, OCME investigators recovered two small empty rubber bags, which likely were drug paraphernalia, and a clear plastic bag that contained a grainy beige substance—likely heroin—hidden in his groin area.

People in custody were the first to notice that Mr. Braunson was unresponsive and raised the alarm, alerting the floor officer at around 8:22 am. Video surveillance footage show that correction officers walked back and forth between the "A" station and Mr. Braunson's bed, from 8:22 am until 8:32 am, at which time medical staff arrived and began rendering aid. During that ten-minute period, uniformed staff never performed chest compressions or CPR.

## 2.  JOSE MEJIA

| | |
|---|---|
| **Name and Age** | Jose Mejia, 34 |
| **Date of death** | June 10, 2021 |
| **DOC admission date** | May 14, 2021 |
| **Cause of death** | Acute methadone intoxication |
| **Facility at time of death** | George R. Vierno Center ("GRVC"), general population housing |
| **Bail amount, if any** | Held on a warrant |

Mr. Mejia was diagnosed with multiple mental health disorders and severe cocaine use disorder, and he tested positive for cocaine when he was first admitted to DOC custody. Throughout his incarceration, he disclosed a significant substance use history of K2, opioids, cannabis, alcohol, and cocaine.

On May 15, at 12:54 pm, CHS referred Mr. Mejia for an immediate mental health evaluation after he reported that he had tried to kill himself in the past but denied that he currently had thoughts of hurting or killing himself. Mr. Mejia also had a history of inpatient psychiatric admissions, and was assessed by mental health staff on May 15, at 7:18 pm, after which he was prescribed psychiatric medication and placed in general population housing, with mental health follow-up by a clinician/psychiatrist.

On May 15, he was referred to A Road Not Taken ("ARNT"), a substance abuse program operating in AMKC and in the Rose M. Singer Center ("RMSC"). ARNT is not a Medication-Assisted Treatment program. On May 19, he reported: "low-level anxiety related to lack of access to cocaine use, after daily use of $100," but, by June 8, his referral to ARNT still appeared as an open order.  Moreover, he was not prescribed methadone at any point during his incarceration.

Video footage revealed that, on the morning of Mr. Mejia's death, he ingested substances from two different cups which another person in custody had given him. A search of Mr. Mejia's property after his death yielded three disposable medication cups containing approximately 30 pills in total. At around 11:14 am, approximately an hour after he ingested the contents of the first cup, Mr. Mejia sluggishly walked around the dayroom—the unit's shared common area—stopping frequently to place his hand on his head. People in custody told Board staff that Mr.

15

Mejia "seemed high." A DOC civilian staff member who spoke with Board staff confirmed that Mr. Mejia did not look well while sitting at a table in the dayroom that day.

Video surveillance footage reveal that, over the next forty minutes, Mr. Mejia struggled to climb stairs or stand upright, he leaned over, and held his head. At approximately 11:56 am, a floor officer saw and spoke with an apparently sluggish Mr. Mejia on a staircase, yet left without raising the alarm about Mr. Mejia's state or condition.[28] Around the same time, clinical staff exited the housing area, having visited the housing area to offer vaccines, according to DOC records.

Thereafter, people in custody helped Mr. Mejia navigate the stairs and sit. Later, at approximately 12:11 pm, they escorted him to his cell. People in custody told Board staff that one of the officers had instructed them to take Mr. Mejia to his cell to lie down rather than sending him to the clinic. Two officers were present in the housing unit at the time.

Between 12:23 pm and 3:43 pm, multiple people in custody and correction officers looked through Mr. Mejia's cell window. In one instance, an officer opened the door and allowed a person in custody to enter Mr. Mejia's cell. A person in custody told DOC investigators that he checked on Mr. Mejia at approximately 3:00 pm, and, at that point, Mr. Mejia "felt cold to the touch." At approximately 3:38 pm, a person in custody entered Mr. Mejia's unsecured cell for at least two minutes, and multiple people entered and gathered around the cell after him. A DOC uniformed staff member told Board staff that none of the unit's cell doors locked.

At 3:43 pm, a correction officer entered Mr. Mejia's cell then quickly stepped out, presumably to call in the medical emergency.  Clinic staff received the notification at 3:45 pm.

It is unclear whether DOC staff performed chest compressions or CPR upon finding Mr. Mejia. At that point, he was on his bed, unresponsive, without a pulse, and with no visible signs of trauma. Clinical staff arrived at 3:53 pm and Mr. Mejia was pronounced dead at 4:39 pm.

### 3.  ESIAS JOHNSON

| Name and Age | Esias Johnson, 24 |
| --- | --- |
| Date of death | September 7, 2021 |
| DOC admission date | August 7, 2021 |
| Cause of death | Acute methadone intoxication |
| Facility at time of death | AMKC, mental observation housing |
| Bail amount, if any | $1/remanded |

According to CHS medical records, Mr. Johnson was diagnosed with multiple substance use-related disorders and tested positive for amphetamines and methamphetamines at his initial medical

---

[28] DOC Directive #4021, Constant Supervision, effective February 2, 2021, sets guidelines for identifying individuals at risk and in need of constant supervision due to (a) self-harm, risk of self-harm, suicide attempt, or threat of; (b) recent substance use or abuse, either stated or witnessed; (c) medical status; (d) mental health status; or (e) security concerns. Said directive requires officer to conduct tours and observe individuals in their custody for unusual incidents, behavior, or conditions.

evaluation. Mr. Johnson disclosed to clinical staff that he was enrolled in a drug treatment program at the time of his arrest.

On August 8, during new admissions processing, CHS referred him for a mental health consultation after he placed the cord connected to the blood pressure machine around his neck, fashioned a knot, and stated that he would kill himself. The referral noted that Mr. Johnson had been hospitalized just four days earlier due to suicidal ideation. Mr. Johnson further stated that he had attempted to "overdose of [sic] drugs" in the past.

He was placed on suicide watch on August 8, but was taken off suicide watch three days later, "given his excitement about his future and no evidence of active suicidality," according to CHS records. In addition, he was referred to ARNT, a drug treatment program at AMKC, however, by September 1, this was still an open referral, and it is unclear whether Mr. Johnson was ever enrolled in the program, let alone participated. Mr. Johnson was also referred to a methadone treatment program known as Key Extended Entry Program ("KEEP"). However, based on CHS records, DOC did not produce him to his initial KEEP counseling appointment on September 1. CHS staff signed a second KEEP referral on September 3, but KEEP intake staff did not see Mr. Johnson before his death on September 7.

On September 1, Mr. Johnson reported to medical staff that he had been using "110 mg methadone daily for the past week (from another patient)" and that he nodded off in the housing area after he took methadone. CHS records indicate that he drank liquid from a water bottle that he said was methadone and expressed concerns about withdrawal since his supply was no longer available. He was scheduled to begin low-dose methadone treatment on September 2, and was advised to avoid extra methadone use for his safety. Records show that Mr. Johnson was administered methadone six times—once a day from September 1 through September 6—and that he had missed six medical visits. He missed two because DOC did not produce him for those medical visits, three because he allegedly refused to be produced, and one because CHS canceled that visit.

Mr. Johnson was housed in a mental observation dormitory-style unit in AMKC. He was scheduled to go to the clinic on August 6, the day before his death, but CHS records indicate that per DOC, Mr. Johnson refused to be seen. Multiple people in custody told DOC investigators that Mr. Johnson was not feeling well and that, for two days—including on the night before his death— he had asked DOC staff to take him to the clinic, but they ignored his pleas. A person in custody reported that a correction officer simply walked away after Mr. Johnson complained to that officer.

Video surveillance footage reviewed by Board staff show that, on September 7, 2021, at approximately 12:12 am, Mr. Johnson got up from his bed and went into the bathroom, where he remained until 1:03 am, at which time he returned to bed. There were no correction officers

in the housing unit at the time, and the nearest correction officer was the "A" station officer in the bubble. At approximately 1:46 am, a correction officer entered the housing unit and took a seat at the "B" post, but that officer did not tour the dormitory. At 2:59 am, the correction officer walked among the beds while using a flashlight, but no officers conducted rounds to ensure all people in custody were alive and breathing every 15 minutes, as required by DOC policies in mental observation units. Multiple officers came and went throughout the night, but they remained seated at the "B" post table.

In addition, there was a suicide watch officer on post that night to monitor three individuals, not Mr. Johnson. People under suicide watch are subject to constant supervision, as defined in DOC Directive #4521R-A, on Suicide Prevention and Intervention. Constant supervision requires maintaining uninterrupted personal visual observation without the aid of surveillance devices and the officer must permanently occupy an established post near the person under supervision. However, the suicide watch officer on post that night also was not conducting rounds or verifying whether the three individuals under his charge were alive and breathing.

At approximately 5:07 am, some people in custody woke up for breakfast, but Mr. Johnson did not move. Based on Board staff's review of video footage, the only movement detected from when he initially laid down at 1:03 am, was at 5:56 am, when he moved his head slightly several times. It wasn't until 9:11 am that an officer walked toward Mr. Johnson's bed and began tapping him. Multiple people in custody assisted in trying to awaken him, and no officers attempted CPR or chest compressions, despite DOC policies that require them to do so. CHS records state that they received an emergency call at 9:15 am. Medical staff were the first to perform life-saving techniques at 9:25 am, and they administered Narcan. However, Mr. Johnson was pronounced dead at 9:43 am.

After Mr. Johnson's death, a search of the housing area revealed two plastic bags on a windowsill by a bed that did not belong to Mr. Johnson. One bag contained 30 Gabapentin pills (approved by the FDA for the treatment of epilepsy and sometimes used as part of depression treatment), two hydrochloride pills (narcotic), ten Mirtazapine pills (antidepressant), and one Ibuprofen. The other bag contained six Prazosin pills (blood pressure medication), sixteen Buspirone pills (anxiety medication), three Citalopram pills (antidepressant), fourteen Aripiprazole pills (depression medication), and a multi-vitamin. Several burned homemade cigarette butts also were recovered in the housing area. Field tests on those remnants were inconclusive.

The New York Daily News reported that Mr. Johnson was scheduled to appear in court on August 20, and that DOC failed to produce him for that appearance. Mr. Johnson's parents attributed his death to DOC's failure to produce him for court, as Mr. Johnson was held on $1 bail for a misdemeanor charge.  He had been told that he could not leave DOC custody without going before a judge. DOC records confirmed that there was a court hearing originally scheduled for

August 20 then rescheduled to September 8, but DOC records did not state why the appearance was rescheduled.

### 4. WILLIAM BROWN

| | |
|---|---|
| **Name and age** | William Brown, 55 |
| **Date of death** | December 14, 2021 |
| **DOC admission date** | November 14, 2021 |
| **Cause of death** | Acute Mdmb-4en-pinaca (synthetic cannabinoid) intoxication |
| **Facility at time of death** | AMKC, general population housing |
| **Bail amount, if any** | $10,000 |

CHS records indicate that Mr. Brown's initial mental health assessment was canceled and rescheduled at least four times. On November 18, 2021, CHS canceled the appointment because CHS staff determined that it was unsafe for them to enter the CDU, where Mr. Brown was housed at the time. According to CHS records, several individuals in the unit shouted aggressively at DOC staff from their cells, a few cell door slots were open, and there was a lot of water on the floor. On November 22, CHS canceled the mental health assessment again, because there was insufficient staffing in the CDU. CHS canceled two other appointments without a note as to why.

During a mental health review on November 14—Mr. Brown's first day in custody—clinical staff noted that he had current mental health and emotional problems, described as schizoaffective disorder. Mr. Johnson stated that he was taking Haloperidol. Due to the multiple canceled mental health evaluations, Mr. Brown did not receive psychiatric medication until 12 days after his admission to EMTC, on November 26.

Mr. Brown was assigned to a general population dormitory-style housing area in AMKC. Board staff reviewed video surveillance footage, which shows that Mr. Johnson and other people in custody had been smoking in the dormitory and dayroom since at least 5:18 pm, on December 14. In addition, the "B" post correction officer did not tour either the dormitory or dayroom every 30 minutes, despite making entries in the logbook stating otherwise. Instead, the "B" post correction officer remained seated, and mostly stationary, at the "B" post table, which was located directly across from the "A" station. At approximately 6:10 pm, the "B" post officer left the post. The post remained empty and there were no correction officers in the housing area until 10:33 pm.

At approximately 10:19 pm, Mr. Brown entered the dayroom, where people in custody were smoking what was described as a cigarette. Mr. Brown also smoked from the cigarette and, within four minutes, he began to slouch in his seat. At the same time, two people in custody helped another individual who appeared to be vomiting.

Mr. Brown fell from his seat at 10:28 pm. People in custody tried to help one another, as multiple people slouched over and vomited. At approximately 10:33 pm, the "B" post officer arrived in the housing area. Instead of rendering aid immediately or calling in an emergency, the correction

19

officer stood by for four minutes, and watched as people in custody shook and patted Mr. Brown, trying to wake him. At 10:37 pm, the "B" post officer left the housing area, entered the "A" station, and returned a minute later. Again, the officer simply stood by until 10:42 pm, when she began performing chest compressions, but she stopped after a minute. By that time, another correction officer had arrived in the housing unit, but that officer did not administer life-saving techniques. The "B" post officer resumed chest compressions at 10:46 pm, at which time medical staff arrived. CHS records reflected they received the medical emergency call at 10:43 pm. Medical staff performed CPR and administered Narcan, but Mr. Brown was pronounced dead at 10:46 pm.

A search conducted after Mr. Brown's death uncovered three unidentified pills, numerous rolled papers with unknown substances inside and one end burnt, and a mop string with one end burnt used as a wick. According to OCME records, there was evidence of small residual partially-smoked cigarette butts in the dayroom. The three pills identified were potentially Mirtazapine (antidepressant), Diphenhydramine hydrochloride (antihistamine), and Buspirone hydrochloride (anxiety medication).

## IV.    OTHER CATEGORIES

| Name and age | Date of death | Facility at time of death | Cause of death per OCME report | Length of stay |
|---|---|---|---|---|
| Richard Blake, 45 | 4/30/2021 | OBCC, general population | Hypertensive and atherosclerotic cardiovascular disease | 1.5 months |
| Robert Jackson, 42 | 6/30/2021 | AMKC, general population | Hypertensive and atherosclerotic cardiovascular disease | 8 months |
| Isa Abdul Karim, 41 | 9/19/2021 | NIC | Pulmonary emboli due to right lower extremity deep vein thrombosis complicating COVID-19 in person with decreased mobility due to degenerative spine disease | 1 month |
| Stephan Khadu, 34 | 9/22/2021 | Vernon C. Bain Center ("VCBC"), general population | Complications of lymphocytic meningitis (probable viral etiology) | 1 year and 9 months |
| Victor Mercado, 64 | 10/15/2021 | Elmhurst Hospital Prison Ward | COVID-19 with complications (contributing hypertensive and atherosclerotic cardiovascular disease) | 3 months |
| Malcolm Boatwright, 28 | 12/10/2021 | AMKC, mental observation | Complications of nontraumatic seizure disorder of undetermined etiology | 1 month |



**BOARD OF CORRECTION**
**CITY OF NEW YORK**

# February & March 2022 Deaths in DOC Custody Report and Recommendations[1]

# May 9, 2022

[1] Authored by Deputy General Counsel Melissa Cintrón Hernández and Director of Special Investigations Rahzeem Gray. Thank you to Director of Violence Prevention Bart Baily, Director of Environmental Safety Katrina Blackman, Director of Public Accountability Barbie Melendez, and Correctional Standards Review Specialist II Jermarley McFarlane for providing information for this investigation. Additional thanks to Executive Director Amanda Masters for her review and comments, and the members of the Jail Death Review subcommittee: Committee Chair Jacqueline Sherman, Interim Board Chair Julio Medina, Dr. Robert Cohen, and Dr. Steven Safyer.

# I.     INTRODUCTION & METHODOLOGY

As of the date of this report's publication, three people have died this year in New York City Department of Correction ("Department" or "DOC") custody. Sixteen people died in DOC custody in 2021. The Board of Correction ("Board" or "BOC") has a duty to investigate the circumstances leading to the death of any individual in DOC custody.[2] These investigations do not focus on criminal wrongdoing or individual fault but rather on identifying areas of improvement and lessons to be learned to prevent further tragedies. Accordingly, this report presents an overview of the three deaths that occurred in February and March 2022, plus the Board's findings and recommendations to address the dysfunction and dangerous persistent issues in the City's jails.

Many of the issues described in this report are longstanding, present in our city's jails for years and, in some cases, decades. The Board wishes to work in partnership with the Department's Commissioner, Louis Molina, and his team in finding a solution to these persistent problems. The broken and dysfunctional system Commissioner Molina inherited led to these tragedies, and we support his leadership and his efforts to properly staff DOC facilities and train uniformed officers. It is the Board's sincere hope that this report is a productive step to supporting change and furthering a collaborative approach, with the goal of improving current conditions for people in custody and staff, and preventing further deaths.

The Board staff's investigative methods included interviews with people in custody and decedents' legal teams, as well as a review of jail video footage, DOC materials, Correctional Health Services ("CHS") medical records, and relevant press coverage. On April 13, 2022, four Board members met with DOC and CHS to review this year's jail deaths. CHS flagged concerns about discussing protected health information (PHI) in the presence of DOC staff, therefore they did not delve into patients' medical history. One of the Board's recommendations will be a timely death review conference between CHS, DOC, and BOC, which comprises the exchange of clinical information.

The Board provided CHS and DOC advance copies of this report and an opportunity to comment. This report solely contains information independently collected and reviewed by Board staff, separate from DOC preliminary investigative materials. Although this report focuses on deaths in 2022, the Board is currently investigating the sixteen deaths that occurred in 2021 and aims to publish a report about our findings.

# II.     TARZ YOUNGBLOOD, 38

Tarz Youngblood was the first reported death in custody in 2022, passing away on February 27, 2022, at Elmhurst Hospital. Mr. Youngblood is survived by his domestic partner, their three children, his stepmother, his mother, his stepsister, and other relatives. Mr. Youngblood was housed in a general population unit in George R. Vierno Center's ("GRVC"). General population is a designated custody level for those who have completed classification and new admission processing, including medical and mental health screening and do not require special housing.

---

[2] Defined in §3-10(c)(2) of title 40 of the Rules of the City of New York.

In Mr. Youngblood's housing unit, people in custody are assigned cells and are locked inside or outside the cell per DOC's Lock-In/Lock-Out directive[3] and in accordance with BOC Minimum Standards.[4] Individuals are prohibited from accessing cells that are not their own and cell access is to be strictly controlled by officers. Housing units are supervised by "A" post officers and "B" post officers. "A" post officers remain within the secured housing area control room ("the "A" station colloquially known as the "bubble"). The "A" station cannot be accessed by people in custody. "B" or floor post officers interact directly with people in custody and conduct rounds (a walk-through inspection of the area). Rounds are to be conducted every thirty minutes in general population units.[5] DOC's Video Monitoring Unit is to notify on-duty facility staff of security breaches observed during real-time monitoring.[6]

At approximately 10:30 am on February 27, Mr. Youngblood was carried out of a cell assigned to another person, unconscious, and down the stairs to a table by people in custody, who were the first to provide emergency aid. DOC staff became aware of Mr. Youngblood's state at that moment; they proceeded to call in a medical emergency to the facility's CHS-managed clinic and perform chest compressions. Although the housing unit was staffed with both an "A" post officer and a "B"/floor post officer at the time, officers are not observed rounding the area for slightly over one hour before this incident. BOC's review of video footage showed that DOC staff did not conduct rounds every thirty minutes nor did they check the cell Mr. Youngblood was in for at least three hours before his death, the window of which was obstructed by some sort of white or grey covering.[7] The Video Monitoring Unit did not notify on-duty staff of any security breaches.

On the day of Mr. Youngblood's death, the "A" post officer assigned to the unit was classified as Medically Monitored Returned Category 3. DOC uniformed employees placed on Medically Monitored Returned Category 3 (MMR3) duty[8] are not permitted to work directly with incarcerated individuals. Medical staff arrived on the scene approximately eight minutes after people in custody brought Mr. Youngblood to the main floor. He was transported to Elmhurst Hospital, where he was pronounced dead at 11:44 am.

---

[3] Of note from DOC Directive #4009R, Lock-In/Lock-Out, effective since 08/27/14, Section III(D): "Correction officers and supervisors are advised that this directive does not in any way modify or nullify their responsibility to patrol and inspect each cell and each entire post area as it is prescribed throughout departmental policy and command level orders.  All cells must be checked whether or not inmates exercise the option to lock-in or out."

[4] See §1-05 of title 40 of the Rules of the City of New York.

[5] Section III(1) of DOC Directive #4514R-C effective since 10/13/2015 states: "Correction officers responsible for the care, custody, and control of the inmates shall remain in their assigned areas and conduct visual observations at 30-minute intervals…(e.g. walking through the area and making a visual observation of each inmate when locked in their cell, observe signs of life, the cell is properly secured, etc.)."

[6] Section IV(C) of DOC Operations Order #2/19 effective since 1/18/19 on the subject of the Video Monitoring Unit (VMU) and Video Review Unit (VRU).

[7] DOC's Security Bulletin #001/13 from the Office of the Assistant Chief of Security dated 01/04/13 on the subject of Cell Window Obstruction/Officer Safety states: "AT NO TIME SHALL AN INMATE BE ALLOWED TO COVER HIS/HER CELL WINDOW OR OTHERWISE CREATE AN OBSTRUCTION OF CORRECTION STAFF TO OBSERVE THE INMATE."

[8] Section II of DOC Operations Order #56/88 effective since 8/15/88 defines three categories of MMR restrictions: "1. No physical limitations – only overtime or tour restrictions; 2. Some physical limitations – able to work a normal tour (in duration) where the job allows ample opportunity for sitting with some standing, walking, or climbing stairs. (This employee cannot be expected to do strenuous physical activity, and cannot supervise inmates alone.); 3. Serious physical/psychological limitations – abilities are more limited than those described above. These employee's abilities or disabilities must be specifically described."

3

## III.   GEORGE PAGAN, 48

George Pagan passed away on March 17, nine days after he arrived at Eric M. Taylor Center ("EMTC").[9] Mr. Pagan is survived by his sister and brother. He was assigned to a general population dormitory-style housing area. The unit is staffed with "A" post and "B" post officers. Mr. Pagan's visibly poor medical state was described by people in custody who resided in the same area. He regularly urinated, defecated, and vomited on himself. He was weak, barely ate, and spent his days laying on his bed or the floor. People in custody brought him food and drink. Video footage showed Mr. Pagan laying on a mattress on the floor next to his bed on March 16, less than twenty-four hours before he died.

On March 16, there was no "B" post officer in the dormitory until 2:30 pm. Based on video footage review, the "B" officer spent their shift within the "A" station control room instead of touring the housing area floor. The "A" post officer was also inside the housing area control room. On March 16 at approximately 5:32 pm, Mr. Pagan's health condition was reported by those in custody to the "A" post officer, prompting the officer to call in a medical emergency.

During an April 13 jail death review meeting, DOC stated that the "A" post officer called in a medical emergency at 5:35 pm. CHS reported receiving the call at 6:12 pm and responding to the housing area at 6:22 pm. As of this report's publication, neither party has explained what led to this reporting discrepancy. CHS stated that they cannot speak to the discrepancy and stand by their records. If DOC's account is accurate, it took over thirty minutes for a medical team to leave the clinic and make their way to the unit. If CHS's account is accurate, the response time was around ten minutes. What is clear is that people in custody took it upon themselves to carry a weakened Mr. Pagan out of the unit and down the steps to the main floor to await medical staff at around 6:17 pm. He was transported to Elmhurst Hospital and was pronounced dead the following day at 8:33 am.

According to his legal team, Mr. Pagan was due to be discharged from DOC custody to a court-ordered drug treatment placement December 2021 during his previous incarceration. However, transportation coordination fell through and Mr. Pagan was released into the community. Prior to his incarceration on March 9, 2022, Mr. Pagan was in "very, very bad shape and probably relapsed," said his legal team. Mr. Pagan had a history of drug and alcohol addiction, as well as concerning mental health and medical history, including life-threatening medical conditions requiring regular monitoring and treatment.

When CHS deems it clinically necessary to monitor a person's possible alcohol withdrawal symptoms, nurses administer the Clinical Institute Withdrawal Assessment (CIWA), which measures ten withdrawal symptoms to indicate whether the symptoms are mild, moderate, or severe.[10]  Based on the CIWA score treatment, the patient may be observed, placed on treatment in the facility, or admitted to the hospital. CHS appropriately treats alcohol withdrawal with low detoxification with a benzodiazepine drug.

---

[9] EMTC-specific staffing issues are discussed in section V. Key Findings of this report, below.
[10] *See* Supplement to Asam News, Vol. 16, No. 1 dated January-February 2001, available here: https://www.ci2i.research.va.gov/paws/pdfs/ciwa-ar.pdf

On March 14, three days before his death, Mr. Pagan was found on the floor of his housing area and brought to the clinic. He had a fever and an elevated pulse, yet no follow-up was scheduled, and he was transported back to his housing area where, per people in custody assigned to the same unit, he was still visibly ill. Mr. Pagan did not receive his methadone medication on three occasions nor critical alcohol withdrawal medication on four occasions, including for almost 48 hours before he was transported to the clinic for emergency care on March 16. At that point, he was hallucinating and unable to walk.

BOC's review of Mr. Pagan's medical record showed that Mr. Pagan missed **nine** scheduled medical appointments for CIWA evaluation and or medication administration over a six-day period. According to the CHS record, DOC failed to produce him in all nine instances.

## IV.  HERMAN DIAZ, 52

Herman Diaz was pronounced dead in EMTC's clinic on March 18, 2022. Mr. Diaz is survived by his five siblings. Mr. Diaz was housed in a general population dormitory-style unit. There was an "A" post officer stationed in the control unit bubble, but no "B" post officer on March 17 or March 18.[11] The "A" post officer present on March 18 was on Medically Monitored Returned Category 3 duty. MMR3 classified uniformed staff cannot interact directly with people in custody.

According to those who witnessed the incident, Mr. Diaz choked and collapsed while eating an orange. Video footage review indicated this happened at approximately 10:16 am. People in custody used the Heimlich maneuver on Mr. Diaz (a first-aid procedure to aid a person who is choking by pushing on their abdomen), turned him on his side, checked his mouth and throat, and could see his lips were turning blue. They knocked on the "A" station window to notify the officer that Mr. Diaz was choking and needed medical assistance. The "A" post officer did not render first aid, remaining inside the "A" station and reportedly called in a medical emergency to the clinic. An "A" post officer's expected role in rendering first aid when there is no "B" post officer assigned to the unit is unclear, whether it is to remain inside the control room and wait for medical response, or to enter the housing area to provide emergency aid.

DOC and CHS again diverge on the critical issue of medical response timing, here disputing whether a medical emergency was called in at all. During the April 13 jail death review meeting, DOC stated that the "A" officer called in a medical emergency twice (DOC records reflect a medical emergency called to the unit at 10:20 am; there is no mention of an additional call). CHS reported not receiving any calls. Again, neither party has explained what led to this discrepancy. CHS maintained they stand by their documentation and cannot speak to the discrepancy.

In the absence of a medical response, at approximately 10:20 the "A" officer opened the unit's entrance gate to allow people in custody to carry Mr. Diaz to the clinic. Along the way to the clinic, officers opened doors and gates to allow them passage to the clinic. None of the officers rendered first aid to Mr. Diaz. Mr. Diaz was pronounced dead at 10:58 am.

---

[11] More EMTC-specific staffing issues are discussed in section V. Key Findings of this report, below.



### Final Report of the
### New York State Commission of Correction:

### In the Matter of the Death of

### Junior Granados,
### an incarcerated individual of the
### Robert N. Davoren Center
### Brooklyn Justice Initiative

### March 29, 2022

### To: Commissioner Louis Molina
### NYC Department of Correction
### 75-20 Astoria Blvd., Suite 100
### East Elmhurst, NY 11370

**Allen Riley**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47 (1)(d), regarding the death of Junior Granados who died on May 28, 2020, as result of circumstances which occurred while an incarcerated individual in the custody of the New York City Department of Correction, the Commission has determined that the following final report be issued.

FINDINGS:

1.   Junior Granados was a 22-year-old Hispanic male who died on 5/28/20 from an acute mixed drug and alcohol intoxication while in the custody of the New York City Department of Corrections (NYC DOC) while in the Brooklyn Justice Initiatives Program following an early release from the Robert N. Davoren Center (RNDC). The Medical Review Board finds that this case should be closed as an accidental death.

2.   Granados was arrested on 11/21/19 by the New York City Police Department and charged with Robbery in the 3rd Degree. Granados was in possession of a stolen credit card which he attempted to use.

3.   Granados was remanded to the custody of NYC DOC at 1:26 a.m. on 11/22/19. According to the NYC DOC Arraignment and Classification Risk Screening Form, Granados appeared to have no medical problems and appeared "OK" to the intake officer. Granados stated that he was homeless and his next of kin was a sister. Granados reported being single and having an 11th grade education. Granados denied any drug or alcohol use. Granados also denied having any gang affiliation and scored zero on the Suicide Prevention Screening Guidelines.

4.   At 3:13 a.m., Granados arrived at RNDC and was placed in Reception Housing.



At 10:27 a.m., Granados was moved to housing M3NL. At 8:33 p.m., Granados was moved to housing area 3 Upper South.

5.   

6.



7.

8.     On 11/27/19, Granados attended court.  He returned at 4:30 p.m. and was placed in the same housing unit.  At 8:52 p.m., Granados was moved to 2 South housing.

9.

10.

11.

12.     On 12/11/19,                                              Granados attended court on this day.  He was sentenced to 364 days.  Upon his return to RNDC, Granados was placed in housing on 2 South at 6:53 p.m.

13.     On 12/12/19, a "Transfer Chart Review was conducted on Granados' record.  At 10:43 a.m., Granados was transferred to the Eric M. Taylor Center (EMTC) in housing unit 7 Lower.

14.

15. .

16.     On 1/3/20, Granados was transferred to housing area 12 Lower.

17.     .

18.     .
On 1/13/20, Granados was transferred to RNDC  M4SL unit.

19.

20.     .

21.     .

22.

23.     .

24.     On 3/25/20, Granados completed a Community Placement Work Release Program Application.  The form indicated that Granados' sentence would end on 7/20/20, and if he violated the rules of the program, he would be returned to the physical custody of the NYC DOC.  Granados was released to the Brooklyn Justice Initiatives Program.

25.     On 5/26/20, Granados had contact with the Brooklyn Justice Initiatives program.

26.     On 5/28/20, Granados was found unresponsive in a park with a baggie of white powder and an alcohol container.  There were no signs of injury.


ACTIONS REQUIRED:

This case be closed as an accidental death.

WITNESS, HONORABLE THOMAS J. LOUGHREN, Commissioner, NYS Commission of Correction, Alfred E. Smith State Office Building, 80 South Swan Street, 12th Floor, in the City of Albany, New York 12210 on this 29th day of March, 2022.


Thomas J. Loughren
Commissioner & Chair
Medical Review Board


TJL:ET:jdb
2020-M-0074
March 2022


cc:     Dana Wax, Acting Chief of Staff
        Melissa Guillaume, Deputy General Counsel
        Patricia Yang, DrPH, Senior Vice President
          Correctional Health Services
        Ross MacDonald, MD, Chief Medical Officer
          Correctional Health Services
        Ronald Greenberg, Director, Compliance and Inspections
          NYC Department of Correction
        Amanda Masters, Acting Executive Director
          NYC Board of Correction



**Final Report of the
New York State Commission of Correction:**


**In the Matter of the Death of**


**Hector Rodriguez aka Herminio Villanueva,
an incarcerated individual of the
Robert N. Davoren Center**


**March 29, 2022**


**To: Commissioner Louis Molina
NYC Department of Correction
75-20 Astoria Blvd., Suite 100
East Elmhurst, NY 11370**


**Allen Riley**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47 (1)(d), regarding the death of Hector Rodriguez aka Herminio Villanueva who died on June 21, 2020, as result of circumstances which occurred while an incarcerated individual in the custody of the New York City Department of Correction, the Commission has determined that the following final report be issued.


FINDINGS:

1.      Hector Rodriguez was a 61-year-old Hispanic male who died on 6/21/20 of bronchial asthma with contributing pulmonary emphysema while in the custody of the New York City Department of Correctional Services (NYC DOCS) at the Robert N. Davoren Center (RNDC).  The Medical Review Board has found that there was a failure of corrections staff to provide first aid and cardiopulmonary resuscitation to Rodriguez which led to his death.  Additionally, the Medical Review Board found that there was inadequate monitoring and assessment of Rodriguez's health during his incarceration.  Remote to Rodriguez's cause of the death, the Medical Review Board also found that there was a lack of adequate documentation of health care, violations of basic security standards and infection control directives to prevent the spread of COVID-19.

2.      Rodriguez was admitted to NYC DOC custody on 3/2/20 directly from the Manhattan Supreme Court with the charge of failure to register or verify as a sex offender.  He was sentenced to one year in jail.

3.      Rodriguez was taken into NYC DOC custody at 1:35 p.m. and his medical triage on the Arraignment and Classification Risk Screening Form was documented as "Normal".  ▮▮▮
▮▮▮▮▮
Rodriguez reported having no next of kin. ▮▮▮▮▮▮▮▮▮▮▮     No special housing considerations were required and
▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Rodriguez had no gang affiliations.  Rodriguez scored a zero on his Suicide Prevention Screening Guidelines and no referrals were made.

4.      On 3/3/20 at 3:32 a.m., Rodriguez was transferred to the Anna M. Kross Center (AMKC).



At 9:37 p.m., Rodriguez was moved to housing on W18LB.

5.

6.

7.

8.

9.

10.

11.

12.

13.



. The Medical Review Board finds that there was a failure to adequately document patient encounter, to include any treatment provided or justification for not providing treatment which is a violation of 9 NYCRR §7010.2(j) which states that adequate medical records must be maintained for incarcerated individuals.

14.

15.

16.

17.

18.

. According to the Inmate Movement Activity Report, Rodriguez was moved to an intake cell at EMTC at 6:30 p.m.

19.



20.   On 4/2/20 at 10:04 a.m., as per the Inmate Movement Activity Report, Rodriguez was moved to housing area 5M.

. The Medical Review Board finds there was a pattern of missed medications with no documentation in the health record regarding a reason doses were missed or any evidence that contact to the ordering prescriber was made.

21.   On 4/3/20, it was documented on the Inmate Movement History Report that Rodriguez was moved to housing area 3U at 5:57 a.m.

22.

23.  The Medical Review Board finds that there was a failure to provide adequate monitoring of a patient with positive COVID-19 who had a history of abnormal vital signs and a underlying respiratory disease.

24.  The Medical Review Board finds that there was a failure by Dr. ____ . and Dr. ____ . to adequately assess a patient with a history of COVID-19 infection and an underlying lung disease evidenced by a failure to perform and document auscultation of lung and heart sounds.

25. On 4/8/20, Rodriguez was transferred back to RNDC and placed on the M4SL housing unit.

26.  .

27. .

28. The Medical Review Board finds that there was an eight-day lapse in the Methadone treatment with no documented evidence of a reason for missed doses or any notification to the medical provider.

29.   On 5/9/20 at 8:45 a.m., health staff responded to a call from the housing unit for an emergency response.  PA ▮▮▮. documented that the health staff arrived at 8:52 a.m. and



30.

31.

32.



33.

34.

35.

36.

37. ███████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████
█████████████████████████████████████████████████ During
an interview with Commission staff, Dr. ████ reported that the telemedicine equipment is
only a camera.  During these encounters, the physician relies on the report of the health
staff with for the patient's diagnostic data such as lung sounds, ███████████████████
█████████████████. The Medical Review Board finds that RN ████. and Dr. ██H. failed to
adequately assess a patient returning from the hospital for an acute respiratory episode
prior to returning the patient to the housing unit.

38. ███████████████████████████████████████████████
█████████████████████████████████████████████████ The Medical
Review Board opines that there was an unnecessary delay, approximately 3 months, in
addressing Rodriguez's HCV who presented at the time of admission with active disease
given his measured viral load.

39. ████████████████████████████████████████████████

40. ████████████████████████████████████████████████

41. ████████████████████████████████████████████████
████████████████████████████████████████████████

42. ████████████████████████████████████████████████

43.



44.

45.   On 6/20/20 at 6:08 p.m., it was documented in the Mod 4 A post logbook that a medical emergency was called for Rodriguez.  Capt. S.S. logged that she responded to the medical emergency at 6:18 p.m. At 6:18 p.m., it was logged in the housing unit logbook that Rodriguez was escorted to the clinic.  Per the Medical Clinic logbook, the medical emergency was called at 6:01 p.m. and a clinic escort was enroute to pick up Rodriguez. At 6:25 p.m. in the clinic logbook, it stated "Medical Emergency stand down at this time". There was no documentation that Rodriguez ever arrived in the medical department. There were no clinic notes indicating that Rodriguez was seen by any health staff. There was no documentation in the housing unit log that Rodriguez ever returned.  The only staff member available to the Commission to interview regarding this incident was CO R.A. who was on duty in the housing unit security booth.  CO R.A. stated that Rodriguez came to the security booth and stated that he was having difficulty breathing.  CO R.A. stated that he called the clinic and an escort came to get Rodriguez.  CO R.A. stated that he did not recall what time Rodriguez came back.  CO R.A. stated that he recalled that Rodriguez was often sick and did spend time at the hospital.  The Medical Review Board finds that Rodriguez had presented again with acute respiratory symptoms but was not provided with proper medical attention.  Additionally, there was an absence of documentation regarding a patient that was presented to the medical area for respiratory distress.  The Medical Review Board opines that had Rodriguez been provided timely medical care on the evening on 6/20/20, his terminal event during the

morning hours of 6/21/20 may have been prevented.

46.     On 6/21/20 at 5:10 a.m., CO K.J. assumed the C post on the Mod 4 Lower unit.  A total count of 22 was noted.

47.     At 6:23 a.m., it was documented that a captain was on post and all appeared secure.  At 7:00 a.m., CO K.J. documented that institutional lock in occurred and that all was secure.

48.     At 7:25 a.m. it was documented by CO K.J. that a medical emergency was called for "inmate with breathing issues.  At 7:30 a.m., CO K.J. documented that a supervisory tour was conducted and there was nothing to report.

49.     A review of recorded video of the area showed that at 7:25 a.m., Rodriguez was sitting on his bunk talking to another incarcerated individual.  Rodriguez can be seen motioning to his chest.  At 7:26 a.m., an incarcerated individual approached Rodriguez to assist Rodriguez by rubbing his back.  At 7:27 a.m., CO K.J. approached the area and stopped one bed away from Rodriguez.  CO K.J. paused then turned and walked away.  CO K.J. can be seen speaking to the officer in the booth.  At 7:28 a.m., Rodriguez appeared to collapse forward and was caught by the incarcerated individual who was rubbing his back.  At 7:29 a.m., CO K.J. can be seen writing in the logbook.  CO K.J. documented that active supervision was completed with "Nothing to report".  The Medical Review Board finds that CO K.J. failed to accurately document a significant incident which is a violation of 9 NYCRR §7003.3(j)(6)(i-iv).   At 7:30 a.m., an incarcerated individual is seen speaking to the security booth officer.  At 7:32 a.m., CO K.J. walked toward Rodriguez and stopped two beds away from the area and watched for one minute.  CO K.J. walked to where the logbook was near the booth window.  CO K.J. stretched and turned toward the booth making a gesture to the booth officer of waiving his open hand from one side of his neck to the other.  At 7:35 a.m., Rodriguez can be seen slumping to one side and was helped upright by an incarcerated individual.  CO K.J. can be seen observing the incident.  CO K.J. can be seen leaving the housing unit, leaving the door ajar and going into the vestibule area.  At 7:36 a.m., it appeared that incarcerated individuals were calling for help.  At 7:37 a.m., CO K.J. returned to the housing area.  At 7:38 a.m. another incarcerated individual approached Rodriguez and tried to wake him.  An incarcerated individual then picked Rodriguez up and carried him up to the vestibule. Rodriguez appeared to be limp in the individual's arms.  A group of incarcerated individuals went to the vestibule with the incarcerated individual carrying Rodriguez. They remain there for less than one minute and turn around and place Rodriguez on the first bed inside the living unit.  Officer K.J. stood nearby observing.  Incarcerated individuals can be seen getting a pillow and a blanket for Rodriguez. An incarcerated individual can also be seen attempting to comfort Rodriguez by rubbing his arm and chest.

50.     In a written statement, CO K.J. stated that she observed Rodriguez struggling to breathe and coughing.  She stated that she went back and forth between Rodriguez and the booth to check his breathing and to inform CO T.C. of the condition.  CO K.J. documented that the incarcerated individuals were stating that Rodriguez did not belong on the living unit because he was sick, and they just keep sending him back to the unit after sick call.  CO K.J. documented that after five minutes, CO T.C. called a medical emergency over the radio.  CO K.J. wrote that the incarcerated individuals carried

Rodriguez to the front of the housing unit because health staff did not come timely. CO K.J. stated that the incarcerated individuals placed Rodriguez on the bed and while the incarcerated individual was rubbing Rodriguez's chest, Rodriguez was breathing "faintly". CO K.J. was unavailable for interview by Commission staff. The Medical Review Board finds that there was a gross failure to adequately respond to an imminent medical emergency. CO K.J. failed to provide first aid to an incarcerated person with difficulty breathing and failed to provide cardiopulmonary resuscitation to an incarcerated person in her care. As a result of CO K.J.'s lack of response, cardiopulmonary resuscitation was delayed by approximately 19 minutes.

51.     During this incident at 7:26 a.m., the security booth can be seen on the video with the door propped open. At 7:34 a.m., an incarcerated individual can be seen leaving the housing unit and entering the security booth. During this time, the security booth door is open, and the living unit door is unsecured. The individual removes a large coffee pot and takes it to the living unit. During an interview with Commission staff, CO T.C. stated that at approximately 7:29 a.m., CO K.J. knocked on the window and stated that an incarcerated individual was having difficulty breathing. CO T.C. stated that the incarcerated individuals were yelling for help. CO T.C. stated a call was made to the clinic and CO. V.C. answered the phone. CO T.C. stated that she also radioed to medical and was informed that health staff were enroute. CO T.C. did not mention that the incarcerated individuals were moving Rodriguez when asked to describe the incident. When asked if Rodriguez was moved, CO T.C. stated that the incarcerated individuals moved Rodriguez closer to the door for health staff and that she could hear them yelling for CO K.J. to assist. When CO T.C. was asked about the process for the doors and allowing incarcerated individuals in the security booth, she stated that the doors must be secured tightly but an incarcerated individual could be in the booth if they needed to give her something. The Medical Review Board finds that there was a failure by officers to maintain the safety and security of the unit due to failing to secure the living unit door, security booth door, and allowing an incarcerated individual into the security booth area. These are all in violation of 9 NYCRR §7003.1 which states that the facility must develop and employ procedures to ensure that proper facility safety, security, and supervision is maintained.

52.     

53.     Per a video review, two health staff arrive in the living unit at 7:42 a.m. At the same time, Capt. T.J. arrives. Capt. T.J. enters the area without a mask. Two health staff attempted to obtain a radial pulse and place an automated external defibrillator on Rodriguez. Two officers and Capt. T.J. are standing nearby watching the health staff. At 7: 45 a.m., health staff begin chest compressions. At 7:56 a.m., health staff place a

nasal cannula on Rodriguez with oxygen.  At this time, there are three officers and Capt. T.J. standing in the area observing the situation without masks.  The Medical Review Board finds that NYC DOC staff failed to follow proper infection control practices as per Chairman's Memorandum 6-2020 and Executive Order 202.16 which states that employees shall wear face coverings when in direct contact with customers or members of the public.  At 7:56 a.m., health staff place a non-rebreather on Rodriguez while chest compressions continue.  Several officers and captains enter the area. Most of the security staff are not wearing masks.  At 7:58 a.m., health staff attach an ambu bag to the oxygen and begin to bag Rodriguez.  The Medical Review Board finds that health staff failed to perform adequate CPR by not initiating the use of an ambu-bag for a patient without respirations.  During the incident, health staff took turns performing chest compressions.  One officer enters the area and assists with CPR.  At 8:04 a.m., Urgicare physician ███. can be seen entering the area and examining Rodriguez.

54.   

55.   EMS arrived at 8:15 a.m. ███████████████

███████  REQUIRED:

TO THE COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF CORRECTION:

1.   The Commissioner shall conduct an investigation into the conduct of Correction Officer K.J. and the failure to accurately document a significant incident, failure to provide first aid, and any life-saving interventions to an incarcerated individual in her care.  The Commissioner shall provide the Board with a copy of the report findings and any corrective actions taken to assure compliance with 9 NYCRR §7003.3.

     *In a response to the Commission's preliminary report dated 2/14/22, the NYC DOC Commissioner indicated that formal disciplinary charges were brought against the officer and the officer has resigned from NYC DOC.*

2.   The Commissioner shall conduct an investigation into the actions of Capt. T.J. and the other responding officers for failure to comply with infection control directives included in Chairman's Memorandum 6-2020 and Executive Order 202.6.  The Commissioner shall provide the Board with a copy of the report findings and any corrective actions taken to assure compliance with Chairman's Memorandum 6-2020 and Executive Order 202.6.

     *In a response to the Commission's preliminary report dated 2/14/22, the NYC DOC Commissioner indicated that staff violated infection control directives but would not be*



**Final Report of the
New York State Commission of Correction:**


**In the Matter of the Death of**


**Christopher Cruz,
an incarcerated individual of the
Anna M. Kross Center**


**June 28, 2022**


**To: Commissioner Louis Molina
NYC Department of Correction
75-20 Astoria Blvd., Suite 100
East Elmhurst, NY 11370**



**Allen Riley**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47 (1)(d), regarding the death of Christopher Cruz who died on October 9, 2020, as result of circumstances which occurred while an incarcerated individual in the custody of the New York City Department of Correction, the Commission has determined that the following final report be issued.

FINDINGS:

1.      Christopher Cruz was a 27-year-old male who died on 10/9/20 due to unknown causes while in the custody of the New York City Department of Corrections (NYC DOC) at the Anna M Kross Center (AMKC). Although viral DNA was identified at Cruz's autopsy, a specific antigen could not be identified and toxicology studies had no positive findings. The Medical Review Board has found that NYC DOC staff failed to comport with the requirements of 9 NYCRR §7003.3 due to failing to document Cruz's flooding of his cell and behavior in the 12 hours prior to his terminal event.

2.      Cruz had a medical history of asthma with prescribed inhalers of Albuterol and Q-var. Cruz had a mental health history of Schizophrenia with outpatient treatment in the community. Cruz was prescribed Buspar, Cogentin, and Haldol and was frequently non-compliant with taking the prescribed medications.

3.      Cruz's criminal history began on 4/27/19 when Cruz was arrested for Menacing 3rd Degree. On 4/28/19, Cruz was arraigned on charges of Attempted Arson 2nd and 3rd Degree, Reckless Endangerment 2nd Degree, Arson 5th Degree, Attempted Criminal Mischief 4th Degree, and Harassment 2nd Degree. In November 2019, Cruz pled guilty to Attempted Arson 5th Degree and was sentenced to probation. On 5/11/20, Cruz was resentenced to 90 days. On 12/27/19, Cruz was incarcerated as a court direct admission from the Bronx Criminal Court for charges of Kidnapping 2nd Degree and Arson 5th Degree with a bail amount of $10,000. Cruz had an extraordinarily difficult adjustment to incarceration and was infracted nineteen times and found guilty seventeen times. He was in at least 26 documented use of force incidents with NYC DOC staff during his near 10 months of incarceration. The violations varied from assault on staff and other incarcerated individuals, fighting and physically resisting staff.

4.      On 12/27/19 at 11:00 p.m., Cruz had a suicide screening completed by DOC staff. Cruz verbalized thoughts of killing himself, appeared agitated, angry, and was verbally combative. A mental health referral was completed. Cruz was seen by Licensed Mental Health Counsellor (LMHC) J.F. and was cleared for general population with mental health follow-up. On 12/28/19 at 2:41 a.m., Cruz was seen by Physician Assistant (PA) T.B. Cruz had a urine toxicology test which was documented as negative. Cruz's vital signs were documented as: weight 118 pounds, blood pressure 100/57, temperature 98.5, pulse 62, respirations 16, and oxygen saturation 98%. The community medication fill list was reviewed and noted a prescription for Benztropine. Cruz reported having a history of Schizophrenia but denied having any suicidal thoughts or intents. Cruz reported the use of PCP/LSD/hallucinogens. Cruz reported having a history of asthma without treatment in the community.

5.     On 12/28/19 at 3:55 a.m., LMHC B.M. attempted to meet with Cruz for an initial mental health assessment and treatment plan review. Cruz refused mental health services, despite encouragement. Cruz signed a refusal of treatment form. Cruz stated: "I am seeing and hearing things. I can't be here because people will try to hurt me. If you don't send me to Bellevue. I will break this computer, say I won't."  Cruz expressed having visual and auditory hallucinations. There was no documented evidence of psychosis noted during the encounter. Cruz was goal directed in going to Bellevue Hospital. Cruz was alert and oriented times three. Cruz's mood was stable with appropriate affect, good eye contact, good attention span, coherent speech, and relevant thought process. Cruz later denied having any auditory or visual hallucinations. Cruz denied having any suicidal thoughts or ideation. Cruz would have a second refusal scheduled with the psychiatrist based on his ECW (electronic chart system) chart review. According to the review of ECW, Cruz had been diagnosed with Schizophrenia, other (or unknown) substance use disorder-severe for K2, cannabis use disorder-moderate, alcohol use disorder-moderate, and Generalized Anxiety Disorder. Cruz had been treated with Haldol Decanoate, Buspirone, and Benztropine. Cruz was not an imminent danger to himself or others during this visit. Cruz did not present with symptoms warranting a Mental Observation (MO) level of care. Cruz was encouraged to seek mental health services if needed. Cruz agreed to see mental health the following day.

6.     On 12/28/19 at 5:37 p.m., Cruz was seen by LMHC J.F. who noted that Cruz had been referred to mental health due having a history of Schizophrenia. Cruz was known to NYC DOC staff dating back to 2011. Cruz had the following primary diagnoses: Adjustment Disorder, Schizophrenia (in remission), and intermittent explosive disorder. Cruz reported that he wanted to go to Bellevue Hospital and stated: "I can't be here, I can't be in this building. I feel dizzy and nervous, I need to be around nurses." Cruz had a history of hospitalization five times in the past at Lincoln, Montefiore, Jacobi, Bronx, and Lebanon Hospitals. Cruz's first admission was at the age of 15 and the last admission was in 2019. A review of the Psychiatric Services and Clinical Knowledge Enhancement System (PSYCKES) clinical report dated on 5/11/19 indicated: "alcohol, cannabis, cocaine, other psychoactive substance related disorders, Schizophrenia." Cruz had received services at Samaritan Village and White Plains Road Medical Services. According to the 2012 mental health notes, Cruz had a past history of mental health and was hospitalized at Bronx Lebanon Hospital for having a psychotic break in 2011. Cruz was incarcerated in 2011. Cruz reported that he was discharged from NYC DOC and was placed in a court mandated long-term substance abuse program called Phoenix House. Cruz reported that after a few months at Phoenix House, he violated the program. Cruz reported that he felt paranoid and felt someone was following him. Cruz reported that his most recent hospitalization had occurred that month. Cruz reported drinking alcohol and using K2. Cruz reported his last use was the day before the incarceration. Cruz did not endorse having any thoughts of self-harm and he scored low on the suicide assessment scale. During this interview, Cruz did not demonstrate any symptoms of Schizophrenia. Cruz presented with an euthymic mood, an appropriate affect and was alert and oriented times three. Cruz had linear and logical thought process and was superficially engaged. Cruz seemed to be goal directed not to be housed and reported that he wanted to be sent to Bellevue. Cruz reported his next court date was 12/31/19 and that he was going to get a program, Cruz reported that he was incarcerated because his significant other said Cruz threatened her. Cruz was forward thinking and said, "when I go to court on the 12/31, I will be offered a program and will probably leave 12/31." Cruz did not demonstrate any evidence of psychosis, mood

dysregulation, or acute distress. Cruz did not warrant a mental observation level of care at this time. Cruz appeared clinically stable to be housed in general population with mental health follow-up. Cruz was given a provisional diagnosis of amphetamine or other stimulant induced bipolar and related disorder with mild use disorder. In two weeks, Cruz was to be seen again and the mental health diagnosis would be amended accordingly. Cruz was cleared for general population with mental health follow up.

7.    On 12/30/19, Cruz was seen at sick call by Dr. J.R. and stated that he had Schizophrenia and wanted medications. Cruz was referred to mental health.

8.    On 1/2/20, Cruz was seen by Dr. H.C. Cruz reported doing "okay". Cruz reported leaving DOC in October and requested to go back on his medications but did not want the Haldol injection. Cruz reported that it caused side effects and stated that he wanted the pills instead. Cruz was well-known to mental health at NYC DOC and was last seen on 9/23/19 as per the chart review. Cruz was discharged with Haldol Decanoate 175 mg, Buspar 5 mg at bedtime, and Cogentin 1 mg twice a day, which was added due to a report of dystonic effects with the Haldol. Cruz reported that he followed up at White Plains Clinic. Cruz admitted to using K2 and cannabis every day recently however, Cruz couldn't remember the last time he took K2. Cruz admitted to a history of alcohol abuse but was a poor historian about the last time he drank. Cruz presented as calm, cooperative, with no overt psychosis, no mania, no mood disturbances. Cruz denied having any suicidal or homicidal ideation. Cruz exhibited no acute psychiatric distress. Cruz's diagnosis was Schizophrenia. The plan was to resume Haldol 10 mg twice a day, Buspar 5 mg daily, and Cogentin 1 mg twice a day.

9.    On 1/7/20, per Licensed Clinical Social Worker (LCSW) D.W., Cruz was referred by DOC due to expressing a desire to commit suicide. Cruz indicated that he was feeling paranoid and was thinking of hurting himself and scared that he might hurt himself. Cruz felt others were out to get him and did not feel safe in the present housing area. Cruz indicated feeling nervous for some time and feeling that he might get extorted. Cruz was somewhat guarded and refused to verbalize any known triggers to his present thoughts. Cruz did not appear to have a plan. Cruz's mood was depressed. Cruz denied experiencing any auditory hallucinations. Cruz appeared fearful of being harmed. Cruz's diagnosis at this visit was listed as Schizophrenia. Cruz was placed in C-71 at AMKC on suicide watch. LCSW D.W. documented that Cruz may require civil psychiatric hospitalization pursuant to Mental Hygiene Law, Section 9.39 or 9.43 in as much as Cruz had conducted himself in a manner which was likely to result in serious harm to himself/others and Cruz appeared to be mentally ill.

10.   On 1/8/20 at 5:10 a.m., Cruz was seen by Nurse Practitioner (NP) H.O. for a new admit to MO housing. Cruz's medications included: Haldol 10 mg twice a day, Cogentin 1 mg twice a day, and Buspar 5 mg at bedtime. Cruz's medication compliance was noted to be 60% for the Haldol, 60% for the Cogentin, and 100% for the Buspar. Cruz indicated that he was feeling paranoid and was thinking of hurting himself and scared that he may hurt himself. Cruz stated, "I need to go to MO house, general population makes me paranoid. I fear being jumped. I can't stay in general population." Cruz denied having any suicidal or homicidal ideation. The plan was to discontinue the suicide watch, admit to MO, and follow up in seven days.

11.   On 1/13/20 at 5:19 p.m., Cruz was seen by NP J.C. for a medication follow-up. Cruz was diagnosed with Schizophrenia and was being treated with Cogentin, Buspar, and

Haldol with a noted 70% compliance. Cruz stated, "I like it here, no problems." Cruz exhibited no suicidal ideation and no auditory or visual hallucinations. Cruz did not appear to be in any acute distress, nor did Cruz appear to pose an imminent threat to himself or to others at that time. The treatment/medication regimen was discussed along with the risks versus benefits of medication and Cruz was made aware of the importance of compliance. The diagnoses listed at this visit was Schizophrenia. The plan was that Cruz was to follow-up in two weeks.

12.     On 1/15/20 and 1/22/20, Cruz was seen by MHP (unknown title) C.S. for a comprehensive treatment plan encounter. Cruz was observed standing near the door in his cell. Cruz cooperated and related well in the session. Cruz presented with a normal mood and appropriate affect. Cruz's thought processes were described as organized, relevant, and goal directed. Cruz reported taking his medications and denied any substance use since his incarceration. Cruz denied having any suicidal ideation or any hallucinations. Cruz's diagnosis was listed as Schizophrenia, Alcohol Use Disorder-moderate, Cannabis use disorder-moderate, and other hallucinogen use disorder-severe. The plan was to continue MO housing.

13.     On 1/28/20, Cruz was seen by NP J.C. Cruz's medication compliance decreased from 70% to 56% for the Haldol but was 80% for the Buspar. Cruz stated, "I will do better this week." Cruz reported his mood was "okay." Cruz denied having any suicidal ideation or hallucinations. Cruz did not appear to be in acute distress, nor did he appear to pose an imminent threat to himself or to others. The diagnosis at this visit was listed as Schizophrenia. The plan was to follow up in two weeks.

14.     On 1/29/20, Cruz was seen by MHP C.S. for a follow-up session. Cruz was minimally cooperated in the session and presented with a normal mood and appropriate affect. Cruz's thought processes were organized, relevant, and goal directed. Cruz denied using any substances since his incarceration. Cruz had not shown any behavior problems since his transfer to the unit and was beginning to socialize with some of his peers. There were no signs and symptoms of psychosis or mood disorder reported. Cruz also denied having any suicidal or homicidal ideation or hallucinations. The diagnosis listed at this visit was Schizophrenia.

15.     On 2/4/20, Cruz was seen for an asthma follow-up by PA N.F. Cruz's vital signs were documented as: blood pressure 126/80, temperature 98.5, pulse 76, respirations 16, and peak flow 600. Cruz verbalized no complaints.

16.     On 2/5/20, MHP CS met with Cruz for a mental health follow-up. Cruz cooperated and related well in the session. Cruz presented with a normal mood and appropriate affect. Cruz's thought processes were organized, relevant, and goal directed with self-preservation plans. Cruz stated: "I am worried about my case." Cruz explained that he was incarcerated for a parole violation and a kidnapping case and he didn't know how the kidnapping case was going, but his lawyer had scheduled a video conference to explain his options. Cruz exhibited no signs and symptoms of psychosis or mood disorder. Cruz denied having any suicidal ideation or hallucinations.

17.     On 2/11/20, Cruz was seen by NP J.C. for a medication follow-up. Cruz's medication compliance increased from 56% to 86%.  Cruz indicated, "I am doing better. Meds keeping me calm." Cruz denied having any suicidal ideation or hallucinations. The diagnosis listed at this visit was Schizophrenia.

18.   On 2/11/20, Cruz was involved in an altercation with another incarcerated individual (II) without injury and refused medical attention or assessment.

19.   On 2/12/20, NP J.C. met with Cruz due to statements that Cruz made to the discharge planner the day prior regarding suicidal ideation. NP J.C. inquired about Cruz's statements and wellbeing and Cruz acknowledged that he was in an acute level of distress the day prior after receiving bad news from the court. Cruz denied having any current suicidal ideation and was future oriented. Cruz also reported that he had difficulty sleeping due to escalating anxiety and NP J.C. provided him psychoeducation regarding sleep hygiene.

20.   On 2/12/20, Cruz was seen by Dr. A.K. for complaints of heartburn that was reported to be intermittent for two days. Cruz's examination was listed as normal and Cruz was given Maalox with relief.

21.   On 2/12/20, Cruz was seen by MHP C.S. for a mental health follow-up. Cruz stated, "I am good. Can you send me to Bronx State?" Cruz stated, "They will take care of me better." Cruz reported that he would be going back to court on 3/24 to be rearrested on other charges. Cruz presented with a normal mood and appropriate affect. The medication reevaluation note for 2/11/20 showed 86% compliance. Cruz denied having any suicidal ideation or hallucinations. Cruz was to remain in MO housing.

22.   On 2/19/20 at 9:49 a.m., Cruz was seen by PA N.F. for complaints of itchy testes and pain on the left side of his chest. Cruz's vital signs were documented as: blood pressure 121/74, temperature 98.2, pulse 60, and respirations 16. Examination revealed there was tenderness to the left side of the chest on palpation. Cruz's lungs were clear to auscultation bilaterally. New orders were written for Ibuprofen 400 mg twice a day. An order for a chest x-ray was written.

23.   On 2/19/20 at 7:01p.m., Cruz was seen by PA G.K. for pain over the left chest for seven days without shortness of breath or wheezing. An examination revealed mild tenderness over the left axillary line. There was no erythema, no swelling, full air entry bilaterally, and lungs were clear to auscultation. Cruz's vital signs were documented as: blood pressure 116/73, temperature 98.6, pulse 75, respirations 14, and oxygen saturation 99%. A chest x-ray was completed which revealed no fracture but did note a probable small bilateral cervical rib. The diagnosis was costochondritis. The plan was that Cruz was administered Ibuprofen 400 mg stat.

24.   On 2/19/20, Cruz was seen by MHP M.O. Cruz engaged minimally and asked to go to sleep. Cruz was minimally cooperative and related well. Cruz presented with a neutral mood and an appropriate affect. Cruz's thought process was spontaneous, organized, and relevant. There were no noted or reported thoughts of harm to self and/or others nor any safety/security concerns. Cruz was to continue in mental health treatment with MO housing and psychiatrist and clinician follow-ups.

25.   On 2/25/20, Cruz was seen by Licensed Master Social Worker (LMSW) B.V. Cruz presented with an organized thought process and normal speech. Cruz relayed mental health medication compliance and reported that his medications was effective at treating his mental health symptoms. Cruz denied having any suicidal or homicidal ideation, hallucinations, or loss of appetite.

26.     On 2/25/20, per consultation with Dr. V.F., Cruz was being discharged from MO housing as Cruz's symptoms had stabilized. Cruz was said to be 86% adherent to his psychotropic medications. Since coming to the unit, Cruz had been consistently observed to demonstrate a linear, organized, and relevant thought process without the evidence of acute paranoia or other delusions. Cruz had not endorsed having any auditory hallucinations, nor had he been observed to be internally preoccupied or distracted. Cruz could consistently make his needs known to staff and regularly spoke up in community meetings on the unit. Given the stability Cruz had demonstrated in over a month of observation, the consistency with which Cruz adhered to the psychotropic medications, and the lack of overall symptom endorsement, Cruz did not appear to require this level of care to effectively treat his ongoing mental health symptoms. It was noted that it was likely that future endorsements of symptoms particularly suicidal ideation may be made to secure preferred housing. The diagnosis was listed as Schizophrenia, Cannabis Use Disorder-Moderate, Alcohol Use Disorder-Moderate, Other (or Unknown) Substance Use disorder-severe. The plan was to discharge to general population.

27.     On 2/26/20, 2/27/20, and 2/29/20, Cruz was seen by medical staff, both PA and Dr., following three separate uses of force (UOF) with DOC staff. Cruz stated that he was not injured. There was no loss of consciousness, bruises, swelling, bleeding, nausea/vomiting, neck pain, nor deficits noted. Cruz's vital signs were stable after each incident.

28.     On 3/1/20 at 11:20 p.m., Cruz was seen by LCSW R.T. Cruz was referred to mental health via DOC for a change in his behavior. Cruz reported that he wanted to return to C-71. LCSW R.T. consulted with the mental health supervisor on duty. Cruz's compliance with mental health medications was 86%. Cruz was not manic nor psychotic. Cruz denied having any suicidal ideation or hallucinations. Cruz's mood was described as irritable. Cruz was goal directed to return to C-71. Cruz was cleared to return to general population with mental health follow-up.

29.     On 3/2/20 at 1:30 a.m., Cruz was seen by PA J.D. following a use of force with DOC staff. Cruz denied having any injuries or complaints, denied any head, neck, back or chest pain. Cruz's vital signs were documented as: blood pressure 101/64, temperature 97, pulse 64, respirations 16, and oxygen saturation 99%.

30.     On 3/2/20 at 8:25 p.m., Cruz was seen by Dr. C.C. Cruz complained of having difficulty adjusting to general population and requested to return to MO house. Cruz was angry and hostile. Cruz denied having any homicidal/suicidal ideation. Cruz's medication compliance was noted to be: Haldol 60%, Buspar 70%, and Cogentin 60%. The plan was general population with mental health follow-up.

31.     On 3/3/20, Cruz was seen by LMHC Y.L. Cruz presented with a stat referral for suicidal ideation. Cruz presented as defiant with the area captain who escorted him into the clinic. Cruz would not step into the holding pen. Cruz was observed to be mild to moderately agitated. Cruz, ultimately with two officers, entered the holding pen. Cruz was heard complaining about not wanting to wait and stated, "not having time for this." Cruz presented with internal preoccupation. Cruz appeared to be experiencing auditory hallucination and endorsed having visual hallucinations of seeing people attacking him. The captain reported that Cruz was "trying to fight everyone" in each housing area/intake

which he had been transferred into the past week, since his release from the MO unit on 2/25/2020. Cruz denied having any suicidal ideation. Cruz reported that he didn't know why he was transferred from MO. Cruz then stated that he must go call his daughter and stated that he did not want to go to MO and wanted to be sent back to his house. Cruz demonstrated a labile, primarily angry mood. Cruz presented with mild thought blocking. Cruz's diagnosis at this visit was listed as Schizophrenia. The plan was to transfer Cruz to C-71 for further evaluation.

32.    On 3/3/20 at 11:58 a.m., Cruz was seen by NPP D.B. and indicated, "I'm support (SIC) to be in mental health housing." Cruz complained that he did not know why he was moved to general population because he needed the treatment from mental health housing. Cruz threatened to call 311 if he did not get housed on the MO unit. Cruz reported having vague visual hallucinations. Cruz reported that he was going through a lot of stuff. Cruz denied having any suicidal or homicidal ideation. Cruz was transferred from C-95 to C-71 for re-evaluation. Cruz had been discharged from the MO unit on 2/25 and since then had been trying to get back to the MO unit. Cruz presented as linear, organized without evidence of any acute paranoia or other delusions. Cruz's medication compliance had decreased further to 27%. Cruz was encouraged to take all the medications as ordered. Cruz was fit for general population and returned to the current housing area.

33.    On 3/3/20 at 5:05 p.m., Cruz was seen by Dr. H.M. Cruz reported that he was involved in a use of force with DOC. Cruz complained of having pain on the left side of the chest wall, inside his upper lip, and on his forehead. Cruz denied any loss of consciousness, nausea, vomiting, or shortness of breath. Cruz's vital signs were documented as: blood pressure 140/70, temperature 97.4, pulse 80, respirations 12, and oxygen saturation 99%. New orders were written for an x-ray of the chest and ribs and Tylenol as needed.

34.    On 3/4/20 at 11:32 a.m., Dr. P.W. noted that Cruz had a left 9th rib fracture.

35.    On 3/8/20 at 7:58 a.m., Cruz was seen by NP L.M. following a response to a medical emergency. Upon medical's arrival to the housing area, Cruz was standing at the gate entrance with no signs of acute distress. Cruz was smiling and stated, "I need my pump." Cruz ambulated downstairs to the stretcher and was transported to the clinic where he was assessed. The assessment revealed tenderness to the left side and chest wall. Cruz did have a history of a recent left 9th rib fracture but reported that he had been doing pushups. Cruz was advised that he should not be doing pushups to allow his rib to heal. A new prescription for Naproxen was written.

36.    On 3/9/20 at 10:50 p.m., Cruz was seen by LCSW R.T. Cruz had made substantial improvement and rarely evidenced impairment. Cruz denied having any suicidal/homicidal ideation or hallucinations. Cruz was cooperative, stable, and goal directed. Cruz was more cooperative and calmer than on previous mental health encounters within the past 30 days. Cruz was compliant with the Haldol, Cogentin, and Buspirone. Cruz was to house in general population with mental health follow up.

37.    On 3/10/20, Cruz was seen by MHP C.V. Cruz stated, "I want out this building send me to Manhattan House now!" Cruz was advised that DOC would have to transfer him out of the facility and that mental health could not do that. Cruz then became threatening towards staff stating: "you better move me now or else!" Cruz then inched forward in the chair and at that time, MHP C.V. terminated the session, left the office, and asked DOC

to remove Cruz. Cruz was documented as being uncooperative, hostile, demanding, and threatening to the clinician. Cruz did not exhibit having any signs of psychosis or acute distress. Cruz denied having any suicidal or homicidal ideations. Cruz was to remain in general population with mental health follow up.

38.    On 3/12/20 at 3:51 p.m., Cruz was seen by PA E.N. for complaints of chest pain. Cruz's vital signs were documented as: blood pressure 125/65, temperature 97.1, pulse 57, blood sugar 86, respirations 16, and oxygen saturation 99%. Cruz was found in the dorm chatting with other IIs and walked toward the medical team in no acute distress. Cruz stated that he had left sided chest pain for one day. Cruz described the pain as sharp, not radiating, and aggravated by deep breathing. Cruz denied having any dizziness, diaphoresis, known history of heart disease, shortness of breath, cough, nausea or vomiting, fever, or recent cold symptoms. Cruz reported a history of asthma, anxiety/depression, recent injury to the left side of his ribs and also was treated for heartburn recently. Cruz's vital signs were repeated and documented as: blood pressure 135/70, pulse 61, respirations 16, and oxygen saturation 100%. Cruz had an electrocardiogram performed which revealed sinus rhythm with sinus arrythmia early repolarization (ST elevation with normally inflected T wave). Cruz reported having side effects from his mental health medications and requested a mental health referral. Cruz was discussed with the mental health supervisor and was to be scheduled for an evaluation. Cruz's diagnosis was Schizophrenia. Cruz's Naproxen was changed to Tylenol. The provider noted that Cruz had mild symptoms, unspecified, likely anxiety versus referred left rib pain status post injury with fracture left 9th rib.

39.    On 3/12/20 at 7:52 p.m., Cruz was seen by PA. H.C. Cruz was brought to the clinic escorted by DOC as Cruz was reportedly acting out in the housing area. Cruz insisted that he did not do anything and that he does not "like to be supervised." Cruz became calm and indicated that the problem was that Cruz was still having side effects from the Haldol and stated, "my eyes are rolling sometimes." Cruz was compliant with the medications with compliance rate of Haldol 84%, Buspar 89%, and Cogentin 84%. Cruz requested to increase the Cogentin in lieu of another trial of antipsychotics. Cruz presented with adequate impulse control and with no psychotic features. Cruz denied having any suicidal or homicidal ideation. Cruz was found to be in no acute degeneration of his condition. The diagnosis listed at this visit was Schizophrenia. The plan was to increase Cogentin to 2 mg twice a day and to continue Haldol and Buspar. Cruz was to follow up in seven days with mental health. Cruz was re-evaluated by PA. H.C. on 3/13/20 for the increased medication dosage and denied any further complaints.

40.    On 3/17/20 at 7:57 a.m., Cruz was seen by PA Q.A. for complaints of rib pain. Cruz denied having any shortness of breath, cough, chest pain, or any medical problem currently. New orders written for Naproxen 250 mg twice a day.

41.    On 3/19/20 at 5:45 p.m., Cruz was seen by PA H.C. Cruz presented as calm, cooperative, and exhibited no gross psychosis. There was no suicidal or homicidal ideation noted. Cruz's diagnosis was listed as Schizophrenia. Cruz was clinically stable and medication compliance was noted to be 86% for Buspar  and Haldol and Cogentin at 79%.

42.    On 3/20/20 at 11:39 p.m., Cruz was seen by PA E.N. Cruz reported having a fever and stated that he was worried about COVID. Cruz denied having any recent signs or symptoms of a cold, cough, shortness of breath, or chest pain. Cruz's vital signs were

documented as: blood pressure 92/61, temperature 96.9, pulse 68, respirations 16, and oxygen saturation 98%.  Cruz was reassured that his examination was normal.

43.     On 3/21/20 at 10:37 p.m., Cruz was seen by LCSW R.T. Cruz was not suicidal or homicidal. Cruz reported having no hallucinations. Cruz was not manic or psychotic. Cruz reported that he had a bad dream the night prior and that there was a person in the dream that wanted to kill Cruz. Cruz had been to mental health eight times since 3/2/2020. Cruz wanted to go to C-71 for increased mental health treatment. LCSW R.T. informed Cruz that general population mental health staff could see Cruz during the week on 3/24/2020. Cruz was to follow up with mental health.

44.     On 3/25/20 at 8:11 p.m., Cruz was seen by PA G.C. for complaints of a stuffy nose and sneezing for one day. Cruz denied having any cough, fever, sore throat, chills, or night sweats. Cruz's vital signs were documented as: blood pressure 99/65, temperature 98.6, pulse of 65, and respirations 18. New orders were written for Diphenhydramine 25 mg one tablet by mouth twice a day.

45.     On 3/26/20 at 6:08 a.m., Cruz was seen by PA J.D. Cruz complained of having a sore throat and dry, non-productive cough, which began the night prior. Cruz denied having any fever, chills or body aches or shortness of breath. Cruz's vital signs were documented as: blood pressure 106/66, temperature 97.5, pulse 65, respirations 16, and oxygen saturation of 98%. Cruz was transferred to Eric M. Taylor Center (EMTC) to the communicable disease unit (CDU) after consultation with Dr. P.W. from Urgi-care. At 1:27 p.m., Cruz was seen for an evaluation for COVID for court screening. Per the document, Cruz had court on 3/26/20 at 1:26 p.m. and despite the form stating that Cruz was advised that he should quarantine, isolate or self-monitor, the medical provider documented that Cruz was fit to attend court. The form noted that Cruz did not present with symptoms. Cruz's vital signs were documented as: blood pressure 100/62, temperature 97.9, pulse 82, respirations 14, and oxygen saturation 99%.

46.     On 3/27/20 at 12:04 p.m., Cruz was seen by untitled provider M.D. for COVID-19 testing, Cruz complained of having a sore throat but was afebrile. Cruz requested medication to relieve the throat pain. Cruz's vital signs were documented as: blood pressure 100/63, temperature 98.4, pulse 68, respirations 14, and oxygen saturation 98%. Cruz's diagnosis was listed as pharyngitis and Cruz was given Tylenol 975 mg in the clinic. New orders were written for COVID -19 and influenza tests, continue to monitor vital signs and temperature, Peridex 0.12% rinse and Lidocaine viscous solution.

47.     On 3/31/20 at 10:10 a.m., PA J.R. documented that Cruz was COVID positive. Cruz was issued literature to read regarding COVID-19.  At 3:33 p.m., Cruz's vital signs were documented as: blood pressure 111/63, temperature 99.9, pulse 76, respirations 16, and oxygen saturation of 98%.

48.     On 3/31/20 at 6:29 p.m., Cruz was seen by Dr. A.A. for complaints of chest pain for one day in the upper mid chest. Cruz denied having a cough, there was no wheezing or shortness of breath, no sore throat, no diarrhea. Cruz requested medication specifically to treat the corona virus. Cruz was advised that the symptoms were treated. Cruz had a low-grade temperature of 99.9 and the other vital signs were normal. Cruz stated that Tylenol does not work for him and a dose of Naprosyn was prescribed, and an electrocardiogram was ordered. The plan was for a new test order for electrocardiogram and Naproxen 250 mg.

49.     On 4/1/20 at 7:53 p.m., Cruz was seen by PA J.R. Cruz stated that he was seeing and hearing things. Cruz denied having any suicidal or homicidal ideation. Cruz had been brought down by mental health because he was showing radical changes in behavior. Cruz appeared to be talking with someone and having hallucinations. Cruz's vital signs were documented as: blood pressure 114/78, temperature 98.8, pulse 70, respirations 14, and oxygen saturation 98%. Cruz was referred to mental health and was placed on suicide watch.

50.     On 4/1/20 at 11:37 p.m., Cruz was seen by Dr. A.C. Dr. A.C. noted that Cruz was referred to mental health via medical due to reportedly having auditory and visual hallucinations. Cruz was on a suicide watch. Cruz reported "the voices are telling me to kill myself." The DOC suicide watch officer reported the Cruz was observed talking to himself, attempting to hang himself with a towel from the camera in the intake pen, and splashing staff with unknown liquids. Cruz was brought to intake because he was splashing his peers and disrupting his housing unit for reasons unknown. Cruz stated his 10-year-old daughter was currently in Bellevue Hospital with COVID and was demanding that he be given the opportunity to contact her. However, Cruz could not inform the Dr. as to how Cruz found out this information. Cruz tested positive for COVID. At that time, Cruz did not have a fever and denied having any shortness of breath, sore throat, or headache. Cruz was prescribed Haldol 10mg, Cogentin 2mg, and Buspar 5mg. Cruz's chart showed that he had been given the medications, but it was unclear if he was taking the medication given the recent change in behavior. While in intake, Cruz continued to attempt to hang himself from the camera because "the voices are telling me to kill myself, because everyone hates me", but stopped when approached by DOC and mental health. However, when staff attempted to verbally engage with Cruz, he presented with a blank stare and started to splash staff with an unidentified substance and started to cry. Given Cruz's recent drastic change in behavior and recent COVID+ results, Cruz appeared to need a higher level of care. Urgicare initiated a 3-hour run and Cruz was transferred to the Psychiatric Prison Ward at Bellevue Hospital. During an interview with Commission staff, CO M.B. reported that he transported Cruz to Bellevue. Prior to the transfer, Cruz reportedly ripped the entire holding pen apart and was very erratic and irrational.

51.     On 4/2/20, Cruz was seen at Bellevue Hospital by Dr. J.C. for an evaluation. Dr. J.C. indicated that all information received from DOC was reviewed and documented. During the interview at Bellevue, Cruz stated that he was "seeing things." When asked what things he was seeing, Cruz could not say. Cruz also could not say how long he had seen them, nor why what he was seeing was bothersome to him. When Cruz was asked why he could not remember these things, he said, "I guess I have a bad memory." Cruz acknowledged his behavior prompted the referral, and when asked his reasons for being suicidal, Cruz offered no information regarding timing, planning, intent, triggers, nor reasons that he was trying to injure himself in full view of staff at NYC DOC. The provider noted an Elmhurst Hospital visit with the impression of malingering in December 2019. On review of systems, Cruz did not complain of having a depressed mood, anhedonia, or having any suicidal ideation. Cruz was noted to have no hopelessness, worthlessness nor any reason why he felt that he deserved to die or felt that suicide was the solution. Cruz denied having any trouble with sleep, appetite, energy, or concentration. Cruz had no complaints of manic or psychotic symptoms. Cruz denied having any severe anxiety or somatic complaints. On exam, Cruz was calm, cooperative, well related, and groomed. Cruz's speech was conversational in volume, fluency, and

prosody. Cruz's thought processes were linear, logical, with no suicidal or homicidal ideation, and no coherent delusions. Cruz's mood was listed as "OK" and his affect was stable and appropriate. The diagnostic impression was listed as Malingering, with secondary gain of hospitalization to avoid EMTC where he was recently moved or to see his daughter if he believed she was at Bellevue. The plan was for Cruz to return to NYC DOC with no indication for an admission at that time.

52.   On 4/2/20 at 1:45 p.m., Cruz was seen on return from Bellevue by PA J.R.  Cruz's discharge diagnosis was listed as malingering. Cruz's vital signs were documented as: blood pressure 107/67, temperature 97.6, pulse 68, respirations 14, and oxygen saturation 98%. Per mental health, Cruz was to be discharged to a mental observation dorm in OBCC.

53.   On 4/2/20 at 10:54p.m., Cruz presented to the clinic after being involved in a use of force with DOC. Cruz claimed no injuries.

54.   On 4/3/20 at 1:55 p.m., Cruz was seen by Dr. A.K. Cruz reported being slammed into a wall by the officer. Cruz claimed pain in his bilateral elbows over the olecranon and had no other complaints at that time. Cruz had an abrasion and soft tissue injury to bilateral elbows. There was a low index of suspicion for fracture. The plan included an order for Motrin 400 mg as needed for pain and advised ice, rest, and follow up in one week if no improvement or sooner if worsening. Per LCSW T.B., Cruz was transferred to C-71 on suicide watch.

55.   On 4/3/20 at 2:25 p.m., Cruz was seen by MHP L.O. in the intake department of EMTC and stated, "Miss, Miss... I want to get out of here! I'm negative! I'm negative so I can leave and they still have me here. Can you get me transferred back to AMKC? Can you tell them I'm heat sensitive and I can't go to OBCC? Thank you." Cruz was observed in a holding pen socializing with peers in the pen. Cruz was to remain on watch throughout the weekend due to emotional instability and significant anxiety.

56.   On 4/4/20 at 5:35 p.m., Cruz was seen by LMSW G.G. cell side for suicide watch protocol. Cruz stated "I am tired. I need to stay in this building. I can't be in other jails. Check my record." Cruz's mood was listed as being slightly irritable. Cruz denied having any auditory or visual hallucinations. Cruz complained of being tired and would not complete the interview despite prompting from the writer. As per DOC, Cruz had remained in his cell since his transfer. Cruz was to remain in MO housing on suicide watch.

57.   On 4/4/20 at 6:30 p.m., Cruz was seen by Dr. A.K. Cruz reported having body aches. Cruz's vital signs were documented as: blood pressure 93/64, temperature 97.7, pulse of 73, respirations 16, and oxygen saturation 98%. New orders were written for Naproxen 500 mg twice a day.

58.   On 4/4/20 at 9:07 p.m., Cruz was seen by NP H.O. Cruz came from EMTC for MO housing. NP H.O. spoke to Dr. R. about Cruz's disposition and stated that Cruz was cleared to go to general population or MO. Cruz had been compliant with his medications. Cruz was cooperative, calm, with no gross psychosis, no mania, no suicidal or homicidal ideation, or auditory or visual hallucinations noted. Cruz was requesting to be housed in general population. Suicide observation was discontinued. Cruz was to be

housed in MO and to follow up in seven days. The diagnoses listed at this visit was Schizophrenia.

59.    On 4/4/20 at 9:21 p.m., Cruz was seen by Dr. A.K. after a fight with another individual but refused the examination.

60.    On 4/6/20 at 10:18 a.m., Cruz was seen by MHP J.C. and noted that Cruz was re-admitted to C-71 on 4/5/20 after being cleared from EMTC. Cruz's compliance with psychotropic medications was inconsistent, yet despite that, Cruz was regularly described as linear, organized, relevant, and goal directed. Cruz was recently evaluated at Bellevue and determined to be malingering. Cruz was known to MHP J.C. and was observed to be consistently absent any evidence of acute psychotic symptoms. Cruz was currently requesting to go to general population. Cruz had several times endorsed suicidal ideation to manipulate housing, only to be determined to not be an imminent risk thereafter. Cruz was psychiatrically stable even absent consistent adherence to his psychotropic medications, was able to advocate for his own needs, and was likely malingering symptoms per Bellevue Hospital. Cruz did not require a MO level of care. Cruz's mental health needs were indicated that they be met in general population going forward. Given the recent diagnosis of malingering, it was noted that Cruz should receive mental health intervention while housed in general population. Cruz's diagnosis was indicated that it might needed to be revisited for clarification purposes.

61.    On 4/6/20, Cruz had an electrocardiogram performed that was ordered on 3/31/20 which revealed sinus rhythm with marked sinus arrhythmia, ST elevation probably early repolarization (ST elevation with normally inflected T wave). The unidentified signature on the electrocardiogram noted that Cruz was asymptomatic.

62.    On 4/9/20 at 9:08 p.m., Cruz was seen by Dr. B.C. Cruz presented to the clinic with a history of asthma. Cruz complained of chest tightness and stated that his asthma pump was not working. Cruz was in no acute respiratory distress. An assessment revealed that Cruz's lungs were clear to auscultation and percussion with no wheezes. Cruz was clinically stable. Cruz's vital signs were documented as: blood pressure 98/64, temperature 98, pulse 68, respirations 16, and oxygen saturation 98%. The plan was to add Q-Var to the regimen.

63.    On 4/13/20 at 7:45 p.m., Cruz was seen by LCSW R.T. for follow-up. Cruz denied having any suicidal or homicidal ideation or hallucinations. Cruz reported and was observed to be experiencing considerably less anxiety and stress. Cruz was not manic nor psychotic. Cruz was compliant with his mental health treatment. Cruz's diagnosis was listed as Schizophrenia-moderate. Cruz was cleared for general population housing with mental health follow-up.

64.    On 4/23/20 at 11:59 a.m., Cruz was seen by MHP C.W. Cruz stated that he wanted different mental health medications. Cruz's vital signs were documented as: blood pressure 100/69, temperature 97, pulse 54, and respirations 14. Cruz had an appointment to see mental health for 4/27/20.

65.    On 4/25/20 at 6:14 p.m., Cruz was seen by LCSW R.T. Cruz was referred to mental health via DOC due to suicidal ideation. Cruz denied having any suicidal or homicidal ideation and denied having any hallucinations. Cruz stated that he did not want to take Haldol and that he wanted to come to mental health more frequently. Cruz was informed

that he was called to mental health on previous days and the notes indicated that Cruz "missed visit" or "refused from housing area." Cruz reported this was not true. The records indicated that Cruz missed the visit or was not produced on 4/20/20, 4/15/20, and 4/13/20. Cruz's next mental health follow-up was scheduled for 4/26/20. Cruz was to house in general population with mental health follow-up.

66.     On 4/27/20 at 4:46 p.m., Cruz was seen by PA A.M. for a medication re-evaluation. Cruz was prescribed Haldol 10 mg twice a day, Buspar 5 mg at bedtime, and Cogentin 2 mg twice a day. Cruz denied having any psychosis, homicidal and suicidal ideation, or hallucinations. Cruz had poor medications compliance with Haldol. The diagnosis listed at this visit was Schizophrenia. The plan was to continue medications and mental health follow-up.

67.     On 4/28/20 at 2:59 p.m., Cruz was seen by PA S.O. for sick call. Cruz complained of non-stop sharp chest pain since last night. Cruz denied having any shortness of breath, nausea, or vomiting. Cruz's vital signs were documented as: blood pressure 97/68, temperature 97.2, pulse 79, respirations 16, and oxygen saturation 97%. Cruz's examination was listed as normal. New orders were written for an electrocardiogram and Tylenol. There was no documentation to support that this electrocardiogram was performed.

68.     On 5/1/20 at 5:29 p.m., a medical response was called for Cruz for possible illicit drug use. Cruz was in the housing unit and verbally refused to come to the clinic for an evaluation. A refusal consent was obtained and the medical team left the housing unit and returned to clinic. Cruz was in no acute distress.

69.     On 5/2/20 at 1:55 p.m., Cruz was seen by Dr. R.C. Cruz was noted to have 20% compliance with Haldol, Cogentin, and Buspar. Cruz was encouraged to take his medication. Cruz was to continue with the mental health follow-up.

70.     On 5/6/20 at 6:03 p.m., Cruz was seen by Dr. C.H. Cruz was seen after a fight with another individual. Cruz's vital signs were documented as: blood pressure 101/68, temperature 97.4, pulse 69, respirations 16, and oxygen saturation 99% Cruz had a contusion of the left knee. The wound was cleaned with Betadine and a band-aid was applied.

71.     On 5/8/20, Cruz was seen by LCSW R.T. Cruz was referred to mental health via DOC stat due to having suicidal ideation. Cruz was goal directed to leave AMKC and go to George R. Vierno Center (GRVC). Cruz was observed pre and post mental health interview and appeared anxious, irritable, and could not sit still. Cruz reported having an "incident" in the housing area but he would not give any details. LCSW R.T. requested DOC assess Cruz for a security move to GRVC. Cruz denied having any suicidal or homicidal ideation, or hallucinations. The plan was to remain in general population.

72.     On 5/10/20 at 4:21 p.m., Cruz was seen by LCSW R.T. for follow-up. Cruz was still observably anxious. Cruz did not like AMKC and wanted to go to GRVC. Cruz denied having any suicidal or homicidal ideation or hallucinations. Cruz was goal directed to read "anything." Cruz was to remain in general population with mental health follow-up.

73.     On 5/11/20, Cruz's chart was reviewed by PhD R.M. and was cleared for CAPS.

74. On 5/20/20, Cruz was seen by PA T.G. Cruz refused a heat sensitive housing placement due to his asthma history and a refusal was signed.

75. On 5/24/20 at 8:12 p.m., Cruz was seen by LCSW R.T. Cruz was coping well. Cruz reported that his bail was $500.00 and hoped to go home soon. Cruz stated that he wanted to transfer to "Beacon". Cruz was compliant with his prescribed mental health medication. The diagnosis listed at this visit was Schizophrenia and Cruz was to continue in general population with mental health follow-up.

76. On 5/25/20 at 5:41 p.m., Cruz was seen by PA A.M. Cruz denied having any psychosis. Cruz denied having any suicidal or homicidal ideation or hallucinations. Cruz was cooperative, had no racing thoughts, related well, and was goal oriented. Cruz had a 46 to 64% compliance with the medications and Cruz reported having no side effects. The plan was to continue Cogentin 2 mg twice a day, Haldol 10 mg twice a day, and Buspar 5 mg at bedtime. Cruz was to return to the clinic in four weeks.

77. On 5/28/20 at 5:19 p.m., Cruz was seen by LMHC Y.L. Cruz presented as calm and somewhat quiet and reported that he needed to see mental health right away. There was a stat DOC referral that indicated Cruz reported suicidality. Cruz reported that he was not suicidal and that he was "stressed." Cruz stated that his lawyer said that he needed therapy and that he should get therapy as much as possible. Cruz reported, with significantly hesitant speech, that his grandmother died two days ago. Cruz stated: "I'm upset about it." Cruz stated, "she was old." Cruz also stated that "the only thing that helps me is to speak with a therapist, my lawyer says I need therapy." LMHC Y.L. discussed with Cruz the possibly of having his assigned therapist increase the sessions, however, a chart review indicated that Cruz had been seen frequently, due to DOC referrals. Cruz stated that when he needed to talk, he needed to be brought down right then. He expressed anger/frustration with DOC because they don't bring him down when he wanted to be brought down. Cruz displayed concrete thought at the time. LMHC Y.L. discussed with Cruz the need for him to use learned coping skills from therapy and apply them to daily life, discussed a set day for therapy and the need for him to work on utilizing his learned skills to cope until his next session is scheduled, if possible, rather than expressing suicidal ideation.

78. On 5/29/20 at 1:12 p.m. and at 9:27 p.m., Cruz was seen by Dr. C.H. following a use of force with DOC. There were no obvious physical injuries noted.

79. On 6/1/20 at 9:46 p.m., Cruz was seen by M.S. Cruz was referred to mental health by DOC due to changes in behavior, fighting, and radical behavior. Cruz stated that he was doing alright but still had bouts of anger. Cruz stated this often led to a fight. Cruz stated that he was taking his meds and wanted to continue. Cruz stated that he would prefer to continue with mental health follow-up with his previous therapist so it was noted that an email would be sent to her. Cruz denied having any problems with his peers in the housing area.

80. On 6/2/20 at 3:24 p.m., Cruz was seen by Dr. C.H. Cruz complained of having chest pain and bilateral wrist pain. Cruz's vital signs were documented as a blood pressure of 98/66, a temperature of 97.5, a pulse of 65, respirations of 16, and an oxygen saturation of 97%. Cruz was diagnosed with costochondritis and Naproxen was ordered. On 6/2/20, Cruz was admitted to the Clinical Alternative to Punitive Segregation unit (CAPS).

81.     On 6/8/20 at 7:10 a.m., Cruz was seen by Dr K.K. following a multiple incarcerated individual fight in the housing area. Cruz complained of having right hand pain without injury noted. Cruz's vital signs were documented as a blood pressure of 100/75, a temperature of 97.8, a pulse of 82, respirations of 16, and an oxygen saturation of 98%. Cruz was to continue Naproxen.

82.     On 6/9/20 at 9:38 p.m., Cruz was seen by LMHC E.C. for a mental health follow-up. Cruz was observed standing at his cell door speaking with DOC staff in a hostile and agitated manner. Cruz displayed appropriate eye contact throughout the encounter, was cooperative and engaged without displaying any difficulty with psychomotor skills, or acute distress. Cruz stated, "Miss! I need services! I'm not getting my services here! I've been tellin' them I got asthma, I got lung issues, I can't breathe! I had surgery on my ribs, for real, I can show you! I need help Miss, for real! My lawyer said I need to get my therapy every day! I need my therapy, my one-on-one every day! I need it! I need x-rays, I need to go to the Clinic! I got asthma! Check my medical records! Check my chart, I'm worse than all these n*ggas in here! I've been in mental health jail! I got mental issues Miss! I need my therapy, my judge even said it!" Since the admission into CAPS on 06/02/20, Cruz had perseverated over the fact that his "judge" and "the lawyer" have informed him that he must have "therapy" "every day". Cruz continued to demand to be taken to Harts Island for treatment and x-rays and was informed by the CAPS RN to go to sick-call to further discuss his complaints. Cruz was able to yell at the top of his lungs out his cell window to peers on different units, rap out loud while dancing in the cell, and laugh with peers out on the unit with no medical limitation. Cruz also continued to threaten to call his lawyer and 311 to make complaints if all his needs were not met on the unit. Cruz reported being compliant with his medication regime. Cruz denied having any suicidal or homicidal ideation or hallucinations. Diagnoses at this visit was Schizophrenia. The plan was for Cruz to continue to be monitored closely by mental health staff for maladaptive/attention-seeking behaviors and to remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

83.     On 6/11/20, Cruz was seen by medical following an altercation with another individual. Cruz denied injury and refused vital signs.

84.     On 6/12/20 at 2:54 p.m., Cruz was seen by RN B.E. and Dr. D.M. Cruz was asking "Miss when will I have my X-ray?" Cruz had been evaluated by medical on different occasions but kept demanding an x-ray. Cruz attacked other peers on the unit unprovoked and became aggressive and hostile when demanding the x-ray. Dr. D.M. was unable to examine Cruz due to Cruz's behaviors but noted no acute or emergent issue. Cruz would be scheduled for a follow-up with the medical provider.

85.     On 6/12/20 at 9:35 p.m., Cruz was seen by Dr. A.L. for a right leg injury while playing in the yard. Cruz's vital signs were documented as: blood pressure 106/68, pulse 60, temperature 98, respirations 16, and oxygen saturation 98%. Cruz's right shin had abrasion with tenderness and swelling. Cruz was issued an ice pack and Tylenol 975 mg. An x-ray was scheduled for the following day.

86.     On 6/16/20 11:13 a.m., Cruz was seen by Dr. A.O. for a follow-up to his complaints of leg pain. Cruz had a pending x-ray. Cruz stated that he had right leg/shin area pain for a few weeks after an injury. Cruz's vital signs were documented as: blood pressure 111/76, temperature 98.4, pulse 64, respirations 16, and oxygen saturation 98%.  The

examination revealed that the right shin area had no swelling, erythema, or tenderness, and had a normal range of motion. Diagnosis was musculoskeletal pain. Cruz was advised that he would be followed up after the x-ray. The x-ray was completed and was reported as negative for fracture.

87.    On 6/16/20 at 8:38 p.m., Cruz was seen by LMHC E.C. Cruz stated, "Miss, my lawyer is not picking up the phone. I'm tryin' to tell her my asthma is getting worse! I have heart pains – like a shooting pain like someone is stabbing me, and I can't breathe real good. You know with that Corona they lettin' people out who got bad breathing problems, and my breathing been real bad. I cry at night sometimes because my chest hurt and I can't breathe real good. Can ya'll call my lawyer for me?" Cruz continued to be superficial in nature when engaging with mental health staff and discussing his mental health "concerns," as most of his concerns were usually targeted to his medical issues surrounding his asthma. Cruz was goal-directed to go to the gym and play basketball with his peers, and attended once gym was called, despite having present issues with his breathing. Cruz was unable to describe what he was enduring or feeling regarding his mental health. Cruz continued to report daily nightmares and "seeing things," but when approached by mental health staff of these concerns, Cruz was unable to articulate the experiences. Cruz continued to perseverate over having his one-on-one mental health sessions "every day." Cruz denied having any suicidal or homicidal ideation, plan or intent and denied any auditory hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up. Mental health staff continued to engage Cruz to closely monitor his symptoms and behavior for diagnostic clarification.

88.    On 6/21/20 at 7:17 p.m., Cruz was seen by RN B.E. During the evening medication pass, Cruz collected his medications, put them in his mouth, spat them out and said he was choking.

89.    On 6/24/20 at 3:26 p.m., Cruz was seen by Doctor of Nurse Practice (DNP) N.H. Cruz was recently admitted to CAPS following an infraction. Since the admission, Cruz had been in tenuous behavioral control but 100 % compliant with medications. Cruz denied having any suicidal or homicidal ideation. It was noted that Cruz was safe for continued CAPS. The plan was to continue the current medications and to follow up in two weeks.

90.    On 6/24/20 at 7:27 p.m., Cruz was seen by LMHC E.C. for a mental health follow-up. During the encounter, Cruz displayed appropriate eye contact throughout, was superficially cooperative yet engaged fully, did not display any difficulty with psychomotor skills, or in acute distress. Cruz stated, "I'm good Miss. How are you and me? (PT was being inappropriate and was re-directed) I'm playin' Miss, I've been doing better, I'm good, right?!" Cruz would continue to become inappropriate with LMHC E.C. Cruz continued to be superficial in nature when engaging with mental health staff and discussing his mental health "concerns," as most of his concerns are usually targeted to his medical issues surrounding his asthma. Cruz had been attending clinical groups daily with increased participation. Cruz denied having any suicidal or homicidal ideation, plan or intent and denied having any auditory hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

91.    On 6/29/20 at 4:00 p.m., Cruz was seen by Dr. D.M. for right fifth digit pain. The examination revealed no significant swelling, full range of motion, and tenderness at

MCP joint with bruise/sprain. The plan was to try Ibuprofen 800 twice a day, buddy taping finger and follow-up with medical as needed.

92.     On 6/30/20 at 8:53 p.m., Cruz was seen by LMHC E.C. Cruz stated, "Ms. C, how long have I been here? I know my time is almost up! I'm going to be able to leave soon right? It should be like next week. I want to go. I'm going home soon too. I need to get out of here, get back to my daughter. I can do more out there, get my life together." Cruz was goal-directed to be discharged from the CAPS. Cruz was informed that he would leave when housing was secured for him and when behaviorally, he was ready for discharge. Cruz superficially acknowledged this dialogue. Cruz reported that he was compliant with his medication regime. Cruz denied having any suicidal/homicidal ideation, plan or intent and denied hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

93.     On 7/1/20 at 4:01 p.m., Cruz was seen by P.A. S.O. Cruz claimed that he developed abdominal pain the night prior after drinking soup. Cruz stated the soup did not taste good. Cruz reported having one bowel movement last night which was soft. Cruz denied having any nausea or vomiting. Cruz ate his breakfast. Cruz pointed to his epigastric area as the location of the pain. Cruz was given Maalox stat, would be re-evaluated later that date. PA S.O. went Cruz's cell at 4:00 p.m. (note times as listed in the documentation) for a re-evaluation, Cruz had gone for a visit as per DOC.

94.     On 7/6/20 at 10:07 p.m., Cruz was seen by LMHC E.C. for a follow-up. Cruz stated, "Miss, when am I gettin' out of here, my time is up right? I know you said it wasn't going to be today, but Dr. Will come back tomorrow right? So, I can go this week, right?" Cruz was reminded of his dialogue with LMHC the week prior. Cruz was superficially responsive to this information but continued to persevere over his time in CAPS being "done," and his desires to return to general population housing. Cruz had been attending clinical groups daily with increased participation and efforts. Cruz denied having any suicidal/homicidal ideation or hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

95.     On 7/7/20 at 4:42 p.m., Cruz was seen by Dr. N.H. for a medication reevaluation. Cruz was childish throughout interview and continued to make sexually inappropriate comments. Cruz denied having any residual symptoms and denied having any adverse effects from the medications.  Cruz denied having any suicidal/homicidal ideation or hallucinations. The diagnoses at this visit included Schizophrenia. Cruz was to continue medications and to follow up in two weeks.

96.     On 7/14/20 at 11:20 a.m., Cruz was seen by PA S.O. for sick call for complaints of epigastric pain since the previous night. Cruz denied having any diarrhea, nausea, or vomiting. Cruz's vital signs were documented as: blood pressure 105/75, temperature 97.3, pulse 59, respirations 16, and oxygen saturation 99%. New orders were written for Omeprazole 20 mg daily. Cruz was educated to stop taking Ibuprofen and Naprosyn. At 9:46 p.m., Cruz was seen by Dr. D.O. Cruz was involved in an altercation with another individual that resulted in a use of force. Cruz complained of a scratch on his right arm. Cruz's vital signs were documented as: blood pressure 100/66, temperature 97, pulse 67, respirations 14, and oxygen saturation 98%. The plan was a bandage to the scratch and to follow up as needed.

97.     On 7/14/20 at 8:58 p.m., Cruz was seen by LMHC E.C. Cruz discussed potential tension between Cruz and another individual on the unit. Cruz responded, "Nah, I'm going to leave him alone, I'm not like that. I don't want no problems." Mental health staff continue to remind Cruz of CAPS policies and the behaviors that are expected of him in regard to his dialogue/actions towards staff and his peers. Cruz stated that he understood and that he did not want to be discharged and moved from CAPS, as Cruz reported that he liked receiving the mental health programming and being on a unit with less patients and less violence and tension. Cruz denied having any suicidal/homicidal ideation or hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

98.     On 7/16/20 at 12:34 p.m., Cruz was seen by Dr. A.K. Cruz complained of having gas in his stomach and requested Maalox. Cruz denied having any abdominal pain, nausea, or vomiting. Cruz reported not receiving his Omeprazole. Cruz's vital signs were documented as: blood pressure 101/68, temperature 98.8, pulse 74, respirations 16, and oxygen saturation 100%. Cruz's diagnosis was dyspepsia. Cruz was educated and advised to eat small meals and avoid spicy food. Cruz received a dose of Maalox and Omeprazole and verbalized feeling better.

99.     On 7/17/20 at 6:24 p.m., Cruz was seen by Dr. L.A. for asthma follow-up. Cruz's vital signs were documented as: blood pressure 109/67, temperature 98, pulse 80, respirations 16, peak flow 550, and oxygen saturation of 100%. Cruz's diagnosis was intermittent asthma well-controlled. Cruz was to continue the medication and to follow up in six months.

100.    On 7/21/20 at 12:46 p.m., Cruz was seen by DNP N.H. Cruz reported he was okay and asked where "Dr. Will", the clinic supervisor, was. Cruz was informed that he would be seen when the doctor was available and Cruz appeared accepting of this information. Cruz denied having any psychiatric symptoms and endorsed good sleep and appetite. There were no significant clinical changes since the last encounter. The plan was to continue the medications and to follow up in two weeks.

101.    On 7/21/20 at 10:57 p.m., Cruz was seen by LMHC E.C. for a mental health follow-up. Cruz was out in the MO yard completing evening recreation. Cruz stated, "It's so nice outside. I felt like I was on a beach. When you go outside it feels like you somewhere else. It was so good. We should go rec out there more. We should go outside more, you heard?" Cruz also continued to advocate to be discharged from CAPS. Cruz reported that he would like to be returned to general population housing as his "time here is up". Cruz denied having any suicidal/homicidal ideation or hallucinations. Cruz would remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

102.    On 7/24/20 at 2:26 p.m., Cruz was seen by Dr. D.M. for the dyspepsia follow-up. Cruz wanted to discuss his asthma. Cruz reported nebulizer use in the community and reported that inhalers don't help. Cruz reported that his last exacerbation of asthma occurred two to three months ago. Cruz reported having hospitalizations in the past but denied having to ever be intubated. Cruz reported that his main trigger was heat. Cruz asked that further discussion be deferred until next week. Cruz reported that he was not in a good mood. The diagnosis was listed as asthma and reported uncontrolled symptoms. The visit ended abruptly as  per Cruz's request. Cruz was to follow up in one week.

103.    On 7/25/20 and 7/26/20, Cruz was seen by medical after an altercation with other individuals. Cruz refused the exam and there was no injury noted.

104.    On 7/28/20 at 3:27 p.m., Cruz was seen by Dr. H.M. for complaints of pain in his left wrist. Cruz reported that he was involved in a fight two days prior. Cruz denied having any numbness, tingling, or radiation of pain. Cruz indicated that the pain was at the lower end of the left ulnar area. Examination revealed mildly swollen, mildly tender, movements of left wrist reduced, otherwise neurovascular intact. The symptoms were discussed with Dr. A.T. and an x-ray of the area was negative for fracture. Cruz was ordered Ibuprofen 400 mg twice a day.

105.    On 7/28/20 at 7:59 p.m., Cruz was seen by LMSW E.C. Cruz was involved in a physical altercation with a peer on the unit on 7/25/20 and Cruz was deemed the aggressor. As a result, Cruz was locked in his cell by DOC for security precautions. On 7/26/20, Cruz was approached aggressively by that same peer and a fight ensued. On 7/27/20, the II's were on an alternative lock-out plan for security precautions. As of 7/28/20, the II's had made amends and were out on the unit with no present issue. Cruz stated, "I don't know why that lady (referring to Mental Health Therapy Aide (MHTA)) lied on me Miss. I ain't say nothing inappropriate to her! I ain't violate her, she lied on me. I ain't say nothing. I don't know why she told all the staff I was inappropriate, it ain't true. I ain't do nothing! I want to go back to GP Miss." During the prior two weeks, Cruz's behaviors continued to have to be re-directed as Cruz had been sexually inappropriate with staff, displaying poor boundaries with the MHTA, and following and promoting negative behaviors amongst his peers. Cruz had been unwilling to fully cooperate with his treatment and was requesting to be transferred back to general population. Cruz was to remain in CAPS with continued compliance with mental health treatment and psychiatrist follow-up.

106.    On 7/29/20 at 1:14 p.m., per Dr. E.W. Cruz had completed his time in CAPS and was deemed appropriate to move to general population. Cruz had not exhibited any acute signs of mental illness. Cruz had been able to engage in linear, goal-directed discussions with no evidence of any internal preoccupation, thought blocking, paranoia, or delusional thinking. Cruz had not shown any signs of mania, anxiety, or depression. Cruz reportedly took the medications however, there were several times that he was believed to have cheeked the pills. Cruz was cleared for general population with mental health follow-up.

107.    On 7/31/20 at 11:14 a.m., Cruz was seen by Dr. C.H. Cruz's vital signs were documented as: blood pressure 107/72, temperature 97.4, pulse 58, respirations 16, and oxygen saturation of 99%. Cruz was advised that the left wrist x-ray was negative for fracture. Cruz was advised to continue Ibuprofen and to return as needed.

108.    On 8/1/20 at 12:25 p.m., Cruz was seen by Dr. R.C. for a DOC referral. Cruz was noted to be angry, upset, appeared to have an issue in the housing area, demanding, and goal directed. Cruz was recently discharged from CAPS and was demanding to return to CAPS. Cruz's medication compliance was noted to be 77% for the Cogentin , Buspar, and Haldol. Cruz was deemed to need a higher level of care. Cruz was referred to C-71 MO housing.

109.    On 8/1/20 at 3:29 p.m., Cruz was seen by Dr. O.O. Cruz reported that he needed to get back on the CAPS unit because he liked the therapy he got on the unit. Cruz stated that he wanted to continue getting the same mental health therapy. When Cruz was told that he had to be accepted to get back into CAPS program, he reported that he still owed box time and he was willing to have DOC put him back in CAPS. Cruz's evaluation indicated goal-directed behavior to secure a preferred accommodation. Cruz presented as calm and cooperative with no signs of overt illness. Cruz denied having any suicidal ideation. Cruz denied having any issues with his current mental health medications. Cruz was not in need of the MO level of care and was cleared to return to general population. Cruz was advised to discuss any safety-related issues with DOC so that he could be moved to another general population housing area.

110.    On 8/3/20 at 4:24 p.m., Cruz was seen by Dr. M.A. for a follow-up for dyspepsia. Cruz denied having any heartburn or abdominal pain. Cruz's vital signs were documented as: blood pressure 100/67, temperature 97.7, pulse 55, respirations 15, and oxygen saturation 100%. Cruz's diagnosis was dyspepsia.

111.    On 8/6/20 at 11:16 a.m., Cruz was seen by LMSW B.T. Cruz was seen for a 30 day follow-up. Cruz was alert, oriented, well-related, and able to engage appropriately. Cruz was adjusting to general population housing. Cruz was to follow up in 30 days.

112.    On 8/11/20 at 2:20 p.m., Cruz was involved in an altercation with another II and then DOC staff. Cruz refused the medical evaluation. At 10:06 p.m., Cruz was seen by PA S.M. for a use of force examination. Cruz stated that he sustained scratches to the right wrist and right ankle. Cruz reported pain to both the right wrist and right ankle and this was aggravated by the tight placement of the hand and leg restraints. Cruz denied having any paresthesia, no weakness to bilateral lower extremity, no calf pain, no headache, no dizziness, no chest pain, no shortness of breath, no palpitations, and no abdominal pain. Cruz's vital signs were documented as: blood pressure 100/65, temperature 97.1, pulse 82, respirations 15, and oxygen saturation of 100%. On exam, superficial non-bleeding abrasions were noted to the right distal ventral wrist, with no boney involvement, range of motion intact and non-bleeding superficial abrasion noted to right distal anterior tibia with no boney involvement were identified. Both areas were cleaned with Betadine and covered with dry sterile dressing. Cruz was educated to remove the dressing the next morning and to keep the wound dry for 24 hrs. At 10:16 p.m., Cruz was seen a second time by PA S.M. after Cruz was involved in use of force with DOC staff in the intake area of GRVC where he had just been transferred to. Cruz denied having any injuries. Cruz stated that he was asking DOC to present him to the clinic to obtain his missed evening dose of medications. As per the charge nurse, confirmation was made that Cruz did not receive the evening medications. Cruz was redirected to nursing staff for stat medication.

113.    On 8/13/20 at 12:45 p.m., Cruz was seen by Dr. B.O. Cruz was involved in a use of force with DOC staff. Cruz's vital signs were documented as: blood pressure 116/68, temperature 97.9, pulse 78, respirations 16, and oxygen saturation of 99%. Cruz was noted to have a small abrasion on the left palm with a questionable age/origin and mild right forearm discomfort on deep palpation. The examination revealed full range of motion to the shoulders bilaterally, hips bilaterally, and knees bilaterally without tenderness. The plan was Tylenol twice a day as needed for five days and cleansed abrasion with normal saline and apply bandage cover.

114.    On 8/13/20 at 3:34 p.m., Cruz was seen by MHP W.S. Cruz had transferred from the MO housing unit to general population and to a different facility a few days prior. Cruz had multiple uses of force since the transfer to the new facility. Cruz continued to have poor impulse control and adjustment. Cruz was offered individual counseling but was marginally engaged. Cruz would remain in general population with mental health follow-up. Per the note from MHP J.O., there was concern about Cruz's difficulty accessing medications. Cruz's current compliance with Haldol 10 mg was 75%, with Buspirone 5 mg 83%, and with Cogentin 2 mg 75%. The CAPS discharge summary also indicated a concern for Cruz's history of cheeking medications. As a result, administration of psychiatric medications was changed to direct observed therapy (DOT) until Cruz was assessed by psychiatry service.

115.    On 8/15/20 at 7:02 p.m., Cruz was seen by Dr. A.K. Cruz complained of low back pain following a use of force on 8/13/2020. Cruz stated that he was slammed to the floor by DOC staff and hurt both his elbows and lower back. Cruz denied having any radiation of pain, numbness, tingling, or weakness in the lower extremities. Cruz's vital signs were documented as: blood pressure 116/65, pulse 73, respirations 17, and oxygen saturation 99%. Neurological examination was noted to be normal. Cruz was advised to try Tylenol and if no improvement in pain, he could return to medical.

116.    On 8/16/20 at 1:38 p.m. Cruz was seen by the RN requesting cold compresses for his injuries sustained on 07/13/2020 which were previously addressed with analgesics. A cold compress was provided. At 5:47 p.m., Cruz was seen by PA D.J. Cruz stated: " I need ointment for the cut on my finger." Cruz had an injury to left hand 2nd digit on 8/13/2020 and was requesting bacitracin ointment for the finger. Cruz's vital signs were documented as: blood pressure 114/70, temperature 98, pulse 70, respirations 14, and oxygen saturation 99%. The examination revealed that Cruz had full range of motion, a healing superficial wound to the left 2nd digit interphalangeal joint, no erythema, no tenderness, no swelling, capillary refill less than two seconds, no cyanosis to nail beds, and no sensory deficit. The abrasion was cleansed with normal saline and bacitracin ointment applied. Cruz could follow up as needed.

117.    On 8/18/20 at 2:39 p.m., Cruz was seen by Dr. C.C. Cruz reported that his right hand and elbow were slammed by the closing cell's door. Cruz complained of having minimal pain, scratches and blood shots on his two fingers. Cruz's vital signs were documented as: blood pressure 108/78, pulse 92, respirations 16, and oxygen saturation 97%. The examination revealed right elbow minimal tenderness, no swelling, full range of motion, no open wound, no deformity, and no step-off sign. The examination of the right hand revealed full range of motion, no deformity, no swelling, no step-off sign, was able to make a fist, and moved all the fingers without problem. The dorsal part of the hand revealed a scratch, the middle and 4th finger with two small bloodshot. Cruz was prescribed Ibuprofen 400 mg twice a day.

118.    On 8/19/20 at 5:29 p.m., Cruz was seen by PA S.M. Cruz was involved in an altercation with another individual in the housing area. Cruz reported having no physical injuries. Cruz reported that he hated being at GRVC and wanted to be transferred to AMKC. Cruz reported that he would keep engaging in physical altercations until DOC transferred him to AMKC. Cruz was requesting to sign out of heat sensitivity housing. Cruz's vital signs were documented as: blood pressure 108/54, pulse 69, respirations 16, and oxygen saturation 98%. There was no medical treatment/intervention required at that time. Cruz was refusing heat sensitivity housing and signed a refusal of treatment waiver.

119.    On 8/27/20 at 12:56 p.m., Cruz was seen by Dr. A.C., for a psychiatric medication
        review. The plan was to continue the same medications and to continue therapy with the
        clinician. At 5:53 p.m., Cruz was seen by LMSW P.W. for a 30 day follow-up. Cruz did
        not appear to be in any distress. The importance of medication compliance was
        discussed and Cruz was encouraged to be compliant. Cruz reported that he spoke with
        family members and was waiting for them to pay his bail. Cruz's speech was clear and
        his thought process was relevant. Cruz appeared hopeful due to family planning to bail
        him out.

120.    On 9/4/20 at 11:52 a.m., Cruz was seen by MHP E.S. Cruz asked to be seen by mental
        health stating that it was an emergency and that he needed to be seen now. Cruz stated,
        "why can't I be seen every day. Miss, have anger issues. I need to have a therapist be
        there whenever I need. What don't you understand?" Cruz inquired as to why it wasn't
        possible to be seen by mental health daily. Cruz reported, "I get really angry miss. I have
        anger issues. I have bad asthma. I get nightmares. I have bad dreams. I have a 3-year-
        old daughter that I'm upset that I can't see her and be with her. I need to be able to see
        mental health whenever I feel like I'm gonna get angry like I need to be able to see them
        right then and there. My judge and lawyer said that I need to be provided that. I wasn't
        seeing anyone in the Beacon, and I wasn't seeing anyone in Manhattan house. This is
        not how other facilities work. I should be seen whenever I need to be seen. I was in
        CAPS before. I had someone to talk to whenever I needed. I had activities every day.
        What do you mean you don't have that here? I need to be seen one on one every day".
        MHP E.S. noted that it was unclear whether Cruz experienced signs and symptoms of
        having auditory hallucinations and paranoia when a means of seeking attention or if his
        previous history of signs and symptoms and presentation are genuine. MHP E.S. noted
        that given the limited time to assess/observe, and the current hostility of Cruz, they were
        unable to determine whether Cruz met the full criteria for Schizophrenia. MHP E.S.
        noted that based on Cruz's current presentation as well as his documented history, it
        appeared that Cruz presented with a pervasive pattern of instability across several
        domains. Cruz displayed a pattern of unstable interpersonal relationships; displayed
        reckless destructive behavior and impulsivity; demonstrated affective instability shown
        by his marked reactivity of mood; appeared to frequently express inappropriate, intense
        anger and difficulty regulating and controlling emotions/anger; transient, stress related
        paranoid ideation; recurrent suicidal behavior and threats. While the above signs and
        symptoms fit criteria for a personality disorder, most notably Borderline Personality
        Disorder, more time was needed to be taken to properly assess and evaluate Cruz in
        order to accurately diagnosis. Cruz was advised that while in general population, mental
        health sees Cruz's once every four weeks, but that if he needed to be seen more often,
        mental health can schedule his appointments closer together. Due to the above, a rule
        out was made for Unspecified Personality Disorder. Cruz was to follow up with the
        psychiatrist.

121.    On 9/4/20 at 11:58 p.m., Cruz was seen by Dr. B.O. for complaints of stomach upset
        following his dinner meal. During the interrogation and discussion, Cruz became
        aggressive and threatening and to pre-empt unintended consequences, Dr. B.O. walked
        out of the cubicle and instructed DOC to remove Cruz. Cruz was advised that he was
        free to see another practitioner.

122.    On 9/8/20 at 11:05 a.m., Cruz was seen by Dr S.S. and claimed that he could not
        swallow pills. Cruz had been complaint with his medications and recently claimed

noncompliance due to an inability to swallow pills. Cruz voiced having no difficulty swallowing food. New orders were obtained to crush and liquify Cruz's medications.

123.    On 9/8/20 at 10:37 p.m., Cruz was seen by Dr B.Q. Cruz stated "they don't want me in that house, I don't want to leave the building. The building is good for me. I can chill here. They want to send me to intake. I can't be in there; I am heat sensitive. I want to go to the clinic pen and wait to speak to the Dep. 'J' told me she was going to put me in M3SU. I want to go there. I have mental health issues. There is a guy in here who is my age. Can you talk to the Dep for me? Don't talk to the officers. They won't do it." Dr. B.Q. attempted to get details from Cruz as to why DOC was moving him and if he contributed to this, Cruz was guarded and evasive. Cruz focused on heat sensitivity and requested to be moved to the young adult mental observation unit. Cruz was informed by the Dr. and the captain that he couldn't be moved there due to his age. Cruz stated that he was done talking and left the room. Cruz refused to return to the housing area and became argumentative with officers. Cruz had to be escorted out of the clinic. Cruz had caused issues on the housing unit with peers and Cruz did not feel comfortable going back there and wanted to be transferred to the mental observation unit. Cruz had been fine in general population until this situation. The diagnosis was listed as Schizophrenia and rule out Unspecified Personality Disorder. Cruz was taken back to intake and was to continue to follow up with mental health. At 11:45 p.m., Cruz was seen by PA D.A. as Cruz was involved in a use of force with DOC staff. Cruz complained of left shoulder and throat pain. Cruz was seen by medical without injury or deformity noted.

124.    On 9/9/20, Cruz was seen by Dr. F.M. for complaints of left shoulder and chest pain. The examination revealed point tenderness and reproducible pain over the 7th and 8th ribs in the mid clavicular line of the left chest. The examination of the left shoulder revealed no deformity, full range of motion, mild point tenderness AC joint on palpation. New orders were written for Naproxen 500 mg twice a day.

125.    On 9/9/20 at 7:02 p.m., Cruz was seen by Dr. B.Q. for a DOC referral. Cruz stated "I want to kill myself. I feel like the officers are out to get me, plus I can't talk to anyone in my family because none of them want anything to do with me." Dr. B.Q. noted that Cruz was seen twice the day prior, once by the psychiatrist and in the evening by Dr. B.Q. Cruz had expressed that many people did not want to be bothered with him and that he felt threatened by DOC. Dr. B.Q. noted that Cruz had caused problems for himself in his housing area and likely had security issues that he was trying to avoid by making the statements. Cruz was found with a weapon the day prior during an altercation with DOC staff. Given Cruz's history of impulsivity and propensity to escalate his behavior, Cruz was placed on suicide watch and transferred to C-71 as a precaution. Dr B.Q. documented that Cruz may require civil psychiatric hospitalization pursuant to Mental Hygiene Law, Section 9.39 or 9.43 in as much as Cruz had conducted himself in a manner which was likely to result in serious harm to himself/others and Cruz appeared to be mentally ill.

126.    On 9/9/20 at 10:23 p.m., Cruz was seen by PA F.S. Cruz was referred to C-71 for radical behavior changes, planning to inflict bodily harm, frequent displays of shouting, and constantly fighting and arguing. Cruz was transferred on a suicide watch due to his history of impulsivity and propensity. Cruz stated, "I feel horrible, nothing is going right with DOC and case. I have the feeling wanting to hang up." Cruz presented as mildly depressed. Cruz's medication compliance was: 31% for the Cogentin, 66% for the Buspirone, and 100% for the Haloperidol. Cruz's diagnosis was listed as Unspecified

Personality Disorder and Schizophrenia. The plan was to continue medications and suicide watch with psychiatrist follow-up in one week.

127.   On 9/10/20 at 3:00 p.m., per Dr J.R., Cruz refused medical care following a use of force after an altercation with another individual. Cruz denied having any injury. At 3:25 p.m., Cruz was seen by Dr. M.M. Cruz stated: "I want to go to CAPS." When the clinician tried to explain that there was a waitlist and the transfer to CAPS was not based on Cruz wanting to be housed there, Cruz stated: "I don't want to be here. I will do whatever it takes to get myself to CAPS." Cruz did not endorse having any suicidal ideation. Cruz reported feeling supported by his daughter and her mother, with whom he spoke to every day. Cruz did not appear to be in distress but was clearly goal-oriented to be transferred to CAPS. Cruz's tone and demeanor were appropriate until he was told that he would not be transferred to CAPS, at which time Cruz became hostile and threatening. Cruz's diagnosis was Schizophrenia. The suicide watch was discontinued but Cruz would remain in MO housing. Dr. M.M. noted there was no longer a need for the evaluation of Cruz for civil commitment pursuant to Mental Hygiene Law, Section 9.39 or 9.43.

128.   On 9/14/20 at 9:44 a.m., Dr. M.M. documented that on 9/9/20, Cruz was admitted to C-71 on a suicide watch after reporting suicidal ideation. The following day, Cruz denied having any suicidal ideation and was goal oriented. Cruz threatened to "do whatever it takes to get himself to CAPS" and shortly after the encounter, Cruz assaulted another II on the unit and was transferred to a cell MO unit. Cruz's behavior was clearly goal oriented. Cruz's diagnosis was Schizophrenia (under reconsideration). Given Cruz's current functioning, it was the opinion of the mental health treatment team that Cruz did not require maintenance on an MO unit at that time and would be able to manage effectively with a general population level of care. At 2:30 p.m., Cruz was seen by medical staff after a use of force. However, Cruz denied being in the use of force and refused medical care.

129.   On 9/15/20 at 8:29 p.m., Cruz was seen by the RN on a transfer from RNDC to AMKC. Cruz's vital signs were documented as: blood pressure 116/72, pulse 82, respirations 14, temperature 97.8, and oxygen saturation 100%.

130.   On 9/16/20 at 10:11 a.m., per Dr. O.O., Cruz's medications were changed from DOT to pharmacy as Cruz was on CAPS. As per the CAPS nurse, all mental health medications are dispensed as pharmacy.

131.   On 9/19/20 at 2:45 p.m., Cruz was involved in a use of force with DOC staff and was seen by Dr. F.C. Cruz's vital signs were documented as: blood pressure 114/70, temperature 98.2, pulse 72, respirations 14, and oxygen saturation 98%. Cruz denied injury.

132.   On 9/24/20 at 12:10 p.m., Cruz was seen by LMHC B.M. Cruz was cooperative, exhibited no psychosis, was under good self-control, and voiced having no suicidal ideation. Cruz did not pose an imminent threat to himself and was able to make his needs known. Cruz's diagnosis was listed as Schizophrenia and Cruz was open to having this provider as a new clinician.

133.   On 10/1/20 at 3:27 p.m., Cruz was seen for sick call by PA S.O. for having complaints of epigastric pain after eating his meal. Cruz's vital signs were documented as: blood

pressure 116/72, pulse 82, respirations 14, oxygen saturation 98%, and temperature 98.2. Cruz was given Maalox and verbalized feeling better.

134.   On 10/2/20 at 3:29 p.m., Cruz was seen cell side by PhD E.W. due to security reasons. Cruz had been verbally aggressive toward peers and DOC. The day prior, Cruz had attempted to fight another peer. Cruz was cooperative and complained of having a stomachache and made various somatic complaints. However, further in the discussion, Cruz denied complaints. Cruz was questioned about any substance abuse and Cruz denied use. Cruz denied having any suicidal or homicidal thoughts.

135.   On 10/6/20 at 1:02 p.m., Cruz was seen by DNP N.H. cell side as Cruz was locked in for security reasons after yelling threats to staff and DOC. Cruz's cell was dirty with water, clothes, urine, and food strewn across the floor. Cruz reportedly urinated on the floor the day prior and was behaviorally dysregulated over the weekend. Cruz had bloodshot eyes and recently had participated in a visit.  Cruz would not engage in the conversation of illicit drug use. Cruz's medication compliance was noted to be 80% for Haloperidol and 0-20% for the Benztropine and Buspirone. Since the admission to CAPS, Cruz had been in tenuous behavioral control and compliant with medications. Cruz was currently dysregulated, hostile, and unwilling to participate in meaningful encounters. The diagnosis was listed as Schizophrenia. The plan was to discontinue the Buspirone in setting of non-adherence and unclear indications, to lower the Benztropine in setting of minimal adherence and unclear indication and would follow up in one week.

136.   On 10/6/20 at 4:45 p.m., Cruz was seen by RN B.E. Cruz was alert and oriented times two and locked in due to behavioral issues. Cruz had flooded his cell and scattered items all over the cell. Cruz was observed screaming and cursing in his cell. Cruz accepted his medications then poured the medications down the sink. Cruz was observed behaving in a bizarre manner and laughing at some internal stimuli.

137.   On 10/7/20 at 12:35 p.m., Cruz was seen by RN K.L. Cruz refused Benztropine, Haloperidol, Albuterol, and Beclomethasone. Cruz was seen in his cell area pacing back and forth. Cruz's cell was disorganized and dirty. Cruz was withdrawn and not communicating.

138.   On 10/7/20 at 4:03 p.m., Cruz was seen by Dr. D.M. Dr. D.M. met with Cruz and  the mental health team to rule out medical pathology for behavior changes. Cruz was noted to have acute behavior changes over the past week that was thought to be secondary to substance use. Cruz denied having any pain. Cruz stated that he was depressed because he just found out that his grandmother passed away two days ago, which was an issue he had reported back on 5/28/20. As Dr. D.M. was walking away, Cruz mentioned difficulty breathing and would not respond when asked if he was using his inhalers. Cruz's vital signs were documented as: blood pressure 121/79, pulse 82, respirations 14, oxygen saturation 100%, and temperature 98.2. Dr. D.M. noted that there was a limited assessment due to security issues and Cruz's behavior but that he did not observe any objective signs of an acute emergent medical pathology.

139.   On 10/8/20 at 1:20 p.m., Cruz was seen by LMHC B.M. Cruz reported during the visit that he was feeling okay and reported that he had not been eating as DOC had not been giving him food. Cruz reported that he had not been sleeping, but also reported having bad dreams. Cruz denied having any other complaints. Cruz denied having any housing area issues and told staff that he would clean up his cell. Cruz's cell was noted to have

water, urine, food, and clothes on the floor. Cruz's eyes appeared blood shot and Cruz was having difficulty keeping his eyes open during the encounter. The mental health team suspected possible substance use earlier in week. There was no psychosis noted and Cruz was responding appropriately. Cruz denied being fed but food and a tray were noted in the cell. Cruz understood the purpose of the session and actively participated with no issues. Cruz was receptive and in agreeance to his discussed goals. Cruz was future-oriented to continue working on his implemented goals provided.

140.   On 10/8/20 at 6:06 p.m., RN B.E. noted that Cruz had refused his mental health medications and that Cruz was referred to the counselor. At 6:06 p.m., Cruz was transferred to a new cell due to Cruz flooding his cell. Cruz was observed jumping from his bed onto the floor. When Cruz was asked how he was doing, Cruz did not answer and just laughed. During an interview with Commission staff, CO C.C. reported that Cruz had been removed from the cell, showered, and given clean clothes when his cell was changed under direction of Captain J. Institutional lock-in was documented as occurring at 9:00 p.m. with nothing unusual reported during the night shift.

141.   Per a nursing note documented on 10/9/20 at 3:44 p.m., RN Y.B. went to Cruz's cell door and observed Cruz from the window in door. Cruz was asked if he wanted his a.m. medications and Cruz moved in a manner that RN Y.B. and DOC interpreted as a firm head shaking no. The actual time of the nursing encounter was not indicated in the note.

142.   A review of Gentech video footage of the housing area on 10/9/20 was completed by DOC staff and revealed:

At 6:06 a.m. a Captain is seen touring the MOD 1- lower housing area along with the B-officer. The Captain flashed a light in each cell as he passed.

At approximately 6:10 a.m., the Captain is seen leaving the area and an unidentified incarcerated individual was sitting in the dayroom wearing a white shirt and a white beany. The B-officer walked to the dayroom area and changed the channel on the TV, stood there for approximately two minutes and walked away.

At approximately 6:45 a.m., the B-officer returned to the dayroom area and was looking into a cell behind the TV area momentarily before walking back over to the B-post. He placed something on the desk and continued walking around the housing area.

At approximately 6:47 a.m. the B-officer sat at the desk making a logbook entry. At approximately 6:52 a.m., the B-officer left the housing area.

At 7:00 a.m., another officer entered the housing area, and was seen touring the housing area and then left.

At 7:35 a.m., the officers returned to the housing area and the second officer was observed taking notes.

At 7:38 a.m., the B-officer was observed alongside the second officer unlocking cell doors, making visual inspections, and taking notes. At 7:40 a.m., the second officer left the area.

At 8:02 a.m., a female staff member was seen walking through the housing area.

At 8:05 a.m., an officer was seen looking into a cell while another officer was performing supervisory rounds and looked into each cell. There were four officers in the housing area, two sitting at the 13-post and two walking around the housing area. The worker II began conducting sanitation in the housing area and was seen retrieving the broom and supplies.

At 8:10 a.m., two officers were standing in front of the cell behind the TV area for a minute then they walked away.

At 8:29 a.m., there were three officers sitting at the B-post desk writing reports.

At 8:44 a.m., an officer was seen conducting supervisory rounds of the housing area and looked inside each cell before returning the B-post desk.

At 8:53 a.m., a female captain arrived and walked over to Cruz's cell with two officers and looked inside. The captain completed a supervisory tour of the unit and looked in each cell. At 8:58 a.m., the captain left the area.

At 9:14 a.m., an officer was observed standing looking into the cell near the dayroom area before the video is ghosted per the DOC report.

143.   A review of the video by SCOC staff for AMKC Mod 1 on 10/9/20 revealed the following:

At 9:19 a.m., three officers were seen sitting at the desk. One II who was identified as an Suicide Prevention Aid (SPA) was sitting on a table watching TV in the area of cell 2, Cruz's cell.

At 9:21 a.m., two officers were seen at the door of Cruz's cell. One officer remained at the door looking in the cell. A third officer then walked to the cell and looked in. That officer then conducted a supervisory round on the unit looking in all cells.

At 9:30 a.m., two officers are at Cruz's cell door looking in.

At 9:31 a.m., the SPA was observed looking into the cell.

At 9:32 a.m., the cell door was opened and one of the officers was seen going to the control window.

At 9:34 a.m., medical responded.

A review of this recorded video footage by Commission staff revealed a gross violation of correctional security procedure. A medical staff member was observed running to the cell and removing their lab coat with photographic identification attached and throwing the lab coat in the direction of the II SPA who held the lab coat for the remainder of the time that he was out of his cell. When directed by DOC staff to return to his cell, the SPA is seen taking the staff member's lab coat into his cell with him.

144.   A review of Mod I Lower A post logbook revealed that on 10/9/20 from 12:00 a.m. until 5:00 a.m., general supervisory tours were completed every 30 minutes. At 5:30 a.m., the supervisory tours were noted to be active until the medical emergency occurred and

then they were conducted every 30 minutes. There was no indication in the logbook of any issues with Cruz or flooding of the cell. This in violation of 9 NYCRR §7003.3(j)(6) (i), (ii), (iii), and (iv) which states:

> All written records pertaining to facility housing supervision shall be recorded in ink in a bound ledger of consecutively numbered pages which shall be maintained in each housing areas.  Such records shall include, but not limited to, the following information:
> (6)any significant events and activities occurring during supervision, including:
> (i)the date and time of such event or problem;
> (ii) the names of all prisoners and/or staff involved;
> (iii) facility staff response to such event or problem, including a summary of what occurred;
> (iv) a description of the condition of any prisoners involved;

145.   A review of Mod 1 Lower B post logbook revealed that on 10/9/20 from 12:00 a.m. until 5:00 a.m., general supervisory tours were completed every 30 minutes. At 5:00 a.m., it was noted that Cruz refused breakfast. At 5:30 a.m., active supervisory tours began. At 6:30 a.m., active supervisory tours were completed. At 7:30 a.m., general supervisory tours were completed. At 8:30 a.m., 8:45 a.m., and 9:00 a.m., active supervisory tours were completed. At 9:15 a.m., Cruz was found unresponsive and a medical emergency was activated.

146.   On 10/9/20 at 9:33 a.m., medical was called for an unresponsive individual. RN Y.B. and Dr. D.M. arrived and found Cruz lying on his back without a carotid pulse and chest compression were initiated. Cardiac monitor revealed asystole. There was blood-tinged secretions coming out of Cruz's mouth and nares during compressions. Cruz was given Narcan times two without response. IV access was established and 1 mg Epinephrine was given without effect. Urgi care arrived and intubated Cruz. EMS arrived. Per Dr. P.W., at 10:15 a.m., CPR was stopped, and Cruz was pronounced dead.

147.   During an interview with Commission staff, CO J.T. stated that he performed supervisory tours and noted that Cruz was lying in bed breathing and appeared sleeping. When notified that Cruz was not breathing, CO J.T. assisted with CPR. CO J.T. was unable to recall the last CPR training he received.

148.   During an interview with Commission staff, CO A.S. reported that the last time he received any CPR training was at the corrections academy. CO A.S. stated that Cruz's baseline was very erratic. CO A.S. reported that the night before, Cruz was up flooding the cell all night and it was not unusual for Cruz to be sleeping all morning . The requirements of 9 NYCRR §7010.2(f) state:

*Facility personnel shall receive training and maintain certification in approved first aid and emergency life saving techniques including the use of emergency equipment.*

As accepted certifications and trainings in CPR/First Aid are generally good for three years or less, the Medical Review Board finds that NYC DOC is not in comportment with the requirements of the Minimum Standard.



**Final Report of the
New York State Commission of Correction:**


**In the Matter of the Death of**


**Wilson Diaz-Guzman,
an incarcerated individual of the
Otis Bantum Correctional Center**


**June 28, 2022**


**To: Commissioner Louis Molina
NYC Department of Correction
75-20 Astoria Blvd., Suite 100
East Elmhurst, NY 11370**



**Allen Riley**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47 (1)(d), regarding the death of Wilson Diaz-Guzman who died on January 22, 2021, as result of circumstances which occurred while an incarcerated individual in the custody of the New York City Department of Correction, the Commission has determined that the following final report be issued.

FINDINGS:

1.   Wilson Diaz-Guzman was a 30-year-old male who died on 1/22/2021 due to a suicidal hanging while in the custody of the New York City Department of Corrections (NYC DOC) at the Otis Bantum Correctional Center (OBCC). The Medical Review Board has found that there was a failure by Correctional Health Services (CHS) to recognize and treat Diaz-Guzman's acute suicidal ideation.  The Medical Review Board opines that had Diaz-Guzman received proper psychiatric referrals and treatment, his death may have been prevented. The Board has also found that there were a failures of NYC DOC staff to comport with Minimum Standard requirements for supervision and deprivation of essential services and a failure to refer Diaz-Guzman to mental health services despite displaying signs of severe agitation.

2.   Diaz-Guzman had a medical history of diabetes type II and hyperlipidemia. Community pharmacy information indicated that Diaz-Guzman was prescribed Januvia 100 mg daily and Humalog Insulin. Diaz-Guzman had a prescription for Lisinopril that was last filled in January 2020. Diaz-Guzman had a mental health history of Adjustment Disorder without any documentation of medications being prescribed.

3.   Diaz-Guzman was charged with Predatory Sexual Assault Against a Child on 1/16/21. Diaz-Guzman was to return to court on 1/22/21 and was detained on $150,000 bond or $50,000 cash bail.

4.   Diaz-Guzman was received in NYC DOC at the Eric M. Taylor Center (EMTC) on 1/17/21. Diaz-Guzman had no known previous incarcerations. At 12:30 a.m., a suicide screening was completed, and Diaz-Guzman responded "no" to all questions. At 12:22 a.m., per the arraignment and classification risk screening form, there was no indication of any medical needs. The intake sheet noted that Diaz-Guzman spoke English. Diaz-Guzman was housed on 7 lower which is medical cohort housing.

5.   On 1/17/21 at 2:23 p.m., Diaz-Guzman was seen by patient care aide (PCA) O.C. Diaz-Guzman's vital signs were documented as: blood glucose 310, weight 192 pounds, blood pressure 143/89, temperature 98.7, pulse 101, respirations 16, and oxygen saturation 98%. Diaz-Guzman stated that his medications were Lantus, Januvia, and Metformin. Diaz-Guzman denied having any hypertension. At 2:45 p.m., Diaz-Guzman was seen by medical staff J.A. and responded "yes" to having thoughts to hurting/killing self now and a stat referral to mental health was completed. Per Dr. T.A., at 3:53 p.m., Diaz-Guzman's medications were ordered and included: sliding scale insulin, Lantus 30 units at bedtime, Lipitor 10 mg at bedtime, Metformin 1000 mg daily, Januvia 50 mg daily, Lisinopril 2.5 mg daily, fingerstick in evening with Lantus and sliding scale coverage.

6. On 1/17/21(written in note as 2/17/21) at 9:31 a.m., Diaz-Guzman was seen by Licensed Clinical Social Worker (LCSW) W.B. for an initial mental health assessment. LCSW W.B. indicated that the medical intake was reviewed and that Diaz-Guzman was seen after indicating to medical staff member J.A. during the intake process that he was feeling depressed and that he had thoughts of harming himself due to his arrest. Diaz-Guzman reported that he lived with his mother and brother and that this was his first incarceration with no prior arrests. Diaz-Guzman denied having any prior psychiatric hospitalizations. Diaz-Guzman reported having a history of alcohol usage. Diaz- Guzman's crime and charges were discussed. Diaz-Guzman denied having any suicidal thoughts. Per LCSW W.B., Diaz-Guzman was cleared for general population with mental health follow-up. During an interview with Commission staff, LCSW W.B. started that Diaz-Guzman spoke and understood English and that he was very articulate. Diaz-Guzman stated that his charges were unjust. LCSW W.B. stated that the follow-up was scheduled for 14 days. Additionally, during an interview with Commission staff, LCSW W.B. noted that the documented time and date of the interview were inaccurate but the encounter did occur after medical evaluation at 3:53 p.m.  The Medical Review Board opines that there was a failure by the CHS clinical staff to refer Diaz-Guzman, a stat patient from medical who expressed suicidal ideation, to psychiatry for assessment and possible treatment prior to clearing him to be housed in general population.

7. On 1/18/21 at 6:34 a.m., Diaz-Guzman's HGBA1C was noted to be 11.7.

8. On 1/19/21 at 2:40 p.m., Diaz-Guzman was seen by mental health provider (MHP) T.H. The mental health progress note indicated that no interpreter was needed. Diaz-Guzman was reportedly brought over from medical. Diaz-Guzman was to be seen for his diabetes and revealed to the nurse some superficial scratches on his arm. MHP T.H. noted that due to the computer system being down for some time, it was not clear whether an injury report was filed or not. As such, a medical referral was put in and further action could be taken as deemed necessary. Diaz-Guzman reported that he made the superficial scratches to his arm the night prior. Diaz-Guzman reported that he was fearful for his safety due to his charges and wanted someone to pay attention to him. Diaz-Guzman denied having suicidal or homicidal ideation, was future oriented, goal directed, and easily engaged. Diaz-Guzman did not appear to be in any acute distress. Diaz-Guzman reported that his housing area was ok and that he felt safe. Diaz-Guzman reported that he had made a friend with one of the other incarcerated individuals and that he helped to keep the housing area clean. Diaz-Guzman denied having hallucinations and did not appear to be responding to internal stimuli. Diaz-Guzman had court on 1/22/2021 and was hopeful he would be able to post bail and be able to get out. Diaz-Guzman was already seen for an initial appointment, knew that he would have future appointments with mental health, and was educated on how to ask for a DOC referral if he felt that he needed to see mental health before his next appointment. Diagnoses at this visit included Adjustment Disorder and the plan was for general population with mental health follow-up.  The Medical Review Board opines that concurrent referrals from medical to mental health indicating both suicidal ideation and self-harm were indicative of suicidal risk which were not adequately identified nor addressed by the CHS mental health providers.  The concurrent referrals should have prompted mental health to request an increase in Diaz-Guzman's supervision, a measure which could have prevented his death.

9.    On 1/21/21 at 2:13 p.m., per NYC DOC documentation, the EMTC tour commander prompted a request for rehousing due to security concerns and Diaz-Guzman was transferred to OBCC and housed in 3S cell 17. There was no available additional documentation regarding this request.

10.   On 1/21/21 at 4:28 a.m., per medical provider V.L., Diaz-Guzman's was brought down to medical complaining of feeling unsafe in his housing area. Diaz-Guzman was worked up and wanted his sugar to be tested. Diaz-Guzman's vital signs were documented as: blood pressure 146/91, temperature 98.7, pulse 92, respirations 18, and oxygen saturation 99%. Diaz-Guzman's finger stick was 320. Dr. C was notified and due to receiving additional insulin earlier in addition to his standing insulin dosage, Dr. C. stated that Diaz-Guzman did not require any additional insulin at that time. Diaz-Guzman's concerns regarding the housing unit were elevated to DOC and the medical staff would continue to monitor his health.

11.   On 1/21/21 at 10:57 p.m., per medical provider M.J., Diaz-Guzman was not produced for his fingerstick.

12.   On 1/22/21 at 2:52 p.m., per RN L.B., Diaz-Guzman was seen and denied having any COVID symptoms.

13.   On 1/22/21, a review of the Gentech video review revealed:

At 3:20 p.m., CO S.S. conducted a supervisory tour and looked into all cells.
At 3:53 p.m., CO K.B. conducted a supervisory tour and looked into all cells.

At 4:04 p.m., 4:27 p.m., and 4:52 p.m., CO S.S. performed phone hook ups for cells 19, 20, and 21.

At 4:00 p.m., 4:30 p.m., 5:00 p.m., and 5:30 p.m. per the 3-control logbook and 3 south logbook, active supervision tours were completed and verified per review of the housing area video.

At 5:40 p.m., an unidentified CO interacted with Diaz-Guzman in cell 17.

At 5:43 p.m., CO R. was on the unit affording unknown services.

At 5:45 p.m., Captain R.N. and CO S.S. conducted a supervisory tour and looked into all cells. Captain R.N. was seen knocking on cell 17 and standing there for short period. Captain R.N. then continued his tour. Captain R.N. returned to cell 17 and knocked again before walking away.

At 5:46 p.m., Captain R.N. and CO S.S. had cell 17 opened and removed a mattress. CO S.S. gestured for Diaz-Guzman to step out of the cell but Guzman did not. Captain R.N. spoke to Diaz-Guzman and the cell door was closed.
During an interview with Commission staff, CO S.S. reported that Diaz-Guzman was blocking the view of his cell with the mattress and therefore it was removed. Captain R.N. also stated that Diaz-Guzman had smeared a substance on the cell door window. CO S.S. stated that he was unaware of the plan to deal with Diaz-Guzman's behaviors. Per Captain R.N. and CO S.S., Diaz-Guzman did not speak English. There was no

indication in the housing or control logbook of this incident or the mattress removal. This is a violation of 9 NYCRR §7003.3(j)(6)(i), (ii), (iii), and (iv) which states:

*"any significant events and activities occurring during supervision, including:*
*(i) the date and time of such event or problem;*
*(ii) the names of all prisoners and/or staff involved;*
*(iii) facility staff response to such event or problem, including a summary of what occurred;*
*(iv) a description of the condition of any prisoners involved;"*

Additionally, there was no documentation as to why Diaz-Guzman's mattress was removed or if the removal had been reviewed and approved by a commanding officer. This was in violation of 9 NYCRR §7075.5(b) which states:

"*Unless otherwise specified by the provisions of this Title, the provision of an essential service to an inmate shall not be denied, restricted or limited unless the chief administrative officer determines that providing such essential service would cause a threat to the safety, security, or good order of the facility, or the safety, security, or health of the inmate, staff or other inmates. Any such determination shall be made by the chief administrative officer in writing, and shall state the specific facts and reasons underlying the determination*".

At 5:51 p.m., ADW S. and Captain R.N. and an unidentified officer walked to cell 17 and looked inside. The officer retrieved the keys for the pipeline closet, opened it and did something inside closet before closing the door. The camera revealed that Diaz-Guzman was pacing in his cell. During an interview with Commission staff, Captain R.N. stated that the plan was to utilize the extraction team if Diaz-Guzman continued to be uncooperative and flood the cell. There was no documentation in the logbook to reflect that Diaz-Guzman was flooding the cell. This is a violation of 9 NYCRR §7003.3(j)(6)(i), (ii), (iii), and (iv).

At 5:52 p.m., CO S.S. was observed sweeping the water accumulated in front of cell 17.

At 5:57 p.m., Captain R.N. exited the housing area.

At 6:00 p.m., Fire Safety Unit (FSU) Officer S. and FSU CO J.S. entered the housing area and walked to cell 17. The officers looked inside the cell and took pictures. The officers exited the area at 6:05 p.m. Another officer approached cell 17 and engaged in conversation. During an interview with Commission staff, FSU J.S. stated that he tried to engage Diaz-Guzman in conversation and offer him assistance. Diaz-Guzman was just repeating get away from my cell. FSU J.S. attempted to speak to Diaz-Guzman in Spanish and Diaz-Guzman continued the same response.

The Medical Review Board finds that there was a pattern of escalating behavior with Diaz-Guzman that should have prompted an emergency referral to mental health.

14.   At 6:18 p.m., CO S.S. and CO K.B. conducted a supervisory tour and looked into all cells. At cell 17, they engaged in brief conversation and walked away.

15.     At 6:54 p.m., CO K.B. approached cell 17 and observed Diaz-Guzman with a sheet wrapped around his neck hanging from the sprinkler head. CO K.B. made a radio call and the cell door was opened. At 6:56 p.m., CO S.S. arrived at cell 17 and the officers entered the cell for approximately three minutes. CO S.S. then ran to the front of the housing area and used the housing area phone to activate a medical emergency. During an interview with Commission staff, CO S.S. reported that he held Diaz-Guzman up so CO K.B. could remove the cloth from around the neck and assist with CPR.  CO S.S. could not recall the last time he completed CPR training. At 7:07 p.m., the medical staff, officers and Captain R.N. responded to cell 17. Diaz was placed on the floor in the hallway and CPR was continued. Urgi-care was called.
Per the EMS report and per the clinic logbook, at 7:11 p.m. EMS was activated and arrived at 7:19 p.m. At 7:19 p.m., Captain R.N. assisted with CPR.
At 7:35 p.m., CPR was stopped and Dr. P.W. pronounced Diaz-Guzman dead.

16.     Per a review of medical documentation, at 7:01 p.m., medical was notified of a medical emergency. PA C., Dr. D.O., RN B., and RN A. responded. Upon their arrival, Diaz-Guzman was found unresponsive. The cardiac monitor revealed asystole. Dr. P.W. arrived and Narcan and Epinephrine were given without effect.

17.     Per a review of DOC phone recordings, a phone call on 1/22/21 from 10:17 a.m. until 10:32 a.m. between Diaz-Guzman and his mother was translated. Diaz-Guzman begged his mother to do anything to get him out of the facility. Diaz-Guzman stated that no one was bothering him, and that guards were good, but he could not stay inside another day. Diaz-Guzman's mother stated that she was trying but that $50,000 was a lot of money for poor people. Diaz-Guzman's mother stated tomorrow was another day. Guzman stated "do you think I am not going to make it tomorrow. And I wanna let you know that I love you if anything, if anything I love you and everybody." Diaz-Guzman's mother responded, "we are going to take you out of there and do not talk like that, we will talk in the afternoon and if anything, we will talk tomorrow."


ACTIONS REQUIRED:


TO THE COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF CORRECTIONS:

1.      The Commissioner shall conduct an investigation into the actions of DOC officers assigned to supervise Diaz-Guzman who failed to follow the requirements of 9 NYCRR §7075.5(b). Administrative action should be taken if the officers are found to be in violation of department directives.

2.      The Commissioner shall conduct an investigation into the actions of the DOC officers assigned to supervise Diaz-Guzman to determine why an immediate mental health referral was not made following Diaz-Guzman's escalating behaviors.

3.      The Commissioner shall conduct an investigation into the actions of DOC officers assigned to supervise Diaz-Guzman and failed to follow the requirements of 9 NYCRR §7003.3(j)(6)(i), (ii), (iii), and (iv). Administrative action should be taken if the officers are found to be in violation of department directives.

A report of findings and corrective actions taken shall be provided to the Medical Review Board



**Final Report of the
New York State Commission of Correction:**


**In the Matter of the Death of**


**Javier Velasco,
an incarcerated individual of the
Anna M. Kross Center**


**June 28, 2022**


**To: Commissioner Louis Molina
NYC Department of Correction
75-20 Astoria Blvd., Suite 100
East Elmhurst, NY 11370**



**Allen Riley**
*Chairman*

**Thomas J. Loughren**
*Commissioner*

**Yolanda Canty**
*Commissioner*

GREETINGS:

WHEREAS, the Medical Review Board has reported to the NYS Commission of Correction pursuant to Correction Law, section 47 (1)(d), regarding the death of Javier Velasco who died on March 19, 2021, as result of circumstances which occurred while an incarcerated individual in the custody of the New York City Department of Correction, the Commission has determined that the following final report be issued.

FINDINGS:

1.    Javier Velasco was a 37-year-old male who died on 3/19/21 due to a suicidal hanging while in the custody of the New York City Department of Corrections (NYC DOC) at the Anna M. Kross Center (AMKC). The Medical Review Board has found that Correctional Health Services (CHS) failed to recognize Velasco's acute suicidal ideation and refer him for psychiatric hospitalization after a serious suicide attempt and then removed suicide watch measures prematurely without proper psychiatric consultation. The Medical Review Board opines that Velasco's death was preventable had his suicidal ideation been properly identified and treated. Additionally, the Medical Review Board has found that NYC DOC staff failed to comport with the requirements of 9 NYCRR §7003.3 due to failing to conduct adequate supervisory tours of the housing area where Velasco resided.

2.    Velasco was incarcerated on 3/5/21 on a charge of Criminal Contempt 1st Degree with $10,000 bail and was awaiting court.  Additionally, Velasco had a parole violation detainer. In May 2016, Velasco, while on probation, operated a motor vehicle in an intoxicated condition on a public road. Velasco was initially sentenced to five years of probation on 4/20/17 and one year of confinement.

3.    Velasco had no chronic medical conditions and was prescribed Ibuprofen for shoulder and head pain. Velasco had undergone an x-ray of the shoulder which was negative. Velasco had a history of suicide attempts in 2017 while incarcerated in NYC DOC. Velasco was not prescribed any mental health medications and was not receiving treatment in the community.

4.    On 3/5/21 at 3:19 p.m., Velasco was received in NYC DOC at the Eric M. Taylor Center (EMTC). At 3:27 p.m., a suicide screening was completed by DOC staff and Velasco denied having any suicidal thoughts.

5.    On 3/6/21 at 7:20 a.m., Velasco was seen by Dr. S.S. for an intake assessment. Velasco's vital signs were documented as: blood pressure 120/74, pulse 80, respirations 16, oxygen saturation 96%, and temperature 97.9. Velasco reported to the physician that he consumed alcohol two to four times a month and that consisted of three or four drinks. Dr. S.S. documented the examination as being normal and that Velasco denied all medical history or having suicidal thoughts.

6.    On 3/16/21 at 4:00 a.m., Velasco tied a bed sheet around his neck and attached it to the toilet door in the shower area. Velasco then climbed on the toilet and attempted to jump off. CO D.M. reported hearing a loud bang from the bathroom, urgently responded and saw Velasco with the sheet around the neck. CO D.M. cut the sheet from Velasco's neck

and laid Velasco on his side. Velasco was taken to medical but denied having any injuries per the injury report. The mental health status notification and observation transfer form noted that Velasco was placed on constant watch on C-71 at 5:35 a.m., per Licensed Certified Social Worker (LCSW) W.B. Velasco was transferred to AMKC and referred to mental health. During an interview with Commission staff, CO D.M. reported that Velasco was very upset with the officer for cutting him down stating that he just wanted to die. The Medical Review Board notes that supervision and actions by the officer most likely prevented Velasco's death at that time.

7.      On 3/16/21 at 7:32 a.m., Velasco was seen by LCSW W.B. for an initial mental health assessment and treatment plan. Velasco reported having numerous violations of parole and multiple domestic violence issues with the wife. Velasco reported that his wife had Multiple Sclerosis which impaired her thinking. Velasco reported serving 15 years in jail due to a violation of an order of protection. Velasco reported feeling hopeless and helpless. Velasco reported having prior treatment at Inwood Community CTR as outpatient. Velasco was maintained on suicide watch and referred to the mental health clinician for an evaluation.

8.      On 3/16/21 at 6:11 p.m., Psychiatric Nurse Practitioner (NPP) D.B. evaluated Velasco and determined that Velasco would remain on suicide watch. Velasco stated that since the last suicide screening was completed, he had thoughts of self-harm as well as going to sleep and not waking up. Velasco's diagnosis was listed as Adjustment Disorder-unspecified.  The Medical Review Board opines that Velasco had a serious suicide attempt and had acute suicidal ideation that warranted consideration of forensic hospitalization.

9.      On 3/17/21 at 4:58 a.m., Velasco was seen by Dr. K.K. for complaints of shoulder pain and head pain. Velasco's vital signs were documented as: blood pressure 119/66, pulse 74, respirations 15, and oxygen saturation 98%. Doctor K.K. ordered Ibuprofen 800 mg twice a day and x-rays were ordered. Velasco refused the medications and insisted on going to the hospital. Velasco was advised that a hospital referral was not needed.

10.     On 3/17/21 at 2:03 p.m., per LCSW G.G., Velasco was seen for suicide watch protocol on QL8. Velasco stated "mentally I feel perfect, I tried to hang up but wasn't really suicidal it was a moment of weakness, I wanted to go to Bellevue. It was stupid, I am only here for a parole violation. When can I go back to population? I used to work in the pantry in 4TOP (a mental health substance abuse housing unit). I am alcoholic. Spending 15 years in prison is not rehabilitation. I want to fix myself. I would like an alcohol program. I spend my time working out." Velasco firmly denied having any suicidal ideation and reiterated that the recent self-harm gesture was a ploy to get to Bellevue. Velasco denied having any auditory or visual hallucinations. There was no evidence of any thought disorders noted. Velasco was listed as being future oriented and motivated for alcohol treatment. Velasco's primary diagnosis was listed as Adjustment Disorder with mixed anxiety and depressed mood. LCSW G.G. documented that the case was conferenced with Dr. V.F. The decision was made to discontinue the suicide watch and Velasco would remain in mental observation (MO) housing. Velasco had a pending appointment with mental health staff for the following day.  The Medical Review Board opines that decision to remove Velasco from suicide watch was premature given the seriousness of his attempt, without having received a follow-up psychiatric consultation, and not having established his history of prior suicide attempts by hanging.

11.     On 3/18/21 at 11:45 a.m., Velasco was seen by LCSW C.R. for a comprehensive treatment plan. The comprehensive treatment plan noted that Velasco attempted to hang himself because he was upset. LCSW C.R. noted that recent suicide attempts had resulted in brief hospitalizations at Bellevue Hospital and Elmhurst Hospital. Velasco's past diagnoses included: alcohol induced depression, history of domestic violence, and attempted suicide by hanging in 2017 related to the loss of a son. The recent suicide attempt diagnosis was Adjustment Disorder unspecified. LCSW C.R. noted that Velasco was observed resting in his cell and willingly engaged with staff. Velasco endorsed pain from the torn ligament in his right shoulder. Velasco reported that he was offered five to "many years" for the violation of parole. Velasco reported that he was seeking a program. Velasco denied having outpatient treatment or medications in the community but did report having two prior psychiatric hospitalizations as a result of suicide attempts by hanging. Velasco reported having significant marital problems which he reported was the reason for the incarceration. Velasco reported having a history of alcohol abuse since the age of seven years old and reported daily consumption. Velasco denied having any drug abuse. Velasco reported having four children with four different women. Velasco reported that he had not worked since 2016. Velasco denied having any suicidal or homicidal ideation or psychosis. Velasco reported experiencing anxiety, worry, frustration from physical pain, incarceration and depressive symptoms and hopelessness. Per a review of NYC DOC records, Velasco had at least three suicide attempts between 5/4/17 and 5/9/17 all by hanging to which Velasco was sent to the hospital for an evaluation and was kept for 24 hours. Velasco's primary diagnosis was Adjustment Disorders unspecified. Velasco indicated a willingness to engage in therapy and treatment for alcohol abuse. The plan was to refer Velasco to a clinician, to the social worker, and a referral to A Road Not Taken (ARNT),  a substance abuse program.

12.     On 3/18/21 8:03 p.m., Velasco had a negative x-ray of the shoulder.

13.     On 3/18/21, Velasco locked in his cell at 8:57 p.m. CO A.I. and CO A.A. were on duty at that time. At 11:05 p.m., Captain S. completed a supervisory tour.

14.     On 3/19/21 at 2:45 a.m., CO S.B. relieved CO A.A. for Enhanced Suicide Observation (ESO) watch of cell number one which housed another incarcerated individual. At 3:01 a.m., CO V.C. relieved CO A.I. Per the DOC investigation report, CO V.C. did not make adequate supervisory tours as evidenced by the failure to look in the cells during his rounds and CO V.C. did not complete the 15-minute supervisory rounds after the suicide prevention aide (SPA) completed his shift.

15.     On 3/19/21 at 5:18 a.m., CO G.M. stated that Velasco was found hanging in his cell via a bed sheet affixed to the air vent. CO V.C. and CO S.B. entered the cell and cut the sheet from around Velasco's neck. Velasco was placed on the bed and CPR was initiated by the CO's and a pocket mask was utilized for rescue breaths. The officer's body camera was activated upon the entry into the cell. The officer on A post was advised to call a medical emergency but was unfamiliar with the process and CO G.M. returned to the desk to activate a medical response. Medical responded at 5:27 a.m. Upon medical's arrival, Dr. K.K. requested that Urgicare and EMS be activated. Captain M. was the Bravo house supervisor and was advised of a medical response ton quad lower 8. Upon arrival, Captain M. noted that medical staff were in cell #29 and were performing CPR. Medical staff continued CPR, initiated IV access, applied the AED without shock advised, and performed rescues breaths with bag valve mask. Medical staff could be

heard on the body cam video repeatedly asking for EMS. At 5:38 a.m., Dr. A.L. the Urgicare physician arrived, and Velasco was intubated and given five rounds of Epinephrine and one dose of Narcan. Thirty-one minutes into the body camera footage, there was confirmation that someone was calling EMS. EMS arrived at 6:07 a.m.  At 6:10 a.m., Velasco was pronounced dead at the facility by Dr. A.L. During an interview with Commission staff several different procedures were given as to whose responsibility it was to activate EMS. CO V.C. stated that the Captain calls EMS. Captain U.M. stated that the A post staff in the clinic or tour commander's office calls EMS but did not designate who should make the call.  Another CO reported that the medical clinic activates EMS. An RN stated that the nurses call EMS. RN O.M. stated that they are unsure who calls EMS. P.A. S.M. stated that one of the nurses calls EMS. The Medical Review Board opines that there was a lack of clear direction and policy regarding the activation of EMS and this resulted in a failure of timely activation.

16.    Per a review the QL8 logbook entry by CO V.C., a medical response was called at 5:09 a.m. for Velasco. Per the Quad 6/8/A post log, the medical response was called at 5:20 a.m. per CO K.

17.    A review of recorded video footage for 3/19/21 revealed:

At 12:01 a.m., CO performed a supervisory tour and looked in the cells with a flashlight.

At 12:04 a.m., CO and SPA performed supervisory tours and looked in the cells with a flashlight.

At 12:17 a.m., SPA performed rounds and looked in all cells.

At 12:28 a.m., CO performed a supervisory tour and looked in the cells.

At 12:29 a.m. and 12:46 a.m., the SPA performed rounds and looked in the cells.

At 1:00 a.m. and 1:24 a.m., the CO performed a supervisory tour and looked in the cells.

At 1:33 a.m., the CO performed an inadequate supervisory tour and failed to look in all the cells .

At 2:00 a.m., the SPA completed his shift and returned to the cell and from that time, supervisory tours should have been completed every 15 minutes.

At 2:21 a.m., the CO and ADW M.O. performed a supervisory tour and looked in the Cells.

At 3:09 a.m., 3:30 a.m., 4:00 a.m., and 4:34 a.m., CO V.C. performed inadequate supervisory tours and failed to look in all the cells.

At 4:39 a.m., CO V.C. walked to cell 14.

At 5:10 a.m., CO G.M. performed supervisory rounds carrying a meal tray and looked in all cells and looked in cells 27 and 28 twice. CO G.M. also went back to cell 29 twice.

At 5:14 a.m., CO G.M. walked down the housing unit again and stopped and looked in

cell 29. The video then showed CO G.W. and CO V.C. enter cell 29. Two more CO's arrived and responded to cell 29.

At 5:18 a.m., a CO exits cell 29 and runs to the front of block.

At 5:27 a.m., medical arrived.

At 5:29 a.m., a female with a white shirt arrived.

At 5:35 a.m., a male with a white shirt arrived.

At 5:36 a.m., more medical staff arrived with a video recorder.

At 5:46 a.m., Urgicare arrived.

The failure of the security staff to perform adequate supervisory tours was in violation of 9 NYCRR §7003.3(c), Supervision of prisoners in facility housing areas which states: "At a minimum, general supervision shall be maintained in all facility housing areas when all prisoners are secured in their individual housing units".

18.     There were suicide letters given to another incarcerated individual from Velasco which stated that Velasco intended to kill himself and the letter stated what to do after his death. These letters were to be given to the family upon the individual's release and were not opened.

19.     A review of phone calls made by Velasco prior to his death revealed that Velasco had indicated an intent to kill himself, however, this information was not relayed to any NYC DOC staff.

20.     On 3/19/21 at 2:08 p.m., CHS staff N.J. noted that Velasco missed a nursing follow-up appointment as there was no escort available and the patient was not produced. However, it is noted that Velasco was deceased at that time.

21.     On 3/20/21 at 3:22 p.m. and 3/21/21 at 3:05 p.m., CHS staff member P.S. noted that Velasco had a missed a nursing appointment for follow-up and that DOC stated the patient did not want to come to the clinic, that patient would remain on the transportation list and the area captain was notified. However, it is noted that Velasco was deceased at that time.


ACTIONS REQUIRED**:**

TO THE COMMISSIONER OF THE NEW YORK CITY DEPARTMENT OF CORRECTIONS:

1.     The Commissioner shall conduct an investigation into the actions of the DOC officers assigned to supervise Velasco and their failure to complete required security rounds in comportment with the requirements of 9 NYCRR §7003.3. Administrative action should be taken if the officers are found to be in violation of department directives.

2.     The Commissioner shall review the policies and procedures regarding the supervision of incarcerated individuals. A copy of any revisions shall be forwarded to the Board to