

**HON. SYLVIA O. HINDS-RADIX**
*Corporation Counsel*

T**HE** C**ITY OF** N**EW** Y**ORK**
L**AW** D**EPARTMENT**
100 CHURCH STREET
NEW YORK, NY 10007

Kimberly M. Joyce
phone: (212) 356-2650
email: kjoyce@law.nyc.gov

November 14, 2022

**BY ECF**

Honorable Laura Taylor Swain
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

    Re: *Nunez, et al. v. City of New York et al,* 11-cv-5845 (LTS)

Your Honor:

  This letter is respectfully submitted on behalf of defendants the City of New York ("City") and the Department of Correction ("DOC" or "the Department") (collectively, "defendants") to provide the Court with an update prior to the status conference scheduled for Thursday, November 17, 2022 at 2:30 p.m.

**Status Update**

  Defendants appreciate the Monitor's status report submitted on October 28, 2022 (Dkt. 472), generally agree with its contents and assessments, and share the Monitor's concerns about the work that remains to be done. It is precisely this concern that continues to drive Mayor Adams and Commissioner Molina to take bold steps to effectuate necessary change throughout the Department. While the City's jails are not yet where they need to be, the City has taken significant steps towards fulfilling the requirements of the Action Plan endorsed by the Court on June 14, 2022 (Dkt. 466). Those steps provide the necessary foundation for continued reform.

1

Staffing

First, with respect to Department staffing, Commissioner Molina has demonstrated that Members of Service who are not performing optimally, or who do not adhere to Department policies, will face serious consequences. In this regard, Commissioner Molina has:

- Significantly revised the Department's supervisory structure by removing the former uniformed Chiefs (in their place he has streamlined the reporting structure and improved efficiency by appointing two Associate Commissioners and a number of Deputy Commissioners as outlined below);
- Suspended over 500 Members of Service (a greater number of suspensions than in the prior two years combined);
- Separated 30 Members of Service for being Absent Without Leave ("AWOL") for 5 or more consecutive days;
- Terminated over 180 Members of Service (more terminations than any Department Commissioner in recent years); and
- Reviewed and issued final determinations regarding over 2,200 disciplinary cases.

Further, last week, on November 10, 2022, after a long-term investigation of sick leave abuse by the City's Department of Investigation ("DOI"), three active Members of Service were arrested by DOI and are being prosecuted by the U.S. Attorney's Office for the Eastern District of New York for federal program fraud. DOI also referred ten other active Members of Service to DOC for internal discipline. DOC will review these referrals and move forward expeditiously.

Commissioner Molina is committed to creating a culture of accountability, excellence, and professionalism. In addition to suspensions and terminations where necessary, he has taken steps to ensure that staff who should be at work are at work, and has re-assigned staff to front-line, inmate facing posts. In this regard:

- On January 7, 2022 there were over 2,700 Members of Service out sick; as of today, the average of Members of Service out sick daily is 800;
- 47 Members of Service previously in violation of leave policy have returned to work;
- The Department has seen marked improvements in both the number of Members of Service out on Sick Leave and the number of Members of Service who are on Medically Modified status ("MMR") preventing them from having inmate-facing responsibilities. For example:
    - The daily average sick leave percentage in January 2022 was 26.1%. In October 2022 that rate was down to 12.2%;
    - The daily average MMR percentage was 8.9% in January 2022. In October 2022 that rate was down to 6.9%;
- As of September 15, 2022, the Department has re-deployed 18 Captains to facility/inmate-facing posts, 27 Captains to sensitive units within DOC, and continues to reassess staff for re-deployment; and
- The Department has begun to restructure schedules for Deputy Wardens ("DW") so that those who were previously scheduled to work between the hours of 7:00

a.m. and 3:00 p.m. will now be scheduled in the evening and on weekends to ensure sufficient supervisory coverage on all tours.

The Department is also committed to promoting Members of Service who are ready for additional responsibilities, and to developing future Department leaders. In this regard:

- The Department has identified 25 Captains for promotions to Assistant Deputy Warden ("ADW"), and 8 Assistant Deputy Wardens for promotion to Deputy Warden;
- The Commissioner recently restored the joint Cadet Education, Empowerment & Development for Success (CEEDS) Program, with John Jay College of Criminal Justice, which had been suspended for the preceding three years. There are currently 11 students enrolled in the Department's one-to two-year program that leads to careers with the New York City Department of Correction; and
- A class of 109 recruits is scheduled to graduate from the academy in December 2022, and the Department plans to onboard an additional academy class in early in 2023. Additionally, 75 recruits graduated from the academy on January 31, 2022, and another 46 recruits graduated on June 3, 2022.

To further invest in the growth and support of the Department's uniformed supervisors, since the beginning of the year, Commissioner Molina has appointed 28 new Department leaders, many from outside the City of New York, all of whom have significant correctional/law enforcement experience in other jurisdictions. Included among these new hires are:

- The Department's Senior Deputy Commissioner of Operations, who is a 30-year industry expert and executive leader from the Los Angeles Sheriff's Office. The Senior Deputy Commissioner of Operations began work at the Department on October 31, 2022;
- A Deputy Commissioner of Security Operations who has over 33 years of experience in the New York State correctional system. The Deputy Commissioner of Security Operations began work at the Department on May 16, 2022;
- A Deputy Commissioner of Administration who has over 29 years of law enforcement experience. The Deputy Commissioner of Administration began work at the Department on September 6, 2022; and
- A Deputy Commissioner of Classification, Custody Management & Facility Operations who has over 35-years of law enforcement experience. The Deputy Commissioner of Classification, Custody Management & Facility Operations began work at the Department on July 25, 2022.

In the short time since these individuals have joined the Department, substantial work has already been done including engaging consultants on inmate deaths, conducting major disturbance assessments, reviewing and tackling issues such as the classification system and intake, and working directly with Jim Austin on the new restrictive housing model. Significantly, in his recent report, the Monitor noted the "…candid, insightful, well-informed plans to fundamentally alter the way the Department operates" that have already begun under this new leadership team. Monitor's Report, dated October 28, 2022, page 7 (Dkt. 472).

> "These 28 Department leaders reflect a sea-change that bodes well for the development of solutions that fit the contours of the complex problems. Importantly, armed with experience in other systems, the new leadership team has been able to enter the system, begin to analyze problems and conceptualize solutions that have at their core the connection to correctional best practice that the Monitoring Team has been harping about for years."

Monitor's October 28th Report, pg. 7.

Moreover, the Monitor found the new leadership team to be comprised of "highly capable individuals who fully grasp the enormity of the task, and who have already identified tangible and practical solutions to address the myriad of issues" facing the Department. Monitor's October 28th Report, pg. 80. Further,

> "…the Commissioner's hiring decisions, clear mandates to his staff about what must occur, courage to make unpopular changes, and creativity to his approach to solving decades-old problems does provide some degree of confidence among the Monitoring Team that the Department is now poised to begin to build the foundation on which future improvements to staff practice will need to rest."

Monitor's October 28th Report, pg. 9.

In addition to this new executive leadership team, the defendants have now determined that new leadership is also necessary at the facility level if systemic change is to be realized and sustained. As the Court is likely aware, each facility that houses incarcerated individuals historically has had one Warden as its top supervisor. Due to applicable provisions of the New York State Civil Service Law and the New York City Administrative Code, each Warden has been promoted from within the Department's current uniformed ranks. At the May 24, 2022 conference before this Court, Commissioner Molina set forth a plan to support and improve the effectiveness of the current uniformed Wardens, whereby each facility would be led by one uniformed Warden and one civilian Assistant Commissioner who would report directly to the Associate Commissioner of Operations. At the time Commissioner Molina appeared before this Court he believed this plan would provide the structure necessary to effect change in the facilities. However, since the last Court conference, the Commissioner has determined that this plan will not work both because of the dual supervisory structure and a dearth of external candidates appropriate and qualified for the Assistant Commissioner positions.

As a result, defendants are conferring with the parties regarding a Stipulation and Proposed Order for the Court's consideration. The Stipulation and Proposed Order would waive certain provisions of State and Local law in order to expand the Commissioner's ability to hire individuals to serve as Warden from outside the Department's current uniformed ranks. Hiring wardens externally is an action that the Monitor has been urging the City to take for many years. The parties (SDNY and Legal Aid) have also stated their support for this action at both status conferences before Your Honor earlier this year. The City previously did not agree that such

action was necessary because the Department believed that bringing in Assistant Commissioners to co-manage facilities with Wardens would facilitate the necessary infusion of external knowledge and oversight at the facility level. Having tried unsuccessfully to fill these Assistant Commissioner positions, defendants respectfully submit that the proposed Stipulation and Order is both necessary and legally supportable under the Prison Litigation Reform Act, 42 U.S.C. § 1997e. An infusion of external expertise at the Warden level coupled with the new executive leadership team, and a focus on professional development and training to strengthen the Department's current Deputy Wardens, Assistant Deputy Wardens and Captains, will provide the necessary foundation for change. As a result, the City has determined that it is neither necessary nor legally appropriate at this time to seek to expand the proposed waiver request to other facility leadership positions.

<u>Citywide Efforts</u>

Second, as defendants previously reported to the Court, to make reforming the City's jails a citywide priority, the City created the Rikers Interagency Task Force ("Task Force") to support the Nunez Action Plan. The Task Force has met weekly since June 2022. The Task Force is led by Deputy Mayor Philip Banks and Chief Counsel to the Mayor Brendan McGuire. The Law Department creates the weekly agenda, with input from the member agencies, which include the Office of Labor Relations, Office of Management and Budget, Department of Citywide Administrative Services, Correctional Health Services, Law Department, Department of Correction, Mayor's Counsel's Office, Department of Design & Construction, Mayor's Office of Criminal Justice, and Mayor's Office of Contract Services. The Task Force ensures that all relevant City agencies are working together to operationalize the Action Plan, and to ensure that the Department has the necessary resources and commitments to implement the Action Plan.

For example, collaboration during Task Force meetings has resulted in expeditious vetting of new hires, streamlined appointments of new staff and promotional positions, and approval of funding needs. As noted by the Monitor, the Task Force has "effectively resolved a number of issues that required multiagency collaboration and cooperation." Monitor's October 28th Report, pg. 8.

In the coming months, the Task Force will also coordinate initiatives concerning the length of stay of incarcerated individuals and interagency review of in-custody and compassionate release deaths, with the goal of improving cooperation and efficiency among agencies and the City's partners in State government, so as to improve outcomes for individuals in the City's jails.

Additionally, the City confirms that, through Task Force members the Mayor's Office of Criminal Justice and the Mayor's Counsel's Office, it has complied with the Court's order to provide copies of the October 28, 2022 status report "to relevant stakeholders whose work affects the court processing times of cases involving Rikers detainees. . . [including] the leadership of the District Attorneys' Offices, the Office of Court Administration, relevant public defenders organizations, and other relevant stakeholders . . . ." As further directed by the Court, the City's transmittal to these entities included a copy of the status report along with a statement that "the Court is concerned about prolonged pretrial stays of incarcerated individuals at Rikers."

(Dkt. 473). The City shares the concern of the Court and the Monitor with expediting cases of those individuals who have been incarcerated for a prolonged period at Rikers. To that end, the Mayor's Office of Criminal Justice has been working with the District Attorney's Offices to identify and expedite any such cases. The City is also working with the Governor's Office and other relevant stakeholders, including the Center for Court Innovation, on a task force to shorten court processing times and to focus on the cases of those who have been in pretrial detention for a substantial period of time at Rikers.

**Legal Aid's Motion for Receivership**

During pre-conference communications between the parties, Legal Aid has stated its intention to the City to file a motion with the Court for contempt and the appointment of a receiver. Defendants respectfully submit that the Court should deny Legal Aid's application to make such a motion, and the City will oppose such a motion should Legal Aid be permitted to proceed. As the Monitor keenly noted in his report: "[i]f it were simply a matter of requiring certain things to occur via a regulation or court order, the Department's problems would have been resolved years ago." Monitor's October 28th Report, pg. 4. Indeed, defendants respectfully submit that a receiver is not the answer to solving the Department's problems. There is nothing that a receiver would do that the Department and the City are not already doing. In this moment bold remedies are necessary, and this administration is ready, willing, and legally able to take such steps. In instances where defendants determine that measures are required that the defendants are not legally able to take, defendants are committed to seeking appropriate relief from the Court (such as the request with respect to hiring wardens, as noted above). Taking the time to oppose a motion for a receiver will necessarily detract the Department and the City's time and efforts from the real reform issues at hand. Receiverships are ordered as a last resort, and plaintiffs cannot demonstrate that such extreme action is necessary or appropriate.

Change does not happen overnight, and decades-long problems will not be solved in the first year of this administration. As the Monitor noted in his report:

> "[t]he problems are so deeply entrenched and complicated that no single person, power, or authority will be able to fix them on the rapid schedule that the gravity of the problems demand. A quick fix is simply not possible. Systematically, the basic practices of the systems must each be individually dissected, corrected, and then ultimately adopted by the staff…
>
> … [t]he perfect storm of the past two years further destabilized a system that was already in crisis, one reeling from a poor foundation weakened by decades of neglect and internal and external mismanagement"

Monitor's October 28th Report, pgs 5, 4. Nonetheless, the Court, the Monitor, and the Parties have never had such a willing group of individuals ready to keep making the difficult and unpopular choices to improve conditions.

6

Defendants acknowledge that the City is not where it wants to be in terms of the conditions in the City's jails, the levels of violence, or the deaths in custody. Defendants know that there is considerable work to be done to improve the conditions for every incarcerated individual and staff member who lives or works at Department facilities; which is why defendants have agreed to each of the Monitor's Immediate Step Recommendations to Prevent Self-Harm made in the October 28, 2022 Status Report (pp. 29-30) and are working with the Monitoring Team and recently onboarded Department executive leadership on the specifics of each's recommendation's implementation. The City and Department will meet regularly with the Monitor and his team to apprise them of implementation and seek their input. It is clear that the Department and the City are the ones best positioned to continue this work. The appointment of a receiver would be akin to hitting a restart button and would cause unnecessary disruption in the new leadership.

The Monitor noted in his report that this Monitoring Period "culminated in an important step – for the first time since the inception of the Consent Judgment, the Department has moved out of Non-Compliance with the requirement to impose timely, appropriate, and meaningful accountability as required by the Consent Judgment § VIII, ¶ 1, and meaningful requirements of this section of the Consent Judgment appears achievable." Monitor's October 28th Report, pg. 96. While defendants recognize that there are other areas of the Consent Judgment where compliance has not yet been achieved, positive change is happening, and will continue to happen due to this Commissioner and this Mayor.

Defendants look forward to continuing to work collaboratively with the Monitor and his team to achieve the Action Plan's goals, and toward the shared goal of a safer and more humane jail system for all. Additionally, Commissioner Molina and I look forward to meeting with the Court on November 17th, with some of the Department's executive leadership team present, to answer whatever questions the Court may have. I reiterate the City's full commitment to continued reform at Rikers, and I thank the Court for its time and consideration of the City's submission.

Respectfully submitted,

*/s/ Kimberly M. Joyce*
Kimberly M. Joyce
Senior Counsel


CC:   BY ECF
      *All counsel of record*