

199 Water Street
New York, NY 10038
(212) 577-3300
https://www.legalaidnyc.org/

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Chief Attorney*
Criminal Practice

Mary Lynne Werlwas
*Director*
Prisoners' Rights Project

November 14, 2022

*Via ECF*
Hon. Chief Judge Laura Taylor Swain
United States District Court for the Southern District of New York
500 Pearl Street
New York, NY 10006

      Re:     *Nuñez v. City of New York,* 11-civ-5845 (LTS)

Your Honor:

      We write respectfully on behalf of the Plaintiff Class in connection with the November 17, 2022 conference to address the Second Status Report on DOC's Action Plan by the *Nuñez* Independent Monitor filed on October 28, 2022 (Dkt. 472) and to further describe our position on the necessary next steps beyond the summary provided in the Monitor's report today (Dkt. 475).

      The October 28 Report describes a level of imminent danger to the Plaintiff Class remarkably worse than the conditions that necessitated entry of the Consent Judgment in 2015. Despite seven years of intensive monitoring and four successive remedial orders, the City has not complied with the core requirements of the Court-ordered relief. Uses of force remain rampant with few consequences, investigations and staff discipline face huge backlogs, and security failures abound in jails effectively left unsupervised. The multitude of plans, programs, and promises the City has announced have not worked: whatever steps they have taken, members of the Plaintiff Class are being injured and dying in their custody at an extraordinary rate due to Defendants' non-compliance. Seven years into this Consent Judgment, the jails have not been made safer. In the face of this humanitarian crisis, further reliance on the City's promises or on court orders that won't be followed cannot abate the risks of harm Plaintiffs face every day they remain incarcerated by the City. A full review of the facts will demonstrate that the continuing violation of Plaintiffs' constitutional rights cannot be redressed absent appointment of a receiver to reverse the City's persistent failure to follow this Court's orders. As we explain below, we intend to file a motion setting forth the basis for such relief, and respectfully ask the Court to endorse the briefing schedule set forth below.

      <u>Harm to the Plaintiff Class Under the "Action Plan"</u>

      The October 28 Report shows that the Plaintiff Class faces more deadly and pervasive harm now than it did when the Court first entered the Consent Judgment. Dkt. 472, at 60-70. In particular, the levels of violence that Plaintiffs suffer at the hands of uniformed staff are catastrophically high: staff have used force against Plaintiff Class members 5,135 times in the first nine months of this year alone. *Id.* at 60. Controlled for population, the resultant rate of 10.24 uses of force per 100 people in custody vastly exceeds the 3.96 rate from 2016. *Id*. When force is used in 2022, it more often results in serious injuries than in 2016. *Id.* at 62. Moreover, the Monitor cited the prevalence of

**Justice in Every Borough.**

"avoidable, unnecessary and excessive uses of force," *(id.* at 61) and the astonishing number of use of force incidents that occur where staff had violated basic duties such as locking cell doors or properly applying restraints. *Id.* at 106 & n.97.

Alarmingly, the Monitor reports that the jails *still* are "without sufficient staff to provide adequate safety and access to services." *Id.* at 32.  Each day, "a significant portion of the Department's workforce is out sick or on modified duty" and on a "daily basis, some housing unit posts continue to not have any staff assigned to them … and staff regularly work overtime (at least double, if not *triple shifts*)." *Id.*  The Monitor further reports that staff abandon their housing posts, leaving incarcerated people without supervision and requiring staff performing other essential duties such as facilitating recreation or other services to cover these posts.  *Id.*

These failures lead not only to injury, but to death.  At the time the Court so-ordered the Action Plan, six Class members had died this year; under the Action Plan, 12 *more* Class members have died.  Dkt. 472, Appendix at x-xi.[1]  The circumstances of many of these deaths directly implicate this Court's orders, such as failures to follow the suicide prevention protocol, unstaffed posts, staff on medically-monitored status failing to intervene, failure to round, and failure to improve supervision and basic security practices. *See* First Remedial Order (Dkt. 350) at § A ¶ 1, A ¶ 2, A ¶ 4; Second Remedial Order (Dkt. 398) at ¶¶ 1(i)(a), 1.i.b; Action Plan (Dkt. 465) at §§ A ¶1(d), A ¶ 3(a), C ¶ 3, D ¶ 2.  For there to be 18 deaths in just ten months underscores the gravity of the harm faced by Plaintiffs every day they are denied relief.  That these deaths have occurred despite the unprecedented scrutiny of the jails evidences the intractability of the City's failures.

Progress Under the Action Plan

Although the Action Plan was approved by the Court on June 14, 2022 (Dkt. 465), its operative requirements almost entirely mirrored recommendations made by the Monitor on March 16, 2022 (Dkt. 438, at 67-74) and by April, the City claimed it was implementing many of those recommendations.  *See* Letter to Court, April 25, 2022 (Dkt. 450) at 3-5.  As the Monitor stated, the "timelines in no way do justice to the gravity of the situation [but]…. represent the best the City and Department have reported they can do at this juncture." Letter to Court, June 10, 2022 (Dkt. 462) at 2.  The Monitor cautioned that, in addition to following the Action Plan, the City "must bring all resources to bear to...eliminate any constraints that are inhibiting the City and Department from fully addressing the Monitoring Team's recommendations," and "*immediately* and *aggressively* remove all barriers to implementation of initiatives that are necessary to bring safety and stability to the jails. Given the daily risk of harm to incarcerated individuals and staff, *nothing less should be tolerated."* Monitor Report, April 20, 2022 (Dkt. 445) at 7, 9 (emphasis supplied).

Despite the relatively low bar set by the Action Plan, which is replete with vague terms and absent timelines, the facts reported in the October 28 Report demonstrate that the City did not fulfill its April promises—let alone "immediately and aggressively" resolve obstacles to reform. It did not hire any assistant commissioners to work with wardens (Dkt. 472, at 15-16); did not hire civilians to work in places long-identified as appropriate for civilianized roles (Dkt. 472, at 14); and did not

---

[1] Since the October 28, 2022 Monitor Report, another person has died in the custody of Defendants: Gilberto Garcia, on October 31, 2022.  Ransom, Jan and Jonah Bromwich, *Tracking the Deaths in New York City's Jail System*, The New York Times (November 4, 2022), https://www.nytimes.com/article/rikers-deaths-jail.html.

complete development of a restrictive housing model (Dkt. 472, at 92-93).  Nor did it remedy the violations of this Court's orders on other fronts. For example:

- Over 1,000 use of force incidents are pending investigation, and nearly 93% of full investigations closed in the previous period were excessively long, in violation of ¶ VII.9(a) of the Consent Judgment.
- The average caseload of Full ID investigators increased from 23 to 28 cases from July 2021 to July 2022, despite the requirement of caseload caps set forth in § B ¶ 3 of the First Remedial Order.  Dkt. 472, at 136-140.
- Over 1,100 disciplinary cases in which DOC found misconduct related to uses of force had yet to be adjudicated (*id.* at 152).
- The Monitor found that "the number of suicides, and the different circumstances in which they occurred, strongly suggest that additional steps to strengthen practices for preventing, identifying, and addressing the risk of suicide beyond the policy updates and staff messaging that occurred via the Second Remedial Order and the Action Plan are necessary." *Id*. at 28.
- Despite the Monitor's long-repeated encouragement for the Department to use suspensions as a close-in-time accountability tool (*see* Dkt. 472, at 150)—and in the face of extraordinary rates of force and increased severity of injury (*supra*)— Defendants have decreased the number of use of force-related suspensions in 2022 as compared to prior years.  Dkt. 472, Appendix at vii.
- Not only has the Department remained non-compliant with the requirement to minimize unnecessary uses of force by emergency response teams like the E.S.U., the nucleus of the culture of violence this action seeks to dismantle, but under the current administration, the E.S.U. began using tasers on incarcerated people for the first time since 2017.  *Id.* at 118-119.

We will not restate here all the Monitor's findings, but highlight two areas of non-compliance that demonstrate the inadequacy of the current process to providing relief to the Plaintiff Class.

*Failures to Improve Facility Leadership and Supervision.* The Monitor has identified the shortcomings of facility leadership as a barrier to reform for at least three and a half years. *See* Seventh Monitor Report (Dkt. 327) at 16-17, 19, 23; Eleventh Monitor Report (Dkt. 368) at 8-10.  The failure of these leaders to dismantle the violent culture in the facilities is central to the City's longstanding inability to cure the constitutional violations in this case—indeed, many requirements of this Court's four remedial orders are targeted at correcting entrenched supervision failures in the facility.  Yet DOC still does not have an adequate and accountable supervisory structure, and the October 28 Report describes the Department moving *backwards* in key respects.

For example, notwithstanding the requirement that DOC assign more Captains to facilities and "substantially *increase* the number of Assistant Deputy Wardens" (Dkt. 350, § A ¶ 4) to supervise these captains, the number of Captains and ADWs has *declined:* whereas in January 2021 the Department had 80 ADWs and 523 Captains in facilities and court commands, by June 2022 those numbers were 49 and 474 respectively. Dkt. 472, at 112-115.  Moreover, the Department has not even had Deputy Wardens in the jails on weekends or evenings, an astonishing admission given

that line staff are working double or triple shifts and the dangerous conditions in the facilities. *Id.* at 37. While the Department is currently promoting 25 Captains to ADW positions, the net gain is minimal, as they also are promoting 7 ADWs to Deputy Wardens; these promotions will also exacerbate the shortage of Captains. *Id.* at 115.

The Monitor deemed the City non-compliant with these requirements. *Id.* Yet the City offers no plan for fixing this daisy-chain of shortage of supervisors other than to maintain the status quo of the civil service process—the exact strategy that caused non-compliance in the first place, and the opposite of the "aggressive and immediate" action the Monitor demanded in April. *See supra.*

The Department also fails to hold the supervisors they *do* have accountable for performing their jobs incompetently.  For example, facility leaders continue to conduct "*patently* biased, unreasonable, or inadequate" use of force reviews (Dkt. 472, at 107, emphasis in original)—expressly prohibited by the First Remedial Order § A ¶ 1(i) (Dkt. 350). That Order also requires the Department to take disciplinary or corrective actions when leaders do conduct "biased, unreasonable and inadequate" reviews (*id.* at ¶ 1(ii)), but there is no evidence the Department has done so.  Indeed, the City informs us that in 2022, it has initiated no discipline – formal or informal – against any personnel above the rank of ADW in connection with their obligations under the Court's orders.

The City's principal plan for redressing this supervisory vacuum appears to rest on the proposed expansion of its authority to hire wardens externally (Dkt. 475, at 2): that with such authority, the Department *might* replace some indeterminate number of the current wardens with external hires at some indeterminate time; and that *if* hired, these new wardens might bring skills that trickle down to the Deputy Wardens and lower supervisory ranks. While expanding the hiring pool is necessary, this entirely speculative chain of reasoning is not a plan, let alone a plan that can yield results in a reasonable time.

Indeed, the process leading to this proposed expansion of a warden hiring pool illustrates the fundamental difficulty in making progress in any meaningful time under the current structure.  The Monitor formally recommended 18 months ago that the City expand the pool of potential wardens and Deputy Wardens to include correction professionals from other jurisdictions. (11th Report, Dkt. 368, at 10, 15). Defendants objected that this might be inconsistent with certain state and local laws, yet in protracted negotiations refused to agree to an order pursuant to 18 U.S.C. § 3626(a)(1)(b). Thus, the Second Remedial Order directed Defendants to confer with relevant state officials and other stakeholders about how those barriers might be overcome. Dkt. 350.  Yet again, rather than seeking a court order, Defendants created a substitute of hiring new civilian leaders to share responsibility with wardens.  The fundamental flaws of such a structure were plain from the moment it was proposed.  Plaintiffs objected, and so too did the Monitoring Team—Deputy Monitor Anna Friedberg noted in the May 24, 2022 court conference, "The record is clear that leadership in the facilities are lacking and the workaround developed is simply insufficient at this stage."  Transcript of May 24, 2022 Court Conference (Dkt. No. 460) at 18:19-21.  In a letter describing the Action Plan, the Monitor stated that expanding the warden applicant pool was "*necessary* to ensure the success of the reform effort."  Letter to Court, June 10, 2022 (Dkt. 462), at 3 (emphasis supplied).

Nonetheless, the Action Plan incorporated this non-solution, and the City was obligated to hire the new civilian leaders. Dkt. 465, § A(3)(b)(ii)(2)(b).  But as the October 28 Report shows, the City did not even implement its own plan, and *did not hire a single civilian leader* meant to serve in this warden-adjacent role. Dkt. 472, at 15-16.  Only now, after 18 months of recommendations and significant expenditure of party and judicial resources, has the City agreed to seek a court order to hire wardens outside the Department.  This obviously necessary step took over a year and a half to simply *initiate*.  Notably, the City refuses to seek the same tool to address the shortage of Deputy Wardens—who, unlike wardens, are represented by a labor union—notwithstanding the Monitor's prior recommendation that they do so and its command to aggressively remove *all* barriers to relief. Dkt. 368, at 15.  This is not a sustainable model for resolving the many *more* obstacles to compliance that the City has failed to redress, and that continue to harm the Plaintiff Class.

*Intake*.  The Action Plan and Second Remedial Order mandated that the City "[p]rocess all incarcerated individuals…through Intake and place them in an assigned housing unit within 24 hours," and use "a reliable system to track and record the amount of time any incarcerated individual is held in Intake and any instance when an incarcerated individual remains in Intake for more than 24 hours." Dkt. 465, E.3.a;  Dkt. 398, 1.i.c.  In November 2021, the Department reported zero New Admission intake overstays, and the Monitor conveyed this representation in its report.  Dkt. 420, at iii-iv.  Plaintiffs' Counsel were concerned about the reliability of this representation, as we had reliable reports to the contrary, which we provided to the Monitor and Defendants.  In subsequent reports, the Monitor and Nunez Compliance Unit indeed confirmed several examples of intake overstays.  Dkt. 438, 47-48; Dkt. 467, Appendix at xii.  Indeed, the same week Defendants were proposing their Action Plan, the Board of Correction reported significant violations of the 24-hour rule. BOC Meeting, June 14, 2022, at 1:55:25.[2]  Board documents from late June described in detail cases of individuals locked in intake shower cages filled with blood and feces – after the Action Plan had been ordered. *See* Emails of Melissa Cintron-Hernandez, June 28, 2022, *attached*.  These are plain violations of the requirements of the Action Plan and Second Remedial Order.

More astonishingly, the BOC documents revealed that the Department's data on intake overstays had been purposefully manipulated.  A BOC memorandum noted, "Board staff observed and documented a pattern of data manipulation to DOC's Intake Dashboard.  Specifically, Board staff documented 16 instances [over the period of a few days] where Department staff retroactively changed a person's "In-Custody Start Time," in what appears to be an effort to obscure or "cure" 24-hour housing violations." Memo to Amanda Masters, July 5, 2022, at 1.  The Monitor referenced this information in its October 28 Report, concluding it could not say why the data had been altered.  The Monitor concluded that at present there *is* no "reliable data" on intake overstays, and the extent of 24-hour violations "is simply unknown." Dkt. 472 at 87.  Not only is this an independent violation of a separate provision of the Action Plan and Second Remedial Order's requirement of a reliable tracking system, but it severely undermines the ability of the parties, Monitor, and Court to rely upon the Department's own data about compliance with the Court's orders.

---

[2] Available at https://www.youtube.com/watch?v=J0FJNRoy8ps&t=6925s.

<u>Next Steps to Remedy Seven Years of Non-Compliance with Court Orders</u>

The Court entered the Consent Judgment in this matter over 7 years ago. Dkt. 249. The City has failed to substantially comply with the core provisions of that Consent Judgment, including requirements to implement the use of force directive; conduct timely, fair and unbiased investigations of uses of force; discipline staff for misconduct with timely and effective sanctions; and follow basic security practices to protect incarcerated people under the age of 19. *See, e.g.*, Dkt. 350, at 2. The Court entered a Remedial Order on August 14, 2020 to "address…on-going non-compliance" (Dkt. 350), but achieved little traction in these core areas. Following the Monitor's reports of immediate danger and chaos in the jails (Dkts. 378, 380, 387), the Court entered the Second Remedial Order targeting discrete operational practices causing danger and violence in the facilities, such including overstays in intake areas, suicide prevention, basic security protocols, and revamping facility leadership (Dkt. 398) and a Third Remedial Order requiring hiring a disciplinary manager and accelerating a subset of discipline cases (Dkt. 424). But these orders failed to abate the non-compliance with core requirements of the Consent Judgment, as the City did not obey them. *See, e.g.,* Dkt. 438, at 44 ("The Monitoring Team is disappointed to report that the initiatives required by the Second Remedial Order...to address dire and emergent conditions in the jails and the Department's persistent Non-Compliance with the requirements of the Consent Judgment have largely fallen flat."). Nor has Defendants' self-styled Action Plan brought them into compliance with the Court's prior orders.

The Plaintiff Class is being subjected to grave and immediate harm by the City's non-compliance. Excessive use of force is rampant. Eighteen people have died this year in City custody. The City jails are a humanitarian crisis. The City has demonstrated for seven years that it is unable to remedy this harm. A succession of orders by this Court seeking to enforce its existing injunction have proven insufficient, as the City does not comply with this Court's orders. In these extraordinary circumstances, appointment of a receiver with the power and duty to take robust and timely action where Defendants will not, without protracted motion practice before the court, is a necessary remedy to ensure compliance. *See, e.g., Plata v. Schwarznegger,* 2005 WL 2932253 (N.D. Cal. October 3, 2005); *United States v. Hinds Cty.*, 2022 WL 3022385 (S.D. Miss. July 29, 2022); *Dixon v. Barry,* 967 F. Supp. 535, 550-55 (D.D.C. 1997).

Plaintiffs therefore intend to file a motion setting forth the facts demonstrating contempt and the need to appoint a receiver to bring Defendants into compliance with the Court's orders and abate the on-going constitutional violations. Plaintiffs have conferred with Defendants, and they do not consent to appointment of a receiver. Plaintiffs therefore intend to file a motion for contempt and appointment of a receiver on December 15, 2022. We intend to support the motion with indisputable facts, principally from the Monitor's reports and City's own data. We propose that Defendants respond by January 13, 2023, and Plaintiffs reply on January 27, 2023. The City's request for 60 days to respond is vastly excessive, given their intimate familiarity with the facts in the matter and the gravity of the harm that accrues to Plaintiffs every day. Should any material facts be disputed, the parties will propose to the Court procedural mechanisms for resolving those disputes.

<u>The Monitor's Request to Delay Provision of Updated Information Should Be Denied.</u>

Plaintiffs oppose the Monitor's request to delay provision of its next report from January 31, 2023 to March 31, 2023.  The Action Plan's reporting schedule suspended the Monitor's duty to report on most provisions of the Consent Judgment and remedial orders, but accelerated the timeline for provision of the new reports —both because of the imminent danger in the jails, but also because these conditions may necessarily compel further steps while the Plan is underway.  We are sensitive to the demands on the resources of the Monitoring Team and appreciate their views on when to conduct their assessments.  Plaintiffs thus proposed a compromise whereby Defendants would provide a January 2023 update of several key facts reported in the October 28 report, and other discrete measures of progress.  But Defendants have baselessly insisted that any such update—of the very matters being discussed in Court this week—must be kept secret from the public and the Court through a confidentiality order.  Defendants asserted no privilege or privacy interests in such information, nor could they.  Because Defendants were unable to agree to a reasonable alternative to the Monitor's January 28, 2023 Report, and information on the emergency situation in the jails cannot be delayed until March, Plaintiffs oppose the Monitor's request.

 We thank the Court for its attention to these serious matters.

| | |
|---|---|
| Respectfully submitted,<br>/s/<br>Mary Lynne Werlwas<br>Kayla Simpson<br>David Billingsley | /s/<br>Debra L. Greenberger<br>Jonathan Abady |
| | EMERY CELLI BRINCKERHOFF<br>ABADY WARD & MAAZEL LLP |
| THE LEGAL AID SOCIETY<br>PRISONERS' RIGHTS PROJECT | Counsel for Plaintiff Class |
| Counsel for Plaintiff Class | |

# ATTACHMENT

## Cintron Hernandez, Melissa (BOC)

**From:** Baily, ███ (BOC)
**Sent:** Tuesday, June 28, 2022 9:48 PM
**To:** Masters, Amanda (BOC); Rivas Salas, Nashla (BOC); McFarlane, ███ (BOC)
**Cc:** Cintron Hernandez, Melissa (BOC); Georges-Yilla, Jasmine (BOC)
**Subject:** Re: ███ - EMTC Intake

I reviewed the Genetec footage from 6/26 pretty thoroughly and I couldn't find any visual evidence to suggest that Mr. ███ was ever removed from intake decontamination shower area from when he was placed there at 6:29 AM until when it appears he was removed on a gurney at 6:02 PM (11.5 hours later). When he was finally removed on a gurney at 6:02 PM, he was wearing the same outfit and he was shoeless (as he was when he entered early in the morning).



**From:** Masters, Amanda (BOC) <amasters@boc.nyc.gov>
**Sent:** Tuesday, June 28, 2022 3:50 PM
**To:** Baily, ███ (BOC) <bbaily@boc.nyc.gov>; Rivas Salas, Nashla (BOC) <nsalas@boc.nyc.gov>; McFarlane, ███ (BOC) <JMcFarlane@boc.nyc.gov>
**Cc:** Cintron Hernandez, Melissa (BOC) <mcintronhernandez@boc.nyc.gov>; Georges-Yilla, Jasmine (BOC) <JGeorges-Yilla@boc.nyc.gov>
**Subject:** RE: ███ - EMTC Intake

███

**From:** Baily, ███ (BOC) <bbaily@boc.nyc.gov>
**Sent:** Tuesday, June 28, 2022 3:41 PM
**To:** Rivas Salas, Nashla (BOC) <nsalas@boc.nyc.gov>; Masters, Amanda (BOC) <amasters@boc.nyc.gov>; McFarlane, ███ (BOC) <JMcFarlane@boc.nyc.gov>
**Cc:** Cintron Hernandez, Melissa (BOC) <mcintronhernandez@boc.nyc.gov>; Georges-Yilla, Jasmine (BOC) <JGeorges-Yilla@boc.nyc.gov>
**Subject:** ███ - EMTC Intake

Hi All,

It came to my attention that ███ was seriously injured in the intake at EMTC on Sunday. He's currently in the Intensive Care Unit at Bellevue Hospital, where I just met with him (see Attachments A, B, C for photos of him, taken with his permission). I observed injuries to his face, hands and legs. I tried to interview him but he's in a great deal of pain and wasn't able to speak much.

Mr. ███ was brought into custody on 6/22/22. His court screening form notes: "MEDICAL ATTN/PSYCH EVAL". On the morning of 6/26, he was involved in a UOF with intake staff (the UOF was limited to the application of chemical agent). Following the UOF, he was taken to the decontamination area where he was

1

presumably locked in the shower stall there (a small steel cage). Mr. ▮ remained in this area for a currently undetermined amount of time. But based on my initial Genetec review, it's possible he was left in the shower stall for approximately 12 hours. During the course of these 12 hours, it appears he was serious injured by others or himself. The Department has so far not reported on this incident as far as I can tell. Attached is a slideshow of the initial Genetec review I put together (see Attachment D).

This afternoon, I visited the EMTC intake decontamination area where Mr. ▮ was held (and possibly injured). I found a person in custody locked in the shower stall and screaming hysterically. He reported to me that he had been placed in the stall by ESU officers more than two hours earlier and that there was human feces and blood present in the stall/cage, which I documented (see Attachment E and F). I reported this situation to the Intake Captain (Captain Jeffries), who told me he would have this person removed from the decontamination area immediately.

Thanks,

**Memorandum**

Date: July 5, 2022
To: Amanda Masters
From: Board Staff
Re: An Update to the June 2022 Memo on Conditions in the Intake Area at EMTC

---

Background

Since the June 14, 2022, Board meeting, Board staff have continued to monitor closely the conditions at EMTC. This memo focuses on four topics: 1) main intake pens that are less crowded and cleaner; 2) unsanitary and inhumane conditions in two holding pens in the intake area; 3) the Department's misuse of the decontamination area; and 4) continued safety concerns due to insufficient staffing and unstaffed B-posts.[1]

All findings are based on Board staff's in-person and virtual observations, interviews with people in custody and DOC staff, review of DOC records, and digital data and information available on DOC systems (e.g., Genetec and DOC Intake Dashboard). Board staff have shared all concerns with facility leadership and will continue to work with DOC to address them.

Findings

*Main Intake*

Over the past month, operations in the main intake at EMTC have improved, as the intake pens appear to be overcrowded less frequently than in the previous month. In addition, it appears that cleaning crew sanitation rounds are occurring more regularly. Also, the facility opened an officer station in the back of the intake area, allowing for the possibility of increased security in that area. In addition, at the request of Board staff and the EMTC leadership's subsequent direction, Department staff installed a bench in intake pen #8—a pen which previously lacked any seating and forced people in custody, who were in intake for extended periods, to sleep or lay on the floor.

In mid-June, while monitoring the Department's Intake Dashboard—a computer program that tracks time in custody for all new admissions, to ensure compliance with the requirement that all newly admitted people be housed within 24 hours of entering DOC custody—Board staff observed and documented a pattern of data manipulation to DOC's Intake Dashboard. Specifically, Board staff documented 16 instances where Department staff retroactively changed a person's "In Custody Start Time," in what appears to be an effort to obscure or "cure" 24-hour housing violations. On June 16, 2022, Board staff reported these findings to the Acting Warden, who, in turn, addressed them promptly.

Lastly, the Department has significantly increased their use of the body scanner at EMTC. Following the June 14th meeting, the Department has scanned over 300 people compared to the seven people that were scanned between June 1st to June 12th.

Despite these improvements, there are still many safety concerns regarding the housing areas at EMTC, especially as they relate to unstaffed B-posts, the facility's misuse of its shower decontamination area in

---

[1] BOC staff have continued to closely monitor unstaffed posts at EMTC and learned that on June 28, 2022, there were 24 B-Post areas without a B-post officer at EMTC.

1

the main intake, and the unsanitary and inhumane conditions in two of the main intake's holding pens. The three incidents described below demonstrate these safety concerns and are a sample of our findings:

| Date | Area of Concern | Description |
|---|---|---|
| June 30, 2022 | Unstaffed B Posts | At approximately 9:15AM, ▮▮▮▮▮ was brutally beaten by several people in custody in the bathroom in 7 Lower at EMTC, a new admission housing area. There was no B-Post staff on the floor at the time of the assault, and consequently there was no staff available to intervene or help Mr. ▮▮▮ until 5 minutes after the assault had ended. Thereafter, Mr. ▮▮▮ was transported to Elmhurst Hospital, where he was intubated. As of July 5, Mr. ▮▮▮ remains hospitalized, and the Department has not reported this incident to the DOC Central Operations Desk ("COD") as a "Serious Injury" or as an "Unresponsive/Unconscious Inmate." |
| June 25, 2022 | Inappropriate Use of Decontamination Area | ▮▮▮▮▮ was involved in a questionable use of force ("UOF") in 1 Main—a Mental Observation Housing area—at approximately 2:05 PM. Following the UOF, the Department escorted him to the main clinic holding pen, where he was involved in a fight and UOF and was sprayed with OC. Thereafter, DOC staff removed him from the clinic and placed him in the decontamination shower cage in the Main Intake. Video footage suggests that Mr. ▮▮▮ remained in the decontamination shower cage until the following morning, at which time he was briefly let out, only to become subject to another UOF, as he was sprayed again with OC for disobeying orders. DOC staff then escorted Mr. ▮▮▮ back to the decontamination shower cage, where it appears he remained until approximately 6:00 PM.<br><br>In sum, it appears that Mr. ▮▮▮ might have been confined to the decontamination shower cage for more than 24 hours, without access to food or medical or mental health assistance. It is difficult to determine precisely how long Mr. ▮▮▮ was in the shower cage, as there are no working Genetec cameras in this area.<br><br>Eventually, a medical emergency was activated and EMS transported Mr. ▮▮▮ to the hospital. People in custody informed Board staff that Mr. ▮▮▮ persistently engaged in self-harm during the many hours he was in the shower cage—banging his head and punching and kicking the metal cage. Mr. ▮▮▮ has been in the Intensive Care Unit at Bellevue Hospital since June 27, and Board staff met with him there, and documented extensive injuries to his body.<br><br>Despite his involvement in multiple uses of force, beginning at 2:05 PM on June 25, Mr. ▮▮▮ was not seen by CHS staff until approximately 6:00 PM on 6/26/22. Moreover, despite the nature of Mr. ▮▮▮ extensive physical injuries, DOC reported Mr. ▮▮▮'s injuries as being associated with the Use of Force incidents and fight, and *not* self-harm. |

2

| June 25, 2022 | Unsanitary Conditions in Intake Pen 9 | At 11:33PM, a still-unidentified person in custody defecated on himself and soiled his clothes and the floor in the Main Intake in Pen #9, which does not have a toilet or sink. He and others in custody spent the next 12 hours in that pen, at times sleeping on the floor in the feces. The unidentified person remained in his soiled uniform for nearly 12 hours and was able to change at approximately 11:16 AM, only after another person in custody removed the clean uniform that he had on and offered it to that still-unidentified person. |
|---|---|---|

*Other Concerns*

Additionally, BOC staff are concerned about people in custody's ability to access other essential services, such as linen exchange, the ability to meet with a legal aid representative and access to the Department's grievance system. This is important because of the high census at the facility and the fact that detainees are spending longer than 10 days at EMTC. On July 5, 2022, there were 715 people in EMTC and 34% (n=208) of detainees (non-city sentenced) had been in custody between 15 to 30 days. BOC staff have been working with facility leadership to ensure that the following needs are met:
1. Ensure that the facility gets assigned a grievance officer to assist with speaking to people in custody and collecting grievance forms.
2. Ensure that EMTC gets a permanent Legal Aid employee to help connect people with their attorney in a confidential setting. Legal Aid represents approximately 60 percent of the population at EMTC
3. Ensure that Linen Exchange occurs more frequently.

**Recommendations**
- The Department should create and commit to a plan to staff all B-Posts in all housing areas at EMTC on all three tours. It is important to note that approximately 90% of all serious injuries occur in housing areas.
- The Department should install Genetec cameras in the Decontamination Shower Area in the EMTC Main Intake and commit to a plan to closely monitor this area for misuse.
- The Department should either install toilets and sinks in Pen #8 and #9 in the EMTC Main Intake or stop using those pens.

3